1  PETER J. ELIASBERG (SB# 189110)
   peliasberg@aclu-sc.org
2  MARISOL ORIHUELA (SB# 261375)
   morihuela@aclu-sc.org
3  ACLU FOUNDATION OF SOUTHERN CALIFORNIA
   1313 W. 8th Street
4  Los Angeles, CA 90017
   Telephone: (213) 977-9500
5  Facsimile: (213) 977-5299

6  Attorneys for Plaintiffs
   ALEX ROSAS and JONATHAN GOODWIN, on behalf of
7  themselves and of those similarly situated

8  (Counsel continued on next page)

9

10               UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                    CV12-00428 PSG (SHx)

13  ALEX ROSAS and JONATHAN          CASE NO.
    GOODWIN on behalf of themselves
14  and of those similarly situated,   **COMPLAINT FOR INJUNCTIVE
                                       RELIEF CLASS ACTION**
15               Plaintiff,

16      vs.

17  LEROY BACA, Sheriff of Los Angeles
    County Jails; PAUL TANAKA,
18  Undersheriff, Los Angeles Sheriff's
    Department; CECIL RHAMBO,
19  Assistant Sheriff, Los Angeles Sheriff's
    Department; and DENNIS BURNS,
20  Chief of the Custody Operations
    Division, Los Angeles Sheriff's
21  Department,

22               Defendants.

23

24

25

26

27

28

COMPLAINT FOR INJUNCTIVE RELIEF

1   MARGARET WINTER (*pro hac vice application forthcoming*)
2   mwinter@npp-aclu.org
    ERIC BALABAN (*pro hac vice application forthcoming*)
3   ebalaban@npp-aclu.org
4   DAVID M. SHAPIRO (*pro hac vice application forthcoming*)
5   dshapiro@npp-aclu.org
    NATIONAL PRISON PROJECT OF THE
6   AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
7   915 15th St., NW
    Washington, D.C. 20005
8   Telephone:  (202) 393-4930
    Facsimile:  (202) 393-4931
9
    DONNA M. MELBY (SB# 86417)
10  donnamelby@paulhastings.com
    JOHN S. DURRANT (SB# 217345)
11  johndurrant@paulhastings.com
    JADE H. LEUNG (SB# 279651)
12  jadeleung@paulhastings.com
    ELIZABETH C. MUELLER (SB# 278283)
13  bethmueller@paulhastings.com
    PAUL HASTINGS LLP
14  515 South Flower Street
    Twenty-Fifth Floor
15  Los Angeles, CA  90071-2228
    Telephone:  (213) 683-6000
16  Facsimile:  (213) 627-0705

17  Attorneys for Plaintiffs
    ALEX ROSAS and JONATHAN GOODWIN, on
18  behalf of themselves and of those similarly situated

19
20
21
22
23
24
25
26
27
28

COMPLAINT FOR INJUNCTIVE RELIEF

## I.      JURISDICTION AND VENUE

1.      This action is brought pursuant to the Eighth and Fourteenth Amendments to the Constitution of the United States and to 42 U.S.C. § 1983.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

2.      Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391.

## II.     STATEMENT OF THE CASE

3.      Plaintiffs Alex Rosas and Jonathan Goodwin are inmates in the custody of Sheriff Leroy Baca in the Los Angeles County Jails.  Rosas and Goodwin have been beaten and threatened with violence by deputies of the Los Angeles County Sheriff's Department (the "Department" or "LASD").  Mr. Rosas and Mr. Goodwin have also witnessed deputies beating other inmates.  The abuse that Rosas and Goodwin suffered and witnessed is typical of the abuse inflicted by deputies on countless other inmates in the jails, and is part of a pattern and practice of deputy-on-inmate violence that has persisted for many years.  In the last few years alone, there have been dozens of documented cases of extreme and unjustified violence by deputies against inmates.  Defendants are aware of the culture of deputy violence that pervades the Jails but have failed to take reasonable measures to remedy the problem.  Plaintiffs charge Sheriff Leroy Baca, Undersheriff Paul Tanaka, Assistant Sheriff Cecil Rhambo, and Chief of Custody Operations Department Dennis Burns[1] with violations of Plaintiffs' Eighth and Fourteenth Amendment rights to reasonable protection from violence and excessive force.  Plaintiffs bring this action on behalf of themselves and other current and future inmates in the Los Angeles County Jails, seeking injunctive and declaratory relief.

---

[1] "Defendants" collectively refers to Leroy Baca ("Sheriff Baca"), Paul Tanaka ("Undersheriff Tanaka"), Cecil Rhambo ("Assistant Sheriff Rhambo"), and Dennis Burns ("Chief Burns").  Defendants are Los Angeles County officials responsible for policies governing the conduct of LASD deputies and for the safety of the inmates in their custody in the Los Angeles County Jails.

1    4.    Los Angeles County has the largest jail system in the world,

2    with an average daily population of approximately 15,000 inmates.  The great

3    majority of the inmates are pre-trial detainees who are not being held pursuant to a

4    criminal conviction.  Large numbers of inmates in the jails have not committed, and

5    are not charged with, with violent offenses.  There are inmates held in the jails on

6    Immigration & Customs Enforcement (ICE) holds, charges of public intoxication,

7    traffic violations, and warrants for failure to appear on a wide variety of minor

8    offenses.[2]  Indeed a number of the inmates whose beatings are described in this

9    complaint were being detained on non-violent misdemeanors, improper warrants

10   and other minor offenses.  See paragraphs 71-72, 161.  Deputy violence against

11   inmates in the Los Angeles County Jails is commonplace, but it is especially

12   pervasive in three facilities that comprise a single complex on Bauchet Street in

13   downtown Los Angeles:  Men's Central Jail, Twin Towers Correctional Facility

14   ("TTCF") and the Inmate Reception Center ("IRC") (collectively, "the Jails").

15   5.    Inmates in the Jails live in fear of deputy violence.  It is typical

16   for deputies to subject unresisting inmates to grossly excessive force by slamming

17   inmates' heads into walls, punching them in the face with their fists, kicking them

18   with their boots, and shooting them multiple times with their tasers – and for these

19   beatings to result in serious injuries to the inmates, including broken legs, fractured

20   eye sockets, shattered jaws, broken teeth, severe head injuries, nerve damage,

21   dislocated joints, collapsed lungs, and wounds requiring dozens of stitches and

22   staples.  Deputies sadistically beat inmates with serious mental illness.  They have

23   beaten inmates who are already in fragile medical condition, including inmates in

24   wheelchairs.  Deputies have beaten inmates for asking for medical treatment, for

25

26   [2] Los Angeles County Jail Overcrowding Reduction Report, at xvi Vera Institute of
     Justice, September 2011 ("Vera staff observed arraignments for people who spent
27   one or two nights in jail for FTA on charges of not paying a $1.50 metro fare.  Vera
     was told that some judicial officers routinely set bail at $50,000 for one FTA, and
28   jail sentences for FTA for jay walking and failure to pay traffic fines.").

-2-      COMPLAINT FOR INJUNCTIVE RELIEF

1   the color of their skin, or for no apparent reason at all.  Deputies also enlist and

2   encourage other inmates to carry out savage attacks.

3       6.    Many of the beatings that routinely occur in the jails are far

4   more severe than the infamous 1991 beating of Rodney King by members of the

5   Los Angeles Police Department.  The violence is not the work of a few rogue

6   deputies.  Rather, it is a systemic problem that has continued unchecked for

7   decades.

8       7.    Many deputies belong to gangs inside the Jails.  Like members

9   of street gangs, these deputies sport tattoos to signal their gang membership.  They

10   beat up inmates to gain prestige among their peers, and "earn their ink" by breaking

11   inmates' bones.  They seek to control the Jails, and to a significant degree they do

12   control the areas where they work.

13       8.    The "3000 Boys" is one such deputy gang, named for the third

14   floor of Men's Central Jail where its members work.  Members of the 3000 Boys,

15   who sport a "3000" tattoo on the backs of their necks, inflict violence on inmates,

16   foment violence among inmates, and even deploy violence on other deputies who

17   resist their abusive practices.  A similar deputy gang operates on the second floor of

18   Men's Central Jail.  On information and belief, members of the "2000 Boys"

19   designate their gang membership with tattoos of a Roman numeral "II" on their

20   legs.  Violent deputy gangs have operated in the LASD at least since the 1980s and

21   perhaps since the early 1970s.  The 3000 Boys and 2000 Boys have been operating

22   with Defendants' knowledge and acquiescence.

23       9.    Defendants' ongoing failure to halt these abuses has

24   communicated to the deputy gangs that they can carry out brutal assaults on inmates

25   with impunity.  In fact, Defendants' permissiveness has so emboldened the deputy

26   gangs that they have begun to carry out their brutal assaults on inmates more and

27   more openly, and even in the presence of civilian volunteer workers in the Jails.

28   Jail chaplains and the court-appointed jail monitors of the American Civil Liberties

-3-      COMPLAINT FOR INJUNCTIVE RELIEF

1   Union ("ACLU") have provided eyewitness accounts of deputies beating non-
2   resisting inmates in the Jails.

3         10.    There is a widespread fear among inmates of reporting deputy
4   misdeeds to the ACLU or anyone else, because deputies regularly retaliate against
5   those who lodge complaints, with beatings, strip searches, body cavity searches,
6   destructive cell shake-downs, confiscation of belongings, and trumped-up
7   disciplinary and criminal charges.

8         11.    Defendants and all of the high-ranking officials in the
9   Department are aware – and, in the case of at least three of them, have been aware
10  for years – of the pattern of deputy violence, intimidation, and retaliation against
11  inmates.  It has been publicly reported, documented, and condemned on scores of
12  occasions during the past twenty years.  Starting in 2006, a captain and a now-
13  retired commander, both in the custody division, have reported to Defendants
14  problems with deputy gangs and deputies using excessive and unnecessary force,
15  but Defendants did not take appropriate steps to address the problem.  Sheriff Baca,
16  Undersheriff Tanaka, Chief Burns, and other supervisors in these jails and at the
17  highest levels of the Department have acquiesced in, fostered, and implicitly
18  authorized the abuse by failing to promulgate adequate policies on the use of force,
19  failing to adequately train and supervise deputies in the face of historical and
20  continued evidence of abuse, failing to conduct meaningful investigations of reports
21  of excessive force, failing to hold guilty deputies accountable, and ignoring
22  evidence that deputies and other Department officials are covering up incidents of
23  excessive force.

24        12.    In 1992, the prestigious Kolts Commission – formed at the
25  behest of the Los Angeles County Board of Supervisors to conduct a review of the
26  policies, practices, and procedures of the Sheriff's Department – issued a scathing
27  report documenting numerous incidents of excessive force, lax discipline, and the
28  presence of deputy gangs.  The Kolts Report resulted in the appointment of Special

COMPLAINT FOR INJUNCTIVE RELIEF

1   Counsel to the Board of Supervisors for Oversight of the Sheriff's Department,

2   Merrick Bobb.  Bobb issued 30 semi-annual reports between 1993 and 2011.  The

3   County's Office of Independent Review ("OIR"), headed by Michael Gennaco, has

4   repeatedly reported incidents of serious abuse to Sheriff Baca.  The ACLU, which

5   serves as class counsel to all detainees in Los Angeles County Jails in *Rutherford v.*

6   *Baca*, No. 75-04111 (C.D. Cal.), and which has been appointed by the District

7   Court in that case to monitor conditions in the Los Angeles County Jails, has

8   submitted multiple reports to Sheriff Baca over several years, documenting more

9   than 70 cases of extreme deputy-on-inmate violence.

10          13.     Despite Sheriff Baca's actual knowledge of this pattern of

11   violence and cover-ups, he has failed over a period of many years to take

12   reasonable measures to halt the abuses.  Even now that the pervasiveness and the

13   extraordinary brutality of the deputy-on-inmate abuse has become common

14   knowledge through the release of reports by the ACLU, Sheriff Baca has left in

15   place his principal subordinates in charge of supervising the Custody Division of

16   the Sheriff's Department, Undersheriff Paul Tanaka and Chief Burns, who have

17   day-to-day responsibility for ensuring the inmates' safety, and under whose regime

18   this pattern of abuse has flourished.

19          14.     The ultimate goal of this lawsuit is to end the longstanding

20   pattern of deputy-on-inmate abuse by requiring Defendants to put in place a system

21   of accountability, which they have for so long failed to do.  That system must

22   include, at minimum, adequate policies on the use of force, proper training on the

23   policies, proper supervision of deputies, thorough review of use of force incidents,

24   and appropriate discipline for improper use of force or failure to report its use.

25   **III.   PARTIES**

26          15.     Plaintiffs Rosas and Goodwin are inmates in the custody of the

27   LASD who were previously housed in Men's Central Jail and are currently housed

28   in Twin Towers.  Plaintiffs have been subjected to deputy violence and threats of

COMPLAINT FOR INJUNCTIVE RELIEF

1   violence and they have witnessed deputies violently abusing other inmates. They

2   are at continuing risk of being subjected to deputy violence as a result of

3   Defendants' acts and omissions.

4           16.     Defendant Leroy Baca has been the Sheriff of Los Angeles

5   County since 1998. As Sheriff, he is the chief executive officer of the LASD. By

6   California law, the Sheriff is answerable for the safekeeping of the inmates in his

7   custody. Cal. Gov't Code §§ 26605, 26610; Cal. Penal Code § 4006. Sheriff Baca

8   is responsible for the management and control of all Los Angeles County Jails, and

9   for all matters relating to the selection, supervision, promotion, training, and

10  discipline of the uniformed staff, including the supervisory security staff, of the

11  County Jails. He is also responsible for the care, custody, and control of all inmates

12  housed in the County Jails. Sheriff Baca is regularly provided with reports of

13  applications of force, allegations of unreported and excessive use of force, and

14  other breaches of security in the County Jails. Plaintiffs sue Sheriff Baca in his

15  official capacity.

16          17.     Defendant Paul Tanaka is Undersheriff of the LASD. He serves

17  as second-in-command of the Department and oversees its daily operations. Along

18  with Sheriff Baca, Undersheriff Tanaka is also responsible for the care, custody,

19  and control of all inmates housed in the County Jails. Plaintiffs sue Undersheriff

20  Tanaka in his official capacity.

21          18.     Defendant Cecil Rhambo is one of two Assistant Sheriffs of the

22  LASD. He oversees the leadership of the Department's Custody Division, among

23  other responsibilities. Plaintiffs sue Assistant Sheriff Rhambo in his official

24  capacity.

25          19.     Defendant Dennis Burns has been employed by the LASD for

26  more than 36 years. He is currently assigned as the Chief of the Custody

27  Operations Division which, along with the Correctional Services Division, is

28  responsible for the operation of the County Jails. The responsibilities of the

-6-                    COMPLAINT FOR INJUNCTIVE RELIEF

1   Custody Operations Division include the tracking of violent incidents and the

2   formulation of responses designed to protect the personal safety of Department staff

3   and inmates in its custody.  He has formerly served as Captain of the LASD's

4   Internal Affairs Bureau ("IAB"), which is responsible for conducting administrative

5   investigations against Department members who have engaged in misconduct by

6   violating the Department's policies and procedures.  Plaintiffs sue Chief Burns in

7   his official capacity.

8           20.    All Defendants are sued in their official capacities for

9   declaratory and injunctive relief.  At all times referred to in this complaint,

10   Defendants were acting within the scope of their employment as employees of the

11   Department, and acting under color of state and municipal law.

12   **IV.    FACTUAL ALLEGATIONS**

13          A.    <u>There Is A Longstanding, Pervasive, And Notorious Culture,</u>

14                <u>Pattern, And Practice Of Deputy Violence Against Inmates In The</u>

15                <u>Los Angeles County Jails</u>

16          21.    There is a longstanding pattern and practice in the Los Angeles

17   County Jails, and particularly in the Jail Complex in downtown Los Angeles, of

18   deputy-on-inmate violence and deputy-instigated inmate-on-inmate abuse.

19   Multiple oversight and monitoring agencies, including the U.S. Department of

20   Justice, the LASD's OIR, the Special Counsel to the Los Angeles County Board of

21   Supervisors for oversight of the Sheriff's Department, and the ACLU, have issued

22   reports on the use of excessive force and other abuses by the LASD against the

23   inmates in its custody and in many cases made recommendations to address the

24   problem.

25          22.    According to Thomas Parker, a former FBI agent and Assistant

26   Special Agent in Charge of the Bureau's Los Angeles Field Office, who oversaw

27   the FBI investigation into the force, "There is at least a two-decade history of

28   corruption within the ranks of the LASD. . . .[N]o one at the command level . . .

-7-                    COMPLAINT FOR INJUNCTIVE RELIEF

1    appears to have been held accountable and appropriately punished for failure to

2    properly supervise and manage their subordinate personnel and resources.  In my

3    opinion, this has provided the 'seedbed' for continued lax supervision, violence,

4    and corruption within LASD and the county jails it administers."  Sheriff Baca and

5    other LASD officials have "essentially abdicated their responsibilities to provide a

6    safe, secure, and corruption-free incarceration environment within the Los Angeles

7    County Jail System."  The result, Mr. Parker concluded, is a pattern of inmates

8    "suffering severe injuries, maiming, and death, some caused by fellow inmates, but

9    most often at the hands of, or with the acquiescence or assistance of, the deputy

10   sheriffs who are their keepers."  Mr. Parker states, "I have never experienced any

11   facility exhibiting the volume and repetitive patterns of violence, misfeasance, and

12   malfeasance impacting the Los Angeles County Jail system."

13          23.    In May 1990, the *Los Angeles Times* published an investigative

14   report disclosing that excessive force cases represented three-fourths of all major

15   legal settlements and jury awards over a three-year period; that half of the deputies

16   involved in major cases had been sued in the past for brutality; and that one training

17   officer had been sued ten times in ten years.  The newspaper quoted sources

18   familiar with the Department who claimed that a code of silence made deputies

19   reluctant to testify against fellow officers, even those who repeatedly used

20   excessive force.  The Department kept no separate records of the deputies who were

21   sued for excessive force or the outcomes of the suits.[3]

22          24.    In 1989, the Los Angeles County Board of Supervisors formed a

23   blue-ribbon commission to conduct a review of "the policies, practices and

24   _____

25   [3] Merrick Bobb, Police Assessment Resource Center ("PARC"), *10th Semiannual
     Report 12* (Feb. 1999), *available at*
     http://www.parc.info/client_files/LASD/10th%20Semiannual%20Report.pdf (citing
26   Daryl Kelley & Victor Merina, *Alleged Brutality by Deputies Costs County:  Law
     Enforcement:  Excessive-Force Lawsuits Have Nearly Doubled in Recent Years.
27   Sheriff Block Stands by Department Policies and His Officers,* Los Angeles Times,
     May 27, 1990, at A1, available at http://articles.latimes.com/1990-05-27/news/mn-
28   514_1_excessive-force).

COMPLAINT FOR INJUNCTIVE RELIEF

1   procedures of the Sheriff's Department, including recruitment, training, job
2   performance and evaluation, record keeping and management practices, as they
3   relate to allegations of excessive force, the community sensitivity of deputies and
4   the Department's citizen complaint procedure." The Board of Supervisors
5   appointed the late Judge James G. Kolts ("Kolts") as Special Counsel to the Board.
6   Kolts was a former star prosecutor and a highly respected former Los Angeles
7   County Superior Court judge. The team Kolts assembled for this project became
8   known as the Kolts Commission. In July 1992, after an extensive investigation, the
9   Kolts Commission issued a scathing 359-page report (the "Kolts Report").[4] The
10  Kolts Report detailed a history of excessive use of force and lax discipline within
11  the LASD, and concluded that the Department had failed to reform itself. The
12  Commission recommended civilian monitoring of the LASD.[5]

13          25.     In January 1993, the Board of Supervisors passed a resolution to
14  carry out the recommendations of the Kolts Commission, and the Board retained
15  Special Counsel, Merrick J. Bobb, to monitor LASD's compliance with the Kolts
16  Report and to report to the Board semi-annually regarding such compliance.[6] Bobb
17  continues to serve to this day as Special Counsel to the Los Angeles County Board
18  of Supervisors, and remains the Board of Supervisors' monitor of the LASD and its
19  operations.[7]

20          26.     In his fourth Semiannual Report, dated June 1995, Special
21  Counsel Bobb reported the following:

22          27.     "[W]e continued to find too many cases involving unnecessary
23  force in responses to verbal taunts or passive noncompliance. Most of these

24  _____

25  [4] James G. Kolts, *Kolts Report* (July 1992), *available at*
    http://www.parc.info/client_files/Special%20Reports/3%20-
26  %20Kolts%20Report%20-%20LASD.pdf.
    [5] Id. at 4, 345-49.
27  [6] Merrick Bobb, PARC, *1st Semiannual Report* 1(Oct. 1993), *available at*
    http://www.parc.info/client_files/LASD/1st%20Semiannual%20Report.pdf.
28  [7] Merrick Bobb, PARC, *30th Semiannual Report* (Sept. 2011), *available at*
    http://www.parc.info/client_files/LASD/30th%20Semiannual%20Report.pdf.

