# EXHIBIT A
# PART 1

PETER J. ELIASBERG (SB# 189110)
peliasberg@aclu-sc.org
MARISOL ORIHUELA (SB# 261375)
morihuela@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5299

FILED
CLERK, U.S. DISTRICT COURT

JAN 1 8 2012

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN GOODWIN, on behalf of
themselves and of those similarly situated

(Counsel continued on next page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CV12-0428** PS6(SHx)

ALEX ROSAS and JONATHAN
GOODWIN on behalf of themselves
and of those similarly situated,

        Plaintiff,

    vs.

LEROY BACA, Sheriff of Los Angeles
County Jails; PAUL TANAKA,
Undersheriff, Los Angeles Sheriff's
Department; CECIL RHAMBO,
Assistant Sheriff, Los Angeles Sheriff's
Department; and DENNIS BURNS,
Chief of the Custody Operations
Division, Los Angeles Sheriff's
Department,

        Defendants.

CASE NO.

**COMPLAINT FOR INJUNCTIVE
RELIEF CLASS ACTION**

COMPLAINT FOR INJUNCTIVE RELIEF

MARGARET WINTER (*pro hac vice application forthcoming*)
mwinter@npp-aclu.org
ERIC BALABAN (*pro hac vice application forthcoming*)
ebalaban@npp-aclu.org
DAVID M. SHAPIRO (*pro hac vice application forthcoming*)
dshapiro@npp-aclu.org
NATIONAL PRISON PROJECT OF THE
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St., NW
Washington, D.C. 20005
Telephone: (202) 393-4930
Facsimile: (202) 393-4931

DONNA M. MELBY (SB# 86417)
donnamelby@paulhastings.com
JOHN S. DURRANT (SB# 217345)
johndurrant@paulhastings.com
JADE H. LEUNG (SB# 279651)
jadeleung@paulhastings.com
ELIZABETH C. MUELLER (SB# 278283)
bethmueller@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA 90071-2228
Telephone: (213) 683-6000
Facsimile: (213) 627-0705

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN GOODWIN, on
behalf of themselves and of those similarly
situated

COMPLAINT FOR INJUNCTIVE RELIEF

## I.   JURISDICTION AND VENUE

1.     This action is brought pursuant to the Eighth and Fourteenth Amendments to the Constitution of the United States and to 42 U.S.C. § 1983. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

2.     Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391.

## II.   STATEMENT OF THE CASE

3.     Plaintiffs Alex Rosas and Jonathan Goodwin are inmates in the custody of Sheriff Leroy Baca in the Los Angeles County Jails. Rosas and Goodwin have been beaten and threatened with violence by deputies of the Los Angeles County Sheriff's Department (the "Department" or "LASD"). Mr. Rosas and Mr. Goodwin have also witnessed deputies beating other inmates. The abuse that Rosas and Goodwin suffered and witnessed is typical of the abuse inflicted by deputies on countless other inmates in the jails, and is part of a pattern and practice of deputy-on-inmate violence that has persisted for many years. In the last few years alone, there have been dozens of documented cases of extreme and unjustified violence by deputies against inmates. Defendants are aware of the culture of deputy violence that pervades the Jails but have failed to take reasonable measures to remedy the problem. Plaintiffs charge Sheriff Leroy Baca, Undersheriff Paul Tanaka, Assistant Sheriff Cecil Rhambo, and Chief of Custody Operations Department Dennis Burns[1] with violations of Plaintiffs' Eighth and Fourteenth Amendment rights to reasonable protection from violence and excessive force. Plaintiffs bring this action on behalf of themselves and other current and future inmates in the Los Angeles County Jails, seeking injunctive and declaratory relief.

---

[1] "Defendants" collectively refers to Leroy Baca ("Sheriff Baca"), Paul Tanaka ("Undersheriff Tanaka"), Cecil Rhambo ("Assistant Sheriff Rhambo"), and Dennis Burns ("Chief Burns"). Defendants are Los Angeles County officials responsible for policies governing the conduct of LASD deputies and for the safety of the inmates in their custody in the Los Angeles County Jails.

-1-                    COMPLAINT FOR INJUNCTIVE RELIEF

4.     Los Angeles County has the largest jail system in the world, with an average daily population of approximately 15,000 inmates.  The great majority of the inmates are pre-trial detainees who are not being held pursuant to a criminal conviction.  Large numbers of inmates in the jails have not committed, and are not charged with, with violent offenses.  There are inmates held in the jails on Immigration & Customs Enforcement (ICE) holds, charges of public intoxication, traffic violations, and warrants for failure to appear on a wide variety of minor offenses.[2]  Indeed a number of the inmates whose beatings are described in this complaint were being detained on non-violent misdemeanors, improper warrants and other minor offenses.  See paragraphs 71-72, 161.  Deputy violence against inmates in the Los Angeles County Jails is commonplace, but it is especially pervasive in three facilities that comprise a single complex on Bauchet Street in downtown Los Angeles:  Men's Central Jail, Twin Towers Correctional Facility ("TTCF") and the Inmate Reception Center ("IRC") (collectively, "the Jails").

5.     Inmates in the Jails live in fear of deputy violence.  It is typical for deputies to subject unresisting inmates to grossly excessive force by slamming inmates' heads into walls, punching them in the face with their fists, kicking them with their boots, and shooting them multiple times with their tasers — and for these beatings to result in serious injuries to the inmates, including broken legs, fractured eye sockets, shattered jaws, broken teeth, severe head injuries, nerve damage, dislocated joints, collapsed lungs, and wounds requiring dozens of stitches and staples.  Deputies sadistically beat inmates with serious mental illness.  They have beaten inmates who are already in fragile medical condition, including inmates in wheelchairs.  Deputies have beaten inmates for asking for medical treatment, for

---

[2] Los Angeles County Jail Overcrowding Reduction Report, at xvi Vera Institute of Justice, September 2011 ("Vera staff observed arraignments for people who spent one or two nights in jail for FTA on charges of not paying a $1.50 metro fare.  Vera was told that some judicial officers routinely set bail at $50,000 for one FTA, and jail sentences for FTA for jay walking and failure to pay traffic fines.").

-2-                    COMPLAINT FOR INJUNCTIVE RELIEF

the color of their skin, or for no apparent reason at all. Deputies also enlist and encourage other inmates to carry out savage attacks.

6.    Many of the beatings that routinely occur in the jails are far more severe than the infamous 1991 beating of Rodney King by members of the Los Angeles Police Department. The violence is not the work of a few rogue deputies. Rather, it is a systemic problem that has continued unchecked for decades.

7.    Many deputies belong to gangs inside the Jails. Like members of street gangs, these deputies sport tattoos to signal their gang membership. They beat up inmates to gain prestige among their peers, and "earn their ink" by breaking inmates' bones. They seek to control the Jails, and to a significant degree they do control the areas where they work.

8.    The "3000 Boys" is one such deputy gang, named for the third floor of Men's Central Jail where its members work. Members of the 3000 Boys, who sport a "3000" tattoo on the backs of their necks, inflict violence on inmates, foment violence among inmates, and even deploy violence on other deputies who resist their abusive practices. A similar deputy gang operates on the second floor of Men's Central Jail. On information and belief, members of the "2000 Boys" designate their gang membership with tattoos of a Roman numeral "II" on their legs. Violent deputy gangs have operated in the LASD at least since the 1980s and perhaps since the early 1970s. The 3000 Boys and 2000 Boys have been operating with Defendants' knowledge and acquiescence.

9.    Defendants' ongoing failure to halt these abuses has communicated to the deputy gangs that they can carry out brutal assaults on inmates with impunity. In fact, Defendants' permissiveness has so emboldened the deputy gangs that they have begun to carry out their brutal assaults on inmates more and more openly, and even in the presence of civilian volunteer workers in the Jails. Jail chaplains and the court-appointed jail monitors of the American Civil Liberties

Union ("ACLU") have provided eyewitness accounts of deputies beating non-resisting inmates in the Jails.

10.   There is a widespread fear among inmates of reporting deputy misdeeds to the ACLU or anyone else, because deputies regularly retaliate against those who lodge complaints, with beatings, strip searches, body cavity searches, destructive cell shake-downs, confiscation of belongings, and trumped-up disciplinary and criminal charges.

11.   Defendants and all of the high-ranking officials in the Department are aware – and, in the case of at least three of them, have been aware for years – of the pattern of deputy violence, intimidation, and retaliation against inmates.  It has been publicly reported, documented, and condemned on scores of occasions during the past twenty years.  Starting in 2006, a captain and a now-retired commander, both in the custody division, have reported to Defendants problems with deputy gangs and deputies using excessive and unnecessary force, but Defendants did not take appropriate steps to address the problem.  Sheriff Baca, Undersheriff Tanaka, Chief Burns, and other supervisors in these jails and at the highest levels of the Department have acquiesced in, fostered, and implicitly authorized the abuse by failing to promulgate adequate policies on the use of force, failing to adequately train and supervise deputies in the face of historical and continued evidence of abuse, failing to conduct meaningful investigations of reports of excessive force, failing to hold guilty deputies accountable, and ignoring evidence that deputies and other Department officials are covering up incidents of excessive force.

12.   In 1992, the prestigious Kolts Commission – formed at the behest of the Los Angeles County Board of Supervisors to conduct a review of the policies, practices, and procedures of the Sheriff's Department – issued a scathing report documenting numerous incidents of excessive force, lax discipline, and the presence of deputy gangs.  The Kolts Report resulted in the appointment of Special

-4-                     COMPLAINT FOR INJUNCTIVE RELIEF

Counsel to the Board of Supervisors for Oversight of the Sheriff's Department, Merrick Bobb. Bobb issued 30 semi-annual reports between 1993 and 2011. The County's Office of Independent Review ("OIR"), headed by Michael Gennaco, has repeatedly reported incidents of serious abuse to Sheriff Baca. The ACLU, which serves as class counsel to all detainees in Los Angeles County Jails in *Rutherford v. Baca*, No. 75-04111 (C.D. Cal.), and which has been appointed by the District Court in that case to monitor conditions in the Los Angeles County Jails, has submitted multiple reports to Sheriff Baca over several years, documenting more than 70 cases of extreme deputy-on-inmate violence.

13.    Despite Sheriff Baca's actual knowledge of this pattern of violence and cover-ups, he has failed over a period of many years to take reasonable measures to halt the abuses. Even now that the pervasiveness and the extraordinary brutality of the deputy-on-inmate abuse has become common knowledge through the release of reports by the ACLU, Sheriff Baca has left in place his principal subordinates in charge of supervising the Custody Division of the Sheriff's Department, Undersheriff Paul Tanaka and Chief Burns, who have day-to-day responsibility for ensuring the inmates' safety, and under whose regime this pattern of abuse has flourished.

14.    The ultimate goal of this lawsuit is to end the longstanding pattern of deputy-on-inmate abuse by requiring Defendants to put in place a system of accountability, which they have for so long failed to do. That system must include, at minimum, adequate policies on the use of force, proper training on the policies, proper supervision of deputies, thorough review of use of force incidents, and appropriate discipline for improper use of force or failure to report its use.

## III.    PARTIES

15.    Plaintiffs Rosas and Goodwin are inmates in the custody of the LASD who were previously housed in Men's Central Jail and are currently housed in Twin Towers. Plaintiffs have been subjected to deputy violence and threats of

-5-                COMPLAINT FOR INJUNCTIVE RELIEF

violence and they have witnessed deputies violently abusing other inmates. They are at continuing risk of being subjected to deputy violence as a result of Defendants' acts and omissions.

