# EXHIBIT A
# PART 2

in the assault, punching, stomping, and kicking the man while he lay on his stomach on the floor, not resisting and not even trying to shield himself from the deputies' blows. The assault left the man bleeding from his face and the top of his head, with one of his eyes swollen shut.

**J.     Victims Of Deputy Abuse Experience Intimidation And Retaliation**

162.   There is a widespread fear among inmates at Men's Central Jail and Twin Towers of reporting deputy misdeeds to the ACLU, or anyone else, because deputies regularly retaliate against those who lodge complaints. When inmates complain about mistreatment, deputies respond with punishment: strip searches, body cavity searches, destructive cell shake-downs, confiscation of their belongings, or solitary confinement. If inmates complain of being beaten, the Sheriff's Department will likely bring false disciplinary charges against them for assault against the deputies who beat them, and in some cases hand them over for criminal prosecution on the bogus charges.

163.   In March 2011, after Mr. U told a nurse that a deputy had earlier refused to take him to his medical appointment, the deputy said to Mr. U, "I can make it that you slip in the shower next time and need serious medical attention."

164.   In January 2011, two deputies verbally and physically assaulted Shawn Meyers in an elevator for his interactions with ACLU representatives. The deputies slammed Mr. Meyers, who uses a wheelchair, against the wall, and said, "That's your warning."

165.   In January 2011, Deputy Carbajal overheard inmate Mani Sadri complain about being threatened by another deputy. Deputy Carbajal warned Mr. Sadri not to complain any more to ACLU, and threatened to have other inmates kill him. Deputy Carbajal said, "Don't complain to anyone if you want to make it out of here alive."

COMPLAINT FOR INJUNCTIVE RELIEF

166.   In November and December 2010, in the Twin Towers, deputies repeatedly threatened Mr. V, whose criminal case had received extensive media coverage.  On one occasion, a module officer refused to give Mr. V a blanket, saying he did not "give them to murderers."  Another deputy told him, "[S]o you're [Mr. V].  I can't wait to get you to my floor."  When Mr. V was transferred to Men's Central Jail, Deputies Ibarra and another deputy repeatedly asked him what he was in jail for, and punched his ribs until he answered.  They called Mr. V a "piece of shit," told him he would not receive basic necessities such as food, and said they would turn him over "to the Southsiders," which Mr. V understood as a threat to turn him over to the Southsiders gang.  Deputy Ibarra told him not to complain about the incident, or the deputy would "go in your cell and beat you up personally."

167.   In June 2010, after Robert Dragusica spoke with the ACLU about violence inside Men's Central Jail, deputies began threatening and intimidating him.  The behavior of the deputies caused Mr. Dragusica to refuse two opportunities to speak with the ACLU again, because he was scared of what the deputies might do.  After eventually speaking with the ACLU a second time, deputies sent Mr. Dragusica to disciplinary segregation for a fabricated contraband charge.

168.   Deputies sent another inmate to beat Emmanuel Benson in May 2009, after he reported that a guard had assaulted him the day before.  A deputy opened the door to Mr. Benson's cell in Men's Central Jail and allowed the other inmate to enter.  The inmate punched Mr. Benson twice in the face and told him he was sent because Mr. Benson reported the deputy's attack.  Mr. Benson did not request medical treatment in fear of further retaliation.

169.   In March 2009, deputies severely beat Daysuan Rushing in retaliation for his speaking to the ACLU.  After Mr. Rushing spoke with an ACLU representative who visited his row, deputies delayed him as he returned from a

court appearance. Mr. Rushing, who was restrained in waist chains, was forced up against a wall with his legs spread. Deputy Zuniga slapped the back of his head twice and then kicked Mr. Rushing's leg, causing him to fall to the ground. Deputy Zuniga and another officer began punching and kicking Mr. Rushing, and hit him repeatedly in the face and knees with a flashlight. The deputies then pepper sprayed Mr. Rushing in the face and threw him down a flight of stairs. While Mr. Rushing was laying on the ground bleeding, Deputy Zuniga said, "You fucking whiners, tell this to the ACLU, I dare you." As a result of the beating, Mr. Rushing received stitches on both sides of his face.

170. Deputies beat Mr. W in Men's Central Jail and he was subsequently refused pain medication that he was supposed to receive, because he had complained to the ACLU.

171. Defendants Sheriff Baca and Chief Burns have long been aware of the Department's practice of retaliating against inmates, including a pattern of arresting the victims of staff beatings and initiating their prosecution for assault, without any meaningful internal investigation of the facts surrounding the incident. In 2010, the ACLU filed in *Rutherford* a motion for a protective order asking that Defendants and their agents be enjoined from retaliating against inmates for speaking with the ACLU. That motion was accompanied by numerous declarations attesting to incidents of retaliation, including retaliation in the form of physical abuse. Despite this knowledge, Defendants have denied that retaliation is a significant problem and have failed to adequately investigate the problem. Instead, they have tolerated and encouraged staff to continue to arrest and request prosecution of inmates beaten in the jails. Their continued acquiescence in this practice manifests deliberate indifference toward the rights of the Plaintiffs and all other inmates in the Jails.

172. In a November 2010 declaration, Chief Burns made a categorical statement under oath that "every allegation of retaliation" that the

-52-                    COMPLAINT FOR INJUNCTIVE RELIEF

ACLU had brought to LASD's attention that the Department had investigated "has been determined to be **without merit**. ... [T]he Department takes allegations of retaliation and other deputy misconduct extremely seriously and such claims are always thoroughly investigated."[41] On information and belief, this statement was false and Chief Burns knew it was false at the time he made it.

173. On information and belief, Plaintiffs allege that Undersheriff Tanaka is also aware of this pattern of retaliation.

174. In its October 2011 report, the OIR stated that expectations that custody personnel will not engage in retaliation and the use of excessive force is not "consistently reinforced up the chain of command":

> "[T]he key to preventing questionable force incidents and ensuring the fair treatment of inmates is in the hands of line-level supervisors. If sergeants do not actively engage with those they supervise, deputies and custody assistants too easily can lose sight of the expectations the Department places on them and engage in the type of abusive, retaliatory conduct inmates frequently complain of. The Department has not always staffed the jails sufficiently to provide the necessary level of supervisory involvement, and its expectation of sergeants is not consistently reinforced up the chain of command.[42]

**K.** **Supervisory Officials Have Condoned A Pattern Of Inadequate Investigations And Cover-Ups**

175. The LASD brushes aside most inmate reports of violence. The Department's apparent indifference to such complaints gives deputies a sense of

---

[41] Decl. of Chief Dennis Burns, Nov. 5, 2010, at ¶ 3, filed in *Rutherford v. Baca*, 75-cv-04111-DDP, 2006 WL 3065781 (C.D. Cal. 2006) (No. 245) (emphasis in original).
[42] Los Angeles County Office of Independent Review, *supra* note 31, at 10.

unchecked autonomy in the way they perform their jobs. Incidents of deputy-on-inmate violence, after nominal or no investigation by LASD, are routinely reported by deputies as an unprovoked inmate-on-deputy assault, and if an inmate complains of being beaten or injured by jail deputies, those complaints are almost universally declared unfounded. Most of these complaints get "resolved" at the lowest levels in the LASD. Proper reporting procedures are routinely ignored.

