PETER J. ELIASBERG (SB# 189110)
peliasberg@aclu-sc.org
MARISOL ORIHUELA (SB# 261375)
morihuela@aclu-sc.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Phone:  (213) 977-9500
Fax:  (213) 977-5299

DONNA M. MELBY (SB# 86417)
donnamelby@paulhastings.com
JOHN S. DURRANT (SB# 217345)
johndurrant@paulhastings.com
JADE H. LEUNG (SB# 279651)
jadeleung@paulhastings.com
ELIZABETH C. MUELLER (SB#
278283)
bethmueller@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071-2228
Phone:  (213) 683-6000
Fax:  (213) 627-0705

MARGARET WINTER (*pro hac vice*)
mwinter@npp-aclu.org
ERIC BALABAN (*pro hac vice
application forthcoming*)
ebalaban@npp-aclu.org
DAVID M. SHAPIRO (*pro hac vice
application forthcoming*)
dshapiro@npp-aclu.org
NATIONAL PRISON PROJECT OF
THE AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St., NW
Washington, D.C. 20005
Phone:  (202) 393-4930
Fax:  (202) 393-4931

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN
GOODWIN, on behalf of themselves
and of those similarly situated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>LEROY BACA, Sheriff of Los Angeles County Jails, et al.,<br><br>Defendants. | CASE NO. CV 12-00428 DDP<br><br>**DECLARATION OF TONI V. BAIR IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:      March 26, 2012<br>Time:     10:00 a.m.<br>Ctrm.:     3<br>Judge:    Hon. Dean D. Pregerson |

LEGAL_US_W # 70654181.1

BAIR DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

# DECLARATION OF TONI V. BAIR

1. My name is Toni V. Bair; I am a Corrections Consultant primarily dealing with professional correctional management, and the use of force. I have previously testified and consulted in approximately twenty-five jail systems and seventeen prison systems in the areas of professional correctional management, failure to protect, unnecessary use of force matters, wrongful death cases, and several other cases regarding correctional and constitutional issues. A detailed statement of my qualifications, experience, and training is attached as Exhibit A: CV.

2. I have been a Corrections professional for more than twenty-five years in both juvenile and adult systems, jails, and state prisons. I have held the following positions in Corrections: Counselor, Captain, Investigator, Unit Manager, Warden, Regional Administrator, and Assistant Commissioner. I opened the first Utah Department of Corrections Youthful Offender Prison as a Warden. I have been Warden of Virginia's Maximum Security Mecklenburg Correctional Center as well as a Regional Administrator supervising eleven prisons in Virginia. While in New York City as Assistant Commissioner for one of the nation's largest urban jails, I was responsible for overseeing the Department's compliance with constitutional issues and court orders in the seventeen jails throughout the five boroughs of New York City. I recently participated in writing a "BRIEF OF CORRECTIONS PROFESSIONALS AS AMICI CURIAE IN SUPPORT OF RESPONDENT" in the Supreme Court of the United States, *Reginald Wilkinson, et al., Petitioners v. Charles E. Austin, et al.*, Respondents No. 04-495.

3. I have been retained by the Plaintiff class, which is represented by the ACLU Foundation of Southern California and the ACLU National Prison Project, in the matter of *Rutherford v. Baca*. I have been asked to render my expert opinion regarding the investigative procedures conducted by the Los Angeles County Sheriff's Department (LASD) in the matter of staff-on-inmate assaults.

## Sources of Information and Methodology

4.        In arriving at my opinions, I have reviewed the following documents:

Declaration of Esther Lim, ACLU Jails Project Coordinator;

Declaration of Scott Budnick, citizen un-escorted volunteer;

Declaration of Paulino Juarez, volunteer Chaplain, Office of Restorative Justice for the Archdiocese of the LA Catholic Church;

Declaration of ████████, volunteer Chaplain since 2005 in the Men's Central Jail (MCJ);

Declarations of 69 current or former prisoners

Declaration of Mary Tiedeman;

Declaration of Chief Dennis Burns in Support of Defendants' Opposition for Injunctive Relief;

Plaintiffs' Notice of Filing of Report Concerning Los Angeles County Jails;

Cited Declarations; and

ACLU Annual Report May 2010.

5.        The methodology that I used in forming my expert opinion is based upon my twenty-five plus years as a corrections practitioner.  During this time, I have held seven different corrections positions in two different state prisons systems and in one of the nation's largest urban jails (NYC).

6.        My correctional training has been extensive. It includes state and federal courses in: Basic Firearms Instructor School Bureau of Indian Affairs (Certified Instructor), Advanced Firearms Instructor School Bureau of Indian Affairs (Certified Advanced Instructor), Fingerprint Identification School FBI, Investigative Procedures Salt Lake County Attorney's Office, Special Investigative Supervisors Training U.S. Department of Justice, Self-Defense Techniques (AKIDO) Federal Bureau of Prisons (Certified Instructor), Riot-Disturbance

Control Federal Bureau of Prisons (Certified Instructor), KOGA Baton (Certified Instructor), Management Training National Institute of Corrections, Excellence in Public Management State of Virginia, Management Training American Correctional Association, and Category I Police Officer Training.

7.    In addition, I relied upon my educational background in psychology, sociology, criminology, social work, and public administration. I also relied upon my correctional experience as an expert witness and corrections consultant where I have consulted and testified on seventy-one different occasions in twenty-three different states on the local, state, and federal levels.

8.    I continue to be an active member of the American Corrections Association and the American Jails Association, receiving and reading their publications. This has helped me to keep current with the discipline of professional corrections management.

9.    Finally, in forming my opinions, I relied heavily on my experience over the past thirty years of teaching college on both the baccalaureate and masters levels. From 1994 to 2004, I taught full time in a nationally known Criminal Justice Program. Courses which I have taught include Criminal Justice Ethics, Criminal Justice Management, Research Methods, Corrections Law, Community Corrections, Senior Seminar, Prisons, and Victimology.

