# EXHIBIT "A"

**Peter J. Eliasberg**
ACLU of Southern California
1313 West 8th Street
Los Angeles, California 90017
213-977-9500 ext 228
peliasberg@aclu-sc.org

## LEGAL EXPERIENCE

**2011-**            Legal Director and and Manheim Family Attorney for First
                     Amendment Rights for the ACLU of Southern California
                     Significant cases listed on separate sheet

**2004-2011**        Managing Attorney and Manheim Family Attorney for First
                     Amendment Rights for the ACLU of Southern California
                     Significant cases listed on separate sheet

**2002-2004**        Managing Attorney for the ACLU of Southern California

**1996-2001**        Staff Attorney for the ACLU of Southern California
                     George Slaff First Amendment Fellow

**1995-1996**        Law Clerk for the Honorable Stephen Reinhardt
                     United States Court of Appeals for the Ninth Circuit

**1994-1995**        Law Clerk for the Honorable Stanley Sporkin
                     United States District Court for the District of Columbia

**Summer 1994**      Summer Associate, Cleary, Gottlieb, Steen & Hamilton
                     New York City

                     Summer Associate, Office of Policy Development, United States
                     Department of Justice, Washington, D.C.

**Summer 1993**    Summer Associate ACLU of Northern California
San Francisco

**Summer 1992**    Summer Associate NAACP Legal Defense Fund
New York City

## EDUCATION

**1991-1994**    Harvard Law School, Cambridge, Massachusetts
J.D., magna cum laude
Ames Moot Court Semi-Finalist
Research Assistant for Richard Fallon, Professor of
Federal Courts and Constitutional Law

**1978-1982**    Yale College, New Haven, Connecticut
B.A., *magna cum laude*
Honors In History

## SELECTED APPEARANCES IN CIVIL RIGHTS CASES IN FEDERAL AND STATE COURT

## FIRST AMENDMENT SPEECH AND ASSOCIATION

Porter v. Bowen – successfully represented plaintiffs in Ninth Circuit Court of Appeals making First Amendment challenge to California Secretary of State's attempt to prohibit so-called vote swapping web sites.

Alliance For Survival v. City of Los Angeles -- Case on behalf of non-profit peace and environmental organization challenging validity of city's anti-solicitation ordinance. Argued for Plaintiffs in Ninth Circuit Court of Appeals and California Supreme Court on certification of state law question.

Valley Vote v. City of Los Angeles -- Represented and negotiated settlement for non-profit group barred from gathering petition signatures in public forum.

Burkow v. City of Los Angeles – Obtained preliminary injunctive relief forbidding defendant from enforcing ordinance banning "For Sale" signs on parked cars. Defendant subsequently agreed to cease enforcing the ordinance permanently in settlement agreement.

Lifestyles Inc. v. Stroh -- Successfully represented adult organization that had been barred from holding its annual sensual and erotic art exhibition. Obtained injunctive relief allowing exhibition to go forward. Argued for Plaintiff in Ninth Circuit Court of Appeals.

Neal v. Basset Unified School District – Represented student suspended for writing open letter to school community critical of principal. Obtained Temporary Restraining Order enabling student to return to school and Preliminary Injunction allowing student to attend graduation with his class and obtain his diploma.

## FIRST AMENDMENT RELIGION

Buono v. Norton – Successfully represented plaintiffs challenging display of Latin Cross on federal land in Mojave National Preserve in both district court and the Ninth Court of Appeals.  Represented Plaintiff in United States Supreme Court on challenge to validity of congressional transfer of land upon which the Latin Cross is located.

Bacus v. Palo Verde Unified School District – Case on behalf of two teachers challenging constitutionality of school board practice of opening school board meetings with sectarian prayers. Successfully argued appeal for Plaintiffs in Ninth Circuit Court of Appeals.

ACLU v. City of Redlands – Obtained injunctive relief under the Establishment Clause preventing City of Redlands from sponsoring March For Jesus Parade.

## FOURTH AMENDMENT AND PRIVACY

Trujillo/Bernhard v. City of Ontario – Represented class of police officers challenging warrantless video surveillance of police locker room.  Successfully argued appeal for Plaintiff class in Ninth Circuit Court of Appeal of denial of qualified immunity to Defendants.

Fitzgerald v. City of Los Angeles – Represented group of homeless individuals and obtained settlement in challenge to pattern of arrests and searches of Plaintiffs.

Riordan v. Verizon and Campbell v. AT&T – Representing telephone customers in challenge to telecommunications carriers' practice of turning over customer phone records to the National Security Agency.

## DISABILITY RIGHTS

Beauchamp v. MTA -- class action suit on behalf of bus riders in wheelchairs

Exhibit A
Page 6

against the Los Angeles County MTA for failing to obey Americans With Disabilities Act.  Obtained preliminary injunctive relief and negotiation settlement agreement requiring significant improvements in bus service to riders with mobility impairments.

Miles v. Superior Court – Represented class of persons with disabilities challenging inaccessibility of Los Angeles County Superior Courts.

## EDUCATIONAL EQUITY

Daniel v. California  –  Challenge to unequal access to AP classes under the California State Constitution.  Case resulted in settlement through legislation setting up AP Challenge Grant program for schools with few or no AP classes.

Williams v. California – Challenge to unequal and inadequate school facilities, unqualified    teachers and lack of instructional materials in K-12 public schools. Settlement provided for, among other things, $800 million emergency repair program and monitoring of facilities, access to instructional materials by County Superintendents of Education.

## EQUAL PROTECTION

Gregorio T. v. Wilson -- case successfully challenging the constitutionality of California's Proposition 187.

## FREEDOM OF INFORMATION

Wiener v. FBI -- successfully represented University of California history professor seeking documents concerning the FBI's surveillance of John Lennon during the early 1970's

Exhibit A
Page 7

**HABEAS CORPUS**

McDougal v. Ramon -- Successfully challenged confinement of Whitewater suspect, Susan McDougal, in 23-hour lockdown in Los Angeles County Jail.

**References for Peter J. Eliasberg**

Professor William B. Rubenstein
Harvard Law School - AR323
1545 Massachusetts Avenue
Cambridge, Massachusetts 02138
617.496.7320
rubenstein@law.harvard.edu
(former Project Director and Staff Attorney, ACLU National LGBT and AIDS Projects, 1987-1995)

Hector Villagra
Legal Director
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, California 90017
213-977-9500 ext 101
hvillagra@aclu-sc.org

# EXHIBIT "B"

## Witness Declaration Index

| SINGLE LETTER ALIASES | CURRENT PRISONER'S NAME | Exhibit No. |
|---|---|---|
| Mr. D | Ramiro Alvarez | C |
| Mr. O | Jonathan Bobier | D |
| | Christopher Brown | E |
| | Scott Budnick | F |
| | Erik Camacho | G |
| | Michael Cervantes | H |
| | Garry Crumpton | I |
| | Chaplain Doe | J |
| | Arturo Fernandez | K |
| | Macario Garcia | L |
| | Darrell Garrett | M |
| | Jonathan Goodwin | N |
| | Gordon Grbavac | O |
| | Joseph Hager | P |
| Mr. X | Michael Holguin | Q |
| | Michael Jefferson | R |
| | Eefrom Jones | S |
| | Ravon Jones | T |
| | Chaplain Paulino Juarez | U |
| | Alex Krehbiel | V |
| | Esther Lim | W |
| Mr. W | Thaddeus Love | X |
| | Juan Diego Mares | Y |
| | Shawn Meyers | Z |
| Mr. I | Fred Nowden | AA |
| | Rashaad Pilgrim | BB |
| | Alex Rosas | CC |
| | Mani Sadri | DD |
| | Cameron Saul | EE |
| | Stephen Teran | FF |
| Mr. C | Eric White | GG |

# EXHIBIT "C"

# DECLARATION OF RAMIRO ALVAREZ

I, RAMIRO ALVAREZ, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am an inmate at Men's Central Jail. I am currently housed in 3500.

3.      In October 2009 there was a big fight between about 20 deputies and 40 inmates. I was trying to get out of the way, but the deputies said I tried to attack one of them so they made me a K-10 and housed me in a single cell in 3500.

4.      I have been beaten up by the deputies multiple times. One time, about 10-15 deputies came into my cell and started beating me up. They asked me, "You like beating up on cops? Don't disrespect by partners again." They dropped me to the floor and started to kick my head. They hit me in the face and kicked my body. They hit me with their flashlights over and over again. They used their flashlights like a bat, like I was a baseball or something.

5.      The deputies said that I was trying to assault one of them, but even after they had me on the floor with my hands behind my back they kept hitting me. They tased me several times. One of the deputies said, "Man, I was trying to kill you."

6.      After the beating, the deputies told me I better not tell anyone about what happened. My leg was purple and bruised and I couldn't really walk for like 2 weeks. I needed stitches. My face was bruised up pretty bad, too. I still have scars on my face and on my head from where they hit me. I grew out my hair to hide some of the scars on my head.

7.      Even though I needed stitches, the deputies told me not to go to the clinic. They said that if I went to the clinic they would beat me up even worse when I got back. The clinic tried calling me in over and over for about a week, and I refused every time. I refused medical care because the deputies told me to. I refused stitches. I refused a tetanus shot. I refused everything.

8.      Another time, I was housed on FISH row and about 10 deputies came to escort me to the hole. They told me to face the wall and then they hit me. I fell to the floor because of my injured leg. Once I was on the floor the deputies started jumping on me like it was a wrestling match. They jumped on me with their elbows and knees like I was a mattress. They told me I better not tell anyone anything or

Exhibit C
Page 11

they would kill me.

9.    I refused all medical care from the clinic again, but I did get some antibiotics from the nurse. I push myself to get better. I give myself physical therapy to get my leg working again. The deputies see me working out with my injured leg and tell me that they are going to beat me up worse later. They come to my cell 5 at a time. I hear them standing outside talking about whether they're going to beat me up again.

10.    I haven't filed a complaint yet because I don't want to make things worse, but I've seen the deputies send several people to the hospital. They take advantage of us when we are handcuffed. They try to provoke me to act out to start a fight, but I don't pay attention to them. They see us as less because we did something wrong, but then they do the same thing. What makes them any different?

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 23rd day of October, 2009 in Los Angeles, California.

_____/s/_____
**RAMIRO ALVAREZ**

Exhibit C
Page 12

**Declaration of** _Ramiro Alvarez_

I, _Ramiro Alvarez_, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am an inmate at Men's Central Jail. I am currently housed at 3500.

3. In October 2009, there was a big fight between about 20 ~~inmates~~ deputies and 40 inmates. I was trying to get out of the way, but the deputies said I tried to attack one of them so they made me a k 10 and housed me in a single cell in 3500.

4. I have been beaten up by the deputies multiple times. One time, about 10-15 deputies came into my cell and started beating me up. They asked me, "You like beating up on cops? Don't disrespect my partner again." They dropped me to the floor and started to kick my head. They hit me in the face and kicked my body. They hit me with their flashlights over and over again. They used their flashlight like a bat, like I was a baseball or something.

5. The deputies said that I was trying to assault one of them, but even after they had me on the floor with my hands behind my back they kept hitting me. They tased me several times. One of the deputies said, "Man, I was trying to kill you."

6. After the beating, the deputies told me I better not tell anyone about what happened. My leg was purple and bruised and I couldn't really walk for like 2 weeks.

Exhibit C
Page 13

I needed stitches. My face was bruised up pretty bad, too. I still have scars on my face and on my head from where they hit me. I grew out my hair to hide some of the scars on my head.

7) Even though I needed stitches, the deputies told me not to go to the clinic. They said that if I went to the clinic they would beat me up even worse when I got back. The clinic tried calling me in over and over for about a week, and I refused every time. I refused medical care because the deputies told me to. I refused stitches. I refused a tetanus shot. I refused everything.

8) Another time, I was housed on FISH row and about 10 deputies came to escort me to the hole. They told me to face the wall and then they hit me. I fell to the floor because of my injured leg. Once I was on the floor the deputies started jumping on me like I was a mattress. They jumped on me with their elbows and knees like it was a wrestling match. They told me I better not tell anyone anything or they'd kill me.

9) I refused all medical care from the clinic again, but I did get some antibiotics from the nurse. I push myself to get better. I give myself physical therapy to get my legs working again. The deputies see me working out with my injured leg and tell me that they are going to beat me up

Exhibit C
Page 14

worse later. They come to my cell at 5 at a time. I hear them standing outside talking about whether they're going to beat me up again. (10) I haven't filed a complaint yet because I don't want to make things worse, but I've seen the deputies send several people to the hospital. They take advantage of us when we are handcuffed. They try to provoke me to act out to start a fight, but I don't pay attention to them. They see us as less because we did something wrong, but then they do the same thing. What makes them any different?

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 23 day of Oct, 2009 in Los Angeles, California.

Exhibit C
Page 15

# EXHIBIT "D"

**Declaration of Jon Bobier**

I, Jon Bobier, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called on to testify I could and would do so competently as follows:

2.    I have been an inmate in the Los Angeles County Jail System since July 2010. I am currently housed in cell #8239, 8200 block - the medical ward of Men's Central Jail for inmates with open wounds    MY BOOKING #1S 2421251    *JB*

3.    I have a prolapsed intestine due to a severe beating at the hands of the Los Angeles Police Department when I was arrested on July 24, 2010. Because of the beating, my intestine protrudes three to four inches from my anus. I require access to clean water to clean my exposed intestine. My medical condition prevents me from walking long distances and requires me to use a wheelchair.

4.    When I was first brought to Men's Central Jail I was housed in the 7000 floor. This is the ambulatory floor, meant for inmates who are recovering from surgery or who have to use crutches or walkers. While I was there, I had to use water from a communal toilet to clean my exposed intestine. I was afraid that if I kept cleaning myself with communal toilet water this would worsen my medical condition. I repeatedly asked the deputies if I could be switched to medical housing. I believed my being placed on 7000 block was a mistake. However, my complaints to the deputies did not yield any results.

5.    On March 14, 2011 I filed a complaint with the A.C.L.U. regarding the Sheriff department's refusal to house me in a cell with an accessible sink and toilet in order properly to treat my medical condition. After my complaint was processed by the A.C.L.U., I was moved to the 8200 block of Men's Central Jail, the medical ward for inmates with open wounds.

6.    On or about April 11, 2010 Deputy Bryant, a chubby white male 5' 8" tall weighing around 180 lbs with light-colored balding hair, came into my cell. Deputy Bryant told me that I had been declassified from the medical ward back to the 7000 floor. He spoke to me in an normal manner and there was no indication that he was angry at me. I asked if this had been a mistake and showed Deputy Bryant a letter from the A.C.L.U. regarding the complaint I filed

about my medical condition. After I showed Deputy Bryant the letter he suddenly became very angry and pushed down from a shelf several plastic bottles of shampoo and assorted toiletries. The bottles hit me and it hurt pretty badly but I did not suffer any injuries.

7.    Deputy Bryant, then escorted me out of 8200 block. We took the elevator down to 7000 floor. We exited the elevator to the area in front of the control booth. This is a large open room that is connected to several hallways that lead to different housing sections. Three deputies stepped out of the control booth and Bryant told the other deputies that I was a troublemaker. Bryant said: "You're a complainer, huh? You like to complain?" I believe he was referring to my complaint to the A.C.L.U. about my housing section.

8.    I got out of my wheelchair and sat down on a bench attached to the wall. The deputies began to search through all my belongings; they went through all my papers and my photographs. The deputies claimed that I did not need a wheelchair and when I showed them my Disability Placement Program Verification form (which says I have a mobility impairment and require a wheelchair) one of the deputes said: "That A.D.A (American Disabilities Act) doc doesn't mean crap to me." One of the deputies took away the wheelchair to someplace that I wasn't able to see.

9.    While I was waiting, deputy Holland came up to me and began yelling at me. Deputy Holland is 6'2" tall, buff, white, weights around 240 pounds, and has a short, G.I.-style haircut. He called me a "troublemaker" and said that I liked to complain. Deputy Holland then told deputy Bryant to leave. Bryant replied "Can't I just stay and watch a little longer?" After Bryant left, Holland walked me to my new cell. He told me repeatedly to "hurry up" but because of my condition I can't move very fast. Before we reached the hallway that would take me to my new cell, I asked Holland if I could go back to pick up my belongings. Holland got frustrated said "Shut up and move!" and hit me in my lower back. It was an upward strike; I don't recall if it was an open-handed slap or a punch. It did hurt, though. I have a bullet wound in my upper back and a bullet lodged in the back of my neck from 1992; the blow landed between those two wounds and was extremely painful. It felt like someone stabbed me. On a ten point scale, I would give it an 8; the blow knocked the wind out of me.

10.    After that, Holland took me to my new cell in 7000 block. I was left in that cell for twenty-four hours. No one came in to check up on me even though I have a severe medical condition. I did not call out for treatment because I was afraid of running into the guards again. Someone finally came in the next day and took me downstairs to the clinic for treatment. Nurse Haggerty was working down there at the time and she was surprised that I had been in 7000 block. She said there was no reason for that to have happened. She spoke to the doctor and had me transferred back to 8200 block.

11.    I did not file a formal complaint with the Sheriff because this incident seemed minor in comparison to other incidents of violence that go on here. Violence is such an ordinary thing here that I felt it should not be reported. It's very common for deputies to retaliate against inmates; they are very vindictive.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 13th day of July 2011 in Los Angeles, California.

Jon Bobier

## Declaration of Jon Bobier

I, Jon Bobier, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called on to testify I could and would do so competently as follows:

2.    I have been an inmate in the Los Angeles County Jail System since July 2010. I am currently housed in cell #8239, 8200 block - the medical ward of Men's Central Jail for inmates with open wounds. My booking number is 2421251.

3.    I have a prolapsed intestine due to a severe beating at the hands of the Los Angeles Police Department when I was arrested on July 24, 2010. Because of the beating, my intestine protrudes three to four inches from my anus. I require access to clean water to clean my exposed intestine. My medical condition prevents me from walking long distances and requires me to use a wheelchair.

4.    When I was first brought to Men's Central Jail I was housed in the 7000 floor. This is the ambulatory floor, meant for inmates who are recovering from surgery or who have to use crutches or walkers. While I was there, I had to use water from a communal toilet to clean my exposed intestine. I was afraid that if I kept cleaning myself with communal toilet water this would worsen my medical condition. I repeatedly asked the deputies if I could be switched to medical housing. I believed my being placed on 7000 block was a mistake. However, my complaints to the deputies did not yield any results.

5.    On March 14, 2011 I filed a complaint with the A.C.L.U. regarding the Sheriff department's refusal to house me in a cell with an accessible sink and toilet in order properly to treat my medical condition. After my complaint was processed by the A.C.L.U., I was moved to the 8200 block of Men's Central Jail, the medical ward for inmates with open wounds.

