# EXHIBIT "R"

# DECLARATION OF MICHAEL JEFFERSON

I, Michael Jefferson, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am ~~thirty-one~~ twenty-nine years old and African American. On April 28, 2011, I was placed in Module 5900, which does not have a row or cells because it is a dormitory. I am currently in Module 2200, Row B, Cell 10 of Men's Central Jail ("MCJ") and was still there on Friday, July 8, 2011. My booking number is 2721975.

**Deputy on Inmate violence**

3.    About a month ago, on a Saturday, either May 28th or June 4th, 2011, I had gone to the afternoon pill call where there was a nurse who was Hispanic, about 5'7", who looked 38 to 40 years old, had black hair that was pinned up, brown eyes and a light brown complexion. I asked her for some foot cream and she said she didn't have any. The doctor had prescribed me foot cream for my athlete's foot. I needed the medication because my foot was itchy and hurt when I walked.

4.    The same nurse was at evening pill call, which is at seven or eight o'clock. There were about 10 of us inmates lined up in the hallway and when it was my turn, I asked the nurse again for some foot cream. She responded loudly, "Didn't I tell you earlier that I didn't have any medication?"

5.    ~~I began walking back to my module when~~ Suddenly, a Hispanic deputy standing nearby who I later found out was Deputy Quintana, told me to get against the wall. I didn't get a good look at him at this point because I was facing the wall. I had seen him three or four times at pill call since this day, but he usually sits hunched over in a way that blocks his nametag. On around June 19th or 20th, 2011, I finally saw his nametag at a pill call.

6.    I got against the wall ~~and he said to turn around and face it.~~ and he told

me to "spread it" and kicked my legs pretty hard so that I almost fell. Then he ordered me to take off my shoes, socks, T-shirt and blue jumpsuit. Deputy Quintana then escorted me to the laundry room in just my boxer shorts.

7.    In the laundry room, Deputy Quintana told me to get on my knees and face the wall. He asked what cell I was in. I told him 10, and he left.

8.    Meanwhile, two other deputies were watching me as I was on my knees facing the wall. I could not see their faces because I was facing the wall, but I heard the two of them talking to each other. One of the deputies told me twice to "face the fucking wall." I was already facing the wall, so I figured he wanted my face to be closer to it, but I couldn't because of my eyeglasses.

9.    I heard him whisper loudly to the other deputy, "This nigger can't fucking listen and face the wall." Then, he came and smashed the front and left side of my face against the wall, which broke the left temple off of my glasses. My forehead hurt because the deputy forced my head against the wall for a few seconds. I feel like the deputies were racially motivated, otherwise they wouldn't have called me "nigger." I also have a sense that part of the reason they abused me was because three of the four deputies on duty that night were Hispanic, and the nurse was Hispanic. The fourth deputy was Caucasian.

10.    After 15 minutes in the laundry room, Deputy Quintana escorted me back to my module with my hands behind my back, and he walked behind me.

11.    I looked back and he said, "Don't fucking look at my officers," then punched me on the left side of my face. The punch was hard enough to shake me up. It left my face puffy and took a couple of days for the swelling to go down. I walked a few steps and looked back again and he told me to go to my cell. It was at this point that I was able to see Deputy Quintana's face, and recognize him when I saw him on days after the incident.

12.    I asked Deputy Quintana on the walk back to my module if I could get the temple piece that broke off. He angrily replied, "No! Fucking take it back

to your fucking cell!" I didn't know what I could do with the broken piece anyway, but it was the only pair of glasses I have and they were a gift from my mother. I put in a request that day to see the eye doctor, but received no response. *to get my glasses repaired or replaced*

13. When I got back to my cell, it was completely torn up. The mattress, bed sheets, and blankets were gone. Later that night, I asked ~~one of the~~ Custody Assistants *Luna* if I could get a mattress, but he said they didn't have any right now.

14. I slept in nothing but boxers for two nights. It was really cold at night, *because the air conditioning was running* and I felt unsanitary sleeping on the steel bed frame without any mattress. The mattress was returned on Monday, and my clothes on Tuesday by the trustees who handle the distribution of these items.

15. I asked the morning shift deputies if I could go to the laundry room and try to find the temple of my glasses, but they said the laundry room had been cleaned out and there was nothing in there.

16. I can barely see without my glasses; words in front of my face look blurry if I am not wearing them. I am currently wearing my broken glasses with a missing left temple, and some tape in the middle and right hinge of the frame to prevent the cracks from getting bigger.

17. This incident has traumatized me. I now feel threatened by the deputies and am afraid they will hit me if I look at one of them. I still feel scared walking past all the deputies. I'm always nervous thinking that a deputy might assault me again. That's my biggest fear right now.

18. I usually take medication for seizures and asthma, but ever since the incident, I have been refusing my medication most of the time to minimize my interaction with then nurses and deputies at pill call. I still have to go to the pill calls, but if I could I wouldn't even go, in order to avoid Deputy Quintana. *once you refuse medication, you immediately go back to your cell and don't have to wait in line any longer*

**Denied Medical Help**

19. About two weeks prior to the incident above, I went to the nurse

because I had chest pains. I was concerned because I had a mild heart attack two years ago.

20. The first nurse took my pulse as I sat by a second nurse's desk. The first nurse looked either Filipina or Cambodian, 5'5", petite with a long ponytail. The second nurse also looked Filipina or Cambodian, about 5'6", petite with a ponytail and longer hair than the first nurse. The second nurse was sitting at another desk about ten feet away, and I was talking to her about my chest pains.

21. Then, a third nurse, who I think is the head nurse or in a position higher than the first two nurses, came over to where I was sitting. She was older than the first two nurses, looks in her 40s, either Filipina or Cambodian, about 5'5", with black hair past her shoulders. She asked me, "Who are you talking to?" It sounded like she asked in a sarcastic way because she had been in the room while I was talking to the second nurse, and I thought she must have seen who I was talking to. I replied, "I'm talking to the nurse over there," and pointed to the second nurse, who didn't say anything. The third nurse asked, "What nurse?" I replied, "Can't you see I'm talking to that nurse over there?"

22. Then third nurse said, "You don't have to say it with attitude." I said to her, "I don't have attitude." She said, "Yes, you do," and yelled for a deputy. From my experience, whenever the nurses use the word "attitude," the deputy intervenes.

23. Deputy Simpson came within 30 seconds, into the room and said he was going to take me to the hole for ten days. I told him I had chest pains. He asked the first nurse about my condition and she said, "There's nothing wrong with him." So he sent me to the hole without addressing my chest pains.

24. My chest pains lasted about an hour and a half from the time I went to see the nurse and until I went to the hole. At times it was very painful. It felt really sharp and tight, like something was stabbing me. When I was in the hole, I had my inhaler so that helped, but it was still hard to deal with the pain. Although

Deputy Simpson told me I would be in the hole for ten days, I was released after seven days.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed this 8th day of July, 2011 in Los Angeles, California.

Michael Jefferson

# DECLARATION OF MICHAEL JEFFERSON

I, Michael Jefferson, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am twenty-nine years old and African American. On April 28, 2011, I was placed in Module 5900, which does not have a row or cells because it is a dormitory. I am currently in Module 2200, Row B, Cell 10 of Men's Central Jail ("MCJ") and was still there on Friday, July 8, 2011.  My booking number is 2721975.

**Deputy on Inmate violence**

3.    About a month ago on a Saturday, either May 28th or June 4th, 2011, I had gone to the afternoon pill call where there was a nurse who was Hispanic, about 5'7", who looked 38 to 40 years old, had black hair that was pinned up, brown eyes and a light brown complexion. I asked her for some foot cream and she said she didn't have any. The doctor had prescribed me foot cream for my athlete's foot. I needed the medication because my foot was itchy and hurt when I walked.

4.    The same nurse was at evening pill call, which is at seven or eight o'clock. There were about 10 of us inmates lined up in the hallway and when it was my turn, I asked the nurse again for some foot cream. She responded loudly, "Didn't I tell you earlier that I didn't have any medication?"

5.    Suddenly, a Hispanic deputy standing nearby, who I later found out was Deputy Quintana, told me to get against the wall. I didn't get a good look at him at this point because I was facing the wall. I had seen him three or four times at pill call since this day, but he usually sits hunched over in a way that blocks his nametag. On around June 19th or 20th, 2011, I finally saw his nametag at a pill

call.

6.    I got against the wall and he told me to "spread it" and kicked my legs pretty hard so that I almost fell. Then he ordered me to take off my shoes, socks, T-shirt and blue jumpsuit. Deputy Quintana then escorted me to the laundry room in just my boxer shorts.

7.    In the laundry room, Deputy Quintana told me to get on my knees and face the wall. He asked what cell I was in. I told him 10, and he left.

8.    Meanwhile, two other deputies were watching me as I was on my knees facing the wall. I could not see their faces because I was facing the wall, but I heard the two of them talking to each other. One of the deputies told me twice to "face the fucking wall." I was already facing the wall, so I figured he wanted my face to be closer to it, but I couldn't because of my eyeglasses.

9.    I heard him whisper loudly to the other deputy, "This nigger can't fucking listen and face the wall." Then, he came and smashed the front and left side of my face against the wall, which broke the left temple off of my glasses. My forehead hurt because the deputy forced my head against the wall for a few seconds. I feel like the deputies were racially motivated, otherwise they wouldn't have called me "nigger." I also have a sense that part of the reason they abused me was because three of the four deputies on duty that night were Hispanic, and the nurse was Hispanic. The fourth deputy was Caucasian.

10.    After 15 minutes in the laundry room, Deputy Quintana escorted me back to my module with my hands behind my back, and he walked behind me.

11.    I looked back and he said, "Don't fucking look at my officers," then punched me on the left side of my face. The punch was hard enough to shake me up. It left my face puffy and took a couple of days for the swelling to go down. I walked a few steps and looked back again and he told me to go to my cell. It was at this point that I was able to see Deputy Quintana's face, and recognize him when I saw him on days after the incident.

Exhibit R
Page 123

12. I asked Deputy Quintana on the walk back to my module if I could get the temple piece that broke off. He angrily replied, "No! Fucking take it back to your fucking cell!" I didn't know what I could do with the broken piece anyway, but it was the only pair of glasses I have and they were a gift from my mother. I put in a request that day to see the eye doctor to get my glasses repaired or replaced, but received no response.

13. When I got back to my cell, it was completely torn up. The mattress, bed sheets, and blankets were gone. Later that night, I asked Custody Assistant Luna if I could get a mattress, but he said they didn't have any right now.

14. I slept in nothing but boxers for two nights. It was really cold at night because the air conditioning was running, and I felt unsanitary sleeping on the steel bed frame without any mattress. The mattress was returned on Monday, and my clothes on Tuesday by the trustees who handle the distribution of these items.

15. I asked the morning shift deputies if I could go to the laundry room and try to find the temple of my glasses, but they said the laundry room had been cleaned out and there was nothing in there.

16. I can barely see without my glasses; words in front of my face look blurry if I am not wearing them. I am currently wearing my broken glasses with a missing left temple, and some tape in the middle and right hinge of the frame to prevent the cracks from getting bigger.

17. This incident has traumatized me. I now feel threatened by the deputies and am afraid they will hit me if I look at one of them. I still feel scared walking past all the deputies. I'm always nervous thinking that a deputy might assault me again. That's my biggest fear right now.

18. I usually take medication for seizures and asthma, but ever since the incident, I have been refusing my medication most of the time to minimize my interaction with then nurses and deputies at pill call. Once you refuse medication, you immediately go back to your cell and don't have to wait in line any longer. I

still have to go to the pill calls, but if I could I wouldn't even go, in order to avoid Deputy Quintana.

**Denied Medical Help**

19.    About two weeks prior to the incident above, I went to the nurse because I had chest pains. I was concerned because I had a mild heart attack two years ago.

20.    The first nurse took my pulse as I sat by a second nurse's desk. The first nurse looked either Filipina or Cambodian, 5'5", petite with a long ponytail. The second nurse also looked Filipina or Cambodian, about 5'6", petite with a ponytail and longer hair than the first nurse.  The second nurse was sitting at another desk about ten feet away, and I was talking to her about my chest pains.

21.    Then, a third nurse, who I think is the head nurse or in a position higher than the first two nurses, came over to where I was sitting. She was older than the first two nurses, looks in her 40s, either Filipina or Cambodian, about 5'5", with black hair past her shoulders. She asked me, "Who are you talking to?" It sounded like she asked in a sarcastic way because she had been in the room while I was talking to the second nurse, and I thought she must have seen who I was talking to. I replied, "I'm talking to the nurse over there," and pointed to the second nurse, who didn't say anything. The third nurse asked, "What nurse?" I replied, "Can't you see I'm talking to that nurse over there?"

22.    Then third nurse said, "You don't have to say it with attitude." I said to her, "I don't have attitude." She said, "Yes, you do," and yelled for a deputy. From my experience, whenever the nurses use the word "attitude," the deputy intervenes.

23.    Within 30 seconds, Deputy Simpson came into the room and said he was going to take me to the hole for ten days. I told him I had chest pains. He asked the first nurse about my condition and she said, "There's nothing wrong

with him." So he sent me to the hole without addressing my chest pains.

24.    My chest pains lasted about an hour and a half from the time I went to see the nurse and until I went to the hole. At times it was very painful. It felt really sharp and tight, like something was stabbing me. When I was in the hole, I had my inhaler so that helped, but it was still hard to deal with the pain. Although Deputy Simpson told me I would be in the hole for ten days, I was released after seven days.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed this 8th day of July, 2011 in Los Angeles, California.

_____/s/_____

Michael Jefferson

# EXHIBIT "S"

**Declaration of Eefrom Jones**

I, Eefrom Jones, hereby declare:

1.  I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.  I am an inmate in the Los Angeles Jail. I have been here for two years and have spent the vast majority of the time in Men's Central Jail in a single-man cell.

3.  Since I have been at the county jail I have been getting psych medications. I take these because I have hallucinations and depression.

4.  On September 24 in the afternoon I was escorted to the attorney room for a visit with an individual my attorney sent to talk to me about my mental health because I have been found incompetent to stand trial. After the visit I was escorted back to my module by Deputy Navarro.

5.  When I went upstairs in my module (3500) Deputy Navarro followed me up there. I was making a left at the top of the stairs when Deputy Navarro grabbed me from behind. He yelled at me to stay down and don't move. Then he just started punching me and he was sitting on my side. I remember seeing a female deputy named Leos there, too. I know there were a lot more deputies because I could hear them and I saw other people, I just could not see their names.

6.  They hit me with a taser and pepper sprayed me in the face. I kept trying to tell them that I had asthma but they kept going.

7.  After they were done, they took me downstairs to the medical clinic at Men's Central Jail. They interviewed me on video here also. The next day they sent me to the hospital and that's when I found out my shoulder was broken.

8.  I went to court on October 7th. Then on October 10 the same Lt. who interviewed me the first time pulled me out to interview me again. I thought this was really weird and this made me scared because they had put me right back into the same hosuing area that the deputies who beat me up worked in. However, this time I thought I needed to speak up so I told the Lieutenant the deputies names - specifically Deputy Navarro.

9.  The Lt interviewing me (Lt. Rivera) told me that just for precautions they wanted

me to see the psychiatrist. So they sent me back, again, to 3500 to wait.

10.    The next thing I know, Deputy Navarro comes up to my cell and tells to cuff up because I am going to the psych. This is about 15 minutes after my interview so I was really worried about him escorting me after I had just told the Lieutenant that he beat me up.

11.    I went out of my cell with Deputy Navarro into the hallway. He told me to take off all of my clothes. There were about 8 other deputies standing there also. Deputy Navarro then started yelling at me that this is his floor and he would do whatever he wanted. He said "don't worry, you'll be coming back. 9 times out of 10 they come back." He was talking about how I was going to the Towers to see the psych.

12.    Then Deputy Navarro told em to bend over, totally naked. He flashed the flashlight up my butt and all them started laughing. Then another deputy came over and stuck his finger up there. I kept telling them this ain't right but they were just laughing. It was horrible.

13.    I am terrified to go back over to where those deputies are. In the 2 years I've been here I haven't had problems with deputies. I told my psych that I would kill myself before I would go back over there and let those guys kill me. What they did to me is horrible.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 19th day of October, 2009 in Los Angeles, California.

_____/s/_____

Eefrom Jones

Declaration of **Eefrom Jones**

I, **Eefrom Jones**, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am an inmate in the Los Angeles Jail. I have been here for two years and have spent the vast majority of the time in Men's Central Jail in a single-man cell.

3.    Since I have been at the county jail I have been getting psych medications. I take these because I have hallucinations and depression.

4.    On September 24 in the afternoon I was escorted to the attorney room for a visit with an individual my attorney sent to talk to me about my mental health because I have been found incompetent to stand trial. After the visit I was escorted back to my module by Deputy Navarro.

5.    When I went upstairs in my module (3500) Deputy Navarro followed me up there. I was making a left at the top of the stairs when Deputy Navarro grabbed me from behind. He yelled at me to stay down and don't move. Then he just started punching me and he was sitting on my side. I remember seeing a female Deputy named Leos there, too. I know there were a lot more deputies because I could hear them and I saw other people, I just could not see their names.

E. J.

6. They hit me with a taser and pepper sprayed me in the face. I kept trying to tell them that I had asthma but they kept going.

7. After they were done, they took me downstairs to the medical clinic at New Central Jail. They interviewed me on video here also. The next day they sent me to the hospital and thats when I found out my shoulder was broken.

8. I went to court on October 7th. Then on October 10 the same Lt who interviewed me the first time pulled me out to interview me again. I thought this was really weird and this made me scared because they had put me right back into the same housing area that the deputies who beat me up worked in. However, this time i thought I needed to speak up so I told the lieutant the deputies names - specifically Deputy Navarro.

9. The Lt interviewing me (Lt Rivera) told me that just for precautions they wanted me to see the psychiatrist. So they sent me back, again, to 3500 to wait.

10. The next thing I know, Deputy Navarro comes up to my cell and tells to cuff up because I am going to the psych. This was about 15 minutes after my interview so I was really worried about him escorting me after I had just told the lieutenant that he beat me up.

11. I went out of my cell with Deputy Navarro

E.J.

Exhibit S
Page 130

into the hallway. He told me to take off all of my clothes. There were about 8 other deputies standing there also. Deputy Navarro then started yelling @ me. That this is his floor and he would do whatever he wanted. He said "don't worry, you'll be coming back. 9 times out of 10 they come back". He was talking about how I was going to the Towers to see the psych.

12. Then Deputy Navarro told me to bend over, totally naked. He flashed the flashlight up my butt and all them started laughing. Then another deputy came over and stuck his finger up there. I kept telling them this aint right but they were just laughing. It was horrible.

13. I am terrified to go back over to where those deputies are. In the 2 years I've been here I haven't had problems with deputies. I told my psych that I would kill myself before I would go back over there and let those guys kill me. What they did to me is horrible.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 19th day of October 2009 in Los Angeles, California.

*Efrom Jones*
Eefrom Jones

# EXHIBIT "T"

**Declaration of Ravon Jones**

I, Ravon Jones, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am 34 years old. I am currently housed in Module 2400, Row B, Cell 7. My booking number is 2674730.

3.     On March 28, 2011, I witnessed four African-American trustees beat up and sexually assault an African-American inmate, whose last name is Silva, with a broomstick. I was in my cell, in Cell 7 and Silva was in the cell next to me, Cell 8. The Custody Assistant ("CA"), CA Zamora, on duty allowed the assault to occur because the trustees entered Silva's cell and the only way his cell door could have opened is if the CA Zamora opened it.

March 28, 2011

4.     Approximately 5 p.m., I heard an inmate named "Gary" say that Silva was throwing his urine out onto the floor in front of his cell. When I looked out of my cell in the direction of the voice, to see who had said the comment, I saw "Gary" standing outside of the main gate before you get onto Row B. "Gary", who looks Armenian, is a trustee that works on my module.

5.     I did not see Silva throwing any urine outside of his cell and my cell is next to him. RJ

6.     Fifteen to twenty minutes later, I saw two African-American trustees nicknamed, "E-Dub" and "Cat" come up to Silva's cell asking him what he was doing. These two trustees were the trustees on the Gang Module that's on the same floor that I am housed. I had seen them before when I was housed in Module 2600, which is also on the same floor that I am currently housed. When I was on Module 2600 I had to go on the Gang Module one day and I saw them there. I saw them other times when they would come and hang out with their friends who were also housed on Module 2600.

7.     The trustees were on our module and row to help pass out dinner and they're there to clean and do other errands on the module.

Exhibit T
Page 132

8.    Silva was in the cell by himself, even though it was a four-man cell. I heard the sound of the gate crank that is located outside of the deputies' control room that is stationed outside our row. I have heard this noise many times before and I knew that this meant that a cell door was going to open.

9.    I saw Silva's cell door slide open ~~to the right~~ RJ from right to left. I was able to see this because I used a makeshift hand mirror and focused it on Silva's cell. I could see through the mirror that it was his cell door that was opening. Inmates make these hand mirrors using the foil lining inside our potato chips or any other kinds of chips' bags and they're cut out into a circle so that they fit on the bottom of a cup. We then attach the foil to the bottom and we can use it as a hand mirror.

10.    I know that it was opened by Custody Assistant ("CA") Zamora because he was the only Los Angeles Sheriff's Department ("LASD") employee working on my module on that shift. RJ I saw CA Zamora earlier that day and I saw that he was the only LASD employee working on Module 2400. RJ

11.    I also know that the gate crank and the controls to open the cells are located in a locked area where the deputy's control booth is located. The only way to get in there is if you had a key to open the locked area.

12.    When Silva's cell door opened I saw "E-Dub" and "Cat" run into his cell and I saw them punching Silva. I could see from the side of my cell the two trustees punching him for what seemed like 5 seconds, then I saw them drag Silva towards the back of the cell. I wasn't able to see what they were doing after they dragged him, but I could hear Silva screaming. It seemed like they were beating him up for 3-4 minutes and I could hear Silva screaming the entire time. While the trustees were beating him up, the inmates on my row starting banging things inside their cells to cover up Silva's screaming, but I was still able to hear the screaming since I was right next to his cell.

13.    After the 3-4 minutes, I saw the two trustees leave his cell and using the hand mirror again, I saw his cell slide close ~~to the left~~ RJ from left to right and I heard the sound of the gate crank at the

same time.

14.    I asked Silva if he was okay and he said that he was okay. But I don't know if he really was okay.

15.    Fifteen minutes later, I heard "Gary" yell out that Silva was throwing urine outside his cell again. I saw "E-Dub" come back to his cell and say, "Oh, that wasn't enough?"

16.    I then heard from the row above us, Row D, an inmate named "Tiny Gizzle", who is a friend of "E-Dub" yell out, "Dub's gonna put a broomstick up his [Silva's] ass." I could tell from the sound of the voice that it was "Tiny Gizzle's" voice.

17.    At 7 p.m., our Commissary or Store items were passed out on our row. After the store items were passed out, I again heard the gate crank and saw with my hand mirror, Silva's cell slide open again in the same way that I had seen it open earlier. I then saw "E-Dub", "Cat" and two other African-American trustees, who were also trustees on the Gang Module, run into his cell. I saw that "E-Dub" was carrying a broomstick. I heard what sounded like the sound of one of our mattresses slamming against a body. I then saw a broomstick handle sticking straight out of his cell. I then saw blood on the end of the broomstick. I heard Silva yelling and screaming very loudly during this entire assault. I also heard one of the trustees say, "You had enough? You had enough? You had enough?" It seemed like the entire beating and sexual assault lasted five minutes. I then saw the trustees run out of his cell and heard one of them say, "Come on, man. Come on, man." I then heard the gate crank and saw that Silva's cell door had slid closed.

18.    While the assault was going on, I heard "Tiny Gizzle" say, "Silva's getting a broomstick up his ass."

19.    After 2-3 minutes, I asked Silva if he was okay. He said, "Yeah, but my butt is bleeding." About 15 minutes later, I saw a camera walked down our row, looked into Silva's cell and walked to the back door located at the end of our row.

20.    Approximately 11 p.m., when the next shift came on, I heard Silva yelling, "Man down! Man down! My butt is bleeding!"

