PETER J. ELIASBERG (SB# 189110)
peliasberg@aclu-sc.org
MARISOL ORIHUELA (SB# 261375)
morihuela@aclu-sc.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Phone:  (213) 977-9500
Fax:  (213) 977-5299

DONNA M. MELBY (SB# 86417)
donnamelby@paulhastings.com
JOHN S. DURRANT (SB# 217345)
johndurrant@paulhastings.com
JADE H. LEUNG (SB# 279651)
jadeleung@paulhastings.com
ELIZABETH C. MUELLER (SB# 278283)
bethmueller@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071-2228
Phone:  (213) 683-6000
Fax:  (213) 627-0705

MARGARET WINTER (*pro hac vice*)
mwinter@npp-aclu.org
ERIC BALABAN (*pro hac vice application forthcoming*)
ebalaban@npp-aclu.org
DAVID M. SHAPIRO (*pro hac vice application forthcoming*)
dshapiro@npp-aclu.org
NATIONAL PRISON PROJECT OF THE AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th St., NW
Washington, D.C. 20005
Phone:  (202) 393-4930
Fax:  (202) 393-4931

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN GOODWIN, on behalf of themselves and of those similarly situated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> LEROY BACA, Sheriff of Los Angeles County Jails, et al., <br><br> Defendants. | CASE NO. CV 12-00428 DDP <br><br> **DECLARATION OF STEVE MARTIN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> Date:  March 26, 2012 <br> Time:  10:00 a.m. <br> Ctrm.:  3 <br> Judge:  Hon. Dean D. Pregerson |

MARTIN DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

**Declaration of Steve Martin**

I, Steve Martin, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      My general qualifications as an expert in the field of corrections are set forth in my Curriculum Vitae, attached hereto as Exhibit A.  I began my career as a correctional officer in 1972 at a maximum security prison (Ellis Unit) operated by the Texas Department of Corrections (TDC).  I also worked as a correctional officer at the single TDC prison for female felony offenders (Goree Unit).  I subsequently served as a casework intern with the Federal Bureau of Prisons at the Federal Correctional Institution, Ft. Worth, Texas.  While employed as a Federal Probation and Parole Officer in McAllen, Texas (1975-1977) I served on a jail planning commission for Hidalgo County, Texas.  During my employment in the Tulsa County District Attorney's Office (1980) I was assigned the Civil Division to assist the county attorneys defending the Tulsa County Sheriff on matters related to the operation of the county jail, including a class action jail conditions lawsuit.

3.      In 1981, I rejoined the TDC in the Legal Counsel's Office and ultimately served as General Counsel and chief of staff to the Director.  In my service with the TDC, I was involved in the development of policies and procedures in the areas of classification, administrative and punitive segregation, inmate disciplinary procedures, use of force, special needs prisoners and other operational issues.  Much of this work related to compliance with court orders in Ruiz v. Estelle, a system-wide conditions lawsuit brought by the prisoners and the U.S. Department of Justice.  In my capacity as General Counsel, I was directly responsible for formulating and coordinating TDC's response to all compliance monitoring reports filed with the court by the Special Master.  During the course of this work, I routinely conducted site inspections and conferred with facility and central office managers regarding implementation of the remedial plans.

- 1 -

4.      As an independent corrections consultant (1987 to present), I have been retained on many occasions as a corrections expert by the U. S. Department of Justice, Civil Rights Division, related to a wide variety of correctional management issues; by both defendants' and plaintiffs' counsel in numerous cases; by federal courts; and by a variety of state and local governmental entities.  I have made well over 700 site inspections to jails, prisons, and youth facilities in more than 38 states, Puerto Rico, the U.S. Virgin Islands, Guam, Saipan, Jamaica, and Northern Ireland.  I am currently serving as a court monitor for litigation related to use of force and restraints in the New York City Department of Corrections and the Ohio Department of Youth Services; and, as a court appointed expert involving conditions of confinement in the Broward County, Florida jail system.  I recently completed service on the Travis County, Texas Citizen Bond Advisory Committee and chaired the Sub-Committee on Jails in which we made recommendations adopted by the Travis County Board of Supervisors on the expansion of jail beds for the county jail system.  I have served as a federal court monitor in cases involving three other state prison systems (Mississippi, Arizona & Montana) and four metropolitan jail systems (New York City, Long Island, Baltimore and Gulfport, Mississippi).  I am also presently involved in jail litigation/investigations in New York, New Orleans, Denver, and Columbus, Ohio.  Over the years of my work, I have been involved in jail conditions cases in many of the fifty largest jails in the U.S., including Los Angeles, New York, Chicago, Houston, Baltimore, Pittsburgh, Detroit, Seattle, Las Vegas, New Orleans, Milwaukee, and Philadelphia.

5.      I have been qualified as an expert in the field of corrections and have testified as such on more than fifty occasions, mostly in federal courts.  I am co-author of *Texas Prisons: The Walls Came Tumbling Down*, (Texas Monthly Press, 1987); and contributed *to Courts, Corrections, and the Constitution* (Oxford University Press, 1990) and *Building Violence: How America's Rush to*

- 2 -

MARTIN DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

*Incarcerate Creates More Violence* (Sage Publications, 2000). I have published numerous articles related to correctional issues in law reviews and professional journals. I have also served on the adjunct or visiting faculties of six universities, including the University of Texas School of Law.

6. A listing of publications I have authored/co-authored may be found at pages 12-14 of my Curriculum Vitae, attached hereto as Exhibit A.

7. I have reviewed LASD policies concerning use of force in the jails, as well as some proposed changes to the LASD's current use of force policies. Those policies are attached as Exhibit B.

8. Based on review of these policies and my corrections experience, I have concluded that they are, first and foremost, disjointed and unstructured, and as a consequence, fail to create a clear and comprehensive approach to manage staff use of force in the LA County jails. A non-inclusive list of deficiencies are as follows: no statement of purpose, no expected outcomes, no definitions, no prohibitions, no statement of principles, no guidance on proportionality between resistance/response, no training requirements, no guidance on force in special circumstances, no identification of authorized weapons/devices, no identification of unauthorized weapons/tactics, no distinction between calculated/immediate force, no guidance on videotaping and review, no requirement for an injury report on every use of force incident, no guidance on use of restraints, and no administrative review/referral process.

9. In reaching this conclusion, I have taken into account the fact that the use of force policies have been revised to forbid head strikes, including with impact weapons, unless the standards for use of lethal force have been met. While these revisions improve the use of force policies, they do not change my conclusion about the inadequacy of the policies expressed in paragraph 8.

10. In my opinion, having appropriate policies on the use of force, and the review of force incidents, is essential in a correctional setting. Absent clear and

- 3 -

MARTIN DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

detailed policies, it is extremely difficult to train personnel because clear and detailed written policies provide the framework for proper training.

11. Having clear and detailed policies on use of force is also essential to the supervision of deputies in the use of force as well as the review of use of force incidents. Clear and detailed policies provide the framework that supervisors can use to determine the appropriate handling by deputies of planned use of force incidents.

12. Clear and detailed policies also provide the benchmark by which use of force incidents can be reviewed to determine whether the incident was properly handled, and, if not, what is the appropriate response – including retraining, discipline, or even termination.

13. In summary, where a correctional institution such as the Los Angeles County Jails has inadequate use of force policies, it is highly likely that training on use of force, supervision of planned force incidents, review of use of force incidents, and the responses to inappropriate use of force will all be deficient. And, it is also highly likely that those deficiencies will subject inmates to needless and significant risks of serious harm.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 16th day of February, 2012 in Austin, Texas.

Steve Martin

# EXHIBIT A

# CURRICULUM VITAE

**NAME:**              Steve J. Martin

**ADDRESS:**           8513 Adirondack Trail
                       Austin, Texas 78759

**TELEPHONE:**         Office:  (512)346-7607
                       E-mail:  sjmart@sbcglobal.net

**DATE OF BIRTH:**     August 27, 1948

**EDUCATION:**

1973                   Bachelor of Science
                       Criminology and Corrections
                       Sam Houston State University
                       Huntsville, Texas

1974                   Master of Arts
                       Correctional Administration
                       Sam Houston State University
                       Huntsville, Texas

1981                   Juris Doctor
                       University of Tulsa
                       School of Law
                       Tulsa, Oklahoma
                       (Admitted to Texas State Bar-Card #13106550)

**EMPLOYMENT:**

1987-Present           Corrections Consultant and Attorney

1986-1987              Gray & Becker, Attorneys at Law
                       General practice law firm engaged in litigation, administrative
                       law, civil rights and legislative work.

