PETER J. ELIASBERG (SB# 189110)
peliasberg@aclu-sc.org
MARISOL ORIHUELA (SB# 261375)
morihuela@aclu-sc.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Phone: (213) 977-9500
Fax: (213) 977-5299

DONNA M. MELBY (SB# 86417)
donnamelby@paulhastings.com
JOHN S. DURRANT (SB# 217345)
johndurrant@paulhastings.com
JADE H. LEUNG (SB# 279651)
jadeleung@paulhastings.com
ELIZABETH C. MUELLER (SB# 278283)
bethmueller@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071-2228
Phone: (213) 683-6000
Fax: (213) 627-0705

MARGARET WINTER (*pro hac vice*)
mwinter@npp-aclu.org
ERIC BALABAN (*pro hac vice application forthcoming*)
ebalaban@npp-aclu.org
DAVID M. SHAPIRO (*pro hac vice application forthcoming*)
dshapiro@npp-aclu.org
NATIONAL PRISON PROJECT OF
THE AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St., NW
Washington, D.C. 20005
Phone: (202) 393-4930
Fax: (202) 393-4931

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN
GOODWIN, on behalf of themselves
and of those similarly situated

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> LEROY BACA, Sheriff of Los Angeles County Jails, et al., <br><br> Defendants. | CASE NO. CV 12-00428 DDP <br><br> **DECLARATION OF TOM PARKER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> Date: March 26, 2012 <br> Time: 10:00 a.m. <br> Ctrm.: 3 <br> Judge: Hon. Dean D. Pregerson |

LEGAL_US_W # 70661285.2

PARKER DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

# DECLARATION OF TOM PARKER

## I. Introduction

I, Tom Parker, I make this declaration based on my own personal knowledge, except where indicated, and if called to testify I could and would do so competently as follows:

1. On February 13, 2011, I was retained by Peter Eliasberg, who is now the Legal Director, American Civil Liberties Union Foundation of Southern California (ACLU), on behalf of the Plaintiff Class in the matter captioned "DENNIS RUTHERFORD, ET AL, V. LEROY BACA, ET AL, Civ. 75-004111-DDP," U.S. District Court, Central District of California, to examine numerous inmate, former inmate, and civilian declarations, legal filings, correspondence, ACLU reports, and media articles and broadcasts, and, based upon my training, knowledge, and experience, to assess allegations of physical abuse and excessive use of force against inmates within the Los Angeles County Jails system and the Los Angeles County Sheriff's Department (LASD), which staffs and manages the jails.

2. I was subsequently provided with numerous documents, generally described above, by Mr. Eliasberg, and I also independently found other documents and literature, all of which I reviewed in pertinent part while doing my investigation, research, analysis, and preparation for this declaration. I also conducted interviews with some of the declarants to analyze the information they provided. Based upon this review, I made various observations regarding allegations of violence and mistreatment against inmates by their guards and arrived at certain findings and conclusions as set forth hereinafter in this declaration.

3. A tour of the Men's Central Jail and Twin Towers Jail was requested by the ACLU and approved and scheduled by LASD for April 6, 2011, for me and another expert witness on this matter. At the last minute, the LASD abruptly

cancelled this tour. I have been inside both jails before, but not since approximately 1992 - 1993, and this tour is still necessary to put the contents and context of most of the documents I have reviewed into a proper perspective.

## II.  Executive Summary

4.      I am a 24-year veteran of the Federal Bureau of Investigation (FBI). When I retired in 1994, I was Assistant Special Agent in Charge (ASAC) of the Los Angeles Regional Office -- the FBI's second largest field division at that time. I had served in that position since November 1989.  In my career at the FBI, I supervised and participated in numerous investigations into allegations of criminal and civil rights violations by law enforcement agency personnel, including within the Narcotics Division of the Los Angeles County Sheriff's Department and the Los Angeles Police Department, as well as within numerous jails and prisons throughout the country.

5.      On February 13, 2011, I was retained by the Plaintiff class in *Rutherford v. Baca* CV 75-04111 DDP, to examine numerous inmate declarations, legal filings, correspondence, reports, and media articles and broadcasts, and, based upon my training, knowledge, and experience, to assess allegations of physical abuse, excessive use of force by deputies against inmates as well as deputy-instigated inmate-on-inmate abuse within the Los Angeles County Jails system and the Los Angeles County Sheriff's Department (LASD), which staffs and manages the jails.

6.      Of all the jails I have had the occasion to visit, tour, or conduct investigations about, domestically and internationally, I have never experienced any facility exhibiting the volume and repetitive patterns of violence, misfeasance, and malfeasance impacting the Los Angeles County Jail system, particularly Men's Central Jail, and to a lesser extent, the two Twin Towers facilities. This jail system is one of the largest in the United States, if not the world.  It regularly houses every

type of criminal, and thus has every conceivable problem a correctional facility can have.  However, in most facilities that are professionally managed these problems are usually anomalies, rather than the norm.  In the case of the Los Angeles County Jails, the anomalies appear to be the norm.

7.    Deputy violence and abuse is legally impermissible whether perpetrated against convicted felons or against pre-trial detainees.  It is worth noting, nevertheless, that the great majority of inmates in the Los Angeles County jail facilities are simply awaiting trial and, by law and the U.S. Constitution, are still legally presumed innocent until proven guilty.

8.    My principal opinions and conclusions are as follows:

9.    To an astonishing extent, unchecked violence, both deputy-on-inmate and inmate-upon-inmate, permeates Men's Central Jail and Twin Towers Jails, which are components of the Los Angeles County Jails, managed by the Los Angeles County Sheriff's Department under the leadership of Sheriff Leroy Baca.

10.    Sheriff Baca and his top management team LASD have essentially abdicated their responsibilities to provide a safe, secure, and corruption-free incarceration environment within the Los Angeles County Jail System.  This has resulted in a pattern of countless inmates' suffering severe injuries, maiming, and death, some caused by fellow inmates, but most often at the hands of, or with the acquiescence or assistance of, the deputy sheriffs who are their keepers.

11.    The lack of effective, consistent, and impartial investigation by LASD into such evidence raises bright red flags as warning signals that things are horribly amiss in the operation and management of the Los Angeles County Jail System, especially Men's Central Jail and the Twin Towers Jail facilities.

12.    The evidence I have seen in preparing this declaration is overwhelming with regard to systemic violence, misfeasance, and malfeasance, including corruption, within the Los Angeles County jails, especially the Men's Central Jail and the Twin Towers facilities.  There is a prevalent and long-term

PARKER DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

pattern of such unchecked violence, and it has become the accepted practice in jail operations, along with systemic institutional actions to cover it up.

13.    For the most part, within these three facilities, there is inattentive and inadequate supervision, a virtually autonomous staff of deputies managing the inmate population by their own arbitrary and often violent whims, widespread violations and lack of enforcement of the Jails' own rules and policies, discipline so lax it is bordering on being nonexistent, and inculcation of fear in inmates through intimidation and physical and verbal abuse.  There is also an overarching lack of sensitivity and attention to inmates' physical handicaps, medical needs, mental health issues, personal hygiene, living conditions, personal safety, and basic civil rights.  These conditions have existed for years without any meaningful remediation and continue to exist virtually unchecked today.

14.    At least since the 1980s and perhaps as far back as the early 1970s, the LASD has had an unknown number of deputy gang-like subgroups using tattoos, hand-signs, intimidation tactics, and physical violence often bordering on vigilante-style justice, to maintain their dominance not only within their assigned duty stations but also within the LASD in general.  Sheriff Baca has been aware of the existence of these deputy-gang sub-groups, which have existed within the LASD as far back as 1972, and Under Sheriff Paul Tanaka was a member of one such gang, perhaps the most infamous one, earlier in his career.

15.    The Kolts Commission, almost 20 years ago, recognized and exposed the existence of "Deputy Gangs" and reported that their actions are "of a profoundly serious nature, touching the fundamental fitness of the LASD to perform its mission."  Their actions were described as "numerous acts of excessive force including shootings, beatings and the destruction of property."  Such "Deputy Gangs" still exist today, seemingly with impunity, right under the eyes of all levels of the current management of LASD.  One specific Deputy Gang, the "3000

Boys," appears to be the most virulent based on what I have reviewed for this declaration.

16. Incidents of deputy-on-inmate violence, after no or only nominal investigation by LASD, are routinely reported by deputies as unprovoked inmate-on-deputy assaults. If an inmate complains of being beaten or injured by jail deputies, those complaints are almost universally declared unfounded. Most of these complaints get "resolved" at the lowest levels in the LASD. Proper reporting procedures seem to be routinely ignored.

17. Merrick Bobb, President and founding director of the Police Assessment Resource Center (PARC), serves as Special Counsel to the Board of Supervisors to monitor the LASD. Between 1993 and 2010, Mr. Bobb has published 29 reports on his monitoring the status of operations and reform within LASD. Many of those reports during that 17-year period report numerous incidents involving excessive use of force by deputies in the jails, including "cases in which the decision to exonerate the officer [in excessive force cases] simply defies explanation, and there are still incidents, almost all in the custody setting, where the use of force is either senseless or overly severe."

18. Neither the Special Counsel, nor the Office of Independent Review (OIR) has any real authority or means to effectively address problems in the county jails or within the LASD. PARC does research on issues in the LASD, including the jails, and issues semi-annual reports, which include findings and recommendations – many of them excellent – about problems in the jails. However, the Sheriff has no obligation to adopt any of those recommendations. OIR does not conduct independent investigations of use of force incidents, but instead must rely on assessing incidents of force through reports and materials presented to them by the LASD. In addition, LASD does not have any obligation to accept OIR's conclusion as to whether a use of force was appropriate, or OIR's recommendation of the appropriate discipline to be imposed on officers who are

- 5 -    PARKER DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

found to have violated LASD policy or the law.  Thus, there is only a façade of outside independent oversight of the LASD, when, in reality, the LASD has rendered it ineffective.

19.    The volume of complaints and injuries I have reviewed in preparing this declaration is absolutely astonishing to me as a criminal justice professional and former senior law enforcement executive manager.  The similarities and consistency of the incidents reported by the inmates' declarations lends tremendous credibility to those allegations.  They are further validated by reports of outside individuals – including jail chaplains and instructors – with no reason to cast unfounded aspersions upon LASD deputies and managers.

20.    It is highly significant that a number of civilian witnesses to deputy violence have come forward and reported witnessing deputies attack non-resisting inmates.  Their accounts indicate that deputies feel such a sense of impunity that they are unafraid to assault inmates even in areas where they know they may be observed by civilians.  Their experiences suggest that the culture of deputy violence in the Jails has become so hardened and pervasive that deputies feel emboldened to carry out their attacks even in non-secluded areas.

21.    To date, neither the LASD, Sheriff Baca, nor any of his top subordinates has been held accountable for such failures. Having investigated corruption, the use of excessive force, and other irregularities in numerous police and sheriff's departments and custodial facilities, including the LASD, I have seen agencies that are perfectly capable of effectively and impartially investigating themselves, but have seen an even larger number that do not have that capability or the will to acquire it. It is clear that LASD has been, and still is, incapable of investigating itself with regard to the clear evidence of jail violence and other misfeasance and malfeasance.

22.    I am quite familiar with the infamous LAPD Rampart Division corruption scandal, as well as the equally infamous Rodney King matter.  In my

opinion, based on my investigation reported herein, this matter involving high levels of violence within the LASD County Jail System is actually significantly more systemic, involving many more LASD officers, supervisors, and managers than the number of LAPD officers, managers, and supervisors involved in the Rampart matter. In addition, many of the incidents of jail violence are far more severe than the King beating or much of the other excessive force that was prevalent at that time in the LAPD.

23. The voluminous evidence I have reviewed cries out for an independent, far-reaching, and in-depth investigation by the Federal Government of the conditions and acts of unchecked violence within the Los Angeles County Jails, especially at the Men's Central Jail and the Twin Towers Jail facilities, if not the entire management and operation of the jail system. The U.S. Department of Justice Civil Rights Division and the Federal Bureau of Investigation are most likely the only agencies with the authority, independence, and expertise to conduct such an investigation. Since the LASD appears totally incapable and lacking in motivation to correct these problems, it remains for the federal government and the courts to do so. The problem can no longer be ignored.

## III.  Qualifications

24. I retired from the Federal Bureau of Investigation (FBI) in February, 1994, as Assistant Special Agent in Charge (ASAC) of the Los Angeles Regional Office -- the FBI's second largest field division at that time. I had served in that position since November, 1989, and, during my tenure, was executive manager in charge of all criminal investigative programs involving major violent crimes, organized crime, drug trafficking, white collar crimes, and public and police corruption. In that position, I was also responsible for creating, implementing, and directing a variety of specialized investigative squads and interagency task forces, including the Southwestern U.S. Joint Drug Intelligence Group, to address specific

violent crimes, organized crime, drug trafficking, financial crimes, and gang activity. Additionally, I was the FBI executive representative to the U.S. High Intensity Drug Trafficking Area Executive Board responsible for the coordination and supplemental funding of all international and domestic drug enforcement investigations by Federal, state, and local law enforcement agencies in the Los Angeles area.

25. Among my other myriad management responsibilities was oversight of the massive FBI investigation into widespread corruption and malfeasance within the Narcotics Division of the Los Angeles County Sheriff's Department, and the FBI investigation into the infamous Rodney King incident involving excessive use of force by officers of the Los Angeles Police Department. Both of these investigations involved law enforcement officers and supervisors violating the rights of criminal suspects by engaging in activities which were far outside of accepted law enforcement and criminal justice practices, and were also outside the boundaries of even marginally reasonable law enforcement actions, not to mention being outright illegal. Management and supervisory shortcomings contributed to each of the situations. In both of those cases, numerous officers were convicted and sentenced to prison terms. Additionally, I was the senior Federal law enforcement executive, working in tandem with both the Los Angeles County Sheriff and the Chief of the Los Angeles Police Department, commanding the law enforcement responses to both the massive 1992 riots and the 1994 Northridge earthquake.

26. My other field operations command responsibilities included serving as on-site commander for major arrests, barricaded subject and hostage incidents, SWAT deployments, tactical operations not involving SWAT, execution of search warrants, drug seizures and arrests, undercover operations, the investigation of excessive use of force by law enforcement and custodial officers in violation of the civil rights of private citizens, and shooting incidents involving FBI Agents and members of interagency task forces.

27. My management responsibilities also included the approval of the initiation of FBI criminal investigations, the evaluation of the sufficiency of FBI investigative results prior to the issuance of criminal complaints or indictments, approval and oversight of undercover operations, and assuring compliance with FBI and Attorney General Guidelines on the conduct of investigations and personnel behavior. I was also responsible for conducting and managing internal affairs matters including violations of FBI policies and procedures and any use of deadly force by FBI Agents.

28. Prior to my assignment to Los Angeles, I served in a variety of FBI investigative, supervisory, and management positions in various field offices and two tours of management duty at FBI Headquarters (FBIHQ). During the first FBIHQ assignment, I served as a Program Manager in the Office of Congressional and Public Affairs, where I managed public affairs programs and served as the Senior Speechwriter for the FBI Director. I regularly dealt with the news media in that assignment, including preparing press releases, the Director's Congressional Testimony and speeches, and conducting press conferences.

29. I also served as a guest lecturer at training sessions for the FBI's field media representatives. In a second assignment to FBIHQ, I also served for more than two years as an Assistant Inspector on the FBI's Inspection Staff, which examined and evaluated the effectiveness and efficiency of FBI management and supervision, as well as investigative and administrative operations, in field offices and FBI Headquarters Divisions. For approximately ten years, I was an FBI field police instructor for police officers and corrections officials around the country for several general law enforcement topics, including basic police supervision, organized crime investigations, informant development, and report writing. I have also been a guest lecturer at the FBI Academy on public corruption, racketeering, criminal investigative procedures, and FBI management policies.

30. In most of my field assignments – as a Special Agent investigator, as a

Supervisory Special Agent, as an Assistant Inspector, and as an Assistant Special Agent in Charge of one of the FBI's top two offices – I have visited, conducted, and supervised investigations in numerous city and county jails, state prisons, Federal Correctional Institutions (FCI), and Metropolitan Detention Centers (MDC) across the country.  The vast majority of these investigations involved murders, excessive use of force by custodial officers, prison staff corruption, and other correctional facility irregularities. Sometimes these investigations concerned whether there was a pattern and practice of illegal acts.  Additionally, I have met with and interviewed numerous staff and inmates in the majority of these facilities for investigative purposes and had extensive contact with jail and prison managers in relation to same.  Included among these facilities in which I have conducted official FBI business or other investigations have been the following:

County Jails

Harris County Jail in Houston, Texas

St. Louis County Jail in Missouri

Hennepin County Jail in Minneapolis, Minnesota

Ramsey County Jail in St. Paul, Minnesota

Clark County Jail in Las Vegas, Nevada

Peter Pitchess Detention Center in Castaic, California

Ventura County Jail in Ventura, California

Santa Barbara County Jail in Santa Barbara, California

Los Angeles County Jail in Lancaster, California

State Prisons

Parchman State Prison in Mississippi

Huntsville State Prison in Texas

Stillwater State Prison in Minnesota

Minnesota State Prison in St. Cloud, Minnesota

Southern Nevada State Correctional Center in Jean, Nevada

LEGAL_US_W # 70661285.2

- 10 -

PARKER DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

Nevada State Prison in Carson City, Nevada

Missouri State Prison in Jefferson City, Missouri

Federal Correctional Institutions

Sandstone FCI in Minnesota

Duluth FCI in Minnesota

La Tuna FCI in Texas

El Reno FCI in Oklahoma

Lompoc FCI in California

Terminal Island FCI in California

Federal Metropolitan Detention Center- Los Angeles in California

San Pedro Immigration Detention Center in California

Mira Loma Federal Immigration Detention Center in California

Federal Immigration Detention Center – Florence in Arizona

31.    Since retiring from the FBI and engaging in criminal justice consulting and expert witness work over the past 18 years, I have visited and toured jail and prison facilities, and met with corrections officials, in a number of international locations, as set forth in my narrative CV attached here to as Exhibit A.

32.    I have also served as an expert witness in Federal and state courts in excess of twenty-five times on law enforcement excessive use of force, law enforcement corruption, financial fraud, and political asylum applications alleging discriminatory actions and violence by police and/or correctional officers in the country from which they were fleeing.  In many of these asylum cases, I journeyed to the country of origin to investigate the veracity of the asylum-seekers claims. These matters included actual courtroom testimony, sworn declarations, reports, and/or depositions.

33.    I hold a Bachelor of Arts degree in Criminal Justice Administration and a Master of Arts degree in Public Safety Management and Education, and

graduated from the FBI's Executive Development Institute as well as numerous in-service training programs for FBI Agents and FBI managers. I was also certified as an FBI Management Instructor to train law enforcement supervisory and command personnel in management techniques for many phases of command responsibilities, including the management of critical incidents, ethics and corruption, personnel management, performance measurement and appraisal, budgeting, media relations, strategic planning, excessive use of force investigations, and disciplinary policies and actions. I was also an Adjunct Instructor in Criminology for the University of St. Francis, Joliet, Illinois.

34. From 1999 to 2003, I also served as chairman of a non-profit program funded by the U.S. government to consult with and train police officers, corrections officials, prosecutors, and judges in nine different cities in the Russian Federation to increase their professionalism, reduce violence and corruption against citizens and prison inmates, and implement community policing programs, among other topics. This project provided me with the opportunities to visit a number of Russian jails and prisons and to observe and discuss their facilities, procedures, and management.

35. I served a two-year term (2009-2010) as a member of the Fire and Police Commission for the City of Santa Barbara, California, including one year as the Vice-Chair of the commission which has advisory oversight responsibilities for both the fire and police services in the city.

36. My prior expert witness engagements are also included in Exhibit A attached to this declaration.

## IV. **Methodology**

37. Giving due consideration to the purpose of this declaration, I have approached this project as a career law enforcement professional and investigator, not as an academic or corrections expert. So, my perspective is that of a trained

LEGAL_US_W # 70661285.2

- 12 -

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

and highly experienced investigator looking for the facts, analyzing them, and arriving at certain conclusions based upon the facts I have found.

38.    The investigative methodology I applied to its preparation was to gather as much background information as possible on reports of historical corruption and violence, as well as allegations of mistreatment of inmates within the Los Angeles County Sheriff's Department and the Los Angeles County Jail system.  My attention in this regard was primarily focused upon Men's Central Jail and the Twin Towers 1 and 2 Jails.  I was first provided with numerous declarations collected by the ACLU from present and past inmates of these facilities describing specific incidents of violence, mistreatment, or maltreatment directed against them or others, reportedly for no perceived reason, by their deputy sheriff guards or by other inmates at the instigation of the deputies or under their ignoring eye.  I was also provided with reports from outside third parties providing services to the jails, including instructors and chaplains, alleging that they had witnessed mistreatment of inmates; numerous court filings pertinent to this litigation; and  declarations by ACLU jail monitors and by LASD officials.  I have interviewed several of these declarants in order to assess the validity of their statements. I have also conferred with and obtained information from one of the leading corrections experts in California, if not the country, who is very familiar with the Los Angeles County Jails System.

39.    I also reviewed reports from the offices of Special Counsel James Kolts (Kolts Commission), from Merrick Bobb – Special Counsel to the Los Angeles County Board of Supervisors, and from the Office of Independent Review (OIR) concerning various incidents in the jails; media reports of violence and alleged corruption by jail personnel, academic articles on jail violence and mistreatment of inmates, publications by the American Correctional Association  – of  which I am a member – regarding jail and prison standards and best practices; and other books and journals on law enforcement and corrections cultures and

practices. I reviewed and analyzed these materials in light of my 45 years of experience in the criminal justice system as a police officer, FBI Special Agent, FBI Supervisory Special Agent, FBI executive manager, consultant, and law enforcement educator, along with my familiarity with domestic and foreign correctional facilities and my international consulting and investigations experience focused on criminal justice issues. From this documentation, literature, knowledge, experience, and training, I was able to arrive at the various observations and conclusions I describe later in this declaration.

## V. **Background**

40.    Before any meaningful assessment of LASD and its management of the county jail system, can be accomplished, it is necessary to review the historical background of that department, looking for trends, patterns, or practices that appear to either suggest or demonstrate a 'seedbed' for present day practices and patterns.    Therefore, this section of my declaration is intended to provide that historical foundation and give context to the rest of the declaration, which will set forth the results of my review and analysis of a long history of incidents and allegations concerning, excessive use of force and corruption, within the Los Angeles County Sheriff's Department (LASD) and Los Angeles County Jail system.

41.    In this declaration, I focus primarily upon reports of deputy-on-inmate violence and mistreatment, and lax or missing supervision and insufficient staff discipline within the Los Angeles County Jail facilities, particularly at the Men's Central Jail and the Twin Towers 1 and 2 jails. It is important, however, to take into account a chronological history of corruption and excessive use of force by LASD deputies, both in and out of the jail environment, to understand the context in which deputy-on-inmate violence has been allowed to flourish in the LASD-run county jail system.

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

A. Recent History of Corruption and Use of Excessive Force within LASD and Los Angeles County Jails.

42.    In the late 1980s and the early 1990s, the LASD was the subject of a major corruption scandal when it was discovered that a surprisingly large number of deputies in the Narcotics Division were engaging in wholesale theft of money and illicit drugs from drug dealers and money launderers they were investigating. The elite LASD Majors II team was at the heart of these allegations, as were some members of other Majors teams. The FBI and the LASD launched a joint investigation of these suspicions and allegations, to which they assigned the project codename, Operation Big Spender.  Subsequently, over a five year period of investigations and prosecutions, 25 felony convictions were obtained against LASD deputies from several of the "Majors" narcotics units and their associates in these schemes.  I was the executive manager over much of the FBI role in that investigation.[1]

43.    Additionally, on October 2, 1992, thirteen LASD deputies, accompanied by eighteen other city, state, and Federal law enforcement officers, National Guard personnel, and a technician for some sophisticated search equipment from the Jet Propulsion Laboratory, raided the ranch of Donald Scott in the Ventura County portion of Malibu, California. They were there to serve a search warrant seeking thousands of marijuana plants allegedly under cultivation on the ranch.   The LASD was the lead agency in this raid, commanded by a lieutenant and four sergeants.  No marijuana or any other illicit drugs were found, however, during the raid, Mr. Scott was shot and killed by the lead LASD deputy who had also been the affiant on the search warrant application.  A subsequent investigation by the Ventura County District Attorney (DA), as set forth in his

---

[1]    Personal knowledge and experience.

report dated March 30, 1993, determined that the probable cause statement for the warrant contained material misstatements, evasions, and omissions by the affiant which otherwise would have resulted in the warrant application being denied. The Ventura County DA stated in his report, "The misstatements and the omissions make the warrant invalid."

44. That investigation also revealed that the lead LASD deputy probably fabricated information, pressured other outside law enforcement officers on the team to go along with false information he wanted to use in the warrant application, and thus, "obtained a search warrant that was not supported by probable cause." The Ventura County DA concluded that the real LASD motivation behind the search warrant was their desire to seize and forfeit the multi-million dollar Scott ranch, the proceeds of which would accrue to LASD. In his comprehensive report on the whole debacle, in which he was highly critical of LASD, the DA stated, "The search warrant became Donald Scott's death warrant," and "What we cannot forget is that Donald Scott's death could and should have been avoided." He went on to recommend that: "….sheriffs and police chiefs statewide should review consent agreements…..to determine how much authority they wish to give to sheriff's deputies from other counties and police officers from other cities." He also recommended that the LASD pursue an administrative investigation into the activities of the lead LASD deputy on the raid, and that the LASD "should examine its policies and procedures regarding obtaining and executing search warrants to prevent a recurrence of the events which led to the death of Donald Scott."[2]

45. The LASD and Los Angeles County ultimately settled the lawsuit by Scott's wife and children arising from the case for $5 Million.

