# EXPERT DECLARATION OF
# STEVE MARTIN

## DECLARATION OF STEVE J. MARTIN

I, Steve J. Martin, hereby declare:

1.  I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.  My general qualifications as an expert in the field of corrections are set forth in my Curriculum Vitae, attached hereto as Exhibit 1.  I began my career as a correctional officer in 1972 at a maximum security prison (Ellis Unit) operated by the Texas Department of Corrections (TDC).  I also worked as a correctional officer at the single TDC prison for female felony offenders (Goree Unit).  I subsequently served as a casework intern with the Federal Bureau of Prisons at the Federal Correctional Institution, Ft. Worth, Texas.  While employed as a Federal Probation and Parole Officer in McAllen, Texas (1975-1977) I served on a jail planning commission for Hidalgo County, Texas.  During my employment in the Tulsa County District Attorney's Office (1980) I was assigned the Civil Division to assist the county attorneys defending the Tulsa County Sheriff on matters related to the operation of the county jail, including a class action jail conditions lawsuit.

3.  In 1981, I rejoined the TDC as Legal Counsel and, subsequently, as General Counsel and Executive Assistant to the Director.  During this time, one of my responsibilities was to assist in the development policies and procedures for TDC, including staff use of force.  As the TDC  Director for Legal Affairs, my directorate had the primary responsibility for monitoring implementation of, and compliance with, court mandated requirements (*Ruiz v. Estelle,* USDC/SD TX), including use of force policies, procedures, and practices.   I was also responsible for reviewing and approving all use of force investigations conducted by the Internal Affairs Division of TDC.  During a period of two years, I reviewed hundreds of investigations into alleged misuse of force.  I personally conducted numerous investigations involving allegations of excessive or unnecessary force by TDC personnel.

1

4.      I have reviewed and/or assisted in the development/revision of use of force policies and procedures for a wide variety of confinement operations in the United States (U. S.), Puerto Rico, the Virgin Islands, Guam, and the Northern Mariana Islands.  I also reviewed and revised use of force standards (including those relating to use of restraints and non-lethal/lethal weaponry) for the U.S. Immigration and Naturalization Service.

5.      During the course of my fifteen years of service to the U. S. Department of Justice (DOJ), Civil Rights Division, Special Litigation Section (1994-2008), I conducted numerous investigations involving claims of misuse of force in U. S. jails and prisons.  In a number of these DOJ cases, I was asked to assist in the development of corrective measures to eliminate patterns and practices of unnecessary and excessive force and thereafter monitor implementation of the remedial measures adopted by the subject facility.  In addition, I have served as a consultant and expert for U.S. Attorneys prosecuting criminal civil rights violations of excessive use of force.  I have been involved on numerous occasions in class action litigation related to use of force claims in prisons, jails, and juvenile detention systems, including system-wide claims.

6.      I have served as a court appointed monitor in a variety of class action lawsuits (both jails and prisons), a number of which involved use of force claims. For over three years (1998-2002), I jointly monitored the New York City Department of Corrections (NYDOC) on a comprehensive remedial order involving use of force at the Central Punitive Segregation Unit at Rikers Island (*Sheppard vs Phoenix,* USDC SD/NY*)*.  During the course of monitoring NYDOC's compliance, I reviewed in excess of 1000 use of force incidents and investigations, many of which involved the application of restraints, chemical agents, and impact weaponry.  From 2002 through 2005, I served as a court monitor in Nassau County (Long Island), New York, in an excessive force class action brought by the U. S. Attorney's Office in Brooklyn and DOJ (*USA vs*

2

*Nassau County,* USDC ED/NY).

7.     I am presently serving as a subject matter expert on use of force and restraints for the Federal Court Monitor in a system-wide conditions lawsuit involving the Ohio Department of Youth Services (*S. H. v. Stickrath,* USDC SD/Ohio).  I am also serving as a Court Monitor in a class action lawsuit involving the use of restraints/force on jail detainees confined on the medical and/or forensic mental health units at the Bellevue and Elmhurst Hospital Centers, jointly operated by the New York City Department of Corrections and the New York City Health and Hospital Corporation (*Reynolds v. Schriro*, USDC SD/New York).  I was recently appointed as a Court Monitor in a class action lawsuit involving, among other things, staff use of force at the Walnut Grove Youth Correctional Facility, Mississippi Department of Corrections (*C.B. v. Walnut Grove Correctional Authority,* USDC.SD/Mississippi).   I have investigated and/or monitored use of force issues in many of the 50 largest jails in the U.S., including those in New York City, Los Angeles, Chicago, Baltimore, Detroit, Houston, Pittsburgh, New Orleans, Seattle, Oklahoma City, Milwaukee, Philadelphia, and Las Vegas.

