PETER J. ELIASBERG (SB# 189110)
peliasberg@aclu-sc.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Phone:  (213) 977-9500
Fax:  (213) 977-5299

JOHN S. DURRANT (SB# 217345)
johndurrant@paulhastings.com
ELIZABETH C. MUELLER (SB# 278283)
bethmueller@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071-2228
Phone:  (213) 683-6000
Fax:  (213) 627-0705

MARGARET WINTER (*pro hac vice*)
mwinter@npp-aclu.org
ERIC BALABAN (*pro hac vice*)
ebalaban@npp-aclu.org
NATIONAL PRISON PROJECT OF
THE AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St., NW
Washington, D.C. 20005
Phone:  (202) 393-4930
Fax:  (202) 393-4931

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN
GOODWIN, on behalf of themselves
and of those similarly situated

(counsel for Defendant on additional
caption page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>Jim McDonnell, Sheriff of Los Angeles County, in his official capacity,<br><br>Defendant. | CASE NO. CV 12-00428 DDP<br><br>**JOINT MOTION FOR PRELIMINARY APPROVAL AND NOTICE OF PROPOSED SETTLEMENT**<br><br>Honorable Dean D. Pregerson<br>Ctrm:  3 |

ROGER H. GRANBO (SB# 108372)
rgranbo@counsel.lacounty.gov
RODRIGO A. CASTRO-SILVA (SB# 185251)
rcastro-silva@counsel.lacounty.gov
OFFICE OF COUNTY COUNSEL
Kenneth Hahn Hall of Administration
500 West Temple Street, 6th Floor
Los Angeles, California 90012
Phone:  (213) 974-1804
Fax:  (213) 626-7446

Attorneys for Defendant
Jim McDonnell, Sheriff of Los Angeles County,
in his official capacity

## I.    **INTRODUCTION**

Counsel for the Plaintiff Class and Defendant Jim McDonnell (collectively, the "Parties") have reached a proposed settlement of this action. Pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), the Parties respectfully request that the Court: (1) grant preliminary approval of the terms of the proposed settlement agreement ("the Settlement"); (2) approve the Parties' proposed Notice to the Plaintiff Class; (3) direct notice to the Plaintiff Class; and (4) set a date for a fairness hearing for final approval of the Settlement. The grounds for this Motion are set forth below.

## II.    **PROCEDURAL BACKGROUND**

On January 18, 2012, named Plaintiffs Alex Rosas and Jonathan Goodwin filed the original Complaint in this action alleging that inmates in Men's Central Jail, Twin Towers Correctional Facility, and the Inmate Reception Center (collectively, "the Downtown Jail Complex") were being subjected to a pattern of unnecessary and excessive force by Los Angeles Sheriff's Department ("Department") personnel, and that the Sheriff was aware of the problem and had not taken reasonable steps to prevent the excessive force. (Dkt. 1.) Specifically, the Complaint alleged, among other things, that the Sheriff had not put in place an adequate use of force policy, training on use of force was inadequate, investigations of use of force incidents were cursory, use of force incidents were not adequately documented and tracked, and discipline for Department personnel who used excessive force and supervisors who condoned it was non-existent or overly lenient. (*See generally id.*) To remedy these problems, the Complaint requested an injunction and other relief.[1] (*See id.* at Prayer for Relief, ¶¶ 2-3.)

---

[1] Specifically, the Complaint requested the following relief: (1) "adequate policy on the use of force"; (2) "adequate investigation of all use of force incidents and inmate-on-inmate violence, with investigations performed unconnected to the attack under investigation"; (3) "appropriate training in use of force and prevention of inmate-on-inmate violence"; (4) "appropriate discipline of staff members found to be involved in

-1-            JOINT MOT. FOR PRELIM. APPROVAL
                AND NOT. OF PROPOSED SETTLEMENT

From nearly the inception of this action, counsel for the Plaintiff Class and Defendant engaged in extensive arms-length negotiations to reach a mutually satisfactory settlement. On April 24, 2012, while Defendant's pleading challenges and motion to disqualify the ACLU Foundation of Southern California, and Plaintiffs' motion for class certification were still pending, Plaintiffs' Counsel approached Defendant with a detailed framework for settlement. (*See* Dkt. 62-1 at 4-5.) Thereafter, on June 29, 2012, Defendant filed – and the Court granted – a request to schedule a settlement conference before a judicial officer. (*See* Dkt. 59-61, 68, 74, 81.) In the subsequent years, the Parties continued their settlement negotiations with the assistance of the Court. (*See, e.g.*, Dkt. 88, 93, 95-105, 107, 108.) As part of these negotiations, the Parties exchanged voluminous discovery, engaged multiple experts and other stakeholders in discussions regarding proposed policy changes to the Downtown Jails Complex, and held numerous settlement conferences before the Honorable Dean D. Pregerson.

In late September 2014, the Parties reached a proposed settlement agreement to resolve all claims in the case. (*See* Ex. A (Settlement Agreement and Release of Claims dated Sept. 26, 2014).) The Settlement provides that the Court will appoint three experts, Richard Drooyan, Robert Houston, and Jeffrey Schwartz ("the Expert Panel"), to develop a plan to address and remedy the alleged pattern of excessive force ("the Implementation Plan"). (*See id.* at §§ II.1, III.2, & V.) In tandem, Defendant agrees to implement each of the provisions in the Implementation Plan as soon as reasonably practicable after final approval of the Settlement by the Court. (*See id.* at § VIII.1.) The Settlement also provides that the Expert Panel will monitor the Department's implementation of, and continued compliance with, the terms of the Implementation Plan and make periodic reports to the Court on its

---

improper use of force incidences"; and (5) "appropriate selection and supervision of command and uniformed custodial staff." (*See id.* at Prayer for Relief, ¶¶ 2-3.)

-2-

findings. (*Id.* at § II.1.) Finally, the Settlement contains other provisions governing, *inter alia*, the procedures governing the Court's preliminary and final approval of the Settlement, the notice provided to the Plaintiff Class, and the attorneys' fees and expenses provided to Plaintiffs' Counsel. (*See, e.g.*, *id.* at § IV & XIII.)

In October 2014, the Expert Panel finalized the Implementation Plan. (*See* Ex. B.) The Implementation Plan addresses 21 major areas[2] and contains more than 100 specific provisions that the Department must implement, including the following:

- The Sheriff should be personally engaged in the management of the Downtown Jail Complex by the Department, and the Sheriff should regularly and adequately monitor the Department's use of force policies and practices (*id.* at § 1.2);

- The Department will revise and re-organize its use of force policies for Custody Operations and add policies including ones restricting the use of chemical agents and kicking inmates, and requiring that inmates' medical records be checked whenever possible before using Tasers or chemical agents (*see, e.g.*, *id.* at §§ 2.1-2.13, 4.3.);

- Deputies assigned to the Downtown Jail Complex must receive, among other

---

[2] The major areas covered by the Implementation Plan are: (1) Leadership, Administration and Management; (2) Use of Force Policies and Practices; (3) Training and Professional Development Related to Use of Force; (4) Use of Force on Mentally Ill Prisoners and Other Special Needs Populations; (5) Data Tracking and Reporting of Force Incidents; (6) Inmate Grievances and Other Complaints of Excessive Force; (7) Inmate Supervision, Staff Inmate Relations, and Communication with Prisoners; (8) Retaliation Against Inmates; (9) Security Practices; (10) Management Presence in Housing Units; (11) Management Review of Force Incidents and Data; (12) Reviews and Investigations of Use of Force Incidents; (13) Disposition of Use of Force Reviews and Staff Discipline Issues; (14) Criminal Referrals and External Reviews of Use of Force Incidents; (15) Documentation and Recording of Force Incidents; (16) Health Care Assessments and Documentation Following Force Incidents; (17) Use of Restraints; (18) Adequate Staffing and Staff Rotations; (19) Early Warning System Related to Use of Force; (20) Protocols for Planned Uses of Force; (21) Organizational Culture Related to Use of Force. (*See generally* Ex. B.)

-3-                    JOINT MOT. FOR PRELIM. APPROVAL
                      AND NOT. OF PROPOSED SETTLEMENT

training, a one-time, eight-hour use of force policy training course and a yearly two-hour refresher course; a one-time, four-hour course in ethics, professionalism and treating inmates with respect and a two-hour refresher course every other year (s*ee id.* at §§ 3.1-3.6.);

- The Department will track the status of all investigations, reviews and evaluations of all Custody use of force incidents and allegations of force to ensure that investigations, reviews, and evaluations are completed appropriately and timely (*id.* at § 5.1.); and

- All custody Sergeants should receive an initial 16-hour block of training in conducting use of force investigations, reviewing use of force reports, and the Department's new protocols for conducting such investigations, and a two-hour refresher course every year (*id.* at § 12.1.).

Further, the Implementation Plan provides that the Expert Panel will monitor: (1) the Department's implementation of each provision contained in the Implementation Plan; (2) the Department's adherence in practice to the policy change through the monitoring period; and (3) the Department's investigation of any potential violations of the revised policies, and any remedial steps taken by the Department in response to violations. (*Id.*)

In November 2014, Defendant submitted the Settlement and Implementation Plan to the Los Angeles County Board of Supervisors ("Board of Supervisors") for approval as set forth in the Settlement. (*See* Ex. A at § I.2.) The Board of Supervisors approved the Settlement on December 16, 2014.

Under to the terms of the Settlement, the Parties have agreed to file this Motion and all other documents necessary to obtain preliminary and final approval of the Settlement on behalf of the Plaintiff Class. (*See, e.g.*, *id.* at §§ IV.I, IV.2, XIV.5.) The Settlement is intended to fully, finally and forever resolve, discharge and settle the claims in this lawsuit, subject to Court approval. (*See id.* at §§ VII.1, VII.2.)

JOINT MOT. FOR PRELIM. APPROVAL
AND NOT. OF PROPOSED SETTLEMENT

III. **ARGUMENT**

A. **THE COURT SHOULD PRELIMINARILY APPROVE THE PROPOSED SETTLEMENT**

Rule 23(e) provides that the claims of a certified class may be settled or compromised only with the Court's approval. *See* Fed. R. Civ. P. 23(e). Approval of a proposed settlement is a matter within the broad discretion of the district court. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025-26 (9th Cir. 1998) ("We have repeatedly stated that the decision to approve or reject a settlement is committed to the sound discretion of the trial judge[.]"). The law favors settlement, particularly in class actions and other complex cases where substantial resources can be conserved by avoiding the time, cost, and rigors of formal litigation. *See, e.g.*, *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (noting the Ninth Circuit's "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned"). These concerns apply with particular force in cases such as this one, where settlement would avoid protracted litigation and provide necessary relief to the Plaintiff Class in a timely manner.

