PETER J. ELIASBERG (SB# 189110)
peliasberg@aclu-sc.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Phone:  (213) 977-9500
Fax:    (213) 977-5299

JOHN S. DURRANT (SB# 217345)
johndurrant@paulhastings.com
ELIZABETH C. MUELLER
(SB# 278283)
bethmueller@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071-2228
Phone:  (213) 683-6000
Fax:    (213) 627-0705

MARGARET WINTER (*pro hac vice*)
mwinter@npp-aclu.org
ERIC BALABAN (*pro hac vice*)
ebalaban@npp-aclu.org
NATIONAL PRISON PROJECT OF
THE AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St., NW
Washington, D.C. 20005
Phone:  (202) 393-4930
Fax:    (202) 393-4931

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN
GOODWIN, on behalf of themselves
and of those similarly situated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JIM MCDONNELL, Sheriff of Los Angeles County, in his official capacity,<br><br>Defendant. | CASE NO. CV 12-00428 DDP<br><br>**PLAINTIFFS' OPPOSITION TO ALADS'S MOTION TO INTERVENE**<br><br>**[DECLARATION OF JOHN DURRANT, DECLARATION OF ESTHER LIM, AND OBJECTIONS TO EVIDENCE FILED AND SERVED CONCURRENTLY HEREWITH]**<br><br>Date:      March 9, 2015<br>Time:      10:00 a.m.<br><br>Honorable Dean D. Pregerson<br>Ctrm:  3 |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ......................................................................................1

II.  FACTUAL BACKGROUND.....................................................................3

III. ARGUMENT.............................................................................................7

A.   This Court Should Deny the Intervenors' Motion as Untimely............7

1.   The Stage of the Proceeding Weighs Against Intervention........8

2.   The Prejudice to the Parties Weighs Against Intervention.......11

3.   The Absence of any Adequate Reason for the Nearly Three Year Delay Weighs Against Intervention.......................15

B.   Stricter Standard for Permissive Intervention ....................................22

C.   ALADS Has Missed an Opportunity to Break with the Past..............22

IV.  CONCLUSION........................................................................................24

PLS.' OPP'N TO ALADS'S
MOT. TO INTERVENE

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaniz v. Tillie Lewis Foods,*
    572 F.2d 657 (9th Cir. 1978) ................................................................. 14, 16, 19

*Aleut Corp. v. Tyonek Native Corp.,*
    725 F.2d 527 (9th Cir. 1984) ..................................................................9, 11

*C.S. v. Cal. Dep't of Educ.,*
    No. 08-CV-0226 W (AJB), 2008 WL 962159
    (S.D. Cal. Apr. 7, 2008).................................................................................16

*Cal. Dep't of Toxic Substances Control v. Commercial Realty*
    *Projects,* 309 F.3d 1113 (9th Cir. 2002)........................................... *passim*

*Choike v. Slippery Rock Univ.,*
    297 F. App'x 138 (3d Cir. 2008) ...............................................................9

*D'Amato v. Deutsche Bank,*
    236 F.3d 78 (2d Cir. 2001)............................................................................9

*Empire Blue Cross & Blue Shield v. Janet Greeson's A Place For Us,*
    *Inc.,* 62 F.3d 1217 (9th Cir. 1995) ...........................................................12

*Garza v. Cnty. of Los Angeles,*
    918 F.2d 763 (9th Cir. 1990) ......................................................................15

*High Sierra Hikers Ass'n v. U.S. Dep't of Interior,*
    No. C 09-04621 RS, 2012 WL 1949153 (N.D. Cal. May 29, 2012)...................16

*Hufnagle v. Rino Int'l Corp.,*
    No. CV 10-08695 DDP VBKX, 2012 WL 6553743
    (C.D. Cal. Dec. 14, 2012) ........................................................ 9, 12, 13, 19

*League of United Latin American Citizens v. Wilson,*
    131 F.3d 1297 (9th Cir. 1997) .................................................................8, 16, 22

*Morris v. Tate,*
    24 F. App'x 520 (6th Cir. 2001) ..................................................................9

*NAACP v. New York,*
    413 U.S. 345 (1973)............................................................... 7, 17, 21, 22

*Newdow v. Cong. of the U.S.,*
    No. CIV. S-05-2339 FCD PAN, 2006 WL 47307
    (E.D. Cal. Jan. 6, 2006)................................................................................16

-ii-

PLS.' OPP'N TO ALADS'
MOT. TO INTERVENE

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Officers For Justice v. Civil Service Comm'n,*
934 F.2d 1092 (9th Cir. 1991) .......................................................................17

*Orange Cnty. v. Air Cal.,*
799 F.2d 535 (9th Cir. 1986) ...............................................................8, 12, 20

*Peruta v. Cnty. of San Diego,*
771 F.3d 570 (9th Cir. 2014) ..............................................................15, 16, 17

*Prete v. Bradbury,*
438 F.3d 949 (9th Cir. 2006) .......................................................................16

*Reeves v. Wilkes,*
754 F.2d 965 (11th Cir. 1985) ......................................................................21

*Smith v. Marsh,*
194 F.3d 1045 (9th Cir. 1999) ...............................................................8, 11, 16

*Stotts v. Memphis Fire Dep't,*
679 F.2d 579 (6th Cir. 1982) .......................................................................21

*U.S. v. California,*
538 Fed. Appx. 759 (9th Cir. 2013).................................................................15

*United States v. Alisal Water Corp.,*
370 F.3d 915 (9th Cir. 2004) ..........................................................14, 15, 18, 21

*United States v. Oregon,*
745 F.2d 550 (9th Cir. 1984) ......................................................................14, 15

*United States v. Oregon,*
913 F.2d 576 (9th Cir. 1990) ...............................................................7, 12, 18

*United States v. Washington,*
86 F.3d 1499 (9th Cir. 1996) ...............................................................7, 11, 15

**RULES**

Fed. R. Civ. P.
24(a) ...................................................................................................7
24(b)(1) ...............................................................................................7

Fed. R. Evid. 801...........................................................................................23

Local Rule 7-3 ..............................................................................................9

PLS.' OPP'N TO ALADS'
MOT. TO INTERVENE

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**OTHER AUTHORITIES**

L.A. Times (Pub. Jan. 18, 2012), *available at*
    http://latimesblogs.latimes.com/lanow/2012/01/lasd-brass-failed-to-
    root-out-deputy-abuse-a/ ...................................................................................3

L.A. Times (Pub. Jan. 19, 2012), *available at*
    http://articles.latimes.com/print/2012/jan/19/local/la-me-jails-aclu-
    20120119 ............................................................................................................3

L.A. Weekly (Pub. Jan. 18, 2012), *available at*
    http://www.laweekly.com/news/aclu-sues-sheriff-lee-baca-and-
    undersheriff-paul-tanaka-over-long-standing-deputy-violence-
    against-inmates-2390808 ...................................................................................3

Los Angeles Daily News (Pub. Jan. 18, 2012), *available at*
    www.dailynews.com/general-news/20120118/aclu-files-class-
    action-lawsuit-against-la-county-sheriff-lee-baca-top ......................................3

