# EXHIBIT A

# PART 1



# Report of the Citizens' Commission on Jail Violence

September 2012

http://ccjv.lacounty.gov

September 28, 2012

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, CA  90012

Dear Supervisors:

We are pleased to submit this Report of the Citizens' Commission on Jail Violence for your consideration.  This Report is the culmination of many months of investigation and public hearings regarding allegations of excessive use of force in the Los Angeles County jails.

As you know, the Board of Supervisors formed our Commission last October with a mandate "to conduct a review of the nature, depth and cause of the problem of inappropriate deputy use of force in the jails, and to recommend corrective action as necessary."  In the ensuing months, we have endeavored to conduct as thorough an investigation as possible with the assistance of pro bono attorneys from some of the most respected law firms in Los Angeles, as well as staff, interns, and volunteers under the leadership of the Executive Director.

Throughout our process, Commission staff spoke with a wide array of individuals and reviewed thousands of documents.  We appreciate those individuals who were willing to share their candid perspectives and recognize that it has not been easy for many of them.  We also thank the Sheriff and his staff for their cooperation throughout this investigation.

It has been an honor for each of us to serve on the Commission.  We believe that our diverse perspectives -- as well as the careful analysis and comprehensive review conducted by our staff -- have resulted in a thoughtful, objective and thorough Report.  We also believe that our recommendations, if implemented, can bring about lasting and meaningful changes within the Los Angeles County jails. We urge the Board and the Sheriff to adopt our recommendations with all deliberate speed and further urge the Board to establish a mechanism periodically to assess progress in implementing our recommendations.

Very truly yours,

Hon. Lourdes G. Baird, Chair             Rev. Cecil L. Murray, Vice Chair

Hon. Robert C. Bonner        Mr. Alexander Busansky        Chief Jim McDonnell

Hon. Carlos R. Moreno        Hon. Dickran M. Tevrizian

# Citizens' Commission on Jail Violence

## COMMISSIONERS

Hon. Lourdes G. Baird, Chair
Rev. Cecil L. Murray, Vice Chair

Hon. Robert C. Bonner
Mr. Alexander Busansky
Chief Jim McDonnell

Hon. Carlos R. Moreno
Hon. Dickran M. Tevrizian

## EXECUTIVE DIRECTOR

Miriam Aroni Krinsky

## GENERAL COUNSEL

Richard E. Drooyan

## DEPUTY GENERAL COUNSEL

Douglas A. Axel
Nancy Sher Cohen
Bert H. Deixler
Sharon Dolovich
Kimberly A. Dunne

Tamerlin J. Godley
Carolyn J. Kubota
Marcellus McRae
Aaron Murphy
Fernando L. Aenlle-Rocha

James Sanders
David Schindler
Daniel N. Shallman
Maurice Suh

## COUNSEL

Seth Baglin
Aaron Bloom
Cristyn Chadwick
Michelle Cheng
Yunah Chung
Rachel Feldman
Lauren Fujiu
Jared Goldstein
Ronald K. Gorsich
Michael Guitar
Hilary Jay

Chris J. Jung
Patrick E. Kennell III
Poonam Kumar
Shawn S. Ledingham, Jr.
Matthew A. Macdonald
Gabe D. Miller
Molly Moeser
Cisca Mok
Mina Noroozkhani
Kimberly Nortman
Yolanda Ochoa

Cassie D. Palmer
Hema Patel
George E. Pence
Antonio Raimundo
Nicholas C. Soltman
Robert M. Swerdlow
Brent W. Wilner
Dan Weiss
Michael H. Weiss
William Yu

## PROJECT MANAGERS

Julie Quinn
Katherine Williams

## INVESTIGATOR

Adam Dawson

## PROJECT ASSISTANT

Tia Britt

## INTERNS, VOLUNTEERS AND SUPPORT STAFF

Gregory Bok
Lily Bu
Alicia Castro
Maxwell Cohen
Teresa Cotsirilos
John Given
Adam Grant
David Issa
Brie Jefferson

Joshua Krebs
Nancy Leu
Dustin Linden
Samuel Liu
Teresa Magula
Melissa Nadal
David Nealy
Kathleen O' Connell
Erica Quitana

Susan Reimers
Andrew Roach
Arash Sadat
Ali Al-Sarraf
David Simson
Jonathan Soleimani
Alisa Sommer
Roisin Ward

# Citizens' Commission on Jail Violence

Thanks to the following law firms

Gibson, Dunn & Crutcher LLP
Kendall, Brigg &Klieger LLP
Latham & Watkins LLP
Munger, Tolles & Olson LLP
O'Melveny & Myers LLP
Proskauer Rose LLP
Reed Smith LLP
Sidley Austin LLP
White & Case LLP

We would like to express our thanks to Munger Tolles & Olsen LLP and staff
for hosting and housing the Commission and its staff.

# TABLE OF CONTENTS

Page

Glossary of Terms _____ i

CHAPTER 1: INTRODUCTION _____ 1

    The Nature of the Problem _____ 3

    Moving Forward _____ 6

    The Commission's Process and Methodology _____ 9

CHAPTER 2: A HISTORY OF RECOMMENDED REFORMS _____ 13

    Introduction _____ 13

    Findings _____ 14

CHAPTER 3: USE OF FORCE _____ 29

    Introduction _____ 29

    Findings _____ 30

    Recommendations _____ 56

CHAPTER 4: MANAGEMENT _____ 61

    Introduction _____ 61

    Findings _____ 63

    Recommendations _____ 86

CHAPTER 5: CULTURE _____ 95

    Introduction _____ 95

    Findings _____ 97

    Recommendations _____ 111

CHAPTER 6: PERSONNEL _____ 117

    Introduction _____ 117

    Findings _____ 118

    Recommendations _____ 135

CHAPTER 7: DISCIPLINE _____ 143

    Introduction _____ 143

Findings _____ 144

Recommendations _____ 169

CHAPTER 8: OVERSIGHT _____ 177

Introduction _____ 177

Findings _____ 179

Recommendations _____ 190

## GLOSSARY OF TERMS

| | |
|---|---|
| ACLU | American Civil Liberties Union |
| ADP | Average Daily Inmate Population |
| ALADS | Association for Los Angeles Deputy Sheriffs |
| BIU | Background Investigation Unit |
| CARS | Command Accountability Reporting System |
| CCJV | Citizens' Commission on Jail Violence |
| CDCR | California Department of Corrections and Rehabilitation |
| CFRC | Custody Force Review Committee |
| CFRT | Custody Force Response Team |
| CMTF | Commander Management Task Force |
| CRIPA | Civil Rights of Institutionalized Persons Act |
| DOJ | United States Department of Justice |
| EFRC | Executive Force Review Committee |
| EPC | Executive Planning Committee |
| ERCOM | Los Angeles County Employees' Relations Committee |
| FAST | Facility Automated Statistical Tracking |
| IAB | Internal Affairs Bureau |
| ICIB | Internal Criminal Investigations Bureau |
| IRC | Inmate Reception Center |
| JMET | Jail Mental Health Evaluation Team |
| LASD | Los Angeles Sheriff's Department |
| LJN | Large Jail Network |
| MCJ | Men's Central Jail |
| MOA | Memorandum of Agreement |
| MOU | Memorandum of Understanding |
| MPP | Manual of Policy and Procedure |
| OIG | Office of Inspector General |
| OIR | Office of Independent Review |
| POST | Peace Officer Standards and Training |
| PPI | Personnel Performance Index |
| PPOA | Professional Peace Officers Association |
| SCIF | Sheriff's Critical Incident Forum |

# CHAPTER ONE
# INTRODUCTION

There has been a persistent pattern of unreasonable force in the Los Angeles County jails that dates back many years. Notwithstanding a litany of reports and recommendations to address the problem of violence in the County jails issued by multiple bodies over more than two decades, it was only recently that the Los Angeles County Sheriff's Department ("LASD" or the "Department") began to implement changes that significantly reduced the level of force used by Deputy Sheriffs in the jails. Both the responsibility for, and the solutions to, the problem of excessive force in the County jails lies with the Department's leadership. Significantly, the Department failed to identify, monitor and address force problems until the Sheriff began to take action last year in the wake of a series of scathing reports, the glare of adverse publicity, actions by the County Board of Supervisors (the "Board") including creating the Citizens' Commission on Jail Violence (the "Commission" or "CCJV"), and a series of public hearings by both the Commission and the Board.

As a result of the recent attention of the Sheriff and the reforms he instituted, the number of force incidents, and in particular Significant Force incidents, in the jails has dropped dramatically. Yet even with these recent reductions, troubling indicia of a force problem remain. Whether recent force reductions will be sustained over time when public attention recedes, and whether the entire Department is truly committed to the Sheriff's stated vision for the jails and the implementation of these reforms, remains to be seen.

The Department provides a myriad of services and is a very complex organization with 17,000 sworn and non-sworn civilian employees.[1] It patrols the unincorporated areas of one of the largest counties in the United States with a population of over 9.8 million[2], provides police services to over 40 cities in Los Angeles County plus unincorporated areas, operates the Los Angeles Regional Crime Laboratory, provides security for the courts throughout the County, and

---

[1] As of December 31, 2010, there were 18,747 budgeted positions, but only 16,989 total personnel. http://file.lacounty.gov/lasd/cms1_171991.pdf.
[2] Los Angeles County 2011 Population Estimate of 9,889,056 per U.S. Census Data. http://quickfacts.census.gov/qfd/states/06/06037.html.

runs the largest jail system in the country. The jail system includes eight geographically distant facilities that house some of the most dangerous and violent inmates and rival gang members in the nation. In addition to operating the jails, the Department transports prisoners to and from the courts and runs the Custody facilities in the courts.

The Los Angeles County jail system has been plagued by many problems over the years, from overcrowded and substandard jail conditions to allegations that deputies used excessive or unnecessary force on inmates and facilitated inmate on inmate violence. These problems have been the subject of numerous reports, starting with the Kolts Report in 1992, and detailed in periodic reports by Special Counsel Merrick Bobb and the Office of Independent Review ("OIR"). Last fall, the American Civil Liberties Union (the "ACLU") issued a scathing report entitled "Cruel and Unusual Punishment: How a Savage Gang of Deputies Control LA County Jails" detailing mounting concerns with violence in the jails. It was soon followed by a critical report from OIR, stating in no uncertain terms that "deputies sometimes use unnecessary force against inmates in the jails, to either exact punishment or to retaliate for something the inmate is perceived to have done" and expressed concern that "the times in which deputies 'get away' with using excessive force may be on the rise."[3] At the same time, the *Los Angeles Times* published a series of articles recounting allegations of excessive force, a "code of silence" among Custody deputies, deputy misconduct in the jails, and the existence of an on-going federal criminal investigation into abuses in the jails.

With a bright spotlight placed squarely on the Department and its jails, the Sheriff created a Commander Management Task Force ("CMTF" or the "Task Force") last fall to "[t]ransform the culture of our custody facilities into a safe and secure learning environment for staff and inmates, and provide a level of service and professionalism consistent with our Core Values." At the same time, the Board of Supervisors created this Commission with a mandate "to conduct a review of the nature, depth and cause of the problem of inappropriate deputy use of force in the jails, and to recommend corrective action as necessary." The Board also directed the Commission to "hold[] this Board and the Sheriff accountable for their speedy and effective implementation" of necessary reforms.

---

[3] "Violence in the Los Angeles County Jails: A Report on Investigations and Outcomes" (October 2011) ("OIR 2011 Violence in the Jails Report"), p. 2.

*Report of the Citizens' Commision on Jail Violence*

It is important to note that the Commission is not charged with investigating force incidents identified by the ACLU or others to determine whether deputies used unnecessary or excessive force in specific cases; indeed, the Commission lacks the necessary authority and resources to do so. Instead, that responsibility lies with the Department itself and with investigatory bodies including federal authorities and the Los Angeles County District Attorney (in cases where there are allegations of criminal conduct).

Without subpoena power or the power to compel testimony, the Commission relied upon the cooperation of the Department and the Sheriff, and the willingness of current and former members of the Department, percipient witness, and inmates to talk voluntarily to the Commission staff and, in some limited cases, to testify publicly. The Commission staff also consulted with numerous experts and heads of correctional facilities in California and throughout the nation. Some current and former members of the Department, including some high-ranking former members, declined to speak to Commission staff, and most of them were unwilling to testify publicly. In some instances, these individuals indicated that their reluctance stemmed from fear of retaliation by high level Department officials, although it should be noted that the Sheriff personally encouraged Department personnel to talk to Commission staff.

The Commission recognizes that there are concerns about the credibility of inmates, just as in some cases the credibility of deputies involved in a force incident may also be at issue. As such, this report does not rest on the credibility of any one witness, but is based upon the totality of the information provided to the Commission, the corroboration of that information, and the common themes and patterns that emerged.

## A.    The Nature of the Problem

As detailed in this Report, the problem of excessive and unnecessary force in the Los Angeles County jails was the result of many factors, beginning most fundamentally with a failure of leadership in the Department. Simply stated, the Sheriff did not pay enough attention to the jails until external events forced him to do so. Further, his senior leaders failed to monitor conditions in the jails and elevate use of force issues so that they received the necessary attention by the Sheriff, and the Undersheriff engaged in conduct that undermined supervision of aggressive deputies and promoted an environment of lax and untimely discipline of deputy

misconduct. With multiple command layers between the jails and the Sheriff, there was no one in the Department who was responsible *and* accountable to the Sheriff for addressing the force problems in the jails. Nor was there an experienced, professional corrections leader in place to capably run the County's vast and challenging jail system.

Through the formation of the CMTF last fall, the Sheriff has been personally engaged in efforts to reform the jails, and the Department has now taken a number of steps to address the use of force problems, including promulgating long-overdue Force Prevention and Anti-Retaliation policies and enhancing (at least for the time being) supervision in the jails. As a result, the Department has been able to dramatically reduce the number of force incidents throughout the jails while, at the same time, reducing the number of inmate assaults on deputies. These statistics reinforce the testimony of current and former Department personnel, inmates, jail chaplains and monitors that much of the force used by deputies prior to the formation of the CMTF and over a series of years was unnecessary, excessive, and in violation of the Department's policies. As Special Counsel Merrick Bobb observed in testimony before the Commission earlier this year, when "the word went out [from the Sheriff that]… 'I want to see those numbers down'" the deputies "responded" and force incidents dropped significantly.

Notwithstanding the recent reforms, the Commission does not believe that the problem of excessive use of force in the jails has been "fixed." Some of the high level leaders who allowed force problems to continue unabated have not been held accountable, thereby sending a troubling message to a Department in need of a clear directive that accountability is expected and will be enforced at *all* levels. Ultimately, true reform of the jails will depend upon the committed leadership and engagement of the Sheriff and the Department's senior leaders, as well as institutionalized structural reforms within the Department and strong independent oversight.

From what the Commission has observed, reform will not be easy. The Sheriff himself has recognized that reform will require the Department to "transform [its] culture [.]"[4] Over the years, there has been a mindset among some deputies that reflects a lack of respect for inmates, views force as the preferred option to control inmates, and bristles at supervision. Management has contributed to this mindset by sending the wrong signals, in both its words and deeds, by

---

[4] Commander Management Task Force Six Status Update of Jail Reform ("CMTF Six Month Report"), p. 2.

*Report of the Citizens' Commision on Jail Violence*

failing to address long-standing problems and to reinforce respect for the Department's Core Values, and by failing in some cases to ensure prompt and appropriate consequences for misbehavior. Further, the Commission is troubled by the recent report of the Association for Los Angeles Deputy Sheriffs ("ALADS"), which indicates that deputies feel, as a result of the Sheriff's recent reforms, that they have "lost control" of the jails.[5] The implicit suggestion that these deputies believe they must use force to show inmates who is "running the jails" reflects a cultural mindset that can impede meaningful and lasting reform.[6]

This troubling culture in Custody, which has produced both on duty and off duty aggressive misconduct, is exacerbated by the Department's training, staffing, supervision, and discipline policies. The Department staffs the jails with brand new deputies who are trained for Patrol assignments, have inadequate Custody training, have little desire to be in Custody, and remain in the jails far too long as their Patrol training and skills diminish before they ever receive a Patrol assignment. The Department's Custody training is woefully inadequate, and long initial tenures in the jails for new deputies after extensive Patrol training in the Academy make little sense. Compounding the problems, most supervisors are brand new Sergeants and Lieutenants while some of the deputies they supervise have been in Custody assignments for upwards of five to seven years. The result is that senior deputies who may be disdainful of supervision can exercise undue influence over new deputies.

Another set of concerns stems from the Department's disciplinary system. The Department's discipline procedures and policies are inadequate to ensure swift and certain punishment for the improper use of force and dishonesty. The disciplinary system is complex, multi-layered and disjointed, and there have been well-documented lapses in processing use of force packages, and failures to take the necessary steps to ensure that the disciplinary system timely addresses these problems. Further, Department leaders have undermined the investigative and discipline systems by inappropriate comments and conduct and the Commission has seen evidence suggesting that acts of dishonesty are not always subject to the "zero tolerance" philosophy articulated by the Sheriff.

---

[5] ALADS Custody Division Working Group (Draft) Report, dated July 19, 2012 ("ALADS Report"), p. 10.
[6] *Id.*

*Report of the Citizens' Commission on Jail Violence*　　　　　　　　　　　　Page 5

B.    **Moving Forward**

In order to have lasting reform in the jails, the Department needs to be re-structured to ensure accountability for the operation of the jails. There should be a new Assistant Sheriff for the Custody Division who is a professional and experienced corrections leader, reports directly to the Sheriff, and is directly accountable for jail operations.

The Commission considered whether the responsibility for operating the County's jails should be taken away from the Sheriff altogether, but rejected this alternative approach for two reasons: (1) it would take legislation that would require time to pass (assuming passage could be achieved); and more importantly (2) it would diffuse accountability for operating the jails. If the jails are taken away from the Sheriff, the first questions that need to be answered would be: how is the head of the new Custody Division going to be selected and to whom is that person going to report? Unless the head of the Custody Division is to be elected, which would politicize a position that requires extensive professional experience, he or she would have to be selected by the Board of Supervisors. That person would thus be accountable to five Supervisors, who need a majority vote to act and are likely to have different views on the operation of the jails, instead of reporting to a single elected County Sheriff.

As the Sheriff noted in his testimony, he is accountable to the voters who can choose not to re-elect him if they are not satisfied with how he is doing his job, including running the jails. The Commission believes that accountability is an absolute necessity and the best system would be for the Sheriff to appoint an experienced corrections expert to be accountable directly and singularly to him for running the jails while he is, in turn, accountable to the voters.

The Commission recommends that the Department adopt a "dual track" system whereby Deputy Sheriffs are recruited and trained for careers in Custody assignments with opportunities for promotions from within the Custody Division. The Commission also recommends increased use of Custody Assistants, who are less expensive than deputies and trained for Custody assignments. Establishing a stand-alone Custody Division within the Sheriff's Department under the leadership of an experienced corrections expert would expedite the necessary cultural reforms, develop a skilled workforce committed to the distinct corrections profession, and ensure that the recent reductions in use of force are sustained and ongoing problems are remediated.

The Department's disciplinary system needs to be simplified. All cases involving injuries to inmates should be investigated by trained Internal Affairs investigators (or the Internal Criminal Investigations Bureau if there are allegations of criminal conduct) in a newly created Investigations Division under the leadership of a Chief, and all but the most serious cases should be determined by Unit Commanders with oversight by their Commanders and Chiefs. Penalties for excessive use of force and dishonesty should be enhanced. There should also be a newly created Internal Audits and Inspection Division under a Chief to ensure that there is compliance with the Department's policies and procedures governing the Custody Division.

Finally, the existing oversight entities -- Special Counsel, OIR, and the Ombudsman -- should be absorbed and consolidated into a single Office of Inspector General reporting to the Board of Supervisors with responsibility for providing independent oversight of the Department, including its jail operations and discipline system; conducting its own investigations in a limited number of particularly sensitive cases; monitoring jail conditions and inmate grievances; and reviewing the Department's internal audits and inspections.

The Commission considered whether the Office of Inspector General should be under an independent civilian commission, but concluded that this was not necessary as long as the Board of Supervisors remains engaged in oversight of the jails. Unlike the Board of Police Commissioners for the City of Los Angeles, which is empowered under the Los Angeles City Charter to oversee the Los Angeles Police Department, a civilian commission would not have any legal authority over the Sheriff's Department absent enabling legislation. In the City of Los Angeles, the elected Mayor appoints the Police Commissioners and also selects the Chief of Police. In the County, the Sheriff is the elected public official ultimately responsible for the Department and the jails. The Board of Supervisors, in turn, can exercise oversight through its control of the Department's budget, by receiving the reports of the Inspector General, and by requiring the Sheriff and the head of the Custody Division to address in public hearings the status of recommended reforms, trends in use of force, and other pertinent aspects of the operation of the jails. The Commission believes that a fully empowered and integrated Office of Inspector General reporting to an engaged Board of Supervisors can provide the necessary independent oversight of the Department to ensure that it implements meaningful and lasting reforms.

While much has been accomplished by the Sheriff's Department in the last year, more remains to be done to ensure that needed reforms are implemented and the reduction in force incidents continues on into the future. The Department and the Board find themselves at a moment of immense challenges, but also have a real opportunity to move forward in a constructive and positive manner. This will require an ongoing commitment by the Sheriff, new and accountable leadership over Custody, empowered independent oversight and ongoing engagement by the Board.

Finally, we note that there are three issues related to the operations of the jails that have been raised, but that we do not address elsewhere in this Report. First, what should be done with Men's Central Jail ("MCJ")? Virtually everyone we spoke to during our investigation, including jail monitors, outside experts, Deputy Sheriffs, advocates, and Department leadership, expressed the view that MCJ should be "torn down." The Commission agrees with this view; MCJ is an antiquated, dungeon-like facility that exacerbates force problems in the jails, makes supervision challenging, and increases the likelihood that some deputies will be tempted to engage in aggressive behavior and use force as a first response rather than a last option. But the Commission also agrees that tearing down MCJ and building a new jail will not solve the longstanding problems of excessive force that have arisen most visibly at MCJ, but that also cut across the other jail facilities. These problems will continue to plague the Department absent the necessary leadership, accountability, supervision, training, personnel, discipline, culture, and oversight changes discussed in this Report.

