# EXHIBIT A

# PART 2

## Findings

1.  **Force too often has been viewed as a means to control the inmate population and establish deputy authority in the jails.**

For a number of years, force has been viewed by some Custody deputies as a means to control the inmate population rather than a last resort response to assaultive or resistant behavior. This mindset -- and "force first" approach -- was described by past and current Department personnel interviewed by the Commission. Witnesses also recounted instances of unprovoked use of force by Custody deputies or use of force well beyond what was needed to neutralize a dangerous situation. In short, there was a dissonance between the Core Values articulated by the Sheriff and the attitudes of these deputies.

In testimony before the Commission, retired Commander Robert Olmsted noted that when he assumed his position as Captain of MCJ he observed "a ton of force. Off duty. On duty. I don't even know where to start." Commander Olmsted's account of his early days as a Captain at MCJ in 2007 is particularly telling: he found three deputies on both the 2000 and 3000 floors with broken hands as a result of hitting or trying to hit an inmate (in the latter case a deputy missed the inmate and slammed his fist into a wall). Olmsted quickly realized the need to educate Custody deputies about alternative and nonaggressive ways to subdue a hostile inmate. The mindset Olmsted discovered among the deputies was that force was necessary to assert authority and show inmates who was in charge of the jails, with inadequate consideration of alternative ways to manage a situation or de-escalate tension. Further, even if the use of force by a deputy was appropriate to respond to a recalcitrant or aggressive inmate, deputy reactions were often disproportionate and excessive.

This force-first mindset was still evident two years later. In the fall of 2009, following a spike in Significant Force at MCJ, Lieutenant Smith reported to then Commander Olmsted that there were six deputies who had more than 20 uses of force in a five year period ending in 2008 (and only one of these deputies was hired before 2005) and 42 deputies who had 10 or more uses of force in the 24 months ending in November 2009, almost all of which occurred on the 2000, 3000 and 4000 floors of MCJ.

This mindset is reflected, most recently, in the ALADS Report presented to the Commission. Based upon a survey of Custody deputies, ALADS concluded that these deputies

*Report of the Citizens' Commission on Jail Violence*                                      Page 97

believe they have lost their ability to control inmates, whom they assert are now "running the jails." This concern emanates from their perception that, as a result of the Sheriff's recent reforms, they have lost the ability to use force as a means to address inmate misbehavior.

That deputies would resort to force in the first instance is perhaps not surprising given the absence until very recently of any Departmental guidance that force should be a last resort and not a preferred option. Pursuant to the Force Prevention Policy announced by the Sheriff in November 2011, deputies are now directed to try first to de-escalate incidents with verbal communications, to reach out to supervisors for assistance in seeking compliance from disruptive inmates, and to be more proactive in planning for interactions that may lead to force with the goal of preventing the use of force whenever possible.

Current and former LASD personnel suggest a number of reasons why deputies often prematurely turn to force. As one former supervisor noted, deputies are often afraid to talk to inmates or are ill-equipped to use words to de-escalate a tense situation. In assessing over 150 force incidents at MCJ, Lieutenant McCorkle similarly noted that "there are tacit issues that may reflect why certain deputies have a higher number of significant force events, such as the ability to communicate appropriately with inmates." Fear also may have been a factor in the use of force by more inexperienced deputies, who would rather throw the first punch than risk assault by an inmate. Group dynamics further contributed to the use of force. As Commander Parra explained in his testimony before the Commission, when a deputy calls for more deputies, the resulting show of force may escalate the situation, exacerbate tensions, and increase the likelihood of use of force (including by deputies who arrive on the scene with no understanding of the preexisting dynamic). Finally, among impressionable new deputies, there was a mindset that being aggressive was valued by some in the Department.

In sum, tolerance for excessive force used by at least some deputies in Custody has the danger of leading to what one expert cautioned can become "abuses of force … so 'normalized' that deputies can no longer perceive them as abusive." This can perpetuate a damaging culture that can ultimately affect even those deputies in Custody who do not subscribe to these views and are intent on doing the right thing.

## 2.    The Department condoned a deputy-versus-inmate culture.

Although the Core Values articulated by the Sheriff require deputies to perform their duties "with respect for the dignity of all people," this value was not embraced by all Custody deputies. The lack of respect by deputies toward inmates is a significant component of the Department's culture that contributed to the use of excessive force in the jails. Some deputies went as far as encouraging inmate-on-inmate fighting as a means of control or retaliation stemming from a lack of respect for the inmate population. Outside witnesses including clergy and ACLU observers in the jails testified that some deputies were disrespectful and abusive towards inmates in order to exert authority.

Fostering an "us versus them" culture creates an atmosphere that contributes to excessive use of force. As noted in the most recent report of the Commander Management Task Force: "Interaction between inmates and staff are critically important since the jail culture for inmates is so heavily centered on respect."

The lack of respect for inmates manifested itself in a number of ways. For example, a common thread that appears to have led to excessive force stemmed from disrespectful communication between deputies and inmates, which LASD management identified as a possible factor "in inciting assaults." The use of profanity or a disrespectful directive to an inmate at times led to conflict that could have been avoided with professional communications.

The investigation also revealed that some deputies showed disrespect to inmates in other daily interactions. One inmate witness reported that deputies occasionally shut off hot water and/or heat at MCJ. Another observed that deputies who wanted to pick on an inmate would subject that inmate to multiple searches, throw away his possessions, or arbitrarily take away blankets or clothes. This lack of respect was reflected in the graffiti found in 2007 in a control booth at MCJ, which included the derogatory statement "don't feed the animals."

As with the use of force generally, peer pressure contributed to the adoption of an "us versus them" mentality. One outside observer noted that many deputies begin their tenure at MCJ as respectful and courteous, but their approach shifts after exposure to both the negative jail culture and the pressure of fellow deputies. One example of this dynamic arose when a deputy was chastised and given the label "Deputy Love" after deputies concluded that he was too

respectful of inmates. The deputies who challenged his behavior said he needed to yell at inmates and use less respectful language; the deputy eventually asked to be transferred from his assigned floor to escape pressure from his peers.

Most troubling are the reports received by the Commission of gratuitous and unprovoked violence (or encouragement of violence) against inmates. One witness spoke of the practice of "racking the gates," in which a deputy would unlock the cells of inmates to facilitate inmate "gladiator" fights. Another spoke of deputies intentionally placing inmates of different races or gangs together to provoke violence. Incidents such as these were documented by the Department as early as 2004.

The Sheriff has attempted to address these culture issues through Town Hall meetings and his Education Based Initiative. But as the recent ALADS report reflects, many of the 453 Custody deputies who responded to the ALADS survey (approximately 22% of Custody deputies) seemingly question the Sheriff's approach to improving inmate-deputy relations. For example, 70% of the deputies who responded (313 deputies) believe that "[i]nmates' respect for deputies has declined because they feel 'empowered.'" It is particularly telling that ALADS has approached the recent reforms as a zero-sum proposition in which any attempt to engage and listen to inmates is viewed as a threat to deputy authority. Yet, while ALADS criticized the recently implemented Town Halls and the perceived undue demands of the Sheriff's Education-Based Incarceration program, these efforts are viewed by the Sheriff and outside experts as demonstrating an interest in and respect for inmate contributions and rehabilitation that has helped reduce the tension in the jails. Moreover, contrary to ALADS' claim that the jails have become more dangerous for deputies over the past year, the number of force incidents and inmate assaults on Department personnel has dropped significantly during that period.

Although the Sheriff has memorialized in the Custody Division Manual the importance of treating inmates with "respect and dignity," it is less clear that all of the top leaders and managers in the Department share the Sheriff's commitment to these principles. It will be important for deputy training, supervisory oversight, and the discipline process to reinforce an unambiguous message that deputies serving in the jails are custodians of the inmate population, and to emphasize that the Department is committed -- at all levels -- to promoting efforts to engage and rehabilitate inmates while also ensuring a safe Custody environment for all.

*Report of the Citizens' Commision on Jail Violence*

### 3.    The Department's tolerance of deputy cliques contributed to the excessive use of force in the jails.

The Department has a long history of deputy cliques -- groups of deputies who self-associate and self-identify, often because of a particular posting or assignment, to the exclusion of those outside the group. These named cliques have included the "Little Devils," the "Vikings," the "Regulators," and others. In addition to their names, they have self-identified through logos and in some cases tattoos. Although work-related groups and associations are natural and can be healthy, these subcultures within the Department contributed to acts of insubordination, aggressive behavior, and excessive force in the jails for many years.

Problems associated with deputy cliques have long been known to the Department. The 1992 Kolts Report discussed the problems associated with the "Vikings" clique at the Lynwood Station, which gave rise to an excessive force lawsuit against the Department that resulted in a $9 million settlement. The Kolts Report found that the "Vikings" clique was comprised of "an inner group of deputies with peculiar and unique hard attitudes" that "manifested themselves in the form of excessive force and disciplinary problems between deputies and their supervisors." Kolts recommended that the Department "identify, root out, and punish severely any lingering gang-like behavior by its deputies," and that "[u]nit commanders [] aggressively break up deputy groups which manifest any of the conduct which signifies gang-related activity."

Despite the Kolts Report's recommendations nearly two decades ago, deputy cliques have continued to exist within the Department with the knowledge and tacit approval of Department leaders. One noteworthy example, the "Regulators," was reported to have formed at Century Station as early as 1999 and continued to exist at that Station until at least 2007, when Department leaders informed the Sheriff that the group had "semi-infiltrated the Department and its Core Values and daily functions." The group was found to have controlled overtime assignments and promotions at the Century Station and "boldly used" the Station's facilities "for their meetings, with no regard for supervision." The group "did not respect rank," and "would run the station as a subculture fraction." The Department report recommended enhanced training, including training of all Captains about "Sub-Cultures and Cultures of the stations and how they can undermine the Management."

The presence of deputy cliques has not been limited to Patrol assignments. At MCJ, aggressive cliques have been long-known to Department management. Beginning at least as early as 2003, supervising deputies observed groups of deputies, primarily from the 2000 and 3000 floors at MCJ, engaging in aggressive, cliquish behavior. Among other things, these deputies were observed associating together while on duty, leaving their posts *en masse* at the end of their shifts and refusing to commingle with other deputies. They were highly resistant to supervision, committed acts of open insubordination, and sought to intimidate, bully and undermine supervisors whose policies they did not like. Many such deputies had been serving together for several years in the same Custody assignment and younger deputies who joined the group were susceptible to their negative influences. The cliques from the 2000 and 3000 blocks at MCJ became known as the "2000 Boys" and "3000 Boys," respectively; some purportedly had tattoos with Roman numerals in their calf areas to identify their membership in the clique. According to retired Commander Olmsted, a deputy reportedly fractured the orbital bone of a non-combative inmate to "earn his ink" -- a tattoo with the Roman numeral "II" -- signifying his membership in the 2000 Boys clique.

The existence of such cliques can erode a deputy's moral compass and make the deputy more resistant to supervisory oversight. As one outside jail leader observed, "[w]here informal power groups provide the true day-to-day leadership, it is common for jail employees to develop an 'us-them' mentality both about organizational leaders and inmates. This may cause staff to form stronger horizontal alliances with each other in a way that overshadows good decision making about what is right and wrong." Most significant for present purposes, the aggressive nature of these cliques and their resistance to supervision likely contributed to a significant increase in the use of force against inmates on the 2000 and 3000 floors at MCJ.

Recognizing the corrosive nature of these groups, beginning as early as 2003, some MCJ supervisors sought to break up the core groups of deputy participants in the cliques. In early 2003, a Lieutenant tried to rotate deputies off the 2000 and 3000 floors, but was informed by his supervisor that he should handle the problem deputies on those floors "without sending his problems elsewhere." Another Lieutenant tried to assign 2000 and 3000 deputies working overtime to a different section of the jail, only to later learn that the deputies were ignoring their new assignments and working their regular posts. A Sergeant on the 2000 floor in 2003 did

manage to rotate problem deputies off the floor for a few weeks, during which time he observed the use of force incidents on the floor dramatically decrease. Thereafter, however, management ordered that the deputies be returned to the 2000 floor, and use of force incidents returned to their pre-rotations levels. A short time later, a small inmate riot took place on the 2000 floor. The Sergeant who had attempted to implement the rotation policy was told by a deputy that the riot was instigated by another deputy to bury the Sergeant in paperwork so he would not be able to walk the floor and supervise.

Problems with the deputy cliques on the 2000 and 3000 floors continued at MCJ over the years. In February 2006, Captain Clark implemented a policy to rotate deputies among assignments, but it was vetoed by then-Assistant Sheriff Tanaka. (See the Management Chapter for a discussion of these events.) This incident was widely perceived by MCJ supervisors as undermining their authority and eliminating any ability they had to break up cliques on the 2000 and 3000 floors. It is all the more remarkable in light of the Department's well known history and longstanding problems with deputy cliques. Indeed, the Kolts Report recommended that "[u]nit commanders [] aggressively break up deputy groups which manifest any of the conduct which signifies gang-related activity." A rotation policy is an accepted and appropriate response to address and prevent the formation of cliques and the disrespect of authority that cliquish behavior foments. Yet, then-Assistant Sheriff Tanaka, who himself had been a member of the Vikings group that had been the subject of the Kolts Report, rescinded the policy, undermined the authority of unit leaders and emboldened complaining deputies.

Predictably, the problematic and aggressive cliques on the 2000 and 3000 floors at MCJ continued after 2006, contributing to use of force incidents in the jail. Indeed, according to Department records, a significant spike in the number of force incidents in MCJ occurred within a few months after the Clark rotation plan was vetoed by Tanaka and force was particularly high on the 2000 and 3000 floors.

The problems with MCJ deputy cliques culminated at a Christmas party in December 2010, at which 3000 floor deputies engaged in a brawl with other MCJ deputies. The matter received significant media attention and became a high profile embarrassment to the Department. In the wake of this incident, OIR urged the Department to consider whether the fight "could be traced in part to the tolerance of floor cliques among deputies." OIR additionally noted that its

investigation revealed "troubling signs of such a culture" and "evidence that jail supervisors apparently knew about the use of 'gang-like' signs and other troubling behavior well before the eruption of violence at the Christmas party." More recently, in discussing the incident and a photograph of "the involved deputies prior to the incident holding up three fingers in a way that that could be interpreted as throwing 'gang signs,'" OIR expressed its concerns about the "apparent formation of a group by some deputies who apparently identified more with their floor assignment than their unit assignment or with the Sheriff's Department."

In early 2011, to help break up the MCJ deputy cliques, the Department implemented a rotation policy at MCJ similar to the one proposed by Captain Clark five years earlier. This rotation policy continues to exist today, albeit in a modified form.

Despite the longstanding problems that have been created by deputy cliques within the Department, some within the Department continue to minimize the issues created by these groups. One Commander told the Commission that he thought the allegations of deputy cliques were overblown; that one had to understand "kids" today; and that the MCJ deputies who resisted rotations were good deputies who simply wanted to continue working with their friends. This same Commander likened deputy clique tattoos to other tattoos displayed by members of the armed forces, such as the 101st Airborne. The President of ALADS similarly downplayed concerns about cliques and testified that he did not believe that deputy cliques existed in the jails.

Although camaraderie and friendly competition among units can be a natural and healthy aspect of any institution, cliques of deputies that resist or undermine supervision, violate Department policies, exert negative influences over other deputies, use frequent and excessive force against inmates, and engage in other violent behavior against members of the public and other deputies represent threats to the very integrity, ethics, and mission of the Department.

4.    **The Department's tolerance of a code of silence impeded its ability to prevent, detect, and discipline the use of excessive force.**

A "code of silence," by which officers fail to report or misreport improper or unlawful conduct by other officers, is not an unknown problem in law enforcement agencies. Law enforcement officers are trained to protect one another, creating a natural resistance to coming forward with information that could be detrimental to the career of a colleague. As a retired

LASD Commander stated, "we all know there is a code of silence in law enforcement. [It is] culturally imbued into the profession." He added that it is especially problematic in Custody, where deputies face a "host of ethical dilemmas" during the day to day performance of their duties.

To adequately identify, investigate and respond to alleged violations of Department policy, including allegations of excessive use of force, it is imperative that the Department foster a culture that promotes the honest reporting of violations of law and Department rules, and in particular the excessive use of force, by Custody deputies. Yet several current and former Department witnesses stated that use of force incidents at MCJ were often not reported, and allegations of excessive use of force were at times extremely difficult to investigate, because deputies would not truthfully recount what they had witnessed. Use-of-force packages often contained boilerplate descriptions of the events giving rise to the use of force and in some incidents deputies were not truthful about use of force.

Particularly troubling, this "code of silence" appears to have been tacitly or even expressly encouraged by certain Department leaders. When Lieutenant Bornman was attempting to investigate a 2009 bar fight involving four deputies from the MCJ 2000 floor, he reported to MCJ Captain Cruz that the identified participants in the fight were less than forthcoming about what had happened. In response, Cruz instructed, "don't look too hard." Tanaka, an Assistant Sheriff at the time, similarly told deputies and supervisors at Century Station in 2007 that Captains should not "put 'cases' on deputies" for misconduct and that "he would be checking to see which Captains were putting the most cases on deputies" and he would be "putting a case on them."

Experts report that the most effective way to address a code of silence is to implement a "zero tolerance" policy that aggressively punishes the failure to report and the misreporting of use of force incidents. Indeed, corrections leaders who have sought to address an imbedded code of silence underscored the need for harsh and visible consequences for failure to report or misreporting, starting with a presumption of *termination* when personnel are dishonest about excessive force. Two corrections leaders touted the use of criminal prosecutions against dishonest officers, and one even walked deputies "out in handcuffs" to send a strong message

that complicity in a code of silence would not be tolerated. Another expert stressed the dangers created when supervisors "give a blind eye to a blind report."

Matthew Cate, the Secretary of the California Department of Corrections and Rehabilitation ("CDCR"), echoed these messages in his testimony before the Commission. During his tenure as Inspector General at CDCR, high profile prison violence and code of silence problems were addressed through various strategies, including a discipline policy that imposed termination as the base punishment for falsely reporting or, in egregious cases, failing to report the excessive use of force. CDCR extensively trains its officers on the potential career-ending consequences of adhering to the code of silence and the need to truthfully report use of force incidents, and management sent a clear message that false or non-reporting of use of force incidents would not be tolerated. As Cate explained, while he was willing to rehabilitate jail personnel who engaged in excessive force, employees who were untruthful could not remain in his agency.

Although the Sheriff has articulated a strong disapproval of dishonesty, LASD has been lax in ferreting out or disciplining acts of dishonesty. As discussed in greater detail in the Discipline Chapter, the Department rarely finds employees to have engaged in false reporting of use of force. In addition, there have been documented incidents of false statements that resulted in light penalties and no finding of a violation reflecting the deputy's dishonesty. Moreover, the LASD discipline matrix for false statements, in sharp contrast to that of CDCR, starts with a base penalty of only 10 or 15 days. This lenient approach to dishonesty is insufficient to address a code of silence that has been part of the County's jail culture.

### 5.    Off duty deputy misconduct reflects a confrontational and aggressive culture among some in the jails.

Various witnesses before the Commission recounted a number of incidents reflecting aggressive off duty misconduct by MCJ jail deputies, some of which resulted in arrests of deputies. In one incident in 2003, a deputy who was arrested by the West Covina Police Department for DUI was verbally abusive to the arresting officers, stating that he was a 3000 floor deputy and the police should "not mess with" him. In another incident, four deputies were arrested by the Fullerton Police Department after jointly assaulting a patron at a bar. There was

also a fight at BJ's restaurant where a deputy punched a woman patron. Those issues came to a head with the 2010 Christmas party fight among Custody deputies.

Both OIR and Special Counsel have expressed concerns over the Department's failure to vigorously scrutinize or adequately punish off duty misconduct. In the wake of those events, OIR observed, "[o]ne way in which the disciplinary system can … maintain vigilance over the development of young deputies and jail culture is to scrutinize off-duty misconduct."

**6.    The Department has lacked sufficient training and guidance on ethical behavior and de-escalation techniques.**

Department personnel have underscored the need for greater focus on deputies' ethical training and guidance. A retired Commander expressed the view that the Department's training needs to do more to: (1) instill integrity in deputies; (2) train deputies about the LASD's discipline process and the consequences of misconduct; (3) train deputies to talk to inmates and de-escalate situations; and (4) train deputies to involve supervisors and managers in decisions that can lead to the use of force.

One former supervisor emphatically pointed out that the LASD needs to teach deputies "right and wrong from the get go." Similarly, the retired Commander told the Commission that there is little, if any, ethical training offered to deputies. He added that deputies need to be aware of the discipline process and know the consequences of their actions, including lying or covering up force incidents. The retired Commander also said that deputies need more training in dealing with inmates and learning to "talk their way" out of confrontations and de-escalate tense situations. He said deputies need to be trained in "role playing" exercises that teach them what to do when their authority is challenged.

In order to enhance its existing training on these issues, the Department reports that it is adding additional academy training in Nobility Policing, Respect-Based Leadership and Respect-Based Communication to address these deficiencies.

Troubling incidents in the jails underscore the need for a stronger emphasis on the Department's Core Values as well as a concerted effort to instill those principles in its personnel to promote a more positive jail culture. At least one witness has observed that there is a dissonance between those values and the actual attitudes and conduct of deputies.

