# EXHIBIT B

(HTTP://WWW.LATIMES.COM/)

# L.A. NOW (http://www.latimes.com/local/lanow/)

SOUTHERN CALIFORNIA -- THIS JUST IN

« Previous Post (http://latimesblogs.latimes.com/lanow/2012/01/arrests-made-killing-five-transients-2008.html) | L.A. NOW Home (http://www.latimes.com/local/lanow/) | Next Post » (http://latimesblogs.latimes.com/lanow/2012/01/severed-hand-found-near-head-under-hollywood-sign.html)

f   𝕐   ➤   ✉   🖨

# LASD brass failed to root out deputy abuse, ACLU suit alleges

JANUARY 18, 2012 | 11:46 AM

The American Civil Liberties Union filed a lawsuit Wednesday accusing Los Angeles County Sheriff's Department brass of failing to root out deputy brutality inside the county's jails.

The lawsuit details multiple allegations of abuse from inmates, including claims Sheriff Lee Baca and his top executives are "aware of the culture of deputy violence that pervades the Jails but have failed to take reasonable measures to remedy the problem." The ACLU is a court-appointed monitor of jailhouse conditions.

Case 2:12-cv-00428-MWF-E     Document 120-6     Filed 02/17/15     Page 3 of 81     Page ID
#:2865
LASD brass failed to root out deputy abuse, ACLU suit alleges | L.A. NOW | Los Angele...     Page 2 of 4

Accusations of deputy brutality in the jails have been common for years but are difficult to substantiate one way or another without more evidence. The FBI is investigating allegations of abuse and other deputy misconduct inside the jails.

The ACLU's lawsuit seeks a federal court injunction ordering the Sheriff's Department to provide better training to deputies to prevent force, more thorough investigation of force incidents and appropriate discipline of misconduct.

Among the claims in the ACLU's lawsuit is that some violence against inmates is commonplace, that deputies are poorly trained in dealing with mentally ill inmates and that jailers have formed "gangs."

"Like members of street gangs, these deputies sport tattoos to signal their gang membership," the ACLU alleges. "They beat up inmates to gain prestige among their peers, and 'earn their ink' by breaking inmates' bones."

In an interview with The Times, a recently retired jails commander also said that deputies had formed cliques inside Men's Central Jail and that some guards earned respect from veteran members of those cliques by using excessive force.

Sheriff's spokesman Steve Whitmore disputed the ACLU's claims, saying the Sheriff's Department has implemented a variety of reforms he said have helped drive down the number of force incidents in the jails.

"There is no gang mentality among the deputies," Whitmore said. "The deputies come to work every day to keep those jails safe and sound for everybody."

Whitmore said ACLU representatives never mentioned their intention to file a lawsuit during a meeting last week with sheriff's officials. He said the department would continue to cooperate with the organization, despite the lawsuit.

Peter Eliasberg, legal director of the ACLU of Southern California, said the Sheriff's Department only recently provided his organization with a full policy on using force inside the jails. He complained the policy lacks details and helpful scenario-based instructions for deputies.

"Their force policies are a joke," he said. "They might as well not have any."

The lawsuit makes reference to several issues reported recently in The Times. In it, the ACLU accuses Baca of failing to shake up his executive staff despite receiving warnings of brutality inside the jails.

The Times reported recently that former jails Commander Robert Olmsted warned sheriff's executives about excessive force and shoddy investigations but was told that the jail culture couldn't be changed. One executive denied making such a comment.

The lawsuit also references allegations in The Times by a former top sheriff's rookie who resigned from his jail's post after alleging his supervisor made him beat up a mentally disabled inmate and then cover it up.

-- Robert Faturechi and Jack Leonard

---

## Comments



Add a comment...

Comment



Hyatt Teresa · Antelope Valley College
my daugter inlaw has been in jail for misd. for close to a year and she is mentally ill and they refuse to let her go to court until dec
what if anything can i do
Reply · Like · August 7, 2014 at 5:40am

(http://www.latimes.com/)

LASD brass failed to root out deputy abuse, ACLU suit alleges | L.A. NOW | Los Angele...    Page 4 of 4

Terms of Service (http://www.latimes.com/lat-terms,0,7374802.story) | Privacy Policy (http://privacy.tribune.com) | About Our Ads (http://www.latimes.com/lat-about-our-ads,0,3875412.htmlstory) | © 2015 (http://www.latimes.com/services/site/la-reprint-request-splash,0,6731163.htmlstory) | About This Site (http://www.latimes.com/about/)

# EXHIBIT C





**Lawsuits**

# ACLU Sues Sheriff Lee Baca & Undersheriff Paul Tanaka Over Long-Standing Deputy Violence Against Inmates

By Chris Vogel
Wed, Jan 18, 2012 at 11:41 AM
Categories: Lawsuits

On July 22, LA County jail inmate Jonathan Goodwin says he witnessed several deputies beat and kick a fellow inmate whose hands were bound in shackles.

Nearly three long weeks later, says Goodwin, one of the deputies involved in the beating walked into Goodwin's cell to show him who was boss -- telling him, without explanation, to "cuff up." As Goodwin tells it, the next thing he knew, he was up against the wall in the hallway while two deputies punched him in the head.

Just as one of the deputies cracked his fist across Goodwin's jaw, says Goodwin, other deputies nearby joined in on what would turn out to be a tooth-rattling gang-beating. Goodwin says he did not receive any medical treatment but was criminally charged by the deputies with causing a disturbance.



Gabriel Carrillo after deputies beat him at jail

Today, 29-year-old Goodwin, alongside inmate Alex Rosas, 24, who also claims he was beaten by deputies, took the first step down the long and hopeful road toward justice.

On behalf of the inmates, the American Civil Liberties Union has filed a class-action lawsuit against the top members of the sheriff's department - including Sheriff Lee Baca, Undersheriff Paul Tanaka and Dennis Burns, head of the department's custody operations - for violating their Constitutional rights to reasonable protection from violence and excessive force.

The ACLU's Peter Eliasberg is encouraged that Baca has recently committed to addressing many of the problems, but says, "this suit is directed at them because they have allowed deputies to go unpunished, covered up their behavior and for years made no effort to reform this broken system."

In its vastly detailed 76-page complaint, the ACLU hammers Baca, Burns and **Tanaka** - who, somewhat oddly, also serves as the Mayor of Gardena - for turning a blind eye to a years-long stream of compelling evidence of abusive deputies.

The ACLU accuses the department's top brass of having "acquiesced in, fostered, and implicitly authorized" the abuse by failing to supervise deputies, by failing to perform meaningful investigations into reports of abuse, and by failing to hold guilty deputies accountable.

States the lawsuit:

> Rampant violence at the Jails has resulted from a failure of leadership at the top level of the Department. Such a pervasive, deeply-entrenched, and notorious pattern of excessive force could not have continued unabated over a period of many years without a code of silence on the part of front-line and supervisory staff, combined with management staff's failure to require accountability, and their engaging in an outright cover-up.

Throughout the lawsuit, the ACLU provides reams of examples of inmates claiming to have witnessed beatings or been abused. One of them is Gabriel Carrillo, whose beating by deputies in the visiting lobby of Men's Central Jail was **first reported** last spring by *LA Weekly*.

The lawsuit chronicles a history of evidence of abuse and provides plenty of examples of other related issues, including deputies using inmates to beat on other inmates, abuse victims experiencing retaliation and racially motivated violence against inmates.

In one instance this last August, for example, the lawsuit states that a deputy repeatedly slammed the face of an African-Ameican inmate into a wall, after which the deputy allegedly said, "I hate you motherfucking monkeys. Damn nigger!"

Overall, the violence against inmates is describes as:

> Slamming inmates' heads into walls, punching them in the face with fists, kicking them with boots, and shooting them multiple times

with tasers - and for these beatings to result in serious injuries to the inmates, including broken legs, fractured eye sockets, shattered jaws, broken teeth, severe head injuries, nerve damage, dislocated joints, collapsed lungs, and wounds requiring dozens of stitches and staples.

Margaret Winter, Associate Director of the ACLU National Prison Project, calls Baca's jails the "shame of the nation," and says the goal of the lawsuit is, "to ensure and end at long last to the reign of terror by deputies against inmates."

## GET THE WEEKLY NEWSLETTER

Our weekly feature stories, movie reviews, calendar picks and more - minus the newsprint and sent directly to your inbox.

enter email

## Related Content

   

Woman Caught Trying to Sell Her 1-Year-Old Daughter Has Heartbreaking Excuse (Stirring Daily)

I Was a Web Cam Performer

10 Weirdest Places to Stay in Los Angeles

Want to Go Back in Time and Fly First Class in a Pan Am 747? Now You Can

Recommended by

RELATED

| | |
|---|---|
| Lawsuits | Jonathan Goodwin |
| Lee Baca | Undersheriff Paul |
| Crime and Law | Criminal Sentencing and Punishment |





Budapest Festival Orchestra
Iván Fischer, music director · Pinchas Zukerman, violin
Fri, Jan 23 at 8pm · The Music Center at Strathmore
Presented by WASHINGTON PERFORMING ARTS
Get Tickets

# EXHIBIT D

http://www.dailynews.com/general-news/20120118/aclu-files-class-action-lawsuit-against-la-county-sheriff-lee-baca-top-brass

## ACLU files class action lawsuit against L.A. County Sheriff Lee Baca, top brass

*By Christina Villacorte, Staff Writer*                                                    DailyNews.com

The American Civil Liberties Union slapped Sheriff Lee Baca and his top brass with a federal class action suit Wednesday, accusing them of condoning "savage" beatings of inmates by deputies at county jails.

Filed on behalf of pretrial detainees Alex Rosas and Jonathan Goodwin, as well as current and future inmates, the lawsuit does not seek monetary damages.

Instead, the plaintiffs want a federal court order to end the alleged "long-standing and widespread pattern of violence" at county jails, according to Margaret Winter, associate director of the ACLU National Prison Project.

"(The plaintiffs) are not asking to be recompensed for what happened in the past," she said. "They're just asking that the judge enter an injunction requiring the sheriff to stop violence like this from happening so that they and all other inmates in the jail, currently and in the future, are protected."

ACLU legal director Peter Eliasberg said Baca, Undersheriff Paul Tanaka, Assistant Sheriff Cecil Rhambo and Dennis Burns, chief of custody operations, "allowed deputies to go unpunished, covered up their behavior and for years made no effort to reform this broken system."

The lawsuit alleges violations of inmates' rights under the Eighth Amendment prohibition of cruel and unusual punishment, and of pretrial detainees' rights under the Fourteenth Amendment's prohibition of punishment prior to conviction.

Baca's spokesman, Steve Whitmore, denied ACLU's claims.

"Violence is not condoned in the Sheriff's Department," he said.

"Don't forget: violence is perpetrated by the inmates," Whitmore added. "The inmates begin the violent act and the deputies contain it. Regrettably, sometimes they have to use force."

Whitmore added Baca recently installed dozens of cameras inside the jails as a preventive measure, and followed other recommendations by the Board of Supervisors and the recently created Citizen's Commission on Jail Reforms.

Supervisor Zev Yaroslavsky, who proposed the Citizen's Commission, acknowledged there were problems at the jails but was skeptical of claims that Baca condoned abuse.

"These kinds of problems don't take place without someone being asleep on the job or worse, but I think it's a stretch to say that the sheriff has personally condoned this kind of activity," he said.

"I think Baca takes this very seriously, but he has to communicate that concern and his expectations down the chain of command," Yaroslavsky added.

The lawsuit, filed in U.S. District Court for the Central District of California, listed allegations by dozens of inmates over a period of several years.

Both plaintiffs Rosas and Goodwin claimed to have witnessed deputies beating a handcuffed and non-resisting inmate in 2011. They said the same deputies later went into their cells, punched them in the

http://www.dailynews.com/general-news/20120118/aclu-files-class-action-lawsuit-against-la-county-sheriff-lee-baca-top-brass

head and other parts of the body. One was also sent to solitary confinement.

"It is typical for deputies to subject unresisting inmates to grossly excessive force by slamming inmates' heads into walls, punching them in the face with their fists, kicking them with their boots, and shooting them multiple times with their Tasers - and for these beatings to result in serious injuries to the inmates, including broken legs, fractured eye sockets, shattered jaws, broken teeth, severe head injuries, nerve damage, dislocated joints, collapsed lungs, and wounds requiring dozens of stitches and staples," the formal complaint stated.

"Deputies sadistically beat inmates with serious mental illness," it continued. "They have beaten inmates who are already in fragile medial condition, including inmates in wheelchairs. Deputies have beaten inmates asking for medical treatment, for the color of their skin, or for no apparent reason at all."

ACLU said one inmate even accused a deputy of raping him in his cell. The alleged victim gave videotaped testimony about the alleged incident, which is posted on ACLU's website.

The ACLU has been monitoring the county jails since 1985. In October, it said it had gathered 70 sworn statements from purported victims and eyewitnesses to the alleged beatings.

Five of the eyewitnesses are civilians, including two chaplains and a Hollywood movie producer.

The lawsuit also accused deputies of belonging to gangs and "earning their ink" - gang insignia tattooed on the backs of their necks and other parts of their body - by breaking inmates' bones. It also claimed deputies enlist and encourage other inmates to participate in the abuse.

christina.villacorte@dailynews.com, 213-974-8985

# EXHIBIT E

**Los Angeles Times** | ARTICLE COLLECTIONS

← Back to Original Article

## ACLU sues L.A. County Sheriff's Department

*The suit accuses department brass of failing to root out deputy brutality in jails.*

January 19, 2012 | By Jack Leonard and Robert Faturechi, Los Angeles Times

The American Civil Liberties Union filed a lawsuit Wednesday, accusing Los Angeles County Sheriff's Department brass of failing to root out deputy brutality inside the county's jails.

The lawsuit details multiple allegations of inmate abuse and alleges Sheriff Lee Baca and his top executives are "aware of the culture of deputy violence that pervades the Jails but have failed to take reasonable measures to remedy the problem." The ACLU is a court-appointed monitor of jailhouse conditions.

Accusations of deputy brutality in the jails have been common for years but are difficult to substantiate without more evidence. The FBI is investigating allegations of abuse and other deputy misconduct inside the jails.

The ACLU lawsuit aims to get the Sheriff's Department to provide better training for deputies to prevent force, more thorough investigation of force incidents and appropriate discipline of misconduct.

The suit also alleges that deputies are poorly trained in dealing with mentally ill inmates and that jailers have formed "gangs."

"Like members of street gangs, these deputies sport tattoos to signal their gang membership," the ACLU alleges. "They beat up inmates to gain prestige among their peers, and 'earn their ink' by breaking inmates' bones."

In an interview with The Times, a recently retired jails commander also said that deputies had formed cliques inside Men's Central Jail and that some guards earned respect from veteran members of those cliques by using excessive force.

Sheriff's spokesman Steve Whitmore disputed the ACLU's allegations, saying the department has implemented a variety of reforms that have helped reduce the number of force incidents in the jails.

"There is no gang mentality among the deputies," Whitmore said. "The deputies come to work every day to keep those jails safe and sound for everybody."

