14-0406\PDECS150224.ejg
GREEN & SHINEE, A P.C.
RICHARD A. SHINEE State Bar No. 62767
ELIZABETH J. GIBBONS State Bar No. 147033
Attorneys at Law
16055 Ventura Boulevard, Suite 1000
Encino, California 91436
Phone: (818) 986-2440
Facsimile: (818) 789-1503
Attorneys for Intervener, ALADS

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX ROSAS, et al., | Case No. 2:12 CV 00428-DDP-SH |
| Plaintiffs, | |
| v. | **DECLARATION OF RICHARD A. SHINEE WITH EXHIBITS THERETO, IN SUPPORT ALADS' REPLIES TO PLAINTIFFS' AND DEFENDANT'S OPPOSITION TO MOTION TO INTERVENE** |
| LEROY BACA, et al., | |
| Defendants. | |
| ASSOCIATION FOR LOS ANGELES DEPUTY SHERIFFS, On Behalf of Its Members, | DATE:        March 9, 2015 |
| [Proposed] Intervenor, | TIME:        10:00 A.M.<br>PLACE:       Courtroom 3<br>             Hon. Dean D. Pregerson |

Proposed Intervenor, Association for Los Angeles Deputy Sheriffs ("ALADS"), hereby submits the following Declaration and Exhibits in support of ALADS' Reply to Defendant's Opposition to ALADS' Motion to Intervene, filed concurrently herewith.

DATED: February 24, 2015                   Respectfully submitted,

                                            GREEN & SHINEE, A P.C.


                                            By: _____//S//_____
                                                RICHARD A. SHINEE
                                                Attorneys for Intervener, ALADS

**<u>DECLARATION OF RICHARD A. SHINEE</u>**

I, Richard A. Shinee, hereby declare as follows:

1.      I am an attorney at law, duly admitted to practice before all the courts of the State of California, as well as the Central District of California and the 9th Circuit Court of Appeal.  I am the senior partner in the law firm of Green & Shinee, the attorneys for Intervenor, ALADS in this litigation.

2.      The facts set forth in this declaration are true based upon my own personal knowledge.  As to those facts stated herein to be based on information and belief, I believe those facts to be true.  If called as a witness, I would and could competently testify to the facts set forth herein.

3.      In my capacity as General Counsel to ALADS, I have directly participated in numerous meet and confer negotiations with the Department.  In addition, I have had the opportunity to both examine ALADS Executive Directors and Board Members, as well as cross-examine Sheriff's Department managers involved in the collective bargaining process, in the course of numerous Unfair Labor Practice Charge proceedings concerning negotiations, or lack thereof.

4.      I have, in addition, been involved in discussions with Department managers and executives which were clearly not meet and confer negotiations or collective bargaining meetings.

5.      Based upon this experience, I am quite familiar with the normal process followed in meet and confer sessions, as well as the significant differences between negotiation sessions and informational exchange meetings.

6.      For example, in meet and confer bargaining sessions, I always include a bargaining team consisting of ALADS members who are knowledgeable about the subject matter which is being negotiated.  In an information exchange meeting, I would usually participate alone or with one or two ALADS Board members and/or the Executive Director of ALADS.

7.      Similarly, in a bargaining session I would ensure that a

secretary from ALADS was present to be a scribe, taking detailed notes of the discussion.  In an informational exchange meeting, I would not include a scribe.

8.      It is my practice, which I have followed for over 35 years of participating in labor negotiations, to always begin a bargaining session with a discussion of ground rules.  These ground rules generally include an agreement between the parties as how proposals and counter-proposals will be made, i.e., orally or in writing, an agreement concerning whether the parties will sign off on each separate issue as a tentative agreement as the agreement is reached, or wait until all issues have been decided and then prepare a written tentative agreement.

10.      Prior to our first meeting which the Sheriff's Department in January, 2015, which I understood to be in response to my December 19, 2014 letter to Sheriff McDonnell, the only correspondence I received from the Department was a letter from Lt. Daniel Lopez, a copy of which is attached to my previously filed declaration and marked as Exhibit C.

11.      The content of Lt. Lopez's letter seemed to me to be deliberately vague as to the Department's intent and purpose of this meeting.  In that it uses terms such as "*meet and discuss*" and "*informational meeting*" when we specifically requested from Sheriff McDonnell was to bargain over the changes required by the Settlement Agreement and Implementation Plan.

