**SCHEPER KIM & HARRIS LLP**
RICHARD E. DROOYAN (Bar No. 65672)
rdrooyan@scheperkim.com
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone: (213) 613-4655
Facsimile:  (213) 613-4656

**Monitor and on behalf of Monitors**
**Jeffrey Schwartz and Robert Houston**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS, et al.<br><br>            Plaintiffs,<br><br>          v.<br><br>LOS ANGELES COUNTY SHERIFF LEROY BACA, in his Official Capacity,<br><br>          Defendant. | CV No. 12-00428 DDP<br><br>**PANEL'S SECOND REPORT** |

Pursuant to the Section V of the Settlement Agreement And Release of Claims, the Monitors appointed by this Court, Jeffrey Schwartz, Robert Houston, and Richard Drooyan (collectively the "Panel") hereby submit the attached Panel's Second Report "evaluating Defendant's Compliance with Action Plan" prepared by the Panel and approved by the Court for the six-month period from January 1, 2016, to December 31, 2016.  This Report takes into consideration the comments from the parties in accordance with Section V of the Agreement.  The Panel is available to answer any questions the Court may have regarding the Report at such times as are convenient for the Court and the parties.

DATED:  March 1, 2017          Respectfully submitted,

                               SCHEPER KIM & HARRIS LLP
                               RICHARD E. DROOYAN


                               By:  /s/ Richard E. Drooyan
                                    Richard E. Drooyan
                                    Monitor and on behalf of Monitors Jeffrey
                                    Schwartz and Robert Houston

# PANEL'S SECOND REPORT

The Settlement Agreement and Release (the "Agreement") between the parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan ('Reports') [developed by the Panel] at intervals the Panel shall determine."  This Report sets forth the status of, and assesses, the implementation of the provisions of the Action Plan (the "Plan") during the period from January 1, 2016, through December 31, 2016 (the "Second Reporting Period"), and is created for the purposes of the settlement of the *Rosas* case.

This Report  takes into consideration letters received from the Parties in response to the draft of this report submitted to the Parties in accordance with Section V of the Agreement.  By letter dated February 2, 2017, counsel for Plaintiffs responded to Defendant's comments on the draft report, but advised the Panel that "Plaintiffs' ability to comment meaningfully [on the draft report] is hampered by Defendant's refusal to provide any of the documents" Plaintiffs previously requested.  The Panel understands that County has objected to the scope of Plaintiffs' document requests.  The Panel also understands that the Parties are attempting to negotiate a resolution of this issue.  The Panel encourages the Parties to reach agreement on the relevant documents and information Plaintiffs need to be able to assess the Panel's conclusions about the Department's compliance with the Action Plan.  In May 2014, the Parties retained the Panel "to prepare an Action Plan relating to certain policies and practices employed in the Los Angeles County Jails" in downtown Los Angeles (the "Downtown Jail Complex")[1] in areas of concern to the Parties. Pursuant to Paragraph III of the Agreement, the Panel developed a Plan that was submitted to the Parties and the Court in October 2014.[2]  The Plan sets forth provisions that the Los Angeles County Sheriff is required to implement in the twenty-one areas discussed in this Report pertaining to the use of force by members of the Sheriff's Department (the "Department") in the Downtown Jail Complex.

The Agreement contemplated that many of the provisions of the Plan would be implemented within six months after the Panel submitted the Plan to the Court and the parties,[3] but the Agreement did not receive Final Approval from this Court until April 21, 2015.  Further, as discussed in the Panel's Report submitted to the Court on April 7, 2016, for the Initial Reporting Period from July 1, 2015 through December 31, 2015, the Agreement contemplates a two-step process of Department's "implementation" of the Panel's recommendations followed by the Panel's monitoring the Department's "compliance."  It provides that "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented, it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')."  Agreement, Paragraph VIII.  Thus, for example, the Department must

---

[1] The jails in the Downtown Jail Complex are Men's Central Jail ("MCJ"), the Twin Towers Correctional Facility ("TTCF") and the Inmate Reception Center ("IRC").

[2] The Panel used the term "Implementation Plan" rather than "Action Plan."

[3] *See* Paragraph VIII(1) ("It is anticipated. . .that Defendant will implement and be judged to be in compliance with numerous recommendations in six months or less from the submission of the Action Plan to the Court").

