Jeremy D. Matz - State Bar No. 199401
    jmatz@birdmarella.com
Kimberley M. Miller - State Bar No. 260280
    kmiller@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Mary C. Wickham – State Bar No. 145664
    mwickham@counsel.lacounty.gov
Rodrigo A. Castro-Silva – State Bar No. 185251
    rcastro-silva@counsel.lacounty.gov
Amie S. Park – State Bar No. 273346
    apark@counsel.lacounty.gov
OFFICE OF THE COUNTY COUNSEL
Kenneth Hahn Hall of Administration
500 West Temple Street, #648
Los Angeles, California 90012-2713
Telephone: (213) 974-1804 ·
Facsimile: (213) 626-7446

Attorneys for Defendant
Los Angeles County
Sheriff Jim McDonnell

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>JIM MCDONNELL, Sheriff of Los Angeles County, in his official capacity,<br><br>        Defendant. | CASE NO. CV 12-00428 DDP (MRW)<br><br>**DECLARATION OF DANIEL J. DYER IN SUPPORT OF DEFENDANT SHERIFF JIM McDONNELL'S OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENTAND IN SUPPORT OF DEFENDANT'S OFFICIAL INFORMATION PRIVILEGE OBJECTIONS TO PLAINTIFFS' DOCUMENT REQUESTS**<br><br>Date:    March 12, 2018<br>Time:    10:00 a.m.<br>Crtrm.:  9C<br><br>Assigned to Hon. Dean D. Pregerson |

3470686.1

Case No. CV 12-00428 DDP (MRW)

I, Daniel J. Dyer, hereby declare as follows:

1.    I am a Commander with the Los Angeles County Sheriff's Department ("Department").  The following facts are within my personal knowledge or belief and, if called as a witness, I could and would competently testify thereto.

2.    I am the commanding supervisor for the *Rosas v. McDonnell* Settlement Agreement ("*Rosas*") related to the use of force at Inmate Reception Center, Twin Towers Correctional Facility, and Men's Central Jail (collectively, the "Jail Complex").

3.    The Action Plan (also known as the "Implementation Plan") for *Rosas* was approved by the Court in or around January 2015.  It is divided into twenty-one sections that cover discrete categories of Department operations that implicate potential force used against inmates in the Jail Complex.  For example, Section 1 covers Leadership, Administration and Management; Section 2 covers Use of Force Policies and Practices; and Section 6 covers Inmate Grievances and Other Complaints of Excessive Force.  Each section contains several Substantive Provisions, which collectively comprise the requirements imposed by the Action Plan on the Department relating to the area covered by the corresponding section.  There are a total of 104 Substantive Provisions across the twenty-one sections in the Action Plan.  The majority of the Substantive Provisions require quarterly compliance obligations and are monitored by a Panel of three experts.

4.    In turn, the Panel has adopted a 108-page Monitoring Plan and Compliance Measures that were finalized by the Panel on November 17 2016, and which define how the Department must demonstrate – and how the Panel will assess and determine – the Department's compliance with the 104 Substantive Provisions of the Action Plan.  There are a total of 442 Compliance Measures.

5.    As a result of a separate settlement agreement, the *United States of America v. County of Los Angeles, et al.* ("DOJ"), the Department was required to create the Custody Compliance and Sustainability Bureau ("CCSB") which consists

DECLARATION OF DANIEL J. DYER IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT

of Department employees, ranging from captain to custody assistants, dedicated to compliance with the DOJ settlement agreement, which consists of 69 Provisions and 210 compliance measures.  The Action Plan for *Rosas* did not create a similar compliance bureau.  As a result, the Department tasked approximately 12 CCSB members full-time to (a) ensure that *Rosas* compliance reports are timely provided to the Panel for monitoring, and (b) identify and assist in implementing improvements.

6.      In order to demonstrate compliance, CCSB provides self-assessment reports for each Substantive Provision to the Panel.  Each self-assessment requires CCSB to review all documents and determine whether the Department is in non-compliance or in substantial compliance with each Substantive Provision.  From these self-assessments, the Department is able to learn where improvements need to be made in the system to achieve substantial compliance.

7.      Each self-assessment requires CCSB members to gather the data and cull what is necessary to determine compliance for each separate Substantive Provision.  Often times the data collection itself can take several hours as the Department must gather source documents from various locations based on the subject matter of the Substantive Provision.

