**SCHEPER KIM & HARRIS LLP**
RICHARD E. DROOYAN (Bar No. 65672)
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone: (213) 613-4655
Facsimile:  (213) 613-4656
Email:  rdrooyan@scheperkim.com

**Monitor and on behalf of Monitors**
**Jeffrey Schwartz and Robert Houston**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS, et al. | CV No. 12-00428 DDP |
| Plaintiffs, | |
| v. | **PANEL'S THIRD REPORT** |
| LOS ANGELES COUNTY SHERIFF LEROY BACA, in his Official Capacity, | |
| Defendant. | |

Pursuant to the Section V of the Settlement Agreement And Release of Claims, the Monitor appointed by this Court, Jeffrey Schwartz, Robert Houston, and Richard Drooyan (collectively the "Panel") hereby submit the attached Panel's Report "evaluating Defendant's Compliance with Action Plan" prepared by the Panel and approved by the Court for the twelve-month period from January 1, 2017, to December 31, 2017.  This Report takes into consideration the comments from the parties in accordance with Section V of the Agreement.  The Panel is available to answer any questions the Court may have regarding my Report at such times as are convenient for the Court and the parties.

DATED:  March 22, 2018            Respectfully submitted,

                                  SCHEPER KIM & HARRIS LLP
                                  RICHARD E. DROOYAN


                                  By:  /s/ Richard E. Drooyan
                                       Richard E. Drooyan
                                       Monitor and on behalf of Monitors Jeffrey
                                       Schwartz and Robert Houston

## PANEL'S THIRD REPORT

The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan ('Reports') [developed by the Panel] at intervals the Panel shall determine."  This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from January 1, 2017, through December 31, 2017 (the "Third Reporting Period"), and it is created for the purposes of the settlement of the *Rosas* case. It takes into consideration comments received from the Parties regarding the draft sent to them on March 2, 2018, in accordance with Paragraph V of the Settlement Agreement.

In May 2014, the Parties retained the Panel "to prepare an Action Plan relating to certain policies and practices employed in the Los Angeles County Jails" in downtown Los Angeles (the "Downtown Jail Complex")[1] in areas of concern to the Parties.  Pursuant to Paragraph III of the Agreement, the Panel developed an Implementation Plan that was submitted to the Parties and the Court in October 2014.[2]  The Plan sets forth provisions that the Los Angeles County Sheriff is required to implement in twenty-one areas by members of the Sheriff's Department (the "Department") in the Downtown Jail Complex.  The Plan was approved by the Court on April 7, 2016.

The Settlement Agreement contemplates a two-step process involving the Department's "implementation" of the Panel's recommendations followed by the Panel's monitoring of the Department's "compliance" with the recommendations.  It provides that "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented, it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')."  Agreement, Paragraph VIII.

The Department has implemented 102 of the Panel's recommendations through December 31, 2017.[3]  Two of the recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in the case filed by the United States Department of Justice.  There are three additional recommendations pertaining to the development of the Early Warning System required by Sections 19.1 through 19.3 that have not been implemented by the Department as of December 31, 2017.

---

[1] The jails in the Downtown Jail Complex are Men's Central Jail ("MCJ"), the Twin Towers Correctional Facility ("TTCF") and the Inmate Reception Center ("IRC").

[2] In developing the plan, the Panel used the term "Implementation Plan" rather than "Action Plan."  This report uses the terms "Action Plan" or "Plan" to refer to the Panel's plan.

[3] The Panel has certified the Department's implementation of 101 of the Panel's recommendations.  Although not formally certified,  the Panel approved the Department's implementation of Paragraph 12.1, which requires that Custody sergeants receive 16 hours of training in conducting force investigations, after attending training sessions in February 2017.

