**SCHEPER KIM & HARRIS LLP**
RICHARD E. DROOYAN (Bar No. 65672)
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone: (213) 613-4655
Facsimile:  (213) 613-4656

**Monitor and on behalf of Monitors**
**Jeffrey Schwartz and Robert Houston**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS, et al. | CV No. 12-00428 DDP |
| Plaintiffs, | |
| v. | **PANEL'S FOURTH REPORT** |
| LOS ANGELES COUNTY SHERIFF LEROY BACA, in his Official Capacity, | |
| Defendant. | |

`

Pursuant to the Section V of the Settlement Agreement And Release of Claims, the Monitor appointed by this Court, Jeffrey Schwartz, Robert Houston, and Richard Drooyan (collectively the "Panel") hereby submits the attached Panel's Fourth Report "evaluating Defendant's Compliance with Action Plan" prepared by the Panel and approved by the Court for the nine-month period from January 1, 2018, to September 30, 2018.  This Report takes into consideration the comments from the parties in accordance with Section V of the Agreement.  The Panel is available to answer any questions the Court may have regarding my Report at such times as are convenient for the Court and the parties.

DATED:  November 15, 2018          Respectfully submitted,

SCHEPER KIM & HARRIS LLP
RICHARD E. DROOYAN

By:  /s/ Richard E. Drooyan
Richard E. Drooyan
Monitor and on behalf of Monitors Jeffrey
Schwartz and Robert Houston

# PANEL'S FOURTH REPORT

The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan [developed by the Panel] ('Reports') at intervals the Panel shall determine."  This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from January 1, 2018, through September 30, 2018 (the "Fourth Reporting Period"),[1] and it is created for the purposes of the settlement of the *Rosas* case.  It takes into consideration comments received from the Parties regarding the draft sent to them on October 16, 2018, in accordance with Paragraph V of the Settlement Agreement.[2]

In May 2014, the Parties retained the Panel "to develop a corrective action plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles" (the "Downtown Jail Complex").[3]  Pursuant to Paragraph III of the Settlement Agreement, the Panel developed a Plan that was submitted to the Parties and the Court in October 2014.[4]  The Plan sets forth provisions in twenty-one areas that the Los Angeles County Sheriff is required to implement in the Downtown Jail Complex.  The Plan was approved by the Court on April 7, 2016.  Under Paragraph VIII of the Settlement Agreement, "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented, it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')."

With the introduction of the Employee Review System ("ERS") on August 1, 2018, to implement Sections 19.1 through 19.3 of the Settlement Agreement, the Sheriff has implemented 105 of the Panel's recommendations in the Downtown Jail Complex.[5]  The remaining two recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in *United States v. County of Los Angeles, et al*., CV No. 15-05903 (JEMx).

The Panel visited the Downtown Jail Complex on January 16 and 17, 2018, April 9 and 10, 2018, and July 9 and 10, 2018.  The Panel spoke informally with inmates while touring the

---

[1] It is anticipated that in the future the Panel will report to the Court semi-annually on or before December 1 (for the second and third quarters) and on or before June 1 (for the fourth and first quarters).

[2] Plaintiffs' Response to Monitors' Draft Report ("Plaintiffs' Response") was received on October 29, 2018.  Defendant's Response to Monitor's Fourth Draft Report was received on November 5, 2018.

[3] The jails in the Downtown Jail Complex are Men's Central Jail, the Twin Towers Correctional Facility, and the Inmate Reception Center.

[4] In developing the plan, the Panel used the term "Implementation Plan" rather than "Action Plan."  This report uses the terms "Action Plan" or "Plan" to refer to the Panel's plan.

[5] The Sheriff implemented the ERS in the rest of the jail facilities as of November 1, 2018.

jails and also interviewed inmates identified by Plaintiffs outside the presence of Department personnel.  The Panel debriefed the Custody leadership on the Panel's observations of conditions in the jails, and the issues raised by inmates during the interviews.  The Panel also reviewed force packages and grievances pertaining to incidents involving the inmates who were interviewed to determine if any of the incidents involved problematic force or misconduct by Los Angeles County Sheriff's Department (the "Department") personnel.

On April 10, 2018, the Panel met with Sheriff Jim McDonnell to discuss his oversight of the Department's jail operations; the Department's compliance with the Action Plan; the Panel's observations concerning conditions in the Downtown Jail Complex; the nature and extent of the force used by Department personnel in the jails; and the Panel's recommendation that the Department expand its use of direct supervision in housing units as an inmate management tool.  The Panel also had multiple meetings with the Department's Inmate Grievance Coordinator and met with the Inmate Grievance Teams at Men's Central Jail ("MCJ") and the Twin Towers Correctional Facility ("TTCF") to review the Department's implementation of its new grievance policies and procedures.

On May 10, 2018, the Panel adopted a Revised Monitoring Plan and Compliance Measures (the "Revised Compliance Measures"), effective April 1, 2018, that is organized around conceptually related topics.  Under the Revised Compliance Measures, the Panel assesses the Department's compliance with the provisions relating to the use, reporting, and investigation of force by selecting and reviewing 25 force packages each quarter.  Beginning with the Second Quarter of 2018, the Panel has qualitatively assessed the use, reporting and investigation of force by Department members in each force package based upon the applicable provisions in the Action Plan (the "vertical" approach) and then determined compliance with the Plan based upon quantitative thresholds.  The Panel also has qualitatively assessed the Department's compliance with each of the provisions of the Plan relating to the use, reporting, and investigation of force across all of the force incidents reviewed by the Panel (the "horizontal" approach).

