1  **SCHEPER KIM & HARRIS LLP**
2  RICHARD E. DROOYAN (Bar No. 65672)
   601 West Fifth Street, 12th Floor
3  Los Angeles, CA  90071-2025
   Telephone: (213) 613-4655
4  Facsimile:  (213) 613-4656
5
   **Monitor and on behalf of Monitors**
6  **Jeffrey Schwartz and Robert Houston**
7
8                    UNITED STATES DISTRICT COURT
9                  CENTRAL DISTRICT OF CALIFORNIA
10                      WESTERN DIVISION
11
12  ALEX ROSAS, et al.                    CV No. 12-00428 DDP
13            Plaintiffs,
                                          **PANEL'S FIFTH REPORT**
14
15            v.
16  LOS ANGELES COUNTY SHERIFF
   LEROY BACA, in his Official
17  Capacity,
18            Defendant.
19
20  `
21
22
23
24
25
26
27
28
                                              Case No.CV 12-00428 DDP
                    PANEL'S FIFTH REPORT

1    Pursuant to the Section V of the Settlement Agreement And Release of
2  Claims, the Monitor appointed by this Court, Jeffrey Schwartz, Robert Houston, and
3  Richard Drooyan (collectively the "Panel") hereby submits the attached Panel's
4  Fifth Report "evaluating Defendant's Compliance with Action Plan" prepared by the
5  Panel and approved by the Court for the period from July 1, 2018, through
6  December 30, 2018.  This Report takes into consideration the comments from the
7  parties in accordance with Section V of the Agreement.  The Panel is available to
8  answer any questions the Court may have regarding my Report at such times as are
9  convenient for the Court and the parties.

10

11  DATED:  May 31, 2019          Respectfully submitted,

12                               SCHEPER KIM & HARRIS LLP
13                               RICHARD E. DROOYAN

14

15

16                               By:  /s/ Richard E. Drooyan

17                                    Richard E. Drooyan
                                     Monitor and on behalf of Monitors Jeffrey
18                                   Schwartz and Robert Houston

19

20

21

22

23

24

25

26

27

28

# PANEL'S FIFTH REPORT

The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan [developed by the Panel] ('Reports') at intervals the Panel shall determine." This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from July 1, 2018, through December 31, 2018 (the "Fifth Reporting Period"), and it is created for the purposes of the settlement of the *Rosas* case. In accordance with Paragraph V of the Settlement Agreement, it takes into consideration comments received from the Parties on May 13, 2019, regarding the draft of the report that was sent to them on April 25, 2019. The Report also includes reference to some events that occurred after the end of the Fifth Reporting Period that the Panel believes have potential impact on Custody Operations and reforms mandated by the Settlement Agreement.

Although the Panel anticipated that it would submit semi-annual reports to the Court on or before June 1 (for the fourth quarter of each year and the first quarter of the following year) and December 1 (for the second and third quarters),[1] the Sheriff's Department's (the "Department") most recent Self-Assessment Status Report encompasses the Third and Fourth Quarters of 2018.[2] In order to align the Panel's reports with the Department's time periods, the Panel has included in this Report its use of force analysis undertaken in the Third Quarter of 2018, which was in the Panel's Fourth Report, as well as its analysis in the Fourth Quarter of 2018. This will allow the Fifth Report and the Panel's future monitoring reports to coincide with the Department's Self-Assessment reports.

In May 2014, the Parties retained the Panel "to develop a corrective action plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles" (the "Downtown Jail Complex").[3] The Implementation Plan developed by the Panel (referred to in the Settlement Agreement as an "Action Plan") sets forth provisions in twenty-one areas that the Los Angeles County Sheriff is required to implement in the Downtown Jail Complex. The Plan was approved by the Court on April 7, 2016. Under Paragraph VIII of the Settlement Agreement, "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented, it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')."

As of November 1, 2018, the Sheriff's Department implemented 104 of the Panel's 106 recommendations. The remaining two recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement

---

[1] *See* Panel's Fourth Report, p. 1.

[2] The Department's Self-Assessment was submitted on March 15, 2019, and Augmented on March 29, 2019.

[3] The jails in the Downtown Jail Complex are Men's Central Jail, the Twin Towers Correctional Facility, and the Inmate Reception Center.

Agreement and Stipulated Order of Resolution in *United States v. County of Los Angeles, et al.*, CV No. 15-05903 (JEMx) (the "DOJ case").[4]

The Panel visited the Downtown Jail Complex during the Fifth Reporting Period on July 9 and 10, 2018, and again on November 1 and 2, 2018.  As in the past, the Panel spoke informally with inmates and Department personnel while touring the jails.  The Panel debriefed the Custody leadership on the Panel's observations of conditions in the jails, and the issues raised by inmates during the interviews.

On November 1, 2018, the Panel met with Sheriff Jim McDonnell to discuss his oversight of the Department's jail operations; the Department's compliance with the Action Plan; the Panel's observations concerning conditions in the Downtown Jail Complex; the nature and extent of the force used by Department personnel in the jails; and the Panel's recommendation that the Department expand its use of direct supervision in housing units as an inmate management tool. On February 22, 2019, during the next reporting period, the Panel met with Sheriff Alex Villanueva to discuss his vision for the Department and the Panel's monitoring activities and observations about his role in ensuring that the reforms instituted by the Department continue and that Department personnel are held accountable for their conduct.

The Panel also had several meetings during the Fifth Reporting Period with the Department's Inmate Grievance Coordinator and the Inmate Grievance Teams at Men's Central Jail ("MCJ") and the Twin Towers Correctional Facility ("TTCF") to review the Department's implementation of its new grievance policies and procedures.

On May 10, 2018, the Panel adopted a Revised Monitoring Plan and Compliance Measures (the "Revised Compliance Measures"), effective April 1, 2018, that is organized around conceptually related topics.  Under the Revised Compliance Measures, the Panel assesses the Department's compliance with the provisions relating to the use, reporting, and investigation of force by selecting and reviewing 25 force packages each quarter.

Pursuant to the Panel's request, the Department developed a "Use of Force Packet Review" checklist to ensure that investigating Sergeants address all applicable provisions of the Action Plan and to facilitate the Panel's review of force packages under the Revised Compliance Measures.  On October 29, 2018, the Department issued an Informational Bulletin to Sergeants "tasked with the investigation of a force incident," stating that "The *Rosas* Use of Force Packet Review is a mandatory component of the Department's Supervisor's Report on Use of Force (SH-R-438P)."  The entries on the checklist need to be supported by reports or other documents in the force packages.  Because most of the force incidents reviewed by the Panel during the Third and Fourth Quarters of 2018 occurred before October 29, 2018, the checklist was used primarily by the Department's Custody Compliance and Sustainability Bureau ("CCSB") to review force packages before they were sent to the Panel during the Fifth Reporting Period.

---

[4] The other recommendations in the *Rosas* Action Plan have been implemented in the other jail facilities outside of the Downtown Jail Complex pursuant to Paragraph 81 of Settlement Agreement and Stipulated Order of Resolution in the DOJ case.

During the Fifth Reporting Period, the Panel reviewed 44 completed force packages that were selected by the Panel from a comprehensive list of force incidents compiled by the Department.  The packages were selected without input from the Department.[5]  After reviewing the completed force packages, the Panel met with Custody Commanders after the end of each quarter to discuss the force incidents that were of concern to the Panel.  The reporting of the force, the supervisors' investigations, and the Commanders' reviews were also discussed in these meetings.  The Panel subsequently met with Class Counsel to review issues they had identified in the 24 force packages reviewed by the Panel in the Fourth Quarter of 2018.[6]  This Report reflects the input from both the Custody Commanders and Class Counsel.

Under the Revised Compliance Measures, the Department provides the Panel with self-assessments of its compliance with the non-force related provisions in the Action Plan.  All of the Department's results for the training required by the Action Plan are subject to verification by auditors retained by the Panel.  Others provisions are subject to verification by the Panel, which has "the right to select the records that must be reviewed to determine the Department's compliance with the Action Plan [and] to request and review additional records and categories of records as necessary to assess the Department's Compliance with specific provisions of the Plan[.]"  During the Fifth Reporting Period, as reflected below, the Panel randomly selected and reviewed records posted by the Department to verify the Department's self-assessments of its compliance with various provisions.

