**SCHEPER KIM & HARRIS LLP**
RICHARD E. DROOYAN (Bar No. 65672)
800 West Sixth Street, 18th Floor
Los Angeles, CA  90017-2701
Telephone: (213) 613-4655
Facsimile:  (213) 613-4656

**Monitor and on behalf of Monitors**
**Jeffrey Schwartz and Robert Houston**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS, et al. | CV No. 12-00428 DDP |
| Plaintiffs, | |
| | **PANEL'S SIXTH REPORT** |
| v. | |
| LOS ANGELES COUNTY SHERIFF LEROY BACA, in his Official Capacity, | |
| Defendant. | |

`

1    Pursuant to the Section V of the Settlement Agreement And Release of

2  Claims, the Monitor appointed by this Court, Jeffrey Schwartz, Robert Houston, and

3  Richard Drooyan (collectively the "Panel") hereby submits the attached Panel's

4  Sixth Report "evaluating Defendant's Compliance with Action Plan" prepared by

5  the Panel and approved by the Court for the period from January 1, 2019, through

6  June 30, 2019.  This Report takes into consideration the comments from the parties

7  in accordance with Section V of the Agreement.  The Panel is available to answer

8  any questions the Court may have regarding my Report at such times as are

9  convenient for the Court and the parties.

10

11  DATED:  November 26, 2019        Respectfully submitted,

12                                                      SCHEPER KIM & HARRIS LLP
                                                        RICHARD E. DROOYAN
13

14

15

16                                                      By:  /s/ Richard E. Drooyan
                                                              Richard E. Drooyan
17                                                            Monitor and on behalf of Monitors Jeffrey
                                                              Schwartz and Robert Houston
18

19

20

21

22

23

24

25

26

27

28

# PANEL'S SIXTH REPORT

The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan [developed by the Panel] ('Reports') at intervals the Panel shall determine." This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from January 1, 2019, through June 30, 2019 (the "Sixth Reporting Period"), and it is created for the purposes of the settlement of the *Rosas* case. In accordance with Paragraph V of the Settlement Agreement, it takes into consideration comments received from the Parties on November 20, 2019,[1] regarding the draft of the report that was sent to them on October 29, 2019.

In May 2014, the Parties retained the Panel "to develop a corrective action plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles" (the "Downtown Jail Complex"). The plan developed by the Panel sets forth provisions in twenty-one areas that the Sheriff is required to implement in the Downtown Jail Complex. The plan was approved by the Court on April 7, 2016. Under Paragraph VIII of the Settlement Agreement, "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented, it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')."

As of November 1, 2018, the Sheriff's Department has implemented 104 of the Panel's 106 recommendations. The remaining two recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in *United States v. County of Los Angeles, et al.*, CV No. 15-05903 (JEMx) (the "DOJ case").[2]

The Panel visited the Downtown Jail Complex during the Sixth Reporting Period on February 21-22, 2019, and again on April 29-30, 2019. As in the past, the Panel spoke informally with inmates and Department personnel while touring the jails. The Panel debriefed the Custody leadership on the Panel's observations of conditions in the jails, and the issues raised by inmates during the interviews. The Panel also interviewed inmates identified by Plaintiffs regarding force incidents and grievances involving these inmates.

---

[1] Plaintiffs' November 20, 2019 Letter reiterates many of their prior concerns regarding access to video footage, redactions in documents provided to Class Counsel, the Panel's use of its Revised Compliance Measures to assess the Department's Compliance, and the Panel's reliance on the Department's self-assessments. *See* Plaintiff's Letter, pp. 1, n. 2, pp. 3-4, 5. The Panel addressed these concerns in its Fifth Report, *see* pp. 3, 5, 13, and will not repeat its responses here, except to note that the Panel encourages the County to provide Class Counsel with the same camera angles and information in the force packages provided to the Panel.

[2] The other recommendations in the *Rosas* Action Plan have been implemented in the other jail facilities outside of the Downtown Jail Complex pursuant to Paragraph 81 of Settlement Agreement and Stipulated Order of Resolution in the DOJ case.

As noted in the Panel's Fifth Report, on February 22, 2019, the Panel met with Sheriff Alex Villanueva to discuss his vision for the Department, the Panel's monitoring activities, and the importance of the Sheriff's role in ensuring that the reforms instituted by the Department continue and Department personnel are held accountable for their conduct. The Panel again met with Sheriff Villanueva on October 21, 2019 for an update on Custody Operations after he had been in office for over 10 months.

On April 8, 2019, the Panel expressed its concerns in writing to Sheriff Villanueva regarding the reinstatement of former Deputies who had been terminated for misconduct. According to published reports, soon after Sheriff Villanueva took office in December 2018, the Department attempted to reinstate "two deputies [who had been] fired for misconduct – one accused of assaulting and harassing a woman and lying about it, the other for using unreasonable force during an arrest." (*Los Angeles Times,* "L.A. County Sheriff Alex Villanueva Reinstates Four More Fired Deputies," April 5, 2019.)  The Department attempted to reinstate the Deputy accused of dishonesty, notwithstanding that his termination had been upheld by the Civil Service Commission.  As the Panel advised the Sheriff, the reinstatement of Deputies who engaged in acts of dishonesty or excessive force is inconsistent with the recommendations of the Citizens' Commission on Jail Violence ("CCJV") and the provisions in the Action Plan that were promulgated to further implement CCJV's recommendations.[3]

During the Sixth Reporting Period, the Interim Inspector General reported "a sharp increase in the number of administrative investigations that the Department was inactivating." (Office of Inspector General, "Report-Back on LASD Internal Administrative Investigations and Dispositions of Disciplinary Actions," April 11, 2019, p. 2.)[4]  At the same time, there was a "marked decrease" in the number of administrative investigations in the First Quarter of 2019 as compared to the same time period in prior years. (*Id.,* p. 3, n. 4.)  A subsequent report of the Inspector General noted that the "number of inactivated cases has since decreased [in the months of March through May 2019] and is more in line with past administrations."[5] (Office of Inspector General, "Report-Back on LASD Internal Administrative Investigations and Dispositions of Disciplinary Actions for March, April and May 2019," July 22, 2019, p. 1.)  That report also notes, however, that "the Department has reduced the number of administrative investigations it initiates.  Based on information provided by the Department, the number of administrative investigations initiated from January through May 2019 is the lowest at any time during the last ten years, a period that spans the administrations of [the last three] sheriffs[.]" (*Id.*)

The Panel met with the Department's Inmate Grievance Coordinator during both of the Panel's site visits in the Sixth Reporting Period to discuss the Department's implementation of its new grievance policies and procedures, and review the Inmate Grievance Coordinator's reports to

---

[3] Neither of the deputies were members of the Department's Custody Division at the time of the underlying misconduct or when they were fired for their misconduct.

[4] *See* Panel's Fifth Report, p. 5.

[5] This is likely because most of the inactivated investigations in December 2018 through February 2019 were initiated under former Sheriff Jim McDonnell and because there was the "marked decrease" in the number of administrative investigations initiated in the First Quarter of 2019.  With fewer investigations, there were fewer to inactivate.

Custody commanders.  As in the past, the Panel was impressed with the progress the Department continues to make in its handling of inmate grievances and requests.

During the Sixth Reporting Period, the Panel reviewed 50 completed force packages that were selected by the Panel from a comprehensive list of force incidents compiled by the Department.  The Panel also reviewed additional force packages involving cell extractions to ensure that all of the force provisions of the Action Plan were reviewed during the Sixth Reporting Period.  The packages were selected without input from the Department.[6]  After reviewing the completed force packages, the Panel met with Custody Commanders to discuss the force incidents that were of concern to the Panel.  The reporting of the force, the supervisors' investigations, and the Commanders' reviews were also discussed in these meetings.  The Panel also received a letter from Class Counsel regarding the force packages reviewed by the Panel in the First Quarter of 2019, and met with Class Counsel to review issues they had identified in the force packages reviewed by the Panel in the Second Quarter of 2019.  The Panel's analysis of these packages set forth in this Report reflects the input from both the Custody Commanders and Class Counsel.

