**SCHEPER KIM & HARRIS LLP**
RICHARD E. DROOYAN (Bar No. 65672)
800 West Sixth Street, 18th Floor
Los Angeles, CA 90017-2701
Telephone: (213) 613-4655
Facsimile: (213) 613-4656

**Monitor and on behalf of Monitors**
**Jeffrey Schwartz and Robert Houston**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS, et al. | CV No. 12-00428 DDP |
| Plaintiffs, | **PANEL'S SEVENTH REPORT** |
| v. | |
| LOS ANGELES COUNTY SHERIFF LEROY BACA, in his Official Capacity, | |
| Defendant. | |

1    Pursuant to the Section V of the Settlement Agreement And Release of

2  Claims, the Monitor appointed by this Court, Jeffrey Schwartz, Robert Houston, and

3  Richard Drooyan (collectively the "Panel") hereby submits the attached Panel's

4  Seventh Report "evaluating Defendant's Compliance with Action Plan" prepared by

5  the Panel and approved by the Court for the six-month period from July 1, 2019, to

6  December 31, 2019.  This Report takes into consideration the comments from the

7  parties in accordance with Section V of the Agreement.  The Panel is available to

8  answer any questions the Court may have regarding my Report at such times as are

9  convenient for the Court and the parties.

10

11  DATED:  June 1, 2020              Respectfully submitted,

12                                   SCHEPER KIM & HARRIS LLP
13                                   RICHARD E. DROOYAN

14

15                                   By:  /s/ *Richard E. Drooyan*
16                                        Richard E. Drooyan
17                                        Monitor and on behalf of Monitors Jeffrey
                                          Schwartz and Robert Houston

18

19

20

21

22

23

24

25

26

27

28

# PANEL'S SEVENTH REPORT

The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan [developed by the Panel] ('Reports') at intervals the Panel shall determine." This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from July 1, 2019, through December 31, 2019 (the "Seventh Reporting Period"), and it is created for the purposes of the settlement of the *Rosas* case. In accordance with Paragraph V of the Settlement Agreement, it takes into consideration comments received from the Parties on May 15, 2020, regarding the draft of this report that was sent to them on May 1, 2020.

In May 2014, the Parties retained the Panel "to develop a corrective action plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles" (the "Downtown Jail Complex"). The plan developed by the Panel sets forth provisions in twenty-one areas that the Sheriff is required to implement in the Downtown Jail Complex. The plan was approved by the Court on April 7, 2016. Under Paragraph VIII of the Settlement Agreement, "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented, it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')."

The Sheriff's Department (the "Department") implemented 104 of the Panel's 106 recommendations as of November 1, 2018. The remaining two recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in *United States v. County of Los Angeles, et al.*, CV No. 15-05903 (JEMx) (the "DOJ case").[1]

The Panel visited the Downtown Jail Complex during the Seventh Reporting Period on August 13-14, 2019, and again on December 16-17, 2019. As in the past, the Panel spoke informally with inmates and Department personnel while touring the jails. The Panel debriefed the Custody leadership on the Panel's observations of conditions in the jails, and the issues raised by inmates during the interviews. As noted in the Panel's Sixth Report, the Panel also met with Sheriff Villanueva on October 21, 2019 for an update on Custody Operations after his first ten months in office.

The Panel continues to have some concerns about the reduction in the number of Internal Affairs investigations first noted by the Office of Inspector General. For the nine-month period ending September 30, 2019, there were 226 investigations by the Internal Affairs Bureau for the entire Department in comparison to 414 investigations during the same nine-month period in 2018. This is by far the fewest such investigations for any year going back to 2010 (and is even

---

[1] The other recommendations in the *Rosas* Action Plan have been implemented in the other jail facilities outside of the Downtown Jail Complex pursuant to Paragraph 81 of Settlement Agreement and Stipulated Order of Resolution in the DOJ case.

significantly fewer than in the two years prior to the investigation of the Citizens' Commission on Jail Violence).  (Office of Inspector General, "Report-Back on LASD Internal Administrative Investigations and Dispositions of Disciplinary Actions for March, April and May 2019," July 22, 2019, p. 1.)

With respect to the Custody Division, the Department reports that there were 170 administrative investigations initiated in 2018 and 108 in 2019.  Although there was "a significant outlier in the 2018 cases" because there were 20 administrative investigations initiated in response to a single incident at NCCF in March 2018, there was still a drop-off of more than 20% in the number of administrative investigations from 2018 to 2019.  It should be noted, however, that there were 53 internal affairs investigations initiated in the period from July through December 2018 and 64 investigations initiated in the same period in 2019.  The Panel does not share the Plaintiffs' bald conclusion that the year-to-year reduction in administrative investigations necessarily means that the Department "has run afoul of its obligations to enforce the provisions of the Settlement Agreement among its personnel."  Plaintiffs' Response to Monitors' Draft Seventh Report, dated May 15, 2010 ("Plaintiffs' Resp."), p. 2.

Although not directly responsive to the Panel's concerns regarding the Department's commitment to vigorously investigate allegations of misconduct, the Department reports that it "has taken proactive steps to guide staff in situations that have been identified by the Panel and the Department as problematic," which it "hopes. . .will have a direct correlation to the reduction of forces based on poor tactical decision-making."  Defendant's Response to Monitor's Seventh Draft Report ("Defendant's Resp."), p. 1.  The Panel commends the Department's continued commitment to addressing these issues.

During the Seventh Reporting Period, the Department transferred the Inmate Grievance Coordinator to another position in the Department.  Under his leadership, the Department made significant progress in its implementation of the grievance provisions of the *Rosas* Action Plan and the use of technology to receive and track the Department handling of inmate grievances. The Panel met with the outgoing Inmate Grievance Coordinator and his replacement during site visits in the Seventh Reporting Period to discuss the Department's implementation of its grievance policies and procedures.  Although the Department continued to make progress in its handling of inmate grievances and requests during the Seventh Reporting Period, the Panel is concerned that the loss of the Inmate Grievance Coordinator's leadership, experience, and expertise will impact the Department's ability to achieve Compliance with all of the grievance provisions of the Action Plan in the near future.  This is not intended as a reflection on the new leadership, but a recognition of the challenges they face in replacing an outstanding Inmate Grievance Coordinator.

During the Seventh Reporting Period, the Panel reviewed 50 completed force packages that were selected by the Panel from a comprehensive list of force incidents compiled by the Department and Internal Affairs investigations of three force incidents.  The Panel also reviewed additional force packages involving cell extractions to ensure that all of the force provisions of the Action Plan were reviewed during the Seventh Reporting Period.  The force packages were

selected without input from the Department.[2]  After reviewing the completed force packages, the Panel met with Custody Commanders on December 17, 2019 and February 28, 2020, to discuss the force incidents that were of concern to the Panel.  The reporting of the force, the supervisors' investigations, and the Commanders' reviews were also discussed in these meetings.

Due to the coronavirus-related travel restrictions and stay-at-home orders, the Panel was unable to meet with Class Counsel as scheduled on March 20, 2020 to review issues they had identified in the force packages reviewed by the Panel in the Seventh Reporting Period, and Plaintiffs' counsel did not respond to the Panel's effort to follow-up on their suggestion to review the incidents through a video conference.  Although the Panel has found input from both parties to be helpful in its analysis of the Force Packages, given the uncertainties of the pandemic, the Panel was not able to delay this report pending a meeting with Class Counsel.  The Panel believes that it needs to report to the Court and the parties at least every six months so that its assessments of the Department's compliance are reasonably current, even if this means the Panel does not have the benefit of input from Plaintiffs' Counsel.[3]

Under the Revised Compliance Measures, the Department provides the Panel with self-assessments of its compliance with the non-force related provisions in the Action Plan.  The Department submitted its Seventh Self-Assessment Status Report (the "Seventh Self-Assessment") on March 16, 2020, and augmented its self-assessment (the "Augmented Seventh Self-Assessment") on April 1, 2019.  During the Seventh Reporting Period, the Panel randomly selected and reviewed records posted by the Department to verify the Department's self-assessments of its compliance with non-force provisions of the Action Plan.  All of the Department's training results are subject to verification by auditors retained by the Panel.

Plaintiffs express concern with the Panel's "reliance on [the Department's] self-assessments to assess compliance" and "seemingly exclusive reliance on the results of [the Department's] self-reporting – without any independent verification of the accuracy of such reporting."  Plaintiffs' Resp., pp 3, 4.  The Panel does not, however, simply take the Department's self-assessments at face value.  Either the Panel's members review the Department's source documents themselves or the Panel's auditors verify the Department's results (mostly with respect to the training provisions of the Action Plan).  The Panel's auditors review training records provided by the Department and, when necessary, request additional information and documentation to verify the Department's results.  The Panel is satisfied that the auditors are rigorously reviewing the Department's source documentation.

The only example cited by Plaintiffs of the Panel's purported "exclusive reliance" on the Department's reported results concerns the handling of use of force grievances as required by

_____

[2] Most of the force incidents reviewed by the Panel in the Seventh Reporting Period occurred during the First and Second Quarters of 2019.

[3] Plaintiffs again complain that they are not able determine the Department's compliance with various provisions because of redactions applied by the Department to "documents provided to Class Counsel" and the video records they received "make it difficult—if not impossible—to assess the use of force employed."  Plaintiffs' Resp., pp. 5,6.  These are issues for Plaintiffs to resolve with the Department and, if necessary, with the Court.

