1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SCHEPER KIM & HARRIS LLP**
MARC S. HARRIS (Bar No. 136647)
800 West Sixth Street, 18th Floor
Los Angeles, CA  90017-2701
Telephone: (213) 613-4655
Facsimile:  (213) 613-4656

**Monitor and on behalf of Monitors**
**Jeffrey Schwartz and Robert Houston**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS, et al. | CV No. 12-00428 DDP |
| Plaintiffs, | |
| | **PANEL'S EIGHTH REPORT** |
| v. | |
| LOS ANGELES COUNTY SHERIFF LEROY BACA, in his Official Capacity, | |
| Defendant. | |

1    Pursuant to the Section V of the Settlement Agreement And Release of

2 Claims, the Monitors appointed by this Court, Jeffrey Schwartz, Robert Houston,

3 and Marc S. Harris (collectively the "Panel") hereby submit the attached Panel's

4 Eighth Report "evaluating Defendant's Compliance with Action Plan" prepared by

5 the Panel for the six-month period from January 1, 2020, to June 30, 2020.  This

6 Report takes into consideration the comments from the parties in accordance with

7 Section V of the Settlement Agreement.  The Panel is available to answer any

8 questions the Court may have regarding this Report at such times as are convenient

9 for the Court and the parties.

10

11 DATED:  January 4, 2021          Respectfully submitted,

12                                 SCHEPER KIM & HARRIS LLP
                                   MARC S. HARRIS
13

14

15                                 By:  /s/ Marc S. Harris
                                        Marc S. Harris
16                                      Monitor and on behalf of Monitors Jeffrey
17                                      Schwartz and Robert Houston

18

19

20

21

22

23

24

25

26

27

28

# PANEL'S EIGHTH REPORT

The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan [developed by the Panel] ('Reports') at intervals the Panel shall determine." This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from January 1, 2020, through June 30, 2020 (the "Eighth Reporting Period"), and it is created for the purposes of the settlement of the *Rosas* case. In accordance with Paragraph V of the Settlement Agreement, it takes into consideration comments received from the Parties on December 14 and 15, 2020, regarding the draft of the report that was sent to them on December 1, 2020.

In May 2014, the Parties retained the Panel "to develop a corrective action plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles" (the "Downtown Jail Complex"). The plan developed by the Panel sets forth provisions in twenty-one areas that the Sheriff is required to implement in the Downtown Jail Complex. The plan was approved by the Court on April 7, 2016. Under Paragraph VIII of the Settlement Agreement, "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented, it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')."

As of November 1, 2018, the Sheriff's Department (the "Department") has implemented 104 of the Panel's 106 recommendations. The remaining two recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in *United States v. County of Los Angeles, et al.*, CV No. 15-05903 (JEMx) (the "DOJ case").[1]

The Panel visited the Downtown Jail Complex during the Eighth Reporting Period on February 27 and 28, 2020.[2] During that visit, the Panel spoke to a number of inmates in the Downtown Jail Complex. Although we heard some complaints about the responsiveness of staff and adequacy of medical care, as in the past, the inmates interviewed consistently told us that excessive force was not an issue in the County Jails. The Panel continues to sense a positive culture regarding the treatment of inmates and the use of force within the jails. The importance of this finding should not be underestimated. When the Panel's work began in 2014, the Downtown jails had achieved considerable notoriety and it was clear that the beating of inmates had to stop and the staff culture – then anti-inmate and enforcement-oriented – had to change. It has. The beatings stopped years ago, and the jail culture has become service-oriented and remains so. Those changes were accomplished by the men and women of the Department and

---

[1] The other recommendations in the *Rosas* Action Plan have been implemented in the other jail facilities outside of the Downtown Jail Complex pursuant to Paragraph 81 of Settlement Agreement and Stipulated Order of Resolution in the DOJ case.

[2] Due to restrictions and safety concerns caused by the COVID-19 pandemic, the Panel was not able to visit the jails in the Second Quarter of 2020.

that, too, should not be lost in assessing the Department's progress since the Panel commenced its work.

In the Panel's Seventh Report, we noted the continuing reduction in the number of force incidents in 2019 in the Downtown Jail Complex, with an average of 115 force incidents per month in these facilities in the first half of the year and an average of 107 force incidents per month in the second half of the year. These statistics compared favorably to 2018, when the monthly average was 130. We noted with concern, however, that while the total number of force incidents decreased in 2019, the number of Category 2 force incidents[3] increased 8.7% from a total of 23 per month in 2018 to 25 per month in 2019. The decrease in total force incidents from 2018 to 2019 was attributable almost entirely to the substantial decrease in the number of minor "non-categorical incidents."[4]

In the first half of 2020, not only has the positive trend with respect to the total number of force incidents continued, but the number of Category 2 force incidents has decreased substantially from 2019. According to data provided by the Department, during the Eighth Reporting Period, the total number of force incidents in the Downtown Jail Complex was 454, an average of 76 per month. This represents a 29% decrease from the second half of 2019, and a 41% decrease from 2018. With respect to Category 2 incidents, the monthly average has dropped from 25 in 2019 to 13 in the first six months of 2020. This represents a 48% decrease in Category 2 incidents. The decreases in Category 2 incidents from the Seventh Reporting Period were seen at all three of the Downtown jail facilities.[5]

The numbers with respect to Category 3 force incidents are not definitive. According to the Department's posted self-assessment, there were four Category 3 cases in 2019, all of which occurred at the MCJ facility.[6] In the first half of 2020, there was one Category 3 case at TTCF and three cases at MCJ. While Category 3 incidents will remain a focus of the Panel because of their severity, the small overall numbers of such incidents prevent drawing reliable conclusions about changes over time.[7]

During the Eighth Reporting Period, the Panel reviewed 49 completed force packages that were selected by the Panel from a comprehensive list of force incidents compiled by the Department. The Panel selected 29 force packages for review in the First Quarter of 2020 and received 27 of those force packages. In the Second Quarter of 2020, the Panel received 22 of the

---

[3] Category 2 force encompasses most incidents with an "identifiable injury," including relatively minor injuries such as a cut or a bruise. Force that is likely to, or does, result in severe injuries is classified as a Category 3 incident.

[4] "Non-categorical incidents" are minor uses of force that are used to control inmates, are captured on video, and do not result in injuries or complaints of pain.

[5] Much of this decrease is undoubtedly attributable to the significant reduction in the inmate population in the Second Quarter of 2020 due to the COVID-19 pandemic. The positive results were also present in the first three months of the year, but to a much lesser extent.

[6] There were no Category 3 cases at either IRC or TTCF in 2018 or 2019.

[7] The Panel does not share Plaintiffs' characterization of the Category 3 data as reflecting a "disturbing" trend.

26 requested force packages.[8]  Although the force incidents at issue occurred primarily in 2019, the Department was not able to complete its investigations regarding many of the force incidents in time for the Panel to evaluate the cases during the Eighth Reporting Period.  The inability of the Department to complete its use of force investigations in a timely manner has substantially impacted the Panel's ability to assess and review force packages.  For several years, the Panel has identified 25 cases near the beginning of a quarter, and the Department has usually been able to complete most, if not all, of those identified cases that were in progress and then sent the Panel all 25 cases in time for the Panel to review them and then meet with the Custody managers about problematic cases early in the next quarter.  Essentially, the Panel's review process was self-contained, quarter by quarter. That has now been lost.  Cases identified for first quarter review were still arriving in the second and third quarters.  Importantly, that makes it more difficult to assess progress over time.  The Panel has recently discussed this issue with the Sheriff and with the Assistant Sheriff for Custody Operations, and in its response to the Panel's draft report the Department has outlined a series of concrete steps designed to improve the timeliness of completion of force packages.  The Panel looks forward to working with the Department to address this situation.

Under the Revised Compliance Measures, the Department provides the Panel with self-assessments of its compliance with the non-force related provisions in the Action Plan.  The Department submitted its Eighth Self-Assessment Status Report (the "Eighth Self-Assessment") on September 15, 2020, and augmented its self-assessment (the "Augmented Eighth Self-Assessment") on October 20, 2020.  During the Eighth Reporting Period, the Panel reviewed records posted by the Department to verify the Department's self-assessments of its compliance with non-force provisions of the Action Plan.  All of the Department's training results are subject to verification by auditors retained by the Panel.

During the Seventh Reporting Period, a new Assistant Sheriff took over the leadership of the Department's Custody Operations.  Under the new Custody leadership, the Department continued to cooperate fully with the Panel during the Eighth Reporting Period.  The Department and County Counsel facilitated our visits and inmate interviews, answered our questions, and responded to our requests for documents and information.  They also engaged in constructive conversations with the Panel about our findings regarding the use of force incidents we reviewed and the Department's continuing efforts to implement the terms of the *Rosas* Action Plan.  We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.

---

[8] One additional package from the Second Quarter list was received in late-October and will be reviewed during the Ninth Reporting period.

