**WINSTON & STRAWN  LLP**
MARC S. HARRIS (Bar No. 136647)
333 South Grand Avenue, 38th Floor
Los Angeles, CA  90071-1543
Telephone: (213) 615-1700
Facsimile:  (213) 615-1750
Email:  msharris@winston.com

**Monitor and on behalf of Monitors**
**Jeffrey Schwartz and Robert Houston**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS, et al. | CV No. 12-00428 DDP |
| Plaintiffs, | |
| | **PANEL'S NINTH REPORT** |
| v. | |
| LOS ANGELES COUNTY SHERIFF LEROY BACA, in his Official Capacity, | |
| Defendant. | |

1    Pursuant to the Section V of the Settlement Agreement And Release of
2  Claims, the Monitors appointed by this Court, Jeffrey Schwartz, Robert Houston,
3  and Marc S. Harris (collectively the "Panel") hereby submit the attached Panel's
4  Ninth Report "evaluating Defendant's Compliance with Action Plan" prepared by
5  the Panel for the six-month period from July 1, 2020, to December 31, 2020.  This
6  Report takes into consideration the comments from the parties in accordance with
7  Section V of the Settlement Agreement.  The Panel is available to answer any
8  questions the Court may have regarding this Report at such times as are convenient
9  for the Court and the parties.

10
11  DATED:  June 30, 2021              Respectfully submitted,

12                                    WINSTON & STRAWN LLP
13                                    MARC S. HARRIS

14

15                                    By:  /s/ *Marc S. Harris*
16                                         Marc S. Harris
                                           Monitor and on behalf of Monitors Jeffrey
17                                         Schwartz and Robert Houston

18
19
20
21
22
23
24
25
26
27
28

# PANEL'S NINTH REPORT

The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan [developed by the Panel] ('Reports') at intervals the Panel shall determine."  This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from July 1, 2020 to December 31, 2020 (the "Ninth Reporting Period"), and it is created for the purposes of the settlement of the *Rosas* case.  In accordance with Paragraph V of the Settlement Agreement, it takes into consideration comments received from County Counsel on June 17, 2021, and from Class Counsel on June 22, 2021, regarding the draft of the report that was sent to them on June 1, 2021.

In May 2014, the Parties retained the Panel "to develop a corrective action plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles" (the "Downtown Jail Complex").  The plan developed by the Panel sets forth provisions in twenty-one areas that the Sheriff is required to implement in the Downtown Jail Complex.  The plan was approved by the Court on April 7, 2016.  Under Paragraph VIII of the Settlement Agreement, "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented, it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')."  As of November 1, 2018, the Sheriff's Department (the "Department") has implemented 104 of the Panel's 106 recommendations.  The remaining two recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in *United States v. County of Los Angeles, et al*., CV No. 15-05903 (JEMx) (the "DOJ case").[1]

In the Panel's Eighth Report, we noted the continuing reduction in the number of force incidents during the first six months of 2020 in the Downtown Jail Complex, with an average of 76 force incidents per month in these facilities in the first half of the year.[2]  These totals compared favorably with the latter half of 2019, which saw an average of 107 force incidents per month, and with 2018, when the monthly average was 130.  We also noted that this positive trend applied to Category 2 force incidents[3] in the first half of 2020.  According to data provided by the Department, the number of Category 2 incidents fell from 25 per month in 2019 to 13 in the first six months of 2020.  The decreases in Category 2 incidents were seen at all three of the

---

[1] The other recommendations in the *Rosas* Action Plan have been implemented in the other jail facilities outside of the Downtown Jail Complex pursuant to Paragraph 81 of Settlement Agreement and Stipulated Order of Resolution in the DOJ case.

[2] Since the publication of our Eighth Report, the Department has revised its data slightly for the first half of 2020.  The current data reflects 441 total force incidents in the Downtown jails during the first half of 2020, representing 73.5 incidents per month.

[3] Category 2 force encompasses most incidents with an "identifiable injury," including relatively minor injuries such as a cut or a bruise.  Force that is likely to, or does, result in severe injuries is classified as a Category 3 incident.  Category 3 incidents have been relatively rare.

Downtown jail facilities.  We noted in our Eighth Report that much of this decrease was undoubtedly attributable to the significant reduction in the inmate population in the Second Quarter of 2020 due to the COVID-19 pandemic.

In the second half of 2020, the use of force numbers increased slightly across all of the Downtown facilities, but are still well below the numbers we saw in 2018 and 2019.  According to the Department's statistics, there were 516 uses of force across all three facilities, a 17% increase from the first half of the year.  Most of this increase was due to increases in the number of Category 1 incidents at TTCF and MCJ.[4]  Category 2 incidents increased by 5% across the three facilities.[5]  Notably, there were no Category 3 force incidents at any of the Downtown jail facilities in the second half of 2020.[6]

While the overall force numbers continue to trend downward, instances of problematic uses of force continue to occur in the Downtown jail facilities.  During the Ninth Reporting Period, the Panel reviewed 53 completed force packages that were selected by the Panel from a comprehensive list of force incidents compiled by the Department.[7]  In more than 25% of the force packages reviewed, the Panel found some aspect of the force used during the encounter that violated the force prevention principles of Section 2.2 of the Action Plan.  In cases where some force may be warranted, the Panel continues to see improper head strikes by Department personnel.  Even more troubling, the Panel reviewed a small number of cases in the Fourth Quarter of 2020 where it appears force was used as discipline or corporal punishment – a practice that had seemed to have all but vanished within the Downtown jail facilities.  The Panel

---

[4] As they have in the past, Plaintiffs raise concerns about the Department's classification of force incidents.  Plaintiffs' Response, p. 4.  As we noted in our Eighth Report, the Panel has seen no evidence of systematic misclassification in the dozens of force incidents we review each quarter.  With respect to the single incident identified by Plaintiffs as having been misclassified as a Category 2 incident (as opposed to Category 3), we have reviewed the incident and concur in the Department's classification.

[5] At TTCF, there was a 22% *decrease* in Category 2 incidents (from 31 to 24); at IRC there was a 10% increase (from 21 to 23); and at MCJ there was a 30% increase (from 30 to 39).  The Department has pointed to the sharp increase in state prison inmates housed in the County jails due to public health precautions as contributing to the rise in force incidents, noting that state prison inmates "currently make up more than 20% of the jail population and increase difficulties and challenges in managing routine challenges, creating opportunities for force avoidance, and put pressure on traditional living conditions issues that exacerbate tensions between inmates and staff." Department Response, p. 1.

[6] Plaintiffs point to a Category 3 incident the Panel reviewed in the Fourth Quarter of 2020 as evidence of the lack of reliability of the Department's overall force statistics.  Plaintiffs' Response, p. 4.  Although reviewed in the Fourth Quarter, the subject incident took place in April 2020.

[7] The Panel reviewed 25 force packages in the Third Quarter of 2020 and 28 force packages in the Fourth Quarter of 2020.  As discussed below at pages 8-9, the Panel did not select these force packages randomly or in proportion to the frequency with which various categories of force occur.  Rather, the Panel selected for review the force incidents most likely to involve problematic uses of force.

considers these cases to be outliers – the Department has made tremendous progress in improving the culture at the Downtown jail facilities and the overwhelming majority of interactions between Department staff and inmates are handled professionally and conscientiously.  Even where we have found fault with the tactics or the level of force used in a particular situation, the Panel has almost never concluded that malicious motives were driving the offending staff member.  We expect the Department to pay particular attention to these uses of force that appear motivated by anger or the desire for retribution.

Other issues raised by the Panel in prior reports persisted in the Ninth Reporting period, most notably, the failure of the Department to mete out discipline in cases where force policies are violated, or Department personnel inaccurately describe force incidents in their written reports.  Although tremendous strides have been made by the Department in limiting improper uses of force and developing a culture that discourages bad practices and emphasizes more positive staff-inmate relationships, the Panel believes that further progress in eliminating improper uses of force can only be achieved if deputies who clearly cross the line are disciplined.

With regard to the non-force related provisions in the Action Plan, the Department submitted its Ninth Self-Assessment Status Report (the "Ninth Self-Assessment") on March 15, 2021, and augmented its self-assessment (the "Augmented Ninth Self-Assessment") on April 15, 2021.  During the Ninth Reporting Period, the Panel reviewed records posted by the Department to verify the Department's self-assessments of its compliance with non-force provisions of the Action Plan.  The Panel's evaluation of the provisions of the self-assessment reports are included in this Report.  All of the Department's training results are subject to verification by auditors retained by the Panel.

Due to the restrictions and safety concerns caused by the COVID-19 pandemic, the Panel was not able to visit the jails in the second half of 2020.  Accordingly, the Panel is not able to offer an assessment of the state of the relationship between Department personnel and inmates beyond what can be gleaned from the data and our review of the selected force packages.  We hope to resume visits to the jails in the latter half of 2021.

The Department continued to cooperate fully with the Panel during the Ninth Reporting Period.  The Department and County Counsel answered our questions and responded to our requests for documents and information.  They also engaged in constructive conversations with the Panel about our findings regarding the use of force incidents we reviewed and the Department's continuing efforts to implement the terms of the Rosas Action Plan.  We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.

