DAWYN HARRISON
Acting County Counsel
STEVEN G. EDWARDS (Cal. Bar No. 304165)
Deputy County Counsel
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012
Tel: (213) 974-1811
Email:  sedwards@counsel.lacounty.gov

Attorneys for Defendants
LOS ANGELES COUNTY SHERIFF

**Submitted on behalf of Monitors Robert Houston
and Jeffrey Schwartz**

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS, et al.,<br><br>       Plaintiffs,<br><br>       v.<br><br>LOS ANGELES COUNTY SHERIFF ALEX VILLANUEVA, in his official capacity,<br><br>       Defendant. | Case No. 12-cv-00428-DDP (MRW)<br><br>**PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE**<br><br>Hon. Dean D. Pregerson<br>United States District Judge |

Pursuant to Section V of the Settlement Agreement And Release of Claims, the Monitors appointed by this Court, Jeffrey Schwartz and Robert Houston (collectively, the "Panel") hereby submit the attached Panel's Tenth Report "evaluation Defendant's Compliance with Action Plan" prepared by the Panel for the six-month period from January 1, 2021 to June 30, 2021.  This Report takes into consideration the comments from the parties in accordance with Section V of the Settlement Agreement.  The Panel is available to answer any questions the Court may have regarding this Report as such times as are convenient for the Court and the parties.

Concurrent with the filing of this Report, the Panel respectfully requests a status conference with the Court for the reasons set forth in greater detail in the Introduction to the Report.

With the consent of the parties, the Panel requested counsel file this Report on its behalf as neither monitor has easy access to the Court's electronic filing system.


 Dated: April 7, 2022                              Respectfully submitted,

                                                  By /s/ Monitor Bob Houston
                                                  Monitor and on behalf of Monitor
                                                  Dr. Jeff Schwartz

.

PANEL'S TENTH REPORT AND REQUEST FOR STATUS CONFERENCE

## PANEL'S TENTH REPORT

**Introduction and Request for Status Conference:**

The Monitors have been in place on this case for eight years, since 2014.  Active monitoring of LASD's progress toward compliance with the Settlement Agreement has been continuous for the last six years, or since 2016.

While great progress was made on many fronts in the initial years of monitoring (none more important than the elimination of inmate beatings[1] and the change in culture of the downtown facilities from enforcement-oriented to service-oriented), as noted in prior Monitor reports, that has not been the case recently.–From the use of force packages we have been reviewing, we are no longer seeing progression towards professional management of force situations. It is time for the jail culture to stop supporting behaviors that are forbidden by Policy.

As the Monitors reported to the jail management during their most recent visit and tour, in December, 2021, the Panel is deeply concerned that progress on some key issues has 'plateaued' on some key issues and actually regressed on some others.  **The Monitors respectfully request a status conference with the Court in light of the recent lack of progress on key issues.**

The Panel recognizes that the jails, and all of LASD, have been in uncharted waters for the last two years.  Staff shortages due to inability to recruit combined with extraordinary sickness and other absenteeism rates have affected staff morale and had far-reaching consequences in many areas of operations.  In spite of that, it is the Department's responsibility to move toward compliance and the Panel's responsibility to report on that progress or lack of progress.

More specifically, the use of "head shots" (punches to the head of an inmate) where prohibited by policy, has been relatively unchanged in the last two years or more, and may be increasing.  No issue has been discussed more with management over the last six years and especially in the last two years, to little avail.  That problem is compounded by two other factors.  Use of force reviews by supervisors and managers in the serious cases selected by the Monitors, almost always fail to note out-of-policy head shots or – less frequently – attempts to justify them.  Then the supervisors and managers are not held accountable for those failures

---

[1] The panel is referencing situations in which multiple Deputies continued to beat and/or kick an inmate after he was on the floor and sometimes unconscious, or in which inmates were taken to off camera locations where brutal uses of force were administered as retaliation or for intimidation, or the like. The panel distinguishes these situations from uses of force that are out of compliance with policy but are not primarily retaliation and are not intended to inflict serious injury.

and the Deputies using the improper for are "counseled" or sent to remedial training and actual discipline is seldom imposed.  While the Department has openly acknowledged this continuing issue in discussions with the Monitors, and is now contemplating changes to the way head shots are categorized and reported, there has been little real change or progress in more than two years.

A second long-standing and consistent problem is the tendency of Deputies to fail to call for a supervisor when encountering a recalcitrant inmate, as required by policy and Provision 2.7, and/or to put hands on an inmate unnecessarily, resulting in a use of force.  This problem is closely related to another issue, the 32 hours of DeVRT training provided to all jail staff.  In simple terms, the Panel sees little evidence that the DeVRT training has been generally effective and little evidence of specific de-escalation skills from that training.  The panel was concerned about DeVRT from the outset several years ago and spent a great deal of time suggesting changes.  After repeated attempts by the Monitors to suggest a fundamentally different approach to conflict resolution training were rejected, the Panel did approve the DeVRT curriculum, hoping that the Department's approach would be successful and the Monitors would be proved wrong.  Ultimately, it was the Department's decision about the content of this training but the results over several years have reinforced the Panel's view that the DeVRT training is substantially less effective than is needed.  (We found **Compliance** with **3.3** on June 30th, 2018)

Another frequent issue of concern is the Department's use of the WRAP, a relatively new piece of equipment and procedure for immobilizing inmates to prevent further violence.  The Monitors were assured that the WRAP policy satisfactorily addressed their major concerns but case reviews suggested the policy in question was being violated on a regular basis.  The Monitors wrote to the Department twice about the unreasonable delay in revising and following policy.  We were told that the Department would investigate the matter and get back to the Monitors.  That has not happened. The Monitors recognize that there are many stakeholders weighing in on the WRAP Policy revision but the continuing practice with WRAP cannot be justified. Short of a new and formally approved policy, the Department could have issued one or more directives to correct the improper and potentially dangerous WRAP practices, but has not.  While the positions of other stakeholders may complicate this situation, the Department is ultimately responsible for what they do and do not approve as policy, and when.

In the first few years of monitoring, the Panel selected cases for a given quarter from the cases in which the Department investigation was complete.  That meant that almost all of the cases selected were a year or more in arrears.  In order to have a substantial number of cases that were more recent, the Monitors arranged with the Department that some selected cases would continue to be those in which investigations were complete but an additional group of cases would be selected that were relatively recent and for which the Department agreed to complete investigations with high priority.  This selection process was intended to recognize ongoing improvements in performance.  That arrangement worked well until perhaps two years ago.  Since then, the cases have been increasingly in arrears and the panel finds itself

sometimes evaluating incidents from eighteen months ago or more.  The Monitors, in assessing a quarter, do not have some of the cases requested in advance for review that quarter.  Obviously, the Panel's feedback is far less helpful when it concerns a case from a year and a half ago.  The Monitors have raised this problem repeatedly, informally and formally, but it is getting worse rather than better.

The Monitors note that throughout this Report, auditors have not examined some source documents.  From the initiation of monitoring the Rosas agreement, specific source documents have been reviewed by auditors working with the Department-appointed Monitor, initially Richard Drooyan and for the last few years, Marc Harris.  When Mr. Harris resigned as Monitor to accept a special assignment in Washington D.C., his law firm no longer maintained a contract with the auditors.

The Department should have made alternative arrangements to rehire the auditors but has not.  As a consequence, the Monitors are unable to vouch for the accuracy of some of the findings reported by the Department in its self-report.  It is a necessity that the auditors be rehired or some other auditing arrangement be developed.

In the past, the Auditors have generally corroborated the Department's self-assessment data.  That would suggest that even in the absence of Auditors, the Monitors could rely on the findings in the self-assessment reports.  However, a recent development has cast doubt on that conclusion.  Provision 6.11 requires the Department to log and report all inmate grievances falling into any of five categories.  For the first two quarters of 2021, the Department reported two such grievances.  However, the Monitors reviewed information documenting an additional eight such grievances in Q1 and Q2, 2021.  The Panel wrote to the Department asking about the unreported grievances and received a quick reply saying the Department would review the situation.  It has been over three weeks and the Panel has not received anything.  The apparent under-reporting raises the specter that other self-reporting may be substantially incorrect.

This situation is not isolated and there is a concerning pattern of failure to respond in substance to questions or issues raised by the Monitors.  As mentioned above, the Panel has twice written about WRAP policies and practices.  Except for an informal explanation of why the new WRAP policy has not been approved, the Panel still has no answers or information.

Following our last site visit, the Monitors wrote to the Department on Jan. 2,2021, listing a number of concerns, issues and questions.  We received an immediate reply that the Department would review those and respond to us. That was over three months ago and we have received nothing.

The Panel has previously expressed concern about lack of clarity regarding the specifics of the "force concepts" training assigned by MCJ Unit Commanders.  *See* Seventh Report, p. 25, n.36 (noting that the annual refresher course required by Section **3.1** is not appropriate as a remedial measure for individuals with disproportionate number of uses of force situations).

The Panel has not been furnished with any further information and remains concerned about the appropriateness of the remedial use of force training.


The Monitors do not expect instantaneous information but the quick response of "We will look into this and get back to you", followed by nothing, makes it particularly difficult to determine the Department's compliance status.

One situation at MCJ and asked about in that Jan. 2 letter was of most serious concern. We wrote:

"On Sept. 7, 2021 there may have been information that a firearm might have been smuggled into MCJ. That appears to have led to a shakedown of at least two tiers and a strip search and X-ray search of the inmates on those tiers. During our visit, many inmates were interviewed separately by the Monitors. Inmate complaints about this situation were very consistent. They said they were taken out of their cells in the morning, given no explanation (except for oneinmate who said he was told the reason for the search by a deputy), strip searched, then walked naked en masse through the jail and down to the room with the X-ray machine, passing large numbers of male and female staff members, some of whom, according to the inmates we interviewed, mocked them or made other humiliating comments. They stated that they got boxers but still no shoes and were taken to the yard where they were kept for hours until returned to their cells that night."

