PETER J. ELIASBERG
(SB# 189110)
peliasberg@aclusocal.org
MELISSA L. CAMACHO-CHEUNG
(SB# 264024)
mcamacho@aclusocal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Phone: (213) 977-9500
Fax: (213) 977-5299

NICOLAS MORGAN (SB# 166441)
nicolasmorgan@paulhastings.com
KYLE M. JONES (SB# 307814)
kylejones@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071-2228
Phone: (213) 683-6000
Fax: (213) 627-0705

ERIC BALABAN (*pro hac vice*)
ebalaban@aclu.org
NATIONAL PRISON PROJECT OF
THE AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St., NW
Washington, D.C. 20005
Phone: (202) 393-4930
Fax: (202) 393-4931

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN
GOODWIN, on behalf of themselves
and of those similarly situated

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>LEROY BACA, Sheriff of Los Angeles County, in his official capacity,<br><br>Defendant. | CASE NO. CV 12-00428 DDP (MRW)<br><br>**PLAINTIFFS' RESPONSE TO MONITORS' TENTH REPORT AND JOINDER IN THEIR REQUEST FOR A STATUS CONFERENCE**<br><br>Date:<br>Time:<br>Crtrm.: 9C<br><br>Assigned to Hon. Dean D. Pregerson |

Plaintiffs respectfully submit their Response to the Monitors' Tenth Report and Joinder in their Request for a Status Conference.[1]

I. **INTRODUCTION**

Nearly six years ago, this Court approved the court-enforceable Settlement Agreement and Release (the "Settlement Agreement") between the parties in this action. The Settlement Agreement represented the culmination of several years of litigation necessary to stop wanton violence and egregious constitutional violations against incarcerated persons at certain Los Angeles county jails (the "Downtown LA Jails"). The Parties entered into the Settlement Agreement to protect the constitutional rights of incarcerated persons within those jails going forward. The Settlement Agreement incorporates the Implementation Plan, which obligates the Los Angeles County Sheriff's Department (the "Department") to undertake numerous improvements to its policies, training, conduct, and reporting to give effect to the Settlement Agreement.

For the past six years, the Monitors have been assessing the Department's progress on meeting the requirements of the Implementation Plan and, thereby, complying with the terms of the Settlement Agreement. The Monitors most recent report (the "Tenth Report") makes clear that the Department has not made sufficient progress over the past six years. Indeed, Monitors' findings in the Tenth Report demonstrate that the Department has repeatedly fallen far short of its responsibilities as progress on several key issues has plateaued and "actually regressed on some others." (Tenth Report (Dkt. No. 205) at 1.)

---

[1] Plaintiffs have also filed an unredacted version of this document, along with supporting materials received from the Department referenced herein, with the Court under seal pursuant to Section V(F) of the Stipulated Protective Order Regarding Class Counsel's Access to Documents entered by the Court on May 11, 2018.

Plaintiffs support and join in the Monitors' request for a status conference at the earliest opportunity. (*See id.*) A status conference is necessary for both parties to update the court on the current status of the Downtown LA Jails, to address the Department's lack of progress on key issues, and to determine an immediately actionable plan through with the Department may meet the requirements of the Implementation Plan and the Settlement Agreement.

## II. RESPONSE

The Department's failure to improve conditions for incarcerated persons in four critical areas guides our decision to join the Monitors' request for a status conference: (i) impermissible head strikes (Section 2.6[2]); (ii) failure to implement appropriate force-prevention policies (Section 2.2); (iii) dishonesty, and subsequent lack of accountability or discipline, in reporting by Department personnel (Sections 5.3 and 13.1); and (iv) failure to minimize medical distress (Sections 17.5 and 17.6). The Department's failure to address these issues creates grave and ongoing dangers for the incarcerated persons in the Downtown LA Jails, including serious physical injury and risk of death.

### A. Head Strikes

The need to eliminate the use of head strikes against, and mitigate head injuries of, incarcerated persons in the Downtown LA Jails is a central focus of both Plaintiffs' case[3] and the Settlement Agreement and Implementation Plan.

