OFFICE OF COUNTY COUNSEL
DAWYN HARRISON (SBN 173855)
Acting County Counsel
  *dharrison@counsel.lacounty.gov*
STEVEN EDWARDS (SBN 304165)
Deputy County Counsel
  *sedwards@counsel.lacounty.gov*
500 West Temple St., Floor 6
Los Angeles, California 90012
Tel:    (213) 974-1807/(213) 893-6755
Fax:    (213) 687-8822


KENDALL BRILL & KELLY LLP
ROBERT E. DUGDALE (SBN 167258)
  *rdugdale@kbkfirm.com*
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, CA  90067
Tel:    (310) 272-7904/7919
Fax:    (310) 556-2705


Counsel for Defendant
Alex Villanueva, Sheriff of Los
Angeles County, in His Official Capacity

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS, et al.,<br><br>　　　　Plaintiffs,<br><br>　　　　v.<br><br>ALEX VILLANUEVA, Sheriff of Los Angeles County, in his official capacity,<br><br>　　　　Defendant. | Case No. CV 12-00428-DDP (MRW)<br><br>**DEFENDANT'S RESPONSE TO PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE**<br><br>Hon. Dean D. Pregerson<br>United States District Judge |

603338855

DEFENDANT'S RESPONSE TO PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................ 1

II.   RESPONSE ........................................................................................ 3

    A.    THE REPORT MINIMIZES THE DEPARTMENT'S SIGNIFICANT SUCCESSES CURBING IMPROPER USES OF FORCE ......................................................................................... 3

    B.    THE REPORT MINIMIZES ESSENTIAL FACTS WHEN ADDRESSING THE DEPARTMENT'S COMPLIANCE CHALLENGES ................................................................................ 6

    C.    THE REPORT CONTAINS CONTRADICTORY CONCLUSIONS AND  FACTUAL INACCURACIES ........................................... 8

        1.    The Report Includes Contradictory Statements Regarding the Department's Compliance ................................................... 8

        2.    The Report Offers Conflicting Statements Concerning the Department's Willingness to Prevent Improper Head Strikes............. 9

        3.    The Report Misstates the Fact That the Monitors Approved the ...... 10

        4.    The Independent Auditors Should be Retained by a Monitor and the County Has No Objection to a Monitor Doing So................ 11

    D.    THE REPORT STRAYS FROM THE DEPARTMENT'S REQUIREMENTS UNDER THE SETTLEMENT ................................... 12

    E.    THE DEPARTMENT IS TAKING CORRECTIVE ACTIONS TO ADDRESS THE AREAS REFERENCED IN THE REPORT FOR WHICH IT HAS YET TO ACHIEVE COMPLIANCE............................ 14

III.  CONCLUSION.................................................................................. 15

## I.   __INTRODUCTION__

The Los Angeles County Sheriff's Department (the "Department") is fully committed to maintaining an environment in its jails that is safe and free of violence, and is grateful to the Monitoring Panel for its exceptionally hard work helping the Department work toward full compliance with the *Rosas* Settlement Agreement (the "Settlement").  The Department has carefully reviewed the Panel's Tenth Report (the "Report") and agrees there are areas where the Department can improve – and the Department, as always, is fully committed to doing so.  Unfortunately, however, the Report in many important ways provides an incomplete and inaccurate portrayal of the Department's efforts to curb improper uses of force at the Department's downtown jail facilities (the "Downtown LA Jails"), as well as the Department's major successes in significantly reducing improper uses of force.  This Response is being filed to clarify the record on these issues.

