Kathleen M. Kenney
343 Sweet Grass Way
Richmond, KY 40475
Email: kkenney4695@gmail.com

**Monitor and on behalf of Monitors
Robert Houston and Nicholas E. Mitchell**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS, et al., <br> Plaintiffs, <br> v. <br><br> LOS ANGELES COUNTY SHERIFF ROBERT LUNA, in his official capacity, <br><br> Defendant. | Case No. 12-cv-00428 DDP (MRW) <br><br> **PANEL'S ELEVENTH REPORT** <br><br> Hon. Dean D. Pregerson <br> United States District Judge |

1  Pursuant to Section V of the Settlement Agreement And Release of Claims, the
2  Monitors appointed by this Court, Robert Houston, Nicholas E. Mitchell, and Kathleen Kenney
3  (collectively, the "Panel") hereby submit the attached Panel's Eleventh Report "evaluation
4  Defendant's Compliance with Action Plan" prepared by the Panel for the twelve-month period from
5  July 1, 2021 to June 30, 2022. This Report takes into consideration the comments from the parties
6  in accordance with Section V of the Settlement Agreement. The Panel is available to answer any
7  questions the Court may have regarding this Report as such times as are convenient for the Court
8  and the parties.

9

10  DATED: March 8, 2023                    Respectfully Submitted,

11

12                                         KATHLEEN M. KENNEY

13

14

15                                    By: /s/ Kathleen M. Kenney

16                                         Kathleen M. Kenney

17                                         Monitor and on behalf of Monitors

18                                         Robert Houston and

19                                         Nicholas E. Mitchell

20

21

22

23

24

25                                         2

26

27

28                                                         Case No. 12-cv-00428 DDP (MRW)

**PANEL'S ELEVENTH REPORT**

# Table of Contents

Panel's Eleventh Report ................................................................................................................ 2

Action Plan Implementation Assessment ...................................................................................... 7

    I. Administrative Provisions ........................................................................................................ 7
        A. Leadership and Accountability ........................................................................................... 7
        B. Management Visits ............................................................................................................ 13
        C. Rotations and Transfers ................................................................................................... 14

    II. Use of Force Policies and Practices .................................................................................... 15
        A. Overall Use of Force Policies .......................................................................................... 15
        B. Use of Force Practices & Review of Packages ............................................................... 16
        C. Quarterly Findings—Use of Force Provisions ................................................................ 20

    III. Training ............................................................................................................................... 23

    IV. Reporting and Investigation of Force Incidents .................................................................. 28
        A. Reporting and Investigation Provisions in Force Package Reviews ................................ 28
        B. Reporting & Investigations Provisions as Reported by Department ................................ 31
        C. Quarterly Findings—Reporting and Investigations Provisions ....................................... 34

    V. Inmate Grievances ............................................................................................................... 36
        A. Grievance Forms .............................................................................................................. 36
        B. Emergency Grievances ..................................................................................................... 37
        C. Inmate Grievance Coordinator ........................................................................................ 38
        D. Handling of Grievances ................................................................................................... 40
        E. Deadlines ......................................................................................................................... 41
        F. Communications with Inmates ......................................................................................... 42

    VI. Use of Restraints ................................................................................................................ 43

    VII. Early Warning System ...................................................................................................... 45

    Appendix A: Compliance Chart .............................................................................................. 47

# Panel's Eleventh Report

The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca*, Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan [developed by the Panel] ('Reports') at intervals the Panel shall determine." This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from July 1, 2021 to June 30, 2022 (the "Eleventh Reporting Period") and is created for the purposes of the settlement of the *Rosas* case. In accordance with Paragraph V of the Settlement Agreement, it takes into consideration comments received from the Parties on February 17, 2023.

In May 2014, the Parties retained the Panel "to develop a corrective action plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles" (the "Downtown Jail Complex"). The plan developed by the Panel sets forth provisions in twenty-one areas that the Sheriff is required to implement in the Downtown Jail Complex. The plan was approved by the Court on April 7, 2016. Under Paragraph VIII of the Settlement Agreement, "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')." As of November 1, 2018, the Sheriff's Department (the "Department") has implemented 104 of the Panel's 106 recommendations. The remaining two recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in *United States v. County of Los Angeles, et al.*, CV No. 15-05903 (JEMx) (the "DOJ case").

Since the *Panel's Tenth Report* and Request for a Status Conference was filed on April 7, 2022, there have been two personnel changes to the Monitoring Panel. First, Kathleen Kenney began serving as a Monitor on April 25, 2022, as the replacement for Marc Harris. Mr. Harris resigned as a Monitor in September 2021. Next, Jeffrey Schwartz resigned from his Monitoring position on June 17, 2022, due to health reasons.[1] Nicholas E. Mitchell replaced Mr. Schwartz on or about August 17, 2022.

With the Court's guidance, during the Status Conference held on May 12, 2022, the Parties agreed to develop a written plan to achieve compliance with the following four key areas: (1) eliminating impermissible head strikes; (2) the proper use of the WRAP; (3) appropriate utilization of force avoidance and de-escalation techniques; and (4) accountability. The timeline for developing and reaching an agreement on a joint compliance plan has been extended a few times due to the personnel changes in the Panel and the election of a new Sheriff for Los Angeles County. The Parties plan to finalize a new compliance plan addressing the four areas noted above on or before the next Status Conference scheduled for February 13, 2023. If the Parties have outstanding issues they are unable to reach agreement on, they will bring those issues to the Court's attention on February 13, 2023.

Due to the restrictions and safety concerns caused by the COVID-19 pandemic, the Panel was not able to visit the jails in the Third Quarter of 2021. The Panel conducted two Monitoring visits during the Eleventh Reporting Period: one in December 2021 and another in June 2022. With regard to the non-force related provisions in the Action Plan, the Department submitted its Eleventh Self-Assessment Status Report (the "Eleventh Self-Assessment") on October 7, 2022, and its Augmented Self-Assessment Report (the "Augmented Eleventh Self-Assessment") on December 14, 2022. During the Eleventh Reporting Period, the Panel reviewed records posted by the Department to verify the Department's self-assessments

---

[1] Sadly, Mr. Schwartz passed away on August 10, 2022. His dedicated service to the *Rosas* case was greatly appreciated by the Parties and the Panel.

of its compliance with non-force provisions of the Action Plan. The Panel's evaluation of the provisions of the self-assessment reports are included in this Report. The Panel's auditors reviewed source documents associated with the Training Provisions as well as Restraint Provisions 17.3 and 17.4.

The overall force numbers are trending downward. The total amount of force incidents for the Eleventh Reporting Period is 1,084. When compared to the first two quarters of 2021 in the Tenth Reporting Period, incidents have decreased in each of the last three six- month periods. The first two quarters of 2021 had 593 incidents, the last two quarters of 2021 had 558 incidents, and the first two quarters of 2022 had 526 incidents, which is a 5.7% decrease every six months.[2] We believe that these successive decreases in the number of use of force incidents represent meaningful progress by the Department at achieving the goals of the Agreement.  In order to sustain this progress, we encourage Department supervisors to model appropriate behavior with inmates and to hold staff accountable for inappropriate behavior.

During the Eleventh Reporting Period, the Panel reviewed a total of 91 completed force packages that were selected from a comprehensive list of force incidents compiled by the Department. The Panel did not select these force packages randomly or in proportion to the frequency with which various categories of force occur. Rather, the Panel selected for review the force incidents most likely to involve problematic uses of force.[3] In 30 of the 91 force packages reviewed, the Panel found some aspect of the force used during the encounter that violated the force prevention principles of Section 2.2 of the Action Plan. In cases where some force may be warranted, the Panel continues to see improper head strikes by Department personnel. The use of head strikes is covered in more detail below.

During the newly configured Panel's first Monitoring visit in November 2022, the Panel conducted a series of focus groups with staff and discussions with inmates at each of the Downtown Jails.[4] The participants were randomly selected by one of the Monitors.[5] The Panel found the focus groups and discussions beneficial and plans to utilize them in future visits.

The following ideas were expressed by custody staff during the focus groups:
- Staffing shortages are a concern. Regularly working double shifts negatively impacts morale.
- Staff believe inmates are not held accountable for their bad behavior/actions.
- Staff are generally satisfied with the training they receive.
- Staff are aware of the *Prohibited Force Policy*.
- Sergeants spend too much of their time doing paperwork.
- Staff want to return to a previous time when staff had more control over inmates.
- Staff want to use the tools they have available (e.g., WRAP) without so many restrictions.
- Employing time and distance principles is seen as "giving up ground" with inmates.
- Staff would like to be able to go "hands on" more often with recalcitrant inmates.
- One staff member acknowledged that although he was not a fan of the recalcitrant inmate policy, it does, in fact, reduce incidents of force.

---

[2] The 2021 data noted here was pulled from the County's posted source documents.  The Panel acknowledges the Tenth Report indicated there were 565 uses of force in the first two quarters of 2021.

[3] The Panel usually selects cases in which staff deployed/utilized the taser, WRAP, or head strikes.

[4] While the visit is outside of the Eleventh Reporting Period (3Q21 – 2Q22), the Panel believes it is important to provide the Court with timely data and information in its reports.

[5] The Panel conducted three focus groups with staff: 7 from Men's Central Jail (MCJ); 12 from (Twin Towers Correctional Facility (TTCF)/Inmate Reception Center (IRC) and 6 Sergeants (2 from each facility) and three discussion sessions with inmates: 5 from IRC; 4 from TTCF and 4 from MCJ. The views expressed by focus group participants are not necessarily reflective of the views of all members of custody staff or inmates.

The following themes emerged from the group discussions with inmates:
- The majority indicated not feeling concerned about being subjected to excessive force by staff.
- There is a strong desire for more programming and jobs.
- The grievance system is not viewed as effective.
- Jail conditions are a significant concern, including access to necessary medical and mental health care.
- Inmates are sometimes unable to timely get necessary comfort items, such as blankets and warm clothing, particularly in the IRC, which is often cold.
- There are fears of retaliation for complaining about issues, particularly regarding a staff member.
- While some staff interactions were fine, issues were noted regarding being treated disrespectfully by staff. One inmate added that staff relationships improved the longer you were at the facility.

The Panel has consistently raised concerns about the Department's use of head strikes. These concerns have been noted in previous Panel Reports and in conversations with the Sheriff, Assistant Sheriff, and senior leaders in the Department. Former Assistant Sheriff Brendan Corbett was focused on reducing head strikes.[6] On April 12, 2022, the Department issued a *Prohibited Force Directive* that prohibits head strikes with personal weapons unless all three of the following criteria are present: (1) the inmate is assaultive, (2) there is an imminent danger of serious injury to personnel or others, and (3) there are no other means to avoid serious physical injury. Plaintiffs believe the head strike policy should be even more stringent. The Parties and the Monitors are engaged in ongoing discussions regarding this policy.

Former Assistant Sheriff Corbett held several briefings with supervisory staff to ensure they were aware of the new *Prohibited Force Directive* and his expectations regarding the use of head strikes. These briefings were effective in getting his message across. When the Panel toured the Downtown Jails in June 2022, Panel members asked random staff whether they were aware of the *Prohibited Force Directive,* and they all indicated they were. During the Panel's Focus Groups in November 2022, staff indicated they were aware of the *Prohibited Force Directive* and the limited circumstances where they could utilize head strikes. The Department has been tracking the use of head strikes and focusing on improving the statistics noted below.

*Figure 1* reflects the total number of head strikes per year by facility. TTCF had a total of 14 in 2020, 30 in 2021, and 16 in 2022, which is a 50% to 52% swing year over year. MCJ had a total of 29 in 2020, 32 in 2021, and 17 in 2022, which is a significant (47%) decrease. Notably, MCJ had 9 head strikes in 3Q21 and 3 in 2Q22, a 66% decrease. IRC has had little to no change in its number of head strikes—18 in 2020, 19 in 2021, and 18 in 2022. The total number of use of force head strikes by facility and month over the past two years are represented in *Table 1* below. The year over year comparison percentages from 2021 to 2022 reflect an overall and continuing decrease in head strikes.



*Figure 1:* Total Head Strikes Per Year By Facility

---

[6] Former Assistant Sheriff Brendan Corbett ran the Custody Division until November 2022.

4

*Table 1: Use of Force Head Strikes by Facility and Month*

| Use of Force Head Strikes | | | TTCF | MCJ | IRC | Monthly | YTD | Year Over Year YTD Percent Comparison |
|---|---|---|---|---|---|---|---|---|
| 2021 | Q1 | JAN | 1 | 4 | 2 | 7 | 7 | |
| | | FEB | 3 | 1 | 3 | 7 | 14 | |
| | | MAR | 3 | 4 | 1 | 8 | 22 | |
| | Q2 | APR | 3 | 5 | 2 | 10 | 32 | |
| | | MAY | 2 | 1 | 1 | 4 | 36 | |
| | | JUN | 3 | 2 | 2 | 7 | 43 | |
| | Q3 | JUL | 5 | 3 | 1 | 9 | 52 | |
| | | AUG | 3 | 3 | 2 | 8 | 60 | |
| | | SEP | - | 3 | 1 | 4 | 64 | |
| | Q4 | OCT | 1 | 2 | - | 3 | 67 | |
| | | NOV | 2 | 3 | 2 | 7 | 74 | |
| | | DEC | 4 | 1 | 2 | 7 | 81 | |
| **2021 Year Total** | | | **30** | **32** | **19** | **81** | **552** | |
| 2022 | Q1 | JAN | - | 2 | 4 | 6 | 6 | -14% |
| | | FEB | 4 | - | 1 | 5 | 11 | -21% |
| | | MAR | 1 | 5 | - | 6 | 17 | -23% |
| | Q2 | APR | 1 | 3 | 4 | 8 | 25 | -22% |
| | | MAY | - | - | 1 | 1 | 26 | -28% |
| | | JUN | 2 | - | 2 | 4 | 30 | -30% |
| | Q3 | JUL | - | 1 | 2 | 3 | 33 | -37% |
| | | AUG | 3 | 1 | 1 | 5 | 38 | -37% |
| | | SEP | 2 | 1 | - | 3 | 41 | -36% |
| | Q4 | OCT | 1 | - | - | 1 | 42 | -37% |
| | | NOV | 1 | 1 | 3 | 5 | 47 | -36% |
| | | DEC | 1 | 3 | - | 4 | 51 | -37% |
| **2022 Year Total** | | | **16** | **17** | **18** | **51** | **367** | **-34%** |

The Department's concerted focus on head strikes in the past several months appears to be having a positive impact on the downward trend. The Panel has previously registered its concern that the use of head strikes was often not identified by the supervisors investigating and reviewing use of force incidents. In the more recent use of force packages the Panel has reviewed, the head strikes are identified during the supervisor's review, but they are characterized as justifiable under the Department's policies. The Panel has yet to review a case where the supervisor concludes the use of head strikes was inappropriate. In order for the Department to achieve compliance with Provision 2.6 (head strikes), staff must be held accountable head strikes.  For several years and as noted in Panel Reports, the Monitors have recommended that head strikes should be removed from the 'Personal Weapons' umbrella and instead, become a separate category of force used.  Further, Deputies and Supervisors should explain in their reports how the narrow conditions of Provisions 2.6 and 2.10 were met.

For the Eleventh Reporting Period, the Department is found in compliance with 77 of the 100 applicable (104 total) provisions set forth by the Action Plan. Compliance results per category are as follows:
  (1)  8 out of 9 of the Administrative Provisions
  (2)  15 out of 25 of the Force Provisions
  (3)  9 out of 11 of the Training Provisions
  (4)  18 out of 24 of the Investigations & Reporting Provisions
  (5)  23 out of 24 of the Grievances Provisions
  (6)  2 out of 8 of the Restraints Provisions (Note this category includes 4 not applicable.)
  (7)  2 out of 3 of the Early Warning System Provisions

Provisions determined compliant for the Eleventh Reporting Period, that were found out of compliance in the *Panel's Tenth Report,* include: 5.3 Unexplained Discrepancies; 6.11 Failure to Handle Grievances; 6.19 PREA Deadline; and 19.3 Performance Mentoring Programs.

