OFFICE OF COUNTY COUNSEL
Dawyn Harrison (173855)
County Counsel
*dharrison@counsel.lacounty.gov*
Dylan Ford (228699)
Deputy County Counsel
*dford@counsel.lacounty.gov*
500 West Temple St., Floor 6
Los Angeles, California 90012
Telephone: 213.974.1811
Facsimile: 213,687.8822

KENDALL BRILL & KELLY LLP
Robert E. Dugdale (167258)
*rdugdale@kbkfirm.com*
Daniel Barlava (334910)
*dbarlava@kbkfirm.com*
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, CA 90067
Telephone: 310.556.2700
Facsimile: 310.556.2705

Attorneys for Defendant
Robert Luna, Sheriff of Los
Angeles County, in his Official Capacity

[Counsel continued on next page]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT LUNA, Sheriff of Los Angeles County, in his official capacity, <br><br> Defendant. | CASE NO. CV 12-00428 DDP (MRW) <br><br> **JOINT STATUS REPORT** <br><br> Judge: Hon. Dean D. Pregerson <br> Crtrm: 9C <br> Date: April 19, 2023 <br> Time: 10:00 am |

Case No. CV 12-00428 DDP (MRW)

JOINT STATUS REPORT

PETER J. ELIASBERG
(SB# 189110)
peliasberg@aclusocal.org
MELISSA CAMACHO
(SB# 264024)
mcamacho@acluscal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Phone:  (213) 977-9500
Fax:  (213) 977-5299

NICOLAS MORGAN
(SB# 166441)
nicolasmorgan@paulhastings.com
STEPHEN TURANCHIK
(SB# 248548)
sturanchik@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071-2228
Phone:  (213) 683-6000
Fax:  (213) 627-0705

CORENE KENDRICK
(SB# 226642)
ckendrick@aclu.org
MARISOL DOMINGUEZ-RUIZ
(SB# 345416)
mdominguez-ruiz@aclu.org
ACLU NATIONAL PRISON PROJECT
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930
Fax: (202) 393-4931


Attorneys for Plaintiffs
Alex Rosas and Jonathan Goodwin
on behalf of themselves and those similarly situated

Case No. CV 12-00428 DDP (MRW)

JOINT STATUS REPORT

The parties submit this joint status report in anticipation of the status conference scheduled for Wednesday, April 19, 2023, at 10 a.m.

## I.    Relevant Procedural History

Nearly eight years ago, this Court approved the court-enforceable Settlement Agreement and Release (the "Settlement Agreement") between the Parties in this action.  The Settlement Agreement represented the culmination of several years of litigation necessary to stop a pattern of the use of excessive force against incarcerated persons at certain Los Angeles County jails (the "Downtown LA Jails").  The Parties entered into the Settlement Agreement to protect the constitutional rights of incarcerated persons within those jails going forward.  The Settlement Agreement incorporated an Implementation Plan (also referred to as the Action Plan) written by the court-appointed monitors (the "Panel"), which obligates the Los Angeles County Sheriff's Department (the "Department" or "LASD") to undertake numerous improvements to its policies, training, conduct, and reporting to give effect to the Settlement Agreement.

On April 8, 2022, the Monitors filed their Tenth Report with the Court, evaluating the Department's compliance with the Implementation Plan for the period from January 1, 2021 to June 30, 2021.  Dkt. 205 (the "Tenth Report").  In the Tenth Report, the Panel noted the Department's "great progress" since the initiation of this litigation, while also finding that the Department's "progress on some key issues has 'plateaued.'"  *Id.* at 2.  Accordingly, the Panel requested the Court hold a status conference, and included recommendations to bring the Department into compliance with the remaining Settlement Agreement provisions with which the Department had not yet reached full compliance.

On April 21, 2022, Plaintiffs filed their response to the Tenth Report and joined in the Panel's request for a status conference.  Dkt. 207.  On May 4, 2022, the Department filed its response to the Tenth Report, and challenged many of its conclusions, including by pointing out that the Department had, in fact, reached

1

compliance with over 75 percent of the Rosas Implementation Plan's roughly 100 provisions and that overall uses of force in the Downtown LA Jails had decreased significantly from 2019 to 2021. *See* Dkt. 210 at 8-10.

