UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - -

HONORABLE DEAN D. PREGERSON, DISTRICT JUDGE PRESIDING

ALEX ROSAS, et. al.,                )
                                    )
        Plaintiffs,                 )
                                    )
                                    )
                                    )
        vs.                         ) No. CV 12-00428-DDP
                                    )
                                    )
                                    )
LEROY BACA, et al.,                 )
                                    )
        Defendants.                 )
_____     )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

*STATUS CONFERENCE*

LOS ANGELES, CALIFORNIA

WEDNESDAY, APRIL 19, 2023

_____

MARIA R. BUSTILLOS
OFFICIAL COURT REPORTER
C.S.R. 12254
UNITED STATES COURTHOUSE
350 WEST 1ST STREET
SUITE 4455
LOS ANGELES, CALIFORNIA 90012
(213) 894-2739

**A P P E A R A N C E S**

**ON BEHALF OF THE PLAINTIFFS,**
**ALEX ROSAS, et. al.:**                    ACLU FOUNDATION OF SOUTHERN
                                            CALIFORNIA
                                            BY:  PETER J. ELIASBERG,
                                            ESQ.
                                            1313 WEST EIGHTH STREET
                                            LOS ANGELES, CA 90017
                                            (213)977-5228


                                            ACLU FOUNDATION OF SOUTHERN
                                            CALIFORNIA
                                            BY:  MELISSA L.
                                            CAMACHO-CHEUNG
                                            1313 WEST EIGHT STREET
                                            LOS ANGELES, CA 90017
                                            (213)977-9500


                                            ACLU NATIONAL PRISON PROJECT
                                            BY:  CORENE T. KENDRICK,
                                            ESQ.
                                            BY:  MARISOL J. DOMINGUEZ
                                            39 DRUMM STREET
                                            SAN FRANCISCO, CA 94111
                                            (202)393-4930


**ON BEHALF OF THE DEFENDANTS,**
**LEROY BACA, et al.:**                     KENDALL, BRILL & KELLY, LLP
                                            BY:  ROBERT E. DUGDALE, ESQ.
                                            10100 SANTA MONICA BOULEVARD
                                            SUITE 1725
                                            LOS ANGELES, CA 90067
                                            (310)556-2700


                                            KENDALL, BRILL & KELLY, LLP
                                            BY:  KATELYN KUWATA, ESQ.
                                            500 WEST TEMPLE STREET
                                            SIXTH FLOOR
                                            LOS ANGELES, CA 90012
                                            (310)272-7929

**A P P E A R A N C E S (CONT'D)**


**ON BEHALF OF THE DEFENDANTS,**
**LEROY BACA, et. al.:**            LOS ANGELES COUNTY COUNSEL
                                   BY:  DYLAN FORD, ESQ.
                                   500 WEST TEMPLE STREET
                                   SIXTH FLOOR
                                   LOS ANGELES, CA 90012
                                   (213)893-5939



ALSO APPEARING:  MARGARET CARTER, DOJ
COMPLIANCE OFFICER

UNITED STATES DISTRICT COURT

4

**I N D E X**

<u>PAGE</u>

STATUS CONFERENCE:                                                          5

UNITED STATES DISTRICT COURT

5

LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 19, 2023

-o0o-

(COURT IN SESSION AT 10:11 A.M.)

THE COURTROOM DEPUTY:  Calling item number one, CV 12-428 -DDP:  Alex Rosas, et al. Leroy Baca, et al.

Will counsel please make their appearances.

MR. DUGDALE:  Good morning, Your Honor. Robert Dugdale on behalf of the defendants.  And I'm present at counsel table with chief DOJ Compliance Officer Margaret Carter, Michael McCarthy from my law firm and Dylan Ford from the Office of County Counsel.  Also present in the courtroom, Your Honor, is Assistant Sheriff Sergio Aloma, who is in charge of the jails.

THE COURT:  Good morning.

MR. DUGDALE:  Good morning, Your Honor.  Thank you.

MR. ELIASBERG:  Good morning, Your Honor. Peter Eliasberg from the ACLU Southern California on behalf of Mr. Rosas, Mr. Goodwin and the plaintiff class.  I'm here with co-counsel Corene Kendrick from the ACLU's national prison project.  Melissa Camacho from the ACLU of Southern California and Marisol Dominguez Ruiz from the ACLU's national prison project.

THE COURT: Very well. Good morning. Thank you.

All right. I've read your recent submission, your status report. Mr. Eliasberg, tell me where we are.

MR. ELIASBERG: Well, Your Honor, without going into a long --

THE COURT: Let's make sure, because we have 50 folks on Zoom that you speak directly into the microphone. Why don't you use the lectern.

MR. ELIASBERG: The podium? Thank you, Your Honor.

THE COURT: Thank you.

MR. ELIASBERG: So as Your Honor is aware, after the monitor submitted their 10th report to the court, expressing both some improvement that --

THE COURT: Let's do this: Just for the folks that aren't familiar with everything, just give the executive summary of what this case is about --

MR. ELIASBERG: Absolutely.

THE COURT: -- without any, you know, advocacy. Just keep it clean.

MR. ELIASBERG: Sure.

THE COURT: Okay.

MR. ELIASBERG: This is a case that the

plaintiffs brought, Your Honor, on behalf of a class of people incarcerated in the downtown L.A. jails, alleging that there was a pattern of excessive and unnecessary force being used by deputies and other sheriff personnel and a failure by higher ups in the department to control that excessive use of force.  The case, I believe, was brought in 2012.  We negotiated for a number of years and entered into a court-enforceable settlement agreement in 2015.  The heart of that settlement agreement was that there would be a three -- three monitors appointed by the Court who would develop what was called an implementation or action plan setting forth a number of provisions designed to ensure that the department improved its policies with respect to use of force, its training with respect to use of force and its accountability with respect to the use of force. They -- the action plan contains approximately a hundred provisions.  Since the entry of the decree in the beginning of the monitoring, the monitors have done 11 reports.  Because of the death of Mr. Schwartz, they probably would have done 12.  Basically they've done a report every six months, but the last report covered a year period because of the change of personnel within the monitoring group.

The three monitors in their 10th report

reported to the court that while the department had made substantial progress in a number of areas, they were concerned that in other areas it was a plateauing or perhaps even a regression.  They specifically identified probably four principal areas of concern:  Excessive and unnecessary use of head strikes; failure of the department personnel to use force prevention principles.  Basically force shouldn't be used, unless it's absolutely necessary; but, in fact, what the monitors were concluding was far too often department personnel were sort of rushing in, using force when it wasn't necessary; also failing to follow a process where it ordinarily if at all possible, you call a sergeant to the floor when you're dealing with somebody who may be difficult but is not yet engaged in use of force with the idea that the sergeant -- the cooler head and more experienced will be able to likely prevent use of force from happening.  And then the last major area of concern was the concern about this relatively new restraint device that the department was using called Wrap.  And the monitors had substantial concerns that it was being overused and not used in a safe fashion.

The parties agreed after the status conference in front of Your Honor and the submission of the 10th report to engage in a process where by they would try to

address those four areas through some -- through changes that we hoped we could mutually agree upon in terms of changes in policy, practice, training and accountability.

We have engaged in that process for quite a while now. We've worked very hard at it, but it has at some level been delayed because of both, the death of Mr. Schwartz and the change of the personnel within the monitors, because a number of our meetings have not just been counsel to counsel but involved the monitors because we wanted their expertise to try to help us figure out how to best achieve compliance with the consent decree; but despite the delays and also the change in the sheriff's administration, which necessarily it's hard to negotiate with one person who is outgoing when we don't know whether the new -- there will be policy changes and so on agreed to by the new sheriff; but despite those delays, we have worked very hard. I guess what I would say is, Your Honor, is I feel like the glass --

THE COURT: When you say "we," you mean both sides?

MR. ELIASBERG: Both sides, yeah. I absolutely have no complaint with the effort that's been made by defendant's counsel. I think they've met with us in

10

good faith.  You know, sometimes it's taken longer than I would like, but we're probably a little more nimble than a sheriff's department in terms of being able to come to agreement on what we would like to do.  So we have worked hard.  We have I think achieved a substantial amount of agreement on some important principles.  Perhaps number one, I'm very pleased that the defendants have agreed that they will move to a practice rather than having basically the on-duty sergeant do the initial force review, basically which means that they will be doing review of people that they're supervising.  They have moved -- agreed to move to a dedicated force review unit which we believe will both increase professionalism.  This will be basically the responsibility of these sergeants.  They will be tasked with doing force review.  They will be able to do it I think more quickly.  I think they will be able to do it more consistently and we hope because they won't be directly reviewing people that they -- who they supervise on a day-to-day basis, that we hope that that will also move to a willingness to find more violations when it's appropriate to find violations.  So I think that is a very significant step forward.

With respect to policies, particularly in the area of Wrap and the use of head strikes --

THE COURT: Wrap is the Bola device? No, no, no. Is that what it is?

MR. ELIASBERG: No, it's really sort of a full body device that they use to basically fully restrain people. And it's a -- it's generally -- we think it's being overused, but the idea is with a very difficult person who continues to present a risk who you're trying to transport after the main force event is concluded, this is -- this is a device that the department uses quite regularly.

And so with respect to both head strikes and the Wrap device, the department has agreed to make some pretty substantial changes in their policy.

THE COURT: When you say "head strikes," these are not with any instrument, such as a baton?

MR. ELIASBERG: Well, the policy would cover that, but that's not what we're seeing I think really at all. What we're seeing is punches with a closed fist to the head. I don't remember recently seeing. There were instances in the past of knees to the head. That is not something that we're seeing now. What we're seeing is use of closed fist strikes to the head, basically punches to the head, that's correct, Your Honor.

The department has moved. They have agreed to make changes in their policies with respect to Wrap and

head strikes and I think improve them, particularly with -- well, in both areas, we don't think the changes are enough, but they are certainly something that they have negotiated with us in good faith.

With respect to the Wrap, we're still waiting to see whether there may be some further changes coming down the line because the department is also talking to the Department of Justice and take -- getting comments from Department of Justice and I hope implementing some of those, but there certainly has been movement there. It's not all the movement that we would like.

