PETER J. ELIASBERG
(SB# 189110)
peliasberg@aclusocal.org
MELISSA CAMACHO-CHEUNG
(SB# 264024)
mcamacho@acluscal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Phone:  (213) 977-9500
Fax:  (213) 977-5299

CORENE KENDRICK
(SB# 226642)
ckendrick@aclu.org
MARISOL DOMINGUEZ-RUIZ
(SB# 345416)
mdominguez-ruiz@aclu.org
ACLU NATIONAL PRISON
PROJECT
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930
 Fax: (202) 393-4931

NICOLAS MORGAN
(SB# 166441)
nicolasmorgan@paulhastings.com
STEPHEN TURANCHIK
(SB# 248548)
sturanchik@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071-2228
Phone:  (213) 683-6000
Fax: (213) 627-0705

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN GOODWIN,
on behalf of themselves and of those similarly situated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ROBERT LUNA, Sheriff of Los Angeles County, in his official capacity,<br><br>Defendant. | CASE NO. CV 12-00428 DDP (MRW)<br><br>**REDACTED DECLARATION OF PETER ELIASBERG**<br><br>Honorable Dean D. Pregerson |

**Declaration of Peter Eliasberg**

I, Peter Eliasberg, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am Chief Counsel at the ACLU Foundation of Southern California. I am admitted to practice law in the State of California and before this Court.  I am one of the lead counsel appointed by the Court to represent the class of Plaintiffs in this action.

3.    [REDACTED]

4.    [REDACTED]

5.    [REDACTED]

6.    [REDACTED]

7.    [REDACTED]

8.    Attached as Exhibit F is 16 page document collecting quotations from the Panel's Fourth through Eleventh Reports.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed May 31, 2023 in Los Angeles, California.

/s/ Peter Eliasberg

Peter Eliasberg

1

# Exhibit F

**EXHIBIT F**
**PAGE 2**

A.      **Quotations Re Force**

Panel's Fourth Report, Dkt. 195, pp. 7-8:

> The Department did not satisfy the threshold required to achieve Compliance with the use of force provisions in the Second Quarter of 2018. Recognizing that the cases the Panel reviewed do not constitute a random sample because the Panel focused primarily on more serious Category 2 force incidents when the vast majority of force incidents are Category 1 incidents or Non-Categorical Incidents, the Panel found <u>force incidents in which a Department member punched a recalcitrant inmate in the head</u> or used a Taser against an inmate in restraints when, in the judgment of the Panel, <u>the inmates were not assaultive</u> and there were other reasonable means to control the inmates' behavior.

>> p. 8 FN 11: While acknowledging the Panel's concerns, the Department noted that very few force incidents involve either Tasers or punches to the head. Based upon data provided by the Department, and excluding Non-Categorical Incidents, 1.7% of force incidents in the Downtown Jail Facilities in the Second Quarter of 2018 involved the use of a Taser and less than 6% involved punches by Department personnel.

Panel's Fifth Report, Dkt. 198, p. 11:

> The Panel has an on-going concern about Department members using punches to control resisting inmates, which often occurs when the inmates are on the ground and Department members are trying to handcuff them. <u>Using punches</u> when necessary to defend against assaultive inmates who pose <u>a serious risk of injury</u> to the Department members is, of course, well-within Department policies.

Panel's Sixth Report, Dkt. 199, p. 4

> During the Panel's October 21, 2019 meeting with Sheriff Villanueva, he acknowledged the importance of avoiding the use of force and using force only as a last resort.

Panel's Sixth Report, Dkt. 199, p. 4:

> In addition to the use of force statistics, the Department provided the Panel with reports of "prevented use of force" incidents for the Downtown Jail Facilities that identify the Department members who were able to avoid or prevent the use of force. There were a total of 4,800 reported "prevented use of force" incidents in the Downtown Jail Complex in 2018 as compared to a total of 1,565 reported uses of force, and 2,721 prevented use of force incidents in the first half of 2019 as compared to 693 uses of force in these facilities. These reports reflect that the <u>Department is able to avoid the use of force in the overwhelming majority of court ordered cell extractions and transfers of inmates</u> to the Pitchess Detention Center in the northern part of the County, circumstances in which the potential need to use force is always present.

> They also reflect specific instances in which the Department members used DeVRT or verbal commands to induce recalcitrant inmates to exit their cells (for medical or mental

1

health services) or return to their cells (after court appearances or receiving such services)
or to quell disturbances or break up fights among inmates. That the Department is
tracking this information reflects the importance it places on its members avoiding the
use of force whenever possible.

Panel's Sixth Report, Dkt. 199, p. 6:

When the Panel met with the <u>Sheriff</u> on October 21, 2019, he stated that he regularly
meets with Custody personnel during tours of the jails, and he <u>acknowledged</u> the
importance of conveying to them that <u>force must only be used as a last resort</u>.

