PETER J. ELIASBERG (SB# 189110)
peliasberg@aclusocal.org
MELISSA CAMACHO (SB# 264024)
mcamacho@acluscal.org
**ACLU FOUNDATION OF SOUTHERN CALIFORNIA**
1313 W. 8th Street
Los Angeles, CA 90017
Phone: (213) 977-9500
Fax: (213) 977-5299

CORENE KENDRICK (SB# 226642)
ckendrick@aclu.org
MARISOL DOMINGUEZ-RUIZ
(SB# 345416)
mdominguez-ruiz@aclu.org
**ACLU NATIONAL PRISON PROJECT**
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930
Fax: (202) 393-4931

NICOLAS MORGAN (SB# 166441)
nicolasmorgan@paulhastings.com
STEPHEN TURANCHIK
(SB# 248548)
sturanchik@paulhastings.com
**PAUL HASTINGS LLP**
515 South Flower Street, 25th Floor
Los Angeles, CA 90071-2228
Phone: (213) 683-6000
Fax: (213) 627-0705

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Robert Luna, Sheriff of Los Angeles County, in his official capacity,<br><br>Defendant. | Case No. CV 12-00428 DDP (MRW)<br><br>**REDACTED DECLARATION OF MATTHEW THOMAS** |

Case No. CV 12-00428 DDP (MRW)
DECLARATION OF MATTHEW THOMAS

I, Matthew Thomas, declare as follows:

1. I make this declaration of my own personal knowledge and if called to testify I could and would do so competently as follows.

**ASSIGNMENT AND QUALIFICATIONS**

2. I have been asked by the ACLU to provide medical feedback on the use of force (UOF) specifically involving the WRAP. Below is my opinion based on the review of the videos provided to me and further delineated below. The matters set forth are my independent opinions, true and correct of my own personal and professional knowledge. My opinions are my own and not influenced by any allegiance to the ACLU or law enforcement agencies.

3. I am an Emergency Medicine physician with over 20 years of experience and was formerly a paramedic in the City of San Diego. I am licensed in the State of California and board certified by the American Board of Emergency Medicine. I previously served as the medical director for the California State Parks Law Enforcement and Emergency Services division with an emphasis on training and policy with specific requests to review their use of force (UOF) and restraint policy as it related to AB 490 (a.k.a "The George Floyd law"). I am currently working in San Diego, CA as an Emergency Medicine physician at a busy metropolitan Emergency Department and Trauma Center. My curriculum vitae is attached as Exhibit A.

**COMPENSATION**

4. I am being compensated at the rate of $425 per hour.

**MATERIALS PROVIDED**

5. Plaintiffs' counsel provided me with the text of *Rosas* provision 17.10, use of force reports and videos for the following seven cases, and a document with summaries of the same:

- ▓▓▓▓▓▓
- ▓▓▓▓▓▓▓▓
- ▓▓▓▓▓

- ▮
- ▮
- ▮
- ▮

**OPINIONS**

6. In my medical review of the seven (7) cases involving the WRAP, most of the inmates appeared to be experiencing a level of agitation and excitability that resulted in dangerous conditions for both themselves and the Los Angeles Sheriff Department (LASD) personnel.

7. The unfortunate outcome of these incidents, however, could likely be predicted. The videos and descriptions show most of these individuals to be in a significant level of physical and psychological distress before the deputy encounters begin. As jail personnel, deputies are metaphorical hammers and may be predisposed to see everything as a nail. I see deputies hammering screws that are clearly screws.

8. The approach to these inmates should be considered carefully and trained on to allow for reassessment and modified approaches in these emergency settings. I would favor a more nuanced approach and realization that these individuals are in an acute, and likely chronic, state of crisis. Additional training in recognizing those individuals in acute psychological distress may assist for a more orderly and less violent approach and execution of desired outcomes.

9. The WRAP may not be the injurious culprit, but the force needed to get the inmate into it is a decidedly dangerous aspect for both the inmate and LASD personnel. I think the department is simply lucky that they have not had an in-custody death if these videos represent their standard approach and restraint techniques.

10. It is my recommendation that the LASD re-evaluate their use of the WRAP as to when and how they deploy it. An exit strategy once it is deployed and an attempt to limit the duration of use should also be planned. In the Emergency Department, we do see people in acute psychological distress as potential emergencies

1 for our staff and the individual. They are rapidly assessed and treated to limit the risk
2 to all parties.

