PETER J. ELIASBERG (SB# 189110)
peliasberg@aclusocal.org
MELISSA CAMACHO (SB# 264024)
mcamacho@acluscal.org
**ACLU FOUNDATION OF SOUTHERN CALIFORNIA**
1313 W. 8th Street
Los Angeles, CA 90017
Phone: (213) 977-9500
Fax: (213) 977-5299

CORENE KENDRICK (SB# 226642)
ckendrick@aclu.org
MARISOL DOMINGUEZ-RUIZ
(SB# 345416)
mdominguez-ruiz@aclu.org
**ACLU NATIONAL PRISON PROJECT**
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930
Fax: (202) 393-4931

NICOLAS MORGAN (SB# 166441)
nicolasmorgan@paulhastings.com
STEPHEN TURANCHIK
(SB# 248548)
sturanchik@paulhastings.com
**PAUL HASTINGS LLP**
515 South Flower Street, 25th Floor
Los Angeles, CA 90071-2228
Phone: (213) 683-6000
Fax: (213) 627-0705

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN
GOODWIN, on behalf of themselves
and of those similarly situated

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Robert Luna, Sheriff of Los Angeles County, in his official capacity,<br><br>Defendant. | CASE NO. CV 12-00428 DDP (MRW)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY IMPLEMENTATION PLAN (Dkt. 245).**<br><br>**UNDER SEAL**<br><br>Assigned to Hon. Dean D. Pregerson<br><br>Hearing: June 26, 2023 |

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................1

II.   PROCEDURAL HISTORY ...................................................................2

    a.    Commencement of Litigation, Settlement, and Court Approval..........2

    b.    Monitoring ..................................................................................3

    c.    Panel's Tenth Report and Compliance Plan Process. ..........................3

III.  FACTUAL BACKGROUND .................................................................5

    a.    Evidence of Non-Compliance with Provisions of the Consent Decree and Implementation Plan ..........................................................5

        i.    Head Strikes....................................................................5

        ii.   Force Prevention/De-escalation.........................................6

        iii.  Accountability..................................................................7

    b.    Head Strikes Are Dangerous for Incarcerated Persons and LASD Personnel ................................................................................10

    c.    Blows to the Head Create Particular Risks in Jail ............................12

    d.    The WRAP Is Dangerous, Overused, and Can Be Deadly.................14

IV.   LEGAL STANDARD ........................................................................17

V.    ARGUMENT .....................................................................................18

    a.    Defendants' Noncompliance is a Changed Circumstance that Justifies Modification................................................................................18

    b.    LASD's Use of a Restraint Device That Falls Outside of the Implementation Plan is a Changed Circumstance that Justifies Modification................................................................................19

    c.    The Scope and Duration of Noncompliance Was Not Foreseeable. ..19

    d.    LASD's Pattern of Noncompliance Shows that Maintaining the Status Quo Without Modification Is Unworkable and Would Harm the Public Interest ................................................................................20

    e.    The Proposed Modifications Are "Suitably Tailored" to Address Defendants' Pattern of Noncompliance..........................................20

VI.   CONCLUSION .................................................................................23

i

# TABLE OF AUTHORITIES

**Cases**

*Babu v. Ahern*,
   No. 5:18-cv-07677 (Doc. 266-1 at 36) (N.D. Cal. Aug. 26, 2021)....................16

*City of Revere v. Mass Gen. Hosp.*,
   463 U.S. 239 (1983) ......................................................................................18

*Doss v. Cnty of Alameda*,
   No. 19-CV-07940-CRB, 2022 WL 6156551 (N.D. Cal. Oct. 7, 2022)......................................................................................................16

*Frew ex rel. Frew v. Hawkins*,
   540 U.S. 431 (2004) ......................................................................................18

*Holland v. New Jersey Dept. of Corrs.*,
   246 F.3d 267 (3d Cir. 2001) ..........................................................................18

*Kelly v. Wengler*,
   822 F.3d 1085 (9th Cir 2016).........................................................................18

*Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*,
   564 F.3d 1115 (9th Cir. 2009)........................................................................18

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012)..........................................................................20

*Parsons v. Ryan*,
   912 F.3d 486 (9th Cir. 2018.............................................................................18

*Parsons v. Ryan*,
   949 F.3d 443 (9th Cir. 2020)...........................................................................18

*Rosebrock v. Mathis*,
   745 F.3d 963 (9th Cir. 2014)...........................................................................19

*Rufo v. Inmates of Suffolk Cty. Jail*,
   502 U.S. 367 (1992) .......................................................................................18

*Seattle Times Co. v. Rhinehart*,
   467 U.S. 20 (1984) .........................................................................................18

ii

*Thompson v. Enomoto*,
   915 F.2d 1383 (9th Cir. 1990) ...............................................................................20

*United States v. Sec'ty of Housing and Urban Dev.*,
   239 F.3d 211 (2d Cir. 2001) ..................................................................................20

**Statutes**

Cal. Govt. Code § 7286.5 .............................................................................................15

Cal. Govt. Code § 7286.5(a)(2) ...................................................................................15

Cal. Govt. Code § 7286.5(b)(4) ...................................................................................15

## I.    INTRODUCTION

The April 2015 class action settlement agreement, (Dkt. 133-1), and implementation plan ("plan") created by the Court-appointed panel of expert monitors ("Panel") (Dkt. 133-2), which the Court approved (Dkt. 134, 135), form the backbone of the efforts to address the Los Angeles Sheriff's Department's (LASD) pattern and practice of dangerously excessive force against Plaintiff detainees. Yet for almost 4.5 years, the Panel has dutifully filed report after report— eight, to be precise—detailing LASD's stubborn and repeated failure to implement fundamental provisions of the decree and plan. *See* Declaration of Peter Eliasberg, Ex. F (document collecting quotations from the Panel's Fourth through Eleventh Reports).[1]

Specifically, for years LASD has failed, among other things, to address (1) the overuse of dangerous and unnecessary head strikes; (2) the excessive and unnecessary uses of force due to consistent non-compliance with force prevention policies; (3) dishonest reporting by line personnel about uses of force; and (4) the overuse of the dangerous WRAP restraint device. Central to and underlying all these failures is the unwillingness of supervisors to hold line staff accountable for violations, and the unwillingness of command staff to hold supervisors accountable for rubber stamping these blatant policy violations and dishonest reporting.

