PETER J. ELIASBERG (SB# 189110)
peliasberg@aclusocal.org
MELISSA CAMACHO (SB# 264024)
mcamacho@acluscal.org
**ACLU FOUNDATION OF
SOUTHERN CALIFORNIA**
1313 W. 8th Street
Los Angeles, CA 90017
Phone: (213) 977-9500
Fax: (213) 977-5299

CORENE KENDRICK (SB# 226642)
ckendrick@aclu.org
MARISOL DOMINGUEZ-RUIZ
(SB# 345416)
mdominguez-ruiz@aclu.org
**ACLU NATIONAL PRISON
PROJECT**
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930
Fax: (202) 393-4931

NICOLAS MORGAN (SB# 166441)
nicolasmorgan@paulhastings.com
STEPHEN TURANCHIK
(SB# 248548)
sturanchik@paulhastings.com
**PAUL HASTINGS LLP**
515 South Flower Street, 25th Floor
Los Angeles, CA 90071-2228
Phone: (213) 683-6000
Fax: (213) 627-0705

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Robert Luna, Sheriff of Los Angeles County, in his official capacity,<br><br>Defendant. | Case No. CV 12-00428 DDP (MRW)<br><br>**DECLARATION OF STEPHEN SINCLAIR** |

Case No. CV 12-00428 DDP (MRW)

DECLARATION OF STEPHEN SINCLAIR

I, Stephen Sinclair, declare as follows:

## I.    ASSIGNMENT AND QUALIFICATIONS

1.    I have been retained by Plaintiffs' Counsel to provide expert opinions on the implementation of the 2014 settlement agreement in *Rosas v. Scott*, now *Rosas v. Luna*. Specifically, I was asked to evaluate the Los Angeles Sheriff's Department (LASD) and its ongoing use of head strikes against detainees, de-escalation policies and training to avoid unnecessary uses of force, and the use of the WRAP restraint device.[1] I have been retained at $250 an hour. The matters set forth are my independent opinions, true and correct of my personal and professional knowledge. If called as a witness to testify, I could and would testify competently thereto.

2.    My experience in adult corrections includes the 32 years I spent as an employee of the Washington State Department of Corrections ("WADOC"). I began as a Correctional Officer at the Washington State Penitentiary in September 1988 and concluded my career as the agency Secretary. I was appointed Secretary of WADOC in April 2017, confirmed by the Washington State Senate in January 2018, and served until May 2021.

3.    During my career, I have led numerous significant changes within WADOC, many, but not all, of which are highlighted in my Curriculum Vitae (**Attachment A**). These experiences taught me that creating change and new policy is rarely the most challenging part of a transformation. In my experience, the most difficult part is implementing those changes and sustaining outcomes in the future. Through these experiences, I possess substantial knowledge and experience in implementing change in carceral settings.

4.    In addition to my work experience, I possess a Master of Public Administration degree from the University of Washington; I have attended thousands

---

[1] The WRAP Device includes a locking shoulder harness, a belt to handcuff a person behind their back, and leg restraints so that the custody officers can carry the person or put them in a cart for transport; *see* https://saferestraints.com/?page_id=107.

of hours of training sponsored by WADOC, the Washington State Criminal Justice Training Commission, the Washington State Patrol Investigator Academy, Washington State Tactical Officers Association, and the Walla Walla Police Department. My experience includes training and hours worked as a Reserve Police Officer for the Walla Walla Police Department.

5. Since my retirement in May 2021, I have remained involved in the corrections field, researching, analyzing, and providing expert opinions in cases related to confinement in city, county, and state-operated confinement facilities. In summary, I have spent much of the past 34 years working with, thinking about, and analyzing the field of adult corrections on topics to include, but not limited to: the use of force, the use of administrative segregation and restrictive housing, prison regulations, correctional operations and the policies required to operate a safe and humane corrections systems / facilities.

6. Specific to my use of force experience, I spent 11 years of my WADOC career with the Special Emergency Response Team (SERT) as a team member and eventually as the leader of an emergency response team. The primary mission of the SERT was to provide specialized responses to hostage takings, high-security escorts, and the application of force when required. Having received use-of-force training well beyond that of most other corrections staff, SERT members, including myself, were often called to lead and participate in pre-planned uses of force or immediate responses to significant emergencies in progress. Much of the training for SERT that I received was oriented toward potentially using lethal force and when it is appropriate and inappropriate to use potentially lethal force against an incarcerated person. The cornerstone of the use of possibly deadly force is the requirement that all other reasonable alternatives must be exhausted before using deadly force, time and circumstances permitting. As such, SERT also received substantial training on all levels of force, including verbal tactics or de-escalation techniques, defensive tactics (a.k.a. hands on techniques), and less lethal techniques. Through these experiences, I

DECLARATION OF STEPHEN SINCLAIR

have learned that most potential incidents can be and are resolved by properly applying the lowest levels of force, *e.g*., presence (a.k.a., a show of force)[2] and de-escalation techniques.

7.      Throughout my correctional career as a Sergeant, Lieutenant, Captain, Critical Incident Reviewer,[3] Associate Superintendent (Warden), and Superintendent, I have reviewed a substantial number of uses of force incidents to determine policy compliance. These reviews sometimes resulted in retraining and discipline for the involved staff. While staff discipline is the least desirable outcome of these situations, it is an essential element of maintaining a professional workforce and the agency's integrity. As Assistant Director of Prisons and Director of Prisons, I had responsibility for reviewing and contributing to the use of force policies. As Secretary, I was responsible for all agency policies, including policies governing use of force.

8.      I have served four years as a Commissioner of the Washington State Criminal Justice Training Commission (2012-2021),[4] overseeing curriculum development for basic academies for Law Enforcement and Corrections and certification standards. I also spent four years as a member of the Washington State Sentencing Guidelines Commission (2017-2022).[5] I am an active member of the Correctional Leaders Association (CLA) and the American Correctional Association (ACA).[6] I received the 2020 Tom Clements Award for Innovation from CLA, and

---

[2] "Presence," also known as "show of force" is a tactic where the escalation of an incident is avoided. At the same time, additional staff can respond on the scene and demonstrate to the potential aggressor that aggression is futile based on the disproportionate number of responders.

[3] A Critical Incident Reviewer is an outside investigator who reviews significant situations e.g. use of lethal force, escape, disturbances, etc., by other staff.

[4] *See* Criminal Justice Training Commission - https://cjtc.wa.gov

[5] *See* Sentencing Guidelines Commission - https://sgc.wa.gov/sentencing-guidelines-commission/sgc-members

[6] *See* Correctional Leaders Association - https://www.correctionalleaders.com & American Correction Association - https://www.aca.org

4      Case No. CV 12-00428 DDP (MRW)

DECLARATION OF STEPHEN SINCLAIR

was recognized by Washington Governor Christine Gregoire in 2009 for excellence in management.

9. Concerning the *Rosas* settlement agreement, I have reviewed documents related to the implementation of the settlement agreement between LASD and the Plaintiffs. I also reviewed recent videos of uses of force and use of force report packets. A complete list of all materials that I have reviewed is at **Attachment B.**

**II.  SETTLEMENT AGREEMENT / IMPLEMENTATION PLAN OVERVIEW**

10. The settlement agreement has been in effect since September 2014. Now almost nine years later, there appears to be ongoing failures in critical areas of the agreement, that directly correlate to unnecessary and excessive uses of force. Based on my experience with implementing significant change in an equally large correctional agency, I am perplexed by this fact.[7] The fact that these failures are directly related to the health and safety of the detainees in the custody of LASD, which has a duty to protect the detainees in their custody and care, and of LASD staff, makes it all the more critical that LASD address them without further delays. Yet, after reviewing relevant documents and watching multiple videos provided by Defendants, it is my opinion that excessive, and unnecessary force is still being used far too often by LASD deputies in the jail.

11. The settlement agreement is monitored by three court-appointed monitors and has been since its inception. The court monitors developed an implementation plan filed with the court in April 2015 that defined "mandatory" items

---

[7] The Washington State Department of Corrections (WADOC) is a large organization with many employees and a complex system of facilities and programs. As of 2021, the department employed over 8,500 people, including correctional officers, administrators, and support staff. The WADOC operates 12 state prisons, which house approximately 16,000 inmates, 12 work release facilities, and several other facilities and programs. In addition to managing the state's prison system, the DOC is also responsible for supervising released inmates and providing them with access to reentry services and programs. *See* https://www.doc.wa.gov/

LASD must comply with, and that required policy and other changes necessary to achieve compliance. Dkt. 133-2. Each item had an intended completion date of June 30, 2015, with some extending into 2016 to accommodate staff training. The monitors provide the court with regular reports on compliance by LASD, the latest available for my review was July 1, 2021, to June 30, 2022 (11th Panel Report, Dkt. 238).

12.    The items from the implementation plan most relevant to my review were those that correlated to unnecessary or excessive use of force incidents, and the review process used by LASD to hold, or not, hold staff accountable for incidents of unnecessary or excessive force. I quote the relevant sections as follows:

**1. Leadership, Administration and Management (expect to be completed by June 30, 2015):**

1.3 Department managers should be held accountable should they fail to address use of force problems at the Department's jail facilities.

**2. Use of Force Policies and Practices (expect to be completed by June 30, 2015):**

2.2 The Department's Custody use of force policies should provide that force used by Department members: (a) must be used as a last resort; (b) must be the minimal amount of force that is necessary and objectively reasonable to overcome the resistance; (c) must be terminated as soon as possible consistent with maintaining control of the situation; and (d) must be de-escalated if resistance decreases.

2.5 The Department's Custody use of force policies should provide that a Department member may not strike an inmate or use chemical agents or a taser on an inmate who is restrained unless the inmate is assaultive and presents an immediate threat of injury to a Department member or another person, and unless there are no other more reasonable means to control the inmate.

2.6 The Department's Custody use of force policies should provide that striking an inmate in the head or kicking an inmate who is on the ground, or kicking an inmate who is not on the ground anywhere above the knees is prohibited unless the inmate is assaultive and presents an imminent danger of serious injury to a Department member or another

DECLARATION OF STEPHEN SINCLAIR

person and there are no other more reasonable means to avoid serious physical injury. The Department's Custody use of force policies should also provide that kicking an inmate who is not on the ground below the knees is prohibited unless the inmate is physically assaultive, and the kick is utilized to create distance between the member and the assaultive inmate.

