PETER J. ELIASBERG (SB# 189110)
peliasberg@aclusocal.org
MELISSA CAMACHO (SB# 264024)
mcamacho@acluscal.org
**ACLU FOUNDATION OF
SOUTHERN CALIFORNIA**
1313 W. 8th Street
Los Angeles, CA 90017
Phone:  (213) 977-9500
Fax:  (213) 977-5299

CORENE KENDRICK (SB# 226642)
ckendrick@aclu.org
MARISOL DOMINGUEZ-RUIZ
(SB# 345416)
mdominguez-ruiz@aclu.org
**ACLU NATIONAL PRISON
PROJECT**
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930
Fax: (202) 393-4931

NICOLAS MORGAN (SB# 166441)
nicolasmorgan@paulhastings.com
STEPHEN TURANCHIK
(SB# 248548)
sturanchik@paulhastings.com
**PAUL HASTINGS LLP**
515 South Flower Street, 25th Floor
Los Angeles, CA 90071-2228
Phone:  (213) 683-6000
Fax:  (213) 627-0705

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Robert Luna, Sheriff of Los Angeles County, in his official capacity,<br><br>Defendant. | Case No. CV 12-00428 DDP (MRW)<br><br>**DECLARATION OF MATTHEW THOMAS** |

Case No. CV 12-00428 DDP (MRW)

I, Matthew Thomas, declare as follows:

1.    I make this declaration of my own personal knowledge and if called to testify I could and would do so competently as follows.

**ASSIGNMENT AND QUALIFICATIONS**

2.    I have been asked by the ACLU to provide medical feedback on the use of force (UOF) specifically involving the WRAP. Below is my opinion based on the review of the videos provided to me and further delineated below. The matters set forth are my independent opinions, true and correct of my own personal and professional knowledge. My opinions are my own and not influenced by any allegiance to the ACLU or law enforcement agencies.

3.    I am an Emergency Medicine physician with over 20 years of experience and was formerly a paramedic in the City of San Diego. I am licensed in the State of California and board certified by the American Board of Emergency Medicine. I previously served as the medical director for the California State Parks Law Enforcement and Emergency Services division with an emphasis on training and policy with specific requests to review their use of force (UOF) and restraint policy as it related to AB 490 (a.k.a "The George Floyd law"). I am currently working in San Diego, CA as an Emergency Medicine physician at a busy metropolitan Emergency Department and Trauma Center. My curriculum vitae is attached as Exhibit A.

**COMPENSATION**

4.    I am being compensated at the rate of $425 per hour.

**MATERIALS PROVIDED**

5.    Plaintiffs' counsel provided me with the following materials: use of force reports and videos for the following seven cases and a document with summaries of the same:

- MCJ-00485
- TTCF-00620
- IRC-01256

Case No. CV 12-00428 DDP (MRW)
DECLARATION OF MATTHEW THOMAS

- IRC-01264
- IRC-01692
- TTCF-00226
- IRC-00132

**OPINIONS**

6.    In my medical review of the seven (7) cases involving the WRAP, most of the inmates appeared to be experiencing a level of agitation and excitability that resulted in dangerous conditions for both themselves and the Los Angeles Sheriff Department (LASD) personnel.

7.    The unfortunate outcome of these incidents, however, could likely be predicted. The videos and descriptions show most of these individuals to be in a significant level of physical and psychological distress before the deputy encounters begin. As jail personnel, deputies are metaphorical hammers and may be predisposed to see everything as a nail. I see deputies hammering screws that are clearly screws.

8.    The approach to these inmates should be considered carefully and trained on to allow for reassessment and modified approaches in these emergency settings. I would favor a more nuanced approach and realization that these individuals are in an acute, and likely chronic, state of crisis. Additional training in recognizing those individuals in acute psychological distress may assist for a more orderly and less violent approach and execution of desired outcomes.

9.    The WRAP may not be the injurious culprit, but the force needed to get the inmate into it is a decidedly dangerous aspect for both the inmate and LASD personnel. I think the department is simply lucky that they have not had an in-custody death if these videos represent their standard approach and restraint techniques.

