PETER J. ELIASBERG
(SB# 189110)
peliasberg@aclusocal.org
MELISSA CAMACHO-CHEUNG
(SB# 264024)
mcamacho@acluscal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Phone:  (213) 977-9500
Fax:  (213) 977-5299

NICOLAS MORGAN
(SB# 166441)
nicolasmorgan@paulhastings.com
STEPHEN TURANCHIK
(SB# 248548)
sturanchik@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071-2228
Phone:  (213) 683-6000
Fax:  (213) 627-0705

CORENE KENDRICK
(SB# 226642)
ckendrick@aclu.org
MARISOL DOMINGUEZ-RUIZ
(SB# 345416)
mdominguez-ruiz@aclu.org
ACLU NATIONAL PRISON
PROJECT
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930
Fax: (202) 393-4931

Attorneys for Plaintiffs
ALEX ROSAS and JONATHAN GOODWIN,
on behalf of themselves and of those similarly situated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ROBERT LUNA, Sheriff of Los Angeles County, in his official capacity,<br><br>Defendant. | CASE NO. CV 12-00428 DDP (MRW)<br><br>**REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN**<br><br>**UNDER SEAL**<br><br>Honorable Dean D. Pregerson<br><br>Hearing:  July 26, 2023 |

1

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

# TABLE OF CONTENTS

**Page**

I.    INTRODUCION.................................................................................5

II.    FACTS ...........................................................................................7

    A.    LASD's Pattern of Non-Compliance With Key Rosas Provisions ..............7

    B.    Head Strikes and Use of WRAP Create Significant Risk of Injury ............8

III.    ARGUMENT ..................................................................................11

    A.    The Requested Changes Satisfy the Legal Standard for Modification ......11

    B.    Defendants' Arguments Do Not Undermine the Need for and Appropriateness of the Modifications Plaintiffs Seek..............................12

    C.    Mandatory Discipline is Necessary to Ensure that the Appropriate Policy Changes are Actually Implemented and Sustained ....................................21

    D.    Defendants' Contention That a Municipal Labor Ordinance Precludes Modification to the Implementation Plan is a Red Herring. ......................23

IV.    CONCLUSION...............................................................................27

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Babu v. Ahern*,
No. 5:18-cv-07677 (Doc. 266-1 at 36) (N.D. Cal. Aug. 26, 2021) .................... 10

*Carrillo-Gonzalez v. I.N.S.*,
353 F.3d 1077 (9th. Cir. 2003) .................................................................. 13

*Coleman v. Brown*,
952 F. Supp. 2d 901 (E.D. Cal. 2013) ....................................................... 24

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987) ................................................................................. 14

*Hook v. Ariz. Dep't of Corrs.*,
107 F.3d 1397 (9th Cir. 1997) .................................................................. 24

*Johnson v. Lodge No. 93 of the Fraternal Order of the Police*,
393 F.3d 1096 (10th Cir. 2004) ............................................................... 27

*Kelly v. Wengler*,
822 F.3d 1085 (9th Cir 2016) .................................................................. 11

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
478 U.S. 501 (1986) ........................................................................... 26, 27

*N.C. Bd. of Educ. v. Swann*,
402 U.S. 43 (1971) ................................................................................. 24

*Oxnard Fed'n of Teachers & School Emps., Local 1273 v. Oxnard
Union High Sch. Dist.*,
Case No. LA-CE-6627-E ......................................................................... 25

*Palila v. Haw. Dep't of Land & Natural Resources*,
No. CIV 78-0030 JMS, 2013 WL 1442485 (D. Haw. Apr. 8, 2013) ................. 24

*Rufo v. Inmates of Suffolk County Jail*,
502 U.S. 367 (1992) ............................................................................... 11

*Sierra Club v. Union Oil Co. of Cal.*,
853 F.2d 667 (9th Cir. 1988) ................................................................... 15

3

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED
COMPLIANCE PLAN

*United States v. Ore. State Med. Soc.*,
  343 U.S. 326 (1952) .......................................................................................... 7

**Statutes**

18 U.S.C. § 3626(a)(1)(B) ...................................................................................24

**Other Authorities**

County of Los Angeles Board of Supervisors, Report of Citizens
  Commission on Jail Violence (Sept. 2012),
  https://ccjv.lacounty.gov/wp-content/uploads/2012/09/CCJV-
  Report.pdf .......................................................................................................14

Scott Morris, *Alameda County jail's mental health care would be
  overhauled under proposed lawsuit settlement* ......................................10

State of Cal. Decision of the Public Employment Relations Board,
  PERB Decision No. 2783-H (July 26, 2021) .......................................26

State of Cal. Decision of the Public Employment Relations Board,
  PERB Decision No. 2803 (Jan. 26, 2022).............................................26

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED
COMPLIANCE PLAN

## I. INTRODUCION

Plaintiffs request the Court modify the court-approved Implementation Plan (Dkt. 133-2, "the Plan") that is the cornerstone of the class action settlement agreement between the parties, to address issues upon which the parties reached impasse during court-ordered negotiations. Plaintiffs' proposed modifications are narrowly tailored to address Defendants' unbroken pattern of noncompliance with the Plan's provisions designed to protect Plaintiffs from dangerous and illegal head strikes and unnecessary force, and their perilous overuse of a relatively new restraint device (the "WRAP"), that was not in use when the monitors wrote the Plan. Specifically, Plaintiffs request the Court modify the Plan in four ways to address areas where the parties were unable to agree.

1) Require LASD's Limitations on Force policy to permit head strikes only when deadly force is permissible;

2) Require LASD's Limitations on Force Policy to include more robust force prevention policies for people in restraints;

3) Require modifications of LASD's WRAP policy to eliminate its overuse and curb the significant danger it poses to life and health;

4) Require mandatory discipline for line personnel who violate the head strike, force prevention, honest reporting, and WRAP policies, and for supervisors who sign off on clear violations of those policies with discipline in the ranges called for in LASD's Disciplinary Guidelines.

