PETER J. ELIASBERG (SB# 189110)
peliasberg@aclusocal.org
MELISSA CAMACHO (SB# 264024)
mcamacho@acluscal.org
**ACLU FOUNDATION OF
SOUTHERN CALIFORNIA**
1313 W. 8th Street
Los Angeles, CA 90017
Phone: (213) 977-9500
Fax: (213) 977-5299

CORENE KENDRICK (SB# 226642)
ckendrick@aclu.org
MARISOL DOMINGUEZ-RUIZ
(SB# 345416)
mdominguez-ruiz@aclu.org
**ACLU NATIONAL PRISON
PROJECT**
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930
Fax: (202) 393-4931

NICOLAS MORGAN (SB# 166441)
nicolasmorgan@paulhastings.com
STEPHEN TURANCHIK
(SB# 248548)
sturanchik@paulhastings.com
**PAUL HASTINGS LLP**
515 South Flower Street, 25th Floor
Los Angeles, CA 90071-2228
Phone: (213) 683-6000
Fax: (213) 627-0705

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and of those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Robert Luna, Sheriff of Los Angeles County, in his official capacity,<br><br>Defendant. | Case No. CV 12-00428 DDP (MRW)<br><br>**SUPPLEMENTAL DECLARATION OF STEPHEN SINCLAIR**<br><br>**UNDER SEAL** |

**<u>Supplemental Declaration of Stephen Sinclair</u>**

I, Stephen Sinclair, declare as follows:

1.    I have reviewed the Defendant's Opening Brief Addressing Proposed Compliance plan dated May 31, 2023,[1] as well as Limitations on Force v31 (Sheriff and ACLU Agreement)[2] and WRAP Restraint v33 Rosas Changes[3]. Note: both the Limitations on Force v31 and WRAP Restraint v33 drafts are not mutually agreed to at this time. From my review, I have made opinions about these documents and the *Rosas* matter. My opinions are also based on documents and videos reviewed in the preparation of my previous declaration in the *Rosas v Lu*na matter.[4]

2.    In the Defendant's Opening brief, I identified areas of concern as described in this declaration. As noted in the brief LASD has taken steps to address some of the previous concerns related to:

(1) eliminating impermissible head strikes;

(2) ensuring appropriate utilization of force prevention and de-escalation techniques;

(3) ensuring proper use of the WRAP restraint device, and

(4) ensuring accountability for the Department personnel who violate the Implementation Plan's provisions and or Department use of force policies.

3.   As acknowledged, there has been movement and even noted improvement related to the number of use of force incidents and head strikes. However, as noted by using the term "elimination" in (1) above it demonstrates a goal much higher than LASD has been able to achieve in the last 9 years since the plan became effective.  LASD's goal should be eliminating head strikes as an

---

[1] *See* 251.BRF.DCT. Defendant's Opening Brief Addressing Proposed Compliance Plan 05.31.2023
[2] *See* CDM 7.01.030.00 Prohibited Force v31 (Sheriff and ACLU Agreement) 06.01.23
[3] *See* CDM 7.03.050.00 WRAP Restraint V33 Rosas Changes
[4] *See* 253-1-Redacted-Sinclair-Declaration

1

acceptable use of force unless there are truly unique circumstances such that deadly force is justified.  Until LASD treats head strikes as deadly force and holds personnel accountable through firm discipline for violations of an appropriate head strike policy, it is my opinion that there will continue to be unnecessary head strikes that endanger the health and safety of the inmates who are hit in the head.

4.    While LASD lauds having reduced these incidents, they are a long way from eliminating them.  They report that there were 51 reported uses of head strikes in the downtown jails in 2022 and that there were 16 in the first four months of 2023, which works out to a rate of 48 for 2023.  This decline is a step in the right direction.  But two things are notable. It does not appear that LASD is on pace for any significant decline between 2022 and 2023 (i.e., 51 versus 48), and in my opinion 48 or 51 head strikes in a given year is still too many.  It is evidence of LASD's failure to have in place a sufficiently restrictive policy on use of head strikes and a continued unwillingness to identify use of head strikes as out of policy and discipline their use appropriately.

