Kathleen M. Kenney
343 Sweet Grass Way
Richmond, KY 40475
Email: kkenney4695@gmail.com

**Monitor and on behalf of Monitors**
**Robert Houston and Nicholas E. Mitchell**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS, et al.,<br>Plaintiffs,<br>v.<br><br>LOS ANGELES COUNTY SHERIFF ROBERT LUNA, in his official capacity,<br><br>Defendant. | Case No. 12-cv-00428 DDP (MRW)<br><br>**PANEL'S TWELFTH REPORT**<br><br>Hon. Dean D. Pregerson<br>United States District Judge |

1    Pursuant to Section V of the Settlement Agreement And Release of Claims, the

2  Monitors appointed by this Court, Robert Houston, Nicholas E. Mitchell, and Kathleen Kenney

3  (collectively, the "Panel") hereby submit the attached Panel's Twelfth Report "evaluation

4  Defendant's Compliance with Action Plan" prepared by the Panel for the six-month period from

5  July 1, 2022 to December 31, 2022. This Report takes into consideration the comments from the

6  parties in accordance with Section V of the Settlement Agreement. The Panel is available to

7  answer any questions the Court may have regarding this Report as such times as are convenient

8  for the Court and the parties.

9

10  DATED: October 20, 2023                              Respectfully Submitted,

11

12                                                       KATHLEEN M. KENNEY

13

14

15                                                       By: /S/ Kathleen M. Kenney

16                                                       Kathleen M. Kenney

17                                                       Monitor and on behalf of Monitors

18                                                       Robert Houston and

19                                                       Nicholas E. Mitchell

20

21

22

23

24

25

26

27

28

# PANEL'S TWELFTH REPORT

Table of Contents

Panel's Twelfth Report ........................................................................................................................ 2

Action Plan Implementation Assessment ........................................................................................ 6

**I. Administrative Provisions** .......................................................................................................... **6**
    A.   Leadership and Accountability ............................................................................................. 6
    B.   Management Visits ................................................................................................................ 11
    C.   Rotations and Transfers ....................................................................................................... 12

**II. Use of Force Policies and Practices** ....................................................................................... **14**
    A.   Overall Use of Force Policies ............................................................................................... 14
    B.   Use of Force Practices & Review of Packages ................................................................... 15
    C.   Quarterly Findings—Use of Force Provisions .................................................................. 19

**III. Training** ....................................................................................................................................... **23**
    A.   Use of Force Training ........................................................................................................... 23
    B.   Ethics and Professionalism Training ................................................................................... 24
    C.   Mental Health Training ........................................................................................................ 24
    D.   New Deputy Sheriffs and Custody Assistants ................................................................... 25
    E.   Sergeant Training ................................................................................................................. 27

**IV. Reporting and Investigation of Force Incidents** ............................................................... **28**
    A.   Reporting and Investigation Provisions in Force Package Reviews ............................... 28
    B.   Reporting & Investigations Provisions as Reported by Department ............................. 31
    C.   Quarterly Findings—Reporting and Investigations Provisions ..................................... 34

**V. Inmate Grievances** ...................................................................................................................... **36**
    A.   Grievance Forms .................................................................................................................. 36
    B.   Emergency Grievances ......................................................................................................... 37
    C.   Inmate Grievance Coordinator ........................................................................................... 38
    D.   Handling of Grievances ....................................................................................................... 39
    E.   Deadlines .............................................................................................................................. 40
    F.   Communications with Inmates ........................................................................................... 42

**VI. Use of Restraints** ....................................................................................................................... **43**

**VII. Early Warning System** ............................................................................................................ **45**

Appendix A: Compliance Chart ........................................................................................................ 47

1

# Panel's Twelfth Report

The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan [developed by the Panel] ('Reports') at intervals the Panel shall determine." This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from July 1, 2022, to December 31, 2022 (the "Twelfth Reporting Period") and is created for the purposes of the settlement of the *Rosas* case. In accordance with Paragraph V of the Settlement Agreement, it takes into consideration comments received from the Parties on September 13, 2023.

In May 2014, the Parties retained the Panel "to develop a corrective action plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles" (the "Downtown Jail Complex"). The plan developed by the Panel sets forth provisions in twenty-one areas that the Sheriff is required to implement in the Downtown Jail Complex. The plan was approved by the Court on April 7, 2016. Under Paragraph VIII of the Settlement Agreement, "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')." As of November 1, 2018, the Sheriff's Department (the "Department") has implemented 104 of the Panel's 106 recommendations. The remaining two recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in *United States v. County of Los Angeles, et al.*, CV No. 15-05903 (JEMx) (the "DOJ case").

With the Court's guidance, during the Status Conference held on May 12, 2022, the Parties agreed to develop a written plan to achieve compliance with the following four key areas: (1) eliminating impermissible head strikes; (2) the proper use of the WRAP; (3) appropriate utilization of force avoidance and de-escalation techniques; and (4) accountability. The Court held status hearings in this matter on February 13, 2023, April 19, 2023, June 26, 2023, and September 11, 2023. In advance of the June 26, 2023, Status Hearing, the Parties submitted extensive pleadings pertaining to the four key areas of a written plan to achieve compliance. At the hearing, the Court directed the Parties to attempt to resolve their differences and finalize a written plan to achieve compliance. The Parties have negotiated in good faith throughout this process. The Parties have included the Panel in their recent discussions regarding the WRAP and Limitations of Force policies. While they have not yet resolved their differences, they are continuing to work towards a resolution of this matter.

The Panel's Monitoring visit during the Twelfth Reporting Period occurred in November 2022. With regard to the non-force related provisions in the Action Plan, the Department submitted its Twelfth Self-Assessment Status Report (the "Twelfth Self-Assessment") on April 27, 2023, and its Augmented Self-Assessment Report (the "Augmented Twelfth Self-Assessment") on May 12, 2023. During the Twelfth Reporting Period, the Panel reviewed records posted by the Department to verify the Department's self-assessments of its compliance with non-force provisions of the Action Plan. The Panel's evaluation of the provisions of the self-assessment reports are included in this Report. The Panel's auditors reviewed source documents associated with the Training Provisions as well as Restraint Provisions 17.3 and 17.4.



The Department's overall uses of force at the Downtown facilities continued to trend downward between the Tenth and Twelfth Reporting Period, as shown in Figure 1.[1] In 2021, the overall uses of force totaled 1,150 as compared to 957 in 2022, which is a decrease of 20%. A more detailed analysis of total number of use of force incidents by quarter and facility is provided with Provision 1.3 below. These continuing decreases in the number of use of force incidents in 2022 represent meaningful progress by the Department at achieving the goals of the Agreement. This trend continues into 2023; according to preliminary data provided with the department, there is 36% decrease in use of force incidents from the first half of 2022 (523) to the first half of 2023 (384).[2]

During the Twelfth Reporting Period, the Panel reviewed a total of 50 completed force packages that were selected from a comprehensive list of force incidents compiled by the Department. The Panel did not select these force packages randomly or in proportion to the frequency with which various categories of force occur. Rather, the Panel selected for review the force incidents most likely to involve problematic uses of force.[3] In 30 of the 50 force packages reviewed, the Panel found some aspect of the force used during the encounter that violated the force prevention principles of Section 2.2 of the Action Plan. The percentage of 2.2 non-compliant cases (60%) is nearly double the percentage of non-compliant cases reviewed in the Eleventh Report (33%). The improper use of head strikes continues to be a significant factor driving the Department's non-compliance.

*Figure 2* reflects the total number of head strikes over three 6-month periods per facility. Similar to overall use of force incident trends, the Department's head strike totals show successive decreases between the first half of 2022 and the second half of 2022, from a total of 30 to 22, which is a 27% decrease.[4]



For the Twelfth Reporting Period, TTCF increased the number of head strikes by one (from 9 to 10). IRC had a decrease in head strikes from 12 to 5, a 58% decrease. MCJ had a decrease in head strikes from 9 to 7, a 22% decrease. Head strikes in the first half of 2023 reflect the downward 2022 trend is maintaining.

---

[1] The Sheriff's Department maintains multiple data systems. Updated data was provided to the Panel that showed revised numbers for previous reports. The charts included in this report are consistent with the most recent data reported by the Department and reflect those updated numbers.

[2] While the 2023 data is outside of the Twelfth Reporting Period (3Q22 - 4Q22), the Panel believes it is important to provide the Court with timely data and information in its reports.

[3] The Panel usually selects cases in which staff deployed/utilized the taser, WRAP, or head strikes.

[4] All data in this report are for three of the Department's facilities only: MCJ, TTCF, and IRC.  Other Departmental facilities are also subject to these provisions in United States v. County of Los Angeles, et. al, 2:15-cv-05903.

3

As part of its continued focus on head strikes, the Assistant Sheriff produced a video highlighting the three criteria that must be present prior to utilizing a head strike. Custody staff are required to view the video. During the Panel's July 2023 visit, staff reported they had seen the video and were aware of the requirements of the head strike policy. In most of the Twelfth Reporting Period Use of Force packages involving head strikes, the supervisors investigating and reviewing the incidents concluded the force was reasonable and within Departmental policy. The Panel did not agree with the Department's conclusions in over 85% of these cases. The Panel was pleased to review two cases in which a supervisor correctly concluded the use of head strikes was inappropriate. In order for the Department to achieve compliance with Provision 2.6 (head strikes), staff must be held accountable for impermissible head strikes.

The Panel conducted a series of focus groups with staff and discussions with inmates during its March and July 2023 Monitoring visits. The participants were randomly selected by one of the Monitors. The Panel continues to find the focus groups and discussions beneficial.

The following ideas were expressed by custody staff during the focus groups:[5]
- Staffing shortages are a concern. Staff are regularly working double shifts. Staff are exhausted. This negatively impacts morale.
- Staff believe inmates are not held accountable for their bad behavior/actions.
- General feeling that inmates are faking being mentally ill.
- Concern about the impact of infrastructure issues on safety (e.g., gates not working)
- Staffing shortages in CHS negatively impact facility operations and can lead to force situations.
- Supervisors spend too much of their time doing paperwork.
- Need more supervisors at every level.
- Staff want to use the tools they have available (e.g., WRAP) more often.
- Force review process should be streamlined.

The following themes emerged from the group discussions with inmates:[6]
- The majority indicated not feeling concerned about being subjected to excessive force by staff.
- Concerns regarding psychological abuse by staff - showers freezing cold then turned scalding hot; not getting toilet paper; no working toilet - staff wouldn't take him to use another bathroom.
- Communication with deputies has improved over the years.
- The grievance system is not viewed as effective.
- Contacting ACLU will get things fixed.
- Jail conditions are a significant concern - sewage issues, water not drinkable, cell and shower temperatures a concern, ceilings falling down, etc.

During the Panel's Monitoring visits in March and July 2023, senior Department managers cited staffing shortages as one of the biggest challenges facing the Department. These shortages have led to staff having to work several mandatory overtime shifts per month. Some staff have to work an additional 12 shifts per month. Supervisory staff in the facilities are also working mandatory overtime due to the staffing shortages at the supervisory level. The Panel observed the level of exhaustion among many staff we spoke to during our visits. Requiring staff to work a significant amount of overtime is not sustainable and has a negative impact on morale, retention and staff wellness. Correctional agencies across the country are also

---

[5] In March 2023, the staff focus groups were comprised of deputies and sergeants from IRC and TTCF. In July 2023, the Panel spoke to deputies and sergeants from MCJ as well as Lieutenants and Captains from all three facilities. The views expressed by these staff members are not necessarily reflective of the views of all members of custody staff.

[6] The Panel spoke with a total of 27 inmates as part of the Focus Groups during March and July 2023. All three facilities were represented in the focus groups. The views expressed by the focus group participants are not necessarily reflective of all inmates.

4

facing significant staffing shortages. The Panel has asked the Department to determine whether it is possible to assess the impact of staff overtime on the number of use of force incidents. Realizing the length of time it takes to bring new staff on board, the Panel urges the Department to consider having a thorough staffing analysis completed to ascertain whether the existing staff can be deployed in a manner to reduce the need for overtime.

The Panel continues to raise concerns about the Department's use of head strikes with the Sheriff, Assistant Sheriff, and senior leaders in the Department. On February 22, 2023, the Department issued a *Limitations of Force Directive* (formerly known as the *Prohibited Force Directive*) that prohibits head strikes with personal weapons unless all three of the following criteria are present: (1) the inmate is assaultive, (2) there is an imminent danger of serious injury to personnel or others, and (3) there are no other means to avoid serious physical injury. This policy was discussed with the Court during the June 26, 2023 Status Hearing. The Parties and the Monitors are engaged in ongoing discussions regarding the policy.

For the Twelfth Reporting Period, the Department is found in compliance with 79 of the 100 applicable (104 total) provisions set forth by the Action Plan. Compliance results per category are as follows:
    (1)  8 out of 9 of the Administrative Provisions
    (2)  16  out of 25 of the Force Provisions
    (3)  11 out of 11 of the Training Provisions
    (4)  17 out of 24 of the Investigations & Reporting Provisions
    (5)  22 out of 24 of the Grievances Provisions
    (6)  2 out of 8 of the Restraints Provisions (Note this category includes 4 not applicable.)
    (7)  3 out of 3 of the Early Warning System Provisions

Provisions determined compliant for the Twelfth Reporting Period, that were found out of compliance in the *Panel's Eleventh Report,* include: 2.7 Supervisor Called to Scene, 4.1 Consult Mental Health Professional, 4.4 Cooling Off Period, 4.5 Medical and Mental Health Provider Order, 5.2 Commander's Reviews, 3.6 Probation Reviews, 4.2 Mental Health Professionals, 4.7 Mentally Ill Inmates, 7.3 Prisoner-Staff Communications, and 19.2 Review or ERS (EWS) Reports.

The Department continued to cooperate fully with the Panel during the Twelfth Reporting Period. The Department and County Counsel responded to our inquiries and requests for documents and information. They engaged in constructive conversations with the Panel regarding use of force incidents, policy issues and their continuing efforts to implement the terms of the *Rosas* Action Plan. We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.

5

# Action Plan Implementation Assessment

The Action Plan is divided into seven overarching categories: (1) Administrative; (2) Use of Force; (3) Training; (4) Force Reporting and Force Investigations; (5) Grievances; (6) Restraint; and (7) Early Warning System. Each category contains the substantive provisions with corresponding compliance measures. The Panel's findings towards compliance with each provision for the Twelfth Reporting Period is provided below and organized to mirror the Action Plan.

# I.   Administrative Provisions

## A. Leadership and Accountability

The recommendations in Sections 1.1 through 1.4 of the Action Plan require that Custody be headed by an Assistant Sheriff with no other areas of responsibility, the Sheriff be engaged personally in the management of the jails, the Department's managers be held accountable for any failures to address force problems in the Jails, and that the Department regularly reports to the Board of Supervisors on the use of force in the jails and on its compliance with the Action Plan.

### 1.1 Custody Operations Headed by an Assistant Sheriff

**Provision Description:** Section 1.1 of the Action Plan provides that Custody Operations should continue to be headed by an Assistant Sheriff with no other areas of responsibility assigned.

> ***Compliance Measure Summary:*** Custody Operations headed by an Assistant Sheriff with no other responsibilities for the duration of the Settlement Agreement.

Custody has been headed by an Assistant Sheriff with no other areas of responsibility since mid-2014. Custody was under the direction of Former Assistant Sheriff Corbett from April 18, 2021 through November 2022. Assistant Sheriff Sergio Aloma has been serving in the role of Assistant Sheriff since December 6, 2022. The Panel found both Former Assistant Sheriff Corbett and Assistant Sheriff Aloma to be accessible, forthright, and fully supportive of the work of the Panel.

**1.1 Status:** Compliance[7]                    **As of Date:** January 1, 2017

### 1.2 Personal Engagement of the Sheriff

**Provision Description:** Sheriff should be personally engaged in the management of the Department's jail facilities and regularly and adequately monitor the use of force policies and practices and compliance with the Action Plan.

> ***Compliance Measure Summary:*** Reports every six months on the Sheriff's personal involvement in managing the jail and monitoring use of force policies.

