O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ALEX ROSAS and JONATHAN GOODWIN, on behalf of themselves and of those similarly situated, | ) ) ) ) ) | Case No. CV 12-00428 DDP (SHx) |
| Plaintiff, | ) ) ) | **ORDER GRANTING MOTIONS TO UNSEAL COURT RECORDS** |
| v. | ) ) | |
| LEROY BACA, Sheriff of Los Angeles County Jails; PAUL TANAKA, Undersheriff, Los Angeles Sheriff's Department; CECIL RHAMBO, Assistant Sheriff, Los Angeles Sheriff's Department and DENNIS BURNS, Chief of Custody Operations Division, Los Angeles Sheriff's Department, | ) ) ) ) ) ) ) ) ) ) ) | [Dkt. 268, 269] |
| Defendants. | | |

Presently before the court are two separate motions to unseal court records filed by Los Angeles Times Communications LLC ("LA Times") (Dkt. 268) and WitnessLA (Dkt. 269) (collectively, "Movants"). Having considered the submissions of the parties and heard oral argument, the court grants the motions and adopts the following Order.

**I.  Background**

The facts of this case are set out in greater detail in this Court's prior Order granting Movants' motions to intervene in this matter. (Dkt. 279).  In short, Movants sought leave to intervene to seek to unseal certain videos, and references thereto, filed by Plaintiffs under seal in support of their Motion to Modify Implementation Plan (Dkt. 252).[1]  This Court permitted Movants to intervene for that purpose. (Dkt. 279.)  At argument, Defendants represented that they had no objection to the unsealing of one video exhibit, and Movants indicated that they had no objection to Defendants' proposed redactions of the remaining video exhibits.[2]  In accordance with this Court's prior Order, Defendants have now submitted those redacted exhibits for the court's review, along with a statement, appended to this Order, providing additional context about the events depicted in the videos.  The court now addresses Movants' motion to unseal these materials.

**II.  Discussion**

As a general principle, there is a strong presumption that court records should be open to public inspection. Center for Auto Safety v. Chrysler Grp., LLC, 809 F.3d 1092, 1096 (9th Cir. 2016) (citing Nixon v. Warner Communications, Inc., 435 U.S. 589, 597 (1978)).  "[M]ost judicial records may be sealed only if the court

---

[1] Since the filing of the motion, the court has heard oral argument and held numerous status conferences regarding the parties' ongoing discussions regarding the issues raised in the motion.  Counsel have worked diligently and cooperatively to resolve the majority of the disputes, and continue to meet and confer as to two remaining issues.

[2] Defendants also do not object to the unsealing of various written references to the videos and events depicted therein.

finds 'compelling reasons.'  However, a less exacting 'good cause' standard applies to . . . previously sealed discovery attached to a nondispositive motion.'"[3] Oliner v. Kontrabecki, 745 F.3d 1024, 1025 (9th Cir. 2014) (internal quotation marks and citations omitted); see also Kamakana, 447 F.3d at 1180 ("Unlike private materials unearthed during discovery, judicial records are public documents almost by definition, and the public is entitled to access by default.  This fact sharply tips the balance in favor of production when a document, formerly sealed for good cause under Rule 26(c), becomes part of a judicial record.") (internal citation omitted).

This common law presumption of access to judicial records does not attach, however, to materials that are "traditionally kept secret."  Kamakana, 447 F.3d at 1178 (9th Cir. 2006) (quoting Times Mirror Co. v. United States, 873 F.2d 1210, 1219 (9th Cir.1989)); see also Forbes Media LLC v. United States, 61 F.4th 1072, 1081 (9th Cir. 2023).  This category does not necessarily encompass all law enforcement-related documents.  Kamakana, 447 F.3d at 1185. Rather, the "traditionally secret" "carve-out is a 'term of art' that refers to materials for which there is neither a history of access nor an important public need justifying access." Forbes, 61 F.4th at, 1081.  The archetypical, but not exclusive, exemplars of traditionally secret materials are "grand jury transcripts and warrant materials in the midst of a pre-indictment

---

[3] The terms "dispositive" and "nondispositive" are not, however, literal or "mechanical classifications." Center for Auto Safety, 809 F.3d at 1098.  Rather, the question is whether the motion to unseal is "more than tangentially related to the underlying cause of action."  Id. at 1099, 1101.

