UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - -

HONORABLE DEAN D. PREGERSON, DISTRICT JUDGE PRESIDING

ALEX ROSAS, et. al.,                )
                                    )
        Plaintiffs,                 )
                                    )
                                    )
                                    )
    vs.                             ) No. CV 12-00428-DDP
                                    )
                                    )
                                    )
LEROY BACA, et al.,                 )
                                    )
        Defendants.                 )
_____ )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

*STATUS CONFERENCE [278]*

LOS ANGELES, CALIFORNIA

MONDAY, SEPTEMBER 11, 2023

_____

MARIA R. BUSTILLOS
OFFICIAL COURT REPORTER
C.S.R. 12254
UNITED STATES COURTHOUSE
350 WEST 1ST STREET
SUITE 4455
LOS ANGELES, CALIFORNIA 90012
(213) 894-2739

UNITED STATES DISTRICT COURT

**A P P E A R A N C E S**

**ON BEHALF OF THE PLAINTIFFS,**
**ALEX ROSAS, et. al.:**
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
BY: PETER J. ELIASBERG, ESQ.
1313 WEST EIGHTH STREET
LOS ANGELES, CA 90017
(213)977-5228

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
BY: MELISSA L. CAMACHO-CHEUNG
1313 WEST EIGHT STREET
LOS ANGELES, CA 90017
(213)977-9500

ACLU NATIONAL PRISON PROJECT
BY: MARISOL J. DOMINGUEZ-RUIZ, ESQ.
39 DRUMM STREET
SAN FRANCISCO, CA 94111
(202)393-4930

**ON BEHALF OF THE DEFENDANTS,**
**LEROY BACA, et al.:**
KENDALL, BRILL & KELLY, LLP
BY: ROBERT E. DUGDALE, ESQ.
10100 SANTA MONICA BOULEVARD
SUITE 1725
LOS ANGELES, CA 90067
(310)556-2700

KENDALL, BRILL & KELLY, LLP
BY: ROBERT BAILEY, ESQ.
500 WEST TEMPLE STREET
SIXTH FLOOR
LOS ANGELES, CA 90012
(310)272-7929

**A P P E A R A N C E S (CONT'D)**

**ON BEHALF OF THE DEFENDANTS,**
**LEROY BACA, et. al.:**                LOS ANGELES COUNTY COUNSEL
                                        BY:  DYLAN FORD, ESQ.
                                        500 WEST TEMPLE STREET
                                        SIXTH FLOOR
                                        LOS ANGELES, CA 90012
                                        (213)893-5939


ALSO APPEARING:  MARGARET CARTER, DOJ
COMPLIANCE OFFICER

4

**I N D E X**

PAGE

STATUS CONFERENCE:                                                5

UNITED STATES DISTRICT COURT

LOS ANGELES, CALIFORNIA; MONDAY, SEPTEMBER 11, 2023

-oOo-

(COURT IN SESSION AT 10:11 A.M.)

Monday, September 11, 2023; Judge Pregerson

THE COURTROOM DEPUTY:  This is item number one, case number, CV 12-00428-DDP:  *Alex Rosas, et al. v. Leroy Baca, et al.*

Counsel, please state your appearances.

MR. DUGDALE:  Good morning, Your Honor. Robert Dugdale, Daniel Barlava, Dylan Ford, and Robert Bailey on behalf of the defendant.

MR. DUGDALE:  Good morning.

MR. ELIASBERG:  Good morning, Your Honor. Peter Eliasberg, Melissa Camacho and Marisol Dominguez-Ruiz for the plaintiffs in Rosas.

THE COURT:  Good morning.

And we have a representative from the intervenor, as well.

And do you have a calendar there for me?

Thank you.

MS. SEAGER:  Yes, Your Honor.  Susan Seager on behalf of intervenor WitnessLA.

THE COURT:  Good morning.

MS. TOWNSEND:  Good morning, Your Honor. Katie Townsend on behalf of proposed intervenor, Los

UNITED STATES DISTRICT COURT

Angeles Times Communications, LLC.

THE COURT:  Good morning.

MR. ELIASBERG:  Your Honor, you're going to hear the intervenors' motion first.  Would you like us to --

THE COURT:  I think we should -- you know, I think you could -- you folks can just have a seat.  I wanted to get your appearances, but I think we should do the status conference first.

MR. ELIASBERG:  Okay.

THE COURT:  Okay.  Go ahead.

MR. ELIASBERG:  Good morning, Your Honor.  As you remember, the last time we were here on the motion to modify the compliance plan, we agreed that we would go and take 60 days to have further discussions to see if we could make progress on the issues that we had felt that we were at an impasse.  I think Your Honor had some good insight.  We actually have made progress, particularly, in one area.  I think we are very close to agreeing on a modified WRAP policy.  The defendants have made substantial number of changes that we think are very beneficial.  We're not quite there yet, but that's really -- only probably would be if I hadn't gone away over the weekend.  We haven't made as much progress in some other areas, but I do think given what we've been

able to do in the WRAP, that it doesn't make sense to sort of go -- go to the map quite yet, ideally.  And I think Mr. Dugdale agrees with this.  We were talking about perhaps another 45 days to have continued negotiations.  We've met I believe five times now with the monitor.  So we are not twiddling our thumbs.  We're working -- and it would have been more, except at the first part of the 60-day period, I was on vacation, and then Mr. Dugdale was on vacation; but since the vacations have cleared away, we spent a lot of time and worked quite hard to try to make progress and to meet.  And we would continue to do that with an additional period of time.  The only reason 45 days doesn't work, is I think it's the one day in the whole stretch that Mr. Dugdale isn't available, but something in that neighborhood to give us a little bit more time to negotiate and work to try to come to more agreements, and then to come back in front of you and I either report that we're down to only a few issues or -- or that maybe we've reached resolution on everything.  I don't know that that's going to happen, but I do think that there is the possibility of narrowing the issues that we brought to you a few months ago, if we can have a little bit more time to work together.

THE COURT:  Okay.  And so what are the other

issues?

MR. ELIASBERG:  Well, there's still a question. The defendants have agreed to make a change maybe more, but at least one change in the head strike policy.  The plaintiffs still don't believe that's sufficient.  We need to have further discussions on that.  And then I think the big issue would be the sort of what we call the accountability, the discipline, and the dishonesty question; but frankly, because we've spent so much time on WRAP and because we were making so much progress -- it's complicated, because it's a complicated policy; but that's where we've had the focus for the last probably almost a month now really.

THE COURT:  Okay.  And just let's talk about the head strike policy a little bit.  And my recollection is your position was no head strikes.

MR. ELIASBERG:  Only -- well, our position is that feel only one deadly force is justified.

THE COURT:  I see.  That's right.  And so what's the -- what's the impasse on that issue?

MR. ELIASBERG:  I think it would be better to let Mr. Dugdale respond, but I think in large part, I think the defendants feel that that's too restrictive, and that they believe that their policy, which calls for three different trigger -- or three threshold issues to

be met before a head strike can be used is sufficiently -- is sufficiently restrictive.  And that anything more than that would be -- would perhaps put officers at risk, but I don't want to put words in his mouth; but that is generally what I've gleaned from our negotiations.

THE COURT:  Sure.  Mr. Dugdale....

MR. DUGDALE:  Sure, Your Honor.  I'll back up a little bit and talk about how we've spent our time, because I think Mr. Eliasberg has that right.  We are now on version 36 of the WRAP policy which we hope is the last version.  There were a number of issues at the ACLU and the monitors raised.  This is why this took a while.  And we're talking about a very exacting policy that is single-spaced, four and a half pages that covers really from when they determine to put somebody in the WRAP; how you treat them when they're in the WRAP; when you determine when they could be taken out of the WRAP; time limits; medical monitoring.  It's a very comprehensive policy.

Now, to the credit of the ACLU and the monitors, we think version 36 is probably the most complete WRAP policy that exists in the history of WRAP policies.  So -- and it's important because we don't dispute the issue that it could potentially be dangerous

if misused.  And so we want to limit its use and we want to use it safely.

Head strikes, we -- so we have four different meetings on the WRAP, three with the monitors.  We've had one meeting with the monitoring team about the head strike policy.  We're only at version 33 of the head strike policy, which falls within a larger policy on the limitations of use of force.  As the Court will remember -- or remembers now, when we were here last time, our policy read that you could not use a head strike, unless there was an imminent danger of serious bodily injury, which we believe corresponded with what California law required.  We have added in the 33rd version "and/or death to personnel or others" to make it clear that head strikes should only be used in a very limited fashion.  And by adding "and/or death" emphasized the very limited nature or circumstances when head strikes should be used.  I think the ACLU may have some problems with that.  There's a preamble.  I think they want more language in about the limitations of the use of head strikes.  We're willing to listen to that. The monitoring team has comments to version 33 that we're still working through.

