UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - -

HONORABLE DEAN D. PREGERSON, DISTRICT JUDGE PRESIDING

ALEX ROSAS, et. al.,                    )
                                        )
        Plaintiffs,                     )
                                        )
                                        )
                                        )
    vs.                                 ) No. CV 12-00428-DDP
                                        )
                                        )
                                        )
LEROY BACA, et al.,                     )
                                        )
        Defendants.                     )
_____ )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

*STATUS CONFERENCE [290]*

LOS ANGELES, CALIFORNIA

MONDAY, OCTOBER 30, 2023

_____


MARIA R. BUSTILLOS
OFFICIAL COURT REPORTER
C.S.R. 12254
UNITED STATES COURTHOUSE
350 WEST 1ST STREET
SUITE 4455
LOS ANGELES, CALIFORNIA 90012
(213) 894-2739

**A P P E A R A N C E S**

**ON BEHALF OF THE PLAINTIFFS,**
**ALEX ROSAS, et. al.:**        ACLU FOUNDATION OF SOUTHERN
                               CALIFORNIA
                               BY:  PETER J. ELIASBERG,
                               ESQ.
                               1313 WEST EIGHTH STREET
                               LOS ANGELES, CA 90017
                               (213)977-5228


                               ACLU FOUNDATION OF SOUTHERN
                               CALIFORNIA
                               BY:  MELISSA L.
                               CAMACHO-CHEUNG
                               1313 WEST EIGHT STREET
                               LOS ANGELES, CA 90017
                               (213)977-9500


                               ACLU NATIONAL PRISON PROJECT
                               BY:  MARISOL J.
                               DOMINGUEZ-RUIZ, ESQ.
                               39 DRUMM STREET
                               SAN FRANCISCO, CA 94111
                               (202)393-4930


                               ACLU NATIONAL PRISON PROJECT
                               BY:  CORENE T. KENDRICK
                               425 CALIFORNIA STREET
                               SUITE 700
                               SAN FRANCISCO, CA 94104


                               ACLU SoCAL
                               BY:  JACOB R. REISBERG
                               1313 WEST 8TH STREET
                               SUITE 200
                               LOS ANGELES, CA 90017
                               (213)977-9500

3

**A P P E A R A N C E S (CONT'D)**

**ON BEHALF OF THE DEFENDANTS,
LEROY BACA, et al.:**                     KENDALL, BRILL & KELLY, LLP
                                          BY:  ROBERT E. DUGDALE, ESQ.
                                          10100 SANTA MONICA BOULEVARD
                                          SUITE 1725
                                          LOS ANGELES, CA 90067
                                          (310)556-2700


                                          KENDALL, BRILL & KELLY, LLP
                                          BY:  ROBERT BAILEY, ESQ.
                                          500 WEST TEMPLE STREET
                                          SIXTH FLOOR
                                          LOS ANGELES, CA 90012
                                          (310)272-7929


                                          KENDALL, BRILL & KELLY, LLP
                                          BY:  DANIEL BARLAVA
                                          10100 SANTA MONICA BOULEVARD
                                          SUITE 1725
                                          LOS ANGELES, CA 90067
                                          (310)272-7919


                                          LOS ANGELES COUNTY COUNSEL
                                          BY:  DYLAN FORD, ESQ.
                                          500 WEST TEMPLE STREET
                                          SIXTH FLOOR
                                          LOS ANGELES, CA 90012
                                          (213)893-5939

UNITED STATES DISTRICT COURT

**I N D E X**

PAGE

STATUS CONFERENCE [290]:                                    5

LOS ANGELES, CALIFORNIA; MONDAY, OCTOBER 30, 2023

-o0o-

(COURT IN SESSION AT 10:06 A.M.)

THE COURTROOM DEPUTY:  Calling calendar item number one, case number CV 12-0428-DDP:  *Alex Rosas, et al. v. Leroy Baca, et al.*

Counsel, state your appearance.

MR. DUGDALE:  Good morning, Your Honor. Robert Dugdale, Daniel Barlava, Robert Bailey, and Dylan Ford on behalf of the defendants.

THE COURT:  Yes, good morning.

MR. ELIASBERG:  Good morning, Your Honor. Peter Eliasberg from ACLU, with my colleagues, Elisa Camacho and Jacob Reisberg on Zoom and Marisol Dominguez-Ruiz and Corene Kendrick from the ACLU National Prison Project on behalf of the plaintiffs.

THE COURT:  Good morning.  And we'll all use the mics so that everyone that is here remotely can hear us.  I'm going to be looking at my monitor, but all of the monitors, and folks that are here by Zoom, as well.

Okay.  For the status conference, Mr. Eliasberg?

MR. ELIASBERG:  Good morning, Your Honor.  So the parties have continued to be discussing the principal issues that we brought to this court in June

UNITED STATES DISTRICT COURT

6

that we believed we've reached impasse on.  I have some good news, which is that with respect to one of the issues which was the use of the WRAP restraint, the parties have reached an agreement, which involves, basically, the adoption of a new WRAP policy that includes some restrictions on the use of WRAP that weren't -- weren't in previous policy.  Additionally, a spit mask bulletin that provides for restrictions on the use of a spit mask with somebody on the WRAP, not an absolute ban, but some -- some stringent restrictions.

In addition, the parties have agreed that the monitors will write an implementation measure and put it into Section 17 of the current *Rosas* implementation Plan and that they will seek -- they will submit a draft to the parties.  We'll have an opportunity to comment.  And then they will submit it to the Court for approval for submission.  So that is good news.  We've taken one of the issues and I think resolved it.  Just working out the details.

We have had a number of discussions with respect to the limitations of force policy, which includes the restriction on head strikes.  We have not reached agreement.  We actually met on Friday.  The department has been spending a fair amount of time speaking with the monitors.  They've now submitted a

policy to us, but we just got it on Friday.  And we would like to inform the court we'd like a week to get back to the defendants.  I'm not saying we won't accept it or we will, but we need to think carefully about it before we decide on that.

We have not had the opportunity to discuss accountability issues; focusing on discipline and other ways to ensure that the kinds of things that we've identified and that the monitors have identified where we think that force violations that should have been identified as violations aren't by the department, but the monitors find them to be violations.  We really haven't gotten anywhere on that, Your Honor.  And then in addition, we agreed with the defendants that we would discuss, too, their desire to take some of the provisions of the implementation plan where the department has been in compliance for a period of years off reporting, but that is also something that we have not really had the opportunity to discuss.  So that's where they are.

You know, Your Honor, our concerns -- we're glad that we resolved the WRAP.  We still do believe that changes need to be made with respect to limitations on force and force prevention and so on, accountability because Your Honor has seen the most recent monitors'

report, which shows a continued pattern of violations in those areas.  Now, on a positive side, we're glad to see use of force numbers going down, but we still are very concerned that in certain areas, the monitors continue to find violations where the department don't -- does not.  So that's -- that's where we are, Your Honor. I'm, obviously, happy to answer any questions.

In terms of thinking going forward, we do want to continue to work on the limitations on force.  I would ask that we have another six weeks to try to resolve the outstanding issues.  At a certain point, though, I think, you know, if -- if we feel a need to bring things to the court, we understand you may not agree with our position.  But at some point, I think -- I don't want to keep just talking if we reach impasse. I think we do need to have sort of a drop dead point on which we could come back to this court and report.  We know we -- there's certain issues we can't resolve and that we would like to, if the plaintiffs choose, make a motion on that.  But that would be our suggestion as to how to proceed.

I have not -- ordinarily, we discuss these things in advance.  I haven't -- because we were so frantically dealing with the head strikes stuff on Friday, I have not had a chance, in advance, to present

that approach to Mr. Dugdale.  So, obviously, I'm open to hearing if he has a different idea about how things should proceed.

THE COURT:  So just going to sort of a touchdown as -- or thinking about other touchdowns being the sort of integrity of the reporting process, and just take head strikes for an example.  Certain things, in my experience, are sort of self-regulating.  That means if you have an honest reporting of a head strike, the more that that information is maintained and reported with integrity, the better the information and the more that whatever the consequences might be can be addressed.  And the whole process starts, you know, self -- it becomes able to -- to make adjustments because it understands what -- what's going on.

So tell me a little bit about your confidence that head strikes are being accurately or, at least, reported.

MR. ELIASBERG:  I feel pretty confident that -- that we are seeing a good -- we -- we don't see every -- let me step back, Your Honor.  The monitors each -- each reporting period -- each six-month reporting period, which covers two quarters.  In each quarter, they get 25 full force packages and for -- so they're -- so they're reviewing 50 for every report that they provide to the

Court.

And they are careful to -- they don't just get a random sample as we've talked about.  They will say, we want to see -- we want to make that sure we're seeing, if not all, most of any report -- any --

THE COURT:  But how do you know that the head strikes get reported to begin with?

MR. ELIASBERG:  Um, well, I think one way we -- we have reasonable confidence is we also get reports from people who come to us and talk to us about, you know, I was beaten up or I was abused in the jails.  And we have some ability to square what we receive with what gets reported.  And I don't think that we have seen any indication that there is -- which was not the case a long time ago.  I don't think we've seen any indication that people are coming to us and saying, this happened.  They may have a different version of what happened, but I don't think we're seeing any indication of we get a report that something happened to somebody and the department doesn't seem to have any record of it.  So....

THE COURT:  I mean, with folks spending very little time often in -- in custody, how do you have confidence that you are getting a -- you know -- that you are getting meaningful data from people that you can

correlate with the use of force packets that you're getting?

MR. ELIASBERG:  Well, I think, Your Honor -- I mean, it is a closed system at some level, but I don't -- I -- I mean, some of this, unfortunately, is gut.  And some of this is also what we experienced in the past where we clearly could see that there were people who would report stuff to us and the department didn't have records of it.  That's not the case.  I -- I mean, I think it is possible that that's happening.  But I -- I'm really more concerned about the stuff where I know that we're getting reports and the monitors are saying, you know, out of -- out of the 50 or so head strike videos that we reviewed, 26 of them or 24 of them were out of policy.  And the department only found four or five of them out of policy.

THE COURT:  You're not as concerned about somebody that gets punched in the head without justification, but they're there for only a week and you would never know about it?

MR. ELIASBERG:  I am not as concerned about that.  I mean, I -- I get -- obviously, that is something that we would be worried about.  And I do have some concern that we don't have the ability to ferret that out to the extent I would like.  But I -- it is not

my principal concern.

THE COURT:  Do you do exit interviews?

MR. ELIASBERG:  We do -- we have -- we do talk to people who tell us about incidents after they leave the jails.  We don't stand at the -- we do go into the jails and talk to people.  We don't stand and wait for people to come out and ask them what their experience is, but we do talk to people after they have come out of jails.

THE COURT:  Only if they approach you?

