OFFICE OF COUNTY COUNSEL
Dawyn Harrison (173855)
County Counsel
  dharrison@counsel.lacounty.gov
Dylan Ford (228699)
Deputy County Counsel
  dford@counsel.lacounty.gov
500 West Temple St., Floor 6
Los Angeles, California 90012
Telephone:  (213) 974-1807
Facsimile:   (213) 687-8822

KENDALL BRILL & KELLY LLP
Robert E. Dugdale (167258)
  rdugdale@kbkfirm.com
Daniel Barlava (334910)
  dbarlava@kbkfirm.com
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067-4013
Telephone: (310) 272-7904
Facsimile: (310) 286-0727

*Attorneys for Defendant
Robert Luna, Sheriff of Los Angeles
County, in his Official Capacity*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT LUNA, Sheriff of Los Angeles County, in his Official Capacity,<br><br>Defendant. | Case No. 2:12-cv-00428-DDP(MRW)<br><br>**JOINT STATUS REPORT**<br><br>Date:  April 22, 2024<br>Time:  10:00 a.m.<br>Judge: Hon. Dean D. Pregerson<br>Crtrm: 9C |

# JOINT STATUS REPORT

The Parties submit this joint status report in anticipation of the status conference scheduled for April 22, 2024, and to update the Court on the status of the Parties' negotiations regarding the issues raised by Plaintiffs in their Motion to Modify the Court-Approved Implementation Plan (Dkt. No. 252, "Motion to Modify").

At the June 26, 2023 status conference, the Parties agreed to conduct further negotiations with respect to (1) the Los Angeles Sheriff's Department's (the "LASD") policy regarding head strikes, (2) the LASD's use of the WRAP restraint device, and (3) accountability and discipline for use of force and reporting violations. On November 27, 2023, the Parties jointly represented to the Court that "Plaintiffs have agreed to withdraw the portion of their Motion to Modify related to the alleged overuse and improper use of the WRAP" on terms jointly agreed to by the parties. Dkt. No. 288. On December 8, 2023, the Parties filed a joint status report which stated that "[t]he Parties have now agreed to a new LASD Limitations on Force policy, which covers a variety of uses of force, including head strikes." Dkt. No. 294. The agreed-upon policies were submitted to the Court as exhibits to the status conference reports.

At the March 11, 2024 status hearing, the Parties reported and reiterated to the Court that they had reached agreement on the WRAP and Limitations on Use of Force policies, and that the Parties were very close to agreement accountability / discipline. At that time, the Court directed the Parties to report back on April 1, 2024, and set the status hearing for April 22, 2024.

On April 3, 2024, Counsel for LASD notified Plaintiffs that county counsel had met with the Los Angeles County Professional Peace Officers Association ("PPOA"), the union that represents supervisors and custody assistants, and that PPOA had concerns about the Limitations on Force policy. County counsel sent a revised version of the previously agreed-upon policy with the union's proposed

changes to the policy. County counsel also indicated that the WRAP policy – which Plaintiffs had also been led to believe was final and agreed-upon – would also need to go to those unions for review, comment, and possible revision.

Each of these subjects is addressed below.

A.  THE LIMITATIONS ON FORCE POLICY

The Parties previously reported to the Court that they had reached agreement on a new LASD Limitations on Force policy, which covers a variety of uses of force, including head strikes. *See* Doc. 294.

**Defendant's Position:**

Subsequent to reaching an agreement with Plaintiffs regarding the particulars of this policy and following the most recent status conference held in this matter on March 11, 2024, the LASD presented the Limitations of Force policy agreed to by the Parties to PPOA, the union that represents LASD supervisors and custody assistants, as well as to the Association for Los Angeles County Deputy Sheriffs ("ALADS"), the union that represents LASD deputies. The LASD is obligated to seek input on this policy from PPOA and ALADS because this new proposed policy represents a material change in the employment conditions of the LASD deputies and their supervisors who are subject to the policy.

In the past, when presented with such policies, PPOA and ALADS have not advocated for alterations to them. On this occasion, however, PPOA and ALADS have proposed several changes to the Limitations of Force policy agreed to by the Parties. The LASD does not feel that these changes materially alter the agreement reached by the Parties. Furthermore, the LASD will not agree to any changes to this policy advocated by PPOA and/or ALADS that dilute the policy's aim of reducing head strikes and other serious uses of force covered by the policy. However, the LASD is obligated, pursuant to its contractual obligations with its employees, to listen to and take into account the views of PPOA and ALADS as to this policy. The LASD takes this obligation it owes to the LASD's workforce seriously; and it

values the input provided by PPOA and ALADS, as it is often the case that the views expressed by those most impacted by policies such as the Limitations of Force policy ultimately helps create clearer, better policies that have the buy-in of LASD deputies needed to make the implementation of such policies successful. Moreover, the LASD believes that a failure to negotiate this policy in good faith with PPOA and ALADS would create an additional downside, as such an approach raises a risk that either union could initiate litigation that would ultimately delay the implementation of a new Limitations of Force policy much longer than the time it will take to negotiate this policy with the unions.[1]

