Kathleen M. Kenney
343 Sweet Grass Way
Richmond, KY 40475
Email: kkenney4695@gmail.com

**Monitor and on behalf of Monitors**
**Robert Houston and Nicholas E. Mitchell**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS, et al.,<br>Plaintiffs,<br>v.<br>LOS ANGELES COUNTY SHERIFF ROBERT LUNA, in his official capacity,<br>Defendant. | Case No. 12-cv-00428 DDP (MRW)<br><br>**PANEL'S THIRTEENTH REPORT**<br><br>Hon. Dean D. Pregerson<br>United States District Judge |

Case No. 12-cv-00428 DDP (MRW)

PANEL'S THIRTEENTH REPORT

Pursuant to Section V of the Settlement Agreement And Release of Claims, the Monitors appointed by this Court, Kathleen Kenney, Robert Houston, and Nicholas E. Mitchell (collectively, the "Panel") hereby submit the attached Panel's Thirteenth Report "evaluation Defendant's Compliance with Action Plan" prepared by the Panel for the six-month period from January 1, 2023 to June 30, 2023. This Report takes into consideration the comments from the parties in accordance with Section V of the Settlement Agreement. The Panel is available to answer any questions the Court may have regarding this Report as such times as are convenient for the Court and the parties.

DATED: May 21, 2024                                          Respectfully Submitted,

                                                            KATHLEEN M. KENNEY

                                                            By: /S/ Kathleen M. Kenney
                                                            Kathleen M. Kenney
                                                            Monitor and on behalf of Monitors
                                                            Robert Houston and
                                                            Nicholas E. Mitchell

2                                    Case No. 12-cv-00428 DDP (MRW)

PANEL'S THIRTEENTH REPORT

# PANEL'S THIRTEENTH REPORT

## Table of Contents

| | | |
|---|---|---|
| Panel's Thirteenth Report | | 2 |
| Action Plan Implementation Assessment | | 7 |
| **I.** | **Administrative Provisions** | **7** |
| | A. Leadership and Accountability | 7 |
| | B. Management Visits | 12 |
| **II.** | **Use of Force Policies and Practices** | **14** |
| | A. Overall Use of Force Policies | 14 |
| | B. Use of Force Practices & Review of Force Packages | 15 |
| | C. Quarterly Findings—Use of Force Provisions | 20 |
| **III.** | **Training** | **23** |
| | A. Use of Force Training | 23 |
| | B. Ethics and Professionalism Training | 23 |
| | C. Mental Health Training | 24 |
| | D. New Deputy Sheriffs and Custody Assistants | 25 |
| | E. Sergeant Training | 26 |
| **IV.** | **Reporting and Investigation of Force Incidents** | **27** |
| | A. Reporting and Investigation Provisions in Force Package Reviews | 27 |
| | B. Reporting & Investigations Provisions as Reported by Department | 31 |
| | C. Quarterly Findings—Reporting and Investigations Provisions | 33 |
| **V. Inmate Grievances** | | **35** |
| | A. Grievance Forms | 35 |
| | B. Emergency Grievances | 36 |
| | C. Inmate Grievance Coordinator | 37 |
| | D. Handling of Grievances | 38 |
| | E. Deadlines | 39 |
| | F. Communications with Inmates | 40 |
| **VI.** | **Use of Restraints** | **42** |
| **VII. Early Warning System** | | **44** |
| Appendix A: Compliance Chart | | 46 |

# Panel's Thirteenth Report

The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan [developed by the Panel] ('Reports') at intervals the Panel shall determine." This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from January 1, 2023, to June 30, 2023 (the "Thirteenth Reporting Period") and it takes into consideration comments received from the Parties on May 1, 2024.

In May 2014, the Parties retained the Panel "to develop a corrective action plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles" (the "Downtown Jail Complex"). The plan developed by the Panel sets forth provisions in twenty-one areas that the Sheriff is required to implement in the Downtown Jail Complex. The plan was approved by the Court on April 7, 2016. Under Paragraph VIII of the Settlement Agreement, "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')." As of November 1, 2018, the Sheriff's Department (the "Department") has implemented 104 of the Panel's 106 recommendations. The remaining two recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in *United States v. County of Los Angeles, et al.*, CV No. 15-05903 (JEMx) (the "DOJ case").

With the Court's guidance, during the Status Conference held on May 12, 2022, the Parties agreed to develop a written plan to achieve compliance with the following four key areas: (1) eliminating impermissible head strikes; (2) the proper use of the WRAP; (3) appropriate utilization of force avoidance and de-escalation techniques; and (4) accountability. After the filing of the Panel's Twelfth Report, the Court held status hearings in this matter on October 30, 2023, December 11, 2023, January 29, 2024, March 11, 2024, and April 22, 2024.

The Parties reached an agreement on the Limitations of Force and WRAP Restraint policies in late 2023. The County recently informed the Plaintiffs, the Panel, and the Court that the Los Angeles County Professional Peace Officers Association (PPOA), the union representing supervisors and custody assistants, had proposed revisions to the Limitations on Force policy. *See* Joint Status Report, *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP, Dkt. 312. The County also indicated its intent to meet with the Deputies' Union, the Association for Los Angeles Deputy Sheriffs (ALADS) regarding this revised policy. The County further indicated that both of these Unions would need to be consulted regarding the revisions to the WRAP Restraint policy. The negotiations with the unions are ongoing.

With regard to accountability, the Parties have agreed to revisions to Provision 13.1 and 15.7 and a new Compliance Measure for 1.3. The Panel drafted a new Provision to cover the use of the WRAP Restraint. The Parties have submitted comments on the Provision. Since the draft WRAP Restraint provision is based on the Department's WRAP policy, the Provision will not be finalized until the policy is finalized.

The Panel's Monitoring visit during the Thirteenth Reporting Period occurred in March 2023. With regard to the non-force related provisions in the Action Plan, the Department submitted its Thirteenth Self-Assessment Status Report (the "Thirteenth Self-Assessment") on December 8, 2023. During the Thirteenth Reporting Period, the Panel reviewed records posted by the Department to verify the Department's self-assessments of its compliance with non-force provisions of the Action Plan. The Panel's evaluation of the

2

provisions of the self-assessment reports is included in this Report. The Panel's auditors reviewed source documents associated with the Training Provisions and Restraint Provisions 17.3 and 17.4.

The Department's overall uses of force at the Downtown facilities continued to trend downward between the Eleventh, Twelfth, and Thirteenth Reporting Periods, as shown in *Figure 1*. A more detailed analysis of the total number of use of force incidents by quarter and facility is provided with Provision 1.3 below. This trend continued into 2023 where there was a 27% decrease in use of force incidents from the first half of 2022 (523) to the first half of 2023 (384), and a 12% decrease from the Twelfth to Thirteenth Reports.[1]



*Figure 1*

During the Thirteenth Reporting Period, the Panel reviewed a total of 50 completed force packages selected from a comprehensive list of force incidents compiled by the Department. The Panel did not select force packages randomly or in proportion to the frequency with which various categories of force occur. Rather, the Panel selected for review the force incidents most likely to involve problematic uses of force.[2] In 21 of the 50 force packages reviewed, the Panel found some aspect of the force used during the encounter that violated the force prevention principles of Section 2.2 of the Action Plan—resulting in a non-compliance rate of 42%, which is a decrease from the 60% non-compliance in the Twelfth Report.



*Figure 2* reflects the total number of head strikes over two years, or four 6-month periods, per facility. Similar to overall use of force incident trends, the Department's head strike totals show successive decreases between the first half of 2022 and the first half of 2023, from a total of 30 to 22, which is a 27% decrease, and maintained for this reporting period.[3] Based on preliminary data for the second half of 2023, the Department showed significant decreases in head strikes from 22 to 12, which is a 45% decrease.

*Figure 2*

For the Thirteenth Reporting Period, TTCF head strikes remained at 10. IRC had an increase in head strikes from 5 to 7, a 40% increase, but still significantly less than its 12 reported head strikes in the first half of 2022. MCJ had a decrease in head strikes from 7 to 5, a 28% decrease. Head strikes in the first half of 2023 reflect the downward 2022 trend is maintaining.

The downward trends of the overall use of force numbers, head strikes, and cases non-compliant with Provision 2.2 Force Prevention Principles represent meaningful progress by the Department at achieving the goals of the Settlement Agreement.  In addition to continuing to focus on reducing overall uses of force and head strikes, the Department must hold Deputies accountable for use of force violations and hold supervisory staff accountable when they fail to identify and appropriately address violations.  In a majority of the cases reviewed by the Panel for this Report in which the Panel identified force policy

---

[1] While the 3Q23 and 4Q23 data are outside of the Thirteenth Reporting Period (1Q23 - 1Q23), the Panel believes it is important to provide the Court with timely data and information in its reports.

[2] The Panel usually selects cases in which staff deployed/utilized the taser, WRAP, or personal weapons.

[3] All data in this report are for three of the Department's facilities only: MCJ, TTCF, and IRC.  Other Departmental facilities are also subject to these provisions in United States v. County of Los Angeles, et. al, 2:15-cv-05903.

3

violations, Department managers either failed to identify, properly analyze, or address those violations. For example, the Panel found violations of the Department's Limitations of Force (head strikes) policy in 17 cases. The Department concluded the force used in 15 of these cases was objectively reasonable and within Departmental policy. In the remaining two cases, the Department identified concerns with the force used and referred the cases for further investigation. Speaking plainly, this must change for the Department to achieve compliance with the Settlement Agreement. Requiring line personnel and supervisory staff to articulate whether the policy criteria were satisfied in a use of force case would enhance accountability. For example, in cases involving head strikes, the Deputy who punched the inmate in the head and all supervisory staff reviewing the case should address whether the following three criteria from the Limitations of Force Policy were present: (1) the inmate was assaultive, (2) there was an imminent danger of serious injury to personnel or others, and (3) there were no other means to avoid serious injury.

The County has indicated that its newly constituted Custody Force Investigations Team (CFIT) will enhance its ability to properly investigate and identify force policy violations. The Panel has met with investigators and executives from this Team and is hopeful that the Department's optimism is justified. The Panel will continue to review and analyze Departmental force reviews to assess whether the thoroughness and quality of the analysis improves under CFIT and include further discussion of that issue in future Monitoring Reports.

The Panel conducted a series of focus groups with staff and discussions with inmates during its October 2023 and January 2024 Monitoring visits. The participants were randomly selected. The Panel continues to find the focus groups and discussions beneficial.

The following ideas were expressed by custody staff during the focus groups:[4]
- Staff have zero control over inmates. There is no disincentive for inmates to violate the rules.
- Staffing shortages continue to be a significant concern. Staff are regularly working double shifts and are exhausted.
- Need additional staff in Facilities to assist with fixing infrastructure problems.
- Should not remove force options just for the sake of the inmates. Deputies' safety matters as well.
- Stricter enforcement of jail rules to alleviate force incidents.
- Force policy should be reviewed because inmates think they can attack staff and staff cannot defend themselves.
- WRAP policy needs to be less restrictive – go back to the original policy.
- Need to increase deputy staffing levels, which would decrease the amount of mandated overtime and with increased personnel, inmates less likely to become recalcitrant.
- More training in proper force options like pressure points.

The following themes emerged from the group discussions with inmates:[5]
- Processing into the jail was more organized and faster than in years past.
- They were able to get grievance forms.
- The grievance system is not viewed as effective.
- Staff did not want to be disturbed/bothered. Concern about knocking on door to ask for medical assistance.

---

[4] In October 2023, staff focus groups were comprised of deputies and sergeants from IRC and TTCF. In January 2024, the Panel spoke to deputies and sergeants from MCJ as well as Lieutenants and Captains from all three facilities. The views expressed are not necessarily reflective of the views of all members of custody staff.

[5] The Panel spoke with a total of 19 inmates as part of the Focus Groups during October 2023 and January 2024. All three facilities were represented in the focus groups. The views expressed by the focus group participants are not necessarily reflective of all inmates.

4

- The majority were not concerned about being subjected to excessive force by staff.
- Food is always served cold.

In addition to speaking with the randomly selected inmates in groups, the Panel also interviewed specific inmates who were identified by Plaintiffs' counsel. They raised concerns about being subjected to excessive use of force. Some of the inmates also reported difficulties accessing grievance forms. The following two specific examples of excessive force allegations have not been substantiated and are currently being investigated by the Department. One inmate described an incident in which a deputy slammed the cell door on his hand. That action resulted in him losing the tip of his finger.  Another inmate reported being assaulted by other inmates at the urging of a deputy. He noted that the deputy came into his dorm and told all of the inmates in the dorm their dorm wouldn't be receiving any basic supplies (toilet paper, food, etc.) until they "handled" the inmate who was later attacked by unidentified inmates when he went into the bathroom. There are no cameras in the bathroom, so the assault was not captured on video. Following the assault, he remained in the dorm. He was subjected to a second, more severe assault by unidentified inmates. He sustained a broken jaw and had some of his teeth knocked out. The third-party grievances filed on his behalf are pending investigation.

During the Panel's Monitoring visits in October 2023 and January 2024, senior Department managers cited continued staffing shortages as one of the biggest challenges facing the Department. This is the same significant challenge noted in prior Monitoring Visits. While the Department has been able to hire additional staff, retention challenges have continued to be an obstacle to satisfactory staffing numbers. At the downtown jails, staff continue to be mandated to work several overtime shifts per month. Requiring staff to work a significant amount of overtime is not sustainable and has a negative impact on morale, retention, and staff wellness. It also may contribute to negative force outcomes violating the Rosas provisions. The Panel renews its recommendation for the Department to have a thorough, independent staffing analysis completed to ascertain whether existing staff can be more effectively deployed in a manner that reduces the need for mandatory overtime.  In response to a draft of this Report, the Department indicated that it "embraces" this recommendation and is working to obtain funding and identify a suitable firm to perform this analysis.

For the Thirteenth Reporting Period, the Department is found in compliance with 78 of the 100 applicable (104 total) provisions set forth by the Action Plan. Compliance results per category are as follows:
    (1)  7 out of 9 of the Administrative Provisions
    (2)  17 out of 25 of the Force Provisions
    (3)  11 out of 11 of the Training Provisions
    (4)  17 out of 24 of the Investigations & Reporting Provisions
    (5)  21 out of 24 of the Grievances Provisions
    (6)  2 out of 8 of the Restraints Provisions (Note this category includes 4 not applicable.)
    (7)  3 out of 3 of the Early Warning System Provisions

Provisions determined compliant for the Thirteenth Reporting Period that were found out of compliance in the *Panel's Twelfth Report* include: 2.5 Force on Restrained Inmates, 2.11 Planned Chemical Spray, 2.13 Check of Medical Records, 20.3 Planned Use of Force, 4.2 Mental Health Professionals, 12.4 Uninvolved Supervisors, and 6.5 Grievances Against Staff.

Provisions determined out of compliance for the Thirteenth Reporting that were found in compliance in the *Panel's Twelfth Report* include: 10.2 Documented Visits, 2.7 Supervisors Called to Scene, 2.10 Authorized Weapons, 15.5 Clarification After Video, 6.4 Use of Force Grievances, and 6.19 Response to Inmate Grievances.

5

The Department continued to cooperate fully with the Panel during the Thirteenth Reporting Period. The Department and County Counsel responded to our inquiries and requests for documents and information. They engaged in constructive conversations with the Panel regarding use of force incidents, policy issues and their continuing efforts to implement the terms of the *Rosas* Action Plan. We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.

6

# Action Plan Implementation Assessment

The Action Plan is divided into seven overarching categories: (1) Administrative; (2) Use of Force; (3) Training; (4) Force Reporting and Force Investigations; (5) Grievances; (6) Restraint; and (7) Early Warning System. Each category contains the substantive provisions with corresponding compliance measures. The Panel's findings towards compliance with each provision for the Thirteenth Reporting Period are provided below and organized to mirror the Action Plan.

