1  Kathleen M. Kenney
2  343 Sweet Grass Way
   Richmond, KY 40475
3  Email: kkenney4695@gmail.com

4  **Monitor and on behalf of Monitors**
   **Robert Houston and Nicholas E. Mitchell**

5

6              **UNITED STATES DISTRICT COURT**

7          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

8                   **WESTERN DIVISION**

9  ALEX ROSAS, et al.,                Case No. 12-cv-00428-DDP (MRW)
10 Plaintiffs,
   v.                                 **PANEL'S FOURTEENTH REPORT**
11
   LOS ANGELES COUNTY SHERIFF
12 ROBERT LUNA, in his official       Hon. Dean D. Pregerson
   capacity,                          United States District Judge
13
   Defendant.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                      Case No. 12-cv-00428 DDP (MRW)

                    PANEL'S FOURTEENTH REPORT

1       Pursuant to Section V of the Settlement Agreement And Release of Claims, the

2  Monitors appointed by this Court, Kathleen Kenney and Robert Houston (collectively,

3  the "Panel") hereby submit the attached Panel's Fourteenth Report "evaluation Defendant's

4  Compliance with Action Plan" prepared by the Panel for the six-month period from

5  July 1, 2023 to December 31, 2023. This Report takes into consideration the comments

6  from the parties in accordance with Section V of the Settlement Agreement. The Panel

7  is available to answer any questions the Court may have regarding this Report as such

8  times as are convenient for the Court and the parties.

9

10  DATED: November 22, 2024          Respectfully Submitted,

11

12                        KATHLEEN M. KENNEY

13

14

15                        By: /S/ Kathleen M. Kenney

16                        Monitor and on behalf of Monitors

17                        Robert Houston and

18                        Nicholas E. Michell

19

20

21

22

23

24

25

26

27

28

Case No. 12-cv-00428-DDP (MRW)

PANEL'S FOURTEENTH REPORT

# PANEL'S FOURTEENTH REPORT

**Table of Contents**

| | | |
|---|---|---:|
| Panel's Fourteenth Report | | 2 |
| Action Plan Implementation Assessment | | 7 |
| **I.** | **Administrative Provisions** | **7** |
| | A.   Leadership and Accountability | 7 |
| | B.   Management Visits | 12 |
| | C.   Rotations and Transfers | 13 |
| **II.** | **Use of Force Policies and Practices** | **14** |
| | A.   Overall Use of Force Policies | 14 |
| | B.   Use of Force Practices & Review of Force Packages | 15 |
| | C.   Quarterly Findings—Use of Force Provisions | 20 |
| **III.** | **Training** | **22** |
| | A.   Use of Force Training | 22 |
| | B.   Ethics and Professionalism Training | 23 |
| | C.   Mental Health Training | 23 |
| | D.   New Deputy Sheriffs and Custody Assistants | 24 |
| | E.   Sergeant Training | 25 |
| **IV.** | **Reporting and Investigation of Force Incidents** | **26** |
| | A.   Reporting and Investigation Provisions in Force Package Reviews | 26 |
| | B.   Reporting & Investigations Provisions as Reported by Department | 30 |
| | C.   Quarterly Findings—Reporting and Investigations Provisions | 33 |
| **V.** | **Inmate Grievances** | **34** |
| | A.   Grievance Forms | 34 |
| | B.   Emergency Grievances | 35 |
| | C.   Inmate Grievance Coordinator | 36 |
| | D.   Handling of Grievances | 37 |
| | E.   Deadlines | 39 |
| | F.   Communications with Inmates | 40 |
| **VI.** | **Use of Restraints** | **41** |
| **VII.** | **Early Warning System** | **43** |
| Appendix A: Compliance Chart | | 45 |

# Panel's Fourteenth Report

The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan [developed by the Panel] ('Reports') at intervals the Panel shall determine." This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from July 1, 2023, to December 31, 2023 (the "Fourteenth Reporting Period") and it takes into consideration comments received from the Plaintiffs' counsel on October 24, 2024 and the Los Angeles County Sheriff's Department on October 25, 2024.

In May 2014, the Parties retained the Panel "to develop a corrective action plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles" (the "Downtown Jail Complex"). The plan developed by the Panel sets forth provisions in twenty-one areas that the Sheriff is required to implement in the Downtown Jail Complex. The plan was approved by the Court on April 7, 2016. Under Paragraph VIII of the Settlement Agreement, "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')." As of November 1, 2018, the Sheriff's Department (the "Department") has implemented 104 of the Panel's 106 recommendations. The remaining two recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in *United States v. County of Los Angeles, et al.*, CV No. 15-05903 (JEMx) (the "DOJ case").

Since the May 12, 2022 Status Conference, the Parties have been working to develop a written plan to achieve compliance with the following four key areas: (1) eliminating impermissible head strikes; (2) the proper use of the WRAP Restraint; (3) appropriate utilization of force avoidance and de-escalation techniques; and (4) accountability. On July 3, 2024, the Court held a Settlement Conference to assist in resolving the Parties' impasse on the Limitations of Force Policy and the WRAP Restraint Policy.  With the Court's assistance, the Parties finalized these policies at the conclusion of the Settlement Conference. On July 8, 2024, the Parties filed a Stipulation asking the Court to enter an order declaring the policies are final and subject to no further revision absent agreement by the parties, leave from the Court, or until the Department achieves substantial compliance with the provisions of the Settlement Agreement Implementation Plan in this case impacted by these policies for 18 months. *See* Stipulation, *Alex Rosas, et al. V. Leroy Baca,* Case No. CV 12-000248-DPP, Dkt. 323. The Court granted the Parties' Stipulation approving the Department's Limitations on Force and WRAP Policies and ordered the Department to implement those policies as soon as it could carry out the process to do so.  *See* Order Granting Parties' Stipulation Re: Submission of Los Angeles Sheriff's Department Policies, *Alex Rosas, et al. V. Leroy Baca,* Case No. CV 12-000248-DPP, Dkt. 325. The Department published the two policies on August 4, 2024.  The implementation process includes a two-to-three-week grace period for the policies to be briefed and disseminated.  The Department implemented these two policies on September 1, 2024.

The Parties have worked collaboratively on the Panel's proposed revisions to Provisions related to accountability.  Specifically, the Parties have agreed to revisions to Provision 13.1 (Documenting Dishonesty) and 15.7 (Individual Perceptions) and a new Compliance Measure for 1.3 (Accountability for Failing to Address Policy Violations).  A new Provision related to the WRAP Restraint is currently under review by the Parties.  The Parties plan to file a Stipulation by the year's end setting forth all the proposed revisions to the Revised Monitoring Plan and Compliance Measures. Included in the revisions will be the agreed upon list of 18 Provisions to move to non-reporting status.

The Department's overall uses of force at the Downtown facilities continued to trend downward over the past two years, as shown in *Figure 1*. This downward trend continued through each 6-month reporting period, with a 36% decrease between the first half of 2022 (523 incidents) and the last half of 2023 (336 incidents). Further, comparing 2022 totals to 2023 totals shows a 25% decrease in uses of force from 957 in 2022 to 720 in 2023, as shown in *Figure 2*. A more detailed analysis of the total number of use of force incidents by quarter and facility is provided with Provision 1.3 below.



*Figure 1*



*Figure 2*

During the Fourteenth Reporting Period, the Panel reviewed a total of 50 completed force packages selected from a comprehensive list of force incidents compiled by the Department. The Panel did not select force packages randomly or in proportion to the frequency with which various categories of force occur. Rather, the Panel selected for review the force incidents most likely to involve problematic uses of force.[1] The Panel found 43 of the 50 (86%) force packages reviewed compliant with use of force prevention principles of Provision 2.2. This is a notable increase from the 29 out of 50 (58%) incidents compliant with 2.2 in the Thirteenth Reporting Period and the 20 out of 50 (40%) incidents compliant with 2.2 in the Twelfth Reporting Period.

Provision 2.6 of the Action Plan prohibits head strikes and kicks unless (1) the inmate is assaultive (2) there is imminent danger of serious injury and (3) there are no other means to avoid serious physical injury. The Panel found 44 out of the 50 (88%) force packages reviewed compliant with Provision 2.6. This is a notable increase from the 32 out of 50 (64%) incidents compliant with 2.6 in the Thirteenth Reporting Period and the 26 out of 50 (52%) incidents compliant with 2.6 in the Twelfth Reporting Period. The significant increases in compliance status with 2.2 and 2.6 are shown in *Figure 3*.



*Figure 3*

These increases in compliance rates for Provisions 2.2 and 2.6 demonstrate meaningful progress at achieving the goals of the Settlement Agreement during this Reporting Period. One factor driving the increases is the overall reduction in head strikes by Custody Personnel in jails. *Figure 4* reflects the total number of head strikes over two years per facility. Overall, the Department's head strike totals show successive decreases between the first half of 2022 and the second half of 2023. There is a 60% decrease in head strikes over a two-year period from 30 to 12 and a 45% decrease between the Thirteenth



*Figure 4*

(1Q+2Q23) and Fourteenth (3Q+4Q23) Reporting Periods, from 22 to 12, respectively. TTCF had four (4) head strikes, IRC had one (1), and MCJ had seven (7) in the Fourteenth Reporting Period. TTCF decreased from ten (10) to four (4) between the Thirteenth and Fourteenth Reporting Periods. a 60% decrease. IRC decreased from seven (7) to one (1) between the Thirteenth and Fourteenth Reporting

---

[1] The Panel usually selects cases in which staff deployed/utilized the taser, WRAP, or personal weapons.

Periods, an 86% decrease. MCJ increased from five (5) to seven (7) between the Thirteenth and Fourteenth Reporting Periods, which is a 40% increase in the number of head strikes.

Based on preliminary data for the first half of 2024, the Department has not maintained this downward trend yet has also not returned to prior levels. Data provided by the Department shows a 50% increase in total head strikes from 12 to 18 between the last half of 2023 and the first half of 2024, as shown in *Figure 5*. Ongoing data analysis and tracking will determine the impact of compliance with Provisions 2.2 and 2.6 and if the status is maintained.



*Figure 5*

Out of the 50 cases the Panel reviewed, the Department utilized head strikes in 12 of those cases. The Panel found the Department's actions in 6 of the 12 cases met the criteria for 2.6 and were therefore compliant. In the remaining 6 cases, the Department acknowledged concerns with the head strikes in 2 of those cases but did not clearly find a 2.6 violation or request an administrative investigation in those cases. The gap between what the Panel found out of compliance and what the Department found in compliance has narrowed. The Panel has made clear that to further narrow that gap, the Department must hold Deputies accountable for use of force violations and hold supervisory staff accountable when they fail to identify and appropriately address violations. Note that the Department achieved compliance with 2.2 and 2.6 for the group of cases the Panel reviewed for the Fourth Quarter of 2023.[2] The Department has demonstrated its ability to achieve compliance with these critical force provisions and will hopefully focus on maintaining that compliance.

The Panel conducted a series of focus groups with staff and discussions with inmates during its May and August 2024 Monitoring visits. The participants were randomly selected. The Panel continues to find the focus groups and discussions beneficial.

The following ideas were expressed by custody staff during the focus groups:[3]
- Increase in percentage of inmates with mental health issues has resulted in frequent assaults on staff.
- Lowered population in IRC has helped lower incidents in the facility.
- Support having Body-Worn Cameras.
- Do not take advantage of staff "wellness breaks" due to concerns about leaving their partners without sufficient coverage.
- Need to improve accountability for inmate misconduct.
- Department should allow carotid restraint again. It is arguably safer than striking an inmate.
- Provide staff with mixed martial arts classes.
- There are too many restrictions on use of force.
- The Department should make all promotions (Sergeants/Lieutenants) come from within custody. This will improve morale.

---

[2] The cases the Panel reviewed for the Fourth Quarter did not necessarily occur in the Fourth Quarter. Cases are reviewed by the Panel as they are received from the Department.

[3] In May 2024, staff focus groups were comprised of deputies and sergeants from IRC and TTCF. In August 2024, the Panel spoke to deputies and custody assistants from MCJ. The views expressed are not necessarily reflective of the views of all members of custody staff.

The following themes emerged from the group discussions with inmates:[4]
- Staff speak to inmates disrespectfully.
- They have difficulty getting grievance forms and when they file one, they do not receive a response.
- They believe custody staff are administering Narcan to inmates experiencing medical distress from non-drug-related problems such as seizure disorders.
- They raised concerns about air quality, mold, and toilets and sinks not working.
- The majority were not concerned about being subjected to excessive force by staff.
- They are very motivated to participate in programming but are not given the opportunity to do so.
- Food quality and temperature (served cold) were a frequent complaint raised by the inmates.

In addition to speaking with the randomly selected inmates in groups, the Panel also interviewed specific inmates who were identified by Plaintiffs' counsel. They raised concerns about being subjected to excessive use of force, retaliation and harassment. One inmate reported he had refused a Wayside transfer due to a medical condition. He alleges staff grabbed him, threw him on the ground, punched him in the head/eye—possibly using a flashlight—and placed a knee on his neck. These allegations are being investigated by the Department. The Panel has requested to review this Use of Force Package once the investigation and review processes have been completed.

During the Panel's Monitoring visits in May and August 2024, senior Department managers noted staffing shortages continue to be one of the Department's biggest challenges. Staff are mandated to work several overtime shifts per month, negatively impacting morale. In August, the Panel observed that the number of overtime shifts staff are working has improved slightly.  The Panel has previously recommended the Department have a thorough, independent staffing analysis completed to ascertain whether existing staff can be more effectively deployed in a manner that reduces the need for mandatory overtime.  The Department embraced the recommendation and made the formal request for monies necessary to have a consultant perform an independent staffing analysis of the entire Department. The Board of Supervisors has approved the request, and the Department is moving forward with identifying and hiring a contractor to perform this staffing analysis.

Senior managers also reported they are focused on staff wellness and are piloting a program where staff in the facilities are given the opportunity for a wellness break during their shift. The Department continues to work on implementing the Body Worn Camera Program in custody. They are currently negotiating the policy with the unions. Finally, the Panel met with newly appointed Assistant Sheriff Paula L. Tokar in August. She is very familiar with the Rosas case and expressed the Department's commitment to reaching compliance with the Rosas Action Plan.

For the Fourteenth Reporting Period, the Department is found in compliance with 81 of the 100 applicable (104 total) provisions set forth by the Action Plan. Compliance results per category are as follows:
(1)  8 out of 9 of the Administrative Provisions
(2)  16 out of 25 of the Force Provisions
(3)  11 out of 11 of the Training Provisions
(4)  20 out of 24 of the Investigations & Reporting Provisions
(5)  21 out of 24 of the Grievances Provisions
(6)  2 out of 8 of the Restraints Provisions (Note this category includes 4 not applicable provisions.)
(7)  3 out of 3 of the Early Warning System Provisions

---

[4] The Panel spoke with approximately 35 inmates as part of the Focus Groups during May and August 2024. All three facilities were represented in the focus groups. The views expressed by the focus group participants are not necessarily reflective of all inmates.

Provisions determined compliant for the Fourteenth Reporting Period that were found out of compliance in the *Panel's Thirteenth Report* include: 10.2 Housing Unit Documentation, 2.3 Inmate on Inmate Violence, 2.8 Prevent Excessive Force, 15.3 Force by Other Members, 15.4 Description of Injuries, 15.5 Clarification After Video, 16.2 Photographs of Injuries, and 6.4 Use of Force Grievances.

Provisions determined out of compliance for the Fourteenth Reporting that were found in compliance in the *Panel's Thirteenth Report* include: 2.13 Check of Medical Records, 2.12 Chemical Spray and Tasers, 9.2 Escorting of Inmates, 15.1 Timeliness of Reports, and 6.2 Availability of Grievance Forms. The Department had been in compliance with the latter four of these provisions (2.12, 9.2, 15.1, and 6.2) for over three years. See *Appendix A: Compliance Chart* to see compliance status for each provision over the last three reporting periods.

