Kathleen M. Kenney
343 Sweet Grass Way
Richmond, KY 40475
Email: kkenney@federalcourtmonitor.com

**Monitor and on behalf of Monitors**
**Robert Houston and Nicholas E. Mitchell**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS, et al.,<br>Plaintiffs,<br>v.<br><br>LOS ANGELES COUNTY SHERIFF<br>ROBERT LUNA, in his official<br>capacity,<br><br>Defendant. | Case No. 12-cv-00428-MWF (MRW)<br><br>**PANEL'S FIFTEENTH REPORT**<br><br>Hon. Michael W. Fitzgerald<br>United States District Judge |

Case No. 12-cv-00428-MWF (MRW)

Pursuant to Section V of the Settlement Agreement and Release of Claims, the Monitors appointed by this Court, Robert Houston, Nicholas E. Mitchell, and Kathleen Kenney (collectively, the "Panel") hereby submit the attached Panel's Fifteenth Report, evaluating Defendant's compliance with the Action Plan for the six-month period from January 1, 2024 to June 30, 2024. This Report takes into consideration the comments from the parties in accordance with Section V of the Settlement Agreement. The Panel is available to answer any questions the Court may have regarding this Report at such times as are convenient for the Court and the parties.

DATED: October 15, 2025

Respectfully Submitted,

KATHLEEN M. KENNEY

By: /S/ Kathleen M. Kenney
Monitor and on behalf of Monitors
Robert Houston and
Nicholas E. Michell

## PANEL'S FIFTEENTH REPORT

**Table of Contents**

Panel's Fifteenth Report                                                                                 2
Action Plan Implementation Assessment                                                    10

   **I.   Administrative Provisions**                                                    **10**
      A.   Leadership and Accountability                                        10
      B.   Management Visits                                                    16
      C.   Rotations and Transfers                                              17

   **II.   Use of Force Policies and Practices**                              **19**
      A.   Overall Use of Force Policies                                        19
      B.   Use of Force Practices & Review of Force Packages                    20
      C.   Quarterly Findings—Use of Force Provisions                           24

   **III.  Training**                                                          **26**
      A.   Use of Force Training                                                26
      B.   Ethics and Professionalism Training                                  27
      C.   Mental Health Training                                               27
      D.   New Deputy Sheriffs and Custody Assistants                           28
      E.   Sergeant Training                                                    29

   **IV.  Reporting and Investigation of Force Incidents**                 **30**
      A.   Reporting and Investigation Provisions in Force Package Reviews      30
      B.   Reporting & Investigations Provisions as Reported by Department      34
      C.   Quarterly Findings—Reporting and Investigations Provisions          36

   **V. Inmate Grievances**                                                **38**
      A.   Grievance Forms                                                      38
      B.   Emergency Grievances                                                 39
      C.   Inmate Grievance Coordinator                                         40
      D.   Handling of Grievances                                               41
      E.   Deadlines                                                            43
      F.   Communications with Inmates                                          44

   **VI.  Use of Restraints**                                              **45**

   **VII. Early Warning System**                                           **47**

Appendix A: Compliance Chart                                                             49

# Panel's Fifteenth Report

The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan [developed by the Panel] ('Reports') at intervals the Panel shall determine." This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from January 1, 2024, to June 30, 2024 (the "Fifteenth Reporting Period") and it takes into consideration comments received from the Plaintiffs' counsel on September 29, 2025 and the Los Angeles County Sheriff's Department on September 26, 2025.

In May 2014, the Parties retained the Panel "to develop a corrective action plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles" (the "Downtown Jail Complex"). The plan developed by the Panel sets forth provisions in twenty-one areas that the Sheriff is required to implement in the Downtown Jail Complex. The plan was approved by the Court on April 7, 2016. Under Paragraph VIII of the Settlement Agreement, "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')." As of November 1, 2018, the Sheriff's Department (the "Department") has implemented 104 of the Panel's 106 recommendations. The remaining two recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in *United States v. County of Los Angeles, et al.*, CV No. 15-05903 (JEMx) (the "DOJ case").

Since the May 12, 2022 Status Conference, the Parties have been working to develop a written plan to achieve compliance with four key areas: (1) eliminating impermissible head strikes; (2) proper use of the WRAP Restraint; (3) appropriate utilization of force avoidance and de-escalation techniques; and (4) accountability. The Department implemented the Limitations on Force (head strikes) Policy and the WRAP Restraint Policy on September 1, 2024. With regard to accountability, the Parties have agreed to revisions to Provision 13.1 (Documenting Dishonesty) and 15.7 (Individual Perceptions) and a new Compliance Measure for 1.3 (Accountability for Failing to Address Policy Violations). A new Provision related to the WRAP Restraint has also been agreed upon. The Parties plan to file a Stipulation by November 1, 2025 setting forth the proposed revisions to the Revised Monitoring Plan and Compliance Measures, which will include the agreed upon list of 19 Provisions moved to non-reporting status.

The Panel has been monitoring the Department's implementation of the Rosas settlement agreement for close to ten years. In that time, the Department has made significant progress to achieve compliance with the Agreement. For example, it has drafted and implemented clear, well-organized, and specific use of force policies for a custodial setting, installed a large number of cameras throughout the jails, implemented a multi-layer force review system, and focused on decreasing overall uses of force in the Downtown Jail Complex. This report, like others the Panel has filed, highlights two key areas that the Department must focus on in order to achieve Rosas compliance: (1) eliminating impermissible head strikes and (2) developing an effective system of accountability for impermissible uses of force.

*Eliminating Impermissible Head Strikes*
In recent years, the Department has focused on reducing the number of head strikes used by its staff, and, as noted on page 5, those efforts have had a positive impact on the number of head strikes in the Downtown Jail Complex. This progress is encouraging. Yet, the Panel has identified several areas where the Department needs to do more work. First, misperceptions about head strikes continue to persist among jail staff. For example, staff have told the Panel that they are never allowed to use head strikes under any circumstances and that they are supposed to do nothing when an inmate punches them in the face. This belief is false and must be countered with further explanation of the relevant policies, and demonstration of examples of permissible versus impermissible head strikes. Second, the Panel has continued to identify head strikes that

2

violate the Rosas Provisions where jail leadership have not identified those violations. For example, the Panel reviewed a case involving an inmate-on-inmate assault. Deputies intervened to stop the assault and one of the inmates continued to be assaultive and resist the deputies' actions. Four of the nine deputies involved punched the inmate a total of ten times. Six of the ten punches were head strikes and deemed out of compliance by the Panel. The investigator noted that the Department "does not train custody personnel to use personal weapons to gain compliance from suspects/inmates." All levels of supervisory review found the force used to be objectively reasonable. Developing effective accountability processes in which Department leaders identify and hold staff accountable for impermissible head strikes is also essential.

*Fluctuating Use of Force and Head Strike Numbers, 2021-2024*
Between 2021 and 2023, the Department saw a consistent decrease in uses of force at the Downtown facilities, with 1150 in 2021, 957 in 2022, and 720 in 2023. Yet in 2024, the total number of uses of force increased to 805, a 12% increase from the prior year. See *Figure 1*.

When comparing 6-month reporting periods over two years, there was a 20% increase in the number of uses of force for this Fifteenth Reporting Period (1Q24 + 2Q24). As shown in *Figure 2*, there were a total of 336 uses of force in the last half of 2023 as compared to 402 in the first half of 2024. This increase holds into the last half of 2024 based on preliminary data reported by the Department, with 403 incidents.



*Figure 1*



*Figure 2*

While the Fifteenth reporting period and the preliminary results for the Sixteenth reporting period show no change in the number of uses of force—402 versus 403, respectively, there was a significant change between quarters. Of the 402 total use of force incidents in the Fifteenth reporting period, 199 were in 1Q24 and 203 were in 2Q24. Of the 403 incidents reported in the Sixteenth reporting period, 242 were in 3Q24 and 161 were in 4Q24. As shown in *Figure 3*, there was an increase in incidents over the first three quarters of 2024— 2% between 1Q24 and 2Q24 and 19% between 2Q24 and 3Q24—with a 33% decrease in 4Q24, with 161 incidents. A total of 161 incidents in a quarter is the lowest number reported for any quarter in 2023 and 2024, also shown in *Figure 3*. The orange box indicates the current reporting period.



*Figure 3*

3

Head strikes, too, have fluctuated, though the overall trend has been down. As shown in *Figure 4*, there was a 37% increase in the total number of head strikes from 2020 to 2021—60 to 82— followed by a 37% decrease in 2022—with 52 head strikes— and an additional decrease in 2023 of 35%—with 34 head strikes. The Department maintained a total number of 34 head strikes throughout 2024. Similarly, the percentage of incidents involving head strikes has decreased from 7.1% in 2021 (82 head strikes in 1150 incidents), to 5.4% in 2022 (52 head strikes in 957 incidents), to 4.7% in 2023 (34 head strikes in 720 incidents), and to 4.2% in 2024 (34 head strikes in 805 incidents).



*Figure 4*

As shown in *Figure 5*, there were swings within the jail facilities in the number of head strikes. For example, over the last three reporting periods, IRC has gone from 7 to 1 to 4 total head strikes. Similarly, TTCF swung from 10 to 4 to 6 head strikes. These swings range from 40% to nearly 90% increases and decreases over time, as noted in the *Panel's Fourteenth Report* (p. 3-4). For the Fifteenth reporting period, there was a 25% increase in the total number of head strikes across all facilities from 12 to 15. While MCJ had a 29% decrease from seven (7) to five (5), TTCF and IRC both had increases: TTCF increased by 50% from four (4) to six (6) and IRC increased by 300% from one (1) to four (4).

Based on preliminary data for the Sixteenth Reporting Period, it appears this upward trend continued with an additional 27% increase across all facilities in the Third and Fourth Quarters of 2024 from 15 to 19. This data will be further analyzed in the Sixteenth Report. Ongoing data analysis and tracking will determine the impact on compliance with Provisions 2.2 and 2.6 and if the status is maintained.



*Figure 5*

*Enhancing Accountability for Use of Force Violations, Including Impermissible Head Strikes*
Various Provisions of the Agreement and the Action Plan require the Department to develop processes to improve accountability for use of force violations. This includes Provision 1.3 ("Department managers should be held accountable should they fail to address use of force problems at the Department's jail facilities"); Provisions 5.1, 4.2, 5.2, 5.3, 12.2, 12.3, 12.4, 12.5, 15.1, 15.2, 15.3, 15.4, 15.5, 15.6, 16.7, 16.1, 16.2, 16.3 (requiring accurate and timely reporting and investigation of force incidents); and Provision 13.1

4

(zero tolerance for dishonesty in force reporting, and requiring the Department to explain any failure to appropriately discipline staff found to have been dishonest or to have engaged in excessive force).[1] Construing these Provisions, the Panel has repeatedly noted that unless line personnel are held accountable for violations of force policy – and supervisors are in turn held accountable for failing to do so – LASD will struggle to reduce the number of impermissible head strikes and will not come into compliance with the Agreement. For example, in the Eleventh Report (p. 12), the Panel noted:

> "The Panel continues to review cases involving violations of policy, such as head punches for inmate control, that result in Departmental actions that do not reflect the seriousness of the offenses. The Department must hold Deputies accountable for use of force violations and hold supervisory staff accountable when they fail to identify and/or appropriately address violations."

In the Thirteenth Report (p. 3-4) the Panel explained:

> "In a majority of the cases reviewed by the Panel for this Report in which the Panel identified force policy violations, Department managers either failed to identify, properly analyze or address those violations. For example, the Panel found violations of the Department's Limitations of Force (head strikes) policy in 17 cases. The Department concluded the force used in 15 of these cases was objectively reasonable and within Departmental policy. In the remaining two cases, the Department identified concerns with force used and referred the cases for further investigation. Speaking plainly, this must change for the Department to achieve compliance with the Settlement Agreement."

Under Department policy, when there is evidence of apparent misconduct during a use of force, an administrative investigation is to be opened to further investigate that incident. *See generally*, Custody Operations Force Manual 7-07/000.00 Use of Force Review Procedures. In the Fifteenth Reporting Period, the Panel saw some modest improvement in the willingness of Department leaders to recommend administrative investigations in the face of apparent use of force violations, including impermissible head strikes. The Panel reviewed a total of 50 completed force packages selected from a comprehensive list of force incidents compiled by the Department. The Panel did not select force packages randomly or in proportion to the frequency with which various categories of force occur. Rather, the Panel selected for review the force incidents most likely to involve problematic uses of force.[2] The Panel found 41 of the 50 (82%) force packages reviewed compliant with use of force prevention principles of Provision 2.2. This is a slight decrease from the 86% compliance in the Fourteenth Report, yet still a notable increase from the 58% compliance in the Thirteenth Reporting Period and 40% in the Twelfth Reporting Period, as shown in Figure 6.



*Figure 6*

Provision 2.6 of the Action Plan prohibits head strikes and kicks unless (1) the inmate is assaultive, (2) there is imminent danger of serious injury, and (3) there are no other more reasonable means to avoid serious physical injury. The Panel found 42 out of the 50 (84%) force packages reviewed compliant with Provision 2.6. This is a slight decrease from the 88% compliance in the Fourteenth Report, yet still a

---

[1] These provisions were predated by other evaluations of the Department that noted the need for enhanced accountability for use of force violations. *See, e.g.*, Final Report of the 2012 Citizens Commission on Jail Violence ("Timely investigations and discipline commensurate with the nature of the misconduct are essential to sustaining a reduction in the use of excessive and unnecessary force and ameliorating a code of silence in the jails. So too is a discipline system that severely punishes false reports and failures to report such incidents.")( available at https://ccjvlacounty/.gov/wp-content/uploads/2012/09/CCJV-Report.pdf).

[2] The Panel usually selects cases in which staff deployed/utilized the taser, WRAP, or personal weapons.

5

notable increase from the 64% compliance in the Thirteenth Reporting Period and the 52% compliance in the Twelfth Reporting Period, as shown in Figure 7.



Figure 7

Maintaining this compliance rate for Provisions 2.2 and 2.6 through the Fifteenth Reporting Period demonstrates meaningful progress in achieving the goals of the Settlement Agreement. Yet, in the cases the Panel identified as non-compliant, the Department continued to struggle to identify the force violations and properly refer them for administrative investigations.

The Panel continued to encounter resistance from Department leaders to opening administrative investigations in the face of apparent use of force violations, including impermissible head strikes. This resistance has been communicated in certain meetings with Department leaders and is highlighted by several cases reviewed by the Panel in the Fifteenth Reporting Period. Of the 50 cases the Panel reviewed for the Fifteenth Reporting Period, the Department used head strikes in 15 cases. The Panel found the Department's actions in 8 of the 15 cases met the criteria for 2.6 and were therefore compliant. In the 7 remaining cases, the Department concluded the actions of staff were objectively reasonable and within Departmental policy in all seven. Two cases, summarized below, are illustrative:

In the first case, two deputies removed a high-security, handcuffed inmate from his cell in order to escort him down a narrow jail hallway. Both deputies went hands-on, with one deputy gripping the back of the inmate's neck. The inmate's head forcefully struck the window ledge of the wall opposite his cell. In the deputy's use of force report, he claimed his hand ended up behind the inmate's neck by accident, that the inmate quickly turned and that it was the inmate's own momentum that drove his head into the wall/window ledge. This claim was belied by the video evidence, which reflected the deputy braced his body for leverage with his hand gripping the back of the inmate's neck, and drove the inmate's head into the window ledge. Serious head lacerations resulted from this impact.

The Department's force review was encapsulated in a short, two-page document that provided no analysis of the use of force, did not reconcile the deputy statements and the video as to the cause of the impact, or evaluate the credibility of the staff accounts. It concluded, without explanation, that deputies "used strategies and/or tactics which failed to comply with Department policies and/or procedures, and/or training". Based on the documents provided to the Panel, a five-day suspension was recommended for those infractions, but no Rosas violations were found as to the force itself.[3]

In the second case, an inmate with profound mental illness, in a suicide gown, was being moved to a new housing location. He was placed at, and cuffed to, a metal spider table in the dayroom, and a bag of his clothing was placed nearby. When deputies walked away, he removed his hand from the cuff and began dressing in the clothing from the bag. Two deputies returned. In their use of force reports, they indicated that when they approached the inmate, he "bladed his body," "raised his fists," and "leaned back taking a fighting stance." He then allegedly threw a punch at one of the deputies. Although the video footage from both CCTV cameras is partially corrupted for the seconds covering the alleged punch, none of the aggressive behavior reported by the deputies is depicted, which shows the inmate sitting calmly as staff approached.

The video does show that the deputies closed the distance, and one deputy delivered several forearm strikes and another deputy delivered several forearm strikes followed by three punches to the inmate's face. In their review of the incident, the Department's Custody Force Investigation Team ("CFIT") identified "possible

---

[3] This matter was referred to the District Attorney's Office for prosecution. The case was declined, and the Department appeared to use the declination to bolster its perception that there was no violation with the head slamming portion of the case.

6

collaboration" by the deputies in their preparation of use of force reports because their reports included verbiage that was "almost identical," and contained the same rare, unique errors, such as the inclusion of the phrase "handcuffed immediately handcuffed" in both reports.

Despite this evidence of collaboration, and lack of any video evidence that the inmate was aggressive, CFIT credited the deputies' accounts that the inmate was "assaultive," and it therefore found the force justified: "Overall, the force used during this incident appeared to be reasonable by the fact that the [Suspect] assaulted deputy personnel." CFIT recommended an administrative investigation to address possible violations of Handling Insubordinate, Recalcitrant, Hostile or Aggressive Inmates Policy, and the apparent collaboration in the preparation of force reports, which would violate the Rosas Provisions and Department rules.

