# EXHIBIT 2

**REVISED MONITORING PLAN AND COMPLIANCE MEASURES**

The Monitors have determined that the existing 108-page, hybrid Monitoring Plan, with some provisions subject to direct reviews by the Monitors and other provisions subject to the Monitors' audits of reviews by the Sheriff's Department, is unworkable to assess the Department's compliance with the 100+ provisions of the Action Plan.  For example,  under the plan the Monitors select and review random force packages to assess the Department's compliance with some Compliance Measures and the Department selects and reviews scores of other force packages to compose statistical reports assessing compliance with other Compliance Measures.  The Department's reports are then audited by the Monitors, who randomly select and assess some of force packages reviewed by the Department.  Since the Compliance Measures are not part of the Settlement Agreement or the Action Plan, the Monitor have decided to revise the Compliance Measures for purposes of assessing the Department's compliance with the Action Plan, effective April 1, 2018.

As in the past, the Monitors may, as they deem necessary, conduct spot checks of Men's Central Jail ("MCJ"), the Twin Towers Correctional Facility ("TTCF"), and the Inmate Reception Center ("IRC")(collectively the "Downtown Jail Complex); audit the records of these facilities, including the records of inmates in these facilities; and interview inmates and staff at these facilities at any time. The Monitors reserve the right to select the records that must be reviewed to determine the Department's compliance with the Action Plan, to request and review additional records and categories of records as necessary to assess the Department's Compliance with specific provisions of the Plan, and to seek and consider information and documents from Plaintiffs as part of their assessment. To prove compliance with each provision, the Department must document, in the reports, the action(s) taken to satisfy every requirement.

For the many of the use of force and the reporting and investigation provisions, the Monitors will qualitatively assess the use, reporting, and investigation of the force in selected force packages based upon the applicable provisions of the Action  Plan (the "vertical" approach), and then determine whether the percentage of packages in compliance meets a quantitative threshold.  The Monitors will also assess the Department's Compliance with applicable provisions across all of the  force packages (the "horizontal" approach) to ensure that the Monitors assess the Department's Compliance with each of the provisions in the Plan.  The Compliance Measures reflect a similar approach for some of the restraint provisions.  Other provisions in these categories have been grouped and will be assessed separately.

The Monitors have grouped the Grievance provisions of the Action Plan into subcategories, which generally will be assessed for compliance separately based upon site visits, interviews with the Inmate Grievance Coordinator and the Inmate Grievance Teams, reports from the Grievance Coordinator, and reviews of inmate grievances.  The Compliance Measures for the Administrative provisions and the Early Warning System are individually assessed for Compliance. The Compliance Measures for the Training provisions remain the same and mirror the Compliance Measures in the Department of Justice Settlement Agreement.

1

The Monitors intend to rely on qualitative assessments in addition to the quantitative requirements of the Compliance Measures in determining the Department's compliance, particularly where the sample population is too small to obtain statistically significant results or the results are within in a few percentage points – either above or below – of the quantitative requirement.  The qualitative assessments will take into consideration issues such as the nature and extent of any violations of Department policies; the supervision, disciplinary record, number and experience of Department personnel involved in the violations; the quality of the Department's investigations; the supervisors' responses to force incidents; the Unit Commanders' assessments of the supervisors' performances; any corrective measures taken; and whether appropriate discipline (up to and including termination) was imposed.

The Monitors have reviewed and approved the policies the Department has adopted to address the requirements of the Action Plan.  These policies must be included in the Custody Division Manual, which includes the Custody Use of Force Manual (Volume 7) and the Grievance Manual (Volume 8), for the duration of the relevant compliance periods. The Department must notify the Monitors and Plaintiffs if any of the approved policies are to be modified or changed, and when and how Department members are to be notified of the  revised policies.  The Department must notify the Monitors in advance of any planned curriculum changes,  The Monitors reserve the right to approve any such modifications before they are implemented.

The Monitors also have reviewed and approved the Department's curriculum and training materials, and they have attended training sessions for the training required under the Action Plan.  The policies approved by the Monitors and implemented by the Department must be addressed in this training for the duration of the relevant compliance periods.  The Monitors will review the Department's Compliance with the training required under the Action Plan, and the thresholds required for training current and new deputies and the required refresher training for the duration of the relevant compliance periods.  The Monitors reserve the right approve any changes in the curriculum before they are implemented.

To the extent that any of the Compliance Measures require reports by the Department to the Board of Supervisors, the Monitors, or the Office of Inspector General, the Monitors will assess the accuracy and completeness of the reports.  Further, to the extent that the Department's reports to the Monitors are based on a review of Department records, those records will be made available to the Monitors.

In the event of any conflicts between the Monitoring Plan and the Settlement Agreement, the Settlement Agreement will control.

From 2022 to 2025, the Parties engaged in negotiations that resulted in amendments to the Settlement Agreement. The Monitors have informed the Parties' discussions and approved revisions to the Compliance Measures. Revisions are indicated by "(Revised 2025)" notations below. The revised Compliance Measures are effective November 1, 2025.

## I.    ADMINISTRATIVE PROVISIONS

**SUBSTANTIVE PROVISIONS**

1.1    Custody Operations should continue to be headed by an Assistant Sheriff with no areas of responsibility other than Custody Operations.

1.2    The Sheriff should be personally engaged in the management of the Department's jail facilities, and the Sheriff should regularly and adequately monitor the Department's use of force policies and practices, and its compliance with this court-ordered Action Plan.

1.3    Department managers should be held accountable should they fail to address use of force problems at the Department's jail facilities.

1.4    The Department should report regularly to the Board of Supervisors on use of force and the status of the Department's compliance with this Action Plan.

**COMPLIANCE MEASURES**

Custody Operations must be headed by an Assistant Sheriff with no other areas of responsibility for the duration of the Settlement Agreement as required by Paragraph 1.1.

During the relevant implementation periods, the Department must report to the Monitors every six months on the Sheriff's personal involvement in managing the Department's jail facilities, and monitoring the Department's use of force policies and practices and its compliance with the Action Plan as required by Paragraph 1.2.  The Sheriff will meet with the Monitors at least once every six months to discuss his personal involvement.

(Revised 2025) Compliance with Paragraph 1.3 requires the Department to provide a quarterly report that: (a) contains a copy of the report in 13.1/13.2 compliance measure 2(a); (b) identifies each facility in which there was a substantial increase of more than 25% force incidents or Category 3 force incidents from the prior quarter; (c) assesses whether the Unit Commander and Commander appropriately addressed any substantial increases in force incidents or Category 3 force incidents, violations of the use of force policies, or the supervision of Department members involved in a substantial increase in force incidents (an increase of more than 25% force incidents with a minimum of two more force incidents from the prior quarter); and (d) indicates what the Department did to hold Unit Commanders and Commanders accountable if they failed to address the matters reference in subsection (c) above.  The Monitors will determine whether the Department's report reasonably assesses force incidents, policy violations, and supervision as required by this paragraph. The Monitors will determine whether the evaluations of the force incidents conducted by the Supervisor (or CFIT), Watch Commander, Unit Commander and Facility Commander were thorough, explained the reasons for their conclusions, appropriately identified policy violations and took the necessary steps to hold staff accountable for any identified policy violations.

3

At least once every six months the Department will report publicly to the Board of Supervisors on (a) its use of force in the jails, including use of force statistics and trends; training on use of force policies and procedures; the number of cases referred for administrative or criminal investigations for violations of the use of force policies; summaries of the results of investigations and discipline imposed for violations of the use of force policies and misconduct involving force; and (b) the status of the Department's compliance with the Action Plan and any impediments to the Department's compliance.   The Department will provide the Monitors with a copy of its reports to the Board and the transcript of the proceedings.  The Monitors will assess the accuracy and completeness of the Department's reports.

**SUBSTANTIVE PROVISIONS**

10.1    Senior managers from the rank of Unit Commanders and above should be required periodically to tour the jail facilities, including nights and weekends.

10.2    Housing units should document visits to jail facilities by Department managers (above the rank of Sergeant) in electronic records or visitor logs.