COMPLAINT FOR INJUNCTIVE RELIEF

1    incidents arose in the jails, where we found a substantial number of instances where

2    deputies appear to over-react to apparently slight provocations, like stepping out of

3    the chow line, by shoving the inmate against the wall or slapping him in the face." 

4    Further, the use of "transparently phony pretext[s] ('the suspect stared at me

5    aggressively') to justify or excuse unnecessary or excessive force . . . is still

6    practiced to an uncomfortable and unacceptable degree in the custody setting."[8]

7         28.    "[W]e do not believe that The Department has yet implemented

8    the Kolts recommendations with respect to force investigations."[9]

9         29.    "In its analysis of over 1,000 force-related investigations

10   spanning a five-year period, the Kolts Report concluded that the Department was

11   too lenient in the way it disciplined officers found to have engaged in excessive

12   force.  The situation has not changed very much. . . . [C]aptains remain disinclined

13   to impose substantial penalties for serious misconduct."[10]  "[W]e continue to find

14   cases in which the decision to exonerate the officer [in excessive force cases]

15   simply defies explanation, and there are still incidents, *almost all in the custody*

16   *setting*, where the use of force is either senseless or overly severe."[11]

17        30.    In a 1997 letter from the Acting Assistant Attorney General of

18   the Civil Rights Division of the U.S. Department of Justice ("DOJ") to the then-Los

19   Angeles County Executive, Joanne Sturges, the DOJ reported that "Inmates who are

20   mentally ill or housed in mental health housing are subject to an unacceptably high

21   risk of physical abuse and other mistreatment at the hands of other inmates and

22   custodial staff.  Moreover, the Jail does not adequately investigate allegations of

23   abuse against its inmates."[12]  The DOJ reported that they had "received numerous

24

---

25   [8] Merrick Bobb, PARC, 4th Semiannual Report 15 (June 1995), available at
     http://www.parc.info/client_files/LASD/4th%20Semiannual%20Report.pdf.
     [9] Id. at 19.
26   [10] Id. at 22.
     [11] Id. at 20-21 (emphasis added).
27   [12] Letter from Isabelle Katz Pinzler, Civil Rights Division, USDOJ, to Joanne
     Sturges, Los Angeles County Executive, *CRIPA Investigation of Mental Health*
28   *Services in the Los Angeles County Jail* 17 (Sept. 5, 1997).

COMPLAINT FOR INJUNCTIVE RELIEF

reports from inmates and advocates regarding serious physical abuse of inmates in mental health housing . . . including kicks, punches, beatings, and sexual assaults. Although the Jail claims that it has discounted some of these claims . . . the investigation of these claims was inadequate and serious questions remain regarding the extent of physical abuse of mentally ill inmates. We agree with Special Counsel Merrick Bobb's finding that in the Jail 'there is callous treatment [of inmates] at times, a problem that LASD management knows about but has not acted sufficiently aggressively to resolve.'"[13]  Furthermore, "[t]he Jail's failure to investigate promptly and thoroughly allegations of abuse against mentally ill inmates, and its failure to take appropriate action in response to incidents of abuse, enables the abuse of these inmates to continue."[14]  The report also stated, "The treatment received by one inmate indicates that excessive use of force and physical mistreatment of inmates with mental illnesses may be in part the result of inadequate training."[15]

31.     In his tenth Semiannual Report, dated February 1999, Special Counsel Bobb pointed to a long list of recent crises on the custody side of the Department, including "troubling inmate deaths at the hands of custody personnel[,]" "inmate on inmate violence[,]" and "vigilante-like behavior at Twin Towers."[16]

32.     On December 19, 2002, the Los Angeles County and the United States entered into a Memorandum of Agreement Regarding Mental Health Services at the Los Angeles County Jail ("MOA").[17]  Sheriff Baca was one of the signers of the MOA, which was entered into "to avoid potential litigation

---

[13] Id. at 17-18 (citing Merrick Bobb, PARC, *6th Semiannual Report* 11-13 (Sept. 1996)).
[14] Id. at 21.
[15] Id. at 18.
[16] Merrick Bobb, *supra* note 2, at 17.
[17] Memorandum of Agreement Between the United States and Los Angeles County, California Regarding Mental Health Services at the Los Angeles County Jail, *available at* http://www.justice.gov/crt/about/spl/documents/lacountyjail_mh.php.

COMPLAINT FOR INJUNCTIVE RELIEF

concerning the mental health services at the Jail."[18]  Among the provisions in the MOA were ones addressing training of correctional staff in "professional and humane treatment of mentally ill inmates," and the prevention and investigation of abuse of mentally ill inmates.[19]

33.    In March 2003, the US DOJ sent to County Counsel a compliance letter on the 2002 MOA about treatment of the mentally ill.  The letter concluded that the Sheriff's Department was not in compliance with the requirement of the MOA that LASD "provide mandatory orientation and continuing competency-based training for correctional staff in the identification and custodial care of mentally ill inmates including, but not necessarily limited to

        a.    interpreting or responding to bizarre or aberrant behaviors,

        b.    recognizing and responding to indications of suicidal thoughts,

        c.    proper suicide observation,

        d.    recognizing common side effects of psychotropic medications,

        e.    professional and humane treatment of mentally ill inmates, and

        f.    response to mental health crises including suicide intervention and cell extractions."

34.    In November 2004, Special Counsel Merrick Bobb presented to Sheriff Baca and the Board of Supervisors a confidential report finding that "Los Angeles County's largest jail is so outdated, understaffed and riddled with security flaws that it jeopardizes the lives of guards and inmates."[20]  The report concluded that Men's Central Jail suffers from "lax supervision and a long-standing jail culture that has shortchanged accountability for inmate safety and security."[21]

---

[18] Id.
[19] Id.
[20] Jack Leonard & Richard Winton, *L.A. Jail Called Deadly, Outdated*, Los Angeles Times, Feb. 3, 2005, *available at* http://articles.latimes.com/2005/feb/03/local/me-jail3 [hereinafter *L.A. Jail Called Deadly, Outdated*].
[21] Megan Garvey & Richard Winton, *Critics of Jails Voice Alarm*, Los Angeles Times, Feb. 14, 2006, *available at* http://articles.latimes.com/2006/feb/14/local/me-jails14.

COMPLAINT FOR INJUNCTIVE RELIEF

35.   In his nineteenth Semiannual Report, dated February 2005, Special Counsel Merrick Bobb noted:

> From the Kolts Report onward, there has been a paradoxical contradiction between Internal Affairs investigations that exonerated the officer and litigation arising out of the same incident that cost the County substantial money in settlement and judgments. Those same disparities continue to exist after 2003 and 2004. . . . While at times one might find instances in which the County's lawyers have unwisely settled, it is far more common to find cases where the LASD let an officer off the hook when a judge or jury would not. We can only say as we have in the past that these disparities "fuel[] the fire of those who would strip the Sheriff of the privilege of investigating and disciplining his own employees." (citing the Fifteenth Semiannual Report at 73).[22]

36.   In June 2008 the ACLU issued a report by Dr. Terry Kupers, an expert on mental illness among incarcerated populations.[23] The report was filed in the *Rutherford* litigation, served on Sheriff Baca's counsel, and sent directly to a number of high-ranking officials in the LASD Custody Division. In his report Dr. Kupers made a number of conclusions including: "[A]t the Los Angeles County Jail the claims by prisoners [of abuse by deputies] are so widespread, and the reports of abuse so consistent among multiple reporters, that is seems very likely there is an unacceptably high incidence of custodial abuse. Multiple prisoners have told me about abuse they have undergone or witnessed, and most say

---

[22] Merrick Bobb, PARC, *19th Semiannual Report* 38 (Feb. 2005), *available at* http://www.parc.info/client_files/LASD/19th%20Semiannual%20Report.pdf.
[23] Terry A. Kupers, Report on Mental Health Issues at Los Angeles County Jail (June 27, 2008), *available at* http://www.aclu-sc.org/documents/view/173.

COMPLAINT FOR INJUNCTIVE RELIEF

1  it is disproportionately directed at prisoners with serious mental illness."[24]

2  Dr. Kupers also opined that the problem "is made worse by inappropriate un-

3  diagnosing and consignment of prisoners suffering from serious mental illness to

4  general population housing."[25]  Dr. Kupers further found that "there seems to be

5  very little mental health training for most other officers, and given the fact that

6  officers work over-time in most assignments, this means that prisoners with mental

7  illness outside of Tower 1 are often guarded by officers with little or no training in

8  mental health."[26]  He also found "disturbing evidence of custodial abuse of

9  prisoners with serious mental illness," and "crowding and idleness at every level[]

10  further exacerbate the problems."[27]

11          37.     Dr. Kupers also made numerous recommendations to address

12  the serious problems he found with the treatment of mentally ill prisoners including

13  that "[a]ll officers . . . be required to undergo intensive training in working with

14  prisoners with mental illness" and that jail officials "halt custodial abuse" by

15  implementing "zero tolerance from the top, education for prisoners about their

16  rights and the grievance process, training and support to encourage staff to report

17  abuse by other staff, a confidential complaint system that fosters prisoner trust and

18  action, and prompt and thorough investigation with appropriate consequences for

19  offending staff."[28]

20          38.     In April 2010, a Los Angeles County Sheriff's deputy, Joshua

21  Sather, who had graduated at the top of his recruit class, resigned after only a few

22  weeks on the job, alleging that a supervisor made him beat up a mentally ill jail

23  inmate.  Sather was the sole Honor Recruit in his graduating class from the

24  academy, and had been recognized for his leadership and other abilities.  As with

25  virtually all rookies, his first assignment was jail duty.  On March 22, 2010, Sather

26  _____
    [24] Id. at 41.
27  [25] Id.
    [26] Id. at 21.
28  [27] Id. at 44.
    [28] Id. at 49.

-14-                    COMPLAINT FOR INJUNCTIVE RELIEF

1    was working on the sixth floor mental health ward of Twin Towers.  At some point

2    during Sather's shift, he, his supervisor and other deputies used force on a mentally

3    ill inmate.  Soon afterward, Sather, crying and distraught, called his uncle, a veteran

4    Sheriff's detective, and told him that he had participated in an unjustified beating,

5    that shortly before the beating his supervisor said, "We're gonna go in and teach

6    this guy a lesson," and that the attack had been covered up.  Sather's uncle

7    confronted the supervisor about making his nephew "beat up 'dings.'"[29]  Sheriff's

8    officials launched an investigation and determined that an uncooperative inmate

9    had been subdued by force, but concluded that no misconduct had occurred.

10           39.    In May 2010, the ACLU National Prison Project and the ACLU

11   of Southern California submitted to Sheriff Baca and to the *Rutherford* Court the

12   ACLU's "Annual Report on Conditions Inside Los Angeles County Jail – 2008-

13   2009."[30]  The report included declarations documenting scores of complaints from

14   inmates and their families about deputy-inflicted injuries, ranging from broken ribs

15   and black eyes to severe head wounds that required staples.  The report also

16   documented a persistent pattern of retaliation and threats of retaliation by deputies

17   against inmates who protested the conditions of their confinement.

18           40.    In September 2010, the ACLU National Prison Project and the

19   ACLU of Southern California submitted to Sheriff Baca and filed with the

20   *Rutherford* Court the ACLU's "Interim Report on Conditions in the Los Angeles

21   County Jails."[31]  That report stated:

22   [29] Robert Faturechi, *L.A. County Deputy Says He Was Forced to Beat Mentally Ill
     Inmate*, Los Angeles Times, Oct. 7, 2011, *available at*
23   http://articles.latimes.com/2011/oct/07/local/la-me-honor-recruit-20111007.
     [30] Mary Tiedeman & Daniel Ballon, ACLU National Prison Project & ACLU of
24   Southern California, *Annual Report on Conditions Inside Los Angeles County Jail –
     2008-2009* (May 5, 2010), filed in *Rutherford v. Baca*, 75-cv-04111-DDP (no.
25   217).  The report is also available at: http://www.aclu.org/files/assets/2010-5-5-
     AnnualReport-JailConditionsatMCJ.pdf.
26   [31] Mary Tiedeman et al., ACLU National Prison Project & ACLU of Southern
     California, *2010 Interim Report on Conditions in the Los Angeles County Jails*
27   (Sept. 9, 2010), filed in *Rutherford v. Baca*, 75-cv-04111-DDP (no. 226).  The
     report is also available at: http://www.aclu.org/files/assets/2010-9-9-
28   LACountyJailsReport.pdf.

                                                    -15-          COMPLAINT FOR INJUNCTIVE RELIEF

The ACLU's 2009 Annual Report describes the pervasive pattern of violence that we observed in Men's Central Jail (MCJ) in 2009. During the first eight months of 2010, the violence has continued unabated. One aspect of the violence we discussed in our 2009 report was deputies' use of excessive and unjustified force, which continues to date: in the five-month period from March 10 through August 10, 2010, we received more than 70 complaints of excessive and/or unjustified force, or retaliation by deputies against prisoners, or both. Twenty of the prisoners making these complaints have provided us with sworn written statements.[32]

41.     In December 2010, the media reported on a large-scale brawl at an LASD Christmas party at a banquet hall in Montebello. The brawl was between members of the 3000 Boys (the deputy gang discussed above in Paragraph 8) and other deputies who worked in Men's Central Jail. In commenting publicly on the incident, Sheriff Baca characterized it as the "drunkenness of a few bad apples," and opined that cops "know how to take care of themselves," and that they need to "man up and say, 'I'm not a wimp.'" Sheriff Baca insisted that "the core of what occurred with these 3000 boys ... wasn't their tattoo. It wasn't their unit. It was their friendship and their drinking."[33]

42.     The OIR, however, disagreed, stating, "Perhaps most concerning is the evidence that jail supervisors apparently knew about the use of 'gang-like' signs and other troubling behavior well before the eruption of violence at the Christmas party."[34]

---

[32] Id. at 3.
[33] *KTLA Special Report: The Gang Behind the Badge? Part 4* (KTLA television broadcast), *available at* http://www.ktla.com/videobeta/?watchId=53592a86-dc74-4336-9cb3-323ea72e02d5.
[34] Los Angeles County Office of Independent Review, *Violence in the Los Angeles*

COMPLAINT FOR INJUNCTIVE RELIEF

1          43.     On September 25, 2011, the *Los Angeles Times* reported that the

2    FBI was conducting a criminal investigation into deputy abuse at the Jails.[35]

3          44.     On September 28, 2011, the ACLU filed an Annual Report in

4    *Rutherford v. Baca*, reporting seventy cases of extreme deputy abuse in the

5    previous year, including accounts by civilian eyewitnesses of savage deputy

6    beatings of inmates in the Jails.[36]

7          45.     On October 13, 2011, the OIR issued a report stating that the

8    Sheriff's Department has failed over many years to follow through on proposals to

9    address violence in the Jails.[37]

10          46.     In early December 2011, Robert Olmsted, a retired top LASD

11    official who had been the Captain in charge of Men's Central Jail before being

12    promoted to Commander in the LASD's Custody Division, and who oversaw both

13    Men's Central Jail and Twin Towers, publicly disclosed that Sheriff Baca and other

14    senior Department staff, including Defendants Tanaka and Burns, have long had

15    actual knowledge of the pattern of widespread deputy violence in the Jails.

16    Olmsted had repeatedly informed Defendants Baca, Tanaka, and Burns of such

17    problems, and tried to raise red flags about shoddy investigations that allowed

18    deputies to escape scrutiny for using force.  Olmsted had also voiced concerns to

19    them about deputies forming gang-like aggressive cliques.  Chief Burns told

20    Olmsted that it was impossible to change the deputy culture in Men's Central Jail.

21    Sheriff Baca never followed up with Commander Olmsted after he twice

22    approached him about problems in Men's Central Jail.  *See* Paragraphs 197 – 203,

23    for further discussion of Olmsted and his perspective on the problems in the Jails.

24    *County Jails:  A Report on Investigations and Outcomes* 8 (Oct. 2011), *available at*
      http://laoir.com/reports/OIR-Report-on-Violence-in-the-Jails-(Oct.2011).pdf.
25    [35] Robert Faturechi, *FBI Probing Reports of Beatings in L.A. County Jails*, Los
      Angeles Times, Sept. 25, 2011, *available at*
26    http://articles.latimes.com/2011/sep/25/local/la-me-fbi-jails-20110925.
      [36] Sarah Liebowitz et al., ACLU National Prison Project & ACLU of Southern
27    California, *Annual Report on Conditions Inside Los Angeles County Jail* (Sept. 28,
      2011), filed in *Rutherford v. Baca*, 75-cv-04111-DDP (no. 294).
28    [37] Los Angeles County Office of Independent Review, *supra* note 31, at 7.

COMPLAINT FOR INJUNCTIVE RELIEF

47.    On January 10, 2012 Sheriff Baca testified to the Board of Supervisors that use of force often arises when inmates have been declassified from mental health housing in TTCF Tower 1 to be returned to Men's Central Jail.  This practice of improperly declassifying mentally ill inmates from mental health housing in Tower 1 and placing them in general population in MCJ is one that Dr. Kupers identified *almost four years earlier* as resulting in the abuse of mentally ill inmates.

48.    On January 11, 2012, the *Los Angeles Times* reported that the Sheriff's Department had admitted that use of force against inmates in the Los Angeles County jails was disproportionately directed at inmates with mental illness. "Los Angeles County jailers are more likely to use force against mentally ill inmates than other prisoners, according to a new Sheriff's Department report that acknowledges the lockups need specially trained staff to reduce the violence."[38] This admission comes almost four years after Dr. Kupers concluded that deputy on inmate abuse was disproportionately directed at mentally ill inmates, that deputies lacked proper training in dealing with the mentally ill, and recommended that "[a]ll officers . . . be required to undergo intensive training in working with prisoners with mental illness."

49.    On January 14, 2012, the *Los Angeles Times* reported that the United States had filed felony bribery charges against Gilbert Michel, a deputy in the Sheriff's Department Custody Division.[39]  The article also reported that Deputy Michel had "made statements which implicated him, along with several other jail employees, as having participated in four prior unreported incidents of improper uses of force."

---

[38] Jack Leonard & Robert Faturechi, *L. A. County Jailers More Likely to Use Force on Mentally Ill Inmates*, Los Angeles Times, Jan. 11, 2012, *available at* http://www.latimes.com/news/local/la-me-sheriff-jails-20120111,0,2284536.story.
[39] Robert Faturechi & Jack Leonard, *1st Charge Filed in FBI Probe of L.A. Sheriff's Deputy Misconduct*, Los Angeles Times, Jan. 14, 2012, *available at* http://www.latimes.com/la-me-deputy-cellphone-20120114,0,7670956.story.