16.   Defendant Leroy Baca has been the Sheriff of Los Angeles County since 1998. As Sheriff, he is the chief executive officer of the LASD. By California law, the Sheriff is answerable for the safekeeping of the inmates in his custody. Cal. Gov't Code §§ 26605, 26610; Cal. Penal Code § 4006. Sheriff Baca is responsible for the management and control of all Los Angeles County Jails, and for all matters relating to the selection, supervision, promotion, training, and discipline of the uniformed staff, including the supervisory security staff, of the County Jails. He is also responsible for the care, custody, and control of all inmates housed in the County Jails. Sheriff Baca is regularly provided with reports of applications of force, allegations of unreported and excessive use of force, and other breaches of security in the County Jails. Plaintiffs sue Sheriff Baca in his official capacity.

17.   Defendant Paul Tanaka is Undersheriff of the LASD. He serves as second-in-command of the Department and oversees its daily operations. Along with Sheriff Baca, Undersheriff Tanaka is also responsible for the care, custody, and control of all inmates housed in the County Jails. Plaintiffs sue Undersheriff Tanaka in his official capacity.

18.   Defendant Cecil Rhambo is one of two Assistant Sheriffs of the LASD. He oversees the leadership of the Department's Custody Division, among other responsibilities. Plaintiffs sue Assistant Sheriff Rhambo in his official capacity.

19.   Defendant Dennis Burns has been employed by the LASD for more than 36 years. He is currently assigned as the Chief of the Custody Operations Division which, along with the Correctional Services Division, is responsible for the operation of the County Jails. The responsibilities of the

Custody Operations Division include the tracking of violent incidents and the formulation of responses designed to protect the personal safety of Department staff and inmates in its custody. He has formerly served as Captain of the LASD's Internal Affairs Bureau ("IAB"), which is responsible for conducting administrative investigations against Department members who have engaged in misconduct by violating the Department's policies and procedures. Plaintiffs sue Chief Burns in his official capacity.

20. All Defendants are sued in their official capacities for declaratory and injunctive relief. At all times referred to in this complaint, Defendants were acting within the scope of their employment as employees of the Department, and acting under color of state and municipal law.

IV. **FACTUAL ALLEGATIONS**

A. **There Is A Longstanding, Pervasive, And Notorious Culture, Pattern, And Practice Of Deputy Violence Against Inmates In The Los Angeles County Jails**

21. There is a longstanding pattern and practice in the Los Angeles County Jails, and particularly in the Jail Complex in downtown Los Angeles, of deputy-on-inmate violence and deputy-instigated inmate-on-inmate abuse. Multiple oversight and monitoring agencies, including the U.S. Department of Justice, the LASD's OIR, the Special Counsel to the Los Angeles County Board of Supervisors for oversight of the Sheriff's Department, and the ACLU, have issued reports on the use of excessive force and other abuses by the LASD against the inmates in its custody and in many cases made recommendations to address the problem.

22. According to Thomas Parker, a former FBI agent and Assistant Special Agent in Charge of the Bureau's Los Angeles Field Office, who oversaw the FBI investigation into the force, "There is at least a two-decade history of corruption within the ranks of the LASD. . . . [N]o one at the command level . . .

-7-                    COMPLAINT FOR INJUNCTIVE RELIEF

appears to have been held accountable and appropriately punished for failure to properly supervise and manage their subordinate personnel and resources. In my opinion, this has provided the 'seedbed' for continued lax supervision, violence, and corruption within LASD and the county jails it administers." Sheriff Baca and other LASD officials have "essentially abdicated their responsibilities to provide a safe, secure, and corruption-free incarceration environment within the Los Angeles County Jail System." The result, Mr. Parker concluded, is a pattern of inmates "suffering severe injuries, maiming, and death, some caused by fellow inmates, but most often at the hands of, or with the acquiescence or assistance of, the deputy sheriffs who are their keepers." Mr. Parker states, "I have never experienced any facility exhibiting the volume and repetitive patterns of violence, misfeasance, and malfeasance impacting the Los Angeles County Jail system."

23. In May 1990, the *Los Angeles Times* published an investigative report disclosing that excessive force cases represented three-fourths of all major legal settlements and jury awards over a three-year period; that half of the deputies involved in major cases had been sued in the past for brutality; and that one training officer had been sued ten times in ten years. The newspaper quoted sources familiar with the Department who claimed that a code of silence made deputies reluctant to testify against fellow officers, even those who repeatedly used excessive force. The Department kept no separate records of the deputies who were sued for excessive force or the outcomes of the suits.[3]

24. In 1989, the Los Angeles County Board of Supervisors formed a blue-ribbon commission to conduct a review of "the policies, practices and

[3] Merrick Bobb, Police Assessment Resource Center ("PARC"), *10th Semiannual Report 12* (Feb. 1999), *available at* http://www.parc.info/client-files/LASD/10th%20Semiannual%20Report.pdf (citing Daryl Kelley & Victor Merina, *Alleged Brutality by Deputies Costs County: Law Enforcement: Excessive-Force Lawsuits Have Nearly Doubled in Recent Years. Sheriff Block Stands by Department Policies and His Officers*, Los Angeles Times, May 27, 1990, at A1, available at http://articles.latimes.com/1990-05-27/news/mn-514_1_excessive-force).

procedures of the Sheriff's Department, including recruitment, training, job performance and evaluation, record keeping and management practices, as they relate to allegations of excessive force, the community sensitivity of deputies and the Department's citizen complaint procedure." The Board of Supervisors appointed the late Judge James G. Kolts ("Kolts") as Special Counsel to the Board. Kolts was a former star prosecutor and a highly respected former Los Angeles County Superior Court judge. The team Kolts assembled for this project became known as the Kolts Commission. In July 1992, after an extensive investigation, the Kolts Commission issued a scathing 359-page report (the "Kolts Report").[4] The Kolts Report detailed a history of excessive use of force and lax discipline within the LASD, and concluded that the Department had failed to reform itself. The Commission recommended civilian monitoring of the LASD.[5]

25. In January 1993, the Board of Supervisors passed a resolution to carry out the recommendations of the Kolts Commission, and the Board retained Special Counsel, Merrick J. Bobb, to monitor LASD's compliance with the Kolts Report and to report to the Board semi-annually regarding such compliance.[6] Bobb continues to serve to this day as Special Counsel to the Los Angeles County Board of Supervisors, and remains the Board of Supervisors' monitor of the LASD and its operations.[7]

26. In his fourth Semiannual Report, dated June 1995, Special Counsel Bobb reported the following:

27. "[W]e continued to find too many cases involving unnecessary force in responses to verbal taunts or passive noncompliance. Most of these

---

[4] James G. Kolts, *Kolts Report* (July 1992), *available at* http://www.parc.info/client_files/Special%20Reports/3%20-%20Kolts%20Report%20-%20LASD.pdf.
[5] Id. at 4, 345-49.
[6] Merrick Bobb, PARC, *1st Semiannual Report* 1(Oct. 1993), *available at* http://www.parc.info/client_files/LASD/1st%20Semiannual%20Report.pdf.
[7] Merrick Bobb, PARC, *30th Semiannual Report* (Sept. 2011), *available at* http://www.parc.info/client_files/LASD/30th%20Semiannual%20Report.pdf.

COMPLAINT FOR INJUNCTIVE RELIEF

incidents arose in the jails, where we found a substantial number of instances where deputies appear to over-react to apparently slight provocations, like stepping out of the chow line, by shoving the inmate against the wall or slapping him in the face." Further, the use of "transparently phony pretext[s] ('the suspect stared at me aggressively') to justify or excuse unnecessary or excessive force . . . is still practiced to an uncomfortable and unacceptable degree in the custody setting."[8]

28.   "[W]e do not believe that The Department has yet implemented the Kolts recommendations with respect to force investigations."[9]

29.   "In its analysis of over 1,000 force-related investigations spanning a five-year period, the Kolts Report concluded that the Department was too lenient in the way it disciplined officers found to have engaged in excessive force. The situation has not changed very much. . . . [C]aptains remain disinclined to impose substantial penalties for serious misconduct."[10] "[W]e continue to find cases in which the decision to exonerate the officer [in excessive force cases] simply defies explanation, and there are still incidents, *almost all in the custody setting*, where the use of force is either senseless or overly severe."[11]

30.   In a 1997 letter from the Acting Assistant Attorney General of the Civil Rights Division of the U.S. Department of Justice ("DOJ") to the then-Los Angeles County Executive, Joanne Sturges, the DOJ reported that "Inmates who are mentally ill or housed in mental health housing are subject to an unacceptably high risk of physical abuse and other mistreatment at the hands of other inmates and custodial staff. Moreover, the Jail does not adequately investigate allegations of abuse against its inmates."[12] The DOJ reported that they had "received numerous

---

[8] Merrick Bobb, PARC, 4th Semiannual Report 15 (June 1995), available at http://www.parc.info/client_files/LASD/4th%20Semiannual%20Report.pdf.
[9] Id. at 19.
[10] Id. at 22.
[11] Id. at 20-21 (emphasis added).
[12] Letter from Isabelle Katz Pinzler, Civil Rights Division, USDOJ, to Joanne Sturges, Los Angeles County Executive, *CRIPA Investigation of Mental Health Services in the Los Angeles County Jail* 17 (Sept. 5, 1997).

COMPLAINT FOR INJUNCTIVE RELIEF

reports from inmates and advocates regarding serious physical abuse of inmates in mental health housing . . . including kicks, punches, beatings, and sexual assaults. Although the Jail claims that it has discounted some of these claims . . . the investigation of these claims was inadequate and serious questions remain regarding the extent of physical abuse of mentally ill inmates. We agree with Special Counsel Merrick Bobb's finding that in the Jail 'there is callous treatment [of inmates] at times, a problem that LASD management knows about but has not acted sufficiently aggressively to resolve.'"[13] Furthermore, "[t]he Jail's failure to investigate promptly and thoroughly allegations of abuse against mentally ill inmates, and its failure to take appropriate action in response to incidents of abuse, enables the abuse of these inmates to continue."[14] The report also stated, "The treatment received by one inmate indicates that excessive use of force and physical mistreatment of inmates with mental illnesses may be in part the result of inadequate training."[15]

31.   In his tenth Semiannual Report, dated February 1999, Special Counsel Bobb pointed to a long list of recent crises on the custody side of the Department, including "troubling inmate deaths at the hands of custody personnel[,]" "inmate on inmate violence[,]" and "vigilante-like behavior at Twin Towers."[16]

32.   On December 19, 2002, the Los Angeles County and the United States entered into a Memorandum of Agreement Regarding Mental Health Services at the Los Angeles County Jail ("MOA").[17] Sheriff Baca was one of the signers of the MOA, which was entered into "to avoid potential litigation

---

[13] Id. at 17-18 (citing Merrick Bobb, PARC, *6th Semiannual Report* 11-13 (Sept. 1996)).
[14] Id. at 21.
[15] Id. at 18.
[16] Merrick Bobb, *supra* note 2, at 17.
[17] Memorandum of Agreement Between the United States and Los Angeles County, California Regarding Mental Health Services at the Los Angeles County Jail, *available at* http://www.justice.gov/crt/about/spl/documents/lacountyjail_mh.php.

COMPLAINT FOR INJUNCTIVE RELIEF

Case 2:12-cv-00428-MWF-E    Document 19-1    Filed 02/17/12    Page 15 of 52    Page ID
Case 2:12-cv-00428-DDP-SH    Document 1    Filed 01/18/12    Page 14 of 92    Page ID #:28
#:178

concerning the mental health services at the Jail."[18]  Among the provisions in the MOA were ones addressing training of correctional staff in "professional and humane treatment of mentally ill inmates," and the prevention and investigation of abuse of mentally ill inmates.[19]

33.    In March 2003, the US DOJ sent to County Counsel a compliance letter on the 2002 MOA about treatment of the mentally ill.  The letter concluded that the Sheriff's Department was not in compliance with the requirement of the MOA that LASD "provide mandatory orientation and continuing competency-based training for correctional staff in the identification and custodial care of mentally ill inmates including, but not necessarily limited to

    a.   interpreting or responding to bizarre or aberrant behaviors,

    b.   recognizing and responding to indications of suicidal thoughts,

    c.   proper suicide observation,

    d.   recognizing common side effects of psychotropic medications,

    e.   professional and humane treatment of mentally ill inmates, and

    f.   response to mental health crises including suicide intervention and cell extractions."