176. Corrections expert Toni V. Bair reviewed the investigative procedures and policies of the Los Angeles County Jails and found them to be "grossly substandard."[43] For example, during the investigation of Use of Force incidents the supervisor of the attacking deputies often interviews the inmate victim, rather than an independent supervisor.[44]

177. This practice is permitted by LASD policy, even though it is considered unacceptable and unprofessional by corrections experts.

178. Moreover, LASD sergeants and lieutenants often permit the very officers accused of assault to be present during the interview of the inmate for the use of force investigation, a tactic that has the purpose and effect of intimidating the inmate and impacting his testimony. *See, e.g.,* the August 2009 incident with inmate Gordon Grbavac, discussed in Paragraph 90 above. Mr. Bair declared that this practice is "unheard of in professionally conducted investigations and interviews," and stated that "It is no wonder that the prisoner frequently … alters his story so as not to implicate the officer(s) involved in the incident."[45]

179. Even though permitting a deputy who was involved in a force incident with an inmate to be present during the interview of the inmate is grossly unprofessional, LASD policy did not forbid this practice until the ACLU's 2011

---

[43] Decl. of Toni V. Bair, Sept. 27, 2011, at 3, filed in *Rutherford v. Baca*, 75-cv-04111-DDP, 2006 WL 3065781 (C.D. Cal. 2006) (No. 294-13).
[44] Id. ¶ 12.
[45] Id. ¶ 16.

COMPLAINT FOR INJUNCTIVE RELIEF

report revealed how frequently involved deputies were present during inmate interviews.

180. The *Los Angeles Times* recently reported that according to an internal LASD memorandum, deputies were "were crafting narratives 'dramatized to justify' force and delaying using weapons such as pepper spray that could end fights 'to dispense appropriate jailhouse justice.'"[46]

181. In 2011, a correctional expert in an inmate's excessive force case against Sheriff Baca noted both false reports by deputies and the complete absence of an after-the-fact review of a serial cell extraction in Men's Central Jail, in which deputies injured a number of inmates.[47] The report stated, among other things, that with respect to the deputies' documentation of the use of force, "some crucial reports are missing, others are substantially incomplete and still other reports are inaccurate or false."[48] In addition, the report stated: "One of the most disturbing aspects of this incident is that there was apparently not so much as a cursory review of the situation, let alone a serious investigation" by supervisors of what led to the disturbance on the cell block and the response that culminated in the serial cell extractions.[49]

182. In its 2011 report, the OIR stated "too often we have found" that "the investigations of force incidents that result in less serious or no apparent injuries to the inmate" are "lackluster, sometimes slanted, and insufficiently thorough."[50]

---

[46] Robert Faturechi & Jack Leonard, *Sheriff Baca Was Warned about Jail Deputies Conduct, Retiree Says*, Los Angeles Times, Dec. 1, 2011, *available at* http://articles.latimes.com/2011/dec/01/local/la-me-jail-commander-20111201-1 [hereinafter *Sheriff Baca Was Warned*].
[47] Expert Report of Jeffrey Schwartz, Feb. 8, 2011, filed in *Ramirez v. Baca*, CV08-2813-DSF (C.D. Cal.) (No. 118).
[48] Id. at 15.
[49] Id. at 20.
[50] Los Angeles County Office of Independent Review, *supra* note 31, at 4.

COMPLAINT FOR INJUNCTIVE RELIEF

183.   Former FBI Executive Thomas Parker concluded that there are "systemic institutional actions to cover [] up" the longstanding pattern of unchecked deputy-on-inmate violence at the jails.

184.   The institutional cover-ups often take the form of filing criminal charges against inmate victims of deputy violence.  The odds are low of an inmate winning an acquittal against the sworn testimony of deputy witnesses.  A criminal conviction of the inmate for his "assault" on the deputy – in reality, the deputy's assault on the inmate – results in a complete immunization of the deputy assailants and the Department for from civil liability for the assault.

185.   In January 2011, James Parker, an inmate whom ACLU Jails Project Coordinator Esther Lim witnessed being brutally beaten and tasered by Deputies Ochoa and Hirsch, was subsequently charged with battery against a peace officer and resisting a peace officer.  For additional examples of trumped-up charges filed against victims of deputy abuse, *see, e.g.,* Paragraphs 54 – 60 (Macario Garcia), 115 (Mr. M), and 125 (Evan Tutt) above.

186.   The Department has even charged *visitors* to the Jails in this fashion.  As discussed in Paragraph 69, Gabriel Carillo was assaulted by deputies while visiting his brother in Men's Central Jail in February 2011.  In April, 2001, he was charged with resisting and officer and battery.[51]  The District Attorney later dismissed the charges against him after the ACLU issued its 2011 Annual Report and the *Los Angeles Times* revealed that the FBI was investigating deputy-on-inmate abuse in the jails.

187.   In contrast, LASD frequently chooses not to forward to the District Attorney information about deputies who have been disciplined or even terminated for using excessive force against inmates.  As the *Los Angeles Times* reported: "In several cases in recent years, deputies who were disciplined or even

---

[51] *The People v. Gabriel M. Carillo,* BA381607 (Los Angeles County Superior Court).

COMPLAINT FOR INJUNCTIVE RELIEF

fired for abusing inmates escaped criminal scrutiny because Sheriff's Department officials chose not to give the evidence to the district attorney's office, opting to handle the cases internally."[52]

### L.   Defendants Have Actual Knowledge Of Deputy Violence And Have Failed To Take Reasonable Measures To Avert It

188.   Rampant violence at the Jails has resulted from a failure of leadership at the top level of the Department.  Such a pervasive, deeply-entrenched, and notorious pattern of excessive force could not have continued unabated over a period of many years without a code of silence on the part of front-line and supervisory staff, combined with management staff's failure to require accountability, and their engaging in outright cover-up.[53]

189.   Despite overwhelming evidence of the culture of deputy-on-inmate violence, Sheriff Baca, Undersheriff Tanaka, and Chief Burns have stubbornly refused to acknowledge the problem.  They and their spokespeople have publicly taken the position that victims' allegations have been investigated thoroughly and found to be false, and they have attacked the credibility of civilian witnesses to deputy violence.  On information and belief, they have routinely dismissed inmates' complaints of staff beatings, even when the deputies allegedly involved had failed to report a use of force and the inmate was seriously injured; when the inmate's injuries were obviously more serious than the staff accounts of their actions would suggest; and when the same deputies reported essentially the same scenarios over and over to describe incidents in which different inmates were injured.