## OPINIONS

**A.    The Policies and Practices of the LASD With Respect to Investigation of Use of Force Incidents Are Grossly Substandard.**

10.    Whenever staff lays hands on a prisoner, a Use of Force Report and/or an Unusual Incident Report should always be filled out by all of the staff who were involved or who witnessed the incident prior to their leaving shift. Management must ensure that prisoner witnesses as well as medical staff and any civilian witnesses are interviewed and file reports of a Use of Force in order to ensure that all of the facts are provided. These reports are then reviewed by management to

determine if further investigation is warranted.  In addition, if a prisoner files a complaint (written or verbal) with management, it is incumbent that an investigation into these complaints be conducted.

11.   All reports and custody investigations must be reviewed by an independent department/division in order to assure that cover-ups are not taking place and that the constitutional rights of the incarcerated are protected.  This independent reviewer should not be in the chain of command of the custody division.  This ensures a thorough review that is insulated from undue influence of the correctional staff who may be abusing their positions.

12.   The Los Angeles Sheriff's Department (LASD) Custody Division conducts its own investigations.  The record indicates that a Sergeant and sometimes a Lieutenant video tape their interviews with a prisoner who has experienced a Use of Force.  Frequently, these Sergeants or Lieutenants directly supervise the Deputies who were involved in the Use of Force.  This is improper.  If a deputy has abused his position by assaulting a prisoner, this also reflects on his supervisor.  Consequently, a supervisor who does not have direct supervisory authority over the deputies must conduct the initial investigation/interview.

13.   In Gordon Grbavac's declaration he stated that after his beating:

*A Sergeant asked, How did all this blood get here?  I told the Sergeant that his deputies had assaulted me.  After the Sergeant left, the deputy said to me, Are you fucking kidding me, you motherfucker.  You better change your story or were going to show you what we do to fat asses.  You better say that you did this to yourself.  I was extremely scared and felt very threatened.  I thought that the deputies might kill me if I didn't do what they said.  So I told them that I would tell the sergeant that I did it to myself.  The Sergeant came back and interviewed me on*

*camera. The white deputy stood 5 feet from me during the interview. At no time did the sergeant direct who had beaten me to leave the area where the sergeant was interviewing me. I told him that I had banged my head on the window.*

In Peter Johnson's declaration he stated that:

*After Deputy Ochoa beat me and pepper sprayed me...a sergeant came over and asked me what happened. He told someone to go get a video camera. The Sergeant interviewed me with a video camera in the hallway near the deputy control room and I saw Deputies Ochoa, Reynosa and Saldivar standing less than 10 feet away from where I was being interviewed.*

14.    These two accounts indicate that the housing unit Sergeant was the one conducting the videotaped interviews, which should not be taking place.

15.    In addition, the declaration of Paulino Juarez stated that Sergeant Barbosa, who was the housing unit Sergeant during the deputy attack on an African American handcuffed prisoner, participated in the Jail investigation interview with Chaplain Juarez.

16.    Many of the prisoners whose declarations I have reviewed in this matter have stated that while they were being interviewed for the investigation of the Use of Force incident, one or more of the deputies who were involved in the incident stood by and observed the prisoner interviews. This practice is unheard of in professionally-conducted investigations and interviews. It is no wonder that the prisoner frequently tells the interviewer that he "fell," causing the injuries to himself, or otherwise alters his story so as not to implicate the officer(s) involved in the incident. *See, e.g.,* Declaration of Gordon Grbavac ¶ 14; Declaration of Juan Pablo Reyes ¶ 13; Declaration of Peter Johnson Declaration ¶¶ 11-12; Declaration

5

of Christopher Brown ¶¶ 28-29. The presence during the interview of a deputy who was involved in a Use of Force incident is highly likely to intimidate the prisoner and affect his testimony. Numerous prisoner declarations describe this practice occurring in different housing units and even different jails facilities which leads me to believe that this is a common event.

17.    Another enormous problem with the process LASD routinely employs in conducting investigations of Use of Force incidents is the practice of deputy intimidation of prisoners prior to interviews. Numerous prisoners have stated that deputies told them they would suffer the consequences if they did not claim self-infliction or otherwise protect the deputies. *See* Declaration of Michael Cervantes ¶ 7; Declaration of Declaration of Gordon Grbavac ¶¶ 13-14; Declaration of Alex Rosas ¶¶ 11-13; Declaration of Stephen Teran ¶¶ 19-20;    The fear of further assaults prevented some of these prisoners from telling management what actually took place.

18.    A more troubling aspect of the lack of a professionally-conducted investigation appears in the four civilian declarations I reviewed. Esther Lim, the Jails Project Coordinator for the ACLU of Southern California who is charged with monitoring the LA County Jails, witnessed a staff assault on a prisoner. While visiting another prisoner, Ms. Lim witnessed two Deputies "savagely beating" a non-resisting prisoner. Deputy Ochoa has been identified by prisoners numerous times in Use of Force incidents. Declaration of Peter Johnson; Declaration of Christopher Atkins. During the beating, the two Deputies repeatedly shouted, "Stop Resisting"; "Stop Fighting". The next day, Ms. Lim was reviewing the daily logs which gave an accounting of the incident Ms. Lim observed. The log identified the prisoner but failed to identify the deputies. The accounting also indicated that the prisoner was fighting with one of the deputies an assertion disputed by Ms. Lim.

19.    In his Declaration, a civilian volunteer named Scott Budnick indicated

6

tasered non-threatening and non-resisting prisoners. Mr. Budnick reported one of these incidents to a sergeant who told Mr. Budnick that he would follow up with him. Yet, Mr. Budnick was never interviewed about the incident by LASD personnel.