6.    On or about April 11, 2010 Deputy Bryant, a chubby white male 5' 8" tall weighing around 180 lbs with light-colored balding hair, came into my cell. Deputy Bryant told me that I had been declassified from the medical ward back to the 7000 floor. He spoke to me in an normal manner and there was no indication that he was angry at me. I asked if this had been a mistake and showed Deputy Bryant a letter from the A.C.L.U. regarding the complaint I filed

about my medical condition. After I showed Deputy Bryant the letter he suddenly became very angry and pushed down from a shelf several plastic bottles of shampoo and assorted toiletries. The bottles hit me and it hurt pretty badly but I did not suffer any injuries.

7.    Deputy Bryant, then escorted me out of 8200 block. We took the elevator down to 7000 floor. We exited the elevator to the area in front of the control booth. This is a large open room that is connected to several hallways that lead to different housing sections. Three deputies stepped out of the control booth and Bryant told the other deputies that I was a troublemaker. Bryant said: "You're a complainer, huh? You like to complain?" I believe he was referring to my complaint to the A.C.L.U. about my housing section.

8.    I got out of my wheelchair and sat down on a bench attached to the wall. The deputies began to search through all my belongings; they went through all my papers and my photographs. The deputies claimed that I did not need a wheelchair and when I showed them my Disability Placement Program Verification form (which says I have a mobility impairment and require a wheelchair) one of the deputes said: "That A.D.A (American Disabilities Act) doc doesn't mean crap to me." One of the deputies took away the wheelchair to someplace that I wasn't able to see.

9.    While I was waiting, deputy Holland came up to me and began yelling at me. Deputy Holland is 6'2" tall, buff, white, weights around 240 pounds, and has a short, G.I.-style haircut. He called me a "troublemaker" and said that I liked to complain. Deputy Holland then told deputy Bryant to leave. Bryant replied "Can't I just stay and watch a little longer?" After Bryant left, Holland walked me to my new cell. He told me repeatedly to "hurry up" but because of my condition I can't move very fast. Before we reached the hallway that would take me to my new cell, I asked Holland if I could go back to pick up my belongings. Holland got frustrated said "Shut up and move!" and hit me in my lower back. It was an upward strike; I don't recall if it was an open-handed slap or a punch. It did hurt, though. I have a bullet wound in my upper back and a bullet lodged in the back of my neck from 1992; the blow landed between those two wounds and was extremely painful. It felt like someone stabbed me. On a ten point scale, I would give it an 8; the blow knocked the wind out of me.

Exhibit D
Page 20

10.    After that, Holland took me to my new cell in 7000 block. I was left in that cell for twenty-four hours. No one came in to check up on me even though I have a severe medical condition. I did not call out for treatment because I was afraid of running into the guards again. Someone finally came in the next day and took me downstairs to the clinic for treatment. Nurse Haggerty was working down there at the time and she was surprised that I had been in 7000 block. She said there was no reason for that to have happened. She spoke to the doctor and had me transferred back to 8200 block.

11.    I did not file a formal complaint with the Sheriff because this incident seemed minor in comparison to other incidents of violence that go on here. Violence is such an ordinary thing here that I felt it should not be reported. It's very common for deputies to retaliate against inmates; they are very vindictive.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 13th day of July, 2011 in Los Angeles, California.

_____\s_____

Jon Bobier

# EXHIBIT "E"

**Declaration of Christopher Brown**

I, Christopher Brown, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am a thirty-four years old.  I was placed in Module 142, Pod F, Cell 3 of Twin Towers Correctional Facility ("TTCF") January 18, 2011 and was still there on Monday, January 24, 2011.  My booking number is 1365261.

3.    On January 24, 2011, I was called out of my cell and was told over the public announcement ("PA") speaker that I had a visit in the Attorney Room.  I don't know what time it was because I don't have a watch and the modules and the pods don't have clocks.  We don't even go out to the Outdoor Recreation Area much so I can't really tell what time it is.  But I think it was around dinner time because I remember that I was eating the burrito that was served to us for dinner as I was walking to the Attorney Room.

4.    I went to the Attorney Room and Esther Lim from the ACLU of Southern California's Jails Project was there to speak to me.  There is a diagram attached to this declaration as Exhibit 1 that depicts the attorney room and the surrounding areas.  I sat in telephone booth number five, directly across from Lim.  The spot where I was sitting, facing Ms. Lim is marked as B1 on the diagram and the spot where she was sitting is marked as E1.  The booth had a window partition separating us.

5.    While speaking to Ms. Lim, I heard cussing, someone say "motherfucker", scuffling noises, boots squeaking and thuds from repositioning feet and other noises that sounded like a fight, so I stood up and walked over to door that was to the left of where I was sitting.

6.    This door separates the Attorney Room from the Staging Area, which is on the other side of the door.  The Staging Area is a large area that contains the Outdoor Recreation Area and you would have to go through this area to get to the pods on that module.  The Staging Area is on the attached diagram.

7.    The door that I looked through had two windows on it; a window on the upper half of the door and a window on the lower half of the door.  The windows were approximately

Exhibit E
Page 22

two feet in height and one and a half feet in length. The place where I was standing, looking into the Staging Area through the window on the door that separates the Attorney Room from the Staging Area is marked on the attached diagram as B2.

8.    I saw an inmate, who looked African-American, whom I later learned was Parker. He had big braids that were sticking out from his head and was standing next to the water fountain in the Staging Area with his hands covering his face with two deputies punching him. At this point, I could only see the deputies' backs, but could see both of them punching Parker. The spot where I first saw Parker is depicted by a black figure with P-1 next to it and the deputies who were punching Parker are depicted by the two X's on the attached diagram.

9.    I looked back over to Ms. Lim who was standing at the window in the Attorney Room and I shrugged my shoulders at her and said, "See. It's happening now."

10.    When I looked back over to Parker, I saw him stumbling forward, towards me, falling to the ground, in between the two deputies, with his hands out in front of him. When he hit the ground, I saw Parker's arms fall to his side.

11.    He looked like he was knocked out because he appeared limp.

12.    When Parker fell, his head was up against the door where I was standing. When he fell, he was closer to where I was standing than he had been when he was standing up at the drinking fountain. The spot where Parker fell is depicted by the black figure with a P-2 next to it on the diagram.

13.    The drinking fountain in the Staging Area is about ten feet away from the door where I was standing.

14.    At this point, I was able to see both deputies' faces and I saw Deputy Hirsch, whom I know because I had seen him working on my module many times, punching Parker who was on the ground. I saw Deputy Hirsch kneeling over Parker, punching his face and head area about two to three times. I then saw Deputy Hirsch kneeing Parker on the head and neck area about three times.

15.    After I saw Deputy Hirsch kneeing Parker, I saw Deputy Hirsch place his hands on the wall, bracing himself as he kneed Parker in the facial area and then saw him jump up then

Exhibit E
Page 23

down, hitting Parker again in the same area with his knee.

16.    At this point, I yelled at Deputy Hirsch three times to "Stop." Deputy Hirsch did not stop and he did not look over at my direction.

17.    I then saw Deputy Ochoa, whom I know because I had seen him working on my module, put the taser gun up against Parker's leg, pull the trigger and heard the sound of the taser gun, which sounds like "ch ch ch ch" and seeing the spark from the taser gun. Deputy Ochoa then yelled at Parker, "Stop fighting" and "Stop resisting" and then tased him again. Deputy Ochoa again yelled at Parker, "Stop fighting" and "Stop resisting" and tased him once more.

18.    When Deputy Ochoa yelled at Parker to "Stop fighting" and "Stop resisting"; Parker was not fighting or resisting before or after those commands. He looked like he was knocked out.

19.    While Deputy Ochoa was tasing Parker, I saw Deputy Hirsch pulling his hands away from Parker's body, shaking his hands and saying, "Ow! Fuck!" Deputy Hirsch did that every time Deputy Ochoa was tasing Parker. Deputy Hirsch was punching Parker while Parker was being tased and it looked like Deputy Hirsch was feeling the shocks when Parker was getting tased.

20.    I could also see Parker going into convulsion-like movements when he was being tased. Parker's body would lock up and then shake when he was being tased. He looked like he was having a seizure. I know what people look like when they are having a seizure because I used to have seizures and I had a cousin who had seizures.

21.    The minute or so of what I saw of Parker lying on the ground, I didn't see him moving at all, other than what looked like convulsions when he was being tased. He was not fighting with the deputies or trying to resist. He was just lying there.

22.    I stopped watching because I saw Deputy Ochoa look at me, point his index finger at me and heard him yell, "Lay down on your stomach and face the fucking wall." I immediately complied and did what Deputy Ochoa asked me to do.

23.    I was on my stomach in the Attorney Room for approximately ten minutes. I did lift my head up once after a few minutes to see if Ms. Lim was still in the Attorney Room. She

was no longer in the Attorney Room, but I did see several deputies walking into the Attorney Room on the side of where Ms. Lim had been sitting, not where the inmates would sit.

24.    While I was lying there, I heard someone, I could not see who, ask Parker, "What happened, Parker?" That's when I figured out that it was Parker whom Deputies Ochoa and Hirsch had beaten. I heard Parker mumbling. I then heard someone say, "Bring out the gurney." I think a gurney was brought up because I heard squeaking wheels that sounded like a gurney.

25.    I could also see the flashes from a camera, so someone, I don't know who, since I was lying on my stomach with my head away from the door, was taking pictures behind me where the beating had happened.

26.    I saw a sergeant and I asked him if I could get up. He said that I could, so I got up and sat on the stool in telephone booth number six, which is closer to the window than telephone booth number five. The attached diagram shows the relationship of telephone booth five to booth six. I don't know the sergeant's name because his name was on a gold name tag, so the reflection made it difficult for me to see his name. But he was White, around my height, which is six feet three inches, and had a gray crew cut.

27.    I could also see through the lower part of the door through its window, that a trustee was mopping up a red substance that looked like blood. I was not able to see how much, but I could see some of the mop strings slide under the door and could see the red substance on the mop. Some of the water that was used to mop up that area also spilled under the door.

28.    The same sergeant with the gold name tag came up to me and chatted with me. I told him that I served in MOS or Military Occupation Specialities and he told me that he was a 13 Foxtrot and I told him that I was a 31 Uniform. He then asked me what happened and asked me if I wanted to talk about it on tape. I told him, "Yeah, that's fine."

29.    Deputy Ochoa was present during this part of the interview.

30.    As I was telling the sergeant that I saw Deputy Ochoa punching Parker, Deputy Ochoa stared at me in an aggressive manner, so I asked him "What?" He aggressively said "What?" back at me.

31.    The sergeant then said, "Alright, hold on" and walked off with Deputy Ochoa.

Exhibit E
Page 25

32.    While I was waiting for the sergeant to come back, I saw Deputy Hirsch and asked him, "How's your hand?" Deputy Hirsch said to me, "It hurts. I think I might have slipped a knuckle. I don't think it's broken."

33.    I told him that a lady from the ACLU was here and saw what had happened. I told him, "I'm tired of this shit; the violence." Deputy Hirsch then said to me, "My advice is to stay out of it. It doesn't have anything to do with you."

34.    Approximately twenty minutes later, the sergeant with the gold name tag came *and I saw him carrying a video* back to where I was still sitting in the Attorney Room. Sergeant Ramos was with him. I was *camera* able to see Sergeant Ramos' name because it was stitched onto his uniform and it wasn't imprinted on a gold name tag. Deputy Ochoa was not with them.

35.    The sergeant with the gold name tag then asked me again if I wanted to talk about what happened on tape and I again told him, "Yeah." They both left and returned back with a video camera.

36.    I told them that I didn't feel comfortable talking in the Attorney Room because there is an intercom speaker inside the room and it can be activated by the control room and any one in the control room could hear the conversation. Sergeant Ramos said that all the trustees are in another room, so they won't be able to hear and that the deputies in the Control Room can't hear either.

37.    Sergeant Ramos then said, "If you fear for your safety, you don't have to do it." I felt very intimated by this comment like he was trying to discourage me from saying anything.

38.    They then began to interview me about what I saw without the camera being on. I could see that the sergeant with the gold name tag had the camera to his side and I didn't see a red light flashing on the camera.

39.    Sergeant Ramos told me not to speak about what I thought or believed, just about what I saw and heard.

40.    Sergeant Ramos said to me while I was telling them what I saw and heard, "Well, you look uncomfortable. It looks like you don't want to say anything." Again, I felt intimidated by Sergeant Ramos and felt like he was trying to discourage me from talking about what I saw.

Exhibit E
Page 26

Even though I felt intimidated and discouraged by Sergeant Ramos, I wanted to talk out of duty. I thought, if someone had seen me being beat up by deputies like the way it happened to Parker, I'd want that person to stand up for me and tell what happened.

41.     I told the sergeant with the gold name tag and Sergeant Ramos that I thought Deputies Ochoa and Hirsch went too far.  Sergeant Ramos told me, "you should see the bump on Hirsch's head from when he [Parker] hit him."

42.     I told Sergeant Ramos, "That's not what I saw.  He wasn't fighting and he wasn't combative."

43.     Sergeant Ramos also asked me who my visitor was and I told him that it was some chick who came to see me.  He then said, "Well, I know who she is and where she's from, but it's not going to change my report.  This isn't criminal, it's administrative."

44.     The sergeant with the gold name tag then turned on the camera, faced it towards me and both the sergeant with the gold name tag and Sergeant Ramos announced themselves verbally and re-interviewed me.

45.     One of the questions they asked me is if I saw the deputies hit Parker with a weapon and I told him that I didn't see them hit Parker with a weapon, but I saw both Deputies Ochoa and Hirsch punching and kneeing Parker pretty good.  I also said that I saw Deputy Ochoa tasing Parker a lot.

46.     I felt that this interview was not in depth, specific and detailed as the unrecorded interview.  For example, they didn't ask me how many times I saw each of the deputies punch Parker like when they asked me in the unrecorded interview.  I also felt very nervous and uncomfortable during the interview because of Sergeant Ramos' comments during the unrecorded interview.

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

47.    The sergeant with the gold name tag then turned off the camera and he and Sergeant Ramos escorted me out of the Attorney Room and back to my pod.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed February 2, 2011 in Los Angeles, California.

Christopher Brown

2-2-11

Control Room

Entrance to Pods

Outdoor Recreation Area

Stairway to 2nd Floor

Staging Area – Module 142

Column

Water Fountain

P-1 (standing)

P-2 (prone)

Door w/Windows on upper & lower halves

Wall w/2 side-by-side Windows

Door w/Metal Table Attached

Clinic

Hallway

Attorney Room – Inmates

Attorney Room – Visitors

Module 142 Attorney Room

Exhibit E
Page 29

**Declaration of Christopher Brown**

I, Christopher Brown, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am a thirty-four years old. I was placed in Module 142, Pod F, Cell 3 of Twin Towers Correctional Facility ("TTCF") January 18, 2011 and was still there on Monday, January 24, 2011. My booking number is 1365261.

3.    On January 24, 2011, I was called out of my cell and was told over the public announcement ("PA") speaker that I had a visit in the Attorney Room. I don't know what time it was because I don't have a watch and the modules and the pods don't have clocks. We don't even go out to the Outdoor Recreation Area much so I can't really tell what time it is. But I think it was around dinner time because I remember that I was eating the burrito that was served to us for dinner as I was walking to the Attorney Room.

4.    I went to the Attorney Room and Esther Lim from the ACLU of Southern California's Jails Project was there to speak to me. There is a diagram attached to this declaration as Exhibit 1 that depicts the attorney room and the surrounding areas. I sat in telephone booth number five, directly across from Lim. The spot where I was sitting, facing Ms. Lim is marked as B1 on the diagram and the spot where she was sitting is marked as E1. The booth had a window partition separating us.

5.    While speaking to Ms. Lim, I heard cussing, someone say "motherfucker", scuffling noises, boots squeaking and thuds from repositioning feet and other noises that sounded like a fight, so I stood up and walked over to door that was to the left of where I was sitting.

6.    This door separates the Attorney Room from the Staging Area, which is on the other side of the door. The Staging Area is a large area that contains the Outdoor Recreation Area and you would have to go through this area to get to the pods on that module. The Staging Area is on the attached diagram.

7.    The door that I looked through had a two windows on it; a window on the upper half of the door and a window on the lower half of the door. The windows were approximately

two feet in height and one and a half feet in length. The place where I was standing, looking into the Staging Area through the window on the door that separates the Attorney Room from the Staging Area is marked on the attached diagram as B2.

8.   I saw an inmate, who looked African-American, whom I later learned was Parker. He had big braids that were sticking out from his head and was standing next to the water fountain in the Staging Area with his hands covering his face with two deputies punching him. At this point, I could only see the deputies' backs, but could see both of them punching Parker. The spot where I first saw Parker is depicted by a black figure with P-1 next to it and the deputies who were punching Parker are depicted by the two X's on the attached diagram.

9.   I looked back over to Ms. Lim who was standing at the window in the Attorney Room and I shrugged my shoulders at her and said, "See. It's happening now."

10.   When I looked back over to Parker, I saw him stumbling forward, towards me, falling to the ground, in between the two deputies, with his hands out in front of him. When he hit the ground, I saw Parker's arms fall to his side.

11.   He looked like he was knocked out because he appeared limp.

12.   When Parker fell, his head was up against the door where I was standing. When he fell, he was closer to where I was standing than he had been when he was standing up at the drinking fountain. The spot where Parker fell is depicted by the black figure with a P-2 next to it on the diagram.

13.   The drinking fountain in the Staging Area is about ten feet away from the door where I was standing.

14.   At this point, I was able to see both deputies' faces and I saw Deputy Hirsch, whom I know because I had seen him working on my module many times, punching Parker who was on the ground. I saw Deputy Hirsch kneeling over Parker, punching his face and head area about two to three times. I then saw Deputy Hirsch kneeing Parker on the head and neck area about three times.

15.   After I saw Deputy Hirsch kneeing Parker, I saw Deputy Hirsch place his hands on the wall, bracing himself as he kneed Parker in the facial area and then saw him jump up then

down, hitting Parker again in the same area with his knee.

16.    At this point, I yelled at Deputy Hirsch three times to "Stop." Deputy Hirsch did not stop and he did not look over at my direction.

17.    I then saw Deputy Ochoa, whom I know because I had seen him working on my module, put the taser gun up against Parker's leg, pull the trigger and heard the sound of the taser gun, which sounds like "ch ch ch ch" and seeing the spark from the taser gun. Deputy Ochoa then yelled at Parker, "Stop fighting" and "Stop resisting" and then tased him again. Deputy Ochoa again yelled at Parker, "Stop fighting" and "Stop resisting" and tased him once more.

18.    When Deputy Ochoa yelled at Parker to "Stop fighting" and "Stop resisting"; Parker was not fighting or resisting before or after those commands. He looked like he was knocked out.

19.    While Deputy Ochoa was tasing Parker, I saw Deputy Hirsch pulling his hands away from Parker's body, shaking his hands and saying, "Ow! Fuck!" Deputy Hirsch did that every time Deputy Ochoa was tasing Parker. Deputy Hirsch was punching Parker while Parker was being tased and it looked like Deputy Hirsch was feeling the shocks when Parker was getting tased.

20.    I could also see Parker going into convulsion-like movements when he was being tased. Parker's body would lock up and then shake when he was being tased. He looked like he was having a seizure. I know what people look like when they are having a seizure because I used to have seizures and I had a cousin who had seizures.