21.    I saw that someone from the upper tier, Row D, had thrown a banana down to our row.

22. When Deputy Johnson, the deputy on our module for the shift that started about 11 p.m. came over, the inmates on Row D said, "That's the banana that Silva used to stick up his butt. He used that banana right there." He then asked Silva, "What's going on?"

23. Silva said, "Man, Zamora let four inmates shove a broomstick up my butt and rape me." Deputy Johnson said, "Man, you came over from another module and now you're starting problems here? I'm gonna let you sit there for a minute."

24. I told Deputy Johnson, "Come on man. He needs medical attention." Deputy Johnson didn't say anything and walked away.

25. About 15 minutes later, Custody Assistant Augustine came over to Silva's cell and asked him, "What the hell happened over here?" CA Augustine was the LASD employee who was working on Module 2200, which is the Module right next to our Module, Module 2400.

26. Silva must have bent over to show CA Augustine his injury because I saw CA Augustine turn on his flashlight and shine it into Silva's cell.

27. CA Augustine said, "Damn! What happened?" Silva told him, "Man, CA Zamora let 4 inmates come in here and shove a broomstick and rape me."

28. Deputy Johnson then came over, handcuffed Silva and escorted him out of his cell.

29. I could see a large amount of blood on Silva's pants when he came out of his cell.

30. Silva didn't come back to the module or his cell that night.

March 29, 2011

31. At about 10-11 a.m. the next morning, I had a medical pass to have the bandage on my leg cleaned by medical. I had received a cut on my leg during my arrest.

32. When I walked down to the medical area, I saw about 10-12 deputies, lieutenants and sergeants in the hallway, standing around.

33. As I was sitting down on the bench outside the medical area, I saw Silva walking in the hallway back and forth. He told me that he wasn't able to sit down, which was why he was walking back and forth. He was in his boxers and I could see blood on his boxers.

34. I went back to my module and cell 15 minutes later. I saw that there was a

Hispanic inmate in Silva's cell.

35.    An hour after I had returned from my medical pass, Silva was brought back to our module and into his cell. He was wearing what looked like new jail pants because I didn't see any blood on them.

36.    When he got into his cell, I asked him if he was okay. He said that his butt was still bleeding.

37.    He then said that he needed toilet paper, so I passed him some of the toilet paper that I had. I asked him if it was enough and he told me it was.

38.    An hour later, "Gary" was cleaning outside our row and he yelled out, "I got a Black [Silva] down here throwing pee." Again, I didn't see Silva throwing any urine outside of his cell.

39.    I then saw about 9 deputies, Senior Deputy Meza and a sergeant walk over to Silva's cell.

40.    One of them said, "Face down. Don't move. If you move we're going to pepper spray you." I could see that some of the deputies had their pepper spray canisters out and faced it in Silva's direction.

41.    I told Silva, "Don't move. Don't do anything. They're just trying to find a reason to pepper spray you."

42.    One of the deputies then handcuffed Silva and took him out of his cell.

43.    I have not seen Silva since the deputies took him out of his cell.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 11th day of April, 2011 in Los Angeles, California.

*Rayon Jones*

Rayon Jones

**Declaration of Ravon Jones**

I, Ravon Jones, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am 34 years old. I am currently housed in Module 2400, Row B, Cell 7. My booking number is 2674730.

3.      On March 28, 2011, I witnessed four African-American trustees beat up and sexually assault an African-American inmate, whose last name is Silva, with a broomstick. I was in my cell, in Cell 7 and Silva was in the cell next to me, Cell 8. The Custody Assistant ("CA"), CA Zamora, on duty allowed the assault to occur because the trustees entered Silva's cell and the only way his cell door could have opened was if the CA Zamora opened it.

<u>March 28, 2011</u>

4.      Approximately 5 p.m., I heard an inmate named "Gary" say that Silva was throwing his urine out onto the floor in front of his cell. When I looked out of my cell in the direction of the voice, to see who had said the comment, I saw "Gary" standing outside of the main gate before you get onto Row B. "Gary", who looks Armenian, is a trustee that works on my module.

5.      I did not see Silva throwing any urine outside of his cell and my cell is next to him.

6.      Fifteen to twenty minutes later, I saw two African-American trustees nicknamed, "E-Dub" and "Cat" come up to Silva's cell asking him what he was doing. These two trustees were the trustees on the Gang Module that's on the same floor that I am housed. I had seen them before when I was housed in Module 2600, which is also on the same floor that I am currently housed. When I was on Module 2600 I had to go on the Gang Module one day and I saw them there. I saw them other times when they would come and hang out with their friends who were also housed on Module 2600.

7.      The trustees were on our module and row to help pass out dinner and they're there to clean and do other errands on the module.

Exhibit T
Page 137

8. Silva was in the cell by himself, even though it was a four-man cell. I heard the sound of the gate crank that is located outside of the deputies' control room that is stationed outside our row. I have heard this noise many times before and I knew that this meant that a cell door was going to open.

9. I saw Silva's cell door slide open from right to left. I was able to see this because I used a makeshift hand mirror and focused it on Silva's cell. I could see through the mirror that it was his cell door that was opening. Inmates make these hand mirrors using the foil lining inside our potato chips or any other kinds of chips' bags and they're cut out into a circle so that they fit on the bottom of a cup. We then attach the foil to the bottom and we can use it as a hand mirror.

10. I know that it was opened by Custody Assistant ("CA") Zamora because he was the only Los Angeles Sheriff's Department ("LASD") employee working on my module on that shift. I saw CA Zamora earlier that day and I saw that he was the only LASD employee working on Module 2400.

11. I also know that the gate crank and the controls to open the cells are located in a locked area where the deputy's control booth is located. The only way to get in there is if you had a key to open the locked area.

12. When Silva's cell door opened I saw "E-Dub" and "Cat" run into his cell and I saw them punching Silva. I could see from the side of my cell the two trustees punching him for what seemed like 5 seconds, then I saw them drag Silva towards the back of the cell. I wasn't able to see what they were doing after they dragged him, but I could hear Silva screaming. It seemed like they were beating him up for 3-4 minutes and I could hear Silva screaming the entire time. While the trustees were beating him up, the inmates on my row starting banging things inside their cells to cover up Silva's screaming, but I was still able to hear the screaming since I was right next to his cell.

13. After the 3-4 minutes, I saw the two trustees leave his cell and using the hand mirror again, I saw his cell slide close from left to right and I heard the sound of the gate crank at the same time.

Exhibit T
Page 138

14. I asked Silva if he was okay and he said that he was okay. But I don't know if he really was okay.

15. Fifteen minutes later, I heard "Gary" yell out that Silva was throwing urine outside his cell again. I saw "E-Dub" come back to his cell and say, "Oh, that wasn't enough?"

16. I then heard from the row above us, Row D, an inmate named "Tiny Gizzle", who is a friend of "E-Dub" yell out, "Dub's gonna put a broomstick up his [Silva's] ass." I could tell from the sound of the voice that it was "Tiny Gizzle's" voice.

17. At 7 p.m., our Commissary or Store items were passed out on our row. After the store items were passed out, I again heard the gate crank and saw with my hand mirror, Silva's cell slide open again in the same way that I had seen it open earlier. I then saw "E-Dub", "Cat" and two other African-American trustees, who were also trustees on the Gang Module, run into his cell. I saw that "E-Dub" was carrying a broomstick. I heard what sounded like the sound of one of our mattresses slamming against a body. I then saw a broomstick handle sticking straight out of his cell. I then saw blood on the end of the broomstick. I heard Silva yelling and screaming very loudly during this entire assault. I also heard one of the trustees say, "You had enough? You had enough? You had enough?" It seemed like the entire beating and sexual assault lasted five minutes. I then saw the trustees run out of his cell and heard one of them say, "Come on, man. Come on, man." I then heard the gate crank and saw that Silva's cell door had slid closed.

18. While the assault was going on, I heard "Tiny Gizzle" say, "Silva's getting a broomstick up his ass."

19. After 2-3 minutes, I asked Silva if he was okay. He said, "Yeah, but my butt is bleeding." About 15 minutes later, I saw CA Zamora walk down our row, look into Silva's cell and walk to the back door located at the end of our row. This door leads to Row D, the tier above our row, Row B.

20. Approximately 11 p.m., when the next shift came on, I heard Silva yelling, "Man down! Man down! My butt is bleeding!"

21. I saw that someone from the upper tier, Row D, had thrown a banana down to our

Exhibit T
Page 139

row.

22. When Deputy Johnson, the deputy on our module for the shift that started about 11 p.m. came over, the inmates on Row D said, "That's the banana that Silva used to stick up his butt. He used that banana right there." He then asked Silva, "What's going on?"

23. Silva said, "Man, Zamora let four inmates shove a broomstick up my butt and rape me." Deputy Johnson said, "Man, you came over from another module and now you're starting problems here? I'm gonna let you sit there for a minute."

24. I told Deputy Johnson, "Come on man. He needs medical attention." Deputy Johnson didn't say anything and walked away.

25. About 15 minutes later, Custody Assistant Augustine came over to Silva's cell and asked him, "What the hell happened over here?" CA Augustine was the LASD employee who was working on Module 2200, which is the module right next to our module, Module 2400.

26. Silva must have bent over to show CA Augustine his injury because I saw CA Augustine turn on his flashlight and shine it into Silva's cell.

27. CA Augustine said, "Damn! What happened?" Silva told him, "Man, CA Zamora let 4 inmates come in here and shove a broomstick and rape me."

28. Deputy Johnson then came over, handcuffed Silva and escorted him out of his cell.

29. I could see a large amount of blood on Silva's pants when he came out of his cell.

30. Silva didn't come back to the module or his cell that night.

<u>March 29, 2011</u>

31. At about 10-11 a.m. the next morning, I had a medical pass to have the bandage on my leg cleaned by medical. I had received a cut on my leg during my arrest.

32. When I walked down to the medical area, I saw about 10-12 deputies, lieutenants and sergeants in the hallway, standing around.

33. As I was sitting down on the bench outside the medical area, I saw Silva walking in the hallway back and forth. He told me that he wasn't able to sit down, which was why he was walking back and forth. He was in his boxers and I could see blood on his boxers.

34. I went back to my module and cell 15 minutes later. I saw that there was a Hispanic inmate in Silva's cell.

35. An hour after I had returned from my medical pass, Silva was brought back to our module and into his cell. He was wearing what looked like new jail pants because I didn't see any blood on them.

36. When he got into his cell, I asked him if he was okay. He said that his butt was still bleeding.

37. He then said that he needed toilet paper, so I passed him some of the toilet paper that I had. I asked him if it was enough and he told me it was.

38. An hour later, "Gary" was cleaning outside our row and he yelled out, "I got a Black [Silva] down here throwing pee." Again, I didn't see Silva throwing any urine outside of his cell.

39. I then saw about 9 deputies, Senior Deputy Meza and a sergeant walk over to Silva's cell.

40. One of them said, "Face down. Don't move. If you move we're going to pepper spray you." I could see that some of the deputies had their pepper spray canisters out and faced it in Silva's direction.

41. I told Silva, "Don't move. Don't do anything. They're just trying to find a reason to pepper spray you."

42. One of the deputies then handcuffed Silva and took him out of his cell.

43. I have not seen Silva since the deputies took him out of his cell.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 11th day of April, 2011 in Los Angeles, California.

_____/s/_____

Ravon Jones

Case 2:12-cv-00428-MWF-E    Document 20-6    Filed 02/27/12    Page 29 of 151    Page ID #:484

# EXHIBIT "U"

**Declaration of Paulino Juarez**

I, Paulino Juarez, hereby declare:

1.      I am a Deacon in the Catholic Church and a Chaplain of the Office of Restorative Justice for the Archdiocese of Los Angeles. My ministery consists of visiting inmates at Men's Central Jail ("MCJ") and being their spiritual advisor. I have done this for about 14 years. What follows is my eyewitness account of a cruel, unjust, and horrific beating inflicted on an apparently handcuffed and defenseless inmate by the several Los Angeles Sheriff's deputies. I will also relate how the Los Angeles Sheriff Department ("LASD") failed to conduct a full and thorough investigation of this incident or punish those responsible.

BEATING IN FEBRUARY OF 2009

2.      In the early morning of Wednesday February 11, 2009 I was at MCJ to walk the rows and talk to inmates as I usually do. I asked Sergeant Barbosa if I could walk the rows in Module 3700 earlier than usual. I usually walk 3700 and talk with inmates in the afternoon, but I needed to leave the jail early that day. It was about 10:30 in the morning when I asked him to let me into 3700. He said it was fine. So I walked to door marked Y on the diagram attached as Exhibit 1, which depicts the area around Modules 3500 and 3700. I got the attention of the deputy in the booth who opened the doors for me to allow me to enter 3700 Abel row. As soon as I walked into the row, the door shut behind me. I began talking to one of the inmates, Ernesto Carrillo, whose cell was closest to where I had entered on the Abel row in 3700.

3.      A few minutes after I began my conversation with Mr. Carrillo, I heard thumps and gasps, which sounded like someone being beaten. I stopped talking to Mr. Carrillo, walked to the door marked PJ on the attached diagram, and looked to where I heard the sounds.

4.      What I saw shocked me. I saw three deputies beating up an inmate whom I believe was handcuffed. The inmate was African-American, about 5'11

Exhibit U
Page 142

tall and of a thin build. He was standing with his back against the wall while three deputies, Ramirez, Aguilar, and another one whose name I do not know, pounded his face and body with punches. At the time, I recognized the deputies, but did not know their names, two of which I later learned.

5. While they were hitting him, the deputies kept shouting "Stop fighting! Stop resisting!"

6. I believe the inmate was handcuffed, and that the handcuffs were attached to a chain strung around his waist for two reasons. First, I have never seen inmates from either 3500 or 3700 outside the module without being escorted by deputies and without being handcuffed with their cuffs attached to a waist chain. Also, I never saw the inmate raise his hands to protect his face, even as the deputies were punching him in the face. Because it is so natural to try to block your face if you are being punched, I believe he could not raise his hands to protect himself because he was cuffed with the cuffs chained to his waist.

7. The inmate was not raising his hands to block the punches, nor was he resisting in any way. He was doing nothing to avoid the deputies' blows besides turning to his side and letting them hit his back or ribs. At various points, I heard the inmate cry out, "Please stop!" "I am doing nothing wrong, please stop!"

8. The beating occurred between the entrance to the module and the door to the trustee dorm. The area where the beating was occuring was well-lit. I was about ten or fifteen feet away from the site of the beating. I watched the beating as I was standing inside the module near the door where I had entered. The spot where I was standing watching the deputies beat the inmate is marked with my initials PJ on Exhibit 1. The spot where the inmate was standing is marked with an X. The approximate location of the three deputies as they punched the inmate is marked with three black circles. The door I was standing at is made up of vertical and horizontal of bars that allow you to see clearly through the door, as is the other door I looked through to see the beating, which is marked

with a Z.   It was dark where I was standing, and the deputies had their backs to me as they were attacking the inmate.

9.    Since I witnessed the beating, they have put up plastic sheets over some of the bars that I was looking through to see the beating and increased the amount of light in and around the area where I was standing watching the beating.

10.    The deputies continued punching the inmate for another minute until he finally collapsed face first onto the floor. I heard a loud thump as his head hit the floor. The orientation of the inmate's body after he fell is marked with a stick figure drawing on the attached diagram. After the inmate had fallen to the floor, the deputies showered his body and head with kicks from their boots. The inmate's body lay limp and merely absorbed their blows. After the inmate hit the ground, he yelled "stop" one or two more times and then he went silent. At that point, I thought he was unconscious. Yet the deputies continued to yell "Stop fighting!"

11.    A few seconds after the inmate fell, one deputy knelt down with one knee on the inmate's back, the foot of his other leg on the ground next to the inmate, and began punching the inmate on the back of his head and neck, while the other two deputies stood and watched.

12.    After another minute or so, the deputy who was punching the inmate paused for a second, and the other deputies begain kicking him again. A couple of seconds later, the deputy who was kneeling on the inmate turned his head and noticed me standing at the gate with my hands clutching the bars. I was frozen with shock from what I had been watching.

13.    When we made eye contact, the deputy also froze and had a nervous and surprised look on his face. Then he began making signs to the others with his hands, motioning them to stop the beating.

14.    Another deputy who was inside the control booth kept shouting "Code Four! Code Four!" which another deputy later told me is their signal that a

deputy is involved in a fight.

15.    A few seconds passed before the other two deputies caught on and stopped kicking the inmate. They froze also.

16.    Then almost immediately, two more deputies entered the hallway through the door marked Y on the attached diagram, and one of them started kicking the inmate who was still lying limp on the floor. The other deputy who had just come in lifted his boot up and stomped the inmate two or three times hard on his back, even though the inmate was not moving or saying anything. While these two deputies were kicking and stomping the inmate, the three deputies who had started the assault were signaling with their hands, presumably to make the two deputies notice me and stop attacking the inmate. Then, the two deputies who had just come in froze.

17.    Presumably as a result of the Code Four call, Senior Gesky came through the already open main entrance door marked as Y on Exhibit 1 along with a huge group of deputies who stopped at the entrance. Gesky opened the door marked Z, then came directly to the door where I was standing and opened it to let me out.

18.    I walked slowly out towards the door marked Y, pushing my cart, which had Bibles, books, paper and pencils on it. As I was walking, I looked over at the inmate – still lying on the ground and not moving – and saw a large pool of blood. The pool of blood looked to be a about two feet in diameter in the area around his head and shoulders.

19.    As I was leaving, Gesky looked very angry and yelled out "Check if he has HIV."

20.    From when I started watching until the end, the beating seemed like it lasted about three minutes. I stood there and watched the whole thing, holding on tightly to the bars of the door to the row in utter disbelief of what I was seeing. I didn't know what else to do. I was completely paralyzed by shock and fear. I

couldn't believe that the deputies, who are supposed to be there to protect the inmates and prevent violence, were acting in such a blatantly criminal manner.

21. As I was leaving the module the group of deputies parted to let me pass. None of them said anything to me, but a number of them looked at me in a in way that made me feel afraid. The last person I remember passing in the hallway was Sergeant Barbosa, who was walking towards the module from his office. I noticed he looked nervous. I told him "Some of your guys are in big trouble," and I walked away.

22. When I saw Mr. Carillo a couple of weeks later when I next walked the 3700 Abel row, he told me that deputies had carried the inmate out on a stretcher. But, I did not see the body carried away. Mr. Carillo also told me the inmate looked as if he might have been dead.

THE SHAM INVESTIGATION

23. After leaving the module, I walked back to the chaplain's office. I was shaking because I was overwhelmed with fear and apprehension. I was very scared that some of the deputies who knew I had seen them would do something bad to me.

24. When I got to the office I told one of my colleagues what I had seen and that I needed to leave the jails as fast as possible. I went home and tried to calm down, but I was still terribly shaken up.

25. Eventually, I called my supervisor, Father George, and left him a message saying it was an emergency and that I needed to talk with him as soon as possible. He called me back that night, and I explained to him what I had seen. He told me to write up a report of what I had seen.

26. The day after the beating, I returned to MCJ and spoke with Sergeant Barbosa. I told him that I was going to write up a report and give it to both him and the Archdiocese. Barbosa told me that a deputy had said to him that the beating occurred because the inmate had spit on one of the deputies. But Barbosa

said he did not believe it, and I told him I did not believe it either. I said I never heard the deputies say anything like "don't spit on me" or "why did you do that to me?" Barbosa also asked me how many deputies had participated, and I told him that it was originally three but two more had joined in. I remember telling him that if this incident had occurred on the streets, the perpetrators would have been charged with assault with intent to kill.

27. For days after I remained badly shaken up. I was having a terrible time sleeping.

28. When I went to the jails over the next few days deputies looked at me in a manner that made me feel threatened. Some said things like "Rat" and "Motherfucker" after I had passed by, but never directly to my face.

29. I worked on the report for a number of days. While I was still working on it, I showed it to a colleague, who urged me to go speak with a psychologist.

30. When I finally finished the report, I brought it to Sergeant Barbosa in his office. I told him that I hoped the deputies' reports of the incident were similar. I said that because I was trying to convey that if their reports were different from mine, then they would not be telling the truth. A copy of the report I gave to Sergeant Barbosa is attached as Exhibit 2.

31. Sergeant Barbosa told me that they would need to do a video interview of me. When he told me I was going to be interviewed, I become even more afraid. Once I had seen what five deputies would do to a non-resisting and apparently handcuffed and helpless inmate, I was afraid about what they or others in the sheriff's department might do to me.

32. A couple of days after I turned in my report, I received a telephone call from someone in LASD telling me to come to a Lieutenant's office the next day for the interview. After getting the call, I contacted the Archdiocese to arrange for a lawyer to come to the interview with me.

33. Some time before the interview, a lawyer for the Archdiocese called me to tell me that he had contacted the LASD and that he had been told that I would not be permitted to bring a lawyer.

34. When I went to the interview, I was interviewed by an African-American lieutenant with a French sounding last name. Sergeant Barbosa was there also, and he filmed the interview.

35. The lieutenant asked me about the beating, and I told him what I had seen. The lieutenant also asked some other random personal questions such as what country I was from that had nothing to do with the beating. When I asked him why they were asking me such questions, they said it didn't matter.

36. The interview lasted about 20 minutes. At the end of the interview, the lieutenant assured me that he would contact me to keep me up to date on the investigation. He also apologized for what I had seen and promised me there would be a thorough investigation.

37. A few days later, I told Father George that I was worried about the inmate. Shortly thereafter, Father George told me he had spoken with LASD Lieutenant Daboren, who informed him the inmate had been released a few days after the beating.

38. It wasn't until more than two years later that I heard anything about the beating from an official of the LASD. During those two years, no one from LASD did any kind of follow up interview. Nor did anyone from Office of Independent Review (OIR) ever interview me.

39. In the meantime, I kept insisting to my boss, Father George, that something had to be done. I also continued working at MCJ and saw the same deputies who beat up the inmate on a regular basis. They are still working in MCJ. From what I can tell, they were not suspended much less terminated.

40. In June 2011, Father George managed to schedule a meeting with the OIR to discuss the beating. I met with Michael Gennaco and Walter Katz of OIR

at their offices in Commerce on or about June 24, 2011. Father George and another colleague from the Archdiocese were also there with me. During the meeting, Father George told Mr. Gennaco that I wanted to know what happened with the investigation of the beating. Mr. Gennaco and Mr. Katz told us that the case had been resolved internally and that Sheriff Baca had not been informed about the beating.

41.   During interview I told Mr. Gennaco and Mr. Katz about another inmate I knew about, Juan Pablo Reyes, who had told me that he had been beaten by the deputies, put in a cell naked, and then raped by inmates in the cell. Mr. Gennaco appeared to know nothing about incident based on the expression on his face when I mentioned the incident, and he asked me all sorts of questions about it. He promised that he and OIR would continue doing investigations, and he said he was interested in meeting with us regularly so that we could keep him informed about what we knew.

42.   Shortly thereafter, a colleague told me that Father George had been contacted by the office of Sheriff Lee Baca. My colleague told me Sheriff Baca wanted to schedule a meeting with Father George and me.

43.   On or about July 26, 2011, I met with Sheriff Baca at his office in Monterrey Park. Also at the meeting were Captain Ornelas, Michael Gennaco and Walter Katz of OIR, Cecil W. Rhambo, the Assistant Sheriff, along with Father George and Patty, another colleague from the Archdiocese who works in the jails.

44.   The first thing Sheriff Baca mentioned was the beating I had witnessed. He asked for the file of the investigation, and Mr. Gennaco handed a folder to him. Sheriff Baca asked me what had happened and asked me for the report I had written about the incident. I told him I did not have it, but said I assumed it was in the file. Sheriff Baca looked in the folder, which appeared to contain about 10 sheets of paper, and said "your report is not in here."

45.   Then I explained to him what I had seen of the beating. When I

finished Sheriff Baca began to read from a paper that was in the folder, which sounded liked the findings of the investigation.  He said that it had been determined that the prisoner was schizophrenic and that deputies had to strike him a couple of times with their fists to get him into his cell. He also said, appearing to read from the findings, that the inmate had reported that he had been run over by a truck before coming to MCJ and that his bruises were the result of the accident, not from being beaten.

46.    Another part of the paper that Sheriff Baca read from said that the chaplain who had witnessed the incident was "exaggerating." I also remember his reading that after the incident the inmate had been escorted to the clinic by Deputy Cortez.