1985-1986              Texas Office of the Attorney General - Special Assistant
                       Attorney General.  Worked as a consultant to the Chief of the
                       Enforcement Division on litigation involving the Texas
                       Department of Corrections.

(Vita current as of January 2012)

**STEVE J. MARTIN VITA PAGE 2**
**Employment (continued)**

1981-1985

Texas Department of Corrections - Executive Assistant to the Director (1984-85); General Counsel (1983-85); Legal Counsel (1981-83)
Huntsville, Texas

As Legal Counsel, I served as the in-house attorney on class action litigation. In 1982, I was given responsibility for providing primary case administration of RUIZ v. ESTELLE (a class action conditions lawsuit in which virtually all operational aspects of the prison system were subject to court orders). From 1983-85, I served as the chief legal officer of the department. I also served as the liaison to the Office of the Special Master in RUIZ as well as liaison to the Office of the Attorney General and the Texas Legislature. From 1984 I also served as the Director's Executive Assistant, an operations position and the third ranking official in the department.

1980-1981

Tulsa County District Attorney's Office
Assistant District Attorney/ Legal Intern
Tulsa, Oklahoma

As an Assistant District Attorney/Legal Intern, I provided representation to county jail officials on civil rights litigation filed by county jail prisoners. I also drafted a set of jail standards adopted by the district judges for operation of the jail.

1975-1980

United States Probation and Parole Office
U.S. Probation and Parole Officer
McAllen, Texas (1975-77)
Tulsa, Oklahoma (1977-80)

As a probation officer I supervised an average caseload of 50 to 75 probationers and parolees in addition to conducting pre-sentence and pre-trial diversion reports.

1974

Federal Bureau of Prisons
Federal Corrections Institution Casework Intern
Fort Worth, Texas

Exhibit A
Page 6

**STEVE J. MARTIN VITA PAGE 3**
**Employment (continued)**

After my first year of graduate school, I worked as a summer Casework Intern for the Director of Mental Health Programs at the facility.

1972-1973        Texas Department of Corrections
Correctional Officer
Huntsville, Texas

I was assigned to the Ellis Unit, a maximum security prison, and worked routine security posts such as cellblocks, control center, hall officer, and death row. I also worked at the Goree Unit for female offenders.

**REPRESENTATIVE PROFESSIONAL ACTIVITIES:**

2001-Present        Appointed as a Court Expert, CARRUTHERS v. JENNE, to examine the conditions of confinement in Broward County Department of Detention, Ft. Lauderdale, Florida.

2003-Present        Retained as an expert witness in DISABILITY ADVOCATES, INC. v. NEW YORK STATE OFFICE OF MENTAL HEALTH, et al., involving class action civil rights claims regarding the treatment of mentally ill inmates confined to disciplinary segregation, New York State Department of Corrections.

2005-Present        Retained as an expert witness, T.R., P.R., and K.W. v. SOUTH CAROLINA DEPARTMENT OF CORRECTIONS, class action litigation regarding the treatment of mentally ill inmates in the South Carolina Department of Corrections.

2006-Present        Member of Editorial Board, *Correctional Law Reporter.*

2006-Present        Retained as an expert, DITTIMUS-BEY, et al. v. TAYLOR, et al., regarding conditions of confinement at the Camden County Jail, Camden, New Jersey.

2007-Present        Retained as an expert by Independent Fact Finder and Court Montior, S.H. v. STICKRATH, to examine/monitor staff use of force, restraints, seclusion, classification, youth

**STEVE J. MARTIN VITA PAGE 4**
**Representative Professional Activities (continued)**

|  |  |
|---|---|
|  | disciplinary practices, and youth grievances at the Ohio Department of Youth Services. |
| 2008-Present | Retained as an expert witness, CARTY v DEJONGH, regarding conditions of confinement at facilities in St. Thomas, Virgin Islands. |
| 2009-Present | Retained as an expert witness, HICKS v HETZEL, regarding conditions of confinement at the Donaldson Correctional Facility, Bessemer, Alabama. |
| 2010-Present | Retained as an expert witness, SHREVE v FRANKLIN COUNTY JAIL, regarding use of force. |
| 2010-Present | Retained as an expert witness, SOLIS v BACA, regarding strip searches at the Los Angeles County Jail. |
| 2010-Present | Appointed as Court Monitor, REYNOLDS v SCHRIRO, to monitor use of restraints by New York City Department of Corrections at the Bellevue and Elmhurst hospitals. |
| 2010-Present | Retained by the Department of Homeland Security, Office for Civil Rights and Civil Liberties as penology expert. |
| 2011-Present | Retained by Department of Justice, State of California, as a consultant in the matter of COLEMAN V. BROWN. |
| 2011-Present | Retained as an expert witness, KELLEY v ERICKSEN, regarding placement and conditions of confinement at the Green Bay Correctional Institution, Wisconsin. |
| 2011-Present | Retained as an expert witness, BLAKE v MAYNARD, regarding excessive use of force claim at the Maryland Reception and Diagnostic Classification Center. |
| 2011 | Retained as an expert witness, BARKER v JONES, regarding excessive use of force claim at the Bullock Correctional Facility, Alabama Department of Corrections. |

**STEVE J. MARTIN VITA PAGE 5**
**Representative Professional Activities (continued)**

| | |
|---|---|
| 2011 | Retained as an expert witness, HAMILTON v HALL, regarding correspondence policies of the Santa Rosa County Jail, Florida. |
| 2004-2011 | Appointed as Court Monitor, GATES v. BARBOUR, to monitor capacity orders for the Mississippi Department of Corrections. |
| 2005-2011 | Retained as an expert witness, FAIRLEY v. ANDREWS, regarding allegations of excessive force in the Cook County Jail, Chicago, Illinois. |
| 2007-2011 | Retained as an expert witness, VANDEHEY v. VALLARO, regarding use of force at the Garfield County Jail, Colorado. |
| 2008-2011 | Retained as expert witness, SILVERSTEIN v. BOP, regarding confinement at the United States Penitentiary Administrative Maximum ("ADX"), Florence, Colorado. |
| 2010 | Participated as *amici curiae,* SCHWARZENEGGER v PLATA, regarding prison overcrowding in the California Department of Corrections. |
| 1993-2008 | United States Department of Justice, Civil Rights Division, Special Litigation Section, Corrections Expert. |
| 2005-2008 | Retained as an expert, WILLIAMS v. TASER INTERNATIONAL, INC., regarding use of force at the Gwinnett County Detention Center, Georgia. |
| 2006-2008 | Retained as an expert witness, IKO v. GALLEY, regarding use of force at the Western Correctional Institution, Maryland Department of Public Safety and Correctional Service. |
| 2007 | Participated as *amici curiae*, IQBAL v. ASHCROFT, U. S. Court of Appeals, 2nd Cir., regarding treatment of detainees at the Metropolitan Detention Center, New York City. |
| 2007-2008 | Retained by the U.S. Attorney's Office, New York City, to examine staff use of force at the Westchester County Jail, White Plains, New York. |