---

[2] MICHAEL D. BRADBURY, REPORT ON THE DEATH OF DONALD SCOTT, (1993).

LEGAL_US_W # 70661285.2

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

46.     A significant number of reports have been issued by oversight and monitoring agencies, including the U.S. Department of Justice and the Office of Independent Review, on the use of excessive force and malfeasance within the LASD.

47.     In 1991, partially as a result of Big Spender, along with other factors, the Los Angeles County Board of Supervisors appointed James G. Kolts as Special Counsel to the Board and assigned him the task of conducting a review of "the policies, practices and procedures of the Sheriff's Department, including recruitment, training, job performance and evaluation, record keeping and management practices, as they relate to allegations of  excessive force, the community sensitivity of deputies and the Department's citizen complaint procedure."  The team Kolts assembled for this project became known as the Kolts Commission.  In July 1992, Kolts issued his report.[3]

48.     The following are key quotations from the Introduction to the Kolts report:

- "My staff and I found deeply disturbing evidence of excessive force and lax discipline. The LASD has not been able to solve its own problems of excessive force in the past and has not reformed itself with adequate thoroughness and speed."[4]

- "…this report is a somber and sobering one in terms of the large number of brutal incidents that have been and still are occurring. This Department, like the LAPD, has too many officers who have resorted to unnecessary and excessive force. The Department has not done an effective job disciplining them.  It has not dealt adequately with those who supervise them.  It has not

---

[3]     KOLTS COMM'N, KOLTS COMMISSION REPORT(1992).
[4]     *Id*. at 1.

PARKER DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

listened enough to what the communities and constituencies of the LASD want and expect in their police."[5]

- "Thus, the Department has a longer way to go than it has travelled thus far before its procedures and practices in the area of force, complaint resolution, internal investigation, and community policing are at levels consistent with Sheriff Sherman Block's expressed core values and where this large and very important law enforcement agency should be."[6]

- "We urge the elimination of any and all roadblocks or intimidation or discouragement to expression of a resident's right to complain and be heard with respect to asserted police misconduct.  We recommend responsible review of LASD determinations that citizens' complaints are not well-founded by detached and neutral persons outside the Department. We recommend internal reform to make everyone in the Department accountable for reducing excessive force and listening to the voice of the community."[7]

- "In sum, we recommend that the Department concentrate intense energy and commitment to move the Department much faster and much farther toward community policing, problem-solving policing, and toward a style of policing that treats every county resident with dignity and respect and deals firmly with any employee who does not."[8]

49.    In the same report, the Kolts Commission deals with the issue of "Deputy Gangs," notably "The Vikings," within the Lynwood Station at that time. The report states:  "These allegations merited investigation because they are of a

---

[5]    *Id*. at 3.
[6]    *Id*. at 4.
[7]    *Id*. at 4.
[8]    *Id*. at 4.

profoundly serious nature, touching the fundamental fitness of the LASD to perform its mission."[9]

50.    The Kolts Commission Report paid particular attention to the *Thomas v. County of Los Angeles* lawsuit in U.S. District Court, Central District of California. *Thomas,* No. CV 90-5217 TJH (Ex), para. 7 (C.D. Cal. Oct. 8, 1991). Focusing upon the Lynwood Station, the plaintiff alleges that "deputies at the Lynwood Station engaged in numerous acts of excessive force, including shootings, beatings and the destruction of property."  (Kolts Report, p. 323.)  The plaintiffs further alleged that such activities by deputies – including the Vikings – continued unabated and unchecked by LASD supervisors failing to maintain control over their deputies.  "In a preliminary injunction hearing before [Federal] Judge Hatter, the plaintiffs won an order instructing the LASD to follow its own operational guidelines.  Regarding the Vikings, Judge Hatter found that '[m]any of the incidents which brought about this situation involved a group of Lynwood area deputies who are members of a neo-Nazi, white supremacist gang – the Vikings – which also exists with the knowledge of departmental policy makers.'" [10]

51.    "Other civil suits have also involved allegations of gang-like behavior by deputies. A typical piece of evidence is the fact that certain deputies wear tattoos, sometimes accompanied by language that could be interpreted as being ethnically derogatory (e.g. "Chango Fighter")."[11]

52.    "The former Captain of Lynwood served as the commander from June 1989 until May 1992.  He told us that he regarded the Viking symbol as a 'childish' distraction from the professional responsibilities of the Lynwood

---

[9]    *Id*. at 323.
[10]    *Id*. at 323-24.
[11]    *Id*. at 324.

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

deputies, and eventually eliminated the Viking emblem as Lynwood's symbol…."[12]

53.    "The Captain acknowledged that a group of deputies at the Lynwood Station had affiliated especially closely with the Viking symbol.  He further stated that this 'inner group' of Vikings had in the past engaged in misbehavior, such as painting Viking graffiti over street gang graffiti, harassing [LASD] supervisors and damaging their personal property."[13]

54.    The report noted that this reform-minded Captain was removed from his command after subordinates complained about his aggressive efforts to reform his station. Shortly thereafter, he retired.

55.    "The issue of deputy gangs is inflammatory and should not be allowed to fester. Therefore, we recommend that LASD take aggressive steps to eradicate offensive station mascots and conduct an immediate, thorough Internal Affairs investigation to identify, root out, and punish severely any lingering gang-like behavior by its deputies.  Unit commanders should aggressively break up deputy groups which manifest any of the conduct which signifies gang-related activity."[14]

56.    The Kolts Commission found that there was, indeed, a history of excessive use of force and lax discipline within the LASD, and concluded that the Department had failed to reform itself.  The Commission recommended civilian monitoring of the LASD.[15]

57.    On January 5, 1993, the Board of Supervisors received and accepted the Kolts Report and, without dissent, passed a resolution to carry out its recommendations. The Supervisors pointed out that much work still needed to be done and that they needed the guidance and advice of  a Special Counsel to

---

[12]    *Id*. at 325.
[13]    *Id*. at 326.
[14]    *Id*. at 332.
[15]    *Id*. at 1.

LEGAL_US_W # 70661285.2

PARKER DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

monitor LASD's compliance with the Kolts Report and to report to the Board semi-annually for three years regarding such compliance. In June, 1993, the Board retained a Special Counsel, Merrick J. Bobb, for this purpose.[16]

58.    Bobb headed a non-profit organization, the Police Assessment Resource Center (PARC), which became the entity to facilitate this monitoring responsibility. Bobb, aided by the staff of PARC, continues to serve to this day as Special Counsel to the Los Angeles County Board of Supervisors and the Sheriff, and remains as monitor of the LASD and its operations. The specific mission of the Special Counsel and his staff is to investigate, monitor, and provide a twice yearly critical review of the performance of the Los Angeles County Sheriff's Department (LASD) in managing the risk of police misconduct and its attendant social and fiscal costs to the County.[17]

59.    Between 1993 and 2010, Special Counsel Bobb and PARC issued 29 semi-annual reports as required by the Board. A significant number of these reports touched upon the continuing problems within LASD of officer misconduct and excessive use of force and violence in the county jails. Some illustrative excerpts pertinent to this report, spread across the 17 years they have been issued, follow:[18]

60.    In his 4th Semi-Annual Report (June 1995), Bobb reported the following:

"…we continued to find too many cases involving unnecessary force in responses to verbal taunts or passive noncompliance. Most of these incidents arose in the jails, where we found a substantial number of instances where deputies appear to over-react to apparently slight provocations, like stepping out of the chow line, by shoving the inmate against the wall or

[16]    MERRICK BOBB & PARC, FIRST SEMI-ANNUAL REPORT 1 (1993).
[17]    *Id.*
[18]    PARC: POLICE ASSESSMENT RESOURCE CENTER, http://www.parc.info.

slapping him in the face.  It formerly was the case that in both patrol and custody settings, an officer would at times resort to a transparently phony pretext ('the suspect stared at me aggressively') to justify or excuse unnecessary or excessive force.  Although the use of such pretexts has abated on the patrol side, it is still practiced to an uncomfortable and unacceptable degree in the custody setting."[19]

"…we do not believe that The Department has yet implemented the Kolts recommendations with respect to force investigations."[20]

"In its analysis of over 1,000 force-related investigations spanning a five-year period, the Kolts Report concluded that the Department was too lenient in the way it disciplined officers found to have engaged in excessive force."[21]

"The situation has not changed very much.  Despite the LASDs promulgation of written guidelines for discipline in November, 1991, we still found substantial variations in the discipline imposed both between stations and within a given station itself. We also found that captains remain disinclined to impose substantial penalties for serious misconduct."[22]

"…we continue to find cases in which the decision to exonerate the officer *[in excessive force cases]* simply defies explanation, and there are still incidents, almost all in the custody setting, where the use of force is either

---

[19]    MERRICK BOBB & PARC, 4TH SEMI-ANNUAL REPORT 15 (1995).
[20]    *Id.* at 19.
[21]    *Id.* at 22.
[22]    *Id.* at 22.

- 22 -

senseless or overly severe."[23]

61.    In his 10th Semi-Annual Report, February, 1999, Bobb pointed out the following:

"In May, 1990, the Los Angeles Times published an exposé of the Sheriff's Department's troubling record with respect to excessive force.  It found that in 1989, 151 excessive force lawsuits had been filed against the Sheriff's Department, nearly double the number of lawsuits in the five years previously.  Approximately two-thirds of all the litigation filed in 1989 alleged excessive force.  Excessive force cases represented three-fourths of all major legal settlements and jury awards over a three-year period. The Times found that half of the deputies involved in major cases had been sued in the past for brutality and that one training officer had been sued ten times in ten years. The newspaper quoted sources familiar with the Department who claimed that a code of silence made deputies reluctant to testify against fellow officers, even those who repeatedly used excessive force.   The Department kept no separate records of the deputies who were sued for excessive force or the outcomes of the suits.  *Los Angeles Times, May 27, 1990, Part A, Page A-1*."[24]

"The more recent crises have largely been on the custody side – from asserted corruption and procurement scandals to auditing questions; escapes and mistaken releases to over-detentions; shameful treatment of the mentally ill to erratic treatment of the physically ill; jail suicides; jail riots and disturbances; troubling inmate deaths at the hands of custody personnel; inmate on inmate violence; problems identifying and appropriately housing inmates;   allegations   of   vigilante-like   behavior   at   Twin   Towers;

[23]    MERRICK BOBB & PARC, 4TH SEMI-ANNUAL REPORT 21-22 (1995).
[24]    MERRICK BOBB & PARC, 10TH SEMI-ANNUAL REPORT 12 (1999).

overcrowding with inmates sleeping on the floors; a work release program that was letting risky inmates out with minimal supervision."[25]

62.   In his 12th Semi-Annual Report, June, 2000, pages 45–50, Bobb identified ongoing problematic issues regarding the medical care of inmates in the County Jails:[26]  In my professional experience, long-standing pattern of bad medical care and maltreatment of the disabled is often indicative of a general indifference to inmate well-being, an attitude that may also often express itself in a pattern of excessive force.   Bobb identified the following persistent issues:

- Chronic understaffing of County Medical Services and the County Department of Mental Health;
- Failed delivery of medications, including continuing lapses and breakdowns in the delivery of inmates going to court and otherwise in movement throughout the Los Angeles County Jail system;
- Interruptions in prescription medications because of lack of access to MDs;
- Interruptions in prescription medications and special diets for transferred inmates;
- Delays and errors in dispensing medication because there are too few nurses and those who are there are chronically overworked;
- Prescription medications and other treatments prescribed at IRC *[Inmate Reception Center]* screening exams or by other physicians are not delivered to inmates;
- Considerable and chronic delays before an inmate can see a doctor in the first place and subsequent long waits for follow-up visits and treatment;

---

[25]   *Id.* at 17.

[26]   MERRICK BOBB & PARC, 12TH SEMI-ANNUAL REPORT 45-50 (2000).

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

- Inadequate documentation of medical care, including duplicative, poorly organized, incomplete, and chronically unavailable medical charts;

- Lapses in identification, triage, placement, and treatment of sick inmates when they first enter the Los Angeles County Jail system at the Inmate Reception Center;

- Failure to provide medical care meeting requisite legal standards in custodial settings, particularly in the areas of chronic and long-term disease;

- Failure to respond appropriately and in a timely fashion to provide short-term care, responses to emergencies, and ongoing courses of treatment, including the necessity to transport prisoners away from Twin Towers to County-USC Medical Center for specialized treatment;

- Failure to respond appropriately and in a timely fashion because of the necessity to transport inmates from outlying jail facilities to the downtown area for diagnosis and treatment in some instances;

- Breakdowns in communication and coordination between and among Medical Services, Department of Mental Health, and the Sheriff's custody personnel, leading to failures to provide medication and timely medical care, including failures to track inmates as they move around the system;

- Absence of clarity in lines of authority;

- Absence of clear rules resolving the interplay of medical, psychiatric, and custodial priorities.

63.    In March, 2008, the ACLU asked Dr. Terry A. Kupers, MD, MSP, a board certified psychiatrist and an expert on correctional mental health issues, to study and report on systemic problems regarding the treatment of mentally ill

inmates in Los Angeles County Jail.[27] Dr. Kupers issued his report on June 27, 2008.

64. Dr. Kupers noted that, "…of 2,088 inmates listed on the mental health case-load, at least 350 are receiving only medications while being subjected to severe overcrowding or isolation and receiving no mental health programming – this is far from adequate mental health treatment. I would estimate with a high degree of certainty that at least double the number on the current caseload need mental health treatment. I base this partly on national figures for the prevalence of mental illness in jails, partly on the frequency of complaints about inadequate mental health care in general population and disciplinary housing units in the jail, and partly on the fact that it was so easy for me, in a two-day tour, to locate a significant number of prisoners who suffer from serious mental illness and yet have never been on the caseload or have been discharged from the caseload ("de-classed" or "de-classified) and transferred from mental health housing to general population, administrative segregation or disciplinary housing."[28]

65. Dr. Kupers also noted numerous jail architectural and behavioral characteristics that are of concern to him. Pertinent among these were the following observations and comments by Dr. Kupers:[29]

- Jail overcrowding with inadequate fixtures and space in predominantly windowless cells exists in the Men's Central Jail

- In the Medical Disability/Stepdown area (6050), men in wheelchairs, on crutches, and otherwise disabled were stuffed like sardines into long interconnecting, dark rooms with far too many bunk beds for them to be able to walk around. There were no visible desks of chairs;

---

[27]    DR. TERRY A. KUPERS, REPORT ON MENTAL HEALTH ISSUES AT LOS ANGELES COUNTY JAIL (2008).
[28]    *Id.* at 6.
[29]    *Id.* at 7-8.

PARKER DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

- Altercations in these conditions are practically inevitable;
- As the men become angrier, their confusion and symptoms of mental illness mount;
- As an individual prone to psychosis becomes angrier, and/or is subjected to conditions that exacerbate irritability and anger, his thinking becomes more regressed and irrational, thus worsening his mental illness, often precipitating a state of acute decompensation or "breakdown;
- Open expressions of rage and frequent eruptions of violence tend to push individuals prone to psychiatric breakdown over the edge
- The more violence, the more madness, and the overcrowding exacerbates both;
- Some prisoners with mental illness become preferred victims of violence.

66.   Perhaps most importantly, Dr. Kupers pointed out that "the same conditions that worsen psychiatric disorders also affect the staff and make treatment problematic.  The staff, both custody and mental health staff, spend a lot of time in the same crowded conditions.  Their irritability is enlarged by the noise and crowding, and, on average, staff tend to become increasingly insensitive to prisoner concerns when they have to interact with masses of prisoners each day. Officers become impatient, and are prone to gruffness, which leads to prisoners feeling disrespected and becoming angry.  Then, the prisoner's anger causes the officers to punish them, often for rather minor infractions, and the prisoners become more resentful.  It is in this unfortunate mix that excessive force and other abuses become more frequent occurrences."[30]

---

[30]   *Id*. at 16.

67. Dr. Kupers also states, "There are many reports of abuse by custody staff, and independent reports from many prisoners that the abuse is disproportionately directed at prisoners suffering from mental illness."[31]

68. Among several recommendations Dr. Kupers makes in his report, two are especially pertinent to the current situation in the jails. These are:[32]

- Training of staff must be enhanced. All officers, not just those working in *[mental health areas]* must be required to undergo intensive training in working with prisoners with mental illness. Training in gender sensitivity, multicultural sensitivity, and so forth should be included in the package.

- Take all effective steps to halt custodial abuse. The remedy includes zero tolerance from the top, education for prisoners about their rights and the grievance process, training and support to encourage staff to report abuse by other staff, a confidential complaint system that fosters prisoner trust and action, and prompt and thorough investigation with appropriate consequences for offending staff. Staff members must be required to report abuse by other staff members, and must be disciplined if they fail to do so. This includes mental health staff, who must be required to report custodial abuse and must be protected from retaliation when they do so. The reporting procedure must be entirely confidential and protection from retaliation must be guaranteed.

69. Dr. Kupers' 2008 findings are all the more troubling because more than a decade earlier the United States Department of Justice (DOJ) had made similar findings –findings which LASD obviously did not heed. In a 1997 letter from the Acting Assistant Attorney General of the Civil Rights Division of the U.S. Department of Justice (DOJ) to the Los Angeles County Executive, DOJ

---

[31] *Id*. at 45.
[32] *Id*. at 49.

reported its findings that "Inmates who are mentally ill or housed in mental health housing are subject to an unacceptably high risk of physical abuse and other mistreatment at the hands of other inmates and custodial staff. Moreover, the Jail does not adequately investigate allegations of abuse against its inmates." The USDOJ further reported that they had "…received numerous reports from inmates and advocates regarding serious physical abuse of inmates in mental health housing…including kicks, punches, beatings, and sexual assaults. Although the Jail claims that it has discounted some of these claims, … the investigation of these claims was inadequate and serious questions remain regarding the extent of physical abuse of mentally ill inmates. We agree with Special Counsel Merrick Bobb's finding that in the Jail '…there is a callous treatment [of inmates] at times, a problem that LASD Management knows about but has not acted sufficiently aggressively to resolve.'"[33]

70.    In 1999-2000, another major corruption scandal unfolded within the LASD, demonstrating the degree of corruption with the Los Angeles County Jail system. Eleven LASD employees, all jail staff, including four sworn officers and seven civilian employees, were alleged to be engaging in a massive credit card fraud scheme; moreover, at least two of those employees were alleged to be selling "black tar heroin" to jail inmates. The investigation, which resulted in numerous convictions, was code-named "Operation Easy Money."[34]

71.    Yet another bit of luster was removed from the badge of the LASD in June 2007, when Newsweek magazine published an article concerning Sheriff Lee Baca's "Executive Reserve Corps" which allowed Hollywood celebrities and other influential people around the county to be issued and carry a Sheriff's badge and a

[33]    Letter from Civil Rights Divison, USDOJ, to Los Angeles County Executive, "CRIPA Investigation of Mental Health Services in the Los Angeles County Jail"(1997).
[34]    Beth Shuster, *2 Jail Workers Suspect of Selling Drugs*, L.A. TIMES, May 26, 2000.

gun after completing only minimal hours of essentially rudimentary training and passing a background check.  Examples of favoritism towards these celebrities and influential citizens began to surface after some of them got themselves into criminal trouble with their badges and guns.  The president of the Association of Los Angeles Deputy Sheriffs publicly stated that deputies were concerned that there is "a pattern of political, financial, and celebrity favoritism" because of their connections to the Sheriff.  The concern is when these celebrities receive different treatment in the criminal justice system than the everyday person, and that appears to be the case."[35]

72.    On May 28, 2010, the Los Angeles Times reported (in pertinent part):[36]

> "The Los Angeles County Sheriff's Department has given reserve badges to people who flunked mandatory law enforcement tests and attended classes at unauthorized locations, including the Four Seasons Hotel in Beverly Hills, 20th Century Fox Studios, and possibly a yacht, according to a state report issued Thursday." . . .

> "As a result, 99 reserve deputies are being stripped of their badges or demoted to lower-level volunteer status, authorities said." . . .

> "Investigators with the state's Commission on Peace Officers Standards and Training reviewed the operation of the department's reserve program from 2003 to 2008 and found significant problems in training and recordkeeping.  In several cases, officials discovered that some course material and attendance records had been fabricated.  On nine occasions, records showed an instructor teaching students at two locations at the same time." . . .

---

[35]    Jamie Reno, *Tinseltown's Sheriff*, NEWSWEEK, June 27, 2007.

[36]    Robert Faturechi & Richard Winton, *Probe Spurs Demotion or Ouster of 99 L.A. County Reserve Deputies*, L.A. TIMES, May 29, 2010.

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

"According to the report, nearly 75% of the department's 847 reserve deputies did not meet the state's minimum training requirements as of December, 2008. A sheriff's spokesman said most of those reserves have since been retrained to comply with state standards…The 99 reserves demoted or ousted were mostly businessmen and business-women.  At least one is a celebrity…" . . .

"The department's reserve and training programs have had troubles in past years, including allegations that some well-connected supporters of Sheriff Lee Baca were given badges or other special favors." . . .

"More recently, in 2008 Baca had to order his academy to stop training new, full-time recruits until it addressed problems exposed by state inspectors.  One instructor gave recruits the answers to their tests, and those who had failed training courses were allowed to repeatedly retest until they passed." . . .

"'There are some serious shortcomings here,' said Michael Gennaco, head of the county's Office of Independent Review (OIR), which monitors the Sheriff's Department,  'People who violated policy will be held accountable….It is unfortunate that deputies who did do the training here are going to have to be retrained.'"

73.    Regarding yet another special report commissioned by the Board of Supervisors for Special Counsel Merrick Bobb, the Los Angeles Times reported on February 3, 2005 (set forth in pertinent part):[37]

"Los Angeles County's largest jail is so outdated, understaffed and riddled with security flaws that it jeopardizes the lives of guards and inmates, the county's expert on the jail system concluded in a confidential report recommending that the facility be closed. Special counsel Merrick

_____

[37]    Jack Leonard & Richard Winton, *L.A. Jail Called Deadly, Outdated*, L.A. TIMES, February 3, 2005.

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

Bobb sharply criticized Men's Central Jail in downtown Los Angeles for failing to prevent dangerous inmates from being housed with lower-risk inmates and said the cellblocks' design ensured that any response to an inmate takeover would be extraordinarily bloody." . . .

"The 6,338-bed jail, the largest in the country, 'is nightmarish to manage' and suffers from 'lax supervision and a long-standing jail culture that has shortchanged accountability for inmate safety and security,' Bobb said.

The Board of Supervisors ordered the report, obtained by The Times, after inmates killed five fellow inmates in county jails between October 2003 and April 2004. Four of the slayings occurred at Men's Central, one of six jails -- housing 18,495 inmates total -- that the county operates." . . .

"Bobb's is the most critical of several recent inquiries into the jail system, all of which have called for security improvements. Even after the slayings in Men's Central, Bobb said, deputies continued to seriously err in classifying inmates and deciding where to house them. Baca said he planned to refurbish Men's Central by adding security cameras and upgrading locks on doors. He is also weighing whether to replace bars on the front of each cell with doors to prevent inmates from passing messages and weapons back and forth."

74.     Another L.A. Times article on April 16, 2009, reported (in pertinent part):[38]

"There has been a dramatic upswing in the number of Los Angeles County sheriff's deputies arrested for alcohol-related offenses in recent years, suggesting a growing drinking problem within the department, a county watchdog agency reported Wednesday.

---

[38]     Richard Winton, *Why is Alcohol a Growing Problem in L.A. Sheriff's Dept*, L.A. TIMES, Apr. 16, 2009.

"Last year, 70 sworn and civilian employees of the Sheriff's Department were arrested. The majority of those arrests involved employees driving off-duty while under the influence of alcohol, according to an annual report produced by the county Office of Independent Review. In many cases, drunk deputies were carrying firearms at the time of their arrests.

"Michael Gennaco, the head of the office, said alcohol-related arrests have nearly tripled since 2004. Alcohol-related incidents in 2009 are at the same pace as last year.

"Gennaco's report also cited two cases in which deputies drew their guns after coming out of bars. In one case, a deputy followed a bar hostess to her car, flashed his badge, told her he'd 'like to molest her' and kissed her on the neck. He displayed his handgun before kissing her again, according to the report. The deputy pleaded no contest to a misdemeanor charge of disturbing the peace and was suspended for 15 days, the report said.  In the other case, an intoxicated deputy got into an argument with bar patrons and waved his handgun to prove he was an officer, the report stated.

"Baca acknowledged Wednesday that the number of alcohol-related arrests indicated that some deputies have a drinking problem. Gennaco's report, however, expressed concern that deputies in field assignments were being transferred to work in the jails as a punishment for misconduct."