8.     I have been qualified as an expert in the field of corrections and have testified as such on more than fifty occasions, mostly in federal courts.

9.     I am co-author of *Texas Prisons:  The Walls Came Tumbling Down*, (Texas Monthly Press, 1987); and contributed *to Courts, Corrections, and the Constitution* (Oxford University Press, 1990) and *Building Violence: How America's Rush to Incarcerate Creates More Violence* (Sage Publications, 2000). I have published numerous articles related to correctional issues in law reviews and professional journals.  I have also served on the adjunct or visiting faculties of six universities, including the University Of Texas School Of Law.

10.     A listing of publications I have authored/co-authored may be found at pages 12-14 of my Curriculum Vitae, attached hereto as Exhibit 1.

11.     I was asked by plaintiffs' counsel in *Rutherford v. Baca* and *Rosas v.*

3

*Baca* to examine and review reports ("Head Injuries") compiled by them related to use of force incidents that had occurred in the Los Angeles County Jails (LACJ) for the years 2008-2011.  These reports included information related to the date of the incident, summaries of the force applied by deputies, the facility where the incident occurred, and the resulting injuries.

12.   Having been advised that plaintiffs' counsel had compiled this information on approximately fifty-seven inmates, I elected to take a random sample of these inmates to determine whether there was a discernible pattern of head injuries sustained by these inmates during the staff use of force event.  I instructed plaintiffs' counsel to identify every third inmate on their Head Injuries reports and provide that information to me.

13.   In addition to the Head Injuries reports on these nineteen use of force incidents, I was provided inmate declarations that corresponded with each event.

14.   Having reviewed the Head Injuries reports and the accompanying declarations for the aforementioned nineteen randomly selected inmates, the number and extent of head injuries sustained in these use of force incidents strongly suggest that LACJ deputies at alarming levels too frequently employ hard impact head strikes during use of force incidents.  As a result, the nineteen incidents reviewed reflected an exceedingly high incidence of head injuries many of which included multiple head injuries to the same inmate.  Moreover, many of these injuries required medical procedures such as suturing and staples.  Some of the inmates sustained facial fractures and tooth injuries while others required hospitalization to attend their injuries.

15.    For example, Mr. FF described an incident of multiple head strikes in his declaration[1], which is attached hereto along with supporting medical records as Exhibit 2:

---

[1] Declaration of Mr. FF, 4/19/11

4

Deputy Carefoot asked, 'You want to see a sergeant?' He then put up his hand and tried to slap his hand against my ear like he was going to pop my ear drums. I moved my head, which caused Deputy Carefoot to hit the back of my head. Deputy Carefoot then punched the right side of my face with a closed fist about 2-3 times. The punches felt like a painful sting and felt like I got hit with a baseball. He then grabbed me forcefully and threw me to the floor. As soon as I hit the floor, Deputy Carefoot kicked me about ten times on the left and right sides of my face, the right side of my jaw, and the back of my head. He was kicking me so hard that I saw a pool of my own blood on the floor. It felt like he kicked me for about one minute. Once he finished kicking me, he said on his radio, '415.' I found out that a 415 is a fight with a deputy. I had heard deputies say this on the radio when there's a fight going on. He then kicked my left ear three times. The kicks to my ear felt like a strong, heavy, and painful pressure. It hurt so much that all I could feel was the pressure from the kicks. I got run over by a car in 2009 and the kicks to my ear were more painful.

Medical records show that Mr. FF was taken to the hospital, where he was treated for a fractured jaw, a lacerated ear, and significant damage to his right eye. Medical records also show he underwent surgery to remove a dislocated intraocular lens.