Approval of class action settlements involves a two-step process. First, "counsel submit the proposed terms of settlement and the judge makes a preliminary fairness evaluation." *Manual for Complex Litigation, Fourth* § 21.632 (2004); *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004); *cf. Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1377 (9th Cir. 1993) (noting and implicitly approving the district court's use of a preliminary approval process). "Once the judge is satisfied as to . . . the results of the initial inquiry into the fairness, reasonableness, and adequacy of the settlement, notice of a formal Rule 23(e) fairness hearing is given to the class members." *Manual for Complex Litigation, Fourth* § 21.633. Second, after notice is given to class members, the Court determines whether final approval of the settlement is warranted. *Id.*; *Nat'l Rural Telecommunications Coop.*, 221 F.R.D. at 525.

-5-

The purpose of the preliminary approval of a proposed settlement "is for a court to determine whether notice of the proposed settlement should be sent to the class, not to make a final determination of the settlement's fairness." William B. Rubenstein, 4 Newberg on Class Actions § 13:13 (5th ed.). In making the "initial inquiry" into the fairness, reasonableness, and adequacy of the settlement, *see Manual for Complex Litigation, Fourth* § 21.633, courts may consider "some or all" of the following factors: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *Hanlon*, 150 F.3d at 1026; *Nat'l Rural Telecommunications Coop.*, 221 F.R.D. at 525. Indeed, one factor alone may prove determinative, and the Court may make the determination on the basis of information already known to the Court. *Nat'l Rural Telecommunications Coop.*, 221 F.R.D. at 525 (citing *Torrisi*, 8 F.3d at 1376); *Manual for Complex Litigation, Fourth* § 21.632.

Here, the Court is well aware of the proposed Settlement and how the parties reached it, and preliminary approval of the Settlement is appropriate. As demonstrated below, all of the pertinent factors weigh heavily in favor of granting preliminary approval of the Settlement.

First, and most importantly, the terms of the Settlement and Implementation Plan are reasonably calculated to remedy the alleged constitutional violations in the Downtown Jail Complex that Plaintiffs raised in the Complaint. For that reason alone, the Settlement is fair, reasonable, and adequate to the Plaintiff Class.

Second, it is abundantly clear that continued litigation would be expensive, complex, and lengthy as the issues in this case have been highly contested by the

-6-

JOINT MOT. FOR PRELIM. APPROVAL
AND NOT. OF PROPOSED SETTLEMENT

Parties to date.  Both Parties have expended substantial resources in briefing the issues raised in Defendant's motions to dismiss and motion to disqualify the ACLU, Plaintiffs' motion for class certification, and the lengthy negotiations required to obtain a settlement.  This significant expenditure of time and resources would almost certainly continue if the Court did not approve the Settlement, as the Parties would be required to re-open fact and expert discovery, draft motions for summary judgment, and prepare for a lengthy trial.  Importantly, continued protracted litigation is not in the interest of the Plaintiff Class as it would prolong the amount of time before relief is provided.

Third, the proposed Settlement was the product of extensive and contentious arms-length bargaining between experienced counsel representing the Plaintiff Class and Defendant.  The negotiations were presided over by the Court, and informed at every step by experts and other stakeholders.  Indeed, the Expert Panel crafted the Implementation Plan, which, unlike the Settlement, was not subject to the Parties' bargaining.

Fourth, Plaintiffs' counsel anticipates a positive reaction to the Settlement from the Plaintiff Class, given that the Implementation Plan requires the Department to both implement large-scale changes and ensure that other changes that have commenced or been completed must remain in place to address the allegations made in this case.  Indeed, named Plaintiff Alex Rosas agreed to the Settlement and the press coverage of the Settlement has been favorable.  With respect to the absent members of the Plaintiff Class, Plaintiffs' counsel can best address this issue at the fairness hearing, after these individuals have had an opportunity to review and comment on the Settlement.

In sum, it is clear that the Settlement is fair, reasonable, and adequate to the Plaintiff Class.  Accordingly, the Court should grant preliminary approval of the Settlement.

JOINT MOT. FOR PRELIM. APPROVAL
AND NOT. OF PROPOSED SETTLEMENT

B.      **The Court Should Approve the Proposed Method of Class Notice**

Rule 23(e) requires the Court to direct notice of a settlement to the members of the Plaintiff Class.  Fed. R. Civ. P. 23 (e)(1) ("The court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal or compromise.").  In a class settlement for injunctive relief only under Rule 23(b)(2), individualized notice is not required. *Compare* Fed. R. Civ. P. 23(c)(2)(A), *with* Fed. R. Civ. P. 23(c)(2)(B).  "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'"  *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Circ. 1980)).

The Parties have appended to this Motion a proposed Notice to members of the Plaintiff Class.  (Ex. C.)  The proposed Notice complies with due process and Rule 23, because it fairly, plainly, and accurately describes the nature of the action, the definition of the Plaintiff Class, the key provisions of the Settlement, and the attorneys' fees and costs provided to Plaintiffs' counsel thereunder.  *See* Fed. R. Civ. P. 23(c)(2)(B) (discussing requirements for content of mandatory notice for class certified pursuant to Rule 23(b)(3), which are more onerous than requirements for elective notice pursuant to Rule 23(b)(2)); *see also* Rubenstein, 3 Newberg on Class Actions § 8.17.  Additionally, the Notice identifies Plaintiffs' Counsel and clearly explains how the members of the Plaintiff Class may ask questions and/or lodge objections to the Settlement.  *Id.*  As the Notice gives members of the Plaintiff Class a fair and full opportunity to consider the Settlement and to come forward and be heard if they desire, the content of the Notice satisfies the requirements of due process and Rule 23.

As outlined in the Settlement, the Parties propose that copies of the Notice

JOINT MOT. FOR PRELIM. APPROVAL
                                     AND NOT. OF PROPOSED SETTLEMENT

will be posted in both English and Spanish in the following locations:

- The common area of all housing units in Men's Central Jail and Twin Towers Correctional Facility, and in places in the Inmate Reception Center where inmates who are being process into the jails can read them;

- In places where K-10 inmates and inmates in disciplinary segregation in Men's Central Jail and Twin Towers Correctional Facility can read them; and

- The websites for Defendant and Plaintiffs' Counsel.

(*See* Ex. A at § IV.2.)  Further, Defendant will provide copies of the notice upon request to K-10 inmates and inmates who have been in disciplinary segregation in Men's Central Jail and Twin Towers Correctional Facility for more than 10 days during the notice period.  (*Id.*)  As the Plaintiff Class consists of present and future inmates in the Downtown Jail Complex, the Parties' proposed plan for distributing the Notice is a reasonable method to inform members of the Plaintiff Class of the terms of the Settlement.  Therefore, the proposed plan complies with the requirements of due process and Rule 23(e)(1).

In short, the proposed Notice and plan for distributing the Notice adequately protects the interests of members of the Plaintiff Class.  Accordingly, the Court should approve the Notice and direct that notice is provided to the Plaintiff Class as provided herein.

### C.     **The Court Should Schedule the Final Approval Hearing**

The Parties request that the Court set a hearing for final approval of the Settlement pursuant to Rule 23(e)(2).  The Parties submit herewith a proposed Order regarding notice to the members of the Plaintiff Class, procedures for objections and the final fairness hearing.  This schedule is similar to schedules followed and approved by numerous courts in class action settlements and provides due process to members of the Plaintiff Class with respect to their rights concerning the settlement.  *See, e.g., Torrisi*, 8 F.3d at 1375 (notice provided 31 days before the

JOINT MOT. FOR PRELIM. APPROVAL
AND NOT. OF PROPOSED SETTLEMENT

deadline for written objections and 45 days before the hearing).

IV.   **CONCLUSION**

For the foregoing reasons, the Parties respectfully request that the Court grant preliminary approval of the terms of the Settlement, approve the proposed Notice to the Plaintiff Class, and direct the notice to the Plaintiff Class.  The Parties also request that the Court grant the proposed order regarding notice to the members of the Plaintiff Class, procedures for objections and the timing for the final fairness hearing.

Dated:  January 6, 2015                    Respectfully Submitted,

ACLU FOUNDATION OF
SOUTHERN CALIFORNIA

By:_____/s/ Peter Eliasberg_____
            PETER ELIASBERG


NATIONAL PRISON PROJECT OF THE
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

By:_____/s/ Margaret Winter_____
            MARGARET WINTER


PAUL HASTINGS LLP

By:_____/s/ John Durrant_____
            JOHN DURRANT

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated


OFFICE OF COUNTY COUNSEL

By:_____/s/ Rodrigo A. Castro-Silva_____
            RODRIGO A. CASTRO-SILVA

Attorneys for Defendant Sheriff Jim McDonnell, in his official capacity only

-10-                    JOINT MOT. FOR PRELIM. APPROVAL
                        AND NOT. OF PROPOSED SETTLEMENT

# EXHIBIT A

## SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

### RECITALS

A.    This Settlement Agreement and Release ("Agreement") is made and entered into on or about September 26, 2014, by and between Plaintiff Alex Rosas on behalf of himself and the Plaintiff Class, as defined below, on the one hand, and Defendant Sheriff John L. Scott, in his official capacity ("Defendant"), on the other hand, (collectively, "the Parties") with reference to the following facts:

B.    Plaintiffs Alex Rosas and Jonathan Goodwin ("Named Plaintiffs") filed a Complaint, and thereafter a First Amended Complaint ("Complaint") in the United States District Court, Central District of California, entitled *Alex Rosas, et al. v. Leroy D. Baca*, Case No. CV 12-00428 DDP, which arose out of certain alleged acts and/or omissions by Defendant ("the Civil Action").  In the Civil Action, Plaintiffs sought certain declaratory and injunctive relief against Defendant as a result of purported events that occurred at Men's Central Jail ("MCJ"), Twin Towers Correctional Facility ("TTCF"), and the Inmate Reception Center ("IRC") (collectively, "the Jail Complex in downtown Los Angeles"), and that allegedly resulted in injuries to the Plaintiff Class;

C.    On or about June 7, 2012, the Court entered an order granting Plaintiffs' motion for class certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure, certifying a declaratory/injunctive relief class that, for purposes of this Agreement, is defined as "all inmates, now and in the future, in the custody of the Los Angeles County Sheriff's Department in the Jail Complex in downtown Los Angeles" ("the Plaintiff Class");

D.    Named Plaintiffs and the Plaintiff Class are represented by court-appointed class counsel, the American Civil Liberties Union, the ACLU Foundation of Southern California, and Paul Hastings LLP (collectively, "Class Counsel"); and,

E.    The Parties desire to settle all of the claims arising out of the Civil Action which Named Plaintiffs and the Plaintiff Class have or may have against Defendant, including its employees, representatives, and agents, both named and unnamed, as of the date of this Agreement.