Patt Morison, The ACLU files suit against the L.A. County Sherriff's
    Department (Pub. Jan. 19, 2012), *available at*
    http://www.scpr.org/programs/patt-
    morrison/2012/01/19/22187/the-aclu-charges-the-la-country-
    sheriffs-departmen/ ............................................................................................3

Statement of Proceedings for the Regular Meeting of the Board of
    Supervisors, Dec. 16, 2014 at p. 57, *available at*
    http://portal.lacounty.gov/wps/portal/sop/ .......................................................6

## I.    **INTRODUCTION**

ALADS's[1] Motion to Intervene ("Motion") is untimely and should be denied. More than *three years ago*, Plaintiffs initiated this lawsuit with a widely publicized Class Action Complaint.  The Complaint sought broad changes to policies and procedures regarding the use of force in Men's Central Jail, Twin Towers Correctional Facility, and the Inmate Reception Center (the "Jails").  More than *two years ago*, Plaintiffs and Defendant (the "Parties") informed the Court that they were engaged in settlement negotiations.  Again, these settlement negotiations were no secret:  a cursory review of this Court's docket reveals numerous entries showing that settlement talks were ongoing.  *Now*, after years of difficult negotiations and after the Parties have finally reached a settlement agreement (the "Settlement") regarding appropriate injunctive relief, ALADS comes to this Court seeking to upset the Settlement.  Plaintiffs dispute that ALADS had any right to be heard regarding the subjects of the Settlement.  But, even if ALADS had such a right, it should have sought to intervene long ago.  Clear Ninth Circuit authority requires the denial of motions to intervene under circumstances such as these.  The Court should follow that authority and deny the Motion.

As the Court is well aware, this lawsuit is poised on the brink of complete resolution:  the Parties have signed a Settlement, agreed to an implementation plan, received preliminary approval from the Court, and posted notice of the Settlement in the Jails and on the websites of the ACLU of Southern California and the Los Angeles County Sheriff's Department ("LASD").  The Parties now await only the fairness hearing and the Court's final approval.  Getting the matter to this point required arduous efforts not only by the Parties and their counsel, but also by this Court.  Permitting intervention would potentially nullify those efforts and delay relief to Plaintiffs.  Given the advanced stage of the proceedings and the clear

---

[1] "ALADS" is the Association for Los Angeles Deputy Sheriffs.  According to its website, it is a union that represents peace officer employees of the County of Los Angeles.

prejudice to the existing Parties that would result from intervention, ALADS must provide a compelling justification for its delay.

ALADS has not done so. Instead, it offers a justification that relies upon an erroneous legal standard. ALADS does not deny that it has known for years about the existence of this lawsuit, the allegations in the Complaint, and the remedies sought by Plaintiffs. Rather, ALADS suggests that it could stand idly on the sidelines while the Parties litigated and then negotiated a settlement, and nevertheless intervene three years later when it supposedly learned that Defendant had not represented its interests in a manner to ALADS's liking. ALADS claims that it only realized that the County of Los Angeles (the "County") had "given away the farm," when it read about the Settlement in a December 16, 2014 editorial in the *Los Angeles Times*.

Even if true, that does not matter. The question with respect to timeliness is simply when ALADS knew, or should have known, that its interests *potentially* could be impacted by the lawsuit (or a negotiated resolution of the lawsuit) – *not* when it supposedly became clear that LASD had not represented such interests in a manner agreeable to ALADS. The lengthy complaints on file in this case explicitly described the types of relief sought. The ACLU was not shy about publicizing the lawsuit or the relief it sought through the lawsuit. As might be expected, the press took note of the high profile lawsuit and wrote extensively about it. That was enough to put ALADS on notice.

Nevertheless, ALADS waited months and then years, declining to intervene even when settlement discussions were underway. ALADS would have this Court accept the absurd: that ALADS need only intervene when it decides that it does not like the terms of a settlement. The law provides ALADS no such veto power. Settlements would be nearly impossible to reach if courts allowed intervention after the completion of settlement negotiations. ALADS's delay is inexcusable under the law and fatal to its Motion.

-2-

## II.    FACTUAL BACKGROUND

More than three years ago, on January 18, 2012, Plaintiffs Alex Rosas and Jonathan Goodwin filed this lawsuit on behalf of a putative class of all current and future members of the Jails. (Dkt. 1.) The Plaintiffs' goal was to remedy "the pattern of excessive force and physical abuse in [the] jails." (*Id.*)

To this end, and as ALADS acknowledges in its Motion, the Complaint explicitly requests:

a)    "adequate policy on the use of force";

b)    "adequate investigation of all use of force incidents and inmate-on-inmate violence, with investigations performed by personnel unconnected to the attack under investigation";

c)    "appropriate training in use of force and prevention of inmate-on-inmate violence";

d)    "appropriate discipline of staff members found to be involved in improper use of force incidences . . ."; and

e)    "appropriate selection and supervision of command and uniformed custodial staff."

(*Id.* at Prayer for Relief, ¶¶ 2-3.) The Complaint received a considerable amount of press, including in the *Los Angeles Times*, the same paper that published the December 16, 2014 editorial that, allegedly, finally put ALADS on notice that this lawsuit could impact its rights.[2]

---

[2] *See* Declaration of John Durrant (Durrant Decl.) at ¶ 3(A) – (G), Exs. B – H (Chris Vogel, ACLU Sues Sheriff Lee Baca & Undersheriff Paul Tanaka Over Long-Standing Violence Against Inmates, *L.A. Weekly*, (Pub. Jan. 18, 2012), *available at* http://www.laweekly.com/news/aclu-sues-sheriff-lee-baca-and-undersheriff-paul-tanaka-over-long-standing-deputy-violence-against-inmates-2390808 (discussing complaint and example allegation); Christina Villacorte, ACLU files class action lawsuit against L.A. County Sheriff Lee Baca, top brass, *Los Angeles Daily News*, (Pub. Jan. 18, 2012), *available at* www.dailynews.com/ general-news/20120118/aclu-files-class-action-lawsuit-against-la-county-sheriff-lee-baca-top brass (detailing allegations underlying complaint); Robert Faturechi and Jack Leonard, LASD brass failed to root out deputy abuse, ACLU suit alleges, *L.A. Times*, (Pub. Jan. 18, 2012), *available at* http://latimesblogs.latimes.com/ lanow/2012/01/lasd-brass-failed-to-root-out-deputy-abuse-a/ (discussing allegations underlying complaint); Jack Leonard and Robert Faturechi, ACLU sues L.A. County Sheriff's Department, *L.A. Times*, (Pub. Jan. 19, 2012), *available at* http://articles.latimes.com/print/2012/jan/ 19/local/la-me-jails-aclu-20120119 (explaining lawsuit); Patt Morison, The ACLU files suit against the L.A. County Sherriff's Department, (Pub. Jan. 19, 2012), *available at* http://www.scpr.org/programs/patt-morrison/2012/01/19/22187/the-aclu-charges-the-la-country-

-3-                                              PLS.' OPP'N TO ALADS'S
                                                 MOT. TO INTERVENE

Motion practice commenced in February 2012, and continued through June 2012. Defendant moved to dismiss, which the Court granted in part and denied in part. (Dkt. 19, 26 & 54.) Defendant moved to disqualify the ACLU as counsel, and the Court denied the motion. (Dkt. 29 & 55.) Plaintiffs moved for class certification, which the Court granted. (Dkt. 20 & 54.) Between July 11, 2012 and February 14, 2014, the Parties engaged in voluminous discovery and briefing on discovery issues, with Plaintiffs initially propounding 145 requests for production and 20 interrogatories before agreeing in February 2013 to narrow these requests to facilitate a cost-efficient and timely settlement. (Durrant Decl. ¶ 5.) Defendant ultimately produced (and counsel for Plaintiffs reviewed) nearly 100,000 pages of documents and video recordings to Plaintiffs. (Durrant Decl. ¶ 5, Ex. I (Feb. 14, 2014 correspondence from T. Kim regarding Defendant's 20th production of documents).)