Second, should the County fund the installation of more cameras in the jails? The Commission agrees with the recent observation of OIR that cameras are "an invaluable tool for objective accounting and insight," and that it "is unfortunate that it took years of discussion and delay before they were installed and operational at MCJ."[7] Cameras serve as a deterrent to the use of unnecessary and excessive force, enhance the reliability of the investigation of these incidents, and facilitate supervisors' ability to proactively spot check and identify personnel problems in need of correction. The Commission also agrees that the Department should complete the installation of additional cameras in Twin Towers and the Inmate Reception Center

---

[7] Office of Independent Review Tenth Annual Report, September 2012 ("OIR Tenth Annual Report"), p. 6.

with alacrity, and that the Board of Supervisors should provide funding for the installation of additional cameras at the other facilities. Videotapes should also be periodically reviewed by supervisors to spot-check the conduct of deputies. Even with these tools, however, cameras are not a cure all and cannot saturate every corridor and corner of the jails.

Third, should the Department work with the Court to expedite the release on bond of pre-trial detainees charged with minor, non-violent crimes? It is open to debate whether there is a direct correlation between the number of force incidents in the jails and the number of these inmates, who are less likely to be dangerous than inmates charged with violent crimes. Historically, the greatest number of force incidents have taken place, for example, on the floors in MCJ that house the most dangerous and violent inmates or in the areas of the jail housing mentally ill inmates. In any event, reducing the inmate population will give the Department greater flexibility in housing inmates and improve the ratio of Department personnel to inmates. Experts agree that this will give Custody personnel greater control over the jails, enable them to spend more time monitoring the most problematic inmates, and make it less likely that they will use force to ensure compliance with their directives.

## C.    The Commission's Process and Methodology

The Commission was formed in October of last year and was fully staffed with its seven members, Executive Director and General Counsel at the beginning of this year. Since its inception, the Commission has met thirteen times; six of those meetings included testimony by 29 witnesses. Some of those individuals -- and in particular current and former Department personnel -- testified with full knowledge that their remarks would not be well received by their current and former colleagues. Indeed, one witness described his appearance and testimony before the Commission as "the hardest thing I've ever done in my life" and another witness stated that, while he was testifying voluntarily, "I did not ask to participate in these proceedings. It pains me to be here." The Commission is deeply indebted to these and other individuals who shared their insights with us.

In the course of its investigation into the nature and depth of the Department's use of force, the Commission relied on several key sources of data and information. Over the past nine months, the Commission staff, which included dozens of pro bono attorneys in nine of the most

respected law firms in Los Angeles, along with staff and volunteers under the Executive Director's Office, spent thousands of hours interviewing over 150 individuals.  These witnesses included over 60 current and former LASD personnel throughout the chain of command -- including Deputy Sheriffs, Sergeants, Lieutenants, Captains, Commanders and other high-ranking LASD officials.  In addition, Commission staff interviewed percipient witnesses, including current and former inmates, jail clergy, and jail monitors, as well as family members of alleged victims of excessive force.  Further, the staff interviewed numerous use of force experts and high ranking corrections personnel from around the nation -- including nearly two dozen jail leaders from various systems around the nation -- to better understand the implementation of the industry's best corrections practices.  Commissioners and Commission staff toured MCJ, the Inmate Reception Center ("IRC"), Twin Towers and the Pitchess Detention Center, and Commission staff visited jail facilities outside of Los Angeles County and spoke with over a dozen leaders from California jails.

The Commission received over 35,000 pages of documentary evidence, including LASD internal documents and policies; investigative reports; redacted personnel records; reports from the Office of Independent Review, Special Counsel Merrick Bobb, and the ACLU; and witness statements and deposition transcripts.  The Department gave us full cooperation and was responsive to all our requests, although challenges from ALADS limited our access to personnel and disciplinary records and required a time consuming process of redaction of deputy names from these records.  While this information was invaluable, the Commission had no ability to compel production of information and had only limited access to internal communications among LASD personnel.

Finally, LASD maintains substantial statistical data on various aspects of the jail system, including use of force incidents.  Pursuant to specific requests, LASD provided to the Commission extensive -- but in some instances conflicting -- statistical information regarding use of force trends and incidents within the jail system, which the staff analyzed as part of its investigation.  In conjunction with this review, the staff interviewed key LASD personnel to understand these statistics as well as the systems the Department utilizes to track use of force.

*Report of the Citizens' Commision on Jail Violence*

The Commission conducted its investigation with the recognition that statistical, anecdotal and documentary evidence have limitations and each can only tell one part of any story. The totality of the evidence, however, provides a credible picture of the excessive force problem in the Los Angeles County jail system that has not been addressed adequately by the Department's leaders, policies and systems.

## CHAPTER TWO
## A HISTORY OF RECOMMENDED REFORMS

### Introduction

The Citizens' Commission on Jail Violence is not the first body to investigate the issue of excessive force in Los Angeles County jails and recommend reforms in the operation of the Department's Custody Division.  For nearly two decades, respected oversight groups, experts, and advocates have identified a broad range of troubling issues that go to the core of the Department's culture, management and operation of its jails.  Some of these recommendations have cycled through numerous reports, often with nearly identical language, the same factual predicate, and at times increasing levels of frustration.

The failure to address aggressive deputy behavior within the jails has been a recurring theme in many of these reports.  Over *twenty years* ago concerns about these issues were raised by the Kolts Report, which found "deeply disturbing evidence of excessive force and lax discipline."[1]  Yet the Department continues to finds itself plagued by the same force and discipline concerns and a problematic culture that resulted in excessive force in the County jails over many years.

It is particularly troubling that suggested changes in personnel, culture, management, and discipline in the ensuing two decades have met with little response from the Department.  Indeed, had these changes been implemented, even in part, the County might well have avoided years of litigation costs, injured inmates, and adversely impacted deputy careers.

At a fundamental level, the failure to heed recommendations made -- and advanced repeatedly over time -- is a failure of leadership in the Department.  As the Sheriff has acknowledged, it was *his* responsibility to ensure that reforms recommended by these oversight and advocacy groups were implemented and that problems of excessive force in the County jails were addressed.  Yet, his response has been insufficient.

---

[1] "Los Angeles County Sheriff's Department: Report by Special Counsel James G. Kolts and Staff," July 1992 ("Kolts Report"), p. 1.

## Findings

1.   **Both Special Counsel and OIR have recommended numerous reforms aimed at addressing excessive force in the jails that have not been implemented.**

For nearly two decades, civilian oversight bodies have advanced a long list of recommendations aimed at addressing issues, including excessive force, in the County jails. The Office of Special Counsel, created in 1993 in the wake of the Kolts Report, and the Office of Independent Review ("OIR"), created in 2001 at the suggestion of Sheriff Baca, both monitor LASD and issue reports to the Board of Supervisors with detailed findings and recommendations. While each body operates under a different mandate and has a slightly different focus (as discussed in the Oversight Chapter), their work is complementary. A common thread that unites these bodies and their reports is the lack of meaningful or timely action by the Department in response to many of their proposed reforms.

   a.   **Background: Kolts, Special Counsel and OIR**

In December 1991, prompted by an increase in the number of officer-involved shootings, civil unrest in response to these events, and rising litigation costs in police misconduct cases, the Los Angeles County Board of Supervisors appointed retired Judge James Kolts to serve as Special Counsel to the Board and conduct an investigation into allegations of misconduct within LASD, including "excessive force, the community sensitivity of deputies, and the Department's citizen complaint procedure."[2] Judge Kolts appointed Merrick J. Bobb to serve as General Counsel of the investigation.

The Kolts Report was issued in July 1992 and included a wide array of recommendations addressing problems arising from LASD practices, including recruitment, training, hiring, discipline, culture and complaints. Notably, the report questioned the Department's commitment to addressing and remedying use of force concerns: "The LASD has not been able to solve its own problems of excessive force in the past and has not reformed itself with adequate thoroughness and speed."[3]

---

[2] Kolts Report, p. 1.
[3] *Id.*

*Report of the Citizens' Commission on Jail Violence*

The Board of Supervisors accepted the Kolts Report and agreed that the Sheriff should implement its recommendations, but was cognizant of the need for ongoing civilian oversight to ensure appropriate monitoring of Department misconduct. In particular, "there was criticism that the report had not recommended a civilian review board which would take over the LASD's power to investigate and discipline police misconduct."[4] As a result, the Board of Supervisors appointed Merrick Bobb to serve as Special Counsel and track the Department's implementation of the recommendations set forth in the Kolts Report. His role has shifted over time to include Department-wide issues and policies.

Over nearly two decades, Special Counsel has issued 31 Semiannual Reports, over half of which have contained substantial discussion of issues and concerns in County jails -- ranging from excessive use of force to the suitability of Custody as a first assignment for new deputies. Threaded through these many reports are upwards of 100 detailed recommendations regarding the hiring, training, disciplining, placement and supervision of deputies in the jails, as well as recommendations concerning the treatment of inmates and use of force policies. Many of Special Counsel's recommendations have gone unheeded and others have languished for more than a decade before the Department responded.

In 2000, at the urging of Sheriff Baca, the Board of Supervisors authorized the creation of the Office of Independent Review to critically evaluate the Department's internal investigations. OIR's mission is to "provide legal advice to ensure that allegations of officer misconduct involving LASD are investigated in thorough, fair, and effective ways."[5]

While OIR's primary focus is on the adequacy and thoroughness of individual investigations, OIR has issued annual reports over the years discussing specific issues and concerns within the Department, including challenges and problems it has observed within the jails. Unlike Special Counsel, OIR's reports and recommendations tend to be more case-specific and not primarily focused on systemic problems or reforms. Even with that focus, OIR has identified a host of areas in need of reform, many of which relate to Custody operations. In recent years OIR's Custody-related concerns have become more forceful and have been accompanied by broader suggestions for reform. These recommendations echo many of the

---

[4] Special Counsel Eleventh Semiannual (October 1999), p. 1.
[5] OIR website, http://laoir.com/mission.html, as of 8/8/2012.

*Report of the Citizens' Commission on Jail Violence*                    Page 15

themes addressed by Special Counsel and similarly have gone unaddressed by the Department for a period of years.

### b.    The Recommended Reforms

### (i) Staffing of the Jails

One of the most troubling concerns raised in the Kolts Report and referenced repeatedly by Special Counsel -- and until very recently largely ignored by the Department -- relates to the nature and assignment of personnel to staff the jails.  These reports reflect concerns spanning twenty years in regard to both the wisdom of placing new deputies in Custody and the protracted length of Custody assignments.

Dating back to the Kolts Report, questions were raised regarding the "thesis that the custody assignment is an appropriate placement for a young deputy so early in his or her career."[6]  Shortly thereafter, in 1994, Special Counsel criticized the Department's failure to address this issue: "The Department promised it would look at options to at least expedite the custody rotation.  We have seen none, and the length of the custody rotation continues to grow longer; estimates now put it at six years."[7]  In urging the Department to shorten the length of time that deputies spend in Custody, Special Counsel proposed an assignment of no more than 18 months to two years.[8]  This recommendation failed to generate any Department response, and one year later Special Counsel noted: "In the last six months, our concern about the jails has deepened, and the length of time young deputies spend in custody rotations continues to grow."[9]  The following year, he reiterated anew:

> Stagnation in the Department makes the rotation through custody a long one.  It does the deputy and the Department no good to have deputies in custody jobs for so long.  Almost all of the troublesome cases we have seen recently seem to come from jail settings where deputies have been callous or lash out in anger.... But the question must be asked whether the long custody rotations unacceptably raise the risk that more deputies will lose control at one time or another and simply not keep uppermost in mind that inmates

---

[6] Kolts Report, p. 237.
[7] Special Counsel 2nd Semiannual Report (April 1994), p. 3.
[8] *Id.*, pp. 2-3.
[9] Special Counsel 4th Semiannual Report (June 1995), p. 4.

> are humans, not fish. We thus continue strongly to advocate that deputies interested in a patrol career be rotated out of custody assignments earlier and that greater use be made of deputies willing to make the jails their career.[10]

In his recent 2012 Report, Special Counsel underscored once again both the seriousness of these concerns and their interrelationship with violence in the jails: "the forced jail assignment undercuts morale and may also breed abusive behavior on the part of deputies unable or unwilling to exercise reasonable restraint and self control."[11]

Both Kolts and Special Counsel have suggested other reforms aimed at addressing Custody staffing issues and concerns. They urged the Department to consider a dual-track system whereby only those deputies wishing to pursue a career in Custody are assigned to the jails and deputies seeking a career in Patrol bypass Custody altogether and go directly to Patrol. This notion was raised over 20 years ago by Kolts. In 2005, Special Counsel resurrected this concept as a "promising alternative" to address plummeting deputy morale stemming from prolonged Custody assignments. He explained:

> A system with two classifications of deputies would have a number of benefits. Deputies who want to work in custody would be able to make a career of that decision, and deputies who want to work on the streets could do so after spending little or no time in the jails, depending on inmate population and staffing levels.[12]

Only recently have these recommendations garnered any response from the Department and even now they remain simply ideas under consideration, as opposed to reforms the Department has committed to implementing.

### (ii) Deputy Rotations

Both Kolts and Special Counsel have recommended that deputies rotate within, *and between,* facilities to avoid stagnation, increase deputies' exposure to a wider range of job assignments, and guard against the proliferation of troubling deputy cliques. Kolts suggested that each deputy work in minimum, medium and maximum security facilities, thus guaranteeing

---

[10] Special Counsel 5th Semiannual Report (February 1996), pp. 9-10.
[11] Special Counsel 31st Semiannual Report (May 2012), p. 11.
[12] Special Counsel 20th Semiannual Report (August 2005), pp. 31-32.

that young, impressionable deputies are exposed to a variety of facilities and inmates.[13]  Special Counsel has reiterated this recommendation in ongoing conversations with LASD.  More recently -- and in the wake of concerns regarding aggressive deputy behavior -- Special Counsel stressed the importance of rotations not simply within facilities but also among different jails: "Stagnant assignments within the jail create opportunities for cliques to form and subcultures to develop."[14]

While moving deputies to distant facilities would be more difficult, Department managers have noted that rotations could be implemented among the proximate MCJ, Twin Towers, Inmate Reception Center, and Century Regional Detention Facility jails.  These facilities are very different in feel, physical layout and type of inmate and could offer a wide breadth and diversity of experience to new deputies.  Yet the Department has not opted to implement this reform.  Moreover, while the Department implemented in recent years a policy of deputy rotations among floors at Men's Central Jail, that reform is being undercut by *ad hoc* decisions to exempt entire sections of the jail from the rotations.

### (iii)  Disciplinary Transfers to Custody

OIR has raised concerns about the Department's past practice of using Custody as an assignment for disciplinary transfers, which necessarily impacts the nature and quality of Custody personnel.

In a report issued in 2009, OIR noted the troubling use of Custody as a place where the Department transferred personnel based on disciplinary concerns.  That report noted:

> [W]e have always cautioned against forced transfers as a way of dealing with a particularly problematic employee by making him or her someone else's problem.  The disciplinary transfer to custody is a particularly dangerous form of this practice for deputies who should be discharged, as it brings senior deputies embittered by the disciplinary process in close, direct contact with newly-hired deputies....  Rather than allowing such contamination of newer deputies

---

[13] Kolts Report, p. 245.
[14] Special Counsel 31st Semiannual Report (May 2012), p. 10.

by the embittered transgressing deputy, the Department would be better served by terminating such an employee.[15]

While Department leaders now insist that this practice is no longer in place, there is no written articulation of policies forbidding this practice from arising in the future.

### (iv)  Problematic Use of Force and Inadequate Force Investigations

Both OIR and Special Counsel have identified various problems over the years in regard to force practices, investigations, and policies in the jails.  They have also proposed various reforms intended to address these concerns.

As early as 1994 (in his Fourth Semiannual Report), Special Counsel observed that there were "many investigations wherein deputies respond to talkative or uncooperative inmates with a slap to the face or a shove to the wall."[16]  Three years later, Special Counsel noted that "[t]his trend has continued."[17]

In February 2003, Special Counsel expressed specific concerns over the large number of force incidents that involved deputies' use of flashlights as impact weapons.[18]  He recommended that the Department stop teaching deputies to use flashlights as impact weapons and urged LASD to develop lighter and safer flashlights.  Four years later, in December 2007, Special Counsel again raised the issue, this time with a more insistent and frustrated tone: "By and large, our concerns about the disproportionate and inappropriate use of flashlights as impact weapons seem to have fallen on deaf ears at LASD.  The Department continues to train its personnel to use flashlights as an impact weapon."[19]

The Department's response to these recommendations was that ALADS was opposed to a change in policy.  It was not until the Sheriff's March 13, 2012, report to the Board of Supervisors -- some nine years after Special Counsel first raised the issue -- that the Sheriff finally agreed to make a change in policy to reduce the size and weight of flashlights in

---

[15] OIR Seventh Annual Report (April 2009), pp. 26-27.
[16] Special Counsel 4th Semiannual Report (June 1995), p.25.
[17] Special Counsel 7th Semiannual Report (April 1997), p. 47.
[18] Special Counsel 16th Semiannual Report (February 2003), pp. 61-66.
[19] Special Counsel 24th Semiannual Report (December 2007), p. 37.

Custody.[20]  On May 23, 2012, the Department finally memorialized this new policy in the Custody Division Manual, effective September 1, 2012.

Beginning in 2003, OIR began to voice concerns about the quality of use of force investigations in the jails "and the legitimacy of the findings that emerged from them."[21]  Since that time, numerous recommendations have been made by OIR and Special Counsel to ensure that the investigations are fair, thorough and robust.

In 2003, OIR noted that its examination of force investigations had revealed the use of leading questions, a failure to give credence to an inmate's account of the events and a failure to account for physical signs of injury.  OIR determined that a "significant issue is a lack of training for supervisors at the jail facilities regarding how to conduct objective and thorough force investigations."[22]  Eight years later, in 2011, OIR reiterated these concerns and again recommended that "[u]nit level investigators should receive ongoing training in conducting force interviews of inmates and witnesses."[23]  OIR also recommended that any force investigation determine whether supervisorial deficiencies may have a played a role in the event.[24]

In its most recent 2012 report, OIR echoed these concerns.  Noting that it has "regularly" discussed these investigatory deficiencies during supervisory training, OIR observed that these problems nonetheless continue to arise:

> [W]hen we periodically reviewed force packages during the course of our work, we continued to note problems, including a failure to identify all relevant witnesses, deputy reports that apparently were copied and pasted from another deputy's report, biased interviews of inmates, interviews of inmates conducted at inappropriate times, and a failure to gather complete medical information regarding an inmate's injuries.[25]

### (v) Discipline Deficiencies

Kolts, OIR and Special Counsel have all criticized the adequacy of Department discipline

---

[20] Sheriff's "Status of Recommendations Report to the Board of Supervisors" (March 13, 2012), p. 2.
[21] OIR Second Annual Report (October 2003), p. 15.
[22] *Id.*, p. 16.
[23] OIR 2011 Violence in the Jails Report, p. 23.
[24] *Id.*, p. 24.
[25] OIR Tenth Annual Report (September 2012), p. 18.

and noted in particular that the Department needs to impose stricter discipline on those deputies who fail to recall an incident and/or who misrepresent a force incident in the course of a unit level inquiry or investigation. Judge Kolts noted that "at times, deputies in custody are taught to adhere to a code of silence."[26] Kolts recommended strict enforcement, punishment and monitoring of these instances of dishonesty.

In 2003, OIR similarly recommended that misrepresentation of a force event be considered "a separate violation above and beyond the use of force itself and to formally charge the employee in question with false statements whenever appropriate."[27] Six years later, in 2009, Special Counsel raised the same concern and recommended that the Department consistently evaluate employee performance for patterns of "substandard candor."[28] Special Counsel also urged the Department to monitor closely those officers who are charged with allegations of "false statements" or "use of force" to ensure that the allegations are not associated with a larger trend of substandard performance.[29]

Both bodies have also noted concerns with the Department's failure to vigorously scrutinize or adequately punish off duty misconduct. Those concerns played out in a 2010 Christmas party fight among Custody deputies. OIR thereafter observed "[o]ne way in which the disciplinary system can help the department maintain vigilance over the development of young deputies and jail culture is to scrutinize off-duty misconduct."[30]

OIR also has been troubled by the ability of Captains to modify and reduce discipline at the end of the disciplinary procedure. OIR has also expressed concerns about LASD's failure to consult with them before reducing proposed discipline or holding penalties in abeyance, noting: "Too many times we have been chagrined to learn that a Department executive has modified a disciplinary decision without engaging in dialogue from us."[31] This concern has yet to be addressed and OIR recently urged the creation of new Department policies memorializing OIR's

---

[26] Kolts Reports, p. 244.
[27] OIR Second Annual Report (October 2003), p. 47.
[28] Special Counsel 27th Semiannual Report (August 2009), p. 35.
[29] *Id.*, p. 36.
[30] OIR 2011 Violence in the Jails Report, p. 3.
[31] OIR Fourth Annual Report (October 2005), pp. iv, 19.