**7.    Poor leadership has contributed to the troubling culture in the jails.**

For LASD management to properly emphasize and demand ethical behavior, Sergeants and Lieutenants must subscribe to and model those ethical principles and proactively supervise the deputies under their charge. Without genuine supervision, deputies will not be held accountable for their mistakes and will feel free to engage in unethical behavior. Unfortunately, there has been a lack of sufficiently trained or adequately supported Sergeants and Lieutenants in the jails. As one retired supervisor commented, "the problem [is] not so much 'resistance' to supervision as the 'absence' thereof." Another retired Commander explained that new deputies are a "blank slate" when they come into the jails; they need to be mentored by Sergeants and Lieutenants who instill in them that their actions have consequences and will not go unpunished. He said that he blamed supervisors more than deputies for the problems in the jails.

Individuals interviewed by the Commission emphasized that management often did not seek to discipline deputies involved in excessive force incidents at MCJ. One supervisor stated that when incidents involving use of force against an inmate occur, management fails to ask fundamental questions that would expose abuse. Instead, management at times has simply transferred high use of force deputies to other assignments. If the problem relates to a specific inmate, the inmate may be moved to another facility. Many believe this method of addressing problems explains why poor performance or excessive use of force by deputies goes unnoticed throughout the jail system. This approach reinforces the lack of consequences for deputies, or for their supervisors, for unnecessary or excessive force. Often no one is held accountable for excessive use of force and improper behavior goes unchecked.

As discussed in the Management Chapter, many witnesses attributed the culture problems in the jail to conduct by Undersheriff Tanaka, who encouraged deputies to "work in the 'grey' area" and told them to "function right on the edge of the line." These remarks promoted a culture and mindset among deputies that they could act with impunity because they had Undersheriff Tanaka's protection and, therefore, did not face the risk of discipline. Moreover, Tanaka's intervention in decisions in the jail reinforced a culture of deputies unreceptive to the chain of command and resistant to supervisors' efforts to control misbehavior. Commander Olmsted described how Tanaka responded with indifference even after use of force issues were forcefully brought to his attention.

*Report of the Citizens' Commision on Jail Violence*

Witnesses identified Captain Cruz as contributing to the troubling MCJ jail culture. They described how Captain Cruz would listen and pay "lip service" to the need for discipline, but would ultimately take no action. For example:

- Former Commander Olmsted testified how, after he retired, he began receiving numerous phone calls about uses of force at MCJ. He communicated those concerns to Captain Cruz, who downplayed the severity of the force used and instead attempted to ascertain the identity of the informant.

- Lieutenant Bornman reported that Captain Cruz responded to a surveillance video of several deputies severely beating an inmate by saying that he saw "nothing wrong" with the level of force used.

- During an investigation of several off duty deputies fighting with patrons at a local restaurant, Lieutenant Bornman told Captain Cruz that he was having trouble identifying the individuals involved. Captain Cruz discouraged Bornman from thoroughly investigating the matter or determining the identities of the deputies involved.

- An ACLU monitor described how Captain Cruz and other jail leaders rationalized the excessive level of force used in a cell extraction that the monitor witnessed. Captain Cruz informed the monitor that the deputies "did what they needed to do," and that this was the level of force required with this "type of inmate population who has a group mentality and won't negotiate." Captain Cruz went on to say that the results of throwing a 160 pound inmate onto cement were "just sort of about physics. This is going to happen."

- During a speech at a 2009 Christmas party attended by deputies working the 2000 floor at MCJ, Captain Cruz asked the deputies what he always told them and they responded with laughter and in unison, "not in the face!"

- According to one witness, Captain Cruz told deputies involved in a force incident that that they should have kicked or punched the complaining inmates a little harder.

These persistent and unfortunate comments by senior managers Tanaka and Cruz contributed to a troubling culture in the jails.

Further exacerbating this problem was the reluctance of supervisors to find use of force by deputies to be out of policy. Commander Olmsted testified that, after an independent analysis, he discovered 18 of the 40 use of force reports he reviewed were clearly "out of policy," yet all had been approved by Sergeants, Lieutenants, or Captains as appropriate uses of force. Moreover, as reported elsewhere in this Report, Department supervisors rarely found uses

of force in the jails to be unreasonable or out of policy. As a consequence, the culture in the jails was one where deputies considered themselves free to use force and supervisors were ineffective in controlling them.

**8.    The Department's failure to appropriately value Custody positions contributed to a negative and unprofessional culture in the jails.**

Within LASD, Custody is widely perceived to be a less important and less desirable assignment. As discussed in more detail in the Personnel Chapter, there is a pervasive view in the Department that time spent in Custody results in "lost years." In addition, some Patrol deputies have been transferred to Custody as punishment or because they were unable to handle their Patrol assignments. These perceptions foster a negative and at times unprofessional environment in the jails.

Most deputies join the Department seeking to become Patrol deputies, but many find themselves spending their early years in Custody, creating widespread feelings of discontent and frustration. One retired LASD manager opined that 95-99% of deputies did not want to be working in the jails; another supervisor believed that as many as two-thirds of the deputies in Custody were unhappy. These feelings of discontent are exacerbated by the fact that many deputies who want to go to Patrol have to remain in Custody for what most consider to be too long, sometimes as many as seven or eight years or even longer.

In contrast to the lengthy Custody assignments for new deputies, Sergeants have, until recently, remained in Custody for only a short period of time, an average of approximately one year. This has resulted in disgruntled and frustrated deputies, managed by Sergeants who do not have a vested interest in the effective management of the jails. Although one recent reform extends the length of supervisory assignments in the jails to two years, there is still a significant imbalance between the time that most deputies are assigned to Custody and the time that supervisors will remain there, and it is not clear that this change will be sufficient to address this problem.

The failure to value the Custody assignment, the lengthy periods in Custody for deputies, and the short assignments in Custody for Sergeants all have contributed to the cultural problems discussed in this Report. Although a career Custody track (discussed in the Personnel Chapter)

can ameliorate some of these concerns, that will not happen overnight. Deputies who want to be in Patrol will still be in Custody for some time. At a fundamental level only the engagement of high level leadership can enhance the perception of Custody and address these cultural concerns

9.    **ALADS response to the Sheriff's reforms reflects an entrenched and problematic culture.**

The response of the deputies' union to the Sheriff's reforms suggest that it will not be easy for the Sheriff to "transform the culture" of the jails. Based upon survey responses from approximately 22% of the deputies in Custody, ALADS reports that Custody deputies believe that the "new policies and procedures implemented in response to allegations of abuse have had unintentional consequences on inmate behavior and deputies' ability to control inmates without incident." According to the survey, 70% of responding Custody deputies believe that, as a result of Town Hall meetings and other reforms put in place by the Sheriff in recent months, inmates' respect for deputies has declined, and 50.1% believe that inmates have become more aggressive. ALADS goes on to conclude, without citing any evidence, statistical or otherwise, that "[t]his lack of respect has led inmates to be significantly more hostile toward deputies and resistant to their directives," even though Department statistics show that both force incidents and inmate assaults on deputies have decreased significantly. ALADS further reports that "deputies feel that they have largely 'lost control' of the jails, with a sense that 'the inmates are running the jails.'"

ALADS' vision appears to favor less outreach to inmates and the use of more force to control inmate behavior. If so, it will be very difficult for the Sheriff to complete the implementation of his reforms and to change permanently the culture in the jails from one based upon confrontation to one based upon respect, communication and reduced violence.

## Recommendations

5.1    **The Department must continue to implement reforms that emphasize respect for, engagement of, and communication with inmates.**

The reforms that the Sheriff has initiated -- including Town Hall meetings and Education Based Incarceration -- reflect an approach that is based upon respect for inmates and that seeks to improve communication by affording inmates a constructive (and nonviolent) outlet for their concerns and frustrations. Not surprisingly, since the Sheriff's reforms have been instituted,

*Report of the Citizens' Commission on Jail Violence*                                    Page 111

there has been a reduction in both force incidents and assault on the deputies. Although ALADS has questioned these changes, the Commission urges the Sheriff to maintain these more progressive approaches and to affirmatively combat the mindset that promotes confrontation and aggression as a vehicle for control within the jails.

**5.2    The Department's Force Prevention Policy should be stressed in Academy training and reiterated in continuing Custody Division training.**

The fundamental principles of the Department's Force Prevention Policy -- force is a last resort and deputies should use only the minimum amount of force necessary -- as well as concrete practices for implementation of that policy, should be stressed at the Academy and at every ongoing opportunity for on-the-job training. The Department's formal and informal training of Custody deputies should remind deputies that in many instances time is on their side, they should enlist the support of a supervisor whenever possible, they should use their communication skills to defuse situations, and -- as one Captain told the Commission -- they should "leave [their] ego[s] at the door" to avoid escalating a minor infraction into an incident that will require the use of force. There will be, without doubt, times in which deputies will need to use force to gain compliance with a lawful and proper directive (as well as to break-up fights), but the goal of the Force Prevention Policy is to use force as a last resort and only when necessary. These fundamental principles must become ingrained in jail culture.

**5.3    The Department should enhance its ethics training and guidance in the Academy as well as in continuing Custody Division training.**

It is vitally important that new impressionable deputies receive the necessary ethics training and guidance in both the Academy and thereafter. They must understand the repercussions to their careers if they adhere to a code of silence, protect other deputies, fail to report uses of force, or mislead or provide false information to investigators, their supervisors, or other Department personnel. New deputies are subject to the pressures of their peers, particularly where many of their peers will have been in the jails for several years and often longer than the supervisors. They must come to the job with the proper ethical framework, which must be reinforced by the Department at every opportunity. The Department should enhance its ethics training and guidance and stress the importance of ethical behavior and adherence to the Department's Core Values.

**5.4    The Department must make Custody a valued and respected assignment and career.**

As discussed in more detail in the Personnel Chapter, the Department should adopt a dual-track career system whereby deputies would be recruited separately for Custody and Patrol and would have the opportunity to have a career in Custody. This would eventually lead to a separate Custody Division staffed with deputies and Custody Assistants with personalities and skills better suited to a Custody assignment. It also would reduce the number of, and eventually eliminate, deputies rotating through Custody on the way to their desired Patrol assignments. Patrol deputies would no longer find themselves "marking time" in an assignment they do not want. These changes will result in an improved morale and culture in the jails.

In the interim, as this new system is being implemented, Department leaders must take proactive steps -- through valuing jail service in promotion decisions, assignment of quality personnel to the jails, and affirmative recognition of the importance of Custody -- to demonstrate that Custody is a valued and respected assignment. As one Sheriff opined: "all sworn personnel should be treated as equals and the message between the police function and the jail function should be, 'One job is not better or worse than the other. They're just different.'"

**5.5    Senior leaders must be more visible in the jails.**

Senior Department leaders must regularly visit the jails and meet with deputies to hear any concerns they may have. Along with Custody supervisors, especially jail Captains, the Department's most visible and highest level leaders must walk the halls and participate in Town Hall meetings and the Sheriff's Education Based Initiative to show their commitment to these programs. This direct engagement and physical presence by high level leadership in the jails will go far to underscore the value the Department places on Custody work and help to set the tone at the top.

**5.6    LASD must have a firm policy and practice of zero tolerance for acts of dishonesty that is clearly communicated and enforced.**

The most effective antidote to a code of silence is the implementation of clear, timely and harsh discipline for acts of dishonesty or failure to report uses of force. Yet LASD's recommended disciplinary range for, as well as its handling of, these cases has signaled lax attention within the Department to acts of dishonesty that undermine the discovery and

investigation of use of force.  As discussed in greater detail in the Discipline Chapter, the Department needs to modify its disciplinary matrix and fortify its approach to, and the timeliness of, these investigations of dishonesty. There must be a clear message to deputies from their first day on the job -- and reinforced throughout their tenure in the Department -- that there will be zero tolerance for dishonesty.

**5.7    The Department should have a sensible rotation policy to protect against the development of troubling cliques.**

The Department should continue to rotate deputies among job assignments and also rotate them among proximate facilities.  To the extent that there are meet and confer issues that require consultation with ALADS, the Department should seek to negotiate greater flexibility on the assignments of deputies to jobs, shifts or facilities, consistent with the needs of the Department.

The rotation policy should take into consideration the practicalities and realities of running a jail system, including the nature of particular assignments that may require more experience or skills (e.g., K-10 inmates or inmates with mental health issues), and should not necessarily rotate all of the deputies in one location at the same time.  The Commission is concerned, however, that the Department has reduced its commitment to the rotation of deputies based on articulated concerns that in some circumstances it may be necessary to leave some deputies in an assignment for longer periods of time and not rotate all deputies at the same time. Indeed, the Commission has already heard that exceptions to the recent rotation policy are being made on an *ad hoc* basis without a clear articulation of the rationale for exceptions.  The Commission believes that there should be a sensible and firm rotation policy, implemented in a common sense way (where not all deputies are moved at once) that will reduce the risk of deputy cliques while at the same time meeting the needs of the Department.  If exceptions are to be made, they should be rare, clearly documented and based on articulated and specific reasons. Moreover, the Commission believes that there is merit to the recommendation by Special Counsel that deputies rotate among facilities and believes that this can be accomplished with minimal disruption by movement of deputies among proximate facilities (such as MCJ, Twin Towers, and IRC).

### 5.8    LASD should discourage participation in destructive cliques.

Deputy cliques have been a longstanding problem in the Department and have had a particularly troubling impact on force issues in the jails. While the Department cannot prohibit discretionary decisions by deputies to associate with each other, it should discourage membership and participation in identifiable cliques or subgroups and prohibit use of Department resources and time to further the activities of these groups. In particular, high level Department leaders should actively discourage membership in deputy cliques and avoid promoting or condoning a culture of allegiance to a subpart of the Department.

The Department should also adopt policies that prohibit visible tattoos associated with deputy cliques that can undermine a sense of camaraderie and loyalty to the Department as a whole and that have also in some instances been used as a reward for aggressive behavior.

# CHAPTER SIX
# PERSONNEL AND TRAINING

## Introduction

The Department's personnel and training policies and practices do not adequately address the needs of the Custody Division and the safe, sound and effective operation of its jails.  There is a strong consensus among deputies that the Department views its primary role as law enforcement and Patrol operations, and that Custody is perceived to be of secondary importance. That mindset is reinforced by the Department's stated Mission, which makes no mention of Custody or the operation of the jails.[1]  Deputies are recruited and hired largely for Patrol, resulting in a mindset from the outset that Patrol is the primary work of the Department. Deputies interviewed by the Commission often referred to the Custody Division as a "step child," and repeatedly articulated the view that Custody work experience is not respected, years in Custody are viewed as "lost time," and only Patrol experience counts towards promotion and advancement.  The Department's personnel and training policies and practices both reflect and reinforce the second class status of Custody.

Among the policies and practices that communicate and perpetuate this view that Custody is not the "real" work of the Department are the following examples:

- The Department's Academy for new recruits spends a total of only *two hours* out of a total of 18 weeks of instruction on Custody specific training;

- The Department's Leadership & Training Division does not oversee any training for Custody beyond the two hours in the Academy and a newly-added 10 days of "Nobility Policing" post-Academy that includes some Custody-related scenarios;

- Custody has been used as a place for the Department to place deputies who have encountered problems in their Patrol assignments or are under investigation for misconduct;

- Deputies cannot be promoted without Patrol experience and, while technically a Sergeant could be promoted to Lieutenant while assigned to Custody, in practice it virtually never occurs; and

---

[1] The Department's stated mission is to: "Lead the fight to prevent crime and injustice . . . [and] Partner with the people we serve to secure and promote safety in our communities."

- According to the long-standing supervisorial assignment practices, Custody has historically received "who's left" after the highest rated new supervisors are chosen by Patrol and specialty units.

The Commission believes that there needs to be an organization-wide recognition of the importance of the work of the Custody Division in the Department's overall mission. In particular, there should be a re-thinking of the Department's mission, training, personnel policies and practices to reflect Custody's valued function and address the needs of Custody with a long-term goal of establishing a stand-alone Custody Division.

## Findings

**1.    While the Department's hiring policies and procedures are generally consistent with industry standards, application of these policies has at times been problematic.**

Although the Commission heard concerns about a perceived decrease in the Department's hiring standards that some believed resulted in the hiring of less qualified deputies, the Department's hiring practices and policies are consistent with industry standards. The concerns arise from the large swings in hiring, which can result in the Department hiring *lesser* qualified candidates who nevertheless still meet the Department's standards. There have also been some concerns about whether the Department, over time, has acted in full accordance with its articulated hiring policies.

In its broad outlines, the hiring process has remained constant over the last decade. Hiring and recruitment are overseen by the Department's Personnel Administration Unit, which is under the oversight of the Administrative Services Division. The primary components of the process are application; written and oral exam; detailed background investigation; polygraph testing; and psychological evaluation. Applicants are eliminated from consideration at each stage of this process.

If an applicant makes it through all of these stages, the background investigator prepares a report detailing his or her concerns about the candidate, if any. The report is then subjected to three levels of review: by the Background Investigation Unit ("BIU") Sergeant; by the Pre-Employment Operations Sergeant; and by the unit Lieutenant. All three check the thoroughness of the investigation, which is not complete until all three agree that it was adequate. The Lieutenant is responsible for final approval of the recommendation.

Since October 2008, marginal candidates have also been reviewed by the Commanders' Review Panel, which is tasked with reviewing the files and making the final determination about their suitability for employment.[2] The Department then selects the best candidates from the pool of qualified applicants. The final hiring decision is made by senior staff in the Department's Personnel Administration Unit taking into account the candidate's level of education, skills, maturity, and expressed dedication to a career in law enforcement.

The California State Commission on Peace Officer Standards and Training ("POST") conducts annual compliance inspections of all participating agencies' background investigations. Prior to 2009, POST consistently found LASD to be in compliance with its minimum requirements. POST did not complete an audit of the background investigations process in 2010 or 2011, due to budgetary constraints. The next scheduled audit is in 2012.

In 2009, OIR conducted a review of LASD's background investigations. It similarly found that, in the great majority of cases, the Department's background investigations were "objective and thorough." OIR found, however, that in a small number of cases the BIU failed adequately to investigate certain elements of an applicant's personal history and/or failed to take heed of negative information in an applicant's file.[3] OIR identified some specific areas of improvement in the Department's policies and procedures and the Department has implemented the vast majority of these recommendations.[4]

A number of witnesses attributed current difficulties in the jails to the progressive relaxation of drug-use standards for new deputies over the last two decades. The Department, like virtually all other law enforcement agencies, has changed its standards regarding drug use

---

[2] The Department conducts its own internal reviews of its hiring standards, but it has not sought an independent audit. According to the CMTF, the Department is inquiring into the use of the Audit Controller to conduct bi-annual audits of the background investigations process.

[3] OIR's Tenth Annual report also includes concerns about the hiring process arising from its investigation of the Department's hiring of officers from the Maywood Police Department when that department was disbanded and LASD took over the peace officer duties for the city. OIR found that some of the 11 hires were questionable and that the nature of this particular hiring situation (hiring existing peace officers that would otherwise lose their jobs) may have resulted in less rigorous identification of issues and concerns and lapses in implementation of protocol. *See* OIR Tenth Annual Report at 124–38.

[4] The two recommendations that have not been completed are: (1) to arrange for a neutral audit of the work of the contract psychologists; and (2) to arrange for internal reviews of the background investigations of deputies who are involuntarily separated from the Department in order to find ways of improving the process.

*Report of the Citizens' Commission on Jail Violence*                                                   Page 119

over the years to reflect changing public mores, and the Commission has been unable to identify a link between these changes and violence in the jails.[5]

Other witnesses also expressed the view that the Department's hiring standards had fallen generally in recent years, which may have something to do with the hiring of lesser qualified deputies during upswings in hiring (as discussed below). Some witnesses believed that new deputies were less respectful of authority, less dedicated to the job, and less willing to work hard. Some suggested that new recruits were younger and had less military experience. Others suggested that new recruits were more likely to have gang affiliations and quasi-criminal backgrounds. While it may be that new deputies are of a different make-up or mindset than deputies of past generations, these are common complaints found in many organizations reflecting a widely recognized generation gap and do not appear to be the result of the Department's hiring policies and practices.

The Commission did find some evidence of favoritism in the hiring process, but these incidents appear to be isolated and not widespread. Some interviewees recounted incidents where Department executives intervened in the screening process to benefit a preferred candidate. For example, one witness told the Commission that, after a background investigator decided to disqualify a candidate with personal connections to an executive, the file was reassigned to a different investigator. The second investigator cleared the candidate and the candidate was hired. These incidents are troubling, but the Commission has found little evidence to suggest that such incidents are systemic or that such actions resulted in the widespread hiring of unqualified candidates.

In sum, LASD's hiring standards remain compliant with POST guidelines and, when hiring proceeds at a reasonable pace, the current system is capable of selecting well-qualified individuals for the Department. While some concerns exist in regard to the application of these standards, these problems have not been pervasive.

---

[5] The Department's drug policy continues to exclude those who have engaged in regular or heavy drug use.

2. **The Department's cyclical hiring has resulted in the hiring of lesser qualified deputies.**

The Department's pattern of hiring impacts the quality of the deputies that the Department hires and results in the hiring of some less qualified deputies. The Department's hiring is entirely dependent on budgetary considerations, and its hiring practices have followed a classic boom-and-bust pattern. For example, in 2003, the Department hired only 75 new deputies. In 2007, that number swelled to over 1,200. Hiring numbers again plunged in 2009 to just 194 and then to a single hire in 2010. The Department's hiring numbers in recent years are as follows:

| Year | Hires |
|------|-------|
| 2003 | 75 |
| 2004 | 190 |
| 2005 | 582 |
| 2006 | 1047 |
| 2007 | 1271 |
| 2008 | 455 |
| 2009 | 194 |
| 2010 | 1 |
| 2011 | 120 |

As these numbers reflect, in the "bust" years, there were partial or complete hiring freezes in which few deputies were hired. In the "boom" years, the Department aggressively filled all of the positions for which funding was available. This pattern has repeated itself several times over the last two decades. The Department experienced partial or complete hiring freezes from 1991 to 1994, from 2002 to 2005, and from 2008 to 2011, corresponding to periods of economic contraction. Each hiring freeze has historically been followed by a hiring boom.