Peter Eliasberg, legal director of the ACLU of Southern California, said the Sheriff's Department only recently provided his organization with a full policy on using force inside the jails. He complained the policy lacks details and helpful scenario-based instructions for deputies.

"Their force policies are a joke," he said. "They might as well not have any."

At a news conference Wednesday, however, ACLU staffers backed away from their call last year for Baca to resign, saying he had become receptive to jail reforms. Reasserting their call for his ouster, they said, would be a distraction.

The ACLU lawsuit refers to several issues reported recently in The Times. In it, the ACLU accuses Baca of failing to shake up his executive staff despite receiving warnings of brutality inside the jails.

Former jails Cmdr. Robert Olmsted told The Times that he had warned executives about excessive force and shoddy investigations but was told that the jail culture couldn't be changed. One executive denied making such a comment.

The lawsuit also refers to allegations in The Times by a former top sheriff's rookie who resigned from his jail post after alleging that his supervisor made him beat up a mentally disabled inmate and then cover it up.

*jack.leonard@latimes.com*

*robert.faturechi@latimes.com*

# EXHIBIT F

It's your last chance to place your winning bid. Don't miss out!

KPCC ONLINE AUCTION
Bid now

## Patt Morrison

<em>Patt Morrison</em> is known for its innovative discussions of local politics and culture, as well as its presentation of the effects of national and world news on Southern California. Hosted by

## 89.3 KPCC

- Listen Live
- News
- Programs
- Events
- Support Us
- About Us

- KPCC on Twitter
- KPCC on Facebook
- KPCC on Google+

Search KPCC

**Donate Now**

Show Nav

## 89.3 KPCC

Close

- Listen Live
- News
- Programs
- Events
- Support Us
- About Us

## Follow KPCC

- KPCC on Twitter
- KPCC on Facebook
- KPCC on Google+

## 89.3 KPCC

Close
Search:
Search
Submit Query

# The ACLU files suit against the L.A. County Sheriff's Department

by **Patt Morrison** January 19 2012



David McNew/Getty Images

Listen to this story 14 min 27 sec

**Share**

- Share via Emailemail
- Share on Twitter2
- Share on Facebook

Is the situation in Los Angeles County's jails getting better or worse?

In its 2011 annual report, the American Civil Liberties Union (ACLU) – the court-appointed monitor of jailhouse conditions – detailed a series of abuses, including the possibility of deputy "gangs" in which new members earn the respect of veteran members by beating inmates. At the time, the ACLU called for the resignation of Sheriff Lee Baca, who claimed he had no knowledge of the abuse. Subsequently the ACLU rescinded its call for Baca's resignation and has gone on record stating that Baca has been receptive to the idea of jail reforms. On Wednesday, however, the ACLU filed a lawsuit charging that Baca and "his top commanders condoned a long-standing, widespread pattern of violence by deputies against inmates in the county jails." According to the ACLU, the lawsuit, filed on behalf of two former pretrial detainees, "seeks both injunctive and declaratory relief on behalf of all present and future inmates of the jails."

## WEIGH IN

Have you or do you know anyone who has either been incarcerated or who works in a Los Angeles County jail? Do his or her reports match up with the ACLU's charges? How systemic is inmate abuse, and how do we address it?

## Guests:

Peter Eliasberg, legal director, ACLU of Southern California

Frank Mendoza, long-time member, Just Detention International, a nonprofit organization working to prevent sexual abuse abuse in prisons and jails.

Steve Whitmore, senior media advisor, LA County Sheriff's Department

## Related Links

- ACLU sues L.A. County Sheriff's DepartmentSource: latimes.com
- ACLU: Sheriff Lee Baca must resign over County Jail reportSource: latimesblogs.latimes.com
- Jail volunteers accuse deputies of abusing L.A. County prisonersSource: latimes.com
- American Civil Liberties UnionSource: aclu.org

- Just Detention InternationalSource: spr.org

More from this episode *Patt Morrison for January 19, 2012*

## Patt Morrison For January 19, 2012

- The ACLU files suit against the L.A. County Sheriff's Department
- Head, hands and feet found in Hollywood
- Heal the Bay president, Mark Gold, steps down after 23 years with the group
- Mitt Romney pays 15 percent, should you too?
- Let the Sundance indie film dance begin
- Johnny Otis – the "godfather of rhythm and blues" – dies at 90
- What can we learn from gay men about being happy?

## Share

- Share via Emailemail
- Share on Twitter2
- Share on Facebook

## Comments

Join the discussion



Become a KPCC Sponsor

# Recently on Patt Morrison

September 07 2012

## Comedy Congress: Live from the 2012 Democratic National Convention, Day 5



September 07 2012

## Hollywood shows its love for the Dems at the DNC



September 07 2012

## Political cartooning, where art and politics collide



## About Patt Morrison

*Patt Morrison* is a live two-hour public affairs show. The program is known for its innovative discussions of local politics and culture, and for its presentation of national and world news as it affects Southern California.

- Facebook
- Podcast
- RSS



6 Comments   kpcc                                                              Login ▾

Sort by Newest ▾                                                          Share   Favorite ★

Join the discussion...

**spellcheck** · 3 years ago
you misspelled county I'm just saying
∧ | ∨ · Reply · Share ›

**Adam** · 3 years ago
Really? Frank Mendoza was a prison guard. Dude.......
∧ | ∨ · Reply · Share ›

**michael from Orange** · 3 years ago
This sounds a bit strong but it sort of sounds like the "lunatics are running the asylum"
∧ | ∨ · Reply · Share ›

**Sharon McNary at KPCC News** · 3 years ago
Hello from Sharon McNary in the KPCC newsroom. If you have an experience in a California jail or prison that you would like to share confidentially with our reporters, please use this link. A KPCC journalist will respond directly to you. www.scpr.org/network/questions...
∧ | ∨ · Reply · Share ›

> **Joao** ⤳ Sharon McNary at KPCC News · 3 years ago
> this is a great use of this comments section, Sharon. I hope it's working!  cheers.
> ∧ | ∨ · Reply · Share ›
>
> > **Sharon McNary at KPCC News** ⤳ Joao · 3 years ago
> > Thanks very much, I heard from a few people in response.
> > ∧ | ∨ · Reply · Share ›

Subscribe   Add Disqus to your site   Privacy



BEAUTY MAKEUP & MORE at COLORIST MAKE-UP ACADEMY

Become a KPCC Sponsor

# Enjoy *Patt Morrison*? Try KPCC's other programs.



## AirTalk

### With Larry Mantle

#### Weekdays 11 a.m.-1 p.m.

Lively and in-depth discussions of city news, politics, science, entertainment, the arts, and more.

LatestFeb. 5
AirTalk for February 5, 2015



## FilmWeek

### With Larry Mantle

#### Friday noon-1 p.m.

Reviews of the week's new movies, interviews with filmmakers, and discussion.

LatestJan. 30
Filmweek: 'Black or White,' 'Project Almanac,' 'The Loft' and more!



## Off-Ramp

### With John Rabe

#### Saturday Noon to 1:00 p.m. and Sunday 6:00 to 7:00 p.m.

A weekly look at Southern California life covering news, arts and culture, and more.

LatestFeb. 4
Transgender TV chopper pilot flies again! Off-Ramp for February 7, 2015



## Take Two

### With Alex Cohen & A Martínez

#### Weekdays 9 to 11 a.m.

News and culture through the lens of Southern California.

LatestFeb. 6
Eric Holder, Columbia's 'Black Girls Matter' study, Oscar contender 'Parvaneh'

See all of our programs

## What's popular now on KPCC



Northridge doctor turns away unvaccinated children

February 04 2015



Would you support efforts to ditch Calif's 'personal' vaccine exemption?

February 04 2015



### How homelessness impacts the youngest children

February 04 2015



### LAUSD data highlights classes with large enrollments

February 04 2015

Play

00:00

00:00

Download audio file   Mute   Stop and Close

## KPCC's coverage is a Southern California resource provided by member-supported public radio. We can't do it without you.

**Your contributions power KPCC. Give today.**

89.3 KPCC

# 89.3 KPCC

## 89.1 KUOR 90.3 KVLA

Support the voices you trust! Pledge Now

## Sections

- Local
- US & World
- Politics
- Science
- Arts & Entertainment
- Immigration
- Business
- Crime & Justice
- Education
- Health
- AudioVision
- Archive

## Programs

- Take Two
- AirTalk
- Off-Ramp
- Programs A–Z
- Program Schedule
- Program Archive

## Events

- The Crawford Family Forum
- Sponsored Events

## Stay Connected

- Facebook
- Twitter
- Google Plus

- Newsletters
- RSS
- Podcasts

Get our newKPCC for iPad app.

## About

- About KPCC
- Staff
- Contact Us
- Help / FAQ
- Feedback
- Careers @ KPCC

## 89.3 KPCCSouthern California Public Radio

**474 S. Raymond Ave.**
**Pasadena, CA 91105**

Call in: 866-893-5722

## Our Partners

- American Public Media
- National Public Radio
- BBC
- Public Radio International
- NBC 4
- Pasadena City College

- Terms & Conditions
- Privacy
- Feedback
- © 2015 Southern California Public Radio

# EXHIBIT G

 **NBCLA.com**

 **PRINT THIS**

Powered by ▣ Clickability

NEWS > LOCAL

# ACLU Files Lawsuit Against Sheriff Baca Over Inmate Abuse

Lawsuit claims Baca had knowledge of "pattern of violence and cover-up"

ByAshley Gordon

ACLU Executive Director Hector Villagra says the reason for the suit is that violence is still rampant in the jails. (Published Thursday, Jan 19, 2012)
Tuesday, Jan 31, 2012 • Updated at 4:37 PM PST

The American Civil Liberties Union Wednesday filed a federal civil rights lawsuit against Sheriff Lee Baca for what it described as "extraordinary brutality" by deputies against inmates in LA County jails.

"We file suit because for years, violence by deputies against detainees, most of whom are still awaiting trial and have to be presumed innocent, has been brutal and it has been rampant," said Hector Villagra, the executive director of the ACLU of Southern California.

The lawsuit was filed on behalf of plaintiffs Alex Rosas and Jonathan Goodwin, two county jail inmates. The suit states that Rosas and Goodwin were "beaten and threatened with violence by deputies of the Los Angeles County Sheriff's Department" and also witnessed deputies beating other inmates.

ACLU claims these are typical cases that are a part of a pattern and practice in the LASD that has gone unpunished for several years.

"Despite Sheriff Baca's actual knowledge of this pattern of violence and cover-up, he has failed over a period of many years to take reasonable measures to halt the abuses," reads the lawsuit.

Baca, who has been sheriff since 1998, did not immediately respond to the lawsuit. However, in a past interview he admitted that some deputies have mistreated prisoners in county jails.

The suit alleges that dozens of inmates have been subjected to "grossly excessive force," which has included "slamming inmates' heads into walls, punching them in the face with fists, kicking them multiple times with boots, and shooting them multiple times with tasers." The force reportedly resulted in serious injuries to inmates.

There is mention of deputies belonging to gangs inside the jails in the lawsuit as well, one being the "3000 Boys" at Men's Central Jail in downtown Los Angeles. Members of these gangs would "earn their ink" by breaking inmates' bones, it goes on to say.

Deputy-on-inmate abuse first garnered attention in September when the ACLU released a report documenting inmate complaints. Included in the report were testimonies from civilian witnesses. Soon after, the FBI launched an investigation into the alleged brutality.

*Follow NBCLA for the latest LA news, events and entertainment:* Twitter: @NBCLA // Facebook: NBCLA

**Find this article at:**
http://www.nbclosangeles.com/news/local/ACLU-Lawsuit-Sheriff-Lee-Baca-Inmate-Abuse-Brutality--137624143.html

☐ Check the box to include the list of links referenced in the article.

© NBC Universal, Inc. | All Rights Reserved.

# EXHIBIT H

LAW.COM    Welcome to the Law.com network. Click here to register and get started.    Sign Out | My Account



Sign up for your FREE subscription now

An ALM Web site

# THE NATIONAL
# LAW JOURNAL
with D.C. news from LegalTimes

This Site | Law.com Network | Legal Web

Search the Legal Web    Go >>

| 30 Day Free Trial | | National News | | Washington News | | |
| Home | Legal Business | Law Schools | Columns | Verdicts | Opinion | Video Center | Blog |

NLJ Home > News > ACLU alleges 'pattern and practice of deputy-on-inmate violence' in L.A. jails

Font Size: [+][−]

# ACLU alleges 'pattern and practice of deputy-on-inmate violence' in L.A. jails

**Amanda Bronstad** | Frqwifw | DxtiDuäfdiv
The National Law Journal | February 1, 2012



Sukw   Ip dlo   Uhsulqw# i 0hip kvkqv   Srv#il#rp p hgw



Sheriff Lee Baca
Photo: J. Rosenfeld

The American Civil Liberties Union of Southern California has sued Los Angeles County Sheriff Lee Baca and high-ranking aides for allegedly failing to stem rampant abuse and excessive force against inmates by deputies at three downtown jails.

The filing of the suit, on Jan. 18, capped months of reports about inmates being beaten and, at times, hospitalized, at the Men's Central Jail, the Twin Towers Correctional Facility and the Inmate Reception Center.

The FBI has looked into reports of misconduct too, including the use of excessive force. On Jan. 13, Deputy Gilbert Michel, an ex-guard, pleaded guilty to accepting $20,000 in bribes and smuggling a cell phone and other contraband into the Men's Central Jail for an inmate who turned out to be an undercover informant.

The ACLU has been serving as a court-appointed monitor of Los Angeles County's jails for years as part of a separate lawsuit filed against Baca over inmate overcrowding. The new suit was filed on behalf of two individuals, Alex Rosas and Jonathan Goodwin, who allege that deputies beat them last year while they were being held as pretrial detainees.

They alleged violations of their Eighth Amendment right to be free of "cruel and unusual punishment" and the Fourteenth Amendment's prohibition of punishment prior to conviction. The abuse happened after they witnessed another inmate being beaten, according to the complaint.

"The abuse that Rosas and Goodwin suffered and witnessed is typical of the abuse inflicted by deputies on countless other inmates in the jails, and is part of a pattern and practice of deputy-on-inmate violence that has persisted for many years," the document said.

Steve Whitmore, a spokesman for Baca, criticized the ACLU for filing its suit three days after the sheriff presented the organization with an update on several internal investigations. ACLU officials said nothing about the planned lawsuit during that meeting, he said.

"There has to be a fundamental foundation of honesty between the organizations," Whitmore said. "The sheriff will continue to work with the ACLU, and lawyers for the county will respond to the lawsuit. A majority of the allegations have already been investigated and most of them, if not all, are unfounded."



Advertisement

ALM Legal Intelligence
More Research. More Insight. More Business.



I lqg#vlp ldu#Frqwhqw

Firms mentioned

Companies, agencies mentioned

Key categories

Most viewed stories

Fresh round of litigation targets 12 law schools over jobs data

Congress' unconstitutional pay freeze

E-Discovery: A question of costs

Two auto parts companies to pay $548M in antitrust prosecution

George Washington sharpens focus on health care policy

Advertisement

LAW.COM    Welcome to the Law.com network. Click here to register and get started.