12.      The first meeting following my letter to Sheriff McDonnell took place on January 27, 2015.  I attended the meeting with a selected bargaining team, which consisted of my partner, Elizabeth Gibbons, ALADS' Vice President, ALADS' Executive Director, one of the ALADS Membership Outreach Consultants, whose assignment is to interface with deputies assigned to some of the County Jails, a deputy sheriff who is assigned to one of the County Jails, and a scribe.

13.      At the first meeting, the Department arrived with an assembled bargaining team, which consisted of the Captain and Lt. Lopez from Employee

Relations, two attorneys from County Counsel's office, one of whom, Mr. Brouwer, I had previously engaged in various negotiations with, the other, Mr. Beck, I had never met before, Commander Dyer from Custody Service administration, and at least 3 three lieutenants from Custody Division.

14. My first and most important concern at this meeting was to determine what exactly the Department's position was with regard to the purpose of the meeting. My bargaining team and I believed we were there to negotiate and bargain over the language and substance of the terms of the Implementation Plan. If that was not the Department's purpose, there would be no reason to continue the discussions.

15. In an effort to learn the Department's position, I directly asked the Department's bargaining team if they believed they had a duty to meet and confer with us over the terms of the policies to be adopted under the Implementation Plan. After much hemming and hawing on the Department's team's part, Lt. Lopez finally stated that they did believe the matter was negotiable and they were there to meet and confer with ALADS. Mr. Brouwer immediately contradicted Lt. Lopez and stated that he did not believe the Department had any obligation to negotiate with ALADS as no substantial changes to any policy were going to be made and any changes were all within management's prerogative.

16. We discussed this issue for some time as I had no interest in wasting my time, nor the time of any of my bargaining team members, if the meeting was for nothing more than the Department to tell us what rule and policy changes were going to impose. Mr. Brouwer's position on whether the meeting was a bargaining session or not vacilated from absolutely not, to well, it depends on which provision of the Implementation Plan you are talking about, to we are just hear to listen to your concerns, to we do have an obligation to bargain over any changes which affect discipline, officer safety or workload.

17. At the end of this first meeting, we scheduled additional

meetings for January 29th, January 30th, and February 2, 2015.  The only reason I agreed to schedule these additional meeting dates was because of Mr. Brouwer's specific agreement that the meetings were for the purpose of bargaining over the proposed rule and policy changes required by the Implementation Plan.

18.    The January 29, 2015 meeting was subsequently cancelled as the result of Mr. Brower's refusal to provide me with a complete copy of the finalized Implementation Plan, which I needed to ensure that all parties were working off the same document.  Mr. Brouwer subsequently provided me with that document and a second meeting took place on January 30, 2015.   I began the meeting by discussing ground rules, as we had not touched on this subject in the prior meeting.  This issue was not discussed in the first meeting because so much of the meeting involved our attempts to understand, and get a clear answer from the Department on its position whether the meetings were or were not meet and confer sessions.

19.    When I proposed ground rules for the meetings, which again was based on my understanding of the Department's position that these were formal meet and confer negotiation sessions, Mr. Brouwer specifically agreed to my proposed ground rules that the parties would exchange written proposals for language changes and when any such changes were agreed upon, a tentative agreement on that topic would be signed as the negotiations progressed, rather than wait until the end.

20.    Mr. Brouwer likewise agreed that a final written agreement would be drafted reflecting all points of agreement between the parties when the negotiations were complete.  No written agreements or memorialization of agreements would be necessary or even contemplated if these meetings were, as Commander Dyer now characterizes them, simply the Department listening to ALADS' concerns about the policy and rule changes required by the Implementation Plan.

4

21.     The final written agreement which I proposed, and to which Mr. Brouwer agreed, is commonly referred to by the parties as a Side Letter Agreement, an Operational Agreement, or Points of Agreement, and is designed and intended to be an enforceable labor contract between the parties.  ALADS and the Sheriff's Department have, over the years, entered into, and abided by, approximately 600 such Agreements.

22.     Side Letter or Operational Agreements are always the end product of meet and confer negotiations.  They are not prepared as the result of information meetings between ALADS and the Department.

23.     In my further effort to ensure that ALADS and my bargaining team members were not simply wasting our time in these meetings, I also asked, at the January 29, 2015 meeting, if any of the Department representatives present had the authority to agree to any changes to the proposed policy and rule modifications required by the Implementation Plan which were being discussed at the meeting. Mr. Brouwer stated that any changes had to be agreed to by both the Panel of three experts as well as the Plaintiffs in this litigation.