1

first adopt new use of force policies that implement the recommendations in Section 2 of the Plan. Once the Panel certifies that the Department has adopted the required policies, the Panel monitors the Department's use of force in the Downtown Jail Complex to assess its compliance with these policies.

Although the Agreement contemplates the Panel will commence its monitoring new policies once it certifies that they have been adopted by the Department, the Panel recognized that the Department also needed to develop and commence the new training required by the Action Plan before the Panel could assess the Department's compliance with these policies. For example, the Department needed to commence the new training required by Sections 3 ("Training and Professional Development Related to Use of Force") and 4 (specialized training on the "Use of Force on Mentally Ill Prisoners and Other Special Needs Populations") of the Action Plan before the Panel commenced monitoring compliance with policies encompassed in Section 2 ("Use of Force Policies and Practices"), Section 9 ("Security Practices"), Section 15 ("Documentation and Recording of Force Incidents"), and Section 17 ("Use of Restraints"). Similarly, the Panel concluded that the Department needed to develop new training "in conducting use of force investigations" and "the new protocols for conducting such investigations" required by Section 12.1 before it commenced monitoring of the protocols that were adopted to implement the rest of Section 12 ("Reviews and Investigations of Use of Force Incidents"), Section 15 ("Documentation and Recording of Force Incidents"), and Section 16 ("Health Care Assessments").

The Panel also recognized that the Parties needed a set of Compliance Measures by which the Panel would measure the Department's compliance with the policies adopted to implement the Action Plan. Unlike in *United States of America v. County of Los Angeles and Los Angeles County Sheriff Jim McDonnell,* CV No. 15-05903 (the "DOJ case"), the Parties in the *Rosas* case did not agree on Compliance Measures before they entered into the Settlement Agreement. Thus the Panel needed to develop Compliance Measures for the 105 provisions in the 21 different subject matter areas in the Plan that covered training, policies, and practices, with input from the parties to ensure that the final Compliance Measures were both meaningful and achievable. The complex and time-consuming process to develop and finalize the Compliance Measures took several months before the Panel concluded that the Compliance Measures satisfied this criteria. The Panel gave both Parties several opportunities to critique and comment on the various drafts of the Compliance Measures, and incorporated many of the changes requested by the Parties. On November 17, 2016, the Panel adopted the final Compliance Measures that they will use to determine the Department's compliance with the provisions of the Plan for the twelve- and eighteen-month periods required by the Settlement Agreement.

As noted in the Panel's First Report, on December 11, 2015, the Panel certified that the Department had "adopted policies, directives, and practices that implement" 67 of the recommendations in the Action Plan, including all of the use of force related policy recommendations. Pursuant to agreement of the parties, the certification was as of December 1, 2015. Also during the First Reporting Period, the Panel approved the Department's Ethics training program, although it omitted the program from its December 11, 2015 certification.

2

On December 19, 2016, the Panel certified that the Department adopted policies, directives, and practices to implement another 33 recommendations in nine areas during the Second Reporting Period from January 1, 2016. At the same time, the Panel also certified the Department's Ethics training program.

As of December 19, 2016, the Department has implemented 101 of the recommendations in the Plan. The Panel is of the view that two of the recommendations, §4.10 (expansion of conflict resolution training) and §9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in the DOJ case, but there is a disagreement among the parties about whether the Panel is required to monitor the Department's compliance with §9.1, which sets forth requirements for safety checks that are encompassed by the terms of the Settlement Agreement in the DOJ case. Absent instructions to the contrary from the Court, the Panel is not intending to monitor the Department's safety checks that are being monitored in the DOJ case.

There are four additional recommendations that have not been implemented by the Department as of December 31, 2016, pertaining to the use of force investigations training required by §12.1, and development of a formal Early Warning System as required by §§19.1 through 19.3. The Panel met with the Department on December 19, 2016, to discuss concerns about the use of force investigations training and to receive a status report on the Early Warning System set forth in this report.

There is one significant remaining issue that the Panel believes the parties need to resolve. Under the Settlement Agreement, all recommendations implemented during the same six-month period are grouped together for purposes of determining compliance with the "consecutive" twelve-month period, no matter how disparate the recommendations may be. Under this "cross-collateralization," a failure to comply with a recommendation in one area during a twelve-month period means that the twelve-month time period starts over for all recommendations that were implemented in the same six-month period. This is the case regardless of the relationship between the recommendations implemented in the same period.