8.      Pursuant to Substantive Provision 2.2 of the Implementation Plan, Compliance Measure 5, on a quarterly basis, the Panel randomly selects a minimum of 25 completed force packages to review.  According to the Department's standard compliance procedure, the Department reviews and provides an assessment of all doucments prior to production to the Panel.  In addition, the Panel requires the Department to review each force package and complete a Force Package Assessment which identifies the specific Substantive Provisions relevant to each Force Package.  Review of each force package can take an average of three and one-half hours per force package.  Thus, each quarter, CCSB members spend on average nearly 90 hours of their time conducting this review.  The factors that influence the

DECLARATION OF DANIEL J. DYER IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT

review time for each force package include the number of videos to view, the number of incident reports including supplemental reports, and Supervisory Use of Force Investigation reports.  Other factors include the number of witness interviews, the assessment of *Rosas* force-related provisions, as well as the complexity and type of force.  This time estimate does not include the time to scan documents, copy video, or make formal requests from the respective jail facilities for the documents.

9.   I have received and reviewed the December 20, 2016 correspondence from Class Counsel (attorneys for the *Rosas* plaintiffs) requesting numerous documents from the Department.  An enormous amount of time and labor would be required to produce the documents requested by Class Counsel.

10.   For example, Request Nos. 13 and 14 (as identified in the Department's June 5, 2017 correspondence, marked as Exhibit H, Document No.152-12 on the Court's Docket), request the following:

a.   Request No. 13: A log of all force packages for each force incident occurring January 1, 2017 to March 31, 2017 (defined to include all uses of physical force, chemical agents, weapons, restraints, tasers, and other electronic stun gun devices; cell extractions; incident involving prisoners on the mental health caseload; incidents prompted by a medical or mental health provider's order; and incidents which a Department member asserts that s/he was assaulted by an inmate). From this log, Plaintiffs will choose a sufficient number of force packages to review. The chosen force packages must then be produced to Plaintiffs.

b.   Request No. 14: Of the use of force packages chosen for review in Section B, their corresponding use of force investigation packages. These packages shall include investigation or hearing reports following force incidents, any disciplinary/corrective action taken, and related disciplinary and personnel records. This shall also include reports from any investigation, disciplinary hearing and/or other measure conducted against managers for failing to address use of force problems. *See id*. §1.3.

DECLARATION OF DANIEL J. DYER IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT

11. In First Quarter 2017, there were a total of 368 force packages identified in the Department's log for the Jail Complex. As such, even if Class Counsel requested only 10 force packages for review, that would require CCSB to spend approximately 30 to 40 hours to gather and assess the contents of those force packages – essentially a full work week for a CCSB employee. These same CCSB employees are already spending an average of two or more full work weeks per quarter reviewing the 25+ force packages requested by the Monitors each quarter. Moreover, Class Counsel is requesting documents related to any disciplinary or corrective actions taken, and documents relevant to related disciplinary and personnel records, which would take additional hours to gather and assess for each of the force packages requested by Plaintiffs.

12. As a further example, Request No. 27 (as identified in Document No. 152-12), requests the following:

a. Request No. 27: Any documentation of reviews conducted of Department members during the probationary period and post-probationary period. *See id*. Section 3.6.

13. In the Jail Complex, there are 1,863 Deputies and Custody Assistants, not including sergeants and above. Two performance reviews are provided during the probationary period, and non-probationary members receive one performance review annually. Class Counsel's request includes post-probationary reviews, even though Substantive Provision 3.6 is designed "[t]o ensure a meaningful probationary period[.]" This essentially means that Class Counsel is requesting all reviews for each employee's entire career with the Department. On average, one review would require approximately 30 minutes to locate, gather, review, and prepare for production. Even if the 1,863 Deputies and Custody Assistants had only one review each in their entire careers (which is not the case), producing all such reviews to Class Counsel would require over 116 work days for one person to complete (1,863 reviews x 30 minutes = 55,890 minutes; 55,890 minutes / 60 minutes per hour =

3470686.1

4

DECLARATION OF DANIEL J. DYER IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT

931.5 hours; 931.5 hours / 8 hours per work day = 116.4 work days).

14.    As another example, Request No. 34 (as identified in Document No. 152-12), requests the following:

    a.    Request No. 34: A log of all inmate grievances filed January 1, 2017 to March 31, 2017, including grievances filed against staff.

    b.    Class Counsel further states that "[a]fter reviewing the log of inmate grievances, the plaintiffs may request additional information and documentation relating to the inmate grievance system including, but not limited to, [several wide-ranging categories of documentation]."