1

Although the Agreement contemplates that the Panel will commence its monitoring of the Department's new policies once it has certified that the policies have been adopted by the Department, the Panel recognized that the Department needed to develop and commence new training before the Panel could assess the Department's compliance with the new policies. During the Third Reporting Period, the Panel attended several training sessions and approved the Department's force investigations training, and reviewed and approved the Department's curriculum and training materials for the refresher training courses in ethics, conflict resolution (known as DeVRT), and use of force required by the Plan.[4]

The Panel visited the Downtown Jail Complex on March 21, 2017 through March 23, 2017, June 21, 2017 through June 22, 2017, August 31, 2017, and November 9, 2017. The Panel spoke informally with inmates while touring the jails and also conducted formal interviews with inmates that were not in the presence of Department personnel. The Panel debriefed the Custody leadership on the Panel's observations of conditions in the jails, and the issues raised by inmates during the interviews. The Panel also reviewed force packages and grievances pertaining to incidents involving the inmates who were interviewed by the Panel to determine if any of the incidents involved problematic force or misconduct by Department personnel.

On June 21, 2017 the Panel met with Sheriff Jim McDonnell to discuss his oversight of the Department's jail operations; the Department's implementation of, and compliance with, the Action Plan recommendations; and the Panel's observations concerning conditions in the Downtown Jail Complex and the nature and extent of the force used by Department personnel against inmates in the jails. The Panel also had multiple meeting with the Department's Inmate Grievance Coordinator and met with the Inmate Grievance Teams at Men's Central Jail ("MCJ") and the Twin Towers Correctional Facility ("TTCF") to review the Department's implementation of its new grievance polices. As discussed below, the Panel noted progress in the Department's tracking and handling of inmate grievances.

During the Third Reporting Period, the Panel reviewed 75 completed force packages that were selected by the Panel from a comprehensive list of force incidents compiled by the Department. The packages were selected without input from the Department. The Panel subsequently met with Custody Commanders to review the force that was used in incidents that were of concern to the Panel. The reporting of the force, the supervisors' investigations, and the commanders' reviews were also discussed with the Commanders. Although there were issues with the Department's tactics in some cases that may have contributed to the use of force that could have been avoided, the Panel found only one incident where the force may have been excessive.

One of the problems encountered by the Panel in reviewing the force packages was the delay between the dates of the force incidents and the completion of the force packages, which was often over nine months. This meant that the Panel was reviewing uses of force by Department members who had not received the new DeVRT and use of force training and force investigations were conducted by sergeants who had not received the new investigations training, which limited the usefulness of the feedback the Panel could provide to the Department. In order

---

[4] The use of force refresher training was approved in January 2018.

to reduce the delay, the Department decided to focus its investigative resources on force incidents occurring after January 1, 2017.  In addition, it decided that incidents captured on videotape that involve minimal force,[5] no injuries to inmates, and no evidence of misconduct would be subject to more limited investigations and expedited reviews.  The Department dedicated considerable efforts to developing the plan for the investigation of these "Non-Categorical Incidents," which the Department adopted after it was reviewed and approved by the Panel.[6]  The focus on the 2017 incidents and expedited handling of the Non-Categorical Incidents has resulted in shortening the lag time and allowing the Panel to review the force sooner, often within six months of the incident.

In the course of reviewing force packages and monitoring the Department's compliance with the provisions in the Action Plan, it became apparent to the Panel that the existing 108-page Monitoring Plan was unwieldly and unworkable to assess the Department's Compliance with the 100+ provisions of the Action Plan.  For example, some provisions relating to the use, reporting or investigation of force were subject to the Panel's direct reviews of force packages selected by the Panel, and other provisions were subject to the Panel's audits of reviews by the Department of other randomly selected force packages.  Since the Compliance Measures are not part of the Settlement Agreement or the Action Plan, after several meetings and discussions with the Parties, the Panel decided to revise the Compliance Measures for the purpose of assessing the Department's compliance with the Action Plan.

The Panel proposed revised Compliance Measures to the Parties on December 19, 2017.  Although there are 21 areas in the Action Plan, the revised Compliance Measures are organized around conceptually related topics.  Under the revised Compliance Measures, the Panel will qualitatively assess the use, reporting and investigation of force by Department members based upon the applicable provisions in the Action Plan (the "vertical" approach) and then determine compliance with the Plan based upon quantitative thresholds.  The Panel will also assess the Department's compliance with specific provisions of the Plan across all of the force incidents (the "horizontal" approach).  The Panel believes that this "hybrid" approach will facilitate the Panel's monitoring and reporting of the  Department's compliance with each of the provisions of the Action Plan.