Under the Revised Compliance Measures, the Department provides the Panel with self-assessments of its compliance with the non-force related provisions in the Action Plan,[6] some of which (relating primarily to training) are subject to verification by auditors retained by the Panel.[7]  The Plaintiffs have expressed a concern that "it is not clear that the Monitors may rely on a self-assessment alone as to determine compliance with any Action Plan provision.  To do so appears at odds with the Monitors' duties, as spelled out in the Action Plan[.]"  Plaintiffs' Response, p. 2.  The Panel's findings pertaining to the non-force related provisions are not, however, "based only on the LASD's reporting," *Id.*  Under the Revised Compliance Measures,

---

[6] The Department submitted its Self-Assessment Status Report on September 17, 2018, and its augmented Self-Assessment Status Report on October 1, 2018.

[7] Plaintiffs correctly note that the Department "may only reach compliance *after* the Monitors verify the training requirements," but object to the Panel including "all of these provisions as in compliance in Appendix A to the Draft Fourth Report."  Plaintiffs' Response, pp. 2-3.  The Panel has added a note to Appendix A to this Final Fourth Report, to indicate which compliance findings are subject to verification by the Panel's auditors and to the Department's continuing compliance with the requirements for refresher training.

the Panel has "the right to select the records that must be reviewed to determine the Department's compliance with the Action Plan [and] to request and review additional records and categories of records as necessary to assess the Department's Compliance with specific provisions of the Plan[.]"  During the Fourth Reporting Period, the Panel randomly selected and reviewed records posted by the Department to verify the Department's self-assessments of its compliance with various provisions.

Pursuant to the Panel's request, the Department developed a "Use of Force Packet Review" checklist to ensure that investigating Sergeants address all applicable provisions of the Action Plan and to facilitate the Panel's review of force packages under the Revised Compliance Measures.  During the Fourth Reporting Period, the checklist was used primarily by the Department's Custody Compliance and Sustainability Bureau ("CCSB") to review force packages that were sent to the Panel.  Because the checklist was used as an "after-the-fact" review of force packages rather than as a tool for Sergeants conducting investigations, neither CCSB nor the Panel were able to determine if the Department was in compliance with certain provisions of the Plan (e.g., training on weapons, separation of deputies before writing reports, timeliness of reports) in many cases because, as noted by Plaintiffs, "the force packages and investigative packages did not have sufficient information."  Plaintiffs' Response, p. 3.

On October 29, 2018, the Department issued an Informational Bulletin to Sergeants "tasked with the investigation of a force incident," stating that the "*Rosas* Use of Force Packet Review is a mandatory component of the Department's Supervisor's Report on Use of Force (SH-R-438P)."  The Panel believes that the use of the checklist by Sergeants who are conducting force investigations will facilitate the Panel's review of the force packages and improve the Department's compliance with the Action Plan.

During the Fourth Reporting Period, the Panel reviewed 43 completed force packages that were selected by the Panel from a comprehensive list of force incidents compiled by the Department.  The packages were selected without input from the Department.  After reviewing the completed force packages, the Panel met with Custody Commanders on two occasions to discuss force incidents that were of concern to the Panel.  The reporting of the force, the supervisors' investigations, and the Commanders' reviews were also discussed in these meetings.

One of the problems encountered by the Panel in reviewing force packages has been the delay between the occurrence of the force incidents and the completion of the investigations, which was often over nine months.  In order to reduce the delay, the Department decided to focus its investigative resources on force incidents occurring after January 1, 2017.  In addition, the Department developed a plan for expediting the investigation of "Non-Categorical Incidents" involving minimal force that was captured on video by cameras in the jail facilities.  The Department adopted the plan after it was reviewed and approved by the Panel.  The focus on the 2017 incidents and the expedited handling of the Non-Categorical Incidents resulted in shortening the lag time in the Third Reporting Period through December 31, 2017, but the Panel noted an increase in the lag time in the first sixth months of the Fourth Reporting Period.  As a result, for the Third Quarter of 2018, the Panel requested both pending and completed force packages, with the expectation that the Department would expedite the completion of the pending force packages for review by the Panel during the Fourth Reporting Period.

Unfortunately, due to the complexity of some of these investigations and the enhanced level of review of these investigations by Commanders, the Department was not able to complete all of the pending investigations requested by the Panel before the end of the Fourth Reporting Period. As a result, the Panel only reviewed 20 of the 25 designated force incidents in the Third Quarter of 2018 after having reviewed 23 of the 25 designated force incidents in the Second Quarter of 2018.

There is one significant remaining issue that the Panel believes the Parties should address. Under the Settlement Agreement, all recommendations implemented during the same six-month period are grouped together for purposes of determining compliance with the "consecutive" twelve-month period under the Action Plan, no matter how disparate the recommendations may be. The Panel urges the Parties to adopt a meaningful and achievable framework for determining the Department's compliance with this provision of the Settlement Agreement.

As has been the case since the beginning of the Initial Reporting Period, the County cooperated fully with the Panel during the Fourth Reporting Period. The Department and County Counsel facilitated our visits and inmate interviews, answered our questions, responded to our requests for documents and information, provided status reports regarding the implementation of the grievance policies and the ERS, and engaged in constructive conversations about our findings regarding the use of force incidents we reviewed. We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests. Plaintiffs' counsel also has been fully cooperative with the Panel by identifying inmates for the Panel to interview and discussing the issues relating to the Panel's monitoring of the Department's compliance with the Action Plan.

## ACTION PLAN IMPLEMENTATION

### Introduction

Most of the Panel's work is centered on determining the Department's compliance with over 100 specific requirements of the Settlement Agreement.  These individual provisions do not, however, exist in a vacuum; rather, they are embedded in the culture and operation of Los Angeles County Jails.  After more than four years touring the Jails, interviewing staff and inmates, meeting with the Sheriff and the Custody Command staff, reviewing and approving training materials, and assessing force packages, the Panel is pleased to note two important changes in Custody Operations that should not be overlooked in reviewing the Panel's report on the Department's implementation of the specific provisions of the Action Plan as required by the Settlement Agreement.