Plaintiff's May 13, 2019 response to the Panel's draft of this Report ("Plaintiffs' Response") expresses considerable concern about the Class Counsel's lack of access to County records.[7]  The Panel encourages the County to provide Class Counsel with the documentation they need to evaluate the Panel's reports as the Panel appreciates the input it received from the parties regarding the draft of this Report.  Nevertheless, this is an issue for the parties to resolve.  The Panel believes that it has sufficient information from the Department's documentation and Self-Assessments; the parties' comments to the draft Report, and the Panel's site visits and interviews to make the compliance and non-compliance findings set forth in the Report in accordance with Article VIII of the Settlement Agreement.

---

[5] Most of the force incidents reviewed by the Panel in the Fifth Reporting Period occurred during the First and Second Quarters of 2018.

[6] The Panel also discussed with Class Counsel the issues they identified in the force packages the Panel reviewed in the First Quarter of 2019, which will be reflected in the Panel's next report to the Court.

[7] *See* Plaintiffs' Response, p. 3 (expressing concern about the Panel's reliance on the Department's Self-Assessments because of "Class Counsel's inability to evaluate compliance with numerous Action Plan provisions due to insufficient data"); p. 4 (noting that "deficiencies [in existing information] cannot be cured unless the [Department] substantially decreases the redactions it applies to the document provided to Class Counsel"); p. 5 (noting that the Panel has "access to substantially more data than Class Counsel"); and p. 5 n. 5 ("Stated differently, Class Counsel is not receiving the information which it needs to evaluate the LASD's compliance with the Action Plan").

As has been the case since the beginning of the Initial Reporting Period, the Department cooperated fully with the Panel during the Fifth Reporting Period.  The Department and County Counsel facilitated our visits and inmate interviews, answered our questions, responded to our requests for documents and information, and provided status reports regarding the implementation of the grievance policies and the Early Warning System known as the Employee Review System ("ERS").  They also engaged in constructive conversations with the Panel about our findings regarding the use of force incidents we had reviewed and the Department's continuing efforts to implement the terms of the *Rosas* Action Plan.  We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.  Plaintiffs' counsel also has been fully cooperative with the Panel by identifying inmates for the Panel to interview and facilitating those interviews; reviewing and commenting on the Department's use of force packages; and raising and discussing issues relating to the Panel's monitoring of the Department's compliance with the Action Plan.

## ACTION PLAN IMPLEMENTATION

In the Panel's Fourth Report dated December 1, 2018, for the period from January 1, 2018, through September 30, 2018, we noted that the staff culture in the jails had changed and Department members were not using force to punish or retaliate against inmates or force that resulted in severe injuries.  During a site visit in November, the Panel did not observe anything that caused any concerns regarding the staff culture or the use of force by Department members. This is consistent with the observations of the new Assistant Sheriff for Custody who took over custody operations on December 3, 2018.  In his introductory remarks to the Board of Supervisors on January 15, 2019, he stated:

> I have been asked to come back from retirement and after running the Custody Division, and I can tell you there's a difference between night and day.  I am very familiar with the Rosas decision and the [Citizens' Commission on Jail Violence] C.C.J.V. and walking into the environment and see the changes that have been made now is extremely incredible, and we're going to attempt to sustain [that] process.

He closed by stating, "Although we're not completely there yet, we are going to continue to move forward in that direction."  In addition to having an Assistant Sheriff who is committed to implementing the provisions of the Action Plan, the Department needs a strong, experienced Command Staff in Custody with extensive knowledge of the provisions to achieve and maintain Compliance with the Plan for the periods required by the Settlement Agreement.

Notwithstanding this cause for optimism, there are some recent developments that are of concern to the Panel.  According to published reports, the Department has reinstated "two deputies fired for misconduct – one accused of assaulting and harassing a woman and lying about it, the other for using unreasonable force during an arrest." (*Los Angeles Times,* "L.A. County Sheriff Alex Villanueva Reinstates Four More Fired Deputies," April 5, 2019.)  The Deputy accused of dishonesty was rehired by the Department, notwithstanding that his termination had been upheld by the Civil Service Commission.  Although these Deputies were not members of the Department's Custody Division at the time of the incidents at issue in these cases, the Panel is concerned that the reinstatement of Deputies who have been fired for dishonesty or excessive use of force sends the wrong message to Department personnel about the Department's commitments to the on-going reforms in the jails, and to holding Department personnel accountable for such misconduct in the future.

Of additional concern is a recent Report of the Interim Inspector General, which "observed a sharp increase in the number of administrative investigations that the Department was inactivating."  (Office of Inspector General, "Report-Back on LASD Internal Administrative Investigations and Dispositions of Disciplinary Actions," April 11, 2019, p. 2.)  At the same time, there was a "marked decrease" in the number of administrative investigations in the first quarter of 2019 as compared to the same time period in prior years.  (*Id.,* p. 3, n. 4.)  According to the Report, "31 investigations appear to have been inactivated based on [a] new directive or direction, as they do not appear to be in conformance with Department policy," and in 20 of these deactivated investigations, "the employees' alleged conduct appears to have been in

violation of Department policy." (*Id.,* p. 3.)  Some of the problematic dispositions identified by the Inspector General's Report involved Department members in Custody operations who failed to report force, made false statements, improperly used fixed restraints, failed to timely rescue a victim inmate, conducted inadequate safety checks, and improperly imposed discipline. Although these may be isolated cases, the Panel is nevertheless concerned with these instances of apparent misconduct.  The Panel agrees with the Plaintiffs' observation in their response to the Panel's report, that the Department "cannot have a policy of zero tolerance for dishonesty or failure to report force if it terminates ongoing investigations of personnel alleged to have engaged in those forms of misconduct." (Plaintiffs' Response, p. 2.)

While the Panel recognizes that the Department historically has deactivated administrative investigations for various reasons, the "sharp increase" in deactivated investigations coupled with the "marked decrease" in the number of these investigations, calls into question the extent to which the Department will hold Deputies accountable for misconduct, including in particular dishonesty and excessive use of force, in the future.  Coupled with the reinstatements discussed above, the signal it sends to the Custody staff about the direction of the Department is of concern to the Panel.

The change in the Department's approach to discipline is reflected in its response to the Panel's draft of this Report, which states that:

> [i]n determining the specific discipline to be issued in a given case, the Department is taking a holistic approach and addressing systemic shortcomings which impact staff behavior (*e.g.,* where there is a need for additional training, improvements in policies or procedures, or additional staff or other resources, etc.). This change in approach increases flexibility for Division leadership without reducing consistency in enforcing Department policy or firmness in implementing discipline when warranted.

(Defendants' Response, p. 2.)

The Panel understands the need for some "flexibility" with respect to the *imposition* of discipline to ensure that the punishment is proportionate to the misconduct or violations of Department policies.  The Panel is concerned, however, about a "holistic approach" that seeks to address "systemic shortcomings" rather than the Department member's conduct and that will inevitably lead to inconsistencies and a lack of "firmness in implementing discipline when warranted."  Such an approach will undermine confidence in the fairness of the disciplinary system if some members will be punished while others will receive training or mentoring for similar violations.  It will also undermine the effectiveness of the system to deter misconduct if the consequences for misconduct are likely to be training or mentoring in lieu of discipline.  In many cases, the combination of discipline and training can provide the most impactful outcome.

1.      **Leadership, Administration and Management**

The recommendations in Sections 1.1 through 1.4 of the Action Plan require that Custody be headed by an Assistant Sheriff with no other areas of responsibility, the Sheriff be engaged personally in the management of the jails, the Department's managers be held accountable for any failures to address force problems in the jails, and the Department regularly report to the Board of Supervisors on the use of force in the jails and on its compliance with the Action Plan.

The Department has been in **Compliance** with Sections 1.1 and 1.2 of the Action Plan since well before January 1, 2017.[8]  Custody has been headed by an Assistant Sheriff with no other areas of responsibility since mid-2014.  It is was under the direction of Assistant Sheriff Kelly Harrington during most of the Fifth Reporting Period until December 2, 2018, and then for the last month of the reporting period under Assistant Sheriff Robert Olmsted after Sheriff Alex Villanueva took office on December 3, 2018.