Under the Revised Compliance Measures, the Department provides the Panel with self-assessments of its compliance with the non-force related provisions in the Action Plan.  The Department submitted its Sixth Self-Assessment Status Report (the "Sixth Self-Assessment") on September 16, 2019, and augmented its self-assessment (the "Augmented Sixth Self-Assessment") on October 10, 2019.  During the Sixth Reporting Period, the Panel randomly selected and reviewed records posted by the Department to verify the Department's self-assessments of its compliance with non-force provisions of the Action Plan.  All of the Department's training results are subject to verification by auditors retained by the Panel.

As has been the case since the beginning of the Initial Reporting Period, the Department cooperated fully with the Panel during the Sixth Reporting Period.  The Department and County Counsel facilitated our visits and inmate interviews, answered our questions, responded to our requests for documents and information, and provided status reports regarding the implementation of the grievance policies and the Early Warning System known as the Employee Review System ("ERS").  They also engaged in constructive conversations with the Panel about our findings regarding the use of force incidents we had reviewed and the Department's continuing efforts to implement the terms of the *Rosas* Action Plan.  We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.  Plaintiffs' counsel also has been fully cooperative with the Panel by identifying inmates for the Panel to interview and facilitating those interviews; reviewing and commenting on the Department's use of force packages; and raising and discussing issues relating to the Panel's monitoring of the Department's compliance with the Action Plan.

---

[6] Most of the force incidents reviewed by the Panel in the Sixth Reporting Period occurred during the Third and Fourth Quarters of 2018.

## ACTION PLAN IMPLEMENTATION

In the Panel's Fifth Report, we again noted the positive changes in the staff culture, and we reported that we did not observe anything in our November 2018 site visit that caused concerns regarding the staff culture or changed patterns of use of force by Department members. During the Panel's October 21, 2019 meeting with Sheriff Villanueva, he acknowledged the importance of avoiding the use of force and using force only as a last resort.

During the Sixth Reporting Period, the Panel interviewed two inmates identified by Class Counsel about troubling force incidents in 2018, which are discussed below. We did not, however, hear complaints about excessive force in informal conversations with other inmates during our site visits in February and April 2019 following the election of Sheriff Villanueva. As in the past, the inmates consistently told us that excessive force was not an issue and conditions were much better than when they previously had been incarcerated in the County Jails.

In the Panel's Fifth Report, we noted a reduction in the number of force incidents in the second half of 2018 in the Downtown Jail Complex, where there was an average of 117 force incidents per month in comparison to an average of 144 incidents per month in the first six months of 2018.[7] While the overall trend continued in the first half of 2019, with an average of 115 force incidents per month in these facilities, the mix was different. The number of Category 2 force incidents increased from a total of 122 incidents in the second half of 2018 to 152 in the first half of 2019.[8] At the same time, the number of minor "non-categorical incidents" ("NCI's")[9] decreased from a total of 193 to 113. Excluding NCIs, there were 84 "categorical" force incidents[10] per month in the Downtown Jail Complex in the second half of 2018 and 96 force incidents per month in the first half of 2019, which is a 14.3% increase.[11] Although the number of categorical force incidents in the first half of 2019 is similar to the number of such incidents in the first half of 2018,[12] on an annualized basis there is a 10% increase in the number of Category 2 incidents in 2019 and a 4.9% increase in the total number of categorical force incidents.[13] To

---

[7] *See* Panel's Fifth Report, p. 10. These figures are based upon statistics provided by the Department.

[8] Category 2 force encompasses most incidents with an "identifiable injury," including relatively minor injuries such as a cut or a bruise. Force that is likely to, or does, result in severe injuries is classified as a Category 3 incident. Fortunately, there have been very few Category 3 force incidents (under 0.2% of all force incidents) since the Court approved the Rosas Action Plan in 2016.

[9] "Non-categorical incidents" ("NCI") are minor uses of force that are used to control inmates, are captured on video, and do not result in injuries or complaints of pain.

[10] "Categorical" force incidents are those incidents classified as Category 1, 2, or 3.

[11] Most of this increase was in the First Quarter of 2019. There was a 6.4% decrease in the number of categorical force incidents in the Second Quarter of 2019.

[12] There was an average of 99 categorical force incidents per month in the Downtown Jail Complex in the first half of 2018.

[13] This is because of the significant decrease in categorical force incidents in the second half of 2018 to 85.5 incidents per month in the Downtown Jail Complex.

the Department's credit, the most serious Category 3 force incidents have been, and continue to be, so infrequent that trends over time are not meaningful.

In addition to the use of force statistics, the Department provided the Panel with reports of "prevented use of force" incidents for the Downtown Jail Facilities that identify the Department members who were able to avoid or prevent the use of force. There were a total of 4,800 reported "prevented use of force" incidents in the Downtown Jail Complex in 2018 as compared to a total of 1,565 reported uses of force, and 2,721 prevented use of force incidents in the first half of 2019 as compared to 693 uses of force in these facilities. These reports reflect that the Department is able to avoid the use of force in the overwhelming majority of court-ordered cell extractions and transfers of inmates to the Pitchess Detention Center in the northern part of the County, circumstances in which the potential need to use force is always present. They also reflect specific instances in which the Department members used DeVRT or verbal commands to induce recalcitrant inmates to exit their cells (for medical or mental health services) or return to their cells (after court appearances or receiving such services) or to quell disturbances or break up fights among inmates. That the Department is tracking this information reflects the importance it places on its members avoiding the use of force whenever possible.

As in the past, the Panel interviewed inmates who complained to Class Counsel about excessive force and misconduct by Sheriff's Department personnel. Following the interviews, the Panel requested and reviewed grievances submitted by the inmates and the force packages for the incidents. One of the incidents was a Category 3 incident in which the inmate sustained an orbital fracture as a result of fight with a Deputy. There were contradictory accounts given by the inmate and other inmate witnesses, on the one hand, and the Department personnel, on the other. The Panel could not resolve these differing accounts or determine if the force was out of policy because the fight occurred in a caged area between Deputy stations leading to rows of cells that did not have a camera. After reviewing this incident, a member of the Panel worked with the Department to identify other similar caged areas that lacked cameras and additional areas where cameras should be placed. The Panel urges the County to install cameras in these areas at MCJ;[14] this is even more important now that the County intends to continue to use MCJ for the foreseeable future.

The Panel cannot stress enough the importance of having cameras in all of the common areas of the County's jails. The vast majority of the force incidents have been captured on CCTV videos that are sufficiently clear to resolve contradictory accounts. Further, the cameras deter assaults by inmates and excessive force by Department personnel.

## 1.    Leadership, Administration and Management

The recommendations in Sections 1.1 through 1.4 of the Action Plan require that Custody be headed by an Assistant Sheriff with no other areas of responsibility, the Sheriff be engaged personally in the management of the jails, the Department's managers be held accountable for

---

[14] A second incident involved a chemical sprayed into a cell by a Deputy who believed an inmate was about to throw a liquid substance at him. The Panel could not resolve the contradictory accounts because there are no cameras in, or pointed into, individual cells.

any failures to address force problems in the jails, and the Department regularly report to the Board of Supervisors on the use of force in the jails and on its compliance with the Action Plan.

The Department has been in **Compliance** with Sections 1.1 and 1.2 of the Action Plan since well before January 1, 2017.[15] Custody has been headed by an Assistant Sheriff with no other areas of responsibility since mid-2014. It was under the direction of Assistant Sheriff Robert Olmsted during the entire Sixth Reporting Period. During the Panel's meeting with the Sheriff on October 21, 2019, we were advised that Assistant Sheriff Olmsted will be stepping down in December 2019. Consistent with CCJV's recommendations, the Panel strongly urges the Sheriff to appoint "an individual with experience in managing a large corrections facility or running a corrections department" as the new Assistant Sheriff over Custody.

On February 22, 2019, the Panel met with Sheriff Villanueva, and reviewed his oversight of the jail facilities and the Panel's findings and observations. The Department has provided the Panel with a log of the frequent meetings that Sheriff Villanueva had with Assistant Sheriff Olmsted from January 1, 2019, through June 30, 2019, to review use of force data and trends, suicide attempts and rescue force, deployment of chemical agents and personal weapons, facility security concerns, assaults on staff, use of force against mentally ill inmates, and de-escalation techniques. When the Panel met with the Sheriff on October 21, 2019, he stated that he regularly meets with Custody personnel during tours of the jails, and he acknowledged the importance of conveying to them that force must only be used as a last resort.