Section 6.4.  *Id.*, p. 4.  Plaintiffs quote the first sentence in the paragraph in the draft report regarding the Department's reported results for Section 6.4, but omit and ignore the third paragraph of the draft, which expressly states that "[t]he source documents posted by the Department for Sections 6.4 and 6.5 have been reviewed by the Panel."  See Panel's Draft Report, dated May 1, 2017, p. 17, and p. 20, *infra.*

During the Seventh Reporting Period, there was considerable turnover in the leadership of the Department's Custody Operations.  There were Acting Commanders over several facilities, Acting Chiefs, and a new Assistant Sheriff, who took over the leadership of Custody in December 2019.  The Sheriff appointed new Commanders and Chiefs in Custody as of the beginning of 2020.  The Panel believes that the turnover in Custody's leadership impacted the Department's efforts to achieve compliance with various provisions of the Action Plan in 2019. The new Custody leadership has plans to enhance training and revise policies to address some of the concerns that have been expressed by the Panel, and it will be important that the Department have enough time to implement and assess the efficacy of the new training and policies.

Notwithstanding the turnover in the Custody leadership, the Department continued to cooperate fully with the Panel during the Seventh Reporting Period.  The Department and County Counsel facilitated our visits and inmate interviews, answered our questions, and responded to our requests for documents and information.  They also engaged in constructive conversations with the Panel about our findings regarding the use of force incidents we had reviewed and the Department's continuing efforts to implement the terms of the *Rosas* Action Plan.  We appreciate their responsiveness, transparency, professionalism, feedback and comments on the Panel's draft report, and courtesy in handling our monitoring requests.

## ACTION PLAN IMPLEMENTATION

The Panel spoke to a number of inmates during our site visits in the Seventh Reporting Period.  Although we heard some complaints about the responsiveness to grievances and the adequacy of medical care, as in the past, the inmates consistently told us that excessive force was not an issue in the County Jails.

In the Panel's Sixth Report, we noted that the reduction in the number of force incidents in the second half of 2018 in the Downtown Jail Complex continued in the first half of 2019, with an average of 115 force incidents per month in these facilities, but the mix of incidents was different.[4]  This trend continued in the second half of 2019, with an average of 107 force incidents per month.  For the year, the number of force incidents was 111 per month in 2019 in comparison to 130 per month in 2018, a decrease of 14.6%.  Category 2 force incidents, however, increased 8.7% from a total of 23 per month in 2018 to 25 per month in 2019.[5]  At the same time, the number of minor "non-categorical incidents" ("NCI's")[6] decreased 54% from a total of 37 per month in 2018 to 17 per month in 2019.  Excluding NCIs, "categorical" force incidents[7] were roughly the same:  93 "categorical" force incidents per month in 2018 and 94 such force incidents per month in 2019.

Plaintiffs report that they "remain incredulous regarding the 54% decrease of non-categorical incidents" and "worry that NCIs are being systematically underreported."  Plaintiffs' Resp., p. 3.  The Panel does not share Plaintiffs' concern because the vast majority of force incidents are captured on CCTV cameras and the adverse consequences to Department members for failing to report force far outweigh any perceived benefit to not reporting a minor use of force.  The Panel believes that it is equally likely that the Department has de-escalated a greater number of incidents.  The Panel's concern is that in the same period, the number of Category 2 force incidents increased, which may indicate a trend towards Department members using higher levels of force.

The number of Category 3 incidents initially reported by the Department increased from one at MCJ in 2018 to five in 2019.[8]  There were no Category 3 cases at either IRC or TTCF in 2018 and 2019.  Category 3 cases initially reported represented 1.07% of the force incidents at MCJ and 0.3% of the force incidents in the Downtown Jail Complex in 2019.  Although the percentage increase in Category 3 incidents at MCJ was substantial, given the small numbers it is not statistically significant.  As of the date of this Report, the Panel has reviewed three of the

---

[4] See Panel's Sixth Report, p. 4.  These figures are based upon statistics provided by the Department.

[5] Category 2 force encompasses most incidents with an "identifiable injury," including relatively minor injuries such as a cut or a bruise.  Force that is likely to, or does, result in severe injuries is classified as a Category 3 incident.

[6] "Non-categorical incidents" ("NCI") are minor uses of force that are used to control inmates, are captured on video, and do not result in injuries or complaints of force.

[7] "Categorical" force incidents are those incidents classified as Category 1, 2, or 3.

[8] The Department subsequently "downgraded" two of the incidents from Category 3 to Category 2 because the inmates' "injuries related to pre-existing conditions."

Category 3 cases and found that the force in all three cases was in compliance with the Action Plan and the Department's policies.

In addition to the use of force statistics, the Department provided the Panel with reports of "prevented use of force" incidents for the Downtown Jail Facilities that identify the Department members who were able to avoid or prevent the use of force in situations where force has often been used. According to the Department's reports, in 2018 there were 1,565 reported uses of force and 4,800 reported "prevented use of force" incidents in the Downtown Jail Complex. In 2019, there were 1,334 reported uses of force and 6,134 prevented use of force incidents in the Downtown Jail Complex. In other words, according to the Department's data, as the reported uses of force in the Downtown Jail Facilities have declined by approximately 15%, the reported "prevented use of force" incidents have increased by approximately 28%.

These reports reflect that the Department is able to avoid the use of force in the overwhelming majority of court-ordered cell extractions and transfers of inmates to the Pitchess Detention Center in the northern part of the County, circumstances in which the potential need to use force is always present. They also reflect specific instances in which the Department members used DeVRT or verbal efforts to induce recalcitrant inmates to exit their cells (for medical or mental health services or in response to court orders), return to their cells (after receiving such services, court appearances, or outdoor recreation), or comply with directives (e.g., change into jail clothes). Members also used these techniques to stop inmates from engaging in self-inflicted violence, break-up fights, or quell disturbances.

As noted in the Panel's Fifth Report, the Panel reviewed a Category 3 force incident in a caged area between Deputy stations, but it could not resolve contradictory accounts given by inmates and Department personnel because the force was not captured on camera. After reviewing this incident, a member of the Panel worked with the Department to identify other similar caged areas that lacked cameras and other areas where cameras should be placed. Although the Department installed cameras in some of the identified areas, it did not install them in the caged areas at MCJ that are similar to where the Category 3 force incident took place. The Department reports there was a "misunderstanding on the coverage requested" and "MCJ indicates that they would complete the caged area installation based on the feedback from the Panel." Defendant's Resp., p. 3. The Panel urges the County to install cameras in these caged areas at MCJ as soon as possible.

The Panel reiterates that it cannot stress enough the importance of having cameras in all of the common areas of the County's jails. The vast majority of the force incidents have been captured on CCTV videos that are sufficiently clear to show the nature and extent of the force used by Department members and to enable the Panel to assess the reasonableness of the force. Further, the cameras deter assaults by inmates and excessive force by Department personnel.

As Plaintiffs' note, the incidents captured on CCTV cameras do not have audio, which would certainly help to evaluate the Department's "compliance with key provisions of the Settlement Agreement." Plaintiffs' Response, p. 1. There is, however, nothing in the Settlement Agreements in either the *Rosas* or *DOJ* case that require the CCTV cameras to have audio and the Panel does not agree with Plaintiffs' suggestion that it is "impossible" to evaluate these

provisions without audio recordings.  The force packages produced by the Department include written force reports by Department members, recorded interviews of inmate suspects and witnesses, and Commanders' reviews.  In the Monitors' experiences with numerous other agencies, it is not an industry standard to install audio on fixed cameras.

**1.      Leadership, Administration and Management**

      **A.      Leadership and Accountability**

      The recommendations in Sections 1.1 through 1.4 of the Action Plan require that Custody be headed by an Assistant Sheriff with no other areas of responsibility, the Sheriff be engaged personally in the management of the jails, the Department's managers be held accountable for any failures to address force problems in the jails, and the Department regularly report to the Board of Supervisors on the use of force in the jails and on its compliance with the Action Plan.

      The Department has been in **Compliance** with Sections 1.1 of the Action Plan since well before January 1, 2017.[9]  Custody has been headed by an Assistant Sheriff with no other areas of responsibility since mid-2014.  It was under the direction of Assistant Sheriff Robert Olmsted during most of the Seventh Reporting Period.  Following his retirement, he was replaced on December 15, 2019 by Bruce Chase.  Although Assistant Sheriff Chase does not have the "experience in managing a large corrections facility or running a corrections department" outside the Department as recommended by the Citizens' Commission on Jail Violence, he was formerly the Captain of the Custody Compliance and Sustainability Bureau (CCSB) and a Chief in Custody Operations, has extensive knowledge of the requirements of the *Rosas* Action Plan, and has expressed to the Panel his commitment to the reforms mandated by the Plan.

      On October 21, 2019, the Panel met with Sheriff Villanueva and reviewed his oversight of the jail facilities and the Panel's findings and observations.  As noted in the Panel's Sixth Report, the Sheriff stated that he regularly meets with Custody personnel during tours of the jails, and he acknowledged the importance of conveying that force must only be used as a last resort.  Sheriff Villanueva also committed to the Panel that he would increase the frequency with which he meets staff at shift change briefings and that he would use those meetings to underscore the importance of the *Rosas* provisions.