## ACTION PLAN IMPLEMENTATION

1.   **Leadership, Administration and Management**

    A.   **Leadership and Accountability**

       The recommendations in Sections 1.1 through 1.4 of the Action Plan require that Custody be headed by an Assistant Sheriff with no other areas of responsibility, the Sheriff be engaged personally in the management of the jails, the Department's managers be held accountable for any failures to address force problems in the jails, and the Department regularly report to the Board of Supervisors on the use of force in the jails and on its compliance with the Action Plan.

       The Department has been in **Compliance** with Sections 1.1 of the Action Plan since well before January 1, 2017.[9]  Custody has been headed by an Assistant Sheriff with no other areas of responsibility since mid-2014.  It was under the direction of Assistant Sheriff Bruce Chase during the Eighth Reporting Period.  Although Assistant Sheriff Chase does not have the "experience in managing a large corrections facility or running a corrections department" outside the Department as recommended by the Citizens' Commission on Jail Violence, he was formerly the Captain of the Custody Compliance and Sustainability Bureau (CCSB) and a Chief in Custody Operations, has extensive knowledge of the requirements of the *Rosas* Action Plan, and has expressed to the Panel his commitment to the reforms mandated by the Plan.  The Panel has found Assistant Sheriff Chase to be accessible, forthright and fully supportive of the work of the Panel.

       Due to COVID-related restrictions, the Panel was not able to meet with Sheriff Villanueva during the first half of 2020.[10]  The Department has provided the Panel with a log of the frequent meetings that Sheriff Villanueva had with Assistant Sheriff Chase from January 8, 2020, through June 30, 2020, to review use of force incidents, the use of less lethal weapons and personal weapons, cell extractions, Category 3 incidents and associated injuries, use of force against mentally ill inmates, dorm disturbances, gassing incidents, deployment of chemical agents, de-escalation of force, suicide attempts and rescue force, inmates entering the facilities under the influence and available detox housing units, facility security concerns, assaults on staff, and alternative tactical approaches to address current inmate populations.  The Panel is satisfied that the Sheriff is personally engaged in the management of the Department's Custody operations and the Department is in **Compliance** with Section 1.2 of the Action Plan.

---

     [9] Use of the term **Compliance** in bold is a finding of compliance as of a certain date.  The Panel's findings are set forth on the Appendix attached hereto.  For other provisions, the Department has either not achieved compliance or is no longer in compliance during this current reporting period.  Based upon the Panel's findings, the Parties will determine whether the Settlement Agreement is subject to termination pursuant to Section VIII of the agreement.  As noted in the Panel's prior reports, the Panel encourages the "Parties to adopt a meaningful and achievable framework to determine the Department's compliance with the Settlement Agreement" in the future.

     [10] The Panel met with the Sheriff by video conference on November 3, 2020.

Section 1.3 of the Action Plan provides that Department managers should be held accountable should they fail to address use of force problems at the Department's jail facilities. The Compliance Measures require the Department to provide a quarterly report that sets forth the number and rank of personnel found to have violated its use of force policies in the jails. In the First Quarter of 2020, the Department reports one disposition for a founded violation of the Department's use of force policies arising out of a 2019 incident in MCJ, which resulted in a written reprimand. There were no founded dispositions at TTCF or IRC in the First Quarter of 2020. In the Second Quarter of 2020, there were no founded dispositions for violation of the Department's use of force policies at any of the Downtown jail facilities. While this report satisfies the applicable Compliance Measure, the Panel is concerned that reports of "founded dispositions of violations of the Department's use of force policies" do not provide the data necessary for the Panel to assess whether Department managers are appropriately addressing use of force policies at the jails. The Panel is aware, based on its review of force packages, of instances in which violations of the Department's use of force policies did not result in findings of violations or disciplinary action for founded violations. The Panel has expressed concern for several reporting periods that the Department relies too heavily on remedial training rather than discipline in situations where the Department agrees that use of force policies have been violated. The Panel has also seen numerous cases involving violations of policy, such as head punches for inmate control, that result in outcomes that do not reflect the seriousness of the offense. We look forward to working with the Department to evaluate additional data and metrics to assess the Department's compliance with Section 1.3 going forward.[11]

Compliance Measures for Section 1.3 also require the Department to provide data regarding overall force incidents and Category 3 incidents so the Panel can assess whether there have been substantial increases and whether any such increases have been appropriately addressed by Unit Commanders and Commanders. Excluding non-categorical force incidents, there was a 21.5% decrease in overall force incidents at IRC, an 8.9% decrease at MCJ, and a 5.6% increase at TTCF in the First Quarter of 2020. With respect to Category 3 incidents, there was an increase from two incidents in the Fourth Quarter of 2019 to four incidents in the First Quarter of 2020.[12] While this represents a 100% increase, the Category 3 incidents do not appear to raise concerns about a pattern of excessive force given the nature of the incidents and the relatively small number of them. Command Staff at the two impacted facilities appear to have taken appropriate measures to address the modest increases in Category 3 incidents. Accordingly, the Department was in **Compliance** with Section 1.3 of the Action Plan at all of the Downtown jail facilities in the First Quarter of 2020.

For the Second Quarter of 2020, all three Downtown jail facilities experienced a substantial decrease in force incidents. Excluding non-categorical force incidents, there was a

---

[11] Both the Department and Plaintiffs have commented on this section of the Panel's draft report, highlighting the significance of this critical component of the Action Plan. While the Panel stands by its finding of **Compliance** with respect to Section 1.3, we reiterate our intention to look beyond the narrow Compliance Measures currently in place to assess compliance with this provision.

[12] There were three Category 3 incidents at MCJ and one at TTCF.

50% decrease in force incidents at IRC, a 2.4% decrease at MCJ, and a 28% decrease at TTCF in the Second Quarter of 2020.[13]   The Department's posted Self-Assessment reveals no Category 3 incidents in the Second Quarter of 2020.   Accordingly, the Department was in **Compliance** with Section 1.3 of the Action Plan at all of the Downtown Jail facilities in the Second Quarter of 2020.

The Department was in **Compliance** with Section 1.4 in the Eighth Reporting Period.  On March 4, 2020, Assistant Sheriff Chase, a Commander in Custody Operations and the Unit Commander responsible for CCSB made a presentation to the Board of Supervisors on the Department's compliance with the *Rosas* Action Plan through the Fourth Quarter of 2019.

### B.    Management Visits

Sections 10.1 and 10.2 require the Department's leadership to tour each of the jail facilities and document those visits.  The Department's Eighth Self-Assessment reports that it maintained Compliance with Sections 10.1 and 10.2 as of January 1, 2020, through March 17, 2020,[14] with 100% of the required visits by the Sheriff and Assistant Sheriff, as well as by the Captains, Commanders, and Chiefs.[15]  The Department documented these visits, along with visits by Watch Commanders, as required by Section 10.2.  The Panel notes that the logs reflect very brief visits to each of the Downtown jail facilities by the Sheriff on one day (March 3, 2020).  While we recognize that the Sheriff has a myriad of responsibilities, and COVID-19 restrictions limited his access to the facilities during this reporting period, this is the second consecutive reporting period where we have noted the Sheriff's limited presence at the jails.[16]  The Panel has reviewed the source documents provided by the Department and verified the other results reported by the Department.

The Department has asked the Panel to consider suspending the requirements of these provisions during the pendency of the COVID-19 restrictions.  Plaintiffs suggest the Panel "hold findings of compliance in abeyance" for this reporting period.  The Panel will not record a finding for these provisions for the Second Quarter of 2020 or the upcoming Ninth Reporting Period due to the inability of the Department to safely conduct the required visits.  Beginning in

---

[13] As noted above, these marked decreases are likely attributable to the reduction in inmate population due to the COVID-19 pandemic.

[14] The Panel has been advised that Executive Tours for the ranks of Commander and above were suspended on March 17, 2020, due to safety concerns related to COVID-19.  The Panel accepts this justification for the failure to conduct the required Executive visits in the Second Quarter of 2020.

[15] Where there is more than one Unit Commander or Commander for a facility, the Department's posted audit results combine the tours by all of assigned commanders for that facility.

[16] The Department notes that Unit Commanders frequently walk their facilities and relay any concerns to Custody Division Executives.  The Panel has no concerns in this regard – our concern stems from the limited presence of the Sheriff at the jails.  On that issue, we endorse the Plaintiffs' suggestion that the Department explore other options for greater direct involvement by the Sheriff at the jails in the event physical visits continue to present health or safety issues.

the First Quarter of 2021, the Panel intends to assess compliance with these provisions, and will work with the Parties to develop technology-based alternatives to in-person visits if current pandemic conditions persist.