## ACTION PLAN IMPLEMENTATION

1.   **Leadership, Administration and Management**

   A.   **Leadership and Accountability**

   The recommendations in Sections 1.1 through 1.4 of the Action Plan require that Custody be headed by an Assistant Sheriff with no other areas of responsibility, the Sheriff be engaged personally in the management of the jails, the Department's managers be held accountable for any failures to address force problems in the jails, and the Department regularly report to the Board of Supervisors on the use of force in the jails and on its compliance with the Action Plan.

   The Department has been in **Compliance** with Sections 1.1 of the Action Plan since well before January 1, 2017.[8]  Custody has been headed by an Assistant Sheriff with no other areas of responsibility since mid-2014.  It was under the direction of Assistant Sheriff Bruce Chase during the Ninth Reporting Period.  The Panel found Assistant Sheriff Chase to be accessible, forthright and fully supportive of the work of the Panel.[9]

   The Panel met with Sheriff Villanueva by video conference in November 2020, and again in April 2021. The Department has provided the Panel with a log of the frequent meetings that Sheriff Villanueva had with Assistant Sheriff Chase from July 2, 2020, through December 31, 2020, to review use of force incidents, the use of less lethal weapons and personal weapons, cell extractions, Category 3 incidents and associated injuries, use of force against mentally ill inmates, dorm disturbances, gassing incidents, deployment of chemical agents, de-escalation of force, suicide attempts and rescue force, inmates entering the facilities under the influence and available detox housing units, facility security concerns, assaults on staff, and alternative tactical approaches to address current inmate populations.  The Panel is satisfied that the Sheriff is personally engaged in the management of the Department's Custody operations and the Department is in **Compliance** with Section 1.2 of the Action Plan.

   Section 1.3 of the Action Plan provides that Department managers should be held accountable should they fail to address use of force problems at the Downtown jail facilities. The Compliance Measures require the Department to provide a quarterly report that sets forth the number and rank of personnel found to have violated its use of force policies in the jails.  In the

---

   [8] Use of the term **Compliance** in bold is a finding of compliance as of a certain date.  The Panel's findings are set forth on the Appendix attached hereto.  For other provisions, the Department has either not achieved compliance or is no longer in compliance during this current reporting period.  Based upon the Panel's findings, the Parties will determine whether the Settlement Agreement is subject to termination pursuant to Section VIII of the agreement.  As noted in the Panel's prior reports, the Panel encourages the "Parties to adopt a meaningful and achievable framework to determine the Department's compliance with the Settlement Agreement" in the future.

   [9] The Panel was recently advised that Assistant Sheriff Chase has been re-assigned within the Department and will be replaced by Assistant Sheriff Brendan Corbett, who was previously a Chief in the Custody Division and prior to that was a Captain in the Division as well.

Third Quarter of 2020, the Department reports two dispositions for founded violations of the Department's use of force policies at IRC, one of which resulted in a 20-day suspension and the other a written reprimand. There were no founded dispositions at TTCF or MCJ in the Third Quarter of 2020. In the Fourth Quarter of 2020, there were nine founded dispositions for violation of the Department's use of force policies at MCJ. Six of the involved employees received written reprimands, two received brief suspensions, and one deputy resigned. There were no founded dispositions at TTCF or IRC in the Fourth Quarter of 2020.

Compliance Measures for Section 1.3 also require the Department to provide data regarding overall force incidents and Category 3 incidents so the Panel can assess whether there have been substantial increases and whether any such increases have been appropriately addressed by Unit Commanders and Commanders. For the Third Quarter of 2020, each of the Downtown jail facilities experienced an increase in the total use of force incidents compared to the low totals from the Second Quarter of 2020. Excluding non-categorical force incidents, there was a 42% increase in overall force incidents at IRC,[10] a 19% increase at MCJ, and a 13% increase at TTCF in the Third Quarter of 2020. There were no Category 3 incidents at any of the Downtown jail facilities in the Third Quarter of 2020. The Panel finds the Department in compliance with this aspect of Section 1.3 of the Action Plan at all of the Downtown jail facilities in the Third Quarter of 2020.

For the Fourth Quarter of 2020, all three Downtown jail facilities experienced continued increases in the number of force incidents. Excluding non-categorical force incidents, there was a 52% increase in force incidents at TTCF,[11] a 23% increase at IRC, and a 6% increase at MCJ in the Fourth Quarter of 2020.[12] The Department's posted Self-Assessment reveals no Category 3 incidents in the Fourth Quarter of 2020. The Panel finds the Department in compliance with this aspect of Section 1.3 of the Action Plan at all of the Downtown Jail facilities in the Fourth Quarter of 2020.

The Department's Self-Assessment report concludes that the Department was out of compliance with Section 1.3 for the Fourth Quarter based on a discovered failure of TTCF to investigate an inmate grievance from June 2019 alleging force was used as retaliation. Although a subsequent investigation determined that the inmate's claims were unfounded and Department personnel acted appropriately, the Department correctly notes that the delay in processing this

---

[10] The Department attributes this increase to a 129% increase in the census at IRC and a doubling of the average processing time of inmates coming through IRC due to the need to test for COVID and the state prison moratorium on accepting newly remanded inmates.

[11] The Department attributes the increase at TTCF to an increase in court activity and an increase in the average daily inmate population.

[12] As noted above and in our Eighth Report, the substantial reduction in force incidents during most of 2020 was likely related to the reduction in the jail population due to safety precautions related to the pandemic. In the Fourth Quarter of 2020, the inmate population in the Downtown Jails increased due to the large number of state prison inmates who remained in the County jails due to the state prison moratorium noted above.

incident prevented a proper evaluation of the incident.  Nevertheless, the Panel does not believe that a finding of non-compliance with Section 1.3 based on this incident is appropriate.[13]

While the Panel does not believe that a finding of non-compliance with Section 1.3 is appropriate based on a single failure to investigate promptly an inmate grievance (particularly where the grievance turns out to be wholly unfounded), we concur in the ultimate conclusion reached by the Department regarding non-compliance with Section 1.3.  The basis for our determination is the Department's persistent reluctance to impose discipline in those cases where use of force policies are violated.  The Panel continues to see cases involving violations of policy, such as head punches for inmate control, that result in Departmental actions that do not reflect the seriousness of the offense.  The Panel has highlighted this shortcoming in prior reports (*see* Eighth Report, p. 5) but has not seen any meaningful change in the extent to which Department staff (and managers) are held accountable for violation of force policies.  The Panel is also concerned that in cases where the Panel has found a policy violation regarding use of force, and where the supervisors or mid-managers reviewing the incident have failed to identify a policy violation or even question the use of force, no action is ever taken against the supervisor and/or mid-manager.  Accordingly, the Panel finds the Department out of compliance with Section 1.3 of the Action Plan.

The Department was in **Compliance** with Section 1.4 in the Ninth Reporting Period.  On November 10, 2020, Assistant Sheriff Chase, a Commander in Custody Operations and the Unit Commander responsible for CCSB made a presentation to the Board of Supervisors on the Department's compliance with the *Rosas* Action Plan.

### B.    Management Visits

Sections 10.1 and 10.2 require the Department's leadership to tour each of the jail facilities and document those visits.  The Department has previously asked the Panel to consider suspending the requirements of these provisions during the pendency of the COVID-19 restrictions.  The Panel did not record a finding for these provisions for the Second Quarter of 2020, and will not report a finding for the Ninth Reporting Period due to the inability of the Department to safely conduct the required visits.  Beginning in the First Quarter of 2021, the Panel intends to assess compliance with these provisions, and will work with the Parties to develop technology-based alternatives to in-person visits if current pandemic conditions persist.[14]

### C.    Rotations and Transfers

Sections 18.1 and 18.2 require the Department to (1) maintain Custody-wide rotation policies and rotate personnel as required by the policies, and (2) audit each unit's compliance

---

[13] The failure to investigate and track the allegation of force may constitute a violation of Sections 5.1, 6.13, and/or 8.3.

[14] The Department reports in its Ninth Self-Assessment that, in February 2021, the Department adopted protocols to allow executives to "virtually visit" jails and provide feedback to staff regarding their observations while COVID-related safety precautions remain in place.

with its rotation policies.  The Department's Ninth Augmented Self-Assessment reports that it achieved 99% Compliance in the Ninth Reporting Period.  Each of the Downtown jail facilities has a reasonably current Unit Order setting forth its rotation policy and the source documents indicate that most Department personnel are rotated in Compliance with those policies.  The Department is in **Compliance** with Section 18.1 and Section 18.2 through December 31, 2020.

The Department's Ninth Self-Assessment reports that it maintained 100% **Compliance** with Section 21.1 as of July 1, 2020, through December 31, 2020.  The Panel has reviewed the Department's source documents stating the reasons for Deputy transfers to Custody during the Ninth Reporting Period, which reflect that no member was transferred or assigned to Custody as a sanction for problematic conduct.