"Questions: Who approved this procedure?
Is this a standard procedure?
Once stripped outside their cells, why were the inmates not given boxers and sandals before escorting them through the jail?
How long were various groups of inmates kept naked?
How long before various groups of inmates were returned to their cells?
What level of supervisor oversaw these events?
Is there a policy governing this type of search?
Did all inmates get food, water and access to bathrooms at reasonable intervals?"

The Department's immediate response said they had already completed an "After-Action Report" and Corrective Action Plans.  We have received neither of these and no other information.

It should also be noted that the previous nine Monitoring reports were authored by all three Monitors.  This report is written by the remaining two Monitors, Robert Houston and Jeffrey Schwartz.  While Mr. Harris formally resigned as a Monitor in early Sept., 2021, he had informally told all parties a month earlier that he was almost certainly leaving.  Since he was

4

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

appointed by the Department[2], it is their responsibility to replace him.  In spite of several inquiries and entreaties, the Department took several months to identify a replacement but within the last several weeks the Department has said the arrangements could not be completed.  It is now seven months since Marc Harris signaled his departure.  Since the Monitors divide cases for review, this situation results in a fifty percent increase in workload for the remaining two Monitors.  The encouraging news is that the Department has just indicated it has selected a replacement Monitor and, while contracts and approvals must still be finalized, it appears a return to a three Monitor Panel may be soon.

        The Panel notes compliance and non-compliance for every provision in each of its reports but there is no consensus among the Parties about what that means in relation to termination.  More specifically, the Parties have never agreed on the question of grouping of provisions (into "buckets") that determine which provisions must be in compliance concurrently with other Provisions  As noted in the Panel's prior reports, the Panel has encouraged both Parties to adopt a meaningful framework to determine the Department's compliance with the Settlement Agreement but the Monitors are unaware of attempts in the last few years by either Party to initiate discussion or negotiations about that or other unresolved issues.  The Monitors believe that a clear pathway to compliance would be a valuable motivating factor for all.

        In order to be as constructive as possible, the Monitors have provided a list of suggested changes to policies and procedures related to the *Rosas* agreement.  That list of recommendations is Appendix B to this report.  It should be emphasized that these are just that, recommendations, and are not required by the settlement agreement or in any other fashion.

The Monitors also plan to make a substantial change in the manner in which they report compliance and non-compliance on a quarterly basis.  Beginning with the Second Semester of 2021, the Monitors will provide both Parties a Force Matrix for all cases reviewed during each Quarter. This Matrix provides the Department's compliance/non-compliance/non-applicable with each Provision in every case we review.

**Brief History:**

        The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan [developed by the Panel] ('Reports') at intervals the Panel shall determine."  This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from January 1, 2021, to July 31st, 2021, and it is created

---

        [2] Per the Rosas settlement agreement, a second Monitor, Jeffrey Schwartz, was appointed by the Plaintiffs and the third, Robert Houston was mutually agreed upon by both parties.

for the purposes of the settlement of the *Rosas* case.  In accordance with Paragraph V of the Settlement Agreement, it takes into consideration comments received from the Class Counsel on March 17th, 2022 and the Defendants on March 21st, 2022,

In May 2014, the Parties retained the Panel "to develop a corrective action plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles" (the "Downtown Jail Complex").  The plan developed by the Panel sets forth provisions in twenty-one (21) areas that the Sheriff is required to implement in the Downtown Jail Complex.  The plan was approved by the Court on April 7, 2016.  Under Paragraph VIII of the Settlement Agreement, "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')."  As of November 1, 2018, the Sheriff's Department (the "Department") has implemented 104 of the Panel's 106 recommendations.  The remaining two recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in *United States v. County of Los Angeles, et al*., CV No. 15-05903 (JEMx) (the "DOJ case").

In the Panel's Ninth Report, for the second half of 2020, the use of force numbers increased slightly across all of the Downtown facilities, but were still well below the numbers we saw in 2018 and 2019.  It was noted in our Eighth and Ninth Reports that much of this decrease was undoubtedly attributable to the significant reduction in the inmate population in the Second Quarter of 2020 due to the COVID-19 pandemic.  In the First Semester of 2021, we have seen 565 incidents across all three facilities, an increase of 9% from the Second half of 2020. Most of these incidents were of Category 1.  Notably, there were no Category 3 force incidents at any of the Downtown jail facilities in the second half of 2020 while there were four (4) Category 3 force incidents in Quarters One and Two of 2021.  While the numbers of Category 3 incidents are too small to distinguish reliable differences from random variation, the increase in Category 3 incidents is a cause for concern.

The Panel reviewed 25 force packages in the First Quarter of 2021 and 25 force packages in the Second Quarter of 2021.  The Panel did not select these force packages randomly or in proportion to the frequency with which various categories of force occur.  Rather, the Panel selected for review the force incidents most likely to involve serious uses of force, as has been the case since the beginning of *Rosas* monitoring.

Other issues raised by the Panel in prior reports persisted in the Tenth Reporting period, most notably, the failure of the Department to mete out discipline in cases where force policies are violated or Department personnel inaccurately described force incidents in their written reports.  Although significant strides have been made by the Department in limiting improper uses of force and developing a culture that discourages bad practices and emphasizes more positive staff-inmate relationships, the Panel believes that further progress in eliminating improper uses of force can only be achieved if deputies who are proven to have cross the line are disciplined by supervisors who call out this behavior.

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

Regarding the non-force related provisions in the Action Plan, the Department submitted its Tenth Self-Assessment Status Report (the "Tenth Self-Assessment") on January 22, 2022. During the Tenth Reporting Period, the Panel reviewed records posted by the Department to verify the Department's self-assessments of its compliance with non-force provisions of the Action Plan.  The Panel's evaluation of the provisions of the self-assessment reports are included in this Report.

Due to the restrictions and safety concerns caused by the COVID-19 pandemic, the Panel was not able to visit the jails in the First Half of 2021.  Accordingly, the Panel was not able to offer an assessment of the state of the relationship between Department personnel and inmates beyond what can be gleaned from the data and our review of the selected force packages.  We resumed our visits to the Jails in December 2021.

During the Tenth Reporting Period, the Panel reviewed fifty (50) completed force packages from the First and Second Quarters of 2021 that were selected by the Panel from a comprehensive list of all force incidents compiled by the Department.  As noted above, the Department continues to struggle to complete its use of force investigations in a timely manner.

The Department continued to cooperate well with the Panel.  The Department and County Counsel answered most questions and responded to our requests for documents and information.  They also engaged in constructive virtual meetings on February 3rd, 2021, and May 18th, 2021, with the Panel concerning our findings regarding the use of force incidents we reviewed.  We appreciate their professionalism, and courtesy in handling our monitoring requests.

**ACTION PLAN IMPLEMENTATION**

I.   **Leadership, Administration and Management**

   A.   **Leadership and Accountability**

The recommendations in **Sections 1.1 through 1.4** of the Action Plan require that Custody be headed by an Assistant Sheriff with no other areas of responsibility, the Sheriff be engaged personally in the management of the jails, the Department's managers be held accountable for any failures to address force problems in the Jails, and that the Department regularly reports to the Board of Supervisors on the use of force in the jails and on its **Compliance** with the Action Plan.

The Department has been in **Compliance** with Sections **1.1** and **1.2** of the Action Plan since January 1, 2017. Custody has been headed by an Assistant Sheriff with no other areas of responsibility since mid-2014.  Custody was under the direction of Bruce Chase for most of the

7

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

1st Semester of 2021.  Assistant Sheriff Corbett was appointed during the Tenth Reporting Period on April 18th, 2021.  The Panel found both Assistant Sheriff Chase and Corbett to be accessible, forthright, and fully supportive of the work of the Panel.

The Panel met with Sheriff Villanueva by a Webx video conference in April 2021, and again in early January 2022. Both conversations were candid and forthright.  The Monitors expressed concern with the frequency of head punches during our reviews of force packages. The Panel also advised the Sheriff that supervisors need to identify and properly handle situations where force is avoidable (2.2, Force as a last resort) or unnecessarily applied.  The Sheriff discussed the lack of resources in the jails in general and the staff and supervisor shortages in particular.

Section **1.3** of the Action Plan provides that Department managers should be held accountable if they fail to address use of force problems at the Downtown jail facilities.  The Compliance Measures require the Department to provide a quarterly report that sets forth the number and rank of personnel found to have violated use of force policies in the Jails.  In the First Quarter of 2021, one (1) sergeant and one (1) deputy were addressed with written reprimands.  In the Second Quarter, two (2) deputies received written reprimands.  The Panel notes that in each of those two quarters, the Panel found a substantial number of additional cases in which personnel violated use of force policies and/or the recalcitrant inmate policy. Each of those cases is identified for the Department with particularity prior to the Panel's quarterly meeting with Department managers and supervisors and then discussed in detail at that meeting.  More specifically, the Monitors find that often supervisor reviews neither identify, nor effectively address, deputy abuses of inmates with head punches.  These punches are forbidden by Provisions and the LASD Custody Manual.  Although this has been an ongoing high priority issue, progress toward stemming this behavior has slowed, or more likely, backtracked, based on Monitor force reviews during the first two quarters of 2021.  The Monitors emphasized during the December 2021 visit that a change is necessary, both in deputy actions and supervisor reviews.  The Department is thus **Not in Compliance** with this portion of Section **1.3.**

In discussions with command staff members over several quarters, the Monitors have recommended that head punches/strikes be removed from the umbrella of 'personal weapons' and given a separate status.  During our December 2021 Monitoring visit, the Department said they have agreed to this change but gave no time frame for a policy redraft.