---

[2] References to a "Section" in this document refer to sections of the Implementation Plan. (Dkt. No. 133.)

[3] *See, e.g.*, First Amended Complaint ¶ 5 ("It is typical for deputies to subject unresisting inmates to grossly excessive force by slamming inmates' heads into walls, punching them in the face with their fists, kicking them with their boots, and shooting them multiple times with their tasers – and for these beatings to result in serious injuries to the inmates, including broken legs, fractured eye sockets, shattered jaws, broken teeth, severe head injuries, nerve damage, dislocated joints, collapsed lungs, and wounds requiring dozens of stitches and staples.") (Dkt No. 32); 2012 Annual Report on Conditions Inside Los Angeles County Jails: The

Specifically, Section 2.6 of the Implementation Plan provides that "striking an inmate in the head or kicking an inmate who is on the ground, or kicking an inmate who is not on the ground anywhere above the knees is prohibited unless the inmate is assaultive and presents an imminent danger of serious injury . . . ."

The Department flouts this clear directive. Indeed, the Department has failed to achieve compliance with Section 2.6 in any of the past six reports. (*See* Dkt. Nos. 198 at 24;199 at 22; 201 at 26; 202 at 25; 203 at 25.) The Department's non-compliance is not based on technicalities; rather, as the Monitors note in the Tenth Report, the use of unnecessary and avoidable head strikes is a persistent problem among Department personnel and many head strikes are avoidable. (Tenth Report at 12.) As a further example, the Monitors noted in their Eighth Report ***ten cases in a single quarter*** in which Department staff "inappropriately stuck an inmate in the head." (Dkt. No. 202 at 10.) In the Tenth Report the Monitors described numerous use of force incidents in which sheriff's personnel improperly used head strikes. (Tenth Report at 13-14).

Responsibility for longstanding failure to comply with Section 2.6 does not lie just with the line personnel who repeatedly use head strikes, but also with supervisors and managers. As the Monitors stated in their report about the pattern of improper use of head strikes: "[n]o issue has been discussed more with management over the last six years and especially in the last two years, to little avail. That problem is compounded by two other factors. Use of force reviews by supervisors and managers in the serious cases selected by the Monitors almost always fail to note out-of-policy head shorts or—less frequently—attempts to justify them." (Tenth Report at 1.) In other words, deputies regularly use improper head

---

Troubling Pattern of Deputy-on-Inmate Head Strikes and Inmate Head Injuries in the Los Angeles County Jails ("[T]here is clear evidence that the Los Angeles County Sheriff's Department ("LASD") deputies have used head strikes with alarming regularity in the Los Angeles County jails.") (Dkt. No. 79-1)

strikes, supervisors and managers do not call out these policy violations, deputies are not disciplined, and managers are not held accountable for failing to supervise and hold line personnel accountable. (*Id.*)

### B. Continued Violations of Force-Prevention Policies

Force prevention—the use of non-force techniques before force is employed, and a limit on permissible force to the minimum amount necessary to achieve the legitimate security purposes—is the central tenet of the Department's revised force policies and the Implementation Plan. Yet, over the last six years the Department has never achieved compliance with Section 2.2, which requires that force used by Department members "(a) must be used as a last resort; (b) must the minimal amount of force that is necessary and objectively reasonable to overcome the resistance; (c) must be terminated as soon as possible…and (d) must be de-escalated if resistance decreases."

The Monitors found in their Fifth, Seventh, Eighth, and Ninth Reports that Department staffs resorted to using force too quickly and did not attempt to de-escalate confrontations as required. (*See* Dkt. Nos. 198 at 10; 201 at 12; 202 at 10; 203 at 9.) In the Ninth Report, for example, the Monitors flagged various instances in which Department personnel "unnecessarily put hands on" a non-assaultive inmate, then used the individual's reaction to justify their use of force. (Dkt. No. 203 at 9.) In their Tenth Report, the Monitors found that the Department made no progress, again expressing concern that "Department members sometimes react too quickly and should take advantage of 'time and distance' to de-escalate situations and avoid using force altogether." (Tenth Report at 12.)