First, the Report minimizes the Department's tremendous progress in preventing improper uses of force, reducing years of impressive, hard-fought gains to a single sentence and accompanying footnote in a 33-page report.  Since the onset of this litigation over ten years ago, it is undeniable that the Department has eliminated the types of brutal and unjustified inmate beatings that sparked this litigation; that uses of force resulting in serious injuries to inmates have plummeted; and that the culture at the Downtown LA Jails, which once celebrated the use of excess force to intimidate and retaliate against inmates, has been replaced with a culture of service where such abuses of authority are not countenanced.  These significant achievements did not come about by accident.  The Department has assembled a team of eight hard-working deputies and supervisors to monitor and improve the Department's compliance with the terms of the Settlement and accompanying Implementation Plan, and it has also initiated a number of new programs, policy changes, and systematic fixes designed to prevent, discourage, detect, and punish unconstitutional uses of force against inmates at the Downtown LA Jails.  Most importantly, these efforts have borne fruit.  The Department is currently in

603338855

1

DEFENDANT'S RESPONSE TO PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE

compliance with almost 75 percent of the roughly 100 provisions in the Implementation Plan that governs this case, and it has been in compliance with the majority of these provisions for years.

Second, while the Report notes several areas where the Department has yet to achieve substantial compliance, it is important to view these areas in a context that is not included in the Report.  For instance, while the Department is in full agreement with the Report's position that head strikes should only be used under limited circumstances, it would be wrong to conclude, as the Report suggests, that Deputies resort to using head strikes in a systematic way.  They do not.  In fact, during the time period covered by the Report, only 6 percent of uses of force that took place in the Downtown LA Jails involved any form of head strike at all.

More broadly, it is critical to understand that the uses of force examined by the Monitors are not representative of the full universe of uses of force against inmates, 76 percent of which do not involve any serious physical force, special weapons, or injury.  When the Monitors conduct their review of "force packages" in this case, they examine only 25 uses of force in a given period.  Furthermore, the Monitors do not select the cases to review by, for example, randomly selecting cases involving Category II uses of force.  Instead, the Monitors pre-select cases for their review that are most likely to involve problematic uses of force.  It is unfair to characterize the results emanating from such an analysis, which is confined to reviewing a limited number of hand-picked cases involving the most challenging circumstances, as representative of how force is typically deployed at the Downtown LA Jails.

Third, while the Department is grateful for the Monitors' exceptionally hard work in drafting the Report, and is mindful that their work was made more difficult by the absence of input from a Monitor chosen by the County, the Report contains a number of

603338855

2

DEFENDANT'S RESPONSE TO PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE

inaccuracies that merit mention.[1]  Indeed, in several instances, the Report includes internal inconsistencies concerning matters as fundamental as whether the Department achieved compliance with certain provisions.

Finally, on several occasions, the Report wrongly criticizes the Department for failing to take certain actions it is not obligated to take under the terms of the Settlement or accompanying Implementation Plan.  This scope creep places unfair burdens on the Department and threatens to distract it from taking the actions necessary to address the significant obligations actually imposed by the Settlement.

Notwithstanding the flaws in the Report, the Department's leadership appreciates the Panel's input and recognizes the need to improve its level of compliance in this case, particularly when it comes to minimizing head strikes and improving use of the WRAP device.  To that end, the Department is already taking corrective actions to address those areas where the Department has thus far fallen short of compliance under the Settlement Agreement.

## II.    RESPONSE

### A.    THE REPORT MINIMIZES THE DEPARTMENT'S SIGNIFICANT SUCCESSES CURBING IMPROPER USES OF FORCE

While the Department acknowledges the need for improved performance in some of the areas highlighted in the Report, any objective review of the Department's performance should similarly acknowledge that it has made significant progress in curbing instances of inmate abuse at the Downtown LA Jails since the onset of this litigation.  The Panel publicly recognized this progress just five months earlier, striking a much different tone about the Department's performance as compared to the negative

---

[1]   The Monitoring Panel in this case initially consisted of Richard Drooyan (chosen by the County), Jeffrey Schwartz (chosen by Plaintiffs), and Robert Houston (agreed to by both parties).  In 2019, Mr. Drooyan retired and was replaced as the County-selected Monitor by Marc Harris, who himself resigned from that position in September 2021.  As a result of Mr. Harris' resignation, the Report is the first report prepared without the input of a Monitor selected by the County.  The County recently retained Kathleen Kenney, the former Assistant Director and General Counsel for the Federal Bureau of Prisons, to replace Mr. Harris.