The Department continued to cooperate fully with the Panel during the Eleventh Reporting Period. The Department and County Counsel responded to our inquiries and requests for documents and information. They engaged in constructive conversations with the Panel regarding use of force incidents, policy issues and their continuing efforts to implement the terms of the Rosas Action Plan. We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.

# Action Plan Implementation Assessment

The Action Plan is divided into seven overarching categories: (1) Administrative; (2) Use of Force; (3) Training; (4) Force Reporting and Force Investigations; (5) Grievances; (6) Restraint; and (7) Early Warning System. Each category contains a number of substantive provisions with corresponding compliance measures. The Panel's findings towards compliance with each provision for the Eleventh Reporting Period is provided below and organized to mirror the Action Plan.

# I.      Administrative Provisions

## A. Leadership and Accountability

The recommendations in Sections 1.1 through 1.4 of the Action Plan require that Custody be headed by an Assistant Sheriff with no other areas of responsibility, the Sheriff be engaged personally in the management of the jails, the Department's managers be held accountable for any failures to address force problems in the Jails, and that the Department regularly reports to the Board of Supervisors on the use of force in the jails and on its compliance with the Action Plan.

### 1.1 Custody Operations Headed by An Assistant Sheriff

**Provision Description:** Section 1.1 of the Action Plan provides that Custody Operations should continue to be headed by an Assistant Sheriff with no other areas of responsibility assigned.

> *Compliance Measure Summary:* Custody Operations headed by an Assistant Sheriff with no other responsibilities for the duration of the Settlement Agreement.

Custody has been headed by an Assistant Sheriff with no other areas of responsibility since mid-2014. Custody was under the direction of Former Assistant Sheriff Corbett from April 18, 2021 through November 2022.  The Panel found Former Assistant Sheriff Corbett to be accessible, forthright, and fully supportive of the work of the Panel. The Assistant Sheriff worked collaboratively with the Panel and engaged in meaningful discussions to address many of the issues that are at the heart of this case.

**1.1 Status:** Compliance[7]              **As of Date:** January 1, 2017

### 1.2 Personal Engagement of the Sheriff

**Provision Description:** Sheriff should be personally engaged in the management of the Department's jail facilities and regularly and adequately monitor the use of force policies and practices and compliance with the Action Plan.

> *Compliance Measure Summary:* Reports every six months on the Sheriff's personal involvement in managing the jail and monitoring use of force policies.

The Department has provided the Panel with a log of frequent meetings that Former Sheriff Alex Villanueva had with Former Assistant Sheriff Corbett during the Second Semester of 2021 and First Semester of 2022. Between July 7, 2021 and December 28, 2021, the Sheriff and Assistant Sheriff had 46

---

[7] Use of the term Compliance is a finding of compliance as of a certain date. The Panel's findings are set forth on the Appendix attached hereto. For other provisions, the Department has either not achieved compliance or is no longer in compliance during the Eleventh Reporting Period. Based upon the Panel's findings, the Parties will determine whether the Settlement Agreement is subject to termination pursuant to Section VIII of the Settlement Agreement. As noted in the Panel's prior reports, the Panel encourages the "Parties to adopt a meaningful and achievable framework to determine the Department's compliance with the Settlement Agreement" in the future.

meetings in which they discussed such topics as: use of force incidents, the use of less lethal weapons and personal weapons; cell extractions; Category 3 incidents and associated injuries; use of force against mentally ill inmates; gassing incidents; suicide attempts; and inmate population numbers. Between January 3, 2022 and June 27, 2022, the Sheriff and Assistant Sheriff met 25 times to discuss the issues noted above.

>*Compliance Measure Summary:* Meet with the Monitors at least once every six months to discuss personal involvement.

Monitors Robert Houston and Jeffrey Schwartz met with Former Sheriff Alex Villanueva by video conference on January 3, 2022. Monitor Kathleen Kenney met with Former Sheriff Alex Villanueva by video conference on July 13, 2022. The Sheriff cited staffing shortages, particularly at the Sergeant level, as one of the greatest challenges facing the Department. These shortages impacted the timely review of force packages and grievances. The Sheriff noted the Sergeants were weighed down with paperwork and did not have an adequate amount of time to be visible and make rounds, which could have a negative impact on overall uses of force.

**1.2 Status:** Compliance                    **As of Date:** January 1, 2017

## 1.3 Accountability for Failing to Address Policy Violations

**Provision Description:** Section 1.3 of the Action Plan provides that Department managers should be held accountable should they fail to address use of force problems at the jail facilities.

>*Compliance Measure Summary:* A quarterly report that sets forth the number and rank of personnel found to have violated use of force policies.

The Department provided a report for all four quarters of the Eleventh Reporting Period, which are summarized below in *Table 2*. The resulting discipline for these violations is reflected in *Table 3*.

*Table 2: Number of Personnel Found to Have Violated Use of Force Policies by Quarter and Facility*

|      | TTCF | MCJ | IRC |
|------|------|-----|-----|
| 3Q21 | 1    | 1   | 0   |
| 4Q21 | 2    | 3   | 0   |
| 1Q22 | 0    | 2   | 0   |
| 2Q22 | 2    | 0   | 0   |

*Table 3: Discipline Imposed by Violation*

|        | Case No. | Facility | Rank | Discipline        |
|--------|----------|----------|------|-------------------|
| 3Q2021 | 1        | TTCF     | SGT  | 3-day Suspension  |
|        | 2        | MCJ      | DSG  | 1-day Suspension  |
| 4Q2021 | 1        | TTCF     | DSG  | 5-day Suspension  |
|        |          | TTCF     | DSG  | 3-day Suspension  |
|        | 2        | TTCF     | DSG  | 2-day Suspension  |
|        |          | TTCF     | DSG  | Written Reprimand |
|        |          | TTCF     | DSG  | Resigned          |
|        |          | TTCF     | DSG  | Written Reprimand |
|        |          | TTCF     | C/A  | 5-day Suspension  |
|        | 3        | MCJ      | DSG  | 1-day Suspension  |

8

| | 4 | MCJ | DSG | 1-day Suspension |
|---|---|---|---|---|
| | 5 | MCJ | DSG | Removal |
| 1Q2022 | 1 | MCJ | DSG | 3-day Suspension |
| | 2 | MCJ | SGT | Written Reprimand |
| 2Q2022 | 1 | TTCF | DSG | Written Reprimand |
| | 2 | TTCF | DSG | Written Reprimand |

SGT = Sergeant    DSG = Deputy Sheriff Generalist    C/A = Custody Assistant, Sheriff

***Compliance Measure Summary:*** Section 1.3 requires the Department to identify each facility in which there was a 25% increase in the number of use of force incidents or Category 3 incidents from the previous quarter.

*Overall Uses of Force*

The Department provided data that reflects the number of use of force incidents per month by facility and category. For the Eleventh Reporting Period, there was a total of 295 incidents in 3Q21, 263 in 4Q21, 255 in 1Q22, and 271 in 2Q22, as shown in *Figure 2*. The difference in incidents from 3Q21 to 1Q22 represents a 13.6% decrease. The difference in incidents from 1Q22 to 2Q22 represents a 6.3% increase. The total amount of use of force incidents for the Eleventh Reporting Period was 1,084. When compared to the Tenth



Reporting Period with the first two quarters of 2021, incidents are decreasing each six months: the first two quarters of 2021 had 593 incidents, the last two quarters of 2021 had 558 incidents, and the first two quarters of 2022 had 526 incidents, which is approximately a 5.7% decrease every six months.

Of the 1,084 use of force incidents for the Eleventh Reporting Period, TTCF accounted for 408 of the incidents (37.6%), MCJ accounted for 423 of incidents (39.0%), and IRC accounted for 253 of the incidents (23.3%)—see *Figure 3*.

The total uses of force by quarter and category are reflected in *Figure 4*. Across all quarters, the majority (66%) of incidents were Category 1. Category 1 cases involve incidents with no injuries. During the Tenth Reporting Period there was a 32.0% increase in Category 1 incidents between the First and Second Quarters of 2021, with 172 and 227 total Category 1 incidents in 1Q21 and 2Q21, respectively. For the Eleventh Reporting Period, Category 1 incidents decreased for the first three quarters. While there was an 8.9% increase in the final quarter, the number of incidents reflect a downward trend that is 18.9% less



9

than 2Q21. Similarly, the Category 2 incidents reflect a downward trend compared to the 65 and 62 incidents reported for the First and Second Quarters of 2021 respectively. Category 2 cases involve an identifiable injury (could be a minor injury). Category 2 incidents represent 19.6% of the total number of incidents.

*Figures 5, 6, and 7* below identify the number of use of force incidents by category per facility over each quarter for the Eleventh Reporting Period.







Between 2Q21 and 3Q21, the following increases or decreases by 25% or more are as follows: *Note that 2Q21 data is from the Tenth Reporting Period and not reflected in the charts above but relevant for calculating percentage change for the Eleventh Reporting Period.

- TTCF decreased NCI incidents by 27% from 11 to 8.
- MCJ decreased its Category 1 incidents by 26% from 99 to 73.
- MCJ increased its Category 2 incidents by 40% from 25 to 35.
- MCJ decreased its Category 3 incidents by 100% from 2 to 0.
- IRC increased its NCI incidents by 100% from 7 to 14.
- IRC decreased its Category 2 incidents by 38% from 16 to 10.
- IRC increased its Category 3 incidents from 0 to 1.

Between 3Q21 and 4Q21, the following increases or decreases by 25% or more are as follows:

- TTCF increased NCI incidents by 25% from 8 to 10.
- MCJ increased NCI incidents by 36% from 11 to 15.
- MCJ decreased Category 2 incidents by 46% from 35 to 19.
- MCJ increased Category 3 incidents from 0 to 1.
- IRC decreased Category 1 incidents by 33% from 36 to 24.
- IRC increased Category 2 incidents by 30% from 10 to 13.
- IRC decreased Category 3 incidents by 100% from 1 to 0.

Between 4Q21 and 1Q22, the following increases or decreases by 25% or more are as follows:

- TTCF decreased Category 2 incidents by 29% from 24 to 17.
- TTCF increased Category 3 incidents from 0 to 1.
- MCJ decreased NCI incidents by 33% from 15 to 10.
- MCJ decreased Category 3 incidents by 100% from 1 to 0.
- IRC increased NCI incidents by 75% from 12 to 21.
- IRC increased Category 1 incidents by 67% from 24 to 40.

Between 1Q22 and 2Q22, the following increases or decreases by 25% or more are as follows:

- TTCF increased NCI incidents by 100% from 9 to 18.
- TTCF decreased Category 3 incidents by 100% from 1 to 0.
- MCJ increased NCI incidents by 40% from 10 to 14.
- MCJ increased Category 3 incidents by from 0 to 1.
- IRC decreased NCI incidents by 57% from 21 to 9.
- IRC increased Category 1 incidents by 25% from 40 to 50.

*Category 3 Incidents*

There was a total of five Category 3 incidents during the Eleventh Reporting Period—one Category 3 incident in the Third Quarter of 2021, one in the Fourth Quarter 2021, one in the First Quarter 2022, and two in the Second Quarter of 2022. Of the five incidents, one occurred at TTCF and two occurred at both IRC and MCJ, respectively. Due to the infrequency of Category 3 incidents, a single incident results in 50% to 100% swings quarter to quarter, which triggers CCSB to request a response from the facility's Unit Commander on its handling of involved staff.

> **Compliance Measure:** When there is a 25% or more increase from quarter to quarter, the Unit Commander reports on his or her response to involved staff. If the Unit Commander failed to address the matter, the Department indicates its response to hold the Unit Commander accountable.

*Overall Uses of Force*

The Department is required to address increases of 25% or more for all categories. Outside of one occasion, responses are only provided for Category 3 incidents.

According to the CCSB, in 1Q22 there was a 38% increase in uses of force at IRC—from 36 incidents to 50. In response, IRC indicated that the increase in uses of force was even higher than noted by CCSB. There was a 47% increase with 49 from the previous quarter and 72 in 1Q22. However, IRC included Non-Categorized Incidents as well as Category 1, 2 and 3 cases in their data. IRC determined contributing factors, such as the use of suicide prevention gowns, and addressed them via online training. In addition, a supervisor is now required at search line.

*Category 3 Specific*

In 3Q21 there was an increase in Category 3 incidents from the previous quarter at IRC—zero incidents to one. In response, the involved personnel were sent to Use of Force Refresher training. Further action may be taken at the close of the IAB investigation. In 4Q21 there was an increase in Category 3 incidents from the previous quarter at MCJ—from zero incidents to one. The response to this incident was not noted as the incident remains under IAB investigation. In 1Q22 there was an increase in Category 3 incidents from the previous quarter at TTCF—zero incidents to one. In 2Q22 there was an increase in Category 3 incidents from the previous quarter at IRC and MCJ—from zero to one at each. In response, IRC indicated it continues to brief personnel on important issues and to provide education on alternatives to minimize inmate contact. MCJ responded by holding briefings on each shift with lieutenants and sergeants, conducting training scenarios, and reviewing maintenance issues in the module.

As noted on Page 2 of this Report, the Parties are currently developing a written plan to achieve compliance with various provisions of this Agreement, including its Accountability provisions. The plan will enhance this provision that broadly requires Department managers to be held accountable should they fail to address use of force problems. The Panel continues to review cases involving violations of policy, such as head punches for inmate control, that result in Departmental actions that do not reflect the seriousness of the offenses. The Department must hold Deputies accountable for use of force violations and hold supervisory staff accountable when they fail to identify and/or appropriately address violations.

**1.3 Status:** Out of Compliance          **As of Date:** N/A

## 1.4 Reports to the Board of Supervisors

**Provision Description:** Department regularly reports to the Board of Supervisors on use of force status and compliance with the Action Plan.

> ***Compliance Measure:*** Report publicly at least every six months to the Board of Supervisors on use of force data, training, investigation outcome summaries, and discipline as well as overall compliance.

On November 16, 2021, Former Assistant Sheriff Brendan Corbett, a Commander in Custody Operations and Captain for Custody Compliance and Sustainability Bureau made presentations to the Board of Supervisors on the Department's work to comply with the Action Plan. The Department was scheduled to make a presentation to the Board of Supervisors in June 2022. The Board requested the presentation be moved to July 12, 2022. Former Assistant Sheriff Brendan Corbett provided an update on use of force statistics, training on use of force policies, misconduct, the Body Warn Cameras (BWC) pilot, revised WRAP directive and tracking head strike incidents. While the Department's two reports to the Board of Supervisors during the Eleventh Reporting Period covered the topics noted in the Compliance Measures, the Department's July 12, 2022 report did not address two specific areas the Board of Supervisors requested from the Department during its November 16, 2021 presentation. Specifically, the Board

12

requested the Sheriff include a five-year overview of the improvement in the jails and use of force incidents involving mentally ill inmates and incidents with those who are not mentally ill.

**1.4 Status:** Compliance          **As of Date:** June 12, 2018

# B. Management Visits

The recommendations in Sections 10.1 and 10.2 of the Action Plan address required tours of senior managers and the documentation of visits on housing units. Due to COVID-19, the Panel agreed to the development of technology-based alternatives ("virtual visits") for executives at the commander's rank and above to use in the event physical visits cannot be conducted. During the Eleventh Reporting Period, a portion of the executive visits were conducted virtually. On April 1, 2022, the Department resumed physical tours and inspections for all executives.