On May 12, 2022, the Parties attended a status conference, and agreed to negotiate in good faith to reach agreement on a plan that would bring the Department into compliance with the Implementation Plan. Pursuant to a stipulation entered into between the Parties, on May 27, 2022, the Court ordered the Parties to work in conjunction with the Panel to develop a written plan for the Department to achieve compliance with key facets of this case addressed in the Panel's Tenth Report. Dkt. 218. The Parties agreed to focus on four key areas: (1) eliminating impermissible head strikes; (2) ensuring appropriate utilization of force prevention and de-escalation techniques; (3) accountability; and (4) ensuring proper use of the WRAP restraint device. *Id.* at 2. Since June 2022, the Parties have met and conferred regularly, including on several occasions with the Monitors present, and have exchanged several draft compliance plans in an effort to reach agreement as ordered by the Court.

On March 8, 2023, the Panel filed its Eleventh Report, which provided an assessment of Defendant's compliance with the Implementation Plan for the period of July 1, 2021, to June 30, 2022. *See* Dkt. 238 (the "Eleventh Report"). The Eleventh Report found the Department compliant with 77 out of the 100 applicable provisions in the Implementation Plan. *See id.* at 7. Furthermore, the Eleventh Report acknowledged key areas of improvement with respect to the Department's use of force, including without limitation:

- (1) consistent declines in the Department's overall use of force numbers over each of the three previous reporting periods, from 593 incidents in the first two quarters of 2021, to 558 in the second two quarters of 2021, to 526 in the first two quarters of 2022 (*see id.* at 5) ("The overall force numbers are trending downward…We believe that

2

these successive decreases in the number of use of force incidents represent meaningful progress…”);

- (2) an approximately 50 percent decrease in the total number of head strikes in both MCJ (from 32 to 17) and TTCF (from 30 to 16) from 2021 to 2022, including *multiple months in both facilities without a single head strike in 2022 (see id.* at 6-7);

- (3) leadership's “effective” communication of the Department's new head strike directive, which the Panel credited for the significant downward trend in head strikes (*see id.* at 6) (“The Department's concerted focus on head strikes in the past several months appears to be having a positive impact on the downward trend.”); and

- (4) Department personnel's use of de-escalation and force avoidance tactics, even in situations involving “threats to [the] personal safety” of Department personnel. *See id.* at 24 (describing four use of force incidents and noting that in three of them, Department personnel used “de-escalation tactics, time and distance, planning, and brought resources to resolve situations with minimal force”).

However, the Panel also found that the Department was non-compliant with a number of the *Rosas* provisions that align with the areas the parties have agreed to focus on in attempting to enter into a compliance plan. Specifically, the Panel found the Department non-compliant with:

- Provision 1.3 (Accountability for Failing to Address Policy Violations), which is designed to ensure supervisors hold line personnel accountable for violations of Department policy required by the Rosas Implementation Plan. *Id.* at 10-14 (“The Department must hold deputies accountable for use of force violations and hold supervisory

3

Case No. CV 12-00428 DDP (MRW)

JOINT STATUS REPORT

staff accountable when they fail to identify and/or appropriately address violations.");

- Provision 2.2, which calls for "force to be used as a last resort, with minimal amount of force necessary, [force] terminated as soon as reasonably safe to do so, and de-escalated as resistance decreases." *Id.* at 18 ("Of the 91 use of force packages reviewed, 30 cases were found non-compliant with this provision, which amounts to a 67.0% compliance [rate] which is below the 90% compliance threshold."); and

- Provision 2.6, which governs head strikes or kicks. *Id.* at 19 (finding 65.1% of the 86 cases reviewed in which head strikes were found to be in compliance, "which is below the 90% compliance threshold."). Relevant to both accountability and improper use of head strikes, the Panel noted, "[t]he Panel has yet to review a case where the supervisor concludes the use of head strikes was inappropriate. In order for the Department to achieve compliance with Provision 2.6 (head strikes), staff must be held accountable for head strikes." *Id.* at 7.

- The Panel also noted "a few" instances in which deputy reports were either inconsistent with the video evidence or were not forthcoming about their own actions, while ultimately finding the Department compliant with *Rosas* Provision 13.1, which addresses dishonest reporting by deputies in use of force reports and how supervisors address it. *Id.* at 34-35. Still, the Panel recognized the need for added accountability regarding accurate and honest reporting in force packages, and stated its intention to revise the Compliance Measure for 13.1. *See id.* at 35.