I think the biggest area -- so there have been areas of improvement. The department has also agreed that with their use of force reviews, not only are they going to have a dedicated unit handling that rather than the on-duty sergeants, but they've also agreed to basically create certain templates that require the reviewer to go through the "elements of the policy" and say, okay, there was a head strike used. What we were previously seeing was something along the line of a conclusion that it was okay. Now, the department has agreed that they will have a template where they have to go through and really say, was this an assaultive inmate. Did the person who was hit, struck in the head, was there other reasonable alternatives? So the idea is

that we will professionalize and get better accountability on the force reviews.  I think that's a very significant step, but the glass is half empty part of this is, there are -- from our perspective, is there are areas where we either don't have complete agreement or we're quite far apart with the department.  I think the major one is this:  We believe -- and I certainly believe there is support from what the monitors have found in their reports.  I'm sure Mr. Dugdale will have a different, you know, interpretation of this; but that what we found is that frequently -- we believe frequently there are inappropriate uses of force.  And the supervisors are not finding violations or when they do, the discipline meted out is substantially simply not sufficient for the gravity of the offense that we believe has occurred.  We had, therefore, recommended -- well, the monitors had initially recommended strong resumptions.  We'd actually say, we'd believe that for certain offenses, discipline needs to be mandatory.  We're not talking across the board for every violation. We're talking about a -- a small subset of violations. We believe that in order for there to be the kind of accountability that the department needs to get itself into compliance with this decree, there needs to be some mandatory punishment.  And I think that our position I

believe is supported by the monitors own findings that when they have focus groups with sheriff's deputies, sheriff's deputies continue to say things like, gee, we really would rather -- we'd like to be more hand's on with recalcitrant inmates.  That's not consistent with what Rosas provides, it's not consistent with forced prevention, principles -- one point in the Rosas' decree.  And so we think that it is -- that's a substantial area of disagreement.  And honestly, I don't think, despite as I said, very good faith negotiations.  I don't doubt that at all, that the department is trying to figure out ways to meet us in areas.  I don't think that's an impasse that we're going to resolve by further negotiation.  So I guess where I would say -- and I think Mr. Dugdale would agree -- where we are is, we think we have reached agreement on a number of important principles.  We think we're -- there's some more things that we could get to if we had another month to --

THE COURT:  Maybe that's just a drafting issue in terms of -- you know, mandatory punishment is sort of -- it sort of reminds me of the guidelines that were in -- still in place to some extent in sentencing, and it's difficult to, you know, sort of sometimes put everything into a box that fits neatly.  And sometimes the way around those issues is to create a presumption

that this sort of punishment might be appropriate without mandating it.  And if the presumption is there, there has to be a -- some -- you know, appropriately articulated reason why it wasn't followed.  And that would seem to me to be one possible drafting area to sort of avoid the clash of mandating a particular outcome and still keeping the system with accountability.

MR. ELIASBERG:  I appreciate Your Honor's thoughts on that, but the reason I'm concerned that that's not going to work here is, because we were actually surprised.  The department did -- I had not initially seen their disciplinary guidelines.  They -- you know, they've been very good about -- sometimes slow -- but they've been good about providing us documents.  They gave us the department's disciplinary guidelines.  I frankly was pleasantly surprised to see that they both say that in the -- you know, basically something along the lines -- I'm not quoting verbatim but in the ordinary course, discipline should be in the range set forth.  And the range of penalties we think is quite firm.  So for example, use of force violation, unreasonable force violation calls for 15 days determination.  But I've rarely, if ever, seen in our force reviews of the cases that we review along with the

16

monitors, rarely have ever seen discipline like that imposed when the department does find a violation. So I'm concerned they already have that presumption and it's not working.

THE COURT: Sure. But even if you say "unreasonable use of force," that unreasonable use could be something that is not -- doesn't cause any serious injuries. It could be unreasonable because someone did something that was -- there was an inappropriate, you know, use of an arm restraint or something else that doesn't rise to the level of creating some serious risk of harm. So maybe what you're saying is just simply a summary, and I'm reading too much into it.

MR. ELIASBERG: Well, no, I -- Your Honor, that's why we didn't suggest that all violations should be subject to mandatory. We actually -- and if I'm under-inclusive I apologize. I think I'm nailing the vast majority. And we basically said head strike violation, because that's inherently -- and the monitors have said this: When you strike somebody with in the head with a fist, that's inherently a very dangerous act. There are times when it may be necessary. But if the department finds a violation of their own policy, this shouldn't have happened. This was not an appropriate use of head strike, we think that's the kind

of violation where there should be mandatory punishment. And we're only providing mandatory punishment -- we're requesting it through -- for dishonesty, which as Your Honor goes to the core of any system of accountability.  If deputies are lying about what's happening in force reports and they're found to be dishonest, that should be punished on a mandatory basis. So we are only really asking for mandatory punishment in a small subset of areas.  We're not saying anytime there's a violation of something that the punishment has to --

THE COURT:  I see.  So you're -- you're -- sure.  It makes -- I understand.  You're saying on the sort of -- the more extreme side of the situation, the bell-shape curve, you -- you think that those areas are just black-and-white.  They're just clear-cut.  There has to be some mandatory accountability for the egregious situations.

MR. ELIASBERG:  Exactly.  And at this point, Your Honor, we're not in a place where Mr. Dugdale is saying, you're proposing five areas of mandatory punishment, and we're willing to do three.  What his position -- and if I'm misstating it, of course, he'll correct me; but his position is basically, we're not going to go there.  We think that every punishment,

there has to be discretion for the department to decide what to do under those circumstances.  And that's I think where we are clearly at an impasse.  But in some, Your Honor, we've made a lot of progress.  We think there are certain areas where we can I think finalize some things with a little bit more time, but I'm not asking -- we're not asking for a lot -- another month.  And I think there are going to be a couple of areas where we're going to be at an impasse, and we are hoping that the Court would allow us at that point to say -- to brief to the Court, these are the areas of impasse.  Here's why we think a change either must be made or if defendants say doesn't need to be made, in order to ensure that the fundamental purposes of the consent decree here Court enforceable settlement agreement are implemented and that Your Honor can say no I don't think this is necessary or yes, I think this has to be here for the department to finally get to full compliance with the consent decree.

THE COURT:  I mean, that's fine, or we could have something akin to a settlement agreement where we talk about it before you get into an adversarial situation.  So I'd leave that up to you to think about.

MR. ELIASBERG:  That's fine, Your Honor. We're -- we're willing to do it.  I think what we are

hoping to get either today or some kind of written submission from the Court or order from the Court is sort of a clear guidance of how you want us to wrap this up.  We really have put in a lot of work.  We've tried very hard.  We're willing to continue to do some more negotiation, and if the Court says, you gotta bring in a neutral mediator or whatever, you know, we're willing to do that; but we've been going at this a while.  And at a certain point, I think we both recognize that we're kind of at a stale mate on some important issues, and we'd love some guidance from the Court as how you think best --

THE COURT:  You mean "guidance" in terms of -- I'm unclear on what you mean.

MR. ELIASBERG:  Well, for example, if Your Honor could say, okay, four more weeks.  Then I'm going to set a briefing schedule.  You present to me your areas of impasse, and I'll tell you based on your presentations whether I think this has to be implemented by department or doesn't have to be implemented in order to further the purposes and really get the department to reach full compliance.

THE COURT:  Sure.  So you want a date for the final chapter?

MR. ELIASBERG:  I think that's a great sum-up.

THE COURT:  Okay.

MR. ELIASBERG:  Thank you, Your Honor.

THE COURT:  Let me ask you another question -- I'll ask Mr. Dugdale a question.  Go ahead, Mr. Dugdale.  And if you want to elaborate on Mr. Eliasberg's characterization of what this case is about, feel free to do so, as well.

MR. DUGDALE:  Thank you very much, Your Honor.  So I think Mr. Eliasberg's characterization of the history of this is accurate and where we're at and where our areas of disagreement continue to be.  I just wanted to focus the Court on a few important things:  First, that there has been substantial progress made, not only in terms of our negotiations in the past year but in decreasing uses of force in the jail in the past year.  So we came here last May as a result of the monitors' 10th report which pointed out such things as the fact that head strikes were too high -- head strikes that shouldn't happen were way too high.  So in the past year, when you compare 2021 to 2022, there have been a decrease of 50 percent in the use of head strikes in the jails.

So there were a total of 17 head strikes last year at MCJ, the Men's Central Jail; a total of 16 at Twin Towers, two of the three facilities that are looked

at here.  And overall, a decrease of 50 percent in the use of head strikes.  So -- and again, as Your Honor noted, we're talking about punches to the head.  We're not talking about using a flashlight or a baton or a knee to the head or boot to the head.

THE COURT:  And, do you -- you know, individual officers are tracked in terms of -- or deputies, I should say, are tracked in terms of the use of head strikes; is that right?

MR. DUGDALE:  That is -- that is another change that has come about since the 10th report, is we have something called a "head strike tracker" that tracks head strikes, where they occur, which facility they occur, which unit in that facility we're able to tell, and then track down on a more micro level which deputies are employing head strikes and if there are --

THE COURT:  They track it down or it says?

MR. DUGDALE:  The head strike tracker does not identify particular deputies.  It -- it shows the -- where these head strikes occur, but those numbers allow us then to go to that location and -- and see if there's a dramatic rise, why is that?  Is this a deputy that is --

THE COURT:  Well, in terms of deputies, theoretically, repeated use of head strikes is not

readily available information?

MR. DUGDALE:  No, that's not -- that's not accurate.  We are able to track.  We just don't track it in this document.  We are able to track when we go back and look, okay, we find deputy X.  We know deputy X had a prior head strike.  That is -- that is trackable.  In fact, as a provision in this case, we have something called an "early warning system" that identifies problematic deputies.  So if there were repeated instances of deputies acting outside of policy, that would be tracked, Your Honor, but -- as a requirement of this agreement alone.  But -- but the point is, there is a better effort right now to track head strikes.  And the head strikes are on the decrease.  And -- and we take this issue seriously, of course.  Like even a punch to the face or certainly multiple punches to the face could seriously hurt somebody or even kill them.  This is not a John Wick movie where you can get punched --

THE COURT:  How do you know that the data you're receiving on the frequency of head strikes is accurate?  How do you know that you're being told there was a head strike.