Panel's Eighth Report. Dkt. 202, p. 10:

Medical science informs us that head blows are the 'hidden injuries' that create or
exacerbate mental illness. Agencies nationwide have long moved away from acceptance
of head strikes. We encourage the Department to pay particular attention to this issue
moving forward.

Plaintiffs identify several cases in which force was used against restrained inmates, and
correctly note that the Panel determined that the force used in certain of these cases was
excessive.

Panel's Ninth Report, Dkt. 203, p. 10:

Medical science informs us that some head blows are the 'hidden injuries' that create or
exacerbate mental illness. Agencies nationwide have long moved away from acceptance
of head strikes.

**B.      <u>Accountability and Failure to Discipline</u>**

Panel's First Report, Dkt. 141, p. 6

The Panel does not believe that it is necessary for the Department to set forth in advance
what penalties may be imposed if commanders do not address force problems in the jails,
<u>as long as the Department does, in fact, hold them accountable</u> if they fail to address
problems in their facilities.

Panel's Fifth Report, Dkt. 198, p. 6:

While the Panel recognizes that the Department historically has deactivated
administrative investigations for various reasons, the "<u>sharp increase</u>" in deactivated
<u>investigations coupled with the "marked decrease</u>" in the number of these investigations,
<u>calls into question the extent to which the Department will hold Deputies accountable for
misconduct</u>, including in particular dishonesty and excessive use of force, in the future.
Coupled with the reinstatements discussed above, the signal it sends to the Custody staff
about the direction of the Department is of concern to the Panel.

Panel's Fifth Report, Dkt. 198, p. 6:

EXHIBIT F
PAGE 4

The Panel understands the need for some "flexibility" with respect to the *imposition* of
discipline to ensure that the punishment is proportionate to the misconduct or violations
of Department policies. The Panel is concerned, however, about a "holistic approach" that
seeks to address "systemic shortcomings" rather than the Department member's conduct
and that will inevitably lead to inconsistencies and a lack of "firmness in implementing
discipline when warranted." Such an approach will undermine confidence in the fairness
of the disciplinary system if some members will be punished while others will receive
training or mentoring for similar violations. It will also undermine the effectiveness of the
system to deter misconduct if the consequences for misconduct are likely to be training or
mentoring in lieu of discipline. In many cases, the combination of discipline and training
can provide the most impactful outcome.

Panel's Fifth Report, Dkt. 198, p. 17:

The Panel is concerned that reviewing Commanders are reluctant to find a use of force
out of policy (and therefore subject to discipline) even when they acknowledge that the
force was problematic, and they will instead find that troubling incidents raise
performance and training issues.

Panel's Eighth Report. Dkt. 202, p. 5:

The Panel has expressed concern for several reporting periods that the Department relies
too heavily on remedial training rather than discipline in situations where the Department
agrees that use of force policies have been violated. The Panel has also seen numerous
cases involving violations of policy, such as head punches for inmate control, that result
in outcomes that do not reflect the seriousness of the offense.

Panel's Ninth Report, Dkt. 203, p. 3:

Other issues raised by the Panel in prior reports persisted in the Ninth Reporting period,
most notably, the failure of the Department to mete out discipline in cases where force
policies are violated, or Department personnel inaccurately describe force incidents in
their written reports. Although tremendous strides have been made by the Department in
limiting improper uses of force and developing a culture that discourages bad practices
and emphasizes more positive staff-inmate relationships, the Panel believes that further
progress in eliminating improper uses of force can only be achieved if deputies who
clearly cross the line are disciplined.

Panel's Ninth Report, Dkt. 203, p. 6:

While the Panel does not believe that a finding of non-compliance with Section 1.3 is

appropriate based on a single failure to investigate promptly an inmate grievance
(particularly where the grievance turns out to be wholly unfounded), we concur in the
ultimate conclusion reached by the Department regarding non-compliance with Section
1.3. The basis for our determination is the Department's persistent reluctance to impose
discipline in those cases where use of force policies are violated. The Panel continues to

see cases involving violations of policy, such as head punches for inmate control, that result in Departmental actions that do not reflect the seriousness of the offense. The Panel has highlighted this shortcoming in prior reports (see Eighth Report, p. 5) but <u>has not seen any meaningful change in the extent to which Department staff (and managers) are held accountable for violation of force policies</u>. The Panel is also concerned that in cases where the Panel has found a policy violation regarding use of force, and where the <u>supervisors or mid-managers reviewing the incident have failed to identify a policy violation or even question the use of force, no action is ever taken against the supervisor and/or mid-manager</u>.

Panel's Tenth Report, Dkt. 205, p. 2:

From the use of force packages we have been reviewing, <u>we are no longer seeing progression towards professional management of force situations</u>. It is time for the jail culture to stop supporting behaviors that are forbidden by Policy.