3     11.     Specific instances where an improved approach could have significantly
4 limited risk to LACSD personnel and inmates follow:

5     12. ███████. ████████████████████████████████████
6 ████████████████████████████████████████████████████████████
7 ████████████████████████████████████████████████████████████
8 ████████████████████████████████████████████████████████████
9 ████████████████████████████████████████████████████████████.

10     13.     It appeared that there was an almost 4-minute period where this inmate,
11 already in the medical clinic, could have been deescalated, verbally or medically, and
12 the subsequent UOF and WRAP application may have been avoided.

13     14. ████████████████████████████████████████████
14 ████████████████████████████████████████████████████████████
15 ████████████████████████████████████████████████████████████
16 ████████████████████████████████████████████████████████████
17 ██████████████████ These actions represent a potential significant risk to the
18 inmate's ability to breathe. ███████████████████████████████████
19 ████████████████████████████████████████████████

20     15.     The █████████████████████████████████████████
21 ████████████████████████████████████████████████████████████
22 ████████████████████████████████████████████████████████████
23 ████████████████████████████████████████████████████████████
24 ████████████████████████████████████████████████████████████
25 ████████████████████████████████████████████████████

---

[1] Times refer to UOF video timestamps.

16. ▮▮▮▮▮ In this handheld video there are clear warning signs from the beginning that this is not going to go well. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17. This is a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Involvement of medical/psychological personnel could have identified this individual as one who did not have the capacity to comply. This knowledge could have prompted a different and less risky approach for all involved. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

18. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This still represented a significant risk and could have resulted in a much worse outcome in a different inmate or even this one in similar circumstances.

19. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1  ███████ but I see no documented involvement of mental health professionals. No
2  vital signs are documented in his medical assessment.

3      21.   ███████. In this instance, we have a limited view of the goings-on
4  and no sound from the static surveillance video. We have no footage of the WRAP
5  application. ███████
6  ███████
7  ███████
8  ███████
9  ███████
10 ███████

11     22.   He had ███████ so trouble had been anticipated. If
12 possible, maintaining him in a more open space where he might not have felt
13 physically intimidated may have prevented the following events. ███████
14 ███████ offering or administering antipsychotic
15 and/or anti-anxiety medications, with inmate consent, prior to this may have
16 deescalated the situation as well. ███████
17 ███████ and so giving the inmate options and a sense of control
18 and a goal may have also worked. By the time it came to handcuffing, the inmate was
19 likely agitated enough that he was not capable of complying and felt threatened in that
20 space.

21     23.   ███████
22 ███████
23 ███████ The handheld video was not made
24 available to me for review[2], but ███████
25 ███████ Although the in-house investigation

---

[2] Plaintiffs' counsel inform me that they did not receive a copy of the handheld video from LASD.

1 ▮
2 ▮
3 ▮
4 ▮
5 ▮
6 ▮
7 ▮. It is medically reasonable to
8 expect that if the five deputies were having difficulty breathing then the one restrained
9 inmate also had difficulty breathing. ▮.
10    24. Ultimately, LASD reviewers concluded ▮
11 ▮. I would disagree; in the persistently
12 agitated schizophrenic with repetitive outbursts, a limited capacity to understand and
13 comply with orders, and the potential for concomitant excitatory drugs in his system,
14 there were multiple deescalation techniques, pharmacologic options, and a needed
15 flexibility in where his mental health evaluation took place that could have mitigated
16 substantial risk to LASD personnel and the inmate.
17    25. ▮
18 ▮
19 ▮
20 ▮
21 ▮
22 ▮
23 ▮
24    26. ▮
25 ▮
26 ▮
27 ▮
28 ▮

1  ███████████████████████████████████████████. This likely
2  represented an acute respiratory distress worsened by existing psychological issues
3  and the acute struggle as well as limitations of his ability to breathe freely and could
4  represent a significant health risk. ██████████████████████████████
5  ██████████████████████████████████████████████████████
6  █████████████████████████████████████. No vital signs
7  were documented.

8        27.   ████████. In this takedown, only surveillance camera footage without
9  sound is available for review. ████████████████████████████████
10 ██████████████████████████████████████████████████████
11 ██████████████████████████████████████████████████████
12 ██████████████████████████████████████████████████████
13 ██████████████████████████████████████████████████████
14 ██████████████████████████████████████████████████████
15 ████████████████████████.