These failures have persisted—year after year—despite the Panel's repeatedly identifying violations and warning of the necessity for change. Plaintiffs do not dispute improvements in some provisions in the last decade. But in its last report, the Panel found LASD non-compliant with 23 of the plan's 100 provisions. Dkt. 238. And LASD has *never* been compliant with the head strike and force prevention provisions of the plan.

---

[1] The Panel has filed 11 reports. Starting with the Fourth Report, it began to assess Defendants' compliance with each *Rosas* provision against the compliance measures it developed for those provisions. Citations to Panel reports are to the page number of the report, and not the page assigned by the ECF system.

This pattern of non-compliance is a changed factual circumstance that justifies the Court's modifying a consent decree –or in this case the implementation plan -- under governing law. More importantly, the need to protect people incarcerated in the County jails from dangerous and unnecessary force, requires modifications to finally bring the Department into compliance.

## II.    PROCEDURAL HISTORY

### a.    Commencement of Litigation, Settlement, and Court Approval

Plaintiffs filed a putative class action complaint on January 18, 2012. Dkt 1. The complaint (and first amended complaint, Dkt. 32) alleged, among other things:

- There was a "pattern and practice of deputy-on-inmate violence that has persisted for many years" in the jails. Dkt. 1 ¶ 3.

- LASD Command staff was "aware of the culture of deputy violence that pervades the Jails but have failed to take reasonable measures to remedy the problem." *Id.* ¶ 3.

- One aspect of the pattern of excessive force was deputies' "punching [incarcerated people] in the face with their fists" resulting in "fractured eyes sockets, broken teeth, [and] severe head injuries" *Id.* ¶ 5.

- Command staff had "fail[ed] to promulgate adequate policies on the use of force, fail[ed] to adequately train and supervise deputies in the face of historical and continued evidence of abuse, fail[ed] to conduct meaningful investigations of reports of excessive force, [and] fail[ed] to hold guilty deputies accountable. *Id.* ¶ 11.

- "The ultimate goal of this lawsuit is to end the longstanding pattern of deputy on inmate abuse *by requiring Defendants to put in place a system of accountability, which they have for so long failed to do*." *Id.* ¶ 14 (emphasis added)

On June 7, 2012, the Court certified a class of "all present and future inmates confined in the Jail Complex in downtown Los Angeles." Dkt. 54. Settlement discussions began on June 29, 2012, and continued for two years. *See* Dkt. 59-61, 68, 93, 95-105. With guidance from the Court, the parties executed a class action settlement in September 2014, the principal components of which were the appointment of an expert panel who would draw up an implementation plan binding

on the Defendants after input from the parties. Dkt. 110. The Panel finalized the plan in October 2014. Defendants then submitted the agreement and plan to the Board of Supervisors for approval, which it did on December 16, 2014. After a fairness hearing on April 20, 2015, the Court entered an order approving the agreement, and retained jurisdiction to enforce its terms. Dkt. 134, 135.

### b.      Monitoring

The Panel began monitoring compliance with the agreement and plan in December 2015. The Panel bases its assessments of compliance on, among other things, review of LASD's policies and procedures, tours of jails and interviews with LASD personnel and incarcerated persons, self-assessments by LASD, review of use of force videos and reports, compliance measures the Panel developed, and comments from counsel for the parties. *See. e.g.*, Dkt. 141 (First Report) at 1; Dkt. 238 at 3 (Eleventh Report) at 3 (describing review of use of force packages); *id.* at 9-46 (assessing compliance with *Rosas* provisions against measures).

### c.      Panel's Tenth Report and Compliance Plan Process.

In the Tenth Report, filed April 7, 2022, the Panel stated:

> While great progress was made on many fronts in the initial years of monitoring (none more important than the elimination of inmate beatings[2] and the change in culture of the downtown facilities from enforcement-oriented to service-oriented), as noted in prior Monitor reports, that has not been the case recently. For the use of force packages we have been reviewing, we are no longer seeing progression towards professional management of force situations. It is time for the jail culture to stop supporting behaviors that are forbidden by Policy.

Dkt. 205 at 1.

The Tenth Report highlighted the continued lack of progress in eliminating

---

[2] The Panel stated inmate beatings were "situations in which multiple Deputies continued to beat and/or kick an inmate after he was on the floor and sometimes unconscious, or in which inmates were taken to off camera locations where brutal uses of force were administered as retaliation or for intimidation or the like." Dkt. 205 at 1 n.1.

out of policy "'head shots' (punches to the head of an inmate);" the lack of accountability for deputies who violated the head strike policy and supervisors who approved out of policy head strikes or failed to impose meaningful discipline in the infrequent instances when they found the punches out of policy; failure to employ force prevention tactics; and regular violations of the department's policy for the "relatively new" WRAP restraint. *Id.* at 1-3. For the first time ever, the Panel requested a status conference and included a series of recommendations designed to move Defendants into compliance with the plan. *Id.* at 1, 30-33.

Following the May 12, 2022 status conference, the parties began negotiations with the goal of agreeing to a "compliance plan" embodying changes in policy, training, data collection, and procedure to bring LASD into compliance. This has included multiple meetings between counsel, some involving the Panel, numerous exchanges of written proposals, and ultimately agreement on a number of changes. The process is explained in detail in the April 18, 2023 Joint Status Report, which Plaintiffs incorporate here. Dkt. 240. Since the April 18 status conference, counsel have had four more teleconference sessions.

This process has resulted in agreement on a number of significant changes including:

- Defendants will create an independent Force Review Team to review use of force incidents with the goal of improving the quality of reviews and removing supervisors from evaluating whether the personnel they supervise violated Department policies.

- Defendants will create and utilize templates in force reviews requiring reviewers to, among other things, expressly address whether the elements of particular force policies were violated.

- Defendants will expand the data it gathers and distributes to the Panel and Plaintiffs' counsel with the goal of improving compliance with the *Rosas* Provisions and Department's Custody Use of Force Manual policies designed to implement the *Rosas* Provisions.