**5. Data Tracking and Reporting of Force Incidents (expect to be completed by June 30, 2015):**

5.2 Evaluations of force incidents by Unit Commanders should be reviewed as follows:

All Category 1 Force cases and Category 2 cases that do not meet the criteria for a roll-out by the Custody Force Review Team should be reviewed by a least one Commander in Custody Operations;

All allegations of force should be reviewed by at least two Commanders in Custody Operations;

Category 2 Force cases that meet the criteria for a roll-out by the Custody Force Review Team should be reviewed by the Custody Force Review Committee; and

Category 3 Force cases should be reviewed by the Executive Force Review Committee.

5.3 The Department's Custody use of force policies should provide that any unexplained tactical decisions pertaining to uses of force or any discrepancies among witnesses and/or evidence should be referred by the reviewing Commander(s) or committee in writing back to the incident investigator for additional investigation and then reported back in writing to the reviewing Commander(s) or committee.

**13. Disposition of Use of Force Reviews and Staff Discipline Issues (expect to be completed by June 30, 2015):**

13.1 The Department should have a firm policy of zero tolerance for acts of dishonesty or failure to report uses of force. If the Department does not terminate a member who is found to have been dishonest, used

7                                              Case No. CV 12-00428 DDP (MRW)

excessive force, or violated PREA, the Department should document the reasons why the member was not terminated and, in addition to the discipline that is imposed, the Department should place the member on a formal and adequate performance review program and closely monitor the member's performance.

Dkt. 133-2 at pp. 1-2, 5-6, 10-11.

### III.    SUMMARY OF MY OPINIONS

13.    In reviewing the available monitor (Panel) reports, it was startling to see that in eight years, LASD has never achieved compliance with implementation plan items 2.2, 2.6, 2.7, & 5.2. LASD has only achieved compliance once for 5.3. For item 1.3, it appears there was compliance at an earlier stage, but it has since slipped out of compliance for the most recent reports.

14.    The LASD has full control over its employees when it comes to performing their job duties. This includes enforcing agency policies, training standards, and performance expectations, as well as providing proper supervision to ensure employees adhere to these standards. They also have the power to discipline or even fire employees who repeatedly fail to meet expectations or commit serious offenses.

15.    In my experience, writing expectations in policy is essential, as is ensuring staff receive the necessary training on the policy expectations. However, effectively delivering the previously mentioned steps doesn't guarantee that the policy will become a practice. Ultimately, only adequate supervision and management of those expectations once staff have been trained will ensure that policy becomes a practice. This requires supervisors and managers to hold staff accountable to those expectations; if not, the policy becomes moot, and staff will not follow it, knowing there are no repercussions. Simply stated, having a policy doesn't ensure the practice of those policy expectations. Effective staff training is essential, but ultimately it is constant and effective supervision and management and holding staff accountable that will cause those policy expectations to become practice. Based on the material I have

reviewed, it is my opinion that LASD has failed to hold employees accountable to published use of force standards. Additional detail for this opinion is provided below in Part VII.

16. Like all confinement facilities or agencies, LASD has an "affirmative duty of care and custody" for individuals in its custody and control. People held in custody or control of a law enforcement agency, such as the LASD, have a right to be free from unreasonable risk of harm. Therefore, it is a basic requirement for law enforcement agencies to take reasonable steps to protect the safety and well-being of individuals in their custody or control. Based on the numerous Panel reports that I reviewed, as well as my review of use-of-force packets and video, LASD has failed to significantly reduce the inappropriate use of head strikes by staff against inmates, is overusing the WRAP restraints device, and is engaging in unnecessary force when it can be avoided.

## IV. OVERVIEW OF USE OF FORCE IN LAW ENFORCEMENT AND CORRECTIONS, AND THE NEED FOR DE-ESCALATION

17. The following general overview is provided to give some perspective and background on the use of force and standard practices in law enforcement and corrections related to the various levels of force and when they may be used. The following gives a general description of the levels of force and highlights the differences between their use in corrections and law enforcement in the community. As an example, it is highly unlikely deputies working in a jail are going to encounter an inmate armed with a firearm or need to stop a fleeing person from jumping into a car, driving dangerously, and potentially hurting others.

18. As discussed below in Paragraph 25, there is some difference between corrections and law enforcement, because corrections are in a controlled environment where the detainee's physical mobility and access to deadly weapons is more limited than any subject in the community. It should be noted that the terminology used to describe levels of force can vary significantly between agencies, but the general

DECLARATION OF STEPHEN SINCLAIR

approach is consistent and includes similar tactics, techniques, and weapons, all based on the level of resistance being encountered.

18.    The levels of force used in any given situation are based on a continuum that escalates based on the level of resistance displayed by the subject who is trying to be controlled (*e.g.* suspect, inmate, etc.) It is a universal goal in use-of-force situations to use only the least amount of force necessary to control the subject and situation in the safest possible manner for all involved. It is important to note that even though I used the term "continuum," this should not be interpreted to mean that each level or step must be attempted before elevating to a higher level of force. The immediacy and severity of the situation can dictate and even require rapid escalation in the force necessary to resolve the situation. An example of a situation that can require a rapid escalation is in life safety incidents where the officer, or someone else, is at immediate risk of grievous bodily injury or even death, for example, a police officer who is facing a person armed with a gun.

19.    Critical considerations for any agency in use-of-force situations are: is using physical/deadly force appropriate for the situation and do the totality of the circumstances, including immediacy and severity of the threat as well as the seriousness of the objective justify the force being used? Law enforcement and corrections levels of force can generally be clustered into general categories. The category of most significance is de-escalation tactics, depending on the agency, these may or may not be included as a level of force because technically de-escalation tactics do not require force and, when done effectively can preclude the need for force.

20.    **De-escalation tactics** are actions a peace officer uses that are intended to minimize the likelihood of the need to use force during an incident. Depending on the circumstances, de-escalation tactics may include, but are not limited to: using clear instructions and verbal persuasion; attempting to slow down or stabilize the situation so that more time, options, and resources are available to resolve the incident; creating physical distance by employing tactical repositioning to maintain the benefit of time,

10

distance, and cover; when there are multiple officers, designating one officer to communicate to avoid competing commands; requesting and using available support and resources, such as a crisis intervention team, a designated crisis responder or other behavioral health professional, or back-up officers, and certainly a supervisor.

21.    As an example of a failure to de-escalate, in one of the use of force incidents I reviewed, (# MCJ-03103), it started because the deputy involved was arguing with the inmate about soap. The inmate did not like the responses he was getting from the deputy and asked to talk to the supervisor, who likely could have resolved the situation without the use of force.[8] Supervisors are helpful in these situations because when there is a dispute between staff and inmates, the supervisor is viewed as the final answer, even when the inmate doesn't get what they think they should, they feel heard and can generally accept the answer. The deputy could have simply said he would see if one was available and made the call on the radio summoning a supervisor and probably others to the scene. He could have continued dialogue or not, from a safe distance waiting for others to respond. If the deputy had done this instead of pushing the confrontation with the inmate, it most probably would have resolved the situation through de-escalation. Unfortunately, the deputy failed to use de-escalation techniques or call for a supervisor, and it resulted in the use of force.

22. Another example of a failure to de-escalate a situation, which resulted in excessive force, is MCJ-922-02082. Again, an inmate who is restrained at the wrist behind his back is exiting a cell to be escorted somewhere. The video does not include audio, so it is not possible to know what was being said. If there was an aggressive dialogue between the deputies and the inmate, then the officers could and should have paused before opening the cell, and directed the inmate to back out of the cell to gauge the inmate's level of cooperation. Instead, deputies just opened the cell and the inmate

---

[8] A key requirement of the Implementation Plan is that "Department members confronted with a situation in which force may be required must call a supervisor to the scene as soon as time and circumstances permit." *See* Dkt. 133-2 at ¶ 2.7.

DECLARATION OF STEPHEN SINCLAIR

walked out face forward. LASD's Force Manual 7-01/050.05 Inmate Extraction Procedures says, "[w]hen simple instructions and requests fail to cause and inmate to exit a confined area, a supervisor, at the minimum rank of sergeant, shall be notified in all but life-threatening or exigent circumstances." Again, deputies failed to use de-escalation or alternate procedures that could have prevented this use of force.

23.     Because of this failure, the deputies allowed the inmate to exit the cell and the inmate attempted to pull away. As a result, one deputy grabs the inmate by the head and aggressively slams his head into a concrete wall, causing significant head trauma with lacerations to the inmate's head, as shown below:



LASD policy 7-01/030.00 Prohibited Force specifically prohibits the excessive force used by the deputies including, "[d]eliberately or recklessly striking an individual's head against a hard, fixed object (e.g. concrete floor, wall, jail bars, etc.). In this incident, no use of force documentation was available for my review. However, included with the videos I reviewed, was a separate video looking directly into a cell, presumably after the incident, and I could see the involved deputies apparently discussing the incident and acting out the events that just occurred, which is also against LASD policy.

24.     The following is a general categorization of levels of force used in law enforcement and corrections.

Case No. CV 12-00428 DDP (MRW)
DECLARATION OF STEPHEN SINCLAIR

**Physical Force –** Techniques to direct movement (e.g., push back, escort, lift, carry); control holds like joint manipulation, wrist/finger locks; open hand techniques, takedowns and use of restraints.

**Intermediate/Less Lethal Force** – Use of Oleoresin Capsicum (OC or Pepper Spray), punches, kicks, or other strikes to the body when not directed toward the head, neck, throat or spine. Use of batons, tasers, impact weapons, or munitions when not directed toward the head, neck, throat or spine.

**Deadly Force** – All uses of firearms directed at an individual and can include using less lethal weapons and impact devices when directed to the subject's head, neck, throat, or spine area. The inclusion of less lethal is because when directed to the subject's head, neck, throat, or spine can result in death or grievous bodily injury. As is commonly known, the use of lethal force is reserved for life-threatening situations when no other reasonable alternative exists. I discuss head strikes further in Part V.

25.    In corrections as compared to patrol, the significant difference is that correctional officers are in a secure environment they are familiar with, which means the "suspect" will not get away. Other corrections officers are assigned to control rooms or booths, and they can give directives for non-involved inmates to return to their cells and then secure their cell doors or isolate the incident and individuals by securing doors only under the officers' control. The officer addressing an agitated detainee is almost always under observation by other staff, who can immediately call for the assistance of others. Response times in correctional settings are significantly shorter than for law enforcement in the community, and generally should be measured in seconds instead of minutes, based on the almost immediate availability of additional staff who have radios, can hear the call for help, and can respond immediately while those assigned to control booths secure the area.