10.    It is my recommendation that the LASD re-evaluate their use of the WRAP as to when and how they deploy it. An exit strategy once it is deployed and an attempt to limit the duration of use should also be planned. In the Emergency Department, we do see people in acute psychological distress as potential emergencies

3

for our staff and the individual. They are rapidly assessed and treated to limit the risk to all parties.

11.     Specific instances where an improved approach could have significantly limited risk to LACSD personnel and inmates follow:

12.     MCJ-04485. In this handheld video we see the inmate, prone on the floor, bleeding and restrained. Multiple deputies were surrounding him, holding him down, and he was stating that he could not breathe. There was immediate implementation of the WRAP and spit mask. He is rolled to "recovery" position and appears to cooperate around 17 seconds into the video.  Hobble strap was applied to a complaint inmate.

13.     It appeared that there was an almost 4-minute period where this inmate, already in the medical clinic, could have been deescalated, verbally or medically, and the subsequent UOF and WRAP application may have been avoided.

14.     Around 4:20[1], the inmate is snorting and appearing to try to clear his nasal passages which are filled with blood related to his later-identified orbital (bones around the eye) fracture. A minute later at 5:20, the deputies perceived a threat from this, and they placed the inmate in the prone position with significant force to the back of his head and neck. These actions represent a potential significant risk to the inmate's ability to breathe. A spit sock is placed with additional struggling and grunting from the inmate and continued muffled cries that he cannot breathe.

15.     The WRAP is initiated, and I again noted significant pressure placed on the inmate's torso starting at 9:28. Attempts to attach the WRAP chest strap to the leg straps forced the inmate into a crunched position that further limits his ability to breathe. This lasted for almost 2 minutes, which is enough time to represent a life threat for a person, already in extremis. No vital signs were taken in medical, but the inmate was transported to hospital by paramedics with an orbital fracture.

---

[1] Times refer to UOF video timestamps.

4

16.    TTCF-00620. In this handheld video there are clear warning signs from the beginning that this is not going to go well. The inmate is severely agitated. He is pacing in his cell, talking to himself, and appears to have a hyper-religious component to his behavior. He has a cross torn out from a piece of paper and is holding it against the window for the deputies to see and perhaps keep them away. It is clear that the inmate cannot be reasoned with and is in a state of psychological crisis.

17.    This is a planned takedown with the use of gas irritants to induce compliance. Involvement of medical /psychological personnel could have identified this individual as one who did not have the capacity to comply. This knowledge could have prompted a different and less risky approach for all involved. Significant UOF to induce compliance, place handcuffs and a hobble strap can be inferred though not seen due to the deputy presence limiting our view inside the cell.

18.    The initial takedown requires 6 minutes of struggle until he is removed from the cell. His airway and breathing during this phase appear to be intact. This still represented a significant risk and could have resulted in a much worse outcome in a different inmate or even this one in similar circumstances.

19.    Outside the cell, we finally get a glimpse at the force being used. We see around 19:40 that there is significant pressure applied to the inmate's back that has the potential to risk chest wall expansion. At 20:24 the inmate sounds out of breath, with spit sock on and a muffled voice stating that he can't breathe. Note that this is also after chemical agents were applied twice in the cell. Our view is again obscured by multiple deputies over the inmate's torso. Then, at 21:00 in the video, we see the inmate rotated into the seated position by the deputies and three minutes of really significant force used to initiate the connection of the chest component to the leg component of the WRAP system.

20.    At the end, we see the inmate's face bloodied. Deputies reported getting kicked and head butted, the inmate sustained a lip laceration and multiple bruises. An after-action report concluded all reasonable attempts were made to mitigate the

situation, but I see no documented involvement of mental health professionals. No vital signs are documented in his medical assessment.

21.    IRC-01256. In this instance, we have a limited view of the goings-on and no sound from the static surveillance video. We have no footage of the WRAP application. We can see that, as the inmate interacts with the mental health / social worker, he is visually agitated. From the report, it is revealed that his diagnoses include anxiety, Post Traumatic Stress Disorder (PTSD), and schizophrenia. His behavior was noted to be a "sign of distress and agitation" prior to seeing the mental health social worker. He is also seemingly paranoid based on his constant looking around and shaking of his head.