These changes are justified under governing legal standards, and the Court-appointed Monitors' repeated findings of noncompliance with the head strike and force prevention policies, the severe dangers posed by head strikes and overuse of the WRAP, and LASD's failure – also repeatedly identified by the Monitors -- to implement a culture of accountability for use of force violations and dishonesty. Indeed, the Monitors repeatedly have warned of LASD's failure to identify clear violations of head strikes, force prevention, and honest reporting policies, or to

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

impose discipline when violations are identified, and command staff's failure to address failures by lower level supervisors to impose accountability.

Defendants' filing opposing these essential changes is more notable for what it does not say than what it does. Defendants do not dispute – nor can they – that:

- the Monitors have found LASD noncompliant with the Plan's head strike provisions in every report filed with the Court;

- the Monitors have found LASD noncompliant with the two principal force prevention provisions in every report filed with the Court;

- the Monitors have warned repeatedly that a principal reason for LASD's failure to reach compliance with head strike and force prevention provisions is that line personnel rarely if ever are held accountable for violations of these provisions, or for dishonest reporting, and supervisors are not held accountable for rubber stamping violations and dishonest reporting;

- head strikes are extremely dangerous and create a substantial risk of serious injury or even death including, but not limited to, traumatic brain injury (TBI), broken facial bones, or eye injuries causing permanent vision impairment or blindness;

- blows to the head exacerbate mental illness and PTSD, or that a person with mental illness or PTSD who is punched in the head is more likely to suffer TBI than someone without mental illness or PTSD.

Nor do Defendants address their overuse of WRAP, or that they fell out of compliance with Provision 17.5 ("Minimize Medical Distress") because of their misuse of it.[1]

Defendants' principal argument against Plaintiffs' proposed modifications is that things are marginally better. This is meritless. Recent decline in uses of force and head strikes, and increased use of force prevention techniques, are welcome. But they do not change that in every Monitors' report, including the most recent one, Defendants are woefully out of compliance. "It is the duty of the courts to beware of

---

[1] Plaintiffs did not receive the revised WRAP policy until June 1, 2023, and the parties agreed not to discuss it until this brief. Dkt 257.

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Ore. State Med. Soc.*, 343 U.S. 326, 333 (1952).[2]

Therefore, the Court should modify the Plan as proposed by Plaintiffs and their experts.[3]

## II. FACTS

Plaintiffs set forth in their opening brief the Monitors' findings on LASD's head strike and force prevention policies, as well as their repeated warnings that this noncompliance would not be remedied unless LASD addressed its failure to impose accountability for these violations and dishonest reporting. *See* Dkt. 255 at 5, 9-13. Plaintiffs incorporate those arguments herein, and only briefly reiterate the Monitors' conclusions here.

### A. LASD's Pattern of Non-Compliance With Key Rosas Provisions

#### 1.     Head Strikes

LASD has not complied with the head strike provision, *Rosas* 2.6, in any report from the Fourth through the Eleventh -- *a period of 4.5 years*. Dkt. 195 at 7-8, Dkt. 198 at 10; Dkt. 199 at 11; Dkt. 201 at 12, 26; Dkt. 202 at 9, 25; Dkt. 203 at 9, 10, 25; Dkt. 205 at 1, 12, 13, 27; Dkt. 238 at 17, 47. The Panel established a compliance threshold of 90% for head strike use of force incidents. In its most recent report, it found "[o]f the applicable cases reviewed, 65.1% (56 out of 86) were . . . in compliance. Dkt. 238 at 17.

---

[2] And as noted *infra* Part III.D., Defendants' contention that the Court cannot change the Plan to require mandatory discipline for a specific set of violations misstates the case they rely on and ignores Supremacy Clause precedent holding a federal court may override a state or local law that interferes with a remedial scheme necessary to effect federal rights.

[3] Defendants note negotiations over whether Defendants have to keep reporting on certain measures. Dkt. 251 at  25. Plaintiffs have agreed that Defendants can cease reporting under the self-reporting requirements for five provisions. They did not agree that Defendants will no longer be subject to continued monitoring for those provisions.

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

### 2.   Force Prevention

The Monitors have found LASD out of compliance with the two *Rosas* provisions designed to minimize or prevent uses of force, *Rosas* 2.2 and 2.7, ever since the Fourth Report when the Monitors began reviewing a selection of force packages against their compliance thresholds. Dkt. 195 at 8-9, 17; Dkt. 198 at 10, 24; Dkt. 199 at 10-11, 22; Dkt. 201 at 11-12, 26; Dkt. 202 at 9, 11, 25; Dkt. 203 at 9-10, 25; Dkt. 205 at 12, 13, 27; Dkt. 238 at 16-17, 47. LASD was well out of compliance in the Panel's most recent report. The Monitors found that "[o]f the 91 use of force packages reviewed, 30 cases were found non-compliant [with 2.2] . . . which amounts to a 67.0% compliance." Dkt. 238 at 16. The compliance figure for Provision 2.7 was 81.3%. *Id.* at 17.

### 3.   WRAP

LASD did not use the WRAP when the *Rosas* provisions were written and agreed upon. In their last two reports, however, the Monitors found LASD noncompliant with Provision 2.5, which governs use of force against people who are restrained, "[b]ased largely on this WRAP issue." Dkt. 205 at 15; *see also* Dkt. 238 at 17. In the Eleventh Report, the Monitors found LASD was out of compliance with *Rosas* 17.5, the policy that personnel must limit medical distress, due to dangers of asphyxiation during WRAP application. Dkt 238 at 19; *see also* Dkt. 205 at 11 (noting "WRAP procedures risking compressional asphyxia"). The most recent compliance figure for 17.5 was a scant 55.7% (44 out of 79 cases). Dkt. 238 at 19.

## B. Head Strikes and Use of WRAP Create Significant Risk of Injury

### 1.   Head Strikes

Plaintiffs submitted expert declarations from an emergency physician who worked in Twin Towers for three years,[4] a neurologist who has written more than 200 peer-reviewed publications about traumatic brain injury,[5] and a facial

---

[4] Declaration of Shamsher Samra, M.D., Dkt 255-5.
[5] Declaration of Erin David Bigler, Ph.D., Dkt 255-2.