5.    I have not reviewed any newer use of force packages than the ones I reviewed for my prior declaration to determine subsequent discipline or corrective action taken by LASD towards its employees who engaged in the use of impermissible head strikes. Because of this, I must rely upon the Monitors' repeated discussion of LASD's multi-year non-compliance with the provision in the Rosas Implementation Plan governing head strikes (Provision 2.6).  I have also relied on nine (9) incidents I did review.  Eight of the nine were reviewed under LASD's previous head strike policy, and one was reviewed under the new policy, which the Department asserts is an appropriate standard.  In 8 of the 9, it was obvious to me that the use of head strikes was unnecessary and excessive force.  And in none of those 8 was it apparent any discipline was issued to those involved in the impermissible use of head strikes, based on the pre-existing Custody

Operations Force Manual.[5] In the most recent incident I reviewed, (MCJ-00856) the Department found multiple head strikes against a handcuffed inmate to be compliant with the new head strike policy Thus, even in incidents where individuals were in restraints at the time they were struck in the head with a fist, there was no noted discipline under either the old head strike policy or the new revised policy.

A.    Eliminating impermissible head strikes

6.    In my experience, there is never a justification for the use of head strikes on individuals who are already restrained and thus no longer have the ability to render serious bodily injury or death. Even in an extreme case where a restrained person head-butts an escorting deputy, the deputy always has the ability to step back and reposition themselves to avoid this type of contact. Then the deputy can use alternative tactics like take-down techniques or control techniques to guide the individual to the ground until others can assist. In all but one of the force situations I reviewed, there was more than one deputy present when the head strike was used, and the other involved deputies could maintain control while the assaulted deputies create a safe distance and then re-engages to assist the other(s).

7.    LASD proposes to replace the current language about the prohibited force with limitations on force. In the first paragraph, it says "Department members may only use these force options -- head strikes with personal weapons, kicking an inmate who is on the ground, and kicking a standing inmate anywhere above the knee --when they reasonably believe that an inmate is violent _or_ has demonstrated by their physical action and intent to be violent and reasonably appears presently capable of causing serious physical injury."  The policy goes on to state that those same three uses of force may only be used when:

(1)    the inmate is assaultive,

(2)    there is imminent danger of serious injury to personnel or others, and

---

[5] *See* Custody Division Manual _ Volume 7 - Custody Operations Force Manual

3

(3)    there are no other reasonable means to avoid serious physical injury.

8.    As I have explained in my previous declaration, I do not believe that this change is adequate to address the multi-year pattern of non-compliance with the *Rosas* head strike provision and the failure of LASD to hold its personnel accountable for unnecessary use of head strikes.  My opinion is based on not only the failures the Monitors have identified, but also my own review of 9 relatively recent use of force incidents involving head strikes, the incident under the new policy in which the LASD approved clearly unnecessary head strikes against a restrained inmate, and the fact that LASD 2023 head strike numbers are still far too high.

9.    Thus, it is my strong recommendation that head strikes with "personal weapons" be included under "Deadly Force" as one of the "types of force [that] may only be used if a Department member can reasonably articulate that the circumstances justify the use of deadly force . . ."  As I noted in my previous declaration, in one incident a deputy used head strikes in response to a forceful head strike from an *unrestrained* inmate (#MCJ-04485), and I opined those head strikes *were justifiable* because the inmate was unrestrained and commencing to seriously injure the deputy.  That conclusion is consistent with my recommendation that LASD should adopt an "only where deadly force is permissible" standard because in my professional opinion when a correctional officer is subjected to a head punch by an unrestrained inmate, it is a situation where deadly force in the form of head punches is justified.

10.    It is important for me to note this incident because it shows that there are circumstances where officers would still be permitted to use head strikes against an unrestrained inmate if head strikes are moved to the "Deadly Force" portion of LASD's Limitation of Force Policy. Indeed the policy makes clear that the types of force that are considered deadly force may be used *if* "a Department member can reasonably articulate that the circumstances justify the use of deadly

4

force as defined in AB392 and PC 835a, Subsection (c)(1)." In my experience in corrections a situation where an unrestrained inmate initiates force against a deputy by punching him or her in the head posing a risk of serious bodily injury or death, the standard is met, provided no alternative exists.