The Department has provided the Panel with a log of frequent meetings that Former Sheriff Alex Villanueva had with Former Assistant Sheriff Corbett during the Third and Fourth Quarters of 2022. Between July 27, 2022 and November 2, 2022, the Sheriff and Assistant Sheriff had 21 meetings in which they discussed such topics as: use of force incidents, the use of less lethal weapons and personal weapons; cell extractions; Category 3 incidents and associated injuries; use of force against mentally ill inmates; gassing incidents; dorm disturbances; suicide attempts; available detox housing units; facility security

---

[7] Use of the term Compliance is a finding of compliance as of a certain date. The Panel's findings are set forth on the Appendix attached. For other provisions, the Department has either not achieved compliance or is no longer in compliance during the Twelfth Reporting Period. Based upon the Panel's findings, the Parties will determine whether the Settlement Agreement is subject to termination pursuant to Section VIII of the Settlement Agreement.

concerns; assaults on staff and alternate tactical approaches to address current inmate population. Sheriff Robert Luna assumed his position on December 6, 2022. Between December 6, 2022 and December 31, 2022, the Sheriff and Assistant Sheriff Sergio Aloma met twice to discuss the issues noted above.

**Compliance Measure Summary:** Meet with the Monitors at least once every six months to discuss personal involvement.

Sheriff Robert Luna met with the Panel virtually on December 21, 2022. The Panel appreciated the Sheriff's willingness to meet so soon after he assumed office. The Sheriff indicated he was committed to transparency, working collaboratively with external stakeholders and finding a path to bring the Department into compliance with the *Rosas* case.

**1.2 Status:** Compliance                     **As of Date:** January 1, 2017

## 1.3 Accountability for Failing to Address Policy Violations

**Provision Description:** Section 1.3 of the Action Plan provides that Department managers should be held accountable should they fail to address use of force problems at the jail facilities.

**Compliance Measure Summary:** A quarterly report that sets forth the number and rank of personnel found to have violated use of force policies.

The Department provided a report for both quarters of the Twelfth Reporting Period, which are summarized in *Table 1*. There were no founded violations of use of force policies reported in 3Q22.[8] In 4Q22, there were 8 founded violations of use of force policies--6 at MCJ and 2 at TTCF. The resulting discipline for these violations is reflected in *Table 2*.

*Table 1: UoF Policy Violations*

|       | TTCF | MCJ | IRC |
|-------|------|-----|-----|
| 3Q22  | 0    | 0   | 0   |
| 4Q22  | 2    | 6   | 0   |

*Table 2: 4Q22 Discipline Imposed by Violation*

| Case No. | Facility | Rank | Discipline |
|----------|----------|------|------------|
| 1 | MCJ | Deputy | 1-day Suspension |
| 2 | MCJ | Deputy | 1-day Suspension |
|   |     | Deputy | 1-day Suspension |
|   |     | Deputy | Written Reprimand |
| 3 | MCJ | Sergeant | Written Reprimand |
|   |     | Custody Assistant | 1-day Suspension |
|   |     | Deputy | 1-day Suspension |
| 4 | MCJ | Deputy | Written Reprimand |
|   |     | Deputy | Written Reprimand |
|   |     | Deputy | Written Reprimand |
|   |     | Deputy | Written Reprimand |
| 5 | MCJ | Deputy | Written Reprimand |
|   |     | Deputy | Written Reprimand |
| 6 | MCJ | Sergeant | Written Reprimand |
|   |     | Sergeant | Written Reprimand |
| 7 | TTCF | Deputy | Written Reprimand |
|   |     | Deputy | Written Reprimand |
| 8 | TTCF | Deputy | Written Reprimand |
|   |     | Deputy | Written Reprimand |
|   |     | Deputy | Written Reprimand |

[8] The reporting for Provision 1.3 occurs when the discipline for the founded violation occurs and not when the policy violation occurs. In this Report, the Panel found 17 out of the 25 cases reviewed for 3Q22 in violation of the force prevention principles of Section 2.2. Should the Department find staff involved in those cases violated policy, those violations would not be recorded until the quarter the discipline was imposed.

*Compliance Measure Summary:* Section 1.3 requires the Department to identify each facility in which there was a 25% increase in the number of use of force incidents or Category 3 incidents from the previous quarter.

*Overall Uses of Force*

The Department provided data that reflects the number of use of force incidents per month by facility and category. The monthly numbers have been collapsed into quarterly totals for analysis as shown in Figure 3. For the Twelfth Reporting Period (3Q22 and 4Q22), there were a total of 434 use of force incidents– 256 in 3Q22 and 178 in 4Q22, which is a 30% decrease in incidents between the two quarters. When comparing data by half year, there is an overall decrease in the number of incidents–with a 6%



*Figure 3*

Total Number of UoF Incidents & Percent Change by Quarter

decrease between the second half of 2021 and the first half of 2022 (559 to 523 incidents) and a further 17% decrease in the second half of 2022 (523 to 434). When comparing the second half of 2021 to the second half of 2022, there was a 22% decrease over the year from 559 cases to 434.



*Figure 4*

Of the 434 use of force incidents for the Twelfth Reporting Period, TTCF accounted for 147 of the incidents (34%), MCJ accounted for 185 of the incidents (43%), and IRC accounted for 102 of the incidents (23%)—see *Figure 4*. This pattern is similar to the Eleventh Report where MCJ accounted for 39%, TTCF for 38%, and IRC for 23%.

The total uses of force by quarter and category for the Twelfth Reporting Period are reflected in *Figure 5.*[9] For both quarters, the majority of the 434 incidents (72%) were Category 1. Category 1 cases involve incidents with no injuries. This breakdown of incidents is in alignment with previous quarters where Category 1 incidents reflect the highest number of UoF incidents. Category 1 incidents occurred at a rate over four times more often than the next closest category, Category 2 (17%) and NCI (10%) incidents. Category 3 incidents are the smallest percentage of incidents (1%) and are further assessed in the section below.

The Department is required to address increases of 25% or more for all use of force categories. As noted above in *Figure 5,* NCI and Category 2 incidents of uses of force decreased between 2Q22 and 3Q22 as well as between 3Q22 and 4Q22. Category 1 incidents increased by 2 incidents (1%) between 2Q22 and 3Q22, which does not meet the threshold of 25%. Category 3 incidents increased by more than 25% between 2Q22 and 3Q22 and is further assessed in the *Category 3 Specific* section below.



*Figure 5*

UoF Incidents by Category & Quarter

---

[9] Incident data from 2Q22 is included in this figure to show and determine increases and decreases for 3Q22.

In this reporting period, the increases or decreases of 25% or more in use of force incidents are as follows:

- NCI incidents decreased by 22% between 2Q22 and 3Q22 (37 to 29) and by 55% between 3Q22 and 4Q22 (29 to 13).
- Category 1 incidents decreased by 29% from 184 to 130 between 3Q22 and 4Q22.
- Category 3 incidents increased by 33% from 3 to 4 between 2Q22 and 3Q22.
- Category 3 incidents decreased by 75% from 4 to 1 between 3Q22 and 4Q22.
- Total number of UoF incidents decreased by 30% from 256 to 178 between 3Q22 and 4Q22.



*Figure 6*

During the Tenth Reporting Period (1Q21-2Q21) there was a 34% increase in Category 1 incidents between the First and Second Quarters of 2021, increasing from 168 to 225, as shown in *Figure 6*. For the Eleventh Reporting Period (3Q21 - 2Q22), Category 1 incidents initially decreased. While there was an 8% increase in the final quarter, the number of incidents reflect a downward trend that is 19% less than 2Q21. For the Twelfth Reporting Period, there is a 29% decrease in Category 1 incidents from 184 to 130 between 3Q22 and 4Q22, which is the lowest number of Category 1 incidents in a two-year period.

Similarly, there is a downward trend in Category 2 incidents over the past two years, as shown in *Figure 7*. There was a 17% decrease between 2Q22 and 3Q22 and an additional 13% decrease between 3Q22 and 4Q22. In total, there were 260 Category 2 uses of force in 2021 and 169 in 2022, which is a decrease of 35% over one year. Over this two-year period, Category 2 incidents have decreased from 68 in 1Q21 to 34 in 4Q22, which is a 50% decrease.



*Figure 7*

The figures below identify the number of use of force incidents by category per facility. Data is included from both quarters of the Twelfth Reporting Period (3Q22 and 4Q22) as well as the first two quarters of 2022. Note that only the increases or decreases of 25% or more are included in the narrative below. In addition, while 1Q22 data is included in the charts to show the annual trend, it was not included in the percent change assessment.

9

*Twin Towers Correctional Facility*

In 2022 TTCF had a total of 337 use of force incidents as depicted by *Figure 8.* The total number of incidents from 2022 is a 25% decrease compared to 449 incidents in 2021. For the Twelfth Reporting Period increases or decreases of more the 25% at TTCF are as follows:

- Between 2Q22 and 3Q22, TTCF decreased NCI incidents by 67% from 15 to 5.
- Between 3Q22 and 4Q22, TTCF decreased NCI incidents by 80% from 5 to 1. Between 3Q22 and 4Q22, TTCF decreased Category 1 incidents by 29% from 66 to 47.
- Between 3Q22 and 4Q22, TTCF decreased Category 2 incidents by 25% from 16 to 12.
- Between 2Q22 and 3Q22, TTCF decreased Category 3 incidents by 100% from 1 to 0.



*Figure 8*

*Men's Central Jail*

In 2022 MCJ had a total of 376 use of force incidents as depicted by *Figure 9.* The total number of incidents from 2022 is a 19% decrease compared to 464 incidents in 2021. For the Twelfth Reporting Period increases or decreases of more the 25% at MCJ are as follows:

- Between 2Q22 and 3Q22, MCJ decreased Category 2 incidents by 59% from 17 to 7.
- Between 2Q22 and 3Q22, MCJ increased Category 3 incidents by 200% from 1 to 3.
- Between 3Q22 and 4Q22, MCJ decreased NCI incidents by 44% from 16 to 9.
- Between 3Q22 and 4Q22, MCJ increased Category 2 incidents by 143% from 7 to 17.
- Between 2Q22 and 3Q22, MCJ increased Category 3 incidents by 200% from 1 to 3.
- Between 3Q22 and 4Q22, MCJ decreased Category 3 incidents by 67% from 3 to 1.



*Figure 9*

*Inmate Reception Center*

In 2022 IRC had a total of 244 use of force incidents as depicted by *Figure 10*. The total number of incidents from 2022 is a 3% increase compared to 237 incidents in 2021. For the Twelfth Reporting Period increases or decreases of more the 25% at MCJ are as follows:

- Between 3Q22 and 4Q22, IRC decreased NCI incidents by 63% from 8 to 3.
- Between 3Q22 and 4Q22, IRC decreased Category 1 incidents by 40% from 43 to 26.
- Between 2Q22 and 3Q22, IRC increased Category 2 incidents by 33% from 12 to 16.
- Between 3Q22 and 4Q22, IRC decreased Category 2 incidents by 69% from 16 to 5.
- Between 3Q22 and 4Q22, IRC decreased Category 3 incidents by 100% from 1 to 0.
- IRC decreased NCI incidents by 58% between the first and second half of 2022 from 26 to 11.



*Figure 10*

10

> *Compliance Measure:* When there is a 25% or more increase from quarter to quarter, the Unit Commander reports on his or her response to involved staff. If the Unit Commander failed to address the matter, the Department indicates its response to hold the Unit Commander accountable.

### Overall Uses of Force

The Department is required to address increases of 25% or more for all use of force categories. As noted above in *Figure 6*, NCI and Category 2 incidents of uses of force decreased between 2Q22 and 3Q22 as well as between 3Q22 and 4Q22. Category 1 incidents increased by 1%, 2 incidents, between 2Q22 and 3Q22, which does not meet the threshold of 25%. Therefore, there were no Unit Commander reports to review. Category 3 incidents had increases over 25% and are further assessed in the section below.

### Category 3 Specific

Due to the infrequency of Category 3 incidents, a single incident results in 50% to 100% swings quarter to quarter, which triggers CCSB to request a response from the Unit Commander on its handling of involved staff. Between 2Q22 and 3Q22, MCJ increased Category 3 incidents by 200% from 1 to 3. In response, the Unit Commander and Commander reportedly held briefings on each shift with line lieutenants and sergeants. The Unit Commander and Commander reviewed the performance of each sergeant and deputy involved and held multiple training scenarios to better prepare for future situations.

During the Twelfth Reporting Period, the Panel reviewed many cases involving violations of policy, such as impermissible head strikes, in which the supervisory reviews failed to identify the policy violations. The Parties are currently developing a written plan to achieve compliance with various provisions of this Agreement, including its Accountability provisions. The plan will enhance this provision that broadly requires Department managers to be held accountable should they fail to address use of force problems. The Department must hold Deputies accountable for use of force violations and hold supervisory staff accountable when they fail to identify and/or appropriately address violations.

**1.3 Status:** Out of Compliance            **As of Date:** N/A

## 1.4 Reports to the Board of Supervisors

**Provision Description:** Department regularly reports to the Board of Supervisors on use of force status and compliance with the Action Plan.

> *Compliance Measure:* Report publicly at least every six months to the Board of Supervisors on use of force data, training, investigation outcome summaries, and discipline as well as overall compliance.

The Department did not report to the Board of Supervisors (BOS) on the use of force status and compliance with the Action Plan during the Third or Fourth Quarter of 2022. The timing of the regular reports to the BOS are triggered by the Panel's reports filed with the Court. As a result of the changes to the configuration of the Panel, the Eleventh Report was delayed. The Department appeared before the BOS in July 2023 and addressed the Eleventh Report.

**1.4 Status:** Compliance            **As of Date:** June 12, 2018

# B. Management Visits

The recommendations in Sections 10.1 and 10.2 of the Action Plan address required tours of senior managers and the documentation of visits on housing units.

11

## 10.1 Senior Manager Tours

**Provision Description:** Senior managers ranked Unit Commanders and above should be required to periodically tour jail facilities, including nights and weekends.

> ***Compliance Measures Summary:*** 10.1(a) Unit Commanders tour at least two evenings and one weekend day per quarter.

During the Third and Fourth Quarter of 2022, the Unit Commanders from MCJ, IRC and TTCF met the requirements of this provision with 100% compliance.

> ***Compliance Measures Summary:*** 10.1(b)–(e) Varying frequencies in visit requirements for Department executives—Unit Commanders up to Sheriff—to tour and inspect the Downtown Jail Complex.

These requirements were met for both quarters of the Twelfth Reporting Period. The Commanders, Chiefs in Custody Operations, the Assistant Sheriff and the Sheriff achieved 100% compliance with the requirements to tour and inspect the Downtown Jail Complex. In the Eleventh Report, the Panel noted that Former Sheriff Alex Villanueva's tours of the facilities were for very short periods of time. Sheriff Robert Luna was sworn in as Sheriff on December 5, 2022. The Panel did not have the opportunity to raise the issue of abbreviated tours with Sheriff Luna until their first meeting on December 21, 2022. The Panel addressed the importance of conducting meaningful tours and inspections with Sheriff Robert Luna and invited him to accompany the Panel during their next Monitoring Visit. Sheriff Luna accompanied the Panel on a portion of their tour of the downtown facilities in March 2023. The Panel observed Sheriff Luna engaging in lengthy conversations with staff and inmates.  The Panel finds the Department in Compliance with this provision.

**10.1 Status:** Compliance          **As of Date:** June 30, 2018

## 10.2 Housing Unit Documentation

**Provision Description:** Housing units should document visits from department managers in electronic records or visitor logs.

> ***Compliance Measure Summary:*** Visits by Department managers to the Downtown Jail Complex are documented and made available to the Monitors.

The visits to the jail facilities by Department managers (above the rank of Sergeant) were documented in electronic visitor logs for the Twelfth Reporting Period. The logs in SharePoint noted only the required number of visits to meet the threshold for Provision 10.1 compliance. For example, Provision 10.1 (a)(b)(c) requires a total of 72 inspections. At least 72 were completed and the logs for those inspections are noted in SharePoint.

**10.2 Status:** Compliance          **As of Date:**  June 30, 2018

# C. Rotations and Transfers

The recommendations in Sections 18.1, 18.2, and 20.1 of the Action Plan address custody-wide rotation policies, semi-annual audits of unit compliance, and not assigning or transferring staff to custody as a formal sanction.

## 18.1 Custody-Wide Rotation Policy

**Provision Description:** Maintain a custody-wide rotation policy and rotate staff members as often as provided by policy.

12

## 18.2 Semi-Annual Rotation Audit

**Provision Description**: Conduct an audit semi-annually for each unit's compliance with rotation policies.

> ***Compliance Measures Summary:*** Maintain facility rotation policy and audit compliance every six months. Provide reports to the Monitors to demonstrate if at least 90% of staff were rotated according to policy.