3

investigation." Id. at 1082 (quoting Kamakana, 447 F.3d at 1185). In Forbes, for instance, Department of Justice requests to a travel agency for information about a fugitive's travel plans were held to be akin to these "paradigmatic" examples, and thus fell outside the presumption of public access as materials "traditionally kept secret." Id. at 1075-76, 1082.

Here, Movants seek access to videos taken inside correctional facilities, and descriptions of and references to the same. Movants do not contend that there is any "history of public access" to such materials. Forbes, 661 F.4th at 1082. Nor could they, as it is self-evident that access to carceral facilities and information about their inner workings is highly restricted.[4] But even in the absence of a historical tradition of access, a sufficiently important public need may create a presumption of access where the "ends of justice" so demand. See Forbes, 61 F.4th at 1082; Kamakana 447 F.3d at 1185 ("a class of documents is ['traditionally kept secret'] if there is '*neither* a history of access *nor* an important public need justifying access.'") (emphasis original) (quoting Times Mirror, 873 F.2d at 1219). This is such a case.

Putting aside any apportionment of blame, the indisputable fact remains that, even after the better part of a decade,

---

[4] It bears mention, however, that materials that are "traditionally kept secret" at one point in time may change in character at a later date. The Ninth Circuit has recognized, for example, that even paradigmatically secret pre-indictment warrant materials have historically been made public after an investigation is terminated, and that the common law right of access attaches at that point. United States v. Bus. of Custer Battlefield Museum & Store Located at Interstate 90, Exit 514, S. of Billings, Mont., 658 F.3d 1188, 1192-94 (9th Cir. 2011).

4

Defendants are not in full compliance with all of the terms of the Settlement Agreement. The parties continue to disagree as to whether and how current implementation plans should be modified to best achieve full compliance, and to seek the court's guidance as to those questions. The parties' respective positions, the Monitors' recommendations, and this Court's determinations are based, in part, on evaluations of materials currently inaccessible to the public. This lack of access hampers "the public's understanding of the function and operation of the judicial process," weakens "a check on the judiciary," and impairs "the legitimate interests of the public and the press in keeping a watchful eye on the workings of public agencies." Custer Battlefield Museum, 658 F.3d at 1194 (internal quotation marks and alteration omitted). This latter interest is particularly important here, where progress toward full compliance with the Settlement Agreement, or lack thereof, may be laid at the feet of past, present, or future elected policymakers. Given the important public need for fuller information about conditions within the jails, the materials at issue here do not qualify for the "traditionally kept secret" exception to the presumption of public access.

    To overcome a presumption of access, a party seeking to seal a judicial record must "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure." Kamakana, 447 F.3d at 1178-79 (internal quotation marks and citations omitted). Defendants have not met this burden. Although Defendants contend that release of the videos may implicate privacy concerns or

5

interfere with investigative efforts, the Ninth Circuit has made clear that "[s]imply mentioning a general category of privilege, without any further elaboration or any specific linkage with the documents, does not satisfy the burden."[5] Kamakana, 447 F.3d at 1184.  Moreover, "in a particular case involving materials subject to the common law right of access, [privacy and other concerns] may be redressed through a court's discretion [] to release redacted versions of the documents." Custer Battlefield Museum, 658 F.3d at 1194.  In compliance with the court's prior Order, and absent objection from Movants, Defendants here have diligently worked to redact information that might implicate privacy or safety concerns of both jail staff and inmates, without compromising the informational value of the exhibits Movants seek to unseal.  The court is therefore confident that the balance of the public's interest in access to the sealed materials against any competing interest of Defendants weighs strongly in favor of the former.

**III. Conclusion**

For the reasons stated above, Movants Motion to Unseal is GRANTED.[6]  The six redacted videos lodged under seal by Defendants on November 7, 2023 (Dkt. 291) are hereby ordered unsealed.[7]  The

---

[5] Indeed, Defendants have represented that the events depicted in Exhibit 5, which has already been publicized from another source, have already resulted in a referral for criminal prosecution.