THE COURT:  So what -- what -- what's the definition of a head strike?  Because I -- you know --

MR. DUGDALE:  In this -- in this --

THE COURT:  Does that refer to fist, head or does it --

MR. DUGDALE:  In this -- in this -- right.  So there are different types of head strikes.

THE COURT:  Sorry.  Let me just finish.  Fist, head versus wall, head.

MR. DUGDALE:  Correct.  This is what's called the use of --

THE COURT:  I'm sorry.

MR. DUGDALE:  I'm sorry.  We're talking over each other.

THE COURT:  We are.  Yes, You need another vacation, Mr. Dugdale.

(Laughter.)

MR. DUGDALE:  That would be awesome.  I don't even remember taking the last one, but yes.

THE COURT:  I know I was listening to you guys talk about -- and can we do anything about the temperature in the courtroom?

MR. DUGDALE:  Yeah, it is -- I'm under the surface of the sun, here, Your Honor.

And under the warm water is not really doing it either.

(Laughter.)

MR. DUGDALE:  Anyway....  Your Honor, so the question is:  What is a head strike?  So what we are talking about here is called "use of personal weapons, which is your fist.  That is your personal weapon.  So what we're talking about with this policy and what the ACLU has been talking about this time is punching a person in the face in its most basic description.  And as they contended before, they believe this happens too frequently.  I will say we're down substantially from where we were two years ago, somewhere trending around 50 head strikes this year at records island, for instance, where there's similar litigation going on, there are 400 head strikes.  They were at 400 head strikes last year in a smaller facility.  So certainly comparison --

THE COURT:  Right.  So 50 head strikes.  And just give me a little perspective in terms of number of inmates that pass through and how that number can be related to some sort of metric.

MR. DUGDALE:  Sure.  It's over 40,000 inmates a year that pass through the downtown jail facilities, including the IRC, the Twin Towers facility, at Men's Central Jail.  And head strikes comprise approximately two percent of all uses of force involve a head strike -- this use of a fist to punch somebody in the

face.  Like, I'm just going to call it punching, rather than head strikes from now on -- punching of the head, because that -- that -- eliminate the nomenclature to make it more clear what I'm talking about.  So approximately 2 percent of uses of force involve punches to the head.  And -- and there were -- I think there were 52 last year that we tracked that were trending, not much differently this year, somewhere around 50.  And -- and again, not all 50 of these involve improper uses.  There are a number of those -- or even though where the monitors would say they're justified, because the deputy was himself facing an imminent threat of serious bodily injury or death being punched himself, for instance.  There were others, as the ACLU has pointed out, were not justified:  Somebody spits on a deputy and he punches the inmate.  Somebody -- there is one -- there's a video of a deputy, bull kicking, meaning kicking from behind -- a deputy who is moving him -- and he punched him.  The ACLU and the monitors have problems with those issues.  And those are the ones that we're trying to eliminate where a deputy is not facing an imminent threat of serious bodily injury, which as Your Honor knows, defined under California law, we're talking about broken bones -- you know, potential broken bones or permanent disfigurement as a result of

being bitten or elbowed in a certain way.  We're talking about really severe injuries where punching somebody to protect yourself doesn't seem out of bounds.  And, in fact, that would be in accordance with what California law applies; but that's where our debate is currently at, how to limit head strikes.  And we welcome that debate.  The sheriff is not interested in expanding the number of times that his deputies are punching inmates in the face, especially if that's needless and not justified.  So we are trying to craft a policy that limits those occasions as much as possible, keeping in mind that deputies also have to have an ability to protect themselves in these situations.

We see situations where deputies get attacked all the time by inmates.  The MCJ, especially is filled with a number of violent individuals.  And a lot of them gratuitously go after guards.  The assaults on inmates through the use of head strikes is much greater than the number of times that -- that deputies use head strikes to protect themselves --

THE COURT:  I think you got that --

MR. DUGDALE:  But I'm not trying to --

THE COURT:  I think you got that one backwards.

MR. DUGDALE:  The number of instances where inmates utilize head strikes is much greater than the

15

number of times that deputies protect themselves --

THE COURT:  Just sort of another little bit more background information -- I always ask this question:  How do you characterize the population in terms of folks that have significant, you know, mental health issues?

MR. DUGDALE:  Well, as -- as Your Honor knows through the DOJ litigation, that number has been steadily rising over the past several years.  We've hit for the first time I will say in the last six months, where it has plateaued and is starting to go down, but there are still approximately, I would say between 40 and 43 percent of the inmates in the L.A. county jail system have what are defined as serious mental Health issues.  And many of them are -- many of them are located -- at least, the most severely mentally impaired individuals that we have in custody are Twin Towers where we see a number of these head strikes.  So another thing that the sheriff's department is trying to do is better educate deputies as far as how to deal with individuals with mental illness.  They get specialty training on this.  And it is, admittedly, a difficult task here.  The monitors may note in their last report -- we believe they may make note of this in the next report, but some deputies have a problem accepting

this idea that people have the mental illnesses that they have, and that they think there is more malingering than is being detected; but, again, we're -- the sheriff is committed to try to reduce head strikes.  We face a difficult task because we have so many people with mental health issues where obeying commands is not sometimes the norm.  And it presents a difficult situation.  That doesn't justify using a head strike and --

THE COURT:  And the sheriff's deputies in the jail because I've been there many times, they don't carry weapons.

MR. DUGDALE:  They do not.  There is a limited availability for a Taser for a preplanned use of force.

THE COURT:  Right.  But they're not -- the folks that are walking around doing rounds, inmate movements, all the things that happen on a daily basis, the interactions, those deputies are not armed.

MR. DUGDALE:  That's correct, Your Honor.  It would be -- it would be dangerous for the deputies, as well as the inmates to have weapons available in the jails.

THE COURT:  Right.  I understand that.  But -- you know, it's just good to make sure everybody understands that.

MR. DUGDALE:  Yes, and I will add to that.  I mean, this is covered in another policy which says you can only use a -- a weapon with -- what's called "an impact weapon," like a flashlight or something like that or a baton, if it's available.  There is a threat of deadly force.  Obviously, there is an order of magic greater when you're hitting somebody in the head with a metal object, rather than a fist.  Both could cause severe damage.  Nobody is disputing that fact, but that's a different policy.  And that's a policy where you can only use an impact weapon if there's a threat of -- an imminent threat of death that you face.

THE COURT:  Right.  And the deputies do not carry those types of impact weapons typically anyway.

MR. DUGDALE:  That's correct.  That is correct.  So that was not always the case, I mean, that the initiation of this litigation and before there were occasions where flashlights were being used to hit inmates and the like; but those days are in the rearview mirror here.  That -- it is a very, very rare occurrence where an impact weapon is used to strike an inmate under any circumstance.  There are limited cases where Tasers are used and the like, but -- but that itself is really rare.  So for the most part, you're talking about the most severe use of force is a punch to the face, and

that's what we're trying -- we're trying to limit even that number, Your Honor.  So -- and I recognize there's more discussions that have to happen --

THE COURT:  And so you agreed to the language essentially of the imminent threat of great bodily injury?  That word "imminent" is something that seems to be okay?  You're just arguing about context, the sort of preamble; is that accurate?

MR. DUGDALE:  I don't want to -- I don't want to characterize the ACLU's position.  So we've had -- we've only had one discussion about this particular policy.  So there may be more.  They -- they --

THE COURT:  Okay.

MR. DUGDALE:  So I don't want to characterize -- but what I do have some degree of confidence -- and I think Mr. Eliasberg shares that -- is our discussions happened fruitful on other issues. You know, we did a whole other case in *Rutherford* where we came to a very comprehensive agreement that has really benefitted Mr. Eliasberg's class members as far as the delivery of services in the IRC.  With that as a background, I think we have the ability to negotiate to reasonable solutions that benefit everybody; accomplishes what the sheriff wanted to accomplish, and accomplishes the greater good for Mr. Eliasberg's

clients too.  So rather than hash out these differences in open court right now -- no offense, Your Honor, you're a wonderful mediator --

THE COURT:  No, I don't want to hash them out right now.  The other question -- just maybe another sort of general informational question, which is what is the sort of state of monitoring by folks that are not part of the sheriff's chain of command, be it the ACLU, the monitors -- just sort of characterize the level of transparency in the jail right now, generally in terms of outside monitors?