MR. ELIASBERG:  That's correct.  We do -- we do talk to people in the jails when we go in and visit.

THE COURT:  Okay.  I mean, okay.  I just to -- I don't want to micro-manage anything, but, to me, sort of exit interviews are an important integrity process when it comes to making sure that you -- you really are capturing some meaningful percentage, but it's just a thought.

MR. ELIASBERG:  No.  And I appreciate that. And I can certainly talk to my colleagues about whether that's something that we should put into part of our -- our process.  But as I said, we have enough other things where we actually have reporting and we have a basis for pretty significant concerns so that -- I don't want to minimize what Your Honor is saying, but we have -- we

have other fish to fry that are -- that are, basically, hitting us right in the face when we get monitors' reports and when we review use of force packages ourselves.

THE COURT:  I understand -- and -- and what about the -- okay.  There's sort of an interrelated issue with use of force and discipline, as well, right?

MR. ELIASBERG:  Absolutely.

THE COURT:  Okay.

MR. ELIASBERG:  And the monitors have said over and over again the head strike issue is not going to be resolved until the department continually identifies head strikes that are out of policy and disciplines for them.  I mean, that's what their own reports say.  And I think that they would confirm -- confirm that if you were to ask them here in court today.

So, yeah, the -- the process of identifying violations -- just to give you specifics from the last report, which was just filed through the court within -- within the last week.  "Of the applicable" -- and I'm quoting here from their report on page 16, "Of the applicable cases reviewed, 52 percent, 26 out of 50, were found to be in compliance."  Which means that 48 were out of compliance.  That's well below the 52 compliance rate -- percent compliance rate, represents

the decrease from the 65 percent compliance rate noted in the 11th report.  So not only are they way out of -- way below the 90 percent compliance threshold that the monitors have said, but the numbers went down.  Now, again, the numbers -- the -- the pure numbers did go down.  That is a positive sign.  But of the times that head strikes are being used, they were way out of compliance according to the monitors' own findings.

So we think that in order to get to that, there has to be better accountability within the department.  There is no other way to get to this problem except the department has to say, this is out of compliance.  And people are getting disciplined for it.  The monitors are finding that.  The department isn't.

THE COURT:  Is there a disagreement between you and the County over the definition of compliance?

MR. ELIASBERG:  Not that I'm -- not that I'm aware.  I mean, if the county has ever said to the monitors, we think this threshold for 90 percent compliances is too high, I'm not aware of it.  These compliance --

THE COURT:  Well, I guess what I was asking would the criteria for when a particular incident is in compliance or not?

MR. ELIASBERG:  I think that's a question you

have to ask Mr. Dugdale.  But, certainly, we feel that, you know, that the monitors are -- are dead on. Obviously, there can be occasional cases in the margins, but where the monitors are finding 48 percent of the cases out of compliance, even if one or two are on the margins, that doesn't matter.

THE COURT:  "Out of compliance" means -- translation, excessive force?

MR. ELIASBERG:  Excessive force.  Doesn't meet the policy for when a head strike can be used.  That's correct, Your Honor.

THE COURT:  Okay.  By definition, that also means a potential constitutional violation?

MR. ELIASBERG:  That's correct, Your Honor. Absolutely.

THE COURT:  Okay.  All right.  Thank you.

MR. DUGDALE:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. DUGDALE:  So I -- I will start by -- I know Mr. Eliasberg said we didn't have a chance to discuss this, but I think giving us another six weeks to discuss those matters to which we have not yet reached agreement makes some sense.  We have taken complicated issues involving what were formerly numerous disputes such as the WRAP policy and -- and folded them into a policy

16

that we all agree to.  I have some confidence that we can reach an ultimate agreement on the limitations of force policy.

We spent a lot of time since we were last here on September 11th with the monitors going through that policy.  I can talk the Court through some of that if the Court wishes, but it's -- I think it's much more clear than it was on September 11th.  We have definitions for things to make people understand them.  We can train on this policy.  And it's much more restrictive on when a head strike can be imposed.  We've included the -- "or deaf" language that we've referenced before to -- to severely cut back on the number of times that people can use head strikes legitimately under this policy.  And among other things, to make it very clear to deputies that, as a first matter, they have to use deescalation whenever they encounter a situation.  And as a second matter, the use of a head strike is very limited when they face imminent risk of -- of death or serious bodily injury and they have no other reasonable technique that they can use to avoid using a head strike in response to the use of force that they're facing.

So we -- we worked really hard on this.  And I -- and I think that hopefully the ACLU will be pleased with the strides that we've made since the last policy.

We are in version number 36 of this policy right now just to give the Court some indication about the number of times that we have gone back to the department and rewritten the policy to try and come up with some common ground. We have given -- we've given a lot of ground to get to 36 here.

And the other thing too --

THE COURT: That sounds like a world record, 36.

MR. DUGDALE: We're trying to go for it -- we're trying not to break that record, Your Honor.

THE COURT: Okay.

MR. DUGDALE: But there are other stakeholders that we have to deal with here. We have to deal with the USDOJ, who gets some input on this. We have to deal with ALADS, the -- the deputies' union. We have to deal internally with people within the sheriff's department, including those in the training department to make sure they can actually train what we're giving the deputies. So there -- there's a lot of work involved in this, but I -- I have some reasonable degree of confidence that we'll come to some agreement on that, which is an important step.

On -- on the issue of head strikes, I do want to give the Court an update on where we stand on head

strikes because the Court -- every time we come here, you ask for context of -- of the head strikes and what -- what does it mean to have X number of head strikes?  So we have the most recent reporting data. And to go back for one second and answer the Court's question about the integrity of the data, I want to assure the Court that this data is -- every time a use of force happens, it is closely scrutinized.  And to my knowledge, there have not been any issues either raised by the ACLU or the monitoring panel to question the integrity of the use of force data that the department is reporting.

THE COURT:  That -- to me, that means that if a deputy uses a head strike, that it gets reported.  And the deputy knows that there are consequences for not reporting it.

MR. DUGDALE:  Right.  Correct, Your Honor.  So let -- let's just go with the "is reported" part of this first, which is an important part.  There is no lack of oversight of these issues at the jail right now.  We have the three monitors in the monitoring panel here. We have the ACLU that oversees this case, signs to the inmates inside the jail that they can call the ACLU if they have any complaint whatsoever, are prevalent. They're everywhere.

We have the USDOJ, who has oversight here with an overlapping monitor, Monitor Mitchell.

We have the inspector general's office, who has oversight of --

THE COURT:  I understand that.  But if you have a large percentage of the population that has mental health challenges, which we know is true, you know, are those folks going to get on the phone and call when they get punched in the head in some area of the jail that doesn't have cameras?

MR. DUGDALE:  Well, look, there are also 2,000 cameras in the jail.

THE COURT:  Yes.  And there are a lot of dead -- dead areas in the jail.  I'm not casting dispersions on the integrity of the deputies or any of that.  I'm just -- I'm just doing my own due diligence to make sure that there is accurate reporting.

MR. DUGDALE:  Of course.  And -- and -- and that -- that's -- that's the most important thing -- is at least a baseline here to make sure that the reporting is accurate.  But the County's point here is there's been no question about this issue before.  I'm not saying people haven't questioned it.  I'm -- I'm saying people -- if people have questioned it, they haven't sided on the idea that somehow the reporting is flawed,

including the head strike reporting.

THE COURT:  Yeah.  I mean, if it was probably me, I would probably do exit interviews for a week or two or some period of time and just audit my results to see if the feedback that I'm getting is consistent with the system.  That's all.

MR. DUGDALE:  Understood, Your Honor.

So in -- in -- when it comes to reporting, one thing we specifically track is head strikes because -- and this is a relatively recent development from about a year and a half ago because the head strike issue was such a big issue in this case.  The department wants to know how many head strikes are occurring, where they're occurring, and to make sure that we are monitoring trends.  Are there deputies -- the same deputies who are repeatedly using this technique?  Is it happening in one particular area of the jail where we might want to focus in on to make sure that we can minimize head strikes there?

THE COURT:  Sure.

MR. DUGDALE:  And so these numbers are given to the monitors.  We have a -- we have a head strike tracker.  We've offered to give it to the ACLU, as well.  And these numbers are reviewed and essentially audited by the monitoring team.  In fact, the last -- before the

last report, it turns out we'd over-reported head strikes.  We had some instances where there was a takedown, for instance, and somebody hit their head when they went down.  And we mistakenly reported it as a head strike, which is a punch to the face or some sort of hit to the face.  So --

THE COURT:  Well, what's a push where your head hits a wall?  Is that a head strike?

MR. DUGDALE:  Well, that is potentially even more serious.  So if --

THE COURT:  Right, but what do you call it?

MR. DUGDALE:  So we have a category in the limitations of use of force policy that deals with situations where a deputy -- if a deputy intentionally hits a -- hits an inmate's head against the wall or the floor to cause injury to the person's head, that is an entirely separate category.  That is a circumstance where that deputy has to have -- has to have basis to use deadly force to use a technique like that, to slam an inmate's head against the wall.

THE COURT:  But it's not tracked as a head strike even though the strike is done by the wall?  When someone's pushed against the wall, that's not considered a head strike?

MR. DUGDALE:  Well --

THE COURT:  I'm just trying to understand the reporting as opposed to --

MR. DUGDALE:  No. That would be -- that would be considered a Category 2 or depending on the severity of the injury, Category 3, use of force.  So it's tracked.  I mean, it -- these are reviewed.  You know, Your Honor had the one video that I -- I know that the Court has reviewed in connection with the motion to unseal those filed by the *L.A. Times* and *L.A. List*.  And it's an -- from last July I believe it was where deputies -- two deputies held an inmate.  He hit his head against --

THE COURT:  Sure.  I saw it.

MR. DUGDALE:  So --

THE COURT:  So head strikes really literally means a punch to the head.

MR. DUGDALE:  Correct.  So we're talking about punches to the face.  It's called "use of personal weapon."  It -- it's a head strike, okay?

THE COURT:  You answered my question.  Thank you.

MR. DUGDALE:  So let me discuss, for context purposes, the numbers when it comes to head strikes.  So I will give you the data for the past three years, 2021, 2022, and 2023 to date:  So in 2021, there were 82 head

strikes at the three facilities this case deals with. In 2022, there were 52.  So there was a 37 percent decrease between '21 and '22.

Now we're in '23.  We have the data for the first three quarters of 2023.  And there have only been 25 head strikes through the first three quarters in 2023.

So we are on pace, through the end of the year, to have 33, 34 head strikes at these three facilities by the end of year.  So down from 52 from last year.  So we've gone from 82 to 52 to 33, 34 assuming we keep on our current trend.