In an effort to expedite finalization of the Limitations of Force policy, the LASD will holding its next meetings with PPOA and ALADS concerning the Limitations of Force policy on April 11 and April 12, 2024, and the LASD will provide any proposed revisions to the policy resulting from these meetings to Plaintiffs' counsel and the Monitoring Panel by April 12, 2024 in an effort to see if the Parties can come to agreement on any proposed revised language to the policy prior to the status conference on April 22, 2024.

**Plaintiffs' Position:**

Plaintiffs reasonably believed that the Parties had reached agreements on the Limitations on Force and WRAP policy changes, as the County had represented to the Plaintiffs, the Court-appointed Monitors, and the Court itself. Indeed, Counsel for Defendants had not informed Plaintiffs or the Monitors that they planned to seek

---

[1] For instance, should negotiations between the LASD and the unions reach an impasse due to a failure of the LASD to negotiate the particulars of this policy in good faith with the unions, the unions would have, among other rights provided under state law and County ordinances, to seek to mediate any disputed issues, to hold a fact-finding hearing on the disputed issues before a neutral individual or panel of individuals, to seek redress before the State of California's Public Employment Relations Board, to seek relief in the California Superior Court, and/or to seek intervention in this case to assert its views on this policy.

the union's input or rewrites of the Parties' long-negotiated policy revisions, reached after days of negotiations over months, with the assistance and input of the Monitors. Plaintiffs had relied in good faith upon the representations of Defendants' counsel that the Parties were in agreement, and the Parties had represented the same to the Court. Plaintiffs also had negotiated in good faith with Defendants, making concessions and counter-offers in reliance on Defendants' negotiation positions. At no time during these negotiations did Counsel for Defendants indicate that these "agreements" were not sound and would have to be sent out to the law enforcement unions for their revisions.

More fundamentally, Plaintiffs disagree with Defendants' view that the unions have veto or rewrite power over these negotiated changes.[2] Plaintiffs' position is that neither the Limitations on Force policy nor the WRAP policy changes are subject to mandatory bargaining with the unions. *See Long Beach Police Officer Assn. v. City of Long Beach*, 156 Cal. App. 3d 996, 1009 (Cal. Ct. App. 1984) (*citing San Jose Peace Officer's Assn. v. City of San Jose*, 78 Cal. App. 3d 935 (Cal. Ct. App. 1978)); *accord Building Material & Construction Teamsters' Union v. Farrell,* 41 Cal. 3d 651, 655-56 (1986) (establishing balancing test for mandatory bargaining and distinguishing police use-of-force because the "burden of requiring an employer to confer about such fundamental decisions clearly outweighs

---

[2] LASD rejects this characterization. The LASD is not now representing, nor has it ever represented to Plaintiffs, that PPOA or ALADS have "veto or rewrite power" over LASD policies. Instead, as Counsel for the LASD has explained, and as Plaintiffs acknowledge, PPOA and ALADS must both be consulted prior to a change in the material working conditions of LASD deputies and supervisors. While the LASD is not ultimately required to accept any changes proposed by the unions, it cannot consider its consultation obligation as satisfied simply by providing notice of a policy that the unions will be required to accept, as Plaintiffs suggest. The LASD fully understands the ACLU's frustration with delays to finalization of the agreed-upon policies. That said, the LASD believes that the unions' involvement in this process will makes these policies better, not worse.

the benefits to employer-employee relations that bargaining would provide").

These policies may be subject to *consultation* with the unions, as defined in the county code as "to communicate verbally or in writing for the purpose of presenting and obtaining views or advising of intended actions." L.A.C.C. § 5.04.030. Defendants may therefore ***advise*** the unions of their intention to change the Limitations on Force and WRAP policies – but for the purpose of this case they have already agreed to do so, with the specific changes that negotiated with Plaintiffs.

Even if the policies that Defendants have agreed to are subject to mandatory bargaining under state labor law, this Court has the inherent authority to waive state law if it interferes with this Court's orders enforcing the constitutional or federal statutory rights of incarcerated people, as "[i]t is well established that, under the Supremacy Clause, a state law is void if it actually conflicts with the United States Constitution or a federal statute." *Hook v. Arizona Dep't of Corrs.*, 107 F.2d 1397, 1402-03 (9th Cir 1997); *see also Coleman v. Brown*, 922 F.Supp.2d 1004, 1050-51 (E.D. Cal./N.D. Cal. 2013) (Three Judge Panel) (holding that "[t]he Court is empowered to override the applicable state provisions if necessary" to vindicate the federal court's prior orders or the constitutional rights of people) (citing Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1)(B)); *Coleman v. Brown*, 952 F.Supp.2d 901, 931 (E.D. Cal./N.D. Cal. 2013) (Three Judge Panel) (waiving "to the extent necessary" the California administrative procedures act, and "any and all local and state laws and regulations" to implement prison population reduction plan)); *see also N.C. St. Bd. of Educ. v. Swann*, 402 U.S. 43, 45 (1971) (holding that "state policy must give way when it operates to hinder vindication of federal constitutional guarantees.").