# I.    Administrative Provisions

## A. Leadership and Accountability

The recommendations in Sections 1.1 through 1.4 of the Action Plan require that Custody be headed by an Assistant Sheriff with no other areas of responsibility, the Sheriff be engaged personally in the management of the jails, the Department's managers be held accountable for any failures to address force problems in the Jails, and that the Department regularly reports to the Board of Supervisors on the use of force in the jails and on its compliance with the Action Plan.

### 1.1 Custody Operations Headed by an Assistant Sheriff

**Provision Description:** Section 1.1 of the Action Plan provides that Custody Operations should continue to be headed by an Assistant Sheriff with no other areas of responsibility assigned.

> *Compliance Measure Summary:* Custody Operations headed by an Assistant Sheriff with no other responsibilities for the duration of the Settlement Agreement.

Custody has been headed by an Assistant Sheriff with no other areas of responsibility since mid-2014. Assistant Sheriff Sergio Aloma has been serving in the role of Assistant Sheriff since December 6, 2022.

**1.1 Status:** Compliance[6]            **As of Date:** January 1, 2017

### 1.2 Personal Engagement of the Sheriff

**Provision Description:** Sheriff should be personally engaged in the management of the Department's jail facilities and regularly and adequately monitor the use of force policies and practices and compliance with the Action Plan.

> *Compliance Measure Summary:* Reports every six months on the Sheriff's personal involvement in managing the jail and monitoring use of force policies.

The Department has provided the Panel with a log of frequent meetings that Sheriff Robert Luna had with Assistant Sheriff Aloma during the First and Second Quarters of 2023. Between January 2, 2023 and June 29, 2023 the Sheriff and Assistant Sheriff had 43 meetings in which they discussed such topics as: use of force incidents, the use of less lethal weapons and personal weapons; inmates entering facilities under the influence; de-escalation of force; assaults on staff; suicide attempts; cell extractions; Category 3 incidents and associated injuries; use of force against mentally ill inmates; gassing incidents; dorm disturbances; available detox housing units; facility security concerns; and alternate tactical approaches to address the current inmate population.

---

[6] Use of the term Compliance is a finding of compliance as of a certain date. The Panel's findings are set forth in the Appendix attached. For provisions not in compliance in this Report, the Department has either not yet achieved compliance or is no longer in compliance during the Thirteenth Reporting Period.

7

*Compliance Measure Summary:* Meet with the Monitors at least once every six months to discuss personal involvement.

During the Panel's initial meeting with Sheriff Robert Luna on December 21, 2022, the Panel invited the Sheriff to accompany it during its next facility tours. On March 21, 2023, Sheriff Luna accompanied the Panel on its tour of Men's Central Jail. This joint tour represents the first time the Sheriff has participated in the Panel's monitoring visit in this manner. The Panel discussed issues of concern with the Sheriff and observed his meaningful interactions with staff and inmates.

**1.2 Status:** Compliance                    **As of Date:** January 1, 2017

## 1.3 Accountability for Failing to Address Policy Violations

**Provision Description:** Section 1.3 of the Action Plan provides that Department managers should be held accountable should they fail to address use of force problems at the jail facilities.

*Compliance Measure Summary:* A quarterly report that sets forth the number and rank of personnel found to have violated use of force policies.

The Department provided a report for both quarters of the Thirteenth Reporting Period, which are summarized in *Table 1*. There were two founded violations of use of force policies reported in 1Q23—one at TTCF and one at MCJ.[7] In 2Q23, there were eight founded violations of use of force policies—3 at TTCF, 3 at MCJ, and 2 at IRC. The resulting discipline for these violations is reflected in *Table 2*.

*Table 1: UoF Policy Violations*

|  | TTCF | MCJ | IRC | Total |
|---|---|---|---|---|
| 1Q23 | 1 | 1 | 0 | 2 |
| 2Q23 | 3 | 3 | 2 | 8 |

*Table 2: 1Q23 and 2Q23 Discipline Imposed by Violation*

| First Quarter 2023 | | | |
|---|---|---|---|
| **Case No.** | **Facility** | **Rank** | **Discipline** |
| 1 | MCJ | Sergeant | Written Reprimand |
| 2 | TTCF | Deputy | Written Reprimand |
| **Second Quarter 2023** | | | |
| **Case No.** | **Facility** | **Rank** | **Discipline** |
| 1 | MCJ | Deputy | 1-day Suspension |
|  |  | Deputy | Written Reprimand |
|  |  | Deputy | Written Reprimand |
|  |  | Deputy | Written Reprimand |
|  |  | Deputy | 2-day Suspension |
|  |  | Deputy | 1-day Suspension |

---

[7] The reporting for Provision 1.3 occurs when the discipline for the founded violation occurs and not when the policy violation occurs. In this Report, the Panel found 13 out of the 25 cases reviewed for 1Q23 in violation of the force prevention principles of Section 2.2. Should the Department find staff involved in those cases violated policy, those violations would not be recorded until the quarter the discipline was imposed.

8

| 2 | IRC | Deputy | 4-day Suspension |
| 3 | MCJ | Deputy | 3-day Suspension |
| 4 | TTCF | Deputy | Written Reprimand |
| 5 | TTCF | Deputy | Written Reprimand |
| 6 | IRC | Deputy | Written Reprimand |
| 7 | MCJ | Deputy | 10-day Suspension |
| 8 | TTCF | Deputy | Written Reprimand |

There were 10 founded violations of use of force policies involving 14 Deputies and 1 Sergeant for the Thirteenth Reporting Period. The discipline imposed ranged from a Written Reprimand to a 10-day suspension. In the Twelfth Reporting Period, there were 8 founded violations of use of force policies involving 16 Deputies, 1 Custody Assistant, and 3 Sergeants. The discipline imposed included Written Reprimands and 1-day suspensions. (Panel's Twelfth Report, p.7) The disciplinary sanctions imposed in the Thirteenth Reporting Period appear to be more severe than sanctions imposed in the Twelfth Reporting Period. In response to the Parties' focus on Accountability, the Department will provide the Panel and Plaintiffs' counsel with more timely and detailed information related to use of force policy violations and the disciplinary sanctions imposed for those violations.

> ***Compliance Measure Summary:*** Section 1.3 requires the Department to identify each facility in which there was a 25% increase in the number of use of force incidents or Category 3 incidents from the previous quarter.

*Overall Uses of Force*
The Department provided data that reflects the number of use of force incidents per month by facility and category. The monthly numbers have been collapsed into quarterly totals for analysis as shown in *Figure 3*. For the Thirteenth Reporting Period (1Q23 and 2Q23), there were a total of 384 use of force incidents– 185 in 1Q23 and 199 in 2Q23. There are no significant (more than 25%) changes in the total number of use of force incidents between quarters. When comparing the Thirteenth Reporting Period totals to the next reporting period, the Department is maintaining trend levels.



*Figure 3*



*Figure 4*

Of the 384 use of force incidents for the Thirteenth Reporting Period, TTCF accounted for 141 of the incidents (37%), MCJ accounted for 169 of the incidents (44%), and IRC accounted for 74 of the incidents (19%)—see *Figure 4*. This allocation pattern resembles previous trends.

The total uses of force by quarter and category for the Thirteenth Reporting Period are reflected in *Figure 5.*[8] For both quarters, the majority of the 384 incidents were Category 1 with 283 total incidents representing 74% of the total number. Category 1

---

[8] Incident data from 2Q22 is included in this figure to show and determine increases and decreases for 3Q22.

9

cases involve incidents with no injuries. Category 1 incidents occurred over four times more often than the next closest category, which are Category 2 incidents totaling 69 and representing 18% and NCI incidents at 29 total incidents representing 8%. Category 3 incidents totaled three for this reporting period and represent 1% of all incidents and are further assessed in the section below. This allocation pattern resembles trends from previous reports.

The Department is required to address increases of 25% or more for all use of force categories. As noted above in *Figure 5*, NCI incidents increased from 1Q23 to 2Q23 from 11 to 18, which is a 64% increase. Though not reflected in Figure 5, it is of note that preliminary data from 3Q23 reflects a 47% decrease in Category 2 incidents—from 38 to 20 incidents. Category 3 incidents overall decreased from 2 to 1; however, there was an increase at TTCF by more than 25% between 1Q23 and 2Q23, which is further assessed in the *Category 3 Specific* section.



*Figure 5*

The figures below identify the number of use of force incidents by category per facility. Data is included from both quarters of the Thirteenth Reporting Period (1Q23 and 2Q23) as well as the last quarter of 2022 to reflect any changes of 25% or more between quarters. Note that only the increases or decreases of 25% or more are included in the narrative below. In addition, while 3Q23 data is included in the charts to show the preliminary trend n, it was not included in the percent change assessment.

*Twin Towers Correctional Facility*
For the Thirteenth Reporting Period, TTCF had a total of 141 use of force incidents—61 in 1Q23 and 80 in 2Q23, which is a 31% increase in overall incidents between quarters. Although outside of this reporting period, it is of note that preliminary 3Q23 data reflects the number of incidents decreased by 28%, restoring trend levels. *Figure 6* depicts the total numbers of incidents by category over three quarters. For the Thirteenth Reporting Period, increases or decreases of more the 25% at TTCF are as follows:



*Figure 6*

- Between 4Q22 and 1Q23, TTCF increased NCI incidents by 200% from 1 to 3.
- Between 1Q23 and 2Q23, TTCF increased NCI incidents by 67% from 3 to 5.
- Between 1Q23 and 2Q23, TTCF increased Category 2 incidents by 55% from 11 to 17.

10

*Men's Central Jail*
For the Thirteenth Reporting Period, MCJ had a total of 169 use of force incidents—87 in 1Q23 and 82 in 2Q23. *Figure 7* depicts the total numbers of incidents by category over three quarters. For the Thirteenth Reporting Period increases or decreases of more the 25% at MCJ are as follows:

- Between 4Q22 and 1Q23, MCJ decreased NCI incidents by 44% from 9 to 5.
- Between 1Q23 and 2Q23 NCI incidents increased by 80% from 5 to 9.
- Between 4Q22 and 1Q23, MCJ increased Category 3 incidents by 100% from 1 to 2.
- Between 1Q23 and 2Q23, MCJ decreased Category 3 incidents by 100% from 2 to 0.



*Figure 7*

*Inmate Reception Center*
For the Thirteenth Reporting Period, IRC had a total of 74 use of force incidents—37 in both quarters respectively. *Figure 8* depicts the total numbers of incidents by category over three quarters. For the Thirteenth Reporting Period increases or decreases of more the 25% at IRC are as follows:

- Between 1Q23 and 2Q23, IRC increased NCI incidents by 33% from 3 to 4.
- Between 4Q22 and 1Q23, IRC increased Category 2 incidents by 40% from 5 to 7.

*Figure 8*

> ***Compliance Measure:*** When there is a 25% or more increase from quarter to quarter, the Unit Commander reports on his or her response to involved staff. If the Unit Commander failed to address the matter, the Department indicates its response to hold the Unit Commander accountable.

*Category 3 Specific*
Due to the infrequency of Category 3 incidents, a single incident results in 50% to 100% swings quarter to quarter, which triggers CCSB to request a response from the Unit Commander on its handling of involved staff. Category 3 incidents that resulted in an increase of 25% or more for the Thirteenth Reporting Period are as follows:

- Between 4Q22 and 1Q23, MCJ increased Category 3 incidents from 1 to 2.
- Between 1Q23 and 2Q23, TTCF increased Category 3 incidents from 0 to 1.

In response, the MCJ Training Unit will conduct in-service Dynamic Scenario Training with all three shifts multiple times each month. TTCF is also sending personnel involved to De-escalation Verbal Resolution Training (DVRT) and Control, Escort, and Restraint Techniques (CERT) training. In addition, the TTCF Force Compliance team will send weekly briefings addressing force policy compliance.

Similar to the Eleventh and Twelfth Reporting Periods, the Panel reviewed many cases in the Thirteenth Reporting Period involving violations of policy, such as impermissible head strikes, in which the supervisory reviews failed to identify the policy violations. As part of the Parties' Accountability discussions, they have agreed to the Panel's proposed revisions to the Compliance Measures for this

11

Provision. The Panel will assess whether the supervisors' evaluations of use of force incidents are sufficiently thorough, explain the reasons for their conclusions, appropriately identify policy violations, and hold staff accountable for those violations. The Department must hold Deputies accountable for use of force violations and hold supervisory staff accountable when they fail to identify and/or appropriately address those violations.

**1.3 Status:** Out of Compliance                    **As of Date:** N/A

## 1.4 Reports to the Board of Supervisors

**Provision Description:** Department regularly reports to the Board of Supervisors on use of force status and compliance with the Action Plan.

> *Compliance Measure:* Report publicly at least every six months to the Board of Supervisors on use of force data, training, investigation outcome summaries, and discipline as well as overall compliance.

The Department did not report to the Board of Supervisors (BOS) on the use of force status and compliance with the Action Plan during the First or Second Quarter of 2023. The timing of the regular reports to the BOS is triggered by the Panel's reports filed with the Court. The BOS had originally scheduled the Department to appear before them on June 27, 2023, to address the Eleventh Report. The BOS changed this schedule and had the Department appear before in July 2023. This appearance will be addressed in the Fourteenth Report.

**1.4 Status:** Compliance                    **As of Date:** June 12, 2018

# B.  Management Visits

The recommendations in Sections 10.1 and 10.2 of the Action Plan address required tours of senior managers and the documentation of visits on housing units.

## 10.1 Senior Manager Tours

**Provision Description:** Senior managers ranked Unit Commanders and above should be required to periodically tour jail facilities, including nights and weekends.

> *Compliance Measures Summary:* 10.1(a) Unit Commanders tour at least two evenings and one weekend day per quarter.

During the Third and Fourth Quarter of 2022, the Unit Commanders from MCJ, IRC, and TTCF met the requirements of this provision with 100% compliance.

> *Compliance Measures Summary:* 10.1(b)–(e) Varying frequencies in visit requirements for Department executives—Unit Commanders up to Sheriff—to tour and inspect the Downtown Jail Complex.

These requirements were met for both quarters of the Thirteenth Reporting Period. The Unit Commanders, Chiefs in Custody Operations, the Assistant Sheriff and the Sheriff achieved 100% compliance with the requirements to tour and inspect the Downtown Jail Complex for both the First and Second Quarter of 2023. The Commanders achieved 97% compliance in the Second Quarter of 2023.  A total of 72 tours were required and 71 were completed. The Panel finds the Department in Compliance with this provision.

**10.1 Status:** Compliance                    **As of Date:** June 30, 2018

12

## 10.2 Housing Unit Documentation

**Provision Description:** Housing units should document visits from department managers in electronic records or visitor logs.

> *Compliance Measure Summary:* Visits by Department managers to the Downtown Jail Complex are documented and made available to the Monitors.

The visits to the jail facilities by Department managers (above the rank of Sergeant) were documented in electronic visitor logs for the First Quarter of 2023. During the Second Quarter of 2023, MCJ failed to follow the Uniform Daily Activity Log which indicates personnel at the minimum rank of Lieutenant shall conduct unannounced checks in the housing area. The facility was issued a Corrective Action Plan and a briefing was conducted with all assigned Lieutenants to highlight the requirements of this provision.

**10.2 Status:** Out of Compliance        **As of Date:**      N/A

# C. Rotations and Transfers

The recommendations in Sections 18.1, 18.2, and 21.1 of the Action Plan address custody-wide rotation policies, semi-annual audits of unit compliance, and not assigning or transferring staff to custody as a formal sanction.

## 18.1 Custody-Wide Rotation Policy

**Provision Description:** Maintain a custody-wide rotation policy and rotate staff members as often as provided by policy.

## 18.2 Semi-Annual Rotation Audit

**Provision Description**: Conduct an audit semi-annually for each unit's compliance with rotation policies.

> *Compliance Measures Summary:* Maintain facility rotation policy and audit compliance every six months. Provide reports to the Monitors to demonstrate if at least 90% of staff were rotated according to policy.