The Panel's Monitoring visits during the Fourteenth Reporting Period occurred in July and October 2023. With regard to the non-force related provisions of the Action Plan, the Department submitted its Fourteenth Self-Assessment Report (the "Fourteenth Self-Assessment") on July 11, 2024. During the Fourteenth Reporting Period, the Panel reviewed records posted by the Department to verify the Department's self-assessments of its compliance with non-force provisions of the Action Plan. The Panel's evaluation of the provisions in the self-assessment reports is included in this Report. The Panel's auditors reviewed source documents associated with the Training Provisions and Restraint Provisions 17.3 and 17.4.

The Department continued to cooperate fully with the Panel during the Fourteenth Reporting Period. The Department and County Counsel responded to our inquiries and requests for documents and information. They engaged in constructive conversations with the Panel regarding use of force incidents, policy issues, and their continuing efforts to implement the terms of the *Rosas* Action Plan. We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.

# Action Plan Implementation Assessment

The Action Plan is divided into seven overarching categories: (1) Administrative; (2) Use of Force; (3) Training; (4) Force Reporting and Force Investigations; (5) Grievances; (6) Restraint; and (7) Early Warning System. Each category contains substantive provisions with corresponding compliance measures. The Panel's findings towards compliance with each provision for the Fourteenth Reporting Period are provided below and organized to mirror the Action Plan.

# I.    Administrative Provisions

## A. Leadership and Accountability

The recommendations in Sections 1.1 through 1.4 of the Action Plan require that Custody be headed by an Assistant Sheriff with no other areas of responsibility, the Sheriff be engaged personally in the management of the jails, the Department's managers be held accountable for any failures to address force problems in the Jails, and that the Department regularly reports to the Board of Supervisors on the use of force in the jails and on its compliance with the Action Plan.

### 1.1 Custody Operations Headed by an Assistant Sheriff

**Provision Description:** Section 1.1 of the Action Plan provides that Custody Operations should continue to be headed by an Assistant Sheriff with no other areas of responsibility assigned.

> *Compliance Measure Summary:* Custody Operations headed by an Assistant Sheriff with no other responsibilities for the duration of the Settlement Agreement.

Custody has been headed by an Assistant Sheriff with no other areas of responsibility since mid-2014. Assistant Sheriff Sergio Aloma served in the role of Assistant Sheriff for Custody Operations – with no other areas of responsibility – during the Fourteenth Reporting Period.

**1.1 Status:** Compliance[5]                    **As of Date:** January 1, 2017

### 1.2 Personal Engagement of the Sheriff

**Provision Description:** Sheriff should be personally engaged in the management of the Department's jail facilities and regularly and adequately monitor the use of force policies and practices and compliance with the Action Plan.

> *Compliance Measure Summary:* Reports every six months on the Sheriff's personal involvement in managing the jail and monitoring use of force policies.

The Department has provided the Panel with a log of frequent meetings that Sheriff Robert Luna had with Assistant Sheriff Aloma during the Third and Fourth Quarters of 2023. Between July 3, 2023 and December 25, 2023, the Sheriff and Assistant Sheriff had 49 meetings in which they discussed such topics as: use of force incidents, the use of less lethal weapons and personal weapons; inmates entering facilities under the influence; de-escalation of force; assaults on staff; suicide attempts; cell extractions; Category 3 incidents and associated injuries; use of force against mentally ill inmates; gassing incidents; dorm disturbances; available detox housing units; facility security concerns; and alternate tactical approaches to address the current inmate population.

---

[5] Use of the term Compliance is a finding of compliance as of a certain date. The Panel's findings are set forth in the Appendix attached. For provisions not in compliance in this Report, the Department has either not yet achieved compliance or is no longer in compliance during the Fourteenth Reporting Period.

*Compliance Measure Summary:* Meet with the Monitors at least once every six months to discuss personal involvement.

The Panel met with Sheriff Robert Luna during our July and October 2023 visits. The Panel addressed a number of issues related to Rosas compliance and specifically noted its concerns related to head strikes. The Panel emphasized the need to hold staff accountable for violations of the Limitations on Force policy.

**1.2 Status:** Compliance                    **As of Date:** January 1, 2017

## 1.3 Accountability for Failing to Address Policy Violations

**Provision Description:** Section 1.3 of the Action Plan provides that Department managers should be held accountable should they fail to address use of force problems at the jail facilities.

*Compliance Measure Summary:* A quarterly report that sets forth the number and rank of personnel found to have violated use of force policies.

*Table 1: Cases with Discipline Imposed*

The Department provided a report for both quarters of the Fourteenth Reporting Period, which is summarized in *Table 1*. There were five cases involving six staff with various use of force policy violations reported in 3Q23—two cases at TTCF, two at MCJ, and one at IRC.[6] In 4Q23, there were six cases involving seven staff with various use of force policy violations—one case at TTCF, three at MCJ, and two at IRC. The resulting discipline for these violations is reflected in *Table 2*.

|  | TTCF | MCJ | IRC | Total |
|---|---|---|---|---|
| 3Q23 | 2 | 2 | 1 | 5 |
| 4Q23 | 1 | 3 | 2 | 6 |

*Table 2: 3Q23 and 4Q23 Discipline Imposed*

| Third Quarter 2023 |  |  |  |
|---|---|---|---|
| **Case No.** | **Facility** | **Rank** | **Discipline** |
| 1 | IRC | Deputy | Discharge |
| 2 | MCJ | Deputy | 2-Day Suspension |
| 3 | MCJ | Deputy | Written Reprimand |
|  | MCJ | Deputy | Resigned |
| 4 | TTCF | Custody Assistant | Written Reprimand |
| 5 | TTCF | Deputy | Written Reprimand |
| **Fourth Quarter 2023** |  |  |  |
| **Case No.** | **Facility** | **Rank** | **Discipline** |
| 1 | IRC | Deputy | 2-day Suspension |
| 2 | MCJ | Deputy | 4-day Suspension |
| 3 | IRC | Custody Assistant | 20-day Suspension |

---

[6] The reporting for Provision 1.3 occurs when the discipline for the founded violation occurs and not when the policy violation occurs. In this Report, the Panel found 7 out of the 50 cases reviewed in violation of the force prevention principles of Section 2.2. The Panel also found 6 out of 12 head strike cases out of compliance with Section 2.6 and 24 cases out of compliance with Section 17.5. Should the Department find staff involved in those cases violated policy, those violations would not be recorded until the quarter the discipline was imposed.

|   | IRC | Deputy | 30-day Suspension |
|---|-----|--------|-------------------|
| 4 | TTCF | Sergeant | Written Reprimand |
| 5 | MCJ | Sergeant | Written Reprimand |
| 6 | MCJ | Deputy | Written Reprimand |

There were eleven (11) cases of use of force policy violations involving nine (9) Deputies, two (2) Sergeants, and two (2) Custody Assistants. The discipline imposed ranged from a Written Reprimand to a Discharge. In the Thirteenth Reporting Period, there were ten (10) cases of use of force policy violations involving fourteen (14) Deputies and one (1) Sergeant. The discipline imposed ranged from a Written Reprimand to a 10-day suspension. (Panel's Thirteenth Report, p. 9). In the Twelfth Reporting Period, there were eight (8) cases of use of force policy violations involving sixteen (16) Deputies, one (1) Custody Assistant, and three (3) Sergeants. The discipline imposed included Written Reprimands and 1-day suspensions. (Panel's Twelfth Report, p.7). The disciplinary sanctions imposed in the Fourteenth Reporting Period appear to be more severe than sanctions imposed in the Twelfth or Thirteenth Reporting Periods. It is important to note, however, no staff were disciplined for an out-of-policy head strike in the Fourteenth Reporting Period. The Panel hopes to be able to provide a more comprehensive assessment of the Department's disciplinary actions imposed for use of force-related violations in the future. The Department will soon provide the Panel and Plaintiffs' counsel with more timely and detailed information related to use of force policy violations and the disciplinary sanctions imposed for those violations. This information will allow the Panel to better track the disciplinary outcome of the use of force packages reviewed.

*Compliance Measure Summary:* Section 1.3 requires the Department to identify each facility in which there was a 25% increase in the number of use of force incidents or Category 3 incidents from the previous quarter.

*Overall Uses of Force*
The Department provided data that reflects the number of use of force incidents per month by facility and category. The monthly numbers have been collapsed into totals by Reporting Period for analysis as shown in *Figure 6*. For the Fourteenth Reporting Period (3Q23 and 4Q23), there were a total of 336 use of force incidents– 167 in 3Q23 and 169 in 4Q23. There are no significant (more than 25%) changes in the total number of use of force incidents between quarters for this reporting period. The Department maintained a steady downward trend in total number of



*Figure 6*

overall incidents up to this reporting period. For example, when comparing 3Q and 4Q of 2022 to 3Q and 4Q of 2023, there was a 23% decrease in total number of incidents—from 434 to 336. However, based on preliminary 2024 data, the Department has increased its number of incidents for the first time in three years—from 336 in the Fourteenth Reporting Period to 402 in 1Q24 and 2Q24, a 20% increase in incidents.

Of the 336 use of force incidents for the Fourteenth Reporting Period, TTCF accounted for 116 of the incidents (35%), MCJ accounted for 169 of the incidents (50%), and IRC accounted for 51 of the incidents (15%)—see *Figure 7*.

*Figure 7*

9

The total uses of force by quarter and category for the Fourteenth Reporting Period are reflected in *Figure 8.*[7,8] For both quarters, the majority of the 336 incidents were Category 1 with 249 total incidents representing 74% of the total number. Category 1 cases involve incidents with no injuries. There were 49 total number of Category 2 incidents representing 15% of all incidents. NCI at 37 total incidents representing 11% of all incidents, and a total of one Category 3 incident representing 0% of all incidents. This allocation pattern resembles trends from previous reports.

The Department is required to address increases of 25% or more for all use of force categories. As noted in *Figure 8*, there were no reportable increases in NCI or Category 1 incidents for this reporting period. Category 2 incidents decreased by 45% from 38 (2Q) to 21 (3Q) and then increased by 33% from 21 (3Q) to 28 (4Q). Category 3 incidents fluctuated from one incident (2Q) to zero incidents (3Q) and back to one (4Q), which represents 100% swings. Category 3 incidents are further discussed in the dedicated *Category 3 Specific* section below.


*Figure 8*

The figures below identify the number of use of force incidents by category per facility. Data is included from both quarters of the Fourteenth Reporting Period (3Q23 and 4Q23) as well as the second quarter of 2023 to reflect any changes of 25% or more between quarters. Note that only the increases or decreases of 25% or more are included in the narrative below.

*Twin Towers Correctional Facility*
For the Fourteenth Reporting Period, TTCF had a total of 116 use of force incidents—58 in each quarter. *Figure 9* depicts the total number of incidents by category over three quarters. For the Fourteenth Reporting Period, increases or decreases of more than 25% at TTCF are as follows:

- Between 2Q23 and 3Q23, the total number of incidents decreased by 28% from 80 to 58.
- Between 3Q23 and 4Q23, NCI incidents increased by 50% from 4 to 6.
- Between 2Q23 and 3Q23, Category 2 incidents decreased by 50% from 16 to 8.
- Between 3Q23 and 4Q23, Category 2 incidents decreased by 25% from 8 to 6.
- Between 2Q23 and 3Q23, Category 3 incidents decreased by 100% from 1 to 0.


*Figure 9*



---

[7] The data provided to the Panel from CCSB is subject to change as incidents are categorized and recategorized following or during investigation. Thus, the numbers cited are subject to change and may not match the numbers in previous or future Panel Reports. The Panel uses data from the Monthly Force Used by Category Report provided in the closest proximity to the generation of the Panel's Report. The data cited here is consistent with Department data totals presented as of September 10, 2024.
[8] Incident data from 2Q23 is included in this figure to show and determine increases and decreases for 3Q23.

*Men's Central Jail*
For the Fourteenth Reporting Period, MCJ had a total of 169 use of force incidents—81 in 3Q23 and 88 in 4Q23. *Figure 10* depicts the total number of incidents by category over three quarters. For the Fourteenth Reporting Period increases or decreases of more than 25% at MCJ are as follows:

- Between 3Q23 and 4Q23, Category 2 incidents increased by 50% from 10 to 15.
- Between 3Q23 and 4Q23, Category 3 incidents increased from 0 to 1.


*Figure 10*

*Inmate Reception Center*
For the Fourteenth Reporting Period, IRC had a total of 51 use of force incidents—28 in 3Q23 and 23 in 4Q23. *Figure 11* depicts the total number of incidents by category over three quarters. For the Fourteenth Reporting Period increases or decreases of more than 25% at IRC are as follows:

- Between 2Q23 and 3Q23, NCI incidents increased by 75% from 4 to 7.
- Between 3Q23 and 4Q23, NCI incidents decreased by 71% from 7 to 2.
- Between 2Q23 and 3Q23, Category 1 incidents decreased by 28% from 25 to 18.
- Between 2Q23 and 3Q23, Category 2 incidents decreased by 63% from 8 to 3.
- Between 3Q23 and 4Q23, Category 2 incidents increased by 133% from 3 to 7.


*Figure 11*

   ***Compliance Measure:*** When there is a 25% or more increase from quarter to quarter, the Unit Commander reports on his or her response to involved staff. If the Unit Commander failed to address the matter, the Department indicates its response to hold the Unit Commander accountable.

*Category 3 Specific*
Due to the infrequency of Category 3 incidents, a single incident results in 50% to 100% swings quarter to quarter, which triggers CCSB to request a response from the Unit Commander on its handling of staff involved in a Category 3 incident. Category 3 incidents that resulted in an increase of 25% or more for the Fourteenth Reporting Period are as follows:

- Between 3Q23 and 4Q23, MCJ increased Category 3 incidents from 0 to 1.

Initially, the Department reported two Category 3 incidents at MCJ in 3Q23, one in August and one in September. The Unit Commander noted in the response to CCSB that these two cases were being investigated by IAB. Through this investigation, the two incidents were found to not meet the criteria for a Category 3 incident and were reclassified. Thus, the charts above reflect zero (0) Category 3 incidents for 3Q23. With the inclusion of the two incidents in the initial data, the one incident that occurred in 4Q23 did not trigger a response from the Unit Commander, as it registered as a decrease instead of an increase. As such, there is no response generated by the Unit Commander nor record of how this increase in incidents was handled with involved staff at MCJ between 3Q23 and 4Q23. The Panel recognizes this

lack of record as the Department operationalizing the investigative process and not as an oversight in reporting for this provision.

The Panel reviewed many cases in the Fourteenth Reporting Period involving violations of policy, such as not using force as a last resort or utilizing a "heavy forward" when placing an inmate in the WRAP, in which the supervisory reviews failed to identify the policy violations. Pursuant to the agreed upon revisions to the Compliance Measures for 1.3, the Panel will assess whether the supervisors' evaluations of use of force incidents are sufficiently thorough, explain the reasons for their conclusions, appropriately identify policy violations, and hold staff accountable for those violations. The Department must hold Deputies accountable for use of force violations and hold supervisory staff accountable when they fail to identify and/or appropriately address those violations.

        **1.3 Status:** Out of Compliance          **As of Date:** N/A

## 1.4 Reports to the Board of Supervisors

**Provision Description:** Department regularly reports to the Board of Supervisors on use of force status and compliance with the Action Plan.

> *Compliance Measure:* Report publicly at least every six months to the Board of Supervisors on use of force data, training, investigation outcome summaries, and discipline as well as overall compliance.

The Department presented its Rosas report to the Board of Supervisors on July 11, 2023. Its report covered all of the required topics including use of force data, training, the outcome of investigations, and overall compliance with Rosas. The Department was scheduled to appear before the Board of Supervisors on December 19, 2023. The Board postponed their presentation until January 30, 2024. That presentation will be covered in the Panel's Fifteenth Report.

        **1.4 Status:** Compliance          **As of Date:** June 12, 2018

# B. Management Visits

The recommendations in Sections 10.1 and 10.2 of the Action Plan address required tours of senior managers and the documentation of visits on housing units.