In the review of the incident conducted by jail commanders, the three-prong test embedded within Rosas 2.6 and the Department's Limitations on Force Policy, which requires that there must be "no other reasonable alternative" in order to justify the use of head strikes, was not applied nor mentioned. It was concluded that the force "was the result of the suspect's attack on deputy personnel," without explaining how they reached that conclusion or addressing the lack of video evidence of such aggression. In addition, they overruled CFIT, asserting instead that a "Use of Force Refresher training, which encompasses report writing," would be scheduled for involved staff. No Rosas violations were identified.

The Panel met with the Department's senior leadership to emphasize concerns about the cases and highlight systemic deficiencies in the Department's force review practices. Recommendations were provided to assist the capability of Custody Division leaders in identifying Rosas violations. The Panel continues to work collaboratively with the Department regarding these issues which, again, must be corrected for the Department to come into compliance with the Settlement Agreement.

Achieving an effective accountability system will require the Department to overcome its reluctance to open administrative investigations into staff who have potentially committed force violations. Unlike other law enforcement and custodial agencies, LASD only allows Chiefs to forward a case/complaint for an administrative investigation. This policy lends itself to staff narrowing the scope of what cases get sent to the Chiefs for possible referral. The culture around administrative investigations must change. An administrative investigation is a process to find out what happened, not an indictment of involved staff. It may clear staff of wrongdoing or be used to hold them accountable for policy violations. There appears to be a sense in the Department that if staff are referred for an administrative investigation, they are presumed guilty, which is not accurate. Moreover, the Panel is concerned that some supervisors mistakenly believe identifying policy violations that could lead to an administrative investigation is not being "supportive" of staff. This belief and lack of action lead to confusion among staff members because standards of behavior are not established in a consistent manner.

To address some of these concerns, in 2023, the Panel recommended the Department create an independent team to review use of force cases. The Department agreed with the recommendation, in part, and established the Custody Force Investigations Team ("CFIT"). The initial force investigations for Category 2 cases are now completed by a CFIT Sergeant instead of a Sergeant from the jail where the force occurred. Once CFIT completes its investigations, however, the cases are sent back to the facility for review by the Watch Commander, Unit Commander, and Commander. Sending the investigation back to the facility where the force occurred does not offer the independence that the Panel had hoped for and recommended.

The Panel's preliminary impressions of the CFIT investigations were positive. They were completed timelier and were more likely to identify potential policy violations if necessitated by facts. However, the Panel has since seen several cases in which the CFIT investigator recommended an administrative investigation and that recommendation was later overturned by supervisory personnel at the jail itself. The Panel made known its concerns with about this, and was advised that when that happens, a higher level of

7

review will take place to ensure the decision to not open a case was appropriate. In a recent meeting with CFIT staff, the Panel learned it will no longer be empowered to recommend an administrative investigation but rather some type of "further review" of the matter. The Panel is continuing to monitor whether CFIT is actually conducting effective, thorough, and independent force investigations and will provide additional information in future reports.

The other critical component of an effective accountability system is discipline. Penalties must be commensurate to the severity of the offense and administered in a timely and fair process. LASD's disciplinary guidelines are appropriate and, if followed, can serve as the basis of an effective accountability system. Staff discipline is further discussed under Provision 1.3, on Page 11.

*Staff and Inmate Focus Groups*
The Panel conducted a series of focus groups with staff and discussions with inmates during its October 2024 and January 2025 Monitoring visits. The participants were randomly selected. The Panel continues to find the focus groups and discussions beneficial.

The following ideas were expressed by custody staff during the focus groups:[4]
- Concern about not having access to internet. Staff must look at inmate televisions to see current events, such as a school lockdown
- Bus shortages create potential force situations. Inmates fighting in cells.
- Concern about how much overtime staff have to work, particularly with consecutive shifts – the impact is like being legally impaired.
- Do one little thing wrong and get a PLE that stays in your file for one year.
- Concerns about not being able to defend themselves without getting into trouble.
- Inmates are aware that we don't want to use force.
- Deputies should be allowed to view video prior to writing force reports, similar to a patrol setting.

The following themes emerged from the group discussions with inmates:[5]
- The way you are treated is all about respect. You show respect, you get respect.
- Only compliments for the staff – 100% on our side.
- No force issues noted.
- Not getting enough food – not enough calories.
- Difficult to be seen by medical staff – even when having chest pains.
- Unit overcrowded – triple bunked. Not enough seats to sit down and eat.
- Concerns about retaliation if you raise issues.

---

[4] In October 2024, staff focus groups were comprised of deputies and sergeants from IRC and TTCF. In January 2025, the Panel spoke to deputies and custody assistants from MCJ. The views expressed are not necessarily reflective of the views of all members of custody staff.

[5] The Panel spoke to approximately 12 inmates as part of focus groups during the October 2024 and January 2025 visits. All three facilities were represented in focus groups. The views expressed by the focus group participants are not necessarily reflective of all inmates. The Panel also gathered feedback from inmates dispersed throughout the Downtown Jail Complex during its tours, and with inmates specifically identified by Plaintiffs.

8

*Reporting Period Compliance Results*



*Figure 8*

For the Fifteenth Reporting Period, the Department is found in compliance with 80 of the 100 applicable (104 total) provisions set forth by the Action Plan. As shown in Figure 8, compliance results per category are as follows:

(1) 8 out of 9 of the Administrative Provisions (89%)
(2) 18 out of 25 of the Force Provisions (68%)
(3) 11 out of 11 of the Training Provisions (100%)
(4) 17 out of 24 of the Investigations & Reporting Provisions (71%)
(5) 21 out of 24 of the Grievances Provisions (88%)
(6) 2 out of 8 of the Restraints Provisions (50%)[6]
(7) 3 out of 3 of the Early Warning System Provisions (100%)

The Panel's Monitoring visits during the Fifteenth Reporting Period occurred in January and May 2024. With regard to the non-force related provisions of the Action Plan, the Department submitted its Fifteenth Self-Assessment Report (the "Fifteenth Self-Assessment") on April 11, 2025. During the Fifteenth Reporting Period, the Panel reviewed records posted by the Department to verify the Department's self-assessments of its compliance with non-force provisions of the Action Plan. The Panel's evaluation of the provisions in the self-assessment reports is included in this Report. The Panel's auditors reviewed source documents associated with the Training Provisions and Restraint Provisions 17.3 and 17.4.

Provisions determined compliant for the Fifteenth Report that were found out of compliance in the *Panel's Fourteenth Report* include the following four (4) provisions: (1) 2.10 Authorized Weapons, (2) 2.12 Chemical Spray and Tasers, (3) 2.13 Check of Medical Records, and (4) 7.2 Notification of Results.

Provisions determined out of compliance for the Fifteenth Report that were found in compliance in the *Panel's Fourteenth Report* include the following five (5) provisions: (1) 4.1 Consult Mental Health Professionals, (2) 14.1 Review of Criminal Referrals, (3) 15.7 Individual Perceptions, (4) 16.2 Photograph of Injuries, and (5) 7.3 Prisoner-Staff Communication. See *Appendix A: Compliance Chart* for compliance status with each provision over the last three reports.

The Department continued to cooperate fully with the Panel during the Fifteenth Reporting Period. The Department and County Counsel responded to our inquiries and requests for documents and information. They engaged in constructive conversations with the Panel regarding use of force incidents, policy issues, and their continuing efforts to implement the terms of the *Rosas* Action Plan. We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.

---

[6] Note four (4) of the eight (8) Restraint provisions are not applicable.

9

# Action Plan Implementation Assessment

The Action Plan is divided into seven overarching categories: (1) Administrative; (2) Use of Force; (3) Training; (4) Force Reporting and Force Investigations; (5) Grievances; (6) Restraint; and (7) Early Warning System. Each category contains substantive provisions with corresponding compliance measures. The Panel's findings regarding compliance with each provision for the Fifteenth Reporting Period are provided below and organized to mirror the Action Plan.

## I.    Administrative Provisions

## A. Leadership and Accountability

The recommendations in Sections 1.1 through 1.4 of the Action Plan require that Custody be headed by an Assistant Sheriff with no other areas of responsibility, the Sheriff be engaged personally in the management of the jails, the Department's managers be held accountable for any failures to address force problems in the Jails, and that the Department regularly reports to the Board of Supervisors on the use of force in the jails and on its compliance with the Action Plan.

### 1.1 Custody Operations Headed by an Assistant Sheriff

**Provision Description:** Section 1.1 of the Action Plan provides that Custody Operations should continue to be headed by an Assistant Sheriff with no other areas of responsibility assigned.

> *Compliance Measure Summary:* Custody Operations headed by an Assistant Sheriff with no other responsibilities for the duration of the Settlement Agreement.

Custody has been headed by an Assistant Sheriff with no other areas of responsibility since mid-2014. Assistant Sheriff Sergio Aloma served in the role of Assistant Sheriff for Custody Operations – with no other areas of responsibility – during most of the Fifteenth Reporting Period. Assistant Sheriff Paula Tokar assumed the role of Acting Assistant Sheriff on June 21, 2024.

**1.1 Status:** Compliance[7]              **As of Date:** January 1, 2017

### 1.2 Personal Engagement of the Sheriff

**Provision Description:** Sheriff should be personally engaged in the management of the Department's jail facilities and regularly and adequately monitor the use of force policies and practices and compliance with the Action Plan.

> *Compliance Measure Summary:* Reports every six months on the Sheriff's personal involvement in managing the jail and monitoring use of force policies.

The Department has provided the Panel with a log of frequent meetings that Sheriff Robert Luna had with Assistant Sheriff Aloma during the First and Second Quarters of 2024. Between January 10, 2024 and June 26, 2024, the Sheriff and Assistant Sheriff had 30 meetings in which they discussed such topics as: use of force incidents, the use of less lethal weapons and personal weapons, cell extractions, Category 3 incidents and associated injuries, use of force against mentally ill inmates, dorm disturbances, gassing incidents, deployment of chemical agents, de-escalation of force, suicide attempts, inmates entering

---

[7] Use of the term Compliance is a finding of compliance as of a certain date. The Panel's findings are set forth in the Appendix attached. For provisions not in compliance in this Report, the Department has either not yet achieved compliance or is no longer in compliance during the Fifteenth Reporting Period.

10

the facilities under the influence and available detox housing units, facility security concerns, assaults on staff, and alternative tactical approaches to address current inmate populations. Additionally, the Assistant Sheriff advised the Sheriff of any significant incidents/events deemed sensitive in nature as they occurred.

> ***Compliance Measure Summary:*** Meet with the Monitors at least once every six months to discuss personal involvement.

Due to in-person scheduling issues, the Panel met with Sheriff Robert Luna virtually on May 8, 2024. The Panel discussed Rosas compliance issues including accountability for force violations.

**1.2 Status:** Compliance                    **As of Date:** January 1, 2017

## 1.3 Accountability for Failing to Address Policy Violations

**Provision Description:** Section 1.3 of the Action Plan provides that Department managers should be held accountable should they fail to address use of force problems at the jail facilities.

> ***Compliance Measure Summary:*** A quarterly report that sets forth the number and rank of personnel found to have violated use of force policies.

The Department provided a report for both quarters of the Fifteenth Reporting Period, which is summarized in *Table 1*. There were four cases involving six staff with various use of force policy violations reported in 1Q24—two cases at TTCF, one at MCJ, and one at IRC.[8] In 2Q24, there were zero founded investigations with imposed discipline. The resulting discipline for these violations is reflected in *Table 2*.

*Table 1: Cases with Discipline Imposed*

|         | TTCF | MCJ | IRC | Total |
|---------|------|-----|-----|-------|
| 1Q24    | 2    | 1   | 1   | 4     |
| 2Q24    | 0    | 0   | 0   | 0     |

*Table 2: 1Q24 and 2Q24 Discipline Imposed*

| **First Quarter 2024** | | | |
|---|---|---|---|
| **Case No.** | **Facility** | **Rank** | **Discipline** |
| 1 | IRC | Custody Assistant | 10-Day Suspension |
| 2 | TTCF | Deputy | Written Reprimand |
| | | Custody Assistant | Written Reprimand |
| | | Deputy | Written Reprimand |
| 3 | TTCF | Sergeant | 1-Day Suspension |
| 4 | MCJ | Deputy | Written Reprimand |
| **Second Quarter 2024** | | | |
| **Case No.** | **Facility** | **Rank** | **Discipline** |
| N/A | N/A | N/A | N/A |

---

[8] The reporting for Provision 1.3 occurs when the discipline for the founded violation occurs and not when the policy violation occurs. In this Report, the Panel found 9 out of the 50 cases reviewed in violation of the force prevention principles of Section 2.2. The Panel also found 7 out of 15 head strike cases out of compliance with Section 2.6 and 18 cases out of compliance with Section 17.5. Should the Department find staff involved in those cases violated policy, those violations would not be recorded until the quarter the discipline was imposed.

11

There were four (4) cases of use of force policy violations involving six (6) staff members: three (3) Deputies, one (1) Sergeant, and two (2) Custody Assistants. The discipline imposed ranged from a Written Reprimand to a 10-day suspension. Of the six (6) staff disciplined, four (4) included initial allegations of unreasonable force (Code 3-10/030.00) with "unresolved" findings.

In one incident, an inmate filed a grievance alleging excessive force by staff. The force incident was reviewed, an administrative investigation was initiated, and it was determined that a Custody Assistant used non-approved control holds on an inmate who was not physically resisting. Specifically, the Custody Assistant used unreasonable force on the inmate's feet and toes and failed to report the force to a supervisor. The inmate's feet were later X-rayed, and no abnormalities were noted. This unreasonable force occurred while staff were attempting to place the inmate in a suicide gown. Several staff were present during this incident, including a Sergeant. The Sergeant was not able to see the Custody Assistant's actions during the force. The Custody Assistant received a 10-day suspension. Due to the length of the investigation, discipline was imposed approximately 22 months after the incident.

In another incident, a mentally ill inmate was secured to a spider table in his unit. He did not want to go back to his cell and told staff he would assault them if they tried to uncuff him from the table and return him to his cell. A Sergeant was present and conducted a "planned use of force" on the recalcitrant inmate. The Sergeant directed staff to utilize chemical agents on the restrained inmate and did not follow extraction protocols. This was in violation of policy (Use of Force Against Restrained Inmates) and Rosas Provision 2.5 (Force on a Restrained Inmate). In addition to being required to attend training, the Sergeant received a one-day suspension. The sustained charges for the staff involved in this incident related to "Obedience to laws, regulations and orders." The Panel needs to conduct further analysis of the Department's disciplinary system in order to assess their accountability for violations of administrative investigations.

The Panel has overall concerns with when, whether, and how discipline is investigated, documented, and consistently and fairly applied. Overall, case details provided are sparse and don't include justification for findings. The Parties have agreed to revisions to the Compliance Measures for this Provision, which will hopefully become effective by the end of the year. Pursuant to those revisions, the Panel will assess whether the supervisor's evaluation of the use of force incidents are sufficiently thorough, explain the reasons for their conclusions, appropriately identify policy violations, and hold staff accountable for those violations. Additionally, the Department has begun providing the Plaintiffs and the Panel with more timely and detailed information related to use of force policy violations and the disciplinary sanctions imposed for those violations. This information will assist the Panel in assessing the Department's accountability system.

*Discipline Historical Context*
In the Fourteenth Reporting Period, there were eleven (11) cases of use of force policy violations involving nine (9) Deputies, two (2) Sergeants, and two (2) Custody Assistants. Discipline imposed ranged from a Written Reprimand to a Discharge. (*Panel's Fourteenth Report*, p. 8-9.) In the Thirteenth Reporting Period, there were ten (10) cases of use of force policy violations involving fourteen (14) Deputies and one (1) Sergeant. The discipline imposed ranged from a Written Reprimand to a 10-day suspension. (*Panel's Thirteenth Report*, p. 8-9). In the Twelfth Reporting Period, there were eight (8) cases of use of force policy violations involving sixteen (16) Deputies, one (1) Custody Assistant, and three (3) Sergeants. The discipline imposed included Written Reprimands and 1-day suspensions. (*Panel's Twelfth Report*, p.7). In the Eleventh Reporting Period, there were eleven (11) cases of use of force policy violations involving thirteen (13) Deputies, two (2) Sergeants, and one (1) Custody Assistant. Discipline imposed ranged from Written Reprimand to Discharge. (*Panel's Eleventh Report*, p. 8-9.)

12

Since the Eleventh Reporting Period to present, there have been forty-four (44) cases of uses of force policy violations resulting in discipline involving seventy (70) Department personnel: fifty-five (55) Deputies, nine (9) Sergeants, and six (6) Custody Assistants, as shown in *Figure 9.* As shown in *Table 3,* of the fifty-five (55) Deputies, thirty (30) received Written Reprimands, nine (9) 1-day suspensions, four (4) 2-day suspensions, three (3) 3-day suspensions, two (2) 4-day suspensions, one (1) 5-day suspension, one (1) 10-day suspension, one (1) 30-day suspension, two (2) removals or discharges, and two (2) resignations. Of the nine (9) Sergeants, seven (7) received Written Reprimands, one (1) 1-day suspension, and one (1) 3-day suspension. Of the six (6) Custody Assistants, two (2) received Written Reprimands, one (1) 1-day suspension, one (1) 5-day suspension, one (1) 10-day suspension, and one (1) 20-day suspension.