**COMPLIANCE MEASURES**

Compliance with Paragraphs 10.1 and 10.2 will require that[1]

(a)    Unit Commanders tour and inspect their facilities on at least two evenings and one weekend day per quarter;

(b)    Commanders in Custody Operations tour and inspect each facility at the Downtown Jail Complex under their commands at least twelve times during the dayshifts and two nights or weekend days per quarter;

(c)    Chiefs in Custody Operations tour and inspect each facility at the Downtown Jail Complex under their commands at least six times during the day shifts and  one night or weekend day per quarter;

(d)    The Assistant Sheriff for Custody tours and inspects each facility at the Downtown Jail Complex at least twice every quarter, one of which should be at night or on a weekend day;

(e)    The Sheriff tours and inspects each facility at the Downtown Jail Complex at least once every quarter; and

(f)    Visits to jail facilities by Department managers (above the rank of Sergeant) are documented in electronic or visitor logs available to the Monitors.

Compliance requires that, in the aggregate, at least 95% of the required tours under subparts (a) through (c) above are conducted each quarter, and that the Assistant Sheriff for Custody and the Sheriff tour the facilities as required by subparts (d) and (e) each quarter.

---

[1] As used in these measures, tours of jail facilities are not required when the manager is on leave, on vacation, or away from the facility, including when traveling for Department purposes.

**SUBSTANTIVE PROVISIONS**

18.1    The Department should maintain its Custody-wide rotation policies and rotate Department members at least as often as provided in those policies.

18.2    The Department should audit semi-annually each unit's compliance with its rotation policies.

**COMPLIANCE MEASURES**

1.    Each jail facility unit must develop and maintain a rotation policy approved by a Custody  Chief or Commander.

2.    The Department must audit each unit's compliance with its rotation policies every six months and report the results to the Monitors.

3.    Compliance with Paragraphs 18.1 and 18.2 requires the Department to provide audit results demonstrating that 90% of the available Department members have been rotated at least as often as provided in the approved rotation policies.

**SUBSTANTIVE PROVISION**

21.1    The Department's policies should provide that the Department will not transfer or assign a staff member to Custody as a formal or informal sanction for problem deputies.

**COMPLIANCE MEASURES**

1.      On a quarterly basis, the Department will review the personnel records of all Department members who are transferred to Custody Operations from other Divisions (excluding new members who are assigned initially to Custody Operations from the Academy, and members who have been newly demoted to Custody Assistant).

2.      The Department shall provide the Monitors with a log, updated quarterly, that identifies each member who was transferred to Custody Operations within six months of a finding of misconduct or a policy violation and sets forth the reason(s) for the member's transfer.

3.      Compliance will require that no member was transferred to Custody as a sanction for misconduct or a policy violation.

## II.    <u>USE OF FORCE PROVISIONS</u>

**SUBSTANTIVE PROVISIONS**

2.1     The Department should have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations that includes all use of force policies and procedures that are in the Custody Division Manual and the sections of the Manual of Policy and Procedures that are applicable to the Custody Operations.  The Custody Force Manual should not include sections of the Manual of Policy and Procedures that are only applicable to other areas of the Department and should not include sections that are not applicable to the use of force by Department members.

8.2     The Department should combine the "Complaints of Retaliation" provisions in 512/000.00 and 5-12/010.00 into one section in the Custody Division Manual to ensure that there is a single, consistent policy on the handling of such grievances regardless of who receives the grievance and who is the subject of the grievance.

17.2     The Department should combine and conform all provisions related to restraints on pregnant inmates into one section in the Custody Division Manual (by combining the *Restraining Pregnant Inmates* section under 5-03/130.00 (Medically Ordered Restraint Devices) and Section 5-03/115 (Pregnant Inmates).

20.1     The Custody Force Manual should indicate that there are two types of force: Reactive Force and Planned Force, and it should eliminate the definitions of rescue force, directed force, and medical assistance force, which do not reflect the Department's force policies or provide guidance in the use of force

20.2     Reactive Force should be defined as force that is used in response to an immediate threat to the safety of any Department member or inmate, the immediate threat of the destruction of a substantial amount of property, or the immediate threat of an escape, and when there is no time to plan or wait for assistance.

**COMPLIANCE MEASURE**

The Department will provide the Monitors with a Custody Division Manual that includes all force policies applicable to the use of force in Custody Operations logically organized, in one place.  The Department may modify individual policies as appropriate to ensure that the Manual is targeted for use of force by Department members in Custody Operations, so long as the revised policies comply with the Action Plan, but it must maintain all of the force policies logically organized in one place in the Custody Division Manual for the duration of the Compliance Period.  The Department will also provide the Monitors with the policies required by Paragraphs 8.2, 17.2, 20.1 and 20.2 of the Action Plan, which must remain in effect for the duration of the relevant compliance periods.

**SUBSTANTIVE PROVISIONS**

2.2     The Department's Custody use of force policies should provide that force used by Department members:  (a) must be used as a last resort; (b) must be the minimal amount of force that is necessary and objectively reasonable to overcome the resistance; (c) must be terminated as soon as possible consistent with maintaining control of the situation; and (d) must be deescalated if resistance decreases.

2.3     The Department's Custody use of force policies should provide that it is a violation of Department policy to cause or facilitate inmate-on-inmate violence or to harass or otherwise verbally provoke an inmate to justify the use of force against the inmate.  The policies should also provide that staff are prohibited from publicly humiliating inmates; from using slurs concerning race, gender, ethnicity, or sexual-orientation; using obscenities; or exposing prisoners to an unreasonable risk of being assaulted by fellow prisoners.

2.4     The Department's Custody use of force policies should provide that force may not be used as discipline or corporal punishment.

2.5     The Department's Custody use of force policies should provide that a Department member may not strike an inmate or use chemical agents or a Taser on an inmate who is restrained unless the inmate is assaultive and presents an immediate threat of injury to a Department member or another person, and unless there are no other more reasonable means to control the inmate.

2.6     (Revised 2025) Consistent with the stipulated, Court-approved policies filed with the Court on July 7, 2024, the Department's Custody use of force policies should provide that striking an inmate in the head or kicking an inmate who is on the ground, or kicking an inmate who is not on the ground anywhere above the knees is prohibited unless the inmate is physically assaultive and presents an imminent danger of serious injury and/or death to a Department member or another person and other techniques would be ineffective.  The Department's Custody use of force policies should also provide that kicking an inmate who is not on the ground below the knees is prohibited unless the inmate is physically assaultive, and the kick is necessary to create distance between the member and the assaultive inmate and to prevent potential injury.

2.7     The Department's Custody use of force policies should provide that Department members confronted with a situation in which force may be required must call a supervisor to the scene as soon as time and circumstances permit.

2.8     The Department's Custody use of force policies should provide that all Department members are responsible for preventing excessive force, and that Department members witnessing excessive force have a duty to attempt to stop, reduce or control the force being used.

2.9     The Department's Custody use of force policies should provide that when confronting an armed inmate, every effort should be made to control the inmate at a distance and

9

avoid the types of force that would subject Department members to close contact with the inmate.

2.10    The Department's Custody use of force policies should provide that Department members may only use instruments of force or weapons that are (1) authorized by the Department and (2) for which they have been trained, except that Department members may use any available instruments or weapons to prevent imminent loss of life or serious bodily injury if there are no other more reasonable alternative available.

2.11    The Department's Custody use of force polices should provide that Department members are required to wait a sufficient amount of time after applying chemical agents to allow the chemical agents to take full effect before applying additional chemical agents or other force in a cell extraction or other planned use of force.

2.12    The Department's Custody use of force policies should provide that chemical agents and Tasers and other electronic stun devices should not be used:  (a) against an inmate when he or she no longer presents a danger or is no longer resistant; (b) against inmates known to suffer  medical conditions that may be aggravated or affected by such agents; or (c) in a manner contradictory to the manufacturer's recommendations or Department training.

2.13    The Department's Custody use of force policies should provide that, when time and circumstances permit, an inmate's medical/mental health records should be checked before chemical agents or Tasers and other electronic stun devices are used against the inmate.  If a medical check finds these items are contra-indicated, they should not be used (subject, however, to the exception in 2.10, above).

4.1    The Department's Custody use of force policies should require a mental health professional to be on-scene to attempt to resolve the situation without force whenever there is a cell extraction or, to the extent possible, any other similar planned use of force.