-18-                    COMPLAINT FOR INJUNCTIVE RELIEF

**B.     Representative Examples Of Deputy Violence Against Inmates**

50.     Degrading, cruel, and sadistic deputy attacks on inmates are not isolated incidents at the Jails; they are commonplace. Time and again, numerous deputies attack one inmate. Even as the inmate lies motionless on the ground, new deputies are summoned by radio and join in the attack. In the course of a beating, it is a common practice for deputies to yell "Stop fighting!" or "Stop resisting!" to an inmate who is neither fighting nor resisting. This practice is an effort to fabricate a reason to blame the inmates for the attacks.

**a.     Mr. A[40]**

51.     On September 24, 2011, Mr. A was lying down on the floor of his pod in Twin Towers suffering from a migraine headache and vertigo. When Mr. A asked Deputy Alatorre for his prescribed migraine medication, Deputy Alatorre kicked a book at him and left the module, ignoring his request for the medication.

52.     When Deputy Alatorre returned later with Deputy Ewell, Deputy Alatorre grabbed Mr. A by the shirt and tried to pull him off the floor. Mr. A lost his balance and hit his chin on the floor. The two deputies dragged Mr. A to his cell, forced him against the wall, and twisted his right arm so hard that he yelled out in pain. Deputy Alatorre pulled down Mr. A's pants below the buttocks and verbally taunted him, while Deputy Ewell sat on Mr. A's legs right below his exposed buttocks. Deputy Alatorre pushed Mr. A's face against the wall, hitting his forehead, and then placed Mr. A in a stress position for several minutes by pushing his knee or boot into Mr. A's back. Although Mr. A was still suffering from the migraine and vertigo, in addition to an injured back and an arm that felt like it was broken, the deputies waved off medical staff from helping Mr. A.

---

[40] Due to the ongoing risk of violent retaliation against inmates from deputies in the Sheriff's Department, the identities of inmates currently housed in the Jails have been protected -- with the exception of the named Plaintiffs.

COMPLAINT FOR INJUNCTIVE RELIEF

53.     One day later, Mr. A was given twenty-five days in disciplinary segregation as a result of the incident.  Mr. A was 48 years old at the time of the beating.

**b.     Macario Garcia**

54.     In July 2011, when Macario Garcia was housed in Men's Central Jail, Deputy Chavez came to his cell and told him to get up because he had an appointment with an eye doctor.  Deputy Chavez handcuffed him from behind and then escorted Mr. Garcia out of his cell.  Deputy Wiener was standing inside the gated deputy's control booth next to the cell door controls.

55.     Mr. Garcia is blind in one eye as a result of a previous beating by deputies.  He is 42 years old, and of very slight build: he is 6'2" and weighs 165 pounds.  At approximately 6'2" and 275 pounds, Deputy Chavez is of massive build and outweighs Mr. Garcia by more than 100 pounds.  Deputy Weiner weighs approximately 220 pounds.

56.     Deputy Weiner said to Mr. Garcia, "Oh, it's you, you piece of shit, punk."  Evidently referring to an incident two weeks earlier in which he had strip-searched Mr. Garcia, Deputy Weiner said, "Shut the fuck up, punk.  You ain't nothing but a coward bitch.  You had your chance to fight me but you didn't."  Deputy Chavez said, "You're not going to go to your doctor's appointment. … Get against the wall."  Mr. Garcia complied and faced the wall opposite the deputy's control booth.  Deputies Chavez and Weiner attacked him, punching him several times until he fell to the ground from the blows.  After Mr. Garcia fell, Deputies Chavez and Weiner punched and kicked his head, face, body and legs, and beat his body and torso with their flashlights.  The deputies also pulled his hair and slammed his head on the ground.  The beating continued for approximately five minutes.  Mr. Garcia heard Deputy Weiner call out radio code "415," meaning an officer is involved in a fight.  Mr. Garcia then blacked out.

COMPLAINT FOR INJUNCTIVE RELIEF

1      57.    When Mr. Garcia regained consciousness he heard Deputies

2  Chavez and Weiner yelling, "Stop resisting! Stop pulling away!" Mr. Garcia was

3  still handcuffed and not resisting in any way. He saw several other deputies

4  running toward him. A deputy sprayed Mr. Garcia in the face with pepper spray as

5  Deputies Chavez and Weiner continued to punch and kick him.

6      58.    The deputies then tried to pull Mr. Garcia to his feet by his arms,

7  which were handcuffed behind him. Mr. Garcia felt a sharp pain in his collarbone

8  and heard a loud crack. Though he yelled in pain, the deputies continued pulling on

9  his arms and dragged him toward the elevator. Mr. Garcia's face was covered in

10  blood. He was unable to walk so deputies dragged him to the medical clinic.

11  There, the nurses said that he should be taken to the Los Angeles Medical Center

12  because his injuries were so serious.

13      59.    While waiting to be transferred to the hospital, Mr. Garcia heard

14  deputies laughing at him. One deputy said, "You didn't get hit. You fell." A

15  sergeant and two deputies interviewed him on video about the incident, and

16  Mr. Garcia reported that Deputies Chavez and Weiner assaulted him.

17      60.    At the hospital, medical staff told Mr. Garcia that he had a

18  broken collarbone. He received stitches above both of his eyebrows and had

19  bruises on his face and legs. Mr. Garcia now has dizzy spells and sometimes hears

20  a ringing in his ear. Mr. Garcia cannot raise his right arm more than three to six

21  inches. Less than a week later, two lieutenants and a sergeant took pictures of

22  Mr. Garcia's injuries; however, they did not ask him any questions about the

23  incident. The DA has since filed criminal charges against Mr. Garcia for, among

24  other things, assaulting a deputy.

25      **c.    Arturo Fernandez**

26      61.    In July 2011, Arturo Fernandez was returning to his cell when

27  deputies attacked him, slamming him to the ground, shooting pepper spray into his

28  eyes, and repeatedly pummeling his body. While Mr. Fernandez was walking

    COMPLAINT FOR INJUNCTIVE RELIEF

1  towards his cell, his hands cuffed behind him, Deputy Guerrero ordered him to

2  move more quickly, and then began punching the back of his neck.  When

3  Mr. Fernandez responded with an expletive, Deputy Guerrero forced him to the

4  wall, pinning him by his neck.  Although Mr. Fernandez did not fight back, Deputy

5  Guerrero yelled, "Stop resisting, motherfucker."  Another deputy slammed

6  Mr. Fernandez to the ground.  With his hands cuffed, Mr. Fernandez could not

7  break his fall.  More deputies arrived; with pepper spray in his eyes, Mr. Fernandez

8  could not see how many.  He felt kicks, punches, and hard blows that seemed to

9  come from flashlights.  After picking Mr. Fernandez up, deputies again slammed

10 him to the ground.

11        62.    Throughout the attack, Mr. Fernandez, who has asthma, worried

12 that he would lose consciousness.  Two eyewitnesses saw him bleeding profusely

13 and heard him say that he could not breathe.  When the attack was over,

14 Mr. Fernandez was sent to the hospital.  He had contusions on his head, required

15 stitches on his elbow, suffered hearing loss in one ear, and continues to have

16 headaches.

17        **d.    Lawrence Davis**

18        63.    On March 16, 2011, Deputies Diaz, Rodriguez, and Owens

19 pepper-sprayed and brutally beat a black inmate, Lawrence Davis, until he was

20 unconscious.  The deputies fractured Mr. Davis's jaw and knocked out one of his

21 teeth.  One or more of the deputies then carved the letters "MY" into Mr. Davis's

22 scalp.  "MY" is the first two letters of the Mexican/Hispanic slur "MYATE" used

23 pejoratively for blacks.

24        **e.    Mr. B**

25        64.    In March 2011, deputies slammed Mr. B's head into a cement

26 wall, leaving him with a concussion and a gash that took 35 stitches to close.  The

27 group of deputies, including Deputies Moorman and Ibarra and Custody Assistant

28 Perez, punched his face and head, and kicked his ribs.  They aimed pepper spray

                                    -22-      COMPLAINT FOR INJUNCTIVE RELIEF

1    into his eyes before shooting taser probes into his back.  The confrontation began

2    because deputies thought Mr. B had called them "gay."  When Mr. B repeatedly

3    denied the accusation, a deputy yelled to the row of pro per inmates – who serve as

4    their own legal representatives – "y'all pro pers think you can get away with

5    anything.  We the 3000 Boys," a reference to the gang-like group of deputies in

6    Men's Central Jail, discussed in Paragraph 8 above.  A deputy said to Mr. B, "Baca

7    pays us to take kickboxing classes to whip peoples' asses."  The deputy grabbed

8    Mr. B's head, slamming his face into the wall.  Blood poured down, pooling on the

9    ground, and he passed out.  Deputies handcuffed Mr. B's arms behind his back and

10   repeatedly punched his face and head, while other deputies stood watching.

11          65.     When Mr. B regained consciousness, one deputy was sitting on

12   his back, punching his face and head.  Another was kicking Mr. B's ribs.  Although

13   Mr. B was motionless, the deputies yelled, "Stop resisting."  Mr. B pleaded with

14   them to stop.  One deputy shot him with pepper spray.  Another sank three taser

15   probes into his flesh.

16          66.     Two of the deputies who beat Mr. B stood roughly 6 feet tall,

17   and weighed approximately 200 pounds.  The custody assistant was slightly shorter

18   and weighed about 180 pounds.  Mr. B is 5 feet 7 inches and weighs 135 pounds.

19   A sergeant accused him of assaulting the deputies, but the ambulance technician on

20   the scene pointed out that the deputies showed no signs of injury.  Another sergeant

21   returned to the module to take pictures of the scene, but he did not interview any of

22   the inmates who had witnessed the assault.

23          67.     Mr. B spent two days in the hospital and four days in the jail's

24   medical unit.  After returning to his row, another deputy threatened him, saying:

25   "the ACLU ain't going to be watching me forever."

26          68.     Although there were numerous inmates in the law library who

27   were able to see the assault through the library window, no one from LASD

28   bothered to interview any of the eyewitnesses.

COMPLAINT FOR INJUNCTIVE RELIEF

1

### f.   Gabriel Carillo

2        69.    On or about February 26, 2011, at least three deputies, including

3  Deputy Luviano, severely beat Gabriel Carillo, who had come to Men's Central Jail

4  to visit his brother. The deputies repeatedly kicked and punched Mr. Carillo, while

5  he was handcuffed, severely cutting and bruising his face (photos attached hereto as

6  Exhibit A). The deputies also pepper sprayed Mr. Carillo in the face while he was

7  handcuffed and lying on the floor. During the beating one or more deputies

8  repeatedly yelled "Stop resisting! Stop kicking!" even though Mr. Carillo was not

9  resisting or kicking. Subsequently the deputies filed false reports causing the

10  District Attorney to charge Mr. Carillo with battery against a peace officer, resisting

11  arrest, and three other counts. On October 14, 2011, the DA dismissed the charges

12  against him.

13

### g.   Cesar Mancilla

14       70.    On or about February 24, 2011, deputies savagely beat Cesar

15  Mancilla at IRC. Mr. Mancilla was in a large holding cell with other inmates, when

16  the deputies ordered him to stand with his head down. Mr. Mancilla obeyed.

17  Suddenly, and without justification or warning, several uniformed personnel

18  attacked Mr. Mancilla, hitting, kicking, and pepper-spraying him. The deputies

19  handcuffed Mr. Mancilla, and continued to beat him. Mr. Mancilla was denied

20  food, water, and medical attention for the remainder of the night.

21       71.    On February 25, 2011, a doctor examined Mr. Mancilla and

22  determined he had a collapsed lung, two broken ribs, a nasal fracture, four broken

23  teeth (photo attached hereto as Exhibit B), burns on his skin from the pepper spray,

24  and other injuries. Mr. Mancilla was in jail on a non-violent misdemeanor.

25

### h.   Stephen Teran (Second Incident)

26       72.    In February 2011, while Stephen Teran was housed in Men's

27  Central Jail, deputies heard that Mr. Teran's attorney had requested his medical

28  records relating to a use of force. The deputies beat Mr. Teran, repeatedly punching

    COMPLAINT FOR INJUNCTIVE RELIEF

1   and kicking his body, neck, and head.  Mr. Teran's cheekbone was broken.  He had

2   to wear a neck brace, and doctors told him that he may have suffered nerve damage.

3                  **i.**    **Garry Crumpton**

4           73.   In January 2011, while inmates in Men's Central Jail were in a

5   line headed to court, Deputy Ortiz shoved Garry Crumpton against the wall.

6   Mr. Crumpton said, "You didn't have to do me like that."  Deputy Ortiz then placed

7   him in a painful chokehold.  Even though Mr. Crumpton put his hands in the air in

8   a show of non-resistance, Deputy Ortiz slammed him to the floor, knocking him

9   unconscious.  Another deputy instructed all the other inmates in line to face the

10  wall.  While Mr. Crumpton lay face-down and motionless on the ground, seven or

11  eight deputies punched and kicked him.  He was removed to a caged area in the jail.

12  Deputy Ortiz came by to speak with him about the incident.  Though Mr. Crumpton

13  did not agree with the deputy's account, he assented to everything Deputy Ortiz

14  said because he did not want to be assaulted again.

15                 **j.**    **Michael Cervantes**

16          74.   In December 2010, Deputy Lyon noticed Mr. Cervantes's gang

17  tattoo and began smacking the back of his head and taunting him.  When

18  Mr. Cervantes turned to look at Deputy Lyon, he punched Mr. Cervantes's left

19  cheek, tackled him to the ground, sat on top of him, and punched his face and neck.

20  Approximately eight other deputies rushed to join Deputy Lyon.  The deputies

21  bashed Mr. Cervantes's leg with a flashlight until he bled, kicked him in the

22  stomach, and stunned him twice with a taser gun.  When the attack was over, the

23  deputies cautioned Mr. Cervantes not to tell the nurses "anything funny."  Due to

24  the severity of his injuries, Mr. Cervantes was taken to the hospital and spent one

25  week in the jail's medical ward.  He continues to suffer dizzy spells.

26                 **k.**    **Stephen Teran (First Incident)**

27          75.   In December 2010, several deputies severely beat Stephen Teran

28  while he was in the IRC.

      COMPLAINT FOR INJUNCTIVE RELIEF

76.     While Mr. Teran was being searched, Custody Assistant Martinez repeatedly told him to hurry up.  Martinez then grabbed Mr. Teran by the neck, choking him, and dragged him to a cell where he threw Mr. Teran to the ground.  Martinez kicked him in the ribs two or three times.  Deputy Sims, who was present during the attack, told Mr. Teran, "If you give us any problems we're going to put you in the hospital."

77.     A few hours later, Mr. Teran was sent back to the processing line.  While interviewing Mr. Teran for classification purposes, Deputy Sims dropped Mr. Teran's classification card on the floor next to him and told him to pick it up.  When Mr. Teran did not pick up the card, Deputy Sims punched him in the face, knocking him over.  Deputy Sims then threw Mr. Teran to the floor and repeatedly kicked him in the head and torso.  Four to six other deputies, including Deputies Miller and Escobado, ran over and joined in the beating, punching, kicking, and striking Mr. Teran with their flashlights.  As they were beating Mr. Teran, the deputies yelled, "Stop fighting! Stop resisting!"

78.     After two or three minutes, the deputies dragged Mr. Teran to a cell and handcuffed him to the leg of a bench, forcing him to kneel on the floor.  The deputies kicked Mr. Teran in the back several times.  Mr. Teran saw blood pouring off his head and face, pooling on the ground beneath him.  He heard the deputies say they did not want blood on their clothes.  The deputies then they put a plastic bag over Mr. Teran's head, making it almost impossible for him to breathe.  The deputies laughed as they left the cell.

79.     The deputies returned about twenty minutes later and told Mr. Teran he would be interviewed on camera.  They threatened to press charges if he said anything.  Mr. Teran told the interviewer that he had fallen.  Later, the deputies again threatened him and warned him not to talk about the incident.

COMPLAINT FOR INJUNCTIVE RELIEF

### l.     Rashaad Pilgrim

80.     In July 2010, deputies in Men's Central Jail targeted Rashaad Pilgrim as he stood in line to receive his medication.  The deputies instructed all of the inmates in line to face the wall.  Deputy Reza approached Mr. Pilgrim from behind and yelled at him before punching him twice in the face.  When Mr. Pilgrim returned to his cell a few minutes later, he called his mother to report what happened.  Not long after, Deputies Reza and Milpad ordered the inmates to line up and go to the day room, but instructed Mr. Pilgrim to stay behind and face the wall. One deputy spread his legs, as if to search him.  Instead, the other deputies began to punch Mr. Pilgrim in the face and head.  Mr. Pilgrim lost consciousness.  When Mr. Pilgrim woke up, he was on the floor and the deputies were still punching him and yelling, "Stop fighting!"  A deputy then slammed Mr. Pilgrim's face into the concrete floor, chipping his teeth.  Later, doctors told Mr. Pilgrim he had fractures in his face, blunt head trauma, injury to his right ear, and a chipped tooth.

### m.     Alex Krehbiel

81.     In July 2010, a deputy approached Alex Krehbiel as he was returning from a visit with his attorney.  Mr. Krehbiel had been trying to get back to his housing unit but the door was locked.  The deputy ordered Mr. Krehbiel to face the wall and yelled in his ear, "This is my fucking house! Where do you think you are? This is my fucking house!"  The deputy then slammed Mr. Krehbiel's forehead against the wall twice.  A group of deputies approached, taunting Mr. Krehbiel, and one of them punched him in the face.  The deputies pushed Mr. Krehbiel into the laundry room, knocked him to the floor, and punched and kicked his head, ribs, and back.  The deputies then pepper sprayed Mr. Krehbiel's eyes and mouth, and slammed his head into the floor.  As a result of the incident, Mr. Krehbiel was given twenty-nine days in disciplinary segregation.

COMPLAINT FOR INJUNCTIVE RELIEF

n.    **Juan Diego Mares**

82.    In June 2010, deputies beat Juan Diego Mares so violently that he suffered a fractured jaw, and required multiple eye surgeries and eight stitches in his ear.  The incident began after deputies conducted a search of all the cells on Mr. Mares's row.  Mr. Mares noticed that some of his property was missing, including items he had just purchased from the commissary.  After Mr. Mares asked to speak with a sergeant about the missing property, Deputy Carefoot shoved him hard against a wall, slapped his ear, punched his face several times, and threw him to the ground.  Once Mr. Mares was on the ground, Deputy Carefoot kicked him roughly ten times in the face, jaw, and back of his head, causing a large pool of Mr. Mares's blood to form on the floor.  The deputy then kicked Mr. Mares's ear three times, an experience he described as more painful than when he was hit by a car.  Following the attack, a senior deputy questioned Mr. Mares about the incident and said to him, "You know you're going [back] to the same module once they're done cleaning you up."  Mr. Mares interpreted this as the senior deputy threatening him not to report the incident.

o.    **Santiago Sanchez**

83.    In June 2010 a deputy assaulted Santiago Sanchez following a visit from Mr. Sanchez's girlfriend and mother.  The deputy grabbed the back of Mr. Sanchez's shirt and swung him into a steel pole.  The deputy proceeded to place Mr. Sanchez into a stress position, twisting both of his arms behind his back so his fingers were pressed between his shoulder blades.  The deputy then slammed Mr. Sanchez's head down on top of the metal counter in the visitation room.  The deputy held Mr. Sanchez in that position for a minute or two while verbally harassing him.

p.    **Jimmie Knott**

84.    In June 2010, while waiting in line for his hepatitis shot, Jimmie Knott asked Senior Deputy Sanchez if he could get some new shoes, as his had a

1    split in them. Senior Deputy Sanchez told Mr. Knott to get out of line and to strip

2    down. Mr. Knott complied and stripped to his boxers. Senior Deputy Sanchez then

3    told him to get on his knees, and as Mr. Knott was bending to the floor, Senior

4    Deputy Sanchez hit him in the temple, causing his head to bleed. Other deputies

5    then came over and began hitting, kicking and kneeing him. Mr. Knott curled into

6    a fetal position and waited for the violence to subside. After two or three minutes,

7    the deputies stopped hitting him and took him to medical. On the way to medical,

8    the deputies told him to say that he fell down the stairs. Mr. Knott complied,

9    because he was afraid of being beaten again. Mario Love witnessed the attack and

10   verified Mr. Knott's account. Mr. Love described the deputies involved as being

11   like "a pack of wolves." Later, while Mr. Love was waiting to talk to the ACLU,

12   deputies pulled him aside and interrogated him in a threatening way.