34.    In November 2004, Special Counsel Merrick Bobb presented to Sheriff Baca and the Board of Supervisors a confidential report finding that "Los Angeles County's largest jail is so outdated, understaffed and riddled with security flaws that it jeopardizes the lives of guards and inmates."[20]  The report concluded that Men's Central Jail suffers from "lax supervision and a long-standing jail culture that has shortchanged accountability for inmate safety and security."[21]

_____

[18] Id.
[19] Id.
[20] Jack Leonard & Richard Winton, *L.A. Jail Called Deadly, Outdated*, Los Angeles Times, Feb. 3, 2005, *available at* http://articles.latimes.com/2005/feb/03/local/me-jail3 [hereinafter *L.A. Jail Called Deadly, Outdated*].
[21] Megan Garvey & Richard Winton, *Critics of Jails Voice Alarm*, Los Angeles Times, Feb. 14, 2006, *available at* http://articles.latimes.com/2006/feb/14/local/me-jails14.

-12-          COMPLAINT FOR INJUNCTIVE RELIEF

35.     In his nineteenth Semiannual Report, dated February 2005, Special Counsel Merrick Bobb noted:

> From the Kolts Report onward, there has been a paradoxical contradiction between Internal Affairs investigations that exonerated the officer and litigation arising out of the same incident that cost the County substantial money in settlement and judgments. Those same disparities continue to exist after 2003 and 2004. . . . While at times one might find instances in which the County's lawyers have unwisely settled, it is far more common to find cases where the LASD let an officer off the hook when a judge or jury would not. We can only say as we have in the past that these disparities "fuel[] the fire of those who would strip the Sheriff of the privilege of investigating and disciplining his own employees." (citing the Fifteenth Semiannual Report at 73).[22]

36.     In June 2008 the ACLU issued a report by Dr. Terry Kupers, an expert on mental illness among incarcerated populations.[23] The report was filed in the *Rutherford* litigation, served on Sheriff Baca's counsel, and sent directly to a number of high-ranking officials in the LASD Custody Division. In his report Dr. Kupers made a number of conclusions including: "[A]t the Los Angeles County Jail the claims by prisoners [of abuse by deputies] are so widespread, and the reports of abuse so consistent among multiple reporters, that is seems very likely there is an unacceptably high incidence of custodial abuse. Multiple prisoners have told me about abuse they have undergone or witnessed, and most say

---

[22] Merrick Bobb, PARC, *19th Semiannual Report* 38 (Feb. 2005), *available at* http://www.parc.info/client_files/LASD/19th%20Semiannual%20Report.pdf.
[23] Terry A. Kupers, Report on Mental Health Issues at Los Angeles County Jail (June 27, 2008), *available at* http://www.aclu-sc.org/documents/view/173.

-13-                COMPLAINT FOR INJUNCTIVE RELIEF

it is disproportionately directed at prisoners with serious mental illness."[24] Dr. Kupers also opined that the problem "is made worse by inappropriate un-diagnosing and consignment of prisoners suffering from serious mental illness to general population housing."[25] Dr. Kupers further found that "there seems to be very little mental health training for most other officers, and given the fact that officers work over-time in most assignments, this means that prisoners with mental illness outside of Tower 1 are often guarded by officers with little or no training in mental health."[26] He also found "disturbing evidence of custodial abuse of prisoners with serious mental illness," and "crowding and idleness at every level[] further exacerbate the problems."[27]

37.    Dr. Kupers also made numerous recommendations to address the serious problems he found with the treatment of mentally ill prisoners including that "[a]ll officers . . . be required to undergo intensive training in working with prisoners with mental illness" and that jail officials "halt custodial abuse" by implementing "zero tolerance from the top, education for prisoners about their rights and the grievance process, training and support to encourage staff to report abuse by other staff, a confidential complaint system that fosters prisoner trust and action, and prompt and thorough investigation with appropriate consequences for offending staff."[28]

38.    In April 2010, a Los Angeles County Sheriff's deputy, Joshua Sather, who had graduated at the top of his recruit class, resigned after only a few weeks on the job, alleging that a supervisor made him beat up a mentally ill jail inmate. Sather was the sole Honor Recruit in his graduating class from the academy, and had been recognized for his leadership and other abilities. As with virtually all rookies, his first assignment was jail duty. On March 22, 2010, Sather

[24] Id. at 41.
[25] Id.
[26] Id. at 21.
[27] Id. at 44.
[28] Id. at 49.

-14-                    COMPLAINT FOR INJUNCTIVE RELIEF

was working on the sixth floor mental health ward of Twin Towers. At some point during Sather's shift, he, his supervisor and other deputies used force on a mentally ill inmate. Soon afterward, Sather, crying and distraught, called his uncle, a veteran Sheriff's detective, and told him that he had participated in an unjustified beating, that shortly before the beating his supervisor said, "We're gonna go in and teach this guy a lesson," and that the attack had been covered up. Sather's uncle confronted the supervisor about making his nephew "beat up 'dings.'"[29] Sheriff's officials launched an investigation and determined that an uncooperative inmate had been subdued by force, but concluded that no misconduct had occurred.

39.    In May 2010, the ACLU National Prison Project and the ACLU of Southern California submitted to Sheriff Baca and to the *Rutherford* Court the ACLU's "Annual Report on Conditions Inside Los Angeles County Jail – 2008-2009."[30] The report included declarations documenting scores of complaints from inmates and their families about deputy-inflicted injuries, ranging from broken ribs and black eyes to severe head wounds that required staples. The report also documented a persistent pattern of retaliation and threats of retaliation by deputies against inmates who protested the conditions of their confinement.

40.    In September 2010, the ACLU National Prison Project and the ACLU of Southern California submitted to Sheriff Baca and filed with the *Rutherford* Court the ACLU's "Interim Report on Conditions in the Los Angeles County Jails."[31] That report stated:

[29] Robert Faturechi, *L.A. County Deputy Says He Was Forced to Beat Mentally Ill Inmate*, Los Angeles Times, Oct. 7, 2011, *available at* http://articles.latimes.com/2011/oct/07/local/la-me-honor-recruit-20111007.
[30] Mary Tiedeman & Daniel Ballon, ACLU National Prison Project & ACLU of Southern California, *Annual Report on Conditions Inside Los Angeles County Jail – 2008-2009* (May 5, 2010), filed in *Rutherford v. Baca*, 75-cv-04111-DDP (no. 217). The report is also available at: http://www.aclu.org/files/assets/2010-5-5-AnnualReport-JailConditionsatMCJ.pdf.
[31] Mary Tiedeman et al., ACLU National Prison Project & ACLU of Southern California, *2010 Interim Report on Conditions in the Los Angeles County Jails* (Sept. 9, 2010), filed in *Rutherford v. Baca*, 75-cv-04111-DDP (no. 226). The report is also available at: http://www.aclu.org/files/assets/2010-9-9-LACountyJailsReport.pdf.

-15-          COMPLAINT FOR INJUNCTIVE RELIEF

The ACLU's 2009 Annual Report describes the pervasive pattern of violence that we observed in Men's Central Jail (MCJ) in 2009. During the first eight months of 2010, the violence has continued unabated. One aspect of the violence we discussed in our 2009 report was deputies' use of excessive and unjustified force, which continues to date: in the five-month period from March 10 through August 10, 2010, we received more than 70 complaints of excessive and/or unjustified force, or retaliation by deputies against prisoners, or both. Twenty of the prisoners making these complaints have provided us with sworn written statements.[32]

41. In December 2010, the media reported on a large-scale brawl at an LASD Christmas party at a banquet hall in Montebello. The brawl was between members of the 3000 Boys (the deputy gang discussed above in Paragraph 8) and other deputies who worked in Men's Central Jail. In commenting publicly on the incident, Sheriff Baca characterized it as the "drunkenness of a few bad apples," and opined that cops "know how to take care of themselves," and that they need to "man up and say, 'I'm not a wimp.'" Sheriff Baca insisted that "the core of what occurred with these 3000 boys … wasn't their tattoo. It wasn't their unit. It was their friendship and their drinking."[33]

42. The OIR, however, disagreed, stating, "Perhaps most concerning is the evidence that jail supervisors apparently knew about the use of 'gang-like' signs and other troubling behavior well before the eruption of violence at the Christmas party."[34]

[32] Id. at 3.

[33] KTLA Special Report: The Gang Behind the Badge? Part 4 (KTLA television broadcast), available at http://www.ktla.com/videobeta/?watchId=53592a86-dc74-4336-9cb3-323ea72e02d5.

[34] Los Angeles County Office of Independent Review, Violence in the Los Angeles

-16-                COMPLAINT FOR INJUNCTIVE RELIEF

43. On September 25, 2011, the *Los Angeles Times* reported that the FBI was conducting a criminal investigation into deputy abuse at the Jails.[35]

44. On September 28, 2011, the ACLU filed an Annual Report in *Rutherford v. Baca,* reporting seventy cases of extreme deputy abuse in the previous year, including accounts by civilian eyewitnesses of savage deputy beatings of inmates in the Jails.[36]

45. On October 13, 2011, the OIR issued a report stating that the Sheriff's Department has failed over many years to follow through on proposals to address violence in the Jails.[37]

46. In early December 2011, Robert Olmsted, a retired top LASD official who had been the Captain in charge of Men's Central Jail before being promoted to Commander in the LASD's Custody Division, and who oversaw both Men's Central Jail and Twin Towers, publicly disclosed that Sheriff Baca and other senior Department staff, including Defendants Tanaka and Burns, have long had actual knowledge of the pattern of widespread deputy violence in the Jails. Olmsted had repeatedly informed Defendants Baca, Tanaka, and Burns of such problems, and tried to raise red flags about shoddy investigations that allowed deputies to escape scrutiny for using force. Olmsted had also voiced concerns to them about deputies forming gang-like aggressive cliques. Chief Burns told Olmsted that it was impossible to change the deputy culture in Men's Central Jail. Sheriff Baca never followed up with Commander Olmsted after he twice approached him about problems in Men's Central Jail. *See* Paragraphs 197 – 203, for further discussion of Olmsted and his perspective on the problems in the Jails.

County Jails: A Report on Investigations and Outcomes 8 (Oct. 2011), *available at* http://laoir.com/reports/OIR-Report-on-Violence-in-the-Jails-(Oct.2011).pdf.
[35] Robert Faturechi, *FBI Probing Reports of Beatings in L.A. County Jails,* Los Angeles Times, Sept. 25, 2011, *available at* http://articles.latimes.com/2011/sep/25/local/la-me-fbi-jails-20110925.
[36] Sarah Liebowitz et al., ACLU National Prison Project & ACLU of Southern California, *Annual Report on Conditions Inside Los Angeles County Jail* (Sept. 28, 2011), filed in *Rutherford v. Baca,* 75-cv-04111-DDP (no. 294).
[37] Los Angeles County Office of Independent Review, *supra* note 31, at 7.