---

[52] Jack Leonard & Robert Faturechi, *D.A. in the Dark on Jail Probes*, Los Angeles Times, Dec. 4, 2011, *available at* http://articles.latimes.com/2011/dec/04/local/la-me-jails-da-20111205.

[53] "The only way in which an established pattern of inappropriate use of force can be maintained is through a combination of a code of silence on the part of front-line and supervisory staff and a management staff posture of lack of accountability or outright cover-up." Jeffrey A. Schwartz, *Fixing Use-of-Force Problems*, American Jails (2010).

-57-                                    COMPLAINT FOR INJUNCTIVE RELIEF

190.    Sheriff Baca has failed or refused to hold accountable high-ranking supervisors in the face of significant nonfeasance and malfeasance by these supervisors and by the officers they oversee.  Both Chief of Custody Operations Burns and Undersheriff Tanaka remain in the positions they held, or have been promoted, despite the epidemic of deputy on inmate abuse in the jails that Sheriff Baca is aware occurred over the past years.

191.    With rare exception, deputies whose misconduct is brought to the attention of supervisory personnel continue to work with inmates in Department-operated jails without any substantial disciplinary action being taken against them.

192.    The fact that physical abuse by officers remains unchecked and unrestrained leads the staff to believe that inmates may be beaten with impunity. Sheriff Baca's actions and omissions have created the perception among high-ranking supervisors in the Sheriff's Department that a supervisor who turns a blind eye towards evidence of staff misuse of force and fails to investigate incidents in which inmates are injured by staff will suffer no damage to his or her career.

193.    In September 2011, the release of the ACLU's annual report on the Los Angeles County Jails, detailing some seventy recent instances of extreme deputy violence against inmates and other serious abuse of inmates, and press reports of an FBI probe involving deputy violence in the Jails, set off a media storm.  Sheriff Baca responded by dismissing any possibility of a systemic problem, and with wildly inconsistent and self-serving statements about his lack of awareness of the problem.

194.    Sheriff Baca first flatly denied the existence of a systemic problem.  Nicole Nishida, one of the sheriff's spokespersons, said that the department thoroughly investigated all complaints of abuse that it received and that most were unsubstantiated.[54]

[54] Jennifer Medina, *Report Details Wide Abuse in Los Angeles Jail System,* N.Y.

COMPLAINT FOR INJUNCTIVE RELIEF

195.   As public criticism of Sheriff Baca continued to mount, and new allegations surfaced, the Sheriff acknowledged there were widespread problem but claimed that he had not been aware of its existence. As reported on October 10, 2011, Defendant Baca stated: "We are going to look into this and we welcome anyone to look into it as well." He contended that "[t]he widespread problem can't be defined until we know what all the issues are."[55]

196.   On October 16, 2011, the Sheriff told the *Los Angeles Times* that his command staff occasionally left him in the dark about the Jails' problems. "I wasn't ignoring the jails. I just didn't know," Baca said. "People can say, 'What the hell kind of leader is that?' The truth is I should've known. So now I do know."[56]

197.   Finally, in early December 2011, it came to light that Sheriff Baca and other senior officials in LASD had in fact known of the pattern of widespread deputy violence in the Jails for years. Robert Olmsted, a retired top LASD official with supervisory authority over Men's Central Jail, had repeatedly informed Sheriff Baca of such problems. The *Los Angeles Times* reported on December 1:

> A top commander in Los Angeles County's jail system said he warned Sheriff Lee Baca and other senior officials last year about deputies using excessive force against inmates but was ignored until the problems grew into a public scandal.
>
> In an interview with The Times, Robert Olmsted said he

Times, Sept. 28, 2011, *available at* http://www.nytimes.com/2011/09/28/us/aclu-suit-details-wide-abuse-in-los-angeles-jail-system.html?_r=1&pagewanted=all.
[55] Jennifer Medina, *Pressed, Sheriff Agrees to Jails Inquiry*, N.Y. Times, Oct. 10, 2011, *available at* http://www.nytimes.com/2011/10/11/us/pressed-sheriff-agrees-to-abuse-inquiry.html?_r=1&scp=1&sq=margaret%20winter%20aclu&st=cse.
[56] Jack Leonard & Robert Faturechi, *Baca Says He Was out of Touch with County's Jails*, Los Angeles Times, Oct. 16, 2011, *available at* http://www.latimes.com/news/local/la-me-baca-jails-20111016,0,5570416.story [hereinafter *Baca Says He Was out of Touch*].

tried to raise red flags about shoddy investigations that allowed deputies to escape scrutiny for using force. He also voiced concern about deputies forming aggressive cliques.

He alleged that two top officials rebuffed him, telling him it was impossible to change the deputy culture in the downtown L.A. lockup, an antiquated facility that houses some of the county's most dangerous inmates.

Olmsted, a 32-year department veteran who retired late last year, had commissioned several confidential audits and internal memos that found serious problems with excessive force and inadequate supervision in the jail. He said top sheriff's officials seemed not to take his concerns seriously.

...

"It's frustrating knowing that this never, ever needed to have occurred," Olmsted said. "There was a systematic failure of leadership."

...

Olmsted said he twice approached Baca to discuss the problems at Men's Central Jail. The first time was at a department barbecue. Baca, he said, told him he would be in touch but never followed up.

Months later, Olmsted said, he spoke to the sheriff at a charity food giveaway. The event occurred soon after a group of Men's Central Jail deputies had been caught fighting each other at an off-duty, department holiday party. After the brawl, sheriff's officials said some of the

-60-                    COMPLAINT FOR INJUNCTIVE RELIEF

> deputies had formed a clique whose members flashed gang-like hand signs.
>
> Olmsted said he told the sheriff he wanted to discuss how to improve supervision at the jail to prevent similar problems in the future. Baca, he said, agreed to talk but again never followed through.[57]

198. Commander Olmsted raised the issue of unchecked violence not only with Defendant Baca but also with Defendants Burns and Tanaka:

> Burns, he said, told him the jail's culture could not be changed. Frustrated, Olmsted said he took his concerns in the summer of 2010 to Asst. Sheriff Marvin O. Cavanaugh, who was sympathetic but told him the same thing. He also spoke to then-Asst. Sheriff Paul Tanaka, who as undersheriff now runs the day-to-day operations of the department.[58]

199. Witness LA reported: "In a series of interviews with the *LA Justice Report*, Olmsted [stated] … '[T]he real problem is how departmental leadership allowed this jail situation to occur.'" "The problems inside the jail were ignored by the Sheriff's command staff. I went to [Custody Chief Dennis] Burns, [Undersheriff Paul] Tanaka. And I went to Lee Baca. I told them I needed help trying to corral this situation and I was ignored."[59]

200. Commander Olmsted also found, as early as 2009, that reported use of force was not being properly investigated and the official paperwork

---

[57] *Sheriff Baca Was Warned, supra* note 42.
[58] *Id.*
[59] Matthew Fleischer, *Dangerous Jails, Part 2: Ignoring the Warnings*, WitnessLA, Dec. 1, 2011, *available at* http://witnessla.com/sheriff-lee-baca/2011/admin/dangerous-jails-part-2-ignoring-the-warnings-by-matt-fleischer/ (emphasis omitted).