20. Paulino Juarez, a Chaplain for the Office of Restorative Justice for the Archdiocese of the LA Catholic Church, witnessed several deputies strike, kick, and taser a non-resisting, non-fighting, hand-cuffed, and waist-chained prisoner. The deputies were constantly yelling, "Stop Resisting"; "Stop Fighting". A "Code 4" was announced over the PA system and two other deputies arrived at the scene and began kicking the prisoner who was bleeding and motionless on the floor. A Sergeant appeared just after the beating took place.

21. Chaplain Juarez was told he was going to be interviewed regarding his witnessing the Use of Force incident. He requested that an attorney from the Archdiocese accompany him for the interview, a request which was denied by the LASD. During a later meeting with Sheriff Baca, the Sheriff stated that the Investigative File for the incident did not contain the detailed report of the incident that Chaplain Juarez had written. During this meeting, Sheriff Baca read from what appeared to be the findings of the investigation, and the only reference to the Chaplain was that he had "exaggerated".

22. It is difficult to understand how the administration of the Jail could ignore a civilian volunteer's account of this Use of Force by merely stating that he had "exaggerated" and not include his report in the Investigative File.

23. Chaplain DOE who has been ministering to the prisoners since 2005, states that he witnessed a Use of Force incident. He observed several deputies kicking and kneeing a non-resisting, non-fighting prisoner who was lying on the ground for several minutes. A Sergeant was also present during the assault. Two deputies told Chaplain DOE to leave the area and go inside. Even though numerous deputies and a Sergeant knew that Chaplain DOE was an eyewitness to

7

the incident, he was never interviewed regarding this incident by LASD personnel. The failure to interview a civilian eyewitness to a Use of Force incident renders the results of that investigation incomplete, useless, and unprofessional in today's correctional management.

24. A related concern is that civilian volunteers in the jails appear to be concerned that if they do come forward and report what they have seen, the LASD will retaliate against them by terminating their jail access. The declarations of three civilian eyewitnesses to Use of Force incidents (including the two jails chaplains ████████████ and Paulino Juarez, and volunteer teacher Scott Budnick) reveal enormous problems with the LASD's practices of conducting investigations of Use of Force incidents involving deputies and prisoner. Scott Budnick states he told some Chaplains of the unjustified force he was observing and the chaplains advised him not to report it. They said that LASD had a practice of ejecting volunteers from the jails if they reported abuses and that he wouldn't be able to work any longer with the prisoners he was teaching. They told him that they were afraid to report instances of abuse because they would lose their jobs. Obviously, if civilians fear reporting possible illegal activities by LASD personnel, it undermines the quality and validity of any investigation conducted by LASD into the Use of Force incidents.

25. A troubling aspect of these civilian reports is that civilians who witness a Use of Force fear for their own safety if they attempt to intervene during the assault. Declaration of Paulino Juarez ¶¶ 20, 23; Declaration of ████████ ¶ 14. I have never experienced or heard of staff, volunteers or citizens going into a correctional facility and being afraid for their own safety at the hands of staff. Prisoners: yes, occasionally; but staff: UNHEARD OF.

26. In the Declaration of Custody Chief Dennis Burns filed with the Court in Rutherford, he cites an oversight agency called Office of Independent Review (OIR) as a check and balance to the investigations that his staff performs.

8

However, the documents I have reviewed show that the investigative role OIR plays is extremely limited.

27.    It is my understanding that OIR does not conduct its own independent review of Use of Force incidents in the LA County Jails. Rather, OIR only reviews the jail investigations that the jail submits to OIR. Even if OIR does sometimes conduct its own interviews, it is hard to understand why it did not elect to interview a chaplain who was an eyewitness to a significant Use of Force incident. Because OIR rarely, if ever, conducts its own interviews, the quality of its reviews is severely undermined if LASD does not have proper policies and procedures in place. For example, if a prisoner witness is intimidated prior to or during his interview by the deputy/s who the prisoner says assaulted him, the value of the Jail investigation is compromised. Worse still, if a civilian eyewitness to deputy abuse, such as Chaplain ████████, is never interviewed, then the jail investigation presented to OIR for its review is almost useless.

28.    In addition, OIR receives an enormous amount of force packages and is unable to review all of them thoroughly due to the size of its staff. Finally, OIR does not have a lot of power with LASD because LASD does not have to follow OIR's recommendations. OIR simply writes reports agreeing or disagreeing with how LASD handled a particular Use of Force incident.

29.    Based on the above, it would appear that OIR is of little value in being a check and balance to the investigations conducted by the LASD.

**B.    There Is a Significant Problem in the Jails with Deputies Using Excessive and Illegal Force against Prisoners**

30.    I am well aware from my 30-plus years in corrections that prisoners do not always tell the whole truth; however, the old saying "where there is smoke, there is fire" is apt in this situation. There are far too many reports of staff-on-inmate assaults in LA County Jails to ignore the strong probability that rogue deputies in the LASD jails are routinely assaulting prisoners. Experienced

deputies in the LASD jails are routinely assaulting prisoners. Experienced correctional professionals have learned that many times, what prisoners say and how they say it "rings true." That is, it sounds believable; I repeatedly found myself making this "rings true" observation as I was reading the numerous prisoner declarations I have reviewed in this matter.

31.    My observation that numerous statements in the prisoner declarations rang true was reinforced by a number of other factors.

32.    First, four civilian eyewitnesses (two chaplains, a volunteer tutor, and an ACLU Jails monitor) have made sworn statements that they witnessed excessive and/or unprovoked force against prisoners. In addition, Mr. Budnick reported that LASD personnel admitted to treating prisoners harshly and even beating them. During his orientation with approximately 40 other volunteers, staff warned them that they would observe deputies cursing at prisoners and using force against them because this was the only way that prisoners could be taught to comply with jail rules. After witnessing one of the five beatings, Mr. Budnick told a deputy what he had observed and the deputy responded, "Yeah, we fuck these guys up all the time." Declaration of Scott Budnick ¶12.