21.    The minute or so of what I saw of Parker lying on the ground, I didn't see him moving at all, other than what looked like convulsions when he was being tased. He was not fighting with the deputies or trying to resist. He was just lying there.

22.    I stopped watching because I saw Deputy Ochoa look at me, point his index finger at me and heard him yell, "Lay down on your stomach and face the fucking wall." I immediately complied and did what Deputy Ochoa asked me to do.

23.    I was on my stomach in the Attorney Room for approximately ten minutes. I did lift my head up once after a few minutes to see if Ms. Lim was still in the Attorney Room. She

was no longer in the Attorney Room, but I did see several deputies walking into the Attorney Room on the side of where Ms. Lim had been sitting, not where the inmates would sit.

24.     While I was lying there, I heard someone, I could not see who, ask Parker, "What happened, Parker?" That's when I figured out that it was Parker whom Deputies Ochoa and Hirsch had beaten. I heard Parker mumbling. I then heard someone say, "Bring out the gurney." I think a gurney was brought up because I heard squeaking wheels that sounded like a gurney.

25.     I could also see the flashes from a camera, so someone, I don't know who, since I was lying on my stomach with my head away from the door, was taking pictures behind me where the beating had happened.

26.     I saw a sergeant and I asked him if I could get up. He said that I could, so I got up and sat on the stool in telephone booth number six, which is closer to the window than telephone booth number five. The attached diagram shows the relationship of telephone booth five to booth six. I don't know the sergeant's name because his name was on a gold name tag, so the reflection made it difficult for me to see his name. But he was White, around my height, which is six feet three inches, and had a gray crew cut.

27.     I could also see through the lower part of the door through its window, that a trustee was mopping up a red substance that looked like blood. I was not able to see how much, but I could see some of the mop strings slide under the door and could see the red substance on the mop. Some of the water that was used to mop up that area also spilled under the door.

28.     The same sergeant with the gold name tag came up to me and chatted with me. I told him that I served in MOS or Military Occupation Specialities and he told me that he was a 13 Foxtrot and I told him that I was a 31 Uniform. He then asked me what happened and asked me if I wanted to talk about it on tape. I told him, "Yeah, that's fine."

29.     Deputy Ochoa was present during this part of the interview.

30.     As I was telling the sergeant that I saw Deputy Ochoa punching Parker, Deputy Ochoa stared at me in an aggressive manner, so I asked him "What?" He aggressively said "What?" back at me.

31.     The sergeant then said, "Alright, hold on" and walked off with Deputy Ochoa.

Exhibit E
Page 33

32.    While I was waiting for the sergeant to come back, I saw Deputy Hirsch and asked him, "How's your hand?" Deputy Hirsch said to me, "It hurts. I think I might have slipped a knuckle. I don't think it's broken."

33.    I told him that a lady from the ACLU was here and saw what had happened. I told him, "I'm tired of this shit; the violence." Deputy Hirsch then said to me, "My advice is to stay out of it. It doesn't have anything to do with you."

34.    Approximately twenty minutes later, the sergeant with the gold name tag came back to where I was still sitting in the Attorney Room. Sergeant Ramos was with him. I was able to see Sergeant Ramos' name because it was stitched onto his uniform and it wasn't imprinted on a gold name tag. Deputy Ochoa was not with them.

35.    The sergeant with the gold name tag then asked me again if I wanted to talk about what happened on tape and I again told him, "Yeah." They both left and returned back with a video camera.

36.    I told them that I didn't feel comfortable talking in the Attorney Room because there is an intercom speaker inside the room and it can be activated by the control room and any one in the control room could hear the conversation. Sergeant Ramos said that all the trustees are in another room, so they won't be able to hear and that the deputies in the Control Room can't hear either.

37.    Sergeant Ramos then said, "If you fear for your safety, you don't have to do it." I felt very intimated by this comment like he was trying to discourage me from saying anything.

38.    They then began to interview me about what I saw without the camera being on. I could see that the sergeant with the gold name tag had the camera to his side and I didn't see a red light flashing on the camera.

39.    Sergeant Ramos told me not to speak about what I thought or believed, just about what I saw and heard.

40.    Sergeant Ramos said to me while I was telling them what I saw and heard, "Well, you look uncomfortable. It looks like you don't want to say anything." Again, I felt intimidated by Sergeant Ramos and felt like he was trying to discourage me from talking about what I saw.

Even though I felt intimidated and discouraged by Sergeant Ramos, I wanted to talk out of duty. I thought, if someone had seen me being beat up by deputies like the way it happened to Parker, I'd want that person to stand up for me and tell what happened.

41.    I told the sergeant with the gold name tag and Sergeant Ramos that I thought Deputies Ochoa and Hirsch went too far. Sergeant Ramos told me, "you should see the bump on Hirsch's head from when he [Parker] hit him."

42.    I told Sergeant Ramos, "That's not what I saw. He wasn't fighting and he wasn't combative."

43.    Sergeant Ramos also asked me who my visitor was and I told him that it was some chick who came to see me. He then said, "Well, I know who she is and where she's from, but it's not going to change my report. This isn't criminal, it's administrative."

44.    The sergeant with the gold name tag then turned on the camera, faced it towards me and both the sergeant with the gold name tag and Sergeant Ramos announced themselves verbally and re-interviewed me.

45.    One of the questions they asked me is if I saw the deputies hit Parker with a weapon and I told him that I didn't see them hit Parker with a weapon, but I saw both Deputies Ochoa and Hirsch punching and kneeing Parker pretty good. I also said that I saw Deputy Ochoa tasing Parker a lot.

46.    I felt that this interview was not in depth, specific and detailed as the unrecorded interview. For example, they didn't ask me how many times I saw each of the deputies punch Parker like when they asked me in the unrecorded interview. I also felt very nervous and uncomfortable during the interview because of Sergeant Ramos' comments during the unrecorded interview.

\\\

\\\

\\\

\\\

\\\

47.   The sergeant with the gold name tag then turned off the camera and he and Sergeant Ramos escorted me out of the Attorney Room and back to my pod.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed February 2, 2011 in Los Angeles, California.

_____/s/_____

Christopher Brown

2-2-11



Control Room

Entrance to Pods

Stairway to 2nd Floor

Outdoor Recreation Area

Staging Area – Module 142

Column

Water Fountain

P-1
(standing)
XX

P-2
(prone)
X X

Door w/Windows on
upper & lower halves

Wall w/2 side-by-side
Windows

Door w/Metal
Table Attached

Clinic

Hallway

Attorney Room – Inmates
B1   B2
4   5   6   7

Attorney Room – Visitors
E1   E2
4   5   6   7

Module 142 Attorney Room

Exhibit E
Page 37

# EXHIBIT "F"

# DECLARATION OF SCOTT BUDNICK

I, Scott Budnick, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I work in film production at Warner Bros. Studio.

3. I am writing this declaration to describe numerous incidents I witnessed in Men's Central Jail ("MCJ") between 2007-2010 during which one or more Los Angeles County Sheriff's ("LASD") personnel physically abused inmates who did nothing to provoke the abuse or where deputies continued to taser, kick or beat inmates when they were not threatening or resisting the deputies.

4. In 2004, I became involved as a writing teacher for a non-profit organization which provides writing classes to the youth who are in the Los Angeles County Juvenile Hall system.

5. Through this teaching opportunity, I mentored and taught many youth who later transitioned into the Los Angeles County Jail System ("LACJS") upon the youth's turning eighteen years old.

6. Zev Yaroslavsky of the Los Angeles County Board of Supervisors awarded me with the Los Angeles Volunteer Award in his district, District 3, for the work I had done with youth in, I believe, 2006. That same year, I approached Zev's justice deputy, Joseph Charney, and asked if he could help me gain access to the jails so I could continue to mentor and teach the youth who were now in the LACJS. He agreed to help me, and I was approved to be a non-escort volunteer with the LACJS. As a non-escort volunteer, I was able to move around most of the jail without having LASD personnel escort me.

7. During my orientation in what I believe to have been late in 2006, I was in a room with approximately forty volunteers. The deputies conducting the orientation told us that we were going to hear the deputies cursing at the inmates

Exhibit F
Page 38

and that we were going to hear and see things that we were not accustomed to hearing and seeing, such as deputies using force against the inmates. They told us that deputies sometimes needed to speak and act this way with inmates because this was the only way that the inmates could be taught to comply with jail rules.

8. During my time at MCJ from late 2006-2010, I have seen approximately five incidents of deputies abusing inmates and heard one incident of an inmate being beaten by deputies. I have been at MCJ approximately twice a month between 2006 and 2008.

9. I have gone into MCJ much less frequently since 2008 because I became so disgusted with what I saw there and have primarily tried to work with juveniles who are in Twin Towers or other jail facilities outside MCJ.

10. The first time I observed abuse in MCJ was sometime in 2007 -- I believe it was fairly early in the year. I was going up to what is now the Hospital Ward; it used to be the floor that housed minors. When the elevator doors opened, I saw approximately seven deputies directly in front of the elevator doors. I believe one of them was a sergeant because he had stripes on his shirt. I saw two of the deputies tasering a big, African-American inmate who was lying on the ground motionless, approximately three to five times.

11. I did not report this incident because I saw that a sergeant was present, so I assumed that the sergeant was or would handle the matter appropriately. I was also new to the jail and didn't know the ramifications of reporting an incident like this.

12. Shortly thereafter, I did talk to a young white deputy in one of the modules that housed minors and told him what I saw. This deputy said to me, "Yeah, we fuck these guys up all the time."

13. The second time I witnessed abuse in MCJ was in or about November 2008. I was teaching a writing class in MCJ and was standing next to the door of the classroom waiting for the youth to come to class. The classroom is the first

room you see once you get off the escalator and enter the main hallway to get to all the modules on the floor.

14.    While I was standing there, I saw a group of inmates walking in a straight line with approximately 6-7 deputies around them. I saw one of the deputies, a big, White deputy stop an older, African-American inmate. He ordered the inmate get out of the line and then strip searched him naked in the middle of the hallway in the view of me and others who were in the hallway. I'm not sure why he was pulled out of the line. I think it might have been because he didn't have his hands in his pockets, but I am certain that the inmate did not attack or threaten the deputies.

15.    I then saw the White deputy grab the inmate's head and smash his head into the wall, hard. It was so hard that I could hear an audible crack when the deputy slammed his head against the wall.

16.    At no point did I see the inmate do anything to any of the other prisoners or the deputy; in fact, the inmate was very respectful to the deputy.

17.    After I saw this, I quickly went back inside the classroom.

18.    The third time I observed deputy on inmate abuse was, I believe, in December 2008. Again I was right outside the classroom where I taught my writing class in MCJ waiting for students to come to the class and I saw an inmate, who was young and Hispanic walking down the hallway. There were approximately three deputies who stopped him and strip searched him. I saw one of the deputies, who was young and also appeared Hispanic, grab the inmate's hand and arm and twist his arm up behind his back, forcefully. I then saw the deputy push the inmate to the ground. I could not see any reason why the deputies were doing this because the inmate did not do anything to the deputies, did not threaten them or break any rules.

19.    After I saw this, I went inside the Chaplains' office and mentioned it to some of the chaplains who were there. The group of chaplains in the office,

who were from various denominations, advised me against reporting this incident. They said the LASD had a practice of kicking people out of the jails and if I reported the incident then I wouldn't be able to work with the students any longer. They also told me that they were scared to report any of the incidents of abuse that they had seen because they were afraid to lose their jobs.

20.   I was also hesitant to report what I had observed to LASD because I had personally spoken with another jails chaplain.  He told me that he had been kicked out of the LACJS because he was a "whistleblower" who had reported to LASD and others incidents of abuse that he had seen in the jails.

21.   The fourth incident that I witnessed was in or about July 2009 on the 4000 floor of MCJ.  It was similar to the incident that I observed taking place in or about November 2008.  I was going to visit a module when I saw a Hispanic inmate who appeared to be in his late 30's to early 40's getting off the escalator. He seemed to be confused about where he was supposed to go and asked one of the deputies where Module 4600 was.  There were approximately four deputies near the inmate.  The deputies started to poke fun at him and asked him if he had mental issues since he did not seem to know how to find his module.  I then saw two of the deputies grab the inmate's hand and arm and forcefully twist the inmate's arm up behind his back.  I then saw the deputies grab the inmate's head, place it on the wall and twist the inmate's face hard up against the wall.

21.   The inmate was not fighting with the deputies, but was compliant.

22.   I reported this incident to Sergeant Renfro when I walked into his office. The conversation was brief, in which I told Sergeant Renfro what I had seen and heard.  Sergeant Renfro was attentive and respectful and said that he "would get into this immediately."  However, I have never heard from Sergeant Renfro about the outcome of his investigation, nor did any LASD personnel ever contact me to interview me or otherwise speak with me about the incident that I had reported.

23.    The fifth incident that I witnessed occurred in late 2009.  I was going to Module 3600 to see one of my students and saw that the module door was cracked opened.  Usually the door is closed and I have to be buzzed in to enter.  I opened the door and when I turned to the "chow hall", I saw three deputies, one who was White and two who appeared Latino, kicking, punching and beating up an inmate, who was skinny and African-American.  When I first saw the deputies punching the inmate he was standing.  He quickly fell to the ground due to the blows.  I then saw the deputies kicking and beating the inmate when he was on the ground.  I could hear the deputies yelling, "Stop resisting!" over and over again, yet I could see from the inmate's legs that he was not moving or resisting.  There was no one in the chow hall except the three deputies and the inmate who was getting beat up by the deputies.

24.    I have repeatedly had chaplains of all faiths who work in the jails tell me that it is common practice for deputies to yell, "Stop fighting!" and "Stop resisting!" at inmates who are not fighting or resisting while the deputies are beating them.  They have also told me that deputies think they can continue to abuse inmates as long as they yell, "Stop fighting!" and "Stop resisting!"

25.    In the beginning of 2010, I was in Module 1750 and as I was talking to an inmate, who was handcuffed in the shower area, I could hear another inmate getting beat up in the adjacent row.  I could clearly hear the sounds of boots and flashlights hitting a body repeatedly.  I could also hear the inmate screaming, "Get off of me!"

\ \ \

\ \ \

\ \ \

\ \ \

26.    The inmate with whom I had been talking told me that two deputies and one sergeant on Module 1750 were the ones doing the beating. It is my understanding that one of the deputies was later disciplined for what he did in another incident and that the other deputy is on a medical leave. I also understand that the sergeant now works in the Courts.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed March 30, 2011 in Los Angeles, California.

Scott Budnick

# EXHIBIT "G"

## Declaration of Erik Camacho

I, Erik Camacho, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      On Friday, November 12, 2010, I was arrested and taken to the Inmate Reception Center.

3.      I had a heart problem, and I complained of having chest pains. On November 14, 2010, I was transferred to the USC medical ward for four days.

4.      On November 18, 2010, I was in a hospital room. I was handcuffed and in a bed. I was hooked up to a cardiac machine, and an IV catheter.  In the morning, after breakfast, a nurse came into the room. She was escorted by a female deputy.  The nurse brought in water that I had requested earlier, and she placed it down on a tray next to my bed. The female deputy was Hispanic. She had a long ponytail and was wearing lots of makeup. She was approximately 5'1, and weighed approximately 135 pounds.

5.      I asked the nurse if I could have a blanket. She said "No, there aren't any." I told her that I had just seen them in a cart. I told her "You're a damn liar."

6.      The female deputy was standing next to the nurse.  The deputy picked up a full plastic cup of water and threw it in my face. The water was cold. There was ice in the cup.

7.      I told the deputy, "You fucking bitch. Why did you do that?" She responded, "You're lucky it was just cold water."

8.      I asked the deputy for her name and she stepped away, back toward the door.  I asked the nurse for her name. Her name badge was hanging from her neck.  The nurse threw her badge over her shoulder, toward her back. I could no longer see it. She was Asian, approximately 5'7. She had a very light complexion. She did not have any accent.

9.      I told the female deputy, "You stupid bitch. There's cameras in the corner that see exactly what you did. I'm gonna report you." She then laughed and walked off. She and the nurse left the room together.

10.     An hour later, Sergeant Lyle came to see me. I had not seen him before, but he

Exhibit G
Page 44

told me his name and I could see it on his badge. He asked me what happened. I told him the female deputy threw water on me. I said I wanted to file a complaint.

11. He told me he would look into it. He asked my mother's name and wrote it down. I do not know why he asked about my mother's name. He then left the room.

12. Approximately an hour later, I was transferred to county jail. I didn't expect to be transferred. I was still supposed to get an ultra sound to check on my heart. I knew I still needed that procedure because the day before the doctor had told me what else needed to be done. I never got the ultra sound.

13. Several officers that I had never seen before came in, and told me to get up. After they took off my handcuffs, I sat up and they put me in a wheelchair. They then transferred me in a vehicle back to the county jail. I was booked at the Inmate Reception Center. This was still November 18, 2010. I spent the night at IRC.

14. I was then transferred to Men's Central Jail, 7100. I was still in the wheelchair that they gave me from USC. This was on November 19, 2010.

15. On November 26, 2010, at approximately 7:00 p.m., it was time for pill call. That is the normal time for pill call. A deputy yelled, "Pill call! Pill call!" I wheeled myself out of my cell for the pill call. The nurse's station is up the hall, past several cells, right in front of the officers' observation room. I went to the nurse's station and locked the brakes on my wheelchair. I spoke to an Asian nurse and I said, "I'm feeling very claustrophobic. It's getting to me. I need to be transferred into a bigger cell."

16. A black female deputy was standing within two feet of the nurse. There were approximately five deputies standing around near the nurse's station. Before the nurse said anything, the black female deputy came up to me. I read her badge. Her name was Deputy Pontonantos. She walked behind me and grabbed my wheelchair by the handles. She swung me around to push me back to my cell. My brakes were locked. I reached down to unlock my brakes, as she was pushing on the chair. I felt someone punch me on the back of my head. The punch made my head go forward. I turned my head around immediately, and she was the only person standing right behind me.

Exhibit G
Page 45

stomped on my head. During this time, I was on the floor, still in my collapsed wheelchair.

23. At some point during the dragging, my shoes must have fallen off. When we got to my cell, I was no longer wearing them. Deputy Pontonantos had one of my shoes. She proceeded to slap me in the face with the shoe, six or seven times. With the last slap, she threw the shoe at my face. I felt that I was receiving kicks to my legs and my knees and my back. One deputy kicked me between the legs, on my testicles. Then they all left the room.

24. I lay on the floor in my cell, in the collapsed wheelchair. A black trustee inmate, heavy set, told the deputies "You guys are a bunch of cowards." The officers closed the door to my cell.

25. I began yelling for help, saying "Man down! Man down!" I wanted help from one of the nurses. I heard a deputy say, "You dumb bitch get back to your job. We're custody. You're medical. This is none of your business." I heard a female arguing with a male. I heard no response for about a half an hour. Then, I heard a male voice yelling at the female, "I know what you did you stupid bitch. Why did you run so quick to the elevator? What did you do? File a report, or talk to the watch commander?" The male voice sounded like Deputy Gomez, and the female voice sounded like the same Asian nurse. I heard the female voice respond, "I didn't do anything." The male voice said, "You're a damn liar. I saw you leave, running. Why were you running?" She said, "I have nothing to say to you. It's none of your business."