47.    During the meeting Sheriff Baca stated,  "This happened two years ago and I'm only finding out about it now?"

48.    Still, all Sheriff Baca said about my account of the beating was that "Punches are allowed but kicks are not allowed in my department." He told Assistant Sheriff Rhambo to "check up on that." Then the meeting went on to discuss other matters.

49.    I have lost faith and trust in the LASD. They clearly did not take my testimony seriously, and they attempted to cover up what really happened. I cannot understand why my report of the incident was not in the investigation folder.

50.    The conclusions that Sheriff Baca read also make no sense.  First, I never heard the deputies attempt to persuade or even verbally threaten the inmate to get him to go into his cell.  Second, the inmate's cell was in the  upper tier, so the report's claim that they needed to punch him to get him to go into his cell makes no sense because they were not even close to the stairs to the upper tier, much less on the upper tier when they were beating him.  Third, I cannot understand how punching an inmate – much less kicking and stomping on him -- could ever be necessary to get him to go into his cell.  Also, if the inmate was

schizophrenic, then why was he in MCJ instead of Twin Towers, where inmates with mental illness are supposed to be housed? Finally, given how badly the inmate had been beaten, and the fact that he was lying motionless on the floor in a pool of blood when I left, I found the idea that he had been "escorted to the clinic" by Deputy Cortez very hard to believe.

51. Witnessing that barbaric beating has had a very profound effect on me. To this day, recalling the beating brings tears to my eyes, and I cannot finish talking about it without taking a few moments to compose myself.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed September 3, 2011 in Los Angeles, California.

_____
Paulino Juarez



Catholic Chaplains' Office
Men's Central Jail, Los Angeles, CA
February 18, 2009

My name is Paulino Juarez-Ramirez. I am a Catholic chaplain and a member of the Office of Restorative Justice of the Archdiocese of Los Angeles. I have been a chaplain at Men's Central Jail since July of 1998.

On February 11, 2009, I asked permission of Sergeant Barbosa to visit all of the rows in the 3700 module. He called the module and they said that I could visit. I arrived at the module and I entered Able row and began talking with an inmate housed in A-3. Five minutes later, I could hear someone yelling. I walked to the gate and from there I observed that someone was being beaten. I observed that at no time did the inmate fight back or resist. He was thrown to the ground and was kicked by two deputies. A third one was kneeling on the inmate's back and, with his fist, was hitting his neck, the back of his head and his jaws beneath his ears. While they were beating him the deputies kept shouting "stop fighting, stop fighting". The inmate never did try to fight back, but kept shouting "Please stop; please stop. I am not fighting." As I continued to observe, I saw that these blows continued for almost two minutes. Finally, one of the deputies turned and saw me inside of Able row. He froze. But the others continued kicking the inmate. And they kept saying, "Stop fighting, stop fighting" while they continued beating him, until the deputy who had seen me stopped them. They immediately opened the outside door and a group of deputies came running in (that group had not seen me). At this point I did not hear anything more from the inmate and assumed he was unconscious. Two of the deputies in the front of the group then came in and started kicking the inmate in his ribs, while he was still lying on the floor. One of the deputies gave him two last blows, stomping on his spinal column.
Finally, the deputy who had seen me stopped them. Then all of them saw me within the bars and suddenly became totally silent. Senior Geske was part of the group that entered later, and walked toward me, opened Able gate, and asked me to leave. I did so slowly; I looked again at the inmate, who was not moving at all. I could see blood on the floor. I left the module and in the hallway of 3000 I met approximately 20 deputies coming toward 3700, followed by Sergeant Barbosa.
At that time I felt helpless, sad, upset, angry, and anguished, wondering what the final and lasting effects would be on that inmate, who had been the victim of torture so cruel and inhumane. I was thinking of the deputies and I felt that I had witnessed a crime and I was afraid. When I arrived at the Chaplains' office, I met one of my fellow chaplains and told this person about what I had seen. That day I

Exhibit U
Page 153

did not want to talk to the Sergeant about the incident. During the night I could hardly sleep. The next day I went to Sergeant Barbosa's office and explained everything that I had witnessed and that, in my opinion, there had been no justification. It was a flagrant injustice against this helpless person and I asked Sergeant Barbosa to put a stop to these kinds of attacks. Sergeant Barbosa asked me how many deputies had participated. I told him that there were three in the beginning and two deputies later joined in - a total of five. He told me that in their report the deputies had admitted participating in the beating, but he did not share any more details of that report. Also, the Sergeant told me that the incident started because the inmate had spit on a deputy, but the Sergeant added that he did not believe it, and neither do I.

Since the inmate was under control at the time, the question for me was, "What was the purpose of the deputies' continuing beating this man without compassion or mercy?" I think that, if a situation of this magnitude had occurred in streets, the perpetrators would without any doubt be charged with assault with intent to kill.

Since that day I have felt afraid while walking the 3000 hallway, because I see the look in the eyes of the deputies, as they know I was a witness to the whole affair. I wonder what they are thinking of me, and especially what they might do about it and what may happen in the future. Sincerely, since I did not do anything wrong, I am afraid of retaliation. I am now seeing a psychotherapist to assist me to process this disagreeable experience. I feel the support of my chaplain colleagues, my spiritual director and my pastor, who all know about the incident. Another point is that in the past I had been informed by various inmates that they had seen other inmates being beaten by deputies without any reason. And now from my own experience I know this to be true.

This atmosphere of violence without justification causes in the minds and hearts of the inmates in this facility, especially those who suffer such unspeakable aggression, to harbor rancor, anger, hatred and resentment. This could play itself out in the streets with acts of aggression toward citizens and especially toward law enforcement officers.

Therefore, my petition as Chaplain in this institution is that this inexplicable and excessive use of force cease and, when restraint is necessary, the deputies adhere to their basic core values of respect, integrity, common sense, human decency and fairness.

# EXHIBIT "V"

# DECLARATION OF ALEX KREHBIEL

I, Alex Krehbiel, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I have been housed in Men's Central Jail since May 19, 2010.

3.    On Thursday, July 29, 2010, I met with my attorney, Jonathan Mandel, for about 30 minutes in the attorney room. When I finished, I began to walk back to my housing unit.

4.    On the way back, I decided to walk to the medical clinic to try to get treatment for a bad cough I had. I waited there for about 30 minutes until a nurse told me that since I didn't have a sick pass I would have to return to my housing unit without getting treatment.

5.    I walked back to my housing unit, 32/3400. When I arrived at the unit, I saw that the door separating the housing unit from the hallway was closed and locked. I approached the closed door and stood there, looking around to see if I could find a deputy to let me in.

6.    The door to the adjacent unit was open, so inmates were able to look through the cracks in their cells to see me.

7.    An inmate from that unit must have seen me, because someone yelled out, "Hey Little Raymond Steve!" which is my nickname. I couldn't see who was yelling, so I yelled back in the direction of that unit, "Hey who was that?"

8.    The yelling drew the attention of a group of about six deputies who were standing at the other end of the tier. One of the deputies in the group started to walk toward me as he yelled, "What the fuck are you doing? What the fuck do you think you're doing?" The other deputies in the group were just watching what was happening.

9.    The deputy who walked toward me was white and he looked like he was in his early 40s. He had a thin build and stood about 6 feet tall. He wore glasses and had a blonde buzz cut that was going a little grey. He must have been a sergeant or lieutenant or something more senior because he had gold bars on his shoulders.

10.    He continued to approach me, and I told him that I was coming back from the attorney room and the door to my housing unit was closed. He kind of ignored what I was saying and kept yelling

Exhibit V
Page 155

at me, "Why are you yelling?" so I quietly told him, "I'm sorry, I'm sorry."

11.     When he got really close to me he yelled at me to face the wall. I turned my body to face the wall and he yelled in my right ear, "This is my fucking house! Where do you think you are? This is my fucking house!"

12.     As he was yelling at me, he tried to grab my head and slam my forehead against the wall with his hands. The first time he tried, I stiffened my neck away from the wall and squirmed around, so he wasn't able to get a lot of leverage. He tried to slam my head a second time and I wasn't able to resist, so my forehead slammed hard against the wall. I had a bruise on the upper right side of my forehead for a few days after that.

13.     When the deputy slammed my head the second time, an inmate yelled out, "Hey stop, leave him alone!" The deputy heard that and he eased up on me. So he stopped holding my head and walked away.

14.     The other deputies in the group had been watching this whole thing. Once the deputy who had slammed my head against the wall left, they all started walking closer to me and taunting me. I looked around at all of them closing in on me and it was then that I had the feeling that I was going to get beat up.

15.     One of the deputies told me to face the wall again, so I faced the wall. He came up behind me and punched me on the right side of my ribs. I flinched and bent over to my right side and another deputy punched me in the right side of my face. His fist pressed my cheek hard against my teeth and the inside of my cheek split open.

16.     I asked them, "Why are you doing this?" but they just yelled back at me, "Shut the fuck up!"

17.     The group of deputies pushed me into the laundry room. The laundry room was empty, and no other inmate could see what was going on. Then they just began to beat the hell out of me.

18.     One of them swept my legs out from under me with his leg and I fell onto my side. They all beat me, punching and kicking me on the back of my head, on my ribs, and on my back.

19.     I was in shock, I didn't know why they were beating me up and I couldn't believe this was happening. They all had turns beating me, and I was wrestling around on the ground with one of them

Exhibit V
Page 156

for a little while. While they were doing this I was yelling at them asking them why they were doing this to me. They kept yelling "We're not jumping you! Shut the fuck up! Where you from, asshole? Where you from?"

20.    I tried to dodge them all as best I could, but there were so many deputies and I couldn't get out of the laundry room. I got beaten up pretty badly. One deputy especially was trying to punch me over and over, and all I could do was evade and block the punches with my hands and arms as best I could. We were wrestling around on the floor for several minutes.

21.    After a little while I just balled up small as I could on the floor. That same deputy yelled at me, "Why are you balling up? Why are you balling up?" I yelled back at him, "Because you're beating the hell out of me!" And he yelled back, "You're tough, aren't you? You're tough!" I think he was getting frustrated that he wasn't landing hard punches or maybe that I wasn't punching him back. He kept trying to hit me, but after a while I successfully held his hands away from me so he couldn't punch me anymore. Once I did that, he yelled to the other deputies, "Cuff him! He's getting an add charge!" I heard that and I yelled back, "For what? Y'all just beat the hell out of me!" They didn't actually cuff me at that time, though.

22.    I wear my hair in two braided ponytails that reach a few inches below my collar bone. One of the deputies pushed me on my stomach, held his knee on my upper back, and pulled my braids up to force my head off the ground. I couldn't see what he looked like because I was face down on the ground.

23.    I saw a spray can coming at me out of the corner of my eye, and he sprayed me in the face with mace. It went right in my eyes and my eyes were burning and burning. It was really painful. The mace dripped into my mouth and I swallowed some of it. It got into my lungs, which made me hack and cough. I was still on my belly and I tried to roll over on my side a little bit so I could breathe better, but the deputy kept pushing me back on the ground. I thought I was going to suffocate. I was hurting bad from the beating, but the mace was the worst part.

24.    When they sprayed me, I got so scared that I started yelling out, "Help! Help!" When I started yelling, one of the deputies picked my head up as far off of the ground as he could, and then slammed it down on the ground two times. Then I just lay there for a while, moaning incoherently.

Exhibit V
Page 157

25. They brought me out of the laundry room to another hallway somewhere to a deputy with a handheld camcorder and asked me questions about what had happened. I don't know exactly where we went because my eyes were still burning from the mace. I could barely see anything, so they had to guide me forward by holding my arms and pointing me in the right direction. I was just hoping they wouldn't run me into anything.

26. The deputy turned the camcorder off and said, "Listen, I know how these things happen. Next time just let them cuff you and don't say anything." I told him, "That's not what they wanted to do. They *did* what they wanted to do."

27. He sighed and told me, "I don't want inmates thinking they can run their own program. I also don't want inmates getting the shit beat out of them."

28. After I was done, they guided me over to the medical clinic where someone put drops in my eyes to neutralize the mace. I felt so beat up that I was scared of how I was going to look. When I was able to open my eyes a little bit I was surprised that I didn't look beaten and bloody. They also bandaged a cut on my forehead and took x-rays of my ribs. Then a couple deputies took me back to my housing unit.

29. For days after that, I had a big, dark bruise under my right eye and all these knots and contusions all over my head. My ribs began to hurt worse and worse as the bruises developed. Two weeks later, I still have trouble breathing, moving, and sleeping. As a result of this incident, I was given twenty-nine days in the hole.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed September 1, 2010 in Los Angeles, California.

**Alex Krehbiel**

Exhibit V
Page 158

# EXHIBIT "W"

**Declaration of Esther Lim**

I, Esther Lim, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am the Jails Project Coordinator for the ACLU of Southern California ("ACLU/SC").

3. I am submitting this declaration to describe a savage beating of a prisoner by two Los Angeles Sheriff's ("LASD") deputies, which I witnessed in the Twin Towers Correctional Facility ("TTCF") on January 24, 2011.

4. In brief, I saw two deputies, Ochoa and Hirsch, beat and taser an African-American prisoner, James Parker, multiple times while he was lying on the ground, not moving or resisting in any way for what seemed to me to be about two minutes. During the beating, the deputies repeatedly shouted, "Stop resisting!" and "Stop fighting!" while the prisoner lay limp on the floor.

5. The deputies and the prisoner were no more than about ten feet away from me and I was able to see what happened.

6. The following day, Tuesday, January 25, 2011, a false account of the incident appeared in the official LASD daily Inmate Reception Center ("IRC") Division Log.

Monday, January 24, 2011-1700 hours

7. On Monday, January 24, 2011, I was at TTCF's Module 142's Attorney Room located on the right hand side of the fourth floor at approximately 1700 hours.

8. I was there to speak to a prisoner named Christopher Brown, booking number 1365261.

9. I was seated at the third phone booth, which is phone booth number five, in the Attorney Room. There is a label with the booth's number posted above the booth.

10. There are a total of seven, separate phone booths; the phone booths being numbered sequentially higher until the last telephone booth, number seven. Telephone booth number seven is the closest to the wall located to the right, when facing the prisoner and the

furthest away from elevators. The diagram, which is attached hereto as Exhibit 1, shows the placement of telephone booths number four through seven. Phone booths one through three are not pictured in the diagram, but they would be to the left of booths four through seven on the diagram.

11.     Each phone booth has a large window that is approximately three and a half feet in height and two feet in length. There is a small, metal table for the attorney and a stool. These furnishings are the same for the prisoner who sits on the opposite side of the attorney with the window partition in between. There is also a phone that is located on the right hand side of the window. Exhibit 1 shows the area, located on the left hand side of the diagram, where the prisoners (Attorney Room - Inmates) and where the attorneys sit (Attorney Room - Visitors).

12.      I was sitting in telephone booth number five as shown in Exhibit 1. E1 on the attached diagram shows my location. As I sat facing Mr. Brown, who was sitting in the seat that is marked as B1 on the attached diagram, the wall was to my right.

13.     The wall, which is approximately six feet in length, has two, large, side-by-side windows that looks out to the Staging Area. The wall is labeled in Exhibit 1. The Staging Area contains the Outdoor Recreation Area and other shared areas. Exhibit 1 displays what the Staging Area looks like, in addition to other key areas. One would need to walk through the Staging Area to get to the different pods or housing areas of the module as indicated in Exhibit 1. Both windows are approximately three and a half feet in height and three feet in length. All measurements are approximations, but I used a ruler on my clipboard to measure the wall and windows.

14.     At approximately 1730 hours, while I was speaking to Mr. Brown, I heard noises like people scuffling around, sounds of fists hitting a body, thuds against the wall and other noises that sounded like a fight. My location when I was speaking to Mr. Brown is marked in Exhibit 1 as E1.

15.     As I stood up to see what was causing the noise, Mr. Brown stood up as well. I walked over to the window on the wall, as indicated in Exhibit 1 as E2 and looked to my left. I saw Deputies Ochoa and Hirsch punching an African-American prisoner, whom I later learned

was James Parker, whose booking number is 2540169. Mr. Parker was identified to me by Mr. Brown when I visited him during my ACLU walk-through of TTCF, Module 142, Pod F on Tuesday, January 25, 2011.

16.    As I stood at the spot marked as E2 on the attached diagram, I could see Mr. Parker, who was in the spot marked as P-2, lying face down on the ground positioned in the way the black figure on the attached diagram is positioned, i.e., with his feet pointed towards the water fountain. Deputies Ochoa and Hirsch were next to Mr. Parker in the spots on the diagram that are marked with two X's.

17.    Mr. Parker was lying on his stomach and he appeared to be unconscious as he was not moving.

18.    I saw both Deputies Hirsch and Ochoa simultaneously punching Mr. Parker about three to four times and kneeing Mr. Parker about two to three times. I heard both deputies yell, "Stop fighting!" and "Stop resisting!".

19.    Even though the deputies were yelling, "Stop fighting!" and "Stop resisting!", Mr. Parker was not trying to kick, hit or otherwise fight with the deputies. He was lying on the ground motionless, doing nothing. I thought he looked unconscious as he was not moving or making any sounds.

20.    I also saw Deputy Ochoa placing the taser gun on Mr. Parker's leg approximately three to four times and approximately two to three times onto his back area. I could hear the shocks that the taser gun made when it was being utilized on Mr. Parker. Deputy Ochoa continued yelling, "Stop fighting!" and "Stop resisting!" as he was tasing Mr. Parker.

21.    Mr. Parker looked like he was a mannequin that was being used as a punching bag as he was not showing any sort of movement. I thought he was knocked out or perhaps even dead.

22.    Approximately one minute after I saw Deputies Ochoa and Hirsch beating Mr. Parker, I observed Deputy Ochoa bring his left index finger to his lips, showing this motion to Deputy Hirsch, who was yelling, "Stop resisting!" and "Stop fighting!" about three to four times.

23.    After Deputy Ochoa brought his finger to his lips, Deputy Hirsch yelled, "Stop

resisting!" and "Stop fighting!" once more to Mr. Parker, who was still not moving or making noise.

24.    During the course of the time that I was watching the deputies beat Mr. Parker, I heard both deputies yelling, "Stop resisting!" and "Stop fighting!" to Mr. Parker more than five times each. While the deputies were yelling this out, it sounded like the deputies were reading from a script.

25.    Approximately thirty seconds after I saw Deputy Ochoa bring his left index finger to his lips, I hit my right palm against the window approximately three times so that I could get the deputies' attention. They did not look over in my direction.

26.    The approximately two minutes that I was watching the deputies beat and tase Mr. Parker, it appeared that he was unconscious as he was not moving. He was not fighting with the deputies. He was just lying there, making no movements or sound.

27.    At the end of the two minutes of my observation of this incident, I heard over the public announcement speaker, "Stay in your seat."

28.    At that point, I walked over to my seat where Mr. Brown was sitting across from me and I asked him who the deputies were. He told me that they were Deputies Hirsch and Ochoa. Mr. Brown said he knew the deputies' names because both deputies work on his module. I was in the spot marked as E1 while I was talking with Mr. Brown and he was in the spot marked as B1.

29.    After speaking briefly with Mr. Brown, I walked back over to the window and saw Deputies Hirsch and Ochoa in a kneeling position over Mr. Parker and approximately five seconds later, Deputy Ochoa looked at me and using his index finger, signaled that I needed to move away from the window.

30.    I stood at the window for approximately three or four seconds more and then I walked back over to telephone booth number five and I could see Mr. Brown lying on the ground in the Attorney Room on the prisoner's side, in the prone position with his head away from the window.

31.    At this time, I got up from my seat, gathered my belongings and walked over to

the elevator and took the elevator down to the first floor.

32. When the elevator doors opened to the first floor, I saw approximately three to four deputies who were about to take the elevator up.

33. I then left the Twin Towers 1 Visiting Area and exited TTCF.

<u>Tuesday, January 25, 2011-0930 hours</u>

34. On Tuesday, January 25, 2011 at approximately 0930 hours, I was checking my ACLU/SC email account. Every morning, I receive the IRC Division Count, the IRC Division Log, the Custody Division 0600 Count, the IRC Processing Time and the IRC Clinic Processing Time reports.

35. Daily, I review each of the logs, reports and counts, print and file them in their respective areas and place them in the appropriate binders.

36. I reviewed the IRC Division Log for Monday, January 24, 2011, a true and correct copy of which is attached hereto as Exhibit 2. I reviewed the 1645 hours log entry entitled, "Significant Use of Force-TTCF."

37. There were approximately five paragraphs detailing the account of an altercation between two unnamed deputies and Inmate James Parker, booking number 2540169.

38. I noticed that the log stated the incident occurred at 1645 hours, which is approximately forty-five minutes earlier than when I observed the beating at approximately 1730 hours.

39. In paragraph two, of the description of the incident on the Division Log, it states that "Both Inmate Parker and the deputy went to the ground as Inmate Parker continued his attack." I observed both Deputies Ochoa and Hirsch kneeling over Mr. Parker, attacking, punching and kneeing him while he was on the ground. I also saw Mr. Parker being non-combative as he was not moving, not resisting and was not fighting. He looked limp as if he might be unconscious as he was not making any movements or sounds while Deputies Ochoa and Hirsch were beating him. Mr. Parker was not attacking any of the deputies as paragraph two alleges.

40. In paragraph three, it states that, "Inmate Parker continued his attack as the second

deputy utilized his taser, striking him in the mid-back area. Inmate Parker continued punching the first deputy. The second deputy then dry-stunned Inmate Parker three times in the back area and one time in the right hamstring. Inmate Parker then stopped fighting and was handcuffed without further incident."

41.    I did observe Deputy Ochoa tasing Mr. Parker's back and rib area approximately two to three times and Deputy Ochoa tasing Mr. Parker's leg approximately three to four times. However, the statement in paragraph three that Mr. Parker did not stop fighting until the deputies had tased Mr. Parker four to five times is false.  Parker was not fighting or resisting at any time when I observed him, including while Deputy Ochoa tased him multiple times in the back and leg.

42.    During the entire time I was observing Mr. Parker, including the time during which he was repeatedly punched, kneed and tased, he was not striking or attacking Deputies Ochoa and Hirsch. In fact, Mr. Parker was motionless during the whole time that he was lying on the ground and Deputies Ochoa and Hirsch were punching, kneeing and tasing him. As I said above, I thought he was unconscious or perhaps dead, while he was being beaten and tased, because he was not moving at all.

43.    During the time I observed Mr. Parker on the ground and Deputies Ochoa and Hirsch kneeing, punching and tasing him, I heard the deputies repeat, "Stop resisting!" and "Stop fighting!" more than five times each. However, Mr. Parker was not resisting, nor was he fighting with the deputies.

<u>Tuesday, January 25, 2011-1555 hours</u>

44.    On Tuesday, January 25, 2011 at approximately 1535 hours, I telephoned TTCF's Watch Commander/Lieutenant Bodenstedt and informed him that ACLU/SC Staff Attorney Jessica Price and I were going to do an ACLU walk through at approximately 1555 hours that day.

45.    Price and I arrived at the TTCF Control Room at approximately 1555 hours and Sergeant Geary met us at approximately 1600 hours.

46.    I asked to enter Module 142 and Sergeant Geary escorted us there.

47.    I asked to enter Pod F and she stated that she needed to find a deputy. I did not see any module deputies around.

48.    Sergeant Geary yelled out, "Deputy Ochoa!" and asked that he assist her. I immediately recognized Deputy Ochoa as the deputy whom I saw beating and tasing Mr. Parker on Monday, January 24, 2011. I also saw his name on the name tag on his uniform.

49.    Ms. Price and I entered Module 142, Pod F and I spoke to several prisoners there about various complaints and Title 15 infractions. I also saw Ms. Price speaking to prisoners.

50.    While speaking to the prisoners, I saw Deputy Ochoa staring at me in an aggressive manner through the window that separates the pod from the deputies' area.

51.    While in Pod F, I spoke to Mr. Brown as he is currently housed there and asked him if anything happened after I had left the Attorney Room on Monday, January 24, 2011 and he told me that he was interviewed by two sergeants. I asked him if I could call him out to the Attorney Room the next day, Wednesday, January 26, 2011 to talk about it. Mr. Brown told me that I could.