**STEVE J. MARTIN VITA PAGE 6**
**Representative Professional Activities (continued)**

| | |
|---|---|
| 2008-2009 | Retained as an expert witness, JACKSON v. GERL, regarding use of force at the Wisconsin Secure Program Facility, Boscobel. |
| 2007-2009 | Retained as an expert witness, YOUNG v. COOK COUNTY,  regarding the strip search policies of the Cook County Jail. |
| 2007-2008 | Retained as an expert witness, RUTLEDGE v. COOK COUNTY, regarding staff use of force at the Cook County Jail. |
| 2006-2008 | Retained as an expert witness, WILKERSON, et al. v. STALDER, regarding the placement of inmates in long-term segregation at the Louisiana State Penitentiary, Angola. |
| 2006-2007 | Retained as a consulting expert by the State Attorney, 13th Judicial Circuit, Tampa, Florida,  In Re: In-Custody Death of Martin Lee Anderson while confined at the Bay County Boot Camp, Panama City, Florida. |
| 2004-2006 | Retained as an expert witness, INGLES v. TORO, class action use of force litigation involving the New York City Department of Corrections. |
| 2005-2006 | Retained as an expert witness, GILLIS v. LITSCHER, et al., regarding placement of an inmate in the Behavior Management Program, Wisconsin Secure Program Facility. |
| 2005 | Member, Travis County, Citizen Bond Advisory Committee; Chairman, Sub-Committee on Jails, Travis County, Texas. |
| 2005 | Participated as *amici curiae*, WILKINSON v. AUSTIN, No. 04-495, Supreme Court of the United States; placement process for inmates in supermax prisons. |
| 2002-2005 | Appointed as Court Monitor, UNITED STATES v. NASSAU COUNTY, to monitor Settlement Agreement on use of force, Nassau County Corrections Center, Long Island, New York. |

**STEVE J. MARTIN VITA PAGE 7**
**Representative Professional Activities (continued)**

| | |
|---|---|
| 2002-2005 | Retained as a consultant by the Georgia Attorney General's Office to review use of force practices at the Phillips State Prison, Buford, Georgia. |
| 2003-2004 | Retained as an expert witness, HARGETT v. ADAMS, class action litigation regarding conditions of confinement at the Joliet Treatment & Detention Facility, Illinois. |
| 2003-2004 | Retained as an expert witness, NEW TIMES v. ADAMS, class action litigation regarding censorship practices of the Colorado Department of Corrections. |
| 2002-2004 | Retained by the United States Attorney's Office, San Francisco, as an expert in UNITED STATES v. LEWIS; criminal civil rights prosecution for civil rights violations at the Pelican Bay State Prison. |
| 2003-2004 | Retained as a consultant by the Georgia Attorney General's Office in BURNS v. WETHERINGTON, regarding civil rights claim for failure to protect an inmate at the Lee Arrendale State Prison, Alto, Georgia. |
| 2004 | Retained as a consultant to the Ohio Department of Youth Services on staff use of force. |
| 2004 | Retained as a consultant by the Los Angeles County, Special Counsel, to assist in a report to the Los Angeles County Board of Supervisors on inmate violence in the Los Angeles County jails. |
| 2000-2002 | Appointed as Court Monitor, DOES v. STEWART, to monitor a system-wide class action remedial order on protective segregation for the Arizona Department of Corrections. |
| 1998-2002 | Appointed as Court Monitor, SHEPPARD v. PHOENIX, to monitor a court order on use of force in the New York City Department of Corrections, Rikers Island. |
| 2001 | Retained by the United States Department of Justice and the United States Attorney's Office, Brooklyn, New York to assist in the development of remedial plan for Nassau |

Exhibit A
Page 11

**STEVE J. MARTIN VITA PAGE 8**
**Representative Professional Activities (continued)**

|  |  |
|---|---|
|  | County Sheriff's Department, Division of Correction, Use of Force. |
| 2001 | Retained by the United States Attorney's Office, San Francisco, as an expert in UNITED STATES v. POWERS and GARCIA, a criminal civil rights prosecution for civil rights violations at the Pelican Bay State Prison. |
| 2001 | Retained by the Los Angeles County Board of Supervisors to evaluate the in-custody restraint death of a detainee. |
| 2001 | Served as a Member of the research team of the Berkman Center, Harvard Law School, to evaluate rehabilitation programs in two Jamaican maximum security prisons. |
| 2000 | Participated as *amici curiae*, ATWATER v. CITY OF LAGO VISTA, No. 99-1408, Supreme Court of the United States, regarding custodial arrests for a non-jailable misdemeanor. |
| 1989-2000 | Retained as an expert witness and consultant, FELICIANO v. COLON, conditions litigation involving the Puerto Rico prison system. |
| 1999-2001 | Retained as an expert, MULDROW v. KEOHANE, litigation regarding the use of restraints, USP, Atlanta, Georgia. |
| 1999-2000 | Retained as an expert, SABATINO v. AMENN, class action litigation on the use of restraints, Erie County Prison, Pennsylvania. |
| 1999-2000 | Retained as a consultant to review Immigration and Naturalization Service Detention Standards, United States Department of Justice. |
| 1996-1999 | Retained as an expert, LEE v. COUGHLIN, litigation involving punitive segregation at Sing Sing/Southport prisons, New York. |
| 1998-1999 | Retained as an expert, SPATES v. IOWA CORRECTIONAL INSTITUTION FOR WOMEN, conditions litigation. |

Exhibit A
Page 12

**STEVE J. MARTIN VITA PAGE 9**
**Representative Professional Activities (continued)**

1992-1995                Retained as an expert witness, MADRID v. GOMEZ, conditions litigation involving Pelican Bay State Prison, California.

1996-1998                Retained as an expert witness, COLLINS v. ALGARIN, litigation involving excessive force at Montgomery County Jail, Pennsylvania.

1994-1998                Retained as an expert witness, ALLEN v. CHISHOLM, excessive use of force litigation involving Montana State Prison.

1995-1998                Retained as an expert witness, BOLTON v. COOMBE, litigation involving double celling practices at Woodbourne Correctional Facility, New York.

1996-1998                Retained as an expert witness, SOLOMON v. DELLANA, litigation involving excessive use of force at the Allegheny County Jail, Pittsburgh.

1997-1998                Retained as an expert witness, BLACKMON v. McCOTTER, litigation involving stabbing death of inmate at the Central Utah Correctional Facility.

1997-1998                Retained as an expert witness, CLARK v. CALIFORNIA, litigation involving treatment of developmentally disabled prisoners in the California Department of Corrections.

1997-1998                Retained as an expert witness, TATE v. GOMEZ, litigation involving lethal force at the Corcoran State Prison, California.

1994-1995                Retained as an expert witness by the New York Attorney General's Office, BIN-WAHAD v COUGHLIN, litigation involving claim of retaliatory transfer in New York Department of Corrections.

1993-1995                Retained as a consultant to the Texas Comptroller of Public Accounts, Performance Review of the Texas Department of Criminal Justice.

**STEVE J. MARTIN VITA PAGE 10**
**Representative Professional Activities (continued)**

| | |
|---|---|
| 1991-1993 | Gubernatorial appointee to the Texas Punishment Standards Commission; Vice-Chair, Policy Development Committee. |
| 1989-1993 | Retained as a consultant and expert witness on prison and jail litigation by the Texas Attorney General's Office. |
| 1992-1993 | Retained as a consultant, BENJAMIN v. ABATE. Principal author of Reports of Plaintiffs' Expert Consultants on Conditions in the New York City Jails, Legal Aid Society, New York. |
| 1991-1992 | Staff Director, Study Committee on Judicial Education, Texas Supreme Court. Principal investigator for the Report on Judicial and Court Personnel Education Programs. |
| 1990-1992 | Retained as an expert witness and consultant, JENSEN v. CLARKE, crowding litigation involving Nebraska State Prison, Lincoln, Nebraska. |
| 1989-1993 | Retained as a consultant on litigation involving numerous county jails including Detroit, Seattle, Houston, Austin and San Antonio. |
| 1989-1991 | Assisted Texas Legislature on the development of criminal justice legislation, 71st and 72nd Legislatures. |
| 1988-1989 | Gubernatorial Appointee to Texas Council on Offenders with Mental Impairments; Chairman, Legislative Subcommittee. |
| 1986-1990 | Retained by Corrections Corporation of America, Nashville, Tennessee, to assist in the development and operation of private prison facilities in Texas. |
| 1988-1992 | Employed as expert witness by Prison Law Office, San Quentin on litigation involving Vacaville, San Quentin and Tracy prisons. |
| 1987-1993 | Employed as expert witness by Prisoners Legal Services of New York on litigation involving Attica and Elmira prisons. |

**STEVE J. MARTIN VITA PAGE 11**
**Representative Professional Activities (continued)**

1987-1989                      Employed as expert witness by NAACP LDF, New York on
                               death row conditions litigation in Missouri and Arkansas.