75.    In 2010, the Office of Independent Review issued a "2010 Update" to their previous report on alcohol-related incidents within the LASD. This update highlighted the disturbing fact that there had been a 37.5% increase in alcohol-related incidents involving LASD employees for the first five months of 2010 when compared to the same period in 2009.  The report stated that this rise was unprecedented, and went on to state, "While most are one-time offenders, some have repeatedly gotten into incidents involving alcohol.  While **many of the incidents involved young deputies in custody assignments** (emphasis added), the

occurrence of alcohol-related incidents runs indiscriminately across the Department, impacting on every Division and ensnaring mature officers, first line supervisors, and females alike." [39]

76.    From all of my graduate study, management training, management experience, teaching of management, and review of the literature over the years, I know that the culture of any organization is a product of top management's attitudes, ethics, policies, style of leadership, and examples set, and the imbuement of those traits into the senior management team, and, similarly, their passing along such traits to lower level supervisors and staff.  In other words, top management generally dictates, or maintains, the culture of an organization, and enforces it through appropriate incentives and discipline.  The culture of an organization, in turn,  then determines its norms and behaviors, determines what gets rewarded and what gets punished, determines how individuals view and treat not only each other, but also their customers, clients, or service recipients.  Organizational culture is intangible but very powerful, and the leader of an organization has the most impact on it.

77.    Therefore, poorly selected employees with little if any self-control, combined with lax discipline and non-enforcement of organizational policies and ethics, lack of incentives to perform the job properly, poor role models at the top, and the deliberate indifference of top management, is a recipe for disaster in any organization.[40]

78.    On May 5, 2010, the ACLU National Prison Project and the ACLU-Southern California released their "Annual Report on Conditions Inside Los Angeles County Jail – 2008-2009." The report attached multiple declarations documenting scores of consistent complaints from prisoners and their family

[39]    OFFICE OF INDEPENDENT REVIEW, ALCOHOL-RELATED INCIDENTS – 2010 UPDATE: SUPPLEMENTAL REPORT (2010).
[40]    Personal knowledge, training, and experience.

members in a twelve-month period about deputy-inflicted injuries, ranging from broken ribs and black eyes to severe head wounds that need to be stapled together. The report also documented a persistent pattern of prisoners claiming that they had been retaliated against or threatened by jail staff for protesting the conditions of their confinement.

79.    In his 29th Semiannual Report, issued in July, 2010, Special Counsel Merrick Bobb and PARC, made remarks that I quote here as being especially pertinent to my report:[41]

80.    "Nearly a quarter (22 percent) of jail hate crime case files contained only an incident report—nothing else. There was nearly an even split between those reports that had a Case Closure Report (52 percent) and those that did not (47 percent). Not one report had a Case Activity Log; JIU informed us that while many of the cases do have Case Activity Logs, they were not included in the files we were given. Why we were given incomplete files remains an open question. We have not independently audited JIU's assertion that Case Activity Logs actually exist, even though they were not in the files given to us, as they should have been. We were troubled by the flip and arrogant manner of one JIU sergeant toward one of our staff members and toward the issue of hate crimes in jail. This is one of the few instances in the many years of our monitoring where LASD staff has failed to be courteous and informative."

81.    "In many of the jail hate crime cases, we were frustrated by the lack of officer response in the incidents themselves. According to the files, it appears that several of the incidents occurred because officers simply were not around— sometimes for hours or days. They apparently did not notice a hate crime occurring or were not swift enough to stop it. As one sergeant told us, this is not simply a hate crime issue, but a general issue. We agree and have a substantial concern that

---

[41]    MERRICK BOBB & PARC, 29TH SEMIANNUAL REPORT 138-39 (2010).

there is inadequate deputy coverage in the jails, which presents opportunities for untoward incidents, be they hate crimes or other misconduct. We also wonder why a large number of hate crime victims chose to waive prosecution, despite initial indications in the case file that they were willing to identify suspects and testify."

82.    Further, in this 29th Semi-Annual Report, Bobb states:[42] "The incidents we describe in this report therefore follow long-standing serious lapses by the jail staff leading to death and serious injury to inmates. Some have concluded that Men's Central is beyond the possibility of redemption."

83.    In a special report dated July 19, 2010, captioned, "Deputy Vigilance in the Jails," the OIR reported on yet another example of corruption and malfeasance within the LASD management of the jail system.  In this incident, which occurred in a discipline module housing high-security inmates who were being punished for not following jail rules, the report states, "A deputy assigned to the county jail (specific facility not identified), was performing a mandated "inmate welfare check" in the very early morning hours on the short 12-cell row of inmates for which he was responsible.  This part of his job consisted of a walk down the row twice per hour so the deputy could look into each cell and confirm that each inmate in the one-man cells was breathing and not in distress. When the deputy looked into a cell near the beginning of the row, he noticed that the inmate was sitting on his bunk facing away from the bars in the same position he had been in the last time the deputy had checked.  He looked closer and recognized that something was amiss."  The inmate had committed suicide by the use of a ligature around his neck attached to a grate in the back wall of the cell.  The inmate was cut down, but declared dead at the scene.

84.    Investigation by LASD Internal Affairs Division revealed that the inmate's limbs were already quite stiff when he was removed from his cell for life-

---

[42]    MERRICK BOBB & PARC, 29th SEMIANNUAL REPORT 3 (2010).

PARKER DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

saving efforts prior to being declared dead. This indicated to the investigators that perhaps the inmate welfare check logs maintained by the discipline module deputy that night were not accurate. Further investigation revealed that the hand-written log entries documenting half-hour checks were, indeed, not accurate, and had apparently been filled in by that deputy long after the required check time. Yet additional investigation discovered that the deputy had performed only two of his required inmate welfare checks in the six hours prior to the discovery of the suicide, and had performed no checks at all during the last hour and forty minutes prior to the discovery of the inmate suicide. It came to light that the deputy had gone to the staff gym to work out and shower on one occasion, and on another had left the jail entirely to go to an outside restaurant for a "chow run." The deputy was found to have been away from his assigned post and duties for an estimated total of three hours during the first 5-1/2 hours of his shift. It was also learned that the deputy's sergeant had condoned the "chow run." The deputy admitted he had faked the hand-written records of some of his row checks.

85.    Further investigation uncovered a photocopied sheet of paper in the deputies module booth containing bar codes, each labeled with the names of the rows of jail cells on that floor. Since 2007, the inmate welfare checks have been documented through the use of hand-held bar code scanners which are used by deputies to scan permanent bar code plaques at the end of each row of jail cells. Each scan records the exact time it was performed thus documenting the time a deputy checked that row. Additional photocopied bar code cheat sheets were found in other areas of the jail, and one deputy admitted how he used it to record row checks from his desk without having to actually walk the rows. Ten additional deputies were found to have used such bar code sheets, and the creator of the sheets was subsequently identified and admitted what he had done, including describing how he had created the sheets.

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

86.    Several disciplinary actions were taken as a result of this matter, and subsequent remedial focus was placed upon the sergeants who were provided with computers to monitor the scanning on a real-time basis but were also "encouraged to walk the rows" themselves more frequently and to conduct periodic audits of scanner record printouts to look for fraudulent  activity. [43]

87.    Subject to question, however, is how a deputy can be gone from his post for three out of five-and-a-half hours and the deputy's absence not be noticed by his sergeant, and why the sergeants were not already routinely checking the scanning reports prior to this incident. To me, this indicates a total laxity, and possible breakdown, in the supervisory responsibilities and accountability of these jail sergeants and their superiors, as well as the overall jail administration.  Why even have a scanning system if its proper use is not being reviewed and validated?

88.    The OIR Report went on to point out that, "The scanner cheating cases demonstrate a disappointing lapse in integrity on the part of the involved deputies. Their actions were overt and premeditated and demonstrated wholesale failure on the deputies' part to recognize one of the most important responsibilities of a custody deputy, namely to diligently watch over and provide safety and security for inmates under his or her supervision."

89.    "It was particularly unfortunate that most of the offending deputies were at the beginning of their law enforcement careers."[44]

90.    I have reviewed letters from the ACLU to County Counsel Roger Grambo and outside attorney for the LASD, Paul B. Beach, dated June 19, 2009,[45] another letter to Assistant Sheriff Marvin Cavanaugh dated July 1, 2009,[46]   and a

---

[43]    OFFICE OF INDEPENDENT REVIEW, DEPUTY VIGILANCE IN THE JAILS 2-5 (2010).

[44]    *Id.* at 6.

[45]    Letter from ACLU to County Counsel Roger Granbo and Paul Beach (June 19, 2009).

[46]    Letter from ACLU to Assistant Sheriff Marvin Cavanaugh (July 1, 2009).

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

third letter to Sheriff Leroy Baca on October 28, 2009.[47] Each of these letters sets forth details of various retaliatory actions by deputies against inmates in Men's Central Jail for talking to the ACLU, three of them assuredly occurred after the issuance of the unit order of June 20, 2009 (see below) strictly prohibiting such retaliatory actions.

91. On June 20, 2009, the LASD issued Unit Order # 5-12-010 (revised on November 2, 2009), which prohibited jail deputies and civilian personnel from retaliating against any inmates who make complaints or speak to the ACLU or any other inmate advocacy group. Specifically, the order prohibited:

- Questioning any inmate about any of his contacts with the ACLU or any other inmate advocacy group and/or:

- Threatening, harassing, or otherwise retaliating against any inmate on account of his contacts with the ACLU or any other inmate advocacy group.[48]

## VI. Inmate Declarations of Violence, Misfeasance, and Malfeasance in Jails

92. I have reviewed approximately ten inmate declarations setting forth incidents of such retaliation for inmates after meeting or talking with the ACLU, or for requesting showers or reporting violent incidents to custody deputies (see Exhibit B). All but a few of these declarations reported retaliation incidents after the promulgation of the June 20, 2009, non-retaliation unit order. That retaliation has taken the form of beatings – sometimes with flashlights; intimidating and coercive interrogations to pressure inmates into divulging their legally privileged discussions with the ACLU; intimidating inmates who are scheduled for legal meetings with the ACLU, by sending five-man teams of deputies as escorts to the

---

[47] Letter from ACLU to Sheriff Leroy Baca (Oct. 28, 2009).
[48] LASD Unit Order 5-12-010, Rev. 11-2-09.

meetings, and then afterwards intensely interrogating the inmates about the content of the conversation with the ACLU; denying television and shower privileges to inmates who have met with the ACLU; planting contraband and then searching and ransacking cells of inmates who have talked to the ACLU;  sending inmates to "the hole" for minor infractions and without the requisite due process after they had spoken to the ACLU; denying doctor visits or other medical treatment;  physically abusing inmates to force them to disclose the nature of their criminal charge; threatening inmates with beatings by other inmates, and actually arranging beatings by other inmates.

93.    A "Memorandum of Points and Authorities In Support of Motion For Protective Order" filed in *Rutherford v. Baca,* CV 75-04111 DDP with the Federal Court on October 8, 2010, sets forth on page 6:  "In 2010, retaliation has continued to increase, so that even speaking to an ACLU staff person in the attorney room now exposes prisoners to the risk of retaliation, On virtually every monitoring visit to the jail, the ACLU encounters several prisoners who refuse to talk to the monitors, explaining that they fear retaliation if deputies see or suspect them of speaking to the ACLU."  On page 7, the filing states, "Plaintiffs have submitted to the court multiple sworn declarations with detailed allegations showing the *Rutherford* class members reasonably fear retaliation if they cooperate in the litigation. Deputies retaliate against some prisoners by savagely beating them; in some of these cases, deputies plant drugs or contraband on the prisoner as a pretext for disciplining them or using excessive force.  Deputies subject some prisoners who meet with the ACLU to repeated searches in which they destroy the prisoners' family photographs and other personal property.  Deputies deny some prisoners showers or television, stating that this is "because you are talking to the ACLU."[49]

---

[49]    Memorandum of Points and Authorities in Support of Motion for Protective Order, *Rutherford v. Baca* CV 75-04111 DDP 6 (C. D. Cal. Oct. 8, 2010).

LEGAL_US_W # 70661285.2

94.   I have reviewed approximately 70 inmate sworn declarations (affidavits) and   the sworn declarations of four non-inmate civilians with first-hand accounts of incidents in LASD jails, primarily the Men's Central Jail but also including the Twin Towers 1 and 2, obtained by the ACLU-SC jail monitors, which individually and collectively substantiate the above findings and observations by Merrick Bobb and PARC, and the ACLU-SC Jails Project, regarding deputy-on-inmate abuse.   Many of these declarations, and the ones reporting retaliation for talking to the ACLU, were about incidents occurring on the 3000 floor.   A summary chart of these declarations, set forth in Exhibit B, substantiates the finding in the reports of both Special Counsel Merrick Bobb and of OIR.

95.   Of those 70 or so declarations, one that is particularly illustrative of the problems in the jails and the nature of the deputy-on-inmate violence is a declaration from inmate Antonio Rodriguez, dated October 21, 2009,[50]   in which he describes a beating he and another inmate, Justin Castro, received on September 1, 2009, at Men's Central Jail.   This declaration also highlights the observations of the Kolts Commission and Special Counsel Bobb's reports "on Deputy Gangs." The prisoner states that before they were beaten, they encountered approximately 15-20 deputies, including a sergeant, on a lower floor where their cells were located. They had been returning from the law library.   Rodriguez heard one deputy turn to another and ask if he was ready to "earn his ink" (i.e. tattoo).   The second deputy said he was.   Rodriguez and Castro were then handcuffed and taken upstairs to the 3301 corridor by 6-8 of the deputies.   Both inmates were told to face the wall.   One of the deputies then struck Rodriguez several times in the head with a flashlight. Rodriguez fell to the floor.   One of the deputies directed another to break Rodriguez' legs, and the other deputy then held Rodriguez' legs, and hit his

---

[50]   Declaration of Antonio Rodriguez, *Rutherford v. Baca,* CV 75-04111 DDP (C.D. Cal. Oct. 21, 2009).

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

ankle using his flashlight "like a baseball bat." Rodriguez was struck several times and began to bleed and to lose feeling in his legs. The deputies then turned him on his back and began stomping on him.  The deputy who had struck him grabbed his second leg and hit it with his flashlight, breaking it.  Other deputies told him to get up, but he could not do so due to his leg injuries.  He was then hit in the head again with a flashlight.  He lost track of Castro while being attacked by the deputies, but last remembered him being jumped on by other deputies.  While all of this was going on, one of the deputies was clearly keeping a look-out for the sergeant.

96.     When the sergeant arrived, Rodriguez was taken to the hospital on a gurney because he could not walk.  At the hospital, an emergency room doctor asked him if he had tried to stab a deputy.  The doctor told him that he had heard that Rodriguez and Castro had allegedly tried to assault a deputy with a weapon. The deputies had said that they had found a weapon that Castro had pulled out of his waistband -- even though he had been handcuffed at the waist the whole time, and had been searched before the alleged assault had taken place.  Rodriguez states that neither inmate had done anything to bring this kind of attack on themselves and that he still does not know why they were beaten.

97.     Rodriguez read in one of the official incident reports prepared after the beating that a deputy had heard  what sounded like a shank hit the floor, that Rodriguez appeared to have turned around  to try and grab it, and the deputy feared for his life, even though Rodriguez was handcuffed at his waist the whole time. Another report said that a deputy pushed Castro up against a wall and that a shank fell to the floor.  The incident reports said that force had been used to subdue the two inmates, but did not mention that both of them were handcuffed at the waist, and did not mention their broken legs.

98.     Because of the deputies' claim that Rodriguez had orchestrated an attack on a deputy, Jail officials took away his "pro per" status, meaning they took away the access to the prison law library that the jail grants to prisoners without

lawyers and who must represent themselves in their criminal cases.  Once the deputies found out that the ACLU was inquiring into the circumstances of the beating, they started harassing him – searching his cell and breaking his glasses. They also asked him, "Why did you go this route [evidently meaning the ACLU])?"  The deputy who had beaten him told him that he "better not cry like a bitch to anyone" and that he better not talk to Internal Affairs or anyone else about the incident. Prior to this incident, Rodriguez had been beaten on an earlier occasion by deputies, suffering a chipped tooth and a fractured eye socket, and been shocked by a Taser several times, but he did not report those earlier incidents. He decided to report this one because the deputies had broken his legs, and he felt that if he stayed quiet, it would just happen again to him or to someone else.

99.    On July 9, 2009, a handicapped inmate, Carlos Ortiz, provided a declaration[51] to the ACLU-SC setting forth his very negative experiences in Men's Central Jail, where he had been confined for four weeks awaiting trial.  He was shot at age 16 and is confined to a wheelchair and also wears a colostomy bag.  At the jail, the colostomy bag gets changed "like every six days" according to the declaration, while at home he changes it "every few days" and cleans it thoroughly. He has nothing to clean it with except a standard bar of soap which irritates the skin at the colostomy bag attachment site. He regularly asks for medical help with the colostomy, but his requests are ignored. The jail medical personnel also recently cut back on his pain medication for severe abdominal and back pain. When he finally got a nurse to stop at his cell, and told her about his pain and the medication cutback, she told him he would have to wait, and did not do anything else to ease his pain.  The next morning, he noticed blood in his colostomy bag. When the medical staff were told about it, he was taken to the county hospital. While at the hospital, he received stronger pain medication, but when he returned

---

[51]    Declaration of Carlos Ortiz, *Rutherford v. Baca,* CV 75-04111 DDP (C.D. Cal. July 9, 2009).

to the jail, it was again cut back to a lesser strength.  He also stated that deputies make fun of the inmates who have medical and disability issues.

100.   A few days before giving this declaration, according to his statement in the declaration, the jail medical staff tried to "declass" him out of his wheelchair even though he can't walk. When he resisted getting out of the chair, a deputy pushed him out of the chair and threw him on the floor. The ACLU arrived right after that happened, and he was not declassed that day.  Instead, he got thrown in the "hole."

101.   The inmate accounts of deputy abuse and cover-up that reach the ACLU monitors are probably only the tip of the iceberg.  On May 18, 2011, the Los Angeles Times published an article headlined, "Attorney barred from photographing man's injuries in alleged jail beating."[52]  Deputy Public Defender John F. Montoya was representing a client, inmate Frederico Bustos, who two months before, had been beaten by deputies and suffered severe bruising to his face, stomach, chest, right arm, and both legs and feet.  Bustos' left eye was so badly swollen that Montoya thought he might lose it.  Montoya also reported that Bustos was so badly beaten that he was almost unrecognizable.  He wanted to have an investigator from his office go into the jail and photograph Bustos' injuries, and had obtained a court order allowing him to do so; however, LASD officials repeatedly turned down his requests, ignoring the court order.  Sheriff's spokesman Steve Whitmore explained that they had declined on the advice of County Counsel, but had video-taped the encounter in which Bustos obtained his injuries, and would give the Public Defender's Office a copy of same after they had finished their Internal Affairs investigation of the incident. Whitmore also stated to the press that Bustos was not as seriously injured as his attorney alleged, and had been an

---

[52]    Jack Leonard & Robert Faturechi, *Attorney Barred From Photographing Man's Injuries in Alleged Jail Beating*, L.A. TIMES, May 8, 2011.

PARKER DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

"extraordinarily aggressive" inmate who was known to hurt himself and others. "We have nothing to hide," Whitmore said.

## VII.  **Non-Inmate Witness Declarations and Statements**

102.   Further disturbing among the documentation I have reviewed is a court filing in *Rutherford v. Baca,* CV 75-04111 DDP, captioned, "Plaintiffs' Supplemental Filing In Support of Motion For Protective Order and Ex Parte Application To Vacate Submission of Plaintiff's Motion For A Protective Order; Declarations in Support," filed 2/7/11, [53] which includes declarations by Esther Lim, ACLU-SC Jails Project Coordinator, [54] and Los Angeles County Jail prisoners Christopher Brown and Shawn Meyers.  The Lim and Brown declarations describe the beating and multiple taser discharges against inmate James Parker by two Sheriff's deputies while Mr. Parker was on the ground, neither resisting nor even moving. Both Lim and Brown witnessed the beating, further described in their declarations.  The filing points out that Lim's declaration is particularly significant because this is the first time an ACLU jail monitor has actually been an eyewitness to deputies beating a prisoner.   Inmate Meyers' declaration describes recent retaliation and threats of retaliation by LASD deputies against Meyers, which seem to unrelated to the James Parker incident, but further affirm ongoing retaliation against inmates for talking to the ACLU monitors.

103.   In her declaration dated February 4, 2011, Ms. Lim states that she was in the LASD Twin Towers Correctional Facility, a part of the Los Angeles County Jail system, on January 24, 2011, interviewing inmate Christopher Brown in an

---

[53]    Plaintiff's Supplemental Filing in Support of Motion for Protective Order and Ex Parte Application to Vacate Submission of Plaintiff's Motion For a Protective Order; Declaration of Support, *Rutherford v. Baca,* CV 75-04111 DDP (C.D. Cal. Feb. 7, 2011).

[54]    Declaration of Esther Lim, ACLU, *Rutherford v. Baca,* CV 75-04111 DDP (C.D. Cal. Feb. 4, 2011).

Attorney Room at Module 142.  While she was speaking to Brown, she heard sounds of "people scuffling around, sounds of fists hitting a body, thuds against the wall and other noises that sounded like a fight."  She stood up to find the source of the noises, and Brown stood up as well on his side of the glass partition in the attorney room booth separating him from Ms. Lim.  Lim walked over to the window of the room which looks out into a common area on that floor of the jail. Looking to her left, she saw two deputies, later identified as Deputy Ochoa and Deputy Hirsch "punching an African-American inmate" later identified as James Parker.  She could see that Parker was lying face down on the ground, on his stomach, and appeared to be unconscious. She also  "saw both Deputies Hirsch and Ochoa simultaneously punching Parker about three or four times" while yelling "Stop fighting!"  and "Stop resisting!"  In spite of what the deputies repeatedly yelling "Stop fighting!" and "Stop resisting!" Parker continued to lay motionless on the floor, doing nothing.  He was not kicking, hitting, or otherwise trying to resist or fight with the deputies.  Lim felt he was unconscious as he was not moving or making any sounds.  She also saw Deputy Ochoa place his Taser gun on Parker's leg approximately three or four times and two or three times to his back area.  She could hear the Taser discharge sounds while Ochoa was using it on Parker.  While doing this, Ochoa continued to yell, "Stop fighting!"  and "Stop resisting!"

104.   In spite of the beating and the tasering, Parker was not showing any movement, and she thought he remained unconscious throughout same. In her declaration, she described Parker as looking "like he was a mannequin that was being used as a punching bag."  She even thought he "might be knocked out or perhaps even dead."

105.   Approximately one minute later, Lim saw Deputies Ochoa and Hirsch continuing to beat Parker even though he was limp and motionless on the floor.  At one point, Ochoa put his finger to his lips motioning to Hirsch to stop yelling "Stop

fighting!" and "Stop resisting!" which Hirsch had continued to do. During this entire incident, she heard both deputies yell this more than five times each, and they sounded like they "were reading from a script."

106. Lim tried to get their attention by pounding her hand on the window several times, but neither deputy looked in her direction. About two minutes into the incident, a voice came over the loudspeaker, "Stay in your seat." She, thus, returned to her stool in the interview booth, and asked Brown the identities of the deputies. Brown replied that they were Hirsch and Ochoa. After speaking with Brown for another minute or two, she got up again and went over to the window, where she saw Ochoa and Hirsch kneeling over Parker. Ochoa looked up at her and, using his index finger, signaled that she needed to move away from the window. She stood there for three or four seconds and then walked back over to the interview booth and could see that Brown was now lying on the floor on the other side of the booth in a prone position with his head away from the window. She got up from her seat, gathered her things, and left the attorney room and the jail.

107. The next day, January 25, 2011, she checked her email where she received, on a daily basis, the IRC Division count, the Custody Division Count, and other reports. On the IRC Division Log, she found a five paragraph entry at "1645 hours," captioned "Significant Use of Force – TTCF." The five paragraphs described an altercation between two unnamed deputies and inmate James Parker. She noticed that the time of the incident was listed as "1645 hours" which was 45 minutes earlier than it actually occurred, 1730 hours. The Log also indicated that "Both Inmate Parker and the deputy went to the ground as Inmate Parker continued his attack." Since she had actually seen the incident, and saw Parker only lying on the floor, not moving, not resisting, and not fighting – totally non-combative – while the deputies were kneeing him, punching him, and otherwise attacking him. He was lying limp on the floor, not making any sounds or movements while he

was being beaten. She also noticed that the Log stated that "Inmate Parker continued his attack as the second deputy utilized his Taser, striking him the mid-back area. Inmate Parker continued punching the first deputy. The second deputy then dry-stunned Inmate Parker three times in the back area and one time in the right hamstring. Inmate Parker then stopped fighting and was handcuffed without further incident," per the Sheriff's Department Log Sheet Report, 1/24/11.

108. She knew first-hand that the Log's description of Parker's alleged fighting with the deputies was false, especially the part about him fighting when he was being tased. In fact, Parker was not moving at all throughout her observation of this incident.

109. On January 26, 2011, she interviewed inmate Christopher Brown and took a declaration[55] from him as to what he had seen on January 24th. In his declaration, Brown's stated that while he was meeting with Ms. Lim on that day, he "heard cussing, scuffling noises, boot squeaking, and thuds from repositioning feet and other noises that sounded like a fight" just outside of the Attorney's Room where they were meeting. He got up and walked over to the window of the door on his side of the partition. He could see inmate James Parker standing next to the nearby water fountain with his hands over his face while two deputies were punching him. He told Ms. Lim, who was standing at the window on her side of the partition also looking out towards Parker and the deputies, "See. It's happening now." When he looked back at Parker, he was stumbling forward, toward Brown's door, and then falling to the ground in between the two deputies. When he hit the ground, he could first see Parker's hands out in front of him, and then his arms fall to his side. Parker appeared to be unconscious and limp.