16.    Mr. NN wrote in his declaration[2], attached hereto as Exhibit 3 along with photographs and the supporting declarations of four inmate witnesses:

I was facing the wall in a relaxed posture when, suddenly, Deputy Moorman grabbed my head with one hand and forcefully slammed my face against the cement wall. I was one foot away from the wall so Deputy Moorman was able to gather momentum before my forehead made impact. I was in shock. I immediately placed both

_____

[2] Declaration of Mr. NN, 8/22/11

5

hands on my head to check for damages. When I saw and felt my blood pouring down my face and the floor, I passed out. When I regained consciousness, I was handcuffed with my wrists behind my back. Deputy Moorman was mounted on my back, as I was forced to lie on my stomach, and was punching the side of my face as well as hammerfisting (closed fist in an overhand motion) the back of my head. Deputy Ibarra was kicking me in my rib area. [...] Meanwhile, Deputy Ibarra pepper sprayed me. As soon as the chemical made impact with my eyes, my eyes began burning. I had a cough attack and was short of breath. I asked them to please stop. Deputy Moorman then directed C.A. Perez to "go get the taser." [...] C.A. Perez grabbed a taser and shot the hooks to my back area. He tasered me three times. My muscles tightened, I felt a painful pulsation throughout my body and could not move. While being tased, Deputy Moorman was punching the right side of my face and back of my head. My face was forced onto the cement floor, I was motionless, and I, again, told the deputies that I was not resisting and to please stop. Deputy Ibarra eventually pulled Deputy Moorman off of me. Once he was off, I was able to move so I got into a fetal position. I lay in my own pool of blood. I could barely see since blood had run into my eye.

Mr. NN was taken to the hospital, where he required thirty-five stitches to close a two-inch laceration on his forehead.

17. Mr. HHH, a fellow inmate who witnessed the deputies abuse Mr. NN, wrote in a declaration[3]:

Mr. NN was facing the wall, hands to his sides, when all of a sudden Deputy Moorman grabbed Mr. NN's head and viciously slammed it against the concrete wall. Mr. NN's knee buckled and he fell to the floor. I did not see Mr. NN do anything aggressive towards the deputies […] before Deputy Moorman attacked him.

---

[3] Declaration of Mr. HHH, 8/19/11

6

[…] I then saw Deputy Ibarra pepper spray Mr. NN's face while Deputy Moorman held his face to the floor with his hands and had his knee on his back. C.A. Perez then pulled out his taser and shot the taser's hooks onto Mr. NN's back. […] When I saw his body motionless, moving only with each taser jolt shaking him violent, I felt sick to my stomach. In my mind, I kept saying, 'This is wrong.'

18.    Inmates Mr. GGG and Mr. JJJ also signed declarations describing, in similar terms, the use of force against Mr. NN, including describing Deputy Moorman grabbing Mr. NN and slamming his head into the wall.[4]

19.    Mr. III, another inmate who witnessed deputies beating Mr. NN, wrote[5]:

I heard the footsteps of numerous deputies approaching our module, and as the door was opening, Deputy Moorman or Ibarra said, 'Stop resisting! Stop resisting! Get the pepper spray!" I could see that Mr. NN was not resisting, however.

20.    Based on the details provided by the inmate declarants there may be a pattern in which the deputies often employ hard impact head strikes in a punitive and retaliatory fashion rather than as a tactic to immobilize or neutralize inmate resistance.  For example, Mr. F described in his declaration[6] a retaliatory beating for informing an ACLU representative that he had not been given a shower:

[Officer] Zuniga said to me, 'You don't like my program,' and I asked him, 'What program is that?' He then asked me why I don't like his shower program. I asked him what did he mean by that. Then he told me that 'we can fix that,' and he slapped the back of my head with his open hand. I called him a punk, and then he slapped me again. I was wearing glasses at the time so I turned my head up against the wall. This whole time the other deputy, the one

---

[4] Declaration of Mr. GGG, 8/19/11; Declaration of Mr. JJJ, 8/19/11
[5] Declaration of Mr. III, 8/19/11
[6] Declaration of Mr. F, 6/16/09

7

who escorted me, was just standing there. Next Zuniga kicked my legs out from under me and I was spread eagle up on the wall, still waist-chained. He kicked me again, and I lost my balance and fell. Then Zuniga just started punching me in the back. Then the other officer joined in, and they both started kicking me. [...] He then smacked the flashlight across my face. The flashlight hit me on my face. Then he hit me in the jaw with the flashlight. Then they hit me in the knees. [...] In fact, my legs are still swollen from them hitting my legs. While I was down on the ground they also sprayed me in the face. While I was down on the ground, Zuniga said, 'You fucking whiners, tell this to the ACLU, I dare you.'

This declaration is attached, along with seventeen supporting photographs, as Exhibit 5. A couple of the photographs show blood seeping through the gauze wrapped around Mr. F's head. Other photographs show bruising, swelling, and abrasions on Mr. F's face and swelling and wounds on his legs.  The allegations, coupled with the extent of injuries suffered by this and other declarants, warrant a serious and probing investigation to determine if force was used appropriately.