IT IS THEREFORE AGREED BETWEEN THE PARTIES AS FOLLOWS:

## I.    AGREEMENT CONTINGENT ON APPROVAL BY THE COURT AND THE BOARD OF SUPERVISORS.

1.    This Agreement and the obligations of the Parties thereunder are contingent upon the final approval by the Court, as set forth below.

2.    This Agreement and the obligations of the Parties thereunder also are contingent upon the approval by the Los Angeles County Board of Supervisors ("the Board"), as set forth below.

HOA.1098696.2                                                    1

3.      In the event that: (1) this Agreement does not receive approval by the Board; (2) this Agreement does not receive final approval by the Court; or (3) any appeal of the Court's final approval of this Agreement is filed and not upheld on appeal, then this Agreement shall be of no force or effect and shall not be admissible in any court for any reason, except that Defendant agrees to pay reasonable compensation to the Panel, as defined below, for services rendered as of that date.

## II.      APPOINTMENT OF A PANEL TO DEVELOP A CORRECTIVE ACTION PLAN AND EVALUATE COMPLIANCE WITH THE PLAN.

1.      The Court will appoint Richard Drooyan, Jeffrey Schwartz, and Robert Houston ("the Panel"), pursuant to Rule 706 of the Federal Rules of Evidence, to develop a corrective action plan ("Action Plan") designed to ensure that the Plaintiff Class are not subjected to excessive force in the Jail Complex in downtown Los Angeles, and to monitor and advise the Court on Defendant's compliance with the Action Plan.

2.      The Panel will be entitled to reasonable compensation in an amount approved by the Board and the Court. Defendant will bear the cost of the compensation of the Panel.

3.      In the event Mr. Drooyan becomes unavailable during the term of this Agreement, then Defendant will select his replacement. If Mr. Schwartz becomes unavailable during the term of this Agreement, then Class Counsel will select his replacement. If Mr. Houston becomes unavailable during the term of this Agreement, then the Parties will meet and confer to reach agreement regarding a replacement.

## III.      DEVELOPMENT AND SUBSTANTIVE PROVISIONS OF THE ACTION PLAN.

1.      By October 6, 2014, at latest, the Panel will submit the Action Plan to the Court for its review and approval.

2.      In developing the Action Plan, the Panel may consider provisions relating to Use of Force Policies, Practices and Documentation; Training and Professional Development Related to Use of Force; Use of Force on Prisoners with Mental Illness and other Special Needs Populations; Security Policies and Practices; and any such other areas regarding use of force as they may deem necessary. In developing the Action Plan, the Panel will make best efforts to make it consistent with the recommendations of the Citizen's Commission on Jail Violence, which Defendant is already in the process of implementing. In developing the Action Plan, the Panel will make its best estimates as to how long it should take Defendant to implement each recommendation and include those estimates in its Action Plan.

3.      Prior to submitting the Action Plan to the Court, the Panel will provide a draft of the Action Plan to the Parties for their review and comment. After input from the Parties, the Panel may, in their discretion, revise the draft Action Plan. Within 30 days of the Panel providing a final version of the Action Plan to the Parties, counsel for Defendant shall submit the Action Plan and this Agreement to the Board for its review and consideration with respect to whether to approve the Agreement. Within 60 days of the Panel providing a final version of the Action Plan to the Parties, the Board shall decide whether it will approve the Agreement. If the Board

HOA.1098696.2                                                    2

approves the Agreement, the Parties will seek preliminary and then final approval of this Agreement with the Court as set forth below. If the Board fails to indicate its approval or disapproval of the Agreement within 60 days of the Panel providing a final version of the Action Plan to the Parties, the Agreement will be deemed rejected at which time either Party may request confirmation from the Court that settlement discussions have ended.

IV.    **CLASS NOTICE AND SETTLEMENT FAIRNESS HEARING.**

The following procedures will govern the Court's preliminary and final approval of this Agreement and notice to the Plaintiff Class:

1.    Within 21 days of any approval of the Action Plan and the Agreement by the Board, the Parties will file a joint stipulation requesting that the Court grant preliminary approval of this Agreement, as well as approve the notice to the Plaintiff Class. The Parties will submit the proposed forms of all notices and other documents necessary to implement this Agreement to the Court, including the final Action Plan. The Parties will translate the proposed class notice into Spanish. Defendant will provide notice of the proposed settlement to the appropriate federal and state officials, as required by the Class Action Fairness Act ("CAFA") codified at 28 U.S.C. § 1715.

2.    If the Court grants preliminary approval of this Agreement and approves the notice to the Plaintiff Class, the Parties will take the following steps to effect notice of this Agreement as required by the CAFA:

   a.    Defendant will promptly post a copy of the notice to the Plaintiff Class in both English and Spanish in the common area of all housing units in MCJ and TTCF and in places in the IRC where inmates who are being processed into the jails can read them;

   b.    Defendant will post copies of the notice to the Plaintiff Class in both English and Spanish in places where K-10 inmates and inmates in disciplinary segregation in MCJ and TTCF can read them. Defendant will provide copies of the notice upon request to K-10 inmates and inmates who have been in disciplinary segregation in MCJ and TTCF for more than 10 days during the notice period. Defendant will bear the cost of translating, printing, posting, and distributing the notice to the Plaintiff Class; and

   c.    Defendant and Class Counsel promptly will post a copy of the notice to the Plaintiff Class in both English and Spanish on their respective websites.

3.    Objecting to the Settlement. The notice to the Plaintiff Class will provide that class members ("Class Members") who wish to object to the Agreement prior to the fairness hearing may do so by filing with the Court a written statement objecting to the Agreement.

4.    Fairness Hearing: On or after the later of: (1) 51 days of the posting of the notice to the Plaintiff Class, or (2) 90 days of the last date of service of the proposed settlement on the appropriate federal and state officials as required by CAFA, the Court will conduct a hearing for final approval of this Agreement ("the Fairness Hearing"). No Class Member will be entitled to

be heard at the Fairness Hearing (whether individually or through separate counsel) unless written notice of the Class Member's intention to appear at the Fairness Hearing is served on counsel for the Parties no later than 21 days prior to the Fairness Hearing. The Court, in its discretion, may determine which Class Members, if any, who have requested to appear will be entitled to appear and be heard at the Fairness Hearing. No Class Member may object to this Agreement, unless copies of any written objections or briefs are filed with the Court and served on counsel for the Parties no later than 21 days prior to the Fairness Hearing. Class Members who fail to file and serve timely objections in the manner specified above will be deemed to have waived any objections and will be foreclosed from making any objection (whether by appeal or otherwise) to this Agreement or the Court's approval thereof.

5.      In the event that the Court grants final approval of this Agreement, it shall enter an order: (1) memorializing its final approval of this Agreement; (2) granting costs and attorneys' fees to Class Counsel as set forth in Section XIII; (3) dismissing the Civil Action, with prejudice (including, without limitation, dismissal in favor of Defendant and all of its employees, representatives, and agents, both named and unnamed); and (4) retaining jurisdiction for the purpose of enforcing the provisions of this Agreement or modifying it in accordance with Section XIV(6) below. The Parties shall bear their own costs, expenses, and attorneys' fees incurred in the Civil Action, except as otherwise provided herein.

## V.      **PERIODIC REPORTS BY THE PANEL.**

The Panel will prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan ("Reports") at intervals the Panel shall determine. The Panel will provide the Reports to the Parties in draft form prior to submission to the Court, will consider the Parties' comments, and may in its discretion make responsive changes before submitting the Reports to the Court. The Reports shall state that they are created for purposes of this settlement. The Reports may not be used against Defendant in any other legal proceeding for any purpose.

## VI.     **INSPECTION BY CLASS COUNSEL.**

On reasonable notice, Class Counsel will have reasonable access to the Jail Complex in downtown Los Angeles, including without limitation staff, inmates, and documents, for inspection to evaluate compliance with the Action Plan. Class Counsel shall provide Defendant's counsel with 10 days' notice before any document request and 4 days' notice before any on-site inspection. Defendant's counsel shall have the right to be present for any jail inspection and/or discussion with Sheriff's Department personnel. Defendant reserves the right to object, whether on privilege grounds or otherwise, to any document request made by Class Counsel. The Parties agree to negotiate in good faith to resolve any disputes concerning objections to document requests from Class Counsel and if the dispute cannot be resolved, to submit the issue to the Court for resolution. Any information or documents obtained by Class Counsel under this section may be used solely for purposes of this action and may not be used in any other action for any purpose. Nothing in this section shall restrict monitoring activities by the ACLU (such as readily available access to Title 15 logs) in *Rutherford v. Scott*, Case No. CV 75-04111-DDP.

## VII.  RELEASE.

1.    Except as otherwise provided in this Agreement and as separate consideration for the agreements contained herein, Named Plaintiffs and the Plaintiff Class hereby absolutely, fully and forever release, relieve, waive, relinquish, and discharge Defendant and its successors, predecessors, related entities, departments, subsidiaries, representatives, assigns, agents, partners, officers, directors, managers, insurers, shareholders, employees, and attorneys, including, without limitation, the Board and Lawrence Beach Allen & Choi, A Professional Corporation, and each of them ("Released Parties"), of, and from, any and all known claims for equitable relief, subject to the following limitations:  (i) this waiver shall not apply to claims based on acts or omissions arising after the date of execution of this Agreement; and (ii) this waiver shall be limited to the allegations made in the Complaint (which do not include claims for damages).