Settlement discussions commenced on June 29, 2012, when Defendant requested a settlement conference. (*See* Dkt. 59; *see also* Dkt. 60 & 61.) Plaintiffs filed a response to Defendant's request on July 3, 2012, which contained a copy of a detailed settlement framework that Plaintiffs had presented to Defendant on April 24, 2012 and Defendant's June 13, 2012 response. (Dkt. 62-1 at 4-5, 7-8.) On July 6, 2012, Defendant filed a reply in support of his request for a settlement conference, noting that "the Sheriff's Department is genuinely interested in pursuing settlement discussions." (Dkt. 63 at 2.) On August 10, 2012, the Court scheduled a settlement conference for August 31, 2012. (Dkt. 68.) Following a continuance, the settlement conference was held on October 12, 2012. (Dkt. 74 & 81.) In the years that followed, the Parties continued their settlement negotiations with the assistance of the Court, including multiple settlement conferences before

---

sheriffs-departmen/ (explaining claims and relief sought in lawsuit); Ashley Gordon, ACLU Files Lawsuit Against Sheriff Baca Over Inmate Abuse, NBC Los Angeles, (Pub. Jan 19, 2012) (on file with author) (discussing lawsuit)).

PLS.' OPP'N TO ALADS'S MOT. TO INTERVENE

the Court.  In total, there were *more than 20 public filings and orders* on the Court's docket explicitly referring to the Parties' settlement negotiations.[3]

Multiple docket entries from several months prior to the December 16, 2014 announcement of the Settlement made clear the potentially broad scope of settlement.  On May 22, 2014, the Court entered a minute order stating that the Parties discussed "settlement of this entire matter" and that "[t]he parties agree that a panel of experts, comprised of Richard Drooyan, Robert Houston, and Jeffrey Schwartz, shall be retained to prepare an Action Plan relating to certain policies and practices employed in the Los Angeles County Jails." (Dkt. 101)[4]  The Court further instructed:

> The parties will submit a list of areas of concern to the Panel no later than Wednesday, May 28, 2014. *The Panel has been granted broad authority*, including the authority to address subjects not raised by the Parties and/or to conclude that further action is not required on certain issues.

(*Id.* (emphasis added).)  Finally, the Court required the Parties to "circulate a proposed Settlement Agreement memorializing this understanding by May 29, 2014." (*Id.*)  On September 19, 2014, the Court entered a minute order setting deadlines for the finalization of the settlement agreement and for the expert panel to

---

[3] *See, e.g.*, May 21, 2013 (Dkt. 88; stipulation indicating settlement talks are ongoing); September 30, 2013 (Dkt. 93; Order setting settlement conference for October 23, 2013); October 23, 2013 (Dkt. 95; Court minutes noting settlement conference was conducted and scheduling further conference for January 9, 2014); January 9, 2014 (Dkt. 96 & 97; Court minutes noting settlement conference was conducted and scheduling further conference for February 28, 2014); February 28, 2014 (Dkt. 98; Court minutes noting settlement conference was conducted); May 15, 2014 (Dkt. 99; Minute Order scheduling a "status conference re: settlement" for May 22, 2014); May 22, 2014 (Dkt. 100; entering minutes of a settlement conference and scheduling additional "status conference re: settlement" for June 12, 2014; Dkt. 101, as discussed above); June 12, 2014 (Dkt. 102; Court minutes noting settlement conference was conducted and scheduling further conference for July 10, 2014); July 9, 2014 (Dkt. 103; Court minutes changing time for July 10, 2014 settlement conference); July 10-11, 2014 (Dkt. 104 & 105, Court minutes noting settlement conference was conducted).

[4] The Action Plan ultimately was called the "Implementation Plan."  Solely for purposes of this Motion, Plaintiffs continue to refer to it as the Action Plan.

complete the Action Plan (the latter of which the Court subsequently continued). (Dkt. 107 & 108.)

With this guidance from the Court, the Parties were able to execute the Settlement in late September 2014, followed by the expert panel's finalization of an Action Plan in October 2014. Defendant then submitted the Settlement and Action Plan to the Los Angeles County Board of Supervisors ("Board of Supervisors") for approval. On at least three occasions, the Board of Supervisors' agendas on the County's website indicated that the Board was to discuss this litigation. (Durrant Decl. ¶ 8(A)-(C), Exs. Q (Nov. 12, 2014 agenda), R (Dec. 9, 2014 agenda), & S (Dec. 16, 2014 agenda).) The Board of Supervisors approved the Settlement on December 16, 2014.[5] The Settlement required the Parties to file a joint stipulation requesting that the Court grant preliminary approval of the Settlement within 21 days of the Board of Supervisor's approval – *i.e.*, by January 6, 2015.

As ALADS indicates, the *Los Angeles Times* published an editorial about the Settlement on December 16, 2014, the latest installment of its ongoing coverage of the litigation. On December 19, 2014, ALADS wrote to counsel for the Parties, indicating its intent to intervene in the litigation.[6] The Parties met and conferred with ALADS on December 30, 2014 and January 5, 2015. (Durrant Decl. ¶ 10.) On December 30, 2014, Peter Eliasberg of the ACLU sent to ALADS's counsel an email link to a publicly available website containing the Settlement Agreement, because ALADS had claimed not to have seen the Agreement. (*Id.*, Ex. U.)

_____

[5] (Durrant Decl. ¶ 8(C), Ex. S (Statement of Proceedings for the Regular Meeting of the Board of Supervisors, Dec. 16, 2014 at p. 57, *available at* http://portal.lacounty.gov/wps/portal/sop/ (discussing Rosas litigation and providing link to settlement agreement)).

[6] ALADS also indicates that it contacted and subsequently met with the LASD about proposed policy changes in connection with this lawsuit. (Motion at 7-8; Shinee Decl. ¶¶ 24, 27.) The Parties had no involvement in these communications or conferences, but disputes any suggestion that "no one from the Sheriff's Department had been involved in any of the settlement agreement or implementation agreement negotiations." (Motion at 8.) To the contrary, the Sheriff's Department personnel were involved in numerous settlement discussions and meetings with the Parties. (Durrant Decl. ¶ 6.) In fact, LASD officials attended settlement conferences before the Court. (*Id.*)

-6-

In accordance with the terms of the Settlement, the Parties moved for preliminary approval on January 6, 2015.