*Report of the Citizens' Commission on Jail Violence*                    Page 21

input and role in the Department's disciplinary process.[32]

### (vi) Inadequate Tracking of Inmate Complaints

Both OIR and Special Counsel have identified deficiencies in the way inmate complaints are tracked. In 2004, OIR stated that it had "worked with Custody Division officials to promote improved tracking of inmate complaints of deputy misconduct."[33] OIR reported that the Department agreed to connect inmate complaints with the accused deputy "so that a deputy who is the subject of numerous complaints can come to the attention of supervisors as a potential 'red flag.' "[34] Five years later, however, Special Counsel raised the identical issue and made the same recommendation, noting that no actual progress had been made. Special Counsel underscored the importance of capturing inmate complaints within the Personal Performance Index ("PPI") database saying:

> The sheer number of complaints from inmates, regardless of the complaint's merits or the ultimate administrative outcome, might provide crucial insights into patterns of superior or substandard performance among a population of new officers who might be particularly receptive to behavioral intervention, retraining, or mentoring.[35]

Three years later, in its May 2012 Report, Special Counsel expressed frustration and concern that it was, yet again, revisiting the same recommendation: "We have repeatedly recommended that inmate complaints against personnel be included in the PPI and reiterate that recommendation now, particularly in view of rising concern about alleged misconduct at the Los Angeles County Jail."[36]

In its most recent report, OIR has also expressed frustration with the pace of the Department's actions in this area, noting that "[f]or at least the past eight years, OIR has recognized that the failure to track inmate complaints by deputy creates a problematic gap in the Department's ability to monitor deputies' performance and hold them accountable when

---

[32] OIR Tenth Annual Report (September 2012), p. 19, fn. 8.
[33] OIR Third Annual Report (October 2004), p. 12.
[34] *Id.*
[35] Special Counsel 27th Semiannual Report (August 2009), p. 42.
[36] Special Counsel 31st Semiannual Report (May 2012), p. 49.

necessary." [37] Noting its longstanding recommendation on this issue -- and the Department's promised response -- dating back to 2004, OIR observed: "[t]he Department obviously did not fulfill its 2004 representation to us, and this failure has now presented a problem for the Department in litigation that is finally being rectified." [38]

### (vii) Improvements In and Use of PPI

Special Counsel has repeatedly identified the need to improve various aspects of PPI.[39] In 2003, Special Counsel observed that the reports and data sent to PPI were often error-ridden, inconsistent and delayed.[40]

Special Counsel has also noted that supervisors fail to make effective use of PPI, perhaps due to a lack of knowledge regarding PPI's capabilities and/or an unwillingness to utilize it. In 2003, Special Counsel bluntly stated: "Use of the PPI for risk management has fallen. It is symptomatic of a trend that we have noted over the past four years of a reduced commitment and interest in the proactive identification and reduction of risk. We deplore it."[41]

The Commission's investigation suggests that this problem may persist. For example, one high ranking official acknowledged that when a problem employee was administratively transferred to his facility, he failed to check the employee's profile in PPI to determine the nature of the employee's performance problems. He stated that it would have been a good idea, but that it was not mandatory. He was therefore unaware that the deputy had been involved in an off-duty fight for which he received a suspension. That deputy was later demoted due to subsequent misconduct.

Special Counsel has also identified the need to update and expand PPI. In 2003, Special Counsel recommended that performance indicators be updated to include a broader range of behaviors. In a report issued six years later, he noted that while PPI was state of the art when it was created, no updates had been made in the intervening twenty years. As a result, Special Counsel recommended anew that more data be collected and new fields added -- including

---

[37] OIR Tenth Annual Report (September 2012), p. 40.
[38] *Id.*
[39] Special Counsel 31st Semiannual Report (May 2012), pp. 15-34; Special Counsel 27th Semiannual Report (August 2009), pp. 4, 11-12.
[40] Special Counsel 16th Semiannual Report (February 2003), p. 2.
[41] *Id.*, p. 59.

performance indicators he had previously recommended -- to maximize and modernize PPI's usefulness as an early warning alert system.[42]

The many issues identified above reflect a history of missed opportunities -- recommendations made by Kolts, Special Counsel and OIR over a period of years that the Department has either ignored or addressed only belatedly. Had these thoughtful and detailed suggestions been implemented, they could have reduced force problems in the County's jails.

2.    **The ACLU has also raised repeated concerns about mistreatment of inmates by deputies in County jails.**

The ACLU has issued reports and pursued litigation raising concerns about jail conditions generally, as well as abusive behavior by deputies directed at inmates, that certainly should have alerted the Department's leadership to these problems several years ago. Their recommendations have gone largely unaddressed over the ensuing years.

a.    **Background**

The ACLU has issued a series of reports over the past few years recounting "the escalating pattern of deputy violence in the jails."[43] In annual and interim reports issued from 2008 through 2011, the ACLU detailed conditions inside the jails and allegations of abuse of inmates by deputies. In a report authored in 2009 by a correctional mental health expert, the ACLU also identified specific concerns in regard to mistreatment of inmates with mental illness. As discussed herein, many of the issues raised in these reports reflect unresolved challenges that the Department continues to grapple with.

b.    **ACLU Reports on Men's Central Jail**

In May 2010, the ACLU issued a highly critical report recounting in detail an array of troubling incidents of physical abuse by deputies of inmates at Men's Central Jail in 2009. The report described a "pervasive pattern of violence" observed in MCJ over those years.[44] It identified inadequate training, ineffective management, overcrowding, and a troubling culture in

---

[42] Special Counsel 27th Semiannual Report (August 2009), p. 11.
[43] ACLU Release, "A Sheriff with his Head in the Sand" (September 12, 2012), http://www.aclu.org/blog/prisoners-rights/sheriff-his-head-sand.
[44] ACLU "2010 Interim Report on Conditions Inside Los Angeles County Jail" (September 2010), p. 3.

*Report of the Citizens' Commision on Jail Violence*

the jails[45] as causes underlying what it described as "an apparent culture of violence and fear, including ... the use of excessive force by deputies."[46] The ACLU specifically recommended reforms including: enhancing deputy use of communication and negotiation skills; reducing the use of non-lethal weapons, restraints, and physical force whenever possible; enhancing deputy training and supervision to better "distinguish between those situations that require physical force and those that do not;" and equipping deputies with more skills and tools to understand when force is necessary through a "use of force hierarchy" that describes the kind and degree of force appropriate under different situations as well as de-escalation techniques to prevent force.[47]

Many of these same concerns were reiterated in the ACLU's September 2010 Interim Report on Conditions inside Los Angeles County Jail, in which the ACLU opined that "the violence has continued unabated."[48] The ACLU described "a pattern of excessive force by deputies" and "retaliation by Sheriff's Department employees against prisoners for communicating to the ACLU and other prisoners' advocates."[49] The report asserted that inmates are "the target of unprovoked attacks by deputies, with multiple deputies often joining in the beatings."[50] The report summarized statements from former prisoners detailing their accounts of being beaten by deputies, as well as allegations that "deputies intentionally place prisoners in danger of violence at the hands of fellow prisoners by opening cell doors to allow members of opposite gangs to attack one another and by encouraging prisoners to beat up other prisoners to keep them in line."[51]

One year later, in September 2011, the ACLU issued an even more detailed and scathing account of alleged abuse by deputies of inmates, noting that "to be an inmate in the Los Angeles County jails is to fear deputy attacks."[52] That report stressed the significance of the wide array of witnesses -- including civilians -- who had come forward to report observed abuse of inmates, noting that "[t]heir experiences suggest that the culture of deputy violence in the jails has become so hardened and pervasive that deputies feel emboldened to carry out their attacks even

---

[45] ACLU "Annual Report on Conditions Inside Men's Central Jail 2008 – 2009" (May 2010), p. 9.
[46] *Id.* p. 1.
[47] ACLU 2008 - 2009 Annual Report, pp. 21-22.
[48] *Id.*, p. 3.
[49] *Id.*, p. 2.
[50] *Id.*, p. 3.
[51] *Id.*, p. 6.
[52] ACLU 2010 Interim Report, p. 1.

in non-secluded areas."[53]   While this report contained no specific recommended reforms, it did question the commitment of LASD leadership to tackling these longstanding concerns and reducing violence in the jails.

### c.     The Kupers Mental Health Report

In 2009, the ACLU released a report authored by Dr. Terry Kupers, a nationally-recognized expert on mental health issues in correctional facilities.[54]   The report documented what Dr. Kupers described as "toxic" conditions inside MCJ, where massive overcrowding, idleness, and a shortage of mental health treatment resources led to violence among inmates and abuse by deputies.[55]   Dr. Kupers specifically stated "[t]here are many reports of abuse by custody staff, and independent reports from many prisoners that the abuse is disproportionately directed at prisoners suffering from mental illness."[56]   The ACLU submitted the report to Sheriff Baca in 2008, and elected to release it publicly the following year, after months of negotiations with the Department failed to produce any meaningful changes to address the concerns that Dr. Kupers identified.[57]

Based on his findings, Dr. Kupers made several specific recommendations for improving conditions at MCJ, many of which overlap with recommendations made by other bodies that have examined conditions in the jails.  Notably, Dr. Kupers' recommendations go beyond addressing the overcrowded conditions in the jails and the treatment of mentally-ill inmates.[58]   In addition to enhanced training for Custody staff and more robust monitoring, Dr. Kupers emphasized the importance of taking "all effective steps to halt custodial abuse."[59]   These included "zero tolerance [for such abuse] from the top, education for prisoners about their rights and the grievance process, training and support to encourage staff to report abuse by other staff, a

---

[53] *Id.*, p. 11.
[54] ACLU Release, "ACLU Releases Expert's Report on Nightmarish Conditions at Men's Central Jail in Los Angeles" (4/14/2009), http://www.aclu.org/prisoners-rights/aclu-releases-experts-report-nightmarish-conditions-mens-central-jail-los-angeles.
[55] Letter enclosing Report on Mental Health Issues at Los Angeles Jail by Dr. Terry Kupers (July 7, 2008), pp. 6-10, 40-46.
[56] *Id.*, p. 45.
[57] ACLU Release, "ACLU Releases Expert's Report on Nightmarish Conditions at Men's Central Jail in Los Angeles" (4/14/2009), http://www.aclu.org/prisoners-rights/aclu-releases-experts-report-nightmarish-conditions-mens-central-jail-los-angeles.
[58] Letter enclosing Report on Mental Health Issues at Los Angeles Jail by Terry Kupers, (July 7, 2008), pp. 45-50.
[59] *Id.*, p. 49.

confidential complaint system that fosters prisoner trust and action, and prompt and thorough investigation with appropriate consequences for offending staff."[60]

### 3.    The Department of Justice similarly expressed concerns regarding treatment of mentally ill inmates and inadequate training in handling this population.

Well before Dr. Kupers prepared his report, the United States Department of Justice ("DOJ") investigated allegations that conditions at MCJ violated inmates' constitutional rights pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"). In a harsh critique of Department personnel and practices, 16 years ago DOJ found that "inmates who are mentally ill or housed in mental health housing are subject to an unacceptably high risk of physical abuse and other mistreatment at the hands of other inmates and custody staff. Moreover, the Jail does not adequately investigate allegations of abuse against its inmates."[61] DOJ also identified inadequacies in training as one of the underlying concerns: "excessive use of force and physical mistreatment of inmates with mental illnesses may be in part the result of inadequate training."[62]

In an attempt to remedy these violations, DOJ and Los Angeles County reached a Memorandum of Agreement ("MOA"). The MOA, signed by Sheriff Baca on behalf of LASD, required "mandatory orientation and continuing competency based in-service training for correctional staff in the identification and custodial care of mentally ill inmates."[63] Additionally, the MOA stated, "Staff shall not be permitted to physically, verbally, or mentally abuse inmates with mental illness. Allegations of abuse of mentally ill inmates or inmates in mental health housing shall be promptly and thoroughly investigated and staff members found to have abused inmates shall be appropriately disciplined."[64]

The MOA had the potential to be a significant step forward in addressing the needs of mentally ill inmates and held the promise of improved conditions during their confinement. Yet eight years later, in sworn deposition testimony, Sheriff Baca said that he had never seen this agreement, was unaware of any DOJ findings regarding mistreatment of mentally ill inmates in the County jails, and had no knowledge of the MOA or the DOJ findings letter underlying the

---

[60] *Id.*, p. 49.
[61] DOJ Letter to Los Angeles County re CRIPA Investigation of Mental Health Services in the Los Angeles County Jail (September 5, 1997), p 17.
[62] *Id.*, p 18.
[63] Memorandum of Agreement "Regarding Mental Health Services at the Los Angeles County Jail," p. 6.
[64] *Id.*, p.7.

MOA that he had signed.[65]  The Sheriff explained that he has does not "personally involve [him]self with the specifics of activities that are going on," but rather relies on his staff.[66]

Equally troubling is the ongoing and still unresolved nature of the challenges at issue in the DOJ agreement -- the need to adequately train deputies to nonviolently interact with inmates who suffer from serious mental illnesses.  In July 2012 -- fifteen years after the MOA -- ALADS released a report acknowledging that deputies "are not mental health professionals trained to manage mentally ill inmates" and that "changes need to be made to ensure [deputies] are better able to manage an incident, avoid use of force, and remain safe in the workplace."[67]  ALADS proposed a series of recommendations to "overhaul the policies and procedures" including increased training from "mental health workers on how to manage mentally ill inmates."[68]  They urged the addition of "in-service trainings for deputies and supervisors centered on officer safety, management of mentally ill inmates, and other issues that relate to force." [69]

Department data, as well as witnesses interviewed by the Commission, confirm that these issues remain unresolved.  The data reflect that over 30% of the use of force incidents in Custody involved inmates who have a mental history.  Moreover, as noted by ALADS, training in regard to the unique needs and challenges of this population continues to be deficient.

---

[65] Deposition in *Baca v. Gavira* (2005), pp. 65-67, 70, 256.

[66] *Id.,* p 74.

[67] ALADS Report, p. 13.

[68] *Id.,* pp. 14-15.

[69] *Id.,* p. 15.

*Report of the Citizens' Commision on Jail Violence*

# CHAPTER THREE
# USE OF FORCE

## Introduction

Statements and testimony from inmates, current and former Sheriff's Department personnel, jail chaplains and monitors, as well as the Sheriff's Department's own records, demonstrate that there has been a persistent pattern of unnecessary and excessive use of force in the Los Angeles County jails. In October 2011, the Office of Independent Review captured the essence of the problem in a report on "Violence in the Los Angeles County Jails," stating that "it cannot be denied that deputies sometimes use unnecessary force against inmates in the jails, either to exact punishment or to retaliate against something the inmate is perceived to have done." The OIR Report referenced mounting concerns about inmate mistreatment and opined, "[o]ne troubling aspect of our initial review of the recent ACLU report is that the times in which deputies 'get away' with using excessive force may be on the rise."

Most of the force in the last five years has been Significant Force or force that was not directed or supervised. In addition, multiple witnesses, both inmates and non-inmates, described numerous instances in which LASD personnel used force when no threat was present, used force disproportionate to the threat posed, used force after the threat had ended, or enabled inmates to assault other inmates.

Although the Department has taken steps to remediate this problem since public scrutiny intensified in the fall of 2011 -- efforts that have resulted in a significant drop in the number of reported use of force incidents -- use of excessive force remains a concern. This conclusion is supported by anecdotal evidence, as well as available statistical evidence, which shows that, as recently as last year, the majority of force incidents, including many involving Significant Force, were not in response to inmate assaults. It is likely that the force used in a number of these incidents was, at the very least, unnecessary.

The Commission based some of its analysis on data provided by the Sheriff's Department, but the Department's force records are not entirely reliable and likely underreport the use of force. The reliability of the tracking systems is undermined by disparities between the two main Department databases tracking force, which has led to inconsistent reporting of the

number of use of force incidents. In addition, even when incidents are reported, there have been lags of months or even years before key information is entered into the Department's tracking databases, which means the information is not always current. Furthermore, the system designed to assess employee performance does not track inmate complaints by deputy name, thereby diminishing the ability to identify and correlate patterns of misconduct by employee.

More troubling are the data and witness accounts considered by the Commission showing that the existing systems underreport the use of force. Specifically, this evidence indicates that LASD personnel who use or witness force, and inmates who are the recipients of force, may not report all force incidents. This underreporting suggests that the nature and extent of the use of force in the jails are likely greater than the statistics demonstrate.

The Department's Use of Force Policy is also problematic. There is no single, comprehensive Use of Force Policy that is readily identifiable, available in one place, or easy to understand. Remarkably, until last November, the Department did not have a force prevention policy directing LASD personnel that force should be used only as "a last resort" and that, if necessary, they should only use the least amount of force that is "objectively reasonable" to maintain safety in the jails. Even now, the existing policies do not reflect an overall philosophy of preventing and limiting force, and are based upon a force options chart that is confusing and does not reflect the well-established "objectively reasonable" standard articulated by the United States Supreme Court.

Moreover, notwithstanding the volume of force incidents and the number of inmate complaints of which the Department is aware, the Department rarely finds a use of force to be "unreasonable." That track record casts doubt on whether the Department is correctly and consistently applying its stated policy that "unnecessary force" is "unreasonable."

### Findings

1.    **LASD personnel have used force against inmates when the force was disproportionate to the threat posed or there was no threat at all.**

Under LASD policy, deputies are prohibited from using force that is "unnecessary or excessive given the circumstances." According to Men's Central Jail policies, "[a]ggressive or hostile inmates who are confined within their cell . . . and do not pose an immediate threat to

staff personnel or other inmates shall not be removed from their location. The floor or area sergeant shall be promptly notified."

Despite these policies, the Commission heard a number of accounts from inmates and non-inmate witnesses describing the use of force when an inmate posed no threat either because the inmate was restrained or confined to a cell. In particular, the Commission was told about several instances where LASD personnel used unnecessary force against restrained or confined inmates who had behaved in a lewd or disrespectful (but non-violent) way. In one instance, an inmate was grabbed by the throat, pushed into a glass window and thrown onto the ground for smirking at deputies. Another inmate was taken to an isolated recreation area and beaten with a flashlight for insulting a deputy. In another incident, a deputy who thought an inmate mumbled had something disrespectful repeatedly punched the inmate in the head and did not stop even though his Sergeant yelled at him to cease. Although lewd and disrespectful behavior by inmates is unacceptable, LASD's own policies forbid the use of force to impose discipline on inmates to remediate such behavior.

Witnesses also told the Commission that LASD personnel have used force against an inmate simply because the inmate questioned a particular action or deputy decision. One inmate stated that he was beaten for asking why he had been denied showers. Another inmate told the Commission that when he asked why he was being moved from his cell, the deputy handcuffed him, strip-searched him in the hallway, and began punching the back of the inmate's head. Although the inmate was still handcuffed and wearing only boxers, seven more deputies and a Custody Assistant ran towards the scene and joined in a beating that lasted approximately five more minutes until a Sergeant arrived.

Witnesses also recounted the use of excessive force to ensure compliance with a deputy's order, even though no threat was present. In one incident the Commission heard about, a non-inmate witness saw an inmate walking towards an area of the jail with a deputy shouting, "Stop! Stop!" The inmate did not obey the order and continued to walk. The non-inmate witness saw the deputy walk up to the inmate and smash his head into the wall. The inmate then fell to the floor and the deputy began kicking the inmate. Other deputies joined the altercation as well.

The Commission also learned that large groups of deputies have rushed towards the location of a force incident to join the use of force against an inmate who no longer posed a threat. While the involvement of additional deputies should be expected to lessen the threat posed by a single inmate, the Commission has been told that the involvement of numerous deputies prolongs and intensifies the use of force, frequently leading to the use of excessive force. One deputy describing an incident involving two handcuffed and waist-chained inmates on the 3000 floor of MCJ explained: "When force happens, the whole world rolls. Especially if a deputy's involved . . . . Like everybody from our floor responded. I believe 2000 [floor deputies] responded. So there was – I couldn't even tell you how many deputies were up there." In another instance, an inmate on the 3000 floor of MCJ in February 2011 saw an inmate charged with attempted murder of a police officer being dragged out of the shower area by a group of deputies. The deputies took the inmate up the cell row where the inmate witness could not see what was happening. However, the inmate said that he heard what "sounded like a stampede," which he believes was the rush of deputies to the scene. When the deputies returned with the other inmate, he was covered with boot prints all over his chest and back. One of the deputies said to the inmate, "Bet you won't [expletive] with cops anymore, will you?"

The Commission also was told of incidents in which the force used may have been initially justified based on aggressive behavior by the inmate, but the deputy either used an amount of force disproportionate to the threat posed or continued to use force after the threat had been neutralized. For example, in July 2007, a deputy encountered an inmate who had left in the middle of a church service at MCJ. When the inmate clenched his fists and slowly began swinging his body back and forth, the deputy immediately kicked the inmate. Another deputy yanked the inmate to the ground and the inmate was punched repeatedly in the face and the body. A third deputy arrived and put the inmate in an arm lock and a fourth deputy pepper sprayed the inmate. When the inmate allegedly grabbed a deputy's leg, one deputy punched the inmate five times in the ribs and another deputy repeatedly struck the inmate with his flashlight until the inmate released his grip. The inmate was treated for a bloody nose, facial swelling, and a bruised arm.

A video of another incident in April 2011 shows that an inmate, who allegedly had a shank hidden in his anus and refused to be X-rayed, was taken to a different part of the jail and

handcuffed. A deputy said something to the inmate and, in contravention of orders, un-cuffed the inmate, who swung at the deputy. Three or four deputies responded, beat the inmate while he was lying on the floor, and then dragged him to a back room where they repeatedly used a Taser on him.

The Commission recognizes that some of these incidents were disputed by deputies and that inmates are not always reliable witnesses. Nevertheless, the number of incidents the Commission learned about from a wide range of sources -- including non-inmate witnesses, Department records, and OIR -- and the consistent fact patterns among many of these incidents are disturbing and cannot be ignored.

2.    **The drop in use of force incidents following public scrutiny of LASD corroborates the anecdotal evidence of a historical use of force problem.**

LASD provided the Commission with the number of Custody Division use of force incidents recorded in the Department's internal tracking systems from 2002 through June 30, 2012. While this data and other information analyzed by the Commission reflect troubling trends regarding the use of force in the jails (see discussion below), there has been a marked drop in use of force incidents that coincides with increased public scrutiny of LASD practices and deputy conduct in the jails. This recent drop-off in use of force indicates that LASD has the ability to reduce force when it makes a commitment to do so and that the higher system-wide levels of force in prior years were unnecessary and excessive.

The Department statistics for January 1, 2006 through June 30, 2012, classify force incidents as either "Significant Force" or "Less Significant Force." Although the Commission has concerns about the reliability of LASD's data (see discussion in finding 10 below), it nonetheless reflects a dramatic reduction in Less Significant Force incidents from 582 incidents in 2006 to 163 incidents in 2011 (a 72% reduction). The reduction in Significant Force during this same time frame is much less dramatic; Significant Force incidents went from 588 in 2006 to 418 in 2011 (a 29% reduction).