The task of hiring large numbers of new deputies in boom years means that the Department must both (1) expand the applicant pool through recruiting efforts, thus drawing in candidates who may not be as dedicated to, or well suited for, a law enforcement career; and (2) reach deeper into the qualified applicant pool, taking candidates who may be less qualified for any number of reasons. Because these hiring booms tend to be correlated with economic swings, they generally occur when other law enforcement agencies and the private sector are expanding their own hiring. This increased competition pushes the Department still deeper into the

applicant pool and makes it more difficult to hire well-qualified applicants. To illustrate, in fiscal year 2004/2005, the Department could fill only 75% of the authorized positions.

Other corrections leaders have underscored the concerns that can arise when hiring standards are relaxed to accommodate cyclical needs. The head of one large metropolitan jail observed that this can lead to problems in both quality and professionalism. He noted, "there is a tendency for organizations to just hire. You must have a good selection process. Failure to do that will lead to lots of discipline problems."

The impact of the hiring swings is also illustrated by OIR's 2009 report examining background investigations. OIR found that, during the 2005 to 2007 hiring boom, the Department relaxed hiring standards, applying a "holistic" review standard that permitted investigators to ignore factors that would previously have been disqualifying. In addition, OIR found that psychiatric personnel felt additional pressure during this period to rate applicants qualified. OIR's 2009 review of the hiring patterns suggests that the Department was hiring a much larger percentage of the applicant pool in 2005 to 2007 than in prior years. Witnesses we spoke with confirmed that, historically, approximately 10% of applicants ultimately were hired. But during the hiring boom of 2005 to 2007, the Department hired more than 20% of the applicants.[6]

To the extent that these cycles result in the hiring of less qualified deputies, who are less mature, have weaker communication skills, or fewer demonstrated leadership abilities, it necessarily impacts the Department's capabilities to handle the myriad of challenges presented in a custodial environment.

3.  **Department training for Custody is far below both industry best practices and training standards in other corrections systems.**

Experts interviewed by the Commission repeatedly emphasized that, while careful hiring is important, diligent background investigations and hiring standards will not solve use of force problems. As important is training, leadership, and support given to employees who are hired.

---

[6] Another side effect of the boom-and-bust hiring pattern is the need to dismantle and rebuild the BIU and the Academy staff with each swing, further challenging the effectiveness of the hiring and training process.

A well qualified deputy may fail if given poor support, training, and supervision. A lesser qualified deputy can still succeed in an environment that provides guidance and support.

In training (and supervision discussed below), the Department falls far short. The training provided to deputies to prepare them for their position in the jails is well below the minimum levels expected. Currently, LASD deputies beginning a Custody position receive the following training:

- 18 weeks of Academy training with only two hours dedicated specifically to Custody;

- Two weeks of Nobility Policing Training after the Academy (added at the end of 2011), some of which deals with Custody specific situations; and

- Two weeks of practical Custody Division training at the assigned facility.

Once on the job, the Deputies are assigned a Custody Training Officer for 12 weeks and must complete a training checklist on various topics relating to the Custody position. Thereafter, deputies are expected to participate in 24 hours of continuing training each year, some of which is Custody specific.

Not only does Custody training get short shrift, it is not considered a responsibility of the Department's Leadership & Training Division. As currently structured, the Department's Leadership & Training Division oversees the Academy, with its two hours of Custody specific training, and the two week, post-Academy, Nobility Policing training. It does not oversee any other training for Custody, which is handled by the Custody Division itself. This means that the division of the Department dedicated to the training of deputies in accordance with the industry's best practices has little oversight or management of most of the Department's Custody training. Even if Custody managers are able to identify training voids and craft curriculum for Custody, the Leadership & Training Division can offer valuable added insights. This also sends a strong message that training for Custody is not a part of the Department's primary mission or significant enough to be part of the Department's training division.

Moreover, the limited amount of Custody specific training is far below industry best practices. Experts agree that comprehensive Custody specific training before individuals begin work in the jails is vitally important. Many systems have robust Custody-only training programs

well in excess of 10 weeks. The head of the Department of Corrections in New York believes 15 to 17 weeks of training should be standard for Custody assignments; that department provides 16 weeks of corrections training -- the same length of training for Custody deputies in San Diego. And Miami has a 22 week corrections training academy, after which Custody deputies are tested and "certified" to work in the jails. LASD's training falls well-short of these best practices standards.

There is further uniform agreement among deputies, Department leaders, and experts that special training in dealing with mentally ill inmates is essential. The Department does not, however, provide sufficient training in this area. Currently deputies receive the following training relating to mental illness: two hours in the Academy regarding mental illness generally but not specific to Custody or inmates; four hours of training on mental illness and inmates during the two weeks of Custody Division specific training, and two hours of training every year of their assignment to the Custody Division as part of their 24 hours of ongoing education. This Custody Division training on  mental illness was instituted in July 2010 as part of a directive to enhance mental illness training. These efforts are an improvement, but still insufficient.

The Department further does not adequately train supervisors for Custody. Prior to 2010, a Sergeant assigned to Custody only had the limited training he or she received at the two week "Super School" that all new Sergeants and Lieutenants attend, which did not and still does not address Custody specific issues. Beginning in 2010, the Custody Division began implementing an eight hour course on leadership in the jails, which accounts for the totality of Custody specific training provided to a Sergeant or Lieutenant serving in Custody. As one corrections head noted, the "weak link" in jail systems is often the result of promoting people without providing proper and necessary training. Another expert recommended that supervisors receive at least 40 hours of training before beginning a Custody assignment, as well as 40 hours of ongoing training.

The Department's failure to provide adequate training for Custody generally, and mental health issues in particular, most obviously means that deputies and supervisors are not adequately prepared for their assignments. Moreover, this failure reinforces the message that work in Custody is not important to the Department.

4.    **The Department's promotion and supervisorial assignment process reinforce the second class nature of Custody service.**

According to several managers, deputies believe that they will not advance in the Department working on the corrections side of LASD.  There is a widespread belief that Custody work is "lost time" in one's career -- often described as a "dead end job" -- in comparison to working Patrol where, in the same amount of time, a deputy can be promoted to Sergeant or Lieutenant.  Many interviewees expressed the notion that deputies seeking promotion believe they are better off working *any other assignment* outside of Custody.

The Department's promotion policies and procedures reinforce the message that Custody is not the "real work" of the Department.  Most significantly: (1) a deputy cannot be promoted to Sergeant from the Custody Division without Patrol experience; (2) a Sergeant is rarely, if ever, promoted to Lieutenant while in the Custody Division; and (3) the Custody Division is generally assigned the Sergeants and Lieutenants who are left over once the Patrol and specialty division supervisorial positions are filled.

In order for deputies to promote to the rank of Sergeant, they must be serving or have served in a Patrol division and pass a Sergeant's exam, which consists of three parts: (1) a written exam; (2) an oral exam; and (3) an "Appraisal of Promotability" (the "AP").  The written exam tests a deputy's knowledge of various codes and regulations.  The oral exam presents scenarios that the deputy must analyze before a two-person panel (either two Lieutenants or a Lieutenant and a Captain).  Lastly, the AP is calculated by the deputy's direct superior (a Sergeant with at least six months of supervision over the deputy) and reviewed by officers in the two ranks above the superior (Lieutenant and Captain), who can amend or revise the initial appraisal.  The AP is a score given to the deputy based on certain criteria out of 100 point total.

To be eligible for a promotion to Lieutenant, a Sergeant similarly must have successfully completed a Patrol (or specialty) assignment.  While it is technically possible under current policy to promote from Sergeant to Lieutenant from a custodial assignment, it almost never happens.  Promotions to Lieutenant follow the same process as promotions to Sergeant.

Once a deputy has been promoted to Sergeant or Lieutenant, the Department's process for placement of these supervisors further de-values Custody.  Sergeants and Lieutenants

actively lobby with Captains for positions in various Patrol and specialty divisions. The
Captains then tell Personnel Administration whom they want to serve with them. Once the
Sergeant/Lieutenant placements are made for the Patrol and specialty divisions (including
movement of Sergeants and Lieutenants within the Department as well as placement of newly
promoted deputies), the remainder of the Sergeants/Lieutenants are placed in the Custody
Division. The Department candidly acknowledged in interviews that Custody generally gets
"who's left" in terms of supervisor placement. While the Commission heard some examples
where Custody Captains lobbied for top Sergeants and Lieutenants, this was not the norm.

Even more troubling were the reports from various witnesses interviewed by the
Commission that a Custody supervisorial assignment is used as retribution for supervisors who
are out of favor with the Department leaders. It was commonly understood among these
witnesses that Sergeants, Lieutenants and Captains who were not in favor with senior leadership
would get Custody assignments.

**5.     Custody has a history of deficient supervisory performance.**

As one jail head aptly noted, when examining the quality of jail supervision it is helpful
to ask if supervisors are "correcting the problem or part of the problem." LASD personnel and
outside experts agree that many of the challenges encountered in the County jails can be
attributed to inadequate supervision. Numerous witnesses noted that, putting aside the number
of supervisors, supervision was inadequate. Complaints ranged from Sergeants "chit chatting"
away from their assigned floors, to Sergeants afraid to discipline or talk to the deputies they
supervised, to so-called "deputy-fives" (officers with a Sergeant's pay grade and title who
nonetheless still think and act like a deputy). In addition, because of the steep learning curve for
new Sergeants and Lieutenants in Men's Central Jail, we were told that some supervisors relied
on more senior floor deputies to suggest deputy assignments. Part of the problem is that
supervisors rotate through Custody faster than do the deputies whom they supervise. As a result,
deputies and Sergeants alike know that the deputies will probably outlast their new boss. Certain
individuals interviewed also indicated that even well-meaning supervisors are burdened with
significant paper work, which takes their attention away from walking the halls and providing an
active and energized presence on the floors they supervise.

Sergeants, too, view correctional assignments negatively. One retired manager told the Commission that Sergeants have the impression that correctional work is where one "parks" his or her career until being reassigned or promoted. Because there is no tie between promotions and successful Custody correctional work, there is little incentive for a Sergeant to effectively manage by taking on hard problems or proactively address underperforming deputies.

**6.     The ratio of supervisors to deputies in Custody is inadequate.**

An additional reason for the lack of adequate supervision is that there are not enough supervisors. As of June 2012, the ratio of Sergeants to supervisees in the Custody Division was approximately 14:1.[7] Excluding the recent addition of 19 additional Sergeants to MCJ, the ratio is more than 15:1. These supervisory ratios are far higher than appropriate for the safe operation of the jails. Indeed, last October, the Sheriff asked the County's Chief Executive Officer for "the addition of 101 Sergeant and 10 Lieutenant positions in the amount of $21.4 million" for the Custody Division.

In further recognition of this problem, and as an interim step, beginning in late 2011 the Commander Management Task Force "borrowed" 19 Sergeants and 2 Lieutenants from other divisions and moved them into MCJ. This move, along with other steps taken by the Task Force, has contributed to the decrease in incidents of violence. Unfortunately, the Commission was told that these borrowed supervisors are only on loan and the Department plans to return them to the other divisions at some point, leaving the Custody Division again with significantly inadequate supervision ratios.

**7.     Staffing the jails primarily with inexperienced deputies, and keeping them in Custody for a lengthy time period, has a host of negative consequences.**

It has been LASD's longstanding policy that deputies begin their career with the Department, post-Academy, in the Custody Division. Prior to 1983, deputies were permitted to remain in Custody assignments for their entire career. However, in the early 1980s the Department found too many deputies were remaining in Custody assignments. In response, the Department adopted what is now known as the "214 Rule." Under the rule, deputies who

---

[7] According to statistics provided by the Department, as of June 2012, there were 226 Sergeants supervising 207 bonus deputies, 1873 Deputy Sheriffs, and 1093 Custody Assistants. If one uses budgeted positions instead of filled positions, the ratio increases to approximately 16:1.

graduated with or after Academy class 214 must transfer to a Patrol assignment at some point and cannot stay in Custody indefinitely.

The process for deputies to move out of Custody is fairly complicated. Once a deputy joins the Department and is working in an assigned Custody facility, he or she must submit a transfer request form identifying no less than three (and up to six) Patrol Stations to which he or she would like to be transferred. The Department maintains a list of individuals desiring a transfer to each Station. When a spot at a Station opens up, the vacancy goes to the most senior person on the transfer list. The transfer list may include deputies already assigned to Patrol assignments, so assignments to the most coveted Stations may be monopolized by more senior deputies. Notably, a deputy in Custody will not necessarily be able to transfer to Patrol when his or her name rises to the top of the transfer list. With limited exception, the deputy will be permitted to transfer only when there is a new academy graduate (or other deputy seeking a Custody assignment) who can take his or her place.

Currently, deputies are permitted to request extensions of their assignment to Custody. Though most deputies are eager to transfer to Patrol, some desire to remain in Custody assignments for various reasons. Deputies may have become accustomed to the Custody environment. Others may be wary of the challenges of Patrol. Still others may stay because of the opportunities for overtime afforded by custodial assignments or because their relative seniority in the jails gives them better assignments and schedules. Historically, deputies were limited to submitting a certain number of requests to extend their time in Custody. Recently, however, the Department has, on a *de facto* basis, permitted an unlimited number. This year, the Department granted approximately 350 requests to remain in Custody. This is up substantially from 2005 when 35-40 such requests were granted.

Once a deputy is transferred to Patrol, he or she completes a two-week Patrol school and then must successfully complete a six-phase probationary assignment on Patrol (usually lasting six months). If the deputy fails, he or she is sent back to Custody for six months with instructions to improve on whatever skill deficiency resulted in the deputy's disqualification. The deputy is then given a second chance to complete Patrol school and a probationary assignment. Those who fail generally are discharged, though we have heard anecdotal accounts of such individuals being reassigned as Custody Assistants.

*Report of the Citizens' Commision on Jail Violence*

Ultimately, the length of a deputy's stay in Custody is determined almost exclusively by two factors: (1) the deputy's choice of Station; and (2) the rate at which the Department is hiring new deputies. Deputies who select "faster" Stations may transfer out quickly. "Fast" Stations are those that are regarded as less desirable, have higher turnover, and often are concentrated in outlying areas.

The Department does not track the length of deputies' stays in Custody so the Commission does not have specific data on this issue. However, anecdotal evidence suggests that the average length of stay is now between five and seven years. Some deputies stay in Custody even longer -- as long as 14 years -- before they are transferred to a Patrol assignment.

To the extent the length of stay can be estimated from the data we have been given, it suggests that this estimate is correct. In 2007, more than 1,000 deputies graduated from the Academy. In the years since then, only 800 additional deputies have graduated from the Academy. With a jail staff of approximately 2,100 deputies, this suggests that most if not all of the class of 2007 remains in custodial facilities. Much of the blame for this lies in the budget process. Lengthy hiring freezes mean that deputies hired during boom times must wait a long period of time before they can rotate out of Custody assignments.

The boom and bust hiring patterns, however, are not the only causes. As noted, there are currently approximately 2,100 deputies assigned to the Custody Division at any given time. The Department's annual attrition rate averages about 367. Simple mathematics dictates that it will take a number of years for a deputy to move to a Patrol assignment even when the Department is hiring at replacement rates.

There is no generally accepted standard for how long a deputy should remain in a Custody assignment before transferring to Patrol. Many of the experts said that any time in Custody was too long. Even those jail heads who believed that Custody might potentially be beneficial to the development of a new deputy agreed that five years was far too long for a Custody assignments to last.

Staffing the jails with brand new deputies for lengthy periods has a number of deleterious consequences. First, it means that the Department is staffing the jails with employees who -- by and large -- recently applied for and were trained for a different job: Patrol. Witness after

*Report of the Citizens' Commission on Jail Violence*                                    Page 129

witness emphasized that the great majority of deputies assigned to custodial positions do not want to work there and are just "marking time" waiting for their opportunity to leave.

Second, it is bad for morale, recruitment, and retention. The consensus view of the witnesses with whom we spoke was that extended assignments in Custody have created serious morale problems in the jails. In a recent ALADS poll, more than 80% of Custody deputies who responded stated that the low morale in the jails had negatively impacted productivity. The Commission also heard evidence that lengthy jail assignments had caused high-quality deputies to leave and join other departments (or to join other departments right out of the Academy).

Third, it impacts preparation for Patrol. Experts emphasized that the skills taught in the Academy -- like all skills -- are perishable and can be lost during an extended Custody assignment. It makes little sense to invest six months training a new deputy for a Patrol responsibility only to let those skills perish during a five- to seven-year Custody assignment.

Fourth, the jails may be a counterproductive assignment for the youngest and most inexperienced deputies. As several witnesses suggested, training Patrol officers to deal with ordinary citizens by exposing them to some of the most violent offenders early in their career may be counter-productive.

With these concerns in mind, one expert labeled the LASD approach to staffing Custody the "worst possible system for running jails," noting that new deputies go through training with a focus on being a street cop and are sent to the jails for a period of years where they often learn bad habits and aggressive approaches to dealing with people and suffer from plummeting morale. He noted that by the time deputies surface to Patrol, years later, they have forgotten much of what they learned in the Academy about being an effective Patrol deputy.

In testimony before the Commission, representatives from ALADS espoused a contrary view. The ALADS President insisted that the time deputies spend in Custody is important for their training and development as Patrol officers in that the jails teach young deputies how to interact with criminals and provide them with insights on criminal conduct. Many other law enforcement agencies, however, successfully run Patrol operations without first sending deputies or officers through an assignment in a jail system. Given the other downsides to extended

Page 130                                    *Report of the Citizens' Commision on Jail Violence*

Custody assignments for new deputies, the Commission finds that the benefits of the Department's Custody staffing approach is outweighed by its many inherent costs.

**8.     Some of the newest Custody deputies have been assigned to the most difficult floors or modules.**

The Commission also has concerns about how assignments within the jails have been made. In many cases, some of the newest deputies were assigned to take on some of the most challenging assignments. For example, at MCJ the "2000" and "3000" floors have the most dangerous inmates. We found evidence that some of the newest deputies have been assigned to these floors. Similarly, we found that new deputies have been assigned to the "5150" floor that houses mentally ill inmates, who are among the most challenging to work with. We understand that the Department is ending this practice, but have seen no written policy memorializing this change.

**9.     The Department fails adequately to monitor the performance of deputies in Custody assignments.**

All deputies in LASD undergo two probationary periods in their career. First, a deputy is on probation for the first 12 months of his career, no matter what assignment he or she is in. Second, consistent with the understanding that Patrol is the Department's primary work, a deputy's "real" probationary period does not occur until he or she is assigned to Patrol. At this point, the deputy is assigned a training officer for six months and must establish his or her ability to handle the Patrol duties. Deputies who cannot complete the field training for Patrol must return to Custody for six months, retake the Patrol school, and complete field training.

In 2009, OIR found that the Department was not taking advantage of the initial probationary period to monitor deputies' performance. Following the OIR Report, the Department took steps to ensure that the Department capitalized on the probationary period in Custody to screen new deputies.[8] Department policy now requires that, within 90 days of a probationary employee undertaking an assignment, the relevant Unit Commander must review the employee's "work habits, performance, and training records." Probationary employees who

---

[8] This is additionally important because deputies do not have civil service protection during the first probationary period and can be fired for any reason.

*Report of the Citizens' Commission on Jail Violence*                                                      Page 131

are the subject of administrative or other investigations will also be reviewed by their Unit Commander to determine whether the employee should be retained.

The Commission is concerned that the Department may still not be taking adequate advantage of the probationary period to weed out deputies who may present disciplinary problems. The Department's own statistics bear this out: since 2000, only 205 Deputy Sheriffs (out of a more than 4500) have failed to complete their probationary period (less than 5%).[9]

Experts confirm that these low numbers suggest that the Department is not taking adequate steps to monitor the performance of the newest deputies during their probationary periods in Custody. While experts acknowledged that it is impossible to say with precision what percentage of new deputies should fail during a probationary period, one expert said that he would expect close to a 10% fail-rate during the probationary period. In one well regarded jail system, nearly 25% of recruits are fired within the first year. The Department's persistently low failure rates suggest that careful attention to this issue remains necessary.

### 10.    The Department's lack of a rotation policy contributed to the growth of cliques, a culture of silence, and problems of insubordination.

Prior to 2011, the Department had no formal rotation policy governing deputies assigned to Custody. As a result, deputies often spent years working the same floor with the same small cadre of deputies. The lack of rotation has been a significant contributor to the Department's problems with use-of-force, resistance to supervision, and the development of a culture of silence.

The experts who consulted with the Commission repeatedly and consistently emphasized the importance of regular rotation of assignments -- both between floors as well as among proximate facilities -- as a mechanism to address these problems. As they explained, when deputies work together for long periods on the same floor, they may develop their own internal hierarchy and a problematic sense of ownership over the physical space. In addition, personal relationships between the deputies may discourage reporting of inappropriate behavior, a

---

[9] Indeed, the first probationary period, when the deputy is assigned to Custody, is of so little consequence that the Department's Personnel Administration Unit could not recall any deputy having ever failed this period when asked about this issue.

problem that is compounded when deputies expect to continue working together for an extended period. As one current sheriff explained:

> Complacency is further entrenched when personal relationships between people cause a reluctance to take corrective action …. In a setting like a jail this issue can be particularly prevalent because employees are sometimes dependent upon each other for their personal safety. Some of the greatest contributors to a 'code of silence' are fears that future aid may be delayed in retaliation for reporting a coworker's misconduct or omission.