The complaint, more than 80 pages long, lists dozens of examples of inmates allegedly beaten for little to no apparent reason, or in retaliation for having witnessed or reported violence by deputies. The suit was filed as a class action on behalf of the thousands of inmates housed in the county's jails.

"It is typical for deputies to subject unresisting inmates to grossly excessive force by slamming inmates' heads into walls, punching them in the face with their fists, kicking them with their boots, and shooting them multiple times with their tasers -- and for these beatings to result in serious injuries to the inmates, including broken legs, fractured eye sockets, shattered jaws, broken teeth, severe head injuries, nerve damage, dislocated joints, collapsed lungs, and wounds requiring dozens of stitches and staples," the complaint said.

Deputies used racial epithets and targeted inmates in poor medical condition or suffering mental illness, it continued, and formed their own gangs on at least two floors of the Men's Central Jail.

Despite numerous official reports by a Los Angeles County Board of Supervisors commission and the county's Office of Independent Review that deputies were using excessive force and abusing inmates, Baca has failed to change the culture of the jails, the suit alleged.

Involved in both cases is the ACLU National Prison Project. Donna Melby, a partner, and John Durrant, an associate, in the Los Angeles office of Paul Hastings, are providing pro bono legal support in the abuse case.

"The ultimate goal of this lawsuit is to end the longstanding pattern of deputy-on-inmate abuse by requiring Defendants to put in place a system of accountability, which they have for so long failed to do," the complaint said.

In addition to Baca, the suit names Undersheriff Paul Tanaka, Assistant Sheriff Cecil Rhambo and Chief of Custody Operations Department Dennis Burns.

*Contact Amanda Bronstad at abronstad@alm.com.*

Subscribe to The National Law Journal





Sign Out | My Account

VerdictSearch.com

One of the Internet's largest libraries of case histories with over 170,000 Verdicts.

lawjobs.com

TOP JOBS
Jr. Corporate/ Securities Associate for Top Dallas Law Firm
Warren Recruiting
Dallas, Texas

ASSOCIATE--CORPORATE / HEALTHCARE
Abelson Legal Search
Pennsylvania

MORE JOBS
POST A JOB

Advertisement

LAWYERS GUIDE TO FORMULAS IN DEAL DOCUMENTS AND SEC FILINGS
by Carla J. Garrett, Hayden J. Trubitt and Contributing Authors
Edited by Matthew B. Swartz
LJP Law Journal Press

# From the Law.com Network



The 2011 Electronic AmLaw 200



Amex Again Loses Bid to Enforce Waivers

New Adolescent Diversion Program Strives to Treat Youthful Defendants Like 'Kids'



Penn State Insurer Seeks to Limit Coverage in Sandusky Sex Abuse Case

Wolf Block Asks Justices to Review Ex-Partner's Lawsuit



Police Indictments Signal Court Battle

Mandatory CLE Gets A Formal Endorsement



Extremely Loud a Incredibly Deep

How to Work Wit

terms & conditions | privacy | advertise | about NLJ.com | contact us | subscribe

the LAW.COM network

LAW.COM        ALM REGIONAL        DIRECTORIES        BOOKS & NEWSLETTERS        EVENTS & CONFERENCES

## LAW.COM

Connecticut Law Tribune

Welcome to the Law.com network. Click here to register and get started.



Sign Out | My Account

International News
Lists, Surveys & Rankings
Legal Blogs
Site Map

Daily Business Review (FL)
Delaware Law Weekly
Daily Report (GA)
The Legal Intelligencer (PA)
New Jersey Law Journal
New York Law Journal

ALM Experts
LegalTech® Directory
In-House Law Departments at the Top 500 Companies
New York's Women Leaders in the Law
The National Law Journal Leadership Profiles
National Directory of Minority Attorneys

Best-Selling Books
Publication E-Alerts
Law Journal Newsletters
LawCatalog Store
Law Journal Press Online

ALM Events
LegalTech®
Virtual LegalTech®
Virtual Events
Webinars & Online Events
Insight Information

### ALM NATIONAL

The American Lawyer
The Am Law Litigation Daily
Corporate Counsel
Law Technology News
The National Law Journal

GC New York
The Recorder (CA)
Texas Lawyer

### RESEARCH

ALM Legal Intelligence
Court Reporters
MA 3000
Verdict Search
ALM Experts
Legal Dictionary
Smart Litigator

### REPRINTS

Reprints

### ONLINE CLE

CLE Center

### CAREER

Lawjobs

About ALM | About Law.com | Customer Support | Reprints | Privacy Policy | Terms & Conditions
Copyright 2012. ALM Media Properties, LLC. All rights reserved.

ALM
An Integrated Media Company

# EXHIBIT I



ATTORNEYS AT LAW

www.lawrencebeach.com

100 West Broadway, Suite 1200
Glendale, California 91210
T 818-545-1925
F 818-545-1937

Orange County
2677 N. Main Street, Suite 370
Santa Ana, California 92705
T 714-479-0180
F 714-479-0181

February 14, 2014

**VIA MESSENGER**

Deborah Kang
Paul Hastings LLP
515 S. Flower St., 25th Floor
Los Angeles, CA 90071

Re:    Rosas, et al. v. Baca
       U.S.D.C. Case No. CV 12-00428 DDP (SHx)

Dear Ms. Kang:

Enclosed please find Defendant's twentieth, and final, production of documents (Bates Nos. 82303 through 98383) associated with the Parties' settlement negotiations in the above-referenced matter. Please be advised that the enclosed documents have been designated as Confidential Information pursuant to the Protective Order. (*See*, Docket No. 84.) Please also be advised that duplicates of Bates Nos. 18519 through 18564, which were previously produced to Plaintiffs, are also included on the enclosed hard drive.

Very truly yours,

LAWRENCE BEACH ALLEN & CHOI, PC

Tammy Kim

TXK/jpv
Enclosures

RECEIVED

FEB 14 2014

PAUL HASTINGS

# EXHIBIT J

| | |
|---|---|
| **From:** | Richard Drooyan <rdrooyan@scheperkim.com> |
| **Sent:** | Monday, October 13, 2014 4:13 PM |
| **To:** | Mueller, Beth C.; Granbo, Roger |
| **Cc:** | McDonald, Terri; Peter Eliasberg; Margaret Winter; jasletra@aol.com; rhouston@unomaha.edu; bdhouston@cox.net |
| **Subject:** | Emailing: Final Implementation Plan |
| **Attachments:** | Final Implementation Plan.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Attached please find the Implementation Plan developed by the Court Monitors. We would like to thank both the Department and the ACLU for your constructive suggestions and the cooperation we received in connection with this challenging project.

The next step will be for the Court Monitors to meet with the Department to go over the protocols and process for the monitoring of the Department's implementation of the plan.

Again, thank you very much for your assistance.

# EXHIBIT K

**From:** McDonald, Terri [mailto:tmcdonal@lasd.org]
**Sent:** Wednesday, October 1, 2014 12:22 PM
**To:** 'Richard Drooyan'; Peter Eliasberg; 'Granbo, Roger'
**Cc:** jasletra@aol.com; rhouston@unomaha.edu; bdhouston@cox.net
**Subject:** RE: Court Monitor Recommendations (Sept 30) (red-lined)

Good Morning Everyone

Thank you again for sharing your recommendations, we really appreciate being allowed to provide feedback during the process. While I remain concerned about the potential reduction in fidelity with requiring CIT training for all deputies in such a quick time period, my larger concern is relative to recommendation 8.1 regarding security checks. We had previously discussed that the *Rosas* agreement has the potential to scope creep into other areas, particularly the DOJ discussions, and Section 8.1 is the most significant example of our concerns. The requirement to conduct enhanced security checks, particularly 15 minute checks, has the backdrop of reducing self-injurious behavior. As I have mentioned, this document reflects an excellent effort of focusing the discussion on force related issues but this area, from my perspective, is outside of that scope. Grievances is another area that remains on the margins as this document addresses all grievances, not just force or allegation of abuse grievances, but we are not discussing grievances in any other venue, so I have not focused my concern on that section and can support the recommendations.

I am concerned that when we last spoke, we mentioned we are in negotiations with DOJ on frequency of security checks and wanted to negotiate with only one entity and preferred it be DOJ because of the 15 minute check issue. During that discussion I thought there was already a decision that 15 minutes clearly was within the purview of the DOJ discussions, so the Monitors focused on 30 minute cell checks. We asked that you reconsider after talking to DOJ to confirm they are working with us on that issue and we have gotten updated proposed language from DOJ since we last spoke and they continue to make recommendations on security checks. This effectively means we are in discussion with two different entities and are potentially subject to two separate monitors on the same issue.

The issue of frequency of security checks is a potentially very significant impact to the County and warrants intensive evaluation and discussions, which is why we had asked that we do that in relation to overall staffing discussions with DOJ, rather than piecemeal here. Section 8.1, as written, is a very, very expensive section of this document, so we have to take it seriously, and the monitoring of security checks and quality of checks will end up being in the DOJ discussions. While I absolutely respect your collective perspectives, I have to state that the frequency of security checks, particularly the 15 minute checks, does not have a clear and direct nexus to the *Rosas* case. It is also clear to me

1

that the BOS does not want any form of scope creep between the various agreements and will not readily agree to us responding to two entities on the same topic. As a result, for a myriad of reasons, if section 8.1 remains in this document, I will recommend that they reject the language because of scope creep and the dual monitoring systems that will inherently emerge.

I know you have worked very hard on this and am very, very grateful for all the discussions, so I do not want to seem confrontational or closed minded. But I must respectfully ask that the Monitoring Panel reconsider and remove the language in 8.1. Certainly this recommendation can be moved to the suggestions document and we have no opposition to that.

I have not yet talked to my team about this issue as I wanted to provide my perspective more discretely, so they may find a couple of minor issues that we would want to discuss but this was too important to delay. Thanks so much and if you want to have a call on this, please let me know. I am intermittently available today.

**From:** Richard Drooyan [mailto:rdrooyan@scheperkim.com]
**Sent:** Tuesday, September 30, 2014 5:16 PM
**To:** McDonald, Terri; Peter Eliasberg; 'Granbo, Roger'
**Cc:** jasletra@aol.com; rhouston@unomaha.edu; bdhouston@cox.net
**Subject:** Court Monitor Recommendations (Sept 30) (red-lined)

Attached is our latest (red-lined) draft of the Court Monitor's Recommendations that takes into consideration the most recent comments we received from the Department and the ACLU. This represents our current thinking on the Recommendations that we are planning to submit to the Court on Monday, October 6.

We are available for separate telephone conferences with the parties this week to discuss our edits and receive any final comments you may have before we submit our Recommendations to the Court. Please let us know if you would like to have a telephone conference with us and some times you are available.

# EXHIBIT L

**From:** Peter Eliasberg [mailto:PEliasberg@ACLUSOCAL.ORG]
**Sent:** Thursday, June 05, 2014 5:40 PM
**To:** 'Paul Beach'; 'Granbo, Roger'
**Cc:** mwinter@npp-aclu.org; Terri McDonald; rgranbo@counsel.lacounty.gov; Parra, Eric G.; Lehman, Jennifer; Justin W. Clark; John Chambers; Eric Balaban (ebalaban@npp-aclu.org); Durrant, John S.
**Subject:** RE: Rosas v. Scott -- Settlement documentation per court order

Dear Roger and Paul, please see the attached letter, enclosures referred to in the letter, and draft settlement agreement.
Sincerely,
Peter Eliasberg

> **From:** Paul Beach [mailto:pbeach@lbaclaw.com]
> **Sent:** Thursday, May 29, 2014 5:02 PM
> **To:** Peter Eliasberg; Durrant, John S.
> **Cc:** mwinter@npp-aclu.org; Terri McDonald; rgranbo@counsel.lacounty.gov; Parra, Eric G.; Lehman, Jennifer; Justin W. Clark; John Chambers
> **Subject:** Rosas v. Scott -- Settlement documentation per court order
>
> Gentlemen:
>
> Attached please find the following:
>
> 1. Cover letter from Paul Beach
> 2. Draft Settlement Agreement
> 3. Draft Exhibit to Settlement Agreement
>
> Thank you,

1

Paul Beach
Lawrence Beach Allen & Choi, PC

## SETTLEMENT AGREEMENT AND GENERAL RELEASE OF CLAIMS

### RECITALS

A.      This Settlement Agreement and Release ("Agreement") is made and entered into on or about June __, 2014, by and between the Plaintiff Class, as defined below, on the one hand, and Defendant Sheriff John Scott, in his official capacity ("Defendant"), on the other hand, (collectively, "the Parties") with reference to the following facts:

B.      Plaintiffs Alex Rosas and Jonathan Goodwin filed a Complaint, and thereafter a First Amended Complaint ("Complaint") in the United States District Court, Central District of California, entitled *Alex Rosas, et al. v. Leroy D. Baca*, Case No. CV 12-00428 DDP, which arose out of certain alleged acts and/or omissions by Defendant ("the Civil Action"). In the Civil Action, Plaintiffs sought certain declaratory and injunctive relief against Defendant as a result of purported events that occurred at Men's Central Jail ("MCJ"), Twin Towers Correctional Facility ("TTCF"), and the Inmate Reception Center ("IRC") (collectively, "the Los Angeles County Jails"), and that allegedly resulted in injuries to Plaintiffs;

C.      On or about June 7, 2012, the Court entered an order granting Plaintiffs' motion for class certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure, certifying a declaratory/injunctive relief class that, for purposes of this Agreement, is defined as "all inmates, now and in the future, in the custody of the Los Angeles County Sheriff's Department in the Los Angeles County Jails" ("the Plaintiff Class");

D.      The Plaintiff Class are represented by court-appointed class counsel, the American Civil Liberties Union, the ACLU Foundation of Southern California, and Paul Hastings LLP (collectively, "Class Counsel"); and,

E.      The Parties desire to settle all of the claims arising out of the Civil Action which the Plaintiff Class have or may have against Defendant, including its employees, representatives, and agents, both named and unnamed, as of the date of this Agreement.

IT IS THEREFORE AGREED BETWEEN THE PARTIES AS FOLLOWS:

## I.      AGREEMENT CONTINGENT ON COURT APPROVAL.

In the event that:  1) this Agreement does not receive final approval by the Court; or 2) any appeal of the Court's approval of this Agreement is filed and not upheld on appeal, then this Agreement shall be of no further force or effect and shall not be admissible in any court for any reason, except that Defendant agrees to pay reasonable compensation to the Panel.

## II.     ANY STIPULATED AGREEMENT CONCERNING ATTORNEYS' FEES AND COSTS IS CONTINGENT ON APPROVAL BY BOARD OF SUPERVISORS.

1.      The Parties hereby acknowledge and agree that any stipulated agreement of attorneys' fees and costs to Class Counsel prior to final settlement approval in this matter ("Attorney Fee

Agreement") shall be contingent upon the approval of the Los Angeles County Board of Supervisors ("the Board"). Upon entry of any Attorney Fee Agreement, Defendant shall promptly submit a request for approval of the Attorney Fee Agreement to the Board for its approval. The Board shall indicate its approval or disapproval of the Attorney Fee Agreement no later than 60 days prior of the scheduled date for final settlement approval by the Court in this case. If the Board fails to approve the fee settlement within 60 days of entry of an Attorney Fee Agreement, it shall be deemed disapproved.