24.     My response to this statement by Mr. Brower was that ALADS is therefore entitled to negotiate these proposed rule changes directly with Plaintiffs and the panel.  Mr. Brouwer replied that the only way those negotiations would happen is if this intervention Motion is granted.  Mr. Brouwer, however, thereafter specifically agreed that any agreement reached during these negotiations would be formally memorialized in a written Side Letter Agreement between ALADS and the Department.

25.     If, as Commander Dyer stated in his Declaration, the Department made clear that the meetings were not negotiation sessions, but were just a chance for ALADS to air its concerns, I would not have attended any further meetings but would, instead, have filed an unfair labor practice charge against the Department.  Based upon the Department's position in its Opposition brief that it

has no obligation to meet and confer or negotiate these rule changes with ALADS, my office has begun to prepare an Unfair Labor Practice Charge to be filed as soon as possible.

26.    In addition, during the first meeting on January 27, 2015 Commander Dyer volunteered to the ALADS bargaining team that neither he nor anyone from the Sheriff's Department had any involvement at all in the preparation or creation of the Implementation Plan.  Commander Dyer stated that he was handed the Implementation Plan as a completed document, or as he characterized it, "*a done deal*," to which the Department had no initial input, and was told "*this is what is going to the Court*."

27.    Commander Dyer further stated in the first meeting that there were some modifications made to the Document at the Department's request but they were minor changes and not all of the changes the Department requested were made.

28.    At the second meeting, on January 30, 2015, Commander Dyer was asked directly if he was involved in the preparation of the content of the Implementation Plan.  Contrary to his representations to this Court in his Declaration, Commander Dyer stated to ALADS that no one from the Department had any input into the Implementation Plan, that it was prepared by County Counsel representing the County not the Sheriff's Department, Plaintiffs' counsel and the Panel, and that he first saw the plan as a completed "done deal" at an unknown time in approximately late Fall of 2014.

29.    During all three meetings which my bargaining team and I have had with the Department to date, we have requested that the Department provide us with documents which we identify as necessary for us to prepare for further negotiations.  The provision of such documents is, again, a requirement during collective bargaining but not during an informational meeting.

30.    During the first meeting, we requested that the Department

6

provide us with all documents exchanged by the parties in the creation and preparation of the Implementation Plan.  Mr. Brouwer agreed to provide these documents but refused, on the basis of privilege, to provide us with documents related to the selection of the Panel members.

31.     In the second meeting, we asked Commander Dyer to provide us with the original version of the Implementation Plan which he was given as "*a done deal*" as well as the suggested changes which were offered by the Department.  At the January 30, 2015 meeting Commander Dyer stated he would provide us with that information.  At the February 2, 2015 meeting, however, Commander Dyer stated he could not find those documents but that he was still looking for them.

32.     On February 13, 2015, in anticipation of a bargaining session which had scheduled for February 17, 2015, I sent Mr. Brouwer a letter requesting, again, all the documents which we had requested orally in our three prior meetings, and which Mr. Brouwer in those meetings had agreed to provide.  A copy of my February 13, 2015 letter is attached hereto and marked as Exhibit "G."

33.     Our scheduled February 17th meeting was cancelled due to the illness of one of our bargaining team members.  On February 20, 2015, Mr. Brouwer responded to my February 13th letter, now refusing to provide us with the original version of the Implementation Plan or any modifications suggested by Commander Dyer, as well as a number of other documents which the Department previously agreed to provide.  A copy of Mr. Brouwer's February 20, 2015 email is attached hereto and marked as Exhibit "H."

34.     Also contrary to the Department's position in their Opposition papers, the proposed rule change which will impose a "*firm zero tolerance policy for  acts of dishonesty*" as is required by Section 13 of the Implementation Plan, does directly and significantly impact the negotiated grievance procedure between ALADS and the Sheriff's Department.

7

35. The negotiated grievance procedure, which is set forth in Appendix B of the MOU, and the consistent practice of the parties under the terms of the MOU, allows a deputy sheriff who has been notified of the Department intent to discipline him or her with any penalty less than discharge, including any suspension, demotion in rank, removal from a bonus position, transfer, or a reprimand, to grieve that proposed discipline. Through the grievance procedure, the discipline may be modified, reduced, or eliminated, but not increased.

36. The negotiated grievance procedure provides for a three step process. The first step is a meeting between the deputy and his or her unit commander, in most cases a Captain. The second step is a Review Board hearing. The Review Board consists of the deputy's Chief, Area Commander, and two peers of his or her choice. The third step is Arbitration. A copy of the negotiated MOU grievance procedure is attached hereto and marked as Exhibit "I."