Plaintiffs have expressed the view that, under the Agreement, the Department must demonstrate compliance with all of the 105 recommendations for twelve consecutive months because not all of the recommendations were implemented within twelve months after the Plan was submitted to the parties and the Court, notwithstanding that there was no Final Approval of the Settlement Agreement for six months after the Plan was submitted. Based upon the many new policies and systems the Department is implementing across 21 categories in the Action Plan, the additional training required, and the Compliance percentages that the Department is required to meet, the Panel is doubtful that, despite the Department's best efforts, it will be able to comply with all 105 recommendations for twelve consecutive months in the foreseeable future.

As noted by Plaintiffs, in a meeting with the Parties last year the Panel expressed the view that "it is appropriate to consider organizing the compliance groupings (buckets) in a different way from that set out in the Settlement" rather than "grouping them based on the time of implementation." Plaintiffs report that they have "agreed to amend the termination provision

3

by changing to subject matter buckets," and that that the Parties "are in the process of negotiating how to amend the consent decree provision on compliance and termination." The Panel urges the parties to develop a meaningful and achievable framework for determining the Department's compliance under the Settlement Agreement.

As discussed in more detail below, during the Second Reporting Period, the Panel visited the jails in the Downtown Jail Complex on multiple occasions and met with inmates and staff during those visits, observed training several sessions, and met with the leadership of Custody operations on several occasions to provide feedback on the Panel's observations. The Panel also reviewed force packages pertaining to incidents involving inmates who were interviewed by the Panel and/or identified by Plaintiffs as having potentially problematic issues. The Panel also reviewed and recommended revisions to the Department's curriculum and training materials for the Conflict Resolution (known as DeVRT), and use of force training programs. The Panel's recommendations were generally well received by the Department and both those training programs were approved. The Panel also reviewed and commented on the use of force investigations training, but did not finally approve that training during the Second Reporting Period. The Panel also attended training sessions for DeVRT and for the new use of force policies, and made a number of suggestions for enhancing the training sessions.

The Panel also reviewed multiple drafts of policies adopted by the Department to create a substantially revamped new system for the handling of inmate grievances and requests. The Panel recommended a number of revisions to the grievance system and policies, which were generally adopted by the Department. The Panel ultimately approved the new grievance system, which was implemented by the Department on July 15, 2016.

Finally, as noted, the Panel drafted and revised proposed Compliance Measures to set forth how the Panel would determine the Department's compliance the Action Plan. On November 17, 2016, the Panel promulgated Compliance Measures for the 105 recommendations that will be the subject of the Panel's monitoring activities beginning as of January 1, 2017.

4

## ACTION PLAN IMPLEMENTATION

### 1.    Leadership, Administration and Management

The four recommendations in this section (§1.1 through §1.4) of the Action Plan require that Custody Operations be headed by an Assistant Sheriff with no other areas of responsibility, the Sheriff be personally engaged in management of the Department's jail facilities, Department managers be held accountable for any failures to address force problems in the jails, and the Department regularly report to the Board of Supervisors on use of force and its compliance with the Action Plan.  Custody Operations has been headed by an Assistant Sheriff with no other areas of responsibility since well before December 1, 2015, and is continuing this structure under Kelly Harrington, the new Assistant Sheriff for Custody Operations, who was hired to replace Assistant Sheriff Terri McDonald.

The Department also provided policies regarding the responsibilities of the Sheriff, the Assistant Sheriff for Custody Operation, and command staff, and described reporting practices to implement each of these provisions, effective December 1, 2015.  The Department has since revised CDM 2-01/030.00 to address the requirements of §1.3 of the Action Plan to require Unit Commanders to be "held accountable should they fail to address use of force problems" in their jail facilities.

### 2.    Use of Force Policies and Practices

The first recommendation in this section (§2.1) requires the Department to "have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations[.]"  On October 16, 2015, the Department provided the Panel with a Custody Operations Force Manual with separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints, Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved Shootings.  This implements §2.1, effective December 1, 2015.

The remaining twelve recommendations (§2.2 through §2.13) require the Department to adopt new use of force policies for Custody Operations.  The Department submitted multiple drafts of proposed use of force polices to the Panel to implement these recommendations.  The Panel reviewed the drafts, required changes where appropriate, and ultimately approved use of force policies for Custody Operations that implement these recommendations, effective December 1, 2015.