15.    During First Quarter 2017, the Department received nearly 5000 inmate grievances, which include 440 grievances against staff.  Even if Class Counsel requested the additional information and documentation only as to the 440 grievances against staff, it would require approximately 7 work days for one person to gather and produce that additional information and documentation.  This would require compiling each individual grievance, the notices related to each grievance, and any investigations associated with the grievance.  These documents are not centrally based; at least half of the grievances during First Quarter 2017 would require manual searches, scanning, and/or photocopying, as they are located in various bureaus, units, or facilities.  This would require further hours for CCSB to review and assess each grievance against staff.

16.    In my capacity as the commanding supervisor for the *Rosas* Settlement Agreement, I am personally knowledgeable and highly informed about the Department's obligations under the Settlement Agreement and the resources available to and committed by the Department to achieve compliance with it.  As noted above, the Department does not have additional resources to develop a separate compliance bureau for *Rosas,* but instead tasked members of CCSB to work on compliance with *Rosas*.  These CCSB members are already working at full capacity and the Department does not have the resources to hire additional

3470686.1                                   5                      Case No. CV 12-00428 DDP (MRW)

employees to do this work.  In other words, any document review and production to Plaintiffs will be done by the same twelve CCSB personnel who are already working full-time on the Department's compliance with *Rosas*.  A Court order mandating that the Department produce the documents requested by Class Counsel would drastically interfere with the Department's ability to comply with the Settlement Agreement, by, among other ways, (a) diverting significant resources away from compliance with *Rosas*, and reallocating those resources to gathering and producing documents to Class Counsel; and (b) delaying the submission of compliance reports to the Panel.  This would seriously hinder the parties' mutual goal of achieving compliance with the terms of the Settlement Agreement.

17.     In addition, plaintiffs' Request Nos. 2, 4, 8, 14, 16, 18-20, 25-27, 34 and 35 (as identified in Document No. 152-12), require the Department to produce peace officer personnel records, including the entire performance reviews of 1,863 deputies and custody assistants assigned to the Jail Complex, as well as complaints against these deputies and custody assistants, internal affairs investigations, discipline records, and possible criminal records.  I believe that identification and/or disclosure of the documents responsive to these requests are contrary to the public interest for the reasons set forth below.

18.     As the supervising commander of *Rosas,* I am obliged under constitutional, statutory, and decisional law to invoke privileges and/or protections against discovery or disclosure of such records and to maintain the confidentiality of such records.  Depending on the circumstances presented by a given case, it is my understanding that such privileges and/or protections against discovery or disclosure may be afforded by the United States Constitution, First Amendment; the California Constitution, Article I, Section 1; California *Penal Code* Sections 832.5, 832.7 and 832.8; California *Evidence Code* Sections 1040 and 1043 et. seq; the Official Information Privilege; the right to privacy; and decisional law relating to such provisions.  In addition, in any case in which discovery or disclosure is sought of an

3470686.1

Case No. CV 12-00428 DDP (MRW)

DECLARATION OF DANIEL J. DYER IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT

officer's personnel records or records maintained pursuant to California *Penal Code* Section 832.5 or information from those records, the Department must notify the individual whose records are sought immediately upon receipt of written notice from the party seeking such records pursuant to California Evidence Code Section 1043(a).  In this matter, this would require notification to nearly 2000 Department personnel.

19.    In my experience as a law enforcement officer, I have observed that deputies generally understand and expect that information such as personal data, employment history, and other private information about them will not be voluntarily disclosed by them or their employer.  Statutes such as California *Penal Code* Sections 146(e) and 1328.5 and California *Vehicle Code* Section 1808.4 explicitly recognize that the disclosure of certain information about law enforcement deputies can jeopardize their safety and the safety of their families.  In view of the clear dangers of law enforcement work, the Department has an abiding interest in assuring the safety, security, and privacy of its deputies and their families to the fullest extent possible.

20.    In accordance with law and standard police procedures, deputies who are interviewed in connection with an administrative investigation are admonished that their failure to answer questions fully and directly may result in disciplinary action against them.  Deputies who are the subject(s) of the administrative investigation are further advised that their statements and any information gained therefrom may not be used against them in any subsequent criminal proceedings, but that such statements or information will only be used against them in subsequent administrative proceedings.  Deputies are essentially ordered by the Department to answer questions in connection with the administrative investigation under threat of disciplinary action up to and including termination.  While deputies may be forthcoming in such interviews, they are not free to withhold information or to refuse to answer questions without risking significant consequences to their law

DECLARATION OF DANIEL J. DYER IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT

enforcement careers including termination of employment.