The Panel received comments about the revised Compliance Measures from the County by letter dated December 26, 2017, and from Plaintiffs' counsel by letter dated January 18, 2018.  Pursuant to the Panel's request, to facilitate the Panel's review of force packages under the revised Compliance Measures and ensure that the investigating sergeants address all applicable provisions of the Action Plan, the Department developed a "Use of Force Packet Review" checklist that tracks the Plan.  The checklist is currently used by the Department to review the force packages that are sent to the Panel, and it is intended to be used by sergeants who conduct force investigations in 2018.

---

[5] For example, when a Deputy uses a firm grip to guide a passively resisting inmate back into a cell.

[6] The Panel understands that the plan was also reviewed and approved by the Office of Inspector General.

As of the date of the filing of this Report, the Panel has not issued the revised Compliance Measures pending the resolution of an on-going dispute between the Parties over Plaintiffs' access to the Department's records.  In early 2017, Plaintiffs' Counsel advised the Panel that their "ability to comment meaningfully [on the draft the Panel's Second Report] is hampered by Defendant's refusal to provide any of the documents" Plaintiffs previously requested.  During discussions regarding the Panel's proposal to revise the Compliance Measures, Plaintiffs' Counsel reiterated their concerns that they would be unable to assess the Panel's conclusions regarding the Department's compliance with the revised measures without off-site access to the information reviewed and relied upon by the Panel.  Without intending to comment on the merits of the Parties' positions, the Panel is planning to wait until the outstanding discovery disputes are resolved before issuing the revised Compliance Measures.

There is one other significant remaining issue from last year that the Panel believes the Parties still need to resolve.  Under the Settlement Agreement, all recommendations implemented during the same six-month period are grouped together for purposes of determining compliance with the "consecutive" twelve-month period, no matter how disparate the recommendations may be.  Under this "cross-collateralization," a failure to comply with a recommendation in one area during a twelve-month period means that the twelve-month time period starts over for all recommendations that were implemented in the same six-month period.  This is the case regardless of the relationship between the recommendations implemented in the same period.  The Panel remains of the view that it is appropriate to organize the compliance buckets by grouping related provisions rather than by grouping unrelated provisions based on when they were implemented.  The Panel urges the Parties to adopt a meaningful and achievable framework for determining the Department's compliance under the Settlement Agreement.

Although the Panel has not formally assessed the Department's compliance with each of the provisions of the Action Plan in the Third Reporting Period, the Panel was actively involved in monitoring the Department's efforts to address the provisions of the Action Plan through reviewing force packages, touring the Downtown Jail Complex, interviewing inmates, reviewing the new grievance system, and meetings with the Department's Command staff.  This Report sets forth the Panel's conclusions regarding the status of the Department's compliance with the provisions of the Action Plan in the seven areas discussed below.  It is anticipated that the Panel will begin to formally and quantitatively monitor the Department's compliance with the provisions of the Action Plan in the next reporting period.

As has been the case since the beginning of the Initial Reporting Period, the County cooperated completely with the Panel during the Third Reporting Period.  The Department and County Counsel facilitated our visits and inmate interviews, answered our questions, responded to our requests for documents and information, provided status reports regarding the implementation of the grievance policies and the Early Warning System, and engaged in constructive conversations with us about our findings regarding the use of force incidents we reviewed.  We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.  Plaintiffs' counsel also has been fully cooperative with the Panel by identifying inmates for the Panel to interview and discussing the issues relating to the Panel's monitoring of the Department's compliance with the Action Plan.

4

**ACTION PLAN IMPLEMENTATION**

**1.      Leadership, Administration and Management**

The four recommendations in Sections 1.1 through 1.4 of the Action Plan require that
Custody Operations be headed by an Assistant Sheriff with no other areas of responsibility, the
Sheriff be engaged personally in the management of the jails, the Department's managers be held
accountable for any failures to address force problems in the jails, and the Department regularly
report to the Board of Supervisors on the use of force in the jails and its compliance with the
Action Plan.

The Department has provided policies regarding the responsibilities of the Sheriff, the
Assistant Sheriff for Custody Operation, and the command staff, and it has described reporting
practices to implement each of these provisions, effective December 1, 2015.  Custody
Operations has been headed by an Assistant Sheriff with no other areas of responsibility since
well before December 1, 2015.  It is currently under the direction of Kelly Harrington, the
Assistant Sheriff for Custody Operations.

In June 2017, the Panel met with Sheriff Jim McDonnell and reviewed his oversight of
the jail facilities and the Panel's findings and observations.  The Department has provided the
Panel with a log of the Sheriff's meetings with Assistant Sheriff Harrington over the period
January 1, 2017 through June 30, 2017, to review use of force data and trends, training of
Department personnel, the Panel's observations, the Board of Supervisors' inquiries, the
Department's tracking and monitoring systems, and inmate deaths.

The Department has implemented revised CDM 2-01/030.00 to address the requirements
of §1.3 of the Action Plan that require Unit Commanders to be "held accountable should they fail
to address use of force problems" in their jail facilities.  Consistent with the use of force statistics
the Department has provided to the Panel, the Department reports that "none of the facilities had
a substantial increase of 25% in overall force incidents, nor did any facility have a substantial
increase in Category 3 force incidents" in the fourth quarter of 2017.

The Department reports that the Assistant Sheriff for Custody Operations reported on the
Department's use of force in the jails to the Board of Supervisors on August 15, 2017, and
anticipates the next report to the Board "will occur in the upcoming months."

There are a number of other provisions in the Action Plan that relate to the
responsibilities of management in Custody Operations.  Sections 10.1 and 10.2 require senior
managers to periodically tour the jails and the Department to document visits by managers
(above the rank of Sergeants) in electronic records or visitor logs.  Sections 18.1 and 18.2 require
the Department to (1) maintain Custody-wide rotations policies and (2) audit each unit's
compliance with its rotations policies.  Section 21.1 requires that the Department's policies
"provide that the Department will not transfer or assign a staff member to Custody as a sanction

5

for problem employees."  The Panel has certified that the Department adopted policies to implement these additional management recommendations.

The Department reports that in the fourth quarter of 2017, "Senior Manager's completed 75 tours [of the Downtown Jail Complex]" and "the Department did not transfer any Department members to Custody as a sanction for misconduct or a policy violation," but the Panel has not independently verified the Department's reported results.

**2.      Use of Force Policies and Practices**

Section 2.1 in the Action Plan requires the Department to "have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations[.]"  On October 16, 2015, the Department provided the Panel with a Custody Operations Force Manual with separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints, Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved Shootings.

The recommendations in the Action Plan that pertain to the Department use of force in Custody Operations are summarized as follows:

- Section 2.2 through 2.13 require the Department to adopt a comprehensive set of new use of force policies for Custody Operations.

- Sections 4.1 through 4.5 require the Department to adopt specific use of force policies for dealing with mentally ill prisoners.

- Sections 9.2 through 9.3 require the Department to adopt specific policies for escorting inmates after force incidents and intervening to protect inmates as soon as it is reasonably safe to do so.

- Section 17.5 requires the Department to adopt policies for minimizing the risk of an inmate's medical distress during and after a force incident.

- Sections 20.1 through 20.3 require the Department to define Reactive Force and Planned Force and adopt use of force policies for Planned Force (such as cell extractions).

The Panel reviewed multiple drafts of the Department's policies to implement these recommendations, required changes where appropriate, and certified that the Department had implemented these recommendations, effective December 1, 2015.

During the Third Reporting Period, the Panel undertook a number of efforts to monitor the Department's use of force in the Downtown Jail Complex.  The Panel visited the jails on multiple occasions, and interviewed inmates identified by Plaintiffs as having knowledge of, or complaints about, excessive use of force by Deputy Sheriffs and Custody Assistants.  The Panel reviewed force packages regarding specific incidents identified by these inmates, which included reviewing video footage of these incidents, but the Panel did not find any instances of excessive

6

force by Department personnel in these incidents. The Panel also talked informally with many other inmates about, among other things, the use of force in the jails by Department personnel. As in the past, the Panel did not hear complaints in these informal discussions about excessive use of force by Department personnel. These inmates acknowledged that Department personnel did not use force to retaliate against or punish inmates, although some inmates complained that Department personnel used other means (such as discipline) to retaliate against inmates. Some of the inmates interviewed thought that instances of retaliation that did not involve force were becoming more prevalent because the widespread presence of cameras largely precluded Department personnel from using force to retaliate against inmates. The Panel is concerned that these comments may reflect a change in the culture in the Downtown Jail Complex and in the attitude of Department personnel towards the inmate populations.

In the Third Reporting Period, the Panel reviewed 75 completed force packages of incidents that occurred in 2016 and the first six months of 2017. There was one case about which the Panel expressed concerns to Department Commanders that the force used by Department personnel may have been excessive. As this was the only one of the cases reviewed by the Panel in which the force incident was not captured on one of the closed circuit television cameras,[7] it is not possible to conclude definitely whether the force was reasonable. In some other cases, the Panel found that the Department's use of force was reasonable, but may not have been necessary if the Department personnel had used communication skills from the DeVRT training, had maintained greater distance from the inmate, or waited the arrival of other personnel. With the one possible exception, the problematic force incidents reviewed by the Panel involved tactical issues rather than excessive or unreasonable force. In the other force packages, the force complied with the provisions applicable to the force that was used and the Panel concluded that the force was reasonable. Some of the force packages were, however, not in compliance with the provision related to checking medical records before using chemical sprays and Tasers, and the force packages did not always report on the training of members on the weapons used as required by the Action Plan.

Among the positive aspects noted by the Panel were that (1) the number of Department members involved in force incidents was limited to those necessary to control the inmates and (2) the sergeants on scene did a good job controlling the number of personnel involved and the extent of the force used. To put the Panel's findings on Use of Force practices during the Third Reporting Period into perspective, the situation in the Downtown Jails is significantly improved in comparison to the years reviewed by the Citizen Commission on Jail Violence. There are no allegations of multiple Deputies involved in beating inmates or using force to retaliate against inmates, serious Category 3 uses of force are almost non-existent, and inmates continue to comment on the changes in use of force in the Jails from the "old days." The Panel has observed management working consistently and aggressively to achieve these important reforms.

---

[7] A second force incident involving the same inmate after he had been transported to the medical clinic was captured on the closed circuit cameras. The second use of force was reasonable and consistent with the Department's use of force policies.

3.      **Training**

Sections 3.1 through 3.4 of the Action Plan require that Department members receive training in use of force policies and in ethics, professionalism, and treating inmates with respect; and that new Department members receive six weeks of Custody specific training in the Academy or the Jail Continuum in Custody Operations.  Sections 4.6 through 4.9 require the Department to provide Custody-specific, scenario-based, skill development training for existing and new personnel in Crisis Intervention and Conflict Resolution and on "identifying and working with mentally ill inmates."  Section 12.1 requires that all Custody sergeants receive training in conducting use of force investigations.

The Panel reviewed the Department's proposed ethics curriculum and training materials, attended several training sessions, and approved the Department's ethics training required by Section 3.2 in May 2015.  On March 4, 2016, the Panel approved the Department's "De-escalation & Verbal Resolution Training" ("DeVRT") materials to implement the recommendations in Sections 4.6 through 4.9.[8]  The Panel reviewed the Department's proposed curriculum and training materials for its use of force policies, and attended a training session in December 2016.  The Panel certified the Department's use of force training complied with Section 3.1 as of December 16, 2016.  During the Third Reporting Period, the Panel approved the Department's 16-hour use of force investigation training, and also reviewed and approved the Department's curriculum and training materials for the ethics and conflict resolution refresher training courses, and reviewed the curriculum and training materials for the use of force and use of force investigations refresher training courses.

Since the First Reporting Period beginning on July 1, 2015, new deputies have been required to complete a six-week Custody Operations course that includes training in ethics, professionalism and treating inmates with respect, and new Custody Assistants have received training in these subjects during their nine-week Academy training.  The new deputies also have received the approved use of force and conflict resolution training in the Academy and the Jail Continuum and new Custody Assistants have received use of force training and training in "identifying and working with mentally ill inmates."

During the Third Reporting Period, existing deputies continued to receive the approved ethics and conflict resolution training.  Beginning in November 2016 and continuing through the Third Reporting Period, they received the  training in the Department's new use of force policies that was approved by the Panel.  Beginning on February 24, 2017 and continuing through the Third Reporting Period, sergeants in Custody received the approved training in conducting force investigations.  The Department reports that it has "trained 1263 deputies in DeVRT[,] which includes training in 'identifying and working with mentally ill inmates,' 1715 deputies and custody assistants in the Custody Use of Force training, 1632 deputies and custody assistants in Ethics, and 119 of 128 sergeants in the Supervisors Use of Force Report Writing and Documentation at the Downtown Jail Complex."  The Panel intends to retain auditors to audit

---

[8] For Department members who received the DeVRT training before it was finally approved, the first eight-hour refresher course that is required every other year will include the additional subjects added to the DeVRT training after November 6, 2015.

and verify the Department's reported training results after the revised Compliance Measures are issued.

Section 3.5 requires Unit Commanders to determine what additional training, counseling or mentoring may be required when a personnel complaint involving the use of force is resolved with a finding that it "Appears Employee Conduct Could Have Been Better." Section 3.6 requires unit commanders to review new Department members within six months of being initially assigned to Custody and again before the end of their probationary period. The Department has adopted policies that implement Sections 3.5 and 3.6, and it reports that "in the Fourth Quarter of 2017, there were no inmates grievances that directly resulted in a finding of 'Appears Employee Conduct Could Have Been Better.'"

**4.      Reporting and Investigation of Force Incidents**

The recommendations in the Action Plan that pertain to the reporting and investigation of force used by Department personnel in Custody Operations are summarized as follows:

- Section 4.2 requires the Department's policies to require supervisors investigating the use of force by Department members to interview any mental health professionals who attempted to resolve the incident without force.

- Sections 5.1 through 5.3 require the Department to track use of force investigations, reviews, and evaluations; review evaluations of force incidents; and conduct additional investigation of discrepancies and unexplained tactical decisions.

- Section 8.3 requires that evaluations of investigations of inmate grievances that Department members used force to retaliate against inmates should be reviewed by the Custody Force Review Committee.

- Section 11.1 requires that the Custody Force Rollout Team's involvement in reviewing force incidents not delay the Department's investigation of the force incidents.

- Sections 12.2 through 12.5 require the Department to adopt policies and practices regarding the interviewing of suspects and inmate witnesses in connection with force incidents, the supervisors who conduct the investigations, and the order and format of the force packages.

- Sections 13.1 and 13.2 require the documentation of reasons and reports to the Office of Inspector General whenever the Department does not terminate a member who has been found to have been dishonest, used excessive force, or violated the Prisoner Rape Elimination Act ("PREA").

- Section 14.1 and 14.2 require (1) an additional review of referrals of an inmate for criminal prosecution arising from an incident involving the use of force by a Department member and (2) timely referrals to the District Attorney of "officer misconduct that may amount to criminal violations."

9

- Sections 15.1 through 15.7 require the Department to have specific policies and procedures regarding the reporting of force by Department members and the review of force reports by Watch Commanders/Supervising Lieutenants and Unit Commanders.

- Sections 16.1 through 16.3 require the Department to have medical assessments of inmates and Department members involved in force incidents.

The Panel reviewed drafts of the Department's policies to implement these recommendations, required changes where appropriate, and certified that the Department had adopted policies to implement these recommendations effective December 1, 2015.

As noted above, in the Third Reporting Period, the Panel reviewed 75 completed force packages of incidents that occurred in 2016 and the first six months of 2017. The Panel found that Department members' reports of the force they used or witnessed reflected their individual perceptions, they reported the force by other members, and the reports were consistent with the videotapes of the incidents from the Closed Circuit Television cameras located throughout the common areas in the jails. The Panel noted, however, the members often failed to describe injuries suffered by the inmate as required by the Action Plan, and the Panel was not able to determine whether the members were separated before they submitted their written reports, as also required by the Plan. With one exception, every incident was depicted on video (and usually by more than one camera), although there were a few instances in which it was difficult to see exactly what happened because of the camera angles or the distance between the camera and the incident. In addition, because the CCTV cameras do not have sound, the videos cannot always establish what precipitated the incident.

The Panel also found that investigators adhered to policies for the investigation of force incidents, which require inmate witnesses to be interviewed away from other inmates and suspects to be interviewed away from the members who used the force, although the interviews of witnesses and suspects were often somewhat superficial. The investigators tended to focus on the suspects' injuries, which is certainly of paramount concern, and gave short-shrift to the suspects' version of the incident. This may be, in part, because of the availability of video evidence, which in most cases clearly shows what happened and usually corroborated the force reported by Department members. In addition, the investigations in late 2016 and early 2017 were conducted by sergeants who had not taken the new use of force investigations training approved by the Panel and first offered in late February 2017. It may, however, also reflect the possibility of an inherent bias in favor of an organization's own personnel, in this case the Department's personnel involved in the force incident. Although this bias is not unexpected, it is incumbent upon the Department and its investigators to make every effort to conduct fair and impartial investigations for the purpose of determining the facts rather than exonerating Department members.

The Panel has experienced difficulties in determining the Department's compliance with some of the provisions (e.g., separation of deputies, timeliness of reports), which may addressed with the use of a checklist that includes all of the provisions of the Action Plan relating to the

10

use, reporting, and investigation of force. This will help ensure that investigating sergeants address each of the provisions applicable to each force incident in the force package.

The Panel noted that some of the commanders who reviewed problematic force incidents failed to identify and analyze potential issues with the force used by the Department personnel. Even though the Panel determined that the commanders' conclusions in these cases were not unreasonable, the commanders did not analyze sufficiently the tactics and alternatives to the force, or explain the basis for their conclusions that the force was consistent with Department policy. During a January 2018 monitoring visit, the Panel noted that the reviews by commanders were improved. The Panel certainly benefits from a more in-depth analysis of these incidents by experienced law enforcement command staff.

## 5.      Inmate Grievances

Sections 6.1 through 6.20 require extensive changes in how the Department handles inmate grievances and requests for service. On July 15, 2016 the Department issued a new "Inmate Grievance Manual," which is Volume 8 of the Custody Division Manual, to implement a new grievance system. It was approved by the Panel after extensive discussions with the Department and reviews of multiple drafts of the grievance policies. On December 19, 2016, the Panel certified that the Department had adopted policies and practices to implement the recommendations in this section.

Section 7.1 through 7.3 require the Department to advise inmates of the voluntary Conflict Resolution Meeting available under the Department's Conflict Resolution Policy; advise inmates of the results of Department investigations of inmate grievances; and ensure adequate avenues for constructive prisoner-staff communications. Section 8.1 requires the Department to prohibit personnel from retaliating against inmates.[9] The Panel certified that the Department adopted policies and practices to implement these recommendations, effective December 1, 2015. These policies are part of the grievance system, and will be monitored by the Panel as part of the new grievance system.

During the Third Reporting Period, the Department began to implement the new grievance system, which is a significant challenge given the volume of inmate grievances and requests. The Panel met with Department's Inmate Grievance Coordinator on several occasions to discuss the progress the Department has made in implementing the new system and the reports generated for the Department's managers regarding inmate grievances and requests, grievances against staff, and trends at the different facilities. The Inmate Grievance Coordinator described the Department's plans for the use of iPADs to facilitate the handling of inmate grievances and requests,[10] and he reviewed the reports generated for the Department's managers. The Panel also

---

[9] Section 8.2 requires the Department to combine polices pertaining to "Complaints of Retaliation" into one section in the Custody Division Manual. On July 15, 2016, the Department adopted a revised policy in CDM §8-03/050 (Grievance of Retaliation) as part of the inmate new grievance system.

[10] The Department reports that there "are currently 130 iPads through the facilities and the Department anticipates adding more." As noted by the Department, the iPads "provide a

met with the Inmate Grievance Teams at MCJ and TTCF to assess how the teams are handling and tracking inmate grievances and requests at their facilities to ensure that the Department is responding timely.  The Panel believes that the Department is making progress in implementing a new grievance system to facilitate timely responses that appropriately address inmate grievances and requests, although Plaintiffs report that they have identified "new and continuing problems with the inmate grievance system."

The policies adopted by the Department for the new inmate grievance system do not "establish a centralized unit with sworn personnel, custody assistants, and civilian personnel" that would be "co-located" in the Twin Towers Correctional Facility and the Pitchess Detention Center as required by §6.16, although they do provide for some additional centralized oversight.  Based upon interviews with the Inmate Grievance Coordinator, meetings with the Inmate Grievance Teams, including interviews by the Monitor in the DOJ case with Inmate Grievance Teams at the other facilities,[11] the Panel believes that the decentralized grievance system can effectively and efficiently handle inmate grievances and requests for service, but the Panel is prepared to visit this issue if necessary.

Grievances about and requests for medical series are, upon receipt by the Department, forwarded directly to the County's Medical Department.  The Panel decided it would not monitor the appropriateness of the medical response to grievances and requests because the Panel does not have the expertise to judge medical diagnostic or treatment issues.  The Panel will, however, monitor the timeliness of response to medical grievances.

Inmate grievances about staff conduct, including staff use of force, are subject to a lengthy internal investigation process that usually exceeds the 15-day response requirement for grievances against staff.  This is because of the volume and the time it takes to thoroughly investigate most of these grievances.  The Panel has approved a procedure involving notifying the inmates that the grievances would not be answered in 15 days, but were being reviewed.[12]

## 6.    Use of Restraints

Section 17.1 requires that the Custody Force Manual include "a separate section that sets forth the general principles governing the use of restraints" identified in this recommendation.  This Department included such a separate section in the Manual, effective December 1, 2015.

---

wealth of information to the inmates, including responses to requests for various information[.]"  Plaintiffs are concerned, however, about "the limited availability to inmates of IPads because of scarce out of cell time" and "the poor functionality of the IPads caused by the horrific WiFi access in the jails[.]"

[11] The Monitor in the DOJ case met with the Inmate Grievance teams at the Century Regional Detention Facility, the North County Correctional Center, and the Pitchess Detention Center and reviewed the logs of outstanding grievances at these facilities.

[12] The Department reports that beginning in July 2017, it "began to conduct weekly meetings with each facility" focused on outstanding grievances against staff, and that 96% of the investigations of these grievances received in 2017 had been completed as of January 2018.

12

Sections 17.2 through 17.4 and 17.6 through 17.10 require the Department to adopt specific policies for the use of restraints in Custody Operations.  The Panel certified that the Department adopted policies that implement these recommendations, effective December 1, 2015.

Some of the 75 force packages reviewed by the Panel during the Third Reporting Period involved force on inmates who were controlled on the ground or placed in restraints, which required the Department to take steps to minimize breathing problems and medical distress.  The Panel did not observe any problematic instances in which inmates experienced these problems, but the Panel recognizes that it will need to examine a larger pool of force packages involving incidents in which inmates were subjected to specific security restraints (such as multi-point restraints and Safety Chairs) to be able assess the Department's compliance with the provisions of the Action Plan pertaining to the use of restraints.

**7.    Early Warning System**

Sections 19.1 through 19.3 require the Department to develop a formal Early Warning System to identify potentially problematic employees based upon objective criteria.  The Panel again met with the Department during the Third Reporting Period to discuss the status of the Early Warning System, and the Department provided the factors considered in evaluating whether a "use of force is potentially problematic," which are among the factors that should be included in a robust Early Warning System.  Although "the new platform" was in the testing stages" in the Second Reporting Period, the system was not in use during the Third Reporting Period.

13