First, the staff culture in the Jails has changed.  What had been a culture based upon enforcement now emphasizes communication, de-escalation, and the Department's responsibility for the welfare of the inmates in its custody.  Changing an organization's culture is usually a difficult and slow process.  This change has happened more quickly than might have been predicted, and it is the men and women of the Department who deserve credit for this change under the leadership of the Sheriff and Custody Operations.

The second important change is that Department members do not appear to be using force to punish or retaliate against inmates or force that results in severe injuries (such as broken bones that were too often the result of the force that was noted by the Citizens' Commission on Jail Violence).  That is not to say that all force incidents were in compliance with all of the provisions of the Action Plan, but the Panel did not find situations in which inmates were beaten or where force was used in retaliation or as punishment.

### 1.      Leadership, Administration and Management

The recommendations in Sections 1.1 through 1.4 of the Action Plan require that Custody be headed by an Assistant Sheriff with no other areas of responsibility, the Sheriff be engaged personally in the management of the jails, the Department's managers be held accountable for any failures to address force problems in the jails, and the Department regularly report to the Board of Supervisors on the use of force in the jails and on its compliance with the Action Plan.

The Department has been in **Compliance** with Sections 1.1 and 1.2 of the Action Plan since well before January 1, 2017.[8]  Custody has been headed by an Assistant Sheriff with no other areas of responsibility since mid-2014.  It is currently under the direction of Assistant Sheriff Kelly Harrington.  In April 2018, the Panel met with the Sheriff and reviewed his oversight of the jail facilities and the Panel's findings and observations.  The Department has provided the Panel with a log of the Sheriff's frequent meetings with Assistant Sheriff Harrington

---

[8] Use of the term **Compliance** in bold is a finding of Compliance as of a certain date, which in some instances are still subject to verification by the Panel's auditors.  These findings are set forth on the Appendix attached hereto.

5

from July 1, 2017 through June 30, 2018, that include, among other things, the review of use of force data and trends, suicide attempts and rescue force, deployment of chemical agents and personal weapons, facility security concerns, assaults on staff, use of force against mentally ill inmates, and de-escalation techniques.

The Department did not achieve Compliance with Section 1.3 in the Second Quarter of 2018 because it was unable to assess "whether supervisors appropriately addressed supervision of Department members involved in a substantial increase in force incidents[.]"  It anticipates that the ERS, which was implemented to establish the Early Warning System required by Section 19, "will now allow the Department to capture the information necessary to audit this report."

The Department is in **Compliance** with Section 1.4 as of June 12, 2018, when the Assistant Sheriff for Custody Operations reported on the Department's use of force in the jails and its implementation of the *Rosas* Settlement Agreement to the Board of Supervisors.  It has also provided the Panel with a copy of the transcript of the Department's presentation.

The Department is in **Compliance** with Sections 10.1 and 10.2 as of June 30, 2018.  The Sheriff and Assistant Sheriff visited the jail facilities as required by Section 10.1 as did the Captains, Commanders, and Chiefs.  The Department documented these visits, along with the visits by the Watch Commanders, as required by Section 10.2.

Sections 18.1 and 18.2 require the Department to (1) maintain Custody-wide rotations policies and (2) audit each unit's compliance with its rotations policies.  The Department's augmented Self-Assessment reports 100% **Compliance** with rotation polices in each jail facility as required by Section 18.1.  The Department was, however, "unable to assess" Section 18.2 because, "due to a programing error[,] the data obtained for use in the audit of the rotation policy was flawed."  Augmented Self-Assessment Report, p. 2

The Department is in **Compliance** with Section 21.1 as of June 30, 2018.  As supported by the posted documentation, the Department reports that "no member was transferred to Custody as a sanction for misconduct or a policy violation."

## 2.    Use of Force Policies and Practices

Section 2.1 of the Action Plan requires the Department to "have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations[.]"  On October 16, 2015, the Department provided the Panel with a Custody Operations Force Manual with separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints, Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved Shootings.  The Department maintains a separate, free-standing and logically organized Custody Force Manual that satisfies Section 2.1 and includes specific provisions that satisfy Sections 8.2 (Complaints of Retaliation), 17.2 (Pregnant Inmates), 20.1 (Types of Force), and 20.2 (Reactive Force) of the Action Plan.  The Department has been in **Compliance** with these Sections since the Panel began monitoring the Department's compliance as of January 1, 2017.

6

The other recommendations in the Action Plan that pertain to the Department's use of force in Custody Operations are summarized as follows:

- Sections 2.2 through 2.13 require the Department to adopt a comprehensive set of new use of force policies for Custody Operations.

- Sections 4.1 through 4.5 require the Department to adopt specific use of force policies for dealing with mentally ill prisoners.

- Sections 9.2 through 9.3 require the Department to adopt specific policies for escorting inmates after force incidents and intervening to protect inmates as soon as it is reasonably safe to do so.

- Section 17.5 requires the Department to adopt policies for minimizing the risk of an inmate's medical distress during and after a force incident.

- Sections 20.1 through 20.3 require the Department to define Reactive Force and Planned Force and adopt use of force policies for Planned Force (such as cell extractions).

The Panel reviewed multiple drafts of the Department's policies to implement these recommendations, required changes where appropriate, and certified that the Department had implemented these recommendations, effective December 1, 2015.

During the Fourth Reporting Period, the Panel undertook a number of efforts to monitor the Department's use of force in the Downtown Jail Complex. The Panel visited the jails on multiple occasions, and interviewed inmates identified by Plaintiffs as having knowledge of, or complaints about, excessive use of force by Deputy Sheriffs and Custody Assistants. The Panel also had informal discussions with a number of other inmates during these visits. The Panel did not hear complaints about excessive force by Department personnel in these informal discussions. These inmates indicated that Department personnel have not used force to retaliate against, or punish, inmates, and they did not express any concerns about the force used by Department personnel.[9]

The Panel reviewed 23 completed force packages to assess the Department's Compliance with the use of force provisions in the Action Plan under the Revised Compliance Measures in the Second Quarter of 2018. The Department did not satisfy the threshold required to achieve Compliance with the use of force provisions in the Second Quarter of 2018. Recognizing that the cases the Panel reviewed do not constitute a random sample because the Panel focused primarily on more serious Category 2 force incidents when the vast majority of force incidents

---

[9] Although some inmates have in the past expressed the belief that some Department members retaliate against inmates by imposing harsher disciplinary sanctions for founded infractions, the Panel did not hear any such concerns from inmates during a recent site visit in the Fifth Reporting Period.

are Category 1 incidents or Non-Categorical Incidents,[10] the Panel found force incidents in which a Department member punched a recalcitrant inmate in the head or used a Taser against an inmate in restraints when, in the judgment of the Panel, the inmates were not assaultive and there were other reasonable means to control the inmates' behavior.[11]  These incidents, which the Panel found to be in violation of Sections 2.5 and 2.6 of the Action Plan, were discussed with Commanders in Custody Operations following the Panel's visits to the Downtown Jail Complex in July 2018.[12]

The Panel determined that the Department was in compliance with most of the other use of force provisions, except with the provision relating to escorting inmates involved in force incidents (Section 9.2).  In addition, the information provided by the Department was often not sufficient for the Panel to determine the Department's compliance with the provision relating to the training on the use of authorized weapons (Section 2.10).

In order to review 25 force packages in real time (that is, with less delay between the incident itself and the Panel's review of the investigation), in the Third Quarter of 2018 the Panel selected 10 completed force packages and 15 pending investigations of more complex cases with the understanding that the Department would expedite its review of the pending investigations so that the Panel could review the completed force packages during the Fourth Reporting Period.  Given the complexity of the cases and the enhanced level of review by Commanders, the Department was not able to complete all 15 of the pending investigations before the end of the quarter so the Panel only reviewed 20 completed force packages during the Third Quarter of 2018.

Of the 20 completed force packages the Panel reviewed, the Panel concluded that 15 were in Compliance with the use of force provisions,[13] and that the Department did not reach the 90% threshold for Compliance with the Action Plan.  The Panel also concluded that the Department was not in compliance with the following specific provisions of the Action Plan:

---

[10] In 2017, 84.5% of the force incidents in all of the jail facilities were either Category 1 incidents or Non-Categorical Incidents and 15.3% were Category 2 incidents.  There were only three Category 3 incidents out of a total of 1901 incidents (one at the Inmate Reception Center, one at MJC, and one at North County Correctional Facility).

[11] While acknowledging the Panel's concerns, the Department noted that very few force incidents involve either Tasers or punches to the head.  Based upon data provided by the Department, and excluding Non-Categorical Incidents, 1.7% of force incidents in the Downtown Jail Facilities in the Second Quarter of 2018 involved the use of a Taser and less than 6% involved punches by Department personnel.

[12] Plaintiff's Response notes "specific examples of non-compliance with the Action Plan in several of the packages that [Class Counsel] has been able to review."  Plaintiffs' Response, p. 4.  With one exception, these cases involve force incidents in 2016 that were not reviewed by the Panel during the Fourth Reporting Period.  With respect to the one case that involved a force incident in 2017, the Panel (and the Department) agrees with the Plaintiffs' conclusions that it violated the Department's cell extraction policies.  *Id.,* pp, 4-5.

[13] In the case involving the violation of the Department's cell extraction policies the force itself was not unreasonable.

8

head strikes (Section 2.6) and calling supervisors to the scene (Section 2.7), and it did not have sufficient information to determine the Department's compliance with the provision pertaining to the use of authorized weapons (Section 2.10).[14]  The Panel's overarching concern was that Department members sometimes reacted too quickly in a confined environment instead waiting for readily available backup resources and taking more time to plan on how to respond to a recalcitrant inmate.

The Panel reviewed these incidents with Commanders in Custody Operations on the Panel's recent site visit during the Fifth Reporting Period.  Although the Commanders did not necessarily agree that the force in these cases violated the Department's use of force polices, they noted that they had ordered corrective action consisting of additional training of Department personnel in several of these cases.

Although the Department was in compliance with other use of force provisions in the 20 force packages reviewed by the Panel, under the Revised Compliance Measures, the Panel is supposed to review 25 force packages to assess the Department's compliance with the use of force provisions.  That the Panel was only able to review 20 force packages in the Third Quarter of 2018, precludes the Panel from finding the Department in compliance with these other force provisions.[15]

In order to review 25 force packages each quarter going forward, it appears that the Panel will have to continue to rely on completed force packages for incidents that occurred up to almost a year earlier.  The Panel is concerned, however, that reviewing force packages up to a year in arrears will limit the usefulness of its findings regarding the Department's compliance with its use of force policies.  Further, it appears from the most recent force tracker generated by the Department that the Department is getting further behind in completing the investigations of the more serious Category 2 force incidents.

### 3.    Training

Sections 3.1 through 3.4 of the Action Plan require that Department members receive training on use of force policies and on ethics, professionalism, and treating inmates with respect; and that new Department members receive six weeks of Custody specific training in the Academy or the Jail Continuum in Custody Operations.  Sections 4.6 through 4.9 require the

---

[14] Plaintiffs note that Class Counsel "has not been able to determine whether" the Department complied with a number of other provisions of the Action Plan because force packages "contain insufficient information to evaluate whether or not the LASD is in compliance with certain Action Plan Provisions."  Plaintiffs' Response, p. 2.  This may because "Class Counsel has received only videos for less than 20% of the force packages they have received." *Id.,* p. 5.  The Panel received videos for all of the 43 force packages reviewed during the Fourth Reporting Period and had sufficient information to evaluate the Department's compliance with almost all of the use of force provisions in the Action Plan.

[15] The is also the case for the provisions of the Action Plan relating to the reporting and investigation of force incidents.

9

Department to provide Custody-specific, scenario-based, skill development training for existing and new personnel in Crisis Intervention and Conflict Resolution and on "identifying and working with mentally ill inmates." Section 12.1 requires that all Custody Sergeants receive training in conducting use of force investigations.

The Department reports that as of June 30, 2018, 97% of the existing deputies and Custody Assistants in the downtown jails received the one-time eight hour use of force training required by Section 3.1;[16] and 95% received the one-time four hour training course in ethics, professionalism, and treating inmates with respect required by Section 3.2. The Department also reports that as of June 30, 2018, 97% of the existing deputies at the downtown jails and the mental health unit at the Century Regional Detention Facility ("CRDF") received the 32 hours of training on Crisis Intervention and Conflict Resolution Training, including eight hours of identifying and working with mentally ill inmates, required by Sections 4.6 and 4.7; and 98% of the additional existing deputies at CRDF, the North County Correctional Facility ("NCCF"), and the Pitchess Detention Center jails received the eight hours training in identifying and working with mentally ill inmates required by Section 4.7.

The Department reports that since the First Reporting Period beginning on July 1, 2015, new deputies have been required to complete a six-week Custody Operations course that includes training in ethics, professionalism and treating inmates with respect, and new Custody Assistants have received training in these subjects during their nine-week Academy training. The Department also reports that as of June 30, 2018, 95% of the new Deputies and 100% of the new Custody Assistants have received the training required by Section 3.3. The new Deputies also have received the approved use of force and conflict resolution training in the Academy and the Jail Continuum and new Custody Assistants have received use of force training and training in "identifying and working with mentally ill inmates." The Department reports that as of June 30, 2018, 98% of new members have received the training required by Section 4.8 and 100% have received the training required by Section 4.9.

The Department reports that as of June 30, 2018, 90.4% of the Sergeants assigned to Custody as of October 1, 2016,[17] have received the 16 hours of training in conducting use of force investigations required by Section 12.1.

The Department's reported training results are subject to verification by the Panel's auditors. If verified by the auditors, the Department will have achieved Compliance with all of the initial training requirements in the Action Plan. In future reporting periods, the Panel will monitor attendance at the mandated refresher courses, which is required to maintain Compliance with the training provisions.

Section 3.5 requires Unit Commanders to determine what additional training, counseling or mentoring may be required when a personnel complaint involving the use of force is resolved

---

[16] The use of force training that was approved by the monitors includes the custody-based use of force scenarios required by Section 3.4.

[17] The Department reports that there were no Sergeants promoted to that position after October 1, 2016.

10

with a finding that it "Appears Employee Conduct Could Have Been Better."  The Department reports that there was one such case, and it was in **Compliance** with Section 3.5 as of June 30, 2018.

Section 3.6 requires Unit Commanders to review new Department members within six months of being initially assigned to Custody and again before the end of their probationary period.  Based upon a random selection of personnel records, the Department reports that 73% of the new Department members were reviewed as required by Section 3.6, which is below the 95% threshold for Compliance.

## 4.      Reporting and Investigation of Force Incidents

As discussed below, many of the recommendations in the Action Plan that pertain to the reporting and investigation of force used by Department personnel in Custody Operations are also assessed by the Panel through a review of the completed force packages.  Other provisions are reported by the Department as follow:

- Section 5.1 requires the Department to track use of force investigations, reviews, and evaluations; review evaluations of force incidents; and conduct additional investigation of discrepancies and unexplained tactical decisions.  The Department reports 92% compliance, which is less than the 95% threshold for timely entering force incidents or allegations into the database.

- Section 8.3 requires that evaluations of investigations of inmate grievances that Department members used force to retaliate against inmates should be reviewed by the Custody Force Review Committee.  The Department reports that it is "Non-Compliant" with this provision, and it is "working on restructuring [CFRC's] scheduling to meet this provision."

- Section 11.1 requires that the Custody Force Rollout Team's involvement in reviewing force incidents not delay the Department's investigation of the force incidents.  The Department's augmented Self-Assessment reports that it achieved **Compliance** with Section 11.1 in the Second Quarter of 2018 in that the Custody Force Rollout Team did not delay the investigation of any of the force incidents "beyond the period permitted by law for imposing discipline."

- Sections 13.1 and 13.2 require the documentation of reasons and reports to the Office of Inspector General whenever the Department does not terminate a member who has been found to have been dishonest, used excessive force, or violated the Prisoner Rape Elimination Act ("PREA").  The Department reports that there were no incidents in the Second Quarter of 2018 that were subject to Sections 13.1 and 13.2.

- Sections 14.1 and 14.2 require (1) an additional review of referrals of an inmate for criminal prosecution arising from an incident involving the use of force by a Department member and (2) timely referrals to the District Attorney of "officer misconduct that may amount to criminal violations."  The Department reports 100% in **Compliance** with

Section 14.1 in the Second Quarter of 2018, and there "were no criminal filings on Department personnel related to force for the 2nd Quarter of 2018."

For the Second Quarter of 2018, the Panel reviewed 23 completed force packages of incidents. The Department did not satisfy the 90% threshold required by the Revised Compliance Measures for the reporting and investigation of force provisions in the Second Quarter of 2018. Department members' own use of force reports were consistent with videotapes of incidents from Closed Circuit Television cameras, but they did not always report force used by other members or describe an inmate's visible injuries. The Panel is cognizant, however, that sometimes Department members involved in a force incident may not be able to observe all of the force used by other members.

Also in the 23 completed force packages, some force reports were not timely or it could not be determined if the reports were timely (Section 15.1), and the Panel could not always determine if the Department members involved in the force incidents were separated before they wrote their reports. (Section 15.6.) The Panel also noted that there were instances in which inmates were not interviewed away from other inmates. (Section 12.2.) Finally, the Panel asked the Commanders to provide additional analyses of these issues in their reviews of the force packages.

For the Third Quarter of 2018, the Panel reviewed 20 completed force packages to assess compliance with the provisions of the Action Plan relating to the reporting and investigation of force incidents. The Panel concluded that 17 (or 85%) were in Compliance with these provisions, which was below the 90% threshold for Compliance. The Panel again concluded that the Department was not in compliance with the provision regarding the location of inmate witness interviews. In addition, the information provided by the Department was often not sufficient for the Panel to determine the Department's compliance with provisions relating to the timeliness of reports, and the separation of Department personnel after a force incident.[18] The Panel also noted a pattern whereby the Commanders engaged in more thorough reviews of the tactics leading up to the force incidents than the reasonableness of the actual force used by the members. The Panel acknowledges, however, that Commanders have been responsive to Panel's comments and the Commanders' reviews have been more helpful to the Panel in its more recent reviews of the force incidents.

**5.    Inmate Grievances**

The Action Plan requires extensive changes in how the Department handles inmate grievances and requests for service. On July 15, 2016, the Department issued a new "Inmate Grievance Manual" (Volume 8 of the Custody Division Manual) to implement a new grievance system.

---

[18] The Panel anticipates that many of these issues will be resolved once Sergeants begin using the checklist as intended to address all of the applicable provisions of the Rosas Action Plan.

The Panel assessed the Department's implementation of the new grievance system as follows:

Sections 6.1 through 6.6 require that separate forms for inmate grievances be reasonably available to inmates and that the forms have specific check boxes.  Section 7.1 requires the Department to advise inmates of the voluntary Conflict Resolution Meeting available under the Department's Conflict Resolution Policy.[19]  Based upon site visits, the Panel concluded that the forms meeting these requirements of the Action Plan are reasonably available to inmates.  Sections 6.4 and 6.5 also require the Department to establish that use of force grievances and retaliation grievances against staff are brought to the attention of Unit Commanders and properly handled.   Based upon a review of the relevant grievances in the randomly selected month of April, the Department reports 100% **Compliance** with these provisions.  These results for Section 6.5 are still subject to verification by the Panel.

Sections 6.7 and 6.8 of the Action Plan set forth specific requirements for the determination, handling, and notifications of non-medical emergencies.  Based upon the selection and review of the grievances marked "emergency" in the month randomly selected by the Panel, the Department reports 100% Compliance with Section 6.7 and 98% Compliance with Section 6.8.[20]  The results for Sections 6.7 and 6.8 have been verified by the Panel.  Although some of the grievances that the Department determined were non-emergent could be viewed as emergencies, the Department handled the grievances expeditiously as required by the nature of the grievance.  Accordingly, the Department is in **Compliance** with the provisions.

Section 6.9 requires that emergency grievances be forwarded to the Inmate Grievance Coordinator.  Sections 6.13, 6.14, and 6.15 require the Inmate Grievance Coordinator to track the Department's handling of inmate grievances, provide a monthly report to the Unit Commander and senior management in Custody on the status of inmate grievances, and analyze inmate grievances for problematic trends.  During the Fourth Reporting Period, the Panel met with the Department's Inmate Grievance Coordinator on several occasions to discuss the significant progress the Department has made in implementing the new grievance system and the reports generated for the Department's managers regarding inmate grievances and requests, grievances against staff, and trends at the different facilities.  The Department provided documentation showing that the Inmate Grievance Coordinator received the information about emergency grievances required by Section 6.9 and that detailed reports were prepared by the Inmate Grievance Coordinator for managers pursuant to the requirements of Sections 6.13, 6.14, and 6.15.  The Department is in **Compliance** with Sections 6.9, 6.13, 6.14, and 6.15. as of June 30, 2018.

Sections 6.10 and 6.12 require that grievances be collected daily, logged in, and tracked in an inmate grievance database.  The Department reports that 84% of the grievances were

---

[19] The Department reports that only one grievance was resolved through the Conflict Resolution Policy in the Second Quarter of 2018.

[20] The Department determined that the first 50 grievances marked "emergency" were not actually emergencies.  Thus the Department identified five grievances that were actual emergencies to determine that they were handled in accordance with Section 6.7.

13

collected timely, which is below the 95% threshold for Compliance with Section 6.10.  The Department also provided a spreadsheet showing that 100% of the grievances in the randomly selected months were entered into the database and handled as required by Section 6.12. Accordingly, the Department is in **Compliance** with Section 6.12 as of June 30, 2018.

Section 6.11 requires that the Custody Division Manual provide that failing to comply with Department policies requiring proper handling of inmate grievances may be cause for discipline.  The Department reports that it "did not complete any investigations for the relevant type of grievances in Second Quarter 2018."

Sections 6.17, 6.18, 6.19, 6.20, and 7.2 set forth the deadlines for filing use of force and PREA grievances,[21] the Department's initial responses, inmates' right to appeal, and the Department's notifications of the results of the investigations.  The Department provided reports reflecting that it adhered to these deadlines for all grievances selected pursuant to the applicable Compliance Measures during the Second Quarter of 2018 for Sections 6.17 (use of force),[22] 6.18 (PREA), 6.19 (initial response), and 6.20 (right to appeal).  The Panel agrees that the Department is in **Compliance** with Sections 6.17, 6.18, and 6.20 as of June 30, 2018, but the Panel believes that more data and analysis is needed to determine whether the Department is in Compliance with Section 6.19.  The Department reports that it will expand the universe of grievances it will assess to determine if it is in Compliance with Section 6.19 beginning with the Third Quarter of 2018.

The policies adopted by the Department for the new inmate grievance system do not "establish a centralized unit with a sworn supervisor, custody assistants, and civilian personnel" that is "co-located" in TTCF and the Pitchess Detention Center as required by Section 6.16, although the policies do provide for additional centralized oversight.  Based upon interviews with the Inmate Grievance Coordinator, meetings with the Inmate Grievance Teams, including interviews by the Monitor in the DOJ case with Inmate Grievance Teams at the other facilities, the Panel believes that the decentralized grievance system is effectively and efficiently handling inmate grievances and requests for service and, therefore, the Department is in **Compliance** with this provision.

Section 7.3 requires the Department to "ensure that there are adequate avenues for constructive prisoner-staff communication[.]"  The Department provided logs of Town Hall meeting and Prisoner Staff Communications at MCJ and TTCF during the randomly selected month of April.  The Panel is of the view that the Department is in **Compliance** with Section 7.3 as of June 30, 2018.

Section 8.1 prohibits Department personnel from retaliating against inmates.  The Department's summaries reflect that the Department is in **Compliance** with Section 8.1 as of June 30, 2018, in that discipline was imposed for the one founded grievance in the First Quarter

---

[21] Section 6.18 provides that there is no deadline for filing PREA grievances.

[22] The Department reports that it accepts all use of force investigations.

of 2018 and for the two founded grievances in the Second Quarter of 2018.[23]  The discipline in these cases consisted of lower level Performance Log Entries, which is imposed when the member's conduct is not egregious or malicious, and it is considered to be a training issue.

**6.      Use of Restraints**

Section 17.1 requires that the Custody Force Manual include "a separate section that sets forth the general principles governing the use of restraints" identified in this recommendation. The Department included such a separate section in the Manual, effective December 1, 2015.

Sections 17.1, 17.3, 17.4, and 17.6 through 17.9 (the "Restraint Provisions") of the Action Plan require the Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than 20 minutes, subjected to security restraints for an extended length of time. . .or subjected to a multi-point restraint in the Downtown Jail Complex[.]"  To assess Compliance, the Panel is supposed to "select generally 25 incidents involving Security Restraints" from the list supplied by the Department to assess the Department's compliance with the security restraint provisions.

During the Fourth Reporting Period, the Department generated a list of incidents involving the use of a Safety Chair, but the list did not include the other Security Restraints listed above.  The Department reports that it "is currently working to document" the use of the other security restraints, which it anticipates providing to the Panel in the next reporting period.

Section 17.10 provides that medication cannot be used solely for security purposes.  The Department provided a log of the Administration of Involuntary Medications in the Second Quarter of 2018, which shows all of the medication was administered pursuant to a Court Order for inmates incompetent to stand trial or in response to a petition for a lack of capacity to refuse medications.  Accordingly, the Department is in **Compliance** with Section 17.10 as of June 30, 2018.

**7.      Early Warning System**

Sections 19.1 through 19.3 require the Department to develop a formal Early Warning System to identify potentially problematic employees based upon objective criteria.  The Panel met with the Department during the Fourth Reporting Period to review and discuss the ERS

---

[23] Although the supporting documents for the grievances against staff show the results of the investigations, they do not show how the grievances were investigated or the basis of the Department's findings or discipline.  As a result, the Panel is unable to qualitatively assess the Department's reported conclusions regarding the actions of the employees that were the subject of the inmates' grievances.  In the future, the Department should summarize or describe the investigations and the basis for its findings, which can be done for a random sample, depending on the number of these investigations.  In addition, the Panel had questions about the Department's responses to inmates stating that the Department was unable to make a determination regarding the inmates' grievances, in cases where the Department had determined that staff performance could have been better or should have been different.

proposed by the Department to establish the Early Warning System.  The Panel approved the ERS in July and it was implemented by the Department on August 1, 2018, as a pilot program in the Downtown Jail Complex.  It was implemented in the rest of the jail facilities effective November 1, 2018.  Accordingly, the Department is in **Compliance** with Section 19.1 in the Downtown Jail Complex as of August 1, 2018.  The Department did not report to the Monitors the results of its reviews of the ERS for the required notifications and consultations during last two months of the Fourth Reporting Period.

**APPENDIX**

| NO. | PROVISION | STATUS | DATE |
|---|---|---|---|
| | | | |
| | **Leadership, Administration & Management** | | |
| | | | |
| 1.1 | Assistant Sheriff | Compliance | January 1, 2017 |
| 1.2 | Sheriff | Compliance | January 1, 2017 |
| 1.3 | Supervision | | |
| 1,4 | Reports to Board | Compliance | June 12, 2018 |
| 10.1 | Jail Visits | Compliance | June 30, 2018 |
| 10.2 | Documented Visits | Compliance | June 30, 2018 |
| 18.1 | Rotation in Custody | Compliance | June 30, 2018 |
| 18.2 | Documentation of Rotation | | |
| 21.1 | Transfers to Custody | Compliance | June 30, 2018 |
| | | | |
| | **Use of Force Polices & Practices** | | |
| | | | |
| 2.1 | Custody Force Manual | Compliance | January 1, 2017 |
| 2.2 | Force Prevention Principles | | |
| 2.3 | Inmate on Inmate Violence | | |
| 2.4 | Use of Force as Discipline | | |
| 2.5 | Force on Restrained Inmates | | |
| 2.6 | Head Strikes or Kicks | | |
| 2.7 | Supervisors Called to Scene | | |
| 2.8 | Prevent Excessive Force | | |
| 2.9 | Armed Inmates | | |
| 2.10 | Authorized Weapons | | |
| 2.11 | Planned Chemical Spray | | |
| 2.12 | Chemical Spray & Tasers | | |
| 2.13 | Check of Medical Records | | |
| 4.1 | Consult MH professionals | | |
| 4.3 | Spray on MH inmates | | |
| 4.4 | Cooling Off Periods | | |
| 4.5 | Medical or MH Provider | | |
| 8.2 | Complaints of Retaliation | Compliance | January 1, 2017 |
| 9.2 | Escorting of Inmates | | |
| 17.2 | Pregnant Inmates | Compliance | January 1, 2017 |
| 17.5 | Minimize Medical Distress | | |
| 20.1 | Categories of Force | Compliance | January 1, 2017 |
| 20.2 | Reactive Force | Compliance | January 1, 2017 |
| 20.3 | Planned Use of Force | | |
| | | | |

17

| | | | |
|---|---|---|---|
| | **Training**[24] | | |
| | | | |
| 3.1 | Use of Force Training | Compliance | June 30, 2018 |
| 3.2 | Ethics, Professionalism | Compliance | June 30, 2018 |
| 3.3 | Custody Training | Compliance | June 30, 2018 |
| 3.4 | Custody-based scenarios | Compliance | June 30, 2018 |
| 3.5 | Add training/mentoring | Compliance | June 30, 2018 |
| 3.6 | Probation Reviews | | |
| 4.6 | Crisis Intervention | Compliance | June 30, 2018 |
| 4.7 | Mentally Ill Inmates | Compliance | June 30, 2018 |
| 4.8 | Mentally Ill Inmates (for new Department members) | Compliance | June 30, 2018 |
| 4.9 | Crisis Intervention  (for new Department members) | Compliance | June 30, 2018 |
| 12.1 | Force Investigations | Compliance | June 30, 2018 |
| | | | |
| | **Investigation & Reporting of Force** | | |
| | | | |
| 4.2 | Mental Health Professionals | | |
| 5.2 | Commanders' Reviews | | |
| 5.3 | Unexplained Discrepancies | | |
| 12.2 | Location of Inmate Interviews | | |
| 12.3 | Suspect Interviews | | |
| 12.4 | Uninvolved Supervisors | | |
| 12.5 | Standard Order & Format | | |
| 15.1 | Timeliness of Reports | | |
| 15.2 | All Department Witnesses | | |
| 15.3 | Force by Other Members | | |
| 15.4 | Description of Injuries | | |
| 15.5 | Clarification after Video | | |
| 15.6 | Separation of Deputies | | |
| 15.7 | Individual Perceptions | | |
| 16.1 | Healthcare Assessment | | |
| 16.2 | Photographs of Injuries | | |
| 16.3 | Medical Report of Injuries | | |
| | | | |
| | **Inmate Grievances** | | |
| | | | |
| 6.1 | Separate Grievance Forms | Compliance | January 1, 2017 |
| 6.2 | Available Grievance Forms | Compliance | January 1, 2017 |

---

[24] The Panel's Compliance findings for Sections 3.1 through 3.4, 4.6 through 4.9, and 12.1 are subject to verification by the Panel's auditors.

18

| 6.3 | Emergency Grievances Forms | Compliance | January 1, 2017 |
|------|------|------|------|
| 6.4 | Use of Force Grievances | Compliance | June 30, 2018 |
| 6.5 | Grievances Against Staff | Compliance | June 30, 2018 |
| 6.6 | Right to Appeal Form | Compliance | January 1, 2017 |
| 6.7 | Handling Emergency Grievances | Compliance | June 30, 2018 |
| 6.8 | Notification of Non-Emergency | Compliance | June 30, 2018 |
| 6.9 | Grievance Coordinator Review | Compliance | June 30, 2018 |
| 6.10 | Collection of Grievances | | |
| 6.11 | Failure to Handle Grievances | | |
| 6.12 | Tracking Inmate Grievances | Compliance | June 30, 2018 |
| 6.13 | Grievance Coordinator Tracking | Compliance | June 30, 2018 |
| 6.14 | Grievance Coordinator Reports | Compliance | June 30, 2018 |
| 6.15 | Grievance Coordinator Analysis | Compliance | June 30, 2018 |
| 6.16 | Centralized Grievance Unit | Compliance | January 1, 2017 |
| 6.17 | Use of Force Deadline | Compliance | June 30, 2018 |
| 6.18 | PREA Deadline | Compliance | June 30, 2018 |
| 6.19 | Response to Inmate Grievances | | |
| 6.20 | Appeals of Grievances | Compliance | June 30, 2018 |
| 7.2 | Notification of Results | | |
| 7.3 | Prisoner-staff Communications | Compliance | June 30, 2018 |
| 8.1 | Anti-retaliation | Compliance | June 30, 2018 |
| | | | |
| | **Use of Restraints** | | |
| | | | |
| 17.1 | Restraint Provisions | | |
| 17.2 | Pregnant Inmates | Compliance | January 1, 2017 |
| 17.3 | Safety Chair Procedures | | |
| 17.4 | Safety Checks | | |
| 17.6 | Multi-point Restraint Procedures | | |
| 17.7 | Approval of Multi-point Restraints | | |
| 17.8 | Continued Use of Restraints | | |
| 17.9 | Supervisor Approval of Restraints | | |
| 17.10 | Involuntary Medications | Compliance | June 30, 2018 |
| | | | |
| | **Early Warning System** | | |
| | | | |
| 19.1 | Development of EWS | Compliance | August 1, 2018 |
| 19.2 | Report Review and Notification | | |
| 19.3 | Performance Mentoring Programs | | |

19