On November 1, 2018, the Panel met with then Sheriff Jim McDonnell, and reviewed his oversight of the jail facilities and the Panel's findings and observations.  The Department has provided the Panel with a log of the frequent meetings that Sheriff McDonnell and Sheriff Villanueva had with the Assistant Sheriffs for Custody Operations from July 1, 2018, through December 31, 2018, that reviewed use of force data and trends, suicide attempts and rescue force, deployment of chemical agents and personal weapons, facility security concerns, assaults on staff, use of force against mentally ill inmates, and de-escalation techniques.

The Department achieved **Compliance** with Section 1.3 in the Third Quarter of 2018.  There was only one founded disposition for a violation of the Department's use of force policies and there were no significant increases in force incidents generally, or Category 3 incidents specifically, in that quarter, and the number of force incidents was down from the prior quarter in the Downtown Jail Complex.  In the Fourth Quarter of 2018 there were no founded dispositions for violations of the Department's use of force policies and one pending investigation.  There were no significant increases in force incidents or Category 3 incidents and the number of force incidents was once again down from the prior quarter in each of the facilities.[9]

---

[8] Use of the term **Compliance** in bold is a finding of Compliance as of a certain date, which in some instances are still subject to verification by the Panel's auditors.  The Panel's findings are set forth on the Appendix attached hereto.  For other provisions, the Department has either not achieved Compliance or is no longer in Compliance during this current reporting period.  Based upon the Panel's findings, the parties will determine whether the Settlement Agreement is subject to termination pursuant to Section VIII of the agreement.  As noted in the Panel's prior reports, the Panel encourages the "Parties to adopt a meaningful and achievable framework to determine the Department's compliance with the Settlement Agreement" in the future.

[9] Per agreement with the Monitors, the Department's handling of Deputies who have more than a 25% increase in uses of force will be assessed under Sections 19.2 and 19.3, which covers the Department's Employee Review System.

Plaintiffs question this finding in light of the Panel's stated concern about "the reluctance of reviewing Commanders to find a [problematic] use of force out of policy [and] instead find that troubling incidents raise performance and training issues." *See* Plaintiffs' Response, p. 6; and p. 16, *infra*. The Panel believes that it should assess the Commander reviews of Unit Commander evaluations under Section 5.2, which specifies the Commanders responsible for reviews of individual incidents, rather than under Section 1.3, which is focused on the nature and extent of force incidents in each of the jails, rather than on individual incidents. Based upon the number and types of force incidents in the Third and Fourth Quarters of 2018, it does not appear that the Department has failed to hold Commanders' accountable for force problems in the jails.

The Department is in **Compliance** with Section 1.4 as of June 12, 2018, when the Assistant Sheriff for Custody Operations reported on the Department's use of force in the jails and its implementation of the *Rosas* Settlement Agreement to the Board of Supervisors. Because Sheriff Alex Villanueva assumed office on December 3, 2018, the Panel agreed that the presentation to the Board scheduled for December 11, 2018 could be continued to January 2019. The Assistant Sheriff for Custody Operations and a Commander in Custody made a presentation to the Board on January 15, 2019. The Department provided the Panel with a copy of the transcript of the Department's presentation on that date, and it is in compliance through January 15, 2019.

The Department is in **Compliance** with Sections 10.1 and 10.2 as of June 30, 2018, through December 31, 2018. The Sheriff and Assistant Sheriff visited the jail facilities as required by Section 10.1, as did the Captains, Commanders, and Chiefs. The Department documented these visits, along with visits by Watch Commanders, as required by Section 10.2. The Panel has reviewed the source documents provided by the Department and verified the results reported by the Panel.

Sections 18.1 and 18.2 require the Department to (1) maintain Custody-wide rotation policies and rotate personnel as required by the policies, and (2) audit each unit's compliance with its rotation policies. The Department's Augmented Self-Assessment reports 100% **Compliance** with Section 18.1, and 94% **Compliance** with Section 18.2 in the Fifth Reporting Period. It appears, however, that the Department may have misconstrued Section 18.1 as being limited to requiring each jail to maintaining a rotation policy. Nevertheless, the Department met the 90% threshold for Compliance because 94% of the Department personnel in the Downtown Jail facilities were rotated in accordance with the units' policies.[10] Further it appears that the Department assessed whether each of the facilities was in compliance with its rotation policies and analyzed the circumstances for "non-compliance and the corrective action." The Panel has reviewed the source documents provided by the Department and verified the results reported by the Panel.[11]

---

[10] The Rotation Polices for each of the Downtown Jail Facilities was updated in January 2019.

[11] Although IRC was in compliance with its rotation policies in most instances, the Panel notes that at least five deputies in specialized positions subject to 36-months rotation were in those positions for upwards of 79 to 98 months (that is, from three and a half to five years after the end of the 36 month period).

The Department's Self-Assessment reports 100% **Compliance** with Section 21.1 as of
June 30, 2018, through December 31, 2018.  The Panel has reviewed the source documents
provided by the Department and verified that no member was transferred or assigned to Custody
as a sanction for problematic conduct.

**2.       Use of Force Policies and Practices**

Section 2.1 of the Action Plan requires the Department to "have a separate, revised, free-
standing, and logically organized Custody Force Manual for Custody Operations[.]"  On October
16, 2015, the Department provided the Panel with a Custody Operations Force Manual with
separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints,
Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved
Shootings.  The Department's Custody Force Manual satisfies Section 2.1 and includes specific
provisions that satisfy Sections 8.2 (Complaints of Retaliation), 17.2 (Pregnant Inmates), 20.1
(Types of Force), and 20.2 (Definition of Reactive Force) of the Action Plan.  The Department
has been in **Compliance** with these Sections since the Panel began monitoring the Department's
compliance as of January 1, 2017.

The other recommendations in the Action Plan that pertain to the Department's use of
force in Custody Operations are summarized as follows:

- Sections 2.2 through 2.13 require the Department to adopt a comprehensive set of new
  use of force policies for Custody Operations.

- Sections 4.1 through 4.5 require the Department to adopt specific use of force policies for
  dealing with mentally ill prisoners.

- Sections 9.2 through 9.3 require the Department to adopt specific policies for escorting
  inmates after force incidents and intervening to protect inmates as soon as it is reasonably
  safe to do so.

- Section 17.5 requires the Department to adopt policies for minimizing the risk of an
  inmate's medical distress during and after a force incident.

- Section 20.3 requires the Department to adopt use of force policies for Planned Force
  (such as cell extractions).

The Panel reviewed multiple drafts of the Department's policies to implement these
recommendations, required changes where appropriate, and certified that the Department had
implemented these recommendations, effective December 1, 2015.

As noted in the Panel's Fourth Report, the lag time between the occurrence of the force
incidents and the completion of the investigations has made it difficult for the Department to
produce, and for the Panel to review, recent force incidents.  For the Third Quarter of 2018, the
Panel requested both pending and completed force packages, with the expectation that the

Department would expedite the completion of the pending force packages for review by the Panel during the Fourth Reporting Period.  Unfortunately, due to the complexity of some of these investigations and the enhanced level of review of these investigations by Commanders, the Department was not able to complete all of the pending investigations requested by the Panel before the end of the Fourth Reporting Period.  As a result, the Panel only reviewed 20 of the 25 designated force incidents in the Third Quarter of 2018.

It should be noted that the universe of force incidents selected by the Panel includes a disproportionate number of the more serious Category 2 incidents involving the use of personnel weapons (punches) by Department personnel.  According to Use of Force statistics provided by the Department for the calendar year 2018, 82.4% of the force incidents in the Downtown Jail Complex were either Category 1 incidents or Non-Categorical incidents, and 17.4% were Category 2 incidents.  Further, many of the Category 2 incidents did not involve significant force, but were nevertheless identified as Category 2 incidents based upon a complaint of pain or a relatively minor head injury such as a cut or bruise.  There were also two Category 3 incidents, both of which were at MCJ.  Notably, there was a significant reduction in the number of force incidents in the Downtown Jail Facilities in the second half of 2018, where there was an average of 117 force incidents per month, in contrast to the first six months of the year, where there was an average of 144 incidents per month.

As reported in the Panel's Fourth Report, 15 of the 20 completed force packages reviewed by the Panel in the Third Quarter of 2018 were in Compliance with the use of force provisions[12] and the Department did not reach the 90% "vertical" threshold for Compliance with the Action Plan.  The Panel also concluded that the Department was not in compliance with the following specific provisions of the Action Plan:  head strikes (Section 2.6) and calling supervisors to the scene (Section 2.7), and it did not have sufficient information to determine the Department's compliance with the provision pertaining to the use of authorized weapons (Section 2.10).  The Panel's overarching concern was that Department members sometimes reacted too quickly in a confined environment instead of waiting for readily available backup resources and taking more time to respond to a recalcitrant inmate.  There were incidents where Department members could have taken advantage of "time and distance" to de-escalate the situation and avoid using force altogether or to plan a potentially safer use of force.

In the Fourth Quarter of 2018, the Panel reviewed 24 force incidents, consisting of a combination of investigations that were already completed and pending investigations that were completed during the period.  The Panel concluded that 19 of the 24 packages reviewed were in Compliance with the use of force provisions, and that the Department did not reach the 90% "vertical" threshold for Compliance with the Action Plan.  The Panel also concluded that the Department was not in compliance with the following provisions of the Action Plan:  force prevention principles (Section 2.2), head strikes (Section 2.6) and use of chemical agents and Tasers (Sections 2.10 and 11).  It should be noted, however, as pointed out by the Department in its response to the Panel's draft of this Report, force incidents involving head strikes or Tasers made "up less than 1 and 3 percent of the total uses of force" during the second half of 2018.

---

[12] In the case involving the violation of the Department's cell extraction policies the force itself was not unreasonable.

Further, incidents involving personal weapons (punches) "made up only five percent of total uses of force."  (Defendant's Response, p. 3.)

The Panel has an on-going concern about Department members using punches to control resisting inmates, which often occurs when the inmates are on the ground and Department members are trying to handcuff them.  Using punches when necessary to defend against assaultive inmates who pose a serious risk of injury to the Department members is, of course, well-within Department policies.

The Panel reviewed the problematic incidents with Custody Commanders during the Panel's site visits.  Although the Commanders did not necessarily agree that the force in these cases violated the Department's use of force polices, they noted that they had ordered corrective action consisting of additional training of Department personnel in several of these cases.  During the Panel's meetings with Commanders, the Panel recommended that the Department use ankle restraints when moving high risk inmates to increase safety for staff and other inmates.

Plaintiffs' Response to the draft of this Report expressed concern about the "use of a vertical assessment to determine [the Department's] compliance with the Action Plan and Settlement Agreement."  (Plaintiffs' Response, p. 3.)[13]  Their concern is unfounded.  The use of the vertical assessment gives a realistic assessment of the reasonableness of each use of force incident taking into consideration all of the applicable provisions of the Action Plan, and the Department is required to establish that 90% of the force incidents satisfy that vertical assessment.  The Panel also undertakes a horizontal assessment of the Department's compliance with *each* of the applicable provisions of the Plan, which is not based upon a percentage threshold.  Once the Department meets the 90% threshold for the vertical assessments, the Panel reports on its horizontal assessments of the Department's compliance with each applicable provision.  Since the Department did not reach the 90% threshold for the vertical assessment during the Fifth Reporting Period, this Report only discusses the Panel's horizontal assessments of provisions that are of particular concern to the Panel.[14]  By employing both methods of assessment, the Panel believes that it is holding the Department to a high standard of compliance.

---

[13] Plaintiffs also acknowledge, however, that it is the Panel's "prerogative" to draft the revised Compliance Measures.  (Plaintiffs' Letter, p. 2.)  Although it would be easier for the Panel to simply provide its subjective assessment of the Department's compliance with each of the provisions in the Action Plan, the Panel believed that it was important to develop Compliance Measures so that the Department would have an understanding of what is required to achieve compliance, and both parties would know how the Panel is determining Compliance.

[14] There were some provisions for which the Panel was unable to conduct a horizontal assessment, which is a prerequisite to finding Compliance with the Use of Force Provisions.  For example, one problem noted by the Panel was the lack of enough cases involving planned use of force and cell extractions involving mentally ill inmates, which precluded the Panel from conducting horizontal assessments of Sections 4.1 through 4.5 (Use of Force on Mentally Ill Inmates).  In future reporting periods, the Panel will select a random sample of such cases from a separate list that the Department has now generated.

The Department's response to the draft of this Report urged the Panel to take the
Department's "thorough investigations, and the variety of counseling, education, training and
discipline that often results from them, into consideration in determining the Department's
compliance with its *Rosas* obligations."  (Department's Response, p. 4.)  While the Panel does
take into consideration the quality of the investigations and the discipline imposed, the Panel is
concerned that the Department is often reluctant to find violations that should be subject to
discipline; the Panel does not view "counseling, education, [and] training" to be "forms of
discipline."  It may be, as suggested by the Department, that Commanders at all levels will be
less reluctant to find misconduct or policy violations going forward if there is greater flexibility
in the imposition of discipline.  The Panel believes that the imposition of discipline sends a
message regarding accountability quite apart from the harshness of the specific penalty.

The statistics are consistent with what the Panel observed during the Fifth Reporting
Period.  The Panel visited the jails on two occasions, and had discussions with a number of
inmates during these visits.  Once again, the Panel did not hear complaints from inmates in these
formal discussions about excessive force by Department personnel.  These inmates indicated that
Department personnel have not used force to retaliate against, or punish, inmates, and they often
volunteered that they did not encounter the excessive use of force that had been present in the
jails years ago.

## 3.     Training

Sections 3.1 through 3.4 of the Action Plan require that Department members receive
training on use of force policies and on ethics, professionalism, and treating inmates with
respect; and that new Department members receive six weeks of Custody-specific training in the
Academy or the Jail Continuum in Custody Operations.  Sections 4.6 through 4.9 require the
Department to provide Custody-specific, scenario-based, skill development training for existing
and new personnel in Crisis Intervention and Conflict Resolution and in "identifying and
working with mentally ill inmates."  Section 12.1 requires that Custody Sergeants receive
training in conducting use of force investigations.

The Department's training results are subject to audit by the Panel's auditors.  All of the
Department's reported results for the initial training of existing Deputy Sheriffs and Custody
Assistants and for new members in the Jail Operations Continuum or the Academies set forth
below have been verified by the Panel's auditors.  The auditors verified that the Department's
new members had received the required initial training from when it was first offered through the
"as of" date reported by the Department for the completion of the initial training required for
existing Deputies.  Accordingly, the Panel has deemed the Department to be in Compliance "as
of" the date reported by the Department for the completion of the initial training required for
existing Deputies.

Going forward, the Department is required to provide refresher training annually or every
other year in each of the areas required by Sections 3.1 through 3.4 and 4.6 through 4.9 of the
Action Plan.  The Department's reported results on the initial refresher training have been
verified by the auditors so that the Department is still in Compliance with the training provisions

as set forth below.  The Department's reports on future refresher training will also be subject to verification by the Panel's auditors.

The Department previously reported that as of June 30, 2018, 97% of the existing Deputies and Custody Assistants in the Downtown Jail Complex had received the initial eight-hour use of force training required by Section 3.1.[15]  The Department's most recent Self-Assessment reports that 96% of the trained Deputy Sheriffs and Custody Assistants completed the required refresher course.[16]  The Department is in **Compliance** with Section 3.1 as of June 30, 2018.

The Department previously reported that as of June 30, 2018, 95% of the existing personnel received the initial four-hour training course in ethics, professionalism, and treating inmates with respect as required by Section 3.2.  The Department's most recent Self-Assessment reports that 95% of the trained Deputy Sheriffs and Custody Assistants completed the required refresher course.  The Department is in **Compliance** with Section 3.2 as of June 30, 2018.

The Department previously reported that as of June 30, 2018, 97% of the existing Deputies at the Downtown Jail Complex and the mental health unit at the Century Regional Detention Facility ("CRDF") received the 32 hours of training on Crisis Intervention and Conflict Resolution Training, including the eight hours of identifying and working with mentally ill inmates, required by Sections 4.6 and 4.7; and 98% of the remaining Deputies at CRDF, and all Deputies at the North County Correctional Facility ("NCCF"), and the Pitchess Detention Center ("PDC") jails received the eight hours training in identifying and working with mentally ill inmates required by Section 4.7.  The Department's recent Self-Assessments report that 96% of the Deputies in the Downtown Jail Complex and the mental health unit at CRDF and 97% of the remaining Deputies at CRDF and the Deputies at the other facilities received the required refresher training as of December 31, 2018.  The Department is in **Compliance** with Section 4.6 and 4.7 as of June 30, 2018.

The Department has reported since the First Reporting Period that, beginning on July 1, 2015, newly assigned Deputies have been required to complete a six-week Custody Operations course that includes training in use of force and ethics, professionalism and treating inmates with respect, and new Custody Assistants have received training in these subjects during their Academy training.  The Department reported that as of June 30, 2018, 95% of the new Deputies and 100% of the new Custody Assistants have received the six weeks of custody training

---

[15] The use of force training that was approved by the Panel includes the custody-based use of force scenarios in **Compliance** with Section 3.4.

[16] The Panel granted the Department extensions for Deputies who received the basic use of force training in 2017 and 2018 for completion of the initial refresher courses.  The Panel expects Department personnel to complete future refresher courses before the end of December of the years in which they are required.

required by Section 3.3.[17]  The Department is in **Compliance** with Section 3.3 as of June 30,
2018.[18]

The Department previously reported that 98% of new Deputies had received the approved
conflict resolution training in the Academy and the Jail Continuum, and 100% of newly assigned
Custody Assistants had received the conflict resolution (DeVRT) training and training in
"identifying and working with mentally ill inmates" required by Sections 4.8 and 4.9 as of June
30, 2018.  The Department Self-Assessment reports that 98% of new Deputies and 100% of new
Custody Assistants received the training required by Sections 4.8 and 4.9 in the Third Quarter of
2018, and 100% of newly assigned Deputies and Custody Assistants received the required
training in the Fourth Quarter of 2018.  The Department is in **Compliance** with Sections 4.8 and
4.9 as of June 30, 2018.

The Department previously reported that as of June 30, 2018, 90.4% of the Sergeants
assigned to Custody as of October 1, 2016, had received the 16 hours of training in conducting
use of force investigations required by Section 12.1.  The Department's Self-Assessment reports
that 91% of the existing Sergeants have received the required refresher training and that 97% of
the Sergeants newly promoted in Custody in the Third and Fourth Quarters of 2018 have
received the required training.

Section 3.5 requires Unit Commanders to determine "what additional training, counseling
or mentoring may be required when a personnel complaint involving the use of force is resolved
with a finding that it 'Appears Employee Conduct Could Have Been Better;' direct that the
Department member undergo such additional training, counseling, or mentoring; and document
the action taken."  The Department's Self -Assessment reports that there was one such case in the
Second Quarter of 2018, which was in Compliance with Section 3.5; no such cases in the Third
Quarter of 2018; and two such cases in the Fourth Quarter of 2018, both of which were in
Compliance.  The supporting documentation initially provided by the Department, however, only
showed the required "additional training" for one of the two cases in the Fourth Quarter of 2018.
Subsequently, the Department submitted documentation showing that there was a debriefing
after the force incident in the second case.

Focusing on the "may be required" language in Section 3.5, the Department's response to
the draft of this Report suggests that it can be satisfied by the usual debriefing that occurs after a
force incident.  (Defendant's Response, p. 4.)  The Panel disagrees with this interpretation;
Section 3.5 requires the Unit Commander to determine "*what* additional training, counseling, *or*
mentoring may be required," direct the member to "undergo *such* additional training, counseling

---

[17] New Deputies are also required to undergo the refresher training each year or each two
years after they have been assigned to a custody facility.  The refresher training results for new
Deputies are included in the refresher training results for existing Deputies because they are no
longer considered to be new Deputies when they are required to undergo the refresher training.

[18] The Department's most recent Self-Assessments report that 96% of newly assigned
Deputies and 100% of newly assigned Custody Assistants received the required training in use of
force and ethics in the Third Quarter of 2018 and 100% of the newly assigned Deputies and
Custody Assistants received the required training during the Fourth Quarter of 2018.

*or* mentoring," and document it.  Section 3.5 requires something more than a debriefing when a member's conduct "Could Have Been Better," and the Department was out of compliance with Section 3.5 as of the end of the Fifth Reporting Period.

Section 3.6 requires Unit Commanders to review new Department members within six months of being initially assigned to Custody and again before the end of their probationary period.  Based upon a random selection of personnel records, the Department reports that 89.3% of the new Department members were reviewed as required by Section 3.6 in the second six months of 2018, which is below the 95% threshold for Compliance.

## 4.    Reporting and Investigation of Force Incidents

Many of the recommendations in the Action Plan that pertain to the reporting and investigation of force used by Department personnel in Custody Operations are assessed by the Panel through a review of the completed force packages.  Other provisions are reported by the Department as follow:

- Section 5.1 requires the Department to track use of force investigations, reviews, and evaluations; review evaluations of force incidents; and conduct additional investigation of discrepancies and unexplained tactical decisions.  The Department reports 92% of the force incidents in the Third Quarter of 2018 were timely entered into the database as required by Section 5.1, and 95% were timely entered in the Fourth Quarter of 2018, which equals the 95% threshold required for **Compliance** as of the end of the Fourth Quarter.  The Panel has reviewed the source documents provided by the Department and verified the results reported by the Department.[19]

- Section 8.3 requires that investigations of inmate grievances that Department members used force to retaliate against inmates should be evaluated by the Custody Force Review Committee.  The Department reports that it did not achieve Compliance with this provision in either the Third or Fourth Quarters of 2018.

- Section 11.1 requires that the Custody Force Rollout Team's involvement in reviewing force incidents not delay the Department's investigation of the force incidents.  The Compliance Measure requires that "95% of the investigations reviewed by CFRT were not delayed beyond the period permitted by law for imposing discipline.  The Department previously reported that that it achieved **Compliance** with Section 11.1 in the Second Quarter of 2018.  Because there were no use of force incidents in which there was a finding of a policy violation or misconduct in either the Third or Fourth Quarters of 2018,

---

[19]The Department's Self-Assessment finding for the Fourth Quarter of 2018 is based upon a finding that more than 95% of the incidents were entered into the database "within two hours after *the end of the shift*."  The Panel agreed to this modification to account for force incidents that occur at the end of a shift.  The Panel notes that the Department's supporting documents reflect that the vast majority of incidents are entered into the database within or shortly two hours after the *incident*.

the predicate for determining compliance with Section 11.1 did not exist in those quarters, and therefore it remains in **Compliance** with this provision.

- Section 13.1 requires the Department to "have a firm policy of zero tolerance for acts of dishonesty or failure to report uses of force."  Section 13.1 and 13.2 require the documentation of reasons and reports to the Office of Inspector General whenever the Department does not terminate a member who has been found to have been dishonest, used excessive force, or violated the Prisoner Rape Elimination Act ("PREA").  The Department reports that there were no incidents in the Third or Fourth Quarters of 2018 that were subject to Sections 13.1 and 13.2, and therefore it remains in **Compliance** with these provisions.

- Sections 14.1 and 14.2 require (1) an additional review of referrals of inmates for criminal prosecution arising from incidents involving the use of force by Department members and (2) timely referrals to the District Attorney of "officer misconduct that may amount to criminal violations."  The Department reports 100% in **Compliance** with Section 14.1 in the Third Quarter of 2018, and 96% in the Fourth Quarter of 2018.  With respect to Section 14.2, there was one timely criminal referral to the District Attorney in the Third Quarter of 2018, and "no criminal filings on Department personnel *related to force* for the Fourth Quarter of 2018."[20]  The one case that was referred to the District Attorney in the Third Quarter of 2018 concerned an incident that occurred two years earlier.  The incident was under investigation by the Internal Criminal Investigations Bureau during that time and was referred well-within the statute of limitations.  Accordingly, the Department is in **Compliance** with Section 14. 2 as of the Third Quarter of 2018.

As noted in the Panel's Fourth Report, the Panel reviewed 20 (rather than the required 25) completed force packages in the Third Quarter of 2018 to assess compliance with the provisions of the Action Plan relating to the reporting and investigation of force incidents.  The Panel concluded that 17 out of the 20 (or 85%) were in Compliance with these provisions, which was below the 90% "vertical" threshold for Compliance.  The Panel concluded that the Department was not in compliance with the provision regarding the location of inmate witness interviews (Section 12.2).  In addition, the information provided by the Department was often not sufficient for the Panel to determine the Department's compliance with provisions relating to the timeliness of reports (Section 15.2), and the separation of Department personnel after a force incident (Section 15.6).

The Panel concluded that 20 of the 24 completed force packages reviewed in the Fourth Quarter of 2018 were in Compliance, which is below the 90% "vertical" threshold for

---

[20] The Panel notes that Section 14.2 is not limited to force incidents.  In its response to the draft of this Report, the Department states that its "reporting in this category is limited to referrals to the District Attorney's Office by the Department of alleged misconduct by members of the Custody Division, those referrals are not limited to incidents involving the use of force." (Department's Response, p. 6.)  The Panel agrees that 14.2 is limited to members of Custody Division and is not limited to incidents involving the use of force.

Compliance.  The Panel is concerned that reviewing Commanders are reluctant to find a use of force out of policy (and therefore subject to discipline) even when they acknowledge that the force was problematic, and they will instead find that troubling incidents raise performance and training issues.  The Panel also notes that the Department did not achieve Compliance with the requirement for the timely completion of force reports (Section 15.2), and the Panel was unable to determine if the Department was in Compliance with the requirement that personnel be separated prior to completing their required reports (Section 15.6).

Plaintiffs' May 13, 2019 response to the draft of this Report states that "Class Counsel has identified several force packages where [Department] employees appear to dishonestly present their uses of force but supervisors who review the report do not appear to address—or punish—such dishonesty."  (Plaintiffs' Response, p. 6.)  Plaintiffs cite three force incidents in their response.  (*Id.,* n. 8).  These cases were reviewed by the Panel in the Fourth Quarter of 2018, and the Panel's vertical assessments found that the reporting/investigations of these incidents were not in compliance with the Action Plan, although the Panel did not conclude that the issues of concern involved dishonesty.  It should be noted however, that in the Fourth Quarter of 2018 the Panel found only one additional case that was not in compliance with the reporting/investigation provisions.  While 20 out of 24 cases (83.6%) in compliance is below the 90% threshold for Compliance, the vast majority of the cases reviewed by the Panel did not have the problems identified by the Plaintiffs.

## 5.    Inmate Grievances

The Action Plan requires extensive changes in how the Department handles inmate grievances and requests for service.  On July 15, 2016, the Department issued a new "Inmate Grievance Manual" (Volume 8 of the Custody Division Manual) to implement a new grievance system.  The Panel assessed the Department's implementation of the new grievance system as follows:

Sections 6.1 through 6.6 require that separate forms for inmate grievances be reasonably available to inmates and that the forms have specific check boxes.  Section 7.1 requires the Department to advise inmates of the voluntary Conflict Resolution Meeting available under the Department's Conflict Resolution Policy.[21]  Based upon site visits during the Fifth Reporting Period, the Panel concluded that the forms meeting these requirements of the Action Plan are still reasonably available to inmates, and the Department is in **Compliance** with those provisions relating to the availability of the required forms.

Sections 6.4 and 6.5 also require the Department to establish that use of force grievances and retaliation grievances against staff are brought to the attention of Unit Commanders within 10 days and properly handled.  Based upon a review of the relevant grievances in the randomly

---

[21] Although the grievance forms have the required notification right above the inmate's signature, the Department reports that no grievances were resolved through the Conflict Resolution Policy in the Third and Fourth Quarters of 2018.  The Panel encourages the Department to seek alternative means of communicating the availability of the voluntary Conflict Resolution Policy.

selected month, the Department reports 100% Compliance with these provisions in the Third Quarter of 2018.  The Department also reports that it achieved the 90% threshold for **Compliance** for Section 6.4 in the Fourth Quarter of 2018, but the Augmented Self-Assessment reports that it only achieved Partial Compliance for Section 6.5 in that quarter because the relevant grievances against staff were not brought timely to the Unit Commander at MCJ.

Sections 6.7 and 6.8 of the Action Plan set forth specific requirements for the determination, handling, and notifications of non-medical emergencies.  Based upon the selection and review of the grievances marked "emergency" in the month randomly selected by the Panel, the Department reports 100% Compliance with Sections 6.7 and 6.8 for the Third and Fourth Quarters of 2018.[22]  The results for Sections 6.7 and 6.8 have been verified by the Panel.  Although some of the grievances that the Department determined were non-emergent could be viewed as more pressing, the Department handled the grievances expeditiously as required by the nature of the grievance.  Accordingly, the Department is in **Compliance** with these provisions for the period July 1, 2018, through December 31, 2018.

Section 6.9 requires that emergency grievances be forwarded to the Inmate Grievance Coordinator.  Sections 6.13, 6.14, and 6.15 require the Inmate Grievance Coordinator to track the Department's handling of inmate grievances, provide a monthly report to the Unit Commander and senior management in Custody on the status of inmate grievances, and analyze inmate grievances for problematic trends.  The Panel met with the Department's Inmate Grievance Coordinator during both site visits in the Fifth Reporting Period to review the Department's implementation of the new grievance system and the reports generated for the Department's managers regarding inmate grievances and requests, grievances against staff, and trends at the different facilities.  The Department provided documentation to the Panel showing that for the Third and Fourth Quarters of 2018, the Inmate Grievance Coordinator received the information about emergency grievances required by Section 6.9 and prepared detailed reports for managers required by Sections 6.13, 6.14, and 6.15.  The Department is in **Compliance** with Sections 6.9, 6.13, 6.14, and 6.15, as of July 1, 2018, through December 31, 2018.

Sections 6.10 and 6.12 require that grievances be collected daily, logged in, and tracked in an inmate grievance database.  The Department's Augmented Self-Assessment reports that 94% of the grievances were collected timely in the Third Quarter of 2018 and 85% in the Fourth Quarter of 2018,[23] which is below the 95% threshold for Compliance with Section 6.10.  The Department reports that 100% of the grievances in the randomly selected months in the Third Quarter of 2018 were entered into the database and handled as required by Section 6.12.  The Department also reports that 98% of the grievances were entered and tracked in the database and

---

[22] The Department determined that the first 50 grievances marked "emergency" were not actually emergencies.  The Department identified only four grievances in September 2018 that were actual emergencies and determined that they were handled in accordance with Section 6.7.

[23] The Department reports that its Fourth Quarter 2018 results "were non-compliant due to 'programming errors' that prevented its scanners from properly recording the time the grievances were collected from the locked grievance boxes."

100% were reviewed within 24 hours in the Fourth Quarter of 2018.  Accordingly, the Department is in **Compliance** with Section 6.12 as of the Third Quarter 2018.[24]

Section 6.11 requires that the Custody Division Manual provide that failing to comply with Department policies requiring proper handling of inmate grievances may be cause for discipline.  The Department previously reported that it "did not complete any investigations for the relevant type of grievances in Second Quarter 2018."  For the Fifth Reporting Period, the Department reports that one such incident was identified, but it was subsequently "determined the grievance did not meet the requirements of 6.11."  The Panel notes, however, that the Interim Inspector General's April 11, 2019 report indicates that a supervisor "located over 200 inmate requests/grievances in drawers, some of which were about a year old and had not been addressed."

The Department reports that it "took very seriously [this] incident identified by OIG."  The Inmate Grievance Coordinator "was tasked with personally inspecting all of the drawers of each grievance sergeant at every facility via unannounced visits to ensure that the situation described was an isolated incident.  Further, the Department began hosting town halls for inmates specifically focused on the grievance process."

The Department is also working to make the "grievance process accessible by inmates electronically. . .without the involvement of custody staff[.]"  During a recent site visit, members of the Panel were impressed with a demonstration of the system by an inmate in TTCF.  Once implemented throughout the County jails, it will expedite the handling of inmate grievances and requests and "dramatically reduce the involvement of custody staff" in the process.  The Inmate Grievance Coordinator's best, although admittedly rough, estimate was that the entire grievance process will be available electronically to inmates in 24 months.

The Department's progress was reflected in comments from inmates in recent site visits.  The complaints from inmates heard by the Panel tended to focus on the substance of the response to a grievance rather than a lack of response.  This allowed for discussions of the essence of an inmate's concerns rather than a lack of response.

Sections 6.17, 6.18, 6.19, 6.20, and 7.2 set forth the deadlines for filing use of force and PREA grievances,[25] the Department's initial responses, inmates' right to appeal, and the Department's notifications of the results of the investigations.  The Department previously provided reports reflecting that it adhered to these deadlines for all grievances selected pursuant

---

[24] The Panel had concerns that the source documents do not always support the Department's findings because the dates stamped on the grievances are not consistent with the "Grievance Reviewed" date in the Department's electronic records.  In response, the Department "explained that the collecting sergeants initially review the grievances to determine if immediate action is required.  They stamp each grievance with a date and time that reflects both the collection and initial review.  The [review] date in the electronic records is, however, the last date the grievance was reviewed."  The Department acknowledged the "confusion and has revised its audit tools. . .to better clarify this process."

[25] Section 6.18 provides that there is no deadline for filing PREA grievances.

to the applicable Compliance Measures during the Second Quarter of 2018 for Sections 6.17 (use of force),[26] 6.18 (PREA), and 6.20 (right to appeal).  The Department's Self-Assessment reports that it has adhered to these deadlines for these grievances in both the Third and Fourth Quarters of 2018.  It also reports that it adhered to the deadlines for advising inmates of adjudications as required by Section 7.2 for the Fourth Quarter of 2018.  The documentation provided by the Department supports its reported findings, and the Panel agrees that the Department is in **Compliance** with Sections 6.17, 6.18, and 6.20 as of July 1, 2018, through December 31, 2018, and with Section 7.2 as of October 1, 2018, through December 31, 2018.  The Department's Augmented Self-Assessment reports it was not in Compliance with Section 6.19 because it did not achieve the 90% threshold for responding to grievances that are not against staff within 15 days.

The policies adopted by the Department for the new inmate grievance system do not "establish a centralized unit with a sworn supervisor, custody assistants, and civilian personnel" that is "co-located" in TTCF and PDC as required by Section 6.16.  The policies do, however, provide for additional centralized oversight.  Based upon interviews with the Inmate Grievance Coordinator, meetings with the Inmate Grievance Teams, including interviews by the Monitor in the DOJ case with Inmate Grievance Teams at the other facilities, the Panel believes that the decentralized grievance system is effectively and efficiently handling inmate grievances and requests for service with quicker resolutions and, therefore, the Department is in **Compliance** with this provision.

The Panel found the Department in Compliance with Section 6.16 in the draft of its Fourth Report, which was submitted to the parties on October 17, 2018, and filed with the Court on November 15, 2018.  Plaintiffs' response to the Panel's draft of the Fourth Report, dated October 29, 2018, did not object to this finding.  In their response to the Panel's draft of the Fifth Report, dated May 13, 2019, Plaintiffs have objected to this finding because the "Monitors have overstepped the bounds of their authority" and "must receive the Court's approval" if it wants to "redraft Section 6.16 of the Action Plan."  (Plaintiffs' Response, p. 7.)  The Panel disagrees with the Plaintiffs' assertion that this constitutes a re-draft; the Department has a centralized unit under the direction of an Inmate Grievance Coordinator and it has Inmate Grievance Teams at each of the Downtown Jail Facilities as well as at CRDF, NCCF and PDC North (for both North and South).  The Panel believes that current system is consistent with the intention of the Panel in drafting Section 6.16 as long as it "is effectively and efficiently handling inmate grievances and requests for service."[27]

Section 7.3 requires the Department to "ensure that there are adequate avenues for constructive prisoner-staff communication[.]"  The Department's Self-Assessment reports that the Department was in Compliance with Section 7.3 during both the Third and Fourth Quarters of 2018.  The Department provided logs of Town Hall meetings at MCJ and TTCF during the

---

[26] The Department previously reported that it accepts all use of force investigations.

[27] Panel does not, however, have any objection if the parties want to propose a revision of Section 6.16 as long as it provides for an effective and efficient system.  (See Plaintiff's Response, p. 7, n. 10.)

randomly selected months of September and November.  The Panel is of the view that the Department is in **Compliance** with Section 7.3 as of June 30, 2018, through December 31, 2018.

Section 8.1 prohibits Department personnel from retaliating against inmates.  The Department previously reported summaries reflect that the Department was in Compliance with Section 8.1 as of March 31, 2018, in that discipline was imposed for the one founded grievance in the First Quarter of 2018 and for the two founded grievances in the Second Quarter of 2018.[28]  The Department reports that there were no founded violations of the anti-retaliation policy in the Third or Fourth Quarters of 2018.  The Department subsequently reported that it "incorrectly identified and reported two events as "Founded" violations of the Anti-Retaliation policy, when in fact there was no such violation."  In these cases, several Department members received a Performance Log Entry ("PLE") because their conduct, while not a violation of the policy, "could or should have been better."[29]

The Plaintiffs have expressed a concern about the enforcement of the Anti-Retaliation now that the Department has reverted back to the 2012 disciplinary guidelines in light of a court decision invalidating subsequent guidelines.  (Plaintiff's Letter, p. 2.)  The Panel believes, however, that the Department has ample authority to discipline members for violations of the Anti-Retaliation Policy, which are likely to violate other Department and Custody manual provisions as well, even if there is no specific guideline range for retaliating against inmates.  The County reports that the Department's Anti-Retaliation Policy has been "in place since February 2012, before the September 2012 guidelines were adopted.  Discipline for violations of that policy under the 2012 guidelines are considered under the rubric of 'Performance to Standards' which provides for a discipline range of '[written reprimand] to discharge.'"

## 6.      Use of Restraints

Section 17.1 requires that the Custody Force Manual include "a separate section that sets forth the general principles governing the use of restraints" identified in this recommendation.  The Department included such a separate section in the Manual, and is in **Compliance** with this requirement of Section 17.1, effective December 1, 2015.

Sections 17.1, 17.3, 17.4, and 17.6 through 17.9 (the "Restraint Provisions") of the Action Plan require the Department to provide the Panel "with a list of incidents in which

---

[28] Plaintiffs assert that the Panel should review how the grievances were investigated or the basis of the Department's findings of a violation of the anti-retaliation policy and the PLE. (Plaintiffs' Response, p. 7.)  Neither Section 8.1 nor the Compliance Measures require the Department to provide this information.  Further, the Panel will be in a position to assess the reasonable of any discipline imposed based upon the Department's finding.

[29] The Panel does not consider a PLE to be discipline.  A Unit Performance Log signed by a Department Member in the source documents provided by the Department states that the member was "counseled" about the violation and "understood that any further violation *may result* in disciplinary action."

inmates were placed in a Safety Chair, restrained to a fixed object for more than 20 minutes, subjected to security restraints for an extended length of time. . .or subjected to a multi-point restraint in the Downtown Jail Complex[.]"  Under the Revised Compliance Measures, the Panel is supposed to select and review 25 incidents involving Security Restraints from the Department's list to assess the Department's compliance with the security restraint provisions.

During the Fifth Reporting Period, the Department generated a list of incidents involving the use of a Safety Chair, but the list did not include other Security Restraints used by the Department.  On March 28, 2018, the Department submitted a proposed revision to the Department's policy on Fixed Restraints" (CDM 7-03/000.05), which will require that, "no later than twenty (20) minutes after the application of [a] fixed restraint, Department personnel shall initiate documentation of the inmate's monitoring in the Fixed Restraint Log[.]"  Once the proposed policy is implemented, the Department should be able to provide the *Rosas* Monitors with a complete list of incidents involving the use of Security Restraints, from which the Monitors will select 25 incidents to review for compliance with these provisions.

Section 17.10 provides that medication cannot be used solely for security purposes.  The Department's Self-Assessment, confirmed by a log of the Administration of Involuntary Medications, reports that there were no instances in which medication was used solely for security purposes in the Third and Fourth Quarters of 2018.  Accordingly, the Department has been in **Compliance** with Section 17.10 as of July 1, 2018, through December 31, 2018.

7.     **Early Warning System**

Section 19.1 requires the Department to develop an Early Warning System to identify potentially problematic employees based upon objective criteria.  The Panel met with the Department during the Fourth Reporting Period to review and discuss the Department's proposed ERS.  The Panel approved the ERS in July 2018, and it was implemented by the Department as a pilot program in the Downtown Jail Complex on August 1, 2018, and in the rest of the jail facilities as of November 1, 2018.  The Department is in **Compliance** with Section 19.1 in the Downtown Jail Complex as of August 1, 2018.

Section 19.2 requires Compliance Lieutenants to review monthly reports generated by the ERS and notify Unit Commanders and the Assistant Sheriff for Custody of the results, and Section 19.3 requires Unit Commanders to determine whether problematic employees should be placed on performance mentoring program.  Under the Revised Compliance Measures, Compliance Lieutenants must notify the Unit Commander and Assistant Sheriff for Custody Operations 90% of the time within 10 days after reviewing monthly reports generated by the Early Warning System and 95% of the time within 30 days.  For each potentially problematic Department member identified through the Early Warning System, the Unit Commander must consult with the appropriate Chief and document the reasons why any problematic members are not placed on a performance mentoring program 95% of the time.

The Department's Self-Assessment reports that the Department achieved Compliance with Section 19.2 in the Third Quarter of 2018 at all facilities in the Downtown Jail Complex, but did not achieve Compliance in the Fourth Quarter of 2018 at MCJ or the Inmate Reception

Center ("IRC").  Similarly, the Self-Assessment reports that the Department achieved
Compliance with Section 19.3 in the Third Quarter of 2018 at all facilities, but not in the Fourth
Quarter of 2018 at MCJ or IRC.

**APPENDIX**

| NO. | PROVISION | STATUS | DATE |
|---|---|---|---|
| | | | |
| | **Leadership, Administration & Management** | | |
| | | | |
| 1.1 | Assistant Sheriff | Compliance | January 1, 2017 |
| 1.2 | Sheriff | Compliance | January 1, 2017 |
| 1.3 | Supervision | Compliance | September 30, 2018 |
| 1,4 | Reports to Board | Compliance | June 12, 2018 |
| 10.1 | Jail Visits | Compliance | June 30, 2018 |
| 10.2 | Documented Visits | Compliance | June 30, 2018 |
| 18.1 | Rotation in Custody | Compliance | June 30, 2018 |
| 18.2 | Documentation of Rotation | Compliance | December 31, 2018 |
| 21.1 | Transfers to Custody | Compliance | June 30, 2018 |
| | | | |
| | **Use of Force Polices & Practices** | | |
| | | | |
| 2.1 | Custody Force Manual | Compliance | January 1, 2017 |
| 2.2 | Force Prevention Principles | | |
| 2.3 | Inmate on Inmate Violence | | |
| 2.4 | Use of Force as Discipline | | |
| 2.5 | Force on Restrained Inmates | | |
| 2.6 | Head Strikes or Kicks | | |
| 2.7 | Supervisors Called to Scene | | |
| 2.8 | Prevent Excessive Force | | |
| 2.9 | Armed Inmates | | |
| 2.10 | Authorized Weapons | | |
| 2.11 | Planned Chemical Spray | | |
| 2.12 | Chemical Spray & Tasers | | |
| 2.13 | Check of Medical Records | | |
| 4.1 | Consult MH professionals | | |
| 4.3 | Spray on MH inmates | | |
| 4.4 | Cooling Off Periods | | |
| 4.5 | Medical or MH Provider | | |
| 8.2 | Complaints of Retaliation | Compliance | January 1, 2017 |
| 9.2 | Escorting of Inmates | | |
| 17.2 | Pregnant Inmates | Compliance | January 1, 2017 |
| 17.5 | Minimize Medical Distress | | |
| 20.1 | Categories of Force | Compliance | January 1, 2017 |
| 20.2 | Reactive Force | Compliance | January 1, 2017 |
| 20.3 | Planned Use of Force | | |

| | **Training**[30] | | |
|---|---|---|---|
| | | | |
| 3.1 | Use of Force Training | Compliance | June 30, 2018 |
| 3.2 | Ethics, Professionalism | Compliance | June 30, 2018 |
| 3.3 | Custody Training | Compliance | June 30, 2018 |
| 3.4 | Custody-based scenarios | Compliance | June 30, 2018 |
| 3.5 | Add training/mentoring | | |
| 3.6 | Probation Reviews | | |
| 4.6 | Crisis Intervention | Compliance | June 30, 2018 |
| 4.7 | Mentally Ill Inmates | Compliance | June 30, 2018 |
| 4.8 | Mentally Ill Inmates (for new Department members) | Compliance | June 30, 2018 |
| 4.9 | Crisis Intervention  (for new Department members) | Compliance | June 30, 2018 |
| 12.1 | Force Investigations | | |
| | | | |
| | **Investigation & Reporting of Force** | | |
| | | | |
| 4.2 | Mental Health Professionals | | |
| 5.1 | Tracking of Force Incidents | Compliance | December 31, 2018 |
| 5.2 | Commanders' Reviews | | |
| 5.3 | Unexplained Discrepancies | | |
| 11.1 | CFRT Involvement | Compliance | June 30, 2018 |
| 12.2 | Location of Inmate Interviews | | |
| 12.3 | Suspect Interviews | | |
| 12.4 | Uninvolved Supervisors | | |
| 12.5 | Standard Order & Format | | |
| 14.1 | Review of Criminal Referrals | Compliance | July 1. 2018 |
| 14.2 | Timeliness of Criminal Referrals | Compliance | July 1, 2018 |
| 15.1 | Timeliness of Reports | | |
| 15.2 | All Department Witnesses | | |
| 15.3 | Force by Other Members | | |
| 15.4 | Description of Injuries | | |
| 15.5 | Clarification after Video | | |
| 15.6 | Separation of Deputies | | |
| 15.7 | Individual Perceptions | | |
| 16.1 | Healthcare Assessment | | |
| 16.2 | Photographs of Injuries | | |
| 16.3 | Medical Report of Injuries | | |
| | | | |

---

[30] The Department's reported results for Sections 3.1 through 3.4, 4.6 through 4.9, and 12.1 have been verified by the Panel's auditors.

25

|  | **Inmate Grievances** |  |  |
|---|---|---|---|
|  |  |  |  |
| 6.1 | Separate Grievance Forms | Compliance | January 1, 2017 |
| 6.2 | Available Grievance Forms | Compliance | January 1, 2017 |
| 6.3 | Emergency Grievances Forms | Compliance | January 1, 2017 |
| 6.4 | Use of Force Grievances | Compliance | July1, 2018 |
| 6.5 | Grievances Against Staff | Compliance | July1, 2018 |
| 6.6 | Right to Appeal Form | Compliance | January 1, 2017 |
| 6.7 | Handling Emergency Grievances | Compliance | July 1, 2018 |
| 6.8 | Notification of Non-Emergency | Compliance | July 1, 2018 |
| 6.9 | Grievance Coordinator Review | Compliance | July 1, 2018 |
| 6.10 | Collection of Grievances |  |  |
| 6.11 | Failure to Handle Grievances |  |  |
| 6.12 | Tracking Inmate Grievances |  |  |
| 6.13 | Grievance Coordinator Tracking | Compliance | July 1, 2018 |
| 6.14 | Grievance Coordinator Reports | Compliance | July 1, 2018 |
| 6.15 | Grievance Coordinator Analysis | Compliance | July 1, 2018 |
| 6.16 | Centralized Grievance Unit | Compliance | January 1, 2017 |
| 6.17 | Use of Force Deadline | Compliance | July 1, 2018 |
| 6.18 | PREA Deadline | Compliance | July 1, 2018 |
| 6.19 | Response to Inmate Grievances |  |  |
| 6.20 | Appeals of Grievances | Compliance | July 1, 2018 |
| 7.2 | Notification of Results | Compliance | October 1, 2018 |
| 7.3 | Prisoner-staff Communications | Compliance | June 30, 2018 |
| 8.1 | Anti-retaliation |  |  |
|  |  |  |  |
|  | **Use of Restraints** |  |  |
|  |  |  |  |
| 17.1 | Restraint Provisions |  |  |
| 17.3 | Safety Chair Procedures |  |  |
| 17.4 | Safety Checks |  |  |
| 17.6 | Multi-point Restraint Procedures |  |  |
| 17.7 | Approval of Multi-point Restraints |  |  |
| 17.8 | Continued Use of Restraints |  |  |
| 17.9 | Supervisor Approval of Restraints |  |  |
| 17.10 | Involuntary Medications | Compliance | July 1, 2018 |
|  |  |  |  |
|  | **Early Warning System** |  |  |
|  |  |  |  |
| 19.1 | Development of EWS | Compliance | August 1, 2018 |
| 19.2 | Report Review and Notification |  |  |
| 19.3 | Performance Mentoring Programs |  |  |