In the First Quarter of 2019, there were two founded dispositions for violations of the Department's use of force policies in the Downtown Jail Complex, which resulted in one suspension and one written reprimand. Excluding non-categorical force incidents, there was a 66.7% increase in force incidents at IRC, a 63.6% increase at MCJ, and a 1.6% increase at TTCF in the First Quarter of 2019. Although the percentage increases are concerning, there was a dramatic *decrease* in the number of force incidents in IRC and MCJ from the Third Quarter to the Fourth Quarter of 2018, and the number of force incidents at IRC in the First Quarter of 2019 was the same as in the Third Quarter of 2018. Overall, there was a 30.7% increase in the number of categorical force incidents in the Downtown Jail Complex in the First Quarter of 2019.

The IRC Unit Commander explained that there was a "mass changeover in supervision" and "an increase of over 8,000 new bookings" in the First Quarter of 2019. The MCJ Unit Commander explained that "MCJ has implemented new practices to mitigate, manage and reduce the probability of force incidents from re-occurring," including orientation for new personnel by the MCJ Compliance Team and additional supervision during inmate movement.

_____

[15] Use of the term **Compliance** in bold is a finding of Compliance as of a certain date. The Panel's findings are set forth on the Appendix attached hereto. For other provisions, the Department has either not achieved Compliance or is no longer in Compliance during this current reporting period. Based upon the Panel's findings, the parties will determine whether the Settlement Agreement is subject to termination pursuant to Section VIII of the agreement. As noted in the Panel's prior reports, the Panel encourages the "Parties to adopt a meaningful and achievable framework to determine the Department's compliance with the Settlement Agreement" in the future.

There were two founded dispositions for violations of the Department's use of force policies in the Second Quarter of 2019, which resulted in written reprimands.  One of the force incidents occurred in November 2014, but the investigation was not completed until 2019 because one of the accused members, a Custody Assistant who had failed to report a use of force he witnessed, was on military leave for much of 2016 through 2019.  The Custody Assistant received a written reprimand that was reduced from a proposed five day suspension.  The other five Department members involved in that same incident received suspensions that were imposed in 2017.  In light of the decrease in the number of Internal Affairs Bureau investigations noted by the Inspector General, *see* p. 2, *supra*, and the discipline imposed on the other Department members in this case, the decision to reduce the discipline imposed on the Custody Assistant may reflect a relaxation of the Department's disciplinary standards that is of concern to the Panel.

Excluding non-categorical force incidents, in the Second Quarter of 2019 there was a 25.4% decrease in the number of force incidents at TTCF and a 7.4% decrease at MCJ, but there was a 32% increase in the number of force incidents in IRC. There were no significant increases in Category 3 incidents in that quarter (there was only one incident, which was at MCJ).

The IRC Unit Commander explained that the "increase in uses of force [in IRC] has been primarily attributed to the lack of a force review team, which has created a large administrative burden on line supervis[ors]. . . [who] have been spending a significant portion of their shift working on administrative tasks and not in the deputy work stations."[16]  He reported an increase by over 1,000 new bookings as compared to the Second Quarter of 2018, which "caused logistical challenges" that increased the "risk that inmates with mental health and/or behavior issues may decompensate or act out in frustration because of the delay, increasing the likelihood of a use of force."  He reported that "IRC has reassigned one (1) sergeant to the force review team" to address this problem, which "should free the line supervisors to work directly with personnel under their supervision more frequently."  An area Commander "concur[red]" with these "findings and recommendations," which were approved by a Custody Division Chief.

As reflected in the significant decrease in the number of categorical force incidents at MCJ in the Second Quarter of 2019, the Panel believes that the MCJ Unit Commander took steps to address the spike in force incidents in the First Quarter of 2019, although the number of force incidents in the Second Quarter of 2019 (100) is still significantly higher than the number of incidents during the Third Quarter (83) and the Fourth Quarter of 2018 (66).[17]  The Panel is,

---

[16] In the Panel's meeting with the Sheriff on October 21, 2019, he indicated that the Department does not have enough sergeants to provide both the necessary first line supervision and timely complete unit level investigations of force incidents.  Without commenting on budget or funding issues, the Panel observes that additional Sergeants would facilitate the Department's ability to perform both of these functions, which are essential to ensure that Department members adhere to the use of force provisions in the Action Plan.

[17] The Panel disagrees with Plaintiffs' assertion that this is inconsistent with the Panel's findings regarding the Department's Compliance with Sections 13.1 and 13.2.  *See* Plaintiffs Letter, p. 6.  The Panel does not believe the a Unit Commander's failure to report why a member who was placed on a Unit Performance Mentoring Program was not terminated or to advise the

however, concerned about the increases at IRC over the first two quarters of 2019,[18] and
questions whether re-assigning one Sergeant is sufficient to address these increases.  The
Department reports that in the First and Second Quarters of 2019 it achieved **Compliance** with
Section 1.3, which requires Unit Commanders to address use of force problems in their facilities.
The Panel is of the view, however, that this finding should be limited to TTCF and MCJ.

Plaintiffs identified four force packages that they assert reflect dishonest conduct by
Department employees who were not punished by supervisors for "such dishonesty."  *See*
Plaintiffs' Letter, p. 7.  They "infer dishonesty from severe discrepancies between a LASD
employee's description of a use of force incident and the video of the incident."  *Id.*  The Panel
agrees with the Plaintiffs' assessment of one of the force incidents, but does not agree with
Plaintiffs' conclusions that there is "brazen inaccuracy" in the other force packages.  The Panel
does not disagree, however, that the Department must "vigorously police" any inaccurate force
reports and the Panel "must meticulously review force packages and other documents submitted
by [the Department] for indices of dishonesty."  *Id.*

The Department is in **Compliance** with Section 1.4.  The Assistant Sheriff for Custody
Operations under Sheriff McDonnell reported on the Department's use of force in the jails and its
implementation of the *Rosas* Settlement Agreement to the Board of Supervisors on June 12,
2018.  Because Sheriff Alex Villanueva assumed office on December 3, 2018, the Panel agreed
that the presentation to the Board scheduled for December 11, 2018 could be continued to
January 2019.  The Assistant Sheriff for Custody Operations and a Commander in Custody made
a presentation to the Board on January 15, 2019.  The Department provided the Panel with a
copy of the transcript of the Department's presentation on that date.  After multiple continuances
that were not always within the Department's control, on September 10, 2019, a Commander in
Custody Operations and the Unit Commander responsible for the Custody Compliance and
Sustainability Bureau ("CCSB") made a presentation to the Board of Supervisors on the
Department's Compliance with the *Rosas* Action Plan through the First Quarter of 2019.[19]  One
of the Panel's members attended the Department's presentation to the Board and responded to
questions from the Supervisors.  In order to maintain Compliance with Section 1.4, the
Department needs to make another report to the Board no later than the First Quarter of 2020 on
its Compliance through the Third Quarter of 2019 and every six months thereafter.

Sections 10.1 and 10.2 require the Department's leadership to tour each of the jail
facilities and document those visits.  The Department's Sixth Self-Assessment reports that it
maintained **Compliance** with Sections 10.1 and 10.2 as of June 30, 2018, through June 30, 2019.

---

Inspector General means that the Commander failed to address the increase in the number of
force incidents at MCJ.

[18] From 39 incidents in the Fourth Quarter of 2018 to 86 incidents in the Second Quarter
of 2019.  Going back further, there were 65 incidents in the Third Quarter of 2018.  Taking an
average of 52 force incidents per quarter, the 86 force incidents represents a 65% increase in
force incidents since the last reporting period.

[19] Although the Commander was an articulate and well-prepared spokesperson for the
Department, no one from senior leadership in the Custody Division was present to answer the
Board's questions.

The Sheriff and Assistant Sheriff visited the jail facilities as required by Section 10.1, as did the Captains, Commanders, and Chiefs.[20]  The Department documented these visits, along with visits by Watch Commanders, as required by Section 10.2.  The Panel has reviewed the source documents provided by the Department and verified the results reported by the Department.

Sections 18.1 and 18.2 require the Department to (1) maintain Custody-wide rotation policies and rotate personnel as required by the policies, and (2) audit each unit's compliance with its rotation policies.  The Department's Sixth Self-Assessment reports 99% **Compliance** with Section 18.1, and 99% **Compliance** with Section 18.2 in the Sixth Reporting Period. The Panel has reviewed the source documents provided by the Department and verified the results reported by the Department.  Unit Commanders are rotating non-exempt personnel found to be "out of Compliance" in audits of the unit's compliance with its rotations policies.[21]

The Department's Sixth Self-Assessment reports that it maintained 100% **Compliance** with Section 21.1 as of June 30, 2018, through June 30, 2019.  The Panel has reviewed the source documents provided by the Department, which reflect that no member was transferred or assigned to Custody as a sanction for problematic conduct.

## 2.      Use of Force Policies and Practices

Section 2.1 of the Action Plan requires the Department to "have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations[.]"  On October 16, 2015, the Department provided the Panel with a Custody Operations Force Manual with separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints, Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved Shootings.  The Department's Custody Force Manual satisfies Section 2.1 and includes specific provisions that satisfy Sections 8.2 (Complaints of Retaliation), 17.2 (Pregnant Inmates), 20.1 (Types of Force), and 20.2 (Definition of Reactive Force) of the Action Plan.  The Department has been in **Compliance** with these Sections since the Panel began monitoring the Department's compliance as of January 1, 2017.

The other recommendations in the Action Plan that pertain to the Department's use of force in Custody Operations are summarized as follows:

- Sections 2.2 through 2.13 require the Department to adopt a comprehensive set of new use of force policies for Custody Operations.

---

[20] Where there is more than one Unit Commander or Commander for a facility, the Department's posted audit results combine the tours by all of assigned commanders for that facility.

[21] The Department's posted audit results reflect that one Deputy who has been in a 36-month rotation position in IRC for 72 months has been out on leave and a second Deputy in the position for 44 months was moved "following previous audit findings."  The other Deputies who had been in their positions for upwards of 79 to 98 months, *see* Panel's Fifth Report, p. 8, n. 11, were rotated out during the Fifth Reporting Period.

- Sections 4.1 through 4.5 require the Department to adopt specific use of force policies for dealing with mentally ill prisoners.

- Sections 9.2 through 9.3 require the Department to adopt specific policies for escorting inmates after force incidents and intervening to protect inmates as soon as it is reasonably safe to do so.

- Section 17.5 requires the Department to adopt policies for minimizing the risk of an inmate's medical distress during and after a force incident.

- Section 20.3 requires the Department to adopt use of force policies for Planned Force (such as cell extractions).

The Panel reviewed multiple drafts of the Department's policies to implement these recommendations, required changes where appropriate, and certified that the Department had implemented these recommendations, effective December 1, 2015.

The Department has made some changes and/or additions to the policies that were approved by the Panel in 2015. Some of the changes were reviewed by the Monitor and the Department of Justice in the DOJ case, and reflect their comments in that case, but they were not reviewed by the entire *Rosas* Panel. The Panel has compared the current version of the Custody Division Manual, dated August 16, 2019, with the version dated October 15, 2015, that was approved by the Panel. Although most of the changes are acceptable, the Panel has advised the Department that some modifications are necessary and recommended other modifications.[22]

Per the applicable Compliance Measures, the Panel selected 25 force incidents to review in the First Quarter of 2019 without any input from the Department. As in the past, the universe of force incidents selected by the Panel includes a disproportionate number of the more serious Category 2 incidents involving the use of personnel weapons (punches) by Department personnel. According to Use of Force statistics provided by the Department for the Sixth Reporting Period, 82.2% of the force incidents in the Downtown Jail Complex were either Category 1 incidents or Non-Categorical incidents, and 17.7% were Category 2 incidents.

To reduce the lag time between the occurrence of the force incidents and the completion of the force investigations, the Panel requested both completed and pending force investigations, with the expectation that the Department would expedite the completion of the pending force packages before the end of the First Quarter of 2019. The Department was able to complete all of the pending investigations requested by the Panel before the end of the First Quarter of 2019, and the Panel reviewed 25 completed force packages in that quarter.

The Panel concluded that 22 of the 25 completed force packages reviewed in the First Quarter of 2019 were in Compliance with the use of force provisions of the Action Plan, which is

---

[22] The Panel appreciates that the Department has indicated that it will ensure that *Rosas*-related changes will be submitted to the Panel in the future and it is "working to address" the modifications and recommendations "referenced by the Panel."

slightly below the 90% "vertical" threshold for Compliance with the Action Plan.  The Panel also concluded that the Department was not in compliance with the following specific provisions of the Action Plan:  force prevention principles (Section 2.2), head strikes (Section 2.6), and the use of chemical weapons and Tasers (Section 2.12).[23]  As in the past, the Panel's main concern was that Department members sometimes reacted too quickly and should have taken advantage of "time and distance" to de-escalate the situation and avoid using force altogether or to plan a potentially safer use of force.  The Panel reiterates its view that additional improvement can be achieved by the Department to avoid force altogether in some confrontational situations.

In the Second Quarter of 2019, the Panel again reviewed 25 force incidents, consisting of a combination of investigations that were already completed and pending investigations that were completed during the period.  The Panel concluded that 20 of the 25 packages reviewed were in Compliance with the use of force provisions, and that the Department did not reach the 90% "vertical" threshold for Compliance with the Action Plan.  The Panel also concluded that the Department was not in compliance with the following provisions of the Action Plan:  force prevention principles (Section 2.2) and calling supervisors before handling recalcitrant inmates (Section 2.7).  The failure to call a supervisor when confronted with a recalcitrant inmate is a variant on the need for Department members to take more time before using force to control a recalcitrant inmate.

The Panel also reviewed four cell extractions in the Second Quarter of 2019, to assess the Department's compliance with specific provisions that are applicable to the use of force in those circumstances (e.g., checking medical records before using force (Section 2.13), consulting with Mental Health Professionals (Section 4.1), Cooling Off periods (Section 4.4), Mental Health Provider's Order (Section 4. 5), and Planned uses of force protocols (Section 20.3)).  The Panel did not find any issues with the minimal force used in the cell extractions and the Department followed all of the applicable protocols for use of force in those circumstances.

The Panel again reviewed the problematic incidents with Custody Commanders during the Panel's site visits, and took into consideration their comments in reaching the conclusions set forth in this Report.  During the Panel's meetings with Commanders, the Panel again recommended that the Department use ankle restraints when moving high risk inmates to increase safety for staff and other inmates. The Department's training bureau has undertaken to research these kinds of restraints.

The Panel received a letter from Plaintiffs' counsel, dated May 13, 2019, setting forth Plaintiffs' comments and concerns regarding the force packages the Panel had reviewed in the First Quarter of 2019.  The Panel also met with Plaintiffs' counsel on October 1, 2019, to review their comments and concerns regarding the force packages the Panel had reviewed in the Second Quarter of 2019.  The Panel took into consideration Plaintiffs' comments and concerns in reaching the conclusions in this report.

---

[23] The Panel also found that the Department was not in compliance with 20.3 pertaining to the planned use of force protocols, but the universe of cases was too small to generate meaningful results.

It is perhaps not surprising that the parties have widely divergent views on whether the use of force was appropriate in a number of cases, but the Panel has found the parties' input to have been very helpful.

3.     **Training**

Sections 3.1 through 3.4 of the Action Plan require that Department members receive training on use of force policies and on ethics, professionalism, and treating inmates with respect; and that new Department members receive six weeks of Custody-specific training in the Academy or the Jail Continuum in Custody Operations. Sections 4.6 through 4.9 require the Department to provide Custody-specific, scenario-based, skill development training for existing and new personnel in Crisis Intervention and Conflict Resolution and in "identifying and working with mentally ill inmates." Section 12.1 requires that Custody Sergeants receive training in conducting use of force investigations.

The Department's training results are subject to audit by the Panel's auditors. All of the Department's reported results for the initial training of existing Deputy Sheriffs and Custody Assistants and for new members set forth below have been verified by the Panel's auditors based upon reviews of Department rosters and training records. The auditors verified that the Department's new members had received the required initial training from when it was first offered through the "as of" date reported by the Department for the completion of the initial training required for existing Deputies and Custody Assistants. Accordingly, the Panel has deemed the Department to be in Compliance "as of" the date reported by the Department for the completion of the initial training required for existing personnel. Going forward, the Department's continuing Compliance with the training provisions will be based upon its Compliance with the refresher training required every year or every other year.

As of June 30, 2018, 97% of the existing Deputies and Custody Assistants in the Downtown Jail Complex had received the initial eight-hour use of force training required by Section 3.1.[24]  96% of the trained Deputy Sheriffs and Custody Assistants completed the required refresher course through December 31, 2018.[25]  The refresher results for the Third and Fourth Quarters of 2018 have been verified by the Panel's auditors and the Department is in **Compliance** with Section 3.1 as of June 30, 2018, through December 31, 2018. The Department's Augmented Sixth Self-Assessment reports that its "preliminary assessment results" as of June 30, 2019, indicate that 90% of the Deputies and Custody Assistants completed the required use of force refresher course in the Sixth Reporting Period. The final results will be subject to verification by the Panel's auditors.

---

[24] The use of force training that was approved by the Panel includes the custody-based use of force scenarios in **Compliance** with Section 3.4.

[25] The Panel granted the Department extensions for Deputies who received the basic use of force training in 2017 and 2018 for completion of the initial refresher courses. The Panel expects Department personnel to complete future refresher courses before the end of December of the years in which they are required.

As of June 30, 2018, 95% of the existing personnel received the initial four-hour training course in ethics, professionalism, and treating inmates with respect as required by Section 3.2. 95% of the trained Deputy Sheriffs and Custody Assistants completed the required refresher course through December 31, 2018.  The refresher results for the Third and Fourth Quarters of 2018 have been verified by the Panel's auditors and the Department is in **Compliance** with Section 3.2 as of June 30, 2018, through December 31, 2018.  The Department's Augmented Sixth Self-Assessment reports that its "preliminary assessment results" as of June 30, 2019 indicate that 96% of the Deputies and Custody Assistants completed the required ethics refresher course in the Sixth Reporting Period.  The final results will be subject to verification by the Panel's auditors.

As of June 30, 2018, 97% of the existing Deputies at the Downtown Jail Complex and in the mental health unit at the Century Regional Detention Facility ("CRDF") received the 32 hours of training on Crisis Intervention and Conflict Resolution Training (DeVRT), including the eight hours of identifying and working with mentally ill inmates, required by Sections 4.6 and 4.7.  Also as of that date, 98% of the remaining Deputies at CRDF, and all Deputies at the North County Correctional Facility ("NCCF"), and the Pitchess Detention Center ("PDC") jails received the eight hours training in identifying and working with mentally ill inmates required by Section 4.7.

96% of the Deputies in the Downtown Jail Complex and the mental health unit at CRDF and 97% of the remaining Deputies at CRDF and the Deputies at the other facilities received the required refresher training for the Third and Fourth Quarters of 2018. The refresher results have been verified and the Department is in **Compliance** with Section 4.6 and 4.7 as of June 30, 2018, through December 31, 2018.  The Department's Augmented Sixth Self-Assessment reports that its "preliminary assessment results" as of June 30, 2019 indicate that 98% of the Deputies and Custody Assistants the completed the refresher course required by Section 4.6 and 92% completed the refresher course required by Section 4.7 in the Sixth Reporting Period.  The final results will be subject to verification by the Panel's auditors.

The Department has reported since the First Reporting Period that, beginning on July 1, 2015, newly assigned Deputies have been required to complete a six-week Custody Operations course that includes training in use of force and ethics, professionalism and treating inmates with respect, and new Custody Assistants have received training in these subjects during their Academy training.  The Department's posted audit results reflect that the Department has exceeded the 95% Compliance standard for new Deputies through May 2019 and for new Custody Assistants through June 2019.  These results have been verified by the Panel's auditors and the Department is in **Compliance** with Section 3.3 as of June 30, 2018 through June 30, 2019.[26]

The Department previously reported that 98% of new Deputies had received the approved conflict resolution training in the Academy and the Jail Continuum, and 100% of newly assigned Custody Assistants had received the conflict resolution training (DeVRT) and training in

---

[26]  There were no Deputy graduations in March or June 2019 and no Custody Assistant graduations in January through March 2019 or May 2019.

"identifying and working with mentally ill inmates" required by Sections 4.8 and 4.9 as of June 30, 2018. The Department's posted audit results reflect that 100% of new Deputies received the training required by Sections 4.8 and 4.9 in the First Quarter of 2019, and 98/100% of newly assigned Deputies[27] and 100% Custody Assistants received the required training in the Second Quarter of 2019. These results have been verified by the Panel's auditors and the Department is in **Compliance** with Sections 4.8 and 4.9 as of June 30, 2018 through June 30, 2019.

The Department previously reported that as of June 30, 2018, 90.4% of the Sergeants assigned to Custody as of October 1, 2016, had received the 16 hours of training in conducting use of force investigations required by Section 12.1.[28] These results have been verified by the Panel's auditors. The Department's posted audit results report that 100% of the Sergeants newly promoted in Custody in the Second Quarter of 2019 received the required training.[29] For the period October 1, 2016, through March 31, 2018, the Department's posted results reflect partial compliance. The resulting cumulative compliance for newly promoted Sergeants through the Second Quarter of 2019 falls under the 95% compliance standard. These cumulative results are subject to verification by the Panel's auditors once the Department achieves the 95% threshold. The Department's Augmented Sixth Self-Assessment reports that "preliminary assessment results" as of June 30, 2019 indicate that 93% of the Sergeants who completed the initial training received the required training refresher course in the Sixth Reporting Period. The final results will be subject to verification by the Panel's auditors.

Section 3.5 requires Unit Commanders to determine "what additional training, counseling or mentoring may be required when a personnel complaint involving the use of force is resolved with a finding that it 'Appears Employee Conduct Could Have Been Better;' direct that the Department member undergo such additional training, counseling, or mentoring; and document the action taken." The Department's Sixth Self-Assessment reports that there were no such cases in the First or Second Quarters of 2019.

Section 3.6 requires Unit Commanders to review new Department members within six months of being initially assigned to Custody and again before the end of their probationary period. Based upon a random selection of personnel records, the Department reports that 68% of the new Department members were reviewed as required by Section 3.6 in the first six months of 2019, which is below the 95% threshold for Compliance.

**4.      Reporting and Investigation of Force Incidents**

Many of the recommendations in the Action Plan that pertain to the reporting and investigation of force used by Department personnel in Custody Operations are assessed by the Panel through a review of the completed force packages. Other provisions are reported by the Department as follow:

---

[27] 98% in the April 2019 class and 100% in the May 2019 class.

[28] *See* Self-Assessment Status Report, September 2018, p. 13.

[29] There were no newly promoted Sergeants in the First Quarter of 2019.

- Section 5.1 requires the Department to track use of force investigations, reviews, and evaluations; review evaluations of force incidents; and conduct additional investigation of discrepancies and unexplained tactical decisions.  The Department reports that 94% of the force incidents in the First Quarter of 2019 were timely entered into the database as required by Section 5.1, and 91% were timely entered in the Second Quarter of 2019, which is below the 95% threshold required for Compliance.

- Section 8.3 requires investigations of inmate grievances that Department members used force to retaliate against inmates be timely evaluated by the Custody Force Review Committee.  The Department reports that it did not achieve Compliance with this provision in either the First or Second Quarters of 2019.  The Department reports that a Corrective Action Plan ("CAP") "has been issued" to "improve. . .tracking and scheduling[.]"

- Section 11.1 requires that the Custody Force Rollout Team's involvement in reviewing force incidents not delay the Department's investigation of the force incidents.  The Compliance Measure requires that "95% of the investigations reviewed by CFRT were not delayed beyond the period permitted by law for imposing discipline."  The Department previously reported that that it achieved **Compliance** with Section 11.1 in the Second Quarter of 2018.  Because there were no use of force incidents reviewed by CFRT in which there was a finding of a policy violation or misconduct in either the Fifth or Sixth Reporting Periods, the predicate for determining compliance with Section 11.1 did not exist in those periods.

- Section 13.1 requires the Department to "have a firm policy of zero tolerance for acts of dishonesty or failure to report uses of force."  Section 13.1 and 13.2 require the documentation of the reasons and reports to the Inspector General whenever the Department does not terminate a member who has been found to have been dishonest, used excessive force, or violated the Prisoner Rape Elimination Act ("PREA").  The Department reports that there were no incidents in the First Quarter of 2019 that were subject to Sections 13.1 and 13.2.[30]  In the Second Quarter of 2019, the Department determined that a Department member had failed to report a force incident that occurred in April 2018 and issued a written reprimand.  On September 17, 2019, a Captain in MCJ approved a recommendation that the member "be placed on the Unit Performance Mentoring Program."  The documents submitted by the Department do not, however, reflect "the reasons why the member was not terminated" as required by Section 13.1 or show that a report was submitted to the Inspector General as required by Section 13.2.[31]

---

[30] As the Panel previously stated, it agrees with Plaintiffs that the Department "cannot have a policy of zero tolerance for dishonesty or failure to report if it terminates ongoing investigations of personnel alleged to have engaged in those forms of misconduct."  Plaintiffs' Letter, dated November 20, 2019, p. 3; *see* Panel's Fifth Report, p. 6.

[31] As noted above, *see* pp. 6-7, *supra,* in the Second Quarter of 2019, the Department also found that a second member had failed to report the use of force by another department member four and a half years earlier in November 2014.  The investigation was not completed until the Second Quarter of 2019 because the member who failed to report the force was on Military

- Sections 14.1 and 14.2 require (1) an additional review of referrals of inmates for
  criminal prosecution arising from incidents involving the use of force by Department
  members and (2) timely referrals to the District Attorney of "officer misconduct that may
  amount to criminal violations."  The Department reports 100% in **Compliance** with
  Section 14.1 in the First Quarter of 2019, and 96% in the Second Quarter of 2019.  With
  respect to Section 14.2, there was one timely criminal referral to the District Attorney 14
  days after the Department learned of the incident in the First Quarter of 2019, and "no
  referrals of a Department member for possible prosecution for alleged misconduct that
  may amount to a criminal violation for the 2nd Quarter, 2019."  Accordingly, the
  Department is in **Compliance** with Section 14.2 as of the Third Quarter of 2018, through
  the Second Quarter of 2019.

The Panel reviewed 25 completed force packages in the First Quarter of 2019 to assess
compliance with the provisions of the Action Plan relating to the reporting and investigation of
force incidents.  The Panel concluded that 22 out of the 25 (or 88%) were in Compliance with
these provisions, which was below the 90% "vertical" threshold for Compliance.  The Panel
concluded that the Department was not in compliance with the provision regarding the
Commanders' reviews (Section 5.2) and the reporting of the observation of visible injuries or the
lack of such injuries (Section 15.4).  In addition, the information provided by the Department
was often not sufficient for the Panel to determine the Department's compliance with the
provision relating to the separation of Department personnel after a force incident (Section 15.6).

The Panel concluded that 21 of the 25 (or 84%) completed force packages reviewed in
the Second Quarter of 2019 were in Compliance, which is below the 90% "vertical" threshold for
Compliance.  The Panel concluded that the Department was not in compliance with the provision
regarding the location of inmate interviews (Section 12.2) and the reporting of visible injuries
(Section 15.4).  In addition, the information provided by the Department was not, in many cases,
sufficient for the Panel to determine the Department's compliance with the provision relating to
the separation of Department personnel after a force incident (Section 15.6).

## 5.    Inmate Grievances

The Action Plan requires extensive changes in how the Department handles inmate
grievances and requests for service.  On July 15, 2016, the Department issued a new "Inmate
Grievance Manual" (Volume 8 of the Custody Division Manual) to implement a new grievance
system.  The Panel assessed the Department's implementation of the new grievance system as
follows:

Sections 6.1 through 6.6 require that separate forms for inmate grievances be reasonably
available to inmates and that the forms have specific check boxes.  Section 7.1 requires the
Department to advise inmates of the voluntary Conflict Resolution Meeting available under the
Department's Conflict Resolution Policy.  Based upon site visits during the Sixth Reporting

---

Leave.  He received a written reprimand, but has not been placed on a performance mentoring
plan because he is currently on active duty in the Army.

Period, the Panel concluded that the forms meeting these requirements of the Action Plan are reasonably available to inmates, and the Department remains in **Compliance** with those provisions relating to the availability of the required forms.

The Department is required to establish that use of force grievances (Section 6.4) and retaliation grievances (Section 6.5) against staff are brought to the attention of Unit Commanders within 10 days and properly handled. Based upon a review of the relevant grievances in the randomly selected month, the Department reports that 83% of the use of force grievances were in Compliance with Section 6.4 in the First Quarter of 2019, which is below the 90% threshold for Compliance and 92% were in Compliance in the Second Quarter of 2019, which exceeds the threshold for **Compliance**. The Department also reports that 97% of the retaliation grievances were in **Compliance** with Section 6.5 in the First Quarter of 2019 and 100% in the Second Quarter of 2019. The source documents posted by the Department for Sections 6.4 and 6.5 have been reviewed by the Panel, which verified that these grievances were handled appropriately.

Sections 6.7 and 6.8 of the Action Plan set forth specific requirements for the determination, handling, and notifications of non-medical emergencies. Based upon the selection and review of the grievances marked "emergency" in the month randomly selected by the Panel, the Department reports "there were no grievances that met the criteria of Provision 6.7 during the randomly selected months. . . . All 50 grievances in each quarter were downgraded per Custody Division policy and assessed in Provision 6.8." The Department reports 100% Compliance with Section 6.8 for the First Quarter of 2019, and 99% Compliance in the Second Quarter of 2019. The source documents posted by the Department for Sections 6.7 and 6.8 have been reviewed by the Panel, which verified that it was appropriate to deem these grievances as non-emergent. As in the past, the Department handled non-emergent grievances expeditiously as required by the nature of the grievance. Accordingly, the Department is in **Compliance** with these provisions for the period July 1, 2018, through June 30, 2019.

Section 6.9 requires that emergency grievances be forwarded to the Inmate Grievance Coordinator. Sections 6.13, 6.14, and 6.15 require the Inmate Grievance Coordinator to track the Department's handling of inmate grievances, provide a monthly report to the Unit Commander and senior management in Custody on the status of inmate grievances, and analyze inmate grievances for problematic trends. The Panel met with the Department's Inmate Grievance Coordinator during both site visits in the Sixth Reporting Period to review the Department's implementation of the new grievance system and the reports generated for the Department's managers. The Department provided documentation to the Panel showing that for the First and Second Quarters of 2019, the Inmate Grievance Coordinator received the information about emergency grievances required by Section 6.9 and prepared detailed reports for managers as required by Sections 6.13, 6.14, and 6.15. The Department is in **Compliance** with Sections 6.9, 6.13, 6.14, and 6.15, as of July 1, 2018, through June 30, 2019.

Sections 6.10 and 6.12 require that grievances be collected daily, logged in, and tracked in an inmate grievance database. The Department's Sixth Self-Assessment reports that 98% of the grievances were collected and reviewed with 24 hours in the First Quarter of 2019 and 96% in the Second Quarter of 2019. The source documents for these results posted by the Department

were reviewed by the Panel and support the Department's reported findings.  Accordingly, the Department is in **Compliance** with Section 6.10 as of January 1, 2019, through June 30, 2019.

The Department's Sixth Self-Assessment reports that 98% of the grievances in the randomly selected months in the First Quarter of 2019 were entered into the database and handled as required by Section 6.12, and 100% of the grievances were entered and tracked in the database in the Second Quarter of 2019.  Again, the source documents for these results were available to, and reviewed by, the Panel.  Accordingly, the Department is in **Compliance** with Section 6.12 as of the July 1, 2018, through June 30, 2019.

Section 6.11 requires that the Custody Division Manual provide that failing to comply with Department policies requiring proper handling of inmate grievances may be cause for discipline.  The Department's Sixth Self-Assessment reports that "[n]o Department members were found to have violated the grievance policy during the [Sixth] reporting period."

Sections 6.17, 6.18, 6.19, 6.20, and 7.2 set forth the deadlines for filing use of force and PREA grievances,[32] the Department's initial responses, inmates' right to appeal, and the Department's notifications of the results of the investigations.  The Department's Sixth Self-Assessment reports that it adhered to the deadlines for these grievances in both the First and Second Quarters of 2019.  It also reports that it adhered to the deadlines for advising inmates of the results of adjudications as required by Section 7.2 for the First Quarter of 2019, but not the Second Quarter of 2019.  The posted source documents for these results were reviewed by the Panel and support the Department's reported findings. The Panel agrees that the Department is in **Compliance** with Sections 6.18 and 6.20 as of July 1, 2018, through June 30, 2019.

The Department's Self-Assessment reports it was in Compliance with Section 6.19 in the Second Quarter of 2019 because it responded to 92% of grievances against staff and 96% of grievances not against staff within 15 days.  At the time that the Panel developed the Action Plan, the Medical Services Bureau was part of the Sheriff's Department and subject to the fifteen-day notification requirement in Section 6.19.  Although medical is now part of Correctional Health Services within the Department of Health Services, it must still respond to inmate grievances against the medical staff  (e.g., lack of a timely response to a request for medical services) within 15 days, and report its compliance with this requirement to the Panel.

As previously reported, the Panel believes that the decentralized grievance system developed by the Department under the direction of an Inmate Grievance Coordinator is effectively and efficiently handling inmate grievances and requests for service and that the Department is in **Compliance** with Section 6.16.[33]

---

[32] Section 6.18 provides that there is no deadline for filing PREA grievances.

[33] The Plaintiffs again assert that the Panel has "overstepped the bounds of [its] authority. *See* Plaintiffs' Letter, p. 8.  As the Panel previously reported, it "believes that the current system is consistent with the intention of the Panel in drafting Section 6.16 as it 'is effectively and efficiently handling inmate grievances and requests for service.'"  *See* Panel's Fifth Report, p. 20.

Section 7.3 requires the Department to "ensure that there are adequate avenues for constructive prisoner-staff communication[.]"  The Department's Sixth Self-Assessment reports that the Department was in Compliance with Section 7.3 during both the First and Second Quarters of 2019.  The Department provided logs of Town Hall meetings at MCJ and TTCF during the randomly selected months of March and April 2019.  Per Compliance Measure 7.3-1, the Town Hall assessments are limited to the General Population housing units, and the logs provided by the Department for those housing units reflect that relatively few General Population inmates attended the meetings.  The logs provided for the Second Quarter of 2019 reflect, however, that there were Town Hall meetings in special housing units (discipline/administrative segregation, mental health, and high security) and that more inmates attended the meetings in these units.  Based upon these logs, the Panel is of the view that the Department has achieved **Compliance** with Section 7.3 in the Second Quarter of 2019, with the understanding that in the future the Department will provide logs for special units as well as general population units and Town Hall meeting reports for 10% of all the inmates who attended the Town Hall meetings.

The Monitors have long suggested converting, where possible, to direct supervision to enhance safety and security.  Implementation of the principles and practices of direct supervision would help the Department remain in compliance with Section 7.3 as the program ensures direct communication between inmates and staff, 16 hours a day, seven days a week.  In addition, Deputies and Custody Assistants would be well-positioned to prevent inmate on inmate violence, and quickly call for backup and intervene when it occurs, among other well-documented advantages.

Section 8.1 prohibits Department personnel from retaliating against inmates.  The Department previously reported that it was in Compliance with Section 8.1 as of March 31, 2018, through December 31, 2018.[34]  The Department posted the results of the investigations approved by Unit Commanders in the randomly selected months and the number of anti-retaliation grievances received and investigated in the First and Second Quarters of 2019.  It reports that there were no founded violations of the anti-retaliation policy in either quarter.  The Panel finds that the Department has maintained **Compliance** with Section 8.1 through June 30, 2019.

The Panel agrees with the Plaintiffs that it cannot "rely exclusively on the results of LASD's self-reporting, without conducting any independent investigation on [its] own" to establish Compliance with Section 8.1.  *See* Plaintiffs' Letter, p. 4.  Plaintiffs erroneously state, however, that the Panel concluded that the Department "maintained compliance with Section 8.1 despite the fact that it did not review any supporting documents whatsoever."  *Id.,* p. 8.  The Panel reviewed the investigative summaries that were posted by the Department of the anti-retaliation grievances that Unit Commanders deemed unfounded in the random months of March and April 2019.[35]

---

[34]  Discipline was imposed for the one founded grievance in the First Quarter of 2018 and for the two founded grievances in the Second Quarter of 2018.  There were no founded violations of the anti-retaliation policy in the Third or Fourth Quarters of 2018.

[35]  The investigative summaries included reports of interviews of inmates and staff.

6.      **Use of Restraints**

Section 17.1 requires that the Custody Force Manual include "a separate section that sets forth the general principles governing the use of restraints" identified in this recommendation. The Department included such a separate section in the Manual, and is in **Compliance** with this requirement of Section 17.1, effective December 1, 2015.

Sections 17.1, 17.3, 17.4, and 17.6 through 17.9 (the "Restraint Provisions") of the Action Plan require the Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than 20 minutes, subjected to security restraints for an extended length of time. . .or subjected to a multi-point restraint in the Downtown Jail Complex[.]"  Under the Revised Compliance Measures, the Panel is supposed to select and review 25 incidents involving Security Restraints from the Department's list to assess the Department's compliance with the security restraint provisions.

During the Sixth Reporting Period, the Department generated a list of incidents involving the use of a Safety Chair and Fixed Restraints in the Downtown Jail Complex in the First Quarter of 2019, and provided the Inmate Safety Chair Security Check Logs for use of the safety chair at TTCF and IRC in the First and Second Quarters of 2019.  The Department also provided Safety Check Logs for at least some of the safety chair uses at MCJ in the Second Quarter of 2019. There were no logs for the use of fixed restraints in areas not under direct observation of Department members.

The Panel does not believe that it needs to review force packages to assess the Department's compliance with the Restraint Provisions of the Action Plan, but it does need a complete list of all uses of the safety chair and all uses of fixed restraints in areas not under constant, direct observation, and security check logs showing that the inmates were checked at least every 15 minutes and that medical professionals performed necessary vitals checks.

In most instances, the safety chair is used at TTCF and IRC to transport mentally ill inmates to court without any uses of force. The Inmate Safety Chair Security Check Logs for the inmates at TTCF reflect that Department personnel are, in the vast majority of cases, checking on the inmates every twenty minutes as required by Section 17.4, although in some cases the Deputies did not provide any details regarding the inmate's condition, the authorization for keeping the inmate in the chair for more than two hours was missing, or the release time was not indicated.  These issues were less prevalent in the Inmate Safety Chair Security Check Logs for IRC.[36]  Further, there is no indication that medical professionals are performing any vitals checks even though inmates are often in the safety chairs for several hours while they are transported to court, attend the court proceedings, and are then transported back to TTCF.  Periodic vitals checks are necessary in order to establish compliance with Section 17.3 even if the inmate does not struggle and force is not used to place the inmate in the chair.[37]

---

[36] In some cases at both TTCF and IRC, the observations occurred at the exact same time intervals (e.g., 15 minutes), which the Panel believes is problematic.

[37] It is the Panel's understanding that the County and the Department do not use "multi-point restraints," which are subject to Section 17.6 through 17.9 of the Action Plan.

Section 17.10 provides that medication cannot be used solely for security purposes. The Department's Self-Assessment, confirmed by a log of the Administration of Involuntary Medications, reports that there were no instances in which medication was used solely for security purposes in the First and Second Quarters of 2019. Accordingly, the Department has been in **Compliance** with Section 17.10 as of July 1, 2018, through June 30, 2019.

**7.      Early Warning System**

Section 19.1 requires the Department to develop an Early Warning System to identify potentially problematic employees based upon objective criteria. The Panel approved the ERS in July 2018, and it was implemented by the Department as a pilot program in the Downtown Jail Complex on August 1, 2018, and in the rest of the jail facilities as of November 1, 2018. The Department has been in **Compliance** with Section 19.1 in the Downtown Jail Complex since August 1, 2018.

Section 19.2 requires Compliance Lieutenants to review monthly reports generated by the ERS and notify Unit Commanders and the Assistant Sheriff for Custody of the results, and Section 19.3 requires Unit Commanders to determine whether problematic employees should be placed on performance mentoring program. Under the Revised Compliance Measures, Compliance Lieutenants must notify the Unit Commander and Assistant Sheriff for Custody Operations 90% of the time within 10 days after reviewing monthly reports generated by the Early Warning System and 95% of the time within 30 days. For each potentially problematic Department member identified through the Early Warning System, the Unit Commander must consult with the appropriate Chief and document the reasons why any problematic members are not placed on a performance mentoring program.

The Department's Sixth Self-Assessment reports that the Department achieved Compliance with Sections 19.2 and 19.3 in the First and Second Quarters of 2019 at all facilities in the Downtown Jail Complex. The supporting documents posted by the Department show that the ERS generates a Monthly Report that is reviewed by the Unit Commander, who makes the required notifications to a Chief and Assistant Sheriff. Based upon the Unit Commanders' reviews of the incidents identified through the ERS, there were reassignments of duties, additional formal training, assignment of a mentoring sergeant, and requests for administrative investigations. It is apparent that Department commanders are reviewing the reports generated by the ERS and the incidents involving the potentially problematic Department members identified by the ERS. Although there is some variation in how often the Unit Commanders decide that additional action is warranted, they are all reviewing the incidents involving their potentially problematic members and it appears that the ERS is working as intended.[38] According, the Panel finds the Department was in **Compliance** with Section 19.2 and 19.3 in the First and Second Quarters of 2019.

---

[38] One Unit Commander favored additional training while another favored mentoring. The Command staff in the Sheriff's Department should ensure that the Unit Commanders are taken a consistent approach in deciding what additional action is warranted.

**APPENDIX**

| NO. | PROVISION | STATUS | DATE[39] |
|---|---|---|---|
| | | | |
| | **Leadership, Administration & Management** | | |
| | | | |
| 1.1 | Assistant Sheriff | Compliance | January 1, 2017 |
| 1.2 | Sheriff | Compliance | January 1, 2017 |
| 1.3 | Supervision | Compliance | September 30, 2018 (MCJ and TTCF) |
| 1.4 | Reports to Board | Compliance | June 12, 2018 |
| 10.1 | Jail Visits | Compliance | June 30, 2018 |
| 10.2 | Documented Visits | Compliance | June 30, 2018 |
| 18.1 | Rotation in Custody | Compliance | June 30, 2018 |
| 18.2 | Documentation of Rotation | Compliance | December 31, 2018 |
| 21.1 | Transfers to Custody | Compliance | June 30, 2018 |
| | | | |
| | **Use of Force Polices & Practices** | | |
| | | | |
| 2.1 | Custody Force Manual | Compliance | January 1, 2017 |
| 2.2 | Force Prevention Principles | | |
| 2.3 | Inmate on Inmate Violence | | |
| 2.4 | Use of Force as Discipline | | |
| 2.5 | Force on Restrained Inmates | | |
| 2.6 | Head Strikes or Kicks | | |
| 2.7 | Supervisors Called to Scene | | |
| 2.8 | Prevent Excessive Force | | |
| 2.9 | Armed Inmates | | |
| 2.10 | Authorized Weapons | | |
| 2.11 | Planned Chemical Spray | | |
| 2.12 | Chemical Spray & Tasers | | |
| 2.13 | Check of Medical Records | | |
| 4.1 | Consult MH professionals | | |
| 4.3 | Spray on MH inmates | | |
| 4.4 | Cooling Off Periods | | |
| 4.5 | Medical or MH Provider | | |
| 8.2 | Complaints of Retaliation | Compliance | January 1, 2017 |
| 9.2 | Escorting of Inmates | | |

[39] This represents the date the Department came into the compliance that it has maintained through the date of this report.

| 17.2 | Pregnant Inmates | Compliance | January 1, 2017 |
|---|---|---|---|
| 17.5 | Minimize Medical Distress | | |
| 20.1 | Categories of Force | Compliance | January 1, 2017 |
| 20.2 | Reactive Force | Compliance | January 1, 2017 |
| 20.3 | Planned Use of Force | | |
| | | | |
| | **Training**[40] | | |
| | | | |
| 3.1 | Use of Force Training | Compliance | June 30, 2018 |
| 3.2 | Ethics, Professionalism | Compliance | June 30, 2018 |
| 3.3 | Custody Training | Compliance | June 30, 2018 |
| 3.4 | Custody-based scenarios | Compliance | June 30, 2018 |
| 3.5 | Add training/mentoring | | |
| 3.6 | Probation Reviews | | |
| 4.6 | Crisis Intervention | Compliance | June 30, 2018 |
| 4.7 | Mentally Ill Inmates | Compliance | June 30, 2018 |
| 4.8 | Mentally Ill Inmates (for new Department members) | Compliance | June 30, 2018 |
| 4.9 | Crisis Intervention  (for new Department members) | Compliance | June 30, 2018 |
| 12.1 | Force Investigations | | |
| | | | |
| | **Investigation & Reporting of Force** | | |
| | | | |
| 4.2 | Mental Health Professionals | | |
| 5.1 | Tracking of Force Incidents | | |
| 5.2 | Commanders' Reviews | | |
| 5.3 | Unexplained Discrepancies | | |
| 8.3 | CFRC Review | | |
| 11.1 | CFRT Involvement | Compliance | June 30, 2018 |
| 12.2 | Location of Inmate Interviews | | |
| 12.3 | Suspect Interviews | | |
| 12.4 | Uninvolved Supervisors | | |
| 12.5 | Standard Order & Format | | |
| 13.1 | Documenting dishonesty | | |
| 13.2 | Reports of Dishonesty/PREA | | |
| 14.1 | Review of Criminal Referrals | Compliance | July 1, 2018 |
| 14.2 | Timeliness of Criminal Referrals | Compliance | July 1, 2018 |
| 15.1 | Timeliness of Reports | | |
| 15.2 | All Department Witnesses | | |
| 15.3 | Force by Other Members | | |

[40] The Department's reported results for Sections 3.1 through 3.4, 4.6 through 4.9, and 12.1 have been verified by the Panel's auditors.

| | | | |
|------|------------------------------|----------------|------------------------------|
| 15.4 | Description of Injuries | | |
| 15.5 | Clarification after Video | | |
| 15.6 | Separation of Deputies | | |
| 15.7 | Individual Perceptions | | |
| 16.1 | Healthcare Assessment | | |
| 16.2 | Photographs of Injuries | | |
| 16.3 | Medical Report of Injuries | | |
| | | | |
| | **Inmate Grievances** | | |
| | | | |
| 6.1 | Separate Grievance Forms | Compliance | January 1, 2017 |
| 6.2 | Available Grievance Forms | Compliance | January 1, 2017 |
| 6.3 | Emergency Grievances Forms | Compliance | January 1, 2017 |
| 6.4 | Use of Force Grievances | Compliance | July 1, 2018 |
| 6.5 | Grievances Against Staff | Compliance | July 1, 2018 |
| 6.6 | Right to Appeal Form | Compliance | January 1, 2017 |
| 6.7 | Handling Emergency Grievances | Compliance | July 1, 2018 |
| 6.8 | Notification of Non-Emergency | Compliance | July 1, 2018 |
| 6.9 | Grievance Coordinator Review | Compliance | July 1, 2018 |
| 6.10 | Collection of Grievances | Compliance | January 1, 2019 |
| 6.11 | Failure to Handle Grievances | | |
| 6.12 | Tracking Inmate Grievances | Compliance | July 1, 2018 |
| 6.13 | Grievance Coordinator Tracking | Compliance | July 1, 2018 |
| 6.14 | Grievance Coordinator Reports | Compliance | July 1, 2018 |
| 6.15 | Grievance Coordinator Analysis | Compliance | July 1, 2018 |
| 6.16 | Centralized Grievance Unit | Compliance | January 1, 2017 |
| 6.17 | Use of Force Deadline | | |
| 6.18 | PREA Deadline | Compliance | July 1, 2018 |
| 6.19 | Response to Inmate Grievances | | |
| 6.20 | Appeals of Grievances | Compliance | July 1, 2018 |
| 7.2 | Notification of Results | | |
| 7.3 | Prisoner-staff Communications | Compliance | April 1, 2019 |
| 8.1 | Anti-retaliation | Compliance | April 1, 2019 |
| | | | |
| | **Use of Restraints** | | |
| | | | |
| 17.1 | Restraint Provisions | Compliance | December 1, 2015 |
| 17.3 | Safety Chair Procedures | | |
| 17.4 | Safety Checks | Compliance | January 1, 2019 (TTCF only) |
| 17.6 | Multi-point Restraint Procedures | Not Applicable | |
| 17.7 | Approval of Multi-point Restraints | Not Applicable | |
| 17.8 | Continued Use of Restraints | Not Applicable | |

| 17.9 | Supervisor Approval of Restraints | Not Applicable | |
|---|---|---|---|
| 17.10 | Involuntary Medications | Compliance | July 1, 2018 |
| | | | |
| | **Early Warning System** | | |
| | | | |
| 19.1 | Development of EWS | Compliance | August 1, 2018 |
| 19.2 | Report Review and Notification | Compliance | January 1, 2019 |
| 19.3 | Performance Mentoring Programs | Compliance | January 1, 2019 |