      The Department has provided the Panel with a log of the frequent meetings that Sheriff Villanueva had with Assistant Sheriff Olmsted from July 1, 2019, through October 23, 2019, to review use of force data and trends, suicide attempts and rescue force, deployment of chemical agents and personal weapons, facility security concerns, assaults on staff, use of force against

---

      [9] Use of the term **Compliance** in bold is a finding of compliance as of beginning of the quarter in which the Department achieves Compliance.  The Panel's findings are set forth on the Appendix attached hereto.  Based upon the Panel's findings, the parties will determine whether the Settlement Agreement is subject to termination pursuant to Section VIII of the agreement. As noted in the Panel's prior reports, the Panel encourages the "Parties to adopt a meaningful and achievable framework to determine the Department's compliance with the Settlement Agreement" in the future.

mentally ill inmates, and de-escalation techniques.  Although it does not appear that the Sheriff
met with Assistant Sheriff Olmsted after October 23, 2019, and the Department did not provide a
log of any meetings with Assistant Sheriff Chase through the end of the Seventh Reporting
period in December 2019, based upon the Panel's meeting with the Sheriff, the logs provided by
the Department, and the Sheriff's visits to the Downtown Jail facilities in the Fourth Quarter of
2019, the Panel is satisfied that the Sheriff is personally engaged in the management of the
Department's Custody operations and the Department is in **Compliance** with Section 1.2 of the
Action Plan.  The Panel disagrees with Plaintiffs' assertion that the absence of documented
meetings over the last two months of 2019 means that the Sheriff was not personally engaged in
the management of the jails during the Seventh Reporting Period.  See Plaintiffs' Resp., p. 9.

In the Third Quarter of 2019, there was one founded disposition for violations of the
Department's use of force policies arising out of a 2017 incident in MCJ, which resulted in a
five-day suspension.  There were no founded dispositions at TTCF or IRC in the Third Quarter
of 2019.  Excluding non-categorical force incidents, there was a 3.4% increase in force incidents
at IRC, a 14.8% increase at MCJ, and a 5.3% increase at TTCF in the Third Quarter of 2019
from the Second Quarter of 2019.  Overall, there was an 8.1% quarterly increase in force
incidents in the Downtown Jail Complex, which is below the 25% threshold that triggers a
Department assessment under Compliance Measure 1.3.  Accordingly, the Department was in
**Compliance** with Section 1.3 of the Action Plan at all of the Downtown Jail facilities in the
Third Quarter of 2019.

In the Fourth Quarter of 2019, there were two founded dispositions for violation of the
Department's use of force policies by failing to call a supervisor in one instance at MCJ and
failing to maintain adequate distance resulting in the use of a chemical spray on a recalcitrant
inmate at IRC.  The Department imposed written reprimands in both cases.  Excluding non-
categorical force incidents, there was a 13.2% decrease in force incidents at IRC, a 22.4%
decrease at MCJ, and a 21.7% decrease at TTCF in the Fourth Quarter of 2019 from the Third
Quarter of 2019.  There was an increase in the number of Category 3 incidents from none in the
Third Quarter of 2019 to two in the Fourth Quarter; both incidents are under investigation by
IAB, but do not appear to raise concerns about a pattern of excessive force.  Accordingly, the
Department remained in **Compliance** with Section 1.3 of the Action Plan at all of the Downtown
Jail facilities in the Fourth Quarter of 2019.

The Department was in **Compliance** with Section 1.4 in the Seventh Reporting Period.
On September 10, 2019, a Commander in Custody Operations and the Unit Commander
responsible for CCSB made a presentation to the Board of Supervisors on the Department's
Compliance with the *Rosas* Action Plan through the First Quarter of 2019.  One of the Panel's
members attended the Department's presentation to the Board and responded to questions from
the Supervisors.  On March 4, 2020, Assistant Sheriff Chase, along with the Commander and
Captain in charge of CCSB, made a report to the Board of Supervisors on the Department's
compliance through the Second Quarter of 2019.  We note, however, that the report was
somewhat cursory, and the Supervisors appeared to want more detailed and meaningful
information.  The Department reports that it "will ensure the Supervisors' questions are taken
into consideration in how the presentation [of the next report] is drafted."  Defendant's Resp., p.
3.

### B.      Management Visits

Sections 10.1 and 10.2 require the Department's leadership to tour each of the jail facilities and document those visits.  The Department's Seventh Self-Assessment reports that it maintained Compliance with Sections 10.1 and 10.2 as of July 1, 2019, through December 31, 2019, with 100% of the required visits by the Sheriff and Assistant Sheriff, as well as by the Captains, Commanders, and Chiefs.[10]  The Department documented these visits, along with visits by Watch Commanders, as required by Section 10.2.  It appears, however, that the Sheriff only spent four minutes in TTCF (in module 172) and five minutes in IRC.  While the Panel recognizes that the Sheriff has a myriad of responsibilities, the Compliance Measures only require him to visit each of the Downtown Jail facilities once a quarter.  In the Fourth Quarter of 2019, it appears that he visited each of these facilities for 45 minutes each and then visited MCJ on Christmas Day.  The Panel has reviewed the source documents provided by the Department and verified the other results reported by the Department and concluded that the Department has maintained **Compliance** with Section 10.1 as of October 1, 2019, through December 31, 2019,[11] and with Section 10.2 as of July 1, 2019, through December 1, 2019.

### C.      Rotations and Transfers

Sections 18.1 and 18.2 require the Department to (1) maintain Custody-wide rotation policies and rotate personnel as required by the policies, and (2) audit each unit's compliance with its rotation policies.  The Department's Seventh Augmented Self-Assessment reports that it achieved 98% Compliance in the Seventh Reporting Period.  Each of the Downtown Jail facilities has a reasonably current Unit Order setting forth its rotation policy and the source documents indicate that most Department personnel are rotated in Compliance with those policies.  The Department is in **Compliance** with Section 18.1 as of July 1, 2018, through December 31, 2019 and with Section 18.2 as of January 1, 2019, through December 31, 2019.

The Department's Seventh Self-Assessment reports that it maintained 100% **Compliance** with Section 21.1 as of July 1, 2018, through December 31, 2019.  The Panel has reviewed the Department's source documents stating the reasons for Deputy transfers to Custody during the Seventh Reporting Period, which reflect that no member was transferred or assigned to Custody as a sanction for problematic conduct.

---

[10] Where there is more than one Unit Commander or Commander for a facility, the Department's posted audit results combine the tours by all of assigned commanders for that facility.

[11] The Panel agrees with Plaintiffs that the Sheriff's visits in the Third Quarter of 2019 were insufficient to satisfy Section 10.1.  This is why the Department's Compliance with this provision is as of the beginning of the Fourth Quarter of 2019, while its Compliance with Section 10.2 has continued from an earlier period.

2.      **Use of Force Policies and Practices**

Section 2.1 of the Action Plan requires the Department to "have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations[.]"  On October 16, 2015, the Department provided the Panel with a Custody Operations Force Manual with separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints, Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved Shootings.  The Department's Custody Force Manual satisfies Section 2.1 and includes specific provisions that satisfy Sections 8.2 (Complaints of Retaliation), 17.2 (Pregnant Inmates), 20.1 (Types of Force), and 20.2 (Definition of Reactive Force) of the Action Plan.  The Department has been in **Compliance** with these Sections since the Panel began monitoring the Department's compliance as of January 1, 2017.

The other recommendations in the Action Plan that pertain to the Department's use of force in Custody Operations are summarized as follows:

- Sections 2.2 through 2.13 require the Department to adopt a comprehensive set of new use of force policies for Custody Operations.

- Sections 4.1 through 4.5 require the Department to adopt specific use of force policies for dealing with mentally ill prisoners.

- Sections 9.2 through 9.3 require the Department to adopt specific policies for escorting inmates after force incidents and intervening to protect inmates as soon as it is reasonably safe to do so.

- Section 17.5 requires the Department to adopt policies for minimizing the risk of an inmate's medical distress during and after a force incident.

- Section 20.3 requires the Department to adopt use of force policies for Planned Force (such as cell extractions).

The Panel reviewed multiple drafts of the Department's policies to implement these recommendations, required changes where appropriate, and certified that the Department had implemented these recommendations, effective December 1, 2015.

In prior reporting periods, the Department made some changes and/or additions to the policies that were approved by the Panel in 2015.  Some of the changes were reviewed by the Monitor and the Department of Justice in the DOJ case, and reflect their comments in that case, but they were not reviewed by the entire *Rosas* Panel.  The Panel has compared the current version of the Custody Division Manual, dated August 16, 2019, with the version dated October 15, 2015, that was approved by the Panel.  Although most of the changes were acceptable, the Panel has advised the Department that some modifications are necessary and recommended other modifications.  By letter dated January 14, 2020, the Department notified the Panel that it had made a change requested by the Panel and another that was recommended.  The Department also advised the Panel that it was considering the Panel's other recommendations.  The Panel expects

that any future policy changes that impact the *Rosas* provisions will be submitted to the Panel for its review before the changes are implemented.

### A.     Third Quarter 2019 Results

Per the applicable Compliance Measures, the Panel selected 25 force incidents to review in the Third Quarter of 2019 without any input from the Department.  In addition, the Panel reviewed three cases investigated by the Internal Affairs Bureau during the Seventh Reporting Period.  As in the past, the universe of 25 force incidents selected by the Panel included a disproportionate number of the more serious Category 2 incidents, particularly those involving the use of personal weapons (punches) by Department personnel.

The Panel recommends that head strikes be removed from the "Personal Weapon" Category in the Department's Use of Force policies.  Punches to the head should instead become its own category of "Head Strikes," and Deputies should be required to explain specifically why a head strike was necessary or occurred.  Training, force packages, and supervisor reviews should also reflect this change in the Department's policies.[12]

As in the past, Plaintiffs have objected to the Panel's "use of a vertical assessment to determine LASD's compliance with the Action Plan and Settlement Agreement." Notwithstanding that Plaintiffs recognize that this "allows [the Panel] to evaluate the overall quality of force packages that implicate several Plan provisions," they assert that the "vertical assessment is inconsistent with the Monitor's responsibilities under the Plan" and "the Settlement Agreement, into which the Plan is incorporated."  Plaintiffs' Resp., p. 6.

As the Panel has previously explained, Plaintiff's concern is "unfounded" because the Panel has undertaken both a "vertical assessment. . . of the reasonableness of each use of force incident taking into consideration all of the applicable provisions of the Action Plan" and also a "horizontal assessment of the Department's compliance with *each* of the applicable provisions of the Plan[.]"[13]  Nevertheless, based upon Plaintiffs' objections that the vertical assessment "cannot form the basis of any determination under the Settlement Agreement as to the Department's compliance [with the Action Plan]," Plaintiffs' Resp., pp. 6-7, the Panel has decided to eliminate the vertical assessments and rely exclusively on its horizontal assessment to report the Department's compliance with each of the provisions of the Action Plan applicable to the Department's use, reporting, and investigation of force by its members as requested by Plaintiffs.  The Panel does, however, intend to continue to meet with the Department's Commanders to review force packages the Panel deems problematic.

Based upon the horizontal assessments of each provision across all of the force packages, the Panel concluded that in the Third Quarter of 2019 the Department was not in Compliance

---

[12] According to Use of Force statistics provided by the Department for the Seventh Reporting Period, 77% of the force incidents in the Downtown Jail Complex were either Category 1 incidents or Non-Categorical incidents, 22.7 % were Category 2 incidents, and 0.3% were Category 3 incidents.

[13] See Panel's Fifth Report, p. 11 (emphasis in original).

with the following provisions of the Action Plan applicable to the use of force by its members:
force prevention principles (Section 2.2), calling supervisors to the scene before handling
recalcitrant inmates (Section 2.7), and checking medical records (Section 2.13). Because the
Panel is no longer using the vertical assessments as a threshold for determining the Department's
compliance with the use of force provisions, the Panel found that the Department was in
**Compliance** as of the Third Quarter of 2019 with the remaining provisions of the Action Plan
pertaining to the Department's use of force in Custody Operations not involving cell
extractions.[14]

As in the past, the Panel's main concern was that Department members sometimes
reacted too quickly and should have taken advantage of "time and distance" to de-escalate the
situation and avoid using force altogether or to plan a potentially safer use of force. The failure
to call a supervisor when confronted with a recalcitrant inmate is a variant on the need for
Department members to take more time before using force to control a recalcitrant inmate. The
Department has shared with the Panel its intention to focus on these issue in its ongoing use of
force refresher training required by the Action Plan, and has shown the Panel videos it has
created to emphasize taking advantage of time and distance and calling a supervisor to help de-
escalate an incident whenever possible or to direct deputies when de-escalation efforts have not
served as an effective deterrent.

### B.     Fourth Quarter 2019 Results

In the Fourth Quarter of 2019, the Panel again reviewed 25 force incidents, consisting of
a combination of investigations that were already completed and pending investigations that
were completed during the period. Based upon the Panel's assessments of each of the provisions
in the Action Plan, the Panel concluded that the Department was not in compliance with the
following provisions of the Action Plan in the Fourth Quarter of 2019: Force Prevention
Principles (Section 2.2), Head Strikes (Section 2.6), Calling Supervisors (Section 2.7) and
Escorting Inmates by Involved Deputies (Section 9.2).[15] Based upon the Panel's review across
the 25 force packages, the Panel found that the Department was in **Compliance** with the
remaining use of force provisions not specifically applicable to cell extractions.

The Panel also reviewed four cell extractions in the Fourth Quarter of 2019 to assess the
Department's compliance with specific provisions that are applicable to the use of force in those
circumstances (e.g., checking medical records before using force (Section 2.13), consulting with
Mental Health Professionals (Section 4.1), Use of Chemical Spray on Mentally Ill Inmates
(Section 4.3), Cooling Off periods (Section 4.4), Mental Health Provider's Order (Section 4. 5),
and Planned uses of force protocols (Section 20.3)). The Panel did not find any issues with the

---

[14] The provisions pertaining to the cell extractions were evaluated in the Fourth Quarter
of 2019, and the Department's Compliance with those provisions begins in that quarter.

[15] Section 9.2 prohibits involved Deputies from escorting inmates against whom force
was used from the scene of the incident. Although the Panel reviewed instances in which this
provision was violated during this reporting period, the escorts are always videotaped and the
Panel did not see any instance in which a Deputy involved in the force incident used additional
force while escorting the inmate away from the scene.

minimal force used in the reviewed cell extractions and the Department followed all of the applicable protocols for use of force in those circumstances.  Accordingly, the Panel found that the Department was in **Compliance** with those provisions as of the Fourth Quarter of 2019.

As has been the practice of the Panel, we reviewed the problematic incidents identified during our review with Custody Commanders during the Panel's site visits, and took into consideration their comments in reaching the conclusions set forth in this Report.  During the Panel's meetings with Commanders, the Panel again recommended that the Department use ankle restraints when moving high risk inmates to increase safety for staff and other inmates, which the "Department continues to evaluate" for the movement of high-risk inmates."

3.      **Training**

Sections 3.1 through 3.4 of the Action Plan require that Department members receive training on use of force policies and on ethics, professionalism, and treating inmates with respect; and that new Department members receive six weeks of Custody-specific training in the Academy or the Jail Continuum in Custody Operations.  Sections 4.6 through 4.9 require the Department to provide Custody-specific, scenario-based skill development training for existing and new personnel in Crisis Intervention and Conflict Resolution and in "identifying and working with mentally ill inmates."  Section 12.1 requires that Custody Sergeants receive training in conducting use of force investigations.

The Department's training results are subject to audit by the Panel's auditors.  All of the Department's reported results for the initial training of existing Deputy Sheriffs and Custody Assistants and for new members set forth below have been verified by the Panel's auditors based upon reviews of Department rosters and training records.  The auditors verified that the Department's new members had received the required initial training from when it was first offered through the "as of" date reported by the Department for the completion of the initial training required for existing Deputies and Custody Assistants.  Accordingly, the Panel has deemed the Department to be in Compliance "as of" the date reported by the Department for the completion of the initial training required for existing personnel.  Beginning in the Seventh Reporting Period, the Department's continuing Compliance with the training provisions is determined by its Compliance with the refresher training required every year or every other year. The results are subject to verification by the Panel's auditors.

A.      **Use of Force Training**

As of June 30, 2018, 97% of the existing Deputies and Custody Assistants in the Downtown Jail Complex had received the initial eight-hour use of force training required by Section 3.1.[16]  96% of the trained Deputy Sheriffs and Custody Assistants completed the required refresher course through December 31, 2018.[17]  The refresher results for the Third and Fourth

---

[16] The use of force training that was approved by the Panel includes the custody-based use of force scenarios in **Compliance** with Section 3.4.

[17] The Panel granted the Department extensions for Deputies who received the basic use of force training in 2017 and 2018 for completion of the initial refresher courses.  The Panel

Quarters of 2018 were verified by the Panel's auditors and the Department is in **Compliance** with Section 3.1 as of June 30, 2018, through December 31, 2018. The Department's Augmented Seventh Self-Assessment reports that 94% of the Deputy Sheriffs and Custody Assistants received the required refresher training in 2019. The results are subject to verification by the Panel's auditors.

### B.     Ethics and Professionalism Training

As of June 30, 2018, 95% of the existing personnel received the initial four-hour training course in ethics, professionalism, and treating inmates with respect as required by Section 3.2. 95% of the trained Deputy Sheriffs and Custody Assistants completed the required refresher course through December 31, 2018. The refresher results for the Third and Fourth Quarters of 2018 were verified by the Panel's auditors and the Department is in **Compliance** with Section 3.2 as of June 30, 2018, through December 31, 2018. The Seventh Augmented Self-Assessment reports that 95% of the Deputy Sheriffs and Custody Assistants received the required refresher training in 2019. The results have been verified by the Panel's auditors.

### C.     Mental Health Training

As of June 30, 2018, 97% of the existing Deputies at the Downtown Jail Complex and in the mental health unit at the Century Regional Detention Facility ("CRDF") received the 32 hours of training on Crisis Intervention and Conflict Resolution Training (DeVRT), including the eight hours of identifying and working with mentally ill inmates, required by Sections 4.6 and 4.7. Also as of that date, 98% of the remaining Deputies at CRDF, and all Deputies at the North County Correctional Facility ("NCCF"), and the Pitchess Detention Center ("PDC") jails received the eight-hour training in identifying and working with mentally ill inmates required by Section 4.7.

96% of the Deputies in the Downtown Jail Complex and the mental health unit at CRDF and 97% of the remaining Deputies at CRDF and the Deputies at the other facilities received the required refresher training[18] for the Third and Fourth Quarters of 2018. The refresher results were verified by the Panel's auditors and the Department is in **Compliance** with Section 4.6 and 4.7 as of June 30, 2018, through December 31, 2018. The Seventh Augmented Self-Assessment reports that for Section 4.6, 98% of the Deputy Sheriffs and Custody Assistants received the required refresher training in 2019. The Seventh Self-Assessment reports that for Section 4.7, 96% of the Deputies received the required four hours of refresher training in 2019. These results have been verified by the Panel's auditors.

---

expects Department personnel to complete future refresher courses before the end of December of the years in which they are required.

[18] Eight hours every other year for Section 4.6 and four hours every other year for Section 4.7.

14

### D.        New Deputy Sheriffs and Custody Assistants

The Department has reported since the First Reporting Period that, beginning on July 1, 2015, newly assigned Deputies have been required to complete a six-week Custody Operations course that includes training in use of force and ethics, professionalism and treating inmates with respect, and new Custody Assistants have received training in these subjects during their Academy training as required by Section 3.3.  The Department's posted audit results reflect that the Department has exceeded the 95% Compliance standard for new Deputies and new Custody Assistants for the Third and Fourth Quarters of 2019.[19]  The results were verified by the Panel's auditors and the Department is in **Compliance** with Section 3.3 as of June 30, 2018, through December 31, 2019.

The Department previously reported that 98% of new Deputies had received the approved conflict resolution training in the Academy and the Jail Continuum, and 100% of newly assigned Custody Assistants had received the conflict resolution training (DeVRT) and training in "identifying and working with mentally ill inmates" required by Sections 4.8 and 4.9 as of June 30, 2018, and that 100% of new Deputies received the training in the First Quarter of 2019, and 98/100% of newly assigned Deputies and 100% Custody Assistants received the required training in the Second Quarter of 2019.[20]  These results were verified by the Panel's auditors and the Department is in **Compliance** with Sections 4.8 and 4.9 as of June 30, 2018 through June 30, 2019.  The Department's Seventh Self-Assessment reports that 100% of the new Deputies and new Custody Assistants received the required training in the Third and Fourth Quarters of 2019. These results have been verified by the Panel's auditors.

Section 3.5 requires Unit Commanders to determine "what additional training, counseling or mentoring may be required when a personnel complaint involving the use of force is resolved with a finding that it 'Appears Employee Conduct Could Have Been Better;' direct that the Department member undergo such additional training, counseling, or mentoring; and document the action taken."  The Department's Seventh Self-Assessment reports that there was one disposition with this finding in the Third Quarter of 2019 and, "with the concurrence of the Unit Commander, it was recommended that the officer attend a 'Force Refresher' and a 'Critical Decision Making' class."  There were no such cases in the Fourth Quarter of 2019.  The Department is in **Compliance** with Section 3.5 as of July 1, 2019.

Section 3.6 requires Unit Commanders to review new Department members within six months of being initially assigned to Custody and again before the end of their probationary period.  Based upon a random selection of personnel records, the Department reports that 68% of the new Department members were reviewed as required by Section 3.6 in the first six months of 2019, which is below the 95% threshold for Compliance.  The Department's Augmented Seventh Self-Assessment reports only 45% of the new members were reviewed as required by Section 3.6

---

[19] There were no Deputy Sheriff graduations in September 2019 and no Custody Assistant graduations in July, September, October and November 2019.

[20] There were no newly assigned Custody Assistants in the First Quarter of 2019 or May of 2019.

in the last six months of 2019.[21]  These results are troubling since they suggest that Unit Commanders are not vigorously reviewing new Department members before they receive greater job security after the completion of their probationary periods.  This makes it more difficult for the Department to terminate problematic employees who should have been identified during their probationary periods.[22]

### E.    Sergeant Training

The Department previously reported that as of June 30, 2018, 90.4% of the Sergeants assigned to Custody as of October 1, 2016, had received the 16 hours of training in conducting use of force investigations required by Section 12.1.  These results were verified by the Panel's auditors.  The Department's posted audit results report that 100% of the Sergeants newly promoted in Custody in the Second and Third Quarters of 2019 received the required training.[23]  The results for the Second and Third Quarters of 2019 have been verified by the Panel's auditors.  The resulting cumulative compliance for newly promoted Sergeants through the Third Quarter of 2019 falls under the 95% compliance threshold.

The Department's Seventh Self-Assessment reports that 100% of the Sergeants who were required to receive refresher training received the required refresher training in 2019.  The results for 2019 have been verified by the Panel's auditors.

### 4.    Reporting and Investigation of Force Incidents

Many of the recommendations in the Action Plan that pertain to the reporting and investigation of force used by Department personnel in Custody Operations are assessed by the Panel through a review of the completed force packages.  Other provisions are reported by the Department as follows:

Section 5.1 requires the Department to track use of force investigations, reviews, and evaluations; review evaluations of force incidents; and conduct additional investigation of discrepancies and unexplained tactical decisions.  The Department reports that 89% of the force incidents in the Third Quarter of 2019 were timely entered into the database as required by Section 5.1, and 96% were timely entered in the Fourth Quarter of 2019, which is above the 95% threshold required for **Compliance** as of the Fourth Quarter of 2019.[24]

---

[21] 60% were reviewed with 60 months and 80% within one year.  The Department reports that 50% of the non-compliant six-month assessments were only a day late, which means that 80% were reviewed within one day of the six-month requirement.  It also reports that four of the one-year evaluations were not compliant because "paperwork [was] not readily available due to employee resignations and movement."

[22] The Department reports that a Corrective Action Plan (CAP) will be issued to address these problems and that the Downtown Jail facilities "were briefed on the importance of ensuring all documents are completed in a timely manner, retained, and readily available when requested."

[23] There were no newly promoted Sergeants in the First or Fourth Quarters of 2019.

[24] Plaintiffs response to the draft of this report states that the Panel's "finding of compliance for Section 5.1 appears to suffer from an arithmetic error." Plaintiffs' Resp., p 10.

Section 8.3 requires that investigations of grievances claiming that Department members used force to retaliate against inmates be timely evaluated by the Custody Force Review Committee ("CFRC"). The Department reports that it achieved **Compliance** with this provision in both the Third and Fourth Quarters of 2019. The source documents reflect that all of these retaliation grievances were timely evaluated by CFRC.

Section 11.1 requires that the Custody Force Rollout Team's involvement in reviewing force incidents not delay the Department's investigation of the force incidents. The Compliance Measure requires that "95% of the investigations reviewed by CFRT were not delayed beyond the period permitted by law for imposing discipline." The Department previously reported that it achieved **Compliance** with Section 11.1 in the Second Quarter of 2018. Because there were no use of force incidents reviewed by CFRT in which there was a finding of a policy violation or misconduct in either the Fifth, Sixth, or Seventh Reporting Periods, the predicate for determining compliance with Section 11.1 did not exist in those periods and the Department remains in **Compliance**.

Section 13.1 and 13.2 require the Department to document why "a member who is found to have been dishonest, used excessive force, or violated [the Prisoner Rape Elimination Act] PREA" was not terminated; place the member on a performance review program; and send a report to the Inspector General. In the Second Quarter of 2019, the Department found that two Department members had failed to report force incidents that occurred in November 2014 and April 2018, and issued written reprimands. On September 17, 2019, a Captain in MCJ approved a recommendation that one of the members "be placed on the Unit Performance Mentoring Program;" the second member was on military leave.[25]

The Department's Seventh Self-Assessment reports that there were no incidents in the Third Quarter of 2019 that were subject to Section 13.1 and 13.2. The Department's posted Self-Assessment reports that one Department member who engaged in acts of dishonesty was terminated in the Fourth Quarter of 2019 and the Office of Inspector General was notified on March 20, 2020 of the termination.[26] The Department is in **Compliance** with Sections 13.1 and 13.2 as of the Fourth Quarter of 2019.

The predicate for Sections 13.1 and 13.2 and the pertinent Compliance Measures is a Department *finding* that a member was "dishonest, used excessive force, or violated PREA."

---

Plaintiffs mistakenly assumed that the Compliance finding was for the entire Seventh Reporting Period. The Panel has revised this paragraph to make it clearer that the Compliance is only as of the Fourth Quarter 2019.

[25] The documents submitted by the Department did not reflect that a report was submitted to the Inspector General because "failure to report force" was included in Section 13.1, but not 13.2. Notwithstanding the absence of a clear directive in Section 13.2, the Department reports that, going forward, it "will ensure the requirements of 13.1 are included in the letters to the OIG required under 13.2." Defendant's Resp., p. 4.

[26] In the future, the Department should promptly advise the OIG of actions taken against members found to have used excessive force, engaged in acts of dishonesty, or violated PREA.

Contrary to Plaintiffs objections, Plaintiffs' Resp., pp 11-12, these sections do not involve internal investigations where the Department did not find, but arguably should have found, such a violation.  The accuracy and truthfulness of force reports and Commanders' reviews of those reports are covered by Sections 5.2 (Commanders' Reviews); 5.3 (unexplained discrepancies); 15.3 (reports of force by other members); 15.4 (reports of inmate's injuries); and 15.7 (reports reflecting individual perceptions).  The Panel agrees with Plaintiffs that it "must vigorously police use of force packages with dishonest or recklessly inaccurate reports," Plaintiffs' Resp., p. 12, but not under Sections 13.1 and 13.2.

Sections 14.1 and 14.2 require (1) an additional review of referrals of inmates for criminal prosecution arising from incidents involving the use of force by Department members and (2) timely referrals to the District Attorney of "officer misconduct that may amount to criminal violations."  The Department reports 97% in **Compliance** with Section 14.1 in the Third Quarter of 2019, and 100% in the Fourth Quarter of 2019.[27]  With respect to Section 14.2, there were "no referrals of a Department member for possible prosecution for alleged misconduct that may amount to a criminal violation for Quarter 3, 2019."  The Department's Augmented Seventh Self-Assessment reports that 100% of the incidents were timely referred in the Fourth Quarter of 2019.[28]  Accordingly, the Department is in **Compliance** with Section 14.2 as of the Third Quarter of 2018, through the Fourth Quarter of 2019.

A.      **Third Quarter 2019 Results**

The Panel reviewed 25 completed force packages in both the Third and Fourth Quarters of 2019 to assess compliance with the provisions of the Action Plan relating to the reporting and investigation of force incidents.[29]  The Panel concluded that the Department was not in compliance with the provision regarding the Commanders' reviews (Section 5.2), the timeliness of force reports (Section 15.1), the reporting of the observation of visible injuries or the lack of such injuries (Section 15.4), and photographs of members' injuries.  In addition, the documentation provided by the Department was not sufficient for the Panel to determine the Department's compliance with the provision relating to the separation of Department personnel after a force incident (Section 15.6).  In order to achieve compliance with Section 15.6, separation of Department members to write their use of force reports, the supervisor must document that the members were separated and how this separation was accomplished.  The

---

[27] Although the source documents reflect the dates that the Unit Commanders reviewed the criminal reports and authorized them to "be submitted for prosecution," the documents do not reflect when the referrals were received by the District Attorney as referenced in the summaries submitted by the Department.

[28] There were five incidents that were submitted by the Internal Criminal Investigations Bureau ("ICIB") to the District Attorney in the Fourth Quarter of 2019.  Two of the referrals were within six months of the dates the Department learned of the incidents; two were within a year, and one was within two years.  All were within the three-year statute of limitations in Section 801 of the California Penal Code.

[29] The Panel did not include in its assessment the three IAB cases that were ultimately reviewed by the Executive Force Review Committee ("EFRC") but focused on the unit-level force investigations and Commander reviews.

Department was in **Compliance** with the remaining provisions relating to the Investigation and
Reporting of force incidents.

      B.      **Fourth Quarter 2019 Results**

The Panel also reviewed 25 completed force packages in the Fourth Quarter of 2019 for
Compliance with the reporting and investigation provisions of the Action Plan.  The Panel
concluded that the Department was not in compliance with the provision regarding
Commanders' reviews (Section 5.2), and the timeliness of force reports (Section 15.1).  In
addition, the information provided by the Department was not, in many cases, sufficient for the
Panel to determine the Department's compliance with the provision relating to the separation of
Department personnel after a force incident (Section 15.6).  The Department was in **Compliance**
with the remaining provisions relating to the Investigation and Reporting of force incidents.

Although Plaintiffs state that they "have identified force packages where [Department
members] appear to dishonestly present their uses of force," they cite only one case involving a
force incident that took place in 2018 and that was reviewed by the Panel in the Fourth Quarter
of 2019.  See Plaintiffs' Resp., pp. 11-12.  In that case, Plaintiffs reference a "Supervisor's report
acknowledging the deputy's false statement that he entered into the inmate's cell with another
deputy and stating that no chokehold or carotid restraint used despite video showing such." *Id.*,
p. 12 n. 18.  To the contrary, neither the Sergeant who conducted the force investigation nor any
of the Commanders who reviewed the force and the investigation found that the deputy had
made any false statements or that he had used a chokehold or carotid restraint.  In reviewing the
force package, the Panel did not find that the deputy had been dishonest or had used excessive
force.

**5.**      **Inmate Grievances**

The Action Plan requires extensive changes in how the Department handles inmate
grievances and requests for service.  On July 15, 2016, the Department issued a new "Inmate
Grievance Manual" (Volume 8 of the Custody Division Manual) to implement a new grievance
system.  The Panel assessed the Department's implementation of the new grievance system in
the Seventh Reporting Period as follows:

      A.      **Grievance Forms**

Sections 6.1 through 6.6 require that separate forms for inmate grievances be reasonably
available to inmates and that the forms have specific check boxes.  Section 7.1 requires the
Department to advise inmates of the voluntary Conflict Resolution Meeting available under the
Department's Conflict Resolution Policy.[30]  Based upon site visits during the Seventh Reporting
Period, the Panel concluded that the forms meeting these requirements of the Action Plan are

---

[30] The Department reports that there were "no grievances against staff complaints
adjudicated [in the Third and Fourth Quarters of 2019] in which a Conflict Resolution Meeting
was conducted."

reasonably available to inmates, and the Department remains in **Compliance** with those provisions relating to the availability of the required forms in printed or electronic format.

Sections 6.4 and 6.5 of the Action Plan require that use of force grievances and retaliation grievances against staff are brought to the attention of Unit Commanders within 10 days and properly handled.  Based upon a review of the relevant grievances in the randomly selected month, the Department reports that 100% of the use of force grievances were in Compliance with Section 6.4 in the Third Quarter of 2019 and 90% were in Compliance in the Second Quarter of 2019, which meets the threshold for **Compliance**.  The Department also reports that 100% of the retaliation grievances in the Third and Fourth Quarters of 2019 were in **Compliance** with Section 6.5.  The source documents posted by the Department for Sections 6.4 and 6.5 have been reviewed by the Panel, which verified that these grievances were handled appropriately.

## B.  Emergency Grievances

Sections 6.7 and 6.8 of the Action Plan set forth specific requirements for the determination, handling, and notifications of non-medical emergencies.  Section 6.7 requires: (1) Deputies to send any grievance marked "emergency" to a supervisor for review "as soon as possible;" (2) supervisors to determine if "the situation requires immediate action to protect the life or safety of the inmate;" (3) supervisors to notify watch commanders/shift supervisors of any non-medical emergencies; (4) watch commanders/shift supervisors to immediately confirm the emergencies exist and take action "to protect the inmates;" and (5) watch commanders/shift supervisors to notify the inmate in writing about "what action was taken to address the emergency."  The Compliance Measures require that 95% of the grievances marked as emergencies "be reviewed and handled as required by [Section] 6.7."  It is implicit in Section 6.7 that a supervisor's determination that the situation requires immediate action and a watch commander's confirmation that emergencies exist will be reasonable.

Section 6.8 requires that if a non-medical emergency does not exist, the Department must (1) notify the inmate that it will be handed as a non-emergency grievance and (2) "document why it was determined not to be an emergency."  The Compliance Measure requires that 90% of the non-emergencies be "handled as required by 6.8" and that the inmate is notified within five days of the non-emergency determination.

Based upon the selection and review of the grievances marked "emergency" in the months randomly selected by the Panel, the Department reports "there were no grievances that met the criteria of [Section] 6.7 during the randomly selected months" in the Seventh Reporting Period.  All 50 grievances in each quarter were downgraded per Custody Division policy and assessed in accordance with Section 6.8.  The Panel reviewed the 50 grievances assessed by the Department for the Third Quarter of 2019 and determined that two of the grievances should have been handled as emergencies.  Thus, 96% of the grievances were properly handled by the Department as non-emergencies, which is above the threshold for Compliance in the Third Quarter of 2019.[31]  The Panel also reviewed the 50 cases assessed by the Department for the

---

[31] In one of the two cases, the Department appears to have handled the grievance as an emergency notwithstanding the non-emergency determination.

Fourth Quarter of 2019 and determined that one of the grievances should have been handled as an emergency and that 98% of the grievances were properly handled as non-emergencies. Accordingly, the Department is in **Compliance** with Section 6.7 for the period July 1, 2018, through December 31, 2019.  Nevertheless, the Panel agrees with Plaintiffs that, going forward, the Department must provide better explanations for downgrades of "emergency" grievances to non-emergencies.  A conclusory statement that the grievance was deemed not to be an emergency is not sufficient if, on its face, the grievance suggests that there is some urgency to it.

The Department's Seventh Self-Assessment reports 96% Compliance with the notification provisions of Section 6.8 for the Third Quarter of 2019, and 94% Compliance in the Fourth Quarter of 2019.  The source documents posted by the Department for Section 6.8 reflect that inmates are notified that their grievances are being handled as non-emergencies, but often do not document the reasons for the downgrade as required by Section 6.8.  Accordingly, the Panel is not able to assess the Department's compliance with Section 6.8.

### C.      Inmate Grievance Coordinator

Section 6.9 requires that emergency grievances be forwarded to the Inmate Grievance Coordinator.  Sections 6.13, 6.14, and 6.15 require the Inmate Grievance Coordinator to track the Department's handling of inmate grievances, provide a monthly report to the Unit Commander and senior management in Custody on the status of inmate grievances, and analyze inmate grievances for problematic trends.  The Panel met with the Department's Inmate Grievance Coordinator during both site visits in the Seventh Reporting Period to review the Department's implementation of the new grievance system and the reports generated for the Department's managers.  The Department provided documentation to the Panel showing that for the Third and Fourth Quarters of 2019, the Inmate Grievance Coordinator received the information about emergency grievances required by Section 6.9 and prepared detailed reports for managers as required by Sections 6.13, 6.14, and 6.15.[32]  The Department is in **Compliance** with Sections 6.9, 6.13, 6.14, and 6.15, as of July 1, 2018, through December 31, 2019.

The Panel believes that the structure of the grievance system developed by the Department under the overall direction of an Inmate Grievance Coordinator who monitors each facility's compliance with the grievance provisions of the Action Plan is effectively and efficiently handling inmate grievances and requests for service.  The Panel believes that it is sufficiently centralized to be in **Compliance** with Section 6.16.  Plaintiffs once again object to the Panel's finding on the grounds that the Panel has "overstepped the bounds of [its] authority." The Panel disagrees; Plaintiffs' remedy under the Settlement Agreement is to address this with the Court.

---

[32] While those reports are very detailed, they would be improved if they included the outcomes of grievances (percentage sustained, percentage denied, other findings) and the outcomes of appeals broken down by type of grievance and facility.

### D.      Handling of Grievances

Sections 6.10 and 6.12 require that grievances be collected daily, logged in, and tracked in an inmate grievance database.  The Department's Seventh Self-Assessment reports that 100% of the grievances were collected and reviewed within 24 hours and handled as required in both the Third and Fourth Quarters of 2019.  The source documents for these results posted by the Department were reviewed by the Panel and support the Department's reported findings. Accordingly, the Department is in **Compliance** with Section 6.10 as of January 1, 2019, through December 31, 2019.

The Department's posted Self-Assessment reports that 100% of the grievances at both MCJ and TTCF in the randomly selected months in the Third and Fourth Quarters of 2019 were entered into the database as required by Section 6.12.  Again, the source documents for these results were available to, and reviewed by, the Panel.  Accordingly, the Department is in **Compliance** with Section 6.12 as of the July 1, 2018, through December 31, 2019.

Section 6.11 requires that the Custody Division Manual provide that failing to comply with Department policies requiring proper handling of inmate grievances may be cause for discipline.  The Department reports that there were two claims that Department members improperly handled inmate grievances during the Seventh Reporting Period, but no members were found to have violated the grievance policy.  The source documents do not, however, include the basis for the Department's findings in those two cases.[33]

Section 8.1 prohibits Department personnel from retaliating against inmates.  The Department previously reported that it was in Compliance with Section 8.1 as of March 31, 2018, through June 30, 2018.  The Department posted the results of the investigations approved by Unit Commanders in the randomly selected months and the number of anti-retaliation grievances received and investigated in the Third and Fourth Quarters of 2019.  It reports that there were no founded violations of the anti-retaliation policy in either quarter.  Accordingly, the Department has maintained **Compliance** with Section 8.1 through December 31, 2019.

Plaintiffs complain that the Panel concluded the Department "maintained compliance with Section 8.1, even though it did not review any supporting documents whatsoever.  The [Panel] must ensure not only that discipline is imposed, but also that [the Department] comes to reasonable conclusions in its investigations and metes out appropriate punishments."  Plaintiffs' Resp. p. 11 (cite omitted).  The Department's "posted results of the investigations approved by Unit Commanders in the randomly selected months" summarized the investigations and the basis of the Unit Commanders' findings that there were no violations of the anti-retaliation provisions. The Panel reviewed these summaries and determined that the investigations and conclusions were reasonable.  It will be incumbent upon the Department to continue to provide the Panel with the investigations approved by the Unit Commanders in the randomly selected months (up to a maximum of the first 25 investigations approved) so that the Panel can continue to assess the

---

[33] Plaintiffs assert that the Panel's "finding of compliance with Section 6.11 is unfounded at this time."  Plaintiffs' Resp., p. 10.  The Panel did not, however, find the Department in Compliance with Section 6.11.

reasonableness of the Department's investigations and conclusions regarding retaliation grievances.

### E.    Deadlines

Sections 6.17, 6.18, 6.19, and 6.20 set forth the deadlines for filing use of force and PREA grievances,[34] the Department's initial responses, inmates' right to appeal, and the Department's notifications of the results of the investigations.  The Department's Seventh Self-Assessment reports that it adhered to the deadlines for these grievances in both the Third and Fourth Quarters of 2019.  The Department achieved 100% compliance with all of these provisions in both quarters except that "no items were identified for the Department's self-assessment universe" for Section 6.17 in the Third Quarter of 2019 and there was 96% Compliance with Section 6.19 in the Fourth Quarter of 2019.  The Panel agrees that the Department is in **Compliance** with Section 6.17 as of October 1, 2019, through December 31, 2019 and Sections 6.18 and 6.20 as of July 1, 2018, through December 31, 2019.  As previously noted by the Panel, however, the Department needs to report on the timeliness of responses by Correctional Health Services to inmate grievances against the medical staff (e.g., lack of a timely response to a request for medical service) to achieve Compliance with Section 6.19.

The Seventh Self-Assessment also reports that the Department adhered to the deadlines for advising inmates of the results of adjudications as required by Section 7.2 for Third Quarter (92%) and the Fourth Quarter (96%) of 2019.  The posted source documents for these results were available to, and reviewed by, the Panel.  Accordingly, the Department is in **Compliance** with Section 7.2 as of July 1, 2018, through December 31, 2019.

### F.    Communications with Inmates

Section 7.3 requires the Department to "ensure that there are adequate avenues for constructive prisoner-staff communication[.]"  The Department's Seventh Self-Assessment reports that the Department was in Compliance with Section 7.3 during both the Third and Fourth Quarters of 2019.  The Department provided logs of Town Hall meetings at MCJ and TTCF during the randomly selected months the Third and Fourth Quarters of 2019 that included Town Hall meetings in special housing units as well as in General Population housing units. Based upon these logs, the Panel is of the view that the Department has achieved **Compliance** with Section 7.3 in the for the period April 1, 2019, through December 31, 2019.

### 6.    Use of Restraints

Section 17.1 requires that the Custody Force Manual include "a separate section that sets forth the general principles governing the use of restraints" identified in this recommendation. The Department included such a separate section in the Manual and is in **Compliance** with this requirement of Section 17.1, effective December 1, 2015.

---

[34] Section 6.18 provides that there is no deadline for filing PREA grievances.

Section 17.3 requires medical examinations of inmates placed in safety chairs and Section 17.4 requires safety checks of inmates in fixed restraints every twenty minutes.  Periodic vitals checks are necessary in order to establish Compliance with Section 17.3, even if the inmate does not struggle and force is not used to place the inmate in the chair.

The Compliance Measures require the Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than 20 minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex.[35]

During the Seventh Reporting Period, the Panel reviewed the Inmate Safety Chair Security Check Logs and Fixed Restraint logs at Downtown Jail Complex provided by the Department for the Third and Fourth Quarters of 2019.  The Inmate Safety Chair Security Check Logs and fixed restraint logs reflect that Department personnel are, in the majority of cases, checking on the inmates every twenty minutes as required by Section 17.4, although in some cases the Deputies did not provide any details regarding the inmate's condition, the authorization for keeping the inmate in the chair for more than two hours, or the release time.  Department personnel also used a variety of forms that make it difficult for the Panel to verify the results and confirm its Compliance with Section 17.4.

Finally, there is no indication that medical professionals are performing any vitals checks even though inmates are often in the safety chairs for several hours while they are transported to court, attend the court proceedings, and are then transported back to TTCF.  The Department reports that the "Custody Division intends to work with the Court Services Division and the criminal courts to ensure inmates do not remain in the safety chairs for longer than absolutely necessary."

Section 17.10 provides that medication cannot be used solely for security purposes.  The Department's posted Self-Assessment, confirmed by a log of the Administration of Involuntary Medications, reports that the overwhelming majority of involuntary medications were pursuant to court orders and there were no instances in which medication was used solely for security purposes in the Third and Fourth Quarters of 2019.  Accordingly, the Department has been in **Compliance** with Section 17.10 as of July 1, 2018, through December 31, 2019.

7.      **Early Warning System**

Section 19.1 requires the Department to develop an Early Warning System to identify potentially problematic employees based upon objective criteria.  The Panel approved the Employee Review System ("ERS") in July 2018, and it was implemented by the Department as a pilot program in the Downtown Jail Complex on August 1, 2018, and in the rest of the jail facilities as of November 1, 2018.  The Department has been in **Compliance** with Section 19.1 in the Downtown Jail Complex since August 1, 2018.

---

[35] Sections 17.6 through 17.9 govern the application of multi-point restraints, which the Panel has been advised by the Department it does not use.

24

Section 19.2 requires Compliance Lieutenants to review monthly reports generated by the ERS and notify Unit Commanders and the Assistant Sheriff for Custody of the results, and Section 19.3 requires Unit Commanders to determine whether problematic employees should be placed on performance mentoring program.  Under the Revised Compliance Measures, Compliance Lieutenants must notify the Unit Commander and Assistant Sheriff for Custody Operations 90% of the time within 10 days after reviewing monthly reports generated by the Early Warning System and 95% of the time within 30 days.  For each potentially problematic Department member identified through the Early Warning System, the Unit Commander must consult with the appropriate Chief and document the reasons why any problematic members are not placed on a performance mentoring program.

The Department's Seventh Self-Assessment reports that the Department achieved Compliance with Sections 19.2 and 19.3 in the Third and Fourth Quarters of 2019 at all facilities in the Downtown Jail Complex.  The supporting documents posted by the Department show that the ERS generates a Monthly Report that is reviewed by the Unit Commander, who makes the required notifications to a Chief and Assistant Sheriff.  Based upon the Unit Commanders' reviews of the incidents identified through the ERS, there were reassignments of duties, additional training in a "force concepts class," and requests for administrative investigations.  It is apparent that Department commanders are reviewing the reports generated by the ERS and the incidents involving the potentially problematic Department members identified by the ERS.  Although there is still some variation in how often the Unit Commanders decide that additional action is warranted and what action they take, they are all reviewing the incidents involving their potentially problematic members.  Accordingly, the Panel finds the Department was in **Compliance** with Section 19.2 in the Third and Fourth Quarters of 2019.

With respect to Section 19.3, it is apparent that the Unit Commanders are, in consultation with the appropriate Chiefs, evaluating members who are identified through the ERS.  The Panel is concerned, however, that there is a lack of detail regarding the reason why the TTCF Unit Commander decided no action was necessary for the TTCF members identified in the ERS and why the MCJ Commander decided that training was appropriate in some cases.[36]  The reasons for the reassignments of personnel at IRC were adequately explained.  The Department reports that it "is looking at developing guidelines for Unit Commanders to utilize for deciding corrective actions[.]"

---

[36] The Panel assumes that this "force concepts class" recommended by the MCJ Unit Commander is different than the annual use of force refresher class required by Section 3.1 of every Department member.  The annual refresher course is not appropriate as a remedial measure for individuals with disproportionate number of use of force situations.  The Department needs to provide the Panel with the specifics of this class before the Panel can conclude that the course is an appropriate remedial measure.

**APPENDIX**

| NO. | PROVISION | STATUS | DATE[37] |
|---|---|---|---|
|  |  |  |  |
|  | **Leadership, Administration & Management** |  |  |
|  |  |  |  |
| 1.1 | Assistant Sheriff | Compliance | January 1, 2017 |
| 1.2 | Sheriff | Compliance | January 1, 2017 |
| 1.3 | Supervision | Compliance | July 1, 2018 (MCJ and TTCF) July 1, 2019 (IRC) |
| 1.4 | Reports to Board | Compliance | June 12, 2018 |
| 10.1 | Jail Visits | Compliance | October 1, 2019 |
| 10.2 | Documented Visits | Compliance | July 1, 2018 |
| 18.1 | Rotation in Custody | Compliance | July 1, 2018 |
| 18.2 | Documentation of Rotation | Compliance | January 1, 2019 |
| 21.1 | Transfers to Custody | Compliance | July 1, 2018 |
|  |  |  |  |
|  | **Use of Force Polices & Practices** |  |  |
|  |  |  |  |
| 2.1 | Custody Force Manual | Compliance | January 1, 2017 |
| 2.2 | Force Prevention Principles |  |  |
| 2.3 | Inmate on Inmate Violence | Compliance | July 1, 2019 |
| 2.4 | Use of Force as Discipline | Compliance | July 1, 2019 |
| 2.5 | Force on Restrained Inmates | Compliance | July 1, 2019 |
| 2.6 | Head Strikes or Kicks |  |  |
| 2.7 | Supervisors Called to Scene |  |  |
| 2.8 | Prevent Excessive Force | Compliance | July 1, 2019 |
| 2.9 | Armed Inmates | Compliance | July 1, 2019 |
| 2.10 | Authorized Weapons | Compliance | July 1, 2019 |
| 2.11 | Planned Chemical Spray |  |  |
| 2.12 | Chemical Spray & Tasers | Compliance | July 1, 2019 |
| 2.13 | Check of Medical Records | Compliance | October 1, 2019 |
| 4.1 | Consult MH professionals | Compliance | October 1, 2019 |
| 4.3 | Spray on MH inmates | Compliance | October 1, 2019 |
| 4.4 | Cooling Off Periods | Compliance | October 1, 2019 |
| 4.5 | Medical or MH Provider | Compliance | October 1, 2019 |

---

[37] This represents the date the Department came into the compliance that it has maintained through the date of this report.

| 8.2 | Complaints of Retaliation | Compliance | January 1, 2017 |
|------|----------------------------|------------|-----------------|
| 9.2 | Escorting of Inmates | | |
| 17.2 | Pregnant Inmates | Compliance | January 1, 2017 |
| 17.5 | Minimize Medical Distress | Compliance | July 1, 2019 |
| 20.1 | Categories of Force | Compliance | January 1, 2017 |
| 20.2 | Reactive Force | Compliance | January 1, 2017 |
| 20.3 | Planned Use of Force | Compliance | October 1, 2019 |
| | | | |
| | **Training**[38] | | |
| | | | |
| 3.1 | Use of Force Training | Compliance | June 30, 2018 |
| 3.2 | Ethics, Professionalism | Compliance | June 30, 2018 |
| 3.3 | Custody Training | Compliance | June 30, 2018 |
| 3.4 | Custody-based scenarios | Compliance | June 30, 2018 |
| 3.5 | Add training/mentoring | Compliance | July 1, 2019 |
| 3.6 | Probation Reviews | | |
| 4.6 | Crisis Intervention | Compliance | June 30, 2018 |
| 4.7 | Mentally Ill Inmates | Compliance | June 30, 2018 |
| 4.8 | Mentally Ill Inmates (for new Department members) | Compliance | June 30, 2018 |
| 4.9 | Crisis Intervention (for new Department members) | Compliance | June 30, 2018 |
| 12.1 | Force Investigations | | |
| | | | |
| | **Investigation & Reporting of Force** | | |
| | | | |
| 4.2 | Mental Health Professionals | Compliance | October 1, 2019 |
| 5.1 | Tracking of Force Incidents | Compliance | October 1, 2019 |
| 5.2 | Commanders' Reviews | | |
| 5.3 | Unexplained Discrepancies | Compliance | July 1, 2019 |
| 8.3 | CFRC Review | Compliance | December 31, 2019 |
| 11.1 | CFRT Involvement | Compliance | June 30, 2018 |
| 12.2 | Location of Inmate Interviews | Compliance | July 1, 2019 |
| 12.3 | Suspect Interviews | Compliance | July 1, 2019 |
| 12.4 | Uninvolved Supervisors | Compliance | July 1, 2019 |
| 12.5 | Standard Order & Format | Compliance | July 1, 2019 |
| 13.1 | Documenting dishonesty | Compliance | October 1, 2019 |
| 13.2 | Reports of Dishonesty/PREA | Compliance | October 1, 2019 |
| 14.1 | Review of Criminal Referrals | Compliance | July 1, 2018 |
| 14.2 | Timeliness of Criminal Referrals | Compliance | July 1, 2018 |

---

[38] The Department's reported results for Sections 3.1 through 3.4, 4.6 through 4.9, and 12.1 have been verified by the Panel's auditors.

| 15.1 | Timeliness of Reports | | |
|------|------------------------|------------|------------------|
| 15.2 | All Department Witnesses | Compliance | July 1, 2019 |
| 15.3 | Force by Other Members | Compliance | July 1, 2019 |
| 15.4 | Description of Injuries | Compliance | October 1, 2019 |
| 15.5 | Clarification after Video | Compliance | July 1, 2019 |
| 15.6 | Separation of Deputies | | |
| 15.7 | Individual Perceptions | Compliance | July 1, 2019 |
| 16.1 | Healthcare Assessment | Compliance | July 1, 2019 |
| 16.2 | Photographs of Injuries | Compliance | July 1, 2019 |
| 16.3 | Medical Report of Injuries | Compliance | July 1, 2019 |
| | | | |
| | **Inmate Grievances** | | |
| | | | |
| 6.1 | Separate Grievance Forms | Compliance | January 1, 2017 |
| 6.2 | Available Grievance Forms | Compliance | January 1, 2017 |
| 6.3 | Emergency Grievances Forms | Compliance | January 1, 2017 |
| 6.4 | Use of Force Grievances | Compliance | July 1, 2018 |
| 6.5 | Grievances Against Staff | Compliance | July 1, 2018 |
| 6.6 | Right to Appeal Form | Compliance | January 1, 2017 |
| 6.7 | Handling Emergency Grievances | Compliance | July 1, 2018 |
| 6.8 | Notification of Non-Emergency | | |
| 6.9 | Grievance Coordinator Review | Compliance | July 1, 2018 |
| 6.10 | Collection of Grievances | Compliance | January 1, 2019 |
| 6.11 | Failure to Handle Grievances | | |
| 6.12 | Tracking Inmate Grievances | Compliance | July 1, 2018 |
| 6.13 | Grievance Coordinator Tracking | Compliance | July 1, 2018 |
| 6.14 | Grievance Coordinator Reports | Compliance | July 1, 2018 |
| 6.15 | Grievance Coordinator Analysis | Compliance | July 1, 2018 |
| 6.16 | Centralized Grievance Unit | Compliance | January 1, 2017 |
| 6.17 | Use of Force Deadline | Compliance | October 1, 2019 |
| 6.18 | PREA Deadline | Compliance | July 1, 2018 |
| 6.19 | Response to Inmate Grievances | | |
| 6.20 | Appeals of Grievances | Compliance | July 1, 2018 |
| 7.2 | Notification of Results | Compliance | July 1, 2018 |
| 7.3 | Prisoner-staff Communications | Compliance | April 1, 2019 |
| 8.1 | Anti-retaliation | Compliance | April 1, 2019 |
| | | | |
| | **Use of Restraints** | | |
| | | | |
| 17.1 | Restraint Provisions | Compliance | December 1, 2015 |
| 17.3 | Safety Chair Procedures | | |
| 17.4 | Safety Checks | | |
| 17.6 | Multi-point Restraint Procedures | Not Applicable | |

| 17.7 | Approval of Multi-point Restraints | Not Applicable | |
|------|-----------------------------------|----------------|---|
| 17.8 | Continued Use of Restraints | Not Applicable | |
| 17.9 | Supervisor Approval of Restraints | Not Applicable | |
| 17.10 | Involuntary Medications | Compliance | July 1, 2018 |
| | | | |
| | **Early Warning System** | | |
| | | | |
| 19.1 | Development of EWS | Compliance | August 1, 2018 |
| 19.2 | Report Review and Notification | Compliance | January 1, 2019 |
| 19.3 | Performance Mentoring Programs | | |