### C.    Rotations and Transfers

Sections 18.1 and 18.2 require the Department to (1) maintain Custody-wide rotation policies and rotate personnel as required by the policies, and (2) audit each unit's compliance with its rotation policies. The Department's Eighth Augmented Self-Assessment reports that it achieved 99% Compliance in the Eighth Reporting Period. Each of the Downtown jail facilities has a reasonably current Unit Order setting forth its rotation policy and the source documents indicate that most Department personnel are rotated in Compliance with those policies. The Department is in **Compliance** with Section 18.1 and Section 18.2 through June 30, 2020.

The Department's Eighth Self-Assessment reports that it maintained 100% **Compliance** with Section 21.1 as of January 1, 2020, through June 30, 2020. The Panel has reviewed the Department's source documents stating the reasons for Deputy transfers to Custody during the Eighth Reporting Period, which reflect that no member was transferred or assigned to Custody as a sanction for problematic conduct.

### 2.    Use of Force Policies and Practices

Section 2.1 of the Action Plan requires the Department to "have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations[.]" On October 16, 2015, the Department provided the Panel with a Custody Operations Force Manual with separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints, Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved Shootings. The Department's Custody Force Manual satisfies Section 2.1 and includes specific provisions that satisfy Sections 8.2 (Complaints of Retaliation), 17.2 (Pregnant Inmates), 20.1 (Types of Force), and 20.2 (Definition of Reactive Force) of the Action Plan. The Department has been in **Compliance** with these Sections since the Panel began monitoring the Department's compliance as of January 1, 2017.

The other recommendations in the Action Plan that pertain to the Department's use of force in Custody Operations are summarized as follows:

- Sections 2.2 through 2.13 require the Department to adopt a comprehensive set of new use of force policies for Custody Operations.

- Sections 4.1 through 4.5 require the Department to adopt specific use of force policies for dealing with mentally ill prisoners.

- Sections 9.2 through 9.3 require the Department to adopt specific policies for escorting inmates after force incidents and intervening to protect inmates as soon as it is reasonably safe to do so.

- Section 17.5 requires the Department to adopt policies for minimizing the risk of an inmate's medical distress during and after a force incident.

- Section 20.3 requires the Department to adopt use of force policies for Planned Force (such as cell extractions).

The Panel reviewed multiple drafts of the Department's policies to implement these recommendations, required changes where appropriate, and certified that the Department had implemented these recommendations, effective December 1, 2015.

During the Eighth Reporting Period, the Department advised the Panel of several proposed changes to the policies that were previously approved by the Panel. The Panel was given the opportunity to comment on the proposed changes. Although most of the proposed changes were acceptable, the Panel has advised the Department that some modifications are necessary and recommended other modifications to existing policy. The Panel provided those comments in writing to the Department on September 15, 2020. The Panel has not yet been advised by the Department whether the changes requested and suggested by the Panel have been or will be made.

## A.     Review of Force Incidents

The Action Plan requires that the Panel review selected force packages each quarter to assess whether the use of force was in compliance with Sections 2.2 through 2.13, 4.1 through 4.5, 9.2, 9.3, and 17.5 (the "Force Provisions") of the Action Plan. In prior reporting periods, the Panel has conducted a "vertical assessment" of each reviewed use of force to assess the reasonableness of the use of force "taking into consideration all of the applicable provisions of the Action Plan" and also a "horizontal assessment of the Department's compliance with *each* of the applicable provisions of the Plan."[17] Plaintiffs had objected to the use of the vertical assessment.[18] In its Seventh Report, the Panel decided to eliminate the vertical assessment and rely exclusively on its horizontal assessment to report the Department's compliance with each of the provisions of the Action Plan applicable to the Department's use, reporting, and investigation of force by its members as requested by Plaintiffs. The Panel continues with that approach in this Report.

As has been the practice of the Panel, we reviewed the problematic incidents identified during our review with Custody Commanders, and took into consideration their comments in reaching the conclusions set forth in this Report. The Panel also met with Plaintiffs' counsel to review the force incidents identified as problematic by the Panel, as well as additional incidents Plaintiffs' counsel considered problematic. The input of the Department and Plaintiffs' counsel was extremely helpful in reviewing and assessing compliance with the Force Provisions.

---

[17] See Panel's Fifth Report, p. 11 (emphasis in original).
[18] See Plaintiffs' Response to Sixth Report, p. 3.

Plaintiffs have raised certain objections regarding the Panel's reliance on the Department's data and the Department's classification of force incidents.  Plaintiffs' Response, pp. 3-4.  The Panel has noted in this report, as in prior reports, the steps it takes to review and verify the information provided by the Department.  There are situations, however, where the Panel takes at face value representations made by the Department, including whether there have been any complaints involving use of force that were resolved with an "Appears Employee Conduct Could Have Been Better" finding.[19]  There is no way for the Panel to independently verify the Department's self-reporting in all areas without greatly increasing the staff and budget of the Panel, and the Department has given the Panel no reason to question the data it provides.  With respect to the classification of force incidents, there has been no change in the policy definitions of the respective force categories, and the Panel has seen no evidence of systematic misclassification in the dozens of force incidents we review each quarter.

## 1. <u>First Quarter 2020 results</u>

Per the applicable Compliance Measures, the Panel selected 29 force incidents to review in the First Quarter of 2020 and received and reviewed 27 of those force packages.[20]  The packages were selected without input from the Department.  As has been the Panel's approach in past reporting periods, the Panel selected for review the force incidents most likely to involve problematic uses of force:  The Panel asked to review all Category 3 incidents[21] (those involving force that is likely to, or does, result in severe injuries) and most Category 2 incidents that involved strikes or kicks by Department personnel.  Thus, the universe of force incidents selected by the Panel included a disproportionate number of the more serious incidents involving the use of force by Department personnel.[22]

Based on the assessment of each provision across all of the force packages, the Panel concluded that in the First Quarter of 2020 the Department was not in Compliance with the following provisions of the Action Plan applicable to the use of force by its members:  Force prevention principles (Section 2.2), head strikes or kicking inmates (Section 2.6), and calling supervisors to the scene before engaging with recalcitrant inmates (Section 2.7).   The Panel found that the Department was in **Compliance** as of the First Quarter of 2020 with the remaining Force Provisions of the Action Plan.

---

[19] Plaintiffs suggests that the Panel improperly relied on the Department's representation that there were no such complaints in the reporting period in assessing compliance with Section 3.5.

[20] Most of the force incidents reviewed by the Panel in the Eighth Reporting Period occurred during the latter half of 2019.

[21] The Panel asked to review all four of the Category 3 incidents from 2019.  Only two of those force packages were produced by the Department.  The Panel has been advised that the remaining Category 3 force packages from 2019 are still being reviewed by the Internal Affairs Bureau.

[22] According to Use of Force statistics provided by the Department for the Eighth Reporting Period, 81.5% of the force incidents in the Downtown Jail Complex were either Category 1 incidents or non-categorical incidents, 17.6 % were Category 2 incidents, and 0.9% were Category 3 incidents.

As in the past, the Panel's main concern was that Department members sometimes reacted too quickly and should have taken advantage of "time and distance" to de-escalate the situation and avoid using force altogether or to plan a potentially safer use of force. The failure to call a supervisor when confronted with a recalcitrant inmate is a corollary of the need for Department members to take more time before using force to control a recalcitrant inmate. The Department has shared with the Panel its intention to focus on these issues in its ongoing use of force refresher training required by the Action Plan, and has shown the Panel videos it has created to emphasize taking advantage of time and distance and calling a supervisor to help de-escalate an incident whenever possible or to direct deputies when de-escalation efforts have not served as an effective deterrent. The Panel appreciates the Department's emphasis on improving in this area.

The other persistent problem regarding the use of force identified by the Panel is the improper use of head strikes.[23] The Panel found 10 cases in the First Quarter where personnel inappropriately struck an inmate in the head. These incidents occurred at all three jail facilities under a variety of different circumstances. In many of the cases, the use of force was justifiable under the circumstances, but the danger presented by the inmate (if any) did not justify a head strike. Head strikes should be reserved for situations where the inmate is "high risk/assaultive." Yet, too often, head strikes are used as a control mechanism to subdue an aggressive inmate. Medical science informs us that head blows are the 'hidden injuries' that create or exacerbate mental illness. Agencies nationwide have long moved away from acceptance of head strikes. We encourage the Department to pay particular attention to this issue moving forward.

Plaintiffs identify several cases in which force was used against restrained inmates, and correctly note that the Panel determined that the force used in certain of these cases was excessive. The Panel determined, however, based on a qualitative assessment of the totality of cases reviewed during the reporting period, that the Department was in compliance with Section 2.5.

Plaintiffs contend that the Department is out of compliance with Section 2.8, relating to preventing excessive force by other Department personnel. The Panel believes Plaintiffs are misconstruing this provision. Section 2.8 requires Department members witnessing excessive force to stop, reduce or control the force being used. The cases cited by Plaintiffs involve incidents where multiple Department members were involved in efforts to restrain or subdue an inmate, and force was used by one or more of the Department members. Some of these cases involved the use of excessive force, which the Panel has found to violate Section 2.2 and/or Section 2.6. However, in the view of the Panel, none of these incidents presented a situation

---

[23]  The Panel has recommended in prior reports that head strikes be removed from the "Personal Weapon" Category in the Department's Use of Force policies. Punches to the head should instead become its own category of "Head Strikes," and Deputies should be required to explain specifically why a head strike was necessary or occurred. Policy, training, force packages, and supervisor reviews should reflect this change. The Department has not yet responded to this recommendation.

where one Department member had the opportunity to stop or reduce the force used by another
Department member and failed to do so.

## 2. <u>Second Quarter 2020 results</u>

In the Second Quarter of 2020, the Panel reviewed 22 force incidents.  The Panel
concluded that the Department was not in compliance with the same provisions of the Action
Plan noted with respect to the First Quarter of 2020:  Force prevention principles (Section 2.2),
head strikes or kicking inmates (Section 2.6), and calling supervisors to the scene before
engaging with recalcitrant inmates (Section 2.7).  The Panel found that the Department was in
**Compliance** as of the Second Quarter of 2020 with the remaining Force Provisions of the Action
Plan.

The Panel reviewed only one cell extraction in the Second Quarter of 2020 to assess the
Department's compliance with specific provisions that are applicable to the use of force in those
circumstances.[24]  In that one case, the Panel found the Department's use of force to be
appropriate and reasonable, but the documentation did not establish compliance with the
provisions related to mental health professional on-scene to attempt to resolve the situation
(Section 4.1), cooling off periods (Section 4.4), and mental health provider's order (Section 4.5).
However, given the sample size of one, the Panel has not determined the Department's
compliance with these provisions in the Second Quarter of 2020.  Instead, the Panel will consider
this case with others in the Ninth Reporting period.

## 3. <u>Training</u>

Sections 3.1 through 3.4 of the Action Plan require that Department members receive
training on use of force policies and on ethics, professionalism, and treating inmates with
respect; and that new Department members receive six weeks of Custody-specific training in the
Academy or the Jail Continuum in Custody Operations.  Sections 4.6 through 4.9 require the
Department to provide Custody-specific, scenario-based skill development training for existing
and new personnel in Crisis Intervention and Conflict Resolution and in "identifying and
working with mentally ill inmates."  Section 12.1 requires that Custody Sergeants receive
training in conducting use of force investigations.

The Department's training results are subject to audit by the Panel's auditors.  All of the
Department's reported results for the initial training of existing Deputy Sheriffs and Custody
Assistants and for new members set forth below have been verified by the Panel's auditors based
upon reviews of Department rosters and training records.  The auditors verified that the
Department's new members had received the required initial training from when it was first
offered through the "as of" date reported by the Department for the completion of the initial
training required for existing Deputies and Custody Assistants.  Accordingly, the Panel has
previously deemed the Department to be in compliance "as of" the date reported by the
Department for the completion of the initial training required for existing personnel.  Beginning

---

[24] In the past, including the First Quarter of 2020, the Department has typically provided
the Panel at least three cell extraction cases each quarter.

in this Eighth Reporting Period, the Department's continuing compliance with the training provisions is determined by its compliance with the refresher training required every year or every other year.

### A. Use of Force Training

As of June 30, 2018, 97% of the existing Deputies and Custody Assistants in the Downtown Jail Complex had received the initial eight-hour use of force training required by Section 3.1.[25]  96% of the trained Deputy Sheriffs and Custody Assistants completed the required refresher course through December 31, 2018.[26]  The refresher results for the Third and Fourth Quarters of 2018 were verified by the Panel's auditors and the Department is in **Compliance** with Section 3.1 as of June 30, 2018, through December 31, 2018.  The Department's Augmented Seventh Self-Assessment reported that 94% of the Deputy Sheriffs and Custody Assistants received the required refresher training in 2019.  These results have been verified by the Panel's auditors.  The Panel will maintain the **Compliance** assessment from the Seventh Reporting Period pending the year-end refresher training results for 2020.[27]  The final 2020 results will be subject to verification by the Panel's auditors.

### B. Ethics and Professionalism Training

As of June 30, 2018, 95% of the existing personnel received the initial four-hour training course in ethics, professionalism, and treating inmates with respect as required by Section 3.2.  95% of the trained Deputy Sheriffs and Custody Assistants completed the required refresher course through December 31, 2018.  The refresher results for the Third and Fourth Quarters of 2018 were verified by the Panel's auditors and the Department is in **Compliance** with Section 3.2 as of June 30, 2018, through December 31, 2018.  The Seventh Augmented Self-Assessment reported that 95% of the Deputy Sheriffs and Custody Assistants received the required refresher training in 2019, and that result was verified by the Panel's auditors.  The Panel will maintain the **Compliance** assessment from the Seventh Reporting Period pending the year-end refresher training results for 2020.  The final 2020 results will be subject to verification by the Panel's auditors.

---

[25] The use of force training approved by the Panel includes the custody-based use of force scenarios, constituting **Compliance** with Section 3.4.

[26] The Panel granted the Department extensions for Deputies who received the basic use of force training in 2017 and 2018 for completion of the initial refresher courses.  The Panel expects Department personnel to complete future refresher courses before the end of December of the years in which they are required.

[27] The Department's Eighth Self-Assessment reports that certain training classes were cancelled or modified due to COVID-19 safety restrictions as of March 17, 2020, and that it may be difficult for the Department to train as many personnel during 2020 as would have been trained absent the pandemic.  These limitations may impact the Department's ability to comply with training provisions of the Action Plan, and will be considered and addressed in the Panel's Ninth Report.

### C.      Mental Health Training

As of June 30, 2018, 97% of the existing Deputies at the Downtown Jail Complex and in the mental health unit at the Century Regional Detention Facility ("CRDF") received the 32 hours of training on Crisis Intervention and Conflict Resolution Training (DeVRT), including the eight hours of identifying and working with mentally ill inmates, required by Sections 4.6 and 4.7.  Also as of that date, 98% of the remaining Deputies at CRDF, and all Deputies at the North County Correctional Facility ("NCCF"), and the Pitchess Detention Center ("PDC") jails received the eight hours training in identifying and working with mentally ill inmates required by Section 4.7.

The Seventh Self-Assessment reported that for 2019, 98% of the Deputy Sheriffs and Custody Assistants received the required refresher training[28] for Section 4.6 and 96% of the Deputies received the required four hours of refresher training for Section 4.7.  The refresher results were verified by the Panel's auditors and the Department was found to be in Compliance with Section 4.6 and 4.7 as of December 31, 2019.  The Panel will maintain the **Compliance** assessment from the Seventh Reporting Period pending the year-end refresher training results for 2020.  The final 2020 results will be subject to verification by the Panel's auditors.

### D.      New Deputy Sheriffs and Custody Assistants

The Department has reported since the First Reporting Period that, beginning on July 1, 2015, newly assigned Deputies have been required to complete a six-week Custody Operations course that includes training in use of force and ethics, professionalism and treating inmates with respect, and new Custody Assistants have received training in these subjects during their Academy training as required by Section 3.3.  The Department's posted audit results reflect that the Department has exceeded the 95% Compliance standard for new Deputies and new Custody Assistants for the First and Second Quarters of 2020.  These results have been verified by the Panel's auditors and the Department is in **Compliance** with Section 3.3 through June 30, 2020.

The Department previously reported that 100% of new Deputies and Custody Assistants had received the conflict resolution training (DeVRT) and training in "identifying and working with mentally ill inmates" ("IIMI") required by Sections 4.8 and 4.9 in the Third and Fourth Quarters of 2019.  These results were verified by the Panel's auditors and the Department was found to be in Compliance with Sections 4.8 and 4.9 as of June 30, 2018 through December 31, 2019.  The required DeVRT and IIMI training takes place after Deputy Sheriffs and Custody Assistant Academy graduations and prior to assuming duties at their unit of assignment.  The Department's Eighth Self-Assessment reports that 100% of the new Deputies received the required training in the First and Second Quarters of 2020.  The Department further reports that there were no Custody Assistant Academy graduations during the First or Second Quarters of 2020.  The results for the First and Second Quarters of 2020 have been verified by the Panel's auditors.  The Department is in **Compliance** with Sections 4.8 and 4.9 through June 30, 2020.

---

[28] Eight hours every other year for Section 4.6 and four hours every other year for Section 4.7.

Section 3.5 requires Unit Commanders to determine "what additional training, counseling or mentoring may be required when a personnel complaint involving the use of force is resolved with a finding that it 'Appears Employee Conduct Could Have Been Better;' direct that the Department member undergo such additional training, counseling, or mentoring; and document the action taken." The Department's Eighth Self-Assessment reports that there were no inmate grievances against staff involving use of force where the disposition was that it "Appears Employee Conduct Could Have Been Better." The Department is in **Compliance** with Section 3.5 as of June 30, 2020.

Section 3.6 requires Unit Commanders to review new Department members within six months of being initially assigned to Custody and again before the end of their probationary period. Based upon a random selection of personnel records, the Department reports that 68% of the new Department members were reviewed as required by Section 3.6 in the first six months of 2020, which is below the 95% threshold for Compliance. These results are consistent with the lackluster results from the Seventh Reporting Period, and suggest that the Corrective Action Plan and other measures implemented by the Department following prior non-compliant quarters were not successful in ensuring compliance. The Department reports in its Eighth Self-Assessment Report that further briefings have been conducted to explain to Unit Commanders at each facility the importance of timely reviews.

## E.      Sergeant Training

The Department previously reported that as of June 30, 2018, 90.4% of the Sergeants assigned to Custody as of October 1, 2016, had received the 16 hours of training in conducting use of force investigations required by Section 12.1. These results were verified by the Panel's auditors. The Department's posted audit results report that 100% of the Sergeants newly promoted in Custody in the First Quarter of 2020 received the required training. These results have been verified by the Panel's auditors. The Department reports that the sole promoted Sergeant in the Second Quarter of 2020 received the required training in October 2020, the earliest opportunity to do so in light of COVID-19 restrictions on in-person classes. This training has been verified by the Panel's auditors. The resulting cumulative compliance for newly promoted Sergeants through the Second Quarter of 2020 remains under the 95% compliance threshold.

The Department's Eighth Self-Assessment reports that the Department will submit its annual results for Sergeants who were required to receive refresher training in 2020 in the Ninth Reporting Period. These results will be subject to verification by the Panel's auditors.

## 4.      **Reporting and Investigation of Force Incidents**

Many of the recommendations in the Action Plan that pertain to the reporting and investigation of force used by Department personnel in Custody Operations are assessed by the Panel through a review of the completed force packages. Other provisions are reported by the Department as follows:

- Section 5.1 requires the Department to track use of force investigations, reviews, and evaluations; review evaluations of force incidents; and conduct additional investigation of discrepancies and unexplained tactical decisions.  The Department reports that 100% of the force incidents in the First Quarter of 2020 were timely entered into the database as required by Section 5.1, and 96% were timely entered in the Second Quarter of 2020, which is above the 95% threshold required for **Compliance**.

- Section 8.3 requires that investigations of grievances claiming that Department members used force to retaliate against inmates be timely evaluated by the Custody Force Review Committee ("CFRC").  The Department reports that it achieved **Compliance** with this provision in the First Quarter of 2020, but did not achieve compliance in the Second Quarter of 2020 due to two of the seven grievances covered by this provision not being presented to the CFRC within 30 days of the Unit Commander's evaluation.  The Department reports that it has provided further instruction to the custody facilities to improve timeliness of review by CFRC.

- Section 11.1 requires that the Custody Force Rollout Team's involvement in reviewing force incidents not delay the Department's investigation of the force incidents.  The Compliance Measure requires that "95% of the investigations reviewed by CFRT were not delayed beyond the period permitted by law for imposing discipline."  The Department previously reported that it achieved **Compliance** with Section 11.1 in the Second Quarter of 2018.  Because there were no use of force incidents reviewed by CFRT in which there was a finding of a policy violation or misconduct in either the Fifth, Sixth, Seventh, or Eighth Reporting Periods, the predicate for determining compliance with Section 11.1 did not exist in those periods and the Department remains in **Compliance**.

- Section 13.1 requires the Department to "have a firm policy of zero tolerance for acts of dishonesty or failure to report uses of force."  Sections 13.1 and 13.2 require the documentation of the reasons and reports to the Inspector General whenever the Department does not terminate a member who has been found to have been dishonest, used excessive force, or violated the Prisoner Rape Elimination Act ("PREA").  The Department's Eighth Self-Assessment reports that in the First Quarter of 2020 a Custody Assistant was terminated for dishonesty in connection with an internal investigation.  The Inspector General was advised of this action.  There were no incidents in the Second Quarter of 2020 that were subject to Section 13.1 and 13.2.  The Department is in **Compliance** with Sections 13.1 and 13.2 through June 30, 2020.[29]

---

[29] The Panel remains concerned that reviewed use of force packages sometimes reflect Deputy reports that are inaccurate and self-serving, but which are not treated as "dishonesty" or "integrity" issues by the Department.  *See* Seventh Report, p. 18.  The Panel is not ready to conclude, as urged by Plaintiffs in their response to a draft of this Report, that every failure to discipline a Deputy who writes an inaccurate report regarding a force incident constitutes a violation of Section 13.1.  However, the Panel believes a more rigorous review of this issue by the Department would improve accuracy and candor in use of force reports.

- Sections 14.1 and 14.2 require (1) an additional review of referrals of inmates for criminal prosecution arising from incidents involving the use of force by Department members and (2) timely referrals to the District Attorney of "officer misconduct that may amount to criminal violations." The Department reports 100% in **Compliance** with Section 14.1 in the First and Second Quarters of 2020. With respect to Section 14.2, there was one timely referral of a Department member for possible prosecution for alleged misconduct that may amount to a criminal violation in each of the First and Second Quarters of 2020. Accordingly, the Department is in **Compliance** with Section 14.2 as of the Third Quarter of 2018, through the Second Quarter of 2020.

### A.    First Quarter 2020 Results

The Panel reviewed 27 completed force packages in the First Quarter of 2020 to assess compliance with the provisions of the Action Plan relating to the reporting and investigation of force incidents. The Panel concluded that the Department was not in compliance with the following provisions: Commanders' reviews (Section 5.2), unexplained discrepancies in reports (Section 5.3), location of inmate interviews (Section 12.2), the timeliness of force reports (Section 15.1), and the reporting of the observation of visible injuries or the lack of such injuries (Section 15.4). In addition, the documentation provided by the Department was not sufficient for the Panel to determine the Department's compliance with the provision relating to the separation of Department personnel after a force incident (Section 15.6). In order to achieve compliance with Section 15.6, the supervisor must document that the members were separated and how this separation was accomplished.

As in the past, the Panel has found the Department out of compliance with Section 5.2, relating to the evaluation of force incidents by appropriate Commanders, based on the fact that we are not consistently seeing rigorous reviews across all levels of the Department. We continue to see improper uses of force validated in the initial Supervisor's review, and while the Watch Commander and Unit Commander reviews are more substantive and probing than we saw in the early years of our monitoring, one or both Commander reviews often concur in the erroneous evaluation of the reviewing Sergeant. This is an area where there has been improvement by the Department, but the Panel expects to see more consistent recognition of problematic uses of force at all levels of review.

### B.    Second Quarter 2020 Results

The Panel reviewed 22 completed force packages in the Second Quarter of 2020. The Panel concluded that the Department was not in compliance with the following provisions: Commanders' reviews (Section 5.2), unexplained discrepancies in reports (Section 5.3), location of inmate interviews (Section 12.2), timeliness of force reports (Section 15.1), and failure to report force by other members (Section 15.3). In addition, the information provided by the Department was not, in many cases, sufficient for the Panel to determine the Department's compliance with the provision relating to the separation of Department personnel after a force incident (Section 15.6).

5.      **Inmate Grievances**

The Action Plan requires extensive changes in how the Department handles inmate
grievances and requests for service.  On July 15, 2016, the Department issued a new "Inmate
Grievance Manual" (Volume 8 of the Custody Division Manual) to implement a new grievance
system.  The Panel assessed the Department's implementation of the new grievance system in
the Eighth Reporting Period as follows:

A.      **Grievance Forms**

Sections 6.1 through 6.6 require that separate forms for inmate grievances be reasonably
available to inmates and that the forms have specific check boxes.  Section 7.1 requires the
Department to advise inmates of the voluntary Conflict Resolution Meeting available under the
Department's Conflict Resolution Policy.[30]  The Panel has previously concluded that the forms
meeting the requirements of the Action Plan are reasonably available to inmates, and the
Department remains in **Compliance** with those provisions relating to the availability of the
required forms in printed or electronic format.

One area of concern identified during this reporting period is the significant backlog in
processing grievances filed against staff, particularly at MCJ.  During the first six months of
2020, there were 264 complaints against staff that were received and assigned for review.  Only
13 of those complaints had been resolved by the end of the Second Quarter of 2020 – fewer than
three cases per month.  The Panel's data suggests that the bottleneck is with the reviewing
Sergeants at MCJ.  The Panel understands that recent staffing cuts within Custody Operations
may be contributing to this backlog.  Regardless of the reason, the Department must improve its
processing of complaints against staff.  The appropriate and prompt handling of these types of
grievances – perhaps more than any other type of grievance – is critical to maintaining an
appropriate culture within the jails and giving credibility to the grievance process.  We
understand that the Department has addressed this issue with its team at MCJ, and that the
Department intends to take substantial steps to increase the number of Sergeants in Custody
Division in the First Quarter of 2021.  We look forward to seeing substantial improvement on
this issue in the coming months.

Sections 6.4 and 6.5 of the Action Plan require that use of force grievances and retaliation
grievances against staff are brought to the attention of Unit Commanders within 10 days and
properly handled.  Based upon a review of the relevant grievances in the randomly selected
months, the Department reports that 100% of the use of force grievances were in Compliance
with Section 6.4 in the First and Second Quarters of 2020, which meets the threshold for
**Compliance**.  The Department also reports that 100% of the retaliation grievances in the First
and Second Quarters of 2020 were in **Compliance** with Section 6.5.  The source documents

---

[30] The Department reports that there were no grievances adjudicated by means of a
Conflict Resolution Meeting in the First Quarter of 2020 and two Conflict Resolution Meetings
in the Second Quarter of 2020.

posted by the Department for Sections 6.4 and 6.5 have been reviewed by the Panel, which verified that these grievances were handled appropriately.

### B.       Emergency Grievances

Sections 6.7 and 6.8 of the Action Plan set forth specific requirements for the determination, handling, and notifications of non-medical emergencies.  Section 6.7 requires: (1) Deputies to send any grievance marked "emergency" to a supervisor for review "as soon as possible;" (2) supervisors to determine if "the situation requires immediate action to protect the life or safety of the inmate;" (3) supervisors to notify watch commanders/shift supervisors of any non-medical emergencies; (4) Watch Commanders/shift supervisors to immediately confirm the emergencies exist and take action "to protect the inmates;" and (5) Watch Commanders/shift supervisors to notify the inmate in writing about "what action was taken to address the emergency."  The Compliance Measures require that 95% of the grievances marked as emergencies "be reviewed and handled as required by [Section] 6.7."  It is implicit in Section 6.7 that a supervisor's determination that the situation requires immediate action and a Watch Commander's confirmation that emergencies exist will be reasonable.  Section 6.8 requires that if the Department determines that a non-medical emergency does not exist, the Department must notify the inmate that it will be handled as a non-emergency grievance and document why it was determined not to be an emergency.

Based upon the review of the grievances marked "emergency" in the month randomly selected by the Panel for the First Quarter of 2020, the Department reports there were only two grievances that met the criteria of Section 6.7,[31] and that both of these grievances were properly handled under Section 6.7.[32]  The Panel has reviewed each of the 50 grievances produced from the First Quarter of 2020.  The Panel agrees that the two grievances handled as emergencies were handled consistent with Section 6.7.  However, the Panel is concerned that the Department may be too quick to reject inmate characterizations of grievances as "emergencies" where there is a possibility of danger to the life or safety of the inmate.  In several cases, grievances were downgraded to "non-emergent" upon initial review, but nevertheless promptly and appropriately addressed by the Department.  While the inmates' claims of potential danger may be exaggerated in many of these cases, the seemingly reflexive response of downgrading the grievance, but then promptly addressing it, seems unnecessary and potentially dangerous.

---

[31] The source documents provided by the Department reveal that there were more than 50 grievances marked "emergency" by inmates during the selected month.  However, in assessing compliance with Section 6.7, the Department appears to have reviewed only the two grievances during the selected month that were properly characterized as emergent.  The grievances the Department treated as non-emergent appear to have been assessed in the context of Section 6.8 compliance.  The Panel believes that the Section 6.7 assessment requires a review of whether the "downgrade" of a grievance marked "emergency" was proper, and has reviewed the Department's Section 6.8 source materials to conduct this assessment.

[32] As part of its Section 6.8 analysis, the Department concluded that all 50 of the reviewed grievance were properly downgraded to non-emergent.

Both the Department and Plaintiffs have commented on the Panel's observations regarding the treatment of emergency grievances, with the Department offering clarification regarding its procedures for evaluating such grievances and noting its practice of treating as an emergency any complaint that identifies "potentially dangerous" concerns or issues. The Panel reiterates its observations that the Department consistently addresses grievances in a timely manner, but, in some cases, has adopted an overly narrow view of whether the concern raised is "potentially dangerous." We believe that close cases should be resolved in favor of treating the grievance as an emergency.

For the Second Quarter of 2020, the Department reviewed 50 grievances that were handled as emergent[33] and found that all of them were properly handled. The Department also reviewed 50 grievances that were marked as "emergency" but handled as non-emergent and found that 100% of the grievances were properly downgraded. The Panel has reviewed the source documents related to the selected grievances and determined that the grievances handled as emergent and those downgraded to non-emergent in the Second Quarter of 2020 were appropriately handled by the Department.

Accordingly, the Department is in **Compliance** with Section 6.7 and Section 6.8 for the period January 1, 2020, through June 30, 2020.

### C.     Inmate Grievance Coordinator

During the Seventh Reporting Period, the Department appointed a new Inmate Grievance Coordinator to continue implementation of the grievance provisions of the Rosas Action Plan and the use of technology to receive and track the Department handling of inmate grievances. The Panel met with the Inmate Grievance Coordinator twice during the Eighth Reporting Period to discuss the Department's implementation of its grievance policies and procedures.

Section 6.9 requires that emergency grievances be forwarded to the Inmate Grievance Coordinator. Sections 6.13, 6.14, and 6.15 require the Inmate Grievance Coordinator to track the Department's handling of inmate grievances, provide a monthly report to the Unit Commander and senior management in Custody on the status of inmate grievances, and analyze inmate grievances for problematic trends. The Department provided documentation to the Panel showing that for the First and Second Quarters of 2020, the Inmate Grievance Coordinator received the information about emergency grievances required by Section 6.9 and prepared detailed reports for managers as required by Sections 6.13, 6.14, and 6.15. The Department is in **Compliance** with Sections 6.9, 6.13, 6.14, and 6.15 through June 30, 2020.

As previously reported, the Panel believes that the structure of the grievance system developed by the Department under the direction of an Inmate Grievance Coordinator is

---

[33] The marked increase in the number of grievances handled as "emergent" in the Second Quarter of 2020 is due to a policy decision by the Department to handle as an emergency any grievance that referenced COVID-19.

effectively and efficiently handling inmate grievances and requests for service and that the
Department is in **Compliance** with Section 6.16.[34]

### D.     Handling of Grievances

Sections 6.10 and 6.12 require that grievances be collected daily, logged in, and tracked
in an inmate grievance database.  The Compliance Measures for these provisions require that the
Department review the first 25 consecutive grievances from MCJ and the first 25 consecutive
grievances from TTCF during the randomly selected month to determine if they were collected,
reviewed and tracked as required.  The Department's Eighth Self-Assessment reports that 100%
of the reviewed grievances were collected and reviewed within 24 hours and handled as required
in both the First and Second Quarters of 2020.  The source documents posted by the Department
reflect that, while the 50 reviewed grievances were collected in a timely manner, there were
numerous days during the selected months where grievances were not collected from boxes at
both facilities.[35]  Accordingly, the Department is not in Compliance with Section 6.10 for the
First and Second Quarters of 2020.

The Department has objected to this finding of non-compliance as unfair because it is
based on information outside that required to be provided under the applicable Compliance
Measure.  (Department's Response, pp. 6-7.)  The Panel disagrees.  The Department's failure to
comply with Section 6.10, which requires that grievances be collected on at least a daily basis, is
undisputed.  Although the Revised Monitoring Plan and Compliance Measures sets forth a
mechanism for assessing compliance with this provision, it also states that "[t]he Monitors
reserve the right . . . to request and review additional records and categories of records as
necessary to assess the Department's Compliance with specific provisions of the Plan."  The
records relied upon by the Panel to assess compliance with Section 6.10 were appropriately
considered.

The Department's Eighth Self-Assessment reports that 100% of the grievances at both
MCJ and TTCF in the randomly selected months in the First and Second Quarters of 2020 were
entered into the database as required by Section 6.12.  The source documents for these results
were available to, and reviewed by, the Panel.  Accordingly, the Department is in **Compliance**
with Section 6.12 through June 30, 2020.

---

[34] As they have in the past, Plaintiffs contend that the Department is out of compliance
with Section 6.16 because it has not implemented a centralized grievance unit.  For the reasons
set forth in the Seventh Report, the Panel disagrees.  *See* Seventh Report, p. 21.

[35] The Panel notes that the Compliance Measure for Section 6.10 may not yield data
sufficient to assess compliance with this provision.  For example, the first 25 consecutive
grievances at MCJ for the selected months were collected within the first several days of the
month.  If, as was the case during the First and Second Quarters of 2020, MCJ timely collected
grievances from its collection boxes in the first week of the month, but failed to collect
grievances on several days during the remainder of the month, the review called for by the
Compliance Measure would not reveal that shortcoming.  The Panel appreciates the Department
providing collection data beyond that required by the Compliance Measure to allow the Panel to
properly assess the Department's collection efforts.

Section 6.11 requires that the Custody Division Manual provide that failing to comply with Department policies requiring proper handling of inmate grievances may be cause for discipline. The Department reports that there were two claims that Department members improperly handled inmate grievances resolved during the Eighth Reporting Period. In neither case was the member found to have violated the grievance policy. Accordingly, the Department is in **Compliance** with Section 6.11 through June 30, 2020.

Section 8.1 prohibits Department personnel from retaliating against inmates. The Department posted the results of the investigations approved by Unit Commanders in the randomly selected months and the number of anti-retaliation grievances received and investigated in the First and Second Quarters of 2020. It reports that in the First Quarter of 2020 there were six grievances alleging retaliation resolved in the selected month, with no findings of a violation of the anti-retaliation policy. For the entire quarter, there were 56 anti-retaliation grievances received, two investigations completed, and no founded violations of the anti-retaliation policy. In the Second Quarter of 2020 there were four grievances alleging retaliation resolved in the selected month, with no findings of a violation of the anti-retaliation policy. For the entire quarter, there were 52 anti-retaliation grievances received, two investigations completed, and no founded violations of the anti-retaliation policy. The Panel reviewed the investigative summaries that were posted by the Department of the anti-retaliation grievances that Unit Commanders deemed unfounded in the random months of February and May 2020 and agrees with the Commanders' assessments. The Panel finds that the Department has maintained **Compliance** with Section 8.1 through June 30, 2020.

Although the Department continues to make progress in its handling of inmate grievances and requests, the Panel is disappointed that the Department appears to have lost momentum with respect to the use of technology to electronically receive and track the Department's handling of inmate grievances within the jails. The plan was to install iPads in tamper-proof cases within the living units and to automate the grievance process, retaining paper grievance forms for those inmates that preferred them. Prior to installing grievance software, the iPads in TTCF were outfitted with inmate request and information software so that questions about an inmate's account, court dates, medical appointments, and much more could be accessed and answered by inmates without staff involvement. That was a huge success, with hundreds of thousands of inmate inquiries answered immediately, which removed a huge workload from frontline staff and eliminated a great deal of inmate frustration when staff does not have time to get answers to those questions. The Panel was most optimistic about the Department expanding the program to the other facilities and enhancing them with the grievance system capabilities, but a combination of technological challenges, indecision regarding the appropriate operating system and delays due to COVID-19 and other health issues within the jails appears to have set the entire initiative back. The Department reports that it continues to press forward on this initiative. The Panel expects the Department to re-double its efforts to more widely implement the electronic tablet program throughout the Downtown Jail Complex.

### E.      Deadlines

Sections 6.17, 6.18, 6.19, and 6.20 set forth the deadlines for filing use of force and
PREA grievances,[36] the Department's initial responses, inmates' right to appeal, and the
Department's notifications of the results of the investigations.  The Department's Eighth Self-
Assessment reports that it adhered to the deadlines for these grievances in both the First and
Second Quarters of 2020.  The Panel agrees that the Department is in **Compliance** with Sections
6.17, 6.18 and 6.20 through June 30, 2020.  As previously noted by the Panel, however, the
Department reports on the timeliness of responses by Correctional Health Services to inmate
grievances against the medical staff  (e.g., lack of a timely response to a request for medical
service), a metric required in order to achieve Compliance with Section 6.19.  The Panel
recognizes that Jail Health Services is under a separate County agency, but has suggested for
some time that representatives from the Health Department participate in the grievance review
with Department members and the Panel.  That has not happened, but the health grievance
notifications continue to fall substantially below compliance.

### F.      Communications with Inmates

The Eighth Self-Assessment also reports that the Department adhered to the deadlines for
advising inmates of the results of adjudications as required by Section 7.2 for First Quarter
(95%) and the Second Quarter (100%) of 2020.  The posted source documents for these results
were available to, and reviewed by, the Panel.  Accordingly, the Department is in **Compliance**
with Section 7.2 through June 30, 2020.

Section 7.3 requires the Department to "ensure that there are adequate avenues for
constructive prisoner-staff communication[.]"  The Department's Eighth Self-Assessment reports
that the Department was in Compliance with Section 7.3 during both the First and Second
Quarters of 2020.  The Department provided logs of Town Hall meetings at MCJ and TTCF
during the randomly selected months the First and Second Quarters of 2020 that included Town
Hall meetings in special housing units as well as in General Population housing units.  Based on
these logs, the Panel is of the view that the Department has achieved **Compliance** with Section
7.3 for the period January 1, 2020, through June 30, 2020.

### 6.      Use of Restraints

Section 17.1 requires that the Custody Force Manual include "a separate section that sets
forth the general principles governing the use of restraints" identified in this recommendation.
The Department included such a separate section in the Manual, and is in **Compliance** with this
requirement of Section 17.1, effective December 1, 2015.

Section 17.3 requires medical examinations of inmates placed in safety chairs and
Section 17.4 requires safety checks of inmates in fixed restraints every twenty minutes.  The
Compliance Measures require the Department to provide the Panel "with a list of incidents in
which inmates were placed in a Safety Chair, restrained to a fixed object for more than 20

---

[36] Section 6.18 provides that there is no deadline for filing PREA grievances.

minutes, subjected to security restraints for an extended length of time" in the Downtown Jail Complex.[37]

During the Eighth Reporting Period, the Department provided the Inmate Safety Chair Security Check Logs for use of the safety chair and Fixed Restraint Logs at Downtown Jail Complex in the First and Second Quarters of 2020.  The Inmate Safety Chair Security Check Logs and Fixed Restraint Logs reflect that Department personnel are, in the majority of cases, checking on the inmates every twenty minutes as required by Section 17.4, although in some cases the Deputies did not provide any details regarding the inmate's condition, the authorization for keeping the inmate in the chair for more than two hours, or the release time.  Further, there is no indication that medical professionals are performing any vitals checks even though inmates are often in the safety chairs for several hours while they are transported to court, attend the court proceedings, and are then transported back to the facilities.  Periodic vitals checks are necessary in order to establish Compliance with Section 17.3 even if the inmate does not struggle and force is not used to place the inmate in the chair.

Section 17.10 provides that medication cannot be used solely for security purposes.  The Department's posted Self-Assessment, confirmed by a log of the Administration of Involuntary Medications, reports that the overwhelming majority of involuntary medications were pursuant to court orders and there were no instances in which medication was used solely for security purposes in the First and Second Quarters of 2020.  Accordingly, the Department has been in **Compliance** with Section 17.10 through June 30, 2020.

## 7.    Early Warning System

Section 19.1 requires the Department to develop an Early Warning System to identify potentially problematic employees based upon objective criteria.  The Panel approved the Employee Review System ("ERS") in July 2018, and it was implemented by the Department as a pilot program in the Downtown Jail Complex on August 1, 2018, and in the rest of the jail facilities as of November 1, 2018.  The Department has been in **Compliance** with Section 19.1 in the Downtown Jail Complex since August 1, 2018.

Section 19.2 requires Compliance Lieutenants to review monthly reports generated by the ERS and notify Unit Commanders and the Assistant Sheriff for Custody of the results within specified time periods.  Under the Revised Compliance Measures, Compliance Lieutenants must notify the Unit Commander and Assistant Sheriff for Custody Operations 90% of the time within 10 days after reviewing monthly reports generated by the Early Warning System and 95% of the time within 30 days.  The Department's Eighth Self-Assessment reports that the Department achieved Compliance with Section 19.2 in the First and Second Quarters of 2020 at all three

---

[37] Sections 17.6 through 17.9 govern the application of multi-point restraints, which the Panel has been advised by the Department it does not use.

Downtown jail facilities.[38]  Based on the source documents provided, the Panel concludes that the Department was in **Compliance** with Section 19.2 for the First and Second Quarters of 2020.

Section 19.3 requires Unit Commanders to determine whether problematic employees should be placed on a performance mentoring program.  For each potentially problematic Department member identified through the Early Warning System, the Unit Commander must consult with the appropriate Chief and document the reasons why any problematic members are not placed on a performance mentoring program.  Based on the documents provided, it appears that Unit Commanders are notifying their appropriate Chief of those instances in which employees are not placed on a performance mentoring program, but they are *not* engaging in the required consultation with the Chief.  Moreover, Unit Commanders at MCJ are not properly documenting the reasons identified employees are not being placed on performance mentoring programs.  Instead, MCJ tends to assign any employee identified by the EWS to some form of remedial training, either "force concepts" or "use of force refresher."[39]  The only exceptions appear to be situations in which there is an administrative investigation in progress.  The Panel finds the Department to be out of compliance on Section 19.3.

---

[38] The Department reports a delay in providing the January 2020 monthly report for TTCF to the Division Chief; however, this delay did not impact its compliance with the Section 19.2 deadlines.

[39] The Panel has previously expressed concern about lack of clarity regarding the specifics of the "force concepts" training assigned by MCJ Unit Commanders.  *See* Seventh Report, p. 25, n.36 (noting that the annual refresher course required by Section 3.1 is not appropriate as a remedial measure for individuals with disproportionate number of use of force situations).

**APPENDIX**

| NO. | PROVISION | STATUS[40] | DATE[41] |
|---|---|---|---|
| | | | |
| | **Leadership, Administration & Management** | | |
| | | | |
| 1.1 | Assistant Sheriff | Compliance | January 1, 2017 |
| 1.2 | Sheriff | Compliance | January 1, 2017 |
| 1.3 | Supervision | Compliance | September 30, 2018 (MCJ and TTCF) July 1, 2019 (IRC) |
| 1.4 | Reports to Board | Compliance | June 12, 2018 |
| 10.1 | Jail Visits | Compliance* | June 30, 2018 |
| 10.2 | Documented Visits | Compliance* | June 30, 2018 |
| 18.1 | Rotation in Custody | Compliance | June 30, 2018 |
| 18.2 | Documentation of Rotation | Compliance | January 1, 2019 |
| 21.1 | Transfers to Custody | Compliance | June 30, 2018 |
| | | | |
| | **Use of Force Polices & Practices** | | |
| | | | |
| 2.1 | Custody Force Manual | Compliance | January 1, 2017 |
| 2.2 | Force Prevention Principles | | |
| 2.3 | Inmate on Inmate Violence | Compliance | July 1, 2019 |
| 2.4 | Use of Force as Discipline | Compliance | July 1, 2019 |
| 2.5 | Force on Restrained Inmates | Compliance | July 1, 2019 |
| 2.6 | Head Strikes or Kicks | | |
| 2.7 | Supervisors Called to Scene | | |
| 2.8 | Prevent Excessive Force | Compliance | July 1, 2019 |
| 2.9 | Armed Inmates | Compliance | July 1, 2019 |
| 2.10 | Authorized Weapons | Compliance | July 1, 2019 |
| 2.11 | Planned Chemical Spray | Compliance** | January 1, 2020 |
| 2.12 | Chemical Spray & Tasers | Compliance | July 1, 2019 |
| 2.13 | Check of Medical Records | Compliance | October 1, 2019 |
| 4.1 | Consult MH professionals | Compliance** | October 1, 2019 |
| 4.3 | Spray on MH inmates | Compliance | October 1, 2019 |

[40] A single asterisk denotes that assessment of the provision was suspended during the Second Quarter of 2020 based on the Department's inability to comply due to COVID-19 restrictions.  A double asterisk denotes that there was insufficient data to assess compliance during the Second Quarter of 2020.

[41] This represents the date the Department came into the compliance that it has maintained through the date of this report.

| 4.4 | Cooling Off Periods | Compliance** | October 1, 2019 |
|-----|---------------------|--------------|-----------------|
| 4.5 | Medical or MH Provider | Compliance** | October 1, 2019 |
| 8.2 | Complaints of Retaliation | Compliance | January 1, 2017 |
| 9.2 | Escorting of Inmates | Compliance | January 1, 2020 |
| 17.2 | Pregnant Inmates | Compliance | January 1, 2017 |
| 17.5 | Minimize Medical Distress | Compliance | July 1, 2019 |
| 20.1 | Categories of Force | Compliance | January 1, 2017 |
| 20.2 | Reactive Force | Compliance | January 1, 2017 |
| 20.3 | Planned Use of Force | Compliance | October 1, 2019 |
|  |  |  |  |
|  | **Training**[42] |  |  |
|  |  |  |  |
| 3.1 | Use of Force Training | Compliance | June 30, 2018 |
| 3.2 | Ethics, Professionalism | Compliance | June 30, 2018 |
| 3.3 | Custody Training | Compliance | June 30, 2018 |
| 3.4 | Custody-based scenarios | Compliance | June 30, 2018 |
| 3.5 | Add training/mentoring | Compliance | July 1, 2019 |
| 3.6 | Probation Reviews |  |  |
| 4.6 | Crisis Intervention | Compliance | June 30, 2018 |
| 4.7 | Mentally Ill Inmates | Compliance | June 30, 2018 |
| 4.8 | Mentally Ill Inmates (for new Department members) | Compliance | June 30, 2018 |
| 4.9 | Crisis Intervention  (for new Department members) | Compliance | June 30, 2018 |
| 12.1 | Force Investigations |  |  |
|  |  |  |  |
|  | **Investigation & Reporting of Force** |  |  |
|  |  |  |  |
| 4.2 | Mental Health Professionals | Compliance | October 1, 2019 |
| 5.1 | Tracking of Force Incidents | Compliance | October 1, 2019 |
| 5.2 | Commanders' Reviews |  |  |
| 5.3 | Unexplained Discrepancies |  |  |
| 8.3 | CFRC Review |  |  |
| 11.1 | CFRT Involvement | Compliance | June 30, 2018 |
| 12.2 | Location of Inmate Interviews |  |  |
| 12.3 | Suspect Interviews | Compliance | July 1, 2019 |
| 12.4 | Uninvolved Supervisors | Compliance | July 1, 2019 |
| 12.5 | Standard Order & Format | Compliance | July 1, 2019 |
| 13.1 | Documenting dishonesty | Compliance | October 1, 2019 |
| 13.2 | Reports of Dishonesty/PREA | Compliance | October 1, 2019 |
| 14.1 | Review of Criminal Referrals | Compliance | July 1, 2018 |

---

[42] The Department's reported results for Sections 3.1 through 3.4, 4.6 through 4.9, and 12.1 have been verified by the Panel's auditors.

| 14.2 | Timeliness of Criminal Referrals | Compliance | July 1, 2018 |
|------|----------------------------------|------------|--------------|
| 15.1 | Timeliness of Reports | | |
| 15.2 | All Department Witnesses | Compliance | July 1, 2019 |
| 15.3 | Force by Other Members | | |
| 15.4 | Description of Injuries | Compliance | April 1, 2020 |
| 15.5 | Clarification after Video | Compliance | July 1, 2019 |
| 15.6 | Separation of Deputies | | |
| 15.7 | Individual Perceptions | Compliance | July 1, 2019 |
| 16.1 | Healthcare Assessment | Compliance | July 1, 2019 |
| 16.2 | Photographs of Injuries | Compliance | July 1, 2019 |
| 16.3 | Medical Report of Injuries | Compliance | July 1, 2019 |
| | | | |
| | **Inmate Grievances** | | |
| | | | |
| 6.1 | Separate Grievance Forms | Compliance | January 1, 2017 |
| 6.2 | Available Grievance Forms | Compliance | January 1, 2017 |
| 6.3 | Emergency Grievances Forms | Compliance | January 1, 2017 |
| 6.4 | Use of Force Grievances | Compliance | July 1, 2018 |
| 6.5 | Grievances Against Staff | Compliance | July 1, 2018 |
| 6.6 | Right to Appeal Form | Compliance | January 1, 2017 |
| 6.7 | Handling Emergency Grievances | Compliance | July 1, 2018 |
| 6.8 | Notification of Non-Emergency | Compliance | January 1. 2020 |
| 6.9 | Grievance Coordinator Review | Compliance | July 1, 2018 |
| 6.10 | Collection of Grievances | | |
| 6.11 | Failure to Handle Grievances | Compliance | January 1, 2020 |
| 6.12 | Tracking Inmate Grievances | Compliance | July 1, 2018 |
| 6.13 | Grievance Coordinator Tracking | Compliance | July 1, 2018 |
| 6.14 | Grievance Coordinator Reports | Compliance | July 1, 2018 |
| 6.15 | Grievance Coordinator Analysis | Compliance | July 1, 2018 |
| 6.16 | Centralized Grievance Unit | Compliance | January 1, 2017 |
| 6.17 | Use of Force Deadline | Compliance | October 1, 2019 |
| 6.18 | PREA Deadline | Compliance | July 1, 2018 |
| 6.19 | Response to Inmate Grievances | | |
| 6.20 | Appeals of Grievances | Compliance | July 1, 2018 |
| 7.2 | Notification of Results | Compliance | July 1, 2018 |
| 7.3 | Prisoner-staff Communications | Compliance | April 1, 2019 |
| 8.1 | Anti-retaliation | Compliance | April 1, 2019 |
| | | | |
| | **Use of Restraints** | | |
| | | | |
| 17.1 | Restraint Provisions | Compliance | December 1, 2015 |
| 17.3 | Safety Chair Procedures | | |
| 17.4 | Safety Checks | | |
| 17.6 | Multi-point Restraint Procedures | Not Applicable | |

| 17.7 | Approval of Multi-point Restraints | Not Applicable | |
|------|------|------|------|
| 17.8 | Continued Use of Restraints | Not Applicable | |
| 17.9 | Supervisor Approval of Restraints | Not Applicable | |
| 17.10 | Involuntary Medications | Compliance | July 1, 2018 |
| | | | |
| | **Early Warning System** | | |
| | | | |
| 19.1 | Development of EWS | Compliance | August 1, 2018 |
| 19.2 | Report Review and Notification | Compliance | January 1, 2019 |
| 19.3 | Performance Mentoring Programs | | |