## 2.    Use of Force Policies and Practices

Section 2.1 of the Action Plan requires the Department to "have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations[.]"  On October 16, 2015, the Department provided the Panel with a Custody Operations Force Manual with separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints, Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved Shootings.  The Department's Custody Force Manual satisfies Section 2.1 and includes specific provisions that satisfy Sections 8.2 (Complaints of Retaliation), 17.2 (Pregnant Inmates), 20.1 (Types of Force), and 20.2 (Definition of Reactive Force) of the Action Plan.  The Department has been in **Compliance** with these Sections since the Panel began monitoring the Department's compliance as of January 1, 2017.

The other recommendations in the Action Plan that pertain to the Department's use of force in Custody Operations are summarized as follows:

- Sections 2.2 through 2.13 require the Department to adopt a comprehensive set of new use of force policies for Custody Operations.

- Sections 4.1 through 4.5 require the Department to adopt specific use of force policies for dealing with mentally ill prisoners.

- Sections 9.2 through 9.3 require the Department to adopt specific policies for escorting inmates after force incidents and intervening to protect inmates as soon as it is reasonably safe to do so.

- Section 17.5 requires the Department to adopt policies for minimizing the risk of an inmate's medical distress during and after a force incident.

- Section 20.3 requires the Department to adopt use of force policies for Planned Force (such as cell extractions).

The Panel reviewed multiple drafts of the Department's policies to implement these recommendations, required changes where appropriate, and certified that the Department had implemented these recommendations, effective December 1, 2015.

During the Eighth Reporting Period, the Department advised the Panel of several proposed changes to the policies that were previously approved by the Panel. The Panel was given the opportunity to comment on the proposed changes. Although most of the proposed changes were acceptable, the Panel has advised the Department that some modifications are necessary and recommended other modifications to existing policy. During the Ninth Reporting period, the Panel continued to work with the Department with respect to proposed revisions to the force policies, including revising the provision regarding prohibited uses of force. The Department has been receptive and responsive to comments and suggestions raised by the Panel.

A.     Review of Force Incidents

The Action Plan requires that the Panel review selected force packages each quarter to assess whether the use of force was in compliance with Sections 2.2 through 2.13, 4.1 through 4.5, 9.2, 9.3, and 17.5 (the "Force Provisions") of the Action Plan. As has been the practice of the Panel, we reviewed the problematic incidents identified during our review with Custody Commanders, and took into consideration their comments in reaching the conclusions set forth in this Report. The Panel also met with Plaintiffs' counsel to review the force incidents identified as problematic by the Panel, as well as additional incidents Plaintiffs' counsel considered problematic.[15] The input of the Department and Plaintiffs' counsel was extremely helpful in reviewing and assessing compliance with the Force Provisions.

The Department continues to struggle to complete its use of force investigations in a timely manner but has worked diligently in the Ninth Reporting Period to complete the force packages requested by the Panel. We are hopeful that with the filling of many of the Sergeant vacancies in Custody Division in early 2021 the pace of the Department's use of force investigations will improve, and the Panel will be better able to assess progress in something approaching real time. The Panel's review of force cases with the Custody Division managers is most effective when the cases are as recent as possible. If the Panel is reviewing cases that are more than a year old, the value of the discussion between the Panel and the Department necessarily decreases.

1.     __Third Quarter 2020 results__

Per the applicable Compliance Measures, the Panel selected 28 force incidents to review in the Third Quarter of 2020 and received and reviewed 25 of those force packages. The packages were selected without input from the Department. As has been the Panel's approach in

---

[15] Plaintiffs have complained they are not able to determine the Department's compliance with various provisions of the Action Plan because of redactions by the Department to documents provided, as well as incomplete production of video records. As we have noted in the past in response to identical complaints (*see* Seventh Report, n.3), these are issues for Plaintiffs to resolve with the Department and, if necessary, the Court.

past reporting periods, the Panel selected for review the force incidents most likely to involve problematic uses of force:  The Panel asked to review all Category 3 incidents[16] (those involving force that is likely to, or does, result in severe injuries) and most Category 2 incidents that involved strikes or kicks by Department personnel.  Thus, the universe of force incidents selected by the Panel included a disproportionate number of the more serious incidents involving the use of force by Department personnel.[17]

Based on the assessment of each provision across all of the force packages, the Panel concluded that in the Third Quarter of 2020 the Department was not in Compliance with the following provisions of the Action Plan applicable to the use of force by its members:  Force prevention principles (Section 2.2), head strikes or kicking inmates (Section 2.6), and calling supervisors to the scene before engaging with recalcitrant inmates (Section 2.7).   The Panel found that the Department was in **Compliance** in the Third Quarter of 2020 with the remaining Force Provisions of the Action Plan.

As in the past, the Panel's main concern was that Department members sometimes reacted too quickly and should have taken advantage of "time and distance" to de-escalate the situation and avoid using force altogether or to plan a potentially safer use of force.  The failure to call a supervisor when confronted with a recalcitrant inmate is a corollary of the need for Department members to take more time before using force to control a recalcitrant inmate.  Notwithstanding the Department's continued acknowledgement that these issues must be addressed in its ongoing use of force refresher training, we continue to see instances of force that could have been mitigated by taking advantage of time and distance and calling a supervisor to help de-escalate the incident. We also see cases where an inmate may not be recalcitrant but where a Deputy unnecessarily puts hands on an inmate, the inmate reacts to that, and a use of force ensues.

Although there were fewer cases in the Third Quarter of 2020 involving improper head strikes this continues to be an issue for the Department.[18]  In many of the cases, the use of force was justifiable under the circumstances, but the danger presented by the inmate (if any) did not

---

[16] The Panel asked to review both Category 3 incidents from 2020 that had not previously been requested.  One of those force packages was produced by the Department and reviewed among the incidents reviewed for the Fourth Quarter of 2020.  The Panel has been advised that the remaining Category 3 force packages from 2020 are still being reviewed by the Internal Affairs Bureau.

[17] According to Use of Force statistics provided by the Department for the Ninth Reporting Period, 83% of the force incidents in the Downtown Jail Complex were either Category 1 incidents or non-categorical incidents, and 17 % were Category 2 incidents.  There were no Category 3 incidents.

[18] The Panel has recommended in prior reports that head strikes be removed from the "Personal Weapon" Category in the Department's Use of Force policies.  Punches to the head should instead become its own category of "Head Strikes," and Deputies should be required to explain specifically why a head strike was necessary or occurred.  Policy, training, force packages, and supervisor reviews should reflect this change.  The Department has not yet responded to this request.

justify a head strike.  Head strikes should be reserved for situations where the inmate is "high risk/assaultive."  Yet, too often, head strikes are used as a control mechanism to subdue an aggressive inmate.  Medical science informs us that some head blows are the 'hidden injuries' that create or exacerbate mental illness.  Agencies nationwide have long moved away from acceptance of head strikes.  We encourage the Department to pay particular attention to this issue moving forward.

## 2.  Fourth Quarter 2020 results

In the Fourth Quarter of 2020, the Panel reviewed 28 force incidents.  The Panel concluded that the Department was not in compliance with the following provisions of the Action Plan applicable to the use of force by its members in the Fourth Quarter of 2020:  Force prevention principles (Section 2.2), force used as discipline (Section 2.4), head strikes or kicking inmates (Section 2.6), and calling supervisors to the scene before engaging with recalcitrant inmates (Section 2.7).  The Panel found that the Department was in **Compliance** in the Fourth Quarter of 2020 with the remaining Force Provisions of the Action Plan.

The Panel identified several cases during the Fourth Quarter where the use of force appeared motivated by a desire to punish the inmate for resistive or assaultive conduct.[19]  For example, in one incident several deputies struggled to control a handcuffed inmate who resisted being placed in a suicide gown and then became assaultive when deputies tried to apply the WRAP device.  Although the inmate was handcuffed, he was able to grab and twist the fingers of one deputy and forcefully grab the thigh of another deputy.  Several deputies used permissible force to stop the assaults by the inmate and gain compliance.  The inmate then grabbed the genitals of a deputy who was kneeling behind him to assist in applying the WRAP device.  In response to this violent assault, the deputy punched the inmate several times in the face, with at least one of the blows coming after the deputy appeared to be free from the inmate's grasp.  Another deputy intervened to stop the punches by his colleague.  While much of the force used in this incident was justified by the inmate's resistive and assaultive conduct, and the punches at issue were an immediate response to a serious assault by the inmate, the Panel concluded that the most aggressive and violent punches were motivated by a desire for retribution against the assaultive inmate.  As noted above, this conduct, while aberrational, is particularly troubling to the Panel.

The Panel reviewed several cell extractions in the Third and Fourth Quarters of 2020 to assess the Department's compliance with specific provisions that are applicable to the use of force in those circumstances.  The Panel concluded that, in the Fourth Quarter of 2020, the Department was not in compliance with Section 4.1 of the Action Plan, related to having a mental health professional on-scene to attempt to resolve the situation.

---

[19] It is important to note that the cases of concern to the Panel all involved immediate reactions of Department members to assaultive conduct by inmates.  These were *not* cases where a Department member sought out an inmate for retribution or punishment after a "cooling off" period.

Plaintiffs have identified several concerns this reporting period related to the force used by Department personnel in applying the WRAP device to inmates following force incidents. As noted below in the discussion regarding the restraint provisions of the Action Plan, the Panel worked with the Department in developing the policy related to the use of the WRAP device and intends to meet with the Department to discuss the implementation of that policy and the concerns raised by Plaintiffs regarding the force used in relation to the application of the device. To date, we have not found the Department out of compliance with any provision of the Action Plan based on its use of the WRAP device.

Plaintiffs identify three cases in which force was used against restrained inmates (two of which involved the application of the WRAP device) and urge a finding of non-compliance with respect to Section 2.5. While the Panel did identify a small number of cases in this reporting period where strikes or tasers were used on restrained inmates,[20] the Panel determined, based on a qualitative assessment of the totality of cases reviewed during the reporting period, that the Department was in compliance with Section 2.5.

3.   **Training**

Sections 3.1 through 3.4 of the Action Plan require that Department members receive training on use of force policies and on ethics, professionalism, and treating inmates with respect; and that new Department members receive six weeks of Custody-specific training in the Academy or the Jail Continuum in Custody Operations. Sections 4.6 through 4.9 require the Department to provide Custody-specific, scenario-based skill development training for existing and new personnel in Crisis Intervention and Conflict Resolution and in "identifying and working with mentally ill inmates." Section 12.1 requires that Custody Sergeants receive training in conducting use of force investigations.

The Department's training results are subject to audit by the Panel's auditors. All of the Department's reported results for the initial training of existing Deputy Sheriffs and Custody Assistants and for new members set forth below have been verified by the Panel's auditors based upon reviews of Department rosters and training records. The auditors verified that the Department's new members had received the required initial training from when it was first offered through the "as of" date reported by the Department for the completion of the initial training required for existing Deputies and Custody Assistants. Accordingly, the Panel has previously deemed the Department to be in compliance "as of" the date reported by the Department for the completion of the initial training required for existing personnel. The Department's continuing compliance with the training provisions is determined by its compliance with the refresher training required every year or every other year.

---

[20] The Panel disagrees with Plaintiffs' contention that pressure applied to a restrained inmate implicates Section 2.5, which refers to strikes or the use of chemical agents or a Taser on a restrained inmate.

### A.  Use of Force Training

As of June 30, 2018, the Department was found to be in compliance with the training requirements of Section 3.1.[21]  In the Eighth Reporting Period, the Department reported that certain training classes were cancelled or modified due to COVID-19 safety restrictions and requested that the Panel defer an assessment of this provision until the Ninth Reporting Period. In its Augmented Ninth Self-Assessment Report, the Department notes an inability to conduct the required Section 3.1 training due to the state's suspension of training courses in June 2020 and requests a six-month extension to train personnel and meet compliance with Section 3.1 based on the course approved by the state in April 2021.  The Panel will maintain the **Compliance** assessment from the Seventh Reporting Period pending the year-end refresher training results for 2020.  The final 2020 results will be subject to verification by the Panel's auditors.

### B.  Ethics and Professionalism Training

As of June 30, 2018, 95% of the existing personnel received the initial four-hour training course in ethics, professionalism, and treating inmates with respect as required by Section 3.2. 95% of the trained Deputy Sheriffs and Custody Assistants completed the required refresher course through December 31, 2018.  In its Augmented Ninth Self-Assessment Report, the Department notes an inability to conduct the required Section 3.2 training due to limited class sizes as a result of pandemic safety restrictions and budget cuts that have pulled instructors away from training activities to assist in custody facilities.  The Department has requested a six-month extension to conduct the 2020 assessment.  The Panel will maintain the **Compliance** assessment from the Seventh Reporting Period pending the year-end refresher training results for 2020.  The final 2020 results will be subject to verification by the Panel's auditors.

### C.  Mental Health Training

As of June 30, 2018, 97% of the existing Deputies at the Downtown Jail Complex and in the mental health unit at the Century Regional Detention Facility ("CRDF") received the 32 hours of training on Crisis Intervention and Conflict Resolution Training (DeVRT), including the eight hours of identifying and working with mentally ill inmates, required by Sections 4.6 and 4.7.  Also as of that date, 98% of the remaining Deputies at CRDF, and all Deputies at the North County Correctional Facility ("NCCF"), and the Pitchess Detention Center ("PDC") jails received the eight hours training in identifying and working with mentally ill inmates required by Section 4.7.

The Seventh Self-Assessment reported that for 2019, 98% of the Deputy Sheriffs and Custody Assistants received the required refresher training[22] for Section 4.6 and 96% of the Deputies received the required four hours of refresher training for Section 4.7.  The refresher

---

[21] The use of force training approved by the Panel includes the custody-based use of force scenarios, constituting **Compliance** with Section 3.4.

[22] Eight hours every other year for Section 4.6 and four hours every other year for Section 4.7.

results were verified by the Panel's auditors and the Department was found to be in Compliance
with Section 4.6 and 4.7 as of December 31, 2019.  In its Augmented Ninth Self-Assessment
Report, the Department notes an inability to conduct the required Section 4.6 and Section 4.7
training due to limited class sizes as a result of pandemic safety restrictions and budget cuts that
have pulled instructors away from training activities to assist in custody facilities.  The
Department has requested a six-month extension to conduct the 2020 assessment.  The Panel will
maintain the **Compliance** assessment from the Seventh Reporting Period pending the year-end
refresher training results for 2020.  The final 2020 results will be subject to verification by the
Panel's auditors.

### D.    New Deputy Sheriffs and Custody Assistants

The Department has reported since the First Reporting Period that, beginning on July 1,
2015, newly assigned Deputies have been required to complete a six-week Custody Operations
course that includes training in use of force and ethics, professionalism and treating inmates with
respect, and new Custody Assistants have received training in these subjects during their
Academy training as required by Section 3.3.  The Department's posted audit results reflect that
the Department has exceeded the 95% Compliance standard for new Deputies and new Custody
Assistants for the Third Quarter of 2020.  These results have been verified by the Panel's
auditors and the Department is in **Compliance** with Section 3.3 through September 30, 2020.  In
its Augmented Ninth Self-Assessment Report, the Department notes an inability to conduct the
required Section 3.3 training for the Fourth Quarter of 2020 due to limited class sizes as a result
of pandemic safety restrictions and budget cuts that have pulled instructors away from training
activities to assist in custody facilities.  The Department has requested a six-month extension to
conduct the 2020 assessment. The Panel notes that the six weeks of Custody Operations training
is fundamental and imperative for both new Deputies and new Custody Assistants and does not
concur with the decision to reassign the necessary trainers.  Thus, the Panel finds the Department
in non-compliance with Section 3.3 for the Fourth Quarter of 2020.

The Department previously reported that 100% of new Deputies and Custody Assistants
had received the conflict resolution training (DeVRT) and training in "identifying and working
with mentally ill inmates" ("IIMI") required by Sections 4.8 and 4.9 in the Third and Fourth
Quarters of 2019.  These results were verified by the Panel's auditors and the Department was
found to be in Compliance with Sections 4.8 and 4.9 as of June 30, 2018 through December 31,
2019.  The required DeVRT and IIMI training takes place after Deputy Sheriffs and Custody
Assistant Academy graduations and prior to assuming duties at their unit of assignment.  The
Department's Ninth Self-Assessment reports that 100% of the new Deputies received the
required training in the Third and Fourth Quarters of 2020.  The results for the Third and Fourth
Quarters of 2020 have been verified by the Panel's auditors.  The Department is in **Compliance**
with Sections 4.8 and 4.9 through December 31, 2020.

Section 3.5 requires Unit Commanders to determine "what additional training, counseling
or mentoring may be required when a personnel complaint involving the use of force is resolved
with a finding that it 'Appears Employee Conduct Could Have Been Better;' direct that the
Department member undergo such additional training, counseling, or mentoring; and document
the action taken."  The Department's Ninth Self-Assessment reports that there were no inmate

13

grievances against staff involving use of force where the disposition was that it "Appears Employee Conduct Could Have Been Better." The Department is in **Compliance** with Section 3.5 as of December 31, 2020.

Section 3.6 requires Unit Commanders to review new Department members within six months of being initially assigned to Custody and again before the end of their probationary period. Based upon a random selection of personnel records, the Department reports that 78% of the new Department members were reviewed as required by Section 3.6 in the last six months of 2020, which is substantially below the 95% threshold for Compliance. These results are consistent with the lackluster results from earlier reporting periods, and suggest that the Corrective Action Plan and other measures implemented by the Department following prior non-compliant quarters were not successful in ensuring compliance. The Department reports in its Ninth Self-Assessment Report that further briefings have been conducted to explain to Unit Commanders at each facility the importance of timely reviews.

E.    **Sergeant Training**

Section 12.1 requires that all Custody Sergeants receive an initial 16-hour block of training in conducting use of force investigations. The Panel approved the 16-hour initial training course on February 24, 2017. During the Fourth Quarter of 2016, the Department did not reach compliance due to nine sergeants failing to receive the approved training within 90 days after the course was approved; however, the Department has since demonstrated to the Panel that by the Third Quarter of 2019 virtually all of the Sergeants who initially missed the required training have completed their training. These results have been confirmed by the auditors. Since the Fourth Quarter of 2019, 100% of the Sergeants newly promoted in Custody received the required training. These results have been verified by the Panel's auditors. Accordingly, the Panel finds the Department in **Compliance** with Section 12.1 as of the Third Quarter of 2019.[23] The Department reports that there were no newly promoted Sergeants in the Third and Fourth Quarters of 2020. The Department's Augmented Ninth Self-Assessment reports that 97% of the Sergeants who were required to receive refresher training received the required refresher training in 2020. The results for 2020 have been verified by the Panel's auditors.

4.    **Reporting and Investigation of Force Incidents**

Many of the recommendations in the Action Plan that pertain to the reporting and investigation of force used by Department personnel in Custody Operations are assessed by the Panel through a review of the completed force packages. Other provisions are reported by the Department as follows:

- Section 5.1 requires the Department to track use of force investigations, reviews, and evaluations; review evaluations of force incidents; and conduct additional investigation of discrepancies and unexplained tactical decisions. The Department reports that 100% of the force incidents in the Third Quarter of 2020 were timely entered into the database as

---

[23] The Appendix has been revised to reflect the accurate date of compliance.

required by Section 5.1, and 96% were timely entered in the Fourth Quarter of 2020,
which is above the 95% threshold required for **Compliance**.

- Section 8.3 requires that investigations of grievances claiming that Department members
  used force to retaliate against inmates be timely evaluated by the Custody Force Review
  Committee ("CFRC"). The Department reports that it achieved 100% **Compliance** with
  this provision in the Third and Fourth Quarters of 2020.[24]

- Section 11.1 requires that the Custody Force Rollout Team's involvement in reviewing
  force incidents not delay the Department's investigation of the force incidents. The
  Compliance Measure requires that "95% of the investigations reviewed by CFRT were
  not delayed beyond the period permitted by law for imposing discipline." The
  Department previously reported that it achieved **Compliance** with Section 11.1 in the
  Second Quarter of 2018. Because there were no use of force incidents reviewed by
  CFRT in which there was a finding of a policy violation or misconduct in either the Fifth,
  Sixth, Seventh, Eighth, or Ninth Reporting Periods, the predicate for determining
  compliance with Section 11.1 did not exist in those periods and the Department remains
  in **Compliance**.

- Section 13.1 requires the Department to "have a firm policy of zero tolerance for acts of
  dishonesty or failure to report uses of force." Sections 13.1 and 13.2 require the
  documentation of the reasons and reports to the Inspector General whenever the
  Department does not terminate a member who has been found to have been dishonest,
  used excessive force, or violated the Prisoner Rape Elimination Act ("PREA"). The
  Department's Ninth Self-Assessment reports that in the Third Quarter of 2020 one deputy
  was found to have used excessive force during an incident in 2016, and another deputy
  was found to have made false statements during an internal investigation. Neither deputy
  was terminated – the former was discharged due to an unrelated Internal Affairs
  investigation and the latter resigned. The Inspector General was advised of both matters.
  During the Fourth Quarter of 2020, one deputy was found to have made false statements
  to his supervisor and was placed on a formal performance review program.[25] The
  Inspector General was advised of the action. The Department is in **Compliance** with
  Sections 13.1 and 13.2 through December 31, 2020.[26]

---

[24] As noted above, the handling of the inmate grievance noted by the Department in its
self-assessment under Section 1.3 may constitute a violation of Section 8.3. Nevertheless, the
Panel concurs in the Department's finding of overall compliance with Section 8.3.

[25] The Panel notes that the instances of dishonesty identified by the Department in its
Ninth Self-Assessment do not appear to relate to reported uses of force.

[26] The Panel has previously noted its concern that reviewed use of force packages include
staff reports that are inaccurate and self-serving, but which are not treated as "dishonesty" or
"integrity" issues by the Department. See Seventh Report (p. 18) and Eighth Report (p. 15). In
this Report, the Panel has found the Department out of compliance with Sections 5.2
(Commanders' reviews); 5.3 (unexplained discrepancies); and 15.3 (reports of force by other
members), based in large part on reports that do not accurately describe the use of force or the
inmate's conduct that prompted the use of force. Nevertheless, the Panel has deemed the

Plaintiffs object to the Panel's finding of compliance with respect to Section 13.1, asserting that mere compliance with the Compliance Measures adopted by the Panel (and revised in 2018) does not constitute compliance with this provision of the Action Plan. (Plaintiffs' Response, p. 13). Plaintiffs' assessment of this provision relies on the first sentence of Section 13.1, which states: "The Department should have a firm policy of zero tolerance for acts of dishonesty or failure to report uses of force." However, the remainder of Section 13.1 suggests that the assessment of this "zero tolerance" policy should be limited to whether the Department acts decisively in those cases where a member has been found to have been dishonest, used excessive force, or violated PREA. The Compliance Measures adopted by the Panel follow this reading of the provision. To the extent there is a dispute about the reach of the Section 13.1, the parties should attempt to resolve that issue.

- Sections 14.1 and 14.2 require (1) an additional review of referrals of inmates for criminal prosecution arising from incidents involving the use of force by Department members and (2) timely referrals to the District Attorney of "officer misconduct that may amount to criminal violations." The Department reports 100% in **Compliance** with Section 14.1 in the Third and Fourth Quarters of 2020. With respect to Section 14.2, there were four referrals to the District Attorney in the Third Quarter of 2020. Two of the referrals were within six months of the incident, and one referral was approximately 10 months after the incident. The fourth incident, involving alleged workers compensation fraud by an employee, was not referred to the District Attorney until almost three years after the incident. In the Fourth Quarter of 2020, there was one referral to the District Attorney, involving MCJ employees alleged to have committed aggravated assault. The matter was referred two years after the incident. The Department has not demonstrated good cause for the lengthy delays in referring the aforementioned cases to the District Attorney. Accordingly, the Department is not in compliance with Section 14.2 for the Third and Fourth Quarters of 2020.

## A.    Third Quarter 2020 Results

The Panel reviewed 25 completed force packages in the Third Quarter of 2020 to assess compliance with the provisions of the Action Plan relating to the reporting and investigation of force incidents. The Panel concluded that the Department was not in compliance with the following provisions: Commanders' reviews (Section 5.2), unexplained discrepancies in reports (Section 5.3), location of inmate interviews (Section 12.2), failure to report force by other members (section 15.3) and separation of involved staff until completion of their reports (15.6).[27]

---

Department in compliance with Sections 13.1 and 13.2 based on the Department's adherence to the Compliance Measures applicable to those provisions.

[27] As noted in our prior reports, the documentation provided by the Department is not sufficient for the Panel to determine the Department's compliance with Section 15.6. To achieve compliance with Section 15.6, the supervisor must document that the members were separated and how this separation was accomplished. The Department has advised the Panel that it is now requiring that information in the Supervisors' reports.

As noted above, the Panel remains concerned that inaccurate reporting by Department staff regarding uses of force is not being consistently identified and addressed.  Indeed, in the majority of cases where the Panel has found the use of force to be out of policy there is at least one report, either by the offending staff member or a witnessing staff member, that does not accurately describe the use of force or the inmate's conduct that prompted the use of force.  The Panel recognizes that perceptions and memories will vary in these intense and fast-developing situations, but there have been repeated instances in which staff reports are clearly contradicted by video evidence.[28]  Although supervisors will occasionally note discrepancies in reports or possible collaboration among staff in the preparation of the reports, we rarely see a robust discussion by reviewing commanders of inaccurate characterizations in reports, and never see discipline imposed for submission of false reports.

More generally, while the Watch Commander and Unit Commander reviews are more substantive and probing than we saw in the early years of our monitoring, we are not consistently seeing rigorous reviews across all levels of the Department.  We continue to see improper uses of force validated in the initial Supervisor's review and one or both Commander reviews often concur in the erroneous evaluation of the reviewing Sergeant.  This is an area where there has been improvement by the Department, but the Panel expects to see more consistent recognition of problematic uses of force at all levels of review.

### B.    Fourth Quarter 2020 Results

The Panel reviewed 28 completed force packages in the Fourth Quarter of 2020.  The Panel concluded that the Department was not in compliance with the following provisions: Commanders' reviews (Section 5.2); unexplained discrepancies in reports (Section 5.3), location of inmate interviews (Section 12.2), presence at suspect interview of involved personnel (Section 12.3), failure to report force by other members (section 15.3), and failure to note injuries (section 15.4).  In addition, the information provided by the Department was not, in many cases, sufficient for the Panel to determine the Department's compliance with the provision relating to the separation of Department personnel after a force incident (Section 15.6).

Plaintiffs challenge the Panel's finding of compliance with respect to Section 15.1, which relates to the timeliness of reports.  The Panel reviews several types of reports prepared by the Department.  Section 15.1 relates to reports required of members who use or assist in force or supervisors who direct force.  Those individuals are required to submit reports prior to the end of shift absent serious injury or other extenuating and documented reason for not doing so.  During this reporting period, there were a very small number of late reports judged by this criterion.

### 5.    <u>Inmate Grievances</u>

The Action Plan requires extensive changes in how the Department handles inmate grievances and requests for service.  On July 15, 2016, the Department issued a new "Inmate

---

[28] The Panel routinely identifies for the Department instances of such false reporting at the quarterly force review meetings.

Grievance Manual" (Volume 8 of the Custody Division Manual) to implement a new grievance system.  The Panel assessed the Department's implementation of the new grievance system in the Ninth Reporting Period as follows:

### A.    Grievance Forms

Sections 6.1 through 6.6 require that separate forms for inmate grievances be reasonably available to inmates and that the forms have specific check boxes.  Section 7.1 requires the Department to advise inmates of the voluntary Conflict Resolution Meeting available under the Department's Conflict Resolution Policy.[29]  The Panel has previously concluded that the forms meeting the requirements of the Action Plan are reasonably available to inmates, and the Department remains in **Compliance** with those provisions relating to the availability of the required forms in printed or electronic format.

One area of continuing concern is the significant backlog in processing grievances filed against staff, particularly at MCJ.  The Panel raised this issue in its Eighth Report, and has seen little change in this reporting period.  During the second half of 2020, there were 230 complaints against staff at MCJ that were received and assigned for review.  Only 25 of those complaints had been resolved by the end of the Fourth Quarter of 2020 – approximately four cases per month.[30]  The Department's data continues to reflect a bottleneck with the reviewing Sergeants at MCJ.  The Panel understands that staffing cuts within Custody Operations are contributing to this backlog. The Department has taken steps in the First Quarter of 2021 to increase Sergeant staffing in the Custody division, and expects to improve its processing of grievances in the next reporting period.  As we have noted in the past, the appropriate and prompt handling of grievances against staff – perhaps more than any other type of grievance – is critical to maintaining an appropriate culture within the jails and giving credibility to the grievance process.  We look forward to seeing substantial improvement on this issue in the coming months.

Sections 6.4 and 6.5 of the Action Plan require that use of force and retaliation grievances against staff are brought to the attention of Unit Commanders and properly handled.  The applicable Compliance Measures require that grievances be brought to the Unit Commander within 10 days of receipt.  Based upon a review of the relevant grievances in the randomly selected months, the Department reports that 89.5% use of force grievances were in Compliance with Section 6.4 in the Third Quarter of 2020[31] and 100% were in Compliance in the Fourth Quarter of 2020.  Although the Department fell slightly below the 90% compliance measure threshold in the Third Quarter, the Panel finds the Department in **Compliance** with Section 6.4 for the Third and

---

[29] The Department reports that there were no grievances adjudicated by means of a Conflict Resolution Meeting in the Third Quarter of 2020 and two Conflict Resolution Meetings in the Fourth Quarter of 2020.

[30] Although this is nearly double the number of grievances completed in the first half of the year, the results are still woeful.

[31] Two of 19 grievances were not provided to a Unit Commander within 10 days of collection; however, the vast majority were processed within 5 days.

Fourth Quarters of 2020.[32]  The Department reports that 96% of the retaliation grievances in the Third Quarter and 100% in the Fourth Quarter of 2020 were in **Compliance** with Section 6.5.  The source documents posted by the Department for Sections 6.4 and 6.5 have been reviewed by the Panel, which verified that these grievances were handled appropriately.

B.      **Emergency Grievances**

Sections 6.7 and 6.8 of the Action Plan set forth specific requirements for the determination, handling, and notifications of non-medical emergencies.  Section 6.7 requires: (1) Deputies to send any grievance marked "emergency" to a supervisor for review "as soon as possible;" (2) supervisors to determine if "the situation requires immediate action to protect the life or safety of the inmate;" (3) supervisors to notify watch commanders/shift supervisors of any non-medical emergencies; (4) Watch Commanders/shift supervisors to immediately confirm the emergencies exist and take action "to protect the inmates;" and (5) Watch Commanders/shift supervisors to notify the inmate in writing about "what action was taken to address the emergency."  The Compliance Measures require that 95% of the grievances marked as emergencies "be reviewed and handled as required by [Section] 6.7."  It is implicit in Section 6.7 that a supervisor's determination that the situation requires immediate action and a Watch Commander's confirmation that emergencies exist will be reasonable.  Section 6.8 requires that if the Department determines that a non-medical emergency does not exist, the Department must notify the inmate that it will be handled as a non-emergency grievance and document why it was determined not to be an emergency.

Based upon the review of the grievances marked "emergency" in the month randomly selected by the Panel for the Third Quarter of 2020, the Department reports there were 50 grievances that met the criteria of Section 6.7, and in eight instances the inmates were not provided with a written response to the grievance within the required five days.  This performance falls below the threshold for compliance.  The Panel has reviewed each of the 50 grievances produced from the Third Quarter of 2020 in which a grievance marked "emergency" was downgraded.  The Panel identified only two instances where the grievance should have been treated as emergent.

For the Fourth Quarter of 2020, the Department reviewed 22 grievances that were handled as emergent and found that in three cases the inmates were not provided with a written response to the grievance within the required five days.  The Department also reviewed 50 grievances that were marked as "emergency" but handled as non-emergent and found that 100% of the grievances were properly downgraded.  The Panel has reviewed the source documents related to the selected grievances and determined that virtually all of the grievances downgraded to non-emergent in the Fourth Quarter of 2020 were appropriately downgraded by the Department.  Accordingly, the Panel agrees with the Department's Self-Assessment that it was in

---

[32] The Panel rejects Plaintiffs' contention that the Department should be found out of compliance with Section 6.4 based on its self-identified failure to meet the 90% threshold of the Compliance Measure.  The reviewed documents reveal that the Department has been diligent in bringing force grievances to Unit Commanders, sufficient to establish compliance with the language of Section 6.4.

**Compliance** with Section 6.7 in the Fourth Quarter of 2020 and in **Compliance** with Section 6.8 in the Third and Fourth Quarters of 2020.

### C.    Inmate Grievance Coordinator

Section 6.9 requires that emergency grievances be forwarded to the Inmate Grievance Coordinator.  Sections 6.13, 6.14, and 6.15 require the Inmate Grievance Coordinator to track the Department's handling of inmate grievances, provide a monthly report to the Unit Commander and senior management in Custody on the status of inmate grievances, and analyze inmate grievances for problematic trends.  The Department provided documentation to the Panel showing that for the Third and Fourth Quarters of 2020, the Inmate Grievance Coordinator received the information about emergency grievances required by Section 6.9 and prepared detailed reports for managers as required by Sections 6.13, 6.14, and 6.15.  The Department is in **Compliance** with Sections 6.9, 6.13, 6.14, and 6.15 through December 31, 2020.

The Panel met with the Inmate Grievance Coordinator during the Ninth Reporting Period to discuss the Department's implementation of its grievance policies and procedures and overall trends with respect to the Department's handling of inmate grievances.  As previously reported, the Panel believes that the structure of the grievance system developed by the Department under the direction of an Inmate Grievance Coordinator is effectively and efficiently handling inmate grievances and requests for service and that the Department is in **Compliance** with Section 6.16.[33]

### D.    Handling of Grievances

Sections 6.10 and 6.12 require that grievances be collected daily, logged in, and tracked in an inmate grievance database.  The Compliance Measures for these provisions require that the Department review the first 25 consecutive grievances from MCJ and the first 25 consecutive grievances from TTCF during the randomly selected month to determine if they were collected, reviewed and tracked as required.  The Department's Ninth Self-Assessment reports that 100% of the reviewed grievances were collected and reviewed within 24 hours and handled as required in both the Third and Fourth Quarters of 2020.  The collection logs provided by the Department confirm that all 50 of the grievances selected for review were collected and reviewed as required by Section 6.10.[34]  A review of the Unit Collection data for MCJ and TTCF during the selected

---

[33] Plaintiffs again raise an objection regarding the Panel's finding with respect to Section 6.16.  Plaintiffs' Response, p. 11.  Long ago, the Panel made a determination that the structure of grievance teams at the Downtown Jails proposed by the Department, including the appointment of a Grievance Coordinator responsible for supervising the grievance teams at all of the facilities, was equivalent in function to the centralized system specified in the Action Plan and acceptable, pending progress and specific results.

[34] As noted in our Eighth Report, the Compliance Measure for Section 6.10 does not yield data sufficient to assess compliance with this provision.  For example, the first 25 consecutive grievances at MCJ for the selected months were collected within the first three days of the month.  The fact that MCJ timely collected grievances from its collection boxes in those first three days does not provide a meaningful measurement of the Department's compliance

months reveals that MCJ collection compliance exceeded 95% for both quarters, and TTCF achieved 92% compliance in the selected month in the Third Quarter and 93% compliance in the selected month in the Fourth Quarter.  The Panel finds the Department in **Compliance** with Section 6.10 for the Third and Fourth Quarters of 2020.

The Department's Ninth Self-Assessment reports that 100% of the grievances at both MCJ and TTCF in the randomly selected months in the Third and Fourth Quarters of 2020 were entered into the database as required by Section 6.12.  The source documents for these results were available to, and reviewed by, the Panel.  Accordingly, the Department is in **Compliance** with Section 6.12 through December 31, 2020.

Section 6.11 requires that the Custody Division Manual provide that failing to comply with Department policies requiring proper handling of inmate grievances may be cause for discipline.  The Department reports that there was one claim that Department members failed to provide grievance forms to an inmate upon request.  The Department provided to the Panel the required log reflecting this claim and the report of the investigation into the inmate's claim, during which the accused staff were all exonerated.  Accordingly, the Department is in **Compliance** with Section 6.11 through December 31, 2020.

Section 8.1 prohibits Department personnel from retaliating against inmates.  The Department posted the results of the investigations approved by Unit Commanders in the randomly selected months and the number of anti-retaliation grievances received and investigated in the Third and Fourth Quarters of 2020.  It reports that in the Third Quarter of 2020 there were six grievances alleging retaliation resolved in the selected month, with no findings of a violation of the anti-retaliation policy.  For the entire quarter, there were 59 anti-retaliation grievances received, no investigations completed, and no founded violations of the anti-retaliation policy.  In the Fourth Quarter of 2020 there were eight grievances alleging retaliation resolved in the selected month, with no findings of a violation of the anti-retaliation policy.  For the entire quarter, there were 19 anti-retaliation grievances received, no investigations completed, and no founded violations of the anti-retaliation policy.  The Panel reviewed the investigative summaries that were posted by the Department of the anti-retaliation grievances that Unit Commanders deemed unfounded in the random months of August and October 2020 and agrees with the Commanders' assessments.[35]  The Panel finds that the Department has maintained **Compliance** with Section 8.1 through December 31, 2020.

The Panel has previously noted its disappointment regarding the pace of implementation of technology to electronically receive and track the Department's handling of inmate grievances within the jails. (*See* Eighth Report, p. 21).  The plan was to install iPads in tamper-proof cases within the living units and to automate the grievance process, retaining paper grievance forms for those inmates who preferred them.  Prior to installing grievance software, the iPads in TTCF

---

with Section 6.10.  As such, the Panel has reviewed (and will continue to review) the Unit Collection compliance data for the entire month to assess compliance with Section 6.10.

[35] The grievances reviewed by the Panel were *resolved* by the Department during the selected months (August and October) and deemed to be unfounded.  These grievances were all received and investigated in prior quarters.

were outfitted with inmate request and information software so that questions about an inmate's account, court dates, medical appointments, and much more could be accessed and answered by inmates without staff involvement. That was a huge success, with hundreds of thousands of inmate inquiries answered immediately, which removed a huge workload from frontline staff and eliminated a great deal of inmate frustration when staff does not have time to get answers to those questions. The Panel was most optimistic about the Department expanding the program to the other facilities and enhancing them with the grievance system capabilities, but a combination of technological challenges, indecision regarding the appropriate operating system and delays due to COVID-19 and other health issues within the jails appears to have set the entire initiative back. The Department reports that it continues to press forward on this initiative. The Panel expects the Department to re-double its efforts to more widely implement the electronic tablet program throughout the Downtown Jail Complex.

### E.    Deadlines

Sections 6.17, 6.18, 6.19, and 6.20 set forth the deadlines for filing use of force and PREA grievances,[36] the Department's initial responses, inmates' right to appeal, and the Department's notifications of the results of the investigations. The Department's Ninth Self-Assessment reports that it adhered to the deadlines for these grievances in both the Third and Fourth Quarters of 2020. The Panel has reviewed the source materials provided by the Department and agrees that the Department is in **Compliance** with Sections 6.17, 6.18 and 6.20 through December 31, 2020.[37]

As previously noted by the Panel, however, the Department reports on the timeliness of responses by Correctional Health Services to inmate grievances against the medical staff (e.g., lack of a timely response to a request for medical service), a metric required to achieve Compliance with Section 6.19. The Panel recognizes that Correctional Health Services is under a separate County agency but has suggested for some time that representatives from the Health Department participate in the grievance review with Department members and the Panel. That has not happened, but the health grievance notifications continue to fall substantially below compliance.

### F.    Communications with Inmates

The Ninth Self-Assessment also reports that the Department adhered to the deadlines for advising inmates of the results of adjudications as required by Section 7.2 for Third Quarter (96%) and the Fourth Quarter (91%) of 2020. The posted source documents for these results were available to, and reviewed by, the Panel. Accordingly, the Department is in **Compliance** with Section 7.2 through December 31, 2020.

---

[36] Section 6.18 provides that there is no deadline for filing PREA grievances.

[37] Plaintiffs acknowledge that Department policy aligns with the appropriate deadlines set forth in these provisions but points out that the grievance form provided to inmates reflects an inaccurate (shorter) deadline in certain cases. The Panel will notify the Department that this issue has been identified by Plaintiffs as an error that needs correcting but will not find substantive non-compliance on Section 6.17 this reporting period.

Section 7.3 requires the Department to "ensure that there are adequate avenues for constructive prisoner-staff communication[.]" The Department's Ninth Self-Assessment reports that the Department was in Compliance with Section 7.3 during both the Third and Fourth Quarters of 2020.  The Department provided logs of Town Hall meetings at MCJ and TTCF during the randomly selected months the Third and Fourth Quarters of 2020 that included Town Hall meetings in special housing units as well as in General Population housing units.  Based on these logs, the Panel is of the view that the Department has achieved **Compliance** with Section 7.3 for the period July 1, 2020, through December 31, 2020.

### 6.     Use of Restraints

Section 17.1 requires that the Custody Force Manual include "a separate section that sets forth the general principles governing the use of restraints" identified in this recommendation. The Department included such a separate section in the Manual, and is in **Compliance** with this requirement of Section 17.1, effective December 1, 2015.

Section 17.3 requires medical examinations of inmates placed in safety chairs and Section 17.4 requires safety checks of inmates in fixed restraints every twenty minutes.[38]  The Compliance Measures require the Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than 20 minutes, subjected to security restraints for an extended length of time" in the Downtown Jail Complex.[39]

During the Ninth Reporting Period, the Department provided the Inmate Safety Chair Security Check Logs for use of the safety chair and Fixed Restraint Logs at Downtown Jail Complex in the Third and Fourth Quarters of 2020.  With respect to safety chairs, the Department continues to fail to conduct and/or document the medical checks required by Section 17.3, and in more than half of the cases in each quarter Department personnel either failed to check on the inmate every twenty minutes or failed to provide an adequate record of that check as required by Section 17.4.  Accordingly, the Panel finds the Department out of compliance with each of those provisions.

Section 17.10 provides that medication cannot be used solely for security purposes.  The Department's posted Self-Assessment, confirmed by a log of the Administration of Involuntary Medications, reports that every administration of involuntary medications was pursuant to court order and there were no instances in which medication was used solely for security purposes in

---

[38] Many situations that have in prior years involved the use of safety chair, transport chairs or gurneys, particularly for transportation of inmates after uses of force, have been supplanted by use of the WRAP device. The Panel has worked with the Department on policy governing the use of the WRAP device and will work with the Department to develop appropriate measures to assess compliance with the Restraint Provisions of the Action Plan impacted by the use of the WRAP device.

[39] Sections 17.6 through 17.9 govern the application of multi-point restraints, which the Panel has been advised by the Department it does not use.

the Third and Fourth Quarters of 2020.  Accordingly, the Department has been in **Compliance** with Section 17.10 through December 31, 2020.

7.     **Early Warning System**

Section 19.1 requires the Department to develop an Early Warning System to identify potentially problematic employees based upon objective criteria.  The Panel approved the Employee Review System ("ERS") in July 2018, and it was implemented by the Department as a pilot program in the Downtown Jail Complex on August 1, 2018, and in the rest of the jail facilities as of November 1, 2018.  The Department has been in **Compliance** with Section 19.1 in the Downtown Jail Complex since August 1, 2018.

Section 19.2 requires Compliance Lieutenants to review monthly reports generated by the ERS and notify Unit Commanders and the Assistant Sheriff for Custody of the results within specified time periods.  Under the Revised Compliance Measures, Compliance Lieutenants must notify the Unit Commander and Assistant Sheriff for Custody Operations 90% of the time within 10 days after reviewing monthly reports generated by the Early Warning System and 95% of the time within 30 days.  The Department's Ninth Self-Assessment reports that the Department achieved 100% Compliance with Section 19.2 in the Third and Fourth Quarters of 2020 at all three Downtown jail facilities.  Based on the source documents provided, the Panel concludes that the Department was in **Compliance** with Section 19.2 for the Third and Fourth Quarters of 2020.

Section 19.3 requires Unit Commanders to determine whether problematic employees should be placed on a performance mentoring program.  For each potentially problematic Department member identified through the Early Warning System, the Unit Commander must consult with the appropriate Chief and document the reasons why any problematic members are not placed on a performance mentoring program.  The supporting documents posted by the Department show that the Unit Commanders are reviewing the reports generated by the ERS and evaluating the incidents involving the potentially problematic Department members to determine whether a performance mentoring program is appropriate.  The Department reports that Unit Commanders consult with the appropriate Chief on these issues, who indicates concurrence in the respective recommendations in a written memorandum.  Accordingly, the Panel finds the Department was in **Compliance** with Section 19.3 in the Third and Fourth Quarters of 2020.

**APPENDIX**

| NO. | PROVISION | STATUS[40] | DATE[41] |
|---|---|---|---|
| | | | |
| | **Leadership, Administration & Management** | | |
| | | | |
| 1.1 | Assistant Sheriff | Compliance | January 1, 2017 |
| 1.2 | Sheriff | Compliance | January 1, 2017 |
| 1.3 | Supervision | | |
| 1.4 | Reports to Board | Compliance | June 12, 2018 |
| 10.1 | Jail Visits | Compliance* | June 30, 2018 |
| 10.2 | Documented Visits | Compliance* | June 30, 2018 |
| 18.1 | Rotation in Custody | Compliance | June 30, 2018 |
| 18.2 | Documentation of Rotation | Compliance | January 1, 2019 |
| 21.1 | Transfers to Custody | Compliance | June 30, 2018 |
| | | | |
| | **Use of Force Polices & Practices** | | |
| | | | |
| 2.1 | Custody Force Manual | Compliance | January 1, 2017 |
| 2.2 | Force Prevention Principles | | |
| 2.3 | Inmate on Inmate Violence | Compliance | July 1, 2019 |
| 2.4 | Use of Force as Discipline | | |
| 2.5 | Force on Restrained Inmates | Compliance | July 1, 2019 |
| 2.6 | Head Strikes or Kicks | | |
| 2.7 | Supervisors Called to Scene | | |
| 2.8 | Prevent Excessive Force | Compliance | July 1, 2019 |
| 2.9 | Armed Inmates | Compliance | July 1, 2019 |
| 2.10 | Authorized Weapons | Compliance | July 1, 2019 |
| 2.11 | Planned Chemical Spray | Compliance | January 1, 2020 |
| 2.12 | Chemical Spray & Tasers | Compliance | July 1, 2019 |
| 2.13 | Check of Medical Records | Compliance | October 1, 2019 |
| 4.1 | Consult MH professionals | | |
| 4.3 | Spray on MH inmates | Compliance | October 1, 2019 |
| 4.4 | Cooling Off Periods | Compliance | October 1, 2019 |
| 4.5 | Medical or MH Provider | Compliance | October 1, 2019 |
| 8.2 | Complaints of Retaliation | Compliance | January 1, 2017 |
| 9.2 | Escorting of Inmates | Compliance | January 1, 2020 |

[40] A single asterisk denotes that assessment of the provision was suspended during the Third and Fourth Quarters of 2020 based on the Department's inability to comply due to COVID-19 restrictions.

[41] This represents the date the Department came into the compliance that it has maintained through the date of this report.

| | | | |
|------|--------------------------------------------|--------------|------------------|
| 17.2 | Pregnant Inmates | Compliance | January 1, 2017 |
| 17.5 | Minimize Medical Distress | Compliance | July 1, 2019 |
| 20.1 | Categories of Force | Compliance | January 1, 2017 |
| 20.2 | Reactive Force | Compliance | January 1, 2017 |
| 20.3 | Planned Use of Force | Compliance | October 1, 2019 |
| | | | |
| | **Training**[42] | | |
| | | | |
| 3.1 | Use of Force Training | Compliance* | June 30, 2018 |
| 3.2 | Ethics, Professionalism | Compliance* | June 30, 2018 |
| 3.3 | Custody Training | | |
| 3.4 | Custody-based scenarios | Compliance | June 30, 2018 |
| 3.5 | Add training/mentoring | Compliance | July 1, 2019 |
| 3.6 | Probation Reviews | | |
| 4.6 | Crisis Intervention | Compliance* | June 30, 2018 |
| 4.7 | Mentally Ill Inmates | Compliance* | June 30, 2018 |
| 4.8 | Mentally Ill Inmates (for new Department members) | Compliance | June 30, 2018 |
| 4.9 | Crisis Intervention (for new Department members) | Compliance | June 30, 2018 |
| 12.1 | Force Investigations | Compliance | July 1, 2019 |
| | | | |
| | **Investigation & Reporting of Force** | | |
| | | | |
| 4.2 | Mental Health Professionals | Compliance | October 1, 2019 |
| 5.1 | Tracking of Force Incidents | Compliance | October 1, 2019 |
| 5.2 | Commanders' Reviews | | |
| 5.3 | Unexplained Discrepancies | | |
| 8.3 | CFRC Review | Compliance | |
| 11.1 | CFRT Involvement | Compliance | June 30, 2018 |
| 12.2 | Location of Inmate Interviews | | |
| 12.3 | Suspect Interviews | | |
| 12.4 | Uninvolved Supervisors | Compliance | July 1, 2019 |
| 12.5 | Standard Order & Format | Compliance | July 1, 2019 |
| 13.1 | Documenting dishonesty | Compliance | October 1, 2019 |
| 13.2 | Reports of Dishonesty/PREA | Compliance | October 1, 2019 |
| 14.1 | Review of Criminal Referrals | Compliance | July 1, 2018 |
| 14.2 | Timeliness of Criminal Referrals | | |
| 15.1 | Timeliness of Reports | Compliance | July 1, 2020 |
| 15.2 | All Department Witnesses | Compliance | July 1, 2019 |
| 15.3 | Force by Other Members | | |

[42] The Department's reported results for Sections 3.1 through 3.4, 4.6 through 4.9, and 12.1 have been verified by the Panel's auditors.

| | | | |
|---|---|---|---|
| 15.4 | Description of Injuries | | |
| 15.5 | Clarification after Video | Compliance | July 1, 2019 |
| 15.6 | Separation of Deputies | | |
| 15.7 | Individual Perceptions | Compliance | July 1, 2019 |
| 16.1 | Healthcare Assessment | Compliance | July 1, 2019 |
| 16.2 | Photographs of Injuries | Compliance | July 1, 2019 |
| 16.3 | Medical Report of Injuries | Compliance | July 1, 2019 |
| | | | |
| | **Inmate Grievances** | | |
| | | | |
| 6.1 | Separate Grievance Forms | Compliance | January 1, 2017 |
| 6.2 | Available Grievance Forms | Compliance | January 1, 2017 |
| 6.3 | Emergency Grievances Forms | Compliance | January 1, 2017 |
| 6.4 | Use of Force Grievances | Compliance | July 1, 2018 |
| 6.5 | Grievances Against Staff | Compliance | July 1, 2018 |
| 6.6 | Right to Appeal Form | Compliance | January 1, 2017 |
| 6.7 | Handling Emergency Grievances | Compliance | October 1, 2020 |
| 6.8 | Notification of Non-Emergency | Compliance | January 1. 2020 |
| 6.9 | Grievance Coordinator Review | Compliance | July 1, 2018 |
| 6.10 | Collection of Grievances | Compliance | July 1, 2020 |
| 6.11 | Failure to Handle Grievances | Compliance | January 1, 2020 |
| 6.12 | Tracking Inmate Grievances | Compliance | July 1, 2018 |
| 6.13 | Grievance Coordinator Tracking | Compliance | July 1, 2018 |
| 6.14 | Grievance Coordinator Reports | Compliance | July 1, 2018 |
| 6.15 | Grievance Coordinator Analysis | Compliance | July 1, 2018 |
| 6.16 | Centralized Grievance Unit | Compliance | January 1, 2017 |
| 6.17 | Use of Force Deadline | Compliance | October 1, 2019 |
| 6.18 | PREA Deadline | Compliance | July 1, 2018 |
| 6.19 | Response to Inmate Grievances | | |
| 6.20 | Appeals of Grievances | Compliance | July 1, 2018 |
| 7.1 | Conflict Resolution | Compliance | January 1, 2017 |
| 7.2 | Notification of Results | Compliance | July 1, 2018 |
| 7.3 | Prisoner-staff Communications | Compliance | April 1, 2019 |
| 8.1 | Anti-retaliation | Compliance | April 1, 2019 |
| | | | |
| | **Use of Restraints** | | |
| | | | |
| 17.1 | Restraint Provisions | Compliance | December 1, 2015 |
| 17.3 | Safety Chair Procedures | | |
| 17.4 | Safety Checks | | |
| 17.6 | Multi-point Restraint Procedures | Not Applicable | |
| 17.7 | Approval of Multi-point Restraints | Not Applicable | |
| 17.8 | Continued Use of Restraints | Not Applicable | |

| 17.9 | Supervisor Approval of Restraints | Not Applicable | |
|---|---|---|---|
| 17.10 | Involuntary Medications | Compliance | July 1, 2018 |
| | | | |
| | **Early Warning System** | | |
| | | | |
| 19.1 | Development of EWS | Compliance | August 1, 2018 |
| 19.2 | Report Review and Notification | Compliance | January 1, 2019 |
| 19.3 | Performance Mentoring Programs | Compliance | January 1, 2019 |