Compliance Measures for Section 1.3 also require the Department to provide data regarding overall force incidents and Category 3 incidents so the Panel can assess whether there have been substantial increases and whether any such increases have been appropriately addressed by Unit Commanders and Commanders.  There were two (2) Category 3 uses of force in the First Quarter and two (2) in the Second Quarter of 2021.  If there was communication among the Commanders and Unit Commanders about the increase in Category 3 incidents, it was not documented or otherwise apparent from the information the Panel reviewed.  The Department has **Not Achieved Compliance** with this aspect of **1.3.**

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

The total uses of force for the First two quarters of 2021 was 565.  In Quarter 1 there were 246 uses of force, and 319 in Quarter 2.  This represents a 30% increase from Quarter 1 to Quarter 2, 2021.  For the First Quarter of 2021, there were 35 NCIs, and for the Second Quarter there were 28 NCIs (a 20% decrease).  For the First Quarter of 2021, there were 144 Category 1 incidents, and for the Second Quarter there were 227 Category 1 incidents (a 58% increase).  For the First Quarter of 2021, there were 65 Category II incidents, and for the Second Quarter there were 63 Category II incidents (a 3% decrease).  The Panel finds the Department **In Compliance with this portion of Section 1.3** of the Action Plan with regard to providing overall data on uses of force.

Section **1.3** has multiple elements and the Department is in compliance with some but out of compliance with others.  The Panel's decision of non-compliance was based primarily on the Department's persistent reluctance to impose discipline in those cases where use of force policies are violated.  Additionally, in cases where the Panel has found a policy violation regarding use of force, and where the supervisors or mid-managers reviewing the incident have failed to identify a policy violation, or even question the use of force, little action is taken with the supervisor and/or mid-manager.  Accordingly, the Panel finds the Department **Out of Compliance with Section 1.3** of the Action Plan.

The Department is **In Compliance** with Section **1.4** in the Tenth Reporting Period.  On April 6th, 2021, Assistant Sheriff Bruce Chase, Commander Sergio Aloma, and then-Captain Larry Alva made presentations to the Board of Supervisors on the Department's work to comply with the *Rosas* Action Plan.

**B.   Management Visits**

Sections 10.1 and 10.2 require the Department's leadership to tour each of the jail facilities and document those visits.  The Department has previously asked the Panel to consider suspending the requirements of these provisions during the pendency of the COVID-19 restrictions.  Beginning in the First Quarter of 2021, the Panel agreed to the development of technology-based alternatives to in-person visits.  The Department used video cameras for virtual visits throughout the Facilities.  The Panel finds this acceptable for both Quarters of this Reporting period.  The Department is **In Compliance** with both **10.1** and **10.2.** As the frequency of COVID 19 cases has lessened, leadership now needs to tour facilities in accordance with these Provisions.

**C.   Rotations and Transfers**

Sections **18.1** and **18.2** require the Department to (1) maintain Custody-wide rotation policies and rotate personnel as required by these policies, and (2) audit each facilities' compliance with its rotation policies.  The Department's Tenth Self-Assessment reports that the Department achieved 99% Compliance in the Tenth Reporting Period.  Each of the Downtown Jail facilities has a reasonably current Unit Order setting forth its rotation policy and the source documents indicate that most Department personnel are rotated in Compliance with these

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

policies.  The Department is **In Compliance** with Section **18.1** and Section **18.2** through June
30th 2021.

## II.      Use of Force Policies and Practices

Section **2.1** of the Action Plan requires the Department to "have a separate, revised,
free-standing, and logically organized Custody Force Manual for Custody Operations[.]" On
October 16, 2015, the Department provided the Panel with a Custody Operations Force Manual
with separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints,
Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved
Shootings.  The Department's Custody Force Manual **Satisfies Section 2.1** and includes specific
provisions that **Satisfy Sections 8.2** (Complaints of Retaliation), **17.2** (Pregnant Inmates), **20.1**
(Types of Force), and **20.2** (Definition of Reactive Force) of the Action Plan.  The Department
has been **In Compliance** with these Sections since the Panel began monitoring the
Department's compliance as of January 1, 2017.

The other recommendations in the Action Plan that pertain to the Department's use of
force in Custody Operations are summarized as follows:

- Sections **2.2** through **2.13** require the Department to adopt a comprehensive set of new
  use of force policies for Custody Operations.

- Sections **4.1** through **4.5** require the Department to adopt specific use of force policies
  for dealing with mentally ill prisoners.

- Sections **9.2** through **9.3** require the Department to adopt specific policies for escorting
  inmates after force incidents and intervening to protect inmates as soon as it is
  reasonably safe to do so.

- Section **17.5** requires the Department to adopt policies for minimizing the risk of an
  inmate's medical distress during and after a force incident.

- Section **20.3** requires the Department to adopt use of force policies for Planned Force
  (such as cell extractions).

The Panel reviewed multiple drafts of the Department's policies to implement these
recommendations, required changes where appropriate, and certified that the Department had
implemented these policy recommendations effective December 1, 2015.

During the Eighth Reporting Period, the Department advised the Panel of several
proposed changes to the policies that were previously approved by the Panel.  The Panel was
given the opportunity to comment on the proposed changes.  Although most of the proposed
changes were acceptable, the Panel has advised the Department that some modifications are
necessary and recommended other modifications to existing policy.  During the Ninth and

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

Tenth Reporting periods, the Panel continues to work with the Department with respect to proposed revisions to the force policies, including revising the provision regarding prohibited uses of force.  The Department has been receptive to comments and suggestions raised by the Panel, although the policies discussed have not been consistently finalized.

The WRAP policy and its application remain ongoing high priority concerns for the Panel.  The WRAP policy has not been approved by the Monitors, as required, and the practices used with WRAP appear to be almost diametrically opposed to the way in which the Department explained that WRAP was being used.  **Provision 17.6 is non-compliant** specifically because of WRAP procedures risking compressional asphyxia (see MCJ-04485 and IRC-01256, for ex.).

## A.      Review of Force Incidents

The Action Plan requires that the Panel review selected force packages each quarter to assess whether the use of force is in Compliance with Sections **2.2** through **2.13, 4.1** through **4.5, 9.2, 9.3,** and **17.5** (the "Force Provisions") of the Action Plan.  As has been the practice of the Panel, we reviewed the problematic incidents identified during our review with Custody Commanders and took into consideration their comments in reaching the conclusions set forth in this Report.  The Panel also met with Plaintiffs' counsel to review the force incidents identified as problematic by the Panel as well as additional incidents Plaintiffs' counsel considered problematic.  The input of the Department and Plaintiffs' counsel was most helpful in reviewing and assessing compliance with the Force Provisions

The Department continues to struggle to complete its use of force investigations in a timely manner.  In 2020 and in early 2021, we were hopeful that with the filling of many of the Sergeant vacancies in the Custody Division the pace of the Department's use of force investigations would improve, and the Panel would be better able to assess progress in something approaching real time.  While these positions were being filled during the First and Second Quarters of 2021, the necessity for more Sergeants persists and the backlog of cases ready for our review has not diminished.

As noted above, the Panel's review of force cases with the Custody Division managers is most effective when the cases are as recent as possible.  If the Panel is reviewing cases that are more than a year old, the value of the discussion between the Panel and the Department is diminished.

### 1.  First Quarter 2021 Results

Per the applicable Compliance Measures, the Panel selected 25 force incidents to review in the First Quarter of 2021 and received and reviewed all 25 of those force packages.  The packages were selected without input from the Department.  As has been the Panel's approach in past Reporting periods, the Panel selected for review the force incidents most likely to involve problematic uses of force.  The Panel asked to review all Category 3 incidents (those involving force that is likely to, or does, result in severe injuries) and many Category 2 incidents

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

that involved strikes by Department personnel.  Thus, the universe of force incidents selected by the Panel continues to include a disproportionate number of the more serious incidents involving the use of force by Department personnel.

Based on the assessment of each provision across all the reviewed force packages, the Panel concluded that from January to June 2021, the Department was ~~not in~~ **Not In Compliance** with Five (5) Packages with the following Provision~~s~~ violations **2.2** Force Prevention Principles, **2.6** Head Strikes or Kicking Inmates **2.7** Calling Supervisors to the Scene Before Physically Engaging with Recalcitrant Inmates, **2.13** Check of Medical Records, **5.2** Commanders' Reviews, **5.3** Unexplained Discrepancies in Reports, **12.2** Location of Inmate Interviews, **15.3** Force by Others, **15.6** Separation of Deputies to Write Reports, and **20.3** Planned Use of Force. The most problematic cases were as follows:

| Quarter 1 | IRC 00884 |
|---|---|
| | MCJ 02673 |
| | MCJ 2817 |
| | TTCF 01226 |
| | TTCF 01605 |

Each of those cases was identified by the Panel for the Department and discussed or considered at the meetings between the Panel and Department that focused on problematic use of force cases.

As in previous Reports, the Panel has expressed concern that Department members sometimes react too quickly and should take advantage of "time and distance" to de-escalate situations and avoid using force altogether.  The Panel often sees opportunities to plan a safer use of force.  The failure to call a supervisor when confronted with a recalcitrant inmate is a corollary of the need for Department members to take time before using force to control a recalcitrant inmate.  The Department shared with the Panel their four (4) short new training videos developed for ongoing use of force refresher training required by the Action Plan.  These videos were created to emphasize the advantage of time and distance and calling a supervisor to help de-escalate an incident whenever possible.  The Panel found the new videos to be realistic and effective but questions about who would be trained and when, had not been determined.

The other persistent problem regarding the use of force identified by the Panel is the use of head strikes, as discussed earlier in this report.  The Panel again found cases in the First Quarter where personnel struck an inmate in the head, but the statements or actions presented by the inmate did not justify a head strike.  In some of these cases, a use of force short of head strikes was justified, but in other cases the use of force itself was avoidable.

As in the past, the Panel has found the Department out of compliance with Section **5.2**, relating to the evaluation of force incidents by supervisors since we are not consistently seeing rigorous reviews across all levels of the Department.  We continue to see improper uses of force validated in the initial Supervisor's review and, while the Watch Commander and Unit

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

Commander reviews are more substantive and probing than we saw in the early years of our monitoring, one or both Commander reviews often concur with the erroneous evaluation of the investigating Sergeant.  In situations where the deputies use head strikes, the packages are nearly universally found to be following policy even where adverse action is taken with the deputy or deputies.  Policy violations that involve abusive behavior need to be called out of compliance for what they are, serious violations by personnel and an improper use of force.

For example, in this 1st Quarter, case TTCF 020-01226, Deputy X entered a Module to escort Inmate S to Court. IM S refused to go to Court due to withdrawal pain from heroin. Deputy X placed his palm on IM S's bicep while stating that he would take him to the Clinic. The Deputy went 'hands on' before calling for a supervisor and waiting for this backup. IM S sat up in bed and swung his elbow striking Deputy X in the face. Rather than stepping back from a sitting inmate, Deputy X punched Inmate S twice (2) in the face. In his Report, Deputy X stated that his head strikes did not have the intended effect. In a Supervisor Review: 'Personnel could have adhered to basic officer safety principles, not entered the cell, and requested medical and sergeant support'. Monitors found the incident non-compliant with **2.2**, force not used as a last resort**, 2.6**, no head strikes unless inmate is both assaultive and there is an imminent threat of serious injury, **2.7**, Supervisor not called to the scene, **20**.3, Supervisor not on the scene, 5.2, Supervisor review,  because the Deputy's head punches were not identified as  Provision/Policy violations, **12.3**, an involved Deputy was a part of IM S's interview, **12.4**, Un-involved supervisor, the assigned investigator was a part of the force used, and **15.6**, Separation of Deputies to write reports, because no document in force package to verify this separation was in the record.

The Monitors were advised by Assistant Sheriff Corbett that the Department has begun to gather statistics and information about the use of head strikes.  Further, he will be sharing these results with Command Staff.  The Panel expressed its appreciation and support of these decisions.  The Monitors recommend that the results become a part of the Early Warning System to hold staff and supervisors more accountable.

The documentation provided by the Department was not sufficient for the Panel to determine the Department's compliance with the provision relating to the separation of Department personnel after a force incident.  To achieve compliance with Section **15.6**, the supervisor must document that the members were separated and how this separation was accomplished.

## 2. Second Quarter 2021 Results

In the Second Quarter of 2021, the Panel reviewed 25 force incidents.  The Panel concluded that the Department was **Not In Compliance** with Seven (7) Use of Force Cases that include the same provisions of the Action Plan noted in the First Quarter.  The Department is not in Compliance with the following Provisions: **2.2**, Force Prevention Principles, **2.6**, Head Strikes or Kicking Inmates, **2.7**, Calling Supervisors to the Scene Before Physically Engaging with Recalcitrant Inmates, **2.13**, Check of Medical Records, **5.2**, Commanders' Reviews, **5.3**,

13

Unexplained Discrepancies in Reports, **8.3,** CFRC Reviews, **12.2,** Location of Inmate Interviews, 15.3, Force by Others, 15.6, Separation of Deputies to Write Reports, and **20.3,** Planned Use of Force. The most problematic cases in the Second Quarter (also identified for the Department and discussed with them):

|          |           |
|----------|-----------|
| Quarter 2 | IRC 01472 |
|          | MCJ 04852 |
|          | MCJ 00790 |
|          | TTCF 00267 |
|          | IRC 01584 |
|          | MCJ 04267 |
|          | IRC 01527 |

For example, this 2nd Quarter's IRC 920-01527, Deputy Y approached IM Mc because he had walked away from him during an escort. IM Mc was standing about one foot away from a corridor wall while facing outward. With no hesitation, Deputy Y grabbed IM Mc chest and slammed him into the wall. Deputy Y punched IM Mc 5-9 times in the head, and Deputy Z punched IM Mc 6-8 times in the head as they took IM Mc to the floor because they 'feared' that the Inmate might become assaultive. Deputy Reports did not include force by others. Deputy X made no report about the Inmate striking him in the collarbone until after he watched the videos. He then stated he remembered feeling a 'sharp pain'. Reviewing Supervisors did not 'call out' the punches as being out of compliance, nor did they critique the slamming of IM Mc onto the wall. Monitors found this to be a **2.2** violation for avoidable force, not used as a last resort, more than minimal force used, force not de-escalated or terminated when inmate was controlled, a **2.6** violation for head strikes when inmate was neither assaultive nor high risk, **17.5**, inmate was not placed in the recovery position once controlled, **17.6**, inmate was not placed on side on a gurney (WRAP was used) for transportation, **20.3**, supervisor was not called to the scene to direct force, **20.3**, supervisor not on scene, **5.2**, Supervisor Review - had some criticisms but head shots were not addressed, **15.6**, no documentation of Deputies being separated to write reports, and **15.3**, Deputies did not report force by others. Although IM B's witness statements aligned with the video, supervisor reviews were written to deny his credibility. Although IM Mc was struck several times in the head, no photographs were taken of the Inmate. Supervisor report states Deputy X was trying to cuff up IM Mc, video evidence shows that this was not true. Supervisor report states inmate was physically assaultive toward personnel and, again, from video evidence that was simply not true.

Also in this Second Quarter, IRC 01472, Inmate S was escorted out of his cell and was placed face down on a spider table. The Inmate had refused to cooperate with the inmate wristband count. Inmate raised his arms. Custody Assistant S punched the Inmate 5 times on head during the take down because the CA 'feared' for himself and his partners' safety. Monitors found a **2.2** violation, force was not used as a last resort, **2.6** violation, Inmate struck only for control, **2.7.**, Supervisor not called to the scene, **17.5**, inmate not placed in recovery position after being controlled, **17.6**, Inmate not carried from scene on his side, **5.2**, Supervisors only minimally called out head punches and violations of recalcitrant inmate policy, **15.3**,

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

Deputies did not report punches by CA, and **15.6**, no documentation of staff being separated to write their reports.

The Panel has reviewed some cell extractions this period, especially transfers to Wayside, where medical checks are not made before the extraction, and use of chemicals/taser, and de-escalation are sometimes non-existent.  The Panel concluded that in the First and Second Quarters of 2021, there is **Not Enough Data** present **To Decide** on the Department's **Compliance** with Section **4.1** of the Action Plan, related to having a mental health professional on-scene to attempt to resolve the situation.

Plaintiffs have identified several concerns related to the force used by Department personnel in applying the WRAP device to inmates following force incidents.  In discussions regarding the restraint provisions of the Action Plan, the Panel worked with the Department in developing the policy related to the use of the WRAP device and intends to meet with the Department to discuss the implementation of that policy and the concerns raised by Plaintiffs regarding the force used in the application of the device.  Plaintiffs identified cases in which force was used against restrained inmates involving the application of the WRAP device and urged a finding of non-compliance with respect to Section **2.5**.  While Plaintiffs' concerns with the WRAP centered on the application of the device and more specifically on the potential for positional asphyxia due to compression of the head, neck and chest and the time inmates are held face down, the Panel's primary concern was whether the WRAP is used to prevent further physical confrontation during transport, or whether it is being used more broadly as a warning and deterrent to other inmates, which would be improper.  The Department has told the Panel that the WRAP is only used if an inmate has been assaultive toward staff or has a history of staff assaults, and pointed to the WRAP policy that requires supervisory approval in advance and requires a supervisor on-scene when the WRAP is applied.  During case reviews, the Panel realized that these two policy provisions were regularly violated, with no supervisory or management comment or discussion, and no accountability.  The Monitors twice wrote to the Department about this issue and the Department said it would review and respond, but has not. Based largely on this WRAP issue, the Department is **Out of Compliance with Section 2.5.**

3.  **Training**

Sections **3.1 through 3.4** of the Action Plan require that Department members receive training on use of force policies, ethics, professionalism, and treating inmates with respect. New Department members are to receive six (6) weeks of specific training in Custody Operations.  Sections **4.6 through 4.9** require the Department to provide Custody-specific, scenario-based skill development training for existing and new personnel in Crisis Intervention and Conflict Resolution and in "identifying and working with mentally ill inmates."  Section **12.1** requires that Custody Sergeants receive specific training in conducting use of force investigations.

The Panel has previously deemed the Department to be complying "as of" the date reported by the Department for the completion of the initial training required for existing

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

personnel.  The Department's continuing compliance with the training provisions is determined
by its compliance with the refresher training required every year or every other year.  The 2020
Assessment was submitted on July 16th, 2021.  That self-assessment did not include any data for
the first two quarters of 2021.  The Department will submit its report of refresher training with
the 11th Court Report as part of its Self-Assessment.

The Monitors note that the lack of de-escalation skills has been a serious and frequent problem
identified in use of force case reviews. In **4.6**, the Department is required to conduct training
with the frequency and duration noted in this Provision. However, this Provision also requires
"scenario-based, skill development training". So, both the quantity and quality of its delivery
are key aspects of this Provision. The Panel has determined that this training and refresher
training is not favorably changing Deputy behavior and should be re-created and approved by
the Monitors. **The Panel finds Non -Compliance with Sections 4.6 through 4.9**.

### a.  Use of Force Training

As of June 30, 2018, the Department was found to **Be Compliant** with the training
requirements of Section **3.1**.  In the 8th Reporting Period, the Department reported that certain
training classes were canceled or modified due to COVID-19 safety restrictions and requested
that the Panel defer an assessment of this provision through the 9th Reporting Period.

The Monitors note the crucial role of use of force training in achieving compliance and do not
believe a one-year hiatus in that training is consistent with the *Rosas* agreement.  The
Department is **Out of Compliance** with this Provision.

### b.  Ethics and Professionalism Training

The Department requested a six (6) month extension on ethics and professionalism
training to July 16th, 2021, but has not conducted any of that training during the granted
extension.  The Monitors find the Department **Out of Compliance** with Provision **3.2**.

### c.  Mental Health Training

In 2021, the Department requested a six (6) month extension on mental health training that the
Monitors granted in the ninth reporting period.  Here again, the training did not occur during
this extension and **the Monitors find this Provision (4.7) Out of Compliance.**

### d.  New Deputy Sheriffs and Custody Assistants

The Department reported that since the First Reporting Period beginning on July 1,
2015, newly assigned Deputies have been required to complete a six-week Custody Operations
course that includes training in use of force and ethics, professionalism and treating inmates
with respect, and new Custody Assistants, have received training in these subjects during their
Academy training as required by Section **3.3**.  The Department's posted results reflect that the
Department has met the 95% Compliance standard for new Deputies and new Custody
Assistants since June 2018.  The Department requested an extension on **3.3**, not because the

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

required training was not completed timely, but because the training sign-up sheets could not be located. The Department is tracking down individuals who completed the training so that they can sign new training records. The Monitors do not think an extension is necessary and find the Department is in **Compliance** with **3.3**.

The Department previously reported that 100% of new Deputies and Custody Assistants had received the conflict resolution training (DeVRT) and training in "identifying and working with mentally ill inmates" ("IIMI") required by Sections **4.8** and **4.9**. The required DeVRT and IIMI training takes place after Deputy Sheriffs and Custody Assistant Academy graduations and prior to assuming duties at their unit of assignment. The Department's Tenth Self-Assessment reports that 100% of the new Deputies received the required training in the First and Second Quarters of 2021. The Department is **In Compliance with Sections 4.8 and 4.9** through June 2021.

Section **3.5** requires Unit Commanders to determine "what additional training, counseling or mentoring may be required when a personnel complaint involving the use of force is resolved with a finding that it 'Appears Employee Conduct Could Have Been Better' direct that the Department member undergo additional training, counseling, or mentoring, and document the action taken." The Department's Tenth Self-Assessment reports that there were no inmate grievances against staff involving use of force where the disposition was that it "Appears Employee Conduct Could Have Been Better." The Department is **In Compliance with Section 3.5** as of the end of June 2021.

Section **3.6** requires Unit Commanders to review new Department members within six (6) months of being initially assigned to Custody and again before the end of their probationary period. Based upon a random selection of personnel records, the Department reports that all the new Department members were reviewed as required by Section **3.6** during the first six (6) months of 2021. Prior to 2021, the Department had never been close to compliance on this provision. To change that, the Compliance Bureau initiated a number of steps to inform Unit Commanders of the specifics of this requirement, and to track progress. These efforts were fully successful and resulted in 100 per cent of new personnel receiving both required evaluations. The Department is thus **In Compliance with 3.6**.

e. **Sergeant Training**

Section **12.1** requires that all Custody Sergeants receive an initial 16-hour block of training in conducting use of force investigations. The Panel approved the 16-hour initial training course on February 24, 2017. The Department has since demonstrated to the Panel that by the Third Quarter of 2019 virtually all the Sergeants who initially missed the required training had completed their training. No Sergeants were promoted during the First Quarter of 2021 and all 53 of the Sergeants promoted in the Second Quarter did receive the use of force investigations training. Accordingly, the Panel finds the Department **In Compliance with Section 12.1** for the 10th Reporting Period.

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

4.   **Reporting and Investigation of Force Incidents**

Many of the recommendations in the Action Plan that pertain to the reporting and investigation of force used by Department personnel in Custody Operations are assessed by the Panel through a review of the completed force packages.  Other provisions are reported by the Department as follows:

- Section **5.1** requires the Department to track use of force investigations, reviews, and evaluations; review evaluations of force incidents; and conduct additional investigation of discrepancies and unexplained tactical decisions.  The Department reports that 96% of the force incidents in the First Quarter of 2021 were timely entered into the database as required by **Section 5.1,** and 96 % were timely entered in the Second Quarter of 2021 which is above the 95% threshold required for being **In Compliance**.

- Section **8.3** requires that investigations of grievances claiming that Department members used force to retaliate against inmates be timely evaluated by the Custody Force Review Committee ("CFRC").  The Department reports that it achieved 100% **Compliance** with this provision in the First and Second Quarters of 2021.

- Section **11.1** requires that the Custody Force Rollout Team's involvement in reviewing force incidents not delay the Department's investigation of the force incidents.  The Compliance Measure requires that "95% of the investigations reviewed by CFRT were not delayed beyond the period permitted by law for imposing discipline."  The Department previously reported that it achieved **Compliance with Section 11.1** in the Second Quarter of 2018.  **The Department continues to be in substantial compliance with 11.1** through the 10th Reporting period.

- Section **13.1** requires the Department to "have a firm policy of zero tolerance for acts of dishonesty or failure to report uses of force."  Sections **13.1 and 13.2** require the documentation of the reasons and reports to the Inspector General whenever the Department does not terminate a member who has been found to have been dishonest, used excessive force, or violated the Prisoner Rape Elimination Act ("PREA").  The Department continues to be **In Substantial Compliance** in the Tenth Reporting Period.

The Panel has previously noted its concern that reviewed use of force packages include staff reports that are inaccurate and self-serving, but which are not treated as "dishonesty" or "integrity" issues by the Department.  In this Report, the Panel has found the Department **Out of Compliance with Sections 5.2** (Commanders' reviews); **5.3** (unexplained discrepancies); and **15.3** (reports of force by other members), based on reports that do not accurately describe the use of force or the inmate's conduct that prompted the uses of force.  Nevertheless, the Panel has deemed the Department **In**

18

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

**Compliance with Sections 13.1 and 13.2** based on the Department's adherence to the Compliance Measures applicable to those provisions.

- **Sections 14.1 and 14.2** require (1) an additional review of referrals of inmates for criminal prosecution arising from incidents involving the use of force by Department members and (2) timely referrals to the District Attorney of "officer misconduct that may amount to criminal violations." The Department reports 100 % **Compliance** with Section **14.1** for the First and Second Quarters of 2021. In the Self-Assessment Report, the Department requested to remain in compliance with **14.2**, noting the complexity of these cases. "Complexity" is not the real problem here. Many of the cases involving potential criminal conduct of staff are investigated under section 801 of the penal code, which allows three years to actually file a case. Until a case is investigated and referred to the DA for prosecution, or dropped, it is confidential and cannot be reported to the Custody Compliance Bureau. That means that a number of cases are not reported as referred to the DA for two or two-and-one-half years, in direct conflict with the *Rosas* requirement of six months. It was a mistake that the County initially agreed to the six months but the conflict was likely not apparent then. The Monitors recommend that the Parties change the six month requirement in light of the three year rule in 801 p.c.. In the interim, **the Monitors must consider the Department Out of Compliance with 14.2**, since the Panel cannot over-ride what the Parties have agreed to.

- Provision **15.6** requires the separation of personnel to write reports after a use of force and ensure that independent reports are written. Supervisors need to document in writing that the separation occurred and how this was accomplished to achieve compliance with this Provision. Compliance with **15.6** would greatly assist with **15.2** compliance, that is, every Department member wrote an independent report. The Monitors find **Non-Compliance with 15.6 and 15.2**

**III.    Inmate Grievances**

The Action Plan requires extensive changes in how the Department handles inmate grievances and requests for service. On July 15, 2016, the Department issued a new "Inmate Grievance Manual" (Volume 8 of the Custody Division Manual) to implement a new grievance system.

**A.    Grievance Forms**

Sections **6.1 through 6.6** require that separate forms for inmate grievances be reasonably available to inmates and that the forms have specific checkboxes. Section **7.1** requires the Department to advise inmates of the voluntary Conflict Resolution Meeting available under the Department's Conflict Resolution Policy. The Panel has previously concluded that the forms meet the requirements of the Action Plan and are reasonably available to inmates. The Department remains **In Compliance** with those provisions relating to the availability of the required forms in printed or electronic format.

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

One area of continuing concern is the significant backlog in processing grievances against staff.  The Panel raised this issue in its Eighth Report and has seen little change in this reporting period.  The Department's data continues to reflect a bottleneck with the reviewing Sergeants.  The Panel understands that staffing cuts within Custody Operations are contributing to this backlog.  The Department has taken steps in the First Quarter of 2021 to increase Sergeant staffing in the Custody division and expects to improve its processing of grievances in the next reporting period.  As we have noted in the past, the appropriate and prompt handling of grievances against staff – perhaps more than any other type of grievance – is critical to maintaining an appropriate culture within the jails and giving credibility to the grievance process. We look forward to seeing substantial improvement on this issue in the coming months.

An area of continuing concern is the significant backlog in processing grievances filed against staff, particularly at MCJ.  The Panel raised this issue in its Eighth and Ninth Reports and has seen little change in this Tenth Reporting period.  During the first half of 2021, 100 % of the complaints against staff that were received were assigned for review.  The Department's data continues to reflect a bottleneck with the reviewing Sergeants.  The Panel understands that staffing cuts within Custody Operations are contributing to this backlog.  The Department has taken steps to increase Sergeant staffing in the Custody Division and expects to improve its processing of grievances.

Sections **6.4 and 6.5** of the Action Plan require that use of force grievances and retaliation grievances against staff are brought to the attention of Unit Commanders within 10 days and properly handled.  Based upon a review of the relevant grievances in the randomly selected months, the Department reports that 100 % of force grievances were in Compliance with Section **6.4** in the First Quarter of 2021 and 100 % were in Compliance in the Second Quarter of 2021.   The Department also reports that only 87% of the retaliation grievances in the First Quarter and 83% in the Second Quarter of 2021 were in compliance with Section **6.5**.  Source documents indicate that although TTCF (3/3) and IRC (1/1) complied, MCJ (10/12) was not in compliance These total numbers are so low that missing only two (2) cases meets both the spirit and intent of **6.5**, while falling somewhat short of the criterion. Therefore, the Department is **In Compliance** with **6.4 and 6.5.**

B.      **Emergency Grievances**

**Sections 6.7 and 6.8** of the Action Plan set forth specific requirements for the determination, handling, and notifications of non-medical emergencies.  Section **6.7** requires: (1) Deputies to send any grievance marked "emergency" to a supervisor for review "as soon as possible;" (2) supervisors to determine if "the situation requires immediate action to protect the life or safety of the inmate;" (3) supervisors are to notify watch commanders/shift supervisors of any non-medical emergencies; (4) Watch Commanders/shift supervisors are to immediately confirm the emergent circumstances.  The Compliance Measures require that 95% of the grievances marked as emergencies "be reviewed and handled as required by [Section]

20

**6.7**".  It is implicit in Section **6.7** that a supervisor's determination that the situation requires immediate action and a Watch Commanders confirmation that emergencies exist will be reasonable.  Section 6.8 requires that if the Department determines that a non-medical emergency does not exist, the Department must notify the inmate that it will be handled as a non-emergency grievance and document why it was determined not to be an emergency.

Based upon the review of the grievances marked "emergency" in the month randomly selected by the Panel for the First Quarter of 2021, Sharepoint reports indicate that there were 15 grievances that met the criteria of Section **6.7** and 93% (14 of 15) were properly reviewed and handled correctly.

This performance falls below the threshold for compliance as it is at a level of 93%.  The Panel has also reviewed each of the 50 grievances produced from the First Quarter of 2021 in which a grievance marked "emergency" was downgraded and it was found that 100% of cases were correctly downgraded.  The Panel identified zero (0) instances where the grievance should have been treated as emergent but were not, and there were zero (0) instances where the inmate was not provided with a written response to the grievance within the required five (5) days.

Based upon the review of the grievances marked "emergency" in the month randomly selected by the Panel for the Second Quarter of 2021, the Department reports there were 26 grievances that met the criteria of Section **6.7**, including one instance that should have been treated as an emergency, but was not.  This performance is above the threshold for compliance as it is at a level of 96%.  The Panel has also reviewed each of the 50 grievances produced from the First Quarter of 2021 in which a grievance marked "emergency" was downgraded and it found that 100% of instances were correctly downgraded.  The Panel identified zero (0) instances where the grievance should have been treated as emergent but was not, and in one (1) instance the inmate was not provided with a written response to the grievance within the required five days.  The Panel agrees that **6.7 and 6.8 remain In Compliance** that was first achieved July 1st 2018.

**C.      Inmate Grievance Coordinator**

**Section 6.9** requires that emergency grievances be forwarded to the Inmate Grievance Coordinator.  **Sections 6.13, 6.14, and 6.15** require the Inmate Grievance Coordinator to track the Department's handling of inmate grievances, provide a monthly report to the Unit Commander and senior management in Custody on the status of inmate grievances, and analyze inmate grievances for problematic trends.  The Department provided documentation to the Panel showing that for the First and Second Quarters of 2021, the Inmate Grievance Coordinator received the information about emergency grievances required by Section **6.9** and prepared detailed reports for managers as required by Sections **6.13, 6.14**, and **6.15**.  The Department is **In Compliance with Sections 6.9, 6.13, 6.14, and 6.15** through June 30th, 2021.

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

The Panel met via WEBx with the Inmate Grievance Coordinator on April 28th, 2021, during the Tenth Reporting Period to discuss the Department's implementation of its grievance policies and procedures and overall trends with respect to the Department's handling of inmate grievances.  As previously reported, the Panel believes that the structure of the grievance system developed by the Department under the direction of an Inmate Grievance Coordinator is effectively and efficiently handling inmate grievances and requests for service.  The Department continues to be **In Compliance with Section 6.16**, that was first achieved on January 17th, 2017.

###     D.      Handling of Grievances

**Sections 6.10 and 6.12** require that grievances be collected daily, logged in, and tracked in an inmate grievance database.  The Compliance Measures for these provisions require that the Department review the first 25 consecutive grievances from MCJ and the first 25 consecutive grievances from TTCF during the randomly selected month to determine if they were collected, reviewed, and tracked as required.  The Department's Tenth Self-Assessment reports that 100% of the reviewed grievances were collected and reviewed within 24 hours and handled as required in both the First and Second Quarters of 2021.  The collection logs provided by the Department confirm that all 50 of the grievances selected for review were collected and reviewed as required by Section 6.10.  Accordingly, the Department remains **In Compliance with Section 6.10** for the First and Second Quarters of 2021.

The Department's Tenth Self-Assessment reports that 100 % of the grievances at both MCJ and TTCF in the randomly selected months in the First and Second Quarters of 2021 were entered into the database as required by Section 6.12.  The source documents for these results were available to, and reviewed by, the Panel.  Accordingly, the Department is **In Compliance With Section 6.12** through June of 2021. Compliance with **6.12** was first achieved on July 1st 2018.

**Section 6.11** requires that the Custody Division Manual provide that failing to comply with Department policies requiring proper handling of inmate grievances may be cause for discipline.  The Department reports that there were no claims that Department members failed to provide grievance forms to an inmate upon request.  As discussed above, the Monitors have asked the Department about a group of unreported grievances that appear to contradict the department's conclusion.  In the absence of a response from the Department, **the Monitors find non-Compliance with 6.11.**

The Panel has previously noted its concerns regarding the pace of implementation of technology to electronically receive and track the Department's handling of inmate grievances within the jails.  The plan was to install iPads in tamper-proof cases within the living units and to automate the grievance process, retaining paper grievance forms for those inmates who preferred them.  Prior to installing grievance software, the iPads in TTCF were outfitted with inmate request and information software so that questions about an inmate's account, court dates, medical appointments, and much more could be accessed and answered by inmates

22

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

without staff involvement.  That was a huge success, with hundreds of thousands of inmate inquiries answered immediately which removed a huge workload from frontline staff and eliminated a great deal of inmate frustration when staff does not have time to get answers to those questions.  All were optimistic about the Department expanding the program to the other facilities and enhancing them with the grievance system capabilities but a combination of technological challenges, indecision regarding the appropriate operating system, and delays due to COVID-19 and other health issues within the jails appears to have set the initiative back.  The Department reports that it continues to press forward on this initiative.  The Panel hopes the Department will re-double its efforts to more widely implement the electronic tablet program throughout the Downtown Jail Complex.

**Section 8.1** prohibits Department personnel from retaliating against inmates.  The Department posted the results of the investigations approved by Unit Commanders in the randomly selected months and the number of anti-retaliation grievances received and investigated in the First and Second Quarters of 2021.  The Department reports that in the First Quarter of 2021 there were no grievances alleging retaliation resolved in the selected month.  For the entire quarter, there were 14 anti-retaliation grievances received, no investigations completed, and no founded violations of the anti-retaliation policy.  In the Second Quarter of 2021 there was one (1) grievance alleging retaliation resolved in the selected month. This grievance was investigated and it was found that the actions taken by the employee were reasonable.  For the entire quarter there were 14 anti-retaliation grievances received, one investigation completed, and no founded violations of the anti-retaliation policy.  The Panel reviewed the investigative summaries that were posted by the Department.  Of the anti-retaliation grievances that Unit Commanders deemed unfounded in the randomly selected months of March and April of 2021, the Panel agrees with the Commanders' assessments.  The Panel finds that the Department has maintained **Compliance with Section 8.1** through June 2021.

### E.   Deadlines

**Sections 6.17, 6.18, 6.19, and 6.20** set forth the deadlines for filing use of force and PREA grievances, the Department's initial responses, inmates' right to appeal, and the Department's notifications of the results of the investigations.  The Department's Tenth Self-Assessment reports that it adhered to the deadlines for these grievances in both the First and Second Quarters of 2021.  The Panel has reviewed the source materials provided by the Department and agrees that the Department is **In Compliance with Sections 6.18 and 6.20** through June 2021. However, the Grievance Form needs to correct information about deadlines for filing reports concerning staff and PREA, as pointed out in our Ninth Report.  There is no indication the grievance form has yet been corrected, **resulting in non-Compliance on Section 6.17.**

The Panel has previously noted that the Department reports on the timeliness of responses by Correctional Health Services to inmate grievances against the medical staff (e.g., lack of a timely response to a request for medical service), a metric required to achieve

Compliance with **Section 6.19**.  However, during the Panel's December 2021 visit with the Department, we were informed that Medical is now cooperating to a greater degree with the Department grievance staff, which is encouraging.  **The Department has not yet achieved Compliance with 6.19.**

During the Monitors' most recent visit, in December 2021, the Monitors requested that the Grievance Coordinator audit a sample of grievances to determine if the responses to inmate grievances were relevant and reasonable.  The Grievance Coordinator agreed to do that and the Monitors look forward to reviewing that data.

## IV. Communications with Inmates

The Tenth Self-Assessment also reports that the Department adhered to the deadlines for advising inmates of the results of adjudications as required by **Section 7.2** for First Quarter (100%) and the Second Quarter (100%) of 2021.  The posted source documents for these results were available to, and reviewed by, the Panel.  Accordingly, the Department is **In Compliance with Section 7.2** through June of 2021.

**Section 7.3** requires the Department to "ensure that there are adequate avenues for constructive prisoner-staff communication[.]" The Department's Tenth Self-Assessment reports that the Department was in Compliance with Section 7.3 during both the First and Second Quarters of 2021.  The Department provided 10% of the recorded prisoner-staff communications that occurred during Town Hall meetings at MCJ and TTCF during the randomly selected months during the First and Second Quarters of 2021 that included Town Hall meetings in special housing units as well as in General Population housing units.  Based on these logs, the Panel concludes that the Department has achieved **Compliance with Section 7.3** for the period January through June of 2021.

## V. Use of Restraints

**Section 17.1** requires that the Custody Force Manual include "a separate section that sets forth the general principles governing the use of restraints" identified in this recommendation.  The Panel concludes that the Department included such a separate section in the Manual and **Continues its Compliance with** this requirement of **Section 17.1,** first effective on December 1, 2015.

**Section 17.3** requires medical examinations of inmates placed in safety chairs and **Section 17.4** requires safety checks of inmates in fixed restraints every twenty (20) minutes. The Compliance Measures require the Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty (20) minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex.

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

During the Tenth Reporting Period, the Department provided the Inmate Safety Chair Security Check Logs for use of the safety chair and Fixed Restraint Logs at Downtown Jail Complex in the First and Second Quarters of 2021.  The Inmate Safety Chair Security Check Logs and Fixed Restraint Logs reflect that Department personnel are, in most cases, checking on the inmates every twenty (20) minutes as required by Section **17.4**.  However, there is no indication that medical professionals are performing any vitals checks required by Section **17.3** even though inmates are often in the safety chairs for several hours while they are transported to court, attend the court proceedings, and are then transported back to the facilities. Additionally, information regarding **17.3** and **17.4** were not present within the SharePoint files. Periodic vitals checks are necessary to establish Compliance with Section **17.3** even if the inmate does not struggle and force is not used to place the inmate in the chair.  **Compliance has not been achieved on 17.3 and 17.4.**

Section **17.10** provides that medication cannot be used solely for security purposes. The Department's posted Self-Assessment, confirmed by a log of the Administration of Involuntary Medications, reports that every administration of involuntary medications was pursuant to court order and there were no instances in which medication was used solely for security purposes in the First and Second Quarters of 2021.  Accordingly, the Department has been **In Compliance with Section 17.10** through June 30th of 2021.

## VI. Early Warning System

Section **19.1** requires the Department to develop an Early Warning System to identify potentially problematic employees based upon objective criteria.  The Panel approved the Employee Review System ("ERS") in July 2018, and it was implemented by the Department as a pilot program in the Downtown Jail Complex on August 1, 2018, and in the rest of the jail facilities as of November 1, 2018.  The Department has been **In Compliance with Section 19.1** in the Downtown Jail Complex since August 1, 2018.

During early discussions on objective criteria, the Monitors suggested that the Department look broadly at objective criteria that can continually strengthen the usefulness and integrity of this System.  For example, the Department will soon have information on the use of head punches by deputies.  This information can be added to the criteria for Early Warning conversations and actions.

Section **19.2** requires Compliance Lieutenants to review monthly reports generated by the ERS and notify Unit Commanders and the Assistant Sheriff for Custody of the results within specified time periods.  Under the Revised Compliance Measures, Compliance Lieutenants must notify the Unit Commander and Assistant Sheriff for Custody Operations 90% of the time within 10 days after reviewing monthly reports generated by the Early Warning System and 95% of the time within 30 days.  The Department's Tenth Self-Assessment reports that the Department achieved 100% Compliance with Section **19.2** in the First and Second Quarters of 2021 at all three (3) Downtown jail facilities.  Based on the source documents provided, the Panel concludes that the Department was **Out of Compliance with Section 19.2 for the First Two**

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

Quarters of 2021, because information for the Second Quarter was not available on
SharePoint.

Section 19.3 requires Unit Commanders to determine whether problematic employees
should be placed on a performance mentoring program.  For each potentially problematic
Department member identified through the Early Warning System, the Unit Commander must
consult with the appropriate Chief and document the reasons why any problematic members
are not placed on a performance mentoring program.

Based on the documents provided, it appears that Unit Commanders are notifying their
appropriate Chief of those instances in which employees are not placed on a performance
mentoring program, but they are not engaging in the required consultation with the Chief.
Moreover, Unit Commanders at MCJ are not properly documenting the reasons why identified
employees are not being placed on performance mentoring programs.  Instead, MCJ tends to
assign any employee identified by the EWS to some form of remedial training, either "force
concepts" or "use of force refresher."  The only exceptions appear to be situations in which
there is an administrative investigation in progress.  **The Panel finds the Department to be out
of compliance on Section 19.3.**

The Department argues that they should be found in compliance on **19.2** and **19.3** largely
because of two years of earlier continuous findings of compliance on both Provisions.  That
would only be true if those two measures were in a group ("bucket") in which all other
provisions in the group had been in simultaneous compliance for at least 18 months.  The
Parties have failed to agree on which provisions are in which groups, or buckets, and the Panel
cannot assume answers to that question, which is the exclusive purview of the Parties.

**-END-**

26

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

## APPENDIX A

| NO. | PROVISION | STATUS[3] | DATE[4] |
|---|---|---|---|
| | | | |
| | **Leadership, Administration & Management** | | |
| | | | |
| 1.1 | Assistant Sheriff | Compliance | January 1, 2017 |
| 1.2 | Sheriff | Compliance | January 1, 2017 |
| 1.3 | Supervision | | |
| 1.4 | Reports to Board | Compliance | June 12, 2018 |
| 10.1 | Jail Visits | Compliance* | June 30, 2018 |
| 10.2 | Documented Visits | Compliance* | June 30, 2018 |
| 18.1 | Rotation in Custody | Compliance | June 30, 2018 |
| 18.2 | Documentation of Rotation | Compliance | January 1, 2019 |
| 21.1 | Transfers to Custody | Compliance | June 30, 2018 |
| | | | |
| | **Use of Force Policies & Practices** | | |
| | | | |
| 2.1 | Custody Force Manual | Compliance | January 1, 2017 |
| 2.2 | Force Prevention Principles | | |
| 2.3 | Inmate on Inmate Violence | Compliance | July 1, 2019 |
| 2.4 | Use of Force as Discipline | Compliance | July 1, 2019 |
| 2.5 | Force on Restrained Inmates | | |
| 2.6 | Head Strikes or Kicks | | |
| 2.7 | Supervisors Called to Scene | | |
| 2.8 | Prevent Excessive Force | Compliance | July 1, 2019 |
| 2.9 | Armed Inmates | Compliance | July 1, 2019 |
| 2.10 | Authorized Weapons | Compliance | July 1, 2019 |
| 2.11 | Planned Chemical Spray | Compliance** | January 1, 2020 |
| 2.12 | Chemical Spray & Tasers | Compliance | July 1, 2019 |
| 2.13 | Check of Medical Records | | |
| 4.1 | Consult MH professionals | Compliance** | October 1, 2019 |
| 4.3 | Spray on MH inmates | Compliance | October 1, 2019 |

- A single asterisk denotes that assessment of the provision was suspended during the Second Quarter of 2020 based on the Department's inability to comply due to COVID-19 restrictions. A double asterisk denotes that there was insufficient data to assess compliance during the First Semester of 2021.
- This represents the date the Department came into the compliance that it has maintained through the date of this report.

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

| 4.4 | Cooling Off Periods | Compliance** | October 1, 2019 |
| 4.5 | Medical or MH Provider | Compliance** | October 1, 2019 |
| 8.2 | Complaints of Retaliation | Compliance | January 1, 2017 |
| 9.2 | Escorting of Inmates | Compliance | January 1, 2020 |
| 17.2 | Pregnant Inmates | Compliance | January 1, 2017 |
| 17.5 | Minimize Medical Distress | Compliance | July 1, 2019 |
| 20.1 | Categories of Force | Compliance | January 1, 2017 |
| 20.2 | Reactive Force | Compliance | January 1, 2017 |
| 20.3 | Planned Use of Force | | |
| | | | |
| | **Training**[5] | | |
| | | | |
| 3.1 | Use of Force Training | | |
| 3.2 | Ethics, Professionalism | | |
| 3.3 | Custody Training | Compliance | June 30, 2018 |
| 3.4 | Custody-based scenarios | Compliance | June 30, 2018 |
| 3.5 | Add training/mentoring | Compliance | July 1, 2019 |
| 3.6 | Probation Reviews | Compliance | June 30, 2021 |
| 4.6 | Crisis Intervention | | |
| 4.7 | Mentally Ill Inmates | | |
| 4.8 | Mentally Ill Inmates (for new Department members) | Compliance | June 30, 2018 |
| 4.9 | Crisis Intervention (for new Department members) | Compliance | June 30, 2018 |
| 12.1 | Force Investigations | Compliance | June 30, 2021 |
| | | | |
| | **Investigation & Reporting of Force** | | |
| | | | |
| 4.2 | Mental Health Professionals | Compliance | October 1, 2019 |
| 5.1 | Tracking of Force Incidents | Compliance | October 1, 2019 |
| 5.2 | Commanders' Reviews | | |
| 5.3 | Unexplained Discrepancies | | |
| 8.3 | CFRC Review | Compliance | June 30, 2021 |
| 11.1 | CFRT Involvement | Compliance | June 30, 2018 |
| 12.2 | Location of Inmate Interviews | | |
| 12.3 | Suspect Interviews | Compliance | July 1, 2019 |
| 12.4 | Uninvolved Supervisors | Compliance | July 1, 2019 |
| 12.5 | Standard Order & Format | Compliance | July 1, 2019 |
| 13.1 | Documenting dishonesty | Compliance | October 1, 2019 |
| 13.2 | Reports of Dishonesty/PREA | Compliance | October 1, 2019 |
| 14.1 | Review of Criminal Referrals | Compliance | July 1, 2018 |

---

5

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

| | | | |
|---|---|---|---|
| 14.2 | Timeliness of Criminal Referrals | | July 1, 2018 |
| 15.1 | Timeliness of Reports | Compliance | |
| 15.2 | All Department Witnesses | Compliance | July 1, 2019 |
| 15.3 | Force by Other Members | | |
| 15.4 | Description of Injuries | Compliance | April 1, 2020 |
| 15.5 | Clarification after Video | Compliance | July 1, 2019 |
| 15.6 | Separation of Deputies | | |
| 15.7 | Individual Perceptions | Compliance | July 1, 2019 |
| 16.1 | Healthcare Assessment | Compliance | July 1, 2019 |
| 16.2 | Photographs of Injuries | Compliance | July 1, 2019 |
| 16.3 | Medical Report of Injuries | Compliance | July 1, 2019 |
| | | | |
| | **Inmate Grievances** | | |
| | | | |
| 6.1 | Separate Grievance Forms | Compliance | January 1, 2017 |
| 6.2 | Available Grievance Forms | Compliance | January 1, 2017 |
| 6.3 | Emergency Grievances Forms | Compliance | January 1, 2017 |
| 6.4 | Use of Force Grievances | Compliance | July 1, 2018 |
| 6.5 | Grievances Against Staff | Compliance | |
| 6.6 | Right to Appeal Form | Compliance | January 1, 2017 |
| 6.7 | Handling Emergency Grievances | Compliance | July 1, 2018 |
| 6.8 | Notification of Non-Emergency | Compliance | January 1. 2020 |
| 6.9 | Grievance Coordinator Review | Compliance | July 1, 2018 |
| 6.10 | Collection of Grievances | Compliance | June 30, 2021 |
| 6.11 | Failure to Handle Grievances | | |
| 6.12 | Tracking Inmate Grievances | Compliance | July 1, 2018 |
| 6.13 | Grievance Coordinator Tracking | Compliance | July 1, 2018 |
| 6.14 | Grievance Coordinator Reports | Compliance | July 1, 2018 |
| 6.15 | Grievance Coordinator Analysis | Compliance | July 1, 2018 |
| 6.16 | Centralized Grievance Unit | Compliance | January 1, 2017 |
| 6.17 | Use of Force Deadline | Compliance | October 1, 2019 |
| 6.18 | PREA Deadline | Compliance | July 1, 2018 |
| 6.19 | Response to Inmate Grievances | | |
| 6.20 | Appeals of Grievances | Compliance | July 1, 2018 |
| 7.2 | Notification of Results | Compliance | July 1, 2018 |
| 7.3 | Prisoner-staff Communications | Compliance | April 1, 2019 |
| 8.1 | Anti-retaliation | Compliance | April 1, 2019 |
| | | | |
| | **Use of Restraints** | | |
| | | | |
| 17.1 | Restraint Provisions | Compliance | December 1, 2015 |
| 17.3 | Safety Chair Procedures | | |
| 17.4 | Safety Checks | | |

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

| 17.6 | Multi-point Restraint Procedures | | |
|---|---|---|---|
| 17.7 | Approval of Multi-point Restraints | Not Applicable | |
| 17.8 | Continued Use of Restraints | Not Applicable | |
| 17.9 | Supervisor Approval of Restraints | Not Applicable | |
| 17.10 | Involuntary Medications | Compliance | July 1, 2018 |
| | | | |
| | **Early Warning System** | | |
| | | | |
| 19.1 | Development of EWS | Compliance | August 1, 2018 |
| 19.2 | Review of ERS (EWS) reports | | |
| 19.3 | Performance Mentoring Programs | | |

# Appendix B

# Monitor Recommendations for bringing LASD into Compliance with Rosas Implementation Plan

1) Reissue WRAP policy strengthening emphasis on requirement that a Sergeant must approve every use in advance and be present for application of WRAP. Also emphasize that WRAP is restricted to situations in which inmate has been assaultive toward staff, as opposed to resistive; or situations in which the inmate has a history of assaults against staff. Hold line staff and supervisors accountable if this policy is violated. The WRAP is subject to scrutiny under Provision 17.5.

2) Authorize one or both remaining Monitors to rehire, or hire new, auditors to verify data.

3) Finalize revisions to Prohibited Force policy (CDM 7-01/030.00) that further restricts use of head strikes with personal weapons, kicking, and the use of force on restrained

inmates, including adding a requirement that use of head strikes with personal weapons, kicking, and use of force on restrained inmates be used only when there are no other reasonable means to avoid serious physical injury, including, specifically, stepping away from an inmate or otherwise using non-violent methods to avoid or de-escalate a confrontation with an inmate.

4) Remove references to high risk/assaultive behavior as rationales for use of force in all use of force policy and training materials and discontinue use of force options chart in all custody training.  Citizen's Commission on Jail Violence Recommendation 14.

5) Require any personnel who have employed head strikes to explain in his/her report(s) the decision to do so and how doing so was consistent with the revised Prohibited Force policy including why there were no other reasonable means to avoid serious physical injury.

6) Require any supervisor reviewing use of force incident in which head strikes were used to specifically evaluate whether the use of head strikes was consistent with the revised Prohibited Force policy, including (i) whether there were no other reasonable means to avoid serious physical injury and (ii) whether the explanation from the LASD personnel was credible given all the evidence available to the supervisor.

7) Discipline should be the presumptive consequence for any personnel who employed head strikes and failed to explain in his/her report(s) the decision to do so and how doing so was consistent with the revised Prohibited Force policy including why there were no other reasonable means to avoid serious physical injury.  Discipline imposed may not be solely a Performance Log Entry or re-training or limited to a Performance Log Entry and re-training.[*]

8) Discipline should be the presumptive consequence for any personnel found to have violated the head strike provision of the revised Prohibited Force policy (CDM 7-01/030.00).  Discipline imposed may not be solely a Performance Log Entry or re-training or limited to a Performance Log Entry and re-training.  Any personnel who violated the head strike provision and is not terminated must be placed in a formal and adequate performance review program.  (Rosas Implementation Plan 13.1)

9) Discipline should be the presumptive consequence for any supervisor who fails to specifically evaluate whether any use of head strikes was consistent with revised Prohibited Force policy including (i) whether there were no other means to avoid physical injury and (ii) whether the explanation from the LASD personnel was supportable given all the evidence available to the supervisor.  Discipline imposed may not be solely a Performance Log Entry or re-training or limited to a Performance Log Entry and re-training.

---

[*] While supervisors are encouraged to require supplemental training for personnel found to have violated the Prohibited Force, Force Prevention, and Recalcitrant Inmate policies, supplemental training may not be in lieu of imposing discipline.

Tenth Court Report on LA Jails; Monitors Jeffrey A. Schwartz and Robert Houston; March 6, 2022

10) Discipline should be the presumptive consequence for any supervisor who concludes that a use of head strikes that violated revised Prohibited Force policy was reasonable and consistent with LASD policy.  Discipline imposed may not be solely a Performance Log Entry or re-training or limited to a Performance Log Entry and re-training.

11) Discipline should be the presumptive consequence for any personnel found to have failed to employ de-escalation tactics, including failing to call a supervisor to the scene when time and circumstances permitted, or otherwise violating the policy on handling insubordinate, recalcitrant, hostile, or aggressive inmates (CDM 7-02/020.00).  Discipline imposed may not be solely a Performance Log Entry or re-training or limited to a Performance Log Entry and re-training.

12) Discipline should be the presumptive consequence for any supervisor who concludes that any personnel found to have failed to employ de-escalation tactics, including failing to call a supervisor to the scene when time and circumstances permitted, or otherwise violating the policy on handling insubordinate, recalcitrant, hostile, or aggressive inmates (CDM 7-02/020.00), acted reasonably and in a manner consistent with LASD policy.  Discipline imposed may not be solely a Performance Log Entry or re-training or limited to a Performance Log Entry and re-training.

13) Discipline should be the presumptive consequence for any personnel found to have written any report that contains clear inconsistencies between actions taken leading up to or during use of force incident and any video of that incident.  Discipline imposed may not be solely a Performance Log Entry or re-training or limited to a Performance Log Entry and re-training.

14) Discipline should be the presumptive consequence for any supervisor who fails to note and recommend discipline for any personnel who wrote any report that contains clear inconsistencies between actions taken leading up to or during use of force incident and any video of that incident.  Discipline imposed may not be solely a Performance Log Entry or re-training or limited to a Performance Log Entry and re-training.

15) Custody Division Executives and the Office of the Inspector General should re-examine effectiveness of CFRC process and how it is being used to do critical analysis of all Category 2 uses of force, including how it is functioning to evaluate disciplinary decisions and how it interacts with the Custody Force Review Team processes, to ensure that policy violations are timely identified and appropriately addressed and that all responsible personnel – including high-level managers -- are held accountable.

16) Department Executives and the Office of the Inspector General should re-examine both effectiveness of IAB review of category 3 cases, and EFRC review and policy determinations on category 3 cases and determine whether category 3 force incidents should instead be investigated and analyzed within the custody division rather than by IAB and EFRC

17) Replace current DiVRT de-escalation training with alternative training approved by the Monitors that is a minimum of 32 hours of custody-specific, scenario-based, skill development training on Crisis Intervention and Conflict Resolution for: a) all members of the Custody Division currently assigned to MCJ, TTCF, and IRC and b) all new Department members in the Academy or in Custody before they are assigned to any jail facilities.  (Rosas Implementation Plan 4.6)

18) Require that all members assigned to MCJ, TTCF, and IRC have an 8-hour refresher course every other year based on Crisis Intervention and Conflict Resolution training approved by the monitors.  (Rosas Implementation Plan 4.6)