### C. Dishonesty in Reporting by Department Personnel

Section 13.1 of the Implementation Plan contains a strict "zero tolerance" policy for dishonesty and false reporting. Section 5.3 supports 13.1 by requiring the reviewing commander, the custody force review committee or the executive force

review committee must refer to the incident investigator discrepancies among witnesses or evidence relating to uses of force for additional investigation.

The Department has not complied. The Monitors have consistently noted that Department personnel have written reports containing inaccurate versions of the facts and give "short-shrift to the suspects' version of the incident." (See Dkt. No. 181 at 10.) The Department's conduct has not improved in more recent reporting periods. (*See* Dkt. No. 203 at 17 (noting that "in the majority of cases where the Panel has found the use of force to be out of policy there is at least one report, either by the offending staff member or a witnessing staff member, that does not accurately describe the use of force or the inmate's conduct that prompted the use of force").) In the current report the Monitors again found that deputies were writing reports that did not accurately describe their use of force or the behavior of incarcerated people that they claim justified their use of force. (Tenth Report at 18 ("In this Report, the Panel has found the Department Out of Compliance with Sections 5.2 (Commanders' reviews); 5.3 (unexplained discrepancies); and 15.3 (reports of force by other members), based on reports that do not accurately describe the use of force or the inmate's conduct that prompted the uses of force.").)[4]

Worse yet, the Monitors' reports indicate that the staff members rarely, if ever, face consequences for their violations. (*See* Dkt. No. 203 at 17 ("We rarely see a robust discussion by reviewing commanders of inaccurate characterizations in reports, and never see discipline imposed for submission of false reports.").) The problems with excessive force and dishonest reporting will never be fixed until

---

[4] As far back as 2011, the Citizens Commission on Jail Violence (CCJV) concluded that the Department "rarely finds or meaningfully punishes dishonesty and failure to report use of force incidents . . . ." Report of Citizens' Commission on Jail Violence, Executive Summary ("CCJV Report") at 11 (available at https://ccjv.lacounty.gov/wp-content/uploads/2012/09/CCJV-Executive-Summary.pdf).

supervisors and managers identify the problems in their use of force reviews and discipline deputies for their actions.[5] (Tenth Report at 6 ("[F]urther progress in eliminating improper uses of force can only be achieved if deputies who are proven to have cross[ed] the line are disciplined by supervisors. . . .").)[6]

### D. Significant Problems with Use of WRAP Restraint

The Monitors expressed significant concerns about, and found the Department out of compliance with a number of provisions in the Implementation Plan because of, its use of the WRAP restraint. A WRAP restraint is a device used to immobilize a person by using harnesses, straps, and buckles to lock a person's legs together and clip their torso into a seated position. Section 2.5 prohibits a use of force on an incarcerated person who is already restrained unless the inmate is assaultive and presents an immediate threat of injury to a department member or other person. Yet the monitors found that the Department regularly violated this Provision by routinely using the WRAP[7] restraint on people who were not assaultive or had a history of staff assaults. (Tenth Report at 15). The Monitors also expressed concern that the Department regularly violated the requirement in its own WRAP

---

[5] "Timely investigations and discipline commensurate with the nature of the misconduct are essential to sustaining a reduction in the use of excessive and unnecessary force and ameliorating a code of silence in the jails. So too is a discipline system that severely punishes false reports and failures to report such incidents." CCJV Report at 13.

[6] The monitors found the Department in compliance with 13.1 because the compliance measure for 13.1 requires the Department to take action *only* when it makes a finding of dishonesty. (Tenth Report at 18.) However, as the Monitors noted, supervisors and managers do not make findings of dishonesty even when there are blatant discrepancies between what is on video and how deputies describe their decision to use force and the events leading up to it. (*Id.*; Dkt. No. 203 at 17.)

[7] Using the WRAP restraint on someone who is already restrained by deputies and/or is already handcuffed is a use of force under the Department's own definition of use of force. Custody Division Manual 3-10/010.00 (Use of Force Defined "Force is Defined as any physical effort used to control or restrain another, or to overcome the resistance of another.").

1  policy that there must be advance supervisory approval for use of the WRAP
2  restraint and a supervisor on the scene when the WRAP restraint is applied. (*Id.*)
3  In addition, Sections 17.5 and 17.6 are designed to prevent positional
4  asphyxia. Section 17.5 prohibits Department members from "placing their weight
5  on an inmate's back or shoulders in a way that impairs the inmate's breathing. Once
6  an inmate is controlled, he or she should be placed on his or her side to minimize
7  breathing problems and the risk of medical distress or positional asphyxia." Section
8  17.6 requires continuous observation of incarcerated people who are placed on their
9  back or stomach for an extended period of time and that medical staff be called at
10 the first sign of difficulties with breathing. While these provisions are designed to
11 protect against severe risk to incarcerated persons' life and health, the Monitors
12 identified a number of incidents in which the WRAP restraint was used in a manner
13 that violated these provisions. (Tent Report at 11)("Provision 17.6 is non-compliant
14 specifically because of WRAP procedures risking compressional asphyxia (see
15 MCJ-04485 and IRC-01256)[.]"). (*See also id.* at 14 (describing use of force
16 incident in which WRAP was used, and department violated Sections 17.5 and 17.6,
17 by not placing incarcerated person on his side once controlled and on gurney during
18 transportation).)
19 ████████████████████████████████████████
20 ████████████████████████████████████████
21 ████████████████████████████████████████
22 ████████████████████████████████████████
23 ████████████████████████████████████████
24 ████████████████████████████████████████
25 ████████████████████████████████████████
26 ████████████████████████████████████████
27 ████████████████████████████████████████
28 ████████████████████████████████████████

1 ████████████████████████████████████████
2 ████████████████████████████████████████
3 ████████████████████████████████████████
4 ████████████████████████████████████████
5 ████████████████████████████████████████
6 ██████████████████████████████ Plaintiffs are deeply
7 concerned that the Department's unsafe WRAP procedures will soon lead to a
8 deadly asphyxiation. This is not hyperbole. At least five deaths have been reported
9 from use of a WRAP restraint in California between 2001 and 2018.[8]

///

///

///

---

[8] See Greg Moran, *Earl McNeil death focuses attention on use of the WRAP restraint*, San Diego Union Tribune (Sept. 27, 2018, 6:15 PM), https://www.sandiegouniontribune.com/news/public-safety/sd-me-wrap-history-20180926-story.html ("In California alone there have been five reported deaths since 2001, most concentrated in the Bay Area."). A recent article details an incident in which a Los Angeles County deputy knelt on the head of a handcuffed inmate for three minutes. The Los Angeles Sheriff's Department attempted to cover up the incident. *See* Alene Tchekmedyian, *Fearing Bad Publicity, LASD covered up a case of deputy who knelt on inmate's head*, L.A. TIMES (Mar. 26, 2022, 8:21 AM), https://www.latimes.com/california/story/2022-03-25/sheriff-deputy-force-coverup.

## III. CONCLUSION

The Department's failure to comply with the aforementioned provisions, among others, reveals a pervasive culture of violence, dishonesty, and unaccountability that makes it impossible for the Department to ever achieve compliance with the Implementation Plan and Settlement Agreement. The Department's progress on these key fronts is unacceptable six years after the approval of the Settlement Agreement. Plaintiffs therefore support and join in the Monitors' request for a status conference to discuss the critical issues facing the Downtown LA Jails and craft an immediately executable plan for the Department to achieve compliance with the Implementation Plan and Settlement Agreement.

DATED: April 20, 2022

Kyle Jones
PAUL HASTINGS LLP

By:  /s/ Kyle Jones
Kyle Jones
Attorneys for Plaintiffs Alex Rosas and Jonathan Goodwin, on behalf of themselves and of those similarly situated