603338855

3

DEFENDANT'S RESPONSE TO PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE

tone which permeates the Report.  Specifically, on November 16, 2021, the Panel appeared in a public meeting before the Los Angeles County Board of Supervisors, and Plaintiffs' Monitor made the following remarks:

> The situation in 2008 to '11, then with the appointment of C.C.J.V. [the Citizen's Commission on Jail Violence], was truly terrible in the jails.  Rather quickly, in the next couple of years, we found the beatings stopped.  The situation with a bunch of deputies standing ground and beating an inmate or kicking an inmate – well documented, they have been gone since then.  We have been very pleased.  There has been no re-occurrence of those kinds of egregious situations.  Second, and I think equally important, very quickly, in the first couple of years of monitoring, the Downtown Jails changed from anti-inmate enforcement oriented to a much more professional service oriented culture.  That has also been maintained, and that is hugely important.  I cannot tell you how many inmates, as we walk through the jail four time a year until COVID, said to us, "What's changed?  I've been here five time, and this time they are not beating the crap out of us," or something like that.  Sometimes more colorful, but the inmates knew immediately about the change in the staff and the culture.

L.A. County Bd. of Supervisors Meeting (Nov. 16, 2021); Tr. at 178:14-179:7 (available at http://file.lacounty.gov/SDSinter/bos/sop/transcripts/1115714_111621.pdf).

Moreover, in contrast to the Report's references to the Department's alleged indifference towards curbing improper head strikes and uses of the WRAP, Plaintiffs' Monitor reported the following on these same subjects:

> Originally, when we would meet quarterly with the jail managers, the discussions were frank but actually contentious and sometimes adversar[ial].  That is no longer true, for the last perhaps two years or so.  We are on the same side.  Everybody's goal is to get the Department into compliance and get them out of the consent decree.  That is what we're all – so we are working towards the same goals, and there is a lot of cooperation, and some of the arguing about what is and isn't okay with specific incidents of force have really gone by the boards. ***The management and much of the supervisory structure are with us on head shots.  We have been working closely on WRAP***.

*Id.* at 179:11-22 (emphasis added).

Consistent with the Monitors' past assessments, and notwithstanding the challenges involved with overhauling a major institution plagued with budget problems, staffing shortfalls, and the task of overseeing a population of more than 10,000 inmates

DEFENDANT'S RESPONSE TO PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE

which include, in great numbers, the mentally ill and the extremely dangerous, the Downtown LA Jails have indisputably undergone transformational reform since this lawsuit was filed in 2012.  The Report's failure to provide any more than a passing reference to the Department's progress in this area is unfortunate.

In truth, the Department and the County have implemented significant structural reforms over the past ten years to curb violence at the Downtown LA Jails and to move toward compliance with the Settlement, including the following:

* The creation of a team of Department personnel, currently consisting of six deputies and two sergeants, who are exclusively dedicated to working to move the Department toward compliance in this case;

* The installation of virtual wall-to-wall video surveillance throughout the Downtown LA Jails, an antiseptic measure long sought by reformers, including Plaintiffs' counsel;

* The wholesale turnover of the Downtown LA Jails' leadership, which commenced with the prosecutions of former Sheriff LeRoy Baca, former Undersheriff Paul Tanaka, and several deputies accused of violating inmates' civil rights at the Downtown LA Jails;

* The settlement of United States v. County of Los Angeles, et al., CV 15-5903-DDP (the "DOJ case"), which has resulted in sweeping changes at the Downtown LA Jails required by a separate, 69-measure settlement agreement;

* The creation and involvement of new institutional bodies with direct oversight of the Downtown LA Jails and the conduct of deputies who work inside the jails, including the Custody Compliance and Sustainability Bureau, the Los Angeles County Sheriff's Department Office of Inspector General, and the Civilian Oversight Commission, as well as the operation of the Citizen's Commission on Jail Violence, which was only newly in existence when Plaintiffs filed the instant lawsuit;

* The initiation of a pilot program in which deputies are wearing body-worn cameras to record their interactions with inmates, in the same manner as deputies who wear such devices record their interactions with citizens on the streets.

Implementing these changes has not been cheap.  Indeed, through the end of 2021, the County spent tens of millions of dollars in its efforts to move the Department toward compliance in this case.[2]

---

[2]  Because many of the Settlement's requirements are not easily trackable for budgeting purposes, that figure likely understates the true cost of compliance.

603338855

5

DEFENDANT'S RESPONSE TO PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE

More importantly, the Department's investment has yielded significant results. To date, the County has reached compliance with approximately 75 percent of the roughly 100 provisions contained in the Implementation Plan agreed to by the parties, virtually eliminated the type of egregious inmate abuses that were commonplace prior this lawsuit, and radically transformed the culture of the Downtown LA Jails.

In short, the Department has made significant progress since this lawsuit began to ensure that the type and volume of inmate abuses that plagued the Downtown LA Jail for decades are a thing of the past, and it has cooperated with the Monitors to resolve the outstanding issues preventing the Department from reaching full compliance. To the extent the Report does not acknowledge these facts – as the Report's authors did just five months ago – they should be included in the record to provide a balanced assessment of the Department's performance.

### B.   THE REPORT MINIMIZES ESSENTIAL FACTS WHEN ADDRESSING THE DEPARTMENT'S COMPLIANCE CHALLENGES

The Department acknowledges that it must improve in several areas identified in the Report to achieve full compliance with its obligations under the Settlement. However, in considering these shortcomings, it is important to understand some essential facts that are missing, or at least not properly emphasized, in the Report.

Regarding the use of head strikes, the Department recognizes that head strikes, particularly when delivered with a weapon, are a dangerous use of force and should be restricted. Accordingly, the Department is fully committed to ensuring that staff abide by Implementation Plan provisions 2.5 and 2.6, which require, among other things, that Department policy prohibit staff from striking a restrained inmate "unless the inmate is assaultive and presents an immediate threat of injury, and unless there are no other more reasonable means to control the inmate." While the Department fully embraces these goals, it is important to place the issue of improper head strikes, as addressed in the Report, in its proper context. Though the Report implies that deputies use head strikes as

603338855

6

DEFENDANT'S RESPONSE TO PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE

a force technique with regularity, in the period of time examined in the Report, only 6 percent of all uses of force committed by deputies at the Downtown LA Jails involved head strikes. The Department is fully committed to eliminating all head strikes that do not occur in a manner consistent with Department policy. However it is not the case that the use of head strikes runs as rampantly as the Report erroneously implies.

Moreover, when evaluating the Department's compliance, it is critically important to recognize that, by the Monitors' own admission, the use of force cases they examine are not a representative sample of use of force cases that occur at the Downtown LA Jails. Instead, to assess the Department's compliance with the Settlement's use of force provisions, the Monitors review 25 cases which are questionable on their face based on various red flags.[3] Accordingly, the Report cannot be read, and should not be read, as an accurate portrayal of a typical use of force incident in the Downtown LA Jails, the overwhelming majority of which do not involve weapons or serious uses of force.

Finally, while the Report accuses the Department of backsliding with regard to curbing improper uses of force, and with failing to ensure that deputies properly employ force-prevention policies, it is undeniable that uses of force at the Downtown LA Jails dropped in 2021 when compared to pre-COVID times in 2019. Indeed, despite an acute shortage of deputies in 2021 due to COVID, the unavailability of normal programming for inmates due to social distancing restrictions and quarantine requirements, and a marked increase in drug usage in the Downtown LA Jails in 2021 as compared to 2019[4] – all factors that could have contributed to a spike in inmate violence – the Department actually made significant progress on several key metrics measuring the use of force: (1) NCIs (the least serious forms of force used on inmates) fell from 316 in 2019 to 231 in

---

[3] For instance, the Monitors select cases for review by scanning Department records for use of force reports containing the key terms "head strikes," "tasers," and other key words indicating a serious use of force was employed.

[4] As evidence of this increased drug use, in 2019, Deputies used 79 doses of NARCAN to counteract suspected drug overdoses at the Downtown LA Jails. In 2021, Deputies administered over five times (396) such doses.

603338855

7

DEFENDANT'S RESPONSE TO PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE

2021; (2) category one uses of force decreased from 1,193 in 2019 to 1,118 in 2021; and (3) category two uses of force plummeted from 419 in 2019 to 325 in 2021 (a 22 percent drop).  Indeed, the only circumstance in which uses of force increased between 2019 and 2021 were cases involving category three uses of force, but this was a net increase of just three cases (from five category three cases in 2019 to eight in 2021).[5]

## C.     THE REPORT CONTAINS CONTRADICTORY CONCLUSIONS AND FACTUAL INACCURACIES

In a number of instances, the Report includes information that is internally inconsistent and/or factually inaccurate, including the following examples:

### 1.     The Report Includes Contradictory Statements Regarding the Department's Compliance

Most fundamentally, the Report reaches internally inconsistent conclusions regarding whether the Department is in compliance with at least six different provisions of the Implementation Plan.[6]  For example, the Report concludes that the Department is currently non-compliant with Implementation Plan provisions 4.8 and 4.9, which require the Department to train its personnel in crisis intervention and conflict resolution, including for inmates with mental illnesses.  *See* Report at 16 ("The Panel finds **Non-Compliance** with Sections 4.6-4.9.").  However, in a separate portion of the Report, the Monitors reach the exact opposite conclusion, stating that "[t]he Department is **In Compliance with Sections 4.8 through 4.9**" while also noting that "100% of the new Deputies received the required training [called for by these Provisions] in the First and Second Quarters of 2021." *Id.* at 17.  The Report does not provide any explanation for

---

[5]  Significantly, overall uses of force have decreased in the past two years despite the fact a hiring freeze, budget curtailments, and COVID-related absences have left the Department understaffed, particularly in the supervisorial ranks, in the Downtown LA Jails.  Unfortunately, at the same time, these staffing issues have led to delays in completing force investigations in a timely manner, which is another area where the Report finds fault with the Department.

[6]  Specifically, the Report reaches internally conflicting conclusions regarding the Department's compliance with provisions 4.8, 4.9, 8.3, 14.2, 15.2, and 19.2.

603338855

8

DEFENDANT'S RESPONSE TO PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE

this apparent contradiction, nor does it do so in the four other instances where the Report vacillates between stating that the Department is simultaneously in compliance and out of compliance with the same provision.

### 2.   The Report Offers Conflicting Statements Concerning the Department's Willingness to Prevent Improper Head Strikes

The Report's statements regarding the Department's commitment to stopping improper head strikes are also internally inconsistent.  First, the Report notes that "[n]o issue has been discussed more with management over the last six years and especially in the last two years, *to little avail*."  Report at 1 (emphasis added).  However, the Report's characterization of the Department as unwilling to take action on head strikes is contradicted by other portions of the Report, which acknowledge that the Department is, in fact, actively working to better monitor and curtail improper head strikes by taking corrective actions the Monitors support.[7]

The Report's reference to the Department's alleged lack of cooperation on head strikes is also contradicted by the testimony that Plaintiffs' Monitor provided to the Los Angeles County Board of Supervisors in November 2021, in which he told the Board, "we are working towards the same goals, and there is a lot of cooperation, and some of the arguing about what is and isn't okay with specific incidents of force have really gone by the boards.  ***The management and much of the supervisory structure are with us on head shots***."  L.A. County Bd. of Supervisors Meeting (Nov. 16, 2021), Tr. at 179:17-22 (emphasis added).

Regardless, to the extent the Panel's contradictory statements on this issue leave any doubt, the Department wants to be clear:  The Department takes the Panel's concern about head strikes seriously; it acknowledges that there is much more work to be done in

---

[7]   For example, as the Report acknowledges: "[T]he Department has begun to gather statistics and information about the use of head strikes…[and] will be sharing these results with the Command Staff.  The Panel expressed its appreciation and support of these decisions."  Report at 13.

603338855

9

DEFENDANT'S RESPONSE TO PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE

this area; and, consistent with what it has informed the Monitors, it is already planning corrective actions to address and bring the Department into compliance on this important issue.

### 3.    The Report Misstates the Fact That the Monitors Approved the De-escalation and Verbal Resolution Training That the Report Now Claims Is Ineffective

While the Report finds the Department in compliance with Provision 3.3,[8] it separately concludes that the Department's De-escalation and Verbal Resolution Training ("DeVRT") is ineffective, and that it was unilaterally implemented by the Department over the Monitors' objections.  *See* Report at 2 (finding "little evidence that DeVRT has been generally effective and little evidence of specific de-escalation skills from that training," and also that "it was the Department's decision about the content of this training").  This is not accurate, as shown by the prior reports issued by the full three-member Monitoring Panel, *none of which raised a single concern* related to the Department's DeVRT program.  In fact, in contrast with the current Report, previous reports issued by the full panel of Monitors credited the Department's DeVRT training program with changing the behavior of jailhouse personnel and with reducing overall use of force incidents.  *See, e.g.,* D.I. 201 at 6 (identifying "specific instances in which the Department members used DeVRT or verbal efforts to induce recalcitrant inmates to exit their cells…stop inmates from engaging in self-inflicted violence, break-up fights, or quell disturbances").

Moreover, as previously acknowledged by the full Monitoring Panel, the Monitors were deeply involved in designing and approving the Department's DeVRT program. *See, e.g.,* D.I. 148 at 4 (explaining that "[the Monitors] reviewed and recommended revisions to the Department's curriculum and training materials for the Conflict Resolution (known as DeVRT) and use of force training programs" and these revisions

---

[8]  Provision 3.3 states: "New Department members should receive a minimum of six weeks of classroom, custody training, which may include training in the Academy or the Jail Continuum and in Crisis Intervention and Conflict Resolution."

603338855

10

"were generally well received by the Department"); D.I. 181 at 8 ("On March 4, 2016, the Panel approved the Department's 'De-escalation & Verbal Resolution Training.'"). Additionally, after approving the Department's DeVRT curriculum, the Monitors "attended training sessions for DeVRT and for the new use of force policies, and made a number of suggestions for enhancing the training sessions." D.I. 148 at 4. Similarly, the Monitors were involved in implementing the Department's DeVRT refresher course. *See* D.I. 181 at 2.

As made clear in these previous reports, the Department and the Monitors worked together to develop the DeVRT curriculum now in place. This curriculum has achieved tangible results, as evidenced by the marked drop in use of force incidents since 2019 reported above. The Department is open to the Monitors' views on how this training can be improved, and is working on more impactful ways to deliver this training. Still, as the Panel previously determined, the Department has long since met its obligations with respect to the development of this training and its continued use.

**4.    The Independent Auditors Should be Retained by a Monitor and the County Has No Objection to a Monitor Doing So**

The County is also disheartened by the Report's statements concerning the current absence of auditors to assist them in this case. According to the Report, the Department is to blame for the absence of auditors for the most recent assessment period. *See* Report at 3 ("The Department should have made alternative arrangements to rehire the auditors but has not"). The Report implies that the absence of these auditors casts doubt on the accuracy of the Department's self-reporting, even though data reported by the Department has always proven accurate in the past. *See id.* ("As a consequence, the Monitors are unable to vouch for the accuracy of some of the findings reported by the Department…"). These criticisms are unfair.

First, as the Department previously informed the Monitors, the Department does not believe it should hire auditors directly and unilaterally in this case, as such an arrangement could call into question the auditors' independence and threaten the

11

DEFENDANT'S RESPONSE TO PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE

credibility of their work.  Second, sometime after the resignation of Monitor Marc Harris, the County and one of the Monitors specifically discussed the possibility of the two remaining Monitors directly hiring auditors, as the auditors had previously been retained through Mr. Harris.  However, the Monitor told the County it was not necessary to proceed in that manner at that time.  As the County stated previously, the County does not object to any Monitor contracting with the auditors and has recently put the Monitors in touch with the prior auditors used in this case who have confirmed they are willing to continue with their role.  The County hopes this resolves the issue.[9]

### D.    THE REPORT STRAYS FROM THE DEPARTMENT'S REQUIREMENTS UNDER THE SETTLEMENT

In addition to issuing contradictory and, in some instances, inaccurate conclusions relating to the Department's compliance, the Report purports to impose new obligations on the Department that do not appear in the *Rosas* Settlement and accompanying Implementation Plan.  The Report further erroneously suggests that the Department's failure to comply with these new and unilaterally-created obligations constitutes a failure by the Department to comply with the Implementation Plan itself.  This is of course incorrect.

For instance, in at least one case, the Monitors appear to have unilaterally changed the metric by which compliance with an Implementation Plan provision is measured.  Specifically, the Monitors find the Department non-compliant with Implementation Plan provisions 4.6-4.9 based only on the conclusory assertion that "this training and refresher training is not favorably changing Deputy behavior."  Report at 16.  The Report then

---

[9]   In addition to the Report's errors referenced above, the Panel broke with a long-standing practice in this case by including identifying information related to specific use of force incidents in the Report without first providing notice to the County or seeking the County's consent to do so.  The practice of anonymizing uses of force referenced in reports the Panel publicly files has been in place since the onset of this litigation.  It exists, not to inhibit the Monitors from reporting on allegedly improper uses of force, but rather so the Department and the Monitors can have a free-flowing dialogue about uses of force at the Downtown LA Jails without concern that the manner in which the Monitors publicly disclose information that comes into their position concerning uses of force exposes the County to potential litigation.

DEFENDANT'S RESPONSE TO PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE

states that the training "should be re-created and approved by the Monitors." Putting aside the Report's lack of evidence to support this claim, as well as the Report's internally inconsistent evaluation of the Department's compliance with these provisions (*see supra* Section C(1)), nothing in the Settlement authorizes the Monitors to base a conclusion about compliance with these provisions on the Monitors' satisfaction or dissatisfaction with the *results* of the training at issue. The agreed-upon metric for these provisions is completely different, as compliance is instead based on *the number of deputies who receive the training* at issue. Nor does the Settlement authorize the Monitors to unilaterally throw out an agreed-upon training curriculum and demand the Department start over.

As another example, the Report references a search that took place at the Men's Central Jail in September 2021 in response to a report that a gun had been smuggled into that facility by members of a gang. The Report criticizes the Department for failing to respond to a lengthy list of questions from the Monitors concerning this incident. Report at 4. First of all, it is far from clear how this search (which did not result in the use of any force and did not take place during the time period covered by the Report), and many of the Monitors' questions concerning it, have anything to do with the Settlement. Furthermore, the Report's description of this event omits important facts concerning the Department's communications with the Monitors about this event, including the fact that the Monitors explicitly advised the Department *against* providing any confidential information related to this search. Thus, the Report's reference to this incident and criticism of the Department for failing to provide confidential information the Monitors indicated the Department did not have to provide is particularly unwarranted.

These are just a few examples of attempts to impose new obligations on the Department separate from those agreed upon by all parties in the Implementation Plan years ago. The Department objects to the imposition of such new obligations outside the bounds of the Settlement, and objects further to attempts to equate a failure to comply with such obligations with a failure to comply with the Implementation Plan provisions

actually agreed to by the parties.

**E.     THE DEPARTMENT IS TAKING CORRECTIVE ACTIONS TO ADDRESS THE AREAS REFERENCED IN THE REPORT FOR WHICH IT HAS YET TO ACHIEVE COMPLIANCE**

Regardless of its concerns with the Report, the Department remains fully committed to taking those steps necessary to bring it in full compliance with the terms of the Settlement, as well as addressing the four primary shortcomings the ACLU identified in its response to the Report, (D.I. 207): (1) improper head strikes (covered by provision 2.6 of the Implementation Plan); (2) implementing appropriate force-prevention policies (covered by provision 2.2); (3) reporting uses of force and disciplining deputies who engage in improper uses of force (covered by provisions 5.3 and 13.1); and (4) undertaking force prevention practices that minimize the likelihood of causing medical distress to an inmate (covered by provisions 17.5 and 17.6).

The Department is actively working on corrective actions to address each of these issues.  For example, with regard to eliminating improper head strikes and ensuring the proper use of the WRAP, the Department is currently updating its policies in these areas, as recommended by the Monitors.  This corrective measure will provide deputies with clearer direction and guidance regarding the limited circumstances when head strikes are a permissible use of force and on using the WRAP device in a manner that is safe for staff and inmates alike; reduce security risks that are unfortunately common, such as the need for secondary uses of force in cases involving assaultive inmates; and allow staff to transport inmates from the site of an incident to medical and mental health locations in the Downtown LA Jails quickly, safely, and efficiently.

In addition, the Department is currently developing new data-driven approaches for monitoring head strikes and the use of the WRAP.  This process will allow the Department to track incidents involving head strikes and the deployment of the WRAP and to make relevant and aggregate data available to command-level staff.  With regard to head strikes, this data-tracking system will allow the Department to (1) fast-track use

of force investigations involving head strikes to ensure that, in the rare circumstances when head strikes are utilized, they are used in compliance with guidelines established by the Settlement; (2) explore specific incidents involving head strikes in greater detail; (3) focus on potentially problematic staff involved in uses of force featuring head strikes; (4) more quickly identify problematic trends regarding the use of head strikes that require a training response or other corrective action; and (5) determine whether such corrective actions have an impact in reducing the occurrence of inappropriate force responses involving head strikes.  With regard to the WRAP, the Department's work in building a better data and tracking framework will allow Department executives to (1) objectively identify facilities or units where the WRAP is being potentially overused; (2) better understand how long the WRAP device is being employed when used; (3) identify facilities or units where additional training regarding the proper use of the WRAP should be provided; and (4) identify staff who may not be following the Department's yet-to-be finalized policy.

Finally, as part of the Department's mentoring and training components, the Department is exploring an expansion of its Employee Performance Review process that incorporates whether deputies have been involved in incidents involving head strikes and/or the WRAP as a performance element, even when the underlying force incident has not been referred for formal investigation.  Furthermore, the Department is developing enhanced training on the heavily-restricted use of head strikes and the safe use of the WRAP as a means of restraining an inmate under the proper circumstances. The Department believes these efforts, among others the Department is currently exploring, will improve staff conduct in these areas, provide clearer notice to the staff regarding prohibited conduct, and ultimately provide the Department with a better means to hold deputies accountable who engage in inappropriate uses of force.

## III.    CONCLUSION

Since this litigation began, the Department has made significant progress in curbing unjustified uses of force, and has invested a tremendous amount of time, effort,

manpower, and money to reach compliance with approximately three-quarters of its obligations under the Implementation Plan. While the Department acknowledges that significant work remains to reach compliance with the remaining provisions, the claim that a "pervasive culture of violence, dishonesty, and unaccountability" exists within the Department and impacts how it operates the Downtown LA Jails[10] is unwarranted. The Department is committed to reaching full compliance with the terms of the *Rosas* Settlement; it is putting together an action plan to reach this goal; and it recognizes the importance of turning this plan into actions that create a safe environment at the Downtown LA Jails for inmates and staff alike.

DATED: May 3, 2022                                      KENDALL BRILL & KELLY LLP


                                                       /s/ Robert E. Dugdale
                                                       ROBERT DUGDALE

                                                       *Attorney for Alex Villanueva, in His*
                                                       *Official Capacity as Los Angeles*
                                                       *County Sheriff*

---

[10]    *See* Plaintiffs' Response to Monitors' Tenth Report and Joinder in Their Request for a Status Conference, D.I. 207 at 10 (Apr. 21, 2022).

603338855                                      16
DEFENDANT'S RESPONSE TO PANEL'S TENTH REPORT AND REQUEST FOR A STATUS CONFERENCE