## 10.1 Senior Manager Tours

**Provision Description:** Senior managers ranked Unit Commanders and above should be required to periodically tour jail facilities, including nights and weekends.

> ***Compliance Measures Summary:*** 10.1(a) Unit Commanders tour at least two evenings and one weekend day per quarter.

During the Third Quarter of 2021, the Unit Commanders from MCJ and TTCF met 100% compliance, while those from IRC did not. A Corrective Action Plan was implemented, and IRC has met compliance for the remaining quarters of the Eleventh Reporting Period. The IRC Unit Commander reached 66% compliance by completing two in-person tours and one virtual tour. The virtual tour was suspended for Unit Commanders during the Eleventh Reporting Period and therefore, it was not counted as compliant. The overall compliance for Section 10.1(a) for the Third Quarter of 2021 is 88%, which falls below the 95% compliance threshold.

The Department's Eleventh Self-Assessment noted this is the first time since June 2018 that they failed to meet compliance and requests the Panel consider this factor and keep it in Compliance with Provision 10.1 as of June 30, 2018. The Panel has considered the totality of the circumstances and determined that one missed tour by one Unit Commander should not remove the Department from Compliance.

> ***Compliance Measures Summary:*** 10.1(b)–(e) Varying frequencies in visit requirements for Department executives—Unit Commanders up to Sheriff—to tour and inspect the Downtown Jail Complex.

These requirements were met for all four quarters of the Eleventh Reporting Period. The Panel notes that many of Sheriff Alex Villanueva's tours, both virtual and in person, were for very short periods of time. For example, on March 30, 2022, the Sheriff visited (in person) MCJ at 4:00 p.m., the IRC at 4:08 p.m. and TTCF at 4:13 p.m. The Panel has addressed the importance of conducting meaningful tours and inspections with Sheriff Robert Luna. In order for the Department to remain in compliance with this provision, the tours by the Department's executives will need to be of a sufficient duration to assess the operations of the facility.

**10.1 Status:** Compliance          **As of Date:** June 30, 2018

## 10.2 Housing Unit Documentation

**Provision Description:** Housing units should document visits from department managers in electronic records or visitor logs.

*Compliance Measure Summary:* Visits by Department managers to the Downtown Jail Complex are documented and made available to the Monitors.

The visits to the jail facilities by Department managers (above the rank of Sergeant) were documented in electronic visitor logs for all four quarters of the Eleventh Reporting Period.

**10.2 Status:** Compliance      **As of Date:** June 30, 2018

# C. Rotations and Transfers

The recommendations in Sections 18.1, 18.2, and 20.1 of the Action Plan address custody-wide rotation policies, semi-annual audits of unit compliance, and not assigning or transferring staff to custody as a formal sanction.

## 18.1 Custody-Wide Rotation Policy

**Provision Description:** Maintain a custody-wide rotation policy and rotate staff member as often as provided by policy.

## 18.2 Semi-Annual Rotation Audit

**Provision Description**: Conduct an audit semi-annually for each unit's compliance with rotation policies.

*Compliance Measures Summary:* Maintain facility rotation policy and audit compliance every six months. Provide reports to the Monitors to demonstrate if at least 90% of staff were rotated according to policy.

The Department's posted results reflect that the Department achieved 99.7% Compliance in the Eleventh Reporting Period. Each of the Downtown jail facilities had a current Unit Order setting forth its rotation policy and the source documents indicate that most Department personnel are rotated in Compliance with these policies.  In reviewing the Unit Orders regarding Facility Job Rotation, the Panel identified there are many posts exempted from the 6-month rotation rule and extend the rotation to twelve, twenty-four, or thirty-six months. While the Panel recognizes the need to have staff remain in certain posts beyond 6 months, there is a concern the Department may be approaching the point where the exceptions swallow the rule. The Panel requests the Administration Commander carefully review the list of posts exempted from the 6-month rotation rule and review future Unit Orders pertaining to Facility Job Rotation.

**18.1 Status:** Compliance      **As of Date:** June 30, 2018
**18.2 Status:** Compliance      **As of Date:** January 1, 2019

## 21.1 Transfers to Custody

**Provision Description:** Policy should provide that a staff member will not be assigned to Custody as a formal or informal sanction for problem Deputies.

*Compliance Measures Summary:* On a quarterly basis, personnel records are reviewed for staff transferred to Custody from other divisions and a report is provided to the Monitors identifying each staff member who was transferred to Custody within six months of a finding of misconduct or policy violation.

The Department's Eleventh Self-Assessment reflects that it maintained 100% compliance from July 1, 2021, through June 30, 2022. The Panel has reviewed the Department's source documents stating the reasons for Deputy transfers to Custody during the Eleventh Reporting Period. No Department member was transferred or assigned to Custody as a sanction for misconduct or a policy violation during the Eleventh Reporting Period.

**21.1 Status:** Compliance      **As of Date:** June 30, 2018

14

## II.    Use of Force Policies and Practices

### A. Overall Use of Force Policies

The recommendations in Sections 2.1, 8.2, 17.2, 20.1, and 20.2 of the Action Plan address the revision, modification, and organization of policy into one logical manual.

**2.1 Separate and Organized Custody Force Manual for Custody Operations**

**Provision Description:** The Action Plan requires the Department to "have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations[.]"

**8.2 Complaints of Retaliation into Grievance Policy**

**Provision Description:** Combine retaliation provisions into one grievance section to ensure a single, consistent policy on handling grievances.

**17.2 Pregnant Inmate Policy**

**Provision Description:** Combine and conform provisions related to restraints on pregnant inmates with medically ordered restraint provisions.

**20.1 Categories of Force in Policy**

**Provision Description:** Policy indicates only two types of force: reactive and planned.

The Department's Supervisor's Use of Force Investigation Form (P438) still lists various types of force (e.g., reactive, etc.) The Panel requests that the form be revised by July 1, 2023 in order to remain in Compliance with this provision.

**20.2 Reactive Force Definition**

**Provision Description:** Reactive Force is defined as force used in response to an immediate threat of safety, destruction, or escape, and when there is no time to wait for assistance.

> ***Compliance Measure Summary***: A Custody Division Manual that includes all force policies applicable to Custody Operations, including those outlined by 8.2, 17.2, 20.1, and 20.2.

On October 16, 2015, the Department provided the Panel with a Custody Operations Force Manual with separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints, Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved Shootings. The Department's Custody Force Manual satisfies Section 2.1 and includes specific provisions that satisfy Sections 8.2, 17.2, 20.1, and 20.2 of the Action Plan.

**2.1, 8.2, 17.2, 20.1, and 20.2 Status:** Compliance          **As of Date:** January 1, 2017

15

## B.  Use of Force Practices & Review of Packages

The recommendations in Sections 2.2 through 2.13, 4.1 through 4.5, 9.2, 9.3, 17.5, and 20.3 have provisions related to policy as well as application. The Panel reviewed multiple drafts of the Department's policies to implement these recommendations, required changes where appropriate, and certified that the Department had implemented these policy recommendations effective December 1, 2015.

The findings below pertain to the application of policies into practice and are supported by the selection of use of force cases reviewed. For the Eleventh Reporting Period a total of 91 packages were reviewed: 21 in 3Q21, 25 in 3Q21, 25 in 1Q22, and 20 in 2Q22. It is of note that the cases reviewed for each quarter did not necessarily occur in the quarter they were reviewed, nor was the investigation necessarily completed during that quarter. The Panel requests at least 30 cases per quarter for their review. As the cases were sent to the Panel, they were reviewed as they were received. The cases reviewed involved incidents as far back as February 2020 and through May 2022. Overall results for the Eleventh Reporting Period by provision are below. Findings for each quarter is provided in Section C: *Quarterly Findings*.

> ***Compliance Measure Summary:*** (#1-7) Within 10 days of the end of each quarter the Department will provide the Monitors with a cumulative force synopsis for each incident in the Downtown Jail Complex showing the status of force investigations. The Monitors will select a minimum of 25 force packages to review for compliance with the Action Plan of all force provisions through Vertical and Horizontal Assessments. The Department will provide each package and include a summary sheet that indicates how the Department assessed each applicable provision. Force incidents will need to be 90% or more compliant with each provision for the Vertical Assessments.

### 2.2 Force Prevention Principles

**Provision Description:** Policy provides that force be used as a last resort, with minimal amount of force necessary, terminated as soon as reasonably safe to do so, and de-escalated as resistance decreases.

Of the 91 use of force packages reviewed, 30 cases were found non-compliant with this provision, which amounts to a 67.0% compliance, which is below the 90% compliance threshold.

**2.2 Status:** Out of Compliance          **As of Date:** N/A

### 2.3 Inmate-on-Inmate Violence

**Provision Description:** Policy indicates it is a violation for staff to cause, facilitate, or provoke inmate-on-inmate violence or to expose inmates to an unreasonable risk of assault. Further, staff are prohibited from publicly humiliating inmates or using slurs or obscenities.

Of the applicable cases reviewed, 97.7% (43 out of 44) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.3 Status:** Compliance          **As of Date:** July 1, 2019

### 2.4 Use of Force as Discipline

**Provision Description:** Policy indicates use of force not be used as discipline or corporal punishment.

Of the applicable cases reviewed, 98.9% (87 out of 88) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.4 Status:** Compliance          **As of Date:** July 1, 2019

16

## 2.5 Force on Restrained Inmate

**Provision Description:** Policy indicates staff may not strike, use chemical agents, or Taser a restrained inmate, unless the inmate is assaultive, presents an immediate threat, and no other reasonable means.

Of the applicable cases reviewed, 83.6% (46 out of 55) were found to be in compliance, which is below the 90% compliance threshold.

**2.5 Status:** Out of Compliance       **As of Date:** N/A

## 2.6 Head Strikes or Kicks

**Provision Description:** It is prohibited to strike an inmate in the head, kicking an inmate who is on the ground, or kicking an inmate above the knees if not on the ground unless the inmate is assaultive and presents an imminent danger and there are no more reasonable means to avoid injury. Kicking an inmate who is not on the ground below the knees is prohibited unless used to create distance between a staff member and an assaultive inmate.

Of the applicable cases reviewed, 65.1% (56 out of 86) were found to be in compliance, which is below the 90% compliance threshold.

**2.6 Status:** Out of Compliance       **As of Date:** N/A

## 2.7 Supervisor Called to Scene

**Provision Description:** A supervisor must be called to the scene in a situation where use of force may be required as soon as time and circumstances permit.

Of the applicable cases reviewed, 81.3% (74 out of 91) were found to be in compliance, which is below the 90% compliance threshold.

**2.7 Status:** Out of Compliance       **As of Date:** N/A

## 2.8 Prevent Excessive Force

**Provision Description:** All members are responsible for preventing excessive uses of force and those who witness such events have a duty to stop, reduce, or control the use of force being used.

Of the applicable cases reviewed, 94.3% (33 out of 35 cases) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.8 Status:** Compliance       **As of Date:** July 1, 2019

## 2.9 Armed Inmates

**Provision Description:** When confronting an armed inmate, every effort should be made to control the inmate at a distance.

Of the applicable cases reviewed, 100.0% (2 out of 2 cases) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.9 Status:** Compliance       **As of Date:** July 1, 2019

## 2.10 Authorized Weapons

**Provision Description:** Department members can only use authorized weapons for which they have been trained. Any available instrument can be used to prevent imminent loss of life or serious bodily injury if no other means or alternative is available.

17

Of the applicable cases reviewed, 96.6% (57 out of 59) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.10 Status:** Compliance          **As of Date:** July 1, 2019

### 2.11 Planned Chemical Spray

**Provision Description:** After applying a chemical agent, members are required to wait a sufficient amount of time before applying additional chemical or force in a cell extraction or planned use of force.

Of the applicable cases reviewed, 90.0% (18 out of 20 cases) were found to be in compliance, which meets the 90% compliance threshold.

**2.11 Status:** Compliance          **As of Date:** January 1, 2020

### 2.12 Chemical Spray & Tasers

**Provision Description:** Chemical sprays, Tasers, and stun devices should not be used against an inmate who no longer presents a danger or is no longer resisting, ones known to suffer medical conditions that may be aggravated by use, or in a manner contradictory to manufacturer guidance or Department training.

Of the applicable cases reviewed, 93.1% (27 out of 29) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.12 Status:** Compliance          **As of Date:** July 1, 2019

### 2.13 Check of Medical Records

**Provision Description:** An inmate's medical/mental health records should be checked prior to use of chemical agents, Tasers, or stun devices when time and circumstances permit.

Of the applicable cases reviewed, 68.4% (13 out of 19 cases) were found to be in compliance, which is below the 90% compliance threshold.

**2.13 Status:** Out of Compliance          **As of Date:** N/A

### 4.1 Consult Mental Health Professionals

**Provision Description:** Require a mental health professional on-scene to attempt to resolve a situation during a cell extraction or planned use of force.

Of the applicable cases reviewed, 76.5% (13 out of 17 cases) were found to be in compliance, which is below the 90% compliance threshold.

**4.1 Status:** Out of Compliance          **As of Date:** N/A

### 4.3 Spray on Mental Health Inmates

**Provision Description:** Discontinue use of chemical following an initial burst if the inmate is acutely psychotic or severely mentally disabled and unable to conform behavior to commands.

Of the applicable cases reviewed, 100.0% (7 out of 7 cases) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.3 Status:** Compliance          **As of Date:** October 1, 2019

## 4.4 Cooling Off Periods

**Provision Description:** In situations involving a mentally ill inmate who does not present as an obvious danger to self or others is refusing to exit his or her cell, allow a reasonable cooling off period. After, a mental health professional or supervisor can attempt compliance without use of force.

Of the applicable cases reviewed, 81.3% (13 out of 16 cases) were found to be in compliance, which is below the 90% compliance threshold.

          **4.4 Status:** Out of Compliance      **As of Date:** N/A

## 4.5 Medical or Mental Health Provider Order

**Provision Description:** When a planned use of force is precipitated by a medical or mental health provider, such as for treatment purposes, the ordering provider, or designee, is given the opportunity to intervene to de-escalate and ensure order should remain in effect.

Of the applicable cases reviewed, 75.0% (3 out of 4 cases) were found to be in compliance, which is below the 90% compliance threshold.

          **4.5 Status:** Out of Compliance      **As of Date:** N/A

## 9.2 Escorting of Inmates

**Provision Description:** Following a use of force, the staff member escorting the recalcitrant inmate to medical, holding, or segregation should not be the same member involved in the confrontation.

Of the applicable cases reviewed, 95.5% (84 out of 88) were found to be in compliance, which exceeds the 90% compliance threshold.

          **9.2 Status:** Compliance      **As of Date:** January 1, 2020

## 9.3 Duty to Protect & Intervene

**Provision Description:** Members have a duty to protect and to intervene in inmate-on-inmate violence when reasonably safe to do so.

Of the applicable cases reviewed, 100.0% (32 out of 32) were found to be in compliance, which exceeds the 90% compliance threshold.

          **9.3 Status:** Compliance      **As of Date:** July 1, 2022

## 17.5 Minimize Medical Distress

**Provision Description:** Avoid, to the extent possible, placing weight on an inmate's back or shoulders in a way that impairs breathing. Once under control, place inmate on side to minimize breathing problems.

Of the applicable cases reviewed, 55.7% (44 out of 79 cases) were found to be in compliance, which is below the 90% compliance threshold.

          **17.5 Status:** Out of Compliance      **As of Date:** N/A

## 20.3 Planned Force

**Provision Description:** Planned Forces should be video recorded and include a medical professional on scene or on standby, a supervisor on scene, and with a Shift Supervisor approval.

Of the applicable cases reviewed, 68.0% (17 out of 25 cases) were found to be in compliance, which is below the 90% compliance threshold.

          **20.3 Status:** Out of Compliance      **As of Date:** N/A

## C. Quarterly Findings—Use of Force Provisions

### Third Quarter 2021 Results

In the Third Quarter of 2021, the Panel reviewed 21 force incidents—4 from TTCF, 11 from MCJ, and 6 from IRC. The Department is not in Compliance with the following Use of Force Provisions: (1) 2.2 Force Prevention Principles; (2) 2.6 Head Strikes or Kicking Inmates; (3) 2.7 Calling Supervisors to the Scene Before Physically Engaging with Recalcitrant Inmates; (4) 17.5 Minimize Medical Distress; (5) 20.1 Categories of Force; and (6) 20.3 Planned Use of Force.

> Provisions with compliance rates below 70% include the following:
> - 2.2 Force Prevention Principles at 66.7% compliance.
> - 2.6 Head Strikes or Kicking Inmates at 50.0% compliance.
> - 17.5 Minimize Medical Distress at 68.4% compliance.
> - 20.3 Planned Use of Force at 66.7% compliance. *Note this quarter included three applicable cases with one found non-compliant.

The cases reviewed for this quarter found full compliance, or 90% or above compliance, with the following provisions: 2.3, 2.4, 2.5, 2.8, 2.10 – 2.13, 4.1, 4.3 - 4.5, 9.2, and 9.3.

### Fourth Quarter 2021 Results

In the Fourth Quarter of 2021, the Panel reviewed 25 force incidents—11 from TTCF, 8 from MCJ, and 6 from IRC. The Department is not in Compliance with the following Use of Force Provisions: (1) 2.2 Force Prevention Principles; (2) 2.5 Force on Restrained Inmates; (3) 2.6 Head Strikes or Kicking Inmates; (4) 2.7 Calling Supervisors to the Scene Before Physically Engaging with Recalcitrant Inmates; (5) 2.12 Chemical Spray & Tasers; (6) 2.13 Check of Medical Records; (7) 4.1 Consult Mental Health Professionals; (8) 4.4 Cooling Off Periods; (9) 4.5 Medical or Mental Health Provider Order; (10) 17.5 Minimize Medical Distress; (11) 20.1 Categories of Force; and (12) 20.3 Planned Use of Force.

> Provisions with compliance rates below 70.0% include the following:
> - 2.2 Force Prevention Principles at 56.0% compliance.
> - 2.5 Force on Restrained Inmates at 64.7% compliance.
> - 2.6 Head Strikes or Kicking Inmates at 59.1% compliance.
> - 2.13 Check of Medical Records at 57.1% compliance.
> - 4.5 Medical or Mental Health Provider Order at 50.0% compliance.

The cases reviewed for this quarter found full compliance, or 90% or above compliance, with the following provisions: 2.3, 2.4, 2.8, 2.10, 2.11, 4.3, 9.2, and 9.3.

### First Quarter 2022 Results

In the First Quarter of 2022, the Panel reviewed 25 force incidents—7 from TTCF, 6 from MCJ, and 12 from IRC. The Department is not in Compliance with the following Use of Force Provisions: (1) 2.2 Force Prevention Principles; (2) 2.6 Head Strikes or Kicking Inmates; (3) 2.7 Calling Supervisors to the Scene Before Physically Engaging with Recalcitrant Inmates; (4) 2.8 Prevent Excessive Force; (5) 2.11 Planned Chemical Spray; (6) 2.13 Check of Medical Records; (7) 4.4 Cooling Off Periods; (8) 12.2 Location on Inmate Interviews; (9) 15.6 Separation of Deputies to Write Reports; (10) 16.2 Photographs of Injuries; (11) 17.5 Minimize Medical Distress; (12) 20.1 Categories of Force; and (13) 20.3 Planned Use of Force.

> Provisions with compliance rates below 70% include the following:
> - 2.8 Prevent Excessive Force at 66.7% compliance.
> - 17.5 Minimize Medical Distress at 44.0% compliance.

20

The cases reviewed for this quarter found full compliance, or 90% or above compliance, with the following provisions: 2.3, 2.4, 2.5, 2.9, 2.10, 2.12, 4.1, 4.3, 9.2, and 9.3.

## Second Quarter 2022 Results

In the Second Quarter of 2022, the Panel reviewed 20 force incidents—3 from TTCF, 8 from MCJ, and 9 from IRC. The Department is not in Compliance with the following Use of Force Provisions: (1) 2.2 Force Prevention Principles; (2) 2.5 Force on Restrained Inmates; (3) 2.6 Head Strikes or Kicking Inmates; (4) 2.7 Calling Supervisors to the Scene Before Physically Engaging with Recalcitrant Inmates; (5) 2.8 Prevent Excessive Force; (6) 2.13 Check of Medical Records; (7) 4.1 Consult Mental Health Professionals; (8) 4.4 Cooling Off Periods; (9) 17.5 Minimize Medical Distress; and (10) 20.3 Planned Use of Force.

> Provisions with compliance rates below 70% include the following:
> - 2.2 Force Prevention Principles at 65.0% compliance.
> - 2.13 Check of Medical Records at 60.0% compliance.
> - 4.1 Consulting Mental Health Professionals at 60.0% compliance.
> - 17.5 Minimize Medical Distress at 37.5% compliance.
> - 20.3 Planned Use of Force at 60.0% compliance.

The cases reviewed for this quarter found full compliance, or 90% or above compliance, with the following provisions: 2.3, 2.4, 2.9, 2.10, 2.12, 4.1, 4.3, 9.2, 9.3, and 20.1.

## Review of Force Incidents

The Action Plan requires that the Panel review selected force packages each quarter to assess whether the use of force is in Compliance with Sections 2.2 through 2.13, 4.1 through 4.5, 9.2, 9.3, and 17.5 (the "Force Provisions") of the Action Plan. As has been the practice of the Panel, we reviewed the problematic incidents identified during our review with Custody Commanders and took into consideration their comments in reaching the conclusions set forth in this Report. The Panel also met with Plaintiffs' counsel to review the force incidents identified as problematic by the Panel as well as additional incidents Plaintiffs' counsel considered problematic. The input of the Department and Plaintiffs' counsel was extremely helpful in reviewing and assessing compliance with the Force Provisions.

The Department continues to struggle to complete its use of force investigations in a timely manner but has worked diligently in the Eleventh Reporting Period to complete the force packages requested by the Panel. It is important to highlight the fact that the Eleventh Reporting Period is a full year, which means the Panel was seeking 100 use of force packages. The Panel recognizes the staff shortages, particularly at the Sergeant level, has a significant impact on the Department's ability to complete these investigations in a timely manner. The Panel's review of force cases with the Custody Division managers is most effective when the cases are as recent as possible. If the Panel is reviewing cases that are more than a year old, the value of the discussion between the Panel and the Department necessarily decreases.

As summarized in Provision 2.2, the four key components of force used by Department members are as follows: (a) must be used as a last resort; (b) must be minimal amount of force that is necessary and objectively reasonable to overcome the resistance; (c) must be terminated as soon as possible consistent with maintaining control of the situation; and (d) must be de-escalated if resistance decreases. A pathway to *Rosas* compliance will entail a change in force reviews, accountability and consistent employment of 'time and distance' techniques. In some cases, Deputies and Custody Assistants are not employing 'time and distance' or de-escalation techniques. Noted below are three cases in which the components of Provision 2.2 were followed and one case that was not compliant with Provision 2.2.

21

In Case 1, Deputies took Inmate A to a cell occupied by Inmate B. Inmate B verbally refused to accept Inmate A into his cell.  Believing Inmate B would cooperate, Deputies opened the cell door.  Initially, Inmate B turned around to be cuffed but pulled away after his left wrist was cuffed and then put up his fists in a fighting stance. The cuff on Inmate B's left wrist became a weapon. Instead of using a head strike, Deputies took Inmate B to the floor to be restrained. The Deputies were patient and used no head or body strikes in a risky situation.

In Case 2, Inmate C was awaiting transfer to TTCF. Inmate C cooperated by placing his hands through the door hatch to be cuffed.  After his right wrist was cuffed, he pulled away from the Deputies and was now armed with a weapon (handcuffs).  Rather than entering the cell, Deputies called for a supervisor and a planned use of force followed. Supervisors and a Mental Health Worker were brought into the incident and employed extreme patience and concern for Inmate C. After much time and effort, it became obvious Inmate C would not comply. An extraction team entered the cell and struggled with Inmate C before receiving cooperation from Inmate C.  No head strikes were employed, and Inmate C was restrained.  In one of the supervisory reviews, it was noted "Personnel did a great job throughout this incident.  Ample force mitigation efforts were made, and the personnel involved quickly adapted, changing plans and tactics accordingly as the dynamic situation unfolded."

In Case 3, Inmate D approached a Deputy, took a fighting stance and raised his fists. Deputies called for a supervisor and employed de-escalation tactics to lower Inmate D's assaultive behavior.  In a supervisory review, the report noted "Deputy B showed great restraint when Inmate D squared up with his fists raised challenging him to fight. Deputy B could have employed personnel weapons but chose not to and instead continued to talk to Inmate D to try and de-escalate him."

These three cases illustrate the professional behavior displayed by most personnel. In Case 4, Inmate E was being escorted back to his housing unit, cuffed behind his back. A Deputy put Inmate E's back to the wall of the elevator. When Inmate E pushed forward and resisted being placed against the wall, he was taken to the floor and punched 15 times by at least two Deputies.  One of the supervisory reviews of the incident concluded "…based on the facts surrounding this incident, it appears that the application of force was objectively reasonable."

The Panel believes the first three cases involved greater threats to personal safety than the last case, yet personnel used de-escalation tactics, time and distance, planning, and brought resources to resolve situations with minimal force.  Further, Supervisors recognized and praised patience and de-escalation. The fourth case, however, illustrates how inappropriate force can be embraced by Supervisors. Leadership must hold Deputies accountable for unwarranted punches for Rosas compliance.

22

# III.   Training

Sections 3.1 through 3.4 of the Action Plan require that Department members receive training on use of force policies, ethics, professionalism, and treating inmates with respect. New Department members are to receive six (6) weeks of specific training in Custody Operations. Sections 4.6 through 4.9 require the Department to provide Custody-specific, scenario-based skill development training for existing and new personnel in Crisis Intervention and Conflict Resolution and in "identifying and working with mentally ill inmates." Section 12.1 requires that Custody Sergeants receive training in conducting use of force investigations.

The Panel has previously deemed the Department to be complying "as of" the date reported by the Department for the completion of the initial training required for existing personnel. The Department's continuing compliance with the training provisions is determined by its compliance with the refresher training required every year or every other year. The Department submitted its report of refresher training compliance as part of its Eleventh Self-Assessment. Due to changes in the Panel after the *Panel's Ninth Report*, the Panel's auditors were not involved in verifying the Department's results as discussed in the *Panel's Tenth Report*. During the Eleventh Reporting Period, the Panel's auditors have conducted audits for the Department's results spanning the Tenth and Eleventh Reporting Periods to ensure that all results have been audited.

## A. Use of Force Training

### 3.1 Use of Force Training

**Provision Description:** Requires use of force training for all existing Department members in Custody Operations, which should include at a minimum, a one-time eight-hour use of force policy training course for all members assigned to custody and then a two-hour refresher course every year.

> ***Compliance Measure Summary:*** Section 3.1(a) requires that 90% of Deputies and Custody Assistants assigned to Custody as of July 1, 2016 completed the required training.

As of June 30, 2018, the Department was found to be compliant Section 3.1(a).

> ***Compliance Measure Summary:*** Section 3.1(b) requires that 90% of Deputies and Custody Assistants assigned to Custody who completed the initial training receive the two-hour refresher course every year.

The Panel's auditors previously verified the Department's reported annual refresher training results for 2018 and 2019 and the Department was found to be in Compliance with Section 3.1(b) as of December 31, 2019. In the Eighth Reporting Period, the Department reported that certain training classes were canceled or modified due to COVID-19 safety restrictions and requested that the Panel defer an assessment of this provision until the Ninth Reporting Period. In the Ninth Reporting Period, the Department requested a six-month extension to train personnel and meet compliance with Section 3.1(b). The Department posted its results for 2020 in July 2021 reflecting Compliance. The Panel's auditors could not verify the reported results for 2020.  The Department's Eleventh Self-Assessment reports that it maintained Compliance with Section 3.1(b) for 2021. The Panel's auditors verified the reported results for 2021 and determined that the Department is in Compliance for 2021.[8]

> **3.1 Status:** Compliance           **As of Date:** December 31, 2021

---

[8] The *Panel's Tenth Report* determined that the Department was out of Compliance with Section 3.1 due to the "one-year hiatus in [] training."

### 3.4 Custody-based Use of Force Scenarios

**Provision Description:** Custody-based, use of force scenarios included as part of the use of force policy training provided by the Custody Training & Standard Bureau on an in-service and refresher basis.

The use of force training approved by the Panel includes the custody-based use of force scenarios.

<b>3.4 Status:</b> Compliance      <b>As of Date:</b> June 30, 2018

## B. Ethics and Professionalism Training

### 3.2 Ethics and Professionalism Training

**Provision Description:** Requires training all existing Department members in Custody Operations, which should include at a minimum, a one-time four (4) hour training course in ethics, professionalism, and treating inmates with respect, and then a two (2) hour refresher course every other year.

> *Compliance Measure Summary:* Section 3.2(a) requires that 90% of Deputies and Custody Assistants assigned to Custody as of July 1, 2016 completed the required training.

As of June 30, 2018, the Department was found to be in Compliance with the training requirements of Section 3.2(a).

> *Compliance Measure Summary:* Section 3.2(b) requires that 90% of Deputies and Custody Assistants assigned to Custody who completed the initial training receive the two-hour refresher course every other year.

The Panel's auditors previously verified the Department's reported annual refresher training results for 2018 and 2019 and found the Department to be in Compliance with Section 3.2(b) as of December 31, 2019. In the Eighth Reporting Period, the Department reported that certain training classes were canceled or modified due to COVID-19 safety restrictions and requested that the Panel defer an assessment of this provision until the Ninth Reporting Period. In the Ninth Reporting Period, the Department requested a six-month extension to train personnel and meet compliance with Section 3.2(b). The Department posted its results for 2020 in July 2021 reflecting Compliance. The reported refresher training results for 2020 have been verified by the Panel's auditors.

The Department's Eleventh Self-Assessment reports that it maintained compliance with Section 3.2(b) for 2021. The reported results for 2021 have been verified by the Panel's auditors and determined that the Department is in Compliance for 2021.[9]

<b>3.2 Status:</b> Compliance      <b>As of Date:</b> June 30, 2018

## C. Mental Health Training

### 4.6 Crisis Intervention

**Provision Description:** The Department should provide a minimum of 32 hours of custody-specific, scenario-based, skill development training to all Deputy Sheriffs on Crisis Intervention and Conflict Resolution with eight (8) hours of refresher training every other year.

---

[9] The *Panel's Tenth Report* determined that the Department was out of Compliance with Section 3.2.

## 4.7 Mentally Ill Inmates

**Provision Description:** The Department should provide a minimum of eight (8) hours of custody specific, scenario based, skill development training on identifying and working with mentally ill inmates to all existing Custody personnel with a four (4) hour refresher course every other year.

> **Compliance Measure Summary:** Sections 4.6(a) and 4.7(a) requires that 90% of Deputies assigned to Custody as of July 1, 2016 completed the required training.

As of June 30, 2018, the Department was found to be Compliant with the De-Escalation and Verbal Resolution Training (DeVRT), mentally ill inmates, and refresher training requirements of Sections 4.6(a) and 4.7(a).[10]

> **Compliance Measure Summary:** Sections 4.6(b) and 4.7(b) requires that 90% of Deputies assigned to Custody who completed the initial training receive the eight-hour refresher course every other year.

The Panel's auditors previously verified the Department's reported annual refresher training results for 2018 and 2019 and the Department was found to be in Compliance with Sections 4.6(b) and 4.7(b) as of December 31, 2019. In the Eighth Reporting Period, the Department reported that certain training classes were canceled or modified due to COVID-19 safety restrictions and requested that the Panel defer an assessment of this provision until the Ninth Reporting Period. In the Ninth Reporting Period, the Department requested a six-month extension to train personnel and meet compliance with Sections 4.6(b) and 4.7(b). The Department posted its results for 2020 in July 2021 reflecting Compliance. The reported results for 2020 have been verified by the Panel's auditors.

The Department's Eleventh Self-Assessment reports that it maintained compliance with Section 4.6(b) for 2021. These results have been verified by the Panel's auditors and the Department is in Compliance with Section 4.6 as of June 30, 2018 through December 31, 2021.

The Department's Eleventh Self-Assessment also reports that the Department was unable to maintain Compliance with Section 4.7(b) for 2021. Therefore, the Department is out of Compliance with Section 4.7 for 2021.[11]

|  |  |
|---|---|
| **4.6 Status:** Compliance | **As of Date:** June 30, 2018 |
| **4.7 Status:** Out of Compliance | **As of Date:** N/A |

# D. New Deputy Sheriffs and Custody Assistants

## 3.3 Custody Training

**Provision Description:** Section 3.3 of the Action Plan requires training all new Deputies in use of force and ethics, professionalism, and treating inmates with respect. Section 3.3 also requires the same for new Custody Assistants, who have received training in these subjects during their Academy training.

---

[10] Section 4.6 pertains to Deputies assigned to MCJ, TTCF, IRC, or assigned to work with mentally ill inmates at CRDF (the "Designated Facilities"). Section 4.7 pertains to remaining Deputies at CRDF, and all Deputies at NCCF and PDC jails. The Action Plan requires an initial eight (8) hour training course, and then a four (4) hour refresher course every other year under Section 4.7. Deputies captured under Section 4.7 receive the same training as Deputies under Section 4.6, which includes the training contemplated under Section 4.7.

[11] The *Panel's Tenth Report* determined that the Department was out of Compliance with Section 4.7. It did not contain a compliance rating for Section 4.6.

*Compliance Measure Summary:* Section 3.3 requires that 95% of new Deputies and Custody Assistants completed the required training.

The Department reported that since the First Reporting Period beginning on July 1, 2015, newly assigned Deputies have been required to complete a six-week Custody Operations course that includes training in use of force and ethics, professionalism and treating inmates with respect, and new Custody Assistants, have received training in these subjects during their Academy training as required by Section 3.3. The Panel's auditors previously verified results through September 30, 2020. The Department's posted results reflect that the Department has met the 95% Compliance threshold through June 30, 2022. The results have been verified by the Panel's auditors and the Department is in Compliance with Section 3.3 as of June 30, 2018 through June 30, 2022.

**3.3 Status:** Compliance          **As of Date:** June 30, 2018

## 4.8 Mentally Ill—New Staff

**Provision Description:** Provide a minimum of eight (8) hours of custody specific, scenario-based, skill development training on identifying and working with mentally ill inmates to all new members as part of the Jail Operations Continuum.

## 4.9 Crisis Intervention—New Staff

**Provision Description:** Provide a minimum of 32 hours of custody specific, scenario-based, skill development training in Crisis Intervention and Conflict Resolution to new Department members in the Academy or in Custody before they are assigned to any jail facilities.

*Compliance Measure Summary:* Sections 4.8 and 4.9 requires that 95% of new Deputies and Custody Assistants completed the required training.

The Department provides new Deputies in De-Escalation and Verbal Resolution Training (DeVRT) and training in identifying and working with mentally ill inmates (IIMI).[12]  The required DeVRT and IIMI training takes place after Deputy Sheriffs and Custody Assistant Academy graduations and prior to assuming duties at their unit of assignment. The Panel's auditors previously verified the Department was in Compliance with Sections 4.8 and 4.9 as of June 30, 2018, through December 31, 2020. In the Tenth Reporting Period, the Department reported that there were no new Deputy or Custody Assistant Graduations in the First Quarter of 2021 and that 100% of new Deputies and Custody Assistants had received the required training in the Second Quarter of 2021. The Department's Eleventh Self-Assessment reports that there new no new Deputy or Custody Assistant Graduations in the Third Quarter of 2021 and that 100% of the new personnel received the required training in the Fourth Quarter of 2021 and First and Second Quarters of 2022. These results have been verified by the Panel's auditors and the Department is in Compliance with Sections 4.8 and 4.9 as of June 30, 2018 through June 30, 2022.

**4.8 and 4.9 Status:** Compliance          **As of Date:** June 30, 2018

## 3.5 Additional Training and Mentoring

**Provision Description:** Requires Unit Commanders to determine "what additional training, counseling, or mentoring may be required when a personnel complaint involving the use of force is resolved with a finding that it 'Appears Employee Conduct Could Have Been Better' direct that the Department member undergo additional training, counseling, or mentoring, and document the action taken."

*Compliance Measure Summary:* Section 3.5 requires that 90% of personnel complaints involving use of force that were resolved with a "Appears Employee Conduct Could

---

[12] The Panel has previously agreed that IIMI is included in the DeVRT curriculum of Section 4.9.

Have Been Better" finding reflect documentation that the Unit Commander reasonably determined what additional training, counseling or mentoring was required.

The Department's Eleventh Self-Assessment reports that there were no inmate grievances against staff involving use of force where the disposition was that it "Appears Employee Conduct Could Have Been Better." The Department is in Compliance with Section 3.5 as July 1, 2019 through June 30, 2022.

**3.5 Status:** Compliance            **As of Date:** July 1, 2019

## 3.6 Probation Reviews

**Provision Description:** Requires Unit Commanders to review new Department members within six (6) months of being initially assigned to Custody and again before the end of their probationary period.

*Compliance Measure Summary:* Section 3.6 requires that 95% of the new Department members in Custody Operations were reviewed (1) within six months after being assigned to Custody and (2) again before their first post-probationary assignment.

The Department's Eleventh Self-Assessment reports that it achieved 92% compliance in the Second Semester of 2021 and First Semester of 2022, less than the 95% threshold required by Section 3.6. Therefore, the Department is out of Compliance with Section 3.6.

**3.6 Status:** Out of Compliance            **As of Date:** N/A

## E. Sergeant Training

## 12.1 Force Investigations Training

**Provision Description:** Requires that all Custody Sergeants receive an initial 16-hour block of training in conducting use of force investigations, reviewing use of force reports, and the Department's protocols for conducting such investigations. It also requires a two (2) hour refresher course every year.

*Compliance Measure Summary:* Section 12.1-1 requires that 90% of all Custody Sergeants received the initial training and a two (2) hour refresher course every year. Section 12.1-2 requires that 95% of new Sergeants completed the required training before or within 90 days after they assume their duties in Custody.

The Panel approved the 16-hour initial training course required by Section 12.1 on February 24, 2017. The Panel's auditors previously verified Compliance with Section 12.1 as of July 1, 2019, through December 31, 2020. The Department's posted results reflect that there were no newly promoted Sergeants in the First Quarter of 2021 and that 100% of Sergeants received the required training in the Second Quarter of 2021. The Department's Eleventh Self-Assessment reports that it maintained compliance through June 30, 2022. These results have been verified by the Panel's auditors and the Department is in Compliance with Section 12.1 as of July 1, 2019 through June 30, 2022.

**12.1 Status:** Compliance            **As of Date:** July 1, 2019

27

# IV.      Reporting and Investigation of Force Incidents

## A. Reporting and Investigation Provisions in Force Package Reviews

The findings below pertain to the application of policies into practice and are supported by the selection of use of force cases reviewed. For the Eleventh Reporting Period a total of 91 packages were reviewed: 21 in 3Q21, 25 in 3Q21, 25 in 1Q22, and 20 in 2Q22. Overall results for each provision during the Eleventh Reporting Period are below. Findings for each quarter are in *Section C: Quarterly Findings*.

> ***Compliance Measure Summary:*** (#1-7) Within 10 days of the end of each quarter the Department will provide the Monitors with a cumulative force synopsis for each incident in the Downtown Jail Complex. The Monitors will select a minimum of 25 force packages to review for compliance with the Action Plan of all reporting and investigations provisions through Vertical and Horizontal Assessments. The Department will provide each package and include a summary sheet that indicates how the Department assessed each applicable provision. Reporting and Investigations provisions will need to be 90% or more compliant for the Vertical Assessments.

### 4.2 Mental Health Professionals

**Provision Description:** Supervisors investigating uses of force are required to interview mental health professionals who witnessed the incident or attempted to resolve it. Record interview if consented to.

Of the applicable cases reviewed, 66.7% (10 out of 15 cases) were found to be in compliance, which is below the 90% compliance threshold.

**4.2 Status:** Out of Compliance          **As of Date:** N/A

### 5.2 Commander's Reviews

**Provision Description:** Evaluations of force incidents by Unit Commanders are reviewed pursuant to the category level requirement.

Of the applicable cases reviewed, 86.8% (79 out of 91) were found to be in compliance, which is below the 90% compliance threshold.

**5.2 Status:** Out of Compliance          **As of Date:** N/A

### 5.3 Unexplained Discrepancies

**Provision Description:** Any unexplained tactical decisions or discrepancies among witnesses should be referred in writing between the reviewing Commander(s) and investigator.

Of the applicable cases reviewed, 91.3% (63 out of 69) were found to be in compliance, which exceeds the 90% threshold.

**5.3 Status:** Compliance          **As of Date:** July 1, 2022

### 12.2 Location of Inmate Interviews

**Provision Description:** Inmate witnesses to force incidents should be asked to be interviewed, and interviewed, away from other inmates.

Of the applicable cases reviewed, 56.3% (36 out of 64) were found to be in compliance, which is below the 90% compliance threshold.

**12.2 Status:** Out of Compliance          **As of Date:** N/A

## 12.3 Suspect Interviews

**Provision Description:** No Department member involved in the use of force should be present for or participate in the interviews.

Of the applicable cases reviewed, 94.4% (85 out of 90) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.3 Status:** Compliance          **As of Date:** July 1, 2019

## 12.4 Uninvolved Supervisors

**Provision Description:** Force investigations should not be conducted by the direct supervisor of the staff member involved in the use of force.

Of the applicable cases reviewed, 90.1% (82 out of 91) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.4 Status:** Compliance          **As of Date:** July 1, 2019

## 12.5 Standard Order and Format

**Provision Description:** Use of force packages organized in a standard order and format.

Of the applicable cases reviewed, 98.9% (89 out of 90) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.5 Status:** Compliance          **As of Date:** July 1, 2019

## 15.1 Timeliness of Reports

**Provision Description:** Every staff member who uses or assists in a force incident completes a separate and independent written report before going off duty.

Of the applicable cases reviewed, 92.2% (83 out of 90) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.1 Status:** Compliance          **As of Date:** July 1, 2019

## 15.2 All Department Witnesses

**Provision Description:** Each staff member who witnesses a use of force prepares a written report unless the Watch Commander specifically designates a witness when a large number witnessed the same event.

Of the applicable cases reviewed, 94.5% (86 out of 91) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.2 Status:** Compliance          **As of Date:** July 1, 2019

## 15.3 Force by Other Members

**Provision Description:** Staff member who uses force describes the type used in a written report as well the type used by others.

Of the applicable cases reviewed, 82.2% (74 out of 90) were found to be in compliance, which is below the 90% compliance threshold.

**15.3 Status:** Out of Compliance          **As of Date:** N/A

29

## 15.4 Description of Injuries

**Provision Description:** Staff members who use of witness a use of force describe visible or apparent injuries to department members, inmates, or others involved.

Of the applicable cases reviewed, 90.0% (81 out of 90) were found to be in compliance, which meets the 90% compliance threshold.

**15.4 Status:** Compliance          **As of Date:** April 1, 2020

## 15.5 Clarification After Video

**Provision Description:** A Department member who wants to make any clarifications or changes after viewing a video of a force incident should be required to either prepare a supplemental report or specifically note any changes to the Department member's initial report.

Of the applicable cases reviewed, 94.1% (32 out of 34) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.5 Status:** Compliance          **As of Date:** July 1, 2019

## 15.6 Separation of Deputies

**Provision Description:** To the extent practical, Department members should be separated until they have completed their use of force reports and/or witness reports.

Of the applicable cases reviewed, 4.6% (4 out of 88) were found to be in compliance, which is below the 90% compliance threshold. The Panel has advised the Department on how to document how the Deputies were separated to complete their reports.

**15.6 Status:** Out of Compliance          **As of Date:** N/A

## 15.7 Individual Perceptions

**Provision Description:** Report reviewers ensure each report reflects individual perceptions and recollections of the events and that they do not have common wording or phrasing.

Of the applicable cases reviewed, 92.3% (84 out of 91) were found to be in compliance, which exceeds the compliance threshold.

**15.7 Status:** Compliance          **As of Date:** July 1, 2019

## 16.1 Healthcare Assessment

**Provision Description:** A documented medical assessment of each inmate upon whom force is used as soon as practical after the force incident.

Of the applicable cases reviewed, 94.3% (83 out of 88) were found to be in compliance, which exceeds the compliance threshold.

**16.1 Status:** Compliance          **As of Date:** July 1, 2019

## 16.2 Photographs of Injuries

**Provision Description:** Supervisors investigating force incidents photograph any injury, swelling, or redness sustained by staff members and document the absence of injury.

Of the applicable cases reviewed, 74.1% (40 out of 54) were found to be in compliance, which is below the 90% compliance threshold.

**16.2 Status:** Out of Compliance          **As of Date:** N/A

30

## 16.3 Medical Report of Injuries

**Provision Description:** Medical staff treating an injured inmate report any injuries related to a use of force or an allegation by the inmate of a use of force.

Of the applicable cases reviewed, 96.1% (73 out of 76) were found to be in compliance, which exceeds the compliance threshold.

**16.3 Status:** Compliance          **As of Date:** July 1, 2019

# B. Reporting & Investigations Provisions as Reported by Department

Many of the recommendations in the Action Plan that pertain to the reporting and investigation of force used by Department personnel in Custody Operations are assessed by the Panel through a review of the completed force packages. Other provisions are reported by the Department as follows:

## 5.1 Tracking of Force Incidents

**Provision Description:** Requires the Department to track the status of all investigations, reviews, and evaluations of all use of force incidents and allegations to ensure they were completed appropriately and timely. By the end of the shift, a supervisor or Internal Affairs investigator enters incidents into database with a summary and an initial category classification.

> *Compliance Measure Summary:* 5.1(2) On a quarterly basis, Monitors determine if the completed force packages reviewed were entered into the database pursuant to 5.1(1).

The Department reports that 100% of the force incidents were timely entered into the database in the Third and Fourth Quarter of 2021 and the Second Quarter of 2022. Twenty-two out of twenty-three force incidents were timely entered into the database during the First Quarter of 2022 resulting in 95.7% Compliance rating for that quarter.

> *Compliance Measures Summary:*
> 5.1(1) and (4a): 95% of use of force incidents are entered into the database within two hours of the end of shift in which the incident occurred.
> 5.1(4)b and c: 90% of investigations of Deputies and Custody Assistants were completed timely and appropriately.

The information provided by the Department in the Eleventh Self-Assessment and posted in their database for Section 5.1 pertains to Compliance Measures 1 and 4(a) of 5.1. This is the same universe of information the Department has provided for years and which the Panel has determined the Department to be in Compliance. No information has been provided related to Compliance Measure 4(b) or 4(c). The Panel randomly reviewed ten of the use of force packages they reviewed for the Eleventh Reporting Period and found the investigations were completed within the statutory timeframes.

**5.1 Status:** Compliance*          **As of Date:** October 1, 2019

*The Panel has advised the Department that in order to remain in Compliance with this provision, they need to provide the data that demonstrates their compliance with Compliance Measures 4(a), (b) and (c) beginning in 2023.

## 8.3 CFRC Review

**Provision Description:** Evaluations of grievance investigations claiming force was used to retaliate against an inmate should be reviewed by the Custody Force Review Committee.

31

*Compliance Measures Summary:* A list of completed investigations of inmate grievances claiming use of force was used in retaliation is provided quarterly to the Monitors and will include the CFRC review of the investigation's evaluation.

The Department reports, and the Panel concurs, that it achieved 100% Compliance with this provision in the Third and Fourth Quarters of 2021 and First and Second Quarters of 2022. There were 11 grievances reviewed in the Third Quarter of 2021, 4 in the Fourth Quarter of 2021, 11 in the First Quarter of 2022, and 17 in the Second Quarter of 2022. In many of these grievances, inmates had checked all boxes available, including Emergency, Use of Force, Retaliation, and Harassment.

**8.3 Status:** Compliance                 **As of Date:** June 30, 2021

## 11.1 CFRT Involvement

**Provision Description:** The Custody Force Rollout Team (CFRT) involvement in reviewing evaluations should not delay the investigation.

*Compliance Measure Summary*: 95% of the investigations reviewed by CFRT were not delayed and discipline imposed timely if there is a policy violation finding.

There were no force incidents reviewed by CFRT where there was a finding of a policy violation or misconduct in all four quarters of the Eleventh Reporting Period.

**11.1 Status:** Compliance                 **As of Date:** June 30, 2018

## 13.1 Documenting Dishonesty

**Provision Description:** A firm zero tolerance policy for acts of dishonesty, use of excessive force, failures to report uses of force, and violations of PREA. For any staff member not terminated for such an act documentation is made as to the reason and the discipline imposed as well as placement on a monitored performance review program.

*Compliance Measures Summary:* 95% compliance with all completed investigations where there was a finding of dishonesty, failure to report uses of force, or PREA violations as well as documentation for incidents that did not result in termination.

The Department's Self-Assessment indicates they achieved 100% compliance in all four quarters of the Eleventh Reporting Period. The following is a summary of the data posted for each quarter.

- Third Quarter of 2021: Two Deputies were terminated for dishonesty—both cases involved off-duty misconduct. One Deputy received a one-day suspension, required to take several classes, placed on a Unit Level Performance Mentorship, and was transferred to the Patrol Division for a violation of the Department's Force Prevention policy.
- Fourth Quarter of 2021: There were a total of five incidents for this quarter. In one use of force incident, a Deputy was discharged due to violations of the Honesty Policy. In a second incident, a Deputy was relieved of duty related to off-duty misconduct. In a third incident involving two deputies, one Deputy received a five-day suspension and was placed on Unit Level Performance Mentorship. The other Deputy received a three-day suspension for a violation of the Recalcitrant Inmate Policy.  The Department does not consider violations of this policy to fall within the scope of 13.1. In a fourth incident, a Custody Assistant received a five-day suspension and was placed on a Unit Level Performance Mentorship Program. This incident also involved a Deputy who received a two-day suspension and three Deputies who received written reprimands. These four staff members received discipline for violation of the Recalcitrant Inmate Policy. Finally, in a

fifth incident, a Deputy was removed from a Bonus Position and placed on a Unit Level Performance Mentorship.

- First Quarter of 2022: One Sergeant received a five-day suspension, was placed in Unit Performance Mentoring, and transferred to Patrol for force-related violations.
- Second Quarter of 2022: Two incidents occurred—a Custody Assistant resigned following PREA allegations and a Deputy received a written reprimand for violating Performance Standards (force related). The employee was not placed on a monitored formal Performance Review Program.

The Panel believes violations of the Recalcitrant Inmate Policy may fall within the criteria of 13.1, specifically under the category of excessive force. The facts noted in the posted documentation indicate the distinction between the sustained charges in these use of force cases is not significant enough to warrant not placing someone in a Performance Mentoring Program. The Panel, however, recognizes this standard had not previously been made known to the Department and, therefore, will not find the Department out of compliance for failing to include these cases in their reporting. Moreover, the Panel acknowledges there may be violations of the Recalcitrant Inmate Policy that would not fall in the scope of 13.1. The Panel finds the Department in Compliance with 13.1 for this Reporting Period.

The Panel has previously noted concerns with Use of Force packages including staff reports that are inaccurate and self-serving, but which are not treated as "dishonesty" or "integrity" issues—see Seventh Report (p. 18), Eighth Report (p. 15) and Ninth Report (p. 15, Fn 26). In a few of the force packages reviewed for this Reporting Period, the Panel saw staff reports that were either inconsistent with the video evidence or were not forthcoming about their own actions. For example, a Deputy had placed his knee on an inmate's neck for 46 seconds. In his report, he noted he had "inadvertently" positioned his knee over the inmate's upper back and neck area. This characterization was not identified as dishonest or problematic in the supervisory reviews of the matter.

The Panel recognizes the need for accountability regarding staff's accurate and honest reporting in force packages. The Panel plans to revise the Compliance Measure for 13.1 and will share a draft with the Parties prior to implementation.

**13.1 Status:** Compliance          **As of Date:** October 1, 2019

## 13.2 Reports of Dishonesty and PREA

**Provision Description:** All findings of dishonesty, failures to report uses of force, and violations of PREA and supporting documentation is provided to the Office of the Inspector General quarterly.

The Inspector General was advised of all the actions noted above in Section 13.1.

**13.2 Status:** Compliance          **As of Date:** October 1, 2019

## 14.1 Review of Criminal Referrals

**Provision Description:** An additional review of referrals of inmates for criminal prosecution arising from incidents involving the use of force by Department members to ensure charges are not being brought to help justify the use of force.

*Compliance Measures Summary:* Requires the Department review all referrals of an inmate for criminal prosecution for assaulting a staff member and report to the Monitors that 95% of referrals were reviewed by the Unit Commander who verified charges were brought as justification for use of force.

33

The Department reports 100% compliance with Section 14.1 for the Third Quarter of 2021 and the First and Second Quarters of 2022. For the Fourth Quarter of 2021, the Department reports 96% Compliance, indicating 25 cases were reviewed by a Unit Commander before the criminal referral was sent and one case was sent prior to review by the Unit Commander.

**14.1 Status:** Compliance              **As of Date:** July 1, 2018

## 14.2 Timeliness of Criminal Referrals

**Provision Description:** Timely forward incidents of officer misconduct that may amount to criminal violations to the Office of the District Attorney.

> *Compliance Measures Summary:* Requires the Department review all referrals of a staff member for possible prosecution for alleged misconduct and report to the Monitors that 90% of referrals were sent to the Office of the District Attorney within six months.

Source documents indicate there was one case referred to the District Attorney for possible prosecution of a staff member, which was referred in the First Quarter of 2022. Upon further review of this matter, it was determined the incident was not force-related and therefore, outside of the scope of this Provision.

**14.2 Status:** Compliance              **As of Date:** July 1, 2018

# C. Quarterly Findings—Reporting and Investigations Provisions

## Third Quarter 2021 Results

Third Quarter 2021, the Panel reviewed 21 force incidents—11 from MCJ, 6 from IRC, and 4 from TTCF. The Department is not in Compliance with the following Reporting & Investigations Provisions: (1) 5.2 Commanders' Reviews; (2) 5.3 Unexplained Discrepancies in Reports; (3) 12.2 Location of Inmate Interviews; (4) 12.4 Uninvolved Supervisors; (5) 15.1 Timeliness of Force Reports; (6) 15.3 Force by Others; (7) 15.6 Separation of Deputies to Write Reports; and (8) 16.2 Photographs of Injuries.

> Provisions with the lowest compliance rates include the following:
> - 12.2 Location of Inmate Interviews at 53.3% compliance.
> - 15.6 Separation of Deputies to Write Reports at 0.0% compliance.
> - 16.2 Photographs of Injuries with 63.6%.

The cases reviewed for this quarter found full compliance or 90% or above compliance with the following provisions: 4.2, 12.3, 15.1, 15.2, 15.4, 15.7, 16.1, and 16.3.

## Fourth Quarter 2021 Results

Fourth Quarter 2021, the Panel reviewed 25 force incidents—8 from MCJ, 6 from IRC, and 11 from TTCF. The Department is not in Compliance with the following Reporting & Investigations Provisions: (1) 4.2 Mental Health Professionals; (2) 5.2 Commanders' Reviews; (3) 12.2 Location on Inmate Interviews; (4) 12.4 Uninvolved Supervisors; (5) 15.1 Timeliness of Force Reports; (6) 15.3 Force by Others; (7) 15.5 Clarification After Video; (8) 15.6 Separation of Deputies to Write Reports; (9) 15.7 Individual Perceptions; and (10) 16.2 Photographs of Injuries.

> Provisions with compliance rates below 70% include the following:
> - 4.2 Mental Health Professionals at 50.0% compliance.
> - 12.2 Location of Inmate Interviews at 52.2% compliance.
> - 15.6 Separation of Deputies to Write Reports at 8.0% compliance.
> - 16.2 Photographs of Injuries at 61.5% compliance.

34

The cases reviewed for this quarter found full compliance or 90% or above compliance with the following provisions: 5.3, 12.3, 12.4, 12.5, 15.2, 16.1, and 16.3. It is of note that provisions 12.4, 15.1, and 15.7 each resulted in 88.0% compliance.

## First Quarter 2022 Results

First Quarter 2022, the Panel reviewed 25 force incidents—6 from MCJ, 12 from IRC, and 7 from TTCF. The Department is not in Compliance with the following Reporting & Investigations Provisions: (1) 4.2 Mental Health Professionals; (2) 12.2 Location on Inmate Interviews; (3) 14.2 Timeliness of Criminal Referrals; (4) 15.6 Separation of Deputies to Write Reports; and (5) 16.2 Photographs of Injuries.

> Provisions with compliance rates below 70% include the following:
> - 12.2 Location on Inmate Interviews at 60.0%.
> - 15.6 Separation of Deputies to Write Reports at 4.2%.

The cases reviewed for this quarter found full compliance or 90% or above compliance with the following provisions: 5.2, 5.3, 12.3, 12.5, 15.1 – 15.5, 15.7, 16.1, and 16.3. It is of note that Provision 12.4 resulted in 88% compliance.

## Second Quarter 2022 Results

Second Quarter 2022, the Panel reviewed 20 force incidents—8 from MCJ, 9 from IRC, and 3 from TTCF. The Department is not in Compliance with the following Reporting & Investigations Provisions: (1) 4.2 Mental Health Professionals; (2) 12.2 Location of Inmate Interviews; and (3) 15.6 Separation of Deputies to Write Reports.

> Provisions with compliance rates below 70% include the following
> - 12.2 Location on Inmate Interviews at 63.6% compliance.
> - 15.6 Separation of Deputies to Write Reports at 5.6% compliance.

The cases reviewed for this quarter found full compliance or 90% or above compliance with the following provisions: 5.2, 5.3, 12.3, 12.4, 12.5, 15.1, 15.2, 15.4, 15.5, 15.7, 16.1, and 16.3.

# V. Inmate Grievances

The Action Plan requires extensive changes in how the Department handles inmate grievances and requests for service. On July 15, 2016, the Department issued a new *Inmate Grievance Manual* (Volume 8 of the Custody Division Manual) to implement a new grievance system. The Panel assessed the Department's implementation of the new grievance system in the Eleventh Reporting Period as follows:

## A. Grievance Forms

### 6.1 Separate Grievance Forms

**Provision Description:** Inmate grievances and inmate requests reported on separate forms, either paper or electronically.

### 6.2 Availability of Grievance Forms

**Provision Description:** Grievance forms are reasonably available to inmates at all times.

During the Panel's June 2022 visit to the Downtown Jail Complex, they noted there were a few boxes within housing units that did not contain any blank grievance forms. When asked about the absence of the forms, staff noted the forms were available at the officer's station. Staff indicated the reason the forms were not out in the box was because inmates were using the forms for purposes other than filing grievances (e.g., gambling slips, etc.). The Panel asked a couple of inmates in those areas whether they knew how to access grievance forms and they said they could go to the officer's station. The Panel advised County Counsel's office of their observations regarding the grievance forms and highlighted the importance of having the forms accessible.[13]

### 6.6 Right to Appeal Form

**Provision Description:** Grievance forms include a check box indicating whether the complaint was upheld or denied and a statement regarding the right to appeal and time frame.

> ***Compliance Measures Summary:*** Monitors determine the availability of forms and requirements of 6.1 through 6.6 through onsite visits, interviews with inmates and staff, and a review of 25 consecutive force and retaliation grievances in a month.

The Panel has previously concluded that the forms meet the requirements of the Action Plan and include the appeals check box.

**6.1, 6.2, and 6.6 Status:** Compliance     **As of Date:** January 1, 2017

### 7.1 Conflict Resolution Meeting

**Provision Description:** Inmates who submit grievances should be advised that a conflict resolution meeting is voluntary to address the grievances without a personnel investigation. If successful, the grievance resolution is documented accordingly.

In the randomly selected months in the Third and Fourth Quarters of 2021 as well as the Second Quarter of 2022 there were zero Conflict Resolution Meetings held. In the randomly selected month during the First Quarter of 2022 there were three meetings held and documented accordingly.

**7.1 Status:** Compliance     **As of Date:** January 1, 2017

---

[13] The grievance forms were located in the boxes in the housing units the Panel toured during the November 2022 visit to the Downtown Jail Complex.

## 6.4 Use of Force Grievances

**Provision Description:** Grievance forms should include "use of force" as a specific category of "grievances against staff" and brought to the attention of Unit Commanders.

>   ***Compliance Measure Summary:*** 90% of force grievances reviewed were brought to the attention of the Unit Commander within 10 days of receipt and properly handled.

Based upon a review of the relevant grievances in the randomly selected months, the Department reports that 70% of force grievances were in Compliance with Section 6.4 in the Third Quarter of 2021. There was a total of 17 grievances that met the criteria for Section 6.4—12 were properly handled and five were not. According to the Department, the Custody Automated Reporting and Tracking System (CARTS) usually generates a Unit Commander Notification e-mail to ensure grievances against staff are brought to the Unit Commander's attention. Due to a server failure during the last two weeks of September 2021, these emails were not being sent to the Unit Commanders and the system was not generating an error message, so facilities were unaware the Unit Commander was not getting notified. CCSB will coordinate a plan to ensure Unit Commanders are notified within the timeframe if the system fails in the future. The Department notes it has been compliant with Section 6.4 since July 1, 2018, and requests the Panel find it Compliant for the Eleventh Reporting Period. It achieved 100% Compliance in the Second Quarter of 2021 as well as the First and Second Quarters of 2022. Considering the server failure and plans to address the notifications should a similar situation arise, as well as the three quarters of 100% compliance, the Panel finds the Department is in Compliance with Section 6.4 for the Eleventh Reporting Period.

**6.4 Status:** Compliance                    **As of Date:** July 1, 2018

## 6.5 Grievances Against Staff

**Provision Description:** Grievance forms should include "retaliation" and "harassment" as specific categories of "grievances against staff" and brought to the attention of Unit Commanders.

>   ***Compliance Measure Summary:*** 90% retaliation grievances reviewed were brought to the attention of the Unit Commander within 10 days of receipt and properly handled.

The Department reports that 100% of the retaliation grievances in the Third and Fourth Quarters of 2021 and the Second Quarter of 2022 were brought to the Unit Commanders attention within 10 days and handled appropriately. In the First Quarter of 2022, 95% of the grievances were handled appropriately.

**6.5 Status:** Compliance                    **As of Date:** July 1, 2018

# B. Emergency Grievances

## 6.3 Emergency Grievance Forms

**Provision Description:** A prominent box is placed on the form to indicate an "Emergency Grievance."

>   ***Compliance Measure Summary:*** Monitors verify compliance with 6.3 through interviews of staff and inmates and review of grievances marked "emergency.

A prominent box is located on the grievance form and confirmed through reviews and interviews.

**6.3 Status:** Compliance                    **As of Date:** January 1, 2017

### 6.7 Handling Emergency Grievances

**Provision Description:** Grievances marked "emergency" are given to and reviewed by a supervisor as soon as possible to determine if immediate action is needed to protect life or safety. Provide the inmate a written response documenting action taken to address the emergency.

> ***Compliance Measure Summary:*** Monitors review 50 consecutive grievances to ensure 95% of grievances marked "emergency" were reviewed and handled pursuant to Section 6.7.

Third Quarter 2021: Based upon the review of the grievances marked "emergency" in the month randomly selected by the Panel, the Department reports there were 10 grievances that met the criteria for Section 6.7 and 90% were in compliance, which falls below the 95% compliance threshold.

Fourth Quarter 2021: Based upon the review of the grievances marked "emergency" in the month randomly selected by the Panel, the Department reports there were 9 grievances that met the criteria for Section 6.7 and 88% were in compliance, which falls below the 95% compliance threshold.

First Quarter 2022: Based upon the review of the grievances marked "emergency" in the month randomly selected by the Panel, the Department reports there were 8 grievances that met the criteria for Section 6.7 and 100% were in compliance, which exceeds the 95% compliance threshold.

Second Quarter 2022: Based upon the review of the grievances marked "emergency" in the month randomly selected by the Panel, the Department reports there were 9 grievances that met the criteria for Section 6.7 and 100% were in compliance, which exceeds the 95% compliance threshold.

The Department's Self-Assessment for this provision appears to be more restrictive than the provision provides. The Panel does not interpret the five-day notification requirement applicable to Section 6.7.

**6.7 Status:** Compliance  **As of Date:** July 1, 2018

### 6.8 Notification of Non-Emergency

**Provision Description:** If the grievance is determined to be non-emergent, the inmate is notified as soon as practical that the grievance will be handled as non-emergent with reason documented.

> ***Compliance Measure Summary:*** Monitors review 50 consecutive grievances to ensure 90% of those determined non-emergent were documented and notifications to inmates were made within five days.

Third Quarter 2021 through Second Quarter 2022: The Panel has reviewed the 50 grievances produced from each of the four quarters of the Eleventh Reporting Period in which a grievance marked "emergency" was downgraded. In all four quarters, it was found that 100% of instances were correctly downgraded, which exceeds the 90% compliance threshold. The Panel identified zero (0) instances where the grievance should have been treated as emergent but were not, and there were zero (0) instances where the inmate was not provided with a written response within the required five days.

**6.8 Status:** Compliance  **As of Date:** July 1, 2018

## C. Inmate Grievance Coordinator

The recommendations in Sections 6.9, 6.13, 6.14, and 6.15 of the Action Plan address expectations and duties of the Inmate Grievance Coordinator position.

## 6.9 Inmate Grievance Coordinator

**Provision Description:** Requires all emergency grievances be forwarded to the Inmate Grievance Coordinator (IGC) who will review for proper handling and notify the Unit Commander if not properly handled.

The Department's posted data pertaining to Section 6.9 indicates the IGC received the emergency grievances for the Eleventh Reporting Period and that there was not a need to notify the Unit Commander of improperly handled grievances. The manner in which the data is provided, however, makes it challenging to ascertain whether the IGC determined the emergency grievance was handled properly. There are many "Null" notations in the charts, which indicate the IGC did not write any notes. The Panel will discuss the manner in which this data is compiled with the IGC during the next Monitoring visit.

**6.9 Status:** Compliance          **As of Date:** July 1, 2018

## 6.13 Grievance Coordinator Tracking

**Provision Description:** Regularly track the handling of inmate grievances to ensure that the investigations are completed timely and reasonably, and that inmates are notified of the results of the investigations.

## 6.14 Grievance Coordinator Reports

**Provision Description:** Provide a monthly report to Unit Commanders on the status of grievances, timeliness of investigations, responses to grievances and appeals, and inmate notifications.

## 6.15 Grievance Coordinator Analysis

**Provision Description:** Analyze inmate grievances monthly to identify any problematic trends and provide that analysis in a monthly report to Unit Commanders and senior management.

> ***Compliance Measures Summary:*** Provide the Monitors with one or more quarterly report to address all requirements of the Coordinator provisions. The Inmate Grievance Coordinator will meet with the Monitors once a quarter.

The Department provided documentation to the Panel showing that for the Third and Fourth Quarters of 2021 and First and Second Quarters of 2022 the IGC prepared detailed reports for managers as required by Sections 6.13, 6.14, and 6.15.

The Panel met with the Inmate Grievance Coordinator twice during the Eleventh Reporting Period to discuss the Department's implementation of its grievance policies and procedures and overall trends with respect to the Department's handling of inmate grievances.

**6.13, 6.14, and 6.15 Status:** Compliance          **As of Date:** July 1, 2018

## 6.16 Centralized Grievance Unit

**Provision Description:** Establish a centralized unit to collect, review, categorize, forward for investigations, and make appropriate notifications for inmate grievances.

The Panel previously determined the Department's structure of a Grievance Coordinator supervising the grievance teams at all of the Downtown Jail Complex facilities was equivalent in function to a centralized system and was acceptable, pending progress and specific results. The Panel continues to deem the Department's Grievance Team structure acceptable.

**6.16 Status:** Compliance          **As of Date:** January 1, 2017

39

## D. Handling of Grievances

### 6.10 Collection of Grievances

**Provision Description:** Grievances should be collected from the locked grievance boxes on each living unit no less frequently than once per day. Collection time should be recorded in a log and reviewed within 24 hours of collection.

> *Compliance Measures Summary:* Monitors will inspect collection boxes, verify that the database is accurate and up-to-date, and ensure that 95% of grievances selected for review are collected, reviewed, entered, and tracked timely.

The Department's Eleventh Self-Assessment reports that 100% of the reviewed grievances were collected and reviewed within 24 hours and handled as required in the Third and Fourth Quarters of 2021 and First and Second Quarters of 2022. The collection logs provided by the Department confirm that all 100 of the grievances selected for review were collected and reviewed as required by Section 6.10.

As noted in our Eighth Report, the Compliance Measure for Section 6.10 does not yield data sufficient to assess compliance with this provision. For example, the first 25 consecutive grievances at TTCF for the selected months were collected within the first three days of the month. The fact that TTCF timely collected grievances from its collection boxes in those first three days does not provide a meaningful measurement of the Department's compliance with Section 6.10. As such, the Panel has reviewed (and will continue to review) the Unit Collection compliance data for the entire month to assess compliance with Section 6.10.

Reviewing the monthly grievance data, the Department achieved 97% compliance in the Third and Fourth Quarters of 2021 and the First Quarter of 2022 and 98% compliance in the Second Quarter of 2022. Due to Wifi issues at MCJ, the Department switched to Watch Commander logs to track the information related to this provision.

**6.10 Status:** Compliance          **As of Date:** July 1, 2021

### 6.11 Failure to Handle Grievances

**Provision Description:** Failing to provide an inmate with a grievance form when requested, destroying or concealing grievances, failing to respond appropriately to a grievance, attempting to intimidate an inmate from filing a grievance, and retaliating against an inmate who has filed a grievance, may each be a cause for disciplinary action.

> *Compliance Measure Summary:* Provide the Monitors with a log of any inmate grievances about the matters encompassed by Paragraph 6.11, the result of the investigations of those grievances, and documentation that appropriate corrective action was taken in 100% of cases.

The Department reports that there were no claims of custodial staff failing to provide an inmate with a grievance when requested, destroying or concealing grievances, attempting to intimidate an inmate for filing a grievance, and retaliating against an inmate who filed a grievance. No staff members have been found to have engaged in the conduct encompassed by this Provision. The Panel has previously expressed concern about the accuracy of the Department's methods for identifying 6.11 grievances. *See Panel's Tenth Report and Request for a Status Conference* at pp. 3, 22. The Panel is again concerned the Department's methods for identifying 6.11 grievances are not accurately capturing the universe of grievances. Retaining a Compliance rating in the next Reporting Period will require the County to demonstrate that its method for identifying 6.11 grievances is accurate and functioning as intended. The Panel will address this matter during the next Monitoring visit.

**6.11 Status:** Compliance          **As of Date:** July 1, 2022

## 6.12 Tracking Inmate Grievances

**Provision Description:** All inmate grievances should be entered into and tracked in an inmate grievance database that reflects the nature and status of the grievance, and personnel responsible for the Department's handling of the grievance.

> *Compliance Measures Summary:* Monitors will review 25 grievances from MCJ and 25 from TTCF to ensure that 95% of grievances reviewed are collected, reviewed, entered, and tracked timely.

The Department's Eleventh Self-Assessment reports that 100% of the grievances at both MCJ and TTCF in the randomly selected month in the Third Quarter of 2021 and 98% of the grievances at both MCJ and TTCF in the randomly selected months in the Fourth Quarter of 2021 and First and Second Quarters of 2022 were entered into the database as required by Section 6.12. The source documents for these results were available to, and reviewed by, the Panel.

**6.12 Status:** Compliance                    **As of Date:** July 1, 2018

## 8.1 Anti-Retaliation

**Provision Description:** Prohibits Department personnel from retaliating against inmates.

> *Compliance Measures Summary:* Department implements and enforces an anti-retaliation policy and provide Monitors with a quarterly log of cases and findings as well as the first 25 investigations alleging retaliation.

The Department posted the results of the investigations approved by Unit Commanders in the randomly selected months and the number of anti-retaliation grievances received and investigated in the Third and Fourth Quarters of 2021 and First and Second Quarters of 2022, which is as follows:

- Third Quarter of 2021 there were 43 anti-retaliation grievances received, three investigations completed, and no founded violations of the anti-retaliation policy.
- Fourth Quarter of 2021 there were 62 anti-retaliation grievances received, no investigations completed and no founded violations of the anti-retaliation policy.
- First Quarter of 2022 there were 47 grievances received, one investigation completed in which the employee was exonerated and no founded violations of the anti-retaliation policy.
- Second Quarter of 2022 there were 38 anti-retaliation grievances filed in the, no investigations completed and no founded violations of the anti-retaliation policy.

The Panel reviewed the investigative summaries that were posted by the Department. Of the anti-retaliation grievances that Unit Commanders deemed unfounded in the randomly selected months for the Eleventh Reporting Period, the Panel agrees with the Commanders' assessments.

**8.1 Status:** Compliance                    **As of Date:** April 1, 2019

# E.  Deadlines

## 6.17 Use of Force Deadlines

**Provision Description**: A 30-day deadline in place for filing use of force grievances by inmates.

> *Compliance Measures Summary:* 1(a), 95% compliance with the first 25 use of force grievances determined by the Department to be untimely.

41

The Department's source documents for this provision indicate they achieved 100% Compliance for all four quarters of the Eleventh Reporting Period. There were 9 use of force grievance that were submitted beyond the 30-day deadline. While those grievances were denied, they were still investigated.

**6.17 Status:**  Compliance                    **As of Date:** October 1, 2019

## 6.18 PREA Deadline

**Provision Description:** There should be no deadline for filing Prison Rape Elimination Act grievances.

*Compliance Measures Summary:* 1(b), 95% compliance with the first 25 PREA grievances.

Three grievances were filed during the Eleventh Reporting Period that met the criteria for Section 6.18. The Department achieved 100% Compliance between the Third Quarter of 2021 and the Second Quarter of 2022.

**6.18 Status:**  Compliance                    **As of Date:** July 1, 2018

## 6.19 Response to Inmate Grievances

**Provision Description:** Department should respond to inmate grievances "within 15 calendar days after the submission of the grievance," absent exceptional circumstances, which must be documented.

*Compliance Measures Summary:* 1(d and e), 90% compliance with the first 25 grievances against staff in which the investigation was not completed within 15 days.

The Department reports responding to the randomly selected 25 grievances that were not against staff, within the 15-day deadline, 100% of the time for the Eleventh Reporting Period. For the 25 randomly selected grievances against staff, the Department's documents indicate they met the 15-day deadline in 92% of the cases in the Third Quarter of 2021 and Second Quarter of 2022, 100% in the Fourth Quarter of 2021 and 96% in the First Quarter of 2022.

**6.19 Status:**  Compliance                    **As of Date:** July 1, 2022

## 6.20 Appeals of Grievances

**Provision Description:** Inmates should have 15 days from receipt of a denial of a grievance (or from release from segregations) to file an appeal of the grievance.

*Compliance Measures Summary:* 1(c), 95% compliance with the first 25 appeals of grievances determined by the Department to be untimely.

According to the Department's source documents, there were no appeals that met the criteria for this provision during the Eleventh Reporting Period.

**6.20 Status:**  Compliance                    **As of Date:** July 1, 2018

## F.  Communications with Inmates

## 7.2 Notification of Results

**Provision Description:** Inmate should be advised of the results of the investigation of grievances against personnel, but not any sanction imposed, within 10 days of adjudication.

*Compliance Measures Summary:* 1(f), 90% compliance with the first 25 completed grievances against staff, including the inmate notifications.

42

The Augmented Eleventh Self-Assessment also reports that the Department adhered to the deadlines for advising inmates of the results of adjudications as required by Section 7.2 for the Third Quarter of 2021 (100%), the Fourth Quarter of 2021 (96%), the First Quarter of 2022 (96%), and the Second Quarter of 2022 (96%). The posted source documents for these results were available to, and reviewed by, the Panel.

**7.2 Status:** Compliance                      **As of Date**: July 1, 2018

## 7.3 Prisoner-Staff Communications

**Provision Description:** The Department should ensure that there are adequate avenues for constructive prisoner-staff communication, such as Town Hall meetings.

>*Compliance Measures Summary:* Maintain logs of Town Hall meetings and report to the Monitors that each jail facility has conducted Town Hall meetings for a randomly selected month per quarter. Monitors interview inmates and staff to assess the adequacy of communications.

The Department's Eleventh Self-Assessment reports that the Department was not in Compliance with Section 7.3 during both the Third and Fourth Quarters of 2021. In the Third Quarter of 2021, there were only four meetings logged at MCJ. MCJ was issued a Corrective Action Plan. MCJ only logged 13 meetings in the Fourth Quarter of 2021. Another Corrective Action Plan was issued that included a Town Hall Audit checklist. The Department met the requirements of Section 7.3 in the First and Second Quarters of 2022. The Department provided 10% of the recorded prisoner-staff communications that occurred during Town Hall meetings at MCJ and TTCF during the randomly selected months during the Eleventh Reporting Period that included Town Hall meetings in special housing units as well as in General Population housing units.

**7.3  Status:** Out of Compliance                      **As of Date:** N/A

# VI.   Use of Restraints

## 17.1 Restraint Provisions

**Provision Description:** Custody Force Manual must include "a separate section that sets forth the general principles governing the use of restraints."

The Panel concludes that the Department included such a separate section in the Manual.

**17.1 Status:** Compliance                      **As of Date:** December 1, 2015

## 17.3 Safety Chair Procedures

**Provision Description:** Requires immediate medical examinations of inmates placed in Safety Chairs with a use of force, or if the inmate struggles against the Safety Chair restraints. Section 17.3 also requires that inmates' vitals are checked every hour while in the Safety Chair.

>*Compliance Measures Summary:* Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex. The Monitors conduct a Vertical and Horizontal Assessment of approximately 25 incidents to determine at least 90% compliance with restraint provisions.

During the Eleventh Reporting Period, the Department provided the Inmate Safety Chair Security Check Logs for use of the safety chair and Fixed Restraint Logs at the Downtown Jail Complex for the Third and

43

Fourth Quarters of 2021 and First and Second Quarters of 2022.[14] The Panel's auditors note there is no indication that medical professionals, or any Custody personnel, are performing vitals checks even though inmates are often in the safety chairs for several hours while in transport to and from court and during court proceedings. Periodic vitals checks are necessary to establish compliance even if the inmate does not struggle and force is not used to place the inmate in the Safety Chair.

Though the Panel's auditors' audit is ongoing, they note that uses of force to place an inmate into safety chairs are rare.[15] Due to vital checks not occurring as required the Department is out of Compliance with Section 17.3.

<strong>17.3 Status:</strong> Out of Compliance          <strong>As of Date:</strong> N/A

## 17.4 Safety Checks

**Provision Description:** Requires safety checks of inmates in fixed restraints every twenty minutes to verify and document the inmate is not in indue pain or that restraints are not creating injury.

> ***Compliance Measures Summary:*** Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex. The Monitors conduct a Vertical and Horizontal Assessment of approximately 25 incidents to determine at least 90% compliance with restraint provisions.

The Inmate Safety Chair Security Check Logs and Fixed Restraint Logs reflect that Department personnel are conducting safety checks on many inmates every twenty minutes, as required by Section 17.4.[16]However, the fixed restraint log provided does not explicitly document personnel verifying that the inmate is not in undue pain or that the restraints are not causing injury.  Therefore, the Department is Out of Compliance with Section 17.4.

<strong>17.4 Status:</strong> Out of Compliance          <strong>As of Date:</strong> N/A

## 17.6 – 17.9 Multi-Point Restraints

**Provision Descriptions:** The provisions in these sections are specific to the use and application of multi-point restraints. The Department does not employ the use of multi-point restraints and these provisions are therefore not applicable.

<strong>17.6 – 17.9 Status:</strong> Not Applicable          <strong>As of Date:</strong> N/A

## 17.10 Involuntary Medications

**Provision Description:** The Department's Custody use of force policies should provide that medication may not be used solely for security purposes.

---

[14] The Panel's auditors observe that the logs provided are often completed inconsistently from one log to the next and do not appear to reflect the requirements of Section 17.3. An example is that the logs appear to reflect that a medical evaluation is only necessary if the inmate is expected to remain in the safety chair longer than one hour. Another example is that there is no field within the logs for vitals checks to be recorded.

[15] There are two confirmed records out of 57 safety chair records provided over the four quarters during the Eleventh Reporting Period that indicate a use of force was used and a healthcare evaluation was performed. There are two records that require further confirmation of whether a use of force was used to place the inmate into a safety chair.

[16] While the use of safety chairs for transportation are not subject to Section 17.4, it should be noted that the Department's policy requires safety checks to be recorded every 15 minutes. Based on the Department's posted results, there appears to be on use of fixed restraints during the Eleventh Reporting Period, during the Second Quarter of 2022. The Department's posted results for the Second Quarter of 2022 also includes four WRAP Restraint/WRAP Cart Security Check Logs. The Parties are working on a policy to govern the use of the WRAP restraint and appropriate Compliance Measures to assess compliance with the Action Plan.

*Compliance Measures Summary:* Department will provide a log documenting the administration of involuntary medications and the reason for it. Monitors will review the log and interview involved medical and mental health professionals to verify medication was not used solely for security purposes.

The Department's posted results reflect that every administration of involuntary medications was pursuant to court order and there were no instances in which medication was used solely for security purposes in the Eleventh Reporting Period. According to the log of Administration of Involuntary Medication, inmates received involuntary medication the following number of times per quarter: 559 in the Third Quarter of 2021; 447 in the Fourth Quarter of 2021; 518 in the First Quarter of 2022 and: 469 in the Second Quarter of 2022. The Director of Mental Health for Correctional Health Services (CHS) confirmed the Department does not use medication solely for security purposes.

**17.10  tatus:** Compliance                    **As of Date:** July 1, 2018

# VII. Early Warning System

## 19.1 Development of EWS

**Provision Description:** Develop a system to identify potentially problematic Department members based upon objective criteria, such as number of force incidents, inmate grievances, allegations of misconduct, performance reviews, and policy violations.

*Compliance Measure Summary:* The system identifies potentially problematic employees upon objective criteria.

The Panel approved the Employee Review System ("ERS") in July 2018, and it was implemented by the Department as a pilot program in the Downtown Jail Complex on August 1, 2018, and in the rest of the jail facilities as of November 1, 2018.

**19.1 Status:** Compliance                    **As of Date:** August 1, 2018

## 19.2 Review of EWS Reports

**Provision Description:** Compliance Lieutenants review reports monthly to identify potentially problematic Department members and promptly notify the Unit Commander and the Assistant Sheriff for Custody Operations in writing.

*Compliance Measure Summary:* Unit Commanders make notifications within ten days 90% of the time and within thirty days 95% of the time.

The Department's posted results indicate it achieved 100% Compliance with Section 19.2 in the Fourth Quarter of 2021 and First Quarter of 2022. In the Third Quarter of 2021, the Department's made the appropriate notifications in 93% of the cases. The Department explains that in September 2021, MCJ did not request an ERS report. The employee who usually handles this task was on medical leave and the institution did not assign the task to someone else. The Department asks the Panel to consider finding it in Compliance and notes MCJ has met 100% compliance with this provision since the First Quarter of 2019. A corrective action was established to address the issue. In the Second Quarter of 2022, the Department's compliance was 77% due to MCJ mistakenly seeking the April ERS report on April 1. As a result, no employees were identified when three potentially problematic employees has been identified and therefore, the appropriate notification were not made in 10 days as required by Section 19.2.

**19.2 Status:** Out of Compliance          **As of Date:** N/A

45

## 19.3 Performance Mentoring Programs

**Provision Description:** Unit Commanders required to determine whether problematic employees should be placed on a performance mentoring program. For each potentially problematic Department member identified through the EWS, the Unit Commander must consult with the appropriate Chief and document the reasons why any problematic members are not placed on a performance mentoring program.

> ***Compliance Measure Summary:*** Chief is consulted 95% of the time to determine if a non-disciplinary performance program is appropriate. If so, specific performance metrics were in place and the reason for the decision was provided 95% of the time.

For three of the four quarters of the Eleventh Reporting Period, the Department's posted results reflect 100% compliance with this provision. As a result of MCJ not requesting an ERS report in September 2021, the Department's compliance rate for the Third Quarter of 2021 was 93%. As noted above, this error/oversight was a result of a staff member being on medical leave and no one else being assigned to handle the task. Given the totality of the circumstances, the Panel finds the Department in Compliance for the Eleventh Reporting Period.

**19.3 Status:** Compliance          **As of Date:** July 1, 2022

# Appendix A: Compliance Chart

| NO. | PROVISION | STATUS | DATE[17] |
|-----|-----------|--------|----------|
| **Leadership, Administration & Management** | | | |
| 1.1 | Assistant Sheriff | Compliance | January 1, 2017 |
| 1.2 | Sheriff | Compliance | January 1, 2017 |
| 1.3 | Supervision | | |
| 1.4 | Reports to Board | Compliance | June 12, 2018 |
| 10.1 | Jail Visits | Compliance | June 30, 2018 |
| 10.2 | Documented Visits | Compliance | June 30, 2018 |
| 18.1 | Rotation in Custody | Compliance | June 30, 2018 |
| 18.2 | Documentation of Rotation | Compliance | January 1, 2019 |
| 21.1 | Transfers to Custody | Compliance | June 30, 2018 |
| | | | |
| **Use of Force Policies & Practices** | | | |
| 2.1 | Custody Force Manual | Compliance | January 1, 2017 |
| 2.2 | Force Prevention Principles | | |
| 2.3 | Inmate on Inmate Violence | Compliance | July 1, 2019 |
| 2.4 | Use of Force as Discipline | Compliance | July 1, 2019 |
| 2.5 | Force on Restrained Inmates | | |
| 2.6 | Head Strikes or Kicks | | |
| 2.7 | Supervisors Called to Scene | | |
| 2.8 | Prevent Excessive Force | Compliance | July 1, 2019 |
| 2.9 | Armed Inmates | Compliance | July 1, 2019 |
| 2.10 | Authorized Weapons | Compliance | July 1, 2019 |
| 2.11 | Planned Chemical Spray | Compliance | January 1, 2020 |
| 2.12 | Chemical Spray & Tasers | Compliance | July 1, 2019 |
| 2.13 | Check of Medical Records | | |
| 4.1 | Consult MH professionals | | |
| 4.3 | Spray on MH inmates | Compliance | October 1, 2019 |
| 4.4 | Cooling Off Periods | | |
| 4.5 | Medical or MH Provider | | |
| 8.2 | Complaints of Retaliation | Compliance | January 1, 2017 |
| 9.2 | Escorting of Inmates | Compliance | January 1, 2020 |
| 9.3 | Duty to Protect & Intervene | Compliance | July 1, 2022 |
| 17.2 | Pregnant Inmates | Compliance | January 1, 2017 |
| 17.5 | Minimize Medical Distress | | |
| 20.1 | Categories of Force | Compliance | January 1, 2017 |
| 20.2 | Reactive Force | Compliance | January 1, 2017 |
| 20.3 | Planned Use of Force | | |
| | | | |
| **Training** | | | |
| 3.1 | Use of Force Training | Compliance | December 31, 2021 |
| 3.2 | Ethics, Professionalism | Compliance | June 30, 2018 |
| 3.3 | Custody Training | Compliance | June 30, 2018 |
| 3.4 | Custody-based scenarios | Compliance | June 30, 2018 |

---

[17] This represents the date the Department came into the compliance that it has maintained through the date of this report.

| | | | |
|---|---|---|---|
| 3.5 | Add training/mentoring | Compliance | July 1, 2019 |
| 3.6 | Probation Reviews | | |
| 4.6 | Crisis Intervention | Compliance | June 30, 2018 |
| 4.7 | Mentally Ill Inmates | | |
| 4.8 | Mentally Ill Inmates (for new Department members) | Compliance | June 30, 2018 |
| 4.9 | Crisis Intervention (for new Department members) | Compliance | June 30, 2018 |
| 12.1 | Force Investigations | Compliance | July 1, 2019 |
| | | | |
| **Investigation & Reporting of Force** | | | |
| 4.2 | Mental Health Professionals | | |
| 5.1 | Tracking of Force Incidents | Compliance[18] | October 1, 2019 |
| 5.2 | Commanders' Reviews | | |
| 5.3 | Unexplained Discrepancies | Compliance | July 1, 2022 |
| 8.3 | CFRC Review | Compliance | June 30, 2021 |
| 11.1 | CFRT Involvement | Compliance | June 30, 2018 |
| 12.2 | Location of Inmate Interviews | | |
| 12.3 | Suspect Interviews | Compliance | July 1, 2019 |
| 12.4 | Uninvolved Supervisors | Compliance | July 1, 2019 |
| 12.5 | Standard Order & Format | Compliance | July 1, 2019 |
| 13.1 | Documenting Dishonesty | Compliance | October 1, 2019 |
| 13.2 | Reports of Dishonesty/PREA | Compliance | October 1, 2019 |
| 14.1 | Review of Criminal Referrals | Compliance | July 1, 2018 |
| 14.2 | Timeliness of Criminal Referrals | Compliance | July 1, 2018 |
| 15.1 | Timeliness of Reports | Compliance | July 1, 2019 |
| 15.2 | All Department Witnesses | Compliance | July 1, 2019 |
| 15.3 | Force by Other Members | | |
| 15.4 | Description of Injuries | Compliance | April 1, 2020 |
| 15.5 | Clarification after Video | Compliance | July 1, 2019 |
| 15.6 | Separation of Deputies | | |
| 15.7 | Individual Perceptions | Compliance | July 1, 2019 |
| 16.1 | Healthcare Assessment | Compliance | July 1, 2019 |
| 16.2 | Photographs of Injuries | | |
| 16.3 | Medical Report of Injuries | Compliance | July 1, 2019 |
| | | | |
| **Inmate Grievances** | | | |
| 6.1 | Separate Grievance Forms | Compliance | January 1, 2017 |
| 6.2 | Available Grievance Forms | Compliance | January 1, 2017 |
| 6.3 | Emergency Grievances Forms | Compliance | January 1, 2017 |
| 6.4 | Use of Force Grievances | Compliance | July 1, 2018 |
| 6.5 | Grievances Against Staff | Compliance | July 1, 2018 |
| 6.6 | Right to Appeal Form | Compliance | January 1, 2017 |
| 6.7 | Handling Emergency Grievances | Compliance | July 1, 2018 |
| 6.8 | Notification of Non-Emergency | Compliance | July 1, 2018 |
| 6.9 | Grievance Coordinator Review | Compliance | July 1, 2018 |

---

[18] The Panel has advised the Department that in order to remain in Compliance with this provision, they need to provide the data that demonstrates their compliance with Compliance Measures 4(a), (b) and (c) beginning in 2023.

48

| 6.10 | Collection of Grievances | Compliance | July 1, 2021 |
|------|--------------------------|------------|--------------|
| 6.11 | Failure to Handle Grievances | Compliance | July 1, 2022 |
| 6.12 | Tracking Inmate Grievances | Compliance | July 1, 2018 |
| 6.13 | Grievance Coordinator Tracking | Compliance | July 1, 2018 |
| 6.14 | Grievance Coordinator Reports | Compliance | July 1, 2018 |
| 6.15 | Grievance Coordinator Analysis | Compliance | July 1, 2018 |
| 6.16 | Centralized Grievance Unit | Compliance | January 1, 2017 |
| 6.17 | Use of Force Deadline | Compliance | October 1, 2019 |
| 6.18 | PREA Deadline | Compliance | July 1, 2018 |
| 6.19 | Response to Inmate Grievances | Compliance | July 1, 2022 |
| 6.20 | Appeals of Grievances | Compliance | July 1, 2018 |
| 7.1 | Conflict Resolution Meeting | Compliance | January 1, 2017 |
| 7.2 | Notification of Results | Compliance | July 1, 2018 |
| 7.3 | Prisoner-staff Communications | | |
| 8.1 | Anti-retaliation | Compliance | April 1, 2019 |
| | | | |
| **Use of Restraints** | | | |
| 17.1 | Restraint Provisions | Compliance | December 1, 2015 |
| 17.3 | Safety Chair Procedures | | |
| 17.4 | Safety Checks | | |
| 17.6 | Multi-point Restraint Procedures | Not Applicable | |
| 17.7 | Approval of Multi-point Restraints | Not Applicable | |
| 17.8 | Continued Use of Restraints | Not Applicable | |
| 17.9 | Supervisor Approval of Restraints | Not Applicable | |
| 17.10 | Involuntary Medications | Compliance | July 1, 2018 |
| | | | |
| **Early Warning System** | | | |
| 19.1 | Development of EWS | Compliance | August 1, 2018 |
| 19.2 | Report Review and Notification | | |
| 19.3 | Performance Mentoring Programs | Compliance | July 1, 2022 |