With regard to the aforementioned efforts to formulate a joint compliance

plan, on June 10, 2022, each Party submitted a framework for a compliance plan; and, on June 13, 2022, the Parties and the Panel met to discuss the Parties' respective proposals.  On October 7, 2022, the Panel provided written comments on the Parties' frameworks for their compliance plans.  Then, on October 31, 2022, Plaintiffs' counsel submitted to the Panel and Defendant's counsel a more comprehensive version of Plaintiffs' compliance plan that included consideration of the prior feedback concerning the plan provided by the Panel and Defendant's counsel.  On November 4, 2022, Defendant's counsel followed suit by submitting a more comprehensive version of the Department's compliance plan that included consideration of the feedback previously provided by the Panel and Plaintiff's counsel.

On November 9, 2022, after these versions of each Party's compliance plan were exchanged, the Parties and the Panel met in person and conferred about each Party's respective plan and the Panel's comments as to each Party's plan.  Following this meeting, on November 19, 2022, Defendant's counsel provided a list of several elements from the Parties' respective compliance plans Defendant believed could be agreed upon as part of a potential joint compliance plan reached by both Parties.  Beyond this tentative agreement to include the elements identified by Defendant's counsel on November 19, 2022, in a joint compliance plan, the Parties agreed to continue to work with each other and the Panel to see if they could find additional common ground in formulating a joint compliance plan

As the Parties explained in a prior status report filed in December 2022, their ability to reach agreement on specific proposals was delayed by the election of Sheriff Luna and Sheriff Luna's appointment of a new Assistant Sheriff in charge of the LASD's Custody Division.  However, beginning in February, counsel for the Parties resumed holding periodic meetings to discuss the framework of a potential joint compliance plan, have exchanged written proposals concerning such a plan, and have made considerable progress in identifying areas of common ground that

could form the basis of a potential joint compliance plan, while also identifying areas of disagreement where the Parties are unlikely to find common ground.

**II.    Current Status of Parties' Negotiations**

      **A.    Areas of Agreement**

Despite delays caused by both the resignation of one of the Monitors and the election of a new Sheriff, the Parties have met and conferred numerous times, have exchanged numerous written proposals and obtained written feedback from the Panel on their proposals, and have reached significant areas of agreement on measures to include in a compliance plan.

Most significantly, based on feedback from Plaintiffs and the Panel, the Department has agreed to set up a centralized, dedicated unit of supervisors to conduct use of force reviews, rather than having reviews conducted – as is currently the case – by the sergeants who often supervise the deputies whose use of force is under review.  Plaintiffs strongly support this change and believe it will help improve the quality of use of force reviews and the speed with which reviews are completed, and are hopeful it will increase accountability for violations of policy.

In addition to professionalizing the use of force review process, the Parties have also agreed to standardize the use of force reporting process.  For example, Defendant has agreed to create a number of standardized templates for deputies to fill out when completing use of force reports; these templates will require deputies to assess various factors with respect to whether a use of force is permissible under Department policy.  The Department intends to solicit input from the Panel when designing this template.  Additionally, the Department has agreed to create a template for the Department's supervisory personnel to use when reviewing uses of force.  The Parties agree that these templates will force both writers and reviewers to address in detail whether a use of force complies with the "elements" as set forth in the relevant Department policy.

The Parties have also agreed that the Department will meet with the Panel and

the Plaintiffs to discuss their objections to the Department's force prevention training, known as DeVRT, after permitting the Panel and Plaintiffs' counsel to attend a DeVRT training and providing them with the materials used during the DeVRT training.

The Parties have also agreed that the Department will "fast track" the review of <u>all</u> uses of force involving head strikes, ensuring that any use of force involving a head strike is reviewed by Department leadership within 90 days.

**B.      Principal Areas of Disagreement**

Notwithstanding these significant areas of agreement, the Parties have reached an impasse on other terms.  In some areas, Plaintiffs believe certain changes are necessary and Defendants disagree.  For example, Plaintiffs believe that for certain offenses, such as violations of the policy governing use of head strikes or dishonest reporting on a use of force report, there need to be mandatory penalties.  Plaintiffs also believe that for first violations of those offenses, the *mandatory* punishment should be – at minimum – the penalty range set forth the Department's "Guidelines for Discipline and Education-Based Alternatives.  For example, the standard range of discipline for a use of unreasonable force is 15 days suspension to discharge.  *See* LASD, *Guidelines for Discipline and Education-Based Alternatives* (2020) at 27.  According to the current Guidelines, discipline for specific violations is "intended as a guide only and should not be imposed 'automatically' in relation to actual infractions" but the Guidelines also provide that "[d]iscipline is expected remain with the standard range in most instances."  *Id.* at 26.  Plaintiffs believe that the lack of accountability for use of force violations and instances of dishonesty and the Department's failure to comply with the head strike provision for 11 Panel reports requires mandatory discipline for certain violations.

By contrast, the Department's position is that the Department will "not 'mandate' discipline in any case, as each disciplinary decision is based on the individual circumstances of the case and the individual involved."  The Department

7

believes it would be unjust to impose mandatory punishments on Department personnel for violations of the Department policy without consideration of factors such as (1) an employee's service record, including any prior disciplinary history; (2) the severity of a use of force and the seriousness of the violation; and (3) other relevant circumstances in aggravation or mitigation.  Furthermore, a mandatory minimum scheme might violate the Department's collective bargaining agreements and lead to civil service hearing outcomes where discipline is not sustained and is ultimately overturned and erased.  The Department does not believe that Plaintiffs have demonstrated that mandatory minimums are necessary, particularly since Department personnel have been suspended and in some cases terminated for violations of the Department's use of force policy.

In other areas, the Parties agree that changes are appropriate, but disagree as to the scope of the change. For example, the Department has agreed to change its prior head strike policy so that head strikes are only permissible if (1) the inmate is assaultive; (2) the inmate presents an imminent danger of serious injury; and (3) there are no other more reasonable means to avoid serious injury.  Plaintiffs believe that this policy represents an improvement as compared to the Department's prior head strike policy, but nonetheless believe the Department's policy should be made more restrictive so that head strikes are only permitted where use of deadly force is justified—*i.e.,* where an employee's life is at risk.  The Department notes the current downward trend in the number of incidents involving head strikes in the Downtown LA Jails since the implementation of its new policy limiting the use of force and believes the new policy will lead to further, dramatic declines.

Overall, the main areas of impasse at the moment are (1) the specific policy that should apply to the use of head strikes; (2) whether there is a need for mandatory discipline for certain offenses, specifically violations of whatever head strike policy is ultimately adopted, failure to engage in force prevention, dishonesty in force reporting, and failure of supervisors to identify violations of these policies

and hold personnel accountable for violations; and (3) whether the Department should be required to compile and report certain information to Plaintiffs and the Panel.[1]

As part of the Parties' negotiations, the Parties have created a document that sets forth each Party's position, the Panel's respective comments, and the areas where the Parties have reached agreement.  The document is attached as Exhibit A.

In light of the progress that the Parties have made and the impasse they have reached on certain key issues, the Parties request that the Court do two things: (1) grant the Parties an additional four weeks to attempt to work out the details on certain areas where the Parties have not yet reached agreement but believe agreement may be possible; and (2) set a briefing schedule for the Parties to present to the Court their respective positions on the principal areas of impasse so that the Court can determine what (if any) provisions must be included in a compliance plan to further address the four key issues identified by the Court on May 27, 2022.  The Parties also welcome any guidance from the Court on how to address the areas of impasse.

Respectfully Submitted,

---

[1] Notably, the Department has agreed to increase the amount of information about uses of force, head strikes, and disciplinary outcomes that it gathers and reports to Plaintiffs and the Monitors, but has not agreed to all Plaintiffs' requests for additional information.

9                          Case No. CV 12-00428 DDP (MRW)

JOINT STATUS REPORT

DATED:  April 18, 2023        KENDALL BRILL & KELLY LLP

By:     <u>s/ Robert E. Dugdale</u>
Robert E. Dugdale
Attorneys for Robert Luna, Sheriff of Los Angeles County, in his Official Capacity

DATED:  April 18, 2023        ACLU FOUNDATION OF SOUTHERN CALIFORNIA

By:     <u>s/ Peter J. Eliasberg</u>
Peter J. Eliasberg
Attorneys for Plaintiffs Alex Rosas and Jonathan Goodwin, on behalf of themselves and of those similarly situated

## **ATTESTATION UNDER LOCAL RULE 5-4.3.4**

I, Robert E. Dugdale, attest that the above listed signatories on whose behalf this document is being filed have concurred in the filing's content and have authorized the filing.

Dated: April 18, 2023        <u>s/ Robert E. Dugdale</u>
                       Robert E. Dugdale