MR. DUGDALE:  Well, every use of force gets reported as a result of this agreement.

23

THE COURT:  Theoretically.

MR. DUGDALE:  Well, I mean, if we didn't report it, we would seriously be out of compliance.  And that to my knowledge has not been an issue raised by the monitors, whether we're prop -- whether we're reporting uses of force or not.  So uses of force are being reported across the board every time they occur.  That would be a real problem that's not been identified by the monitors as a problem of uses of force are not being --

THE COURT:  Well what?  Medical personnel are also required to report treatment for head strikes?

MR. DUGDALE:  You would have to look in a more micro level to see that, but deputies are -- every use of force is reported.  And you -- head strikes are reported as head strikes.  And uses of force are reviewed to see if they involved a head strike, and that is how the head strike tracker takes place.  This is not --

THE COURT:  Just so I understand, there's video evidence or video available that can be used to make sure that the reporting is done accurately?

MR. DUGDALE:  Correct.  So another significant change --

THE COURT:  I mean, it's a hypothetical problem

within any organization --

MR. DUGDALE:  Of course.

THE COURT:  -- and that is, people don't like to report things that are bad because they know there are consequences.  So anytime you're dealing with self-reporting, it's inherently problematic, unless you have safeguards.

MR. DUGDALE:  Of course.  And those cameras are one of the safeguards, Your Honor.  So there -- unlike -- unlike at the admin of this litigation, I mean this is a completely different place that we're at today than we were when this litigation was filed.  And one of the big differences is that there are cameras throughout these facilities now that detect, you know, these instances.  And one of the changes that we're agreeing to through this compliance plan is to analyze that video footage and make sure that in a report or review of the use of force, we are comparing that video footage to what the deputy who used -- had a use of force says.

THE COURT:  And the monitors would have access to that video, and they can double-check to see if things are being reported?

MR. DUGDALE:  Correct.  The monitors and plaintiff's counsel.  So we make all of this information available.  And, in fact, Your Honor, one of the -- one

of pleasant and recent changes that we've had is, we have started reviewing these uses of force with the monitors earlier on. So we -- we don't -- we're not looking at uses of force with the monitors that are two years old or something like that. If there's a problematic use of force, the monitors have access to that video, they brought these instances to our attention, and we have had in some cases hours long discussions about particular uses of force. And what happens is, we will look at the video. We will look at the report. We will compare the two things, analyze whether the use of force was appropriate, analyze whether the reporting of that use of a -- of -- of force was accurate. And -- and we are starting now to share that information with the monitors and review them -- that information, you know, as early as we can to try and -- and make sure that everybody understands what's going on in the process, including what discipline or even pre-discipline is happening to the deputies who are involved in uses of force. So when I say "pre-discipline," is that deputy suspended, pending resolution of it and things like that.

THE COURT: Okay. You've answered my question. So you may continue with the -- your comments.

MR. DUGDALE: Thank you, Your Honor. So head

strikes are down.  Overall uses of force are down.  I believe they're at levels lower than 2020 when the jails were less populated and people were confined to their cells due to COVID.  So I think one of the headlines to take away is that this is improving.  I don't think anybody can argue that it's not.  I understand plaintiff's counsel's position that there are more ways to go here.  And that's why we've had these discussions about these four areas:  Head strikes, the use of the Wrap, diversion, force of voidance techniques, and accountability.  And -- and as Mr. Eliasberg indicated, we have some minor issues that may be able to -- may be able to clear up and come to consensus on with drafting, maybe not; but the two big-picture issues are the overall head strike policy which should be employed, which we believe the policy which, in fact, matches what is required under this very agreement is very restrictive and has shown success in reducing head strikes and accountability, where we believe that steps that we are taking will enhance deputy accountability.  And I -- I must say, I think there's probably very little chance we will agree to mandatory minimum penalties.  We believe that the fair way to deal with discipline is twofold.  First of all, to look at all the circumstances.  This is sort of a 3553(e) *Booker*

analysis I know Your Honor is real familiar --

THE COURT:  I think you were able to pull that one out of your head so quickly.

MR. DUGDALE:  Thank you.  I still remember.

THE COURT:  Do you remember the eight factors?

MR. DUGDALE:  I do remember the eight factors.

I may only get six or seven of them right now.

THE COURT:  I just made up the number about eight.  It's nonexclusive.

MR. DUGDALE:  I believe there's more than eight, but in any event....

(Laughter.)

MR. DUGDALE:  We want to look at the totality of the circumstances, the individual involved.  And the second big piece of this is to have progressive discipline.  We are not going to treat a deputy the same way who engages in multiple uses of force out of policy and -- versus a deputy who engages in a -- in a policy violation where the ramifications as Your Honor indicated, may -- they vary largely.  So, again, we want to -- and we should we believe through discipline, individualize it.  There's another issue on discipline, of course, too.  And that's that we don't have -- the sheriff does not have unilateral say over changing a disciplinary policy.  These things are all subject to

collective bargaining with ALAD's, the deputies union. So I --

THE COURT:  I don't know that I'm necessarily buying that argument, but go ahead.

MR. DUGDALE:  Okay.  In any event, I suspect if we start litigating over this, that we will have an intervenor.  And -- and, again, I think the more -- more important point is that we just don't think that mandatory minimums here --

THE COURT:  So how do we get to the finish line on this?  You've got two major components remaining. Mr. Eliasberg wants a cutoff date to either agree or litigate or have some third party help mediate.  But it needs to be ready for finality soon.  And what do you suggest in terms its of timing on that?  I was thinking six weeks.

MR. DUGDALE:  Six weeks is fine for us to report back as far as sort of the final, final this is where we're at -- these are where we think we have to go to our corners, and perhaps in that process we can figure out a method.  I mean, we have monitors who have sat through these discussions that I'm sure have -- and have given input on these subjects, including the accountability subject.  We have -- Your Honor, we have a magistrate judge.  I believe it's

Magistrate Judge Wilner involved in this case who perhaps could try to mediate disputes here.  So I'm not -- I'm not hopeful we're going to close the gap entirely, but I think we could close the gap on a number of other issues substantially between now and six weeks from now.  And I do also as another headline, in addition, to the headline that use of force is going down, head strikes are going down, say that we have made a lot of progress in the past year.  So we attached a document to the status report.  I know it was very, you know, recently filed.  But the areas of agreement on the color coded chart at the end, when they're in green that's where we agree.  And there's a lot of green right now.  There was not before.

THE COURT:  Let's get it done.

MR. DUGDALE:  Of course.

THE -- COURT:  So if we have another settlement conference, are we going to be -- I mean, another status conference, are we going to be right back here talking about this impasse?  Because you've said, "I don't see any movement," the ACLU has said, "We don't see any movement," I'm trying to sort of think about ways and suggested some, that maybe there's a way to provide accountability and consequences, but also have room for flexibility.  And that's what you want?

30

MR. DUGDALE:  Of course.  So look, let me be very, very clear, especially the new sheriff.  I mean, the new sheriff is limitedly involved in making sure that we come into compliance on all of these issues, including the other ones we're going to talk about today.  And the tone at the top is very strongly in favor of doing everything the right way that we have to do to follow the law and follow our obligations under these agreements.

So -- and, you know, it is a relative new tenure.  As I think the Court knows, he has set up a constitutional policing section headed by former U. S. Attorney Eileen Decker, who I know is following these proceedings today.  So we have a new tone at the top on this agreement, particularly to make sure we're trying to do the right thing.  Are we going to bridge every gap and come to ground with the ACLU?  I don't know about that, Your Honor.  But we are --

THE COURT:  Let's do this then -- let's just -- why don't I just say this:  In six weeks, you will tell me what you've agreed upon, and you will -- to the extent there are things that you have not agreed upon, you will file the final substantive motion on this matter.

MR. DUGDALE:  I think that's a fair way to go

UNITED STATES DISTRICT COURT

about doing it.  And internally, we can set our own deadlines to figure out what we agree to and what we don't.  I do --

THE COURT:  Really what I'm saying is, in six weeks, you know, I need -- you know, I need cross-motions on the remaining issues in this case, and they will include whatever issues have not been resolved.

MR. DUGDALE:  That's fine, Your Honor.  We -- we want to get to the finish line on this too to finalize it, I think as explained by Mr. Eliasberg, things like setting up this independent use of force committee, who are going to help us get there and -- and -- and we will share all that information, and we will put our differences before the Court and figure out how to proceed.

THE COURT:  I know you've all worked very well together.  I do.  So I appreciate that.  And so let's do that.  Do we have a date?

THE COURTROOM DEPUTY:  May 31.

THE COURT:  May 31.  Okay.

MR. DUGDALE:  Thank you, Your Honor.

THE COURT:  We're all clear on that.

MR. ELIASBERG:  So we will report to the court areas of agreement, and we will file our initial

UNITED STATES DISTRICT COURT

cross-motion.

THE COURT:  I assume you're not going to agree on all areas.  So I will expect you to file a motion on that date.  Cross-motions for summary adjudication on those issues.

MR. ELIASBERG:  Okay.

MR. DUGDALE:  Your Honor, that's fine.  I think what we will do internally is set an internal deadline to under -- to understand between us what those differences are.

THE COURT:  I figure you will do that, as well.

MR. DUGDALE:  Yes.  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.

MR. ELIASBERG:  Thank you, Your Honor.

THE COURT:  Okay.  Let's call the next matter.

(Whereupon, proceedings adjourned.)

- - -

**C E R T I F I C A T E**

UNITED STATES DISTRICT COURT

ALEX ROSAS, et. Al.,                          :

                    vs.                       :   No. CV 12-00428-DDP

LEROY BACA                                    :


I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


/S/_____          //____

MARIA R. BUSTILLOS                        DATE
OFFICIAL REPORTER

34

**/**

/S [1] - 33:21

**1**

10100 [1] - 2:20
10:11 [1] - 5:3
10th [5] - 6:15, 7:25, 8:24, 20:17, 21:11
11 [1] - 7:19
12 [1] - 7:21
12-00428-DDP [2] - 1:10, 33:5
12-428 [1] - 5:5
12254 [1] - 1:22
1313 [2] - 2:6, 2:11
15 [1] - 15:23
16 [1] - 20:24
17 [1] - 20:23
1725 [1] - 2:20
19 [2] - 1:18, 5:1
1ST [1] - 1:23

**2**

2012 [1] - 7:7
2015 [1] - 7:9
202)393-4930 [1] - 2:16
2020 [1] - 26:2
2021 [1] - 20:20
2022 [1] - 20:20
2023 [2] - 1:18, 5:1
213 [1] - 1:24
213)893-5939 [1] - 3:5
213)977-5228 [1] - 2:7
213)977-9500 [1] - 2:12
28 [1] - 33:12

**3**

31 [2] - 31:20, 31:21
310)272-7929 [1] - 2:25
310)556-2700 [1] - 2:21
350 [1] - 1:23
3553(e [1] - 26:25
39 [1] - 2:15

**4**

4455 [1] - 1:23

**5**

5 [1] - 4:2
50 [3] - 6:8, 20:21, 21:1

**500** [2] - 2:24, 3:4

**7**

753 [1] - 33:11

**8**

894-2739 [1] - 1:24

**9**

90012 [3] - 1:24, 2:25, 3:5
90017 [2] - 2:7, 2:11
90067 [1] - 2:21
94111 [1] - 2:16

**A**

A.M [1] - 5:3
able [10] - 8:17, 10:3, 10:16, 10:17, 21:14, 22:3, 22:4, 26:12, 26:13, 27:2
ABOVE [1] - 33:14
ABOVE-ENTITLED [1] - 33:14
absolutely [3] - 6:20, 8:9, 9:23
access [2] - 24:20, 25:6
accountability [12] - 7:16, 9:4, 13:2, 13:23, 15:8, 17:5, 17:17, 26:11, 26:19, 26:20, 28:24, 29:24
accurate [4] - 20:10, 22:3, 22:22, 25:14
accurately [1] - 23:22
achieve [1] - 9:12
achieved [1] - 10:5
ACLU [7] - 2:4, 2:9, 2:13, 5:19, 5:23, 29:21, 30:17
ACLU's [2] - 5:22, 5:24
act [1] - 16:22
acting [1] - 22:10
action [2] - 7:12, 7:17
addition [1] - 29:7
address [1] - 9:1
adjourned [1] - 32:16
adjudication [1] - 32:4
admin [1] - 24:10
administration [1] - 9:14
adversarial [1] - 18:22
advocacy [1] - 6:21
agree [7] - 9:2, 14:15, 26:22, 28:12, 29:13, 31:2, 32:2
agreed [11] - 8:23,

9:17, 10:8, 10:12, 11:12, 11:24, 12:13, 12:16, 12:22, 30:21, 30:22
agreeing [1] - 24:15
agreement [14] - 7:9, 7:10, 10:4, 10:6, 13:5, 14:16, 18:16, 18:21, 22:12, 22:25, 26:17, 29:11, 30:15, 31:25
agreements [1] - 30:9
ahead [2] - 20:4, 28:4
akin [1] - 18:21
al [8] - 1:7, 1:12, 2:4, 2:19, 3:3, 5:5, 33:4
ALAD's [1] - 28:1
Alex [1] - 5:5
ALEX [3] - 1:7, 2:4, 33:4
alleging [1] - 7:2
allow [2] - 18:10, 21:20
Aloma [1] - 5:13
alone [1] - 22:12
ALSO [1] - 3:8
alternatives [1] - 12:25
amount [1] - 10:6
analysis [1] - 27:1
analyze [3] - 24:16, 25:11, 25:12
AND [3] - 33:9, 33:12, 33:14
AND/OR [1] - 33:18
ANGELES [9] - 1:17, 1:24, 2:7, 2:11, 2:21, 2:25, 3:3, 3:5, 5:1
answered [1] - 25:23
ANY [1] - 33:17
anytime [2] - 17:9, 24:5
apart [1] - 13:6
apologize [1] - 16:17
appearances [1] - 5:6
APPEARING [1] - 3:8
appointed [1] - 7:11
appreciate [2] - 15:9, 31:18
appropriate [4] - 10:22, 15:1, 16:25, 25:12
appropriately [1] - 15:3
APRIL [2] - 1:18, 5:1
ARE [1] - 33:18
area [5] - 8:18, 10:25, 12:12, 14:9, 15:5
areas [20] - 8:2, 8:3, 8:5, 9:1, 12:2, 12:13, 13:5, 14:12, 17:9, 17:15, 17:21, 18:5, 18:9, 18:11, 19:18, 20:11, 26:9, 29:11, 31:25, 32:3

argue [1] - 26:6
argument [1] - 28:4
arm [1] - 16:10
articulated [1] - 15:4
assaultive [1] - 12:23
Assistant [1] - 5:13
assume [1] - 32:2
AT [1] - 5:3
attached [1] - 29:9
attention [1] - 25:8
attorney [1] - 30:13
available [3] - 22:1, 23:21, 24:25
avoid [1] - 15:6
aware [1] - 6:14

**B**

Baca [1] - 5:5
BACA [4] - 1:12, 2:19, 3:3, 33:6
bad [1] - 24:4
bargaining [1] - 28:1
based [1] - 19:18
basis [2] - 10:20, 17:7
baton [2] - 11:15, 21:4
beginning [1] - 7:19
BEHALF [3] - 2:4, 2:18, 3:2
behalf [3] - 5:8, 5:20, 7:1
bell [1] - 17:15
bell-shape [1] - 17:15
best [2] - 9:12, 19:12
better [2] - 13:1, 22:13
between [2] - 29:5, 32:9
big [3] - 24:13, 26:14, 27:15
big-picture [1] - 26:14
biggest [1] - 12:12
bit [1] - 18:6
black [1] - 17:16
black-and-white [1] - 17:16
board [2] - 13:20, 23:7
body [1] - 11:4
Bola [1] - 11:1
Booker [1] - 26:25
boot [1] - 21:5
BOULEVARD [1] - 2:20
box [1] - 14:24
bridge [1] - 30:16
brief [1] - 18:11
briefing [1] - 19:17
BRILL [2] - 2:19, 2:23
bring [1] - 19:6
brought [3] - 7:1, 7:7, 25:7
BUSTILLOS [3] - 1:21, 33:9, 33:22
buying [1] - 28:4
BY [7] - 2:5, 2:10,

2:14, 2:15, 2:19, 2:23, 3:3

**C**

C.S.R [1] - 1:22
CA [6] - 2:7, 2:11, 2:16, 2:21, 2:25, 3:5
California [2] - 5:19, 5:23
CALIFORNIA [7] - 1:2, 1:17, 1:24, 2:5, 2:9, 5:1, 33:11
CAMACHO [1] - 2:10
Camacho [1] - 5:22
CAMACHO-CHEUNG [1] - 2:10
cameras [2] - 24:8, 24:13
Carter [1] - 5:10
CARTER [1] - 3:8
case [7] - 6:19, 6:25, 7:6, 20:6, 22:7, 29:1, 31:6
cases [2] - 15:25, 25:8
cells [1] - 26:4
CENTRAL [2] - 1:2, 33:10
Central [1] - 20:24
certain [4] - 12:17, 13:19, 18:5, 19:9
certainly [4] - 12:3, 12:10, 13:7, 22:16
CERTIFY [1] - 33:11
chance [1] - 26:22
change [6] - 7:23, 9:8, 9:14, 18:12, 21:10, 23:24
changes [9] - 9:1, 9:3, 9:17, 11:13, 11:25, 12:2, 12:6, 24:15, 25:1
changing [1] - 27:24
chapter [1] - 19:24
characterization [2] - 20:6, 20:9
charge [1] - 5:14
CHARGED [1] - 33:17
chart [1] - 29:12
check [1] - 24:21
CHEUNG [1] - 2:10
chief [1] - 5:9
CIRCUIT [1] - 33:17
circumstances [3] - 18:2, 26:25, 27:14
clash [1] - 15:6
class [2] - 5:21, 7:1
clean [1] - 6:22
clear [5] - 17:16, 19:3, 26:13, 30:2, 31:23
clear-cut [1] - 17:16
clearly [1] - 18:3
close [2] - 29:3, 29:4
closed [2] - 11:18, 11:22

**co** [1] - 5:21
**co-counsel** [1] - 5:21
**CODE** [1] - 33:12
**coded** [1] - 29:12
**collective** [1] - 28:1
**color** [1] - 29:12
**coming** [1] - 12:6
**comments** [2] - 12:8, 25:24
**committee** [1] - 31:13
**compare** [2] - 20:20, 25:11
**comparing** [1] - 24:18
**complaint** [1] - 9:24
**complete** [1] - 13:5
**completely** [1] - 24:11
**COMPLIANCE** [1] - 3:8
**Compliance** [1] - 5:10
**compliance** [7] - 9:12, 13:24, 18:19, 19:22, 23:3, 24:16, 30:4
**components** [1] - 28:11
**concern** [3] - 8:5, 8:18, 8:19
**concerned** [3] - 8:3, 15:10, 16:3
**concerns** [1] - 8:21
**concluded** [1] - 11:8
**concluding** [1] - 8:10
**conclusion** [1] - 12:21
**CONFERENCE** [4] - 1:16, 4:2, 33:16, 33:19
**conference** [3] - 8:23, 29:18, 29:19
**confined** [1] - 26:3
**CONFORMANCE** [2] - 33:15, 33:18
**consensus** [1] - 26:13
**consent** [3] - 9:13, 18:15, 18:19
**consequences** [2] - 24:5, 29:24
**consistent** [2] - 14:5, 14:6
**consistently** [1] - 10:18
**constitutional** [1] - 30:12
**CONT'D** [1] - 3:1
**contains** [1] - 7:17
**continue** [4] - 14:3, 19:5, 20:11, 25:24
**continues** [1] - 11:7
**control** [1] - 7:5
**cooler** [1] - 8:16
**core** [1] - 17:4
**CORENE** [1] - 2:14
**Corene** [1] - 5:21
**corners** [1] - 28:20
**CORRECT** [1] - 33:13
**correct** [4] - 11:23, 17:24, 23:23, 24:23

**COUNSEL** [1] - 3:3
**counsel** [7] - 5:6, 5:9, 5:21, 9:10, 9:25, 24:24
**Counsel** [1] - 5:12
**counsel's** [1] - 26:7
**County** [1] - 5:12
**COUNTY** [1] - 3:3
**couple** [1] - 18:8
**course** [8] - 15:20, 17:23, 22:15, 24:2, 24:8, 27:23, 29:16, 30:1
**court** [4] - 6:16, 7:8, 8:1, 31:24
**COURT** [50] - 1:1, 1:21, 5:3, 5:15, 6:1, 6:8, 6:13, 6:17, 6:21, 6:24, 9:21, 11:1, 11:14, 14:19, 16:5, 17:12, 18:20, 19:13, 19:23, 20:1, 20:3, 21:6, 21:17, 21:24, 22:20, 23:1, 23:11, 23:20, 23:25, 24:3, 24:20, 25:23, 27:2, 27:5, 27:8, 28:3, 28:10, 29:15, 29:17, 30:19, 31:4, 31:17, 31:21, 31:23, 32:2, 32:11, 32:13, 32:15, 33:9, 33:10
**Court** [11] - 7:11, 18:10, 18:11, 18:15, 19:2, 19:6, 19:11, 20:12, 30:11, 31:15
**court-enforceable** [1] - 7:8
**COURTHOUSE** [1] - 1:22
**COURTROOM** [2] - 5:4, 31:20
**courtroom** [1] - 5:12
**cover** [1] - 11:16
**covered** [1] - 7:22
**COVID** [1] - 26:4
**create** [2] - 12:17, 14:25
**creating** [1] - 16:11
**cross** [3] - 31:6, 32:1, 32:4
**cross-motion** [1] - 32:1
**cross-motions** [2] - 31:6, 32:4
**curve** [1] - 17:15
**cut** [1] - 17:16
**cutoff** [1] - 28:12
**CV** [3] - 1:10, 5:5, 33:5

# D

**dangerous** [1] - 16:21
**data** [1] - 22:20
**date** [4] - 19:23, 28:12,

31:19, 32:4
**DATE** [1] - 33:22
**day-to-day** [1] - 10:20
**days** [1] - 15:23
**DDP** [1] - 5:5
**deadline** [1] - 32:8
**deadlines** [1] - 31:2
**deal** [1] - 26:23
**dealing** [2] - 8:14, 24:5
**DEAN** [1] - 1:5
**death** [2] - 7:20, 9:7
**decide** [1] - 18:1
**Decker** [1] - 30:13
**decrease** [3] - 20:21, 21:1, 22:14
**decreasing** [1] - 20:15
**decree** [6] - 7:18, 9:13, 13:24, 14:8, 18:15, 18:19
**dedicated** [2] - 10:13, 12:15
**defendant's** [1] - 9:25
**defendants** [3] - 5:8, 10:8, 18:13
**DEFENDANTS** [2] - 2:18, 3:2
**Defendants** [1] - 1:13
**delayed** [1] - 9:7
**delays** [2] - 9:13, 9:18
**Department** [2] - 12:8, 12:9
**department** [23] - 7:5, 7:14, 8:1, 8:7, 8:10, 8:20, 10:3, 11:9, 11:12, 11:24, 12:7, 12:13, 12:21, 13:6, 13:23, 14:11, 15:12, 16:2, 16:23, 18:1, 18:18, 19:20, 19:21
**department's** [1] - 15:16
**DEPOSIT** [1] - 33:18
**deputies** [13] - 7:4, 14:2, 14:3, 17:5, 21:7, 21:15, 21:19, 21:24, 22:9, 22:10, 23:14, 25:19, 28:1
**DEPUTY** [2] - 5:4, 31:20
**deputy** [8] - 21:22, 22:5, 24:19, 25:21, 26:20, 27:16, 27:18
**designed** [1] - 7:13
**despite** [3] - 9:13, 9:18, 14:10
**detect** [1] - 24:14
**determination** [1] - 15:24
**develop** [1] - 7:11
**device** [5] - 8:20, 11:1, 11:4, 11:9, 11:12
**differences** [3] - 24:13, 31:15, 32:10
**different** [2] - 13:10,

24:11
**difficult** [3] - 8:15, 11:6, 14:23
**directly** [2] - 6:9, 10:19
**disagreement** [2] - 14:9, 20:11
**disciplinary** [3] - 15:13, 15:16, 27:25
**discipline** [11] - 13:14, 13:19, 15:20, 16:1, 25:18, 25:19, 25:21, 26:24, 27:16, 27:21, 27:22
**discretion** [1] - 18:1
**discussions** [3] - 25:9, 26:8, 28:22
**dishonest** [1] - 17:7
**dishonesty** [1] - 17:3
**disputes** [1] - 29:2
**DISTRICT** [5] - 1:1, 1:2, 1:5, 33:10
**diversion** [1] - 26:10
**DIVISION** [1] - 1:3
**DO** [1] - 33:11
**document** [2] - 22:4, 29:10
**documents** [1] - 15:16
**DOJ** [2] - 3:8, 5:9
**Dominguez** [1] - 5:24
**DOMINGUEZ** [1] - 2:15
**done** [5] - 7:19, 7:21, 23:22, 29:15
**double** [1] - 24:21
**double-check** [1] - 24:21
**doubt** [1] - 14:11
**down** [7] - 12:7, 21:15, 21:17, 26:1, 29:8
**downtown** [1] - 7:2
**drafting** [3] - 14:19, 15:5, 26:13
**dramatic** [1] - 21:22
**DRUMM** [1] - 2:15
**due** [1] - 26:4
**DUGDALE** [28] - 2:19, 5:7, 5:16, 20:8, 21:10, 21:18, 22:2, 22:24, 23:2, 23:13, 23:23, 24:2, 24:8, 24:23, 25:25, 27:4, 27:6, 27:10, 27:13, 28:5, 28:17, 29:16, 30:1, 30:25, 31:9, 31:22, 32:7, 32:12
**Dugdale** [6] - 5:8, 13:9, 14:15, 17:20, 20:4
**duty** [2] - 10:9, 12:16
**DYLAN** [1] - 3:3
**Dylan** [1] - 5:11

# E

**early** [2] - 22:8, 25:16
**effort** [2] - 9:24, 22:13
**egregious** [1] - 17:18
**eight** [4] - 27:5, 27:6, 27:9, 27:11
**EIGHT** [1] - 2:11
**EIGHTH** [1] - 2:6
**Eileen** [1] - 30:13
**either** [4] - 13:5, 18:12, 19:1, 28:12
**elaborate** [1] - 20:5
**elements** [1] - 12:18
**Eliasberg** [5] - 5:19, 6:4, 26:11, 28:12, 31:11
**ELIASBERG** [21] - 2:5, 5:18, 6:6, 6:11, 6:14, 6:20, 6:23, 6:25, 9:23, 11:3, 11:16, 15:9, 16:14, 17:19, 18:24, 19:15, 19:25, 20:2, 31:24, 32:6, 32:14
**Eliasberg's** [2] - 20:5, 20:9
**employed** [1] - 26:15
**employing** [1] - 21:16
**empty** [1] - 13:3
**end** [1] - 29:12
**enforceable** [2] - 7:8, 18:15
**engage** [1] - 8:25
**engaged** [2] - 8:15, 9:5
**engages** [2] - 27:17, 27:18
**enhance** [1] - 26:20
**ensure** [2] - 7:13, 18:14
**entered** [1] - 7:8
**entirely** [1] - 29:4
**ENTITLED** [1] - 33:14
**entry** [1] - 7:18
**especially** [1] - 30:2
**ESQ** [5] - 2:6, 2:14, 2:19, 2:23, 3:3
**et** [8] - 1:7, 1:12, 2:4, 2:19, 3:3, 5:5, 33:4
**event** [2] - 11:8, 28:5
**event...** [1] - 27:11
**evidence** [1] - 23:21
**exactly** [1] - 17:19
**example** [2] - 15:22, 19:15
**excessive** [3] - 7:3, 7:6, 8:5
**executive** [1] - 6:19
**expect** [1] - 32:3
**experienced** [1] - 8:17
**expertise** [1] - 9:11
**explained** [1] - 31:11
**expressing** [1] - 6:16

**extent** [2] - 14:22, 30:22
**extreme** [1] - 17:14

## F

**face** [2] - 22:16
**facilities** [2] - 20:25, 24:14
**facility** [2] - 21:13, 21:14
**fact** [5] - 8:9, 20:17, 22:7, 24:25, 26:16
**factors** [2] - 27:5, 27:6
**failing** [1] - 8:12
**failure** [2] - 7:5, 8:6
**fair** [2] - 26:23, 30:25
**faith** [3] - 10:1, 12:4, 14:10
**familiar** [2] - 6:18, 27:1
**far** [3] - 8:10, 13:6, 28:18
**fashion** [1] - 8:22
**favor** [1] - 30:7
**FEE** [1] - 33:17
**FEES** [1] - 33:17
**few** [1] - 20:12
**figure** [6] - 9:12, 14:12, 28:21, 31:2, 31:15, 32:11
**file** [3] - 30:23, 31:25, 32:3
**filed** [2] - 24:12, 29:11
**final** [4] - 19:24, 28:18, 30:23
**finality** [1] - 28:14
**finalize** [2] - 18:5, 31:11
**finally** [1] - 18:18
**findings** [1] - 14:1
**fine** [5] - 18:20, 18:24, 28:17, 31:9, 32:7
**finish** [2] - 28:10, 31:10
**firm** [2] - 5:11, 15:22
**first** [2] - 20:12, 26:24
**fist** [3] - 11:18, 11:22, 16:21
**fits** [1] - 14:24
**five** [1] - 17:21
**flashlight** [1] - 21:4
**flexibility** [1] - 29:25
**floor** [1] - 8:14
**FLOOR** [2] - 2:24, 3:4
**focus** [2] - 14:2, 20:12
**folks** [2] - 6:9, 6:17
**follow** [3] - 8:12, 30:8
**followed** [1] - 15:4
**following** [1] - 30:13
**footage** [2] - 24:17, 24:18
**FOR** [3] - 33:9, 33:10, 33:17
**force** [43] - 7:4, 7:6,

7:15, 7:16, 8:7, 8:8, 8:11, 8:15, 8:17, 10:10, 10:13, 10:16, 11:8, 12:14, 13:2, 13:12, 15:22, 15:23, 15:25, 16:6, 17:6, 20:15, 22:24, 23:6, 23:9, 23:15, 23:16, 24:18, 24:19, 25:2, 25:4, 25:6, 25:9, 25:12, 25:13, 25:20, 26:1, 26:10, 27:17, 29:7, 31:12
**forced** [1] - 14:6
**FORD** [1] - 3:3
**Ford** [1] - 5:11
**FOREGOING** [1] - 33:12
**FORMAT** [1] - 33:15
**former** [1] - 30:12
**forth** [2] - 7:13, 15:21
**forward** [1] - 10:23
**FOUNDATION** [2] - 2:4, 2:9
**four** [4] - 8:5, 9:1, 19:16, 26:9
**FRANCISCO** [1] - 2:16
**frankly** [1] - 15:17
**free** [1] - 20:6
**frequency** [1] - 22:21
**frequently** [2] - 13:11, 13:12
**front** [1] - 8:24
**full** [3] - 11:3, 18:18, 19:22
**fully** [1] - 11:4
**fundamental** [1] - 18:14

## G

**gap** [3] - 29:3, 29:4, 30:17
**gee** [1] - 14:3
**generally** [1] - 11:5
**given** [1] - 28:23
**glass** [2] - 9:20, 13:3
**Goodwin** [1] - 5:20
**gotta** [1] - 19:6
**gravity** [1] - 13:15
**great** [1] - 19:25
**green** [2] - 29:12, 29:13
**ground** [1] - 30:17
**group** [1] - 7:24
**groups** [1] - 14:2
**guess** [2] - 9:19, 14:14
**guidance** [3] - 19:3, 19:11, 19:13
**guidelines** [3] - 14:21, 15:13, 15:17

## H

**half** [1] - 13:3
**hand's** [1] - 14:4
**handling** [1] - 12:15
**hard** [5] - 9:6, 9:15, 9:19, 10:5, 19:5
**harm** [1] - 16:12
**head** [46] - 8:6, 8:16, 10:25, 11:11, 11:14, 11:19, 11:20, 11:22, 11:23, 12:1, 12:19, 12:24, 16:18, 16:21, 16:25, 20:18, 20:21, 20:23, 21:2, 21:3, 21:5, 21:8, 21:12, 21:13, 21:16, 21:18, 21:20, 21:25, 22:6, 22:13, 22:14, 22:21, 22:23, 23:12, 23:15, 23:16, 23:17, 23:18, 25:25, 26:9, 26:15, 26:18, 27:3, 29:8
**headed** [1] - 30:12
**headline** [2] - 29:6, 29:7
**headlines** [1] - 26:4
**heart** [1] - 7:9
**HELD** [1] - 33:14
**help** [3] - 9:11, 28:13, 31:13
**HEREBY** [1] - 33:11
**high** [2] - 20:18, 20:19
**higher** [1] - 7:5
**history** [1] - 20:10
**hit** [1] - 12:24
**honestly** [1] - 14:9
**Honor** [34] - 5:7, 5:13, 5:16, 5:18, 6:6, 6:12, 6:14, 7:1, 8:24, 9:19, 11:23, 16:14, 17:4, 17:20, 18:4, 18:16, 18:24, 19:16, 20:2, 20:8, 21:2, 22:11, 24:9, 24:25, 25:25, 27:1, 27:19, 28:24, 30:18, 31:9, 31:22, 32:7, 32:12, 32:14
**Honor's** [1] - 15:9
**HONORABLE** [1] - 1:5
**hope** [3] - 10:18, 10:20, 12:9
**hoped** [1] - 9:2
**hopeful** [1] - 29:3
**hoping** [2] - 18:10, 19:1
**hours** [1] - 25:8
**hundred** [1] - 7:17
**hurt** [1] - 22:17
**hypothetical** [1] - 23:25

## I

**idea** [3] - 8:16, 11:6, 12:25
**identified** [2] - 8:4, 23:8
**identifies** [1] - 22:8
**identify** [1] - 21:19
**impasse** [6] - 14:13, 18:3, 18:9, 18:12, 19:18, 29:20
**implementation** [1] - 7:12
**implemented** [3] - 18:16, 19:19, 19:20
**implementing** [1] - 12:9
**important** [5] - 10:6, 14:16, 19:10, 20:12, 28:8
**imposed** [1] - 16:2
**improve** [1] - 12:1
**improved** [1] - 7:14
**improvement** [2] - 6:16, 12:13
**improving** [1] - 26:5
**IN** [5] - 5:3, 33:9, 33:14, 33:15, 33:18
**inappropriate** [2] - 13:12, 16:9
**incarcerated** [1] - 7:2
**include** [1] - 31:7
**including** [3] - 25:18, 28:23, 30:5
**inclusive** [1] - 16:17
**increase** [1] - 10:14
**independent** [1] - 31:12
**indicated** [2] - 26:11, 27:20
**individual** [2] - 21:6, 27:14
**individualize** [1] - 27:22
**information** [5] - 22:1, 24:24, 25:15, 25:16, 31:14
**inherently** [3] - 16:19, 16:21, 24:6
**initial** [2] - 10:10, 31:25
**injuries** [1] - 16:8
**inmate** [1] - 12:24
**inmates** [1] - 14:5
**input** [1] - 28:23
**instances** [4] - 11:20, 22:10, 24:15, 25:7
**instrument** [1] - 11:15
**internal** [1] - 32:8
**internally** [2] - 31:1, 32:8
**interpretation** [1] - 13:10
**intervenor** [1] - 28:7
**involved** [6] - 9:10,

23:17, 25:20, 27:14, 29:1, 30:3
**IS** [2] - 33:12, 33:15
**issue** [4] - 14:19, 22:15, 23:4, 27:22
**issues** [9] - 14:25, 19:10, 26:12, 26:14, 29:5, 30:4, 31:6, 31:7, 32:5
**item** [1] - 5:4
**itself** [1] - 13:23

## J

**jail** [1] - 20:15
**Jail** [1] - 20:24
**jails** [4] - 5:14, 7:2, 20:22, 26:2
**John** [1] - 22:18
**JUDGE** [1] - 1:5
**judge** [1] - 28:25
**Judge** [1] - 29:1
**JUDICIAL** [2] - 33:16, 33:19
**Justice** [2] - 12:8, 12:9

## K

**KATELYN** [1] - 2:23
**keep** [1] - 6:22
**keeping** [1] - 15:7
**KELLY** [2] - 2:19, 2:23
**KENDALL** [2] - 2:19, 2:23
**Kendrick** [1] - 5:21
**KENDRICK** [1] - 2:14
**kill** [1] - 22:17
**kind** [4] - 13:22, 16:25, 19:1, 19:9
**knee** [1] - 21:5
**knees** [1] - 11:20
**knowledge** [1] - 23:4
**knows** [1] - 30:11
**KUWATA** [1] - 2:23

## L

**L.A** [1] - 7:2
**largely** [1] - 27:20
**last** [4] - 7:22, 8:18, 20:16, 20:23
**Laughter** [1] - 27:12
**law** [2] - 5:11, 30:8
**leave** [1] - 18:23
**lectern** [1] - 6:10
**LEROY** [4] - 1:12, 2:19, 3:3, 33:6
**Leroy** [1] - 5:5
**LESS** [1] - 33:17
**less** [1] - 26:3
**level** [4] - 9:7, 16:11, 21:15, 23:14
**levels** [1] - 26:2

36

37

likely [1] - 8:17
limitedly [1] - 30:3
line [4] - 12:7, 12:20, 28:10, 31:10
lines [1] - 15:19
litigate [1] - 28:13
litigating [1] - 28:6
litigation [2] - 24:10, 24:12
LLP [2] - 2:19, 2:23
location [1] - 21:21
look [7] - 22:5, 23:13, 25:10, 26:24, 27:13, 30:1
looked [1] - 20:25
looking [1] - 25:4
LOS [9] - 1:17, 1:24, 2:7, 2:11, 2:21, 2:25, 3:3, 3:5, 5:1
love [1] - 19:11
lower [1] - 26:2
lying [1] - 17:5

**M**

magistrate [1] - 28:25
Magistrate [1] - 29:1
main [1] - 11:8
major [3] - 8:18, 13:7, 28:11
majority [1] - 16:18
mandating [2] - 15:2, 15:6
mandatory [12] - 13:19, 13:25, 14:20, 16:16, 17:1, 17:2, 17:7, 17:8, 17:17, 17:21, 26:22, 28:9
MARGARET [1] - 3:8
Margaret [1] - 5:10
MARIA [3] - 1:21, 33:9, 33:22
MARISOL [1] - 2:15
Marisol [1] - 5:24
matches [1] - 26:16
mate [1] - 19:10
matter [2] - 30:24, 32:15
MATTER [1] - 33:14
McCarthy [1] - 5:10
MCJ [1] - 20:24
mean [10] - 9:21, 18:20, 19:13, 19:14, 23:2, 23:25, 24:10, 28:21, 29:18, 30:2
means [1] - 10:11
mediate [2] - 28:13, 29:2
mediator [1] - 19:7
medical [1] - 23:11
meet [1] - 14:12
meetings [1] - 9:9
Melissa [1] - 5:22
MELISSA [1] - 2:10
Men's [1] - 20:24

met [1] - 9:25
meted [1] - 13:14
method [1] - 28:21
Michael [1] - 5:10
micro [2] - 21:15, 23:14
microphone [1] - 6:10
might [1] - 15:1
minimum [1] - 26:22
minimums [1] - 28:9
minor [1] - 26:12
misstating [1] - 17:23
MONICA [1] - 2:20
monitor [1] - 6:15
monitoring [2] - 7:19, 7:24
monitors [21] - 7:11, 7:19, 7:25, 8:9, 8:21, 9:9, 9:10, 13:8, 13:17, 14:1, 16:1, 16:19, 23:5, 23:9, 24:20, 24:23, 25:3, 25:4, 25:6, 25:15, 28:21
monitors' [1] - 20:16
month [2] - 14:18, 18:8
months [1] - 7:22
morning [5] - 5:7, 5:15, 5:16, 5:18, 6:1
motion [3] - 30:23, 32:1, 32:3
motions [2] - 31:6, 32:4
move [3] - 10:8, 10:12, 10:21
moved [2] - 10:12, 11:24
movement [4] - 12:10, 12:11, 29:21, 29:22
movie [1] - 22:18
MR [47] - 5:7, 5:16, 5:18, 6:6, 6:11, 6:14, 6:20, 6:23, 6:25, 9:23, 11:3, 11:16, 15:9, 16:14, 17:19, 18:24, 19:15, 19:25, 20:2, 20:8, 21:10, 21:18, 22:2, 22:24, 23:2, 23:13, 23:23, 24:2, 24:8, 24:23, 25:25, 27:4, 27:6, 27:10, 27:13, 28:5, 28:17, 29:16, 30:1, 30:25, 31:9, 31:22, 31:24, 32:6, 32:7, 32:12, 32:14
multiple [2] - 22:16, 27:17
must [2] - 18:12, 26:21
mutually [1] - 9:2

**N**

nailing [1] - 16:17
NATIONAL [1] - 2:13
national [2] - 5:22, 5:24
neatly [1] - 14:24
necessarily [2] - 9:15, 28:3
necessary [4] - 8:9, 8:12, 16:22, 18:17
need [3] - 18:13, 31:5
needs [4] - 13:19, 13:23, 13:24, 28:14
negotiate [1] - 9:15
negotiated [2] - 7:7, 12:4
negotiation [2] - 14:14, 19:6
negotiations [2] - 14:10, 20:14
neutral [1] - 19:7
new [7] - 8:19, 9:16, 9:17, 30:2, 30:3, 30:10, 30:14
next [1] - 32:15
nimble [1] - 10:2
nonexclusive [1] - 27:9
noted [1] - 21:3
number [9] - 5:4, 7:7, 7:13, 8:2, 9:9, 10:7, 14:16, 27:8, 29:4
numbers [1] - 21:20

**O**

obligations [1] - 30:8
occur [4] - 21:13, 21:14, 21:20, 23:7
occurred [1] - 13:16
OF [13] - 1:2, 1:15, 2:4, 2:4, 2:9, 2:18, 3:2, 33:10, 33:13, 33:16, 33:19
offense [1] - 13:15
offenses [1] - 13:19
Office [1] - 5:11
OFFICER [1] - 3:8
Officer [1] - 5:10
officers [1] - 21:7
OFFICIAL [3] - 1:21, 33:9, 33:22
often [1] - 8:10
old [1] - 25:5
ON [3] - 2:4, 2:18, 3:2
on-duty [2] - 10:9, 12:16
one [13] - 5:4, 9:15, 10:7, 13:7, 14:7, 15:5, 24:9, 24:12, 24:15, 24:25, 26:4, 27:3
ones [1] - 30:5

order [4] - 13:22, 18:14, 19:2, 19:20
ordinarily [1] - 8:13
ordinary [1] - 15:20
organization [1] - 24:1
outcome [1] - 15:7
outgoing [1] - 9:16
outside [1] - 22:10
overall [3] - 21:1, 26:1, 26:15
overused [2] - 8:22, 11:6
own [3] - 14:1, 16:23, 31:1

**P**

PAGE [2] - 4:2, 33:15
part [1] - 13:3
particular [3] - 15:6, 21:19, 25:9
particularly [3] - 10:24, 12:1, 30:15
parties [1] - 8:23
party [1] - 28:13
past [5] - 11:20, 20:14, 20:15, 20:19, 29:9
pattern [1] - 7:3
penalties [2] - 15:21, 26:23
pending [1] - 25:21
people [6] - 7:2, 10:11, 10:19, 11:5, 24:3, 26:3
percent [2] - 20:21, 21:1
perhaps [4] - 8:4, 10:7, 28:20, 29:2
period [1] - 7:23
person [3] - 9:15, 11:7, 12:24
personnel [6] - 7:4, 7:23, 8:7, 8:10, 9:8, 23:11
perspective [1] - 13:4
PETER [1] - 2:5
Peter [1] - 5:19
picture [1] - 26:14
piece [1] - 27:15
place [4] - 14:22, 17:20, 23:18, 24:11
plaintiff [1] - 5:20
plaintiff's [2] - 24:24, 26:7
plaintiffs [1] - 7:1
Plaintiffs [1] - 1:8
PLAINTIFFS [1] - 2:4
plan [3] - 7:12, 7:17, 24:16
plateauing [1] - 8:3
pleasant [1] - 25:1
pleasantly [1] - 15:17
pleased [1] - 10:7
podium [1] - 6:11
point [6] - 14:7, 17:19,

18:10, 19:9, 22:12, 28:8
pointed [1] - 20:17
policies [3] - 7:14, 10:24, 11:25
policing [1] - 30:12
policy [12] - 9:3, 9:17, 11:13, 11:16, 12:18, 16:23, 22:10, 26:15, 26:16, 27:17, 27:18, 27:25
populated [1] - 26:3
position [4] - 13:25, 17:23, 17:24, 26:7
possible [2] - 8:13, 15:5
practice [2] - 9:3, 10:9
pre [2] - 25:19, 25:21
pre-discipline [2] - 25:19, 25:21
PREGERSON [1] - 1:5
present [4] - 5:9, 5:12, 11:7, 19:17
presentations [1] - 19:19
PRESIDING [1] - 1:5
presumption [3] - 14:25, 15:2, 16:3
pretty [1] - 11:13
prevent [1] - 8:17
prevention [2] - 8:7, 14:7
previously [1] - 12:20
principal [1] - 8:5
principles [4] - 8:7, 10:7, 14:7, 14:17
PRISON [1] - 2:13
prison [2] - 5:22, 5:24
problem [3] - 23:8, 23:9, 23:25
problematic [3] - 22:9, 24:6, 25:6
proceed [1] - 31:16
PROCEEDINGS [2] - 1:15, 33:14
proceedings [2] - 30:14, 32:16
process [5] - 8:12, 8:25, 9:5, 25:18, 28:20
professionalism [1] - 10:14
professionalize [1] - 13:1
progress [4] - 8:2, 18:4, 20:13, 29:9
progressive [1] - 27:15
project [2] - 5:22, 5:25
PROJECT [1] - 2:13
prop [1] - 23:5
proposing [1] - 17:21
provide [1] - 29:23
provides [1] - 14:6
providing [2] - 15:15,

UNITED STATES DISTRICT COURT

38

17:2
**provision** [1] - 22:7
**provisions** [2] - 7:13, 7:18
**pull** [1] - 27:2
**punch** [1] - 22:15
**punched** [1] - 22:19
**punches** [4] - 11:18, 11:23, 21:3, 22:16
**punished** [1] - 17:7
**punishment** [9] - 13:25, 14:20, 15:1, 17:1, 17:2, 17:8, 17:10, 17:22, 17:25
**purposes** [2] - 18:14, 19:21
**PURSUANT** [1] - 33:11
**put** [3] - 14:23, 19:4, 31:15

## Q

**quickly** [2] - 10:17, 27:3
**quite** [4] - 9:5, 11:10, 13:6, 15:22
**quoting** [1] - 15:19

## R

**raised** [1] - 23:4
**ramifications** [1] - 27:19
**range** [2] - 15:21
**rarely** [2] - 15:24, 16:1
**rather** [3] - 10:9, 12:15, 14:4
**reach** [1] - 19:22
**reached** [1] - 14:16
**read** [1] - 6:3
**readily** [1] - 22:1
**reading** [1] - 16:13
**ready** [1] - 28:14
**real** [2] - 23:8, 27:1
**really** [8] - 11:3, 11:17, 12:23, 14:4, 17:8, 19:4, 19:21, 31:4
**reason** [2] - 15:4, 15:10
**reasonable** [1] - 12:25
**recalcitrant** [1] - 14:5
**receiving** [1] - 22:21
**recent** [2] - 6:3, 25:1
**recently** [2] - 11:19, 29:11
**recognize** [1] - 19:9
**recommended** [2] - 13:16, 13:17
**reducing** [1] - 26:18
**REDUCTION** [1] - 33:18
**regression** [1] - 8:4
**regularly** [1] - 11:10

**REGULATIONS** [2] - 33:15, 33:19
**relative** [1] - 30:10
**relatively** [1] - 8:19
**remaining** [2] - 28:11, 31:6
**remember** [4] - 11:19, 27:4, 27:5, 27:6
**reminds** [1] - 14:21
**repeated** [2] - 21:25, 22:9
**report** [16] - 6:4, 6:15, 7:22, 7:25, 8:25, 20:17, 21:11, 23:2, 23:12, 24:4, 24:17, 25:11, 28:18, 29:10, 31:24
**reported** [6] - 8:1, 22:25, 23:7, 23:15, 23:16, 24:22
**REPORTED** [1] - 33:13
**REPORTER** [3] - 1:21, 33:9, 33:22
**REPORTER'S** [1] - 1:15
**reporting** [4] - 23:5, 23:22, 24:6, 25:13
**reports** [3] - 7:20, 13:9, 17:6
**requesting** [1] - 17:3
**require** [1] - 12:17
**required** [2] - 23:12, 26:17
**requirement** [1] - 22:11
**resolution** [1] - 25:22
**resolve** [1] - 14:13
**resolved** [1] - 31:8
**respect** [7] - 7:14, 7:15, 7:16, 10:24, 11:11, 11:25, 12:5
**responsibility** [1] - 10:15
**restrain** [1] - 11:4
**restraint** [2] - 8:19, 16:10
**restrictive** [1] - 26:18
**result** [2] - 20:16, 22:25
**resumptions** [1] - 13:18
**review** [7] - 10:10, 10:11, 10:13, 10:16, 15:25, 24:17, 25:15
**reviewed** [1] - 23:17
**reviewer** [1] - 12:18
**reviewing** [2] - 10:19, 25:2
**reviews** [3] - 12:14, 13:2, 15:25
**rise** [2] - 16:11, 21:22
**risk** [2] - 11:7, 16:11
**Robert** [1] - 5:8
**ROBERT** [1] - 2:19

**room** [1] - 29:24
**ROSAS** [3] - 1:7, 2:4, 33:4
**Rosas** [3] - 5:5, 5:20, 14:6
**Rosas'** [1] - 14:7
**Ruiz** [1] - 5:24
**rushing** [1] - 8:11

## S

**safe** [1] - 8:22
**safeguards** [2] - 24:7, 24:9
**SAN** [1] - 2:16
**SANTA** [1] - 2:20
**sat** [1] - 28:22
**schedule** [1] - 19:17
**Schwartz** [2] - 7:20, 9:8
**second** [1] - 27:15
**section** [1] - 30:12
**SECTION** [1] - 33:11
**see** [9] - 12:6, 15:17, 17:12, 21:21, 23:14, 23:17, 24:21, 29:20, 29:21
**seeing** [6] - 11:17, 11:18, 11:19, 11:21, 12:20
**seem** [1] - 15:5
**self** [1] - 24:6
**self-reporting** [1] - 24:6
**sentencing** [1] - 14:22
**sergeant** [3] - 8:13, 8:16, 10:10
**sergeants** [2] - 10:15, 12:16
**Sergio** [1] - 5:13
**serious** [2] - 16:7, 16:11
**seriously** [3] - 22:15, 22:17, 23:3
**SESSION** [1] - 5:3
**set** [5] - 15:21, 19:17, 30:11, 31:1, 32:8
**setting** [2] - 7:12, 31:12
**settlement** [5] - 7:8, 7:9, 18:15, 18:21, 29:17
**seven** [1] - 27:7
**shape** [1] - 17:15
**share** [2] - 25:14, 31:14
**Sheriff** [1] - 5:13
**sheriff** [5] - 7:4, 9:18, 27:24, 30:2, 30:3
**sheriff's** [4] - 9:14, 10:3, 14:2, 14:3
**shown** [1] - 26:18
**shows** [1] - 21:19
**side** [1] - 17:14
**sides** [2] - 9:22, 9:23

**significant** [3] - 10:23, 13:3, 23:23
**simply** [2] - 13:14, 16:12
**situation** [2] - 17:14, 18:23
**situations** [1] - 17:18
**six** [7] - 7:22, 27:7, 28:16, 28:17, 29:5, 30:20, 31:4
**SIXTH** [2] - 2:24, 3:4
**slow** [1] - 15:15
**small** [2] - 13:21, 17:9
**someone** [1] - 16:8
**sometimes** [4] - 10:1, 14:23, 14:24, 15:14
**soon** [1] - 28:14
**sort** [12] - 8:11, 11:3, 14:20, 14:21, 14:23, 15:1, 15:6, 17:14, 19:3, 26:25, 28:18, 29:22
**SOUTHERN** [2] - 2:4, 2:9
**Southern** [2] - 5:19, 5:23
**specifically** [1] - 8:4
**stale** [1] - 19:10
**start** [1] - 28:6
**started** [1] - 25:2
**starting** [1] - 25:14
**STATES** [6] - 1:1, 1:22, 33:10, 33:12, 33:16, 33:19
**status** [4] - 6:4, 8:23, 29:10, 29:18
**STATUS** [2] - 1:16, 4:2
**STENOGRAPHICALLY** [1] - 33:13
**step** [2] - 10:23, 13:3
**steps** [1] - 26:19
**still** [4] - 12:5, 14:22, 15:7, 27:4
**STREET** [6] - 1:23, 2:6, 2:11, 2:15, 2:24, 3:4
**strike** [11] - 12:19, 16:18, 16:20, 16:25, 21:12, 21:18, 22:6, 22:23, 23:17, 23:18, 26:15
**strikes** [26] - 8:6, 10:25, 11:11, 11:14, 11:22, 12:1, 20:18, 20:21, 20:23, 21:2, 21:9, 21:13, 21:16, 21:20, 21:25, 22:13, 22:14, 22:21, 23:12, 23:15, 23:16, 26:1, 26:9, 26:19, 29:8
**strong** [1] - 13:17
**strongly** [1] - 30:6
**struck** [1] - 12:24
**subject** [3] - 16:16, 27:25, 28:24
**subjects** [1] - 28:23

**submission** [3] - 6:3, 8:24, 19:2
**submitted** [1] - 6:15
**subset** [2] - 13:21, 17:9
**substantial** [6] - 8:2, 8:21, 10:6, 11:13, 14:9, 20:13
**substantially** [2] - 13:14, 29:5
**substantive** [1] - 30:23
**success** [1] - 26:18
**sufficient** [1] - 13:15
**suggest** [2] - 16:15, 28:15
**suggested** [1] - 29:23
**SUITE** [2] - 1:23, 2:20
**sum** [1] - 19:25
**sum-up** [1] - 19:25
**summary** [3] - 6:19, 16:13, 32:4
**supervise** [1] - 10:20
**supervising** [1] - 10:12
**supervisors** [1] - 13:13
**support** [1] - 13:8
**supported** [1] - 14:1
**surprised** [2] - 15:12, 15:17
**suspect** [1] - 28:5
**suspended** [1] - 25:21
**system** [3] - 15:7, 17:4, 22:8

## T

**table** [1] - 5:9
**tasked** [1] - 10:16
**techniques** [1] - 26:10
**template** [1] - 12:22
**templates** [1] - 12:17
**TEMPLE** [2] - 2:24, 3:4
**tenure** [1] - 30:11
**terms** [9] - 9:2, 10:3, 14:20, 19:13, 20:14, 21:7, 21:8, 21:24, 28:15
**THAT** [2] - 33:11, 33:14
**THE** [62] - 2:4, 2:18, 3:2, 5:4, 5:15, 6:1, 6:8, 6:13, 6:17, 6:21, 6:24, 9:21, 11:1, 11:14, 14:19, 16:5, 17:12, 18:20, 19:13, 19:23, 20:1, 20:3, 21:6, 21:17, 21:24, 22:20, 23:1, 23:11, 23:20, 23:25, 24:3, 24:20, 25:23, 27:2, 27:5, 27:8, 28:3, 28:10, 29:15, 29:17, 30:19, 31:4, 31:17,

31:20, 31:21, 31:23, 32:2, 32:11, 32:13, 32:15, 33:9, 33:10, 33:12, 33:13, 33:14, 33:15, 33:16, 33:18, 33:19
**theoretically** [2] - 21:25, 23:1
**therefore** [1] - 13:16
**they've** [5] - 7:21, 9:25, 12:16, 15:14, 15:15
**thinking** [1] - 28:15
**third** [1] - 28:13
**THIS** [1] - 33:17
**thoughts** [1] - 15:10
**three** [5] - 7:10, 7:25, 17:22, 20:25
**throughout** [1] - 24:13
**timing** [1] - 28:15
**TITLE** [1] - 33:12
**TO** [1] - 33:11
**today** [4] - 19:1, 24:11, 30:6, 30:14
**together** [1] - 31:18
**tone** [2] - 30:6, 30:14
**top** [2] - 30:6, 30:15
**total** [2] - 20:23, 20:24
**totality** [1] - 27:13
**Towers** [1] - 20:25
**track** [6] - 21:15, 21:17, 22:3, 22:4, 22:13
**trackable** [1] - 22:6
**tracked** [3] - 21:7, 21:8, 22:11
**tracker** [3] - 21:12, 21:18, 23:18
**tracks** [1] - 21:12
**training** [2] - 7:15, 9:3
**TRANSCRIPT** [4] - 1:15, 33:13, 33:15, 33:17
**transport** [1] - 11:8
**treat** [1] - 27:16
**treatment** [1] - 23:12
**tried** [1] - 19:4
**TRUE** [1] - 33:12
**try** [4] - 8:25, 9:11, 25:16, 29:2
**trying** [4] - 11:7, 14:11, 29:22, 30:16
**Twin** [1] - 20:25
**two** [5] - 20:25, 25:4, 25:11, 26:14, 28:11
**twofold** [1] - 26:24

## U

**unclear** [1] - 19:14
**under** [5] - 16:17, 18:2, 26:17, 30:8, 32:9
**under-inclusive** [1] - 16:17

**unilateral** [1] - 27:24
**union** [1] - 28:1
**unit** [3] - 10:13, 12:15, 21:14
**UNITED** [6] - 1:1, 1:22, 33:10, 33:12, 33:16, 33:19
**unless** [2] - 8:8, 24:6
**unlike** [2] - 24:10
**unnecessary** [2] - 7:3, 8:6
**unreasonable** [4] - 15:23, 16:6, 16:8
**up** [7] - 18:23, 19:4, 19:25, 26:13, 27:8, 30:11, 31:12
**ups** [1] - 7:5
**uses** [13] - 11:9, 13:12, 20:15, 23:6, 23:9, 23:16, 25:2, 25:4, 25:9, 25:20, 26:1, 27:17

## V

**vary** [1] - 27:20
**vast** [1] - 16:18
**verbatim** [1] - 15:19
**versus** [1] - 27:18
**video** [7] - 23:20, 23:21, 24:16, 24:18, 24:21, 25:7, 25:10
**violation** [9] - 13:20, 15:22, 15:23, 16:2, 16:19, 16:23, 17:1, 17:10, 27:19
**violations** [5] - 10:21, 10:22, 13:13, 13:21, 16:15
**voidance** [1] - 26:10
**vs** [2] - 1:10, 33:5

## W

**waiting** [1] - 12:5
**wants** [1] - 28:12
**warning** [1] - 22:8
**ways** [3] - 14:12, 26:7, 29:22
**WEDNESDAY** [2] - 1:18, 5:1
**weeks** [6] - 19:16, 28:16, 28:17, 29:5, 30:20, 31:5
**WEST** [5] - 1:23, 2:6, 2:11, 2:24, 3:4
**WESTERN** [1] - 1:3
**white** [1] - 17:16
**Wick** [1] - 22:18
**willing** [4] - 17:22, 18:25, 19:5, 19:7
**willingness** [1] - 10:21
**Wilner** [1] - 29:1
**WITH** [2] - 33:15,

33:18
**wrap** [1] - 19:3
**Wrap** [7] - 8:20, 10:25, 11:1, 11:12, 11:25, 12:5, 26:10
**written** [1] - 19:1

## Y

**year** [6] - 7:23, 20:14, 20:15, 20:20, 20:24, 29:9
**years** [2] - 7:7, 25:5

## Z

**Zoom** [1] - 6:9

UNITED STATES DISTRICT COURT