Panel's Tenth Report, Dkt. 205, p. 2:

More specifically, the use of "head shots" (punches to the head of an inmate) where prohibited by policy, has been relatively unchanged in the last two years or more, and may be increasing. No issue has been discussed more with management over the last six years and especially in the last two years, to little avail. That problem is compounded by two other factors. Use of force reviews by supervisors and managers in the serious cases selected by the Monitors, almost always fail to note out-of-policy head shots or – less frequently – attempts to justify them<u>. Then the supervisors and managers are not held accountable for those failures and the Deputies using the improper for are "counseled" or sent to remedial training and actual discipline is seldom imposed</u>. While the Department has openly acknowledged this continuing issue in discussions with the Monitors, and is now contemplating changes to the way head shots are categorized and reported, <u>there has been little real change or progress in more than two years</u>.

Panel's Tenth Report, Dkt. 205, p. 6:

Other issues raised by the Panel in prior reports persisted in the Tenth Reporting period, most notably, the failure of the Department to mete out discipline in cases where force policies are violated or Department personnel inaccurately described force incidents in their written reports. Although significant strides have been made by the Department in limiting improper uses of force and developing a culture that discourages bad practices and emphasizes more positive staff-inmate relationships, <u>the Panel believes that further progress in eliminating improper uses of force can only be achieved if deputies who are proven to have cross the line are disciplined by supervisors who call out this behavior</u>.

Panel's Tenth Report, Dkt. 205, p. 8:

Section 1.3 of the Action Plan provides that Department managers should be held accountable if they fail to address use of force problems at the Downtown jail facilities. The Compliance Measures require the Department to provide a quarterly report that sets

4

forth the number and rank of personnel found to have violated use of force policies in the
Jails. In the First Quarter of 2021, one (1) sergeant and one (1) deputy were addressed
with written reprimands. In the Second Quarter, two (2) deputies received written
reprimands. <u>The Panel notes that in each of those two quarters, the Panel found a
substantial number of additional cases in which personnel violated use of force policies
and/or the recalcitrant inmate policy</u>.

Panel's Tenth Report, Dkt. 205, pp. 12-13:

As in the past, the Panel has found the Department out of compliance with Section 5.2,
relating to the evaluation of force incidents by supervisors since we are not consistently
seeing rigorous reviews across all levels of the Department. We continue to see improper
uses of force validated in the initial Supervisor's review and, while the Watch
Commander and Unit Commander reviews are more substantive and probing than we saw
in the early years of our monitoring, one or both Commander reviews often concur with
the erroneous evaluation of the investigating Sergeant. <u>In situations where the deputies
use head strikes, the packages are nearly universally found to be following policy even
where adverse action is taken with the deputy or deputies. Policy violations that involve
abusive behavior need to be called out of compliance for what they are, serious violations
by personnel and an improper use of force</u>.

Panel's Eleventh Report, Dkt. 238, p. 2:

With the Court's guidance, during the Status Conference held on May 12, 2022, the
Parties agreed to develop a written plan to achieve compliance with the following four
key areas: (1) eliminating impermissible head strikes; (2) the proper use of the WRAP;
(3) appropriate utilization of force avoidance and de-escalation techniques; and (4)
accountability

Panel's Eleventh Report, Dkt. 238, p. 5:

In the more recent use of force packages the Panel has reviewed, the head strikes are
identified during the supervisor's review, but they are characterized as justifiable under
the Department's policies. <u>The Panel has yet to review a case where the supervisor
concludes the use of head strikes was inappropriate</u>. In order for the Department to
achieve compliance with Provision 2.6 (head strikes), <u>staff must be held accountable [for]
head strikes</u>.

Panel's Eleventh Report, Dkt. 238, p. 12:

the Parties are currently developing a written plan to achieve compliance with various
provisions of this Agreement, including its Accountability provisions.  The plan will
enhance this provision that broadly requires Department managers to be held accountable
should they fail to address use of force problems. The Panel continues to review cases
involving violations of policy, such as head punches for inmate control, that result in
Departmental actions that do not reflect the seriousness of the offenses. <u>The Department</u>

must hold Deputies accountable for use of force violations and hold supervisory staff accountable when they fail to identify and/or appropriately address violations.

Panel's Eleventh Report, Dkt. 238, p. 22:

In Case 4, Inmate E was being escorted back to his housing unit, cuffed behind his back. A Deputy put Inmate E's back to the wall of the elevator. When Inmate E pushed forward and resisted being placed against the wall, he was taken to the floor and punched 15 times by at least two Deputies. One of the supervisory reviews of the incident concluded "…based on the facts surrounding this incident, it appears that the application of force was objectively reasonable."

. . .

The fourth case, however, illustrates how inappropriate force can be embraced by Supervisors. Leadership must hold Deputies accountable for unwarranted punches for Rosas compliance.

### 1.    Head Strike Violations

Panel's Fourth Report, Dkt. 195, pp. 8-9

The Panel also concluded that the Department was not in compliance with the following specific provisions of the Action Plan:

head strikes (Section 2.6) and calling supervisors to the scene (Section 2.7), and it did not have sufficient information to determine the Department's compliance with the provision pertaining to the use of authorized weapons (Section 2.10).

The Panel's overarching concern was that Department members sometimes reacted too quickly in a confined environment instead waiting for readily available backup resources and taking more time to plan on how to respond to a recalcitrant inmate.

Panel's Fourth Report, Dkt. 195, p. 17:

Other discussion of non-compliance with head strike provision (Rosas 2.6).

Panel's Fifth Report, Dkt. 198, p. 10

The Panel also concluded that the Department was not in compliance with the following provisions of the Action Plan: force prevention principles (Section 2.2), head strikes (Section 2.6) and use of chemical agents and Tasers (Sections 2.10 and 11).

Panel's Fifth Report, Dkt. 198, p. 24

Other discussion of non-compliance with head strike provision (Rosas 2.6).

Panel's Sixth Report, Dkt. 199, p. 5:

As in the past, the Panel interviewed inmates who complained to Class Counsel about excessive force and misconduct by Sheriff's Department personnel. Following the

6

interviews, the Panel requested and reviewed grievances submitted by the inmates and the force packages for the incidents. One of the incidents was a Category 3 incident in which the inmate <u>sustained an orbital fracture</u> as a result of fight with a Deputy. There were contradictory accounts given by the inmate and other inmate witnesses, on the one hand, and the Department personnel, on the other.

Panel's Sixth Report, Dkt. 199, p. 11:

The Panel also concluded that the Department was <u>not in compliance</u> with the following specific provisions of the Action Plan: force prevention principles (Section 2.2), <u>head strikes</u> (Section 2.6), and the use of chemical weapons and Tasers (Section 2.12).  As in the past, the Panel's main concern was that Department members sometimes reacted too quickly and should have taken advantage of "time and distance" to de-escalate the situation and avoid using force altogether or to plan a potentially safer use of force.

Panel's Sixth Report, Dkt. 199, p. 22:

Other discussion of non-compliance with head strike provision (Rosas 2.6).

Panel's Seventh Report, pp. 11-12

The Panel recommends that head strikes be removed from the "Personal Weapon" Category in the Department's Use of Force policies. Punches to the head should instead become its own category of "Head Strikes," and Deputies should be required to explain specifically why a head strike was necessary or occurred.

Panel's Seventh Report, Dkt. 201, p. 12:

In the Fourth Quarter of 2019, the Panel again reviewed 25 force incidents, consisting of a combination of investigations that were already completed and pending investigations that were completed during the period. Based upon the Panel's assessments of each of the provisions in the Action Plan, the Panel concluded that <u>the Department was not in compliance</u> with the following provisions of the Action Plan in the Fourth Quarter of 2019: <u>Force Prevention Principles</u> (Section 2.2), <u>Head Strikes</u> (Section 2.6), Calling Supervisors (Section 2.7) and Escorting Inmates by Involved Deputies (Section 9.2).

Panel's Seventh Report, p. 26:

Other discussion of non-compliance with head strike provision (Rosas 2.6).

Panel's Eighth Report. Dkt. 202, p. 9:

Based on the assessment of each provision across all of the force packages, the Panel concluded that in the First Quarter of 2020 <u>the Department was not in Compliance</u> with the following provisions of the Action Plan applicable to the use of force by its members: <u>Force prevention principles</u> (Section 2.2), <u>head strikes or kicking inmates</u> (Section 2.6), and calling supervisors to the scene before engaging with recalcitrant inmates (Section 2.7).

7

Panel's Eighth Report. Dkt. 202, p. 10:

> The other persistent problem regarding the use of force identified by the Panel is the improper use of head strikes. The Panel found 10 cases in the First Quarter where personnel inappropriately struck an inmate in the head. These incidents occurred at all three jail facilities under a variety of different circumstances. In many of the cases, the use of force was justifiable under the circumstances, but the danger presented by the inmate (if any) did not justify a head strike. Head strikes should be reserved for situations where the inmate is "high risk/assaultive." Yet, too often, head strikes are used as a control mechanism to subdue an aggressive inmate.

Panel's Eighth Report. Dkt. 202, p. 11:

> In the Second Quarter of 2020, the Panel reviewed 22 force incidents. The Panel concluded that the Department was not in compliance with the same provisions of the Action Plan noted with respect to the First Quarter of 2020: Force prevention principles (Section 2.2), head strikes or kicking inmates (Section 2.6), and calling supervisors to the scene before engaging with recalcitrant inmates (Section 2.7).

Panel's Eighth Report. Dkt. 202, p. 25:

> Other discussion of non-compliance with head strike provision (Rosas 2.6).

Panel's Ninth Report, Dkt. 203, pp. 2-3:

> In cases where some force may be warranted, the Panel continues to see improper head strikes by Department personnel. Even more troubling, the Panel reviewed a small number of cases in the Fourth Quarter of 2020 where it appears force was used as discipline or corporal punishment – a practice that had seemed to have all but vanished within the Downtown jail facilities. The Panel considers these cases to be outliers – the Department has made tremendous progress in improving the culture at the Downtown jail facilities and the overwhelming majority of interactions between Department staff and inmates are handled professionally and conscientiously. Even where we have found fault with the tactics or the level of force used in a particular situation, the Panel has almost never concluded that malicious motives were driving the offending staff member. We expect the Department to pay particular attention to these uses of force that appear motivated by anger or the desire for retribution.

Panel's Ninth Report, Dkt. 203, p. 9:

> Based on the assessment of each provision across all of the force packages, the Panel concluded that in the Third Quarter of 2020 the Department was not in Compliance with the following provisions of the Action Plan applicable to the use of force by its members: Force prevention principles (Section 2.2), head strikes or kicking inmates (Section 2.6), and calling supervisors to the scene before engaging with recalcitrant inmates (Section 2.7).

Panel's Ninth Report, Dkt. 203, pp. 9-10:

8

In many of the cases, the use of force was justifiable under the circumstances, but the danger presented by the inmate (if any) <u>did not justify a head strike</u>. Head strikes should be reserved for situations where the inmate is "high risk/assaultive." Yet, too often, head strikes are used as a control mechanism to subdue an aggressive inmate.

Panel's Ninth Report, Dkt. 203, p. 10:

The Panel identified several cases during the Fourth Quarter where the use of force appeared motivated by a desire to punish the inmate for resistive or assaultive conduct. For example, in one incident several deputies struggled to control a handcuffed inmate who resisted being placed in a suicide gown and then became assaultive when deputies tried to apply the WRAP device. Although the inmate was handcuffed, he was able to grab and twist the fingers of one deputy and forcefully grab the thigh of another deputy. Several deputies used permissible force to stop the assaults by the inmate and gain compliance. The inmate then grabbed the genitals of a deputy who was kneeling behind him to assist in applying the WRAP device. In response to this violent assault, the deputy <u>punched the inmate several times in the face, with at least one of the blows coming after the deputy appeared to be free from the inmate's grasp</u>. Another deputy intervened to stop the punches by his colleague. While much of the force used in this incident was justified by the inmate's resistive and assaultive conduct, and the punches at issue were an immediate response to a serious assault by the inmate, <u>the Panel concluded that the</u>

<u>most aggressive and violent punches were motivated by a desire for retribution</u> against the assaultive inmate. As noted above, this conduct, while aberrational, is particularly troubling to the Panel.

Panel's Ninth Report, Dkt. 203, p. 25:

Other discussion of non-compliance with head strike provision (Rosas 2.6).

Panel's Tenth Report, Dkt. 205, p. 2:

More specifically, <u>the use of "head shots" (punches to the head of an inmate) where prohibited by policy, has been relatively unchanged in the last two years or more, and may be increasing</u>. No issue has been discussed more with management over the last six years and especially in the last two years, to little avail. That problem is compounded by two other factors. Use of force reviews by supervisors and managers in the serious cases selected by the Monitors, almost always fail to note out-of-policy head shots or – less frequently – attempts to justify them. Then the supervisors and managers are not held accountable for those failures and the Deputies using the improper for are "counseled" or sent to remedial training and actual discipline is seldom imposed. While the Department has openly acknowledged this continuing issue in discussions with the Monitors, and is now contemplating changes to the way head shots are categorized and reported, there has been little real change or progress in more than two years.

Panel's Tenth Report, Dkt. 205, p. 8:

EXHIBIT F
PAGE 11

More specifically, <u>the Monitors find that often supervisor reviews neither identify, nor effectively address, deputy abuses of inmates with head punches.</u> <u>These punches are forbidden by Provisions and the LASD Custody Manual</u>. Although this has been an ongoing high priority issue, progress toward stemming this behavior has slowed, or more likely, backtracked, based on Monitor force reviews during the first two quarters of 2021. The Monitors emphasized during the December 2021 visit that a change is necessary, both in deputy actions and supervisor reviews.

Panel's Tenth Report, Dkt. 205, p. 12:

The other persistent problem regarding the use of force identified by the Panel is the use of head strikes, as discussed earlier in this report. The Panel again found cases in the First Quarter where personnel struck an inmate in the head, but the statements or actions presented by the inmate did not justify a head strike. In some of these cases, a use of force short of head strikes was justified, but in other cases the use of force itself was avoidable.

Panel's Tenth Report, Dkt. 205, pp. 13-14:

In the Second Quarter of 2021, the Panel reviewed 25 force incidents. The Panel concluded that the Department was Not In Compliance with Seven (7) Use of Force Cases that include the same provisions of the Action Plan noted in the First Quarter. The Department is not in Compliance with the following Provisions: 2.2, Force Prevention Principles, 2.6, <u>Head Strikes or Kicking Inmates</u>, 2.7, Calling Supervisors to the Scene Before Physically Engaging with Recalcitrant Inmates, 2.13, Check of Medical Records, 5.2, Commanders' Reviews, 5.3, Case 2:12-cv-00428-DDP-MRW Document 205 Filed Unexplained Discrepancies in Reports, 8.3, CFRC Reviews, 12.2, Location of Inmate Interviews, 15.3, Force by Others, 15.6, Separation of Deputies to Write Reports, and 20.3, Planned Use of Force.

Panel's Tenth Report, Dkt. 205, p. 27:

Other discussion of non-compliance with head strike provision (Rosas 2.6).

Panel's Eleventh Report, Dkt. 238, p.3:

In cases where some force may be warranted, the Panel continues to see improper head strikes by Department personnel.

Panel's Eleventh Report, Dkt. 238, p. 17:

It is prohibited to strike an inmate in the head, kicking an inmate who is on the ground, or kicking an inmate above the knees if not on the ground unless the inmate is assaultive and presents an imminent danger and there are no more reasonable means to avoid injury. Kicking an inmate who is not on the ground below the knees is prohibited unless used to create distance between a staff member and an assaultive inmate.

10

Of the applicable cases reviewed, 65.1% (56 out of 86) were found to be in compliance, which is below the 90% compliance threshold.

Panel's Eleventh Report, Dkt. 238, p. 47:

Other discussion of non-compliance with head strike provision (Rosas 2.6).

### 2.       Force Prevention Violations

Panel's Third Report, Dkt. 181, p. 13

The Panel noted that some of the <u>commanders</u> who reviewed problematic force incidents <u>failed to identify and analyze potential issues with the force used by the Department personnel</u>.  Even though the Panel determined that the commanders' conclusions in these cases were not unreasonable, the commanders did not analyze sufficiently the tactics and alternatives to the force, or explain the basis for their conclusions that the force was consistent with Department policy.

Panel's Fifth Report, Dkt. 198, p. 12:

The Department's response to the draft of this Report urged the Panel to take the Department's "thorough investigations, and the variety of counseling, education, training and discipline that often results from them, into consideration in determining the Department's compliance with its Rosas obligations." (Department's Response, p. 4.) While the Panel does take into consideration the quality of the investigations and the discipline imposed, the Panel is concerned that <u>the Department is often reluctant to find violations that should be subject to discipline; the Panel does not view "counseling, education, [and] training" to be "forms of discipline</u>." It may be, as suggested by the Department, that Commanders at all levels will be less reluctant to find misconduct or policy violations going forward if there is greater flexibility in the imposition of discipline. The Panel believes that the imposition of discipline sends a message regarding accountability quite apart from the harshness of the specific penalty.

Panel's Fifth Report, Dkt. 198, p. 10:

The Panel also concluded that the Department was <u>not in compliance</u> with the following provisions of the Action Plan: <u>force prevention principles</u> (Section 2.2), head strikes (Section 2.6) and use of chemical agents and

Tasers (Sections 2.10 and 11).

Panel's Sixth Report, Dkt. 199, p. 11:

The Panel also concluded that the Department was <u>not in compliance</u> with the following provisions of the Action Plan: <u>force prevention principles</u> (Section 2.2) and calling supervisors before handling recalcitrant inmates (Section 2.7). The failure to call a supervisor when confronted with a recalcitrant inmate is a variant on the need for

11

Department members to take more time before using force to control a recalcitrant inmate.

Panel's Seventh Report, Dkt. 201, pp. 11-12:

Based upon the horizontal assessments of each provision across all of the force packages, the Panel concluded that in the Third Quarter of 2019 the Department was not in Compliance with the following provisions of the Action Plan applicable to the use of force by its members: <u>force prevention principles</u> (Section 2.2), calling supervisors to the scene before handling recalcitrant inmates (Section 2.7), and checking medical records (Section 2.13).

Panel's Seventh Report, Dkt. 201, p. 12:

In the Fourth Quarter of 2019, the Panel again reviewed 25 force incidents, consisting of a combination of investigations that were already completed and pending investigations that were completed during the period. Based upon the Panel's assessments of each of the provisions in the Action Plan, the Panel concluded that <u>the Department was not in compliance</u> with the following provisions of the Action Plan in the Fourth Quarter of 2019: <u>Force Prevention Principles</u> (Section 2.2), <u>Head Strikes</u> (Section 2.6), Calling Supervisors (Section 2.7) and Escorting Inmates by Involved Deputies (Section 9.2).

Panel's Seventh Report, Dkt 201, p. 12

As in the past, the Panel's main concern was that Department members sometimes reacted too quickly and should have taken advantage of "time and distance" to de-escalate the situation and avoid using force altogether or to plan a potentially safer use of force. The failure to call a supervisor when confronted with a recalcitrant inmate is a variant on the need for Department members to take more time before using force to control a recalcitrant inmate.

Panel's Eighth Report, Dkt. 202, p. 10

As in the past, the Panel's main concern was that Department members sometimes reacted too quickly and should have taken advantage of "time and distance" to de escalate the situation and avoid using force altogether or to plan a potentially safer use of force. The failure to call a supervisor when confronted with a recalcitrant inmate is a corollary of the need for Department members to take more time before using force to control a recalcitrant inmate.

Panel's Eighth Report. Dkt. 202, p. 11:

In the Second Quarter of 2020, the Panel reviewed 22 force incidents. The Panel concluded that the <u>Department was not in compliance</u> with the same provisions of the Action Plan noted with respect to the First Quarter of 2020: <u>Force prevention principles</u>

12

(Section 2.2), <u>head strikes or kicking inmates</u> (Section 2.6), and calling supervisors to the scene before engaging with recalcitrant inmates (Section 2.7).

Panel's Ninth Report, Dkt. 203, p. 9:

> Based on the assessment of each provision across all of the force packages, the Panel concluded that in the Third Quarter of 2020 the Department was not in Compliance with the following provisions of the Action Plan applicable to the use of force by its members: <u>Force prevention principles</u> (Section 2.2), <u>head strikes or kicking inmates</u> (Section 2.6), and calling supervisors to the scene before engaging with recalcitrant inmates (Section 2.7).

Panel's Eleventh Report, Dkt. 238, p. 16:

> Policy provides that force be used as a last resort, with minimal amount of force necessary, terminated as soon as reasonably safe to do so, and de-escalated as resistance decreases.

> Of the 91 use of force packages reviewed, 30 cases were found non-compliant with this provision, which amounts to a 67.0% compliance, which is below the 90% compliance threshold.

### 3. Dishonesty in Force Reports

Panel's Third Report, Dkt. 181, p. 12

> The Panel noted, however, the members often failed to describe injuries suffered by the inmate as required by the Action Plan, and the Panel was not able to determine whether the members were separated before they submitted their written reports, as also required by the Plan.

> The investigators tended to focus on the suspects' injuries, which is certainly of paramount concern, and <u>gave short-shrift to the suspects' version of the incident</u>. This may be, in part, because of the availability of video evidence, which in most cases clearly shows what happened and usually corroborated the force reported by Department members. In addition, the investigations in late 2016 and early 2017 were conducted by sergeants who had not taken the new use of force investigations training approved by the Panel and first offered in late February 2017. It may, however, also reflect the possibility of an inherent bias in favor of an organization's own personnel, in this case the Department's personnel involved in the force incident. Although this bias is not unexpected, <u>it is incumbent upon the Department and its investigators to make every effort to conduct fair and impartial investigations for the purpose of determining the facts rather than exonerating Department members</u>.

Panel's Fourth Report, Dkt. 195, p. 12:

EXHIBIT F
PAGE 15

Department members' own use of force reports were consistent with videotapes of incidents from Closed Circuit Television cameras, but they did not always report force used by other members or describe an inmate's visible injuries. The Panel is cognizant, however, that sometimes Department members involved in a force incident may not be able to observe all of the force used by other members.

Panel's Fifth Report, Dkt. 198, p. 5:

According to published reports, the Department has reinstated "two deputies fired for misconduct – one accused of assaulting and harassing a woman and lying about it, the other for using unreasonable force during an arrest." (Los Angeles Times, "L.A. County Sheriff Alex Villanueva Reinstates Four More Fired Deputies," April 5, 2019.) The Deputy accused of dishonesty was rehired by the Department, notwithstanding that his termination had been upheld by the Civil Service Commission. Although these Deputies were not members of the Department's Custody Division at the time of the incidents at issue in these cases, the Panel is concerned that the reinstatement of Deputies who have been fired for dishonesty or excessive use of force sends the wrong message to Department personnel about the Department's commitments to the on-going reforms in the jails, and to holding Department personnel accountable for such misconduct in the future.

Panel's Fifth Report, Dkt. 198, p. 6:

Some of the problematic dispositions identified by the Inspector General's Report involved Department members in Custody operations who failed to report force, made false statements, improperly used fixed restraints, failed to timely rescue a victim inmate, conducted inadequate safety checks, and improperly imposed discipline.

Although these may be isolated cases, the Panel is nevertheless concerned with these instances of apparent misconduct. The Panel agrees with the Plaintiffs' observation in their response to the Panel's report, that the Department "cannot have a policy of zero tolerance for dishonesty or failure to report force if it terminates ongoing investigations of personnel alleged to have engaged in those forms of misconduct."

Panel's Sixth Report, Dkt. 199, p. 8:

Plaintiffs identified four force packages that they assert reflect dishonest conduct by Department employees who were not punished by supervisors for "such dishonesty." See Plaintiffs' Letter, p. 7. They "infer dishonesty from severe discrepancies between a LASD employee's description of a use of force incident and the video of the incident." Id. The Panel agrees with the Plaintiffs' assessment of one of the force incidents, but does not agree with Plaintiffs' conclusions that there is "brazen inaccuracy" in the other force packages. The Panel does not disagree, however, that the Department must "vigorously police" any inaccurate force reports and the Panel "must meticulously review force packages and other documents submitted by [the Department] for indices of dishonesty."

14

Panel's Eighth Report. Dkt. 202, p. 15, n. 29:

> The Panel remains concerned that reviewed use of force packages sometimes reflect Deputy reports that are inaccurate and self-serving, but which are not treated as "dishonesty" or "integrity" issues by the Department. See Seventh Report, p. 18. The Panel is not ready to conclude, as urged by Plaintiffs in their response to a draft of this Report, that every failure to discipline a Deputy who writes an inaccurate report regarding a force incident constitutes a violation of Section 13.1. However, the Panel believes a more rigorous review of this issue by the Department would improve accuracy and candor in use of force reports.

Panel's Ninth Report, Dkt. 203, p. 3:

> Other issues raised by the Panel in prior reports persisted in the Ninth Reporting period, most notably, the failure of the Department to mete out discipline in cases where force policies are violated, or Department personnel inaccurately describe force incidents in their written reports. Although tremendous strides have been made by the Department in limiting improper uses of force and developing a culture that discourages bad practices and emphasizes more positive staff-inmate relationships, the Panel believes that further progress in eliminating improper uses of force can only be achieved if deputies who clearly cross the line are disciplined.

Panel's Ninth Report, Dkt. 203, p. 17:

> As noted above, the Panel remains concerned that inaccurate reporting by Department staff regarding uses of force is not being consistently identified and addressed. Indeed, in the majority of cases where the Panel has found the use of force to be out of policy there is at least one report, either by the offending staff member or a witnessing staff member, that does not accurately describe the use of force or the inmate's conduct that prompted the use of force. The Panel recognizes that perceptions and memories will vary in these intense and fast-developing situations, but there have been repeated instances in which staff reports are clearly contradicted by video evidence.  Although supervisors will occasionally note discrepancies in reports or possible collaboration among staff in the preparation of the reports, we rarely see a robust discussion by reviewing commanders of inaccurate characterizations in reports, and never see discipline imposed for submission of false reports.

> FN 28:  The Panel routinely identifies for the Department instances of such false reporting at the quarterly force review meetings

Panel's Ninth Report, Dkt. 203, p. 17:

> We continue to see improper uses of force validated in the initial Supervisor's review and one or both Commander reviews often concur in the erroneous evaluation of the reviewing Sergeant. This is an area where there has been improvement by the Department, but the Panel expects to see more consistent recognition of problematic uses of force at all levels of review.

EXHIBIT F

PAGE 17

Panel's Tenth Report, Dkt. 205, p. 18:

> The Panel has previously noted its concern that reviewed use of force packages include staff reports that are inaccurate and self-serving, but which are not treated as "dishonesty" or "integrity" issues by the Department. In this Report, the Panel has found the Department Out of Compliance with Sections 5.2 (Commanders' reviews); 5.3 (unexplained discrepancies); and 15.3 (reports of force by other members), based on reports that do not accurately describe the use of force or the inmate's conduct that prompted the uses of force.

**C.    WRAP Device Use**

Panel's Tenth Report, Dkt. 205, p. 2:

> Another frequent issue of concern is the Department's use of the WRAP, a relatively new piece of equipment and procedure for immobilizing inmates to prevent further violence. The Monitors were assured that the WRAP policy satisfactorily addressed their major concerns but case reviews suggested the policy in question was being violated on a regular basis. The Monitors wrote to the Department twice about the unreasonable delay in revising and following policy. We were told that the Department would investigate the matter and get back to the Monitors. That has not happened. The Monitors recognize that there are many stakeholders weighing in on the WRAP Policy revision but the continuing practice with WRAP cannot be justified. Short of a new and formally approved policy, the Department could have issued one or more directives to correct the improper and potentially dangerous WRAP practices, but has not.

Panel's Tenth Report, Dkt. 205, p. 11:

> The WRAP policy and its application remain ongoing high priority concerns for the Panel. The WRAP policy has not been approved by the Monitors, as required, and the practices used with WRAP appear to be almost diametrically opposed to the way in which the Department explained that WRAP was being used. Provision 17.6 is non-compliant specifically because of WRAP procedures risking compressional asphyxia (see MCJ-04485 and IRC-01256, for ex.).

Panel's Tenth Report, Dkt. 205, p. 15:

> The Department has told the Panel that the WRAP is only used if an inmate has been assaultive toward staff or has a history of staff assaults, and pointed to the WRAP policy that requires supervisory approval in advance and requires a supervisor on-scene when the WRAP is applied. During case reviews, the Panel realized that these two policy provisions were regularly violated, with no supervisory or management comment or discussion, and no accountability. The Monitors twice wrote to the Department about this issue and the Department said it would review and respond, but has not. Based largely on this WRAP issue, the Department is Out of Compliance with Section 2.5.