16        28.   ████████████████████████████████████████.
17 Medical intervention would not likely have changed the outcome, but identification
18 of the distressed innate earlier may have led to psychiatric intervention that could have
19 prevented the event. Compression of the torso and neck could, again, represent a
20 dangerous airway and respiratory compromise. ██████████████████
21 ████████████████ No vitals signs documented in medical.

22        29.   ████████ ████████████████████████████████
23 ████████████████████████████████████████ There were many known
24 factors that should have alerted deputies that this was going to go poorly. ████
25 ██████████████████████████████████████████████████████
26 ██████████████████████████████████████████████████████
27 ██████████████████████████████████████████████████████
28 ██████████████████████████████████████████████████████

1 ██████████████████████████████████████████████████████
2 ██████████████████████████████████████████████████████.
3    30.   The ████████████████████████████████████████
4 ██████████████████████████████████████████████████████
5 ██████████████████████████████████████████████████████
6 ██████████████████████████████████████████████████████
7 ██████████████████████████████████████████████████████
8 ██████████████████████████████████████████████████████
9 ██████████████████████████████████████████████████████
10 ██████████████████████████████████████████████████████
11 ██████████████████████████████████████████████████████
12 ██████████████████████████████
13    31.   The ████████████████████████████████████████
14 ██████████████████████████████████████████████████████
15 ██████████████████████████████████████████████████████
16 ██████████████████████████████████████████████████████
17 ██████████████████████████████████████████████████████
18 ██████████████████████████████████████████████████████

   32.   This is a concerning setup, creating a likelihood of LASD personnel injury and acute inmate decompensation. It could likely have been mitigated or avoided with additional preplanning and involvement of appropriate medical / psychiatric professionals and the implementation of consented antipsychotic / antianxiety medications.   The ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████ – a reasonable time to do a re-check is within eight (8) hours. No vital signs were ever documented.

33. ████████. Again, ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████.

34. ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████Full credit to the Sergeant█
████████████████████████████He stated,██████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████.

35. At times, ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████. It is possible that further deescalation techniques could have been successful. One option in a distraught but still partially lucid patient would be to allow a semblance of choice though the outcome could have still been deputy driven. Alternative intervention by medical and/or mental health professionals could have been beneficial and again the possibility of voluntary medication could be considered.

36. The presentations of the inmates in the videos I viewed are concerning in that similar presentations (high levels of agitation combined with acute psychological distress) could result in an in-custody death potentially unrelated to positional asphyxiation and without regard to restraint techniques - but would be a death just the same. The pathway to cardiac arrest associated with these cases is complex and may not be 100% avoidable regardless of LASD action but risk may increase with even minimal respiratory compromise, making WRAP application with pressure to the torso and airways, even more dangerous. Again, my opinion is that the LASD is "lucky" that they have not had an in-custody death related to forced restraint, including the use of the WRAP. These presentations are an acute potential life-threatening event marked commonly by aggressive words and / or actions, and disorientation.

37. At this time, there is no absolute contraindication for the use of the WRAP, restraint chairs, spit masks, Electronic Controlled Weapons (ECW), or oleoresin capsicum (OC) spray for the control of an inmate in acute psychological distress in the medical literature. There have been no good appropriately or even possibly randomized trials in this field that would allow me to make recommendations as to the safest physical means to control an inmate in crisis. Any use of these techniques should be done so cautiously and with deputy and inmate safety in mind.

38. Deputies should not rely on restraint or weapon company literature or most medical studies to reassure themselves of the safety of their actions. These various devices are tested on healthy volunteers, not on individuals with the complex metabolic derangements that can come with agitation whether psychotic, pharmacologic or a combination of the two.

39. The goal of the restraining team should be to determine the best path to limit the potential for personnel and inmate harm. This includes an exit strategy, and could be simply a cooling off period, offering antipsychotic / antianxiety medications in the appropriate individual, a graduated approach while developing trust with the

individual, and other types of deescalation. The restraint time should be limited to under an hour.

40. I recommend a more thorough medical evaluation than those documented here to include vital signs and to determine the potential for acute decompensation. At a minimum, a heart rate and a temperature should be documented. Those with evidence of an elevated metabolic state with an elevated temperature should be referred for emergent evaluation by a physician.

41. The WRAP can potentially be a useful tool to limit an inmate's movement, aid in inmate transport, and potentially decrease both deputy and inmate risk, but it should be used with extreme caution. The application process in the acutely agitated inmate is not without peril. In my opinion, these risks to LASD and the inmate can be broken down into two main categories: (1) the application process itself, and (2) the maintenance and removal phase.

42. For WRAP application, there is no noted technique within the company's application training slides that puts pressure on the suspect's torso, neck or head, which would violate California State Assembly Bill 490[3]. However, when we see this in real world application, there is significant risk of respiratory compromise to the inmate. The addition of personal, electronic or chemical weapons during WRAP application potentially increases risk to the inmate.

43. Although physical struggle from being placed in the device and intrinsic inmate factors are likely to play a more significant role in any adverse medical outcome, the WRAP does not prevent the irrational inmate from continuing to fight against the restraints. Continued struggle while in the WRAP could result in progressive loss of adrenaline, increased body temperature, and a metabolic acidic environment. In this setting, there are other changes within the body that could result

---

[3] https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202120220AB490

in cardiac arrest with minimal restriction of respiratory status or even happen spontaneously. When in the WRAP, there is also limited exposure of the inmate for visual and physical inspection and significant changes may go unnoticed to the observer despite the best intentions. When removing the WRAP without sufficient deescalation, as in [redacted], there is the risk of a continually agitated and violent inmate injuring LASD or themselves as restrictive measures are lessened.

44. In short, best practices would be to 1) de-escalate such that restraints are not required, 2) if they are required, limit the amount of time utilizing physical restraints to effect the detention, 3) with any restraint, special care should be taken to never restrict an inmate's ability to breathe which would include compression of the torso or forced flexion of the neck or airway, 4) transition to a seated position to allow for unfettered movement of the chest wall and quick identification of a change in mental state by the deputy, 5) keep the individual as calm as possible, and 6) when time and conditions permits, involvement of medical personnel is highly recommended before aggressive restraint takes place. If restraints are required beyond handcuffs in the agitated and psychologically distressed inmate, immediate medical evaluation, once safe, should take place. Inmate consented use of short or long-acting antipsychotics or sedatives are a reasonable option in the emergency setting to deescalate.

45. *Rosas* provision 17.10 states, in part, that "medication may not be used solely for security purposes." Consented medication without coercion may be seen as a humanitarian component getting these individuals in crisis through another traumatic event. Medical / psychological intervention may be another effective means to limit the risk to all individuals involved. I realize that this option may be limited by current LASD policy and availability of medical personnel in all areas. I have not received LASD's current version of the WRAP policy and thus cannot comment on whether it takes these best practices into account at this time.

46. Another issue I noticed from my review of the reports is that there does not seem to be adequate communication between deputies themselves, or the medical / mental health practitioners and the deputies, as to the rationale for patient movements and/or inmate history. If available, and when time permits, it may be useful to review the individual's past history to affect the desired outcome.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 30, 2023, in San Diego, CA.

*(signature)*

Matthew Thomas, MD

# EXHIBIT A

*Curriculum Vitae*
# Matthew Morrill Thomas, MD

1034 Novara St
San Diego, California 92107
(619) 847-5422
Matthew.Thomas.MD@gmail.com

## POSTGRADUATE TRAINING / EDUCATION

**Naval Medical Center, San Diego, CA**
- Emergency Medicine Residency                              August 2003 – August 2006

**Naval Medical Center, San Diego, CA**
- Transition Year Internship                                June 2000 – June 2001
- Combat Casualty Care Course, November 2000

**Columbia University College of Physicians and Surgeons, New York, NY**
- Doctor of Medicine                                         August 1996 – May 2000

**University of San Diego, CA**
- B.A. Biology, Chemistry Minor                              January 1991 – May 1995
- Magna Cum Laude

**Southwestern College, Chula Vista, CA**
- EMT-Paramedic Certification                                January 1992 – December 1992

**Certification / Courses**
- Medical Licensure: California A76430, 2001 – Present
- American Board of Emergency Medicine, 2007 – Present
- Emergency Department Bedside Ultrasound credentialed
- PALS, 1992 – 2009
- ACLS, 1992 – 2019
- ATLS, 2000 – 2010
- Combined Humanitarian Assistance Response Training, March 2002
- Advanced Airway Course, May 2006

## PROFESSIONAL EXPERIENCE

**Emergency Medicine Staff Physician, Sharp Memorial Hospital Emergency Department and Trauma Center, San Diego**
- September 2016 – Present

**Medical Director, California State Parks, Law Enforcement and Emergency Services Division**
- August 2021 – March 2022
- Responsible for medical training and oversight of 1500+ Law Enforcement, Lifeguards and non-sworn personnel throughout California
- Provided medical review and recommendations for existing use of force policies, defensive tactics, ground control, and use of restraint devices for Law Enforcement Division in light of 2021 CA AB 490 and Section 7286.5 of the Government code relating to Law Enforcement Agencies.

**Emergency Medicine Staff Physician, Scripps Torrey Pines Urgent Care**

- March 2015 – Present

**Emergency Medicine Staff Physician, Scripps Memorial Hospital Encinitas**
- September 2009 – June 2015
- EMS liaison / teaching adjunct Carlsbad Fire Department, Oceanside Fire Department, San Diego City Fire Department/ AMR Paramedic Services as well as multiple EMT-I level transportation agencies
- Emergency Disaster Preparedness Committee

**Emergency Medicine Staff Physician, Scripps Mercy Downtown and Scripps Memorial Hospital Encinitas**
- September 2009 – June 2010

**United States Navy, Lieutenant Commander, Medical Corps**
- Active Duty:  June 2000 – October 2009
- In-Active Navy Reserve: April 1996 – May 2000

**Emergency Medicine Staff Physician, Naval Medical Center San Diego, CA**
- October 2008 – October 2009
- Academic Faculty for PGY 2-4 Emergency Medicine Residency with 24 residents, rotating interns, medical students and Nurse Practitioners
- EM Quality Assurance Director
- Morbidity and Mortality Conference Coordinator
- EM Representative for Operation and Invasive Procedure Committee – responsible for developing, reviewing, and instituting new Procedural Sedation and Analgesia Protocol

**Emergency Medicine Staff Physician, US Naval Hospital Okinawa, Japan**
- September 2006 – September  2008
- Emergency Medical Services Director – Quality Assurance, Protocol Development, Training
- Disaster Area Response Team Leader – Mass Casualty Response and Training
- Grand Rounds Coordinator – Urosoe Hospital – Ginowan, Japan

**Emergency Medicine Staff Physician, Expeditionary Medical Facility Kuwait (EMF-K)**
- July 2007 – February2008
- Director of Joint Service Medical Evacuation Committee – Organized patient transfer and overhaul of emergency communication network in Kuwaiti Theater of Operation
- QA Director for all patient transfers to EMF-K
- Developed protocols for Traumatic Brain Injury and Abdominal Pain cases to minimize air and ground transport risk

**General Medical Officer, Camp Pendleton, CA**
- August 2001 – August 2003
- Senior Battalion Surgeon and Marine Expeditionary Unit Surgeon
- Operation Iraqi Freedom, Baghdad, Iraq – Combat Medical Operations
- Associate Investigator of Combat Trauma Medicine

**Pre-Hospital / Emergency Medical Services, San Diego County, CA**
- **Southwestern College: Paramedic Instructor** September 2000 – 2003
- **Sharp Memorial Hospital – ED Tech / Ward Clerk -** December 1995 – August 1996
- **City of San Diego Paramedic Services – EMT- Paramedic** December 1992 – October 1993
- **Schaefer Ambulance Service - EMT-Basic** – February 1991 – November 1992
- **Instructor – PHTLS, ACLS, PALS, BLS** – 1993 – 2009 – Varying times

## PRESENTATIONS / PUBLICATIONS
- Clinical Pathologic Case presentation semi-finalist "Superior Mesenteric Artery Syndrome", Society of Academic Emergency Medicine Annual Conference, Orlando, FL, April 2004
- Is an Elevated Post-Void Residual a Risk Factor for Bacteriuria?, Society for Urodynamics and Female Urology - October 2007

## OTHER / SELECT AWARDS
- Proficient in Spanish
- Personal Military Awards: Navy Commendation Medal, Army Commendation Medal, Navy Achievement Medal, Combat Action Ribbon, Overseas Service Ribbon (2), Sea Service Deployment Medal (3), Humanitarian Service Medal, Presidential Unit Citation, Iraqi Freedom Medal, Marine Expeditionary Force Ribbon, Global War on Terrorism Medal
- Columbia University: Honors in Emergency Medicine, Sports Medicine, Neurology, Psychiatry, Physical Diagnosis, Primary Care, and Science Basic to the Practice of Medicine
- University of San Diego: Academic scholarship 1992-1995; Top Academic Senior 1995, Dean's List Honors 1991 – 1995, Kappa Gamma Pi (Catholic Honors Society)
- Southwestern College: President's List 1992