- Defendants will permit the Panel and Plaintiffs' counsel to observe its DeVRT (de-escalation) training, receive the materials provided in the training, and

consider comments from the Panel and Plaintiffs' counsel.[3]

The areas of disagreement before the Court for resolution are 1) whether the LASD must implement a policy whereby head strikes are permissible only when deadly force is justified; 2) whether there must be mandatory discipline when LASD personnel violate the head strike, force prevention, and honest reporting and WRAP requirements, and reviewers fail to identify these violations or impose mandatory discipline when they do; and 3) certain modifications to the consent decree related to the WRAP and force prevention[4].

## III. FACTUAL BACKGROUND

### a. Evidence of Non-Compliance with Provisions of the Consent Decree and Implementation Plan

#### i. Head Strikes

Starting with its Fourth Report, the Panel assessed LASD's compliance with each *Rosas* provision in the plan. Despite repeated expressions of concern by the Panel, LASD has not complied with the head strike provision, 2.6, in any report from the Fourth through the Eleventh — *a period of about 4.5 years*. Dkt. 195 at 7-8, Dkt. 198 at 10; Dkt. 199 at 11; Dkt. 201 at 12, 26; Dkt. 202 at 9, 25; Dkt. 203 at 9, 10, 25; Dkt. 205 at 1, 12, 13, 27; Dkt. 238 at 17, 47.

The Panel repeatedly has raised problems with LASD's improper use of head strikes. In its Fifth Report, the Panel stated it "has an on-going concern about Department members using punches to control resisting inmates, which often occurs when the inmates are on the ground and Department members are trying to handcuff them." Dkt. 198 at 11. The Eighth Report stated that a "persistent problem regarding the use of force identified by the Panel is the improper use of head strikes. The Panel found 10 cases in the First Quarter where personnel inappropriately struck an inmate

---

[3] All agreements are included in the Compliance Plan document filed concurrently.
[4] Plaintiffs will propose specific modifications to the consent decree to address any deficiencies in LASD's WRAP and limitations on force policies, which LASD has not yet provided but will provide by June 1, 2023. Dkt. 250.

in the head." Dkt. 202 at 10. The Panel warned of the risks and urged LASD to reduce head strikes: "Medical science informs us that head blows are the 'hidden injuries' that create or exacerbate mental illness. Agencies nationwide have long moved away from acceptance of head strikes. We encourage the Department to pay particular attention to this issue moving forward." *Id*.

Despite these warnings, the Panel again found LASD out of compliance in its Tenth Report: "The use of 'head shots' (punches to the head of an inmate) where prohibited by policy, has been relatively unchanged in the last two years or more, and may be increasing." Dkt. 205 at 1. The Eleventh Report again found LASD noncompliant with head strike provisions; the Panel has a compliance threshold of 90% for cases involving head strikes and found, "[o]f the applicable cases reviewed, 65.1% (56 out of 86) were . . . in compliance. Dkt. 238 at 17.

### ii.    Force Prevention/De-escalation

Two provisions of the plan address the goal of minimizing and/or preventing uses of force. Provision 2.2 requires that

> the Department's Custody use of force policies should provide that force used by Department members: (a) must be used as a last resort; (b) must be the minimal amount of force that is necessary and objectively reasonable to overcome the resistance; (c) must be terminated as soon as possible consistent with maintaining control of the situation; and (d) must be de-escalated if resistance decreases.

Dkt 133-2 at 2. Provision 2.7, the "recalcitrant inmate" provision, requires that "Department members confronted with a situation in which force may be required must call a supervisor to the scene as soon as time and circumstances permit." *Id.*

LASD's noncompliance with these force prevention provisions is as bad as its noncompliance with the head strike provision. Starting with the Fourth Report, LASD has not complied with Provisions 2.2 and 2.7 in each report. Dkt. 195 at 8-9, 17; Dkt. 198 at 10, 24; Dkt. 199 at 10-11, 22; Dkt. 201 at 11-12, 26; Dkt. 202 at 9, 11, 25; Dkt. 203 at 9-10, 25; Dkt. 205 at 12, 13, 27; Dkt. 238 at 16-17, 47. As with

head strikes, LASD falls far short of the 90% compliance threshold. The Eleventh Report found that "[o]f the 91 use of force packages reviewed, 30 cases were found non-compliant [with 2.2] . . . which amounts to a 67.0% compliance." Dkt. 238 at 16. The compliance figure for Provision 2.7 was 81.3%. *Id.* at 17.

LASD's long-standing noncompliance persists in the face of the Panel's repeated statements of concern. The Fifth Report stated:

> The Panel's overarching concern was that Department members sometimes reacted too quickly in a confined environment instead of waiting for readily available backup resources and taking more time to respond to a recalcitrant inmate. There were incidents where Department members could have taken advantage of "time and distance" to de-escalate the situation and avoid using force altogether or to plan a potentially safer use of force.

Dkt. 198 at 10. A year later, the Panel reiterated:

> As in the past, the Panel's main concern was that Department members sometimes reacted too quickly and should have taken advantage of "time and distance" to de-escalate the situation and avoid using force altogether or to plan a potentially safer use of force. The failure to call a supervisor when confronted with a recalcitrant inmate is a variant on the need for Department members to take more time before using force to control a recalcitrant inmate.

Dkt. 201 at 12.

The Panel raised the same concern in its Eighth and Tenth Reports. Dkt. 202 at 10; Dkt. 205 at 2. The Eleventh Report noted two especially troubling facts based on focus groups with LASD personnel: many staff felt that "[e]mploying time and distance principles is seen as 'giving up ground' with inmates" and staff "would like to be able to go 'hands on' more often with recalcitrant inmates." Dkt. 238 at 3.

### iii.    Accountability

Over the course of almost five years, the Panel repeatedly detailed LASD's failure to identify violations of policy for head strikes, force prevention, and dishonest reporting, or to impose discipline when supervisors identify violations.

7

The Fifth Report described the Panel's "concern[] that reviewing Commanders are reluctant to find a use of force out of policy (and therefore subject to discipline) even when they acknowledge that the force was problematic, and they will instead find that troubling incidents raise performance and training issues." Dkt. 198 at 17. The Panel warned "[i]t will also undermine the effectiveness of the system to deter misconduct if the consequences for misconduct are likely to be training or mentoring in lieu of discipline. In many cases, the combination of discipline and training can provide the most impactful outcome." *Id.* at 6. The Eighth Report stated:

> The Panel has expressed concern for several reporting periods that the Department relies too heavily on remedial training rather than discipline in situations where the Department agrees that use of force policies have been violated. The Panel has also seen numerous cases involving violations of policy, such as head punches for inmate control, that result in outcomes that do not reflect the seriousness of the offense.

Dkt. 202 at 5; *see also* Dkt. 203 at 3 (9th Report) (noting a failure "to mete out discipline in cases where force policies are violated, or Department personnel inaccurately describe force incidents in their written reports.").

The Panel strengthened its criticism in its Tenth Report, highlighting reviewers' failure to hold line staff accountable, *and* managers' failure to hold supervisors accountable for not identifying violations nor imposing discipline:

> Use of force reviews by supervisors and managers in the serious cases selected by the Monitors, almost always fail to note out-of-policy head shots or – less frequently – attempts to justify them. Then the supervisors and managers are not held accountable for those failures and the Deputies using the improper for[m] are "counseled" or sent to remedial training and actual discipline is seldom imposed. While the Department has openly acknowledged this continuing issue . . . , there has been little real change or progress in more than two years.

Dkt. 205 at 1-2; *see also id.* at 12-13. The Panel warned LASD would not eliminate use of force violations unless supervisors identified violations and disciplined staff for them. "[T]the Panel believes that further progress in eliminating improper uses

of force *can only be achieved* if deputies who are proven to have cross[ed] the line are disciplined by supervisors who call out this behavior." *Id.* at 6 (emphasis added).

The Eleventh Report reiterated that LASD could not achieve compliance with Provision 2.6 unless staff were held accountable for out of policy head strikes. Dkt. 238 at 5 ("The Panel has yet to review a case where the supervisor concludes the use of head strikes was inappropriate. *In order for the Department to achieve compliance with Provision 2.6 (head strikes), staff must be held accountable [for] head strikes*.") (emphasis added).

The Panel repeatedly has identified lack of accountability as a key reason why LASD has not rooted out staff's dishonest reporting or supervisors' failure to identify and impose appropriate discipline for dishonesty. The Eighth Report said that the Panel "remains concerned that reviewed use of force packages sometimes reflect Deputy reports that are inaccurate and self-serving, but which are not treated as 'dishonesty' or 'integrity' issues by the Department." Dkt. 202 at 15, n.29. The Ninth Report noted that "[a]lthough supervisors will occasionally note discrepancies in reports or possible collaboration among staff in the preparation of the reports, we rarely see a robust discussion by reviewing commanders of inaccurate characterizations in reports, *and never see discipline imposed for submission of false reports*." Dkt. 203 at 17 (emphasis added). The Eleventh Report stated:

> The Panel has previously noted concerns with Use of Force packages including staff reports that are inaccurate and self-serving, but which are not treated as "dishonesty" or integrity issues – see Seventh Report (p. 18), Eighth Report (p. 15) and Ninth Report (p.15 Fn 26). In a few of the force packages reviewed for this Reporting Period, the Panel saw staff reports that were either inconsistent with the video evidence or were not forthcoming about their own actions. For example, a Deputy had placed his knee on an inmate's neck for 46 seconds. In his report, he noted he had "inadvertently" positioned his knee over the inmate's upper back and neck area. This characterization was not identified as dishonest or problematic in the supervisor reviews of the matter.

Dkt. 238 at 33.

### b. Head Strikes Are Dangerous for Incarcerated Persons and LASD Personnel

As explained by emergency room physician Dr. Shamsher Samra, who worked as a clinician in Twin Towers for three years, "closed fist strikes to the head can, and frequently do result in severe, and potentially, fatal injuries." Declaration of Shamsher Samra ¶ 7. Medical risks include concussions/traumatic brain injury (TBI), intracranial hemorrhages, fractured facial bones, including orbital bones and jaws, sensory or motor nerve damage in the face, and eye injuries including globe rupture, retinal detachment, corneal lacerations, and hyphema. *Id*. ¶¶ 10-23; Declaration of Raymond Dunn, MD ¶ 6. These injuries can have serious additional consequences. Intracranial hemorrhages, aka brain bleeds, can "contribute to permanent neurological damage, permanent intellectual disability, and chronic seizure disorder among other long-term sequelae" and even cause death. Samra Dec. ¶¶ 10-11. Eye injuries can lead to permanent vision impairment or blindness. *Id.* ¶¶ 21-22; Dunn Dec. ¶ 7. Concussions can cause or exacerbate PTSD and mental illnesses. *Id.* ¶¶ 24-25; Declaration of Erin Bigler ¶¶ 25-30.[5] And a blow or blows to the head can cause multiple severe injuries. For example, a head punch that fractures a facial bone will almost always also cause TBI and can also cause nerve damage in the face that result in facial drooping, permanent scarring, and/or slurring of speech. Bigler Dec. ¶ 18; Dunn Dec. ¶¶ 6, 8.

According to Dr. Dunn, Professor of Surgery in the Department of Surgery Division of Plastic Surgery at the University of Massachusetts Medical Center, blows to the head "are almost universally associated with facial bone and soft tissue injury" which include "mandible or jaw injuries [which are] particularly problematic." Dunn Dec.¶¶ 5-9. Damage to the mandible and jaw is reasonably likely to cause dental injury which creates "risks of multiple long term chronic

---

[5] The Panel previously made same warning to LASD. Dkt. 202 at 10.

medical issues including infections throughout the body and particularly the heart — in particular endocarditis[6] —having a severe  impact on longevity.” *Id*. ¶ 9.

Head punches pose a significant risk of concussion or other forms of TBI. According to Erin David Bigler, Ph.D, Professor Emeritus of Psychology and Neuroscience at Brigham Young University, and author of more than 200 publications on TBI, the “consistency of brain tissue has often been referred to as ‘jello-like.’” Bigler Dec. ¶ 5.

> Being a ‘soft’ organ, with force impact or any kind of rapid acceleration movement the brain moves at a different rate than that of the skull, impacting against the inner surface of the skull as well as stretching and deforming in all different ways. It is the stretching, twisting and pulling actions within brain tissue that breaks brain cells, ruptures blood vessels and damages the brain, as well as the brain banging against the inner surface of the skull, causing bruising. Traumatic brain Injury (TBI) occurs because of the movement of very delicate brain tissue that stretches neural fibers and blood vessels beyond their tolerance limit.

*Id*. ¶ 5; *see also id.*, Ex. C, (video depiction of the stretching and twisting of the brain resulting from impact to the head, showing how that twisting damages neural fibers and blood vessels in the brain).[7]

Dr. Bigler explains that the “increased neurological and neuropsychiatric sequelae from experiencing a concussion/mild TBI include clinical disorders of depression and anxiety, earlier onset dementia including added risks for Alzheimer’s and Parkinson’s Disease.” *Id*. ¶ 6. The TBI risk is magnified when a person is punched multiple times in the head. “Overall, it is my expert opinion that any incident in which a person is punched in the head multiple times, as I observed in a number of the force incidents I reviewed, presents a significant risk of brain damage even when no single blow is forceful enough to be concussive. . . because of the

---

[6] Inflammation and infection of the membrane that lines the inside of the chambers of the heart and comprises the surface of the heart valves.

[7] The video is on a CD lodged concurrently with the Court. *See* Notice of Lodging of Exhibits C & D to Declaration of Erin Bigler.

11

cumulative effects [of] repeated blows." *Id.* ¶ 21.

Punching someone in the face or head also poses risks to sheriff's personnel who do the punching, risking fractures to the fingers or hands, known as "boxer fractures," and soft tissue injuries requiring immobilization or surgical management. Samra Dec. ¶ 23. Punching someone in the mouth can also cause hand lacerations that are "prone to complicated hand infections that may require hospitalization and surgical debridement." *Id.*

### c.    Blows to the Head Create Particular Risks in Jail

Head strikes are particularly risky in the jail for four reasons.

***First***, more than 41% of the people in the LA jail suffer from serious mental illness.[8] As Dr. Bigler explains, "'Mental Health' is actually a misnomer; everything is about 'Brain Health' where emotional health is a subset. With the high incidence of brain health issues in those incarcerated, as a population they are at higher risk for sustaining brain injury and damage from blows to head." Bigler Dec. ¶ 25. "Having sustained a TBI increases the likelihood of developing new or novel onset neuropsychiatric disorders as well as more rapid cognitive and physical decline with aging." *Id.* ¶ 5; *see also* Samra Dec. ¶ 25. Those who have mental illness and psychosis in the jails "may be experiencing delusions, paranoia, [and] disorientation, that can lead to behavior that is considered threatening, erratic, or disobedient increasing risk of strikes from custody." Samra Dec. ¶ 25.

There is also a high incidence of incarcerated people who suffer from PTSD. Bigler Dec. ¶ 27. PTSD "is truly a brain disorder manifested by changes in core brain areas that regulate emotional functioning." *Id.* ¶ 28. People with PTSD who are struck in the head are more likely to experience TBI, and the blow will likely exacerbate their PTSD. *Id* ¶ 27. In other words, there is a vicious cycle whereby incarcerated people with mental illness are more likely to act in ways that will cause

---

[8] Vera Institute of Justice, *Care First L.A.: Tracking Jail Decarceration*, at https://www.vera.org/care-first-la-tracking-jail-decarceration.

12

them to be subject to force. Samra Dec. ¶ 25. When that force is a blow to the head, their mental illness (or PTSD) will make them more likely to suffer TBI, and the TBI caused by the blow creates a significant risk of exacerbating their mental illness or PTSD. Bigler Dec. ¶ 27.

*Second*, people incarcerated in jails and prisons are more likely to have chronic disease such as hypertension and diabetes than the general population. Bigler Dec. ¶ 31. People with chronic disease "are more likely than those who do not have these chronic conditions to suffer TBI when they are struck in the head with a closed fist and/or hit their head on a hard surface resulting from a fall caused by a punch to the head." *Id.*

*Third*, barriers to timely and thorough medical care in the jails exacerbate the risks of serious harm from head strikes. Dr. Samra, who worked at Twin Towers, explains that changes in cognitive states from intracranial hemorrhage may be missed by custody staff who confuse the symptoms with psychiatric illness, intoxication, or intellectual or developmental disability, which are common in jails. Failure to identify intracranial bleeding symptoms may lead to delays in treatment, which can cause permanent brain damage or even death. Samra Dec. ¶ 15. "Additional barriers to timely evaluation in locked facilities include arranging transport for medical assessment, transport to acute care facilities, barriers in communication with medical staff (i.e., discontinuity in report to acute care providers, or reluctance of patients in custody to reveal history of injury.)" *Id*. ¶ 16.

*Fourth*, a person who is injured by a blow to the head can suffer exacerbation of the harmful effects of the blow or serious additional injury from the effects of a resulting fall. Jails are full of hard surfaces – metal bars and benches, concrete or cinder block walls, floors, and tables. Samra Dec. ¶ 9. If one's head hits a hard surface after a head strike, it "often produces a second level TBI. This further damages the brain because it adds to additional stretching and twisting actions of neural cells and blood vessels further disrupting neural communication between the

13

brain cells and incapacitating their ability to function normally." Bigler Dec. ¶ 12.

In sum, Dr. Samra concluded based on his review of 9 videos depicting head strikes in the jails:

> It is my medical opinion that the head strike or strikes had a reasonable probability of causing significant medical injury including serious damage to an eye or eyes and subsequent vision impairment, a concussion, broken facial bone, or for a person with a mental illness or PTSD, exacerbation of that mental illness or PTSD.  If serious injury did not occur, it was fortuitous.

Samra Dec. ¶ 27.

### d.     The WRAP Is Dangerous, Overused, and Can Be Deadly

In 2017, LASD began using a device called the WRAP to transport people after uses of force instead of handcuffs, waistchains, hobbles, or safety chairs.[9] The WRAP comprises an ankle strap, a leg wrap circling the legs from thighs to ankles, leg bands that hold the leg strap in place, and a harness that goes around the chest and shoulders, which is clipped to the leg harness, as shown below:



[10]

WRAP application poses a danger to life because of the potential for positional asphyxiation. California law defines positional asphyxia as:

---

[9] *See* https://saferestraints.com/?page_id=107; Sinclair Dec. ¶ 46. Defense counsel provided the 2017 start date via email on file with Plaintiffs' counsel.

[10]   WRAP   Application   Manual   at   11-13,   https://saferestraints.com/wp-content/uploads/2022/03/The-WRAP-Application-Manual-March-2022-Final.pdf.

> situating a person in a manner that compresses their airway and reduces the ability to sustain adequate breathing. This includes, without limitation, the use of any physical restraint that causes a person's respiratory airway to be compressed or impairs the person's breathing or respiratory capacity, including any action in which pressure or body weight is unreasonably applied against a restrained person's neck, torso, or back, or positioning a restrained person without reasonable monitoring for signs of asphyxia.

Cal. Govt. Code § 7286.5(b)(4).[11] "People may die from positional asphyxia accidentally, when the mouth and nose are blocked, or where the chest may be unable to fully expand." Declaration of Stephen Sinclair, ¶ 47 n.13.

For the last two reports, the Panel found LASD's use of the WRAP involves risks of asphyxia. The Tenth Report found LASD noncompliant "because of WRAP procedures risking compressional asphyxia." Dkt. 205 at 13. LASD previously was compliant with Provision 17.5 ("Minimize Medical Distress") since July 1, 2019, Dkt. 203 at 28, but WRAP use took it out of compliance in 2023, as the Eleventh Report found only 44 out of 79 incidents (55.7%) compliant. Dkt. 238 at 21.

Dr. Matthew Thomas is an emergency medicine physician who recently served as the Medical Director for the California State Parks Law Enforcement and Emergency Services division, where he reviewed policies on restraint devices in light of AB 490. Thomas Dec. ¶ 3. In reviewing LASD videos and use of force packages for seven incidents that involved WRAP application or removal, Dr. Thomas observed LASD personnel frequently placing pressure on a restrained person's torso, neck, and head, putting people at risk of asphyxiation. *Id.* ¶¶ 5-6, 14-15, 19, 26-28. He concluded, "the department is simply lucky that they have not had an in-custody death if these videos represent their standard approach and restraint techniques." *Id.* ¶ 9.

---

[11] While carotid restraints and choke holds were already prohibited by Section 7286.5, AB 490 (enacted after George Floyd's murder) amended it in 2021 to prohibit "techniques or transport methods that involve a substantial risk of positional asphyxia." Cal. Govt. Code § 7286.5(a)(2). https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202120220AB490.

For example, in MCJ-04485, the person – who is already "snorting and appearing to try to clear his nasal passages, which are filled with blood" due to an orbital fracture– has "significant force" applied to the back of his head and neck while prone, followed by "significant pressure" placed on his torso. *Id.* at ¶¶ 12-15. Deputies "forced [him] into a crunched position that further limits his ability to breathe" for almost two minutes, while the deputies attempt to clip the chest strap to the leg straps. *Id.* at ¶ 15. Dr. Thomas concluded, "[this] is enough time to represent a life threat for a person, already in extremis." *Id*. Similarly in IRC-01264, Dr. Thomas identified evidence of "acute respiratory distress." *Id.* at ¶¶ 25-26.

Concerns about death due to the WRAP are justified. In recent years, many California law enforcement agencies have settled wrongful death cases due to asphyxia during WRAP use, including: Pleasanton ($5.9 million);[12] Alameda County ($2.7 million);[13] Hayward (three cases totaling $2.4 million);[14] San Diego

---

[12] Nate Gartrell, *Pleasanton will pay $5.9 to settle police restraint death*, S.J. MERCURY NEWS, Aug. 9, 2021 at https://www.mercurynews.com/2021/08/09/pleasanton-will-pay-5-9-million-to-settle-police-restraint-death-suit-but-lawyer-says-family-turned-down-millions-more-for-meeting-with-police/.

[13] *Doss v. Cnty of Alameda,* No. 19-CV-07940-CRB, 2022 WL 6156551 *1 (N.D. Cal. Oct. 7, 2022) (jail detainee died of asphyxiation after deputies "placed [him] in a WRAP device, and placed a spit mask over his head."). The jail stopped using the WRAP, as noted in the settlement of an injunctive relief class action case. *Babu v. Ahern*, No. 5:18-cv-07677 (Doc. 266-1 at 36) (N.D. Cal. Aug. 26, 2021).

[14] Erin Baldassari, *Hayward, BART agree to $1.07 million settlement for son of man killed during traffic stop*, S.J. MERCURY NEWS, June 8, 2017 at https://www.mercurynews.com/2017/06/08/hayward-bart-agree-to-1-07-million-settlement-for-son-of-man-killed-during-traffic-stop/; Angela Ruggiero, *'I can't breathe:' Hayward to pay $1 million to family of man who died in police custody*, S.J. MERCURY NEWS, Oct. 8, 2019 at https://www.mercurynews.com/2019/10/08/i-cant-breathe-city-to-pay-1m-to-family-of-man-who-died-in-police-custody/; Dan Lawton, *Officer-involved death prompts lawsuit by family, questions about handling of case*, S.J. MERCURY NEWS, Oct. 17, 2015 at https://www.mercurynews.com/2015/10/17/hayward-officer-involved-death-prompts-lawsuit-by-family-questions-about-handling-of-case/.

(cont'd)

16

County ($1.35 million);[15] and National City ($300,000).[16]

The WRAP's danger is exacerbated its routine use. Stephen Sinclair, former Secretary of the Washington State Department of Corrections, with over 30 years of corrections experience, stated the "WRAP is an exceptional restraint reserved for only the most uncontrollable inmates," and explained that "[i]t was surprising to [him] how routinely the WRAP was used [by LASD], even when traditional approaches absent the WRAP would have been safer, faster, and reduced inmate contact." Sinclair Dec. ¶ 45. Both Mr. Sinclair and Dr. Thomas noted instances when personnel used WRAP on people who could have been transported safely through other means. *See id.* ¶ 50; Thomas Dec. ¶¶ 13, 22.

WRAP overuse also increases risks of injury to LASD staff. Mr. Sinclair noted dangers to staff due to lengthy application process and close proximity, including one instance when a deputy was injured. Sinclair Dec. ¶¶ 48, 56. "Throughout this video, I questioned how the WRAP was safer for everyone involved, staff and inmates." *Id.*¶ 57. Mr. Sinclair noted that frequent WRAP use could also lead to workplace injury from "the requirement for staff to lift inmates." *Id.* ¶ 45.

## IV.    LEGAL STANDARD

Courts may modify a consent decree or class action settlement when there has been "a significant change either in factual conditions or in law," which can be established by a showing that (1) "changed factual conditions make compliance … substantially more onerous"; (2) the injunction or decree "proves to be unworkable because of unforeseen obstacles;" or (3) enforcement "without modification would

---

[15] Morgan Cook, *County settles lawsuit over in-custody death for 1.35 million*, S.D. UNION-TRIBUNE, Sept. 23, 2022 at https://www.sandiegouniontribune.com/news/watchdog/story/2022-09-23/county-settles-lawsuit-over-in-custody-death-for-1-35-million.

[16] Alex Riggins, *National City approves $300K settlement in Earl McNeil lawsuit*, S.D. UNION-TRIBUNE, Sept. 21, 2022 at https://www.sandiegouniontribune.com/news/public-safety/story/2021-09-21/national-city-approves-300k-settlement-in-earl-mcneil-death-lawsuit.

(cont'd)

17

be detrimental to the public interest." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 384 (1992).[17] Proposed modification(s) must also be "suitably tailored to resolve the problems created by the changed ... conditions." *Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1120 (9th Cir. 2009).

## V. ARGUMENT

### a. Defendants' Noncompliance is a Changed Circumstance that Justifies Modification

Substantial noncompliance qualifies as a "significant change in circumstances" that supports modification. *See Labor/Cmty. Strategy Ctr*, 564 F.3d at 1120-21; *Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir 2016); *Holland v. New Jersey Dept. of Corrs.*, 246 F.3d 267, 283-84 (3d Cir. 2001).

As explained above, the Panel has found Defendants noncompliant with provisions governing head strikes, force prevention, and accountability for years. Mr. Sinclair reviewed the Panel's reports and a number of use of force packages, and concurs with the Panel's conclusions. Sinclair Dec. ¶¶ 40-43, 72. Nor is noncompliance minimal. The Eleventh Report found LASD noncompliant with provision 2.6 in 30 of 86 cases, about 35% of the total. Dkt. 238 at 17. In that Report,

---

[17] Citations and internal quotation marks omitted herein unless otherwise noted. Plaintiffs seek modification only of the implementation plan, not the settlement agreement, pursuant to the Court's inherent power to issue further enforcement orders and injunctive relief to effectuate the purpose of a decree, settlement agreement, injunction, or previous orders. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984) (courts may enter further orders by exercising "the equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices"). For such a further order, Plaintiffs do not have to meet the *Rufo* standard. *See Parsons v. Ryan*, ("*Parsons II*"), 912 F.3d 486, 499-500 (9th Cir. 2018). However, in an abundance of caution, Plaintiffs demonstrate below that they meet the more stringent *Rufo* test, thus necessarily meeting the less stringent standard for modification of the implementation plan. *Cf. City of Revere v. Mass Gen. Hosp.*, 463 U.S. 239, 244 (1983). Moreover, whether the document is entitled "consent decree," "settlement agreement," or "Stipulation" is not dispositive; the Court retains jurisdiction to modify or enforce the parties' agreement. *See Parsons v. Ryan*, ("*Parsons III*"), 949 F.3d 443, 454-55 (9th Cir. 2020); *Parsons II*, 912 F.3d at 497-98.

18

the Panel found Defendants noncompliant with 23 of 100 provisions.

**b.** **LASD's Use of a Restraint Device That Falls Outside of the Implementation Plan is a Changed Circumstance that Justifies Modification**

In 2017, after the implementation plan was approved, LASD began using the WRAP to transport people after a force incident instead of handcuffs, waistchains, hobbles, or safety chairs. While 17.1 addresses the use of restraints generally, other provisions meant to address more dangerous forms of restraints do not apply to the WRAP. Provision 17.3 governs safety chairs, and 17.6-17.9 govern multi-point restraints. The WRAP is neither, and thus its use is not directly addressed by any provision in the implementation plan.

The Panel no longer evaluates compliance for 17.6-17.9 (Multi-point Restraint Procedures, Approval of Multi-point Restraints, Continued Use of Restraints, or Supervisor Approval of Restraints) because "these sections are specific to the use and application of multi-point restraints. The Department does not employ the use of multi-point restraints and these provisions are therefore not applicable." Dkt 238 at 44. LASD employs safety chairs, and the Panel evaluates their use under 17.3. *See, e.g.,* Dkt 238 at 43-44.

As WRAP is not a safety chair or a multi-point restraint device, the plan's current provisions do not provide sufficient guiderails for its use. Recognizing this gap, the Panel noted in its Eleventh Report that "The Parties are working on a policy to govern the use of the WRAP restraint and appropriate Compliance Measures to assess compliance with the Action Plan." Dkt. 238 at 46 n.16.

**c.** **The Scope and Duration of Noncompliance Was Not Foreseeable.**

This multiyear pattern of noncompliance was not "anticipated" by the parties. When the parties settled the case, Plaintiffs rightfully assumed Defendants intended to comply with court-approved implementation plan. *Cf. Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) ("We presume that a government entity is acting in

good faith when it changes its policy . . . .").

> **d.** **LASD's Pattern of Noncompliance Shows that Maintaining the Status Quo Without Modification Is Unworkable and Would Harm the Public Interest**

Repeated failure by LASD to comply is a changed circumstance sufficient to show that compliance is both "unworkable" and "detrimental to the public interest." *See United States v. Sec'ty of Housing and Urban Dev.*, 239 F.3d 211, 218 (2d Cir. 2001); *cf. Thompson v. Enomoto*, 915 F.2d 1383, 1388-89 (9th Cir. 1990).

For example, the risks of severe injury and even death resulting from overuse of head strikes by LASD personnel demonstrate the public interest in modifying the implementation plan in ways recommended by Mr. Sinclair. *See* Sinclair Dec. ¶¶ 22-24, 29-42. And it is clearly in the public interest for LASD to stop utilizing excessive and unnecessary force against the people incarcerated in its jails. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

> **e.** **The Proposed Modifications Are "Suitably Tailored" to Address Defendants' Pattern of Noncompliance**

Plaintiffs seek modification to address LASD's non-compliance with the head strike and force prevention provisions, and the failure to impose accountability for line personnel who violate those provisions, or engage in dishonest reporting, and the supervisors who fail to identify those violations or impose appropriate discipline. Plaintiffs also seek modification to include guiderails for the WRAP like those originally included to govern safety chair and multi-point restraint use. Specifically, Plaintiffs ask the Court modify the implementation plan by requiring that:

1) The Department's head strike policy forbid the use of head strikes unless use of deadly force is justified;

2) The Department be required to impose *mandatory* discipline consistent with the penalties set forth in its current disciplinary guidelines for

20

violating the head strike, force prevention, and honest reporting requirements, as well as for supervisors who fail to identify or impose discipline for those violations.

3) Necessary modifications to force prevention policies and adding provisions related to the WRAP.[18]

These changes are suitably tailored to Defendants' pattern of non-compliance. Mr. Sinclair reviewed all the Monitors reports, 16 use of force packages and videos including nine involving head strikes, and both the head strike policy in the 2021 use of force manual, and the proposed revision that LASD unveiled in the compliance plan process, which provides that head strikes are only to be used if (1) the inmate is assaultive; (2) the inmate presents an imminent danger of serious injury; and (3) there are no other more reasonable means to avoid serious injury. Sinclair Dec. ¶¶ 13, 29-33, & Attach. B.

In at least three of the nine head strike incidents he reviewed, "the inmate was already restrained and multiple deputies were present." *Id*. ¶ 36. Mr. Sinclair stated that "the use of head strikes with a restrained inmate is egregious, unnecessary, and excessive." *Id.* Considering all the materials he reviewed, he concluded "the use of head strikes by LASD deputies against inmates in their care and control is primarily unnecessary and excessive." *Id.* ¶ 38. He also concluded that both the 2021 policy and the recent revision were "too lenient." *Id.* ¶¶ 32-33. One reason he concluded the new directive was too lenient was that supervisors —applying the new directive — recently approved multiple head strikes against a person restrained with wrist restraints and his arms behind his back, including strikes after he had already been taken to the ground. *Id.* ¶¶ 33-34. "In my opinion this is an example showing where the inmate could not and did not inflict serious injury and posed no threat of causing serious injury while the two deputies were on top of him and were inflicting head

---

[18] Because Defendant has not yet provided the most recent Limitations on Force or WRAP policies, Plaintiffs will ask for any necessary modifications in their June 12, 2023 filing as provided in the parties' stipulation. Dkt 250.

and body strikes. Because of this the deputies should have been disciplined for their actions." *Id.* ¶ 35. As a result of the longstanding and continued excessive use of dangerous head strikes, Mr. Sinclair concluded that "LASD must elevate what is required before head strikes can be used by staff and clarify that they are prohibited uses of force except in life-threatening situations. LASD should elevate the use of head strikes to deadly force like other agencies[19] have done." *Id.* ¶ 74.

This change of policy is necessary, but insufficient, to address years of noncompliance with Provision 2.6. Sinclair Dec. ¶¶ 15, 75. Unfortunately, LASD does not hold line personnel accountable for violating the Department's current head strike policies. *See supra*, § III.a.iii.; Sinclair Dec. ¶ 15. Thus, a policy of mandatory discipline for those who violate the "deadly force" head strike policy is essential. To end LASD's overuse of dangerous head punches, "will take a cultural shift and require increased mandatory discipline for those who use this form of unnecessary and excessive force." *Id.* ¶ 75.

The Panel and Mr. Sinclair concluded the lack of accountability also causes longstanding failures to comply with force prevention requirements or to address deputies engaging in dishonesty in their force reports. *See supra* §§ III.a.ii-iii.; Sinclair Dec. ¶ 70.

> In reviewing the use of force documents provided[,] several incidents of dishonest reporting and downplaying by reviewers were noted, which represent a significant issue for LASD. In my opinion this is the root cause for the ongoing use of unnecessary head strikes (excessive force) and other negative behaviors. If LASD continues not to hold deputies accountable for these incidents nothing will change, just like in the preceding eight years they have been under this settlement agreement.

Sinclair Dec. ¶ 59; *see also* ¶ 70.

---

[19] Sinclair Dec. ¶ 31 and n.9 (citing policies of Washington State Department of Corrections and City of New York Department of Corrections).

22

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the Motion to Modify the Implementation Plan. A proposed order is attached and will be submitted to the Court's chambers in accordance with Local Rules.

Respectfully submitted,

DATED: May 31, 2023            By:   */s/ Peter J. Eliasberg*

Peter J. Eliasberg
Melissa Camacho
**ACLU FOUNDATION OF SOUTHERN CALIFORNIA**

Corene T. Kendrick
Marisol Dominguez-Ruiz
**ACLU NATIONAL PRISON PROJECT**

Nicholas Morgan
Stephen Turanchik
**PAUL HASTINGS LLP**

Attorneys for Plaintiffs Alex Rosas, *et al.*

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 31, 2023, I electronically transmitted the above document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to Counsel for Defendants who are registered CM/ECF users.

DATED:     May 31, 2023                    */s/ Peter J. Eliasberg*
                                            Peter J. Eliasberg

                                            *Attorney for Plaintiffs*

24

## <u>PROOF OF SERVICE</u>

I am employed in the City of Los Angeles and County of Los Angeles, State of California.  I am over the age of 18, and not a party to the within action. My business address is 515 South Flower Street, Twenty-Fifth Floor, Los Angeles, California  90071-2228.

On May 31, 2023, I served the foregoing document(s) described as:

•    **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY IMPLEMENTATION PLAN (DKT. 245). UNDER SEAL**

on the interested parties as follows:

| | |
|---|---|
| Robert Dugdale, Esq. | Dylan Ford |
| *rdugdale@kbkfirm.com* | Senior Deputy County Counsel |
| KENDALL BRILL & KELLY LLP | *dford@counsel.lacounty.gov* |
| 10100 Santa Monica Blvd., Suite 1725 | OFFICE OF COUNTY COUNSEL |
| Los Angeles, CA 90067 | 500 West Temple St, Floor 6 |
| Telephone: (310) 272-7904/7919 | Los Angeles, California 90012 |
| ***Attorney for Defendant*** | Telephone: (213) 893-5939 |
| ***SHERIFF ROBERT LUNA*** | ***Attorney for Defendant*** |
| | ***Robert Luna, Sheriff of Los Angeles*** |
| | ***County*** |

☒    **VIA ELECTRONIC SERVICE :**

By personally emailing the aforementioned document(s) in PDF format to the respective email address(es) listed above on May 31, 2023, I did not receive an electronic message indicating any errors in transmission.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on May 31, 2023, at Los Angeles, California.

_____
Irma Gamino

PROOF OF SERVICE