26.    In reviewing the multiple LASD use of force videos, I was struck by the exceptional number of staff who responded immediately once the use of force ensued. In some of these situations, there were more than twenty (20) responding staff, and in

13                                    Case No. CV 12-00428 DDP (MRW)

DECLARATION OF STEPHEN SINCLAIR

all but one (1) situation there were a minimum of three (3) officers present at the time of the use of force. The immediate availability of these staff is important because it causes a significant power shift, in a one-on-one situation there is a significantly greater risk to a singular responding deputy; when multiple staff are present using their control tactics training, they can more easily control individual limbs reducing the risk of significant injury to all involved. Additionally, with multiple staff, they can use team tactics to overpower the subject.

27.   Because of the controlled environment, the immediacy with which additional staff can respond to an incident, and the number of staff that LASD has responding, this should mitigate LASD's need for higher levels of force. Staff should be trained to create distance between themselves and the aggressive inmate, call for backup, and use team tactics to restrain an uncooperative inmate if necessary. Team tactics are the most common practice when corrections staff are restraining an uncooperative inmate. With team tactics, multiple staff, depending on their level of training, are applying hands-on techniques, including: finger, wrist, and other counter joint techniques, takedowns, and pressure points. In very extreme situations, staff may use body strikes to get the inmate restrained. Once restrained, sometimes including in leg restraints, the inmate is considered controlled. In the most extreme situations where an inmate is resisting but restrained, a wheelchair, gurney, or wrap devices may be used to safely transport the inmate to a more secure setting.

28.   There is also a downside to team tactics because often, one officer will be using a pain compliance technique like a wrist, finger or joint manipulation to get control of their limb of responsibility. This causes the subject to reflexively react to the pain and other involved officers then perceive the reaction as aggression or resistance, increasing and escalating the level of force they are using. I believe this was the case in at least five of the videos I reviewed, including MCJ-04485, TTCF-00620, MCJ-02673, TTCF-00226, IRC-01256, and possibly others. In the case of team tactics, this reflex-reaction can be mitigated through communication and an on-

Case No. CV 12-00428 DDP (MRW)

DECLARATION OF STEPHEN SINCLAIR

scene supervisor directing the actions of the deputies, but even this isn't always effective in confined spaces and or when the supervisors can't see all that is going on. In instances when you are dealing with someone who is restrained or you are trying to remove the restraints, the best course of action is to back off, talk to the person to explain what you are trying to accomplish, and re-assess. Minimizing the number of staff involved is also helpful in these situations.

## V.    LASD'S USE OF FORCE POLICY & HEAD STRIKE PRACTICES

29.    In addition to reviewing the settlement agreement, the implementation plan, and monitor reports, I have also reviewed the latest, available to me, LASD Custody Division Manual: Volume 7 – Custody Operations Force Manual (Force Manual), and 10 use of force incidents (video & reports) where head strikes were used against a detainee (9 videos), or where deputies struck a class member's head against a fixed object, namely, the wall (1 video). LASD has made changes over the last nine years to its Force Manual; however, based on the ongoing failures of compliance, the appearance is none of these changes have been effective. As stated in paragraph 15, simply changing policy without accountability rarely results in behavior change.

30.    In the Force Manual I reviewed, dated 3/23/21, it says.

The following uses of force are prohibited absent life-threatening or high risk / assaultive situations:
- Any kicking above the knee
- Carotid restraints
- Head strikes

31.    In my training and professional experience, head strikes are reserved for self-defense when there is an immediate risk of grievous bodily injury or death to the responding officer or someone the officer is trying to protect, this is because impact weapons like fists and feet when used to strike to the head, neck, throat, and spine have a significantly greater risk of serious bodily injury or death. The court monitors have repeatedly reported that LASD's overuse of head strikes is dangerous. *See*

Case No. CV 12-00428 DDP (MRW)

DECLARATION OF STEPHEN SINCLAIR

Panel's Eighth Report, Jan. 4, 2021 (Dkt. 202 at p. 10)[9] ("Medical science informs us that head blows are the 'hidden injuries' that create or exacerbate mental illness. Agencies have long moved away from acceptance of head strikes. We encourage the Department to pay particular attention to this issue moving forward."); Eleventh Report, March 8, 2023 (Dkt. 238 at p. 3) ("In cases where some force may be warranted, the Panel continues to see improper head strikes by Department personnel.") Some examples of jurisdictions that consider strikes with hands and feet to the head, neck, throat, or spine as a deadly force option include New York City and Washington State.[10] There is some indication even LASD must view head strikes as akin to using a deadly weapon, because in at least one of the incidents (#MCJ-04485) LASD charged the involved inmate—who used head strikes against an officer—with Assault with a Deadly Weapon.[11] In the case of law enforcement officers in the community, this risk is significant when required to go hands-on with individuals based on any unknowns and the lack of timely back-up. There is a life safety

[9] Citations are to the Panel's Reports' page numbers.

[10] *See, e.g.*, Washington Department of Corrections, DOC 410.920, Use of Force Outside of Prisons at Part II.A.3.a. (defining deadly force as "strikes to the head, neck, or spine") at https://agportal-s3bucket.s3.amazonaws.com/useofforcepolicy/UseOfForcePolicy256.pdf; Corrections Dep't, City of New York, Directive 5006R-D, Use of Force at Part II.G ("The Department strictly prohibits the use of high impact force, including … strikes or blows to the head, face, groin, neck, kidneys, and spinal column" except where the staff person is "in imminent danger of serious bodily injury or death, and where lesser means are impractical or ineffective") at https://www.nyc.gov/assets/doc/downloads/directives/Directive_5006R-D_Final.pdf.

[11] As Steve J. Martin, a use-of-force expert and former administrator and general counsel with the Texas Department of Corrections has written, "[I]f a self-defense tactic such as non-blunt force can effectively neutralize a disruptive prisoner, it is not appropriate to strike the prisoner with blunt force to the head, especially when such strikes often do not actually neutralize the aggressing inmate. In fact, such tactics often create a purely retaliatory cycle of violence in which both the officer and prisoner sustain injuries and the degree of injuries sustained is more serious." Steve J. Martin, *Staff Use of Force in United States Confinement Settings*, 22 Wash. U. J. L. & Pol'y, 145, 152-53 (2006).

16

Case No. CV 12-00428 DDP (MRW)

DECLARATION OF STEPHEN SINCLAIR

component to remaining conscious and maintaining possession of your firearm.

32.    Three head strike incidents that I reviewed occurred after the revised Force Manual was issued (3/23/21). In all of these incidents, there were two or more deputies present when the head strikes occurred. All head strikes used by staff were after any assaultive behavior from the inmate had ceased. In two instances, head strikes were used on inmates in restraints. In one incident the inmate was restrained at the time and spat on a deputy who then hit the inmate in the face with a closed fist, which appeared to be out of anger or retribution. In my opinion, all three of these incidents involving head strikes were unprofessional, unnecessary, and excessive. The most severe administrative action taken in these three cases (#MCJ-00856, MCJ-00999, IRC-00030) was re-training for one of the assaults carried out by a deputy, but the use of head strikes was still determined to be "objectively reasonable" or "reasonable" by the second-level supervisors in all three cases. All three of these situations were not life-threatening to the involved staff, so the only criteria used to justify these excessive force incidents must have been "high risk/assaultive situations." I believe this language is extremely lenient and a loophole used as justification not to hold staff accountable.

33.    LASD has recently issued a directive stating head strikes may only be used in use of force if (1) the inmate is assaultive; (2) the inmate presents an imminent danger of serious injury; and (3) there are no other more reasonable means to avoid serious injury. In my opinion, this new language is as lenient as the previous language because a head strike incident (MCJ-00856) that occurred after the directive was issued, involved unnecessary head strikes (*e.g.*, excessive force) against a restrained inmate and was nonetheless approved by supervisors. The inmate was in wrist restraints with his arms behind his back, being escorted by two deputies, when he horse kicks one of the deputies behind him in the leg. Deputies immediately head strike the inmate and continue with body and head strikes while the inmate is on the ground. In the Supervisor's Report on Use of Force, the supervisors said,

Were other force options considered?

No. The incident was in defense and reactionary to an unprovoked attack. Deputy personnel; acted accordingly in response to the attack.

I did discuss that head strikes are acceptable and within policy under certain circumstances; however, when feasible, body strikes and/or other force options are preferable. I reminded the deputies of Rosas Provision 2.6 which states that striking an inmate in the head is prohibited unless the inmate is assaultive and presents an imminent danger of serious injury to a department member or another person and there are no other more reasonable means to avoid serious injury. Suspect (name redacted) was physically assaultive, the deputies were in danger of being seriously injured and due to the rapidly evolving situation their force options were limited.

34.    The Lieutenant who reviewed this head strike incident in the Watch Commander's Use of Force Review and Incident Analysis concluded.

Based on the information provided in the Supervisor's Report on Use of Force prepared by Sergeant (redacted) # (redacted) and after reviewing the videos and written reports, I determined that the force used in this incident by Deputies (redacted) and (redacted) was objectively reasonable to overcome the suspect's assaultive behavior. The actions of personnel involved in this force were within Department Policy.

35.    In my opinion this is an example showing where the inmate could not and did not inflict serious injury and posed no threat of causing serious injury while the two deputies were on top of him and were inflicting head and body strikes. Because of this the deputies should have been disciplined for their actions.

36.    In total, I reviewed nine (9) videos and packets documenting use of head strikes by LASD deputies against inmates in custody. In at least three, maybe more, of these head strikes incidents the inmate was already restrained, and multiple staff were present. Based on LASD Force Manual and my training and experience, the use of head strikes with a restrained inmate is egregious, unnecessary, and excessive. In a previously mentioned incident (#IRC-00030) three deputies were escorting a

18    Case No. CV 12-00428 DDP (MRW)

DECLARATION OF STEPHEN SINCLAIR

restrained inmate who spat on a deputy, who the used a head strike. There was no noted corrective or disciplinary action for the use of head strike. In one of the before-mentioned situations of head strikes while in restraints, an inmate was biting the finger of a deputy, this may be justification for a head strike, but it appeared there were other reasonable options available to get the inmate to stop, including the use of OC spray, which they did use. Because of the number of deputies covering the inmate in the video I could not determine the effectiveness of the OC.

37.    Also of note, was that in one of the head strike incidents, (#MCJ-04485) the deputy wrote that the head strikes were used when he (the deputy) was actively taking head strikes from an unrestrained inmate. There was no video to support the written statement by staff, but as written this was the one and only that I reviewed when the head strikes were justifiable, in my professional experience.

38.    My overall impression from my review of the materials provided is that the use of head strikes by LASD deputies against inmates in their care and control is primarily unnecessary and is excessive. Even with the current limiting language used by the LASD in their Force Manual, it is being abused and causing unnecessary harm to the inmate population. LASD has been scrutinized on this topic for nine years and still fails to achieve compliance tells me there is an established culture at all levels of the organization that still believes it is okay to use head strikes as long as there is justification in somebody's mind.

39.    It is evident in all of the incidents of head strikes I reviewed, that all could have been avoided and the situation could and should have been resolved using options that were available at the time to the involved staff.

40.    As mentioned above at Paragraph 31, some correctional agencies have taken proactive steps to eliminate head strikes. They have done this by elevating them to deadly force, which requires exceptional justification for the staff who use them. Even if LASD does take the simple step of eliminating the words "high risk/assaultive situation" from their Prohibited Force policy, they will have to increase accountability

19                                    Case No. CV 12-00428 DDP (MRW)

as well dramatically. Staff that do use head strikes, absent exceptional justification, must be held accountable with discipline that demonstrates the administration's zero tolerance for the use of head strikes. It appears that in the preceding nine years the LASD has never placed this level of importance on this egregious act.

41.    The Court monitors have chronicled this failure repeatedly, pointing to the need for more accountability by supervisors and incident reviewers, yet the problem persists. For example, in the Panel's Eighth Report (Jan. 4, 2021), the monitors wrote:

> The Panel has expressed concern for several reporting periods that the Department relies too heavily on remedial training rather than discipline in situations where the Department agrees that use of force policies have been violated. The Panel has also seen numerous cases involving violations of policy, such as head punches for inmate control, that result in outcomes that do not reflect the seriousness of the offense.

Dkt. 202 at p. 5. In the Panel's Tenth Report (April 7, 2022), the monitors wrote:

> More specifically, the use of "head shots" (punches to the head of an inmate) where prohibited by policy, has been relatively unchanged in the last two years or more, and may be increasing. No issue has been discussed more with management over the last six years and especially in the last two years, to little avail. That problem is compounded by two other factors. *Use of force reviews by supervisors and managers in the serious cases selected by the Monitors, almost always fail to note out-of-policy head shots or – less frequently – attempts to justify them. Then the supervisors and managers are not held accountable for those failures and the Deputies using the improper for are "counseled" or sent to remedial training and actual discipline is seldom imposed*. While the Department has openly acknowledged this continuing issue in discussions with the Monitors, and is now contemplating changes to the way head shots are categorized and reported, there has been little real change or progress in more than two years.

Dkt. 205 at pp. 1-2 (emphasis added).

42.    And in March of 2023, in their Eleventh Report, the Panel wrote that it "has yet to review a case where the supervisor concludes the use of head strikes was

Case No. CV 12-00428 DDP (MRW)

DECLARATION OF STEPHEN SINCLAIR

inappropriate. In order for the Department to achieve compliance with Provision 2.6 (head strikes), staff must be held accountable [for] head strikes." Dkt. 238 at p. 5. I concur with the court monitors that these are problems that must be addressed.

## VI.    LASD USE OF WRAP RESTRAINT DEVICE

43.    As requested by Plaintiffs' counsel, I reviewed a number of LASD use-of-force incidents involving head strikes by officers, almost all of which also included the use of the WRAP restraint. I also reviewed additional uses of force incidents specific to the use of the WRAP restraint.

44.    I am familiar with the WRAP restraint device from its limited use in WADOC. In my experience, it was a tool reserved for those extreme cases where restrained inmates, who continued to thrash and react violently while in traditional restraints, were further secured for transport. The primary reason for using the WRAP was to prevent self-injury of the inmate during transport.

45.    Of the sixteen total videos and use of force packets I reviewed for this declaration, I could determine the WRAP restraint was used in at least ten (10) incidents, and suspect it may have been used in more based on the apparent routine use of the device by LASD. It was surprising to me how routinely the WRAP was used, even when traditional approaches absent the WRAP would have been safer, faster, and reduced inmate contact. Also of note was that when the WRAP was used, deputies were required to lift the inmate onto the transport cart. Requiring this level of physical exertion as a matter of course is surprising because a known top cause of workplace injuries is overexertion, including non-impact injuries resulting from the exertion of physical efforts such as lifting, lowering, pushing, holding, carrying, turning or throwing. Routine use of the WRAP and the requirement for staff to lift inmates may even contribute increased workplace injuries for the LASD deputies.

46.    Traditional approaches can include the use of just wrist restraints behind the back (not waist restraints), followed by leg restraints at the ankles for greater levels of resistance. If transport or escort is required a wheelchair or gurney can be used.

When the inmate needs to be placed in the secure cell, staff can use a cuff retainer to secure them in the cell.[12] If an inmate attempts to pull away at any time, staff can maintain control by controlling the cuff retainer. In my professional experience, the WRAP is an exceptional restraint reserved for only the most uncontrollable inmates.

47.    Prior to the expanded knowledge of positional asphyxia, the most uncontrollable inmates may have been restrained by a cord/rope secured to the wrist restraints and the leg restraints placing them in an awkward position where they could no longer thrash, bang their head or contort their bodies. This practice has not been used in many decades because of the numerous in-custody deaths resulting from positional asphyxia.[13] In 2021, in response to the killing of George Floyd and other people, California passed AB 490, which prohibits law enforcement agencies from authorizing techniques or transport methods that involve a substantial risk of positional asphyxia.[14]

---

[12] A cuff retainer is a simple tool made from a 6-to-8 foot rope with a clasp at one end that attaches to the cuffs. This allows staff to pass the rope through the cuff/ feeding port in the cell door. The inmate is instructed to kneel while the leg restraints are removed, then the cell door is closed, and the inmate is instructed to stand up and back up to the cuff port so the wrist restraints can be removed. The use of the cuff retainer is a safe way to place inmates in a secure cell and remove restraints while at the same time allowing staff to maintain control of the inmate and wrist restraints.

[13] Positional asphyxia, also known as postural asphyxia, is a form of asphyxia that occurs when someone's position prevents the person from breathing adequately. People may die from positional asphyxia accidentally, when the mouth and nose are blocked, or where the chest may be unable to fully expand. U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, National Law Enforcement Technology Center, *Positional Asphyxia—Sudden Death*, (June 1995) at https://www.ojp.gov/pdffiles/posasph.pdf.

[14] The bill took effect on Jan. 1, 2022, and amended Gov't Code Section 7286.5. *See* https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id= 202120220AB490. It defines positional asphyxia as "situating a person in a manner that compresses their airway and reduces the ability to sustain adequate breathing. This includes, without limitation, the use of any physical restraint that causes a person's respiratory airway to be compressed or impairs the person's breathing or

48.   LASD's routine use of the WRAP also has the effect of prolonging incidents and requires deputies to have unnecessary contact with the inmates. With the WRAP deputies are required to apply a leg harness and a back/chest harness, then cinch the two together with a strap. This amount of restraint is unnecessary because in my experience, once an inmate is restrained with wrist and leg restraints, they can typically move under their own power, but their ability to inflict injury on others is mitigated when escorting staff use appropriate escort techniques.

49.   In the videos I viewed, there were incidents (TTCF-00620, IRC-01264, IRC-001692), of deputies forcing the inmate's head down and forward bending them over their legs while exerting an extreme amount of force on the inmate's back by cinching the strap. While I am not purporting to be a medical expert, in my professional opinion, this appeared to be an unsafe practice that could impact an inmate's ability to breathe. In several videos, inmates could be heard saying they couldn't breathe, some before the WRAP was even applied, and some after.

50.   The draft WRAP restraint document implies that WRAP is a restraint of last resort when all other methods have failed. In the videos I reviewed, this did not appear to be the case; often, inmates had already been restrained, were not allowed to stand up, and then automatically placed in the WRAP before any assessment could be completed. In most cases, deputies held down these inmates, so there was no opportunity for all involved to have a cooling-off period.

51.   A cooling-off period is a period of time that can last for several minutes or even just a couple of minutes, depending on the situation, so everyone can take a break and reassess the situation before moving forward. This cooling-off period will

respiratory capacity, including any action in which pressure or body weight is unreasonably applied against a restrained person's neck, torso, or back, or positioning a restrained person without reasonable monitoring for signs of asphyxia." Gov. Code § 7286.5 (b)(4).

allow the on-scene supervisor to dialogue with the involved inmate to determine better if there is a need for the WRAP.

52.    The draft document indicates the on-duty watch commander shall authorize the use of the WRAP; some videos I viewed did not have audio, making it impossible to determine if authorization was requested. Still, my overall impression was that no prior authorization was sought or given before using the WRAP. Even if the new language is adopted in the draft WRAP Restraint document, based on the LASD's track record, I am skeptical that their existing culture will be able to implement these changes and hold staff accountable, based on my review of these incidents and the reviews conducted on them.

53.    There was an exceptional video provided, which made me question the practicality of using the WRAP as routinely as LASD does. (# TTCF-00226) In the video, the inmate was already in the WRAP and arrived at what appeared to be a disciplinary cell. Four deputies lift the inmate out of the cart and carry him into the cell. There are five deputies and the inmate in a small area between the metal bunk and the wall, which appears to be a space approximately 7 feet long by 4 feet wide. In this limited area, deputies attempt to remove the WRAP, and the inmate can be heard grunting; it appears a deputy is applying body pressure to try and maintain control, but it is also likely causing distress and pain for the inmate.[15]

54.    The inmate complains about the pain repeatedly, and you can see deputies shuffling around in the small area as the situation escalates. The inmate says the cuff hurts and is getting agitated, continuing to cry out in pain. Deputies are telling him to relax, but he is obviously in pain from the control techniques the deputies are using. At this point, there are five deputies within the confined space in part of the cell, and an additional deputy and sergeant also in the cell. The inmate continues screaming in pain, and the deputies' movements are more aggressive.

---

[15] *See* Paragraph 28 (description of drawbacks of team tactics).

55.   This continues for approximately 10 minutes; the inmate screams out about his ankle hurting. There are 3-4 deputies on him at this time, most probably one of them kneeling on his ankle. At about 12 minutes, all other restraints are off because deputies are preparing to exit the cell but maintain body pressure on the inmate. Another deputy comes into the cell with an unholstered Taser, but the other deputies' bodies entirely cover the inmate. At 15:57 minutes into the video OC (Pepper Spray) is used on the inmate.

56.   At 17:53 minutes, someone screams out, and two deputies throw multiple punches at the inmate. Because of the number of deputies present, it cannot be determined from the video where they were punching the inmate. In the documentation, one deputy states that he "punched him several times to the face area" (p. 44). It appears more punches were delivered shortly after this, but again hard to determine in the video. At 19:18, the wrist restraints were removed. This WRAP removal lasted approximately 19 brutal minutes. The inmate was hurt throughout the incident, and at least one deputy received a bite to his finger.

57.   There were no other videos that showed the WRAP removal process, and I hope they were not as brutal as this one was. Throughout this video, I questioned how the WRAP was safer for everyone involved, staff and inmates. Granted, I could not see the inmate's actions or gauge his resistance level, but I could hear he was in pain throughout this incident. I could not help but reflect on the countless uses of force I have been involved in or reviewed during my career and speculate if using the traditional approach with leg restraints, wrist restraints, and a cuff retainer would have had a different outcome. I believe it would have been different and safer for everyone involved.

58.   Based on the videos I reviewed that involved using the WRAP restraint, it is my opinion that LASD overuses this tool and should reserve its use for genuinely exceptional circumstances, not for common application after fights and assaults.

## VII.  DISHONEST REPORTING & LACK OF ACCOUNTABILITY

59.    In reviewing the use of force documents provided several incidents of dishonest reporting and downplaying by reviewers were noted, which represent a significant issue for LASD. In my opinion this is the root cause for the ongoing use of unnecessary heads strikes (excessive force) and other negative behaviors. If LASD continues not to hold deputies accountable for these incidents nothing will change, just like in the preceding eight years they have been under the settlement agreement.

60.    The LASD Guidelines for Discipline and Education-Based Alternatives spell out what LASD considers to be discipline. Verbal counseling and retraining are considered non-disciplinary, yet almost exclusively, in the use of force documents provided with the incidents I reviewed, they were used to address incidents of obvious excessive force and dishonesty. In the LASD Guidelines for Discipline and Education-Based Alternatives, dishonesty is specifically cited as an example of a situation that would warrant non-progressive discipline. In my opinion, LASD has the ability and authority to discipline for these actions but routinely fails to do so. The penalty ranges provided in the Guidelines are adequate; the problem is that LASD routinely fails to impose the discipline within the range. Given LASD's long history of noncompliance and the materials I have reviewed, those penalties should be mandatory for the issues I have discussed above, *i.e.*, overuse of head strikes.

61.    LASD deputies are POST (Peace Officer Standards and Training) certified. In California, law enforcement and corrections officers (deputies) can lose POST certification under certain circumstances. POST has the authority to revoke, suspend, or deny certification to law enforcement officers who engage in certain conduct or fail to meet certain standards.[16]

---

[16] *See* 11 CCR § 1202, Peace Officer Certificates; https://govt.westlaw.com/calregs/Document/IEB831B7058E011EDB4D7A6ED066E269F?viewType=FullText&originationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc.Default)

62.    California law provides for a range of disciplinary actions that can be taken against law enforcement officers who engage in misconduct, including revocation or suspension of POST certification. POST may revoke or suspend an officer's certification for a variety of reasons, including:

- Conviction of a felony or certain misdemeanors
- Dishonesty or falsification of official reports
- Use of excessive force
- Discrimination or harassment[17]

63.    In addition to the above reasons, POST may also revoke or suspend an officer's certification for other conduct that reflects poorly on the officer's fitness to serve as a law enforcement officer.

64.    California law requires law enforcement agencies to report to POST any officer who is terminated or resigns in lieu of termination due to a violation of POST standards, including use of excessive force, dishonesty or falsification of official reports, and discrimination or harassment.[18] Reporting officers who violate POST standards is important to ensure the integrity of the law enforcement profession, and to maintain public trust in law enforcement. By reporting officers who violate POST standards, law enforcement agencies help to ensure that these officers are held accountable for their actions and that they do not continue to work as law enforcement officer in California.

65.    As noted above tolerance for excessive use of force and dishonesty has significant impacts for LASD and the law enforcement professional overall. In Part V, I chronicled incidents where I believe excessive force was used. In addition to this, I

---

[17] *See* 11 CA ADC § 1205 Serious Misconduct; https://govt.westlaw.com/calregs/Document/I415583F08DAF11ED85DFA03C23B73F24?viewType=FullText&originationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc.Default)

[18] *See* Post Commission on Peace Officers Standards and Training, https://post.ca.gov/sb-2

believe there were several incidents of dishonest reporting where deputies minimized the level of force used or failed to report it at all.

66.    In addition to dishonest reporting by the deputies themselves, there were incidents where supervisors and incident reviewers downplayed incidents and failed to hold deputies accountable. This justification is a classic example of why LASD is failing to hold their staff accountable. This is indicative of a culture that needs to change. I have experienced incidents where cronyism is pervasive in a correctional culture, so I know the devasting impacts on the integrity of the organization and even the morale of the work unit. Cronyism is created when staff who work together for extended periods of time and then some are eventually promoted into positions of greater responsibility, where they are required to hold their former peers accountable but fail to do so. Based on my review of the mentioned incidents cronyism is pervasive in LASD corrections. Some examples of what I have stated are listed here.

- Incident MCJ-04390: One deputy describes the detainee's alleged seated punch (see above) to the deputy's leg as "I felt the great force of his punch." The deputy also describes the detainee's injuries (he was bleeding profusely from the head after a head strike) as "redness to cheek and small cut," which appears to be cut and pasted on more than one witness statement. But the medical report has full litany of injuries including bloody and swollen nose and cut lip. (pp. 45-46). One deputy stated, "I did observe swelling and redness along with blood protruding from [the detainee's] right facial area." (p. 36)

- Incident TTCF-01254: While being placed in a WRAP cart after a cell extraction, the detainee is spitting a little because of OC spray during cell extraction. At 12:22, deputy hits him in the side of the face. In the written report, witnesses and watch commander downplay head strike (p. 21 – deputy who hit him says he "struck." Witness deputies say "tap" at p. 24, "lightly struck" at p. 25, "lightly tapped" at p. 28, and watch commander calls it a "gentle nudge" at p. 36). Not found out of policy until final level of review at pp. 43-44. Nothing in that final review, however, notes the problems with deliberately downplaying the force used.

- Incident MCJ-03103: The detainee is asking for soap, talking on the hall, asks to speak to a supervisor, the deputy slams him against the wall and

28

DECLARATION OF STEPHEN SINCLAIR

punches him multiple times in the head. Witness statements (other incarcerated people) at pp. 11-13, the detainee's statement at p. 13, and the video all contradict deputy's justification (pp. 29-31) for using force. The watch commander claims to be unable to evaluate veracity because of video pixelation (p. 40).

- Incident MCJ-02673: The repeated statements by deputies in their reports about how the head strike was to respond to the detainee having his hands underneath him and their fear he had a weapon seem fabricated. (e.g., p. 38). There is a lot of what seems to be copying among the reports – almost verbatim discussion of inmates' having shanks, inmates of the same race initiating force to keep face among their peers, etc. (p. 38) "Due to the fact of recent attacks on deputy personnel and several shanks (inmate jail made weapons) being recovered from Module 2400, I immediately went towards the deputies. . . " "Due to previous events of inmates making threats and staff assaults against deputy personnel at MCJ, coupled with the numerous recovered jail house-made weapons (shanks) in Modules 2200/2400, I was on heightened alert." (p. 43) "Within the last week, there have been threats and staff assaults within the facility. Also the 2000 Floor personnel have recovered a numerous amount of jail made weapons 'Shanks.'" (p. 53)

- Incident MCJ-00690: The video shows at 1:15 that one deputy puts his knee on the detainee's neck with what appears to be full weight and appears to have his right fist pushed against the detainee's face; at 1:39 the deputy takes his knee off the detainee's neck. Deputy writes that he "inadvertently put his neck across [detainee's] back and shoulders" (p. 14) – inconsistent with video. LASD witnesses write that after they took the detainee's cap off, "I observed inmate [] turn his body while lifting both of his arms upward." (p. 15). This also is inconsistent with video. LASD witness does not mention seeing the other deputy put his knee on the detainee's neck. (p. 15) The deputy who used his knee was disciplined, but not for dishonest reporting, nor were the other witnesses flagged for dishonest reporting. IAB noted that the video footage showed the knee on head/neck (p. 9).

67.    In my 32 years directly working in the corrections profession I have experienced use of force situations from all angles, as the one performing it, documenting it as the on-scene supervisor, reviewing it, and even as an independent Critical Incident Review member and team leader. I can recognize creative writing

intended to minimize or justify inappropriate actions by staff. I also recognize the importance of honest reporting for the reasons previously expressed.

68.     As an example, while I was a Correctional Captain at one facility, my office window faced a courtyard where inmate movement took place. I spent a lot of time there reviewing use-of-force reports. One day I heard a radio call for an incident taking place in the courtyard outside my office. I witnessed a new corrections officer confront an aggressive inmate, after attempting to de-escalate the situation the officer essentially tackled the inmate to take him to the ground to apply wrist restraints. It was not excessive and was practical given the situation. A couple of days later I was reading the use of force package for this incident, in the officer's statement he had written in his report, he had used a straight arm bar technique to place the inmate on the ground. Obviously, this was not what happened, so I left my office to speak with that same officer and ask why he had not reported what he did in the use of force. He said he was afraid to write down the tackle because it wasn't a trained technique and other staff had told him what to write. I explained to the new officer that the most important thing he can do in corrections is to maintain his integrity and that of the agency through honest reporting and instructed him to re-write his report to reflect the true events.

69.     In my example, the officer was justified in his actions, was new to the profession, and conformed to the culture he was in. He was admonished for this but also, he was educated on the expectations of the agency. Later in my monthly Lieutenant's meeting with the Lieutenants who reported to me, I talked about this situation to clarify my expectations for honest reporting and explained that if this goes unchecked they are doing their staff a great disservice, which could have a negative impact on a person's employment. I also pointed out the fact we never know when an incident will become the subject of an external review and when that happens their inactions will then be the problem. It was their responsibility to ensure all their staff had a clear understanding of acceptable boundaries. Apparently, this had the desired

effect because I started seeing a change in the verbiage used in the use of force reports I was reviewing.

70.    I recognize the small number of LASD incidents I reviewed was likely a small percentage of their overall use-of-force incidents and because of this, it may be easy for LASD to try and overlook dishonesty. My experience says the opposite, whenever these incidents of dishonesty are recognized, they must be appropriately addressed in order to maintain to the integrity of the agency. Appropriately addressing, with discipline, these situations with staff is equally important to those same staff so they and all their peers clearly understand the professional boundaries required by their profession.

71.    In corrections, there will always be some incidents where staff use excessive force and or are dishonest about their actions, my experience tells me every one of these is a critical incident and must be addressed with discipline. Failure to address these situations, by disciplining the responsible staff, will make it acceptable making it a part of your culture and increasing the rate of occurrence. Based on the level of acceptance demonstrated by LASD, through their lack of accountability, they have created a culture of acceptance for excessive and unnecessary use of force.

72.    This lack of accountability was noted many times in the Monitor reports, I am in complete agreement with their observations. This includes the reports I quoted above at Paragraph 41, and the following:

- Panel's Fifth Report (May 31, 2019), Dkt. 198 at p. 6: "[T]he 'sharp increase' in deactivated investigations coupled with the 'marked decrease' in the number of these investigations, calls into question the extent to which the Department will hold Deputies accountable for misconduct, including in particular dishonesty and excessive use of force, in the future. …[T]he direction of the Department is of concern to the Panel."

- Panel's Fifth Report at p. 17: "Commanders are reluctant to find a use of force out of policy (and therefore subject to discipline) even when they acknowledge that the force was problematic…"

Case No. CV 12-00428 DDP (MRW)

DECLARATION OF STEPHEN SINCLAIR

- Panel's Eighth Report (Jan. 4, 2021), Dkt. 202 at p. 5: "The Panel has expressed concern for several reporting periods that the Department relies too heavily on remedial training rather than discipline in situations where the Department agrees that use of force policies have been violated. The Panel has also seen numerous cases involving violations of policy, such as head punches for inmate control, that result in outcomes that do not reflect the seriousness of the offense."

- Panel's Ninth Report (June 30, 2021), Dkt. 203 at p.6: "The Panel continues to see cases involving violations of policy, such as head punches for inmate control, that result in Departmental actions that do not reflect the seriousness of the offense. The Panel has highlighted this shortcoming in prior reports (see Eighth Report, p. 5) but has not seen any meaningful change in the extent to which Department staff (and managers) are held accountable for violation of force policies. The Panel is also concerned that in cases where the Panel has found a policy violation regarding use of force, and where the supervisors or mid-managers reviewing the incident have failed to identify a policy violation or even question the use of force, no action is ever taken against the supervisor and/or mid-manager."

- Panel's Tenth Report (April 7, 2022), Dkt. 205 at p.2: "From the use of force packages we have been reviewing, we are no longer seeing progression towards professional management of force situations. It is time for the jail culture to stop supporting behaviors that are forbidden by Policy."

- Panel's Tenth Report at p. 6: "Other issues raised by the Panel in prior reports persisted in the Tenth Reporting period, most notably, the failure of the Department to mete out discipline in cases where force policies are violated or Department personnel inaccurately described force incidents in their written reports."

- Panel's Eleventh Report (March 8, 2023), Dkt. 238 at p. 12: "The Panel continues to review cases involving violations of policy, such as head punches for inmate control, that result in Departmental actions that do not reflect the seriousness of the offenses. The Department must hold Deputies accountable for use of force violations and hold supervisory staff accountable when they fail to identify and/or appropriately address violations."

Case No. CV 12-00428 DDP (MRW)

DECLARATION OF STEPHEN SINCLAIR

- Panel's Eleventh Report at p. 22: "In Case 4, Inmate E was being escorted back to his housing unit, cuffed behind his back. A Deputy put Inmate E's back to the wall of the elevator. When Inmate E pushed forward and resisted being placed against the wall, he was taken to the floor and punched 15 times by at least two Deputies. One of the supervisory reviews of the incident concluded "…based on the facts surrounding this incident, it appears that the application of force was objectively reasonable.' . . . The fourth case, however, illustrates how inappropriate force can be embraced by Supervisors. Leadership must hold Deputies accountable for unwarranted punches for Rosas compliance."

73.    In sum, the process currently used by LASD to review use of force incidents is not working. Because of this, I would recommend a review process to include more independent reviews conducted by individuals outside the work unit where the incident took place. These independent reviewers must hold the integrity of the organization above all else in order to prevent the continuation of cronyism. These independent reviewers must also be empowered to invoke mandatory discipline in all instances of dishonesty and excessive force.

## VIII. CONCLUSION & RECOMMENDATIONS

74.    LASD has been part of the *Rosas* settlement agreement and implementation plan for nine years and has made some effort to show improvement related to the use of force requirements of the implementation plan. However, they have never achieved compliance in the critical areas. Based on this, LASD must elevate what is required before head strikes can be used by staff and clarify that they are prohibited uses of force except in life-threatening situations. LASD should elevate the use of head strikes to deadly force like other agencies have done.

75.    In addition, the administration must prioritize this change, and ensure that staff at all levels are held accountable to the policy expectations. This will take a cultural shift and require increased mandatory discipline for those who use this form of unnecessary and excessive force. This accountability must extend to those who review and endorse these actions by staff. Again, LASD has yet to achieve this based

on their current approach for the entirety of the settlement agreement, and implementation plans existence. Because of the appearance of cronyism and lack of accountability, the best approach for LASD to use for the review of use-of-force reports is the use of independent reviewers with an interest in organizational integrity who are empowered to invoke mandatory discipline.

76.    The WRAP restraint is being overused and, as a result, likely, causing more harm than good. An analysis of work-related injuries or secondary use-of-force incidents as a result of using the WRAP should be conducted by LASD. In my professional opinion, the WRAP should be reserved for those rare and unique situations where other forms of restraint have failed.

77.    Finally, I can't imagine any correctional administrator wanting to see anybody hurt in their correctional system, least of all their staff. Staff and inmates are most likely to be hurt during the use of force, which is why there is an emphasis on only using the amount of force necessary to resolve the situation. It is also a reason to avoid use-of-force whenever possible. The way to do this is to emphasize de-escalation tactics, including creating distance, waiting for backup before taking aggressive action, and slowing things down to allow everyone to evaluate their options, including the inmates. When these incidents result in unnecessary or excessive use of force the responsible staff should be disciplined to re-enforce the expectation.

78. In the videos I reviewed, I noted several instances where deputies could have used the before mentioned approaches and would have changed the situation. This even applies when engaged in the use of force once the inmate has been restrained; pausing and letting everyone evaluate the situation, stopping the pressure on the inmate, may change the situation altogether. This is especially true when using team tactics and having multiple staff apply control techniques that perpetuate the incident. LASD would benefit from cooling-off periods to better measure the

resistance level. This would be applicable in the use of force and the application of the WRAP.

Case No. CV 12-00428 DDP (MRW)

DECLARATION OF STEPHEN SINCLAIR

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 30, 2023, in Olympia, Washington.

Stephen Sinclair

Case No. CV 12-00428 DDP (MRW)

DECLARATION OF STEPHEN SINCLAIR

# ATTACHMENT A

# STEVE SINCLAIR



## Executive Summary

Over 30 years of progressive experience in adult male and female corrections from serving as a Correctional Officer to being appointed Secretary of the Washington State Department of Corrections by Gov. Jay Inslee in 2017. Accountable for over 19,000 supervised individuals and over 17,000 incarcerated individuals within 12 correctional facilities and 12 work release facilities.

Experience with all levels in corrections settings within a state correctional system including maximum custody (restrictive housing), work release, reentry and community corrections. Specialty areas include restrictive housing reform, violence reduction, use of force, programming, gender responsive/trauma informed services, correctional culture change and emergency response.

Developed and co-directed the highly successful Sustainable Practices Lab (SPL) at the Washington State Penitentiary resulting in thousands of incarcerated individuals receiving training and work experience in conservation, horticulture, aquaculture, carpentry and many other fields. The program has produced hundreds of thousands of pounds of produce for the facility as well as local residents in need of food. Additionally, SPL has significantly reduced landfill waste through repairs and recycling of goods and materials including reclamation of over 30,000 board feet of wood.

Delicately and successfully navigated and developed years-long productive relationships with numerous diverse stakeholders including the state legislature, victim advocates, Columbia Legal Services, Disability Rights Washington, NAACP, Teamsters Local 117 and the Washington Federation of State Employees.

Recipient of the 2020 Tom Clements Award for Innovation by the Correctional Leaders Association and recognized by Governor Christine Gregoire in 2009 For Excellence in Management.

In 2021, after retirement from 32 years with Washington State Department of Corrections, started the Justice & Liberty Group, LLC (JALG). As an expert I have produced several reports for clients and participated in depositions as well as provided trial testimony.  In January of 2022 JALG was retained by the Kansas Department for Aging and Disability Services to conduct and extensive security review and cultural assessment of the Larned State Hospital, following two recent elopements of patients.

My experience as an expert witness has been informative and educational because it has given me the opportunity to conduct forensic reviews of situations that have not gone well. This is a unique opportunity because late in my career in corrections I was rarely able to delve into and do my own analysis of the incidents that went wrong in the agency. Doing this work now has informed my opinions a great deal and helps me see the common, but sometimes unique failures that result in negative outcomes for correctional agencies and facilities.

**EXHIBIT A**
**PAGE 38**

The work as an expert has also enabled me to view countless policies and practices of jails and correctional agencies from across the nation. I understand the commonalities of the correctional work as well as the risks these organizations take when they are not responsive to an evolving world.

## Knowledge, Skills, and Abilities

*Culture Change*
Expert understanding of the value of creating a balance between security practices and incarcerated individual programs in order to create a safe and humane correctional environment for the incarcerated and the staff who work there. Significant experience through multiple levels of leadership in leading employees through change to enhance correctional culture, improve practices and deliver better outcomes.

*Systems Change*
Demonstrated ability to analyze complex situations to find systemic changes that enhance correctional environments, increasing defensibility of practice and reduced tort liability. Specialized expertise in creating agency policy to address emerging issues based on case law and being proactive to increase humanity in the correctional system.

*Stakeholder Engagement and Policy Development*
Extensive experience working with elected and non-elected members of the legislature and other stakeholder groups including victim advocates and families of incarcerated individuals to find policy solutions to complex social problems and build strategic efforts to move these initiatives forward to become law. Significant experience testifying at hearings and developing relationships with key elected officials with influence over the agency and its budget.

Guided many challenging and adversarial meetings to successful resolutions including collective bargaining agreements, agency policy and public policy. Key stakeholders included Columbia Legal Services, Disability Rights Washington, NAACP, Teamsters Local 117, and the Washington Federation of State Employees.

*Labor Relations*
Skilled negotiator when working with labor unions or special interest groups with a demonstrated ability to find solutions and achieve mutually beneficial outcomes. Led effort to create new Collective Bargaining Agreement (CBA) language to change an age-old practice impacting bid rights for staff assigned to restrictive housing. In subsequent CBA negotiations with the Teamsters local 117 successfully negotiated first time for Interest Arbitration in a state contract.

*Crisis Management*
Skilled crisis manager having successfully led various facilities and groups through numerous crisis situations in a complex authorizing environment. Implemented incident command structure to quickly established highly organized response to acute and on-going crises including 16 months of agency leadership during the COVID-19 pandemic.

*Leadership Development*
Extensive experience mentoring and developing leaders to be successful in their organizations. Significant role in redefining leadership teams to build trust amongst members and establish shared operating norms for teams.

**EXHIBIT A
PAGE 39**

## Accomplishments

**Secretary – WADOC Headquarters 2017-2021**

- Led agency transformation to strengthen alignment between strategic goal to reduce recidivism and agency operations by establishing separate division responsible for successful reentry.
- Developed successful new strategic approach to funding agency budget resulting in the largest budget increase in the agency's history.
- Successfully competed for and was selected by the Vera Institute restrictive housing reform initiative "*Safe Prisons, Safe Communities: From Isolation to Dignity and Wellness Behind Bars*"
- Led delegation to Norway to engage in knowledge sharing and immersive learning experience about their world-renowned approach to corrections.
- Established foundation for significant culture change through extensive work with AMEND and the Norwegian correctional system to adapt best practices to the Washington corrections system as part of a broader effort to shift the culture of the agency.
- Successfully led and navigated numerous political dynamics to pass legislation to improve correctional outcomes (see legislative successes)
- Transformed executive management team from dysfunctional to highly cohesive and trusting that eliminated silos and increased collaboration. Prior to this transformation the team was evaluated and determined to be exceptionally dysfunctional based on the "*The Five Dysfunctions of a Team*" assessment. The post evaluation using the same tool showed a significantly improved culture. Post assessment by the Coraggio Group showed these improvements - Trust +93%, Conflict +53%, Commitment +68%, Accountability+50%, Results +72%
- Coalesced agency staff from bottom up to change agency mission statement and values to reflect the importance of delivering humane and people-centered corrections work.
- Ensured integration of agency values in daily work by changing the employee evaluation process to prioritize adherence to and demonstration of agency values as primary expectations.
- Drove implementation of the agency's first-ever Dynamic Risk tool to assess incarcerated individuals' risk to re-offend.
- Successfully developed and implemented first WADOC Transgender, Intersex, and/or Gender Non-conforming Housing and Supervision policy.

**Prisons Director - WADOC Headquarters 2014-2017**
- Implemented agency policy that eliminated punishment for self-harm by individuals with mental illness. Reduced length of segregation time for offenders in crisis and improved conditions of confinement.
- Effectively managed the division budget by ending the fiscal year under budget.

**EXHIBIT A PAGE 40**

- Designed and implemented an outcomes-based management system for the Prisons Division that focuses on results through the use of performance metrics and quarterly performance reviews
- Created a headquarters outcome-based management system for statewide program managers to clarify roles and responsibilities as well as better align efforts to agency outcomes.
- Implemented incentives to decrease energy use and carbon production in prisons facilities.
- Partnered with colleagues to change internal audit process to monitor individual facility corrective action plans in the areas of Safety, Operations Inspections, Emergency Management, and Critical Incident Reviews.  Facility operations became more efficient and agency policy compliance increased and agency risk reduced.
- Partnered with Chief Financial Officer to create a facility fiscal management system to better manage the division's budget. The use of this system has created a common language and process. This has resulted in increased performance and better trained emerging leaders with the skills necessary to effectively manage with limited resources.
- Facilitated the launch of bee keeping programs at all 12 correctional facilities following successful partnership with the Sustainability in Prisons Project to co-host a statewide Bee Summit to promote and expansion of bee keeping within the correctional system.
- Served as agency lead for Teamsters Collective Bargaining Agreement for the 2017-2019 biennium.

**Deputy Director Prisons - WADOC HQ 2011-2012**
- As Deputy Director partnered with the Vera Institute to evaluate the use of max custody in WADOC. This resulted in changes in practice that significantly reduced the use of max custody beds and operating costs.
- Initiated partnership with Disability Rights Washington to better serve offenders with disabilities who are housed in specialized units and max custody. The effectiveness of this relationship has prevented potential litigation and improved our service to individuals with disabilities.
- Agency lead for Teamster 117 Collective bargaining
- Initiated significant changes to agency Restrictive Housing policy resulting in 40% reduction of time spent in Restrictive Housing pending administrative action.

**Superintendent – Washington State Penitentiary 2008-2014**
- Reduced violence through the application of several strategies including Prisons *Cease Fire Model (intervention of gang violence)*, Earned Incentive Program, Creation of Sustainable Practices Lab (Job Creation), and Max Custody Congregate Programming. Maintained 30% violence reduction at the Washington State Penitentiary. (*https://results.wa.gov/archived-decrease-rate-violent-infractions-prison* )
- Created the *Sustainable Practices Lab* to reduce idleness and give incarcerated individuals to contribute to our communities and local non-profits.  Currently employees over 120 people.
- Partnered with facility Business Advisors to create a fiscal management system that increased ownership and accountability for facility budgets. Reduced facility expenditures by $1,000,000 in first year in food service and plant maintenance.
- One of the first states in nation to create congregate programming in maximum custody so those with greatest need could be afforded opportunities for change. Significantly reduced rate of return to max custody. Engaged staff in shifting culture to reduce violence against staff and need for uses of force.

**EXHIBIT A
PAGE 41**

- Partnered with Washington State University to start a *Monarch butterfly* rearing program in a specialized living unit to improve the diminishing Monarch population.
- Instituted an Earned Incentive Program (incentive based level system) to expand incentives for well behaving individuals. This system allowed individuals who demonstrated good behavior to have expanded access to recreational activities, fund raising events and other incentives.
- Re-started facility gardening program to decrease food cost and provide more fresh vegetables for facility population. Reduced food costs and harvested over 175,000 pounds of fresh produce, which went to the facility kitchens and local non-profit organizations.

**Associate Superintendent - Callam Bay Corrections Center & Washington State Penitentiary 2004-2008**
- Led an effort to establish assigned seating in the dining hall that eliminated large scale fights and significantly reduced one on one altercations.
- Worked with office clerical staff to develop violence trends and data collection systems which was instrumental in violence reduction efforts.
- Created a work group of managers, supervisors and officers focused on reducing facility violence through data analysis.
- Created work group to review current practices in population management of the facility segregation unit.
- One of only two agency staff selected to participate in the Executive Excellence Program presented by the University of Washington.

**Captain – Clallam Bay Corrections Center**
- Worked with Roster Manager to create overtime trend analysis to better manage overtime spending. Significantly reduced overtime expenditures.
- Created local Emergency Response Committee to develop a group of subject matter experts to participate in local and statewide audits.
- Led a group of managers and supervisors through a successful audit that resulted in exceptional marks for the facility's security practices.
- Developed a partnership with regional law enforcement agencies for the sharing of resources in various mutual aid events.
- Selected to represent the department in contract negotiations for legislated civil service reform in 2005.
- Designed & implemented facility movement control system (system modeled by other facilities).
- Implemented roster management procedures that dramatically reduced employee grievances related to roster management.
- Received Governor's recognition for facilitating a process improvement team to streamline correctional officer hiring procedures. Greatly increased number of qualified correctional officer applicants which reduced overtime related to vacancies by 150%.
- Facility recognition for exceptional practices - developed, planned and led Correctional Lieutenants in process to prepare facility for departmental security management audits
- Implemented and coordinated Inmate Recovery Team (escape response team) at Clallam Bay Corrections Center and with sister facility.
- Coordinated participation of facility emergency response teams in regional border and narcotics enforcement effort involving local, state and federal law enforcement agencies.
- Planned and coordinated numerous facility wide searches.

**EXHIBIT A**
**PAGE 42**

- Developed facility violence trend analysis system to better determine where to deploy appropriate resources for targeted results. Reduced facility violence by over 50%.
- Acted as leader of the Security Management group for the development of the CBCC Strategic Plan.

## Additional Positions Held

**Shift Lieutenant**                                                       **1997 - 2000**
Washington State Penitentiary

**Correctional Sergeant**                                               **1995 - 1999**
Washington State Penitentiary

**Correctional Investigator**                                         **1992 - 1995**
Washington State Penitentiary

**Correctional Officer**                                                 **1988 - 1992**
Washington State Penitentiary

## Special Assignments

**Special Emergency Response Team**                         **1989 - 2000**
Washington State Penitentiary
Squad Leader

**Inmate Recovery Team**                                             **1995 - 2000**
Washington State Penitentiary
Team Leader
Department Coordinator

**United States Army**                                                   **1984 - 1988**
Honorably Discharged

## Groups/Organizations

**Washington Criminal Sentencing Taskforce (Legislative Body)**     **2020 - 2021**
Member

**Washington Criminal Justice Training Academy**     **2017 - 2021**
Commissioner

**Washington Sentencing Guidelines Commission**     **2017 -2021**
Member

**Sustainability in Prisons Project**                             **2016 - 2021**
Co-Director

**EXHIBIT A
PAGE 43**

**Correctional Leaders Association**                                      **2017 - Present**
Program and Training Committee, Chair
Restrictive Housing Committee, Member

**Correctional Peace Officer Foundation**                                 **2017 -2021**
Member

**American Correctional Association**                                     **2014 - 2021**
Member

**Walla Walla Valley Early Learning Coalition**                          **2008 - 2011**
Member

**Walla Walla Chamber of Commerce**                                      **2008 - 2014**
Member

**Walla Walla Executive Alliance**                                       **2008 - 2014**
Member

**Inmate Recovery Team Academy**                                         **2001 - 2008**
Lead Instructor; Agency Coordinator

**Boy Scouts of America**                                                **2003 - 2004**
Scout Master

**Statewide Emergency Response Committee**                               **2000 - 2005**
Lead Instructor; Agency Coordinator

**Departmental Emergency Response Auditor**                              **2000 - 2008**
Lead Instructor; Agency Coordinator

**Departmental Security Management Auditor**                             **2003 - 2008**
Lead Instructor; Agency Coordinator

## Education/Training

**Master of Public Administration (MPA)**                                **2007 Graduate**
University of Washington, Daniel J. Evans School of Public Affairs

**Cascade School of Executive Excellence**                               **2006**
Dan Evans School of Public Affairs, University of Washington

**Law Enforcement Officer, Reserve**                            **March 1997 – October 1997**
Washington State Criminal Justice and Training Commission
Reserve Law Enforcement Academy

**Washington State Patrol Investigator**                                    **September 1992**
Washington State Patrol Academy

**Correctional Officers Academy**                                           **December 1988**
Washington State Criminal Justice and Training Commission

**Emergency Medical Technician**                                            **1987 - 1988**
Pikes Peak Community College
Colorado Spring, CO

## Other Training/Certifications

- Mid-Management                                               November 2000
- First Level Supervision                                      March 1996
- Tracking Operations for Technical Teams                      April 1994
- Drug Investigator                                            April 1993
- Audio Intelligence Devices (Montana CJTC)                    May 1993
- Advanced SWAT                                                April 1991
- SWAT Basic                                                   October 1989
- Emergency Response Instructor                                April 1998
- Universal Tracking                                           September 1997
- Firearms Instructor Update                                   April 1997
- H&K MP5 Operator                                             January 1997
- Modified Tactical Team                                       November 1996
- Firearms Instructor                                          June 1996
- Electronic Restraint Devices                                 January 1996
- Polaroid Photography for Law Enforcement                     October 1995
- Tactical Tracking Instructor                                 September 1995
- Instructor Development                                       September 1995
- The Reid Tech. of Interview & Interrogation                  May 1995
- Washington State Patrol ACCESS/WACIC                         1992 - 1998
- Inmate Tele-monitoring Operations                            January 1993
- Explosive Entry Techniques                                   January 1991

## Case Work

1.  Deposition & Testimony - Darold R.J Stenson v. Eldon Vail, et al. No. 08-2-02080-8 (March 2009) (Prevailed in trial)

NOTE: All of the following work has been accomplished since May 2021.

2.  Report, Deposition & Testimony – December 14, 2021, Vincent Keith Bell v. Yvette Williams, Michele Fisher, City and County of San Francisco et al., Case No.: 3:18-cv-01245-SI, U.S. District Court, Northern District of California, San Francisco Division. (Prevailed at trial)

3. Report & Deposition - Jack Emmitt Williams v. Lawrence, et al., Case No. 3:19-cv-01369-CRB (PR), U.S. District Court, Northern District of California, San Francisco Division. (Settled)

4. Report & Deposition – Maurice L. Wallace, #R-10764 v. John Baldwin, et al., Case No. 17-cv-00576-DWD, U.S. District Court, Southern District of Illinois. (On-going)

5. Report – Odelvin Jacinto Martinez as Administrator of the Estate of Ferdy Isais Jacinto Martinez v. County of Rockland et.al., Case # 21-cv-1276, U.S. District Court Southern District of New York (Settled)

6. Report & Testimony - Dewayne Earl Bartholomew -Pierce County Superior Court No. 1 Case #. 81-1-00579-1 (Positive Result)

7. Report & Deposition – John Rapp (for Nicholas Winton Rapp) vs. NaphCare, Inc., et al., case # 3:21-cv-05800. Galanda Broadman, PLLC (On-going)

8. Reports (3) & Deposition (2) - Sidley Austin, LLP (All cases on-going) (Some cases information pending expert disclosure)
      - Report & Deposition - Wonder Williams vs Anthony J. Annucci, et al, Case No. 9:20-cv-0147-(BKS-TWD)
      - Report & Deposition – Troy Hendrix vs Anthony J. Annucci, et al, Case No. 9:20-cv-743 (GTS/TWD)
      - Report – Lee Woods vs Anthony J. Annucci, et al, Case No. 9:20-cv-570 (BKS/CFH)

9. Retained – Makyyla Holland vs Broome County; David E. Harder et al Case No 22-CV-00297-DNH-CFH, United States District Court for the Northern District of New York, Paul, Weiss, Rifkind, Wharton & Garrison LLP (On-going)

10. Testimony – State of Oregon vs James Samuel Defrank - Malheur County 9th Judicial District of Oregon Case #11094090C (Not Guilty)

11. Report – Kristi Goldstein vs City of Philadelphia case No. 2:21-CV-01433, United States District Court for the Eastern District of Pennsylvania, Pennsylvania Institutional Law Project (Settled)

12. Report – Gonzalez vs TDCJ Case no. DCCV21-2825-87, District Court of Anderson County, Texas & Gonzalez vs Lumpkin et al case No. 6:21-cv-351, United States District Court for the Eastern District of Texas. Edwards Law, Austin, Texas (On-going)

13. Retained – Oregon Public Defense Services Commission, Office of Public Defense Services resentencing Anthony Scott Garner Case No. 981296 Clatsap County, Oregon (On-going)

14. Retained – Michael T. Smith, (for Jeana Michelle Rogers) vs NaphCare, Inc., & Kitsap County case No. 3:22-cv-05069-DGE. Galanda Broadman, PLLC (On-going)

15. Report – Ethan Lofton, =by and through Veda Leary as Guardian of Ethan Lofton v. Franklin County Mississippi, Amite County, Mississippi Case No. 5:22-CV-0052-DCB-BWR, The Eichelberger Law Firm, PLLC, Mississippi (On-going)

**EXHIBIT A**
**PAGE 46**

16. Retained – David Derahn, Pierce County Public Defender's Office (On-going)

17. Retained – American Civil Liberties Union (ACLU) National Office (Case information withheld pending expert disclosure)

18. Retained – Bickerman Dispute Resolution, LLC Case information withheld pending expert disclosure)

**Consulting**
JALG Commissioned by the Kansas Department for Aging and Disability Services to conduct a Security Review and Cultural Assessment of the Larned State Hospital. January 2022 – April 2022

**Collective Bargaining & Personnel Matters**
Washington PERC # 128405-I-16 Arbitrator's R18
FMCS No. 161203-0576-6 DOC# 1082-3096 Arbitrator's R11

## Publications

Politico, Opinion| Why Pell Grants Can Help Fight the Pandemic, December 4, 2020

# ATTACHMENT B

*Rosas v. Luna*
*Stephen Sinclair Corrections Expert Review Materials*

### *Rosas* Case Documents
*Rosas* Settlement Agreement (Dkt. 110)
Final Implementation Plan (Dkt. 133-1)

### *Rosas* Monitor Panel Reports
Panel's 1st Report (Dkt. 141)
Panel's 2nd Report (Dkt. 148)
Panel's 3rd Report (Dkt. 181)
Panel's 4th Report (Dkt. 195)
Panel's 5th Report (Dkt. 198)
Panel's 6th Report (Dkt. 199)
Panel's 7th Report (Dkt. 201)
Panel's 8th Report (Dkt. 202)
Panel's 9th Report (Dkt. 203)
Panel's 10th Report (Dkt. 205)
Panel's 11th Report (Dkt. 238)

### LASD Policies
Custody Division Manual _ Volume 7 - Custody Operations Force Manual.pdf
LASD Guidelines for Discipline.pdf
WRAP RESTRAINT Monitors and Plaintiffs Proposed Changes 03.07.2023.docx

### Use of Force Packages / Videos
1. ███████
2. ███████
3. ███████
4. ███████
5. ███████
6. ██████
7. ████████
8. ███████
9. ██████████
10. ████████
11. ████████
12. ████████
13. ████████
14. ███████
15. ███████
16. ███████

**Miscellaneous Research / Articles / Other Jurisdictions' Policies**

https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?sectionNum=1205.&lawCode=PEN

https://post.ca.gov
11 CCR § 1202, Peace Officer Certificates;
https://govt.westlaw.com/calregs/Document/IEB831B7058E011EDB4D7A6ED066E269F?viewType=FullText&originationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc.Default)
11 CA ADC § 1205 Serious Misconduct;
https://govt.westlaw.com/calregs/Document/I415583F08DAF11ED85DFA03C23B73F24?viewType=FullText&originationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc.Default)

Washington State Policies
https://www.atg.wa.gov/news/news-releases/ag-ferguson-releases-model-use-force-policy-law-enforcement-agencies
Washington Department of Corrections, DOC 410.920, Use of Force Outside of Prisons at Part II.A.3.a., https://agportal-s3bucket.s3.amazonaws.com/useofforcepolicy/UseOfForcePolicy256.pdf

Corrections Department, City of New York, Directive 5006R-D, Use of Force at Part II.G, https://www.nyc.gov/assets/doc/downloads/directives/Directive_5006R-D_Final.pdf.

Steve J. Martin, *Staff Use of Force in United States Confinement Settings*, 22 Wash. U. J. L. & Policy, 145, 152-53 (2006), https://journals.library.wustl.edu/lawpolicy/article/810/galley/17645/view/.

U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, National Law Enforcement Technology Center, *Positional Asphyxia—Sudden Death*, (June 1995) at https://www.ojp.gov/pdffiles/posasph.pdf

## PROOF OF SERVICE

I am employed in the City of Los Angeles and County of Los Angeles, State of California.  I am over the age of 18, and not a party to the within action. My business address is 515 South Flower Street, Twenty-Fifth Floor, Los Angeles, California  90071-2228.

On May 31, 2023, I served the foregoing document(s) described as:

• **DECLARATION OF STEPHEN SINCLAIR**

on the interested parties as follows:

| | |
|---|---|
| Robert Dugdale, Esq. | Dylan Ford |
| *rdugdale@kbkfirm.com* | Senior Deputy County Counsel |
| KENDALL BRILL & KELLY LLP | *dford@counsel.lacounty.gov* |
| 10100 Santa Monica Blvd., Suite 1725 | OFFICE OF COUNTY COUNSEL |
| Los Angeles, CA 90067 | 500 West Temple St, Floor 6 |
| Telephone: (310) 272-7904/7919 | Los Angeles, California 90012 |
| ***Attorney for Defendant*** | Telephone: (213) 893-5939 |
| ***SHERIFF ROBERT LUNA*** | ***Attorney for Defendant*** |
| | ***Robert Luna, Sheriff of Los Angeles*** |
| | ***County*** |

☒    **VIA ELECTRONIC SERVICE :**

By personally emailing the aforementioned document(s) in PDF format to the respective email address(es) listed above on May 31, 2023, I did not receive an electronic message indicating any errors in transmission.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on May 31, 2023, at Los Angeles, California.

_____
Irma Gamino

PROOF OF SERVICE

LEGAL_US_W # 116594521.1