22.    He had three (3) deputies behind him so trouble had been anticipated. If possible, maintaining him in a more open space where he might not have felt physically intimidated may have prevented the following events. As the inmate was already identified to be in emotional crisis, offering or administering antipsychotic and/or anti-anxiety medications, with inmate consent, prior to this may have deescalated the situation as well.  It is noted in the report that multiple brief attempts at deescalation were successful and so giving the inmate options and a sense of control and a goal may have also worked. By the time it came to handcuffing, the inmate was likely agitated enough that he was not capable of complying and felt threatened in that space.

23.    As the deputies try to remove him from the tight space there appears to be a verbal altercation followed by a 4-deputy takedown. They then went off screen for a 3-minute struggle with a hobble strap placed. The handheld video was not made available to me for review[2], but documents tell of multiple complaints of the inability to breathe and pressure to the inmate's back. Although the in-house investigation

---

[2] Plaintiffs' counsel inform me that they did not receive a copy of the handheld video from LASD.

Case No. CV 12-00428 DDP (MRW)

DECLARATION OF MATTHEW THOMAS

concluded there was no excessive pressure to the back, it does note that there was pressure applied to the inmate's back. This report also presumes that there was nothing limiting the individual from breathing and that a spit mask was sufficiently porous to allow for unobstructed respiration. Individual deputies' statements note that the five deputies involved in the UOF were also perspiring and themselves out of breath. This was without anything to limit them from breathing and COVID-19 masks likely porous enough to allow for unobstructed respiration.  It is medically reasonable to expect that if the five deputies were having difficulty breathing then the one restrained inmate also had difficulty breathing. Vital signs were assessed in medical.

24.    Ultimately, LASD reviewers concluded that the situation was unique and no further recommendations were warranted. I would disagree; in the persistently agitated schizophrenic with repetitive outbursts, a limited capacity to understand and comply with orders, and the potential for concomitant excitatory drugs in his system, there were multiple deescalation techniques, pharmacologic options, and a needed flexibility in where his mental health evaluation took place that could have mitigated substantial risk to LASD personnel and the inmate.

25.    IRC-01264. This video shows the planned extrication of a mental health ("suicidal") non-compliant inmate. The inmate does not appear to be in significant emotional distress, but there is limited view in the provided video. The inmate undergoes two 3-second bursts of chemical weapon deployment. This induces choking and coughing. LASD personnel enter with concave shield and cuffing with hobble strap placed over 3 1/2 minutes of struggle. He is pulled out of the cell and restrained on a suicide prevention gown, clothes cut off, and placed in the WRAP.

26.    He is hyperverbal, asking to be told a story, calling out for help, thinking someone is branding him, stating that "they killed my daughter, someone call the police!" and the like. The deputies do appear to limit the pressure restraining the inmate to the extremities. At 18:40 in the video, however, the inmate is rotated into a seated position, and I noted, again, the compression of the head, neck and torso to

7

finalize WRAP placement. The inmate is panting and out of breath. This likely represented an acute respiratory distress worsened by existing psychological issues and the acute struggle as well as limitations of his ability to breathe freely and could represent a significant health risk.  He is placed in the WRAP transport cart and a spit mask applied. Medical documents that the inmate is hostile, confused and uncooperative – all signs of continued acute psychological distress. No vital signs were documented.

27.    IRC-01692. In this takedown, only surveillance camera footage without sound is available for review. The individual appeared to be agitated. In seven (7) seconds, it went from attempts to lead the inmate away to a proverbial dogpile. There were two officers on the inmate's back, though briefly, as the inmate was quickly cuffed and a hobble strap applied. At 4:50 in the video, the inmate was rotated into a seated position with significant force seen placed on the back of his head. This resulted in a forced crunch position of the torso and the inmate's neck with extensive flexion and compression of his airway.

28.    The incident rapidly escalated and was over quite quickly as well. Medical intervention would not likely have changed the outcome, but identification of the distressed innate earlier may have led to psychiatric intervention that could have prevented the event. Compression of the torso and neck could, again, represent a dangerous airway and respiratory compromise. It took an hour and 15 minutes to be medically evaluated. No vitals signs documented in medical.

29.    TTCF-00226. This video involved five to seven deputies attempting for 20 minutes to remove a WRAP device in a confined space.  There were many known factors that should have alerted deputies that this was going to go poorly. The inmate was deemed by mental health staff to be in an elevated mental state. He was known to be involved in multiple violent incidents against law enforcement personnel before and after his arrest, was in the WRAP coming from the Inmate Reception Center to High Observation Housing, and though calm at the time, had a known propensity for

8                    Case No. CV 12-00428 DDP (MRW)
DECLARATION OF MATTHEW THOMAS

violence.  He agreed to cooperate then stopped cooperating. Physical restraint and personal and chemical weapons to facilitate release were the only identified options.

30.    The inmate appeared to be in pain, yelling out and saying "ow" on several occasions from 3:00 to 3:50 then asked for the deputies to "hold up" and was told, "We're not going to hold up, sir."  He agreed again to cooperate around the 4:00 mark. He continued to struggle with statements of pain and asking for a break. Eventually, it led to the inmate attempting to bite the deputies while yelling for help and asking continually for the deputies to hold up. At 7:40 in the video, he states "I need one more person to get off of me so I can breathe." For 12 minutes, the struggle continued in a cycle of inmate pain ("hold on", and "I need you to cooperate" and "stop resisting"), followed by the inmate's "OK." Ultimately, he gets OC sprayed at the 16-minute point in the video.

31.    The post-incident reports indicate that during the struggle, he had "sweated profusely," had complained that he could not breathe with LASD deputies on his torso, had "labored" breathing. According to LASD staff, he had superhuman strength with "little to no response to OC spray" (though it would have been in his respiratory tract), an inability to comply with instructions, and was punched multiple times while restrained (though not without reason since he was biting a deputy).

32.    This is a concerning setup, creating a likelihood of LASD personnel injury and acute inmate decompensation. It could likely have been mitigated or avoided with additional preplanning and involvement of appropriate medical / psychiatric professionals and the implementation of consented antipsychotic / antianxiety medications.  The incident occurred at 9:30 AM, he was medically evaluated from the doorway with no vital signs or physical exam (probably reasonable) but not reevaluated until 4:50 AM the next day. He went nineteen hours without being medically reevaluated – a reasonable time to do a re-check is within eight (8) hours. No vital signs were ever documented.

DECLARATION OF MATTHEW THOMAS

33.    IRC-00132. Again, I see an individual in acute physical and psychiatric crisis. The inmate is first documented on handheld camera sitting in a clinic chair with just a blanket over him, handcuffed to waist chain, and with obvious psychomotor agitation (sewing machine leg, body rocking, intense stares followed by frantic appearing looks around the room). The plan was to escort the inmate to another area of the jail. The handheld camera is initiated prior to physical confrontation telling us the deputies had time to plan this interaction.

34.    Immediately, the inmate resisted the physical contact. The deputy on his left placed their hand on the inmate's shoulder then slid it around to put pressure on the inmate's low-neck region (Video1 at 0:59). Shortly thereafter, the inmate complained that he was being punched in his torso. A spit mask was placed on the inmate. He continued to struggle. Starting at 2:10, with six deputies restraining him, he was asking for help and complaining that he could not breathe and that he was "dying." The lead Sergeant attempted on multiple occasions to calm him and gain control of the situation but failed to realize that the inmate probably thought his life was in danger and was past reasoning. Full credit to the Sergeant, she really did try to talk him down on several occasions.  He stated, "I won't resist" but continued to claim that he could not breathe for another seven (7) minutes. The WRAP was partially applied, and the inmate was transferred to a WRAP cart for movement.

35.    At times, it appeared that the inmate could comply with requests for modified, compliant behavior, but it was likely that he could not maintain that given his fear and deputy physical contact. It is possible that further deescalation techniques could have been successful. One option in a distraught but still partially lucid patient would be to allow a semblance of choice though the outcome could have still been deputy driven. Alternative intervention by medical and/or mental health professionals could have been beneficial and again the possibility of voluntary medication could be considered.

36. The presentations of the inmates in the videos I viewed are concerning in that similar presentations (high levels of agitation combined with acute psychological distress) could result in an in-custody death potentially unrelated to positional asphyxiation and without regard to restraint techniques - but would be a death just the same. The pathway to cardiac arrest associated with these cases is complex and may not be 100% avoidable regardless of LASD action but risk may increase with even minimal respiratory compromise, making WRAP application with pressure to the torso and airways, even more dangerous. Again, my opinion is that the LASD is "lucky" that they have not had an in-custody death related to forced restraint, including the use of the WRAP. These presentations are an acute potential life-threatening event marked commonly by aggressive words and / or actions, and disorientation.

37.    At this time, there is no absolute contraindication for the use of the WRAP, restraint chairs, spit masks, Electronic Controlled Weapons (ECW), or oleoresin capsicum (OC) spray for the control of an inmate in acute psychological distress in the medical literature.  There have been no good appropriately or even possibly randomized trials in this field that would allow me to make recommendations as to the safest physical means to control an inmate in crisis. Any use of these techniques should be done so cautiously and with deputy and inmate safety in mind.

38.    Deputies should not rely on restraint or weapon company literature or most medical studies to reassure themselves of the safety of their actions. These various devices are tested on healthy volunteers, not on individuals with the complex metabolic derangements that can come with agitation whether psychotic, pharmacologic or a combination of the two.

39.    The goal of the restraining team should be to determine the best path to limit the potential for personnel and inmate harm. This includes an exit strategy, and could be simply a cooling off period, offering antipsychotic / antianxiety medications in the appropriate individual, a graduated approach while developing trust with the

11                    Case No. CV 12-00428 DDP (MRW)

DECLARATION OF MATTHEW THOMAS

individual, and other types of deescalation. The restraint time should be limited to under an hour.

40.    I recommend a more thorough medical evaluation than those documented here to include vital signs and to determine the potential for acute decompensation. At a minimum, a heart rate and a temperature should be documented. Those with evidence of an elevated metabolic state with an elevated temperature should be referred for emergent evaluation by a physician.

41.    The WRAP can potentially be a useful tool to limit an inmate's movement, aid in inmate transport, and potentially decrease both deputy and inmate risk, but it should be used with extreme caution.  The application process in the acutely agitated inmate is not without peril. In my opinion, these risks to LASD and the inmate can be broken down into two main categories: (1) the application process itself, and (2) the maintenance and removal phase.

42.    For WRAP application, there is no noted technique within the company's application training slides that puts pressure on the suspect's torso, neck or head, which would violate California State Assembly Bill 490[3].  However, when we see this in real world application, there is significant risk of respiratory compromise to the inmate. The addition of personal, electronic or chemical weapons during WRAP application potentially increases risk to the inmate.

43.    Although physical struggle from being placed in the device and intrinsic inmate factors are likely to play a more significant role in any adverse medical outcome, the WRAP does not prevent the irrational inmate from continuing to fight against the restraints. Continued struggle while in the WRAP could result in progressive loss of adrenaline, increased body temperature, and a metabolic acidic environment.  In this setting, there are other changes within the body that could result

---

[3] https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202120220AB490

DECLARATION OF MATTHEW THOMAS

in cardiac arrest with minimal restriction of respiratory status or even happen spontaneously. When in the WRAP, there is also limited exposure of the inmate for visual and physical inspection and significant changes may go unnoticed to the observer despite the best intentions. When removing the WRAP without sufficient deescalation, as in TTCF-00226, there is the risk of a continually agitated and violent inmate injuring LASD or themselves as restrictive measures are lessened.

44.    In short, best practices would be to 1) de-escalate such that restraints are not required, 2) if they are required, limit the amount of time utilizing physical restraints to effect the detention, 3) with any restraint, special care should be taken to never restrict an inmate's ability to breathe which would include compression of the torso or forced flexion of the neck or airway, 4) transition to a seated position to allow for unfettered movement of the chest wall and quick identification of a change in mental state by the deputy, 5) keep the individual as calm as possible, and 6) when time and conditions permits, involvement of medical personnel is highly recommended before aggressive restraint takes place. If restraints are required beyond handcuffs in the agitated and psychologically distressed inmate, immediate medical evaluation, once safe, should take place. Inmate consented use of short or long-acting antipsychotics or sedatives are a reasonable option in the emergency setting to deescalate.

45.    The Rosas agreement states, in part, that sedative agents cannot be considered for security purposes only.  Consented medication without coercion may be seen as a humanitarian component getting these individuals in crisis through another traumatic event. Medical / psychological intervention may be another effective means to limit the risk to all individuals involved. I realize that this option may be limited by current LASD policy and availability of medical personnel in all areas. I have not received LASD's current version of the WRAP policy and thus cannot comment on whether it takes these best practices into account at this time.

46.     Another issue I noticed from my review of the reports is that there does not seem to be adequate communication between deputies themselves, or the medical / mental health practitioners and the deputies, as to the rationale for patient movements and/or inmate history. If available, and when time permits, it may be useful to review the individual's past history to affect the desired outcome.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 30, 2023, in San Diego, CA.

_____

Matthew Thomas, MD

14

Case No. CV 12-00428 DDP (MRW)

DECLARATION OF MATTHEW THOMAS

# EXHIBIT A

*Curriculum Vitae*
## Matthew Morrill Thomas, MD

1034 Novara St
San Diego, California 92107
(619) 847-5422
Matthew.Thomas.MD@gmail.com

## POSTGRADUATE TRAINING / EDUCATION

**Naval Medical Center, San Diego, CA**
- Emergency Medicine Residency                    August 2003 – August 2006

**Naval Medical Center, San Diego, CA**
- Transition Year Internship                      June 2000 – June 2001
- Combat Casualty Care Course, November 2000

**Columbia University College of Physicians and Surgeons, New York, NY**
- Doctor of Medicine                              August 1996 – May 2000

**University of San Diego, CA**
- B.A. Biology, Chemistry Minor                   January 1991 – May 1995
- Magna Cum Laude

**Southwestern College, Chula Vista, CA**
- EMT-Paramedic Certification                     January 1992 – December 1992

**Certification / Courses**
- Medical Licensure: California A76430, 2001 – Present
- American Board of Emergency Medicine, 2007 – Present
- Emergency Department Bedside Ultrasound credentialed
- PALS, 1992 – 2009
- ACLS, 1992 – 2019
- ATLS, 2000 – 2010
- Combined Humanitarian Assistance Response Training, March 2002
- Advanced Airway Course, May 2006

## PROFESSIONAL EXPERIENCE

**Emergency Medicine Staff Physician, Sharp Memorial Hospital Emergency Department and Trauma Center, San Diego**
- September 2016 – Present

**Medical Director, California State Parks, Law Enforcement and Emergency Services Division**
- August 2021 – March 2022
- Responsible for medical training and oversight of 1500+ Law Enforcement, Lifeguards and  non-sworn personnel throughout California
- Provided medical review and recommendations for existing use of force policies, defensive tactics, ground control, and use of restraint devices for Law Enforcement Division in light of 2021 CA AB 490 and Section 7286.5 of the Government code relating to Law Enforcement Agencies.

**Emergency Medicine Staff Physician, Scripps Torrey Pines Urgent Care**

- March 2015 – Present

**Emergency Medicine Staff Physician, Scripps Memorial Hospital Encinitas**
- September 2009 – June 2015
- EMS liaison / teaching adjunct Carlsbad Fire Department, Oceanside Fire Department, San Diego City Fire Department/ AMR Paramedic Services as well as multiple EMT-I level transportation agencies
- Emergency Disaster Preparedness Committee

**Emergency Medicine Staff Physician, Scripps Mercy Downtown and Scripps Memorial Hospital Encinitas**
- September 2009 – June 2010

**United States Navy, Lieutenant Commander, Medical Corps**
- Active Duty:  June 2000 – October 2009
- In-Active Navy Reserve: April 1996 – May 2000

**Emergency Medicine Staff Physician, Naval Medical Center San Diego, CA**
- October 2008 – October 2009
- Academic Faculty for PGY 2-4 Emergency Medicine Residency with 24 residents, rotating interns, medical students and Nurse Practitioners
- EM Quality Assurance Director
- Morbidity and Mortality Conference Coordinator
- EM Representative for Operation and Invasive Procedure Committee – responsible for developing, reviewing, and instituting new Procedural Sedation and Analgesia Protocol

**Emergency Medicine Staff Physician, US Naval Hospital Okinawa, Japan**
- September 2006 – September  2008
- Emergency Medical Services Director – Quality Assurance, Protocol Development, Training
- Disaster Area Response Team Leader – Mass Casualty Response and Training
- Grand Rounds Coordinator – Urosoe Hospital – Ginowan, Japan

**Emergency Medicine Staff Physician, Expeditionary Medical Facility Kuwait (EMF-K)**
- July 2007 – February2008
- Director of Joint Service Medical Evacuation Committee – Organized patient transfer and overhaul of emergency communication network in Kuwaiti Theater of Operation
- QA Director for all patient transfers to EMF-K
- Developed protocols for Traumatic Brain Injury and Abdominal Pain cases to minimize air and ground transport risk

**General Medical Officer, Camp Pendleton, CA**
- August 2001 – August 2003
- Senior Battalion Surgeon and Marine Expeditionary Unit Surgeon
- Operation Iraqi Freedom, Baghdad, Iraq – Combat Medical Operations
- Associate Investigator of Combat Trauma Medicine

**EXHIBIT A**
**PAGE 17**

**Pre-Hospital / Emergency Medical Services, San Diego County, CA**
- **Southwestern College: Paramedic Instructor** September 2000 – 2003
- **Sharp Memorial Hospital – ED Tech / Ward Clerk -** December 1995 – August 1996
- **City of San Diego Paramedic Services – EMT- Paramedic** December 1992 – October 1993
- **Schaefer Ambulance Service - EMT-Basic** – February 1991 – November 1992
- **Instructor – PHTLS, ACLS, PALS, BLS** – 1993 – 2009 – Varying times

## PRESENTATIONS / PUBLICATIONS
- Clinical Pathologic Case presentation semi-finalist "Superior Mesenteric Artery Syndrome", Society of Academic Emergency Medicine Annual Conference, Orlando, FL, April 2004
- Is an Elevated Post-Void Residual a Risk Factor for Bacteriuria?, Society for Urodynamics and Female Urology - October 2007

## OTHER / SELECT AWARDS
- Proficient in Spanish
- Personal Military Awards: Navy Commendation Medal, Army Commendation Medal, Navy Achievement Medal, Combat Action Ribbon, Overseas Service Ribbon (2), Sea Service Deployment Medal (3), Humanitarian Service Medal, Presidential Unit Citation, Iraqi Freedom Medal, Marine Expeditionary Force Ribbon, Global War on Terrorism Medal
- Columbia University: Honors in Emergency Medicine, Sports Medicine, Neurology, Psychiatry, Physical Diagnosis, Primary Care, and Science Basic to the Practice of Medicine
- University of San Diego: Academic scholarship 1992-1995; Top Academic Senior 1995, Dean's List Honors 1991 – 1995, Kappa Gamma Pi (Catholic Honors Society)
- Southwestern College: President's List 1992

**PROOF OF SERVICE**

I am employed in the City of Los Angeles and County of Los Angeles, State of California. I am over the age of 18, and not a party to the within action. My business address is 515 South Flower Street, Twenty-Fifth Floor, Los Angeles, California 90071-2228.

On May 31, 2023, I served the foregoing document(s) described as:

•   **DECLARATION OF MATTHEW THOMAS**

on the interested parties as follows:

| | |
|---|---|
| Robert Dugdale, Esq. | Dylan Ford |
| *rdugdale@kbkfirm.com* | Senior Deputy County Counsel |
| KENDALL BRILL & KELLY LLP | *dford@counsel.lacounty.gov* |
| 10100 Santa Monica Blvd., Suite 1725 | OFFICE OF COUNTY COUNSEL |
| Los Angeles, CA 90067 | 500 West Temple St, Floor 6 |
| Telephone: (310) 272-7904/7919 | Los Angeles, California 90012 |
| ***Attorney for Defendant*** | Telephone: (213) 893-5939 |
| ***SHERIFF ROBERT LUNA*** | ***Attorney for Defendant*** |
| | ***Robert Luna, Sheriff of Los Angeles County*** |

☒      **VIA ELECTRONIC SERVICE :**

By personally emailing the aforementioned document(s) in PDF format to the respective email address(es) listed above on May 31, 2023, I did not receive an electronic message indicating any errors in transmission.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on May 31, 2023, at Los Angeles, California.

_____
                              Irma Gamino

LEGAL_US_W # 116594521.1