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

reconstruction surgeon[6] who described the numerous severe risks posed by punches to the head. Those risks include intracranial hemorrhages, concussions and other traumatic brain injury ("TBI"), broken orbital bones and jaws, a variety of eyes injuries that can cause permanent vision impairment or blindness, PTSD, and mental illness.[7] *See* Dkt. 255-2, ¶¶ 5, 9, 12, 13, 17, 18, 21, 23; Dkt. 255-3, ¶¶ 4, 6-9; Dkt. 255-5, ¶¶ 10, 11, 18 -24.

As previously detailed by Plaintiffs' experts, head strikes are particularly dangerous in jail for three reasons.

- ***First***, a substantial percentage of people in jails have serious mental illness and high levels of PTSD. People with mental illness and PTSD are more vulnerable to TBI than people who do not suffer with these conditions, and, blows to the head pose a substantial risk of exacerbating mental illness or PTSD.

- ***Second***, people in jails have high levels of chronic disease like diabetes and hypertension, and those conditions make people more vulnerable to suffering TBI as a result of being punched in the head.[8]

- ***Third***, the jails are full of hard surfaces including metal bars, concrete walls and floors and few soft surfaces. People punched in the head and who fall down risk a second TBI from hitting their head against a hard surface

*See* Dkt. 255-2 at ¶¶ 12, 24, 25, 27 -31; Dkt. 255-3 at ¶ 8; Dkt. 255-5 at ¶¶ 9, 24, 25, 27. Dr. Samra, an ER physician who worked at Twin Towers for three years, testified that:

> In all the videos I viewed from the force packages Plaintiffs' counsel provided me. . . , it is my medical opinion that the head strike or strikes had a reasonable probability of causing significant medical injury

---

[6] Declaration of Raymond Dunn, M.D., Dkt. 255-3.

[7] The Monitors have also noted this risk. "Medical science informs us that head blows are the 'hidden injuries' that create or exacerbate mental illness." (Eighth Report) Dkt. 202 at 10.

[8] Defendants did not submit evidence to support any claim that blows to the head pose no serious risk of significant physical or mental injury and acknowledged that "the Department fully recognizes that head strikes are potentially dangerous. . . ." Dkt. 251 at 20

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

including serious damage to an eye or eyes and subsequent vision impairment, a concussion, broken facial bone, or for a person with a mental illness or PTSD, exacerbation of that mental illness or PTSD. If serious injury did not occur, it was fortuitous.

Dkt. 255-5 at ¶ 27.

2.   WRAP

According to Matthew Thomas, an emergency medicine physician with more than 20 years of experience, including a term as medical director for the California State Parks Law Enforcement and Emergency Services division, LASD is "simply lucky" that no one has died yet due to the overuse of the WRAP in the jails. Dkt. 255-6 at ¶¶ 3, 9; Supplemental Declaration of Matthew Thomas, M.D., filed herein, ¶ 28. He reviewed seven WRAP application use of force packages, and did not find a single instance where the pressure on the back and neck used with the WRAP was "reasonable." Supp. Thomas Decl. at ¶ 21. Dr. Thomas found the videos "uncomfortable to watch" and noted that IRC-01692 "[stood] out for the amount of pressure placed on the inmate's head and neck," which were "aggressively flexed forward." *Id.* at ¶ 22.

People have died at the hands of law enforcement due to WRAP, a tragic and unnecessary human loss that also costs cities and counties millions of dollars in wrongful death settlements. Dkt. 255 at 20-21. Alameda County stopped using the WRAP entirely, as a provision of the consent decree in a detainee mental health treatment case.[9] Dr. Thomas found in reviewing LASD's use of force videos that there were "potential significant risk to the inmate's ability to breathe," likely "acute respiratory distress," and "a dangerous airway and respiratory compromise." Dkt. 255-6 at ¶¶ 14, 26, 28.

[9] *Babu v. Ahern*, No. 5:18-cv-07677 (Doc. 266-1 at 36) (N.D. Cal. Aug. 26, 2021), *at* https://oaklandside.org/wp-content/uploads/2021/08/Dkt-266-1-Janssen-Decl-ISO-PLAINTIFFS-Unopposed-Motion-for-Preliminary-Approval-of-Consent-Decree-08-26-2021-1378-1.pdf; *see* Scott Morris, *Alameda County jail's mental health care would be overhauled under proposed lawsuit settlement*, OAKLANDSIDE, Aug. 30, 2021, *at* https://oaklandside.org/2021/08/30/alameda-county-santa-rita-jail-mental-health-care-lawsuit-settlement-reform-consent-decree/.

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

The risk is amplified by LASD's overuse of the WRAP as a mode of transportation after use of force incidents, rather than treating it as an exceptional tool to be used sparingly in rare circumstances. *See* Supplemental Declaration of Stephen Sinclair ¶¶ 24, 27; *see also* Dkt. 255-1 at ¶ 44 (WRAP is a "tool reserved for those extreme cases where restrained inmates, who continued to thrash and act violently while in traditional restraints were further secured for transport").

## III. ARGUMENT

### A. The Requested Changes Satisfy the Legal Standard for Modification

As Plaintiffs explained in their opening brief,[10] the multi-year pattern of non-compliance with the head strike, force prevention provisions, or the Monitors' repeated concerns of failing to hold line personnel or supervisors accountable by ignoring violations and failing to impose discipline when they do identify violations, are changed circumstances justifying modification of the Plan. Dkt. 255 at 22 (citing *Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transit Auth.*, 564 F.3d 1115, 1120-21 (9th Cir. 2009); *Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir 2016). Defendants do not argue otherwise in their filing. And the introduction of the WRAP years *after* the Monitors wrote the Plan is also a changed circumstance that can justify modifying it, Dkt. 255 at 23, and again, Defendants do not suggest otherwise.

Neither Defendants' multi-year pattern of noncompliance or the 2017 introduction of the WRAP, which was not governed by any of the Monitors multiple provisions to address different types of restraints "anticipated" by the parties. Dkt. 255 at 23-24.

The changes Plaintiffs seek are carefully tailored to address the changed circumstances of noncompliance and the WRAP's recent introduction and misuse.

---

[10] As Plaintiffs explained in their opening brief (Dkt. 255 at n.17), because they are seeking to modify only the Implementation Plan, not the consent decree itself, they may not need to meet the standard set forth in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992). But in an abundance of caution they are briefing the *Rufo* standard, which they clearly satisfy.

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

Plaintiffs' expert Stephen Sinclair reviewed all of the Monitors' reports detailing years of noncompliance and numerous use of force videos depicting head strikes that he found "unprofessional, unnecessary, and excessive," including many against people who were restrained, and the revised head strike policy that Defendants have provided as part of the parties' negotiations. Dkt. 255-1 ¶¶ 29-74. He concluded that the policy LASD was proposing was inadequate and they needed to "elevate use of heads strikes to deadly force." *Id.* ¶74; *see also* Sinclair Supp. Decl. ¶ 3. But, according to Mr. Sinclair, policy change alone is not enough. Until LASD provides accountability for its multi-year failure to comply with the head strike, force prevention and accountability provisions in Rosas through imposition of mandatory discipline, it will not come into compliance. Dkt. 255-1 ¶ 60 ("Given LASD's long history of noncompliance and the materials I have reviewed, those penalties should be mandatory for the issues I have discussed above, i.e., overuse of head strikes.").

The WRAP did not exist when the parties agreed to the Plan. Provisions for Safety Chairs and Multi-point Restraints are built into the plan at Rosas 17.3 and 17.6-17.9, but those provisions do not apply to the WRAP. The Monitors explained that a WRAP policy was finally developed before the Tenth Report but immediately expressed frustration that the policy was "regularly violated." Dkt. 205 at 17. Plaintiffs' proposed changes to the WRAP policy are designed to address LASD's overuse of this dangerous and potentially deadly device and to require more robust protections from positional asphyxia.

**B. Defendants' Arguments Do Not Undermine the Need for and Appropriateness of the Modifications Plaintiffs Seek**

    i.    <u>Policy Modifications for Head Strikes and Force Prevention</u>

Defendants largely ignore their long pattern of noncompliance, asserting there is now a recent change in culture in the jails, and a decline in the numbers of force incidents, including head strikes, that demonstrate the revised head strike policy they proposed is sufficient. This is not the case.

12

First, Defendants assert the culture in the jails has somehow and recently dramatically improved. Dkt. 251 at 4; Dkt. 251-3 (Dugdale Dec.) ¶¶ 3-4. They base this assertion on Mr. Dugdale's recounting of what the Monitors reportedly said in an April 2023 meeting about what incarcerated people told the Monitors in March 2023. Dkt. 251-3 ¶¶ 3-4. This third-hand recounting is at least hearsay, or double or triple hearsay under Federal Rule of Evidence 801(c). It is not admissible evidence of anything, much less a basis for the Court to decide if there is a fundamental culture shift at the jails.[11]

But even if the Court were to consider counsel for Defendants' inadmissible hearsay as evidence about culture change, it would still not be a basis to conclude there is a major culture change. And it certainly would not establish that limiting head strikes to deadly force situations is an inappropriate response to the Monitors' findings of non-compliance. Nor would it call into question Mr. Sinclair's conclusion that "the use of head strikes by LASD deputies against inmates in their care and control is primarily unnecessary and is excessive" and his recommendation that "LASD. . . elevate the use of head strikes to deadly force." Dkt. 255-1 ¶¶ 38, 74. His conclusion that LASD's new head strike policy is insufficient to address longstanding patterns of violations is buttressed by his review of an egregious incident in which deputies rained multiple punches to the head of an incarcerated person who was in handcuffs and supervisors *approved the head strikes* as consistent Defendants' new head strike policy. *Id*. ¶¶ 33-35.

There is also ample evidence to undermine LASD's sunny conclusion about a culture change with respect to use of force. Among other things, in the Panel's last report they stated that custody staff expressed the following in focus groups:

[11] Plaintiffs' counsel have great respect for Mr. Dugdale. But his saying now what the Monitors said in April that an incarcerated person in the jails said months early is clearly inadmissible hearsay of multiple degrees, and nothing more than an argument of counsel. "[T]he argument of [] counsel […] does not constitute evidence." *Carrillo-Gonzalez v. I.N.S.*, 353 F.3d 1077, 1079 (9th. Cir. 2003).

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

- Employing time and distance principles is seen as "giving up ground" with inmates, and

- Staff would like to be able to go "hands on" more often with recalcitrant inmates.

Dkt. 238 at 3.[12]

Finally, a review of a set of grievances from incarcerated people that LASD provided to Plaintiffs' counsel on May 30, 2023, as their *Rosas* 6.11 self-assessment, casts serious doubt on any culture change touted in their filing. Dkt. 251 at 9; Camacho Dec. ¶¶ 4-5. A review of those 609 grievances reveals that 20% of them complain of retaliation and threats of retaliation by LASD personnel. Declaration of Marisol Dominguez-Ruiz ¶¶ 4-6. They undermine Defendants' assertion of culture change. They also suggest that people incarcerated in jails may very well not feel comfortable being forthcoming about their fears of violence from LASD deputies.

Defendants' evidence of declining numbers of use of force incidents and incidents involving head strikes is welcome. Dkt 251 9-10. But these declines do not undermine the need for the changes to the head strike, force prevention, and discipline provisions in the Implementation Plan that Plaintiffs seek.

***First***, in the face of a an almost five-year pattern[13] of non-compliance with the head strike and force prevention provisions of *Rosas*, a recent decline in use of force numbers is inadequate under the law. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 69 (1987) (Scalia, J., concurring in part and in the judgment) ("A good or lucky day is not a state of compliance. Nor is the dubious state in which a past . . . problem is not recurring at the moment but the

---

[12] These statements reflect among at least some LASD there remains a "culture" depressingly similar to the "mindset . . and 'force first' approach" the Citizens Commission on Jail Violence identified as part of "a troubling culture in Custody that resulted in the excessive use of force in the jails." Report of Citizens Commission on Jail Violence at pages 95, 97 (Sept. 2012), available at https://ccjv.lacounty.gov/wp-content/uploads/2012/09/CCJV-Report.pdf.

[13] The class action settlement agreement was approved more than eight years ago. But the Monitors did not begin to assess whether LASD's uses of force were compliant with the compliance thresholds the Monitors established until April 2019.

14

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

cause of that problem has not been completely and clearly eradicated."); *see also Sierra Club v. Union Oil Co. of Cal.*, 853 F.2d 667, 671 (9th Cir. 1988) ("Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition.") (citation and quotation marks omitted).

The limited significance of this improvement is particularly true given the significant level of noncompliance in the Panel's most recent Eleventh Report. Indeed, the Panel acknowledged the declining use of force numbers and *still found* LASD non-compliant with Provisions 2.2, 2.6, and 2.7. Dkt. 238 at 3, 47. Moreover, the Panel also stated that if this improvement were to continue, LASD supervisors needed to "model appropriate behavior with inmates *and to hold staff accountable for inappropriate behavior.*" *Id.* at 3.

***Second***, as Plaintiffs' expert Stephen Sinclair states in his Supplemental Declaration, there were two notable aspects of the numbers Defendants cited to. The rate of head strikes for the first four months of 2023 (16, which extrapolates to 48 in 12 months) was on track to be similar to the 51 in 2022. Sinclair Supp. Dec. ¶ 4. In other words, any decline from 2021 to 2022 appears to be leveling out. More important, the number remains much too high. *Id.* ¶¶ 4, 8. Reviewing these numbers, the Panels' reports, and 9 different head strikes incidents, including one in which LASD approved multiple head strikes against someone in handcuffs under its "new" policy, Mr. Sinclair opined in both his declarations that LASD needs to both limit head strikes in its Limitations on Force policy to situations when deadly force is permissible and impose mandatory discipline for violations of that more restrictive policy. *Id.* ¶¶ 9-12, 32-33; Dkt. 255-1 ¶¶ 31, 40, 74.

ii.    Policy Modifications to Effectuate Force Prevention

Defendants produced a new Limitations on Force policy on June 1, 2023. Camacho Dec. ¶ 8, Ex. E. The policy, however, fails to address one of the more egregious failures in force prevention: punching assaultive people in restraints instead of creating distance or using the minimal amount of force necessary to

15

overcome resistance. Provision 2.2 requires the Department to use only "the minimal amount of force necessary and objectively reasonable to overcome the resistance." Yet LASD personnel will punch restrained people when distance or lesser types of force would suffice. Mr. Sinclair described two particularly egregious incidents where deputies punched people in the head while handcuffed. Dkt. 255-1 ¶ 32; *see also* Dkt. 253-6 ¶ 34 (handcuffed person punched in the torso during attempted WRAP application).

The new Limitations on Force policy requires LASD personnel to first use force prevention principles when dealing with a restrained person, but only if that person is restrained to a fixed object:

> If an assaultive aggressive inmate restrained to a fixed object presents an immediate threat of injury to personnel engaged with the inmate, force de-escalation principles require personnel to distance themselves from assaultive conduct and request the presence of a sergeant rather than utilize the force options listed above [personal weapons, tasers, chemical spray], unless immediate intervention is required.

Camacho Dec. ¶ 10, Ex. E at 2.

Defendants' non-compliance with Provision 2.2 necessitates applying time and distance or less dangerous force (e.g., control holds) instead of punching, tasering, or using chemical spray on any person in restraints. Mr. Sinclair agrees with expanding protections on people restrained to fixed objects to *all people in restraints*. "[G]iven LASD's longstanding non-compliance with the *Rosas* force prevention provisions, and the numerous uses of force I saw where unnecessary or excessive force was used against inmates who were restrained, including in the WRAP or in handcuffs, but not restrained to a fixed object, I recommend that language that currently applies only to inmates restrained to a fixed object should also be applied to all restrained inmates." Sinclair Supp. Dec. ¶ 17. Removing the words "to a fixed object" and applying force prevention principles to all people in restraints is a necessary step for LASD to achieve compliance with Provision 2.2.

16

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

iii.   Policy Modifications for WRAP Use

Defendants and Plaintiffs agreed to some provisions related to the WRAP. *See* Dkt. 251-1, Ex. A at 30-31. As part of the negotiation process, the Monitors and Plaintiffs' counsel sent proposed changes to the policy. *See* Thomas Supp. Dec. ¶ 7, Attach. 2. Defendants sent the new WRAP policy, CDM 7-0.03/050.00 v. 33, to Plaintiffs' counsel on June 1, 2023, which integrated joint commitments but rejected many of the Monitors' and plaintiffs' proposed revisions. Camacho Decl. ¶ 6.

The new policy will not sufficiently limit WRAP use, nor provide necessary safety measures to limit the risk of death and injury. It must contain additional provisions that: (1) limit WRAP use to all but the most exceptional circumstances by requiring a cooling-off period before the on-duty watch commander decides whether the WRAP is necessary; (2) clarify that WRAP use is a reportable use of force; (3) provide appropriate safeguards against asphyxiation; and (4) limit the length of time a person spends in the WRAP. These changes are necessary to protect class members and bring Defendants into compliance with *Rosas* 2.5 and 17.5.

a.   A decision to employ the WRAP must be made after a cooling off period

Mr. Sinclair is familiar with the WRAP, which was used in the Washington State Department of Corrections. Dkt. 255-1 ¶¶ 3, 44. In his experience, it is a "tool reserved for those extreme cases where restrained inmates, who continued to thrash and react violently while in traditional restraints, were further secured for transport." *Id.* at ¶ 44. He was "surprise[d] . . . how routinely the WRAP was used, even when traditional approaches absent the WRAP would have been faster, and reduced inmate contact." *Id.* at ¶ 45. "In almost all of the videos [I] reviewed . . . the appearance was the staff were on auto-pilot and went directly to applying the WRAP restraint without conducting any type of assessment after the inmate was restrained." Sinclair Supp. Dec. ¶ 26.

The new WRAP policy will not limit its application after uses of force

17

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

because, as written, the on-duty watch commander can decide to apply it, before giving a person the chance to stop resisting. The new policy states that WRAP may only be "used on inmates who pose an immediate threat to themselves and others." Camacho Dec. ¶ 7, Ex. B at 2. The policy also states that "[t]he WRAP restraint shall only be used when other less restrictive methods have failed, or it is apparent less restrictive alternatives will be ineffective at controlling the inmate." *Id.* at ¶ 7, Ex. B at 1. But nothing prevents a supervising officer from making this decision in the midst of the use of force rather than waiting to see if traditional restraints can be used for transportation after the use of force incident ends. Instead, the policy explicitly states that "an inmate shall be placed in a recovery position while waiting for the WRAP restraint to come to the scene" but only "if circumstances permit." *Id.* at ¶ 7, Ex. B at 2. Mr. Sinclair notes that this provision "implies WRAP will always be used after a use of force incident." Sinclair Supp. Dec. ¶ 26. He recommends (1) a cooling-off period before the on-scene supervisor can decide whether WRAP is necessary and (2) a requirement that the person "remains violent or is physically resisting while in traditional restraints." *Id.* ¶¶ 24, 26. He also recommends stating explicitly in policy that the "WRAP is an exceptional device, used only in exceptional circumstances." *Id.* ¶ 27.

b.     Using the WRAP must constitute a reportable use of force

A requirement that the person "remains violent or is physically resisting while in traditional restraints" would necessitate another policy change, which the Monitors have recommended. If the WRAP can only be applied to someone who "remains violent or is physically resisting," then use of the WRAP must constitute a reportable use of force. The Monitors recommended changing the WRAP policy to read: "The placement of an inmate in the WRAP restraint device constitutes a reportable use of force and must be reported pursuant to CDM section 7-06/000.0, "Use of Force Reporting Procedures." Camacho Dec. ¶ 8, Ex. C at 6.

As Dr. Thomas noted, "Who is being placed in a WRAP restraint when they

18

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

are not resisting? If there is no resistance, due to the risks of respiratory distress and even death inherent in WRAP application, the WRAP must not be used for convenience sake, but rather other methods of restraint such as handcuffs and hobble strap must be used." Thomas Supp. Dec. ¶ 27.

c.   The new WRAP policy must limit the risk of asphyxiation

Dr. Thomas opined that in the new WRAP policy: "I do not see sufficient protections in the current WRAP policy and remain concerned someone could die in connection with use of the WRAP." Thomas Supp. Dec. ¶ 28. The policy states that "personnel shall not use unreasonable pressure on the inmate's back and shoulders to fasten the cinching straps." Camacho Dec. ¶ 7, Ex. B at 2. Dr. Thomas explains that this policy "does not sufficiently address risks of asphyxiation from pressure on an inmate's back and shoulders." Thomas Supp. Dec. ¶ 19. He notes that none of the WRAP applications that he viewed showed deputies using a "reasonable" amount of pressure. *Id.* ¶ 21. Instead, he recommends "[a]t all times during WRAP application, personnel shall not use force on an inmate's back and shoulders that would cause respiratory discomfort or risk respiratory function. No pressure should be placed on the inmate's neck or head to fasten the cinching straps." *Id.* ¶ 19.

Both the Monitors and Dr. Thomas recommend adding a provision designed to limit the use of spit masks with the WRAP to limit dangers from asphyxia and respiratory distress. The monitors recommend:

> Finally, spit masks should not ordinarily be used in conjunction with the WRAP restraint. Spit masks can only be authorized by the on-duty watch commander and staff must specifically articulate the inmate's actions that warrant use of the spit mask. If a spit mask is utilized, medical staff must conduct a medical assessment within fifteen minutes from the time of placement of the spit mask and every fifteen minutes thereafter.

Camacho Dec. ¶ 8, Ex. C at 3. Dr. Thomas additionally recommends that spit masks should only be used if a person is actively spitting and recommends that medical

19

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

checks include "assessment of the inmate's oxygenation status with portable pulse oximetry." Thomas Supp. Dec. ¶¶ 16-17.

Dr. Thomas also recommends: (1) direct visual observation from the moment WRAP placement begins until it is removed (*Id.* ¶ 18); (2) medical staff can demand removal of the WRAP if a medical emergency exists (*Id.* ¶¶ 23-24); and that all medical exams of a person in the WRAP include "documentation of temperature, pulse, and pulse oximetry." *Id.* at ¶ 26. Dr. Thomas and the Monitors recommend the on-duty watch commander consult with medical and mental health staff before using the WRAP. *Id.* at ¶ 11; Camacho Dec. ¶ 8, Ex. C at 3.

d.    People must be removed from WRAP if resistance ceases

The new WRAP policy contains certain deadlines for its use and a directive that "every effort will be made to minimize the amount of time that the inmate is restrained." Camacho Dec. ¶ 7, Ex. B at 2. Yet, a separate provision implies that a person could be taken to the bathroom or allowed to "exercise extremities" but then put back into the WRAP. *Id.* ¶ 7, Ex. B at 3. If a person can be taken out of the WRAP temporarily with no danger, then they should not be put back in it. The Monitors recommend adding to this provision that if a person is released from a portion of the WRAP restraint "without continuing disruptive aggressive behavior" then the person should not be put back into the WRAP. *Id.* ¶ 8, Ex. C at 5.

Plaintiffs synthesized recommended changes to the WRAP policy suggested by the Monitors, Mr. Sinclair, and Dr. Thomas. Camacho Dec. ¶ 9, Ex. D. They ask the Court to direct the Monitors to write a provision to modify the Plan to require LASD to include the following in a modified WRAP policy:

- The decision to employ WRAP must be made after a cooling-off period;
- WRAP is only permissible if the person continues resisting or being violent while in traditional restraints;
- The use of WRAP constitutes a reportable use of force;
- Restrictions on use of spit mask during WRAP, including a requirement

20

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

that the person be actively spitting;

- A Prohibition on placing pressure on the back, neck, and head;

- Medical checks that include temperature, pulse, and pulse oximetry;

- A temporary release without resistance must lead to complete WRAP removal.[14]

**C.      Mandatory Discipline is Necessary to Ensure that the Appropriate Policy Changes are Actually Implemented and Sustained**

Defendants' arguments are meritless in contending that the Plan should not provide for mandatory punishment consistent with current ranges set forth in LASD's *Guidelines for Discipline and Education-Based Alternatives* (the Guidelines) for a violation of a narrow range of offenses – head strike violations, force prevention violations, WRAP violations, dishonest reporting and failure of supervisors to identify or discipline line personnel for these four violations are unpersuasive. (The Guidelines are Exhibit E to the Declaration of Peter Eliasberg, Dkt. 253-4). Defendants suggest that *requiring* discipline for these offenses would be a radical and unwarranted shift. But they do not acknowledge that current Guidelines already provide "[d]iscipline is *expected* to remain within the standard range in *most instances*" and that "[s]ections which indicate a penalty of 'Discharge' (only) *may not be adjusted*." Dkt. 253-4, Ex. E.

Their protestations that requiring discipline in the ranges called for in their Guidelines would be "unfair" ring hollow, when the need for this modification is of their own making. The Monitors repeatedly warned that LASD fails to impose discipline for clear violations of the head strike, force prevention, and honest reporting policies. The Eighth Report stated:

> The Panel has expressed concern for several reporting periods that *the Department relies too heavily on remedial training rather than discipline in situations where the Department agrees that use of force policies have been violated.* The Panel has also seen numerous cases

---

[14] These proposed changes are incorporated in the [Proposed] Revised Order filed concurrently.

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

involving violations of policy, such as head punches for inmate control, that result in outcomes that do not reflect the seriousness of the offense.

Dkt. 202 at 5 (emphasis added); Dkt. 203 at 3 (9th Report) (noting a failure "to mete out discipline in cases where force policies are violated, or Department personnel inaccurately describe force incidents in their written reports.").[15]

The Monitors' Tenth Report described reviewers' failure to hold line staff accountable, *and* managers' failure to hold supervisors accountable for not identifying violations nor imposing discipline:

> Use of force reviews by supervisors and managers in the serious cases selected by the Monitors, almost always fail to note out-of-policy head shots or – less frequently – attempts to justify them. Then the supervisors and managers are not held accountable for those failures and the Deputies using the improper for[m] are "counseled" or sent to remedial training and actual discipline is seldom imposed. While the Department has openly acknowledged this continuing issue . . . , there has been little real change or progress in more than two years.

Dkt. 205 at 1-2; *see also id.* at 12-13; Dkt. 238 (Eleventh Report) at 5 ("The Panel has yet to review a case where the supervisor concludes the use of head strikes was inappropriate. *In order for the Department to achieve compliance with Provision 2.6 (head strikes), staff must be held accountable [for] head strikes.*") (emphasis added).

Yet even though discipline is "expected to remain within the standard range in most instances" Mr. Sinclair found that LASD's practices were very different when supervisors identified excessive force or dishonest reporting:

> Verbal counseling and retraining are considered non-disciplinary, yet almost exclusively, in the use of force documents provided with the incidents I reviewed, they were used to address incidents of obvious excessive force and dishonesty. In the LASD *Guidelines for Discipline and Education-Based Alternatives*, dishonesty is specifically cited as an example of a situation that would warrant non-progressive discipline. In my opinion, LASD has the ability and authority to

---

[15] Nor does LASD's argument recognize the unfairness of having incarcerated people, many of whom were in restraints, suffer multiple punches to the head from deputies who receive nothing more than a referral for additional training.

22

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

discipline for these actions but routinely fails to do so. The penalty ranges provided in the Guidelines are adequate; the problem is that LASD routinely fails to impose the discipline within the range. Given LASD's long history of noncompliance and the materials I have reviewed, those penalties should be mandatory for the issues I have discussed above, i.e., overuse of head strikes.

Dkt. 255-1 ¶ 60.

Requiring discipline for line personnel and supervisors for a narrow range of serious offenses, such as dishonest reporting is not "unfair." It is a necessary remedy to LASD's multi-year failure to impose of regime of accountability for excessive force and dishonest reporting. Moreover, for almost all these offenses, the Guidelines provide for a range of punishment. So the change does not rob the Department of the ability to adjust the level of punishment to account for factors such as prior disciplinary history. *Contra* Dkt. 251 at 16. It simply prohibits LASD from continuing to "rel[y] too heavily on remedial training rather than discipline in situations where the Department agrees that use of force policies have been violated." Dkt. 202 at 5.

### D. Defendants' Contention That a Municipal Labor Ordinance Precludes Modification to the Implementation Plan is a Red Herring.

Defendants contend they cannot agree to Plaintiffs' proposed compliance plan modification because they are hamstrung by a municipal labor ordinance, which they incorrectly assert precludes LASD from changing the disciplinary structure without first bargaining with the deputies' union over that change. Defendants singularly rely on a September 2021 Los Angeles Superior Court decision, (the "ERCOM Decision"), which is inapplicable. This argument fails on multiple grounds.

### 1. The ERCOM Decision Does Not Tie the Court's Hands.

Defendants incorrectly assert they cannot agree to the modification "in light of a court ruling requiring the Department to negotiate such changes with the Deputies' union." Dkt. 251 at 3. The state superior court's ERCOM Decision does *not* prevent this Court from imposing Plaintiff's proposed plan.

23

As a matter of basic federalism principles, a local law or superior court opinion cannot supplant a federal court-ordered settlement agreement or implementation plan. Put differently, this Court has the power to modify or supersede state or local laws that create an untenable barrier for Defendants to comply with their obligations under the federal constitution. *N.C. Bd. of Educ. v. Swann*, 402 U.S. 43, 45 (1971) (holding that "state policy must give way when it operates to hinder vindications of federal constitutional guarantees"); *Hook v. Ariz. Dep't of Corrs.*, 107 F.3d 1397, 1402-03 (9th Cir. 1997) (precluding a state law prohibiting the payment of a Special Master appointed by the federal court under the Supremacy Clause, when the Special Master's appointment was necessary to vindicate constitutional rights of people incarcerated in Arizona prisons); *Coleman v. Brown*, 952 F.Supp.2d 901, 931-32 (E.D. Cal. 2013); *Palila v. Haw. Dep't of Land & Natural Resources*, No. CIV 78-0030 JMS, 2013 WL 1442485, *3-4 (D. Haw. Apr. 8, 2013); *cf.* PLRA, 18 U.S.C. § 3626(a)(1)(B), (permitting courts to "order prospective relief that requires or permits a government official to exceed his or her authority under State or local law")

### 2. Defendants Misinterpret the Holding of the ERCOM Decision

Defendants incorrectly argue that the ERCOM Decision stands for a legal proposition "th[at] the County and the Sheriff have an obligation under" the Employee Relations Ordinance ("ERO") "to bargain with ALADS [the deputies' union] regarding any changes to the disciplinary guidelines imposed as a result of the Settlement Agreement." Dkt. 251 at 23. The sole issue in the ERCOM Decision was the Department's prior unilateral changes to disciplinary guidelines in 2013 and 2016. At no point did LASD raise the *Rosas* Agreement as a defense for not bargaining with ALADS. See Dkt. 251-6 at 34-42. The ERCOM Decision assessed the LASD's liability only in the context of the ERO and did not examine whether LASD's actions were permissible under the *Rosas* Agreement.

Indeed, *Rosas* was only discussed in *dicta* after Judge Chalfant had already

24
REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

ruled against LASD on the merits. The court examined if the remedy at issue, (reverting to the 2012 disciplinary guidelines), would result in LASD violating the *Rosas* Agreement. Judge Chalfant found it would not, because the *Rosas* Agreement did not require specific disciplinary changes but only suggested certain revisions:

> [T]he *Rosas* agreement does not require any specific changes to the Guidelines and only specifies that "[t]he Department should have a policy of zero tolerance for acts of dishonesty or failure to report uses of force" and specifies procedures the Department "should" take if it opts not to terminate an officer for either offense. AR 349-50. Similarly, the DOJ settlement agreement merely calls for the implementation of the *Rosas* settlement and does not impose any additional requirements on the Department. AR 412. Because neither settlement requires the Department to make revisions to the 2012 Guidelines, ERCOM's remedy does not violate either agreement.

Dkt. 251-6 at 48-49 (parentheticals omitted).

But this finding does not — as Defendants claim — mean it imposes an "obligation" to bargain with the union over "any changes" to discipline stemming from the *Rosas* Agreement. Dkt. 251 at 22. Indeed, it supports Plaintiff's position. The superior court correctly observed that if the *Rosas* Agreement did mandate disciplinary changes (which is Plaintiffs' goal here with the proposed modification to the compliance plan), then Defendants could make these "legally required change[s]" to employees' "terms and conditions of employment" and only need to bargain with ALADS "over the effects" of such revisions. Dkt. 251-6 at 49 (emphasis in original). In other words, LASD would not need to negotiate with ALADS over the "decision" to change disciplinary guidelines, since this would be "legally required" (*id.*), but would simply need to satisfy its effects bargaining obligation in connection to those changes.[16]

---

[16] Under California public sector labor law, *effects* bargaining consists of providing a union with "notice and an opportunity to meet and confer over any reasonably foreseeable effects the decision may have" on those represented employees. *Oxnard Fed'n of Teachers & School Emps., Local 1273 v. Oxnard Union High Sch. Dist.*, Case No. LA-CE-6627-E, State of Cal. Decision of the Public Employment

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN

Plaintiff's proposed modification to impose mandatory discipline for specific violations is completely consistent with the ERCOM decision, and Defendants' claims to the contrary are unsupported.

    3.    <u>A Court-Ordered Amended to the Implementation Plan Does</u>
<u>Not Impermissibly Interfere with the Union's Legal Rights.</u>

Defendants try to use the status of ALADS as the deputies' bargaining representative as a reason to not have disciplinary changes to promote accountability and actual compliance with the Settlement Agreement after years of woeful noncompliance. *See* Dkt. 251 at 22-23. They fail to provide a scintilla of evidence or legal support to support their blanket assertion that Plaintiffs' proposed modification would somehow violate the collective bargaining agreement with ALADS. *Id.* Still, any claim by the union that its rights are somehow violated by Defendants complying with a federal court's valid remedial order would fail under Supreme Court precedent.

In *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986), an intervening union sought to void a consent decree entered into between plaintiffs and a city to settle a racial discrimination lawsuit. The Supreme Court held that the district court was not precluded from approving the consent decree because the settlement did not bind the union or impose obligations on them in any way. *Id.* at 528-30. Here, a further implementation plan or remedial order would not

---

Relations Board, PERB Decision No. 2803, at 49 (Jan. 26, 2022), *at* https://perb.ca.gov/wp-content/uploads/decisionbank/decision-2803e.pdf; *see Am. Fed'n of State, County & Muni. Emps. Local 3299, et al. v. Regents of the Univ. of Cal.*, Case No. SF-CE-1300-H, Case No. SF-CE-1302-H, State of Cal. Decision of the Public Employment Relations Board, PERB Decision No. 2783-H at 28 (July 26, 2021) *at* https://perb.ca.gov/wp-content/uploads/decisionbank/decision-2783h.pdf ("Once a firm non-negotiable decision is made, the employer must provide notice and a meaningful opportunity to bargain over the reasonably foreseeable effects of its decision before implementation") (internal quotations omitted). Here, the Court can require Plaintiffs' proposed modification to the compliance plan requiring discipline while LASD still complies with its *effects* bargaining duty.

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED
COMPLIANCE PLAN

adversely affect ALADS' rights. As in *Local No. 93*, such an order here would "not bind [ALADS] to do or not to do anything" and "[i]t imposes no legal duties or obligations on the [ALADS] at all." *Id.* at 529-530. Additionally, "only the parties to the decree [, i.e., the LASD and Plaintiffs,] can be held in contempt of court for failure to comply with its terms." *Id.* at 530. "Moreover, the consent decree does not purport to resolve any claims the [ALADS] might have under the Fourteenth Amendment." *Id. See also Johnson v. Lodge No. 93 of the Fraternal Order of the Police*, 393 F.3d 1096, 1107 (10th Cir. 2004).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant its motion to modify the Implementation Plan.

Respectfully Submitted

June 12, 2023                              /s/ Peter J. Eliasberg

Peter J. Eliasberg

Melissa Camacho
**ACLU FOUNDATION OF SOUTHERN CALIFORNIA**

Corene T. Kendrick
Marisol Dominguez-Ruiz
**ACLU NATIONAL PRISON PROJECT**

Nicholas Morgan
Stephen Turanchik
**PAUL HASTINGS LLP**

Attorneys for Plaintiffs Alex Rosas, *et al.*

REPLY TO DEFENDANT'S OPENING BRIEF ADDRESSING DEFENDANT'S PROPOSED COMPLIANCE PLAN