11. In my 32 years of experience in the Washington Department of Corrections (WDOC) striking restrained individuals in the head has never been an allowable practice and when it did occur was grounds for discipline. The fact the WDOC has included head strikes as a form of deadly force in their use of force policy, even when not restrained, makes it clear this remains the policy and practice. To the best of my knowledge, this has not created a safety issue for staff and is evidence the practice is achievable. My logic includes the fact, as stated in my previous declaration,[6] LASD has charged inmates who use head strikes on staff with assault with a deadly weapon. Granted, I have no idea if the charge was sustained through prosecution, however, it does show LASD perceived this act as assault with a deadly weapon.

12. In sum, I disagree with the assertion in the Defendants' brief that limited head strikes to situations when deadly force is permissible "will endanger the safety of Department personnel working in the Jails." The availability of other techniques that are as effective or more effective and pose a lesser risk to the health and safety of inmates and staff do exist. As an example, the deputy pushing off the assaulter, to create time and distance, then deploying OC could be just as effective. It should also be considered that punching people in the head creates a significant risk that correctional personnel will fracture bones in their hands. Finally, LASD's situation appears to be unique to me because of the nine (9) year history of failing to resolve this problem, so elevating head strikes to deadly force may be the only way to ensure these instances of excessive force receive the scrutiny they deserve.

---

[6] *See* 253-1-Redacted-Sinclair-Declaration, paragraph 31

B.    Addressing LASD's continued non-compliance with force prevention

13.    In addition to changing the Limitations on Force Policy to move head strikes to the deadly force category, it is my opinion the use of "or" in the introductory statement in the Prohibited Force Policy opens a wide range of interpretations[7].  LASD would be better served by rewriting the policy as follows adding the clause which is in bold below:

> Department members may only use these force options when they reasonably believe that an inmate is **assaultive and reasonably appears presently capable of causing serious physical injury** or has demonstrated by their physical action an intent to be violent and reasonably appears presently capable of causing serious physical injury

By making this small change it would require deputies to be faced with an actual physical threat *of serious bodily injury* before using kicks. It would also be more consistent with the language used elsewhere in the draft document

14.    In the next paragraph "Use of Personal Weapons (Head Strikes and Kicks)" LASD states.

> The following types of force may only be used when (1) the inmate is assaultive, (2) there is an imminent danger of serious injury to personnel or others, and (3) there are no other reasonable means to avoid serious physical injury.
> - Head strikes with personal weapons
> - Kicking an inmate who is on the ground
> - Kicking a standing inmate anywhere above the knee."

15.    In addition to moving head strikes out of the portion of the policy and into the deadly force section, I recommend replacing the word "imminent" with "immediate". The use of the word imminent as opposed to immediate could be misinterpreted. The word imminent opens the statement up to perception. As an

---

[7] The opening statement reads as follows:  "Department members may only use these force options – [head strikes with personal weapons, kicking an inmate who is on the ground, and kicking a standing inmate anywhere above the knee --] when they reasonably believe that an inmate is violent or has demonstrated by their physical action and intent to be violent and reasonably appears presently capable of causing serious physical injury."

example, a deputy could justify an improper head strike by saying I thought he was going to hit me, so I punched him first. The use of the word immediate narrows this to mean there is an actual action where my only alternative was to use a kick in self-defense. It should be noted the section called "Use of Force against Restrained Inmates" does use the word immediate, which is a better word choice. For the purposes of training, it would behoove LASD to use consistent terminology.

16.    In the fifth paragraph of the proposed revision, it says.

> If an assaultive inmate restrained to a fixed object presents an immediate threat of injury to personnel engaged with the inmate, force de-escalation principles require personnel to distance themselves from the assaultive conduct and request the presence of a sergeant rather than utilize the force options listed above, unless immediate intervention is required.

17.    This language appears adequate for the situation described, but it does cause me to question why this same language isn't applicable in the previous statement about inmates who are not restrained to a fixed object.  In other words, given LASD's longstanding non-compliance with the *Rosas* force prevention provisions, and the numerous uses of force I saw where unnecessary or excessive force was used against inmates who were restrained, including in the WRAP or in handcuffs, but not restrained to a fixed object, I recommend that language that currently applies only to inmates restrained to a fixed object should also be applied to all restrained inmates.  For example, MCJ-922-02082, which I described in paragraphs 22-23 of my first declaration reveals the impunity LASD personnel appear to have about using unnecessary and dangerous force against restrained inmates.  That case involved two deputies grabbing an inmate who was handcuffed behind his back as he exited a cell and throwing him head first against a wall causing deep lacerations in his head.  Video attached to the concurrently filed Notice of Lodging as Exhibit A.

18.    In relation to the use of head strikes with personal weapons, as stated

7

in paragraph 15 of my previous declaration simply changing the language in the policy so that head strikes are permissible only when deadly force is justified is important to address LASD's longstanding failures. But it is not sufficient to cause the necessary behavior change for staff. To accomplish this LASD will need to hold deputies accountable to the new standard, which did not appear to be the situation under the previous policy.  That is why I have recommended both policy changes and mandatory discipline for violations of the head strike policy.

19.    One encouraging action item taken by LASD was the development of an independent force review team.[8] This approach may reduce instances of cronyism if the independent force review team can increase accountability by recommending discipline for those staff who use impermissible head strikes, but only time will tell.

20.    I do believe the LASD efforts to track incidents where de-escalation efforts were successful is laudable and is a good practice if achieved. This is also true with expressly evaluating this in incidents where the use of force occurred.

21.    For me, the most noteworthy effort is an apparent expansion and improvement to DeVRT training offered to deputies. In my experience, enhanced training for staff can have significant results. As an internal learning tool, actual use of force videos showing what should and should not occur can re-enforce learning.[9]

22.    However, as I noted above with respect to head strikes, for LASD to come into compliance with the *Rosas* force prevention requirements it is essential that it both modify its policies in the ways I have described above and require discipline for personnel who violate them, and supervisors who fail to identify clear violations in their force reviews.

---

[8] See 251-8.DEC.DCT. Declaration of Larry Alva ISO Defendant's Opening Brief Addressing Proposed Compliance Plan 05.31.2023, Page 12, Line 23
[9] Because I have not reviewed the actual curriculum, or any proposed changes to it, I can offer no specific opinions about the content of the training.

8

C.      Ensuring proper use of the WRAP restraint device

23.    I have reviewed LASD's proposed changes to their Custody Division Manual on the use of the WRAP restraint device. In my previous declaration, I reviewed the different draft language that was proposed. In the current proposed WRAP language, it says,

> The WRAP restraint may only be used on inmates who pose an immediate threat to themselves or others when the circumstances reasonably perceived by personnel at the time indicate the WRAP restraint application is necessary to control the inmate. An immediate threat is present when:
> - an inmate is violent or is physically resisting; or
> - an inmate has demonstrated, by words or actions, an intent to be violent or to physically resist, and reasonably appears presently capable of causing physical harm to themselves, custody staff, or others if the WRAP restraint is not applied.

24.    This language is good with one exception, I believe the first bullet should have language that clarifies the inmate has to continue to be violent or actively resistive even in traditional wrist and leg restraints, like "an inmate remains violent or is physically resisting while in traditional restraints". I strongly recommend this policy change, which would demonstrate the use of the WRAP restraint is only permissible in exceptional circumstances after alternatives have been attempted.

25.    Also, this new version of the WRAP policy states that "when applying the WRAP restraint after a use and force, if circumstances permit, the inmate shall be placed in the recovery position while waiting for the WRAP restraint to arrive to the scene."

26.    In my opinion, this language implies the WRAP will always be used after a use of force incident. In almost all the videos reviewed for my prior declaration, the appearance was the staff were on auto-pilot and went directly to applying the WRAP restraint without conducting any type of assessment after the

9

inmate was restrained. In some of those instances, there were multiple staff on the individual, likely causing reflex-reaction and making a true assessment of the level of resistance impossible. Based on the multiple unnecessary uses of WRAP by LASD personnel that I witnessed I suggest adding the following language to clarify the policy:

> Prior to applying the WRAP restraint after a use and force, if circumstances permit, the inmate shall be placed in the recovery position while waiting for the WRAP restraint to arrive to the scene, so the on-scene supervisor can assess the level of risk and resistance posed by the restrained individual prior to the use of the WRAP restraint.

27.    I also recommend language explicitly stating that the WRAP restraint is an exceptional device, used only in exceptional circumstances.

28.    Overall, my opinion from my previous declaration remains the same related to LASD's overuse of the WRAP restraint. The suggested modifications to the proposed language, if adopted, would likely reduce the use of the WRAP restraint device. However, as I have stated elsewhere in both of my declarations writing policy expectations is not the end-all for behavior change (culture change). LASD will need to ensure appropriate training to the new policy expectations as well as constant accountability to ensure the policy is being followed as intended and WRAP use becomes the exception instead of the norm.

D.    Ensuring accountability for the Department personnel who violate the Implementation Plan's provisions and or Department use of force policies.

29.    Again, I believe the creation of an independent review team is a good approach, but I would urge caution in selecting members of this team to avoid cronyism.[10] The independent force review team members should be made fully aware of the expectations of their role to include the paramount task of protecting the integrity of the organization and profession.

---

[10] *See* 253-1-Redacted-Sinclair-Declaration, paragraphs 66, 73 & 75

30. In the interim before the independent force review team is established LASD proposes to have all use of force packets involving head strikes reviewed at the level of the Assistant Sheriff of the Custody Division. I have experienced this approach myself as the Superintendent (Warden) of the Washington State Penitentiary, one of the busiest jobs I have had. In my opinion, the intention is to elevate the importance of these reviews which is good, however, I know it is difficult to give each incident the thorough review it requires. I would recommend the review level immediately before the Assistant Sheriff of the Custody Division, have the expectation to provide completed work to the Assistant Sheriff, which includes a thorough review of the video and all associated materials. As well as identification of critical moments of potential impermissible actions and corrective or disciplinary action recommended by that reviewer.

31. Absent this expectation, reviewers below the top level may not complete as thorough a review as necessary, based on the knowledge it is just going to be looked at by someone else anyway. The best approach is to have the same requirement, including reviewing the video, all the way down to the initial supervisor documenting the use of force incident. I raise this concern because of my experience in that role and recognizing staff can take impermissible actions that you did not see or are unaware of, even when you are right there. With this approach documenting supervisors should be cautioned to only identify questionable actions and not take corrective action, which could cause a double jeopardy situation and preclude more severe discipline when required.

32. Use of impermissible head strikes is excessive force and should be treated as an egregious action taken by the deputy. As pointed out in my previous declaration,[11] inmates who engage in head strikes against deputies can and have been charged with assault with a deadly weapon, which I assume is a felony under California law. While false reporting or dishonesty in reporting may not rise to the

---

[11] *See* Redacted-Sinclair-Declaration, paragraphs 31

same level as a felony, it is devasting in any criminal justice profession, because once proven, all actions or reports generated by the individual going forward are questionable. Under the Supreme Court ruling in *Brady v. Maryland*[12] this information may be exculpatory and therefore damaging to any case the officer/deputy is involved in for the rest of his career. It is my opinion that incidents of excessive force and dishonesty are egregious and require an appropriate level of discipline.

33.    I recognize how the term "Mandatory Discipline" can sound draconian as a stand-alone statement. However, mandatory discipline can be as simple as creating a minimum discipline grid for certain egregious acts like specific types of excessive force like head strikes or failure to follow clear force prevention policies and dishonesty. A minimum discipline grid could include elevated discipline for repeated impermissible actions to include dismissal depending on the circumstances. All of these can only be administered after a thorough investigation and the other elements of just cause have been met. Essentially, what a minimum discipline grid does is make everyone aware of the cardinal sins of the department and what can be expected should it be proven an employee committed such an act.

E.    Conclusion

34.    I have reviewed Defendants' Brief, use of force statistics, supporting materials and revised WRAP and Prohibited Force policies.  A number of the changes they have agreed to with Plaintiffs, including creating an independent review team, creating templates to ensure that force reviewers assess whether head strikes, WRAP use, etc. were consistent with Department policies, are sound.  But nothing in their brief and proposed revised policies changes my opinion that they need to alter their WRAP and Prohibited Force policies (including the portion

---

[12] *See* U.S. Department of Justice, Office of Justice Programs, Police Officer Truthfulness and the Brady Decision; https://www.ojp.gov/ncjrs/virtual-library/abstracts/police-officer-truthfulness-and-brady-decision

addressing head strikes with "personal weapons," i.e., punches to the face or head) and *require* discipline within the ranges set forth in their own disciplinary guidelines for violations of the policies relating to head strikes, force prevention, WRAP, dishonesty, and for supervisors who fail to identify clear violations of those policies or impose appropriate discipline for them.

I declare under penalty of perjury that the foregoing is true and correct. Executed June 12, 2023 in Olympia, Washington.

Stephen Sinclair

13

# Exhibit A

Video Clip

Filed with Notice of Lodging