The Department's posted results reflect that the Department achieved 99.6% Compliance in the Twelfth Reporting Period. Each of the Downtown jail facilities had a current Unit Order setting forth its rotation policy and the source documents indicate that most Department personnel are rotated in Compliance with these policies. In the Eleventh Report, the Panel requested the Administration Commander carefully review the list of posts exempted from the 6-month rotation rule and review future Unit Orders pertaining to Facility Job Rotation. During the Panel's site visit in July 2023, the Administration Commander indicated they had reviewed the posts exempted from the 6-month rotation rule and were making appropriate adjustments to the list of exempted posts. The Panel engaged in preliminary discussions with management staff regarding the benefits of not rotating some staff assigned to certain mental health units. The Panel looks forward to continuing the dialogue on this issue.

**18.1 Status:** Compliance          **As of Date:** June 30, 2018
**18.2 Status:** Compliance          **As of Date:** January 1, 2019

## 21.1 Transfers to Custody

**Provision Description:** Policy should provide that a staff member will not be assigned to Custody as a formal or informal sanction for problem Deputies.

> ***Compliance Measures Summary:*** On a quarterly basis, personnel records are reviewed for staff transferred to Custody from other divisions and a report is provided to the Monitors identifying each staff member who was transferred to Custody within six months of a finding of misconduct or policy violation.

The Department's Twelfth Self-Assessment reflects that it maintained 100% compliance from July 1, 2022, through December 31, 2022. The Panel has reviewed the Department's source documents stating the reasons for Deputy transfers to Custody during the Twelfth Reporting Period. No Department member was transferred or assigned to Custody as a sanction for misconduct or a policy violation during the Twelfth Reporting Period.

**21.1 Status:** Compliance          **As of Date:** June 30, 2018

The chart below is a visual representation of compliance for the above provisions from the last three reports. The shading of the boxes indicates compliance status–blue for *compliance* and red for *out of compliance.* Where percentage of compliance is available, it is progressively noted by intensity of the color. The "As Of" column shows date since first found compliant and the last column includes a check mark if the date meets or exceeds three years of compliance. A chart is provided with each section.

| Administrative Provisions | | Tenth Report | Eleventh Report | Twelfth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| | | 1Q21 - 2Q21 | 3Q21 - 2Q22 | 3Q22 - 4Q22 | | |
| 1.1 | Assistant Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.2 | Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.3 | Supervision | X | X | X | | |
| 1.4 | Reports to Board | C | C | C | 6/12/2018 | ✓ |
| 10.1 | Jail Visits | C | C | C | 6/30/2018 | ✓ |
| 10.2 | Documented Visits | C | C | C | 6/30/2018 | ✓ |
| 18.1 | Rotation in Custody | C | C | C | 6/30/2018 | ✓ |
| 18.2 | Documentation of Rotation | C | C | C | 1/1/2019 | ✓ |
| 21.1 | Transfers to Custody | C | C | C | 6/30/2018 | ✓ |

13

# II.    Use of Force Policies and Practices

## A. Overall Use of Force Policies

The recommendations in Sections 2.1, 8.2, 17.2, 20.1, and 20.2 of the Action Plan address the revision, modification, and organization of policy into one logical manual.

### 2.1 Separate and Organized Custody Force Manual for Custody Operations

**Provision Description:** The Action Plan requires the Department to "have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations[.]"

### 8.2 Complaints of Retaliation into Grievance Policy

**Provision Description:** Combine retaliation provisions into one grievance section to ensure a single, consistent policy on handling grievances.

### 17.2 Pregnant Inmate Policy

**Provision Description:** Combine and conform provisions related to restraints on pregnant inmates with medically ordered restraint provisions.

### 20.1 Categories of Force in Policy

**Provision Description:** Policy indicates only two types of force: reactive and planned.

The Department's Supervisor's Use of Force Investigation Form (P438) still lists various types of force (e.g., reactive, etc.) The Panel requested that the form be revised by July 1, 2023 in order to remain in Compliance with this provision for the Thirteenth Reporting Period.

### 20.2 Reactive Force Definition

**Provision Description:** Reactive Force is defined as force used in response to an immediate threat of safety, destruction, or escape, and when there is no time to wait for assistance.

> ***Compliance Measure Summary***: A Custody Division Manual that includes all force policies applicable to Custody Operations, including those outlined by 8.2, 17.2, 20.1, and 20.2.

On October 16, 2015, the Department provided the Panel with a Custody Operations Force Manual with separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints, Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved Shootings. The Department's Custody Force Manual satisfies Section 2.1 and includes specific provisions that satisfy Sections 8.2, 17.2, 20.1, and 20.2 of the Action Plan.

**2.1, 8.2, 17.2, 20.1, and 20.2 Status:** Compliance          **As of Date:** January 1, 2017

| Use of Force Policy Provisions | | Tenth Report 1Q21 - 2Q21 | Eleventh Report 3Q21 - 2Q22 | Twelfth Report 3Q22 - 4Q22 | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 2.1 | Custody Force Manual | C | C | C | 1/1/2017 | ✓ |
| 8.2 | Complaints of Retaliation | C | C | C | 1/1/2017 | ✓ |
| 17.2 | Pregnant Inmates | C | C | C | 1/1/2017 | ✓ |
| 20.1 | Categories of Force | C | C | C | 1/1/2017 | ✓ |
| 20.2 | Reative Force | C | C | C | 1/1/2017 | ✓ |

## B. Use of Force Practices & Review of Packages

The recommendations in Sections 2.2 through 2.13, 4.1 through 4.5, 9.2, 9.3, 17.5, and 20.3 have provisions related to policy as well as application. The Panel reviewed multiple drafts of the Department's policies to implement these recommendations, required changes where appropriate, and certified that the Department had implemented these policy recommendations effective December 1, 2015.

For the Twelfth Reporting Period a total of 50 packages were reviewed: 25 in 3Q22 and 25 in 4Q22. The cases reviewed for each quarter did not necessarily occur in the quarter they were reviewed, nor was the investigation necessarily completed during that quarter. The Panel requests at least 30 cases per quarter for review. The Panel reviewed cases as they were received. The cases reviewed involved incidents from January 2021 through December 2022. Overall results for the Twelfth Reporting Period by provision are below. Findings for each quarter are provided in Section C: *Quarterly Findings*.

> ***Compliance Measure Summary:*** (#1-7) Within 10 days of the end of each quarter the Department will provide the Monitors with a cumulative force synopsis for each incident in the Downtown Jail Complex showing the status of force investigations. The Monitors will select a minimum of 25 force packages to review for compliance with the Action Plan of all force provisions through Vertical and Horizontal Assessments. The Department will provide each package and include a summary sheet that indicates how the Department assessed each applicable provision. Force incidents will need to be 90% or more compliant with each provision for the Vertical Assessments.

**Vertical Assessment:** Of the 50 cases reviewed, eight (8) were found compliant with Force Provisions, which is 16% of all cases reviewed and below the 90% compliance threshold. Of the eight (8) cases found in compliance with all Force provisions two (2) were from 3Q22 (one at TTCF and one at IRC) and six (6) were from 4Q22 (four at MCJ and two at TTCF).

**Horizontal Assessment:** The findings for the twenty (20) use of force practice provisions in this section represent the Horizontal Assessment, which determines that the Department is in Compliance with each of the applicable Force Provisions. It takes into consideration the objective of the provision and the nature and extent of any violations of the provision. Percentages are calculated based on packages reviewed in both quarters.[10]

## 2.2 Force Prevention Principles

**Provision Description:** Policy provides that force be used as a last resort, with minimal amount of force necessary, terminated as soon as reasonably safe to do so, and de-escalated as resistance decreases.

Of the 50 use of force packages reviewed, 20 cases were found compliant with this provision, which amounts to 40% compliance and is below the 90% compliance threshold. This 40% compliance rate represents a decrease from the 67% compliance rate noted in the Eleventh Report.

**2.2 Status:** Out of Compliance          **As of Date:** N/A

## 2.3 Inmate-on-Inmate Violence

**Provision Description:** Policy indicates it is a violation for staff to cause, facilitate, or provoke inmate-on-inmate violence or to expose inmates to an unreasonable risk of assault. Further, staff are prohibited from publicly humiliating inmates or using slurs or obscenities.

---

[10] For the Horizontal Assessments, the Panel has determined that Compliance will require 90% of the applicable force provisions were in Compliance. The Panel may exercise their discretion and depart from this 90% requirement when considering the objective of the provision and the nature and extent of any violation of the provision.

Of the applicable cases reviewed, 81% (25 out of 31) were found to be in compliance, which is below the 90% compliance threshold. The six cases deemed out of compliance involved staff's unprofessional behavior/use of obscenities. There were no instances in which staff caused, facilitated, or provoked inmate-on-inmate violence.

**2.3 Status:** Out of Compliance        **As of Date:** N/A

## 2.4 Use of Force as Discipline

**Provision Description:** Policy indicates use of force not be used as discipline or corporal punishment.

Of the applicable cases reviewed, 98% (48 out of 49) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.4 Status:** Compliance        **As of Date:** July 1, 2019

## 2.5 Force on Restrained Inmate

**Provision Description:** Policy indicates staff may not strike, use chemical agents, or Taser a restrained inmate, unless the inmate is assaultive, presents an immediate threat, and no other reasonable means.

Of the applicable cases reviewed, 86% (30 out of 35) were found to be in compliance, which is below the 90% compliance threshold.

**2.5 Status:** Out of Compliance        **As of Date:** N/A

## 2.6 Head Strikes or Kicks

**Provision Description:** It is prohibited to strike an inmate in the head, kicking an inmate who is on the ground, or kicking an inmate above the knees if not on the ground unless the inmate is assaultive and presents an imminent danger and there are no more reasonable means to avoid injury. Kicking an inmate who is not on the ground below the knees is prohibited unless used to create distance between a staff member and an assaultive inmate.

Of the applicable cases reviewed, 52% (26 out of 50) were found to be in compliance, which is below the 90% compliance threshold. The 52% compliance rate represents a decrease from the 65% compliance rate noted in the Eleventh Report.

**2.6 Status:** Out of Compliance        **As of Date:** N/A

## 2.7 Supervisor Called to Scene

**Provision Description:** A supervisor must be called to the scene in a situation where use of force may be required as soon as time and circumstances permit.

Of the applicable cases reviewed, 90% (45 out of 50) were found to be in compliance, which meets the 90% compliance threshold.

**2.7 Status:** Compliance        **As of Date:** January 1, 2023

## 2.8 Prevent Excessive Force

**Provision Description:** All members are responsible for preventing excessive uses of force and those who witness such events have a duty to stop, reduce, or control the use of force being used.

Of the applicable cases reviewed, 86% (25 out of 29) were found to be in compliance, which is below the 90% compliance threshold.

**2.8 Status:** Out of Compliance        **As of Date:** N/A

16

## 2.9 Armed Inmates

**Provision Description:** When confronting an armed inmate, every effort should be made to control the inmate at a distance.

Of the applicable cases reviewed, 88% (7 out of 8) were found to be in compliance, which is below the 90% compliance threshold. Given the small universe of applicable cases, the Panel has determined that failing to meet the standard in one case should not remove the County from Compliance for this Provision.

**2.9 Status:** Compliance          **As of Date:** July 1, 2019

## 2.10 Authorized Weapons

**Provision Description:** Department members can only use authorized weapons for which they have been trained. Any available instrument can be used to prevent imminent loss of life or serious bodily injury if no other means or alternative is available.

Of the applicable cases reviewed, 95% (36 out of 38) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.10 Status:** Compliance          **As of Date:** July 1, 2019

## 2.11 Planned Chemical Spray

**Provision Description:** After applying a chemical agent, members are required to wait a sufficient amount of time before applying additional chemical or force in a cell extraction or planned use of force.

Of the applicable cases reviewed, 80% (8 out of 10 cases) were found to be in compliance, which is below the 90% compliance threshold.

**2.11 Status:** Out of Compliance          **As of Date:** N/A

## 2.12 Chemical Spray & Tasers

**Provision Description:** Chemical sprays, Tasers, and stun devices should not be used against an inmate who no longer presents a danger or is no longer resisting, ones known to suffer medical conditions that may be aggravated by use, or in a manner contradictory to manufacturer guidance or Department training.

Of the applicable cases reviewed, 95% (20 out of 21) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.12 Status:** Compliance          **As of Date:** July 1, 2019

## 2.13 Check of Medical Records

**Provision Description:** An inmate's medical/mental health records should be checked prior to use of chemical agents, Tasers, or stun devices when time and circumstances permit.

Of the applicable cases reviewed, 71% (10 out of 14) were found to be in compliance, which is below the 90% compliance threshold.

**2.13 Status:** Out of Compliance          **As of Date:** N/A

## 4.1 Consult Mental Health Professionals

**Provision Description:** Require a mental health professional on-scene to attempt to resolve a situation during a cell extraction or planned use of force.

Of the applicable cases reviewed, 90% (9 out of 10) were found to be in compliance, which meets the 90% compliance threshold.

**4.1 Status:** Compliance          **As of Date:**    January 1, 2023

17

## 4.3 Spray on Mental Health Inmates

**Provision Description:** Discontinue use of chemical following an initial burst if the inmate is acutely psychotic or severely mentally disabled and unable to conform behavior to commands.

Of the applicable cases reviewed, 100% (6 out of 6) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.3 Status:** Compliance          **As of Date:** October 1, 2019

## 4.4 Cooling Off Periods

**Provision Description:** In situations involving a mentally ill inmate who does not present as an obvious danger to self or others is refusing to exit his or her cell, allow a reasonable cooling off period. After, a mental health professional or supervisor can attempt compliance without use of force.

Of the applicable cases reviewed, 100% (9 out of 9) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.4 Status:** Compliance          **As of Date:** January 1, 2023

## 4.5 Medical or Mental Health Provider Order

**Provision Description:** When a planned use of force is precipitated by a medical or mental health provider, such as for treatment purposes, the ordering provider, or designee, is given the opportunity to intervene to de-escalate and ensure order should remain in effect.

Of the applicable cases reviewed, 100% (4 out of 4) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.5 Status:** Compliance          **As of Date:** January 1, 2023

## 9.2 Escorting of Inmates

**Provision Description:** Following a use of force, the staff member escorting the recalcitrant inmate to medical, holding, or segregation should not be the same member involved in the confrontation.

Of the applicable cases reviewed, 90% (45 out of 50) were found to be in compliance, which meets the 90% compliance threshold.

**9.2 Status:** Compliance          **As of Date:** January 1, 2020

## 9.3 Duty to Protect & Intervene

**Provision Description:** Members have a duty to protect and to intervene in inmate-on-inmate violence when reasonably safe to do so.

Of the applicable cases reviewed, 100% (5 out of 5) were found to be in compliance, which exceeds the 90% compliance threshold.

**9.3 Status:** Compliance          **As of Date:** July 1, 2022

## 17.5 Minimize Medical Distress

**Provision Description:** Avoid, to the extent possible, placing weight on an inmate's back or shoulders in a way that impairs breathing. Once under control, place the inmate on side to minimize breathing problems.

Of the applicable cases reviewed, 49% (24 out of 49) were found to be in compliance, which is below the 90% compliance threshold. The biggest factor driving non-compliance for this provision is the use of the WRAP Restraint and the manner in which the inmates are placed in the device.

**17.5 Status:** Out of Compliance          **As of Date:** N/A

18

**20.3 Planned Force**

**Provision Description:** Planned Forces should be video recorded and include a medical professional on scene or on standby, a supervisor on scene, and with a Shift Supervisor approval.

Of the applicable cases reviewed, 62% (8 out of 13) were found to be in compliance, which is below the 90% compliance threshold.

**20.3 Status:** Out of Compliance          **As of Date:** N/A

# C. Quarterly Findings—Use of Force Provisions

## Combined 3Q and 4Q 2022 Results

For the Third and Fourth Quarter of 2022, the Panel reviewed 50 use of force incidents combined—20 from TTCF (40%), 21 from MCJ (42%), and 9 from IRC (18%).

The Department is not in Compliance with 10 of the 20 Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.3 Inmate-on-Inmate Violence, (3) 2.5 Force on Restrained Inmate, (4) 2.6 Head Strikes or Kicking Inmates, (5) 2.8 Prevent Excessive Force, (6) 2.9 Armed Inmates, (7) 2.11 Planned Chemical Spray; (8) 2.13 Check of Medical Records, (9) 17.5 Minimize Medical Distress, and (10) 20.3 Planned Use of Force.

Of the ten (10) Use of Force Provisions out of compliance, four (4) had compliance rates below 70% over 3Q22 and 4Q22 combined. Those provisions include the following:

- 2.2 Force Prevention Principles at 40% compliance.
- 2.6 Head Strikes or Kicking Inmates at 52% compliance.
- 17.5 Minimize Medical Distress at 49% compliance.
- 20.3 Planned Use of Force at 62% compliance.

The cases reviewed found full compliance, or 90% or above compliance, with the following ten (10) of the twenty (20) use of force provisions: 2.4, 2.7, 2.9, 2.10, 2.12, 4.1, 4.3 - 4.5, 9.2, and 9.3.

| Use of Force Practice Provisions, Packet Review | | Tenth Report | Eleventh Report | Twelfth Report | | |
|---|---|---|---|---|---|---|
| | | 1Q21 - 2Q21 | 3Q21 - 2Q22 | 3Q22 - 4Q22 | AS OF | 3YR+ |
| 2.2 | Force Prevention Principles | X | 67% | 40% | | |
| 2.3 | Inmate on Inmate Violence | C | 98% | 81% | | |
| 2.4 | Use of Force as Discipline | C | 99% | 98% | 7/1/2019 | ✓ |
| 2.5 | Force on Restrained Inmates | X | 84% | 86% | | |
| 2.6 | Head Strikes or Kicks | X | 65% | 52% | | |
| 2.7 | Supervisors Called to Scene | X | 81% | 90% | 1/1/2023 | |
| 2.8 | Prevent Excessive Force | C | 94% | 86% | | |
| 2.9 | Armed Inmates | C | 100% | 88% | 7/1/2019 | ✓ |
| 2.10 | Authorized Weapons | C | 97% | 95% | 7/1/2019 | ✓ |
| 2.11 | Planned Chemical Spray | C | 90% | 80% | | |
| 2.12 | Chemical Spray & Tasers | C | 93% | 95% | 7/1/2019 | ✓ |
| 2.13 | Check of Medical Records | X | 68% | 71% | | |
| 4.1 | Consult Mental Health Professionals | C | 77% | 90% | 1/1/2023 | |
| 4.3 | Spray on Mental Health Inmates | C | 100% | 100% | 10/1/2019 | ✓ |
| 4.4 | Cooling Off Periods | C | 81% | 100% | 1/1/2023 | |
| 4.5 | Medical or Mental Health Provider Order | C | 75% | 100% | 1/1/2023 | |
| 9.2 | Escorting of Inmate | C | 96% | 90% | 1/1/2023 | |
| 9.3 | Duty to Protect & Intervene | C | 100% | 100% | 7/1/2022 | |
| 17.5 | Minimize Medical Distress | C | 56% | 49% | | |
| 20.3 | Planned Use of Force | X | 68% | 62% | | |

19

## Third Quarter 2022 Results

In the Third Quarter of 2022, the Panel reviewed 25 force incidents—10 from TTCF (40%), 7 from MCJ (28%), and 8 from IRC (32%).

The Department is not in Compliance with 13 of the 20 Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.3 Inmate-on-Inmate Violence, (3) 2.5 Force on Restrained Inmate, (4) 2.6 Head Strikes or Kicking Inmates, (5) 2.7 Calling Supervisors to the Scene Before Physically Engaging with Recalcitrant Inmates, (6) 2.8 Prevent Excessive Force, (7) 2.11 Planned Chemical Spray, (8) 2.12 Chemical Spray and Tasers, (9) 2.13 Check of Medical Records, (10) 4.1 Consult Mental Health Professionals, (11) 9.2 Escorting of Inmates, (12) 17.5 Minimize Medical Distress, and (13) 20.3 Planned Use of Force.

Of the thirteen (13) Use of Force Provisions out of compliance, five (5) had compliance rates below 70% in 3Q22. Those provisions include the following:
- 2.2 Force Prevention Principles at 32% compliance.
- 2.6 Head Strikes or Kicking Inmates at 52% compliance.
- 4.1 Consult Mental Health Professionals at 67% compliance.
- 17.5 Minimize Medical Distress at 28% compliance.
- 20.3 Planned Use of Force at 63% compliance.

The cases reviewed for 3Q22 found full compliance, or 90% or above compliance, with the following seven (7) of the twenty (20) use of force provisions: 2.4, 2.9, 2.10, 4.3 - 4.5, and 9.3.

## Fourth Quarter 2022 Results

In the Fourth Quarter of 2022, the Panel reviewed 25 force incidents—10 from TTCF (40%), 14 from MCJ (56%), and 1 from IRC (4%).

The Department is not in Compliance with 9 of the 20 Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles; (2) 2.3 Inmate-on-Inmate Violence, (3) 2.5 Force on Restrained Inmates; (4) 2.6 Head Strikes or Kicking Inmates; (5) 2.9 Armed Inmates, (6) 2.11 Planned Chemical Spray, (7) 2.13 Check of Medical Records, (8) 17.5 Minimize Medical Distress, and (9) 20.3 Planned Use of Force.

Of the nine (9) Use of Force Provisions out of compliance, three (3) had compliance rates below 70% in 4Q22. Those provisions include the following:
- 2.2 Force Prevention Principles at 48% compliance.
- 2.6 Head Strikes or Kicking Inmates at 52% compliance.
- 20.3 Planned Use of Force at 60% compliance.

The cases reviewed for 4Q22 found full compliance, or 90% or above compliance, with the following eleven (11) of the twenty (20) Force provisions: 2.4, 2.7. 2.8, 2.10, 2.12, 4.1, 4.3 - 4.5, 9.2, and 9.3.

## Review of Force Incidents

The Action Plan requires that the Panel review selected force packages each quarter to assess whether the use of force is in Compliance with Sections 2.2 through 2.13, 4.1 through 4.5, 9.2, 9.3, and 17.5 (the "Force Provisions") of the Action Plan. The Panel participated in meetings with Custody Commanders and the Plaintiffs' Counsel regarding Use of Force cases reviewed for the Twelfth Reporting Period. The Panel found these meetings constructive and valued the various perspectives offered regarding proposed ratings for specific Force Provisions for various force packages. The Panel notes the value of these discussions would be improved if the cases at issue were recent. The Department continues to struggle to complete its use of force investigations in a timely manner. The Panel is hopeful the timeliness of investigations will improve with the newly formed Force Investigation Unit.

20

As summarized in Provision 2.2, the four components of force are as follows: (a) must be used as a last resort; (b) must be minimal amount of force that is necessary and objectively reasonable to overcome the resistance; (c) must be terminated as soon as possible consistent with maintaining control of the situation; and (d) must be de-escalated if resistance decreases. A pathway to *Rosas* compliance will entail a change in force reviews, accountability, and consistent employment of 'time and distance' techniques. In some cases, Deputies and Custody Assistants are not employing 'time and distance' or de-escalation techniques. Noted below are three cases: one illustrates restraint by deputies, one in which the components of Provision 2.2 were followed, and one not compliant with Provision 2.2.

In Case 1, Deputies created distance and used patience and time with an inmate aggressively blading his body and challenging them to fight.

**Investigation Report**: "Inmate YY was acting erratic, yelling, making racial comments, and made verbal threats to kill custody personnel. He ignored several verbal commands given to him and then threw a chair in the direction of Deputies. Force mitigation and prevention efforts were utilized."

IM *YY "took off his outer shirt and white t-shirt and threw them on the floor, 'showing he was ready to fight'. Deputy initiated a radio broadcast requesting sergeant and additional deputy personnel to respond to their location due to IM YY's recalcitrant behavior. IM YY took a fighting stance toward deputy personnel in the middle of the dayroom by blading his body and positioning his clenched fists in front of his waist. 'I saw muscle tension in his upper body as he challenged deputy personnel to a fight'."* When IM YY closed the distance on the deputies, he was tased.

Deputies used great restraint in managing this tense and volatile incident. All applicable Provisions were in Compliance with the exception of 2.10, use of a second taser (due to tactical miscommunication).

In Case 2, IM Z started two (2) fires in his cell using his suicide wrap. Deputies put out the fire with an extinguisher. They also used MK 9 spray to facilitate an emergency cell entry. The extraction had to be planned quickly. Deputies did the best job possible to get IM Z out of the cell for his personal safety.

This incident involved justifiable head strikes. IM Z punched a Deputy in the face and attempted to rip the face mask off of a Deputy who was laying on the floor in a cell that had fire, smoke and MK9 spray in the air with little to no visibility.  IM Z created a risk of serious bodily injury or death and there were no other options to stop his reckless actions during a volatile cell extraction. IM Z was punched in the face while assaulting Deputies. IM Z created a dangerous situation for himself and the deputies. IAB took the investigation due to a knee strike to the head.

In short, Deputies did a remarkable job bringing an end to this chaotic incident. All applicable Provisions were in Compliance with the exception of 15.6, separation of personnel to write reports.

Case 3 - This case involved an impermissible head strike.  The Panel observed the following in the video of the incident:  *Inmate AA was cuffed and secured to a fixed bench placed outside 171 E pod because he refused housing in a two-man cell. Deputy T took the initiative to visit with IM AA as he sat there. Suddenly, IM AA kicked Deputy T from his seated position. Deputy T immediately struck IM AA in the face knocking him backward before taking him to the floor where he was secured by multiple deputies.*

Deputy T had other reasonable means to control the suspect, such as a tactical retreat. The deputies had not requested a supervisor for IM AA's refusal, which is a violation of the recalcitrant inmate policy.

**The Watch Commander** reported "*Deputy T took immediate action to quell the attack and immediately de-escalated his use of force as Suspect AA stopped his attack."*

21

**The Unit Commander** stated "*Deputy T used personal weapons to stop an unprovoked attack from Suspect AA. Although Suspect AA was partially restrained, it appears he was attempting to cause serious injury to Deputy T when he delivered a front kick to Deputy T's knee. Once the assault from the inmate ceased, Deputy T and responding personnel immediately transitioned to simply restraining Suspect AA.*"

**The Commander** assessed Deputy T actions with the following statement "*consistent with Custody Division Policy and Rosas Settlement Agreement Provisions. Deputy T utilized a personal weapon and punched the suspect one time in the face to stop his assault. The suspect in this incident was assaultive, his violent action had presented the imminent danger or serious injury; however, there appeared an opportunity to retreat and reassess rather than immediately engaging the suspect, who was restrained to the bench. While Deputy T described barriers behind him, there was an open area to his left which he should have noticed in his tactical assessment. Additional personnel were in the immediate area, and this coupled with the area of egress to his left would have allowed Deputy T to distance himself from the suspect and consider other options. For these reasons, I found the force violated Custody Division Policy related to 7-01/020.00 Authorized Use of Force and Rosas Settlement Agreement Provision 2.6, as there appeared to be other reasonable means to avoid further injury*".

Only the Commander performed due diligence when analyzing this incident. This Force situation was in Non-Compliance with Provisions 2.2, 2.5, 2.6, 2.7, 17.5, 12.2, 12.3, 15.3, and 15.6.

22

# III.   Training

Sections 3.1 through 3.4 of the Action Plan require that Department members receive training on use of force policies, ethics, professionalism, and treating inmates with respect. New Department members are to receive six (6) weeks of specific training in Custody Operations. Sections 4.6 through 4.9 require the Department to provide Custody-specific, scenario-based skill development training for existing and new personnel in Crisis Intervention and Conflict Resolution and in "identifying and working with mentally ill inmates." Section 12.1 requires that Custody Sergeants receive training in conducting use of force investigations.

The Panel has previously deemed the Department to be complying "as of" the date reported by the Department for the completion of the initial training required for existing personnel. The Department's continuing compliance with the training provisions is determined by its compliance with the refresher training required every year or every other year. The Department submitted its report of refresher training compliance as part of its Twelfth Self-Assessment.

## A. Use of Force Training

### 3.1 Use of Force Training

**Provision Description:** Requires use of force training for all existing Department members in Custody Operations, which should include at a minimum, a one-time eight-hour use of force policy training course for all members assigned to Custody and then a two-hour refresher course every year.

> ***Compliance Measure Summary:*** Section 3.1(a) requires that 90% of Deputies and Custody Assistants assigned to Custody as of July 1, 2016 completed the required training.

As of June 30, 2018, the Department was found to be compliant with Section 3.1(a).

> ***Compliance Measure Summary:*** Section 3.1(b) requires that 90% of Deputies and Custody Assistants assigned to Custody who completed the initial training receive the two-hour refresher course every year.

The Panel's auditors previously verified the Department's reported annual refresher training results, and the Department was found to be in Compliance with Section 3.1(b) as of December 31, 2021. The Department's Augmented Twelfth Self-Assessment reports that it maintained compliance with Section 3.1(b) for 2022. The results were verified by the Panel's auditors and the Department is in Compliance with Section 3.1 for 2022.

**3.1 Status:** Compliance          **As of Date:** December 31, 2021

### 3.4 Custody-based Use of Force Scenarios

**Provision Description:** Custody-based, use of force scenarios included as part of the use of force policy training provided by the Custody Training & Standard Bureau on an in-service and refresher basis.

The use of force training approved by the Panel includes the custody-based use of force scenarios.

**3.4 Status:** Compliance          **As of Date:** June 30, 2018

23

## B. Ethics and Professionalism Training

### 3.2 Ethics and Professionalism Training

**Provision Description:** Requires training all existing Department members in Custody Operations, which should include at a minimum, a one-time four (4) hour training course in ethics, professionalism, and treating inmates with respect, and then a two (2) hour refresher course every other year.

*Compliance Measure Summary:* Section 3.2(a) requires that 90% of Deputies and Custody Assistants assigned to Custody as of July 1, 2016 completed the required training.

As of June 30, 2018, the Department was found to be in Compliance with the training requirements of Section 3.2(a).

*Compliance Measure Summary:* Section 3.2(b) requires that 90% of Deputies and Custody Assistants assigned to Custody who completed the initial training receive the two-hour refresher course every other year.

The Panel's auditors previously verified Compliance with Section 3.2(a) as of June 30, 2018 and with Section 3.2(b) as of December 31, 2019, through December 31, 2021. The Department's Augmented Twelfth Self-Assessment reports that it maintained compliance with Section 3.2(b) for 2022. These results were verified by the Panel's auditors and the Department is in Compliance with Section 3.2 for 2022.

**3.2 Status:** Compliance          **As of Date:** June 30, 2018

## C. Mental Health Training

### 4.6 Crisis Intervention

**Provision Description:** The Department should provide a minimum of 32 hours of custody-specific, scenario-based, skill development training to all Deputy Sheriffs on Crisis Intervention and Conflict Resolution with eight (8) hours of refresher training every other year.

### 4.7 Mentally Ill Inmates

**Provision Description:** The Department should provide a minimum of eight (8) hours of custody specific, scenario based, skill development training on identifying and working with mentally ill inmates to all existing Custody personnel with a four (4) hour refresher course every other year.

*Compliance Measure Summary:* Sections 4.6(a) and 4.7(a) requires that 90% of Deputies assigned to Custody as of July 1, 2016 completed the required training.

As of June 30, 2018, the Department was found to be Compliant with the De-Escalation and Verbal Resolution Training (DeVRT)[11], mentally ill inmates, and refresher training requirements of Sections 4.6(a) and 4.7(a).[12]

---

[11]One of the four key areas to be addressed in the Parties written plan to achieve compliance is the appropriate utilization of force avoidance and de-escalation techniques. Two of the Monitors reviewed the curriculum and observed 32 hours of the DeVRT Training in May 2023. Overall, the Monitors were impressed with the content and delivery of the training. They met with the Department's training staff and provided feedback regarding the curriculum. The Department is in the process of revising the DeVRT curriculum.

[12] Section 4.6 pertains to Deputies assigned to MCJ, TTCF, IRC, or assigned to work with mentally ill inmates at CRDF (the "Designated Facilities"). Section 4.7 pertains to remaining Deputies at CRDF, and all Deputies at NCCF

> *Compliance Measure Summary:* Sections 4.6(b) and 4.7(b) requires that 90% of
> Deputies assigned to Custody who completed the initial training receive the eight-hour
> refresher course every other year.

The Panel's auditors previously verified the Department's Compliance with Section 4.6(a) as of June 30,
2018, and with Section 4.6(b) as of December 31, 2018 through December 31, 2021. The Department's
Augmented Twelfth Self-Assessment reports that it maintained compliance with Section 4.6(b) for 2022.
These results have been verified by the Panel's auditors and the Department is in Compliance with
Section 4.6 as of June 30, 2018 through December 31, 2022.

After falling out of compliance in the Eleventh Report, the Department's Augmented Twelfth Self-
Assessment reports it regained compliance with Section 4.7(b) in 2022. These results have been verified
by the Panel's auditors and the Department is in Compliance with Section 4.7 as of January 1, 2023.

**4.6 Status:** Compliance          **As of Date:** June 30, 2018

**4.7 Status:** Compliance          **As of Date:** January 1, 2023

# D. New Deputy Sheriffs and Custody Assistants

## 3.3 Custody Training

**Provision Description:** Section 3.3 of the Action Plan requires training all new Deputies in use of force
and ethics, professionalism, and treating inmates with respect. Section 3.3 also requires the same for new
Custody Assistants, who have received training in these subjects during their Academy training.

> *Compliance Measure Summary:* Section 3.3 requires that 95% of new Deputies and
> Custody Assistants completed the required training.

The Department reported that since the First Reporting Period beginning on July 1, 2015, newly assigned
Deputies have been required to complete a six-week Custody Operations course that includes training in
use of force and ethics, professionalism and treating inmates with respect, and new Custody Assistants,
have received training in these subjects during their Academy training as required by Section 3.3. The
Panel's auditors previously verified results through June 30, 2022. The Department's posted results
reflect that the Department has met the 95% Compliance threshold through December 31, 2022. The
results have been verified by the Panel's auditors and the Department is in Compliance with Section 3.3
as of June 30, 2018 through December 31, 2022.

**3.3 Status:** Compliance          **As of Date:** June 30, 2018

## 4.8 Mentally Ill—New Staff

**Provision Description:** Provide a minimum of eight (8) hours of custody specific, scenario-based, skill
development training on identifying and working with mentally ill inmates to all new members as part of
the Jail Operations Continuum.

## 4.9 Crisis Intervention—New Staff

**Provision Description:** Provide a minimum of 32 hours of custody specific, scenario-based, skill
development training in Crisis Intervention and Conflict Resolution to new Department members in the
Academy or in Custody before they are assigned to any jail facilities.

---

and PDC jails. The Action Plan requires an initial eight (8) hour training course, and then a four (4) hour refresher
course every other year under Section 4.7. Deputies captured under Section 4.7 receive the same training as
Deputies under Section 4.6, which includes the training contemplated under Section 4.7.

*Compliance Measure Summary:* Sections 4.8 and 4.9 requires that 95% of new Deputies and Custody Assistants completed the required training.

The Department provides new Deputies in De-Escalation and Verbal Resolution Training (DeVRT) and training in identifying and working with mentally ill inmates (IIMI).[13]  The required DeVRT and IIMI training takes place after Deputy Sheriffs and Custody Assistant Academy graduations and prior to assuming duties at their unit of assignment. The Panel's auditors previously verified the Department was in Compliance with Sections 4.8 and 4.9 as of June 30, 2018, through June 30, 2022. The Department's Twelfth Self-Assessment reports that 100% of the new personnel received the required training in the Third and Fourth Quarters of 2022. These results have been verified by the Panel's auditors and the Department is in Compliance with Sections 4.8 and 4.9 as of June 30, 2018 through December 31, 2022.

**4.8 and 4.9 Status:** Compliance          **As of Date:** June 30, 2018

## 3.5 Additional Training and Mentoring

**Provision Description:** Requires Unit Commanders to determine "what additional training, counseling, or mentoring may be required when a personnel complaint involving the use of force is resolved with a finding that it 'Appears Employee Conduct Could Have Been Better' direct that the Department member undergo additional training, counseling, or mentoring, and document the action taken."

*Compliance Measure Summary:* Section 3.5 requires that 90% of personnel complaints involving use of force that were resolved with a "Appears Employee Conduct Could Have Been Better" finding reflect documentation that the Unit Commander reasonably determined what additional training, counseling or mentoring was required.

The Department's Twelfth Self-Assessment reports that there were no inmate grievances against staff involving use of force where the disposition was that it "Appears Employee Conduct Could Have Been Better." The Department is in Compliance with Section 3.5 as July 1, 2019 through December 31, 2022.

**3.5 Status:** Compliance          **As of Date:** July 1, 2019

## 3.6 Probation Reviews

**Provision Description:** Requires Unit Commanders to review new Department members within six (6) months of being initially assigned to Custody and again before the end of their probationary period.

*Compliance Measure Summary:* Section 3.6 requires that 95% of the new Department members in Custody Operations were reviewed (1) within six months after being assigned to Custody and (2) again before their first post-probationary assignment.

The Department's Twelfth Self-Assessment reports that it achieved 96% compliance in the Second Semester of 2022, greater than the 95% threshold required by Section 3.6. Therefore, the Department is in Compliance with Section 3.6 as of December 31, 2022. These results are subject to verification by the Panel's auditors.

**3.6 Status:** Compliance          **As of Date:** January 1, 2023

---

[13] The Panel has previously agreed that IIMI is included in the DeVRT curriculum of Section 4.9.

26

## E. Sergeant Training

### 12.1 Force Investigations Training

**Provision Description:** Requires that all Custody Sergeants receive an initial 16-hour block of training in conducting use of force investigations, reviewing use of force reports, and the Department's protocols for conducting such investigations. It also requires a two (2) hour refresher course every year.

> ***Compliance Measure Summary:*** Section 12.1-1 requires that 90% of all Custody Sergeants received the initial training and a two (2) hour refresher course every year. Section 12.1-2 requires that 95% of new Sergeants completed the required training before or within 90 days after they assume their duties in Custody.

The Panel approved the 16-hour initial training course required by Section 12.1 on February 24, 2017. The Panel's auditors previously verified Compliance with Section 12.1 as of July 1, 2019, through June 30, 2022. The Department's Twelfth Self-Assessment reports that it maintained compliance through December 31, 2022. These results have been verified by the Panel's auditors and the Department is in Compliance with Section 12.1 as of July 1, 2019 through December 31, 2022.

**12.1 Status:** Compliance          **As of Date:** July 1, 2019

| Training Provisions | | Tenth Report 1Q21 - 2Q21 | Eleventh Report 3Q21 - 2Q22 | Twelfth Report 3Q22 - 4Q22 | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 3.1 | Use of Force Training | X | C | C | 12/31/2021 | |
| 3.2 | Ethics & Professionalism | X | C | C | 6/30/2018 | ✓ |
| 3.3 | Custody Training | C | C | C | 6/30/2018 | ✓ |
| 3.4 | Custody-based Scenarios | C | C | C | 6/30/2018 | ✓ |
| 3.5 | Add Training and Mentoring | C | C | C | 7/1/2019 | ✓ |
| 3.6 | Probation Reviews | C | X | C | 1/1/2023 | |
| 4.6 | Crisis Intervention | X | C | C | 6/30/2018 | ✓ |
| 4.7 | Mentally Ill Inmates | X | X | C | 1/1/2023 | |
| 4.8 | Mentally Ill Inmates (new staff) | C | C | C | 6/30/2018 | ✓ |
| 4.9 | Crisis Intervention (new staff) | C | C | C | 6/30/2018 | ✓ |
| 12.1 | Force Investigations | C | C | C | 7/1/2019 | ✓ |

# IV.     Reporting and Investigation of Force Incidents

## A. Reporting and Investigation Provisions in Force Package Reviews

The findings below pertain to the application of policies into practice and are supported by the selection of use of force cases reviewed. For the Twelfth Reporting Period a total of 50 packages were reviewed: 25 in 3Q22 and 25 in 4Q22. Overall results for each provision during the Twelfth Reporting Period are below. Findings for each quarter are in *Section C: Quarterly Findings*.

> ***Compliance Measure Summary:*** (#1-7) Within 10 days of the end of each quarter the Department will provide the Monitors with a cumulative force synopsis for each incident in the Downtown Jail Complex. The Monitors will select a minimum of 25 force packages to review for compliance with the Action Plan of all reporting and investigations provisions through Vertical and Horizontal Assessments. The Department will provide each package and include a summary sheet that indicates how the Department assessed each applicable provision. Reporting and Investigations provisions will need to be 90% or more compliant for the Vertical Assessments.

**Vertical Assessment:** Of the 50 cases reviewed, four (4) were found compliant with Reporting and Investigative Provisions, which constitutes 8% of all cases reviewed and is below the 90% compliance threshold. Of the four (4) cases in compliance with Reporting and Investigative provisions, all were from 4Q22: two (2) from TTCF, one (1) from IRC, and one (1) from MCJ.

**Horizontal Assessment:** The findings for the seventeen (17) Reporting & Investigative Provisions represent the Horizontal Assessment, which determines the Department is in Compliance with each of the applicable Force Provisions. It takes into consideration the objective of the provision and the nature and extent of any violations of the provision. Percentages are calculated based on packages reviewed in both quarters.

## 4.2 Mental Health Professionals

**Provision Description:** Supervisors investigating uses of force are required to interview mental health professionals who witnessed the incident or attempted to resolve it. Record interview if consented to.

Of the applicable cases reviewed, 85% (6 out of 7) were found to be in compliance, which is below the 90% compliance threshold. However, given the small number of applicable cases and the fact the Department was found non-compliant in only one case, the Panel has found the Department compliant.

          **4.2 Status:**    Compliance               **As of Date:** January 1, 2023

## 5.2 Commander's Reviews

**Provision Description:** Evaluations of force incidents by Unit Commanders are reviewed pursuant to the category level requirement.

Of the applicable cases reviewed, 94% (47 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

          **5.2 Status:** Compliance               **As of Date:** January 1, 2023

## 5.3 Unexplained Discrepancies

**Provision Description:** Any unexplained tactical decisions or discrepancies among witnesses should be referred in writing between the reviewing Commander(s) and investigator.

28

Of the applicable cases reviewed, 93% (41 out of 44) were found to be in compliance, which exceeds the 90% threshold.

**5.3 Status:** Compliance            **As of Date:** July 1, 2022

## 12.2 Location of Inmate Interviews

**Provision Description:** Inmate witnesses to force incidents should be asked to be interviewed, and interviewed, away from other inmates.

Of the applicable cases reviewed, 51% (20 out of 39) were found to be in compliance, which is below the 90% compliance threshold.

**12.2 Status:** Out of Compliance        **As of Date:** N/A

## 12.3 Suspect Interviews

**Provision Description:** No Department member involved in the use of force should be present for or participate in the interviews.

Of the applicable cases reviewed, 90% (45 out of 50) were found to be in compliance, which meets the 90% compliance threshold.

**12.3 Status:** Compliance            **As of Date:** July 1, 2019

## 12.4 Uninvolved Supervisors

**Provision Description:** Force investigations should not be conducted by the direct supervisor of the staff member involved in the use of force.

Of the applicable cases reviewed, 88% (44 out of 50) were found to be in compliance, which is below the 90% compliance threshold.

**12.4 Status:** Out of Compliance        **As of Date:** N/A

## 12.5 Standard Order and Format

**Provision Description:** Use of force packages organized in a standard order and format.

Of the applicable cases reviewed, 98% (48 out of 49) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.5 Status:** Compliance            **As of Date:** July 1, 2019

## 15.1 Timeliness of Reports

**Provision Description:** Every staff member who uses or assists in a force incident completes a separate and independent written report before going off duty.

Of the applicable cases reviewed, 94% (47 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.1 Status:** Compliance            **As of Date:** July 1, 2019

## 15.2 All Department Witnesses

**Provision Description:** Each staff member who witnesses a use of force prepares a written report unless the Watch Commander specifically designates a witness when a large number witnessed the same event.

Of the applicable cases reviewed, 94% (47 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.2 Status:** Compliance            **As of Date:** July 1, 2019

29

## 15.3 Force by Other Members

**Provision Description:** Staff member who uses force describes the type used in a written report as well the type used by others.

Of the applicable cases reviewed, 78% (39 out of 50) were found to be in compliance, which is below the 90% compliance threshold.

**15.3 Status:** Out of Compliance      **As of Date:** N/A

## 15.4 Description of Injuries

**Provision Description:** Staff members who witness a use of force incident describe visible or apparent injuries to department members, inmates, or others involved.

Of the applicable cases reviewed, 76% (38 out of 50) were found to be in compliance, which is below the 90% compliance threshold.

**15.4 Status:** Out of Compliance      **As of Date:** N/A

## 15.5 Clarification After Video

**Provision Description:** A Department member who wants to make any clarifications or changes after viewing a video of a force incident should be required to either prepare a supplemental report or specifically note any changes to the Department member's initial report.

Of the applicable cases reviewed, 93% (27 out of 29) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.5 Status:** Compliance      **As of Date:** July 1, 2019

## 15.6 Separation of Deputies

**Provision Description:** To the extent practical, Department members should be separated until they have completed their use of force reports and/or witness reports.

Of the applicable cases reviewed, 16% (8 out of 50) were found to be in compliance, which is below the 90% compliance threshold. The Panel has advised the Department on how to document how the Deputies were separated to complete their reports.

**15.6 Status:** Out of Compliance      **As of Date:** N/A

## 15.7 Individual Perceptions

**Provision Description:** Report reviewers ensure each report reflects individual perceptions and recollections of the events and that they do not have common wording or phrasing.

Of the applicable cases reviewed, 90% (45 out of 50) were found to be in compliance, which meets the compliance threshold.

**15.7 Status:** Compliance      **As of Date:** July 1, 2019

## 16.1 Healthcare Assessment

**Provision Description:** A documented medical assessment of each inmate upon whom force is used as soon as practical after the force incident.

Of the applicable cases reviewed, 98% (49 out of 50) were found to be in compliance, which exceeds the compliance threshold.

**16.1 Status:** Compliance      **As of Date:** July 1, 2019

30

## 16.2 Photographs of Injuries

**Provision Description:** Supervisors investigating force incidents photograph any injury, swelling, or redness sustained by staff members and document the absence of injury.

Of the applicable cases reviewed, 83% (38 out of 46) were found to be in compliance, which is below the 90% compliance threshold.

**16.2 Status:** Out of Compliance        **As of Date:** N/A

## 16.3 Medical Report of Injuries

**Provision Description:** Medical staff treating an injured inmate report any injuries related to a use of force or an allegation by the inmate of a use of force.

Of the applicable cases reviewed, 96% (48 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**16.3 Status:** Compliance        **As of Date:** July 1, 2019

# B. Reporting & Investigations Provisions as Reported by Department

Many of the recommendations in the Action Plan that pertain to the reporting and investigation of force used by Department personnel in Custody Operations are assessed by the Panel through a review of the completed force packages. Other provisions are reported by the Department as follows:

## 5.1 Tracking of Force Incidents

**Provision Description:** Requires the Department to track the status of all investigations, reviews, and evaluations of all use of force incidents and allegations to ensure they were completed appropriately and timely. By the end of the shift, a supervisor or Internal Affairs investigator enters incidents into a database with a summary and an initial category classification.

> ***Compliance Measure Summary:*** 5.1(2) On a quarterly basis, Monitors determine if the completed force packages reviewed were entered into the database pursuant to 5.1(1).

The Department reports that 95% of the force incidents were timely entered into the database in the  Third Quarter of 2022 (19 out of 20 cases). In the Fourth Quarter of 2022, 100% of the 29 cases were timely entered into the database.

> ***Compliance Measures Summary:***
> 5.1(1) and (4a): 95% of use of force incidents are entered into the database within two hours of the end of shift in which the incident occurred.
> 5.1(4)b and c: 90% of investigations of Deputies and Custody Assistants were completed timely and appropriately.

Pursuant to The Panel's request, the Department began providing specific data pertaining to Compliance Measure 4(b) and 4(c).  The Department reports their compliance rate for the Third Quarter was 40% and 80% for the Fourth Quarter of 2022.

**5.1 Status:** Out of Compliance*        **As of Date:** N/A
*The Panel notes the Department has been in Compliance with 5.1 (1) and 4(a) since October 1, 2019.

31

## 8.3 CFRC Review

**Provision Description:** Evaluations of grievance investigations claiming force was used to retaliate against an inmate should be reviewed by the Custody Force Review Committee.

> ***Compliance Measures Summary:*** A list of completed investigations of inmate grievances claiming use of force was used in retaliation is provided quarterly to the Monitors and will include the CFRC review of the investigation's evaluation.

The Department reports, and the Panel concurs, that it achieved 100% Compliance with this provision in the Third and Fourth Quarters of 2022. There were 10 grievances reviewed in the Third Quarter of 2022 and 3 in the Fourth Quarter of 2022.

**8.3 Status:** Compliance          **As of Date:** June 30, 2021

## 11.1 CFRT Involvement

**Provision Description:** The Custody Force Rollout Team (CFRT) involvement in reviewing evaluations should not delay the investigation.

> ***Compliance Measure Summary***: 95% of the investigations reviewed by CFRT were not delayed and discipline imposed timely if there is a policy violation finding.

There were no force incidents reviewed by CFRT where there was a finding of a policy violation or misconduct in the Twelfth Reporting Period.

**11.1 Status:** Compliance          **As of Date:** June 30, 2018

## 13.1 Documenting Dishonesty

**Provision Description:** A firm zero tolerance policy for acts of dishonesty, use of excessive force, failures to report uses of force, and violations of PREA. For any staff member not terminated for such an act documentation is made as to the reason and the discipline imposed as well as placement on a monitored performance review program.

> ***Compliance Measures Summary:*** 95% compliance with all completed investigations where there was a finding of dishonesty, failure to report uses of force, or PREA violations as well as documentation for incidents that did not result in termination.

The Department's Self-Assessment indicates it achieved 100% compliance in both quarters of the Twelfth Reporting Period. The following is a summary of the data posted for each quarter.

- Third Quarter of 2022: No personnel were terminated for dishonesty during this quarter. However, there were two incidents found to violate the zero-tolerance policy for dishonesty: one involving a deputy and the second a sergeant. In the first case, a deputy did not return to his assignment and left the facility prior to the end of the shift. The deputy was suspended for 15 days without pay and placed on the Mentorship Program. In the second case, a sergeant was found to have submitted falsified overtime work hours and adjusted daily timecards. The sergeant retired prior to the Skelly Hearing. The Department states had the sergeant not retired he would have been terminated.
- Fourth Quarter of 2022: There were a total of seven incidents for this quarter involving ten staff members.
  a. One Custody Assistant was arrested off-duty for domestic violence and suspended for 15 days without pay. The Department determined discharge was not warranted. The Custody Assistant was scheduled for ethics training and placed in the Mentorship Program to monitor performance.

b. One Custody Assistant falsified records and failed to conduct quality safety checks and was suspended for 15 days without pay. The Department determined discharge was not warranted. The Custody Assistant was removed from conducting inmate safety checks, placed on Performance Mentorship, and attended Custody Division Force Policy Refresher Training, ethics training, and DeVRT refresher training.

c. One Deputy was charged with misdemeanor domestic battery and entered a 12-month informal diversion program. An IAB investigation was completed and the deputy was terminated.

d. One Deputy left the facility prior to the end of shift without notification or permission. The Deputy was terminated.

e. One Deputy failed to employ use of force prevention principles to deal with and reassess the actions of an inmate, which resulted in a Category 2 use of force. The deputy received a one-day suspension and attended Custody Division Force Policy Refresher Training.

f. Three Deputies failed to employ use of force prevention principles to deal with and reassess the actions of an inmate, which resulted in a Category 2 use of force. Two received a one-day suspension without pay and the third issued a written reprimand. All three attended Custody Division Force Policy Refresher Training.

g. One Custody Assistant and one Deputy failed to employ use of force prevention principles to deal with and reassess the actions of an inmate, which resulted in a Category 2 use of force. The Custody Assistant was the supervisor on scene and failed to take appropriate action. Each received a one-day suspension without pay and attended Custody Division Force Policy Refresher Training and DeVRT Refresher Training.

The Panel recognizes the need for accountability regarding staff's accurate and honest reporting in force packages. The Panel has shared a draft revised Compliance Measure for 13.1. Discussions regarding the revision will continue as part of the Accountability portion of the written Compliance Plans being created by the Parties.

**13.1 Status:** Compliance            **As of Date:** October 1, 2019

## 13.2 Reports of Dishonesty and PREA

**Provision Description:** All findings of dishonesty, failures to report uses of force, and violations of PREA and supporting documentation is provided to the Office of the Inspector General quarterly.

The Inspector General was advised of all the actions noted above in Section 13.1.

**13.2 Status:** Compliance            **As of Date:** October 1, 2019

## 14.1 Review of Criminal Referrals

**Provision Description:** An additional review of referrals of inmates for criminal prosecution arising from incidents involving the use of force by Department members to ensure charges are not being brought to help justify the use of force.

***Compliance Measures Summary:*** Requires the Department review all referrals of an inmate for criminal prosecution for assaulting a staff member and report to the Monitors that 95% of referrals were reviewed by the Unit Commander who verified charges were not brought as justification for use of force.

The Department reports 96% compliance with Section 14.1 for the Third Quarter of 2022. There were a total of 29 cases referred to the District Attorney's Office and in 28 of those cases, the Unit Commander

verified the charges were not brought as a justification for a use of force prior to the referral being sent to the District Attorney's Office. In the remaining case, the Unit Commander verified the charges were not brought as justification for a use of force approximately two months after the referral had been made.  For the Fourth Quarter of 2022, the Department reports 100% Compliance, indicating 24 cases were reviewed by a Unit Commander before the criminal referral was sent.

**14.1 Status:** Compliance         **As of Date:** July 1, 2018

### 14.2 Timeliness of Criminal Referrals

**Provision Description:** Timely forward incidents of officer misconduct that may amount to criminal violations to the Office of the District Attorney.

> ***Compliance Measures Summary:*** Requires the Department review all referrals of a staff member for possible prosecution for alleged misconduct and report to the Monitors that 90% of referrals were sent to the Office of the District Attorney within six months.

Source documents indicate there were no cases referred to the District Attorney for possible prosecution of a staff member during the Third and Fourth Quarters of 2022. There was no data to assess for this reporting period.

**14.2 Status:** Compliance         **As of Date:** July 1, 2018

| Reporting & Investigations Provisions, Department Reported | | Tenth Report | Eleventh Report | Twelfth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| | | 1Q21 - 2Q21 | 3Q21 - 2Q22 | 3Q22 - 4Q22 | | |
| 5.1 | Tracking of Force Incidents | C | C | X | | |
| 8.3 | CFRC Review | C | C | C | 6/30/2021 | |
| 11.1 | CFRT Involvement | C | C | C | 6/30/2018 | ✓ |
| 13.1 | Documenting Dishonesty | C | C | C | 10/1/2019 | ✓ |
| 13.2 | Reports of Dishonesty/PREA | C | C | C | 10/1/2019 | ✓ |
| 14.1 | Review of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |
| 14.2 | Timeliness of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |

## C. Quarterly Findings—Reporting and Investigations Provisions

### Third Quarter & Fourth Quarter 2022 Results

For the Third and Fourth Quarter of 2022, the Panel reviewed 50 use of force incidents combined—20 from TTCF (40%), 21 from MCJ (42%), and 9 from IRC (18%). The Department is not in Compliance with six (6) of the seventeen (17) Reporting & Investigations Provisions as follows: (1) 12.2 Location of Inmate Interviews, (2) 12.4 Uninvolved Supervisors, (3) 15.3 Force by Other Members, (4) 15.4 Description of Injuries, (5) 15.6 Separation of Deputies, and (6) 16.2 Photographs of Injuries.

Of the six (6) Reporting and Investigations Provisions out of compliance, two (2) had compliance rates below 70% in 3Q22 and 4Q22 combined. Those provisions include the following:
- 12.2 Location of Inmate Interviews at 51% compliance.
- 15.6 Separation of Deputies to Write Reports at 16% compliance.

The cases reviewed for both quarters found full compliance or 90% or above compliance with the following eleven (11) provisions: 4.2, 5.2, 5.3, 12.3, 12.5, 15.1, 15.2, 15.5, 15.7, 16.1, and 16.3.

| Reporting & Investigations Provisions, Packet Review | | Tenth Report | Eleventh Report | Twelfth Report | | |
|---|---|---|---|---|---|---|
| | | 1Q21 - 2Q21 | 3Q21 - 2Q22 | 3Q22 - 4Q22 | AS OF | 3YR+ |
| 4.2 | Mental Health Professionals | C | X | C | 1/1/2023 | |
| 5.2 | Commanders' Reviews | X | X | X | 1/1/2023 | |
| 5.3 | Unexplained Discrepancies | X | C | C | 7/1/2022 | |
| 12.2 | Location of Inmate Interviews | X | X | X | | |
| 12.3 | Suspect Interviews | C | C | C | 7/1/2019 | ✓ |
| 12.4 | Uninvolved Supervisors | C | C | X | | |
| 12.5 | Standard Order & Format | C | C | C | 7/1/2019 | ✓ |
| 15.1 | Timeliness of Reports | C | C | C | 7/1/2019 | ✓ |
| 15.2 | All Department Witnesses | C | C | C | 7/1/2019 | ✓ |
| 15.3 | Force by Other Members | X | X | X | | |
| 15.4 | Description of Injuries | C | C | X | | |
| 15.5 | Clarification After Video | C | C | C | 7/1/2019 | ✓ |
| 15.6 | Separation of Deputies | X | X | X | | |
| 15.7 | Individual Perceptions | C | C | C | 7/1/2019 | ✓ |
| 16.1 | Healthcare Assessment | C | C | C | 7/1/2019 | ✓ |
| 16.2 | Photograph of Injuries | C | X | X | | |
| 16.3 | Medical Report of Injuries | C | C | C | 7/1/2019 | ✓ |

### Third Quarter 2022 Results

For the Third Quarter of 2022, the Panel reviewed 25 force incidents—10 from TTCF (40%), 7 from MCJ (28%), and 8 from IRC (32%). The Department is not in Compliance with eleven (11) of the seventeen (17) Reporting & Investigations Provisions as follows: (1) 5.2 Commander's Reviews, (2) 5.3 Unexplained Discrepancies, (3) 12.2 Location of Inmate Interviews, (4) 12.3 Suspect Interviews, (5) 12.4 Uninvolved Supervisors, (6) 15.1 Timeliness of Reports, (7) 15.3 Force by Other Members, (8) 15.4 Description of Injuries, (9) 15.5 Clarification After Video, (10) 15.6 Separation of Deputies, and (11) 15.7 Individual Perceptions.

Of the eleven (11) Reporting and Investigations Provisions out of compliance, two (2) had compliance rates below 70% in 3Q22. Those provisions include the following:
- 12.2 Location of Inmate Interviews at 52% compliance.
- 15.6 Separation of Deputies to Write Reports at 4% compliance.

The cases reviewed for this quarter found full compliance or 90% or above compliance with the following six (6) provisions: 4.2, 12.5, 15.2, 16.1, 16.2, and 16.3.

### Fourth Quarter 2022 Results

In the Fourth Quarter of 2022, the Panel reviewed 25 force incidents—10 from TTCF (40%), 14 from MCJ (56%), and 1 from IRC (4%). The Department is not in Compliance with the following Reporting & Investigations Provisions: (1) 4.2 Mental Health Professionals; (2) 12.2 Location on Inmate Interviews; (3) 12.4 Uninvolved Supervisors; (4) 15.3 Force by Others, (5) 15.4 Description of Injuries, (6) 15.6 Separation of Deputies to Write Reports; (7) 15.7 Individual Perceptions; and (8) 16.2 Photographs of Injuries.

Of the eight (8) Reporting and Investigations Provisions out of compliance, two (2) had compliance rates below 70% in 4Q22. Those provisions include the following:
- 12.2 Location of Inmate Interviews at 50% compliance.
- 15.6 Separation of Deputies to Write Reports at 28% compliance.

The cases reviewed for this quarter found full compliance or 90% or above compliance with the following provisions: 5.2, 5.3, 12.3, 12.5, 15.1, 15.2, 15.5, 15.7, 16.1, and 16.3.

# V. Inmate Grievances

The Action Plan requires extensive changes in how the Department handles inmate grievances and requests for service. On July 15, 2016, the Department issued a new *Inmate Grievance Manual* (Volume 8 of the Custody Division Manual) to implement a new grievance system. The Panel assessed the Department's implementation of the new grievance system in the Twelfth Reporting Period as follows:

## A. Grievance Forms

### 6.1 Separate Grievance Forms

**Provision Description:** Inmate grievances and inmate requests reported on separate forms, either paper or electronically.

### 6.2 Availability of Grievance Forms

**Provision Description:** Grievance forms are reasonably available to inmates at all times.

During the Panel's November 2022 visit to the Downtown Jail Complex, the boxes within the housing units contained grievance forms.

### 6.6 Right to Appeal Form

**Provision Description:** Grievance forms include a check box indicating whether the complaint was upheld or denied and a statement regarding the right to appeal and time frame.

> *Compliance Measures Summary:* Monitors determine the availability of forms and requirements of 6.1 through 6.6 through onsite visits, interviews with inmates and staff, and a review of 25 consecutive force and retaliation grievances in a month.

The Panel has previously concluded that the forms meet the requirements of the Action Plan and include the appeals check box.

**6.1, 6.2, and 6.6 Status:** Compliance     **As of Date:** January 1, 2017

### 7.1 Conflict Resolution Meeting

**Provision Description:** Inmates who submit grievances should be advised that a conflict resolution meeting is voluntary to address the grievances without a personnel investigation. If successful, the grievance resolution is documented accordingly.

In the randomly selected months in the Third and Fourth Quarters of 2022, no grievances against staff were adjudicated in which a Conflict Resolution was conducted.  There was no data to assess from any facility.

**7.1 Status:** Compliance     **As of Date:** January 1, 2017

### 6.4 Use of Force Grievances

**Provision Description:** Grievance forms should include "use of force" as a specific category of "grievances against staff" and brought to the attention of Unit Commanders.

> *Compliance Measure Summary:* 90% of force grievances reviewed were brought to the attention of the Unit Commander within 10 days of receipt and properly handled.

The Department reports that 88% of force grievances were in Compliance with Section 6.4 in the Third Quarter of 2022. There were a total of  9 grievances that met the criteria for Section 6.4 - 8  were

properly handled and 1 was not.  The Department achieved 100% Compliance in the Fourth Quarter of 2022. In light of the fact there was only 1 grievance that was not handled properly, the Panel finds the Department is in Compliance with Section 6.4 for the Twelfth Reporting Period.

**6.4 Status:** Compliance        **As of Date:** July 1, 2018

## 6.5 Grievances Against Staff

**Provision Description:** Grievance forms should include "retaliation" and "harassment" as specific categories of "grievances against staff" and brought to the attention of Unit Commanders.

> ***Compliance Measure Summary:*** 90% retaliation grievances reviewed were brought to the attention of the Unit Commander within 10 days of receipt and properly handled.

The Department reports that 75% of the retaliation grievances in the Third Quarter of 2022 were brought to the Unit Commanders attention within 10 days and handled appropriately.  There were 12 grievances that met the criteria for 6.5 - 9 were handled appropriately, 3 were not.  In the Fourth Quarter of 2022, 100% of the grievances were handled appropriately.

**6.5 Status:** Out of Compliance        **As of Date:** N/A

# B. Emergency Grievances

## 6.3 Emergency Grievance Forms

**Provision Description:** A prominent box is placed on the form to indicate an "Emergency Grievance."

> ***Compliance Measure Summary:*** Monitors verify compliance with 6.3 through interviews of staff and inmates and review of grievances marked "emergency.

A prominent box is located on the grievance form and confirmed through reviews and interviews.

**6.3 Status:** Compliance        **As of Date:** January 1, 2017

## 6.7 Handling Emergency Grievances

**Provision Description:** Grievances marked "emergency" are given to and reviewed by a supervisor as soon as possible to determine if immediate action is needed to protect life or safety. Provide the inmate a written response documenting action taken to address the emergency.

> ***Compliance Measure Summary:*** Monitors review 50 consecutive grievances to ensure 95% of grievances marked "emergency" were reviewed and handled pursuant to Section 6.7.

The Department's Twelfth Self-Assessment reflects it achieved 100% compliance in the Third and Fourth Quarter of 2022. There were seven (7) grievances that met the criteria for Section 6.7 for the Twelfth Reporting Period and timely notification was provided to the inmate in 6 of those cases. In the remaining case, the inmate was released.

.        **6.7 Status:** Compliance        **As of Date:** July 1, 2018

## 6.8 Notification of Non-Emergency

**Provision Description:** If the grievance is determined to be non-emergent, the inmate is notified as soon as practical that the grievance will be handled as non-emergent with reason documented.

> ***Compliance Measure Summary:*** Monitors review 50 consecutive grievances to ensure 90% of those determined non-emergent were documented and notifications to inmates were made within five days.

The Panel has reviewed the 50 grievances posted for the Twelfth Reporting Period in which a grievance marked "emergency" was downgraded. For the Third Quarter of 2022, it was found that 100% of the grievances were correctly downgraded and the inmate was timely notified that the grievance will be handled as non-emergent.  The Department achieved 96% compliance with this provision in the Fourth Quarter of 2022.  There were 2 of the 50 grievances in which the inmate did not receive timely notification that their grievances would be handled as non-emergent.

**6.8 Status:** Compliance          **As of Date:** July 1, 2018

## C. Inmate Grievance Coordinator

The recommendations in Sections 6.9, 6.13, 6.14, and 6.15 of the Action Plan address expectations and duties of the Inmate Grievance Coordinator position.

### 6.9 Inmate Grievance Coordinator

**Provision Description:** Requires all emergency grievances be forwarded to the Inmate Grievance Coordinator (IGC) who will review for proper handling and notify the Unit Commander if not properly handled.

The Department's posted data pertaining to Section 6.9 indicates the IGC received the emergency grievances for the Twelfth Reporting Period and that there was not a need to notify the Unit Commander of improperly handled grievances. While the manner in which this data is tracked is not entirely clear, particularly with use of the "Null" Category, the Panel is hopeful the Department's new system for tracking grievances will provide more clarity on this, and other Provisions.

**6.9 Status:**  Compliance          **As of Date:**  July 1, 2018

### 6.13 Grievance Coordinator Tracking

**Provision Description:** Regularly track the handling of inmate grievances to ensure that the investigations are completed timely and reasonably, and that inmates are notified of the results of the investigations.

### 6.14 Grievance Coordinator Reports

**Provision Description:** Provide a monthly report to Unit Commanders on the status of grievances, timeliness of investigations, responses to grievances and appeals, and inmate notifications.

### 6.15 Grievance Coordinator Analysis

**Provision Description:** Analyze inmate grievances monthly to identify any problematic trends and provide that analysis in a monthly report to Unit Commanders and senior management.

> *Compliance Measures Summary:* Provide the Monitors with one or more quarterly report to address all requirements of the Coordinator provisions. The Inmate Grievance Coordinator will meet with the Monitors once a quarter.

The Department's posted documentation for the Third and Fourth Quarters of 2022 includes detailed reports and charts for managers as required by Sections 6.13, 6.14, and 6.15.

The Panel met with the Inmate Grievance Coordinator in June and November 2022 to discuss the Department's implementation of its grievance policies and procedures and overall trends with respect to the Department's handling of inmate grievances.

**6.13, 6.14, and 6.15 Status:** Compliance          **As of Date:** July 1, 2018

38

### 6.16 Centralized Grievance Unit

**Provision Description:** Establish a centralized unit to collect, review, categorize, forward for investigations, and make appropriate notifications for inmate grievances.

The Panel previously determined the Department's structure of a Grievance Coordinator supervising the grievance teams at all of the Downtown Jail Complex facilities was equivalent in function to a centralized system and was acceptable, pending progress and specific results. The Panel continues to deem the Department's Grievance Team structure acceptable.

        **6.16 Status:** Compliance           **As of Date:** January 1, 2017

## D. Handling of Grievances

### 6.10 Collection of Grievances

**Provision Description:** Grievances should be collected from the locked grievance boxes on each living unit no less frequently than once per day. Collection time should be recorded in a log and reviewed within 24 hours of collection.

> ***Compliance Measures Summary:*** Monitors will inspect collection boxes, verify that the database is accurate and up-to-date, and ensure that 95% of grievances selected for review are collected, reviewed, entered, and tracked timely.

The Department's Twelfth Self-Assessment reports that 100% of the reviewed grievances were collected and reviewed within 24 hours and handled as required in the Third and Fourth Quarters of 2022.  The collection logs provided by the Department yielded a 95% compliance rate for the Third Quarter of 2022 and a 97% compliance rate for the Fourth Quarter of 2022.  While the overall compliance rate for collecting and reviewing grievances as required by 6.10 is very good, the Panel is concerned with the low collection rates in certain floors/units within the downtown facilities.

As noted in our Eighth Report, the Compliance Measure for Section 6.10 does not yield data sufficient to assess compliance with this provision. For example, the first 25 consecutive grievances at TTCF for the selected months were collected within the first three days of the month. The fact that TTCF timely collected grievances from its collection boxes in those first three days does not provide a meaningful measurement of the Department's compliance with Section 6.10. As such, the Panel has reviewed (and will continue to review) the Unit Collection compliance data for the entire month to assess compliance with Section 6.10.

        **6.10 Status:** Compliance           **As of Date:** July 1, 2021

### 6.11 Failure to Handle Grievances

**Provision Description:** Failing to provide an inmate with a grievance form when requested, destroying or concealing grievances, failing to respond appropriately to a grievance, attempting to intimidate an inmate from filing a grievance, and retaliating against an inmate who has filed a grievance, may each be a cause for disciplinary action.

> ***Compliance Measure Summary:*** Provide the Monitors with a log of any inmate grievances about the matters encompassed by Paragraph 6.11, the result of the investigations of those grievances, and documentation that appropriate corrective action was taken in 100% of cases.

The Department reports that no staff members have been found to have engaged in the conduct encompassed by this Provision. In the Eleventh Report, the Panel expressed concern about the accuracy of the Department's methods for identifying 6.11 grievances.  In March 2023, the Panel met with the Custody Support Service Grievance Team and discussed their concerns with how the universe of 6.11

39

grievances was being identified. Following those discussions, the Grievance Team amended the Third and Fourth Quarter 2022 data posted in SharePoint. The universe of grievance was much broader than previously reported. The Panel finds the Department in Compliance with this provision.

**6.11 Status:** Compliance                    **As of Date:** July 1, 2022

## 6.12 Tracking Inmate Grievances

**Provision Description:** All inmate grievances should be entered into and tracked in an inmate grievance database that reflects the nature and status of the grievance, and personnel responsible for the Department's handling of the grievance.

> *Compliance Measures Summary:* Monitors will review 25 grievances from MCJ and 25 from TTCF to ensure that 95% of grievances reviewed are collected, reviewed, entered, and tracked timely.

The Department's Twelfth Self-Assessment reports that 98% of the grievances at both MCJ and TTCF in the randomly selected month in the Third and Fourth Quarter of 2022 were entered into the database as required by Section 6.12. The source documents for these results were available to, and reviewed by, the Panel.

**6.12 Status:** Compliance                    **As of Date:** July 1, 2018

## 8.1 Anti-Retaliation

**Provision Description:** Prohibits Department personnel from retaliating against inmates.

> *Compliance Measures Summary:* Department implements and enforces an anti-retaliation policy and provides Monitors with a quarterly log of cases and findings as well as the first 25 investigations alleging retaliation.

The Department posted the results of the investigations approved by Unit Commanders in the randomly selected months and the number of anti-retaliation grievances received and investigated in the Third and Fourth Quarters of 2022, which is as follows:

- Third Quarter of 2022 there were 40 anti-retaliation grievances received, nine investigations completed, and no founded violations of the anti-retaliation policy.
- Fourth Quarter of 2022 there were 20 anti-retaliation grievances received, two investigations completed and no founded violations of the anti-retaliation policy.

**8.1 Status:** Compliance                    **As of Date:** April 1, 2019

# E. Deadlines

## 6.17 Use of Force Deadlines

**Provision Description**: A 30-day deadline in place for filing use of force grievances by inmates.

> *Compliance Measures Summary:* 1(a), 95% compliance with the first 25 use of force grievances determined by the Department to be untimely.

The Department's source documents for this provision indicate they achieved 100% Compliance for the Twelfth Reporting Period. There were 4 use of force grievances that were submitted beyond the 30-day deadline. While those grievances were denied, they were still investigated.

**6.17 Status:** Compliance                    **As of Date:** October 1, 2019

## 6.18 PREA Deadline

**Provision Description:** There should be no deadline for filing Prison Rape Elimination Act grievances.

> *Compliance Measures Summary:* 1(b), 95% compliance with the first 25 PREA grievances.

There were 9 grievances filed during the Third Quarter of 2022 that met the criteria for Section 6.18. Since 1 of the 9 grievances was not handled timely, the Department achieved 88% Compliance with this Provision for the Third Quarter of 2022. Given the small universe of applicable grievances and the Department's sustained compliance with this Provision, the Panel finds the Department in Compliance for the Twelfth Reporting Period. There were no PREA related grievances filed in the randomly selected month of October (Fourth Quarter 2022).

**6.18 Status:**  Compliance          **As of Date:** July 1, 2018

## 6.19 Response to Inmate Grievances

**Provision Description:** Department should respond to inmate grievances "within 15 calendar days after the submission of the grievance," absent exceptional circumstances, which must be documented.

> *Compliance Measures Summary:* 1(d and e), 90% compliance with the first 25 grievances against staff and the first 25 grievances not against staff  in which the investigation was not completed within 15 days.

The Department reports responding to the randomly selected 25 grievances that were not against staff, within the 15-day deadline, 100% of the time for the Twelfth Reporting Period. For the 25 randomly selected grievances against staff, the Department's documents indicate they met the 15-day deadline in 84% of the cases in the Third Quarter of 2022 and 92% of the cases in the Fourth Quarter of 2022. The 84% Compliance rate represents 4 out of the 25 grievances that were untimely. The Department's Twelfth Self-Assessment indicates they achieved an overall 92% Compliance rate for the Third Quarter of 2022.

The Panel's review of the source documents for this provision found the Department is providing an inmate with either an extension or an interim response within 15 days. For example, out of the 25 grievances identified for 6.19 (d) for the Fourth Quarter of 2022, there were 16 extensions given and 3 interim responses. Since the extensions and interim responses were provided within the 15-day deadline, the Department was compliant. The purpose of this provision is to ensure inmates receive a substantive response to their grievance in a timely manner. The provision contemplates responses beyond the 15-day deadline to be rare occurrences, which is not what the data shows. The Panel recognizes that providing an extension or an interim response to the inmate within the 15-day deadline has qualified as compliance and will find the Department Compliant for this Reporting period.  However, to remain in Compliance of this Provision, the Panel will require the Department to provide inmates with a substantive response to their grievance within 15 calendar days, absent exceptional circumstances. The Panel will begin applying this standard on January 1, 2024.

**6.19 Status:**  Compliance          **As of Date:** July 1, 2022

## 6.20 Appeals of Grievances

**Provision Description:** Inmates should have 15 days from receipt of a denial of a grievance (or from release from segregations) to file an appeal of the grievance.

> *Compliance Measures Summary:* 1(c), 95% compliance with the first 25 appeals of grievances determined by the Department to be untimely.

According to the Department's source documents, there were no appeals that met the criteria for this provision during the Twelfth Reporting Period.

**6.20 Status:**  Compliance          **As of Date:** July 1, 2018

41

## F. Communications with Inmates

### 7.2 Notification of Results

**Provision Description:** Inmate should be advised of the results of the investigation of grievances against personnel, but not any sanction imposed, within 10 days of adjudication.

> *Compliance Measures Summary:* 1(f), 90% compliance with the first 25 completed grievances against staff, including the inmate notifications.

The Augmented Twelfth Self-Assessment reports the Department out of Compliance with this provision in the Third Quarter of 2022. Specifically, in 8 out of the 25 grievances against staff that were reviewed, the inmate was not notified of the adjudication of the grievance within the required 10-day timeframe. The Compliance Measure requires 90% Compliance and the Department achieved 68% Compliance for the Third Quarter of 2022. MCJ was issued a Corrective Action Plan and implemented new measures to ensure notifications were sent promptly. The Department's Compliance rate for the Fourth Quarter of 2022 was 92%. The Department respectfully requested the Panel find them in Compliance with this provision since they had been in Compliance since July 1, 2018. In considering the totality of the circumstances, the Panel has determined that a 68% Compliance rate cannot be deemed in Compliance.

**7.2 Status:** Out of Compliance          **As of Date**: N/A

### 7.3 Prisoner-Staff Communications

**Provision Description:** The Department should ensure that there are adequate avenues for constructive prisoner-staff communication, such as Town Hall meetings.

> *Compliance Measures Summary:* Maintain logs of Town Hall meetings and report to the Monitors that each jail facility has conducted Town Hall meetings for a randomly selected month per quarter. Monitors interview inmates and staff to assess the adequacy of communications.

The Department's Twelfth Self-Assessment reports that the Department was in Compliance with Section 7.3 during both the Third and Fourth Quarters of 2022.   The Department provided 10% of the recorded prisoner-staff communications that occurred during Town Hall meetings at MCJ and TTCF during the randomly selected months during the Twelfth Reporting Period that included Town Hall meetings in special housing units as well as in General Population housing units.

**7.3 Status:** Compliance                    **As of Date:** January 1, 2023

| Grievance Provisions | | Tenth Report | Eleventh Report | Twelfth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| | | 1Q21 - 2Q21 | 3Q21 - 2Q22 | 3Q22 - 4Q22 | | |
| 6.1 | Separate Grievance Forms | C | C | C | 1/1/2017 | ✓ |
| 6.2 | Availability of Grievance Forms | C | C | C | 1/1/2017 | ✓ |
| 6.3 | Emergency Grievances Forms | C | C | C | 1/1/2017 | ✓ |
| 6.4 | Use of Force Grievances | C | C | C | 1/1/2017 | ✓ |
| 6.5 | Grievances Against Staff | C | C | X | | |
| 6.6 | Right to Appeal Form | C | C | C | 1/1/2017 | ✓ |
| 6.7 | Handling Emergency Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.8 | Notification of Non-Emergency | C | C | C | 7/1/2018 | ✓ |
| 6.9 | Grievance Coordinator Review | C | C | C | 7/1/2018 | ✓ |
| 6.10 | Collection of Grievances | C | C | C | 7/1/2021 | |
| 6.11 | Failure to Handle Grievances | X | C | C | 7/1/2022 | |
| 6.12 | Tracking Inmate Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.13 | Grievance Coordinator Tracking | C | C | C | 7/1/2018 | ✓ |
| 6.14 | Grievance Coordinator Reports | C | C | C | 7/1/2018 | ✓ |
| 6.15 | Grievance Coordinator Analysis | C | C | C | 7/1/2018 | ✓ |
| 6.16 | Centralized Grievance Unit | C | C | C | 7/1/2017 | ✓ |
| 6.17 | Use of Force Deadline | C | C | C | 10/1/2019 | ✓ |
| 6.18 | PREA Deadline | C | C | C | 7/1/2018 | ✓ |
| 6.19 | Response to Inmate Grievances | X | C | C | 7/1/2022 | |
| 6.20 | Appeals of Grievances | C | C | C | 7/1/2018 | ✓ |
| 7.1 | Conflict Resolution Meeting | C | C | C | 1/1/2017 | ✓ |
| 7.2 | Notification of Results | C | C | X | | |
| 7.3 | Prisoner-Staff Communications | C | X | C | 1/1/2023 | |
| 8.1 | Anti-Retaliation | C | C | C | 4/1/2019 | ✓ |

# VI.   Use of Restraints

## 17.1 Restraint Provisions

**Provision Description:** Custody Force Manual must include "a separate section that sets forth the general principles governing the use of restraints."

The Panel concludes that the Department included such a separate section in the Manual.

> **17.1 Status:** Compliance          **As of Date:** December 1, 2015

## 17.3 Safety Chair Procedures

**Provision Description:** Requires immediate medical examinations of inmates placed in Safety Chairs with a use of force, or if the inmate struggles against the Safety Chair restraints. Section 17.3 also requires that inmates' vitals are checked every hour while in the Safety Chair.

> ***Compliance Measures Summary:*** Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex. The Monitors conduct a Vertical and Horizontal Assessment of approximately 25 incidents to determine at least 90% compliance with restraint provisions.

During the Twelfth Reporting Period, the Department provided the Inmate Safety Chair Security Check Logs for use of the safety chair and Fixed Restraint Logs at the Downtown Jail Complex for the Third and

Fourth Quarters of 2022.[14] The Panel's auditors continue to note there is no indication that medical professionals, or any Custody personnel, are performing vitals checks even though inmates are often in the safety chairs for several hours while in transport to and from court and during court proceedings. Periodic vitals checks are necessary to establish compliance even if the inmate does not struggle and force is not used to place the inmate in the Safety Chair.  Out of the 16 and 19 safety chair records provided for the Third and Fourth Quarters of 2022, the Panel's auditors note that there were no uses of force to place an inmate into the chairs.  However, due to vital checks not occurring as required the Department remains out of Compliance with Section 17.3.

**17.3 Status:** Out of Compliance        **As of Date:** N/A

## 17.4 Safety Checks

**Provision Description:** Requires safety checks of inmates in fixed restraints every twenty minutes to verify and document the inmate is not in indue pain or that restraints are not creating injury.

> ***Compliance Measures Summary:*** Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex. The Monitors conduct a Vertical and Horizontal Assessment of approximately 25 incidents to determine at least 90% compliance with restraint provisions.

The Inmate Safety Chair Security Check Logs and Fixed Restraint Logs reflect that Department personnel are generally conducting safety checks on many inmates every twenty minutes, as required by Section 17.4.[15] However, fixed restraint logs provided for the one inmate during the Third Quarter of 2022 and seven during the Fourth Quarter of 2022 provided did not explicitly document personnel verifying that the inmate is not in undue pain or that the restraints are not causing injury.[16]  One of the seven records from the Fourth Quarter of 2022 does not reflect a reason for the use of fixed restraints (handcuffs).[17] Therefore, for these reasons, the Department remains Out of Compliance with Section 17.4.

**17.4 Status:** Out of Compliance        **As of Date:** N/A

## 17.6 – 17.9 Multi-Point Restraints

**Provision Descriptions:** The provisions in these sections are specific to the use and application of multi-point restraints. The Department does not employ the use of multi-point restraints and these provisions are therefore not applicable.

**17.6 – 17.9 Status:** Not Applicable        **As of Date:** N/A

---

[14] The Panel's auditors continue to observe that the logs provided are often inconsistent from one log to the next in documenting the placement in or removal of an inmate from the safety chair.   The logs provided continue to not contain a field for hourly vitals checks to be recorded, a requirement of Section 17.3.

[15] While the use of safety chairs for transportation are not subject to Section 17.4, it should be noted that the Department's policy requires safety checks to be recorded every 15 minutes. Based on the Department's posted results, all safety chair records provided for the Third and Fourth Quarters of 2022 are related to transportation. The Department did not provide any WRAP Restraint/WRAP Cart Security Check Logs for this Reporting Period. The Parties are working on a policy to govern the use of the WRAP restraint.  Once the policy is finalized the Panel will draft an appropriate Compliance Measure to assess compliance with the Action Plan.

[16] While no uses of the safety chair during this Reporting Period are subject to Section 17.4, unlike the Inmate Safety Chair Security Check Logs contain a field verifying whether or not there were "any visible signs of injury or complaint of pain caused by safety chair[,]" the Fixed Restraint Logs do not contain a similar field.

[17] In the field for "Inmate's Initial Behavior and Reason for Fixed Restraint Application," the only notation by the Department is "cooperative," appearing to be in response to the inmate's initial behavior and not the reason for the use of handcuffs.

44

## 17.10 Involuntary Medications

**Provision Description:** The Department's Custody use of force policies should provide that medication may not be used solely for security purposes.

> ***Compliance Measures Summary:*** Department will provide a log documenting the administration of involuntary medications and the reason for it. Monitors will review the log and interview involved medical and mental health professionals to verify medication was not used solely for security purposes.

The Department's posted results reflect that every administration of involuntary medications was pursuant to court order and there were no instances in which medication was used solely for security purposes in the Twelfth Reporting Period. According to the log of Administration of Involuntary Medication, 430 inmates in the Third Quarter of 2022 and 441 inmates in the Fourth Quarter of 2022 received involuntary medication.

**17.10 Status:** Compliance          **As of Date:** July 1, 2018

| | | Tenth Report | Eleventh Report | Twelfth Report | | |
|---|---|---|---|---|---|---|
| **Restraint Provisions** | | **1Q21 - 2Q21** | **3Q21 - 2Q22** | **3Q22 - 4Q22** | **AS OF** | **3YR+** |
| 17.1 | Restraint Provisions | C | C | C | 12/1/2015 | ✓ |
| 17.3 | Safety Chair Procedures | X | X | X | | |
| 17.4 | Safety Checks | X | X | X | | |
| 17.6 | Multi-Point Restraint Procedures | X | N/A | N/A | | |
| 17.7 | Approval of Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.8 | Continued Use of Restraints | N/A | N/A | N/A | | |
| 17.9 | Supervisor Approval of Restraints | N/A | N/A | N/A | | |
| 17.10 | Involuntary Medications | C | C | C | 7/1/2018 | ✓ |

# VII. Early Warning System

## 19.1 Development of EWS

**Provision Description:** Develop a system to identify potentially problematic Department members based upon objective criteria, such as number of force incidents, inmate grievances, allegations of misconduct, performance reviews, and policy violations.

> ***Compliance Measure Summary:*** The system identifies potentially problematic employees upon objective criteria.

The Panel approved the Employee Review System ("ERS") in July 2018, and it was implemented by the Department as a pilot program in the Downtown Jail Complex on August 1, 2018, and in the rest of the jail facilities as of November 1, 2018.

**19.1 Status:** Compliance          **As of Date:** August 1, 2018

## 19.2 Review of EWS Reports

**Provision Description:** Compliance Lieutenants review reports monthly to identify potentially problematic Department members and promptly notify the Unit Commander and the Assistant Sheriff for Custody Operations in writing.

> ***Compliance Measure Summary:*** Unit Commanders make notifications within ten days 90% of the time and within thirty days 95% of the time.

45

For the Third Quarter of 2022, the Department's posted results indicate the Compliance Lieutenant notified the appropriate Unit Commander and the Assistant Sheriff for Custody Operations in writing of potentially problematic employees within 10 days of receiving the monthly reports 93% of the time, and within thirty days 100% of the time.  The Department achieved 100% compliance for both the 10 day and 30 day notification requirements for the Fourth Quarter of 2022.

**19.2 Status:** Compliance          **As of Date:** January 1, 2023

## 19.3 Performance Mentoring Programs

**Provision Description:** Unit Commanders required to determine whether problematic employees should be placed on a performance mentoring program. For each potentially problematic Department member identified through the EWS, the Unit Commander must consult with the appropriate Chief and document the reasons why any problematic members are not placed on a performance mentoring program.

> *Compliance Measure Summary:* Chief is consulted 95% of the time to determine if a non-disciplinary performance program is appropriate. If so, specific performance metrics were in place and the reason for the decision was provided 95% of the time.

For the Twelfth Reporting Period, the Department's posted results reflect 100% compliance with this provision. The posted source documents for these results were available to, and reviewed by, The Panel.

**19.3 Status:** Compliance          **As of Date:** July 1, 2022

| | | Tenth Report | Eleventh Report | Twelfth Report | | |
|---|---|---|---|---|---|---|
| **Early Warning System Provisions** | | **1Q21 - 2Q21** | **3Q21 - 2Q22** | **3Q22 - 4Q22** | **AS OF** | **3YR+** |
| 19.1 | Development of EWS | C | C | C | 8/1/2018 | ✓ |
| 19.2 | Review of ERS (EWS) Reports | X | X | C | 1/1/2023 | |
| 19.3 | Performance Mentoring Programs | X | C | C | 7/1/2022 | |

# Appendix A: Compliance Chart

| Administrative Provisions | | Tenth Report 1Q21 - 2Q21 | Eleventh Report 3Q21 - 2Q22 | Twelfth Report 3Q22 - 4Q22 | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 1.1 | Assistant Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.2 | Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.3 | Supervision | X | X | X | | |
| 1.4 | Reports to Board | C | C | C | 6/12/2018 | ✓ |
| 10.1 | Jail Visits | C | C | C | 6/30/2018 | ✓ |
| 10.2 | Documented Visits | C | C | C | 6/30/2018 | ✓ |
| 18.1 | Rotation in Custody | C | C | C | 6/30/2018 | ✓ |
| 18.2 | Documentation of Rotation | C | C | C | 1/1/2019 | ✓ |
| 21.1 | Transfers to Custody | C | C | C | 6/30/2018 | ✓ |

8   OF 9

| Use of Force Policy Provisions | | | | | | |
|---|---|---|---|---|---|---|
| 2.1 | Custody Force Manual | C | C | C | 1/1/2017 | ✓ |
| 8.2 | Complaints of Retaliation | C | C | C | 1/1/2017 | ✓ |
| 17.2 | Pregnant Inmates | C | C | C | 1/1/2017 | ✓ |
| 20.1 | Categories of Force | C | C | C | 1/1/2017 | ✓ |
| 20.2 | Reactive Force | C | C | C | 1/1/2017 | ✓ |

| Use of Force Practice Provisions, Packet Review | | | | | | |
|---|---|---|---|---|---|---|
| 2.2 | Force Prevention Principles | X | X | X | | |
| 2.3 | Inmate on Inmate Violence | C | C | X | | |
| 2.4 | Use of Force as Discipline | C | C | C | 7/1/2019 | ✓ |
| 2.5 | Force on Restrained Inmates | X | X | X | | |
| 2.6 | Head Strikes or Kicks | X | X | X | | |
| 2.7 | Supervisors Called to Scene | X | X | C | 1/1/2023 | |
| 2.8 | Prevent Excessive Force | C | C | X | | |
| 2.9 | Armed Inmates | C | C | C | 7/1/2019 | ✓ |
| 2.10 | Authorized Weapons | C | C | C | 7/1/2019 | ✓ |
| 2.11 | Planned Chemical Spray | C | C | X | | |
| 2.12 | Chemical Spray & Tasers | C | C | C | 7/1/2019 | ✓ |
| 2.13 | Check of Medical Records | X | X | X | | |
| 4.1 | Consult Mental Health Professionals | C | X | C | 1/1/2023 | |
| 4.3 | Spray on Mental Health Inmates | C | C | C | 10/1/2019 | ✓ |
| 4.4 | Cooling Off Periods | C | X | C | 1/1/2023 | |
| 4.5 | Medical or Mental Health Provider Order | C | X | C | 1/1/2023 | |
| 9.2 | Escorting of Inmate | C | C | C | 1/1/2023 | |
| 9.3 | Duty to Protect & Intervene | C | C | C | 7/1/2022 | |
| 17.5 | Minimize Medical Distress | C | X | X | | |
| 20.3 | Planned Use of Force | X | X | X | | |

16   OF 25

**Training Provisions**

| | | | | | | |
|---|---|---|---|---|---|---|
| 3.1 | Use of Force Training | X | C | C | 12/31/2021 | |
| 3.2 | Ethics & Professionalism | X | C | C | 6/30/2018 | ✓ |
| 3.3 | Custody Training | C | C | C | 6/30/2018 | ✓ |
| 3.4 | Custody-based Scenarios | C | C | C | 6/30/2018 | ✓ |
| 3.5 | Add Training and Mentoring | C | C | C | 7/1/2019 | ✓ |
| 3.6 | Probation Reviews | C | X | C | 1/1/2023 | |
| 4.6 | Crisis Intervention | X | C | C | 6/30/2018 | ✓ |
| 4.7 | Mentally Ill Inmates | X | X | C | 1/1/2023 | |
| 4.8 | Mentally Ill Inmates (new staff) | C | C | C | 6/30/2018 | ✓ |
| 4.9 | Crisis Intervention (new staff) | C | C | C | 6/30/2018 | ✓ |
| 12.1 | Force Investigations | C | C | C | 7/1/2019 | ✓ |

11   OF 11

**Reporting & Investigations Provisions, Packet Review**

| | | | | | | |
|---|---|---|---|---|---|---|
| 4.2 | Mental Health Professionals | C | X | C | 1/1/2023 | |
| 5.2 | Commanders' Reviews | X | X | C | 1/1/2023 | |
| 5.3 | Unexplained Discrepancies | X | C | C | 7/1/2022 | |
| 12.2 | Location of Inmate Interviews | X | X | X | | |
| 12.3 | Suspect Interviews | C | C | C | 7/1/2019 | ✓ |
| 12.4 | Uninvolved Supervisors | C | C | X | | |
| 12.5 | Standard Order & Format | C | C | C | 7/1/2019 | ✓ |
| 15.1 | Timeliness of Reports | C | C | C | 7/1/2019 | ✓ |
| 15.2 | All Department Witnesses | C | C | C | 7/1/2019 | ✓ |
| 15.3 | Force by Other Members | X | X | X | | |
| 15.4 | Description of Injuries | C | C | X | | |
| 15.5 | Clarification After Video | C | C | C | 7/1/2019 | ✓ |
| 15.6 | Separation of Deputies | X | X | X | | |
| 15.7 | Individual Perceptions | C | C | C | 7/1/2019 | ✓ |
| 16.1 | Healthcare Assessment | C | C | C | 7/1/2019 | ✓ |
| 16.2 | Photograph of Injuries | C | X | X | | |
| 16.3 | Medical Report of Injuries | C | C | C | 7/1/2019 | ✓ |

**Reporting & Investigations Provisions, Department Reported**

| | | | | | | |
|---|---|---|---|---|---|---|
| 5.1 | Tracking of Force Incidents | C | C | X | | |
| 8.3 | CFRC Review | C | C | C | 6/30/2021 | |
| 11.1 | CFRT Involvement | C | C | C | 6/30/2018 | ✓ |
| 13.1 | Documenting Dishonesty | C | C | C | 10/1/2019 | ✓ |
| 13.2 | Reports of Dishonesty/PREA | C | C | C | 10/1/2019 | ✓ |
| 14.1 | Review of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |
| 14.2 | Timeliness of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |

17   OF 24

48

**Grievance Provisions**

| | | | | | | |
|---|---|---|---|---|---|---|
| 6.1 | Separate Grievance Forms | C | C | C | 1/1/2017 | ✓ |
| 6.2 | Availabililty of Grievance Forms | C | C | C | 1/1/2017 | ✓ |
| 6.3 | Emergency Grievances Forms | C | C | C | 1/1/2017 | ✓ |
| 6.4 | Use of Force Grievances | C | C | C | 1/1/2017 | ✓ |
| 6.5 | Grievances Against Staff | C | C | X | | |
| 6.6 | Right to Appeal Form | C | C | C | 1/1/2017 | ✓ |
| 6.7 | Handling Emergency Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.8 | Notification of Non-Emergency | C | C | C | 7/1/2018 | ✓ |
| 6.9 | Grievance Coordinator Review | C | C | C | 7/1/2018 | ✓ |
| 6.10 | Collection of Grievances | C | C | C | 7/1/2021 | |
| 6.11 | Failure to Handle Grievances | X | C | C | 7/1/2022 | |
| 6.12 | Tracking Inmate Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.13 | Grievance Coordinator Tracking | C | C | C | 7/1/2018 | ✓ |
| 6.14 | Grievance Coordinator Reports | C | C | C | 7/1/2018 | ✓ |
| 6.15 | Grievance Coordinator Analysis | C | C | C | 7/1/2018 | ✓ |
| 6.16 | Centralized Grievance Unit | C | C | C | 7/1/2017 | ✓ |
| 6.17 | Use of Force Deadline | C | C | C | 10/1/2019 | ✓ |
| 6.18 | PREA Deadline | C | C | C | 7/1/2018 | ✓ |
| 6.19 | Response to Inmate Grievances | X | C | C | 7/1/2022 | |
| 6.20 | Appeals of Grievances | C | C | C | 7/1/2018 | ✓ |
| 7.1 | Conflict Resolution Meeting | C | C | C | 1/1/2017 | ✓ |
| 7.2 | Notification of Results | C | C | X | | |
| 7.3 | Prisoner-Staff Communications | C | X | C | 1/1/2023 | |
| 8.1 | Anti-Retaliation | C | C | C | 4/1/2019 | ✓ |

22   OF 24

**Restraint Provisions**

| | | | | | | |
|---|---|---|---|---|---|---|
| 17.1 | Restraint Provisions | C | C | C | 12/1/2015 | ✓ |
| 17.3 | Safety Chair Procedures | X | X | X | | |
| 17.4 | Safety Checks | X | X | X | | |
| 17.6 | Multi-Point Restraint Procedures | X | N/A | N/A | | |
| 17.7 | Approval of Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.8 | Continued Use of Restraints | N/A | N/A | N/A | | |
| 17.9 | Supervisor Approval of Restraints | N/A | N/A | N/A | | |
| 17.10 | Involuntary Medications | C | C | C | 7/1/2018 | ✓ |

2   OF 8

**Early Warning System Provisions**

| | | | | | | |
|---|---|---|---|---|---|---|
| 19.1 | Development of EWS | C | C | C | 8/1/2018 | ✓ |
| 19.2 | Review of ERS (EWS) Reports | X | X | C | 1/1/2023 | |
| 19.3 | Performance Mentoring Programs | X | C | C | 7/1/2022 | |

3   OF 3

| | | |
|---|---|---|
| TWELFTH REPORT COMPLIANT WITH | 79 | OF 100 |
| COMPLIANT FOR 3 OR MORE YEARS | 60 | OF 100 |