[6] Having determined that the materials should be unsealed pursuant to common law, the court does not address WitnessLA's additional First Amendment argument.  See Forbes, 61 F.4th at 1082 ("[T]he common law, like the First Amendment, turns on roughly similar considerations of historical tradition and the risks and benefits of public disclosure.").

[7] The parties have represented to the court that the videos
(continued...)

6

following sealed documents are also hereby ordered unsealed: (1) Plaintiffs' Memorandum of Points and Authorities in Support of Motion to Modify Implementation Plan (Dkt. 255); (2) Declaration of Stephen Sinclair (Dkt. 255-1); (3) Declaration of Raymond Dunn (Dkt. 255-3); (4) Declaration of Peter Eliasberg (Dkt. 255-4); Declaration of Shamsher Samra (Dkt. 255-6); (5) Declaration of Matthew Thomas (Dkt. 255-7); (6) Plaintiff's Reply Brief (Dkt. 262); (7) Declaration of Matthew Thomas (Dkt. 262-1); (8) Declaration of Stephen Sinclair (Dkt.262-2); (9) Declaration of Melissa Camacho (Dkt. 262-3); and (10) Declaration of Marisol Dominguez-Ruiz (Dkt 262-4).[8] Furthermore, the following lodged documents are ordered to be filed: (1) Plaintiffs' Supplemental Statement in Response to Court Order (Dkt. 285-1); and (2) Amended Declaration of Erin Bigler (Dkt 285-2).[9]

IT IS SO ORDERED.

Dated: November 8, 2023

DEAN D. PREGERSON
United States District Judge

---

[7] (...continued) will be accessible to the public via Plaintiffs' counsel's website and the Los Angeles County Sheriff's Department website.

[8] The Declaration of Erin David Bigler (Dkt. 255-2) shall not be unsealed.

[9] See note 8, above.

7

# APPENDIX

**STATEMENT FROM THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT ACCOMPANYING EDITED VIDEOS OF FORCE INCIDENTS**

The Los Angeles County Sheriff's Department is aware of Judge Dean Pregerson's ruling unsealing certain use of force materials in the *Rosas* case, including six videos of force incidents that took place in the Los Angeles County Jail between October 2019 and July 2022. The Department views Judge Pregerson's decision as an opportunity to build further trust within the community it serves. In keeping with its mission of transparency and accountability, the Sheriff's Department welcomes the opportunity to reveal the steps it has taken to better serve our incarcerated population. In collaboration with the independent outside monitors, and with the assistance of the ACLU, use of force incidents in the Los Angeles County Jail are under constant review and scrutiny. The Department welcomes that scrutiny and opportunity for improvement, as it has led to meaningful revisions to the use of force policies in the jails with the anticipation those changes are providing deputies with better guidance when it comes to understanding the difference between appropriate and inappropriate uses of force, and all Department employees are held accountable for their actions if they fail to recognize that difference.

We also appreciate the opportunity provided by Judge Pregerson to give context to the six videos of use of force incidents that are being unsealed and made available to the public in the redacted form directed by the court. Such context is epssential for several important reasons.

First, it is important to stress that the use of force incidents captured in these six videos are not representative of interactions between deputies and inmates in the Los Angeles County Jail system. The Los Angeles County jail system is the largest of the more than 3,000 county jail systems in the United States, and every year over the past three years between roughly 53,000 and 60,000 inmates pass in and out of Los Angeles County Jail facilities. Accordingly, there are millions of interactions between deputies and inmates in the Los Angeles County Jail system each year. The videos that have been unsealed represent six of the millions of interactions that occurred over a more than two and one-half year period between October 24, 2019 (the date of the earliest use of force incident depicted) and July 4, 2022 (the date of the most recent use of force incident depicted).

Second, the incidents depicted in these six videos do not reflect the measures now in place to hold deputies accountable when they violate the Department's stringent use of force policies. Every one of the uses of force incidents depicted in these videos took place during a prior Sheriff's administration, and all but one took place prior to material changes to use of force policies at the jails that were put into effect last year and continue to be refined in order to ensure that all uses of force are employed only when necessary, particularly in cases when a use of force poses the highest threat of injury to an inmate. These policy changes have proven to be effective. In 2022, there was a 17% decline in the number of force incidents involving inmates when compared to 2021; thusfar in 2023, the number of uses of force at the Los Angeles County Jail facilities that are at issue in the *Rosas* case are on pace to fall by an additional 20% when compared to those 2022 figures and a full 33% when compared to the number of uses of force in the jail in 2021. Furthermore, the number of uses of force involving "head strikes" (punches to the head) -- which amounts to only a small fraction of cases involving uses of force -- have also fallen dramatically during this time period. In 2022, uses of force involving punches to the head fell by over 40% when compared to 2021 figures; and in 2023, the number of uses of force involving head strikes has fallen further still. Indeed, the Department is currently on pace to have only 48 uses of force that involve head strikes in 2023, less than in any previous year since this litigation commenced in 2012.[1] Accordingly, in recent years, and particularly since Sheriff Luna took office, the number of force incidents in the Los Angeles County Jail system has fallen dramatically; the number of cases involving the most serious uses of force, including head strikes, has plummeted; and the number of times when deputies have successfully taken steps to <u>avoid</u> uses of force has climbed to a point where that number now far outpaces the number of occasions when deputies engage in uses of force with inmates. At the same time, Sheriff Luna has set a new tone when it has come to making it clear that, regardless of this dramatic drop in uses of force involving inmates, when

---

[1] In contrast, monitors overseeing compliance with use of force provisions at Rikers Island in New York City, a jail in a metropolitan area holding far fewer inmates than the Los Angeles County Jail, have recently reported that guards at that facility administered head strikes more than 400 times during a two-month period in 2022 alone.

deputies engage in uses of force in a manner that violates the Department's strict use of force policies, they will be held accountable for doing so.  In fact, in the case of the most recent force incident captured in the videos covered by Judge Pregerson's unsealing order, the actions of the deputies are currently being scrutinized by the Los Angeles County District Attorney's Office at the request of the Department for possible criminal prosecution.

Lastly, it is important to keep in mind that even the six videos at issue spanning a 36-month time frame during a prior Sheriff's administration only provide a limited insight into the particular force incidents they partially capture.  For instance, in one case (Exhibit B to the Declaration of Peter Eliasberg) the video at issue shows an inmate laying on the ground and apparently injured, but it does not show the events leading up to when the inmate was injured.  In that case, the inmate at issue was being accompanied to the bathroom by a deputy at the inmate's request; the inmate stopped in the middle of a hallway, removed his pants, and stated that he was going to urinate in the hallway; the inmate attempted to elbow the deputy after he was told he could not urinate in the hallway; the inmate then punched the deputy in the face, after which the deputy punched the inmate in the head.  Indeed, the ACLU's use of force expert who examined this incident concluded that, in his professional experience, the head strike that inflicted the injury ultimately captured in the video resulted from a justifiable use of force.

As Judge Pregerson recently recognized in this case, deputies working in the Los Angeles County Jail work under tremendously difficult circumstances.  The inmate population in the jails consists of many violent individuals who pose a tremendous security risk; and deputies working in the jails are frequently called upon to make split-second decisions on how to respond when confronted with inmates who may pose a serious risk to their safety, to the safety of other inmates, or the inmate's own safety.

The Department is committed to meeting these challenges with conduct that follows the Department's strict guidelines governing the appropriate use of force against an inmate.  In the 11 years since this case was instituted, there has been a complete cultural shift away from the days when such abuses were tolerated, and Sheriff Luna is intent on building on that progress comprehensively, and at a more rapid pace than his predecessors.  The Sheriff's Department will

continue to have an open dialogue with the ACLU and the court-appointed monitors in this case to explore ways to improve the Department's performance and will continue to be forthcoming in its efforts to ensure an honest analysis of every use of force incident that occurs.  There is significant transparency in the *Rosas* case in the form of semi-annual reports to the court on the Department's compliance, as well as public reports the Department makes to the Los Angeles County Board of Supervisors.  The Department welcomes the feedback this scrutiny involves so it may incorporate it as the Department continues to work diligently toward achieving full compliance in this case.