MR. DUGDALE:  Well, there's no shortage of them.  There is -- there -- the monitors in this case?  There's a three-person panel.  They're all present by video conference today.  They frequent the jails.  They come and make regular visits to the jails that are prearranged where they get tours.  They speak with inmates.  They speak with deputies.  They issue semiannual reports every six months, updating the Court and the public on the status of what's happening in the jails that are public.  Those reports are all publicly available.  There was the DOJ case where Mr. Mitchell, who's the monitor in this case is the sole monitor, and similarly, monitors all the issues -- all 69 provisions in that case, which involve the provision of services to

20

those with mental illnesses.  Similarly in that case, he frequently comes to the jail, along with his subject matter experts.  They issue publicly available semiannual monitoring reports there.  It goes beyond that.  We -- as part of *Rosas*, the sheriff or his designee, it's usually the assistant sheriff in charge of custody, provides a public -- a semiannual public report to the Board of Supervisors where members of the public can show up and ask questions about what is going on in this case.  And it's a thorough report with a slideshow that usually lasts for a good deal of time, and provides detailed data on uses of force and policy -- talks about policies, such as the ones we're talking about here.

There is the Inspector General's office who has a heavy presence in the jail and monitors what happens in the jail and issues their own reports on various subjects, and reports to the Board, as well.  Most recently, the California Department of Justice has come in, and they have started looking at issues in the jails.  And there's the Citizens Oversight Commission, which is a Board of citizens as the title might imply, who oversee the sheriff's department's operations, in general, and issue reports and take testimony on a number of matters involving the sheriff's department,

including matters involving the jails.  So there is no lack of eyeballs on what's happening on the jails. There's no lack of transparency for what is happening in the jails.  I think we'll talk about that in the next hearing.

THE COURT:  We will.  But just while we're on the subject in terms of transparency, are those folks that you've mentioned that are not in the sheriff's chain of command, what access do they have to underlying data, primary sources all of that?

MR. DUGDALE:  Well, as of now, pursuant to the protective order in this case, there is -- there's a lot of access.  There is access to video evidence.  There's a 20-page stipulation as the Court probably knows that was entered in this case that covers that access and covers access to video information and use of force files and force summaries and the like.  The monitors get all of this.  We have what we call the share point drive that we put a lot of this data on so people can have access to it.  We allow the ACLU -- you know, they have to give us some heads-up to come to the jail and conduct inspections.  Ms. Camacho is a frequent visitor to the IRC, for instance, and was a frequent visitor at the IRC, as the Court knows, when the *Rutherford* litigation was hot and heavy.  The DOJ counsel come to

the -- come to the jail frequently.

THE COURT:  The ACLU used to have pamphlets and Dropboxes, things like that, I thought.  Mr. Eliasberg, is that true?

MR. ELIASBERG:  We have signs in the jail --

THE COURT:  Signs.

MR. ELIASBERG:  -- that inform people of a number that they can call.  Part of our ability to monitor does come from calls we get from family members and people who are actually incarcerated.  We don't actually distribute pamphlets, but we do have a way and we do get a substantial number of intakes of people who are in the jails.

THE COURT:  I see.

MR. ELIASBERG:  And there are a couple of -- I don't disagree with the things Mr. Dugdale is saying.  I do want to supplement with just a couple small points when he's done on this issue --

THE COURT:  Why don't you jump in right now.

MR. ELIASBERG:  Okay.

MR. DUGDALE:  I'm sorry.  I did forget there are pam- -- there are signs.  They are everywhere in the jail, as well, notifying inmates they can call the ACLU or frankly, others if they -- if they need help.

THE COURT:  Okay.

23

MR. ELIASBERG:  The -- I think everything that Mr. Dugdale said was accurate.  There are a couple of missing pieces that are still a little bit in contention right now.  One is that pursuant to the protective order, we get only one video generally with a force package, even though oftentimes there could be multiple ones.  The monitors have said that they think it makes sense for us to get the same number of videos that they get.  So there could be a force package that we're going to review, the monitors are going to review.  And then we will meet with the monitors to discuss that package, but sometimes the monitors will get multiple angles. Our not getting them can sometimes be frankly to the detriment of defendants.  We've had situations where the monitors have said, oh, gosh, if you look at this from a different angle, we get why you're saying that, but if you look from a different angle, actually you can clearly see why something was justified.  And in other cases, we think that you getting -- getting the full range of videos that the monitors get would enable us to sometimes see problems that we can't see because we only get the one angle or the --

THE COURT:  I see.  But when you meet with the monitors, you can look at all of the angles.

MR. ELIASBERG:  Well, but the problem with that

is we haven't -- what we'd like to do with the monitors, and they -- I think they would agree that they'd benefit from it, is we will let them know in advance, we'd like to go over these packages.  These are the ones that particularly concern us.  And we provide them in advance in explanation of our concern, but sometimes what we provide in advance is, this is what we think we see, but frankly, we're worried that we -- we're missing an angle that you may have.  Sometimes in the meetings -- I don't think the monitors feel any -- I think they feel that they can, if they believe it is very illustrative, show us a video that we have not been provided because they think it is essential for us to understand their perspective, but we don't -- it's hard in the course of a meeting with them even over three hours for them to show us every angle that we haven't had the opportunity to see.  So that's the one of the ways it works.  In addition, the force packages that we get do have redactions in them.  Those are usually specifically identifying information.  The major reason that can be a problem is that we think sometimes it doesn't enable us to see what's really happening with discipline if there is a sort of -- a deputy who has multiple problems.  There's not really a way for us to track it, because we don't know -- we may see there's a force package.  We

may think that there's been a violation. And the department may have even said there's been a violation. We may learn from looking at the package what discipline was imposed, but we don't know if it was actually imposed on somebody who's previously been disciplined or is a name that we've seen before, because we don't see the names that come with the package. So I'm not suggesting we don't have a fair amount of access. We do. I think we have the ability to be an important part of oversight here and seeing problems and identifying problems, but there are a couple of areas where we think it would be helpful for us to get more information than we currently get. But otherwise, I just wanted to add that, not that anything that Mr. Dugdale said about ways that there is accountability or oversight were inaccurate. I just think there were a couple of pieces that were missing.

THE COURT: Okay. And what date works for you for the next status conference?

MR. DUGDALE: Your Honor, I would ask for either November 6 or October 30th -- I'm sorry. I have to go to some parents' college thing that takes me out the end of October, and that's the -- that's the only issue that I have in my personal life that I'm sorry to interfere with a 45-day schedule.

26

MR. ELIASBERG:  Bob, can you say -- the 30th or the 6th?

MR. DUGDALE:  The 30th or the 6th, either would work.

MR. ELIASBERG:  For us the 6th is a problem, but the 30th works.

THE COURT:  Very well.

MR. DUGDALE:  We will see you then, Your Honor. Thank you.

THE COURT:  The 30th, same time, 10:00 a.m.

MR. DUGDALE:  Very well.  And we will continue our process of meeting and conferring.  I think at this next conference -- Mr. Eliasberg and I discussed this -- we will update the Court on where we stand.  If there are disputes and we hope that we've narrowed them considerably, we can talk about how to deal with those hopefully very narrow issues at that time.

THE COURT:  Very well.

MR. DUGDALE:  Thank you.

MR. ELIASBERG:  Thank you, Your Honor.

MR. DUGDALE:  Thank you.

THE COURT:

(Whereupon, proceeding adjourned.)

- - -

UNITED STATES DISTRICT COURT

**C E R T I F I C A T E**

ALEX ROSAS, et al.                                   :

              vs.                         :   No. 12-00428-DDP

LEROY BACA, et al.                                  :

I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

/S/_____          //___

MARIA R. BUSTILLOS                      DATE
OFFICIAL REPORTER

UNITED STATES DISTRICT COURT

/

**/S** [1] - 27:22

**1**

**10100** [1] - 2:19
**10:00** [1] - 26:10
**10:11** [1] - 5:3
**11** [3] - 1:18, 5:1, 5:4
**12-00428-DDP** [3] - 1:10, 5:6, 27:6
**12254** [1] - 1:22
**1313** [2] - 2:6, 2:11
**1725** [1] - 2:20
**1ST** [1] - 1:23

**2**

**2** [1] - 13:5
**20-page** [1] - 21:14
**202)393-4930** [1] - 2:16
**2023** [3] - 1:18, 5:1, 5:4
**213** [1] - 1:24
**213)893-5939** [1] - 3:5
**213)977-5228** [1] - 2:7
**213)977-9500** [1] - 2:12
**278** [1] - 1:16
**28** [1] - 27:13

**3**

**30th** [5] - 25:21, 26:1, 26:3, 26:6, 26:10
**310)272-7929** [1] - 2:25
**310)556-2700** [1] - 2:21
**33** [2] - 10:6, 10:22
**33rd** [1] - 10:13
**350** [1] - 1:23
**36** [2] - 9:11, 9:22
**39** [1] - 2:15

**4**

**40** [1] - 15:12
**40,000** [1] - 12:20
**400** [2] - 12:13
**43** [1] - 15:13
**4455** [1] - 1:23
**45** [2] - 7:4, 7:13
**45-day** [1] - 25:25

**5**

**5** [1] - 4:2
**50** [4] - 12:11, 12:16,

13:8, 13:9
**500** [2] - 2:23, 3:4
**52** [1] - 13:7

**6**

**6** [1] - 25:21
**60** [1] - 6:15
**60-day** [1] - 7:8
**69** [1] - 19:24
**6th** [3] - 26:2, 26:3, 26:5

**7**

**753** [1] - 27:12

**8**

**894-2739** [1] - 1:24

**9**

**90012** [3] - 1:24, 2:24, 3:5
**90017** [2] - 2:7, 2:11
**90067** [1] - 2:20
**94111** [1] - 2:15

**A**

**a.m** [1] - 26:10
**A.M** [1] - 5:3
**ability** [4] - 14:12, 18:22, 22:8, 25:9
**able** [1] - 7:1
**ABOVE** [1] - 27:15
**ABOVE-ENTITLED** [1] - 27:15
**accepting** [1] - 15:25
**access** [7] - 21:9, 21:13, 21:15, 21:16, 21:20, 25:8
**accomplish** [1] - 18:24
**accomplishes** [2] - 18:24, 18:25
**accordance** [1] - 14:4
**accountability** [2] - 8:8, 25:15
**accurate** [2] - 18:8, 23:2
**ACLU** [13] - 2:4, 2:9, 2:13, 9:13, 9:21, 10:18, 12:6, 13:14, 13:19, 19:8, 21:20, 22:2, 22:23
**ACLU's** [1] - 18:10
**add** [2] - 17:1, 25:13
**added** [1] - 10:13
**adding** [1] - 10:16
**addition** [1] - 24:18

**additional** [1] - 7:12
**adjourned** [1] - 26:23
**admittedly** [1] - 15:22
**advance** [3] - 24:3, 24:5, 24:7
**ago** [2] - 7:23, 12:10
**agree** [1] - 24:2
**agreed** [3] - 6:14, 8:3, 18:4
**agreeing** [1] - 6:20
**agreement** [1] - 18:19
**agreements** [1] - 7:17
**agrees** [1] - 7:3
**ahead** [1] - 6:11
**al** [9] - 1:7, 1:12, 2:4, 2:18, 3:3, 5:6, 5:7, 27:5, 27:7
**Alex** [1] - 5:6
**ALEX** [3] - 1:7, 2:4, 27:5
**allow** [1] - 21:20
**almost** [1] - 8:13
**ALSO** [1] - 3:8
**amount** [1] - 25:8
**AND** [3] - 27:10, 27:13, 27:15
**AND/OR** [1] - 27:19
**ANGELES** [9] - 1:17, 1:24, 2:7, 2:11, 2:20, 2:24, 3:3, 3:5, 5:1
**Angeles** [1] - 6:1
**angle** [5] - 23:16, 23:17, 23:22, 24:8, 24:16
**angles** [2] - 23:12, 23:24
**ANY** [1] - 27:18
**anyway** [1] - 17:14
**anyway...** [1] - 12:1
**appearances** [2] - 5:8, 6:8
**APPEARING** [1] - 3:8
**applies** [1] - 14:5
**ARE** [1] - 27:19
**area** [1] - 6:19
**areas** [2] - 6:25, 25:11
**arguing** [1] - 18:7
**armed** [1] - 16:18
**assaults** [1] - 14:17
**assistant** [1] - 20:6
**AT** [1] - 5:3
**attacked** [1] - 14:14
**availability** [1] - 16:14
**available** [5] - 7:15, 16:21, 17:5, 19:22, 20:3
**awesome** [1] - 11:16

**B**

**Baca** [1] - 5:7
**BACA** [4] - 1:12, 2:18, 3:3, 27:7
**background** [2] - 15:3, 18:22

**backwards** [1] - 14:23
**BAILEY** [1] - 2:23
**Bailey** [1] - 5:11
**Barlava** [1] - 5:10
**basic** [1] - 12:7
**basis** [1] - 16:17
**baton** [1] - 17:5
**BEHALF** [3] - 2:4, 2:18, 3:2
**behalf** [3] - 5:11, 5:22, 5:25
**behind** [1] - 13:18
**beneficial** [1] - 6:22
**benefit** [2] - 18:23, 24:2
**benefitted** [1] - 18:20
**better** [2] - 8:21, 15:20
**between** [1] - 15:12
**beyond** [1] - 20:4
**big** [1] - 8:7
**bit** [6] - 7:16, 7:24, 8:15, 9:9, 15:2, 23:3
**bitten** [1] - 14:1
**Board** [3] - 20:8, 20:18, 20:22
**bob** [1] - 26:1
**bodily** [4] - 10:12, 13:13, 13:22, 18:5
**bones** [2] - 13:24, 13:25
**BOULEVARD** [1] - 2:19
**bounds** [1] - 14:3
**BRILL** [2] - 2:18, 2:22
**broken** [2] - 13:24, 13:25
**brought** [1] - 7:23
**bull** [1] - 13:17
**BUSTILLOS** [3] - 1:21, 27:10, 27:23
**BY** [6] - 2:5, 2:10, 2:14, 2:19, 2:23, 3:3

**C**

**C.S.R** [1] - 1:22
**CA** [6] - 2:7, 2:11, 2:15, 2:20, 2:24, 3:5
**calendar** [1] - 5:19
**California** [4] - 10:13, 13:23, 14:4, 20:19
**CALIFORNIA** [7] - 1:2, 1:17, 1:24, 2:5, 2:9, 5:1, 27:12
**CAMACHO** [1] - 2:10
**Camacho** [2] - 5:14, 21:22
**CAMACHO-CHEUNG** [1] - 2:10
**carry** [2] - 16:12, 17:14
**CARTER** [1] - 3:8
**case** [11] - 5:6, 17:16, 18:18, 19:13, 19:22, 19:23, 19:25, 20:1,

20:10, 21:12, 21:15
**cases** [2] - 17:22, 23:19
**CENTRAL** [2] - 1:2, 27:11
**Central** [1] - 12:23
**certain** [1] - 14:1
**certainly** [1] - 12:14
**CERTIFY** [1] - 27:12
**chain** [2] - 19:8, 21:9
**change** [2] - 8:3, 8:4
**changes** [1] - 6:21
**characterize** [4] - 15:4, 18:10, 18:15, 19:9
**charge** [1] - 20:6
**CHARGED** [1] - 27:18
**CHEUNG** [1] - 2:10
**CIRCUIT** [1] - 27:18
**circumstance** [1] - 17:22
**circumstances** [1] - 10:17
**Citizens** [1] - 20:21
**citizens** [1] - 20:22
**class** [1] - 18:20
**clear** [2] - 10:15, 13:4
**cleared** [1] - 7:10
**clearly** [1] - 23:18
**clients** [1] - 19:1
**close** [1] - 6:19
**CODE** [1] - 27:13
**college** [1] - 25:22
**command** [2] - 19:8, 21:9
**commands** [1] - 16:6
**comments** [1] - 10:22
**Commission** [1] - 20:21
**committed** [1] - 16:4
**Communications** [1] - 6:1
**comparison** [1] - 12:15
**complete** [1] - 9:23
**compliance** [1] - 6:14
**COMPLIANCE** [1] - 3:8
**complicated** [2] - 8:11
**comprehensive** [2] - 9:20, 18:19
**comprise** [1] - 12:23
**concern** [2] - 24:5, 24:6
**conduct** [1] - 21:22
**conference** [4] - 6:9, 19:15, 25:19, 26:13
**CONFERENCE** [4] - 1:16, 4:2, 27:17, 27:20
**conferring** [1] - 26:12
**confidence** [1] - 18:16
**CONFORMANCE** [2] - 27:16, 27:19
**considerably** [1] -

UNITED STATES DISTRICT COURT

26:16
**CONT'D** [1] - 3:1
**contended** [1] - 12:8
**contention** [1] - 23:3
**context** [1] - 18:7
**continue** [2] - 7:12, 26:11
**continued** [1] - 7:4
**correct** [4] - 11:8, 16:19, 17:15
**CORRECT** [1] - 27:14
**corresponded** [1] - 10:12
**COUNSEL** [1] - 3:3
**counsel** [2] - 5:8, 21:25
**county** [1] - 15:13
**COUNTY** [1] - 3:3
**couple** [5] - 22:15, 22:17, 23:2, 25:11, 25:16
**course** [1] - 24:14
**COURT** [43] - 1:1, 1:21, 5:3, 5:16, 5:23, 6:2, 6:6, 6:11, 7:25, 8:14, 8:19, 9:7, 10:24, 11:2, 11:6, 11:10, 11:13, 11:18, 12:16, 14:21, 14:23, 15:2, 16:10, 16:15, 16:23, 17:13, 18:4, 18:13, 19:4, 21:6, 22:2, 22:6, 22:14, 22:19, 22:25, 23:23, 25:18, 26:7, 26:10, 26:18, 26:22, 27:10, 27:11
**Court** [5] - 10:8, 19:19, 21:14, 21:24, 26:14
**court** [1] - 19:2
**COURTHOUSE** [1] - 1:22
**courtroom** [1] - 11:20
**COURTROOM** [1] - 5:5
**covered** [1] - 17:2
**covers** [3] - 9:15, 21:15, 21:16
**craft** [1] - 14:10
**credit** [1] - 9:21
**custody** [2] - 15:17, 20:7
**CV** [2] - 1:10, 5:6

**D**

**daily** [1] - 16:17
**damage** [1] - 17:9
**danger** [1] - 10:11
**dangerous** [2] - 9:25, 16:20
**Daniel** [1] - 5:10
**data** [3] - 20:12, 21:10, 21:19

**DATE** [1] - 27:23
**date** [1] - 25:18
**days** [4] - 6:15, 7:4, 7:13, 17:19
**deadly** [2] - 8:18, 17:6
**deal** [3] - 15:20, 20:11, 26:16
**DEAN** [1] - 1:5
**death** [4] - 10:14, 10:16, 13:13, 17:12
**debate** [2] - 14:5, 14:7
**defendant** [1] - 5:11
**defendants** [4] - 6:20, 8:3, 8:23, 23:14
**Defendants** [1] - 1:13
**DEFENDANTS** [2] - 2:18, 3:2
**defined** [2] - 13:23, 15:14
**definition** [1] - 10:25
**degree** [1] - 18:15
**delivery** [1] - 18:21
**Department** [1] - 20:19
**department** [3] - 15:19, 20:25, 25:2
**department's** [1] - 20:23
**DEPOSIT** [1] - 27:19
**deputies** [12] - 14:8, 14:12, 14:14, 14:19, 15:1, 15:20, 15:25, 16:10, 16:18, 16:20, 17:13, 19:18
**DEPUTY** [1] - 5:5
**deputy** [6] - 13:12, 13:16, 13:17, 13:18, 13:21, 24:23
**description** [1] - 12:7
**designee** [1] - 20:6
**detailed** [1] - 20:12
**detected** [1] - 16:3
**determine** [2] - 9:16, 9:18
**detriment** [1] - 23:14
**differences** [1] - 19:1
**different** [6] - 8:25, 10:3, 11:5, 17:10, 23:16, 23:17
**differently** [1] - 13:8
**difficult** [3] - 15:22, 16:5, 16:7
**disagree** [1] - 22:16
**discipline** [3] - 8:8, 24:22, 25:3
**disciplined** [1] - 25:5
**discuss** [1] - 23:11
**discussed** [1] - 26:13
**discussion** [1] - 18:11
**discussions** [4] - 6:15, 8:6, 18:3, 18:17
**disfigurement** [1] - 13:25
**dishonesty** [1] - 8:8

**dispute** [1] - 9:25
**disputes** [1] - 26:15
**disputing** [1] - 17:9
**distribute** [1] - 22:11
**DISTRICT** [5] - 1:1, 1:2, 1:5, 27:11
**DIVISION** [1] - 1:3
**DO** [1] - 27:12
**DOJ** [4] - 3:8, 15:8, 19:22, 21:25
**Dominguez** [1] - 5:15
**DOMINGUEZ** [1] - 2:14
**Dominguez-Ruiz** [1] - 5:15
**DOMINGUEZ-RUIZ** [1] - 2:14
**done** [1] - 22:18
**down** [3] - 7:19, 12:9, 15:11
**downtown** [1] - 12:21
**drive** [1] - 21:19
**Dropboxes** [1] - 22:3
**DRUMM** [1] - 2:15
**Dugdale** [9] - 5:10, 7:3, 7:9, 7:15, 8:22, 11:14, 22:16, 23:2, 25:14
**DUGDALE** [30] - 2:19, 5:9, 5:12, 9:8, 11:1, 11:4, 11:8, 11:11, 11:16, 11:21, 12:1, 12:20, 14:22, 14:24, 15:7, 16:13, 16:19, 17:1, 17:15, 18:9, 18:14, 19:12, 21:11, 22:21, 25:20, 26:3, 26:8, 26:11, 26:19, 26:21
**Dugdale...** [1] - 9:7
**Dylan** [1] - 5:10
**DYLAN** [1] - 3:3

**E**

**educate** [1] - 15:20
**EIGHT** [1] - 2:11
**EIGHTH** [1] - 2:6
**either** [4] - 7:18, 11:24, 25:21, 26:3
**elbowed** [1] - 14:1
**ELIASBERG** [17] - 2:5, 5:13, 6:3, 6:10, 6:12, 8:2, 8:17, 8:21, 22:5, 22:7, 22:15, 22:20, 23:1, 23:25, 26:1, 26:5, 26:20
**Eliasberg** [5] - 5:14, 9:10, 18:16, 22:3, 26:13
**Eliasberg's** [2] - 18:20, 18:25
**eliminate** [2] - 13:3, 13:21
**emphasized** [1] -

10:17
**enable** [2] - 23:20, 24:21
**end** [1] - 25:23
**entered** [1] - 21:15
**ENTITLED** [1] - 27:15
**especially** [2] - 14:9, 14:15
**ESQ** [5] - 2:6, 2:14, 2:19, 2:23, 3:3
**essential** [1] - 24:13
**essentially** [1] - 18:5
**et** [9] - 1:7, 1:12, 2:4, 2:18, 3:3, 5:6, 5:7, 27:5, 27:7
**everywhere** [1] - 22:22
**evidence** [1] - 21:13
**exacting** [1] - 9:14
**except** [1] - 7:7
**exists** [1] - 9:23
**expanding** [1] - 14:7
**experts** [1] - 20:3
**explanation** [1] - 24:6
**eyeballs** [1] - 21:2

**F**

**face** [6] - 12:7, 13:1, 14:9, 16:4, 17:12, 17:25
**facilities** [1] - 12:21
**facility** [2] - 12:14, 12:22
**facing** [2] - 13:12, 13:22
**fact** [2] - 14:4, 17:9
**fair** [1] - 25:8
**falls** [1] - 10:7
**family** [1] - 22:9
**far** [2] - 15:20, 18:20
**fashion** [1] - 10:16
**FEE** [1] - 27:18
**FEES** [1] - 27:18
**felt** [1] - 6:16
**few** [2] - 7:19, 7:23
**files** [1] - 21:17
**filled** [1] - 14:15
**finish** [1] - 11:6
**first** [4] - 6:4, 6:9, 7:8, 15:10
**fist** [5] - 11:2, 11:6, 12:4, 12:25, 17:8
**five** [1] - 7:5
**flashlight** [1] - 17:4
**flashlights** [1] - 17:18
**FLOOR** [2] - 2:24, 3:4
**focus** [1] - 8:12
**folks** [5] - 6:7, 15:5, 16:16, 19:7, 21:7
**FOR** [3] - 27:10, 27:11, 27:18
**force** [14] - 8:18, 10:8, 12:24, 13:5, 16:14, 17:6, 17:25, 20:12,

21:16, 21:17, 23:5, 23:9, 24:18, 24:25
**Ford** [1] - 5:10
**FORD** [1] - 3:3
**FOREGOING** [1] - 27:13
**forget** [1] - 22:21
**FORMAT** [1] - 27:16
**FOUNDATION** [2] - 2:4, 2:9
**four** [2] - 9:15, 10:3
**FRANCISCO** [1] - 2:15
**frankly** [4] - 8:9, 22:24, 23:13, 24:8
**frequent** [3] - 19:15, 21:22, 21:23
**frequently** [3] - 12:9, 20:2, 22:1
**front** [1] - 7:18
**fruitful** [1] - 18:17
**full** [1] - 23:19

**G**

**general** [2] - 19:6, 20:24
**General's** [1] - 20:15
**generally** [3] - 9:5, 19:10, 23:5
**given** [1] - 6:25
**gleaned** [1] - 9:5
**gosh** [1] - 23:15
**gratuitously** [1] - 14:17
**great** [1] - 18:5
**greater** [4] - 14:18, 14:25, 17:7, 18:25
**guards** [1] - 14:17
**guys** [1] - 11:19

**H**

**half** [1] - 9:15
**hard** [2] - 7:11, 24:14
**hash** [2] - 19:1, 19:4
**head** [34] - 8:4, 8:15, 8:16, 9:1, 10:3, 10:5, 10:6, 10:10, 10:15, 10:18, 10:21, 10:25, 11:2, 11:5, 11:7, 12:2, 12:11, 12:13, 12:16, 12:23, 12:24, 13:2, 13:6, 14:6, 14:18, 14:19, 14:25, 15:18, 16:4, 16:8, 17:7
**heads** [1] - 21:21
**heads-up** [1] - 21:21
**health** [2] - 15:6, 16:6
**Health** [1] - 15:14
**hear** [1] - 6:4
**hearing** [1] - 21:5
**heavy** [2] - 20:16, 21:25

30

**HELD** [1] - 27:15
**help** [1] - 22:24
**helpful** [1] - 25:12
**HEREBY** [1] - 27:12
**himself** [2] - 13:12, 13:13
**history** [1] - 9:23
**hit** [2] - 15:9, 17:18
**hitting** [1] - 17:7
**Honor** [18] - 5:9, 5:13, 5:21, 5:24, 6:3, 6:12, 6:17, 9:8, 11:22, 12:1, 13:23, 15:7, 16:19, 18:2, 19:2, 25:20, 26:8, 26:20
**HONORABLE** [1] - 1:5
**hope** [2] - 9:11, 26:15
**hopefully** [1] - 26:17
**hot** [1] - 21:25
**hours** [1] - 24:15

## I

**idea** [1] - 16:1
**ideally** [1] - 7:2
**identifying** [2] - 24:20, 25:10
**illness** [1] - 15:21
**illnesses** [2] - 16:1, 20:1
**illustrative** [1] - 24:11
**imminent** [6] - 10:11, 13:12, 13:22, 17:12, 18:5, 18:6
**impact** [4] - 17:4, 17:11, 17:14, 17:21
**impaired** [1] - 15:16
**impasse** [2] - 6:17, 8:20
**imply** [1] - 20:22
**important** [2] - 9:24, 25:9
**imposed** [2] - 25:4, 25:5
**improper** [1] - 13:9
**IN** [5] - 5:3, 27:10, 27:15, 27:16, 27:19
**inaccurate** [1] - 25:16
**incarcerated** [1] - 22:10
**including** [2] - 12:22, 21:1
**individuals** [3] - 14:16, 15:17, 15:21
**inform** [1] - 22:7
**information** [4] - 15:3, 21:16, 24:20, 25:12
**informational** [1] - 19:6
**initiation** [1] - 17:17
**injuries** [1] - 14:2
**injury** [4] - 10:12, 13:13, 13:22, 18:6
**inmate** [3] - 13:16, 16:16, 17:21

**inmates** [11] - 12:18, 12:20, 14:8, 14:15, 14:17, 14:25, 15:13, 16:21, 17:19, 19:18, 22:23
**insight** [1] - 6:18
**inspections** [1] - 21:22
**Inspector** [1] - 20:15
**instance** [3] - 12:12, 13:14, 21:23
**instances** [1] - 14:24
**intakes** [1] - 22:12
**interactions** [1] - 16:18
**interested** [1] - 14:7
**interfere** [1] - 25:25
**intervenor** [3] - 5:18, 5:22, 5:25
**intervenors'** [1] - 6:4
**involve** [4] - 12:24, 13:5, 13:9, 19:25
**involving** [2] - 20:25, 21:1
**IRC** [4] - 12:22, 18:21, 21:23, 21:24
**IS** [2] - 27:13, 27:16
**island** [1] - 12:11
**issue** [8] - 8:7, 8:20, 9:25, 19:18, 20:3, 20:24, 22:18, 25:24
**issues** [15] - 6:16, 7:19, 7:22, 8:1, 8:25, 9:12, 13:20, 15:6, 15:15, 16:6, 18:17, 19:24, 20:17, 20:20, 26:17
**item** [1] - 5:5
**itself** [1] - 17:23

## J

**jail** [11] - 12:21, 15:13, 16:11, 19:10, 20:2, 20:16, 20:17, 21:21, 22:1, 22:5, 22:23
**Jail** [1] - 12:23
**jails** [9] - 16:22, 19:15, 19:16, 19:21, 20:21, 21:1, 21:2, 21:4, 22:13
**JUDGE** [1] - 1:5
**Judge** [1] - 5:4
**JUDICIAL** [2] - 27:17, 27:20
**jump** [1] - 22:19
**Justice** [1] - 20:19
**justified** [5] - 8:18, 13:11, 13:15, 14:10, 23:18
**justify** [1] - 16:8

## K

**Katie** [1] - 5:25
**keeping** [1] - 14:11
**KELLY** [2] - 2:18, 2:22
**KENDALL** [2] - 2:18, 2:22
**kicking** [2] - 13:17, 13:18
**knows** [4] - 13:23, 15:7, 21:14, 21:24

## L

**L.A** [1] - 15:13
**lack** [2] - 21:2, 21:3
**language** [2] - 10:20, 18:4
**large** [1] - 8:22
**larger** [1] - 10:7
**last** [9] - 6:13, 8:12, 9:12, 10:9, 11:17, 12:14, 13:7, 15:10, 15:23
**lasts** [1] - 20:11
**Laughter** [2] - 11:15, 11:25
**law** [3] - 10:13, 13:23, 14:5
**learn** [1] - 25:3
**least** [2] - 8:4, 15:16
**LEROY** [4] - 1:12, 2:18, 3:3, 27:7
**Leroy** [1] - 5:7
**LESS** [1] - 27:18
**level** [1] - 19:9
**life** [1] - 25:24
**limit** [3] - 10:1, 14:6, 18:1
**limitations** [2] - 10:8, 10:20
**limited** [4] - 10:16, 10:17, 16:13, 17:22
**limits** [2] - 9:19, 14:11
**listen** [1] - 10:21
**listening** [1] - 11:18
**litigation** [4] - 12:12, 15:8, 17:17, 21:25
**LLC** [1] - 6:1
**LLP** [2] - 2:18, 2:22
**located** [1] - 15:16
**look** [3] - 23:15, 23:17, 23:24
**looking** [2] - 20:20, 25:3
**LOS** [9] - 1:17, 1:24, 2:7, 2:11, 2:20, 2:24, 3:3, 3:5, 5:1
**Los** [1] - 5:25

## M

**magic** [1] - 17:6

**major** [1] - 24:20
**malingering** [1] - 16:2
**map** [1] - 7:2
**MARGARET** [1] - 3:8
**MARIA** [3] - 1:21, 27:10, 27:23
**Marisol** [1] - 5:15
**MARISOL** [1] - 2:14
**matter** [1] - 20:3
**MATTER** [1] - 27:15
**matters** [2] - 20:25, 21:1
**MCJ** [1] - 14:15
**mean** [2] - 17:2, 17:16
**meaning** [1] - 13:18
**mediator** [1] - 19:3
**medical** [1] - 9:19
**meet** [3] - 7:11, 23:11, 23:23
**meeting** [3] - 10:5, 24:15, 26:12
**meetings** [2] - 10:4, 24:9
**Melissa** [1] - 5:14
**MELISSA** [1] - 2:10
**members** [3] - 18:20, 20:8, 22:9
**Men's** [1] - 12:22
**mental** [6] - 15:5, 15:14, 15:21, 16:1, 16:6, 20:1
**mentally** [1] - 15:16
**mentioned** [1] - 21:8
**met** [2] - 7:5, 9:1
**metal** [1] - 17:8
**metric** [1] - 12:19
**might** [1] - 20:22
**mind** [1] - 14:12
**mirror** [1] - 17:20
**missing** [3] - 23:3, 24:8, 25:17
**misused** [1] - 10:1
**Mitchell** [1] - 19:22
**modified** [1] - 6:20
**modify** [1] - 6:14
**MONDAY** [2] - 1:18, 5:1
**Monday** [1] - 5:4
**MONICA** [1] - 2:19
**monitor** [4] - 7:6, 19:23, 22:9
**monitoring** [5] - 9:19, 10:5, 10:22, 19:7, 20:4
**monitors** [21] - 9:13, 9:22, 10:4, 13:11, 13:19, 15:23, 19:9, 19:11, 19:13, 19:24, 20:16, 21:17, 23:7, 23:10, 23:11, 23:12, 23:15, 23:20, 23:24, 24:1, 24:10
**month** [1] - 8:13
**months** [3] - 7:23, 15:10, 19:19

**morning** [8] - 5:9, 5:12, 5:13, 5:16, 5:23, 5:24, 6:2, 6:12
**most** [6] - 9:22, 12:7, 15:16, 17:24, 17:25, 20:18
**motion** [2] - 6:4, 6:13
**mouth** [1] - 9:5
**movements** [1] - 16:17
**moving** [1] - 13:18
**MR** [45] - 5:9, 5:12, 5:13, 6:3, 6:10, 6:12, 8:2, 8:17, 8:21, 9:8, 11:1, 11:4, 11:8, 11:11, 11:16, 11:21, 12:1, 12:20, 14:22, 14:24, 15:7, 16:13, 16:19, 17:1, 17:15, 18:9, 18:14, 19:12, 21:11, 22:5, 22:7, 22:15, 22:20, 22:21, 23:1, 23:25, 25:20, 26:1, 26:3, 26:5, 26:8, 26:11, 26:19, 26:20, 26:21
**MS** [2] - 5:21, 5:24
**multiple** [3] - 23:6, 23:12, 24:23

## N

**name** [1] - 25:6
**names** [1] - 25:7
**narrow** [1] - 26:17
**narrowed** [1] - 26:15
**narrowing** [1] - 7:22
**NATIONAL** [1] - 2:13
**nature** [1] - 10:17
**need** [3] - 8:6, 11:13, 22:24
**needless** [1] - 14:9
**negotiate** [2] - 7:17, 18:22
**negotiations** [2] - 7:5, 9:6
**neighborhood** [1] - 7:16
**next** [4] - 15:25, 21:4, 25:19, 26:13
**nobody** [1] - 17:9
**nomenclature** [1] - 13:3
**norm** [1] - 16:7
**note** [2] - 15:23, 15:24
**notifying** [1] - 22:23
**November** [1] - 25:21
**number** [19] - 5:5, 5:6, 6:21, 9:12, 12:17, 12:18, 13:10, 14:8, 14:16, 14:19, 14:24, 15:1, 15:8, 15:18, 18:2, 20:25, 22:8, 22:12, 23:8

UNITED STATES DISTRICT COURT

31

**O**

**obeying** [1] - 16:6
**object** [1] - 17:8
**obviously** [1] - 17:6
**occasions** [2] - 14:11, 17:18
**occurrence** [1] - 17:20
**October** [2] - 25:21, 25:23
**OF** [13] - 1:2, 1:15, 2:4, 2:4, 2:9, 2:18, 3:2, 27:11, 27:14, 27:17, 27:20
**offense** [1] - 19:2
**office** [1] - 20:15
**OFFICER** [1] - 3:8
**officers** [1] - 9:4
**OFFICIAL** [3] - 1:21, 27:10, 27:23
**oftentimes** [1] - 23:6
**ON** [3] - 2:4, 2:18, 3:2
**one** [14] - 5:5, 6:19, 7:14, 8:4, 8:18, 10:5, 11:17, 13:17, 14:23, 18:11, 23:4, 23:5, 23:22, 24:17
**ones** [4] - 13:20, 20:13, 23:7, 24:4
**open** [1] - 19:2
**operations** [1] - 20:23
**opportunity** [1] - 24:16
**order** [3] - 17:6, 21:12, 23:5
**otherwise** [1] - 25:13
**outside** [1] - 19:11
**oversee** [1] - 20:23
**oversight** [2] - 25:10, 25:15
**Oversight** [1] - 20:21
**own** [1] - 20:17

**P**

**package** [6] - 23:6, 23:9, 23:11, 24:25, 25:3, 25:7
**packages** [2] - 24:4, 24:18
**PAGE** [2] - 4:2, 27:16
**pages** [1] - 9:15
**pam** [1] - 22:22
**pamphlets** [2] - 22:2, 22:11
**panel** [1] - 19:14
**parents'** [1] - 25:22
**part** [7] - 7:8, 8:22, 17:24, 19:8, 20:5, 22:8, 25:9
**particular** [1] - 18:11
**particularly** [2] - 6:19, 24:5
**pass** [2] - 12:18, 12:21

**past** [1] - 15:9
**people** [6] - 16:1, 16:5, 21:19, 22:7, 22:10, 22:12
**percent** [3] - 12:24, 13:5, 15:13
**perhaps** [2] - 7:4, 9:3
**period** [2] - 7:8, 7:13
**permanent** [1] - 13:25
**person** [2] - 12:7, 19:14
**personal** [3] - 12:3, 12:4, 25:24
**personnel** [1] - 10:14
**perspective** [2] - 12:17, 24:14
**PETER** [1] - 2:5
**Peter** [1] - 5:14
**pieces** [2] - 23:3, 25:16
**Plaintiffs** [1] - 1:8
**plaintiffs** [2] - 5:15, 8:5
**PLAINTIFFS** [1] - 2:4
**plan** [1] - 6:14
**plateaued** [1] - 15:11
**point** [1] - 21:18
**pointed** [1] - 13:15
**points** [1] - 22:17
**policies** [2] - 9:24, 20:13
**policy** [20] - 6:20, 8:4, 8:11, 8:15, 8:24, 9:11, 9:14, 9:20, 9:23, 10:6, 10:7, 10:10, 12:5, 14:10, 17:2, 17:10, 18:12, 20:13
**population** [1] - 15:4
**position** [3] - 8:16, 8:17, 18:10
**possibility** [1] - 7:22
**possible** [1] - 14:11
**potential** [1] - 13:24
**potentially** [1] - 9:25
**preamble** [2] - 10:19, 18:8
**prearranged** [1] - 19:17
**Pregerson** [1] - 5:4
**PREGERSON** [1] - 1:5
**preplanned** [1] - 16:14
**presence** [1] - 20:16
**present** [1] - 19:14
**presents** [1] - 16:7
**PRESIDING** [1] - 1:5
**previously** [1] - 25:5
**primary** [1] - 21:10
**PRISON** [1] - 2:13
**problem** [4] - 15:25, 23:25, 24:21, 26:5
**problems** [6] - 10:19, 13:20, 23:21, 24:23, 25:10, 25:11
**proceeding** [1] - 26:23

**PROCEEDINGS** [2] - 1:15, 27:15
**process** [1] - 26:12
**progress** [5] - 6:16, 6:18, 6:24, 7:11, 8:10
**PROJECT** [1] - 2:13
**proposed** [1] - 5:25
**protect** [4] - 14:3, 14:13, 14:20, 15:1
**protective** [2] - 21:12, 23:4
**provide** [2] - 24:5, 24:7
**provided** [1] - 24:12
**provides** [2] - 20:7, 20:12
**provision** [1] - 19:25
**provisions** [1] - 19:24
**public** [5] - 19:20, 19:21, 20:7, 20:9
**publicly** [2] - 19:21, 20:3
**punch** [2] - 12:25, 17:25
**punched** [2] - 13:13, 13:19
**punches** [2] - 13:5, 13:16
**punching** [5] - 12:6, 13:1, 13:2, 14:2, 14:8
**PURSUANT** [1] - 27:12
**pursuant** [2] - 21:11, 23:4
**put** [4] - 9:3, 9:4, 9:16, 21:19

**Q**

**questions** [1] - 20:9
**quite** [3] - 6:22, 7:2, 7:11

**R**

**raised** [1] - 9:13
**range** [1] - 23:20
**rare** [2] - 17:20, 17:24
**rather** [3] - 13:1, 17:8, 19:1
**reached** [1] - 7:20
**read** [1] - 10:10
**really** [9] - 6:23, 8:13, 9:16, 11:23, 14:2, 17:23, 18:20, 24:22, 24:24
**rearview** [1] - 17:19
**reason** [2] - 7:13, 24:20
**reasonable** [1] - 18:23
**recently** [1] - 20:19
**recognize** [1] - 18:2

**recollection** [1] - 8:16
**records** [1] - 12:11
**redactions** [1] - 24:19
**reduce** [1] - 16:4
**REDUCTION** [1] - 27:19
**refer** [1] - 11:2
**regular** [1] - 19:16
**REGULATIONS** [2] - 27:16, 27:20
**related** [1] - 12:19
**remember** [3] - 6:13, 10:9, 11:17
**remembers** [1] - 10:9
**report** [5] - 7:19, 15:24, 15:25, 20:8, 20:10
**REPORTED** [1] - 27:14
**REPORTER** [3] - 1:21, 27:10, 27:23
**REPORTER'S** [1] - 1:15
**reports** [6] - 19:19, 19:21, 20:4, 20:17, 20:18, 20:24
**representative** [1] - 5:17
**required** [1] - 10:13
**resolution** [1] - 7:20
**respond** [1] - 8:22
**restrictive** [2] - 8:23, 9:2
**result** [1] - 13:25
**review** [2] - 23:10
**rising** [1] - 15:9
**risk** [1] - 9:4
**ROBERT** [2] - 2:19, 2:23
**Robert** [2] - 5:10, 5:11
**ROSAS** [3] - 1:7, 2:4, 27:5
**Rosas** [3] - 5:6, 5:15, 20:5
**rounds** [1] - 16:16
**RUIZ** [1] - 2:14
**Ruiz** [1] - 5:15
**Rutherford** [2] - 18:18, 21:24

**S**

**safely** [1] - 10:2
**SAN** [1] - 2:15
**SANTA** [1] - 2:19
**schedule** [1] - 25:25
**SEAGER** [1] - 5:21
**Seager** [1] - 5:21
**seat** [1] - 6:7
**SECTION** [1] - 27:12
**see** [15] - 6:15, 8:19, 14:14, 15:18, 22:14, 23:18, 23:21, 23:23, 24:7, 24:17, 24:22, 24:25, 25:6, 26:8

**seeing** [1] - 25:10
**seem** [1] - 14:3
**semiannual** [3] - 19:19, 20:4, 20:7
**sense** [2] - 7:1, 23:8
**SEPTEMBER** [2] - 1:18, 5:1
**September** [1] - 5:4
**serious** [4] - 10:11, 13:13, 13:22, 15:14
**services** [2] - 18:21, 19:25
**SESSION** [1] - 5:3
**several** [1] - 15:9
**severe** [3] - 14:2, 17:9, 17:25
**severely** [1] - 15:16
**share** [1] - 21:18
**shares** [1] - 18:16
**sheriff** [5] - 14:7, 16:3, 18:24, 20:5, 20:6
**sheriff's** [6] - 15:19, 16:10, 19:8, 20:23, 20:25, 21:8
**shortage** [1] - 19:12
**show** [3] - 20:9, 24:11, 24:16
**significant** [1] - 15:5
**signs** [3] - 22:5, 22:6, 22:22
**similar** [1] - 12:12
**similarly** [2] - 19:24, 20:1
**single** [1] - 9:15
**single-spaced** [1] - 9:15
**situation** [1] - 16:8
**situations** [3] - 14:13, 14:14, 23:14
**six** [2] - 15:10, 19:19
**SIXTH** [2] - 2:24, 3:4
**slideshow** [1] - 20:11
**small** [1] - 22:17
**smaller** [1] - 12:14
**sole** [1] - 19:23
**solutions** [1] - 18:23
**sometimes** [7] - 16:7, 23:12, 23:13, 23:21, 24:6, 24:9, 24:21
**somewhere** [2] - 12:10, 13:8
**sorry** [6] - 11:6, 11:10, 11:11, 22:21, 25:21, 25:24
**sort** [9] - 7:2, 8:7, 12:19, 15:2, 18:7, 19:6, 19:7, 19:9, 24:23
**sources** [1] - 21:10
**SOUTHERN** [2] - 2:4, 2:9
**spaced** [1] - 9:15
**specialty** [1] - 15:21
**specifically** [1] - 24:19
**spent** [3] - 7:10, 8:9,

32

9:9
**spits** [1] - 13:15
**stand** [1] - 26:14
**started** [1] - 20:20
**starting** [1] - 15:11
**state** [2] - 5:8, 19:7
**STATES** [6] - 1:1, 1:22, 27:11, 27:13, 27:17, 27:20
**status** [3] - 6:9, 19:20, 25:19
**STATUS** [2] - 1:16, 4:2
**steadily** [1] - 15:9
**STENOGRAPHICALLY** [1] - 27:14
**still** [5] - 8:2, 8:5, 10:23, 15:12, 23:3
**stipulation** [1] - 21:14
**STREET** [6] - 1:23, 2:6, 2:11, 2:15, 2:23, 3:4
**stretch** [1] - 7:14
**strike** [11] - 8:4, 8:15, 9:1, 10:6, 10:7, 10:11, 10:25, 12:2, 12:25, 16:8, 17:21
**strikes** [18] - 8:16, 10:3, 10:15, 10:18, 10:21, 11:5, 12:11, 12:13, 12:14, 12:16, 12:23, 13:2, 14:6, 14:18, 14:19, 14:25, 15:18, 16:4
**subject** [2] - 20:2, 21:7
**subjects** [1] - 20:18
**substantial** [2] - 6:21, 22:12
**substantially** [1] - 12:9
**sufficient** [1] - 8:5
**sufficiently** [2] - 9:2
**suggesting** [1] - 25:8
**SUITE** [2] - 1:23, 2:20
**summaries** [1] - 21:17
**sun** [1] - 11:22
**Supervisors** [1] - 20:8
**supplement** [1] - 22:17
**surface** [1] - 11:22
**Susan** [1] - 5:21
**system** [1] - 15:14

## T

**talks** [1] - 20:13
**Taser** [1] - 16:14
**Tasers** [1] - 17:22
**task** [2] - 15:23, 16:5
**team** [2] - 10:5, 10:22
**temperature** [1] - 11:20
**TEMPLE** [2] - 2:23, 3:4
**terms** [4] - 12:17, 15:5, 19:10, 21:7

**testimony** [1] - 20:24
**THAT** [2] - 27:12, 27:15
**THE** [54] - 2:4, 2:18, 3:2, 5:5, 5:16, 5:23, 6:2, 6:6, 6:11, 7:25, 8:14, 8:19, 9:7, 10:24, 11:2, 11:6, 11:10, 11:13, 11:18, 12:16, 14:21, 14:23, 15:2, 16:10, 16:15, 16:23, 17:13, 18:4, 18:13, 19:4, 21:6, 22:2, 22:6, 22:14, 22:19, 22:25, 23:23, 25:18, 26:7, 26:10, 26:18, 26:22, 27:10, 27:11, 27:13, 27:14, 27:15, 27:16, 27:17, 27:19, 27:20
**themselves** [3] - 14:13, 14:20, 15:1
**THIS** [1] - 27:18
**thorough** [1] - 20:10
**threat** [6] - 13:12, 13:22, 17:5, 17:11, 17:12, 18:5
**three** [5] - 8:25, 10:4, 19:14, 24:15
**three-person** [1] - 19:14
**threshold** [1] - 8:25
**thumbs** [1] - 7:6
**TITLE** [1] - 27:13
**title** [1] - 20:22
**TO** [1] - 27:12
**today** [1] - 19:15
**together** [1] - 7:24
**took** [1] - 9:13
**tours** [1] - 19:17
**Towers** [2] - 12:22, 15:17
**TOWNSEND** [1] - 5:24
**Townsend** [1] - 5:25
**track** [1] - 24:24
**tracked** [1] - 13:7
**training** [1] - 15:22
**TRANSCRIPT** [4] - 1:15, 27:14, 27:16, 27:18
**transparency** [3] - 19:10, 21:3, 21:7
**treat** [1] - 9:17
**trending** [2] - 12:10, 13:7
**trigger** [1] - 8:25
**TRUE** [1] - 27:13
**true** [1] - 22:4
**try** [3] - 7:11, 7:17, 16:4
**trying** [6] - 13:21, 14:10, 14:22, 15:19, 18:1
**twiddling** [1] - 7:6
**Twin** [2] - 12:22, 15:17
**two** [2] - 12:10, 12:24

**types** [2] - 11:5, 17:14
**typically** [1] - 17:14

## U

**under** [4] - 11:21, 11:23, 13:23, 17:21
**underlying** [1] - 21:9
**UNITED** [6] - 1:1, 1:22, 27:11, 27:13, 27:17, 27:20
**unless** [1] - 10:11
**up** [3] - 9:8, 20:9, 21:21
**update** [1] - 26:14
**updating** [1] - 19:19
**uses** [4] - 12:24, 13:5, 13:10, 20:12
**utilize** [1] - 14:25

## V

**vacation** [3] - 7:8, 7:9, 11:14
**vacations** [1] - 7:10
**various** [1] - 20:17
**version** [6] - 9:11, 9:12, 9:22, 10:6, 10:14, 10:22
**versus** [1] - 11:7
**video** [6] - 13:17, 19:15, 21:13, 21:16, 23:5, 24:12
**videos** [2] - 23:8, 23:20
**violation** [2] - 25:1, 25:2
**violent** [1] - 14:16
**visitor** [2] - 21:22, 21:23
**visits** [1] - 19:16
**vs** [2] - 1:10, 27:6

## W

**walking** [1] - 16:16
**wall** [1] - 11:7
**warm** [1] - 11:23
**water** [1] - 11:23
**ways** [2] - 24:17, 25:14
**weapon** [5] - 12:4, 17:3, 17:4, 17:11, 17:21
**weapons** [4] - 12:3, 16:12, 16:21, 17:14
**weekend** [1] - 6:24
**welcome** [1] - 14:6
**WEST** [5] - 1:23, 2:6, 2:11, 2:23, 3:4
**WESTERN** [1] - 1:3
**whole** [2] - 7:14, 18:18
**willing** [1] - 10:21

**WITH** [2] - 27:16, 27:19
**WitnessLA** [1] - 5:22
**wonderful** [1] - 19:3
**word** [1] - 18:6
**words** [1] - 9:4
**works** [3] - 24:17, 25:18, 26:6
**worried** [1] - 24:8
**WRAP** [10] - 6:20, 7:1, 8:10, 9:11, 9:17, 9:18, 9:23, 10:4

## Y

**year** [5] - 12:11, 12:14, 12:21, 13:7, 13:8
**years** [2] - 12:10, 15:9
**yourself** [1] - 14:3

UNITED STATES DISTRICT COURT