During the last quarter, during the third quarter of 2023, there were a total of three head strikes in the three facilities.  Two at Towers -- and I'm sorry.  One at Towers.  Two at MCJ.  So that's the perspective I want the Court to have.

First of all, about the fact that these numbers are going down, they decreased by 60 percent in the past two years to the point we were -- we are at 33, 34 head strikes trending for this year.  Now, to give some further perspective as to what that means, there is a -- I won't call it a case that mirrors this case, but it is -- there's a case at Rikers Island in New York involving similar issues where there are allegations of

excessive uses of force by the jailers at Rikers Island. There's a monitor in place.  During the most recent report by that monitor, he noted that in 2022, there were 400 head strikes at that facility, 400, where at the L.A. County Jail, there were 52.  And Rikers Island, by the way, is a smaller facility than the three jails that we have here that are encompassed by this agreement.  So 400 versus 52.  They had 69 head strikes during a two-month period this year as indicated in their most recent monitor report.  69 versus the 33, 34 that we're trending for, for the entire year here.

So, again, I'm comparing a facility that's actually a little smaller where they have similar issues.  And we are way, way ahead of them.  I'm not saying that's the model to go to, to have a facility where there are 400 head strikes, but it gives you some perspective, Your Honor, as far as how advanced we are compared to that facility that is facing the issues that L.A. County is facing in this case.

And to give the Court, of course, further perspective, when we're talking about 33 head strikes this year trending towards that number, we're talking about a situation where there are roughly --

THE COURT:  What's the population -- sort of profile of that, Ellis Island?

MR. DUGDALE:  So --

THE COURT:  I mean, I -- I don't know if they're apples to apples.  I don't know.  I don't know if -- maybe they're -- one can say maybe their reporting is so much better, maybe their accuracy is so much better.  I know that that's -- you would push back on that, but --

MR. DUGDALE:  I would because it's wrong.

THE COURT:  -- it's just -- it's hard to compare, you -- you know, facilities, unless you -- you really know what you're talking about in terms of the data.  So -- but I take your broad point that you're doing very well.  That's what you're telling me.  So I'm not -- I'm not minimizing that representation in any way.

MR. DUGDALE:  Thank you, Your Honor.

And, of course, you talked about the size of the facility.  So the L.A. County Jail this year will have somewhere in the neighborhood of 50,000 people who pass through it.  Not all of them -- all of them go through the IRC -- or most of them go through the IRC, but not all of them end up at the three facilities we're talking about here.  So we're talking about a smaller number here.  But still, we're talking about literally -- when we're talking about the 2,000

26

employees who work in the jails -- the millions of contacts between those deputies and these inmates.  And again, trending towards 34 head strikes.  And, again, at the same time --

THE COURT:  Well, I mean, in perspective that sounds like a very relatively low number for sure.  For sure, I get it.

MR. DUGDALE:  Okay.  Yeah.

THE COURT:  Okay.

MR. DUGDALE:  At the same time, we recognize that head strikes are danger.  So we're trying to get that number even lower than that.  The other issue about the 32 is all 32, of course, are also not out of policy either.

THE COURT:  Understood.

MR. DUGDALE:  There are -- there are a percentage there.  Now, we may have some quibbles about what percentage are in policy or not.  But, again, we're talking about a relatively low -- low number.  But more importantly than the -- the number being low is an absolute number, it's trending downward.  So when we're talking about the overlap between accountability and head strikes, presumably, the ACLU wants accountability, in part, because they want deterrence.  They want fewer head strikes.  So the argument I would make is that it

is working, especially under the new administration here where it has gone, again, from 52 -- which was a relatively low -- low number -- down to trending to 33, 34 with all of three head strikes in the past quarter.

THE COURT:  Right.

MR. DUGDALE:  So the numbers are going downwards.  The overall use of force numbers similar, Your Honor, are going down.  There were 1,150 in 2021.  There were 384 in the first half of 2023.  These are numbers that were audited by the monitoring team and that appeared in the 12th monitor report that was filed with the court last week.  So, again, the overall use of force numbers are going down.  The head strike numbers are going down dramatically.

And they are going down most dramatically in the past year -- or at least equal to the -- to the -- to the sizable jump between '21 and '22.  The 50 percent number that Mr. Eliasberg was talking about where the monitors have a difference of opinion with the department as to whether a head strike was out of policy, those are reviews from uses of force from last year under the prior administration.  The monitoring team has not yet conducted any audit of uses of force during this administration because the reports lag behind by roughly six months or so.

So part of the thing I think the Court has to consider with accountability is who's asking who to be accountable here. And I will represent that this is a sheriff, and we've seen this before in other actions taken by this sheriff. He has a different view on accountability than the prior sheriff.

The video that the Court saw where the inmate's head was slammed against the wall, those two deputies have been referred for criminal prosecution by the sheriff. This is not a sheriff who is -- who is shy about holding the people who work for him accountable when they violate policy. So --

THE COURT: Okay.

MR. DUGDALE: -- I would suggest, Your Honor, that --

THE COURT: Those are all very positive statements. We would all agree.

MR. DUGDALE: Okay. Well, I was told once by your father when I was in front of the Ninth Circuit --

THE COURT: Oh, no. He's bringing up my father.

(Laughter.)

MR. DUGDALE: I'm -- I'm so sorry. He told me when I was making good points to an argument, I should probably just sit down before I -- I -- I backtracked and lost all ground that I had made.

So I will just end by:  Mr. Eliasberg and the ACLU have been great as far as negotiating with us.  I think you saw this in *Rutherford*, as well, where we took a very dire situation, came up with an agreement.  I think things in that case have been very positive since then.  I have no reason to believe that can't happen here.  So I -- I will sit down and -- and take the ground I've won, Your Honor, unless -- unless the Court has any questions.

THE COURT:  No.  I think six weeks or so sounds fine.  It would probably have to be the -- I don't know if it's -- might be a little less than six weeks.  The first week in December would be better for me.  Maybe the second week -- middle of the -- I'm thinking -- let's take a look.

MR. DUGDALE:  As long as I can avoid December 4th, Your Honor, I'm -- I'm good that first week.

THE COURT:  Yeah, yeah.

You know, we could look at the -- maybe the -- the 7th or the 8th?

MR. DUGDALE:  It will be a day that lives in infamy, Your Honor, okay.

THE COURT:  It will be.

MR. DUGDALE:  It's Pearl Harbor Day.

THE COURT: Really? Okay.

THE COURTROOM DEPUTY: December 7th is a Thursday.

THE COURT: Do you want to do that? Does that work?

MR. ELIASBERG: That's fine, Your Honor.

THE COURT: We'll do the same thing at 10:00 o'clock.

MR. ELIASBERG: All right. Thank you, Your Honor.

THE COURT: Okay. Yes. Okay.

Let -- let's shoot for the Monday, the 11th then.

MR. ELIASBERG: That's fine, Your Honor.

THE COURT: I see I have a trial. Okay. The 11th at 10:00. Okay. Let's do that.

And, Mr. Dugdale, you were finishing up the edits on the videos that were going to be released to the public. You indicated your -- they took a little longer than you thought because we -- I'd asked you to make some changes because I thought the -- you know, I thought that there were things that were unnecessarily removed from the video that needed to be in the video. So you're doing that?

MR. DUGDALE: We are, Your Honor. I -- I will

get back with your clerk by the end of the day as far as an estimate for the amount of time necessary.  It -- it turns out, they have to be edited on a frame-by-frame basis.  You can't just automate this.  So the one that was done well -- that Your Honor approved of -- we're actually having the same person do the other ones, the same exact person.  The one that Your Honor saw was 15 seconds and featured three people.  Some of the other videos have many, many more people and are much longer than 15 seconds.  So this is pretty cumbersome.  The -- the person apparently worked the entire weekend.  We're getting messages at 6:00 a.m. on Saturday.  And -- and we thought we could make the deadline, but it's going to take --

THE COURT:  Okay.  I -- I would have thought there was software that can just blur faces automatically, but maybe that's just --

MR. DUGDALE:  Apparently, it -- it -- there is, but it can't happen with this video because the video is of pretty low quality.  And --

THE COURT:  I see.

MR. DUGDALE:  -- apparently, the quality of the video does not allow the software to do that.  So --

THE COURT:  Okay.  Well, you're working on it.

MR. DUGDALE:  We are working on it.  And -- and

Mr. Eliasberg gets credit for referring us to this person. And I don't -- I don't mean to say that because this person hasn't met the deadline. I meant -- I mean it to say that this person is doing a very good job and is doing a real professional job and is working very hard at --

THE COURT: Okay. Okay.

MR. ELIASBERG: Your Honor, could I raise just one other issue on this with respect to the -- your ruling addressed the videos? It doesn't explicitly address -- I'm not trying to speak for the parties, but we had said that if we wanted context for the videos, it was actually going to come from some of the material that we had to file under seal. And both the *L.A. Times* and I believe *WitnessL.A.* did ask for not just the videos, but also the other under seal filings to be released. And I don't believe Your -- Your Honor's order actually addresses the paper that was filed under seal as opposed to the videos. So I'm just basically letting you know that I -- I think that's still an unaddressed issue at this point.

And since we had asked that the context for the videos be paper that had been filed, I think at some level, the Court needs to address that when you finally address the videos --

THE COURT:  Okay.  Well, is that something that -- okay.  Mr. Marcus reminded me that the defendants were ordered to object if they had any objections.

MR. DUGDALE:  Well, I actually have no problem with -- well, the County doesn't have any problem with what Mr. Eliasberg is talking about.  There are no names that are mentioned here or anything like this.  These are -- these are -- this is some commentary that was given about the under seal -- under seal videos.  We don't have any issue with that.  The -- the videos themselves are going to be presumably available as redacted.  So Mr. Eliasberg's commentary would seem to be fair game, as well.  He filed in June.  So -- so we don't object to this, Your Honor.

THE COURT:  Okay.  I would need to know specifically -- I -- I just -- probably have my clerk contact both parties and just make sure that we're clear on what -- Mr. Eliasberg, do you understand what can be released pursuant to what Mr. Dugdale just stated?

MR. ELIASBERG:  Yes.  I believe -- we had -- when we filed our motion to change the implementation plan or modify the implementation plan, we did file videos.  And we also redacted in certain -- in a declaration or maybe a couple of declarations and a

34

brief certain descriptions of what's in the videos.  So that is really the material that I -- I think we both agree on that.  It has no names.  There are no names in any of it.  So I think we're in agreement as to what --

THE COURT:  So then I think what I need is a -- okay.  If I need further guidance, I'll let you know, but it sounds like I already know what needs to be done because nobody objects.  And the way it is, is fine, right?

MR. ELIASBERG:  But if -- if Mr. Marcus wants to follow up with us, we can --

THE COURT:  If there are any questions, he or I will ask you.

MR. ELIASBERG:  I think there's only one thing I should clarify.  We -- we mistakenly -- in one of the declarations we filed under seal, there was a name in it.  There were some names in it.  We, subsequently, filed that declaration with the names taken out.

THE COURT:  Okay.

MR. ELIASBERG:  So we would like that to be the version that's released, not the original version.

THE COURT:  Okay.  And I would release it at the same time the videos are released, as well.  That's -- that's the plan.

MR. ELIASBERG:  That makes sense, Your Honor.

THE COURT:  Okay.

MR. ELIASBERG -- from the plaintiffs, yes.

MR. DUGDALE:  Yes.  Yes, Your Honor.

THE COURT:  Okay.  What else -- what else is new, Mr. Dugdale?

MR. DUGDALE:  No.  I think we're good, Your Honor.  December 11th we will give you --

THE COURT:  Okay.

MR. DUGDALE:  -- hopefully more good news and -- and an update.

THE COURT:  Okay.

Mr. Eliasberg, anything else?

MR. ELIASBERG:  No, I think that's all. Thank you, Your Honor.

THE COURT:  Okay.  Everybody, have a nice Thanksgiving.  Thank you.

MR. ELIASBERG:  Thank you, Your Honor.  You too.

(Whereupon, proceedings adjourned.)

- - -

UNITED STATES DISTRICT COURT

# C E R T I F I C A T E

ALEX ROSAS, et al.                                :

                          vs.                     :  No. ^

LEROY BACA, et al.                                :

I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


_____/S/_____              //___

MARIA R. BUSTILLOS                           DATE
OFFICIAL REPORTER

UNITED STATES DISTRICT COURT

37

**'**

'21 [2] - 23:3, 27:17
'22 [2] - 23:3, 27:17
'23 [1] - 23:4

**/**

/S [1] - 36:22

**1**

1,150 [1] - 27:8
10100 [2] - 3:5, 3:13
10:00 [2] - 30:8, 30:16
10:06 [1] - 5:3
11th [6] - 14:2, 16:5, 16:8, 30:12, 30:16, 35:7
12-00428-DDP [1] - 1:10
12-0428-DDP [1] - 5:5
12254 [1] - 1:22
12th [1] - 27:11
1313 [3] - 2:6, 2:11, 2:22
15 [2] - 31:8, 31:10
16 [1] - 13:21
17 [1] - 6:13
1725 [2] - 3:6, 3:14
1ST [1] - 1:23

**2**

2 [1] - 22:4
2,000 [2] - 19:11, 25:25
200 [1] - 2:22
202)393-4930 [1] - 2:16
2021 [3] - 22:24, 22:25, 27:8
2022 [3] - 22:25, 23:2, 24:3
2023 [7] - 1:18, 5:1, 22:25, 23:5, 23:7, 23:14, 27:9
213 [1] - 1:24
213)893-5939 [1] - 3:19
213)977-5228 [1] - 2:7
213)977-9500 [2] - 2:12, 2:23
24 [1] - 11:14
25 [2] - 9:23, 23:6
26 [2] - 11:14, 13:22
28 [1] - 36:13
290 [2] - 1:16, 4:2

**3**

3 [1] - 22:5

30 [2] - 1:18, 5:1
310)272-7919 [1] - 3:15
310)272-7929 [1] - 3:11
310)556-2700 [1] - 3:7
32 [2] - 26:13
33 [6] - 23:9, 23:11, 23:20, 24:10, 24:21, 27:3
34 [6] - 23:9, 23:11, 23:20, 24:10, 26:3, 27:4
350 [1] - 1:23
36 [3] - 17:1, 17:6, 17:9
37 [1] - 23:2
384 [1] - 27:9
39 [1] - 2:15

**4**

400 [4] - 24:4, 24:8, 24:16
425 [1] - 2:18
4455 [1] - 1:23
48 [2] - 13:23, 15:4
4th [1] - 29:17

**5**

5 [1] - 4:2
50 [4] - 9:25, 11:13, 13:22, 27:17
50,000 [1] - 25:19
500 [2] - 3:9, 3:17
52 [8] - 13:22, 13:24, 23:2, 23:10, 23:11, 24:5, 24:8, 27:2

**6**

60 [1] - 23:19
65 [1] - 14:1
69 [2] - 24:8, 24:10
6:00 [1] - 31:12

**7**

700 [1] - 2:19
753 [1] - 36:12
7th [2] - 29:21, 30:2

**8**

82 [2] - 22:25, 23:11
894-2739 [1] - 1:24
8th [1] - 29:21
8TH [1] - 2:22

**9**

90 [2] - 14:3, 14:19
90012 [3] - 1:24, 3:10, 3:18
90017 [3] - 2:7, 2:11, 2:23
90067 [2] - 3:6, 3:14
94104 [1] - 2:19
94111 [1] - 2:15

**A**

a.m [1] - 31:12
A.M [1] - 5:3
ability [2] - 10:12, 11:24
able [1] - 9:14
ABOVE [1] - 36:15
ABOVE-ENTITLED [1] - 36:15
absolute [2] - 6:10, 26:21
absolutely [2] - 13:8, 15:15
abused [1] - 10:11
accept [1] - 7:3
according [1] - 14:8
accountability [7] - 7:7, 7:24, 14:10, 26:22, 26:23, 28:2, 28:6
accountable [2] - 28:3, 28:11
accuracy [1] - 25:5
accurate [2] - 19:17, 19:21
accurately [1] - 9:17
ACLU [14] - 2:4, 2:9, 2:13, 2:17, 2:21, 5:13, 5:15, 16:24, 18:10, 18:22, 18:23, 20:23, 26:23, 29:2
actions [1] - 28:4
addition [2] - 6:11, 7:14
additionally [1] - 6:7
address [3] - 32:11, 32:24, 32:25
addressed [2] - 9:12, 32:10
addresses [1] - 32:18
adjourned [1] - 35:19
adjustments [1] - 9:14
administration [3] - 27:1, 27:22, 27:24
adoption [1] - 6:5
advance [2] - 8:23, 8:25
advanced [1] - 24:17
ago [2] - 10:15, 20:11
agree [4] - 8:14, 16:1, 28:17, 34:3
agreed [2] - 6:11, 7:14

agreement [8] - 6:4, 6:23, 15:22, 16:2, 17:22, 24:8, 29:4, 34:4
ahead [1] - 24:14
al [8] - 1:7, 1:12, 2:4, 3:4, 5:6, 36:5, 36:7
ALADS [1] - 17:16
Alex [1] - 5:5
ALEX [3] - 1:7, 2:4, 36:5
allegations [1] - 23:25
allow [1] - 31:23
amount [2] - 6:24, 31:2
AND [3] - 36:10, 36:13, 36:15
AND/OR [1] - 36:19
ANGELES [11] - 1:17, 1:24, 2:7, 2:11, 2:23, 3:6, 3:10, 3:14, 3:16, 3:18, 5:1
answer [2] - 8:7, 18:5
answered [1] - 22:20
ANY [1] - 36:18
appearance [1] - 5:7
appeared [1] - 27:11
apples [2] - 25:3
applicable [2] - 13:20, 13:22
appreciate [1] - 12:19
approach [2] - 9:1, 12:10
approval [1] - 6:16
approved [1] - 31:5
ARE [1] - 36:19
area [2] - 19:9, 20:17
areas [3] - 8:2, 8:4, 19:14
argument [2] - 26:25, 28:23
assuming [1] - 23:11
assure [1] - 18:7
AT [1] - 5:3
audit [2] - 20:4, 27:23
audited [2] - 20:24, 27:10
automate [1] - 31:4
automatically [1] - 31:17
available [1] - 33:12
avoid [2] - 16:21, 29:16
aware [2] - 14:18, 14:20

**B**

BACA [3] - 1:12, 3:4, 36:7
Baca [1] - 5:6
backtracked [1] - 28:24
BAILEY [1] - 3:9
Bailey [1] - 5:9

ban [1] - 6:10
Barlava [1] - 5:9
BARLAVA [1] - 3:13
baseline [1] - 19:20
basis [3] - 12:23, 21:18, 31:4
beaten [1] - 10:11
becomes [1] - 9:14
begin [1] - 10:7
BEHALF [2] - 2:4, 3:4
behalf [2] - 5:10, 5:16
behind [1] - 27:25
below [2] - 13:24, 14:3
better [5] - 9:11, 14:10, 25:5, 25:6, 29:13
between [5] - 14:15, 23:3, 26:2, 26:22, 27:17
big [1] - 20:12
bit [1] - 9:16
blur [1] - 31:16
bodily [1] - 16:20
BOULEVARD [2] - 3:5, 3:13
break [1] - 17:11
brief [1] - 34:1
BRILL [3] - 3:4, 3:8, 3:12
bring [1] - 8:13
bringing [1] - 28:20
broad [1] - 25:12
brought [1] - 5:25
bulletin [1] - 6:8
BUSTILLOS [3] - 1:21, 36:10, 36:23
BY [9] - 2:5, 2:10, 2:14, 2:18, 2:21, 3:5, 3:9, 3:13, 3:17

**C**

C.S.R [1] - 1:22
CA [9] - 2:7, 2:11, 2:15, 2:19, 2:23, 3:6, 3:10, 3:14, 3:18
calendar [1] - 5:4
CALIFORNIA [8] - 1:2, 1:17, 1:24, 2:5, 2:9, 2:18, 5:1, 36:12
CAMACHO [1] - 2:10
Camacho [1] - 5:14
CAMACHO-CHEUNG [1] - 2:10
cameras [2] - 19:10, 19:12
capturing [1] - 12:17
careful [1] - 10:2
carefully [1] - 7:4
case [11] - 5:5, 10:14, 11:9, 18:22, 20:12, 23:1, 23:23, 23:24, 24:19, 29:5
cases [3] - 13:22, 15:3, 15:5

casting [1] - 19:14
category [2] - 21:12, 21:17
Category [2] - 22:4, 22:5
CENTRAL [2] - 1:2, 36:11
certain [6] - 8:4, 8:11, 8:18, 9:7, 33:24, 34:1
certainly [2] - 12:20, 15:1
CERTIFY [1] - 36:12
challenges [1] - 19:7
chance [2] - 8:25, 15:20
change [1] - 33:22
changes [2] - 7:23, 30:21
CHARGED [1] - 36:18
CHEUNG [1] - 2:10
choose [1] - 8:19
CIRCUIT [1] - 36:18
Circuit [1] - 28:19
circumstance [1] - 21:17
clarify [1] - 34:15
clear [3] - 16:8, 16:15, 33:18
clearly [1] - 11:7
clerk [2] - 31:1, 33:17
closed [1] - 11:4
closely [1] - 18:8
CODE [1] - 36:13
colleagues [2] - 5:13, 12:20
coming [1] - 10:16
comment [1] - 6:15
commentary [2] - 33:9, 33:13
common [1] - 17:4
compare [1] - 25:10
compared [1] - 24:18
comparing [1] - 24:12
complaint [1] - 18:24
compliance [14] - 7:17, 13:23, 13:24, 13:25, 14:1, 14:3, 14:8, 14:12, 14:16, 14:21, 14:24, 15:5, 15:7
compliances [1] - 14:20
complicated [1] - 15:23
concern [2] - 11:24, 12:1
concerned [4] - 8:4, 11:11, 11:17, 11:21
concerns [2] - 7:21, 12:24
conducted [1] - 27:23
CONFERENCE [4] - 1:16, 4:2, 36:17, 36:20

conference [1] - 5:21
confidence [5] - 9:16, 10:9, 10:24, 16:1, 17:21
confident [1] - 9:19
confirm [2] - 13:15
CONFORMANCE [2] - 36:16, 36:19
connection [1] - 22:8
consequences [2] - 9:12, 18:15
consider [1] - 28:2
considered [2] - 21:23, 22:4
consistent [1] - 20:5
constitutional [1] - 15:13
CONT'D [1] - 3:1
contact [1] - 33:18
contacts [1] - 26:2
context [4] - 18:2, 22:22, 32:12, 32:22
continually [1] - 13:12
continue [2] - 8:4, 8:9
continued [2] - 5:24, 8:1
CORENE [1] - 2:18
Corene [1] - 5:15
CORRECT [1] - 36:14
correct [5] - 12:11, 15:11, 15:14, 18:17, 22:17
correlate [1] - 11:1
COUNSEL [1] - 3:16
counsel [1] - 5:7
County [5] - 14:16, 24:5, 24:19, 25:18, 33:6
COUNTY [1] - 3:16
county [1] - 14:18
County's [1] - 19:21
couple [1] - 33:25
course [4] - 19:18, 24:20, 25:17, 26:13
court [7] - 5:25, 7:2, 8:13, 8:17, 13:16, 13:19, 27:12
COURT [69] - 1:1, 1:21, 5:3, 5:11, 5:17, 9:4, 10:6, 10:22, 11:17, 12:2, 12:10, 12:13, 13:5, 13:9, 14:15, 14:22, 15:7, 15:12, 15:16, 15:18, 17:8, 17:12, 18:13, 19:5, 19:13, 20:2, 20:20, 21:7, 21:11, 21:21, 22:1, 22:13, 22:15, 22:20, 24:24, 25:2, 25:9, 26:5, 26:9, 26:15, 27:5, 28:13, 28:16, 28:20, 29:10, 29:19, 29:24, 30:1, 30:4, 30:7, 30:11, 30:15, 31:15, 31:21, 31:24, 32:7,

33:1, 33:16, 34:5, 34:12, 34:19, 34:22, 35:1, 35:4, 35:8, 35:11, 35:15, 36:10, 36:11
Court [15] - 6:16, 10:1, 16:6, 16:7, 17:2, 17:25, 18:1, 18:7, 22:8, 23:17, 24:20, 28:1, 28:7, 29:8, 32:24
Court's [1] - 18:5
COURTHOUSE [1] - 1:22
COURTROOM [2] - 5:4, 30:2
covers [1] - 9:23
credit [1] - 32:1
criminal [1] - 28:9
criteria [1] - 14:23
cumbersome [1] - 31:10
current [2] - 6:13, 23:12
custody [1] - 10:23
cut [1] - 16:13
CV [2] - 1:10, 5:5

**D**

danger [1] - 26:11
DANIEL [1] - 3:13
Daniel [1] - 5:9
data [8] - 10:25, 18:4, 18:6, 18:7, 18:11, 22:24, 23:4, 25:12
DATE [1] - 36:23
date [1] - 22:25
dead [4] - 8:16, 15:2, 19:14
deadline [2] - 31:13, 32:3
deadly [1] - 21:19
deaf [1] - 16:12
deal [4] - 17:14, 17:15, 17:16
dealing [1] - 8:24
deals [2] - 21:13, 23:1
DEAN [1] - 1:5
death [1] - 16:19
December [4] - 29:13, 29:17, 30:2, 35:7
decide [1] - 7:5
declaration [2] - 33:25, 34:18
declarations [2] - 33:25, 34:16
decrease [2] - 14:1, 23:3
decreased [1] - 23:19
deescalation [1] - 16:17
DEFENDANTS [1] - 3:4
Defendants [1] - 1:13

defendants [4] - 5:10, 7:3, 7:14, 33:3
definition [2] - 14:16, 15:12
definitions [1] - 16:9
degree [1] - 17:21
department [17] - 6:24, 7:11, 7:17, 8:5, 10:20, 11:8, 11:15, 13:12, 14:10, 14:12, 14:14, 17:3, 17:17, 17:18, 18:11, 20:12, 27:20
DEPOSIT [1] - 36:19
deputies [9] - 16:16, 17:19, 19:15, 20:15, 22:11, 26:2, 28:8
deputies' [1] - 17:16
deputy [5] - 18:14, 18:15, 21:14, 21:18
DEPUTY [2] - 5:4, 30:2
descriptions [1] - 34:1
desire [1] - 7:15
details [1] - 6:19
deterrence [1] - 26:24
development [1] - 20:10
difference [1] - 27:19
different [3] - 9:2, 10:17, 28:5
diligence [1] - 19:16
dire [1] - 29:4
disagreement [1] - 14:15
discipline [2] - 7:7, 13:7
disciplined [1] - 14:13
disciplines [1] - 13:13
discuss [7] - 7:6, 7:15, 7:19, 8:22, 15:20, 15:21, 22:22
discussing [1] - 5:24
discussions [1] - 6:20
dispersions [1] - 19:15
disputes [1] - 15:24
DISTRICT [5] - 1:1, 1:2, 1:5, 36:11
DIVISION [1] - 1:3
DO [1] - 36:12
DOMINGUEZ [1] - 2:14
Dominguez [1] - 5:15
DOMINGUEZ-RUIZ [1] - 2:14
Dominguez-Ruiz [1] - 5:15
done [3] - 21:22, 31:5, 34:7
down [13] - 8:3, 14:4, 14:6, 21:4, 23:10, 23:19, 27:3, 27:8, 27:13, 27:14, 27:15, 28:24, 29:7
downward [1] - 26:21

downwards [1] - 27:7
draft [1] - 6:14
dramatically [2] - 27:14, 27:15
drop [1] - 8:16
DRUMM [1] - 2:15
due [1] - 19:16
DUGDALE [39] - 3:5, 5:8, 15:17, 15:19, 17:10, 17:13, 18:17, 19:11, 19:18, 20:7, 20:21, 21:9, 21:12, 21:25, 22:3, 22:14, 22:17, 22:22, 25:1, 25:8, 25:16, 26:8, 26:10, 26:16, 27:6, 28:14, 28:18, 28:22, 29:16, 29:22, 29:25, 30:25, 31:18, 31:22, 31:25, 33:5, 35:3, 35:6, 35:9
Dugdale [6] - 5:9, 9:1, 15:1, 30:17, 33:20, 35:5
during [5] - 23:13, 24:2, 24:9, 27:24
Dylan [1] - 5:10
DYLAN [1] - 3:17

**E**

edited [1] - 31:3
edits [1] - 30:18
EIGHT [1] - 2:11
EIGHTH [1] - 2:6
either [2] - 18:9, 26:14
ELIASBERG [28] - 2:5, 5:12, 5:23, 9:19, 10:8, 11:3, 11:21, 12:3, 12:11, 12:19, 13:8, 13:10, 14:17, 14:25, 15:9, 15:14, 30:6, 30:9, 30:14, 32:8, 33:21, 34:10, 34:14, 34:20, 34:25, 35:2, 35:13, 35:17
Eliasberg [9] - 5:13, 5:22, 15:20, 27:18, 29:1, 32:1, 33:7, 33:19, 35:12
Eliasberg's [1] - 33:13
Elisa [1] - 5:14
Ellis [1] - 24:25
employees [1] - 26:1
encompassed [1] - 24:7
encounter [1] - 16:17
end [5] - 23:8, 23:10, 25:22, 29:1, 31:1
ensure [1] - 7:8
entire [2] - 24:11, 31:11
entirely [1] - 21:17
ENTITLED [1] - 36:15
equal [1] - 27:16

**especially** [1] - 27:1
**ESQ** [5] - 2:6, 2:14, 3:5, 3:9, 3:17
**essentially** [1] - 20:24
**estimate** [1] - 31:2
**et** [8] - 1:7, 1:12, 2:4, 3:4, 5:5, 5:6, 36:5, 36:7
**everywhere** [1] - 18:25
**exact** [1] - 31:7
**example** [1] - 9:7
**except** [1] - 14:11
**excessive** [3] - 15:8, 15:9, 24:1
**exit** [3] - 12:2, 12:15, 20:3
**experience** [2] - 9:8, 12:7
**experienced** [1] - 11:6
**explicitly** [1] - 32:10
**extent** [1] - 11:25

### F

**face** [5] - 13:2, 16:19, 21:5, 21:6, 22:18
**faces** [1] - 31:16
**facilities** [5] - 23:1, 23:9, 23:15, 25:10, 25:22
**facility** [6] - 24:4, 24:6, 24:12, 24:15, 24:18, 25:18
**facing** [3] - 16:22, 24:18, 24:19
**fact** [2] - 20:25, 23:18
**fair** [2] - 6:24, 33:14
**far** [3] - 24:17, 29:2, 31:1
**father** [2] - 28:19, 28:20
**featured** [1] - 31:8
**FEE** [1] - 36:18
**feedback** [1] - 20:5
**FEES** [1] - 36:18
**ferret** [1] - 11:24
**fewer** [1] - 26:24
**file** [2] - 32:14, 33:23
**filed** [9] - 13:19, 22:9, 27:11, 32:18, 32:23, 33:14, 33:22, 34:16, 34:18
**filings** [1] - 32:16
**finally** [1] - 32:24
**findings** [1] - 14:8
**fine** [4] - 29:11, 30:6, 30:14, 34:8
**finishing** [1] - 30:17
**first** [8] - 16:16, 18:19, 23:5, 23:6, 23:18, 27:9, 29:13, 29:17
**fish** [1] - 13:1
**five** [1] - 11:16
**flawed** [1] - 19:25

**FLOOR** [2] - 3:10, 3:18
**floor** [1] - 21:16
**focus** [1] - 20:17
**focusing** [1] - 7:7
**folded** [1] - 15:25
**folks** [3] - 5:20, 10:22, 19:8
**follow** [1] - 34:11
**FOR** [3] - 36:10, 36:11, 36:18
**force** [24] - 6:21, 7:10, 7:24, 8:3, 8:9, 9:24, 11:1, 13:3, 13:7, 15:8, 15:9, 16:3, 16:22, 18:8, 18:11, 21:13, 21:19, 22:5, 24:1, 27:7, 27:13, 27:21, 27:23
**FORD** [1] - 3:17
**Ford** [1] - 5:10
**FOREGOING** [1] - 36:13
**FORMAT** [1] - 36:16
**formerly** [1] - 15:24
**forward** [1] - 8:8
**FOUNDATION** [2] - 2:4, 2:9
**four** [1] - 11:15
**frame** [2] - 31:3
**frame-by-frame** [1] - 31:3
**FRANCISCO** [2] - 2:15, 2:19
**frantically** [1] - 8:24
**Friday** [3] - 6:23, 7:1, 8:25
**front** [1] - 28:19
**fry** [1] - 13:1
**full** [1] - 9:24

### G

**game** [1] - 33:14
**general's** [1] - 19:3
**given** [4] - 17:5, 20:21, 33:10
**glad** [2] - 7:22, 8:2
**great** [1] - 29:2
**ground** [4] - 17:5, 28:25, 29:8
**guess** [1] - 14:22
**guidance** [1] - 34:6
**gut** [1] - 11:6

### H

**half** [2] - 20:11, 27:9
**happy** [1] - 8:7
**Harbor** [1] - 29:25
**hard** [3] - 16:23, 25:9, 32:6
**head** [60] - 6:22, 8:24, 9:7, 9:9, 9:17, 10:6,

11:13, 11:18, 13:11, 13:13, 14:7, 15:10, 16:11, 16:14, 16:18, 16:21, 17:24, 17:25, 18:2, 18:3, 18:14, 19:9, 20:1, 20:9, 20:11, 20:13, 20:18, 20:22, 21:1, 21:3, 21:4, 21:7, 21:8, 21:15, 21:16, 21:20, 21:21, 21:24, 22:12, 22:15, 22:16, 22:19, 22:23, 22:25, 23:6, 23:9, 23:14, 23:20, 24:4, 24:8, 24:16, 24:21, 26:3, 26:11, 26:23, 26:25, 27:4, 27:13, 27:20, 28:8
**health** [1] - 19:7
**hear** [1] - 5:18
**hearing** [1] - 9:2
**HELD** [1] - 36:15
**held** [1] - 22:11
**HEREBY** [1] - 36:12
**high** [1] - 14:20
**hit** [3] - 21:3, 21:5, 22:11
**hits** [3] - 21:8, 21:15
**hitting** [1] - 13:2
**holding** [1] - 28:11
**honest** [1] - 9:9
**Honor** [37] - 5:8, 5:12, 5:23, 7:13, 7:21, 7:25, 8:6, 9:21, 11:3, 12:25, 15:11, 15:14, 15:17, 17:11, 18:17, 20:7, 22:7, 24:17, 25:16, 27:8, 28:14, 29:8, 29:17, 29:23, 30:6, 30:10, 30:14, 30:25, 31:5, 31:7, 32:8, 33:15, 34:25, 35:3, 35:7, 35:14, 35:17
**Honor's** [1] - 32:17
**HONORABLE** [1] - 1:5
**hopefully** [2] - 16:24, 35:9

### I

**idea** [2] - 9:2, 19:25
**identified** [3] - 7:9, 7:11
**identifies** [1] - 13:12
**identifying** [1] - 13:17
**imminent** [1] - 16:19
**impasse** [2] - 6:1, 8:15
**implementation** [5] - 6:12, 6:13, 7:16, 33:22, 33:23
**important** [4] - 12:15, 17:23, 18:19, 19:19
**importantly** [1] - 26:20
**imposed** [1] - 16:11

**IN** [5] - 5:3, 36:10, 36:15, 36:16, 36:19
**incident** [1] - 14:23
**incidents** [1] - 12:4
**included** [1] - 16:12
**includes** [2] - 6:6, 6:22
**including** [2] - 17:18, 20:1
**indicated** [2] - 24:9, 30:19
**indication** [4] - 10:14, 10:15, 10:18, 17:2
**infamy** [1] - 29:23
**inform** [1] - 7:2
**information** [2] - 9:10, 9:11
**injury** [3] - 16:20, 21:16, 22:5
**inmate** [1] - 22:11
**inmate's** [3] - 21:15, 21:20, 28:7
**inmates** [2] - 18:23, 26:2
**input** [1] - 17:15
**inside** [1] - 18:23
**inspector** [1] - 19:3
**instance** [1] - 21:3
**instances** [1] - 21:2
**integrity** [6] - 9:6, 9:11, 12:15, 18:6, 18:11, 19:15
**intentionally** [1] - 21:14
**internally** [1] - 17:17
**interrelated** [1] - 13:6
**interviews** [3] - 12:2, 12:15, 20:3
**involved** [1] - 17:20
**involves** [1] - 6:4
**involving** [2] - 15:24, 23:25
**IRC** [2] - 25:21
**IS** [2] - 36:13, 36:16
**Island** [4] - 23:24, 24:1, 24:5, 24:25
**issue** [10] - 13:7, 13:11, 17:24, 19:22, 20:11, 20:12, 26:12, 32:9, 32:21, 33:11
**issues** [12] - 5:25, 6:3, 6:18, 7:7, 8:11, 8:18, 15:23, 18:9, 18:20, 23:25, 24:14, 24:18
**item** [1] - 5:4

### J

**JACOB** [1] - 2:21
**Jacob** [1] - 5:14
**jail** [6] - 18:20, 18:23, 19:9, 19:12, 19:14, 20:17
**Jail** [2] - 24:5, 25:18
**jailers** [1] - 24:1

**jails** [7] - 10:11, 12:5, 12:6, 12:9, 12:12, 24:6, 26:1
**job** [2] - 32:4, 32:5
**JUDGE** [1] - 1:5
**JUDICIAL** [2] - 36:17, 36:20
**July** [1] - 22:10
**jump** [1] - 27:17
**June** [2] - 5:25, 33:14
**justification** [1] - 11:19

### K

**keep** [2] - 8:15, 23:11
**KELLY** [3] - 3:4, 3:8, 3:12
**KENDALL** [3] - 3:4, 3:8, 3:12
**Kendrick** [1] - 5:15
**KENDRICK** [1] - 2:18
**kinds** [1] - 7:8
**knowledge** [1] - 18:9
**knows** [1] - 18:15

### L

**L.A** [6] - 22:9, 24:5, 24:19, 25:18, 32:14
**lack** [1] - 18:19
**lag** [1] - 27:24
**language** [1] - 16:12
**large** [1] - 19:6
**last** [11] - 13:18, 13:20, 16:4, 16:25, 20:25, 21:1, 22:10, 23:10, 23:13, 27:12, 27:21
**Laughter** [1] - 28:21
**least** [3] - 9:17, 19:20, 27:16
**leave** [1] - 12:4
**legitimately** [1] - 16:14
**Leroy** [1] - 5:6
**LEROY** [3] - 1:12, 3:4, 36:7
**less** [1] - 29:12
**LESS** [1] - 36:18
**letting** [1] - 32:20
**level** [2] - 11:4, 32:24
**limitations** [5] - 6:21, 7:23, 8:9, 16:2, 21:13
**limited** [1] - 16:19
**List** [1] - 22:9
**literally** [2] - 22:15, 25:25
**lives** [1] - 29:22
**LLP** [3] - 3:4, 3:8, 3:12
**look** [3] - 19:11, 29:15, 29:20
**looking** [1] - 5:19

**LOS** [11] - 1:17, 1:24, 2:7, 2:11, 2:23, 3:6, 3:10, 3:14, 3:16, 3:18, 5:1
**lost** [1] - 28:25
**low** [7] - 26:6, 26:19, 26:20, 27:3, 31:20
**lower** [1] - 26:12

## M

**maintained** [1] - 9:10
**manage** [1] - 12:14
**Marcus** [2] - 33:2, 34:10
**margins** [2] - 15:3, 15:6
**MARIA** [3] - 1:21, 36:10, 36:23
**Marisol** [1] - 5:15
**MARISOL** [1] - 2:14
**mask** [2] - 6:8, 6:9
**material** [2] - 32:13, 34:2
**MATTER** [1] - 36:15
**matter** [3] - 15:6, 16:16, 16:18
**matters** [1] - 15:22
**MCJ** [1] - 23:16
**mean** [15] - 10:22, 11:4, 11:5, 11:10, 11:22, 12:13, 13:14, 14:18, 18:3, 20:2, 22:6, 25:2, 26:5, 32:2, 32:3
**meaningful** [2] - 10:25, 12:17
**means** [7] - 9:8, 13:23, 15:7, 15:13, 18:13, 22:16, 23:22
**meant** [1] - 32:3
**measure** [1] - 6:12
**meet** [1] - 15:9
**MELISSA** [1] - 2:10
**mental** [1] - 19:6
**mentioned** [1] - 33:8
**messages** [1] - 31:12
**met** [2] - 6:23, 32:3
**micro** [1] - 12:14
**micro-manage** [1] - 12:14
**mics** [1] - 5:18
**middle** [1] - 29:14
**might** [3] - 9:12, 20:17, 29:12
**millions** [1] - 26:1
**minimize** [2] - 12:25, 20:18
**minimizing** [1] - 25:14
**mirrors** [1] - 23:23
**mistakenly** [2] - 21:4, 34:15
**Mitchell** [1] - 19:2
**model** [1] - 24:15
**modify** [1] - 33:23

**MONDAY** [2] - 1:18, 5:1
**Monday** [1] - 30:12
**MONICA** [2] - 3:5, 3:13
**monitor** [6] - 5:19, 19:2, 24:2, 24:3, 24:10, 27:11
**Monitor** [1] - 19:2
**monitoring** [6] - 18:10, 18:21, 20:14, 20:25, 27:10, 27:22
**monitors** [18] - 5:20, 6:12, 6:25, 7:9, 7:12, 8:4, 9:21, 11:12, 13:10, 14:4, 14:13, 14:19, 15:2, 15:4, 16:5, 18:21, 20:22, 27:19
**monitors'** [3] - 7:25, 13:2, 14:8
**month** [2] - 9:22, 24:9
**months** [1] - 27:25
**morning** [7] - 5:8, 5:11, 5:12, 5:17, 5:23, 15:17, 15:18
**most** [8] - 7:25, 10:5, 18:4, 19:19, 24:2, 24:10, 25:21, 27:15
**motion** [3] - 8:20, 22:8, 33:22
**MR** [65] - 5:8, 5:12, 5:23, 9:19, 10:8, 11:3, 11:21, 12:3, 12:11, 12:19, 13:8, 13:10, 14:17, 14:25, 15:9, 15:14, 15:17, 15:19, 17:10, 17:13, 18:17, 19:11, 19:18, 20:7, 20:21, 21:9, 21:12, 21:25, 22:3, 22:14, 22:17, 22:22, 25:1, 25:8, 25:16, 26:8, 26:10, 26:16, 27:6, 28:14, 28:18, 28:22, 29:16, 29:22, 29:25, 30:6, 30:9, 30:14, 30:25, 31:18, 31:22, 31:25, 32:8, 33:5, 33:21, 34:10, 34:14, 34:20, 34:25, 35:2, 35:3, 35:6, 35:9, 35:13, 35:17

## N

**name** [1] - 34:16
**names** [5] - 33:7, 34:3, 34:17, 34:18
**National** [1] - 5:16
**NATIONAL** [2] - 2:13, 2:17
**necessary** [1] - 31:2
**need** [7] - 7:4, 7:23, 8:12, 8:16, 33:16, 34:5, 34:6

**needed** [1] - 30:23
**needs** [2] - 32:24, 34:7
**negotiating** [1] - 29:2
**neighborhood** [1] - 25:19
**never** [1] - 11:20
**New** [1] - 23:24
**new** [3] - 6:5, 27:1, 35:5
**news** [3] - 6:2, 6:17, 35:9
**nice** [1] - 35:15
**Ninth** [1] - 28:19
**nobody** [1] - 34:8
**noted** [2] - 14:1, 24:3
**number** [16] - 5:5, 6:20, 16:13, 17:1, 17:2, 18:3, 24:22, 25:24, 26:6, 26:12, 26:19, 26:20, 26:21, 27:3, 27:18
**numbers** [13] - 8:3, 14:4, 14:5, 20:21, 20:24, 22:23, 23:18, 27:6, 27:7, 27:10, 27:13
**numerous** [1] - 15:24

## O

**o'clock** [1] - 30:8
**object** [2] - 33:3, 33:15
**objections** [1] - 33:4
**objects** [1] - 34:8
**obviously** [4] - 8:7, 9:1, 11:22, 15:3
**occasional** [1] - 15:3
**occurring** [2] - 20:13, 20:14
**OCTOBER** [2] - 1:18, 5:1
**OF** [12] - 1:2, 1:15, 2:4, 2:4, 2:9, 3:4, 36:11, 36:14, 36:17, 36:20
**offered** [1] - 20:23
**office** [1] - 19:3
**OFFICIAL** [3] - 1:21, 36:10, 36:23
**often** [1] - 10:23
**ON** [2] - 2:4, 3:4
**once** [1] - 28:18
**one** [16] - 5:5, 6:2, 6:17, 10:8, 15:5, 18:5, 20:8, 20:16, 22:7, 23:16, 25:4, 31:4, 31:7, 32:9, 34:14, 34:15
**ones** [1] - 31:6
**open** [1] - 9:1
**opinion** [1] - 27:19
**opportunity** [3] - 6:15, 7:6, 7:19
**opposed** [2] - 22:2,

32:19
**order** [2] - 14:9, 32:18
**ordered** [1] - 33:3
**ordinarily** [1] - 8:22
**original** [1] - 34:21
**ourselves** [1] - 13:4
**outstanding** [1] - 8:11
**over-reported** [1] - 21:1
**overall** [2] - 27:7, 27:12
**overlap** [1] - 26:22
**overlapping** [1] - 19:2
**oversees** [1] - 18:22
**oversight** [3] - 18:20, 19:1, 19:4
**own** [3] - 13:14, 14:8, 19:16

## P

**pace** [1] - 23:8
**packages** [2] - 9:24, 13:3
**packets** [1] - 11:1
**PAGE** [2] - 4:2, 36:16
**page** [1] - 13:21
**panel** [2] - 18:10, 18:21
**paper** [2] - 32:18, 32:23
**part** [5] - 12:21, 18:18, 18:19, 26:24, 28:1
**particular** [2] - 14:23, 20:17
**parties** [6] - 5:24, 6:4, 6:11, 6:15, 32:11, 33:18
**pass** [1] - 25:20
**past** [5] - 11:7, 22:24, 23:19, 27:4, 27:16
**pattern** [1] - 8:1
**Pearl** [1] - 29:25
**people** [20] - 10:10, 10:16, 10:25, 11:8, 12:4, 12:6, 12:7, 12:8, 12:12, 14:13, 16:9, 16:14, 17:17, 19:23, 19:24, 25:19, 28:11, 31:8, 31:9
**percent** [9] - 13:22, 13:25, 14:1, 14:3, 14:19, 15:4, 23:2, 23:19, 27:17
**percentage** [4] - 12:17, 19:6, 26:17, 26:18
**period** [5] - 7:17, 9:22, 20:4, 24:9
**person** [6] - 31:6, 31:7, 31:11, 32:2, 32:3, 32:4
**person's** [1] - 21:16
**personal** [1] - 22:18
**perspective** [5] -

23:17, 23:22, 24:17, 24:21, 26:5
**Peter** [1] - 5:13
**PETER** [1] - 2:5
**phone** [1] - 19:8
**place** [1] - 24:2
**Plaintiffs** [1] - 1:8
**plaintiffs** [3] - 5:16, 8:19, 35:2
**PLAINTIFFS** [1] - 2:4
**plan** [4] - 7:16, 33:23, 34:24
**Plan** [1] - 6:13
**pleased** [1] - 16:24
**point** [7] - 8:11, 8:14, 8:16, 19:21, 23:20, 25:12, 32:21
**points** [1] - 28:23
**policy** [22] - 6:5, 6:7, 6:21, 7:1, 11:15, 11:16, 13:13, 15:10, 15:25, 16:3, 16:6, 16:10, 16:15, 16:25, 17:1, 17:4, 21:13, 26:13, 26:18, 27:21, 28:12
**population** [2] - 19:6, 24:24
**position** [1] - 8:14
**positive** [4] - 8:2, 14:6, 28:16, 29:5
**possible** [1] - 11:10
**potential** [1] - 15:13
**potentially** [1] - 21:9
**PREGERSON** [1] - 1:5
**present** [1] - 8:25
**PRESIDING** [1] - 1:5
**presumably** [2] - 26:23, 33:12
**pretty** [4] - 9:19, 12:24, 31:10, 31:20
**prevalent** [1] - 18:24
**prevention** [1] - 7:24
**previous** [1] - 6:7
**principal** [2] - 5:25, 12:1
**PRISON** [2] - 2:13, 2:17
**Prison** [1] - 5:16
**problem** [3] - 14:11, 33:5, 33:6
**proceed** [2] - 8:21, 9:3
**proceedings** [1] - 35:19
**PROCEEDINGS** [2] - 1:15, 36:15
**process** [5] - 9:6, 9:13, 12:15, 12:22, 13:17
**professional** [1] - 32:5
**profile** [1] - 24:25
**PROJECT** [2] - 2:13, 2:17
**Project** [1] - 5:16
**prosecution** [1] - 28:9

41

**provide** [1] - 9:25
**provides** [1] - 6:8
**provisions** [1] - 7:16
**public** [1] - 30:19
**punch** [2] - 21:5, 22:16
**punched** [2] - 11:18, 19:9
**punches** [1] - 22:18
**pure** [1] - 14:5
**purposes** [1] - 22:23
**pursuant** [1] - 33:20
**PURSUANT** [1] - 36:12
**push** [2] - 21:7, 25:6
**pushed** [1] - 21:23
**put** [2] - 6:12, 12:21

**Q**

**quality** [2] - 31:20, 31:22
**quarter** [4] - 9:23, 23:13, 23:14, 27:4
**quarters** [3] - 9:23, 23:5, 23:6
**questioned** [2] - 19:23, 19:24
**questions** [3] - 8:7, 29:9, 34:12
**quibbles** [1] - 26:17
**quoting** [1] - 13:21

**R**

**raise** [1] - 32:8
**raised** [1] - 18:9
**random** [1] - 10:3
**rate** [3] - 13:25, 14:1
**reach** [2] - 8:15, 16:2
**reached** [4] - 6:1, 6:4, 6:23, 15:22
**real** [1] - 32:5
**really** [8] - 7:12, 7:19, 11:11, 12:16, 16:23, 22:15, 25:11, 34:2
**Really** [1] - 30:1
**reason** [1] - 29:6
**reasonable** [3] - 10:9, 16:20, 17:21
**receive** [1] - 10:12
**recent** [5] - 7:25, 18:4, 20:10, 24:2, 24:10
**recognize** [1] - 26:10
**record** [3] - 10:20, 17:8, 17:11
**records** [1] - 11:9
**redacted** [2] - 33:13, 33:24
**REDUCTION** [1] - 36:19
**referenced** [1] - 16:12
**referred** [1] - 28:9
**referring** [1] - 32:1

**regulating** [1] - 9:8
**REGULATIONS** [2] - 36:16, 36:20
**Reisberg** [1] - 5:14
**REISBERG** [1] - 2:21
**relatively** [4] - 20:10, 26:6, 26:19, 27:3
**release** [1] - 34:22
**released** [5] - 30:18, 32:17, 33:20, 34:21, 34:23
**reminded** [1] - 33:2
**remotely** [1] - 5:18
**removed** [1] - 30:23
**repeatedly** [1] - 20:16
**report** [13] - 8:1, 8:17, 9:25, 10:5, 10:19, 11:8, 13:19, 13:21, 14:2, 21:1, 24:3, 24:10, 27:11
**REPORTED** [1] - 36:14
**reported** [8] - 9:10, 9:18, 10:7, 10:13, 18:14, 18:18, 21:1, 21:4
**REPORTER** [3] - 1:21, 36:10, 36:23
**REPORTER'S** [1] - 1:15
**reporting** [16] - 7:18, 9:6, 9:9, 9:22, 12:23, 18:4, 18:12, 18:16, 19:17, 19:20, 19:25, 20:1, 20:8, 22:2, 25:4
**reports** [5] - 10:9, 11:12, 13:3, 13:14, 27:24
**represent** [1] - 28:3
**representation** [1] - 25:14
**represents** [1] - 13:25
**resolve** [2] - 8:11, 8:18
**resolved** [3] - 6:18, 7:22, 13:12
**respect** [4] - 6:2, 6:21, 7:23, 32:9
**response** [1] - 16:22
**restraint** [1] - 6:3
**restriction** [1] - 6:22
**restrictions** [3] - 6:6, 6:8, 6:10
**restrictive** [1] - 16:11
**results** [1] - 20:4
**review** [1] - 13:3
**reviewed** [5] - 11:14, 13:22, 20:24, 22:6, 22:8
**reviewing** [1] - 9:25
**reviews** [1] - 27:21
**rewritten** [1] - 17:4
**Rikers** [3] - 23:24, 24:1, 24:5
**risk** [1] - 16:19

**Robert** [2] - 5:9
**ROBERT** [2] - 3:5, 3:9
**ROSAS** [3] - 1:7, 2:4, 36:5
**Rosas** [2] - 5:5, 6:13
**roughly** [2] - 24:23, 27:25
**RUIZ** [1] - 2:14
**Ruiz** [1] - 5:15
**ruling** [1] - 32:10
**Rutherford** [1] - 29:3

**S**

**sample** [1] - 10:3
**SAN** [2] - 2:15, 2:19
**SANTA** [2] - 3:5, 3:13
**Saturday** [1] - 31:12
**saw** [4] - 22:13, 28:7, 29:3, 31:7
**scrutinized** [1] - 18:8
**seal** [6] - 32:14, 32:16, 32:19, 33:10, 34:16
**second** [3] - 16:18, 18:5, 29:14
**seconds** [2] - 31:8, 31:10
**Section** [1] - 6:13
**SECTION** [1] - 36:12
**see** [7] - 8:2, 9:20, 10:4, 11:7, 20:5, 30:15, 31:21
**seeing** [3] - 9:20, 10:5, 10:18
**seek** [1] - 6:14
**seem** [2] - 10:20, 33:13
**self** [2] - 9:8, 9:13
**self-regulating** [1] - 9:8
**sense** [2] - 15:23, 34:25
**separate** [1] - 21:17
**September** [2] - 16:5, 16:8
**serious** [2] - 16:20, 21:10
**SESSION** [1] - 5:3
**severely** [1] - 16:13
**severity** [1] - 22:4
**sheriff** [5] - 28:4, 28:5, 28:6, 28:10
**sheriff's** [1] - 17:17
**shoot** [1] - 30:12
**shows** [1] - 8:1
**shy** [1] - 28:10
**side** [1] - 8:2
**sided** [1] - 19:25
**sign** [1] - 14:6
**significant** [1] - 12:24
**signs** [1] - 18:22
**similar** [3] - 23:25, 24:13, 27:7
**sit** [2] - 28:24, 29:7
**situation** [3] - 16:17,

24:23, 29:4
**situations** [1] - 21:14
**six** [6] - 8:10, 9:22, 15:21, 27:25, 29:10, 29:12
**six-month** [1] - 9:22
**SIXTH** [2] - 3:10, 3:18
**sizable** [1] - 27:17
**size** [1] - 25:17
**slam** [1] - 21:19
**slammed** [1] - 28:8
**smaller** [3] - 24:6, 24:13, 25:23
**so...** [1] - 10:21
**SoCAL** [1] - 2:21
**software** [2] - 31:16, 31:23
**somewhere** [1] - 25:19
**sorry** [2] - 23:16, 28:22
**sort** [8] - 8:16, 9:4, 9:6, 9:8, 12:14, 13:6, 21:5, 24:24
**sounds** [4] - 17:8, 26:6, 29:10, 34:7
**SOUTHERN** [2] - 2:4, 2:9
**speaking** [1] - 6:25
**specifically** [2] - 20:9, 33:17
**specifics** [1] - 13:18
**spending** [2] - 6:24, 10:22
**spent** [1] - 16:4
**spit** [2] - 6:8, 6:9
**square** [1] - 10:12
**stakeholders** [1] - 17:13
**stand** [3] - 12:5, 12:6, 17:25
**start** [1] - 15:19
**starts** [1] - 9:13
**state** [1] - 5:7
**statements** [1] - 28:17
**STATES** [6] - 1:1, 1:22, 36:11, 36:13, 36:17, 36:20
**status** [1] - 5:21
**STATUS** [2] - 1:16, 4:2
**STENOGRAPHICAL LY** [1] - 36:14
**step** [2] - 9:21, 17:23
**still** [4] - 7:22, 8:3, 25:24, 32:20
**STREET** [8] - 1:23, 2:6, 2:11, 2:15, 2:18, 2:22, 3:9, 3:17
**strides** [1] - 16:25
**strike** [19] - 9:9, 11:14, 13:11, 15:10, 16:11, 16:18, 16:21, 18:14, 20:1, 20:11, 20:22, 21:5, 21:8, 21:22, 21:24, 22:19, 27:13,

27:20
**strikes** [32] - 6:22, 8:24, 9:7, 9:17, 10:7, 13:13, 14:7, 16:14, 17:24, 18:1, 18:2, 18:4, 20:9, 20:13, 20:18, 21:2, 22:15, 22:23, 23:1, 23:6, 23:9, 23:15, 23:21, 24:4, 24:8, 24:16, 24:21, 26:3, 26:11, 26:23, 26:25, 27:4
**stringent** [1] - 6:10
**stuff** [3] - 8:24, 11:8, 11:11
**submission** [1] - 6:17
**submit** [2] - 6:14, 6:16
**submitted** [1] - 6:25
**subsequently** [1] - 34:17
**suggest** [1] - 28:14
**suggestion** [1] - 8:20
**SUITE** [5] - 1:23, 2:19, 2:22, 3:6, 3:14
**system** [2] - 11:4, 20:6

**T**

**takedown** [1] - 21:3
**team** [3] - 20:25, 27:10, 27:23
**technique** [3] - 16:21, 20:16, 21:19
**TEMPLE** [2] - 3:9, 3:17
**terms** [2] - 8:8, 25:11
**Thanksgiving** [1] - 35:16
**THAT** [2] - 36:12, 36:15
**THE** [80] - 2:4, 3:4, 5:4, 5:11, 5:17, 9:4, 10:6, 10:22, 11:17, 12:2, 12:10, 12:13, 13:5, 13:9, 14:15, 14:22, 15:7, 15:12, 15:16, 15:18, 17:8, 17:12, 18:13, 19:5, 19:13, 20:2, 20:20, 21:7, 21:11, 21:21, 22:1, 22:13, 22:15, 22:20, 24:24, 25:2, 25:9, 26:5, 26:9, 26:15, 27:5, 28:13, 28:16, 28:20, 29:10, 29:19, 29:24, 30:1, 30:2, 30:4, 30:7, 30:11, 30:15, 31:15, 31:21, 31:24, 32:7, 33:1, 33:16, 34:5, 34:12, 34:19, 34:22, 35:1, 35:4, 35:8, 35:11, 35:15, 36:10, 36:11, 36:13, 36:14, 36:15, 36:16, 36:17, 36:19, 36:20

42

**themselves** [1] - 33:12
**they've** [1] - 6:25
**thinking** [3] - 8:8, 9:5, 29:14
**third** [1] - 23:13
**THIS** [1] - 36:18
**three** [12] - 18:21, 22:24, 23:1, 23:5, 23:6, 23:9, 23:14, 23:15, 24:6, 25:22, 27:4, 31:8
**threshold** [2] - 14:3, 14:19
**Thursday** [1] - 30:3
**TITLE** [1] - 36:13
**TO** [1] - 36:12
**today** [1] - 13:16
**took** [2] - 29:3, 30:19
**total** [1] - 23:14
**touchdown** [1] - 9:5
**touchdowns** [1] - 9:5
**towards** [2] - 24:22, 26:3
**Towers** [2] - 23:15, 23:16
**track** [1] - 20:9
**tracked** [2] - 21:21, 22:6
**tracker** [1] - 20:23
**train** [2] - 16:10, 17:19
**training** [1] - 17:18
**TRANSCRIPT** [4] - 1:15, 36:14, 36:16, 36:18
**translation** [1] - 15:8
**trend** [1] - 23:12
**trending** [6] - 23:21, 24:11, 24:22, 26:3, 26:21, 27:3
**trends** [1] - 20:15
**trial** [1] - 30:15
**true** [1] - 19:7
**TRUE** [1] - 36:13
**try** [2] - 8:10, 17:4
**trying** [5] - 17:10, 17:11, 22:1, 26:11, 32:11
**turns** [2] - 21:1, 31:3
**Two** [1] - 23:16
**two** [8] - 9:23, 15:5, 20:4, 22:11, 23:15, 23:20, 24:9, 28:8
**two-month** [1] - 24:9

### U

**ultimate** [1] - 16:2
**unaddressed** [1] - 32:21
**under** [9] - 16:14, 27:1, 27:22, 32:14, 32:16, 32:18, 33:10, 34:16
**understood** [2] - 20:7, 26:15

**unfortunately** [1] - 11:5
**union** [1] - 17:16
**UNITED** [6] - 1:1, 1:22, 36:11, 36:13, 36:17, 36:20
**unless** [3] - 25:10, 29:8
**unnecessarily** [1] - 30:22
**unseal** [1] - 22:9
**up** [7] - 10:11, 17:4, 25:22, 28:20, 29:4, 30:17, 34:11
**update** [2] - 17:25, 35:10
**USDOJ** [2] - 17:15, 19:1
**uses** [4] - 18:14, 24:1, 27:21, 27:23

### V

**version** [4] - 10:17, 17:1, 34:21
**versus** [2] - 24:8, 24:10
**video** [7] - 22:7, 28:7, 30:23, 31:19, 31:23
**videos** [14] - 11:14, 30:18, 31:9, 32:10, 32:12, 32:16, 32:19, 32:23, 32:25, 33:10, 33:11, 33:24, 34:1, 34:23
**view** [1] - 28:5
**violate** [1] - 28:12
**violation** [1] - 15:13
**violations** [6] - 7:10, 7:11, 7:12, 8:1, 8:5, 13:18
**visit** [1] - 12:12
**vs** [2] - 1:10, 36:6

### W

**wait** [1] - 12:6
**wall** [6] - 21:8, 21:15, 21:20, 21:22, 21:23, 28:8
**wants** [3] - 20:12, 26:23, 34:10
**ways** [1] - 7:8
**weapon** [1] - 22:19
**week** [8] - 7:2, 11:19, 13:20, 20:3, 27:12, 29:13, 29:14, 29:18
**weekend** [1] - 31:11
**weeks** [4] - 8:10, 15:21, 29:10, 29:12
**WEST** [6] - 1:23, 2:6, 2:11, 2:22, 3:9, 3:17
**WESTERN** [1] - 1:3
**whatsoever** [1] -

18:24
**whole** [1] - 9:13
**wishes** [1] - 16:7
**WITH** [2] - 36:16, 36:19
**WitnessL.A** [1] - 32:15
**won** [1] - 29:8
**world** [1] - 17:8
**worried** [1] - 11:23
**WRAP** [6] - 6:3, 6:5, 6:6, 6:9, 7:22, 15:25
**write** [1] - 6:12

### Y

**year** [11] - 20:11, 23:8, 23:10, 23:21, 24:9, 24:11, 24:22, 25:18, 27:16, 27:22
**years** [3] - 7:17, 22:24, 23:20
**York** [1] - 23:24

### Z

**Zoom** [2] - 5:14, 5:20