B. THE WRAP POLICY

As the Parties have previously informed the Court, they have also reached an agreement on a revised policy governing the LASD's use of the WRAP in the

LACJ.

**Defendant's Position:**

That policy is currently pending review of the Office of Inspector General ("OIG"). When its review is completed, it will be sent to the LASD's Bureau of Labor Relations & Compliance) for distribution to the unions.[3] To the extent any of these stakeholders seek any revisions to this policy varying from what the Parties have agreed to, such proposed revisions will immediately be shared with Plaintiffs' counsel and the Monitoring Panel. The LASD understands that Plaintiffs' counsel are not amenable to further revisions to this policy.

**Plaintiffs' Position:**

Plaintiffs reiterate their position set forth above in Part A.

C.  ACCOUNTABILITY ISSUES

With respect to the remaining issue concerning accountability and discipline related to force incidents, the Parties have met and conferred multiple times, including with the Monitors present; have exchanged multiple written communications on the subject; and have reached agreement on several new remedial compliance measures related to accountability and discipline.[4] They include the following:

First, the Parties have agreed that the LASD will provide the Monitors and the ACLU, on a quarterly basis, with a matrix which provides information about the

---

[3] On January 4, 2024, the Monitoring Panel proposed a new substantive provision (Provision 7.11) and compliance measure to the Implementation Plan to account for the LASD's use of the WRAP, since the WRAP was not in use at the time the Implementation Plan in this case was initially formulated. The LASD will be providing comments to this proposal to the Monitoring Panel and Plaintiffs' counsel by April 10, 2024.

[4] Plaintiffs note that they are concerned that these multiple agreements and representations may also be undone by Defendants seeking the union's revisions to the agreed-upon terms.

disposition of force reviews that result in administrative investigations at the Inmate Reception Center, the Twin Towers Correctional Facility, and the Men's Central Jail and the discipline imposed for violations of use of force policies found as a result of these administrative investigations.  This matrix indicates (a) the location where the use of force occurred; (b) the date the use of force occurred; (c) the date when an administrative investigation concerning the use of force was opened; (d) information associating the use of force with a particular use of force package (i.e., the "IV Number" and "URN Number" associated with the use of force); (e) the entity within the LASD handling the investigation (i.e., whether the use of force is being reviewed by the LASD's Internal Affairs Bureau or some other entity within the LASD); (f) the status of the administrative investigation; (g) the disposition of the matter (including whether the investigation is pending, was unfounded, or resulted in a particular manner of discipline); (h) whether the use of force involved a head strike; and (g) any pertinent notes concerning the matter.  Plaintiffs' counsel has requested that this matrix also include the date discipline was imposed, as well as identify what LASD policy or Rosas provision was found to have been violated, if discipline was imposed.  The matrix currently does not include this information. However, that information can be determined by referring to the use of force package associated with the use of force at issue, which the matrix does identify.[5] Moreover, absent a situation where a case identified on the matrix was referred for a possible criminal prosecution, the date discipline was imposed will always be within one year of when the use of force occurred.

      Second, the Parties have agreed to revisions proposed by the Monitors with respect to Provision 15.7 of the Implementation Plan.  Pursuant to this agreement,

---

[5] Plaintiffs dispute that the use of force packages necessarily include the date discipline was imposed or the particular provision in the LASD disciplinary guidelines under which discipline is imposed.

LASD supervisors who review use of force incidents will now be required to ensure that a deputy's initial report of a use of force incident accurately and honestly depicts the incident.

Third, the Parties have agreed to adopt a new compliance measure for Provision 1.3.[6] As a condition of compliance with Provision 1.3, the Monitors will now assess whether LASD supervisors' evaluations of use of force incidents (i) are sufficiently thorough; (ii) sufficiently explain the reasons for their conclusions; and (iii) appropriately identify policy violations and hold staff accountable for identified policy violations.

Fourth, the Parties have agreed to adopt changes to Provision 13.1 of the Implementation Plan, which now will read: "The Department should have a firm policy of zero tolerance for acts of dishonesty, force-related violations, and failure to report uses of force. If the Department does not terminate or suspend a member who is found to have been dishonest, who violated any Department policy in connection with a use of force, or who failed to report a use of force, the Department should document the reasons why the member was not terminated or suspended. The Department should also place members who receive a written reprimand or suspension on a formal and adequate documented performance review program and closely monitor the member's performance."

Fifth, the Parties have agreed that the Sheriff should be provided with an opportunity to demonstrate whether the Custody Force Investigation Team ("CFIT") formed by the Sheriff last summer to conduct independent investigations of the more serious uses of force which occur in the Los Angeles County Jails ("LACJ") can sufficiently address the accountability demanded under the Rosas provisions. Furthermore, the LASD has agreed to provide semi-annual reports to the Monitoring

---

[6] Implementation Plan § 1.3 provides that "Department managers should be held accountable should they fail to address use of force problems at the Department's jail facilities."

Panel and Plaintiffs' counsel summarizing (1) the personnel who are part of CFIT; (2) the number of cases handled by CFIT during the reporting period; and (3) the average amount of time it takes for CFIT to review the cases it handles.[7]

Finally, Defendants announced that the recommended changes to the LASD Disciplinary Guidelines that they had negotiated with the Court Monitors and Plaintiffs would be tabled for a period of time. This "tabling" was announced because the County Counsel's office is currently negotiating revisions of the guidelines with PPOA, ALADS and other "stakeholders," including the U.S. Department of Justice ("USDOJ") in the Antelope Valley case.[8] Plaintiffs confirmed with counsel from USDOJ that these negotiations had not yet started, and proposed on March 26, 2024 that the parties jointly negotiate with DOJ over changes to the Disciplinary Guidelines, and if Defendants would not agree to joint negotiations, that Plaintiffs would agree to table negotiations for only six months.

D.  OTHER ISSUES

In the months before the June 2023 status conference in this matter, the Parties met and conferred and reached agreements concerning a number of other steps the LASD was willing to take in order to (a) minimize head strikes; (b) ensure

---

[7] Currently, the LASD reports that the average amount of time it is taking for CFIT to complete the investigations of the cases it is handling is 60.9 days. This is substantially less time than it was taking Sergeants to complete the investigations of such cases prior to the creation of CFIT. Plaintiffs' counsel has requested information concerning the overall amount of time that it is now taking, on average, to investigate and reach decisions on use of force reviews (including the amount of time such decision-making takes once CFIT completes its role in the process). There is currently not sufficient data available to provide this information. However, the LASD is currently working on tracking this data and will report it to the Monitoring Panel and Plaintiffs' counsel when it becomes available.

[8] See https://lasd.org/wp-content/uploads/2024/01/Transparency_AVDOJ_17_Semi-Annual_Report_December_2023.pdf at 66-67.

the safe usage of the WRAP device; (c) encourage force prevention; and (d) enhance accountability. These steps are memorialized in a filing that was made by the LASD on May 31, 2023 in this case. *See* Dkt. No. 251.

**Defendant's Position:**

Several of these proposed measures are obsolete in light of the agreements that have been reached between the Parties concerning the Limitations of Force policy and the WRAP policy described above; others are obsolete in light of the creation of the CFIT unit described above; and others have not yet been put into practice because the policies that underpin them have not been finalized or because they require further approvals. Within 48 hours of this filing, the LASD will provide a full list to the ACLU of where each of these provisions stand.

**Plaintiffs' Position:**

Having not seen this list, and given Defendants' recent unilateral announcement that the Parties' agreed-upon policy revisions were now being re-negotiated with the unions, Plaintiffs are unable to provide their position to the Court at this time on which of the May 2023 agreements are now "obsolete." Plaintiffs reserve their right to supplement this report to the Court, to provide additional filings or submissions to the Court, to seek a continuance of the April 22, 2024 status hearing until more clarity is obtained from Defendants, and/or to declare

//
//

an impasse and submit all outstanding matters to the Court for hearing and resolution.

DATED: April 8, 2024            KENDALL BRILL & KELLY LLP

By:     /s/ Robert E. Dugdale
Robert E. Dugdale
Attorneys for Defendant Robert Luna,
Sheriff of Los Angeles County, in his
Official Capacity

DATED: April 8, 2024            AMERICAN CIVIL LIBERTIES UNION

By:     /s/ Corene T. Kendrick
Corene T. Kendrick
Attorneys for Plaintiffs Alex Rosas and
Jonathan Goodwin, on behalf of
themselves and of those similarly situated

## ATTESTATION UNDER LOCAL RULE 5-4.3.4

I, Robert E. Dugdale, attest that the above listed signatories on whose behalf this document is being filed have concurred in the filing's content and have authorized the filing.

DATED: April 8, 2024            KENDALL BRILL & KELLY LLP

By:     /s/ Robert E. Dugdale
Robert E. Dugdale