The Department achieved 98.9% Compliance in the Thirteenth Reporting Period. Each of the Downtown jail facilities had a current Unit Order setting forth its rotation policy and the source documents indicate that most Department personnel were rotated in Compliance with these policies.

**18.1 Status:** Compliance        **As of Date:** June 30, 2018
**18.2 Status:** Compliance        **As of Date:** January 1, 2019

## 21.1 Transfers to Custody

**Provision Description:** Policy should provide that a staff member will not be assigned to Custody as a formal or informal sanction for problem Deputies.

> *Compliance Measures Summary:* On a quarterly basis, personnel records are reviewed for staff transferred to Custody from other divisions and a report is provided to the Monitors identifying each staff member who was transferred to Custody within six months of a finding of misconduct or policy violation.

The Department's Thirteenth Self-Assessment reflects that it maintained 100% compliance from January 1, 2023, through June 30, 2023. The Panel has reviewed the Department's source documents stating the reasons for Deputy transfers to Custody during the Thirteenth Reporting Period. No Department member was transferred or assigned to Custody as a sanction for misconduct or a policy violation during the Thirteenth Reporting Period.

**21.1 Status:** Compliance        **As of Date:** June 30, 2018

13

The chart below is a visual representation of compliance for the above provisions from the last three reports. The shading of the boxes indicates compliance status–blue for *compliance* and red for *out of compliance.* The "As Of" column shows the date since first found compliant and the last column includes a check mark if the date meets or exceeds three years of compliance. A chart is provided with each section.

| Administrative Provisions | | Eleventh Report | Twelfth Report | Thirteenth Report | | |
|---|---|---|---|---|---|---|
| No. | Provision | 3Q21 - 2Q22 | 3Q22 - 4Q22 | 1Q23 - 2Q23 | AS OF | 3YR+ |
| 1.1 | Assistant Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.2 | Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.3 | Supervision | X | X | X | | |
| 1.4 | Reports to Board | C | C | C | 6/12/2018 | ✓ |
| 10.1 | Jail Visits | C | C | C | 6/30/2018 | ✓ |
| 10.2 | Documented Visits | C | C | X | | ✓ |
| 18.1 | Rotation in Custody | C | C | C | 6/30/2018 | ✓ |
| 18.2 | Documentation of Rotation | C | C | C | 1/1/2019 | ✓ |
| 21.1 | Transfers to Custody | C | C | C | 6/30/2018 | ✓ |

# II.    Use of Force Policies and Practices

## A. Overall Use of Force Policies

The recommendations in Sections 2.1, 8.2, 17.2, 20.1, and 20.2 of the Action Plan address the revision, modification, and organization of policy into one logical manual.

### 2.1 Separate and Organized Custody Force Manual for Custody Operations

**Provision Description:** The Action Plan requires the Department to "have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations[.]"

### 8.2 Complaints of Retaliation into Grievance Policy

**Provision Description:** Combine retaliation provisions into one grievance section to ensure a single, consistent policy on handling grievances.

### 17.2 Pregnant Inmate Policy

**Provision Description:** Combine and conform provisions related to restraints on pregnant inmates with medically ordered restraint provisions.

### 20.1 Categories of Force in Policy

**Provision Description:** Policy indicates only two types of force: reactive and planned.

The Department's Supervisor's Use of Force Investigation Form (P438) still lists various types of force e.g., reactive, etc. The Panel requested the form be revised by July 1, 2023, in order to remain in Compliance with this provision. This request was referenced in both the Eleventh (p. 17) and Twelfth (p. 14) Reports. During the Panel's May 2024 Monitoring Visit, Department staff explained the process undertaken to revise the P438 Form. Since the Department collects force data from this form, implementing a revised form will require additional computer programming. In light of the Department's efforts to move forward with changing the form, the Panel decided to keep the Department in Compliance with this Provision at this time. The Panel will closely monitor the Department's progress with implementation of the revised form.

14

**20.2 Reactive Force Definition**

**Provision Description:** Reactive Force is defined as force used in response to an immediate threat of safety, destruction, or escape, and when there is no time to wait for assistance.

> *Compliance Measure Summary*: A Custody Division Manual that includes all force policies applicable to Custody Operations, including those outlined by 8.2, 17.2, 20.1, and 20.2.

On October 16, 2015, the Department provided the Panel with a Custody Operations Force Manual with separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints, Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved Shootings. The Department's Custody Force Manual satisfies Section 2.1 and includes specific provisions that satisfy Sections 8.2, 17.2, 20.1, and 20.2 of the Action Plan.

**2.1, 8.2, 17.2, 20.1 and 20.2 Status:** Compliance **As of Date:** January 1, 2017

| Use of Force Policy Provisions | | Eleventh Report | Twelfth Report | Thirteenth Report | AS OF | 3YR+ |
|---|---|:---:|:---:|:---:|:---:|:---:|
| 2.1 | Custody Force Manual | C | C | C | 1/1/2017 | ✓ |
| 8.2 | Complaints of Retaliation | C | C | C | 1/1/2017 | ✓ |
| 17.2 | Pregnant Inmates | C | C | C | 1/1/2017 | ✓ |
| 20.1 | Categories of Force | C | C | C | 1/1/2017 | ✓ |
| 20.2 | Reactive Force | C | C | C | 1/1/2017 | ✓ |

# B. Use of Force Practices & Review of Force Packages

The recommendations in Sections 2.2 through 2.13, 4.1 through 4.5, 9.2, 9.3, 17.5, and 20.3 have provisions related to policy as well as application. The Panel reviewed multiple drafts of the Department's policies to implement these recommendations, required changes where appropriate, and certified that the Department had implemented these policy recommendations effective December 1, 2015.

For the Thirteenth Reporting Period a total of 50 packages were reviewed: 25 in 1Q23 and 25 in 2Q23. The cases reviewed for each quarter did not necessarily occur in the quarter they were reviewed, nor was the investigation necessarily completed during that quarter. The Panel reviewed cases as they were received. The cases reviewed involved incidents from February 2022 through August 2023. Overall results for the Thirteenth Reporting Period by provision are below. Findings for each quarter are provided in Section C: *Quarterly Findings*.

> *Compliance Measure Summary:* (#1-7) Within 10 days of the end of each quarter the Department will provide the Monitors with a cumulative force synopsis for each incident in the Downtown Jail Complex showing the status of force investigations. The Monitors will select a minimum of 25 force packages to review for compliance with the Action Plan of all force provisions through Vertical and Horizontal Assessments. The Department will provide each package and include a summary sheet that indicates how the Department assessed each applicable provision. Force incidents will need to be 90% or more compliant with each provision for the Vertical Assessments.

**Vertical Assessment:** The vertical assessment represents the Panel's analysis of each case to determine the number of cases in which all force provisions were in compliance during the period. Of the 50 cases reviewed, sixteen (16) were found compliant with all Force Provisions, which is 32% of cases reviewed, which is below the 90% compliance threshold. It is, however, a significant increase from the 16% compliance rate in the Twelfth Report. Of the sixteen (16) found in compliance with all Force provisions, five (5) were from 1Q23 (two at TTCF, one at IRC, and two at MCJ) and eleven (11) from 2Q23 (two at TTCF, one at IRC, and eight at MCJ).

15

**Horizontal Assessment:** The horizontal assessment represents the Panel's findings, by provision, for the twenty (20) use of force practice provisions to determine a compliance rating for each provision.  It takes into consideration the objective of the provision and the nature and extent of any violations of the provision. Percentages are calculated based on packages reviewed in both quarters.[9]

## 2.2 Force Prevention Principles

**Provision Description:** Policy provides that force be used as a last resort, with minimal amount of force necessary, terminated as soon as reasonably safe to do so, and de-escalated as resistance decreases.

Of the 50 use of force packages reviewed, 29 cases were found compliant with this provision, which amounts to 58% compliance and is below the 90% compliance threshold. This 58% compliance rate represents an increase from the 40% compliance rate noted in the Twelfth Report.

**2.2 Status:** Out of Compliance          **As of Date:** N/A

## 2.3 Inmate-on-Inmate Violence

**Provision Description:** Policy indicates it is a violation for staff to cause, facilitate, or provoke inmate-on-inmate violence or to expose inmates to an unreasonable risk of assault. Further, staff are prohibited from publicly humiliating inmates or using slurs or obscenities.

Of the applicable cases reviewed, 87% (33 out of 38) were found to be in compliance, which is below the 90% compliance threshold. The five cases deemed out of compliance involved staff's unprofessional behavior or use of obscenities. There were no instances in which staff caused, facilitated, or provoked inmate-on-inmate violence.

**2.3 Status:** Out of Compliance          **As of Date:** N/A

## 2.4 Use of Force as Discipline

**Provision Description:** Policy indicates use of force not be used as discipline or corporal punishment.

Of the applicable cases reviewed, 94% (46 out of 49) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.4 Status:** Compliance          **As of Date:** July 1, 2019

## 2.5 Force on Restrained Inmate

**Provision Description:** Policy indicates staff may not strike, use chemical agents, or Taser a restrained inmate, unless the inmate is assaultive, presents an immediate threat, and no other reasonable means.

Of the applicable cases reviewed, 95% (19 out of 20) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.5 Status:** Compliance          **As of Date:** July 1, 2023

## 2.6 Head Strikes or Kicks

**Provision Description:** It is prohibited to strike an inmate in the head, kick an inmate who is on the ground, or kick an inmate above the knees if not on the ground unless the inmate is assaultive and presents an imminent danger and there are no more reasonable means to avoid injury. Kicking an inmate

---

[9] For the Horizontal Assessments, the Panel has determined that Compliance will require 90% of the applicable force provisions were in Compliance. The Panel may exercise its discretion and depart from this 90% requirement when considering the objective of the provision and the nature and extent of any violation of the provision.

16

who is not on the ground below the knees is prohibited unless used to create distance between a staff member and an assaultive inmate.

Of the applicable cases reviewed, 64% (32 out of 50) were found to be in compliance, which is below the 90% compliance threshold. This 64% compliance rate represents an increase from the 52% compliance rate noted in the Twelfth Report.

**2.6 Status:** Out of Compliance          **As of Date:** N/A

## 2.7 Supervisor Called to Scene

**Provision Description:** A supervisor must be called to the scene in a situation where use of force may be required as soon as time and circumstances permit.

Of the applicable cases reviewed, 78% (38 out of 49) were found to be in compliance, which is below the 90% compliance threshold.

**2.7 Status:** Out of Compliance          **As of Date:** N/A

## 2.8 Prevent Excessive Force

**Provision Description:** All members are responsible for preventing excessive uses of force and those who witness such events have a duty to stop, reduce, or control the use of force being used.

Of the applicable cases reviewed, 60% (3 out of 5) were found to be in compliance, which is below the 90% compliance threshold.

**2.8 Status:** Out of Compliance          **As of Date:** N/A

## 2.9 Armed Inmates

**Provision Description:** When confronting an armed inmate, every effort should be made to control the inmate at a distance.

Of the applicable cases reviewed, 71% (5 out of 7) were found to be in compliance, which is below the 90% compliance threshold.

**2.9 Status:** Out of Compliance          **As of Date:** N/A

## 2.10 Authorized Weapons

**Provision Description:** Department members can only use authorized weapons for which they have been trained. Any available instrument can be used to prevent imminent loss of life or serious bodily injury if no other means or alternative is available.

Of the applicable cases reviewed, 85% (22 out of 26) were found to be in compliance, which is below the 90% compliance threshold.

**2.10 Status:** Out of Compliance          **As of Date:** N/A

## 2.11 Planned Chemical Spray

**Provision Description:** After applying a chemical agent, members are required to wait a sufficient amount of time before applying additional chemical or force in a cell extraction or planned use of force.

Of the applicable cases reviewed, 100% (7 out of 7) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.11 Status:** Compliance          **As of Date:** July 1, 2023

17

### 2.12 Chemical Spray & Tasers

**Provision Description:** Chemical sprays, Tasers, and stun devices should not be used against an inmate who no longer presents a danger or is no longer resisting, ones known to suffer medical conditions that may be aggravated by use, or in a manner contradictory to manufacturer guidance or Department training.

Of the applicable cases reviewed, 100% (12 out of 12) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.12 Status:** Compliance **As of Date:** July 1, 2019

### 2.13 Check of Medical Records

**Provision Description:** An inmate's medical/mental health records should be checked prior to use of chemical agents, Tasers, or stun devices when time and circumstances permit.

Of the applicable cases reviewed, 100% (7 out of 7) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.13 Status:** Compliance **As of Date:** July 1, 2023

### 4.1 Consult Mental Health Professionals

**Provision Description:** Require a mental health professional on-scene to attempt to resolve a situation during a cell extraction or planned use of force.

Of the applicable cases reviewed, 100% (4 out of 4) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.1 Status:** Compliance **As of Date:** January 1, 2023

### 4.3 Spray on Mental Health Inmates

**Provision Description:** Discontinue use of chemical following an initial burst if the inmate is acutely psychotic or severely mentally disabled and unable to conform behavior to commands.

Of the applicable cases reviewed, 100% (3 out of 3) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.3 Status:** Compliance **As of Date:** October 1, 2019

### 4.4 Cooling Off Periods

**Provision Description:** In situations involving a mentally ill inmate who does not present an obvious danger to self or others and is refusing to exit his or her cell, allow a reasonable cooling off period. After, a mental health professional or supervisor can attempt to obtain compliance without the use of force.

Of the applicable cases reviewed, 83% (5 out of 6) were found to be in compliance, which is below the 90% compliance threshold. Given the small number of applicable cases, and the Department's favorable compliance history with this provision, the Panel has determined that failing to meet the standard in one case does not remove the County from Compliance with this Provision.

**4.4 Status:** Compliance **As of Date:** January 1, 2023

### 4.5 Medical or Mental Health Provider Order

**Provision Description:** When a planned use of force is precipitated by a medical or mental health provider, such as for treatment purposes, the ordering provider, or designee, is given the opportunity to intervene to de-escalate and determine whether the order should remain in effect.

Of the applicable cases reviewed, 100% (2 out of 2) were found to be in compliance, which exceeds the 90% compliance threshold.

18

**4.5 Status:** Compliance            **As of Date:** January 1, 2023

## 9.2 Escorting of Inmates

**Provision Description:** Following a use of force, the staff member escorting the recalcitrant inmate to medical, holding, or segregation should not be the same member involved in the confrontation.

Of the applicable cases reviewed, 92% (45 out of 49) were found to be in compliance, which meets the 90% compliance threshold.

**9.2 Status:** Compliance            **As of Date:** January 1, 2020

## 9.3 Duty to Protect & Intervene

**Provision Description:** Members have a duty to protect and to intervene in inmate-on-inmate violence when reasonably safe to do so.

Of the applicable cases reviewed, 100% (6 out of 6) were found to be in compliance, which exceeds the 90% compliance threshold.

**9.3 Status:** Compliance            **As of Date:** July 1, 2022

## 17.5 Minimize Medical Distress

**Provision Description:** Avoid, to the extent possible, placing weight on an inmate's back or shoulders in a way that impairs breathing. Once under control, place the inmate on side to minimize breathing problems.

Of the applicable cases reviewed, 61% (27 out of 44) were found to be in compliance, which is below the 90% compliance threshold. This compliance rate represents an improvement from the 49% compliance rate in the Twelfth Report. The manner in which inmates are placed in the WRAP Restraint continues to be a factor driving non-compliance with this provision. The Department has focused on eliminating the "heavy forward" when placing an inmate in the WRAP Restraint. The path to compliance for this provision is elimination of the "heavy forward," placing inmates into the recovery position as quickly as possible, and holding staff accountable for 17.5 violations.

**17.5 Status:** Out of Compliance            **As of Date:** N/A

## 20.3 Planned Force

**Provision Description:** Planned uses of force should be video recorded and include a medical professional on scene or on standby, a supervisor on scene, and occur after a Shift Supervisor approval has been obtained.

Of the applicable cases reviewed, 100% (7 out of 7) were found to be in compliance, which exceeds the 90% compliance threshold.

**20.3 Status:** Compliance            **As of Date:** July 1, 2023

19

| Use of Force Practice Provisions, Packet Review | | Eleventh Report | Twelfth Report | Thirteenth Report | | |
|---|---|---|---|---|---|---|
| No. | Provision | 3Q21 - 2Q22 | 3Q22 - 4Q22 | 1Q23 - 2Q23 | AS OF | 3YR+ |
| 2.2 | Force Prevention Principles | 67% | 40% | 58% | | |
| 2.3 | Inmate on Inmate Violence | 98% | 81% | 87% | | |
| 2.4 | Use of Force as Discipline | 99% | 98% | 94% | 7/1/2019 | ✓ |
| 2.5 | Force on Restrained Inmates | 84% | 86% | 95% | 7/1/2023 | |
| 2.6 | Head Strikes or Kicks | 65% | 52% | 64% | | |
| 2.7 | Supervisors Called to Scene | 81% | 90% | 78% | | |
| 2.8 | Prevent Excessive Force | 94% | 86% | 60% | | |
| 2.9 | Armed Inmates | 100% | 88% | 71% | | |
| 2.10 | Authorized Weapons | 97% | 95% | 85% | | |
| 2.11 | Planned Chemical Spray | 90% | 80% | 100% | 7/1/2023 | |
| 2.12 | Chemical Spray & Tasers | 93% | 95% | 100% | 7/1/2019 | ✓ |
| 2.13 | Check of Medical Records | 68% | 71% | 100% | 7/1/2023 | |
| 4.1 | Consult Mental Health Professionals | 77% | 90% | 100% | 7/1/2023 | |
| 4.3 | Spray on Mental Health Inmates | 100% | 100% | 100% | 10/1/2019 | ✓ |
| 4.4 | Cooling Off Periods | 81% | 100% | 83% | 1/1/2023 | |
| 4.5 | Medical or Mental Health Provider Order | 75% | 100% | 100% | 1/1/2023 | |
| 9.2 | Escorting of Inmates | 96% | 90% | 92% | 1/1/2020 | ✓ |
| 9.3 | Duty to Protect & Intervene | 100% | 100% | 100% | 7/1/2022 | |
| 17.5 | Minimize Medical Distress | 56% | 49% | 61% | | |
| 20.3 | Planned Use of Force | 68% | 62% | 100% | 7/1/2023 | |

## C. Quarterly Findings—Use of Force Provisions

### Combined 1Q and 2Q 2023 Results

For the First and Second Quarters of 2023, the Panel reviewed 50 use of force incidents combined—12 from TTCF (24%), 23 from MCJ (46%), and 15 from IRC (30%).

The Department was not in Compliance with eight (8) of the twenty (20) Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.3 Inmate-on-Inmate Violence, (3) 2.6 Head Strikes or Kicking Inmates, (4) 2.7 Supervisors Called to Scene, (5) 2.8 Prevent Excessive Force, (6) 2.9 Armed Inmates, (7) 2.10 Authorized Weapons, and (8) 17.5 Minimize Medical Distress.

Of the eight (8) Use of Force Provisions out of compliance, four (4) had compliance rates below 70% over 1Q23 and 2Q23 combined. Those provisions include the following:
- 2.2 Force Prevention Principles at 58% compliance.
- 2.6 Head Strikes or Kicking Inmates at 64% compliance.
- 2.8 Prevent Excessive Force at 60% compliance.
- 17.5 Minimize Medical Distress at 61% compliance.

The Department was in full compliance, or 90% or above, with the following eleven (11) of the twenty (20) use of force provisions: 2.4, 2.5, 2.11, 2.12, 2.13, 4.1, 4.3, 4.5, 9.2, 9.3, and 20.3.

### First Quarter 2023 Results

In the First Quarter of 2023, the Panel reviewed 25 force incidents—7 from TTCF (28%), 8 from MCJ (32%), and 10 from IRC (40%). The Department was not in Compliance with ten (10) of the 20 Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.3 Inmate-on-Inmate Violence, (3) 2.4 Use of Force as Discipline, (4) 2.6 Head Strikes or Kicking Inmates, (5) 2.7 Supervisors Called to

20

Scene, (6) 2.8 Prevent Excessive Force, (7) 2.9 Armed Inmates, (8) 2.10 Authorized Weapons, (9) 4.4 Cooling off Periods, and (10) 17.5 Minimize Medical Distress.

Of the ten (10) Use of Force Provisions out of compliance, six (6) had compliance rates below 70% in 1 Q23. Those provisions include the following:

- 2.2 Force Prevention Principles at 48% compliance.
- 2.6 Head Strikes or Kicking Inmates at 52% compliance.
- 2.8 Prevent Excessive Force at 33% compliance.
- 2.9 Armed Inmates at 0% compliance.
- 4.4 Cooling Off Periods at 67% compliance.
- 17.5 Minimize Medical Distress at 43% compliance.

The Department was in full compliance, or 90% or above, with the following nine (9) of the twenty (20) use of force provisions: 2.5, 2.11, 2.12, 2.13, 4.1, 4.5, 9.2, 9.3, and 20.3.

**Second Quarter 2023 Results**

In the Second Quarter of 2023, the Panel reviewed 25 force incidents—5 from TTCF (20%), 15 from MCJ (60%), and 5 from IRC (20%).

The Department was not in Compliance with four (4) of the 20 Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles; (2) 2.6 Head Strikes or Kicking Inmates, (3) 2.7 Supervisors Called to the Scene, and (4) 17.5 Minimize Medical Distress.

Of the four (4) Use of Force Provisions out of compliance, one (1) had a compliance rate below 70% in 2Q23: 2.2 Force Prevention Principles at 68% compliance.

The Department was in full compliance, or 90% or above, with the following sixteen (16) of the twenty (20) Force provisions: 2.3, 2.4, 2.5, 2.8, 2.9, 2.10, 2.11, 2.12, 2.13, 4.1, 4.3 - 4.5, 9.2, 9.3, and 20.3.

**Review of Force Incidents**

In accordance with the Action Plan, the Panel reviews selected force packages each quarter to assess whether the use of force is in Compliance with Sections 2.2 through 2.13, 4.1 through 4.5, 9.2, 9.3, and 17.5 (the "Force Provisions") of the Action Plan.  Prior to finalizing the ratings for the specific Force Provisions, the Panel participated in meetings with Custody Executives and Supervisors, and the Plaintiffs' Counsel. The format and information shared prior to and during these meetings has evolved. This evolution has led to more transparency and more meaningful discussions regarding compliance ratings. The Panel has consistently noted the value of these discussions would be improved if the cases at issue were recent. The Department believes its recently formed Custody Force Investigation Team (CFIT) will improve the timeliness of the Use of Force investigations.

Achieving compliance with Provisions 2.2 and 2.6, summarized below, is essential for overall *Rosas* compliance. The four components of force in Provision 2.2 are as follows: (a) must be used as a last resort; (b) must be the minimal amount of force that is necessary and objectively reasonable to overcome the resistance; (c) must be terminated as soon as possible consistent with maintaining control of the situation; and (d) must be de-escalated if resistance decreases. Provision 2.6 provides three criteria that must be met prior to striking an inmate in the head: (1) inmate is assaultive; (2) presents imminent danger of serious injury; and (3) there are no other more reasonable means to avoid serious physical injury. Noted below are two cases in which the components of Provision 2.2 and 2.6 were not followed. They illustrate the kinds of issues that recur in the force packages reviewed by the Panel, and which the Department must address.

21

In Case 1, Inmate X stood in a combative stance at his cell door, punching the glass and refusing to be escorted from the cell.  All mitigation attempts were unsuccessful. An extraction team donned its protective gear and entered the cell.  The Use of Force Report noted Deputy A "was able to pin Inmate X in the corner of his cell but while pinned down, Inmate X was somehow still able to punch Deputy A in the head. While Inmate X continued to fight, he bit Deputy B on his finger.  Due to Inmate X punching custody personnel and biting, custody personnel used their personal weapons (fists) to stop his assault."

The Watch Commander concluded, "it appears the application of force was objectively reasonable and correctly reported and within Department Policy." The Unit Commander stated, "the force used by Department personnel was objectively reasonable." The Commander concurred with these findings.

The extraction team was fully suited with gloves, vests, and helmets with clear face shields. The extraction gear is intended and able to protect both the deputies and the inmates from serious physical harm. There is no justifiable reason for a suited-up team to strike an inmate in the head in this situation.

In Case 2, Inmate Y was being moved to permanent housing and headed to the Module door without bringing his mattress with him. Deputy B directed Inmate Y to the bottom of the stairs in order to cuff him.  Seven deputies responded to the incident.  Deputy C indicated Inmate Y had his mouth open and it appeared he was trying to bite Deputy B. Deputy C stated, "I redirected Inmate Y's face away by placing my open left palm to the right side of Inmate Y's face, stopping possible assault." Deputy B punched Inmate Y twice in the face due to his fear Inmate Y was going to bite him.

The Investigating Sergeant counseled staff regarding the need for verbal de-escalation and acknowledged the contact could have been avoided by having the trustee remove the mattress. The Sergeant also discussed the option of closing the door and calling for a supervisor. The Watch Commander concluded it "appears the application of force was objectively reasonable, properly reported, and within Departmental Policy. I do have concerns with the Pre-Force tactics and lack of communication and coordination during the application of force." The Unit Commander indicated, "Although there is no clear depiction of the inmate's assaultive behavior during the time the punches were delivered, video shows the suspect's head going toward Deputy B and is corroborated by two deputy's statements. The punches were necessary to stop the threat and prevent injury."  The Commander concurred with these findings.

In this case, force was not used as a last resort nor was it minimally applied.  Moreover, there were other reasonable means to avoid serious physical injury, which should have informed the Department's review of the incident and its conclusion about the appropriateness of the force used.

.

22

# III.  Training

Sections 3.1 through 3.4 of the Action Plan require that Department members receive training on use of force policies, ethics, professionalism, and treating inmates with respect. New Department members are to receive six (6) weeks of specific training in Custody Operations. Sections 4.6 through 4.9 require the Department to provide Custody-specific, scenario-based skill development training for existing and new personnel in Crisis Intervention and Conflict Resolution and in "identifying and working with mentally ill inmates." Section 12.1 requires Custody Sergeants receive training in conducting force investigations.

The Panel has previously deemed the Department to be complying "as of" the date reported by the Department for the completion of the initial training required for existing personnel. The Department's continuing compliance with the training provisions is determined by its compliance with the refresher training required every year or every other year. The Department reported on its refresher training compliance during the Twelfth Reporting Period.

## A. Use of Force Training

### 3.1 Use of Force Training

**Provision Description:** Requires use of force training for all existing Department members in Custody Operations, which should include at a minimum, a one-time eight-hour use of force policy training course for all members assigned to Custody and then a two-hour refresher course every year.

> *Compliance Measure Summary:* Section 3.1(a) requires that 90% of Deputies and Custody Assistants assigned to Custody as of July 1, 2016 completed the required training.

As of June 30, 2018, the Department was found to be compliant with Section 3.1(a).

> *Compliance Measure Summary:* Section 3.1(b) requires that 90% of Deputies and Custody Assistants assigned to Custody who completed the initial training receive the two-hour refresher course every year.

The Panel's auditors previously verified the Department's reported annual refresher training results, and the Department was found to be in Compliance with Section 3.1(b) as of December 31, 2021, through December 31, 2022. The Department's Thirteenth Self-Assessment reports that it will submit its annual refresher training results for 2023 during the Fourteenth Reporting Period.

**3.1 Status:** Compliance          **As of Date:** December 31, 2021

### 3.4 Custody-based Use of Force Scenarios

**Provision Description:** Custody-based, use of force scenarios included as part of the use of force policy training provided by the Custody Training & Standard Bureau on an in-service and refresher basis.

The use of force training approved by the Panel includes the custody-based use of force scenarios.

**3.4  Status:** Compliance          **As of Date:** June 30, 2018

## B. Ethics and Professionalism Training

### 3.2 Ethics and Professionalism Training

**Provision Description:** Requires training all existing Department members in Custody Operations, which should include at a minimum, a one-time four (4) hour training course in ethics, professionalism, and treating inmates with respect, and then a two (2) hour refresher course every other year.

23

*Compliance Measure Summary:* Section 3.2(a) requires that 90% of Deputies and Custody Assistants assigned to Custody as of July 1, 2016 completed the required training.

As of June 30, 2018, the Department was found to be in Compliance with the training requirements of Section 3.2(a).

*Compliance Measure Summary:* Section 3.2(b) requires that 90% of Deputies and Custody Assistants assigned to Custody who completed the initial training receive the two-hour refresher course every other year.

The Panel's auditors previously verified Compliance with Section 3.2(a) as of June 30, 2018, and with Section 3.2(b) as of December 31, 2019, through December 31, 2022. The Department's Thirteenth Self-Assessment reports that it will submit annual refresher training results for 2023 during the Fourteenth Reporting Period.

**3.2  Status:** Compliance          **As of Date:** June 30, 2018

## C. Mental Health Training

### 4.6 Crisis Intervention

**Provision Description:** The Department should provide a minimum of 32 hours of custody-specific, scenario-based, skill development training to all Deputy Sheriffs on Crisis Intervention and Conflict Resolution with eight (8) hours of refresher training every other year.

### 4.7 Mentally Ill Inmates

**Provision Description:** The Department should provide a minimum of eight (8) hours of custody specific, scenario based, skill development training on identifying and working with mentally ill inmates to all existing Custody personnel with a four (4) hour refresher course every other year.

*Compliance Measure Summary:* Sections 4.6(a) and 4.7(a) require that 90% of Deputies assigned to Custody as of July 1, 2016, completed the required training.

As of June 30, 2018, the Department was found to be Compliant with the De-Escalation and Verbal Resolution Training (DeVRT), mentally ill inmates, and refresher training requirements of Sections 4.6(a) and 4.7(a).

*Compliance Measure Summary:* Sections 4.6(b) and 4.7(b) require that 90% of Deputies assigned to Custody who completed the initial training receive the eight-hour refresher course every other year.

The Panel's auditors previously verified the Department's Compliance with Section 4.6(a) as of June 30, 2018, Section 4.6(b) as of December 31, 2018 through December 31, 2022, and Section 4.7(b) as of December 31, 2022. The Department's Thirteenth Self-Assessment reports that it will submit its annual refresher training results for 2023 during the Fourteenth Reporting Period.

**4.6 Status:** Compliance          **As of Date:** June 30, 2018
**4.7 Status:** Compliance          **As of Date:** January 1, 2023

24

## D. New Deputy Sheriffs and Custody Assistants

### 3.3 Custody Training

**Provision Description:** Section 3.3 of the Action Plan requires training all new Deputies in use of force and ethics, professionalism, and treating inmates with respect. Section 3.3 also requires the same for new Custody Assistants, who have received training in these subjects during their Academy training.

>*Compliance Measure Summary:* Section 3.3 requires that 95% of new Deputies and Custody Assistants completed the required training.

The Department reported that since the First Reporting Period beginning on July 1, 2015, newly assigned Deputies have been required to complete a six-week Custody Operations course that includes training in use of force and ethics, professionalism and treating inmates with respect, and new Custody Assistants, have received training in these subjects during their Academy training as required by Section 3.3. The Panel's auditors previously verified results through December 31, 2022. The Department's posted results reflect that the Department has met the 95% Compliance threshold through June 30, 2023. The results have been verified by the Panel's auditors, and the Department is in Compliance with Section 3.3 as of June 30, 2018, through June 30, 2023.

**3.3 Status:** Compliance        **As of Date:** June 30, 2018

### 4.8 Mentally Ill—New Staff

**Provision Description:** Provide a minimum of eight (8) hours of custody specific, scenario-based, skill development training on identifying and working with mentally ill inmates to all new members as part of the Jail Operations Continuum.

### 4.9 Crisis Intervention—New Staff

**Provision Description:** Provide a minimum of 32 hours of custody specific, scenario-based, skill development training in Crisis Intervention and Conflict Resolution to new Department members in the Academy or in Custody before they are assigned to any jail facilities.

>*Compliance Measure Summary:* Sections 4.8 and 4.9 require that 95% of new Deputies and Custody Assistants completed the required training.

The Department provides new Deputies with De-Escalation and Verbal Resolution Training (DeVRT) and identifying and working with mentally ill inmates (IIMI).[10] The required DeVRT and IIMI training takes place after Deputy Sheriffs and Custody Assistant Academy graduations and prior to assuming duties at their unit of assignment. The Panel's auditors previously verified the Department was in Compliance with Sections 4.8 and 4.9 as of June 30, 2018, through December 31, 2022. The Department's Thirteenth Self-Assessment reports 100% of the new personnel received the required training in the First and Second Quarters of 2023. These results have been verified by the Panel's auditors and the Department is in Compliance with Sections 4.8 and 4.9 as of June 30, 2018, through June 30, 2023.

**4.8 and 4.9 Status:** Compliance        **As of Date:** June 30, 2018

### 3.5 Additional Training and Mentoring

**Provision Description:** Requires Unit Commanders to determine "what additional training, counseling, or mentoring may be required when a personnel complaint involving the use of force is resolved with a finding that it 'Appears Employee Conduct Could Have Been Better' direct that the Department member undergo additional training, counseling, or mentoring, and document the action taken."

---

[10] The Panel has previously agreed that IIMI is included in the DeVRT curriculum of Section 4.9.

25

*Compliance Measure Summary:* Section 3.5 requires that 90% of personnel complaints involving use of force that were resolved with a "Appears Employee Conduct Could Have Been Better" finding reflect documentation that the Unit Commander reasonably determined what additional training, counseling or mentoring was required.

The Department's Thirteenth Self-Assessment reports that there were no inmate grievances against staff involving use of force where the disposition was that it "Appears Employee Conduct Could Have Been Better." The Department is in Compliance with Section 3.5 as July 1, 2019, through June 30, 2023.

**3.5 Status:** Compliance                    **As of Date:** July 1, 2019

## 3.6 Probation Reviews

**Provision Description:** Requires Unit Commanders to review new Department members within six (6) months of being initially assigned to Custody and again before the end of their probationary period.

*Compliance Measure Summary:* Section 3.6 requires that 95% of the new Department members in Custody Operations were reviewed (1) within six months after being assigned to Custody and (2) again before their first post-probationary assignment.

The Department's Twelfth Self-Assessment previously reported that it achieved 96% compliance in the Second Semester of 2022, greater than the 95% threshold required by Section 3.6. The Department's Thirteenth Self-Assessment reports that it achieved 98% compliance in the First Semester of 2023.  These results have been verified by the Panel's auditors, and the Department is in Compliance with Section 3.6 as of December 31, 2022, through June 30, 2023.

**3.6 Status:** Compliance                    **As of Date:** January 1, 2023

# E. Sergeant Training

## 12.1 Force Investigations Training

**Provision Description:** Requires that all Custody Sergeants receive an initial 16-hour block of training in conducting use of force investigations, reviewing use of force reports, and the Department's protocols for conducting such investigations. It also requires a two (2) hour refresher course every year.

*Compliance Measure Summary:* Section 12.1-1 requires that 90% of all Custody Sergeants received the initial training and a two (2) hour refresher course every year. Section 12.1-2 requires that 95% of new Sergeants completed the required training before or within 90 days after they assume their duties in Custody.

The Panel approved the 16-hour initial training course required by Section 12.1 on February 24, 2017. The Panel's auditors previously verified Compliance with Section 12.1 as of July 1, 2019, through December 31, 2022. The Department's Thirteenth Self-Assessment reports that it maintained compliance through June 30, 2023.[11] These results have been verified by the Panel's auditors and the Department is in Compliance with Section 12.1 as of July 1, 2019, through June 30, 2023. The Department's Thirteenth Self-Assessment also reports that it will submit its annual refresher training results for 2023 during the Fourteenth Reporting Period.

**12.1 Status:** Compliance                    **As of Date:** July 1, 2019

---

[11] There were no Sergeant promotions in the Second Quarter of 2023.

26

| Training Provisions | | Eleventh Report | Twelfth Report | Thirteenth Report | | |
|---|---|---|---|---|---|---|
| No. | Provision | 3Q21 - 2Q22 | 3Q22 - 4Q22 | 1Q23 - 2Q23 | AS OF | 3YR+ |
| 3.1 | Use of Force Training | C | C | C | 12/31/2021 | |
| 3.2 | Ethics & Professionalism | C | C | C | 6/30/2018 | ✓ |
| 3.3 | Custody Training | C | C | C | 6/30/2018 | ✓ |
| 3.4 | Custody-based Scenarios | C | C | C | 6/30/2018 | ✓ |
| 3.5 | Add Training and Mentoring | C | C | C | 7/1/2019 | ✓ |
| 3.6 | Probation Reviews | X | C | C | 1/1/2023 | |
| 4.6 | Crisis Intervention | C | C | C | 6/30/2018 | ✓ |
| 4.7 | Mentally Ill Inmates | X | C | C | 1/1/2023 | |
| 4.8 | Mentally Ill Inmates (new staff) | C | C | C | 6/30/2018 | ✓ |
| 4.9 | Crisis Intervention (new staff) | C | C | C | 6/30/2018 | ✓ |
| 12.1 | Force Investigations | C | C | C | 7/1/2019 | ✓ |

# IV.      Reporting and Investigation of Force Incidents

## A. Reporting and Investigation Provisions in Force Package Reviews

The findings below pertain to the application of policies into practice and are supported by the selection of use of force cases reviewed. For the Twelfth Reporting Period a total of 50 packages were reviewed: 25 in 1Q23 and 25 in 2Q23. Overall results for each provision during the Thirteenth Reporting Period are below. Findings for each quarter are in *Section C: Quarterly Findings*.

> *Compliance Measure Summary:* (#1-7) Within 10 days of the end of each quarter the Department will provide the Monitors with a cumulative force synopsis for each incident in the Downtown Jail Complex. The Monitors will select a minimum of 25 force packages to review for compliance with the Action Plan of all reporting and investigations provisions through Vertical and Horizontal Assessments. The Department will provide each package and include a summary sheet that indicates how the Department assessed each applicable provision. Reporting and Investigations provisions will need to be 90% or more compliant for the Vertical Assessments.

**Vertical Assessment:** Of the 50 cases reviewed, twenty-three (23) were found compliant with Reporting and Investigative Provisions, which constitutes 46% of all cases reviewed, which is below the 90% compliance threshold though a significant increase from the 8% compliance rate in the Twelfth Report. Of the twenty-three (23) cases in compliance with the Reporting and Investigative provisions, ten (10) were from 1Q23 (two at TTCF, four at IRC, and four at MCJ) and thirteen (13) were from 2Q23 (one at TTCF, four at IRC, and eight at MCJ.)  Over half of the compliant cases with Reporting and Investigations Provisions were from MCJ.

**Horizontal Assessment:** The findings for the seventeen (17) Reporting & Investigative Provisions represent the Horizontal Assessment, which determines whether the Department is in Compliance with each of the applicable Provisions. It takes into consideration the objective of the provision and the nature and extent of any violations. Percentages are calculated based on packages reviewed in both quarters.

### 4.2 Mental Health Professionals

**Provision Description:** Supervisors investigating uses of force are required to interview mental health professionals who witnessed the incident or attempted to resolve it. Record interview if consented to.

Of the applicable cases reviewed, 100% (5 out of 5) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.2 Status:** Compliance                    **As of Date:** January 1, 2023

27

## 5.2 Commander's Reviews

**Provision Description:** Evaluations of force incidents by Unit Commanders are reviewed pursuant to the category level requirement.

Of the applicable cases reviewed, 94% (47 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**5.2 Status:** Compliance          **As of Date:** January 1, 2023

## 5.3 Unexplained Discrepancies

**Provision Description:** Any unexplained tactical decisions or discrepancies among witnesses should be referred in writing by the reviewing Commander(s) to the investigator.

Of the applicable cases reviewed, 95% (42 out of 44) were found to be in compliance, which exceeds the 90% threshold.

**5.3 Status:** Compliance          **As of Date:** July 1, 2022

## 12.2 Location of Inmate Interviews

**Provision Description:** Inmate witnesses to force incidents should be asked to be interviewed, and then interviewed, away from other inmates.

Of the applicable cases reviewed, 52% (23 out of 44) were found to be in compliance, which is below the 90% compliance threshold.

**12.2 Status:** Out of Compliance          **As of Date:** N/A

## 12.3 Suspect Interviews

**Provision Description:** No Department member involved in the use of force should be present for or participate in the interviews.

Of the applicable cases reviewed, 90% (45 out of 50) were found to be in compliance, which meets the 90% compliance threshold.

**12.3 Status:** Compliance          **As of Date:** July 1, 2019

## 12.4 Uninvolved Supervisors

**Provision Description:** Force investigations should not be conducted by the direct supervisor of the staff member involved in the use of force.

Of the applicable cases reviewed, 96% (48 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.4 Status:** Compliance          **As of Date:** July 1, 2023

## 12.5 Standard Order and Format

**Provision Description:** Use of force packages should be organized in a standard order and format.

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.5 Status:** Compliance          **As of Date:** July 1, 2019

## 15.1 Timeliness of Reports

**Provision Description:** Every staff member who uses or assists in a force incident completes a separate and independent written report before going off duty.

28

Of the applicable cases reviewed, 92% (46 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.1 Status:** Compliance         **As of Date:** July 1, 2019

## 15.2 All Department Witnesses

**Provision Description:** Each staff member who witnesses a use of force prepares a written report unless the Watch Commander specifically designates only certain witnesses to prepare reports when a large number witnessed the same event.

Of the applicable cases reviewed, 94% (47 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.2 Status:** Compliance         **As of Date:** July 1, 2019

## 15.3 Force by Other Members

**Provision Description:** Staff members who use force must describe the type used in a written report as well the type used by others.

Of the applicable cases reviewed, 88% (44 out of 50) were found to be in compliance, which is below the 90% compliance threshold.

**15.3 Status:** Out of Compliance         **As of Date:** N/A

## 15.4 Description of Injuries

**Provision Description:** Staff members who witness a use of force incident must describe visible or apparent injuries to department members, inmates, or others involved.

Of the applicable cases reviewed, 80% (40 out of 50) were found to be in compliance, which is below the 90% compliance threshold.

**15.4 Status:** Out of Compliance         **As of Date:** N/A

## 15.5 Clarification After Video

**Provision Description:** A Department member who wants to make any clarifications or changes after viewing a video of a force incident should be required to either prepare a supplemental report or specifically note any changes to the Department member's initial report.

Of the applicable cases reviewed, 79% (15 out of 19) were found to be in compliance, which is below the 90% compliance threshold.

**15.5 Status:** Out of Compliance         **As of Date:** N/A

## 15.6 Separation of Deputies

**Provision Description:** To the extent practical, Department members should be separated until they have completed their use of force reports and/or witness reports.

Of the applicable cases reviewed, 47% (23 out of 49) were found to be in compliance, which is below the 90% compliance threshold. This represents a significant increase from the 16% compliance rate in the Twelfth Report. The Panel has advised the Department on how to document how this provision was met.

**15.6 Status:** Out of Compliance         **As of Date:** N/A

## 15.7 Individual Perceptions

**Provision Description:** Report reviewers must ensure each report reflects individual perceptions and recollections of the events and that they do not have common wording or phrasing.

29

Of the applicable cases reviewed, 98% (49 out of 50) were found to be in compliance, which exceeds the compliance threshold.

**15.7 Status:** Compliance          **As of Date:** July 1, 2019

## 16.1 Healthcare Assessment

**Provision Description:** A documented medical assessment of each inmate upon whom force is used as soon as practical after the force incident.

Of the applicable cases reviewed, 98% (49 out of 50) were found to be in compliance, which exceeds the compliance threshold.

**16.1 Status:** Compliance          **As of Date:** July 1, 2019

## 16.2 Photographs of Injuries

**Provision Description:** Supervisors investigating force incidents must photograph any injury, swelling, or redness sustained by staff members and document the absence of injury.

Of the applicable cases reviewed, 87% (40 out of 46) were found to be in compliance, which is below the 90% compliance threshold.

**16.2 Status:** Out of Compliance          **As of Date:** N/A

## 16.3 Medical Report of Injuries

**Provision Description:** Medical staff treating an injured inmate must report any injuries related to a use of force or an allegation by the inmate of a use of force.

Of the applicable cases reviewed, 100% (48 out of 48) were found to be in compliance, which exceeds the 90% compliance threshold.

**16.3 Status:** Compliance          **As of Date:** July 1, 2019

| Reporting & Investigations, Packet Review | | Eleventh Report | Twelfth Report | Thirteenth Report | | |
|---|---|---|---|---|---|---|
| No. | Provision | 3Q21 - 2Q22 | 3Q22 - 4Q22 | 1Q23 - 2Q23 | AS OF | 3YR+ |
| 4.2 | Mental Health Professionals | 67% | 85% | 100% | 1/1/2023 | |
| 5.2 | Commander's Reviews | 87% | 94% | 94% | 1/1/2023 | |
| 5.3 | Unexplained Discrepancies | 91% | 93% | 95% | 7/1/2022 | |
| 12.2 | Location of Inmate Interviews | 56% | 51% | 52% | | |
| 12.3 | Suspect Interviews | 94% | 90% | 90% | 7/1/2019 | ✓ |
| 12.4 | Uninvolved Supervisors | 90% | 88% | 96% | 7/1/2023 | |
| 12.5 | Standard Order & Format | 99% | 98% | 100% | 7/1/2019 | ✓ |
| 15.1 | Timeliness of Reports | 92% | 94% | 92% | 7/1/2019 | ✓ |
| 15.2 | All Department Witnesses | 95% | 94% | 94% | 7/1/2019 | ✓ |
| 15.3 | Force by Other Members | 82% | 78% | 88% | | |
| 15.4 | Description of Injuries | 90% | 76% | 80% | | |
| 15.5 | Clarification After Video | 94% | 93% | 79% | | |
| 15.6 | Separation of Deputies | 5% | 16% | 47% | | |
| 15.7 | Individual Perceptions | 92% | 90% | 98% | 7/1/2019 | ✓ |
| 16.1 | Healthcare Assessment | 94% | 98% | 98% | 7/1/2019 | ✓ |
| 16.2 | Photograph of Injuries | 74% | 83% | 87% | | |
| 16.3 | Medical Report of Injuries | 96% | 96% | 100% | 7/1/2019 | ✓ |

30

## B. Reporting & Investigations Provisions as Reported by Department

Many of the recommendations in the Action Plan that pertain to the reporting and investigation of force used by Department personnel in Custody Operations are assessed by the Panel through a review of the completed force packages. Other provisions are reported by the Department as follows:

### 5.1 Tracking of Force Incidents

**Provision Description:** Requires the Department to track the status of all investigations, reviews, and evaluations of all use of force incidents and allegations to ensure they were completed appropriately and timely. By the end of the shift, a supervisor or Internal Affairs investigator enters incidents into a database with a summary and an initial category classification.

> *Compliance Measure Summary:* 5.1(2) On a quarterly basis, Monitors determine if the completed force packages reviewed were entered into the database pursuant to 5.1(1).

The Department reports that 95% of the force incidents were timely entered into the database in the First Quarter of 2023 (23 out of 24 cases). In the Second Quarter of 2023, 100% of the 31 cases were timely entered into the database.

> *Compliance Measures Summary:*
> 5.1(1) and (4a): 95% of use of force incidents are entered into the database within two hours of the end of shift in which the incident occurred.
> 5.1(4)b and c: 90% of investigations of Deputies and Custody Assistants were completed timely and appropriately.

The Department reports its compliance rate for the First Quarter was 53% and 40% for the Second Quarter of 2023. The Panel has emphasized the need to complete use of force investigations within the appropriate timeframes in order to hold staff accountable for any policy violations.

**5.1 Status:** Out of Compliance          **As of Date:** N/A

### 8.3 CFRC Review

**Provision Description:** Evaluations of grievance investigations claiming force was used to retaliate against an inmate should be reviewed by the Custody Force Review Committee.

> *Compliance Measures Summary:* A list of completed investigations of inmate grievances claiming force was used in retaliation is provided quarterly to the Monitors and will include the CFRC review of the investigation's evaluation.

There was no data to access for the Thirteenth Reporting Period. According to the posted information in Sharepoint, there were no grievances in which an inmate claimed force was used against him in retaliation.

**8.3 Status:** Compliance          **As of Date:** June 30, 2021

### 11.1 CFRT Involvement

**Provision Description:** The Custody Force Rollout Team (CFRT) involvement in reviewing evaluations should not delay the investigation.

> *Compliance Measure Summary:* 95% of the investigations reviewed by CFRT were not delayed and discipline imposed timely if there is a policy violation finding.

31

There were no force incidents reviewed by CFRT where there was a finding of a policy violation or misconduct in the Thirteenth Reporting Period.

**11.1 Status:** Compliance                    **As of Date:** June 30, 2018

## 13.1 Documenting Dishonesty

**Provision Description:** The Department must have a firm zero tolerance policy for acts of dishonesty, use of excessive force, failures to report uses of force, and violations of PREA. For any staff member not terminated for such an act documentation is made as to the reason and the discipline imposed as well as placement on a monitored performance review program.

> *Compliance Measures Summary:* 95% compliance with all completed investigations where there was a finding of dishonesty, failure to report uses of force, or PREA violations as well as documentation for incidents that did not result in termination.

The Department's Self-Assessment indicates it achieved 100% compliance in both quarters of the Thirteenth Reporting Period. The following is a summary of the data posted for each quarter.

- First Quarter of 2023: A Deputy Sheriff was terminated for dishonesty/making false statements during a Departmental investigation pertaining to an off-duty arrest for Driving Under the Influence.
- Second Quarter of 2023: The three applicable cases from this quarter involved off-duty misconduct and all resulted in terminations.
  a. A Custody Assistant was involved in a traffic collision. A collision report cited him with a misdemeanor hit and run charge. He was terminated for making False Statements.
  b. A Deputy Sheriff was involved in a fight at a bar in the community. He was drinking and brandished his duty weapon during the fight. He violated the Department's honesty policy and was terminated.
  c. A Deputy Sheriff reported he was the victim of Criminal Threats. He later appeared in Court, in uniform, and stated the incident did not happen as reported by the Station Deputies. He was terminated for making False Statements.

The Panel recognizes the need for accountability regarding staff's accurate and honest reporting in force packages. The Parties have agreed on revision for 13.1 as part of their ongoing discussions on Accountability. The Panel will implement those revisions once they have been approved by the Court.

**13.1 Status:** Compliance                    **As of Date:** October 1, 2019

## 13.2 Reports of Dishonesty and PREA

**Provision Description:** All findings of dishonesty, failures to report uses of force, and violations of PREA and supporting documentation is provided to the Office of the Inspector General quarterly.

For the Thirteenth Reporting Period, the Inspector General was advised of all the actions noted above in Section 13.1.

**13.2 Status:** Compliance                    **As of Date:** October 1, 2019

## 14.1 Review of Criminal Referrals

**Provision Description:** An additional review of referrals of inmates for criminal prosecution arising from incidents involving the use of force by Department members must be performed to ensure charges are not being brought to help justify the use of force.

> *Compliance Measures Summary:* Requires the Department to review all referrals of an inmate for criminal prosecution for assaulting a staff member and report to the Monitors

32

that 95% of referrals were reviewed by the Unit Commander who verified charges were not brought as justification for use of force.

The Department reports 95% compliance with Section 14.1 for the First Quarter of 2023. There was a total of 41 cases referred to the District Attorney's Office and in 39 of those cases, the Unit Commander verified the charges were not brought as a justification for a use of force prior to the referral being sent to the District Attorney's Office. In the remaining 2 cases, the Unit Commander verified the charges were not brought as justification for a use of force within six weeks after the referral had been made. For the Second Quarter of 2023, 29 cases were referred to the District Attorney's Office. One of the 29 cases was not reviewed by the Unit Commander prior to the referral being sent, resulting in a 96% Compliance rate. The Unit Commander's signature appears on the one outlier case approximately six weeks after it was referred.

**14.1 Status:** Compliance                    **As of Date:** July 1, 2018

## 14.2 Timeliness of Criminal Referrals

**Provision Description:** Timely forward incidents of officer misconduct that may amount to criminal violations to the Office of the District Attorney.

> *Compliance Measures Summary:* Requires the Department review all referrals of a staff member for possible prosecution for alleged misconduct and report to the Monitors that 90% of referrals were sent to the Office of the District Attorney within six months.

Source documents indicate there were no cases referred to the District Attorney for possible prosecution of a staff member during the First and Second Quarters of 2023. There was no data to assess for this reporting period.

**14.2 Status:** Compliance                    **As of Date:** July 1, 2018

| Reporting & Investigations, Department Reported | | Eleventh Report | Twelfth Report | Thirteenth Report | | |
|---|---|---|---|---|---|---|
| No. | Provision | 3Q21 - 2Q22 | 3Q22 - 4Q22 | 1Q23 - 2Q23 | AS OF | 3YR+ |
| 5.1 | Tracking of Force Incidents | C | X | X | | |
| 8.3 | CFRC Review | C | C | C | 6/30/2021 | |
| 11.1 | CFRT Involvement | C | C | C | 6/30/2018 | ✓ |
| 13.1 | Documenting Dishonesty | C | C | C | 10/1/2019 | ✓ |
| 13.2 | Reports of Dishonesty/PREA | C | C | C | 10/1/2019 | ✓ |
| 14.1 | Review of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |
| 14.2 | Timeliness of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |

# C. Quarterly Findings—Reporting and Investigations Provisions

## First Quarter and Second Quarter 2023 Results

For the First and Second Quarters of 2023, the Panel reviewed 50 use of force incidents combined—12 from TTCF (24%), 23 from MCJ (46%), and 15 from IRC (30%). The Department is not in Compliance with six (6) of the seventeen (17) Reporting & Investigations Provisions as follows: (1) 12.2 Location of Inmate Interviews, (2) 15.3 Force by Other Members, (3) 15.4 Description of Injuries, (4) 15.5 Clarification After Video, (5) 15.6 Separation of Deputies, and (6) 16.2 Photographs of Injuries.

Of the six (6) Reporting and Investigations Provisions out of compliance, two (2) had compliance rates below 70% in 1Q23 and 2Q23 combined. Those provisions include the following:
- 12.2 Location of Inmate Interviews at 52% compliance.
- 15.6 Separation of Deputies to Write Reports at 47% compliance.

The Department was in compliance, or 90% or above, with the following eleven (11) provisions: 4.2, 5.2, 5.3, 12.3, 12.4, 12.5, 15.1, 15.2, 15.7, 16.1, and 16.3.

33

**First Quarter 2023 Results**

For the First Quarter of 2023, the Panel reviewed 25 force incidents—7 from TTCF (28%), 8 from MCJ (32%), and 10 from IRC (40%). The Department was not in Compliance with seven (7) of the seventeen (17) Reporting & Investigations Provisions as follows: (1) 5.3 Unexplained Discrepancies, (2) 12.2 Location of Inmate Interviews, (3) 15.2 All Department Witnesses, (4) 15.3 Force by Other Members, (5) 15.4 Description of Injuries, (6) 15.6 Separation of Deputies, and (7) 16.2 Photograph of Injuries.

Of the seven (7) Reporting and Investigations Provisions out of compliance, two (2) had compliance rates below 70% in 1Q23. Those provisions include the following:

- 12.2 Location of Inmate Interviews at 55% compliance.
- 15.6 Separation of Deputies to Write Reports at 38% compliance.

The Department was in full compliance, or 90% or above, with the following ten (10) provisions: 4.2, 5.2, 12.3, 12.4, 12.5, 15.1, 15.5, 15.7, 16.1, and 16.3.

**Second Quarter 2023 Results**

In the Second Quarter of 2023, the Panel reviewed 25 force incidents—5 from TTCF (20%), 15 from MCJ (60%), and 5 from IRC (20%) The Department is not in Compliance with seven (7) of the seventeen (17) Reporting & Investigations Provisions as follows: (1) 12.2 Location on Inmate Interviews, (2) 12.3 Suspect Interviews, (3) 15.1 Timeliness of Reports, (4) 15.4 Description of Injuries, (5) 15.5 Clarification After Video, (6) 15.6 Separation of Deputies to Write Reports, and (7) 16.2 Photographs of Injuries.

Of the seven (7) Reporting and Investigations Provisions out of compliance, three (3) had compliance rates below 70% in 2Q23. Those provisions include the following:

- 12.2 Location of Inmate Interviews at 50% compliance.
- 15.5 Clarification After Video at 63% compliance.
- 15.6 Separation of Deputies to Write Reports at 56% compliance.

The Department was in full compliance, or 90% or above, with the following ten (10) provisions: 4.2, 5.2, 5.3, 12.4, 12.5, 15.2, 15.3, 15.7, 16.1, and 16.3.

34

# V. Inmate Grievances

The Action Plan requires extensive changes in how the Department handles inmate grievances and requests for service. On July 15, 2016, the Department issued a new *Inmate Grievance Manual* (Volume 8 of the Custody Division Manual) to implement a new grievance system. The Panel assessed the Department's implementation of the new grievance system in the Thirteenth Reporting Period as follows:

## A. Grievance Forms

### 6.1 Separate Grievance Forms

**Provision Description:** Inmate grievances and inmate requests must be reported on separate forms, either paper or electronically.

### 6.2 Availability of Grievance Forms

**Provision Description:** Grievance forms are reasonably available to inmates at all times.

During the Panel's March 2023 visit to the Downtown Jail Complex, the boxes within the housing units contained grievance forms.

### 6.6 Right to Appeal Form

**Provision Description:** Grievance forms must include a check box indicating whether the complaint was upheld or denied and a statement regarding the right to appeal and time frame.

> *Compliance Measures Summary:* Monitors determine the availability of forms and requirements of 6.1 through 6.6 through onsite visits, interviews with inmates and staff, and a review of 25 consecutive force and retaliation grievances in a month.

The Panel has previously concluded that the forms meet the requirements of the Action Plan and include the appeals check box.

**6.1, 6.2, and 6.6 Status:** Compliance    **As of Date:** January 1, 2017

### 7.1 Conflict Resolution Meeting

**Provision Description:** Inmates who submit grievances should be advised that a conflict resolution meeting is voluntary to address the grievances without a personnel investigation. If successful, the grievance resolution is documented accordingly.

In randomly selected months in the First and Second Quarters of 2023, no grievances against staff were adjudicated in which a Conflict Resolution was conducted. There was no data to assess from any facility.

**7.1 Status:** Compliance                **As of Date:** January 1, 2017

### 6.4 Use of Force Grievances

**Provision Description:** Grievance forms should include "use of force" as a specific category of "grievances against staff" and brought to the attention of Unit Commanders.

> *Compliance Measure Summary:* 90% of force grievances reviewed were brought to the attention of the Unit Commander within 10 days of receipt and properly handled.

The Department reports that 78% of force grievances were in Compliance with Section 6.4 in the First Quarter of 2023. The Department achieved 100% Compliance in the Second Quarter of 2023.

**6.4 Status:** Out of Compliance            **As of Date:** N/A

35

## 6.5 Grievances Against Staff

**Provision Description:** Grievance forms should include "retaliation" and "harassment" as specific categories of "grievances against staff" and brought to the attention of Unit Commanders.

>  *Compliance Measure Summary:* 90% retaliation grievances reviewed were brought to the attention of the Unit Commander within 10 days of receipt and properly handled.

The Department reports that 100% of the retaliation grievances (19) in the First Quarter of 2023 were brought to the Unit Commanders attention within 10 days and handled appropriately. In the Second Quarter of 2023, 97% of the grievances were handled appropriately. Of the 34 grievances that met the criteria, the Unit Commander was not notified about 1 of those grievances within the 10-day timeframe.

**6.5 Status:** Compliance                  **As of Date:** July 1, 2023


# B. Emergency Grievances

## 6.3 Emergency Grievance Forms

**Provision Description:** A prominent box is placed on the form to indicate an "Emergency Grievance."

>  *Compliance Measure Summary:* Monitors verify compliance with 6.3 through interviews of staff and inmates and review of grievances marked "emergency.

A prominent box is located on the grievance form and confirmed through reviews and interviews.

**6.3 Status:** Compliance                  **As of Date:** January 1, 2017


## 6.7 Handling Emergency Grievances

**Provision Description:** Grievances marked "emergency" are given to and reviewed by a supervisor as soon as possible to determine if immediate action is needed to protect life or safety. Provide the inmate a written response documenting action taken to address the emergency.

>  *Compliance Measure Summary:* Monitors review 50 consecutive grievances to ensure 95% of grievances marked "emergency" were reviewed and handled pursuant to Section 6.7.

The Department's Thirteenth Self-Assessment reflects it achieved 100% compliance in the First and Second Quarters of 2023. There was only one grievance that met the criteria for Section 6.7 for the Thirteenth Reporting Period and timely notification was provided to the inmate in that case.

.                  **6.7 Status:** Compliance                  **As of Date:** July 1, 2018


## 6.8 Notification of Non-Emergency

**Provision Description:** If the grievance is determined to be non-emergent, the inmate is notified as soon as practical that the grievance will be handled as non-emergent with reason documented.

>  *Compliance Measure Summary:* Monitors review 50 consecutive grievances to ensure 90% of those determined non-emergent were documented and notifications to inmates were made within five days.

For the First Quarter of 2023, 98% of the grievances were correctly downgraded and the inmate was timely notified that the grievance would be handled as non-emergent. The Department achieved 92% compliance with this provision in the Second Quarter of 2023. There were 4 of the 50 grievances in which the inmate did not receive timely notification that their grievances would be handled as non-emergent.

**6.8 Status:** Compliance                  **As of Date:** July 1, 2018

36

## C. Inmate Grievance Coordinator

The recommendations in Sections 6.9, 6.13, 6.14, and 6.15 of the Action Plan address expectations and duties of the Inmate Grievance Coordinator position.

### 6.9 Inmate Grievance Coordinator

**Provision Description:** Requires all emergency grievances be forwarded to the Inmate Grievance Coordinator (IGC) who will review for proper handling and notify the Unit Commander if not properly handled.

The Department's posted data pertaining to Section 6.9 indicates the IGC received the emergency grievances for the Thirteenth Reporting Period and there was no need to notify the Unit Commander of improperly handled grievances. The way the data was tracked during this Reporting Period was not entirely clear, particularly with the use of the "Null" Category. In response to the Panel's Thirteenth Draft Report, the Department advised the Custody Inmate Grievance Application (CIGA) was created and replaced the old system on June 1, 2024. Posted data for this provision should be clearer in the future.

**6.9 Status:** Compliance          **As of Date:** July 1, 2018

### 6.13 Grievance Coordinator Tracking

**Provision Description:** Regularly track the handling of inmate grievances to ensure the investigations are completed timely and reasonably, and that inmates are notified of the results of the investigations.

### 6.14 Grievance Coordinator Reports

**Provision Description:** Provide a monthly report to Unit Commanders on the status of grievances, timeliness of investigations, responses to grievances and appeals, and inmate notifications.

### 6.15 Grievance Coordinator Analysis

**Provision Description:** Analyze inmate grievances monthly to identify any problematic trends and provide that analysis in a monthly report to Unit Commanders and senior management.

> *Compliance Measures Summary:* Provide the Monitors with one or more quarterly reports to address all requirements of the Coordinator provisions. The Inmate Grievance Coordinator will meet with the Monitors once a quarter.

The Department's posted documentation for the First and Second Quarters of 2023 includes detailed reports and charts for managers as required by Sections 6.13, 6.14, and 6.15.

The Panel met with the Compliance and Sustainability Grievance Team in March 2023 to discuss the Department's implementation of its grievance policies and procedures and overall trends with respect to the Department's handling of inmate grievances.

**6.13, 6.14, and 6.15 Status:** Compliance          **As of Date:** July 1, 2018

### 6.16 Centralized Grievance Unit

**Provision Description:** Establish a centralized unit to collect, review, categorize, forward for investigations, and make appropriate notifications for inmate grievances.

The Panel previously determined the Department's structure of a Grievance Coordinator supervising the grievance teams at all of the Downtown Jail Complex facilities was equivalent in function to a centralized system and was acceptable, pending progress and specific results. The Panel continues to deem the Department's Grievance Team structure acceptable.

**6.16 Status:** Compliance          **As of Date:** January 1, 2017

37

## D. Handling of Grievances

### 6.10 Collection of Grievances

**Provision Description:** Grievances should be collected from the locked grievance boxes on each living unit no less frequently than once per day. Collection time should be recorded in a log and reviewed within 24 hours of collection.

> ***Compliance Measures Summary:*** Monitors will inspect collection boxes, verify that the database is accurate and up-to-date, and ensure that 95% of grievances selected for review are collected, reviewed, entered, and tracked timely.

The Department's Thirteenth Self-Assessment reports that 100% of the reviewed grievances were collected and reviewed within 24 hours and handled as required in the First Quarter of 2023. The collection logs provided by the Department yielded a 96% compliance rate for the Second Quarter of 2023. The Panel has reviewed (and will continue to review) the Unit Collection compliance data to assess compliance with Section 6.10.

As noted in our Eighth Report, the Compliance Measure for Section 6.10 does not yield data sufficient to assess compliance with this provision. For example, the first 25 consecutive grievances at MCJ for the selected months were collected within the first two days of the month. The fact that MCJ timely collected grievances from its collection boxes in those first two days does not provide a meaningful measurement of the Department's compliance with Section 6.10. As such, the Panel has reviewed the Unit Collection compliance data for the entire month to assess compliance with Section 6.10. For the Second Quarter of 2023, MCJ's monthly collection log shows an overall compliance rate of 95%. It is important to note, however, there are some areas within the facility with a very low compliance rate, e.g. 0%, 4%, and 11%. The Panel recommends a Corrective Action Plan be issued to MCJ to address the untimely collection of grievances. The Department has issued this Corrective Action Plan and will include the results in their next Self-Assessment Report.

**6.10 Status:** Compliance             **As of Date:** July 1, 2021

### 6.11 Failure to Properly Handle Grievances

**Provision Description:** Failing to provide an inmate with a grievance form when requested, destroying or concealing grievances, failing to respond appropriately to a grievance, attempting to intimidate an inmate from filing a grievance, and retaliating against an inmate who has filed a grievance, may each be a cause for disciplinary action.

> ***Compliance Measure Summary:*** Provide the Monitors with a log of any inmate grievances about the matters encompassed by Paragraph 6.11, the result of the investigations of those grievances, and documentation that appropriate corrective action was taken in 100% of cases.

For the Thirteenth Reporting Period, the Department reports that no staff members have been found to have engaged in the conduct encompassed by this Provision. In the *Panel's Eleventh Report*, the Panel expressed concern about the accuracy of the Department's method for identifying 6.11 grievances. Following a meeting with the Custody Support Service Grievance Team, the Team adjusted their search criteria. The universe of grievances posted in Sharepoint appears accurate. The Panel finds the Department in Compliance with this provision.

**6.11 Status:** Compliance             **As of Date:** July 1, 2022

38

## 6.12 Tracking Inmate Grievances

**Provision Description:** All inmate grievances should be entered into and tracked in an inmate grievance database that reflects the nature and status of the grievance, and personnel responsible for the Department's handling of the grievance.

> *Compliance Measures Summary:* Monitors will review 25 grievances from MCJ and 25 from TTCF to ensure that 95% of grievances reviewed are collected, reviewed, entered, and tracked timely.

The Department's Thirteenth Self-Assessment reports that 98% of the grievances at both MCJ and TTCF in the randomly selected months in the First and Second Quarters of 2023 were entered into the database as required by Section 6.12. The source documents for these results were available to, and reviewed by, the Panel.

**6.12 Status:** Compliance                **As of Date:** July 1, 2018

## 8.1 Anti-Retaliation

**Provision Description:** Prohibits Department personnel from retaliating against inmates.

> *Compliance Measures Summary:* Department implements and enforces an anti-retaliation policy and provides Monitors with a quarterly log of cases and findings as well as the first 25 investigations alleging retaliation.

The Department posted the results of the investigations approved by Unit Commanders in the randomly selected months and the number of anti-retaliation grievances received and investigated in the First and Second Quarters of 2023, which were as follows:

- First Quarter of 2023 there were 31 anti-retaliation grievances received, and one investigation completed that did not result in a sustained violation of the anti-retaliation policy.
- Second Quarter of 2023 there were 75 anti-retaliation grievances received, and six investigations completed that resulted in no founded violations of the anti-retaliation policy.

The Panel notes that out of the 106 grievances received during this Reporting Period, only seven investigations were completed.   The Department should address the backlog in these investigations.

**8.1 Status:** Compliance                **As of Date:** April 1, 2019

# E.  Deadlines

## 6.17 Use of Force Deadlines

**Provision Description**: A 30-day deadline in place for filing use of force grievances by inmates.

> *Compliance Measures Summary:* 1(a), 95% compliance with the first 25 use of force grievances determined by the Department to be untimely.

The Department's source documents for this provision indicate the Department achieved 100% Compliance for the Thirteenth Reporting Period. There were 6 grievances that met the criteria of this provision, and they were all handled appropriately in accordance with 6.17.

The Panel requests that the Department update the Grievance Forms to reflect the 30-day deadline noted in this Provision.

**6.17 Status:**  Compliance                **As of Date:** October 1, 2019

## 6.18 PREA Deadline

**Provision Description:** There should be no deadline for filing Prison Rape Elimination Act grievances.

> *Compliance Measures Summary:* 1(b), 95% compliance with the first 25 PREA grievances.

39

There were 5 grievances filed during the First Quarter of 2023 and 5 filed during the Second Quarter of 2023 that met the criteria for Section 6.18. They all were handled appropriately in accordance with 6.18.

The Panel requests that the Department update the Grievance Forms to reflect the lack of a deadline for filing a PREA grievance.

**6.18 Status:**  Compliance          **As of Date:** July 1, 2018

## 6.19 Response to Inmate Grievances

**Provision Description:** Department should respond to inmate grievances "within 15 calendar days after the submission of the grievance," absent exceptional circumstances, which must be documented.

> *Compliance Measures Summary:* 1(d and e), 90% compliance with the first 25 grievances against staff and the first 25 grievances not against staff in which the investigation was not completed within 15 days.

The Department reports responding to the randomly selected 25 grievances that were not against staff, within the 15-day deadline, 100% of the time for the Thirteenth Reporting Period. For the 25 randomly selected grievances against staff, the Department's documents indicate they met the 15-day deadline in 72% of the cases in the First Quarter of 2023 and 92% of the cases in the Second Quarter of 2023.  The 72% Compliance rate is not compliant. TTCF was given a Corrective Action Plan and staff received training on how to document the notification in the new system. The Department's Thirteenth Self-Assessment indicates they achieved an overall 96% Compliance rate for the Second Quarter of 2023.

As noted in the Twelfth Report, the purpose of this provision is to ensure inmates receive a substantive response to their grievance in a timely manner. The provision contemplates responses beyond the 15-day deadline to be rare occurrences, which is not what the data shows. The Panel's review of the source documents found the Department is providing an inmate with either an extension or an interim response within 15 days. For example, out of the 25 grievances identified for 6.19 (d) for the Second Quarter of 2023, there were 23 extensions given and 2 had their disposition/status modified.

**6.19 Status:**  Out of Compliance          **As of Date:** N/A

## 6.20 Appeals of Grievances

**Provision Description:** Inmates should have 15 days from receipt of a denial of a grievance (or from release from segregations) to file an appeal of the grievance.

> *Compliance Measures Summary:* 1(c), 95% compliance with the first 25 appeals of grievances determined by the Department to be untimely.

According to the Department's source documents, there were no appeals that met the criteria for this provision during the Thirteenth Reporting Period.

**6.20 Status:**  Compliance          **As of Date:** July 1, 2018

# F.  Communications with Inmates

## 7.2 Notification of Results

**Provision Description:** Inmate should be advised of the results of the investigation of grievances against personnel, but not any sanction imposed, within 10 days of adjudication.

> *Compliance Measures Summary:* 1(f), 90% compliance with the first 25 completed grievances against staff, including the inmate notifications.

40

The Thirteenth Self-Assessment reports 100% Compliance with this provision in the First Quarter of 2023. There were only 2 grievances that met the criteria for this provision and timely notifications to the inmates were made. For the Second Quarter of 2023, the Department's Compliance rate was 86%, which is below the 90% rate required. Specifically, in 6 out of the 7 grievances against staff reviewed, the inmate was notified of the adjudication of the grievance within the required 10-day timeframe. MCJ was issued a Corrective Action Plan for failure to provide the inmate a written response within 10 calendar days of the Unit Commander's adjudication date. Ordinarily, the Panel would consider finding the Department in Compliance with such a small number of grievances and only having 1 out of compliance. However, the Department only achieved 68% Compliance for this provision for the Third Quarter of 2022 and MCJ was issued a Corrective Action Plan at that time. Timely notification to the inmate once the grievance is adjudicated continues to be an issue. The Panel finds the Department Out of Compliance.

**7.2 Status:** Out of Compliance        **As of Date**: N/A

## 7.3 Prisoner-Staff Communications

**Provision Description:** The Department should ensure that there are adequate avenues for constructive prisoner-staff communication, such as Town Hall meetings.

> *Compliance Measures Summary:* Maintain logs of Town Hall meetings and report to the Monitors that each jail facility has conducted Town Hall meetings for a randomly selected month per quarter. Monitors interview inmates and staff to assess the adequacy of communications.

The Department's Thirteenth Self-Assessment reports that the Department was in Compliance with Section 7.3 during both the First and Second Quarters of 2023. The Department provided 10% of the recorded prisoner-staff communications that occurred during Town Hall meetings at MCJ and TTCF during the randomly selected months during the Thirteenth Reporting Period, which included Town Hall meetings in special housing units as well as in General Population housing units.

**7.3  Status:** Compliance        **As of Date:** January 1, 2023

| Grievance Provisions | | Eleventh Report | Twelfth Report | Thirteenth Report | | |
|---|---|---|---|---|---|---|
| No. | Provision | 3Q21 - 2Q22 | 3Q22 - 4Q22 | 1Q23 - 2Q23 | AS OF | 3YR+ |
| 6.1 | Separate Grievance Forms | C | C | C | 1/1/2017 | ✓ |
| 6.2 | Availabilty of Grievance Forms | C | C | C | 1/1/2017 | ✓ |
| 6.3 | Emergency Grievances Forms | C | C | C | 1/1/2017 | ✓ |
| 6.4 | Use of Force Grievances | C | C | X | | |
| 6.5 | Grievances Against Staff | C | X | C | 7/1/2023 | |
| 6.6 | Right to Appeal Form | C | C | C | 1/1/2017 | ✓ |
| 6.7 | Handling Emergency Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.8 | Notification of Non-Emergency | C | C | C | 7/1/2018 | ✓ |
| 6.9 | Grievance Coordinator Review | C | C | C | 7/1/2018 | ✓ |
| 6.10 | Collection of Grievances | C | C | C | 7/1/2021 | |
| 6.11 | Failure to Handle Grievances | C | C | C | 7/1/2022 | |
| 6.12 | Tracking Inmate Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.13 | Grievance Coordinator Tracking | C | C | C | 7/1/2018 | ✓ |
| 6.14 | Grievance Coordinator Reports | C | C | C | 7/1/2018 | ✓ |
| 6.15 | Grievance Coordinator Analysis | C | C | C | 7/1/2018 | ✓ |
| 6.16 | Centralized Grievance Unit | C | C | C | 7/1/2017 | ✓ |
| 6.17 | Use of Force Deadline | C | C | C | 10/1/2019 | ✓ |
| 6.18 | PREA Deadline | C | C | C | 7/1/2018 | ✓ |
| 6.19 | Response to Inmate Grievances | C | C | X | | |
| 6.20 | Appeals to Grievances | C | C | C | 7/1/2018 | ✓ |
| 7.1 | Conflict Resolution Meeting | C | C | C | 1/1/2017 | ✓ |
| 7.2 | Notification of Results | C | X | X | | |
| 7.3 | Prisoner-Staff Communications | X | C | C | 1/1/2023 | |
| 8.1 | Anti-Retaliation | C | C | C | 4/1/2019 | ✓ |

41

# VI.    Use of Restraints

## 17.1 Restraint Provisions

**Provision Description:** Custody Force Manual must include "a separate section that sets forth the general principles governing the use of restraints."

The Panel concludes that the Department included such a separate section in the Manual.
             **17.1 Status:** Compliance                    **As of Date:** December 1, 2015

## 17.3 Safety Chair Procedures

**Provision Description:** Requires immediate medical examinations of inmates placed in Safety Chairs with a use of force, or if the inmate struggles against the Safety Chair restraints. Section 17.3 also requires that inmates' vitals are checked every hour while in the Safety Chair.

> *Compliance Measures Summary:* Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex. The Monitors conduct a Vertical and Horizontal Assessment of approximately 25 incidents to determine at least 90% compliance with restraint provisions.

During the Thirteenth Reporting Period, the Department provided the Inmate Safety Chair Security Check Logs and Fixed Restraint Logs at the Downtown Jail Complex for the First and Second Quarters of 2023. The Panel's auditors continue to note there is no indication that medical professionals, or any Custody personnel, are performing hourly vitals checks even though inmates are often in the safety chairs for several hours while in transport to and from court and during court proceedings. As noted in previous Panel Reports, periodic vitals checks are necessary to establish compliance even if the inmate does not struggle and force is not used to place the inmate in the Safety Chair.  Out of the 10 and 14 safety chair records provided for the First and Second Quarters of 2023, the Panel's auditors noted that there were no explicit indications of a use of force to place an inmate into the chairs.  However, the source documentation provided for three records were inconclusive as to whether a use of force was used to place the inmate in the safety chair.  Due to vital checks not occurring as required, the Department remains out of Compliance with Section 17.3.
             **17.3 Status:** Out of Compliance           **As of Date:** N/A

## 17.4 Safety Checks

**Provision Description:** Requires safety checks of inmates in fixed restraints every twenty minutes to verify and document the inmate is not in undue pain or that restraints are not creating injury.

> *Compliance Measures Summary:* Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex. The Monitors conduct a Vertical and Horizontal Assessment of approximately 25 incidents to determine at least 90% compliance with restraint provisions.

The Inmate Safety Chair Security Check Logs and Fixed Restraint Logs reflect that Department personnel generally conduct safety checks on many inmates every twenty minutes, as required by Section 17.4.[12]

---

[12] While the use of safety chairs for inmate movement are not subject to Section 17.4, it should be noted that the Department's policy requires safety checks to be recorded every 15 minutes, which the majority of checks fall within. Based on the Department's posted results, all but two safety chair records provided for the First and Second

42

However, fixed restraint logs provided for the five inmates during the First Quarter of 2023 and 18 during the Second Quarter of 2023 did not explicitly document personnel verifying that the inmate was not in undue pain or that the restraints were not causing injury.[13] Two records where a safety chair was not used for transportation, but rather as a means of temporary control, indicate that there were no visible signs of injury or complaint of pain. Due to the Fixed Restraint Logs not explicitly documenting whether the inmate was in undue pain or that the restraints were not causing injury, the Department remains Out of Compliance with Section 17.4.

**17.4 Status:** Out of Compliance    **As of Date:** N/A

## 17.6 – 17.9 Multi-Point Restraints

**Provision Descriptions:** The provisions in these sections are specific to the use and application of multi-point restraints. The Department does not employ multi-point restraints and these provisions are therefore not applicable.

**17.6 – 17.9 Status:** Not Applicable    **As of Date:** N/A

## 17.10 Involuntary Medications

**Provision Description:** The Department's Custody use of force policies should provide that medication may not be used solely for security purposes.

> ***Compliance Measures Summary:*** Department will provide a log documenting the administration of involuntary medications and the reason for it. Monitors will review the log and interview involved medical and mental health professionals to verify medication was not used solely for security purposes.

The Department's posted results reflect that every administration of involuntary medications was pursuant to court order and there were no instances in which medication was used solely for security purposes during the Thirteenth Reporting Period. According to the log of Administration of Involuntary Medication, 422 inmates in the First Quarter of 2023 and 332 inmates in the Second Quarter of 2023 received involuntary medication.

**17.10 Status:** Compliance    **As of Date:** July 1, 2018

| Use of Restraint Provisions | | Eleventh Report | Twelfth Report | Thirteenth Report | | |
|---|---|---|---|---|---|---|
| **No.** | **Provision** | **3Q21 - 2Q22** | **3Q22 - 4Q22** | **1Q23 - 2Q23** | **AS OF** | **3YR+** |
| 17.1 | Restraint Provisions | C | C | C | 12/1/2015 | ✓ |
| 17.3 | Safety Chair Procedures | X | X | X | | |
| 17.4 | Safety Checks | X | X | X | | |
| 17.6 | Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.7 | Approval of Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.8 | Continued Use of Restraints | N/A | N/A | N/A | | |
| 17.9 | Supervisor Approval of Restraints | N/A | N/A | N/A | | |
| 17.10 | Involuntary Medication | C | C | C | 7/1/2018 | ✓ |

Quarters of 2023 are related to transportation. The Department did not provide any WRAP Restraint/WRAP Cart Security Check Logs for this Reporting Period. The Parties have agreed to a policy to govern the use of the WRAP restraint. The Panel has submitted a draft WRAP Restraint Provision and Compliance Measure to the Parties. The parties have submitted their comments on the draft and discussions are ongoing.

[13] Unlike the Inmate Safety Chair Security Check Logs, which contain a field verifying whether or not there were "any visible signs of injury or complaint of pain caused by safety chair[,]" the Fixed Restraint Logs do not contain a similar field.

43

# VII. Early Warning System

## 19.1 Development of EWS

**Provision Description:** Develop a system to identify potentially problematic Department members based upon objective criteria, such as number of force incidents, inmate grievances, allegations of misconduct, performance reviews, and policy violations.

> ***Compliance Measure Summary:*** The system identifies potentially problematic employees upon objective criteria.

The Panel approved the Employee Review System ("ERS") in July 2018, and it was implemented by the Department as a pilot program in the Downtown Jail Complex on August 1, 2018, and in the rest of the jail facilities as of November 1, 2018.

**19.1 Status:** Compliance          **As of Date:** August 1, 2018

## 19.2 Review of EWS Reports

**Provision Description:** Compliance Lieutenants must review reports monthly to identify potentially problematic Department members and promptly notify the Unit Commander and the Assistant Sheriff for Custody Operations in writing.

> ***Compliance Measure Summary:*** Unit Commanders make notifications within ten days 90% of the time and within thirty days 95% of the time.

For the First and Second Quarters of 2023, the Department's posted results indicate the Compliance Lieutenant notified the appropriate Unit Commander and the Assistant Sheriff for Custody Operations in writing of potentially problematic employees within 10 days of receiving the monthly reports 100% of the time, and within thirty days 100% of the time.

The Department's Early Warning System identified 12 employees as potentially problematic during the First Quarter of 2023: one was identified in error, one was resolved through Conflict Resolution, two were reassigned to positions less likely to have contact with inmates with mental illness and placed in a performance mentoring program. The Department determined no further action was needed for the remaining 8 employees. For the Second Quarter of 2023, there were 14 Department members identified as potentially problematic. The Department is awaiting the outcome of administrative investigations for two of the employees. Two other employees were reassigned from their posts and placed in a performance monitoring program. One employee resigned and the Department determined no further action was needed for the remaining nine employees.

**19.2 Status:** Compliance          **As of Date:** January 1, 2023

## 19.3 Performance Mentoring Programs

**Provision Description:** Unit Commanders required to determine whether problematic employees should be placed on a performance mentoring program. For each potentially problematic Department member identified through the EWS, the Unit Commander must consult with the appropriate Chief and document the reasons why any problematic members are not placed on a performance mentoring program.

> ***Compliance Measure Summary:*** Chief is consulted 95% of the time to determine if a non-disciplinary performance program is appropriate. If so, specific performance metrics were in place and the reason for the decision was provided 95% of the time.

For the Thirteenth Reporting Period, the Department's posted results reflect 100% compliance with this provision. The posted source documents for these results were available to, and reviewed by, the Panel.

**19.3 Status:** Compliance          **As of Date:** July 1, 2022

44

| Early Warning System Provisions | | Eleventh Report | Twelfth Report | Thirteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 19.1 | Development of EWS | C | C | C | 8/1/2018 | ✓ |
| 19.2 | Review of EWS Reports | X | C | C | 1/1/2023 | |
| 19.3 | Performance Mentoring Programs | C | C | C | 7/1/2022 | |

45

# Appendix A: Compliance Chart

| Thirteenth Report Compliance Chart | | | | | |
|---|---|---|---|---|---|
| **Administrative Provisions** | | **Eleventh Report** | **Twelfth Report** | **Thirteenth Report** | |
| No. | Provision | 3Q21 - 2Q22 | 3Q22 - 4Q22 | 1Q23 - 2Q23 | AS OF | 3YR+ |
| 1.1 | Assistant Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.2 | Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.3 | Supervision | X | X | X | | |
| 1.4 | Reports to Board | C | C | C | 6/12/2018 | ✓ |
| 10.1 | Jail Visits | C | C | C | 6/30/2018 | ✓ |
| 10.2 | Documented Visits | C | C | X | | |
| 18.1 | Rotation in Custody | C | C | C | 6/30/2018 | ✓ |
| 18.2 | Documentation of Rotation | C | C | C | 1/1/2019 | ✓ |
| 21.1 | Transfers to Custody | C | C | C | 6/30/2018 | ✓ |
| **Use of Force Policy Provisions** | | **Eleventh Report** | **Twelfth Report** | **Thirteenth Report** | **AS OF** | **3YR+** |
| 2.1 | Custody Force Manual | C | C | C | 1/1/2017 | ✓ |
| 8.2 | Complaints of Retaliation | C | C | C | 1/1/2017 | ✓ |
| 17.2 | Pregnant Inmates | C | C | C | 1/1/2017 | ✓ |
| 20.1 | Categories of Force | C | C | C | 1/1/2017 | ✓ |
| 20.2 | Reactive Force | C | C | C | 1/1/2017 | ✓ |
| **Use of Force Practice Provisions, Packet Review** | | **Eleventh Report** | **Twelfth Report** | **Thirteenth Report** | **AS OF** | **3YR+** |
| 2.2 | Force Prevention Principles | 67% | 40% | 58% | | |
| 2.3 | Inmate on Inmate Violence | 98% | 81% | 87% | | |
| 2.4 | Use of Force as Discipline | 99% | 98% | 94% | 7/1/2019 | ✓ |
| 2.5 | Force on Restrained Inmates | 84% | 86% | 95% | 7/1/2023 | |
| 2.6 | Head Strikes or Kicks | 65% | 52% | 64% | | |
| 2.7 | Supervisors Called to Scene | 81% | 90% | 78% | | |
| 2.8 | Prevent Excessive Force | 94% | 86% | 60% | | |
| 2.9 | Armed Inmates | 100% | 88% | 71% | | |
| 2.10 | Authorized Weapons | 97% | 95% | 85% | | |
| 2.11 | Planned Chemical Spray | 90% | 80% | 100% | 7/1/2023 | |
| 2.12 | Chemical Spray & Tasers | 93% | 95% | 100% | 7/1/2019 | ✓ |
| 2.13 | Check of Medical Records | 68% | 71% | 100% | 7/1/2023 | |
| 4.1 | Consult Mental Health Professionals | 77% | 90% | 100% | 7/1/2023 | |
| 4.3 | Spray on Mental Health Inmates | 100% | 100% | 100% | 10/1/2019 | ✓ |
| 4.4 | Cooling Off Periods | 81% | 100% | 83% | 1/1/2023 | |
| 4.5 | Medical or Mental Health Provider Order | 75% | 100% | 100% | 1/1/2023 | |
| 9.2 | Escorting of Inmates | 96% | 90% | 92% | 1/1/2020 | ✓ |
| 9.3 | Duty to Protect & Intervene | 100% | 100% | 100% | 7/1/2022 | |
| 17.5 | Minimize Medical Distress | 56% | 49% | 61% | | |
| 20.3 | Planned Use of Force | 68% | 62% | 100% | 7/1/2023 | |

46

| Training Provisions | | Eleventh Report | Twelfth Report | Thirteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 3.1 | Use of Force Training | C | C | C | 12/31/2021 | |
| 3.2 | Ethics & Professionalism | C | C | C | 6/30/2018 | ✓ |
| 3.3 | Custody Training | C | C | C | 6/30/2018 | ✓ |
| 3.4 | Custody-based Scenarios | C | C | C | 6/30/2018 | ✓ |
| 3.5 | Add Training and Mentoring | C | C | C | 7/1/2019 | ✓ |
| 3.6 | Probation Reviews | X | C | C | 1/1/2023 | |
| 4.6 | Crisis Intervention | C | C | C | 6/30/2018 | ✓ |
| 4.7 | Mentally Ill Inmates | X | C | C | 1/1/2023 | |
| 4.8 | Mentally Ill Inmates (new staff) | C | C | C | 6/30/2018 | ✓ |
| 4.9 | Crisis Intervention (new staff) | C | C | C | 6/30/2018 | ✓ |
| 12.1 | Force Investigations | C | C | C | 7/1/2019 | ✓ |
| **Reporting & Investigations, Department Reported** | | **Eleventh Report** | **Twelfth Report** | **Thirteenth Report** | **AS OF** | **3YR+** |
| 5.1 | Tracking of Force Incidents | C | X | X | | |
| 8.3 | CFRC Review | C | C | C | 6/30/2021 | |
| 11.1 | CFRT Involvement | C | C | C | 6/30/2018 | ✓ |
| 13.1 | Documenting Dishonesty | C | C | C | 10/1/2019 | ✓ |
| 13.2 | Reports of Dishonesty/PREA | C | C | C | 10/1/2019 | ✓ |
| 14.1 | Review of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |
| 14.2 | Timeliness of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |
| **Reporting & Investigations, Packet Review** | | **Eleventh Report** | **Twelfth Report** | **Thirteenth Report** | **AS OF** | **3YR+** |
| 4.2 | Mental Health Professionals | 67% | 85% | 100% | 1/1/2023 | |
| 5.2 | Commander's Reviews | 87% | 94% | 94% | 1/1/2023 | |
| 5.3 | Unexplained Discrepancies | 91% | 93% | 95% | 7/1/2022 | |
| 12.2 | Location of Inmate Interviews | 56% | 51% | 52% | | |
| 12.3 | Suspect Interviews | 94% | 90% | 90% | 7/1/2019 | ✓ |
| 12.4 | Uninvolved Supervisors | 90% | 88% | 96% | 7/1/2023 | |
| 12.5 | Standard Order & Format | 99% | 98% | 100% | 7/1/2019 | ✓ |
| 15.1 | Timeliness of Reports | 92% | 94% | 92% | 7/1/2019 | ✓ |
| 15.2 | All Department Witnesses | 95% | 94% | 94% | 7/1/2019 | ✓ |
| 15.3 | Force by Other Members | 82% | 78% | 88% | | |
| 15.4 | Description of Injuries | 90% | 76% | 80% | | |
| 15.5 | Clarification After Video | 94% | 93% | 79% | | |
| 15.6 | Separation of Deputies | 5% | 16% | 47% | | |
| 15.7 | Individual Perceptions | 92% | 90% | 98% | 7/1/2019 | ✓ |
| 16.1 | Healthcare Assessment | 94% | 98% | 98% | 7/1/2019 | ✓ |
| 16.2 | Photograph of Injuries | 74% | 83% | 87% | | |
| 16.3 | Medical Report of Injuries | 96% | 96% | 100% | 7/1/2019 | ✓ |

47

| Grievance Provisions | | Eleventh Report | Twelfth Report | Thirteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 6.1 | Separate Grievance Forms | C | C | C | 1/1/2017 | ✓ |
| 6.2 | Availabilty of Grievance Forms | C | C | C | 1/1/2017 | ✓ |
| 6.3 | Emergency Grievances Forms | C | C | C | 1/1/2017 | ✓ |
| 6.4 | Use of Force Grievances | C | C | X | | |
| 6.5 | Grievances Against Staff | C | X | C | 7/1/2023 | |
| 6.6 | Right to Appeal Form | C | C | C | 1/1/2017 | ✓ |
| 6.7 | Handling Emergency Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.8 | Notification of Non-Emergency | C | C | C | 7/1/2018 | ✓ |
| 6.9 | Grievance Coordinator Review | C | C | C | 7/1/2018 | ✓ |
| 6.10 | Collection of Grievances | C | C | C | 7/1/2021 | |
| 6.11 | Failure to Handle Grievances | C | C | C | 7/1/2022 | |
| 6.12 | Tracking Inmate Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.13 | Grievance Coordinator Tracking | C | C | C | 7/1/2018 | ✓ |
| 6.14 | Grievance Coordinator Reports | C | C | C | 7/1/2018 | ✓ |
| 6.15 | Grievance Coordinator Analysis | C | C | C | 7/1/2018 | ✓ |
| 6.16 | Centralized Grievance Unit | C | C | C | 7/1/2017 | ✓ |
| 6.17 | Use of Force Deadline | C | C | C | 10/1/2019 | ✓ |
| 6.18 | PREA Deadline | C | C | C | 7/1/2018 | ✓ |
| 6.19 | Response to Inmate Grievances | C | C | X | | |
| 6.20 | Appeals to Grievances | C | C | C | 7/1/2018 | ✓ |
| 7.1 | Conflict Resolution Meeting | C | C | C | 1/1/2017 | ✓ |
| 7.2 | Notification of Results | C | X | X | | |
| 7.3 | Prisoner-Staff Communications | X | C | C | 1/1/2023 | |
| 8.1 | Anti-Retaliation | C | C | C | 4/1/2019 | ✓ |
| **Use of Restraint Provisions** | | **Eleventh Report** | **Twelfth Report** | **Thirteenth Report** | **AS OF** | **3YR+** |
| 17.1 | Restraint Provisions | C | C | C | 12/1/2015 | ✓ |
| 17.3 | Safety Chair Procedures | X | X | X | | |
| 17.4 | Safety Checks | X | X | X | | |
| 17.6 | Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.7 | Approval of Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.8 | Continued Use of Restraints | N/A | N/A | N/A | | |
| 17.9 | Supervisor Approval of Restraints | N/A | N/A | N/A | | |
| 17.10 | Involuntary Medication | C | C | C | 7/1/2018 | ✓ |
| **Early Warning System Provisions** | | **Eleventh Report** | **Twelfth Report** | **Thirteenth Report** | **AS OF** | **3YR+** |
| 19.1 | Development of EWS | C | C | C | 8/1/2018 | ✓ |
| 19.2 | Review of EWS Reports | X | C | C | 1/1/2023 | |
| 19.3 | Performance Mentoring Programs | C | C | C | 7/1/2022 | |

48