## 10.1 Senior Manager Tours

**Provision Description:** Senior managers ranked Unit Commanders and above should be required to periodically tour jail facilities, including nights and weekends.

> *Compliance Measures Summary:* 10.1(a) Unit Commanders tour at least two evenings and one weekend day per quarter.

> *Compliance Measures Summary:* 10.1(b)–(e) Varying frequencies in visit requirements for Department executives—Unit Commanders up to Sheriff—to tour and inspect the Downtown Jail Complex.

These requirements were met for both quarters of the Fourteenth Reporting Period. The Unit Commanders, Chiefs in Custody Operations, the Assistant Sheriff and the Sheriff achieved 100% compliance with the requirements to tour and inspect the Downtown Jail Complex for the Third Quarter of 2023. For the Fourth Quarter of 2023, 69 of the 72 required tours by the Unit Commanders, Commanders and Chiefs were completed. One of the Commanders missed three of his tours due to a

vacation.[9] Eight of the nine tours required by the Assistant Sheriff and Sheriff were completed. The Panel exempted the Sheriff from one of his tours due to medical reasons. The Panel finds the Department in Compliance with this provision.

**10.1 Status:** Compliance          **As of Date:** June 30, 2018

## 10.2 Housing Unit Documentation

**Provision Description:** Housing units should document visits from department managers in electronic records or visitor logs.

> *Compliance Measure Summary:* Visits by Department managers to the Downtown Jail Complex are documented and made available to the Monitors.

The visits to the jail facilities by Department managers (above the rank of Sergeant) were documented in electronic visitor logs for the Third and Fourth Quarters of 2023. The posted electronic records included tours and inspections conducted for the two random weeks selected by the Monitors for the Fourteenth Reporting Period. The Panel finds the Department in Compliance with this provision.

**10.2 Status:** Compliance          **As of Date:** January 1, 2024

# C. Rotations and Transfers

The recommendations in Sections 18.1, 18.2, and 21.1 of the Action Plan address custody-wide rotation policies, semi-annual audits of unit compliance, and not assigning or transferring staff to custody as a formal sanction.

## 18.1 Custody-Wide Rotation Policy

**Provision Description:** Maintain a custody-wide rotation policy and rotate staff members as often as provided by policy.

## 18.2 Semi-Annual Rotation Audit

**Provision Description**: Conduct an audit semi-annually for each unit's compliance with rotation policies.

> *Compliance Measures Summary:* Maintain facility rotation policy and audit compliance every six months. Provide reports to the Monitors to demonstrate if at least 90% of staff were rotated according to policy.

The Department achieved 99.9% compliance in the Fourteenth Reporting Period. Each of the Downtown jail facilities had a current Unit Order setting forth its rotation policy and the source documents indicate that most Department personnel were rotated in compliance with these policies.

**18.1 Status:** Compliance          **As of Date:** June 30, 2018
**18.2 Status:** Compliance          **As of Date:** January 1, 2019

## 21.1 Transfers to Custody

**Provision Description:** Policy should provide that a staff member will not be assigned to Custody as a formal or informal sanction for problem Deputies.

> *Compliance Measures Summary:* On a quarterly basis, personnel records are reviewed for staff transferred to Custody from other divisions and a report is provided to the

---

[9] The Compliance Measures for 10.1 and 10.2 include a Footnote that explains "As used in these measures, tours of jail facilities are not required when the manager is on leave, on vacation, or away from the facility, including when traveling for Department purposes.

Monitors identifying each staff member who was transferred to Custody within six months of a finding of misconduct or policy violation.

The Department's Fourteenth Self-Assessment reflects that it maintained 100% compliance from July 1, 2023, through December 31, 2023. The Panel has reviewed the Department's source documents stating the reasons for Deputy transfers to Custody during the Fourteenth Reporting Period. No Department member was transferred or assigned to Custody as a sanction for misconduct or a policy violation during the Fourteenth Reporting Period.

**21.1 Status:** Compliance                    **As of Date:** June 30, 2018

The chart below is a visual representation of compliance for the above provisions from the last three reports. The shading of the boxes indicates compliance status–blue for *compliance* and red for *out of compliance.* The "As Of" column shows the date since first found compliant and the last column includes a check mark if the date meets or exceeds three years of compliance. A chart is provided with each section.

| Administrative Provisions | | Twelfth Report | Thirteenth Report | Fourteenth Report | | |
|---|---|---|---|---|---|---|
| No. | Provision | 3Q22 - 4Q22 | 1Q23 - 2Q23 | 3Q23 - 4Q23 | AS OF | 3YR+ |
| 1.1 | Assistant Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.2 | Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.3 | Supervision | X | X | X | | |
| 1.4 | Reports to Board | C | C | C | 6/12/2018 | ✓ |
| 10.1 | Senior Manager Tours | C | C | C | 6/30/2018 | ✓ |
| 10.2 | Housing Unit Documentation | C | X | C | 1/1/2024 | |
| 18.1 | Custody-Wide Rotation Policy | C | C | C | 6/30/2018 | ✓ |
| 18.2 | Semi-Annual Rotation Audit | C | C | C | 1/1/2019 | ✓ |
| 21.1 | Transfers to Custody | C | C | C | 6/30/2018 | ✓ |

# II.    Use of Force Policies and Practices

## A. Overall Use of Force Policies

The recommendations in Sections 2.1, 8.2, 17.2, 20.1, and 20.2 of the Action Plan address the revision, modification, and organization of policy into one logical manual.

### 2.1 Separate and Organized Custody Force Manual for Custody Operations

**Provision Description:** The Action Plan requires the Department to "have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations[.]"

### 8.2 Complaints of Retaliation into Grievance Policy

**Provision Description:** Combine retaliation provisions into one grievance section to ensure a single, consistent policy on handling grievances.

### 17.2 Pregnant Inmate Policy

**Provision Description:** Combine and conform provisions related to restraints on pregnant inmates with medically ordered restraint provisions.

### 20.1 Categories of Force in Policy

**Provision Description:** Policy indicates only two types of force: reactive and planned.

The Department's Supervisor's Use of Force Investigation Form (P438) still lists various types of force e.g. rescue, directed and medical assistance. The Panel requested the form be revised by July 1, 2023, in order to

14

remain in Compliance with this provision. This request was referenced in both the Eleventh (p. 15) and Twelfth (p. 14) Reports.  The Department has revised the P438 form, however the information must also be updated in the Performance Recording and Monitoring System (PRMS).   This system is used to track forces in custody and patrol.  The Department hopes to complete this update by the end of 2024.

## 20.2 Reactive Force Definition

**Provision Description:** Reactive Force is defined as force used in response to an immediate threat of safety, destruction, or escape, and when there is no time to wait for assistance.

> ***Compliance Measure Summary***: A Custody Division Manual that includes all force policies applicable to Custody Operations, including those outlined by 8.2, 17.2, 20.1, and 20.2.

On October 16, 2015, the Department provided the Panel with a Custody Operations Force Manual with separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints, Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved Shootings. The Department's Custody Force Manual satisfies Section 2.1 and includes specific provisions that satisfy Sections 8.2, 17.2, 20.1, and 20.2 of the Action Plan.

**2.1, 8.2, 17.2, 20.1 and 20.2 Status:** Compliance **As of Date:** January 1, 2017

| Use of Force Policy Provisions | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 2.1 | Custody Force Manual | C | C | C | 1/1/2017 | ✓ |
| 8.2 | Complaints of Retaliation | C | C | C | 1/1/2017 | ✓ |
| 17.2 | Pregnant Inmates | C | C | C | 1/1/2017 | ✓ |
| 20.1 | Categories of Force | C | C | C | 1/1/2017 | ✓ |
| 20.2 | Reactive Force | C | C | C | 1/1/2017 | ✓ |

# B.  Use of Force Practices & Review of Force Packages

The recommendations in Sections 2.2 through 2.13, 4.1, 4.3 through 4.5, 9.2, 9.3, 17.5, and 20.3 have provisions related to policy as well as application. The Panel reviewed multiple drafts of the Department's policies to implement these recommendations, required changes where appropriate, and certified that the Department had implemented these policy recommendations effective December 1, 2015.

For the Fourteenth Reporting Period, a total of 50 packages were reviewed: 25 in 3Q23 and 25 in 4Q23. The cases reviewed for each quarter did not necessarily occur in the quarter they were reviewed, nor was the investigation necessarily completed during that quarter. The Panel reviewed cases as they were received. The cases reviewed involved incidents from January 2023 through January 2024. Overall results for the Fourteenth Reporting Period by provision are below. Findings for each quarter are provided in Section C: *Quarterly Findings*.

> ***Compliance Measure Summary:*** (#1-7) Within 10 days of the end of each quarter the Department will provide the Monitors with a cumulative force synopsis for each incident in the Downtown Jail Complex showing the status of force investigations. The Monitors will select a minimum of 25 force packages to review for compliance with the Action Plan of all force provisions through Vertical and Horizontal Assessments. The Department will provide each package and include a summary sheet that indicates how the Department assessed each applicable provision. Force incidents will need to be 90% or more compliant with each provision for the Vertical Assessments.

**Vertical Assessment:** The vertical assessment represents the Panel's analysis of each case to determine the number of cases in which all force provisions were in compliance during the period. Of the 50 cases reviewed, twenty-two (22) were found compliant with all Force Provisions, which is 44% of cases reviewed, which is below the 90% compliance threshold. Of the twenty-two found in compliance with all Force provisions, twelve (12) were from 3Q23 (three at TTCF, two at IRC, and seven at MCJ) and ten (10) from 4Q23 (five at TTCF, three at IRC, and two at MCJ). In 3Q23, there were an additional three (3) cases found in compliance with 88% of the force provisions. In 4Q23, there were an additional four (4) cases found compliant with 89% of the force provisions and another one (1) found compliant with 88% of the force provisions.

**Horizontal Assessment:** The horizontal assessment represents the Panel's findings, by provision, for the twenty (20) use of force practice provisions to determine a compliance rating for each provision. It takes into consideration the objective of the provision and the nature and extent of any violations of the provision. Percentages are calculated based on packages reviewed in both quarters.[10] Of the twenty (20) provisions, eleven (11) were found in compliance based on the packages reviewed.

## 2.2 Force Prevention Principles

**Provision Description:** Policy provides that force be used as a last resort, with minimal amount of force necessary, terminated as soon as reasonably safe to do so, and de-escalated as resistance decreases.

Of the 50 use of force packages reviewed, 43 cases were found compliant with this provision, which amounts to 86% compliance and is below the 90% compliance threshold. While below the threshold, this 86% compliance rate represents an increase from the 58% compliance rate in the Thirteenth Report and the 40% compliance rate noted in the Twelfth Report.

**2.2 Status:** Out of Compliance          **As of Date:** N/A

## 2.3 Inmate-on-Inmate Violence

**Provision Description:** Policy indicates it is a violation for staff to cause, facilitate, or provoke inmate-on-inmate violence or to expose inmates to an unreasonable risk of assault. Further, staff are prohibited from publicly humiliating inmates or using slurs or obscenities.

Of the applicable cases reviewed, 98% (43 out of 44) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.3 Status:** Compliance          **As of Date:** January 1, 2024

## 2.4 Use of Force as Discipline

**Provision Description:** Policy indicates use of force not be used as discipline or corporal punishment.

Of the applicable cases reviewed, 98% (49 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.4 Status:** Compliance          **As of Date:** July 1, 2019

## 2.5 Force on Restrained Inmate

**Provision Description:** Policy indicates staff may not strike, use chemical agents, or Taser a restrained inmate, unless the inmate is assaultive, presents an immediate threat, and no other reasonable means.

---

[10] For the Horizontal Assessments, the Panel has determined that Compliance will require 90% of the applicable force provisions were in Compliance. The Panel may exercise its discretion and depart from this 90% requirement when considering the objective of the provision and the nature and extent of any violation of the provision.

Of the applicable cases reviewed, 97% (29 out of 30) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.5 Status:** Compliance          **As of Date:** July 1, 2023

## 2.6 Head Strikes or Kicks

**Provision Description:** It is prohibited to strike an inmate in the head, kick an inmate who is on the ground, or kick an inmate above the knees if not on the ground unless the inmate is assaultive and presents an imminent danger and there are no more reasonable means to avoid injury. Kicking an inmate who is not on the ground below the knees is prohibited unless used to create distance between a staff member and an assaultive inmate.

Of the applicable cases reviewed, 88% (44 out of 50) were found to be in compliance, which is below the 90% compliance threshold. This 88% compliance rate represents an increase from the 64% compliance rate noted in the Thirteenth Report and from the 52% compliance rate noted in the Twelfth Report.  For this Reporting Period, the Panel reviewed 12 cases with head strikes and, of those cases, the Panel found 6 out of compliance.

**2.6 Status:** Out of Compliance          **As of Date:** N/A

## 2.7 Supervisor Called to Scene

**Provision Description:** A supervisor must be called to the scene in a situation where use of force may be required as soon as time and circumstances permit.

Of the applicable cases reviewed, 88% (44 out of 50) were found to be in compliance, which is below the 90% compliance threshold.

**2.7 Status:** Out of Compliance          **As of Date:** N/A

## 2.8 Prevent Excessive Force

**Provision Description:** All members are responsible for preventing excessive uses of force and those who witness such events have a duty to stop, reduce, or control the use of force being used.

Of the applicable cases reviewed, 100% (4 out of 4) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.8 Status:** Compliance          **As of Date:** January 1, 2024

## 2.9 Armed Inmates

**Provision Description:** When confronting an armed inmate, every effort should be made to control the inmate at a distance.

Of the applicable cases reviewed, 67% (2 out of 3) were found to be in compliance, which is below the 90% compliance threshold.

**2.9 Status:** Out of Compliance          **As of Date:** N/A

## 2.10 Authorized Weapons

**Provision Description:** Department members can only use authorized weapons for which they have been trained. Any available instrument can be used to prevent imminent loss of life or serious bodily injury if no other means or alternative is available.

Of the applicable cases reviewed, 88% (23 out of 26) were found to be in compliance, which is below the 90% compliance threshold.

**2.10 Status:** Out of Compliance          **As of Date:** N/A

## 2.11 Planned Chemical Spray

**Provision Description:** After applying a chemical agent, members are required to wait a sufficient amount of time before applying additional chemical or force in a cell extraction or planned use of force.

Of the applicable cases reviewed, 100% (7 out of 7) were found to be in compliance, which exceeds the 90% compliance threshold.

<b>2.11 Status:</b> Compliance      <b>As of Date:</b> July 1, 2023

## 2.12 Chemical Spray & Tasers

**Provision Description:** Chemical sprays, Tasers, and stun devices should not be used against an inmate who no longer presents a danger or is no longer resisting, ones known to suffer medical conditions that may be aggravated by use, or in a manner contradictory to manufacturer guidance or Department training.

Of the applicable cases reviewed, 86% (12 out of 14) were found to be in compliance, which is below the 90% compliance threshold.

<b>2.12 Status:</b> Out of Compliance      <b>As of Date:</b> N/A

## 2.13 Check of Medical Records

**Provision Description:** An inmate's medical/mental health records should be checked prior to use of chemical agents, Tasers, or stun devices when time and circumstances permit.

Of the applicable cases reviewed, 83% (10 out of 12) were found to be in compliance, which is below the 90% compliance threshold.

<b>2.13 Status:</b> Out of Compliance      <b>As of Date:</b> N/A

## 4.1 Consult Mental Health Professionals

**Provision Description:** Require a mental health professional on-scene to attempt to resolve a situation during a cell extraction or planned use of force.

Of the applicable cases reviewed, 88% (7 out of 8) were found to be in compliance, which is below the 90% compliance threshold. In light of the fact only one of the applicable cases was out of compliance, the Panel has determined the Department is in Compliance with this provision for this Reporting Period.

<b>4.1 Status:</b> Compliance      <b>As of Date:</b> January 1, 2023

## 4.3 Spray on Mental Health Inmates

**Provision Description:** Discontinue use of chemical following an initial burst if the inmate is acutely psychotic or severely mentally disabled and unable to conform behavior to commands.

Of the applicable cases reviewed, 100% (8 out of 8) were found to be in compliance, which exceeds the 90% compliance threshold.

<b>4.3 Status:</b> Compliance      <b>As of Date:</b> October 1, 2019

## 4.4 Cooling Off Periods

**Provision Description:** In situations involving a mentally ill inmate who does not present an obvious danger to self or others and is refusing to exit his or her cell, allow a reasonable cooling off period. After, a mental health professional or supervisor can attempt to obtain compliance without the use of force.

Of the applicable cases reviewed, 100% (10 out of 10) were found to be in compliance, which exceeds the 90% compliance threshold.

<b>4.4 Status:</b> Compliance      <b>As of Date:</b> January 1, 2023

## 4.5 Medical or Mental Health Provider Order

**Provision Description:** When a planned use of force is precipitated by a medical or mental health provider, such as for treatment purposes, the ordering provider, or designee, is given the opportunity to intervene to de-escalate and determine whether the order should remain in effect.

Of the applicable cases reviewed, 100% (9 out of 9) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.5 Status:** Compliance                 **As of Date:** January 1, 2023

## 9.2 Escorting of Inmates

**Provision Description:** Following a use of force, the staff member escorting the recalcitrant inmate to medical, holding, or segregation should not be the same member involved in the confrontation.

Of the applicable cases reviewed, 88% (43 out of 49) were found to be in compliance, which is below the 90% compliance threshold.

**9.2 Status:** Out of Compliance          **As of Date:** N/A

## 9.3 Duty to Protect & Intervene

**Provision Description:** Members have a duty to protect and to intervene in inmate-on-inmate violence when reasonably safe to do so.

Of the applicable cases reviewed, 100% (10 out of 10) were found to be in compliance, which exceeds the 90% compliance threshold.

**9.3 Status:** Compliance                 **As of Date:** July 1, 2022

## 17.5 Minimize Medical Distress

**Provision Description:** Avoid, to the extent possible, placing weight on an inmate's back or shoulders in a way that impairs breathing. Once under control, place the inmate on side to minimize breathing problems.

Of the applicable cases reviewed, 51% (25 out of 49) were found to be in compliance, which is below the 90% compliance threshold. The path to compliance for this provision is elimination of the "heavy forward," placing inmates into the recovery position as quickly as possible, and holding staff accountable for 17.5 violations.

**17.5 Status:** Out of Compliance          **As of Date:** N/A

## 20.3 Planned Force

**Provision Description:** Planned uses of force should be video recorded and include a medical professional on scene or on standby, a supervisor on scene, and occur after a Shift Supervisor approval has been obtained.

Of the applicable cases reviewed, 100% (8 out of 8) were found to be in compliance, which exceeds the 90% compliance threshold.

**20.3 Status:** Compliance                 **As of Date:** July 1, 2023

| Use of Force Practice Provisions, Packet Review | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 2.2 | Force Prevention Principles | 40% | 58% | 86% | | |
| 2.3 | Inmate on Inmate Violence | 81% | 87% | 98% | 1/1/2024 | |
| 2.4 | Use of Force as Discipline | 98% | 94% | 98% | 7/1/2019 | ✓ |
| 2.5 | Force on Restrained Inmates | 86% | 95% | 97% | 7/1/2023 | |
| 2.6 | Head Strikes or Kicks | 52% | 64% | 88% | | |
| 2.7 | Supervisors Called to Scene | 90% | 78% | 88% | | |
| 2.8 | Prevent Excessive Force | 86% | 60% | 100% | 1/1/2024 | |
| 2.9 | Armed Inmates | 88% | 71% | 67% | | |
| 2.10 | Authorized Weapons | 95% | 85% | 88% | | |
| 2.11 | Planned Chemical Spray | 80% | 100% | 100% | 7/1/2023 | |
| 2.12 | Chemical Spray & Tasers | 95% | 100% | 86% | | |
| 2.13 | Check of Medical Records | 71% | 100% | 83% | | |
| 4.1 | Consult Mental Health Professionals | 90% | 100% | 88% | 1/1/2023 | |
| 4.3 | Spray on  Mental Health Inmates | 100% | 100% | 100% | 10/1/2019 | ✓ |
| 4.4 | Cooling Off Periods | 100% | 83% | 100% | 1/1/2023 | |
| 4.5 | Medical or Mental Health Provider Order | 100% | 100% | 100% | 1/1/2023 | |
| 9.2 | Escorting of Inmates | 90% | 92% | 88% | | |
| 9.3 | Duty to Protect & Intervene | 100% | 100% | 100% | 7/1/2022 | |
| 17.5 | Minimize Medical Distress | 49% | 61% | 51% | | |
| 20.3 | Planned Use of Force | 62% | 100% | 100% | 7/1/2023 | |

## C. Quarterly Findings—Use of Force Provisions

### Combined 3Q and 4Q 2023 Results

For the Fourteenth Reporting Period, the Panel reviewed 50 use of force incidents—25 from TTCF (50%), 13 from MCJ (26%), and 12 from IRC (24%).

The Department was not in Compliance with nine (9) of the twenty (20) Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.6 Head Strikes or Kicking Inmates, (3) 2.7 Supervisors Called to Scene, (4) 2.9 Armed Inmates, (5) 2.10 Authorized Weapons, (6) 2.12 Chemical Spray and Tasers, (7) 2.13 Check of Medical Records, (8) 9.2 Escorting of Inmates, and (9) 17.5 Minimize Medical Distress.

Of the nine (9) Use of Force Provisions out of compliance, two (2) had compliance rates below 70% over 3Q23 and 4Q23 combined. Those provisions include the following:
- 2.9 Armed Inmates at 67% compliance.
- 17.5 Minimize Medical Distress at 51% compliance.

The Department was in full compliance, or 90% or above, with the following eleven (11) of the twenty (20) use of force provisions: 2.3, 2.4, 2.5, 2.8, 2.11, 4.1, 4.3, 4.4, 4.5, 9.3, and 20.3.

### Third Quarter 2023 Results

In the Third Quarter of 2023, the Panel reviewed 25 force incidents—thirteen (13) from TTCF (52%), nine (9) from MCJ (36%), and three (3) from IRC (12%). The Department was not in Compliance with seven (7) of the 20 Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.6 Head Strikes or Kicking Inmates, (3) 2.9 Armed Inmates, (4) 2.10 Authorized Weapons, (5) 2.13 Check of Medical Records, (6) 9.2 Escorting of Inmates, and (7) 17.5 Minimize Medical Distress.

Of the seven (7) Use of Force Provisions out of compliance, two (2) had compliance rates below 70% in 3 Q23. Those provisions include the following:
- 2.9 Armed Inmates at 67% compliance.
- 17.5 Minimize Medical Distress at 54% compliance.

The Department was in full compliance, or 90% or above, with the following thirteen (13) of the twenty (20) use of force provisions: 2.3, 2.4, 2.5, 2.7, 2.8, 2.11, 2.12, 4.1, 4.3, 4.4, 4.5, 9.3, and 20.3.

**Fourth Quarter 2023 Results**

In the Fourth Quarter of 2023, the Panel reviewed 25 force incidents—12 from TTCF (48%), 4 from MCJ (16%), and 9 from IRC (36%).

The Department was not in Compliance with six (6) of the 20 Use of Force Provisions as follows: (1) 2.7 Supervisors Called to the Scene, (2) 2.10 Authorized Weapons, (3) 2.12 Chemical Sprays & Tasers, (4) 2.13 Check of Medical Records, (5) 9.2 Escorting of Inmates, and (6) 17.5 Minimize Medical Distress.

Of the six (6) Use of Force Provisions out of compliance, one (1) had a compliance rate below 70% in 4Q23: 17.5 Minimize Medical Distress at 48% compliance.

The Department was in full compliance, or 90% or above, with the following thirteen (13) of the twenty (20) Force provisions: 2.2, 2.3, 2.4, 2.5, 2.6, 2.8, 2.11, 4.1,[11] 4.3, 4.4, 4.5, 9.3, and 20.3.

There were no incidents reviewed during this quarter applicable to 2.9 Armed Inmates.

**Review of Force Incidents**

In accordance with the Action Plan, the Panel reviews selected force packages each quarter to assess Compliance with Sections 2.2 through 2.13, 4.1, 4.3 through 4.5, 9.2, 9.3, 17.5, and 20.3 (the "Force Provisions") of the Action Plan. Prior to finalizing the ratings for the specific Force Provisions, the Panel participated in meetings with Custody Executives and Supervisors, and the Plaintiffs' Counsel. The information exchanged before these meetings has led to more meaningful and focused discussions about specific compliance ratings. The Panel has consistently noted the value of these discussions would be improved if the cases at issue were recent. The cases reviewed for this Reporting Period occurred between January 18, 2023 and January 3, 2024. The Department believes its recently formed Custody Force Investigation Team (CFIT) will improve the timeliness of the Use of Force investigations. Only a few of the cases the Panel reviewed during this Reporting Period had been investigated by CFIT. The Panel's initial impression of these investigations is favorable as to the timeliness of the investigation and the more detailed analysis related to Rosas provisions. As the Panel reviews more cases that CFIT has investigated, it will be able to better assess the impact CFIT has on the investigations process. The Panel will include further discussion of that issue in future Monitoring reports.

While the Department has significantly improved its compliance percentage with Provisions 2.2 and 2.6 this Reporting Period, its compliance with Provision 17.5 remains significantly below the threshold at 51% (25 out of the 49 applicable cases) compliance. For this Reporting Period, the Department was found out of compliance in 24 of the 49 applicable cases.  Provision 17.5 provides that staff should avoid, to the extent possible under the circumstances, placing their weight on an inmate's back or shoulders in a way that impairs the inmate's breathing. Once the inmate is controlled, he should be placed on his side to minimize breathing problems and the risk of medical distress or positional asphyxia.

The Panel has identified the following three issues that recur in 17.5 non-compliant cases:
1. Staff utilizing a "heavy forward" when placing an inmate in the WRAP
2. Staff leaving an inmate on his stomach for too long while wearing a spit mask
3. Staff applying weight or pressure to the inmate's back and shoulders while he's lying on the ground waiting for the WRAP to arrive

---

[11] The Department was in compliance with five (5) out of the six (6) applicable cases in 4Q23, which is 83% compliance. In light of the fact only one of the applicable cases was out of compliance, the Panel determined this provision compliant.

Moreover, the Panel has reviewed a few cases in which the inmate is saying he can't breathe while he is lying on his stomach and staff reply, "if you are talking, you can breathe." This is a misunderstanding that should be corrected by supervisors and the Training Division. In order to achieve compliance with this provision, the Department must eliminate the use of the "heavy forward," place inmates into the recovery position as quickly as possible and hold staff accountable for 17.5 violations.

# III.  Training

Sections 3.1 through 3.4 of the Action Plan require that Department members receive training on use of force policies, ethics, professionalism, and treating inmates with respect. New Department members are to receive six (6) weeks of specific training in Custody Operations. Sections 4.6 through 4.9 require the Department to provide Custody-specific, scenario-based skill development training for existing and new personnel in Crisis Intervention and Conflict Resolution and in "identifying and working with mentally ill inmates." Section 12.1 requires Custody Sergeants receive training in conducting force investigations.

The Panel has previously deemed the Department to be complying "as of" the date reported by the Department for the completion of the initial training required for existing personnel. The Department's continuing compliance with the training provisions is determined by its compliance with the refresher training required every year or every other year. The Department submitted its report of refresher training compliance as part of its Fourteenth Self-Assessment.

## A. Use of Force Training

### 3.1 Use of Force Training

**Provision Description:** Requires use of force training for all existing Department members in Custody Operations, which should include at a minimum, a one-time eight-hour use of force policy training course for all members assigned to Custody and then a two-hour refresher course every year.

> ***Compliance Measure Summary:*** Section 3.1(a) requires that 90% of Deputies and Custody Assistants assigned to Custody as of July 1, 2016, completed the required training.

As of June 30, 2018, the Department was found to be compliant with Section 3.1(a).

> ***Compliance Measure Summary:*** Section 3.1(b) requires that 90% of Deputies and Custody Assistants assigned to Custody who completed the initial training receive the two-hour refresher course every year.

The Panel's auditors previously verified the Department's reported annual refresher training results, and the Department was found to be in Compliance with Section 3.1(b) as of December 31, 2021, through December 31, 2022. The Department's Fourteenth Self-Assessment reports that it maintained compliance with Section 3.1(b) for 2023. The results were verified by the Panel's auditors and the Department is in Compliance with Section 3.1 for 2023.

**3.1 Status:** Compliance          **As of Date:** December 31, 2021

### 3.4 Custody-based Use of Force Scenarios

**Provision Description:** Custody-based, use of force scenarios included as part of the use of force policy training provided by the Custody Training & Standard Bureau on an in-service and refresher basis.

The use of force training approved by the Panel includes the custody-based use of force scenarios.

**3.4 Status:** Compliance          **As of Date:** June 30, 2018

22

## B. Ethics and Professionalism Training

### 3.2 Ethics and Professionalism Training

**Provision Description:** Requires training all existing Department members in Custody Operations, which should include at a minimum, a one-time four (4) hour training course in ethics, professionalism, and treating inmates with respect, and then a two (2) hour refresher course every other year.

*Compliance Measure Summary:* Section 3.2(a) requires that 90% of Deputies and Custody Assistants assigned to Custody as of July 1, 2016 completed the required training.

As of June 30, 2018, the Department was found to be in Compliance with the training requirements of Section 3.2(a).

*Compliance Measure Summary:* Section 3.2(b) requires that 90% of Deputies and Custody Assistants assigned to Custody who completed the initial training receive the two-hour refresher course every other year.

The Panel's auditors previously verified Compliance with Section 3.2(a) as of June 30, 2018, and with Section 3.2(b) as of December 31, 2019, through December 31, 2022. The Department's Fourteenth Self-Assessment reports that it maintained compliance with Section 3.2(b) for 2023. These results were verified by the Panel's auditors and the Department is in Compliance with Section 3.2 for 2023.

**3.2 Status:** Compliance        **As of Date:** June 30, 2018

## C. Mental Health Training

### 4.6 Crisis Intervention

**Provision Description:** The Department should provide a minimum of 32 hours of custody-specific, scenario-based, skill development training to all Deputy Sheriffs on Crisis Intervention and Conflict Resolution with eight (8) hours of refresher training every other year.

### 4.7 Mentally Ill Inmates

**Provision Description:** The Department should provide a minimum of eight (8) hours of custody specific, scenario based, skill development training on identifying and working with mentally ill inmates to all existing Custody personnel with a four (4) hour refresher course every other year.

*Compliance Measure Summary:* Sections 4.6(a) and 4.7(a) require that 90% of Deputies assigned to Custody as of July 1, 2016, completed the required training.

As of June 30, 2018, the Department was found to be Compliant with the De-Escalation and Verbal Resolution Training (DeVRT), mentally ill inmates, and refresher training requirements of Sections 4.6(a) and 4.7(a). [12]

*Compliance Measure Summary:* Sections 4.6(b) and 4.7(b) require that 90% of Deputies assigned to Custody who completed the initial training receive the eight-hour refresher course every other year.

The Panel's auditors previously verified the Department's Compliance with Section 4.6(a) as of June 30, 2018, Section 4.6(b) as of December 31, 2018 through December 31, 2022, and Section 4.7(b) as of

---

[12] The Training Division recently incorporated the Panel's comments on their DeVRT curriculum.

December 31, 2022. The Department's Fourteenth Self-Assessment reports it maintained compliance with Section 4.6(b) and Section 4.7(b) in 2023. The reported results for Section 4.7 have been verified by the Panel's auditors and the Department is in Compliance with Section 4.7 as of December 31, 2022 through December 31, 2023. The reported results for Section 4.6 are subject to verification by the Panel's auditors.

> **4.6 Status:** Compliance          **As of Date:** June 30, 2018
> **4.7 Status:** Compliance          **As of Date:** January 1, 2023

## D. New Deputy Sheriffs and Custody Assistants

### 3.3 Custody Training

**Provision Description:** Section 3.3 of the Action Plan requires training all new Deputies in use of force and ethics, professionalism, and treating inmates with respect. Section 3.3 also requires the same for new Custody Assistants, who have received training in these subjects during their Academy training.

> *Compliance Measure Summary:* Section 3.3 requires that 95% of new Deputies and Custody Assistants completed the required training.

The Department reported that since the First Reporting Period beginning on July 1, 2015, newly assigned Deputies have been required to complete a six-week Custody Operations course that includes training in use of force and ethics, professionalism and treating inmates with respect, and new Custody Assistants, have received training in these subjects during their Academy training as required by Section 3.3. The Panel's auditors previously verified results through June 30, 2023. The Department's posted results reflect that the Department has met the 95% Compliance threshold through December 31, 2023. The results have been verified by the Panel's auditors, and the Department is in Compliance with Section 3.3 as of June 30, 2018, through December 31, 2023.

> **3.3 Status:** Compliance          **As of Date:** June 30, 2018

### 4.8 Mentally Ill—New Staff

**Provision Description:** Provide a minimum of eight (8) hours of custody specific, scenario-based, skill development training on identifying and working with mentally ill inmates to all new members as part of the Jail Operations Continuum.

### 4.9 Crisis Intervention—New Staff

**Provision Description:** Provide a minimum of 32 hours of custody specific, scenario-based, skill development training in Crisis Intervention and Conflict Resolution to new Department members in the Academy or in Custody before they are assigned to any jail facilities.

> *Compliance Measure Summary:* Sections 4.8 and 4.9 require that 95% of new Deputies and Custody Assistants completed the required training.

The Department provides new Deputies with De-Escalation and Verbal Resolution Training (DeVRT) and training in identifying and working with mentally ill inmates (IIMI).[13] The required DeVRT and IIMI training takes place after Deputy Sheriffs and Custody Assistant Academy graduations and prior to assuming duties at their unit of assignment. The Panel's auditors previously verified the Department was in Compliance with Sections 4.8 and 4.9 as of June 30, 2018, through June 30, 2023. The Department's Fourteenth Self-Assessment reports that 100% of the new personnel received the required training in the Third and Fourth Quarters of 2023. These results have been verified by the Panel's auditors and the Department is in Compliance with Sections 4.8 and 4.9 as of June 30, 2018, through December 31, 2023.

> **4.8 and 4.9 Status:** Compliance          **As of Date:** June 30, 2018

---

[13] The Panel has previously agreed that IIMI is included in the DeVRT curriculum of Section 4.9.

## 3.5 Additional Training and Mentoring

**Provision Description:** Requires Unit Commanders to determine "what additional training, counseling, or mentoring may be required when a personnel complaint involving the use of force is resolved with a finding that it 'Appears Employee Conduct Could Have Been Better' direct that the Department member undergo additional training, counseling, or mentoring, and document the action taken."

> ***Compliance Measure Summary:*** Section 3.5 requires that 90% of personnel complaints involving use of force that were resolved with a "Appears Employee Conduct Could Have Been Better" finding reflect documentation that the Unit Commander reasonably determined what additional training, counseling or mentoring was required.

The Department's Fourteenth Self-Assessment reports no inmate grievances against staff involving use of force where the disposition was that it "Appears Employee Conduct Could Have Been Better." The Department is in Compliance with Section 3.5 as of July 1, 2019, through December 31, 2023.

**3.5 Status:** Compliance          **As of Date:** July 1, 2019

## 3.6 Probation Reviews

**Provision Description:** Requires Unit Commanders to review new Department members within six (6) months of being initially assigned to Custody and again before the end of their probationary period.

> ***Compliance Measure Summary:*** Section 3.6 requires that 95% of the new Department members in Custody Operations were reviewed (1) within six months after being assigned to Custody and (2) again before their first post-probationary assignment.

The Department's Thirteenth Self-Assessment previously reported that it achieved 98% compliance in the First Semester of 2023, greater than the 95% threshold required by Section 3.6. The results for the First Semester of 2023 were verified by the Panel's auditors. The Department's Fourteenth Self-Assessment reports that it achieved 100% compliance in the Second Semester of 2023. The reported results for Section 3.6 are subject to verification by the Panel's auditors.

**3.6 Status:** Compliance          **As of Date:** January 1, 2023

# E. Sergeant Training

## 12.1 Force Investigations Training

**Provision Description:** Requires that all Custody Sergeants receive an initial 16-hour block of training in conducting use of force investigations, reviewing use of force reports, and the Department's protocols for conducting such investigations. It also requires a two (2) hour refresher course every year.

> ***Compliance Measure Summary:*** Section 12.1-1 requires that 90% of all Custody Sergeants received the initial training and a two (2) hour refresher course every year. Section 12.1-2 requires that 95% of new Sergeants completed the required training before or within 90 days after they assume their duties in Custody.

The Panel approved the 16-hour initial training course required by Section 12.1 on February 24, 2017. The Panel's auditors previously verified Compliance with Section 12.1 as of July 1, 2019, through June 30, 2023. The Department's Fourteenth Self-Assessment reports that it maintained compliance through December 31, 2023. These results have been verified by the Panel's auditors and the Department is in Compliance with Section 12.1 as of July 1, 2019, through December 31, 2023.

**12.1 Status:** Compliance          **As of Date:** July 1, 2019

| Training Provisions | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 3.1 | Use of Force Training | C | C | C | 12/31/2021 | ✓ |
| 3.2 | Ethics & Professionalism | C | C | C | 6/30/2018 | ✓ |
| 3.3 | Custody Training | C | C | C | 6/30/2018 | ✓ |
| 3.4 | Custody-based Scenarios | C | C | C | 6/30/2018 | ✓ |
| 3.5 | Add Training and Mentoring | C | C | C | 7/1/2019 | ✓ |
| 3.6 | Probation Reviews | C | C | C | 1/1/2023 | |
| 4.6 | Crisis Intervention | C | C | C | 6/30/2018 | ✓ |
| 4.7 | Mentally Ill Inmates | C | C | C | 1/1/2023 | |
| 4.8 | Mentally Ill Inmates (new staff) | C | C | C | 6/30/2018 | ✓ |
| 4.9 | Crisis Intervention (new staff) | C | C | C | 6/30/2018 | ✓ |
| 12.1 | Force Investigations | C | C | C | 7/1/2019 | ✓ |

# IV.     Reporting and Investigation of Force Incidents

## A. Reporting and Investigation Provisions in Force Package Reviews

The findings below pertain to application of policies into practice and are supported by the selection of use of force cases reviewed. For the Fourteenth Reporting Period 50 packages were reviewed: 25 in 3Q23 and 25 in 4Q23. Overall results for each provision during the Fourteenth Reporting Period are below. Findings for each quarter are in *Section C: Quarterly Findings-Reporting & Investigations Provisions*.

> ***Compliance Measure Summary:*** (#1-7) Within 10 days of the end of each quarter the Department will provide the Monitors with a cumulative force synopsis for each incident in the Downtown Jail Complex. The Monitors will select a minimum of 25 force packages to review for compliance with the Action Plan of all reporting and investigations provisions through Vertical and Horizontal Assessments. The Department will provide each package and include a summary sheet that indicates how the Department assessed each applicable provision. Reporting and Investigations provisions will need to be 90% or more compliant for the Vertical Assessments.

**Vertical Assessment:** Of the 50 cases reviewed, twenty-eight (28) were found compliant with Reporting and Investigative Provisions, which constitutes 56% of all cases reviewed, which is below the 90% compliance threshold though a significant increase from the 8% compliance rate in the Twelfth Report. Of the twenty-eight (28) cases in compliance with the Reporting and Investigative provisions, twelve (12) were from 3Q23 (four at TTCF, two at IRC, and six at MCJ) and sixteen (16) were from 4Q23 (eight at TTCF, six at IRC, and two at MCJ.)

**Horizontal Assessment:** The findings for the seventeen (17) Reporting & Investigative Provisions represent the Horizontal Assessment, which determines whether the Department is in Compliance with each of the applicable Provisions. It takes into consideration the objective of the provision and the nature and extent of any violations. Percentages are calculated based on packages reviewed in both quarters. Of the seventeen (17) provisions, fourteen (14) were found in Compliance based on packages reviewed.

### 4.2 Mental Health Professionals

**Provision Description:** Supervisors investigating uses of force are required to interview mental health professionals who witnessed the incident or attempted to resolve it. Record interview if consented to.

Of the applicable cases reviewed, 100% (7 out of 7) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.2 Status:** Compliance          **As of Date:** January 1, 2023

## 5.2 Commander's Reviews

**Provision Description:** Evaluations of force incidents by Unit Commanders are reviewed pursuant to the category level requirement.

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**5.2 Status:** Compliance          **As of Date:** January 1, 2023

## 5.3 Unexplained Discrepancies

**Provision Description:** Any unexplained tactical decisions or discrepancies among witnesses should be referred in writing by the reviewing Commander(s) to the investigator.

Of the applicable cases reviewed, 98% (42 out of 43) were found to be in compliance, which exceeds the 90% threshold.

**5.3 Status:** Compliance          **As of Date:** July 1, 2022

## 12.2 Location of Inmate Interviews

**Provision Description:** Inmate witnesses to force incidents should be asked to be interviewed, and then interviewed, away from other inmates.

Of the applicable cases reviewed, 49% (19 out of 39) were found to be in compliance, which is below the 90% compliance threshold.

**12.2 Status:** Out of Compliance          **As of Date:** N/A

## 12.3 Suspect Interviews

**Provision Description:** No Department member involved in the use of force should be present for or participate in the interviews.

Of the applicable cases reviewed, 96% (46 out of 48) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.3 Status:** Compliance          **As of Date:** July 1, 2019

## 12.4 Uninvolved Supervisors

**Provision Description:** Force investigations should not be conducted by the direct supervisor of the staff member involved in the use of force.

Of the applicable cases reviewed, 98% (49 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.4 Status:** Compliance          **As of Date:** July 1, 2023

## 12.5 Standard Order and Format

**Provision Description:** Use of force packages should be organized in a standard order and format.

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.5 Status:** Compliance          **As of Date:** July 1, 2019

## 15.1 Timeliness of Reports

**Provision Description:** Every staff member who uses or assists in a force incident completes a separate and independent written report before going off duty.

27

Of the applicable cases reviewed, 88% (44 out of 50) were found to be in compliance, which is below the 90% compliance threshold.

**15.1 Status:** Out of Compliance        **As of Date:** N/A

## 15.2 All Department Witnesses

**Provision Description:** Each staff member who witnesses a use of force prepares a written report unless the Watch Commander specifically designates only certain witnesses to prepare reports when a large number witnessed the same event.

Of the applicable cases reviewed, 96% (48 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.2 Status:** Compliance        **As of Date:** July 1, 2019

## 15.3 Force by Other Members

**Provision Description:** Staff members who use force must describe the type used in a written report as well the type used by others.

Of the applicable cases reviewed, 90% (45 out of 50) were found to be in compliance, which meets the 90% compliance threshold.

**15.3 Status:** Compliance        **As of Date:** January 1, 2024

## 15.4 Description of Injuries

**Provision Description:** Staff members who witness a use of force incident must describe visible or apparent injuries to department members, inmates, or others involved.

Of the applicable cases reviewed, 92% (46 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.4 Status:** Compliance        **As of Date:** January 1, 2024

## 15.5 Clarification After Video

**Provision Description:** A Department member who wants to make any clarifications or changes after viewing a video of a force incident should be required to either prepare a supplemental report or specifically note any changes to the Department member's initial report.

Of the applicable cases reviewed, 100% (13 out of 13) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.5 Status:** Compliance        **As of Date:** January 1, 2024

## 15.6 Separation of Deputies

**Provision Description:** To the extent practical, Department members should be separated until they have completed their use of force reports and/or witness reports.

Of the applicable cases reviewed, 48% (24 out of 50) were found to be in compliance, which is below the 90% compliance threshold. This represents a significant increase from the 16% compliance rate in the Twelfth Report yet remains congruent with the 47% compliance rate from the Thirteenth Report. The Panel has advised the Department on how to document how this provision was met.

**15.6 Status:** Out of Compliance        **As of Date:** N/A

## 15.7 Individual Perceptions

**Provision Description:** Report reviewers must ensure each report reflects individual perceptions and recollections of the events and that they do not have common wording or phrasing.

28

Of the applicable cases reviewed, 98% (49 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.7 Status:** Compliance          **As of Date:** July 1, 2019

## 16.1 Healthcare Assessment

**Provision Description:** A documented medical assessment of each inmate upon whom force is used as soon as practical after the force incident.

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**16.1 Status:** Compliance          **As of Date:** July 1, 2019

## 16.2 Photographs of Injuries

**Provision Description:** Supervisors investigating force incidents must photograph any injury, swelling, or redness sustained by staff members and document the absence of injury.

Of the applicable cases reviewed, 91% (39 out of 43) were found to be in compliance, which exceeds the 90% compliance threshold.

**16.2 Status:** Compliance          **As of Date:** January 1, 2024

## 16.3 Medical Report of Injuries

**Provision Description:** Medical staff treating an injured inmate must report any injuries related to a use of force or an allegation by the inmate of a use of force.

Of the applicable cases reviewed, 100% (49 out of 49) were found to be in compliance, which exceeds the 90% compliance threshold.

**16.3 Status:** Compliance          **As of Date:** July 1, 2019

| Reporting & Investigations, Packet Review | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 4.2 | Mental Health Professionals | 85% | 100% | 100% | 1/1/2023 | |
| 5.2 | Commander's Reviews | 94% | 94% | 100% | 1/1/2023 | |
| 5.3 | Unexplained Discrepancies | 93% | 95% | 98% | 7/1/2022 | |
| 12.2 | Location of Inmate Interviews | 51% | 52% | 49% | | |
| 12.3 | Suspect Interviews | 90% | 90% | 96% | 7/1/2019 | ✓ |
| 12.4 | Uninvolved Supervisors | 88% | 96% | 98% | 7/1/2023 | |
| 12.5 | Standard Order & Format | 98% | 100% | 100% | 7/1/2019 | ✓ |
| 15.1 | Timeliness of Reports | 94% | 92% | 88% | | |
| 15.2 | All Department Witnesses | 94% | 94% | 96% | 7/1/2019 | ✓ |
| 15.3 | Force by Other Members | 78% | 88% | 90% | 1/1/2024 | |
| 15.4 | Description of Injuries | 76% | 80% | 92% | 1/1/2024 | |
| 15.5 | Clarification After Video | 93% | 79% | 100% | 1/1/2024 | |
| 15.6 | Separation of Deputies | 16% | 47% | 48% | | |
| 15.7 | Individual Perceptions | 90% | 98% | 98% | 7/1/2019 | ✓ |
| 16.1 | Healthcare Assessment | 98% | 98% | 100% | 7/1/2019 | ✓ |
| 16.2 | Photograph of Injuries | 83% | 87% | 91% | 1/1/2024 | |
| 16.3 | Medical Report of Injuries | 96% | 100% | 100% | 7/1/2019 | ✓ |

## B. Reporting & Investigations Provisions as Reported by Department

Many of the recommendations in the Action Plan that pertain to the reporting and investigation of force used by Department personnel in Custody Operations are assessed by the Panel through a review of the completed force packages. Other provisions are reported by the Department as follows:

### 5.1 Tracking of Force Incidents

**Provision Description:** Requires the Department to track the status of all investigations, reviews, and evaluations of all use of force incidents and allegations to ensure they were completed appropriately and timely. By the end of the shift, a supervisor or Internal Affairs investigator enters incidents into a database with a summary and an initial category classification.

> *Compliance Measure Summary:* 5.1(2) On a quarterly basis, Monitors determine if the completed force packages reviewed were entered into the database pursuant to 5.1(1).

The Department reports that 100% of the force incidents were timely entered into the database in the Third and Fourth Quarters of 2023.

> *Compliance Measures Summary:*
> 5.1(1) and (4a): 95% of use of force incidents are entered into the database within two hours of the end of shift in which the incident occurred.
> 5.1(4)b and c: 90% of investigations of Deputies and Custody Assistants were completed timely and appropriately.

The Department reports its compliance rate for the Third Quarter was 71% and 80% for the Fourth Quarter of 2023. While this represents an improvement over the Thirteenth Reporting Period, the Panel continues to emphasize the need to complete use of force investigations within the appropriate timeframes in order to hold staff accountable for any policy violations.

**5.1 Status:** Out of Compliance          **As of Date:** N/A

### 8.3 CFRC Review

**Provision Description:** Evaluations of grievance investigations claiming force was used to retaliate against an inmate should be reviewed by the Custody Force Review Committee.

> *Compliance Measures Summary:* A list of completed investigations of inmate grievances claiming force was used in retaliation is provided quarterly to the Monitors and will include the CFRC review of the investigation's evaluation.

There was no data to access for the Fourteenth Reporting Period. According to the posted information in SharePoint, there were no grievances in which an inmate claimed force was used in retaliation.[14]

**8.3 Status:** Compliance          **As of Date:** June 30, 2021

### 11.1 CFRT Involvement

**Provision Description:** The Custody Force Rollout Team (CFRT) involvement in reviewing evaluations should not delay the investigation.

---

[14] During the Panel's monitoring visits, inmates have reported they do not view the grievance system as effective and as a result, may choose not to utilize it.

*Compliance Measure Summary*: 95% of the investigations reviewed by CFRT were not delayed and discipline imposed timely if there is a policy violation finding.

During the Third Quarter of 2023, CFRT reviewed four cases with founded policy violations. CFRT's review did not delay the period permitted by law to impose discipline. The policy violations included Force Prevention and De-Escalation, Obedience to Laws as it relates to Taser Procedures and Obedience to Laws as it relates to Handling Insubordinate/Recalcitrant Inmates. There were no force incidents reviewed by CFRT with a finding of a policy violation or misconduct in the Fourth Quarter of 2023.

**11.1 Status:** Compliance                    **As of Date:** June 30, 2018

## 13.1 Documenting Dishonesty

**Provision Description:** The Department must have a firm zero tolerance policy for acts of dishonesty, use of excessive force, failures to report uses of force, and violations of PREA. For any staff member not terminated for such an act documentation is made as to the reason and the discipline imposed as well as placement on a monitored performance review program.

> *Compliance Measures Summary:* 95% compliance with all completed investigations where there was a finding of dishonesty, failure to report uses of force, or PREA violations as well as documentation for incidents that did not result in termination.

The Department's Self-Assessment indicates it achieved 100% compliance in both quarters of the Fourteenth Reporting Period. The following is a summary of the data posted for each quarter.

- Third Quarter of 2023: A Deputy Sheriff was terminated for dishonesty/making false statements during a Departmental investigation pertaining to a Use of Force incident in which he claimed he did not witness any force, and the CCTV depicted him witnessing the force. In the second case, a Deputy Sheriff was terminated for violating the Department's Honesty/False Statements policy. This incident related to off-duty misconduct in which the Deputy was arrested and charged with illegal marijuana cultivation.
- Fourth Quarter of 2023: In the first of two applicable cases for this quarter, a Deputy Sheriff was terminated for several policy violations including: Professional Conduct – Core Values, Honesty/False Statements; Obstructing an Investigation and Absence. The Deputy refused to report to duty and sent supervisors communications that were unprofessional, inappropriate and/or insubordinate. In the other case posted for this quarter, a Deputy Sheriff received a 30-day suspension for unreasonable force. The Deputy was seen slapping food out of an inmate's hand and then applying a one-handed grip around the inmate's throat for 3-4 seconds. Discrepancies were noted in his report. Pursuant to the discipline guidelines, discharge was not warranted. In addition to the 30-day suspension, the Deputy attended the following training classes: Effective Communication, DeVRT, Ethics and Managing Anger and Stress. He was also placed on a mentorship program to monitor his performance.

The Panel recognizes the need for accountability regarding staff's accurate and honest reporting in force packages. The Panel understands that the Parties intend to file a Stipulation with the revised 13.1 Provision—as well as other revisions to the Monitoring Plan and Compliance Measures—by the end of the year.

**13.1 Status:** Compliance                    **As of Date:** October 1, 2019

## 13.2 Reports of Dishonesty and PREA

**Provision Description:** All findings of dishonesty, failures to report uses of force, and violations of PREA and supporting documentation is provided to the Office of the Inspector General quarterly.

31

For the Fourteenth Reporting Period, the Inspector General was advised of all actions noted above in Section 13.1.

**13.2 Status:** Compliance                    **As of Date:** October 1, 2019

## 14.1 Review of Criminal Referrals

**Provision Description:** An additional review of referrals of inmates for criminal prosecution arising from incidents involving the use of force by Department members must be performed to ensure charges are not being brought to help justify the use of force.

> *Compliance Measures Summary:* Requires the Department to review all referrals of an inmate for criminal prosecution for assaulting a staff member and report to the Monitors that 95% of referrals were reviewed by the Unit Commander who verified charges were not brought as justification for use of force.

The Department reports 100% compliance with Section 14.1 for the Third Quarter of 2023. There was a total of 27 cases referred to the District Attorney's Office and in all 27 of those cases, the Unit Commander verified the charges were not brought as a justification for a use of force prior to the referral being sent to the District Attorney's Office. For the Fourth Quarter of 2023, 19 cases were referred to the District Attorney's Office. One of the 19 cases was not reviewed by the Unit Commander prior to the referral being sent, resulting in a 95% Compliance rate.

**14.1 Status:** Compliance                    **As of Date:** July 1, 2018

## 14.2 Timeliness of Criminal Referrals

**Provision Description:** Timely forward incidents of officer misconduct that may amount to criminal violations to the Office of the District Attorney.

> *Compliance Measures Summary:* Requires the Department review all referrals of a staff member for possible prosecution for alleged misconduct and report to the Monitors that 90% of referrals were sent to the Office of the District Attorney within six months.

Source documents indicate there were no cases referred to the District Attorney for possible prosecution of a staff member during the Third Quarter of 2023. In the Fourth Quarter of 2023, there was one case referred to the District Attorney's Office. The referral occurred 458 days after the incident, which is beyond the six-month time period required by this Provision. The intent of the Provision is to prosecute criminal behavior in a timely manner. The Department met the statute of limitations to bring this case forward. Moreover, considering an agreement a previous Panel had with the Department, the current Panel has decided to keep the Department in Compliance for this rating period.[15]

**14.2 Status:** Compliance                    **As of Date:** July 1, 2018

| Reporting & Investigations, Department Reported | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 5.1 | Tracking of Force Incidents | X | X | X | | |
| 8.3 | CFRC Review | C | C | C | 6/30/2021 | |
| 11.1 | CFRT Involvement | C | C | C | 6/30/2018 | ✓ |
| 13.1 | Documenting Dishonesty | C | C | C | 10/1/2019 | ✓ |
| 13.2 | Reports of Dishonesty/PREA | C | C | C | 10/1/2019 | ✓ |
| 14.1 | Review of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |
| 14.2 | Timeliness of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |

---

[15] The previous Panel had an agreement with the Department to follow Penal Code 801 when referring cases criminal violations involving LASD staff to the Office of the District Attorney. As long as the case was referred within the three-year statute of limitations, the Department would be in Compliance with this Provision. The current Panel plans to meet with the Department's Internal Criminal Investigative Bureau (ICIB) to discuss this Provision.

## C. Quarterly Findings—Reporting and Investigations Provisions

### Third Quarter and Fourth Quarter 2023 Results

For the Third and Fourth Quarters of 2023, the Panel reviewed 50 use of force incidents combined—25 from TTCF (50%), 13 from MCJ (26%), and 12 from IRC (24%).

The Department is not in Compliance with three (3) of the seventeen (17) Reporting & Investigations Provisions as follows: (1) 12.2 Location of Inmate Interviews, (2) 15.1 Timeliness of Reports, and (3) 15.6 Separation of Deputies.

Of the three (3) Reporting and Investigations Provisions out of compliance, two (2) had compliance rates below 70% in 3Q23 and 4Q23 combined. Those provisions include the following:
- 12.2 Location of Inmate Interviews at 49% compliance.
- 15.6 Separation of Deputies to Write Reports at 48% compliance.

The Department was in Compliance, or 90% or above, with the following fourteen (14) provisions: 4.2, 5.2, 5.3, 12.3, 12.4, 12.5, 15.2, 15.3, 15.4, 15.5. 15.7, 16.1, 16.2, and 16.3.

### Third Quarter 2023 Results

For the Third Quarter of 2023, the Panel reviewed 25 force incidents—thirteen (13) from TTCF (52%), nine (9) from MCJ (36%), and three (3) from IRC (12%).

The Department was not in Compliance with five (5) of the seventeen (17) Reporting & Investigations Provisions as follows: (1)12.2 Location of Inmate Interviews, (2) 15.1 Timeliness of Reports, (3) 15.3 Force by Other Members, (4) 15.4 Description of Injuries, and (5) 15.6 Separation of Deputies.

Of the five (5) Reporting and Investigations Provisions out of compliance, two (2) had compliance rates below 70% in 3Q23. Those provisions include the following:
- 12.2 Location of Inmate Interviews at 50% compliance.
- 15.6 Separation of Deputies to Write Reports at 36% compliance.

The Department was in Compliance, or 90% or above, with the following twelve (12) provisions: 4.2, 5.2, 5.3, 12.3, 12.4, 12.5, 15.2, 15.5, 15.7, 16.1, 16.2, and 16.3.

### Fourth Quarter 2023 Results

In the Fourth Quarter of 2023, the Panel reviewed 25 force incidents—twelve (12) from TTCF (48%), four (4) from MCJ (16%), and nine (9) from IRC (36%).

The Department was not in Compliance with three (3) of the seventeen (17) Reporting & Investigations Provisions as follows: (1) 12.2 Location of Inmate Interviews, (2) 15.1 Timeliness of Reports, and (3) 15.6 Separation of Deputies.

Of the three (3) Reporting and Investigations Provisions out of compliance, two (2) had compliance rates below 70% in 4Q23. Those provisions include the following:
- 12.2 Location of Inmate Interviews at 48% compliance.
- 15.6 Separation of Deputies to Write Reports at 60% compliance.

The Department was in Compliance, or 90% or above, with the following thirteen (14) provisions: 4.2, 5.2, 5.3, 12.3, 12.4, 12.5, 15.2, 15.3, 15.4, 15.5, 15.7, 16.1, 16.2 and 16.3.

# V. Inmate Grievances

The Action Plan requires extensive changes in how the Department handles inmate grievances and requests for service. On July 15, 2016, the Department issued a new *Inmate Grievance Manual* (Volume 8 of the Custody Division Manual) to implement a new grievance system. The Panel assessed the Department's implementation of the new grievance system in the Fourteenth Reporting Period as follows:

## A. Grievance Forms

### 6.1 Separate Grievance Forms

**Provision Description:** Inmate grievances and inmate requests must be reported on separate forms, either paper or electronically.

The Panel has previously concluded the forms meet the requirements of the Action Plan.

           **6.1 Status:** Compliance                **As of Date:** January 1, 2017

### 6.2 Availability of Grievance Forms

**Provision Description:** Grievance forms are reasonably available to inmates at all times.

During the Panel's October 2023 visit to the Downtown Jail Complex, some of the boxes within the housing units did not contain grievance forms. Inmates have reported their inability to access grievance forms to the Panel. The Panel has relayed these concerns to the Department and noted the benefits of giving inmates the opportunity to electronically file grievances on a tablet. The Department is supportive of this concept and hopes to be able to provide inmates access to tablets in the future.

           **6.2 Status:** Out of Compliance           **As of Date:** N/A

### 6.6 Right to Appeal Form

**Provision Description:** Grievance forms must include a check box indicating whether the complaint was upheld or denied and a statement regarding the right to appeal and time frame.

> ***Compliance Measures Summary:*** Monitors determine the availability of forms and requirements of 6.1 through 6.6 through onsite visits, interviews with inmates and staff, and a review of 25 consecutive force and retaliation grievances in a month.

The Panel has previously concluded that the forms contain the appeals check box and meet the requirements of the Action Plan.

           **6.6 Status:** Compliance              **As of Date:** January 1, 2017

### 7.1 Conflict Resolution Meeting

**Provision Description:** Inmates who submit grievances should be advised that a conflict resolution meeting is voluntary to address the grievances without a personnel investigation. If successful, the grievance resolution is documented accordingly.

In randomly selected months in the Third and Fourth Quarters of 2023, no grievances against staff were adjudicated in which a Conflict Resolution was conducted. There was no data to assess from any facility.

           **7.1 Status:** Compliance              **As of Date:** January 1, 2017

### 6.4 Use of Force Grievances

**Provision Description:** Grievance forms should include "use of force" as a specific category of "grievances against staff" and brought to the attention of Unit Commanders.

34

*Compliance Measure Summary:* 90% of force grievances reviewed were brought to the attention of the Unit Commander within 10 days of receipt and properly handled.

During the Third Quarter of 2023, 93% of force and retaliation grievances were brought to the attention of the Unit Commander within ten (10) days. Out of the 16 applicable grievances, the Unit Commander was notified within the required timeframe in 15 cases. The Department reports 100% compliance with this provision in the Fourth Quarter of 2023.

**6.4 Status:** Compliance          **As of Date:** January 1, 2024

## 6.5 Grievances Against Staff

**Provision Description:** Grievance forms should include "retaliation" and "harassment" as specific categories of "grievances against staff" and brought to the attention of Unit Commanders.

*Compliance Measure Summary:* 90% retaliation grievances reviewed were brought to the attention of the Unit Commander within 10 days of receipt and properly handled.

The Department reports that 95% of the retaliation grievances (47 out of 49) in the Third Quarter of 2023 were brought to the Unit Commanders attention within 10 days and handled appropriately. In the Fourth Quarter of 2023, 94% of the grievances were handled appropriately. Of the 34 grievances that met the criteria, the Unit Commander was not notified about 2 of those grievances within the 10-day timeframe.

**6.5 Status:** Compliance          **As of Date:** July 1, 2023

# B. Emergency Grievances

## 6.3 Emergency Grievance Forms

**Provision Description:** A prominent box is placed on the form to indicate an "Emergency Grievance."

*Compliance Measure Summary:* Monitors verify compliance with 6.3 through interviews of staff and inmates and review of grievances marked "emergency."

A prominent box is located on the grievance form and confirmed through reviews and interviews.

**6.3 Status:** Compliance          **As of Date:** January 1, 2017

## 6.7 Handling Emergency Grievances

**Provision Description:** Grievances marked "emergency" are given to and reviewed by a supervisor as soon as possible to determine if immediate action is needed to protect life or safety. Provide the inmate a written response documenting action taken to address the emergency.

*Compliance Measure Summary:* Monitors review 50 consecutive grievances to ensure 95% of grievances marked "emergency" were reviewed and handled pursuant to Section 6.7.

The Department's Fourteenth Self-Assessment reflects it achieved 100% compliance in the Third and Fourth Quarters of 2023. There were only two grievances that met the criteria for Section 6.7 for the Fourteenth Reporting Period and timely notification was provided to the inmate in those cases.

.          **6.7 Status:** Compliance          **As of Date:** July 1, 2018

## 6.8 Notification of Non-Emergency

**Provision Description:** If the grievance is determined to be non-emergent, the inmate is notified as soon as practical that the grievance will be handled as non-emergent with reason documented.

35

*Compliance Measure Summary:* Monitors review 50 consecutive grievances to ensure 90% of those determined non-emergent were documented and notifications to inmates were made within five days.

For the Third Quarter of 2023, 100% of the grievances were correctly downgraded and the inmate was notified in a timely manner that the grievance would be handled as non-emergent. The Department achieved 92% compliance with this provision in the Fourth Quarter of 2023. There were two of the 25 grievances in which the inmate did not receive timely notification that their grievances would be handled as non-emergent.

**6.8 Status:** Compliance                    **As of Date:** July 1, 2018

## C. Inmate Grievance Coordinator

The recommendations in Sections 6.9, 6.13, 6.14, and 6.15 of the Action Plan address expectations and duties of the Inmate Grievance Coordinator position.

### 6.9 Inmate Grievance Coordinator

**Provision Description:** Requires all emergency grievances be forwarded to the Inmate Grievance Coordinator (IGC) who will review for proper handling and notify the Unit Commander if not properly handled.

The Department's posted data pertaining to Section 6.9 indicates the IGC received the emergency grievances for the Fourteenth Reporting Period and there was no need to notify the Unit Commander of improperly handled grievances. The way the data was tracked during this Reporting Period was not entirely clear, particularly with the use of the "Null" Category. Moreover, there were several cases in which the IGC had not yet been reviewed by the IGC. As noted in the Thirteenth Report, the Custody Inmate Grievance Application (CIGA) was implemented in June 2024. Posted data for this provision should be clearer starting in the Third Quarter of 2024.

**6.9 Status:** Compliance                    **As of Date:** July 1, 2018

### 6.13 Grievance Coordinator Tracking

**Provision Description:** Regularly track the handling of inmate grievances to ensure the investigations are completed timely and reasonably, and that inmates are notified of the results of the investigations.

### 6.14 Grievance Coordinator Reports

**Provision Description:** Provide a monthly report to Unit Commanders on the status of grievances, timeliness of investigations, responses to grievances and appeals, and inmate notifications.

### 6.15 Grievance Coordinator Analysis

**Provision Description:** Analyze inmate grievances monthly to identify any problematic trends and provide that analysis in a monthly report to Unit Commanders and senior management.

*Compliance Measures Summary:* Provide the Monitors with one or more quarterly reports to address all requirements of the Coordinator provisions. The Inmate Grievance Coordinator will meet with the Monitors once a quarter.

The Department's new Custody Inmate Grievance Application (CIGA) did not initially generate monthly reports summarizing the data noted in 6.13, 6.14, and 6.15. Following discussions with the Panel, the Department created the computer code needed to create these reports. The newly created reports covered all of the categories required by these provisions with the exception of appeals. The Department is working on the code needed to pull the appeals data. Since the gap in providing the data for these monthly reports was a result of switching over to the new grievance system, the Panel has deemed the

36

Department in Compliance with 6.13, 6.14, and 6.15 for this Reporting Period. The Panel requests that the Compliance and Sustainability Grievance Team meet with the Unit Commanders and senior management to ensure the newly created reports are meeting their needs to track, analyze and improve the grievance processes in their facilities.

The Panel met with the Compliance and Sustainability Grievance Team in July and October 2023 to discuss the Department's implementation of its grievance policies and procedures, the Custody Inmate Grievance Application (CIGA), and overall trends with respect to the Department's handling of inmate grievances.

       **6.13, 6.14, and 6.15 Status:** Compliance          **As of Date:** July 1, 2018

## 6.16 Centralized Grievance Unit

**Provision Description:** Establish a centralized unit to collect, review, categorize, forward for investigations, and make appropriate notifications for inmate grievances.

The Panel previously determined the Department's structure of a Grievance Coordinator supervising the grievance teams at all of the Downtown Jail Complex facilities was equivalent in function to a centralized system and was acceptable, pending progress and specific results. The Panel continues to deem the Department's Grievance Team structure acceptable.

       **6.16 Status:** Compliance          **As of Date:** January 17, 2017

# D. Handling of Grievances

## 6.10 Collection of Grievances

**Provision Description:** Grievances should be collected from the locked grievance boxes on each living unit no less frequently than once per day. Collection time should be recorded in a log and reviewed within 24 hours of collection.

> ***Compliance Measures Summary:*** Monitors will inspect collection boxes, verify that the database is accurate and up-to-date, and ensure that 95% of grievances selected for review are collected, reviewed, entered, and tracked timely.

The Department's Fourteenth Self-Assessment reports that 100% of the reviewed grievances were collected and reviewed within 24 hours and handled as required in the Third and Fourth Quarters of 2023. The Panel has reviewed (and will continue to review) the Unit Collection compliance data to assess compliance with Section 6.10.

As noted in our Eighth Report, the Compliance Measure for Section 6.10 does not yield data sufficient to assess compliance with this provision. For example, the first 25 consecutive grievances at MCJ for the selected months were collected within the first two days of the month. The fact that MCJ timely collected grievances from its collection boxes in those first two days does not provide a meaningful measurement of the Department's compliance with Section 6.10. As such, the Panel has reviewed the Unit Collection compliance data for the entire month to assess compliance with Section 6.10. For the Third Quarter of 2023, MCJ's monthly collection log shows an overall compliance rate of 86% and TTCF's overall compliance rate was 98%. The posted results continue to show some areas within MCJ with low compliance rates, e.g. 3% and 74%. The Department has explained that there was an oversight including some of these areas (i.e. Control Booths) in their new grievance database. That oversight has since been corrected. MCJ was issued a Corrective Action Plan to address the untimely collection of grievances. The Department will report on the results of the Corrective Action Plan beginning in January 2024.

       **6.10 Status:** Compliance          **As of Date:** July 1, 2021

## 6.11 Failure to Properly Handle Grievances

**Provision Description:** Failing to provide an inmate with a grievance form when requested, destroying or concealing grievances, failing to respond appropriately to a grievance, attempting to intimidate an inmate from filing a grievance, and retaliating against an inmate who has filed a grievance, may each be a cause for disciplinary action.

> *Compliance Measure Summary:* Provide the Monitors with a log of any inmate grievances about the matters encompassed by Paragraph 6.11, the result of the investigations of those grievances, and documentation that appropriate corrective action was taken in 100% of cases.

For the Fourteenth Reporting Period, the Department reports that no staff members have been found to have engaged in the conduct encompassed by this Provision.

**6.11 Status:** Compliance                **As of Date:** July 1, 2022

## 6.12 Tracking Inmate Grievances

**Provision Description:** All inmate grievances should be entered into and tracked in an inmate grievance database that reflects the nature and status of the grievance, and personnel responsible for the Department's handling of the grievance.

> *Compliance Measures Summary:* Monitors will review 25 grievances from MCJ and 25 from TTCF to ensure that 95% of grievances reviewed are collected, reviewed, entered, and tracked timely.

The Department's posted results report that 100% of the grievances at both MCJ and TTCF in the randomly selected months in the Third and Fourth Quarters of 2023 were entered into the database as required by Section 6.12. The source documents for these results were available to, and reviewed by, the Panel.

**6.12 Status:** Compliance                **As of Date:** July 1, 2018

## 8.1 Anti-Retaliation

**Provision Description:** Prohibits Department personnel from retaliating against inmates.

> *Compliance Measures Summary:* Department implements and enforces an anti-retaliation policy and provides Monitors with a quarterly log of cases and findings as well as the first 25 investigations alleging retaliation.

The Department posted the results of the investigations approved by Unit Commanders in the randomly selected months and the number of anti-retaliation grievances received and investigated in the Third and Fourth Quarters of 2023, which were as follows:

- Third Quarter of 2023 there were 18 anti-retaliation grievances received, and one investigation completed that did not result in a sustained violation of the anti-retaliation policy.
- Fourth Quarter of 2023 there were 100 anti-retaliation grievances received, and one investigation completed that did not result in a sustained violation of the anti-retaliation policy.

The Panel notes that out of the 118 grievances received during this Reporting Period, only two investigations were completed. The Department needs to address this backlog in these investigations.

**8.1 Status:** Compliance                **As of Date:** April 1, 2019

## E. Deadlines

### 6.17 Use of Force Deadlines

**Provision Description**: A 30-day deadline in place for filing use of force grievances by inmates.

> *Compliance Measures Summary:* 1(a), 95% compliance with the first 25 use of force grievances determined by the Department to be untimely.

The Department's source documents for this provision indicate the Department achieved 100% compliance for the Fourteenth Reporting Period. There were four (4) grievances that met the criteria of this provision, and they were all handled appropriately in accordance with 6.17.

The Department has agreed to update the Grievance Forms to reflect the 30-day deadline noted in this Provision. The Department will also be making other changes to the form that require coordination with other units and CHS. In the interim, the Department will post signs by each grievance box noting the 30-day deadline.

**6.17 Status:** Compliance          **As of Date:** October 1, 2019

### 6.18 PREA Deadline

**Provision Description:** There should be no deadline for filing Prison Rape Elimination Act grievances.

> *Compliance Measures Summary:* 1(b), 95% compliance with the first 25 PREA grievances.

There were 8 grievances filed during the Third Quarter of 2023 and 3 filed during the Fourth Quarter of 2023 that met the criteria for Section 6.18. They all were handled appropriately in accordance with 6.18.

As in 6.17, the Department has agreed to update the Grievance Forms to reflect the lack of a deadline for filing a PREA grievance. While the grievance forms are being updated, the Department will post signs by each grievance box indicating there is no deadline to file a PREA grievance.

**6.18 Status:** Compliance          **As of Date:** July 1, 2018

### 6.19 Response to Inmate Grievances

**Provision Description:** Department should respond to inmate grievances "within 15 calendar days after the submission of the grievance," absent exceptional circumstances, which must be documented.

> *Compliance Measures Summary:* 1(d and e), 90% compliance with the first 25 grievances against staff and the first 25 grievances not against staff in which the investigation was not completed within 15 days.

As noted in the Twelfth and Thirteenth Reports, the purpose of this provision is to ensure inmates receive a substantive response to their grievance in a timely manner. The provision contemplates responses beyond the 15-day deadline to be rare. The Department had been considering rating themselves in compliance as long as the inmate received some type of notification within 15 days, including extensions. The Department concurs they are out of compliance with this provision for this Reporting Period.

The Panel finds the Department out of compliance with this provision.

**6.19 Status:** Out of Compliance          **As of Date:** N/A

## 6.20 Appeals of Grievances

**Provision Description:** Inmates should have 15 days from receipt of a denial of a grievance (or from release from segregations) to file an appeal of the grievance.

*Compliance Measures Summary:* 1(c), 95% compliance with the first 25 appeals of grievances determined by the Department to be untimely.

According to the Department's source documents, there were no appeals that met the criteria for this provision during the Fourteenth Reporting Period.

**6.20 Status:** Compliance            **As of Date:** July 1, 2018

# F. Communications with Inmates

## 7.2 Notification of Results

**Provision Description:** Inmate should be advised of the results of the investigation of grievances against personnel, but not any sanction imposed, within 10 days of adjudication.

*Compliance Measures Summary:* 1(f), 90% compliance with the first 25 completed grievances against staff, including the inmate notifications.

The Fourteenth Self-Assessment reports 53% compliance with this provision in the Third Quarter of 2023. There were only 13 grievances that met the criteria for this provision and timely notifications to the inmates were made for 7 of those grievances. For the Fourth Quarter of 2023, the Department's Compliance rate was 89%. Of the 27 grievances that met the 7.2 criteria, timely notification to the inmate occurred for 24 of the grievances. MCJ and IRC were issued a Corrective Action Plan. Timely notification to the inmate once the grievance is adjudicated continues to be an issue. The Panel finds the Department Out of Compliance.

**7.2 Status:** Out of Compliance            **As of Date:** N/A

## 7.3 Prisoner-Staff Communications

**Provision Description:** The Department should ensure that there are adequate avenues for constructive prisoner-staff communication, such as Town Hall meetings.

*Compliance Measures Summary:* Maintain logs of Town Hall meetings and report to the Monitors that each jail facility has conducted Town Hall meetings for a randomly selected month per quarter. Monitors interview inmates and staff to assess the adequacy of communications.

The Department's Fourteenth Self-Assessment reports that the Department was in Compliance with Section 7.3 during both the Third and Fourth Quarters of 2023. The Department provided 10% of the recorded prisoner-staff communications that occurred during Town Hall meetings at MCJ and TTCF during the randomly selected months during the Fourteenth Reporting Period, which included Town Hall meetings in special housing units as well as in General Population housing units.

**7.3 Status:** Compliance            **As of Date:** January 1, 2023

| Grievance Provisions | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 6.1 | Separate Grievance Forms | C | C | C | 1/1/2017 | ✓ |
| 6.2 | Availabilty of Grievance Forms | C | C | X | | |
| 6.3 | Emergency Grievances Forms | C | C | C | 1/1/2017 | ✓ |
| 6.4 | Use of Force Grievances | C | X | C | 1/1/2024 | |
| 6.5 | Grievances Against Staff | X | C | C | 7/1/2023 | |
| 6.6 | Right to Appeal Form | C | C | C | 1/1/2017 | ✓ |
| 6.7 | Handling Emergency Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.8 | Notification of Non-Emergency | C | C | C | 7/1/2018 | ✓ |
| 6.9 | Grievance Coordinator Review | C | C | C | 7/1/2018 | ✓ |
| 6.10 | Collection of Grievances | C | C | C | 7/1/2021 | |
| 6.11 | Failure to Handle Grievances | C | C | C | 7/1/2022 | |
| 6.12 | Tracking Inmate Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.13 | Grievance Coordinator Tracking | C | C | C | 7/1/2018 | ✓ |
| 6.14 | Grievance Coordinator Reports | C | C | C | 7/1/2018 | ✓ |
| 6.15 | Grievance Coordinator Analysis | C | C | C | 7/1/2018 | ✓ |
| 6.16 | Centralized Grievance Unit | C | C | C | 1/17/2017 | ✓ |
| 6.17 | Use of Force Deadline | C | C | C | 10/1/2019 | ✓ |
| 6.18 | PREA Deadline | C | C | C | 7/1/2018 | ✓ |
| 6.19 | Response to Inmate Grievances | C | X | X | | |
| 6.20 | Appeals to Grievances | C | C | C | 7/1/2018 | ✓ |
| 7.1 | Conflict Resolution Meeting | C | C | C | 1/1/2017 | ✓ |
| 7.2 | Notification of Results | X | X | X | | |
| 7.3 | Prisoner-Staff Communications | C | C | C | 1/1/2023 | |
| 8.1 | Anti-Retaliation | C | C | C | 4/1/2019 | ✓ |

# VI.   Use of Restraints

## 17.1 Restraint Provisions

**Provision Description:** Custody Force Manual must include "a separate section that sets forth the general principles governing the use of restraints."

The Panel concludes that the Department included such a separate section in the Manual.

**17.1 Status:** Compliance          **As of Date:** December 1, 2015

## 17.3 Safety Chair Procedures

**Provision Description:** Requires immediate medical examinations of inmates placed in Safety Chairs with a use of force, or if the inmate struggles against the Safety Chair restraints. Section 17.3 also requires that inmates' vitals are checked every hour while in the Safety Chair.

> *Compliance Measures Summary:* Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex. The Monitors conduct a Vertical and Horizontal Assessment of approximately 25 incidents to determine at least 90% compliance with restraint provisions.

During the Fourteenth Reporting Period, the Department provided the Inmate Safety Chair Security Check Logs and Fixed Restraint Logs at the Downtown Jail Complex for the Third and Fourth Quarters of 2023. The Panel's auditors continue to note there is no indication that medical professionals, or any Custody personnel, are performing hourly vitals checks even though inmates are often in the safety chairs for several hours while in transport to and from court and during court proceedings. As noted in previous

41

Panel Reports, periodic vitals checks are necessary to establish compliance even if the inmate does not struggle and force is not used to place the inmate in the Safety Chair. Out of the 29 and 27 unique safety chair records provided for the Third and Fourth Quarters of 2023, the Panel's auditors noted that there were no explicit indications of a use of force to place an inmate into the chairs.[16]  Due to vital checks not occurring as required, the Department remains out of Compliance with Section 17.3.

**17.3 Status:** Out of Compliance          **As of Date:** N/A

## 17.4 Safety Checks

**Provision Description:** Requires safety checks of inmates in fixed restraints every twenty minutes to verify and document the inmate is not in undue pain or that restraints are not creating injury.

> *Compliance Measures Summary:* Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex. The Monitors conduct a Vertical and Horizontal Assessment of approximately 25 incidents to determine at least 90% compliance with restraint provisions.

The Inmate Safety Chair Security Check Logs and Fixed Restraint Logs reflect that Department personnel consistently conduct safety checks on many inmates every twenty minutes, as required by Section 17.4.[17] However, fixed restraint logs provided for the eight inmates during the Third Quarter of 2023 and 11 during the Fourth Quarter of 2023 did not explicitly document personnel verifying that the inmate was not in undue pain or that the restraints were not causing injury.[18] The records reflecting when a safety chair was not used for transportation, but rather as a means of temporary control, indicate that there were no visible signs of injury or complaint of pain. Due to the Fixed Restraint Logs not explicitly documenting whether the inmate was in undue pain or that the restraints were not causing injury, the Department remains Out of Compliance with Section 17.4.

**17.4 Status:** Out of Compliance          **As of Date:** N/A

## 17.6 – 17.9 Multi-Point Restraints

**Provision Descriptions:** The provisions in these sections are specific to the use and application of multi-point restraints. The Department does not employ multi-point restraints and these provisions are therefore not applicable.

**17.6 – 17.9 Status:** Not Applicable          **As of Date:** N/A

## 17.10 Involuntary Medications

**Provision Description:** The Department's Custody use of force policies should provide that medication may not be used solely for security purposes.

---

[16] There was one record at TTCF for the Third Quarter of 2023, where due to incomplete documentation, the Panel's auditors were unable to determine whether or not force was used to place the inmate in the safety chair. In addition, there was one record at MCJ in the Fourth Quarter of 2023, where no indication was made whether force was used or if there were any visible signs of injury.

[17] While the use of safety chairs for inmate movement are not subject to Section 17.4, it should be noted that the Department's policy requires safety checks to be recorded every 15 minutes, which the majority of checks fall within. Based on the Department's posted documentation, all but four safety chair records provided for the Third and Fourth Quarters of 2023 are related to transportation.

[18] Unlike the Inmate Safety Chair Security Check Logs, which contain a field verifying whether or not there were "any visible signs of injury or complaint of pain caused by safety chair[,]" the Fixed Restraint Logs do not contain a similar field.

*Compliance Measures Summary:* Department will provide a log documenting the administration of involuntary medications and the reason for it. Monitors will review the log and interview involved medical and mental health professionals to verify medication was not used solely for security purposes.

The Department's posted results reflect that every administration of involuntary medications was pursuant to court order and there were no instances in which medication was used solely for security purposes in the Fourteenth Reporting Period. According to the log of Administration of Involuntary Medication, 387 inmates in the Third Quarter of 2023 and 162 inmates in the Fourth Quarter of 2023 received involuntary medication.

**17.10 Status:** Compliance          **As of Date:** July 1, 2018

| Use of Restraint Provisions | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 17.1 | Restraint Provisions | C | C | C | 12/1/2015 | ✓ |
| 17.3 | Safety Chair Procedures | X | X | X | | |
| 17.4 | Safety Checks | X | X | X | | |
| 17.6 | Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.7 | Approval of Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.8 | Continued Use of Restraints | N/A | N/A | N/A | | |
| 17.9 | Supervisor Approval of Restraints | N/A | N/A | N/A | | |
| 17.10 | Involuntary Medication | C | C | C | 7/1/2018 | ✓ |

# VII. Early Warning System

## 19.1 Development of EWS

**Provision Description:** Develop a system to identify potentially problematic Department members based upon objective criteria, such as number of force incidents, inmate grievances, allegations of misconduct, performance reviews, and policy violations.

*Compliance Measure Summary:* The system identifies potentially problematic employees upon objective criteria.

The Panel approved the Employee Review System ("ERS") in July 2018, and it was implemented by the Department as a pilot program in the Downtown Jail Complex on August 1, 2018, and in the rest of the jail facilities as of November 1, 2018.

**19.1 Status:** Compliance          **As of Date:** August 1, 2018

## 19.2 Review of EWS Reports

**Provision Description:** Compliance Lieutenants must review reports monthly to identify potentially problematic Department members and promptly notify the Unit Commander and the Assistant Sheriff for Custody Operations in writing.

*Compliance Measure Summary:* Unit Commanders make notifications within ten days 90% of the time and within thirty days 95% of the time.

For the Third and Fourth Quarters of 2023, the Department's posted results indicate the Compliance Lieutenant notified the appropriate Unit Commander and the Assistant Sheriff for Custody Operations in writing of potentially problematic employees within 10 days of receiving the monthly reports 100% of the time, and within thirty days 100% of the time.  The Department is in Compliance with this provision.

**19.2 Status:** Compliance          **As of Date:** January 1, 2023

## 19.3 Performance Mentoring Programs

**Provision Description:** Unit Commanders required to determine whether problematic employees should be placed on a performance mentoring program. For each potentially problematic Department member identified through the EWS, the Unit Commander must consult with the appropriate Chief and document the reasons why any problematic members are not placed on a performance mentoring program.

> *Compliance Measure Summary:* Chief is consulted 95% of the time to determine if a non-disciplinary performance program is appropriate. If so, specific performance metrics were in place and the reason for the decision was provided 95% of the time.

The Department's Early Warning System identified 13 employees in the Third Quarter of 2023 that required further scrutiny. Two of the employees had been relieved of duty pending the outcome of administrative investigations.  One of those investigations was for off-duty misconduct. A third employee was also being administratively investigated. The Department determined no further action was needed regarding the remaining ten (10) employees. During the Fourth Quarter of 2023, 11 employees were identified through the Early Warning System. Two of the employees were being administratively investigated.  One employee was reassigned to a position less likely to have contact inmate contact and was placed on performance monitoring for 60 days. The Department determined no further action was needed regarding the remaining eight (8) employees. The Department's posted results for the Fourteenth Reporting Period reflect 100% compliance with this provision.

**19.3 Status:** Compliance          **As of Date:** July 1, 2022

| Early Warning System Provisions | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 19.1 | Development of EWS | C | C | C | 8/1/2018 | ✓ |
| 19.2 | Review of EWS Reports | C | C | C | 1/1/2023 | |
| 19.3 | Performance Mentoring Programs | C | C | C | 7/1/2022 | |

# Appendix A: Compliance Chart

| Fourteenth Report Compliance Chart | | | | | |
|---|---|---|---|---|---|
| **Administrative Provisions** | | Twelfth Report | Thirteenth Report | Fourteenth Report | | |
| No. | Provision | 3Q22 - 4Q22 | 1Q23 - 2Q23 | 3Q23 - 4Q23 | AS OF | 3YR+ |
| 1.1 | Assistant Sheriff | C | C | C | 1/1/2017 | ✔ |
| 1.2 | Sheriff | C | C | C | 1/1/2017 | ✔ |
| 1.3 | Supervision | X | X | X | | |
| 1.4 | Reports to Board | C | C | C | 6/12/2018 | ✔ |
| 10.1 | Senior Manager Tours | C | C | C | 6/30/2018 | ✔ |
| 10.2 | Housing Unit Documentation | C | X | C | 1/1/2024 | |
| 18.1 | Custody-Wide Rotation Policy | C | C | C | 6/30/2018 | ✔ |
| 18.2 | Semi-Annual Rotation Audit | C | C | C | 1/1/2019 | ✔ |
| 21.1 | Transfers to Custody | C | C | C | 6/30/2018 | ✔ |
| **Use of Force Policy Provisions** | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
| 2.1 | Custody Force Manual | C | C | C | 1/1/2017 | ✔ |
| 8.2 | Complaints of Retaliation | C | C | C | 1/1/2017 | ✔ |
| 17.2 | Pregnant Inmates | C | C | C | 1/1/2017 | ✔ |
| 20.1 | Categories of Force | C | C | C | 1/1/2017 | ✔ |
| 20.2 | Reactive Force | C | C | C | 1/1/2017 | ✔ |
| **Use of Force Practice Provisions, Packet Review** | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
| 2.2 | Force Prevention Principles | 40% | 58% | 86% | | |
| 2.3 | Inmate on Inmate Violence | 81% | 87% | 98% | 1/1/2024 | |
| 2.4 | Use of Force as Discipline | 98% | 94% | 98% | 7/1/2019 | ✔ |
| 2.5 | Force on Restrained Inmates | 86% | 95% | 97% | 7/1/2023 | |
| 2.6 | Head Strikes or Kicks | 52% | 64% | 88% | | |
| 2.7 | Supervisors Called to Scene | 90% | 78% | 88% | | |
| 2.8 | Prevent Excessive Force | 86% | 60% | 100% | 1/1/2024 | |
| 2.9 | Armed Inmates | 88% | 71% | 67% | | |
| 2.10 | Authorized Weapons | 95% | 85% | 88% | | |
| 2.11 | Planned Chemical Spray | 80% | 100% | 100% | 7/1/2023 | |
| 2.12 | Chemical Spray & Tasers | 95% | 100% | 86% | | |
| 2.13 | Check of Medical Records | 71% | 100% | 83% | | |
| 4.1 | Consult Mental Health Professionals | 90% | 100% | 88% | 1/1/2023 | |
| 4.3 | Spray on Mental Health Inmates | 100% | 100% | 100% | 10/1/2019 | ✔ |
| 4.4 | Cooling Off Periods | 100% | 83% | 100% | 1/1/2023 | |
| 4.5 | Medical or Mental Health Provider Order | 100% | 100% | 100% | 1/1/2023 | |
| 9.2 | Escorting of Inmates | 90% | 92% | 88% | | |
| 9.3 | Duty to Protect & Intervene | 100% | 100% | 100% | 7/1/2022 | |
| 17.5 | Minimize Medical Distress | 49% | 61% | 51% | | |
| 20.3 | Planned Use of Force | 62% | 100% | 100% | 7/1/2023 | |

45

| Training Provisions | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 3.1 | Use of Force Training | C | C | C | 12/31/2021 | ✓ |
| 3.2 | Ethics & Professionalism | C | C | C | 6/30/2018 | ✓ |
| 3.3 | Custody Training | C | C | C | 6/30/2018 | ✓ |
| 3.4 | Custody-based Scenarios | C | C | C | 6/30/2018 | ✓ |
| 3.5 | Add Training and Mentoring | C | C | C | 7/1/2019 | ✓ |
| 3.6 | Probation Reviews | C | C | C | 1/1/2023 | |
| 4.6 | Crisis Intervention | C | C | C | 6/30/2018 | ✓ |
| 4.7 | Mentally Ill Inmates | C | C | C | 1/1/2023 | |
| 4.8 | Mentally Ill Inmates (new staff) | C | C | C | 6/30/2018 | ✓ |
| 4.9 | Crisis Intervention (new staff) | C | C | C | 6/30/2018 | ✓ |
| 12.1 | Force Investigations | C | C | C | 7/1/2019 | ✓ |
| **Reporting & Investigations, Department Reported** | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
| 5.1 | Tracking of Force Incidents | X | X | X | | |
| 8.3 | CFRC Review | C | C | C | 6/30/2021 | |
| 11.1 | CFRT Involvement | C | C | C | 6/30/2018 | ✓ |
| 13.1 | Documenting Dishonesty | C | C | C | 10/1/2019 | ✓ |
| 13.2 | Reports of Dishonesty/PREA | C | C | C | 10/1/2019 | ✓ |
| 14.1 | Review of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |
| 14.2 | Timeliness of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |
| **Reporting & Investigations, Packet Review** | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
| 4.2 | Mental Health Professionals | 85% | 100% | 100% | 1/1/2023 | |
| 5.2 | Commander's Reviews | 94% | 94% | 100% | 1/1/2023 | |
| 5.3 | Unexplained Discrepancies | 93% | 95% | 98% | 7/1/2022 | |
| 12.2 | Location of Inmate Interviews | 51% | 52% | 49% | | |
| 12.3 | Suspect Interviews | 90% | 90% | 96% | 7/1/2019 | ✓ |
| 12.4 | Uninvolved Supervisors | 88% | 96% | 98% | 7/1/2023 | |
| 12.5 | Standard Order & Format | 98% | 100% | 100% | 7/1/2019 | ✓ |
| 15.1 | Timeliness of Reports | 94% | 92% | 88% | | |
| 15.2 | All Department Witnesses | 94% | 94% | 96% | 7/1/2019 | ✓ |
| 15.3 | Force by Other Members | 78% | 88% | 90% | 1/1/2024 | |
| 15.4 | Description of Injuries | 76% | 80% | 92% | 1/1/2024 | |
| 15.5 | Clarification After Video | 93% | 79% | 100% | 1/1/2024 | |
| 15.6 | Separation of Deputies | 16% | 47% | 48% | | |
| 15.7 | Individual Perceptions | 90% | 98% | 98% | 7/1/2019 | ✓ |
| 16.1 | Healthcare Assessment | 98% | 98% | 100% | 7/1/2019 | ✓ |
| 16.2 | Photograph of Injuries | 83% | 87% | 91% | 1/1/2024 | |
| 16.3 | Medical Report of Injuries | 96% | 100% | 100% | 7/1/2019 | ✓ |

| Grievance Provisions | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 6.1 | Separate Grievance Forms | C | C | C | 1/1/2017 | ✔ |
| 6.2 | Availabilty of Grievance Forms | C | C | X | | |
| 6.3 | Emergency Grievances Forms | C | C | C | 1/1/2017 | ✔ |
| 6.4 | Use of Force Grievances | C | X | C | 1/1/2024 | |
| 6.5 | Grievances Against Staff | X | C | C | 7/1/2023 | |
| 6.6 | Right to Appeal Form | C | C | C | 1/1/2017 | ✔ |
| 6.7 | Handling Emergency Grievances | C | C | C | 7/1/2018 | ✔ |
| 6.8 | Notification of Non-Emergency | C | C | C | 7/1/2018 | ✔ |
| 6.9 | Grievance Coordinator Review | C | C | C | 7/1/2018 | ✔ |
| 6.10 | Collection of Grievances | C | C | C | 7/1/2021 | |
| 6.11 | Failure to Handle Grievances | C | C | C | 7/1/2022 | |
| 6.12 | Tracking Inmate Grievances | C | C | C | 7/1/2018 | ✔ |
| 6.13 | Grievance Coordinator Tracking | C | C | C | 7/1/2018 | ✔ |
| 6.14 | Grievance Coordinator Reports | C | C | C | 7/1/2018 | ✔ |
| 6.15 | Grievance Coordinator Analysis | C | C | C | 7/1/2018 | ✔ |
| 6.16 | Centralized Grievance Unit | C | C | C | 1/17/2017 | ✔ |
| 6.17 | Use of Force Deadline | C | C | C | 10/1/2019 | ✔ |
| 6.18 | PREA Deadline | C | C | C | 7/1/2018 | ✔ |
| 6.19 | Response to Inmate Grievances | C | X | X | | |
| 6.20 | Appeals to Grievances | C | C | C | 7/1/2018 | ✔ |
| 7.1 | Conflict Resolution Meeting | C | C | C | 1/1/2017 | ✔ |
| 7.2 | Notification of Results | X | X | X | | |
| 7.3 | Prisoner-Staff Communications | C | C | C | 1/1/2023 | |
| 8.1 | Anti-Retaliation | C | C | C | 4/1/2019 | |
| Use of Restraint Provisions | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
| 17.1 | Restraint Provisions | C | C | C | 12/1/2015 | ✔ |
| 17.3 | Safety Chair Procedures | X | X | X | | |
| 17.4 | Safety Checks | X | X | X | | |
| 17.6 | Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.7 | Approval of Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.8 | Continued Use of Restraints | N/A | N/A | N/A | | |
| 17.9 | Supervisor Approval of Restraints | N/A | N/A | N/A | | |
| 17.10 | Involuntary Medication | C | C | C | 7/1/2018 | ✔ |
| Early Warning System Provisions | | Twelfth Report | Thirteenth Report | Fourteenth Report | AS OF | 3YR+ |
| 19.1 | Development of EWS | C | C | C | 8/1/2018 | ✔ |
| 19.2 | Review of EWS Reports | C | C | C | 1/1/2023 | |
| 19.3 | Performance Mentoring Programs | C | C | C | 7/1/2022 | |

47