*Figure 9*

*Table 3: Types of Discipline Imposed*

|  | DSG | SGT | C/A |  |
|---|---|---|---|---|
| **WRITTEN** | 30 | 7 | 2 | 39 |
| **1-DAY** | 9 | 1 | 1 | 11 |
| **2-DAY** | 4 | 0 | 0 | 4 |
| **3-DAY** | 3 | 1 | 0 | 4 |
| **4-DAY** | 2 | 0 | 0 | 2 |
| **5-DAY** | 1 | 0 | 1 | 2 |
| **10-DAY** | 1 | 0 | 1 | 2 |
| **20-DAY** | 0 | 0 | 1 | 1 |
| **30-DAY** | 1 | 0 | 0 | 1 |
| **REMOVAL** | 2 | 0 | 0 | 2 |
| **RESIGN** | 2 | 0 | 0 | 2 |
|  | **55** | **9** | **6** | **70** |



*Figure 10*

Written reprimands are the most frequently imposed discipline, with 56% (39 out of 70) of staff involved in use of force violations receiving written reprimands. The second most frequently imposed discipline is one-day suspensions, with 16% (11 out of 70) of staff receiving one-day suspensions. With this, 71% (50 out of 70) of staff involved in use of force violations receive one-day suspensions or less, and 26% (18 out of 70) receive 2-day suspensions or higher discipline. As shown in *Figure 10*, Custody Assistants were more likely to receive 2 or more days' suspensions than lower discipline compared to Deputies and Sergeants, with 50% (3 out of 6) receiving multi-day suspensions. By comparison, 22% (12 out of 55) of Deputies received multi-day suspensions and 11% (1 out of 9) of Sergeants received multi-day suspensions. Sergeants were more likely to receive written reprimands, with 78% (7 out of 9) receiving written reprimands as compared to 55% (30 out of 55) of Deputies and 33% (2 out of 6) of Custody Assistants.

> ***Compliance Measure Summary:*** Section 1.3 requires the Department to identify each facility in which there was a 25% increase in the number of use of force incidents or Category 3 incidents from the previous quarter.

13

*Overall Uses of Force*

The Department provided data that reflects the number of use of force incidents per month by facility and category. The monthly numbers have been consolidated into quarters for the Reporting Period as shown in *Figure 11*.[9] For the Fifteenth Reporting Period (1Q24 and 2Q24), there were a total of 402 use of force incidents– 199 in 1Q24 and 203 in 2Q24. There are no significant (more than 25%) changes in the total number of use of force incidents between quarters for this reporting period. Following nearly three years of noted decline in the total number of use of force incidents, as highlighted in this report's introduction, this Fifteenth Reporting Period reflects the first increase in as much time. Between 4Q23 and 1Q24, there was 18% increase in incidents—from 169 to 199. The increase between 1Q24 and 2Q24 is nominal at 2%—from 199 to 203. Based on preliminary data for the Sixteenth Reporting Period, the Department augments this increase by another 19% between 2Q24 and 3Q24— from 203 to 242.



Total Number of UoF Incidents for 15th Reporting Period

*Figure 11*



*Figure 12*

Of the 402 use of force incidents for the Fifteenth Reporting Period, TTCF accounted for 121 (30%), MCJ for 207 (52%), and IRC for 74 (18%) of the incidents—see *Figure 12*.

The total uses of force by quarter and category for the Fifteenth Reporting Period are reflected in *Figure 12*.[10,11] For both quarters, the majority of the 402 incidents were Category 1 with 301 (75%) total incidents. Category 1 cases involve incidents with no injuries. There were 56 Category 2 incidents (14%), 42 NCI incidents (10%), and 3 Category 3 incidents (1%). This allocation pattern resembles trends from previous reports.

The Department is required to address increases of 25% or more for all use of force categories. As noted in *Figure 13*, there were no reportable increases in NCI or Category 2 incidents for this reporting period. Category 1 incidents increased by 24% from 122 (4Q23) to 151 (1Q24). Category 3 incidents doubled from one incident (4Q23 and 1Q24) to two incidents in 2Q24, which represents a 100% increase. Category 3 incidents are further discussed in the dedicated *Category 3 Specific* section below.



*Figure 13*

The figures below identify the number of use of force incidents by category per facility. Data is included from both quarters of the Fifteenth Reporting Period (1Q24 and 2Q24) as well as the fourth quarter of 2023 to reflect any changes of 25% or more between quarters. Note that only the increases or decreases of 25% or more are included in the narrative below.

---

[9] Incident data from 4Q23 is included in this figure to show and determine an increase for 1Q24.

[10] The data provided to the Panel from CCSB is subject to change as incidents are categorized and recategorized following or during investigation. Thus, the numbers cited are subject to change and may not match the numbers in previous or future Panel Reports. The Panel uses data from the Monthly Force Used by Category Report provided in the closest proximity to the generation of the Panel's Report. The data cited here is consistent with Department data totals presented as of March 4, 2025.

[11] Incident data from 4Q23 is included in this figure to show and determine increases and decreases for 1Q24.

14

*Twin Towers Correctional Facility*
For the Fifteenth Reporting Period, TTCF had a total of 121 use of force incidents—61 in 1Q24 and 60 in 2Q24. *Figure 14* depicts the total number of incidents by category over three quarters at TTCF. For the Fifteenth Reporting Period, increases or decreases of more than 25% at TTCF are as follows:

- Between 4Q23 and 1Q24, NCI incidents decreased by 67% from 6 to 2.
- Between 1Q24 and 2Q24, NCI incidents increased by 450% from 2 to 11.
- Between 4Q23 and 1Q24, Category 2 incidents increased by 83% from 6 to 11.
- Between 1Q24 and 2Q24, Category 2 incidents decreased by 27% from 11 to 8.



*Figure 14*

*Men's Central Jail*
For the Fifteenth Reporting Period, MCJ had a total of 207 use of force incidents—96 in 1Q24 and 111 in 2Q24. *Figure 15* depicts the total number of incidents by category over three quarters at MCJ. For the Fifteenth Reporting Period increases or decreases of more than 25% at MCJ are as follows:

- Between 4Q23 and 1Q24, NCI incidents increased by 40% from 10 to 14.
- Between 1Q24 and 2Q24, NCI incidents decreased by 43% from 14 to 8.
- Between 4Q23 and 1Q24, Category 2 incidents decreased by 33% from 15 to 10.
- Between 1Q24 and 2Q24, Category 2 incidents increased by 90% from 10 to 19.
- Between 1Q24 and 2Q24, Category 3 incidents doubled from 1 to 2.



*Figure 15*

*Inmate Reception Center*
For the Fifteenth Reporting Period, IRC had a total of 74 use of force incidents—42 in 1Q24 and 32 in 2Q24. *Figure 16* depicts the total number of incidents by category over three quarters at IRC. For the Fifteenth Reporting Period increases or decreases of more than 25% at IRC are as follows:

- Between 4Q23 and 1Q24, overall incidents increased by 83% from 23 to 42.
- Between 4Q23 and 1Q24, NCI incidents increased by 100% from 2 to 4.
- Between 1Q24 and 2Q24, NCI incidents decreased by 25% from 4 to 3.



*Figure 16*

- Between 4Q23 and 1Q24, Category 1 incidents increased by 129% from 14 to 32.
- Between 1Q24 and 2Q24, Category 2 incidents decreased by 67% from 6 to 2.

15

*Compliance Measure:* When there is a 25% or more increase from quarter to quarter, the Unit Commander reports on his or her response to involved staff. If the Unit Commander failed to address the matter, the Department indicates its response to hold the Unit Commander accountable.

*Category 3 Specific*

Due to the infrequency of Category 3 incidents, a single incident results in 50% to 100% swings quarter to quarter, which triggers CCSB to request a response from the Unit Commander on its handling of staff involved in a Category 3 incident. Category 3 incidents that resulted in an increase of 25% or more for the Fifteenth Reporting Period are as follows:

- Between 1Q24 and 2Q24, MCJ increased Category 3 incidents from 1 to 2.

The Department reported two Category 3 incidents at MCJ in 3Q24, both in June 2024. The Unit Commander noted in the response to CCSB that these two cases were being investigated by IAB. The response indicated that "any recommendations or corrective actions have yet to be identified" and noted intention to impose corrective action should policy violations be determined by the investigation.

The Panel reviewed many cases in the Fifteenth Reporting Period involving violations of policy, such as not using force as a last resort or utilizing a "heavy forward" when placing an inmate in the WRAP, in which the supervisory reviews failed to identify the policy violations. Three cases were discussed during the January 2025 meeting between the Panel and the Department involving excessive force with head injuries—one from each facility. In each of these cases no Rosas violations were identified; however, the Panel found each to be not compliant with 2.2 and 2.6 Provisions. The Panel is concerned that the Department does not appropriately identify policy violations, does not consistently and thoroughly refer inaccurate reports for administrative investigation, and has inconsistencies in staff reports compared to CCTV footage.

**1.3 Status:** Out of Compliance          **As of Date:** N/A

## 1.4 Reports to the Board of Supervisors

**Provision Description:** Department regularly reports to the Board of Supervisors on use of force status and compliance with the Action Plan.

*Compliance Measure:* Report publicly at least every six months to the Board of Supervisors on use of force data, training, investigation outcome summaries, and discipline as well as overall compliance.

The Department presented its Rosas report to the Board of Supervisors on January 30, 2024. Its report covered all of the required topics including use of force data, training, the outcome of investigations, and overall compliance with Rosas.

**1.4 Status:** Compliance          **As of Date:** June 12, 2018

# B. Management Visits

The recommendations in Sections 10.1 and 10.2 of the Action Plan address required tours of senior managers and the documentation of visits on housing units.

## 10.1 Senior Manager Tours

**Provision Description:** Senior managers ranked Unit Commanders and above should be required to periodically tour jail facilities, including nights and weekends.

16

> *Compliance Measures Summary:* 10.1(a) Unit Commanders tour at least two evenings and one weekend day per quarter.

> *Compliance Measures Summary:* 10.1(b)–(e) Varying frequencies in visit requirements for Department executives—Unit Commanders up to Sheriff—to tour and inspect the Downtown Jail Complex.

These requirements were not met for both quarters of the Fifteenth Reporting Period. The first quarter was not compliant while the second quarter achieved full compliance.

For the First Quarter of 2024, the Unit Commanders, Chiefs in Custody Operations, and the Assistant Sheriff[12] achieved 100% compliance with the requirements to tour and inspect the Downtown Jail Complex. However, one Commander only achieved 42% compliance with this provision, which lowered the overall Commanders' compliance to 80%. For this quarter, 64 of the 78 required tours were completed, which is 82% compliance and below the 95% threshold. In the Department's Self-Assessment, it is noted that the Commander who failed to complete the mandated tours was issued a Corrective Action Plan and future tours were scheduled in advance and added to the Commander's calendar.

For the Second Quarter of 2024, the Unit Commanders, Commanders, Chiefs in Custody Operations, Assistant Sheriff, and Sheriff achieved 100% compliance with the requirements to tour and inspect the Downtown Jail Complex. All of the 81 required tours were completed.

For the Fifteenth Reporting Period, 145 of the 159 required tours and inspections were completed, which is 91% compliant. While the Department's 91% compliance rating for this Provision is below the 95% threshold, the Panel determined not to place them out of compliance as a result of one Commander missing their required tours for one quarter. The Panel considered the facts that the Department corrected this matter in the Second Quarter of 2024 and they had been in Compliance with this Provision since 2018. The Panel finds the Department in Compliance with this provision.

**10.1 Status:** Compliance          **As of Date:** June 30, 2018

## 10.2 Housing Unit Documentation

**Provision Description:** Housing units should document visits from department managers in electronic records or visitor logs.

> *Compliance Measure Summary:* Visits by Department managers to the Downtown Jail Complex are documented and made available to the Monitors.

The visits to the jail facilities by Department managers (above the rank of Sergeant) were documented in electronic visitor logs for the First and Second Quarters of 2024. The posted electronic records included tours and inspections conducted for the two random weeks selected by the Monitors for each quarter.

**10.2 Status:** Compliance          **As of Date:** January 1, 2024

## C. Rotations and Transfers

The recommendations in Sections 18.1, 18.2, and 21.1 of the Action Plan address custody-wide rotation policies, semi-annual audits of unit compliance, and not assigning or transferring staff to custody as a formal sanction.

---

[12] The Monitors agreed to exempt Sheriff Luna from the Executive Tours during 1Q24 due to extenuating circumstances.

17

## 18.1 Custody-Wide Rotation Policy

**Provision Description:** Maintain a custody-wide rotation policy and rotate staff members as often as provided by policy.

## 18.2 Semi-Annual Rotation Audit

**Provision Description**: Conduct an audit semi-annually for each unit's compliance with rotation policies.

> *Compliance Measures Summary:* Maintain facility rotation policy and audit compliance every six months. Provide reports to the Monitors to demonstrate if at least 90% of staff were rotated according to policy.

The Department achieved 99.9% compliance in the Fifteenth Reporting Period. Each of the Downtown jail facilities had a current Unit Order setting forth its rotation policy and the source documents indicate that most Department personnel were rotated in compliance with these policies. The Panel has agreed to "pause" the rotation policy at TTCF in order for the Department to assist the Department with activating additional mental health step down units utilizing experienced staff. The Panel continues to receive updates from the Department regarding this "pause" in the rotation policy.

**18.1 Status:** Compliance          **As of Date:** June 30, 2018
**18.2 Status:** Compliance          **As of Date:** January 1, 2019

## 21.1 Transfers to Custody

**Provision Description:** Policy should provide that a staff member will not be assigned to Custody as a formal or informal sanction for problem Deputies.

> *Compliance Measures Summary:* On a quarterly basis, personnel records are reviewed for staff transferred to Custody from other divisions and a report is provided to the Monitors identifying each staff member who was transferred to Custody within six months of a finding of misconduct or policy violation.

The Department's Fifteenth Self-Assessment reflects that it maintained 100% compliance from January 1, 2024 through June 30, 2024. The Panel has reviewed the Department's source documents stating the reasons for Deputy transfers to Custody during the Fifteenth Reporting Period. No Department member was transferred or assigned to Custody as a sanction for misconduct or a policy violation during the Fifteenth Reporting Period.

**21.1 Status:** Compliance          **As of Date:** June 30, 2018

The chart below is a visual representation of compliance for the above provisions from the last three reports. The shading of the boxes indicates compliance status–blue for *compliance* and red for *out of compliance.* The "As Of" column shows the date since first found compliant and the last column includes a check mark if the date meets or exceeds three years of compliance. A chart is provided with each section.

| Administrative Provisions | | Thirteenth Report | Fourteenth Report | Fifteenth Report | | |
|---|---|---|---|---|---|---|
| No. | Provision | 1Q23 - 2Q23 | 3Q23 - 4Q23 | 1Q24 - 2Q24 | AS OF | 3YR+ |
| 1.1 | Assistant Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.2 | Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.3 | Supervision | X | X | X | | |
| 1.4 | Reports to Board | C | C | C | 6/12/2018 | ✓ |
| 10.1 | Senior Manager Tours | C | C | C | 6/30/2018 | ✓ |
| 10.2 | Housing Unit Documentation | X | C | C | 1/1/2024 | |
| 18.1 | Custody-Wide Rotation Policy | C | C | C | 6/30/2018 | ✓ |
| 18.2 | Semi-Annual Rotation Audit | C | C | C | 1/1/2019 | ✓ |
| 21.1 | Transfers to Custody | C | C | C | 6/30/2018 | ✓ |

18

# II.    Use of Force Policies and Practices

## A. Overall Use of Force Policies

The recommendations in Sections 2.1, 8.2, 17.2, 20.1, and 20.2 of the Action Plan address the revision, modification, and organization of policy into one logical manual.

### 2.1 Separate and Organized Custody Force Manual for Custody Operations

**Provision Description:** The Action Plan requires the Department to "have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations[.]"

### 8.2 Complaints of Retaliation into Grievance Policy

**Provision Description:** Combine retaliation provisions into one grievance section to ensure a single, consistent policy on handling grievances.

### 17.2 Pregnant Inmate Policy

**Provision Description:** Combine and conform provisions related to restraints on pregnant inmates with medically ordered restraint provisions.

### 20.1 Categories of Force in Policy

**Provision Description:** Policy indicates only two types of force: reactive and planned.

The Department's Supervisor's Use of Force Investigation Form (P438) listed various types of force e.g. rescue, directed and medical assistance. The Panel requested the form be revised by July 1, 2023, in order to remain in Compliance with this provision. This request was referenced in both the Eleventh (p. 15) and Twelfth (p. 14) Reports. The Department's revised P438 was finalized and distributed to the facilities in January 2025.

### 20.2 Reactive Force Definition

**Provision Description:** Reactive Force is defined as force used in response to an immediate threat of safety, destruction, or escape, and when there is no time to wait for assistance.

> ***Compliance Measure Summary***: A Custody Division Manual that includes all force policies applicable to Custody Operations, including those outlined by 8.2, 17.2, 20.1, and 20.2.

On October 16, 2015, the Department provided the Panel with a Custody Operations Force Manual with separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints, Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved Shootings. The Department's Custody Force Manual satisfies Section 2.1 and includes specific provisions that satisfy Sections 8.2, 17.2, 20.1, and 20.2 of the Action Plan.

**2.1, 8.2, 17.2, 20.1 and 20.2 Status:** Compliance **As of Date:** January 1, 2017

| Use of Force Policy Provisions | | Thirteenth Report | Fourteenth Report | Fifteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 2.1 | Custody Force Manual | C | C | C | 1/1/2017 | ✓ |
| 8.2 | Complaints of Retaliation | C | C | C | 1/1/2017 | ✓ |
| 17.2 | Pregnant Inmates | C | C | C | 1/1/2017 | ✓ |
| 20.1 | Categories of Force | C | C | C | 1/1/2017 | ✓ |
| 20.2 | Reactive Force | C | C | C | 1/1/2017 | ✓ |

19

## B. Use of Force Practices & Review of Force Packages

The recommendations in Sections 2.2 through 2.13, 4.1, 4.3 through 4.5, 9.2, 9.3, 17.5, and 20.3 have provisions related to policy as well as application. The Panel reviewed multiple drafts of the Department's policies to implement these recommendations, required changes where appropriate, and certified that the Department had implemented these policy recommendations effective December 1, 2015.

For the Fifteenth Reporting Period, a total of 50 packages were reviewed: 25 in 1Q24 and 25 in 2Q24. The cases reviewed for each quarter did not necessarily occur in the quarter they were reviewed, nor was the investigation necessarily completed during that quarter. The Panel reviewed cases as they were received. The cases reviewed involved incidents from July 2022 through December 2024. Overall results for the Fifteenth Reporting Period by provision are below. Findings for each quarter are provided in Section C: *Quarterly Findings*.

> ***Compliance Measure Summary:*** (#1-7) Within 10 days of the end of each quarter the Department will provide the Monitors with a cumulative force synopsis for each incident in the Downtown Jail Complex showing the status of force investigations. The Monitors will select a minimum of 25 force packages to review for compliance with the Action Plan of all force provisions through Vertical and Horizontal Assessments. The Department will provide each package and include a summary sheet that indicates how the Department assessed each applicable provision. Force incidents will need to be 90% or more compliant with each provision for the Vertical Assessments.

**Vertical Assessment:** The vertical assessment represents the Panel's analysis of each case to determine the number of cases in which all force provisions were in compliance during the period. Of the 50 cases reviewed, twenty-three (23) were found compliant with all Force Provisions, which is 46% of cases reviewed, which is below the 90% compliance threshold. Of the twenty-three found in compliance with all Force provisions, eleven (11) were from 1Q24 (six at TTCF, zero at IRC, and five at MCJ) and twelve (12) from 2Q24 (four at TTCF, four at IRC, and four at MCJ). In 1Q24, there were an additional four (4) cases found in compliance with 89% of the force provisions. In 2Q24, there were another four (4) cases found compliant with 89% of the force provisions and another one (1) found compliant with 88% of the force provisions.

**Horizontal Assessment:** The horizontal assessment represents the Panel's findings, by provision, for the twenty (20) use of force practice provisions to determine a compliance rating for each provision. It takes into consideration the objective of the provision and the nature and extent of any violations of the provision. Percentages are calculated based on packages reviewed in both quarters.[13] Of the twenty (20) provisions, thirteen (13) were found in compliance based on the packages reviewed.

### 2.2 Force Prevention Principles

**Provision Description:** Policy provides that force be used as a last resort, with minimal amount of force necessary, terminated as soon as reasonably safe to do so, and de-escalated as resistance decreases.

Of the 50 use of force packages reviewed, 41 cases were found to be compliant with this provision, which amounts to 82% compliance and is below the 90% compliance threshold. While below the threshold, this 82% compliance rate along with the 86% compliance rate in the Fourteenth Report represents a noteworthy

---

[13] For the Horizontal Assessments, the Panel has determined that Compliance will require 90% of the applicable force provisions were in Compliance. The Panel may exercise its discretion and depart from this 90% requirement when considering the objective of the provision and the nature and extent of any violation of the provision.

20

increase from the 58% compliance rate in the Thirteenth Report and the 40% compliance rate noted in the Twelfth Report.

**2.2 Status:** Out of Compliance        **As of Date:** N/A

### 2.3 Inmate-on-Inmate Violence

**Provision Description:** Policy indicates it is a violation for staff to cause, facilitate, or provoke inmate-on-inmate violence or to expose inmates to an unreasonable risk of assault. Further, staff are prohibited from publicly humiliating inmates or using slurs or obscenities.

Of the applicable cases reviewed, 92% (46 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.3 Status:** Compliance        **As of Date:** January 1, 2024

### 2.4 Use of Force as Discipline

**Provision Description:** Policy indicates use of force not be used as discipline or corporal punishment.

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.4 Status:** Compliance        **As of Date:** July 1, 2019

### 2.5 Force on Restrained Inmate

**Provision Description:** Policy indicates staff may not strike, use chemical agents, or Taser a restrained inmate, unless the inmate is assaultive, presents an immediate threat, and no other reasonable means.

Of the applicable cases reviewed, 92% (35 out of 38) were found to be in compliance, which exceeds the 90% compliance threshold. The Panel finds the Department in Compliance with this provision.

**2.5 Status:** Compliance        **As of Date:** July 1, 2023

### 2.6 Head Strikes or Kicks

**Provision Description:** It is prohibited to strike an inmate in the head, kick an inmate who is on the ground, or kick an inmate above the knees if not on the ground unless the inmate is assaultive and presents an imminent danger and there are no more reasonable means to avoid injury. Kicking an inmate who is not on the ground below the knees is prohibited unless used to create distance between a staff member and an assaultive inmate.

Of the applicable cases reviewed, 84% (42 out of 50) were found to be in compliance, which is below the 90% compliance threshold. This 84% compliance rate represents a slight decrease from the 88% in the Fourteenth Report, yet still an increase from the 64% compliance rate noted in the Thirteenth Report and the 52% compliance rate noted in the Twelfth Report. For this Reporting Period, the Panel reviewed 15 cases with head strikes and, of those cases, the Panel found 7 out of compliance.

**2.6 Status:** Out of Compliance        **As of Date:** N/A

### 2.7 Supervisor Called to Scene

**Provision Description:** A supervisor must be called to the scene in a situation where use of force may be required as soon as time and circumstances permit.

Of the applicable cases reviewed, 86% (43 out of 50) were found to be in compliance, which is below the 90% compliance threshold.

**2.7 Status:** Out of Compliance        **As of Date:** N/A

21

## 2.8 Prevent Excessive Force

**Provision Description:** All members are responsible for preventing excessive uses of force and those who witness such events have a duty to stop, reduce, or control the use of force being used.

Of the applicable cases reviewed, 100% (4 out of 4) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.8 Status:** Compliance          **As of Date:** January 1, 2024

## 2.9 Armed Inmates

**Provision Description:** When confronting an armed inmate, every effort should be made to control the inmate at a distance.

Of the applicable cases reviewed, 50% (1 out of 2) were found to be in compliance, which is below the 90% compliance threshold.

**2.9 Status:** Out of Compliance          **As of Date:** N/A

## 2.10 Authorized Weapons

**Provision Description:** Department members can only use authorized weapons for which they have been trained. Any available instrument can be used to prevent imminent loss of life or serious bodily injury if no other means or alternative is available.

Of the applicable cases reviewed, 97% (33 out of 34) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.10 Status:** Compliance          **As of Date:** July 1, 2024

## 2.11 Planned Chemical Spray

**Provision Description:** After applying a chemical agent, members are required to wait a sufficient amount of time before applying additional chemical or force in a cell extraction or planned use of force.

Of the applicable cases reviewed, 100% (11 out of 11) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.11 Status:** Compliance          **As of Date:** July 1, 2023

## 2.12 Chemical Spray & Tasers

**Provision Description:** Chemical sprays, tasers, and stun devices should not be used against an inmate who no longer presents a danger or is no longer resisting, ones known to suffer medical conditions that may be aggravated by use, or in a manner contradictory to manufacturer guidance or Department training.

Of the applicable cases reviewed, 94% (17 out of 18) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.12 Status:** Compliance          **As of Date:** July 1, 2024

## 2.13 Check of Medical Records

**Provision Description:** An inmate's medical/mental health records should be checked prior to use of chemical agents, tasers, or stun devices when time and circumstances permit.

Of the applicable cases reviewed, 100% (14 out of 14) were found to be in compliance, which exceeds    the 90% compliance threshold.

**2.13 Status:** Compliance          **As of Date:** July 1, 2024

22

### 4.1 Consult Mental Health Professionals

**Provision Description:** Require a mental health professional on-scene to attempt to resolve a situation during a cell extraction or planned use of force.

Of the applicable cases reviewed, 77% (10 out of 13) were found to be in compliance, which is below the 90% compliance threshold.

**4.1 Status:** Out of Compliance          **As of Date:** N/A

### 4.3 Spray on Mental Health Inmates

**Provision Description:** Discontinue use of chemical following an initial burst if the inmate is acutely psychotic or severely mentally disabled and unable to conform behavior to commands.

Of the applicable cases reviewed, 100% (10 out of 10) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.3 Status:** Compliance          **As of Date:** October 1, 2019

### 4.4 Cooling Off Periods

**Provision Description:** In situations involving a mentally ill inmate who does not present an obvious danger to self or others and is refusing to exit his or her cell, allow a reasonable cooling off period. After, a mental health professional or supervisor can attempt to obtain compliance without the use of force.

Of the applicable cases reviewed, 89% (16 out of 18) were found to be in compliance, which is below the 90% compliance threshold. Since the Department is only 1% shy of the compliance threshold and this is a provision it has demonstrated competence with since 2023, the Panel finds the Department in Compliance with this provision.

**4.4 Status:** Compliance          **As of Date:** January 1, 2023

### 4.5 Medical or Mental Health Provider Order

**Provision Description:** When a planned use of force is precipitated by a medical or mental health provider, such as for treatment purposes, the ordering provider, or designee, is given the opportunity to intervene to de-escalate and determine whether the order should remain in effect.

Of the applicable cases reviewed, 91% (10 out of 11) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.5 Status:** Compliance          **As of Date:** January 1, 2023

### 9.2 Escorting of Inmates

**Provision Description:** Following a use of force, the staff member escorting the recalcitrant inmate to medical, holding, or segregation should not be the same member involved in the confrontation.

Of the applicable cases reviewed, 88% (43 out of 49) were found to be in compliance, which is below the 90% compliance threshold.

**9.2 Status:** Out of Compliance          **As of Date:** N/A

### 9.3 Duty to Protect & Intervene

**Provision Description:** Members have a duty to protect and to intervene in inmate-on-inmate violence when reasonably safe to do so.

Of the applicable cases reviewed, 100% (7 out of 7) were found to be in compliance, which exceeds the 90% compliance threshold.

**9.3 Status:** Compliance          **As of Date:** July 1, 2022

23

### 17.5 Minimize Medical Distress

**Provision Description:** Avoid, to the extent possible, placing weight on an inmate's back or shoulders in a way that impairs breathing. Once under control, place the inmate on side to minimize breathing problems.

Of the applicable cases reviewed, 64% (32 out of 50) were found to be in compliance, which is below the 90% compliance threshold. The path to compliance for this provision is the elimination of the "heavy forward," placing inmates into the recovery position as quickly as possible, and holding staff accountable for 17.5 violations.

**17.5 Status:** Out of Compliance          **As of Date:** N/A

### 20.3 Planned Force

**Provision Description:** Planned uses of force should be video recorded and include a medical professional on scene or on standby, a supervisor on scene, and occur after a Shift Supervisor approval has been obtained.

Of the applicable cases reviewed, 93% (13 out of 14) were found to be in compliance, which exceeds the 90% compliance threshold.

**20.3 Status:** Compliance          **As of Date:** July 1, 2023

| Use of Force Practice Provisions, Packet Review | | Thirteenth Report | Fourteenth Report | Fifteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 2.2 | Force Prevention Principles | 58% | 86% | 82% | | |
| 2.3 | Inmate on Inmate Violence | 87% | 98% | 92% | 1/1/2024 | |
| 2.4 | Use of Force as Discipline | 94% | 98% | 100% | 7/1/2019 | ✓ |
| 2.5 | Force on Restrained Inmates | 95% | 97% | 92% | 7/1/2023 | |
| 2.6 | Head Strikes or Kicks | 64% | 88% | 84% | | |
| 2.7 | Supervisors Called to Scene | 78% | 88% | 86% | | |
| 2.8 | Prevent Excessive Force | 60% | 100% | 100% | 1/1/2024 | |
| 2.9 | Armed Inmates | 71% | 67% | 50% | | |
| 2.10 | Authorized Weapons | 85% | 88% | 97% | 7/1/2024 | |
| 2.11 | Planned Chemical Spray | 100% | 100% | 100% | 7/1/2023 | |
| 2.12 | Chemical Spray & Tasers | 100% | 86% | 94% | 7/1/2024 | |
| 2.13 | Check of Medical Records | 100% | 83% | 100% | 7/1/2024 | |
| 4.1 | Consult Mental Health Professionals | 100% | 88% | 77% | | |
| 4.3 | Spray on  Mental Health Inmates | 100% | 100% | 100% | 10/1/2019 | ✓ |
| 4.4 | Cooling Off Periods | 83% | 100% | 89% | 1/1/2023 | |
| 4.5 | Medical or Mental Health Provider Order | 100% | 100% | 91% | 1/1/2023 | |
| 9.2 | Escorting of Inmates | 92% | 88% | 88% | | |
| 9.3 | Duty to Protect & Intervene | 100% | 100% | 100% | 7/1/2022 | |
| 17.5 | Minimize Medical Distress | 61% | 51% | 64% | | |
| 20.3 | Planned Use of Force | 100% | 100% | 93% | 7/1/2023 | |

## C. Quarterly Findings—Use of Force Provisions

### Combined 1Q and 2Q 2024 Results

For the Fifteenth Reporting Period, the Panel reviewed 50 use of force incidents—22 from TTCF (44%), 21 from MCJ (42%), and 7 from IRC (14%).

The Department was not in Compliance with seven (7) of the twenty (20) Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.6 Head Strikes or Kicking Inmates, (3) 2.7 Supervisors Called to Scene, (4) 2.9 Armed Inmates, (5) 4.1 Consult Mental Health Professions, (6) 9.2 Escorting of Inmates, and (7) 17.5 Minimize Medical Distress.

24

Of the seven (7) Use of Force Provisions out of compliance, two (2) had compliance rates below 70% over 1Q24 and 2Q24 combined. Those provisions include the following:

- 2.9 Armed Inmates at 50% compliance. Note there were only two applicable cases.
- 17.5 Minimize Medical Distress at 64% compliance.

The Department was in full compliance, or 90% or above, with the following thirteen (13) of the twenty (20) use of force provisions: 2.3, 2.4, 2.5, 2.8, 2.10, 2.11, 2.12, 2.13, 4.3, 4.4, 4.5, 9.3, and 20.3.

### First Quarter 2024 Results

In the First Quarter of 2024, the Panel reviewed 25 force incidents—twelve (12) from TTCF (48%), thirteen (13) from MCJ (52%), and zero (0) from IRC (0%). The Department was not in Compliance with eight (8) of the 20 Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.3 Inmate on Inmate Violence, (3) 2.5 Force on Restrained Inmates, (4) 2.6 Head Strikes or Kicks, (5) 2.7 Supervisors Called to Scene, (6) 4.1 Consult Mental Health Professionals, (7) 4.5 Medical or Mental Health Provider Order, and (8) 17.5 Minimize Medical Distress.

Of the eight (8) Use of Force Provisions out of compliance, one (1) had a compliance rate below 70% in 1 Q24: 17.5 Minimize Medical Distress at 68% compliance.

The Department was in full compliance, or 90% or above, with the following twelve (12) of the twenty (20) use of force provisions: 2.4, 2.8, 2.9, 2.10, 2.11, 2.12, 2.13, 4.3, 4.4, 9.2, 9.3, and 20.3.

### Second Quarter 2024 Results

In the Second Quarter of 2024, the Panel reviewed 25 force incidents—10 from TTCF (40%), 7 from MCJ (28%), and 8 from IRC (32%).

The Department was not in Compliance with nine (9) of the 20 Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.6 Head Strikes or Kicks, (3) 2.7 Supervisors Called to Scene, (4) 2.9 Armed Inmates, (5) 2.12 Chemical Sprays & Tasers, (6) 4.1 Consult Mental Health Professionals, (7) 4.4 Cooling Off Periods, (8) 9.2 Escorting of Inmates, and (9) 17.5 Minimize Medical Distress.

Of the nine (9) Use of Force Provisions out of compliance, three (3) had a compliance rate below 70% in 2Q24. Those provisions are as follows:

- 2.9 Armed Inmates at 0% compliance
- 4.1 Consult Mental Health Professionals at 67% compliance
- 17.5 Minimize Medical Distress at 60% compliance

The Department was in full compliance, or 90% or above, with the following eleven (11) of the twenty (20) Force provisions: 2.3, 2.4, 2.5, 2.8, 2.10, 2.11, 2.13, 4.3, 4.5, 9.3, and 20.3.

### Review of Force Incidents

In accordance with the Action Plan, the Panel reviews selected force packages each quarter to assess Compliance with Sections 2.2 through 2.13, 4.1, 4.3 through 4.5, 9.2, 9.3, 17.5, and 20.3 (the "Force Provisions") of the Action Plan. Prior to finalizing the ratings for the specific Force Provisions, the Panel participated in meetings with Custody Executives and Supervisors, and the Plaintiffs' Counsel. The information exchanged before these meetings has led to more meaningful and focused discussions about specific compliance ratings. The Panel has consistently noted the value of these discussions would be improved if the cases at issue were recent. The cases reviewed for this Reporting Period occurred between July 4, 2022 and December 19, 2024. Of the cases reviewed, thirty-four (34) incidents occurred in 2024, fifteen (15) incidents occurred in 2023, and one (1) incident occurred in 2022.

25

# III.  Training

Sections 3.1 through 3.4 of the Action Plan require that Department members receive training on use of force policies, ethics, professionalism, and treating inmates with respect. New Department members are to receive six (6) weeks of specific training in Custody Operations. Sections 4.6 through 4.9 require the Department to provide Custody-specific, scenario-based skill development training for existing and new personnel in Crisis Intervention and Conflict Resolution and in "identifying and working with mentally ill inmates." Section 12.1 requires Custody Sergeants receive training in conducting force investigations.

The Panel has previously deemed the Department to be complying "as of" the date reported by the Department for the completion of the initial training required for existing personnel. The Department's continuing compliance with the training provisions is determined by its compliance with the refresher training required every year or every other year. The Department submitted its report on refresher training compliance for 2023 as part of its Fourteenth Self-Assessment. The Department's Fifteenth Self-Assessment notes that refresher training results for 2024, which will be included in the Panel's Sixteenth Report, are in progress.[14]

## A. Use of Force Training

### 3.1 Use of Force Training

**Provision Description:** Requires use of force training for all existing Department members in Custody Operations, which should include at a minimum, a one-time eight-hour use of force policy training course for all members assigned to Custody and then a two-hour refresher course every year.

> ***Compliance Measure Summary:*** Section 3.1(a) requires that 90% of Deputies and Custody Assistants assigned to Custody as of July 1, 2016, completed the required training.

As of June 30, 2018, the Department was found to be compliant with Section 3.1(a).

> ***Compliance Measure Summary:*** Section 3.1(b) requires that 90% of Deputies and Custody Assistants assigned to Custody who completed the initial training receive the two-hour refresher course every year.

The Panel's auditors previously verified the Department's reported annual refresher training results, and the Department was found to be in Compliance with Section 3.1(b) as of December 31, 2021, through December 31, 2023.

**3.1 Status:** Compliance        **As of Date:** December 31, 2021

### 3.4 Custody-based Use of Force Scenarios

**Provision Description:** Custody-based, use of force scenarios included as part of the use of force policy training provided by the Custody Training & Standard Bureau on an in-service and refresher basis.

The use of force training approved by the Panel includes the custody-based use of force scenarios.

**3.4 Status:** Compliance        **As of Date:** June 30, 2018

---

[14] Provisions 3.1, 3.2, 4.6, and 4.7 are all subject to annual refresher trainings with no mid-year results to include in this Fifteenth Report. Findings included in this report for those provisions reflect data from the Fourteenth Report.

26

## B. Ethics and Professionalism Training

### 3.2 Ethics and Professionalism Training

**Provision Description:** Requires training all existing Department members in Custody Operations, which should include at a minimum, a one-time four (4) hour training course in ethics, professionalism, and treating inmates with respect, and then a two (2) hour refresher course every other year.

> *Compliance Measure Summary:* Section 3.2(a) requires that 90% of Deputies and Custody Assistants assigned to Custody as of July 1, 2016 completed the required training.

As of June 30, 2018, the Department was found to be in Compliance with the training requirements of Section 3.2(a).

> *Compliance Measure Summary:* Section 3.2(b) requires that 90% of Deputies and Custody Assistants assigned to Custody who completed the initial training receive the two-hour refresher course every other year.

The Panel's auditors previously verified Compliance with Section 3.2(a) as of June 30, 2018, and with Section 3.2(b) as of December 31, 2019, through December 31, 2023.

                **3.2 Status:** Compliance              **As of Date:** June 30, 2018

## C. Mental Health Training

### 4.6 Crisis Intervention

**Provision Description:** The Department should provide a minimum of 32 hours of custody-specific, scenario-based, skill development training to all Deputy Sheriffs on Crisis Intervention and Conflict Resolution with eight (8) hours of refresher training every other year.

### 4.7 Mentally Ill Inmates

**Provision Description:** The Department should provide a minimum of eight (8) hours of custody specific, scenario based, skill development training on identifying and working with mentally ill inmates to all existing Custody personnel with a four (4) hour refresher course every other year.

> *Compliance Measure Summary:* Sections 4.6(a) and 4.7(a) require that 90% of Deputies assigned to Custody as of July 1, 2016, completed the required training.

As of June 30, 2018, the Department was found Compliant with the De-Escalation and Verbal Resolution Training (DeVRT), mentally ill inmates, and refresher training requirements of Sections 4.6(a) and 4.7(a). [15]

> *Compliance Measure Summary:* Sections 4.6(b) and 4.7(b) require that 90% of Deputies assigned to Custody who completed the initial training receive the eight-hour refresher course every other year.

The Panel's auditors previously verified the Department's Compliance with Section 4.6(a) as of June 30, 2018, Section 4.6(b) as of December 31, 2018, through December 31, 2022, and Section 4.7(b) as of December 31, 2022, through December 31, 2023. The Department's Fourteenth Self-Assessment previously reported that it maintained compliance with Section 4.6(b) through December 31, 2023. The results for Section 4.6 were verified by the Panel's auditors.

                **4.6 Status:** Compliance              **As of Date:** June 30, 2018
                **4.7 Status:** Compliance              **As of Date:** January 1, 2023

---

[15] The Training Division recently incorporated the Panel's comments on their DeVRT curriculum.

27

## D. New Deputy Sheriffs and Custody Assistants

### 3.3 Custody Training

**Provision Description:** Section 3.3 of the Action Plan requires training all new Deputies in use of force and ethics, professionalism, and treating inmates with respect. Section 3.3 also requires the same for new Custody Assistants, who have received training in these subjects during their Academy training.

> *Compliance Measure Summary:* Section 3.3 requires that 95% of new Deputies and Custody Assistants completed the required training.

The Department reported that since the First Reporting Period beginning on July 1, 2015, newly assigned Deputies have been required to complete a six-week Custody Operations course that includes training in use of force and ethics, professionalism and treating inmates with respect, and new Custody Assistants, have received training in these subjects during their Academy training as required by Section 3.3. The Panel's auditors previously verified results through December 31, 2023. The Department's Fifteenth Self-Assessment reports that the Department has met the 95% Compliance threshold through June 30, 2024. The results have been verified by the Panel's auditors, and the Department is in Compliance with Section 3.3 as of June 30, 2018, through June 30, 2024.

**3.3 Status:** Compliance          **As of Date:** June 30, 2018

### 4.8 Mentally Ill—New Staff

**Provision Description:** Provide a minimum of eight (8) hours of custody specific, scenario-based, skill development training on identifying and working with mentally ill inmates to all new members as part of the Jail Operations Continuum.

### 4.9 Crisis Intervention—New Staff

**Provision Description:** Provide a minimum of 32 hours of custody specific, scenario-based, skill development training in Crisis Intervention and Conflict Resolution to new Department members in the Academy or in Custody before they are assigned to any jail facilities.

> *Compliance Measure Summary:* Sections 4.8 and 4.9 require that 95% of new Deputies and Custody Assistants completed the required training.

The Department provides new Deputies with De-Escalation and Verbal Resolution Training (DeVRT) and training in identifying and working with mentally ill inmates (IIMI). The required DeVRT and IIMI training takes place after Deputy Sheriffs and Custody Assistant Academy graduations and prior to assuming duties at their unit of assignment. The Panel's auditors previously verified the Department was in Compliance with Sections 4.8 and 4.9 as of June 30, 2018, through December 31, 2023. The Fifteenth Self-Assessment reports that 100% of the new personnel received the required training in the First and Second Quarters of 2024. These results have been verified by the Panel's auditors, and the Department is in Compliance with Sections 4.8 and 4.9 as of June 30, 2018, through June 30, 2024.

**4.8 and 4.9 Status:** Compliance          **As of Date:** June 30, 2018

### 3.5 Additional Training and Mentoring

**Provision Description:** Requires Unit Commanders to determine "what additional training, counseling, or mentoring may be required when a personnel complaint involving the use of force is resolved with a finding that it 'Appears Employee Conduct Could Have Been Better' direct that the Department member undergo additional training, counseling, or mentoring, and document the action taken."

> *Compliance Measure Summary:* Section 3.5 requires that 90% of personnel complaints involving use of force that were resolved with a "Appears Employee Conduct Could Have

28

Been Better" finding reflect documentation that the Unit Commander reasonably determined what additional training, counseling or mentoring was required.

The Department's Fifteenth Self-Assessment reports that there were no inmate grievances against staff involving use of force where the disposition was that it "Appears Employee Conduct Could Have Been Better." The Department is in Compliance with Section 3.5 as of July 1, 2019, through June 30, 2024.

**3.5 Status:** Compliance          **As of Date:** July 1, 2019

## 3.6 Probation Reviews

**Provision Description:** Requires Unit Commanders to review new Department members within six (6) months of being initially assigned to Custody and again before the end of their probationary period.

> *Compliance Measure Summary:* Section 3.6 requires that 95% of the new Department members in Custody Operations were reviewed (1) within six months after being assigned to Custody and (2) again before their first post-probationary assignment.

The Department's Fourteenth Self-Assessment previously reported that it achieved 100% compliance in the Second Semester of 2023, greater than the 95% threshold required by Section 3.6. The results for the Second Semester of 2023 were verified by the Panel's auditors. The Department's Fifteenth Self-Assessment reports that it achieved 98% compliance in the First Semester of 2024. These results have been verified by the Panel's auditors, and the Department is in Compliance with Section 3.6 as of June 30, 2018, through June 30, 2024.

**3.6 Status:** Compliance          **As of Date:** January 1, 2023

# E. Sergeant Training

## 12.1 Force Investigations Training

**Provision Description:** Requires that all Custody Sergeants receive an initial 16-hour block of training in conducting use of force investigations, reviewing use of force reports, and the Department's protocols for conducting such investigations. It also requires a two (2) hour refresher course every year.

> *Compliance Measure Summary:* Section 12.1-1 requires that 90% of all Custody Sergeants received the initial training and a two (2) hour refresher course every year. Section 12.1-2 requires that 95% of new Sergeants completed the required training before or within 90 days after they assume their duties in Custody.

The Panel approved the 16-hour initial training course required by Section 12.1 on February 24, 2017. The Panel's auditors previously verified Compliance with Section 12.1 as of July 1, 2019, through December 31, 2023. The Department's Fifteenth Self-Assessment reports that it maintained compliance with Section 12.1-2 through June 30, 2024. These results have been verified by the Panel's auditors, and the Department is in Compliance with Section 12.1 as of July 1, 2019, through June 30, 2024.

**12.1 Status:** Compliance          **As of Date:** July 1, 2019

29

| Training Provisions | | Thirteenth Report | Fourteenth Report | Fifteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 3.1 | Use of Force Training | C | C | C | 12/31/2021 | ✓ |
| 3.2 | Ethics & Professionalism | C | C | C | 6/30/2018 | ✓ |
| 3.3 | Custody Training | C | C | C | 6/30/2018 | ✓ |
| 3.4 | Custody-based Scenarios | C | C | C | 6/30/2018 | ✓ |
| 3.5 | Add Training and Mentoring | C | C | C | 7/1/2019 | ✓ |
| 3.6 | Probation Reviews | C | C | C | 1/1/2023 | |
| 4.6 | Crisis Intervention | C | C | C | 6/30/2018 | ✓ |
| 4.7 | Mentally Ill Inmates | C | C | C | 1/1/2023 | |
| 4.8 | Mentally Ill Inmates (new staff) | C | C | C | 6/30/2018 | ✓ |
| 4.9 | Crisis Intervention (new staff) | C | C | C | 6/30/2018 | ✓ |
| 12.1 | Force Investigations | C | C | C | 7/1/2019 | ✓ |

# IV.        Reporting and Investigation of Force Incidents

## A. Reporting and Investigation Provisions in Force Package Reviews

The findings below pertain to application of policies into practice and are supported by the selection of use of force cases reviewed. For the Fifteenth Reporting Period 50 packages were reviewed: 25 in 1Q24 and 25 in 2Q24. Overall results for each provision during the Fifteenth Reporting Period are below. Findings for each quarter are in *Section C: Quarterly Findings-Reporting & Investigations Provisions*.

> *Compliance Measure Summary:* (#1-7) Within 10 days of the end of each quarter the Department will provide the Monitors with a cumulative force synopsis for each incident in the Downtown Jail Complex. The Monitors will select a minimum of 25 force packages to review for compliance with the Action Plan of all reporting and investigations provisions through Vertical and Horizontal Assessments. The Department will provide each package and include a summary sheet that indicates how the Department assessed each applicable provision. Reporting and Investigations provisions will need to be 90% or more compliant for the Vertical Assessments.

**Vertical Assessment:** Of the 50 cases reviewed, thirty-six (36) were found compliant with Reporting and Investigative Provisions, which constitutes 72% of all cases reviewed, which is below the 90% compliance threshold though a significant increase from the 56% in the Fourteenth Report, 46% in the Thirteenth Report, and 8% compliance rate in the Twelfth Report. Of the thirty-six (36) cases in compliance with the Reporting and Investigative provisions, seventeen (17) were from 1Q24 (seven at TTCF, zero at IRC, and ten at MCJ) and nineteen (19) were from 2Q24 (eight at TTCF, six at IRC, and five at MCJ.)

**Horizontal Assessment:** The findings for the seventeen (17) Reporting & Investigative Provisions represent the Horizontal Assessment, which determines whether the Department is in Compliance with each of the applicable Provisions. It takes into consideration the objective of the provision and the nature and extent of any violations. Percentages are calculated based on packages reviewed in both quarters. Of the seventeen (17) provisions, twelve (12) were found in compliance based on packages reviewed.

### 4.2 Mental Health Professionals

**Provision Description:** Supervisors investigating uses of force are required to interview mental health professionals who witnessed the incident or attempted to resolve it. Record interview if consented to.

Of the applicable cases reviewed, 92% (11 out of 12) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.2 Status:** Compliance            **As of Date:** January 1, 2023

30

## 5.2 Commander's Reviews

**Provision Description:** Evaluations of force incidents by Unit Commanders are reviewed pursuant to the category level requirement.

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**5.2 Status:** Compliance          **As of Date:** January 1, 2023

## 5.3 Unexplained Discrepancies

**Provision Description:** Any unexplained tactical decisions or discrepancies among witnesses should be referred in writing by the reviewing Commander(s) to the investigator.

Of the applicable cases reviewed, 97% (38 out of 39) were found to be in compliance, which exceeds the 90% threshold.

**5.3 Status:** Compliance          **As of Date:** July 1, 2022

## 12.2 Location of Inmate Interviews

**Provision Description:** Inmate witnesses to force incidents should be asked to be interviewed, and then interviewed, away from other inmates.

Of the applicable cases reviewed, 60% (18 out of 30) were found to be in compliance, which is below the 90% compliance threshold.

**12.2 Status:** Out of Compliance          **As of Date:** N/A

## 12.3 Suspect Interviews

**Provision Description:** No Department member involved in the use of force should be present for or participate in the interviews.

Of the applicable cases reviewed, 92% (46 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.3 Status:** Compliance          **As of Date:** July 1, 2019

## 12.4 Uninvolved Supervisors

**Provision Description:** Force investigations should not be conducted by the direct supervisor of the staff member involved in the use of force.

Of the applicable cases reviewed, 96% (48 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.4 Status:** Compliance          **As of Date:** July 1, 2023

## 12.5 Standard Order and Format

**Provision Description:** Use of force packages should be organized in a standard order and format.

Of the applicable cases reviewed, 98% (49 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.5 Status:** Compliance          **As of Date:** July 1, 2019

31

## 15.1 Timeliness of Reports

**Provision Description:** Every staff member who uses or assists in a force incident completes a separate and independent written report before going off duty.

Of the applicable cases reviewed, 86% (43 out of 50) were found to be in compliance, which is below the 90% compliance threshold.

**15.1 Status:** Out of Compliance        **As of Date:** N/A

## 15.2 All Department Witnesses

**Provision Description:** Each staff member who witnesses a use of force prepares a written report unless the Watch Commander specifically designates only certain witnesses to prepare reports when a large number witnessed the same event.

Of the applicable cases reviewed, 96% (48 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.2 Status:** Compliance        **As of Date:** July 1, 2019

## 15.3 Force by Other Members

**Provision Description:** Staff members who use force must describe the type used in a written report as well the type used by others.

Of the applicable cases reviewed, 90% (45 out of 50) were found to be in compliance, which meets the 90% compliance threshold.

**15.3 Status:** Compliance        **As of Date:** January 1, 2024

## 15.4 Description of Injuries

**Provision Description:** Staff members who witness a use of force incident must describe visible or apparent injuries to department members, inmates, or others involved.

Of the applicable cases reviewed, 90% (45 out of 50) were found to be in compliance, which meets the 90% compliance threshold.

**15.4 Status:** Compliance        **As of Date:** January 1, 2024

## 15.5 Clarification After Video

**Provision Description:** A Department member who wants to make any clarifications or changes after viewing a video of a force incident should be required to either prepare a supplemental report or specifically note any changes to the Department member's initial report.

Of the applicable cases reviewed, 94% (17 out of 18) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.5 Status:** Compliance        **As of Date:** July 1, 2023

## 15.6 Separation of Deputies

**Provision Description:** To the extent practical, Department members should be separated until they have completed their use of force reports and/or witness reports.

Of the applicable cases reviewed, 82% (41 out of 50) were found to be in compliance, which is below the 90% compliance threshold. This represents a significant increase from the 47% and 48% in the Thirteenth and Fourteenth Report, respectively, and an additional increase from the 16% compliance rate in the Twelfth Report. The Panel has advised the Department on how to document how this provision was met.

**15.6 Status:** Out of Compliance        **As of Date:** N/A

32

## 15.7 Individual Perceptions

**Provision Description:** Report reviewers must ensure each report reflects individual perceptions and recollections of the events and that they do not have common wording or phrasing.

Of the applicable cases reviewed, 88% (43 out of 49) were found to be in compliance, which is below the 90% compliance threshold.

**15.7 Status:** Out of Compliance        **As of Date:** N/A

## 16.1 Healthcare Assessment

**Provision Description:** A documented medical assessment of each inmate upon whom force is used as soon as practical after the force incident.

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**16.1 Status:** Compliance        **As of Date:** July 1, 2019

## 16.2 Photographs of Injuries

**Provision Description:** Supervisors investigating force incidents must photograph any injury, swelling, or redness sustained by staff members and document the absence of injury.

Of the applicable cases reviewed, 88% (36 out of 41) were found to be in compliance, which is below the 90% compliance threshold.

**16.2 Status:** Out of Compliance        **As of Date:** January 1, 2024

## 16.3 Medical Report of Injuries

**Provision Description:** Medical staff treating an injured inmate must report any injuries related to a use of force or an allegation by the inmate of a use of force.

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**16.3 Status:** Compliance        **As of Date:** July 1, 2019

| Reporting & Investigations, Packet Review | | Thirteenth Report | Fourteenth Report | Fifteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 4.2 | Mental Health Professionals | 100% | 100% | 92% | 1/1/2023 | |
| 5.2 | Commander's Reviews | 94% | 100% | 100% | 1/1/2023 | |
| 5.3 | Unexplained Discrepancies | 95% | 98% | 97% | 7/1/2022 | |
| 12.2 | Location of Inmate Interviews | 52% | 49% | 60% | | |
| 12.3 | Suspect Interviews | 90% | 96% | 92% | 7/1/2019 | ✓ |
| 12.4 | Uninvolved Supervisors | 96% | 98% | 96% | 7/1/2023 | |
| 12.5 | Standard Order & Format | 100% | 100% | 98% | 7/1/2019 | ✓ |
| 15.1 | Timeliness of Reports | 92% | 88% | 86% | | |
| 15.2 | All Department Witnesses | 94% | 96% | 96% | 7/1/2019 | ✓ |
| 15.3 | Force by Other Members | 88% | 90% | 90% | 1/1/2024 | |
| 15.4 | Description of Injuries | 80% | 92% | 90% | 1/1/2024 | |
| 15.5 | Clarification After Video | 79% | 100% | 94% | 7/1/2023 | |
| 15.6 | Separation of Deputies | 47% | 48% | 82% | | |
| 15.7 | Individual Perceptions | 98% | 98% | 88% | | |
| 16.1 | Healthcare Assessment | 98% | 100% | 100% | 7/1/2019 | ✓ |
| 16.2 | Photograph of Injuries | 87% | 91% | 88% | 1/1/2024 | |
| 16.3 | Medical Report of Injuries | 100% | 100% | 100% | 7/1/2019 | ✓ |

33

## B. Reporting & Investigations Provisions as Reported by Department

Many of the recommendations in the Action Plan that pertain to the reporting and investigation of force used by Department personnel in Custody Operations are assessed by the Panel through a review of the completed force packages. Other provisions are reported by the Department as follows:

### 5.1 Tracking of Force Incidents

**Provision Description:** Requires the Department to track the status of all investigations, reviews, and evaluations of all use of force incidents and allegations to ensure they were completed appropriately and timely. By the end of the shift, a supervisor or Internal Affairs investigator enters incidents into a database with a summary and an initial category classification.

> *Compliance Measure Summary:* 5.1(2) On a quarterly basis, Monitors determine if the completed force packages reviewed were entered into the database pursuant to 5.1(1).

The Department reports that 100% of the force incidents were entered timely into the database for the First and Second Quarters of 2024.

> *Compliance Measures Summary:*
> 5.1(1) and (4a): 95% of use of force incidents are entered into the database within two hours of the end of shift in which the incident occurred.
> 5.1(4)b and c: 90% of investigations of Deputies and Custody Assistants were completed timely and appropriately.

The Department reports its compliance rate for the First and Second Quarters of 2024 at 73% compliant, which is below the compliance threshold. The Panel continues to emphasize the need to complete use of force investigations within the appropriate timeframes to hold staff accountable for policy violations. Documentation provided indicates that in First Quarter 2024, MCJ and IRC reached 100% compliance, while TTCF only reached 20% compliance. Similarly, in Second Quarter 2024, MCJ reached 100% compliance, IRC reached 80%, and TTCF only reached 40%. TTCF was issued a Corrective Action Plan (CAP) for both quarters and IRC was issued a CAP for the Second Quarter of 2024.

**5.1 Status:** Out of Compliance          **As of Date:** N/A

### 8.3 CFRC Review

**Provision Description:** Evaluations of grievance investigations claiming force was used to retaliate against an inmate should be reviewed by the Custody Force Review Committee.

> *Compliance Measures Summary:* A list of completed investigations of inmate grievances claiming force was used in retaliation is provided quarterly to the Monitors and will include the CFRC review of the investigation's evaluation.

There was no data to access for the Fifteenth Reporting Period. According to the posted information in SharePoint, there were no grievances in which an inmate claimed force was used in retaliation.[16]

**8.3 Status:** Compliance          **As of Date:** June 30, 2021

### 11.1 CFRT Involvement

**Provision Description:** The Custody Force Rollout Team (CFRT) involvement in reviewing evaluations should not delay the investigation.

---

[16] During the Panel's monitoring visits, inmates have reported they do not view the grievance system as effective and as a result, may choose not to utilize it.

34

> *Compliance Measure Summary*: 95% of the investigations reviewed by CFRT were not delayed and discipline imposed timely if there is a policy violation finding.

During the First and Second Quarters of 2024, there were no use of force incidents reviewed by CFRT in which there was a finding of a policy violation or misconduct.

**11.1 Status:** Compliance                    **As of Date:** June 30, 2018

## 13.1 Documenting Dishonesty

**Provision Description:** The Department must have a firm zero tolerance policy for acts of dishonesty, use of excessive force, failures to report uses of force, and violations of PREA. For any staff member not terminated for such an act documentation is made as to the reason and the discipline imposed as well as placement on a monitored performance review program.

> *Compliance Measures Summary:* 95% compliance with all completed investigations where there was a finding of dishonesty, failure to report uses of force, or PREA violations as well as documentation for incidents that did not result in termination.

The Department's Self-Assessment indicates it achieved 100% compliance in both quarters of the Fifteenth Reporting Period. The following is a summary of the data posted for each case: two (2) in First Quarter 2024 and one (1) in Second Quarter 2024.

- First Quarter of 2024: A Deputy Sheriff was terminated on March 7, 2024, for general behavior, immoral conduct, obedience to laws, regulations, and orders, and performance to standards following a plea of no contest to multiple felonies. In the second case a Deputy Sheriff was suspended for 15 days without pay for off-duty domestic violence.
- Second Quarter of 2024: A Deputy Sheriff was discharged April 24, 2024, for violating policies related to false statements and dishonesty/failure to make statements. The Deputy was named in a report for unlawful discharge of a firearm. The case was rejected by the District Attorney's Office for lack of sufficient evidence.

Historically, the cases ordinarily reported pursuant to 13.1 involve off-duty misconduct. To be transparent, the Department has been over-inclusive in the information they have reported for this provision. As part of the ongoing discussions regarding accountability, revisions to this Provision have been agreed upon by the Parties and the Panel. The Parties plan to file a Stipulation setting forth the revised Compliance Measures for this Provision in the coming months.

**13.1 Status:** Compliance                    **As of Date:** October 1, 2019

## 13.2 Reports of Dishonesty and PREA

**Provision Description:** All findings of dishonesty, failures to report uses of force, and violations of PREA and supporting documentation is provided to the Office of the Inspector General quarterly.

For the Fifteenth Reporting Period, the Inspector General was advised of all actions noted above in Section 13.1.

**13.2 Status:** Compliance                    **As of Date:** October 1, 2019

## 14.1 Review of Criminal Referrals

**Provision Description:** An additional review of referrals of inmates for criminal prosecution arising from incidents involving the use of force by Department members must be performed to ensure charges are not being brought to help justify the use of force.

> *Compliance Measures Summary:* Requires the Department to review all referrals of an inmate for criminal prosecution for assaulting a staff member and report to the Monitors

35

that 95% of referrals were reviewed by the Unit Commander who verified charges were not brought as justification for use of force.

The Department is below the 95% compliance threshold for both quarters of the Fifteenth Reporting Period. The Department reports 91% compliance with Section 14.1 for the First Quarter of 2024 with 31 out of 34 cases referred to and verified by the Unit Commander that charges were not brought as a justification for a use of force prior to the referral being sent to the District Attorney's Office. For the Second Quarter of 2024, the Department reports 87% compliance with 14.1 with 21 out of 24 cases reviewed by the Unit Commander prior to submission to the District Attorney's Office. Information provided to the Panel indicates all of the non-compliant cases from the Second Quarter were from MCJ. IRC (1/1) and TTCF (7/7) had 100% compliance with 14.1.

**14.1 Status:** Out of Compliance          **As of Date:** N/A

## 14.2 Timeliness of Criminal Referrals

**Provision Description:** Timely forward incidents of officer misconduct that may amount to criminal violations to the Office of the District Attorney.

> *Compliance Measures Summary:* Requires the Department review all referrals of a staff member for possible prosecution for alleged misconduct and report to the Monitors that 90% of referrals were sent to the Office of the District Attorney within six months.

In the First Quarter of 2024, there was one case referred to the District Attorney's Office. The referral occurred 549 days after the incident, which is beyond the six-month time period required by this Provision. The intent of the Provision is to prosecute criminal behavior in a timely manner. The Department met the statute of limitations to bring this case forward and provided an explanation for the delay beyond six months. The Panel met with the Department's Internal Criminal Investigative Bureau (ICIB) on January 6, 2025. Moving forward, ICIB will provide more detail on the memo submitted to the Monitors to explain delays without violating confidentiality of the case. There were no cases referred to the District Attorney for possible prosecution of a staff member during the Second Quarter of 2024.

**14.2 Status:** Compliance          **As of Date:** July 1, 2018

| Reporting & Investigations, Department Reported | | Thirteenth Report | Fourteenth Report | Fifteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 5.1 | Tracking of Force Incidents | X | X | X | | |
| 8.3 | CFRC Review | C | C | C | 6/30/2021 | |
| 11.1 | CFRT Involvement | C | C | C | 6/30/2018 | ✓ |
| 13.1 | Documenting Dishonesty | C | C | C | 10/1/2019 | ✓ |
| 13.2 | Reports of Dishonesty/PREA | C | C | C | 10/1/2019 | ✓ |
| 14.1 | Review of Criminal Referrals | C | C | X | | |
| 14.2 | Timeliness of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |

# C. Quarterly Findings—Reporting and Investigations Provisions

## First Quarter and Second Quarter 2024 Combined Results

For the First and Second Quarters of 2024, the Panel reviewed 50 use of force incidents combined—22 from TTCF (44%), 21 from MCJ (42%), and 7 from IRC (14%).

The Department is not in Compliance with five (5) of the seventeen (17) Reporting & Investigations Provisions: (1) 12.2 Location of Inmate Interviews, (2) 15.1 Timeliness of Reports, (3) 15.6 Separation of Deputies, (4) 15.7 Individual Perceptions, and (5) 16.2 Photograph on Injuries.

Of the five (5) Reporting and Investigations Provisions out of compliance, one (1) had a compliance rate below 70% in 1Q24 and 2Q24: 12.2 Inmate Interviews at 60% compliance.

36

The Department was in Compliance, or 90% or above, with the following twelve (12) provisions: 4.2, 5.2, 5.3, 12.3, 12.4, 12.5, 15.2, 15.3, 15.4, 15.5, 16.1, and 16.3.

**First Quarter 2024 Results**

For the First Quarter of 2024, the Panel reviewed 25 force incidents— twelve (12) from TTCF (48%), thirteen (13) from MCJ (52%), and zero (0) from IRC (0%).

The Department was not in Compliance with six (6) of the seventeen (17) Reporting & Investigations Provisions: (1) 4.2 Mental Health Professionals, (2) 12.2 Location of Inmate Interviews, (3) 12.3 Suspect Interviews, (4) 15.1 Timeliness of Reports, (5) 15.6 Separation of Deputies, and (6) 16.2 Photograph of Injuries.

Of the six (6) Reporting and Investigations Provisions out of compliance, one (1) had a compliance rate below 70% in 1Q24: 12.2 Location of Inmate Interviews at 54% compliance.

The Department was in Compliance, or 90% or above, with the following eleven (11) provisions: 5.2, 5.3, 12.4, 12.5, 15.2, 15.3, 15.4, 15.5, 15.7, 16.1, and 16.3.

**Second Quarter 2024 Results**

In the Second Quarter of 2024, the Panel reviewed 25 force incidents—10 from TTCF (40%), 7 from MCJ (28%), and 8 from IRC (32%).

The Department was not in Compliance with six (6) of the seventeen (17) Reporting & Investigations Provisions: (1) 12.2 Location of Inmate Interviews, (2) 15.1 Timeliness of Reports, and (3) 15.3 Force by Other Members, (4) 15.4 Description of Injuries, (5) 15.6 Separation of Deputies, and (6) Individual Perceptions.

Of the six (6) Reporting and Investigations Provisions out of compliance, one (1) had a compliance rate below 70% in 2Q24: 12.2 Location of Inmate Interviews at 65% compliance.

The Department was in Compliance, or 90% or above, with the following eleven (11) provisions: 4.2, 5.2, 5.3, 12.3, 12.4, 12.5, 15.2, 15.5, 16.1, 16.2 and 16.3.

37

# V. Inmate Grievances

The Action Plan requires extensive changes in how the Department handles inmate grievances and requests for service. On July 15, 2016, the Department issued a new *Inmate Grievance Manual* (Volume 8 of the Custody Division Manual) to implement a new grievance system. The Panel assessed the Department's implementation of the new grievance system in the Fifteenth Reporting Period as follows:

## A. Grievance Forms

### 6.1 Separate Grievance Forms

**Provision Description:** Inmate grievances and inmate requests must be reported on separate forms, either paper or electronically.

The Panel has previously concluded the forms meet the requirements of the Action Plan.

**6.1 Status:** Compliance          **As of Date:** January 1, 2017

### 6.2 Availability of Grievance Forms

**Provision Description:** Grievance forms are reasonably available to inmates at all times.

During the Panel's January 2024 visit to the Downtown Jail Complex, some of the boxes within the housing units did not contain grievance forms. Inmates have reported their inability to access grievance forms to the Panel. The Department has continued its efforts to procure tablets, although there is not an established date on when they will be available for inmate use. Once the tablets are available, inmates will be able to electronically file grievances.

**6.2 Status:** Out of Compliance          **As of Date:** N/A

### 6.6 Right to Appeal Form

**Provision Description:** Grievance forms must include a check box indicating whether the complaint was upheld or denied and a statement regarding the right to appeal and time frame.

> *Compliance Measures Summary:* Monitors determine the availability of forms and requirements of 6.1 through 6.6 through onsite visits, interviews with inmates and staff, and a review of 25 consecutive force and retaliation grievances in a month.

The Panel has previously concluded that the forms contain the appeals check box and meet the requirements of the Action Plan.

**6.6 Status:** Compliance          **As of Date:** January 1, 2017

### 7.1 Conflict Resolution Meeting

**Provision Description:** Inmates who submit grievances should be advised that a conflict resolution meeting is voluntary to address the grievances without a personnel investigation. If successful, the grievance resolution is documented accordingly.

There were two (2) grievances submitted where Conflict Resolution was offered and successful and subsequently documented in the Custody Inmate Grievance Application (CIGA), one (1) in each quarter of the Fifteenth Reporting Period.

**7.1 Status:** Compliance          **As of Date:** January 1, 2017

38

## 6.4 Use of Force Grievances

**Provision Description:** Grievance forms should include "use of force" as a specific category of "grievances against staff" and brought to the attention of Unit Commanders.

>*Compliance Measure Summary:* 90% of force grievances reviewed were brought to the attention of the Unit Commander within 10 days of receipt and properly handled.

During the First Quarter of 2024, 90% of force and retaliation grievances were brought to the attention of the Unit Commander within ten (10) days. Out of the ten (10) applicable grievances, the Unit Commander was notified within the required timeframe in nine (9) cases. In the one (1) case not handled properly, there were 71 days between collection and notification to the Unit Commander. The Department reports 100% compliance with this provision in the Second Quarter of 2024. Out of the six (6) applicable grievances, all six (6) were brought to the attention of the Unit Commander within the required timeframe.

**6.4 Status:** Compliance                **As of Date:** January 1, 2024

## 6.5 Grievances Against Staff

**Provision Description:** Grievance forms should include "retaliation" and "harassment" as specific categories of "grievances against staff" and brought to the attention of Unit Commanders.

>*Compliance Measure Summary:* 90% retaliation grievances reviewed were brought to the attention of the Unit Commander within 10 days of receipt and properly handled.

In the First Quarter of 2024, the Department reports that 96% of the retaliation grievances (27 out of 28) were brought to the Unit Commanders' attention within 10 days and handled appropriately. In the Second Quarter of 2024, the Department reports 100% (21 out of 21) of grievances were handled appropriately.

**6.5 Status:** Compliance                **As of Date:** July 1, 2023

# B. Emergency Grievances

## 6.3 Emergency Grievance Forms

**Provision Description:** A prominent box is placed on the form to indicate an "Emergency Grievance."

>*Compliance Measure Summary:* Monitors verify compliance with 6.3 through interviews of staff and inmates and review of grievances marked "emergency."

A prominent box is located on the grievance form and confirmed through reviews and interviews.

**6.3 Status:** Compliance                **As of Date:** January 1, 2017

## 6.7 Handling Emergency Grievances

**Provision Description:** Grievances marked "emergency" are given to and reviewed by a supervisor as soon as possible to determine if immediate action is needed to protect life or safety. Provide the inmate a written response documenting action taken to address the emergency.

>*Compliance Measure Summary:* Monitors review 50 consecutive grievances to ensure 95% of grievances marked "emergency" were reviewed and handled pursuant to Section 6.7.

The Department's Fifteenth Self-Assessment reflects it achieved 100% compliance in the First and Second Quarters of 2024. There was only one (1) grievance that met the criteria for Section 6.7 for the Fifteenth Reporting Period and timely notification was provided to the inmate in that case.

**6.7 Status:** Compliance                **As of Date:** July 1, 2018

39

### 6.8 Notification of Non-Emergency

**Provision Description:** If the grievance is determined to be non-emergent, the inmate is notified as soon as practical that the grievance will be handled as non-emergent with reason documented.

> *Compliance Measure Summary:* Monitors review 50 consecutive grievances to ensure 90% of those determined non-emergent were documented and notifications to inmates were made within five days.

For the First Quarter of 2024, the Department reports 100% (33 out of 33) of the grievances were correctly downgraded and the inmate was notified in a timely manner that the grievance would be handled as non-emergent. The Department also reports it achieved 91% compliance in the Second Quarter of 2024 with 22 out of 24 emergency grievances downgraded to non-emergent being properly handled. In the two (2) cases not properly handled, the inmate was notified of the downgrade after 7 days.

**6.8 Status:** Compliance                **As of Date:** July 1, 2018

## C. Inmate Grievance Coordinator

The recommendations in Sections 6.9, 6.13, 6.14, and 6.15 of the Action Plan address expectations and duties of the Inmate Grievance Coordinator position.

### 6.9 Inmate Grievance Coordinator

**Provision Description:** Requires all emergency grievances be forwarded to the Inmate Grievance Coordinator (IGC) who will review for proper handling and notify the Unit Commander if not properly handled.

The Department's posted data pertaining to Section 6.9 for 1Q24 and 2 Q24 indicates there were six (6) grievances deemed emergent. Of those, three (3) were reviewed by the IGC and not applicable for a Unit Commander's review. The other three (3) cases are marked as "not yet reviewed" by the IGC. The way in which the data was tracked for this Provision is confusing. As noted in the Thirteenth Report, the Custody Inmate Grievance Application (CIGA) was implemented in June 2024. Posted data for this provision should be clearer starting in the Third Quarter of 2024.

**6.9 Status:** Compliance                **As of Date:** July 1, 2018

### 6.13 Grievance Coordinator Tracking

**Provision Description:** Regularly track the handling of inmate grievances to ensure the investigations are completed timely and reasonably, and that inmates are notified of the results of the investigations.

### 6.14 Grievance Coordinator Reports

**Provision Description:** Provide a monthly report to Unit Commanders on the status of grievances, timeliness of investigations, responses to grievances and appeals, and inmate notifications.

### 6.15 Grievance Coordinator Analysis

**Provision Description:** Analyze inmate grievances monthly to identify any problematic trends and provide that analysis in a monthly report to Unit Commanders and senior management.

> *Compliance Measures Summary:* Provide the Monitors with one or more quarterly reports to address all requirements of the Coordinator provisions. The Inmate Grievance Coordinator will meet with the Monitors once a quarter.

The Department has created computer codes to generate monthly reports summarizing the data noted in 6.13, 6.14, and 6.15 in the Custody Inmate Grievance Application (CIGA). Following discussions with the

40

Panel, the Department created an additional computer code to provide reports regarding appeals. The reports on appeals were posted in SharePoint covering the Second Quarter of 2024.

The Panel met with the Compliance and Sustainability Grievance Team in January and May 2024 to discuss the Custody Inmate Grievance Application (CIGA), and overall trends with respect to the Department's handling of inmate grievances and the need to ensure the reports they have created in CIGA are meeting the needs of the Unit Commanders and senior managers.

**6.13, 6.14, and 6.15 Status:** Compliance          **As of Date:** July 1, 2018

## 6.16 Centralized Grievance Unit

**Provision Description:** Establish a centralized unit to collect, review, categorize, forward for investigations, and make appropriate notifications for inmate grievances.

The Panel previously determined the Department's structure of a Grievance Coordinator supervising the grievance teams at all of the Downtown Jail Complex facilities was equivalent in function to a centralized system and was acceptable, pending progress and specific results. The Panel continues to deem the Department's Grievance Team structure acceptable.

**6.16 Status:** Compliance          **As of Date:** January 17, 2017

# D. Handling of Grievances

## 6.10 Collection of Grievances

**Provision Description:** Grievances should be collected from the locked grievance boxes on each living unit no less frequently than once per day. Collection time should be recorded in a log and reviewed within 24 hours of collection.

> ***Compliance Measures Summary:*** Monitors will inspect collection boxes, verify that the database is accurate and up-to-date, and ensure that 95% of grievances selected for review are collected, reviewed, entered, and tracked timely.

The Department's Fifteenth Self-Assessment reports that 100% of the reviewed grievances were collected and reviewed within 24 hours and handled as required in the First Quarter of 2024. In the Second Quarter of 2024, 94% of grievances collected were reviewed within 24 hours. The Department's Fifteenth Self-Assessment further reports in May of 2024 MCJ collected grievance boxes 92% of the time and IRC collected 89% of the time.

As noted in our Eighth Report, the Compliance Measure for Section 6.10 does not yield data sufficient to assess compliance with this provision. For example, the first 25 consecutive grievances at MCJ for the selected months were collected within the first two days of the month. The fact that MCJ timely collected grievances from its collection boxes in those first two days does not provide a meaningful measurement of the Department's compliance with Section 6.10. As such, the Panel has reviewed the Unit Collection compliance data for the entire month to assess compliance with Section 6.10. For the First Quarter of 2024, MCJ's monthly collection log shows a compliance rate of 91% and TTCF's compliance rate was 97%. The posted results continue to show some areas within MCJ with low compliance rates, e.g. 16% and 55%. The Department has explained that there was an oversight including some of these areas (i.e. Control Booths and Entry) in their new grievance database. That oversight has since been corrected. MCJ was issued a Corrective Action Plan to address the untimely collection of grievances. The Department's Fifteenth Self-Assessment reports that briefings were held with all supervisory positions at MCJ and IRC to "discuss how to properly document the collections in the e-UDAL."

**6.10 Status:** Compliance          **As of Date:** July 1, 2021

41

### 6.11 Failure to Properly Handle Grievances

**Provision Description:** Failing to provide an inmate with a grievance form when requested, destroying or concealing grievances, failing to respond appropriately to a grievance, attempting to intimidate an inmate from filing a grievance, and retaliating against an inmate who has filed a grievance, may each be a cause for disciplinary action.

> ***Compliance Measure Summary:*** Provide the Monitors with a log of any inmate grievances about the matters encompassed by Paragraph 6.11, the result of the investigations of those grievances, and documentation that appropriate corrective action was taken in 100% of cases.

For the Fifteenth Reporting Period, the Department reports that no staff members were found to have engaged in the conduct encompassed by this Provision. The Panel regularly hears from inmates that they are not able to obtain grievance forms and that staff retaliate against them for filing grievances. When asked what that retaliation looks like, responses include matters pertaining to their daily living, i.e. not providing toilet paper, not allowing them to make phone calls or use the shower, etc. Many reported they did not file another grievance related to the retaliation because they viewed that option as futile. While some inmates file grievances related to retaliation for using the grievance system, the Panel is not aware of any cases in which the Department has found that staff retaliated against an inmate in a manner encompassed by this Provision.

**6.11 Status:** Compliance                    **As of Date:** July 1, 2022

### 6.12 Tracking Inmate Grievances

**Provision Description:** All inmate grievances should be entered into and tracked in an inmate grievance database that reflects the nature and status of the grievance, and personnel responsible for the Department's handling of the grievance.

> ***Compliance Measures Summary:*** Monitors will review 25 grievances from MCJ and 25 from TTCF to ensure that 95% of grievances reviewed are collected, reviewed, entered, and tracked timely.

The Department's posted results report that 100% of the grievances at both MCJ and TTCF in the randomly selected months in the First and Second Quarters of 2024 were entered into the database as required by Section 6.12. The source documents for these results were available to, and reviewed by, the Panel.

**6.12 Status:** Compliance                    **As of Date:** July 1, 2018

### 8.1 Anti-Retaliation

**Provision Description:** Prohibits Department personnel from retaliating against inmates.

> ***Compliance Measures Summary:*** Department implements and enforces an anti-retaliation policy and provides Monitors with a quarterly log of cases and findings as well as the first 25 investigations alleging retaliation.

The Department posted the results of the investigations approved by Unit Commanders in the randomly selected months and the number of anti-retaliation grievances received and investigated in the First and Second Quarters of 2024, which were as follows:

- First Quarter of 2024 there were 104 anti-retaliation grievances received, and zero investigations were completed.
- Second Quarter of 2024 there were 63 anti-retaliation grievances received, and one investigation completed that did not result in a sustained violation of the anti-retaliation policy. The grievance was referred to County Food Services for further investigation.

The Panel notes that out of the 167 grievances received during this Reporting Period, only one (1) investigation was completed. The Department needs to address this backlog in these investigations.

**8.1 Status:** Compliance                    **As of Date:** April 1, 2019

42

## E. Deadlines

### 6.17 Use of Force Deadlines

**Provision Description**: A 30-day deadline in place for filing use of force grievances by inmates.

> ***Compliance Measures Summary:*** 1(a), 95% compliance with the first 25 use of force grievances determined by the Department to be untimely.

The Department's source documents for this provision indicate the Department achieved 100% compliance for the Fifteenth Reporting Period. There were two (2) grievances that met the criteria of this provision—one in each quarter—and they were all handled appropriately in accordance with 6.17.

The Panel was informed that the updated Grievance Forms, reflecting the 30-day deadline noted in this Provision, are in the final stages of approval. The Department has posted signs by each grievance box noting the 30-day deadline. Some of the posted signs have been removed by inmates. The Panel finds the Department in Compliance with this Provision.

<table>
<tr><td>**6.17 Status:** Compliance</td><td>**As of Date:** October 1, 2019</td></tr>
</table>

### 6.18 PREA Deadline

**Provision Description:** There should be no deadline for filing Prison Rape Elimination Act grievances.

> ***Compliance Measures Summary:*** 1(b), 95% compliance with the first 25 PREA grievances.

There were fifteen (15) grievances filed during the First Quarter of 2024 and four (4) filed during the Second Quarter of 2024 that met the criteria for Section 6.18. Eighteen of the nineteen were handled appropriately in accordance with 6.18. The Department is compliant with 95% of the grievances filed.

As in 6.17, the updated Grievance Forms, reflecting the lack of a deadline for filing a PREA grievance, are in the final stages of approval. The Department has posted signs by each grievance box indicating there is no deadline to file a PREA grievance.

<table>
<tr><td>**6.18 Status:** Compliance</td><td>**As of Date:** July 1, 2018</td></tr>
</table>

### 6.19 Response to Inmate Grievances

**Provision Description:** Department should respond to inmate grievances "within 15 calendar days after the submission of the grievance," absent exceptional circumstances, which must be documented.

> ***Compliance Measures Summary:*** 1(d and e), 90% compliance with the first 25 grievances against staff and the first 25 grievances not against staff in which the investigation was not completed within 15 days.

As noted in the Twelfth, Thirteenth, and Fourteenth Reports, the purpose of this provision is to ensure inmates receive a substantive response to their grievance in a timely manner. The provision contemplates responses beyond the 15-day deadline to be rare. The Department had been considering rating themselves in compliance as long as the inmate received some type of notification within 15 days, including extensions. The Department concurs they are out of compliance with this provision for this Reporting Period.

In the randomly selected month during the First Quarter of 2024, 54% of inmate grievances were responded to within 15 days. Only 24% of inmate grievances against staff were responded to within 15 days, and 84% of inmate grievances not against staff were responded to within 15 days. In the randomly selected month during the Second Quarter of 2024, 52% of inmate grievances were responded to within 15 days. Only 28% of inmate grievances against staff were responded to within 15 days, and 76% of inmate grievances not

43

against staff were responded to within 15 days. The Panel finds the Department out of compliance with this provision.

**6.19 Status:** Out of Compliance          **As of Date:** N/A

## 6.20 Appeals of Grievances

**Provision Description:** Inmates should have 15 days from receipt of a denial of a grievance (or from release from segregations) to file an appeal of the grievance.

> *Compliance Measures Summary:* 1(c), 95% compliance with the first 25 appeals of grievances determined by the Department to be untimely.

According to the Department's source documents, there were no appeals that met the criteria for this provision during the Fifteenth Reporting Period.

**6.20 Status:** Compliance          **As of Date:** July 1, 2018

# F.  Communications with Inmates

## 7.2 Notification of Results

**Provision Description:** Inmate should be advised of the results of the investigation of grievances against personnel, but not any sanction imposed, within 10 days of adjudication.

> *Compliance Measures Summary:* 1(f), 90% compliance with the first 25 completed grievances against staff, including the inmate notifications.

The Fifteenth Self-Assessment reports 92% compliance with this provision in the First Quarter of 2024. There were only 25 grievances that met the criteria for this provision and timely notifications to the inmates were made for 23 of those grievances. For the Second Quarter of 2024, the Department's Compliance rate was 100%. Of the 7 grievances that met the 7.2 criteria, timely notification to the inmate occurred for all of the grievances.

**7.2 Status:** Compliance      **As of Date**: July 1, 2024

## 7.3 Prisoner-Staff Communications

**Provision Description:** The Department should ensure that there are adequate avenues for constructive prisoner-staff communication, such as Town Hall meetings.

> *Compliance Measures Summary:* Maintain logs of Town Hall meetings and report to the Monitors that each jail facility has conducted Town Hall meetings for a randomly selected month per quarter. Monitors interview inmates and staff to assess the adequacy of communications.

The Department's Fifteenth Self-Assessment reports that the Department was in Compliance with Section 7.3 during the Second Quarter of 2024 and not in compliance during the First Quarter. The Department provided 10% of the recorded prisoner-staff communications that occurred during Town Hall meetings at MCJ and TTCF during the randomly selected months during the Fifteenth Reporting Period, which included Town Hall meetings in special housing units as well as in General Population housing units. During the First Quarter, MCJ conducted and logged only 17 meetings. MCJ was issued a Corrective Action Plan for failing to conduct Town Hall meetings on a regular basis.

**7.3 Status:** Out of Compliance      **As of Date:** N/A

44

| Grievance Provisions | | Thirteenth Report | Fourteenth Report | Fifteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 6.1 | Separate Grievance Forms | C | C | C | 1/1/2017 | ✓ |
| 6.2 | Availabilty of Grievance Forms | C | X | X | | |
| 6.3 | Emergency Grievances Forms | C | C | C | 1/1/2017 | ✓ |
| 6.4 | Use of Force Grievances | X | C | C | 1/1/2024 | |
| 6.5 | Grievances Against Staff | C | C | C | 7/1/2023 | |
| 6.6 | Right to Appeal Form | C | C | C | 1/1/2017 | ✓ |
| 6.7 | Handling Emergency Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.8 | Notification of Non-Emergency | C | C | C | 7/1/2018 | ✓ |
| 6.9 | Grievance Coordinator Review | C | C | C | 7/1/2018 | ✓ |
| 6.10 | Collection of Grievances | C | C | C | 7/1/2021 | ✓ |
| 6.11 | Failure to Handle Grievances | C | C | C | 7/1/2022 | |
| 6.12 | Tracking Inmate Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.13 | Grievance Coordinator Tracking | C | C | C | 7/1/2018 | ✓ |
| 6.14 | Grievance Coordinator Reports | C | C | C | 7/1/2018 | ✓ |
| 6.15 | Grievance Coordinator Analysis | C | C | C | 7/1/2018 | ✓ |
| 6.16 | Centralized Grievance Unit | C | C | C | 1/17/2017 | ✓ |
| 6.17 | Use of Force Deadline | C | C | C | 10/1/2019 | ✓ |
| 6.18 | PREA Deadline | C | C | C | 7/1/2018 | ✓ |
| 6.19 | Response to Inmate Grievances | X | X | X | | |
| 6.20 | Appeals to Grievances | C | C | C | 7/1/2018 | ✓ |
| 7.1 | Conflict Resolution Meeting | C | C | C | 1/1/2017 | ✓ |
| 7.2 | Notification of Results | X | X | C | 7/1/2024 | |
| 7.3 | Prisoner-Staff Communications | C | C | X | | |
| 8.1 | Anti-Retaliation | C | C | C | 4/1/2019 | ✓ |

# VI.   Use of Restraints

## 17.1 Restraint Provisions

**Provision Description:** Custody Force Manual must include "a separate section that sets forth the general principles governing the use of restraints."

The Panel concludes that the Department included such a separate section in the Manual.

**17.1 Status:** Compliance                    **As of Date:** December 1, 2015

## 17.3 Safety Chair Procedures

**Provision Description:** Requires immediate medical examinations of inmates placed in Safety Chairs with a use of force, or if the inmate struggles against the Safety Chair restraints. Section 17.3 also requires that inmates' vitals are checked every hour while in the Safety Chair.

> ***Compliance Measures Summary:*** Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex. The Monitors conduct a Vertical and Horizontal Assessment of approximately 25 incidents to determine at least 90% compliance with restraint provisions.

During the Fifteenth Reporting Period, the Department provided the Inmate Safety Chair Security Check Logs and Fixed Restraint Logs at the Downtown Jail Complex for the First and Second Quarters of 2024. The Panel's auditors continue to note there is no indication that medical professionals, or any Custody personnel, are performing hourly vitals checks even though inmates are often in the safety chairs for several hours while in transport to and from court and during court proceedings. As noted in previous Panel

45

Reports, periodic vitals checks are necessary to establish compliance even if the inmate does not struggle and force is not used to place the inmate in the Safety Chair. Out of the 33 and 33 unique safety chair records provided for the First and Second Quarters of 2024, the Panel's auditors noted that there were no explicit indications of a use of force to place an inmate into the chairs.[17] Due to vital checks not occurring as required, the Department remains out of Compliance with Section 17.3.

**17.3 Status:** Out of Compliance        **As of Date:** N/A

## 17.4 Safety Checks

**Provision Description:** Requires safety checks of inmates in fixed restraints every twenty minutes to verify and document the inmate is not in undue pain or that restraints are not creating injury.

> *Compliance Measures Summary:* Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex. The Monitors conduct a Vertical and Horizontal Assessment of approximately 25 incidents to determine at least 90% compliance with restraint provisions.

The Inmate Safety Chair Security Check Logs and Fixed Restraint Logs reflect that Department personnel consistently conduct safety checks on many inmates every twenty minutes, as required by Section 17.4.[18] However, fixed restraint logs provided for eight inmates during the First Quarter of 2024 and two in the Second Quarter of 2024 did not explicitly document personnel verifying that the inmate was not in undue pain or that the restraints were not causing injury.[19] The records reflecting when a safety chair was not used for transportation, but rather as a means of temporary control, indicate that there were no visible signs of injury or complaint of pain. Due to the Fixed Restraint Logs not explicitly documenting whether the inmate was in undue pain or that the restraints were not causing injury, the Department remains Out of Compliance with Section 17.4.

**17.4 Status:** Out of Compliance        **As of Date:** N/A

## 17.6 – 17.9 Multi-Point Restraints

**Provision Descriptions:** The provisions in these sections are specific to the use and application of multi-point restraints. The Department does not employ multi-point restraints and these provisions are therefore not applicable.

**17.6 – 17.9 Status:** Not Applicable        **As of Date:** N/A

## 17.10 Involuntary Medications

**Provision Description:** The Department's Custody use of force policies should provide that medication may not be used solely for security purposes.

> *Compliance Measures Summary:* Department will provide a log documenting the administration of involuntary medications and the reason for it. Monitors will review the

---

[17] There were two records at TTCF in the First Quarter of 2024 where, due to incomplete documentation, the Panel's auditors were unable to determine whether or not force was used to place the inmate in the safety chair.

[18] While the use of safety chairs for inmate movement are not subject to Section 17.4, it should be noted that the Department's policy requires safety checks to be recorded every 15 minutes, which the majority of checks fall within. Based on the Department's posted documentation, all but three safety chair records provided for the First and Second Quarters of 2024 are related to transportation.

[19] Unlike the Inmate Safety Chair Security Check Logs, which contain a field verifying whether or not there were "any visible signs of injury or complaint of pain caused by safety chair[,]" the Fixed Restraint Logs do not contain a similar field.

46

log and interview involved medical and mental health professionals to verify medication was not used solely for security purposes.

The Department's posted results reflect that every administration of involuntary medications was pursuant to court order and there were no instances in which medication was used solely for security purposes in the Fifteenth Reporting Period. According to the log of Administration of Involuntary Medication, 125 inmates in the First Quarter of 2024 and 101 inmates in the Second Quarter of 2024 received involuntary medication.

**17.10 Status:** Compliance            **As of Date:** July 1, 2018

| Use of Restraint Provisions | | Thirteenth Report | Fourteenth Report | Fifteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 17.1 | Restraint Provisions | C | C | C | 12/1/2015 | ✓ |
| 17.3 | Safety Chair Procedures | X | X | X | | |
| 17.4 | Safety Checks | X | X | X | | |
| 17.6 | Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.7 | Approval of Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.8 | Continued Use of Restraints | N/A | N/A | N/A | | |
| 17.9 | Supervisor Approval of Restraints | N/A | N/A | N/A | | |
| 17.10 | Involuntary Medication | C | C | C | 7/1/2018 | ✓ |

# VII. Early Warning System

## 19.1 Development of EWS

**Provision Description:** Develop a system to identify potentially problematic Department members based upon objective criteria, such as number of force incidents, inmate grievances, allegations of misconduct, performance reviews, and policy violations.

> *Compliance Measure Summary:* The system identifies potentially problematic employees upon objective criteria.

The Panel approved the Employee Review System ("ERS") in July 2018, and it was implemented by the Department as a pilot program in the Downtown Jail Complex on August 1, 2018, and in the rest of the jail facilities as of November 1, 2018.

**19.1 Status:** Compliance            **As of Date:** August 1, 2018

## 19.2 Review of EWS Reports

**Provision Description:** Compliance Lieutenants must review reports monthly to identify potentially problematic Department members and promptly notify the Unit Commander and the Assistant Sheriff for Custody Operations in writing.

> *Compliance Measure Summary:* Unit Commanders make notifications within ten days 90% of the time and within thirty days 95% of the time.

For the First and Second Quarters of 2024, the Department's posted results indicate the Compliance Lieutenant notified the appropriate Unit Commander and the Assistant Sheriff for Custody Operations in writing of potentially problematic employees within 10 days of receiving the monthly reports 100% of the time, and within thirty days 100% of the time. The Department is in Compliance with this provision.

**19.2 Status:** Compliance            **As of Date:** January 1, 2023

47

## 19.3 Performance Mentoring Programs

**Provision Description:** Unit Commanders required to determine whether problematic employees should be placed on a performance mentoring program. For each potentially problematic Department member identified through the EWS, the Unit Commander must consult with the appropriate Chief and document the reasons why any problematic members are not placed on a performance mentoring program.

> *Compliance Measure Summary:* Chief is consulted 95% of the time to determine if a non-disciplinary performance program is appropriate. If so, specific performance metrics were in place and the reason for the decision was provided 95% of the time.

During the First Quarter of 2024, the Department's Early Warning System (EWS) identified six (6) employees as potentially problematic: one at TTCF, five at MCJ, and zero at IRC. Of those six (6) employees identified, one (1) required secondary screening due to an off-duty incident where an administrative investigation was requested. The Department determined no further action was needed regarding the remaining five employees.

During the Second Quarter of 2024, the Department's EWS identified 27 employees as potentially problematic: one from TTCF, twenty-three from MCJ, and three from IRC. Four (4) of those employees required secondary screening: One employee required secondary screening for on-duty misconduct where an administrative investigation was requested. Another employee had four (4) use of force incidents in a 3-month period. There were "no concerns…identified in any of the use of force incidents," the employee was reassigned to a position without inmate contact. Two other employees required secondary screening due to one having three (3) uses of force in one month and the other having four (4) uses of force in one month. Deputies were reassigned to another floor "where they are less likely to have confrontations with inmates with mental illness." The Department determined no further action was needed regarding the remaining 23 employees. The Department's posted results for the Fifteenth Reporting Period reflect 100% compliance with this provision.

**19.3 Status:** Compliance          **As of Date:** July 1, 2022

| Early Warning System Provisions | | Thirteenth Report | Fourteenth Report | Fifteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 19.1 | Development of EWS | C | C | C | 8/1/2018 | ✓ |
| 19.2 | Review of EWS Reports | C | C | C | 1/1/2023 | |
| 19.3 | Performance Mentoring Programs | C | C | C | 7/1/2022 | |

48

# Appendix A: Compliance Chart

| Fifteenth Report Compliance Chart | | | | | |
|---|---|---|---|---|---|
| **Administrative Provisions** | **Thirteenth Report** | **Fourteenth Report** | **Fifteenth Report** | | |
| No. — Provision | 1Q23 - 2Q23 | 3Q23 - 4Q23 | 1Q24 - 2Q24 | AS OF | 3YR+ |
| 1.1  Assistant Sheriff | C | C | C | 1/1/2017 | ✔ |
| 1.2  Sheriff | C | C | C | 1/1/2017 | ✔ |
| 1.3  Supervision | X | X | X | | |
| 1.4  Reports to Board | C | C | C | 6/12/2018 | ✔ |
| 10.1  Senior Manager Tours | C | C | C | 6/30/2018 | ✔ |
| 10.2  Housing Unit Documentation | X | C | C | 1/1/2024 | |
| 18.1  Custody-Wide Rotation Policy | C | C | C | 6/30/2018 | ✔ |
| 18.2  Semi-Annual Rotation Audit | C | C | C | 1/1/2019 | ✔ |
| 21.1  Transfers to Custody | C | C | C | 6/30/2018 | ✔ |
| **Use of Force Policy Provisions** | **Thirteenth Report** | **Fourteenth Report** | **Fifteenth Report** | **AS OF** | **3YR+** |
| 2.1  Custody Force Manual | C | C | C | 1/1/2017 | ✔ |
| 8.2  Complaints of Retaliation | C | C | C | 1/1/2017 | ✔ |
| 17.2  Pregnant Inmates | C | C | C | 1/1/2017 | ✔ |
| 20.1  Categories of Force | C | C | C | 1/1/2017 | ✔ |
| 20.2  Reactive Force | C | C | C | 1/1/2017 | ✔ |
| **Use of Force Practice Provisions, Packet Review** | **Thirteenth Report** | **Fourteenth Report** | **Fifteenth Report** | **AS OF** | **3YR+** |
| 2.2  Force Prevention Principles | 58% | 86% | 82% | | |
| 2.3  Inmate on Inmate Violence | 87% | 98% | 92% | 1/1/2024 | |
| 2.4  Use of Force as Discipline | 94% | 98% | 100% | 7/1/2019 | ✔ |
| 2.5  Force on Restrained Inmates | 95% | 97% | 92% | 7/1/2023 | |
| 2.6  Head Strikes or Kicks | 64% | 88% | 84% | | |
| 2.7  Supervisors Called to Scene | 78% | 88% | 86% | | |
| 2.8  Prevent Excessive Force | 60% | 100% | 100% | 1/1/2024 | |
| 2.9  Armed Inmates | 71% | 67% | 50% | | |
| 2.10  Authorized Weapons | 85% | 88% | 97% | 7/1/2024 | |
| 2.11  Planned Chemical Spray | 100% | 100% | 100% | 7/1/2023 | |
| 2.12  Chemical Spray & Tasers | 100% | 86% | 94% | 7/1/2024 | |
| 2.13  Check of Medical Records | 100% | 83% | 100% | 7/1/2024 | |
| 4.1  Consult Mental Health Professionals | 100% | 88% | 77% | | |
| 4.3  Spray on Mental Health Inmates | 100% | 100% | 100% | 10/1/2019 | ✔ |
| 4.4  Cooling Off Periods | 83% | 100% | 89% | 1/1/2023 | |
| 4.5  Medical or Mental Health Provider Order | 100% | 100% | 91% | 1/1/2023 | |
| 9.2  Escorting of Inmates | 92% | 88% | 88% | | |
| 9.3  Duty to Protect & Intervene | 100% | 100% | 100% | 7/1/2022 | |
| 17.5  Minimize Medical Distress | 61% | 51% | 64% | | |
| 20.3  Planned Use of Force | 100% | 100% | 93% | 7/1/2023 | |

49

| Training Provisions | | Thirteenth Report | Fourteenth Report | Fifteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 3.1 | Use of Force Training | C | C | C | 12/31/2021 | ✔ |
| 3.2 | Ethics & Professionalism | C | C | C | 6/30/2018 | ✔ |
| 3.3 | Custody Training | C | C | C | 6/30/2018 | ✔ |
| 3.4 | Custody-based Scenarios | C | C | C | 6/30/2018 | ✔ |
| 3.5 | Add Training and Mentoring | C | C | C | 7/1/2019 | ✔ |
| 3.6 | Probation Reviews | C | C | C | 1/1/2023 | |
| 4.6 | Crisis Intervention | C | C | C | 6/30/2018 | ✔ |
| 4.7 | Mentally Ill Inmates | C | C | C | 1/1/2023 | |
| 4.8 | Mentally Ill Inmates (new staff) | C | C | C | 6/30/2018 | ✔ |
| 4.9 | Crisis Intervention (new staff) | C | C | C | 6/30/2018 | ✔ |
| 12.1 | Force Investigations | C | C | C | 7/1/2019 | ✔ |
| **Reporting & Investigations, Department Reported** | | Thirteenth Report | Fourteenth Report | Fifteenth Report | AS OF | 3YR+ |
| 5.1 | Tracking of Force Incidents | X | X | X | | |
| 8.3 | CFRC Review | C | C | C | 6/30/2021 | |
| 11.1 | CFRT Involvement | C | C | C | 6/30/2018 | ✔ |
| 13.1 | Documenting Dishonesty | C | C | C | 10/1/2019 | ✔ |
| 13.2 | Reports of Dishonesty/PREA | C | C | C | 10/1/2019 | ✔ |
| 14.1 | Review of Criminal Referrals | C | C | X | | |
| 14.2 | Timeliness of Criminal Referrals | C | C | C | 7/1/2018 | ✔ |
| **Reporting & Investigations, Packet Review** | | Thirteenth Report | Fourteenth Report | Fifteenth Report | AS OF | 3YR+ |
| 4.2 | Mental Health Professionals | 100% | 100% | 92% | 1/1/2023 | |
| 5.2 | Commander's Reviews | 94% | 100% | 100% | 1/1/2023 | |
| 5.3 | Unexplained Discrepancies | 95% | 98% | 97% | 7/1/2022 | |
| 12.2 | Location of Inmate Interviews | 52% | 49% | 60% | | |
| 12.3 | Suspect Interviews | 90% | 96% | 92% | 7/1/2019 | ✔ |
| 12.4 | Uninvolved Supervisors | 96% | 98% | 96% | 7/1/2023 | |
| 12.5 | Standard Order & Format | 100% | 100% | 98% | 7/1/2019 | ✔ |
| 15.1 | Timeliness of Reports | 92% | 88% | 86% | | |
| 15.2 | All Department Witnesses | 94% | 96% | 96% | 7/1/2019 | ✔ |
| 15.3 | Force by Other Members | 88% | 90% | 90% | 1/1/2024 | |
| 15.4 | Description of Injuries | 80% | 92% | 90% | 1/1/2024 | |
| 15.5 | Clarification After Video | 79% | 100% | 94% | 7/1/2023 | |
| 15.6 | Separation of Deputies | 47% | 48% | 82% | | |
| 15.7 | Individual Perceptions | 98% | 98% | 88% | | |
| 16.1 | Healthcare Assessment | 98% | 100% | 100% | 7/1/2019 | ✔ |
| 16.2 | Photograph of Injuries | 87% | 91% | 88% | 1/1/2024 | |
| 16.3 | Medical Report of Injuries | 100% | 100% | 100% | 7/1/2019 | ✔ |

50

| Grievance Provisions | | Thirteenth Report | Fourteenth Report | Fifteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 6.1 | Separate Grievance Forms | C | C | C | 1/1/2017 | ✔ |
| 6.2 | Availabilty of Grievance Forms | C | X | X | | |
| 6.3 | Emergency Grievances Forms | C | C | C | 1/1/2017 | ✔ |
| 6.4 | Use of Force Grievances | X | C | C | 1/1/2024 | |
| 6.5 | Grievances Against Staff | C | C | C | 7/1/2023 | |
| 6.6 | Right to Appeal Form | C | C | C | 1/1/2017 | ✔ |
| 6.7 | Handling Emergency Grievances | C | C | C | 7/1/2018 | ✔ |
| 6.8 | Notification of Non-Emergency | C | C | C | 7/1/2018 | ✔ |
| 6.9 | Grievance Coordinator Review | C | C | C | 7/1/2018 | ✔ |
| 6.10 | Collection of Grievances | C | C | C | 7/1/2021 | ✔ |
| 6.11 | Failure to Handle Grievances | C | C | C | 7/1/2022 | |
| 6.12 | Tracking Inmate Grievances | C | C | C | 7/1/2018 | ✔ |
| 6.13 | Grievance Coordinator Tracking | C | C | C | 7/1/2018 | ✔ |
| 6.14 | Grievance Coordinator Reports | C | C | C | 7/1/2018 | ✔ |
| 6.15 | Grievance Coordinator Analysis | C | C | C | 7/1/2018 | ✔ |
| 6.16 | Centralized Grievance Unit | C | C | C | 1/17/2017 | ✔ |
| 6.17 | Use of Force Deadline | C | C | C | 10/1/2019 | ✔ |
| 6.18 | PREA Deadline | C | C | C | 7/1/2018 | ✔ |
| 6.19 | Response to Inmate Grievances | X | X | X | | |
| 6.20 | Appeals to Grievances | C | C | C | 7/1/2018 | ✔ |
| 7.1 | Conflict Resolution Meeting | C | C | C | 1/1/2017 | ✔ |
| 7.2 | Notification of Results | X | X | C | 7/1/2024 | |
| 7.3 | Prisoner-Staff Communications | C | C | X | | |
| 8.1 | Anti-Retaliation | C | C | C | 4/1/2019 | ✔ |
| **Use of Restraint Provisions** | | **Thirteenth Report** | **Fourteenth Report** | **Fifteenth Report** | **AS OF** | **3YR+** |
| 17.1 | Restraint Provisions | C | C | C | 12/1/2015 | ✔ |
| 17.3 | Safety Chair Procedures | X | X | X | | |
| 17.4 | Safety Checks | X | X | X | | |
| 17.6 | Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.7 | Approval of Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.8 | Continued Use of Restraints | N/A | N/A | N/A | | |
| 17.9 | Supervisor Approval of Restraints | N/A | N/A | N/A | | |
| 17.10 | Involuntary Medication | C | C | C | 7/1/2018 | ✔ |
| **Early Warning System Provisions** | | **Thirteenth Report** | **Fourteenth Report** | **Fifteenth Report** | **AS OF** | **3YR+** |
| 19.1 | Development of EWS | C | C | C | 8/1/2018 | ✔ |
| 19.2 | Review of EWS Reports | C | C | C | 1/1/2023 | |
| 19.3 | Performance Mentoring Programs | C | C | C | 7/1/2022 | |

51