4.3    The Department's Custody use of force policies should provide that in situations involving an acutely psychotic or other severely mentally disabled inmate, following an initial burst of a chemical agent that has not produced compliance, the Department should discontinue the further use of chemical agents if the inmate is sufficiently mentally disabled that he or she cannot conform his or her behavior to commands.

4.4    The Department's Custody use of force policies should provide that in situations involving a mentally ill inmate who does not present an obvious danger to himself or herself or to anyone else, and who refuses to exit his or her cell without force, there should be a reasonable "cooling off" period after all other non-force attempts at resolution have been tried and failed. Following this "cooling off" period, either a mental health professional, Department supervisor, or watch commander should again try to gain compliance without the use of force.

4.5    The Department's Custody use of force policies should provide that whenever a planned use of force is precipitated by a medical or mental health provider's order (*e.g.*, a cell extraction following a psychiatrist's order that an inmate be moved for treatment purposes), the

prescribing provider should be notified and allowed an opportunity to intervene in an effort to de-escalate the situation and to determine if the provider's order should remain in effect.  If the prescribing provider is unavailable, then another medical or mental health provider should be notified to carry out these duties.

9.2    The Department's Custody use of force policies should provide that, following a use of force or interaction with a recalcitrant inmate, the staff member escorting an inmate to medical, holding or segregation should not be the same staff member involved in the confrontation or use of force unless there is no other staff member reasonably available to escort the inmate.

9.3    The Department's Custody use of force policies should provide that Department members have a duty to protect inmates and to take appropriate steps to intervene in inmate-on-inmate violence as soon as it is reasonably safe to do so.

17.5    The Department's Custody use of force policies should provide that Department members should avoid, to the extent possible under the circumstances, placing their weight on an inmate's back or shoulders in a way that impairs the inmate's breathing.  Once an inmate is controlled, he or she should be placed on his or her side to minimize breathing problems and the risk of medical distress or positional asphyxia.  Inmates carried by members or by gurney or stretcher, should be placed on their side if practical.

20.3    Planned Force should be defined to be all force other than Reactive Force.  With respect to Planned Force, the Department's policies should require, time and circumstances permitting, that: (1) a medical staff person be on scene or, if impractical or unsafe, on stand-by; (2) the event be video recorded; (3) a supervisor be on scene to direct the Use of Force; and (4) Shift Supervisor approval for the Use of Force.

**COMPLIANCE MEASURES**

The following Compliance Measures apply to Sections 2.2 through 2.13, 4.1 through 4.5, 9.2, 9.3 and 17.5 (the "Force Provisions") of the Action Plan:

1.    Within 10 days of the end of each quarter beginning with the quarter ending on March 31, 2018, the Department will provide the Monitors with a cumulative Force Synopsis for each force incident in the Downtown Jail Complex beginning **January 1, 2017,** through the end of the most recent quarter showing, among other things, the status of the force investigation.[2]

2.    On a quarterly basis, the Monitors will select a minimum of 25 completed force incidents from the Force Synopsis to review for purposes of assessing the Department's Compliance with the Force Provisions of the Action Plan.  The Monitors may request additional

---

[2] The Monitors will provide plaintiffs' counsel with access to the electronic version of the force tracker in the offices of Monitor Richard Drooyan so that Plaintiff's counsel can assess the Monitor's selection of the completed force packages to be reviewed by the Monitors and suggest additional force packages for potential review by the Monitors.

11

completed force packages if necessary to determine whether there is a pattern of non-compliance or violations of the provisions are not isolated cases.

3.      On a rolling basis, the Department will provide the Monitors with the requested 25 force packages as expeditiously as possible so that the Monitors can review the packages before the end of the quarter.  Each of the force packages must include a summary sheet that sets forth each of the Force Provisions (as well as other provisions of the Action Plan regarding the reporting of force incidents, the investigation of force incidents and the use of restraints) and indicates how the Department assessed each applicable provision.

4.      The Monitors will assess each force package to determine if the use of force was in Compliance with the Force Provisions based upon an assessment of each applicable Force Provision.  The failure of the Department to comply with specific Force Provisions may, or may not, be sufficient for the Monitors to determine that the force was not in Compliance with the Force Provisions depending on the nature of and reasons for the failure. This assessment is referred to as a "Vertical Assessment."

5.      In reviewing the force packages, the Monitors will also assess whether the uses of force were in Compliance with each of the applicable Force Provisions of the Action Plan.  This assessment  is referred to herein as a "Horizontal Assessment."

6.      To the extent that Monitors determine that the Force Packages they selected do not involve a sufficient number of force incidents to conduct a Horizontal Assessment of the Department's compliance with specific Force Provisions, the Department will provide a list of force incidents that involve those Force Provisions. The Monitors will then select and review additional Force Packages sufficient to assess the Department's compliance with those Force Provisions.

7.      Compliance with the Force Provisions will require that

(a) Based upon Vertical Assessments, 90% of the force incidents reviewed by the Monitors were in  Compliance with the Force Provisions; and

(b) Based upon Horizontal Assessments,  the Monitors determine that the Department is in Compliance with each of the applicable Force Provisions taking into consideration the objective of the provision and the nature and extent of any violations of the provision.

### III.    TRAINING PROVISIONS [3]

**SUBSTANTIVE PROVISIONS**

3.1    Use of force training requirements for all existing Department members in Custody Operations should include, at a minimum, a one-time eight (8) hour use of force policy training course for all members assigned to custody and then a two (2) hour refresher course every year.

3.2    Training requirements for all existing Department members in Custody Operations should include, at a minimum, a one-time four (4) hour training course in ethics, professionalism and treating inmates with respect, and then a two (2) hour refresher course on these subjects at least every other year.

3.4    Custody-based, use of force scenarios should be included as part of the use of force policy training provided by the Custody Training & Standard Bureau on an in-service and refresher basis.

**COMPLIANCE MEASURES**

Compliance will be measured as follows:

(a)    90% of the Deputies and Custody Assistants who were assigned to Custody or to a Custody facility as of **July 1, 2016** ("Retained Personnel"), must complete the required training determined through the following formula:

> Number of Trained Personnel as of the Completion Date
> Number of Retained Personnel remaining as of the Completion Date.

(b)    90% of the Retained Personnel who have completed the initial training course must receive the two hour refresher course as determined through the following formula:

> Number of Trained Personnel remaining in custody for 12 or 24 months[4] after completing the required initial training who receive the Refresher Course
> Number of Retained Personnel remaining in custody for 12 or 24 months after completing the required initial training

---

[3] The Department should provide a quarterly training report showing the percentages of trained personnel for all of the training requirements in the Implementation Plan.  These results will be subject to verification by the Monitors' auditors based upon audits of the Department's training records.

[4] 12 months for Paragraph 3.1 and 24 months for Paragraph 3.2

13

**SUBSTANTIVE PROVISION**

3.3     New Department members should receive a minimum of six weeks of classroom, custody training, which may include training in the Academy or the Jail Continuum and in Crisis Intervention and Conflict Resolution (see 4.9 below), in addition to the in-service training they receive while assigned in the jails.  With the exception of one week of the Department's Jail Operations Continuum training, all of this training should occur before new Department members receive in-service training in the jails, and this training should include at least 12 to 16 hours of both Custody-specific, scenario-based use of force policy training and training in ethics, professionalism and treating inmates with respect.

**COMPLIANCE MEASURES**

Compliance will be measured as follows:

a)     95% of new Deputy Sheriffs sworn after **July 1, 2016**, who successfully complete the Jail Operations Continuum and are assigned to custody must complete the required custody-specific training as part of the Academy or Jail Operations Continuum; and

(b)     95% of new Custody Assistants hired after **July 1, 2016**, who successfully complete the Custody Assistant Academy must complete the required custody-specific training as part of their Academy training.

14

**SUBSTANTIVE PROVISION**

3.5      Unit Commanders should determine what additional training, counseling or mentoring may be required when a personnel  complaint against a Department member involving the use of force is resolved with a finding that it "Appears Employee Conduct Could Have Been Better"; direct that the Department member undergo such additional training, counseling or mentoring; and document the action taken.

**COMPLIANCE MEASURES**

The Department will review and provide a report to the Monitors regarding all personnel complaints involving the use of force that were resolved with "Appears Employee Conduct Could Have Been Better" finding.

Compliance requires that 90% personnel complaints involving the use of force that were resolved with a "Appears Employee Conduct Could Have Been Better" finding reflect documentation that the Unit Commander reasonably determined what additional training, counseling or mentoring was required.

3.6     To ensure a meaningful probationary period, new Department members assigned to Custody Operations should be reviewed within six months after being assigned to Custody and then again before their first post-probationary assignment.

**COMPLIANCE MEASURES**

1.     On a semi-annual basis, the Department will randomly select and review the personnel records of up to a maximum of 50 Deputy Sheriffs and 25 Custody Assistants (excluding personnel on medical or military leave) who graduated from their respective academies during a period from 12 to 18 months prior to the selection of the records.

2.     The Department will determine if the individuals whose records were randomly selected were reviewed within six months of their assignments to Custody and again prior to their first post-probationary assignments with personalized assessments measured against meaningful criteria and provide this information in a semi-annual report to the Monitors.

3.     Compliance requires that 95% of the new Department members in Custody Operations were reviewed (a) within six months after being assigned to Custody and (b) again before their first post-probationary assignment.

**SUBSTANTIVE PROVISION**

4.6      The Department should provide a minimum of 32 hours of Custody-specific, scenario-based, skill development training to all Deputy Sheriffs assigned to the Men's Central Jail, the Twin Towers Correctional Facilities, or the Inmate Reception Center, or who are assigned to work with mentally ill inmates at the Century Regional Detention Facility (the "Deputies in the Designated Facilities") on Crisis Intervention and Conflict Resolution with eight (8) hours of refresher training every other year.

**COMPLIANCE MEASURES**

Compliance will be measured as follows:

(a)      90% of the Deputies who were assigned to a Designated Facility as of **July 1, 2016** ("Retained Personnel"), must complete the required training[5] determined through the following formula:

$$\frac{\text{Number of Trained Personnel as of the Completion Date}}{\text{Number of Retained Personnel remaining as of the Completion Date.}}$$

(b)      90% of the Retained Personnel who have completed the initial training course  must receive the eight-hour refresher course within 24 months of completing the required initial training as determined through the following formula:

$$\frac{\text{Number of Trained Personnel remaining in custody for 24 months after completing the required initial training who receive the Refresher Course}}{\text{Number of Retained Personnel remaining in custody for 24 months after completing the required initial training}}$$

4.7      The Department should provide a minimum of eight (8) hours of custody specific, scenario based, skill development training on identifying and working with mentally ill inmates to all existing Custody personnel with a four (4) hour refresher course every other year.  For Deputies in the Designated Facilities, this training may be a part of the 32 to 40 hours of Crisis Intervention and Conflict Resolution training described above.

---

[5] For Deputy Sheriffs who attended the Department's De-Escalation and Verbal Resolution Training ("DeVRT") after the Monitors approved the curriculum, but before they approved the presentation, the Monitors have agreed that the deputies will be deemed to have received the required training once they attend refresher courses that cover the subjects not included in the DeVRT before it was finally approved by the Monitors.

**COMPLIANCE MEASURES**

Compliance will be measured as follows:

(a)     90% of the Deputies who were assigned to a non-Designated Custody[6] Facility as of **July 1, 2017** ("Retained Personnel"), must complete the required training determined through the following formula:

> Number of Trained Personnel as of the Completion Date
> Number of Retained Personnel remaining as of the Completion Date.

(b)     90% of the Retained Personnel who have completed the initial training course must receive the four-hour refresher course within 24 months of completing the required initial training as determined through the following formula:

> Number of Trained Personnel remaining in custody for 24 months after completing the required initial training who receive the Refresher Course
> Number of Retained Personnel remaining in custody for 24 months after completing the required initial training

**SUBSTANTIVE PROVISIONS**

4.8     The Department should provide a minimum of eight (8) hours of custody specific, scenario-based, skill development training on identifying and working with mentally ill inmates to all new members as part of the Jail Operations Continuum.

4.9     The Department should provide a minimum of 32 hours of custody specific, scenario-based, skill development training in Crisis Intervention and Conflict Resolution to new Department members in the Academy or in Custody before they are assigned to any jail facilities.

**COMPLIANCE MEASURES**

Compliance will require that

(a)     95% of new Deputy Sheriffs who were sworn in after **July 1, 2016,**

---

[6] Compliance for deputies assigned to a Designated Facility who receive their training as part of the 32 to 40 hours of Crisis Intervention and Conflict Resolution training will be determined under the Compliance Measures for Paragraph 4.6.  The Department can provide one compliance package for Paragraphs 4.6 and 4.7 since there is one training course for both provisions.  For the non-Designated Custody facilities, the Department can provide the same compliance package submitted to the Monitor for Paragraph 20 in the Department of Justice Settlement Agreement, which is effective as of July 1, 2017.

18

completed the Jail Operations Continuum, and were assigned to custody, completed the required 32 hours of Crisis Intervention and Conflict Resolution training as part of the Academy training or in the Jail Operations Continuum; and

(b)     95% of the new Custody Assistants who were hired after **July 1, 2016,** and successfully completed their Academy training, completed the required eight hours of training on working with mentally ill inmates, which may be part of Crisis Intervention and Conflict Resolution training, in the Academy or in a Jail Operations Continuum.[7]

---

[7] For new Deputy Sheriffs and Custody Assistants who attended the Department's DeEscalation and Verbal Resolution Training ("DeVRT") after the Monitors approved the curriculum, but before they approved the presentation, they will be deemed to have received the required training once they attend refresher courses that cover the subjects not included in the DeVRT before it was finally approved by the Monitors.

19

**SUBSTANTIVE PROVISION**

12.1    All custody Sergeants should receive an initial 16-hour block of training in conducting use of force investigations, reviewing use of force reports, and the Department's new protocols for conducting such investigations, and a two (2) hour refresher course every year.

**COMPLIANCE MEASURES**

1.    Compliance will be determined as follows:

(a)    90% of the Sergeants who were assigned to Custody or to a Custody  facility as of **October 1, 2016** ("Retained Sergeants"), must complete the required initial training determined through the following formula:

<u>Number of Trained Sergeants as of the Completion Date</u>
Number of Retained Sergeants remaining as of the Completion Date.

(b)    90% of the Sergeants who have completed the initial training course must receive the two-hour refresher course within 24 months of completing the required initial training as determined through the following formula:

 Number of Sergeants remaining in custody for 12 months after <u>completing the required initial training who receive the Refresher Course</u> Number of Sergeants remaining in custody for 12 months after completing the required initial training.

2.    Compliance will also require that 95% of Sergeants promoted after **October 1, 2016** complete the required initial training before or within 90 days after they assume their duties in Custody or after  training approved by the Monitors begins, whichever is later.

## IV.    <u>FORCE REPORTING AND FORCE INVESTIGATIONS</u>

**SUBSTANTIVE PROVISION**

5.1    The Department should track the status of all investigations, reviews and evaluations of all Custody use of force incidents and allegations of force to ensure that investigations, reviews, and evaluations are completed appropriately and timely.  As soon as practical, but no later than the end of the shift during which the use of force incident or allegation of force occurred, the supervisor or Internal Affairs investigator assigned to conduct the initial investigation should enter the use of force incident or the force allegation into a Department

20

database with a summary description of the force incident or allegation and the Category of the force incident as it is known at the time.  The database should be updated promptly to reflect any changes in the status of the investigation, review or evaluation and changes in the Category of the force incident.

### COMPLIANCE MEASURES

1.       Use of force incidents or force allegations shall be entered into a Department database within two hours after the end of the shift during which the incident occurred or the allegation was made.

2.       On a quarterly basis, the Monitors shall determine if the force in completed force packages selected from the Force Synopsis ("Force Tracker") and assessed for Compliance with the Force Provisions was entered into the database timely as required by Compliance Measure 5.1-1.

3.       On a quarterly basis, the Department shall provide the Monitors with a report of all completed investigations of force incidents that were closed during the previous quarter.

4.       Compliance will require that:

(a)       95% of the force incidents or allegations were entered into the database as required by Compliance Measure 5.1-1;

(b)       90% of the investigations of Deputies were completed appropriately and timely within the applicable statutes; and

(c)       90% of the investigations of Custody Assistants were completed appropriately and timely within the applicable statutes.

### SUBSTANTIVE PROVISIONS

4.2       The Department's Custody use of force policies should require supervisors investigating the use of force by Department members to interview any mental health professionals who witnessed the force incident and/or attempted to resolve the incident without force, about the members' use of force and the mental health professional's efforts to resolve the matter without the use of force.  With the consent of the mental health professional, the interview should be recorded on videotape or audiotape.

5.2       Evaluations of force incidents by Unit Commanders should be reviewed as follows:

All Category 1 Force cases and Category 2 cases not that do not meet the criteria for a roll-out by the Custody Force Review Team should be reviewed by a least one Commander in Custody Operations;

21

All allegations of force should be reviewed by at least two Commanders in Custody Operations;

Category 2 Force cases that meet the criteria for a roll-out by the Custody Force Review Team should be reviewed by the Custody Force Review Committee; and

Category 3 Force cases should be reviewed by the Executive Force Review Committee.

5.3    The Department's Custody use of force policies should provide that any unexplained tactical decisions pertaining to uses of force or any discrepancies among witnesses and/or evidence should be referred by the reviewing Commander(s) or committee in writing back to the incident investigator for additional investigation and then reported back in writing to the reviewing Commander(s) or committee.

12.2    Inmate witnesses to force incidents should be asked to be interviewed, and interviewed, away from other inmates.

12.3    No Department member involved in the use of force incident should be present for, or participate in, the request for interview or the interview itself absent exigent circumstances, which must be justified in the supervisors' subsequent reports.

12.4    Force investigations should not be conducted by the direct supervisor of the Department members involved in the use of force incident if the supervisor directed, participated in, or planned the use of force.

12.5    Use of force investigation packages should have a standard order and format.

15.1    The Department's Custody use of force policies should provide that every Department member who uses or assists in the use of Reportable Force, and every supervisor who directed that force be used, should be required to complete a separate and independent written report before going off duty, unless the Watch Commander/ Supervising Lieutenant determines that there are exigent circumstances such as the Department member's physical or medical condition that impair the Department member's ability to complete the report before going off duty, in which case the report should be completed as soon as possible and the reasons for the delay should be documented.

15.2    The Department's Custody use of force policies should provide that every Department member who witnesses the use of force by another Department member should be required to prepare an independent written report unless the Watch Commander/Supervising Lieutenant specifically designates which witnesses will write reports because there are a large number of Department members who witnessed the same incident.

15.3    The Department's Custody use of force policies should provide that a Department member who uses force should describe in his or her written report the force used by any other

22

Department member in response to an inmate's actions during the incident as well as his or her own force.

15.4    The Department's Custody use of force policies should provide that a Department member using force or witnessing force should describe in his or her written report, any visible or apparent injuries to Department members, inmates or other persons involved in a use of force.

15.5    The Department's Custody use of force policies should provide that a Department member who wants to make any clarifications or changes after viewing a video of a force incident should be required to either prepare a supplemental report or specifically note any changes to the Department member's initial report that were made after viewing the video of the force incident.

15.6    The Department's Custody use of force policies should provide that, to the extent practical, Department members should be separated until they have completed their use of force reports and/or witness reports on use of force incidents.

15.7    (Revised 2025) Watch Commanders/Supervising Lieutenants and Unit Commanders should review Department members' force reports to ensure that they accurately and honestly depict the incident, reflect each member's individual perceptions and recollections of the events and that they do not have common wording or phrasing that would suggest inappropriate collaboration on force reports.

16.1    The Department should require a documented medical assessment of each inmate upon whom force is used as soon as practical after the force incident.

16.2    With reasonable accommodations for privacy, the Department should require supervisors investigating force incidents to photograph any injury, swelling or redness sustained by each Department member who asserts orally or in a written force report that the Department member was assaulted by an inmate or note the absence of any injury, swelling or redness in the force package.

16.3    Medical staff treating an injured inmate should be required to report to the Department any injuries related to a use of force or an allegation by the inmate of a use of force.

**COMPLIANCE MEASURES**

The following Compliance Measures apply to Sections 4.2, 5.2, 5.3, 12.2 through 12.5, 15.1 through 15.7, and 16.1 through 16.3 (the "Reporting and Investigation Provisions") of the Action Plan:

1.    Within 10 days of the end of each quarter, the Department will provide the Monitors with a cumulative Force Synopsis "Force Tracker") for each force incident in the Downtown Jail Complex from **January 1, 2017,** through the end of the quarter.

2.      On a quarterly basis, the Monitors will select a minimum of 25 completed Force Packages to review for purposes of assessing the Department's Compliance with the Reporting and Investigation Provisions of the Action Plan.  The 25 completed Force Packages may be the same or different as the Force Packages selected for purpose of assessing the Department's Compliance with the Force Provisions.

3.      On a rolling basis, the Department will provide the Monitors with the 25 force packages as expeditiously as possible so that the Monitors can review the force packages before the end of the quarter.  Each of the force packages must include a summary sheet that indicates whether the Department assessed each applicable Reporting and Investigative Provision.  Each package must also indicate the date and time the Department members submitted their written force reports and whether the deputies were separated before preparing their reports.

4.      The Monitors will conduct a Vertical Assessment of each force package to determine if the reporting and investigation of the force was in Compliance with the Reporting and Investigation Provisions based upon an assessment of each applicable provisions. The failure of the Department to comply with specific Reporting and Investigation Provisions may, or may not, be sufficient for the Monitors to determine that the force was not in Compliance with the Reporting and Investigation Provisions depending on the nature of the failure and the reasons why the force failed to comply with the provisions.

5.      The Monitors will also conduct a Horizontal Assessment of each applicable Reporting and Investigation Provision in the force packages for Compliance with the Action Plan.

6.      Compliance with the  Reporting and Investigative Provisions will require that

(a)  Based upon Vertical Assessments, 90% of the force incidents reviewed by the Monitors were in Compliance with the Reporting and Investigations Provisions; and

(b)  Based upon Horizontal Assessments, the Monitors determine that the Department is in Compliance with each of the applicable Reporting and Investigation Provisions, taking into consideration the objective of the provision and the nature and extent of any violations.

24

**SUBSTANTIVE PROVISION**

8.3     Unit Commanders' evaluations of investigations of inmate grievances that Department members used any level of force to retaliate against inmates should be reviewed by the Custody Force Review Committee to assess the correctness of the evaluations.

**COMPLIANCE MEASURES**

1.     On a quarterly basis, the Department will provide the Monitors with a list of completed investigations of inmate grievances claiming that Department members used force to retaliate against inmates.

2.     The Monitors will select and review generally 25 completed investigations of inmate grievances claiming that Department members used force to retaliate against inmates.

3.     Compliance will require that all Unit Commanders' evaluations of investigations of inmate grievances claiming that force was to retaliate against them were reviewed to assess the correctness of the evaluation at the first scheduled meeting of the Custody Force Review Committee that is more than 30 days after the Unit Commanders' evaluation.

**SUBSTANTIVE PROVISION**

11.1    The Custody Force Rollout Team's involvement in reviewing the correctness of the Unit Commanders' evaluations of force incidents should not delay the Department's investigation of the force incidents.

**COMPLIANCE MEASURES**

1.    On a quarterly basis, the Department will review all force packages reviewed by CFRT in which there was finding of a policy violation or misconduct to verify that any discipline was imposed timely within the applicable limitations period and report to the Monitors on the results of the review.

2.    Compliance will require that 95% of the investigations reviewed by CFRT were not delayed beyond the period permitted by law for imposing discipline.

**SUBSTANTIVE PROVISIONS**

13.1    (Revised 2025) The Department should have a firm policy of zero tolerance for acts of dishonesty, force-related violations, and failure to report uses of force.  If the Department does not terminate or suspend a member who is found to have been dishonest, who violated any Department policy in connection with a use of force, or who failed to report a use of force, the Department should document the reasons why the member was not terminated or suspended. The Department should also place the members who receive a written reprimand or suspension on a formal and adequate performance review program and closely monitor the member's performance.

13.2    (Revised 2025) All findings of dishonesty, force-related violations, and failure to report uses of force by Department members in Custody Operations, the punishment imposed by the Department, and the reasons why any member was not terminated or suspended for those violations should be reported to the Office of Inspector General each quarter.

**COMPLIANCE MEASURES**

1.    (Revised 2025) Compliance will require that 95% of the investigations for the items noted in 2(a) reveal that the member was either (a) terminated or suspended or (b) the Department otherwise complied with the requirements of Paragraph 13.1.

2.    (Revised 2025) Compliance will require the Department to submit the reports described in the following measures:

    a    On a quarterly basis, the Monitors will review all completed internal investigations in which there was a finding of dishonesty, force-related violations, and failure to report uses of force, or any counseling or retraining provided to a Department member on one or more of the following: acts of dishonesty, force-related violations and failure to report uses of force. The report will also set forth the number and rank of the Department personnel.

    b    (Revised 2025) If a Department member is not terminated or suspended as a result of any acts of dishonesty, force-related violations, and failure to report uses of force the Department will document (a) the reasons why the member was not either not terminated or suspended and the mitigating and aggravating factors that support that outcome; and (b) the formal performance review program on which the member was placed and the length of time the member will be on that program.

    c    (Revised 2025) In the semi-annual self-assessment  the Department will detail, and the Monitors will review, the actions taken by the

27

Department in response to specific cases/non-compliant findings identified by the Monitors.

d    (Revised 2025) Compliance will also require the Department to report to the Office of Inspector General all findings for acts of dishonesty, force-related violations, and failure to report uses of force;  the punishment imposed; and the reasons why any member was not terminated or suspended for such violations, and to provide a copy of the report to the Monitors.

**SUBSTANTIVE PROVISIONS**

14.1    Prior to submission, all referrals of an inmate for criminal prosecution for assaulting a staff member, or related charges, arising from an incident involving the use of force by Department members, should be reviewed by a Unit Commander to ensure that the charges are not being brought to help justify the staff use of force.

14.2    The Department should timely forward to the District Attorney's office incidents of officer misconduct that may amount to criminal violations.

**COMPLIANCE MEASURES**

1.    On a quarterly basis, the Department will review all referrals of an inmate for criminal prosecution for assaulting a staff member, or related charges, arising from an incident involving the use of force by Department members and report to the Monitors whether each referral was first reviewed by a Unit Commander who verified that the charges were not being brought to help justify the staff's use of force.

2.    On a quarterly basis, the Department will review all referrals of a Department member for possible prosecution for alleged misconduct that may amount to a criminal violation and report to the Monitors whether each referral was sent to the District Attorney's Office within six months of the Department learning of the misconduct.

3.    Compliance will require that 95% of referrals of an inmate for criminal prosecution for assaulting a staff member, or related charges, arising from an incident involving the use of force by Department members were first reviewed by a Unit Commander who verified that the charges were not being brought to help justify the staff's use of force.

4.    Compliance will require that 90% of the referrals for possible prosecution of a Department member for alleged misconduct that may amount to a criminal violation were sent to the District Attorney's office within six months of the Department learning of alleged misconduct unless the Monitors determine that there was good cause for the delay beyond six months.

28

## V.    GRIEVANCE PROVISIONS

### SUBSTANTIVE PROVISIONS

6.1    Inmate grievances and inmate requests should be reported on separate forms, whether on paper or electronically.

6.2    The Department must ensure that grievance forms are reasonably available to inmates at all times.

6.3    The inmate grievance form should have a prominent box that says, "Emergency Grievance" with boxes to check for "yes" or "no" and a space for a description of the emergency. When an inmate requests a grievance form for an emergency grievance, the inmate should be given the form immediately.

6.4    The Department's inmate grievance forms should include "use of force" as a specific category of "grievances against staff" for inmates to check to ensure that such grievances are brought to the Unit Commanders' attention and properly handled.

6.5    The Department's inmate grievance forms should include "retaliation" and "harassment" as specific categories of "grievances against staff" for inmates to check to ensure that such grievances are brought to the Unit Commanders' attention and properly handled.

6.6    The Department's inmate grievance forms should have a check box indicating whether the complaint was upheld or denied and a statement next to the "denied" box that the inmate has the right to appeal and how long he or she has to appeal.

**7**.1    Inmates who submit grievances should be advised that a Conflict Resolution Meeting under the Department's Conflict Resolution policy in 5-12/000.00 (Inmate Requests for Service and Complaints (Non-Medical/Non-Mental Health)) is voluntary for both the inmate and the involved personnel to address a grievance instead of the Department conducting a personnel investigation and making a finding to resolve the grievance.  If the Conflict Resolution meeting is successful, the grievances should be marked "closed through conflict resolution" in the grievance database and properly documented.

### COMPLIANCE MEASURES

1.    The Monitors will determine the availability of forms meeting the requirements of the Paragraphs 6.1 through 6.6 of the Action Plan on site visits and in interviews with inmates and staff, and they will review the first 25 consecutive force and/or retaliation grievances in a month randomly selected by the Monitors to determine compliance with Paragraphs 6.4 and 6.5 of the plan.  The Monitors also will verify the Department's compliance with Paragraph 6.3 through interviews of staff and inmates and review of the grievances marked "emergency" pursuant to the Compliance Measures for Paragraphs 6.7 and 6.8 set forth below.

29

2. Compliance will require that the Department uses forms that comply with the Substantive Provisions of the Action Plan and 90% of the force and retaliation grievances reviewed by the Monitors were brought to the attention of a Unit Commander within 10 days of receipt and properly handled consistent with Department policy.

**SUBSTANTIVE PROVISIONS**

6.7     The Custody Division Manual should provide that Department members should give all grievances marked "emergency" to a supervisor as soon as possible.  Supervisors should review all emergency grievances as soon as possible to determine if the situation requires immediate action to protect the life or safety of the inmate and, if so, should immediately notify the Watch Commander/Shift Supervisor of the non-medical emergency.  The Watch Commander/Shift Supervisor should immediately confirm that the non-medical emergency exists, take such action as is necessary to protect the inmate, and as soon as time and circumstances permit provide the inmate with a written response documenting what action was taken to address the emergency.

6.8     If the Department determines that a non-medical emergency does not exist, it should notify the inmate as soon as practical that the grievance will be handled as a nonemergency grievance and document why it was determined not to be an emergency.

**COMPLIANCE MEASURES**

1.     On a quarterly basis, the Monitors shall review the first 50 consecutive grievances marked "emergency" by inmates in a month randomly selected by the Monitors.

2.     Compliance will require that (a) 95% of the grievances marked "emergency" were reviewed and handled as required by Paragraph 6.7 and (b) 90% of the grievances in which the Department determined that a non-medical emergency did not exist were (i) handled as required by Paragraph 6.8, and (ii) the inmate was notified of the determination within five days.

**SUBSTANTIVE PROVISION**

6.9     All emergency grievances should be forwarded to the Inmate Grievance Coordinator along with information about the decision made and when the inmate was notified about that decision.  The Inmate Grievance Coordinator should review the emergency grievance to determine if it was handled in accordance with policy and should notify the Unit Commander if it was not handled properly.

6.13     The Inmate Grievance Coordinator should regularly track the Department's handling of inmate grievances to ensure that the investigations are completed timely and reasonably, and that inmates are notified of the results of the investigations.

6.14     The Inmate Grievance Coordinator should provide a monthly report to Unit Commanders and senior management in Custody Operations of the status of inmate grievances, the timeliness of the Department's investigations of the grievances, responses to grievances and grievance appeals, and notifications to inmates of the results of the investigations and grievance appeals.

31

6.15    The Inmate Grievance Coordinator should analyze inmate grievances monthly to identify any problematic trends and should  provide that analysis in a monthly report to Unit Commanders and senior management in Custody Operations.

**COMPLIANCE MEASURES**

1.      Inmate Grievance Coordinator will provide the Monitors with one or more quarterly reports that address the requirements of Paragraphs 6.9, 6.13, 6.14, and 6.15, which shall include the Inmate Grievance Coordinator's reports required by Paragraphs 6.14 and 6.15.

2.      On a quarterly basis, the Monitors will meet with the Inmate Grievance Coordinator.

3.      The Monitors will assess the Department's compliance with Paragraphs 6.9, 6.13, 6.14, and 6.15 of the Action Plan based upon the reports and meetings set forth above.

**SUBSTANTIVE PROVISION**

6.10    Grievances should be collected from the locked grievance boxes on each living unit no less frequently than once per day.  The time of the collection and the person doing the collection should be recorded in the living unit log and in a separate grievance collection log maintained by the Inmate Grievance Coordinator.  Grievances should be reviewed by the Department within 24 hours of the collection of the grievance.

6.12    All inmate grievances should be entered into and tracked in an inmate grievance database that reflects the nature and status of the grievance, and personnel responsible for the Department's handling of the grievance.

**COMPLIANCE MEASURES**

1.      The Monitors will inspect the inmate grievance database to verify that it is accurate and up-to-date.

2.      During the Monitors' visits, the Monitors shall  inspect the grievance collection boxes and review the grievance collection log.

3.      On a quarterly basis, the Monitors will select and review the first 25 consecutive grievances from MCJ and the first 25 consecutive grievances from TTCF in a month randomly selected by the Monitors to determine if they were collected and reviewed timely as required by Paragraph 6.10, and entered and tracked in the inmate grievance database as required by Paragraph 6.12.  These grievances may be the same or different than the grievances reviewed to determine compliance with Paragraphs 6.4 and 6.5.

4.      Compliance will require that 95% of the grievances were collected and reviewed timely and entered into and tracked in the inmate grievance database.

32

**SUBSTANTIVE PROVISION**  .

6.11    The Custody Division Manual should provide that failing to provide an inmate with a grievance form when requested, failing to respond appropriately to a grievance, destroying or concealing grievances, attempting to intimidate an inmate from filing a grievance, and retaliating against an inmate who has filed a grievance, may each be a cause for disciplinary action.

**COMPLIANCE MEASURES**

1.    On a quarterly basis, the Department will provide the Monitors with a log of any inmate grievances about the matters encompassed by Paragraph 6.11 and the result of the investigations of those grievances.

2.    Compliance will require the Department to impose and notify the Monitors of the appropriate corrective action against any member who is found to have engaged in the conduct encompassed by policies required by Paragraph 6.11 in 100% of such cases.

33

**SUBSTANTIVE PROVISION**

6.16    The Department should establish a centralized unit with a sworn supervisor, custody assistants and civilian personnel to be responsible for collecting the inmate grievances and requests from inmates or from secured boxes; reviewing and categorizing the grievances and requests; forwarding them for investigation or handling; and responding to inmates.  Department personnel should be co-located in the Twin Towers and other personnel should be co-located in the Pitchess Detention Center.

**COMPLIANCE MEASURES**

Compliance will require the Department to establish a centralized command to oversee the handling of inmate grievances, and, if the Monitors determine that the grievance personnel are not effective in addressing inmate grievances, to co-locate grievance personnel in TTCF, CRDF, and the Pitchess Detention Center.

**SUBSTANTIVE PROVISION**

6.17    There should be a 30-day deadline for filing use of force grievances by inmates.

6.18    There should be no deadline for filing Prison Rape Elimination Act ("PREA") grievances by inmates.

6.19    The Department should adhere to the requirements in Custody Division Manual 5-12/000.00 and 5-12/010.00 and respond to inmate grievances "within 15 calendar days after the submission of the grievance," absent exceptional circumstances, which must be documented.

6.20    Inmates should have 15 days from receipt of a denial of a grievance to file an appeal of the grievance; however, if the inmate receives the denial while in punitive segregation, the inmate should have 15 days after release from segregation to file the appeal.

7.2    An inmate should be advised of the results of the Department's investigation of the inmate's grievance against personnel, but not any sanction imposed, within 10 days of the Department's adjudication of the grievance.

**COMPLIANCE MEASURES**

1.    On a quarterly basis, the Monitors shall select and review the following grievances during a month randomly selected by the Monitors:

> (a)    the first 25 use of force grievances determined by the Department to be untimely;
>
> (b)    the first 25 PREA grievances;
>
> (c)    the first 25 appeals of grievances determined by the Department to be untimely; and
>
> (d)    the first 25 grievances against staff in which the investigation was not completed within 15 days.
>
> (e)    the first 25 grievances not against staff; and
>
> (f)    the first 25 completed grievances against staff, including the inmate notifications.

2.    Compliance will require that 95% of the grievances and responses were handled appropriately and timely in accordance with the requirements of Paragraphs 6.17, 6.18, and 6.20, and 90% were handled in accordance with the requirements of Paragraphs 6.19[8] and 7.2.

---

[8] For grievances against outside vendors, the Department must notify the inmate that the grievance has been forwarded to the vendor within 15 days of filing the grievance.

**SUBSTANTIVE PROVISION**

7.3     The Department should ensure that there are adequate avenues for constructive prisoner-staff communication, such as Town Hall meetings.

**COMPLIANCE MEASURES**

1.   The Department shall maintain logs of all Town Hall meetings and report to the Monitors that for one randomly selected month per quarter, each jail facility has conducted Town Hall meetings for inmates who are not in disciplinary or administrative segregation, mental health housing, or  high-security units.

2.   The Monitors will periodically interview inmates (including inmates in disciplinary or administrative segregation, mental health housing or high-security units) and staff to assess the adequacy of prisoner-staff communications.

36

**SUBSTANTIVE PROVISION**

8.1     The Department's policies should prohibit personnel from retaliating against inmates.

**COMPLIANCE MEASURES**

1.     The Department must implement an anti-retaliation policy and include this policy in the Custody Force Manual and as a part of in-service and Academy training.

2.     On a quarterly basis, the Department will randomly select and review the results of the first 25 investigations of inmate grievances alleging violations of the anti-retaliation policy in a month randomly selected by the Monitors.

3.     On a quarterly basis, the Department will report on the number of anti-retaliation grievances received, the number of investigations of those grievances completed, and the number of founded  violations of the anti-retaliation policy.

4.     The Monitors will also interview staff and inmates to assess compliance with Paragraph 8.1.

5.     Compliance will require that the Department imposes discipline for conduct by a Department member found to be in violation of the anti-retaliation policy in 100% of such cases.

## VI.    RESTRAINT PROVISIONS

**SUBSTANTIVE PROVISION**

17.1    (Revised 2025) Instead of the introductory paragraph in 5-03/130.00 (Medically Ordered Restraint Devices), the Custody Force Manual should have a separate section that sets forth the general principles governing the use of restraints as follows: (1) restraints are either security restraints or medically ordered restraints; (2) restraints should not be used to punish inmates; (3) restraint devices should only be used where there is a potential threat of physical harm, destruction of property, or escape, or to escort or transport inmates; (4) caution must be used to guard against the risk of medical distress; (5) the longer the restraint, the greater the risk; (6) restraints should never be placed on the head, nose, or neck of an inmate or in any other manner that may interfere with breathing or blood flow; (7) in-cell security restraints should not be used except in emergency circumstances and for the shortest period of time possible; (8) inmates should not be restrained to fixed objects unless the object is designed for that purpose, and then only for the shortest period of time possible; (9) Department members are not authorized to use either a carotid restraint or choke holds.  Any use of a carotid restraint or choke hold will be investigated as a Category 3 use of force with a mandatory Internal Affairs Bureau ("IAB") rollout.  DEFINITIONS:  **Carotid Restraint**:  A vascular neck restraint or any similar restraint, hold, or other defensive tactic in which pressure is applied to the sides of a person's neck that involves a substantial risk of restricting blood flow and may render the person unconscious in order to subdue or control the person.  **Choke Hold:**  Any defensive tactic or force option in which direct pressure is applied to a person's trachea or windpipe.; (10) it is the responsibility of Department members approving or applying restraints (other than restraints used to escort or transport inmates) to ensure that there is frequent, careful, and documented monitoring of the condition of the inmate(s) in restraints; and (11) medical assistance should be summoned immediately whenever an inmate appears to be experiencing medical distress or complains of difficulty breathing.

17.3    The Department's Custody use of force policies should provide that a medical professional should examine an inmate as soon as the inmate is placed in the Safety Chair with a use of force, or if the inmate struggles against the chair restraints, and should perform a vitals check every hour while the inmate is in the Safety Chair.

17.4    The Department's Custody use of force policies should provide that Department members should check at least every 20 minutes on the welfare of any inmate in restraints other than restraints used in escorting or transporting inmates, and verify and document that the inmate is not in undue pain and that the restraints are not creating injury or obvious medical problem.

17.6    The Department's Custody use of force policies should provide that any inmate who is subjected to a multi-point restraint or who is otherwise restrained in a supine position for an extended period of time should be observed continuously so that if the inmate is on his or her back, the inmate does not vomit and asphyxiate, and if on his or her stomach does not stop breathing because of his or her body weight compressing the chest.  Medical staff should be called to the scene at the first sign of such distress.

38

17.7    The Department's Custody use of force policies should provide that multi-point restraints may only be ordered where an inmate poses an immediate threat of serious harm to himself or others and, in the absence of exigent circumstances, such restraints may only be ordered by a medical or mental health professional.

17.8    The Department's Custody use of force policies  should provide that multi-point restraints may only be used until the inmate no longer poses such an immediate threat of serious harm as determined by a medical or mental health professional, and the continued use of the multi-point restraint should be assessed by a medical or mental health professional at least every hour to determine if the inmate continues to pose an immediate threat of serious harm to himself or others.

17.9    The Department's Custody use of force policies should provide that the decision to use a multi-point restraint may be made by a shift supervisor if a medical or mental health professional is not available and there is no alternative such as a safety chair, in which case the supervisor should be responsible for monitoring the inmate's condition and determining whether to release the inmate from the multi-point restraint.

17.11   (Revised/added 2025) Consistent with the stipulated, Court-approved policies filed with the Court on July 7, 2024, the Department's use of force policies should provide that Department members may only place an inmate in the WRAP Restraint when an inmate is violent or physically resisting, or has demonstrated by words or actions an intent to be violent or to physically resist, and, based on the totality of the circumstances, reasonably appears presently capable of causing physical harm to themselves, custody staff, or others if the WRAP restraint is not applied.  Absent emergency circumstances, the WRAP restraint shall be verbally authorized by the on-duty watch commander.  Personnel shall immediately request medical aid if an inmate in any portion of a WRAP restraint complains of or exhibits medical distress and remove the inmate from the WRAP restraint if a medical emergency appears to exist or medical staff so direct because of the medical emergency. If it is determined an inmate shall remain in the WRAP restraint longer than fifteen (15) minutes, in addition to the in-person direct visual observation required at all times, Department members shall perform safety checks twice every thirty (30) minutes, approximately fifteen (15) minutes apart, until the WRAP restraint is removed.  A sergeant shall evaluate the inmate's retention in the WRAP restraint once every 30 minutes. Absent unusual circumstances when the medical needs of other patients take priority, inmates who arrive in the WRAP at the medical clinic will receive priority when it comes to receiving the medical assessment and/or treatment they require, and that medical assessment shall be conducted within one (1) hour from the time of placement in the WRAP restraint to determine if placement is safe based on the inmate's present physical or mental condition.  Inmates shall not remain in the WRAP beyond two (2) hours.  Inmates shall remain under in-person, direct visual observation for the duration of their placement in the WRAP restraint/WRAP Cart.  If an inmate remains affixed to the WRAP Cart for more than one hour, all procedures for the WRAP restraint shall be followed.

**COMPLIANCE MEASURES**

(Revised 2025) The following Compliance Measures apply to Sections 17.1, 17.3, 17.4, 17.6 through 17.9, and 17.11 (the "Restraint Provisions") of the Action Plan.

1.      (Revised 2025) Within 10 days of the end of each quarter, the Department will provide the Monitors with a list of incidents in which inmates were placed in a Safety Chair or WRAP Restraint/WRAP cart, restrained to a fixed object for more than 20 minutes, subjected to security restraints for an extended length of time for other than for escort or transportation, or subjected to a multi-point restraint in the Downtown Jail Complex from **July 1, 2017,** through the end of the quarter.

2.      (Revised 2025) On a quarterly basis, the Monitors will select generally 10 incidents involving Security Restraints for purposes of assessing Compliance with the Restraint Provisions.  On a rolling basis, the Department will provide the Monitors with force packages or other reports on the incidents selected by the Monitors as expeditiously as possible so that the Monitors can review all of the incidents before the end of the quarter.

3.      The Monitors will conduct a Vertical Assessment of each force package to determine if each use of a restraint was in Compliance with the Restraint Provisions based upon an assessment of each applicable provision. The failure of the Department to comply with specific Restraint Provisions may, or may not, be sufficient for the Monitors to determine that the incident was not in Compliance with the Restraint Provisions depending on the nature of the failure and the reasons why the incident failed to comply with the Restraint Provisions.

4.      The Monitors will also conduct a Horizontal Assessment of each of applicable Restraint Provision for Compliance with the Action Plan.

5.      Compliance with the Restraint Provisions will require that

(a)     Based upon Vertical Assessments, 90% of the incidents reviewed by the Monitors were in Compliance with the Restraint Provisions; and

(b)     Based upon Horizontal Assessments, the Monitors determine that the Department is in Compliance with each of the applicable Restraint Provisions taking into consideration the objective of the provision and the nature and extent of any violations.

**SUBSTANTIVE PROVISION**

17.10 The Department's Custody use of force policies should provide that medication may not be used solely for security purposes.

**COMPLIANCE MEASURES**

1.      The Department shall provide the Monitors with a log documenting the administration of involuntary medications in the Downtown Jail Complex, noting the booking number of the inmate, the date of administration, the housing location, and the reason the medication was administered.

2.      The Monitors shall interview involved medical or mental health personnel and review the log of involuntary administrations to assess the Department's compliance with paragraph 17.10, and verify that there are no apparent instances in which medication was used solely for security purposes.

## VII.    EARLY WARNING SYSTEM

**SUBSTANTIVE PROVISIONS**

19.1    The Department should develop a formal Early Warning System to identify potentially problematic Department members based upon objective criteria such as number of force incidents, inmate grievances, allegations of misconduct, performance reviews, and policy violations.  This system should be in addition to subjective assessments and personnel reviews by management.

19.2    The Compliance Lieutenants in each facility should review monthly the reports generated by the Department's Early Warning System to identify potentially problematic Department members and promptly notify the Department member's Unit Commander and the Assistant Sheriff for Custody Operations in writing.

19.3    Unit Commanders should, in consultation with the appropriate Chief, determine whether a non-disciplinary performance mentoring program is appropriate for Department members identified through the Early Warning System and, if so, place the Department member in the program with specific performance metrics.  If the Department decides not to place a Department member identified through the Early Warning System on a performance mentoring program, it should document the reasons for the decision.

**COMPLIANCE MEASURES**

1.    On a quarterly basis, the Department will review the monthly reports generated by the Early Warning System, the Compliance Lieutenants' notifications to Unit Commanders and the Assistant Sheriff for Custody Operations, and any documentation of meetings between Unit Commanders and the appropriate Chief, to verify that

> a.    the Early Warning System identifies potentially problematic employees upon objective criteria;
>
> b.    the Compliance Lieutenants have made the required notifications;
>
> c.    the Unit Commanders consulted with the appropriate Chief to determine whether a non-disciplinary performance mentoring program was appropriate for each problematic Department member and, if so, the member was placed in a program with specific performance metrics.

2.    Compliance will require that

> a.    the Compliance Lieutenants notify the appropriate Unit Commander and the Assistant Sheriff for Custody Operations in writing of potentially problematic employees within ten days of receiving the monthly reports 90% of the time, and within thirty days 95% of the time;

42

b. for each potentially problematic Department member identified through the Early Warning System, the Unit Commander consulted with the appropriate Chief 95% of the time to determine whether a non-disciplinary performance mentoring program is appropriate.

c. for each Department member identified through the Early Warning System who is not placed on a performance mentoring program, that the Unit Commander documents the reasons for the decision 95% of the time.

3. The monthly Early Warning System reports, the notifications to the Unit Commanders and Assistant Sheriff, and the Unit Commanders' decisions shall be available to the Monitors for their review and inspection.

43