13                          q.    **Joseph Hager**

14              85.    In June 2010, deputies took Joseph Hager out of his cell and

15   placed him in handcuffs to go to the law library. At the library, a deputy shoved

16   Mr. Hager up against the wall and kicked his ankle so forcefully it bled. The

17   deputy then dragged Mr. Hager, who was still handcuffed, back to the tier, where

18   he slammed Mr. Hager's face into the edge of a door frame. Mr. Hager blacked

19   out. When Mr. Hager regained consciousness, he was on the ground and Deputies

20   Chavez and Gonzalez were kicking and punching him in the head and face. Even

21   though Mr. Hager was handcuffed, the deputies repeatedly yelled, "Stop resisting!"

22   When the beating subsided, Deputy Chavez told him, "I tried to kill you. You are

23   lucky you are still breathing." The beating caused a fracture in Mr. Hager's face, a

24   black eye, swelling in his ears, and bleeding in his mouth. When staff members

25   interviewed Mr. Hager on camera, he said that he had slipped in the shower, out of

26   fear of what the deputies would do to him if he revealed that they had beaten him.

27   After the beating, Mr. Hager was sent to disciplinary segregation and told he was

28   being charged with assault on a deputy.

1

### r.   Matthew Gjersvold

2   86.   On May 28, 2010, while housed in Twin Towers, Matthew

3   Gjersvold slept through a deputy's call for a head count because of the sleep

4   medication he was taking.  Another inmate woke up Mr. Gjersvold, who is a former

5   police officer, but the deputies noticed that he was late.  Deputy Van Du told

6   Mr. Gjersvold to stand facing the stairs, and then forcefully shoved him onto the

7   metal steps.  Deputy Van Du then handcuffed Mr. Gjersvold and escorted him back

8   to his cell.  At the cell, Deputy Van Du pulled violently on the handcuffs, causing

9   Mr. Gjersvold to fall backwards and break his wrist.

10

### s.   Luis Bueno

11   87.   In May 2010, Luis Bueno was on his way to the church in

12   Men's Central Jail.  Deputies told Mr. Bueno to turn around and return to his cell.

13   As Mr. Bueno was walking back to his cell, a deputy shoved him against the wall

14   and asked him if he wanted to get "fucked up."  As other deputies arrived, the first

15   deputy forced Mr. Bueno to spread his legs and put his hands behind his back.  The

16   deputy then aimed his mace at Mr. Bueno's face.  When Mr. Bueno turned his head

17   to avoid the spray, another deputy punched him in the neck.  Three other deputies

18   joined in and began violently punching Mr. Bueno in the head and body.

19   Mr. Bueno was knocked to the floor, where the beating continued.  When the

20   beating subsided, deputies took Mr. Bueno to the medical center, where he was told

21   he had a fractured nose, a torn ligament in his ankle, a swollen artery in his brain,

22   and possible rib fractures.  Mr. Bueno is now afraid to attend church for fear of

23   encountering the deputies who attacked him.

24

### t.   Walter Morales

25   88.   For about a week in May 2010, deputies in Men's Central Jail

26   beat Walter Morales twice a day with flashlights about his head and body.

27   Mr. Morales believes the deputies beat him because he was arrested for allegedly

28   firing a gun at police officers.  A group of deputies came into Mr. Morales's cell

-30-                COMPLAINT FOR INJUNCTIVE RELIEF

1   and punched and hit him with flashlights.  Mr. Morales has a scar above his eye as

2   a result.  Later, a second shift of deputies beat Mr. Morales while he was restrained

3   in waist chains and handcuffs.

4                          **u.     Michael Holguin**

5           89.    In October 2009, deputies beat Michael Holguin so severely that

6   he was hospitalized with a broken leg, stitches on his face, and staples in his head.

7   The incident occurred as Mr. Holguin was on his way to the showers.  A deputy

8   told him to go back to his cell, preventing him from using the showers.

9   Mr. Holguin asked him why, because he had not received a shower in weeks.  The

10  deputy told him to turn around and placed Mr. Holguin in handcuffs.  The rest of

11  the beating is a blur to Mr. Holguin; all he remembers is being punched in the face

12  by Deputy Luviano and pepper sprayed.  When the beating was over, Deputy Rico

13  said, "That's why you don't say why; just do what you're told."  When Mr. Holguin

14  returned from the hospital, he was sent to disciplinary segregation for "attacking a

15  deputy."

16                         **v.     Gordon Grbavac**

17          90.    In August 2009, deputies in Twin Towers handcuffed Gordon

18  Grbavac, took him into an attorney room, and slammed his head into a thick glass

19  wall more than half a dozen times, leaving blood on the window.  When a sergeant

20  entered the room and asked Mr. Grbavac what had happened, he said the deputies

21  had assaulted him.  The sergeant said he would be right back.  While he was gone

22  one of the deputies who had assaulted Mr. Grbavac threatened him, saying, "Are

23  you fucking kidding me?  You motherfucker!  You better change your story or we

24  are going to show you what we do to fat asses.  You better say you did this to

25  yourself."  Mr. Grbavac thought that the deputies might kill him if he disobeyed, so

26  he agreed to tell the sergeant that his injuries were self-inflicted.  When the sergeant

27  returned with a video camera to interview Mr. Grbavac, one of the deputies who

28  assaulted him was in the room, and the sergeant did not ask him to leave.  Because

1    of the deputy's threats, Mr. Grbavac altered his story and said he had banged his

2    own head against the window.  Mr. Grbavac was released after spending

3    approximately a week in jail, when the charges against him were dismissed.

4                        **w.    Darrell Garrett**

5            91.    In June 2009, a group of deputies assaulted Darrell Garrett in

6    Men's Central Jail while he was restrained in waist chains.  Deputies shoved

7    Mr. Garrett from behind, causing him to tumble down concrete stairs.  Deputies

8    then kicked Mr. Garrett in the face and head, while another deputy held him down.

9    As the beating continued, they hit him in the head with a plastic milk crate, ground

10   his face into the concrete floor, and emptied two cans of mace into Mr. Garrett's

11   mouth, ears, nose and eyes.  The beating caused Mr. Garrett to bleed profusely and

12   to defecate.  Mr. Garrett blacked out as deputies transported him to medical.  In the

13   aftermath of the beating, deputies have threatened and taunted Mr. Garrett, saying

14   they are "going to get him."

15                       **x.    Mr. C**

16           92.    In May 2009 in Men's Central Jail, a deputy told Mr. C to face

17   the wall and said, "Who's the fucking punk now?  Put your fucking nose to the

18   wall."  The deputy punched him in the temple, causing Mr. C to fall to the floor.

19   After Mr. C received a second blow to the top of his head, he tried to crawl away

20   but was stopped by other deputies.  The deputies ripped off Mr. C's pants and shot

21   him with a taser.  Just before Mr. C lost consciousness, he looked down and saw

22   blood pooling on the floor.  As a result of the beating, Mr. C suffered four fractured

23   vertebrae, a shattered right shoulder, a broken rib, and two severely sprained ankles,

24   and was relegated to a wheelchair.  He also received five staples on the top of this

25   head and twelve stitches on his face.  Since the beating, deputies have routinely

26   threatened Mr. C to prevent him from asking for help or reporting the abuse to

27   someone outside the jail.

28

COMPLAINT FOR INJUNCTIVE RELIEF

y.    **Mr. D**

93.    Deputies assaulted Mr. D on a number of different occasions.  In 2009 in Men's Central Jail, ten to fifteen deputies came into Mr. D's cell and assaulted him for allegedly "disrespecting" one of the other deputies.  They dropped Mr. D to the floor and pummeled his head and body with kicks, punches, and blows with their flashlights.  Even after the deputies had Mr. D fully restrained on the floor with his hands behind his back, they repeatedly shot him with a taser.  One deputy said to Mr. D, "Man, I was trying to kill you."  The deputies threatened Mr. D after the attack and told him not to tell anyone what had happened.  Mr. D still has scars on his face and head from the beating.

C.    **Numerous Additional Incidents of Deputies Using Force Against Non-Resisting Inmates**

94.    Additional incidents of deputies using force against non-resisting inmates include the following:

95.    On December 13, 2011, Custody Assistant Martinez tasered 52 year old inmate Mr. E in Twin Towers, and a number of deputies, punched, and kicked him before they handcuffed him.  At the time they used force against him, Mr. E was lying on the ground face down and was not attempting to fight or resist the deputies in any way.  Although Mr. E had been in an altercation with another inmate shortly beforehand, he was not resisting when Custody Assistant Martinez tasered him, or when deputies rushed in and began kicking and punching him.  Mr. E was subsequently sent to the hole for 18 days without a disciplinary hearing; however, deputies presented him with paperwork that stated that he had had a disciplinary hearing.

96.    On December 6, 2011, Mr. F was punched in the face by a deputy while being escorted out of a courtroom with his hands cuffed behind him.  The deputy, who was 6 feet tall and approximately 250 pounds, grabbed the 5'8" and 160 pound Mr. F by the left arm tightly and then punched Mr. F, hitting his left

COMPLAINT FOR INJUNCTIVE RELIEF

1    eye so hard that it knocked Mr. F to the floor.  With blood dripping from a long

2    gash in his face onto the floor, Mr. F was taken to the hospital in an ambulance.

3    Although a doctor stated that Mr. F needed stitches, two deputies told the doctor

4    that Mr. F was fine and Mr. F left the hospital without the stitches.  A sergeant

5    video recorded Mr. F's injuries when he initially boarded the ambulance, and later

6    interviewed him on camera about the beating.  The sergeant informed Mr. F that he

7    could file a lawsuit, but that it would be a "waste of time."  Mr. F still has difficulty

8    seeing out of his left eye.

9         97.    In August 2011, deputies grabbed Anthony Brown, then 52

10   years old, by his windpipe, slammed him to the ground, and repeatedly punched

11   and kicked him all over his body, including in his teeth.  Deputies also shot pepper

12   spray into Mr. Brown's face.  The deputies repeatedly yelled "Quit resisting" at the

13   non-resisting Mr. Brown.

14        98.    On July 12, 2011, a deputy in Twin Towers slammed Charles

15   Celestine against a wall while searching his cell.  The impact caused

16   Mr. Celestine's prosthetic eye to pop out.

17        99.    On June 25, 2011, a deputy in Men's Central Jail punched Mr.

18   G, a 57 year old inmate who uses a wheelchair, in the eye and the mouth.

19        100.   On June 20, 2011, Deputy Jimenez caused Clydell Crawford's

20   bad shoulder to dislocate from its socket by shoving his arms upward forcefully

21   while they were handcuffed behind his back.  Immediately before, Mr. Crawford

22   had asked Deputy Jimenez to be careful because one of his shoulders had

23   previously dislocated.

24        101.   In April 2011, a deputy in Men's Central Jail asked Mr. H why

25   he was in jail before repeatedly punching his head, face, and ribs.  Another deputy

26   kicked Mr. H's ribs.  The beating lasted 30-45 seconds.  Subsequently, one or more

27   deputies cranked open Mr. H's cell, allowing three inmates to come into the cell

28   and assault him.

-34-          COMPLAINT FOR INJUNCTIVE RELIEF

1        102.   In April 2011, a custody assistant kicked, hit, and elbowed

2   Carlos Cacique in Twin Towers.

3        103.   In March 2011 in Men's Central Jail, Deputy Smith knocked a

4   tray of food from Alberto Carreras's hands and twisted his arms behind his back.

5   Deputy Johnson then slammed Mr. Carrera's face against a wall. Deputies hit

6   Mr. Carreras on his face, head, and legs, while yelling "Shut up you fucking

7   faggot" at him. Mr. Carreras had a catheter, and the blows to his legs caused

8   tremendous pain and led him to bleed from his penis.

9        104.   In March 2011, a deputy in Twin Towers dug her nails into

10   Anthony Penmik's skin, leaving marks. Another deputy hit and kicked Mr. Penmik

11   in the legs and buttocks.

12        105.   On February 18, 2011, Mr. I witnessed seven or eight deputies

13   beating up a non-resisting inmate in Men's Central Jail. During the beating, one

14   deputy was pushing the inmate's neck to the floor with a flashlight, while other

15   deputies were yelling "stop resisting."

16        106.   In February 2011 at Twin Towers, Deputy Hernandez forcibly

17   searched Rodney Smith's buttocks with a flashlight, placing the flashlight half an

18   inch into his rectum. Mr. Smith's rectum later bled and became painful, which he

19   attributed to the flashlight's being pushed into his rectum. Mr. Smith also

20   witnessed deputies take away another inmate and apparently attack him; that inmate

21   suffered extensive injuries.

22        107.   In February 2011, Deputy Walker attacked Mr. J in Men's

23   Central Jail after he woke up late for the morning count, causing a cut that required

24   forty stitches.

25        108.   In January 2011, a deputy shoved Mr. K against the wall,

26   roughly twisted his hands and arm, and slammed him to the floor. Once Mr. K was

27   on the floor, several deputies punched and kicked him.

28

     COMPLAINT FOR INJUNCTIVE RELIEF

109. In January 2011, Christopher Brown witnessed two deputies in Twin Towers punching a non-resisting inmate who fell to the floor, apparently unconscious. The deputies then kneed and punched the motionless inmate in the face and head and repeatedly shot the inmate with a taser.

110. On December 29, 2010 in Men's Central Jail, Deputy Gomel tripped Mr. L while he was handcuffed, and then slammed his head against the ground, leaving blood all over the floor. Deputy Gomel then repeatedly punched Mr. L in the head while Deputy Rodriguez pepper sprayed his eyes, triggering his asthma.

111. In December 2010, Deputy Vasquez pushed Michael Campbell's injured back and punched his head multiple times while Mr. Campbell had his hands behind his back and his fingers interlaced. While Deputy Vasquez was punching Mr. Campbell, another deputy had him in a chokehold. Mr. Campbell suffered extensive bruising and pain in his head, neck, and back. Mr. Campbell was 60 years old at the time of the beating.

112. On November 26, 2010, Deputy Pontonantos punched Erik Camacho in the back of the head while he was in his wheelchair. Two other deputies also hit Mr. Camacho. Then, after Mr. Camacho's wheelchair collapsed in the midst of the beating, the deputies dragged him along the floor in the collapsed wheelchair, while Deputy Gomez kicked him. Shortly thereafter, Deputy Pontonantos took one of Mr. Camacho's shoes, which had come off as he was being dragged along the floor, slapped him across face with it, and kicked him in the testicles.

113. On November 18, 2010 in Men's Central Jail, multiple deputies hit, kicked, and kneed Jonathan Dunlap. One deputy then shot pepper spray in Mr. Dunlap's face. Mr. Dunlap required stitches on his eyelid and suffered extensive bruising. Mr. Dunlap was later sent to the hole for twenty days for supposedly assaulting a deputy.

COMPLAINT FOR INJUNCTIVE RELIEF

114.   In November 2010, while on an LASD transport bus to court, Deputy Stevenson repeatedly punched and then forcefully pushed Darrell Rauls, causing him to fall.

115.   In November 2010, deputies in Twin Towers beat Mr. M after he protested Deputy Ochoa's decision to deny him dinner.  Deputies Ochoa, Paket and several others beat him so savagely for complaining that he suffered a fractured nose, bruised kidneys and ribs, a two-centimeter gash on his forehead, and a swollen right eye.  LASD then had him charged with battery against a peace officer and resisting a peace officer, although he had not committed any battery or offered any resistance.

116.   In or about November 2010, a deputy in Men's Central Jail grabbed Mr. N's arm and pulled him off his bunk onto the floor.  The deputy then stepped on Mr. N's fingers, causing swelling and bruises.

117.   In October or November 2010, Steven Moore heard deputies, including Deputy Roberts, beating another inmate in the laundry room near his cell in Men's Central Jail.  Moore stated, "I will never forget this incident because the inmate's terror and pain were so obvious in his screams."  Shortly thereafter, Mr. Moore saw deputies carrying a seemingly unconscious inmate, who was bleeding from his head, out of the laundry room.

118.   In August 2010 in Men's Central Jail, when Keith Nichols refused to discuss his legal case with a deputy, the deputy repeatedly kicked him in the lower back and kidneys with his boot-clad foot, causing intense pain.  The deputy then punched Mr. Nichols in the head and yanked his leg, causing his knee to pop out of position.

119.   In July 2010 in Twin Towers, Custody Assistant Bernadino punched Cedric Smith in the neck and slammed him into the wall.  The deputy then kicked Mr. Smith's feet, even though Mr. Smith had just had his toenail surgically removed.  This was not Mr. Smith's first beating by deputies.  In 2004, deputies

COMPLAINT FOR INJUNCTIVE RELIEF

1   brutally attacked Mr. Smith, punching his face and kicking his stomach, causing
2   him to defecate.  The 2004 attack left Mr. Smith with a severe stomach hernia and a
3   scar over his eye.

4         120.   In April 2010, in Twin Towers, Deputy Bryant angrily pushed
5   Mr. O after he complained to the ACLU about a lack of medical treatment, and
6   Deputy Holland struck Mr. O in the back near O's existing wounds.

7         **D.**   **<u>Racially Motivated Deputy Violence</u>**

8         121.   Many deputies have assaulted inmates while taunting them with
9   racial epithets.  In August 2011, after choking inmate Mr. P and repeatedly
10   slamming his head and face into a metal bar and a wall in Men's Central Jail,
11   Deputy Valdez yelled, "I hate you motherfucking monkeys.  Damn nigger!"

12         122.   In July 2011, inmate Mr. Q witnessed a deputy on the 3000 floor
13   in Men's Central Jail grab a non-resisting African-American inmate, kick his legs,
14   and yell, "All you blacks!  When you mess with my trustees, this is what's going to
15   happen to you."  Numerous deputies then joined the attack, and began kicking,
16   punching, and hitting the inmate with flashlights.  After the attack, Mr. Q saw
17   trustees cleaning blood off the floor and wall.

18         123.   In June 2011, a deputy in Men's Central Jail said of inmate
19   Michael Jefferson, who is African-American, "This nigger can't fucking listen and
20   face the wall."  A deputy then smashed Mr. Jefferson's face into the wall.  Shortly
21   thereafter, Deputy Quintana punched Mr. Jefferson in the face while he was
22   escorting him back to his module.

23         124.   In October 2009, deputies performing cell searches in Men's
24   Central Jail took Mr. R's commissary items.  When he complained, a deputy asked
25   Mr. R, who is African-American, "What's your problem, Monkey?"  The deputy
26   told Mr. R to face his cell and forcefully shoved him into the bars of the cell door.
27   Later that day, after ACLU monitors visited Mr. R's row, deputies threatened all of
28   the inmates with a bean bag canister gun that contains pepper spray pellets.  A

      COMPLAINT FOR INJUNCTIVE RELIEF

1    deputy said, "We don't give a fuck about the ACLU. This is our house. They don't

2    fucking live here."

3         125.   In July 2009, Deputies Delgado, Aviles, Rivera, Thompson,

4    Ortega, Snyder, and others severely beat inmate Evans Tutt on the 3000 floor in

5    Men's Central Jail, while calling Tutt a "fucking nigger." During the beating, the

6    deputies handcuffed Mr. Tutt, and then tasered him, beat him with flashlights, and

7    kicked him. The deputies broke Mr. Tutt's nose in multiple places, injured his ribs,

8    head, face, knee, and leg, chipped his tooth, and left bruises all over his body. The

9    deputies then wrote false reports that prompted the Los Angeles County District

10   Attorney to file criminal charges against Mr. Tutt for resisting a peace officer. The

11   charges were eventually dismissed. Three of the deputies involved in the incident

12   have been identified as members of the 3000 Boys, and two of them were involved

13   in the 2010 Christmas Brawl at a banquet hall in Montebello, described in

14   paragraph 41.

15        **E.    Deputy Violence Against Mentally Ill Inmates**

16        126.   In June 2010, Mr. S, who was suicidal, walked out of his cell

17   with a strip of bed linen tied around his neck and threatened to kill himself. Mr. S

18   had repeatedly asked deputies to see the psychiatrist, but they had mocked him and

19   denied him access to mental health care. Custody Assistant Gonzalez shoved Mr. S

20   back into the cell, turned to his cellmate, Gary Sanchez, and ordered Mr. Sanchez to

21   "regulate" Mr. S. Mr. Sanchez understood this to mean the deputies wanted him to

22   keep Mr. S in line by beating him.

23        127.   In October 2009, while in the IRC, inmate Jonny Johnson saw

24   deputies verbally abusing an elderly man who was visibly mentally ill. The man

25   was unable to follow the deputies' directions. The deputies began to taunt the man

26   and threw a sandwich at him, hitting him in the head. Mr. Johnson came to the

27   man's defense and told the deputies to stop picking on him. A group of deputies

28   then took Mr. Johnson out of the holding cell. One deputy shoved Mr. Johnson's

                                        -39-        COMPLAINT FOR INJUNCTIVE RELIEF

1    head against the wall, while two others began punching him in the torso, knocking

2    the wind out of him.  The deputies then took Mr. Johnson to an area where other

3    inmates were handing out bedding and ordered him to help.  The deputies told

4    Mr. Johnson that as he handed out the bedding, he had to say to each inmate, "I'm a

5    faggot and the deputies are the bomb."

6           128.   In September 2009 in Men's Central Jail, Deputy Navarro

7    stopped Eefrom Jones as he returned from an attorney visit.  Mr. Jones is on

8    psychotropic medication due to a mental illness.  Deputy Navarro pulled Mr. Jones

9    to the ground and sat on him as he punched him.  Other deputies came over and

10   joined in the beating, breaking Mr. Jones's shoulder.  The deputies shot Mr. Jones

11   with a taser and repeatedly pepper sprayed him in the face, although he told them

12   he had asthma.  Approximately two weeks later, after a lieutenant interviewed

13   Mr. Jones about the incident, Deputy Navarro came to Mr. Jones's cell to escort

14   him to the psychologist.  In the hallway, Deputy Navarro ordered Mr. Jones to strip

15   naked and bend over.  Deputy Navarro yelled that this was his floor, and he would

16   do whatever he wanted.  Deputy Navarro shone his flashlight at Mr. Jones's rear

17   and another deputy put his finger in Mr. Jones's anus, as other deputies looked on

18   and laughed.  After these incidents, Mr. Jones reported feeling suicidal.

19        **F.**     **Deputy Assaults Against Inmates For Rules Infractions Or**

20              **Perceived Slights**

21           129.   Deputies often beat inmates for minor rules infractions or

22   perceived slights.  In December 2010, a deputy in Twin Towers savagely beat

23   Derek Griscavage after Mr. Griscavage showed the deputy his middle finger.  First,

24   Deputy Jackson kicked Mr. Griscavage and contorted his shoulders in a manner that

25   caused him pain.  Deputy Jackson then handcuffed Mr. Griscavage and led him

26   away from the pod.  Shortly thereafter an eyewitness saw a deputy push

27   Mr. Griscavage causing him to fall down.  Then at least four deputies began to beat

28   him.  The deputies knocked Mr. Griscavage unconscious, and he woke up in the

-40-            COMPLAINT FOR INJUNCTIVE RELIEF

1   hospital with severe lacerations, a broken nose, a chipped tooth, and bruises on his

2   head.  Three days later, deputies moved Mr. Griscavage to the disciplinary

3   segregation unit for alleged "assault on a deputy."

4           130.   In February 2010, deputies in the jails' Correctional Treatment

5   Center attacked Devon Mannings, an inmate who suffers from a seizure disorder.

6   Mr. Mannings told the deputy he "didn't have a date since high school."  The

7   deputy returned with Deputy Campos and slammed Mr. Mannings to the ground.

8   The deputies threw Mr. Mannings's personal letters, pictures, and legal paperwork

9   into the toilet.  One deputy stomped on Mr. Mannings's hand with his boot,

10  shattering his knuckle.  The deputies repeatedly kicked Mr. Mannings's body while

11  yelling, "Stop resisting," even though he was not resisting in any way.  The

12  deputies handcuffed Mr. Mannings and continued to kick his body and face.  The

13  deputies then shot pepper spray into Mr. Mannings's face and used a taser on him,

14  which caused Mr. Mannings to have a seizure.  When Mr. Mannings regained

15  consciousness after the seizure, he saw blood around him on the floor.  As a result

16  of the beating, Mr. Mannings suffered extensive bruises and required surgery on the

17  shattered knuckle.  He was interviewed on camera and a senior deputy told Mr.

18  Mannings the incident would be investigated.  Although Mr. Mannings was

19  supposed to be allowed to present his version of events at his disciplinary hearing,

20  he was not permitted to do so.

21      **G.   Deputies' Use Of Inmates As Pawns To Inflict Violence On Other**

22      **Inmates**

23          131.   Deputies regularly pit inmates against other inmates, using them

24  as pawns to carry out acts of violence.  Deputies sometimes instigate violence

25  between inmates by allowing inmates from rival gangs to have physical access to

26  each other (for example, by opening up their cell doors from the deputy control

27  booth), or by fomenting discord (for example, by mentioning an inmate's gang

28

COMPLAINT FOR INJUNCTIVE RELIEF

1    affiliation to inmates from a rival gang, or stating in front of other inmates that an

2    inmate is a sex offender).

3        132.   In March 2011, four inmates beat and sexually assaulted another

4    inmate after an LASD custody assistant opened the door to the victim's cell.  The

5    controls to open cell doors are located inside a locked control booth accessible only

6    to deputies and custody assistants.  After the cell door was opened, two inmates

7    went inside and began punching the victim.  An inmate witness heard the victim

8    screaming for several minutes.  Later that evening, the witness heard an inmate say

9    that the victim was going to be sexually assaulted with a broomstick.  The victim's

10   cell door was once again opened and four inmates entered, one of them carrying a

11   broomstick.  The witness heard the victim screaming and saw a broomstick handle

12   with blood on it sticking out of the cell.  Later, the witness saw the victim being

13   escorted away from the cell by a deputy; there was a large amount of blood on the

14   victim's pants.

15       133.   Deputies in Men's Central Jail allowed other inmates to assault

16   Donald Shorts.  Mr. Shorts is a former gang member and was frequently the target

17   of assaults from members of his former gang.  In June 2010, two inmates who were

18   housed in a different module approached Mr. Shorts's cell.  The only way they

19   could have appeared at this cell is if deputies opened the gates.  One of the inmates

20   then yelled to the deputies to open Mr. Shorts's cell door.  The deputies complied,

21   and the two inmates entered the cell and assaulted Mr. Shorts, beating him with

22   their fists and cutting his face and chest with a shank (a homemade knife).  The next

23   day, deputies charged Mr. Shorts with possession of a shank, fighting, and

24   insubordination to staff.

25       134.   In March 2011, a deputy marched Jeremiah Wilkerson past

26   members of a rival gang, telling them, "This is a Norteno.  If the door's 'racked'

27   [opened] you know what to do."  Mr. Wilkerson believed the deputy was trying to

28   make him a target for an attack in retaliation for an earlier altercation.

COMPLAINT FOR INJUNCTIVE RELIEF

1    135.   Cameron Saul, a former inmate who now works as a drug

2    treatment counselor, served as a "house mouse" (a liaison between inmates and

3    deputies) for part of his time in Men's Central Jail, and reported to the deputies

4    about inmates who were causing problems.  On several occasions, deputies told

5    Mr. Saul that inmates should "handle the problem," and that Mr. Saul should line

6    up at least two inmates to say that the problem-causing inmate had "slipped in the

7    shower," in case that inmate complained following the attack.  Mr. Saul later

8    witnessed other inmates take so-called problem inmates to the back of the module

9    and attack them, without deputies intervening to prevent the attack.

10    136.   A deputy placed Mr. T, an inmate who had been in protective

11    custody, in the general population tank, where he was viciously attacked by other

12    inmates.  Mr. T suffered contusions on his head, a busted lip, blurry vision, a

13    swollen ear, and severe emotional trauma.

14    137.   Michael Topete heard someone yelling, "Help, they're killing

15    me!" while someone else was yelling "Shut the fuck up!"  The next morning,

16    Mr. Topete heard other inmates say, "They killed the rapist."  In an unrelated

17    incident, deputies placed Mr. Topete, who had previously been in protective

18    custody, in the general population, where he was attacked by other inmates.

19    138.   On several occasions, deputies placed Rodolpho Mendoza, who

20    was in protective custody, with inmates from the general population, who attacked

21    him.

22    139.   In 2009, Therin McGuire witnessed deputies ordering two

23    inmates to beat up a third inmate in MCJ.

24    **H.    Even Civilians Have Witnessed Deputy Violence Against Inmates**

25    140.   Unchecked deputy-on-inmate violence in Men's Central Jail and

26    Twin Towers has become so pervasive and routine in recent years that deputies

27    carry out savage attacks even in the presence of civilian eye witnesses.  Thomas

28    Parker, former Assistant Special Agent in Charge of the FBI's Los Angeles Field

-43-                    COMPLAINT FOR INJUNCTIVE RELIEF

1    Office noted that the phenomenon of deputies beating inmates in areas visible to

2    civilians suggests that "the culture of deputy violence in the Jails has become so

3    hardened and pervasive that deputies feel emboldened to carry out their attacks

4    even in non-secluded areas."

5         141.   In February 2009, Jails Chaplain Paulino Juarez witnessed a

6    beating on the 3000 floor in Men's Central Jail. Chaplain Juarez was visiting

7    inmates as part of his ministry, when he heard the sounds of someone being beaten.

8    When he walked towards the noises, he saw three deputies, including Deputies

9    Ramirez and Aguilar, in a hallway pounding the face and body of an inmate who

10   stood with his back to the wall. The inmate appeared to be handcuffed; he was

11   neither raising his hands to protect himself, nor resisting in any way. The deputies

12   punched the inmate until he collapsed face-first on the ground, at which point they

13   began kicking him in the head and body. Until this point, the inmate had implored

14   the deputies to stop. On the ground, he fell silent. Though the inmate was

15   apparently unconscious, deputies continued to punch and kick him, and yelled,

16   "Stop fighting!"

17        142.   A deputy finally noticed that Chaplain Juarez was watching the

18   attack and made signs to the others to stop the beating. But a call had gone out to

19   other deputies to join in the attack, and two more deputies entered the hallway and

20   began to kick the motionless inmate. One deputy stomped on the inmate's back.

21   Those deputies who had noticed Chaplain Juarez motioned to the other deputies to

22   alert them to his presence.

23        143.   At the end of the beating there was a puddle of blood some two

24   feet in diameter around the inmate's head. Chaplain Juarez was overwhelmed with

25   fear, worried deputies would harm him. Several eyed him in a threatening way.

26   Some said "rat" and "motherfucker" when he passed them in the jail over the next

27   few days.

28

-44-                    COMPLAINT FOR INJUNCTIVE RELIEF

1    144.   Chaplain Juarez wrote a detailed report of the incident, which he

2    gave to a sergeant and his supervisor at the archdiocese, and he was interviewed by

3    the LASD.  Two years passed before he heard anything from the LASD about the

4    beating.  In a June 2011 meeting among employees of the archdiocese and

5    personnel from OIR, Chaplain Juarez was told that the case had been resolved

6    internally, and that news of the beating had never reached Sheriff Baca.  After the

7    meeting with OIR, a representative of Sheriff Baca's office contacted the Catholic

8    chaplains to set up a meeting with the Sheriff.

9    145.   In July 2011, Sheriff Baca told Chaplain Juarez that the detailed

10   report Chaplain Juarez had written and delivered to the LASD was not included in

11   the LASD's file on the incident.  The file that Sheriff Baca read aloud from

12   described Chaplain Juarez as "exaggerating" the details of the beating.  The

13   description of the attack in the LASD file from which Sheriff Baca read aloud

14   seemed to describe a totally different incident from the one Chaplain Juarez had

15   witnessed:  the file said the inmate was schizophrenic and that deputies had to strike

16   him a few times with their fists to get him into his cell.  Sheriff Baca seemed

17   unconcerned, stating simply that "punches are allowed but kicks are not allowed in

18   my department."

19   146.   In February 2011, another Jail Chaplain, Chaplain Doe, was

20   walking towards the chaplain's office on the third floor of Men's Central Jail, when

21   he saw four or five deputies repeatedly kicking an inmate.  The inmate lay

22   motionless, face-down on the ground.  His hands appeared to be tucked behind his

23   back, where they remained throughout the attack.  The inmate pleaded with the

24   deputies to stop, yelling, "Help me!"  After the deputies continuously kicked the

25   inmate for between two and three minutes, the deputies ordered Chaplain Doe to

26   leave the scene.  Chaplain Doe was afraid that if he tried to stop the beating or even

27   asked the deputies to stop, they would hurt him.  Although Chaplain Doe could no

28   longer see the beating at this point, he could still hear the "thumping" sounds of the

-45-        COMPLAINT FOR INJUNCTIVE RELIEF

1    deputies kicking the inmate, and the inmate's cries for help. Eventually the inmate

2    fell silent but the kicks continued for about another minute. Neither LASD nor the

3    OIR ever questioned Chaplain Doe about the incident, even though a sergeant and

4    numerous deputies were aware that he was an eyewitness to the beating.

5        147.   On January 24, 2011, Esther Lim, the ACLU Jails Project

6    Coordinator, witnessed the savage beating of an immobile, seemingly unconscious

7    inmate in Twin Towers. At the time, Ms. Lim was meeting with another inmate in

8    the facility's attorney room. When she heard what sounded like a fight in the

9    Staging Area, she looked through the windows dividing the attorney room and the

10   Staging Area and saw the attack in progress. Deputies Ochoa and Hirsch

11   repeatedly punched and kneed an inmate who lay face-down and inert on the floor.

12   The inmate was so still that Ms. Lim thought he looked like "a mannequin that was

13   being used as a punching bag." But the deputies persisted in their attack, with one

14   of them shocking the inmate again and again with a taser gun. Although the inmate

15   never moved from his spot on the ground, the deputies repeatedly yelled, "Stop

16   fighting!" and "Stop resisting!"

17       148.   Scott Budnick, a civilian volunteer who mentors young inmates,

18   witnessed five deputy-on-inmate beatings at Men's Central Jail over a three-year

19   period.

20       149.   In early 2007, Mr. Budnick witnessed an incident in which

21   approximately seven deputies used a taser gun repeatedly on an inmate who was

22   lying on the ground motionless. When Mr. Budnick told a deputy what he had

23   seen, the deputy replied, "Yeah, we fuck these guys up all the time."

24       150.   In 2008, while Mr. Budnick waited outside the classroom where

25   he taught inmates, he saw a deputy pull an inmate out of a line, strip search him in

26   full view of numerous people, and then smash his head into the wall with such force

27   that Mr. Budnick heard a loud crack. The inmate had not attacked or threatened the

28   deputy in any way before the attack.

COMPLAINT FOR INJUNCTIVE RELIEF

151.   In December 2008, again while standing outside his classroom, Mr. Budnick saw three deputies stop and strip search an inmate who was walking down the hall.  The deputies forcefully twisted the inmate's arm behind his back and shoved him to the ground.  The inmate had not attacked or threatened the deputies in any way.

152.   In or about July 2009, Mr. Budnick saw several deputies taunt an inmate who asked them for directions to the inmate's module.  The deputies then twisted the inmate's arm behind his back, grabbed the inmate's head and put it against the wall, and then pushed the inmate's face into the wall.

153.   In 2009, Mr. Budnick witnessed three deputies kicking and punching an inmate.  When the inmate fell down, the deputies continued attacking him while he lay on the floor.  The deputies repeatedly yelled "Stop resisting!" – even though Mr. Budnick could see that the inmate was not moving, much less resisting.

154.   Several chaplains cautioned Mr. Budnick not to report one incident of abuse that he witnessed, telling him that if he reported the incident, he would no longer be allowed to volunteer.  The chaplains said that they refrained from reporting incidents of abuse out of fear of losing their jobs.  Several civilians also said that they were afraid to intervene in the deputy-on-inmate attacks they witnessed, for fear if they tried to stop the attacks, deputies would assault them.

155.   Mr. Budnick did report the July 2009 incident to Sergeant Renfro, who promised to "get into this immediately."  Mr. Budnick, however, was never interviewed about what he had observed.  He never heard back from the sergeant, or anyone else at the LASD or OIR, about an investigation into his allegations of deputy violence.

COMPLAINT FOR INJUNCTIVE RELIEF

1      **I.**    <u>**The Pattern Of Deputy-On-Inmate Violence In The Jails Has Been**</u>

2                 <u>**Ongoing For At Least A Dozen Years**</u>

3          156.   In July 2009, after Phillip Westby got into an argument with

4  another inmate in Twin Towers, deputies pulled him out of his cell and slammed

5  his head into the wall.  Deputy O'Hardy handcuffed Mr. Westby and then slammed

6  his head into the wall two more times.  Deputies O'Hardy and Sandoval then led

7  Mr. Westby into the Outdoor Recreation area where they repeatedly punched him in

8  the head, neck, and back, and then threw him to the ground.  Mr. Westby worried

9  that his ribs were broken, but did not seek medical help because he feared

10  retaliation from the deputies.  It took Mr. Westby's bruises almost two weeks to

11  heal.

12          157.   In October 2008, Deputy Cinderelli handcuffed Drequinn

13  Johnson to transport him to a legal visit.  Deputy Cinderelli stopped Mr. Johnson in

14  the hallway, near Deputy Grant, who was considered a "rookie" deputy.  Deputy

15  Cinderelli said to Deputy Grant, "This is training, this is when you get your first

16  force," meaning his first use of force incident.  Deputy Cinderelli then shoved

17  Mr. Johnson against the wall and began punching him.  Mr. Johnson, who was still

18  handcuffed, fell to the ground, and Deputy Grant joined Deputy Cinderelli in

19  punching and kicking him.  Two other deputies came over and joined the melee.

20  The deputies shot Mr. Johnson with a taser twice in the arm.  After the incident,

21  Mr. Johnson was unable to see out of his left eye for about two weeks.  When

22  deputies interviewed Mr. Johnson about the incident, he said he did not remember

23  what had happened, because he was afraid the deputies would hurt him again.

24          158.   In February 2008, after Peter Johnson, who uses a wheelchair,

25  complained about jail conditions, Deputies Ochoa, Reynoso, and Saldivar pulled

26  him off his bed and kicked and kneed his ribs, back, and neck.  The deputies later

27  shot pepper spray into Mr. Johnson's face and caused him to fall out of his

28  wheelchair.  The assault occurred in the wheelchair module in Men's Central Jail.

COMPLAINT FOR INJUNCTIVE RELIEF

159.   On or about December 30, 2007, a deputy repeatedly slammed Robert Powell's head into the wall, scratching and bruising his forehead, and left him outside in the cold.  At the time, Mr. Powell was 58 years old.

160.   In June 2006, a deputy assaulted and raped Frank Mendoza, a gay inmate, in Twin Towers.  Earlier in the day, the same deputy was escorting a line of inmates including Mr. Mendoza and said to them "you all walk like girls." When Mr. Mendoza said to another inmate in the line, "There's a male who's unsure of his masculinity," the deputy grabbed Mr. Mendoza, shoved him against the wall, and threatened him stating, "You better watch it.  I will show you my masculinity.  I will come get you." Later that day, when the inmates returned to their pod, Mr. Mendoza's cell door was left open.  Shortly after the deputy in the tower outside the pod left his post, the deputy who had previously threatened Mr. Mendoza forced him into his cell, tore off his clothes, threw him to the ground, shoved a gag in his mouth and raped him.  After the rape was over, Mr. Mendoza lay shivering and naked in his cell until another deputy found him and asked what had happened.  After Mr. Mendoza reported that he had been raped, the deputy responded, "I do not see anything wrong with you." No LASD personnel interviewed Mr. Mendoza about the incident or took any forensic evidence to investigate whether he had been raped.  Mr. Mendoza had been arrested for public drunkenness and was being held in LA County jail on a warrant for failure to appear that later proved to have been issued in error.

161.   Mario Rocha is a 31 year old who is now pursuing his B.A. at George Washington University in Washington, D.C.  On October 10, 2003, he was in jail on a charge that ultimately resulted in a reversed conviction.  Mr. Rocha was in a holding cell being processed for entry into the jail, when he observed a man in his late 50's or early 60's, who appeared to be mentally ill, on his hands and knees. Mr. Rocha saw a deputy race over, kick the man in the head, and start punching him.  Almost immediately, about four or five other deputies came over and joined

-49-        COMPLAINT FOR INJUNCTIVE RELIEF

1  in the assault, punching, stomping, and kicking the man while he lay on his

2  stomach on the floor, not resisting and not even trying to shield himself from the

3  deputies' blows.  The assault left the man bleeding from his face and the top of his

4  head, with one of his eyes swollen shut.

5      **J.**    **Victims Of Deputy Abuse Experience Intimidation And**

6            **Retaliation**

7        162.  There is a widespread fear among inmates at Men's Central Jail

8  and Twin Towers of reporting deputy misdeeds to the ACLU, or anyone else,

9  because deputies regularly retaliate against those who lodge complaints.  When

10  inmates complain about mistreatment, deputies respond with punishment:  strip

11  searches, body cavity searches, destructive cell shake-downs, confiscation of their

12  belongings, or solitary confinement.  If inmates complain of being beaten, the

13  Sheriff's Department will likely bring false disciplinary charges against them for

14  assault against the deputies who beat them, and in some cases hand them over for

15  criminal prosecution on the bogus charges.

16        163.  In March 2011, after Mr. U told a nurse that a deputy had earlier

17  refused to take him to his medical appointment, the deputy said to Mr. U, "I can

18  make it that you slip in the shower next time and need serious medical attention."

19        164.  In January 2011, two deputies verbally and physically assaulted

20  Shawn Meyers in an elevator for his interactions with ACLU representatives.  The

21  deputies slammed Mr. Meyers, who uses a wheelchair, against the wall, and said,

22  "That's your warning."

23        165.  In January 2011, Deputy Carbajal overheard inmate Mani Sadri

24  complain about being threatened by another deputy.  Deputy Carbajal warned

25  Mr. Sadri not to complain any more to ACLU, and threatened to have other inmates

26  kill him.  Deputy Carbajal said, "Don't complain to anyone if you want to make it

27  out of here alive."

28

    COMPLAINT FOR INJUNCTIVE RELIEF

1     166.   In November and December 2010, in the Twin Towers, deputies

2   repeatedly threatened Mr. V, whose criminal case had received extensive media

3   coverage.  On one occasion, a module officer refused to give Mr. V a blanket,

4   saying he did not "give them to murderers."  Another deputy told him, "[S]o you're

5   [Mr. V].  I can't wait to get you to my floor."  When Mr. V was transferred to

6   Men's Central Jail, Deputies Ibarra and another deputy repeatedly asked him what

7   he was in jail for, and punched his ribs until he answered.  They called Mr. V a

8   "piece of shit," told him he would not receive basic necessities such as food, and

9   said they would turn him over "to the Southsiders," which Mr. V understood as a

10   threat to turn him over to the Southsiders gang.  Deputy Ibarra told him not to

11   complain about the incident, or the deputy would "go in your cell and beat you up

12   personally."

13     167.   In June 2010, after Robert Dragusica spoke with the ACLU

14   about violence inside Men's Central Jail, deputies began threatening and

15   intimidating him.  The behavior of the deputies caused Mr. Dragusica to refuse two

16   opportunities to speak with the ACLU again, because he was scared of what the

17   deputies might do.  After eventually speaking with the ACLU a second time,

18   deputies sent Mr. Dragusica to disciplinary segregation for a fabricated contraband

19   charge.

20     168.   Deputies sent another inmate to beat Emmanuel Benson in

21   May 2009, after he reported that a guard had assaulted him the day before.  A

22   deputy opened the door to Mr. Benson's cell in Men's Central Jail and allowed the

23   other inmate to enter.  The inmate punched Mr. Benson twice in the face and told

24   him he was sent because Mr. Benson reported the deputy's attack.  Mr. Benson did

25   not request medical treatment in fear of further retaliation.

26     169.   In March 2009, deputies severely beat Daysuan Rushing in

27   retaliation for his speaking to the ACLU.  After Mr. Rushing spoke with an ACLU

28   representative who visited his row, deputies delayed him as he returned from a

COMPLAINT FOR INJUNCTIVE RELIEF

1    court appearance.  Mr. Rushing, who was restrained in waist chains, was forced up

2    against a wall with his legs spread.  Deputy Zuniga slapped the back of his head

3    twice and then kicked Mr. Rushing's leg, causing him to fall to the ground.  Deputy

4    Zuniga and another officer began punching and kicking Mr. Rushing, and hit him

5    repeatedly in the face and knees with a flashlight.  The deputies then pepper

6    sprayed Mr. Rushing in the face and threw him down a flight of stairs.  While

7    Mr. Rushing was laying on the ground bleeding, Deputy Zuniga said, "You fucking

8    whiners, tell this to the ACLU, I dare you."  As a result of the beating, Mr. Rushing

9    received stitches on both sides of his face.

10           170.   Deputies beat Mr. W in Men's Central Jail and he was

11   subsequently refused pain medication that he was supposed to receive, because he

12   had complained to the ACLU.

13           171.   Defendants Sheriff Baca and Chief Burns have long been aware

14   of the Department's practice of retaliating against inmates, including a pattern of

15   arresting the victims of staff beatings and initiating their prosecution for assault,

16   without any meaningful internal investigation of the facts surrounding the incident.

17   In 2010, the ACLU filed in *Rutherford* a motion for a protective order asking that

18   Defendants and their agents be enjoined from retaliating against inmates for

19   speaking with the ACLU.  That motion was accompanied by numerous declarations

20   attesting to incidents of retaliation, including retaliation in the form of physical

21   abuse.  Despite this knowledge, Defendants have denied that retaliation is a

22   significant problem and have failed to adequately investigate the problem.  Instead,

23   they have tolerated and encouraged staff to continue to arrest and request

24   prosecution of inmates beaten in the jails.  Their continued acquiescence in this

25   practice manifests deliberate indifference toward the rights of the Plaintiffs and all

26   other inmates in the Jails.

27           172.   In a November 2010 declaration, Chief Burns made a

28   categorical statement under oath that "every allegation of retaliation" that the

-52-          COMPLAINT FOR INJUNCTIVE RELIEF

1    ACLU had brought to LASD's attention that the Department had investigated "has

2    been determined to be **without merit**. ... [T]he Department takes allegations of

3    retaliation and other deputy misconduct extremely seriously and such claims are

4    always thoroughly investigated."[41]  On information and belief, this statement was

5    false and Chief Burns knew it was false at the time he made it.

6           173.   On information and belief, Plaintiffs allege that Undersheriff

7    Tanaka is also aware of this pattern of retaliation.

8           174.   In its October 2011 report, the OIR stated that expectations that

9    custody personnel will not engage in retaliation and the use of excessive force is not

10   "consistently reinforced up the chain of command":

11                 "[T]he key to preventing questionable force incidents and

12                 ensuring the fair treatment of inmates is in the hands of

13                 line-level supervisors.  If sergeants do not actively engage

14                 with those they supervise, deputies and custody assistants

15                 too  easily  can  lose  sight  of  the  expectations  the

16                 Department places on them and engage in the type of

17                 abusive, retaliatory conduct inmates frequently complain

18                 of.    The Department has not always staffed the jails

19                 sufficiently to provide the necessary level of supervisory

20                 involvement,  and  its  expectation  of  sergeants  is  not

21                 consistently reinforced up the chain of command.[42]

22   **K.**    **Supervisory Officials Have Condoned A Pattern Of Inadequate**

23          **Investigations And Cover-Ups**

24          175.   The LASD brushes aside most inmate reports of violence.  The

25   Department's apparent indifference to such complaints gives deputies a sense of

---

[41] Decl. of Chief Dennis Burns, Nov. 5, 2010, at ¶ 3, filed in *Rutherford v. Baca*,
75-cv-04111-DDP, 2006 WL 3065781 (C.D. Cal. 2006) (No. 245) (emphasis in
original).
[42] Los Angeles County Office of Independent Review, *supra* note 31, at 10.

COMPLAINT FOR INJUNCTIVE RELIEF

1    unchecked autonomy in the way they perform their jobs.  Incidents of deputy-on-

2    inmate violence, after nominal or no investigation by LASD, are routinely reported

3    by deputies as an unprovoked inmate-on-deputy assault, and if an inmate complains

4    of being beaten or injured by jail deputies, those complaints are almost universally

5    declared unfounded.  Most of these complaints get "resolved" at the lowest levels in

6    the LASD.  Proper reporting procedures are routinely ignored.

7         176.   Corrections expert Toni V. Bair reviewed the investigative

8    procedures and policies of the Los Angeles County Jails and found them to be

9    "grossly substandard."[43]  For example, during the investigation of Use of Force

10   incidents the supervisor of the attacking deputies often interviews the inmate

11   victim, rather than an independent supervisor.[44]

12         177.   This practice is permitted by LASD policy, even though it is

13   considered unacceptable and unprofessional by corrections experts.

14         178.   Moreover, LASD sergeants and lieutenants often permit the very

15   officers accused of assault to be present during the interview of the inmate for the

16   use of force investigation, a tactic that has the purpose and effect of intimidating the

17   inmate and impacting his testimony.  *See, e.g.,* the August 2009 incident with

18   inmate Gordon Grbavac, discussed in Paragraph 90 above.  Mr. Bair declared that

19   this practice is "unheard of in professionally conducted investigations and

20   interviews," and stated that "It is no wonder that the prisoner frequently ... alters

21   his story so as not to implicate the officer(s) involved in the incident."[45]

22         179.   Even though permitting a deputy who was involved in a force

23   incident with an inmate to be present during the interview of the inmate is grossly

24   unprofessional, LASD policy did not forbid this practice until the ACLU's 2011

25

26

27   [43] Decl. of Toni V. Bair, Sept. 27, 2011, at 3, filed in *Rutherford v. Baca*, 75-cv-04111-DDP, 2006 WL 3065781 (C.D. Cal. 2006) (No. 294-13).
     [44] Id. ¶ 12.
28   [45] Id. ¶ 16.

1   report revealed how frequently involved deputies were present during inmate

2   interviews.

3          180.   The *Los Angeles Times* recently reported that according to an

4   internal LASD memorandum, deputies were "were crafting narratives 'dramatized

5   to justify' force and delaying using weapons such as pepper spray that could end

6   fights 'to dispense appropriate jailhouse justice.'"[46]

7          181.   In 2011, a correctional expert in an inmate's excessive force

8   case against Sheriff Baca noted both false reports by deputies and the complete

9   absence of an after-the-fact review of a serial cell extraction in Men's Central Jail,

10   in which deputies injured a number of inmates.[47]  The report stated, among other

11   things, that with respect to the deputies' documentation of the use of force, "some

12   crucial reports are missing, others are substantially incomplete and still other

13   reports are inaccurate or false."[48]  In addition, the report stated:  "One of the most

14   disturbing aspects of this incident is that there was apparently not so much as a

15   cursory review of the situation, let alone a serious investigation" by supervisors of

16   what led to the disturbance on the cell block and the response that culminated in the

17   serial cell extractions.[49]

18          182.   In its 2011 report, the OIR stated "too often we have found" that

19   "the investigations of force incidents that result in less serious or no apparent

20   injuries to the inmate" are "lackluster, sometimes slanted, and insufficiently

21   thorough."[50]

22

23

---

24   [46] Robert Faturechi & Jack Leonard, *Sheriff Baca Was Warned about Jail Deputies*

25   *Conduct, Retiree Says*, Los Angeles Times, Dec. 1, 2011, *available at*
http://articles.latimes.com/2011/dec/01/local/la-me-jail-commander-20111201-1

26   [hereinafter *Sheriff Baca Was Warned*].
[47] Expert Report of Jeffrey Schwartz, Feb. 8, 2011, filed in *Ramirez v. Baca*, CV08-

27   2813-DSF (C.D. Cal.) (No. 118).
[48] Id. at 15.

28   [49] Id. at 20.
[50] Los Angeles County Office of Independent Review, *supra* note 31, at 4.

      COMPLAINT FOR INJUNCTIVE RELIEF

183.   Former FBI Executive Thomas Parker concluded that there are "systemic institutional actions to cover [] up" the longstanding pattern of unchecked deputy-on-inmate violence at the jails.

184.   The institutional cover-ups often take the form of filing criminal charges against inmate victims of deputy violence.  The odds are low of an inmate winning an acquittal against the sworn testimony of deputy witnesses.  A criminal conviction of the inmate for his "assault" on the deputy – in reality, the deputy's assault on the inmate – results in a complete immunization of the deputy assailants and the Department for from civil liability for the assault.

185.   In January 2011, James Parker, an inmate whom ACLU Jails Project Coordinator Esther Lim witnessed being brutally beaten and tasered by Deputies Ochoa and Hirsch, was subsequently charged with battery against a peace officer and resisting a peace officer.  For additional examples of trumped-up charges filed against victims of deputy abuse, *see, e.g.,* Paragraphs 54 – 60 (Macario Garcia), 115 (Mr. M), and 125 (Evan Tutt) above.

186.   The Department has even charged *visitors* to the Jails in this fashion.  As discussed in Paragraph 69, Gabriel Carillo was assaulted by deputies while visiting his brother in Men's Central Jail in February 2011.  In April, 2001, he was charged with resisting and officer and battery.[51]  The District Attorney later dismissed the charges against him after the ACLU issued its 2011 Annual Report and the *Los Angeles Times* revealed that the FBI was investigating deputy-on-inmate abuse in the jails.

187.   In contrast, LASD frequently chooses not to forward to the District Attorney information about deputies who have been disciplined or even terminated for using excessive force against inmates.  As the *Los Angeles Times* reported: "In several cases in recent years, deputies who were disciplined or even

---

[51] *The People v. Gabriel M. Carillo*, BA381607 (Los Angeles County Superior Court).

COMPLAINT FOR INJUNCTIVE RELIEF

1   fired for abusing inmates escaped criminal scrutiny because Sheriff's Department

2   officials chose not to give the evidence to the district attorney's office, opting to

3   handle the cases internally."[52]

### L. Defendants Have Actual Knowledge Of Deputy Violence And Have Failed To Take Reasonable Measures To Avert It

6       188.   Rampant violence at the Jails has resulted from a failure of

7   leadership at the top level of the Department.  Such a pervasive, deeply-entrenched,

8   and notorious pattern of excessive force could not have continued unabated over a

9   period of many years without a code of silence on the part of front-line and

10   supervisory staff, combined with management staff's failure to require

11   accountability, and their engaging in outright cover-up.[53]

12       189.   Despite overwhelming evidence of the culture of deputy-on-

13   inmate violence, Sheriff Baca, Undersheriff Tanaka, and Chief Burns have

14   stubbornly refused to acknowledge the problem.  They and their spokespeople have

15   publicly taken the position that victims' allegations have been investigated

16   thoroughly and found to be false, and they have attacked the credibility of civilian

17   witnesses to deputy violence.  On information and belief, they have routinely

18   dismissed inmates' complaints of staff beatings, even when the deputies allegedly

19   involved had failed to report a use of force and the inmate was seriously injured;

20   when the inmate's injuries were obviously more serious than the staff accounts of

21   their actions would suggest; and when the same deputies reported essentially the

22   same scenarios over and over to describe incidents in which different inmates were

23   injured.

---

[52] Jack Leonard & Robert Faturechi, *D.A. in the Dark on Jail Probes*, Los Angeles Times, Dec. 4, 2011, *available at* http://articles.latimes.com/2011/dec/04/local/la-me-jails-da-20111205.

[53] "The only way in which an established pattern of inappropriate use of force can be maintained is through a combination of a code of silence on the part of front-line and supervisory staff and a management staff posture of lack of accountability or outright cover-up." Jeffrey A. Schwartz, *Fixing Use-of-Force Problems*, American Jails (2010).

-57-         COMPLAINT FOR INJUNCTIVE RELIEF

1     190.   Sheriff Baca has failed or refused to hold accountable high-

2     ranking supervisors in the face of significant nonfeasance and malfeasance by these

3     supervisors and by the officers they oversee.  Both Chief of Custody Operations

4     Burns and Undersheriff Tanaka remain in the positions they held, or have been

5     promoted, despite the epidemic of deputy on inmate abuse in the jails that Sheriff

6     Baca is aware occurred over the past years.

7     191.   With rare exception, deputies whose misconduct is brought to

8     the attention of supervisory personnel continue to work with inmates in

9     Department-operated jails without any substantial disciplinary action being taken

10    against them.

11    192.   The fact that physical abuse by officers remains unchecked and

12    unrestrained leads the staff to believe that inmates may be beaten with impunity.

13    Sheriff Baca's actions and omissions have created the perception among high-

14    ranking supervisors in the Sheriff's Department that a supervisor who turns a blind

15    eye towards evidence of staff misuse of force and fails to investigate incidents in

16    which inmates are injured by staff will suffer no damage to his or her career.

17    193.   In September 2011, the release of the ACLU's annual report on

18    the Los Angeles County Jails, detailing some seventy recent instances of extreme

19    deputy violence against inmates and other serious abuse of inmates, and press

20    reports of an FBI probe involving deputy violence in the Jails, set off a media

21    storm.  Sheriff Baca responded by dismissing any possibility of a systemic problem,

22    and with wildly inconsistent and self-serving statements about his lack of

23    awareness of the problem.

24    194.   Sheriff Baca first flatly denied the existence of a systemic

25    problem.  Nicole Nishida, one of the sheriff's spokespersons, said that the

26    department thoroughly investigated all complaints of abuse that it received and that

27    most were unsubstantiated.[54]

28    _____
      [54] Jennifer Medina, *Report Details Wide Abuse in Los Angeles Jail System*, N.Y.

-58-                          COMPLAINT FOR INJUNCTIVE RELIEF

195.   As public criticism of Sheriff Baca continued to mount, and new allegations surfaced, the Sheriff acknowledged there were widespread problem but claimed that he had not been aware of its existence. As reported on October 10, 2011, Defendant Baca stated: "We are going to look into this and we welcome anyone to look into it as well." He contended that "[t]he widespread problem can't be defined until we know what all the issues are."[55]

196.   On October 16, 2011, the Sheriff told the *Los Angeles Times* that his command staff occasionally left him in the dark about the Jails' problems. "I wasn't ignoring the jails. I just didn't know," Baca said. "People can say, 'What the hell kind of leader is that?' The truth is I should've known. So now I do know."[56]

197.   Finally, in early December 2011, it came to light that Sheriff Baca and other senior officials in LASD had in fact known of the pattern of widespread deputy violence in the Jails for years. Robert Olmsted, a retired top LASD official with supervisory authority over Men's Central Jail, had repeatedly informed Sheriff Baca of such problems. The *Los Angeles Times* reported on December 1:

> A top commander in Los Angeles County's jail system said he warned Sheriff Lee Baca and other senior officials last year about deputies using excessive force against inmates but was ignored until the problems grew into a public scandal.
>
> In an interview with The Times, Robert Olmsted said he

Times, Sept. 28, 2011, *available at* http://www.nytimes.com/2011/09/28/us/aclu-suit-details-wide-abuse-in-los-angeles-jail-system.html?_r=1&pagewanted=all.
[55] Jennifer Medina, *Pressed, Sheriff Agrees to Jails Inquiry*, N.Y. Times, Oct. 10, 2011, *available at* http://www.nytimes.com/2011/10/11/us/pressed-sheriff-agrees-to-abuse-inquiry.html?_r=1&scp=1&sq=margaret%20winter%20aclu&st=cse.
[56] Jack Leonard & Robert Faturechi, *Baca Says He Was out of Touch with County's Jails*, Los Angeles Times, Oct. 16, 2011, *available at* http://www.latimes.com/news/local/la-me-baca-jails-20111016,0,5570416.story [hereinafter *Baca Says He Was out of Touch*].

-59-                        COMPLAINT FOR INJUNCTIVE RELIEF

1    tried to raise red flags about shoddy investigations that
2    allowed deputies to escape scrutiny for using force.  He
3    also voiced concern about deputies forming aggressive
4    cliques.

5    He alleged that two top officials rebuffed him, telling him
6    it was impossible to change the deputy culture in the
7    downtown L.A. lockup, an antiquated facility that houses
8    some of the county's most dangerous inmates.

9    Olmsted, a 32-year department veteran who retired late
10   last year, had commissioned several confidential audits
11   and internal memos that found serious problems with
12   excessive force and inadequate supervision in the jail.  He
13   said top sheriff's officials seemed not to take his concerns
14   seriously.

15   ...

16   "It's frustrating knowing that this never, ever needed to
17   have occurred," Olmsted said.  "There was a systematic
18   failure of leadership."

19   ...

20   Olmsted said he twice approached Baca to discuss the
21   problems at Men's Central Jail.  The first time was at a
22   department barbecue.  Baca, he said, told him he would
23   be in touch but never followed up.

24   Months later, Olmsted said, he spoke to the sheriff at a
25   charity food giveaway.  The event occurred soon after a
26   group of Men's Central Jail deputies had been caught
27   fighting each other at an off-duty, department holiday
28   party.  After the brawl, sheriff's officials said some of the

-60-          COMPLAINT FOR INJUNCTIVE RELIEF

1        deputies had formed a clique whose members flashed

2        gang-like hand signs.

3        Olmsted said he told the sheriff he wanted to discuss how

4        to improve supervision at the jail to prevent similar

5        problems in the future. Baca, he said, agreed to talk but

6        again never followed through.[57]

7        198. Commander Olmsted raised the issue of unchecked violence not

8 only with Defendant Baca but also with Defendants Burns and Tanaka:

9        Burns, he said, told him the jail's culture could not be

10       changed. Frustrated, Olmsted said he took his concerns in

11       the summer of 2010 to Asst. Sheriff Marvin O.

12       Cavanaugh, who was sympathetic but told him the same

13       thing. He also spoke to then-Asst. Sheriff Paul Tanaka,

14       who as undersheriff now runs the day-to-day operations

15       of the department.[58]

16       199. Witness LA reported: "In a series of interviews with the *LA*

17 *Justice Report*, Olmsted [stated] ... '[T]he real problem is how departmental

18 leadership allowed this jail situation to occur.'" "The problems inside the jail were

19 ignored by the Sheriff's command staff. I went to [Custody Chief Dennis] Burns,

20 [Undersheriff Paul] Tanaka. And I went to Lee Baca. I told them I needed help

21 trying to corral this situation and I was ignored."[59]

22       200. Commander Olmsted also found, as early as 2009, that reported

23 use of force was not being properly investigated and the official paperwork

24

25

---

26 [57] *Sheriff Baca Was Warned, supra* note 42.
[58] Id.

27 [59] Matthew Fleischer, *Dangerous Jails, Part 2: Ignoring the Warnings*, WitnessLA, Dec. 1, 2011, *available at* http://witnessla.com/sheriff-lee-

28 baca/2011/admin/dangerous-jails-part-2-ignoring-the-warnings-by-matt-fleischer/ (emphasis omitted).

    COMPLAINT FOR INJUNCTIVE RELIEF

1   reporting incidents of deputy force at Men's Central Jail – the so-called "use of

2   force packets" – were not being properly prepared:

3          201.   Olmsted found that, not only were many force packages not

4   being investigated, the ones that were cleared were often given only cursory

5   examination. Olmsted had one of his lieutenants pull 30 force reports at random

6   that were in various stages of oversight. A second lietenant [sic], Mark McCorkle,

7   analyzed them. All were either signed off on, or were on the verge of being

8   cleared. Yet of that group of 30, 18 uses of force were questionable in nature and

9   conceivably fell outside of department policy.[60] Commander Olmsted raised the

10  issue of inadequate investigations of use of force with command staff, including

11  Defendants Burns and Tanaka – all of whom ignored the issue. Olmsted took

12  McCorkle's finding regarding inadequate use of force investigations up the chain of

13  command to Custody Chief Dennis Burns, Assistant Sheriff in charge of custody,

14  Marvin Cavanaugh, and Paul Tanaka. No action was taken.[61]

15         202.   In response to these latest revelations from Commander

16  Olmsted, Sheriff Baca, rather than accepting responsibility, publicly laid the blame

17  on Commander Olmsted for not solving the problem. Commander Olmsted didn't

18  need to "ask permission to solve the problem," Baca said.[62] The *Los Angeles Times*

19  commented, on December 2, 2011:

20                 Never mind that a quasi-military organization like the

21                 Sheriff's Department is all about following the chain of

22                 command.  Or that Baca is trying to have it both ways,

23                 suggesting that his command staff failed him by shielding

24                 him from the truth, and at the same time blaming Olmsted

25                 for not taking care of the problem on his own.

26                 How many times can Baca plead ignorance?  This is just

27  ───────────────
    [60] Id.
    [61] Id.
28  [62] *Sheriff Baca Was Warned, supra* note 42.

COMPLAINT FOR INJUNCTIVE RELIEF

1          the latest in a series of objectionable responses that calls

2          into question whether he is capable of running, let alone

3          reforming, the nation's largest jail system.[63]

4          203.   According to Commander Olmsted, when he took the evidence

5   of inadequate investigations of use of force incidents to Chief Burns, Chief Burns

6   did not deny there was a problem, but told Olmsted that the jail's culture could not

7   be changed.[64]

8          204.   Despite their knowledge of the serious problem of improper and

9   excessive use of force in the jails, Defendants have repeatedly failed to take

10  reasonable steps to address the problem.

11         205.   Defendants have failed to put in place adequate policies

12  governing use of force.  The Department's policies are grossly lacking in specificity

13  about typical force scenarios that are likely to arise in the jails and the proper way

14  for custody personnel to handle those situations.

15         206.   The force policies remain severely inadequate even after the few

16  changes to force policies that the Defendants have implemented since the release of

17  the ACLU's 2011 report.

18         207.   The insufficiency of the force policies makes it almost

19  impossible to train deputies adequately on the proper use of force.

20         208.   Sheriff Baca has failed to install cameras in Twin Towers and

21  Men's Central Jail, even though he has stated as far back as 2005 that he planned to

22  install security cameras in Men's Central Jail.[65]  In 2011, after the ACLU released

23  its Annual Report on abuse in the jails, Sheriff Baca admitted that scores of cameras

24

25
_____

26  [63] Editorial, *Baca's Jails Are Baca's Problem:  Sheriff Lee Baca Should Stop Blaming Others and Take Responsibility for Fixing L.A. County's Jails*, Los Angeles Times, Dec. 2, 2011, *available at*

27  http://articles.latimes.com/2011/dec/02/opinion/la-ed-baca-20111202.
[64] *Sheriff Baca Was Warned*, *supra* note 42.

28  [65] *L.A. Jail Called Deadly, Outdated*, *supra* note 19.

COMPLAINT FOR INJUNCTIVE RELIEF

1    that were supposed to have been installed in Men's Central Jail had been sitting in

2    boxes for a year or more.[66]

3              209.  Sheriff Baca, Undersheriff Tanaka, and Chief Burns have failed

4    to implement a system for identifying, logging, and tracking incidents of use of

5    force by deputies and complaints by inmates of use of force by deputies in the LA

6    County jail.

7              210.  For the past five years, the Los Angeles Police Department has

8    had a computerized system, TEEMS II, capable of both tracking use of force

9    information and providing early warning by identifying officers involved in

10   multiple use of force incidents.  Even though LAPD and numerous other law

11   enforcement agencies have such tracking and early warning systems, on

12   information and belief, Defendants either have not designed their Facility

13   Automated Tracking System (F.A.S.T.) or Personnel Performance Index to perform

14   this function for deputies working in the Custody Division, or they have failed to

15   obtain this information from one or both systems, to reduce the number of incidents

16   of excessive or unnecessary use of force in the Jails.  Nor have they created a

17   system that tracks inmate complaints about use of force by deputies in the jails.

18             211.  Defendant Burns has been and is aware of the failures of the

19   Department's tracking systems.  When the ACLU sought a court order in 2010

20   requiring that complaints of retaliation, including identifying the officer(s) who are

21   the subject of such allegations be tracked in F.A.S.T., Chief Burns submitted a

22   sworn declaration to the Court stating, "the FAST was not designed properly to

23   track information about deputy misconduct."

24             212.  A tracking system of this kind is a basic tool for ensuring that all

25   incidents of use of force are properly reviewed and investigated and are commonly

26   used by large jail systems.  The lack of such a system makes it difficult to compile

27

28   [66] *Baca Says He Was out of Touch, supra* note 52.

-64-                    COMPLAINT FOR INJUNCTIVE RELIEF

1  the essential data to detect and address problematic patterns of use of force as they

2  develop.

3        213.  Defendants Baca, Tanaka, and Burns have failed to develop and

4  implement a policy of zero tolerance for deputy violence and abuse of inmates.

5  Then-Assistant Sheriff Tanaka was informed as far back as 2006 by the Captain of

6  Men's Central Jail that there was a problem with improper use of force by deputies

7  at Men's Central Jail.  At that time, Captain Clark also expressed concern about

8  deputy gangs in the jail to Tanaka.  When Captain Clark proposed to set up a

9  rotation system to attempt to break up the deputy gangs, Tanaka transferred Clark

10  out of Men's Central Jail.

11        214.  When Assistant Sheriff Tanaka informed Mr. Olmsted that he

12  was being made the Captain in charge of Men's Central Jail, Tanaka told Olmsted

13  that use of force was a problem in the jail.

14        215.  When Sheriff Baca promoted Olmsted to Commander in the

15  Custody Division, then Assistant Sheriff Tanaka arranged for Dan Cruz to become

16  the Captain at MCJ, even though it was well-known within the LASD that Cruz had

17  been transferred out of the Lennox Station for being about 18 months behind on his

18  paperwork, including his review of use-of-force complaints.  Tanaka nonetheless

19  placed him in a facility where he knew there were problems with use of force.

20        216.  Although Defendants have been repeatedly warned that use of

21  force by deputies is disproportionately directed at inmates with mental illness,

22  Defendants have failed to implement numerous recommendations on training and

23  other appropriate steps to reduce force against mentally ill inmates made by experts.

24        217.  Defendants have abjectly failed to  develop policies that address

25  the problem of endemic brutality in the Jails.  Policies regarding use of force,

26  investigation of use of force, discipline for deputies who have used excessive force

27  or failed to report use of force, supervisors who have mishandled investigations of

28  force, and training of deputies and supervisors all fail to meaningfully address the

-65-     COMPLAINT FOR INJUNCTIVE RELIEF

1   problem.  When allegations of deputy violence arise, they are infrequently

2   investigated, and deputies are rarely disciplined.  Defendants have failed to track

3   incidents of violence, even though systems for doing so are readily available and

4   commonly used.  In this way, Defendants have fostered a pattern and practice of

5   deputy violence against inmates, which places inmates at a significant, ongoing risk

6   of serious and irreparable injury.  Deputies and supervisors alike have come believe

7   that committing abuse (or failing to investigate abuse) will have absolutely no

8   impact on one's career.  As a result, physical abuse by deputies continues

9   unchecked.  The persistent failure or refusal of Sheriff Baca and the other

10   Defendants to supervise deputies properly or take action to curb the misconduct

11   demonstrates Defendants' deliberate indifference to the Plaintiffs' right to

12   reasonable protection from harm.

13   **V.    CLASS ACTION ALLEGATIONS**

14          218.  Plaintiffs Rosas and Goodwin bring this action, pursuant to

15   Federal Rules of Civil Procedure 23(a) and (b)(2), on behalf of all present and

16   future inmates confined in the Jail Complex in downtown Los Angeles:  Men's

17   Central Jail, Twin Towers, and the IRC.  Inmates assigned to Men's Central Jail

18   and Twin Towers spend some period of time in the IRC, and it is commonplace for

19   inmates to be transferred back and forth between Men's Central Jail and Twin

20   Towers.  The class that Plaintiffs seek to represent meets the requirements of Rule

21   23 as follows:

22          **A.    NUMEROSITY**

23          219.  The class meets the numerosity requirement of Rule 23(a)(1).

24   There are more than 4,000 inmates confined within Men's Central Jail and about

25   2,800 inmates in the Twin Towers at any given time.  Between 500 to 1,000 men

26   are processed into or out of the jails through the IRC on any given day.  The

27   membership of the class continuously changes, rendering joinder of all members

28

1   impracticable.  The inclusion within the class of future inmates in the downtown

2   Jail Complex also makes joinder of all members impracticable.

3       **B.**   **COMMONALITY**

4        220.   The class meets the commonality requirement of Rule 23(a)(2).

5   Questions of law and fact presented by the named plaintiffs are common to other

6   members of the class.  The common contentions that unite the claims of the class

7   include the following:

8       (A)   There is an unlawful pattern and practice at the Jails of

9   excessive physical violence used by Sheriff's deputies against inmates.

10       (B)   There is an unlawful pattern and practice at the Jails of

11   Sheriff's deputies enlisting and encouraging inmates to carry out savage attacks

12   against other inmates and promoting inmate-on-inmate violence.

13       (C)   There is an unlawful pattern and practice at the Jails of

14   Sheriff's deputies using violence and threats of violence to coerce false statements

15   from inmates, to cover up unlawful violence and to intimidate inmates and thereby

16   prevent inmates from making complaints or otherwise reporting abuse at these

17   facilities.

18       (D)   Sheriff Baca, Undersheriff Tanaka, Assistant Sheriff

19   Rhambo, and Chief Burns are aware of and deliberately indifferent to the use of

20   excessive force by correctional officers and the enlisting and encouraging of

21   inmates to carry out savage attacks in the Jails.  They acquiesce in and condone this

22   conduct by failing to investigate it, failing to take reasonable measures to end the

23   culture of deputy violence that fosters it, failing to punish deputies who engage in

24   it, protecting those deputies from criminal prosecution, and rewarding such deputies

25   for their conduct.

26       **C.**   **TYPICALITY**

27        221.   Plaintiffs meet the typicality requirement of Rule 23(a)(3),

28   since, as alleged below, the claims of the Plaintiffs are typical of those of the class.

COMPLAINT FOR INJUNCTIVE RELIEF

222.  **Plaintiff Alex Rosas**, twenty-four years old, is currently housed in Twin Towers.[67]  On July 22, 2011, Mr. Rosas witnessed a group of deputies, including Defendants Luviano, Guerrero, Bearer, and Ibarra, severely beating a non-resisting inmate, Arturo Fernandez, who was clad only in boxer shorts and had his hands cuffed behind his back.  As the deputies pummeled the handcuffed Fernandez, they shouted that he was resisting, although he was not.  The deputies then dragged Fernandez away.

223.  An hour after Mr. Rosas witnessed the beating, Deputies Ibarra and Luviano came to his cell and warned him, "You better not say anything."  Mr. Rosas told the deputies that he had not seen anything.  Mr. Rosas was afraid that they would hurt him or arrange for other inmates to attack him.

224.  A few days later, Deputies Ibarra and Luviano again came to Mr. Rosas's cell and threatened him not to say anything.  Terrified that something would happen to him, Mr. Rosas told them again that he had not seen anything.

225.  On August 9, 2011, Deputies Bearer and Ibarra came to Mr. Rosas's cell and told him to "cuff up," meaning to allow himself to be handcuffed.  When Mr. Rosas asked the deputies why he needed to be cuffed, they responded that another inmate had given them a tip that Mr. Rosas had "something" in his cell and that they were "going to toss up your cell."  The deputies handcuffed him and sat him outside in the main hallway.

226.  A few minutes later the deputies moved Mr. Rosas away from the door and out of the sightline of other inmates.  They told him they had found a "slicer" – a razor fashioned into a weapon – in his cell.  Mr. Rosas told the deputies that he had not altered any razors and that the weapon did not belong to him.  Deputy Luviano asked Mr. Rosas, "Why are you lying to my deputies?"  Mr. Rosas responded, "I'm not lying, sir."  The deputies punched him in the back of the head

---

[67] LASD has transferred all Men's Central Jail inmates who submitted affidavits to the Court in *Rutherford v. Baca* to a single unit in the Twin Towers, as of October 5, 2011.

COMPLAINT FOR INJUNCTIVE RELIEF

1   four or five times and told Mr. Rosas he would be going to the "hole" – disciplinary

2   solitary confinement – for possessing the slicer.

3        227.   Later, deputies came to Mr. Rosas's cell with the disciplinary

4   paperwork.  They told Mr. Rosas that if he admitted on the form that he had the

5   slicer they would "make this easier" for him and would not "add on any charges."

6   He understood this to mean that if he lied and said he possessed a slicer then he

7   would not be taken to disciplinary segregation and the deputies would not falsely

8   charge him with assault on an officer.  Mr. Rosas refused to sign the paperwork,

9   and the deputies escorted him to the hole.

10        228.   Mr. Rosas asked Deputy Reza for a complaint form, but Deputy

11   Reza refused to give him one.  Mr. Rosas told the deputy he would ask the

12   afternoon shift deputies for a complaint form and Deputy Reza responded that he

13   would tell the afternoon shift not to give him the form.  When Mr. Rosas asked the

14   afternoon shift deputies for the complaint form, they too refused to give him a form.

15        229.   **Plaintiff Jonathan Goodwin**, 29 years old, is in an inmate in

16   Los Angeles County Jails.  He is currently housed in Twin Towers.

17        230.   On July 22, 2011, when Mr. Goodwin was housed at Men's

18   Central Jail on the 3000 floor, he saw several deputies running towards a row of

19   cells.  He saw deputies leading inmate Arturo Fernandez in handcuffs and then

20   punching him and slamming him to the ground.  Mr. Fernandez fell on his face,

21   with his hands cuffed behind his back.  Several deputies, including Deputies

22   Luviano and Ibarra, punched Mr. Fernandez on his lower back and the sides of his

23   torso.  Another deputy kneed Mr. Fernandez in the back, as if pressing the air out of

24   his lungs.  Mr. Fernandez yelled that he couldn't breathe.  The deputies told him to

25   "Shut the fuck up!"  After the group of deputies punched and kicked Mr. Fernandez

26   countless times, Deputies Ibarra and Luviano escorted Mr. Fernandez out of the

27   housing module.

28

COMPLAINT FOR INJUNCTIVE RELIEF

1        231.   On August 10, 2011, Deputy Luviano came to Mr. Goodwin's

2   cell and told him to "cuff up."   When Mr. Goodwin asked why, Deputy Luviano

3   responded that it was because he could "do whatever the fuck I want" and that

4   Mr. Goodwin "got no rights."   Deputy Luviano handcuffed Mr. Goodwin behind

5   his back and escorted him to the hallway.

6        232.   In the hallway, Deputy Luviano pushed Mr. Goodwin against

7   the wall and kicked his legs open.   Correctional Assistant Flannigan then

8   approached and kicked Mr. Goodwin's ankle and punched his lower back.   Deputy

9   Luviano punched Mr. Goodwin in the back of the head.   Other inmates exclaimed

10  that they saw what Deputy Luviano as doing.   Custody Assistant Flannigan yelled

11  down the row, "You saw that?   Whatcha gonna do about it?"   Deputy Luviano and

12  Correctional Assistant Wendlent then pulled Mr. Goodwin out of the view of other

13  inmates.   Deputy Luviano repeatedly punched Mr. Goodwin on the back of the

14  head, even when other deputies walked into the area.

15       233.   Deputy Luviano then moved around Mr. Goodwin and began to

16  punch him repeatedly in the jaw.   Mr. Goodwin sank to the ground and tried to roll

17  away from Deputy Luviano.   Deputy Luviano continued to punch him in the jaw,

18  and other deputies then joined in the beating.

19       234.   The deputies continued to beat Mr. Goodwin until Deputy

20  Ujolla and Sergeant Soto entered the room and escorted him away.   Mr. Goodwin

21  told Deputy Bearer and Sergeant Soto that the deputies had beaten him.

22  Mr. Goodwin was later interviewed on camera and repeated his account of the

23  incident.   During the interview, Mr. Goodwin felt that Sergeant Soto was trying to

24  misstate the facts and put words in his mouth to make it appear that he was lying.

25       235.   Deputies took Mr. Goodwin to the medical clinic, where he

26  reported that he was experiencing pain in his jaw and back molars.   Medical staff

27  told Mr. Goodwin there was swelling in his head, yet he received no medical

28

COMPLAINT FOR INJUNCTIVE RELIEF

1   treatment.  Later that night, Mr. Goodwin lost a back molar that had been knocked
2   loose during the attack.

3        236.   On August 12, 2011, staff charged Mr. Goodwin with
4   possession of contraband, insubordination and causing a disturbance, profanity
5   toward staff and inmates, and refusal to follow orders.

6   **D.   ADEQUACY OF REPRESENTATION**

7        237.   Plaintiffs are adequate class representatives and thus meet the
8   requirements of Rule 23(a)(4).  Rosas and Goodwin are presently incarcerated
9   within the Jails at issue in this case, they have no conflict of interest with other
10  class members, and they will fairly and adequately protect the interests of the class.
11  They are represented by highly qualified and experienced counsel:  The ACLU
12  National Prison Project, the ACLU of Southern California, and Paul Hastings, LLP,
13  as alleged below.

14       238.   The ACLU National Prison Project and the ACLU of Southern
15  California already serve as class counsel for all prisoners in the Los Angeles
16  County Jails in *Rutherford v. Baca*, a case concerning over-crowding in the Jails.
17  The ACLU also serves as court-appointed monitor in that case, and over a period of
18  more than five years has conducted weekly or bi-weekly monitoring tours of Men's
19  Central Jail.  Class counsel has sought to obtain discovery on deputy-on-inmate
20  abuse in *Rutherford* and moved to compel production of that discovery after
21  Defendants refused to turn it over.  The Court has never ruled on that motion to
22  compel, which was submitted in December 2010.  Class counsel has also informed
23  the Court of its intent to litigate the issue of deputy violence in an evidentiary
24  hearing in *Rutherford*, but the Court has questioned whether the scope of the
25  *Rutherford* judgment encompasses that issue.  The ACLU is thus uniquely well
26  acquainted with the issues of deputy violence in the Jails and well equipped to
27  litigate those claims.  Their work in *Rutherford* on the issues of deputy violence and
28  overcrowding helped trigger a broad criminal investigation by the FBI and the U.S.

COMPLAINT FOR INJUNCTIVE RELIEF

1   Attorney's office, and was a key factor in the decision of the County Board of

2   Supervisors in November 2011 to convene a Commission to study the causes of

3   deputy violence in the Jails.

4          239.   Plaintiffs' co-lead counsel Margaret Winter is the Associate

5   Director of the National Prison Project of the American Civil Liberties Union.

6   Since 1973, the ACLU National Prison Project has been the only organization

7   litigating prisoners' rights cases throughout the nation.  Attorney Winter has

8   litigated prisoners' rights cases, most of them class actions, in federal courts in

9   Alabama, Mississippi, Texas, Arizona, California, Nevada, Idaho, Maryland,

10  Delaware, and Vermont, and in the Fourth, Fifth, Eighth, Ninth,  and Eleventh

11  Circuit Courts of Appeal and the U.S. Supreme Court.  She has argued and won a

12  prisoner's rights case in the U.S. Supreme Court.  Since 2007, Winter has served as

13  co-lead class counsel for all the inmates in Los Angeles County Jails in

14  *Rutherford v. Baca*

15        240.   Plaintiffs' co-lead counsel Peter Eliasberg is the Legal Director

16  of the ACLU Foundation of Southern California.  Since its founding in 1923, the

17  ACLU of Southern California has been litigating a broad variety of civil rights

18  cases, including prisoners' rights cases.  Attorney Eliasberg has been lead counsel

19  or co-lead counsel in numerous federal civil rights class actions in the Central

20  District of California and has been lead counsel in civil rights matters before the

21  United States Court of Appeals for the Ninth Circuit, the California Supreme Court,

22  and the United States Supreme Court, and has argued a case before the U.S.

23  Supreme Court.  Since 2009, Eliasberg has served as co-lead class counsel for all

24  the inmates in Los Angeles County Jails in *Rutherford v. Baca.*

25        241.   Paul Hastings LLP is an international law firm with 18 offices.

26  Paul Hastings currently has 1,029 attorneys worldwide, including 148 attorneys in

27  the Los Angeles office.  Paul Hastings is a global law firm and has sufficient

28  resources to adequately represent the class.  Paul Hastings has been recognized

COMPLAINT FOR INJUNCTIVE RELIEF

1   widely for its work on pro bono cases.  *The American Lawyer* recently ranked Paul

2   Hastings second in the nation in the *American Lawyer Pro Bono Report of 2011*.  In

3   2010, the firm was honored as the Pro Bono Law Firm of the Year by Public

4   Counsel, the world's largest pro bono public interest law firm.  The Los Angeles

5   office of Paul Hastings was awarded the 2010 Pro Bono Service Award by the

6   Legal Aid Foundation of Los Angeles, as the top pro bono law firm in Los Angeles.

7   Paul Hastings has extensive experience in class action litigation, including class

8   action lawsuits involving civil rights.  In 2009, Paul Hastings worked with the

9   ACLU of Southern California in a civil rights class action which rectified

10  unconstitutional and unsafe conditions in an immigration detention center.  Paul

11  Hastings has also recently argued and won a civil rights case before the U.S.

12  Supreme Court.

13          242.   Plaintiffs meet the requirement of Rule 23(b)(2), as Defendants

14  have acted, or omitted to act, on grounds generally applicable to the class, thereby

15  making injunctive relief appropriate with respect to the class as a whole.

16  **VI.    EXHAUSTION OF ADMINISTRATIVE REMEDIES**

17          243.   Both of the named Plaintiffs have exhausted available

18  administrative remedies.

19          244.   On August 24, 2011, Mr. Goodwin filled out an inmate

20  complaint form stating, among other things, "On August 24, 2011, Deputy Luviano

21  and Correctional Assistant Flannigan and other deputies beat me up."  The form

22  was delivered that day to both Watch Commander Limon and Deputy Alvarez at

23  Men's Central Jail.

24          245.   No one from LASD has ever provided Mr. Goodwin with a

25  response to the complaint or informed him that the LASD was seeking an

26  additional 15 days to complete its investigation of the complaint.

27          246.   On August 24, 2011 Mr. Rosas filled out an inmate complaint

28  form stating, among other things, that on "8/9/2011 Deputy Luviano punched me,"

                                        -73-        COMPLAINT FOR INJUNCTIVE RELIEF

1  which was provided to Watch Commander Limon and Deputy Alvarez at Men's

2  Central Jail.

3         247.   A few days later Senior Deputy Lauderdale approached

4  Mr. Rosas, showed him the complaint form and asked him what it was about.  At

5  no point has any LASD personnel provided Mr. Rosas a response to the complaint

6  or informed him that the LASD was seeking an additional 15 days to complete its

7  investigation of the complaint.

8         248.   LASD policy provides that the department shall investigate all

9  complaints within 15 days of their being filed unless the department notifies the

10 inmate in writing that it is seeking an additional 15 days to complete the

11 investigation.  Both Plaintiffs filed their complaints more than 90 days ago without

12 receiving any response from LASD personnel.

13 **VII.   CLAIMS FOR RELIEF**

14     **A.**    **Eighth Amendment To The United States Constitution; 42 U.S.C.**

15         **Section 1983**

16        249.   By reason of the allegations set forth in paragraphs 1 – 248,

17 *supra*, plaintiffs Rosas and Goodwin, and the class they represent, were deprived

18 and continue to be deprived by Defendants of their rights, under the Eighth and

19 Fourteenth Amendments to the United States Constitution, to due process of law

20 and to be free from gratuitous and excessive force, threats of gratuitous and

21 excessive force, degrading and sadistic treatment.

22        250.   The failures of Defendants Baca, Tanaka, and Burns to take

23 appropriate steps to curb the widespread pattern of brutality in Men's Central Jail,

24 the Twin Towers, and the IRC, as described in this Complaint, constitutes

25 deliberate indifference to Plaintiffs' basic need for reasonable protection from harm

26 and violates Plaintiffs' rights to be free from cruel and unusual punishment,

27 including physical abuse and intimidation, degrading, cruel, and sadistic treatment,

28

-74-      COMPLAINT FOR INJUNCTIVE RELIEF

1   and the wanton and needless infliction of pain, as guaranteed to Plaintiffs by the

2   Eighth and Fourteenth Amendments to the United States Constitution.

3        **B.**    **Fourteenth Amendment To The United States Constitution; 42**

4              **U.S.C. Section 1983**

5          251.   By reason of the allegations set forth in paragraphs 1 – 248,

6   *supra*, plaintiffs Rosas and Goodwin, and the class they represent, were deprived,

7   and continue to be deprived, by Defendants of their right to due process and to be

8   free from punishment without process, in the form of gratuitous and excessive

9   force, threats of gratuitous and excessive force, and degrading, cruel and sadistic

10   treatment, as guaranteed to them by the Fourteenth Amendment to the United States

11   Constitution.

12                           **PRAYER FOR RELIEF**

13        WHEREFORE, plaintiffs request this Court as follows:

14       1.   Declare that the continuing inaction of the supervisory defendants, as

15   described above, violates the rights of the Plaintiff class under the Eighth and

16   Fourteenth Amendments to the United States Constitution;

17       2.   Grant   preliminary   and   permanent   injunctive   relief,   enjoining

18   Defendants, their successors, agents, servants, employees, and all those in active

19   concert or participation with them, from subjecting inmates in the Jails to physical

20   abuse and the threat of physical abuse;

21       3.   Require these Defendants to formulate a remedy, subject to the court's

22   approval and modification, if necessary, to end the pattern of excessive force and

23   physical abuse in those jails, including:

24           (A)   adequate policy on the use of force;

25           (B)   adequate investigation of all use of force incidents and inmate-

26   on-inmate violence, with investigations performed by personnel unconnected to the

27   attack under investigation;

28

-75-      COMPLAINT FOR INJUNCTIVE RELIEF

1         (C)    appropriate training in use of force and prevention of inmate-on-

2 inmate violence;

3         (D)    appropriate discipline of staff members found to be involved in

4 improper use of force incidents, improper threats of violence against inmates;

5 incitement of inmate-on-inmate attacks; or failure to report use of force incidents;

6         (E) appropriate selection and supervision of command and uniformed

7 custodial staff.

8     4.    Retain jurisdiction in this case until the unlawful conditions, practices,

9 policies, acts, and omissions complained of herein no longer exist and this Court is

10 satisfied that they will not recur;

11     5.    Award the costs of this action, including reasonable attorneys' fees;

12 and

13 \\\

14 \\\

15 \\\

16 \\\

17 \\\

18 \\\

19 \\\

20 \\\

21 \\\

22 \\\

23 \\\

24 \\\

25 \\\

26 \\\

27 \\\

28 \\\

COMPLAINT FOR INJUNCTIVE RELIEF

6. Grant such other and further relief as this Court deems just and proper.

DATED: January 18, 2012

PETER J. ELIASBERG
MARISOL ORIHUELA
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA

By: _____
        PETER J. ELIASBERG

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN GOODWIN on
behalf of themselves and of those similarly
situated

DATED: January 18, 2012

MARGARET WINTER
ERIC BALABAN
DAVID M. SHAPIRO
NATIONAL PRISON PROJECT OF THE
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

By: _____
        MARGARET WINTER

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN GOODWIN on
behalf of themselves and of those similarly
situated

DATED: January 18, 2012

DONNA M. MELBY
JOHN S. DURRANT
JADE H. LEUNG
ELIZABETH C. MUELLER
PAUL HASTINGS LLP

By: _____
        DONNA M. MELBY

Attorneys for Plaintiffs
Alex Rosas and Jonathan Goodwin

1      6.      Grant such other and further relief as this Court deems just and proper.

2

3    DATED:  January 18, 2012     PETER J. ELIASBERG

4                                   MARISOL ORIHUELA
ACLU FOUNDATION OF SOUTHERN

5                                   CALIFORNIA

6

7                                By:_____
                                      PETER J. ELIASBERG

8                                Attorneys for Plaintiffs
                                ALEX ROSAS and JONATHAN GOODWIN on

9                                behalf of themselves and of those similarly
                                situated

10

11   DATED:  January 18, 2012     MARGARET WINTER

12                                     ERIC BALABAN
                                    DAVID M. SHAPIRO

13                                    NATIONAL PRISON PROJECT OF THE
                                    AMERICAN CIVIL LIBERTIES UNION

14                                    FOUNDATION

15

16                                By:_____
                                      MARGARET WINTER

17                                Attorneys for Plaintiffs

18                                ALEX ROSAS and JONATHAN GOODWIN on
                                behalf of themselves and of those similarly

19                                situated

20   DATED:  January 18, 2012     DONNA M. MELBY

21                                     JOHN S. DURRANT
                                    JADE H. LEUNG

22                                ELIZABETH C. MUELLER
                                PAUL HASTINGS LLP

23

24                                By:_Donna M. Melby_FD.

25                                      DONNA M. MELBY

26                                Attorneys for Plaintiffs
                                Alex Rosas and Jonathan Goodwin

27

28   LEGAL_US_W # 70140023.8

      COMPLAINT FOR INJUNCTIVE RELIEF

# EXHIBIT A

2003.10.01

2003.10.01

# EXHIBIT B



# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Philip S. Gutierrez and the assigned discovery Magistrate Judge is Stephen J. Hillman.

The case number on all documents filed with the Court should read as follows:

## CV12- 428 PSG (SHx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

**ⒸCOPY**

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN, on their own behalf and on behalf of those similarly situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>LEROY BACA, PAUL TANAKA, CECIL RHAMBO, and DENNIS BURNS,<br><br>*See attached.*   DEFENDANT(S). | **CASE NUMBER**<br><br>CV12-00428 PSG (SHx)<br><br><br>**SUMMONS** |

TO:   DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Peter Eliasberg_____, whose address is _ACLU of Southern California, 1313 W. Eighth St, Los Angeles, CA 90017_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

JAN 1 8 2012

Dated: _____

Clerk, U.S. District Court

By: **JULIE PRADO** _SEAL_ _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

1  PETER J. ELIASBERG (SB# 189110)
   peliasberg@aclu-sc.org
2  MARISOL ORIHUELA (SB# 261375)
   morihuela@aclu-sc.org
3  ACLU FOUNDATION OF SOUTHERN CALIFORNIA
   1313 W. 8th Street
4  Los Angeles, CA 90017
   Telephone: (213) 977-9500
5  Facsimile: (213) 977-5299

6  Attorneys for Plaintiffs
   ALEX ROSAS and JONATHAN GOODWIN, on behalf of
7  themselves and of those similarly situated

8  (Counsel continued on next page)

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12

13 ALEX ROSAS and JONATHAN
   GOODWIN on behalf of themselves          CASE NO.
14 and of those similarly situated,
                                            **COMPLAINT FOR INJUNCTIVE**
15              Plaintiff,                   **RELIEF CLASS ACTION**

16         vs.

17 LEROY BACA, Sheriff of Los Angeles
   County Jails; PAUL TANAKA,
18 Undersheriff, Los Angeles Sheriff's
   Department; CECIL RHAMBO,
19 Assistant Sheriff, Los Angeles Sheriff's
   Department; and DENNIS BURNS,
20 Chief of the Custody Operations
   Division, Los Angeles Sheriff's
21 Department,

22              Defendants.

23

24

25

26

27

28

                                    COMPLAINT FOR INJUNCTIVE RELIEF

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
ROSAS, ALEX; GOODWIN, JONATHAN, on their own behalf and on behalf of those similarly situated

**DEFENDANTS**
BACA, LEROY; TANAKA, PAUL; RHAMBO, CECIL; BURNS, DENNIS; in their official capacities
(See attachment for government agencies and titles of each defendant.)

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017 (See attachment for additional counsel.)

**Attorneys (If Known)**

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes  ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No   ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Eighth and Fourteenth Amendment of the U.S. Constitution, and 42 U.S.C. Section 1983, for violation of rights to due process and to be free from excessive force

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | REAL PROPERTY | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | IMMIGRATION | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus-Alien Detainee | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | ☐ 290 All Other Real Property | ☑ 440 Other Civil Rights | | ☐ 871 IRS-Third Party 26 USC 7609 |

# CV12-00428

**FOR OFFICE USE ONLY:**   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)   CIVIL COVER SHEET   Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

VIII(a).  IDENTICAL CASES: Has this action been previously filed in this court and dismissed, remanded or closed?  ☑No  ☐ Yes
If yes, list case number(s): _____

VIII(b).  RELATED CASES:  Have any cases been previously filed in this court that are related to the present case? ☐ No   ☑Yes
If yes, list case number(s):  Case No. Civ. 75-04111-DDP

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                               ☑ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☑ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE:  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Alex Rosas resides in Los Angeles County. Jonathan Goodwin resides in Los Angeles County. | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
    Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Each claim arose in Los Angeles County. | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date January 18, 2012

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but  is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

| *ALEX ROSAS and JONATHAN GOODWIN, on their own behalf and on behalf of those similarly situated v. LEROY BACA, Sheriff, Los Angeles Sheriff's Department; PAUL TANAKA, Undersheriff, Los Angeles Sheriff's Department; CECIL RHAMBO, Assistant Sheriff, Los Angeles Sheriff's Department; and DENNIS BURNS, Chief of the Custody Operations Division, Los Angeles Sheriff's Department* | Page 3 of 4 |
|---|---|

## ATTACHMENT TO CIVIL COVER SHEET

### I(a) Defendants:
Los Angeles Sheriff's Department, Leroy Baca, Sheriff
Los Angeles Sheriff's Department, Paul Tanaka, Undersheriff
Los Angeles Sheriff's Department, Cecil Rhambo, Assistant Sheriff
Los Angeles Sheriff's Department, Dennis Burns, Chief of the Custody Operations Division

### I(b) Attorneys for Plaintiffs:
PETER J. ELIASBERG (SB# 189110)
peliasberg@aclu-sc.org
MARISOL ORIHUELA (SB# 261375)
morihuela@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5299

MARGARET WINTER (*pro hac vice application forthcoming*)
mwinter@npp-aclu.org
ERIC BALABAN (*pro hac vice application forthcoming*)
ebalaban@npp-aclu.org
DAVID M. SHAPIRO (*pro hac vice application forthcoming*)
dshapiro@npp-aclu.org
NATIONAL PRISON PROJECT OF THE AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St., NW
Washington, D.C. 20005
Telephone: (202) 393-4930
Facsimile: (202) 393-4931

| | |
|---|---|
| *ALEX ROSAS and JONATHAN GOODWIN, on their own behalf and on behalf of those similarly situated v. LEROY BACA, Sheriff, Los Angeles Sheriff's Department; PAUL TANAKA, Undersheriff, Los Angeles Sheriff's Department; CECIL RHAMBO, Assistant Sheriff, Los Angeles Sheriff's Department; and DENNIS BURNS, Chief of the Custody Operations Division, Los Angeles Sheriff's Department* | Page 4 of 4 |

## ATTACHMENT TO CIVIL COVER SHEET

DONNA M. MELBY (SB# 86417)
donnamelby@paulhastings.com
JOHN S. DURRANT (SB# 217345)
johndurrant@paulhastings.com
JADE H. LEUNG (SB# 279651)
jadeleung@paulhastings.com
ELIZABETH C. MUELLER (SB# 278283)
bethmueller@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA  90071-2228
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705