-17-    COMPLAINT FOR INJUNCTIVE RELIEF

47. On January 10, 2012 Sheriff Baca testified to the Board of Supervisors that use of force often arises when inmates have been declassified from mental health housing in TTCF Tower 1 to be returned to Men's Central Jail. This practice of improperly declassifying mentally ill inmates from mental health housing in Tower 1 and placing them in general population in MCJ is one that Dr. Kupers identified *almost four years earlier* as resulting in the abuse of mentally ill inmates.

48. On January 11, 2012, the *Los Angeles Times* reported that the Sheriff's Department had admitted that use of force against inmates in the Los Angeles County jails was disproportionately directed at inmates with mental illness. "Los Angeles County jailers are more likely to use force against mentally ill inmates than other prisoners, according to a new Sheriff's Department report that acknowledges the lockups need specially trained staff to reduce the violence."[38] This admission comes almost four years after Dr. Kupers concluded that deputy on inmate abuse was disproportionately directed at mentally ill inmates, that deputies lacked proper training in dealing with the mentally ill, and recommended that "[a]ll officers . . . be required to undergo intensive training in working with prisoners with mental illness."

49. On January 14, 2012, the *Los Angeles Times* reported that the United States had filed felony bribery charges against Gilbert Michel, a deputy in the Sheriff's Department Custody Division.[39] The article also reported that Deputy Michel had "made statements which implicated him, along with several other jail employees, as having participated in four prior unreported incidents of improper uses of force."

[38] Jack Leonard & Robert Faturechi, *L. A. County Jailers More Likely to Use Force on Mentally-Ill Inmates*, Los Angeles Times, Jan. 11, 2012, *available at* http://www.latimes.com/news/local/la-me-sheriff-jails-20120111,0,2284536.story.
[39] Robert Faturechi & Jack Leonard, *1st Charge Filed in FBI Probe of L.A. Sheriff's Deputy Misconduct*, Los Angeles Times, Jan. 14, 2012, *available at* http://www.latimes.com/la-me-deputy-cellphone-20120114,0,7670956.story.

-18-                    COMPLAINT FOR INJUNCTIVE RELIEF

**B.    Representative Examples Of Deputy Violence Against Inmates**

50.    Degrading, cruel, and sadistic deputy attacks on inmates are not isolated incidents at the Jails; they are commonplace. Time and again, numerous deputies attack one inmate. Even as the inmate lies motionless on the ground, new deputies are summoned by radio and join in the attack. In the course of a beating, it is a common practice for deputies to yell "Stop fighting!" or "Stop resisting!" to an inmate who is neither fighting nor resisting. This practice is an effort to fabricate a reason to blame the inmates for the attacks.

### a.    Mr. A[40]

51.    On September 24, 2011, Mr. A was lying down on the floor of his pod in Twin Towers suffering from a migraine headache and vertigo. When Mr. A asked Deputy Alatorre for his prescribed migraine medication, Deputy Alatorre kicked a book at him and left the module, ignoring his request for the medication.

52.    When Deputy Alatorre returned later with Deputy Ewell, Deputy Alatorre grabbed Mr. A by the shirt and tried to pull him off the floor. Mr. A lost his balance and hit his chin on the floor. The two deputies dragged Mr. A to his cell, forced him against the wall, and twisted his right arm so hard that he yelled out in pain. Deputy Alatorre pulled down Mr. A's pants below the buttocks and verbally taunted him, while Deputy Ewell sat on Mr. A's legs right below his exposed buttocks. Deputy Alatorre pushed Mr. A's face against the wall, hitting his forehead, and then placed Mr. A in a stress position for several minutes by pushing his knee or boot into Mr. A's back. Although Mr. A was still suffering from the migraine and vertigo, in addition to an injured back and an arm that felt like it was broken, the deputies waved off medical staff from helping Mr. A.

---

[40] Due to the ongoing risk of violent retaliation against inmates from deputies in the Sheriff's Department, the identities of inmates currently housed in the Jails have been protected -- with the exception of the named Plaintiffs.

-19-            COMPLAINT FOR INJUNCTIVE RELIEF

53.   One day later, Mr. A was given twenty-five days in disciplinary segregation as a result of the incident. Mr. A was 48 years old at the time of the beating.

**b.   Macario Garcia**

54.   In July 2011, when Macario Garcia was housed in Men's Central Jail, Deputy Chavez came to his cell and told him to get up because he had an appointment with an eye doctor. Deputy Chavez handcuffed him from behind and then escorted Mr. Garcia out of his cell. Deputy Wiener was standing inside the gated deputy's control booth next to the cell door controls.

55.   Mr. Garcia is blind in one eye as a result of a previous beating by deputies. He is 42 years old, and of very slight build: he is 6'2" and weighs 165 pounds. At approximately 6'2" and 275 pounds, Deputy Chavez is of massive build and outweighs Mr. Garcia by more than 100 pounds. Deputy Weiner weighs approximately 220 pounds.

56.   Deputy Weiner said to Mr. Garcia, "Oh, it's you, you piece of shit, punk." Evidently referring to an incident two weeks earlier in which he had strip-searched Mr. Garcia, Deputy Weiner said, "Shut the fuck up, punk. You ain't nothing but a coward bitch. You had your chance to fight me but you didn't." Deputy Chavez said, "You're not going to go to your doctor's appointment. … Get against the wall." Mr. Garcia complied and faced the wall opposite the deputy's control booth. Deputies Chavez and Weiner attacked him, punching him several times until he fell to the ground from the blows. After Mr. Garcia fell, Deputies Chavez and Weiner punched and kicked his head, face, body and legs, and beat his body and torso with their flashlights. The deputies also pulled his hair and slammed his head on the ground. The beating continued for approximately five minutes. Mr. Garcia heard Deputy Weiner call out radio code "415," meaning an officer is involved in a fight. Mr. Garcia then blacked out.

-20-   COMPLAINT FOR INJUNCTIVE RELIEF

57. When Mr. Garcia regained consciousness he heard Deputies Chavez and Weiner yelling, "Stop resisting! Stop pulling away!" Mr. Garcia was still handcuffed and not resisting in any way. He saw several other deputies running toward him. A deputy sprayed Mr. Garcia in the face with pepper spray as Deputies Chavez and Weiner continued to punch and kick him.

58. The deputies then tried to pull Mr. Garcia to his feet by his arms, which were handcuffed behind him. Mr. Garcia felt a sharp pain in his collarbone and heard a loud crack. Though he yelled in pain, the deputies continued pulling on his arms and dragged him toward the elevator. Mr. Garcia's face was covered in blood. He was unable to walk so deputies dragged him to the medical clinic. There, the nurses said that he should be taken to the Los Angeles Medical Center because his injuries were so serious.

59. While waiting to be transferred to the hospital, Mr. Garcia heard deputies laughing at him. One deputy said, "You didn't get hit. You fell." A sergeant and two deputies interviewed him on video about the incident, and Mr. Garcia reported that Deputies Chavez and Weiner assaulted him.

60. At the hospital, medical staff told Mr. Garcia that he had a broken collarbone. He received stitches above both of his eyebrows and had bruises on his face and legs. Mr. Garcia now has dizzy spells and sometimes hears a ringing in his ear. Mr. Garcia cannot raise his right arm more than three to six inches. Less than a week later, two lieutenants and a sergeant took pictures of Mr. Garcia's injuries; however, they did not ask him any questions about the incident. The DA has since filed criminal charges against Mr. Garcia for, among other things, assaulting a deputy.

c. **Arturo Fernandez**

61. In July 2011, Arturo Fernandez was returning to his cell when deputies attacked him, slamming him to the ground, shooting pepper spray into his eyes, and repeatedly pummeling his body. While Mr. Fernandez was walking

-21-            COMPLAINT FOR INJUNCTIVE RELIEF

towards his cell, his hands cuffed behind him, Deputy Guerrero ordered him to move more quickly, and then began punching the back of his neck. When Mr. Fernandez responded with an expletive, Deputy Guerrero forced him to the wall, pinning him by his neck. Although Mr. Fernandez did not fight back, Deputy Guerrero yelled, "Stop resisting, motherfucker." Another deputy slammed Mr. Fernandez to the ground. With his hands cuffed, Mr. Fernandez could not break his fall. More deputies arrived; with pepper spray in his eyes, Mr. Fernandez could not see how many. He felt kicks, punches, and hard blows that seemed to come from flashlights. After picking Mr. Fernandez up, deputies again slammed him to the ground.

62. Throughout the attack, Mr. Fernandez, who has asthma, worried that he would lose consciousness. Two eyewitnesses saw him bleeding profusely and heard him say that he could not breathe. When the attack was over, Mr. Fernandez was sent to the hospital. He had contusions on his head, required stitches on his elbow, suffered hearing loss in one ear, and continues to have headaches.

### d. Lawrence Davis

63. On March 16, 2011, Deputies Diaz, Rodriguez, and Owens pepper-sprayed and brutally beat a black inmate, Lawrence Davis, until he was unconscious. The deputies fractured Mr. Davis's jaw and knocked out one of his teeth. One or more of the deputies then carved the letters "MY" into Mr. Davis's scalp. "MY" is the first two letters of the Mexican/Hispanic slur "MYATE" used pejoratively for blacks.

### e. Mr. B

64. In March 2011, deputies slammed Mr. B's head into a cement wall, leaving him with a concussion and a gash that took 35 stitches to close. The group of deputies, including Deputies Moorman and Ibarra and Custody Assistant Perez, punched his face and head, and kicked his ribs. They aimed pepper spray

-22-                COMPLAINT FOR INJUNCTIVE RELIEF

into his eyes before shooting taser probes into his back. The confrontation began because deputies thought Mr. B had called them "gay." When Mr. B repeatedly denied the accusation, a deputy yelled to the row of pro per inmates – who serve as their own legal representatives – "y'all pro pers think you can get away with anything. We the 3000 Boys," a reference to the gang-like group of deputies in Men's Central Jail, discussed in Paragraph 8 above. A deputy said to Mr. B, "Baca pays us to take kickboxing classes to whip peoples' asses." The deputy grabbed Mr. B's head, slamming his face into the wall. Blood poured down, pooling on the ground, and he passed out. Deputies handcuffed Mr. B's arms behind his back and repeatedly punched his face and head, while other deputies stood watching.

65. When Mr. B regained consciousness, one deputy was sitting on his back, punching his face and head. Another was kicking Mr. B's ribs. Although Mr. B was motionless, the deputies yelled, "Stop resisting." Mr. B pleaded with them to stop. One deputy shot him with pepper spray. Another sank three taser probes into his flesh.

66. Two of the deputies who beat Mr. B stood roughly 6 feet tall, and weighed approximately 200 pounds. The custody assistant was slightly shorter and weighed about 180 pounds. Mr. B is 5 feet 7 inches and weighs 135 pounds. A sergeant accused him of assaulting the deputies, but the ambulance technician on the scene pointed out that the deputies showed no signs of injury. Another sergeant returned to the module to take pictures of the scene, but he did not interview any of the inmates who had witnessed the assault.

67. Mr. B spent two days in the hospital and four days in the jail's medical unit. After returning to his row, another deputy threatened him, saying: "the ACLU ain't going to be watching me forever."

68. Although there were numerous inmates in the law library who were able to see the assault through the library window, no one from LASD bothered to interview any of the eyewitnesses.

-23-                    COMPLAINT FOR INJUNCTIVE RELIEF

### f.   Gabriel Carillo

69.   On or about February 26, 2011, at least three deputies, including Deputy Luviano, severely beat Gabriel Carillo, who had come to Men's Central Jail to visit his brother. The deputies repeatedly kicked and punched Mr. Carillo, while he was handcuffed, severely cutting and bruising his face (photos attached hereto as Exhibit A). The deputies also pepper sprayed Mr. Carillo in the face while he was handcuffed and lying on the floor. During the beating one or more deputies repeatedly yelled "Stop resisting! Stop kicking!" even though Mr. Carillo was not resisting or kicking. Subsequently the deputies filed false reports causing the District Attorney to charge Mr. Carillo with battery against a peace officer, resisting arrest, and three other counts. On October 14, 2011, the DA dismissed the charges against him.

### g.   Cesar Mancilla

70.   On or about February 24, 2011, deputies savagely beat Cesar Mancilla at IRC. Mr. Mancilla was in a large holding cell with other inmates, when the deputies ordered him to stand with his head down. Mr. Mancilla obeyed. Suddenly, and without justification or warning, several uniformed personnel attacked Mr. Mancilla, hitting, kicking, and pepper-spraying him. The deputies handcuffed Mr. Mancilla, and continued to beat him. Mr. Mancilla was denied food, water, and medical attention for the remainder of the night.

71.   On February 25, 2011, a doctor examined Mr. Mancilla and determined he had a collapsed lung, two broken ribs, a nasal fracture, four broken teeth (photo attached hereto as Exhibit B), burns on his skin from the pepper spray, and other injuries. Mr. Mancilla was in jail on a non-violent misdemeanor.

### h.   Stephen Teran (Second Incident)

72.   In February 2011, while Stephen Teran was housed in Men's Central Jail, deputies heard that Mr. Teran's attorney had requested his medical records relating to a use of force. The deputies beat Mr. Teran, repeatedly punching

and kicking his body, neck, and head. Mr. Teran's cheekbone was broken. He had to wear a neck brace, and doctors told him that he may have suffered nerve damage.

### i.   Garry Crumpton

73.   In January 2011, while inmates in Men's Central Jail were in a line headed to court, Deputy Ortiz shoved Garry Crumpton against the wall. Mr. Crumpton said, "You didn't have to do me like that." Deputy Ortiz then placed him in a painful chokehold. Even though Mr. Crumpton put his hands in the air in a show of non-resistance, Deputy Ortiz slammed him to the floor, knocking him unconscious. Another deputy instructed all the other inmates in line to face the wall. While Mr. Crumpton lay face-down and motionless on the ground, seven or eight deputies punched and kicked him. He was removed to a caged area in the jail. Deputy Ortiz came by to speak with him about the incident. Though Mr. Crumpton did not agree with the deputy's account, he assented to everything Deputy Ortiz said because he did not want to be assaulted again.

### j.   Michael Cervantes

74.   In December 2010, Deputy Lyon noticed Mr. Cervantes's gang tattoo and began smacking the back of his head and taunting him. When Mr. Cervantes turned to look at Deputy Lyon, he punched Mr. Cervantes's left cheek, tackled him to the ground, sat on top of him, and punched his face and neck. Approximately eight other deputies rushed to join Deputy Lyon. The deputies bashed Mr. Cervantes's leg with a flashlight until he bled, kicked him in the stomach, and stunned him twice with a taser gun. When the attack was over, the deputies cautioned Mr. Cervantes not to tell the nurses "anything funny." Due to the severity of his injuries, Mr. Cervantes was taken to the hospital and spent one week in the jail's medical ward. He continues to suffer dizzy spells.

### k.   Stephen Teran (First Incident)

75.   In December 2010, several deputies severely beat Stephen Teran while he was in the IRC.

-25-                    COMPLAINT FOR INJUNCTIVE RELIEF

76. While Mr. Teran was being searched, Custody Assistant Martinez repeatedly told him to hurry up. Martinez then grabbed Mr. Teran by the neck, choking him, and dragged him to a cell where he threw Mr. Teran to the ground. Martinez kicked him in the ribs two or three times. Deputy Sims, who was present during the attack, told Mr. Teran, "If you give us any problems we're going to put you in the hospital."

77. A few hours later, Mr. Teran was sent back to the processing line. While interviewing Mr. Teran for classification purposes, Deputy Sims dropped Mr. Teran's classification card on the floor next to him and told him to pick it up. When Mr. Teran did not pick up the card, Deputy Sims punched him in the face, knocking him over. Deputy Sims then threw Mr. Teran to the floor and repeatedly kicked him in the head and torso. Four to six other deputies, including Deputies Miller and Escobado, ran over and joined in the beating, punching, kicking, and striking Mr. Teran with their flashlights. As they were beating Mr. Teran, the deputies yelled, "Stop fighting! Stop resisting!"

78. After two or three minutes, the deputies dragged Mr. Teran to a cell and handcuffed him to the leg of a bench, forcing him to kneel on the floor. The deputies kicked Mr. Teran in the back several times. Mr. Teran saw blood pouring off his head and face, pooling on the ground beneath him. He heard the deputies say they did not want blood on their clothes. The deputies then they put a plastic bag over Mr. Teran's head, making it almost impossible for him to breathe. The deputies laughed as they left the cell.

79. The deputies returned about twenty minutes later and told Mr. Teran he would be interviewed on camera. They threatened to press charges if he said anything. Mr. Teran told the interviewer that he had fallen. Later, the deputies again threatened him and warned him not to talk about the incident.

-26- COMPLAINT FOR INJUNCTIVE RELIEF

### l.    Rashaad Pilgrim

80.    In July 2010, deputies in Men's Central Jail targeted Rashaad Pilgrim as he stood in line to receive his medication. The deputies instructed all of the inmates in line to face the wall. Deputy Reza approached Mr. Pilgrim from behind and yelled at him before punching him twice in the face. When Mr. Pilgrim returned to his cell a few minutes later, he called his mother to report what happened. Not long after, Deputies Reza and Milpad ordered the inmates to line up and go to the day room, but instructed Mr. Pilgrim to stay behind and face the wall. One deputy spread his legs, as if to search him. Instead, the other deputies began to punch Mr. Pilgrim in the face and head. Mr. Pilgrim lost consciousness. When Mr. Pilgrim woke up, he was on the floor and the deputies were still punching him and yelling, "Stop fighting!" A deputy then slammed Mr. Pilgrim's face into the concrete floor, chipping his teeth. Later, doctors told Mr. Pilgrim he had fractures in his face, blunt head trauma, injury to his right ear, and a chipped tooth.

### m.    Alex Krehbiel

81.    In July 2010, a deputy approached Alex Krehbiel as he was returning from a visit with his attorney. Mr. Krehbiel had been trying to get back to his housing unit but the door was locked. The deputy ordered Mr. Krehbiel to face the wall and yelled in his ear, "This is my fucking house! Where do you think you are? This is my fucking house!" The deputy then slammed Mr. Krehbiel's forehead against the wall twice. A group of deputies approached, taunting Mr. Krehbiel, and one of them punched him in the face. The deputies pushed Mr. Krehbiel into the laundry room, knocked him to the floor, and punched and kicked his head, ribs, and back. The deputies then pepper sprayed Mr. Krehbiel's eyes and mouth, and slammed his head into the floor. As a result of the incident, Mr. Krehbiel was given twenty-nine days in disciplinary segregation.

-27-    COMPLAINT FOR INJUNCTIVE RELIEF

### n.    Juan Diego Mares

82.    In June 2010, deputies beat Juan Diego Mares so violently that he suffered a fractured jaw, and required multiple eye surgeries and eight stitches in his ear. The incident began after deputies conducted a search of all the cells on Mr. Mares's row. Mr. Mares noticed that some of his property was missing, including items he had just purchased from the commissary. After Mr. Mares asked to speak with a sergeant about the missing property, Deputy Carefoot shoved him hard against a wall, slapped his ear, punched his face several times, and threw him to the ground. Once Mr. Mares was on the ground, Deputy Carefoot kicked him roughly ten times in the face, jaw, and back of his head, causing a large pool of Mr. Mares's blood to form on the floor. The deputy then kicked Mr. Mares's ear three times, an experience he described as more painful than when he was hit by a car. Following the attack, a senior deputy questioned Mr. Mares about the incident and said to him, "You know you're going [back] to the same module once they're done cleaning you up." Mr. Mares interpreted this as the senior deputy threatening him not to report the incident.

### o.    Santiago Sanchez

83.    In June 2010 a deputy assaulted Santiago Sanchez following a visit from Mr. Sanchez's girlfriend and mother. The deputy grabbed the back of Mr. Sanchez's shirt and swung him into a steel pole. The deputy proceeded to place Mr. Sanchez into a stress position, twisting both of his arms behind his back so his fingers were pressed between his shoulder blades. The deputy then slammed Mr. Sanchez's head down on top of the metal counter in the visitation room. The deputy held Mr. Sanchez in that position for a minute or two while verbally harassing him.

### p.    Jimmie Knott

84.    In June 2010, while waiting in line for his hepatitis shot, Jimmie Knott asked Senior Deputy Sanchez if he could get some new shoes, as his had a

-28-    COMPLAINT FOR INJUNCTIVE RELIEF

split in them. Senior Deputy Sanchez told Mr. Knott to get out of line and to strip down. Mr. Knott complied and stripped to his boxers. Senior Deputy Sanchez then told him to get on his knees, and as Mr. Knott was bending to the floor, Senior Deputy Sanchez hit him in the temple, causing his head to bleed. Other deputies then came over and began hitting, kicking and kneeing him. Mr. Knott curled into a fetal position and waited for the violence to subside. After two or three minutes, the deputies stopped hitting him and took him to medical. On the way to medical, the deputies told him to say that he fell down the stairs. Mr. Knott complied, because he was afraid of being beaten again. Mario Love witnessed the attack and verified Mr. Knott's account. Mr. Love described the deputies involved as being like "a pack of wolves." Later, while Mr. Love was waiting to talk to the ACLU, deputies pulled him aside and interrogated him in a threatening way.

### q.   Joseph Hager

85.   In June 2010, deputies took Joseph Hager out of his cell and placed him in handcuffs to go to the law library. At the library, a deputy shoved Mr. Hager up against the wall and kicked his ankle so forcefully it bled. The deputy then dragged Mr. Hager, who was still handcuffed, back to the tier, where he slammed Mr. Hager's face into the edge of a door frame. Mr. Hager blacked out. When Mr. Hager regained consciousness, he was on the ground and Deputies Chavez and Gonzalez were kicking and punching him in the head and face. Even though Mr. Hager was handcuffed, the deputies repeatedly yelled, "Stop resisting!" When the beating subsided, Deputy Chavez told him, "I tried to kill you. You are lucky you are still breathing." The beating caused a fracture in Mr. Hager's face, a black eye, swelling in his ears, and bleeding in his mouth. When staff members interviewed Mr. Hager on camera, he said that he had slipped in the shower, out of fear of what the deputies would do to him if he revealed that they had beaten him. After the beating, Mr. Hager was sent to disciplinary segregation and told he was being charged with assault on a deputy.

r.    **Matthew Gjersvold**

86.    On May 28, 2010, while housed in Twin Towers, Matthew Gjersvold slept through a deputy's call for a head count because of the sleep medication he was taking.  Another inmate woke up Mr. Gjersvold, who is a former police officer, but the deputies noticed that he was late.  Deputy Van Du told Mr. Gjersvold to stand facing the stairs, and then forcefully shoved him onto the metal steps.  Deputy Van Du then handcuffed Mr. Gjersvold and escorted him back to his cell.  At the cell, Deputy Van Du pulled violently on the handcuffs, causing Mr. Gjersvold to fall backwards and break his wrist.

s.    **Luis Bueno**

87.    In May 2010, Luis Bueno was on his way to the church in Men's Central Jail.  Deputies told Mr. Bueno to turn around and return to his cell.  As Mr. Bueno was walking back to his cell, a deputy shoved him against the wall and asked him if he wanted to get "fucked up."  As other deputies arrived, the first deputy forced Mr. Bueno to spread his legs and put his hands behind his back.  The deputy then aimed his mace at Mr. Bueno's face.  When Mr. Bueno turned his head to avoid the spray, another deputy punched him in the neck.  Three other deputies joined in and began violently punching Mr. Bueno in the head and body. Mr. Bueno was knocked to the floor, where the beating continued.  When the beating subsided, deputies took Mr. Bueno to the medical center, where he was told he had a fractured nose, a torn ligament in his ankle, a swollen artery in his brain, and possible rib fractures.  Mr. Bueno is now afraid to attend church for fear of encountering the deputies who attacked him.

t.    **Walter Morales**

88.    For about a week in May 2010, deputies in Men's Central Jail beat Walter Morales twice a day with flashlights about his head and body. Mr. Morales believes the deputies beat him because he was arrested for allegedly firing a gun at police officers.  A group of deputies came into Mr. Morales's cell

COMPLAINT FOR INJUNCTIVE RELIEF

and punched and hit him with flashlights. Mr. Morales has a scar above his eye as a result. Later, a second shift of deputies beat Mr. Morales while he was restrained in waist chains and handcuffs.

### u.    Michael Holguin

89.    In October 2009, deputies beat Michael Holguin so severely that he was hospitalized with a broken leg, stitches on his face, and staples in his head. The incident occurred as Mr. Holguin was on his way to the showers. A deputy told him to go back to his cell, preventing him from using the showers. Mr. Holguin asked him why, because he had not received a shower in weeks. The deputy told him to turn around and placed Mr. Holguin in handcuffs. The rest of the beating is a blur to Mr. Holguin; all he remembers is being punched in the face by Deputy Luviano and pepper sprayed. When the beating was over, Deputy Rico said, "That's why you don't say why; just do what you're told." When Mr. Holguin returned from the hospital, he was sent to disciplinary segregation for "attacking a deputy."

### v.    Gordon Grbavac

90.    In August 2009, deputies in Twin Towers handcuffed Gordon Grbavac, took him into an attorney room, and slammed his head into a thick glass wall more than half a dozen times, leaving blood on the window. When a sergeant entered the room and asked Mr. Grbavac what had happened, he said the deputies had assaulted him. The sergeant said he would be right back. While he was gone one of the deputies who had assaulted Mr. Grbavac threatened him, saying, "Are you fucking kidding me? You motherfucker! You better change your story or we are going to show you what we do to fat asses. You better say you did this to yourself." Mr. Grbavac thought that the deputies might kill him if he disobeyed, so he agreed to tell the sergeant that his injuries were self-inflicted. When the sergeant returned with a video camera to interview Mr. Grbavac, one of the deputies who assaulted him was in the room, and the sergeant did not ask him to leave. Because

-31-          COMPLAINT FOR INJUNCTIVE RELIEF

of the deputy's threats, Mr. Grbavac altered his story and said he had banged his own head against the window. Mr. Grbavac was released after spending approximately a week in jail, when the charges against him were dismissed.

### w.    Darrell Garrett

91.    In June 2009, a group of deputies assaulted Darrell Garrett in Men's Central Jail while he was restrained in waist chains. Deputies shoved Mr. Garrett from behind, causing him to tumble down concrete stairs. Deputies then kicked Mr. Garrett in the face and head, while another deputy held him down. As the beating continued, they hit him in the head with a plastic milk crate, ground his face into the concrete floor, and emptied two cans of mace into Mr. Garrett's mouth, ears, nose and eyes. The beating caused Mr. Garrett to bleed profusely and to defecate. Mr. Garrett blacked out as deputies transported him to medical. In the aftermath of the beating, deputies have threatened and taunted Mr. Garrett, saying they are "going to get him."

### x.    Mr. C

92.    In May 2009 in Men's Central Jail, a deputy told Mr. C to face the wall and said, "Who's the fucking punk now? Put your fucking nose to the wall." The deputy punched him in the temple, causing Mr. C to fall to the floor. After Mr. C received a second blow to the top of his head, he tried to crawl away but was stopped by other deputies. The deputies ripped off Mr. C's pants and shot him with a taser. Just before Mr. C lost consciousness, he looked down and saw blood pooling on the floor. As a result of the beating, Mr. C suffered four fractured vertebrae, a shattered right shoulder, a broken rib, and two severely sprained ankles, and was relegated to a wheelchair. He also received five staples on the top of this head and twelve stitches on his face. Since the beating, deputies have routinely threatened Mr. C to prevent him from asking for help or reporting the abuse to someone outside the jail.

COMPLAINT FOR INJUNCTIVE RELIEF

y.    **Mr. D**

93.    Deputies assaulted Mr. D on a number of different occasions.  In 2009 in Men's Central Jail, ten to fifteen deputies came into Mr. D's cell and assaulted him for allegedly "disrespecting" one of the other deputies.  They dropped Mr. D to the floor and pummeled his head and body with kicks, punches, and blows with their flashlights.  Even after the deputies had Mr. D fully restrained on the floor with his hands behind his back, they repeatedly shot him with a taser.  One deputy said to Mr. D, "Man, I was trying to kill you."  The deputies threatened Mr. D after the attack and told him not to tell anyone what had happened.  Mr. D still has scars on his face and head from the beating.

C.    **Numerous Additional Incidents of Deputies Using Force Against Non-Resisting Inmates**

94.    Additional incidents of deputies using force against non-resisting inmates include the following:

95.    On December 13, 2011, Custody Assistant Martinez tasered 52 year old inmate Mr. E in Twin Towers, and a number of deputies, punched, and kicked him before they handcuffed him.  At the time they used force against him, Mr. E was lying on the ground face down and was not attempting to fight or resist the deputies in any way.  Although Mr. E had been in an altercation with another inmate shortly beforehand, he was not resisting when Custody Assistant Martinez tasered him, or when deputies rushed in and began kicking and punching him.  Mr. E was subsequently sent to the hole for 18 days without a disciplinary hearing; however, deputies presented him with paperwork that stated that he had had a disciplinary hearing.

96.    On December 6, 2011, Mr. F was punched in the face by a deputy while being escorted out of a courtroom with his hands cuffed behind him.  The deputy, who was 6 feet tall and approximately 250 pounds, grabbed the 5'8" and 160 pound Mr. F by the left arm tightly and then punched Mr. F, hitting his left

-33-                    COMPLAINT FOR INJUNCTIVE RELIEF

eye so hard that it knocked Mr. F to the floor. With blood dripping from a long gash in his face onto the floor, Mr. F was taken to the hospital in an ambulance. Although a doctor stated that Mr. F needed stitches, two deputies told the doctor that Mr. F was fine and Mr. F left the hospital without the stitches. A sergeant video recorded Mr. F's injuries when he initially boarded the ambulance, and later interviewed him on camera about the beating. The sergeant informed Mr. F that he could file a lawsuit, but that it would be a "waste of time." Mr. F still has difficulty seeing out of his left eye.

97. In August 2011, deputies grabbed Anthony Brown, then 52 years old, by his windpipe, slammed him to the ground, and repeatedly punched and kicked him all over his body, including in his teeth. Deputies also shot pepper spray into Mr. Brown's face. The deputies repeatedly yelled "Quit resisting" at the non-resisting Mr. Brown.

98. On July 12, 2011, a deputy in Twin Towers slammed Charles Celestine against a wall while searching his cell. The impact caused Mr. Celestine's prosthetic eye to pop out.

99. On June 25, 2011, a deputy in Men's Central Jail punched Mr. G, a 57 year old inmate who uses a wheelchair, in the eye and the mouth.

100. On June 20, 2011, Deputy Jimenez caused Clydell Crawford's bad shoulder to dislocate from its socket by shoving his arms upward forcefully while they were handcuffed behind his back. Immediately before, Mr. Crawford had asked Deputy Jimenez to be careful because one of his shoulders had previously dislocated.

101. In April 2011, a deputy in Men's Central Jail asked Mr. H why he was in jail before repeatedly punching his head, face, and ribs. Another deputy kicked Mr. H's ribs. The beating lasted 30-45 seconds. Subsequently, one or more deputies cranked open Mr. H's cell, allowing three inmates to come into the cell and assault him.

-34-                COMPLAINT FOR INJUNCTIVE RELIEF

102. In April 2011, a custody assistant kicked, hit, and elbowed Carlos Cacique in Twin Towers.

103. In March 2011 in Men's Central Jail, Deputy Smith knocked a tray of food from Alberto Carreras's hands and twisted his arms behind his back. Deputy Johnson then slammed Mr. Carrera's face against a wall. Deputies hit Mr. Carreras on his face, head, and legs, while yelling "Shut up you fucking faggot" at him. Mr. Carreras had a catheter, and the blows to his legs caused tremendous pain and led him to bleed from his penis.

104. In March 2011, a deputy in Twin Towers dug her nails into Anthony Penmik's skin, leaving marks. Another deputy hit and kicked Mr. Penmik in the legs and buttocks.

105. On February 18, 2011, Mr. I witnessed seven or eight deputies beating up a non-resisting inmate in Men's Central Jail. During the beating, one deputy was pushing the inmate's neck to the floor with a flashlight, while other deputies were yelling "stop resisting."

106. In February 2011 at Twin Towers, Deputy Hernandez forcibly searched Rodney Smith's buttocks with a flashlight, placing the flashlight half an inch into his rectum. Mr. Smith's rectum later bled and became painful, which he attributed to the flashlight's being pushed into his rectum. Mr. Smith also witnessed deputies take away another inmate and apparently attack him; that inmate suffered extensive injuries.

107. In February 2011, Deputy Walker attacked Mr. J in Men's Central Jail after he woke up late for the morning count, causing a cut that required forty stitches.

108. In January 2011, a deputy shoved Mr. K against the wall, roughly twisted his hands and arm, and slammed him to the floor. Once Mr. K was on the floor, several deputies punched and kicked him.

COMPLAINT FOR INJUNCTIVE RELIEF

109. In January 2011, Christopher Brown witnessed two deputies in Twin Towers punching a non-resisting inmate who fell to the floor, apparently unconscious. The deputies then kneed and punched the motionless inmate in the face and head and repeatedly shot the inmate with a taser.

110. On December 29, 2010 in Men's Central Jail, Deputy Gomel tripped Mr. L while he was handcuffed, and then slammed his head against the ground, leaving blood all over the floor. Deputy Gomel then repeatedly punched Mr. L in the head while Deputy Rodriguez pepper sprayed his eyes, triggering his asthma.

111. In December 2010, Deputy Vasquez pushed Michael Campbell's injured back and punched his head multiple times while Mr. Campbell had his hands behind his back and his fingers interlaced. While Deputy Vasquez was punching Mr. Campbell, another deputy had him in a chokehold. Mr. Campbell suffered extensive bruising and pain in his head, neck, and back. Mr. Campbell was 60 years old at the time of the beating.

112. On November 26, 2010, Deputy Pontonantos punched Erik Camacho in the back of the head while he was in his wheelchair. Two other deputies also hit Mr. Camacho. Then, after Mr. Camacho's wheelchair collapsed in the midst of the beating, the deputies dragged him along the floor in the collapsed wheelchair, while Deputy Gomez kicked him. Shortly thereafter, Deputy Pontonantos took one of Mr. Camacho's shoes, which had come off as he was being dragged along the floor, slapped him across face with it, and kicked him in the testicles.

113. On November 18, 2010 in Men's Central Jail, multiple deputies hit, kicked, and kneed Jonathan Dunlap. One deputy then shot pepper spray in Mr. Dunlap's face. Mr. Dunlap required stitches on his eyelid and suffered extensive bruising. Mr. Dunlap was later sent to the hole for twenty days for supposedly assaulting a deputy.

-36-        COMPLAINT FOR INJUNCTIVE RELIEF

114. In November 2010, while on an LASD transport bus to court, Deputy Stevenson repeatedly punched and then forcefully pushed Darrell Rauls, causing him to fall.

115. In November 2010, deputies in Twin Towers beat Mr. M after he protested Deputy Ochoa's decision to deny him dinner. Deputies Ochoa, Paket and several others beat him so savagely for complaining that he suffered a fractured nose, bruised kidneys and ribs, a two-centimeter gash on his forehead, and a swollen right eye. LASD then had him charged with battery against a peace officer and resisting a peace officer, although he had not committed any battery or offered any resistance.

116. In or about November 2010, a deputy in Men's Central Jail grabbed Mr. N's arm and pulled him off his bunk onto the floor. The deputy then stepped on Mr. N's fingers, causing swelling and bruises.

117. In October or November 2010, Steven Moore heard deputies, including Deputy Roberts, beating another inmate in the laundry room near his cell in Men's Central Jail. Moore stated, "I will never forget this incident because the inmate's terror and pain were so obvious in his screams." Shortly thereafter, Mr. Moore saw deputies carrying a seemingly unconscious inmate, who was bleeding from his head, out of the laundry room.

118. In August 2010 in Men's Central Jail, when Keith Nichols refused to discuss his legal case with a deputy, the deputy repeatedly kicked him in the lower back and kidneys with his boot-clad foot, causing intense pain. The deputy then punched Mr. Nichols in the head and yanked his leg, causing his knee to pop out of position.

119. In July 2010 in Twin Towers, Custody Assistant Bernadino punched Cedric Smith in the neck and slammed him into the wall. The deputy then kicked Mr. Smith's feet, even though Mr. Smith had just had his toenail surgically removed. This was not Mr. Smith's first beating by deputies. In 2004, deputies

brutally attacked Mr. Smith, punching his face and kicking his stomach, causing him to defecate. The 2004 attack left Mr. Smith with a severe stomach hernia and a scar over his eye.

120. In April 2010, in Twin Towers, Deputy Bryant angrily pushed Mr. O after he complained to the ACLU about a lack of medical treatment, and Deputy Holland struck Mr. O in the back near O's existing wounds.

### D.   Racially Motivated Deputy Violence

121. Many deputies have assaulted inmates while taunting them with racial epithets. In August 2011, after choking inmate Mr. P and repeatedly slamming his head and face into a metal bar and a wall in Men's Central Jail, Deputy Valdez yelled, "I hate you motherfucking monkeys. Damn nigger!"

122. In July 2011, inmate Mr. Q witnessed a deputy on the 3000 floor in Men's Central Jail grab a non-resisting African-American inmate, kick his legs, and yell, "All you blacks! When you mess with my trustees, this is what's going to happen to you." Numerous deputies then joined the attack, and began kicking, punching, and hitting the inmate with flashlights. After the attack, Mr. Q saw trustees cleaning blood off the floor and wall.

123. In June 2011, a deputy in Men's Central Jail said of inmate Michael Jefferson, who is African-American, "This nigger can't fucking listen and face the wall." A deputy then smashed Mr. Jefferson's face into the wall. Shortly thereafter, Deputy Quintana punched Mr. Jefferson in the face while he was escorting him back to his module.

124. In October 2009, deputies performing cell searches in Men's Central Jail took Mr. R's commissary items. When he complained, a deputy asked Mr. R, who is African-American, "What's your problem, Monkey?" The deputy told Mr. R to face his cell and forcefully shoved him into the bars of the cell door. Later that day, after ACLU monitors visited Mr. R's row, deputies threatened all of the inmates with a bean bag canister gun that contains pepper spray pellets. A

-38-          COMPLAINT FOR INJUNCTIVE RELIEF

deputy said, "We don't give a fuck about the ACLU. This is our house. They don't fucking live here."

125.    In July 2009, Deputies Delgado, Aviles, Rivera, Thompson, Ortega, Snyder, and others severely beat inmate Evans Tutt on the 3000 floor in Men's Central Jail, while calling Tutt a "fucking nigger." During the beating, the deputies handcuffed Mr. Tutt, and then tasered him, beat him with flashlights, and kicked him. The deputies broke Mr. Tutt's nose in multiple places, injured his ribs, head, face, knee, and leg, chipped his tooth, and left bruises all over his body. The deputies then wrote false reports that prompted the Los Angeles County District Attorney to file criminal charges against Mr. Tutt for resisting a peace officer. The charges were eventually dismissed. Three of the deputies involved in the incident have been identified as members of the 3000 Boys, and two of them were involved in the 2010 Christmas Brawl at a banquet hall in Montebello, described in paragraph 41.

### E.    Deputy Violence Against Mentally Ill Inmates

126.    In June 2010, Mr. S, who was suicidal, walked out of his cell with a strip of bed linen tied around his neck and threatened to kill himself. Mr. S had repeatedly asked deputies to see the psychiatrist, but they had mocked him and denied him access to mental health care. Custody Assistant Gonzalez shoved Mr. S back into the cell, turned to his cellmate, Gary Sanchez, and ordered Mr. Sanchez to "regulate" Mr. S. Mr. Sanchez understood this to mean the deputies wanted him to keep Mr. S in line by beating him.

127.    In October 2009, while in the IRC, inmate Jonny Johnson saw deputies verbally abusing an elderly man who was visibly mentally ill. The man was unable to follow the deputies' directions. The deputies began to taunt the man and threw a sandwich at him, hitting him in the head. Mr. Johnson came to the man's defense and told the deputies to stop picking on him. A group of deputies then took Mr. Johnson out of the holding cell. One deputy shoved Mr. Johnson's

head against the wall, while two others began punching him in the torso, knocking the wind out of him. The deputies then took Mr. Johnson to an area where other inmates were handing out bedding and ordered him to help. The deputies told Mr. Johnson that as he handed out the bedding, he had to say to each inmate, "I'm a faggot and the deputies are the bomb."

128. In September 2009 in Men's Central Jail, Deputy Navarro stopped Eefrom Jones as he returned from an attorney visit. Mr. Jones is on psychotropic medication due to a mental illness. Deputy Navarro pulled Mr. Jones to the ground and sat on him as he punched him. Other deputies came over and joined in the beating, breaking Mr. Jones's shoulder. The deputies shot Mr. Jones with a taser and repeatedly pepper sprayed him in the face, although he told them he had asthma. Approximately two weeks later, after a lieutenant interviewed Mr. Jones about the incident, Deputy Navarro came to Mr. Jones's cell to escort him to the psychologist. In the hallway, Deputy Navarro ordered Mr. Jones to strip naked and bend over. Deputy Navarro yelled that this was his floor, and he would do whatever he wanted. Deputy Navarro shone his flashlight at Mr. Jones's rear and another deputy put his finger in Mr. Jones's anus, as other deputies looked on and laughed. After these incidents, Mr. Jones reported feeling suicidal.

F.    **Deputy Assaults Against Inmates For Rules Infractions Or Perceived Slights**

129. Deputies often beat inmates for minor rules infractions or perceived slights. In December 2010, a deputy in Twin Towers savagely beat Derek Griscavage after Mr. Griscavage showed the deputy his middle finger. First, Deputy Jackson kicked Mr. Griscavage and contorted his shoulders in a manner that caused him pain. Deputy Jackson then handcuffed Mr. Griscavage and led him away from the pod. Shortly thereafter an eyewitness saw a deputy push Mr. Griscavage causing him to fall down. Then at least four deputies began to beat him. The deputies knocked Mr. Griscavage unconscious, and he woke up in the

hospital with severe lacerations, a broken nose, a chipped tooth, and bruises on his head. Three days later, deputies moved Mr. Griscavage to the disciplinary segregation unit for alleged "assault on a deputy."

130. In February 2010, deputies in the jails' Correctional Treatment Center attacked Devon Mannings, an inmate who suffers from a seizure disorder. Mr. Mannings told the deputy he "didn't have a date since high school." The deputy returned with Deputy Campos and slammed Mr. Mannings to the ground. The deputies threw Mr. Mannings's personal letters, pictures, and legal paperwork into the toilet. One deputy stomped on Mr. Mannings's hand with his boot, shattering his knuckle. The deputies repeatedly kicked Mr. Mannings's body while yelling, "Stop resisting," even though he was not resisting in any way. The deputies handcuffed Mr. Mannings and continued to kick his body and face. The deputies then shot pepper spray into Mr. Mannings's face and used a taser on him, which caused Mr. Mannings to have a seizure. When Mr. Mannings regained consciousness after the seizure, he saw blood around him on the floor. As a result of the beating, Mr. Mannings suffered extensive bruises and required surgery on the shattered knuckle. He was interviewed on camera and a senior deputy told Mr. Mannings the incident would be investigated. Although Mr. Mannings was supposed to be allowed to present his version of events at his disciplinary hearing, he was not permitted to do so.

G.   **Deputies' Use Of Inmates As Pawns To Inflict Violence On Other Inmates**

131. Deputies regularly pit inmates against other inmates, using them as pawns to carry out acts of violence. Deputies sometimes instigate violence between inmates by allowing inmates from rival gangs to have physical access to each other (for example, by opening up their cell doors from the deputy control booth), or by fomenting discord (for example, by mentioning an inmate's gang

affiliation to inmates from a rival gang, or stating in front of other inmates that an inmate is a sex offender).

132.    In March 2011, four inmates beat and sexually assaulted another inmate after an LASD custody assistant opened the door to the victim's cell. The controls to open cell doors are located inside a locked control booth accessible only to deputies and custody assistants. After the cell door was opened, two inmates went inside and began punching the victim. An inmate witness heard the victim screaming for several minutes. Later that evening, the witness heard an inmate say that the victim was going to be sexually assaulted with a broomstick. The victim's cell door was once again opened and four inmates entered, one of them carrying a broomstick. The witness heard the victim screaming and saw a broomstick handle with blood on it sticking out of the cell. Later, the witness saw the victim being escorted away from the cell by a deputy; there was a large amount of blood on the victim's pants.

133.    Deputies in Men's Central Jail allowed other inmates to assault Donald Shorts. Mr. Shorts is a former gang member and was frequently the target of assaults from members of his former gang. In June 2010, two inmates who were housed in a different module approached Mr. Shorts's cell. The only way they could have appeared at this cell is if deputies opened the gates. One of the inmates then yelled to the deputies to open Mr. Shorts's cell door. The deputies complied, and the two inmates entered the cell and assaulted Mr. Shorts, beating him with their fists and cutting his face and chest with a shank (a homemade knife). The next day, deputies charged Mr. Shorts with possession of a shank, fighting, and insubordination to staff.

134.    In March 2011, a deputy marched Jeremiah Wilkerson past members of a rival gang, telling them, "This is a Norteno. If the door's 'racked' [opened] you know what to do." Mr. Wilkerson believed the deputy was trying to make him a target for an attack in retaliation for an earlier altercation.

-42-    COMPLAINT FOR INJUNCTIVE RELIEF

135.   Cameron Saul, a former inmate who now works as a drug treatment counselor, served as a "house mouse" (a liaison between inmates and deputies) for part of his time in Men's Central Jail, and reported to the deputies about inmates who were causing problems. On several occasions, deputies told Mr. Saul that inmates should "handle the problem," and that Mr. Saul should line up at least two inmates to say that the problem-causing inmate had "slipped in the shower," in case that inmate complained following the attack. Mr. Saul later witnessed other inmates take so-called problem inmates to the back of the module and attack them, without deputies intervening to prevent the attack.

136.   A deputy placed Mr. T, an inmate who had been in protective custody, in the general population tank, where he was viciously attacked by other inmates. Mr. T suffered contusions on his head, a busted lip, blurry vision, a swollen ear, and severe emotional trauma.

137.   Michael Topete heard someone yelling, "Help, they're killing me!" while someone else was yelling "Shut the fuck up!" The next morning, Mr. Topete heard other inmates say, "They killed the rapist." In an unrelated incident, deputies placed Mr. Topete, who had previously been in protective custody, in the general population, where he was attacked by other inmates.

138.   On several occasions, deputies placed Rodolpho Mendoza, who was in protective custody, with inmates from the general population, who attacked him.

139.   In 2009, Therin McGuire witnessed deputies ordering two inmates to beat up a third inmate in MCJ.

**H.    Even Civilians Have Witnessed Deputy Violence Against Inmates**

140.   Unchecked deputy-on-inmate violence in Men's Central Jail and Twin Towers has become so pervasive and routine in recent years that deputies carry out savage attacks even in the presence of civilian eye witnesses. Thomas Parker, former Assistant Special Agent in Charge of the FBI's Los Angeles Field

-43-            COMPLAINT FOR INJUNCTIVE RELIEF

Office noted that the phenomenon of deputies beating inmates in areas visible to civilians suggests that "the culture of deputy violence in the Jails has become so hardened and pervasive that deputies feel emboldened to carry out their attacks even in non-secluded areas."

141.   In February 2009, Jails Chaplain Paulino Juarez witnessed a beating on the 3000 floor in Men's Central Jail. Chaplain Juarez was visiting inmates as part of his ministry, when he heard the sounds of someone being beaten. When he walked towards the noises, he saw three deputies, including Deputies Ramirez and Aguilar, in a hallway pounding the face and body of an inmate who stood with his back to the wall. The inmate appeared to be handcuffed; he was neither raising his hands to protect himself, nor resisting in any way. The deputies punched the inmate until he collapsed face-first on the ground, at which point they began kicking him in the head and body. Until this point, the inmate had implored the deputies to stop. On the ground, he fell silent. Though the inmate was apparently unconscious, deputies continued to punch and kick him, and yelled, "Stop fighting!"

142.   A deputy finally noticed that Chaplain Juarez was watching the attack and made signs to the others to stop the beating. But a call had gone out to other deputies to join in the attack, and two more deputies entered the hallway and began to kick the motionless inmate. One deputy stomped on the inmate's back. Those deputies who had noticed Chaplain Juarez motioned to the other deputies to alert them to his presence.

143.   At the end of the beating there was a puddle of blood some two feet in diameter around the inmate's head. Chaplain Juarez was overwhelmed with fear, worried deputies would harm him. Several eyed him in a threatening way. Some said "rat" and "motherfucker" when he passed them in the jail over the next few days.

COMPLAINT FOR INJUNCTIVE RELIEF

144. Chaplain Juarez wrote a detailed report of the incident, which he gave to a sergeant and his supervisor at the archdiocese, and he was interviewed by the LASD. Two years passed before he heard anything from the LASD about the beating. In a June 2011 meeting among employees of the archdiocese and personnel from OIR, Chaplain Juarez was told that the case had been resolved internally, and that news of the beating had never reached Sheriff Baca. After the meeting with OIR, a representative of Sheriff Baca's office contacted the Catholic chaplains to set up a meeting with the Sheriff.

145. In July 2011, Sheriff Baca told Chaplain Juarez that the detailed report Chaplain Juarez had written and delivered to the LASD was not included in the LASD's file on the incident. The file that Sheriff Baca read aloud from described Chaplain Juarez as "exaggerating" the details of the beating. The description of the attack in the LASD file from which Sheriff Baca read aloud seemed to describe a totally different incident from the one Chaplain Juarez had witnessed: the file said the inmate was schizophrenic and that deputies had to strike him a few times with their fists to get him into his cell. Sheriff Baca seemed unconcerned, stating simply that "punches are allowed but kicks are not allowed in my department."

146. In February 2011, another Jail Chaplain, Chaplain Doe, was walking towards the chaplain's office on the third floor of Men's Central Jail, when he saw four or five deputies repeatedly kicking an inmate. The inmate lay motionless, face-down on the ground. His hands appeared to be tucked behind his back, where they remained throughout the attack. The inmate pleaded with the deputies to stop, yelling, "Help me!" After the deputies continuously kicked the inmate for between two and three minutes, the deputies ordered Chaplain Doe to leave the scene. Chaplain Doe was afraid that if he tried to stop the beating or even asked the deputies to stop, they would hurt him. Although Chaplain Doe could no longer see the beating at this point, he could still hear the "thumping" sounds of the

deputies kicking the inmate, and the inmate's cries for help. Eventually the inmate fell silent but the kicks continued for about another minute. Neither LASD nor the OIR ever questioned Chaplain Doe about the incident, even though a sergeant and numerous deputies were aware that he was an eyewitness to the beating.

147.   On January 24, 2011, Esther Lim, the ACLU Jails Project Coordinator, witnessed the savage beating of an immobile, seemingly unconscious inmate in Twin Towers. At the time, Ms. Lim was meeting with another inmate in the facility's attorney room. When she heard what sounded like a fight in the Staging Area, she looked through the windows dividing the attorney room and the Staging Area and saw the attack in progress. Deputies Ochoa and Hirsch repeatedly punched and kneed an inmate who lay face-down and inert on the floor. The inmate was so still that Ms. Lim thought he looked like "a mannequin that was being used as a punching bag." But the deputies persisted in their attack, with one of them shocking the inmate again and again with a taser gun. Although the inmate never moved from his spot on the ground, the deputies repeatedly yelled, "Stop fighting!" and "Stop resisting!"

148.   Scott Budnick, a civilian volunteer who mentors young inmates, witnessed five deputy-on-inmate beatings at Men's Central Jail over a three-year period.

149.   In early 2007, Mr. Budnick witnessed an incident in which approximately seven deputies used a taser gun repeatedly on an inmate who was lying on the ground motionless. When Mr. Budnick told a deputy what he had seen, the deputy replied, "Yeah, we fuck these guys up all the time."

150.   In 2008, while Mr. Budnick waited outside the classroom where he taught inmates, he saw a deputy pull an inmate out of a line, strip search him in full view of numerous people, and then smash his head into the wall with such force that Mr. Budnick heard a loud crack. The inmate had not attacked or threatened the deputy in any way before the attack.

COMPLAINT FOR INJUNCTIVE RELIEF

151.   In December 2008, again while standing outside his classroom, Mr. Budnick saw three deputies stop and strip search an inmate who was walking down the hall.  The deputies forcefully twisted the inmate's arm behind his back and shoved him to the ground.  The inmate had not attacked or threatened the deputies in any way.

152.   In or about July 2009, Mr. Budnick saw several deputies taunt an inmate who asked them for directions to the inmate's module.  The deputies then twisted the inmate's arm behind his back, grabbed the inmate's head and put it against the wall, and then pushed the inmate's face into the wall.

153.   In 2009, Mr. Budnick witnessed three deputies kicking and punching an inmate.  When the inmate fell down, the deputies continued attacking him while he lay on the floor.  The deputies repeatedly yelled "Stop resisting!" – even though Mr. Budnick could see that the inmate was not moving, much less resisting.

154.   Several chaplains cautioned Mr. Budnick not to report one incident of abuse that he witnessed, telling him that if he reported the incident, he would no longer be allowed to volunteer.  The chaplains said that they refrained from reporting incidents of abuse out of fear of losing their jobs.  Several civilians also said that they were afraid to intervene in the deputy-on-inmate attacks they witnessed, for fear if they tried to stop the attacks, deputies would assault them.

155.   Mr. Budnick did report the July 2009 incident to Sergeant Renfro, who promised to "get into this immediately."  Mr. Budnick, however, was never interviewed about what he had observed.  He never heard back from the sergeant, or anyone else at the LASD or OIR, about an investigation into his allegations of deputy violence.

-47-                COMPLAINT FOR INJUNCTIVE RELIEF

I. **The Pattern Of Deputy-On-Inmate Violence In The Jails Has Been Ongoing For At Least A Dozen Years**

156. In July 2009, after Phillip Westby got into an argument with another inmate in Twin Towers, deputies pulled him out of his cell and slammed his head into the wall. Deputy O'Hardy handcuffed Mr. Westby and then slammed his head into the wall two more times. Deputies O'Hardy and Sandoval then led Mr. Westby into the Outdoor Recreation area where they repeatedly punched him in the head, neck, and back, and then threw him to the ground. Mr. Westby worried that his ribs were broken, but did not seek medical help because he feared retaliation from the deputies. It took Mr. Westby's bruises almost two weeks to heal.

157. In October 2008, Deputy Cinderelli handcuffed Drequinn Johnson to transport him to a legal visit. Deputy Cinderelli stopped Mr. Johnson in the hallway, near Deputy Grant, who was considered a "rookie" deputy. Deputy Cinderelli said to Deputy Grant, "This is training, this is when you get your first force," meaning his first use of force incident. Deputy Cinderelli then shoved Mr. Johnson against the wall and began punching him. Mr. Johnson, who was still handcuffed, fell to the ground, and Deputy Grant joined Deputy Cinderelli in punching and kicking him. Two other deputies came over and joined the melee. The deputies shot Mr. Johnson with a taser twice in the arm. After the incident, Mr. Johnson was unable to see out of his left eye for about two weeks. When deputies interviewed Mr. Johnson about the incident, he said he did not remember what had happened, because he was afraid the deputies would hurt him again.

158. In February 2008, after Peter Johnson, who uses a wheelchair, complained about jail conditions, Deputies Ochoa, Reynoso, and Saldivar pulled him off his bed and kicked and kneed his ribs, back, and neck. The deputies later shot pepper spray into Mr. Johnson's face and caused him to fall out of his wheelchair. The assault occurred in the wheelchair module in Men's Central Jail.

-48-                    COMPLAINT FOR INJUNCTIVE RELIEF

159.    On or about December 30, 2007, a deputy repeatedly slammed Robert Powell's head into the wall, scratching and bruising his forehead, and left him outside in the cold.  At the time, Mr. Powell was 58 years old.

160.    In June 2006, a deputy assaulted and raped Frank Mendoza, a gay inmate, in Twin Towers.  Earlier in the day, the same deputy was escorting a line of inmates including Mr. Mendoza and said to them "you all walk like girls." When Mr. Mendoza said to another inmate in the line, "There's a male who's unsure of his masculinity," the deputy grabbed Mr. Mendoza, shoved him against the wall, and threatened him stating, "You better watch it.  I will show you my masculinity.  I will come get you."  Later that day, when the inmates returned to their pod, Mr. Mendoza's cell door was left open.  Shortly after the deputy in the tower outside the pod left his post, the deputy who had previously threatened Mr. Mendoza forced him into his cell, tore off his clothes, threw him to the ground, shoved a gag in his mouth and raped him.  After the rape was over, Mr. Mendoza lay shivering and naked in his cell until another deputy found him and asked what had happened.  After Mr. Mendoza reported that he had been raped, the deputy responded, "I do not see anything wrong with you."  No LASD personnel interviewed Mr. Mendoza about the incident or took any forensic evidence to investigate whether he had been raped.  Mr. Mendoza had been arrested for public drunkenness and was being held in LA County jail on a warrant for failure to appear that later proved to have been issued in error.

161.    Mario Rocha is a 31 year old who is now pursuing his B.A. at George Washington University in Washington, D.C.  On October 10, 2003, he was in jail on a charge that ultimately resulted in a reversed conviction.  Mr. Rocha was in a holding cell being processed for entry into the jail, when he observed a man in his late 50's or early 60's, who appeared to be mentally ill, on his hands and knees. Mr. Rocha saw a deputy race over, kick the man in the head, and start punching him.  Almost immediately, about four or five other deputies came over and joined

-49-                COMPLAINT FOR INJUNCTIVE RELIEF