COMPLAINT FOR INJUNCTIVE RELIEF

reporting incidents of deputy force at Men's Central Jail – the so-called "use of force packets" – were not being properly prepared:

201. Olmsted found that, not only were many force packages not being investigated, the ones that were cleared were often given only cursory examination. Olmsted had one of his lieutenants pull 30 force reports at random that were in various stages of oversight. A second lietenant [sic], Mark McCorkle, analyzed them. All were either signed off on, or were on the verge of being cleared. Yet of that group of 30, 18 uses of force were questionable in nature and conceivably fell outside of department policy.[60] Commander Olmsted raised the issue of inadequate investigations of use of force with command staff, including Defendants Burns and Tanaka – all of whom ignored the issue. Olmsted took McCorkle's finding regarding inadequate use of force investigations up the chain of command to Custody Chief Dennis Burns, Assistant Sheriff in charge of custody, Marvin Cavanaugh, and Paul Tanaka. No action was taken.[61]

202. In response to these latest revelations from Commander Olmsted, Sheriff Baca, rather than accepting responsibility, publicly laid the blame on Commander Olmsted for not solving the problem. Commander Olmsted didn't need to "ask permission to solve the problem," Baca said.[62] The *Los Angeles Times* commented, on December 2, 2011:

> Never mind that a quasi-military organization like the Sheriff's Department is all about following the chain of command. Or that Baca is trying to have it both ways, suggesting that his command staff failed him by shielding him from the truth, and at the same time blaming Olmsted for not taking care of the problem on his own.
>
> How many times can Baca plead ignorance? This is just

[60] Id.
[61] Id.
[62] *Sheriff Baca Was Warned, supra* note 42.

-62-                    COMPLAINT FOR INJUNCTIVE RELIEF

the latest in a series of objectionable responses that calls into question whether he is capable of running, let alone reforming, the nation's largest jail system.[63]

203. According to Commander Olmsted, when he took the evidence of inadequate investigations of use of force incidents to Chief Burns, Chief Burns did not deny there was a problem, but told Olmsted that the jail's culture could not be changed.[64]

204. Despite their knowledge of the serious problem of improper and excessive use of force in the jails, Defendants have repeatedly failed to take reasonable steps to address the problem.

205. Defendants have failed to put in place adequate policies governing use of force. The Department's policies are grossly lacking in specificity about typical force scenarios that are likely to arise in the jails and the proper way for custody personnel to handle those situations.

206. The force policies remain severely inadequate even after the few changes to force policies that the Defendants have implemented since the release of the ACLU's 2011 report.

207. The insufficiency of the force policies makes it almost impossible to train deputies adequately on the proper use of force.

208. Sheriff Baca has failed to install cameras in Twin Towers and Men's Central Jail, even though he has stated as far back as 2005 that he planned to install security cameras in Men's Central Jail.[65] In 2011, after the ACLU released its Annual Report on abuse in the jails, Sheriff Baca admitted that scores of cameras

---

[63] Editorial, *Baca's Jails Are Baca's Problem: Sheriff Lee Baca Should Stop Blaming Others and Take Responsibility for Fixing L.A. County's Jails*, Los Angeles Times, Dec. 2, 2011, *available at* http://articles.latimes.com/2011/dec/02/opinion/la-ed-baca-20111202.
[64] *Sheriff Baca Was Warned*, supra note 42.
[65] *L.A. Jail Called Deadly, Outdated, supra* note 19.

COMPLAINT FOR INJUNCTIVE RELIEF

~~that were supposed to have been installed in Men's Central Jail had been sitting in boxes for a year or more.~~[66]

209. Sheriff Baca, Undersheriff Tanaka, and Chief Burns have failed to implement a system for identifying, logging, and tracking incidents of use of force by deputies and complaints by inmates of use of force by deputies in the LA County jail.

210. For the past five years, the Los Angeles Police Department has had a computerized system, TEEMS II, capable of both tracking use of force information and providing early warning by identifying officers involved in multiple use of force incidents. Even though LAPD and numerous other law enforcement agencies have such tracking and early warning systems, on information and belief, Defendants either have not designed their Facility Automated Tracking System (F.A.S.T.) or Personnel Performance Index to perform this function for deputies working in the Custody Division, or they have failed to obtain this information from one or both systems, to reduce the number of incidents of excessive or unnecessary use of force in the Jails. Nor have they created a system that tracks inmate complaints about use of force by deputies in the jails.

211. Defendant Burns has been and is aware of the failures of the Department's tracking systems. When the ACLU sought a court order in 2010 requiring that complaints of retaliation, including identifying the officer(s) who are the subject of such allegations be tracked in F.A.S.T., Chief Burns submitted a sworn declaration to the Court stating, "the FAST was not designed properly to track information about deputy misconduct."

212. A tracking system of this kind is a basic tool for ensuring that all incidents of use of force are properly reviewed and investigated and are commonly used by large jail systems. The lack of such a system makes it difficult to compile

[66] ~~*Baca Says He Was out of Touch, supra* note 52.~~

-64-                    COMPLAINT FOR INJUNCTIVE RELIEF

the essential data to detect and address problematic patterns of use of force as they develop.

213.    Defendants Baca, Tanaka, and Burns have failed to develop and implement a policy of zero tolerance for deputy violence and abuse of inmates. Then-Assistant Sheriff Tanaka was informed as far back as 2006 by the Captain of Men's Central Jail that there was a problem with improper use of force by deputies at Men's Central Jail. At that time, Captain Clark also expressed concern about deputy gangs in the jail to Tanaka. When Captain Clark proposed to set up a rotation system to attempt to break up the deputy gangs, Tanaka transferred Clark out of Men's Central Jail.

214.    When Assistant Sheriff Tanaka informed Mr. Olmsted that he was being made the Captain in charge of Men's Central Jail, Tanaka told Olmsted that use of force was a problem in the jail.

215.    When Sheriff Baca promoted Olmsted to Commander in the Custody Division, then Assistant Sheriff Tanaka arranged for Dan Cruz to become the Captain at MCJ, even though it was well-known within the LASD that Cruz had been transferred out of the Lennox Station for being about 18 months behind on his paperwork, including his review of use-of-force complaints. Tanaka nonetheless placed him in a facility where he knew there were problems with use of force.

216.    Although Defendants have been repeatedly warned that use of force by deputies is disproportionately directed at inmates with mental illness, Defendants have failed to implement numerous recommendations on training and other appropriate steps to reduce force against mentally ill inmates made by experts.

217.    Defendants have abjectly failed to develop policies that address the problem of endemic brutality in the Jails. Policies regarding use of force, investigation of use of force, discipline for deputies who have used excessive force or failed to report use of force, supervisors who have mishandled investigations of force, and training of deputies and supervisors all fail to meaningfully address the

-65-            COMPLAINT FOR INJUNCTIVE RELIEF

problem. When allegations of deputy violence arise, they are infrequently investigated, and deputies are rarely disciplined. Defendants have failed to track incidents of violence, even though systems for doing so are readily available and commonly used. In this way, Defendants have fostered a pattern and practice of deputy violence against inmates, which places inmates at a significant, ongoing risk of serious and irreparable injury. Deputies and supervisors alike have come believe that committing abuse (or failing to investigate abuse) will have absolutely no impact on one's career. As a result, physical abuse by deputies continues unchecked. The persistent failure or refusal of Sheriff Baca and the other Defendants to supervise deputies properly or take action to curb the misconduct demonstrates Defendants' deliberate indifference to the Plaintiffs' right to reasonable protection from harm.

## V.    CLASS ACTION ALLEGATIONS

218.    Plaintiffs Rosas and Goodwin bring this action, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), on behalf of all present and future inmates confined in the Jail Complex in downtown Los Angeles: Men's Central Jail, Twin Towers, and the IRC. Inmates assigned to Men's Central Jail and Twin Towers spend some period of time in the IRC, and it is commonplace for inmates to be transferred back and forth between Men's Central Jail and Twin Towers. The class that Plaintiffs seek to represent meets the requirements of Rule 23 as follows:

### A.    NUMEROSITY

219.    The class meets the numerosity requirement of Rule 23(a)(1). There are more than 4,000 inmates confined within Men's Central Jail and about 2,800 inmates in the Twin Towers at any given time. Between 500 to 1,000 men are processed into or out of the jails through the IRC on any given day. The membership of the class continuously changes, rendering joinder of all members

impracticable. The inclusion within the class of future inmates in the downtown Jail Complex also makes joinder of all members impracticable.

**B.    COMMONALITY**

220.    The class meets the commonality requirement of Rule 23(a)(2). Questions of law and fact presented by the named plaintiffs are common to other members of the class. The common contentions that unite the claims of the class include the following:

(A)    There is an unlawful pattern and practice at the Jails of excessive physical violence used by Sheriff's deputies against inmates.

(B)    There is an unlawful pattern and practice at the Jails of Sheriff's deputies enlisting and encouraging inmates to carry out savage attacks against other inmates and promoting inmate-on-inmate violence.

(C)    There is an unlawful pattern and practice at the Jails of Sheriff's deputies using violence and threats of violence to coerce false statements from inmates, to cover up unlawful violence and to intimidate inmates and thereby prevent inmates from making complaints or otherwise reporting abuse at these facilities.

(D)    Sheriff Baca, Undersheriff Tanaka, Assistant Sheriff Rhambo, and Chief Burns are aware of and deliberately indifferent to the use of excessive force by correctional officers and the enlisting and encouraging of inmates to carry out savage attacks in the Jails. They acquiesce in and condone this conduct by failing to investigate it, failing to take reasonable measures to end the culture of deputy violence that fosters it, failing to punish deputies who engage in it, protecting those deputies from criminal prosecution, and rewarding such deputies for their conduct.

**C.    TYPICALITY**

221.    Plaintiffs meet the typicality requirement of Rule 23(a)(3), since, as alleged below, the claims of the Plaintiffs are typical of those of the class.

-67-        COMPLAINT FOR INJUNCTIVE RELIEF

222.   **Plaintiff Alex Rosas**, twenty-four years old, is currently housed in Twin Towers.[67]  On July 22, 2011, Mr. Rosas witnessed a group of deputies, including Defendants Luviano, Guerrerro, Bearer, and Ibarra, severely beating a non-resisting inmate, Arturo Fernandez, who was clad only in boxer shorts and had his hands cuffed behind his back.  As the deputies pummeled the handcuffed Fernandez, they shouted that he was resisting, although he was not.  The deputies then dragged Fernandez away.

223.   An hour after Mr. Rosas witnessed the beating, Deputies Ibarra and Luviano came to his cell and warned him, "You better not say anything." Mr. Rosas told the deputies that he had not seen anything.  Mr. Rosas was afraid that they would hurt him or arrange for other inmates to attack him.

224.   A few days later, Deputies Ibarra and Luviano again came to Mr. Rosas's cell and threatened him not to say anything.  Terrified that something would happen to him, Mr. Rosas told them again that he had not seen anything.

225.   On August 9, 2011, Deputies Bearer and Ibarra came to Mr. Rosas's cell and told him to "cuff up," meaning to allow himself to be handcuffed.  When Mr. Rosas asked the deputies why he needed to be cuffed, they responded that another inmate had given them a tip that Mr. Rosas had "something" in his cell and that they were "going to toss up your cell."  The deputies handcuffed him and sat him outside in the main hallway.

226.   A few minutes later the deputies moved Mr. Rosas away from the door and out of the sightline of other inmates.  They told him they had found a "slicer" – a razor fashioned into a weapon – in his cell.  Mr. Rosas told the deputies that he had not altered any razors and that the weapon did not belong to him. Deputy Luviano asked Mr. Rosas, "Why are you lying to my deputies?"  Mr. Rosas responded, "I'm not lying, sir."  The deputies punched him in the back of the head

_____

[67] LASD has transferred all Men's Central Jail inmates who submitted affidavits to the Court in *Rutherford v. Baca* to a single unit in the Twin Towers, as of October 5, 2011.

-68-                    COMPLAINT FOR INJUNCTIVE RELIEF

four or five times and told Mr. Rosas he would be going to the "hole" – disciplinary solitary confinement – for possessing the slicer.

227.    Later, deputies came to Mr. Rosas's cell with the disciplinary paperwork. They told Mr. Rosas that if he admitted on the form that he had the slicer they would "make this easier" for him and would not "add on any charges." He understood this to mean that if he lied and said he possessed a slicer then he would not be taken to disciplinary segregation and the deputies would not falsely charge him with assault on an officer. Mr. Rosas refused to sign the paperwork, and the deputies escorted him to the hole.

228.    Mr. Rosas asked Deputy Reza for a complaint form, but Deputy Reza refused to give him one. Mr. Rosas told the deputy he would ask the afternoon shift deputies for a complaint form and Deputy Reza responded that he would tell the afternoon shift not to give him the form. When Mr. Rosas asked the afternoon shift deputies for the complaint form, they too refused to give him a form.

229.    **Plaintiff Jonathan Goodwin**, 29 years old, is in an inmate in Los Angeles County Jails. He is currently housed in Twin Towers.

230.    On July 22, 2011, when Mr. Goodwin was housed at Men's Central Jail on the 3000 floor, he saw several deputies running towards a row of cells. He saw deputies leading inmate Arturo Fernandez in handcuffs and then punching him and slamming him to the ground. Mr. Fernandez fell on his face, with his hands cuffed behind his back. Several deputies, including Deputies Luviano and Ibarra, punched Mr. Fernandez on his lower back and the sides of his torso. Another deputy kneed Mr. Fernandez in the back, as if pressing the air out of his lungs. Mr. Fernandez yelled that he couldn't breathe. The deputies told him to "Shut the fuck up!" After the group of deputies punched and kicked Mr. Fernandez countless times, Deputies Ibarra and Luviano escorted Mr. Fernandez out of the housing module.

-69-            COMPLAINT FOR INJUNCTIVE RELIEF

231.  On August 10, 2011, Deputy Luviano came to Mr. Goodwin's cell and told him to "cuff up."  When Mr. Goodwin asked why, Deputy Luviano responded that it was because he could "do whatever the fuck I want" and that Mr. Goodwin "got no rights."  Deputy Luviano handcuffed Mr. Goodwin behind his back and escorted him to the hallway.

232.  In the hallway, Deputy Luviano pushed Mr. Goodwin against the wall and kicked his legs open.  Correctional Assistant Flannigan then approached and kicked Mr. Goodwin's ankle and punched his lower back.  Deputy Luviano punched Mr. Goodwin in the back of the head.  Other inmates exclaimed that they saw what Deputy Luviano as doing.  Custody Assistant Flannigan yelled down the row, "You saw that?  Whatcha gonna do about it?"  Deputy Luviano and Correctional Assistant Wendlent then pulled Mr. Goodwin out of the view of other inmates.  Deputy Luviano repeatedly punched Mr. Goodwin on the back of the head, even when other deputies walked into the area.

233.  Deputy Luviano then moved around Mr. Goodwin and began to punch him repeatedly in the jaw.  Mr. Goodwin sank to the ground and tried to roll away from Deputy Luviano.  Deputy Luviano continued to punch him in the jaw, and other deputies then joined in the beating.

234.  The deputies continued to beat Mr. Goodwin until Deputy Ujolla and Sergeant Soto entered the room and escorted him away.  Mr. Goodwin told Deputy Bearer and Sergeant Soto that the deputies had beaten him. Mr. Goodwin was later interviewed on camera and repeated his account of the incident.  During the interview, Mr. Goodwin felt that Sergeant Soto was trying to misstate the facts and put words in his mouth to make it appear that he was lying.

235.  Deputies took Mr. Goodwin to the medical clinic, where he reported that he was experiencing pain in his jaw and back molars.  Medical staff told Mr. Goodwin there was swelling in his head, yet he received no medical

-70-                    COMPLAINT FOR INJUNCTIVE RELIEF

treatment. Later that night, Mr. Goodwin lost a back molar that had been knocked loose during the attack.

236. On August 12, 2011, staff charged Mr. Goodwin with possession of contraband, insubordination and causing a disturbance, profanity toward staff and inmates, and refusal to follow orders.

## D.   ADEQUACY OF REPRESENTATION

237. Plaintiffs are adequate class representatives and thus meet the requirements of Rule 23(a)(4). Rosas and Goodwin are presently incarcerated within the Jails at issue in this case, they have no conflict of interest with other class members, and they will fairly and adequately protect the interests of the class. They are represented by highly qualified and experienced counsel: The ACLU National Prison Project, the ACLU of Southern California, and Paul Hastings, LLP, as alleged below.

238. The ACLU National Prison Project and the ACLU of Southern California already serve as class counsel for all prisoners in the Los Angeles County Jails in *Rutherford v. Baca*, a case concerning over-crowding in the Jails. The ACLU also serves as court-appointed monitor in that case, and over a period of more than five years has conducted weekly or bi-weekly monitoring tours of Men's Central Jail. Class counsel has sought to obtain discovery on deputy-on-inmate abuse in *Rutherford* and moved to compel production of that discovery after Defendants refused to turn it over. The Court has never ruled on that motion to compel, which was submitted in December 2010. Class counsel has also informed the Court of its intent to litigate the issue of deputy violence in an evidentiary hearing in *Rutherford*, but the Court has questioned whether the scope of the *Rutherford* judgment encompasses that issue. The ACLU is thus uniquely well acquainted with the issues of deputy violence in the Jails and well equipped to litigate those claims. Their work in *Rutherford* on the issues of deputy violence and overcrowding helped trigger a broad criminal investigation by the FBI and the U.S.

Attorney's office, and was a key factor in the decision of the County Board of Supervisors in November 2011 to convene a Commission to study the causes of deputy violence in the Jails.

239. Plaintiffs' co-lead counsel Margaret Winter is the Associate Director of the National Prison Project of the American Civil Liberties Union. Since 1973, the ACLU National Prison Project has been the only organization litigating prisoners' rights cases throughout the nation. Attorney Winter has litigated prisoners' rights cases, most of them class actions, in federal courts in Alabama, Mississippi, Texas, Arizona, California, Nevada, Idaho, Maryland, Delaware, and Vermont, and in the Fourth, Fifth, Eighth, Ninth, and Eleventh Circuit Courts of Appeal and the U.S. Supreme Court. She has argued and won a prisoner's rights case in the U.S. Supreme Court. Since 2007, Winter has served as co-lead class counsel for all the inmates in Los Angeles County Jails in *Rutherford v. Baca*

240. Plaintiffs' co-lead counsel Peter Eliasberg is the Legal Director of the ACLU Foundation of Southern California. Since its founding in 1923, the ACLU of Southern California has been litigating a broad variety of civil rights cases, including prisoners' rights cases. Attorney Eliasberg has been lead counsel or co-lead counsel in numerous federal civil rights class actions in the Central District of California and has been lead counsel in civil rights matters before the United States Court of Appeals for the Ninth Circuit, the California Supreme Court, and the United States Supreme Court, and has argued a case before the U.S. Supreme Court. Since 2009, Eliasberg has served as co-lead class counsel for all the inmates in Los Angeles County Jails in *Rutherford v. Baca*.

241. Paul Hastings LLP is an international law firm with 18 offices. Paul Hastings currently has 1,029 attorneys worldwide, including 148 attorneys in the Los Angeles office. Paul Hastings is a global law firm and has sufficient resources to adequately represent the class. Paul Hastings has been recognized

-72-                COMPLAINT FOR INJUNCTIVE RELIEF

widely for its work on pro bono cases. *The American Lawyer* recently ranked Paul Hastings second in the nation in the *American Lawyer Pro Bono Report of 2011*. In 2010, the firm was honored as the Pro Bono Law Firm of the Year by Public Counsel, the world's largest pro bono public interest law firm. The Los Angeles office of Paul Hastings was awarded the 2010 Pro Bono Service Award by the Legal Aid Foundation of Los Angeles, as the top pro bono law firm in Los Angeles. Paul Hastings has extensive experience in class action litigation, including class action lawsuits involving civil rights. In 2009, Paul Hastings worked with the ACLU of Southern California in a civil rights class action which rectified unconstitutional and unsafe conditions in an immigration detention center. Paul Hastings has also recently argued and won a civil rights case before the U.S. Supreme Court.

242. Plaintiffs meet the requirement of Rule 23(b)(2), as Defendants have acted, or omitted to act, on grounds generally applicable to the class, thereby making injunctive relief appropriate with respect to the class as a whole.

## VI. EXHAUSTION OF ADMINISTRATIVE REMEDIES

243. Both of the named Plaintiffs have exhausted available administrative remedies.

244. On August 24, 2011, Mr. Goodwin filled out an inmate complaint form stating, among other things, "On August 24, 2011, Deputy Luviano and Correctional Assistant Flannigan and other deputies beat me up." The form was delivered that day to both Watch Commander Limon and Deputy Alvarez at Men's Central Jail.

245. No one from LASD has ever provided Mr. Goodwin with a response to the complaint or informed him that the LASD was seeking an additional 15 days to complete its investigation of the complaint.

246. On August 24, 2011 Mr. Rosas filled out an inmate complaint form stating, among other things, that on "8/9/2011 Deputy Luviano punched me,"

-73-   COMPLAINT FOR INJUNCTIVE RELIEF

which was provided to Watch Commander Limon and Deputy Alvarez at Men's Central Jail.

247. A few days later Senior Deputy Lauderdale approached Mr. Rosas, showed him the complaint form and asked him what it was about. At no point has any LASD personnel provided Mr. Rosas a response to the complaint or informed him that the LASD was seeking an additional 15 days to complete its investigation of the complaint.

248. LASD policy provides that the department shall investigate all complaints within 15 days of their being filed unless the department notifies the inmate in writing that it is seeking an additional 15 days to complete the investigation. Both Plaintiffs filed their complaints more than 90 days ago without receiving any response from LASD personnel.

## VII. CLAIMS FOR RELIEF

### A. Eighth Amendment To The United States Constitution; 42 U.S.C. Section 1983

249. By reason of the allegations set forth in paragraphs 1 – 248, *supra*, plaintiffs Rosas and Goodwin, and the class they represent, were deprived and continue to be deprived by Defendants of their rights, under the Eighth and Fourteenth Amendments to the United States Constitution, to due process of law and to be free from gratuitous and excessive force, threats of gratuitous and excessive force, degrading and sadistic treatment.

250. The failures of Defendants Baca, Tanaka, and Burns to take appropriate steps to curb the widespread pattern of brutality in Men's Central Jail, the Twin Towers, and the IRC, as described in this Complaint, constitutes deliberate indifference to Plaintiffs' basic need for reasonable protection from harm and violates Plaintiffs' rights to be free from cruel and unusual punishment, including physical abuse and intimidation, degrading, cruel, and sadistic treatment,

and the wanton and needless infliction of pain, as guaranteed to Plaintiffs by the Eighth and Fourteenth Amendments to the United States Constitution.

**B.    Fourteenth Amendment To The United States Constitution; 42 U.S.C. Section 1983**

251.   By reason of the allegations set forth in paragraphs 1 – 248, *supra*, plaintiffs Rosas and Goodwin, and the class they represent, were deprived, and continue to be deprived, by Defendants of their right to due process and to be free from punishment without process, in the form of gratuitous and excessive force, threats of gratuitous and excessive force, and degrading, cruel and sadistic treatment, as guaranteed to them by the Fourteenth Amendment to the United States Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs request this Court as follows:

1.   Declare that the continuing inaction of the supervisory defendants, as described above, violates the rights of the Plaintiff class under the Eighth and Fourteenth Amendments to the United States Constitution;

2.   Grant preliminary and permanent injunctive relief, enjoining Defendants, their successors, agents, servants, employees, and all those in active concert or participation with them, from subjecting inmates in the Jails to physical abuse and the threat of physical abuse;

3.   Require these Defendants to formulate a remedy, subject to the court's approval and modification, if necessary, to end the pattern of excessive force and physical abuse in those jails, including:

(A)   adequate policy on the use of force;

(B)   adequate investigation of all use of force incidents and inmate-on-inmate violence, with investigations performed by personnel unconnected to the attack under investigation;

-75-                    COMPLAINT FOR INJUNCTIVE RELIEF

(C)    appropriate training in use of force and prevention of inmate-on-inmate violence;

(D)    appropriate discipline of staff members found to be involved in improper use of force incidents, improper threats of violence against inmates; incitement of inmate-on-inmate attacks; or failure to report use of force incidents;

(E) appropriate selection and supervision of command and uniformed custodial staff.

4.    Retain jurisdiction in this case until the unlawful conditions, practices, policies, acts, and omissions complained of herein no longer exist and this Court is satisfied that they will not recur;

5.    Award the costs of this action, including reasonable attorneys' fees; and

\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\

**6.**    Grant such other and further relief as this Court deems just and proper.

DATED:  January 18, 2012    PETER J. ELIASBERG
MARISOL ORIHUELA
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA

By:_____
PETER J. ELIASBERG

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN GOODWIN on
behalf of themselves and of those similarly
situated

DATED:  January 18, 2012    MARGARET WINTER
ERIC BALABAN
DAVID M. SHAPIRO
NATIONAL PRISON PROJECT OF THE
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

By:_____
MARGARET WINTER

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN GOODWIN on
behalf of themselves and of those similarly
situated

DATED:  January 18, 2012    DONNA M. MELBY
JOHN S. DURRANT
JADE H. LEUNG
ELIZABETH C. MUELLER
PAUL HASTINGS LLP

By:_____
DONNA M. MELBY

Attorneys for Plaintiffs
Alex Rosas and Jonathan Goodwin

6.    Grant such other and further relief as this Court deems just and proper.

DATED: January 18, 2012       PETER J. ELIASBERG
                              MARISOL ORIHUELA
                              ACLU FOUNDATION OF SOUTHERN
                              CALIFORNIA


                              By:_____
                                         PETER J. ELIASBERG

                              Attorneys for Plaintiffs
                              ALEX ROSAS and JONATHAN GOODWIN on
                              behalf of themselves and of those similarly
                              situated


DATED: January 18, 2012       MARGARET WINTER
                              ERIC BALABAN
                              DAVID M. SHAPIRO
                              NATIONAL PRISON PROJECT OF THE
                              AMERICAN CIVIL LIBERTIES UNION
                              FOUNDATION


                              By:_____
                                         MARGARET WINTER

                              Attorneys for Plaintiffs
                              ALEX ROSAS and JONATHAN GOODWIN on
                              behalf of themselves and of those similarly
                              situated


DATED: January 18, 2012       DONNA M. MELBY
                              JOHN S. DURRANT
                              JADE H. LEUNG
                              ELIZABETH C. MUELLER
                              PAUL HASTINGS LLP


                              By:_____
                                         DONNA M. MELBY

                              Attorneys for Plaintiffs
                              Alex Rosas and Jonathan Goodwin

LEGAL_US_W # 70140023.8

-77-                COMPLAINT FOR INJUNCTIVE RELIEF

# EXHIBIT A

2003.10.01

Case 2:12-cv-00428-DDP-SH    Document 1 #:248 Filed 01/18/12    Page 83 of 92    Page ID #:97

2003.10.01

# EXHIBIT B



# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Philip S. Gutierrez and the assigned discovery Magistrate Judge is Stephen J. Hillman.

The case number on all documents filed with the Court should read as follows:

## CV12- 428 PSG (SHx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

====================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

©COPY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| ALEX ROSAS and JONATHAN GOODWIN, on their own behalf and on behalf of those similarly situated, | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | CV12-00428 PSG (SHx) |
| v. | |
| LEROY BACA, PAUL TANAKA, CECIL RHAMBO, and DENNIS BURNS, | SUMMONS |
| See attached.    DEFENDANT(S). | |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Peter Eliasberg_____, whose address is _ACLU of Southern California, 1313 W. Eighth St, Los Angeles, CA 90017_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

JAN 1 8 2012

Dated: _____

Clerk, U.S. District Court

By: _____

JULIE PRADO    SEAL

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                                           SUMMONS

PETER J. ELIASBERG (SB# 189110)
peliasberg@aclu-sc.org
MARISOL ORIHUELA (SB# 261375)
morihuela@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5299

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN GOODWIN, on behalf of
themselves and of those similarly situated

(Counsel continued on next page)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> LEROY BACA, Sheriff of Los Angeles County Jails; PAUL TANAKA, Undersheriff, Los Angeles Sheriff's Department; CECIL RHAMBO, Assistant Sheriff, Los Angeles Sheriff's Department; and DENNIS BURNS, Chief of the Custody Operations Division, Los Angeles Sheriff's Department, <br><br> Defendants. | CASE NO. <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF CLASS ACTION** |
| --- | --- |

COMPLAINT FOR INJUNCTIVE RELIEF

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
ROSAS, ALEX; GOODWIN, JONATHAN, on their own behalf and on behalf
of those similarly situated

**DEFENDANTS**
BACA, LEROY; TANAKA, PAUL; RHAMBO, CECIL; BURNS, DENNIS; in
their official capacities
(See attachment for government agencies and titles of each defendant.)

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing
yourself, provide same.)

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017 (See attachment for additional counsel.)

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S.
Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship
of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country ☐ 3 | | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from another district (specify):

☐ 6 Multi-
District
Litigation

☐ 7 Appeal to District
Judge from
Magistrate Judge

**V. REQUESTED IN COMPLAINT:     JURY DEMAND:** ☐ Yes   ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes   ☐ No          ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Eighth and Fourteenth Amendment of the U.S. Constitution, and 42 U.S.C. Section 1983, for violation of rights to due process and to be free from excessive force

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | | | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/ PENALTY | |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | | ☐ 610 Agriculture | PROPERTY RIGHTS |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 620 Other Food & Drug | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | | | ☐ 441 Voting | | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | | | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus- Alien Detainee | ☒ 440 Other Civil Rights | ☐ 690 Other | FEDERAL TAX SUITS |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | | ☐ 871 IRS-Third Party 26 USC 7609 |

# CV12-00428

**FOR OFFICE USE ONLY:     Case Number:** _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐No ☑Yes
If yes, list case number(s): Case No. Civ. 75-04111-DDP

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                                                              ☑ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                                                              ☑ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                                                              ☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Alex Rosas resides in Los Angeles County. Jonathan Goodwin resides in Los Angeles County. | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
     Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Each claim arose in Los Angeles County. | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____ Date January 18, 2012

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

| | |
|---|---|
| *ALEX ROSAS and JONATHAN GOODWIN, on their own behalf and on behalf of those similarly situated v. LEROY BACA, Sheriff, Los Angeles Sheriff's Department; PAUL TANAKA, Undersheriff, Los Angeles Sheriff's Department; CECIL RHAMBO, Assistant Sheriff, Los Angeles Sheriff's Department; and DENNIS BURNS, Chief of the Custody Operations Division, Los Angeles Sheriff's Department* | Page 3 of 4 |

## ATTACHMENT TO CIVIL COVER SHEET

### I(a) Defendants:
Los Angeles Sheriff's Department, Leroy Baca, Sheriff
Los Angeles Sheriff's Department, Paul Tanaka, Undersheriff
Los Angeles Sheriff's Department, Cecil Rhambo, Assistant Sheriff
Los Angeles Sheriff's Department, Dennis Burns, Chief of the Custody Operations Division

### I(b) Attorneys for Plaintiffs:
PETER J. ELIASBERG (SB# 189110)
peliasberg@aclu-sc.org
MARISOL ORIHUELA (SB# 261375)
morihuela@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5299

MARGARET WINTER (*pro hac vice application forthcoming*)
mwinter@npp-aclu.org
ERIC BALABAN (*pro hac vice application forthcoming*)
ebalaban@npp-aclu.org
DAVID M. SHAPIRO (*pro hac vice application forthcoming*)
dshapiro@npp-aclu.org
NATIONAL PRISON PROJECT OF THE AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St., NW
Washington, D.C. 20005
Telephone: (202) 393-4930
Facsimile: (202) 393-4931

LEGAL_US_W # 70139052.1

| | |
|---|---|
| *ALEX ROSAS and JONATHAN GOODWIN, on their own behalf and on behalf of those similarly situated v. LEROY BACA, Sheriff, Los Angeles Sheriff's Department; PAUL TANAKA, Undersheriff, Los Angeles Sheriff's Department; CECIL RHAMBO, Assistant Sheriff, Los Angeles Sheriff's Department; and DENNIS BURNS, Chief of the Custody Operations Division, Los Angeles Sheriff's Department* | Page 4 of 4 |

## ATTACHMENT TO CIVIL COVER SHEET

DONNA M. MELBY (SB# 86417)
donnamelby@paulhastings.com
JOHN S. DURRANT (SB# 217345)
johndurrant@paulhastings.com
JADE H. LEUNG (SB# 279651)
jadeleung@paulhastings.com
ELIZABETH C. MUELLER (SB# 278283)
bethmueller@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA  90071-2228
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705