33.    Second, numerous prisoner declarations have stated that as they were being beaten, or as they observed deputies beating other prisoners, the deputies would yell "Stop Fighting" or "Stop Resisting," even though the prisoner against whom force was being used was not resisting. *See, e.g.*, Declaration of Fred Nowden ¶ 6; Declaration of Jonathan Goodwin (08-19-2011) ¶ 22; Declaration of Devon Mannings ¶ 13; Declaration of Alex Rosas ¶ 9. These prisoner declarations are corroborated by three of the civilian eyewitnesses (Esther Lim, Scott Budnick, and Paulino Juarez) each of whom stated that he or she heard deputies yelling "Stop Fighting" and "Stop Resisting" as the deputies were beating prisoners who were not resisting and in some cases were handcuffed. For example, Esther Lim, the Jails Project Coordinator for the ACLU of Southern California who is charged

10

with monitoring the LA County Jails, witnessed a staff assault on a prisoner while she was interviewing another prisoner. She states she witnessed two Deputies (Ochoa and Hirsch) "savagely beating" a non-resisting prisoner while they repeatedly shouted, "Stop Resisting"; "Stop Fighting". Deputy Ochoa has been identified numerous times by prisoners in their declarations regarding Use of Force incidents. *See* Declarations of Christopher Atkins and Peter Johnson.

34. Mr. Budnick declared that Chaplains of all faiths have repeatedly told him that it is common practice for deputies who are beating unresisting prisoners to yell "Stop fighting"; "Stop resisting".

35. In my professional experience, rogue security staff typically use these statements, "Stop fighting" or "Stop resisting," to justify their illegal Use of Force against prisoners.

**C.    Summary**

36. Incidents involving staff-on-inmate Use of Force need to be taken very seriously by supervision and management in our nation's correctional facilities. Unfortunately, there are rogue correctional/detention staff who abuse their positions of authority by assaulting those they are charged to protect. These sworn law enforcement and corrections officers have a constitutional mandate to provide a secure, safe, and humane environment for those in their custody. In the event that force is required to control a prisoner, ". . .*only, that amount of influence necessary to bring the individual safely under control should be used*" (Federal Bureau of Prisons - AKIDO Training).

37. When pervasive, long-standing systemic abuses of this kind exist, it indicates a failure of leadership at the top. This kind of systemic abuse does not occur when the head administrator – who in this case is Sheriff Baca – publicly and professionally declares that the staff-on-prisoner assaults will STOP and that he will no longer tolerate Unnecessary Use of Force on prisoners.

38. In all cases of a Use of Force incident, an independent investigative

department must thoroughly and professionally investigate each incident.

39.    After an initial review of documents provided by all those involved (staff, prisoner, and civilians), if there is any indication that there was an Unnecessary Use of Force, the staff involved should be either assigned to a post that has no direct prisoner contact, or suspended, pending a more thorough investigation.

40.    It is my expert opinion that the myriad accounts of staff-on-prisoner assaults that have been reported and documented as well as the numerous prisoner hospital visits over the years constitute prima facie evidence of systemic staff-on-prisoner abuse by rogue deputies of the LASD jail systems.

41.    Therefore, it is my opinion that the time has come for a drastic response to what is happening in the LASD jails. This response could include a federal criminal investigation by the US Attorney's Office, a federal civil rights investigation under the Civil Rights of Institutionalized Persons Act (CRIPA), or a Court ordered appointment of a Special Master to correct the pattern of pervasive long-standing and unchecked prisoner abuse by deputies against prisoners.

42.    I do not make this last recommendation lightly. As correctional professionals, we should pride ourselves on managing and operating our correctional facilities in a secure, safe and humane manner. It is our responsibility to ensure that the constitutional guarantees that all citizens have are provided to those prisoners that the courts have placed into our custody. However, in this case the abuses that are well documented are pervasive, systemic and ongoing and something drastic must take place to ensure that the staff-on-prisoner assaults that are taking place in the LASD Jail system be stopped.

43.    In my professional opinion, Sheriff Baca is either unwilling or unable to control the systemic abuse that permeates his LA County Jail system. New leadership and thorough, independent professional investigations into staff-on-prisoner abuses and threats are imperative to ensure Los Angeles County has a

well-run professional correctional system, which should guarantee the constitutional rights of those within its charge.

I declare under penalty of perjury that the foregoing is true and correct. Executed September 27, 2011 in Eden, Utah.

Toni V. Bair
Corrections Consultant

13

**EXHIBIT A**

# TONI V. BAIR, CORRECTIONS
# CONSULTANT/EXPERT WITNESS
# P.O. BOX 568, EDEN, UTAH 84310
# 2113 NORDIC VALLEY WAY, EDEN, UTAH 84310
# PHONE/FAX (801) 745-4923
# TONIVBAIR@GMAIL.COM

## CURRICULUM VITA

### WORK EXPERIENCE

1987 - Present  **Corrections Consultant/Expert Witness**

- Specialty areas include Professional Correctional Management, Use of Force, Wrongful Death, Death Row.

1993 - 2008  **Adjunct Professor,** Department of Criminal Justice, Weber State University - Ogden, Utah

- Courses taught include Corrections Law, C.J. Ethics, Community Corrections, Criminal Justice Management, Prisons: Issues and Dilemmas, Research Methods Senior Seminar, Victimology.

1991 - 1993  **Adjunct Professor,** City University of New York, John Jay College of Criminal Justice - New York City and West Point Military Academy

- Courses taught included: Issues in C.J. Personnel, Public Administration (Masters Degree Level Courses).

1990 - 1992  **Assistant Commissioner,** New York City Department of Corrections - New York, New York

- Supervised the Compliance Unit, monitored the Department's adherence to court orders, stipulations, decrees, and judgements as well as the City Board of Correction's Minimum Standards, State Commission of Corrections Minimum Standards and Regulations, and internal policies and procedures of the Department.

- Coordinated the Policy and Procedures Unit, responsible for the rewriting of all policies and procedures in the Department. Approved the writing, formatting, proofing, and issuing of all new policies, procedures, orders, directives and guidelines in the Department.

- Oversaw the Data Coordination Unit, responsible for the collection, analysis, synthesis and interpretation of statistical data collected in the Department. Implemented the networking of all computers within the Assistant Commissioner's office.

- Supervised the Director of the Inmate Grievance Program, who was responsible for responding to all inmate grievance complaints filed by the 23,000 + inmates

Exhibit A
Page 14

within the City's correctional system.

- Oversaw the operation of the Use of Force Unit, which monitored all staff-inmate incidents where force was used.

- Responsible for the coordination of the Department's American Correctional Association Accreditation process.

1986 - 1990  **Regional Administrator**, Virginia Department of Corrections - Richmond, Virginia

- Supervised the Wardens of 7 adult prisons, 3 correctional field units, and 1 work release unit to ensure efficient, effective, professional management and operation.

- Developed and monitored standards of performance for regional office staff, eleven (11) institutional wardens and superintendents to ensure that services were administered in a manner consistent with the Department's mission, policies, procedures, initiatives and objectives.

- Developed long-range plans to meet physical, fiscal and programmatic needs for 11 institutions with a $85,000,000 annual budget, 2,700 staff and over 5,000 inmates.

- Conferred with the Deputy Director for Adult Services, Operations Chiefs, and community representatives about the changing needs in community programs, staffing, funding and security.

- Managed the Central Region Office comprised of 21 staff.

1985 - 1986  **Warden**, Mecklenburg Correctional Center - Boydton, Virginia

- Managed all aspects of a 360-bed maximum security prison with a staff of 357 employees and a $9,000,000 annual budget.

- Developed 3 educational, 2 vocational and 5 work programs for the inmate population.

- During the first 3 months of tenure, a federal contempt court order was dismissed as a direct result of my management of the institution.

1983 -1985  **Warden**,  Utah State Prison  -  Draper, Utah

- Responsible for the opening and management of a 288-bed medium security Youthful Offender (18-22) prison.

- Supervised the Director of the 100-bed women's prison.

- Supervised the Coordinator of the Firefighter Program, an inmate work-release program which fought forest fires throughout the Western United States.

**1982 - 1983** **Prison Investigator**, Utah State Prison - Draper, Utah

- Conducted investigations regarding illegal inmate, visitor, and staff activities including incidents of staff violation of policy.

**1979 - 1982** **Captain**, Utah State Prison - Draper, Utah

- Co-chaired the accreditation process for the prison, receiving the highest rating ever given by the ACA Accreditation Division at that time.

- Responsible for 6 departments, including personnel and training, inmate property, ACA Standards, inmate visiting/mail, and the volunteer program.

- Supervising Social Service Worker for 17 licensed M.S.W. social workers.

- Certified Baton Instructor, Certified Riot Team Instructor and Leader, Certified Firearm Instructor.

**1978 - 1979** **Maximum Security Unit Manager**, Utah State Prison - Draper, Utah

- Management Team was responsible for all Maximum Security Unit and Death Row

**1972 - 1978** **Associate Professor**, Utah State University - Logan, Utah

- Taught social work and sociology courses.

- Supervised all field practicum social work students.

**1969 - 1972** **Chief**, Division Of Probation Juvenile Court - Ogden, Utah

- Supervised 9 probation officers for the five Northern Utah counties.

**1966 - 1969** **Licensed Certified Social Worker** (MSW) - Ogden, Utah

- Marriage and family counselor, individual and adolescent therapy.

**1965 -1967** **Social Worker Utah State Prison - Field Practicuum**

- Spent 2 days a week as a Clinical Social Worker at the USP for the first year and 3 days per week during the second year, of a Field Practicuum towards a Masters Degree in Social Work.

**1962 - 1965** **Boy's Supervisor**, Utah State Industrial School (Youth Corrections) - Ogden, Utah

- Counselor in all housing units of the State's co-educational Industrial School for adjudicated delinquent youth.

## EDUCATION

ABD (Ph.D)   Virginia Commonwealth University, Richmond, Virginia; Doctorate of Public Administration (criminology/criminal justice major), (course work completed, degree not awarded).

ABD (Ph.D)   Utah State University, Logan, Utah - Sociology major, Criminology Emphasis, (course work completed, degree not awarded).

M.S.W.  University of Utah, Salt Lake City, Utah - Social Work major 1967

B.S.     Weber State College, Ogden, Utah - Psychology major  1965

## TRAINING
- Basic Firearms Instructor School, Bureau of Indian Affairs  (Certified Instructor)
- Advanced Firearms Instructor School, Bureau of Indian Affairs (Certified Advanced Instructor)
- Fingerprint Identification School, FBI
- Investigative Procedures, Salt Lake County Attorneys Office
- Special Investigative Supervisors Training, U.S. Department of Justice
- Self-Defense Techniques (AKIDO), Federal Bureau of Prisons (Certified Instructor)
- Riot-Disturbance Control, Federal Bureau of Prisons  (Certified Instructor)
- KOGA Baton  (Certified Instructor)
- Management Training, National Institute of Corrections
- Excellence in Public Management, State of Virginia
- Management Training, American Correctional Association
- Category I Police Officer Training

## PROFESSIONAL ORGANIZATIONS
- American Correctional Association (ACA)
- American Jail Association (AJA)
- Academy of Criminal Justice Educators  (ACJE)
- Western & Pacific Academy of Criminal Justice Educators (WPACJE)

## PROFESSIONAL ACTIVITIES
- Assistant/Adjunct Professor at four (4) Universities (CUNY, VCU, WSU, USU)
- Maintained a private counseling practice for fifteen (15) years
- Certified law enforcement and police science instructor with Utah Police Academy
- Instructor at a conference dealing with development and implementation of the Unit Management Team concept for South Carolina and Indiana DOC's
- Subject of a case study by the Wharton School of Business Program on Correctional Leadership and Innovation for the Edna Clark Foundation entitled <u>A Case Study in the Role of Leadership in a Troubled Prison Setting</u> Adjunct faculty member Waynseboro Academy for Training and Staff Development

Virginia Department of Corrections
- Frequent guest lecturer at the American University, Department of Law, Justice and Society - Washington, D.C.
- Member, Curriculum Advisory Committee Administration of Justice - J. Sergeant Reynolds, Community College Richmond, Virginia
- Mentor, WSU Upward Bound, College prep program for low-income, first generation high school students
- A participant in the writing of: BRIEF OF CORRECTIONS PROFESSIONALS *AN AMICI CURIAE IN SUPPORT OF RESPONDENT*. In the Supreme Court of the United States No. 04-495, Reginald Wilkinson, at al., Petitioners, v. Charles E. Austin, et al., Respondents.

# TONI V. BAIR
# CORRECTIONS CONSULTANT/EXPERT WITNESS
## Consultant Concerning Professional Correctional Management

**CALIFORNIA** (2011) Basra vs. Cate                                    **Report**
Prison policy prohibited beard lengths longer than one/half inch, while hair length could be of any length. Inmates filed a suit challenging the one/half inch beard length policy.

**CALIFORNIA** (2011) Rutherford vs. Baca                                **Report**
A Class Action suit against the Los Angeles Mens Central Jail regarding conditions of confinement, and the prevalence of staff-on-inmate assaults and staff retaliation.

**WASHINGTON** (2011) Tarrer et al. vs. Pierce County et al.            **Report**
Detainees filed a suit against a County Jail for not allowing the Muslim detainees to fully practice their religious beliefs, and providing special housing for Christian detainees.

**MONTANA** (2010) *Peter Leroy Goolsby vs. Darren Raney et al.*        **Report**
A case involving Jail conditions that fell below the standards of care.

**LOUISIANA** (2010) *Ernest Billizone vs. James LeBlanc et al.*        **Report**
An inmate filed a grievance and was given a disciplinary report for using language that was prohibited by a Rule.

**MONTANA** (2009, 2010) *Nelson vs. McMeekin*                          **Report**
A case involving unconstitutional Jail conditions.

**SOUTH CAROLINA** (2010) *Prison Legal News and Human Rights Defense Center vs Berkeley County Sheriff*                          **Deposition  Report**
The Berkeley County Detention Center has a policy that does not allow magazines into the facility which contain one or more staples.

**COLORADO** (2009) Magluta vs. FBOP
A classification case regarding the appropriateness of an inmate being classified to a Super Max facility and BOP's refusal to allow him to transition out of the facility.

**ILLINOIS** (2009) *David Lee Green vs. United States*                 **Report**
A Federal Bureau of Prisons Food Service Supervisor, employed by MCC Chicago, failed

Exhibit A
Page 18

to protect an inmate from assault by another inmate.

**COLORADO**   (2008)    Saleh et al. vs. FBOP                                    **Report - Deposition**
Three inmates transferred to a Super Max facility after the 911 attacks in violation of
P & P without explanation as to the reasons for the transfer.

**MONTANA**   (2007, 2008)    Kottre vs. Missoula County Jail                    **Report**
Detainee was incarcerated for twenty-three months, for an alleged DUI and probation
hold.  Sued for a violation of his 6th amendment rights guaranteeing a speedy trial.

**MICHIGAN**   (2006)    *Hadix v. Caruso*
The advisability of utilizing in cell restraints on a mentally ill inmate.

**COLORADO**   (2006, 2007)    *Jordan vs. Pugh*                    **Deposition - Trial Testimony**
A Federal Prison case challenging the regulation which prohibits inmates from writing and
publishing articles while in prison.

**FLORIDA**   (2006, 2010)    *Joy Perry, et al. vs. Barry Reddish, et al.*    **Report  Deposition**
Several Pen Pal internet sites are suing to get the Florida DOC to rescind a policy which
prohibits inmates from advertising for a Pen Pal.

**ARIZONA**   (2000, 2006)    *Talbow  vs. Maricopa County et al.*              **Deposition**
Inmate in Tent City was not provided adequate nutrition or medical care for his illness,
resulting in his loss of vision.

**CALIFORNIA**   (2006)    *Men's Central Jail  (MCJ) - Los Angeles County*      **Report**
Report for the Court regarding jail conditions at MCJ.

**MONTANA**   (2006)    *Singleton vs. David Schenk*                           **Report**
Sexual harassment and Jail conditions.

**ARIZONA**   (2005)    *Jimenez vs. Maricopa County et al.*                   **Deposition**
Failure to protect where a pre-trial detainee was severely beaten.

**CALIFORNIA**   (2005)    *Cheema v. Chandless*
Jail authorities refuse to allow an immigrant Sheik inmate to wear a religious turban.

**ARIZONA**   (2005, 2009)    DeLong vs. Arpaio                    **Affidavit - Deposition**
Pre-trial detainee, severely beaten by inmates which resulted in the loss of his eye.
**MONTANA**   (2005)    *Johnson vs. Edmisten*                    **Report - Deposition**
Jail conditions case in 72 hour holding facility (Jail).

**ARIZONA** (2004, 2007) *Wilson vs. Maricopa County*    **Report - Deposition - Trial Testimony**
Wilson was severely beaten by inmates & died.  Failure to provide adequate supervision.

**MASSACHUSETTS**   (2004)    *Ashman vs.  Marshall*              **Report - Trial Testimony**

Exhibit A
Page 19

A suit challenging the re-classification of inmates and allowing a disturbance to continue for sixteen days in a housing unit where living conditions fell below the standards of care.

**UTAH**  (2004)  *Regan, et al. vs. County of Salt Lake*
Asked to offer an opinion regarding if the Salt Lake County Jail was in compliance with a current Consent Decree.

**ARIZONA**  (2003)  *Lohoff vs. Maricopa County, et al.*                         **Report**
A mentally ill, bi-polar pre-trial detainee was placed in a overcrowded holding cell and was beaten by other inmates who knew of his alleged sex crime against a minor.

**MICHIGAN**  (2003)  *Fingal Johnson, et al. vs. Bill Martin et al.*             **Deposition**
MDOC policy to ban *Melanic Literature* from the inmate population.

**HAWAI'I**  (2002)  *Tapaoan vs. Hawaii*                                          **Report**
Improper searching, restraining, incarcerating after inmate/detainee has been released by the courts.

**THE CITY OF NEW YORK**  (2002)  *Claude Young  vs. The City of New York*
Was the New York City Department of Corrections negligent in supervising inmates, which led to an inmate-on-inmate assault causing Mr. Young to lose his eye.

**NEW YORK STATE**  (2001)  *Hamilton vs. Goord 98-CV-8022 (AGS)*
Cross-gender frisk searches of female inmates.

**NEW YORK STATE**  (2002)  *Marria vs. Raymond Broaddus*       **Report - Trial Testimony**
NYSDOCS policy to ban *The Five Precentor* newspaper from inmate subscriptions.

**HAWAI'I**  (1999)  *Libby vs. State of Hawai'i, et al.*       **Report - Trial Testimony**
Administrative staff's failure to supervise, resulting in repeated sexual assaults by a corrections officer on a pre-trial detainee.

**HAWAI'I**  (1998)  *Parnell vs. State of Hawaii et al.*
Improper classification and transfer.

**NEW YORK STATE**  (1997)  *Salcedo vs. Bezio, et. al.*
Consulting regarding staff not being disciplined for inmate brutality.

**HAWAI'I**  (1997)  *Allen vs. Iranon, et al.*                 **Report - Trial Testimony**
Consulting and testifying involving retaliation and harassment of a prison employee.

**ILLINOIS**  (1990)
Consulted with the Legal Assistance Foundation on professional correctional management and use of force.

**MASSACHUSETTS**  (1987)

Consulted on a case at Walpole where inmate mail was being read by prison officials.

**OHIO, SOUTH CAROLINA**    (1987)
Along with Ben Martinson (Father of Unit Management) provided a two-day workshop on the Unit Management paradigm for the operations of the Ohio and South Carolina state prison systems.

**INDIANA**    (1986)
Hired by the Indiana Legal Services Program and the Indiana Department of Corrections to look into complaints from inmates regarding operations of the Pendelton Reformatory, Pendelton, Indiana.

**Expert Witness**
**Unnecessary Security Measures in Special Housing Units - SHU's**

**NEW YORK**   (1997)   *People vs. Corey Heath*                    **Trial Testimony**
Inmate assaulted a Correctional Officer and received 15 years isolation as a disciplinary sanction.

**NEW JERSEY**   (1992)   *Baca vs. Byer*                    **Trial Testimony**
Isolation and treatment of a maximum security inmate at Trenton prison.

**NEW YORK**   (1989)   *Bosket vs. Woodbourne Correctional Facility*    **Trial Testimony**
Extraordinary security measures for a maximum security inmate.

**PENNSYLVANIA**   (1989)   *Arbogast et al. vs. David Owens*    **Trial Testimony**
Unnecessary use of force after the October 1989 Camp Hill riot.

**Federal and State Expert Witness**
**Concerning Unnecessary Use of Force**

**NEW YORK   (2010)**    Maurice Boatwright v. Wende Correctional Facility  09 CV 0899

Numerous staff used unnecessary force to restrain inmate Boatwright, breaking two of his fingers and assaulting him numerous times to the face and head.

**FLORIDA**   (2007)   *Daniels vs. Sarasota County Sheriff's Office*    **Deposition**
Excessive force used by Detention Officers in the Sarasota County Jail on a non-resisting inmate, causing permanent paralysis below the neck; lack of adequate medical care.

**NEW YORK STATE**   (2005)   *Sanchez vs. Fraser, et al.*    **Report - Deposition**
Excessive force used in a cell extraction.

**HAWAI'I**   (2005, 2006)   *Belle v. State of Hawai'i*    **Report - Deposition**
While cuffed from behind and being escorted by two corrections staff to his holding cell,

an inmate had his leg broken when taken to the ground for refusing to walk.

**NEW YORK STATE**   (2003)   _Baskerville vs. Goord, et.al._      **Report - Trial Testimony**
Unnecessary use of force on a non-resisting inmate.

**NORTH CAROLINA**   (2002)   _Goings vs. Robbie Lee, Warden et. al._
The need for the length of time, and the technique utilized in a 4-point-restraint case.

**_ARIZONA_**   _(2002)_   _Johnson v. Lewis and Baca vs. Stewart._      **Report - Deposition**
An unnecessary use of force case during a riot in adjacent State facilities, where staff used excessive and prolonged force to contain the inmates in the yard/s.

**HAWAI'I**   (1998)   _Tupelo vs. Penrose, et al._      **Report**
Inmate was beaten and left handcuffed and shackled in his cell for 44 days.

**NEW YORK STATE**   (1997)   _LeGrande against R. Gromley et al._   **Report - Trial Testimony**
Unnecessary use of force, brutality in a cell extraction, denial of medical attention.

**NORTH CAROLINA**   (1995)   _Blanch Correctional Center Inmates vs. N.C. D.O.C._
Class action suit filed on treatment of youthful offenders including use of force, general prison conditions, lack of programming, out of cell time.

**NEW YORK CITY**   (1993)   _D'Angelo against the City of New York_      **Report**
Unnecessary use of force.

**NEW YORK STATE**   (1993)   _Diaz, Marquez vs. Weeden et. al._      **Report**
Unnecessary use of force.

**NEW YORK STATE**   (1993)   _Alexander et al. vs. Smith, et. al._
Gassing of inmates at Attica.

**NEW YORK STATE**   (1988)   _Eng et al. vs. Couglin (Attica)_
Treatment of inmates in the segregation unit.

**NEW YORK CITY**   (1987)   _CIFM Inmates vs. N.Y.C. D.O.C._      **Report - Trial Testimony**
Class action suit - unnecessary use of force and professional correctional management.
**VIRGINIA**   (1985)   _DeLong vs. Murray_
Asked by the Attorney General's Office to render and opinion regarding the appropriateness of security staff gassing an inmate while he was in his cell.

## Expert Witness - Wrongful Death Cases

**IDAHO   (2010)**      _Crystal R. Bannister vs. Caribou County, Ric L. Anderson Sheriff. et al._
Asked to offer an expert opinion regarding the suicide of a pretrial detainee incarcerated in the Caribou County, Idaho Jail.

**IDAHO  (2010)**    _Watson vs. Gooding County_                                    **Report**
A pretrial detainee was incarcerated for DUI, left unattended and hung himself.

**VIRGINIA**   (2009)    _Combs vs. Portsmouith City Jail & P H S_              **Deposition**
A previously diagnosed mentally ill pre-trial detainee was placed in the City Jail and denied medical care as well as proper security observation, which resulted in his untimely death from acute dehydration.

**IDAHO**   (2008)    Johnson vs. Franklin County                                   **Report**
A suicidal inmate was placed in Jail, he was not monitored over an eight hour period and was found hanging.

**MONTANA**   (2007)    Joseph's vs. Gallatain Co. Jail et al.                       **Report**
Plaintiff was arrested on an outstanding warrant for violation of a "no contact order" and taken to Jail.  She was an alcoholic, with a diagnosed heart condition which required medication.  She died of heart failure while in custody.

**ARIZONA**   (2005)    _Sintic vs. State of Arizona, et al._              **Report - Deposition**
Wrongful death and failure to protect in a jail suicide matter.

**ARIZONA**   (2004)    _Blaylock vs. Gila County et al._                            **Report**
Inmate Blaylock received severe head injuries and staff failed to provide timely and adequate medical treatment, resulting in his untimely death.

**ARIZONA**   (2003)    _Vogel vs. Maricopa County, et al._                          **Report**
A mentally handicapped, bi-polar pre-trial detainee was assaulted by C/O in a forced cell extraction, without the presence of medical or psychiatric staff.

**HAWAI'I**   (2002)    _Hill vs. State, et al._                     **Report - Trial Testimony**
State negligence in the drug-related death of an inmate.

**GEORGIA**   (2001)    _Howard vs. City of Columbus_              **Report - Deposition**
Jail officials' deliberate indifference to the medical needs of an inmate resulting in the death of the inmate.

### Expert Witness - Death Row Cases

**MARYLAND**   (2004)    _State vs. Wiggins_                                          **Report**
The Supreme Court overturned Mr. Wiggins conviction and remanded for further sentencing.  At issue was whether he was a risk to staff, inmates and society.

**OKLAHOMA**   (1999)    _H-Unit McAlester, Oklahoma Death Watch Policy_   **Trial Testimony**
Inmates scheduled for execution were placed on death watch 30 days prior to the scheduled execution.

**VIRGINIA**   (1997)   _Murphy vs. State Of Virginia_                                        **Report**
Death row inmate being considered for a life sentence; will he be a threat to staff and/or inmates if clemency is granted?

**TEXAS**   (1995)   _Lackey vs. Wayne_                                                       **Trial Testimony**
Death Row inmate who has been on death row for 15 years; brings up an Eighth Amendment issue, arguing that Texas has "lost" the right to execute him due to their lengthy delays in carrying out the Court's order.

**TEXAS**   (1995)   _Muniz vs. Texas_                                                        **Trial Testimony**
Death Row inmate who has been on death row for 18 years; brings up an Eighth Amendment issue, arguing that Texas has "lost" the right to execute him due to their lengthy delays in carrying out the Court's order.

**TEXAS**   (1994)   _Gosch vs. Texas_                                                        **Trial Testimony**
Texas "jump starting" the execution process to force inmates into Federal court.

**OKLAHOMA**   (1993)   _Mann, et al. vs. Reynolds, et. al._                                  **Trial Testimony**
Death row inmates not being allowed to have contact visits with their attorneys.

**FLORIDA**   (1991)   _Francis vs. State of Florida_                                         **Report**
Death row inmate being considered for a life sentence, will he be a threat to staff and/or inmates?

**GEORGIA**   (1990)   _Brooks vs. State of Georgia_                                          **Trial Testimony**
Death row inmate being considered for a life sentence; would he be a threat to staff?


## Consultant Concerning Staff Bringing Suit Against DOC

**HAWAI'I**   (2002)   _Jo desMarets vs. State of Hawaii_                                     **Report**
Retained by the Hawai'i AG's Office to offer an opinion regarding the DOC's denial of a prison employees allegations of discrimination based upon gender & sexual preference.

9/1/11

Exhibit A
Page 24