26. Approximately a half hour later a deputy opened my cell and a different nurse came into my cell and gave me medication. I tried to tell her where I was hurting. She said, "Just take the medication and be quiet." She handed me the meds, left, and they closed the cell.

27. About 15 minutes later, Deputy Pontonantos came into my cell. She said, "Are you gonna give me any more fucking problems?" I said, "No, I wasn't giving you no problems." She said, "Why did you want to go to another cell?" I told her "I don't want to talk to you," and she said, "I'll take you to another cell. Don't worry." She said it mean, like in a threatening manner. She and the trustee that witnessed the beating picked me up and dragged me to a cell down the hall. This was one of the three high power security cells. They threw me into a bed. My new cell had no blankets and it was very cold. I saw Deputy Pontonantos, then Deputy

Gomez, then Deputy Icu look into my cell at some point after that. That evening, a nurse brought me a wheelchair.

28.    Later that night, I heard a female voice calling for Deputy Pontonantos. I was in my wheelchair. At the door, I lifted myself to the 12 inch by 12 inch window. I saw Deputy Pontonantos open a cell door as a nurse was standing at the door. This other cell was across from my cell and to the right, ten or 15 feet away from my cell. Deputy Pontonantos started slapping an old man who was sitting up in his bed. She was slapping him hard; I could see his head jerk sideways each time she hit him, which was about six or seven times. After she finished slapping him, the nurse went into the cell and gave him his medication. The inmate was white, old, he had grey hair and was in his 60's.

29.    That same evening, within an hour, I heard a female yelling for a deputy. I lifted myself in my wheelchair again. I saw an open cell door, and inside it, another elderly gentleman in his late 60's in his bed. I recognized that inmate as someone who was using a wheelchair the day before, during pill call. I could see a deputy leave the observation room and approach the old man's cell. The old man said, "I can't get out of my wheelchair. Can I please get someone to help me?" The male deputy grabbed him by his shirt, dragged him out of his bed and into the hallway. The deputy said, "You're gonna get off your ass one way or another." The deputy was Hispanic, 5'8 or 5'9, with a dark complexion and dark short hair that was slicked back.

30.    The following day, November 27, 2010, I got a visit from my mom. I showed her the bruising on my right side, on my knees, legs and on my thighs. I had a swollen bruise near my right abdomen that was the size of a football. I told her everything that happened. I feared for my life. I showed her a sheet of paper with the names of the deputies involved. After visiting was over, Deputy Johnson uncuffed me to release me from the visiting window. He wheeled me outside and said, "Where's that other piece of paper at?" He leaned over and told me, "You better learn to keep your mouth shut. I know what I'm telling you." He then wheeled me back to my cell.

31.    Later that day, the pain increased. I started to get dizzy and got a nose bleed. I was concerned because I have a blood condition, Thrombocytopenia, plateletpheresis, which reduces

my platelet count and from which I can bleed to death, internally. I yelled "Man down, man down!" from my cell. It was late at night and the lights were out. I heard a female tell a male "You need to open that door now." The voice sounded like the Asian nurse. The male voice said, "Go to hell bitch. Get back to your little office. I am not opening that door. Fuck him. He deserves what he's getting." The officer said, "It's not gonna be opened." The nurse said, "I'm gonna call the county, someone in charge of custody." The deputy said, "Do ahead, they're not gonna approve it." I looked out my window and I could see her on a cell phone. She said, "That's okay, I'll call the state." As she was dialing, the officer said, "The state's not gonna approve it either." Eventually, a maintenance man came, with a machine that looked like a large power drill, that he later used to drill the locks off other cell doors. He did not use it on my cell. Deputy Pontonantos opened my door. This was around 30 minutes to an hour after I initially began yelling.

32.    Deputy Pontonantos grabbed my wheelchair and wheeled me to the nurse's station. At the nurse's station, they took measurements and documented all the injuries. Within 15 minutes, I was wheeled to twin towers. This was all in the middle of the night, lasting until early morning the next day. I saw a doctor who documented all my injuries. He asked about what happened. I began crying, and told him what happened. I was in so much pain. On a scale of one to ten, I would describe that pain as a ten. A nurse called 911 and I was transported to LCMC. This was on November 28, 2010. At county hospital, they took measurements, gave me a CT scan from my feet to the top of my head, took pictures and took my measurements.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 28th day of January, 2011 in Los Angeles, California.

Erik Camacho

# EXHIBIT "H"

**Declaration of Michael Cervantes**

I, Michael Cervantes, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      On Monday December 6, 2010, I was housed in the 2400 facility at Men's Central Jail ("MCJ"). During the afternoon, the deputies informed us it was our shower time. The other inmates and I took our showers, finished, and lined up in the showers as we normally do at the end of shower time.

3.      A deputy told us to walk back to our cells; I was fifth in line. The deputy is of Caucasian descent, is tall, has messy brownish/blond hair, has blue eyes, has no facial hair, has thin eyebrows, and a pointy nose. As we were making it out of the shower room, a Deputy Lyon (not sure about the spelling) cut off the line behind me and approached me from behind. I knew it was Deputy Lyon because I saw his name tag after he was assigned to the floor I am now housed on, the 2000 floor, and because other inmates on the floor told me his name.

4.      Deputy Lyon started looking at the tattoo across my back of my gang. I could tell because he was hovering over my back as if he was fixated on something that was ~~written across~~ drawn ⁻MAC MAC on ~~the top of~~ my back (which my tattoo is). While walking, Deputy Lyon started to smack me in the back of my head (open fisted). He pushed me to the side and made me face the wall next to ⁻MAC doorway that lead into the showers. I was only wearing boxers and still dripping wet from the shower. He began to taunt me as if he was going to beat me up, trying to provoke a reaction out of me. As I turned my head and shoulders to look at him, Deputy Lyon immediately punched me in my left cheek. I put my hands over my face to try and block any shots to my face.

5.      Deputy Lyon then tackled me to the ground, positioning me face up. He sat on top of me and began swinging at my face and neck. Another deputy nearby saw this incident and called for other deputies. Approximately eight deputies came and joined Deputy Lyon. I became very dazed, and started to come in and out of consciousness. I could still hear footsteps coming from more deputies to join the others. One deputy grabbed my right leg and tucked it under his armpit, then began to beat my ankle and leg with his flashlight, causing a gash and open wound

on my ankle. I also suffered an approximately 3/4 inch gash across my left eye. There was blood all over the floor from the incident.

6.    Deputy Lyon then flipped me back on my stomach. Then, two deputies ~~Him and another deputy then~~ I am not sure who they were because I was flipped on my stomach, face down. MAC tased me. ~~I~~ am sure it was two deputies because four probes hit me, and a taser gun usually has two probes. Two probes hit me on the top right shoulder and two hit me on the lower right portion of my back. I was able to pull off one of the probes that hit me on the lower right portion of my back. I heard one of the deputies say "the bastard took my probe out." While still being tased, I was told to put my hands behind my back in order to be handcuffed. I fell unconscious before I was able to do so.

7.    I was left on the floor bleeding. I am not sure how long I was knocked out for, but when I was able to regain some consciousness, I saw a male and female nurse coming to get me. I was still in the same place I was beaten. They took me to the emergency nurse's clinic, located on the first floor of the MCJ. While being led there, the deputies told me that I'd better "not say anything funny" (meaning to not rat them out and tell the medical staff that they had beat me up), and gestured to their tasers; the taser probes on my back were still attached to the taser guns.

8.    In the nurse's clinic, a sergeant came in to videotape a statement from me. While being videotaped, the nurses were putting ice packs on my face to stop the swelling. The sergeant was Hispanic, chubby, had slicked back hair, had brown eyes, and a flat nose. The taser probes were detached from the gun, but were still on my back. I felt compelled to lie and say I fell in the shower for fear of retaliation from the deputies. Also, ~~that~~ I found out two weeks ago from a MAC trustee that the inmates who showered with me who witnessed the incident were ~~videotape interviewed~~ also videotaped.

9.    The nurses let me go, and I was taken by ambulance to LA-USC Hospital as well, ("hospital"). By the time I got there, my left eye had swollen shut, I had a swollen bump in the middle of my forehead, I had 3 bumps on the top of my head, a bump on each side of my head, and my right eye was almost swollen shut. I could hardly see anything. The hospital staff did not attend to any of my cuts, bruises, or wounds; they didn't even give me stitches on the cut I had above my left eye. All they did on me was perform a cat scan and gave me morphine. I was also seen by an eye doctor, who told me that had I been hit one more time on my left eye, it would have left me permanently blind in that eye, and it would have required surgery to just save the

Exhibit H
Page 50

eyeball in the socket.

10.    The next day, I left the hospital on crutches. I was taken back to MCJ and put in the medical unit for approximately seven days, requiring crutches to get around; the severe pain and cut on my ankle made it impossible for me to get around without crutches. There, I was given Motrin, but did not receive any treatment or stitches for the gash across my left eye or on my ankle. I was then taken out the medical unit and placed in a four man cell on the 3800 floor. There was only me and another inmate housed in the cell. Both my eyes were so red from the broken blood vessels in my eye that it took approximately three weeks for the sclera (the white portion) in each eye to be noticeable again. To this day, I still suffer from dizzy spells arising from this incident. I shudder and get nervous every time I am in the presence of a deputy.

11.    I feel like I was targeted because my gang was supposedly involved in a deputy shooting. I feel like I was retaliated against as a form of redemption for the deputies. I certainly did nothing to provoke the deputies while I was on my way to the showers, in the showers, or leaving the showers.


I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 8th day of April, 2011 in Los Angeles, California.

Michael Cervantes

**Declaration of Michael Cervantes**

I, Michael Cervantes, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    On Monday December 6, 2010, I was housed in the 2400 facility at Men's Central Jail ("MCJ"). During the afternoon, the deputies informed us it was our shower time. The other inmates and I took our showers, finished, and lined up in the showers as we normally do at the end of shower time.

3.    A deputy told us to walk back to our cells; I was fifth in line. The deputy is of Caucasian descent, is tall, has messy brownish/blond hair, has blue eyes, has no facial hair, has thin eyebrows, and a pointy nose. As we were making it out of the shower room, a Deputy Lyon (not sure about the spelling) cut off the line behind me and approached me from behind. I knew it was Deputy Lyon because I saw his name tag after he was assigned to the floor I am now housed on, the 2000 floor, and because other inmates on the floor told me his name.

4.    Deputy Lyon started looking at the tattoo across my back of my gang. I could tell because he was hovering over my back as if he was fixated on something that was drawn on my back (which my tattoo is). While walking, Deputy Lyon started to smack me in the back of my head (open fisted). He pushed me to the side and made me face the wall next to the doorway that lead into the showers. I was only wearing boxers and still dripping wet from the shower. He began to taunt me as if he was going to beat me up, trying to provoke a reaction out of me. As I turned my head and shoulders to look at him, Deputy Lyon immediately punched me in my left cheek. I put my hands over my face to try and block any shots to my face.

5.    Deputy Lyon then tackled me to the ground, positioning me face up. He sat on top of me and began swinging at my face and neck. Another deputy nearby saw this incident and called for other deputies. Approximately eight deputies came and joined Deputy Lyon. I became very dazed, and started to come in and out of consciousness. I could still hear footsteps coming from more deputies to join the others. One deputy grabbed my right leg and tucked it under his armpit, then began to beat my ankle and leg with his flashlight, causing a gash and open wound

Exhibit H
Page 52

on my ankle. I also suffered an approximately 3/4 inch gash across my left eye. There was blood all over the floor from the incident.

6. Deputy Lyon then flipped me back on my stomach. Then, two deputies tased me. I am not sure who they were because I was flipped on my stomach, face down. I am sure it was two deputies because four probes hit me, and a taser gun usually has two probes. Two probes hit me on the top right shoulder and two hit me on the lower right portion of my back. I was able to pull off one of the probes that hit me on the lower right portion of my back. I heard one of the deputies say "the bastard took my probe out." While still being tased, I was told to put my hands behind my back in order to be handcuffed. I fell unconscious before I was able to do so.

7. I was left on the floor bleeding. I am not sure how long I was knocked out for, but when I was able to regain some consciousness, I saw a male and female nurse coming to get me. I was still in the same place I was beaten. They took me to the emergency nurse's clinic, located on the first floor of the MCJ. While being led there, the deputies told me that I'd better "not say anything funny" (meaning to not rat them out and tell the medical staff that they had beat me up), and gestured to their tasers; the taser probes on my back were still attached to the taser guns.

8. In the nurse's clinic, a sergeant came in to videotape a statement from me. While being videotaped, the nurses were putting ice packs on my face to stop the swelling. The sergeant was Hispanic, chubby, had slicked back hair, had brown eyes, and a flat nose. The taser probes were detached from the gun, but were still on my back. I felt compelled to lie and say I fell in the shower for fear of retaliation from the deputies. Also, I found out two weeks ago from a trustee that the inmates who showered with me who witnessed the incident were interviewed and videotaped as well.

9. The nurses let me go, and I was taken by ambulance to LA-USC Hospital ("hospital"). By the time I got there, my left eye had swollen shut, I had a swollen bump in the middle of my forehead, I had 3 bumps on the top of my head, a bump on each side of my head, and my right eye was almost swollen shut. I could hardly see anything. The hospital staff did not attend to any of my cuts, bruises, or wounds; they didn't even give me stitches on the cut I had above my left eye. All they did on me was perform a cat scan and gave me morphine. I was also

seen by an eye doctor, who told me that had I been hit one more time on my left eye, it would have left me permanently blind in that eye, and it would have required surgery to just save the eyeball in the socket.

10.    The next day, I left the hospital on crutches. I was taken back to MCJ and put in the medical unit for approximately seven days, requiring crutches to get around; the severe pain and cut on my ankle made it impossible for me to get around without crutches. There, I was given Motrin, but did not receive any treatment or stitches for the gash across my left eye or on my ankle. I was then taken out the medical unit and placed in a four man cell on the 3800 floor. There was only me and another inmate housed in the cell. Both my eyes were so red from the broken blood vessels in my eye that it took approximately three weeks for the sclera (the white portion) in each eye to be noticeable again. To this day, I still suffer from dizzy spells arising from this incident. I shudder and get nervous every time I am in the presence of a deputy.

11.    I feel like I was targeted because my gang was supposedly involved in a deputy shooting. I feel like I was retaliated against as a form of redemption for the deputies. I certainly did nothing to provoke the deputies while I was on my way to the showers, in the showers, or leaving the showers.


I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 12th day of April, 2011 in Los Angeles, California.

_____/s/_____

Michael Cervantes

# EXHIBIT "I"

## DECLARATION OF GARRY CRUMPTON

I, Garry Crumpton, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I was arrested on November 10th of 2010 and was in Los Angeles County Jail from then until March 2011. I was housed in Men's Central Jail, Pod 2500 during the month of January 2011.

3.    On January 18th, 2011 I was woken up early in the morning by a deputy who announced over the intercom that I was on the list of people to go to court. At approximately 5:30 a.m. my cell door was opened and I was directed by a deputy to proceed to the law library where the court inmates meet before they head out to court. Being that I was a pro per inmate, I schedule my own court dates and therefore I knew that I did not actually have court that day and that I must have been being called for court due to a computer error. After we gathered in the law library, we were led to go pick up our breakfasts and then meet the rest of the inmates who were going to court in the court line downstairs. Everybody going to court lines up in a long hallway. I remember hearing a deputy instruct us to make two lines, one for the Criminal Court Building and one for traffic court. Because my paperwork said I was going to the Pasadena Courthouse and the only case I had out of Pasadena was a misdemeanor hit-and-run, I thought I was suppose to line up in the traffic court line.

4.    After I had been standing in the line for approximately two or three minutes, a deputy began to check everybody's papers to ensure that we were all in the correct lines. While I did not know it at the time, the deputy was Deputy Ortiz.

5.    I learned that he was Deputy Ortiz the next time I went to court because when I saw him in the court line I looked at his name badge to find out what his name was.

6.    On January 18, 2011, when Deputy Ortiz got to me, he took my paperwork, put it on his knee and circled where it said Pasadena Courthouse. He then shoved my paperwork in my chest with his right hand and in the same motion shoved me up against the wall. I said to him, "you didn't have to do me like that". At that point, Deputy Ortiz walked to my left side

Exhibit I
Page 55

and put his right forearm around my neck putting me in a chokehold. On a scale of 1 to 5, with 1 being not too hard and 5 being really painful, I would classify the amount of force that Ortiz used against me while putting me in a chokehold as a 5. When he put me in the chokehold, I raised my hands in the air to make it clear to any deputies that may have been around that I was not fighting back and was not trying to hit Deputy Ortiz.

6. I remember at least one other deputy coming over from the right of me to assist Deputy Ortiz in restraining me but I cannot remember anything about him other than seeing his figure coming towards me as I began to lose consciousness from the chokehold. Right as the other officer approached, Deputy Ortiz, still having his arm wrapped around my neck, slammed me to the floor. I do not remember anything after this point so I must have become unconscious.

7. When I regained consciousness, I was being lifted up by my handcuffs by two officers. Since my hands were behind my back I did not get a look at them so I am not sure which two officers they were. I know there were two of them though because one deputy could not have lifted me up by himself in that way. They took me to a different part of the jail and put me in a wire cage that was located in the area where they strip search inmates coming back from court.

8. After being in the cage for approximately 45 minutes, Deputy Ortiz came over and spoke to me regarding the incident. Even though I did not think what he was saying was right, I just agreed with everything he said because I did not want him to hurt me anymore. He then opened the cage and took me to the court holding tank. I sat there for four to six minutes and then the deputies came with the chains and chained us all up and put us on the bus to the Pasadena Courthouse.

9. Once I got on the bus I started to notice that I had a lot of pain in my neck. The pain was especially exacerbated when I turned my head to one side or the other. When I turned my head to the side, I felt a sharp pain in my neck and the muscles cramping up.

10. When I got to the courthouse, I immediately complained to a sergeant and told him that I needed to go to the hospital right away. He had two bailiffs from the courthouse

Exhibit I
Page 56

transport me to the Pasadena Huntington Memorial Hospital.

11.    Once I was at the hospital, the doctors took an x-ray of my neck. I cannot recall the exact medical terminology they used when they were talking about my condition but I do remember them saying something about muscle spasms in my neck. Upon departing the hospital, doctors handed me my paperwork and the bailiffs took me back to the Pasadena Courthouse.

12.    About a week or two later, I got a court order to be checked by the in-house medical unit at Men's Central Jail. With this court order, I was able to get a cat-scan and x-ray on my neck and a x-rays on my shoulder and my back, which were both bothering me at the time.

13. From what I remember, the people in the medical unit talked about me having muscle spasms. They prescribed me three different medications. One was a muscle relaxer and I can't remember what exactly the other two were for.

14. A week or two after the incident that occurred on January 18th two sergeants came to talk to me about what had happened on that day. I do not know how they heard about the incident because I did not tell anyone about it. They took me into a small room on the unit that used to be a laundry room. They began videotaping me and I was instructed to tell the story in my own words and identify those involved. I told them exactly what had happened, just as I did above.

///

///

///

///

///

///

///

///

///

Exhibit I
Page 57

15. I have run into Deputy Ortiz since the incident and when we have seen each other he gives me a hard time and harasses me verbally. He will say things like "you're the one that got choked and thrown into the ground and wants to sue?" "how's the back?" and "are you going to sue me?".

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed June 30, 2011 in Los Angeles, California.

Garry Crumpton

Exhibit I
Page 58

# EXHIBIT "J"

**Declaration of Chaplain Doe**

I, Chaplain Doe, hereby declare:

1.    I make this declaration based on my own person knowledge and if called to testify I could and would do so competently as follows:

2.    I am a Chaplain and I have been ministering at Men's Central Jail ("MCJ") since 2005. I am at MCJ at least twice a week on Tuesdays and Wednesdays and work primarily on the 3000 Module. I used to work in the 4700 Module to preside over the morning services before the module closed down. I also work on the 2000 Module with the inmates who are allowed to have the blue chaplain visit slips so that they can leave their housing units to meet with chaplains.

<u>Deputy on Inmate Violence</u>

3.    On February 9, 2011, at approximately 8:30 a.m., I was walking towards the chaplains' office located on the 3000 floor of MCJ.

4.    It must have been around the time for Pill Call because I saw several inmates next to the Module 3100/3300 entrance area, standing in line in front of a window. The medical staff dispenses the inmates' medication through the window. I also saw several deputies standing across from the window, watching the inmates get their medication.

5.    Once I got to the chaplains' office, I was in the process of filling up the cart with some Christian literature and Bibles to pass out during my walk through of the modules, when I heard the sounds of deputies running past the chaplains' office and heard the sounds of keys jangling. I knew by these sounds that there was a fight that was occurring in the hallway. I've been a chaplain at the jails for a long time and you learn that when you hear running and keys jangling, a fight is occurring.

6.    I walked out of the dutch door and looked to the left down the

hallway and I saw about 15-20 feet away from me, 4-5 deputies kicking an African-American inmate who was lying on the ground, face down with his head towards the wall and his feet closest to me. I was able to see all of the inmate's body. A diagram of the chaplains' offices, the hallway, and where I saw the beating occurring is attached hereto as Exhibit 1. The spot where the inmate was lying is marked with an "X" and the spot where I was standing is marked with a "G". I was able to see the inmate's hands and it looked like his hands were behind his back. I wasn't able to see if he was handcuffed or not.

7.    I saw one deputy holding onto the inmate's legs and feet and another deputy with his knee across the inmate's neck, while the other deputies were kicking his torso and legs. During the entire time that I was watching, I didn't see the inmate's arms or hands move from behind his back and I saw the deputy had his knee across the inmate's neck during the entire time that I was watching.

8.    While the deputies were kicking the inmate, I could see that he was not fighting with the deputies, but he was yelling out, "Stop! Help me! Help!" The deputies continued to kick him, even though he was not fighting with them and was yelling out for someone to help him.

9.    Then one of the deputies who were kicking the inmate, another Hispanic deputy, looked at me and yelled, "Chaplain! Go inside!"

10.    I didn't go into the chaplains' office; instead I remained where I was and continued to watch the deputies kick the inmate. I didn't go inside because I had heard too many inmates tell me about beatings that the deputies had inflicted on them and I wanted to observe what was happening with my own eyes.

11.    I saw Deputy Perez, who appeared to be Hispanic, sitting at the deputy's desk located several feet away from the chaplains' office, to the right, run past me. As he did so, he yelled at me, "Chaplain! Go inside!" I saw Deputy Perez run over to where the other deputies were kicking the inmate. I knew that it

was Deputy Perez because a couple of days after the beating, I saw him again and I asked him his name. He told me that it was "Perez" and I also saw his name tag.

12. I wasn't able to see anything after that because I went inside the chaplains' office. At that point I had been watching the deputies kick the inmate, non-stop for approximately 2-3 minutes before I turned around to go inside the office. As I was going into the office, I saw Sergeant Jones walking down the hallway that joins the chaplains' office and the Sergeant's office, which is located behind the chaplains' office. When I saw him, I said to him, "That's not right." He didn't say anything to me and walked outside to the hallway where the deputies were kicking the inmate. I also saw Brothers Paulino and Duca by the Catholic Chaplains' office listening to the inmate getting beat up. The spot where they were standing is marked with a "PD".

13. I could still hear the thumping sounds of the deputies kicking the inmate and heard the inmate still yelling for help. Eventually the inmate stopped yelling for help. Yet I still continued to hear the deputies kicking for another minute.

14. I was so horrified by what I saw and I could only imagine the pain that the inmate was feeling. I was so sickened that the deputies were beating up this inmate, who wasn't even resisting and was just yelling for help over and over again. He didn't have a chance with so many deputies surrounding him, kicking and beating him. I was so shocked that the despite the deputies seeing me watch them beat up the inmate, they continued to kick and beat him. It was like they didn't even care that there was a witness. I was afraid that if I had tried to stop the beating or even just yell at the deputies to stop, they would come over and hurt me.

15. Despite the deputies and Sergeant Jones' knowing and seeing that I was a witness to this beating, no one from the Los Angeles Sheriff's Department

("LASD") or the Office of Independent Review ("OIR") contacted or interviewed me about what I saw. It was almost as if no one cared to find out the truth of what happened.

15. I don't know what happened to the inmate and didn't know how badly injured he was because the deputies told me to stay inside the chaplains' office.

### Deputy Locking a Chaplain Inside the MCJ Module

16. On or about July 20, 2011, Chaplain Julio Gonzalez and I were walking on the upper tier of Module 3500 speaking with inmates and handing out religious literature. Chaplain Gonzalez was pushing the cart that carried the literature and I was standing in front of the individual cells to speak with inmates.

17. Sometimes while I am speaking with inmates, Chaplain Gonzalez goes ahead of me to hand out literature and we are temporarily separated while inside the module. July 20 was not any different and Chaplain Gonzalez moved on with the cart while I continued to speak with an inmate in the last row upstairs, which I believe is Row D.

18. While I was speaking with an inmate, Deputy Ibarra walked down the row and walked past me. Deputy Ibarra appears to be Hispanic, about 5'6" and has short hair. I have also heard from other inmates and chaplains that he has a twin brother, but the brother works the afternoon shift and Deputy Ibarra primarily works in the morning.

19. I told the inmate to whom I was speaking to that I expected Deputy Ibarra to lock me in the module because every time that I've completed my walks, Deputy Ibarra has kept me and other chaplains who accompany me locked in the module and makes us wait more than 15 minutes to get out, even though we have called for him to open the door to the module or even when inmates try to help us by yelling to the deputies to open the door.

20.   As I had feared, Deputy Ibarra walked to the end of the row, walked through the door and slammed the door shut.  However, the latch didn't catch and the door bounced opened again.

21.   About 20-25 minutes after Chaplain Gonzalez and I separated, I heard someone calling "Chaplain!  Chaplain!"

22.   I was not expecting anyone to call me by my first name, so I thought that maybe the inmates were calling for another man on the module.

23.   When I left my row, I saw Chaplain Gonzalez behind the gate on Row C and he told me, "Go tell the deputy to unlock me! Go tell them to get me out of here! I've been here for a while."  He told me that he had been locked in for at least 25 minutes.

24.   I went downstairs and found Deputy Ibarra, who was reading a newspaper.  I told him "Hey! You locked Chaplain Julio up there!"  Rather than getting up immediately to unlock Chaplain Gonzalez, Deputy Ibarra just looked at me and continued to read the newspaper.

25.   I went about halfway up the stairs and I happened to pass by the control booth.  I was surprised to see another deputy in the control booth as Deputy Ibarra had told me earlier in the day that he did not have too much man power, which I took to mean that he might have been alone on the module.

26.   The deputy in the control booth looked like he was just waking up from a nap, as he looked shaken up when I saw him from the stairs.  I then went back and told Deputy Ibarra that there was another deputy available.

27.   When Deputy Ibarra finally did get around to releasing Chaplain Gonzalez, Chaplain Gonzalez told Deputy Ibarra that what he did was not nice and asked him why he locked him up.  Deputy Ibarra replied, "It's just a habit."

28.   After Chaplain Gonzalez was locked up, Chaplain Gonzalez and I went to Ed Walsh, the senior Protestant chaplain, to explain what happened.  Mr.

Walsh went with the two of us to speak with the watch commander, whose name I do not recall.

29.    We waited about 20 minutes for the watch commander and when we finally saw him, we explained to him what had just happened.

30.    Rather than reprimand Deputy Ibarra and apologize for his actions, the watch commander seemed to cover for him and said "Maybe he had a bad day." I told the watch commander "You can't have a bad day every day," but the commander seemed intent on protecting his deputy rather than addressing the problem.

### Searches of the Chaplain's Office

31.    In March or April of 2011, as another chaplain and I were coming back from visiting with inmates on the 3500 module, deputies approached us and told us to leave the literature cart outside of our office. I didn't know why they told us to do that. It was the first time it had ever happened to us, but I think they wanted us to leave our cart there so that they could search it.

32.    Around the same time, I arrived at the chaplain's office one morning and found that the office had been searched.

33.    I saw papers everywhere, files that are typically locked were unlocked and opened and books that are usually neatly lined up and placed in the shelves were pulled out and out of place.

34.    I usually am the chaplain who cleans up the offices and puts things in order, so I knew that our office had been searched because the office is never this messy. Whenever I leave the office, I make sure that all the cabinets are locked and I keep the keys in a secret place in the office that only a few of the chaplains know.

### Deputy Searching Chaplains' Literature Cart

35.    On June 8, 2011, at about 10 a.m., I was on Module 3300 by myself

with the literature cart and I told Deputy Moorman that I wanted to take some boxes of literature up to the upper tier. I took a box of literature off of the cart and went upstairs. The trustees on the module were also around to help me take the boxes upstairs.

36. When I came back down to get more boxes, I saw Deputy Moorman taking out books and searching through the boxes that were on the cart and it appeared that he had been searching through them while I was gone. Deputy Moorman never told me that he was going to search the boxes or even ask me.

37. I asked him what he was doing and he said to me, "I'm doing what I'm supposed to be doing. I got my rules and you got your rules. This is my territory. I do whatever I want to do."

38. I told Deputy Moorman that he needed to ask me before he searched through my boxes. I didn't want him or any other deputies searching through the boxes without me or another chaplain present. I was afraid that the deputies might put something in the boxes and say that I put it there.

39. I saw his name on his nametag and I wrote it down. I then told him that I was going to talk to his sergeant and he yelled at me, "Go tell my sergeant. Get out of here!"

40. I was so embarrassed because Deputy Moorman was yelling at me in front of the trustees and I'm sure that the inmates on the module heard him yelling at me as well.

41. I saw Deputy Moorman walk out of the module and saw him walk over to a sergeant, whom I later found out was Sergeant Smurgerm and a group of deputies. I walked out of the module after him and I saw Sergeant Smurgerm and the deputies standing around, laughing and joking. I parked the literature cart halfway into the hallway.

42. I heard Deputy Moorman tell Sergeant Smurgerm that he threw out a

chaplain out of the module. I asked the sergeant if I could talk to him and he said sure.

43. I saw Chaplain Paulino and asked him if he could accompany me and be a witness as I wanted to talk to the sergeant about what had happened. He agreed and we walked over to the sergeant's office.

44. I told Sergeant Smurgerm what had happened and he told me that Deputy Moorman should not have gone through my boxes or searched them without my permission and without me being present. He then asked me if I wanted to go back to the module.

45. I told him that I felt very angry, embarassed and discouraged. I told him that I didn't want to go back to the module, but that I was going to go home.

### Complaint Forms Not Being Filed

46. In January or February of 2011, I had given Sergeant Grubb several complaint forms that inmates had given me. The inmates told me they were giving them to me because if they put the complaint forms in the locked box, the deputies will either throw away the forms or not address the content of the complaints.

47. I gave the complaint forms to Sergeant Grubb and he would tell me that he'd handle them or when he'd see me a couple of days later, he would tell me, "You know that complaint you gave me? Yeah, I took care of it."

48. A few months later, I saw the inmates who had given me the complaint forms and I'd ask them where they've been because I hadn't seen them since they gave me the complaint forms. The inmates would tell me that they went to the "hole" or to the disciplinary unit or that they were beaten up by deputies and then taken to the "hole."

49. Soon after, Sergeant Grubb would ignore me whereas before, he would greet me whenever he would see me.

50.    Also, during my walks of the different modules, I would notice that the complaint box didn't have any blank complaint forms. The inmates would complain to me that they can't fill out a complaint form because the boxes never had blank complaint forms by them.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 15TH day of August 2011 in Los Angeles, California.



# EXHIBIT "K"

**Declaration of Arturo Fernandez**

I, Arturo Fernandez, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am 29 years old and I am currently housed at Men's Central Jail ("MCJ") in Module 3301, Row A, Cell 8. My booking number is 2533061.

3.    On Friday, July 22, 2011, I was housed at MCJ, Module 3100, Row A, Cell 26. At approximately 7:30-8 o'clock in the evening, after my shower, Deputy Guerrero escorted me back to my cell. Deputy Guerrero appears to be Hispanic, is about 5'9" and fat. My hands were handcuffed behind me and I was holding toiletries and my towel.

4.    My cell at the time of the incident was the last cell on Row A and as Deputy Guerrero and I were walking towards my cell, I was in front of Deputy Guerrero. Deputy Guerrero yelled, "Hurry up. Stop lollygagging" at me as we were walking.

5.    When we got in front of cells 25 and my cell, 26, Deputy Guerrero punched the back of my neck. I turned around and looked at the deputy and said to him, "What the fuck?" Deputy Guerrero then pushed me up against the wall that is next to my cell and forced his forearm to my neck. He then yelled at me, "Stop resisting, motherfucker!" and pepper sprayed me. I instantly felt the burn in my eyes. I also had a hard time breathing because I'm asthmatic. I had no idea why he was doing this to me. I wasn't resisting. I was just trying to get into my cell.

6.    Seconds later, I heard another deputy coming over. I'm not sure who the deputy was because the pepper spray in my eye made it hard to see. He grabbed my arms and slammed me to the ground. It hurt and felt like I was being tackled and it hurt. A few seconds after I hit the ground, I heard the sounds of boots and keys jangling and I figured that it was other deputies running over to where we were. I wasn't able to see how many deputies arrived as my eyes were still burning up and tearing from the pepper spray.

7.    As soon as the deputies arrived, they began pummeling me with fists, kicks and other blows that felt like flashlights. I felt like I was being bombarded with a slew of blows for at least a minute or two. I also heard someone—I assume an inmate say, "Deputy _____,

why don't you leave him alone."

8. Once the deputies stopped beating me, someone picked me up and lead me away from my cell and back towards the front of the row. As we were walking, I heard one of the inmates on the row say, "Homie, keep your head up." I replied, "Yeah, alright, homie."

9. The deputies then took me out of the module and out into the hallway on the 3000 floor and then slammed to the ground. When I hit the ground, the deputies started choking me and punched my body again. As they were beating me, they mockingly yelled, "Alright, keep your head up!" I kept yelling at them to stop choking me because I couldn't breathe.

10. I have a history of asthma and in fact, I have a prescription to get breathing treatments with a nebulizer every night. I was scared that I was going to pass out because the deputies kept choking me. It felt like the deputies beat me for more than a minute.

11. I was then taken to the medical clinic. When I arrived one of the nurses, who assessed my injuries told me that I was going to need to go to the hospital, the Los Angeles Medical Center + USC ("LCMC") because I had head contusions, or large bumps on my head.

12. The medical staff must have contacted the paramedics because they arrived soon after. However, a Lieutenant or a Captain and another higher rank Los Angeles Sheriff's Department ("LASD") staff interviewed me on video camera before I went to LCMC. I don't know the names of the LASD staff who interviewed me. However, the Lieutenant or Captain is White, 5'10", older male in his late 40's and the higher rank LASD staff is also White, has silver hair, late 40's to early 50's and about 5'7"-5'8".

13. The LASD staff asked me what happened and I told them that I was beaten up by deputies. They then asked me if I had kicked the deputies and I told them that I hadn't. The higher rank LASD staff asked me if I was mentally ill and I told him that I wasn't. They also did a brief scan of my body of the injuries, but the video camera wouldn't be able to see the bumps on my head because my hair was covering it and the scan was very quick and not very thorough.

14. After the interview, the paramedics escorted me to LCMC where I got x-rays and Cat Scans. The medical staff at LCMC told me that I had several head contusions and that I had to get two stitches on my elbow. I told them that I had really bad headaches and that I couldn't

hear in my right ear. I also was able to see that I had bruises all over my body and bruises that looked like they came from flashlights on the side of my knees and thighs. I had remembered the blows to my knees and thigh area felt like flashlights more so than kicks and punches.

15. I felt like I was at LCMC for at least 12 hours.

16. On July 23, 2011, after I left LCMC, I was taken to the "hole" or the disciplinary unit at MCJ, Module 3301, Row A, Cell 8. No one told me at the time why I was being placed in the hole.

17. One to two days later, Custody Assistant ("CA") Mogul, a female CA gave me a write up that said that I was being sent to the hole for 29 days for fighting and assaulting staff. She said that if I was going to appeal the write up that I needed to do it immediately. I told her that I wanted to.

18. CA Mogul told me write my appeal on the back of the form, so I wrote on the back that I didn't know why I was being written up because I didn't fight or assault the deputies and that it was in fact the deputies who beat me up. I also wrote down that I was handcuffed from behind during the entire time.

19. I asked her for a copy of the report, not just the write up and she told me that if I wanted a copy of the report, I was going to need to subpoena it.

20. The next day, CA Mogul gave me the response to the appeal written by _____. The response basically stated that it was investigated and I was found to be at fault for fighting and assaulting staff.

21. I tried to write a complaint form about what happened since I first got to the hole, but whenever I asked the module deputies, I'd get the run around. The deputies would tell me, "I'll see if we have any", "I'll see what I can do" or "We're too busy." They never have blank complaint forms next to the locked complaint box, so the only way I would be able to get a complaint form is through the deputies, but they're uncooperative.

22. The medical staff at the jails gave me Motrin for my headaches, but I don't want to take them for too long because I know that it can damage my liver. I still get really bad headaches. I also can barely hear out of my right ear. The medical staff told me that as long as it

Exhibit K
Page 71

wasn't bleeding it was fine. They prescribed me ear drops for excess wax, but it doesn't do anything for my ear. I was supposed to get the stitches taken out of my elbow 10 days after the incident, but no one came by. The stitches eventually came out because part of the stitching got caught in my sheets. My right eye also gets blurry every once in a while and I have popped blood vessel next to my iris in my right eye. Most of the bumps on my head are gone, except two, the one behind my right ear and another one on the right side of my forehead.

23.    I'm afraid of retaliation from the deputies because I'm talking to the ACLU. I've spoken to the ACLU before about another beating and I've been written up several times since for things that I didn't do like altering my wristband or saying that I had a razor in my cell when I didn't. I also don't want the deputies planting things in my cell because I'm talking to the ACLU.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 15th day of August, 2011 in Los Angeles, California.

_____
Arturo Fernandez

**Declaration of Arturo Fernandez**

I, Arturo Fernandez, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am 29 years old and I am currently housed at Men's Central Jail ("MCJ") in Module 3301, Row A, Cell 8. My booking number is 2533061.

3.      On Friday, July 22, 2011, I was housed at MCJ, Module 3100, Row A, Cell 26. At approximately 7:30-8 o'clock in the evening, after my shower, Deputy Guerrero escorted me back to my cell. Deputy Guerrero appears to be Hispanic, is about 5'9" and fat. My hands were handcuffed behind me and I was holding toiletries and my towel.

4.      My cell at the time of the incident was the last cell on Row A and as Deputy Guerrero and I were walking towards my cell, I was in front of Deputy Guerrero. Deputy Guerrero yelled, "Hurry up. Stop lollygagging" at me as we were walking.

5.      When we got in front of cells 25 and my cell, 26, Deputy Guerrero punched the back of my neck. I turned around and looked at the deputy and said to him, "What the fuck?" Deputy Guerrero then pushed me up against the wall that is next to my cell and forced his forearm to my neck. He then yelled at me, "Stop resisting, motherfucker!" and pepper sprayed me. I instantly felt the burn in my eyes. I also had a hard time breathing because I'm asthmatic. I had no idea why he was doing this to me. I wasn't resisting. I was just trying to get into my cell.

6.      Seconds later, I heard another deputy coming over. I'm not sure who the deputy was because the pepper spray in my eye made it hard to see. He grabbed my arms and slammed me to the ground. It hurt and felt like I was being tackled and it hurt a lot because I didn't have anything to break my fall. A few seconds after I hit the ground, I heard the sounds of boots and keys jangling and I figured that it was other deputies running over to where we were. I wasn't able to see how many deputies arrived as my eyes were still burning up and tearing from the pepper spray.

7.      As soon as the deputies arrived, they began pummeling me with fists, kicks and

other blows that felt like flashlights. I felt like I was being bombarded with a slew of blows for at least a minute or two. I also heard someone–I assume an inmate say, "Hey! why don't you leave him alone."

8.     Once the deputies stopped beating me, someone picked me up and lead me away from my cell and back towards the front of the row. As we were walking, I heard one of the inmates on the row say, "Homie, keep your head up." I replied, "Yeah, alright, homie."

9.     The deputies then took me out of the module and out into the hallway on the 3000 floor and then slammed to the ground. When I hit the ground, the deputies started choking me and punched my body again. As they were beating me, they mockingly yelled, "Alright, keep your head up!" I kept yelling at them to stop choking me because I couldn't breathe.

10.     I have a history of asthma and in fact, I have a prescription to get breathing treatments with a nebulizer every night. I was scared that I was going to pass out because the deputies kept choking me. It felt like the deputies beat me for more than a minute.

11.     I was then taken to the medical clinic. When I arrived one of the nurses, who assessed my injuries told me that I was going to need to go to the hospital, the Los Angeles Medical Center + USC ("LCMC") because I had head contusions, or large bumps on my head.

12.     The medical staff must have contacted the paramedics because they arrived soon after. However, a Lieutenant or a Captain and another higher rank Los Angeles Sheriff's Department ("LASD") staff interviewed me on video camera before I went to LCMC. I don't know the names of the LASD staff who interviewed me. However, the Lieutenant or Captain is White, 5'10", older male in his late 40's and the higher rank LASD staff is also White, has silver hair, late 40's to early 50's and about 5'7"-5'8".

13.     The LASD staff asked me what happened and I told them that I was beaten up by deputies. They then asked me if I had kicked the deputies and I told them that I hadn't. The higher rank LASD staff asked me if I was mentally ill and I told him that I wasn't. They also did a brief scan of my body of the injuries, but the video camera wouldn't be able to see the bumps on my head because my hair was covering it and the scan was very quick and not very thorough.

14.     After the interview, the paramedics escorted me to LCMC where I got x-rays and

Exhibit K
Page 74

Cat Scans. The medical staff at LCMC told me that I had several head contusions and that I had to get two stitches on my elbow. I told them that I had really bad headaches and that I couldn't hear in my right ear. I also was able to see that I had bruises all over my body and bruises that looked like they came from flashlights on the side of my knees and thighs. I had remembered the blows to my knees and thigh area felt like flashlights more so than kicks and punches.

15. I felt like I was at LCMC for at least 12 hours.

16. On July 23, 2011, after I left LCMC, I was taken to the "hole" or the disciplinary unit at MCJ, Module 3301, Row A, Cell 8. No one told me at the time why I was being placed in the hole.

17. One to two days later, Custody Assistant ("CA") Mogul, a female CA gave me a write up that said that I was being sent to the hole for 29 days for fighting and assaulting staff. She said that if I was going to appeal the write up that I needed to do it immediately. I told her that I wanted to.

18. CA Mogul told me write my appeal on the back of the form, so I wrote on the back that I didn't know why I was being written up because I didn't fight or assault the deputies and that it was in fact the deputies who beat me up. I also wrote down that I was handcuffed from behind during the entire time.

19. I asked her for a copy of the report, not just the write up and she told me that if I wanted a copy of the report, I was going to need to subpoena it.

20. The next day, CA Mogul gave me the response to the appeal written by Sergeant Roberts. The response basically stated that it was investigated and I was found to be at fault for fighting and assaulting staff.

21. I tried to write a complaint form about what happened since I first got to the hole, but whenever I asked the module deputies, I'd get the run around. The deputies would tell me, "I'll see if we have any", "I'll see what I can do" or "We're too busy." They never have blank complaint forms next to the locked complaint box, so the only way I would be able to get a complaint form is through the deputies, but they're uncooperative.

22. The medical staff at the jails gave me Motrin for my headaches, but I don't want

to take them for too long because I know that it can damage my liver. I still get really bad headaches. I also can barely hear out of my right ear. The medical staff told me that as long as it wasn't bleeding it was fine. They prescribed me ear drops for excess wax, but it doesn't do anything for my ear. I was supposed to get the stitches taken out of my elbow 10 days after the incident, but no one came by. The stitches eventually came out because part of the stitching got caught in my sheets. My right eye also gets blurry every once in a while and I have popped blood vessel next to my iris in my right eye. Most of the bumps on my head are gone, except two, the one behind my right ear and another one on the right side of my forehead.

23.    I'm afraid of retaliation from the deputies because I'm talking to the ACLU. I've spoken to the ACLU before about another beating and I've been written up several times since for things that I didn't do like altering my wristband or saying that I had a razor in my cell when I didn't. I also don't want the deputies planting things in my cell because I'm talking to the ACLU.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 15th day of August, 2011 in Los Angeles, California.

_____/s/_____

Arturo Fernandez

# EXHIBIT "L"

**Declaration of Macario Garcia**

I, Macario Garcia, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am 42 years old and I am currently housed at Men's Central Jail ("MCJ"), Module 2700, Row A, Cell 11. My booking number is 2490525. I am 6'2" and 165 pounds.

3. On Friday, July 22, 2011 between 8-10 a.m., I was in Module 2700, Row, A, Cell 11. Deputy Chavez came to the front of my cell and told me to get out because I had an appointment with an eye doctor. Deputy Chavez then handcuffed me from behind before I stepped out of my cell. Deputy Chavez escorted me out of my cell towards the main gate at the front of the row. I saw Deputy Weiner standing inside the gated deputy's control booth, next to the cell door controls.

4. I knew the names of the deputies because they're the module deputies and I've seen them since I've been on this module for 3 months and a week. Deputy Chavez looks like 6'2" and weighs approximately 275 pounds, looks White with light brown hair and Deputy Weiner looks like 5'7" and weighs 220 pounds and he's White and bald.

5. Deputy Weiner then says to me, "Oh, it's you, you piece of shit, punk." I asked him what his problem was. I told him that I didn't do anything disrespectful to him and didn't know why he was talking to me like that. Deputy Weiner said to me, "Shut the fuck up, punk. You ain't nothing but a coward bitch. You had your chance to fight me, but you didn't." I think Deputy Weiner was referring to an incident where he strip searched me after I came back from court a couple of weeks before I got beat up and he took the handcuffs off of me.

6. I again asked him, "What's your problem?"

7. Deputy Chavez then looked at me and said, "You're not going to go to your doctor's appointment. I'm going to take you back to your cell." He then told me, "Get against the wall."

8. I complied and faced the wall that was opposite the deputy's control booth. I heard the locked gate open and close and then both Deputies Chavez and Weiner started

Exhibit L
Page 77

attacking me.

9.    Deputies Chavez and Weiner punched me several times before I fell to the ground from the blows. When I fell, they continued punching and kicking my head, face, body and legs. I don't even know how many times I was hit; it just felt like I was being bombarded by a stream of blows. The deputies also took out of their flashlights and beat my body and torso with them. I was screaming and yelling trying to get them to stop beating me, but they didn't. The deputies also pulled my hair and slammed my head on the ground. The beating felt like it lasted forever, but my guess is that they were beating me for about five minutes before I blacked out. The last thing I heard before I blacked out was Deputy Weiner who called out radio code, "415", which is an officer involved fight.

10.    The first thing I remember when I regained consciousness was seeing a stampede of deputies coming over to where I was lying on the ground. I heard Deputies Chavez and Weiner yell out, "Stop resisting! Stop pulling away!" I wasn't resisting or fighting as it would have been hard for me to do so since I had my hands handcuffed behind me. I didn't hear the deputies saying, "Stop resisting! Stop pulling away!" during the time they were beating me up before I blacked out. I only heard them yell these commands once the backup deputies arrived on scene. I then heard Deputy Chavez yell out to the other deputies, "Spray him! Spray him!"

11.    One of the deputies, I don't recall who or what this deputy looked like, sprayed my face with pepper spray. I felt so much pain and stinging in my face, especially my eyes after I was pepper sprayed. I also felt other deputies besides Deputies Chavez and Weiner punching and kicking me.

12.    The deputies finally stopped attacking me and one of them tried to pull me up by my arms, which were handcuffed behind me. When he did, I felt a sharp pain in my collarbone and heard a large crack. I yelled out in pain, but he continued to try to pull me up.

13.    As the deputies were dragging me to the elevator, I heard deputies yell out to me, "He got what he got coming."

14.    When we finally got into the escalator, I was able to see myself in the security, as I was brought down from the 2000 floor to the 1st floor. I was so scared by what I saw because I

Exhibit L
Page 78

couldn't even recognize myself. I had so much blood all over my face and it looked like blood was dripping down from everywhere.

15.    The deputies dragged me down the escalator because I was unable to walk and took me to the medical clinic on the first floor.

16.    I think there was about 10 or more deputies milling around the medical clinic. I recognized three deputies: Esqueda, Juarez and Lowry III. I was able to identify these deputies because I've had separate incidents with each of the deputies harassing me.

17.    When the nurses saw me, I heard them tell the deputies that I needed to go to the Los Angeles Medical Center + USC ("LCMC") because I had serious injuries.

18.    While I waited to be escorted to LCMC, I heard some of the deputies laughing and heard them say, "You didn't get hit. You fell." A sergeant and two deputies came and interviewed me on video camera. He asked me what happened and I told him that I was assaulted by Deputies Chavez and Weiner.

19.    The sergeant looked like either Hispanic or White with brown hair, 5"11", brown eyes and around 250 pounds.

20.    When I got to LCMC, I underwent a Cat Scan and 2 MRI's. The medical staff told me that I had a broken collarbone and one of the broken halves were facing inward towards my thoracic region causing my shortness of breath and difficulty breathing. I also received stitches above both of my eyebrows and my eyes were completely red. I am very worried about my eyes because I am completely blind in one eye due to Deputies Ledesma and Gonzalez and other deputies' beating me up in 2010 at the Pasadena Courthouse and I didn't know if the pepper spray would cause an infection in my blind eye or my working eye. I also had a lot of pain in my head and had swelling in the back of my head. I had bruises under each eye and bruises all on the front of my legs. I also have swelling on my lower lip.

21.    I am in an incredible amount of pain and I wince every time I move. I can barely move the right side of my body and can barely lift my right hand more than 3-6 inches in an upward direction.

\ \ \

Exhibit L
Page 79

\\\

22. I get very dizzy and sometimes hear a ringing in my ear, which sounds like an alarm is going off inside my head.

23. On 7/26, Esther Lim from the ACLU came to LCMC and saw me

24. On 7/28 or 7/29 in the afternoon, Lt. Wright, another Lieutenant with short, blondish hair and a Sergeant who is Hispanic came to LCMC and took photos of my injuries for the use of force packet. They didn't ask me any questions about what happened to me when I got beaten by Deputies Chavez and Weiner.

25. Either late in July or early August, the orthopedic surgeon told me that my collarbone was broken away from sternum and was found to be 3mm. away from the arteries to my heart.

26. I still am in a lot of pain from these injuries even though it happened on 7/22/11.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 2nd day of August, 2011 in Los Angeles, California.

_____

Macario Garcia

Exhibit L
Page 80

# EXHIBIT "M"

### Declaration of Darrell Garrett

I, Darrell Garrett, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. On June 19th, I was taken out of my cell for court line and waist chained. After I was waist chained, the deputies grabbed me by my waist chains and pulled me up to the bar. They told me to walk to the left and they pushed me from behind twice. I fell down the steps and the deputies told me to "shut the fuck up" and a deputy started kicking me in the face. Another deputy started kicking me in the face on the other side of my face. I was being kicked on both sides and I couldn't see anything. Another deputy was holding me down. I then felt something hard which I later learned was a milk crate. They were hitting me on my head with the milk crate which is a hard plastic. Later on there were patterns on my head from the milk crate. Then they threw me on the floor and they were hitting my head into the concrete floor. Then they grabbed my head and started cheese grating my face into the concrete. They then took two cans of mace and emptied them into my mouth, ears, nose, and eyes. They dragged me down the steps. I was bleeding everywhere. They tried to clean me up with some water but I was bleeding and I had crapped in my pants.

3. They then took me down to medical and even though I suffered a severe beating, they made me walk practically blindly down to medical. I then blacked out and then I was in the hospital at USC Medical Center. They took x-rays. The doctor asked me if I could leave since the deputies wanted to take me back and I was pressured out of fear to say yes.

4. When I returned to MCJ, they did not put me in medical. They just took me back to the hole.

5. I entered the hole on May 21st. A deputy pulled a metal make-shift knife out of his pocket and threatened me to cooperate with them. The deputies had gone through my confidential legal paperwork in my cell. I am a pro-per. The deputy said he had found the metal knife in my cell and unless I cooperated with them they would put me in the hole. The knife was not mine and it was never in my cell. They said if I cooperated they would forget about the knife

and make everything go away.

6. The only time I get out of my cell as a K-10 is the law library. Before last week, they hadn't given showers for two weeks. It had been weeks before I could wash the dried blood off me. On one day they shut off our water for 8 hours so we had no drinking water and we couldn't use the toilets. Whenever I complain they write me up and put me in the hole. They give me opened food and I don't know where it has been so I don't eat it. They verbally abuse me and threaten me, telling me that "they are going to get me." I haven't had any laundry exchange for a month. I haven't gotten mail for 3 weeks. The only time I use the phone is during my law library time. I haven't gotten a bedding exchange for a few weeks. I have been waiting to see the doctor for almost two months and I ask every day the nurses come to see the doctor and I never get on the doctor's line. There are frequently mice running around and I had to block the bottom of my door to prevent the mice from coming in. It is dirty and they haven't cleaned the tier in over a month. The showers are gross and they seem very dirty every time I go in there.

7. Since multiple deputies beat me up, they have verbally threatened me and taunted me, telling me they are going to get me. They tell me that I am not going to get out of the hole and they can charge me with anything.

8. My name is Darrell Garrett. I have been in Men's Central Jail since January. My time here is pending. I am 23 years old.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 9th day of July, 2009 in Los Angeles, California.

_____

Darrell Garrett

Declaration of Darrell Garrett

I, Darrell Garrett hereby declare;

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    On June 19th, I was taken out of my cell for court line and waist chained. After I was waist chained, ~~they~~ the deputies grabbed me by my waist chain~~s~~ and pulled me up to the bar. ~~After~~ They told me to walk to the left and they pushed me from behind twice. I fell down the steps and the deputies told me to "shut the fuck up" and ~~the~~ a deputy punched me in the face. I fell over a bench and a deputy started kicking me in the face. Another deputy started kicking me in the face on the other side of my face. I was being kicked on both sides and I couldn't see anything. I then felt something hard which I later learned was a milk ~~carton~~ crate. They were hitting me on my head with the milk crate which is a hard plastic ~~metal~~. Later on there were patterns on my

Another deputy was holding me down.

Exhibit M
Page 83

head from the milk crate. Then they threw me on the floor and they were hitting my head into the concrete floor. Then they grabbed my head and started cheese grating my face into the concrete. They then took two cans of mace and emptied them into my mouth, ears, nose, and eyes. They dragged me down the steps. I was bleeding everywhere. They tried to clean me up with some water but I was bleeding and I had crapped in my pants.

3. They then took me down to medical and even though I suffered a severe beating, they made me walk practically blindly down to medical. I then blacked out and then I was in the hospital at VSC Medical Center. They took X-rays. The doctor asked me if I could leave since the deputies wanted to take me back and I was pressured out of fear to say yes.

4. When I returned to MCJ they did not put me in medical. They

Exhibit M
Page 84

just took me back to the hole.

5. I entered the hole on May 21st. A deputy pulled a metal make-shift knife out of his pocket and threatened me to cooperate with them. The deputies had gone through my confidential legal paperwork in my cell. ~~because~~ I am a pro-per. The deputy said he had found the metal knife in my cell and unless I cooperated with them they would put me in the hole. The knife was not mine and it was never in my cell. They said if I cooperated they would forget about the knife and make everything go away.

6. The only ~~law library~~ time I get out of my cell as a K-10 is the law library. Before last week they hadn't given showers for two weeks. It had been weeks before I could wash the dried blood off me. On one day they shut off our water for 8 hours so we had no drinking water and ~~they~~ we couldn't use the toilets. Whenever I complain

they write me up and put me in the hole. They are treating us inhumanely and when I try to tell someone they put me in the hole. They give me opened food and I dont know where it has been so I dont eat it. They verbally abuse me and threaten me, telling me that "they are going to get me." I haven't had any laundry exchange for a month. I haven't gotten mail for 3 weeks. The only time I use the phone is during my law library time. I haven't gotten a bedding exchange for a ten weeks. I have been waiting to see the doctor for almost two months and I ask every day the nurses come to see the doctor and I never get on the doctor's line. There are frequently mice running around and I had to block the bottom of my door to prevent the mice from coming in. It is dirty and they haven't cleaned the ~~shower~~ tier in over a month. The showers are gross

and they seem very dirty every time I go in there.

7. Since multiple deputies beat me up, they have verbally threatened me and taunted me, telling me they are going to get me. They tell me that I am not going to get out of the hole and they can charge me with anything.

8. My name is Darrell Garrett. I have been in Men's Central Jail since January. My time here is pending. I am 23 years old.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 9th day of July, 2009 in Los Angeles, California

Printed Name X _____

# EXHIBIT "N"

## Declaration of Jonathan Goodwin

I, Jonathan Goodwin, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am a twenty nine year old male incarcerated in Men's Central Jail (MCJ) since the early part of November 2010.  My booking number is 2537776.  I am submitting this declaration to describe what happened to me on December 4, 2010, when Deputy Sheriff Beas either pepper sprayed or maced ("spray"), choked and beat me, along with other deputies, and the events leading to the beating.

**PRECIPITATING EVENTS**

3.    After December 4, 2010, when Deputy Sheriff Beas sprayed, choked and beat me, along with other deputies, I have been trying to piece together what possibly could have led to the violence and anger directed towards me. I believe it began on Thanksgiving Day, 2010.

4.    On Thanksgiving, I was housed in Module 8200 in MCJ, because I had a Staph infection. I noticed that a Deputy Beas appeared to have injured his leg. I suggested that he do some squats to work the kinks out. I know about that because I exercise a lot and thought it was good advice. Now, when I look back at it, it seems that he did not like that I, an inmate, said anything of a personal nature to him. I recognized Deputy Beas because of his assignment/presence in my module and because I have been able to read his name tag.

5.    The next day, Friday, November 26th, I tried to pass a newspaper to someone in the cell across the row. Deputy Beas came by gave the newspaper to the inmate that I was trying to pass the newspaper to, but then said to me that this was the only favor I was going to get from him. I couldn't understand why he would say that to me. It crossed my mind that he was trying to intimidate me.

**FIRST INSTANCE OF ABUSE BY DEPUTY BEAS**

6.    Later that day, around dinner time, Deputy Beas opened the door to my cell,

ordered me to face the wall, get down on my knees and put my hands behind my back. I did.

7.      When I was kneeling on the ground, he grabbed my fingers as if he would break them, and it was painful. He told me that I was going to respect him. I said that I do respect him, just like I respect anyone. He kept on saying that I was going to respect him. I said that I get it and that I am not here to cause any problems. He started screaming into my ear more along the lines of my having to show him respect. He also told me that he had read up on me in the files–like he was trying to categorize me- finding out who I am. It seemed to me that it was more than his telling me that he was doing his job- but that he was telling me that he was singling me out for his attention to scare me.

8.      I told him that we are all adults and that I did not have anything to prove and was only trying to do my time. I said I had a parole violation for a technical violation, and would be going home in five months. I was trying to talk to Deputy Beas to let him know that I was not less than human and that we could respect each other. In looking back, I guess I should not have said that we are all adults and that I did not have anything to prove. Perhaps I acted with too much dignity.

9.      Later, on the same day, Deputy Beas came back to my cell and removed the magazine and newspapers that I had in my cell. In fact, one of the deputies had loaned me the magazine.

10.      After these incidents, and sometime between November 27th and December 3rd, Deputy Clark asked me what was going on between me and Deputy Beas. I told him that I didn't know, that it just happened. Deputy Clark said that I should try to smooth the situation over. I told Deputy Clark that there was nothing coming from me that would cause any problem. I also know Deputy Clark because of his assignment/presence in my module and because I have been able to read his name tag.

11.      On December 3rd, I was moved from the cell number 8244 which was right across from the deputies' office to cell number 8223.  Cell number 8223 happens to be a somewhat isolated cell, in back, out of the way, and there is no cell across the hall.

12. On Saturday, December 4, 2010, at around dinner time, I was awakened when I heard a key in the door to my cell. When it opened, I saw Deputy Beas. He poked his head in and kicked my dinner tray across the cell floor and then closed the door. He was doing it quickly and it seemed to me that he was trying to do it so that I would not see that he was the one kicking the dinner tray.

13. Normally, it is the trustee who brings the food along with the deputy who opens the door. I got worried with this change, that it wasn't the trustee, and wondered what might be in the food, so I flushed it down the toilet.

14. When Deputy Beas came back he opened the door so that I could push the tray out. I asked him why he had kicked the tray across the floor. Deputy Beas said " I can do what I want." Words simply can't describe the harshness in his voice. I told him that what he had done was disrespectful, unsanitary, unbecoming and a violation of conduct, policy and procedure.

15. He said -- well then-- I better go look at Title 15 and check those rules and guidelines. I said he shouldn't be so sarcastic about looking it up. I asked how long he had been a deputy. He said– for more than four years and that he is above the law.

16. Deputy Beas then said he doesn't have to listen to me or respect me because I am a criminal. I got concerned that there might be some sort of attempt to create a provocation, so I asked to speak to the Sergeant. Deputy Beas appeared angry and flustered, but he said he was going to get the Sergeant. He slammed and locked the door.

17. He returned around ten minutes later, still angry. He told me to step out of my cell. I put my hands in my pockets and walked out. When I did, I saw that there was no sergeant or any other deputy with him. I became apprehensive. As I began to turn right, as he had told me to do, I noticed that Deputy Beas's right hand dropped to the area of his radio and his spray canister. I really don't know if it is pepper stray or mace in the cannister, but it is an orange-like fluid. As I continued turning, I felt a spray come across my left shoulder area and heard him radio for back up. I could see the spray's color as it came across my shoulder.

18. I turned towards Deputy Beas and he sprayed me square in my face. The spray

burned my eyes, and I couldn't see. I was in pain. The burning sensation lasted a long time and I could still feel its effects when I was taken to the nurse's office.

19.    Everything happened very fast. After he sprayed me in my face, I tried to cover my face by kind of putting my elbows against my face, somewhat lowering my body as I did that. He continued spraying me. I tried to turn away. He grabbed my shirt trying to pull it over my head. At around the same time, he punched me around three to five times using his right hand, the hand that held the canister. With upper cut motions, he struck me in my mouth where my teeth are chipped and he then cursed in pain.

20.    When he hit me in my mouth, he dropped the canister. I bent down to pick up the canister and was able to throw it down the hall. While I was bending down, Deputy Beas jumped on my back and started choking me, holding my neck in the crook of his arm. He also tried to drag me back into the cell.

21.    I started to losing consciousness from the choke hold and the spray and fell. He was still on my back and choking me when I fell to the ground. He kept on screaming obscenities in my ear. As I managed to breathe, I placed my hand under his elbow and pushed his arm above my nose.

22.    I remember being back in my cell, on the floor and seeing Deputy Clark run in with a bunch of deputies. They stomped, kicked and were punching at me shouting "Stop resisting!" But, I was not resisting. I don't think that when I pushed Deputy Beas's arm so that I could breathe, that I was resisting. Even so, I pushed Deputy Beas's arm before I was being beaten and attacked in the cell by the other deputies and they were shouting "Stop resisting."

23.    The deputies finally stopped. I think this beating lasted under five minutes.

24.    After the deputies finished beating me, they handcuffed me and dragged me down the hall. They stopped dragging me in front of their office. I was still on the floor when Deputy Lopez stood over me with his foot planted on my back, almost like standing on an animal that had been caught.

25.    I don't doubt that I was using some curse words and was loud after the beating

Exhibit N
Page 91

and while I was being dragged down the hall. Sergeant Ponce de Leon told me to "shut the fuck up" and then asked " where is my injured deputy?" I said "there is no injured deputy." I know it was Sergeant Ponce de Leon because I asked him his name, and he told me. I was able to identify Deputy Lopez from reading his badge while I was sitting handcuffed on the bench waiting for the nurse.

26.   I told Sergeant de Leon about my throwing the canister down the hall. He ordered a deputy to go and pick it up.

27.   I was then handcuffed to a bench outside the MCJ medical clinic and Sergeant de Leon said to the deputies " if he moves, spray him, taser him, and crack his head with a flashlight."

28.   I was injured and in pain all over my body. My eyes were burning from the spray. The nurse at the MCJ station told me that my right eye was reddened as if blood vessels had broken. I had purplish bruises on my torso and rib areas from the beating and kicking. My nose was bleeding. I had a large knot over my right eyebrow, which I think came from being kicked in my head. There was redness around my neck from when I was choked. I also had a cut over my left eye and the fourth finger of my right hand was cut.

29.   Additionally, both my lips were swollen and my bottom lip was busted because Deputy Beas had slugged me in the mouth a number of times.

30.   At the MCJ medical station. Nurse Haggarty cleaned me up, wiping the blood and spray from my face. The deputies took my pants and socks.

31.   After I saw the nurse, I was handcuffed to the bench until, barefoot, wearing only my boxer shorts and t shirt, I was escorted to the Twin Towers Correctional Facility (TTCF) where X-rays of my head were taken and it was decided that I did not need stitches. I don't know if it was a doctor or nurse that made the decision.

32.   At TTCF I believe a doctor prescribed the Tylenol and antibiotics for my injuries. The Tylenol was to be taken twice a day. I got the antibiotics until about January 13th. I am still receiving Tylenol.

33. When I returned to MCJ from TTCF I was placed in cell 8239 ,which is across the hall from the deputies' office. I can't really say how many hours later I returned from TTCF.

34. On December 5, 2010, after a second video interrogation of me was completed, from my cell I could look into the deputies' office and I saw Deputies Beas and Arian talking and looking over at me while Deputy Beas seemed to be writing something, maybe filling out a report. After that, Deputy Beas kept coming to my cell and telling me "we are going to get you, we are going to get you for attempted murder." I know it was Deputy Arian talking with Deputy Beas because Deputy Arian was one of the interrogators in the 2nd video interview. The first video interrogation of me was the night of December 4, 2010.

35. My depression, fear and anger over what happened to me, how I was so powerless to prevent any attack, and what was going to happen to me now, led me to try to kill myself.

36. On December 6th, I asked to see a psychiatrist, because I could feel myself really sinking into depression. A deputy told me " we are not playing your game." I thought the deputy meant that he would do nothing to assist me in contacting a psychiatrist or in contacting anyone for mental health assistance. This only added to my feeling of hopelessness. As a result, I cut the veins in my arms. I can't say what I was trying to do at that moment. Was it to end my life? I don't know, but probably I was. I know my wish was to disappear, to end this helplessness.

37. Apparently, although the deputy told me he was not going to contact the psychiatrist, the contact was made by someone because the psychiatrist came to my cell around 10 to 15 minutes after I had attempted to cut my veins, and spoke to me through the door tray slot. I showed her my arms.

38. A stretcher was ordered. Medical staff members and a deputy escort took me downstairs to the medical clinic where I was cleaned up and bandaged my bloody arms. I also spoke to the psychiatrist at the clinic.

39. After that two deputies took me to the Inmate Reception Center (IRC) where I spoke with someone about why I had attempted suicide. I don't know if the person I saw was a

psychiatrist. She told me that she did not believe that I was suicidal.

40.    After IRC, I was taken back to the medical clinic where deputies handcuffed me to a bench for about five hours. At about 1:00 a.m., three deputies took me to 7th floor of TTCF.

41.    At TTCF deputies put me in my cell and removed all my clothes, so I was naked. There was no mattress or blanket in the cell. The cell was dirty. There was feces smeared on the wall. I think it was Cell 13. I curled up on the floor and tried to sleep.

42.    I was at TTCF from about December 7th to December 9, 2010. On December 8th, a deputy threw water on me from the tray slot. It was a deputy on the night shift. I don't know his name. He was bald, Hispanic, approximately 5'8" -5'10" and in his mid 40's. I asked why he had done that. He said someone had died on him and he had to make sure that I was alive. I spoke to someone at TTCF who may have been a psychiatrist.

43.    I was sent back to MCJ and was first housed in Module 3500. No one told me why I was being transferred from TTCF to MCJ.

44.    Before December 4th, I had just been another member of the general population in MCJ. I am now classified as K-10, in High Power, in Module 3100, and a possible suicide. I am shackled wherever I go.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 19th day of August 2011 in Los Angeles, California.

Jonathan Goodwin

# EXHIBIT "O"

**Declaration of Gordon Grbavac**

I, Gordon Grbavac, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am 44 years old and I am the Superintendent for the California Builders Group Incorporated in Culver City.

3.      On Monday, August 24, 2009, the Los Angeles Sheriff's Department ("LASD") came to my business with a search warrant. Four days after my arrest, I was charged with possessing an assault rifle that was not registered with California.

4.      After I was arrested and taken to the Inmate Reception Center ("IRC") where I was processed. At IRC, I told the assessment deputies that I had relatives who worked for LASD. I have a cousin named Kresimir Kovac who worked at the Century Regional Detention Facility ("CRDF") in Lynwood, California and who now works for the Compton Station. He was arrested in 2002 for conspiracy to offer an assault weapon for sale. I have another cousin named Adrien Grbavac who works at the Temple Station. I have attached a copy of their LASD business cards to this declaration as Exhibit 1.

5.      Despite disclosing this information to the IRC deputies and telling them that I didn't want to be placed in general population, I was still placed in general population.

6.      A couple of days later, a deputy asked me if I had family in law enforcement. I told him that I did. He said, "The inmates know this. Your life is threatened, so I'd say where the deputies can see you." He also said to me, "I don't know why you're not in PC [protective custody] and why you're in general population."

7.      On Thursday, August 27, 2009, I was scheduled to go to court. A deputy came by my cell in the morning and told me to get ready for court. I was escorted to the court processing area. A deputy cut off my wristband and placed another wristband on me. I was then pulled out of the line and escorted to the third floor of TTCF and placed in a 2-man cell. I didn't go to court that day.

8.      When I got there, a few hours later during program time, an inmate came up

behind me. He was Hispanic and had a tattoo of the city, "Azusa" on his neck. The inmate brushed his hand on my lower back. I was very scared when this inmate this to do me so I went into my cell and closed the cell door after me. He came over to my cell window and threatened me saying, "This is it for you. Today's the day." I thought he was going to kill me.

9.    About 3-4 pm, I was in the program area at TTCF. I believe it was right after we had our dinner. Two deputies, one who was Hispanic, 6 feet tall, stocky with short black hair and a White deputy who was 5'9", skinny with short blonde hair walked over to where I was in the program area.

10.    One of the deputies handcuffed me and escorted me through the Staging Area and forcefully shoved me into the Attorney Room. One deputy grabbed me on my left side and the other deputy grabbed me on my right side and as if I was a battering ram, they repeatedly slammed my head and cheek into the window partition that separates the attorneys from the inmates. As they were slamming me into the window, the White deputy said to me, "We're going to teach you a lesson you fat motherfucker." He also asked me, "Did you shit in your pants?"

11.    After a minute or so, a sergeant who is White, about 55 years old, between 5"9" and 5'10", pudgy with short hair came in. He asked, "How did all this blood get here?" When I looked to where he was pointing, I saw blood splattered all over the window partition and saw blood in the cubicle next to where the two deputies had slammed my head.

12.    I told the sergeant that his deputies had assaulted me. The sergeant told me that he'd be right back.

13.    When the sergeant left, the White deputy said to me, "Are you fucking kidding me? You motherfucker. You better change your story or we're going to show you what we do to fat asses. You better say that you did this to yourself." I was extremely scared and felt very threatened. I thought that the deputies might kill me if I didn't do what he said. So I told them that I would tell the sergeant that I did it to myself.

14.    About a minute later, the sergeant came back and interviewed me on camera. I was seated on the stool in the attorney room facing the door to the Staging Area and the sergeant

Exhibit O
Page 96

was facing me, away from the door to the Staging Area with the video camera, interviewing me. The White deputy was standing in the doorway to the Staging Area. From here, the deputy was no more than five feet away from me. I could see him staring at me while the sergeant was interviewing me. At no time did the sergeant direct who had beaten me to leave the area where the sergeant was interviewing me. The sergeant asked me what happened on video camera and I told him that I had banged my head on the window.

15.    After the interview, the sergeant told the White deputy and the Hispanic deputy to take me to the nurses' station. When I got there, one of the deputies took one of the handcuffs off of my wrist and secured it to the rail on the gurney. The nurse then gave me an ice pack for my face. I felt very faint and my hands and arms felt numb.

16.    I heard one of the nurses call for an ambulance. The White deputy then came over to me and pressed his handcuff key into both of my arms, which left puncture marks. I still have the scars from the puncture wounds.

17.    I then heard one of the deputies tell the nurse, "Cancel the ambulance. We're going to take him in a radio car to LCMC [Los Angeles Medical Center + USC]."

18.    Two different deputies escorted me to a squad car. During the ride over to LCMC, one of the deputies asked me what happened. I told him that I had banged my head on the window. I was scared to tell him the truth because I thought if I had told the deputy what really happened, he would tell the other deputies, which I thought would lead to another beating. I also told the deputies that I had a cousin who worked in the Lynwood facility or CRDF.

19.    One of the deputies asked me for his name and I told him that his name was Kovac. One of the deputies pulled out his cell phone and made a call. I believe he was calling my cousin, Kovac. He asked my cousin, "What do you want us to do with him?" I wasn't able to hear what the other person on the other line was saying, but I heard the deputy repeating what the other person on the phone was saying which was, "Go ahead and BBQ him." I had no idea what this meant, but I was very scared. The deputy then said, "We'll meet up for drinks at another time" into the phone.

20.    I was then taken to the Jail Ward at LCMC and was handcuffed to the bed. I had

one arm handcuffed to one side of the bed and the other arm to the other side of the bed.

21. While I was waiting, I heard sounds of someone struggling and pulling on his handcuffs. I heard him yell, "Jesus help me! Help me!" A nurse near me said, "Even Jesus isn't going to help you now." I then heard her laughing after she made this comment. I don't know her name, but she had a heavy Eastern European accent.

22. I then had an MRI done and the doctor told me that I had bleeding in the front right lobe of my brain.

23. After the MRI, an African American deputy who was wearing glasses kept circling my bed in a threatening manner saying, "Let me at him. Let me at him." I was very scared. I didn't know what was going to happen to me.

24. I was then moved to another room. While I was in this room, a different nurse was treating me and making sure that I was comfortable. She appeared to be Haitian. I noticed a doctor and the nurse with the Eastern European accent telling the Haitian nurse to do various errands, instead of doing the errands themselves. After the Haitian nurse would complete the errand, she would immediately come back into my room and again the doctor or nurse would try to get this nurse out of my room by assigning another errand for her to do. I don't know why they were doing this, but I felt like they were trying to get her out of the room, so that something could happen to me.

25. On Friday, August 28, 2009, I was escorted back to TTCF. When I got to TTCF, I was sent to the nurses clinic. An older, White nurse asked me what had happened and I told her that deputies had assaulted me. I felt that I could tell her the truth. She looked very concerned about me and she transferred me to the seventh floor of TTCF where I was placed in my own cell.

26. Later that day, a deputy told me that I was being released so I went to IRC and went through the release process. After I was done with the release process and had changed into my street clothes, Detective Camarillo and Custody Assistant ("CA") Judge escorted me through the long hallway to the back area of IRC. When I got to this area, Detective Camarillo said I was being arrested and he waist-chained me and handcuffed my hands to my waist. I didn't know

why I was being re-arrested.

27.    I was then re-processed at IRC, taken to the fourth floor of IRC and placed in a bunk bed in the program area, instead of a cell.

28.    On Monday, August 31, 2009, I was taken to court and the next day, I was released.

29.    Because the deputies slammed my head against the window, I had a cut over my right eye. My right eye was swollen and my face was also badly bruised for more than a week and it took an additional week for the swelling to go down. There are three photos attached to this declaration as Exhibit 2 of my injuries taken one week after the incident.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 15th day of June, 2011 in Baldwin Park, California.

Gordon Grbavac

**Declaration of Gordon Grbavac**

I, Gordon Grbavac, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am 44 years old and I am the Superintendent for the California Builders Group Incorporated in Culver City.

3.     On Monday, August 24, 2009, the Los Angeles Sheriff's Department ("LASD") came to my business with a search warrant. Four days after my arrest, I was charged with possessing an assault rifle that was not registered with California.

4.     After I was arrested and taken to the Inmate Reception Center ("IRC") where I was processed. At IRC, I told the assessment deputies that I had relatives who worked for LASD. I have a cousin named Kresimir Kovac who worked at the Century Regional Detention Facility ("CRDF") in Lynwood, California and who now works for the Compton Station. He was arrested in 2002 for conspiracy to offer an assault weapon for sale. I have another cousin named Adrien Grbavac who works at the Temple Station. I have attached a copy of their LASD business cards to this declaration as Exhibit 1.

5.     Despite disclosing this information to the IRC deputies and telling them that I didn't want to be placed in general population, I was still placed in general population.

6.     A couple of days later, a deputy asked me if I had family in law enforcement. I told him that I did. He said, "The inmates know this. Your life is threatened, so I'd say where the deputies can see you." He also said to me, "I don't know why you're not in PC [protective custody] and why you're in general population."

7.     On Wednesday, August 26, 2009, I was scheduled to go to court. A deputy came by my cell in the morning and told me to get ready for court. I was escorted to the court processing area. A deputy cut off my wristband and placed another wristband on me. I was then pulled out of the line and escorted to the third floor of TTCF and placed in a 2-man cell. I didn't go to court that day.

8.     When I got there, a few hours later during program time, an inmate came up

Exhibit O
Page 100

behind me. He was Hispanic and had a tattoo of the city, "Azusa" on his neck. The inmate brushed his hand on my lower back. I was very scared when this inmate this to do me so I went into my cell and closed the cell door after me. He came over to my cell window and threatened me saying, "This is it for you. Today's the day." I thought he was going to kill me.

9.    About 3-4 pm, I was in the program area at TTCF. I believe it was right after we had our dinner. Two deputies, one who was Hispanic, 6 feet tall, stocky with short black hair and a White deputy who was 5'9", skinny with short blonde hair walked over to where I was in the program area.

10.    One of the deputies handcuffed me and escorted me through the Staging Area and forcefully shoved me into the Attorney Room. One deputy grabbed me on my left side and the other deputy grabbed me on my right side and as if I was a battering ram, they repeatedly slammed my head and cheek into the window partition that separates the attorneys from the inmates. As they were slamming me into the window, the White deputy said to me, "We're going to teach you a lesson you fat motherfucker." He also asked me, "Did you shit in your pants?"

11.    After a minute or so, a sergeant who is White, about 55 years old, between 5"9" and 5'10", pudgy with short hair came in. He asked, "How did all this blood get here?" When I looked to where he was pointing, I saw blood splattered all over the window partition and saw blood in the cubicle next to where the two deputies had slammed my head.

12.    I told the sergeant that his deputies had assaulted me. The sergeant told me that he'd be right back.

13.    When the sergeant left, the White deputy said to me, "Are you fucking kidding me? You motherfucker. You better change your story or we're going to show you what we do to fat asses. You better say that you did this to yourself." I was extremely scared and felt very threatened. I thought that the deputies might kill me if I didn't do what he said. So I told them that I would tell the sergeant that I did it to myself.

14.    About a minute later, the sergeant came back and interviewed me on camera. I was seated on the stool in the attorney room facing the door to the Staging Area and the sergeant

Exhibit O
Page 101

was facing me, away from the door to the Staging Area with the video camera, interviewing me. The White deputy was standing in the doorway to the Staging Area. From here, the deputy was no more than five feet away from me. I could see him staring at me while the sergeant was interviewing me. At no time did the sergeant direct who had beaten me to leave the area where the sergeant was interviewing me. The sergeant asked me what happened on video camera and I told him that I had banged my head on the window.

15.    After the interview, the sergeant told the White deputy and the Hispanic deputy to take me to the nurses' station. When I got there, one of the deputies took one of the handcuffs off of my wrist and secured it to the rail on the gurney. The nurse then gave me an ice pack for my face. I felt very faint and my hands and arms felt numb.

16.    I heard one of the nurses call for an ambulance. The White deputy then came over to me and pressed his handcuff key into both of my arms, which left puncture marks. I still have the scars from the puncture wounds.

17.    I then heard one of the deputies tell the nurse, "Cancel the ambulance. We're going to take him in a radio car to LCMC [Los Angeles Medical Center + USC]."

18.    Two different deputies escorted me to a squad car. During the ride over to LCMC, one of the deputies asked me what happened. I told him that I had banged my head on the window. I was scared to tell him the truth because I thought if I had told the deputy what really happened, he would tell the other deputies, which I thought would lead to another beating. I also told the deputies that I had a cousin who worked in the Lynwood facility or CRDF.

19.    One of the deputies asked me for his name and I told him that his name was Kovac. One of the deputies pulled out his cell phone and made a call. I believe he was calling my cousin, Kovac. He asked my cousin, "What do you want us to do with him?" I wasn't able to hear what the other person on the other line was saying, but I heard the deputy repeating what the other person on the phone was saying which was, "Go ahead and BBQ him." I had no idea what this meant, but I was very scared. The deputy then said, "We'll meet up for drinks at another time" into the phone.

20.    I was then taken to the Jail Ward at LCMC and was handcuffed to the bed. I had

one arm handcuffed to one side of the bed and the other arm to the other side of the bed.

21. While I was waiting, I heard sounds of someone struggling and pulling on his handcuffs. I heard him yell, "Jesus help me! Help me!" A nurse near me said, "Even Jesus isn't going to help you now." I then heard her laughing after she made this comment. I don't know her name, but she had a heavy Eastern European accent.

22. I then had an MRI done and the doctor told me that I had bleeding in the front right lobe of my brain.

23. After the MRI, an African American deputy who was wearing glasses kept circling my bed in a threatening manner saying, "Let me at him. Let me at him." I was very scared. I didn't know what was going to happen to me.

24. I was then moved to another room. While I was in this room, a different nurse was treating me and making sure that I was comfortable. She appeared to be Haitian. I noticed a doctor and the nurse with the Eastern European accent telling the Haitian nurse to do various errands, instead of doing the errands themselves. After the Haitian nurse would complete the errand, she would immediately come back into my room and again the doctor or nurse would try to get this nurse out of my room by assigning another errand for her to do. I don't know why they were doing this, but I felt like they were trying to get her out of the room, so that something could happen to me.

25. On Friday, August 28, 2009, I was escorted back to TTCF. When I got to TTCF, I was sent to the nurses clinic. An older, White nurse asked me what had happened and I told her that deputies had assaulted me. I felt that I could tell her the truth. She looked very concerned about me and she transferred me to the seventh floor of TTCF where I was placed in my own cell.

26. Later that day, a deputy told me that I was being released so I went to IRC and went through the release process. After I was done with the release process and had changed into my street clothes, Detective Camarillo and Custody Assistant ("CA") Judge escorted me through the long hallway to the back area of IRC. When I got to this area, Detective Camarillo said I was being arrested and he waist-chained me and handcuffed my hands to my waist. I didn't know

Exhibit O
Page 103

why I was being re-arrested.

27.    I was then re-processed at IRC, taken to the fourth floor of IRC and placed in a bunk bed in the program area, instead of a cell.

28.    On Monday, August 31, 2009, I was taken to court and the next day, I was released.

29.    Because the deputies slammed my head against the window, I had a cut over my right eye. My right eye was swollen and my face was also badly bruised for more than a week. There are three photos attached to this declaration as Exhibit 2 of my injuries taken one week after the incident.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 15th day of June, 2011 in Baldwin Park, California.

_____/s/_____

Gordon Grbavac

# EXHIBIT "P"

## Declaration of Joseph Hager

I, Joseph Hager, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    My name is Joseph Hager. I am currently housed at Men's Central Jail. I have been here since June 2009. I might be here for another year. I am 23 years old.

3.    On June 15th, 2010, I was in my cell when a deputy approached me and told me that it was time for me to go to the law library. At the time I was a pro-per and as a pro-per I am entitled to 1 hour and 30 minutes of law library time. That day I was scheduled to go to the law library from 6 pm - 7:30 pm. At 4:30 pm a deputy told me it was time for my law library even though it was 1 hr 30 min before I was schedule to go. I exited my cell and followed orders. I walked to the end of the tier.

4.    When I got to the end of the tier, I was handcuffed behind my back. Another deputy came out of the module office at the front of the tier. The deputy said to me, "Hager, Why do you keep calling law library? We heard you. Shut the fuck up." Since I am housed at the front of the row, I and the other inmates around me call out "law library" for the inmates farther down the row to make sure that the deputies remember to give them their law library time at the appropriate hour. It is our way of helping each other out. This happens everyday so me calling out law library on this particular day was not out of the ordinary. Also, every time that I have called out law library before I have never had a deputy respond to me with hostility.

5.    The deputy who had yelled at me grabbed the back of my shirt by my neck collar and dragged me to the law library which is about 40 ft away from the tier. He pushed me up against the wall. My face was pushed against the wall. He violently kicked my left ankle out with so much force that my ankle started bleeding. He started searching me and pushing my body and my face into the wall. I started asking him why he was doing this. He took the back of my shirt and took me down to the ground. I had not been resisting and I was still handcuffed. He told me to "shut the fuck up." I said "okay okay." He picked me up and was dragging me like I was an unruly dog or something back to the tier. He said I wasn't getting my law library time to day.

Exhibit P
Page 105

When we got back to the front of the row he slammed my face into the edge of the door frame. I dropped to the ground and blacked out. When I came to, I was being kicked in the head and punched in the face. Deputy Chavez and Gonzalez were beating me. I was trying to move my face but they kept punching the back of my head and kicking me in the head with their boots. I blacked out again and when I came to there was a knee in my face. They kept yelling "stop resisting" even though I wasn't moving and was handcuffed the entire time. Deputy Chavez picked me up and said "I tried to kill you. You are lucky you are still breathing."

6.    I was sitting cross-legged on the ground. I asked him why he had hit me and when I tried to say something else he punched me again. I heard that they were searching my cell. I then saw a few deputies bring out my confidential legal materials even though they are not allowed to search my cell unless I am watching and they video tape it.

7.    I then was taken to medical. X-rays were taken. I had a fractured right side of my face, a huge black eye, and bumps all over my head from where they had hit me. Both of my ears were swollen and my mouth was bleeding.

8.    The deputies then interviewed me on camera. I told them that I had slipped in the shower. I lied because I figured if I said anything I would have more problems with the deputies. I was then sent to the hole. I was there for 29 days. They said I was being charged with assault on the deputy who had beat me up. They said I had attempted to headbutt him and violently kick him even though I was handcuffed and either up against the wall or on the ground during the whole thing.

9.    Since then deputies come to my cell to provoke me and taunt me.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 20th day of July, 2010 in Los Angeles, California.

_____

Joseph Hager

Declaration of _Joseph Hager_

I, _Joseph Hager_, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. My name is Joseph Hager. I am currently housed at Men's central Jail. I have been here since ~~May~~ June 2009. I might be here for another year. I am 23 years old.

3. On June 15th, 2010 I was in my cell when a deputy approached me and told me that it was time for me to go to the law library. At the time, I was a pro-per and as a pro-per I am entitled to 1 hour and 30 minutes of law library time. That day I was scheduled to go to the law library from 6pm - 7:30 pm. At 4:30 pm a deputy told me it was time for my law library even though it was 1 hr 30 min before I was scheduled to go. I exited my cell and followed orders. I walked to the end of the tier.

4. When I got to the end of the tier, I was handcuffed behind my back. Another deputy came out of the module office at the front of the tier. The deputy said to me, "Hager, why do you keep calling

1932469

law library? We heard you shut the FUCK up." Since I am housed at the front of the row, I and the other inmates around me call out "law library" for the inmates farther down the rows to make sure that the deputies remember to give them their law library time at the appropriate hour. It is our way of helping each other out. This happens everyday so me calling out law library on this particular day was not out of the ordinary. Also, every time that I have called out law library before I have never had a deputy respond to me with hostility.

5. The deputy who had yelled at me grabbed the back of my shirt by my neck collar and dragged me to the law library which is about 40 ft away from the tier. He pushed me up against the wall. My face was pushed against the wall. He violently kicked my left ankle out with so much force that my ankle started bleeding. He started searching me and pushing my body and my face into the wall. I started asking him why he was doing this. He took the back of my shirt and took me down to the ground. I had not been resisting and I was

1932469

still handcuffed. He told me to "shut the fuck up." I said "okay okay." He picked me up and was dragging me like I was an unruly dog or something back to the tier. He said I wasn't getting my law library time today. When we got back to the front of the row he slammed my face into the edge of the door frame. I dropped to the ground and blacked out. When I came to, I was being kicked in the head and punched in the face. Deputy Chavez and Gonzalez were beating me. I was trying to move my face but they were punching the back of my head and kicking me in the head with their boots. I blacked out again and when I came to there was a knee in my face. They kept yelling "stop resisting" even though I wasn't moving and was handcuffed this entire time. Deputy Chavez picked me up and said "I tried to kill you. You are lucky you are still breathing."

6. I was sitting cross-legged on the ground. I asked him why he had hit me and when I tried to say something else he punched me again. I heard that they were searching my cell. I then saw a few deputies bring out my confidential legal materials even

though they are not allowed to search my cell unless I am watching and they video tape it

7. I then was taken to medical. X-rays were taken. I had a fractured right side of my face, a huge black eye, and bumps all over my head from when they had hit me. Both of my ears were swollen and my mouth was bleeding.

8. The deputies then interviewed me on camera. I told them that I had slipped in the shower. I lied because I figured it I said anything I would have more problems with the deputies. I was then sent to the hole. I was there for 29 days. They said I was being charged with assault on the deputy who had beat me up. They said I had attempted to head butt him and violently kick him even though I was

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this _____ day of _____, 2009 in Los Angeles, California.

handcuffed and either up against a wall or on the ground during the whole thing.

9. Since then deputies come to my cell to provoke me and taunt me.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 20th day of July, 2009 in Los Angeles, California.

X _____

# EXHIBIT "Q"

## DECLARATION OF MICHAEL HOLGUIN

I, MICHAEL HOLGUIN, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am a 29 year-old construction worker from Walnut, CA.  I have been in jail for approximately three and a half weeks.  Up until one week ago I had spent the entire time in Men's Central Jail on a K10 FISH row.  The jail normally classifies me as a K-1 because my dad is a police officer.

3.    During the time I was on the K10 FISH row (3500Charlie) I never got a shower.  One Saturday, a Sgt walked by our row and asked how things were going.  We all told him that we were not getting showers.  The same Sgt. came back the next Saturday and asked us about showers.  We all told him that we still had not gotten any showers.  He said that he was going to come back the next day and check to see if we were getting a shower during the time the log said we were getting showers.  This was on Saturday Oct 17.

4.    The next day, Sunday October 18, the deputies all of a sudden started running showers.  They gave showers to the even cells.  I was in 22, so I was toward the back of the row.  When they got to my cell, they opened my gate and I walked down the row by myself, un-handcuffed.

5.    When I got right in front of the shower the deputy told me to take it back.  I asked "why" because I had not gotten a shower in weeks.  The deputy said "you wanna know why, I'll tell you why. Turn around" I turned around and he came out and put me in handcuffs.

6.    After that it is a little fuzzy but I remember Deputy Lascano punching me in the face.  I remember being pepper sprayed in the face and hearing keys.  After it was over Deputy Rico said to me "that's why you don't say why, just do what you're told."

7.    They beat me up so bad I was at the county hospital for about 3 days.  I have stitches on my eye, staples in my head, they broke my right leg, and I had to have surgery on my left knee.

8.    When I came back from the hospital some deputy gave me a piece of paper that said I have 29 days in the hole for attacking a deputy.  I don't think that makes any sense.  I was handcuffed when they attacked me – there was no way I could do anything to them.  I'm just a guy trying to get

through jail on my way to state prison, where I am waiting to do a 16-month sentence. I don't want any problems in here. I just keep my head down and stay out of the way.

9.    There is no reason why they did this to me. They were supposed to be giving us showers and those deputies just attacked me without reason.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 26th day of October, 2009 in Los Angeles, California.

_____/s/_____

MICHAEL HOLGUIN

Declaration of Michael Holguin

I, Michael Holguin, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am a 29 year-old construction worker from Walnut, CA. I have been in jail for approximately three and a half weeks. Up until one week ago I had spent the entire time in Men's Central Jail on a KIO FISH row. The jail normally classifies me as a K-1 because my dad is a police officer.

3. During the time I was on the KIO FISH row (3500 Charlie) I never got a SHOWER. One Saturday, a Sgt walked by our row and asked how things were going. We all told him that we were not getting SHOWERS. The same Sgt came back the next Saturday and asked us about SHOWERS. We all told him that we still had not gotten any SHOWERS. He said that he was going to come back the next day and check to see if we were getting a SHOWER. During the time the log said we were getting SHOWERS. This was on Saturday Oct 17th.

4. The next day, SUNDAY October 18, the deputies all of a sudden started running SHOWERS. They gave SHOWERS to the even cells. I was in 22, so I was toward the back

MH

of the row. When they got to my cell, they opened my gate and I walked down the row by myself, un handcuffed.

5. When I got right in front of the storage the deputy told me to take it back. I asked "why" because I had not gotten a storage in weeks. The deputy said "you wanna know why, I'll tell you why. Turn around" I turned around and he came out and put me in handcuffs.

6. After that it is a little fuzzy but I remember Deputy Lascano punching me in the face. I remember being pepper sprayed in the face + hearing keys. After it was over Deputy Rico said to me "thats why you don't say why, just do what youre told"

7. They beat me up so bad I was at the county Hospital for about 3 days. I have stiches on my eye, staples in my head, they broke my right leg and I had to have surgery on my left knee.

8. When I came back from the Hospital some deputy gave me a piece of paper that said I have 29 days in the hole for attacking a deputy. I don't think that makes any sense I was handcuffed when they attacked me — there was no way I could do anything to them. I'm just a guy trying to get through jail on my way to state prison, where I

MH

Exhibit Q
Page 115

I am waiting to do a 16 month sentence. I don't want any problems in here. I just keep my head down and stay out of the way.

9. Theres no reason why they did this to me. They were suppose to be giving us starters and those deputies just attacked me without reason.

M H

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 26th day of October, 2009 in Los Angeles, California.

Michael Holgu

Michael Holguin

MH