52.    I also asked him if he knew the name of the prisoner whom Deputy Ochoa and Hirsch had beaten on Monday, January 24, 2011. He said that it was Parker. He did not know where Mr. Parker was or where he was housed. While I was speaking to Mr. Brown, I saw Deputy Ochoa again staring at me aggressively.

53.    After speaking to Mr. Brown, Ms. Price and I left Pod F and were escorted to the TTCF Control Room by Sergeant Geary at approximately 1645 hours. Ms. Price and I then exited TTCF.

<u>Wednesday, January 26, 2011-0920 hours</u>

54.    On Wednesday, January 26, 2011 at approximately 0920 hours, Ms. Price and I met with Mr. Brown in the Attorney Room on Module 142.

55.    I sat in telephone booth number 5 and Ms. Price sat on the stool in telephone booth number four. I asked Mr. Brown if we could take his declaration of what he saw on Monday, January 24, 2011 when he was in the Attorney Room with me. He said yes. I wrote down what he told me he had seen and heard.

Exhibit W
Page 165

56. After taking the declaration for the January 24th incident, I asked if we could take his declaration about the interview that LASD personnel had done with him on the same day. He said yes. I wrote down what he told me he had been asked, seen and heard.

57. Ms. Price and I left the Attorney Room and went down to the Tower 1 Attorney Visiting Area's deputies' desk. I told Deputy Velasquez that Ms. Price and I would like to see Mr. Parker. Deputy Velasquez told us that Mr. Parker was housed in T211, which is the Disciplinary Module and that we needed to go the TTCF Tower 2's Attorney Visiting Area and submit a request to see Mr. Parker there.

58. At approximately 1010 hours, Ms. Price and I arrived at the Attorney Visiting Area's deputies' desk in TTCF Tower 2 to visit Mr. Parker. After an approximately fifteen minute delay, Deputy Shroyer told us that we needed to go to the TTCF Tower 1's Attorney Room as Mr. Parker would be escorted from Tower 2 to Tower 1. The fifteen minute delay was due to the deputies not having a current ACLU Clearance list.

59. At approximately 1030 hours, Deputy Shroyer told Ms. Price and me that Mr. Parker was in the "hole" and because the deputy's partner that was assigned to T221 where Mr. Parker was located, was not available at that time, Mr. Parker would not be able to be escorted to TTCF Tower 1 until the partner returned. Deputy Shroyer told us to go back to TTCF Tower 1 and wait for authorization to see Mr. Parker.

60. Ms. Price and I walked back over to the Tower 1's Attorney Room's deputies' desk and Deputy Velasquez told us at approximately 1035 hours that the module deputy's partner was not there so we needed to wait before Ms. Price and I could visit Mr. Parker.

61. At approximately 1100 hours, Deputy Velasquez stated that Ms. Price and I could go up to Module 171 or the seventh floor's Attorney Room to see Mr. Parker.

62. Ms. Price and I went inside the elevator and went up to the seventh floor to Module 171's Attorney Room and walked to the left after exiting the elevator.

63. There was a delay in being able to communicate with Mr. Parker because the telephones were shut off, meaning Mr. Parker and I could not hear each other on the phone. Another prisoner was in the telephone next to Mr. Parker and I tried to communicate with him

Exhibit W
Page 166

via the telephone and this telephone was also shut off.

64.    I told the deputy who escorted Mr. Parker to the Attorney Room that I couldn't hear Mr. Parker because the phone was broken and he told me to press the intercom button.

65.    I pressed the intercom button that is in the Attorney Room, which is used to communicate with the deputies inside the module's control room. No one answered when I pressed it. I pressed the button an additional three more times and all three times, no one answered.

66.    Ms. Price stated that she would go down to the Tower 1's Attorney Room's deputies' desk to alert them about the phones.

67.    When Ms. Price returned to the Attorney Room, Mr. Parker and I tried the phones again and we were then able to hear each other.

68.    I spoke to Mr. Parker and asked him if he was the prisoner who was involved in the beating incident that had occurred on Monday, January 24, 2011 and he told me that he was. I asked him for his name and he told me that his name was James Parker. I verified this information to the wristband that was fastened on his wrist, which contains the prisoner's name, booking number and other information.

69.    I told him I was from the ACLU/SC's Jails Project and I asked if he wanted to talk to me about what had happened.

70.    I asked him to show me the injuries he sustained from the incident and he showed me his left eye, which was swollen half way shut. He also showed me the stitches he received over his left eyebrow. Using a ruler that is on my clipboard, I measured the area that was closed with stitches. It was approximately two centimeters long. Mr. Parker also said that his left cheek was swollen and that he felt like he had a gash inside his right cheek. Due to the reflection from the overhead lights, I was not able to see anything inside his mouth, which was dark and I did not have a flashlight. He stated that he had a lot of pain on the back of his neck, face, shoulder and said that his left rib area was hurting as well. He stated that he felt like one of his ribs were loose.

71.    I asked him if he was taking any medication for the pain and he said that he was

given Motrin.

Friday, January, 28, 2011

72.    On Friday, January 28, 2011, I visited Mr. Parker.

73.    Mr. Parker told me that on Tuesday, January 25, 2011, when he was brought to Module 142 from the Los Angeles County Medical Center ("LCMC"), a male nurse told him that he needed to get the stitches he received the night before, over his left eyebrow, removed. He didn't know the name of the male nurse, but said he was chunky, Mexican and was Mr. Parker's height, which is five feet nine inches. He also said the male nurse had shoulder length, bushy hair.

74.    Mr. Parker said that he told the male nurse that the doctor at LCMC, who was an Asian woman said that Mr. Parker was not going to have his stitches taken out until Tuesday, February 1, 2011.

75.    He told the male nurse that he was not going to get the stitches removed and he was going to follow the LCMC's doctor's orders.

76.    Mr. Parker stated that he was approached by another nurse at a later time, on the same day, who also told him that he needed to remove his stitches. Mr. Parker told this nurse that he was not going to remove his stitches because the doctor at LCMC said the stitches were going to be removed on Tuesday, February 1, 2011.

77.    Mr. Parker stated that he was again approached by the nursing staff on Wednesday, January 26, 2011; Thursday, January 27, 2011; and today, Friday, January 28, 2011 to remove his stitches.

78.    Mr. Parker said that the female nurse today was more adamant about getting his stitches removed. He didn't know the nurse's name, but said she was Filipino, five feet two inches or five feet four inches in height and had short hair.

\\\

\\\

\\\

\\\

79. He again denied this nurse and didn't allow her to remove his stitches.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 4th day of February, 2011 in Los Angeles, California.

Esther Lim



Exhibit W
Page 170

**COUNTY OF LOS ANGELES
SHERIFF'S DEPARTMENT
LOG SHEET REPORT**

*02/04/2011*

Day: Monday

Detail or Station: <u>CUSTODY DIVISION</u>          January 24, 2010

**0530    WATCH COMMANDER'S REVIEW - LT. CHAVEZ**

**1330    WATCH COMMANDER'S REVIEW - CMDR. RUIZ/ LT. MURPHY**

**1450    ACLU VISIT- TTCF**

Sgt. Johnson Reports, American Civil Liberties Union (ACLU) representatives Esther Lim, Theodore Livingston Young, Alexandra Leigh Howard and Hannah Zoe Weilbacher, visited Twin Towers Correctional Facility. They were escorted by Sergeant Brad Gray (#277068) and spoke with inmates housed in Modules 132 A and B Pod, 141 A Pod and 172 D Pod.

The ACLU representatives completed their interviews within approximately two-hours and forty-minutes. All comments made to Sergeant Gray regarding the visit were favorable.

Custody Division Operations Log entry completed by IRC Watch Deputy Paterno (#488650) at 1450 hours. (GAP)

**1645    SIGNIFICANT USE OF FORCE- TTCF**

Sgt. Johnson, Twin Towers Correctional Facility, reports at approximately 1645 hours this date, Two deputies escorted Inmate James Parker, booking #2540169, to the ABC Outdoor Recreation Area pending transfer to discipline Module 121 for possession of contraband in his cell.

Upon notifying Inmate Parker of his discipline status, Inmate Parker punched one of the deputies with his right hand, striking him on the left side of his face. Inmate Parker then charged at the deputy and continued to punch him in the torso area. The deputy gave commands for Inmate Parker to stop fighting and then punched him on the top of the head with his right hand. As Inmate Parker continued his attack, the deputy punched him an additional four-to-five times in the upper-torso area. Both Inmate Parker and the deputy went to the ground as Inmate Parker continued his attack.

The second deputy observed Inmate Parker punching the first deputy and gave verbal commands for him to stop fighting. As the second deputy went to assist, Inmate Parker punched him in the left rib area and continued his attack on the first deputy. The first deputy

Exhibit W
Page 171

**COUNTY OF LOS ANGELES
SHERIFF'S DEPARTMENT
LOG SHEET REPORT**

02/04/2011

Detail or Station: <u>CUSTODY DIVISION</u>

Day: Monday
January 24, 2010

kneed Inmate Parker one time in the face in self-defense. Inmate Parker continued his attack as the second deputy utilized his taser, striking him in the mid-back area. Inmate Parker continued punching the first deputy. The second deputy then dry-stunned Inmate Parker three times in the back area and one time in the right hamstring. Inmate Parker then stopped fighting and was handcuffed without further incident.

The first deputy sustained a swollen right-hand and redness and swelling to the left side of his face. The first deputy was treated for his injuries at U.S. Healthworks. The second deputy did not sustained any injuries.

Inmate Parker sustained a 2 cm. laceration on his left eyebrow and swelling to the left side of his head. The taser darts did not penetrate his skin. He was escorted to the Tower One Clinic for examination and treatment and then transferred to L.C.M.C. for additonal treatment. (AB)


**2130    WATCH COMMANDER'S REVIEW - LT. MURPHY/ LT. SAUNDERS**


**2358    WATCH COMMANDER'S REVIEW - LT. CHAVEZ**


**2359    LOG CLEARANCE**


No further entries. (AB)

Exhibit W
Page 172

# EXHIBIT "X"

## DECLARATION OF THADDEUS LOVE

I, Thaddeus Love, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I'm a propria persona ("pro per") inmate in Men's Central Jail ("MCJ"). I am housed in Module 2500, Row A, Cell 2. My booking number is 2372006. I have been incarcerated in MCJ since August 2, June 17, 2010.    X  TL

3.    I am writing this declaration as an eyewitness to the deputy assault on William Tillman. I had an unobstructed view of the assault from my cell front and witnessed deputies Moorman, Ibarra and Custody Assistant ("C.A.") Perez surrounding Mr. Tillman just before they all violently attacked him.

4.    A diagram of the view from my cell towards where the deputies assaulted Mr. Tillman is attached as Exhibit 1. The assault took place on the floor, within the yellow lines.

5.    On or about March 25, 2011, as I rested on my bed, I heard a deputy ask William Tillman, who had just entered the module, "What cell are you in?" Mr. Tillman replied, "I'm in Baker 5." Then I saw Deputy Moorman, with Deputy Ibarra just behind him, approach Mr. Tillman and yell, "Stand in the fucking yellow box." Mr. Tillman did what was told and said something to the deputies while turning his head in their direction. Deputy Moorman told him to face the fucking wall. He then said to Mr. Tillman, "you think you're fucking tough. We're the 3000 boys. No one talks shit to us." Deputy Moorman told him to admit he was talking shit, and Mr. Tillman repeatedly denied that he had insulted him. Thereafter, Deputy Moorman said, "that's not gangster shit, that's bitch shit." Mr. Tillman replied, "I'm no bitch." Shortly after, Deputy Moorman then said something like, "Baca pays us to take kickboxing classes to whip peoples' asses." Mr. Tillman replied, "I don't have to take kickboxing classes to whip someone's

TL

Exhibit X
Page 173

ass."

6. By this time, C.A. Perez and Deputy Ibarra and Moorman had formed a semi-circle around Mr. Tillman, with deputy Moorman being closest to Tillman.

7. Deputy Moorman, all of a sudden, grabbed Mr. Tillman's head and viciously slammed it against the cement wall. I remember seeing Mr. Tillman with his hand to his sides, his back towards the deputies, not having the chance to lift his hands to soften the impact.

8. Immediately after his head hit the wall, there were bloodstains on the wall and blood was pouring down to the floor. Mr. Tillman dropped to the ground.

9. As Mr. Tillman was on the floor, I saw Deputy Moorman pull out his handcuffs, grab Tillman's arms and cuff his hands behind his back.

10. Deputy Moorman then mounted Mr. Tillman and began throwing punches to the side of his face and the back of his head. Deputy Moorman had his knee driven into Mr. Tillman's back, his left hand was controlling Tillman's left shoulder, and he used his right hand to throw sharp hooks to Tillman's face and head.

11. Deputy Ibarra and C.A. Perez were watching Deputy Moorman beat Mr. Tillman. They did not say anything, they just watched.

12. While Deputy Moorman was punching Mr. Tillman, another deputy said, "Call for back up."

13. Mr. Tillman was not resisting when his hands were cuffed around his back. In fact, Mr. Tillman was motionless, appeared unconscious, for the next couple seconds after his head was slammed into the wall. After a couple punches had landed, that's when it appeared that Mr. Tillman woke up because he started crying for help. He repeated, "Help me!" and "Please stop!"

14. I heard the footsteps of numerous deputies approaching our module, and as the door was opening, deputy Moorman or Ibarra said, "Stop resisting!

TL   Exhibit X
Page 174

Stop resisting! Get the pepper spray!" I could see that Mr. Tillman was not resisting, however.

15. Deputy Ibarra then pepper sprayed Mr. Tillman in the face, and then C.A. Perez tased him. C.A. Perez shot the taser hooks at Mr. Tillman's back and tased him two to four times. Mr. Tillman had stopped screaming by the time C.A. Perez tased him. But his body shook violently each time he was tased.

16. Because of how close I was to assault, the pepper spray was too strong for me to handle. I started coughing and my eyes began to burn, so I had to back up from my cell front and go to the part of my cell that was farthest from the hallway where the deputies were abusing Mr. Tillman. I retreated towards the back of my cell for about fifteen seconds, in which I also turned my head away from the assault.

17. When I returned to my cell front, there were twenty to thirty deputies in the Module. Two deputies snatched up Mr. Tillman and walked him outside the Module.

18. As he was escorted out, inmates started to yell at deputies, "That's fucked up," and "You didn't have to do that." A deputy responded, "What? All of a sudden you guys want to act as witnesses?"

19. Minutes after, a Sergeant walked inside our Module to take pictures of where the incident took place. The Sergeant took about ten pictures and he did not interview me or ask me any questions about what had taken place right in front of my cell.

20. A trustee came to clean up fifteen or so minutes after the Sergeant left. The trustee mopped up the floor, and used a rag wipe down the blood from the wall.

// //

// //

// //

Exhibit X
Page 175

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed this 19th day of August, 2011 in Los Angeles, California.

Thaddeus Love

Exhibit X
Page 176



Exhibit X
Page 177

# DECLARATION OF THADDEUS LOVE

I, Thaddeus Love, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I'm a propria persona ("pro per") inmate in Men's Central Jail ("MCJ"). I am housed in Module 2500, Row A, Cell 2. My booking number is 2372006. I have been incarcerated in MCJ since June 17, 2010.

3.    I am writing this declaration as an eyewitness to the deputy assault on William Tillman. I had an unobstructed view of the assault from my cell front and witnessed deputies Moorman, Ibarra and Custody Assistant ("C.A.") Perez surrounding Mr. Tillman just before they all violently attacked him.

4.    A diagram of the view from my cell towards where the deputies assaulted Mr. Tillman is attached as Exhibit 1. The assault took place on the floor, within the yellow lines.

5.    On or about March 25, 2011, as I rested on my bed, I heard a deputy ask William Tillman, who had just entered the module, "What cell are you in?" Mr. Tillman replied, "I'm in Baker 5." Then I saw Deputy Moorman, with Deputy Ibarra just behind him, approach Mr. Tillman and yell, "Stand in the fucking yellow box." Mr. Tillman did what was told and said something to the deputies while turning his head in their direction. Deputy Moorman told him to face the fucking wall. He then said to Mr. Tillman, "you think you're fucking tough. We're the 3000 boys. No one talks shit to us." Deputy Moorman told him to admit he was talking shit, and Mr. Tillman repeatedly denied that he had insulted him. Thereafter, Deputy Moorman said, "that's not gangster shit, that's bitch shit." Mr. Tillman replied, "I'm no bitch." Shortly after, Deputy Moorman then said something like, "Baca pays us to take kickboxing classes to whip peoples' asses." Mr. Tillman replied, "I don't have to take kickboxing classes to whip someone's

Exhibit X
Page 178

ass."

6. By this time, C.A. Perez and Deputy Ibarra and Moorman had formed a semi-circle around Mr. Tillman, with deputy Moorman being closest to Tillman.

7. Deputy Moorman, all of a sudden, grabbed Mr. Tillman's head and viciously slammed it against the cement wall. I remember seeing Mr. Tillman with his hand to his sides, his back towards the deputies, not having the chance to lift his hands to soften the impact.

8. Immediately after his head hit the wall, there were bloodstains on the wall and blood was pouring down to the floor. Mr. Tillman dropped to the ground.

9. As Mr. Tillman was on the floor, I saw Deputy Moorman pull out his handcuffs, grab Tillman's arms and cuff his hands behind his back.

10. Deputy Moorman then mounted Mr. Tillman and began throwing punches to the side of his face and the back of his head. Deputy Moorman had his knee driven into Mr. Tillman's back, his left hand was controlling Tillman's left shoulder, and he used his right hand to throw sharp hooks to Tillman's face and head.

11. Deputy Ibarra and C.A. Perez were watching Deputy Moorman beat Mr. Tillman. They did not say anything, they just watched.

12. While Deputy Moorman was punching Mr. Tillman, another deputy said, "Call for back up."

13. Mr. Tillman was not resisting when his hands were cuffed around his back. In fact, Mr. Tillman was motionless, appeared unconscious, for the next couple seconds after his head was slammed into the wall. After a couple punches had landed, that's when it appeared that Mr. Tillman woke up because he started crying for help. He repeated, "Help me!" and "Please stop!"

14. I heard the footsteps of numerous deputies approaching our module, and as the door was opening, deputy Moorman or Ibarra said, "Stop resisting!

Exhibit X
Page 179

Stop resisting! Get the pepper spray!" I could see that Mr. Tillman was not resisting, however.

15.   Deputy Ibarra then pepper sprayed Mr. Tillman in the face, and then C.A. Perez tased him. C.A. Perez shot the taser hooks at Mr. Tillman's back and tased him two to four times. Mr. Tillman had stopped screaming by the time C.A. Perez tased him. But his body shook violently each time he was tased.

16.   Because of how close I was to assault, the pepper spray was too strong for me to handle. I started coughing and my eyes began to burn, so I had to back up from my cell front and go to the part of my cell that was farthest from the hallway where the deputies were abusing Mr. Tillman. I retreated towards the back of my cell for about fifteen seconds, in which I also turned my head away from the assault.

17.   When I returned to my cell front, there were twenty to thirty deputies in the Module. Two deputies snatched up Mr. Tillman and walked him outside the Module.

18.   As he was escorted out, inmates started to yell at deputies, "That's fucked up," and "You didn't have to do that." A deputy responded, "What? All of a sudden you guys want to act as witnesses?"

19.   Minutes after, a Sergeant walked inside our Module to take pictures of where the incident took place. The Sergeant took about ten pictures and he did not interview me or ask me any questions about what had taken place right in front of my cell.

20.   A trustee came to clean up fifteen or so minutes after the Sergeant

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

Exhibit X
Page 180

left. The trustee mopped up the floor, and used a rag wipe down the blood from the wall.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed this 19th day of August, 2011 in Los Angeles, California.

_____/s/_____

Thaddeus Love

Exhibit X
Page 181



To Thaddaus Ray

TC

Exhibit 1

8-10 feet

Exhibit X
Page 182

# EXHIBIT "Y"

**Declaration of Juan Diego Mares**

I, Juan Diego Mares, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am twenty-one years old. I am currently housed at Twin Towers Correctional Facility ("TTCF") in Module 132, Pod E, Cell 6. My booking number is 2001972.

3. On or about the week of June 5, 2010, I was housed at Men's Central Jail ("MCJ") in Module 2600, Row D, Cell 3.

4. On Monday, we received our Commissary or store items.

5. On Tuesday, my cell and the other cells on my row were searched by the module deputies. When I got back to my cell, I noticed that my property was missing, including some of my Commissary items

6. Shortly after I got back to my cell, we were called out to Pill Call and I asked Deputy Carefoot if I could talk to a sergeant about my missing property.

7. He told me to go back to my cell. I told him that I wanted to talk to a sergeant. Deputy Carefoot told me no and then quickly said, "Alright, wait right there." He had me wait next to the showers on my row, which is an upstairs tier.

8. After 5-6 seconds later, he told me to interlace my fingers behind my back. I thought I was going to be handcuffed.

9. He shoved me against the wall really hard. I told him that I wanted to see a sergeant about my property. Deputy Carefoot said, "I don't care. It's a lost cause." I told him that my family had put money on my account so that I can buy things, like the property that is now missing from the search. Deputy Carefoot said, "I don't give a fuck." I again told him that I wanted to see a sergeant.

10. Deputy Carefoot then escorted me downstairs and then back upstairs again. I don't know why he did this, but I think he might have done this to see if the nurse was done with Pill Call on the bottom tier or row.

11. When we got back upstairs, Deputy Carefoot told me to go back to my cell. I

Exhibit Y
Page 183

again told him that I wanted to talk to a sergeant.

12.    He then grabbed my interlaced hands, which were still behind my back, and told me to spread my legs. I complied and spread my legs. He then kicked my legs so that my legs were spread even further. My legs were spread so far apart that I was leaning forward and was unstable.

13.    Deputy Carefoot asked, "You want to see a sergeant?" He then put up his hand and tried to slap his hand against my ear like he was going to pop my ear drums. I moved my head, which caused Deputy Carefoot to hit the back of my head.

14.    Deputy Carefoot then punched the right side of my face with a closed fist about 2-3 times. The punches felt like a painful sting and felt like I got hit with a baseball. He then grabbed me forcefully and threw me to the floor. As soon as I hit the floor, Deputy Carefoot kicked me about ten times on the left and right sides of my face, the right side of my jaw and the back of my head. He was kicked me so hard that I saw a pool of my own blood on the floor. It felt like he kicked me for about one minute.

15.    Once he finished kicking me, he said on his radio, "415." I found out that a 415 is a fight with a deputy. I had heard deputies say this on the radio when there's a fight going on. He then kicked my left ear three times. The kicks to my ear felt like a strong, heavy and painful pressure. It hurt so much that all I could feel was the pressure from the kicks. I got run over by a car in 2009 and the kicks to my ear was more painful.

16.    A couple of minutes later, I saw three deputies running up the stairs to where Deputy Carefoot and I were. I don't know what the deputies looked like because my vision was blurry. One of the deputies put handcuffs on me. Then the deputies picked me up and sat me on a bench in the hallway outside the 2000 floor. A deputy came over with a towel and wiped the blood off my face.

17.    While I sat on the bench, I saw one of the three deputies pat Deputy Carefoot on the back and say, "Oh, you got him pretty good."

18.    I saw a Senior Deputy in the hallway as well. I don't know his name, but he appeared to be Hispanic, about 5'7" to 5'8" tall, which is about my height. I told the Senior

Deputy that I wanted the deputy's name and pointed to Deputy Carefoot. Though this Senior Deputy didn't tell me Deputy Carefoot's name, I found out Deputy Carefoot's name from other inmates. I had given other inmates the deputy's description and they told me his name because they knew who I was talking about from the description I gave them.

19. The Senior Deputy said to me, "You ain't getting shit."

20. The deputies then took me to the Medical Clinic and the nurses there asked me what happened. I told them that one of the deputies beat me up. I saw one of the nurses write something down. I'm not sure what.

21. One of the nurses checked my jaw and said that I might have a fracture. She also checked my ear and said that I had a little scratch and there was blood coming from it.

22. At this point, I was having double vision and I was in a lot of pain. I also could barely talk because of the pain to my jaw.

23. The nurse told the deputies that I needed to go to the hospital.

24. The same time the nurses are examining me, the same Senior Deputy who was in the 2000 floor hallway asked me what happened. He said in front of the nurse, "Did you fall off your bunk?" I told him that I wasn't going to talk to him because he was a "two-striper", which meant that he was a Senior Deputy and that I didn't want to talk to him because he was a Senior Deputy on the 2000 module where I got beat up. I didn't think that he would be fair to me because I have seen him talking to the deputies on my module. I also told him that I wanted to talk to a sergeant. When the nurse walked away to get something to clean my ear, the Senior Deputy told me, "You know you're going to the same module once they're done cleaning you up." I took this as the Senior Deputy threatening me to not say anything.

25. Less than a minute later, I was placed on the gurney. While I was sitting on the gurney, a sergeant, lieutenant and a deputy came in. I don't know their names, but the sergeant was White, stocky and kind of bald. The lieutenant appeared to be either White or Hispanic, light-skinned with slicked back, short, dark hair. The deputy, whom I've seen on my module, was Hispanic, stocky, light-skinned with a bald head. While I was sitting on the gurney, I saw this deputy smirking and laughing at me.

26.    They did a video interview with me and the sergeant asked me what happened. I told them what happened and the sergeant asked me, "Did you hit my deputy with your elbow?"

27.    I told him that my hands had been interlocked behind me, my legs were spread so far apart that I was leaning forward and asked him if he was in that position if it was possible to hit someone with his elbow.

28.    He said, "No, it's not possible." I then responded, "So, I didn't hit your deputy." The sergeant then said, "No more questions."

29.    Once the interview ended, the paramedics came and I was escorted to the Los Angeles Medical Center + USC ("LCMC").

30.    When I got there, the doctor told me that I had a fractured jaw and that I would need to have my jaw wired shut for at least one month so that it could heal. A nurse then cleaned my ear and she said that I would need stitches. I asked her why and I told her that the nurse at TTCF's Medical said that I had a little scratch on my ear. The LCMC nurse said that part of the inside of my ear was split open and I was going to need stitches. She later told me that I got 8 stitches. Even after the nurse gave me 6 anesthesia shots to numb the pain, I could still feel the pain from the kicks to my ear.

31.    The doctor then checked my eye and he told me that the pupil had fallen off and that a piece of my cornea was missing.

32.    On July 30, 2010, I had eye surgery at LCMC where my lens was removed.

33.    From LCMC, I was then sent to the Correctional Treatment Center ("CTC"), which is located in TTCF. I filled out the Los Angeles Sheriff's Department's ("LASD") Inmate Complaint Form and handed it to a deputy. I don't know his name, but he was White, around 40-45 years old, white hair cut into a fade and around 5'8"-5'9" feet tall.

34.    The week of April 4th or the 11th, I'll be going to LCMC because the doctor said that I needed to have a tube inserted in my eye to drain the fluid that has built up in my eye. The eye doctor also said that I was going to need another surgery to put the lens back on and will be needing many more eye surgeries.

\ \ \

Exhibit Y
Page 186

The eye doctor told me that I may never get my vision back to where it was before Deputy Carefoot beat me up.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 19 day of April, 2011 in Los Angeles, California.

Juan Diego Mares

**Declaration of Juan Diego Mares**

I, Juan Diego Mares, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am twenty-one years old. I am currently housed at Twin Towers Correctional Facility ("TTCF") in Module 132, Pod E, Cell 6. My booking number is 2001972.

3.     On or about the week of June 5, 2010, I was housed at Men's Central Jail ("MCJ") in Module 2600, Row D, Cell 3.

4.     On Monday, we received our Commissary or store items.

5.     On Tuesday, my cell and the other cells on my row were searched by the module deputies. When I got back to my cell, I noticed that my property was missing, including some of my Commissary items

6.     Shortly after I got back to my cell, we were called out to Pill Call and I asked Deputy Carefoot if I could talk to a sergeant about my missing property.

7.     He told me to go back to my cell. I told him that I wanted to talk to a sergeant. Deputy Carefoot told me no and then quickly said, "Alright, wait right there." He had me wait next to the showers on my row, which is an upstairs tier.

8.     After 5-6 seconds later, he told me to interlace my fingers behind my back. I thought I was going to be handcuffed.

9.     He shoved me against the wall really hard. I told him that I wanted to see a sergeant about my property. Deputy Carefoot said, "I don't care. It's a lost cause." I told him that my family had put money on my account so that I can buy things, like the property that is now missing from the search. Deputy Carefoot said, "I don't give a fuck." I again told him that I wanted to see a sergeant.

10.     Deputy Carefoot then escorted me downstairs and then back upstairs again. I don't know why he did this, but I think he might have done this to see if the nurse was done with Pill Call on the bottom tier or row.

11.     When we got back upstairs, Deputy Carefoot told me to go back to my cell. I

Exhibit Y
Page 188

again told him that I wanted to talk to a sergeant.

12.    He then grabbed my interlaced hands, which were still behind my back, and told me to spread my legs. I complied and spread my legs. He then kicked my legs so that my legs were spread even further. My legs were spread so far apart that I was leaning forward and was unstable.

13.    Deputy Carefoot asked, "You want to see a sergeant?" He then put up his hand and tried to slap his hand against my ear like he was going to pop my ear drums. I moved my head, which caused Deputy Carefoot to hit the back of my head.

14.    Deputy Carefoot then punched the right side of my face with a closed fist about 2-3 times. The punches felt like a painful sting and felt like I got hit with a baseball. He then grabbed me forcefully and threw me to the floor. As soon as I hit the floor, Deputy Carefoot kicked me about ten times on the left and right sides of my face, the right side of my jaw and the back of my head. He was kicked me so hard that I saw a pool of my own blood on the floor. It felt like he kicked me for about one minute.

15.    Once he finished kicking me, he said on his radio, "415." I found out that a 415 is a fight with a deputy. I had heard deputies say this on the radio when there's a fight going on. He then kicked my left ear three times. The kicks to my ear felt like a strong, heavy and painful pressure. It hurt so much that all I could feel was the pressure from the kicks. I got run over by a car in 2009 and the kicks to my ear was more painful.

16.    A couple of minutes later, I saw three deputies running up the stairs to where Deputy Carefoot and I were. I don't know what the deputies looked like because my vision was blurry. One of the deputies put handcuffs on me. Then the deputies picked me up and sat me on a bench in the hallway outside the 2000 floor. A deputy came over with a towel and wiped the blood off my face.

17.    While I sat on the bench, I saw one of the three deputies pat Deputy Carefoot on the back and say, "Oh, you got him pretty good."

18.    I saw a Senior Deputy in the hallway as well. I don't know his name, but he appeared to be Hispanic, about 5'7" to 5'8" tall, which is about my height. I told the Senior

Deputy that I wanted the deputy's name and pointed to Deputy Carefoot. Though this Senior Deputy didn't tell me Deputy Carefoot's name, I found out Deputy Carefoot's name from other inmates. I had given other inmates the deputy's description and they told me his name because they knew who I was talking about from the description I gave them.

19.    The Senior Deputy said to me, "You ain't getting shit."

20.    The deputies then took me to the Medical Clinic and the nurses there asked me what happened. I told them that one of the deputies beat me up. I saw one of the nurses write something down. I'm not sure what.

21.    One of the nurses checked my jaw and said that I might have a fracture. She also checked my ear and said that I had a little scratch and there was blood coming from it.

22.    At this point, I was having double vision and I was in a lot of pain. I also could barely talk because of the pain to my jaw.

23.    The nurse told the deputies that I needed to go to the hospital.

24.    The same time the nurses are examining me, the same Senior Deputy who was in the 2000 floor hallway asked me what happened. He said in front of the nurse, "Did you fall off your bunk?" I told him that I wasn't going to talk to him because he was a "two-striper", which meant that he was a Senior Deputy and that I didn't want to talk to him because he was a Senior Deputy on the 2000 module where I got beat up. I didn't think that he would be fair to me because I have seen him talking to the deputies on my module. I also told him that I wanted to talk to a sergeant. When the nurse walked away to get something to clean my ear, the Senior Deputy told me, "You know you're going to the same module once they're done cleaning you up." I took this as the Senior Deputy threatening me to not say anything.

25.    Less than a minute later, I was placed on the gurney. While I was sitting on the gurney, a sergeant, lieutenant and a deputy came in. I don't know their names, but the sergeant was White, stocky and kind of bald. The lieutenant appeared to be either White or Hispanic, light-skinned with slicked back, short, dark hair. The deputy, whom I've seen on my module, was Hispanic, stocky, light-skinned with a bald head. While I was sitting on the gurney, I saw this deputy smirking and laughing at me.

26.    They did a video interview with me and the sergeant asked me what happened. I told them what happened and the sergeant asked me, "Did you hit my deputy with your elbow?"

27.    I told him that my hands had been interlocked behind me, my legs were spread so far apart that I was leaning forward and asked him if he was in that position if it was possible to hit someone with his elbow.

28.    He said, "No, it's not possible." I then responded, "So, I didn't hit your deputy." The sergeant then said, "No more questions."

29.    Once the interview ended, the paramedics came and I was escorted to the Los Angeles Medical Center + USC ("LCMC").

30.    When I got there, the doctor told me that I had a fractured jaw and that I would need to have my jaw wired shut for at least one month so that it could heal. A nurse then cleaned my ear and she said that I would need stitches. I asked her why and I told her that the nurse at TTCF's Medical said that I had a little scratch on my ear. The LCMC nurse said that part of the inside of my ear was split open and I was going to need stitches. She later told me that I got 8 stitches. Even after the nurse gave me 6 anesthesia shots to numb the pain, I could still feel the pain from the kicks to my ear.

31.    The doctor then checked my eye and he told me that the pupil had fallen off and that a piece of my cornea was missing.

32.    On July 30, 2010, I had eye surgery at LCMC where my lens was removed.

33.    From LCMC, I was then sent to the Correctional Treatment Center ("CTC"), which is located in TTCF. I filled out the Los Angeles Sheriff's Department's ("LASD") Inmate Complaint Form and handed it to a deputy. I don't know his name, but he was White, around 40-45 years old, white hair cut into a fade and around 5'8"-5'9" feet tall.

34.    The week of April 4th or the 11th, I'll be going to LCMC because the doctor said that I needed to have a tube inserted in my eye to drain the fluid that has built up in my eye. The eye doctor also said that I was going to need another surgery to put the lens back on and will be needing many more eye surgeries.

\ \ \

Exhibit Y
Page 191

The eye doctor told me that I may never get my vision back to where it was before Deputy Carefoot beat me up.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this _____ day of April, 2011 in Los Angeles, California.

_____/s/_____

Juan Diego Mares

# EXHIBIT "Z"

**Declaration of Shawn Meyers**

I, Shawn Meyers, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am fifty-three years old.  I have been at Men's Central Jail ("MCJ") since December 2008.  I've been housed in Module 7200, Cell 7176 since 2010.  My booking number is 1727226.

<u>Friday, January 21, 2011</u>

3.      On Friday, January 21, 2011, I had a visit in the MCJ's Attorney Room from the ACLU of Southern California's Jails Project Coordinator, Esther Lim.  This was approximately the fifth time that I met with Ms. Lim in the Attorney Room.  We had been speaking about Deputy Johnson in Module 2700, in addition to things I have seen in the jail that I believe violate Title 15.

4.      On this day, as Ms. Lim and I were talking, I saw Deputy Hinton, who is the Legal Deputy and the deputy assigned to pass out the prisoners' legal mail, walk from the front of the Attorney Room to the back of the Attorney Room where we were sitting.  He walked past us and then walked approximately _four to six feet_ away from us and stood there with his back towards us.  He was standing there for approximately _five_ minutes then walked away.

<u>Monday, January 24, 2011</u>

5.      On Monday, January 24, 2011 at approximately 4:30 in the afternoon, I was in the Law Library on the 2000 floor of MCJ.  I was in the Law Library because I am a pro per prisoner, a prisoner who represents himself on his own criminal case.  Pro per prisoners are supposed to get two hours of Law Library time a day, but lately we've only been getting an hour and a half.

6.      After I had finished writing up a motion for my case, I played a game of dominoes with another prisoner named Reginald Ford at approximately 5:45 in the evening, while waiting for the deputies to let us out of the library.  I have seen other prisoners play dominoes while they wait for the deputies to let them out of the Law Library.

7. At approximately six o'clock in the evening, I left the Law Library on the 2000 floor of MCJ. I went down the elevator to the first floor of the jail near the gated Control Room.

8. There is a desk in the hallway directly across from the gated Control Room and Deputies Johnson and Hinton were standing there.

9. Deputy Hinton, said to me, "Myers, over here." I wheeled over to him and Deputy Johnson. I use a wheelchair because *I have spinal injuries and I can't walk*. He asked me, "Where's your dominoes?" Deputy Johnson looked at me, crossed his arms and smirked.

10. Deputy Hinton then put on a pair of latex gloves in an attempt to search through my belongings. I carry some of my belongings and legal paperwork in a bag that is strapped onto the back of my wheelchair.

11. When Deputy Hinton put on the latex gloves, Deputy Johnson walked away. At first, I wasn't sure what he was referencing to when he asked me where my dominoes were.

12. I told Deputy Hinton, "They're [dominoes] in my bag." Deputy Hinton then said to me, "Oh, now you all of a sudden have your dominoes. Here they are. You were playing dominoes before you left the law library. That's against pro per rules." I asked him, "Where does it say that playing dominoes is against the rules?"

13. Deputy Hinton then said to me, "I just took away your fucking pro per status and the other dude's [Ford] *other inmate I was playing dominoes with* status. This is retaliation for you having the ACLU in on us. You know when the ACLU lady and you were sitting for two hours in the Attorney Room talking about Johnson, what's going on with Johnson and the stuff that's going on in 7200."

14. I asked him, "Are you serious? Well, you better write me up and we'll be going to Court on Thursday so I'll be telling the judge that and I'll be asking the ACLU to be in court too."

15. Deputy Hinton then told me, "Get the fuck out of here."

16. I wheeled away from Deputy Hinton and went up the elevator to my module.

17. When I got to my cell, I had to wait for a deputy to open up my cell door to get in. Deputy Johnson came over and said to me as he was opening my door, "So you like getting searched?" I told him, "Doesn't bother me. It's your house." I then wheeled in my cell and

Deputy Johnson closed the door.

Tuesday, January 25, 2011

18.    On Tuesday, January 25, 2011 at approximately 7:30 in the evening, I went to the Law Library. My wristband, that contains a bar code and identifying information was scanned. I was informed by Prisoners Reginald Ford and Willie Mays that my pro per status had been taken. They told me that Deputy Hinton came down to the law library and was telling all the prisoners in the law library about my cases and why I was in the law library. Mr. Ford and Mays told me that Deputy Hinton told them that my pro per status was taken away because "He talked to the ACLU." Mr. Ford and Mays also said that Deputy Hinton told them that "He's in the law library so that he can represent himself on misdemeanors."

Thursday, January 27, 2011

19.    On Thursday, January 27, 2011 at approximately 12 o'clock in the afternoon, I went to the law library. Deputy Hinton was inside the law library, but didn't say anything to me.

Sunday, January 30, 2011

20.    On Sunday, January 30, 2011 at approximately 10:30 in the morning, I was on the eighth floor for a visit from a friend. I spoke to her for approximately thirty-five minutes before the phones, with which we were communicating, shut off, indicating that our visit was over.

21.    I exited the visiting area and wheeled over towards the elevators to go back to my housing area. As I was wheeling through the area, I noticed that the day room door was open, but there was no one in the day room. I didn't see any prisoners or deputies.

22.    I pushed the elevator button to go down. The elevator door opened and I entered the elevator. I am in a wheelchair so typically when I am alone in an elevator, I will wheel myself in towards the back wall then turn left so that I am next to the elevator's control panel and facing forward.

23.    I proceeded to do what I described above. I wheeled myself in, facing the back wall, but I was closer to the railing that is attached to the left wall of the elevator, if you are facing the back wall of the elevator. Before I could turn left, two deputies entered the elevator and one of them said to me, "Don't turn around and face the wall." Deputies typically give this

command to prisoners when we are in the elevator with them. Prisoners who are physically able are supposed to face the back of the elevator and those in wheelchairs are to face the wall in their chairs.

24.    One of the deputies told me as he was standing behind me, "Don't you know it's not nice to be fucking with us and talking to the ACLU?"

25.    One of the deputies then pushed the right side of my body and chair and slammed me against the left wall of the elevator. My left shoulder and rib area was slammed up against the handrail that is attached to the left wall of the elevator.

26.    I told the deputies, "Well, Johnson could do better than that." I made this comment to them because I was scared and I feared for my life due to a prior incident I had with Deputy Johnson when he slammed me against the wall in my cell while I was in my wheelchair. I thought by saying this I could convey to the deputies that Deputy Johnson had won, hoping they wouldn't hurt me further.

27.    One of the deputies then said to me, "That's your warning." One of them then pressed the number two button and both deputies exited out of the elevator. When I turned my wheelchair around, they were gone and I saw that the number two button was pressed.

28.    I then rode the elevator to my module and entered my cell.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 4th day of February, 2011 in Los Angeles, California.

Shawn Meyers

# EXHIBIT "AA"

**Declaration of Fred Nowden**

I, Fred Nowden, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am 36 years old. I was arrested on November 19, 2009 and am currently living in Men's Central Jail ("MCJ") Module 2500, cell number 7. My booking number is 2136136.

3.    On or about February 18, 2011 I witnessed seven or eight deputies beating another inmate, Garry Crumpton.

4.    That day, I was walking from the dormitory to the "tank" with other inmates on 2000 floor. The tank is where they house all the inmates waiting to see the judge in court. A bald Asian male deputy and a Hispanic male deputy were leading us to the tank. Inmate Garry Crumpton, who is my friend and also lived on the 2000 floor, was walking 2 or 3 people behind me. While we were walking in line, I was talking to Mr. Crumpton and another inmate directly behind me when the next thing I heard was one of the deputies yelling, "what did you say?!" "are you stupid or something!?" I'm not sure which deputy yelled this.

5.    I was curious to see who the deputy was yelling at so I turned my head over my shoulder. A short white deputy who was standing five feet away from me instructed me and the other inmates in the line to turn and face the wall. The deputies keeping us in line carried metal bars in front of them to discourage any of us from turning around.

6.    I was able to sneak a couple peaks over my shoulder and saw Garry Crumpton lying on his stomach on the floor with both arms spread out above his head, in surrender. One of the deputies had a flashlight pushing on the back of Garry Crumpton's neck, pinning him down. Crumpton was not resisting to the seven or eight deputies who were violently punching and kicking him all over his body. Garry was just lying there absorbing the blows, while the deputies kept

Exhibit AA
Page 197

yelling, "stop resisting!"

7.    The beating seemed to last for about 10 to 20 seconds. The last glance I took over my shoulder, I saw Mr. Crumpton shaking on the floor after most of the deputies beating him up were gone. Then the short white deputy who told us to turn and face the wall told me to get into another line and we continued to walk to the tank.

8.    I don't know what happened to Mr. Crumpton after the beating. I think he went to the hospital because I saw him a couple days later with a soft brace around his neck.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed July 12, 2011 in Los Angeles, California.

_____

Fred Nowden

# EXHIBIT "BB"

## DECLARATION OF RASHAAD PILGRIM

I, RASHAAD PILGRIM, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I have been an inmate in the Los Angeles County Jail for 15 months.

3. On Monday, July 19, 2010, I was housed in Men's Central Jail Module 3200 Row B Cell 6, where I had lived for approximately two months. At about 6:30 a.m. of that day, the deputies of the row opened the cell doors of our cells and told the inmates to line up for pill call. Pill call occurs daily at about the same time and inmates receive their medication during pill call. I lined up with about ten other inmates of my row in the hallway of our row for pill call.

4. The deputies of the row then told the inmates to face the wall. I did not know the deputies' names at that time; all the deputies look the same to me. The other inmates and I faced the wall of our row. Then a deputy came up from behind me and interlaced my fingers behind my back. The deputy said, "What's your fucking problem?" I did not know what he was referring to because I was just facing the wall, just like the other inmates. I don't know why I was singled out. I replied, "I don't have a problem." The deputy behind me said, "Don't respond!" or something like that. Then the deputy punched me in the right side on my face with a closed fist.

5. I turned my head a little to the right to see the deputy's name tag on his uniform. The name tag said, "Reza." I don't know if I've seen Deputy Reza before because all the deputies look the same to me. Deputy Reza saw me looking at his name tag and punched me in the right side of my face with a closed fist again. Then another deputy said, "What's your fucking problem?" I did not reply. The deputy punched me in the shoulder. Deputy Reza and the other deputy then left me alone and went to the head of the pill call line.

6. I stayed in the pill call line, got my pills, and, as I was returning to my cell, I saw the name tag of the other deputy, the one who punched me in the shoulder. His name tag said, "Milpad." I returned to my cell and the other inmates of the row said they saw what happened and that I should call my mother to tell her what happened. Some of the inmates of the row began to shout out their names and booking numbers and said they saw the deputies beat me and would testify against the deputies. I remember some

Exhibit BB
Page 199

of their names were Desmond Little, Jamal Smith, and Milton Clank. I called my mother and told her what happened. I was also worried that Deputy Reza and Deputy Milpad heard the other inmates telling me to call my mother and report the incident.

7.    A couple minutes later, Deputy Reza and Deputy Milpad opened the cell doors of the row and told the inmates to line up in front of the laundry room in order to go to the day room, where we usually have our recreation time. About 20 other inmates and I lined up outside of the laundry room in the hallway of the row. The two deputies told us to strip to our boxers and shake out our clothes, so that any contraband would fall out. The other inmates and I did that and then we put our clothes back on. The deputies then told everyone to go down to the day room for recreation. Deputy Milpad then told me to stay behind and face the wall.

8.    The other inmates left the row and I stayed in the hallway of the row and faced the wall. Deputy Milpad asked me what was in my pockets. I had my socks rolled up in my pockets so I took them out (they didn't fall out when I shook out my clothes during the search) and dropped them to the floor. One the deputies (I do not know which one because I was facing the wall) spread my legs open from behind, like he was going to search me. Then, the deputies began to punch me in the face and head. I lost count of how many punches there were because there were so many. I lost consciousness and when I woke up I was on the floor. The deputies were still punching me. I tried to cover my face with my fingers to protect myself, but then one of the deputies pulled my fingers and bent them, like he was trying to break my fingers off.

9.    I screamed for help the entire time and the deputies said, "Stop fighting." I was not fighting. I screamed, "Why?" because I did not know why they were doing this to me and how to make it stop. They kept on punching me in the face and then one of them shoved my head face-first into the concrete floor, chipping my teeth.

10.    When I looked up again, I saw about 20 other deputies surrounding me. They took me to the medical clinic at Men's Central Jail. And then the paramedics arrived and took me to Los Angeles County + University of Southern California medical hospital.

11.    I was at the hospital from approximately 11 a.m. on Monday, July 19, 2010 to about 2 a.m. on Tuesday, July 20th, 2010. While in the hospital, I had a CAT scan and surgery to remove

hemoglobin in my ear. The doctors told me I had fractures in my face, blunt head trauma, problems with my right ear, and a chipped tooth.

12.    I told the doctors the deputies had beat me and I was afraid to go back to jail. When I got back to jail on Tuesday, July 20, 2010, I was housed in the medical ward at Men's Central Jail, in module 7000.

13.    I have never filed a complaint before and never been put in disciplinary for any reason. I don't know why the deputies targeted me and I am afraid they will try to kill me.

14.    On Saturday, July 24, the deputies told me I was on disciplinary and I lost privileges like recreation, phones, visits and commissary for 29 days for fighting with the deputies. I told the review board the deputies beat me up and I did not fight them but a senior deputy said the deputies would not beat me up for no reason. The senior deputy gave me a paper that said I am on Loss of Privileges" (LOP).

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed July 26, 2010 in Los Angeles, California.

_____

**RASHAAD PILGRIM**

# DECLARATION OF RASHAAD PILGRIM

I, RASHAAD PILGRIM, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I have been an inmate in the Los Angeles County Jail for 15 months.

3.    On Monday, July 19, 2010, I was housed in Men's Central Jail Module 2300 Row B Cell 6, where I had lived for approximately two months. At about 6:30 a.m. of that day, the deputies of the row opened the cell doors of our cells and told the inmates to line up for pill call. Pill call occurs daily at about the same time and inmates receive their medication during pill call. I lined up with about ten other inmates of my row in the hallway of our row for pill call.

4.    The deputies of the row then told the inmates to face the wall. I did not know the deputies' names at that time; all the deputies look the same to me. The other inmates and I faced the wall of our row. Then a deputy came up from behind me and interlaced my fingers behind my back. The deputy said, "What's your fucking problem?" I did not know what he was referring to because I was just facing the wall, just like the other inmates. I don't know why I was singled out. I replied, "I don't have a problem." The deputy behind me said, "Don't respond!" or something like that. Then the deputy punched me in the right side on my face with a closed fist.

5.    I turned my head a little to the right to see the deputy's name tag on his uniform. The name tag said, "Reza." I don't know if I've seen Deputy Reza before because all the deputies look the same to me. Deputy Reza saw me looking at his name tag and punched me in the right side of my face with a closed fist again. Then another deputy said, "What's your fucking problem?" I did not reply. The deputy punched me in the shoulder. Deputy Reza and the other deputy then left me alone and went to the head of the pill call line.

6.    I stayed in the pill call line, got my pills, and, as I was returning to my cell, I saw the name tag of the other deputy, the one who punched me in the shoulder. His name tag said, "Milpad." I returned to my cell and the other inmates of the row said they saw what happened and that I should call my mother to tell her what happened. Some of the inmates of the row began to shout out their names and booking numbers and said they saw the deputies beat me and would testify against the deputies. I remember some



Exhibit BB
Page 202

of their names were Desmond Little, Jamal Smith, and Milton Clank. I called my mother and told her what happened. I was also worried that Deputy Reza and Deputy Milpad heard the other inmates telling me to call my mother and report the incident.

7.    A couple minutes later, Deputy Reza and Deputy Milpad opened the cell doors of the row and told the inmates to line up in front of the laundry room in order to go to the day room, where we usually have our recreation time. About 20 other inmates and I lined up outside of the laundry room in the hallway of the row. The two deputies told us to strip to our boxers and shake out our clothes, so that any contraband would fall out. The other inmates and I did that and then we put our clothes back on. The deputies then told everyone to go down to the day room for recreation. Deputy Milpad then told me to stay behind and face the wall.

8.    The other inmates left the row and I stayed in the hallway of the row and faced the wall. Deputy Milpad asked me what was in my pockets. I had my socks rolled up in my pockets so I took them out (they didn't fall out when I shook out my clothes during the search) and dropped them to the floor. One the deputies (I do not know which one because I was facing the wall) spread my legs open from behind, like he was going to search me. Then, the deputies began to punch me in the face and head. I lost count of how many punches there were because there were so many. I lost consciousness and when I woke up I was on the floor. The deputies were still punching me. I tried to cover my face with my fingers to protect myself, but then one of the deputies pulled my fingers and bent them, like he was trying to break my fingers off.

9.    I screamed for help the entire time and the deputies said, "Stop fighting." I was not fighting. I screamed, "Why?" because I did not know why they were doing this to me and how to make it stop. They kept on punching me in the face and then one of them shoved my head face-first into the concrete floor, chipping my teeth.

10.    When I looked up again, I saw about 20 other deputies surrounding me. They took me to the medical clinic at Men's Central Jail. And then the paramedics arrived and took me to Los Angeles County + University of Southern California medical hospital.

11.    I was at the hospital from approximately 11 a.m. on Monday, July 19, 2010 to about 2 a.m. on Tuesday, July 20th, 2010. While in the hospital, I had a CAT scan and surgery to remove



Exhibit BB
Page 203

Case 2:12-cv-00428-MWF-E    Document 20-6    Filed 02/27/12    Page 99 of 151   Page ID #:554

hemoglobin in my ear. The doctors told me I had fractures in my face, blunt head trauma, problems with my right ear, and a chipped tooth.

12. I told the doctors the deputies had beat me and I was afraid to go back to jail. When I got back to jail on Tuesday, July 20, 2010, I was housed in the medical ward at Men's Central Jail, in module 7000.

13. I have never filed a complaint before and never been put in disciplinary for any reason. I don't know why the deputies targeted me and I am afraid they will try to kill me.

RP 14. On Saturday, July 24, the deputies told me I was on disciplinary and I lost privileges like recreation, phones, visits, and commissary for 29 days for fighting with the deputies. I told the review board the deputies beat me up and I did not fight them but a senior deputy said the deputies would not beat me for no reason. The senior deputy gave me a papers that said I am on "Loss of Privileges" (LOP).

RP

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed July 26, 2010 in Los Angeles, California.

**RASHAAD PILGRIM**

Exhibit BB
Page 204

# EXHIBIT "CC"

**Declaration of Alex Rosas**

I, Alex Rosas, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am 24 years old and am currently housed at Men's Central Jail ("MCJ"), Module 3300, Row B, Cell 17. My booking number is 2598123.

3.    I am writing this declaration to describe the beating of a fellow inmate, Arturo Fernandez, on July 22, 2011 and an incident when deputies attacked and threatened me on August 9, 2011.

4.    On July 22, 2011, Deputies Bearer and Luviano were escorting another inmate and me from the visiting area at MCJ to our module. As we were getting closer to the module, I heard the deputies' radio, but didn't hear what it said. Attached is a diagram of the hallway and the module, labeled as Exhibit 1. My position before entering the module is labeled as "R1", Deputy Luviano is marked as "L", and Deputy Bearer is marked as "B".

5.    Deputy Bearer left us and ran over to the module and opened the door. I didn't know what was going on. I looked back and I saw what looked like 20-30 deputies running towards my module.

6.    Before going through the door to the module, Deputy Luviano told us to go inside the module and face the wall, which we did. My position is marked "R2". When I walked in, I saw Mr. Fernandez handcuffed with blood all over his face.

7.    Deputy Luviano told me to turn around and to stop looking.

8.    I looked over and saw that there were several deputies surrounding Mr. Fernandez and were punching him. Mr. Fernandez is marked as "F". I also saw that Deputy Luviano had Mr. Fernandez' neck in the crook of his arm, holding him in a headlock and saw him throw Mr. Fernandez to the ground. I recognized Deputies Guerrero, Luviano, Bearer and Ibarra as some of the deputies who were beating up Mr. Fernandez. I knew who all of these deputies were because they work on my module. I also heard Mr. Fernandez yelling that he couldn't breathe.

9.    As I was watching the deputies beat Mr. Fernandez, I didn't see Mr. Fernandez fighting with them. I saw that he was handcuffed from behind and being pummeled by deputies. Mr. Fernandez was only wearing his boxers and his shower shoes. I heard deputies yelling that he was resisting, but he wasn't.

Exhibit CC
Page 205

*[handwritten across top: I also saw Deputy [illegible] tackle Mr. Fernandez then press with his knee and all his weight onto Mr. Fernandez' back. I then heard Mr. Fernandez yelling out in pain. AR]*

10. One of the deputies told us to go to our row and we began walking towards our row. As I walked towards my row, I looked back in time to see the deputies dragging Mr. Fernandez out of the door that leads out to the main hallway on the 3000 floor. I didn't see where the deputies took him.

11. A deputy then walked over to us, opened up the gate to our row and I walked to my cell.

12. An hour later, after I had been let inside my cell, Deputies Ibarra and Luviano came to my cell and said to me, "You better not saying anything." I told them that I hadn't seen anything. I was afraid that if I had told them that I had seen the deputies beat up Mr. Fernandez that the deputies were going to do something bad to me or arrange for other inmates to attack me.

13. A few days later, Deputies Ibarra and Luviano again came to my cell and threatened me to not to saying anything. I again told them that I hadn't seen anything. I was very scared that something was going to happen to me.

14. On August 9, 2011, Deputies Bearer and Ibarra came to my cell and told me to "Cuff up", which means to get ready to be handcuffed. I asked them why and they told me, "We're going to search your cell. An inmate told us that you have something in your cell." I told them that I didn't have anything in my cell nor did I have anything to hide. The deputies said, "Tell us where it's at. If you tell us, we won't take you to the 'hole'" I again told them that I didn't have anything. The deputies said, "We're going to toss up your cell." They handcuffed me and escorted me out to the main hallway on the 3000 floor and had me sit outside, facing the wall.

15. *Five minutes AR* later, Deputy Luviano told me to move away from the door. I felt like he didn't want me near the door, so that the inmates wouldn't be able to see the deputies do anything to me. I complied and moved.

16. Deputies Ibarra and Bearer then came up to me and said, "Why did you put something in your phone?" I asked them that I didn't put anything in the phone that is in my cell and asked how I was going to be able to put anything in my phone without any tools. The deputies told me that they had found a razor that was made into a "slicer" or a type of weapon. I

Exhibit CC
Page 206

again told them that I hadn't done it and the weapon wasn't mine.

17.    Deputy Luviano then said to me, "Why are you lying to my deputies?" After he made this comment, he punched the back of my head 4-5 times.

18.    I told him, "I'm not lying, sir." I was trying to be extremely polite because I was already scared that the deputies were going to try to do something to me because the deputies had come up to my cell after they beat up Mr. Fernandez.

19.    One of the deputies said to me, "You're going to the 'hole' for the 'slicer.'"

20.    ~~They escorted me to Module _____ and had me sit outside on the bench.~~ During the course of an hour, the deputies would mockingly ask me, "Are you tired?" several times. An hour later, the deputies came to my cell with the disciplinary paperwork.

21.    The deputies said to me, "Look. We're going to make this easier for you. Write that you had the 'slicer' and we won't add on any charges." I took this to mean that if I lied and confessed that the "slicer" was mine that they wouldn't take me to the "hole" and they wouldn't file any assault on deputies charges against me. I have heard from a lot of inmates that the deputies will file false charges against them after the deputies beat up inmates and saying that it was the inmates who assaulted the staff.

22.    I refused to sign the paperwork. Deputy Ibarra told Deputy Bearer, "Take him to the 'hole.'"

23.    When I was escorted into the "hole" in Module 3301 , Row A , Cell 6 , I asked Deputy Reza if I could get a complaint form. Deputy Reza told me, "You don't get complaint forms in the hole." I told him that I'd ask the afternoon shift deputies for a complaint form as Deputy Reza worked in the mornings. Deputy Reza then told me, "I'll talk to the PM shift to make sure you don't get one."

24.    Even after Deputy Reza said this to me, I waited until the afternoon shift deputies

\\\

\\\

\\\

\\\

Exhibit CC
Page 207

came and asked them for a complaint form.  They told me that I couldn't have one.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed this 22nd day of August, 2011 in Los Angeles, California.

Rosas A.

Alex Rosas

Exhibit CC
Page 208



Exhibit CC
Page 209

**Declaration of Alex Rosas**

I, Alex Rosas, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am 24 years old and am currently housed at Men's Central Jail ("MCJ"), Module 3300, Row B, Cell 17. My booking number is 2598123.

3.    I am writing this declaration to describe the beating of a fellow inmate, Arturo Fernandez, on July 22, 2011 and an incident when deputies attacked and threatened me on August 9, 2011.

4.    On July 22, 2011, Deputies Bearer and Luviano were escorting another inmate and me from the visiting area at MCJ to our module. Attached is a diagram of the hallway and the module, labeled as Exhibit 1. As we were getting closer to the module, I heard the deputies' radio, but didn't hear what it said. My position before entering the module is labeled as "R1", Deputy Luviano is marked as "L" and Deputy Bearer is marked as "B."

5.    Deputy Bearer left us and ran over to the module and opened the door. I didn't know what was going on. I looked back and I saw what looked like 20-30 deputies running towards my module.

6.    Before going through the door to the module, Deputy Luviano told us to go inside the module and face the wall, which we did. When I walked in, I saw Mr. Fernandez handcuffed with blood all over his face.

7.    Deputy Luviano told me to turn around and to stop looking.

8.    I looked over and saw that there were several deputies surrounding Mr. Fernandez and were punching him. Mr. Fernandez is marked as "F." I also saw that Deputy Luviano had Mr. Fernandez' neck in the crook of his arm, holding him in a headlock and saw him throw Mr. Fernandez to the ground. I recognized Deputies Guerrero, Luviano, Bearer and Ibarra as some of the deputies who were beating up Mr. Fernandez. I knew who all of these deputies were because they work on my module. I also heard Mr. Fernandez yelling that he couldn't breathe.

9.    As I was watching the deputies beat Mr. Fernandez, I didn't see Mr. Fernandez

Exhibit CC
Page 210

fighting with them. I saw that he was handcuffed from behind and being pummeled by deputies. Mr. Fernandez was only wearing his boxers and his shower shoes. I heard the deputies yelling that he was resisting, but he wasn't. I also saw Deputy Bearer tackle Mr. Fernandez then press with his knee with all his weight onto Mr. Fernandez' back. I then heard Mr. Fernandez yelling out in pain.

10.   One of the deputies told us to go to our row and we began walking towards our row. As I walked towards my row, I looked back in time to see the deputies dragging Mr. Fernandez out of the door that leads out to the main hallway on the 3000 floor. I didn't see where the deputies took him.

11.   A deputy then walked over to us, opened up the gate to our row and I walked to my cell.

12.   An hour later, after I had been let inside my cell, Deputies Ibarra and Luviano came to my cell and said to me, "You better not saying anything." I told them that I hadn't seen anything. I was afraid that if I had told them that I had seen the deputies beat up Mr. Fernandez that the deputies were going to do something bad to me or arrange for other inmates to attack me.

13.   A few days later, Deputies Ibarra and Luviano again came to my cell and threatened me to not to saying anything. I again told them that I hadn't seen anything. I was very scared that something was going to happen to me.

14.   On August 9, 2011, Deputies Bearer and Ibarra came to my cell and told me to "Cuff up", which means to get ready to be handcuffed. I asked them why and they told me, "We're going to search your cell. An inmate told us that you have something in your cell." I told them that I didn't have anything in my cell nor did I have anything to hide. The deputies said, "Tell us where it's at. If you tell us, we won't take you to the 'hole'" I again told them that I didn't have anything. The deputies said, "We're going to toss up your cell." They handcuffed me and escorted me out to the main hallway on the 3000 floor and had me sit outside, facing the wall.

15.   Five minutes later, Deputy Luviano told me to move away from the door. I felt like he didn't want me near the door, so that the inmates wouldn't be able to see the deputies do

Exhibit CC
Page 211

anything to me.  I complied and moved.

16.    Deputies Ibarra and Bearer then came up to me and said, "Why did you put something in your phone?" I asked them that I didn't put anything in the phone that is in my cell and asked how I was going to be able to put anything in my phone without any tools.  The deputies told me that they had found a razor that was made into a "slicer" or a type of weapon.  I again told them that I hadn't done it and the weapon wasn't mine.

17.    Deputy Luviano then said to me, "Why are you lying to my deputies?" After he made this comment, he punched the back of my head 4-5 times.

18.    I told him, "I'm not lying, sir." I was trying to be extremely polite because I was already scared that the deputies were going to try to do something to me because the deputies had come up to my cell after they beat up Mr. Fernandez.

19.    One of the deputies said to me, "You're going to the 'hole' for the 'slicer.'"

20.    During the course of an hour, the deputies would mockingly ask me, "Are you tired?" several times.  An hour later, the deputies came to my cell with the disciplinary paperwork.

21.    The deputies said to me, "Look.  We're going to make this easier for you.  Write that you had the 'slicer' and we won't add on any charges." I took this to mean that if I lied and confessed that the "slicer" was mine that they wouldn't take me to the "hole" and they wouldn't file any assault on deputies charges against me.  I have heard from a lot of inmates that the deputies will file false charges against them after the deputies beat up inmates and saying that it was the inmates who assaulted the staff.

22.    I refused to sign the paperwork.  Deputy Ibarra told Deputy Bearer, "Take him to the 'hole.'"

23.    When I was escorted into the "hole" in Module 3301, Row A, Cell 6, I asked Deputy Reza if I could get a complaint form.  Deputy Reza told me, "You don't get complaint forms in the hole." I told him that I'd ask the afternoon shift deputies for a complaint form as Deputy Reza worked in the mornings.  Deputy Reza then told me, "I'll talk to the PM shift to make sure you don't get one."

Exhibit CC
Page 212

24.    Even after Deputy Reza said this to me, I waited until the afternoon shift deputies came and asked them for a complaint form.  They told me that I couldn't have one.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed this 22nd day of August, 2011 in Los Angeles, California.

_____/s/_____

Alex Rosas

Exhibit CC
Page 213



Exhibit CC
Page 214

# EXHIBIT "DD"

**Declaration of Mani Sadri**

I, Mani Sadri, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am thirty-~~four~~ five [M.S] years old. I have been at Men's Central Jail ("MCJ") since July 2010. I am currently housed in Module 3500, Row ~~D~~ B [M.S] 19 [M.S], Cell ~~11~~. My booking number is 2388924.

3.    On or about Friday, January 28, 2011, after the morning pill call, I was in my cell.

4.    A deputy came to my cell and said that I had a pass. ~~I don't the name of the deputy, but h~~ His name is Deputy [M.S] Carbajal [M.S] He is Hispanic, tall and bald. He handcuffed me with my hands behind me and waist-cuffed me, which means that I have chains around my waist and wrist.

5.    ~~He~~ Deputy Carbajal [M.S] escorted me down the stairs to the first floor of the module. There was a nurse standing in front of the control booth on the first floor of the module.

6.    The nurse told ~~the~~ [M.S] Deputy Carbajal [M.S] that she needed to share some medical information with me regarding test results and that it was a confidential and private matter. I had taken a court-ordered medical exam approximately at the end of November 2010 and this was the exam that the nurse was referring to.

7.    The nurse asked ~~the~~ Deputy Carbajal [M.S] if there was a room where she and I could go to talk in private.

8.    [M.S] The ~~Deputy~~ Carbajal [M.S] told her that the conversation needed to be done in front of him.

9.    [M.S] The ~~Deputy~~ Carbajal [M.S] walked approximately fifteen feet away from where the nurse and I were standing.

10.    The nurse gave me a letter that was from the Los Angeles Sheriff's Department's headquarters as there was a seal on top of the letter.

11.    She told me that I needed to take the letter she was going to provide me after the conversation; and that I was to take the letter to court with me in March 2011 and give it to the judge.

12.    After she reviewed the letter's contents with me, she told ~~the~~ [M.S] Deputy Carbajal that I needed to sign a form indicating that she had this conversation with me.

*Carbajal M.S*

13. The Deputy said that he couldn't release me from my handcuffs. I wasn't able to sign the form. The nurse then said that she would write down in her notes that I couldn't sign the form because I was handcuffed.

14. As she was writing, I told her that I had seizures and other medical issues, but I wasn't getting treated for them at MCJ. I also expressed to her that I was afraid of Deputy Ibarra who had threatened me in the past. I also told her that I had complained to the ACLU and that they were aware of this. I saw her write down Deputy Ibarra's name in her notes.

15. When I told the nurse that I was afraid of Deputy Ibarra because he had threatened me in the past, I was referring to an incident that occurred in December of 2010. In December, I had written an inmate complaint form against Deputy Ibarra for not allowing me to go to the showers, not giving me some of my meals and not placing me on the doctor's list when I request to be placed on the list for my medical issues. I also had an opportunity to speak to a sergeant about the same complaints as well. I don't know the name of the sergeant, but he is White, short, wears glasses and has a moustache.

16. The sergeant was walking my row in December of 2010 and I asked him if I could speak with him. Deputy Ibarra was walking the row with him and he walked two cells down from where I was housed and stayed there until the sergeant finished talking to me.

17. After I finished speaking to the sergeant, he said he would "look into it."

18. After submitting the complaint and talking to the sergeant about Deputy Ibarra; Deputy Ibarra treated me even more unfairly than before, by again, not letting me take showers, not giving me my food and not allowing me to be placed on the doctor's list. *M.S*

19. After the nurse left, ~~the Hispanic, tall and bald deputy~~ *Deputy Carbajal M.S* then walked me back up to my row.

20. As we got up the stairs, in front of the second floor of the module's control booth, right before the shower area, ~~the Deputy~~ *Carbajal M.S* said to me, "Let me see your letter." I told him, "I'm sorry, but this is confidential. I can't let you see it." He told me, "Shut up and give it to me. You know I can just beat you up."

21. I told him, "I know you can, but there is no need. There's no reason for it."

Deputy Carbajal   M.S

22.    He then told me, "If you contact the ACLU one more time or if I see any letters being sent there, I can open up your cell and say that it was a mistake. I'll have inmates come into your cell and have them finish you. Do your time. Don't complain to anyone if you want to make it out of here alive."

23.    After he said this to me, he escorted me to my cell, uncuffed me and I was placed back in my cell.

Deputy Carbajal    M.S

24.    I knew that ~~this deputy had seen~~ one of my letters that I sent to the ACLU because in late December, before going to court, I gave him a letter that needed to sent to the ACLU. I wrote "ACLU" on the envelope. We are supposed to give the module deputies our outgoing mail and the deputies will then process them and forward them to the appropriate area.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 12th Day of April, 2011 in Los Angeles, California.

Mani Sadri ⟶ by looking at his name badge

M.S 25. I found out Deputy Carbajal's name when he escorted me from medical back to my module, 3500, last week in the afternoon. As we were walking back, I told him that I wanted to talk to a sergeant. I wanted to talk to a sergeant about the incident I described above and because I feared for my life. Deputy Carbajal said, "He's not going to speak to you; He's not your sergeant." He then said, "You better not tell anyone what happened or I'm going to open your cell and have the other inmates finish you. I'm also going to tell them about your case. Who do you think they're going to believe? If someone asks me how your cell got open, I'm going to tell them that I accidentally opened it."   M.S

**Declaration of Mani Sadri**

I, Mani Sadri, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am thirty-five years old. I have been at Men's Central Jail ("MCJ") since July 2010. I am currently housed in Module 3500, Row B, Cell 19. My booking number is 2388924.

3.    On or about Friday, January 28, 2011, after the morning pill call, I was in my cell.

4.    A deputy came to my cell and said that I had a pass. His name is Deputy Carbajal. He is Hispanic, tall and bald. He handcuffed me with my hands behind me and waist-cuffed me, which means that I have chains around my waist and wrist.

5.    Deputy Carbajal escorted me down the stairs to the first floor of the module. There was a nurse standing in front of the control booth on the first floor of the module.

6.    The nurse told Deputy Carbajal that she needed to share some medical information with me regarding test results and that it was a confidential and private matter. I had taken a court-ordered medical exam approximately at the end of November 2010 and this was the exam that the nurse was referring to.

7.    The nurse asked Deputy Carbajal if there was a room where she and I could go to talk in private.

8.    Deputy Carbajal told her that the conversation needed to be done in front of him.

9.    Deputy Carbajal walked approximately fifteen feet away from where the nurse and I were standing.

10.    The nurse gave me a letter that was from the Los Angeles Sheriff's Department's headquarters as there was a seal on top of the letter.

11.    She told me that I needed to take the letter she was going to provide me after the conversation; and that I was to take the letter to court with me in March 2011 and give it to the judge.

12.    After she reviewed the letter's contents with me, she told the Deputy Carbajal that I needed to sign a form indicating that she had this conversation with me.

13. Deputy Carbajal said that he couldn't release me from my handcuffs. I wasn't able to sign the form. The nurse then said that she would write down in her notes that I couldn't sign the form because I was handcuffed.

14. As she was writing, I told her that I had seizures and other medical issues, but I wasn't getting treated for them at MCJ. I also expressed to her that I was afraid of Deputy Ibarra who had threatened me in the past. I also told her that I had complained to the ACLU and that they were aware of this. I saw her write down Deputy Ibarra's name in her notes.

15. When I told the nurse that I was afraid of Deputy Ibarra because he had threatened me in the past, I was referring to an incident that occurred in December of 2010. In December, I had written an inmate complaint form against Deputy Ibarra for not allowing me to go to the showers, not giving me some of my meals and not placing me on the doctor's list when I request to be placed on the list for my medical issues. I also had an opportunity to speak to a sergeant about the same complaints as well. I don't know the name of the sergeant, but he is White, short, wears glasses and has a moustache.

16. The sergeant was walking my row in December of 2010 and I asked him if I could speak with him. Deputy Ibarra was walking the row with him and he walked two cells down from where I was housed and stayed there until the sergeant finished talking to me.

17. After I finished speaking to the sergeant, he said he would "look into it."

18. After submitting the complaint and talking to the sergeant about Deputy Ibarra; Deputy Ibarra treated me even more unfairly than before, by again, not letting me take showers, not giving me my food and not allowing me to be placed on the doctor's list.

19. After the nurse left, Deputy Carbajal then walked me back up to my row.

20. As we got up the stairs, in front of the second floor of the module's control booth, right before the shower area, Deputy Carbajal said to me, "Let me see your letter." I told him, "I'm sorry, but this is confidential. I can't let you see it." He told me, "Shut up and give it to me. You know I can just beat you up."

21. I told him, "I know you can, but there is no need. There's no reason for it."

22. Deputy Carbajal then told me, "If you contact the ACLU one more time or if I see

any letters being sent there, I can open up your cell and say that it was a mistake. I'll have inmates come into your cell and have them finish you. Do your time. Don't complain to anyone if you want to make it out of here alive."

23. After he said this to me, he escorted me to my cell, uncuffed me and I was placed back in my cell.

24. I knew that Deputy Carbajal had seen one of my letters that I sent to the ACLU because in late December, before going to court, I gave him a letter that needed to sent to the ACLU. I wrote "ACLU" on the envelope. We are supposed to give the module deputies our outgoing mail and the deputies will then process them and forward them to the appropriate area.

25. I found out Deputy Carbajal's name by looking at his name badge when he escorted me from Medical back to my module, 3500, last week in the afternoon. As we were walking back, I told him that I wanted to talk to a sergeant. I wanted to talk to a sergeant about the incident I described above and because I feared for my life. Deputy Carbajal said, "He's not going to speak to you. He's not your sergeant." He then said, "You better not tell anyone what happened or I'm going to open your cell and have the other inmates finish you. I'm also going to tell them about your case. Who do you think they're going to believe? If someone asks me how your cell got open, I'm going to tell them that I accidentally opened it."

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 12th day of April, 2011 in Los Angeles, California.

_____/s/_____

Mani Sadri

# EXHIBIT "EE"

## Declaration of Cameron Saul

I, Cameron Saul, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    From May 2007 until November 2009 I was an inmate in Men's Central Jail (MCJ). I now work as a drug treatment counselor at a drug treatment center in the Los Angeles area.

3.    I am submitting this declaration to describe the overcrowding in the dorms and the problems it caused; the regular verbal abuse and humiliating treatment that many Los Angeles County Sheriff's Deputies directed towards gay inmates in MCJ; as well as describing a horrific and unprovoked act of violence by deputies against a gay inmate, which I witnessed.

4.    During the whole time I was in MCJ, I was in what we called "the gay dorm," which was made up of modules 5100, 5200, and 5300. I was in 5100.

### The Dorms Are Overcrowded

5.    Each of the three modules had 100 or more beds in them, beds which were almost always filled. The dorms were horrifically crowded, and the crowding was exacerbated by the fact that we rarely ever got out of the dorms. We ate our meals in the dorms, had no day rooms or other places to go for indoor recreation, and rarely got out to the roof for outdoor recreation.

6.    In fact, some deputies made a point of refusing to permit us to get out of the dorm when we were called for program.

7.    The crowding was also a problem because with all the bunks in the dorm it was impossible for the deputies who supervised the dorms from the control room at the front of the dorm to see what was going on in the back. Accordingly, inmates were able to take other inmates to the back of the dorm and physically abuse them without the deputies ever seeing what was going on.

Exhibit EE
Page 221

8.    Not all of the violence occurred because deputies were unaware of what was going on. In fact, deputies often turned a blind eye toward, or even encouraged inmates to abuse other inmates. For example, early in my time in MCJ, I was a "house mouse." The house mouse acts as a liaison between the inmates and the deputies. One of the things I did as house mouse was inform the deputies about inmates who were causing problems for other inmates, such as stealing other inmates' "store" or abusing other inmates. On a number of occasions when I reported these kinds of problems, the deputies would tell me that "the inmates should handle the problem" and that we should make sure that two inmates be prepared to report that the inmate who was taken care of "had slipped in the shower" so that if the inmate complained that he'd been assaulted, the deputies could include in their report those statements and their conclusion the inmate was making the story up.

9.    I never told inmates that the deputies wanted me to "handle" an inmate who was causing problems by beating him up. But, after I was no longer house mouse, I did witness on a number of occasions inmates take a problem inmate to the back of the dorm and beat him up pretty good, without deputies doing anything to stop it.

10.    I want to be clear that not all deputies encouraged this kind of behavior. For example, if I reported a problem with an inmate to Deputies Bell and Lanni, they always tried to figure out a way to bring the inmates involved together and work the problem out, rather than encouraging inmates to beat up another inmate.

11.    My experience was that there were a lot of deputies in the jails who meant well and probably wanted to do the right thing. But, there are too many who do not, and discriminate against and abuse gay inmates, as well as encouraging violence or engaging in it themselves. Unfortunately, it was also my experience that the bad deputies often have an influence on what goes on that is

disproportionate to their numbers. By contrast, other deputies who do not believe in breaking the rules or abusing inmates, stand by and let the bad deputies do what they want.

12.    The bad deputies also effectively discourage inmates from reporting what they are doing by retaliating against inmates who do complain. A couple of times while I was in MCJ, deputies came into our dorm and said in so many words "if you file a complaint against me this is what you get." Then the deputy would order us into the shower room, make us strip naked, and then the deputy and the straight trustees would take our personal possessions, including our store, and sweep it out of the dorm, allowing the straight trustees to take whatever they wanted. When my dorm mates would complain to the deputies, they would respond "too bad."

Verbal Humiliation and Abuse of Gay Inmates on the Basis of Sexual Orientation.

13.    While I was in MCJ, deputies repeatedly discriminated against gay inmates by verbally abusing and humiliating them.

14.    This abuse never occurred when Deputies Bell and Lanni were around. But they were frequently not around, both because they do not work 24/7 but also because they spent a lot of their time working on classifying new inmates.

15.    One of the principal times deputies would verbally abuse us was during chow time. When it was chow time, deputies would make us line up in the shower. Frequently, we would wait there for as long as half an hour because they made no effort to wait to line us up until they knew the food was coming. Once the trustees brought the food to our dorm, they would have us leave the shower one by one, take a food tray from the straight trustees, walk to the back of the dorm and stand perfectly still with no talking until everyone had gotten his food. While we were waiting for everyone to be served, deputies would frequently call us names, such as "ladies," make fun of particular inmates and what the deputies perceived to

be their lack of maleness, or tell homophobic jokes. They told one almost every time we were served hot dogs, laughing about how we had to be sure we only ate them and did not use them for any other purpose.

Discriminatory Strip Searches of Gay Inmates

16. Although some deputies frequently barred us from going to program, I did go to both Torah study and 12 step programs with Rabbi Yossi Carron on the fourth floor of MCJ on numerous occasions. Straight inmates also went to these sessions with Rabbi Carron, but we were not permitted to go at the same time as straight inmates.

17. On number of occasions, I sat with gay inmates on a bench near Rabbi Carron's office waiting the straight inmates to finish their program with him. There is a diagram of the area around Rabbi Carron's office entitled "4000 Hallway Diagram" attached to this declaration as Exhibit 1. The bench the gay inmates would sit on while waiting for straight inmates to leave his office is marked as "Bench 3" on the diagram. When the straight inmates left his office, I could them walk right past the guard booth and through the metal detector on the 4000 floor before heading back to their module. I do not believe I ever saw a straight inmate be stripped searched, and I am positive I never saw a group of straight inmates stripped searched after leaving Rabbi Carron's office.

18. By contrast, when we left Rabbi Carron's office to return to our dorms, we were regularly stripped naked and ridiculed by the deputies. Most of the time, the deputy who strip searched us, or ordered other deputies to do it, was a very tall Hispanic deputy, in his late-30's with a short Army-type hair cut and a lazy eye, whom I saw frequently on the 4000 floor.

19. One occasion was particularly humiliating for me. I was returning from meeting with Rabbi Carron. The deputy ordered me to strip. When you strip, you have to put your clothes behind you, and you stand there naked while the deputy goes through your clothes. On this occasion, after I had stripped, the

Exhibit EE
Page 224

deputy told me he had to go back to the control booth and that he'd be "right back." He ordered me to sit on the cold, concrete floor completely naked. I waited there for about 15 minutes while lots of people came by including inmates, deputies, and female nurses.

The Beating of Chris Morales

20. One of the inmates in 5100 was named Christopher Morales. Chris was in his late 30's or early 40's. He was taller than me, somewhere between 5'7" and 5'10' and looked to weigh between 200 to 220 pounds. Chris is Hispanic, but has very light skin and looks Caucasian. He had grey hair, wore glasses and had what looked like a hair lip. Chris was a kind man, who was befriended by lots of inmates in the dorm. He was always trying to make people laugh and help other inmates in the dorm stay positive.

21. One day, during chow time, we had followed the ordinary procedure I described above where we lined up in the shower while waiting for our food to come.

22. That day one of the deputies on duty was Caucasian, in his 50's, with glasses and dark brown hair with a little grey in it. I believe his name was Deputy Grayhouse. He worked the 5000 floor a lot and frequently made off-color homophobic jokes. He also regularly refused to let us go to program. For example, if an announcement were made that certain inmates in the dorm had a visitor, he'd refuse to let them go to visiting.

23. That day, while we were all lined up with our food trays in about three rows at the back of the dorm, Deputy Grayhouse shined his flashlight on the back of Morales's neck and yelled out "hey, you." Morales was in front of me, and Grayhouse was behind me, and I could see the flashlight beam shining on the back of Morales's neck. It seemed like Morales did not know Grayhouse was referring to him because he did not react, and Grayhouse did not call his name.

26.    At one point after the beating, I was called to the attorney room and did an interview via television hook up with an attorney who identified himself as Morales' lawyer. He told me that Morales had been charged with assaulting a deputy, or some similar offense. He asked me to describe what I saw in the incident I described above, and I told him. The lawyer said to me he might call me as a witness at Morales's trial. But, I never heard from him after that.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed June 22, 2011 in Los Angeles, California.

Cameron Saul

# 4000 Hallway Diagram

Exhibit EE
Page 227



1. 4000 Control Booth – This is where the Deputies congregate and hang out
2. This bench is where the Deputies hang out when there are inmates in the hallway
3. This is the bench we sit on while waiting for our turn with Rabbi Carron – This is where we see all of the straight inmates walk past the 4000 control gate, through the metal detector and out to the main hallway / escalator landing without being stopped.
4. This is where inmates meet with Rabbi Carron
5. This is the mini clinic where female nurses work
6. This is the area where the gay inmates where strip searched. This is also the area where I was stripped naked and left for 15 minutes.

# EXHIBIT "FF"

**Declaration of Stephen Teran**

I, Stephen Teran, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am 30 years old. I am currently housed at Men's Central Jail ("MCJ") in Module 2400, Row C, Cell 3. My booking number is 1388477.

3.      On December 24, 2010, I was arrested by the Montebello Police Department for trespassing, drinking in public and obstructing an officer. All of the charges were dropped except for the Penal Code 148 (a)(1), which is the obstructing an officer charge. At the time of my arrest, the arresting officer tased me multiple times.

4.      Due to the injuries that were inflicted by the taser gun, I was sent to the Beverly Hospital in Montebello. While there, I received medical treatment for taser wounds and the doctors and nurses checked my vital signs so that I could be medically cleared to be booked and processed for jail.

5.      After I was released from the Beverly Hospital later that night, I was sent to the Inmate Reception Center ("IRC").

6.      At IRC, I was searched by Custody Assistant ("CA") Martinez. I must not have been moving fast enough as I was still recovering from the multiple tasing earlier that night because CA Martinez repeatedly asked me to hurry up. CA Martinez then grabbed my neck, choking me, and dragged me by my neck to a cell. He released my neck and as I fell to the ground, he kicked me in my ribs 2-3 times. I had barely gotten to IRC and had not been searched, so I was still in my street clothes when CA Martinez choked and kicked me.

7.      After I was choked and kicked, I remained in this cell for what seemed like 4-5 hours.

8.      Deputy Sims, who was also there, said to me, "If you give us any problems we're going to put you in the hospital."

9.      I was then sent back through the IRC Processing line. While I was being interviewed by the assessment deputy to determine my classification, Deputy Sims walked by

Exhibit FF
Page 228

and dropped a "JRC" next to me. A JRC is a card that contains an inmate's classification information on it.

10.     He told me to pick it up. From the sound of his voice, I felt like he was trying to intimidate me, especially after he had threatened me earlier when CA Martinez had beaten me.

11.     I told him that I wasn't trying to disrespect him, I just wanted to get through the process and do my time. Deputy Sims then said, "Pick it up. If you don't pick it up I'm gonna put you in the hospital."

12.     I didn't say anything or move. Deputy Sims then punched me hard in the face, which caused me to fall sideways in my seat. At this point, Deputy Sims threw me to the floor and kicked me repeatedly in my head and ribs. Then approximately 4-6 other deputies ran over and began punching and kicking me all over my body. I don't even know how many times I was hit. I just felt punches and kicks all over me. Deputy Miller and Deputy Escobado and several other deputies then hit me with what felt like their flashlights. I felt powerful hits to my ribs, legs and body from what I believed to be their flashlights. I was in an incredible amount of pain and I could barely breathe. As they were kicking and hitting me, they were yelling, "Stop fighting! Stop resisting!" But, I wasn't resisting or fighting with them. I was the one getting beat up. I don't know the names of the other deputies, but one deputy was White, 6'0"; another was a CA and he was Hispanic and the third was Hispanic.

13.     After being beaten for what seemed like 2-3 minutes, some deputies dragged me to an isolated cell. One of them handcuffed my wrist to one of the legs of the bench, which was in the cell, leaving me in a position where I was kneeling down, facing the wall. The way I was handcuffed, I wasn't able to stand up or move. After I was handcuffed, the deputies kicked my lower back about 6-7 times as I was in this kneeling position.

14.     I could see blood pouring from my head and face, where the deputies punched and kicked me, falling into a puddle on the ground from where the deputies

15.     I heard the deputies saying they didn't want my blood on their clothes and on them, so one of the deputies put a plastic bag over my head. With the plastic bag over my head, I could hardly breathe.

16. After the deputies stopped kicking me, I heard them laughing as they left me in the cell by myself.

17. Twenty to thirty minutes later, I heard footsteps outside so I kicked the door to get someone's attention. The door was on my right hand side.

18. Six to seven deputies came into the cell and saw me bleeding on the ground. I saw them go outside and talk before they came back in. I also saw Sergeant Kim standing there as well and she was talking to the deputies. I knew it was Sergeant Kim because she was the only woman there and I saw her name tag. I couldn't hear what they were saying. When they came in, they took my handcuffs off and had me seated on the bench, then I was re-handcuffed.

19. The deputies told me that I was going to be interviewed on camera and told me that they didn't want me to say anything. They said, "If you say anything, we're gonna press charges against you." I told them I wasn't going to say anything because I was afraid that they were going to attack me again. I did tell them that I was thirsty and I was having a hard time breathing.

20. When they came in with the video camera, they asked me, "What are you going to say?" I told them that I wasn't going to say anything and that I was going to say that I fell. They turned on the video camera and asked me, "What happened?" I said, "What do you think happened?" They turned off the camera and said, "What the fuck? You said you weren't going to say anything. Say what was pre-arranged."

21. I told them that I was going to say what they wanted me to say, but I was thirsty and that I wanted some water. Sergeant Kim said that she'd get me some water, so they turned on the video camera and asked me what happened. I said that I fell. They turned off the camera and left. But they didn't even give me any water.

22. About an hour to an hour and a half later, I was escorted in a patrol car to the Los Angeles Medical Center + USC ("LCMC"). The deputies threatened me again saying not to tell anyone what had happened or they were going to press charges against me and say that I was the one who instigated this.

23. When I got to the hospital, I was handcuffed to the bed. The nurses looked

Exhibit FF
Page 230

shocked at what they saw; I could see it in their faces. They told me that there was a huge tear in my lip. I was also bleeding a lot. They wanted me to sign a consent form for medical treatment.

24.    I was extremely scared that if I got medical treatment that I was going to get beaten again, so I refused treatment. I also refused treatment because I thought that my injuries were my only evidence that the deputies had beaten me up. I also didn't trust anyone and just wanted to get away from there and the deputies.

25.    Later, a psychiatrist came in and interviewed me. He told me that he was there to evaluate me. He told me that I needed to get treated for my injuries and my lip, but I kept telling him that I didn't want treatment. He then told the nurses, "Go ahead and do what you have to do. He's not rational and lacks the capacity to make a decision about his medical treatment." I told him that I was not irrational and that I didn't want treatment.

26.    I could see the nurses filling up a syringe with something and then they were trying to inject me with it. I was so confused and scared because I didn't know what was going on and what was going to happen to me. I kept moving my arms, though they were handcuffed, because I didn't know what I was being injected with. They didn't even ask me if I had any allergies to any medications. I don't know the names of the nurses, but the nurse who injected me was male, Hispanic, 5'9" and about 27 years old. I think his name is "Marty." The other nurse was Hispanic and she seemed like she was in her mid-30's.

27.    I don't remember what happened afterwards. I woke up at Twin Towers Correctional Facility ("TTCF") in a bed and I was naked. I felt like I had been drugged and could barely stay awake and keep my eyes open. I fell asleep again soon after.

28.    The next thing I remember is being woken up by my cell door opening and someone throwing in a yellow, jail uniform. I was confused that I was given a yellow, jail uniform. Yellow, jail uniforms are only given to mental health inmates.

29.    The deputies then waist-chained, handcuffed and took me to court. I don't know the names of the deputies and I don't remember what they looked like because I was so confused and I felt like I had been drugged. I had no clue as to why I was in a mental health unit.

30. When I got to court, I couldn't communicate with my attorney or the judge because I was so drugged. I couldn't talk or move my jaw and my tongue felt swollen. I was also having a hard time breathing and felt like I was suffocating.

31. After some time of feeling like this, I must have fainted and fallen to the floor. I don't remember fainting, but am sure I did because the next thing I knew, I awoke in an ambulance on my way to White Memorial Medical Center ("WMMC").

32. After I was at WMMC, I was then taken back to TTCF and placed in a cell, naked. I didn't receive any clothes and was naked for two days..

33. From my understanding, I have not been charged for the IRC incident.

34. On or about the week of February 7, 2011, my attorney requested my medical records for the beating incident that occurred on December 24-25, 2010. *We needed the records to support my case.* ~~I wanted to sue the Los Angeles Sheriff's Department ("LASD") for the trauma and injuries, like my lip region almost being torn off from when the deputies kicked and punched me, so we needed to get my medical records.~~

35. On February 18, 2011, I was housed in the 5600 Dorm at MCJ. About 2-3 am, approximately 2-3 deputies woke me up and brought me out to the hallway. I don't know the names of the deputies, but one was White and the other was a big, Hispanic deputy.

36. When I was in the hallway, one of the deputies asked me why I was asking for my medical records and what I was going to do with it. I didn't know how the deputies knew that my attorney had requested the medical records. — *include*

37. When I didn't respond, one of the deputies slammed my neck against the wall. I felt an excruciating pain in my neck and felt like the deputy had broken my neck. I fell to the ground from the impact and the pain and when I fell, the deputies punched and kicked me repeatedly all over my body, neck and head for what seemed like 2-3 minutes before they stopped beating me.

38. I don't remember what happened next, but I was taken to the Los Angeles Medical Center + USC ("LCMC") around 3:30 am.

39. As a result of the beating, the medical staff at LCMC gave me a neck brace

Exhibit FF
Page 232

because they told me that I had nerve damage in my neck. I am still wearing the neck brace. ST

40. On April 19, 2011, I met with Esther Lim from the American Civil Liberties Union of Southern California ("ACLU/SC") at the MCJ Attorney Room. I met with her for a second time on May 13, 2011 at the MCJ Attorney Room.

41. I gave Ms. Lim a copy of my medical records and gave it to CA Meza so that he could look through it to make sure contraband wasn't being passed through. I heard CA Meza tell Ms. Lim that we weren't allowed to pass any documents to her. Ms. Lim told him that issue was resolved and that we were allowed to pass documents to her and she was allowed to pass documents to us and told him to contact either Lieutenant LaFave, the Watch Commander or someone in the Legal Department.

42. I heard him make a call and ask the person on the other line if inmates could pass documents to the ACLU. I couldn't hear who CA Meza was talking to or what the other person was saying. I heard CA Meza tell the person on the other line my name. After 2-3 minutes, CA Meza went through each page of the documents that I wanted to give Ms. Lim before passing it to her through the slot in the Attorney Room.

43. Ms. Lim and I were done talking so I was trying to leave the Attorney Room. CA Meza stopped me and asked me what I was passing to Ms. Lim. I know that conversations between an attorney or a legal representative is supposed to be confidential so I just told him that it was for my case. I didn't know why he was asking and I didn't think it was right for him to ask what Ms. Lim and I were talking about. I was also afraid that if he knew what we were talking about, CA Meza would tell the other deputies.

44. After leaving the Attorney Room, I walked back to my module, 2500 and went up the escalator. When I got to the floor, I saw a deputy walking towards me. He said, "Turn around and face the wall." I did as he said. I heard a deputy ask, "Is that the motherfucker from downstairs?" I looked over to see who the deputy was referring to.

45. The deputy who walked towards me said, "Face the fucking wall", slammed the right side of my face against the wall and said, "Stupid motherfucker" before walking away.

Exhibit FF
Page 233

46. I don't know the names of the deputies, but both of the deputies were Hispanic.

47. I was still in the neck brace and I was in a lot of pain. Both my neck and my face were hurting a lot after the deputy slammed my face into the wall.

48. When I got to my module and cell, I asked the module officers if I could see a doctor because I was in a lot of pain. The deputies refused to allow me to see someone on the medical staff. They said, "We don't got a pass for you. ~~Too bad~~." I asked every day if I could get a medical pass to see a doctor until May 17, 2011 when I stopped asking because the module deputies refused to let me get medical attention.

49. During the entire time, I was suffering from the pain from my neck and face. I also had horrible headaches and felt a strong pressure behind my eye, like my eye was going to pop out of its socket.

50. On May 19, 2011 in the morning, I received a pass to see a dentist because of a complaint I had submitted to the ACLU/SC. Again, I had submitted numerous complaint forms to see a dentist, but the deputies refused to let me see a dentist, so I had no choice, but to ask the ACLU/SC to file a complaint for me to see a dentist.

51. When I got to the dentist, the dentist's assistant, who was Hispanic, tried to take x-rays of my mouth, but because of my neck brace and the injuries from the December beating and the May beating, it was extremely difficult for me to open my mouth wide enough for the assistant to put the x-ray wings into my mouth.

52. He told me that I would need to get my x-rays from the larger x-ray machine that was nearby. After getting a facial x-ray, the dentist, a Middle-Eastern woman, said that bones in my face were broken. She told me that the x-rays showed that my right cheekbone was fractured and that I needed to go to LCMC.

53. I was sent to the medical clinic and Deputy Suarez was going to take me to LCMC in the squad car.

54. We walked to the 6000 floor control room where Deputy Suarez needed to go to get my LCMC paperwork. He told me to sit down on the bench that was outside of the control room. I then saw him go inside.

55.     A few minutes later, two Senior Deputies came outside to where I was seated. One of them asked me, "What happened?" I told him that I fell on the floor and didn't want to say anything else. I was scared that something else might happen to me if I said that the deputy slammed my face into a wall. The Senior Deputy tried to pressure me into talking and saying that he couldn't help me if I didn't tell him what happened. I told him that he wasn't helping me by stopping me from going to LCMC to fix my broken cheek bone. He told me that I needed to talk to a Sergeant. I told him that I didn't want to talk to anyone and I just wanted to go to LCMC.

56.     Deputy Chavez then escorted me back to the medical clinic. He asked a nurse, who is Asian with blonde hair, to step outside because he needed to talk to her. After talking for a couple of minutes, the nurse came back in and said that I needed to answer some questions before I could go to LCMC. She tried to ask me what had happened. I told her that my face was broken and that they [medical staff] already approved me to go to LCMC to see a doctor, so I didn't know why I needed to answer her questions.

57.     Deputy Chavez then said to me, "I got a degree. I know what you're trying to do. You're trying to sue the Sheriff's department, but it's not going to work. You gotta work like everyone else. You're a gang member."

58.     I asked him what this had to do with me seeing a doctor.

59.     He took me out of the clinic and told me to sit on the bench. He handcuffed me to the bench.

60.     Deputy Chavez and another Senior Deputy tried to force me to sign a paper and said that it was an injury report. I didn't know what it was and told them that I wasn't going to sign anything.

61.     One of the module officers on my module, 2500, was brought down and he said to me, "Why didn't you tell me about this?" I told him that I did and I'm trying to get my face fixed. He said, "You need to be straight with me." I again repeated that I tried to tell him that I needed to see a doctor and all I want to do is get my face fixed.

62.     He then threatened me and said, "You know what's up, right? When you get back

up there, you're going to get nothing but ST what's coming." I told him that I didn't know why he was threatening me. I told him that I wasn't going to name any names. The deputies' threats scared me a lot as did the other deputies' trying to stop me from going to LCMC. I didn't know what they were trying to do or what was going to happen to me.

63.    The Senior Deputy told the deputies, "Leave him there for 4-5 hours. It's not an emergency."

64.    I sat on the bench, handcuffed for 2-3 hours before CA Meza took me to LCMC in the squad car.

65.    When I got to LCMC, I was waiting for the doctor. A nurse came in, saw me and said, "You gotta learn to keep your mouth shut."

66.    When the doctor saw me, he pressed my face and said, "There's no fracture. Your face isn't broken." I told him that he needed to get the x-rays from the dentist at MCJ because those x-rays showed that my cheek bone was fractured. But he didn't take another set of x-rays and he didn't say anything else to me. I was then taken back to MCJ to my module.

67.    The following day in the morning of May 20, 2011 ST, the nurses gave me Flexerall.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this _22_ day of _June_, 2011 in Los Angeles, California.

_____
ST Stephen
Steven Teran

* I met with Ms Lim again on 5/20/2011. A couple of hours later, Deputy Ibarra came by my cell and handed me a write up. The write up was written by Deputy H. Aguirre III for creating a disturbance (verbal) unauthorized communication / profanity towards staff members and Insubordination / Disrespectful to staff # 5100 2011520001. I don't know why I recieved this write up because I didn't do anything but prepare for court after I spoke to Ms. Lim until I got the write up. I think I got the write up because I talked to the Attorney's ST

Exhibit FF
Page 236

**Declaration of Stephen Teran**

I, Stephen Teran, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am 30 years old. I am currently housed at Men's Central Jail ("MCJ") in Module 2400, Row C, Cell 3. My booking number is 1388477.

3.      On December 24, 2010, I was arrested by the Montebello Police Department for trespassing, drinking in public and obstructing an officer. All of the charges were dropped except for the Penal Code 148 (a)(1), which is the obstructing an officer charge. At the time of my arrest, the arresting officer tased me multiple times.

4.      Due to the injuries that were inflicted by the taser gun, I was sent to the Beverly Hospital in Montebello. While there, I received medical treatment for taser wounds and the doctors and nurses checked my vital signs so that I could be medically cleared to be booked and processed for jail.

5.      After I was released from the Beverly Hospital later that night, I was sent to the Inmate Reception Center ("IRC").

6.      At IRC, I was searched by Custody Assistant ("CA") Martinez. I must not have been moving fast enough as I was still recovering from the multiple tasing earlier that night because CA Martinez repeatedly asked me to hurry up. CA Martinez then grabbed my neck, choking me, and dragged me by my neck to a cell. He released my neck and as I fell to the ground, he kicked me in my ribs 2-3 times. I had barely gotten to IRC and had not been searched, so I was still in my street clothes when CA Martinez choked and kicked me.

7.      After I was choked and kicked, I remained in this cell for what seemed like 4-5 hours.

8.      Deputy Sims, who was also there, said to me, "If you give us any problems we're going to put you in the hospital."

9.      I was then sent back through the IRC Processing line. While I was being interviewed by the assessment deputy to determine my classification, Deputy Sims walked by

Exhibit FF
Page 237

and dropped a "JRC" next to me. A JRC is a card that contains an inmate's classification information on it.

10.    He told me to pick it up. From the sound of his voice, I felt like he was trying to intimidate me, especially after he had threatened me earlier when CA Martinez had beaten me.

11.    I told him that I wasn't trying to disrespect him, I just wanted to get through the process and do my time. Deputy Sims then said, "Pick it up. If you don't pick it up I'm gonna put you in the hospital."

12.    I didn't say anything or move. Deputy Sims then punched me hard in the face, which caused me to fall sideways in my seat. At this point, Deputy Sims threw me to the floor and kicked me repeatedly in my head and ribs. Then approximately 4-6 other deputies ran over and began punching and kicking me all over my body. I don't even know how many times I was hit. I just felt punches and kicks all over me. Deputy Miller and Deputy Escobado and several other deputies then hit me with what felt like their flashlights. I felt powerful hits to my ribs, legs and body from what I believed to be their flashlights. I was in an incredible amount of pain and I could barely breathe. As they were kicking and hitting me, they were yelling, "Stop fighting! Stop resisting!" But, I wasn't resisting or fighting with them. I was the one getting beat up. I don't know the names of the other deputies, but one deputy was White, 6'0"; another was a CA and he was Hispanic and the third was Hispanic.

13.    After being beaten for what seemed like 2-3 minutes, some deputies dragged me to an isolated cell. One of them handcuffed my wrist to one of the legs of the bench, which was in the cell, leaving me in a position where I was kneeling down, facing the wall. The way I was handcuffed, I wasn't able to stand up or move. After I was handcuffed, the deputies kicked my lower back about 6-7 times as I was in this kneeling position.

14.    I could see blood pouring from my head and face, where the deputies punched and kicked me, falling into a puddle on the ground from where the deputies

15.    I heard the deputies saying they didn't want my blood on their clothes and on them, so one of the deputies put a plastic bag over my head. With the plastic bag over my head, I could hardly breathe.

16. After the deputies stopped kicking me, I heard them laughing as they left me in the cell by myself.

17. Twenty to thirty minutes later, I heard footsteps outside so I kicked the door to get someone's attention. The door was on my right hand side.

18. Six to seven deputies came into the cell and saw me bleeding on the ground. I saw them go outside and talk before they came back in. I also saw Sergeant Kim standing there as well and she was talking to the deputies. I knew it was Sergeant Kim because she was the only woman there and I saw her name tag. I couldn't hear what they were saying. When they came in, they took my handcuffs off and had me seated on the bench, then I was re-handcuffed.

19. The deputies told me that I was going to be interviewed on camera and told me that they didn't want me to say anything. They said, "If you say anything, we're gonna press charges against you." I told them I wasn't going to say anything because I was afraid that they were going to attack me again. I did tell them that I was thirsty and I was having a hard time breathing.

20. When they came in with the video camera, they asked me, "What are you going to say?" I told them that I wasn't going to say anything and that I was going to say that I fell. They turned on the video camera and asked me, "What happened?" I said, "What do you think happened?" They turned off the camera and said, "What the fuck? You said you weren't going to say anything. Say what was pre-arranged."

21. I told them that I was going to say what they wanted me to say, but I was thirsty and that I wanted some water. Sergeant Kim said that she'd get me some water, so they turned on the video camera and asked me what happened. I said that I fell. They turned off the camera and left. But they didn't even give me any water.

22. About an hour to an hour and a half later, I was escorted in a patrol car to the Los Angeles Medical Center + USC ("LCMC"). The deputies threatened me again saying not to tell anyone what had happened or they were going to press charges against me and say that I was the one who instigated this.

23. When I got to the hospital, I was handcuffed to the bed. The nurses looked

shocked at what they saw; I could see it in their faces. They told me that there was a huge tear in my lip. I was also bleeding a lot. They wanted me to sign a consent form for medical treatment.

24.      I was extremely scared that if I got medical treatment that I was going to get beaten again, so I refused treatment. I also refused treatment because I thought that my injuries were my only evidence that the deputies had beaten me up. I also didn't trust anyone and just wanted to get away from there and the deputies.

25.      Later, a psychiatrist, Harsukhj Savalia DEA 0529411638 came in and interviewed me. He told me that he was there to evaluate me. He told me that I needed to get treated for my injuries and my lip, but I kept telling him that I didn't want treatment. He then told the nurses, "Go ahead and do what you have to do. He's not rational and lacks the capacity to make a decision about his medical treatment." I told him that I was not irrational and that I didn't want treatment.

26.      I could see the nurses filling up a syringe with something and then they were trying to inject me with it. I was so confused and scared because I didn't know what was going on and what was going to happen to me. I kept moving my arms, though they were handcuffed, because I didn't know what I was being injected with. They didn't even ask me if I had any allergies to any medications. I don't know the names of the nurses, but the nurse who injected me was male, Hispanic, 5'9" and about 27 years old. I think his name is "Marty." The other nurse was Hispanic and she seemed like she was in her mid-30's.

27.      I don't remember what happened afterwards. I woke up at Twin Towers Correctional Facility ("TTCF") in a bed and I was naked. I felt like I had been drugged and could barely stay awake and keep my eyes open. I fell asleep again soon after.

28.      The next thing I remember is being woken up by my cell door opening and someone throwing in a yellow, jail uniform. I was confused that I was given a yellow, jail uniform. Yellow, jail uniforms are only given to mental health inmates.

29.      The deputies then waist-chained, handcuffed and took me to court. I don't know the names of the deputies and I don't remember what they looked like because I was so confused and I felt like I had been drugged. I had no clue as to why I was in a mental health unit.

30. When I got to court, I couldn't communicate with my attorney or the judge because I was so drugged. I couldn't talk or move my jaw and my tongue felt swollen. I was also having a hard time breathing and felt like I was suffocating.

31. After some time of feeling like this, I must have fainted and fallen to the floor. I don't remember fainting, but am sure I did because the next thing I knew, I awoke in an ambulance on my way to White Memorial Medical Center ("WMMC").

32. After I was at WMMC, I was then taken back to TTCF and placed in a cell, naked. I didn't receive any clothes and was naked for two days..

33. From my understanding, I have not been charged for the IRC incident.

34. On or about the week of February 7, 2011, my attorney requested my medical records for the beating incident that occurred on December 24-25, 2010. We needed the records to support my case.

35. On February 18, 2011, I was housed in the 5600 Dorm at MCJ. About 2-3 am, approximately 2-3 deputies woke me up and brought me out to the hallway. I don't know the names of the deputies, but one was White and the other was a big, Hispanic deputy.

36. When I was in the hallway, one of the deputies asked me why I was asking for my medical records and what I was going to do with it. I didn't know how the deputies knew that my attorney had requested the medical records.

37. When I didn't respond, one of the deputies slammed my neck against the wall. I felt an excruciating pain in my neck and felt like the deputy had broken my neck. I fell to the ground from the impact and the pain and when I fell, the deputies punched and kicked me repeatedly all over my body, neck and head for what seemed like 2-3 minutes before they stopped beating me.

38. I don't remember what happened next, but I was taken to the Los Angeles Medical Center + USC ("LCMC") around 3:30 am.

39. As a result of the beating, the medical staff at LCMC gave me a neck brace because they told me that I might have nerve damage. I am still wearing the neck brace.

40. On April 19, 2011, I met with Esther Lim from the American Civil Liberties

Union of Southern California ("ACLU/SC") at the MCJ Attorney Room. I met with her for a second time on May 13, 2011 at the MCJ Attorney Room.

41.    I gave Ms. Lim a copy of my medical records and gave it to CA Meza so that he could look through it to make sure contraband wasn't being passed through. I heard CA Meza tell Ms. Lim that we weren't allowed to pass any documents to her. Ms. Lim told him that issue was resolved and that we were allowed to pass documents to her and she was allowed to pass documents to us and told him to contact either Lieutenant LaFave, the Watch Commander or someone in the Legal Department.

42.    I heard him make a call and ask the person on the other line if inmates could pass documents to the ACLU. I couldn't hear who CA Meza was talking to or what the other person was saying. I heard CA Meza tell the person on the other line my name. After 2-3 minutes, CA Meza went through each page of the documents that I wanted to give Ms. Lim before passing it to her through the slot in the Attorney Room.

43.    Ms. Lim and I were done talking so I was trying to leave the Attorney Room. CA Meza stopped me and asked me what I was passing to Ms. Lim. I know that conversations between an attorney or a legal representative is supposed to be confidential so I just told him that it was for my case. I didn't know why he was asking and I didn't think it was right for him to ask what Ms. Lim and I were talking about. I was also afraid that if he knew what we were talking about, CA Meza would tell the other deputies.

44.    After leaving the Attorney Room, I walked back to my module, 2500 and went up the escalator. When I got to the floor, I saw a deputy walking towards me. He said, "Turn around and face the wall." I did as he said. I heard a deputy ask, "Is that the motherfucker from downstairs?" I looked over to see who the deputy was referring to.

45.    The deputy who walked towards me said, "Face the fucking wall", slammed the right side of my face against the wall and said, "Stupid motherfucker" before walking away.

46.    I don't know the names of the deputies, but both of the deputies were Hispanic.

47.    I was still in the neck brace and I was in a lot of pain. Both my neck and my face were hurting a lot after the deputy slammed my face into the wall.

48. When I got to my module and cell, I asked the module officers if I could see a doctor because I was in a lot of pain. The deputies refused to allow me to see someone on the medical staff. They said, "We don't got a pass for you." I asked every day if I could get a medical pass to see a doctor until May 17, 2011 when I stopped asking because the module deputies refused to let me get medical attention.

49. During the entire time, I was suffering from the pain from my neck and face. I also had horrible headaches and felt a strong pressure behind my eye, like my eye was going to pop out of its socket.

50. On May 19, 2011 in the morning, I received a pass to see a dentist because of a complaint I had submitted to the ACLU/SC. Again, I had submitted numerous complaint forms to see a dentist, but the deputies refused to let me see a dentist, so I had no choice, but to ask the ACLU/SC to file a complaint for me to see a dentist.

51. When I got to the dentist, the dentist's assistant, who was Hispanic, tried to take x-rays of my mouth, but because of my neck brace and the injuries from the December beating and the May beating, it was extremely difficult for me to open my mouth wide enough for the assistant to put the x-ray wings into my mouth.

52. He told me that I would need to get my x-rays from the larger x-ray machine that was nearby. After getting a facial x-ray, the dentist, a Middle-Eastern woman, said that bones in my face were broken. She told me that the x-rays showed that my right cheekbone was fractured and that I needed to go to LCMC.

53. I was sent to the medical clinic and Deputy Suarez was going to take me to LCMC in the squad car.

54. We walked to the 6000 floor control room where Deputy Suarez needed to go to get my LCMC paperwork. He told me to sit down on the bench that was outside of the control room. I then saw him go inside.

55. A few minutes later, two Senior Deputies came outside to where I was seated. One of them asked me, "What happened?" I told him that I fell on the floor and didn't want to say anything else. I was scared that something else might happen to me if I said that the deputy

slammed my face into a wall. The Senior Deputy tried to pressure me into talking and saying that he couldn't help me if I didn't tell him what happened. I told him that he wasn't helping me by stopping me from going to LCMC to fix my broken cheek bone. He told me that I needed to talk to a Sergeant. I told him that I didn't want to talk to anyone and I just wanted to go to LCMC.

56.    Deputy Chavez then escorted me back to the medical clinic. He asked a nurse, who is Asian with blonde hair, to step outside because he needed to talk to her. After talking for a couple of minutes, the nurse came back in and said that I needed to answer some questions before I could go to LCMC. She tried to ask me what had happened. I told her that my face was broken and that they [medical staff] already approved me to go to LCMC to see a doctor, so I didn't know why I needed to answer her questions.

57.    Deputy Chavez then said to me, "I got a degree. I know what you're trying to do. You're trying to sue the Sheriff's department, but it's not going to work. You gotta work like everyone else. You're a gang member."

58.    I asked him what this had to do with me seeing a doctor.

59.    He took me out of the clinic and told me to sit on the bench. He handcuffed me to the bench.

60.    Deputy Chavez and another Senior Deputy tried to force me to sign a paper and said that it was an injury report. I didn't know what it was and told them that I wasn't going to sign anything.

61.    One of the module officers on my module, 2500, was brought down and he said to me, "Why didn't you tell me about this?" I told him that I did and I'm trying to get my face fixed. He said, "You need to be straight with me." I again repeated that I tried to tell him that I needed to see a doctor and all I want to do is get my face fixed.

62.    He then threatened me and said, "You know what's up, right? When you get back up there, you're going to get nothing but what's coming." I told him that I didn't know why he was threatening me. I told him that I wasn't going to name any names. The deputies' threats scared me a lot as did the other deputies' trying to stop me from going to LCMC. I didn't know

what they were trying to do or what was going to happen to me.

63. The Senior Deputy told the deputies, "Leave him there for 4-5 hours. It's not an emergency." 2011

64. I sat on the bench, handcuffed for 2 hours before CA Meza took me to LCMC in the squad car.

65. When I got to LCMC, I was waiting for the doctor. A nurse came in, saw me and said, "You gotta learn to keep your mouth shut."

66. When the doctor saw me, he pressed my face and said, "There's no fracture. Your face isn't broken." I told him that he needed to get the x-rays from the dentist at MCJ because those x-rays showed that my cheek bone was fractured. But he didn't take another set of x-rays and he didn't say anything else to me. I was then taken back to MCJ to my module.

67. The following day in the morning of May 20, 2011, the nurses gave me Flexerall.

68. I met with Ms. Lim again on May 20, 2011. A couple of hours later, Deputy Ibarra came by my cell and handed me a write-up. The write up was written by Deputy H. Aguirre III for creating a disturbance (verbal) unauthorized communication/profanity towards staff members and insubordination/disrespectful to staff #51002011520001. I don't know why I received this write-up because I didn't do anything, but prepare for court after I spoke to Ms. Lim until I got the write-up. I think I got the write-up because I talked to the ACLU/SC.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 22 day of June, 2011 in Los Angeles, California.

_____/s/_____

Stephen Teran

# EXHIBIT "GG"

**Declaration of Eric White**

I, Eric White, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     After living in Ohio for 15 years, I sold my house and moved back to California. I am a California native, and wanted to move back with my wife and kids.

3.     Unfortunately, shortly after we moved my marriage fell apart and I had to try and find a place to live with various family members and start a business in Northern California. When my business failed I had to move to LA County with my mother and grandmother.

4.     I was arrested on March 14th, and have been in Men's Central Jail since.

5.     I became a pro per in the middle of April and housed in 2500, B-6. On May 13th I was given tier time, meaning I was allowed to walk up and down the tier and talk to people. At some point during my tier time, Deputy "Curbfoot" told me that the deputies needed to talk to me. He took me to the front of the module, grabbed my hands, leaned up to my ear and said, "Who's the fucking punk now? Put your fucking nose to the wall." I kept telling him that I didn't want any problems. He said , "It's too late now." The first blow I felt was to the right side of my temple. When I went down, I received a crushing blow to the top of my head. After going down, all I can remember is trying to crawl away. then a door flew open and a bunch more deputies came in. I thought they were going to make the others stop, but they all joined in. As i began to lose consciousness, I looked down and saw a pool of blood. I also remember the look on Deputy Briton's face. He looked like he couldn't believe what he was seeing. At the very end, when I was already on the floor and barely conscious, the deputies ripped my pants almost completely off and tasered me. The next thing I remember is Lt. McCray and a Captain at the hospital videotaping me.

6.     I can't think of a single thing I could have done to deserve this beating. I admit I've been disrespectful at times, but nothing that deserves me nearly losing my life. The incident, I believe, was investigated, and as far as I know, nothing has been done.

7.     Th last 4 months of my life, since coming back from the hospital, have been

nothing but terror. After being moved to 7000 at CJ, the wheelchair ward, I slept underneath my bunk and kept my wheelchair tied in front of me for protection. Deputies have repeatedly retaliated against me to get me to not complain or tell people on the outside.

8.    The first time deputies threatened me, I had just been placed in 7000. Deputy "Cicerelli" came into my cell, after I had been asking for assistance, pointed his taser at my face and said, "I'd fucking tase you, but I can't because you'll tell on me. Deputy Curbfoot is my best friend." Deputy "Schurzberg" has called me a "bitch" for writing my mom and telling her how afraid I am. He told me that another inmate that got his leg broken "learned," after I kept putting in inmate request forms. Another deputy told me, "Your just not going to let this shit go, are you?" My privileges were taken away for 22 days for fighting with staff, although I never touched staff. They took my property and it has never been recovered. I was supposed to receive surgery for my injuries, according to the doctors at LCMC, but have not. I have 5 staples on the top of my head, 5 stitches in the middle of my forehead, 3 stitches above my left eye, 4 stitches above my right, 4 fractured vertebrae, a shattered right shoulder, broken rib on my left side and both my ankles were severely sprained. I still have scars on both my legs and on my face and head.

I live in fear everyday. I am afraid to talk to the ACLU, but I know that they use fear to keep the inmates from getting help.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 7th day of October, 2009 in Los Angeles, California.

/S/
_____

Eric White

Exhibit GG
Page 247

Declaration of Eric White

I, Eric White, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. After living in Ohio for 15 years, I sold my house and moved back to California. I am a California native, and wanted to move back with my wife and kids. Unfortunately, shortly after we moved, my marriage fell apart and I had to try and find a place to live with various family members and start a business in Northern California. When my business failed I had to move to LA County with my mother and grandmother.

I was arrested on March 14th, and have been in Men's Central Jail since.

I became a pro-per in the middle of April and housed in 2500, B-6. On May 13th I was given tier time, meaning I was allowed to walk up and down the tier and talk to people. At some point during my tier time, Deputy "Curbfoot" told me that the deputies needed to talk to me. He took me to the front of the module, grabbed my hands, leaned up to my ear and said, "Who's the fucking punk now? Put your fucking nose on the wall." I kept telling him that I didn't want any problems. He said, "It's too late now." The first blow I felt was to the right side of my temple. When I went down, I received a

crushing blow to the top of my head. After going down all I can remember is trying to crawl away. Then a door flew open and a bunch more deputies came in. I thought they were going to make the others stop, but they all joined in. As I began to lose consciousness, I looked down and saw a pool of blood. I also remember the look on Deputy Briton's face. He looked like he couldn't believe what he was seeing. At the very, when I was already on the floor and barely conscious, the deputies ripped my pants almost completely off and tasered me. The next thing I remember is seeing Lt. McRay and a Captain at the hospital video taping me.

I can't think of a single thing I could have done to deserve this beating. I admit I've been disrespectful at times, but nothing that deserves me nearly losing my life. The incident, I believe, was investigated and, as far as I know, nothing has been done.

The last 4 months of my life, since coming back from the hospital, have been nothing but terror. After being moved to 7000 at CJ, the wheel chair ward, I slept underneath my bunk and kept my wheelchair tied in front of me for protection. Deputies have repeatedly retaliated against me to get me to not complain or tell people on the outside. The first time deputies threatened me, I had just

been placed in 7000. Deputy "Cicerelli" came into my cell, after I had been asking for assistance, pointed his taser at my face and said, "I'd fucking tase you, but I can't because you'll tell on me. Deputy Curbfoot is my best friend." Deputies Deputy "Schurzberg" has called me a bitch for writing my mom and telling her how afraid I am. He told me that another inmate that got his leg broken "learned," after I kept putting in inmate request forms. Another deputy told me, "Your just not going to let this shit go, are you?" My privileges were taken away for 22 days for fighting with staff, although I never touched staff. They took my property and it has never been recovered. I was supposed to receive surgery for my injuries, according to the doctors at LCMC, but have not. I have 5 staples on the top of my head, 5 stiches in the middle of my forehead, 3 stitches above my left eye, 4 stitches above right, 4 fractured vertebrae, a shattered right shoulder, broken rib on my left side, and both my ankles were severly sprained. I still have scars on both my legs and on my face and head.

   I live in fear every day. I am afraid to talk to the ACLU, but I know that they use fear to keep the inmates from getting help.

E.W.
2
3

Exhibit GG
Page 250

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this __7__ day of October, 2009 in Los Angeles, California.

x _Eric White_

_Eric White_

E.W.
4

Exhibit GG
Page 251