**TEACHING/LECTURES/SYMPOSIUMS:**

2011                           Panelist, National Institute of Corrections Public Hearings,
                               Shifting the Focus to Reshape Our Thinking Toward
                               Performance Based Outcomes, Stanford University,
                               November 2-3, 2011.

2010                           Participant, Department of Homeland Security, "Roundtable
                               on Mental Health and Immigration Enforcement,"
                               Washington, DC, September 24, 2010

2009                           Speaker, Texas Criminal Defense Lawyers Association,
                               Seminar, Post Conviction Law and Criminal Administrative
                               Remedies, *Status of Prisoners' Rights in Today's Criminal
                               Justice Arena*, January 9, 2009.

2005                           Testified before Commission on Safety & Abuse in
                               America's Prisons on Staff Use of Force in United States
                               Confinement Settings; April 20, 2005, Tampa, Florida.

2003                           Symposium on Prison Reform, Pace Law School, Judicial
                               Institute and the Open Society; moderator and presenter for
                               Effective Post-PLRA Settlement Models, October 2003.

2001                           Presenter, Southern Methodist University School of Law,
                               Colloquium on the Judicial Work of Judge William Wayne
                               Justice, May 2001.

2000                           Guest Lecturer, University of Minnesota Law School,
                               Institute of Criminal Justice; "Responding to the Crowded
                               Jail, Legal Issues."

1999                           Visiting Scholar, Institute of Criminology and School of
                               Law, Queen's University, Belfast, Ireland; Seminar:
                               "Punishment as Big Business: The Iron Triangle," October
                               1999.

**STEVE J. MARTIN VITA PAGE 12**
**Teaching/Lectures/Symposiums (continued)**

| | |
|---|---|
| 1999/2000 | Guest Lecturer, New York University School of Law. |
| 1995 | Guest Lecturer, National Association of Attorneys General Annual Conference; "The Role of Experts in Prison Litigation." |
| 1995 | Testified before the United States Senate Judiciary Committee as a panel member on the Prison Litigation Reform Act. |
| 1990 | Southwest Texas State University, San Marcos, Texas. Adjunct faculty - taught corrections course. |
| 1989 | St. Edwards University, Austin, Texas. Adjunct faculty - taught corrections course. |
| 1988 | Technical Assistance Consultant, National Institute of Corrections Boulder, Colorado. |
| 1986 | The University of Texas School of Law, Austin, Texas. Visiting faculty - taught seminar on institutional reform litigation. |
| 1979-1981 | Langston University, Tulsa, Oklahoma. Adjunct faculty - taught probation and parole, corrections, and criminology courses. |
| 1976-1977 | Pan American University, Edinburg, Texas. Adjunct faculty – taught corrections courses. |
| 1973-1974 | Sam Houston State University, Huntsville, Texas. Graduate Fellow - taught course in social problems. |

**PUBLICATIONS/PAPERS:**

Kercher, Glen A. And Steve J. Martin, "Severity of Correctional Officer Behavior in the Prison Environment," presented before the Texas Academy of Science, Huntsville, Texas, 1975.

Martin, Steve J., and Sheldon Ekland-Olson, Texas Prisons: The Walls Came Tumbling Down, Austin: Texas Monthly Press, 1987.

**STEVE J. MARTIN VITA PAGE 13**
**Publications/Papers (continued)**

Ekland-Olson, Sheldon and Steve J. Martin, "Organizational Compliance with Court-Ordered Reform," 22 *Law and Society Review* 359, 1988.

Martin, Steve J., "Prisoners' Rights", *Texas Tech Law Review*, Volume 20, Symposium 1989, Number 2.

Martin, Steve J., "Texas Prisons: A Brooding Crisis Behind Bars", *Texas Lawyer*, March 13, 1989.

Martin, Steve J., and Sheldon Ekland-Olson, "Ruiz, A Struggle Over Legitimacy", Courts, Corrections and the Constitution: The Impact of Judicial Intervention on Prisons and Jails, edited by John J. DiIulio, Jr., Oxford University Press, 1990.

Martin, Steve J., "The Celling of Texas", *Texas Observer*, January 11, 1991.

Martin, Steve J., "An End to Ruiz: Shifting the Debate from Rhetoric to Reason", Texas Public Policy Foundation, April 1995.

Grant, Darlene  and Steve Martin, "Should Prison Reform Litigation Be Curtailed?" National Council on Crime and Delinquency *Focus*, May 1996.

Martin, Steve J., "Prison Reform Litigation: Shifting the Debate From Rhetoric to Reason," Alan Fortunoff Criminal Justice Colloquium, Center for Research in Crime and Justice of New York University School of Law, February 26, 1996.

Martin, Steve J., Perspectives on Justice, "Inmates Haven't Changed, Prisons Have," *Los Angeles Times*, July 1998.

Martin, Steve J., "Sanctioned Violence in American Prisons," Building Violence: How America's Rush to Incarcerate Creates More Violence, edited by John May, Sage Publications, Inc., January 2000.

Martin, Steve J., "Corrections in the New Millennium: The Mean Season," *Voice for the Defense*, Texas Criminal Defense Lawyers Association, Vol.29 Number 2, March 2000.

Martin, Steve J., "Introduction," *Frontiers of Justice, Volume 3: The Crime Zone*, Biddle Publishing Co., Brunswick, Maine, March 2000.

Martin, Steve J., Book Review: Going Up the River: Travels in a Prison Nation, Punishment & Society, *International Journal of Penology*," Vol. 4, Number 1, January 2002.

Martin, Steve J. Book Review: Punishment & Democracy: Three Strikes and You're Out in California, *British Journal of Criminology*, Vol.43, Number 1 Winter 2003.

**STEVE J. MARTIN VITA PAGE 14**
**Publications/Papers (continued)**

Martin, Steve J.,  Book Review: Maconochie's Gentlemen: The Story of Norfolk Island and the Roots of Prison Reform, *British Journal of Criminology*, Vol.43, Number 4 Autumn 2003.

Hill, Debbie, Larry Hammond, Bruce Skolnik, Steve J. Martin and Donna Clement; "Effective Post-PLRA Settlement Models: A Case Study of Arizona's Protective Segregation Lawsuit," 24  *Pace Law Review* 743 (Spring 2004).

Martin, Steve J., Staff  Use of Force in U.S. Confinement Settings; Commission on Safety and Abuse in America's Prisons, 601 Thirteenth St., N.W., Washington, D. C., *Washington  Journal of Law & Policy*, Volume 22 (2006 ).

Martin, Steve J., Staff Use of Force in U. S. Confinement Settings: Lawful Control Versus Corporal Punishment; *Social Justice Quarterly,* Vol. 33, No.4 (2007).

Martin, Steve J., Effective Expert Witnessing in Corrections Litigation: Rules, Relevance & Reliability, *Correctional Law Reporter;* Volume XX No.1, June/July 2008.

# EXHIBIT B

**LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**

**CUSTODY DIVISION MANUAL**

**Proposed addition to the Custody Division Manual**

**Documentation and Supervisory Response to Inmate Medical Emergencies**

Whenever an inmate suffers injury or illness requiring unanticipated medical care, custody personnel shall immediately notify medical personnel and then a supervisor. Custody personnel shall ensure the inmate receives appropriate medical attention in compliance with CDM 5-03/060.00 (Medical Diagnosis and Treatment).

"Supervisor" in this policy refers to sergeants and above, and does not include deputy sheriff generalists or Supervising Line Deputies "acting" in that capacity.

The supervisor shall respond to either the location of the incident or the clinic and conduct an inquiry to discover the nature of the inmate's medical issue. The supervisor's focus is to ascertain if the inmate's medical condition is the result of an assault or a use of force by Department personnel. The supervisor will interview the inmate (if possible), medical staff, and any employee, inmate, or third party witnesses to establish if force was a factor contributing to the inmate's medical condition. If there is any indication that the inmate's injury/condition is the result of force used by an employee, the supervisor will immediately notify the watch commander. The watch commander will conduct an inquiry and will take appropriate investigative or administrative action.

If the inmate's condition is the result of an assault from another inmate, the watch commander will ensure a crime investigation is conducted and documented.

On the Inmate Injury Report, at the end of the officer's narrative section, the supervisor will briefly note that they interviewed the inmate, and any additional actions initiated as part of his or her inquiry, including all interviews conducted. The watch commander shall ensure the supervisor's notation is present before approving the Inmate Injury Report.

LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

DEPARTMENT MANUAL OF POLICY AND PROCEDURES

Proposed revision to MPP 5-09/430.00  48 hour deadline/alleged force interviews

This revision is proposed to specifically address the concern raised by the Board that any alleged use of force involving inmates be investigated within 48 hours. Because the section is lengthy, only the appropriate sub-section, dealing with the alleged use of force, is included here.

## 5-09/430.00 USE OF FORCE REPORTING AND REVIEW PROCEDURES

Any use of force which is greater than that required for unresisted Department-approved searching or handcuffing, including the use of oleoresin capsicum (pepper) spray, Freeze +P, Deep Freeze aerosols, or powder from a Pepperball projectile must be reported. Additionally, any use of force which results in an injury or a complaint of pain must be reported.

Directed Force

Directed force is any force used by Department personnel at the direction of a supervisor to control an individual or a group.

Responsibilities for Reporting the Use of Force

Members shall immediately make a verbal notification to their immediate supervisor (in this section, "supervisor" refers to a minimum rank of Sergeant) in all cases in which they use reportable force. Members witnessing reportable force used by another Department member or by anyone working with or on behalf of the Department shall immediately advise their supervisor, who will determine whether a separate report/memorandum by the witness(es) is required. Members witnessing reportable force (as defined in this section) used by employees of another law enforcement agency shall immediately advise their supervisor and write a memorandum documenting their presence or, if applicable, provide a copy of their patrol log.

NOTE: For purposes of this section, "reportable force" shall include all cases wherein force is alleged by any individual or group, regardless of the party making the allegation, or their relationship to the party upon whom force was alleged to have been used. The responsibility for reporting an alleged use of force shall belong to the member to whom the alleged use of force was reported. Whenever a supervisor is notified of an alleged use of force involving a suspect or inmate, the supervisor shall fulfill his obligations to conduct interviews as required by this policy as soon as feasible, but no later than 48 hours after the notification.

**LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**

## DEPARTMENT MANUAL OF POLICY AND PROCEDURES

### Proposed revision to MPP 5-09/430.00   Requirements when conducting interviews

This revision is proposed to address concerns raised by the Board, the OIR and the ACLU regarding the way interviews of suspects/inmates are conducted in force investigations. There are no deletions to existing policy. The proposed additions are highlighted. Because the section is lengthy, only the appropriate sub-section, dealing with the Watch Commander's Responsibilities, is included here.

### 5-09/430.00 USE OF FORCE REPORTING AND REVIEW PROCEDURES

Watch Commander/Supervising Lieutenant's Responsibilities

1. The Watch Commander or Supervising Lieutenant shall, with extreme priority, personally examine any suspect/inmate on whom significant force has been used and interview him regarding the incident. Personnel involved in the use of force, either as a participant or a witness, including supervisors directing force, shall not be present when the interview is conducted. When interviewing suspects/inmates regarding use of force incidents, the Watch Commander shall ask the person if he has any injuries, the nature of the injuries, and if he wants medical treatment. These questions must be asked whether or not the suspect/inmate has any apparent injuries (Refer to the section entitled "Medical Treatment" for required treatment.). If the suspect is taken to a medical facility for examination or treatment, the Watch Commander shall ensure that a supervisor interviews the examining physician or qualified medical personnel as to the extent of the injuries, or lack thereof, and whether the injuries are consistent with the degree of force reported.

   The Watch Commander/Supervising Lieutenant shall tape-record the interview of the suspect/inmate and, if appropriate, photograph him, paying particular attention to any known or alleged areas of injury (Obtain suspect consent for photographing injuries hidden by clothing.). The Watch Commander/Supervising Lieutenant should also consider video-taping the interview when appropriate. Prior to beginning the interview, the time, date and location of the interview shall be clearly stated, along with the names, ranks and employee numbers of all persons present.

   The Watch Commander/Supervising Lieutenant shall submit a force review package (see subsection entitled "Force Review Package") to the Unit Commander as soon as possible detailing the results of his review and his recommendation as to whether further action or investigation is warranted.

LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

CUSTODY DIVISION MANUAL

New Custody Division Manual section proposed by the Sheriff

3-02/035.00  FORCE PREVENTION POLICY

Every Custody deputy and staff member shall view their professional duties in the context of safety for themselves and the inmates.
The Department's duty, under Constitutional law, is to not violate the law in order to enforce the law.  Unreasonable force is a violation of the law.

It is the Department's responsibility to prevent violence whenever it appears possible. An analysis of force incidents has established that verbal disrespect between inmates and deputies is a factor that leads to aggressive behavior by either the deputy or the inmate.  Whenever practical:

—    Deputies confronting an uncooperative inmate shall call a supervisor and seek guidance that is aimed at tactical de-escalation of the situation.  The supervisor will endeavor to calm the situation and use as much time as it takes to manage the inmate's verbal aggression.

—    Deputies facing an uncooperative inmate shall remain calm during such occasion and not escalate to an emotional level that violates the Department's Core Values.

—    Inmates themselves have a code of respect in order to avoid conflicts and violence.  Whenever a deputy speaks to an inmate in a disrespectful way it can cause turmoil in the mind of an inmate which can lead to verbal aggression.  Deputies will endeavor, in these cases, to de-escalate verbal conflicts and seek assistance as required by this policy.

When force must be used, deputies and staff shall endeavor to use restraining methods, rather than depend on strikes to subdue an inmate, unless necessary.

Our collective and individual goal is to prevent force through thoughtful communication that ensures respect.

LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

DEPARTMENT MANUAL OF POLICY AND PROCEDURES

Proposed revision to MPP 3-01/025.10   Head Strikes against fixed objects

This revision is proposed to address concerns raised by the Board relative to the justification for the use of force to intentionally strike an inmate's head against a hard, fixed object.  There are no deletions to existing policy.  The proposed additions are highlighted.

3-01/025.10 UNREASONABLE FORCE

Department members shall use only that force which is objectively reasonable. Unreasonable force is that force that is unnecessary or excessive given the circumstances presented to Department members at the time the force is applied. Unreasonable force is prohibited. The use of unreasonable force will subject Department members to discipline and/or prosecution.

Head strikes with an impact weapon are prohibited unless circumstances justify the use of deadly force as outlined in 3-01/025.20, Life-Threatening/Serious Bodily Injury. Additionally, using force specifically intended to incapacitate a suspect or inmate by striking their head against hard, fixed objects such as roadways, cement floors, walls, jail bars, etc., or by deliberately kicking them in the head with a shod foot, or by deliberately striking their head with a knee while they are on the ground, will be subject to the same standard.



3-01/025.20 USE OF FORCE CATEGORIES
This section defines the four categories referred to in the Department's Situational Use of Force Options Chart.
COOPERATIVE
The cooperative category is defined as: Interaction with another person to achieve a particular goal _ no physical force is needed to gain cooperation.
The majority of the people Department personnel interact with have behavior that is described in this category. These individuals respond in a positive way to command presence and are easily directed with verbal requests and commands. Those that require control or searching allow this to take place with no resistance. General control is often achieved by the use of non-verbal actions such as gestures, stance, and facial expressions.
RESISTIVE
The resistive category is defined as: Physical or verbal refusal to cooperate with lawful commands through resistive behavior.
Resistive behavior involves physical or verbal resistance to lawful orders/actions. There are two categories of resistance: passive and active. If the resistance is passive, the individual has refused to follow orders given by the Deputy. If the resistance is active, they may display a number of actions such as running away, flailing their arms, or pulling away. Physical/active resistance can also include the individual assuming an aggressive posture or stance, running away, physically resisting efforts to be secured/handcuffed/controlled, or obscene gestures directed toward lawful presence or requests.
An individual's verbal/non-verbal physical actions can be interpreted to mean that they will not comply with orders or requests made and will resist, not allowing control to be exerted over him/her. The suspect is not specifically "attacking" and does not fully intend to assault or batter.
ASSAULTIVE/HIGH-RISK
Behaviors/Situations that belong in the assaultive/high risk category include: An unlawful threat or unsuccessful attempt to do physical harm to another, causing a present fear of immediate harm; a violent physical attack; a situation in which the totality of articulated facts causes a reasonable officer to form the opinion that a significant credible threat of violence exists.
The assaultive individual has crossed the line of resistance and is threatening an assault, attempting an assault, or physically assaulting the Department personnel or citizen. This category also deals with high-risk situations.
In this category, the likelihood of injury is obvious due to deliberate assaultive actions or other significant threatened actions. These actions (or threatened actions) are so obvious as to make a reasonable person realize that they must do something to defend themself, or others.
LIFE-THREATENING / SERIOUS BODILY INJURY
The life-threatening/serious bodily injury category encompasses actions which are likely to result in serious injury or possibly in the death of a person. Utilizing firearms or impact weapons to vital areas of the body would be reasonable to employ at this level in self defense, or in the defense of others.
Revised 02/07/11



## 5-09/434.00 FORCE/SHOOTING RESPONSE TEAMS AND EXECUTIVE REVIEW

To enhance the Department's quality assurance and control, and ensure Department-wide consistency in our review process, Force/Shooting Response Teams shall respond to and investigate certain force and high-risk incidents and prepare reports that include, but not be limited to, the following: multi-perspective reviews of the incident; reviews of adherence to policy and performance standards; reviews of adherence to Department training; recommendations for changes in policy and training; assessments of the civil liability the Department is exposed to by our operations and procedures; and reviews of other pertinent issues. The Force/Shooting Response Teams consist of representatives from various Department Units, such as Internal Affairs Bureau, Training Bureau, Civil Litigation, Traffic Services, Medical Services, Risk Management, Custody Training, etc., depending on the type of incident and the expertise required. Revised 07/12/02
04/01/96 MPP



## 5-09/434.05 ACTIVATION OF FORCE/SHOOTING RESPONSE TEAMS

Watch Commanders and Supervising Lieutenants are required to make immediate verbal notification to the on-call IAB Lieutenant whenever any of the following occur:

- All shootings by any Department member, both on-duty and off-duty, including accidental discharges, warning shots, and the shooting at animals,
- All incidents in which Deputy personnel are shot,
- Hospitalizations due to injuries caused by any Department member,
- Skeletal fractures caused by any Department member,
- Significant force used by any Department member during or following a vehicular or foot pursuit,
- All large party situations where significant force is used,
- Injury or complaint of injury to a person's head, or neck area resulting in medical evaluation and/or treatment, following contact with any Department member (This does not apply to contamination due to Oleoresin Capsicum spray, Freeze +P or Deep Freeze aerosols, or Pepperball projectile powder),
- All head strikes with impact weapons,
- Canine bites resulting in medical treatment,
- Any death following a contact with any Department member,
- All inmate deaths,
- Injury or complaint of injury to a person_s head, as a result of their head striking an object, i.e., wall, door jamb, metal bars, etc., due to force used by a Department member or as the result of accidental circumstances,
- Any of the above use of force witnessed by a Department member applied by personnel from another law enforcement agency involved in an operation with Department personnel,
- At any scene where the Sheriff_s Response Team (SRT) is deployed.

The on-call IAB Lieutenant shall evaluate the information and determine if a response team activation is appropriate. The on-call Lieutenant shall also determine the appropriate make-up of each team and will cause the notification of those personnel.

The following types of incidents shall require mandatory activation of a Force/Shooting Response Team by the on-call IAB Lieutenant which may consist of an IAB Lieutenant, an IAB Force/Shooting Response Team, and a representative from the Training Bureau or Custody Training:

- All shootings in which a shot was intentionally fired at a person by a Department member,
- Any type of shooting by a Department member which results in a person being hit,
- Force resulting in admittance to a hospital,
- Any death following a use of force by any Department member,
- All head strikes with impact weapons,
- Skeletal fractures, with the exception of minor orbital fractures or minor fractures of the nose, fingers or toes, caused by any Department member,
- Inmate deaths from other than obvious natural causes. This ncludes murders, suicides, overdoses, etc.

The IAB Force/Shooting Response Team shall prepare an administrative review of the incident which shall be submitted to the Executive Force Review Committee. The Captain of Internal Affairs Bureau is responsible for establishing an incident file containing the Force/Shooting Response Team's reports, and for ensuring that they are entered into the Personnel Performance Index.

If at any time the response team IAB Lieutenant determines that an administrative investigation is warranted, he shall brief the concerned Unit Commander, and with the concurrence of the concerned Division Chief, he shall direct the IAB investigators to commence an investigation. If it is determined that the conduct of any Department member may have been criminal in nature, the Force/Shooting Response Team Lieutenant shall immediately notify the concerned Unit

Commander, and with concurrence of the concerned Division Chief, turn the investigation over to the Internal Criminal Investigations Bureau.

Revised 02/07/11
Revised 05/17/09
Revised 12/08/08
Revised 04/11/05
Revised 07/12/02
Revised 02/22/99
04/01/96 MPP



### 3-02/035.00 FORCE PREVENTION POLICY

Every custody deputy and staff member shall view their professional duties in the context of safety for themselves and the inmates.

The Department's duty is to not violate the law in order to enforce the law. Unreasonable force is a violation of Department Policy (MPP 3-01/025.10).

It is the Department's responsibility to prevent violence whenever it appears possible. An analysis of force incidents has established that verbal disrespect between inmates and deputies is a factor that leads to aggressive behavior by either the deputy or the inmate. Whenever practical:

- Deputies confronting an uncooperative inmate shall call a supervisor and seek guidance that is aimed at tactical de-escalation of the situation. The supervisor will endeavor to calm the situation and use as much time as it takes to manage the inmate's verbal aggression.

- Deputies facing an uncooperative inmate shall remain calm during such occasion and not escalate to an emotional level that violates the Department's Core Values.

- Inmates themselves have a code of respect in order to avoid conflicts and violence. Whenever a deputy speaks to an inmate in a disrespectful way it can cause turmoil in the mind of an inmate which can lead to verbal aggression. Deputies will endeavor, in these cases, to de-escalate verbal conflicts and seek assistance as required by this policy.

When force must be used, deputies and staff shall endeavor to use restraining methods, rather than depend on strikes to subdue an inmate, unless necessary.

Our collective and individual goal is to prevent force through thoughtful communication that ensures respect.

11/08/11 CDM

761551N25A - SH-AD (11/90)

COUNTY OF LOS ANGELES

# SHERIFF'S DEPARTMENT

*A Tradition of Service Since 1850*

OFFICE CORRESPONDENCE

DATE:    November 4, 2011

FILE:    211935

FROM:    DENNIS A. BURNS, CHIEF
CUSTODY OPERATIONS DIVISION

ALEXANDER R. YIM, CHIEF
CORRECTIONAL SERVICES DIVISION

TO:    CUSTODY AND CORRECTIONAL UNIT COMMANDERS

SUBJECT:    CUSTODY DIVISION DIRECTIVE 11-005 (FORMAL) CUSTODY FORCE RESPONSE TEAM (CFRT)

The purpose of this directive to establish the Custody Force Response Team.

## CFRT Purpose

The Sheriff's Department has created a Custody Operations Division, Custody Force Response Team, whose goal is to ensure high quality force investigations through incident oversight and investigative evaluation. The Custody Force Response Team (CFRT) will be comprised of sergeants, designated to respond to specific force incidents, where they will monitor various aspects of the inquiry, including but not limited to: interviewing participant employees, inmates, and witnesses, examining any video or evidence and monitoring the facility supervisor as they conduct their inquiry.

The Response Team Sergeants shall act as an on-scene resource for the handling supervisor: providing information, guidance, analysis and recommendations. In the course of reviewing the incident, the Response Team Sergeant may give specific direction to the handling supervisor, if appropriate. The facility supervisor has the primary responsibility of handling and documenting the force incident; however, the CFRT has the authority to take control and assume responsibility for the investigation. In the event of policy violations the CFRT Lieutenant may initiate a request for an administrative (internal) investigation, through proper channels.

In examining force incidents, Response Team Sergeants will pay particular attention to events that precipitated the use of force and the tactics used. In incidents where multiple employees are participants, additional focus will be placed on the actions of responding personnel and the tactics involved in their engagement.

## CFRT Notification

Watch Commanders are required to notify the Internal Affairs Bureau (IAB) per the IAB notification criteria. If IAB responds to the incident, NO notification to the CFRT is required.

Watch Commanders shall make immediate verbal notification to the CFRT Lieutenant

Exhibit B
Page 29

CUSTODY FORCE RESPONSE TEAM    -2-                    November 4, 2011

whenever any of the following force incident criteria are present:

- On an IAB notification, if they <u>decline</u> to respond, the CFRT will be notified
- Significant inmate injuries as a result of employee contact or alleged contact
- Significant employee injuries as a result of inmate contact
- Taser – if use results in significant inmate injury
- Personal weapons used – if use results in significant inmate injury
- Impact Weapon/shod foot used – if use results in significant inmate injury
- Carotid restraint
- Emergency Response Team action resulting in significant inmate injury
- Any head strikes – including the head striking any fixed/hard object
- Watch Commander may seek a CFRT response due to the circumstances

During business hours (M-F, 0800-1700), the Watch Commander shall notify the Custody Force Response Team by calling Custody Headquarters at: (213) 893-5004. After hours notifications shall be made through Sheriff's Headquarters Bureau: (323) 526-5541.

<u>Significant Injuries</u>

Significant injuries consist of more than redness, swelling, or bruising. Complaints of pain will not be considered notification criteria unless the complaint is regarding the head, neck, or spine; or, may possibly be indicative of an internal injury. The removal of Taser probes in and of themselves does not constitute a significant injury.

<u>CFRT Response</u>

The CFRT Lieutenant shall evaluate the information and determine if response is appropriate.

<u>Unit Commander Duties</u>

Upon completion of the Use of Force packet and Watch Commander's review, the facility will contact the respective CFRT Sergeant and make arrangements for delivery of the entire packet (including video and evidence if requested). The use of force packet is due to the CFRT Sergeant no later than 14 days after the incident. The CFRT Sergeant has five business days to review the packet and return it to the facility with noted changes, concerns or questions, if any. The CFRT Lieutenant will review the CFRT Sergeant's notations prior to the return of the packet to the facility.

After the facility makes the appropriate changes and obtains the CFRT Sergeant's concurrence, they will process the packet through their operations staff for Unit Commander's notation (the Unit Commander does not sign the completed packet – but should initial or note as having reviewed it). The packet will then be sent to the CFRT Lieutenant, no later than 30 days after the incident. The investigation will be scheduled for a Custody Force Review Committee (CFRC) evaluation.

When an unforeseen circumstance interferes with a unit's ability to meet any of the

Exhibit B
Page 30

761551N25A - SH - AD - 32A (2/72)

COUNTY OF LOS ANGELES
# SHERIFF'S DEPARTMENT
"A Tradition of Service"
OFFICE CORRESPONDENCE

DATE: October 28, 2011
FILE NO.

FROM:    DENNIS H. BURNS, CHIEF          TO:  CUSTODY UNIT COMMANDERS
         CUSTODY OPERATIONS DIVISION

SUBJECT:  **CUSTODY DIVISION DIRECTIVE 11-006**
          **MANDATORY ROTATION OF LINE PERSONNEL IN CUSTODY**

The purpose of this directive is to ensure job assignments for line personnel in Custody Division are rotated no less than every six months.

Effective immediately, all Custody Division unit commanders shall ensure line personnel are rotated between job assignments no less than every six months. Rotations shall be done in a manner that upholds safety and efficiency, while allowing personnel to learn numerous job functions. Unit commanders with the concurrence of the division chief may use discretion for key positions that require additional training or experience that may impact the effectiveness of their command. These key positions shall be identified and reported annually to the Chief of Custody Division. Unit commanders shall ensure that scheduling records are maintained for 2 years to show compliance with this directive.

The policies and procedures outlined in this directive shall remain in effect until the Custody Division Manual is revised and/or this directive is rescinded.

DHB:JJH:jjh

Exhibit B
Page 31

## Los Angeles County Sheriff's Department

| CORRECTIONAL SERVICES DIVISION OFFENDER SERVICES BUREAU INMATE PROGRAMS UNIT | Unit Order: 1-10-010 |
| --- | --- |
| | Effective Date: 06-01-11 Revision Date: Review Date: |
| **Subject:**  Program Cancellations - Inmate Programs/Education | |
| **Reference:**  CDM 2-00/040.00, 5-13/130.00, 7-30/000.00; CCR Title 15 Section 1061 | |

**PURPOSE OF ORDER:**

To standardize policies, rules and procedures within the unit for program cancellations and standardized reporting requirements for said cancellations, in compliance with the Offender Services Bureau Unit Manual.

**SCOPE OF ORDER:**

This order shall apply to all personnel assigned to and/or working in any capacity within the Offender Services Bureau.

**ORDER:**

All inmate educational/vocational programs within the Los Angeles County Jail system are coordinated and administered via the Offender Services Bureau - Inmate Programs Unit.

In any instance where an inmate program/class is canceled (facility lock-down, instructor/facilitator cancellation, staff shortage, CARP...etc) immediate written notification shall be made to the Inmate Programs Unit Sergeant/Lieutenant, via the LASD email system. Notification shall include the following:
- Title of the inmate program/class
- Facility affected, number of inmates impacted
- Date and time of the cancellation
- Reason for cancellation and any other pertinent information relating to the cancellation
- Any efforts made to substitute or fill-in with any other type of program shall also be included within the email notification.

All personnel assigned to Offender Services Bureau shall familiarize themselves with the contents of this unit order and the Offender Services Bureau Unit Manuals of Policy and Procedures.

**1 of 1**

Exhibit B
Page 32



### 3-01/025.10 UNREASONABLE FORCE

Department members shall use only that force which is objectively reasonable. Unreasonable force is that force that is unnecessary or excessive given the circumstances presented to Department members at the time the force is applied. Unreasonable force is prohibited. The use of unreasonable force will subject Department members to discipline and/or prosecution. Head strikes with an impact weapon are prohibited unless circumstances justify the use of deadly force.
04/01/96 MPP



## 3-02/035.00 FORCE PREVENTION POLICY

Every custody deputy and staff member shall view their professional duties in the context of safety for themselves and the inmates.
The Department_s duty is to not violate the law in order to enforce the law. Unreasonable force is a violation of Department Policy (MPP 3-01/025.10).

It is the Department_s responsibility to prevent violence whenever it appears possible. An analysis of force incidents has established that verbal disrespect between inmates and deputies is a factor that leads to aggressive behavior by either the deputy or the inmate. Whenever practical:

- Deputies confronting an uncooperative inmate shall call a supervisor and seek guidance that is aimed at tactical de-escalation of the situation. The supervisor will endeavor to calm the situation and use as much time as it takes to manage the inmate_s verbal aggression.
- Deputies facing an uncooperative inmate shall remain calm during such occasion and not escalate to an emotional level that violates the Department_s Core Values.
- Inmates themselves have a code of respect in order to avoid conflicts and violence. Whenever a deputy speaks to an inmate in a disrespectful way it can cause turmoil in the mind of an inmate which can lead to verbal aggression. Deputies will endeavor, in these cases, to de-escalate verbal conflicts and seek assistance as required by this policy.



## 3-01/025.30 USE OF FIREARMS AND DEADLY FORCE

The Department's policy on use of firearms and deadly force is:

- Discharging a firearm at another human being is an application of deadly force and must, therefore, be objectively reasonable. Each Department member discharging a firearm must establish independent reasoning for using deadly force. The fact that other law enforcement personnel discharge firearms is not by itself sufficient to justify the decision by a Department member to shoot.
- Department members may use deadly force in self-defense or in the defense of others, only when they reasonably believe that death or serious physical injury is about to be inflicted upon themselves or others.
- Department members may use deadly force to effect the arrest or prevent the escape of a fleeing felon only when they have probable cause to believe that the suspect represents a significant threat of death or serious physical injury to the member or other person(s). If feasible, members shall identify themselves and state their intention to shoot before firing at a fleeing felon.
- The firing of warning shots is inherently dangerous. They should not be fired except under the most compelling circumstances. Warning shots may be fired in an effort to stop a person only when the Department member is authorized to use deadly force, and if the member reasonably believes a warning shot can be fired safely in light of all the circumstances of the encounter.
- Cover fire is defined as target specific controlled fire which is directed at an adversary who poses an immediate and on going lethal threat. This tactic shall only be utilized when the use of deadly force is legally justified. Target acquisition and communication are key elements in the successful use of this tactic. Department members employing cover fire must establish their reason(s) for utilizing this tactic.

Revised 06/13/05
Revised 05/16/05
04/01/96 MPP

LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

DEPARTMENT MANUAL OF POLICY AND PROCEDURES

Proposed revision to MPP 5-09/430.00    Requirements when conducting
interviews

This revision is proposed to address concerns raised by the Board, the OIR and the
ACLU regarding the way interviews of suspects/inmates are conducted in force
investigations.  Deletions to existing policy are noted by strikethrough.  The proposed
additions are highlighted.  Because the section is lengthy, only the appropriate sub-
section, dealing with the Watch Commander's Responsibilities, is included here.


5-09/430.00 USE OF FORCE REPORTING AND REVIEW PROCEDURES

Watch Commander/Supervising Lieutenant's Responsibilities

The Watch Commander or Supervising Lieutenant shall, with extreme priority,
personally examine any suspect/inmate on whom significant force has been used and
interview him regarding the incident.  Except in exceptional circumstances, personnel
involved in the use of force, either as a participant or a witness, including supervisors
directing force, shall not be present when the interview is conducted.  If exceptional
circumstances exist, the justification for deviations to this policy shall be thoroughly
documented in the related reports.  When interviewing suspects/inmates regarding use
of force incidents, the Watch Commander shall ask the person if he has any injuries, the
nature of the injuries, and if he wants medical treatment. These questions must be
asked whether or not the suspect/inmate has any apparent injuries (Refer to the section
entitled "Medical Treatment" for required treatment.). If the suspect is taken to a medical
facility for examination or treatment, the Watch Commander shall ensure that a
supervisor interviews the examining physician or qualified medical personnel as to the
extent of the injuries, or lack thereof, and whether the injuries are consistent with the
degree of force reported.

The Watch Commander/Supervising Lieutenant shall tape record the interview of the
suspect/inmate and, if appropriate, photograph him, paying particular attention to any
known or alleged areas of injury (Obtain suspect consent for photographing injuries
hidden by clothing.). The Watch Commander/Supervising Lieutenant should also
consider video-taping the interview when appropriate.

Exhibit B
Page 36

Where practical, the suspect/inmate should not be interviewed during actual treatment. Prior to beginning the interview, the time, date and location of the interview shall be clearly stated, along with the names, ranks and employee numbers of all persons present.

The Watch Commander/Supervising Lieutenant shall submit a force review package (see subsection entitled "Force Review Package") to the Unit Commander as soon as possible detailing the results of his review and his recommendation as to whether further action or investigation is warranted.

Page 2 of 2

LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

DEPARTMENT MANUAL OF POLICY AND PROCEDURES

Proposed revision to MPP 5-09/430.00   Requirements when conducting
interviews

This revision is proposed to address concerns raised by the Board, the OIR and the
ACLU regarding the way interviews of suspects/inmates are conducted in force
investigations. Deletions to existing policy are noted by strikethrough. The proposed
additions are highlighted. Because the section is lengthy, only the appropriate sub-
section, dealing with the Watch Commander's Responsibilities, is included here.


5-09/430.00 USE OF FORCE REPORTING AND REVIEW PROCEDURES

Watch Commander/Supervising Lieutenant's Responsibilities

The Watch Commander or Supervising Lieutenant shall, with extreme priority,
personally examine any suspect/inmate on whom significant force has been used and
interview him regarding the incident. Except in exceptional circumstances, personnel
involved in the use of force, either as a participant or a witness, including supervisors
directing force, shall not be present when the interview is conducted. If exceptional
circumstances exist, the justification for deviations to this policy shall be thoroughly
documented in the related reports. When interviewing suspects/inmates regarding use
of force incidents, the Watch Commander shall ask the person if he has any injuries, the
nature of the injuries, and if he wants medical treatment. These questions must be
asked whether or not the suspect/inmate has any apparent injuries (Refer to the section
entitled "Medical Treatment" for required treatment.). If the suspect is taken to a medical
facility for examination or treatment, the Watch Commander shall ensure that a
supervisor interviews the examining physician or qualified medical personnel as to the
extent of the injuries, or lack thereof, and whether the injuries are consistent with the
degree of force reported.

The Watch Commander/Supervising Lieutenant shall ~~tape~~ record the interview of the
suspect/inmate and, if appropriate, photograph him, paying particular attention to any
known or alleged areas of injury (Obtain suspect consent for photographing injuries
hidden by clothing.). ~~The Watch Commander/Supervising Lieutenant should also
consider video-taping the interview when appropriate.~~


Page 1 of 2

Exhibit B
Page 38

Where practical, the suspect/inmate should not be interviewed during actual treatment. Prior to beginning the interview, the time, date and location of the interview shall be clearly stated, along with the names, ranks and employee numbers of all persons present.

The Watch Commander/Supervising Lieutenant shall submit a force review package (see subsection entitled "Force Review Package") to the Unit Commander as soon as possible detailing the results of his review and his recommendation as to whether further action or investigation is warranted.

Page 2 of 2

LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

DEPARTMENT MANUAL OF POLICY AND PROCEDURES

Proposed revision to MPP 5-09/430.00  48 hour deadline/alleged force interviews

This revision is proposed to specifically address the concern raised by the Board that any alleged use of force involving inmates be investigated within 48 hours. This revision would simply reinforce the current mandate that alleged uses of force be immediately investigated by supervisors in the same manner as all other force brought to their attention. (After consultation with the OIR, it was agreed that imposing an arbitrary 48 hour timeline would not address the root of the concern, which is the requirement to mandate timely investigation of any alleged use of force.)

Because the section is lengthy, only the appropriate sub-section, dealing with the Watch Commander's Responsibilities, is included here.

5-09/430.00 USE OF FORCE REPORTING AND REVIEW PROCEDURES

Any use of force which is greater than that required for unresisted Department-approved searching or handcuffing, including the use of oleoresin capsicum (pepper) spray, Freeze +P, Deep Freeze aerosols, or powder from a Pepperball projectile must be reported. Additionally, any use of force which results in an injury or a complaint of pain must be reported.

Directed Force

Directed force is any force used by Department personnel at the direction of a supervisor to control an individual or a group.

Responsibilities for Reporting the Use of Force

Members shall immediately make a verbal notification to their immediate supervisor (in this section, "supervisor" refers to a minimum rank of Sergeant) in all cases in which they use reportable force. Members witnessing reportable force used by another Department member or by anyone working with or on behalf of the Department shall immediately advise their supervisor, who will determine whether a separate report/memorandum by the witness(es) is required. Members witnessing reportable force (as defined in this section) used by employees of another law enforcement agency shall immediately advise their supervisor and write a memorandum documenting their presence or, if applicable, provide a copy of their patrol log.

NOTE: For purposes of this section, "reportable force" shall include all cases wherein force is alleged by any individual or group, regardless of the party making the allegation,

Page 1 of 2

Exhibit B
Page 40

or their relationship to the party upon whom force was alleged to have been used. The responsibility for reporting an alleged use of force shall belong to the member to whom the alleged use of force was reported.  Supervisors shall immediately investigate alleged uses of force brought to their attention in the same manner mandated for all reportable force in this policy.

NOTE: Refer to MPP section 5-09/431.00 through 5-09/434.15 for the use of force reporting and review procedures involving shootings by Department members.