110. He could see Deputy Hirsch kneeling over Parker, still punching his face and head area, while Parker was limp on the floor. He then saw Hirsch place

---

[55] Declaration of Christopher Brown, *Rutherford v. Baca,* CV 75-04111 DDP (C.D. Cal. Jan. 26, 2011).

- 48 -

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

his hands on the wall, bracing himself as he first kneed Parker in the facial area and then jumped up and down on the same area with his knee.  He then saw Ochoa put the Taser gun against Parker's leg, pull the trigger (detected by the sound of the Taser being discharged) and seeing the spark of the gun.  Ochoa then yelled at Parker, "Stop fighting!" and "Stop resisting!" and continued to tase him.  Parker was not resisting at all while this was happening and looked to Brown like he was unconscious.  Brown did see Parker's body convulsing when he was being tased.  Other than that, he was just lying there, not fighting or resisting the two deputies.

111.  He stopped watching when Ochoa looked at him, pointed his index finger at him, and yelled, "Lay down on your stomach and face the fucking wall."  He immediately complied.  Sometime later, a Sergeant Ramos arrived and took charge of the scene.  He later wanted to interview Brown, but first told him, "If you fear for your safety, you don't have to do it."  Brown felt intimidated by that admonition, like Ramos was trying to discourage him from submitting to the interview.  Brown agreed to the interview, and while telling the Sergeant what he saw, the Sergeant told him, "Well, you look uncomfortable.  It looks like you don't want to say anything."  Brown again felt intimidated, but continued with the interview.  Ramos then asked him who his visitor was, and Brown told him that it was "some chick who came to see me."  Ramos replied,  "Well, I know who she is and where she's from, but it's not going to change my report.  This is not criminal, it's administrative."  At this point, another Sergeant who was also now present, turned on a video camera, pointed it towards Brown.  The two Sergeants identified themselves on camera, and then began to re-interview him.  When it was finished, Brown felt that it had not been as in depth, specific, or detailed as the prior unrecorded interview.

112.  On March 30, 2011, Scott Budnick provided a sworn declaration to the ACLU describing numerous incidents he witnessed in Men's Central Jail

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

between 2007 and 2010,[56] while volunteering as a teacher providing writing classes to youth who were in the Los Angeles County Juvenile Hall system. Many of his students later found themselves in the Los Angeles County Jail system after turning 18 years of age. At his request, Budnick was eventually approved as a non-escort volunteer teacher in the adult jail system, which allowed him to move around most of the jail without having an LASD escort.

113. During his orientation in late 2006, Budnick was in a room with about 40 similar volunteers, who were told by the deputies conducting the session that they were going to hear deputies cursing at inmates, and hear and see other things that they were not accustomed to hearing and seeing, such as deputies using force against inmates. They were told that deputies sometimes needed to speak and act this way with inmates because that was the only way that the inmates could be taught to comply with jail rules.

114. Between 2006 and 2010, Budnick saw approximately five incidents of deputies abusing inmates and heard one incident where deputies were beating an inmate. He normally was at the Men's Central Jail approximately twice a month between 2006 and 2008. Since 2008, he has gone to Men's Central Jail less frequently because he became so disgusted with what he saw there. He tried to work primarily with youth who were in the Twin Towers or other jail facilities outside of the Men's Central Jail.

115. In his declaration, Budnick reported the following:

- In early 2007, he was going up to what is now the hospital ward, but used to be where young inmates were housed. The elevator door opened and he saw approximately 7 deputies and a big African-American inmate who was lying on the floor motionless. He saw two deputies tasering this man three to five times while he lay there not resisting. A sergeant was among the group, and

---

[56]    Declaration of Scott Budnick, *Rutherford v. Baca,* CV 75-04111 DDP (C.D. Cal. Mar. 16, 2011).

Budnick assumed that he was, or would, handle the incident, so he did not report it. He later talked to a young deputy upstairs in the youth module and told him what he had seen. The deputy replied, "Yeah, we fuck these guys up all the time."

▪ In approximately November, 2008, he was teaching a writing class on the 3000 floor of Men's Central Jail and was standing next to the door of the classroom waiting for his students to arrive, when he saw a group of inmates walking in a straight line with 6 or 7 deputies escorting them. One of the deputies pulled an older African-American inmate out of the line. This individual had not done anything that Budnick could see, and, in fact, had been very respectful to the deputy, but he was required to be strip-searched while standing naked in front of everyone. The deputy then grabbed the inmate's head and smashed it hard into the wall. It was so hard, Budnick could hear an audible crack when the inmate's head hit the wall. Again, he did not report this observation.

▪ In December, 2008, Budnick was again on the 3000 floor of Men's Central Jail waiting for his students when he saw a young, Hispanic inmate walking down the hallway. This inmate was stopped by approximately three deputies who strip-searched him. One of the deputies grabbed the inmates hand and arm and forcefully twisted it up behind his back. The deputy then pushed this inmate to the floor. Budnick had not seen the inmate do anything to deserve this kind of treatment. Following this incident, Budnick went to the jail chaplains' office on the 3000 floor and mentioned what he had seen to some of the chaplains who were there. The group of chaplains, who were of various denominations, told Budnick that he should not report the incident because the LASD had a practice of kicking people out of the jails, and he wouldn't be able to work with his writing students any more. They also told him that they were afraid to report anything they saw because

they could lose their jobs if they did. Budnick had previously spoken with a jail chaplain, who now worked in the Catholic Archdiocese in Los Angeles, who told him of being kicked out of the jails because he was a whistleblower who had reported to LASD and others the incidents of abuse that he had seen in the jails.

- In or about July, 2009, Budnick was on the 4000 floor of Men's Central Jail, again waiting for his students to arrive for the writing class, when he witnessed an Hispanic inmate getting off the escalator. The inmate seemed to be lost and asked a deputy where the 4600 module was located. There were approximately four deputies present at that time. The deputies started to ridicule the inmate, asking him if he had mental problems since he did not seem to know the location of his module. Two of the deputies then grabbed the inmate's hand and arm and forced it up behind his back. The deputies then grabbed the inmate's head and pushed it up against the wall, twisting the inmate's face hard against the wall. The inmate had been totally compliant and had not been fighting with the deputies. Budnick reported this incident to a Sergeant Renfro in the sergeant's office, and was told by the sergeant that he would look into it immediately. He never heard anything more about it, and was never interviewed by anyone.

- In late 2009, Budnick was going to module 3600 to see one of his students when he found the module door slightly ajar, he opened it and walked in. He observed three deputies kicking, punching, and beating up an inmate who was skinny and African-American. At first, this inmate was standing as the deputies were hitting him, then he fell to the floor due to the blows. The deputies continued to kick and beat the inmate while he was lying on the floor. Budnick could hear the deputies repeatedly yelling, "Stop fighting!" "Stop resisting!" over and over again, yet he could see that the inmate was not resisting or even moving. No one else was present when this was

occurring.  Budnick has repeatedly been told by many of the chaplains in the jails that it is a common practice for deputies to yell "Stop fighting!" "Stop resisting!" at inmates who are not doing either while the deputies are beating them.  He was also told that deputies think they can continue abusing the inmates as long as they keep yelling that false mantra.

- In the beginning of 2010, Budnick was in module 1750 talking to an inmate in the shower area who was handcuffed. He could hear another inmate getting beaten in the adjacent row, and could clearly hear the sounds of boots and flashlights repeatedly hitting a body. He could also hear the inmate screaming, "Get off of me!"  The inmate with whom he had been talking told him that two deputies and one sergeant on module 1750 were the ones doing the beating.

116.   On August 24, 2011, Catholic Chaplain Paulino Juarez, who has been a chaplain at the Men's Central Jail for 14 years, provided a declaration describing the beating of an inmate by LASD deputies which he witnessed on February 11, 2009.  As he was providing spiritual counseling and literature to inmates on the 3700 Abel module, he heard sounds as if someone was being beaten just outside of the module door.  When he went to see what the sounds were, he saw three deputies beating up an African-American inmate who was handcuffed to a chain around his waist.  The three deputies were repeatedly "pounding" this inmate's face and were yelling "Stop fighting! Stop Resisting!" as they were striking him. The inmate was not fighting with the deputies, nor was he resisting their striking him since he was handcuffed.  He could not even raise his hands to protect his face.  The inmate kept pleading with them to "Please stop!"  "I'm doing nothing wrong!"  The deputies continued punching this inmate until he finally collapsed on the floor.  Once he was on the floor, the deputies started kicking him in the head and body with their boots.  The inmate just laid there limp, and Chaplain Juarez thought he was now unconscious, yet the deputies continued yelling "Stop

fighting!"   One deputy was punching the inmate even though he was down, while the other deputies were still kicking him.  One deputy knelt down and put his knee on the inmate's back and began punching him on the back of his head and neck. At one point this deputy turned and noticed Chaplain Juarez standing at the module barred door watching them beat this inmate.  The deputy froze with a nervous and surprised look on his face.  He motioned to the other deputies to stop the beating. A few seconds passed before the other deputies caught on and stopped kicking the inmate. At that moment, two more deputies arrived and one started kicking the inmate who was still lying limp on the floor.  The other deputy stomped hard on the inmate's back two or three times with his boots. The other three deputies started motioning with their hands to these two deputies to stop their attacks on the unconscious and limp inmate.  When these two deputies saw the chaplain, they froze.

117.   Another deputy opened the module door and let Chaplain Juarez out of the module.  As he was walking past the still limp inmate, the chaplain noticed a large pool of blood about two feet in diameter around his head and shoulders.  As he walked past the deputies he was given looks which frightened him.  He later learned that the inmate was carried out on a stretcher and looked as if he might be dead.  He does not know what the ultimate resolution was of this incident.

118.   After leaving the module, he walked back to the Chaplain's Office and told one of his colleagues what had just happened.  He was so upset he had to go home to calm down.

119.   Later, he talked with his supervisor, Father George, by telephone and told him what he had witnessed.  Father George told him to write a report of what he had seen.  The next day, Chaplain Juarez told a Sergeant Barbosa that he was going to write a report and give it to him as well as to the Archdiocese.  The sergeant told him that the reason the inmate had been beaten was because he had spit on one of the deputies. Barbosa said, however, that he did not believe it.

LEGAL_US_W # 70661285.2

- 54 -

Barbosa asked him a few questions about how many deputies were involved, and the Chaplain told him there were originally three, but two more had joined in. For the next several days, Chaplain Juarez worked on his report. When he was finished, he took it to Sergeant Barbosa, and told him that he hoped the deputies' reports of the incident were similar, trying to imply that if they were not, the deputies were not telling the truth.

120. A couple of days after he turned in his report, he was directed to a Lieutenant's office to be interviewed on video, but he was not allowed to bring anyone from the Archdiocese with him. During the interview, he told the Lieutenant what he had seen. He was then asked a series of personal questions by the Lieutenant that had nothing to do with the beating he had witnessed, such as what country he was from. When Chaplain Juarez he asked the purpose of those questions, the Lieutenant stopped pursuing that line of inquiry. At the end of the interview, the Lieutenant assured Chaplain Juarez that the matter would be thoroughly investigated and the Lieutenant would keep him up to date on their progress.

121. A few days after the interview, he learned from Father George, that the inmate had been released a few days after the beating.

122. Two years went by without Chaplain Juarez being contacted by anyone at LASD or OIR regarding what he had witnessed. On June, 2011, a meeting arranged by Father George Horan to discuss the meeting took place, attended by Father Horan, Chaplain Juarez, and another colleague from the Archdiocese, with Michael Gennaco and Michael Katz of the Office of Independent Review (OIR). During that meeting, Gennaco told them that the case had been resolved internally without Sheriff Baca being informed of the beating.

123. The next day, Father George was contacted by the office of Sheriff Baca to schedule a meeting with him over this incident. That meeting occurred at Sheriff Baca's office in Monterey Park. It was attended by Michael Gennaco and

- 55 -

Walter Katz of OIR, LASD Assistant Sheriff Rhambo, LASD Captain Ornelas, Father George, Chaplain Juarez, and another colleague from the Archdiocese. Baca inquired about the incident and asked his subordinates to see the file. He also asked Chaplain Juarez for his report on the incident, and Chaplain Juarez responded that it should be in the file as he had turned it in to LASD shortly after the incident.  Baca said the report was not in the file, which consisted of about ten sheets of paper. Baca also told the group that the file indicated the inmate involved in the incident was schizophrenic and the deputies had to strike him a couple of times with their fists to get him into his cell.  Baca also told them that the inmate had reported that he had been run over by a truck before arriving at the Men's Central Jail and that his bruises were obtained during that accident, and not from being beaten.  Another paper in the file, according to Baca, said that the chaplain who witnessed the incident was "exaggerating."  Yet another document in the file stated that the inmate had been taken to the clinic by a Deputy Cortez.

124.   Sheriff Baca then said to his subordinates, "This happened two years ago and I'm only finding out about it now?"  Throughout the discussion, all Baca said about Chaplain Juarez's account of the beating was, "Punches are allowed but kicks are not allowed in my department."  He then told Assistant Sheriff Rhambo to "check up on that."

125.   In a separate interview with me on August 29, 2011, Chaplain Juarez confirmed another segment of his declaration wherein he stated:

"The conclusions that Sheriff Baca read also make no sense.  First, I never hear the deputies attempt to persuade or even verbally threaten the inmate to get him to go into his cell.  Second, the inmate's cell was in the upper tier, so the report's claim that they needed to punch him to get him to go into his cell makes no sense because they were not even close to the stairs to the upper tier, much less on the upper tier when they were beating him.  Third, I cannot understand how punching an inmate – much less kicking and

stomping on him – could ever be necessary to get him to go to his cell.  Also, if the inmate was schizophrenic, then why was he in MCJ (Men's Central Jail) instead of Twin Towers, where inmates with mental illness are supposed to be housed?  Finally, given how bad the inmate had been beaten, and the fact that he was lying motionless on the floor in a pool of blood when I left, I found the idea that he had been "escorted to the clinic" by Deputy Cortez very hard to believe."

126.  Another chaplain, Chaplain Doe, also provided a declaration dated August 15, 2011, which stated, in pertinent part, that he has been performing chaplain duties in Men's Central Jail since 2005, and on February 9, 2011, while carrying out his chaplain duties on the 3000 floor of Men's Central Jail, he witnessed the severe beating of an inmate by deputy sheriffs assigned to the jail.  Around 8:30 a.m. that morning, he was in his chaplain's office, and heard the sounds of keys jangling and people running.  He knew that this usually signifies that a fight was occurring nearby. He walked out of his office into the hallway and about 15 – 20 feet away, saw four or five deputies kicking an African-American inmate who was lying on the ground, face down, with his head towards the wall. One deputy was holding onto the inmate's legs, another had his knee across the inmate's neck, while other deputies were kicking his torso and legs.  Throughout the beating, he never saw the inmate's arms or hands move from behind his back nor did he see the inmate fighting with or resisting the deputies, though he was yelling, "Stop! Help me! Help!"  Even though the inmate was not fighting or resisting, the deputies kept kicking him while he lay on the floor.

127.  After several minutes of watching this incident, the chaplain heard one of the deputies doing the kicking yell at him, "Chaplain! Go inside!"  He did not do so and continued to watch the incident, as he had heard so many inmates complain of these types of beatings by deputies and he wanted to see what was occurring for himself.  Shortly after being yelled at by the first deputy, another

- 57 -

deputy named Perez, got up from his desk just a few feet away from the chaplain's office get up and run past him in the hallway over to where the other deputies were kicking the inmate. Perez also yelled at him, "Chaplain!  Go inside!"  The whole incident took place over a two-to-three minute period.  Chaplain Doe turned to go back into his office when a Sergeant Jones walked towards him from the Sergeant's Office out to where the beating was occurring.  As he passed by, Chaplain Doe told him, "That's not right!"   Sergeant Jones neither stopped nor said anything to him and walked over to where the deputies were beating and kicking the inmate. Chaplain Doe noticed Chaplain Paulino Juarez and Chaplain Duca standing by the door to their office, listening to the beating.  Chaplain Doe could still hear the inmate yelling for help but it soon stopped.  He could also still hear the sounds of the deputies kicking the inmate for at least another minute.

128.   Chaplain Doe also wrote in his declaration that despite the deputies and Sergeant Jones knowing and seeing that he was a witness to the beating, no one from the LASD or the OIR has contacted or interviewed him about the incident.  He also went on to describe several other incidents which he had observed including:

- Getting locked inside the jail cell rows while handing out their spiritual literature, and the deputies obviously ignoring them for lengthy periods of time before finally letting them out of that row.  In one such incident, Chaplain Doe noticed that Chaplain Julio Gonzalez was locked into a cell row in this fashion and couldn't get out.  Chaplain Doe walked over to a deputy sitting at a nearby desk and told him of the situation.  The deputy looked at him and continued on reading his newspaper.  When the deputy finally got around to releasing Chaplain Gonzalez, he was asked why he had done that, and the deputy replied, "It's just a habit." When the watch commander was told about this incident by Chaplain Doe, he responded that

the deputy must be having a bad day, and did not appear interested in any further inquiry or action.

▪ Finding deputies searching the chaplain's offices and their literature car without permission. When Chaplain Doe complained to one of the deputies, the deputy told him, "I'm doing what I'm supposed to be doing. I got my rules and you got your rules. This is my territory. I do whatever I want to do."

129. The Chaplains often are given complaint forms by inmates to be turned in to the jail staff. The inmates said that the reason they did this was because if they put the forms inside the regular collection box for same, the deputies will either throw the forms away or not address the complaint. On one occasion, Chaplain Doe gave a stack of completed complaint forms to a Sergeant Grubb, who told Doe that he would handle them and would get back to him in a few days to tell the chaplain what happened. The sergeant would then later frequently tell him, "I took care of it." Doe would later learn that the inmate filing the complaint would be put in the "hole," or the disciplinary unit, or were beaten up by the deputies – apparently for filing a complaint.

130. As set forth later in this declaration, LASD Assistant Chief Dennis Burns, who is in charge of custody operations, recites a number of "other purported safeguards against any retaliation actions by Department members against inmates, including the fact that there are multiple outside organizations monitoring the Department, its members, and their actions…." He is evidently referring to OIR, Special Counsel Merrick Bobb and PARC, and, perhaps, the ACLU. It is evident, however, from the documents I have reviewed, that neither Bobb/PARC nor OIR actually conduct their own investigations but merely review and assess reports provided to them by LASD.

131. These reports are highly unreliable since LASD declines to interview key witnesses (for example, LASD never interviewed jail Chaplin Doe, who

reported being an eye-witness to severe deputy abuse – or else conducts interviews in such a way as to make them meaningless (as for example when the deputy who is the alleged perpetrator of violence intimidates the witness during the interview). Nor does it appear that OIR even claims to review all use of force reports issuing from LASD, or that LASD is required to follow OIR's recommendations.

132.   Jeanne Woodford, the former warden of San Quentin State Prison, and former Undersecretary and Director of the California Department of Corrections and Rehabilitation, was contacted by me in conjunction with this project. Ms. Woodford is a correctional systems expert with many years of experience, and has held senior management positions in correctional and custodial environments, testifying before Congress and the California legislature on corrections issues, and speaking on and teaching corrections-related subjects at major universities.  She has been repeatedly recognized with various awards for her efforts to reform the criminal justice system in California. Ms. Woodford is familiar with the challenges and problems faced by many county jails in California including the Los Angeles county jails.

133.   Ms. Woodford has informed me:

▪ Many elected sheriffs in the State of California have been police officers or patrol and investigative deputy sheriffs who have limited, if any, experience in operating county jail systems. As a direct result, many Sheriffs in California and elsewhere do not have the expertise to operate the complicated jail systems for which they are responsible.  Often, they rely upon their [equally inexperienced] management staff to oversee the jails; as a result the jails do not receive the attention they deserve.

▪ The State of California has a Correctional Standards Authority (CSA) under the Department of Corrections and Rehabilitation.  The CSA is charged with conducting biannual inspections of state, county and local jail facilities to assess their level of compliance with state-mandated correctional and

PARKER DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

custodial standards.  There is a lack of timeliness and consistency in these inspections, including those required to be conducted of the LASD's County Jail System.  This shortcoming essentially results in that system not being held truly accountable for the quality of its jail operations and management.  The delay in such inspections, or lack thereof, generally results in sub-standard performance and lax oversight of jail personnel and operating policies.  Such problems currently exist in the Los Angeles County jails.

- The California Department of Corrections and Rehabilitation (CDCR) has been struggling for years with all of the various issues currently facing the Los Angeles County Jails System, but through court actions and court monitoring, CDCR has made progress in correcting these problems.  She identified some of these issues as follows:
  - o Lack of an adequate inmate classification system
  - o Lack of adequate and timely medical care
  - o Lack of an ability to track inmate's mental health and physical disability issues through the jails system
  - o Lack of operational and management accountability
  - o Lack of a real and functional inmate grievance system, including a separate one for medical and mental health grievances
  - o Lack of a designated individual or office to track grievances, responses, and appeals.

## VIII.  **Relevant News Media**

134.  During the first two weeks of May 2011, Los Angeles television station KTLA-TV aired a four-part series of news stories captioned:  "Gang

- 61 -

Behind the Badge," [57] which set forth the results of a months-long investigation by one of its investigative reporters into a group of Los Angeles County Sheriff's Deputies, who call themselves the "3000 Boys," working on the third floor of the Los Angeles County Men's Central Jail.  According to the series, members of this sub-group had emblazoned themselves with gang-like tattoos, used various hand-signals to identify themselves and communicate with each other, have been fomenting violence upon the jail inmates they are assigned to guard and protect, and have been engaging in violent acts against Sheriff's Department colleagues who are not members of their "gang."  This included a drunken brawl at the Quiet Cannon, a banquet hall and club in Montebello, where two non-member deputies were severely beaten by six other deputies. Those six were members of the "3000 Boys" and have, reportedly, since been discharged from the Sheriff's Department.

135.   As a part of this television news series, an active duty deputy sheriff agreed to be interviewed by the reporter on the condition that his face be concealed and his voice altered as he feared for his own safety and that of his family.  This deputy detailed how groups of deputies, beyond just the "3000 Boys," and in many different components of the LASD, have banded together in gang-like fashion, adopting unique hand signals, tattoos, and behaviors nearly identical to the myriad of street gangs in the Los Angeles area.  He described initiation rites to such groups as consisting of deputy-involved shootings, beatings, and other violent actions deemed "rites of passage" into membership. Once membership is obtained, according to this anonymous deputy, the initiate is entitled to "ink" – a tattoo that is symbolic of the group.  He identified some of these groups as being the "Vikings," the "Regulators," the "Grim Reapers," and the "3000 Boys",  but also indicated that several other similar groups also exist within the LASD.

---

[57]    KTLA-TV, http://www. ktla.com/videobeta/99c75925-d2db-472b-b549-68592e4ec2f3/News/KTLA-Gang-Behind-the-Badge-Part-One-Carolyn-Costello-Reports.

PARKER DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

136. During the on-camera interview, he added, "Deputies want 'ink' [group symbol tattoos] so badly, they will do anything they have to do to get it," and will bend and break the rules. Once accepted into one of these sub-cultures, the deputies are entitled to special privileges such as special duty assignments, car assignments, preferred schedules, vacations, and similar perks that, apparently, are not as readily available to other "non-member" deputies. He further advised that member deputies are very proud of their membership in these sub-groups and routinely "brag" about same. Most surprisingly, this deputy publicly identified Assistant Sheriff Paul Tanaka, one of the top four leaders of LASD as an "inked" member of the Vikings dating back to when he was assigned to the Lynwood Station earlier in his career. (According to the LASD official website, "Tanaka directly commands and is responsible for the activities of the Department's three Field Operations Patrol Regions, Detective Division, and the Office of Homeland Security," essentially all of the normal policing functions of the department except for the "Custody, Correctional, Court and Technical Services Divisions," which, according to the department's website, are under the other Assistant Sheriff, Marvin Cavanaugh.) The Los Angeles Times and other news media reported that Tanaka, a young deputy assigned to the Lynwood Station in 1987, had been involved in the shooting death of a young Korean man and was named in a wrongful-death lawsuit stemming from the shooting. Los Angeles County eventually settled for close to $1 million. Tanaka reportedly had become a tattooed member of the Vikings a year before that lawsuit. *("The World's Largest Street Gang,"* William Norman Grigg, conservative journalist and talk show host, and author of *Pro Libertate* Blog, May 11, 2011.)

137. Sheriff Lee Baca was interviewed as a part of this television news series, and in his responses to questions from the reporter, he indicated not only his awareness since 1972 of these sub-groups within his department, but, by his televised answers to the reporter's questions, he also seemed to condone

membership in the groups along with at least some of their activities. When asked about the Vikings tattoo of Assistant Sheriff Tanaka, Baca replied that it was "his choice," and that membership in the Vikings and the tattoo "never had anything to do with his performance." He also stated on-camera that he knows "the character of the people with tattoos, and they are not interested in creating problems." He dismissed the deputy-on-deputy brawl at the Quiet Cannon as merely the drunkenness of the six deputies involved, thus implying it was a rather isolated incident. When asked about these sub-group member deputies bullying non-member deputies, Baca astonishingly replied that the alleged victim deputies need to "man-up" and say "I'm not a wimp," rather than condemning these unprofessional practices. He told the reporter that he did not know of any police officer who did not know how to handle being bullied. Again, Baca gave no denial that such bullying exists. He did, however, state that his office door is always open to any deputy who has a complaint about another deputy, but he also admitted that most complaints of this genre never make it to his office. The anonymous deputy, during his interview, stated that if deputies go to their immediate superiors about such problems, "they make it go away."

138. In these KTLA-TV news broadcasts, Evans Tutts, an inmate of the Men's Central Jail, was also shown being interviewed on camera and exhibited numerous wounds he allegedly suffered at the hands of deputies on the 3000 floor. His injuries involved very visible red marks appearing to be bruises on his forehead and neck, a broken front tooth, a broken nose, a bruised right eye, a bruise or cut to his right shoulder, and what appeared to be circular burn marks or circular cuts on one of his arms. These two marks are relatively close together and resemble cigarette burns where a lit cigarette is pressed and held against the skin, but also could possibly be from an extended Taser gun activation against Tutts' arm. His attorney, a Deputy Public Defender, also stated on camera that her client had recently made complaints about his treatment in the jail and she felt his beating

was in retaliation for same. According to the news segment, Tutts spent eleven days in the hospital being treated for his injuries. Tutts provided a declaration to the ACLU dated May 5, 2011, in which he provided more details of his beating and stated this incident occurred on July 26, 2009.

139. This KTLA-TV news series also described another incident at the "Sidebar" lounge in Fullerton where a Deputy David Ortega, and several members of the "3000 Boys," refused to leave the bar at closing time, and physically and verbally challenged the bouncer who was trying to clear the premises at mandatory closing time. A video of this incident was a part of the broadcast where Ortega can be seen accosting and spitting on the bouncer. The bouncer was interviewed on camera and stated that Ortega and two other deputies had told them they were law enforcement officers and, thus, did not have to leave. Ortega and the other deputies allegedly threatened the bouncer as self-identified members of the "3000 Boys," and Ortega also told him that he would "beat the crap out of you and leave you in a pool of your own blood….leave you there to die!" Ortega can be seen spitting on the bouncer. The Fullerton Police were called and they arrested Ortega. He reportedly pled "no contest" to assault and battery charges and was demoted, but, surprisingly, still works at Men's Central Jail.

140. Approximately a year later, Ortega and two others involved in the Christmas brawl were among the numerous deputies who severely beat Evans Tutts (see above) on the 3000 floor of Men's Central Jail.

141. Baca's spokesperson, Steve Whitmore, was also interviewed on camera and denied that there was any unprovoked violence by deputies against inmates in LASD jails, though admitting that, "regrettably," there were mistakes and inappropriate behaviors by jail deputies, but contended that each incident was immediately rectified through investigation and disciplinary action where necessary.

142.    From this series, it would appear that, from Baca on down through the command and supervisory ranks,    the "gang-like" sub-groups and their unprofessional and often violent  conduct, including bullying and attacks on other deputies, are at best tolerated, and at worst, condoned.

## IX.  Denials of LASD Culpability in Acts of Violence in Los Angeles County Jails

143.    Two other specific declarations that I have also reviewed are from LASD Chief Deputy Dennis Burns, who commands the Custody Operations Division, which along with the Correctional Services Division, is responsible for all of the Los Angeles County jails. The second declaration is from Commander Stephen Johnson of the Custody Operations Division.

144.    Chief Burns stated in his sworn declaration, dated 11/5/10, as follows:[58]

> "…every allegation of retaliation at issue in this Motion that the Department has investigated has been determined to be **without merit**.  As set forth in greater detail below, the Department takes allegations of retaliation and other deputy misconduct extremely seriously and such claims are always thoroughly investigated. Here,   none of the Department's investigations have revealed any retaliation         against inmates."

145.    Chief Burns goes on to state that the LASD does not condone, and specifically prohibits, retaliation of any kind against inmates, and that the Department goes to great lengths to prevent retaliation against inmates.  He then described various preventative measures the Department takes to prevent retaliation against inmates, including recruiting "honest, compassionate, and hard-

---

[58]    Declaration of Chief Dennis Burns, et al., *Rutherford v. Baca,* CV 75-04111 DDP (C.D. Cal. Nov. 29, 2010),

LEGAL_US_W # 70661285.2

- 66 -

working people who are capable of learning, following instruction, and using good judgment." (It was noted that the words used by Chief Burns in his declaration in many places are identical to a declaration of a Lt. Mark Liddi, Ventura County Sheriff's Department in a totally unrelated civil action. This causes me to question where that identical language originates from, as well as to question the veracity and sincerity of the statements in both sworn declarations, especially if it is from a "forms manual.")

146. They also do an extensive screening of applicants that includes a criminal history check, motor vehicle check, credit check, employment check, and reference check. Once hired, the recruits attend a 19-week academy where they reportedly receive "extensive training regarding the LASD's policies and practices, as well as well-established law enforcement techniques. This schooling included how to interact with inmates and that inmates are allowed to exercise their rights without being subjected to retaliation." It was noted that Chief Burns does not mention any psychological testing or screening of new recruits, thus, it is unknown if such a program exists within LASD.

147. Chief Burns further states, "Those candidates who successfully complete the academy are then assigned to a custody facility. When they report to their assigned facility, the new deputies are first required to take and pass a 80-hour jail operations course." "The training includes, without limitation, how to follow the LASD's policies and practices applicable to custody facilities, including how to allow inmates to raise and resolve complaints that they may have during the custody environment. After this course, each new deputy was then assigned a training deputy for a period of approximately 12-weeks." Additionally, Chief Burns states that LASD deputies are required to take 24 hours of in-service training on the job which includes, "such subjects as the inmate complaint process, how to interact with inmates, how to provide emergency medical care to inmates, when to use force against inmates, how to use only that force which is necessary, and how

to identify inmates with conditions (such as mental problems) what may pose a threat to other inmates, staff, or the inmate himself."

148.  He also points to the Department having "in place a variety of policies and procedures that govern the conduct of Department personnel," including a provision in the Custody Division Manual stating, "inmates shall not be subject to discipline when making inquiries, or express dissatisfaction in a civil manner, regarding the conditions of confinement."  Chief Burns then goes on to recite a number of other purported safeguards against any retaliation actions by Department members against inmates, including the fact that there are multiple outside organizations monitoring the Department, its members, and their actions, as well as the assertion that inmates have multiple avenues of relief if they feel that they have been subject to retaliation by Department members.  Those avenues include access to staff and supervisors to report such retaliation, inmate complaint forms, an ombudsman, and civil tort action.

149.  This LASD policy statement is numbered 3-04/010.00, captioned "Treatment of Inmates."[59]  This policy states, in pertinent part, that:

1.    LASD "members" shall treat those persons in custody with respect and dignity."

2.    Inmates shall not be subjected to discipline when making inquiries, or express dissatisfaction in a civil manner, regarding the conditions of confinement, including but not limited to:

- Meals
- Housing
- Exercise
- Visiting
- Mail

---

[59]    LASD Order Number 3-04/010.00, Dec. 10, 2011.

- Medical treatment or medications
- The performance of duties of Custody, Department of Mental Health, of Medical Service personnel.

3. "Members shall consider inmate inquiries potentially legitimate and, when appropriate, refer an inmate to personnel who can address the inquiry, or to the inmate complaint procedure.

4. "Members shall refrain from using inappropriate, profane, callous, or degrading remarks, slang words, terms, and phrases while working in any portion of Custody Division." (This statement is followed with various descriptions of what constitutes such verbiage.)

5. "Any Department member who violates this policy shall be subject to discipline."

150. Chief Burns, in his declaration, then states that with regard to the retaliation claims raised by the ACLU that were deemed unfounded, "unfortunately, the details of those investigations (such as the names of personnel alleged involved) cannot be disclosed pursuant to restrictions imposed on the Department by various provisions of California law." According to Burns, this includes information from an officer's personnel file, prior disciplinary actions, and misconduct claims. He also cites the "Peace Officer Bill of Rights" which supposedly grants Peace Officers further protections and rights that limit the Department's ability to discuss or disclose information related to investigations of deputy misconduct.

151. While that may be the law in California, I have great professional disagreement with how it is put into practice. I am aware of several instances in which it was invoked, and it appeared to me that, in those situations, there was much information about the specific incidents which could have been publicly disclosed without posing any threat to the personal safety of the police officer(s)

involved, but was not due to a claim of exemption pursuant to the Police Officers' Bill of Rights.

152. Law enforcement officers are public guardians, paid from taxes by the people they serve, and must be accountable to the citizenry – especially in a democratic society. They have the authority to immediately and forcefully deprive citizens of their freedom, and sometimes their lives. That power cannot remain unchecked and must be subjected to outside scrutiny, and not just by government-appointed and -funded organizations or commissions. Government secrecy and lack of transparency, except for national security and personal privacy interests, are anathema to the democratic freedoms we enjoy in this country. The behavior of police officers in carrying out their duties should be subject to such public scrutiny.

153. Chief Burns also advised in his declaration that there were many factors that went into the Department's decision that the complaints of retaliation were not credible. He cites conflicting statements, the lack of corroborating witnesses, and inmates ultimately "admitting" that their allegations were "not true." Unfortunately, it is impossible to verify whether Burns statements are true when the Department does not release the details or results of their internal investigation, nor whether any threats, coercion, or force were used to obtain those admissions.

154. Both Chief Burns and his subordinate, Commander Stephen Johnson (in a separate declaration),[60] attack the manner in which the ACLU reported allegations of excessive use of force in the jails, or allegations of retaliation against inmates for talking with the ACLU. The fact is that the manner in which the allegations were reported has no significant bearing on the allegations themselves – they are either true or not true – regardless of the reporting mechanism employed.

---

[60] Declaration of Commander Stephen Johnson, *Rutherford v. Baca,* CV 75-04111 DDP (C.D. Cal. Nov. 29, 2010).

155.   It is to be noted that a statement made by the LASD spokesman, Steve Whitmore, as reported in the media on February 8, 2011, regarding ACLU Jails Project Coordinator Esther Lim's witnessing the beating of inmate James Parker publicly posed the question that "if ACLU jail monitor Esther Lim thought Parker was dead or permanently injured, she should have called for medical help or reported it immediately." Whitmore further stated, "What do you do when you think you see someone being beaten to death?  You scream, and you tell someone and you ask someone to check on him.  But she didn't do any of that."[61]

156.   Commander Johnson, in his declaration (supra) picks up on LASD PIO Whitmore's verbal criticism in the press of ACLU Jails Project Coordinator Lim over the James Parker incident. Johnson states that "it is puzzling why the ACLU would choose not to immediately inform the Sheriff's Department of their allegations, especially considering the gravity of their claims."  He then lambasts Ms. Lim for giving a training seminar between the date of the incident and the date of the report, without reporting the incident.

157.   I am surprised that Chief Burns, Commander Johnson, and Public Information Officer (PIO) Whitmore obviously decided to "kill the messenger" rather than work with the ACLU in trying to resolve not only the Parker incident but also the overall violence-against-inmates problem, which is well-documented by numerous inmates, other past and present deputy sheriffs, and outside third party witnesses as partially set forth herein.  Further, as a former FBI Public Affairs manager at FBI Headquarters earlier in my career, and as an FBI executive who has led and participated in press conferences, media interviews, press inquiries, and television and radio programs, it is highly unprofessional for a law enforcement official to publicly attack a complainant or credible provider of information about a possible crime in the news media.  LASD PIO Whitmore's

---

[61]   Associated Press, *Sheriff Launches Probe Into Alleged Inmate Beating*, Feb. 8, 2011, 10:03:15am, PST.

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

media attack on ACLU employee Esther Lim is, in my professional opinion, almost unheard of in truly professional law enforcement circles, and appears to be an effort to deflect attention away from the Parker jail beating incident described previously in this declaration, as well as a blatant, unprofessional, and transparent attempt to protect Sheriff Baca and the LASD from public criticism over the Parker incident, rather than assuring the public that the incident would be thoroughly and impartially investigated.

158. From my years of experience in law enforcement at the "street level" as a police officer and FBI Special Agent, as an FBI field supervisor, and as an FBI executive manager, along with my having been an FBI public affairs manager, as well as from my studies and research, I know that law enforcement supervisors and managers not only constantly seek to protect themselves and their own careers in the media, but also are expected to protect their departments, their superiors, and their staffs from embarrassing situations, from civil liability for misconduct, and from outside detractors. In my experience, this is almost universal throughout law enforcement not only in this country, but worldwide.

159. On January 12, 2011, the ACLU received a letter from Sheriff Lee Baca informing them that the LASD had investigated a number of complaints from ACLU clients that have been brought to the LASD's attention. Baca further advised that "the results of those investigations were reviewed by [LASD] managerial personnel from the Custody Operations Division and the entire investigative process was reviewed and overseen by the Office of Independent Review (OIR). A total of 20 complaints received from June 19, 2009, through October 28, 2009, had been investigated, and a chart summarizing the results of those investigations was provided with the letter from Baca.[62]

---

[62] Letter from Sheriff Leroy Baca to ACLU (Jan. 12, 2011).

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

160.    A review of that chart showed that out of 20 investigations of alleged retaliation complaints, all but two were determined to be unfounded.  Only one was judged as founded and was reportedly handled by the Internal Affairs Bureau of LASD.  No disposition of that complaint was reported in the chart or the letter.  One other was considered "Closed – Inactive 12-30-09 – ICIB."  No additional information was provided in the letter or the chart about that complaint.[63]

## X.  Additional Litigation, Court Actions, and More Recent Media Coverage

161.    During the preparation of this declaration, two additional situations came to my attention which I feel are relevant to this declaration.  The first was on February 11, 2011, when a three judge panel of the United States Court of Appeals for the Ninth Circuit published an opinion in the appellate matter captioned "Dion Starr, *Plaintiff-Appellant*  v. Leroy Baca, Los Angeles County Sheriff, in his individual capacity, *Defendant-Appellee,"* No. 09-55233, D.C. No. 2:08-cv-00508-GW-SH."  This opinion reversed and remanded a previous decision by United States District Court Judge George H. Wu that Sheriff Leroy Baca could be sued for supervisory liability for deliberate indifference in his individual capacity over violence in the Los Angeles County jails.  This appeal arose from a lawsuit filed by inmate Dion Starr, who along with his cell-mate was repeatedly stabbed – twenty-three times – by other inmates.  Starr alleged that on January 27, 2006, "a group of inmates gathered at his cell door and threatened inflict physical harm on him.  He yelled for the deputies guarding the jail to come to his aid.  Instead of protecting him, a deputy opened Starr's cell gate in order to allow the group of inmates to enter," whereupon the inmates "repeatedly stabbed Starr and his cellmate with knife-like objects" while Starr screamed for help and protection.  "After the

---

[63]    *Id.*, attached chart.

- 73 -

PARKER DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

attacking inmates left the cell, several deputies went to Starr. Starr lay on the floor of his cell, seriously injured, bleeding and moaning in pain. One deputy yelled at him, "nigger lay down." While repeatedly yelling "shut up nigger," the deputy then kicked his face, nose, and body numerous times, causing pain, bleeding, and a nose fracture. Other deputies stood by and watched."

162. "Starr sued Baca as well as the deputies directly involved in the attack." "In his claim against Sheriff Baca, Starr alleges unconstitutional conditions of confinement in violation of the Eighth and Fourteenth Amendments." He alleges that Sheriff Baca is liable in his individual capacity because he knew or should have known about the dangers in the Los Angeles County Jail, and that he was deliberately indifferent to those dangers." The District Court subsequently dismissed the claim against Sheriff Baca holding that "Starr's allegations against Sheriff Baca were insufficient to state a claim for supervisory liability because the complaint's recital of prior incidents and accompanying allegations did not sufficiently state a causal connection between Sheriff Baca's action and inaction and the alleged injury to Starr." "The district court directed that final judgment in favor of Sheriff Baca be entered under Federal Rules of Civil Procedure 54(b). Starr appeals."

163. The Ninth Circuit panel held that "the Supreme Court's decision in '*Iqbal'* did not alter the substantive requirements for supervisory liability claims in an unconstitutional conditions of confinement case under the Eighth and Fourteenth Amendments where deliberate indifference is the applicable standard. We also hold that Starr has sufficiently alleged a supervisory liability claim of deliberate indifference (emphasis added) against Sheriff Baca. We therefore reverse the district court's dismissal of Starr's claim against Sheriff Baca and remand for further proceedings."[64]

---

[64] *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011).

(cont'd)

164. The allegations in Starr's complaint are consistent with the mass of evidence I have reviewed of the lack of supervision in the jails, which not only allows gang members to roam the jails unchecked and set upon members of other gangs, but also contributes to extreme forms of deputy-on-inmate abuse.

165. Then, on May 19, 2011, an article appeared in the LA Weekly newspaper headlined "Men's County Jail Visitor Viciously Beaten by Guards" describing the beating of Gabriel Carrillo on February 26, 2011.[72] This article vividly describes the brutal attack by jail deputies upon Gabriel Carrillo, who had merely come to Men's Central Jail to visit his inmate brother. Carrillo had forgotten about a cell phone he was carrying in his pocket. His girlfriend had accompanied him and was also carrying a cellular phone in her boot, awaiting a call from her employer, despite her seeing signs and knowing that cellular phones were prohibited inside the jail facilities. Her phone dropped onto the floor in the visitor's waiting room, and deputies came in, confiscated both phones, handcuffed Carrillo and took both individuals into a break room. According to Carrillo, once in the break room, a deputy pushed Carrillo into the side of a refrigerator and hit him with an uppercut blow, knocking him to the floor. Carrillo later admitted that he "mouthed off" to the deputy, saying "If I weren't in these handcuffs, it'd be a different situation and I wouldn't let myself get thrown around like this." The deputy called for backup, other deputies responded, and Carrillo was severely beaten. He recalls being kicked and punched by three deputies, briefly losing consciousness. He could see his blood pouring from his head onto the floor. He remembers his legs and torso being repeatedly hit, and his legs going numb. He was also sprayed with a chemical spray, causing him to have breathing problems. When he cried out that he could not breathe, a deputy told him to "shut the fuck up" and "if you can talk, you can breathe." He was then taken to the hospital in an

- 75 -

ambulance, where he could not open one eye and had to have stitches above his eyebrow. A doctor at the hospital also told him that he had suffered chemical burns from the chemical spray used on him earlier at the jail. The article contains "before and after" photos of Carrillo showing the severity of his facial injuries.

166. The article claims that LASD has refused to release any specific information about the incident. The article goes on to state, "Somewhat surprising, perhaps, is that critics of the jail and Sheriff Lee Baca have found one fact to be agreed upon: Men's Central Jail is unsupervisable and should be shuttered. Given the county's current budget crisis, however, Baca says there's no money to build a new jail."

167. As pointed out earlier in this declaration, Sheriff Baca has additional incarceration facilities under his command and control and sitting almost totally unused or underused. Indeed, in a July 9, 2011, article in the San Bernardino Sun newspaper, captioned "Counties Brace for Prisoner Transfer," LASD's and Sheriff Baca's spokesperson, Steve Whitmore, stated that, "In Los Angeles County, jails currently hold about 16,000 inmates with overall jail capacity at 22,000."

168. I have also reviewed an article in the L.A. Times, dated September 19, 2011, captioned, "Jurors, Deputies at Odds on Truth," pp. A-1, A-8. This article reported the opinions of jurors in a criminal case that two LASD Deputy Sheriffs had lied on the witness stand about the circumstances leading up to the arrest of an individual for possession of a concealed firearm. The deputies testified that they had observed the defendant throw a loaded revolver onto the roof of a detached garage. A video of the incident by another individual present at the time showed that the officers could not have seen, and did not see, any such actions by the defendant. The arresting Deputy alleged that the video must have been edited. Testing by the District Attorney's Office showed that this did not occur. The same arresting officer also testified that he had seen the other officer with him at the scene return to his patrol vehicle and use the data terminal in the vehicle to check

the registration of the revolver. Sheriff's records, however, showed that neither deputy had used their data terminal at the time of the incident. LASD reportedly conducted its own investigation of the incident and reported that it supported its deputies' version of the incident, stating, "We believe that the video did not contradict the officer's testimony." The jurors, however, disagreed, and found the defendant not guilty, and then went public with their contentions that the two deputies had lied in their sworn testimony. This is yet another example of the willingness of LASD deputies to lie about incidents in which they are involved, including establishing probable cause for an arrest. The defendant actually was incarcerated for more than a month on the disproven charges.

169. This incident further corroborates many of the declarations and facts reviewed in this declaration indicating that some deputies have no compunction, whatsoever, about lying on reports and about other official matters .

170. I have also reviewed two documents captioned, (1) "Plaintiff's Third Set of Requests for Production," and (2) "Plaintiff's First Set of Interrogatories," both apparently filed in *Rutherford v. Baca,* CV 75-04111 DDP, with the court on or about October 22, 2010. The "Plaintiff's Third Set of Requests for Production" asks for production of over 100 documents and other items. The "Plaintiff's First Set of Interrogatories" propounds 18 requests for additional information, such as: "2. List all incidents at the Jail since January 1, 2010, which have been the subject of a use of force review. For each incident, provide the date of the incident and identify the prisoner(s) and staff member(s) involved." It is my understanding that, to date, there has been no production pursuant to these requests.

171. To have had those responses and documents available to me would have significantly aided me in the review and analysis of the jail violence situation, and, most definitely, in arriving at the conclusions set forth hereinafter in this declaration.

- 77 -

172.   Furthermore, I requested a tour of the pertinent jail facilities – Men's Central Jail and the Twin Towers Jails.  This tour was originally scheduled for April 6, 2011, and then abruptly cancelled by the LASD.  Such a tour would have also been of great benefit in arriving at the opinions and conclusions in this declaration.

173.   Again, these refusals strongly suggest to me – as a former law enforcement executive myself –an arrogant practice of obstructionism and obfuscation on the part of LASD, under the command of Sheriff Baca, designed to obstruct this investigation and litigation, and intended to conceal the systemic violence and corruption from the public, the electorate, oversight authorities, and the judicial systems of the State of California and the United States of America.

## XI.   Opinions and Conclusions

174.   Of all the jails I have had the occasion to visit, tour, or conduct investigations within, domestically and internationally, I have never experienced any exhibiting the volume and repetitive patterns of violence, misfeasance, and malfeasance impacting the Los Angeles County Jail system, particularly Men's Central Jail.  I recognize that this jail system is one of the largest in the United States, if not the world, and regularly houses every type of criminal imaginable, and thus has every conceivable problem a correctional facility can have, but in most facilities that are professionally managed, these problems are usually anomalies, rather than the norm.  In the case of the Los Angeles County Jails, the anomalies appear to be the norm.

175.   I also recognize, and know from personal experience, that some custodial facility inmates are prone to making what sometimes prove later to be false, unsubstantiated, embellished, exaggerated or illogical complaints concerning the conditions of their incarceration, their treatment by their overseers, and their fellow inmates.  However, it is stark reality that some inmates also make very

legitimate complaints of the same type, including those inmates displaying significant injuries validating their complaints.  I also know from personal experience that prisoners, regardless of their status, are generally deemed not credible by most law enforcement personnel, and also, to some extent, by the general public.  Thus, most, if not all, of their complaints are given short shrift while statements by police officers are usually accepted at face value, especially during internal investigations by police managers, but also by prosecutors, by juries, and frequently by the courts.

176.  In this declaration, it is not my task to determine which specific complaints I have reviewed are true or false.  It is my task to use my training, knowledge, and investigative experience – and the expertise derived from them – to review, analyze, and render expert investigative opinions and conclusions on the volume of reported violence and inmate abuse  within the Los Angeles County Jail system, particularly the Men's Central Jail, based upon my investigation as reported herein, and, thereafter, to comment upon any trends, practices, and procedures within LASD which appear to be contributing to that abuse and violence.

177.  A number of things stood out to me as I reviewed the declarations, reports, and news stories described above, which informed my conclusions.  First, there were numerous patterns that emerged with some consistency among declarants who could not have conspired to square their accounts, because they were in jail at different times and in different facilities.  Such patterns are telling to a trained investigator.  Second, many incidents of abuse were described by victims, and confirmed by eyewitnesses. Third, civilian eyewitnesses with no discernible motive to lie corroborated a number of the patterns that appear in the inmates statements, such as officers yelling "stop resisting" at non-resisting inmates.

178.  I know from my own law enforcement experience, and conversations with hundreds of police officers, deputy sheriffs, corrections officers, and other

law enforcement personnel over the past 45 years, including my tenure in the FBI, that there is a prevailing sentiment and mentality in the ranks of law enforcement and correctional officers that it is "us against them" (with "them" being citizens, suspects, criminals, defense attorneys, the ACLU, and the news media.)  Having once been of that mindset myself as a police officer early in my career, I know firsthand how this sentiment is one ingredient of a process that turns many young officers into cynical, overly suspicious, obsessively controlling, and, frequently, lying officers who will say or do anything to cover up for, protect, and show loyalty to, their fellow officers and their agencies. It is a unique acculturation process and organizational culture with few parallels, except, perhaps, for certain sectors of the military.

179.   To an astonishing extent, unchecked violence, both deputy-on-inmate and inmate-upon-inmate, permeates Men's Central Jail and Twin Towers jails, which are components of the Los Angeles County Jails, managed by the Los Angeles County Sheriff's Department under the leadership of Sheriff Leroy Baca. The evidence I have seen in preparing this declaration is overwhelming with regard to systemic violence, misfeasance, and malfeasance including corruption.  There is a prevalent and long-term pattern of such unchecked violence, and it has become the accepted practice in jail operations, along with systemic institutional actions to cover it up.

180.   For the most part, within these three facilities, there is inattentive and inadequate supervision, a virtually autonomous staff of deputies managing the inmate population by their own arbitrary and often violent whims, widespread violations and lack of enforcement of the Jails' own rules and policies, discipline so lax it is bordering on being nonexistent, inculcation of fear in inmates through intimidation and physical and verbal abuse, and an overarching lack of sensitivity and attention to inmates' physical handicaps, medical needs, mental health issues, personal hygiene, living conditions, personal safety, and basic civil rights.   These

conditions have existed for years without any meaningful remediation, and continue to exist virtually unchecked today.

181.   Sheriff Baca and his top management team LASD have essentially abdicated their responsibilities to provide a safe, secure, and corruption-free incarceration environment within the Los Angeles County Jail System. This has resulted in a pattern of countless inmates suffering severe injuries, maiming, and death, some caused by fellow inmates, but most often at the hands of, or with the acquiescence or assistance of, the deputy sheriffs who are their keepers.

182.   The lack of effective, consistent, and impartial investigation by LASD into such evidence raises bright red flags as warning signals that things are horribly amiss in the operation and management of the Los Angeles County Jail System, especially Men's Central Jail and the Twin Towers Jail facilities.

183.   At least since the 1980s and perhaps as far back as the early 1970s, the LASD has had an unknown number of deputy gang-like subgroups using tattoos, hand-signs, intimidation tactics, and physical violence often bordering on vigilante-style justice, to maintain their dominance not only within their assigned duty stations but also within the LASD in general.  Sheriff Baca has been aware of the existence of these deputy-gang sub-groups as far back as 1972, and Assistant Sheriff Paul Tanaka was a member of one such gang, perhaps the most infamous one, earlier in his career.

184.   The Kolts Commission, almost 20 years ago, recognized and exposed the existence of "Deputy-Gangs" and reported that their actions are "of a profoundly serious nature, touching the fundamental fitness of the LASD to perform its mission."  Their actions were described as "numerous acts of excessive force including shootings, beatings and the destruction of property." Such "Deputy-Gangs" still exist today, seemingly with impunity, right under the eyes of all levels of the current management of LASD. One specific Deputy-gang, the

LEGAL_US_W # 70661285.2

- 81 -

"3000 Boys" appears to be the most virulent based on what I have reviewed for this declaration.

185. Incidents of deputy-on-inmate violence, after no or only nominal investigation by LASD, are routinely reported by deputies as unprovoked inmate-on-deputy assaults. If an inmate complains of being beaten or injured by jail deputies, those complaints are almost universally declared unfounded. Most of these complaints get "resolved" at the lowest levels in the LASD. Proper reporting procedures seem to be routinely ignored.

186. Neither the Special Counsel, nor the Office of Independent Review (OIR) has any real authority or means to effectively address problems in the county jails or within the LASD. PARC does research on issues in the LASD, including the jails, and issues semi-annual reports, which include findings and recommendations – many of them excellent – about problems in the jails. However, the Sheriff has no obligation to adopt any of those recommendations. OIR does not conduct independent investigations of use of force incidents, but instead must rely on assessing incidents of force through reports and materials presented to them by the LASD. In addition, LASD does not have any obligation to accept OIR's conclusion as to whether a use of force was appropriate, or OIR's recommendation of the appropriate discipline to be imposed on officers who are found to have violated LASD policy or the law. Thus, there is only a façade of outside independent oversight of the LASD, when, in reality, the LASD has rendered it ineffective.

187. Merrick Bobb, President and founding director of the Police Assessment Resource Center (PARC), serves as Special Counsel to the Board of Supervisors to monitor the LASD. Between 1993 and 2010, Mr. Bobb has published 29 reports on his monitoring the status of operations and reform within LASD. Many of those reports over that 17-year period consistently report numerous incidents involving excessive use of force by deputies in the jails,

including "cases in which the decision to exonerate the officer [in excessive force cases] simply defies explanation, and there are still incidents, almost all in the custody setting, where the use of force is either senseless or overly severe."

188.  The volume of complaints and injuries I have reviewed in preparing this declaration is absolutely astonishing to me as a criminal justice professional and former senior law enforcement executive manager.  The similarities and consistency of the incidents reported by the inmates' declarations lends tremendous credibility to those allegations.  They are further validated by reports of outside individuals – jail chaplains and instructors – with no reason to cast unfounded aspersions upon LASD deputies and managers.

189.  The vast number of inmate and third party complaints and reports about violent beatings and assaults within the Men's Central Jail and the Twin Towers Jail, and the large percentage which have been deemed unfounded or not substantiated by the LASD, defies logic.  With a jail population as large as LASD has, and the plethora of reported complaints substantiated by sworn victim declarations, sworn witness declarations, hospital or medical treatment records, photographs and videos of victim's injuries, for the LASD, after going through the motions of investigating itself, to make determinations that almost all of those complaints are unfounded is incredulous.  In my opinion, after having investigated numerous cases of excessive use of force by police and custodial officers, beatings and homicides in jails and correctional facilities, as well as many other forms of law enforcement malfeasance and misfeasance, having studied those problems, and having visited and met with so many jail and correctional officials around the world, there is certainly a reasonable percentage of the such complaints which are valid, and certainly supported by the mathematical law of averages – while the LASD is wanting us to believe that they are purportedly the exception.  As Chief Burns stated in his declaration, "….every allegation of retaliation at issue in this

motion that the Department has investigated has been determined to be without merit."

190.    To date, neither the LASD, Sheriff Baca, nor any of his top subordinates, have been held accountable for such failures. Having investigated corruption, the use of excessive force, and other irregularities in numerous police and sheriff's departments and custodial facilities, including the LASD, I have seen agencies that are perfectly capable of effectively and impartially investigating themselves, but have seen an even larger number who do not have that capability or the will to acquire it. It is clear that LASD has been, and still is, incapable of investigating itself with regard to the clear evidence of jail violence and other misfeasance and malfeasance.

191.    There is at least a two decade history of corruption within the ranks of the LASD.  In most of those cases, lower level deputies and civilian employees were prosecuted, but no one at the command level responsible for those employees appears to have been held accountable and appropriately punished for failure to properly supervise and manage their subordinate personnel and resources.  In my opinion, this has provided the "seedbed" for continued lax supervision, violence, and corruption within LASD and the county jails it administers.

192.    I am quite familiar with the infamous LAPD Rampart Division corruption scandal, as well as the equally infamous Rodney King Matter. In my opinion, based on my investigation reported herein, this matter involving high levels of violence within the LASD County Jail System is actually significantly more systematic, involving many more LASD officers, supervisors, and managers, than the number of LAPD officers, managers, and supervisors involved in the Rampart matter. In addition, many of the incidents of jail violence are far more severe than the King beating or much of the other excessive force that was prevalent at that time in the LAPD.

193.    Such evidence cries out for an independent, far-reaching, and in-depth investigation by the Federal Government of the conditions and acts of unchecked violence within the Los Angeles County Jails, especially at the Men's Central Jail and the Twin Towers Jail facilities, if not the entire management and operation of the jail system. The U.S. Department of Justice Civil Rights Division and the Federal Bureau of Investigation are most likely the only agencies with the authority, independence, and expertise to conduct such an investigation.  Since the LASD appears totally incapable and lacking in motivation to correct these problems, it remains for the federal government and the courts to do so.  The problem can no longer be ignored.

194.    From Sheriff Baca on down through the command and supervisory ranks, the gang-like sub-groups of deputies and their unprofessional and often violent conduct, including bullying and physical attacks on other deputies, is at best, tolerated, and at worst, condoned, thus implying tacit approval of unprofessional conduct in the lower ranks. There is no "zero-tolerance" policy from the top regarding such behavior and conduct.

195.    It is highly significant that civilian witnesses to deputy violence have come forward and reported witnessing deputies attack non-resisting inmates.  Their accounts indicate that deputies feel such a sense of impunity that they are unafraid to assault inmates even in areas where they know they may be observed by civilians.  Their experiences suggest that the culture of deputy violence in the Jails has become so hardened and pervasive that deputies feel emboldened to carry out their attacks even in non-secluded areas.

196.    Following a major corruption scandal within the Narcotics Division of the LASD, the Kolts Commission, in its 1992 report described "disturbing evidence of excessive use of force and lax discipline" and a "large number of brutal incidents that have been and still are occurring," including "too many officers who have resorted to unnecessary and excessive force," [wherein the]

LEGAL_US_W # 70661285.2

- 85 -

PARKER DECL. ISO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION

"Department has not done an effective job of disciplining them." The commission made various recommendations for reform within the LASD to then Sheriff Sherman Block and the Board of Supervisors, which, if implemented back then, have seemingly not survived over the past two decades, since excessive use of force, especially in the jails, is still commonplace in 2011.

197. In 1999-2000, another LASD corruption scandal surfaced wherein eleven jail employees, both sworn and civilian, were engaging in massive credit card fraud, and two of the eleven were selling black tar heroin to jail inmates. This again illustrates the ongoing existence of corruption in the LASD custody facilities.

198. Numerous incidents of LASD staff misfeasance and malfeasance still exist in the provision of mental health services in the jail system, including intentionally "declassifying" inmates suffering from mental problems so they can be removed from mental health housing and placed back into the general population of the jail, failure to recognize and segregate inmates with serious mental illness, failure to provide appropriate medications and therapy, and placing mentally ill inmates in inappropriate jail quarters which worsened their mental problems.

199. Mentally ill inmates in the general population frequently and disproportionately become targets for violence and abuse at the hands of both deputies and other inmates. Among an outside expert's 2008 recommendations for corrective action against excessive violence in the jails were enhancements to the training of staff, and taking effective steps to halt custodial abuse. Confirmation of such violence once again emerged through the expert's findings, which included numerous reports of continued use of excessive force and violence by jail staff.

200. Deputies in Men's Central Jail and Twin Towers 1 and 2, routinely instigate inmate-upon-inmate assaults and other violence in order to punish or intimidate other inmates by intentionally leaving cell doors open, or opening both

module and cell doors, to allow access to those other inmates carrying out the assaults and violence. The number of reported incidents of this type strongly suggests that this is yet another method by which deputies inflict violence upon inmates without getting their own hands "dirty."

201. Deputies have both found, and corruptly created, methods of shirking their duties for hours at a time, including abandoning their post for hours at a time and then creating fraudulent timekeeping records for inmate safety checks never done and to cover their malingering.

202. Throughout this declaration, there are statements and indications of extensive jail overcrowding in the Men's Central Jail, and to a lesser extent, in the Twin Towers Jail facility. Interestingly, on May 22, 2011, the Los Angeles Times published an article pointing out that the North Facility of the Pitchess Detention Center, though it once held 1,600 male inmates, it now holds only two.[65] According to the article, Sheriff's officials stated that it was necessary to all but essentially close, or greatly diminish the populations at some jail facilities for budgetary reasons. The North Facility is one such entity, yet the Men's Central Jail and Twin Towers 1 and 2 are dangerously overcrowded. In fact, prisoners from outside jurisdictions, including the Federal government, are reportedly being housed under contract in some LA County jails. There is no excuse for this in the alleged over-crowded situation some of the jails continue to endure. One obvious alternative is to reduce the populations of the Men's Central Jail and the Twin Towers facilities by moving inmates, especially the large number still legally innocent and awaiting trial, along with a sufficient cadre of their keepers, to the unused facilities – thus, opening a pressure valve to relieve the overcrowding at the downtown facilities.

---

[65] Robert Faturechi, *Wide Open Spaces at L.A. County Lockup*, L.A. TIMES, May 22, 2011.

203. From my own years in law enforcement management, including serving as the Budget Officer for all of the FBI's criminal investigative programs at FBI Headquarters during my career, I know that while money is usually a problem from a budgetary allocation standpoint, it is still upper management's responsibility to set the priorities in how its resources will be allocated and used. In the case of LASD, there is no question that safely running the vast county jail system – one of the largest, if not the largest, in the world – must be a top priority. It is my opinion that, based on all of the information contained herein, Sheriff Baca and his top management team have abdicated that responsibility. When resources are short, management must go to their funding authorities and make the case for additional funding and manpower. If that falls on deaf ears, then the Sheriff – an independently elected official – must take his case to the electorate. He cannot just ignore the problems caused by the shortages – in this case, the injury and death of inmates in his care, and the willful brutality and corruption among his deputies guarding those inmates – and hope they will go away. They do not disappear, but, instead, get worse, as we continue to see in Sheriff Baca's jail system. [66]

204. The misfeasance and malfeasance of LASD described in this declaration, and in the litigation for which it has been prepared, should not be allowed to continue nor to perpetuate itself, as it has apparently done over the past two decades and perhaps longer. To allow this to continue would be nothing short of criminal.

205. Attached to this declaration is Exhibit C, which lists all of the documents, media coverage, court filings, correspondence, and literature I have been provided and reviewed, or have located and researched on my own,  to assist in the preparation of this declaration.

---

73    Neil Nisperos, *Counties Bracing for Prisoner Transfer*, SAN BERNARDINO SUN, July 9, 2011.

## XII. Closing Thoughts

206. "U.S. citizens have a set of values that they expect all law enforcement (local, state, and federal) to practice. To follow these norms and to gain respect, law enforcement personnel must remain ethical and conduct themselves accordingly at all times, both on and off duty. The law enforcement code of ethics and the police code of conduct represent the basis for ethical behavior in law enforcement. In addition, these codes encourage law enforcement's classification as a profession. However, these codes simply constitute words. For them to be effective, law enforcement officials and their leaders must consider them as the bible for law enforcement. Law enforcement personnel must not only believe in the codes but also follow them and display conduct that supports them. Thus, law enforcement officers must live the code."

207. "Any criminal justice system represents an apparatus society uses to enforce the standards of conduct necessary to protect individuals and communities. The laws of this nation, designed to protect and defend the public, provide the framework for a democratic society." International Association of Chiefs of Police, "*The Evolution of the Law Enforcement Code of Ethics*," Police Chief Magazine, January 1992, pp. 14-17

I swear under the penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed February 23, 2012, in Santa Barbara, California.

Tom Parker

PARKER DECL. ISO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION

# EXHIBIT  A

## THOMAS R. PARKER

Culminating a thirty year career in local and Federal law enforcement, Tom Parker spent 24 years with the Federal Bureau of Investigation (FBI) prior to his retirement in February, 1994. He rose through the FBI ranks in a variety of progressively responsible investigative, supervisory, and management positions and retired as Assistant Special Agent in Charge of the Los Angeles FBI Regional Office – the Bureau's second largest office at that time.

Mr. Parker had executive management responsibility for one of the largest field contingents of FBI Agents in the United States investigating organized crime, international narcotics trafficking, major violent crime, violent street gangs, crimes against corporations, white collar crimes, civil unrest, law enforcement and public official corruption, and civil rights violations including police brutality. Included among his responsibilities were the latter phases of investigation into rampant corruption in the Narcotics Division of the Los Angeles County Sheriff's Department, as well as the initiation of the FBI investigation into the Rodney King Matter involving the Los Angeles Police Department. He was also the senior Federal law enforcement executive assigned to the Los Angeles Emergency Command Center managing the law enforcement activities during the infamous 1992 Los Angeles riots, as well as the crisis management of the cataclysmic 1994 Los Angeles earthquake.

During his career, he provided management oversight to numerous FBI investigations involving police brutality, police corruption, excessive use of force by police, and other forms of police misfeasance and malfeasance. He also conducted and supervised numerous cases involving irregularities in jails and prisons, including excessive use of force.

As a senior field commander, Mr. Parker had executive management responsibilities for numerous FBI field supervisors, and was responsible for overseeing and evaluating their supervisory performance. Mr. Parker also created and/or managed various specialized FBI squads and interagency task forces on bank robberies, fugitives, major violent crimes, street gangs, organized crime, drug trafficking, civil unrest, official corruption, and white collar crimes. Mr. Parker also served as the on-site FBI commander for major arrests, execution of search warrants, undercover operations, drug seizures, SWAT operations, hostage negotiations, and shooting incidents involving FBI Agents. He also created and implemented the first Joint Drug Intelligence Center in the western United States which used sophisticated computer systems to gather, analyze, and disseminate complex drug trafficking intelligence data impacting the southwestern border and Pacific coast of the United States. Mr. Parker was also the senior FBI representative to the Western U.S. High Intensity Drug Trafficking Area Executive Board responsible for the coordination of Federal funding for international and domestic drug enforcement investigations by Federal, state, and local law enforcement agencies in the Los Angeles area. In both 1990 and 1991, he was a delegate to the Japanese-American Working Group on Organized Crime.

His field command responsibilities also included approving the initiation of major criminal investigations, including sophisticated undercover operations, the evaluation of the sufficiency of

investigative results prior to the issuance of criminal complaints or indictments, and assuring compliance with Attorney General and FBI Guidelines on the initiation and continuance of criminal investigations.

Mr. Parker was also responsible for reviewing candidates for promotion to supervisory rank and recommending candidates for promotion.  He also conducted numerous internal investigations of violations of FBI ethical standards, policies and procedures, as well as FBI shooting incidents, and recommended disciplinary actions when necessary.  He also served as chairman of the divisional FBI Undercover and Sensitive Investigations Review Committee.

Prior to his assignment to the Los Angeles FBI Office, he was the Chief of Resource Management and Strategic Planning for the Criminal Investigative Division of the FBI at FBI Headquarters, Washington, DC. In that position, Mr. Parker was responsible for the formulation, presentation, and implementation of the FBI budget for all criminal investigative programs, as well as managing the allocation of investigative and program resources to the FBI field offices. He also managed the strategic planning functions for criminal investigations and implemented new change strategies designed to emphasize service industry management concepts in order to increase the FBI responsiveness its constituent clients.

Mr. Parker was also responsible for creating and implementing the first Asset Seizure and Forfeiture Teams in major FBI field offices to identify and locate the illicit profits of major criminals and to recover those profits for ultimate forfeiture to the government.  He was also a member of the FBI's National Undercover Review Committee which had the approval authority over all FBI criminal undercover operations.  He also represented the FBI at U.S. Department of Justice, White House, and Congressional budgetary and strategic planning meetings.

Mr. Parker also served as a member of the FBI Inspection Staff where he conducted compliance, effectiveness, and efficiency examinations of FBI field offices and their investigations throughout the United States and FBI Headquarters divisions, as well as managing internal FBI investigations of Agents and other personnel who have violated FBI policies and procedures in carrying out their duties, or have been involved in shooting and other use of force incidents.

During his FBI career, he held numerous field supervisory and management positions throughout the United States and also served as a Supervisory Special Agent/Program Manager in the Office of the Director, FBI Headquarters, Washington, DC, where he managed a full range of congressional liaison and public affairs functions for the FBI involving Congressional testimony, media relations, law enforcement-press liaison, and citizen information programs. He was also an instructor at various training courses for the press officers of the FBI's field offices.  He also served for two years as senior speech writer for then FBI Director William H. Webster.  Thereafter, Mr. Parker was designated as the Supervisory Special Agent in Charge of the St. Paul, Minnesota FBI Office, where he was responsible for management of all FBI resident agents in Minnesota and their investigations. In this position, he

managed various Federal investigations into the use of violence in local jails and state and Federal prisons.

While a field investigator early in his career, Mr. Parker specialized in the investigation of complex white collar crimes, corruption of police and public officials, and organized crime. He was the FBI representative to the Las Vegas Federal Organized Crime Strike Force investigating corruption within the Nevada gaming industry.  He personally initiated the successful multi-year probe into the hidden Mafia ownership and control of major Las Vegas casinos which resulted in the conviction and imprisonment of the entire leadership of the Mafia families in Chicago, Kansas City, and Cleveland, as well as the liberation of these casinos from organized crime control.  His investigation became the focus of the 1995 hit movie, "Casino" starring Robert DeNiro.

He has personally investigated and/or managed in excess of 8,000 criminal cases while serving in the FBI, including assaults and killings in Federal and state prisons, excessive use of force by police and correctional officers, and corruption within police departments and prisons.
Mr. Parker was an FBI field instructor for police officers and prison officials for over ten years on management and supervision, law enforcement stress, police ethics and corruption, public affairs and media information procedures, informant development and handling, police report writing, criminal investigations,  patrol procedures, and hostage negotiations. He was also a frequent guest lecturer at the FBI Academy, and was also an adjunct Instructor in Criminology for the College of St. Francis, Joliet, Illinois.

Mr. Parker was also a trained and experienced hostage negotiator.  During his career, he has also posed as the co-pilot of a hijacked jetliner in order to obtain the release of passengers being held hostage and capturing the armed skyjacker. He led one of the first successful FBI investigations into the illegal activities of a heavily armed group of ultra-right anti-government militants, and conducted many successful criminal investigations into the organized crime infiltration and control of several labor unions in the United States.  He also conducted or managed a number of investigations which resulted in the conviction and imprisonment of several high-level government officials for corruption, including a police chief, the Speaker of the Missouri State House of Representatives, and two sitting U.S. Congressmen.

Mr. Parker was the recipient of over twenty official commendations from the Director of the FBI for valor, managerial excellence, and investigative achievements.

In addition to his FBI career, Mr. Parker also spent approximately four years as a police officer in Santa Clara, California, where I was assigned to uniformed officer duties, such as patrol, desk officer, booking officer, etc.  During his tenure in that capacity, he was frequently in the Santa Clara County Jail in an official capacity and dealt with custodial deputies on a regular basis there.  Additionally, the Santa Clara Police Department had its own holding facility at the police department in which officers would book and hold prisoners until they were transported to the county jail.  Standard jail policies and procedures were practiced at that facility.

Mr. Parker also served for one year as a Park Ranger - Law Enforcement Specialist in Yosemite National Park where he handled law enforcement duties in one the country's most heavily visited national parks.  He was an on-scene manager and tactical expert on one of the largest critical incidents in National Park history involving deployment of firearms by Park Rangers and the application of strict use of force policies.  He was also in charge of the detention facility maintained by the National Park Service at park headquarters in Yosemite Valley and had the responsibility for creating and implementing incarceration procedures, inmate rules, prisoner movement policies, and inmate safety regulations.

Mr. Parker currently owns and operates an international security, investigative, and criminal justice consulting business based in Southern California. Since its inception in 1994, he and his firm have acted as consultants to various Fortune 500 companies, national and international law firms, foreign business entities, foreign police agencies and correctional officials, and prominent corporate executives and celebrities, and have conducted extremely complex international consulting projects, investigations, and security missions on all five continents.

He has been quoted or interviewed in various national and international mass media outlets including the Wall Street Journal, the New York Times, the Los Angeles Times, and The Washington Post, and has also been a guest expert commentator on CNN, MSNBC, all four major U.S. television networks, and a number of foreign television networks on various major investigations and police operations around the world, including the October, 2002, sniper shootings in the Washington, DC, area, and the 9/11 attacks on the United States.

Mr. Parker has also consulted with various regional units of the Ministry of the Interior Affairs (MVD) in Russia on developing new training programs for their national police force and the Ministry of Justice prisons staff designed to increase their professionalism and responsiveness to the citizenry, reduce violence and corruption by police officers and prison officials, and to improve the thoroughness of their investigative and enforcement operations prior to the arrest of suspected lawbreakers.   He has also provided training to the police in nine cities across Russia in developing community policing programs and more effective responses to gender violence incidents.

Since retiring from the FBI and engaging in criminal justice consulting and expert witness work over the past 17 years, Mr. Parker has toured jail and prison facilities and met with correctional officials to discuss their custodial procedures in the following international locations:

> Moscow, Russia
> Yekaterinburg, Russia
> Nizhny Novgorod, Russia
> St. Petersburg, Russia
> Tomsk, Russia
> Irkutsk, Russia
> Vladivostok, Russia
> Stockholm, Sweden
> Sydney, Australia
> London, England

> Tokyo, Japan
> Pretoria, South Africa

Beginning in 1994, Mr. Parker became active in the human rights movement, and in 1997 was invited to become a member of the California Committee of the Board of Human Rights Watch (HRW), the international human rights monitoring organization.  In 1998, he was selected as a member of its Southern California Executive Committee. In that capacity, he served as an unpaid consultant on the book captioned Shielded From Justice: Police Brutality and Accountability in the United States (Human Rights Watch, 1998), which reported the results of 2-1/2 years of research into continuing problems of police brutality in fourteen American cities, including Los Angeles.

He served for two years as a Commissioner on the Board of Fire and Police Commissioners for the City of Santa Barbara, California.

Mr. Parker also serves as an expert witness domestically and internationally, and has been qualified as an expert witness in state and Federal courts on excessive use of force by law enforcement and law enforcement operational procedures, as well as in complex financial frauds and on highly sensitive political asylum cases.

Mr. Parker is a member of the following professional organizations:

-Society of Former Special Agents of the Federal Bureau of Investigation

-FBI Agents Association (Lifetime Member)

-Academy of Criminal Justice Sciences

-Society for Police and Criminal Psychology

-California Association of Hostage Negotiators

-International Corrections and Prisons Association

-American Corrections Association

-California Probation, Parole, and Correctional Association

-California Attorneys for Criminal Justice (Associate Member)

-Santa Barbara County Bar Association  (Associate Member)

**THOMAS R. PARKER**
**Some Examples of Prior Expert Witness Engagements**

**Carol Ann George v. The County of Santa Barbara, California; ET AL**
USDC Case No. CV09-2258, U.S. District Court, Central District of California, Los Angeles, California
Excessive Use of Force Shooting Death of Donald George by deputies of Santa Barbara County Sheriff's Department – Expert Witness Consulting, Report, Deposition, and upcoming trial testimony for plaintiffs. (2008-2011 – case still pending)

**Richard Dean Turner v. Robert K. Wong, Warden, California State Prison at San Quentin**
USDC Case No. CV 09-7449 GAF, U.S. District Court, Central District of California, Los Angeles, California
Death Penalty Case Habeas Corpus Petition – Expert Witness Consulting and Declaration regarding insufficiency of police investigation for Petitioner-Appellant. (2010 – 2011 – case still pending)

**Kevin Cooper v. Jill Brown, California State Prison at San Quentin**
USDC Case No. CV-04-00656-H, Southern District of California, San Diego, California
Death Penalty Case Habeas Corpus Petition – Expert Witness Consulting, Total review of police investigation leading to conviction of Cooper and imposition of death penalty, and preparation of declaration regarding insufficiency of police investigation, planting of evidence, and other significant malfeasance by investigating police  for Petitioner-Appellant.  (2011 – case still pending)

**Claudia Navarro Pineda Et Al,  v. City of Houston, Texas; D.H. Strouse; D.R. Barrera; P.A. Herrada; D.R. Perkins; Et Al**
USDC No. H-98-3877, Southern District of Texas, Houston Division
Illegal Police Raid Resulting in Shooting Death of Innocent 3rd Party -- Deposition testimony as expert witness for plaintiffs (1998-2001)

**Richard L. Garcia vs. United States of America, United States Postal Service, Et Al**
USDC No. 98-7521 RSWL (SHX), Central District of California
Investigative Malfeasance of U.S. Postal Inspectors resulting in workplace violence shooting of plaintiff -- Deposition testimony as expert witness for plaintiffs (1999)

**Juan Berry, James Suggs vs. Las Vegas Metropolitan Police Department, ET AL**
USDC No. CV-S-99-00446-JBR (RLH), District of Nevada
Excessive Use of Force by Off-Duty SWAT Officers -- Deposition testimony as expert witness for the plaintiffs (2000)

**The Estate of Dwayne Eli Sanchez, Et Al, v. The City of Santa Maria, California**
USDC No. CV 99-5839-JSL (MANx), Central District of California

Shooting Death of Driver of Vehicle by Police -- Deposition testimony as expert witness for plaintiffs (2000-2001)

**Gwen Price; Estate of James Jahar Perez  v. City of Portland, Oregon**
USDC Case Number, C04-1178-MO, U.S. District Court, Portland, Oregon
Excessive Use of Force (Shooting) by Portland Police Department Causing Death of Plaintiff – Expert Witness Case Consulting and Expert Witness Report for Plaintiff (2005)

**Main Street Motor Cars, Inc., Et Al, v. North Las Vegas Police Department, Et Al**
USDC No. CV-S-00-1161-PMP (LRL), District of Nevada
Acts of Official Corruption by Police Captain -- Expert witness report and trial testimony for plaintiffs (2001)

**The Estate of Charles Webb, Et Al, v. The City of North Las Vegas, Nevada, Et Al**
Case No. Unknown, U.S. District Court, District of Nevada, Las Vegas, Nevada
Death of Prisoner While in Police Custody -- Pre-filing expert witness review and analysis for plaintiffs (2001)

**Jerry W. Vlasak, MD v. Las Vegas Metropolitan Police Department**
Case No. Unknown, U.S. District Court, District of Nevada, Las Vegas, Nevada
Excessive Use of Force and False Arrest  – Expert Witness Consulting for Plaintiff (2002)

**Matthew Grace and Geary Johnson v. Howard University**
USDC Case No. 1:04cv00336, U.S. District Court, District of Columbia
Misfeasance of Howard University Police resulting in shooting of Plaintiff Grace and Violation of Constitutional Rights – Expert Witness Consulting (2004)

**United State Gypsum v. LaFarge North America, ET AL**
USDC Case No.  03-CV-6027, U.S. District of Illinois, Northern District of Illinois, Chicago, IL.
Infringement of Intellectual Property and Trade Secrets – Expert Witness Consulting, Report, and Deposition Testimony for Plaintiff  (2006-2008)

**Pioneer Liquidating Corporation vs. San Diego Trust and Savings Bank, Et Al**
USDC No. 94-361-SPK (BTM), Southern District of California
Multi-Million Dollar business fraud case -- Trial testimony as expert witness for plaintiffs (1994-1996)

**Positive IONS, Inc. v. ION Media Networks, Inc., Paxson Communications Corp., Et Al**
USDC No.  CV06-4296 ABC (FFMx), Central District of California
Trademark and Trade Secret Infringement – Expert witness report for defendants (2007)

**In The Matter of Rosario Gambino, Respondent, Detained Alien Removal Proceeding**

DHS Case No. A12-392-286 U.S. Department of Justice, Executive Office for Immigration Review, Office of the Administrative Judge, San Pedro, California

Expert Witness reports and Removal Hearing testimony for Respondent  (2006-2008)

**In The Matter of Roberto Carlos Silva-Pereira, Respondent, Detained Alien Removal Proceeding**

DHS Case No. Unknown, U.S. Department of Justice, Executive Office for Immigration Review, Office of the Administrative Judge, Florence, Arizona

Expert Witness Reports and Hearing Testimony for Respondent Relating to Political Harassment and False Criminal Charges by National Police in El Salvador (2007-2010)

**In The Matter of  Yuliya Kalinin, Respondent – Detained Alien Removal Proceeding**

DHS Case No. Unknown; U.S. Department of Justice, Executive Office for Immigration Review, Office of the Administrative Judge, San Pedro, California

Expert Witness reports and Removal Hearing testimony for Respondent  regarding excessive use of force and false arrests by Russian Police (2006-2007)

**Political Asylum Matters**

Between 2001 and 2007, I have been retained as an expert witness on seven (7) other matters involving sensitive political asylum proceedings arising from police persecution of U.S. asylum seekers, but due to confidentiality restrictions and signed agreements, I am not at liberty to divulge details or captions of same.

# EXHIBIT  B

## SUMMARY CHART OF INMATE INCIDENT COMPLAINTS
## LOS ANGELES COUNTY SHERIFF'S DEPARTMENT AND JAILS

**SUMMARY CHART OF INMATE INCIDENT COMPLAINTS**

**LOS ANGELES COUNTY SHERIFF'S DEPARTMENT AND JAILS**

| Inmate Name | Declaration Date | Incident Date | Details of Incident(s) |
|---|---|---|---|
| Alexik, Brian | 8/19/11 | 3/25/11 | Violence:  Witnessed 3 deputies beat and taser another inmate, William Tillman. (See Tillman entry later in this chart.) |
| Beltran, Ruben | 7/19/10 | 7/2/10 | Retaliation:  Cell searched after filing complaint;  Threatened with Physical harm if ever filed a complaint again; Deputies planted weapon (shank) on him and placed him in "the hole" for 29 days. |
| Benson, Emmanuel | 6/26/09 | 5/14/09 | Violence:  Slapped 5 times on side of head by deputy; Next day, deputy opened his  cell door and allowed another inmate to enter and beat Benson; was told by that inmate that deputy ordered the beating. |
| Bobier, Jon | 7/13/11 | 4/11/11 | Retaliation:   Inmate denied medical treatment for extruded intestines; Filed complaint With ACLU on 3/14/11 and then moved from medical ward back to ambulatory block;  wheelchair taken away from him; Struck in lower back by deputy and called "troublemaker" due to ACLU complaint. |
| Bowman, James | 4/12/11 | 1/16/11 | Retaliation:   Cells ransacked by deputies, personal property and food and milk strewn all over cells; Religious items desecrated by deputies; all occurred one week after ACLU visit. |
| Cacique, Carlos | 7/12/11 | 4/2/11 | Violence:  Inmate beaten and kicked by custodial assistant; denied medical treatment By jail nurse after beating. |
| Camacho, Erik | 1/28/11 | 11/18/10 11/26/10 11/27/10 | Violence:    Inmate asked for blanket while at USC Medical Center custody area, Request  refused, female deputy threw ice water in  his face; transferred back to MCJ. During pill call, female deputy punched him in back of head, and slapped him in face several times with his own shoes, while at same time other deputies kicking him in legs and testicles;  witnessed older male inmate  getting slapped in the face multiple times; witnessed another elderly inmate yanked out of wheelchair by deputies;  told by deputy to keep his mouth shut re his own beatings and ones he witnessed. |

| Inmate Name | Declaration Date | Incident Date | Details of Incident(s) |
|---|---|---|---|
| Candelario, Antonio | 7/16/10 | 1998-present | Violence:   Beaten by jail deputies during incarceration in 1998-99; 4 additional assaults on him by deputies over past 10 years;  on 4/17/10, beaten and repeatedly kicked  by jail deputies; sent to hospital; drugs planted on him by deputies. |
| Cervantes, Michael | 4/12/11 | 12/6/10 | Violence:   Beaten on head with fists by jail deputy; Punched in face by deputy; knocked to ground; deputy continued to beat him on face and neck; Beaten and cut on legs by other deputies with flashlights; Tased by two deputies; treated at jail clinic and taken to hospital. |
| Cleveland, Larry | 7/5/11 | 5/5/11 5/28/11 | Retaliation and Violence:  Handicapped inmate who was denied wheel chair and walker; Lack of facilities for handicapped;  punched in eye multiple times by deputy when seen in wheelchair provided to him by a nurse; denied recreation time and showers;  cell searched and personal papers re his ACLU complaints taken by deputies; |
| Crumpton, Gary | 6/30/11 | 1/18/11 | Violence:  Inmate in line to go to court, deputy places him in chokehold and takes him down to the floor; inmate sustained significant lingering pain |
| Dragusica, Robert | 6/25/10 | 6/10/10 | Violence:   Saw other inmates beaten by deputies; one inmate threatened by deputy and then slap inmate in face so hard it cause his head to snap back; inmate then handcuffed and put in showers for 4 hours;  other inmates deprived of showers and forced to choose between watching TV or taking showers. |
| Dragusica, Robert | 7/16/10 | 6/10/10 | Retaliation:  After meeting with and signing above declaration, Dragusica subjected to intense questioning about interactions with ACLU; deputies making sarcastic comments in cell block re him talking with ACLU; deputies turned off TV after ACLU left; Denied showers for meeting with ACLU; Shaver planted in his cell and he was placed in "the hole" for 29 days; Deputy called ACLU "pieces of shit". |
| Dunlop, Jonathon | 11/24/10 | 11/18/10 | Violence:   Inmate beaten by deputies while in line for "pill call" – hitting, kicking, kneeing him.  Sprayed with pepper spray. |
| Fernandez, Arturo | 8/15/11 | 7/22/11 | Violence:   Inmate struck in back of neck by deputy and then pepper-sprayed; yelled at to "stop resisting" when he was not resisting or fighting; slammed to the ground by another deputy and then pummeled with fists and flashlights, and repeatedly kicked and choked requiring hospitalization and stitches in his head; sent to 'hole'. |

| Inmate Name | Declaration Date | Incident Date | Details of Incident(s) |
|---|---|---|---|
| Fuentes, Alexander | 3/17/11 | 11/20/10 | Corruption:   Denied all but 2 showers from 11/20/10 until 1/7/11; Witnesses deputies scanning inmate barcodes into system multiple times to show showers taken when no showers were ever given. |
| Gaines, Timothy | 7/20/10 | 7/1/10 | Retaliation:   Reported deputies who were scanning  inmates wristband barcodes to show they had showered when one were actually allowed; TVs turned off after inmates speak with ACLU. |
| Garcia, Macario | 4/12/11 | 10/11/10, 10/19/10 | Violence:  Inmate told to shut up and cursed by deputy; when inmate questioned reasons for same, he was beaten by deputies on his ribs, back, shoulder, and head; inmate take to hospital; On 10/19 inmate again beaten about head and body by multiple deputies punching and kicking him causing inmate to spit up blood; female sergeant ridiculed him and told him no one hit him; went to hospital again; two days later, head swelling and eye getting blurry from beating; inmate taken to LA County Medical Center and had emergency surgery to try to save eyesight. |
| Goodwin, Jonathon | 8/23/11 | 7/22/11 8/10/11 | Violence:  Witnessed beating of handcuffed inmate, Arturo Fernandez;  Goodwin taken from cell while handcuffed and was punched repeatedly in back of head and in jaw. |
| Grande, Eric | 7/10/09 | May, 2010 approx. | Violence:   Inmate cut on hand in jail by gang members;  beaten by deputies- hit in face and head slammed against wall; hit in rib area, hit in ribs with flashlight; hit in back of head multiple times by deputy with flashlight; Denied medication for epileptic seizures. |
| Grayson, Jason | 8/19/11 | 3/25/11 | Violence:  Witnessed beating of William Tillman by deputies.  (See Tillman entry later in this chart.) |
| Grbavac, Gordon | 6/15/11 | 8/27/09 | Violence:  Inmate beaten by deputies, head repeatedly slammed into glass partition in attorney visiting room resulting in cut over right eye and being taken to hospital and found to have bleeding in front part of his brain;  Was returned to jail and processed for release on 8/28, but then re-arrested and jailed until 8/31/11. |

| Inmate Name | Declaration Date | Incident Date | Details of Incident(s) |
|---|---|---|---|
| Green, Jason | 4/11/11 | 3/18/11<br>3/20/11<br>3/22/11 | Retaliation:  Inmate needed medical attention, but deputy gave inmate choice of medical or taking a shower; forced to take shower; when taken back to cell asked deputy for complaint form; deputy said loudly, "Why? So you can snitch to the ACLU?" Nurse came to cell and was told by deputies that inmate had refused medical pass. Inmate denied this. Nurse tried to take him to medical, but deputy refused to allow it. Nurse said she would report incident; deputy threatened inmate with injury in shower; On 3/20, inmate threatened with "hole" but allowed to remain in cell with no privileges; On 3/22,  deputies moved inmate to disciplinary cell. |
| Griscavage, Derek | 7/11/11 | 12/25/10 | Violence:  Inmate watching TV and told by deputy to get down on knees, gave deputy the "finger";  kicked by deputy and then cuffed; taken into staging area where he saw 4 or 5 other deputies and was struck and knocked unconscious; while "blacked out", according to other inmates, he was repeatedly struck by the deputy with fists while cuffed, and also kneed, kicked, and punched in the head requiring hospitalization; incurred  eyes split open and  top of ear cut requiring stitches, also had chipped tooth, broken nose, and two large lumps on side of head; later sent to "hole" for 'assaulting a deputy'. |
| Highsmith, Kevin | 4/12/11 | 1/9/11 | Retaliation and Violence:   Group of inmates asked for recreation time so they could shave for court; deputies refused; other deputies came and took the group out to the yard and told them to line up against the wall; inmates told to strip naked and were subjected to full body searches, including rectal exams; deputies made demeaning statements to inmates;  inmates then ordered to get dressed again and taken back to their pod; Inmates found cells totally ransacked  with linens and mattresses thrown on floor, all food and water thrown on floor and became sticky;  Inmates made to clean up mess and put on total lockdown with no TV, no phones, and no movement out of cells. Inmates feel it was retaliation for requesting showers. |
| Holguin, Michael | 10/26/09 | 10/17/09 | Violence:   Denied showers and when finally allowed after complaints, was cancelled at last minute and was handcuffed, punched in face and sprayed with pepper spray by deputy when he asked why shower cancelled;  beaten so badly spent three days  in county hospital; Given 29 days in "the hole" for "attacking a deputy" (while handcuffed). |

| Inmate Name | Declaration Date | Incident Date | Details of Incident(s) |
|---|---|---|---|
| Jefferson, Michael | 7/8/11 | 5/28/11 or 6/4/11 | Violence:  Inmate pulled from pill line, forced to strip and get down on knees; kicked in legs; struck on side of head and front and side of face smashed into the wall breaking his glasses; punched in face while under escort back to cell; cell torn apart while being beaten and mattress, sheets, and blankets removed; made to sleep without any clothing in cold cell; had sought medical attention for chest pains but was denied treatment and thrown in "hole" for 7 days. |
| Johnson, Peter | 6/23/11 | 2/21/08 | Violence:  Inmate is paralyzed and requires wheel chair and catheterization; denied shower for several days and after requesting to be taken for one with request refused, inmate asked to see a sergeant; instead of doing so, deputies pulled him off his bed to floor while he tried to hold on to safety bar; deputy struck him in arms to break hold on bar;  on floor, was kicked repeatedly in ribs and on back by deputy; kneed on neck and back; pepper-sprayed in face; after being handcuffed was kicked again in  torso; pepper-sprayed again; finally put back into wheelchair; when sergeant came to investigate beating, he told inmate that he was going to be put in the "hole"; later charged with battery against a peace officer and convicted with sentence of 8 years; appealed conviction and had conviction overturned. |
| Jones, Eefrom | 10/19/09 | 9/24/09 and 10/7/09 | Violence:   Found mentally incompetent to stand trial; stayed at jail for 2+ years; Had visit and on way back to cell, was thrown to floor while handcuffed, sat on and punched multiple times by deputy; Hit by taser and pepper spray; Was transferred to psych area and deputy who had beaten him forced him to strip naked in front of 8 deputies and then shone flashlight into rectal area; Another deputy stuck finger into inmate's rectum. |
| Jones, Ravon | 4/11/11 | 3/28/11 | Violence:  Witnessed inmate in adjoining cell severely beaten by 4 other trustee inmates in victim's cell;  Deputies would have had to have left cell door open for them to enter; appeared victim inmate may have been sexually attacked with broom-handle; Inmate later saw blood on end of broom stick;  Victim told him that his "butt" was bleeding. |
| Jones, Stephen Paul | 7/14/09 | March, 2008 | Retaliation:   Had head smashed into wall by deputy and verbally abused;  later beaten up in laundry by other deputies while deputies stood by and just watched; wrote letter to ACLU;  a few weeks later after meeting with his attorney, deputies beat him; reported to internal affairs but nothing was ever done; Later pulled out of line and taken into day room where deputy pulled his pants down,  stuck finger up his rectum. |

| Inmate Name | Declaration Date | Incident Date | Details of Incident(s) |
|---|---|---|---|
| Little, Desmond | 6/29/09 | March, 2009 | Denial of Medical and Mental Health Treatment:  Inmate denied medical and mental health treatment; inmate claims he was declassified from mental status after altercation with guard; lack of clean and sufficient shower and toilet facilities; other inmates beaten by guards but are then charged with starting the incident. |
| Love, Mario | 6/29/10 | June, 2010 | Violence:  Witnessed inmate Jimmie Knott being beaten by deputies after asking for better shoes; Knott beaten with flashlights, fists, and kicked; while waiting to meet with ACLU, was interrogated by deputies about why he was in jail and details of his case. |
| Love, Thaddeus | 8/19/11 | 3/25/11 | Violence:  Inmate witnessed beating of William Tillman (See Tillman summary) |
| Mares, Juan Diego | 4/9/11 | 6/5/10 | Violence:   Inmate complained of missing items from cell after it was searched by deputies; asked to see Sergeant; request denied and inmate beaten, kicked in head and face; medical exam revealed possible broken jaw and need to go to hospital; taken to hospital and treated for fractured jaw, 8 stitches in ear; inmates eye badly injured requiring surgical removal of lens and repair of cornea and pupil; needs additional eye surgery. |
| Miller, Dameon | 5/20/11 | October, 2010 | Violence:  After altercation with cellmate, inmate handcuffed and head smashed into wall; beaten in ribs while handcuffed; put into the "hole";  jail classification changed to requiring cuffs and shackles when out of cell. |
| Mizrahi, Ishmael | 7/1/09 | 2009 | Harassment for Being Homosexual:  Homosexual inmate with mental problems called derogatory names such as "Faggot". |
| Moore, Waymon | 4/12/11 | 12/4/10 | Violence:   Inmate grabbed by deputy and forced against wall; slammed to floor by deputies; denied access to sergeant to report incident; mattress and sheets taken from him by deputy; inmate later told to pick up his mattress and linens and while doing so was attacked and beaten by same deputy; hit in ribs; hit over left eye with unknown object; placed in "hole" and handcuffed for 24 hours with no food, water, or linens. |
| Nelson, Floyd | 8/19/11 | 3/25/11 | Violence:  Inmate witness to William Tillman beating by deputies. |
| Nichols, Keith | 7/13/11 | August, 2010 | Violence:  Inmate refused to discuss case with deputy and was ordered to "face the wall" by deputy using racial epithets; Deputy pushed him to floor and kicked inmate repeatedly with full force in back, then punched him in back of head, causing lumps; other deputy pulled his knee out of joint causing need for hospitalization; denied medications for 8-10 days; requested but was refused forms to file complaint. |

| Inmate Name | Declaration Date | Incident Date | Details of Incident(s) |
|---|---|---|---|
| Nowden, Fred | 7/12/11 | 2/18/11 | Violence:  Witness to beating of Garry Crumpton. |
| Ortiz, Carlos | 7/9/09 | June-July, 2009 | Denial of Medical Equipment (Wheelchair) and Retaliation:   Inmate denied proper colostomy bag cleaning and changing; denied pain medication; blood found in colostomy bag and taken to hospital ; deputy pushed inmate from wheel onto floor and tried to take away wheel chair even though inmate cannot walk; when complained to ACLU, inmate placed into "hole". |
| Paz, Dorian | 11/16/10 | September, 2010 | Retaliation and Threats by Deputies:   Following a killing in the jail, another inmate placed in cell next to Paz; That inmate confessed to killing the dead inmate; Paz had also heard that deputies let the murder happen; He reported the info to deputies and homicide detectives; Thereafter, was  referred to by group of deputies as "That's a dead man walking", and "That's the guy" apparently referring to his reporting of the confession and possibility of deputies letting it happen. |
| Penmick, Anthony | 7/15/11 | March, 2011 | Violence:  Inmate and cellmate told by deputies to get out of bed at 10pm and made to face wall; handcuffed and taken into day room; female deputy dug her fingernails into his neck; male deputy kicked him in legs and buttocks; hit in legs with flashlight; while being beaten, mattress and bedding removed from cell along with personal items; denied adequate food and proteins at whim of trustees; served expired and rancid milk causing vomiting. |
| Powell, Robert | 5/11/11 | 12/30/07 | Violence:   Inmate caught "cheeking" sleep medications and deputy slammed inmates head with his forearm into window sill nearby;  Inmate then dragged to outdoor recreation Staging Area and handcuffed; Deputy then smashed inmates head into cement wall; Inmate then handcuffed  to a bar in Outdoor Rec area and made to stay there 5-6 hours in cold temperatures with only light clothing on; Deputy then asked him, "Did you learn your lesson?" Inmate taken to medical area and given IV,; stayed in medical for several days. |
| Rauls, Darrell | 4/12/11 | 11/2/10 | Violence:  Inmate denied medical treatment enroute to court; bus unloaded at courts, inmate on bus alone with deputies; while on bus, beaten by deputy in ribs and upper body; pushed over raised platform by deputy on bus causing fall to floor and injuries. |

| Inmate Name | Declaration Date | Incident Date | Details of Incident(s) |
|---|---|---|---|
| Rettig, Ryan | 8/19/11 | 5/27/11 to 7/25/11 | <u>Denial of Medical and Psychiatric Treatment and Medication</u>:  Inmate developed acute rash all over body; repeatedly denied treatment or given only nominal treatment for rash and denied other required mental health treatment. |
| Reyes, Juan Pablo | 9/12/11 | 12/10/11 Through 12/30/11 | <u>Violence</u>:     Inmate beaten by guards for unknown reason and stripped of trustee status ; made to strip naked and walk through cell modules while deputies yell "Homosexual Walking!" and, in Spanish, "Here goes a faggot walking!"; Though not a gang member was put in new cell with two members of violent Hispanic gang where, assisted by an African-American inmate, he was again beaten by them and anally raped multiple times while his head is stuffed into toilet bowl. Deputies totally ignored his cries for help for hours, and one deputy told him he deserved what happened to him. After seeking refuge in a laundry room, a Chaplain got a Sergeant to take a statement from Reyes, which was filmed. Reyes experienced great pain including in anal area. Was not taken to hospital for two weeks and, while there, was told he needed eye surgery due to the beatings.  Instead of surgery and treatment, he was released from jail sentence two months early. |
| Rodriguez, Antonio | 10/21/09 | 9/1/09 | <u>Violence</u>:  Inmate  and another inmate beaten at same time in Men's Central Jail while returning from law library; One deputy asked by another if he is ready to "earn his ink". Two inmates handcuffed and taken to another area of jail on 3000 floor by 6 – 8 deputies, and told to face the wall.  Rodriguez then struck several times in head by deputy with flashlight, and fell to the floor.  A deputy held his legs and was told by another deputy to "break his legs".  Deputy used his flashlight like a baseball bat and struck inmate's ankle several times until started to lose feeling in legs, and felt blood coming out.  Deputies then stomped on him, and deputy with flashlight hit his leg, breaking it.  When inmate could not get up due to his leg injuries after being ordered to do so, he was struck in the head again with a flashlight. Beating stopped when Sergeant arrived.  Rodriguez taken to hospital on a gurney as could not walk.  Other inmate similarly injured.  At hospital, doctor told him that he had allegedly tried to stab a deputy. Report indicated sound of a "shank" hitting the floor from other inmate and that Rodriguez tried to grab it. (Note:  According to Rodriguez, but he and other inmate were handcuffed at the waist.)  Rodriguez told by deputy not to report this incident to Internal Affairs or anyone else.  After ACLU arrived to take complaint, other deputies also harassed and threatened him and broke his glasses. |

| Inmate Name | Declaration Date | Incident Date | Details of Incident(s) |
|---|---|---|---|
| Rodriguez, Heriberto | 7/9/09 | Over 5 years | Retaliation and Violence:  Inmate at Men's Central Jail for 5 years; Beaten by deputies and contacted ACLU; Medications taken away from him thereafter; Deprived of visits with chaplain and church attendance; mail received 36 days after postmarked; Has seen many beatings over the 5 years. |
| Rosas, Alex | 8/22/11 | 7/22/11 8/9/11 | Violence:  Inmate witness to beating of Arturo Fernandez; threatened by deputies to keep quiet after witnessing that beating; cell searched and "planted" razor blade weapon found with inmate denying he knew anything about it; deputies threatened him with "hole" if he did not sign admission;  punched in back of head 4-5 times by deputy; refused to sign; placed in hole and denied complaint forms. |
| Rushing,  Dayshaun | 6/16/09 | 3/2/09 | Retaliation and Violence:   Inmate reported lack of showers and need for medical attention to ACLU; slapped on back of head by deputy for "not liking his shower program" after ACLU visit; deputy kicked his legs out from under him and fell to floor; Deputies started punching and kicking him, hit him in face and jaw with flashlight, and pepper sprayed while lying on floor; "You fucking whiners, tell this to the ACLU!" then ; thrown off staircase; taken to hospital and received stitches on both sides of face and observed overnight. |
| Sadri, Mani | 4/12/11 | 1/28/11 | Retaliation and Violence:   Lack of treatment for seizures and other medical issues; Had complained to ACLU in 12/10 after being denied showers and some meals and denying doctor's visits; Deputy demanded to see confidential medical status letter addressed to court; Deputy told him if he contacted ACLU one more time or any letters being sent there, deputy would have other inmates come into his cell and beat him up, "Don't complain to anyone if you want to make it out of here alive. |
| Saul, Cameron | 6/22/11 | May, 2007 – November, 2009 | Violence and Overcrowding:  Gay former inmate, now drug counselor, describes overcrowding and lack of use of recreational areas; describes physical abuse of gay inmates by other inmates in back of overcrowded dorms; mistreatment of gay inmates by forcing them to strip naked and allowing straight trustees to take their property; gay inmates subject to humiliating and degrading abuse during mealtime along with homophobic jokes; witness to beating of William Morales. |

| Inmate Name | Declaration Date | Incident Date | Details of Incident(s) |
|---|---|---|---|
| Serrato, Michael | 7/9/09 | 2/15/08 3/31/09 5/15/09 | Violence:  Reports jail conditions awful, mold in showers, rodent infested, plumbing problems, toilets plugged, legal mail delays of over a month; not allowed to seal outgoing legal mail ; Stabbed in face and beaten unconscious by other inmates in laundry room; hospitalized; on return to jail was told to sign paper to ACLUJ that nothing had happened or he would be put in "the hole"; denied glaucoma medication for 6 months; denied inhaler for asthma; on 3/31/09, deputy inserted finger into his rectum;  5/15/09, again beaten by inmates in laundry room on way for dental treatment and denied medical treatment for beating for 20 days. |
| Shaw, Irvin | 4/20/11 | 8/14/10 8/21/10 | Violence:   Beaten by inmate after being labeled as a "snitch" after testifying against co-defendants;  on 8/21/10 another inmate murdered in Men's Central Jail near his cell; asked to be moved to protective custody due to threats from inmates over "snitch" label; refused; neighbor inmate attacked by gang-banger inmates yelled for help over long period of time, no deputy response but deputies watching from front entrance to module as inmates cleaning up blood in cell; |
| Stone,  Monti | 6/25/09 | 6/4/09 | Denial of Mental Health Medications:   Inmate has bi-polar disorder and other mental health issues; de-classed from mental health status and placed into general population; denied psych treatment; medications cut to lesser dose and also denied medications. |
| Teran, Stephen | 6/22/11 | 12/24/10 12/25/10 2/18/11 | Violence and Possible Retaliation:  Inmate grabbed at neck by custody assistant in reception center of jail and dragged into cell; when hold on neck released, inmate fell to floor and kicked in ribs and choked multiple times by custody assistant; also punched in face by deputy during intake phase then thrown to floor and punched and kicked by 4-6 other deputies;  thinks was also hit by during beatings deputies yelled "stop fighting", "stop resisting" multiple times even though inmate doing neither; forced into kneeling and handcuffed position in a cell and then kicked in lower back by deputies; when bleeding from head, deputies placed plastic bag over inmate's head to prevent getting blood on their uniforms resulting in inmate having problem breathing;  inmate threatened if did not say proper things on video camera; taken to USC Medical Center for injuries including "huge tear in lip"; given injection by medical personnel and made him unconscious; passed out in court and taken to hospital; after arrival back at jail, his attorney requested medical records from these events; deputies inquired about reason for medical records request; when inmate declined to answer, he was slammed against a wall by his neck and fell to floor feeling like his neck was broken; deputies punched |

| Inmate Name | Declaration Date | Incident Date | Details of Incident(s) |
|---|---|---|---|
| Teran (Continued) | | | and kicked him for 2-3 minutes and he was taken back to hospital and placed in neck brace and was told he had nerve damage; after meeting with ACLU rep Esther Lim, inmate was questioned about papers exchanged between he and Ms. Lim and he refused to answer; inmate then had right side of face slammed into the wall by deputy; denied dental treatment but when finally got it, mouth x-rays revealed facial bones were broken and inmate taken back to hospital after 4-5 hour delay and additional threats from deputy if he talked about how he got injuries. |
| Tillman, William | 8/22/11 | 3/11/11, 3/15/11, 3/25/11 | Violence:  Inmate beaten by 3 deputies suffering concussion, extensive bruising, and 35 stitches in forehead; head slammed against a block wall, kicked repeatedly in ribs, tasered, and pepper sprayed; deputies watching porn movies in control booth; deputies claimed to be part of 3000 Boys gang; inmate hospitalized for two days. |
| Topete, Michael Four separate declarations | 5/18/11 | 2/13/11, 4/1/11, End of 2008, 2008-09 | Violence:   Inmate filed four declarations reporting incidents of beatings and one possible murder in Men's Central Jail he witnessed or overheard; On one trip to court, before leaving jail, was attacked by gang member inmates who were punching and kicking him for 30 seconds to a minute before deputies intervened;  was taken to medical for cat-scan of head and given aspirin; threatened by gang "shot caller" inmate apparently at behest of custodial assistant; judge soon issue court order to have inmate place in protective custody cell at jail but deputies ignored court order stating they would decide who goes where; harassment by other inmates continued; denied phone use and visits; other reports dealt with denial of outdoor roof visits, deputies threatening other inmates, and possible overhear of killing of another inmate. |
| Tutt, Evans | 5/5/10 | 7/26/09 | Violence:   Inmate verbally abused with racist terms and names; taken by multiple deputies into hallway with door closed and severely beaten; Tasered in back, kicked, kneed, and hit with flashlights while inmate handcuffed;  taken to hospital  and diagnosed with broken nose in multiple places, injured ribs, chipped tooth, head and face injuries, knees and legs injured, and multiple bruises on body;  Reports of incident fabricated by deputies claiming he assaulted them. |
| Villareal, Eduardo | 4/11/11 | 11/12/10 | Violence:   Inmate denied blankets; threatened by deputies with beating if reported any mistreatment; visit with ACLU on 11/24/10 but confronted by deputy prior to visit and accused of writing to ACLU; Punched in ribs by deputy while another deputy hit him in back of head several times; Bible taken away. |

| Inmate Name | Declaration Date | Incident Date | Details of Incident(s) |
|---|---|---|---|
| Westby, Philip | 7/5/11 | October, 2009, 7/19/11 | Violence:  Inmate beaten by deputies on second day in jail; head slammed against wall repeatedly; Deputies yelled at inmate to "Stop Resisting" when he was not resisting and was in handcuffs; Punched in face, head and neck by deputies while handcuffed; ribs injured; In 10/09, inmate beaten in cell by two trustees sent in by deputies. |
| White, Eric | 10/7/09 | 5/13/11 | Violence:  Inmate was walking in module when grabbed by deputy, taken to front of module, and told, "Who's the fucking punk now? Put your fucking nose to the wall." Inmate then struck on right temple.  Also received "crushing blow" to the top of his head after falling to floor from first blow.  Several other deputies arrived and joined in the attack.  Had his clothes almost ripped off and was tasered while down on the floor. Woke up in hospital with Lieutenant and Captain videotaping him.  Received 5 staples on top of head, 5 stitches in middle of forehead, 3 stitches above left eye,  four stitches above right eye, 4 fractured vertebrae, shattered right shoulder, broken left rib, both ankles severely sprained.  Still has scars on top of head, face, and legs. From hospital, inmate moved back to jail's "wheel chair ward" where he was repeatedly harassed and threatened by deputies for reporting prior incident.  Had all privileges taken away for 22 days for "fighting with staff" but he never touched any staff members. Had personal effects taken from him and never returned. |
| Wilkerson, Jeremiah | 4/19/11 | 3/12/11 | Violence:  Caught drinking "pruno" in cells with other inmates; handcuffed and taken into day room and pushed up against wall;  deputy kicked him in legs leaving bruises then hit him in back of head with closed fist; also hit with fist on right side of head; hit multiple  times; inmate went to floor and deputy placed him in "military choke hold" with right arm around neck and left hand on back of head, pushing head  and neck forward so inmate could not breath; stopped just before inmate passed out;  placed in the hole for 21 days. |

**SUMMARY CHART OF NON-INMATE WITNESS DECLARATIONS RE: VIOLENCE**

**AT LOS ANGELES COUNTY SHERIFF'S DEPARTMENT AND JAIL**

| Witness Name | Declaration Date | Incident Date | Witness Observations |
|---|---|---|---|
| Chaplain Doe | 8/15/11 | 2/9/11<br>3/11– 4/11<br>7/20/11 | Violence:    While working as chaplain on 3000 floor of Men's Central Jail, witnessed deputies beating and kicking African-American inmate when inmate neither resisting nor fighting; kicked inmate in torso and legs while a deputy held him down by his legs and another deputy had his knee on inmate's neck; Chaplain ordered by deputies to return to his office by deputies, but stayed to watch further attack on inmate; Sergeant joined the attacking deputies and chaplain heard kicking still occurring even when inmate had stopped yelling;  Even after chaplain had seen the beatings, deputies continued attack on inmate;  Also witnessed another chaplain intentionally left locked inside module by deputy who was not otherwise occupied; Witness to unauthorized searches of chaplain's offices and literature carts by deputies; Witness to lack of inmate complaint forms, so collected complaint forms from inmate himself and turned them in only to find out months later that nothing done re complaints. |
| Juarez, Paulino (Chaplain) | 8/24/11 | 2/11/09 | Violence:   Catholic Deacon serving as chaplain in Men's Central Jail; While meeting with inmate in cell rows, heard sounds like someone being beaten; Saw three deputies beating up an African-American inmate; Deputies pounding him in face and body while he was handcuffed; Inmate was not resisting or fighting but deputies continuously yelling "Stop Resisting! Stop Fighting!" when it was not happening. Inmate pleading for them to "Please stop."  Punching continued until inmate fell to floor and head hit floor; Deputies continued to "shower" punches and kicks to his head and body with boots and fists. One deputy knelt on inmate's back and was punching back of head and neck of inmate while two other deputies stood and watched.  Deputies froze when saw chaplain watching them and motioned to other deputies to stop the beating. Chaplain saw large pool of blood under inmate's head.  Reported beating to chaplain supervisor, Father George, and was told to write up report.  An LASD sergeant told him later that inmate had spit on one of deputies as reason for beating.  Chaplain received threatening looks from deputies for days after beating. Chaplain later interviewed by Lieutenant re beating witnessed. Chaplain turned in his report.  Heard nothing for two years from either LASD or OIR.  Met with OIR on May 20, 2011, and was told beating incident had been handled internally. |

| Witness Name | Declaration Date | Incident Date | Witness Observations |
|---|---|---|---|
| Juarez (Continued) | | | Meeting held with Sheriff Baca and other command officers on May 21, 2011.  Baca claimed to nothing about incident, but stated that it had been determined that inmate was schizophrenic and had to be punched to get into his cell.  (Incident occurred on lower level and far from his cell.)  Baca stated, "Punches are allowed but kicks are not allowed in my department."  Baca told him that his report was not in file, but note indicated chaplain's report was exaggerated, and that inmate's visible injuries were from being hit by truck prior to incarceration. |
| Budnick, Scott (Volunteer  Teacher) | 3/16/11 | Late 2006 thru 2010 | Violence:  Volunteer teacher in Men's Central Jail (MCJ); During initial orientation, he and 40 other volunteers were told they would be hearing and seeing things they were not accustomed to, such as deputies using force against inmates. Group was told deputies needed to speak and act this way because it was only way to teach inmates to comply with jail rules.   In 2007, observed approximately 7 deputies, including a Sergeant, tasering a big, African-American inmate 3 to 5 times while he was lying on the floor motionless; After incident, he talked with deputy in another module of jail and was told by that deputy, "Yeah, we fuck these guys up all the time."<br><br>In approximately November 2008, also in MCJ,  near classroom, saw group of inmates walking in straight line with 6 – 7 deputies around them.  One white deputy ordered an older, African-American inmate out of line, and strip-searched him naked in middle of hallway in view of everyone.  Budnick had not seen inmate do anything to provoke this. Deputy then smashed inmate's head into the wall so hard Budnick could hear an audible crack.<br><br>In approximately December, 2008, Budnick was on 3000 floor of MCJ waiting for students to come to classroom, saw young Hispanic inmate walking down hallway.  Three deputies stopped and strip searched him, and one deputy grabbed and severely twisted inmates arm up behind his back and push him to the floor.  Budnick did not see this inmate do anything to provoke this attack. Budnick went to chaplain's office and told group of chaplains what he had just seen, but they advised him against reporting the incident saying LASD had practice of kicking people out of jails, and they were scared to report any incidents they witnessed out of fear of losing their jobs.  Budnick had also spoken with a former Catholic chaplain who told him that he (chaplain) had been kicked out of the |

| Witness Name | Declaration Date | Incident Date | Witness Observations |
|---|---|---|---|
| Budnick (Continued) | | | LA County Jail System because he was a "whistleblower" who had reported to LASD and others incidents of abuse that he had seen in the jails.<br><br>In approximately July 2009, on 4000 floor of MCJ, while waiting at his classroom for inmate students to arrive, Budnick saw a Hispanic male inmate, 30s to 40s, exit elevator who seemed confused as to where he was. Inmate asked 4 deputies where Module 4600 was.  Deputies started to poke fun at him and asked if he had mental issues.  Budnick saw 2 deputies grab the inmate's arm, and forcefully twist it up behind his back.  Deputies then grabbed inmate's head, placed it on the wall and twisted the inmate's face hard up against the wall.  The inmate was not fighting and was compliant, but had done nothing to deserve this abuse.  Reported incident to Sergeant who said he would look into it immediately, but Budnick never heard from the Sergeant again nor anyone else re: the incident, nor was he ever interviewed about it.<br><br>In late 2009, Budnick went to Module 3600 to see a student, found module door cracked open which was supposed to be closed.  As he entered through the door, he observed 3 deputies kicking, punching, and beating up an African-American inmate.  Inmate was standing at first, and then fell to the floor due to the blows.  The deputies then started kicking and beating the inmate while he was on the floor.  The deputies were yelling, "Stop resisting!" over and over again, yet Budnick could see that the inmate on the floor was neither moving nor resisting. Budnick has repeatedly been told by chaplains in the jail that it is common for deputies to yell "Stop fighting!" and "Stop resisting!" at inmates who are neither fighting nor resisting while deputies are beating them. They have also told Budnick that deputies think they can continue to abuse inmates as long as they yell, "Stop fighting! Stop Resisting!" |
| Lim, Esther<br>ACLU Jails Monitor | 02/04/2011 | 01/24/2011 | ACLU Jails Project Coordinator observed two deputies repeatedly kneeing and punching an inmate who not combative or resisting the deputies.  The deputies also yelled multiple times, "Stop fighting!" and "Stop resisting!" despite the inmate lying on the ground, stomach down, not moving. |

# EXHIBIT  C

## Listing of Items Reviewed for This Report

1.      All declarations of inmates and witnesses set forth in Exhibit B.

2.      Report of Kolts Commission headed by Special Counsel James G. Kolts, 7/1992

3.      First Semi-Annual Report of Special Counsel Merrick Bobb and the Police Assessment Resource Center (PARC), 10/1993

4.      Fourth Semi-Annual Report of Special Counsel Merrick Bobb and the Police Assessment Resource Center (PARC), 6/1995

5.      Seventh Semi-Annual Report of Special Counsel Merrick Bobb and the Police Assessment Resource Center (PARC), 4/1997

6.      Tenth Semi-Annual Report of Special Counsel Merrick Bobb and the Police Assessment Resource Center (PARC), 2/1999

7.      Twelfth Semi-Annual Report of Special Counsel Merrick Bobb and the Police Assessment Resource Center (PARC), 6/2000

8.      Twenty-Ninth Semi-Annual Report of Special Counsel Merrick Bobb and the Police Assessment Resource Center (PARC), July, 2010

9.      "Report on the Death of Donald Scott," Office of District Attorney Michael D. Bradbury, Ventura County, 3/30/93

10.     Annual Report on Conditions Inside Los Angeles County Jail, 2008-2009, ACLU National Prison Project and ACLU of Southern California, 5/5/10

11.     2010 Interim Report on Conditions Inside Los Angeles County Jail, ACLU of Southern California and Disability Rights California, 9/9/10

12.     Website of Police Assessment Resource Center (PARC) – www.parc.info

13.     "Two Jail Workers Suspected of Selling Drugs," Los Angeles Times, Beth Shuster, 5/26/00

14.     "Tinseltown's Sheriff," Newsweek, 6/27/07

15.     "Probe Spurs Demotion or Ouster of 99 L.S. County Reserve Deputies," Los Angeles Times,5/28/10, Robert Faturechi, Richard Winton

Exhibit C
Page 113

16.    "Why is Alcohol a Growing Problem in L.A. Sheriff's Department," Los Angeles Times, 4/16/09, Richard Winton

17.    "Report on Mental Health Issues at Los Angeles County Jail," Dr. Terry A. Kupers, 6/27/08

18.    Los Angeles County Sheriff's Department Unit Order 5-12-010, Rev. 11-2-09

19.    ACLU Letter to County Counsel Roger Granbo and Paul Beach, 6/19/09

20.    ACLU Letter to Assistant Sheriff Marvin Cavanaugh, 7/1/09

21.    ACLU Letter to Sheriff Leroy Baca, 10/28/09

22.    "Memorandum of Points and Authorities in Support of Motion for Protective Order," Dennis Rutherford, et al v. Leroy Baca, et al, 10/8/09, USDC-CDC, Case No. 75-04111-DDP

23.    "Plaintiff's Supplemental Filing in Support of Motion and Ex Parte Application to Vacate Submission of Plaintiff's Motion for a Protective Order, Declaration of Support," Dennis Rutherford, et al v. Leroy Baca, et al, 2/7/11, USDC-CDC, Case No. 75-04111-DDP

24.    Declaration of Esther Lim, ACLU-SC Jails Project Coordinator, 2/4/11

25.    Los Angeles County Sheriff's Department Log Sheet Report, 1/24/10 (correct date should be 1/24/11) re: Significant Use of Force – TTCF

26.    Declaration of Christopher Brown, 2/2/11

27.    Declaration of Shawn Meyers, 2/4/11

28.    "Sheriff Launches Probe into Alleged Inmate Beating," 2/8/11, 10:03:15am, Associated Press

29.    Declaration of Esther Lim, ACLU-SC Jails Project Coordinator, 3/22/11

30.    Declaration of Scott Budnick, 3/16/11

31.    ACLU News Release, 5/5/11, "Sheriff's Refuse to Let Inmates With Disabilities Use Their Wheelchairs in LA County Jails and Punish Them by Denying Accessible Cells"

32.    "Attorney Barred From Photographing Man's Injuries in Alleged Jail Beating," Los Angeles Times, 5/8/11, Jack Leonard, Robert Faturechi

Exhibit C
Page 114

33.    Sheriff Leroy Baca Letter to ACLU with attached chart, 1/12/11

34.    KTLA-TV  (www.ktla.com/videobeta/99c75925-d2db-472b-b549-68592ec2f3/News/KTLA-Gang-Behind-the-Badge-Part-One-Carolyn-Costello-Reports)

35.    "Complaint for Damages; Chris Vasques and Elizario Perez v. County of Los Angeles, Sheriff Leroy Baca, et al," filed 5/4/11, USDC-CDC

36.    "The World's Largest Street Gang," William Norman Grigg, *Pro Libertate* Blog, 5/11/11

37.    "Wide Open Spaces at L.A. County Lockup," Los Angeles Times, 5/22/11, Robert Faturechi

38.    Declaration of LASD Chief Dennis Burns, 11/29/10, filed in USDC-CDC, Case No. CIV-75-04111-DDP

39.    LASD Order Number 3-04/010.00, 12/10/11

40.    Declaration of LASD Commander Stephen Johnson, 11/29/10, filed in USDC-CDC, Case No. CIV-75-04111-DDP

41.    Excerpts from "Dion Starr, Plaintiff-Appellant v. Leroy Baca, Los Angeles County Sheriff, in his individual capacity, Defendant-Appellee, No. 09-55233, D.C. No. 2:08-cv-00508-GW-SH"

42.    "Men's County Jail Visitor Viciously Beaten by Guards," LA Weekly, 5/19/11. P.1

43.    "Counties Bracing for Prisoner Transfer," San Bernardino Sun, 7/9/11

44.    "Testifying: Police Perjury and What To Do About It," Christopher Slobogin, Fall, 1996, (67 U. Colo., L. Rev., 1037)

45.    <u>Breaking Rank: A Top Cop's Exposé of the Dark Side of American Policing</u>, Norm Stamper, 2005, Nation Books

46.    "Anonymous Note Alerted Sheriff to Deputies' Thefts:  Crime:  Officers were stealing drug money….." Los Angeles Times, 12/2/93, Victor Merina

47.    "Horrific Conditions in Los Angeles County Jail," rense.com , 6/20/10, Stephen Lendman

48.    "Sheriff moves to fire six deputies accused in beating," Los Angeles Times, 3/22/11

49.    Declaration of Mary Tiedeman, 9/9/10

Exhibit C
Page 115

50.    Declaration of Lisa Ma, 7/14/10

51.    ACLU Letter to Justin Clark, Attorney, Lawrence Beach Allen & Choi, 4/1/11

52.    "Crooks or Cops: We Can't Be Both," 1/1992, The Police Chief Magazine, Paul Myron, Chief, Detective Division, LASD

53.    "Plaintiff's Third Set of Requests for Production"  10/22/10, Dennis Rutherford, et al v. Leroy Baca, et al, USDC-CDC, Case No.  75-04111-DDP

54.    "Plaintiff's First Set of Interrogatories" 10/22/10, Dennis Rutherford, et al v. Leroy Baca, et al, USDC-CDC, Case No.  75-04111-DDP

55.    Supporting Declaration of Michael J. Gennaco, 9/27/2004

56.    "Defendant's Responses to Plaintiff's Requests for Production of Documents, Set Two (Post Judgment)," 4/1/10, Dennis Rutherford, et al v. Sherman Block, et al, USDC-CDC, Case No.  75-04111-DDP

57.    "Defendant's Opposition to Plaintiff's Motion For Injunctive Relief Order Re Reported Retaliation; Memorandum of Points and Authorities in Support Thereof," 11/29/10, Dennis Rutherford, et al v. Sherman Block, et al, USDC-CDC, Case No.  75-04111-DDP

58.    Justice Without Trial: Law Enforcement in Democratic Society, Jerome H. Skolnick, 2011, 4th Edition, Quid Pro Books

59.    The Police Code of Silence: Walking With the Devil, Michael W. Quinn, 2005, Quinn and Associates

60.    Character and Cops: Ethics in Policing, Edwin J. DeLattre, 2002, 4th Edition, AEI Press

61.    Core Jail Standards, 1st Edition, 2010, American Correctional Association, Commission on Accreditation for Corrections

62.    2010 Standards Supplement, January, 2010, American Correctional Association, Commission on Accreditation for Corrections

63.    Excellence in Corrections, Best Practices, 1998, American Correctional Association

64.    Supplemental Report of "Alcohol-Related Incidents – 2010 Update" of the Office of Independent Review

Exhibit C
Page 116

65. Letter from Isabel Katz Pinzler, Acting Assistant Attorney General, Civil Rights Division, U.S. Department of Justice, undated, to Ms. Joanne Sturges, Los Angeles County Executive, Los Angeles, California, captioned, "CRIPA Investigation of Mental Health Services in the Los Angeles County Jail."

66. Office of Independent Review (OIR) Letter Report dated July 19, 2010, addressed to Board of Supervisors, County of Los Angeles, Los Angeles, California, captioned, "Deputy Vigilance in Jails – Praiseworthy Work and an Unfortunate Exception."

67. Declaration of Jails Chaplain Doe, 8/15/11.

68. Declaration of Jails Chaplain Paulino Juarez, 8/24/11.

69. L.A. Times article, "Jurors, Deputies at Odds on Truth," 9/19/11, pp A-1, A-8.

Exhibit C
Page 117