21.     Because closed fist head strikes, strikes to the head with blunt objects, using force so that inmates' heads strike solid objects such as walls or floors, and/or kicks by deputies produce needless and often times serious injuries (and often times corresponding officer hand injuries), and such tactics are not typically as effective in neutralizing inmate resistance as many other approved tactics that are less potentially injurious, such hard impact strikes to the head should be very infrequently used.  The use of hard impact strikes to the head should be strictly limited to those instances in which the inmate is engaged in aggravated active physical aggression (officer(s) is subject to death or great bodily harm) and other less injurious tactics are impracticable.

22.     When such incidents frequently occur in a particular confinement operation, supervising administrators should be alarmed.  Seasoned correctional

8

administrators have testified on this issue as follows:

> Sandahl testified that incidents where inmates are punched in face by officers should raise concern. *Feb 5 Tr. at 41.* Breed testified that he knew of "no correctional administrator that would advocate striking somebody in the face with their closed fist." *Jan. 28 Tr. at 37.* Deland also testified that it is inappropriate for an officer to punch an inmate with a closed fist, and that such a practice does not serve any legitimate corrections purpose and is solely retaliatory. *Feb. 2 Tr. at 150.* (See *Ruiz v. Johnson,* 37 F.Supp.2d 835, 934).

23.    Based on my training and experience, it is my opinion that these correctional administrators are correct about the impropriety of using head strikes in the correctional environment.

24.    There are, of course, occasions where it is appropriate for corrections personnel to use force against inmates, such as when inmates assault corrections personnel. However, the goal in every situation in which force is appropriate is to bring the situation under control as quickly as possible by restraining the inmate. Head strikes are improper both because they create a far greater risk of severe injury than other well-accepted tactics, and they are less effective means of restraining or immobilizing the inmate than these tactics. For example, officers should be trained to use such techniques that may include: joint locks, leverage locks, pressure points, wrist locks, arm bars, strikes to major muscle mass areas (forearms, thighs, calves), etc. Such defensive tactics are intended to neutralize the inmate's aggression and facilitate restraint without creating a needless risk of serious injury to either the inmate or the officer.

25.    The use of head strikes creates the risks of severe injury, and there are more effective and less dangerous techniques to deal with an aggressive inmate. Thus, the kind of injuries described in the incidents above, and the number of these incidents, are strong evidence that Los Angeles Sheriff's frequently used excessive

9

and unreasonable force, even if the deputies had used force on the injured inmates because those inmates had been aggressive towards, or assaulted the deputies. The principal bases for my conclusion are that a) uses of force against the head should occur extremely rarely in even a large correctional institution; b) uses of force that cause severe head injuries, such as a bone fracture in the face, should occur even more rarely in a large correctional institution: c) I do not recall ever seeing this volume of force incidents involving head strikes during a comparable period of time in any of the large correctional systems where I have reviewed use of force, much less head strikes causing such severe injuries; d) the sixty or so incidents the ACLU has compiled are a tiny percentage of the total force incidents reported by LASD, according to the statistics compiled by the Citizens' Commission on Violence in the Jails ("CCJV"); and e) CCJV also found that a very high percentage (62%) of the force used by deputies in the jails between 2006 and 2011 was "significant force" thus strongly suggesting that there were many more serious injuries, including head injuries, between 2009 and 2012 than the ACLU is aware of.

10

26.    My conclusion is based on the material I have been able to review. To reach an ultimate conclusion, I would want to review additional information, including but not limited to, all the force packages for all incidents of force over a period of a year or more, the rate at which force incidents result in the inmates' needing medical care, the nature of the injuries resulting from these uses of force, and the frequency with which LASD finds these uses of force to be reasonable as opposed to unreasonable or outside policy.

I declare under penalty of perjury of the laws of the state of California and the United States that the foregoing is true and correct.  Executed September 21, 2012 in Austin, Texas

_____

Steve J. Martin

11

26.    My conclusion is based on the material I have been able to review. To reach an ultimate conclusion, I would want to review additional information, including but not limited to, all the force packages for all incidents of force over a period of a year or more, the rate at which force incidents result in the inmates' needing medical care, the nature of the injuries resulting from these uses of force, and the frequency with which LASD finds these uses of force to be reasonable as opposed to unreasonable or outside policy.

I declare under penalty of perjury of the laws of the state of California and the United States that the foregoing is true and correct.  Executed September 21, 2012 in Austin, Texas

Steve J. Martin

11