2.    Named Plaintiffs and the Plaintiff Class acknowledge their intention that, upon execution by the Parties and approval by the Court, this Agreement, except as expressly provided for herein, shall be effective as a full and final accord and satisfaction and settlement of and as a bar to all of the claims in the Civil Action.  Named Plaintiffs and the Plaintiff Class acknowledge that they have been informed by their attorneys, or otherwise have been informed of, and that they are familiar with, Section 1542 of the Civil Code of the State of California, which provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

Named Plaintiffs and the Plaintiff Class hereby waive and relinquish all rights and benefits against the Released Parties that they have or may have under Section 1542 of the Civil Code of the State of California, subject to the following limitations:  (i) this waiver shall not apply to claims based on acts or omissions arising after the date of execution of this Agreement; and (ii) this waiver shall be limited to the allegations made in the Complaint (which do not include claims for damages).

3.    Named Plaintiffs and the Plaintiff Class agree, represent, and warrant that they understand that the Civil Action involves arguable and disputed questions of fact and law, that the liability of Defendant for the alleged acts in the Civil Action is disputed, and that the consideration provided herein is not to be construed as an admission of liability by Defendant, which is expressly denied, and that this Agreement arises from compromise.

## VIII.  TERMINATION.

1.    After the final approval of this Agreement by the Court, Defendant will implement each and every recommendation from the Panel contained in the Action Plan as soon as reasonably practicable. When the Panel certifies that any recommendation of the Action Plan has been implemented, it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ("Compliance Period").  It is anticipated that there will be multiple Compliance Periods for the various recommendations contained in the Action Plan, and that

Defendant will implement and be judged to be in compliance with numerous recommendations in six months or less from the submission of the Action Plan to the Court, others in six to twelve months from the submission of the Action Plan to the Court, and there is a possibility that Defendant may be judged to have come into compliance with others more than twelve months from the submission of the Action Plan to the Court. If, after the Panel reports that the Defendant has initially reached compliance, the Panel subsequently reports that Defendant has fallen out of compliance, Plaintiffs may make a motion to the Court for contempt, but only after having engaged in a good faith attempt to resolve the issue of noncompliance with Defendant's counsel and having allowed a reasonable period to cure noncompliance. The Court may exercise its equitable powers to fashion relief, including ordering compliance and extending the compliance period, consistent with the Prison Litigation Reform Act ("PLRA"). Alternatively, Plaintiffs may request that the Panel propose a remedial plan, which may include an extension of the compliance period, consistent with the PLRA, for the Court's approval.

2.      Defendant may seek to terminate this Agreement through application to the Court, consistent with the PLRA, at such time as all of the following conditions have been satisfied:

(a) For those recommendations that the Panel certifies the Defendant has implemented in six months or less after the submission of the Action Plan to the Court: (i) Defendant must sustain compliance with each of those recommendations for either a period of at least 18 consecutive months or satisfy any alternative requirements imposed pursuant to Paragraph 1 above; and (ii) Defendant must sustain simultaneous compliance with all those recommendations for a period of at least 12 consecutive months prior to filing a motion to terminate;

(b) For those recommendations that the Panel certifies the Defendant has implemented in six to twelve months after the submission of the Action Plan to the Court: (i) Defendant must sustain compliance with each of those recommendations for either a period of at least 18 consecutive months or satisfy any alternative requirements imposed pursuant to Paragraph 1 above; and (ii) Defendant must sustain simultaneous compliance with all those recommendations for a period of at least 12 consecutive months prior to filing a motion to terminate; and

(c) For those recommendations that the Panel certifies the Defendant has implemented in more than twelve months after the submission of the Action Plan to the Court: (i) Defendant must sustain compliance with each of those recommendations for either a period of at least 18 consecutive months or satisfy any alternative requirements imposed pursuant to Paragraph 1 above; and (ii) Defendant must sustain simultaneous compliance with all those recommendations for a period of at least 12 consecutive months prior to filing a motion to terminate.

The period of simultaneous compliance for the recommendations that Defendant implements in six months or less need not run concurrently with the period of simultaneous compliance for the recommendations that Defendant implements in six to twelve months. Neither of those periods needs to run concurrently with the period of simultaneous compliance

for the recommendations that Defendant implements in more than twelve months if those recommendations that were implemented more than twelve months after submission of the Action Plan to the Court were ones the panel estimated in its Action Plan would take more than 12 months to implement. However, if Defendant fails to implement within 12 months one or more recommendations that the Panel estimated could be implemented in 12 months or less, Defendant must maintain simultaneous compliance with those recommendations and the recommendations that were implemented in six to twelve months after the submission of the Action Plan to the Court for a period of at least 12 consecutive months prior to filing a motion to terminate.

IX.    **PLAINTIFFS' AND THE PLAINTIFF CLASS'S ALLEGATIONS, DEFENDANT'S DENIALS, AND LACK OF ADMISSION OF LIABILITY.**

In the Civil Action, Named Plaintiffs and the Plaintiff Class allege that they have been subjected to a pattern of grossly excessive force, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Defendant generally and specifically denies all Named Plaintiffs' and the Plaintiff Class's allegations. It is understood that this Agreement is not an admission of any liability or wrongdoing on the part of Defendant and/or its employees, agents and former employees and agents of Defendant or any other persons.

X.    **AGREEMENT CONDITIONAL ON FINDINGS BY THE COURT PURSUANT TO 18 U.S.C. § 3626(a)(1)(A)**

This Agreement will become null and void unless the Court, in its Stipulated Order and Final Judgment, makes findings that although this matter was not actually litigated or resolved on the merits, the relief is narrowly drawn, extends no further than necessary to correct the alleged violations of the Federal rights, and is the least intrusive means necessary to correct the alleged violations of the Federal rights. *See* 18 U.S.C. § 3626(a)(1)(A). Notwithstanding any other term of this Agreement, the Parties stipulate that Defendant expressly disclaims and does not admit that Defendant is committing any violation of any Federal right. Except to enforce this Agreement, this Section of this Agreement shall not be admissible against Defendant in any court for any purpose.

XI.    **REPRESENTATION OF COMPREHENSION OF THIS AGREEMENT**

In entering this Agreement, Plaintiff Alex Rosas, on behalf of himself and the Plaintiff Class, represents that he has relied upon the advice of Class Counsel, who are the attorneys of his own choice, concerning the legal and other consequences of this Agreement; that the terms of this Agreement have been completely read and explained to him by Class Counsel; and the terms of this Agreement are fully understood and voluntarily accepted by him. Plaintiff Alex Rosas hereby further represents that he has not received or relied upon any legal or other advice from Defendant, Defendant's representatives, and/or attorneys.

HOA.1098696.2                                                        7

## XII.    **WARRANTY OF CAPACITY TO EXECUTE AGREEMENT.**

Plaintiff Alex Rosas, on behalf of himself and the Plaintiff Class, represents and warrants that no other person(s) or entity has, or has had, any interest in the claims, demands, obligations, or causes of action referred to in this Agreement, except as otherwise set forth herein; that he has the sole right and exclusive authority to execute this Agreement; and that he has not sold, assigned, transferred, conveyed or otherwise disposed of any of the claims, demands, obligations or causes of action referred to in this Agreement.

## XIII.    **ATTORNEY FEES AND COSTS.**

1.      Assuming this Agreement is approved by the Court and the Board, and is upheld on appeal (if any), within 45 days of the later of the Court's final approval of the Agreement or the resolution of any appeal, Defendant shall tender to Class Counsel a warrant in the amount of $950,000 made payable to "ACLU Foundation of Southern California" for full and final satisfaction of any and all claims by Named Plaintiffs, the Plaintiff Class, and Class Counsel for attorneys' fees, expenses, and costs related to the Civil Action.  Class Counsel acknowledge and agree to provide to Defendant any and all paperwork and information including, without limitation, a duly executed W-9 IRS form, prior to receiving said payment.

2.      Defendant will pay reasonable attorneys' fees and costs to Class Counsel for ongoing work to ensure compliance with this Agreement.  The amount of fees and costs due to Class Counsel under this paragraph will be determined on a semi-annual basis for the duration of the Court's jurisdiction over this Agreement.  The Parties will try to reach agreement on these semi-annual fee awards and submit a stipulation for the Court's approval.  If the Parties are unable to reach agreement on a semi-annual fee award, Class Counsel will submit a motion for reasonable attorneys' fees, and the Court will determine the appropriate amount of fees.  Under no circumstances shall Class Counsel be entitled to payment of more than $30,000 per year in attorneys' fees and costs to ensure compliance with this Agreement, exclusive of any fees and costs reasonably incurred to oppose any motion to modify or terminate this Agreement by Defendant.

3.      Notwithstanding any other provision in this Agreement, if it becomes necessary for the Plaintiffs to incur additional legal fees in connection with a motion for contempt, the Court may award reasonable fees.

## XIV.    **MISCELLANEOUS.**

1.      Counterparts.

    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

2.      California Law.

    This Agreement shall be interpreted under and pursuant to the laws of the State of California and not construed for or against any party.

3.    Successors and Assigns.

All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the Parties hereto and their respective heirs, legal representatives, successors and assigns.

4.    Parties in Interest.

Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

5.    Further Assurances.

Each of the Parties hereto shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the Parties hereto.

6.    Modifications or Amendments.

No amendment, change or modification of this Agreement shall be valid, unless in writing and signed by all of the Parties hereto and ordered by the Court, or, upon a motion of a party, the party seeking modification establishes that a significant change in facts or law warrants revision and that the proposed modification is suitably tailored to the changed circumstance.

7.    Entire Agreement.

This Agreement constitutes the entire understanding and agreement of the Parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and canceled in their entirety and are of no further force or effect.

8.    Captions.

The captions appearing at the commencement of the sections hereof are descriptive only and for convenience in reference. The sections, and not the captions, shall control and govern in the construction of this Agreement.

HOA.1098696.2                                            9

9.    Severability.

If any part of this Agreement is deemed unenforceable, illegal, or in violation of any State or Federal law, that portion of the Agreement will be severable and the remaining portion or portions of the Agreement will remain in full force and effect.

10.    Expenses.

Each of the Parties shall pay all of their own costs, legal fees, accounting fees, and any other expenses incurred or to be incurred by it or them in negotiating and preparing this Agreement, except as expressly set forth herein.

Dated: *September 24*, 2014        By: _____
                                           Alex Rosas, individually and on behalf of
                                           the Plaintiff Class


APPROVED AS TO FORM AND CONTENT:


Dated: *September 24* 2014         ACLU FOUNDATION OF
                                        SOUTHERN CALIFORNIA

                                   By: _____
                                           Peter Eliasberg
                                           Attorneys for Plaintiffs Alex Rosas and
                                           Jonathan Goodwin, and the Plaintiff Class


Dated: *September 24*, 2014        PAUL HASTINGS **LLP**

                                   By: _____
                                           John Durrant
                                           Attorneys for Plaintiffs Alex Rosas and
                                           Jonathan Goodwin, and the Plaintiff Class

Dated: *September 24* 2014

AMERICAN CIVIL LIBERTIES UNION

By: *Margaret Winter*

Margaret Winter
Attorneys for Plaintiffs Alex Rosas and
Jonathan Goodwin, and the Plaintiff Class

Dated: _____, 2014

OFFICE OF COUNTY COUNSEL,
COUNTY OF LOS ANGELES

By:_____

Roger H. Granbo
Attorneys for Defendant Sheriff John L. Scott,
in his official capacity only

Dated: _____, 2014   AMERICAN CIVIL LIBERTIES UNION

            By: _____

              Margaret Winter
              Attorneys for Plaintiffs Alex Rosas and
              Jonathan Goodwin, and the Plaintiff Class

Dated: 9-26-14, 2014   OFFICE OF COUNTY COUNSEL,
            COUNTY OF LOS ANGELES

            By: _____

              Roger H. Granbo
              Attorneys for Defendant Sheriff John L. Scott,
              in his official capacity only

# EXHIBIT B

**IMPLEMENTATION PLAN**

The Court Monitors appointed by United States District Judge Dean Pregerson in the matter entitled *Rosas, et al. v. Baca,* Case No. CV 12-00428 DDP, have developed this Implementation Plan that the Los Angeles Sheriff's Department (the "Department") shall be required to implement as part of the settlement of the *Rosas* case.  The Court Monitors understand that the items in this Implementation Plan set forth below will be mandatory when submitted by the parties to the Court and ordered by the Court as part of the settlement.

With respect to the policy changes set forth below, the Court Monitors will monitor (1) the Department's implementation of the policy change; (2) the Department's adherence in practice to the policy change through the monitoring period; and (3) the Department's investigation of any alleged or potential violations of the revised policies.  Any violations of these revised policies should be timely and appropriately investigated and appropriately disciplined up to and including termination.

In view of the on-going negotiations between the County of Los Angeles (the "County") and the United States Department of Justice regarding mentally ill and suicidal inmates, we have not made any recommendations to address issues regarding these inmates other than relating to the use of force against these inmates.

1.    **Leadership, Administration and Management (expect to be completed by June 30, 2015):**

1.1    Custody Operations should continue to be headed by an Assistant Sheriff with no areas of responsibility other than Custody Operations.

1.2    The Sheriff should be personally engaged in the management of the Department's jail facilities, and the Sheriff should regularly and adequately monitor the Department's use of force policies and practices, and its compliance with this court-ordered Implementation Plan.

1.3    Department managers should be held accountable should they fail to address use of force problems at the Department's jail facilities.

1.4    The Department should report regularly to the Board of Supervisors on use of force and the status of the Department's compliance with  this Implementation Plan.

2.    **Use of Force Policies and Practices (expect to be completed by June 30, 2015):**

2.1    The Department should have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations that includes all use of force policies and procedures that are in the Custody Division Manual and the sections of the Manual of Policy and Procedures that are applicable to the Custody Operations.  The Custody Force Manual should not include sections of the Manual of Policy and

1

Procedures that are only applicable to other areas of the Department and should not include sections that are not applicable to the use of force by Department members.

2.2     The Department's Custody use of force policies should provide that force used by Department members:  (a) must be used as a last resort; (b) must be the minimal amount of force that is necessary and objectively reasonable to overcome the resistance; (c) must be terminated as soon as possible consistent with maintaining control of the situation; and (d) must be de-escalated if resistance decreases.

2.3     The Department's Custody use of force policies should provide that it is a violation of Department policy to cause or facilitate inmate-on-inmate violence or to harass or otherwise verbally provoke an inmate to justify the use of force against the inmate.  The policies should also provide that staff are prohibited from publicly humiliating inmates; from using slurs concerning race, gender, ethnicity, or sexual-orientation; using obscenities; or exposing prisoners to an unreasonable risk of being assaulted by fellow prisoners.

2.4     The Department's Custody use of force policies should provide that force may not be used as discipline or corporal punishment.

2.5     The Department's Custody use of force policies should provide that a Department member may not strike an inmate or use chemical agents or a taser on an inmate who is restrained unless the inmate is assaultive and presents an immediate threat of injury to a Department member or another person, and unless there are no other more reasonable means to control the inmate.

2.6     The Department's Custody use of force policies should provide that striking an inmate in the head or kicking an inmate who is on the ground, or kicking an inmate who is not on the ground anywhere above the knees is prohibited unless the inmate is assaultive and presents an imminent danger of serious injury to a Department member or another person and there are no other more reasonable means to avoid serious physical injury.  The Department's Custody use of force policies should also provide that kicking an inmate who is not on the ground below the knees is prohibited unless the inmate is physically assaultive, and the kick is utilized to create distance between the member and the assaultive inmate.

2.7     The Department's Custody use of force policies should provide that Department members confronted with a situation in which force may be required must call a supervisor to the scene as soon as time and circumstances permit.

2.8     The Department's Custody use of force policies should provide that all Department members are responsible for preventing excessive force, and that Department members witnessing excessive force have a duty to attempt to stop, reduce or control the force being used.

2.9     The Department's Custody use of force policies should provide that when confronting an armed inmate, every effort should be made to control the inmate at a

2

distance and avoid the types of force that would subject Department members to close contact with the inmate.

2.10    The Department's Custody use of force policies should provide that Department members may only use instruments of force or weapons that are (1) authorized by the Department and (2) for which they have been trained, except that Department members may use any available instruments or weapons to prevent imminent loss of life or serious bodily injury if there are no other more reasonable alternative available.

2.11    The Department's Custody use of force polices should provide that Department members are required to wait a sufficient amount of time after applying chemical agents to allow the chemical agents to take full effect before applying additional chemical agents or other force in a cell extraction or other planned use of force.

2.12    The Department's Custody use of force policies should provide that chemical agents and Tasers and other electronic stun devices should not be used: (a) gainst an inmate when he or she no longer presents a danger or is no longer resistant; (b) against inmates known to suffer  medical conditions that may be aggravated or affected by such agents; or (c) in a manner contradictory to the manufacturer's recommendations or Department training.

2.13    The Department's Custody use of force policies should provide that, when time and circumstances permit, an inmate's medical/mental health records should be checked before chemical agents or Tasers and other electronic stun devices are used against the inmate.  If a medical check finds these items are contra-indicated, they should not be used (subject, however, to the exception in 2.10, above).

**3.      Training and Professional Development Related to Use of Force (curriculum for 3.1 through 3.4 expected to be implemented by June 30, 2015 with training completed by December 31, 2016; 3.5 and 3.6 to be completed by June 30, 2015 ):**

3.1    Use of force training requirements for all existing Department members in Custody Operations should include, at a minimum, a one-time eight (8) hour use of force policy training course for all members assigned to custody and then a two (2) hour refresher course every year.

3.2    Training requirements for all existing Department members in Custody Operations should include, at a minimum, a one-time four (4) hour training course in ethics, professionalism and treating inmates with respect, and then a two (2) hour refresher course on these subjects at least every other year.

3.3    New Department members should receive a minimum of six weeks of classroom, custody training, which may include training in the Academy or the Jail Continuum and in Crisis Intervention and Conflict Resolution (see 4.9 below), in addition to the in-service training they receive while assigned in the jails.  With the exception of

3

one week of the Department's Jail Operations Continuum training, all of this training should occur before new Department members receive in-service training in the jails, and this training should include at least 12 to 16 hours of both Custody-specific, scenario-based use of force policy training and  training in ethics, professionalism and treating inmates with respect.

3.4     Custody-based, use of force scenarios should be included as part of the use of force policy training provided by the Custody Training & Standard Bureau on an in-service and refresher basis.

3.5     Unit Commanders should determine what additional training, counseling or mentoring may be required when a personnel complaint against a Department member involving the use of force is resolved with a finding that it "Appears Employee Conduct Could Have Been Better"; direct that the Department member undergo such additional training, counseling or mentoring; and document the action taken.

3.6     To ensure a meaningful probationary period, new Department members assigned to Custody Operations should be reviewed within six months after being assigned to Custody and again before their first post-probationary assignment.

**4.     Use of Force on Mentally Ill Prisoners and Other Special Needs Populations (expect to be completed by June 30, 2015 for Recommendations 4.1 through 4.5 and training completed by December 31, 2016 for Recommendations 4.6 through 4.9):**

4.1     The Department's Custody use of force policies should require a mental health professional to be on-scene to attempt to resolve the situation without force whenever there is a cell extraction or, to the extent possible, any other similar planned use of force.

4.2     The Department's Custody use of force policies should require supervisors investigating the use of force by Department members to interview any mental health professionals who witnessed the force incident and/or attempted to resolve the incident without force, about the members' use of force and the mental health professional's efforts to resolve the matter without the use of force.  With the consent of the mental health professional, the interview should be recorded on videotape or audiotape.

4.3     The Department's Custody use of force policies should provide that in situations involving an acutely psychotic or other severely mentally disabled inmate, following an initial burst of a chemical agent that has not produced compliance, the Department should discontinue the further use of chemical agents if the inmate is sufficiently mentally disabled that he or she cannot conform his or her behavior to commands.

4.4     The Department's Custody use of force policies should provide that in situations involving a mentally ill inmate who does not present an obvious danger to himself or herself or to anyone else, and who refuses to exit his or her cell without force, there should be a reasonable "cooling off" period after all other non-force attempts at

4

resolution have been tried and failed.  Following this "cooling off" period, either a mental health professional, Department supervisor, or watch commander should again try to gain compliance without the use of force.

4.5     The Department's Custody use of force policies should provide that whenever a planned use of force is precipitated by a medical or mental health provider's order (*e.g.*, a cell extraction following a psychiatrist's order that an inmate be moved for treatment purposes), the prescribing provider should be notified and allowed an opportunity to intervene in an effort to de-escalate the situation and to determine if the provider's order should remain in effect.  If the prescribing provider is unavailable, then another medical or mental health provider should be notified to carry out these duties.

4.6     The Department should provide a minimum of 32 hours of Custody-specific, scenario-based, skill development training to all Deputy Sheriffs assigned to the Men's Central Jail, the Twin Towers Correctional Facilities, or the Inmate Reception Center, or who are assigned to work with mentally ill inmates at the Century Regional Detention Facility (the "Deputies in the Designated Facilities") on Crisis Intervention and Conflict Resolution with eight (8) hours of refresher training every other year.

4.7     The Department should provide a minimum of eight (8) hours of custody specific, scenario based, skill development training on identifying and working with mentally ill inmates to all existing Custody personnel with a four (4) hour refresher course every other year.  For Deputies in the Designated Facilities, this training may be a part of the 32 to 40 hours of Crisis Intervention and Conflict Resolution training described above.

4.8     The Department should provide a minimum of eight (8) hours of custody specific, scenario-based, skill development training on identifying and working with mentally ill inmates to all new members as part of the Jail Operations Continuum .

4.9     The Department should provide a minimum of 32 hours of custody specific, scenario-based, skill development training in Crisis Intervention and Conflict Resolution to new Department members in the Academy or in Custody before they are assigned to any jail facilities.

4.10    Within six months following the completion of the implementation of Recommendations 4.5 through 4.9, the Department should complete an evaluation regarding the effectiveness of the Crisis Intervention and Conflict Resolution training and should submit a written report to the Board of Supervisors recommending whether or not the training should be extended to the remaining Deputies in Custody Operations and/or to Custody Assistants.

**5.     Data Tracking and Reporting of Force Incidents (expect to be completed by June 30, 2015):**

5.1     The Department should track the status of all investigations, reviews and evaluations of all Custody use of force incidents and allegations of force to ensure that investigations, reviews, and evaluations are completed appropriately and timely.  As soon

as practical, but no later than the end of the shift during which the use of force incident or allegation of force occurred, the supervisor or Internal Affairs investigator assigned to conduct the initial investigation should enter the use of force incident or the force allegation into a Department database with a summary description of the force incident or allegation and the Category of the force incident as it is known at the time. The database should be updated promptly to reflect any changes in the status of the investigation, review or evaluation and changes in the Category of the force incident.

5.2    Evaluations of force incidents by Unit Commanders should be reviewed as follows:

All Category 1 Force cases and Category 2 cases not that do not meet the criteria for a roll-out by the Custody Force Review Team should be reviewed by a least one Commander in Custody Operations;

All allegations of force should be reviewed by at least two Commanders in Custody Operations;

Category 2 Force cases that meet the criteria for a roll-out by the Custody Force Review Team should be reviewed by the Custody Force Review Committee; and

Category 3 Force cases should be reviewed by the Executive Force Review Committee.

5.3    The Department's Custody use of force policies should provide that any unexplained tactical decisions pertaining to uses of force or any discrepancies among witnesses and/or evidence should be referred by the reviewing Commander(s) or committee in writing back to the incident investigator for additional investigation and then reported back in writing to the reviewing Commander(s) or committee.

**6.    Inmate Grievances and Other Complaints of Excessive Force (expected to be completed by December 31, 2015):**

6.1    Inmate grievances and inmate requests should be reported on separate forms, whether on paper or electronically.

6.2    The Department must ensure that grievance forms are reasonably available to inmates at all times.

6.3    The inmate grievance form should have a prominent box that says, "Emergency Grievance" with boxes to check for "yes" or "no" and a space for a description of the emergency. When an inmate requests a grievance form for an emergency grievance, the inmate should be given the form immediately.

6.4    The Department's inmate grievance forms should include "use of force" as a specific category of "grievances against staff" for inmates to check to ensure that such grievances are brought to the Unit Commanders' attention and properly handled.

6.5    The Department's inmate grievance forms should include "retaliation" and "harassment" as specific categories of "grievances against staff" for inmates to check to ensure that such grievances are brought to the Unit Commanders' attention and properly handled.

6.6    The Department's inmate grievance forms should have a check box indicating whether the complaint was upheld or denied and a statement next to the "denied" box that the inmate has the right to appeal and how long he or she has to appeal.

6.7    The Custody Division Manual should provide that Department members should give all grievances marked "emergency" to a supervisor as soon as possible. Supervisors should review all emergency grievances as soon as possible to determine if the situation requires immediate action to protect the life or safety of the inmate and, if so, should immediately notify the Watch Commander/Shift Supervisor of the non-medical emergency. The Watch Commander/Shift Supervisor should immediately confirm that the non-medical emergency exists, take such action as is necessary to protect the inmate, and as soon as time and circumstances permit provide the inmate with a written response documenting what action was taken to address the emergency.

6.8    If the Department determines that a non-medical emergency does not exist, it should notify the inmate as soon as practical that the grievance will be handled as a non-emergency grievance and document why it was determined not to be an emergency.

6.9    All emergency grievances should be forwarded to the Inmate Grievance Coordinator along with information about the decision made and when the inmate was notified about that decision. The Inmate Grievance Coordinator should review the emergency grievance to determine if it was handled in accordance with policy and should notify the Unit Commander if it was not handled properly.

6.10    Grievances should be collected from the locked grievance boxes on each living unit no less frequently than once per day. The time of the collection and the person doing the collection should be recorded in the living unit log and in a separate grievance collection log maintained by the Inmate Grievance Coordinator. Grievances should be reviewed by the Department within 24 hours of the collection of the grievance.

6.11    The Custody Division Manual should provide that failing to provide an inmate with a grievance form when requested, failing to respond appropriately to a grievance, destroying or concealing grievances, attempting to intimidate an inmate from filing a grievance, and retaliating against an inmate who has filed a grievance, may each be a cause for disciplinary action.

6.12    All inmate grievances should be entered into and tracked in an inmate grievance database that reflects the nature and status of the grievance, and personnel responsible for the Department's handling of the grievance.

7

6.13    The Inmate Grievance Coordinator should regularly track the Department's handling of inmate grievances to ensure that the investigations are completed timely and reasonably, and that inmates are notified of the results of the investigations.

6.14    The Inmate Grievance Coordinator should provide a monthly report to Unit Commanders and senior management in Custody Operations of the status of inmate grievances, the timeliness of the Department's investigations of the grievances, responses to grievances and grievance appeals, and notifications to inmates of the results of the investigations and grievance appeals.

6.15    The Inmate Grievance Coordinator should analyze inmate grievances monthly to identify any problematic trends and should provide that analysis in a monthly report to Unit Commanders and senior management in Custody Operations.

6.16    The Department should establish a centralized unit with a sworn supervisor, custody assistants and civilian personnel to be responsible for collecting the inmate grievances and requests from inmates or from secured boxes; reviewing and categorizing the grievances and requests; forwarding them for investigation or handling; and responding to inmates. Department personnel should be co-located in the Twin Towers and other personnel should be co-located in the Pitchess Detention Center.

6.17    There should be a 30-day deadline for filing use of force grievances by inmates.

6.18    There should be no deadline for filing Prison Rape Elimination Act ("PREA") grievances by inmates

6.19    The Department should adhere to the requirements in Custody Division Manual 5-12/000.00 and 5-12/010.00 and respond to inmate grievances "within 15 calendar days after the submission of the complaint," absent exceptional circumstances, which must be documented.

6.20    Inmates should have 15 days from receipt of a denial of a grievance to file an appeal of the grievance; however, if the inmate receives the denial while in punitive segregation, the inmate should have 15 days after release from segregation to file the appeal.

**7.     Inmate Supervision, Staff Inmate Relations, and Communication with Prisoners (expected to be completed by June 30, 2015):**

**7**.1     Inmates who submit grievances should be advised that a Conflict Resolution Meeting under the Department's Conflict Resolution policy in 5-12/000.00 (Inmate Requests for Service and Complaints (Non-Medical/Non-Mental Health)) is voluntary for both the inmate and the involved personnel to address a grievance instead of the Department conducting a personnel investigation and making a finding to resolve the grievance. If the Conflict Resolution meeting is successful, the grievances should be

8

marked "closed through conflict resolution" in the grievance database and properly documented.

7.2     An inmate should be advised of the results of the Department's investigation of the inmate's grievance against personnel, but not any sanction imposed, within 10 days of the Department's adjudication of the grievance.

7.3     The Department should ensure that there are adequate avenues for constructive prisoner-staff communication, such as Town Hall meetings.

8.     **Retaliation Against Inmates (expected to be completed by June 30, 2015):**

8.1     The Department policies should prohibit personnel from retaliating against inmates.

8.2     The Department should combine the "Complaints of Retaliation" provisions in 5-12/000.00 and 5-12/010.00 into one section in the Custody Division Manual to ensure that there is a single, consistent policy on the handling of such grievances regardless of who receives the grievance and who is the subject of the grievance.

8.3     Unit Commanders' evaluations of investigations of inmate grievances or complaints that Department members used any level of force to retaliate against inmates should be reviewed by the Custody Force Review Committee to assess the correctness of the evaluations.

9.     **Security Practices (expected to be completed by June 30, 2015):**

9.1     The Department should conduct and document cell checks of inmates in general population cells as well as in segregation and protective custody units at least every 30 minutes on an irregular schedule. The Department should conduct and document cell checks of inmates in the high observation units and the forensic inpatient units at least every 15 minutes on an irregular schedule. All cell checks should be conducted by an officer at the cell front. Should the Department and/or the County reach an agreement with the United States Department of Justice regarding cell checks at the jails that provides for a schedule of checks in general population, segregation, and protective custody units, then those provisions will supersede this provision.

9.2     The Department's Custody use of force policies should provide that, following a use of force or interaction with a recalcitrant inmate, the staff member escorting an inmate to medical, holding or segregation should not be the same staff member involved in the confrontation or use of force unless there is no other staff member reasonably available to escort the inmate.

9.3     The Department's Custody use of force policies should provide that Department members have a duty to protect inmates and to take appropriate steps to intervene in inmate-on-inmate violence as soon as it is reasonably safe to do so.

9

**10.    Management Presence in Housing Units (expected to be completed by June 30, 2015):**

10.1    Senior managers from the rank of Unit Commanders and above should be required to periodically tour the jail facilities, including nights and weekends.

10.2    Housing units should document visits to jail facilities by Department managers (above the rank of Sergeant) in electronic records or visitor logs.

**11.    Management Review of Force Incidents and Data (expected to be completed by June 30, 2015):**

11.1    The Custody Force Rollout Team's involvement in reviewing the correctness of the Unit Commanders' evaluations of the force incidents should not delay the Department's investigation of force incidents.

**12.    Reviews and Investigations of Use of Force Incidents (expected to be completed by June 30, 2015):**

12.1    All custody Sergeants should receive an initial 16-hour block of training in conducting use of force investigations, reviewing use of force reports, and the Department's new protocols for conducting such investigations, and a two (2) hour refresher course every year.

12.2    Inmate witnesses to force incidents should be asked to be interviewed, and interviewed, away from other inmates.

12.3    No Department member involved in the use of force incident should be present for, or participate in, the request for interview or the interview itself absent exigent circumstances, which must be justified in the supervisors' subsequent reports.

12.4    Force investigations  should not be conducted by the direct supervisor of the Department members involved in the use of force incident if the supervisor directed, participated in, or planned the use of force.

12.5    Use of force investigation packages should have a standard order and format.

**13.    Disposition of Use of Force Reviews and Staff Discipline Issues (expected to be completed by June 30, 2015):**

13.1    The Department should have a firm policy of zero tolerance for acts of dishonesty or failure to report uses of force.  If the Department does not terminate a member who is found to have been dishonest, used excessive force, or violated PREA, the Department should document the reasons why the member was not terminated and, in addition to the discipline that is imposed, the Department should place the member on a

10

formal and adequate performance review program and closely monitor the member's performance.

13.2    All findings of dishonesty, excessive force, and PREA violations by Department members in Custody Operations, the punishment imposed by the Department, and the reasons why any member was not terminated for the acts of dishonesty, excessive force, or violation of PREA should be reported to the Office of Inspector General each quarter.

**14.    Criminal Referrals and External Reviews of Use of Force Incidents (expected by June 30, 2015):**

14.1    Prior to submission, all referrals of an inmate for criminal prosecution for assaulting a staff member, or related charges, arising from an incident involving the use of force by Department members, should be reviewed by a Unit Commander to ensure that the charges are not being brought to help justify the staff use of force.

14.2    The Department should timely forward to the District Attorney's office incidents of officer misconduct that may amount to criminal violations.

**15.    Documentation and Recording of Force Incidents (expected to be completed by June 30, 2015):**

15.1    The Department's Custody use of force policies should provide that every Department member who uses or assists in the use of Reportable Force, and every supervisor who directed that force be used, should be required to complete a separate and independent written report before going off duty, unless the Watch Commander/ Supervising Lieutenant determines that there are exigent circumstances, such as the Department member's physical or medical condition, that impair the Department member's ability to complete the report before going off duty, in which case the report should be completed as soon as possible and the reasons for the delay should be documented.

15.2    The Department's Custody use of force policies should provide that every Department member who witnesses the use of force by another Department member should be required to prepare an independent written report unless the Watch Commander/Supervising Lieutenant specifically designates which witnesses will write reports because there are a large number of Department members who witnessed the same incident.

15.3    The Department's Custody use of force policies should provide that a Department member who uses force should describe in his or her written report the force used by any other Department member in response to an inmate's actions during the incident as well as his or her own force.

15.4    The Department's Custody use of force policies should provide that a Department member using force or witnessing force should describe in his or her written

11

report any visible or apparent injuries to Department members, inmates or other persons involved in a use of force.

15.5    The Department's Custody use of force policies should provide that a Department member who wants to make any clarifications or changes after viewing a video of a force incident should be required to either prepare a supplemental report or specifically note any changes to the Department member's initial report that were made after viewing the video of the force incident.

15.6    The Department's Custody use of force policies should provide that, to the extent practical, Department members should be separated until they have completed their use of force reports and/or witness reports on use of force incidents.

15.7    Watch Commanders/Supervising Lieutenants and Unit Commanders should review Department members' force reports to ensure that they reflect each member's individual perceptions and recollections of the events and that they do not have common wording or phrasing that would suggest inappropriate collaboration on force reports.

**16.    Health Care Assessments and Documentation Following Force Incidents (expected to be completed by June 30, 2015):**

16.1    The Department should require a documented medical assessment of each inmate upon whom force is used as soon as practical after the force incident.

16.2    With reasonable accommodations for privacy, the Department should require supervisors investigating force incidents to photograph any injury, swelling or redness sustained by each Department member who asserts orally or in a written force report that the Department member was assaulted by an inmate or note the absence of any injury, swelling or redness in the force package.

16.3    Medical staff treating an injured inmate should be required to report to the Department any injuries related to a use of force or an allegation by the inmate of a use of force.

**17.    Use of Restraints (expected to be completed by June 30, 2015):**

17.1    Instead of the introductory paragraph in 5-03/130.00 (Medically Ordered Restraint Devices), the Custody Force Manual should have a separate section that sets forth the general principles governing the use of restraints as follows: (1) restraints are either security restraints or medically ordered restraints; (2) restraints should not be used to punish inmates; (3) restraint devices should only be used when there is a potential threat of physical harm, destruction of property, or escape, or to escort or transport inmates; (4) caution must be used to guard against the risk of medical distress; (5) the longer the restraint, the greater the risk; (6) restraints should never be placed on the head, nose, or neck of an inmate or in any other manner that may interfere with breathing or blood flow; (7) in-cell security restraints should not be used except in emergency circumstances and for the shortest period of time possible; (8) inmates should not be

12

restrained to fixed objects unless the object is designed for that purpose, and then only for the shortest period of time possible; (9) choke-hold type restraints, including carotid restraints, are prohibited absent life threatening or high risk assaultive situations where no other means of controlling the inmate is available; (10) it is the responsibility of Department members approving or applying restraints (other than restraints used to escort or transport inmates) to ensure that there is frequent, careful, and documented monitoring of the condition of the inmate(s) in restraints; and (11) medical assistance should be summoned immediately whenever an inmate appears to be experiencing medical distress or complains of difficulty breathing.

17.2 The Department should combine and conform all provisions related to restraints on pregnant inmates into one section in the Custody Division Manual (by combining the *Restraining Pregnant Inmates* section under 5-03/130.00 (Medically Ordered Restraint Devices) and Section 5-03/115 (Pregnant Inmates)).

17.3 The Department's Custody use of force policies should provide that a medical professional should examine an inmate as soon as the inmate is placed in the Safety Chair with a use of force, or if the inmate struggles against the chair restraints, and should perform a vitals check every hour while the inmate is in the Safety Chair.

17.4 The Department's Custody use of force policies should provide that Department members should check at least every 20 minutes on the welfare of any inmate in restraints other than restraints used in escorting or transporting inmates, and verify and document that the inmate is not in undue pain and that the restraints are not creating injury or obvious medical problem.

17.5 The Department's Custody use of force policies should provide that Department members should avoid, to the extent possible under the circumstances, placing their weight on an inmate's back or shoulders in a way that impairs the inmate's breathing. Once an inmate is controlled, he or she should be placed on his or her side to minimize breathing problems and the risk of medical distress or positional asphyxia. Inmates carried by members, or by gurney or stretcher, should be placed on their side if practical.

17.6 The Department's Custody use of force policies should provide that any inmate who is subjected to a multi-point restraint or who is otherwise restrained in a supine position for an extended period of time should be observed continuously so that if the inmate is on his or her back, the inmate does not vomit and asphyxiate, and if on his or her stomach does not stop breathing because of his or her body weight compressing the chest. Medical staff should be called to the scene at the first sign of such distress.

17.7 The Department's Custody use of force policies should provide that multi-point restraints may only be ordered where an inmate poses an immediate threat of serious harm to himself or others and, in the absence of exigent circumstances, such restraints may only be ordered by a medical or mental health professional.

13

17.8    The Department's Custody use of force policies should provide that multi-point restraints may only be used until the inmate no longer poses such an immediate threat of serious harm as determined by a medical or mental health professional, and the continued use of the multi-point restraint should be assessed by a medical or mental health professional at least every hour to determine if the inmate continues to pose an immediate threat of serious harm to himself or others.

17.9    The Department's Custody use of force policies should provide that the decision to use a multi-point restraint may be made by a shift supervisor if a medical or mental health professional is not available and there is no alternative such as a safety chair, in which case the supervisor should be responsible for monitoring the inmate's condition and determining whether to release the inmate from the multi-point restraint.

17.10    The Department's Custody use of force policies should provide that medication may not be used solely for security purposes.

**18.    Adequate Staffing and Staff Rotations (expected to be completed by June 30, 2015):**

18.1    The Department should  maintain its Custody-wide rotation policies and rotate Department members at least as often as provided in those policies.

18.2    The Department should audit semi-annually each unit's compliance with its rotation policies.

**19.    Early Warning System Related to Use of Force (expected to be completed by December 31, 2015):**

19.1    The Department should develop a formal Early Warning System to identify potentially problematic Department members based upon objective criteria such as number of force incidents, inmate grievances, allegations of misconduct, performance reviews, and policy violations.  This system should be in addition to subjective assessments and personnel reviews by management.

19.2    The Compliance Lieutenants in each facility should review monthly the reports generated by the Department's Early Warning System to identify potentially problematic Department members and promptly notify the Department member's Unit Commander and the Assistant Sheriff for Custody Operations in writing.

19.3    Unit Commanders should, in consultation with the appropriate Chief, determine whether a non-disciplinary performance mentoring program is appropriate for Department members identified through the Early Warning System and, if so, place the Department member in the program with specific performance metrics.  If the Department decides not to place a Department member identified through the Early Warning System on a performance mentoring program, it should document the reasons for the decision.

14

**20.      Protocols for Planned Uses of Force (expected to be completed by June 30, 2015):**

20.1      The Custody Force Manual should indicate that there are two types of force: Reactive Force and Planned Force, and it should eliminate the definitions of rescue force, directed force, and medical assistance force, which do not reflect the Department's force policies or provide guidance in the use of force

20.2      Reactive Force should be defined as force that is used in response to an immediate threat to the safety of any Department member or inmate, the immediate threat of the destruction of a substantial amount of property, or the immediate threat of an escape, and when there is no time to plan or wait for assistance.

20.3      Planned Force should be defined to be all force other than Reactive Force. With respect to Planned Force, the Department's policies should require, time and circumstances permitting, that: (1) a medical staff person be on scene or, if impractical or unsafe, on stand by; (2) the event be video recorded; (3) a supervisor be on scene to direct the Use of Force; and (4) Shift Supervisor approval for the Use of Force.

**21.      Organizational Culture Related to Use of Force:**

21.1      The Department's policies should provide that the Department will not transfer or assign a staff member to Custody as a formal or informal sanction for problem deputies.

15

# EXHIBIT C

**NOTICE OF PROPOSED CLASS ACTION SETTLEMENT OF CASE ALLEGING PATTERN OF VIOLENCE AGAINST INMATES BY SHERIFF'S PERSONNEL IN MEN'S CENTRAL JAIL, TWIN TOWERS CORRECTIONAL FACILITY AND INMATE RECEPTION CENTER**

This notice is about a proposed settlement of a class action lawsuit against the Los Angeles County Sheriff ("the Sheriff" or "Defendant") involving alleged violations of the Eighth and Fourteenth Amendments to the United States Constitution.

**ABOUT THE LAWSUIT:**

In 2012, two inmates who were housed in the Los Angeles County jail facilities in downtown Los Angeles  filed this lawsuit against the Los Angeles County Sheriff under the United States Constitution alleging that inmates in Men's Central Jail, Twin Towers Correctional Facility, and the Inmate Reception Center ("the Downtown Jail Complex") were being subjected to a pattern of unnecessary and excessive force by Los Angeles Sheriff's Department ("the Department") personnel, and that the Sheriff was aware of the problem and had not taken reasonable steps to prevent the excessive force. Specifically, they alleged, among other things, that the Sheriff had not put in place an adequate use of force policy, training on use of force was inadequate, investigations of use of force incidents were cursory, use of force incidents were not adequately documented and tracked, and discipline for Department personnel who used excessive force and supervisors who condoned it was non-existent or overly lenient.  The Sheriff denies any and all allegations of wrongdoing.  The parties have reached a settlement and this notice provides details of that settlement.

**THE PARTIES:**

Current or former inmates Alex Rosas and Jonathan Goodwin ("Plaintiffs") represent a class of inmates certified by the Court, which is defined as "all inmates, now and in the future, in the custody of the Los Angeles County Sheriff's Department in the Jail Complex in downtown Los Angeles" ("the Plaintiff Class").  The Defendant in the case is Sheriff Jim McDonnell, in his official capacity only.  If you are a present or future inmate in Men's Central Jail, Twin Towers Correctional Facility, or the Inmate Reception Center, you are a member of the Plaintiff Class in this case.

**ABOUT THE SETTLEMENT:**

The following is only a summary of the provisions of the settlement.  The written agreement between the parties has the full terms of the proposed settlement that was preliminarily approved by the Court.  There are instructions below if you want more information about this settlement.

The settlement is for injunctive relief only, which means that the parties are seeking a Court order requiring the LASD to remedy the alleged pattern of excessive force at the Downtown Jail Complex.  This lawsuit has never included a claim for money damages, and the settlement does not involve money damages.  This means that the settlement

1

does **not** entitle you or any member of the Plaintiff Class to a cash payment.  It also means that the settlement does **not** in any way limit you from bringing a claim for damages, if you have such a claim apart from this settlement.

**Appointment of Expert Panel and Creation of, and Monitoring of Compliance with, Remedial Plan**

The settlement provides that the Court will appoint three experts, Richard Drooyan, former Chief Counsel of the Citizens' Commission on Jail Violence, Robert Houston, former Director of the Nebraska Department of Corrections, and Jeffrey Schwartz, an independent corrections consultant ("the Expert Panel"), to develop a plan to address and remedy the alleged pattern of excessive force ("the Remedial Plan").  Defendant agrees to implement all the provisions in the Remedial Plan within various time frames after final approval by the Court.  The settlement also provides that the Expert Panel will monitor the Department's implementation of, and continued compliance with, the terms of the Remedial Plan and make periodic reports to the Court on its findings.

**The Contents of the Remedial Plan**

The Remedial Plan addresses 21 major areas:  (1) Leadership, Administration and Management; (2) Use of Force Policies and Practices; (3) Training and Professional Development Related to Use of Force; (4) Use of Force on Mentally Ill Prisoners and Other Special Needs Populations; (5) Data Tracking and Reporting of Force Incidents; (6) Inmate Grievances and Other Complaints of Excessive Force; (7) Inmate Supervision, Staff Inmate Relations, and Communication with Prisoners; (8) Retaliation Against Inmates; (9) Security Practices; (10) Management Presence in Housing Units; (11) Management Review of Force Incidents and Data; (12) Reviews and Investigations of Use of Force Incidents; (13) Disposition of Use of Force Reviews and Staff Discipline Issues; (14) Criminal Referrals and External Reviews of Use of Force Incidents; (15) Documentation and Recording of Force Incidents; (16) Health Care Assessments and Documentation Following Force Incidents; (17) Use of Restraints; (18) Adequate Staffing and Staff Rotations; (19) Early Warning System Related to Use of Force; (20) Protocols for Planned Uses of Force; (21) Organizational Culture Related to Use of Force.

The Remedial Plan contains more than 100 specific provisions that the Department must implement.  A number of the provisions of the Plan are set forth below in summary fashion.

- The Sheriff should be personally engaged in the management of the Downtown Jail Complex by the Department's jail facilities, and the Sheriff should regularly and adequately monitor the Department's use of force policies and practices;
- The Department will revise and re-organize its use of force policies for Custody Operations and add policies including ones restricting the use of chemical agents and kicking inmates, and requiring that inmates' medical records be checked whenever possible before using Tasers or chemical agents;

2

- Deputies assigned to the Downtown Jail Complex must receive, among other training, a one-time, eight-hour use of force policy training course and a yearly two-hour refresher course; a one-time, four-hour course in ethics, professionalism and treating inmates with respect and a two-hour refresher course every other year;
- The use of force manual shall include, and the Department shall abide by, a requirement that a mental health professional be present whenever there is a planned cell extraction of an inmate with mental illness, and all custody personnel receive custody specific, scenario based, skill development training on identifying and working with mentally ill inmates;
- The Department will track the status of all investigations, reviews and evaluations of all Custody use of force incidents and allegations of force to ensure that investigations, reviews, and evaluations are completed appropriately and timely;
- The Department must ensure that grievance/complaint forms are reasonably available to all inmates at all times, all grievances/complaints are properly tracked in a database, and that the Custody Division Manual includes a provision that failure to provide a grievance form, destroying a grievance form and retaliating against an inmate for filing a grievance form may be a cause for discipline;
- The Department's policies must prohibit personnel from retaliating against inmates;
- The Department's policies must provide that following a use of force incident, involved staff may not escort an inmate to medical, or segregation unless no other Department personnel is reasonably available;
- Department personnel with a rank of Unit Commander or above must periodically tour the jail facilities;
- All custody Sergeants should receive an initial 16-hour block of training in conducting use of force investigations, reviewing use of force reports, and the Department's new protocols for conducting such investigations, and a two-hour refresher course every year;
- The Department must have a firm policy of zero tolerance for acts of dishonesty or failure to report uses of force. If the Department does not terminate a member who is found to have been dishonest or used excessive force, the Department must document the reasons why the member was not terminated;
- The Department must arrange for a documented medical assessment of each inmate upon whom force is used as soon as practical after the force incident;
- The Department must reorganize its policies on the use of restraints in the jails and add safeguards to ensure that they are used only in appropriate circumstances and in a way that minimizes risk of injury or medical distress;
- The Department must maintain its Custody-wide rotation policies and rotate Department personnel at least as often as provided in those policies;
- The Department must develop and maintain a formal Early Warning System to identify potentially problematic LASD personnel based upon objective criteria such as number of force incidents, inmate grievances, allegations of misconduct, performance reviews, and policy violations; and

3

- The Department will not transfer or assign a staff member to Custody as a formal or informal sanction for problem deputies.

## IF YOU WANT MORE DETAILS:

There is a group of lawyers, **Rosas Plaintiffs' Class Counsel**, representing Plaintiffs and the class in this case. You can get a list of these lawyers, a copy of the settlement agreement, and a copy of the experts' remedial plan from the following websites: www.aclusocal.org/rosas; www.aclu.org/[to be added] and www.lasd.org.

For their work in this case, Defendant has agreed to pay **Rosas Plaintiffs' Class Counsel** $950,000 in attorney's fees, subject to approval by the Court.

**To ask questions about the settlement of this case you can:**

(1) Send a letter to **Rosas Plaintiffs' Class Counsel**, c/o ACLU of Southern California, 1313 West 8th Street, Los Angeles, CA 90017.

(2) Send an email to rosaslawsuit@aclusocal.org.

## IF YOU DO NOT OBJECT TO THIS SETTLEMENT:

You do not have to do anything.

## IF YOU OBJECT TO THIS SETTLEMENT:

You must mail a statement explaining why you object to the settlement. The deadline is _____, 2015. Please be sure to include your name, address (if available), telephone number (if available), your signature, a reference to this settlement or the case (*Rosas v. McDonnell*), the portions of the settlement to which you object, and the reasons you object. Mail your objection to:

Rosas Plaintiffs' Class Counsel
c/o ACLU of So. Cal
1313 W. 8th Street
Los Angeles, CA 90017

Rosas Plaintiffs' Class Counsel will provide your objection to the federal judge assigned to this matter, the Honorable Dean D. Pregerson, and to Defendant's Counsel. You must mail your objection by the above deadline; you cannot object to this settlement after the deadline has passed. Even if you object, you do not have the ability to "opt out" of this settlement if the Court approves it.

4

**HEARING REGARDING FINAL APPROVAL OF THIS SETTLEMENT:**

The Court will also hold a hearing about this settlement on _____.  The hearing date could change.  Please check any of the websites listed above close to the date of the hearing for information about any possible change in the hearing date.

The Court gets to decide whether to allow members of the Plaintiff Class who timely served objections to this settlement to speak at the hearing.

The address for the court is:

U.S. Federal District Court, Courtroom 3
312 North Spring Street,
Los Angeles, CA 90012

You can get more details about the hearing from the places listed above.

Para recibir una copia en español, puede solicitar una copia por medio de los miembros de LASD o puede ir a los sitios web enumerados anteriormente.