On January 23, 2015, the Court granted preliminary approval of the Settlement, setting in motion a series of rapidly upcoming deadlines, including for notice to the government and the class and for class member objections, culminating in a fairness hearing on April 13, 2015 (which the Parties jointly stipulated to continue until April 20, 2015). (Dkt. 111 & 112.) Defendant already provided the required notice to the government on January 15, 2015 and posted the class member notices in the jails, in accordance with the Court-ordered deadlines. (Durrant Decl. ¶ 12; Declaration of Esther Lim ¶¶ 3, 6, 12, 15.)

On January 30, 2015, ALADS filed its Motion.

## III. ARGUMENT

### A. This Court Should Deny the Intervenors' Motion as Untimely.

As a threshold matter on any motion to intervene, whether sought as a matter of right or by permission, the application must be timely. Fed. R. Civ. P. 24(a), (b)(1). Both the United States Supreme Court and the Ninth Circuit have made clear that "[i]f [the motion] is untimely, intervention must be denied." *NAACP v. New York*, 413 U.S. 345, 366 (1973); *United States v. Oregon ("Oregon I")*, 913 F.2d 576, 588 (9th Cir. 1990) (finding that "[t]imeliness is the threshold requirement for intervention," and that if the court finds that the motion to intervene is untimely, it need not reach any of the remaining elements of Rule 24).

To determine whether a motion to intervene is timely, this Court evaluates three factors: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *United States v. Washington ("Washington")*, 86 F.3d 1499, 1503 (9th Cir. 1996).

All three factors weigh against timeliness, and, therefore, weigh against intervention.

### 1.    The Stage of the Proceeding Weighs Against Intervention.

The first factor is the stage of the proceeding, which requires the court to evaluate the degree to which the substantive and procedural issues have been settled. *Smith v. Marsh*, 194 F.3d 1045, 1050-51 (9th Cir. 1999).

*League of United Latin American Citizens v. Wilson ("LULAC")*, 131 F.3d 1297, 1302 (9th Cir. 1997), is instructive. There, a foundation sought to intervene 27 months after the filing of a lawsuit challenging California's Proposition 187. *LULAC*, 131 F. 3d at 1301.[7] Addressing the stage of the proceeding factor, the Ninth Circuit found that "a lot of water had already passed underneath [the] litigation bridge," including pleadings, provisional class certification, motion practice, and discovery. *Id.* at 1303. The Ninth Circuit concluded that "the fact that the district court has substantively—and substantially—engaged the issues in this case weighs heavily against allowing intervention . . ." *Id.* Here, ALADS seeks to intervene more than 36 months after Plaintiffs filed their Complaint, after all of the litigation stages at issue in *LULAC* (namely, pleadings, class certification and other motion practice, and discovery), and, importantly, following the Parties' Settlement. At this juncture, the only remaining step is for the Parties to obtain final approval of the Settlement from this Court.

Although there is no dispute that this case has been litigated thoroughly, the Parties' Settlement has special significance. The Ninth Circuit repeatedly has held that attempts to intervene following settlement are untimely. *See, e.g., Orange Cnty. v. Air Cal.*, 799 F.2d 535, 538 (9th Cir. 1986) (affirming denial of motion for intervention and holding that, although the Court had not yet approved the stipulated judgment, "the fact that Irvine waited until after all the parties had come

---

[7] Proposition 187 sought to impose various measures in connection with the treatment of illegal aliens. *LULAC*, 131 F. 3d at 1300.

PLS.' OPP'N TO ALADS'S
MOT. TO INTERVENE

to an agreement after five years of litigation should nevertheless weigh heavily against Irvine"); *Aleut Corp. v. Tyonek Native Corp.*, 725 F.2d 527, 530 (9th Cir. 1984) (ruling that district court did not abuse its discretion in denying motion to intervene, because court "could properly conclude that intervention on the eve of settlement following several years of litigation was not timely").[8] *See also Hufnagle v. Rino Int'l Corp.*, No. CV 10-08695 DDP VBKX, 2012 WL 6553743, at *2 (C.D. Cal. Dec. 14, 2012) (Pregerson, J.) (holding that the stage of proceeding factor weighed against finding a motion to intervene timely, because Derivative Plaintiffs brought the application "at the eleventh hour, a mere two days prior to a final settlement approval hearing that is the product of over two years of litigation and extensive settlement negotiations").[9]

Making matters worse, ALADS purportedly knew it wanted to intervene by December 16, 2014. (*See* Motion at 2, 5-7.) Yet instead of seeking shortened time to file the Motion, or filing this Motion on January 16, 2015 (the earliest filing date possible after the January 5, 2015 meet and confer under Local Rule 7-3), it instead delayed its filing by *two weeks* and only filed this Motion on January 30, 2015. If it had filed the Motion promptly, it at least would have put the Motion before the Court prior to its granting of preliminary approval of the Settlement and triggering of deadlines leading to final approval. Instead, the Court granted preliminary approval, and the final approval clock began ticking while ALADS delayed.

---

[8] *See also Cal. Dep't of Toxic Substances Control v. Commercial Realty Projects*, 309 F.3d 1113, 1119 (9th Cir. 2002) ("In the present case, Cities did not move to intervene until after the parties settled, more than six years after litigation commenced, and on the same day DTSC moved for judicial approval of the consent decree. Intervention at such a late stage weighs heavily against Cities.").).

[9] Other jurisdictions are in accord. *See, e.g., Choike v. Slippery Rock Univ.*, 297 F. App'x 138, 141 (3d Cir. 2008) (affirming denial of student-athlete organization's intervention motion as untimely after parties reached "a tentative settlement" that had been submitted to court for preliminary approval); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 81, 87 (2d Cir. 2001) (affirming denial of intervention motion in Nazi reparations case filed three days before settlement fairness hearing); *Morris v. Tate*, 24 F. App'x 520, 532 (6th Cir. 2001) (affirming denial of county's post-settlement intervention motion as untimely in prisoners' civil rights class action).

-9-   PLS.' OPP'N TO ALADS'S MOT. TO INTERVENE

Rather than trying to explain its own further delay, ALADS disappointingly tries to shift the blame to the Parties, arguing that they moved for preliminary approval on January 6, 2015, to "undercut" this Motion. (Motion at 3.) Specifically, ALADS notes that Parties' counsel indicated during the December 30, 2014 conference that they had not yet filed the signed Settlement or obtained Court approval, and then proceeded to file for preliminary approval on January 6, 2014, one day after the second meet and confer. (Motion at 3.) ALADS's assertion is particularly misguided because *the Parties' Settlement required them to move for preliminary approval by January 6, 2015.* (Durrant Decl. ¶ 7.) At this juncture, one would hope ALADS's counsel to be familiar with the terms of the Settlement. Not only has the Settlement been publicly available at all relevant times on the websites of LASD and ACLU, but, when ALADS's counsel revealed during the December 30 conference that he had neglected even to read the supposedly prejudicial Settlement, Plaintiffs' counsel sent ALADS's counsel a link to it. (Durrant Decl. ¶ 10, Ex. U.)

Moreover, it remains unclear why even the filing of the motion for preliminary approval did not prompt ALADS to get its Motion on file; it still waited for weeks – weeks when it knew or should have known that the Court could rule on preliminary approval. Indeed, if anyone is to be accused of gamesmanship here, it is ALADS; the timing suggests it may have been waiting for the Court's preliminary approval order before moving to intervene, recognizing that its Motion could delay the final approval timeline.

Because this case has progressed substantially to settlement and this Court has substantively engaged the issues, the stage of the proceeding factor weighs overwhelmingly in favor of denying intervention.

## 2.   The Prejudice to the Parties Weighs Against Intervention.

The Court next must consider the presence or absence of prejudice to the *existing* parties in connection with the proposed intervention. *Smith*, 194 F.3d at 1051. Courts have found prejudice in cases where intervention may "prolong the litigation," "threaten the parties' settlement," and "delay relief." *See, e.g., Cal. Dep't of Toxic Substances Control.*, 309 F.3d at 1119 (finding that district court did not abuse its discretion in finding prejudice, where intervention "would complicate the issues and upset the delicate balance achieved by the [consent decree]."). Here, intervention would lead to *all* of these harmful results.

First, intervention will prolong the litigation. *Washington*, 86 F.3d at 1503 (finding that district court did not abuse its discretion in finding prejudice, where intervention "would complicate the issues and prolong the litigation."); *Smith*, 194 F.3d at 1051 (affirming denial of motion to intervene where intervention would lead to the introduction of "additional issues at such a late stage in the proceedings [and that this] would cause undue delay"). This case is near its conclusion. Even assuming that ALADS has a protectable interest in this case (which it does not), a timely motion for intervention in early 2012 when the case was filed (or even late 2012 when the docket revealed the Parties had begun settlement negotiations) could have been entertained without necessarily extending proceedings. At this juncture, however, delay following intervention would be unavoidable, and such delay is grounds for prejudice.

Second, intervention would disrupt the Parties' delicate and complex Settlement, by requiring the Parties to reopen negotiations and revisit resolved issues. *Aleut Corp.*, 725 F.2d at 530 (no abuse of discretion where district court found that intervention on the eve of settlement "would have prejudiced the rights of the [other parties] impermissibly."). Doing so would be especially problematic here, where the Parties reached a Settlement only after two and a half years of

PLS.' OPP'N TO ALADS'S
MOT. TO INTERVENE

negotiations, requiring numerous lengthy settlement conferences before the Court. Participating in these conferences were multiple stakeholders, including counsel for Plaintiffs, Defendant, and the County, representatives of the LASD, and members of the expert panel. (Durrant Decl. ¶ 6(A)-(E), Exs. J – N.) The settlement process also involved a lengthy effort to finalize the Action Plan by the experts, including considering comments and concerns submitted by the Parties to draft versions of the Action Plan. The final result was a true settlement – one that is unlikely to hold should ALADS intervene.

The Ninth Circuit repeatedly has upheld district court decisions to deny intervention efforts that could put settlement efforts at risk. *See, e.g., Empire Blue Cross & Blue Shield v. Janet Greeson's A Place For Us, Inc.*, 62 F.3d 1217, 1220 (9th Cir. 1995) (affirming denial of motion to intervene because "modification could prejudice the parties" and possibly "'unravel' the original settlement"); *Oregon I*, 913 F.2d at 588 (holding that it was not an abuse of discretion for district court to find that "intervening at this stage . . . would seriously prejudice all the parties to the suit because the plan is complex and delicately balanced"); *Orange Cnty.*, 799 F.2d at 538 (affirming denial of motion to intervene where "[t]he district court felt that to allow Irvine to intervene 'at this late date' would be the undoing of five years of protracted litigation finally resolved by the Stipulated Judgment" as intervention would "clearly" prejudice the parties involved); *Cal. Dep't of Toxic Substances Control*, 309 F.3d at 1119 (affirming denial of motion to intervene; finding the "district court … did not abuse its discretion in finding prejudice to the parties, since intervention by Cities would complicate the issues and upset the delicate balance achieved by the Oil Consent Decree.").[10]

_____

[10] *See also Hufnagle*, 2012 WL 6553743, at *2 (denying motion to intervene and holding that "[t]he possibility that intervention at this late date may disrupt a long discussed, otherwise agreed-upon settlement also bears upon the prejudice to the parties to this suit").

ALADS contends that it is "not interested in undoing either of the agreements reached by the parties," and, rather, that it wants to "participat[e] in the presently on-going discussions and negotiations between the appointed panel of monitors and the County" regarding, among other things "specific modifications of existing policies, disciplinary penalties, . . . and possibly other mandatory subjects of bargaining." (Motion at 9.) ALADS either misunderstands, or misrepresents, the process here. The Settlement was signed and the Action Plan is in place; there are no current negotiations ongoing with respect to the Action Plan. The Action Plan itself requires LASD to make certain changes, and in some cases provides guidelines, but it does not dictate the precise details of such changes.[11] If all that ALADS wants to do is provide its opinion to LASD as LASD carries out the Action Plan, there is nothing preventing it from doing so; ALADS does not need to intervene to discuss with LASD its view of the best way to satisfy the terms of the Action Plan.[12] But, if what ALADS actually wants is to alter the Action Plan, permitting intervention for this purpose will threaten serious prejudice to the Parties. The Motion suggests that the latter is ALADS's true goal. For example, ALADS criticizes the Action Plan for "plan[ning] to explain [its] significant policy changes in only one initial 8 hour training class and 2 hours of annual on-going training," dismissing this as "minimal training." (Motion at 14.) First, ALADS misrepresents the Action Plan, which clearly provides these training amounts are a required "minimum" – not a maximum. (Durrant Decl. ¶ 7, Ex. P.) Second, this

---

[11] For example, Section 10.1 provides that senior managers from the rank of Unit Commanders and above "should be required to periodically tour the jail facilities, including nights and weekends." (Durrant Decl. ¶ 7, Ex. P.) It is for LASD to determine the appropriate frequency of and schedule for these tours. (*See also, e.g., id.* at Section 16.3 (indicating that medical staff treating an injured inmate should be required to report injuries related to use of force or an allegation of a use of force, but leaving to LASD the task of devising a reporting system).)

[12] ALADS contends that County counsel indicated that ALADS could not participate in this process unless it intervened in the litigation. (Motion at 9.) Even if true, this is nonsensical; implementation of the Action Plan is not a one-time negotiation, but rather an ongoing process, one that may benefit from the input of a number of stakeholders. There is nothing to stop ALADS, or any other interested group, from expressing its opinions to LASD.

-13-

critique shows that ALADS is attacking the Action Plan on substantive grounds, not simply the way in which it will be carried out.  If ALADS successfully intervenes, it will try to dismantle the Action Plan, and the Settlement could very well collapse as a result, to the clear prejudice of the Parties.

Third, intervention unquestionably would delay relief to Plaintiffs and the Plaintiff Class, who already have waited three years for such relief, during the pendency of this case.  Courts have been especially likely to reject intervention under similar circumstances. *See, e.g., United States v. Alisal Water Corp. ("Alisal")*, 370 F.3d 915, 923 (9th Cir. 2004) (denying intervention that "could complicate and delay long standing efforts … to ensure safe drinking water on behalf of the public"); *Alaniz v. Tillie Lewis Foods*, 572 F.2d 657, 659 (9th Cir. 1978) ("In evaluating the second factor, courts have emphasized the seriousness of the prejudice which results when relief from long-standing inequities is delayed.  Here, the [consent] decree is already being fulfilled; to countermand it now would create havoc and postpone the needed relief.").

ALADS' arguments on prejudice are without merit.

First, ALADS cites *United States v. Oregon ("Oregon II")*, 745 F.2d 550, 553 (9th Cir. 1984), where Idaho successfully intervened in a fishing rights case, contending that the Ninth Circuit there "found . . . insufficient prejudice" to preclude intervention. (Motion at 8.) *Oregon II* simply is inapposite. There, the existing parties had reached an agreement and plan, which the district court had approved; following the notice of two such parties that they intended to withdraw from or renegotiate the agreement, the district court found "changed circumstances" and ordered a new round of negotiations. *Id.* at 552. Thus, unlike here, *Oregon II* involved intervention at a time when the litigation actually was changing course, and two parties had committed to renegotiating the agreement. Furthermore, the *Oregon II* court found that the parties did "not suggest that their problems are materially different now" from when the interveners could have first intervened and

PLS.' OPP'N TO ALADS'S
MOT. TO INTERVENE

that there was not prejudice from the "passage of time." *Id.* at 553. Here, in contrast, events have advanced dramatically from when the Complaint was filed in 2012, with the Parties having litigated the case, negotiated a settlement over two years, and established an Action Plan. That there was no prejudice in *Oregon II* does not mean there is no prejudice here.

Second, ALADS tries to argue that denying intervention would prejudice ALADS members. Even if true, such prejudice is irrelevant to the question of timeliness. Ninth Circuit authority, including *Oregon II* (the case relied upon by ALADS), makes clear that it is prejudice to the *parties* that matters. *Id.* at 552 ("The question of timeliness here thus turns upon the issue of prejudice to the *existing parties* . . .") (emphasis added). *Accord, Garza v. Cnty. of Los Angeles,* 918 F.2d 763, 777 (9th Cir. 1990) (citing *Oregon II,* 745 F.2d at 552). Indeed, the proper way for ALADS to have avoided prejudice to its interests (if any) was to file a timely motion for intervention. Instead, it delayed for years only to complain when it did not like the negotiated terms of the settlement.

Here, any intervention by ALADS would prolong the litigation, disrupt a delicate settlement, and delay relief to the Plaintiff Class. There is no question that the Parties will be prejudiced if the Court were to permit intervention.

### 3. The Absence of any Adequate Reason for the Nearly Three Year Delay Weighs Against Intervention.

Finally, the Court must consider the moving party's explanation for its delay in seeking intervention. *Washington,* 86 F.3d at 1503. "Under . . . longstanding [Ninth Circuit] precedent, a party seeking to intervene must act as soon as he 'knows or has reason to know that his interests might be adversely affected by the outcome of the litigation.'" *Peruta v. Cnty. of San Diego,* 771 F.3d 570, 572 (9th Cir. 2014) (quoting *Oregon I,* 913 F.2d at 589). *Accord Alisal,* 370 F.3d at 923; *Cal. Dep't of Toxic Substances Control,* 309 F.3d at 1120; *U.S. v. California,* 538

Fed. Appx. 759, 760-61 (9th Cir. 2013). Although the length of the delay is not determinative, "any substantial lapse of time weighs heavily against intervention" and a person aiming to intervene years after litigation commences "fights an uphill battle." *LULAC*, 131 F.3d at 1302 (citations omitted).[13]

ALADS offers no adequate explanation why it has delayed so long before intervening. While acknowledging that its General Counsel knew of the lawsuit by mid-2012 (Shinee Decl. ¶ 11), ALADS contends that it was not required to intervene until it knew or should have known that Defendant would not represent its interests, and that this point did not occur until ALADS learned of the Settlement in the December 16, 2014 *Los Angeles Times* editorial. The editorial, ALADS suggests, evidenced "the County's intention to completely re-write" various policies and procedures "which directly effect [sic] . . . ALADS members." (Motion at 5.) ALADS offers several unavailing reasons as to why it did not know about the multiyear settlement negotiation process, including ongoing LASD force investigations involving ALADS members, intentional exclusion of the LASD from the settlement process, and Defendant's purported failure to provide allegedly required notice to ALADS regarding potential changes to the terms and conditions of work for ALADS members.

As a threshold issue, ALADS misstates the standard. As the Ninth Circuit recently confirmed in *Peruta*, ALADS was required to intervene as soon as it

---

[13] *See, e.g., Smith*, 194 F.3d at 1052-53 (affirming denial of intervention motion filed 15 months after complaint); *LULAC*, 131 F.3d at 1301, 1308 (affirming denial of intervention motion filed 27 months after complaints); *Alaniz*, 572 F.2d at 658-59 (affirming denial of intervention motion filed two and a half years after complaint and 17 days after consent decree became effective); *High Sierra Hikers Ass'n v. U.S. Dep't of Interior*, No. C 09-04621 RS, 2012 WL 1949153, at *1-2 (N.D. Cal. May 29, 2012) (denying intervention motion filed two and half years after complaint and "only a month prior to the hearing on remedies"). *Cf. Prete v. Bradbury*, 438 F.3d 949, 954 (9th Cir. 2006) (agreeing with district court that intervention motion filed six days after complaint timely but found granting motion was in error on other grounds); *C.S. v. Cal. Dep't of Educ.*, No. 08-CV-0226 W (AJB), 2008 WL 962159, at *3 (S.D. Cal. Apr. 7, 2008) (ruling that an intervention motion filed four weeks after complaint was timely); *Newdow v. Cong. of the U.S.*, No. CIV. S-05-2339 FCD PAN, 2006 WL 47307, at *1-2 (E.D. Cal. Jan. 6, 2006) (granting intervention motion filed eleven days after complaint).

believed that its interests *might be* adversely impacted by the case.[14] ALADS should have been aware that it might take the position that its interests could be adversely affected by the outcome of this litigation as soon as the Complaint was filed, on January 18, 2012. As ALADS acknowledges in its Motion, the Prayer for Relief in the Complaint requests broad-ranging injunctive relief to remedy the pervasive problems in the Jails and explicitly references proposed changes that would affect deputies such as revised force policies, trainings, investigations, and discipline. (Motion at 1-2; *see also* Dkt. 1 (Compl.) at 2-3.)

Counsel for ALADS on this Motion, who also serves as General Counsel for ALADS, admits that he knew of the lawsuit, but – incredibly – contends that he did not read the publicly-available Complaint until after the publication of the December 16, 2014 editorial. He waited three years to read the Complaint, notwithstanding significant press coverage of the lawsuit and its allegations (including in the *Los Angeles Times*, the paper where the editorial appeared) and even after learning that multiple ALADS members were involved in use of force investigations related to incidents detailed in the Complaint. (Shinee Decl. ¶ 23.) ALADS simply cannot credibly claim that it was not aware, or had no reason to be aware, that the lawsuit might implicate its interests. Indeed, the very fact that ALADS suggests that it did not have to intervene until it became aware that Defendant might not represent its interests is a *clear admission* that ALADS knew it had a potential interest in the case. *Peruta*, 771 F.3d at 573 ("If the movants originally thought that Sheriff Gore adequately protected their interests, they must

---

[14] ALADS cites *Officers For Justice v. Civil Service Comm'n*, 934 F.2d 1092 (9th Cir. 1991) for the proposition that a party does not need to intervene until it should have been aware that its "interests would no longer be protected adequately by the parties." *Id.* at 1095 (citations and quotations omitted). As *Peruta* makes clear, the standard currently applicable in the Ninth Circuit requires a party to intervene as soon as it believes the outcome of the litigation could impact its interests. *Peruta*, 771 F.3d at 572. The *Peruta* rule makes sense; by providing an objective test regarding actual or constructive knowledge concerning the potential impact of a matter, *Peruta* provides a clear rule by which a court can determine "[t]imeliness ... from *all the circumstances*." *NAACP*, 413 U.S. at 366 (1973) (emphasis added).

have 'know[n] that [their] interests might be adversely affected by the outcome of the litigation.' *Oregon*, 913 F.2d at 589. The movants do not deny that they have long been aware of this case.").

Further, even if ALADS had no obligation to intervene until it learned that Defendant might not represent its interests, it is unclear why ALADS assumes that its interests in this lawsuit *ever* were aligned with those of Defendant, such that it could wait at all once the complaint had been filed. *See Alisal*, 370 F.3d at 923 (holding that filing of third amended complaint put intervenor on constructive notice of United States' potentially adverse interest and the need to intervene) (citing *Oregon I*, 913 F.2d at 589). The primary reason for ALADS's existence is to represent the interests of its members in negotiations and other matters with LASD – negotiations that presumably are hotly contested on certain issues as is typical of labor negotiations. In fact, ALADS's General Counsel discusses some of these proceedings in his declaration supporting the Motion. (Shinee Decl. ¶ 5).

Regardless, ALADS still should have intervened as soon as Defendant requested a settlement conference, which occurred in June 2012. Given the scope of the relief sought in the complaint, ALADS should have been aware that the Parties might reach a resolution that would require LASD to alter its "force policies, disciplinary policies, reporting requirements, and discipline and complaint tracking procedures," which are exactly the changes ALADS contends will affect its members' conditions of employment. (Motion at 5.) ALADS suggests that it did not know about the settlement negotiations or, at least, did not realize how comprehensive the Settlement would be. (*See, e.g.*, Motion at 6 (implying that Defendant "settl[ed] the lawsuit for, apparently, everything the Plaintiffs sought by way of remedy.").) ALADS's arguments fail.

First, ALADS *should* have known about the settlement negotiations. This lawsuit is unlike any other against LASD. It is and always has been a high-profile challenge to LASD policies and practices on use of force, led by a major civil rights

public interest organization and a major international law firm, that sought systemic equitable relief. Surely, if there was one lawsuit for ALADS to pay attention to, it was this one. ALADS's General Counsel admits he has known of the lawsuit since its inception. (Shinee Decl. ¶ 11.) Had he looked at the docket, there could be no confusion that settlement negotiations were taking place. More than 20 docket entries and several orders prior to December 16, 2014 refer to "settlement." ALADS claims to have been taken by surprise by the December 16, 2014 editorial, but the broad-ranging nature of the Settlement, the finalization of that Settlement, the engagement of the expert panel, and the development of the Action Plan were all publicly disclosed on the docket. (*See, e.g.*, Dkt. 101, 107 & 108.)

Second, ALADS's claimed surprise about scope of the actual Settlement is not an acceptable excuse for delayed intervention. Even if ALADS's interests were aligned with Defendant's at some point (which Plaintiffs dispute), once settlement negotiations commenced, ALADS should have realized that Defendant would agree to at least *some* policy changes with which it might well disagree. The Ninth Circuit has made clear that potential intervenors bear the risk when they wait until a case is settled before moving to intervene. *See, e.g.*, *Alaniz*, 572 F.2d at 659 ("The crux of appellants' argument is that they did not know the settlement decree would be to their detriment. But surely they knew the risks. To protect their interests, appellants should have joined the negotiations before the suit was settled."); *Cal. Dep't of Toxic Substances Control*, 309 F.3d at 1120 ("While Cities were not certain that the consent decree would be adverse to their interests, they had reason to know that negotiations might produce a settlement decree to their detriment. . . ." (internal citations omitted)); *Hufnagle*, 2012 WL 6553743, at *1 (non-party did not have an adequate reason for delayed motion to intervene, because they had notice of "the substance of the settlement proposal" and "the nature of the assets in issue

in th[e] case" due to court filings).[15] ALADS had no right to wait until it saw the terms of the Settlement before intervening.

Third, ALADS's efforts to explain why it was not aware of settlement proceedings or their scope do not succeed. ALADS suggests that the ongoing force investigations into Complaint allegations involving ALADS members led it to believe that Defendant still was actively litigating the lawsuit. But, again, the issue is when ALADS knew its interests potentially could have been impacted by the case; investigation of ALADS members in connection with allegations at issue in this Complaint should have been a clear sign (as if there were not enough already) that the lawsuit might implicate ALADS's interests. Even if it were relevant when Defendant decided to consider settlement, it is unclear why ALADS thinks LASD force investigations – which LASD was obligated to conduct once it learned of the allegations, regardless of the lawsuit – would be any reflection on the progress of the court case.

ALADS next contends that the Parties intentionally excluded the LASD from settlement negotiations. (Motion at 8.) This claim is simply false. LASD officials were actively involved in settlement negotiations at every step of the process; indeed, members of the LASD attended settlement conferences presided over by Judge Pregerson, provided comments on the Settlement and Action Plan prior to finalization, and discussed proposed changes to extraction policies and related issues with the Parties' counsel.[16] In any event, ALADS's claim also is irrelevant;

---

[15] *See also Orange Cnty.*, 799 F.2d at 538 ("Irvine should have contemplated that due to the serious existing facility constraints at JWA, a likely result of the negotiations would be an agreement to look to other facilities for help, including El Toro. In order to protect itself against this eventuality, Irvine should have intervened sooner.").

[16] (*See, e.g.*, Durrant Decl. ¶ 6(A)-(E), Exs. J (Oct. 13, 2014 email from R. Drooyan of the expert panel to T. McDonald of the LASD, among others, thanking the LASD and Plaintiffs' counsel "for your constructive suggestions and the cooperation we received"); K (Oct. 1, 2014 email from T. McDonald of the LASD providing comments on initial draft of Action Plan); L (May 29, 2014 and June 5, 2014 emails attaching draft settlement agreement to T. McDonald and E. Parra of the LASD); M (March 21, 2014 email attaching proposed revisions to extraction policies to C. Guyovich, S. Walker, S. Smith, V. Trujillo, C. Porlier, A. Peck, J. Dempsey, and V. Allende of the LASD); N (Jan. 9, 2014 email regarding scheduling a meeting to discuss proposed revisions

ALADS should have known about the lawsuit and the settlement proceedings from the Complaint and the docket, regardless of whether or not LASD participated in the settlement process (which it in fact did).

ALADS also alleges that it did not know about the Settlement because, despite being obligated to notify ALADS regarding changes to terms and conditions of work (which it contends are implicated by the Settlement), Defendant failed to provide such required notice. The argument fails, because ALADS is conflating two entirely distinct issues: whether ALADS should have been aware of the lawsuit and its settlement posture, and whether Defendant failed to meet a purported notice requirement. For timeliness, only the first question is at issue: Should ALADS have been aware of the lawsuit and its settlement posture? The answer is unavoidably "Yes." The cases make clear that media coverage and court filings are more than sufficient to put a proposed intervenor on notice. *See, e.g., NAACP*, 413 U.S. at 366 ("The court could reasonably have concluded that appellants knew or should have known of the pendency of the action because of an informative February article in the *New York Times* discussing the controversial aspect of the suit"); *Alisal*, 370 F.3d at 923 (filing of third amended complaint put intervenor on constructive notice need to intervene).[17] Defendant will address the second question in its concurrently filed opposition.

Additionally, as discussed in Section III.A, above, ALADS offers no justification for its additional delay in filing this Motion, following its meet and confer with the Parties – a further delay that appears to be the product of apathy,

_____

to extraction policies to C. Guyovich, P. Pietrantoni, S. Walker, D. Ellison, E. Parra, T. McDonald, S. Smith, and C. Monteagudo of the LASD).)

[17] *See also, e.g., Stotts v. Memphis Fire Dep't*, 679 F.2d 579 (6th Cir. 1982) (discussing whether potential intervenors were aware of a lawsuit and noting that "[s]everal newspaper articles published in the Memphis area apprised the proposed intervenors of the Stotts action months before the 1980 Decree was announced."); *Reeves v. Wilkes*, 754 F.2d 965 (11th Cir. 1985) (addressing whether would-be intervenors knew or should of known of potential interest in case; finding, among other things, that local newspapers "provided continuous coverage of the case's development").

PLS.' OPP'N TO ALADS'S
                                                                MOT. TO INTERVENE

tactical choices, or some combination of the two. Even if the Court were to conclude that ALADS has explained adequately why it did not move to intervene until the December 16, 2014 *Los Angeles Times* editorial, it still should conclude the Motion is untimely because of the additional two-week delay between when it could have filed its motion and when it finally did file. *See NAACP*, 413 U.S. at 366-68 (affirming denial of motion to intervene, where proposed intervenor waited two weeks between time it learned of lawsuit, which had "reached a critical stage", and when it moved to intervene). This delay alone is sufficient basis to deny the Motion, given that ALADS knew how far the case had advanced by the time it claimed it became aware of the scope of the Settlement. *Id.*

As ALADS either knew or should have known that the lawsuit (or, at minimum, the Parties' Settlement) might implicate its interests, it was required to seek intervention years ago. Its unreasonable delay renders the Motion untimely.

**B.    Stricter Standard for Permissive Intervention.**

This Motion is untimely, by any standard. However, should the Court find this Motion to be timely for purposes of intervention by right, it must apply a stricter standard for the permissive intervention inquiry. *LULAC*, 131 F.3d 1297, 1308 ("In the context of permissive intervention, however, we analyze the timeliness element more strictly than we do with intervention as of right." (citing *Oregon*, 745 F.2d at 552 (9th Cir.1984))). [18]

**C.    ALADS Has Missed an Opportunity to Break with the Past.**

Finally, as an aside, it is unfortunate that ALADS – which purports to represent all LASD deputies – included in its Motion claims that conditions in the Jails are not really all that bad, that there is no systemic problem of violence in the jails, and that the inmates complaining of abuse are nearly all liars. (*See, e.g.*,

---

[18] This Opposition leaves no question that the Motion is untimely and must be denied. The Motion also fails to establish any of the other grounds for intervention of right or permissive intervention, as Defendant will explain in his separately-filed opposition. Plaintiffs preserve all arguments with respect to these additional grounds for denial.

PLS.' OPP'N TO ALADS'S MOT. TO INTERVENE

Motion at 6, 9; Shinee Decl. ¶¶ 18-19.) While such contentions are irrelevant to the merits of the Motion,[19] they are nonetheless troubling.

In making these claims, ALADS seems oblivious to the events of the past few years: the findings of the Citizen's Commission on Jail Violence;[20] the resignation of key LASD officials; the successful federal prosecutions of LASD deputies; numerous adverse civil judgments regarding use of force by deputies against inmates; and scores of news articles and rising public opinion critical of the LASD.

Apart from filing a facially untimely motion, ALADS has missed a historic opportunity to stand against the problems of the past and with the efforts to reform. It has once again recited the shopworn and discredited excuses made regularly by Sheriff Baca's LASD and ignored extensive evidence of inappropriate use of force by deputies. And, once again, ALADS stood in the way of reforms that would empower and reward those deputies who joined the LASD with a sincere desire to help their communities and to uphold the Constitution.

The assertions in the Motion are, unfortunately, consistent with a 2012 report by ALADS, which the Citizens Commission found similarly disturbing:

> The Commission is troubled by the recent report of . . . ALADS, which indicates that the deputies feel, as a result of the Sheriff's recent reforms, that they have "lost control of the jails." The implicit suggestion that these deputies believe they must use force to show inmates who is "running the jails" reflects a cultural mindset that can impede meaningful and lasting reform.

(Durrant Decl. ¶ 1, Ex. A (Report of Citizens Commission on Jail Violence) at 5.)

---

[19] ALADS's claims regarding the underlying allegations are not supported by competent evidence. Rather, Mr. Shinee offers statements that are at least double hearsay – the statements of unnamed third parties regarding the supposed findings of unidentified investigations. (Shinee Decl. ¶ 18.) Fed. R. Evid. 801, *et seq.*

[20] (Durrant Decl. ¶ 2, Ex. A (Report of Citizens Commission on Jail Violence) at 1 ("There has been a persistent pattern of unreasonable force in the Jails that dates back many years.").)

-23-

Indeed, by the approach it takes in its Motion, ALADS has only underscored the need for systemic, court-enforced change in the Jails.  LASD and its deputies cannot police themselves.

## IV.    CONCLUSION

For the foregoing reasons, ALADS's Motion is defective on the ground that it is untimely.  Plaintiffs respectfully respect that the Court deny the Motion for lack of timeliness, as well as for failure to meet any of the other requirements of Rule 24, as addressed in the County's concurrently filed opposition to this Motion.

Dated:  February 17, 2015                    Respectfully Submitted,


ACLU FOUNDATION OF
SOUTHERN CALIFORNIA

By:_____ /s/ PETER ELIASBERG_____
                        PETER ELIASBERG


NATIONAL PRISON PROJECT OF THE
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

By:_____ /s/ MARGARET WINTER_____
                        MARGARET WINTER


PAUL HASTINGS LLP

By:_____ /s/ JOHN DURRANT_____
                        JOHN DURRANT

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated

PLS.' OPP'N TO ALADS'S
                                        MOT. TO INTERVENE

## CERTIFICATE OF SERVICE

I, John S. Durrant, hereby certify that, on February 17, 2015, the foregoing was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the NEF, and paper copies will be sent to those indicated as non-registered participants.

/s/   John S. Durrant
John S. Durrant