This reduction, however, must be considered in the context of the reduction in the inmate population during these same years. While the daily population within the jail system is continually in flux, LASD has provided the Commission with the Average Daily Inmate

Population ("ADP") for each year from 2007 through 2011. This information reflects that while the absolute number of use of force incidents decreased from 2007 through 2011, the ADP for the same time period fell from 19,961 to 16,696, a drop of 16%. Other data provided by the Department states that the ADP in 2011 was 15,013, which means the decrease in ADP between 2007 and 2011 was as much as 25%. As these figures reflect, the reduction in Significant Force in Los Angeles County jails during the period 2006 through 2011 is only slightly greater than the reduction in the inmate population. In 2012, however, there have been only 121 Significant Force incidents through June 30, or 242 on an annualized basis, even with an increased inmate population. This is a 59% reduction in Significant Force incidents from 2006 and a 42% reduction from 2011. Thus, starting in the fall of 2011, the number of Significant Force incidents began to drop dramatically.

There are two notable observations that flow from LASD data. First, there was a dramatic increase in Significant Force incidents from 2008 to 2009, 611 incidents in 2008 to 761 incidents in 2009, the majority of which occurred at MCJ (171 to 258) and the Twin Towers facility (150 to 208). In 2008 and 2009, there were 13 force incidents in MCJ involving inmate fractures, which was more than the combined number of fractures from August 2002 through the end of 2007.[1] Tellingly, after Commander Robert Olmsted directed Lieutenant Mark McCorkle to conduct an analysis of over 150 "force events" at MCJ and directed Lieutenant Steve Smith to identify deputies with high use of force in late 2009, Significant Force was reduced (to 494 in the next year), with most of the decrease in MCJ (258 to 116) and Twin Towers (208 to 149).

Second, the most dramatic reductions in force have occurred since the formation of the Commander Management Task Force by the Sheriff and the appointment of this Commission by the Board of Supervisors last fall. Around that same time, the ACLU of Southern California released a report on jail violence in LASD facilities and the *Los Angeles Times* published a series of articles bringing allegations of abuse to light. The public scrutiny and the Commander Management Task Force's actions created an environment in which the Department began to make changes to reduce its use of force, with an emphasis on reducing Significant Force.

---

[1] This data is based on information from LASD's Personnel Performance Index ("PPI"). Data from LASD's Facility Automated Statistical Tracking ("FAST") system states that there were 0 fractures in 2008 and 2009. As discussed below, there are non-trivial differences between FAST and PPI data on use of force incidents.

*Report of the Citizens' Commision on Jail Violence*

The recent reductions in force incidents are reflected in the chart below. Notwithstanding an increase in the inmate population, the average number of all force incidents per month from October 2011 through June 30, 2012 is 38, as compared to 84 from 2006 through December 2010, which is when a Christmas party fight among deputies from MCJ occurred at the Quiet Cannon restaurant,[2] and 53 for the first nine months of 2011 (before the CMTF was created). Similarly, the average number of Significant Force incidents per month since October 2011 is 20, as compared to 51 for the five years from 2006 to 2010, and 41 for the first nine months of 2011.

### USE OF FORCE STATISTICS SUMMARY

| ALL FORCE INCIDENTS MONTHLY AVERAGES 2006-2012 | | | |
|---|---|---|---|
| Date Range | Jan 2006 – Dec 2010 | Jan 2011 – Sept 2011[3] | Oct 2011 – June 2012 |
| Number of Months | 60 | 9 | 9 |
| Total Number of Force Incidents | 5049 | 478 | 344 |
| Average Number of Force Incidents per Month | 84 | 53 | 38 |

| SIGNIFICANT FORCE INCIDENTS MONTHLY AVERAGES 2006-2012 | | | |
|---|---|---|---|
| Date Range | Jan 2006 – Dec 2010 | Jan 2011 – Sept 2011 | Oct 2011 – June 2012 |
| Number of Months | 60 | 9 | 9 |
| Total Number of Significant Force Incidents | 3057 | 368 | 179 |
| Average Number of Significant Force Incidents per Month | 51 | 41 | 20 |

---

[2] The Sheriff has been quoted as saying that he learned about force problems in the jails at the time of this 2010 fight.
[3] The 2011-12 force data is from a letter from the Department to the County Board of Supervisors dated July 10, 2012. We note there are some minor discrepancies between the data in the letter and the other data from the Department, but we do not believe they are material to the analysis.

As can be seen from the data, there has been a dramatic decline in use of force incidents following public scrutiny as well as changes instituted by the Sheriff. While this is commendable, the data also indicates that the force used in the past need not have occurred. LASD's recent ability to markedly decrease the number of force incidents through changes in practice, policy and personnel shows that many force incidents in the past could have been avoided and were thus unnecessary and, under the Department's use of force policies, "unreasonable." (See discussion in finding 6 below.)

Although force incidents have fallen in number, this does not signal that the problem has been resolved. Nor does the decline suggest that the many other problems associated with use of force -- including the failure of jail staff to report force incidents, the tactics used leading up to force incidents, inadequate first line supervisors and training, and lax discipline imposed on jail staff who use force excessively -- have been addressed. To the contrary, other information and statistics on use of force, as discussed below, suggest that use of force remains a serious problem in Los Angeles County jails and that force may revert back to previous levels once the spotlight is off this issue.

**3.      The majority of force used in Los Angeles County jails has been Significant Force.**

During the period of the Commission's review, the Department defined "Significant Force" as involving any of the following factors:

- The inmate suffers an injury resulting from use of force;

- The inmate complains of pain or injury resulting from use of force;

- There is an indication or allegation of LASD misconduct in the application of force; or

- There is an application of force greater than a Department-approved control hold, come-along, or take down.[4]

---

[4] According to OIR's Tenth Annual Report, in the future the Department will have three categories of force: (1) force that meets the criteria for an IAB roll-out, which involves the most serious injuries and significant force; (2) force where there is no identifiable injury whether or not there is a complaint of pain; and (3) all other force.

*Report of the Citizens' Commision on Jail Violence*

A force incident involved "Less Significant" force when there is no injury, complaint of pain or any indication of misconduct, and the incident is limited to any of the following:

- Searching and handcuffing techniques resisted by the suspect;

- Department-approved control holds, come-along, or take down; or

- Use of Oleoresin Capsicum spray, Freeze +P or Deep Freeze aerosols, or Oleoresin Capsicum powder from a Pepperball projectile when the suspect is not struck by a Pepperball projectile.

From 2006 through 2011, Significant Force constituted a clear majority of the force used by Department personnel. During this period, 62% of the use of force incidents involved Significant Force and 38% involved Less Significant Force. Moreover, the percentage of Significant Force increased during this period. In 2006, Significant Force constituted 50% of all incidents; in 2011, the proportion of Significant Force rose to 72%. Notably, 81% of all force incidents at MCJ in 2011 involved Significant Force. This high proportion of Significant Force incidents relative to Less Significant Force incidents strongly suggests that LASD personnel may not have been using the least amount of force necessary to combat the threat of harm or are not reporting this lesser use of force.

The percentage of Significant Force incidents has decreased recently since the formation of the Commander Management Task Force and the appointment of this Commission. In October 2011, there was a large decrease in the number of Significant Force incidents, and November 2011 was the first month in which the number of Less Significant Force incidents was higher than Significant Force Incidents. In the first six months of 2012, Significant Force comprised 53% of all force incidents, in contrast to 2011, when Significant Force was 72% of all force incidents. Again, this data suggests that when LASD pays attention to these issues, improved practices can be achieved.

**4.      Most force in Los Angeles County Jails is non-directed and unsupervised.**

Directed Force is force carried out at the direction of a supervisor. Conversely, non-directed force involves no direction from a supervisor and, as such, is less guided or planned. Unsupervised force is force in the absence of a supervisor. Eighty-four percent of all force incidents in Los Angeles County jails from 2007 through 2011 were non-directed. In the same

period, for 73% of all use of force incidents, no supervisor was present when the incident occurred (which may have been due, in part, to the insufficient number of supervisors). In 2011, 78% of the force was nondirected and 66% of the force was unsupervised.

That nearly all LASD force is non-directed, and the vast majority is unsupervised, indicates that often force is the result of on-the-spot decision making instead of planned and/or supervised action. This is problematic because, as discussed below, the evidence shows that 57% of the force situations in 2011 did not arise from inmate assaultive conduct and, therefore, time should have been on the side of the deputies to call a supervisor before using force.

**5.      Most force incidents in 2011 were not in response to inmate assaults.**

The Department provided information on inmate behavior leading to use of force incidents, including whether the inmate was engaged in "inmate assaultive behavior." These statistics similarly reflect troubling patterns in regard to the circumstances underlying force incidents.

LASD's policies draw a distinction between types of inmate behavior, classifying inmate conduct as: (1) cooperative; (2) resistive; (3) assaultive/high-risk; and (4) life-threatening/serious bodily injury. LASD defines assaultive/high-risk behavior as follows:

> An unlawful threat or unsuccessful attempt to do physical harm to another, causing a present fear of immediate harm; a violent physical attack; a situation in which the totality of articulated facts causes a reasonable officer to form the opinion that a significant credible threat of violence exists. The assaultive individual has crossed the line of resistance and is threatening an assault, attempting an assault, or physically assaulting the Department personnel or citizen. This category also deals with high-risk situations. In this category, the likelihood of injury is obvious due to deliberate assaultive actions or other significant threatened actions. These actions (or threatened actions) are so obvious as to make a reasonable person realize that they must do something to defend themselves, or others.

In contrast, LASD describes resistive conduct this way:

Resistive behavior involves physical or verbal resistance to lawful orders/actions. There are two categories of resistance: passive and active. If the resistance is passive, the individual has refused to follow orders given by the Deputy. If the resistance is active, they may display a number of actions such as running away, flailing their arms, or pulling away. Physical/active resistance can also include the individual assuming an aggressive posture or stance, running away, physically resisting efforts to be secured/handcuffed/controlled, or obscene gestures directed toward lawful presence or requests. An individual's verbal/non-verbal physical actions can be interpreted to mean that they will not comply with orders or requests made and will resist, not allowing control to be exerted over him/her. The suspect is not specifically "attacking" and does not fully intend to assault or batter.

According to LASD's data, in 2011, there were 581 use of force incidents in the jails. Of these, 250 or 43% involved either (1) an inmate vs. inmate assault or (2) an inmate vs. staff assault. The LASD documents containing this information did not specifically define "assault," but it appears that these incidents fall within the Department's definitions of "assaultive/high-risk" or "life threatening/serious bodily injury" inmate behavior, which encompass situations in which an inmate assaults another person. While LASD's documents did not provide specific details as to what types of behaviors were involved in these remaining 331 incidents, it appears likely that, under LASD's definitions of inmate behavior, the inmates must have been "resistive," as no force should be used if the inmate is cooperative and any assaultive or high-risk conduct is likely included in the incidents classified as an inmate vs. inmate assault or an inmate vs. staff assault. Thus, the remaining 57% of the use of force incidents in 2011 did *not* involve inmate assaultive activity. Put differently, in nearly three out of five force incidents, LASD personnel used force against an inmate who was *not* engaged in an assault and who may have done nothing more than passively disobey an instruction.

Of even greater concern is the level of force used to respond to these incidents of non-assaultive behavior. In 2011, there were a total of 418 Significant Force incidents and a total of 250 force incidents that involved inmate assaultive behavior on either another inmate or a deputy. Even assuming that Significant Force was used to respond to *all* of these assaults, there would still be 168 Significant Force incidents that did not involve inmate assaultive behavior.

Stated otherwise, Department personnel used Significant Force on at least 168 occasions (and probably more) to respond to, at most, resistive behavior.

These figures lead to disturbing conclusions about the quantity of force employed and tactics leading to force incidents. They show that deputies frequently use force against inmates who are not attacking anyone and are simply uncooperative or passively resistant. Moreover, that 57% of the force incidents in 2011 were directed against non-assaultive inmates suggests that deputy tactics and skills for interacting with inmates are poor and too often result in the use of force.

An internal Department memorandum prepared by Lieutenant Mark McCorkle in September 2009 at Commander Olmsted's request raised these exact concerns. The memorandum, which was based upon an examination of more than 150 MCJ force packages, noted that "[w]hile in many instances the use of force was reasonable and justified, the events leading up to the incident were not." In other words, even if force was justified to overcome resistance or respond to an assault, the use of force was still problematic because LASD personnel could have used other tactics to avoid altogether the circumstances that eventually resulted in violence. That same memorandum identified poor deputy communication skills as a possible precipitator of force, noting that "the manner in which deputies speak to inmates may play a role in inciting assaults," and questioned whether some force events could have "been mitigated by contacting a supervisor regarding a hostile or uncooperative inmate." These observations, when coupled with the data reflecting that most force in 2011 was used against inmates who were not attacking anyone, suggest that many deputies and Custody Assistants lack the skills, training, or judgment required to handle inmates in a safe and responsible manner. They further confirm that too often force has been used as a first response, rather than as a last resort.

6.    **LASD imposed discipline for unreasonable force violations in less than 1% of force incidents from 2006 to 2011.**

The Commission obtained information on the number of times the Department has imposed discipline after determining that allegations of "unreasonable" use of force incidents were "founded" and out of policy. During the period from 2006 through 2011, *only 36 out of a total of 5,630 use of force incidents* in LASD jail facilities were deemed to be unreasonable.

Thus, according to LASD data, only 0.6% of use of force incidents involved unreasonable force in violation of LASD policy. A use of force expert who testified before the Commission noted that this percentage is exceedingly low.

That the Department found that less than 1% of LASD use of force incidents in the jails involved unreasonable force suggests that the Department is not correctly applying its own policies in assessing force incidents. The Department Custody Manual provides that "[u]nreasonable force is that force that is unnecessary or excessive given the circumstances presented to Department members at the time the force is applied. Unreasonable force is prohibited. The use of unreasonable force will subject Department members to discipline and/or prosecution." The substantial reduction of force after public scrutiny suggests that much of the force that was used prior to October 2011 could have been avoided, and was therefore unnecessary and in violation of Department policy.

LASD internal evaluations of force reflect deficiencies in LASD's investigation system that may account for these very low out-of-policy findings. In the memorandum by Lieutenant McCorkle referenced above, he found numerous examples of policy violations or lack of familiarity with policy requirements. Moreover, he noted that events were "dramatized to justify outcome," and "[v]ery few of the [use of force] packages identified potential policy violations and none were found that recommended any type of disciplinary action." In 2010, Captain Greg Johnson circulated his own analysis of a smaller number of use of force reports from MCJ. His memorandum noted several other concerns, including the fact that many of the force reports omitted important facts or lacked sufficient data. These memoranda, when compared with the Department's determination that 99.4% of its force incidents are "reasonable," paint a picture of an inadequate investigatory and disciplinary system.

7.     **Deputies have enabled inmates to use force against other inmates.**

Numerous witnesses reported that deputies enabled inmates to attack other rival inmates by opening the doors to several cells at once, which inmates refer to as "racking the gates." The Commission was also told about deputies who allowed "enforcer" inmates to attack other inmates the deputies wanted "regulated." And the Commission heard the testimony of a former inmate who described an incident in which two groups of inmates appeared poised to fight in a

dorm in MCJ. Rather than trying to defuse the situation, deputies who were present simply watched the entire episode and speculated as to which inmate was going to be the first to swing.

In addition, the Commission heard about deputies who have placed inmates in dangerous situations. K-10 inmates are high-security "keep-away" inmates, including alleged rapists and child molesters. Witnesses told the Commission that deputies would place these K-10 inmates in the general population and announce their crimes to the other inmates. These allegations have been corroborated by recently installed video cameras, which captured a deputy improperly escorting a high-security inmate together with general population inmates. The Commission has also learned of allegations that deputies intentionally placed an inmate in harm's way by putting him in the same cell with a rival gang member or with an inmate known to be violent or a sexual predator.

Corroborating these accounts is information provided to the Commission by the County indicating that the County has paid $9.47 million to settle lawsuits alleging that deputies intentionally or negligently enabled inmates to assault other inmates. This figure is out of a total of $25,640,144 in settlement payments and litigation costs arising from claims by inmates of improper force -- whether by inmates or by deputies – while in the Department's custody.[5]

8.    **Deputies have used humiliation as a tool to harass inmates.**

Witnesses told the Commission that deputies intentionally humiliate inmates. Inmate witnesses recounted the following incidents, among others: One inmate said he was forced to strip naked and walk in a general population module because a Sergeant mistakenly thought that he was stealing mail. Another inmate reported that he was strip-searched by a deputy who placed his flashlight half an inch into the inmate's rectum.

Jonny Johnson testified that he was beaten in October 2009 simply for telling deputies to stop verbally abusing a mentally-challenged inmate. Johnson stated that deputies took him to an isolated area, pushed his head against the wall and hit him repeatedly in the ribs and the chest. Johnson was then forced to hand out bedding and linens to other inmates and say to each inmate, "I'm a faggot. The deputies are the bomb."

---

[5] Of this amount, $4.575 million was paid for assaults on inmates by deputies in holding cells in a Station and two courthouses.

*Report of the Citizens' Commission on Jail Violence*

A retired LASD Lieutenant described similarly abusive conduct to Commission staff. He explained that in recent years deputies were more likely to force inmates to face the wall and strip-search them in front of everyone to embarrass them for minor infractions. A former inmate at the Pitchess facility told the Commission that he was subjected to seven consecutive strip searches because deputies were mad about a riot that had recently occurred on the inmate's floor. When the inmate finally protested, he was handcuffed and left naked in the shower area for six hours until a Sergeant finally arrived on the floor.

Strip searches under any circumstances can cause inmate humiliation and anxiety. For these reasons, other large jails -- including those in Cook County and New York -- have put in place body scanner machinery that can substantially reduce (and even largely eliminate) the need for strip searches.

### 9.    Use of heavy flashlights as impact weapons leads to unnecessary injuries.

Until recently, LASD provided its deputies with long, heavy metal flashlights for illumination. These flashlights are filled with lead batteries, are not well-balanced and have sharp edges. Thus, if a deputy strikes an inmate with the flashlight, the inmate can sustain serious injuries.

The Sheriff has recently instituted, effective September 1, 2012, a policy change prohibiting the use of the heavy metal flashlights. This recent change represents an important step forward for reducing unnecessary inmate injuries.

### 10.    LASD's statistics on use of force are not reliable.

Like all statistical information, the conclusions that can be drawn from the data are only as reliable as the data itself. Unfortunately, there are numerous indicia that the statistical data provided by LASD may not be completely reliable. For example, the number of unreasonable force incidents identified by LASD and discussed above is in conflict with OIR summaries of Department actions. In its October 2011 Report, OIR reported on 12 specific use of force incidents at County jails that resulted in discipline for the staff involved.[6] According to the OIR report, the 12 incidents (from as far back as October 2009) involved 19 employees who used

---

[6] OIR 2012 Report, pp. 13-22.

force and 10 discharges.[7] This conflicts with the data provided to the Commission by the Department, which shows only four discharges in all of 2009, 2010 and 2011. This inconsistency reinforces concerns with the reliability of LASD data.

Further, there is a concern with the data because of the evidence of underreporting of use of force incidents (see discussion in finding 11 below), which leads to a distorted picture of the true nature and extent of the excessive use of force problem. In addition to underreporting, LASD's inadequate data tracking systems create a separate basis for questioning the reliability of the force statistics.

LASD principally uses two data systems to track issues relating to use of force: the Personnel Performance Index system ("PPI") and Facilities Automated Statistical Tracking system ("FAST"). Both systems track use of force, albeit in different ways.

FAST is an "event-driven" system that is used by LASD management for statistical purposes to track information on a variety of topics, including inmate service complaints, medical issues and force incidents. LASD management uses FAST to identify and analyze trends in use of force incidents and generate statistical reports on where and how force occurs.

In contrast, PPI is a "personnel-driven" system that is used to organize information relating to LASD staff performance. PPI allows a user to pull up electronically scanned versions of use of force documents completed in connection with a force incident involving a specific employee. LASD uses PPI to analyze deputy performance on an individual basis.

A number of problems with these systems suggest that LASD statistics on force incidents are not totally reliable. First, there is no interaction between the PPI and FAST databases. As a result, one cannot look up a force incident in FAST and directly access the corresponding information in PPI. This has led to inconsistent use of force data between the two databases. At times the differences appear relatively small, but in other cases, the disparities appear considerable. For example:

- According to FAST, MCJ had 1,578 force incidents from 2006 through 2010. According to PPI, MCJ had 1,608 force incidents over the same time period.

---

[7] *Id.*

*Report of the Citizens' Commision on Jail Violence*

- According to FAST, there were 116 Significant Force incidents in MCJ in 2010. According to PPI, there were 100 such incidents that year, a difference of 16%.

- FAST data states that 102 Less Significant Force incidents occurred at MCJ in 2008, while PPI puts the number at 126, a difference of 26%.

- PPI data states that there were 15 force incidents in which MCJ inmates suffered bone fractures in 2008, 2009 and 2010. FAST data states that there were 0 fractures at MCJ during these years.

- PPI data states that 1,681 staff members (1,514 deputies and 167 Custody Assistants) used force in 2011 across all LASD jails. FAST states that 1,618 staff members used force -- 154 Custody Assistants (8% lower than PPI) and 1,464 deputies (3% lower than PPI).

Further, it is likely that information on force incidents is not entered into the data systems consistently. The process for data entry into FAST begins with a statistical tracking form, which is filled in by a Sergeant and Watch Commander after a force incident occurs in their facility. The form includes details on the incident along a variety of metrics, including location, injuries and force techniques used. A statistical coordinator at the unit then enters the information on that form into FAST. There is no manual that LASD personnel use when entering the information on a tracking form into FAST. Because of this, LASD personnel acknowledged that there is no guarantee that information about force incidents is being entered consistently.

For all these reasons, the picture painted by the statistics may not be reliable. Indeed, LASD employees with expertise on FAST and PPI indicated that the Department's data systems are in need of replacement or at a minimum a significant update or overhaul. For example, LASD personnel explained that FAST is currently antiquated due to a lack of support over the years and LASD would like to gather more information than FAST can handle.

Aside from inconsistent data and inadequate systems, another deficiency in these systems is that they do not track inmate grievances about force incidents by employee. Several experts consulted in connection with the Commission's investigation noted that tracking inmate grievances on use of force issues is essential to understanding the level of force in a jail facility and also serves as an "early warning system" that can identify problematic behavior and assist with efforts to remediate inappropriate use of force. Tracking is used for this exact purpose in many other corrections systems.

The problem with LASD's approach to tracking inmate use of force grievances is two-fold. First, PPI does not track inmate complaints *at all*. Thus, the Department's computer system used by supervisors and others to monitor employee performance does not reflect these complaints. This inhibits the ability to maintain a meaningful and complete early warning system.

Second, while FAST tracks inmate grievances in general, it does not provide LASD management with useful or timely analysis of use of force grievances. For example, historically the information on inmate grievances in FAST has only been retrievable by inmate name and *not* by *deputy* name. Thus, LASD has not been able to use FAST to find out how many complaints have been filed against particular deputies. In addition, FAST has data on the total number of complaints, but it does not separate those complaints into the various categories of inmate grievances, such as medical complaints, force complaints and facility complaints. As a result, FAST has not produced statistical trend analysis on use of force grievances that management can use to determine which facilities or staff are connected to excessive force complaints.

The Sheriff recently testified before the Commission that the Department is in the process of implementing changes that will enable inmate complaints to be retrieved in FAST by deputy name pursuant to a Custody Division Directive issued on July 25, 2012 (two days before the Sheriff's testimony). This information, however, still will not be available in PPI, which tracks personnel issues and concerns, and the data about grievances in FAST does not always provide meaningful information specifically relating to use of force.

It is important to note that despite the inadequacies of PPI and FAST, the Department was not stripped of the ability to identify use of force concerns and problematic employees. At a fundamental level, the use of force problem in the jails is a problem of identifying and then disciplining personnel who use inappropriate force. Notwithstanding some reliability issues, the Department has extensive data relating to force issues that is available to LASD management. For example, LASD provided to the Commission reports that identify which areas in the individual jails have the highest levels of force. The Department also produced reports identifying the number of force incidents that occurred in the specific shifts in each part of the specific jail facilities. PPI allows LASD to track which employees are using force more

frequently than others. Thus, the Department had sufficient data over time to identify the personnel who are using unjustified and/or excessive force.

**11.    Evidence suggests that the use of force is underreported.**

In addition to the problems with LASD's databases and statistics discussed above, there are several reasons to question whether all force incidents in Los Angele County jails are reflected in the Department's data and records. Numerous witnesses interviewed by Commission staff indicated that not all force incidents are reported by LASD personnel who used force or by inmates against whom force was used.

The most disturbing examples of a systemic breakdown occurred at MCJ in 2010 when LASD Lieutenant Michael Bornman analyzed approximately 100 unprocessed and incomplete use of force reports spanning several years that had not been entered into the Department's data tracking systems. As Bornman acknowledged in testimony before the Commission (discussed in greater detail in the Discipline Chapter), dozens of use of force cases were deemed unfounded years after the fact to simply close cases that had missing files, no witness statements, missing video tapes, and incomplete information upon which to assess deputy performance. Bornman's account reinforces concerns about the accuracy and reliability of LASD's reporting and tracking of force incidents. As recently stated by OIR, "the fact that internal deadlines are breached as often as they are honored calls into question how effectively the Department is managing and tracking its work in these important areas."[8]

Use of force incidents may also be underreported because witnesses fear that LASD personnel will retaliate against them for reporting an incident. Notably, LASD first articulated the concept of an anti-retaliation policy last fall, and finally included a specific policy in its Manual addressing anti-retaliation earlier this year. That the Manual did not previously incorporate an anti-retaliation policy is an indication that LASD was not sufficiently focused on this problem.

The Commission was told of retaliation or threats of retaliation by deputies against inmates who file (or try to file) a complaint following a force incident. Retaliation is reported to have taken several forms, including violent and nonviolent actions.

---

[8] OIR Tenth Annual Report (September 2012), p. 31.

*Report of the Citizens' Commission on Jail Violence*                    Page 47

For example, an inmate stated that he was returning to his cell after visiting his girlfriend, who had just complained to supervisors at MCJ about the way the inmate was being treated. The inmate was stopped in the hallway by approximately 12 deputies. According to the inmate, each deputy was wearing black weight-lifting gloves. When the inmate complied with a deputy's instruction to face the wall, he was immediately attacked from behind. One deputy deployed his Taser, causing the inmate to fall face-first to the floor unconscious. As the inmate drifted in and out of consciousness, he curled into a fetal position as the deputies continued to assault him with punches, kicks, and flashlight strikes. One deputy wrapped the inmate's shirt around his neck and choked him. Another deputy wiped the blood off of the inmate's face and then immediately pepper-sprayed him in the face. When the inmate was finally taken to medical care, he was diagnosed with a chipped tooth, broken nose, broken ribs and rhabdomyolysis, a condition in which muscle trauma causes disintegrated muscle tissue to be released into the bloodstream. He was hospitalized for 11 days.

The Commission also heard about incidents in which inmates were placed in disciplinary segregation immediately after deputies used excessive force against them. Placement in disciplinary segregation makes it very difficult for the inmate to report the incident to others and, furthermore, serves as a reminder to inmates of what actions can be taken by deputies against inmates who divulge deputy misconduct. At times, inmates have been charged with assaulting an officer following an excessive force incident, which can deter other inmates from filing complaints about excessive force. In recent months, at least one inmate successfully defended against such charges at trial, arguing that charges of assault were falsely brought in order to cover for excessive use of force by deputies.

Non-inmate witnesses also expressed a concern about retaliation and threatening conduct by deputies. An observer witness indicated that he was intentionally locked inside jail rows for extended periods of time by deputies. A non-inmate female witness indicated a male deputy threatened to "pat her down" before letting her enter his module. Another non-inmate witness said that the deputies used the names "rat" and "mother[expletive]" to refer to the witness following a force incident. Another non-inmate witness stated the deputies made several threatening comments, gave the witness dirty looks, and stared at the witness in an unsettling manner during future encounters.

Even deputies who report misconduct have been the subject of retaliation. The Commission learned of one case where a deputy who had witnessed a use of force incident that eventually led to another deputy's termination received threats about being a "rat." In another incident, a 2000 floor deputy asked that he be allowed to drop a claim of hazing and harassment because he was "worried about the consequences" and feared things would worsen if he pursued his claim.

Another contributing factor to the underreporting problem is the inmate complaint process (see discussion in the Discipline Chapter). First, some inmates need to ask a deputy for a complaint form. Witnesses told the Commission that deputies at times ignore an inmate's request for those forms. Second, even if the deputy obliges, in some instances the inmate must ask the deputy to put the form into the locked complaint box. Thus, inmates are forced to trust a complaint process that, at times, requires the participation of the very same deputies against whom the complaints are being made.

For example, an inmate on the 1700 module of Men's Central Jail attempted to file a complaint in December 2011. The inmate asked a deputy to put his complaint form in the locked complaint box that only a Sergeant could access. The deputy put the complaint form on top of the complaint box instead. This antagonized the inmate, who loudly complained that the complaint form needed to be put inside the box so that only the Sergeant could read the form. Later, when the inmate was waiting in line to get his haircut, the same deputy pulled him out of line and put him back in his cell because the inmate was purportedly "verbally aggressive" to the deputies.

For all of these reasons, our investigation suggests that the number of use of force incidents is likely underreported in the Los Angeles County jails and that the extent of the problem is larger than the existing data reflect.

The evidence of underreporting also raises the possibility that the dramatic decrease in Less Significant Force stems, at least in part, from a decrease in the reporting of that force. As noted above, over a six-year period ending in 2011, Significant Force was reduced from 588 to 418, which is a 29 % reduction and consistent with the reduction in the ADP referenced above. Because these incidents involved injuries and complaints of pain, they are more likely to attract

attention or generate paperwork such as hospital forms and medical records and, accordingly, more likely to be reported. During the same time period, however, Less Significant Force was reduced from 582 to 163, which is a 72% reduction and significantly higher than the reduction in the ADP. It is also higher than the reduction in Significant Force, even though under a "Force Prevention Policy" one would expect Custody personnel to use Less Significant Force in lieu of Significant Force where possible. Although there may be other explanations, we question whether some of this reduction was the result of deputies failing to report Less Significant Force, which is less noticeable and easier to conceal.

**12.    LASD does not have a comprehensive, integrated and understandable Use of Force Policy, nor does it ensure that deputies understand its policies.**

The Commission reviewed the Department's Manual and Policy of Procedures (the "Manual"), consulted with numerous force and corrections experts, and reviewed model use of force policies. While the Department is in the process of revising its force policy, these changes remain a work in progress. As such, the Commission has identified below concerns with the Department's current policies so that these issues can be factored into the Department's ongoing process of policy revisions.

According to experts, sound and clear use of force policies -- as well as accountability in regard to those policies -- are integral to addressing excessive use of force problems. Notably, some experts who have been involved in successfully turning around jails with a use of force problem have stated that one of the first things they did was draft a strong use of force policy that reflects in clear and concise language the overall philosophy and principles that govern use of force. They emphasized a culture of fidelity to those policies above all else.

Experts stated that, to be effective, the use of force policy must be a comprehensive and easy-to-understand guide on what to do when confronted with a use of force scenario. Deputies and Custody Assistants must know and understand: (1) the force they are authorized to use and (2) what they are required to report. Experts advocate use of force policies that contain all the use of force provisions in one document, beginning with higher-level principles, such as expected outcomes, and then funneling down to specific situations involving force and force reporting and investigation. The United States Immigrations and Custom Enforcement Detention Use of Force Policy and the California Department of Corrections and Rehabilitation Adult

Page 50                                          *Report of the Citizens' Commission on Jail Violence*

Custody and Security Use of Force Policy (the "CDCR Policy") are examples of such policies. These policies are comprehensive, covering all relevant issues involving the use of force, force reporting and investigations. The clear and coherent structure of the policies also means that the more detailed provisions reflect the higher principles.

By contrast, LASD provisions on the use of force are neither comprehensive nor easy to understand. There is no single, comprehensive, and organized policy, and the various provisions do not reflect unified higher-level principles governing all policies related to the use of force. Use of force provisions are scattered in seemingly random chapters and subsections in the Manual, as well as in unit directives, facility memoranda and other written orders. A deputy or supervisor would need to spend hours even to locate -- let alone read and understand -- the various provisions relating to the use of force scattered throughout the thousands of pages in the Manual. For example, the force reporting provisions follow a provision concerning rent control laws and are located hundreds of pages after policies describing when force is appropriate.

Even if the Department's use of force provisions were combined into a single document, this document would be incomplete and difficult to understand. LASD provisions concerning the use of force do not acknowledge that special populations in the jails, including the mentally ill, pregnant inmates, or special needs inmates, may require special techniques or consideration. Experts acknowledge the importance of developing particular rules for these populations, especially for inmates suffering from mental health issues who are often involved in use of force incidents.

LASD use of force provisions also have no organization or cohesion. Higher-level principles are scattered throughout LASD provisions on the use of force, and there is no clear order or structure communicating how each provision relates to the rest of the policies. New provisions such as those on force prevention and anti-retaliation have been added in seemingly random locations, and their guiding principles have not been incorporated into existing, and sometimes even contradictory, older provisions. Significantly, the Situational Use of Force Options Chart, which appears to be a key document governing deputy behavior in possible use of force encounters, is not even located in the Manual.

LASD generally acknowledges the importance of employees understanding the policy by requiring that supervisors shall: (1) "see that employees in their Unit are aware of the existence of the Department Manual of Policy and Procedures and the location within the Unit where a copy or copies are available for their use;" (2) "see that new employees read and understand the Policy and Ethics chapter;" and (3) post revisions to the unit bulletin board. LASD also requires its employees to "be familiar with and conform to, the policies and procedures of the Department manual." Yet, because of the problems described above relating to the lack of coherence and structure, LASD employees would find it extremely difficult to read and understand the policies that govern their exercise of force.

**13.    LASD did not have a policy that set forth basic force avoidance principles prior to November 2011.**

Last fall, following the public spotlight on LASD's use of force and the formation of the Commander Management Task Force as well as this Commission, the Sheriff personally drafted a "Force Prevention Policy." The final policy, set forth in the LASD Custody Manual 3-02/035.00 (Rev. 3/19/12), provides in pertinent part as follows:

> Department members shall only use that level of force
> which is objectively reasonable to uphold safety in the jails
> and should be used as a last resort.
>
> * * *
>
> When force must be used, deputies and staff shall endeavor
> to use restraint techniques when possible, and use only that
> level of force required for the situation, consistent with the
> Department's Situational Use of Force Options Chart.

It is notable that LASD did not have a policy incorporating these basic and fundamental principles until the Sheriff drafted it late last year. When asked why the Department did not have this policy before then, the Sheriff could only respond that it was a "great question." Experts consulted by the Commission noted that these are fundamental principles that corrections departments have had in place for many years. The Commission believes that the failure of LASD's policy to articulate these basic use of force principles until very recently sent the wrong message to deputies and Custody Assistants regarding the propriety of excessive use of force in the jails.

The Sheriff's decision to add a force prevention provision represents a step forward for the Department. Nonetheless, such a provision by itself is not sufficient unless it is fully integrated into an overall coherent use of force policy. Due to the organization of LASD's policies, the current Force Prevention Policy is not located with any other provision concerning the use of force in the Custody Manual.

Further, the principles set forth in the Force Prevention Policy are not reflected in the Situational Use of Force Options Chart, which is referenced in the Force Prevention Policy. The Chart does not tell deputies and Custody Assistants that they should only use force as a last resort and then only use the minimum force necessary. Instead, it directs them to choose from a set of force options based on which category the inmate's behavior fits into. This structure breeds confusion and provides a mixed message to deputies regarding how to evaluate the appropriate use of force in any given encounter.

**14.    The Situational Use of Force Options Chart is not an adequate or well-founded use of force guide.**

The Situational Use of Force Options Chart (the "Chart") is the primary guide for deputies and supervisors regarding how to exercise force. Other than the Chart, the Department's provisions on the use of force provide little specific guidance on when and how much force is appropriate.

The Chart divides inmate's actions and behavior into four separate categories: (1) cooperative; (2) resistive; (3) assaultive/high risk; and (4) life-threatening/serious bodily injury. The deputy determines which category the inmate's actions and behavior fall into based on his or her perception of the incident and analysis of the facts. The deputy's perception of the incident is influenced by a number of factors, including: "the deputy's understanding of State and Federal laws [and] Departmental policies," the deputy's "training," the deputy's "size, strength, personal fitness level, self-defense capabilities, and self-confidence . . .," the deputy's "[p]rior experience," "[a]ny and all factors . . . which influence the deputy's perception of the incident . . . " and "[f]actors regarding the suspect such as: mindset, physical fitness, weapons, comparative size, level of intoxication, number of suspects, training of suspect, perceived suspect self-defense capabilities . . . ." These are virtually all subjective metrics, and do not reference the constitutional standard of "objective reasonableness."

*Report of the Citizens' Commission on Jail Violence*                                    Page 53

Once the deputy determines the category of an inmate's actions and behavior, the Chart lists the available options. For resistive behavior, the Chart allows "control holds," "firm grip," "defensive tactics" such as "takedown," "intermediate weapons control techniques" such as controlling the inmate "by the use of an impact weapon in a restraint capacity," and "chemical agents."

Many experts reject this type of rigid use of force matrix as unhelpful and problematic. The Chart does not accurately or realistically reflect the quickly changing nature of a deputy-inmate confrontation. The lines between cooperative and resistant or resistant and assaultive behavior are blurry, and deputies and supervisors likely have a difficult time determining which category the inmate's conduct fits within during each moment of a fast-moving use of force encounter. Because a rigid force matrix does not accurately capture the nuances of a use of force incident, experts warn that deputies may try after the fact to fit their actions within the proper box based on the force that was used, and thereby falsely characterize the incident, instead of attempting to use force that was objectively reasonable under the circumstances and then honestly articulating the level of force that was used and the basis for that use of force.

The Chart is also problematic because it includes no mention of avoiding or minimizing the use of force and instead implies that the deputy may use any of the options in the applicable category that he or she subjectively believes to be appropriate. By prescribing options based on the inmate's category, the Chart appears to allow and perhaps even call for uses of force that may be unnecessary. For example, a deputy following the Chart in dealing with a resistive inmate may elect not to attempt verbal communication or call a supervisor before exercising force, even if the situation would be better addressed by on or both of those options.

15.    **LASD policies concerning the reporting of force are confusing and fail to clearly articulate the timeline and process for reporting.**

Ambiguities and omissions in use of force reporting requirements -- including failing to require written reports within any defined time period, failing to include precautions to ensure untainted reports based on independent witness accounts, and failing to require statements by all participants in and witnesses to the force -- diminish the integrity and reliability of the reporting process. (Problems that relate to the investigatory process will be discussed in the Discipline Chapter.) These concerns are manifest in the current LASD policies in a host of ways.

First, although Department members are required to verbally report a use of force incident, the provisions do not clearly indicate when a Department member is required to write a use of force report. Instead, the reporting provision states "[w]henever an incident involving reportable force requires a first report, all details regarding the use of force shall be included in the report," but it fails to make clear when a "first report" must be prepared.

Second, the provisions do not clearly require all Department witnesses to the force incident to write a written report. Experts agree that *all* personnel involved in a use of force incident and *all* personnel who witnessed a use of force incident should be required to write a use of force report. Requiring a use of force report from Department participants and all witnesses ensures that there is proper documentation of the use of force incident, improves the accuracy of reporting, and allows proper review.

Third, the provisions do not prohibit personnel involved in a force incident from collaborating with each other in the preparation of use of force reports. When multiple deputies involved in a force incident speak with each other before providing their statements or writing their reports, they can taint each other's recollections of the incident. Other agencies' use of force policies, such as the CDCR Policy, specifically prohibit personnel from such collaboration.

Fourth, the provisions are unclear as to the timing of and supervisorial involvement in reporting requirements. There is a lack of clarity as to when -- or if -- a supervisor must complete a "Supervisor's Report" on use of force, or how these requirements play out when other teams outside the unit engage.

Experts stress the importance of prompt reporting of all use of force incidents, and many corrections leaders described the need for a clear policy requiring completion of force reports before the end of the shift when force was used. Yet these requirements are absent from LASD policies. Failing to require timely reporting and review leads to inaccurate reporting and an environment of lax attention to these issues.

## Recommendations

**3.1    LASD should promulgate a comprehensive and easy-to-understand Use of Force Policy in a single document.**

For LASD personnel to be able to act in accordance with the Department's Use of Force Policy, the policy must be comprehensive, readily accessible, and easy to read. There should be a single document that sets forth in clear and consistent language in the policy manual: (1) overall principles governing the use of force; (2) specific and clear provisions providing guidance regarding the use of force; (3) a list of the weapons that LASD personnel are and are not authorized to carry; and (4) requirements and specific time limits for reporting force incidents.

**3.2    LASD personnel should be required to formally acknowledge, in writing, that they have read and understand the Department's Use of Force Policy.**

**3.3    All LASD Custody personnel should be provided training on a new comprehensive and easy to understand Use of Force Policy and how it applies in Custody.**

The Department's Use of Force Policy is only as effective as the understanding of the policy by Department personnel. The Department should provide personnel with dedicated training on a new comprehensive and easy to understand Use of Force Policy. This training should emphasize the importance of complying with the policy, include specific training on how the policy applies in the Custody setting, and should make clear that if any other training conflicts with the policy, the force policy controls.

**3.4    The Department's Use of Force Policy should reflect a commitment to the principles of the Force Prevention Policy and prohibit inmate retaliation or harassment.**

According to OIR's Tenth Annual Report, "the new section containing force-related policies" in the Department's newly revised Manual of Policy and Procedures "begins with a statement echoing the values expressed in the Force Prevention Policy." In addition to incorporating the provisions of the Force Prevention Policy providing that LASD personnel use force "as a last resort" and then only use the minimum amount of force necessary under the circumstances, the policy should also incorporate the provisions of the Anti-Retaliation Policy that force cannot be used to retaliate against inmates for any reason, to discipline inmates for misconduct by inmates, or to harass or intimidate inmates.

**3.5** **LASD's Use of Force Policy should be based upon the objectively reasonable standard rather than the Situational Use of Force Options Chart.**

The Department's Situational Use of Force Options Chart is ill-suited to the dynamic and rapidly changing nature of deputy-inmate interactions and confrontations, and it does not reflect the principles of the Force Prevention Policy. Instead of attempting to justify a specific type of force based upon specific inmate behavior, the Department's Use of Force Policy should be predicated upon the constitutional standard of what an objectively reasonable law enforcement officer would do under the circumstances. This will require LASD personnel to articulate the reasons for their use of force, which will be judged by an objectively reasonable standard that takes into account the totality of the circumstances under which the force was used.

**3.6** **The Use of Force Policy should articulate a strong preference for planned, supervised, and directed force.**

LASD should distinguish between reactive and planned force and make clear in its policy the Department's preference for planned, supervised, and directed force.

**3.7** **The Use of Force Policy should account for special needs populations in the jails.**

Specific instructions for special populations within the jail, such as inmates with special needs, may provide deputies with the tools to avoid use of force encounters and will better protect deputies and inmates. For example, the Use of Force policy should state that, if a situation arises involving a special needs inmate, the appropriate medical or mental health staff should be consulted, whenever possible, prior to the planned use of force. For mentally ill patients, this could possibly avoid an unnecessary confrontation and use of force.

**3.8** **PPI and FAST should be replaced with a single, reliable, and comprehensive data tracking system.**

PPI and FAST are antiquated and cumbersome systems that should be replaced or overhauled. The replacement or updated system would provide a single data tracking system for both statistical analysis and for monitoring employee performance. This would eliminate a source of inconsistent data on use of force.

Procedures and rules for data entry for use of force tracking systems should be uniform so that data and force incidents are entered and classified consistently.

*Report of the Citizens' Commission on Jail Violence*                                          Page 57

The Commission is well aware that the creation of an upgraded and improved tracking system requires a substantial investment of resources and time and urges the Board of Supervisors to provide the necessary funds for such an upgrade. The Commission believes, however, that interim steps to enhance reliability and reporting can and should be instituted by the Department.

**3.9    Inmate grievances should be tracked in PPI by the names of LASD personnel.**

Inmate grievances must be tracked by the names of LASD personnel to identify deputies who may not have the interpersonal skills to deal with inmates in a Custody setting, identify deputies who have used force on too many occasions, and comply with the Department's obligations in responding to *Pitchess* motions for deputy-specific information. The recent change to FAST is intended to enable the Department to comply with its obligations in connections with *Pitchess* motions. This change does not, however, provide a comprehensive way to track potentially concerning information in a single integrated personnel system. Until the Department overhauls the FAST and PPI systems, the Commission recommends that the information be captured in PPI as well as FAST so that LASD supervisors will only have to query the PPI database to obtain all relevant information for personnel under their supervision.

**3.10    LASD should analyze inmate grievances regarding use of force incidents.**

Analyzing inmate force grievances is essential to understanding the level of force in Custody facilities. LASD should analyze inmate grievances to assess whether individual deputies may be using unnecessary or excessive force and whether there may be use of force problems in particular facilities or particular areas of the jails.

**3.11    Statistical data regarding use of force incidents needs to be vigilantly tracked and analyzed in real time by the highest levels of LASD management.**

**3.12    The Board of Supervisors should provide funding so that the Department can purchase additional body scanners.**

Body scanner machinery can substantially reduce (and even largely eliminate) the need for strip searches, which have been a significant source of tension in the jails. While this equipment is expensive, the Commission supports ongoing efforts by LASD to invest in the

purchase of body scanners for its jails and thereby reduce the need for strip searches, and urges the Board of Supervisors to appropriate the funds necessary to purchase the additional scanners.

*Report of the Citizens' Commision on Jail Violence*

# CHAPTER FOUR
# MANAGEMENT

## Introduction

The excessive force over a period of years in Los Angeles County jails -- and in particular Men's Central Jail -- was due, in no small part, to significant failures of the senior leadership in the Sheriff's Department. Both Sheriff Baca and Undersheriff Tanaka have, in different ways, enabled or failed to remediate overly aggressive deputy behavior as well as lax and untimely discipline of deputy misconduct in the jails for far too long. It is the Commission's view that absent strong, engaged and informed leadership over Custody -- and a more direct line of authority and accountability emanating from the Sheriff -- the Department is unlikely to achieve a lasting reduction in excessive force within its jails.

The Sheriff has claimed that he "did not know" of the problems in the jails until last fall, when the ACLU issued its report on jail violence and the *Los Angeles Times* published a high-profile series of critical articles. Yet these problems are nothing new. Issues with the jails have been detailed for decades in reports by Judge Kolts, Special Counsel, and OIR.

The Sheriff has faulted his senior staff for failing to keep him fully informed about these matters and, without absolving him of responsibility, the Commission concurs. The Department's chain of command -- from the Chief of Custody Operations to the Assistant Sheriff for Custody to the Undersheriff -- failed to address the use of excessive and unnecessary force by Department personnel even though the Captain of MCJ raised concerns about deputy misconduct as early as 2006, a Commander overseeing MCJ from 2009 to 2010 warned of similar problems, and there were internal reports and data identifying troubling trends and a sharp increase in Significant Force in 2009. These lapses allowed problems to continue for years.

Management's failure to address these problems has led the Sheriff to lose confidence in his senior leadership's ability to address the problem of excessive force. This lack of confidence is reflected by the Sheriff's decision to form the Commander Management Task Force -- a body that circumvents those charged with responsibility for overseeing Custody operations -- to carry out his directives and implement his reforms. He has also relieved the Undersheriff and the two

Assistant Sheriffs of responsibility for deciding the appropriate discipline in the most serious cases of deputy misconduct. And yet the Sheriff has failed to hold Department leaders accountable for their actions or the excessive force in the jails that occurred between 2005 and 2010, when those leaders had responsibility for oversight of the Department's Custody operations.

The Sheriff's proposed long term solution to the communication breakdowns and failures among his top leadership, as reflected in his submission to the Commission, is to seek $10 million in permanent funding from the Board of Supervisors for the Task Force to "continue inspections" throughout the entire Department, including Custody operations. The Commission agrees that the Department needs -- and the Board should fund as necessary -- a separate internal audit and inspections division. Our concern, however, is that to the extent the Sheriff uses the Task Force to continue to manage Custody operations and implement his directives, it would institutionalize a second and parallel chain of command over Custody and result in increased confusion, diffuse accountability and further opportunities for miscommunication. More fundamentally, it would do nothing to address the need for a capable, experienced and strong leader to oversee Custody with direct reporting responsibility to the Sheriff.

The troubling role of Undersheriff Tanaka cannot be ignored. Not only did he fail to identify and correct problems in the jails, he exacerbated them. The Commission learned about his ill-advised statements and decisions from a wide array of witnesses and sources. Over the course of several years, the Undersheriff encouraged deputies to push the legal boundaries of law enforcement activities and created an environment that discouraged accountability for misconduct. His repeated statements that deputies should work in an undefined "grey" area contributed to a perception by some deputies that they could use excessive force in the jails and that their aggressive behavior would not result in discipline. The Undersheriff also made numerous statements disparaging the Internal Affairs Bureau ("IAB") and the disciplinary process -- remarks that undermined the authority of IAB and the ability of Department supervisors to control or remediate inappropriate deputy behavior.

Undersheriff Tanaka specifically derailed efforts to address excessive force in MCJ when he vetoed a job rotation plan in 2006. After the plan was announced, he held a meeting with

deputies without the knowledge or presence of supervisors, and in a subsequent meeting berated supervisors who attempted to hold deputies accountable for their conduct. These actions undermined the authority of supervisors, resulted in a breakdown in the chain of command, and perpetuated an environment of aggressive deputy conduct. Ultimately, this set the stage for a sharp increase in the number of force incidents later in 2006 and for the reemergence of use of force problems later on.

Additional leadership and management problems at MCJ contributed to the problems of excessive force. The Captain of MCJ from 2008 to 2010 refused to adhere to the chain of command or report force problems to his Commander. He also failed to monitor the completion of use of force packages and personnel reports, and encouraged aggressive behavior by deputies.

The Commission heard repeated and consistent accounts of leadership failings in the Department over a period of years. Thus, it is not surprising that supervisors struggled to control deputy insubordination, inappropriate treatment of inmates, and aggressive conduct both on and off duty by deputies working in Custody.

## Findings

1.      **The Sheriff failed to monitor and control the use of force in Los Angeles County jails.**

The Sheriff has stated that he only recently became aware of the use of force problems in the jails generally and MCJ in particular. He told the *Los Angeles Times* last October, "I wasn't ignoring the jails. I just didn't know. People can say, 'What the hell kind of leader is that?' The truth is I should have known. So now I know."[1]

The Sheriff's assertions that he was unaware of problems in the jails is remarkable given that a variety of problems in the jails were recounted repeatedly by the Kolts Report, Special Counsel, OIR, and the ACLU. Each of these entities made multiple recommendations over decades, some of which went unheeded or were ignored.

---

[1]*Los Angeles Times,* "Baca Says He Was Out of Touch with County's Jails," October 16, 2011, http://articles.latimes.com/2011/oct/16/local/la-me-baca-jails-20111016.

*Report of the Citizens' Commission on Jail Violence*                                   Page 63

Although Sheriff Baca has admitted that he was aware of problems with the excessive use of force in the jails following the December 2010 fight among deputies at the Quiet Cannon restaurant, it was not until almost a year later, in the fall of 2011 -- after the latest ACLU report, the *Los Angeles Times* articles on jail violence, more vigorous oversight by the Board of Supervisors, and a court decision that the Sheriff could be held personally liable for problems in the jails -- that he became engaged in overseeing the jails. Before these public events shined an unflattering light on the Department, the Sheriff failed to heed multiple warnings, ask probing questions, implement recommended reforms, or apparently review available data that disclosed the extent of the problem of excessive force in the jails.

If a chief executive officer in private business had remained in the dark or ignored problems plaguing one of the company's primary services for years, that company's board of directors likely would not have hesitated to replace the CEO. Dismissal is not an option, of course, when talking about an elected public official. But the Commission was disturbed by the Sheriff's "don't elect me" response to a question about how he should be held accountable for the troubling history of the jails under his watch. His statement seemingly reflects a lack of genuine concern about and acknowledgement of the severity of the problem.

## 2.    LASD senior management failed to investigate the excessive use of force problems at MCJ.

The Sheriff has criticized his management staff for failing to inform him of problems in MCJ and "insulat[ing] him from 'bad news.'" In that vein, he recently told the Board of Supervisors that "a particular Assistant Sheriff knew all the issues that were exposed in the newspapers, and that individual got involved with it, and tried to resolve it, didn't resolve it my way, and this is my point about not knowing." But he also has acknowledged that it was *his* responsibility to ensure that he had the information he needed to monitor conditions in the jails. Without absolving the Sheriff of responsibility, the Commission agrees that the Department's senior leaders failed to identify, investigate or address the problems in the jails.

Undersheriff Paul Tanaka, who served as the Assistant Sheriff in charge of Custody between 2005 and 2007 and had oversight responsibility for the jails, repeatedly claimed that no one ever told him about problems of excessive force in the jails before last fall, and that he had

been "caught by surprise to the extent the problem existed." In recent testimony before the Commission, Tanaka maintained that he was unable to recall any criticisms or concerns about the jails that had been raised by his subordinates, or detailed in numerous OIR and Special Counsel reports, LASD memoranda and media accounts. He professed a lack of knowledge of force problems at MCJ, even in the face of sworn deposition testimony by former MCJ Captain John Clark that Clark proposed a plan to rotate deputies among floors at that facility to address concerns stemming from problem deputies and excessive force. Tanaka insisted that when Clark identified the existence of "problem" deputies, Tanaka never sought to determine the nature or cause of these problems. Tanaka did, however, acknowledge to the Commission that if he had been more diligent about monitoring excessive force when he was Assistant Sheriff for Custody, the Department would not be grappling with the issue today.

The lack of knowledge expressed by Tanaka reflects a high ranking Department official who was out of touch with, or ignored, pervasive problems in a jail system that was directly or indirectly under his command.

These leadership failures were not limited to Tanaka. The Assistant Sheriff for Custody from 2007 through 2010, Marvin Cavanaugh, and the Chief of Custody Operations through 2012, Dennis Burns, also failed to alert the Sheriff to excessive use of force in Custody that occurred under their watch. The Sheriff has advised the Commission that Cavanaugh "opted to not become involved" in what the Sheriff now describes as a failure by MCJ Captain Dan Cruz to follow the directives of his Commander from 2009 to 2010. Although Chief Burns and Assistant Sheriff Cavanaugh were aware a considerable spike in the use of Significant Force at MCJ in early 2010, it does not appear that either of them brought this fact to the attention of the Sheriff.

Former Commander Robert Olmsted has testified that he alerted Chief Burns, Assistant Sheriff Cavanaugh, and Undersheriff Tanaka (who was then the Assistant Sheriff for Patrol) to the problem of excessive force at MCJ, but that each ignored his concerns. Olmsted was so concerned by the rising use of force at MCJ that he directed two Lieutenants from outside of MCJ to conduct independent reviews of force packages and deputies who had used force on a

large number of occasions.[2] Although Tanaka and Cavanaugh both acknowledge meeting with Commander Olmsted to discuss issues at MCJ, they each contend that Olmsted never mentioned the excessive force issues about which he was so concerned. That these officials would be unaware of their own subordinate's concerns about the increasing use of force at MCJ -- concerns that were confirmed by internal Department memoranda and force trend data -- is troubling.

The failure by Department leaders to alert the Sheriff to the rising number of force incidents at MCJ is consistent with a reported tendency of some senior managers to insulate the Sheriff from bad news. The Sheriff has admitted that this is a problem. Weekly Executive Planning Committee ("EPC") meetings -- typically attended by the Sheriff, Undersheriff, Assistant Sheriffs and Division Chiefs -- give senior managers an opportunity to brief the Sheriff on important issues throughout the Department. Before the Sheriff arrives for the EPC meeting, there are "pre-meetings" at which, until at least last year, the Undersheriff and Assistant Sheriffs decided what would and would not be discussed with the Sheriff. Some individuals who have attended the meetings have told the Commission that they observed a hesitance to bring bad news to the Sheriff, and both the Sheriff and the Undersheriff testified that they do not recall a single discussion at any EPC meeting of excessive force in the jails or of the reports commissioned by Commander Olmsted.

These managers cannot, alone, be blamed for their silence. A leader who does not want to hear about problems will not be told of them by those who work under him, and this appears to be the case here. Rather than encouraging staff to inform him of force issues and insisting that actions be taken, the Sheriff has stated that he remained ignorant of these concerns until public events forced them to his attention.

---

[2] Those analyses revealed an array of concerns, including that there were 42 deputies with more than 10 force incidents over a two year period of time.

3.    **LASD management has known about and failed to address the longstanding problem of deputy cliques.**

As discussed in the Culture Chapter, the Department's leaders have been aware of the problem of deputy cliques for years.  Until recently, the focus was primarily on the Patrol side.  One of the earliest known cliques was the Lynwood Vikings, which later morphed into the Regulators based out of Century Station.  The Sheriff was aware of the Regulators dating back at least to 2004, when then Undersheriff William Stonich wrote a memorandum to the Sheriff detailing the activities of the group and recounting an unhealthy climate at the Station that included refusals by deputies to talk with IAB investigators and allegations of in-house extortion.

In October 2007, Commander Willie Miller drafted another detailed memorandum to Sheriff Baca regarding the existence and activities of the Regulators.  Commander Miller informed the Sheriff that the Regulators' philosophy is to "run the Station as a subculture faction...[and] not respect rank."

There was a similar problem with deputy cliques at MCJ that, based on documents reviewed by the Commission, were known to management in the Department as far back as 2004, if not earlier.  These problems became more severe as deputies started spending many years in their positions, becoming bolder and less responsive to supervision.  Captain Clark attempted a number of methods to combat the formation of cliques, including counseling and training.  When these efforts failed, he developed the rotation plan that was vetoed by Tanaka at the behest of MCJ deputies.

It was not until after Captain Cruz was transferred from MCJ in December 2010 that MCJ finally instituted a rotation policy to deal with deputy cliques.  By this time, the problem of deputy cliques had already erupted during the infamous 2010 Christmas Party brawl in which deputies from the 3000 floor of MCJ were involved in a fight with other deputies at the Quiet Cannon restaurant.  Six of these deputies were later terminated.  This time there was no deputies-only meeting or executive veto of the rotation policy.

**4.    The Undersheriff has made statements and engaged in conduct that are inconsistent with the Department's Core Values and that have undermined the authority of IAB and supervisors to address deputy misconduct.**

Numerous witnesses and experts have stressed the need for Department leadership to articulate their expectations from deputies and supervisors with regards to the use of force. A clear and consistent message that deputies are expected to operate within the law and that excessive use of force will not be tolerated is integral to the establishment of an ethical, well-functioning jail culture and force policy. But senior LASD leaders have not always conveyed this message.

Undersheriff Tanaka has made a number of statements that the Commission finds deeply troubling because they convey the wrong messages to Department personnel about the nature of their work and the Department's willingness to hold them accountable for misconduct.

For years, the Undersheriff has given speeches throughout the Department encouraging deputies to "work in the grey area." His comments have been interpreted by law enforcement personnel -- both within LASD and in other agencies -- as meaning that deputies should engage in activities that are on the border of right and wrong or that they should bend the rules and go over the line as long as they do not get caught. These messages directly contravene the Core Values the Sheriff seeks to promote within the Department.

The Undersheriff has provided varying explanations for what he meant by working "in the grey." As the Undersheriff acknowledged in his testimony before the Commission, he had explained in an interview with Commission staff that the "grey area" merely referred to the area between the law and what is morally right, which he described as the "level playing field." In advance of his testimony before the Commission, the Undersheriff sent a Department-wide email offering a different interpretation of "working in the grey area." In that email, he cast the term "grey area" as the discretionary authority given to a law enforcement officer to decide, for example, whether or not to issue a traffic ticket to a speeding motorist.

Sheriff Baca acknowledged in his testimony that there is no "grey area" in law enforcement. Even Undersheriff Tanaka, in his Department-wide email, acknowledges that "the term 'grey area' can be easily misinterpreted by those that choose to do so." Yet it took years for

him to clarify his message, and he did so only on the eve of his testimony before the Commission.

Undersheriff Tanaka has made other troubling statements encouraging deputies to be aggressive. In a memorandum to the Chief of Region III, the Captain of Century Station documented a talk that then-Assistant Sheriff Tanaka gave at the Station in June 2007, at a time when the Station was in the throes of dealing with a group of deputies who called themselves the "Regulators." At the meeting, Tanaka reportedly instructed the deputies to "function right on the edge of the line" and "be very aggressive in their approach to dealing with gang members." He has neither disputed nor provided an explanation for these comments.

At the same Century Station meeting, according to the Captain's memorandum, Tanaka also made comments that undermined the credibility of IAB and the authority of supervisors to hold deputies accountable for misconduct. The memorandum reflects that he told personnel at the Station that supervisors should not "be so hasty in putting 'cases' on deputies" when allegations of deputy misconduct arise. He cautioned that he "would be checking to see which Captains were putting the most cases on deputies and he would be putting a case on them."[3] These remarks were made at a time when problematic deputies had been administratively transferred to address a troubling "subculture" at the Station.

These incidents closely parallel Tanaka's intervention and undermining of leadership at MCJ in 2006. Several witnesses told the Commission about a meeting Tanaka held with supervisors at MCJ in 2006 after he had vetoed the Captain's proposal to rotate deputies among jobs to address the problems of excessive force and deputy cliques. The witnesses reported that Tanaka called supervisors who tried to maintain discipline at MCJ "dinosaurs," and told them that they needed to "coddle" the deputies and leave them alone.[4] At one point in the meeting, he berated a supervisor for purportedly referring to the deputies as "gang members" and harshly shut down the Captain's attempt to respond to his criticisms.

While Tanaka claimed to have little recollection of the precise details of either this meeting or an earlier deputy-only meeting, his statements and tone had a strong impact on those

---

[3] Undersheriff Tanaka testified before the Commission that he did not recall making these statements.
[4] Although Undersheriff Tanaka denies that he used the term "coddle," he recalled the "dinosaur" reference.

in attendance and reportedly gained notoriety in other parts of the Department. One Lieutenant described the meeting as "one of the most uncomfortable experiences" in his life. Another supervisor who testified before the Commission took Tanaka's comments as an abdication of the Department's duty to supervise its deputies: "I felt like I might as well take my stripes off because how were we going to supervise deputy personnel."

Undersheriff Tanaka also has undermined the credibility of IAB on more than one occasion. The Commission heard about a meeting in 2009 with a member of IAB when Tanaka stated that he "hates" IAB. According to the testimony of Captain Patrick Maxwell, the Undersheriff made similar statements at a meeting at Norwalk Station, where he opined: "we have 45 [IAB investigators]. In my opinion, that's 44 [expletive deleted] too many." And as reflected in the memorandum prepared by the Century Station Captain, Tanaka told deputies there that he "didn't like Internal Affairs Bureau and the way they worked."

Despite these accounts, the Undersheriff denies that he dislikes IAB and maintains that he is simply critical of its process, which he believes can take too long and leaves a cloud over the heads of those under investigation. He also believes that IAB has mistreated certain individuals under investigation. He has, however, been unable to explain why he found it necessary to publicly criticize IAB during talks with deputies at various Stations rather than addressing these concerns with IAB leadership directly.

5.      **Several key Department leaders ignored deputy aggression and discouraged discipline at Men's Central Jail.**

Several witnesses described incidents that exemplify a lax attitude toward deputy aggression and discipline at MCJ. As noted above, witnesses recounted the meeting in early 2006 where Tanaka told supervisors that they needed to "coddle" the deputies and to generally "stay out of the way" of the deputies and let them "do their thing." Dan Cruz, who was the Captain of MCJ from 2008 through 2010, told others that Tanaka gave him direct orders to "take care of the deputies" even though Tanaka was no longer the Assistant Sheriff for Custody. Accordingly, Cruz encouraged then-Lieutenant Bornman to "not spend too much time" investigating deputy misconduct and allegations of excessive use of force. Such messages were not limited to private communications. In a speech at a Christmas party in 2009, Cruz jokingly

reminded deputies not to hit inmates in the face, presumably to avoid visible injuries. That the Captain was openly making jokes about inmate abuse reflects a troubling nonchalance toward a serious problem.

One noteworthy example of Cruz's attitude toward deputy misconduct and discipline involved an incident caught on video where several deputies severely beat an inmate while the inmate was lying on the ground. After viewing the video, which captured an excessive use of force in violation of Department policy -- including one deputy inflicting "knee drops onto the [inmate's] upper torso, head/neck area" while the inmate was face down on the ground -- Cruz remarked that he saw "nothing wrong" with the deputies' conduct and the force used. Notwithstanding Cruz's observations, these deputies were eventually disciplined, and one deputy was terminated, for this incident.

Even when force incidents were investigated, they were not necessarily escalated to the proper levels of review. In 2010, OIR reviewed a number of MCJ force packages and found that several force incidents reviewed at the unit level should have been escalated to a higher level of review based on severe injuries to the inmate such as broken bones or other triggering factors. OIR also found it troubling that most of the unit level reviews determined that the force used was within policy and that virtually no force incidents were escalated to IAB for administrative review.

In 2009, a county official responsible for jail oversight met with Captain Cruz to inform him that, based on a close review of MCJ force packets, deputies on the 3000 floor were involved in an unusually high number of force incidents. Captain Cruz agreed to look into transferring the deputies to other assignments, but weeks later he had not done so.

This lax attitude towards deputy aggression and discipline extended to off-duty incidents. On one occasion, a number of off-duty MCJ deputies were involved in a bar fight with civilians. One deputy punched a woman in the face, and another allegedly pulled out his gun. During the administrative investigation, Captain Cruz told Lieutenant Bornman "don't look too hard." And when it was brought to Cruz's attention that the one-year statute of limitations on administrative investigations was about to expire, Cruz responded: "Oh, well, if it drops dead, it drops dead,"

reflecting a lack of concern that the deputies might go unpunished.  Ultimately, Bornman pursued the matter and the deputies involved were disciplined.

After Cruz replaced Olmsted as the Captain of MCJ in April 2008, the incidents of use of Significant Force increased dramatically until the fall of 2009.[5]  In addition, the number of fractures went from three during Olmsted's 15-month tenure to 13 in Cruz's first 21 months as Captain of MCJ.  The increase in force incidents was concentrated on the old side of the jail, with the biggest jumps on the 3000 and 4000 floors.

Senior management was aware of the problems with Captain Cruz's management, but they took no action.  On several occasions, Commander Olmsted went directly to Chief Burns to point out that Cruz had found use of force incidents "in policy" when they clearly were not.  Bornman similarly brought to Burns' attention the multitude of late reports, missing force records and files and other delinquent paperwork and system breakdowns he had observed.  Olmsted testified that Burns' response to his concerns was that one Commander "can't change the culture" at MCJ and that Olmsted should simply "let Cruz fail."

When it became clear that Burns was unable or unwilling to address these issues, Olmsted approached Burns' superior, Assistant Sheriff for Custody Cavanaugh.  Olmsted testified that he presented Cavanaugh with a large stack of documents reflecting morale issues, force concerns (including a spike in the number of inmates with broken bones as a result of force incidents) and Cruz's noncompliance with Olmsted's orders.  According to Olmsted, Cavanaugh responded that he was powerless to make changes absent the support of Tanaka, who was then Assistant Sheriff for Patrol.  Cavanaugh disputes this account; he has told Commission staff that Olmsted generally discussed his disagreements with Cruz without specifying the nature of those disagreements.

Olmsted met with Tanaka a week later to discuss his concerns about excessive force at MCJ.  As noted above, Tanaka claims that Olmsted never mentioned the problems of excessive force in MCJ -- the very issue at the heart of Olmsted's concerns, the subject of memoranda

---

[5] Use of force incidents at MCJ had decreased from 367 in 2006 to 273 in 2007 under Olmsted.  Force was down significantly on the 2000, 3000, and 4000 floors, areas that typically generate high numbers of force incidents.  In fact, force decreased in every area of the jail except the hospital floor.  Significant Force incidents jumped from 171 in 2008 to 258 in 2009, more than offsetting a decrease in Less Significant Force from 102 to 72.

prepared by high level jail supervisors, and the impetus for the meeting. Olmsted disputes Tanaka's testimony, and claims that Tanaka acknowledged in a subsequent meeting that there were problems with Cruz's leadership. Yet according to Olmsted, Tanaka's solution was to have Olmsted mentor Cruz with the help of a new Operations Lieutenant whom Tanaka had selected for MCJ.

This plan did not succeed. Cruz did not form a mentoring relationship with Olmsted and instead resented Olmsted's hands-on management style. In his testimony before the Commission, Sheriff Baca noted that Cruz' dysfunctional relationship with Olmsted, which was known to the Assistant Sheriffs, was a key source of problems at MCJ. Moreover, the Sheriff testified that Cruz was "relieved" based on his failure to heed Olmsted's directives. Even in the face of all of these repeated problems and concerns, Tanaka, during his testimony before the Commission, described Cruz as a "good" and "acceptable" MCJ Captain.

This inaction by high-level Department leadership is particularly troubling. Indeed, as one expert opined, "all a leader has to do is remain silent in the face of misconduct and you've become complicit in what happens next."

6.    **There was a break-down in the chain of command at Men's Central Jail.**

LASD management, and in particular then Assistant Sheriff Tanaka, encouraged deputies in the jails to undercut the chain of command, thereby weakening supervisory authority. Based on their interactions with Tanaka, many deputies believed that they could circumvent the chain of command at MCJ without any repercussions. As a result, there was a perception among some deputies that they did not answer to their direct supervisors and that, if they answered to anyone at all, it was to Tanaka. Not surprisingly, supervisors felt that their authority was undermined, making it difficult for them to dispense discipline and hold subordinates accountable.

The starkest example of this problem stems from the events in February 2006 at MCJ. At the time, Captain Clark proposed to rotate deputies among job assignments within the jail to address a number of problems including the excessive use of force. The Commission was told that Captain Clark cleared the rotation plan with his Commander, the Chief of Custody Operations, and Employee Relations, and that it was also approved by then-Assistant Sheriff

Tanaka. Tanaka, however, claims to have been unaware of either the proposal or its approval by various Department leaders.

After the rotation program was announced, MCJ deputies organized an email campaign to take their complaints directly to Tanaka, circumventing the Chief of Custody Operations, Captain Clark, and his Commander. Several hundred deputies sent identical emails to then Assistant Sheriff Tanaka that began: "When you recently met with us, you stated that if we had any problems with the management of Men's Central, we should contact you. Sir, we have a problem." The email went on to criticize the plan for forcing deputies at MCJ to "change work locations approximately every two months" and for moving deputies from "a particular floor."

In response, then-Assistant Sheriff Tanaka held a deputies-only meeting to address complaints about the rotation policy. Prior to the meeting, Tanaka did not speak with Captain Clark about the rotation policy or even inform him of the meeting. Nor did he request a copy of the proposed policy or otherwise seek to ascertain the details of, or rationale for, the proposed rotations.

Commission staff have not uncovered any written memorandum documenting what was discussed at the deputies-only meeting, but after it occurred, Tanaka met with Captain Clark and ordered him to revoke the new policy. Tanaka maintains that he vetoed the policy because he believed that it entailed rotating deputies "among shifts," which would have been a disruptive way of dealing with what he understood to be a few "problem" deputies. Notably, the deputy emails made no mention of a rotation of *shifts*, which would have been more disruptive of schedules and would certainly have been referenced in their complaints had it been proposed. In fact, Captain Clark's memorandum announcing the policy explicitly stated that all personnel "will remain on your assigned shift."

After Tanaka vetoed the rotation plan, he appears to have had another meeting with deputies that further undermined the chain of command. At this meeting, the only supervisors present were three Lieutenants who had been hand-picked by Tanaka to work in MCJ to provide "leadership" while Clark was still the Captain of MCJ. Judging from when these Lieutenants were assigned to MCJ, this meeting apparently took place a few months after Tanaka vetoed the

rotation plan. The implication was that these three supervisors were "[Tanaka's] guys," and had a more direct pipeline to higher management than other supervisors. Indeed, Commission staff were told that another supervisor was asked to leave this meeting and that only Tanaka's hand-picked Lieutenants were allowed to remain. Tanaka also met with the supervisors at MCJ after he vetoed the rotation plan and told them to "stay out of the way" of the deputies.

Tanaka's actions undercut the chain of command and undermined the authority of jail management to supervise line deputies. This was particularly problematic at MCJ because of its large number of young Sergeants and Lieutenants, many of whom were in their first supervisorial position with the Department and were supervising deputies who had worked in Custody far longer than their supervisors (see discussion in the Personnel Chapter). The deputies, well aware of this discrepancy, often believe that they are the ones in control of the jail and that they do not need to take instructions from newer, less experienced supervisors about how to do their jobs.

Worse, some supervisors in the jails work in Custody because of their poor performance in Patrol assignments. The Department has in the past moved individuals whom they believe are not performing well to Custody, sometimes as punishment and sometimes to keep them out of the public eye. As a result, the jails have been a place for inexperienced and ineffective supervisors, creating an environment where new deputies look to senior deputies rather than supervisors for their role models or mentoring. It is not surprising, then, that the deputies ignore their direct supervisors or undercut the chain of command by appealing to senior management.

Circumventing the chain of command was not unique to deputies at MCJ. Captain Cruz told Lieutenant Bornman that he did not report to his direct supervisors, Commander Olmsted and Chief Burns, but rather to Tanaka. According to one witness, Cruz had an alarm installed on a side entrance to MCJ so that Olmsted could not enter the jail unannounced. And the Sheriff in his testimony before the Commission indicated that he "relieved Cruz of command [because] I was not going to have a captain tell a commander he ain't going to do something." In sum, there was a significant breakdown in the chain of command at MCJ that undermined the efforts of supervisors to hold deputies accountable and of managers to implement reforms to address the problems of excessive force.

7.    **The Sheriff has failed to hold senior management accountable for the excessive use of force in Los Angeles County jails.**

The Sheriff has acknowledged that there was a serious problem with the excessive use of force in the jails and he has criticized his subordinates for failing to alert him to these problems. He has acknowledged that Undersheriff Tanaka should have told him about the mass emails from deputies that Tanaka described as "a sign of distress" at MCJ in February 2006, and has testified that "there is no grey area in the Sheriff's Department from my perspective." He has also acknowledged that Assistant Sheriff Cavanaugh abdicated his responsibilities "in a certain way" when he failed to address the conflict between Commander Olmsted and Captain Cruz.

While the Sheriff has acknowledged these errors, he has taken no action to hold any of his senior managers accountable. Although the problems of excessive force in Los Angeles County jails clouded the tenures of Tanaka, Cavanaugh, and Burns, none of these individuals has been demoted or, to the Commission's knowledge, disciplined in any way.

The Sheriff's explanation to the Commission is that he alone is accountable and it is his responsibility to fix the problems. As the Sheriff correctly observed, ultimately he is accountable to the voters of Los Angeles County who, as he said, can decide not to re-elect him if they are dissatisfied with his performance. But what is troubling about the Sheriff's testimony is the message that it sends to the rest of the Department. Undoubtedly, the Sheriff expects deputies and their supervisors to do their jobs, and they should be held accountable if they do not do so in an ethical, skilled and lawful manner. Yet, notwithstanding the acknowledged failings by senior management, Tanaka remains as Undersheriff, Cavanaugh remains as Assistant Sheriff for Patrol, and Burns was allowed to serve out his tenure and retire as Chief of Custody Operations six months after the Sheriff formed the CMTF. These decisions are admittedly within the Sheriff's sole prerogative. But the Commission is deeply concerned by the message conveyed to the entire Department when senior managers are not held accountable, especially at a time when Custody personnel are in need of strong leadership and a clear directive that accountability, exemplary behavior, and consequences for misconduct are to be taken seriously by all parts of the Department.

**8.    The Sheriff's recent decisions reflect a lack of confidence in senior management's ability to address excessive use of force problems.**

In response to the concerns regarding excessive force in the jails raised by the ACLU and the *Los Angeles Times*, the Sheriff created the CMTF to "cut through the bureaucracy," to reduce violence in the jails by changing the deputy culture, and to implement reforms and new training for jail staff. In response to the most serious issue facing the Department -- excessive force in the jails -- the Sheriff decided that he could not rely on his existing chain of command to solve the problems and implement reforms.

The CMTF is comprised of five Commanders, eight Lieutenants, and eight Sergeants, along with assistants and support staff. The CMTF exists outside the normal chain of command that supervises the jails. It does not include, or report to, the Undersheriff, the Assistant Sheriff for Custody or the Chief of the Custody Division. Instead, it reports directly to the Sheriff. Its very existence reflects the Sheriff's lack of confidence in his senior management and his conclusion that the best way to improve the flow of information and implement reform is to circumvent the existing management structure. The Sheriff holds regular weekly meetings with the CMTF, which the Undersheriff generally does not attend. The Assistant Sheriff for Custody and the Chief of Custody Operations are usually present, although their attendance is more for informational than operational purposes since the Sheriff relies on the CMTF, not the chain of command, to carry out his directives.

Although the CMTF has helped improve the flow of information to the Sheriff and implement important reforms, its structure threatens to perpetuate management gaps and further blur the lines of communication and responsibility. Indeed, one expert hired by the Sheriff to revise the Department's use of force policies noted that while he repeatedly interacted with the CMTF, he never met or spoke with the Chief of Custody Operations even though his work directly impacted the Custody Division.

Recently, the Sheriff advised the Commission that he intends to seek $10 million permanent in funding for the CMTF "to continue inspections in [the] Custody Division and throughout the entire Department." If this proposal is funded, the CMTF would, to an extent, be superimposed over the existing organizational chart, meaning that the Custody Division would

have two sets of managers. This proposal would create a confusing and potentially dysfunctional organizational structure.

Further evidence that the Sheriff has lost confidence in his senior management stems from his changes to the oversight of disciplinary decisions over the past year. In recent months, the Sheriff has shifted the reporting responsibilities of IAB and Internal Criminal Investigations Bureau ("ICIB"). Whereas these bureaus previously reported to the Undersheriff, they now report directly to the Sheriff.

Similarly, the Sheriff modified the process for review of discipline in the Department after a recent incident in which a LASD supervisor threatened to run over a colleague with his car, and later pulled a gun on the individual. The Case Review Committee -- composed at the time of the Undersheriff and the two Assistant Sheriffs -- reduced the recommended discipline from demotion to a 15-day suspension. When the Sheriff learned of the more lenient discipline, he disbanded the Committee and replaced it with three Commanders who report directly to him. This is yet another decision that reflects the Sheriff's lack of confidence in the Undersheriff and high-level Department leadership.

9.    **The Sheriff's recent personal engagement has reduced force incidents in Los Angeles County jails.**

Beginning in October 2011, the Sheriff became personally engaged in addressing the problem of excessive force in the jails. He formed the CMTF to "identify and address deficiencies throughout the jail system" and later expanded it "to inspect and review all aspects of policy, supervision, and training." He also drafted a Force Prevention Policy that makes clear that deputies should use force only as a last resort and then only the minimum amount of force necessary.

As a result of the Sheriff's personal involvement, and as discussed in more detail in the Use of Force Chapter of this Report, the number of force incidents -- and in particular Significant Force -- dropped dramatically. Special Counsel Merrick Bobb summarized the importance of the Sheriff's involvement when he told the Commission last January that when "word went out" that the Sheriff wants "to see those numbers down," the Custody Division responded with a substantial reduction in the number of force incidents. The Sheriff's attention has been an

important factor in reducing force incidents. Unfortunately, it comes after a long hiatus during which problems of excessive use of force went unaddressed.

**10.    The Assistant Sheriff for Custody Division is responsible for managing other divisions only minimally related to Custody operations and is not an experienced corrections leader.**

The Department, which comprises some 18,000 employees, has ten divisions, but only two Assistant Sheriffs. One of the Assistant Sheriffs, Marvin Cavanaugh, oversees the three Field Operations Patrol Regions, the Detective Division and the Homeland Security Division. The other Assistant Sheriff, Cecil Rhambo, oversees the Custody Division, the Court Services Division, the Technical Services Division and the Leadership & Training Division.

The other three divisions under Assistant Sheriff Rhambo's supervision are substantial in size and distinct in nature from the Custody Division. The Court Services Division employs more than 1,100 sworn members and over 500 civilians. It is tasked with providing security and support services to 48 courthouses in Los Angeles County. The Technical Services Division provides technical support services and management of the Department's communications, vehicle fleet, data and information systems, records, criminal justice database, federal excess property acquisition, scientific services, investigations, crime analysis and criminal statistics reporting. Finally, the Leadership & Training Division is responsible for the training of all Department employees, both sworn and civilian, beginning with the academy and continuing throughout their careers.

All of this is *in addition to* the Assistant Sheriff's responsibilities for overseeing eight separate jail facilities, which now house more than 15,000 inmates, and which, together, make up the largest jail system in the nation. The Department itself has acknowledged the "complexity" of this command.

The Assistant Sheriff has too many areas of responsibility to be able to devote the time and energy necessary to provide effective oversight of the Custody Division. Moreover, this position is not now and has not historically been filled by a leader with expertise and training in corrections oversight and management. Indeed, without questioning Assistant Sheriff Rhambo's abilities, we note that he was promoted from the position of Chief of Region II under Patrol and

*Report of the Citizens' Commission on Jail Violence*                                     Page 79

had not served in Custody for at least 14 years at the time that he became the Assistant Sheriff for Custody. While Los Angeles has one of the most complex and challenging corrections systems in the nation, its leadership lacks the specialization, training or professional expertise seen in other corrections systems heads.

11.    **Despite having succeeded in holding LASD Captains accountable for the performance of their Stations, the "Sheriff's Critical Incident Forum" has been downgraded and de-emphasized.**

More than a decade ago, senior Department managers, concerned with what they perceived as a tendency at the Department to blame only deputies or Sergeants for performance shortcomings, created an accountability structure called the Sheriff's Critical Incident Forum ("SCIF"). SCIF was modeled after "Computer Statistics" or "CompStat," a crime-control system developed by the New York Police Department ("NYPD"), and was meant to focus accountability at the Captain level. Under CompStat, NYPD's Deputy Police Commissioner used crime data and statistics to question his Captains about the level of crime in their precincts and demanded that they devise an action plan for reducing crime rates. The system was notable because the Captains were "called out" before their peers and held directly accountable for their Stations' performance. Many cities have adopted a system comparable to CompStat, including Los Angeles, Boston, Philadelphia, Baltimore, Miami, New Orleans and Newark.

At LASD, the idea for SCIF originated as part of the Department's response to the Kolts Report. It was implemented on the Patrol side with the hope of replicating CompStat's success in improving police managers' accountability for the performance of their Stations.

At its height, SCIF was a monthly meeting of Captains, Commanders, Chiefs, and top executives in the Department's Patrol Division, at which the Captains were held accountable for their performances in reducing crime, balancing the budget, and managing civil rights issues such as deputy use of force and citizens' complaints. The executives who ran SCIF used monthly management reports such as the Command Accountability Reporting System ("CARS") report to compare the Captains' performance to their own past performance and that of their peers. The CARS report is a compilation of data and statistics on all relevant risk categories including use of force, citizens' complaints and lawsuits.

During SCIF meetings, the Captains took the podium and fielded probing questions about their Stations. For example, if a Station had an unusually high number of use of force incidents as a percentage of arrests in a given month, the Captain might be required to account for the anomaly and present a plan for reducing the number. Captains were required to review relevant data in advance of the meeting so that they were fully knowledgeable about the issues facing their Stations and could therefore answer the questions posed.

SCIF was implemented only on the Patrol side due to budget and time constraints, not efficacy. The three areas in which a Captain's performance was measured -- crime, budget, and civil rights -- are equally salient in the jail setting. Crimes such as drug use, riots, and rapes occur in jails, jail Captains are responsible for managing the budgets of their facilities, and civil rights issues such as use of force and other grievances are relevant in the jail settings.

Despite promoting greater accountability, SCIF proved to be unpopular. Some Captains felt that management went out of their way to embarrass them in meetings and some resented being told how to run their Stations and the amount of time they were required to invest in the process. After Baca was elected as Sheriff in 1998, he opted to de-emphasize SCIF and instead encouraged Chiefs to conduct "mini-SCIFs" on a regional basis. SCIF was downgraded both in scope and frequency and the CARS reports have fell into disuse. The role or responsibility of jail Captains, and Lieutenants for incidents involving use of force in the jails was rarely, if ever, scrutinized by senior Department managers -- the very concern that animated SCIF originally. Last week the Department initiated SCIF meetings in Custody.

**12.    There is a perception that promotions in LASD are based upon loyalty, not merit.**

The Commission heard from many Department members who believe that promotions and assignments are based on loyalty to the Undersheriff rather than merit. Part of this perception stems from the Undersheriff's central role in the process. In the past, Division Chiefs, with input from their Captains, were primarily responsible for recommending personnel for promotions. These recommendations were highly regarded and usually served as the basis for the Sheriff's decisions on whom to promote.

The Commission was told that the promotions process began shifting away from the Division Chiefs, to the Undersheriff and Assistant Sheriffs, when Tanaka became an Assistant Sheriff. Rather than holding a meeting with the Division Chiefs to solicit their input and discuss candidates for promotion, the Undersheriff and Assistant Sheriffs now simply submit a list of Department employees to the Sheriff for promotion. Sheriff Baca acknowledged the change, but maintains that it was necessary to prevent leaks about upcoming promotions, which he believes came from the Chiefs. Regardless of the reason, this has contributed to the perception among some in the Department that talented people have been overlooked for promotions due to their failure to curry favor with the Undersheriff.

There is also a widely held belief that senior executives, including Undersheriff Tanaka, have invited select members of the Department to meet at Department Headquarters to smoke cigars in what some refer to as a "cigar club." The perception is that invitees are members of an inner circle with access to key leaders within the Department. Both Sheriff Baca and Undersheriff Tanaka deny the existence of a selective "club," but there remains a troubling perception among deputies of selectivity and elitism that perpetuated the belief that patronage and favoritism matter more than merit.

Dan Cruz's rise through the ranks feeds into the perception that loyalty and a connection to the Undersheriff matters in the Department. Before becoming the Captain of MCJ, Cruz was a Lieutenant at Lennox Station. When a new Chief took over Region II, he observed that Cruz was 18 months behind on his paperwork and gave Cruz several months to get up to date. When Cruz failed to do so, he was transferred out of Lennox Station. Cruz was picked up by then Assistant Sheriff Tanaka and placed in the Administrative Services Division, which was under Tanaka's supervision.

Tanaka thereafter transferred Cruz in early 2007 to the position of Operations Lieutenant at MCJ under then Captain Olmsted, who accepted him, albeit unenthusiastically. The Commission was told that Tanaka later supported Cruz's promotion to Captain of MCJ, even though the Chief of Region II and the Chief of the Custody Operations Division suggested another candidate. Against their wishes, Cruz was ultimately given the position. Tanaka maintains that Cruz's direct supervisor, Olmsted, recommended him for the promotion. Olmsted

denies this account; he says that he told Tanaka that Cruz was unqualified to assume the challenging position of running MCJ. Further, according to Olmsted, Tanaka still wanted to promote Cruz to Commander notwithstanding the spike in Significant Force incidents and the incomplete paperwork that Lieutenant Bornman found (including the very type of investigative reviews that Cruz had failed to address at Lennox Station) when Bornman was assigned to MCJ in 2009.

Some witnesses have more bluntly described an environment where, in their view, the Undersheriff can make or break an individual's career. Indeed, several witnesses were reluctant to answer questions or testify publicly in regard to matters that could be viewed as critical of Tanaka due to his perceived clout. Whether or not these accounts are based on reality, the pervasiveness of these attitudes alone is cause for concern.

**13. Campaign contributions accepted by Tanaka from many Department employees furthered perceptions of patronage and favoritism in promotion and assignment decisions.**

Adding to the perceptions of favoritism are the campaign contributions received by the Undersheriff, who in addition to his law enforcement duties has been an elected official in the City of Gardena since 1998. While neither California law nor Department policy prohibits candidates from accepting contributions from employees they supervise, numerous current and former employees expressed concern that the practice has resulted in a perception of favoritism to contributors and undermined Department morale. These concerns were focused almost exclusively on the Undersheriff.

To examine this issue in greater detail, Commission staff reviewed the campaign finance reports the Undersheriff has filed with the City of Gardena. Those records show that 336 Department employees contributed to the Undersheriff's campaigns over the past 13 years.[6] The reports, which cover four elections, show that Department employees contributed a total of approximately $108,311 to the Undersheriff's campaigns from 1998 to 2011. While the average contribution was only $187, some contributions were considerably larger. A subset of 43

---

[6] While there were 336 unique contributors, some of these individuals contributed multiple times, for a total of 577 individual LASD contributions.

Department employees contributed approximately $38,150 (or 35% of the total contributions from the Department).

Among current employees,[7] six of the Department's 11 division chiefs (or 54.5%) have contributed to the Undersheriff's campaigns; 19 of the 31 area Commanders and assistant division (non-sworn) directors (or 61.3%) contributed to his campaigns; and 38 of the 76 Captains and directors (or 50%) contributed. In addition, several Department employees received reimbursements from the Undersheriff's campaign funds for expenditures related to his campaign. For example, employees have been reimbursed for telephone bills, block party expenses and other, unspecified campaign expenditures.

There is a perception among rank-and-file employees that contributing to Tanaka's campaigns is important to promotional and assignment decisions. That perception is not limited to low level employees. Former Commander Olmsted acknowledged that he too believes that deputies have been promoted because of such favoritism. Similarly, Captain Maxwell testified that a Department employee contacted him at his home on a Sunday evening to solicit a contribution for the Undersheriff's campaign and told him that employees of his rank were "expected" to contribute $250. Other witnesses who were interviewed described being solicited to contribute to various Tanaka campaigns and some even suggested that solicitations occurred during work hours and at Department locales. Moreover, some observed that the Undersheriff was running unopposed in a few of these races and that numerous LASD contributors did not live in the City of Gardena or have a vested interest in Tanaka's races.

Concerns were expressed by employees at almost every level of the Department. Some disagreed with the perception of favoritism and felt that contributions did not influence assignments and promotions, but they still expressed concern that the perception itself was harmful to morale and discipline. Even employees who did not contribute felt pressure to attend campaign events in order to have "face time" with the Undersheriff.

---

[7] This information is based on the most recent Administrative Roster, dated 12/20/11. This Administrative Roster lists employees for the ranks of Sheriff through Captain. As it was dated 12/20/11, the chart does not show the consolidation of Correctional Services with the Custody Division. As such, these Divisions were treated separately in our analysis.

While some of these concerns were expressed by former employees who may have been passed over for promotions, similar concerns were repeated by current employees, including those who have themselves received promotions. The issue has also been raised by the Professional Peace Officers Association ("PPOA"). PPOA's President testified before the Commission that the acceptance of campaign contributions has undermined the perception of a merit-based promotional system within the Department.

While witness' concerns about campaign contributions were aimed at Undersheriff Tanaka's mayoral campaign, Tanaka is not the only individual in the Department to have accepted contributions. Both the Sheriff and Assistant Sheriff Rhambo have accepted contributions for their respective campaigns.[8]

The Sheriff received at least $97,850 in contributions to his campaign committee from Department contributors between 1999 and 2011.[9] Whereas Department contributors made up approximately 7% of the total contributors to the Sheriff's committee, Department contributors made up approximately 30% of the Undersheriff's contributors.

## 14.    The Department has no formal policy governing the acceptance of campaign contributions.

LASD has no formal policy governing the acceptance of contributions from employees in the Department generally, or from employees whom the candidate supervises directly or indirectly. The Sheriff has advised the Commission that he is in the process of establishing a policy to govern campaign contributions from one employee to another.

## 15.    The Department's operational staffing model fails to account for jail facility size.

The Department assigns management staff to jails and Stations with no regard to the size of the facility or unit or the number of personnel assigned to that locale. For example, a facility is typically managed by one Captain and a set number of Lieutenants and Sergeants; there is no

---

[8] In 2005, Assistant Sheriff Rhambo ran unsuccessfully for mayor of Compton, California. Commission staff did not conduct an in-depth quantitative analysis of his campaign contributions.
[9] The Commission only reviewed Sheriff Baca's campaign committee, Friends of Lee Baca. Sheriff Baca has several other committees, including Lee Baca's Attorney Fee Fund and Officeholder Account.

adjustment made for the number of deputies assigned to that facility or Station or other attributes that might impact operational staffing needs.

OIR recently underscored these concerns, noting that "whether the unit involved is a station with 50 deputies or a jail unit with multiple times that number of assigned personnel, the operational staffing is virtually unchanged." OIR recommended that the Department "reconsider its operational staffing model so that proportionally more operational resources can be dedicated to the larger units."

**16.    The Department has no Audit and Inspections unit.**

The Department does not have an audit and inspections unit to help ensure compliance with the Department's policies and standards and enable problem areas to be spotted early and brought to the attention of top managers. American Bar Association Standards for the Treatment of Prisoners -- a highly regarded roadmap for the fair, humane and efficient management of jails and prisons -- recommends that correctional agencies establish internal accountability mechanisms including an internal audit unit responsible for conducting regular performance auditing and monitoring compliance with established performance indicators, standards, policies, and other internal controls.

## Recommendations

**4.1    The Sheriff must be personally engaged in oversight of the jails.**

The Sheriff's lack of engagement and failure to monitor the significant spike in force incidents as well as the troubling events at MCJ contributed to the crisis the Department has faced over the past few years. His personal engagement in Custody issues in recent months has had a positive impact on the use of force in the jails; it is vitally important that the Sheriff remain personally involved in the oversight of the jails.

That the Sheriff has numerous other responsibilities is no excuse. Indeed, one of the two primary functions of the Department is overseeing the County jail system. He has already demonstrated that he can oversee reforms in the jail by creating the CMTF and meeting with it weekly. Even after the CMTF moves into other areas or is dissolved, the Sheriff must personally meet with jail leadership and hold them accountable for the management of this critical aspect of

Department operations. He must also continue to demonstrate his commitment to sustained change.

### 4.2 The Sheriff must hold his high level managers accountable for failing to address use of force problems in the jails.

The Sheriff must hold accountable those whose actions have allowed excessive force problems to persist and who shielded him from key information over a period of years. A terrible message -- one directly at odds with any notion of accountability -- is conveyed to the rest of the Department when there are no consequences to senior Department leaders who oversaw the jails when incidents of force were on the rise and a host of related problems occurred.

Of particular concern is the role of Undersheriff Tanaka and his negative impact on accountability and ethical conduct within the Custody Division, which cannot be ignored. While the Sheriff notes that "much attention" has been placed on Tanaka, he states he has "yet to be presented with any evidence of misconduct" on the part of his Undersheriff. The Sheriff misses the point. Holding people in management positions accountable does not require a showing of misconduct. That a particular manager is not getting the job done or has not competently executed against the Sheriff's directives or expectations is, or certainly should be, more than sufficient to remove and re-assign that person.

As significantly, the Sheriff's statement be reconciled with the information, documents and witness accounts that this Commission has received and reviewed over the course of its investigation and the undisputed statements that the Undersheriff has made that are inconsistent with the Department's Core Values.

### 4.3 The Undersheriff should have no responsibility for Custody operations or the disciplinary system.

The Commission believes that true reform of Los Angeles County's jails cannot take place if the Undersheriff continues to have any role, direct or indirect, in overseeing LASD's Custody operations or the disciplinary process, including IAB and ICIB. Although Tanaka's future at the Department is beyond the Commission's mandate, the Commission believes that the

Sheriff should consider whether the Undersheriff should have any operational role or be in the chain of command over any part of the Department.

### 4.4 The Department should create a new Assistant Sheriff for Custody position whose sole responsibility would be the management and oversight of the jails.

No matter how well the current Assistant Sheriff for Custody performs his or her duties, the existing management structure all but guarantees that only a fraction of his or her time will be focused on improving the operations of the jails. To shake free of those limits, the Department should create, and the Board of Supervisors should approve any needed funding for, a third Assistant Sheriff position to focus exclusively on jail operations. Alternatively, the Department should create an equivalent non-sworn position that would allow the Sheriff to appoint the most qualified person to head the Custody Operations Division regardless whether that person is a sworn peace officer.[10]

Creating a high-level executive position responsible solely for jail operations will focus Department management on issues specific to the jails and promote accountability. As one former head of corrections explained, the existence of a high-level executive position, with focused responsibility for jail management, would ensure that an engaged and capable leader takes ownership over the jails and assumes responsibility for addressing the problems that arise in them.

Some jurisdictions have vested the management of their correctional facilities in agencies that are entirely separate from their law enforcement agencies. Experts have noted that there is little reward for jail reforms and, therefore, problems in jails tend to be of secondary importance for law enforcement officials who are more focused on Patrol operations. For these reasons, one option suggested by experts is for Los Angeles to create a separate Department of Corrections under the leadership of a Commissioner or Chief appointed by the Board of Supervisors. The Commission recognizes, however, that this change would require statutory reform, would not be swiftly implemented, and would diffuse accountability. Moreover, this is not the only successful

---

[10] The Los Angeles County Charter contemplates the appointment of a third Assistant Sheriff who is not a sworn deputy. Section 33 of Article 9 of the County Charter, amended by voter initiative in 2002, provides that the office of the Sheriff may consist of "three Assistant Sheriffs, one of whom may be non-sworn and may be appointed from outside the office of the Sheriff".

Page 88                                    *Report of the Citizens' Commision on Jail Violence*

model for jail management. Other municipalities that combine law enforcement and corrections have seen successful management of and turnaround in their jails. The common thread in these situations is the existence of a single experienced and capable high-level official with an individual focus on, and responsibility and accountability for, jail operations.

**4.5    The Sheriff should appoint as the new Assistant Sheriff over Custody an individual with experience in managing a large corrections facility or running a corrections department.**

The last three Assistant Sheriffs for Custody all came from the Patrol side of the Sheriff's Department, and none had any recent experience in the jails. Their expertise and experience was in Patrol, not Custody. As a number of experts have observed, there are significant differences in the skills and expertise required for Patrol and for Custody. The Commission believes that the Sheriff should conduct a nationwide search and appoint an individual with experience in managing a large corrections facility or running a corrections department to be the new Assistant Sheriff for Custody or the non-sworn equivalent of that position.

**4.6    The Assistant Sheriff for Custody should report directly to the Sheriff.**

It is clear that the Department needs to streamline its lines of reporting and communication to the Sheriff. Problems in past years have resulted, in part, from too many layers of review and too many managers who must be consulted before information reaches the Sheriff. The Sheriff should be directly engaged with his Assistant Sheriffs and there should be no filtering or censorship of information and problems -- whether good or bad -- before they reach the Sheriff's desk.

To ensure that the Sheriff is kept current on developments in the jails and that his reforms are implemented, the new Assistant Sheriff for Custody should report directly to the Sheriff and meet with him weekly. The Undersheriff should not be in the chain of command; this will help flatten the reporting structure, enhance the accountability of the new head of the Custody Division to the Sheriff, facilitate the Sheriff's oversight of Custody operations, and remove the filtering process that accounts, in part, for the Sheriff not knowing of "bad news," while at the same time reducing the Undersheriff's influence over Custody operations.

Although it is beyond the Commission's mandate, it would make sense for the same reasons for the other two Assistant Sheriffs to report directly to the Sheriff. The Sheriff should also be supported by a Chief of Staff who would not be in the chain of command, but would be responsible for ensuring that the Sheriff has the information he needs to run the Department and that his directives are carried out. This structure would eliminate the need for the position of Undersheriff and have the added benefit of making the creation of a third Assistant Sheriff position revenue neutral.

### 4.7    The Commander Management Task Force should not be a permanent part of Custody management.

The Commission acknowledges that the CMTF has enabled the Sheriff to implement needed reforms in Los Angeles County jails and that force incidents have declined dramatically since it was formed. It is unclear what role the Sheriff proposes for the Commander Management Task Force going forward and whether the Sheriff contemplates that the Task Force will do more than conduct inspections (either directly for the Sheriff or as part of an Audit and Inspections Division). The Commission does not believe that the Task Force should have a permanent responsibility for the oversight of the jails. Leaving the Task Force in place for more than planned and unplanned inspections would effectively add another layer to an already complex organizational structure, result in confusing lines of authority and make it more difficult to hold senior managers such as the Assistant Sheriff and Chief of Custody Operations accountable for the oversight of the jails. Rather, the Sheriff should appoint an experienced Custody expert to serve as the Assistant Sheriff for Custody and hold that person responsible and accountable for running the jails, implementing the Sheriff's vision and any additional reforms, reducing violence and force incidents and holding deputies and supervisors accountable for their actions.

### 4.8    The Sheriff must regularly and vigilantly monitor the Department's use of force in the jails.

The Sheriff has acknowledged a breakdown in reporting significant uses of force to him and he has filled that gap with the Commander Management Task Force. The Sheriff needs a permanent solution to this problem. The Commission recommends that the new Assistant Sheriff for Custody and the Chief of Custody Operations meet weekly with the Sheriff and

provide reports on jail operations, including weekly use of force statistics, the implementation of the Sheriff's reforms, the status of use of force reviews and disciplinary matters. Periodic reporting should also be made to the Board of Supervisors (see the Oversight Chapter).

The Department should also use data and high level management review of trend lines to hold supervisors more accountable. A detailed review of data with jail supervisors on a routine basis will result in an in-depth understanding and ownership at all supervisory levels of force trends, patterns and other jail issues. Indeed, as numerous experts have noted, leaders manage best what they measure.

**4.9    The Department should implement SCIF on the Custody side to improve the accountability of jail supervisors.**

SCIF proved successful in improving supervisor accountability when it was actively used on the Patrol side. Thus, it is an excellent model to use in Custody as well. The concerns that were raised when the Department originally ran SCIF can easily be addressed by placing a stronger emphasis on constructive feedback, mutual respect, and development of leadership skills. The Commission is aware that the Department has reinstituted this process in Custody and applauds those efforts. Creating a monthly or bi-monthly forum at which Captains are responsible for reporting to senior managers on problematic trends and issues at their facilities -- and how they intend to address those trends and issues in the months ahead -- would serve as a powerful tool to increase accountability and ensure better communication between the Sheriff and his senior leadership.

**4.10    Senior management needs to be more visible and engaged in Custody.**

In addition to frequent review of Custody data and management meetings, senior management (including the Sheriff) should visit the jails and walk through the facilities, both announced and unannounced, on a regular basis and, at a minimum, several times a year. The physical on-site presence of the Sheriff and Assistant Sheriff overseeing Custody is a vital mechanism for meeting with Department personnel and inmates and gaining a first-hand sense of the mood, morale and environment in each jail facility. It also sends an important message that this aspect of the Department's work is valued.

**4.11    Management staff should be assigned and allocated based on the unique size and needs of each facility.**

The current LASD model for allocating administrative staff -- which makes no adjustments for larger facilities or units within the Department -- makes little sense.  In particular, it fails to account for the greater challenges and larger staffing needs at a large jail facility such as MCJ.  The number of prisoners, deputies, and sheer physical size of MCJ create a need for an enhanced management staff to ensure that force packages and other operational needs are handled in an expeditious and thorough manner.  Indeed, past problems with delays in processing force packages underscore this concern.  The Commission recommends that the Department account for these issues in its allocation of management resources and move away from the current "one size fits all" approach to its management staffing model.  Doing so would provide for increased staffing in some facilities and decreased staffing in others.

**4.12    LASD should create an internal Audit and Inspections Division.**

The Commission recommends that the Department create an internal Audit and Inspections Division (either Department-wide or Custody-specific) to conduct regularly planned audits, monitor policy compliance, and engage in both periodic and unannounced inspections of the jails.  It is our understanding that aspects of this existed within LASD in the past.  For Custody, these audits and inspections should be developed by the Chief in charge of the internal Audit and Inspections Division in consultation with the Assistant Sheriff for Custody and the Chief of Custody Operations.  The internal Audit and Inspections Chief would provide reports on the results of the audits and inspections to the Assistant Sheriffs as well as the Sheriff.  The Commission does not recommend that the CMTF fill this void or become a permanent fixture within the Department; instead, the inspections of Custody should be conducted through a newly created internal Audit and Inspections Division.

**4.13    The Department should have a formal policy to address campaign contributions.**

The Department should adopt a formal policy that (1) either (a) prohibits any employee from accepting campaign contributions from another employee he or she supervises (directly or indirectly) in the Department or (b) prohibits any employee who accepts such a campaign contribution from participating in any decision that concerns the promotion, assignment or

discipline of the contributing employee (or the contributing employee's spouse) for a set period of years; (2) prohibits any Department employee from accepting anything of value from a campaign committee for a candidate who is also a Department employee; (3) prohibits any Department employee from soliciting campaign contributions from another Department employee while on duty; (4) prohibits any Department employee from utilizing any Department resources to solicit campaign contributions; and (5) prohibits any Department employee from requesting another employee to solicit campaign contributions on his or her behalf from any other employee.

**4.14    LASD should participate in collaborations such as the Large Jail Network that would enable it to learn about best practices and approaches in other systems.**

The Large Jail Network ("LJN") brings together leaders of jails with over 1,000 inmates and provides them with the opportunity to meet and discuss present day issues and challenges. It also welcomes them to the "safe space" of a confidential electronic listserv where ideas, problems and new thinking are shared on an ongoing basis. A number of corrections leaders have underscored the benefits of this network and described it as one of the most valuable tools at their disposal for sharing best practices and engaging in dialogue with heads of large corrections institutions grappling with common challenges. While many of the largest jails in the nation participate in this network -- including leadership from Cook County, Miami, San Diego and elsewhere -- LASD has been noticeably absent for several years.

The Department should participate in the LJN and take full advantage of a valuable mechanism for learning about best practices and thinking in other systems. Other jails throughout the state and country have faced similar excessive force issues and have developed strategies for dealing with such problems through networking with other jail leaders.

*Report of the Citizens' Commision on Jail Violence*

## CHAPTER FIVE
## CULTURE

### Introduction

Although most of the Deputy Sheriffs assigned to Los Angeles County jails are hard-working and dedicated professionals, there are some who do not share the Department's Core Values and who have contributed disproportionately to the use of force problems that have plagued the jails over time. These deputies are reflective of a disturbing mindset that promotes a lack of respect for inmates, an aggressive view that force is best used early and often to control the inmate population, and a disdain for those supervisors who have endeavored to enforce contrary principles. The existence of these negative influences has created a troubling culture in Custody that resulted in the excessive use of force in the jails.

Over the years, some deputies have viewed force as a way to signal their authority over inmates and to establish "who is running the jails," rather than as a last resort in response to problematic inmate behavior. These deputies have adopted a confrontational approach in their interactions with inmates, thereby heightening disrespect among deputies and inmates and increasing tensions in the jails. Management, in turn, has sent the wrong message by failing to address excessive force and a deputy culture resistant to supervision.

Against this backdrop, new deputies have not received adequate training on ethical decision making or how to de-escalate force, nor have deputies learned -- or seen by management's example -- that reporting misconduct is an important and expected part of their duties. The Department also has failed to address with appropriate rigor the "code of silence" that is an inherent concern among law enforcement agencies. It rarely finds or meaningfully punishes dishonesty and failure to report force incidents, and it takes months (or even years) to address deputy misbehavior. Moreover, for years management has known about and condoned deputy cliques and their destructive subcultures that have undermined the Core Values articulate by the Sheriff. These factors have contributed to force problems in the jails as well as numerous off-duty force incidents involving deputies.

The Sheriff has acknowledged the important role that the Department's culture has played in contributing to the use of excessive force in the Los Angeles County jails and the need

to change that culture to achieve a lasting reduction in levels of force. The "Sheriff's Department Strategy For Jail Reform," announced when he formed the Commander Management Task Force last fall, seeks to "[t]ransform the culture of [the Department's] custody facilities into a safe and secure learning environment for staff and inmates, and provide a level of service and professionalism consistent with our 'Core Values.'"[1]

The Sheriff's approach is consistent with the views of experts that the widespread use of excessive force is both indicative of, and often precipitated by, a problematic organizational culture. As one jail head who was able to improve a troubled jail aptly observed: "Without a unified effort to change culture, an organization is only addressing the symptoms of [force] problems and not the root cause." Yet a lasting transformation of the culture in Custody will not be easy. It will require capable and committed supervisors; strong and clear communication of policies and Core Values; timely and strict enforcement action evidencing zero tolerance for misconduct and dishonesty; and engaged and visible leadership in regard to these issues at the highest level of the Department.

Although some positive reforms have been achieved through the Commander Management Task Force, the recent Custody Division Working Group Report issued by the Association for Los Angeles Deputy Sheriffs (ALADS) suggests that a troubling mindset in Custody remains in place. In responding to what it described as a "perceived problem" of excessive force in the jails, the ALADS Report reflects a fundamentally different view about the nature of existing concerns and how to fix them. According to ALADS, the reforms the Sheriff has implemented -- including a Force Prevention Policy, an Anti-retaliation Policy, Town Hall meetings with inmates, enhanced supervision and Education Based Incarceration programs -- have caused deputies to "feel that they have largely 'lost control' of the jails, with a sense that 'inmates are running the jails.'" The implicit suggestion of the ALADS Report -- more force and inmate discipline to show inmates who is "running the jails" -- underscores the ongoing cultural challenges the Department faces in addressing its use of force issues in a meaningful and lasting way.

---

[1] The Core Values of LASD are: leadership, honor, respect, integrity, wisdom, common sense, fairness and courage.