Moreover, work within a single facility can lead to stagnation and a lack of exposure to other jail environments. Experts particularly emphasized the importance of regular rotation as part of the process of changing a problematic jail culture. In addition, rotation has the side benefit of reducing the development of inappropriate relationships -- friendly or hostile -- between inmates and jail staff.

Recognizing the need for rotation, in January 2011 the Department began rotating floor assignments at MCJ. In October 2011, the Custody Division issued a policy directive requiring that personnel in Custody be rotated no less than every six months. The policy does not, however, go as far as some have recommended and mandate the rotation of deputies between nearby facilities.

The 2011 rotation policy ensures that there are no changes to deputies' days off or shift assignments and there is no requirement that all deputies in a unit be rotated at the same time. Of concern to the Commission, however, is the vaguely defined opportunity for variances from this policy; the policy gives Unit Commanders -- with the concurrence of the Chief of the Custody Division -- the discretion to exempt deputies in "key positions" from the rotation policy. The Commission has been told that *ad hoc* exemptions to the policy are being made. OIR's recent 2012 annual report confirms these concerns; OIR reported that "a commander designated entire sections of MCJ as key positions, in effect making the rotation policy far less robust than initially envisioned."[10]

---

[10] OIR Tenth Annual Report, p. 39.

The Commission recognizes that there are potential challenges to a rotation policy. Deputies who work together for long periods may form effective teams. Long tenure in a particular assignment creates expertise, both about the job functions and about the inmates. Thus, a rotation policy may have some costs. There is no generally accepted way to strike a balance. Indeed, some of the experts we have spoken to recommended more frequent rotations -- as frequently as every four months. The Commission believes, however, that the Department's six month rotation plan strikes a reasonable balance between the need for job familiarity and the need to prevent the formation of cliques, minimize stagnation, and avoid other resulting downsides.

**11.     The Department has used Custody as a place to assign problem deputies.**

Prior to 2011, the Department regularly assigned deputies who had trouble in Patrol assignments to the Custody Division. For example, those subjected to citizen complaints who could not be -- or were not -- terminated were removed from their Patrol assignments and sent to Custody. This practice was confirmed by numerous witnesses with whom the Commission spoke and acknowledged by the Department.

This practice had three effects on the jails. First, and most obviously, it meant that the more problematic deputies were assigned to the jails. Second, it reinforced the message that Custody was a second-class assignment and that the Department did not view Custody as the "real" work of the Department. Third, it had a direct and damaging effect on the Custody culture. The problematic deputies re-assigned to Custody were older and more experienced than the bulk of the deputies in Custody, most of whom are fresh from the Academy. As a result, these deputies were often looked up to by younger deputies and seen as models and floor leaders. One jail head succinctly noted that when jail leadership uses Custody as a disciplinary transfer "you're going to end up reading about yourself."

The Department has informed the Commission that it has ended the practice of punitive transfers to Custody. But no written policy memorializes this decision and ensures that the practice will not arise in the future.

Page 134                              *Report of the Citizens' Commision on Jail Violence*

**12.    The Department underutilizes Custody Assistants.**

The Custody Division is currently staffed with approximately 2,100 deputies and 1,100 Custody Assistants. Pursuant to the MOU between ALADS and the Department, Custody Assistants may comprise no more than 35% of the staff of the jails.

Custody Assistants are significantly less expensive than Deputy Sheriffs. Base salaries for Custody Assistants range between $42,450 and $55,600. Base starting salaries for a Deputy Sheriff range between $56,400 and $70,100. Benefit costs for deputies are also higher. A study by the Professional Police Officers' Association ("PPOA") concluded that, all else being equal, replacing a Deputy Sheriff with a Custody Assistant would save the Department more than $46,000 per employee, meaning that a Deputy Sheriff is 50% more expensive than a Custody Assistant.

Deputy Sheriffs certainly perform duties that a Custody Assistant cannot. Yet witnesses confirmed that Custody Assistants are capable of performing most of the tasks performed by a Custody deputy, particularly since there are no firearms in the jails. Further, though their formal duties are limited, in practice, Custody Assistants perform a wide variety of tasks in the jails. Moreover, Custody Assistants are specifically trained for work in Custody, completing an eight week Academy training program focused solely on Custody work. Accordingly, utilizing more Custody Assistants would save the Department funds (that can be used for important expenditures like increasing the number of supervisors in the jails) and creates a larger proportion of the jail workforce trained and focused on Custody as a profession, with the benefits of such a professionalized workforce.

<u>Recommendations</u>

**6.1    The Department should review and revise its personnel and training policies and procedures to reflect Custody's status as a valued and important part of the Department.**

A fundamental change in the mindset of the Department is required to insure the proper and effective functioning of the jails. Specifically, the Department must consider Custody part of its core mission and revise and implement its personnel and training procedures and policies

accordingly. Along with the other recommendations discussed below, this includes but is not limited to:

- Not assigning "who's left" to Custody supervisory positions and instead striving to assign the best individuals for the positions to those jobs;

- Not using assignment to Custody as discipline or retribution for deputies or supervisors; and

- Allowing promotion from Sergeant to Lieutenant from a Custody position.

**6.2    The Department should develop and implement a long-range and steady hiring plan based upon normal attrition.**

Consistent implementation of the POST-approved hiring policies and procedures should result in the hiring of well-qualified deputies. Yet hiring gluts and freezes compromise this process. Instead of following the boom and bust cycles of the economy, the Department should work with the Board of Supervisors and the Chief Executive Officer to create, budget for, and implement a consistent hiring plan that accounts for regular attrition and modest growth when possible. The Department should resist the temptation to hire deputies in large hiring bursts. Although law enforcement agencies can almost always benefit from having more personnel, the negative consequences of hiring less-qualified deputies, the effectiveness of the training, and the extended stay of deputies in Custody outweigh the short-term benefits of having additional personnel sooner rather than later.

**6.3    Deputies and supervisors should receive significantly more Custody specific training overseen by the Department's Leadership &Training division.**

The Department must increase the amount of Custody specific training that deputies receive before beginning their assignment in Custody. Deputies should receive at least an additional six to eight weeks of Custody training, in addition to the two weeks of training in the jails, before beginning their jail assignments. Some meaningful portion of this training should focus on dealing with inmates who suffer from mental illness. Likewise, supervisors should receive more than eight hours of Custody training before assuming a supervisory role in the jails. All of this training should be implemented and monitored by the Department's Leadership & Training Division.

**6.4     There should be a meaningful probationary period for new deputies in Custody.**

New deputies should have a meaningful probationary period during their first twelve months in Custody.  The Department must rigorously assess each new deputy's abilities and fitness for service and terminate deputies who cannot meet the requisite standards.

**6.5     The number of supervisors to deputies should be increased and the administrative burdens on Custody supervisors should be minimized.**

The Department should make supervision in Custody a high priority and make all efforts to increase significantly the number of Sergeants and Lieutenants.  Likewise, the Department should review and reduce administrative burdens on supervisors in Custody that significantly diminish the supervisor's ability to walk the halls on a regular basis.  Well-trained and active supervisors in the appropriate ratios can make a significant impact on incidents of jail violence.

**6.6     The Department should allow deputies to have a career in Custody and take steps in the interim to decrease the length of new deputy assignments to Custody.**

The Department is in the process of studying a proposal by the CMTF for a Dual Track Career Path, which would allow deputies to remain in Custody and promote up to the level of Captain.  The Commission agrees that there should be such a system, which would allow deputies with the skills and desire to have a career in Custody and reduce the time that other deputies would have to spend in Custody.  This would have a positive impact on morale in the jails and increase the percentage of deputies in Custody who want to be there.

In the interim, the Department should take steps to reduce the time spent by new deputies in Custody.  Increasing the number of Custody Assistants and allowing deputies to choose to remain in Custody long term can help achieve this objective.

**6.7     The Department should utilize more Custody Assistants.**

The Department should negotiate with ALADS and PPOA to increase the use of Custody Assistants in the jails.  This would provide an increased workforce of individuals working in the jails specifically trained for Custody, with the added benefit of saving funds for other important measures including increasing the number of supervisors.

**6.8    Rotations within and among proximate facilities should be implemented.**

The Department should implement a sensible but steadfast policy that ensures rotation of deputies within Custody without vaguely defined exceptions. This rotation policy should include movement of deputies among proximate facilities as well as rotation among floors.

**6.9    The Department's Mission Statement should be changed to reflect the importance of Custody.**

The Department's Mission Statement should be changed to recognize the importance of the Department's operation of the jail. Specifically, it should reflect that one of the Department's main responsibilities is to manage the jails in a humane, fair, and professional manner that maintains a safe and secure environment for inmates in the Department's custody as well as for Department personnel.

**6.10    The Department should create a separate Custody Division with a professional jail workforce.**

Most of the recommendations in this Chapter contemplate the Department continuing with its existing structure where sworn deputies serve in Custody for some initial period and then go out to Patrol, with some deputies returning over the course of their career for a variety of individual reasons (abilities, schedule) and upon promotion. These recommendations are, however, short-term fixes. In the long-term, the Commission recommends that the Department establish a professionalized jail staff composed of Deputy Sheriffs specifically recruited, hired and trained for Custody assignments, supplemented by an increased use of Custody Assistants, with supervisors promoted from within Custody.

Experts uniformly agree that a key to successful jail management is having a core workforce of professionals dedicated to the Custody profession -- individuals who are suited to corrections work with a mindset of a "keeper" and not a law enforcement "catcher," want to work in the jails, and are well-trained for this career. As one jail head stressed, corrections is its own separate profession and should not be simply an "afterthought" or a "stepping stone for patrol." Another corrections leader noted, "I want people who want to be correctional employees, not people who want to use it as a stop off." Others underscored that Patrol and jail

work are "two very different disciplines" and a good correctional officer needs to have a firm set of beliefs about the treatment of inmates and an accompanying set of skills for that job.

The Department's current structure is in conflict with these fundamental principles. Young deputies hired and trained to be Patrol officers are stuck in Custody for a lengthy period waiting to get out on Patrol. A change in the structure -- and the creation of a career Custody Deputy Sheriff position -- would address these concerns. Pursuant to this new model, individuals interested in a career in Custody would be hired into that Division and would be taught in a separate academy lasting at least 16 weeks and dedicated to corrections.

Such a model will work only with a full commitment by the Department leadership to ensure that Custody Deputy Sheriffs are treated with respect and to avoid the development of a "caste" system within the jails. This will require concerted efforts by upper management to inculcate the belief that Custody Deputy Sheriffs are "real" deputies. Other steps that would reinforce this commitment might also include: (1) pay parity at the position of Sergeant and above; (2) use of identical uniforms; and (3) the elimination of other distinctions between these two assignments.

Moreover, supervisory promotions should come from within Custody. This will not only signal the value of expertise developed in this assignment, but also -- as noted by leadership in another large Sheriff's department -- ensure that jail supervisors have credibility among senior staff and in depth knowledge of the personnel and facility under their supervision. All of these steps can help avoid distinctions or restrictions on Custody Deputy Sheriffs that might promote a stigma.

Such a structure would create a professional cadre of jail staff who are invested in the operation and performance of the jails; it would eliminate the morale, recruitment, retention, and training costs of requiring new Deputy Sheriffs to spend multiple years in an undesirable assignment; and it will permit the Department to save money, increase supervision in the jails, and increase the inmate-to-staff ratio.

A number of departments have had success with this type of model, but there have also been serious stumbles in implementing such an approach. The Department must learn from these experiences. For example, San Diego County switched to a similar model in the 1980s;

*Report of the Citizens' Commission on Jail Violence*                                      Page 139

over the course of the last 30 years they have learned important lessons about how to make this structure work, including the importance of leadership and avoiding policies that denigrate the new Custody position. Kern County also switched to this model in early 2000s, but has just switched back. In interviews with this department, it was apparent that at least one reason for its failure was a lack of real commitment from department leadership to the changed model.

It is true that within the Department there are some with strong feelings and firmly held positions against such a change. Some have argued that using Custody Deputy Sheriffs in the jails undermines the Department's ability to adequately respond in an emergency, such as a riot or a fire. But some Custody Deputy Sheriffs would be available and able to assist in emergency response. Further, there is no instance under the current structure where a substantial portion of the deputies currently in the jail could be removed without risking the safety of the inmates or the safety of the staff left behind. And the Department has other sources of personnel -- those who ordinarily would be off-duty, those in administrative and other assignments -- who could respond in an emergency without risking citizen safety. Finally, there has been no instance in which the Department needed a substantial number of jail deputies to be able to respond in an emergency such as a riot or an earthquake. In short, it is a hypothetical risk that has never happened and Los Angeles County has no shortage of other law enforcement agencies that have mutual aid agreements to help each other.

Others have argued that it is important to have a single class of deputy to avoid creating a "caste" system in the Department. The Department's less than successful experiment with creating a modified deputy position to staff the jails in the 1990s reinforces this view for many. In hindsight, the failure of this model appears to be the result of a lack of leadership and Department commitment, as well as a deficient program design, rather than a problem fundamental to the concept of a professional Custody workforce. Experts the Commission spoke with emphasized that a strong message from leadership can blunt significantly the problem of a jail stigma. The San Diego Sheriff's Department successfully has implemented a dual track system and has reduced considerably problems with the "caste" system through consistent messaging from leadership.

The Commission has also heard arguments that individuals interested in careers in Custody are less qualified and less capable than people interested in becoming Patrol deputies.

Page 140                                    *Report of the Citizens' Commion on Jail Violence*

This view appears more to reflect the biases of current Deputy Sheriffs than it does a reasoned and objective view.  The success of other Sheriff's departments and correctional agencies with these systems suggest otherwise, as does the consensus of experts with whom we spoke.

In sum, creating a specific Custody Deputy Sheriff designation and career path within Custody with strong and dedicated commitment from Department leadership would eliminate Patrol deputies languishing in Custody for years, improve morale, and make important strides toward ensuring that Custody is staffed with a well-trained, dedicated and experienced individuals, addressing many of the concerns raised by the current structure.

*Report of the Citizens' Commision on Jail Violence*

# CHAPTER SEVEN
# DISCIPLINE

## Introduction

Timely investigations and discipline commensurate with the nature of the misconduct are essential to sustaining a reduction in the use of excessive and unnecessary force and ameliorating a code of silence in the jails. So too is a discipline system that severely punishes false reports and failures to report such incidents. There are, however, many impediments to the swift and certain imposition of appropriate discipline for the improper use of force and dishonesty in the Los Angeles Sheriff's Department. Some of these impediments are structural. They arise from the unduly complex, multi-layered, and at times disjointed system the Department employs to review force incidents, investigate policy violations, and impose discipline, as well as from the appeals process from misconduct findings by the Department. This system gives rise to poorly performed investigations and long delays between the use of force incident and the ultimate discipline determination. It has resulted in missed opportunities to remediate deputy misconduct at the first sign of trouble, instead allowing problems in some cases to go unaddressed and deputy misbehavior to reach more serious levels before action results. Further, the system does not assure that inmate grievances are sufficiently addressed or that inmates are able to submit their grievances without fear of retaliation.

Other impediments are cultural. There is evidence of the Department's failure to acknowledge the problem of inappropriate use of force in the jails and to take the necessary steps to ensure that the disciplinary system actually addresses this problem. Although the punishment for excessive force is often severe, some force incidents appear to be underreported and not addressed through the discipline process. The Department has found very few force incidents overall to be unreasonable, it has been too lenient about imposing discipline for dishonesty or omissions in reporting the use of force, and there have been well-documented lapses in the processing of use of force packages, lengthy lags in completing pending investigations, and delays in disciplining problematic personnel.

Further, senior LASD officials have undermined the discipline system, which has led to the perception that improper use of force in the jails will not always be subject to punishment.

There is a need for strong leadership dedicated to ensuring that the Department thoroughly investigates any improper uses of force as well as dishonesty about these incidents and that the Department timely imposes appropriate discipline for any misconduct.

## Findings

1.    **There have been well-documented lapses in reporting, investigating and disciplining use of force in the jails.**

There have been critical failures over time by supervisors in the jails to thoroughly and timely investigate use of force and, where appropriate, impose discipline. These failings are evidenced in internal LASD memoranda as well as testimony before the Commission.

In the fall of 2009, Lieutenant Mark McCorkle was asked by Commander Robert Olmsted to take a critical look at the use of force at MCJ. McCorkle reviewed 154 use of force packages from 2005 through 2009. Of those, 36 concerned IAB investigations, 100 involved significant use of force packages from the Personnel Performance Index database, and 18 were "randomly selected force incidents" with "possible policy and/or tactical issues." In each of these incidents, the supervisors had concluded that the force did not warrant the imposition of discipline. Nevertheless, McCorkle found problems with the force and deficiencies in the packages, including the following:

- Use of force packages often provided "dramatized" narratives of force incidents "to justify outcome;"

- A "[l]ack of radio traffic in deputy involved fights," which suggested that deputies were "[i]ntentionally not broadcasting event to avoid supervisor intervention;"

- "Failure to immediately notify a supervisor of a hostile or uncooperative inmate;"

- "Failure to properly secure inmates during cursory searches;"

- "Repeated blows to the head of inmates, causing injury to deputies;"

- "Unavailability, or failure to use appropriate equipment, such as tasers, OC spray and hobble restraints;"

- "Other options purposely delayed in order to dispense appropriate jailhouse 'justice';" and

- "Very few of the packages reviewed identified potential policy violations and none were found that recommended any type of disciplinary action, even Performance Log Entries."

McCorkle's assessment of these reports reveals a deficient investigatory and disciplinary process.

In late 2009, Stephen Johnson, Commander of Custody Operations Division, asked Gregory Johnson, then-Captain of the North County Correctional Facility, to review a sample of seven use of force packages obtained from MCJ, all of which had been determined to reflect "in policy" use of force. In a memorandum dated January 23, 2010, Captain Johnson identified numerous flaws in these force reviews, as well as potential policy violations, including the following:

- "inmate [] alleged that he was slapped by a deputy, yet, this is not investigated by a supervisor;"

- "no radio traffic by any involved personnel;"

- "deputies did not account for bruises to the left side of inmates' head in their documentation;"

- "no medical account for bruises to the right side of inmates head which are identified in Supervisor's Report of Use of Force;"

- "Report claims the contact occurred for the safety of teachers? This is questionable, as the teachers had walked past the incident;"

- "Significant injuries to the inmates right cheek can be seen on a videotaped interview, however, no questions were asked by supervisor as to how the inmate sustained the injuries;"

- "The Inmate alleged there were other inmates looking through a window who probably saw this incident . . . There was no follow up regarding these potential witnesses;"

- "'Contempt of Cop' – Deputy stared down by inmate;" and

- "The Watch Commander's review misstates that the inmate's injuries were consistent with the force reported. It does not explain how the inmate sustained injuries to his forehead, ankles, and right knee."

These findings paint a disturbing picture of the investigative process and use of force policy violations.

Captain Michael Bornman described an equally disturbing state of affairs in testimony before the Commission. In October 2009, Bornman started working as a Lieutenant at MCJ in a unit called "Special Projects." During that assignment, Bornman discovered large numbers of uncompleted force- and discipline-related paperwork that had languished for months, if not years.

First, Bornman received from MCJ Captain Dan Cruz a computer printout indicating approximately 100 use of force reports that had never been acted on, some of which dated as far back as 2005. Many of the force cases had never been entered into the PPI system and even those that had been entered initially remained incomplete so that there was no way to ensure that problem deputies could be identified. According to OIR, some of the cases "had never been completed by the assigned sergeant and/or lieutenant."[1] Compounding that problem, many of the Sergeants who should have filled out the reports had left for other assignments. By the time Bornman sought to investigate these incidents, the underlying files were missing, witness interviews and tapes could not be located, and there were no medical records to examine. As a result, after consultation with high level Department leaders, it was determined that Bornman would deem these force incidents to be unfounded and close the files with a determination that there were "no issues related to performance by any personnel involved in the use of force." That conclusion was not based on any true assessment of the underlying facts or the propriety of the force at issue; it was simply an administrative decision in the face of missing information.

Failure to complete force reports in a timely manner is problematic for a number of reasons. First, the statute of limitations for punishment is one year. If a force package is not acted upon within that year, the deputy's conduct may go unpunished, even if it is later found to be outside policy. Furthermore, if the information is not entered into PPI, the Department cannot accurately track the use of force on a per-deputy basis, thereby missing opportunities for intervention, mentoring, and discipline. Likewise, if such information is not reported, inmates who are seeking to defend themselves against criminal charges for assault on a deputy -- or for

---

[1] OIR Tenth Annual Report (September 2012), p. 30.

Page 146          *Report of the Citizens' Commision on Jail Violence*

that matter other defendants -- may be denied information they are entitled to under *Pitchess v. Superior Court*, 11 Cal. 3d 531 (1974) (holding that a defendant in a criminal action is entitled to access information in the personnel file of an arresting police officer).

Bornman also discovered in a desk drawer 32 uncompleted requests for Employee Performance Reviews that were generated because deputies had reached a certain number of use of force incidents in PPI. LASD policy requires prompt processing of these employee reviews (generally within 30 days) to ensure that performance problems are caught and remediated in a timely manner for the benefit of both the Department and the employee. In this case, however, some of the reports Bornman found were more than 18 months old, and many included Custody deputies who had used force 15 or more times over a three year period, had used Significant Force, or had used force that triggered IAB roll outs. Based on directions from MCJ Captain Cruz, Bornman did not recommend performance mentoring in any case.

Finally, Bornman uncovered 50 unprocessed Commander Service Comment Reports, which are generated when citizens complain or comment about jail conditions. He was also asked by Captain Cruz to process dozens of unattended to and untimely administrative investigations, a number of which involved off duty Custody deputy fights or aggressive behavior.

Through these endeavors, Bornman testified that he observed a dysfunctional system of accountability that had resulted in lax attention to discipline unparalleled in his years at the Department. Indeed, as OIR observed, "[w]hen the data in the Department's tracking system is neither current nor complete, it calls into question the integrity of the whole system and makes less effective any supervisorial use of the data."[2]

## 2. The Department has a multi-layered, complicated and at times ineffective process for reviewing and investigating force incidents.

The investigation of use of force by Custody deputies involves a multi-layered, confusing process. LASD differentiates between a "review" of a force incident and an "administrative investigation" of such an incident. A "review" occurs whenever there is a use of force. Where it

---

[2] OIR Tenth Annual Report (September 2012), p. 31.

*Report of the Citizens' Commission on Jail Violence*                    Page 147

appears that the use of force implicates a policy violation, a "review" may transform into, or be followed by, an "administrative investigation" or a "criminal investigation."

Depending on the severity of the inmate's injury and the nature of the force involved, either a force review or an administrative investigation may be undertaken by a supervising Sergeant, a Watch Commander, the Custody Force Response Team ("CFRT"), or IAB; in the case of a criminal investigation, ICIB will also be involved. Moreover, again depending on the severity of force at issue, the results of a force review or administrative investigation may be reviewed (more than once) by the Unit Commander, the Custody Force Review Committee ("CFRC"), or the Executive Force Review Committee ("EFRC"). Criminal investigations are reviewed by the District Attorney's Office.

### a.    Less Significant Force

When a supervising Sergeant receives a use of force report, he or she is charged with investigating the incident as the first step of a force review. The Sergeant must assess the severity of the inmate's injury and determine whether the use of force was significant. If it involves Less Significant Force -- for instance, where the force results in no injury or only in redness, swelling, or bruising (unless to the head, neck or spine) -- the Sergeant conducts a unit level review. During this process, the Sergeant may interview witnesses and visit the scene of the incident. Ultimately, the Sergeant compiles all of the information gathered into a force packet, which he or she submits to the Lieutenant serving as the Watch Commander for review.

The Watch Commander then reviews the force package for completeness and forwards it to the Unit Commander (the Captain) for a final review and a determination of whether an administrative investigation of a policy violation should be pursued.[3] The administrative investigation may be conducted by either the unit level or by IAB.

### b.    Significant injuries and head strikes

If a "significant injury" resulted from the use of force or a head strike was involved, the Sergeant must immediately contact the Watch Commander, who must first ensure that the inmate's medical needs are met. The Watch Commander's next concern is to determine which

---

[3]All use of force packages are subject to post-hoc review by OIR.

level of review is appropriate. In doing so, the Watch Commander interviews the inmate, on tape, to determine the circumstances of the incident, any injuries, and what level of medical care was necessary.

The Watch Commander uses various criteria to determine whether an IAB "roll out" is necessary. These criteria include: hospitalizations; skeletal fractures; a large number of deputies or inmates involved in the force incident; any injury (or complaint of injury) to an inmate's head or neck that results from the inmate's head hitting a hard object; head strikes with impact weapons; or deliberate kicks with a shod foot or knee strikes to an inmate's head while the inmate is on the ground. If a Watch Commander determines at any point in a force review that any of these criteria are present, he or she must call IAB, who decides to either initiate an IAB roll out or to delegate the review to the unit under the guidance of CFRT, a body recently superimposed on the investigative and disciplinary process in Custody.

If the Watch Commander determines that an incident involving a significant injury or a head strike does not meet the criteria for an IAB roll out, or if IAB declines to roll out, the Watch Commander must notify CFRT. CFRT includes a Lieutenant and eight Sergeants who are charged with providing guidance to the unit level investigators and recommendations with respect to the conduct of force reviews. CFRT also has the authority to assume responsibility for force reviews involving significant injuries or head strikes. If CFRT decides to take over the review, it is then responsible for conducting the review and preparing the force package. If neither CFRT nor IAB takes over the review of the incident, the Sergeant who originally initiated the review then continues the force review in the same manner as described above, with guidance from CFRT. The Sergeant then submits the force package to the Watch Commander. The Watch Commander in turn reviews the force package for completeness and passes it along to the Unit Commander, who must submit it to CFRT for review within 14 days of the incident.

After CFRT comments, it submits the completed package back to the Unit Commander, who reviews CFRT's comments and submits it to the CFRT Lieutenant with his additional comments for submission to CFRC, which consists of three Commanders from the Custody Division. The Unit Commander must submit the force package to CFRC for evaluation, with input from OIR, within 30 days of the incident.

After reviewing the report, CFRC meets (with OIR in attendance) to discuss the force package. Ultimately, CFRC delivers to the Unit Commander findings as to whether: (a) the force was in policy and no additional review is necessary; (b) additional training is appropriate; or (c) an administrative investigation is necessary to determine if a policy violation occurred. The Unit Commander has 30 days to respond to CFRC's findings.

If it is determined that there may be a policy violation, an investigation is then opened and "assigned to the appropriate unit." After the investigation is completed, it returns to the Unit Commander for a final disposition. The Unit Commander reports his decision to CFRC, and the disposition is submitted to the Chief of the Custody Division for final approval. All of this occurs before the deputy is even notified of an intent to impose discipline.

### c.     IAB roll outs

IAB consists of sworn personnel assigned to conduct internal investigations; it may become involved at any stage of the force review process, whenever the criteria referenced above warrant its involvement.[4] An IAB roll out typically involves two IAB Sergeants, an OIR attorney, and sometimes a member of CFRT (depending on the severity of the force). When an IAB roll out proceeds, it supersedes the unit level review, and the Watch Commander will halt the unit level review and assist IAB in facilitating the interview process. Even where witnesses have already been reviewed during the unit review process, IAB will start anew and conduct its own interviews. Despite the suspension of the unit level review as a result of an IAB roll out, however, the supervising Sergeant is still expected to prepare a force packet.

After IAB investigates the scene and conducts interviews, one of the IAB Sergeants prepares and submits a report to an IAB Lieutenant, who signs off on the report as complete. At the conclusion of the IAB investigation, the case is submitted to EFRC. EFRC reviews the report and convenes a panel discussion attended by EFRC, OIR, the Unit Commander, and others. After discussion, EFRC determines whether the force was in policy. If EFRC determines the force was in policy, no further investigation or disciplinary action occurs. If EFRC

---

[4]According to LASD Administrative Investigations Handbook, any investigation involving the possibility of a discharge must be performed by IAB. Although an improper custodial use of force investigation carries with it the potential for discharge, most custodial use of force investigations that are likely to result in less than 15 days suspension are conducted at the unit level.

determines the force was out of policy, EFRC may recommend either an additional administrative investigation or, if the evidence from the IAB review is sufficient, the immediate leveling of disciplinary charges. The discipline is thereafter imposed by the Unit Commander after a *Skelly* hearing (discussed below), with review by the Division Chief.

### d.    The Internal Criminal Investigations Bureau

ICIB is composed of sworn personnel who investigate potentially criminal conduct of Department personnel. If a deputy's alleged conduct is criminal in nature, the Unit Commander is required to notify the Division Chief, who determines whether a criminal investigation is warranted. If during an administrative investigation, the investigator determines that the subject's conduct may have been criminal, the investigator is supposed to discuss the possibility of a criminal investigation with the Unit Commander.

Historically, once a criminal investigation was initiated, any administrative investigation was put on hold to protect the integrity of the criminal investigation. More recently, LASD has opted to determine on a case-by-case basis whether to perform concurrent administrative and criminal investigations.

After ICIB completes its investigation, it presents the case to the District Attorney to determine whether criminal charges are appropriate. The District Attorney has rarely prosecuted LASD deputies for excessive use of force or dishonesty in connection with use of force.

As this account makes clear, LASD's investigative process involves multiple layers, multiple Commanders and multiple entities with roles that vary and at times are overlapping and with engagement triggered by determinations that are not always clearly defined. It is perhaps not surprising, as discussed below, that cases have been lost in the system, investigations take too long, and discipline is not always timely imposed.

### 3.    The investigative process often takes too long to complete.

The Department requires deputies to make an immediate verbal notification to their supervisor after exercising or witnessing reportable force. Once this verbal notification is complete, LASD reporting and investigation provisions fail to clearly specify timelines and deadlines for the report and investigations process.

*Report of the Citizens' Commission on Jail Violence*                    Page 151

The force reporting and investigation provisions do not specify (1) when a written report by a deputy must be submitted; (2) when the supervisor must complete the "Supervisor's Report, Use of Force"; (3) when witness interviews must occur; (4) when the force review package must be completed by the Watch Commander; or (5) when the Unit Commander must evaluate the use of force review package.[5]

Experts stress the importance of prompt reporting of all use of force incidents. In particular, experts advocate requiring personnel to complete use of force reports before the end of the shift when the use of force incident occurred. By failing to require reporting to occur within delineated time periods, LASD policies may lead to less accurate reporting.

A force review should take three to four months and, if EFRC is involved, EFRC should reach a decision within four to six months after the decision. Administrative investigations are also supposed to be timely conducted; any investigator who has not completed an administrative investigation within 90 days (60 days if the deputy has been relieved of duty) must seek an extension of time. A disposition of charges is supposed to be drafted within 30 days of the completion of an investigation (20 days if the deputy has been relieved of duty). Despite these timelines, in practice, many administrative investigations often approach the one year statute of limitation period for the imposition of discipline for misconduct. As OIR recently observed, the Department must "establish reasonable internal deadlines [for force investigations] and find ways to meet those deadlines."[6]

Unlike a force review, in which a deputy has not yet been accused of wrongdoing, an administrative investigation carries with it the possibility of discipline. As such, LASD personnel have the right to representation. According to LASD written policy, a subject deputy is generally only supposed to be given ten days or less to secure representation and prepare for an interview. In practice, however, subject interviews often do not take place until six or seven months after the incident. Even if deputies refrain from intentional collaboration, the more time that elapses and the greater opportunities a deputy has to discuss a use of force incident with others, the more likely that deputy's recollection of the incident will be tainted.

---

[5] As noted above, however, in the case of a force incident that is subject to CFRC review, the Unit Commander must submit the review package to CFRC within 30 days of the incident.
[6] OIR Tenth Annual Report (September 2012), p. 23.

In addition, criminal investigations can further impede timely administrative investigations and Departmental discipline. If LASD does not perform an administrative investigation concurrently with the criminal investigation, the administrative investigation proceeds after the conclusion of the criminal investigation, which can take years. While the one year limitations period for the imposition of discipline for misconduct is tolled during the pendency of the ICIB investigation and any eventual prosecution, this delay hinders discipline in other ways. Evidence may be lost; victims may have been released from Custody; memories may have faded; and the subject deputy may have a new supervisor who does not have any investment in pursuing discipline for incidents that happened years ago and under a prior supervisor.

**4.      There are multiple deficiencies in LASD's investigatory process.**

There are gaps in the Department's investigatory processes that can jeopardize the reliability of the results. In evaluating the Department's initial investigations of the allegations of excessive force in 78 declarations that the ACLU previously submitted to the Department, OIR commented that the challenges of investigating the allegations after the fact "would be less acute had LASD done a better job in the reported force cases of identifying and interviewing potential inmate witnesses at the time of the force incident." OIR went on to criticize the original investigations, stating that "in too many cases, the initial investigative response was underwhelming and there was no consistent practice of identifying and interviewing potential inmate witnesses."[7]

The force reporting and investigation provisions for Less Significant Force only require the Sergeant or immediate supervisor to interview the inmate "if practical" and to complete and distribute a "Supervisor's Report, Use of Force" for each member who used force. The provisions do not, however, require any interviews of inmates or deputy witnesses. This means that for many Less Significant Force incidents, the Sergeant or immediate supervisor may make a decision that no additional review is required based only on the statement of the deputy who used the force.

---

[7] OIR Tenth Annual Report (September 2012), p. 13, fn. 2.

*Report of the Citizens' Commission on Jail Violence*                                    Page 153

Except in compelling circumstances, LASD bars personnel involved in a Significant Force incident from being present while the interview of the inmate on whom force was used is conducted. The provisions do not, however, prohibit those involved in the force incident from participating in interviews of other witnesses.

Under the Department's policies, the Sergeant who supervised or directed the force may be tasked with interviewing inmates and witnesses, or determining if there is misconduct. Even a recently proposed amended policy that seeks to improve investigative practices permits the Sergeant to conduct the investigation in some circumstances, when another supervisor is not "available." Allowing personnel who participated in or supervised a use of force incident to participate in the investigation can interject bias into the process and also intimidate inmate and employee witnesses who may fear retaliation or being shunned from speaking truthfully.

There is no formal policy that requires a review of supervisory performance in the event of directed or supervised force.[8] The supervisor writes the "Supervisor's Report, Use of Force" for each member who used force, but is not required to prepare a report regarding his or her own decisions with respect to directing and supervising the force. The Watch Commander and Unit Commander thus can only judge the supervisor's performance by evaluating what the supervisor has to say about the force used by the deputies.

There is nothing in the use of force provisions that requires deputies involved in a force incident involving injuries to inmates to be interviewed promptly by investigators or to refrain from speaking about the incident with each other before providing statements to their supervisors or providing written statements in their use of force reports. Nor is there any provision that requires deputies involved in the most serious force incidents that are subject to an IAB roll out or CFRT review to be separated until such time as they can be interviewed by an investigator. The provisions also do not require that deputies write their use of force reports separately or prohibit them from sharing computers. When multiple deputies involved in a use of force incident speak with each other before providing their statements or writing their reports, they may taint their recollections of the use of force incident.

---

[8] OIR has noted, however, that the performance of Sergeants and Captains has been "highly scrutinized" by CFRC.

*Report of the Citizens' Commision on Jail Violence*

### 5.    The Department's unit level investigations are not always rigorous or thorough.

Investigations performed by unit level personnel are often incomplete, poorly documented and less rigorous than IAB investigations. As stated by OIR in its most recent report: "we continue to note problems," including the "failure to identify all relevant witnesses, deputy reports that apparently were copied and pasted from another deputy's report; biased interviews of witnesses, interviews of inmates conducted at inappropriate times, and a failure to gather complete medical information regarding an inmate's injuries."[9] Mistakes or inadequate investigations by unit level personnel can create obstacles to the discipline of a subject deputy, especially with respect to collection of the evidence necessary to prove a charge in an administrative proceeding.

The shortcomings of unit level investigators are likely a result of poor training. When deputies are first promoted to Sergeant, the training they receive on the investigation process is not organized and relies heavily on anecdotes. As a result, Sergeants learn most of what they know about investigations on the job, from other Sergeants who were also inadequately trained. Further, unlike with IAB, conducting investigations is not the primary responsibility of Sergeants in Custody. Although unit level investigators have been receiving some training, the Department "is still working on a more comprehensive curriculum."

Another problem is that the investigations are usually conducted by the deputy's supervisor, who may not have an interest in rigorously investigating force incidents by his or her subordinates either because of personal relationships with the deputy or out of a concern that out of policy force incidents may reflect poorly on the supervisor's leadership. Further, inmates are less likely to be comfortable talking to a deputy's supervisor even if the deputy is not present for the interview.

Compounding the problem with the Department's investigation of Less Significant Force is that, as discussed in the Use of Force Chapter, such force may be underreported in the first place. Because Less Significant Force incidents often do not generate evidence of the use of force event itself -- such as hospital forms, medical records, or inmate complaints -- failure to report Less Significant Force bears less risk of being detected. It appears that the trend against

---

[9] OIR Tenth Annual Report (September 2012), p. 18.

reporting Less Significant force has increased in recent years even though it might be expected that Less Significant Force would be more common than Significant Force if deputies are adhering to the principles in the Department's Force Prevention Policy. Nevertheless, from 2006 to 2011, Less Significant Force accounts for far less than half (only 38%) of the force reported during this time period.

It has been reported that some Less Significant Force incidents, which by definition do not result in serious injuries, involve retaliation by deputies against inmates for complaints or the infliction of discipline for perceived misconduct. If such force is not reported, it cannot be reviewed or investigated, and it never becomes a part of the disciplinary system.

**6.    The Department is considering a new policy regarding deputies' reviews of video tapes before writing reports or submitting to formal interviews.**

With the installation of additional cameras in the jails, more force incidents are likely to be caught on video tape, which raises the issue of when during the investigative process deputies should be allowed to view the tape.

While the Department has yet to formalize its policy regarding this issue, in testimony before the Commission the Sheriff suggested that the Department intended to require a deputy involved in a force incident to make an initial verbal statement prior to viewing the tape; under this approach, deputies would be allowed to view the tape before submitting a final written account.

Both OIR and Special Counsel are opposed to allowing deputies to review video footage of an incident before deputies submit a written statement because it allows them to craft their statements to conform to the tape. While requiring deputies to make a statement before viewing the tape helps alleviate concerns about tainted statements, concerns still remain if the deputies are permitted to review the footage before submitting a final written statement. OIR recently expressed the view that the Department's proposed policy "potentially could have hampered the ability to investigate possible policy violations." It believes that this proposed approach "will not sufficiently protect the integrity of the investigation because it provides too much unguided discretion to supervisors and because statements to supervisors would not be recorded in any

way."[10]  OIR now reports that the Sheriff apparently has "concluded that, consistent with OIR's view, Department personnel should be required to write reports prior to viewing the video evidence of an incident.  The details of the video policy are still being finalized."[11]

**7.    The exceedingly low number of unreasonable force incidents casts doubt on the integrity of the investigatory process.**

Unreasonable force is defined by the Department as any force that is excessive *or unnecessary* given the circumstances.  Between 2006 and 2011, only thirty-six incidents -- 0.6% of the 5,630 total force incidents reported during that time -- were found to be unreasonable.  Further, the Department reports that only six Deputy Sheriffs or Custody Assistants were discharged for unreasonable force, with another three deputies retiring.[12]  By way of comparison, according to the PPI data, 18 inmates suffered fractures during the period from 2007 through 2010 in MCJ alone and twelve inmates suffered fractures as a result of a force incident in all Custody facilities in 2011 alone.  These statistics raise serious concerns about whether force is adequately investigated and appropriately disciplined.

**8.    The cumbersome and time consuming discipline and appeal procedure undermines the effectiveness of the discipline system.**

Once the Department decides that discipline is warranted, the Advocacy Unit prepares a notice to impose discipline, which is served on the subject deputy.  Within 15 days of issuing the notice, a so-called "*Skelly*"[13] hearing must occur.  At that hearing, the Advocacy Unit will present the investigative report to the subject deputy, who is given an opportunity to respond to the charges.  If the proposed discipline is a suspension of 15 days or less, the deputy's Captain will preside over the hearing.  If the proposed discipline is a suspension of 16 days or more, or discharge, a Division Chief will preside over the hearing, and the Captain recommending the discipline will ordinarily attend the hearing to observe.

---

[10] OIR Tenth Annual Report (September 2012), p. 28.

[11] *Id.*, p. 30.

[12] In contrast, OIR reports that in the "year or two" before October 2011, at least 10 deputies or custody assistants were discharged for excessive force and 3 resigned as a result of force investigations. OIR 2011 Violence in the Jails Report.

[13] In *Skelly v. State Personnel Board*, 15 Cal.3d 194 (1975) (en banc), the California Supreme Court held that certain of the punitive action (now called adverse action) provisions of the Government Code were unconstitutional because they did not provide an opportunity for the employee to respond to charges prior to the effective date of the adverse action. The so-called "Skelly" hearing was devised in response to this ruling.

*Report of the Citizens' Commission on Jail Violence*                                    Page 157

After the *Skelly* hearing, a letter of imposition of discipline will issue if the Department concludes that discipline is still warranted. If the discipline is a suspension of five days or less, the deputy may seek review of his case before the Los Angeles County Employees' Relations Committee ("ERCOM"). If the discipline is a suspension of six days or more, or discharge, the respondent may seek review before the Civil Service Commission.

The Advocacy Unit prepares and presents LASD cases in matters appealed to the Civil Service Commission and ERCOM.[14] Subject to the Captain's prerogative to settle a case where a proposed discipline of a suspension of less than 15 days is at issue, the Advocacy Unit also handles settlement negotiations.

The Civil Service Commission consists of five Commissioners, who are appointed by the Los Angeles County Board of Supervisors. Civil Service Commission appeals are heard by a single Hearing Officer, who considers a case and presents a final decision to the Commission for review. Hearing Officers are attorneys in private practice retained by the Civil Service Commission. Either LASD or the employee may challenge the Commission's decision in Superior Court.

ERCOM consists of three Commissioners and a Director. Cases can be assigned to a mediator, fact finder, or arbitrator who attempts to resolve the dispute. These individuals are not required to be attorneys. In contrast to proceedings before the Civil Service Commission, there is generally no right to appeal an ERCOM ruling.

Proceedings before the Civil Service Commission or ERCOM may take a year or more to complete, which is in addition to the months of investigation that preceded the decision to impose discipline. These delays favor the deputy, as witnesses' memories may fade and evidence may be lost or forgotten. Further, leadership changes that occur within LASD during the pendency of an administrative proceeding may impact its outcome. For example, the Captain who made the decision to impose discipline may retire or be replaced, and the new Captain may not have as much invested in the discipline process, which may lead to settlements that otherwise would not have occurred. The longer the process, the less effective the discipline will be in

---

[14] Due to an increase in its workload, the Advocacy Unit has come to increasingly rely upon outside counsel to handle disciplinary proceedings, and approximately 50% of proceedings where LASD seeks to discharge an employee are now handled by outside counsel.

deterring and punishing misconduct by deputies.

Compounding the problem, LASD members charged with disciplinary violations involving a punishment of suspension of five days or more have started to bring appeals before ERCOM, even though it lacks jurisdiction over such appeals. As a result, a disciplinary matter may be pending before ERCOM for a year or more before an ERCOM hearing officer determines that ERCOM lacks jurisdiction, at which point the administrative process must "re-start" before the Civil Service Commission.

LASD officials also have raised concerns about the qualifications and perceived bias of the hearing officers selected by Civil Service Commission and ERCOM. One witness told the Commission that it is a common refrain among those charged with making and defending disciplinary decisions that "if we go to ERCOM, we're going to lose." In recent years, the Advocacy Unit has achieved some success before the Civil Service Commission, which has stopped retaining certain problematic attorneys to preside over hearings, but the problems with ERCOM hearings persist.

9.    **The inmate grievance procedure does not ensure that inmate grievances are addressed or that inmates may submit grievances without fear of retaliation.**

Any inmate in Custody may submit a complaint relating to any "condition of confinement"[15] using the Inmate Complaint/Service Request Form. The complaint must be submitted on the proper form within 15 calendar days of the event upon which the complaint is based, or it will be denied. OIR recently noted "on-going problems at MCJ with the lack of availability of inmate complaint forms."[16]

Some of the Custody housing areas have locked boxes accessible to inmates in which they may deposit their completed form. Assigned floor supervisors collect the completed forms from the locked boxes or from the inmates themselves and document the collection of the forms in a daily log. The complaint is assigned to someone ranked Sergeant or above for investigation. This investigation is supposed to be conducted and the complaint resolved within 10 business

---

[15] "Conditions of Confinement" include those relating to "medical/mental health services; complaints against staff; classification actions; disciplinary actions; program participation; chaplain services; telephone; mail; visiting procedures; food, clothing, and bedding; facility conditions; inmate money accounts; inmate property issues; and commissary."

[16] OIR Tenth Annual Report (September 2012), p. 39.

*Report of the Citizens' Commission on Jail Violence*                                          Page 159

days, or as soon as reasonably possible.

The ensuing investigation results in a finding of: founded, unfounded, unresolved, or a designation that the complaint will be forwarded on to the unit, IAB or ICIB for further investigation. After the investigation is completed, the supervisor completes the "Disposition" section of the complaint form and delivers a response to the inmate within ten business days of submission of the complaint; the inmate then signs the response. Inmates can appeal those determinations.

The disposition of the complaint is provided to the inmate, but includes only (1) acknowledgment of the complaint; (2) a statement that the investigation was completed; and (3) assurance that the appropriate administrative action was taken. If the complaint was unfounded or unresolved, the response simply states: "[y]our complaint has been thoroughly investigated; however, we were unable to substantiate that (employee's name) violated any of our Department policies and procedures." If the complaint results in the initiation of a unit level or IAB administrative investigation, this is reported on the form.

Special Counsel has also made a number of recommendations relating to the inmate complaint process that, until recently, were largely ignored by the Department. In his 26th Semiannual Report in 2009, he recommended that the Department respond to inmate complaints even if the complaint was submitted more than 15 days after an incident -- the Department's imposed deadline for inmate complaints. He noted that a large percentage of inmates continued to allege that they never received a response from the Department regarding their complaints. He expressed "serious concerns" regarding the Department's policy of refusing to investigate inmate complaints submitted more than 15 days after an event, and recommended that the Department remove the time limit on accepting and investigating inmate complaints.[17]

The Department has only recently moved to implement this recommendation. Under the current (and recently enacted) inmate complaint policy, all "[c]omplaints submitted 15 calendar days after the event upon which the complaint is based shall be considered late and denied." The only exception is for so-called "personnel" complaints which (while deemed denied) will be investigated even if submitted more than 15 days after the event.

---

[17] Special Counsel 26th Semiannual Report (February 2009), pp. 48-50.

*Report of the Citizens' Commision on Jail Violence*

The Department is considering revising this policy yet again.  Under a draft policy currently under consideration, complaints submitted more than 15 calendar days "after the event upon which the complaint is based" will be automatically denied but "thoroughly investigated."

In practice, inmates appear to be hesitant to file grievances due to their concerns about Department apathy and fear of retaliation.  As reported by the ACLU, "[w]hen inmates complain about mistreatment, deputies respond with punishment: strip searches, body cavity searches, destructive cell shake-downs, or confiscations of their belongings."[18]  In sworn declarations, several MCJ inmates and former inmates expressed a perception that nothing would be gained from filing grievances concerning use of force.

One inmate described a complaint that was torn up by deputies.  Another inmate recounted that after an assault by a deputy he expressed a desire to file a complaint, but was told by a Sergeant that he should "forget about it, let it go," and that "things would be a lot better for [the inmate] if [he] did not file a complaint."  Another inmate reported that, after an assault by two deputies, he asked for a complaint form and was told "[g]o to your [expletive] cell.  You can't have one."  According to this inmate, deputies on his module "are constantly refusing to give us complaint forms," and Sergeants do nothing to remedy the situation.

A fourth inmate reported that after he was subjected to excessive use of force by deputies, he was interviewed within hearing distance of the deputies involved in the incident.  He filed a formal complaint and reported that thereafter he was visited in his cell by a Sergeant who "seemed to be upset and annoyed by the complaint," and told the inmate that "[w]hen you start complaining about things, you only make the situation worse."  He reported that this Sergeant pressured him into signing the portion of the form that is supposed to be signed only *after* LASD fills out the "disposition" section, even thought the section "was completely blank."  This inmate was also re-classified as a K-10, which he testified was "a form of retaliation for not staying silent" about the assault.

It is impossible to say how many incidents escape detection and investigation because of

---

[18] "Cruel and Unusual Punishment: How a Savage Gang of Deputies Controls LA County Jails: A report by the ACLU National Prison Project and the ACLU of Southern California" (September 2011), p. 21; *see also* pp. 19-20 (listing multiple incidents involving retaliation by deputies against inmates who complained about excessive use of force, or threats of retaliation if grievances were filed).

*Report of the Citizens' Commission on Jail Violence*                    Page 161

inmate fears of retaliation.  While the Commission recognizes that there are inherent credibility issues with inmate testimony, there is a notable consistency across these declarations by inmates who had no contact with one another and who were housed in different parts of MCJ.  Taken together these declarations suggest troubling practices that undermine the inmate grievance and reporting process.

A 2011 expert report prepared by Jeffrey Schwartz in connection with litigation against the Department stressed the impact of these reporting deficiencies on the detection of force incidents:

> If staff do not report inmate injuries, and if inmates then do
> not grieve or complain or otherwise bring attention to the
> situations that created their injuries, then an inmate injury
> at the hands of staff may be a tree falling in the forest: if no
> one sees it or later hears of it, did it happen? ... [i]f inmates
> can be kept quiet, then for all intents and purposes nothing
> happened.

Compounding the problem, "there are significant tracking issues with respect to inmate complaints and the Department's responses."[19]  Neither the current PPI tracking system nor the Department's other "bewildering number of databases and various ways of tracking" events and issues (FAST, e-LOTS, and CARTS) document inmate complaints that do not involve use of force,[20] and inmate complaints of force incidents that are tracked in FAST have not been tracked by deputies' names.  OIR recently reported that the Department has now "developed in FAST the capability" to track force complaints by deputy name[21] and the CMTF told Commission staff that this change to FAST has been implemented.  Such an added field in FAST, however, still does not provide a tracking mechanism for this information in the personnel-focused PPI system.  Tracking these reports by personnel is important because these events can presage subsequent use of force incidents.  They may also be a good indicator of the deputies' abilities to manage their responsibilities and respectfully interact with inmates in the jail.

---

[19] OIR Tenth Annual Report (September 2012), p. 39.
[20] *Id.*, p. 40.
[21] *Id.*

*Report of the Citizens' Commission on Jail Violence*

**10.    The Department does not adequately pursue or impose discipline for false statements about use of force.**

The Department has not imposed significant discipline on deputies for making false statements about use of force. The Commission has noted troubling examples in which Custody deputies who made false statements received *de minimis* punishment or had part of the discipline imposed held in abeyance. Moreover, the designated policy violation that serves as a predicate for the ultimate discipline imposed in these cases fails to reflect the underlying acts of dishonesty. This lax treatment of dishonesty can create the impression that the Department does not take seriously the making of false statements about use of force, and undermine any effort to combat a code of silence in the jails.

Captains have the authority to reduce the charged disciplinary violation to a less serious Policy Section violation. Moreover, even after a final discipline determination is made, a Captain may choose to hold some or all of the discipline imposed in abeyance. The use of these methods to reduce discipline for false statements in regard to use of force sends the wrong message about the importance of honesty in reporting the use of force.

One case, described by OIR in its October 2011 report on violence in the jails, exemplifies the problem of down charging. In its report, OIR described the following discipline incident:

> A deputy searched the property of an inmate who was seated on the floor nearby. The deputy thought the inmate mumbled something disrespectful at him and his partner and began punching the inmate in the head and neck. A Sergeant saw the unprovoked attack from a distance and yelled at the deputy to stop, an order the deputy ignored until the Sergeant got much closer. After an investigation and based largely on the statements provided by the Sergeant, the Department fired the deputy and suspended his partner for failing to tell the truth about the incident.

OIR cited the case as an example of LASD holding deputies accountable for unreasonable use of force and dishonesty.[22]

---

[22] OIR 2011 Violence in the Jails Report, p. 13.

*Report of the Citizens' Commission on Jail Violence*                                          Page 163

Although the deputy who used unreasonable force was discharged, the Commission's investigation determined that the second deputy -- who made false statements -- received only a five day suspension. Moreover, the final discipline of the second deputy was imposed only for a violation of the Manual of Policy and Procedure ("MPP") Sections on "obedience to laws, regulations and orders" and "performance to standards." There was no finding of a violation for "fail[ing] to make statements and/or making a false statement during department internal investigations," notwithstanding that the deputy had plainly stated in her account that she "did not know what actions [the other deputy] took against [the] inmate... when [she] [was] within inches of [the assaulting] deputy's unnecessary and unreasonable use of force on inmate."

Another example arose in connection with the fight involving Custody deputies at BJ's Brewery. In that case, the letter of intent to impose discipline on a deputy who struck a female patron in the head and later made false statements during the investigation recommended a 15 day suspension "for failure to make statements and/or making a false statement during a department investigation," noting that the deputy made multiple "false and/or misleading statements to investigators." The final discipline imposed, however, was ten days, with five days held in abeyance and that letter made no reference to the false statement Policy Section. Instead, the discipline was based solely on the MPP Sections for "professional conduct and disorderly conduct."

In a third case, discussed in OIR's recent 2012 report and labeled the "see no evil" problem, a deputy denied having observed a fight in a bar that involved numerous deputies including some assigned to Custody. In support of deputy's claim that she "had not seen anything," the deputy explained that liquid food had gotten into her eyes and that she was rubbing them throughout the key events. When interviewed, she replied "I don't know" or "I didn't see" to many questions. In fact, according to OIR, review of the video tape contradicted her account and showed that she had been looking directly at the fight throughout and was seen laughing as it began. She gave no valid explanation for this contradiction. OIR noted that this deputy was charged with failing to give full and complete statements and "given a significant suspension."[23] Commission staff was told that the deputy received a 15 day suspension but, after

---

[23] OIR Tenth Annual Report (September 2012), p. 55.

*Report of the Citizens' Commission on Jail Violence*

grievance, the 15 days were reduced to 8 days, all of which was to be done by education-based discipline.[24]

The concerns evidenced in these incidents were reinforced by data that reflects a dearth of cases where deputies were disciplined for making false statements regarding use of force.  As part of its investigation, the Commission requested from LASD "all PPI records showing discipline imposed on Custody personnel in the past 5 years for dishonesty, false statements and/or filing false reports in regard to use of force."  LASD's response identified only *two* cases with findings of false statements.  IAB identified a total of *five* cases where discipline was imposed in connection with "founded investigations for discipline imposed on personnel assigned to Custody in the five years between 2007 through 2011 for . . . MPP section 3-01/040.70: False Statements."[25]  By way of comparison, Matthew Cate, Secretary of the California Department of Corrections and Rehabilitation ("CDCR"), testified that the CDCR has terminated 291 employees in the last four years for making false statements in a department with 30,000 sworn personnel.

Severe punishment for false reports and false statements with respect to use of force is critical to overcoming the code of silence and ensuring that problems of violence in the jails are identified, investigated, and punished.  Jail heads repeatedly underscored the importance of starting with a presumption of *termination* for this type of dishonesty.  Reducing charges diminishes the deterrent value of punishment for dishonesty and may encourage the perception that LASD will tolerate -- within certain limits -- covering up an improper use of force.  As expert Jeffrey Schwartz explained, when the Department fails to adequately punish these acts, "the wrong message gets out and, believe me, it gets out fast, it gets to everyone."

**11.    The Department has missed opportunities to remediate problematic force concerns.**

Even with limited access to personnel records, the Commission has noted troubling examples in which Custody deputies engaged in escalating acts of violence before they were ever found to have engaged in misconduct warranting punishment.  In so doing, the Department

---

[24] Education-based discipline is an alternative to suspension, by which the deputy forgoes the suspension by agreeing to take certain classes.

[25] This inconsistency between the Department's PPI-generated data and the data provided by IAB reinforces the finding, as set forth in the Use of Force Chapter, that the Department's statistics are unreliable.

*Report of the Citizens' Commission on Jail Violence*                                        Page 165

missed opportunities to remediate deputy misconduct at the first sign of trouble (or in some cases the second, third, or fourth signs of trouble), thereby allowing violence to go unaddressed and deputy misbehavior to reach more serious levels before any action was taken.

One deputy identified in records produced by the Department demonstrated escalating violence over a period of two years, without Performance Mentoring, imposition of discipline, or any other remediation by the Department. This deputy's uses of force tended to be exceptionally violent, and he often began by immediately punching the inmate in the face. Even more troubling, in multiple instances his use of force seemed to have been motivated by something other than concern over the safety of inmates or LASD personnel. For example, in one instance the deputy pepper sprayed an inmate who looked like he might spit on the deputy. In another instance, the deputy and two others severely beat an inmate, reportedly because he had swung first at the deputy. It appears, however, that the force may have been in retaliation for the inmate's sending a sexually explicit letter to a Custody Assistant.

This deputy's multiple uses of force continued to escalate from the fall of 2008 until October 20, 2010. On that date, several deputies from MCJ learned that an inmate possessed a shank secreted in his rectum. The inmate was escorted to the clinic, where the deputies planned to conduct an X-ray to determine whether the inmate possessed a shank in his rectum. Once there, the inmate refused to submit to an X-ray. The deputies called the Sergeant to determine how to proceed. After the Sergeant spoke with the Watch Sergeant and discussed various options, the Sergeant ordered the deputies to take the inmate back to the 2000 floor and secure him to a bench until he arrived.

The deputies instead took the inmate to the mini-clinic of the jail. Once there, the deputies removed the inmate's handcuffs. The deputies claim that once the inmate's hands were free, the inmate turned toward the deputies and punched a deputy in the face. The deputy in question punched the inmate in the face several times and used his knee to strike the inmate in the back and torso area. Three other deputies punched the inmate in the face and rib cage and kneed the inmate in the back and torso. The inmate suffered lacerations to his head and ear, multiple bruises, Taser puncture marks, and a facture to his rib. The deputy in question received a 30 day suspension, which was reduced to 25 days. Of that, 20 days were held in abeyance by his Captain until March 22, 2013.

A second deputy involved in the mini-clinic incident was also engaged in a similar pattern of use of force, albeit to a lesser degree. This deputy frequently responded to noncompliant inmates by punching them in the face. Disturbingly, this deputy was repeatedly commended for his quick action in resolving potential altercations. He was also involved in the off-duty fight at BJ's restaurant and made false statements about that incident. It took nearly *two years* for the BJ's case to be resolved (from the time of the incident to the time of the final letter of imposition). In that intervening period of time, this deputy was involved in the mini-clinic inmate beating, for which he was ultimately discharged.

In these cases, the Department missed opportunities to address escalating use of force that caused serious injuries to inmates and ultimately led to career ending consequences for one of the deputies and discipline largely held in abeyance for the second.

**12.    LASD's disciplinary guidelines for both use of force and dishonesty are too broad, overly lenient, and at times ignored.**

LASD promulgated disciplinary guidelines in the 1990s to promote the uniform discipline of misconduct in the Department. These guidelines reflect a proposed range of discipline, from five days to discharge, for the "use of unreasonable force." The guidelines provide no further guidance and, according to one witness interviewed by the Commission, most penalties for unreasonable use of force tend to result in discipline at one or the other extreme -- either a five day suspension or discharge. There are very few "in between" cases.

The guidelines also set forth a recommended minimum punishment for making false statements in connection with use of force. The base punishment for making a false statement to a supervisor is ten days; for making untruthful statements during internal investigations, the base recommended discipline is 15 days. In contrast, CDCR's guidelines have a base penalty for both infractions of termination. According to CDCR Secretary Cate, this starting point reflects CDCR's zero tolerance for acts of dishonesty.

LASD's guidelines do not adequately address problems of dishonesty. As Jeffrey Schwartz noted in testimony before the Commission, LASD's standards are "inadequate," and "will not turn around a dysfunctional organizational culture . . . that is deeply embedded."

Finally, the guidelines establish a recommended minimum punishment of five days for failure to report either the use of force or witnessed force. The Department, however, ignored these guidelines and imposed lesser penalties ranging from a written reprimand to a four-day suspension in more than half of the cases identified by LASD as involving a finding that personnel failed to report the use of force.

**13.    Leadership in the Department has undermined the efficacy of the disciplinary process.**

Undersheriff Tanaka and former MCJ Captain Cruz have made statements and taken actions that have undermined the effectiveness of the disciplinary system in the Department generally and at MCJ in particular. As recounted in more detail in the Management and Culture Chapters, the Undersheriff has repeatedly told deputies that "he didn't like Internal Affairs Bureau and the way they worked;" suggested that he would investigate Captains for investigating ("putting cases" on) too many deputies; vetoed Captain Clark's rotation plan; and berated supervisors for attempting to hold deputies accountable for their conduct.

The implicit and explicit message that Tanaka sent to MCJ deputies was that if they "had any problems" with MCJ leadership, they could circumvent the chain of command and go directly to him for redress of their problems. As a result, he undermined the ability of MCJ supervisors to discipline deputies for misconduct. He also called into question the reputation and credibility of IAB personnel who already find themselves in a challenging and sensitive assignment.

Captain Cruz also made comments showing his disdain for the disciplinary process. He told then-Lieutenant Bornman that "Tanaka wants us to take care of our guys," and "don't look too hard" to investigate deputies for misconduct and dishonesty. He also was seemingly unconcerned if the statute of limitations ran before disciplinary charges could be brought, and failed to ensure timely review of a large number of use of force packages and administrative investigations.

The comments and actions of Tanaka and Cruz contributed to a perception that the disciplinary process was anything but rigorous and, as a result, deputies would not be held accountable for using excessive force against inmates in the jails.

**14.    The Sheriff has taken steps to remove the Undersheriff from oversight of internal investigations and discipline for misconduct.**

Until earlier this year, ICIB and IAB (through Leadership & Training) reported to Undersheriff Tanaka. In addition, Tanaka along with Assistant Sheriffs Cavanaugh and Rhambo comprised the Case Review Committee, which was charged with receiving recommendations and imposing discipline in the most serious cases.

Significantly, both IAB and ICIB now report to the Sheriff, although the Undersheriff continues to monitor their investigations in his capacity as the second-in-command in the Department.[26] The Sheriff also recently reconstituted the Case Review Committee after he concluded that the discipline imposed in a case of serious misconduct was too lenient. He formed a new committee comprised of three Commanders who report directly to him.

Given the Undersheriff's negative remarks about IAB and his other comments and actions that undermined the disciplinary process, the Commission is concerned about his continued involvement in, or oversight of, the Department's investigation and discipline of allegations of deputy misconduct. His actions and statements have compromised his ability to oversee any aspect of the disciplinary system.

<u>Recommendations</u>

**7.1    The investigative and disciplinary system should be revamped.**

The Commission believes that the Department's system for investigating and disciplining cases involving use of excessive force is unduly complicated with too many layers. All of the cases that are subject to a response by CFRT and review by CFRC, which involve serious injuries and Significant Force, should be both reviewed and, if appropriate, investigated by an expanded IAB (or ICIB if there is an indication of criminal conduct). That would mean that all uses of force that result in any injuries more than "redness, swelling or bruising," complaints of pain regarding the "head, neck or spine" would be reviewed -- and if necessary investigated – by the more skilled IAB (or ICIB) investigators. All other uses of force would be reviewed and if

---

[26] Based on the Commission's interviews, this change in the IAB and ICIB reporting is not well known to high level leaders within the Department. Indeed, several high-ranking LASD officials interviewed by the Commission were unaware of this recent reporting change and could not correctly identify the current chain of command for IAB and ICIB.

*Report of the Citizens' Commission on Jail Violence*                    Page 169

necessary investigated at the unit level. Even those cases should be spot checked by both IAB and OIR (or the new Office of Inspector General discussed in the Oversight Chapter) as an added layer of oversight.

The results of the IAB investigations should be reviewed by the Unit Commander or EFRC, depending on the severity of injuries or other circumstances that would currently justify an IAB roll out. Thus, the Unit Commander (the Captain in charge of the jail) would still be responsible for deciding whether their deputy's conduct was out of policy and, if so, what discipline should be imposed in all but the most serious cases, which would be reviewed by EFRC. The Captain's decision would be subject to review up through the chain of command by the Commander and Division Chief.

Although the oversight by CFRT and CFRC has served to improve the quality of unit level investigations, the Commission believes that CFRT should be disbanded and IAB's jurisdiction expanded to encompass all cases involving serious injuries.

Having IAB review and investigate all force incidents involving serious injuries will result in more objective, consistent, and higher quality investigations, eliminate a layer of complexity to the investigative process, expedite the decision to investigate (as opposed to just review) force incidents, and reduce the investigatory demands on unit level supervisors. This will free them to focus on the supervision of deputies and spend more time walking the halls. OIR has commented favorably about the quality of the IAB investigations, while expressing concern about the unit level investigations, and this proposed change will result in more cases investigated by IAB and fewer cases handled at the unit level. It will also simplify the disciplinary system into two, rather than three, categories subject to different investigations or oversight, and hold the Unit Commanders responsible for properly determining the reasonableness of the force in all but the most serious force cases.

Further, in all cases involving injuries, IAB investigators should seek out evidence from medical staff, including medical records, statements from personnel who witnessed injuries and photographs of injuries. Medical personnel should also be asked to document that information in their own records.

We recognize the additional investigations will require additional IAB investigators and

*Report of the Citizens' Commision on Jail Violence*

support personnel.  IAB should be afforded sufficient resources and personnel to perform these additional investigations.  This can be achieved, at least in part, by eliminating the CFRT investigative function and redirecting those resources to IAB.  Additional resources should be provided by the Board of Supervisors, as needed.

**7.2   CFRC should monitor Force Packages for trends and concerns and the performance of supervisors.**

CFRC's role should be limited to reviewing the determinations by Unit Commander regarding force incidents and the performance of supervisors in force incidents.  If IAB investigates all cases involving serious injuries, there will be less need for CFRC to review unit level investigations, which would be limited to the Less Significant Force incidents.  The back and forth between the Unit Commander and CFRC noted above is cumbersome and unnecessary for these cases.  The Commission believes, however, that having a Commander from CFRC with a fresh set of eyes review the results of all force investigations, whether conducted by the unit or IAB, for trends, tactical issues, training deficiencies, and any areas of concern would be beneficial and serve as an additional "early warning" system for the Department.  Further, CFRC should continue to scrutinize the performance of supervisors in the force incident to hold them accountable for their actions.

**7.3   Deputies should be required to provide a timely written report of force incidents and not be allowed to review video tape footage prior to completion of that report or any interviews.**

To ensure the integrity of the force review and investigation processes, Department policies and practices should make clear that a deputy involved in a use of force incident is required to provide a written statement detailing the use of force as soon as possible, and no later than the end of his or her shift.  These policies and practices should also make clear that deputies are not permitted to review video footage of the incident before submitting a written statement or being interviewed by the investigators.

**7.4   Deputies involved in Significant Force incidents should be separated and not permitted to talk to each other until they have provided a written statement or been interviewed by investigators.**

Deputies who are involved in use of force incidents that result in injuries to inmates

should be immediately separated and not be permitted to discuss the incident with any other deputies until they have provided a written statement or been interviewed by an investigator. Further, they should not share computers in the preparation of the use of force reports or written statements.

**7.5    IAB and ICIB should be part of an Investigations Division under a Chief who would report directly to the Sheriff.**

The Commission recommends that both IAB, which is under the Leadership & Training Division, and ICIB, which is headed by a Captain, be placed into a newly created Investigations Division under a Chief who would report directly to the Sheriff. This would create a single division responsible for all significant internal investigations under the leadership of a high ranking Department official, and would facilitate parallel investigations where appropriate with ICIB criminal investigations taking precedence over IAB administrative investigations. Having the Chief report directly to the Sheriff would send a clear message that the investigation of allegations of misconduct is a top priority for the Department.

The Commission encourages the Sheriff to consider appointing a sworn or non-sworn Chief of Investigations from outside the Department and with expertise in prosecutive or investigatory work. Other systems, including New York's Department of Corrections, have found it useful to have civilian and/or permanent specialized staff who can bring a qualified, dispassionate and unbiased eye to this process with new approaches to the investigation of these matters.

The Sheriff has, in the past, shown a willingness to seek outside assistance by, for example, urging the creation of OIR. Appointing someone from outside the Department would reflect the Sheriff's determination to ensure that internal investigations will be thorough and unbiased.

**7.6    IAB should be appropriately valued and staffed by personnel that can effectively carry out the sensitive and important work of that bureau.**

The Department's attitude towards IAB is a significant factor affecting the efficacy of that bureau in its investigations of alleged policy violations. If IAB is devalued by management, qualified officers will seek to avoid working in IAB, and IAB investigators will not receive the

support from other units that is necessary to serve their important role. Thus, senior Department leadership should make clear that IAB personnel are valued and that IAB is considered to be a vitally important and career enhancing assignment. Officers in IAB should be afforded opportunities for choice assignments and promotions after serving in IAB.

Some experts have questioned the wisdom of staffing IAB with deputies who have worked with or been supervised by, or who may in the future work with or be supervised by, the very individuals they are charged with investigating. The Sheriff should consider hiring into IAB qualified civilians with law enforcement or investigative experience to become a permanent part of that division.

**7.7     The Discipline Guidelines should be revised to establish increased penalties for excessive force and dishonesty.**

The Discipline Guidelines for the use of unreasonable force permit a broad range of discipline, from five days suspension to discharge. The penalty for making a false statement to a supervisor ranges from 10 days to discharge, and for lying to an investigator ranges from 15 days to discharge. And the penalty for failing to report the use of force is five to 25 days suspension.

The discretion permitted by these ranges is excessive and fails to convey the message that the use of excessive force and the failure to honestly report force will be punished severely by the Department. The Commission recommends that the Department create new penalty ranges for unreasonable force, with (1) a range from 15 days to 30 days suspension for unreasonable Less Significant Force and for any force that was not used as a last resort or was more than necessary, in violation of the Department's Force Prevention Policy, and (2) a significantly higher range, from 30 days to discharge, for unreasonable Significant Force.

There is no justification for failure to report force or for dishonesty during a force review or investigation. The Commission recommends that any Department personnel suspected of failure to report force or dishonesty in connection with a force review or investigation be subject to an administrative investigation by IAB. The Commission also recommends higher penalty ranges for a first offense and termination for a second offense.

**7.8    Each jail should have a Risk Manager to track and monitor use of force investigations.**

The timeliness and thoroughness of force investigations is necessary to ensure proper discipline. Further, increases in use of force have been overlooked by the Department in the past. A "risk management" supervisor should be assigned to each jail facility to help ensure quality control of force reviews and investigations, track their timeliness, and monitor use of force trends in the jail.

**7.9    Force investigations should not be conducted by deputies' supervisors.**

Unit level investigations of force by deputies should not be conducted by their immediate supervisors.

**7.10    Captains should not reduce charges or hold penalties in abeyance for use of force, dishonesty, or failure to report force incidents.**

Allowing Captain to reduce penalties has had a negative impact on the seriousness with which the Department imposes discipline. To ensure a reliable record of a deputy's past conduct and consistent implementation of punishment throughout the Department, Captains should not be given discretion to reduce charges, reduce discipline, or hold penalties in abeyance when the underlying conduct involves use of force, dishonesty, or failure to report use of force.

**7.11    The Department should vigorously investigate and discipline off-duty misconduct.**

Off-duty misconduct reflects poorly on the Department and can bleed into the workplace. The Department should vigorously investigate and discipline personnel for off-duty misconduct. To the extent the conduct does not warrant discharge, Performance Mentoring should be utilized as a means to remediate the problematic behavior and closely monitor deputies who may need further guidance and direction.

**7.12    The Department should implement an enhanced and comprehensive system to track force reviews and investigations.**

While current Department policies require the completion of force reviews and administrative investigations in an appropriate time frame, the Department has not adequately enforced those policies. The Commission recommends that enforcement be accomplished by

more careful tracking of the progression of these matters and by imposition of consequences for all personnel, including supervisors, who fail to meet appropriate timelines.

All administrative investigations, use of force reviews, and requests for employee performance reviews should be logged as soon as they are initiated. The log should include the name and contact information of the person or persons responsible for completing the investigation or review, as well as the appropriate supervisor. An automated system should raise red flags as critical deadlines approach or pass so that both the person responsible for completing the investigation or review and the supervisor are informed. Should an individual fail to meet deadlines, that person should either be subject to a negative evaluation, performance mentoring, or discipline, depending on the severity, frequency, and reasons for failing to meet the deadlines.

**7.13    Inmate complaints should be tracked by deputies' names in PPI.**

Inmate complaints received by the Department should be tracked by deputies' names in PPI, regardless of final disposition, and should be one factor that is examined when PPIs are reviewed for possible personnel issues or concerns. While this information should be examined with due caution, it nonetheless can allow possible trends to be identified early, even where the complaints initially were determined to be unfounded or lacking sufficient evidence to proceed.

**7.14    The inmate grievance process should be improved and include added checks and oversight.**

Inmate complaint forms should bear sequential serial numbers to allow tracking and identification of forms. After completion of the complaints by inmates, copies should be placed in two separate lockboxes, one of which is accessed by LASD and the other by either the ACLU or preferably the Inspector General, if the Board of Supervisors adopts the Commission's recommendation to create that office.

In investigating inmate grievances, inmate interviews should not be conducted by, or in the presence of, the deputy involved in the complaint or that deputy's supervising Sergeant.

The threat of retaliation against inmates for submitting a grievance can silence inmates and hinder the investigatory and disciplinary processes. Harsh penalties should be imposed for any substantiated acts of retaliation. All complaints of retaliation should be investigated by IAB,

reviewed by the proposed Chief of the Investigations Division, and subject to penalties as severe as the penalties for false statements.

**7.15    The use of lapel cameras as an investigative tool should be broadened.**

The Department should implement additional lapel cameras.  We are aware of the Department's recent pilot program and attempts to gain union acceptance of these cameras and encourage continued efforts in this regard.  Use of these cameras is not simply an invaluable evidentiary tool, but it can also deter aggressive acts and quickly absolve deputies of frivolous claims by inmates that might otherwise take time to resolve.

## CHAPTER EIGHT
## OVERSIGHT

### Introduction

Effective oversight is critical to any ongoing effort to address excessive force issues in the County jail system. Although the County has multiple oversight entities with different mandates, force issues in the jail have continued to plague the Department over time and the Department has taken too long to implement needed reforms and ignored critical recommendations.

The Department has multiple oversight mechanisms, staffed by numerous dedicated public servants, for providing civilian review: Special Counsel, the Office of Independent Review and the Office of the Ombudsman. Their efficacy, as well as the limits and barriers they face, necessarily has a significant impact on the issues and proposed reforms addressed throughout this Report. Over the course of many years, these watchdogs have identified numerous problems in the jails, investigated force incidents, monitored the integrity of Department investigations into use of force, responded to inmate and citizen complaints, and issued dozens of reports calling for important reforms.

For all their contributions, each of the existing oversight bodies has significant limitations on what it monitors and what it does with the information it receives. Special Counsel has repeatedly identified critical issues related to use of force, yet it lacks the resources to timely follow up on its recommendations. The Office of Independent Review scrutinizes major force incidents on a micro level, but exercises little oversight over unit level investigations and lacks a mandate to oversee macro policy issues. There is also a gap between the policy level review by Special Counsel and the case review by OIR with respect to the review and identification of trends, tactical issues, and overlapping problems. And the Ombudsman, despite serving as the clearinghouse for public complaints, does not regularly review the totality of inmate complaints to identify systemic patterns and problems or evaluate the Department's progress in resolving these issues.

Even when each entity performs its own functions effectively, the overall result is undermined by the lack of an overarching, consolidated strategy that marshals and leverages

*Report of the Citizens' Commission on Jail Violence*                    Page 177

their collective strengths. As separate units, with different mandates and different protocols, these oversight bodies suffer from too many gaps among them to be able to effectuate comprehensive and lasting changes in the Department.

Although all three oversight bodies monitor some aspects of the county jails, the Department has relied on the American Civil Liberties Union to monitor jail conditions. It has done so even though the ACLU is an adversary in litigation, responsible only to its clients, and is not a full-time, publicly appointed jail monitor.

Too often the Department has paid lip service to recommendations of these oversight bodies knowing that there has not been sustained follow-up to ensure that their recommendations are carried out. Indeed, as discussed in Chapter Two, some of the reforms suggested in this Report were recommended for over a decade by the Special Counsel or repeatedly referenced in OIR reports. That disconnect is underscored by the Department's recent decision to create a matrix of some of Special Counsel's hundred-plus recommendations since 1993 -- a welcome, if belated, effort that nonetheless revealed recommendations that have never been implemented or are still work in progress.

To ensure that there is an effective mechanism for overseeing the Department, the Commission recommends the formation of a single watchdog entity that would streamline and strengthen civilian oversight. This centralized body would subsume and consolidate all of the existing important oversight functions of Special Counsel, OIR and the Ombudsman's office and utilize their existing expertise and knowledge of the Department. It would also monitor conditions in county jails; review use of force investigations and the disciplinary process; conduct its own investigations in particularly sensitive cases; and both review and conduct audits and inspections. It would ensure that the Board of Supervisors and the public are kept informed of conditions in the jails, that problems are identified promptly and visibly, and that necessary reforms are implemented in a timely and transparent manner.

Finally, the Sheriff should be required to respond publicly -- both in person and in writing -- to the recommendations in this Report, as well as the future recommendations propounded by the new oversight entity, and submit regular reports to the Board of Supervisors on the implementation of all of these recommendations.

## Findings

1. **There is no single entity that provides comprehensive monitoring of the Los Angeles County Sheriff's Department and its jails.**

   a. **Special Counsel**

   After the Kolts Report was issued in July 1992, the Board of Supervisors, in recognition of the need for ongoing civilian oversight, appointed Merrick Bobb to serve as Special Counsel. Over time, Special Counsel's role has extended beyond implementing the Kolts recommendations to include risk management liability assessments. That focus has involved reporting on a wide range of issues and policies relating to the entire Department, including Patrol, special units (e.g., detectives), and Custody operations. Special Counsel describes his role as "assist[ing] the Board of Supervisors in its ongoing responsibilities regarding the operations and activities of the LASD by identifying areas in which reforms may be advisable or could be undertaken."[1]

   To date, Special Counsel has issued 31 Semiannual Reports. Concerns relating to Custody generally, and excessive use of force in particular, have been a consistent and recurring topic in these reports. Custody issues have featured prominently in over half of Special Counsel's reports.

   Special Counsel currently has a staff of two assistants, each of whom has a background in public administration and public policy. Although he and his staff have a broad mandate and full access to all Sheriff Department records, his sustained impact on Custody has been limited by his modest staff size and resources. He is only able to address a few issues at a time and often is unable to expeditiously follow up on recommendations that he makes. In some cases, it has been several years between reviews of Custody operations before Special Counsel can evaluate whether his recommendations have been implemented and the issues identified have been resolved. As a result, there has been a tendency over time for his reports to reiterate past recommendations and note -- sometimes with increasing levels of frustration -- the Department's repeated failure to address longstanding concerns.

---

[1] Special Counsel 16th Semiannual Report, p. 103.

*Report of the Citizens' Commission on Jail Violence*                                    Page 179

b.    The Office of Independent Review

OIR was created over a decade ago to oversee the Department's internal investigations. According to the Sheriff, OIR's attorneys "are a second set of eyes and minds" who "basically are ensuring we are getting the job done correctly and that we are not culturally seeing things from our own point of view."

Today, OIR consists of eight attorneys, six of whom monitor and review the Department's internal investigations pursuant to his or her own contract with the Board of Supervisors. OIR's offices are one floor above the offices of IAB, whose investigations OIR monitors. OIR shares email systems with the Department, is on the Department's computer server, and employs staff who are LASD personnel. Under their contracts, OIR attorneys are supposed to have full access to Department records. In some instances, however, OIR has not received -- or been informed about -- pertinent LASD memoranda, data and analyses that could have enlightened their thinking in regard to force trends and concerns and enhanced their ability to advocate for needed reforms.[2] Indeed, OIR's recent report noted that it was "disturb[ed]" to learn of the Department's failure to inform OIR about key memoranda and findings reflecting concerns with force investigations in Custody and observed: "While we have touted our unfettered access to records, we cannot access those records if we are not aware of their existence."[3]

Unlike Special Counsel, which has a broad mandate, OIR is responsible for scrutinizing ongoing investigations to ensure that LASD investigations are thorough, objective, and fair. OIR does not have the authority to conduct its own investigations into alleged individual acts of misconduct. Instead, OIR attorneys review transcripts and recordings of the interviews that IAB conducts; they also have access to other Department documents and information. OIR reviews the quality of these investigations and provides the Department with independent input on the appropriate discipline to impose in a given case. They are not, however, always notified of or consulted about reductions in discipline. Indeed, OIR staff have complained that they "have

---

[2] OIR Tenth Annual Report, p. 18 ("OIR learned for the first time through media coverage at the end of October 2011 that supervisors in the Sheriff's Department has performed analyses and audits of MCJ unit level force packages in 2009 and 2010 ... From our perspective, what is perhaps most disturbing is that no one in the Department shares these memos or findings with OIR.").
[3] *Id.*

been chagrined to learn that a Department executive has modified a disciplinary decision without engaging in dialogue [with OIR]."[4]

In addition to reviewing individual investigations, OIR also has prepared a number of reports on specific issues facing the Department, including concerns about Custody. For example, in its Sixth Annual Report, OIR addressed the circumstances surrounding an inmate who died while at Men's Central Jail. The report highlighted what OIR perceived to be shortcomings in the Department's investigation and addressed the efficacy of changes in the LASD inmate death investigation and review process.

OIR has provided the Department with valuable input that has enhanced the quality of the Department's investigations of Significant Force and the appropriate discipline for instances of misconduct. OIR's recommendations tend, however, to be at a micro level. Unlike Special Counsel, OIR's role is not primarily focused on systemic problems or reforms.

Notwithstanding that OIR has a contract with the Board of Supervisors, over time OIR has functioned as a close advisor to the Sheriff on the investigative and disciplinary process -- a role that the Sheriff has welcomed. Given the nature of that relationship, and the access to the LASD investigative process upon which OIR relies to do its job effectively, there is a perception among some the Commission interviewed that OIR is not sufficiently independent of the Department.

Finally, we note that OIR attorneys (like Special Counsel) have done work for other law enforcement agencies, including the Fullerton and Pasadena police departments. While OIR has tremendously talented and hardworking staff who manage a large volume of work, these outside projects can raise concerns regarding OIR's ability to devote its full time and attention to comprehensive oversight of the Department and its jail facilities.

---

[4] OIR has noted that the LASD is in the process of developing a written policy that requires the Department to consult with OIR prior to making important investigative or disciplinary decisions. OIR Tenth Annual Report, p. 19, fn 8.

*Report of the Citizens' Commission on Jail Violence*                    Page 181

c.    **The Office of the Ombudsman**

Like Special Counsel, the Ombudsman was created in the aftermath of the Kolts Report. The Ombudsman is a product of local ordinance[5] and charged with reviewing the Department's response to citizen and inmate complaints. The Ombudsman is selected by the Sheriff and the Board of Supervisors and the office includes three Assistant Ombudsmen, one of whom handles all complaints about the Sheriff's Department.

The Ombudsman does not investigate complaints in the first instance. Indeed, by ordinance the Ombudsman and panel judges "shall not have independent investigative authority and are not empowered to initiate or conduct investigations or interview witnesses." Rather, inmates and citizens must first complain to the Department directly. If they are dissatisfied with the Department's response, they may ask the Ombudsman to follow up and advocate on their behalf. The complaints can range from medical and mental health issues to service complaints (e.g., lack of hot water, lost property, improper searches) to allegations of excessive force.

The Ombudsman internally logs complaints it receives in a database and tracks the complaints through completion. However, out of concern for confidentiality, the Ombudsman does not generate reports, either to the Department or to the Board of Supervisors.

The Ombudsman must determine whether Department investigations are sufficient and the findings appropriate in a given case. If the Ombudsman believes the investigation or findings are deficient, it must provide a written explanation to the Sheriff's Department describing the investigation's deficiencies. The decision as to whether additional investigation or modification of findings is needed rests with the Sheriff. Without the authority to re-investigate the case, interview witnesses, or otherwise delve into the facts of a case, the Ombudsman is limited to reviewing the reports and witness interviews that were completed during the Department's investigation.

2.    **The Department has failed to address critical issues or implement key recommendations that have been identified over time by Special Counsel and OIR.**

As discussed in Chapter Two, for many years both Special Counsel and OIR have identified a wide array of problems in the jails that have contributed to the excessive use of force.

---

[5] Los Angeles County Ordinance, 2.37.020(A).

Page 182                                                    *Report of the Citizens' Commision on Jail Violence*

They have also identified concrete and practical reforms and delineated a series of recommendations aimed at addressing this problem. Yet a number of these recommendations have met with little or no response from the Department and, as a result, concerns identified for more than a decade have persisted. Moreover, no mechanism exists for holding the Department accountable or ensuring that these reforms are implemented. Until recently, these issues have also drawn inadequate scrutiny by the Board of Supervisors and the public, further reducing the Department's incentive to make suggested changes.

**3.      There is insufficient oversight of LASD force incidents handled at the unit level.**

Although OIR closely monitors the Department's internal investigations of Significant Force incidents, OIR has little involvement in reviewing Less Significant Force incidents that are handled at the unit level. This gap leaves some unit level cases susceptible to weak and potentially compromised investigation.

The bulk of OIR's work in Custody arises from reviewing IAB administrative investigations of incidents involving Significant Force. When criminal conduct is suspected, ICIB conducts the investigation. Although OIR will review ICIB investigations, the responsibility for evaluating the thoroughness and fairness of criminal investigations lies with the District Attorney's office. Moreover, OIR lacks the resources to conduct a robust review of ICIB cases. OIR staff have noted cases in which ICIB summaries were not a fair representation of what was contained in the audio recording of the investigation. However, OIR does not have the resources to listen to every ICIB recording to evaluate the summaries for accuracy.

Department policy requires deputies to immediately report any use of force to their supervisor for possible investigation. Under current guidelines, force incidents are categorized into one of three categories for purposes of conducting reviews and investigations. Incidents that do not involve serious injuries are reviewed at the facility (the unit level); incidents with significant injuries require CFRT notification; and incidents that result in injuries to the head, fractures, or a hospitalization require IAB notification. OIR provides input regarding whether the IAB investigation was thorough and fair and if the appropriate level of discipline was recommended. If, at the conclusion of the investigation, it appears that the force was out of policy, a disciplinary recommendation is made, with OIR's input.

Other Significant Force incidents -- ones that result in significant injuries, such as use of a carotid restraint or firing a Taser -- now trigger a roll out by CFRT. OIR has advocated for a "separate team of investigators" to enhance review of force incidents that result in significant injuries; CFRT was created in December 2011 as a partial response to this recommendation.[6] Before CFRT was created, the cases it handles were addressed only at the unit level. Completed investigations subject to a CFRT roll out are submitted for review to CFRC. As it does with IAB investigations, OIR reviews CFRT investigations for thoroughness and provides input on CFRC's disciplinary recommendations.

Force incidents that do not rise to the IAB or CFRT level are handled by personnel at the jail in which the incident occurred. These unit level force reviews are conducted by a Sergeant who is responsible for interviewing the inmate, deputies, and any additional witnesses. The Watch Commander takes this information and assembles a "force packet" that is then reviewed by the Unit Commander.

As discussed in the Discipline Chapter, incidents that are not investigated by IAB are susceptible to a weak investigation. The Sergeant investigating the incident may not have investigative experience and often is tasked with reviewing the conduct of a deputy who is under his or her command and whose misconduct, if deemed founded, could reflect poorly on that Sergeant. While unit level incidents by definition do not involve the most serious force, such cases can nonetheless involve injuries to inmates and result in significant Department liability, and they can serve as an early indicator of problematic deputy behavior. OIR has consistently expressed concern about the quality of unit level reviews of lower-level force incidents and has noted that there continue to be problems with the quality of force packages OIR attorneys have reviewed. Indeed, OIR has recommended that "sergeants and lieutenants not assigned to the involved jail facility" complete the force packages "to add a degree of professionalism and neutrality [it] saw as lacking in this process."[7]

Unless a case is referred to IAB for further investigation or is investigated by CFRT, OIR will have no involvement in reviewing force that is investigated at the unit level. OIR has access

---

[6] In its 10th Annual Report, OIR notes that it is "premature" to tell whether the CFRT approach has been successful or whether "OIR will revert to its initial recommendation to have a separate team of investigators conduct these investigations." OIR Tenth Annual Report, p. 20.

[7] OIR Tenth Annual Report, p. 20.

*Report of the Citizens' Commision on Jail Violence*

to the force reports and, if prompted by a complainant, may look into them. OIR has also suggested that some particularly sensitive cases might warrant independent investigation by OIR. This authority to independently investigate select cases is one that Inspectors General in other corrections systems -- including New York and California's state prison system -- have deemed important and exercised over time.

OIR has recommended changes to the force review process for non-EFRC cases, including suggesting that Sergeants who were involved in using or directing a use of force should not interview the inmate or prepare the force package and that deputies who used force should not be present during interviews of involved inmates.[8] In addition, OIR has acknowledged that it would be valuable to have OIR attorneys regularly involved in reviewing these force packages for thoroughness and fairness; this would be a natural extension of how OIR currently operates in response to IAB and CFRT investigations. However, OIR currently does not have the resources to carefully review the large volume of force packets that are generated by the Department.

4.    **There is insufficient oversight of the Department's inmate complaint process and the Office of the Ombudsman lacks the authority and resources to adequately oversee it.**

There is no oversight body that regularly conducts a systematic review of inmate complaints to determine whether the Department is responding to them in a timely and adequate manner. Nor does the Department itself regularly track the number of inmate complaints or its progress in responding to them. The ACLU recently alleged in its lawsuit against the Sheriff and other Department officials that inmate complaints relating to force are not adequately investigated and are often "brushe[d] aside." OIR staff have also noted concerns with the inmate complaint process and deemed it to be an "antiquated" system.

Inmate complaints cover a wide spectrum: everything from so-called service complaints, such as lack of access to showers, food, or the law library, to the use of force by deputies. Sergeants are responsible for reviewing inmate complaints. Service complaints that can easily be dealt with are usually referred to deputies for resolution. When an inmate complains about a use of force by a deputy, a Sergeant at the facility will investigate the complaint.

---

[8] In OIR's Tenth Annual Report, it noted that these changes are still under consideration by the Department.

In early 2011, at the behest of the federal judge presiding over *Rutherford v. Baca*,[9] representatives from the ACLU and the LASD met to discuss improvements to the inmate complaint process and forms. The Department appears to have implemented some, but not all, of the changes that were discussed at these meetings.

None of the existing oversight mechanisms are well equipped to provide sufficient oversight of the inmate complaint process. When an inmate or a member of the public is dissatisfied with the Department's response to a complaint, they may ask the Ombudsman to review that decision. But the Ombudsman lacks the authority and resources to independently investigate complaints and does not track the performance of the complaint process as a whole (e.g., the time it takes to process complaints, and the number of complaints that are not responded to). In addition, historically, the Ombudsman has not used the full array of its powers to address the most serious of inmate complaints. For example, the Ombudsman has authority to appoint an independent judge to adjudicate complaints involving certain Significant Force incidents, but that process has rarely been invoked.

**5.    None of the existing oversight entities regularly reviews force statistics.**

The Department has numerous systems in place to collect and track a wide range of statistical data, but the systems are not integrated or cross-referenced and thereby impede the ability of the Department and oversight entities to use the data as an effective monitoring tool. Each system captures significant data related to use of force, but these systems do so in occasionally incongruous ways (as discussed in the Use of Force Chapter).

The Special Counsel has, from time to time, asked the Department to run reports from these databases to identify potential trends or spikes in use of force. For example, in the 29th Semiannual Report, issued in July 2010, Special Counsel reported an increase in the total number of Department-wide force incidents based on statistics obtained from the electronic databases. But these data-based analyses are not prepared on a regular basis.

The same is true of OIR. OIR maintains its own electronic database of cases that it reviews, but OIR has not been tasked with reviewing Department force statistics and it has not

---

[9] *Rutherford v. Baca* is a class action lawsuit brought by the ACLU that challenged conditions in Los Angeles County's Central Jail.

regularly undertaken statistical analyses of force incidents. Moreover, OIR has in some instances failed to receive key LASD force data and numerical information. As noted in their recent report, "we were dismayed to learn that we had been shut out of some of those analyses over the years that we have provided oversight for the Sheriff's Department."

The Ombudsman also does not generate any reports relating to the complaints it receives or monitor any other data compilations. The Assistant Ombudsman in charge of responding to complaints in the jails keeps an internal log of complaints, but the log is not accessible to the public or the Department. The Ombudsman also does not prepare any reports based on that data beyond totaling the number of complaints received and processed.

Regularly reviewing data related to force incidents in the jails with the goal of identifying trends and patterns can provide valuable insights for management and oversight bodies. For example, shortly after the 2010 Christmas Brawl at the Quiet Cannon banquet facility in Montebello, OIR reviewed use of force statistics pertaining to the deputies involved. Even from the limited set of data that was assembled, OIR noted two key trends: (1) there was a marked increase in force incidents involving these deputies in 2009, and (2) the same supervisors were on duty for many of these incidents. The absence of an independent oversight body regularly engaging in data reviews and analyses can leave the problem of troubling trends undiscovered as well as unaddressed for a lengthy period of time.

6. **The Department has relied on the ACLU, an adversary in litigation, to act as a *de facto* jail monitor and has no independent monitor responsible for Custody.**

In the United States, there are a number of correctional systems that have monitors with responsibility for overseeing jail conditions. Others have civilian commissions or other bodies specifically charged with monitoring and reporting on conditions in their jails, including use of force and the ongoing treatment of inmates. These monitors or commissions take many forms and have varying duties and authority. The Texas Commission on Jail Standards is an independent body that sets and monitors standards applicable to jail facilities and can sanction or even de-certify jails that are not in compliance. In Ohio, a legislative-based entity, the Correctional Institution Inspection Committee, conducts unannounced inspections of all Ohio correctional facilities and publishes reports with findings to help legislators make decisions relating to the corrections system. The New York City Board of Correction is an independent

*Report of the Citizens' Commission on Jail Violence*                                         Page 187

civilian body, appointed by government officials, that "monitors conditions in the City's jails, investigates serious incidents . . . reviews inmate and employee grievances, and makes recommendations in critical areas of correctional planning." In all of these instances, independence, routine monitoring, investigatory responsibilities in particularly important or sensitive cases, and transparency are vital elements of the external oversight mechanism.

LASD has neither a permanent jail monitor nor a civilian commission responsible for overseeing jail conditions. Instead, for many years, the Department has relied on the ACLU of Southern California to act as a *de facto* jail monitor through its administration of court ordered monitoring under *Rutherford*. In conjunction with this court-appointed role, the ACLU has been granted access to monitor the conditions in the County jails. The ACLU is authorized to enter the jails, walk the rows, and speak with inmates. The ACLU has one representative assigned to visit the County's many and geographically distant jail facilities and spends most of its time monitoring MCJ and the Twin Towers Correctional Facility -- the two facilities that generate the largest number of complaints. Although the ACLU has sparingly been granted access to logbooks and headcounts, it has significantly less access to Department documents than a court-appointed or legislatively-mandated monitor or civilian oversight body would normally have.

Even though it has responded to inmate complaints, the ACLU is not a true jail monitor. While for many years, the ACLU worked cooperatively with the LASD to identify and respond to issues that affected individual inmates in the jails, a few years ago the ACLU shifted its focus to litigating systemic issues in the jails and has taken on a more adversarial relationship with the Department. In adopting this different approach, the ACLU began conducting most of its inmate interviews in attorney rooms rather than walking the jail rows to observe conditions and conducting on-the-spot impromptu "cell front" interviews. This approach necessarily results in more limited insight into conditions in the jails because the ACLU generally only interviews those inmates who choose to come to the attorney room.

The ACLU's change has been significant enough that OIR launched a pilot program this past summer to serve as a temporary substitute. The program provided OIR with "valuable feedback," but without additional resources OIR has not been able to maintain it. As such, individual issues that may only be identified through an on-site presence and direct interaction with inmates will again be overlooked.

Page 188                                    *Report of the Citizens' Commision on Jail Violence*

Los Angeles also lacks a civilian commission that can bring the community's voice to bear in efforts to bring about enhanced accountability and implementation of suggested reforms. Other jurisdictions have found that a civilian oversight body can play a valuable role in placing questions of jail conditions prominently before the public and engaging the community's voice in implementing needed reforms; vigilance on the part of the Board of Supervisors can also ensure that conditions in the jails remain in the spotlight.

In sum, the LASD lacks a permanent jail monitor like those in other corrections systems throughout the country. The ACLU's recent shift in focus has highlighted the need for a permanent jail monitor focused on responding to inmate complaints and serving as the public's "eyes and ears" in the jails.

7.    **The Board of Supervisors has recently become more engaged in oversight of the jails, which has helped propel reforms and maintain visibility of jail issues.**

Although the Board of Supervisors has received numerous reports from Special Counsel and OIR over time, in the past year the Board of Supervisors has taken a more active role in scrutinizing the Department's policies and practices in Custody. In response to reports by the ACLU and the media recounting concerns in regard to violence in the jails, last fall the Board created this Commission and tasked it with reviewing the "nature, depth and cause of the inappropriate use of force in the County jails and to recommend corrective action as necessary."

Over the past few months, the Board has also endeavored to hold the Sheriff accountable and ensure that recommendations made by OIR and Special Counsel are implemented. In particular, it has requested monthly reports from the Sheriff on his progress in implementing a series of recommendations stemming from past Special Counsel reports. As a result, the Sheriff and senior Department leaders have testified before the Board and provided reports that track the force incidents and detail the status of these recommendations and the progress made. Some recommendations that had taken over a decade to implement have now been implemented in the span of a few months. These recent developments underscore the central role that the Board can play in helping to forge an agenda for much-needed reform.

**8.      The Board has oversight and budgetary authority over LASD.**

Under state law, the Board of Supervisors has both the authority and the obligation to supervise LASD's budget and how the Department disburses public funds. While the Sheriff maintains operational autonomy over his Department, the Board of Supervisors approves the Department's annual budget and also makes certain personnel determinations. The Board allocates funds annually, as part of the yearly budget cycle, and also midstream, as requests or needs arise.

The Board has the authority to monitor how the money it allocates is used and can ask the Sheriff to report back on the status of allocations made for specific purposes. That authority can enable the Board to keep a watchful eye on new reforms or initiatives that it opts to fund.

<u>Recommendations</u>

**8.1      The Board of Supervisors should create an independent Inspector General's Office to provide comprehensive oversight and monitoring of the Department and its jails.**

"Prison oversight is absolutely essential to the safe operation of prisons," according to corrections expert Michele Deitch. In distinguishing internal accountability measures from external scrutiny, Deitch explained that the "goal of [external oversight] is to shine a light on what happens in correctional institutions" and through the resulting transparency provide both protection "from harm and an assurance that rights will be vindicated." As former New York Corrections head Martin Horn observed, external oversight "makes [a corrections system] better; … it forces us to question what, why, and how things are done."

To further these goals, the Commission recommends the appointment of an independent Inspector General and the creation of an Office of the Inspector General ("OIG") with broad authority as well as adequate staffing and funding to review Custody issues and concerns. While the Commission realizes that other parts of the Department are not part of its mandate, similar reasoning -- and economies that would result from full consolidation of the roles of OIR and Special Counsel -- would suggest that the OIG should provide the same independent civilian oversight to review all of the Department's operations. The OIG can help ensure that problems and needed reforms come to light and do not languish for years before they are addressed.

*Report of the Citizens' Commision on Jail Violence*

The Inspector General should be appointed by the Board of Supervisors for a set term of years and be subject to removal only for cause. The Inspector General should report directly to the Board of Supervisors, but have sufficient job security guarantees and autonomy to ensure that he or she operates independently. The Board should create a committee consisting of representatives of the Board, the Department, and the public to oversee the selection process and recommend an Inspector General candidate to the Board. The OIG should also be fully independent of the Department -- it should independently contract with the Board, have its own budget separate from that of the Department, and not share facilities, computer systems or employees with the Department.

The OIG should have unfettered access to Department records, witness interviews, video footage, data, personnel, and facilities. This access, of course, should be subject to existing legal limitations of nondisclosure under state law, which should address any concerns that ALADS or other LASD personnel might have. The OIG should have the right to conduct regular and unannounced inspections of jail facilities and have the authority, in select cases, to conduct its own independent investigations. It should make regular reports to the Board that should be public except as they relate to privileged or individual personnel matters.

The OIG should have three primary functions with respect to Custody: (1) monitoring conditions in the jails and the Department's response to inmate and public complaints; (2) periodically reviewing the Department's use of force statistics, the Department's investigations of force incidents and allegations of misconduct, and the Department's disciplinary decisions; and (3) reviewing the quality of audits and inspections conducted by the Department and conducting its own periodic audits and inspections. Moreover, recognizing that some cases may be sufficiently sensitive or important to warrant independent investigation, the OIG should have authority in select cases -- as it deems necessary -- to conduct its own independent investigations, with qualified staff and sufficient resources to do so.

One branch of the newly created OIG would serve as a jail monitor, thereby obviating the need for the Department to rely on the ACLU for this function. This branch would regularly visit and inspect (both scheduled and unannounced) the Department's Custody facilities and oversee the inmate complaint process. This will include ensuring inmate access to the complaint process, following up on inmate complaints as appropriate to ensure they are resolved promptly

*Report of the Citizens' Commission on Jail Violence*                                                                 Page 191

and fairly, and monitoring the timeliness and efficacy of the Department's responses. The OIG should be a co-recipient of all inmate complaints and independently track complaints as they move through the Department to ensure they are resolved in a timely manner. It should have the right to interview inmates and staff if it believes a complaint has not been adequately addressed. By engaging in all of these activities, and reporting on its findings, the OIG would expand upon the Ombudsman's limited role in following up on inmate complaints and consolidate these functions into a single oversight body.

Special Counsel should also be subsumed within the OIG. As Special Counsel does now, the OIG should be tasked with identifying problematic issues in Custody and in the individual facilities. It should also promptly receive from the Department all force statistics (and other data) from all the Custody facilities on a monthly basis. The OIG should regularly review this data for trends.

Finally, OIR should become a branch within the OIG.[10] As such, external oversight of the investigatory and disciplinary system would be consolidated within the OIG. As noted in the Management Chapter, the Commission recommends that the Department establish an Internal Audit and Inspections Division to evaluate compliance with laws, regulations and Department policies; assess performance of Custody staff; and review areas in need of improvement. The OIG would review the Department's audits and inspections for thoroughness and quality in accordance with generally accepted government auditing standards. On a limited basis, it would also conduct its own periodic audits and inspections of Custody operations.

The Commission recognizes that a truly effective OIG requires the support of both the Board of Supervisors and the Sheriff. As noted throughout this Report, accountability for ongoing problems in the jails and effective enforcement mechanisms for ensuring action on recommended reforms has been lacking. Thus, an OIG that regularly reports to the Board, coupled with the Sheriff's regular reports to the Board during public hearings, will ensure that problems in the jails are identified publicly and not ignored. Moreover, the OIG should meet regularly with the Sheriff and the Assistant Sheriff for Custody to discuss ongoing issues,

---

[10] On a limited basis, the OIG would continue to maintain the privilege OIR currently has with the Department with respect to its advice on individual cases; that privilege has proven valuable to OIR in ensuring access and enabling it to assess the quality of investigations and appropriateness of the discipline imposed.

concerns and recommendations. The OIG can only be truly effective, however, if the Sheriff provides full access to the OIG and embraces this reform just as he has embraced oversight by OIR, and has "welcome[d] input and critique."

While the Commission considered a civilian commission comprised of community leaders as an additional oversight body, such a commission is not necessary if the Board of Supervisors continues to put a spotlight on conditions in the jails and establishes a well-structured and adequately staffed OIG.

## 8.2    The Department should report regularly to the Board of Supervisors on use of force and the status of Custody reform recommendations.

As the Department has done recently, it should continue to report to the Board of Supervisors on the number of force incidents in Custody facilities, broken down by the number of Significant Force and Less Significant Force incidents for each facility. In addition, the Department should report monthly on the number of force incidents found to be "unreasonable" and out of policy.

The Department should also be asked by the Board of Supervisors to promptly respond to each of the recommendations set forth in this Commission's Report in a written report to the Board. The Sheriff should personally present that written response to the Board in a public meeting and then report monthly to the Board on the ongoing status of the Department's implementation of these recommendations (to be accompanied by a monthly written submission with supporting documentation reflecting implementation steps and status).

The Sheriff and Assistant Sheriff for Custody should also make regular reports to the Board on the status of any pending or future recommendations from the OIG (when it is created and staffed) and in the interim from Special Counsel and OIR.

Finally, the Board of Supervisors should use its budgetary and oversight authority to ensure that any funds allocated by the Board to LASD to implement recommendations and reforms contained in this Report are used for their intended purposes.

**8.3    OIR should review unit level investigations for fairness and accuracy.**

In the absence of an OIG, or until one is created, OIR should be given the resources necessary to add a staff position to ensure that the procedures and dispositions of all force incidents handled at the unit level are fair and thorough.  OIR currently does not have the resources it needs to oversee such cases.  OIR should report on patterns and trends it observes based on those unit level reviews.

**8.4    The OIG should review the Department's data for trends, spikes, and patterns in the jails.**

As discussed in the Use of Force Chapter, the technical barriers that make it difficult, if not impossible, to cross-reference data from the Department's various data systems need to be resolved and force and personnel data should be captured in a unified database.   In the interim, the OIG should be tasked with regularly reviewing all force statistics in the various existing data bases and reporting on a regular basis to the Sheriff, Assistant Sheriff for Custody, and the Board on trends, spikes, and patterns in the jails.