2.      Nothing in the foregoing shall impact Class Counsel's right to move the Court for an award of attorneys' fees and costs if the parties do not reach an agreement on fees that is approved by the Board. In the event of a motion for attorneys' fees and costs, all Parties, through their respective counsel, agree to be bound by the Court's final ruling regarding the award of attorneys' fees and costs and to waive any rights of appeal regarding such award.

3.      For the avoidance of doubt, no other aspect of this Agreement shall be contingent upon the approval by the Board.

### III.    APPOINTMENT OF A PANEL TO DEVELOP A CORRECTIVE ACTION PLAN AND EVALUATE COMPLIANCE WITH THE PLAN.

1.      The Court will appoint Richard Drooyan, Jeffrey Schwartz, and Robert Houston ("the Panel"), pursuant to Rule 706 of the Federal Rules of Evidence, to develop a corrective action plan ("Action Plan") designed to ensure that the Plaintiff Class are not subjected to excessive force in the Los Angeles County Jails, and to monitor and advise the Court on Defendant's compliance with the Action Plan.

2.      The Panel will be entitled to reasonable compensation in an amount approved by the Board and the Court. Defendant will bear the cost of the compensation of the Panel.

3.      In the event Mr. Drooyan becomes unavailable during the term of this Agreement, then Defendant will select his replacement. If Mr. Schwartz becomes unavailable during the term of this Agreement, then Class Counsel will select his replacement. If Mr. Houston becomes unavailable during the term of this Agreement, then the Parties will meet and confer to reach agreement regarding a replacement.

### IV.    DEVELOPMENT AND SUBSTANTIVE PROVISIONS OF THE ACTION PLAN.

1.      By August 22, 2014, the Panel will submit the Action Plan to the Court for its review and approval.

2.      In developing the Action Plan, the Panel may consider provisions relating to Use of Force Policies, Practices and Documentation; Training and Professional Development Related to Use of Force; Use of Force on Prisoners with Mental Illness and other Special Needs Populations; Security Policies and Practices; and any such other areas regarding use of force as they may deem necessary. In developing the Action Plan, the Panel will make best efforts to make it

consistent with the recommendations of the Citizen's Commission on Jail Violence, which Defendant is already in the process of implementing.

3.      Prior to submitting the Action Plan to the Court, the Panel will provide a draft of the Action Plan to the Parties for their review and comment.  After input from the Parties, the Panel may in their discretion revise the draft before submitting it to the Court.

## V.     CLASS NOTICE AND SETTLEMENT FAIRNESS HEARING.

The following procedures will govern the Court's preliminary and final approval of this Agreement:

1.      Within 21 days of the execution of this Agreement by Class Counsel and Defendant, the Parties will file a joint stipulation requesting that the Court grant preliminary approval of this Agreement, as well as approve the class notice.  The parties will submit the proposed forms of all notices and other documents that are necessary to implement this Agreement, with the exception of a general description of the final Action Plan, which will be included in the Notice to the Class of Settlement and Fairness Hearing ("Class Notice") as set forth below in Section XII, and the final Action Plan itself.  The Parties will translate the proposed Class Notice into Spanish.

2.      During the period between the filing of the final Action Plan by the Independent Experts and the fairness hearing, the Parties agree that they will take the following steps to effect notice:

      a.  Within ten days after the final Action Plan is filed, the Parties will agree on a summary description of the provision of the final Action Plan to be inserted in the Class Notice, and will file the proposed Class Notice with the Court and request that the Court approve the notice;

      b.  Once the Court approves the Class Notice, Defendant will promptly post a copy of the Class Notice in both English and Spanish in the common area of all housing units in Men's Central Jail and Twin Towers Correctional Facility and in places in the Inmate Reception Center where inmates who are being processed into or out of the jails are likely to see them;

      c.  Defendant further will promptly distribute a copy of the Class Notice in both English and Spanish to all K-10 inmates and inmates in disciplinary segregation in Men's Central Jail and Twin Towers.  Defendant will bear the cost of translating, printing, posting, and distributing the Class Notice in the Los Angeles County Jails;

      d.  Once the Class Notice is approved by the Court, Defendant and Class Counsel promptly will post a copy of the Class Notice and of the Action Plan in both English and Spanish on their websites.

3.      Objecting to the Settlement.  The Class Notice will provide that members of the Plaintiff Class ("Class Members") who wish to object to the Agreement prior to the fairness hearing may do so by filing with the Court a written statement objecting to the Agreement or by calling a toll-

free number established and monitored by Class Counsel. Defendant shall bear the cost of establishing this toll-free objection line. Class Counsel will provide the Court and counsel for Defendant with transcriptions of any messages left on the toll-free objection line. Such written statement must be filed with the Court and served on counsel for the Parties no later than 21 days prior to the fairness hearing. However, the deadline to file an objection will allow at least 30 days from the posting and distribution of the Class Notice, as provided in Section XII.3.b-d above.

4.     No Class Member will be entitled to be heard at the fairness hearing (whether individually or through separate counsel) unless written notice of the Class Member's intention to appear at the fairness hearing is served on counsel for the Parties no later than 21 days prior to the fairness hearing. No Class Member may object to this Agreement, unless copies of any written objections or briefs are filed with the Court and served on counsel for the Parties no later than 21 days prior to the fairness hearing. Class Members who fail to file and serve timely objections in the manner specified above will be deemed to have waived any objections and will be foreclosed from making any objection (whether by appeal or otherwise) to this Agreement.

5.     Fairness Hearing and Stipulated Order and Final Judgment. Within 51 days of the posting of the Class Notice, or at the next available date, the Court will conduct a fairness hearing to consider whether the proposed Agreement is fair, adequate, and reasonable. Three days before the fairness hearing the parties will submit to the Court their proposed Stipulated Order and proposed Final Judgment.

6.     In the event that the Court grants final approval of this Agreement, it shall enter an order: (1) memorializing its final approval this Agreement; (2) granting costs and attorney's fees to Class Counsel as set forth in Section II; (3)dismissing the Civil Action, with prejudice (including, without limitation, dismissal in favor of Defendant and all of its employees, representatives, and agents, both named and unnamed) ; and (4) retaining jurisdiction for the purpose of enforcing the provisions of this Agreement or modifying it if the appropriate standards for modification have been met. The Parties shall bear their own costs, expenses, and attorneys' fees incurred in the Civil Action, except as otherwise provided herein.

## VI.    PERIODIC REPORTS BY THE PANEL.

1.     The Panel will prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan ("Reports") at intervals the Panel shall determine. The Panel will provide the Reports to the Parties in draft form prior to submission to the Court, will consider the Parties' comments, and the Panel may in their discretion make responsive changes before submitting the Reports to the Court.

## VII.    INSPECTION BY CLASS COUNSEL.

1.     On reasonable notice, Class Counsel will have reasonable access to the Los Angeles County Jails, staff, inmates, and documents for inspection to evaluate current conditions to be addressed by the Action Plan and compliance with the Action Plan. Class Counsel shall provide Defendant's counsel with 10-days notice before any inspection of documents. Defendant's

counsel shall have the right to be present for any inspection and/or discussion with Sheriff's Department. Defendant reserves the right to object, whether on privilege or otherwise, to any document or discussion request made by Class Counsel. The Parties agree to negotiate in good faith to resolve any disputes concerning objections to an inspection, document, or discussion request from Class Counsel and if the dispute cannot be resolved, to submit the issue to the Court for resolution.

## VIII.   RELEASE.

1.      Except as otherwise provided in this Agreement and as separate consideration for the agreements contained herein, Plaintiffs and the Plaintiff Class hereby absolutely, fully and forever release, relieve, waive, relinquish, and discharge Defendant and its successors, predecessors, related entities, departments, subsidiaries, representatives, assigns, agents, partners, officers, directors, managers, insurers, shareholders, employees, and attorneys, including, without limitation, the Los Angeles County Board of Supervisors and Lawrence Beach Allen & Choi, A Professional Corporation, and each of them, of, and from, any and all known class action claims for equitable relief that are based upon or directly relate to the Civil Action and the facts and/or allegations asserted in the Civil Action ("the Claims").

2.      The Plaintiff Class acknowledges its intention that, upon execution by the Parties and approval by the Court, this Agreement, except as expressly provided for herein, shall be effective as a full and final accord and satisfaction and settlement of and as a bar to the Claims.

3.      The Plaintiff Class agrees, represents, and warrants that it understands that the Civil Action involves arguable and disputed questions of fact and law, that the liability of Defendant for the alleged acts in the Civil Action is disputed, and that the consideration provided herein is not to be construed as an admission of liability by Defendant, which is expressly denied, and that this Agreement arises from compromise.

## IX.    TERMINATION.

This Agreement shall remain in effect for a period of time to be determined by the Panel. The Court will retain jurisdiction over the Civil Action for the purpose of enforcing, if necessary, compliance with the provisions of this Agreement or modifying it if the appropriate standards for modification have been met. Named Plaintiffs, other members of the Plaintiff Class, and Defendant, and no one else, will have standing to seek enforcement of this Agreement. Nothing in this Agreement shall preclude the Parties from seeking to reduce, or the Court's reducing, the duration of this Agreement.

## X.     PLAINTIFF CLASS'S ALLEGATIONS, DEFENDANT'S DENIALS, AND LACK OF ADMISSION OF LIABILITY.

In the Civil Action, Plaintiff Class alleges that it is being subjected to a pattern of grossly excessive force, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Defendant generally and specifically denies all the Plaintiff Class's allegations. It is understood that this Agreement is not an admission of any liability or wrongdoing on the part

of Defendant and/or its employees, agents and former employees and agents of Defendant or any other persons.

## XI. AGREEMENT CONDITIONAL ON FINDINGS BY THE COURT PURSUANT TO 18 U.S.C. § 3626(A)

This Agreement will become null and void unless the Court, in its Stipulated Order and Final Judgment, makes findings based on the record that the prospective relief provided by the Agreement is narrowly drawn, extends no further than necessary to correct the violations of federal rights as alleged by Plaintiff Class in the Amended Complaint, is the least intrusive means necessary to correct these violations, and complies with the provisions of 18 U.S.C. section 3626(a).

## XII. WARRANTY OF CAPACITY TO EXECUTE AGREEMENT.

The Plaintiff Class represents and warrants that no other person(s) or entity has, or has had, any interest in the claims, demands, obligations, or causes of action referred to in this Agreement, except as otherwise set forth herein; that Plaintiff Class has the sole right and exclusive authority to execute this Agreement; and that Plaintiff Class has not sold, assigned, transferred, conveyed or otherwise disposed of any of the claims, demands, obligations or causes of action referred to in this Agreement.

## XIII. ATTORNEY FEES AND COSTS.

1.      Within 30 days of approval of the award of fees and costs by the Board or any fee award by the Court, Defendant shall tender to Class Counsel a warrant in the full amount owed made payable to "ACLU Foundation of Southern California" for full and final satisfaction of any and all claims by the Plaintiff Class and Class Counsel for attorneys' fees, expenses, and costs related to the Civil Action. Class Counsel acknowledge and agree to provide to Defendant any and all paperwork and information including, without limitation, a duly executed W-9 IRS form, prior to receiving said payment.

2.      Defendant will pay reasonable attorney's fees and costs to Class Counsel for ongoing work to ensure compliance with this Agreement. The amount of fees and costs due to Class Counsel under this paragraph will be determined on a semi-annual basis for the duration of the Court's jurisdiction over this matter. The Parties will try to reach agreement on these semi-annual fee awards and submit a stipulation for the Court's approval. If the Parties are unable to reach agreement on a semi-annual fee award, Class Counsel will submit a motion for reasonable attorney's fees, and the Court will determine the appropriate amount of fees.

## XIV. MISCELLANEOUS.

1. No Warranties or Representations.

The Defendant agrees that he has read this Agreement and understands the terms of this Agreement, Plaintiff Class agrees that it has had an opportunity to have it fully examined by its attorneys.

2. <u>Counterparts</u>.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

3. <u>California Law</u>.
This Agreement shall be interpreted under and pursuant to the laws of the State of California and not construed for or against any party.

4. <u>Successors and Assigns</u>.

All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the Parties hereto and their respective heirs, legal representatives, successors and assigns.

5. <u>Parties in Interest</u>.

Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

6. <u>Further Assurances</u>.

Each of the Parties hereto shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the Parties hereto.

7. <u>Modifications or Amendments</u>.

No amendment, change or modification of this Agreement shall be valid, unless in writing and signed by all of the Parties hereto, or ordered by the Court.

8. <u>Entire Agreement</u>.

This Agreement constitutes the entire understanding and agreement of the Parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and canceled in their entirety and are of no further force or effect.

9. <u>Captions</u>.

The captions appearing at the commencement of the sections hereof are descriptive only and for convenience in reference. The sections, and not the captions, shall control and govern in the construction of this Agreement.

10. Severability.

If any part of this Agreement shall be deemed unenforceable, illegal or in violation of any State or Federal law, that portion of the Agreement shall be severable and the remaining portion or portions of the Agreement shall remain in full force and effect.

11. Expenses.

Each of the Parties shall pay all of their own costs, legal fees, accounting fees, and any other expenses incurred or to be incurred by it or them in negotiating and preparing this Agreement, except as expressly set forth herein.


APPROVED AS TO FORM AND CONTENT:


Dated: _____, 2014        ACLU FOUNDATION OF
                                    SOUTHERN CALIFORNIA


                                    By:_____
                                        Peter Eliasberg
                                        Attorneys for Plaintiff Class
                                        Plaintiff Class


Dated: _____, 2014        PAUL HASTINGS


                                    By:_____
                                        John Durrant
                                        Attorneys for Plaintiff Class


Dated: _____, 2014        AMERICAN CIVIL LIBERTIES UNION


                                    By: _____
                                        Margaret Winter
                                        Attorneys for Plaintiff Class

Dated: _____, 2014       OFFICE OF COUNTY COUNSEL,
COUNTY OF LOS ANGELES


By:_____
      Roger H. Granbo
      Attorneys for Defendant Sheriff John Scott,
      in his official capacity only


Dated: _____, 2014       LAWRENCE BEACH ALLEN & CHOI, PC


By:_____
      Paul B. Beach
      Attorneys for Defendant Sheriff John Scott,
      in his official capacity only

LEGAL_US_W # 78874073.6

# EXHIBIT M

**From:** Monteagudo, Cherry H. [mailto:CHMontea@lasd.org]
**Sent:** Thursday, January 09, 2014 1:58 PM
**To:** Peter Eliasberg; JClark@lbaclaw.com; 'Rgranbo@counsel.lacounty.gov'
**Cc:** Pietrantoni, Paul L.; Walker, Scott W.; Ellison, Dana M.; Smith, Steven R.; Allende, Victor; Chavez, Mary A.; Trujillo, Victor M.
**Subject:** RE: Proposed revisions to extraction policies

Greetings:

Cmdr. Guyovich and her staff are available on the following dates/times:

January 14 – 1030-1130 hrs.  or 1300-1400 hrs.
January 15 – 0900-1000 hrs.
January 16 – 1300-1400 hrs.

Please let me know if this works for you, thank you.

Thank you.

Cherry Monteagudo
(213) 893-5965
Office of Commander Guyovich

**From:** Guyovich, Christy
**Sent:** Thursday, January 09, 2014 1:00 PM
**To:** 'Peter Eliasberg'
**Cc:** 'Granbo, Roger'; Pietrantoni, Paul L.; 'Justin W. Clark'; 'Beth Mueller'; Eric Balaban (ebalaban@npp-aclu.org); Lim, Esther; John Durrant (johndurrant@paulhastings.com); Pietrantoni, Paul L.; Kang, Deborah; Margaret (Peggy) Winter (mwinter@npp-aclu.org); Walker, Scott W.; Ellison, Dana M.; Parra, Eric G.; McDonald, Terri; Smith, Steven R.; Monteagudo, Cherry H.
**Subject:** RE: Proposed revisions to extraction policies

My secretary will start coordinating and get back to you asap.  Thanks.

**From:** Peter Eliasberg [mailto:peliasberg@ACLU-SC.ORG]
**Sent:** Thursday, January 09, 2014 12:50 PM

1

**To:** Guyovich, Christy
**Cc:** 'Granbo, Roger'; Pietrantoni, Paul L.; 'Justin W. Clark'; 'Beth Mueller'; Eric Balaban (ebalaban@npp-aclu.org); Lim, Esther; John Durrant (johndurrant@paulhastings.com); Pietrantoni, Paul L.; Kang, Deborah; Margaret (Peggy) Winter (mwinter@npp-aclu.org); Walker, Scott W.; Ellison, Dana M.; Parra, Eric G.; McDonald, Terri; Smith, Steven R.
**Subject:** RE: Proposed revisions to extraction policies

Christy, we would be pleased to meet with you, Piety and anyone else from the Department as well as anyone from DMH and LASD Medical Services so we can finalize these policies. If someone from LASD contacts me to propose two or three dates/times, I will make sure that my colleagues and I can make one of them.

Sincerely,
Peter Eliasberg

---

**From:** Guyovich, Christy [mailto:CGuyovi@lasd.org]
**Sent:** Wednesday, January 08, 2014 3:58 PM
**To:** Peter Eliasberg
**Cc:** 'Granbo, Roger'; Pietrantoni, Paul L.; 'Justin W. Clark'; 'Beth Mueller'; Eric Balaban (ebalaban@npp-aclu.org); Esther Lim; John Durrant (johndurrant@paulhastings.com); Kang, Deborah; Margaret (Peggy) Winter (mwinter@npp-aclu.org); Walker, Scott W.; Ellison, Dana M.; Parra, Eric G.; McDonald, Terri; Smith, Steven R.
**Subject:** RE: Proposed revisions to extraction policies

Hi Peter,

We just concluded meetings with representatives from the Department of Mental Health (DMH) and the Sheriff's Medical Services Bureau to gain their input regarding your recommendations. There are some areas that necessitate some discussion. I believe it would be beneficial for us to schedule a meeting with all stakeholders. If this is feasible, I'll have my staff coordinate a meeting.

Thanks,
Christy

---

**From:** Peter Eliasberg [mailto:peliasberg@ACLU-SC.ORG]
**Sent:** Tuesday, January 07, 2014 6:14 PM
**To:** Guyovich, Christy
**Cc:** 'Granbo, Roger'; Pietrantoni, Paul L.; 'Justin W. Clark'; 'Beth Mueller'; Eric Balaban (ebalaban@npp-aclu.org); Lim, Esther; John Durrant (johndurrant@paulhastings.com); Kang, Deborah; Margaret (Peggy) Winter (mwinter@npp-aclu.org)
**Subject:** RE: Proposed revisions to extraction policies

Commander Guyovich, we would like to let Judge Pregerson know the status of the extraction policies prior to our meeting with him on January 9. Please let me know where the department is with the revisions we proposed.
Sincerely,
Peter Eliasberg

---

**From:** Peter Eliasberg
**Sent:** Tuesday, December 17, 2013 5:38 PM
**To:** 'Guyovich, Christy'
**Cc:** 'Granbo, Roger'; 'Pietrantoni, Paul L.'; 'Justin W. Clark'; Beth Mueller; Eric Balaban (ebalaban@npp-aclu.org); Esther Lim; John Durrant (johndurrant@paulhastings.com); Kang, Deborah; Margaret (Peggy) Winter (mwinter@npp-aclu.org)
**Subject:** Proposed revisions to extraction policies

Commander Guyovich, I have attached both a clean version of revised extraction policies, and a document that compares what you sent us a few weeks ago and our proposed revised version. As I said before, we were pleased by the revisions you made from the original policies we saw, but we did think

2

there were important additions that needed to be made.  Feel free to contact me if you have any questions.

Sincerely,
Peter Eliasberg

---



**John Durrant | Partner, Litigation Department**
Paul Hastings LLP | 515 South Flower Street, Twenty-Fifth Floor, Los Angeles, C 90071 | Direct: +1.213.683.6144 | Main: +1.213.683.6000 | Fax: +1.213.996. johndurrant@paulhastings.com | www.paulhastings.com

*********************************************************************************
IRS Circular 230 Disclosure: As required by U.S.Treasury Regulations governing tax practice, you are hereby advised that any written tax advice contained herein was not written or intended to be used (and cannot be used) by any taxpayer for the purpose of avoiding penalties that may be imposed under the U.S. Internal Revenue Code.
*********************************************************************************

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.


For additional information, please visit our website at www.paulhastings.com

**REVIEW TIMELINE**: ACLU Comments, 12/16/2013,[1] LASD response 1/16/14, ACLU response 2/10/14, LASD response 03/03/14; ACLU response 03/21/2014)

## 5-05/080.00 INMATE EXTRACTIONS

Inmate extractions are accomplished through directed force in situations where it becomes necessary to remove an inmate who refuses to exit a confined area. A "confined area" is defined as any cell or area that can be isolated or controlled. For the purposes of this procedure, any area, including but not limited to dorms, dayrooms, and recreation areas, may be considered to be confined areas so long as the inmate can be safely contained there long enough for staff to summon a supervisor to the site and to safely plan a response to the situation. In a dormitory or other confined setting where additional inmates are present, it may be necessary for an extraction to be expedited in order to prevent a situation from escalating and involving additional inmates. In such instances, the supervisor may abbreviate the cool-down and negotiation period with the inmate to avoid the development of circumstances that may escalate the incident or cause the involvement or evacuation of additional inmates. (See the Immediate Extractions section below).

The goals of an inmate extraction are to restore order, maintain the security of the facility and safely remove inmates, when necessary, using only the force necessary and reasonable to accomplish the objective. Extraction should be employed only if objectively reasonable efforts, that do not include use of force, are unsuccessful.

Inmate extraction teams shall maintain a high level of proficiency through training. Recurrent training shall include use of force policies and related legal issues; the use of special weapons and related policies; the use of specialized equipment, tactical options, team discipline, and team leadership; handling and negotiating with all inmates including those with special needs; and collaborating with medical and mental health professionals to influence the most effective negotiation results.

During the inmate extraction process, if the inmate indicates a willingness to comply at any time, the team leader will reassess the situation and tactically utilize means necessary to allow the inmate to comply with instructions. If the inmate exits the confined area as the result of negotiations or verbal commands only, the incident shall be documented as an "Inmate Extraction, Verbal Resolution." In no case shall any of these measures regarding extraction, or any kind of use of force (including the use of chemical agents) be used to punish an inmate for refusing to comply.

When simple instructions and requests fail to cause an inmate to exit a confined area, a supervisor, at the minimum rank of sergeant, shall be notified in all but life threatening or exigent circumstances. The sergeant shall go to the confined area, ask other staff to stand far enough back to provide ~~some~~ a level of privacy for the conversation, whenever

---

[1] The ACLU makes these comments in the interests of enacting immediate reforms regarding inmate extractions. The ACLU's comments here should not be construed as an agreement to any terms contained the policies and shall be without prejudice to the ACLU's right to seek further or different reforms.

possible, and reason with the inmate to comply with orders to avoid the necessity of force.

If the sergeant is unsuccessful in gaining the inmate's cooperation, the watch commander and the inmate extraction team shall be notified and respond to the area. The watch commander shall go to the confined area, ask other staff to stand far enough back to provide ~~some~~ a level of privacy for the conversation between the watch commander and the inmate, whenever possible, and reason with the inmate to comply with orders. Deputies who have been involved in the events or conflict with the inmate leading to the need for an extraction  may not be part of the extraction team. If it is necessary to include involved deputies in an extraction team, the decision must be approved by the watch commander and must include a written explanation/justification in his/her report.

Throughout the entire process, best efforts should be used to videotape all negotiations with the involved inmate(s). In all but life threatening or exigent circumstances, mental health professionals must be summoned to the area unless it is clear that the extraction has no mental health component (*e.g.*, the inmate is not on, or has not previously been on the mental health caseload and custody staff have no reason to believe the inmate may have a mental health issue or emotional problem). Mental health professionals must make good faith efforts, including talking to the inmate with privacy, whenever possible, for a clinically significant period of time, to assess the inmate's condition and reason with the inmate to avoid the necessity for use of force. Even if it is clear that the extraction has no mental health component and there are no life threatening or exigent circumstances ~~Although circumstances may not require the presence of a mental health worker~~ so that the presence of a mental health professional is not required, supervisors are nonetheless encouraged to utilize the expertise of a mental health worker ~~their expertise~~ whenever feasible.

> **Comment [A1]:** This is unacceptable unless the sentence is not intended to  expand the narrow set of circumstances in which it is permissible NOT to call a mental health professional, viz. no mental health component and no life threatening or exigent circumstances. It is only ok with Plaintiffs if it is instead designed to encourage using a mental health professional, even in situations where the policy does not REQUIRE calling one. We have clarified it so that it encourages the use of a mental health professional even in situations where the policy does not require that one be called.

In the event of an extraction, the "Watch Commander's Extraction Checklist" shall be used as a guideline from the onset of the event. Department force-reporting procedures as outlined in the Department Manual of Policy and Procedure (MPP), section 3-10/100.00, "Use of Force Reporting Procedures" shall also apply.

Court Removal Orders and Subpoenas

In the event the extraction is based upon a court removal order or subpoena, the watch commander shall contact the judge of the concerned court. The judge shall be advised that force may be necessary to extract the inmate from a confined area to ensure the court appearance. The judge will be offered an opportunity to enforce, rescind or delay the removal order. If the judge demands the inmate appear in court, the inmate shall be extracted on the verbal order of the court. Authorization for the removal from the judge may be relayed and accepted via the court clerk or bailiff. Following the verbal order, the judge will send a facsimile of a minute order requiring the inmate's appearance in court to the unit commander of the concerned facility. In the event that the judge of the

2

concerned court is not available, the watch commander shall make every effort to contact the presiding judge of the court and follow the same procedures.  A record of all contacts between custody facilities and courts along with copies of minute orders shall be included in any subsequent use of force documentation.

Immediate Extractions

The watch commander or on-site supervisor may authorize staff to conduct an immediate extraction when there is a life threatening or exigent circumstance such as: the behavior of an inmate constitutes an immediate and serious threat to the safety of that inmate, staff, visitors, or other inmates (*i.e.*, inciting behavior, assaults, and suicide attempts), or to the institution (*i.e.*, controlling disturbances, including the massive destruction of property).  Nothing in this policy precludes personnel from entering any confined area to execute the rescue of an inmate in the event of exigent or life-threatening circumstances.  However, any such actions by staff must be clearly articulable and the watch commander or on-site supervisor must document the life-threatening or exigent circumstancedocumented.  Additionally, staff must ensure radio communication of the emergency and that sufficient personnel are present to safely execute the removal.  In life threatening circumstances, staff shall not wait for a supervisor unless they lack the staff or experience to conduct the extraction.

Controlled Extractions

Controlled extractions occur in situations where there is no immediate threat to loss of life or institutional security.  Controlled extractions may only be authorized by the watch commander and are prompted by events a security-related enforcement necessity, such as:  requests by medical and or mental health personnel, court orders, over detentionssituations where an inmate is no longer properly held in jail, such as when his or her sentence has run, or when he is scheduled for transfer to state prison, and disciplinary incidents.

> **Comment [A2]:** First, there has to be some minimum threshold standard for when an extraction may be done, not just a list of possible situations that may justify it.  Second, not every disciplinary incident justifies a controlled extraction.

The unit commander shall be notified of all Controlled Extractions prior to the commencement of the extraction.  In the event the unit commander is not available, the inmate extraction may proceed at the watch commander's discretion, and the attempt to notify the unit commander shall be documented as noted above.

Watch Commander Responsibilities

Once it is determined that a controlled extraction may be necessary, the watch commander shall be notified and shall:

- Respond to the location and assume the role of incident commander,
- Confer with the team leader to ensure the criteria is met for an inmate extraction,
- Ensure that a Scribe has been assigned to document the course of events,

3

- Ensure that best efforts are made to videotape the entire extraction process, including all contact with the inmate(s), all negotiations, the extraction rehearsals, and any subsequent interviews with the inmates,
- Review the Watch Commander's Extraction Checklist,
- Notify the unit commander,
- Consult with medical staff, mental health professionals, and clergy as necessary, allowing them an opportunity to communicate with the inmate(s) in an attempt to resolve the situation . When possible, ask staff to stand far enough back to provide ~~some~~ a level of privacy for the conversation between the inmate and medical staff, mental health professionals and clergy.
- Plan the extraction and tactics to be used with the team leader,
- Meet personally with the inmate; ask staff to stand far enough back to provide ~~some~~a level of privacy for the conversation ~~whenever possible~~.
- ~~Confirm with medical~~ staff and /mental health ~~professionals on the viability of utilizing chemical agents based on their assessment of the inmate(s) current mental and physical condition.~~ ~~personnel that the planned tactics are appropriate and reasonable given the inmate's medical and mental status~~,
- Consult with licensed health care professional(s), prior to the use of chemical agents, to determine whether medical symptoms or a medical condition such as asthma, emphysema, a heart condition or hypertension, or symptoms of mental illness constitute a contraindication for use of a chemical agent.  This determination shall be documented and included in the use of force incident package.  Among the factors that shall be considered in making this determination are:  1) is the inmate capable of conforming his/her conduct to directions by correctional staff; 2) does the inmate present an immediate threat of harm to staff, himself/herself, or other inmates; 3) will the use of chemical agents likely exacerbate the inmate's mental health condition and/or present a danger to the inmate's well-being.
- Exercise extreme caution in deciding to use chemical agents for inmates who have been designated as Seriously Mentally Ill or Gravely Disabled, or are exhibiting acute symptoms of psychological distress or decompensation,
- Shall document the specific justification for use of chemical agents versus continued exhaustion of verbal strategies or use of other tactics if a medical or mental health professional believes that the inmate is unable to conform his/her conduct to directions by correctional staff, and there is not an immediate threat of harm to staff or to the inmate him/herself,
- Approve the plan, incorporating information provided by medical and mental health professionals , and standby during team and supporting personnel (*i.e.*, safety officers, medical staff) briefing, deployment, and completion of the extraction,
- Ensure that the safety officer (second team leader, or additional sergeant) is on-scene and directing medical personnel to the extracted inmate,
- Ensure that the inmate is immediately escorted to medical personnel by a supervisor and the appropriate number of personnel who were not directly involved with the extraction,

**Comment [A3]:** Because it controlled it is always possible.

**Comment [A4]:** The proposed change to this section are not acceptable. Viability means "the capacity to be sustained." You can use chemical weapons on an inmate with asthma, i.e., it is viable.but, it is very dangerous medically.  It is essential that the policies require that there be a determination of the appropriateness and reasonableness of the tactics in light of specific factors that we set forth in the previous version.

4

- Obtain visual documentation of all injuries.  Each inmate shall be questioned relative to his/her injuries on the video recording,
- Specifically identify in the Supervisors Report on Use of Force (SH-R-438) those inmates who were injured, and the nature and extent of their injuries,
- Document the decision factors that led to the utilization of the extraction team, their methods and the tactical equipment employed,
- Ensure that extractions initiated on information provided by medical or mental health staff are fully documented in the Supervisors Report on Use of Force (SH-R-438) and Medical/Mental Health Removal Order as appropriate.

In situations involving anticipated extractions of inmates in multiple cells or of an entire row, the watch commander shall carefully evaluate all circumstances prior to authorizing the extraction team's deployment.

<u>Medical / Mental Health / Clergy Intervention</u>

A controlled extraction shall not be accomplished without the physical presence of medical and mental health professionals ~~personnel in all but life-threatening or exigent circumstances.  Additionally, in all controlled extraction situations, a mental health professional and a member of the clergy shall be summoned to the scene.~~ The medical and  mental health professionals shall undertake good faith  efforts, absent dangerous or life threatening circumstances, to gain voluntary cooperation prior to extracting the inmate. When available, clergy staff shall be summoned to assist with the negotiations.

When tactically appropriate, the extraction team shall stand far enough back to provide ~~some~~ a level of privacy between the inmate and mental health professional.  Mental health staff must make good faith efforts, including talking to the inmate with  privacy, whenever possible, for a clinically significant period of time, to assess the inmate's condition and reason with the inmate to avoid the necessity for use of force.

At no time shall custody staff place undue pressure on the  medical, mental health professionals and clergy to conclude their efforts to gain the inmate's compliance, absent dangerous or life threatening circumstances.  If attempts by medical, mental health professionals and clergy fail to elicit cooperation from the inmate, the watch commander shall continue to coordinate a best practice response through consultation with medical and mental health professionals.  In cases involving mentally ill inmates, the watch commander shall confer with medical and mental health professionals to ensure that good faith  efforts have been exhausted prior to initiating a tactical response.  Throughout the entire process, best efforts shall be made to videotape all negotiations between the involved inmate(s) and mental health and medical personnel.

If a medical or mental health staff member requests that an extraction be conducted for medical or psychiatric purposes and the clinician determines that the inmate's medical/mental health needs preclude any waiting or cool-down period that individual shall personally direct the request to the watch commander, who shall be on-scene.

> **Comment [A5]:** If it is life threatening or exigent, then it is does not fit the definition of a controlled extraction. There should be a blanket rule that when t is a controlled extraction, then medical/mental health professionals must be called.

5

Requests shall include information regarding the inmate's clinical history and condition and shall be completely documented.

<u>Use of Chemical Agents During Inmate Extractions</u>

After reasonable efforts to gain the inmate's compliance have been exhausted, chemical agents shall generally be considered as the initial tools of choice in extractions and will, when feasible, be employed before any other weapons are used.

Barring life threatening or exigent circumstances, the watch commander shall ensure that prior to the deployment of any chemical agents medical personnel are on-scene and prepared to provide decontamination treatment to the affected inmate(s). In cases involving mentally ill inmate(s), the watch commander shall seek the advice of mental health and medical personnel on the viability of utilizing chemical agents based on their assessment of the inmate(s) current mental and physical condition.

~~In all cases where chemical agents are deployed, personnel should adhere to the manufacturers' recommended guidelines~~, **provided however** ~~that even if a manufacturer's guidelines would allow for longer or different deployment, in no event may more than three bursts lasting no more than 1-2 seconds of chemical agents be used. In addition, extraction teams should delay entry to give chemical agents sufficient time to gain the desired effect. The goal is to remove the inmate from the confined area without physical contact by extraction team members if possible, thus reducing the risk of injury to staff and inmates. Repeated bursts should not occur until there has been sufficient time for prior bursts to have an effect, and before repeat bursts occur there should be additional attempts by~~ <u>the team leader</u> ~~supervising officers and mental health staff to reason with and negotiate with the inmate so that the repeat bursts will not be necessary.~~

<u>In no case in which Phantom OC spray is used may any burst exceed 1-2 seconds, nor may more than three bursts be used in a single cell extraction. In addition, after an initial use of any chemical agents, the extraction team must delay entry to allow sufficient time for the chemical agent to have its full effect, and to enable the extraction team to remove the inmate from the confined area without physical contact if possible, thus reducing the risk of injury to staff and inmates. If the initial application of chemical agents does not result in the inmate's compliance and it appears that a second application is necessary, then during the interval between each burst the extraction team must again attempt to negotiate and reason with the inmate to avoid the need for an additional burst.</u>

<u>No chemical agents other than Phantom OC spray may be used to effect an extraction until a safety study has been conducted and safety guidelines for use of the chemical have been promulgated after a hearing by the BOS, with opportunity for public review and comment.</u>

**Comment [A6]:** Unless you can show us that all chemical agents list both the recommended length of any burst, and the maximum recommended number of bursts, then reliance on manufacturers' guildelines is completely insufficient. Moreover, we do not think that the possibility that LASD may at some future point choose to use a new chemical agent for extractions and that different numbers of bursts or length of bursts may be appropriate justifies not setting forth clear guidance in these policies. CDCR is currently delineating in their new extraction policies both the appropriate length of bursts and number of bursts, not just stating that manufacturers' guidelines should be followed. LASD should do the same for the chemical agent(s) it is employing. Finally, the after-action report we are sending along with these policies makes clear how potent and effective the Phantom OC spray is. Thus, the policies should delineate the maximum length of bursts, and maximum number of applications for those chemical agents currently being used and a stringent process for the approval of any new agents.

6

Best efforts shall be made to capture every application of a chemical agent during an inmate extraction on videotape.  Before choosing and using a chemical agent in a particular area, the watch commander shall ensure that implementation is appropriate and will not result in air duct transfer.

Circumstances permitting, the affected inmate(s) should be provided decontamination treatment prior to placing a spit mask or other type barrier over their head.  Under all circumstances, the affected inmate(s) shall be provided decontamination treatment at the earliest opportunity.  Personnel shall monitor the involved inmate(s) at all times for signs of medical or mental health distress.

7

# EXHIBIT N

| From: | Peter Eliasberg <peliasberg@ACLU-SC.ORG> |
|---|---|
| Sent: | Friday, March 21, 2014 5:15 PM |
| To: | 'Guyovich, Christy'; Durrant, John S.; Esther Lim; Margaret (Peggy) Winter (mwinter@npp-aclu.org); Durrant, John S.; Eric Balaban (ebalaban@npp-aclu.org); Walsh, Ryan; Mueller, Beth C. |
| Cc: | Walker, Scott W.; Smith, Steven R.; Trujillo, Victor M.; Porlier, Clay S.; 'JClark@lbaclaw.com'; Paul Beach; Peck, Anthony A.; Roger Granbo; Dempsey, Joseph E.; Allende, Victor |
| Subject: | Rosas RE: Proposed revisions to extraction policies |
| Attachments: | Inmate Extraction Policy ACLU response to LASD response 03212014.docx; UOF 06172013.pdf |

Dear Christy, I have attached our response to your last proposal on the extraction policies. As you can see, we have accepted most of your proposed changes, and the areas of remaining disagreement are very few.

However, there are two key places where we will not accept your proposed changes: 1) we will not agree to policies in which the only limitations on the number of applications of a chemical agent and the length of those applications are "manufacturers guidelines"; and 2) we won't agree to the reduction of the assessment to be made by medical and mental health in determining both the likely success and the likely psychological and medical harms from using chemical agents. Our objections and proposed alternatives are set forth in detail in the attached policies, redlines, and comments.

Overall, I think everyone has worked hard and in good faith to come up with improved policies and I hope we can finalize them soon.
Have a good weekend.
Sincerely,
Peter Eliasberg

> **From:** Guyovich, Christy [mailto:CGuyovi@lasd.org]
> **Sent:** Friday, March 21, 2014 10:36 AM
> **To:** Peter Eliasberg; Durrant, John S.; Esther Lim; Margaret (Peggy) Winter (mwinter@npp-aclu.org)
> **Cc:** Walker, Scott W.; Smith, Steven R.; Trujillo, Victor M.; Porlier, Clay S.; 'JClark@lbaclaw.com'; Paul Beach; Peck, Anthony A.; Roger Granbo; Dempsey, Joseph E.; Allende, Victor
> **Subject:** RE: Proposed revisions to extraction policies
>
> Hi Peter,
> In regards to the Inmate Extraction Policy, the Department has postponed the finalization of this policy in an attempt to incorporate as many of your office's proposed changes as possible. I'm sure you understand and appreciate how imperative it is for us to finalize this policy and begin training staff accordingly. I sent the last version to you over two weeks ago and I have not heard anything back. If you have any further comments, please provide them to me by Monday, March 24, 2014 so that we can conclude this process and get this policy implemented.
> Thank you,
> Christy
> **From:** Guyovich, Christy
> **Sent:** Tuesday, March 04, 2014 5:17 PM
> **To:** 'Peter Eliasberg'; Durrant, John S.; Lim, Esther; Margaret (Peggy) Winter (mwinter@npp-aclu.org)
> **Cc:** Walker, Scott W.; Smith, Steven R.; Trujillo, Victor M.; Porlier, Clay S.; 'Rgranbo@counsel.lacounty.gov'; 'JClark@lbaclaw.com'; Paul Beach; Peck, Anthony A.
> **Subject:** RE: Proposed revisions to extraction policies

1

Hi Peter,
Attached are two documents re: the Inmate Extraction policy.  1) LASD comments to ACLU recommendations dated 02/10/14  2) A clean version of the same document.
Let me know if you have any questions about the documents.
Thanks,
Christy

*Commander Christy Guyovich*
*Custody Services Division - Administration*
*Los Angeles County Sheriff's Department*
*TTCF 8th Floor, Rm 808*
*Office (213) 893-5004  Cell (323)219-4618*
*Fax (323) 415-4776 Email: Cguyovi@lasd.org*

---

**From:** Peter Eliasberg [mailto:peliasberg@ACLU-SC.ORG]
**Sent:** Thursday, February 06, 2014 2:59 PM
**To:** Guyovich, Christy; 'Granbo, Roger'; 'JClark@lbaclaw.com'; 'Rgranbo@counsel.lacounty.gov'
**Cc:** Walker, Scott W.; Ellison, Dana M.; Smith, Steven R.; Trujillo, Victor M.; Durrant, John S.; Margaret (Peggy) Winter (mwinter@npp-aclu.org); Lim, Esther
**Subject:** RE: Proposed revisions to extraction policies

We intend to get back to you by Monday.
Best,
Peter

---

**From:** Guyovich, Christy [mailto:CGuyovi@lasd.org]
**Sent:** Thursday, February 06, 2014 1:43 PM
**To:** Peter Eliasberg; 'Granbo, Roger'; 'JClark@lbaclaw.com'; 'Rgranbo@counsel.lacounty.gov'
**Cc:** Walker, Scott W.; Ellison, Dana M.; Smith, Steven R.; Trujillo, Victor M.; Durrant, John S.; Margaret (Peggy) Winter (mwinter@npp-aclu.org); Esther Lim
**Subject:** RE: Proposed revisions to extraction policies

Hi Peter,
I had inquired with Beth last week re: your rewording of specific areas in the Inmate Extraction Policy.  We were waiting for your revisions before moving forward. Can you please advise?
Thanks,
Christy

---

**From:** Peter Eliasberg [mailto:peliasberg@ACLU-SC.ORG]
**Sent:** Tuesday, January 14, 2014 5:46 PM
**To:** 'Granbo, Roger'; Monteagudo, Cherry H.; 'JClark@lbaclaw.com'; 'Rgranbo@counsel.lacounty.gov'; Guyovich, Christy
**Cc:** Pietrantoni, Paul L.; Walker, Scott W.; Ellison, Dana M.; Smith, Steven R.; Allende, Victor; Chavez, Mary A.; Trujillo, Victor M.; Durrant, John S.; Margaret (Peggy) Winter (mwinter@npp-aclu.org); Lim, Esther
**Subject:** RE: Proposed revisions to extraction policies

Roger, Terry is one of our consulting experts. He signed the confidentiality statement on the protective order, and subsequently provided a declaration on the extraction policies and videos of extractions of inmates with severe mental illness. I invited him after Christy informed me that DMH and jails medical services had some concerns and issues with our proposed changes. Because Terry is a psychiatrist and an MD with substantial corrections experience, he will help us address any objections or concerns DMH or medical services may may have with our proposed revisions to the policies.

2

Best,
Peter

---

**From:** Granbo, Roger [mailto:Rgranbo@counsel.lacounty.gov]
**Sent:** Tuesday, January 14, 2014 5:14 PM
**To:** Peter Eliasberg; 'Monteagudo, Cherry H.'; 'JClark@lbaclaw.com';
'Rgranbo@counsel.lacounty.gov'; 'Guyovich, Christy'
**Cc:** Pietrantoni, Paul L.; Walker, Scott W.; Ellison, Dana M.; Smith, Steven R.; Allende, Victor;
Chavez, Mary A.; Trujillo, Victor M.
**Subject:** RE: Proposed revisions to extraction policies

Peter- what role is Terry Kupers playing here?

Roger H. Granbo
Assistant County Counsel
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, CA 90012

(213) 974-1609
rgranbo@counsel.lacounty.gov

CONFIDENTIALITY NOTICE: This email message, including any attachments, from the Office of the County Counsel is intended for the official and confidential use of the recipients to whom it is addressed. It contains information that may be confidential, privileged, attorney work product, or otherwise exempted from disclosure under applicable law. If you have received this message in error, be advised that any review, disclosure, use, dissemination, distribution, or reproduction of this message or its contents is strictly prohibited. Please notify us immediately by reply email that you have received this message in error, and destroy this message, including any attachments.

---

**From:** Peter Eliasberg [mailto:peliasberg@ACLU-SC.ORG]
**Sent:** Tuesday, January 14, 2014 3:57 PM
**To:** 'Monteagudo, Cherry H.'; 'JClark@lbaclaw.com'; 'Rgranbo@counsel.lacounty.gov'; 'Guyovich, Christy'
**Cc:** Pietrantoni, Paul L.; Walker, Scott W.; Ellison, Dana M.; Smith, Steven R.; Allende, Victor;
Chavez, Mary A.; Trujillo, Victor M.
**Subject:** RE: Proposed revisions to extraction policies

Terry Kupers, a psychiatrist and expert on the treatment of inmates with mental illness who knows the LA County jails very well, will be at the meeting on Thursday. Can you let me know who will be at the meeting from DMH and jail medical services?

Thanks.
Peter

---

**From:** Monteagudo, Cherry H. [mailto:CHMontea@lasd.org]
**Sent:** Monday, January 13, 2014 9:21 AM
**To:** 'peliasberg@ACLU-SC.ORG'; 'JClark@lbaclaw.com'; 'Rgranbo@counsel.lacounty.gov'
**Cc:** Pietrantoni, Paul L.; Walker, Scott W.; Ellison, Dana M.; Smith, Steven R.; Allende,
Victor; Chavez, Mary A.; Trujillo, Victor M.
**Subject:** FW: Proposed revisions to extraction policies

Greetings:

3

At your convenience, please let me know if you are available on the following dates/times, thank you.
January 14 – 1030-1130 hrs.  or 1300-1400 hrs.
January 15 – 0900-1000 hrs.
January 16 – 1300-1400 hrs.

---

**From:** Monteagudo, Cherry H.
**Sent:** Thursday, January 09, 2014 1:58 PM
**To:** 'peliasberg@ACLU-SC.ORG'; 'JClark@lbaclaw.com'; 'Rgranbo@counsel.lacounty.gov'
**Cc:** Pietrantoni, Paul L.; Walker, Scott W.; Ellison, Dana M.; Smith, Steven R.; Allende, Victor; Chavez, Mary A.; Trujillo, Victor M.
**Subject:** RE: Proposed revisions to extraction policies

Greetings:

Cmdr. Guyovich and her staff are available on the following dates/times:

January 14 – 1030-1130 hrs.  or 1300-1400 hrs.
January 15 – 0900-1000 hrs.
January 16 – 1300-1400 hrs.

Please let me know if this works for you, thank you.

Thank you.

Cherry Monteagudo
(213) 893-5965
Office of Commander Guyovich

---

**From:** Guyovich, Christy
**Sent:** Thursday, January 09, 2014 1:00 PM
**To:** 'Peter Eliasberg'
**Cc:** 'Granbo, Roger'; Pietrantoni, Paul L.; 'Justin W. Clark'; 'Beth Mueller'; Eric Balaban (ebalaban@npp-aclu.org); Lim, Esther; John Durrant (johndurrant@paulhastings.com); Pietrantoni, Paul L.; Kang, Deborah; Margaret (Peggy) Winter (mwinter@npp-aclu.org); Walker, Scott W.; Ellison, Dana M.; Parra, Eric G.; McDonald, Terri; Smith, Steven R.; Monteagudo, Cherry H.
**Subject:** RE: Proposed revisions to extraction policies

My secretary will start coordinating and get back to you asap.  Thanks.

---

**From:** Peter Eliasberg [mailto:peliasberg@ACLU-SC.ORG]
**Sent:** Thursday, January 09, 2014 12:50 PM
**To:** Guyovich, Christy
**Cc:** 'Granbo, Roger'; Pietrantoni, Paul L.; 'Justin W. Clark'; 'Beth Mueller'; Eric Balaban (ebalaban@npp-aclu.org); Lim, Esther; John Durrant (johndurrant@paulhastings.com); Pietrantoni, Paul L.; Kang, Deborah; Margaret (Peggy) Winter (mwinter@npp-aclu.org); Walker, Scott W.; Ellison, Dana M.; Parra, Eric G.; McDonald, Terri; Smith, Steven R.
**Subject:** RE: Proposed revisions to extraction policies

Christy, we would be pleased to meet with you, Piety and anyone else from the Department as well as anyone from DMH and LASD Medical Services so we can finalize

4

these policies.  If someone from LASD contacts me to propose two or three dates/times, I will make sure that my colleagues and I can make one of them.

Sincerely,
Peter Eliasberg

---

**From:** Guyovich, Christy [mailto:CGuyovi@lasd.org]
**Sent:** Wednesday, January 08, 2014 3:58 PM
**To:** Peter Eliasberg
**Cc:** 'Granbo, Roger'; Pietrantoni, Paul L.; 'Justin W. Clark'; 'Beth Mueller'; Eric Balaban (ebalaban@npp-aclu.org); Esther Lim; John Durrant (johndurrant@paulhastings.com); Kang, Deborah; Margaret (Peggy) Winter (mwinter@npp-aclu.org); Walker, Scott W.; Ellison, Dana M.; Parra, Eric G.; McDonald, Terri; Smith, Steven R.
**Subject:** RE: Proposed revisions to extraction policies

Hi Peter,

We just concluded meetings with representatives from the Department of Mental Health (DMH) and the Sheriff's Medical Services Bureau to gain their input regarding your recommendations.  There are some areas that necessitate some discussion.  I believe it would be beneficial for us to schedule a meeting with all stakeholders.  If this is feasible, I'll have my staff coordinate a meeting.

Thanks,
Christy

---

**From:** Peter Eliasberg [mailto:peliasberg@ACLU-SC.ORG]
**Sent:** Tuesday, January 07, 2014 6:14 PM
**To:** Guyovich, Christy
**Cc:** 'Granbo, Roger'; Pietrantoni, Paul L.; 'Justin W. Clark'; 'Beth Mueller'; Eric Balaban (ebalaban@npp-aclu.org); Lim, Esther; John Durrant (johndurrant@paulhastings.com); Kang, Deborah; Margaret (Peggy) Winter (mwinter@npp-aclu.org)
**Subject:** RE: Proposed revisions to extraction policies

Commander Guyovich, we would like to let Judge Pregerson know the status of the extraction policies prior to our meeting with him on January 9.  Please let me know where the department is with the revisions we proposed.
Sincerely,
Peter Eliasberg

---

**From:** Peter Eliasberg
**Sent:** Tuesday, December 17, 2013 5:38 PM
**To:** 'Guyovich, Christy'
**Cc:** 'Granbo, Roger'; 'Pietrantoni, Paul L.'; 'Justin W. Clark'; Beth Mueller; Eric Balaban (ebalaban@npp-aclu.org); Esther Lim; John Durrant (johndurrant@paulhastings.com); Kang, Deborah; Margaret (Peggy) Winter (mwinter@npp-aclu.org)
**Subject:** Proposed revisions to extraction policies

Commander Guyovich, I have attached both a clean version of revised extraction policies, and a document that compares what you sent us a few weeks ago and our proposed revised version.  As I said before, we were pleased by the revisions you made from the original policies we saw, but we did think

5

there were important additions that needed to be made.  Feel free to contact me if you have any questions.

Sincerely,
Peter Eliasberg

---

PAUL
HASTINGS

**John Durrant | Partner, Litigation Department**
Paul Hastings LLP | 515 South Flower Street, Twenty-Fiftl
90071 | Direct: +1.213.683.6144 | Main: +1.213.683.60
johndurrant@paulhastings.com | www.paulhastings.com

*********************************************************************************
*****************
IRS Circular 230 Disclosure: As required by U.S.Treasury Regulations governing tax practice, you are hereby advised
that any written tax advice contained herein was not written or intended to be used (and cannot be used) by any
taxpayer for the purpose of avoiding penalties that may be imposed under the U.S. Internal Revenue Code.
*********************************************************************************
*****************

This message is sent by a law firm and may contain information that is privileged or confidential. If you received
this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

For additional information, please visit our website at  www.paulhastings.com

6

# EXHIBIT O

## SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

### RECITALS

A.      This Settlement Agreement and Release ("Agreement") is made and entered into on or about September 26, 2014, by and between Plaintiff Alex Rosas on behalf of himself and the Plaintiff Class, as defined below, on the one hand, and Defendant Sheriff John L. Scott, in his official capacity ("Defendant"), on the other hand, (collectively, "the Parties") with reference to the following facts:

B.      Plaintiffs Alex Rosas and Jonathan Goodwin ("Named Plaintiffs") filed a Complaint, and thereafter a First Amended Complaint ("Complaint") in the United States District Court, Central District of California, entitled *Alex Rosas, et al. v. Leroy D. Baca*, Case No. CV 12-00428 DDP, which arose out of certain alleged acts and/or omissions by Defendant ("the Civil Action"). In the Civil Action, Plaintiffs sought certain declaratory and injunctive relief against Defendant as a result of purported events that occurred at Men's Central Jail ("MCJ"), Twin Towers Correctional Facility ("TTCF"), and the Inmate Reception Center ("IRC") (collectively, "the Jail Complex in downtown Los Angeles"), and that allegedly resulted in injuries to the Plaintiff Class;

C.      On or about June 7, 2012, the Court entered an order granting Plaintiffs' motion for class certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure, certifying a declaratory/injunctive relief class that, for purposes of this Agreement, is defined as "all inmates, now and in the future, in the custody of the Los Angeles County Sheriff's Department in the Jail Complex in downtown Los Angeles" ("the Plaintiff Class");

D.      Named Plaintiffs and the Plaintiff Class are represented by court-appointed class counsel, the American Civil Liberties Union, the ACLU Foundation of Southern California, and Paul Hastings LLP (collectively, "Class Counsel"); and,

E.      The Parties desire to settle all of the claims arising out of the Civil Action which Named Plaintiffs and the Plaintiff Class have or may have against Defendant, including its employees, representatives, and agents, both named and unnamed, as of the date of this Agreement.

IT IS THEREFORE AGREED BETWEEN THE PARTIES AS FOLLOWS:

## I.      AGREEMENT CONTINGENT ON APPROVAL BY THE COURT AND THE BOARD OF SUPERVISORS.

1.      This Agreement and the obligations of the Parties thereunder are contingent upon the final approval by the Court, as set forth below.

2.      This Agreement and the obligations of the Parties thereunder also are contingent upon the approval by the Los Angeles County Board of Supervisors ("the Board"), as set forth below.

HOA.1098696.2                                    1

3.      In the event that: (1) this Agreement does not receive approval by the Board; (2) this Agreement does not receive final approval by the Court; or (3) any appeal of the Court's final approval of this Agreement is filed and not upheld on appeal, then this Agreement shall be of no force or effect and shall not be admissible in any court for any reason, except that Defendant agrees to pay reasonable compensation to the Panel, as defined below, for services rendered as of that date.

II.      **APPOINTMENT OF A PANEL TO DEVELOP A CORRECTIVE ACTION PLAN AND EVALUATE COMPLIANCE WITH THE PLAN.**

1.      The Court will appoint Richard Drooyan, Jeffrey Schwartz, and Robert Houston ("the Panel"), pursuant to Rule 706 of the Federal Rules of Evidence, to develop a corrective action plan ("Action Plan") designed to ensure that the Plaintiff Class are not subjected to excessive force in the Jail Complex in downtown Los Angeles, and to monitor and advise the Court on Defendant's compliance with the Action Plan.

2.      The Panel will be entitled to reasonable compensation in an amount approved by the Board and the Court. Defendant will bear the cost of the compensation of the Panel.

3.      In the event Mr. Drooyan becomes unavailable during the term of this Agreement, then Defendant will select his replacement. If Mr. Schwartz becomes unavailable during the term of this Agreement, then Class Counsel will select his replacement. If Mr. Houston becomes unavailable during the term of this Agreement, then the Parties will meet and confer to reach agreement regarding a replacement.

III.      **DEVELOPMENT AND SUBSTANTIVE PROVISIONS OF THE ACTION PLAN.**

1.      By October 6, 2014, at latest, the Panel will submit the Action Plan to the Court for its review and approval.

2.      In developing the Action Plan, the Panel may consider provisions relating to Use of Force Policies, Practices and Documentation; Training and Professional Development Related to Use of Force; Use of Force on Prisoners with Mental Illness and other Special Needs Populations; Security Policies and Practices; and any such other areas regarding use of force as they may deem necessary. In developing the Action Plan, the Panel will make best efforts to make it consistent with the recommendations of the Citizen's Commission on Jail Violence, which Defendant is already in the process of implementing. In developing the Action Plan, the Panel will make its best estimates as to how long it should take Defendant to implement each recommendation and include those estimates in its Action Plan.

3.      Prior to submitting the Action Plan to the Court, the Panel will provide a draft of the Action Plan to the Parties for their review and comment. After input from the Parties, the Panel may, in their discretion, revise the draft Action Plan. Within 30 days of the Panel providing a final version of the Action Plan to the Parties, counsel for Defendant shall submit the Action Plan and this Agreement to the Board for its review and consideration with respect to whether to approve the Agreement. Within 60 days of the Panel providing a final version of the Action Plan to the Parties, the Board shall decide whether it will approve the Agreement. If the Board

approves the Agreement, the Parties will seek preliminary and then final approval of this Agreement with the Court as set forth below. If the Board fails to indicate its approval or disapproval of the Agreement within 60 days of the Panel providing a final version of the Action Plan to the Parties, the Agreement will be deemed rejected at which time either Party may request confirmation from the Court that settlement discussions have ended.

IV.    **CLASS NOTICE AND SETTLEMENT FAIRNESS HEARING.**

The following procedures will govern the Court's preliminary and final approval of this Agreement and notice to the Plaintiff Class:

1.    Within 21 days of any approval of the Action Plan and the Agreement by the Board, the Parties will file a joint stipulation requesting that the Court grant preliminary approval of this Agreement, as well as approve the notice to the Plaintiff Class. The Parties will submit the proposed forms of all notices and other documents necessary to implement this Agreement to the Court, including the final Action Plan. The Parties will translate the proposed class notice into Spanish. Defendant will provide notice of the proposed settlement to the appropriate federal and state officials, as required by the Class Action Fairness Act ("CAFA") codified at 28 U.S.C. § 1715.

2.    If the Court grants preliminary approval of this Agreement and approves the notice to the Plaintiff Class, the Parties will take the following steps to effect notice of this Agreement as required by the CAFA:

    a.    Defendant will promptly post a copy of the notice to the Plaintiff Class in both English and Spanish in the common area of all housing units in MCJ and TTCF and in places in the IRC where inmates who are being processed into the jails can read them;

    b.    Defendant will post copies of the notice to the Plaintiff Class in both English and Spanish in places where K-10 inmates and inmates in disciplinary segregation in MCJ and TTCF can read them. Defendant will provide copies of the notice upon request to K-10 inmates and inmates who have been in disciplinary segregation in MCJ and TTCF for more than 10 days during the notice period. Defendant will bear the cost of translating, printing, posting, and distributing the notice to the Plaintiff Class; and

    c.    Defendant and Class Counsel promptly will post a copy of the notice to the Plaintiff Class in both English and Spanish on their respective websites.

3.    Objecting to the Settlement. The notice to the Plaintiff Class will provide that class members ("Class Members") who wish to object to the Agreement prior to the fairness hearing may do so by filing with the Court a written statement objecting to the Agreement.

4.    Fairness Hearing: On or after the later of: (1) 51 days of the posting of the notice to the Plaintiff Class, or (2) 90 days of the last date of service of the proposed settlement on the appropriate federal and state officials as required by CAFA, the Court will conduct a hearing for final approval of this Agreement ("the Fairness Hearing"). No Class Member will be entitled to

HOA.1098696.2                                3

be heard at the Fairness Hearing (whether individually or through separate counsel) unless written notice of the Class Member's intention to appear at the Fairness Hearing is served on counsel for the Parties no later than 21 days prior to the Fairness Hearing. The Court, in its discretion, may determine which Class Members, if any, who have requested to appear will be entitled to appear and be heard at the Fairness Hearing. No Class Member may object to this Agreement, unless copies of any written objections or briefs are filed with the Court and served on counsel for the Parties no later than 21 days prior to the Fairness Hearing. Class Members who fail to file and serve timely objections in the manner specified above will be deemed to have waived any objections and will be foreclosed from making any objection (whether by appeal or otherwise) to this Agreement or the Court's approval thereof.

5.      In the event that the Court grants final approval of this Agreement, it shall enter an order: (1) memorializing its final approval of this Agreement; (2) granting costs and attorneys' fees to Class Counsel as set forth in Section XIII; (3) dismissing the Civil Action, with prejudice (including, without limitation, dismissal in favor of Defendant and all of its employees, representatives, and agents, both named and unnamed); and (4) retaining jurisdiction for the purpose of enforcing the provisions of this Agreement or modifying it in accordance with Section XIV(6) below. The Parties shall bear their own costs, expenses, and attorneys' fees incurred in the Civil Action, except as otherwise provided herein.

## V.     PERIODIC REPORTS BY THE PANEL.

The Panel will prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan ("Reports") at intervals the Panel shall determine. The Panel will provide the Reports to the Parties in draft form prior to submission to the Court, will consider the Parties' comments, and may in its discretion make responsive changes before submitting the Reports to the Court. The Reports shall state that they are created for purposes of this settlement. The Reports may not be used against Defendant in any other legal proceeding for any purpose.

## VI.    INSPECTION BY CLASS COUNSEL.

On reasonable notice, Class Counsel will have reasonable access to the Jail Complex in downtown Los Angeles, including without limitation staff, inmates, and documents, for inspection to evaluate compliance with the Action Plan. Class Counsel shall provide Defendant's counsel with 10 days' notice before any document request and 4 days' notice before any on-site inspection. Defendant's counsel shall have the right to be present for any jail inspection and/or discussion with Sheriff's Department personnel. Defendant reserves the right to object, whether on privilege grounds or otherwise, to any document request made by Class Counsel. The Parties agree to negotiate in good faith to resolve any disputes concerning objections to document requests from Class Counsel and if the dispute cannot be resolved, to submit the issue to the Court for resolution. Any information or documents obtained by Class Counsel under this section may be used solely for purposes of this action and may not be used in any other action for any purpose. Nothing in this section shall restrict monitoring activities by the ACLU (such as readily available access to Title 15 logs) in *Rutherford v. Scott*, Case No. CV 75-04111-DDP.

## VII.    RELEASE.

1.    Except as otherwise provided in this Agreement and as separate consideration for the agreements contained herein, Named Plaintiffs and the Plaintiff Class hereby absolutely, fully and forever release, relieve, waive, relinquish, and discharge Defendant and its successors, predecessors, related entities, departments, subsidiaries, representatives, assigns, agents, partners, officers, directors, managers, insurers, shareholders, employees, and attorneys, including, without limitation, the Board and Lawrence Beach Allen & Choi, A Professional Corporation, and each of them ("Released Parties"), of, and from, any and all known claims for equitable relief, subject to the following limitations:  (i) this waiver shall not apply to claims based on acts or omissions arising after the date of execution of this Agreement; and (ii) this waiver shall be limited to the allegations made in the Complaint (which do not include claims for damages).

2.    Named Plaintiffs and the Plaintiff Class acknowledge their intention that, upon execution by the Parties and approval by the Court, this Agreement, except as expressly provided for herein, shall be effective as a full and final accord and satisfaction and settlement of and as a bar to all of the claims in the Civil Action.  Named Plaintiffs and the Plaintiff Class acknowledge that they have been informed by their attorneys, or otherwise have been informed of, and that they are familiar with, Section 1542 of the Civil Code of the State of California, which provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

Named Plaintiffs and the Plaintiff Class hereby waive and relinquish all rights and benefits against the Released Parties that they have or may have under Section 1542 of the Civil Code of the State of California, subject to the following limitations:  (i) this waiver shall not apply to claims based on acts or omissions arising after the date of execution of this Agreement; and (ii) this waiver shall be limited to the allegations made in the Complaint (which do not include claims for damages).

3.    Named Plaintiffs and the Plaintiff Class agree, represent, and warrant that they understand that the Civil Action involves arguable and disputed questions of fact and law, that the liability of Defendant for the alleged acts in the Civil Action is disputed, and that the consideration provided herein is not to be construed as an admission of liability by Defendant, which is expressly denied, and that this Agreement arises from compromise.

## VIII.    TERMINATION.

1.    After the final approval of this Agreement by the Court, Defendant will implement each and every recommendation from the Panel contained in the Action Plan as soon as reasonably practicable. When the Panel certifies that any recommendation of the Action Plan has been implemented, it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ("Compliance Period"). It is anticipated that there will be multiple Compliance Periods for the various recommendations contained in the Action Plan, and that

Defendant will implement and be judged to be in compliance with numerous recommendations in six months or less from the submission of the Action Plan to the Court, others in six to twelve months from the submission of the Action Plan to the Court, and there is a possibility that Defendant may be judged to have come into compliance with others more than twelve months from the submission of the Action Plan to the Court. If, after the Panel reports that the Defendant has initially reached compliance, the Panel subsequently reports that Defendant has fallen out of compliance, Plaintiffs may make a motion to the Court for contempt, but only after having engaged in a good faith attempt to resolve the issue of noncompliance with Defendant's counsel and having allowed a reasonable period to cure noncompliance. The Court may exercise its equitable powers to fashion relief, including ordering compliance and extending the compliance period, consistent with the Prison Litigation Reform Act ("PLRA"). Alternatively, Plaintiffs may request that the Panel propose a remedial plan, which may include an extension of the compliance period, consistent with the PLRA, for the Court's approval.

2.    Defendant may seek to terminate this Agreement through application to the Court, consistent with the PLRA, at such time as all of the following conditions have been satisfied:

(a) For those recommendations that the Panel certifies the Defendant has implemented in six months or less after the submission of the Action Plan to the Court: (i) Defendant must sustain compliance with each of those recommendations for either a period of at least 18 consecutive months or satisfy any alternative requirements imposed pursuant to Paragraph 1 above; and (ii) Defendant must sustain simultaneous compliance with all those recommendations for a period of at least 12 consecutive months prior to filing a motion to terminate;

(b) For those recommendations that the Panel certifies the Defendant has implemented in six to twelve months after the submission of the Action Plan to the Court: (i) Defendant must sustain compliance with each of those recommendations for either a period of at least 18 consecutive months or satisfy any alternative requirements imposed pursuant to Paragraph 1 above; and (ii) Defendant must sustain simultaneous compliance with all those recommendations for a period of at least 12 consecutive months prior to filing a motion to terminate; and

(c) For those recommendations that the Panel certifies the Defendant has implemented in more than twelve months after the submission of the Action Plan to the Court: (i) Defendant must sustain compliance with each of those recommendations for either a period of at least 18 consecutive months or satisfy any alternative requirements imposed pursuant to Paragraph 1 above; and (ii) Defendant must sustain simultaneous compliance with all those recommendations for a period of at least 12 consecutive months prior to filing a motion to terminate.

The period of simultaneous compliance for the recommendations that Defendant implements in six months or less need not run concurrently with the period of simultaneous compliance for the recommendations that Defendant implements in six to twelve months. Neither of those periods needs to run concurrently with the period of simultaneous compliance

for the recommendations that Defendant implements in more than twelve months if those recommendations that were implemented more than twelve months after submission of the Action Plan to the Court were ones the panel estimated in its Action Plan would take more than 12 months to implement. However, if Defendant fails to implement within 12 months one or more recommendations that the Panel estimated could be implemented in 12 months or less, Defendant must maintain simultaneous compliance with those recommendations and the recommendations that were implemented in six to twelve months after the submission of the Action Plan to the Court for a period of at least 12 consecutive months prior to filing a motion to terminate.

IX.   **PLAINTIFFS' AND THE PLAINTIFF CLASS'S ALLEGATIONS, DEFENDANT'S DENIALS, AND LACK OF ADMISSION OF LIABILITY.**

In the Civil Action, Named Plaintiffs and the Plaintiff Class allege that they have been subjected to a pattern of grossly excessive force, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Defendant generally and specifically denies all Named Plaintiffs' and the Plaintiff Class's allegations. It is understood that this Agreement is not an admission of any liability or wrongdoing on the part of Defendant and/or its employees, agents and former employees and agents of Defendant or any other persons.

X.   **AGREEMENT CONDITIONAL ON FINDINGS BY THE COURT PURSUANT TO 18 U.S.C. § 3626(a)(1)(A)**

This Agreement will become null and void unless the Court, in its Stipulated Order and Final Judgment, makes findings that although this matter was not actually litigated or resolved on the merits, the relief is narrowly drawn, extends no further than necessary to correct the alleged violations of the Federal rights, and is the least intrusive means necessary to correct the alleged violations of the Federal rights. *See* 18 U.S.C. § 3626(a)(1)(A). Notwithstanding any other term of this Agreement, the Parties stipulate that Defendant expressly disclaims and does not admit that Defendant is committing any violation of any Federal right. Except to enforce this Agreement, this Section of this Agreement shall not be admissible against Defendant in any court for any purpose.

XI.   **REPRESENTATION OF COMPREHENSION OF THIS AGREEMENT**

In entering this Agreement, Plaintiff Alex Rosas, on behalf of himself and the Plaintiff Class, represents that he has relied upon the advice of Class Counsel, who are the attorneys of his own choice, concerning the legal and other consequences of this Agreement; that the terms of this Agreement have been completely read and explained to him by Class Counsel; and the terms of this Agreement are fully understood and voluntarily accepted by him. Plaintiff Alex Rosas hereby further represents that he has not received or relied upon any legal or other advice from Defendant, Defendant's representatives, and/or attorneys.

## XII.   WARRANTY OF CAPACITY TO EXECUTE AGREEMENT.

Plaintiff Alex Rosas, on behalf of himself and the Plaintiff Class, represents and warrants that no other person(s) or entity has, or has had, any interest in the claims, demands, obligations, or causes of action referred to in this Agreement, except as otherwise set forth herein; that he has the sole right and exclusive authority to execute this Agreement; and that he has not sold, assigned, transferred, conveyed or otherwise disposed of any of the claims, demands, obligations or causes of action referred to in this Agreement.

## XIII.   ATTORNEY FEES AND COSTS.

1.      Assuming this Agreement is approved by the Court and the Board, and is upheld on appeal (if any), within 45 days of the later of the Court's final approval of the Agreement or the resolution of any appeal, Defendant shall tender to Class Counsel a warrant in the amount of $950,000 made payable to "ACLU Foundation of Southern California" for full and final satisfaction of any and all claims by Named Plaintiffs, the Plaintiff Class, and Class Counsel for attorneys' fees, expenses, and costs related to the Civil Action. Class Counsel acknowledge and agree to provide to Defendant any and all paperwork and information including, without limitation, a duly executed W-9 IRS form, prior to receiving said payment.

2.      Defendant will pay reasonable attorneys' fees and costs to Class Counsel for ongoing work to ensure compliance with this Agreement. The amount of fees and costs due to Class Counsel under this paragraph will be determined on a semi-annual basis for the duration of the Court's jurisdiction over this Agreement. The Parties will try to reach agreement on these semi-annual fee awards and submit a stipulation for the Court's approval. If the Parties are unable to reach agreement on a semi-annual fee award, Class Counsel will submit a motion for reasonable attorneys' fees, and the Court will determine the appropriate amount of fees. Under no circumstances shall Class Counsel be entitled to payment of more than $30,000 per year in attorneys' fees and costs to ensure compliance with this Agreement, exclusive of any fees and costs reasonably incurred to oppose any motion to modify or terminate this Agreement by Defendant.

3.      Notwithstanding any other provision in this Agreement, if it becomes necessary for the Plaintiffs to incur additional legal fees in connection with a motion for contempt, the Court may award reasonable fees.

## XIV.   MISCELLANEOUS.

1.      Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

2.      California Law.

This Agreement shall be interpreted under and pursuant to the laws of the State of California and not construed for or against any party.

HOA.1098696.2                                         8

3.   Successors and Assigns.

All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the Parties hereto and their respective heirs, legal representatives, successors and assigns.

4.   Parties in Interest.

Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

5.   Further Assurances.

Each of the Parties hereto shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the Parties hereto.

6.   Modifications or Amendments.

No amendment, change or modification of this Agreement shall be valid, unless in writing and signed by all of the Parties hereto and ordered by the Court, or, upon a motion of a party, the party seeking modification establishes that a significant change in facts or law warrants revision and that the proposed modification is suitably tailored to the changed circumstance.

7.   Entire Agreement.

This Agreement constitutes the entire understanding and agreement of the Parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and canceled in their entirety and are of no further force or effect.

8.   Captions.

The captions appearing at the commencement of the sections hereof are descriptive only and for convenience in reference. The sections, and not the captions, shall control and govern in the construction of this Agreement.

HOA.1098696.2                                   9

9.    Severability.

If any part of this Agreement is deemed unenforceable, illegal, or in violation of any State or Federal law, that portion of the Agreement will be severable and the remaining portion or portions of the Agreement will remain in full force and effect.

10.    Expenses.

Each of the Parties shall pay all of their own costs, legal fees, accounting fees, and any other expenses incurred or to be incurred by it or them in negotiating and preparing this Agreement, except as expressly set forth herein.

Dated: _September 24_, 2014          By: _____
                                         Alex Rosas, individually and on behalf of
                                         the Plaintiff Class


APPROVED AS TO FORM AND CONTENT:


Dated: September 24 2014          ACLU FOUNDATION OF
                                     SOUTHERN CALIFORNIA

                                  By: _____
                                      Peter Eliasberg
                                      Attorneys for Plaintiffs Alex Rosas and
                                      Jonathan Goodwin, and the Plaintiff Class


Dated: September 24, 2014          PAUL HASTINGS LLP

                                  By: _____
                                      John Durrant
                                      Attorneys for Plaintiffs Alex Rosas and
                                      Jonathan Goodwin, and the Plaintiff Class


HOA.1098696.2                          10

Dated: _September 24_ 2014       AMERICAN CIVIL LIBERTIES UNION

By: _Margaret Winter_
    Margaret Winter
    Attorneys for Plaintiffs Alex Rosas and
    Jonathan Goodwin, and the Plaintiff Class

Dated: _____, 2014       OFFICE OF COUNTY COUNSEL,
                                              COUNTY OF LOS ANGELES

By:_____
    Roger H. Granbo
    Attorneys for Defendant Sheriff John L. Scott,
    in his official capacity only

Dated: _____, 2014

AMERICAN CIVIL LIBERTIES UNION

By: _____
    Margaret Winter
    Attorneys for Plaintiffs Alex Rosas and
    Jonathan Goodwin, and the Plaintiff Class

Dated: 9-26-14, 2014

OFFICE OF COUNTY COUNSEL,
COUNTY OF LOS ANGELES

By: _____
    Roger H. Granbo
    Attorneys for Defendant Sheriff John L. Scott,
    in his official capacity only

HOA.1098696.2

11