37. All participants in the first two steps, i.e., the deputy's unit commander or Captain, the area Commander, Chief, and both peers, all have the authority under the grievance procedure to modify, reduce, or eliminate the proposed disciplinary penalty.

38. The "*firm zero tolerance policy  for acts of dishonesty*" required by the Implementation Plan directly, and significantly, adversely affects this agreed upon grievance procedure in that it completely strips all authority from the unit commander, Chief, area Commander and peers of any authority to modify, reduce, or eliminate proposed discipline.

39. In addition, by requiring discharge in all cases and under all circumstances where dishonesty is suspected, this rule change required by the Implementation Plan renders the Constitutionally required pre-deprivation hearing afforded to a deputy facing a proposed penalty of discharge completely meaningless since no modification of the penalty is allowed by the proposed new policy.

40.    This proposed "*zero tolerance*"rule change will likewise significantly modify, to the detriment of all ALADS members assigned to any position within the Department, the present policy concerning discipline which will be imposed for various acts of misconduct.

41.    Attached hereto and marked as Exhibit "J," is a copy of the latest version of the "*Guidelines for Discipline*," which constitutes the Department's published policy on discipline.  The vast majority, if not all, present Chiefs, and Assistant Sheriffs in the Sheriff's Department who have ever testified in a Civil Service Commission hearing on a deputy sheriff's appeal from a disciplinary penalty, have testified under oath, in response to questions which I have personally asked them, that the Guidelines for Discipline constitutes the Sheriff's Department's published policy on discipline.

42.    The Department's discipline policy sets forth ranges of discipline which the Department believes are appropriate for specific acts of misconduct.  (Ex. J, pp. 26 - 34.)

43.    The mandatory penalty of discharge in all cases and under all circumstances where force is not properly reported or the Department believes the Deputy is being dishonest, will significantly increase the disciplinary penalties presently in place for those acts of misconduct.

44.    Under the current Guidelines for Discipline, the failure to report force can presently result in a suspension of 15 to 30 days **or** discharge.  (Ex. J at p. 33.)

45.    The failure to report force which is witnessed, rather than used, by a deputy sheriff presently has a maximum penalty of 15 days suspension.  (Ex. J at p. 33.)

46.    Lying to a supervisor presently carries a penalty range of 10 days to discharge.  (Ex. J at p. 29.)

47.    Lying to a supervisor or falsifying a report about a force

incident carries 20 days to discharge.  (Ex. J at p. 29.)

48.     Lying during an investigation, either criminal or administrative, poses a potential penalty of 25 days suspension to discharge.  (Ex. J at p. 30.)

49.     Giving a supervisor false information concerning the reason for initiating or continuing a vehicle pursuit presently results in a penalty of 10 to 15 days suspension, but not discharge.  (Ex. J at p. 34.)

50.     The misuse or abuse of sick time, which invariably involves an allegation of lying about the reason for an absence, presently results in a suspension of 1 to 3 days, but not discharge.  (Ex. J at p. 31; see also, p. 30.)

51.     Involvement in deceitful business practices presently carries a disciplinary penalty of 5 to 15 days off.  (Ex. J at p. 26.)

52.     These are some, but not all, of the potential acts of misconduct involving dishonesty or failure to report force which presently expose a deputy sheriff to disciplinary penalties significantly less sever than discharge.  All of these, however, will be significantly changed by the proposed Rule requiring a zero tolerance policy for all acts of misconduct or failure to report force.

53.     While I did read some, but not all of the ACLU's media releases concerning its filing of the present lawsuit, neither I nor ALADS was ever notified by the Department, in writing, as required by Government Code section 3504.5, that it was entering into settlement negotiations concerning this lawsuit and that the negotiations were aimed at changing the existing force and disciplinary policies of the Department.

54.     Contrary to the representations and arguments asserted by Plaintiffs in their opposition papers, however, neither I nor ALADS was on notice, either actual or constructive, of the relief sought in the complaint, or of the parties' involvement in any discovery procedures, or the parties involvement in any settlement negotiations, until after I read the December 19, 2014 editorial in the Times concerning the agreed upon settlement of the lawsuit.

55.     Further, prior to my review of the Times editorial, I was not aware that this lawsuit would negatively impact ALADS or its rights.  I understood this lawsuit to be concerned with specific alleged acts of excessive force against inmates.  These types of lawsuit are filed regularly against the Sheriff's Department, the County, and often the allegedly involved Deputy.

56.     The County, not ALADS, is statutorily required to provide a defense for the named deputy and to indemnify the deputy for any non-punitive damages awarded by a jury.  ALADS simply does not have the time or the resources to monitor the court dockets of every lawsuit filed against the sheriff's department alleging use of excessive force.

57.     Every conversation I had with a Sheriff's Department manager concerning the present lawsuit between 2012 and 2014 was that the lawsuit was being defended on the merits due to the lack of merit to the substantive allegations.

58.     Many Department managers and executives expressed to me, during this same time frame, a concern that the United States Department of Justice intended to seek a Consent Decree against the Department concerning the use of force in the County jails, and that such consent decree, like the numerous consent decrees which the Federal Government has obtained in major metropolitan areas throughout the County, would significantly change the Department's use of force policy.

59.     No one from the Sheriff's Department, or the County, either formally or informally, ever advised me that they believed the same policy modifications were at issue or would result from the litigation in this case.  It was only during the first meeting with what I believed to be the Department's bargaining team, on January 27, 2014, that I learned that the U.S. Department of Justice had agreed with or was discussing the possibility of allowing the Implementation Plan in this lawsuit take the place of a consent decree with the

federal government.

60.    The first letter I wrote to Sheriff McDonnell concerning the Department's obligations to negotiate any proposed changes to the Department's force and related policies was on December 16, 2014 and specifically related to potential policy changes which ALADS expected to result from a consent decree with the Federal Government.  A copy of my December 16, 2014 letter to Sheriff McDonnell was attached to my previously submitted Declaration, as Exhibit "E," and is not re-submitted herewith to avoid duplication of documents.

61.    After I read the Times' editorial concerning the settlement of the present litigation, I wrote a second letter to Sheriff McDonnell, specifically requesting to meet and confer with the Department regarding policy changes resulting from this settlement.  This letter was sent to the Department in December 19, 2014, the same date on which Ms. Gibbons' letter to counsel regarding our proposed intervention motion was sent.  A copy of my December 19, 2014 letter to Sheriff McDonnell is attached hereto and marked as Exhibit "K."  A copy of Ms. Gibbons' December 19, 2014 letter to counsel was attached to my previously submitted Declaration, as Exhibit "F" and is not re-submitted with this Declaration.

62.    Plaintiffs also assert in their opposition papers that ALADS deliberately delayed for two weeks in filing its Motion for Intervention.  In fact, the only reason for that delay was due to a death in Ms. Gibbons' family.  Ms. Gibbons was primarily responsible for drafting the Motion papers and was pre-occupied during the majority of the month of January, 2015.

63.    The death in Ms. Gibbons' family was the only cause of the delay, and not, as Plaintiffs suggest, ALADS' devious design to wait for the Court's preliminary approval order in an effort to delay the final approval timeline.

I declare under the penalty of perjury of the laws of the State  of California that the foregoing is true and correct.

Executed this 24th day of February, 2015 at Encino, CA.


_____
//S//
RICHARD A. SHINEE

PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF LOS ANGELES        )

I am a citizen of the United States and a resident of the County aforesaid; I am over the age of eighteen years and not a party to the within action; my business address is 16055 Ventura Boulevard, Suite 1000, Encino, California, 91436.

On the date written below, I served the within

**DECLARATION OF RICHARD A. SHINEE WITH EXHIBITS THERETO, IN SUPPORT ALADS' REPLIES TO PLAINTIFFS' AND DEFENDANT'S OPPOSITION TO MOTION TO INTERVENE**

**re: Rosas v. Baca et al., Case No. CV 00428-DDP-SH**

on the interested parties in said action by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States mail at Encino, California, addressed as follows:

**SEE SERVICE LIST**

**XX**     (**FEDERAL**) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on February 24, 2015, at Encino, California.

_____
//S//
Karen Asseraf

## PROOF OF SERVICE MAILING LIST

Donna D. Melby, Esq.
Paul Hastings L.L.P.
515 South Flower Street, 25th Floor
Los Angeles, CA 90071-2228

Eric G. Balaban ACLU National Prison Project
915 Fifteenth Street NW, 7th Floor
Washington, D.C. 20005

Peter J. Eliasberg
ACLU Foundation of Southern California
1313 West Eight Street, Suite 200
Los Angeles, CA 90017

Paul Beach
Lawrence, Beach, Allen & Choi, LLP
100 West Broadway, Suite 1200
Glendale, CA 91210