During the Second Reporting Period, the Panel visited the Downtown Jail Complex on multiple occasions, interviewed inmates identified by Plaintiffs as individuals with knowledge of or complaints about excessive use of force by Department personnel, and talked to many other inmates generally about these issues.  The Panel also reviewed force packages regarding incidents involving the inmates identified by Plaintiffs and did not find any instances of excessive force by Department personnel in these force packages.  Although there were some complaints from the other inmates about, for example, food and responsiveness to grievances,

5

with one exception, the Panel did not hear complaints from them about excessive use of force by Department personnel.  With respect to the one exception, the Department's records seemed to refute the inmate's claim as to where and when the force incident took place.  A number of inmates who had been in the jails in the past volunteered that, with respect to the use of force, "things were a lot better" in the jails this time around, and that Deputy interactions with the inmates were more positive and respectful, and reflect a fundamental and positive change in the culture in the Downtown Jail Complex and the interactions between staff and the inmate populations.

Because the Compliance Measures were not issued and the use of force training was not approved until the fourth quarter of 2016, the Panel did not randomly select force packages for review in the Second Reporting Period.  As of January 1, 2017, the Panel commenced monitoring the Department's compliance with the Compliance Measures by reviewing completed force packages for force incidents in 2016.

### 3.    Training and Professional Development Related to Use of Force

The first four recommendations of this section (§3.1 through §3.4) require that Department members receive training in use of force policies; and ethics, professionalism, and treating inmates with respect; and that new Department members receive additional Custody specific training in these areas in the Academy or the Jail Continuum in Custody Operations.

The Panel reviewed the Department's proposed Ethics curriculum and training materials, attended several training sessions, and approved the Department's Ethics training in May 2015.  Although not certified until December 2016, compliance with §3.2, which requires such ethics training for existing personnel, will be determined when 90% of the existing personnel as of May 1, 2015, have received the ethics training and attended the refresher course as required by the Action Plan until the Agreement is terminated.

During the Second Reporting Period, the Panel reviewed the Department's proposed curriculum and training materials for its use of force policies, and attend a training session in December 2016.  The Panel certified the Department's compliance with §3.1, which requires such training for existing personnel, as of December 16, 2016.  Compliance with §3.1 will be determined when 90% of the existing personnel as of October 1, 2016, have received the use of force training and have attended the refresher course as required by the Plan until the Agreement is terminated.

In the First Reporting Period, the Department reported that new deputies are required to complete a six-week Jail Operations and Jail Operations Continuum course that includes custody-specific, scenario-based use-of-force training and training in ethics, professionalism and treating inmates with respect, and that new Custody Assistants receive training in these subjects during their nine-week Academy training.  For the ethics and use of force training of new personnel, compliance will require that 95% of the new members assigned to Custody Operations after July 1, 2015 receive the training.

6

§3.5 requires Unit Commanders to determine what additional training, counseling or mentoring may be required when a personnel complaint involving the use of force is resolved with a finding that it "Appears Employee Conduct Could Have Been Better."  The Department adopted a policy in CDM 8-01/020.00 as part of its new grievance system to implement this recommendation, which was approved by the Panel and certified as of December 19, 2016.

To implement §3.6, the Department issued 3-01/020.15 to require unit commanders  to review new Department members within 90 days of being initially assigned to a *Unit* and again before the end of their probationary period.  The Panel certified the Department's implementation of §3.6 as of December 1, 2015, as the policy technically meets the requirement of §3.6 that the initial assessment be within "six months of [a probationary employee] being assigned to *Custody*."  In the Panel's First Report, the Panel noted a concern expressed by Plaintiffs that "[n]inety days may be an insufficient time in which to assess and an employee's conduct."  As a result, the Department agreed to extend the 90-day period to six months for initial probationary review; it adopted a new Department-wide policy on September 22, 2016 in the Manual of Policy and Procedures, but had not yet finalized a revised 3-01/020.15 for the Custody Operations as of the end of the Second Reporting Period.  Compliance with §3.6 will require that Unit Commanders conduct meaningful and thorough assessments of the probationary employees performance within six months of the initial assignment and again "30 days prior to the end of the probationary period."  The Panel will randomly review initial and final assessments of probationary employees to assess compliance with this provision.

## 4.      Use of Force on Mentally Ill Prisoners and Other Special Needs Populations

The first five recommendations (§4.1 through §4.5) require the Department to adopt specific use of force policies for Custody Operations for dealing with mentally ill prisoners.  The Panel reviewed drafts of Department use of force policies to implement these recommendations, required changes where appropriate, and certified that the Department had implemented these recommendations, effective December 1, 2015.

The next four recommendations (§4.6 through §4.9) require the Department to provide Custody-specific, scenario-based, skill development training for existing and new personnel in Crisis Intervention and Conflict Resolution and on "identifying and working with mentally ill inmates."  On March 4, 2016, the Panel approved the Department's "De-escalation & Verbal Resolution Training" ("DeVRT") materials to implement these recommendations.  Many Department members have commented that they found the DeVRT training to be very valuable and have used what they learned in the training to avoid having to use force in potentially problematic situations.

At a meeting on March 4, 2016, it was agreed that Department members who received the DeVRT training before it was finally approved will attend the first eight-hour refresher course that is required every other year, and that the refresher course will include the additional subjects added to the DeVRT training after November 6, 2015.  Compliance will be determined once 90% of Department members in Custody as of July 1, 2015 have received the required DeVRT training.  The members who received DeVRT training before the Panel approved the Department's DeVRT training materials will be included in the denominator of the formula to

7

calculate a compliance percentage, but will not be included in the numerator until they have completed the eight-hour refresher course.  In addition 95% of new members sworn in after July 1, 2015, must take the course and, if they took the course before the final materials were approved, they must attend the first eight-hour refresher course.

The final recommendation in this section (§4.10) is moot because the extension of the training in Crisis Intervention and Conflict Resolution to additional personnel is required by the Settlement Agreement in the DOJ case.

**5.      Data Tracking and Reporting of Force Incidents**

The three recommendations in this section (§5.1 through §5.3) require the Department to track use of force investigations, reviews, and evaluations; provide for appropriate reviews of the evaluations of force incidents; and conduct additional investigation of discrepancies and unexplained tactical decisions.  The Panel certified that the Department had adopted policies to implement these recommendations effective December 1, 2015.  Monitoring will begin as of January 1, 2017.

**6.      Inmate Grievances and Other Complaints of Excessive Force**

The recommendations in this section (§6.1 through §6.20) require extensive changes in how the Department handles inmate grievances and requests for service.  On July 15, 2016 the Department issued a new "Inmate Grievance Manual," which is Volume 8 of the Custody Division Manual, to implement a new grievance system.  It was approved by the Panel after extensive discussions with the Department and reviews of multiple drafts of the policies ultimately adopted by the Department.  On December 19, 2016, the Panel certified that the Department had adopted policies and practices to implement the recommendations in this section.  Monitoring of the grievance system will commence as of January 1, 2017, now that the Department has had nearly six months to implement the new system.

One issue that remains to be resolved is whether grievances about the timeliness of medical care are subject to monitoring by the Panel.  There is no disagreement that grievances about the timeliness of the Department's delivery of requests for medical care are subject to monitoring, and the Panel does not believe that it is qualified to assess grievances about the quality of medical care.  Absent agreement of the parties, the Panel intends to monitor all grievances about the timeliness of medical care.

The policies adopted by the Department for the new inmate grievance system do not "establish a centralized unit with sworn personnel, custody assistants, and civilian personnel" that would be "co-located" in the Twin Towers Correctional Facility and the Pitchess Detention Center as required by §6.16, although they do provide for some additional centralized oversight.  As the Panel stated in its initial Report to the Court, it is willing to defer to the Department's judgment on the organization of the grievance system with the understanding that the Panel reserves the right to re-visit the Department's compliance with §6.16 if the Department is not effectively and efficiently handling inmate grievances and requests for service.

**7.    Inmate Supervision, Staff Inmate Relations, and Communications with Prisoners**

The three recommendations in this section (§7.1 through §7.3) require the Department to advise inmates of the voluntary Conflict Resolution Meeting available under the Department's Conflict Resolution Policy; advise inmates of the results of Department investigations of inmate grievances; and ensure adequate avenues for constructive prisoner-staff communications. The Panel certified that the Department adopted policies and practices to implement these recommendations, effective December 1, 2015. Because these policies are, in effect, part of the grievance system, the Panel delayed monitoring until the Panel commences monitoring the new grievance system.

**8.    Retaliation Against Inmates**

Two of the recommendations in this section (§8.1 and §8.3) require the Department to prohibit personnel from retaliating against inmates and require the Custody Force Review Committee to review evaluations of investigations of inmate grievances that force was used to retaliate against the inmate. The Panel certified that the Department adopted policies to implement these recommendations, effective December 1, 2015.

The remaining section (§8.2) requires the Department to combine polices pertaining to "Complaints of Retaliation" into one section in the Custody Division Manual. On July 15, 2016, the Department adopted a revised policy in CDM §8-03/050 (Grievance of Retaliation) as part of the inmate new grievance system. On December 19, 2016, the Panel certified that the Department had implemented this recommendation.

**9.    Security Practices**

The Panel is of the view that the first recommendation in this section (§9.1), which pertains to cell checks, is moot because it is covered by the Settlement Agreement in the DOJ case, and is being monitored in that case. The Panel notes that Plaintiffs object to the Panel's position and believe that "the monitors should still monitor compliance with that provision, as amended through the US DOJ agreement." Absent a directive from the Court, the Panel is not intending to monitor compliance with §9.1.

The remaining two recommendations (§9.2 and §9.3) require the Department's use of force policies to provide that (1) staff members involved in a force incident should not escort the inmate to medical, holding or segregation after the incident and (2) Department members have a duty to protect inmates and to intervene as soon as it is reasonably safe to do so. The Panel reviewed drafts of Department policies to implement these recommendations, required changes where appropriate, and ultimately approved the policies, effective December 1, 2015. The Department has now added language consistent with §9.3 to CDM §7-01.010 (Force Prevention Principles) to track the language of §9.3.

9

**10.    Management Presence in Housing Units**

The two recommendations in this section (§10.1 and §10.2) require senior managers to periodically tour the jails and the Department to document visits by managers (above the rank of Sergeants) in electronic records or visitor logs.  The Panel certified that the Department adopted policies to implement these recommendations, effective December 1, 2015.  Monitoring will commence as of January 1, 2017.

**11.    Management Review of Force Incidents & Data**

The single recommendation in this section (§11.1) requires that the Custody Force Rollout Team's involvement in reviewing the correctness of evaluations of force incidents not delay the Department's investigation of such incidents.  The Panel certified that the Department adopted policies to implement this recommendation, effective December 1, 2015.  Monitoring will commence as of January 1, 2017.

**12.    Reviews and Investigations of Force Incidents**

The first recommendation in this section (§12.1) requires that all Custody Sergeants receive additional training in conducting force investigations and reviewing force reports.  The Panel has reviewed the Department curriculum, training materials, and training to implement this recommendation, and met with the Department on December 15, 2016, to discuss some lingering concerns.  The Panel has been working with the Department to enhance the training, and the Department reports that is has incorporated the Panel's recent suggestions in the training.  The Panel is scheduled to attend an investigative training session for sergeants later this month.  Once the training is approved, compliance will be determined as set forth in the Compliance Measures when 90% of the Sergeants assigned to Custody Operations as of October 1, 2016, have received the training.  In addition, 95% of the Sergeants promoted after that date must receive the training.

The next three recommendations (§12.2 through §12.4) require the Department to adopt policies and practices regarding the interviewing of inmates in connection with force incidents and the escorting of inmates involved in such incidents.  The Panel certified that the Department adopted policies to implement these recommendations, effective December 1, 2015.  Although the Panel has not approved the force investigations training course, the Panel believes that monitoring of these recommendations should commence as of January 1, 2017.

The final recommendation requires that use of force investigative packages should have a standard order and format.  The Panel certified that the Department adopted a policy to implement this recommendation, effective December 1, 2015.  All of the force packages reviewed by the Panel during the Second Reporting Period, including the force packages reviewed by the Monitor in the DOJ case during this period, have had a consistent order and format.

**13.     Disposition of Use of Force Reviews and Staff Discipline Issues**

The two recommendations in this section (§13.1 and §13.2) require the documentation of reasons and reporting to the Office of Inspector General whenever the Department does not terminate a member who has been found to have been dishonest, used excessive force, or violated the Prisoner Rape Elimination Act ("PREA").  During the Second Reporting Period, the Department adopted CDM §4-10/005.00 to implement these recommendations.  The Panel certified the Department's implementation of these recommendations as of December 16, 2016.  Monitoring of these recommendations will commence as of January 1, 2017.

**14.     Criminal Referrals and External Reviews of Use of Force Incidents**

The two recommendations in this section (§14.1 and §14.2) require (1) an additional review of referrals of an inmate for criminal prosecution arising from an incident involving the use of force by a Department member and (2) timely referrals to the District Attorney of "officer misconduct that may amount to criminal violations."  The Panel certified that the Department directive 15-006 implemented §14.1, effective December 1, 2015.  The Department considers the timely referrals to the District Attorney's office to be a practice in place as of December 1, 2015.  Monitoring of these recommendations will commence as of January 1, 2017.

**15.     Documentation and Recording of Force Incidents**

The seven recommendations in this section (§15.1 through §15.7) require the Department to have specific policies and procedures regarding the reporting of force incidents by Department members, the separation of Department members before writing reports of force incidents, and the review of force reports by Watch Commanders/Supervising Lieutenants and Unit Commanders.  The Panel certified that the Department adopted policies to implement these recommendations, effective December 1, 2015.  Monitoring of these recommendations will commence as of January 1, 2017.

**16.     Health Care Assessments and Documentation Following Force Incidents**

The three recommendations in this section (§16.1 through §16.3) require the Department to have policies for medical assessments of inmates and Department members involved in force incidents.  The Panel certified that the Department adopted policies to implement these recommendations, effective December 1, 2015.  The Department has now  revised CDM 7-07/000.00, as requested by Plaintiffs' counsel, to make it clear that the documented medical assessment of the inmate must be completed "as soon as practical."

**17.     Use of Restraints**

The first recommendation in this section (§17.1) requires that the Custody Force Manual include "a separate section that sets forth the general principles governing the use of restraints"

11

identified in this recommendation.  This Department included such a separate section in the Manual, effective December 1, 2015.

The remaining nine recommendations (§17.2 through §17.10) require the Department to adopt specific policies for the use of restraints in Custody Operations.  The Panel certified that the Department adopted policies that implement these recommendations, effective December 1, 2015.  Monitoring of these recommendations will commence as of January 1, 2017.

**18.     Adequate Staffing and Staff Rotations**

The two recommendations in this section (§18.1 and §18.2) require the Department to (1) maintain Custody-wide rotations policies and (2) audit each unit's compliance with its rotations policies.  The Panel certified that the Department adopted a policy for Custody Operations that implements these two recommendations effective December 1, 2015.  Monitoring of these recommendations will commence as of January 1, 2017.

**19.     Early Warning System Related to Use of Force**

The three recommendations in this section (§19.1 through §19.3) require the Department to develop a formal Early Warning System to identify potentially problematic employees based upon objective criteria.  The Panel met with the Department on December 15, 2016, to discuss the status of the  Early Warning System.  In order to develop a usable system in the next reporting period, the Department is rebuilding the current Personal Performance Index ("PPI") based system on a new WEB-based platform that will be able to generate reports on a unit basis and identify potentially problematic employees.  The Department reports that "the new platform has been completed and is in the testing stages."  Although it will not automatically generate "alerts," the Panel believes that it can function as an effective Early Warning System as long as the Department requires Compliance Lieutenants to generate, and Unit Commanders to review, tailored reports at least monthly.  Monitoring of the Early Warning System will require the Department to provide evidence that the reports are generated and reviewed timely.

**20.     Protocols for Planned Use of Force**

The three recommendations in this section (§20.1 through §20.3) require the Department to have two categories of force:  Reactive Force and Planned Force.  The Panel certified that the Department adopted policies to implement these recommendations effective December 1, 2015.  The Panel noted, however, that the force packages we reviewed during the Second Reporting Period continue to refer to force as "Directed Force" and "Rescue Force" rather than just using the terms "Reactive Force" and "Planned Force."  The Department has explained that these terms are used for statistical purposes and are not referenced in the Department's use of force policies.

The Panel believes the comingling of these terms will confuse staff because the Action Plan requires "planned" and "reactive" force, which are used in the Department's policies.  The Panel has recommended that the Department remove all references to force other than reactive or planned from procedures, curriculum, use of force forms, and supervisor review documents.  The Department, however, remains of the view that it is appropriate to "to continue to use 'directed'

12

and 'rescue' force to collect data and to further categorize, where relevant, the primary categories of Planned and Reactive Force" and that they "are important indicators to those who evaluate force statistics."

**21.    Organizational Culture Related to Use of Force**

This section (§21.1) requires that the Department's policies "provide that the Department will not transfer or assign a staff member to Custody as a sanction for problem employees."  On September 22, 2016, the Department adopted CDM §3-02/020.50, which the Panel certified effective December 16, 2016.  Monitoring will commence on January 1, 2017.