21.    It has been my experience that deputies are generally aware of their rights and the procedural safeguards in connection with administrative investigations, including those in the Public Safety Deputies' Procedural Bill of Rights Act, California *Government Code* Section 3300 et. seq., as well as in the previously mentioned authorities.  Subject to such rights and procedural safeguards, however, deputies are nonetheless required to provide information to the investigators conducting the administrative investigation solely for the purposes of that investigation.  To the extent that such information were to be used or disclosed for other purposes or in other proceedings – such as in private civil litigation – the ability of these investigators to conduct fair and thorough administrative investigations would be undermined and impaired by such use or disclosure.

22.    I am informed and believe that it is incumbent upon law enforcement agencies such as the Department to prevent unauthorized disclosure of any record which is compiled by them without a person's consent or records compiled with a person's consent, pursuant to some legal requirement that entitles the person to restrict access to the record.  The Department compiles and maintains records of administrative investigations, citizen complaints, and personal and other data about deputies, among a great many other categories of records.  Each category of records is compiled and kept by the Department for specific, limited purposes.  Access to and dissemination of records within the Department are restricted to those employees who have a need to know or use the information within the records.  Retrieval and circulation of such information for Departmental purposes nonetheless entails expenditure of time, money and human resources.  Nevertheless, controlled access to and dissemination of records within the Department are regarded as essential to insure the integrity and security of such records.

23.    Among other types of confidential information found in deputies' personnel records are performance evaluations by their superior deputies and

3470686.1                                          8                        Case No. CV 12-00428 DDP (MRW)

discipline records. Like many superior deputies who evaluate and rate their subordinates' performances periodically, I am particularly mindful of the objectives underlying the evaluation process. Supervisors want and need to be able to evaluate the performance of their subordinates fairly, candidly, and completely. Supervisors' working relationships with subordinates is important to them, to the subordinates, and to the Department as a whole. In order to improve deputies' performances and thereby develop the quality of law enforcement services, measures such as criticism, counseling, and even discipline of deputies may be employed by superior deputies as an outgrowth of the performance evaluation process. These worthwhile objectives are disserved when deputies' performance evaluations can be used for purposes outside their intended purpose and scope. Correspondingly, some superior deputies may become reluctant to evaluate subordinates quickly and candidly out of concern for the possible misuse of their performance evaluations. Consistency and confidence in the Department's performance evaluation process are vital to deputies, their superiors and the public.

24.    In addition to the prospects of discouraging those persons who may provide information, and violating the rights of others who have provided information to the Department, indiscriminate disclosure and uncontrolled dissemination of confidential records kept by the Department can disrupt the vital, day-to-day operations of the Department; divert Department personnel from their regular duties; erode the integrity and security of such records; adversely affect morale of many Department employees; consume inordinate time, expense and resources; and frustrate the legitimate specific purposes of compiling and maintaining such records.

25.    The foregoing facts underlie the need for confidentiality of various Department records and in my estimation serve the public interest in efficient, lawful and economic delivery of law enforcement services by the Department.

26.    I respectfully urge that any claimed necessity of disclosure of such

Department records be thoroughly scrutinized for its factual and legal sufficiency before being weighed against the aforementioned need for confidentiality of such records.

27.    I have reviewed two versions of a proposed protective order to address potential discovery to be produced to Class Counsel in *Rosas*.  The first version, entitled "[Proposed] Stipulated Protective Order Regarding Class Counsel's Access To Documents", was proposed to Class Counsel by the Department (through its outside counsel).  The second version, entitled "[Proposed] Stipulated Protective Order Regarding Class Counsel's Off-Site Access To Documents", was counter-proposed by Class Counsel to the Department.  I believe that the first version, proposed by the Department, would enable the Department to provide Class Counsel with a substantial and meaningful amount of information relevant to the Department's compliance with the Action Plan, but would still enable the Department to avoid undue burden, make appropriate redactions where necessary, and avoid the chilling effect on administrative investigations and on performance evaluations that I have described above.  I believe that the second version, counter-proposed by Class Counsel, would create a substantial risk of harm to the privacy and law enforcement interests that I have described above, for several reasons, including but not limited to the facts that the second version (a) would compel the Department to produce to Class Counsel far more documents, video, and information than the Panel seeks or receives, (b) does not allow for any redactions, and (c) would permit the discovery to be shared too widely.

///

///

///

///

///

///

DECLARATION OF DANIEL J. DYER IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT

28. Accordingly, on behalf of the Department, I assert the privileges and/or protections afforded by federal and state constitutional, statutory and decisional law against disclosure of such records and the information contained therein.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Dated: February 16, 2018

_____
DANIEL J. DYER
Commander
Los Angeles County Sheriff's Department

3470686.1

11

Case No. CV 12-00428 DDP (MRW)

DECLARATION OF DANIEL J. DYER IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT