Kathleen M. Kenney
343 Sweet Grass Way
Richmond, KY 40475
Email: kkenney@federalcourtmonitor.com

**Monitor and on behalf of Monitors**
**Robert Houston and Nicholas E. Mitchell**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS, et al.,<br>Plaintiffs,<br>v.<br><br>LOS ANGELES COUNTY SHERIFF<br>ROBERT LUNA, in his official<br>capacity,<br><br>Defendant. | Case No. 12-cv-00428-MWF (MRW)<br><br>**PANEL'S SIXTEENTH REPORT**<br><br>Hon. Michael W. Fitzgerald<br>United States District Judge |

1    Pursuant to Section V of the Settlement Agreement and Release of Claims, the

2    Monitors appointed by this Court, Robert Houston, Nicholas E. Mitchell, and Kathleen Kenney

3    (collectively, the "Panel") hereby submit the attached Panel's Sixteenth Report evaluating

4    Defendant's compliance with the Action Plan for the six-month period from July 1, 2024 to

5    December 31, 2024. This Report takes into consideration the comments from the parties in

6    accordance with Section V of the Settlement Agreement. The Panel is available to answer any

7    questions the Court may have regarding this Report at such times as are convenient for the Court

8    and the parties.

9

10    DATED: January 23, 2026                    Respectfully Submitted,

11

12                                              KATHLEEN M. KENNEY

13

14

15                                              By: /S/ Kathleen M. Kenney

16                                              Monitor and on behalf of Monitors

17                                              Robert Houston and

18                                              Nicholas E. Michell

19

20

21

22

23

24

25

26

27

28                            2                        Case No. 12-cv-00428-MWF (MRW)

# PANEL'S SIXTEENTH REPORT

## Table of Contents

| | | |
|---|---|---|
| Panel's Sixteenth Report | | 2 |
| Action Plan Implementation Assessment | | 8 |
| **I.** | **Administrative Provisions** | **8** |
| | A.   Leadership and Accountability | 8 |
| | B.   Management Visits | 15 |
| | C.   Rotations and Transfers | 15 |
| **II.** | **Use of Force Policies and Practices** | **17** |
| | A.   Overall Use of Force Policies | 17 |
| | B.   Use of Force Practices & Review of Force Packages | 17 |
| | C.   Quarterly Findings—Use of Force Provisions | 22 |
| **III.** | **Training** | **24** |
| | A.   Use of Force Training | 24 |
| | B.   Ethics and Professionalism Training | 25 |
| | C.   Mental Health Training | 25 |
| | D.   New Deputy Sheriffs and Custody Assistants | 26 |
| | E.   Sergeant Training | 27 |
| **IV.** | **Reporting and Investigation of Force Incidents** | **28** |
| | A.   Reporting and Investigation Provisions in Force Package Reviews | 28 |
| | B.   Reporting & Investigations Provisions as Reported by Department | 31 |
| | C.   Quarterly Findings—Reporting and Investigations Provisions | 34 |
| **V. Inmate Grievances** | | **36** |
| | A.   Grievance Forms | 36 |
| | B.   Emergency Grievances | 37 |
| | C.   Inmate Grievance Coordinator | 38 |
| | D.   Handling of Grievances | 39 |
| | E.   Deadlines | 41 |
| | F.   Communications with Inmates | 42 |
| **VI.   Use of Restraints** | | **44** |
| **VII. Early Warning System** | | **46** |
| Appendix A: Compliance Chart | | 48 |

# Panel's Sixteenth Report

The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan [developed by the Panel] ('Reports') at intervals the Panel shall determine." This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from July 1, 2024, to December 31, 2024 (the "Sixteenth Reporting Period") and it takes into consideration comments received from the Plaintiffs' counsel and the Los Angeles County Sheriff's Department on January 15, 2026.

In May 2014, the Parties retained the Panel "to develop a corrective action plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles" (the "Downtown Jail Complex"). The plan developed by the Panel sets forth provisions in twenty-one areas that the Sheriff is required to implement in the Downtown Jail Complex. The plan was approved by the Court on April 7, 2016. Under Paragraph VIII of the Settlement Agreement, "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')." As of November 1, 2018, the Sheriff's Department (the "Department") has implemented 104 of the Panel's 106 recommendations. The remaining two recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in *United States v. County of Los Angeles, et al*., CV No. 15-05903 (MWF-Ex) (the "DOJ case").

On November 21, 2025, the Parties filed a Joint Stipulation regarding the Implementation Plan and Compliance Measures. The filing was a culmination of negotiations that the Parties engaged in since the May 12, 2022, Status Conference. During those negotiations, and with the Court's assistance, the Department's Limitations on Force (head strike) and WRAP Restraint policies were finalized and became effective September 1, 2024. The Panel participated in some of the negotiation sessions, proposed revisions to the Implementation Plan and Compliance Measures, and provided comments on all changes to those documents proposed by the Parties. On November 24, 2025, the Court approved the Joint Stipulation and ordered the following:

1. The Court approved the revisions to the Implementation Plan and noted the Plan was in its final form and is not subject to further revisions absent agreement of the parties, leave from the Court, or until the Department achieves substantial compliance with the provisions of the Settlement Agreement Implementation Plan for 18 months (*see Rosas Settlement Agreement, paragraph VIII).* The following provisions were revised:
   - 2.6 Head Strikes or Kicks
   - 13.1 Zero Tolerance Acts of Dishonesty
   - 13.2 Reporting 13.1 Violations to the Office of Inspector General
   - 15.7 Accurate and Honest Depiction of Incidents in Force Reports
   - 17.1 Prohibition Carotid Restraint/Choke Holds
   - 17.11 (new provision) WRAP Restraint

2. The Court also ordered the following nineteen (19) provisions be moved to a non-reporting status beginning in the seventeenth reporting period:

   **Administrative Provisions**
   1. 1.1 Assistant Sheriff
   2. 21.1 Transfers to Custody

   **Use of Force Policy Provisions**
   3. 2.1 Custody Force Manual

2

4.   8.2 Combine Complaints of Retaliation Sections
5.   17.2 Combine Restraint of Pregnant Inmates Sections
6.   20.2 Reactive Force

**Training Provisions**
7.   3.3 Custody Training
8.   4.8 Mentally Ill inmates (new staff)
9.   4.9 Crisis Intervention (new staff)

**Force Reporting & Force Investigations Provisions**
10.  5.2 Level of Command Review by Force Category
11.  12.3 Suspect Interviews

**Reporting & Investigations Provisions**
12.  11.1 Custody Force Review Team Involvement

**Grievance Provisions**
13.  6.1 Separate Grievance Forms
14.  6.6 Right to Appeal Form

**Restraint Provisions**
15.  17.6 Multi-Point Restraint Procedures
16.  17.7 Approval of Multi-Point Restraints
17.  17.8 Continued Use of Multi-Point Restraints
18.  17.9 Supervisor Approval of Multi-Point Restraints
19.  17.10 Involuntary Medication

The Panel reserves and retains the right to reinstate any of these provisions to reporting status, without Court involvement, if the Department makes changes that are contrary to these provisions or if the Panel becomes aware the Department is no longer in compliance with any of the nineteen (19) provisions.

3.   Finally, the Court ordered the parties to resume negotiations on accountability measures and appear before the Court for a status conference on February 23, 2026.

*See* Dkt. No. 349

Additionally, the Parties agreed to changes to Compliance Measures for the following five (5) Provisions:

1.   1.3 Accountability Department Managers for Failing to Address Use of Force Problems
2.   13.1 Zero Tolerance Acts of Dishonesty
3.   13.2 Reporting 13.1 Violations to the Office of Inspector General
4.   17.1 Prohibition Carotid Restraint/Choke Hold
5.   17.11 WRAP Restraint

The Compliance Measures are the quantitative standards the Panel uses to assess compliance and are not part of the Settlement Agreement or Implementation Plan. Most of the changes to the Compliance Measures were made to align with the revisions to the provisions. These are the first revisions to the Implementation Plan and Compliance Measures since 2018. Moreover, this is the first time any provisions have been moved to non-reporting status since the inception of the case. These changes were made to assist the Department with enhancing accountability and narrowing the focus of their efforts to achieve Rosas compliance.

3

The Panel's *Fifteenth Report* highlighted two key areas that the Department must focus on in order to achieve Rosas compliance (1) eliminating impermissible head strikes and (2) developing an effective system of accountability for impermissible uses of force. This report highlights recent trends in overall uses of force, head strikes, and compliance rates for key force provisions. For the past few years, the Department has focused on reducing the overall uses of force and reducing the number of head strikes used by its staff. These efforts had a positive impact in reducing the force and head strike numbers for consecutive reporting periods. Unfortunately, the downward trend has not continued. There was an increase in uses of force in 2024 and an increase in head strikes for this reporting period. Additionally, there has been a slight but steady, decrease in the compliance rates for the key force provisions. Those changes are detailed below.

*Use of Force Numbers*
As reported in the *Panel's Fifteenth Report*, the Department saw consistent and significant decreases between 2021 and 2023, from a total of 1150 use of force incidents in 2021 to 720 in 2023, a decrease of 37%. There was a 12% increase in 2024 from 720 to 805 total use of force incidents. The Department has maintained a consistent number of use of force incidents over the past two reporting periods, with 403 in the Sixteenth Reporting Period and 402 in the Fifteenth Reporting Period. See *Figure 1*.

The jail facilities showed little to no change in the total number of use of force incidents by category. As shown in *Figure 2*,[1] the Sixteenth and Fifteenth Reporting Periods are near identical, varying two (2) to eight (8) incident differences per category.





*Head Strike Numbers*
The Department reported a total number of 34 head strikes in 2024, which maintained the significant downward trend in head strikes since 2021, from 82 to 34, a 58.5% decrease.





When comparing the Sixteenth Reporting Period to the Fifteenth Reporting Period, as shown in *Figure 3*, there was a 27% increase in head strikes from 15 head strikes to 19.

When comparing head strikes by quarter, as shown in *Figure 4*, head strikes increased by 57% between 2Q24 and 3Q24—from 7 to 11. Head strikes decreased in 4Q24 by 27% from 11 to 8. Preliminary data for 1Q25 shows a 13% increase from 8 to 9 head strikes.

Within the jail facilities there were shifts in number of head strikes, as shown in *Figure 5*. IRC increased by 50% from four (4) to six (6) head strikes, MCJ increased 40% from five (5) to seven (7) head strikes, and TTCF maintained six (6) head strikes in both reporting periods. Trends within the facilities swing from 0% to 300%. For example, over the last three reporting periods, IRC steadily increased from one (1) to four (4)

---

[1] Use of Force incidents are at times reclassified based on findings in the investigation. Therefore, numbers presented for the Fifteenth Reporting Period may not match data referenced in the Panel's Fifteenth Report.

to six (6) total head strikes. TTCF increased by 50% from four (4) to six (6) head strikes and then had no change in this reporting period. MCJ decreased by 29% from seven (7) to five (5) and then increased by 40% from five (5) to seven (7) for this reporting period.



*Figure 5*

Based on preliminary data for the Seventeenth Reporting Period, it appears this upward trend did not continue. The Department reports nine (9) head strikes in First Quarter of 2025 and six (6) in Second Quarter of 2025 for a combined fifteen (15) head strikes in the Seventeenth Reporting Period. This data will be further analyzed in the Seventeenth Report.

*Key Compliance Metrics*
The Panel reviewed 50 completed force packages selected from a comprehensive list of force incidents compiled by the Department. The Panel did not select force packages randomly or in proportion to the frequency with which various categories of force occur. Rather, the Panel selected for review the force incidents most likely to involve problematic uses of force.[2] The Panel found 39 of the 50 (78%) force packages reviewed compliant with use of force prevention principles of Provision 2.2. This is a slight decrease from the 82% compliance in the Fifteenth Report and the 86% compliance in the Fourteenth Report, as shown in *Figure 6*.



*Figure 6*

Provision 2.6 of the Action Plan prohibits head strikes and kicks unless (1) the inmate is assaultive, (2) there is imminent danger of serious injury, and (3) there are no other more reasonable means to avoid serious physical injury. The Panel found 41 out of the 50 (82%) force packages reviewed compliant with Provision 2.6. This is a slight yet further decrease from the 84% compliance in the Fifteenth Report and the 88% compliance in the Fourteenth Report, as shown in *Figure 7*.

*Figure 7*

The Panel has seen positive progress from Department leaders identifying force violations and opening administrative investigations for these violations. Of the 50 cases the Panel reviewed for the Sixteenth Reporting Period, the Department used head strikes in 19 cases. The Panel found the Department's actions in 10 of the 19 cases met the criteria for 2.6 and were therefore compliant. In the 9 remaining cases, the Department concluded there either was, or may be, a policy violation(s) in five (5) of the cases. In the remaining four (4) cases, the Department determined the force was objectively reasonable and within Departmental policy. The gap between what the Panel finds out of compliance and what the Department finds out of compliance is narrowing. The case summarized below is illustrative of this narrowing gap:

Inmate X refused to leave his cell to be released to a hospital. A planned extraction ensued. All mitigation efforts to gain the inmate's compliance to voluntarily leave his cell failed. Two bursts of phantom oleoresin capsicum were deployed. The extraction team entered the cell, and the inmate pushed the shield aside and

---

[2] The Panel usually selects cases in which staff deployed/utilized the taser, WRAP, or personal weapons.

5

assaulted staff. One of the deputies punched the inmate at least 19 times, kicked him once, and utilized a knee strike. Several of these punches connected while the inmate was on the ground and controlled. The Commander concluded the deputy's use of personal weapons (head strikes) once the inmate was on the floor and controlled to be unreasonable and requested an administrative investigation. The investigation concluded the deputy violated the Department's Limitation on Force policy. In prior monitoring periods, cases similar to this case were deemed reasonable by the Department and did not result in an administrative investigation.

The Department's progress at narrowing the gap between its findings and those of the Panel's is encouraging. However, as reflected in the four cases in which the Department did not find head strike violations that were identified by the Panel, more work remains to be done. The Panel will continue to work with Department leaders to ensure that they accurately identify inappropriate force and hold staff accountable for violations, and report on the impacts of those efforts in future monitoring reports.

### Staff and Inmate Focus Groups

The Panel conducted a series of focus groups with staff and discussions with inmates during its April and July 2025 Monitoring visits. The participants were randomly selected. The Panel continues to find the focus groups and discussions beneficial.

The following ideas were expressed by custody staff during the focus groups:[3]
- Staff would like to see fewer restrictions on using the WRAP. It was a safe tool to control combative/hostile inmates while waiting for a supervisor.
- Additional training in de-escalation would be an essential ingredient to avoid force.
- Recommend more training with grappling and non-striking methods to teach confidence and proficiency in using force in a way that ends threats and results in the least likelihood of injury.
- Body-worn cameras will help with allegations of force and transparency during investigations.
- Increase staffing levels and 90% of force issues will solve themselves.
- More understanding of deputy use of force by gaining an understanding of the totality of circumstances. It's easy to scrutinize deputies behind a computer screen, but it is important to remember the inmate does not care if you live.
- Too many outside entities have a say over what a Sergeant on the line decides. The line deputies and Sergeants do not feel supported.
- Recommend streamlining the force review process.

The following themes emerged from the group discussions with inmates:[4]
- Would like staff to wear body-worn cameras. This will enhance integrity and either stop or show staff being disrespectful to inmates.
- Reported being able to get grievance forms.
- Concerns that being diagnosed as suicidal and put in a suicide gown was done too frequently.
- No force issues noted by inmates in focus groups. However, inmates spoken with individually by the Panel did raise issues with specific force incidents.
- Reported issues with plumbing and access to cleaning supplies and linens.
- Concerns raised about not having access to church or a chaplain.
- Problems receiving special diets.
- Concerns about retaliation if you raise issues.

---

[3] In April 2025, staff focus groups were comprised of deputies and sergeants from IRC and TTCF. In July 2025, the Panel spoke to deputies and custody assistants from MCJ. The views expressed are not necessarily reflective of the views of all members of custody staff.

[4] The Panel spoke to approximately 14 inmates as part of focus groups during the April and July 2025 visits. All three facilities were represented in focus groups. The views expressed by the focus group participants are not necessarily reflective of all inmates. The Panel also gathered feedback from inmates dispersed throughout the Downtown Jail Complex during its tours, and with inmates specifically identified by Plaintiffs.

*Reporting Period Compliance Results*



*Figure 8*

For the Sixteenth Reporting Period, the Department is found in compliance with 82 of the 100 applicable (104 total) provisions set forth by the Action Plan. As shown in *Figure 8*, compliance results per category are as follows:

(1)    8 out of 9 of the Administrative Provisions (89%)
(2)    20 out of 25 of the Force Provisions (80%)
(3)    11 out of 11 of the Training Provisions (100%)
(4)    20 out of 24 of the Investigations & Reporting Provisions (83%)
(5)    19 out of 24 of the Grievances Provisions (79%)
(6)    2 out of 8 of the Restraints Provisions (50%)[5]
(7)    2 out of 3 of the Early Warning System Provisions (67%)

With regard to the non-force related provisions of the Action Plan, the Department submitted its Sixteenth Self-Assessment Report (the "Sixteenth Self-Assessment") on October 15, 2025. During the Sixteenth Reporting Period, the Panel reviewed records posted by the Department to verify the Department's self-assessments of its compliance with non-force provisions of the Action Plan. The Panel's evaluation of the provisions in the self-assessment reports is included in this Report. The Panel's auditors reviewed source documents associated with the Training Provisions, Early Warning System, and Restraint Provisions 17.3 and 17.4.

Provisions determined compliant for the Sixteenth Report that were found out of compliance in the *Panel's Fifteenth Report* include the following six (6) provisions: (1) 2.9 Armed Inmates, (2) 4.1 Consult Mental Health Professionals, (3) 14.1 Review of Criminal Referrals, (4) 15.1 Timeliness of Reports, (5) 15.7 Individual Perceptions, and (6) 16.2 Photograph of Injuries.

Provisions determined out of compliance for the Sixteenth Report that were found in compliance in the *Panel's Fifteenth Report* include the following four (4) provisions: (1) 15.4 Description of Injuries, (2) 6.9 Grievance Coordinator Review, (3) 6.10 Collection of Grievances, and (4) 19.2 Review of EWS Reports. See *Appendix A: Compliance Chart* for compliance status with each provision over the last three reports.

The Department continued to cooperate fully with the Panel during the Sixteenth Reporting Period. The Department and County Counsel responded to our inquiries and requests for documents and information. They engaged in constructive conversations with the Panel regarding use of force incidents, policy issues, and their continuing efforts to implement the terms of the *Rosas* Action Plan. We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.

---

[5] Note four (4) of the eight (8) Restraint provisions are not applicable.

# Action Plan Implementation Assessment

The Action Plan is divided into seven overarching categories: (1) Administrative; (2) Use of Force; (3) Training; (4) Force Reporting and Force Investigations; (5) Grievances; (6) Restraint; and (7) Early Warning System. Each category contains substantive provisions with corresponding compliance measures. The Panel's findings regarding compliance with each provision for the Sixteenth Reporting Period are provided below and organized to mirror the Action Plan.

# I.    Administrative Provisions

## A. Leadership and Accountability

The recommendations in Sections 1.1 through 1.4 of the Action Plan require that Custody be headed by an Assistant Sheriff with no other areas of responsibility, the Sheriff be engaged personally in the management of the jails, the Department's managers be held accountable for any failures to address force problems in the Jails, and that the Department regularly reports to the Board of Supervisors on the use of force in the jails and on its compliance with the Action Plan.

### 1.1 Custody Operations Headed by an Assistant Sheriff

**Provision Description:** Section 1.1 of the Action Plan provides that Custody Operations should continue to be headed by an Assistant Sheriff with no other areas of responsibility assigned.

> ***Compliance Measure Summary:*** Custody Operations headed by an Assistant Sheriff with no other responsibilities for the duration of the Settlement Agreement.

Custody has been headed by an Assistant Sheriff with no other areas of responsibility since mid-2014. Assistant Sheriff Paula L. Tokay assumed the role of Acting Assistant Sheriff on June 21, 2024 and served in the role of Assistant Sheriff for Custody Operations – with no other areas of responsibility – during the Sixteenth Reporting Period.

**1.1 Status:** Compliance[6]        **As of Date:** January 1, 2017

### 1.2 Personal Engagement of the Sheriff

**Provision Description:** Sheriff should be personally engaged in the management of the Department's jail facilities and regularly and adequately monitor the use of force policies and practices and compliance with the Action Plan.

> ***Compliance Measure Summary:*** Reports every six months on the Sheriff's personal involvement in managing the jail and monitoring use of force policies.

The Department has provided the Panel with a log of frequent meetings that Sheriff Robert Luna had with Assistant Sheriff Tokar during the Third and Fourth Quarters of 2024. Between July 1, 2024 and December 30, 2024, the Sheriff and Assistant Sheriff had 41 meetings in which they discussed topics such as: use of force incidents, the use of less lethal weapons and personal weapons, cell extractions, Category 3 incidents and associated injuries, use of force against mentally ill inmates, dorm disturbances, gassing incidents, deployment of chemical agents, de-escalation of force, suicide attempts, inmates entering

---

[6] Use of the term Compliance is a finding of compliance as of a certain date. The Panel's findings are set forth in the Appendix attached. For provisions not in compliance in this Report, the Department has either not yet achieved compliance or is no longer in compliance during the Sixteenth Reporting Period.

the facilities under the influence and available detox housing units, facility security concerns, assaults on staff, and alternative tactical approaches to address current inmate populations. Additionally, the Assistant Sheriff advised the Sheriff of any significant incidents/events deemed sensitive in nature as they occurred.

> *Compliance Measure Summary:* Meet with the Monitors at least once every six months to discuss personal involvement.

The Panel met with Sheriff Robert Luna on August 7, 2024. The Panel discussed the Department's updated policies and progress towards Rosas compliance.

**1.2 Status:** Compliance                    **As of Date:** January 1, 2017

## 1.3 Accountability for Failing to Address Policy Violations

**Provision Description:** Section 1.3 of the Action Plan provides that Department managers should be held accountable should they fail to address use of force problems at the jail facilities.

> *Compliance Measure Summary:* A quarterly report that sets forth the number and rank of personnel found to have violated use of force policies.

*Table 1: Cases with Discipline Imposed*

The Department provided a report for both quarters of the Sixteenth Reporting Period, which is summarized in *Table 1*. There were three cases involving three staff with various use of force policy violations reported in 3Q24—two cases at TTCF and one at IRC.[7] In 4Q24, there were seven cases involving nine staff with various use of force policy violations—four cases at MCJ and three at TTCF. The resulting discipline for these violations is reflected in *Table 2*.

|  | TTCF | MCJ | IRC | Total |
|---|---|---|---|---|
| 3Q24 | 2 | 0 | 1 | 3 |
| 4Q24 | 3 | 4 | 0 | 7 |

*Table 2: 3Q24 and 4Q24 Discipline Imposed*

| **Third Quarter 2024** | | | |
|---|---|---|---|
| **Case No.** | **Facility** | **Rank** | **Discipline** |
| 1 | IRC | Custody Assistant | 15-Day Suspension |
| 2 | TTCF | Deputy | 3-Day Suspension |
| 3 | TTCF | Deputy | Written Reprimand |
| **Fourth Quarter 2024** | | | |
| **Case No.** | **Facility** | **Rank** | **Discipline** |
| 1 | MCJ | Deputy | Written Reprimand |
| 2 | MCJ | Deputy | 3-Day Suspension |
| | MCJ | Deputy | 3-Day Suspension |
| 3 | MCJ | Deputy | 5-Day Suspension |

---

[7] The reporting for Provision 1.3 occurs when the discipline for the founded violation was imposed, not when the policy violation occurs. In this Report, the Panel found 11 out of 50 cases in violation of the force prevention principles of Section 2.2. The Panel found 9 out of 19 cases where head strikes were out of compliance with Section 2.6 and 12 of 48 applicable cases out of compliance with Section 17.5. Should the Department find staff involved in those cases violated policy, those violations would not be recorded until the quarter the discipline was imposed.

9

| 4 | MCJ | Deputy | 5-Day Suspension |
| 5 | TTCF | Deputy | Written Reprimand |
| | | Deputy | Written Reprimand |
| 6 | TTCF | Custody Assistant | 5-Day Suspension |
| 7 | TTCF | Deputy | 3-Day Suspension |

There were ten (10) cases of use of force policy violations with discipline imposed involving twelve (12) staff members: ten (10) Deputies and two (2) Custody Assistants. Discipline imposed ranged from a Written Reprimand to a 15-day suspension, which involved a Custody Assistant using an impermissible head strike.

Discipline is a critical component of an effective accountability system. Penalties must be commensurate to the severity of the offenses and administered in a timely and fair process. While the Panel has seen an increase in the penalties staff have received for policy violations, additional focus in this area will assist the Department with its compliance efforts.

*Table 3: Discipline Imposed Over Reporting Period*

*Discipline Historical Context*
As shown in Table 3, since the Eleventh Reporting Period to present, there have been fifty-four (54) cases of uses of force policy violations resulting in discipline involving eighty-two (82) Department personnel: sixty-five (65) Deputies, nine (9) Sergeants, and eight (8) Custody Assistants.[8]

| Reporting Period | Cases | Sgt | DSG | C/A | Total Staff |
|---|---|---|---|---|---|
| **11th** | 11 | 2 | 13 | 1 | 16 |
| **12th** | 8 | 3 | 16 | 1 | 20 |
| **13th** | 10 | 1 | 14 | 0 | 15 |
| **14th** | 11 | 2 | 9 | 2 | 13 |
| **15th** | 4 | 1 | 3 | 2 | 6 |
| **16th** | 10 | 0 | 10 | 2 | 12 |
| | 54 | 9 | 65 | 8 | 82 |

As shown in *Figure 9*, in the Sixteenth Reporting Period, of the twelve (12) staff disciplined, 33% received Written Reprimands (4 out of 12) and 67% (8 out of 12) received two or more days' suspension. In the Fifteenth Reporting Period of the six (6) staff disciplined, 67% (4 out of 6) received Written Reprimands, 17% (1 out of 6) received a one-day suspension, and 17% (1 out of 6) received a two or more days' suspension. (*Panel's Fifteenth Report*, p. 11). In the Fourteenth Reporting Period of the thirteen (13) staff disciplined 46% (6 out of 13) received Written Reprimands, 38% (5 out of 13) received two or more days' suspension, and 15% (2 out of 13) were removed or resigned. (*Panel's Fourteenth Report*, p. 8-9.) In the Thirteenth Reporting Period of the fifteen (15) staff disciplined, 60% (9 out of 15) received a Written Reprimand, 13% (2 out of 15) received one-



**Discipline Imposed By Reporting Period**

Legend: Written | 1-Day | 2day+* | Rem/Res

*Figure 9; "Rem/Res" is removal or resignation*

day suspensions, and 27% (4 out of 15) received two or more days' suspension. (*Panel's Thirteenth Report*, p. 8-9). In the Twelfth Reporting Period of the twenty (20) staff disciplined, 75% (15 out of 20) received Written Reprimands and 25% (5 out of 20) received one-day suspensions. (*Panel's Twelfth Report*, p.7). In the Eleventh Reporting Period, of sixteen (16) staff disciplined, 31% (5 out of 16) received Written Reprimands, 19% (3 out of 16) received one-day suspensions, 38% (6 out of 16) received two or more days' suspension, and 13% (2 out of 16) were removed or resigned. (*Panel's Eleventh Report*, p. 8-9.).

---

[8] The Panel will conduct a deeper analysis of the use of force cases resulting in discipline, or no discipline, in the Seventeenth Reporting Period.

As shown in *Table 4,* of the sixty-five (65) Deputies, thirty-four (34) received Written Reprimands, nine (9) 1-day suspensions, four (4) 2-day suspensions, seven (7) 3-day suspensions, two (2) 4-day suspensions, three (3) 5-day suspensions, one (1) 10-day suspension, one (1) 30-day suspension, two (2) removals or discharges, and two (2) resignations. Of the nine (9) Sergeants, seven (7) received Written Reprimands, one (1) 1-day suspension, and one (1) 3-day suspension. Of the eight (8) Custody Assistants, two (2) received Written Reprimands, one (1) 1-day suspension, two (2) 5-day suspensions, one (1) 10-day suspension, one (1) 15-day suspension, and one (1) 20-day suspension.

*Table 4: Types of Discipline Imposed*

| | DSG | SGT | C/A | |
|---|---|---|---|---|
| **WRITTEN** | 34 | 7 | 2 | 43 |
| **1-DAY** | 9 | 1 | 1 | 11 |
| **2-DAY** | 4 | 0 | 0 | 4 |
| **3-DAY** | 7 | 1 | 0 | 8 |
| **4-DAY** | 2 | 0 | 0 | 2 |
| **5-DAY** | 3 | 0 | 2 | 5 |
| **10-DAY** | 1 | 0 | 1 | 2 |
| **15-DAY** | 0 | 0 | 1 | 1 |
| **20-DAY** | 0 | 0 | 1 | 1 |
| **30-DAY** | 1 | 0 | 0 | 1 |
| **REMOVAL** | 2 | 0 | 0 | 2 |
| **RESIGN** | 2 | 0 | 0 | 2 |
| | 65 | 9 | 8 | 82 |



*Figure 10; "Rem/Res" is removal or resignation*

Written reprimands are the most frequently imposed discipline, with 52% (43 out of 82) of staff involved in use of force violations receiving written reprimands. The second most frequently imposed discipline is one-day suspensions, with 13% (11 out of 82) of staff receiving one-day suspensions, followed by 10% (8 out of 82) receiving three-day suspensions. With this, 80% (66 out of 82) of staff involved in use of force violations receive three-day suspensions or less, and 20% (16 out of 82) receive 4-day suspensions or higher discipline.

As shown in *Figure 10*, Custody Assistants were more likely to receive 2 or more days' suspensions than lower discipline compared to Deputies and Sergeants, with 63% (5 out of 8) receiving multi-day suspensions. By comparison, 28% (18 out of 65) of Deputies and 11% (1 out of 9) of Sergeants received multi-day suspensions. Sergeants were more likely to receive written reprimands, with 78% (7 out of 9) receiving written reprimands as compared to 52% (34 out of 65) of Deputies and 25% (2 out of 8) of Custody Assistants.

> ***Compliance Measure Summary:*** Section 1.3 requires the Department to identify each facility in which there was a 25% increase in the number of use of force incidents or Category 3 incidents from the previous quarter.

### Overall Uses of Force

The Department provided data on the number of use of force incidents per month by facility and category. The monthly numbers have been consolidated into quarters for the Reporting Period as shown in *Figure 11.*[9] For the Sixteenth Reporting Period (3Q24 and 4Q24), there were a total of 403 use of force incidents: 242 in 3Q24 and 161 in 4Q24. The number of incidents decreased by



[9] Incident data from 2Q24 is included in this figure to calculate the percent change for 3Q24.

11

33% between 3Q24 and 4Q24 (from 242 to 161), which returns the department to numbers consistent with the Fourteenth Reporting Period and continues into 1Q25 with 167 reported incidents.



**UoF Totals by Category**

*Figure 12*

Of the 403 use of force incidents, TTCF accounted for 134 (33%), MCJ for 211 (52%), and IRC for 58 (14%) of the incidents. The total uses of force by category for the Sixteenth Reporting Period are reflected in *Figure 12*.[10,11] For both quarters, the majority of the 403 incidents were Category 1 with 294 incidents (73%). There were 64 Category 2 incidents (16%), 43 NCI incidents (11%), and 2 Category 3 incidents (0%). This allocation pattern resembles trends from previous reports.

The Department is also required to address increases of 25% or more for each use of force category. For the Sixteenth Reporting Period, there were zero increases of 25% or more. As shown in *Figure 13*, there were three (3) changes[12] of 25% or more: (1) Total uses of force decreased by 33% from 242 to 161; (2) Category 1 incidents decreased by 38% from 182 to 112; (2) Category 3 incidents reduced from two to zero. Category 3 incidents are further discussed in the dedicated *Category 3 Specific* section below.



*Figure 13*

Based on preliminary data for 2025, the Department maintains 167 use of force incidents into 1Q25 and a slight increase in 2Q25 to 189 use of force incidents. These preliminary reports indicate an overall 12% decrease in use of force incidents from 403 to 356 for the Seventeenth Reporting Period.

The figures below identify the number of use of force incidents by category per facility. Data is included from both quarters of the Sixteenth Reporting Period (3Q24 and 4Q24) as well as the Second Quarter of 2024 to reflect any changes of 25% or more between quarters. Note that only the increases or decreases of 25% or more are included in the narrative below.

---

[10] The data provided to the Panel from CCSB is subject to change as incidents are categorized and recategorized following or during investigation. Thus, the numbers cited are subject to change and may not match the numbers in previous or future Panel Reports. The Panel uses data from the Monthly Force Used by Category Report provided in the closest proximity to the generation of the Panel's Report. The data cited here is consistent with Department data totals presented as of July 15, 2025.

[11] Incident data from 2Q24 is included in this figure to calculate the percent change for 3Q24.

[12] For reporting purposes, the Panel includes increases and decreases of 25% or more to reflect Department progress.

*Twin Towers Correctional Facility*
For the Sixteenth Reporting Period, TTCF had a total of 134 use of force incidents—77 in 3Q24 and 57 in 4Q24. *Figure 14* depicts the total number of incidents by category over three quarters at TTCF. For the Sixteenth Reporting Period, increases or decreases of more than 25% at TTCF are as follows:



*Figure 14*

- NCI incidents decreased by 30% from 10 to 7 between 3Q24 and 4Q24.
- Category 1 incidents increased by 32% from 41 to 54 between 2Q24 and 3Q24.
- Category 1 incidents decreased by 28% from 54 to 39 between 3Q24 and 4Q24.
- Category 2 incidents increased by 38% from 8 to 11 between 2Q24 and 3Q24.
- Category 3 incidents increased from 0 to 2 between 2Q24 and 3Q24.
- Category 3 incidents decreased by 100% from 2 to 0 between 3Q24 and 4Q24.
- Total number of incidents increased by 28% from 60 to 77 between 2Q24 and 3Q24.
- Total number of incidents decreased by 26% from 77 to 57 between 3Q24 and 4Q24.

*Men's Central Jail*
For the Sixteenth Reporting Period, MCJ had a total of 211 use of force incidents—127 in 3Q24 and 84 in 4Q24. *Figure 15* depicts the total number of incidents by category over three quarters at MCJ. For the Sixteenth Reporting Period increases or decreases of more than 25% at MCJ are as follows:



*Figure 15*

- NCI incidents increased by 25% from 8 to 10 between 2Q24 and 3Q24.
- Category 1 incidents decreased by 41% from 101 to 60 between 3Q24 and 4Q24.
- Category 3 incidents decreased by 100% from 2 to 0 between 2Q24 and 3Q24.
- Total number of incidents decreased by 34% from 127 to 84 between 3Q24 and 4Q24.

*Inmate Reception Center*
For the Sixteenth Reporting Period, IRC had a total of 58 use of force incidents—38 in 3Q24 and 20 in 4Q24. *Figure 16* depicts the total number of incidents by category over three quarters at IRC. For the Sixteenth Reporting Period increases or decreases of more than 25% at IRC are as follows:



*Figure 16*

- Category 1 incidents decreased by 52% from 27 to 13 between 3Q24 and 4Q24.
- Category 2 incidents increased by 300% from 2 to 8 between 2Q24 and 3Q24.
- Category 2 incidents decreased by 50% from 8 to 4 between 3Q24 and 4Q24.
- Total incidents decreased by 47% from 38 to 20 between 3Q24 and 4Q24.

13

*Compliance Measure:* When there is a 25% or more increase from quarter to quarter, the Unit Commander reports on his or her response to involved staff. If the Unit Commander failed to address the matter, the Department indicates its response to hold the Unit Commander accountable.

## Category 3 Specific

Substantial increases of 25% of more trigger CCSB to request a response from the Unit Commander on its handling of staff involved in a Category 3 incident. The CCSB notified TTCF of its greater than 25% increase in total number of incidents from 2Q24 to 3Q24, including the increase in Category 3 incidents from 0 to 2. In its response, TTCF determined "several inmates were involved in multiple use of force incidents" during 3Q24, and TTCF would recommend those inmates for Complex Case monitoring. TTCF further determined use of force incidents increased during early morning shifts in 3Q24, specifically with Forensic In-Patient extractions. TTCF collaborated with Correctional Health Services and the Department of Mental Health to mitigate these increases. In regard to the Category 3 increase, TTCF reported it would distribute weekly Force Prevention Policy briefings to sergeants and deputies. There were no substantial increases in Category 3 incidents between 3Q24 and 4Q24.[13]

The Panel reviewed many cases in the Sixteenth Reporting Period involving violations of policy, such as impermissible head strikes, not using force as a last resort, or failing to place an inmate in the recovery position, in which the supervisory reviews failed to identify the policy violations. While the Department did identify more policy violations and referred more cases for an administrative investigation in this Reporting Period compared to prior Reporting Periods, there remains work to be done in this area. For the Seventeenth Reporting period (or at least a portion thereof), the revised Compliance Measure will be referenced. The Panel will summarize whether the evaluations of force incidents conducted by the Supervisor (or CFIT), Watch Commander, Unit Commander, and Facility Commander were thorough, explained the reasons for their conclusions, appropriately identified policy violations, and took the necessary steps to hold staff accountable for any identified policy violations.

**1.3 Status:** Out of Compliance        **As of Date:** N/A

## 1.4 Reports to the Board of Supervisors

**Provision Description:** Department regularly reports to the Board of Supervisors on use of force status and compliance with the Action Plan.

*Compliance Measure:* Report publicly at least every six months to the Board of Supervisors on use of force data, training, investigation outcome summaries, and discipline as well as overall compliance.

The Department's presentation to the Board of Supervisors was originally scheduled for July 23, 2024, but was changed to August 6, 2024, so the Panel could be present and available to answer questions from the Board.  The Department's presentation included data and information regarding their use of force statistics, administrative investigations, training, and the status of compliance.

**1.4 Status:** Compliance        **As of Date:** June 12, 2018

---

[13] One incident from November was originally categorized as a Category 3 and later downgraded to a Category 2.

## B. Management Visits

The recommendations in Sections 10.1 and 10.2 of the Action Plan address required tours of senior managers and the documentation of visits on housing units.

### 10.1 Senior Manager Tours

**Provision Description:** Senior managers ranked Unit Commanders and above should be required to periodically tour jail facilities, including nights and weekends.

> ***Compliance Measures Summary:*** 10.1(a) Unit Commanders tour at least two evenings and one weekend day per quarter.

> ***Compliance Measures Summary:*** 10.1(b)–(e) Varying frequencies in visit requirements for Department executives—Unit Commanders up to Sheriff—to tour and inspect the Downtown Jail Complex.

For the Third Quarter of 2024, the Unit Commanders, Chiefs in Custody Operations, the Assistant Sheriff, and the Sheriff achieved 100% compliance with the requirements to tour and inspect the Downtown Jail Complex. One TTCF Commander achieved 85% compliance with this provision, which lowered the overall Commanders' compliance to 95%. For this quarter, 68 of the 72 required tours were completed, which is 97% compliance and exceeds the 95% threshold. In the CCSB SharePoint Report, it is noted that the Commander who failed to complete the mandated tours was on leave for two weeks. All 9 of the 9 required inspections were conducted.[14]

For the Fourth Quarter of 2024, the Unit Commanders, Commanders, Chiefs in Custody Operations, Assistant Sheriff, and Sheriff achieved 100% compliance with the requirements to tour and inspect the Downtown Jail Complex. All of the 81 required tours and inspections were completed.

For the Sixteenth Reporting Period, 140 of the 144 required tours were completed, which is 97% compliant and exceeds the 95% compliance threshold. Of the 18 required inspections, all 18 were completed, which is a compliance of 100% and meets the 100% compliance threshold.

> **10.1 Status:** Compliance           **As of Date:** June 30, 2018

### 10.2 Housing Unit Documentation

**Provision Description:** Housing units should document visits from department managers in electronic records or visitor logs.

> ***Compliance Measure Summary:*** Visits by Department managers to the Downtown Jail Complex are documented and made available to the Monitors.

The visits to the jail facilities by Department managers (above the rank of Sergeant) were documented in electronic visitor logs for the Third and Fourth Quarters of 2024. The posted electronic records included tours and inspections conducted for the two random weeks selected by the Monitors for each quarter.

> **10.2 Status:** Compliance           **As of Date:** January 1, 2024

## C. Rotations and Transfers

The recommendations in Sections 18.1, 18.2, and 21.1 address custody-wide rotation policies, semi-annual audits of unit compliance, and not assigning or transferring staff to custody as a formal sanction.

---

[14] Per Compliance Measures 10 (d) and (e), the Assistant Sheriff is required to conduct at least two inspections per quarter, and the Sheriff is required to conduct at least one at each facility.

### 18.1 Custody-Wide Rotation Policy

**Provision Description:** Maintain a custody-wide rotation policy and rotate staff members as often as provided by policy.

### 18.2 Semi-Annual Rotation Audit

**Provision Description**: Conduct an audit semi-annually for each unit's compliance with rotation policies.

> ***Compliance Measures Summary:*** Maintain facility rotation policy and audit compliance every six months. Provide reports to the Monitors to demonstrate if at least 90% of staff were rotated according to policy.

The Department achieved 100% compliance in the Sixteenth Reporting Period. The source documents indicate that Department personnel were rotated in compliance with the Unit Orders. The rotation policy at TTCF has been paused to assist the Department with activating additional mental health step-down units utilizing experienced staff.

**18.1 Status:** Compliance          **As of Date:** June 30, 2018

**18.2 Status:** Compliance          **As of Date:** January 1, 2019

### 21.1 Transfers to Custody

**Provision Description:** Policy should provide that a staff member will not be assigned to Custody as a formal or informal sanction for problem Deputies.

> ***Compliance Measures Summary:*** On a quarterly basis, personnel records are reviewed for staff transferred to Custody from other divisions and a report is provided to the Monitors identifying each staff member who was transferred to Custody within six months of a finding of misconduct or policy violation.

The Department's Sixteenth Self-Assessment reflects that it maintained 100% compliance from July 1, 2024, through December 31, 2024. The Panel has reviewed the Department's source documents stating the reasons for Deputy transfers to Custody during the Sixteenth Reporting Period. None of the 31 Department members who were transferred to Custody in the Third and Fourth Quarters of 2024 were transferred as a sanction for misconduct or a policy violation.

**21.1 Status:** Compliance          **As of Date:** June 30, 2018

The chart below is a visual representation of compliance for the above provisions from the last three reports. The shading of the boxes indicates compliance status–blue for *compliance* and red for *out of compliance*. The "As Of" column shows the date since first found compliant and the last column includes a check mark if the date meets or exceeds three years of compliance. A chart is provided with each section.

| Administrative Provisions | | Fourteenth Report | Fifteenth Report | Sixteenth Report | | |
|---|---|---|---|---|---|---|
| No. | Provision | 3Q23 - 4Q23 | 1Q24 - 2Q24 | 3Q24 - 4Q24 | AS OF | 3YR+ |
| 1.1 | Assistant Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.2 | Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.3 | Accountability | X | X | X | | |
| 1.4 | Reports to Board | C | C | C | 6/12/2018 | ✓ |
| 10.1 | Senior Manager Tours | C | C | C | 6/30/2018 | ✓ |
| 10.2 | Housing Unit Documentation | C | C | C | 1/1/2024 | |
| 18.1 | Custody-Wide Rotation Policy | C | C | C | 6/30/2018 | ✓ |
| 18.2 | Semi-Annual Rotation Audit | C | C | C | 1/1/2019 | ✓ |
| 21.1 | Transfers to Custody | C | C | C | 6/30/2018 | ✓ |

# II.    Use of Force Policies and Practices

## A. Overall Use of Force Policies

The recommendations in Sections 2.1, 8.2, 17.2, 20.1, and 20.2 of the Action Plan address the revision, modification, and organization of policy into one logical manual.

### 2.1 Separate and Organized Custody Force Manual for Custody Operations

**Provision Description:** The Action Plan requires the Department to "have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations[.]"

### 8.2 Complaints of Retaliation into Grievance Policy

**Provision Description:** Combine retaliation provisions into one grievance section to ensure a single, consistent policy on handling grievances.

### 17.2 Pregnant Inmate Policy

**Provision Description:** Combine and conform provisions related to restraints on pregnant inmates with medically ordered restraint provisions.

### 20.1 Categories of Force in Policy

**Provision Description:** Policy indicates only two types of force: reactive and planned.

The Department's Supervisor's Use of Force Investigation Form (P438) was updated in January 2025 and only lists two types of force.

### 20.2 Reactive Force Definition

**Provision Description:** Reactive Force is defined as force used in response to an immediate threat of safety, destruction, or escape, and when there is no time to wait for assistance.

> ***Compliance Measure Summary***: A Custody Division Manual that includes all force policies applicable to Custody Operations, including those outlined by 8.2, 17.2, 20.1, and 20.2.

On October 16, 2015, the Department provided the Panel with a Custody Operations Force Manual with separate sections on Use of Force Policy, Use of Force with Special Populations, Restraints, Escorting, Chemical Agents, Reporting, Review, Special Weapons, and Deputy-Involved Shootings. The Department's Custody Force Manual satisfies Section 2.1 and includes specific provisions that satisfy Sections 8.2, 17.2, 20.1, and 20.2 of the Action Plan.

**2.1, 8.2, 17.2, 20.1 and 20.2 Status:** Compliance        **As of Date:** January 1, 2017

| Use of Force Policy Provisions | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 2.1 | Custody Force Manual | C | C | C | 1/1/2017 | ✔ |
| 8.2 | Complaints of Retaliation | C | C | C | 1/1/2017 | ✔ |
| 17.2 | Pregnant Inmates | C | C | C | 1/1/2017 | ✔ |
| 20.1 | Categories of Force | C | C | C | 1/1/2017 | ✔ |
| 20.2 | Reactive Force | C | C | C | 1/1/2017 | ✔ |

## B. Use of Force Practices & Review of Force Packages

The recommendations in Sections 2.2 through 2.13, 4.1, 4.3 through 4.5, 9.2, 9.3, 17.5, and 20.3 have provisions related to policy as well as application. The Panel reviewed multiple drafts of the Department's

policies to implement these recommendations, required changes where appropriate, and certified that the Department had implemented these policy recommendations effective December 1, 2015.

For the Sixteenth Reporting Period, a total of 50 packages were reviewed: 25 in 3Q24 and 25 in 4Q24. The cases did not occur in the quarter they were reviewed, nor was the investigation necessarily completed during that quarter. The Panel reviewed cases as they were received. The cases reviewed involved incidents from September 2022 through February 2025. Overall results for the Sixteenth Reporting Period by provision are below. Findings for each quarter are provided in Section C: *Quarterly Findings*.

> ***Compliance Measure Summary:*** (#1-7) Within 10 days of the end of each quarter the Department will provide the Monitors with a cumulative force synopsis for each incident in the Downtown Jail Complex showing the status of force investigations. The Monitors will select a minimum of 25 force packages to review for compliance with the Action Plan of all force provisions through Vertical and Horizontal Assessments. The Department will provide each package and include a summary sheet that indicates how the Department assessed each applicable provision. Force incidents will need to be 90% or more compliant with each provision for the Vertical Assessments.

**Vertical Assessment:** The vertical assessment represents the Panel's analysis of each case to determine the number of cases in which all force provisions were in compliance during the period. Of the 50 cases reviewed, thirty-two (32) were found compliant with all Force Provisions, which is 64% of cases reviewed, which is below the 90% compliance threshold. Of the thirty-two found in compliance with all Force provisions, nineteen (19) were from 3Q24 (nine at TTCF, four at IRC, and six at MCJ) and thirteen (13) from 4Q24 (seven at TTCF, zero at IRC, and six at MCJ). In 3Q24, there was one (1) additional case found in compliance with 89% of the force provisions. In 4Q24, there was another one (1) case found compliant with 89% of the force provisions and another one (1) found compliant with 88% of the force provisions.

**Horizontal Assessment:** The horizontal assessment represents the Panel's findings, by provision, for the twenty (20) use of force practice provisions to determine a compliance rating for each provision. It takes into consideration the objective of the provision and the nature and extent of any violations of the provision. Percentages are calculated based on packages reviewed in both quarters.[15] Of the twenty (20) provisions, thirteen (13) were found in compliance based on the packages reviewed.

## 2.2 Force Prevention Principles

**Provision Description:** Policy provides that force be used as a last resort, with minimal amount of force necessary, terminated as soon as reasonably safe to do so, and de-escalated as resistance decreases.

Of the 50 use of force packages reviewed, 39 cases were found to be compliant with this provision, which amounts to 78% compliance and is below the 90% compliance threshold. In the Fourteenth Reporting Period, the Department made a significant increase in its compliance with 2.2 to 86% compliance from 58% in the Thirteenth Reporting Period and a 40% compliance rate in the Twelfth Reporting Period. Since that time, the last three reporting periods have shown a slight yet consistent decrease in compliance from 86% (14th) to 82% (15th) and now 78% (16th).

     **2.2 Status:** Out of Compliance   **As of Date:** N/A

---

[15] For the Horizontal Assessments, the Panel has determined that Compliance will require 90% of the applicable force provisions were in Compliance. The Panel may exercise its discretion and depart from this 90% requirement when considering the objective of the provision and the nature and extent of any violation of the provision.

## 2.3 Inmate-on-Inmate Violence

**Provision Description:** Policy indicates it is a violation for staff to cause, facilitate, or provoke inmate-on-inmate violence or to expose inmates to an unreasonable risk of assault. Further, staff are prohibited from publicly humiliating inmates or using slurs or obscenities.

Of the applicable cases reviewed, 93% (40 out of 43) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.3 Status:** Compliance                    **As of Date:** January 1, 2024

## 2.4 Use of Force as Discipline

**Provision Description:** Policy indicates use of force not be used as discipline or corporal punishment.

Of the applicable cases reviewed, 100% (48 out of 48) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.4 Status:** Compliance                    **As of Date:** July 1, 2019

## 2.5 Force on Restrained Inmate

**Provision Description:** Policy indicates staff may not strike, use chemical agents, or Taser a restrained inmate, unless the inmate is assaultive, presents an immediate threat, and no other reasonable means.

Of the applicable cases reviewed, 93% (25 out of 27) were found to be in compliance, which exceeds the 90% compliance threshold. The Panel finds the Department in Compliance with this provision.

**2.5 Status:** Compliance                    **As of Date:** July 1, 2023

## 2.6 Head Strikes or Kicks

**Provision Description:** It is prohibited to strike an inmate in the head, kick an inmate who is on the ground, or kick an inmate above the knees if not on the ground unless the inmate is assaultive and presents an imminent danger and there are no more reasonable means to avoid injury. Kicking an inmate who is not on the ground below the knees is prohibited unless used to create distance between a staff member and an assaultive inmate.

Of the applicable cases reviewed, 82% (41 out of 50) were found to be in compliance, which is below the 90% compliance threshold. Consistent with the 2.2 trend noted above, compliance with this provision has seen a slight yet consistent decrease over the last three reporting periods: 88% (14th) to 84% (15th) to 82% (16th). This trend follows a significant increase from the 52% compliance rate in the Twelfth Report and the 64% compliance rate in the Thirteenth Report. For this Reporting Period, the Panel reviewed 19 cases where head strikes were used and, of those cases, the Panel found 9 out of compliance.[16]

**2.6 Status:** Out of Compliance                    **As of Date:** N/A

## 2.7 Supervisor Called to Scene

**Provision Description:** A supervisor must be called to the scene in a situation where use of force may be required as soon as time and circumstances permit.

Of the applicable cases reviewed, 86% (43 out of 50) were found to be in compliance, which is below the 90% compliance threshold.

**2.7 Status:** Out of Compliance                    **As of Date:** N/A

---

[16] As set forth above, of those nine (9) cases that the Panel found out of compliance with Provision 2.6, the Department determined there was a potential policy violation(s) in five (5) of the cases. In the remaining four (4) cases, the Department concluded the force was objectively reasonable and within Departmental policy.

## 2.8 Prevent Excessive Force

**Provision Description:** All members are responsible for preventing excessive uses of force and those who witness such events have a duty to stop, reduce, or control the use of force being used.

Of the applicable cases reviewed, 100% (4 out of 4) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.8 Status:** Compliance                    **As of Date:** January 1, 2024

## 2.9 Armed Inmates

**Provision Description:** When confronting an armed inmate, every effort should be made to control the inmate at a distance.

Of the applicable cases reviewed, 100% (3 out of 3) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.9 Status:** Compliance                    **As of Date:** January 1, 2025

## 2.10 Authorized Weapons

**Provision Description:** Department members can only use authorized weapons for which they have been trained. Any available instrument can be used to prevent imminent loss of life or serious bodily injury if no other means or alternative is available.

Of the applicable cases reviewed, 100% (25 out of 25) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.10 Status:** Compliance                    **As of Date:** July 1, 2024

## 2.11 Planned Chemical Spray

**Provision Description:** After applying a chemical agent, members are required to wait a sufficient amount of time before applying additional chemical or force in a cell extraction or planned use of force.

Of the applicable cases reviewed, 100% (11 out of 11) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.11 Status:** Compliance                    **As of Date:** July 1, 2023

## 2.12 Chemical Spray & Tasers

**Provision Description:** Chemical sprays, tasers, and stun devices should not be used against an inmate who no longer presents a danger or is no longer resisting, ones known to suffer medical conditions that may be aggravated by use, or in a manner contradictory to manufacturer guidance or Department training.

Of the applicable cases reviewed, 95% (19 out of 20) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.12 Status:** Compliance                    **As of Date:** July 1, 2024

## 2.13 Check of Medical Records

**Provision Description:** An inmate's medical/mental health records should be checked prior to use of chemical agents, tasers, or stun devices when time and circumstances permit.

Of the applicable cases reviewed, 100% (15 out of 15) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.13 Status:** Compliance                    **As of Date:** July 1, 2024

## 4.1 Consult Mental Health Professionals

**Provision Description:** Require a mental health professional on-scene to attempt to resolve a situation during a cell extraction or planned use of force.

Of the applicable cases reviewed, 92% (12 out of 13) were found to be in compliance, which exceeds the 90% compliance threshold.

       **4.1 Status:** Compliance        **As of Date:** January 1, 2025

## 4.3 Spray on Mental Health Inmates

**Provision Description:** Discontinue use of chemical following an initial burst if the inmate is acutely psychotic or severely mentally disabled and unable to conform behavior to commands.

Of the applicable cases reviewed, 92% (11 out of 12) were found to be in compliance, which exceeds the 90% compliance threshold.

       **4.3 Status:** Compliance        **As of Date:** October 1, 2019

## 4.4 Cooling Off Periods

**Provision Description:** In situations involving a mentally ill inmate who does not present an obvious danger to self or others and is refusing to exit his or her cell, allow a reasonable cooling off period. After, a mental health professional or supervisor can attempt to obtain compliance without the use of force.

Of the applicable cases reviewed, 100% (13 out of 13) were found to be in compliance, which exceeds the 90% compliance threshold.

       **4.4 Status:** Compliance        **As of Date:** January 1, 2023

## 4.5 Medical or Mental Health Provider Order

**Provision Description:** When a planned use of force is precipitated by a medical or mental health provider, such as for treatment purposes, the ordering provider, or designee, is given the opportunity to intervene to de-escalate and determine whether the order should remain in effect.

Of the applicable cases reviewed, 100% (12 out of 12) were found to be in compliance, which exceeds the 90% compliance threshold.

       **4.5 Status:** Compliance        **As of Date:** January 1, 2023

## 9.2 Escorting of Inmates

**Provision Description:** Following a use of force, the staff member escorting the recalcitrant inmate to medical, holding, or segregation should not be the same member involved in the confrontation.

Of the applicable cases reviewed, 88% (43 out of 49) were found to be in compliance, which is below the 90% compliance threshold.

       **9.2 Status:** Out of Compliance        **As of Date:** N/A

## 9.3 Duty to Protect & Intervene

**Provision Description:** Members have a duty to protect and to intervene in inmate-on-inmate violence when reasonably safe to do so.

Of the applicable cases reviewed, 100% (9 out of 9) were found to be in compliance, which exceeds the 90% compliance threshold.

       **9.3 Status:** Compliance        **As of Date:** July 1, 2022

### 17.5 Minimize Medical Distress

**Provision Description:** Avoid, to the extent possible, placing weight on an inmate's back or shoulders in a way that impairs breathing. Once under control, place the inmate on side to minimize breathing problems.

Of the applicable cases reviewed, 75% (36 out of 48) were found to be in compliance, which is below the 90% compliance threshold. This represents a significant increase from the 51% compliance rate in the Fourteenth Report and 64% in the Fifteenth Report. The Panel continues to reiterate the importance of placing inmates in the recovery position as quickly as possible and holding staff accountable for violations.
     **17.5 Status:** Out of Compliance   **As of Date:** N/A

### 20.3 Planned Use of Force

**Provision Description:** Planned uses of force should be video recorded and include a medical professional on scene or on standby, a supervisor on scene, and occur after a Shift Supervisor approval has been obtained.

Of the applicable cases reviewed, 92% (12 out of 13) were found to be in compliance, which exceeds the 90% compliance threshold.
     **20.3 Status:** Compliance     **As of Date:** July 1, 2023

| Use of Force Practice Provisions, Packet Review | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 2.2 | Force Prevention Principles | 86% | 82% | 78% | | |
| 2.3 | Inmate on Inmate Violence | 98% | 92% | 93% | 1/1/2024 | |
| 2.4 | Use of Force as Discipline | 98% | 100% | 100% | 7/1/2019 | ✓ |
| 2.5 | Force on Restrained Inmates | 97% | 92% | 93% | 7/1/2023 | |
| 2.6 | Head Strikes or Kicks | 88% | 84% | 82% | | |
| 2.7 | Supervisors Called to Scene | 88% | 86% | 86% | | |
| 2.8 | Prevent Excessive Force | 100% | 100% | 100% | 1/1/2024 | |
| 2.9 | Armed Inmates | 67% | 50% | 100% | 1/1/2025 | |
| 2.10 | Authorized Weapons | 88% | 97% | 100% | 7/1/2024 | |
| 2.11 | Planned Chemical Spray | 100% | 100% | 100% | 7/1/2023 | |
| 2.12 | Chemical Spray & Tasers | 86% | 94% | 95% | 7/1/2024 | |
| 2.13 | Check of Medical Records | 83% | 100% | 100% | 7/1/2024 | |
| 4.1 | Consult Mental Health Professionals | 88% | 77% | 92% | 1/1/2025 | |
| 4.3 | Spray on  Mental Health Inmates | 100% | 100% | 92% | 10/1/2019 | ✓ |
| 4.4 | Cooling Off Periods | 100% | 89% | 100% | 1/1/2023 | |
| 4.5 | Medical or Mental Health Provider Order | 100% | 91% | 100% | 1/1/2023 | |
| 9.2 | Escorting of Inmates | 88% | 88% | 88% | | |
| 9.3 | Duty to Protect & Intervene | 100% | 100% | 100% | 7/1/2022 | |
| 17.5 | Minimize Medical Distress | 51% | 64% | 75% | | |
| 20.3 | Planned Use of Force | 100% | 93% | 92% | 7/1/2023 | |

## C. Quarterly Findings—Use of Force Provisions

### Combined 3Q and 4Q 2024 Results

For the Sixteenth Reporting Period, the Panel reviewed 50 use of force incidents—23 from TTCF (46%), 20 from MCJ (40%), and 7 from IRC (14%).

The Department was not in Compliance with five (5) of the twenty (20) Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.6 Head Strikes or Kicking Inmates, (3) 2.7 Supervisors Called to Scene, (4) 9.2 Escorting of Inmates, and (5) 17.5 Minimize Medical Distress. Of the five (5) Use of Force Provisions out of compliance, zero had compliance rates below 70% over 3Q24 and 4Q24 combined.

The Department was in full compliance, or 90% or above, with the following fifteen (15) of the twenty (20) use of force provisions: 2.3, 2.4, 2.5, 2.8, 2.9, 2.10, 2.11, 2.12, 2.13, 4.1, 4.3, 4.4, 4.5, 9.3, and 20.3.

### Third Quarter 2024 Results

In the Third Quarter of 2024, the Panel reviewed 25 force incidents—twelve (12) from TTCF (48%), eight (8) from MCJ (32%), and five (5) from IRC (20%).

The Department was not in Compliance with four (4) of the twenty (20) Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.7 Supervisors Called to Scene, (3) 4.3 Spray on Mental Health Inmates, and (4) 17.5 Minimize Medical Distress. Of the four (4) Use of Force Provisions out of compliance, zero had a compliance rate below 70%.

The Department was in full compliance, or 90% or above, with the following sixteen (16) of the twenty (20) Use of Force Provisions: 2.3, 2.4, 2.5, 2.6, 2.8, 2.9, 2.10, 2.11, 2.12, 2.13, 4.1, 4.4, 4.5, 9.2, 9.3, and 20.3.

### Fourth Quarter 2024 Results

In the Fourth Quarter of 2024, the Panel reviewed 25 force incidents—11 from TTCF (44%), 12 from MCJ (48%), and 2 from IRC (8%).

The Department was not in Compliance with nine (9) of the twenty (20) Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.3 Inmate on Inmate Violence, (3) 2.5 Force on Restrained Inmates, (4) 2.6 Head Strikes or Kicks, (5) 2.7 Supervisors Called to Scene, (6) 4.1 Consult Mental Health Professionals, (7) 9.2 Escorting of Inmates, (8) 17.5 Minimize Medical Distress, and (9) 20.3 Planned Use of Force. Of the nine (9) Use of Force Provisions out of compliance, three (3) had a compliance rate below 70% in 4Q24 as follows:

- 2.2 Force Prevention Principles at 68% compliance
- 2.6 Head Strikes or Kicks at 68% compliance
- 17.5 Minimize Medical Distress at 67% compliance

The Department was in full compliance, or 90% or above, with the following eleven (11) of the twenty (20) Use of Force Provisions: 2.4, 2.8, 2.9, 2.10, 2.11, 2.12, 2.13, 4.3, 4.4, 4.5, and 9.3.

### Review of Force Incidents

In accordance with the Action Plan, the Panel reviews selected force packages each quarter to assess Compliance with Sections 2.2 through 2.13, 4.1, 4.3 through 4.5, 9.2, 9.3, 17.5, and 20.3 (the "Force Provisions") of the Action Plan. Prior to finalizing the ratings for the specific Force Provisions, the Panel participated in meetings with Custody Executives and Supervisors, and the Plaintiffs' Counsel. The information exchanged before these meetings has led to more meaningful and focused discussions about specific compliance ratings. The Panel has consistently noted the value of these discussions would be improved if the cases at issue were recent. The cases reviewed for this Reporting Period occurred between September 7, 2022, and February 11, 2025. Of the cases reviewed, five (5) incidents occurred in 2025, thirty-eight (38) occurred in 2024, six (6) occurred in 2023, and one (1) from 2022.

23

# III.  Training

Sections 3.1 through 3.4 of the Action Plan require that Department members receive training on use of force policies, ethics, professionalism, and treating inmates with respect. New Department members are to receive six (6) weeks of specific training in Custody Operations. Sections 4.6 through 4.9 require the Department to provide Custody-specific, scenario-based skill development training for existing and new personnel in Crisis Intervention and Conflict Resolution and in "identifying and working with mentally ill inmates." Section 12.1 requires Custody Sergeants receive training in conducting force investigations.

The Panel has previously deemed the Department to be complying "as of" the date reported by the Department for the completion of the initial training required for existing personnel. The Department's continuing compliance with the training provisions is determined by its compliance with the refresher training required every year or every other year. The Department submitted its report on refresher training compliance as part of its Sixteenth Self-Assessment.

## A.  Use of Force Training

### 3.1 Use of Force Training

**Provision Description:** Requires use of force training for all existing Department members in Custody Operations, which should include at a minimum, a one-time eight-hour use of force policy training course for all members assigned to Custody and then a two-hour refresher course every year.

> ***Compliance Measure Summary:*** Section 3.1(a) requires that 90% of Deputies and Custody Assistants assigned to Custody as of July 1, 2016, completed the required training.

As of June 30, 2018, the Department was found to be compliant with Section 3.1(a).

> ***Compliance Measure Summary:*** Section 3.1(b) requires that 90% of Deputies and Custody Assistants assigned to Custody who completed the initial training receive the two-hour refresher course every year.

The Panel's auditors previously verified the Department's reported annual refresher training results, and the Department was found to be in Compliance with Section 3.1(b) as of December 31, 2021, through December 31, 2023. The Department's Sixteenth Self-Assessment reports that it maintained compliance with Section 3.1(b) for 2024. For 2024, the Department reported that 1,371 out of the applicable 1,521, or 90.1%, received the required refresher training. Included in this population (and as compliant) were 149 personnel who received their initial use of force training during the year under Provision 3.3, not refresher training. After excluding the 149 new personnel, the Department's overall compliance with 3.1 falls to 89.1%. Because prior Panel Reports did not explicitly state that Custody personnel not yet subject to refresher training should be excluded, the Panel has granted the Department a one-time exception and finds the Department to be in Compliance.

**3.1 Status:** Compliance        **As of Date:** 12/31/2021

### 3.4 Custody-based Use of Force Scenarios

**Provision Description:** Custody-based, use of force scenarios included as part of the use of force policy training provided by the Custody Training & Standard Bureau on an in-service and refresher basis.

The use of force training approved by the Panel includes the custody-based use of force scenarios.

**3.4 Status:** Compliance        **As of Date:** June 30, 2018

24

## B. Ethics and Professionalism Training

**3.2 Ethics and Professionalism Training**

**Provision Description:** Requires training all existing Department members in Custody Operations, which should include at a minimum, a one-time four (4) hour training course in ethics, professionalism, and treating inmates with respect, and then a two (2) hour refresher course every other year.

*Compliance Measure Summary:* Section 3.2(a) requires that 90% of Deputies and Custody Assistants assigned to Custody as of July 1, 2016 completed the required training.

As of June 30, 2018, the Department was found in Compliance with the requirements of Section 3.2(a).

*Compliance Measure Summary:* Section 3.2(b) requires that 90% of Deputies and Custody Assistants assigned to Custody who completed the initial training receive the two-hour refresher course every other year.

The Panel's auditors previously verified Compliance with Section 3.2(a) as of June 30, 2018, and with Section 3.2(b) as of December 31, 2019, through December 31, 2023. The Department's Sixteenth Self-Assessment reports that it maintained compliance with Section 3.2(b) for 2024. These results were verified by the Panel's auditors, and the Department is in Compliance with Section 3.2 for 2024.

**3.2 Status:** Compliance    **As of Date:** June 30, 2018

## C. Mental Health Training

**4.6 Crisis Intervention**

**Provision Description:** The Department should provide a minimum of 32 hours of custody-specific, scenario-based, skill development training to all Deputy Sheriffs on Crisis Intervention and Conflict Resolution with eight (8) hours of refresher training every other year.

**4.7 Mentally Ill Inmates**

**Provision Description:** The Department should provide a minimum of eight (8) hours of custody specific, scenario based, skill development training on identifying and working with mentally ill inmates to all existing Custody personnel with a four (4) hour refresher course every other year.

*Compliance Measure Summary:* Sections 4.6(a) and 4.7(a) require that 90% of Deputies assigned to Custody as of July 1, 2016, completed the required training.

As of June 30, 2018, the Department was found Compliant with the De-Escalation and Verbal Resolution Training (DeVRT), mentally ill inmates, and refresher training requirements of Sections 4.6(a) and 4.7(a).

*Compliance Measure Summary:* Sections 4.6(b) and 4.7(b) require that 90% of Deputies assigned to Custody who completed the initial training receive the eight-hour refresher course every other year.

The Panel's auditors previously verified the Department's Compliance with Section 4.6(a) as of June 30, 2018, Section 4.6(b) as of December 31, 2018, and Section 4.7(b) as of December 31, 2022, through December 31, 2023. The Department's Sixteenth Self-Assessment reports it maintained compliance with Section 4.6(b) and Section 4.7(b) in 2024. These results were verified by the Panel's auditors, and the Department is in Compliance with Section 4.6 and Section 4.7 for 2024.

**4.6 Status:** Compliance    **As of Date:** June 30, 2018
**4.7 Status:** Compliance    **As of Date:** January 1, 2023

25

## D. New Deputy Sheriffs and Custody Assistants

### 3.3 Custody Training

**Provision Description:** Section 3.3 of the Action Plan requires training all new Deputies in use of force and ethics, professionalism, and treating inmates with respect. Section 3.3 also requires the same for new Custody Assistants, who have received training in these subjects during their Academy training.

>**Compliance Measure Summary:** Section 3.3 requires that 95% of new Deputies and Custody Assistants completed the required training.

The Department reported that since the First Reporting Period beginning on July 1, 2015, newly assigned Deputies have been required to complete a six-week Custody Operations course that includes training in use of force and ethics, professionalism and treating inmates with respect, and new Custody Assistants, have received training in these subjects during their Academy training as required by Section 3.3. The Panel's auditors previously verified results through June 30, 2024. The Department's Sixteenth Self-Assessment reports that the Department has met the 95% Compliance threshold through December 31, 2024. The results have been verified by the Panel's auditors, and the Department is in Compliance with Section 3.3 as of June 30, 2018, through December 31, 2024.

**3.3 Status:** Compliance          **As of Date:** June 30, 2018

### 4.8 Mentally Ill—New Staff

**Provision Description:** Provide a minimum of eight (8) hours of custody specific, scenario-based, skill development training on identifying and working with mentally ill inmates to all new members as part of the Jail Operations Continuum.

### 4.9 Crisis Intervention—New Staff

**Provision Description:** Provide a minimum of 32 hours of custody specific, scenario-based, skill development training in Crisis Intervention and Conflict Resolution to new Department members in the Academy or in Custody before they are assigned to any jail facilities.

>**Compliance Measure Summary:** Sections 4.8 and 4.9 require that 95% of new Deputies and Custody Assistants completed the required training.

The Department provides new Deputies with De-Escalation and Verbal Resolution Training (DeVRT) and training in identifying and working with mentally ill inmates (IIMI). The required DeVRT and IIMI training takes place after Deputy Sheriffs and Custody Assistant Academy graduations and prior to assuming duties at their unit of assignment. The Panel's auditors previously verified the Department was in Compliance with Sections 4.8 and 4.9 as of June 30, 2018, through June 30, 2024. The Department's Sixteenth Self-Assessment reports that 100% of the new personnel received the required training in the Third and Fourth Quarters of 2024. These results have been verified by the Panel's auditors, and the Department is in Compliance with Sections 4.8 and 4.9 as of June 30, 2018, through December 31, 2024.

**4.8 and 4.9 Status:** Compliance          **As of Date:** June 30, 2018

### 3.5 Additional Training and Mentoring

**Provision Description:** Requires Unit Commanders to determine "what additional training, counseling, or mentoring may be required when a personnel complaint involving the use of force is resolved with a finding that it 'Appears Employee Conduct Could Have Been Better' direct that the Department member undergo additional training, counseling, or mentoring, and document the action taken."

>**Compliance Measure Summary:** Section 3.5 requires that 90% of personnel complaints involving use of force that were resolved with a "Appears Employee Conduct Could Have Been Better" finding reflect documentation that the Unit Commander reasonably determined what additional training, counseling or mentoring was required.

26

The Department's Sixteenth Self-Assessment reports that there were no inmate grievances against staff involving use of force where the disposition was that it "Appears Employee Conduct Could Have Been Better." The Department is in Compliance with Section 3.5 as of July 1, 2019, through December 31, 2024.

**3.5 Status:** Compliance          **As of Date:** July 1, 2019

## 3.6 Probation Reviews

**Provision Description:** Requires Unit Commanders to review new Department members within six (6) months of being initially assigned to Custody and again before the end of their probationary period.

*Compliance Measure Summary:* Section 3.6 requires that 95% of the new Department members in Custody Operations were reviewed (1) within six months after being assigned to Custody and (2) again before their first post-probationary assignment.

The Department's Fifteenth Self-Assessment previously reported that it achieved 98% compliance in the First Semester of 2024, greater than the 95% threshold required by Section 3.6. The results for the First Semester of 2024 were verified by the Panel's auditors. The Department's Sixteenth Self-Assessment reports that it achieved 100% compliance in the Second Semester of 2024. The reported results for Section 3.6 are subject to verification by the Panel's auditors.

**3.6 Status:** Compliance          **As of Date:** January 1, 2023

# E. Sergeant Training

## 12.1 Force Investigations Training

**Provision Description:** Requires that all Custody Sergeants receive an initial 16-hour block of training in conducting use of force investigations, reviewing use of force reports, and the Department's protocols for conducting such investigations. It also requires a two (2) hour refresher course every year.

*Compliance Measure Summary:* Section 12.1-1 requires that 90% of all Custody Sergeants received the initial training and a two (2) hour refresher course every year. Section 12.1-2 requires that 95% of new Sergeants completed the required training before or within 90 days after they assume their duties in Custody.

The Panel approved the 16-hour initial training course required by Section 12.1 on February 24, 2017. The Panel's auditors previously verified Compliance with Section 12.1 as of July 1, 2019, through June 30, 2024. The Department's Sixteenth Self-Assessment reports that it maintained compliance through December 31, 2024. These results have been verified by the Panel's auditors, and the Department is in Compliance with Section 12.1 as of July 1, 2019, through December 31, 2024.

**12.1 Status:** Compliance          **As of Date:** July 1, 2019

| Training Provisions | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 3.1 | Use of Force Training | C | C | C | 12/31/2021 | ✓ |
| 3.2 | Ethics & Professionalism | C | C | C | 6/30/2018 | ✓ |
| 3.3 | Custody Training | C | C | C | 6/30/2018 | ✓ |
| 3.4 | Custody-based Scenarios | C | C | C | 6/30/2018 | ✓ |
| 3.5 | Add Training and Mentoring | C | C | C | 7/1/2019 | ✓ |
| 3.6 | Probation Reviews | C | C | C | 1/1/2023 | |
| 4.6 | Crisis Intervention | C | C | C | 6/30/2018 | ✓ |
| 4.7 | Mentally Ill Inmates | C | C | C | 1/1/2023 | |
| 4.8 | Mentally Ill Inmates (new staff) | C | C | C | 6/30/2018 | ✓ |
| 4.9 | Crisis Intervention (new staff) | C | C | C | 6/30/2018 | ✓ |
| 12.1 | Force Investigations | C | C | C | 7/1/2019 | ✓ |

27

# IV. Reporting and Investigation of Force Incidents

## A. Reporting and Investigation Provisions in Force Package Reviews

The findings below pertain to application of policies into practice and are supported by the selection of use of force cases reviewed. For the Sixteenth Reporting Period 50 packages were reviewed: 25 in 3Q24 and 25 in 4Q24. Overall results for each provision during the Sixteenth Reporting Period are below. Findings for each quarter are in *Section C: Quarterly Findings-Reporting & Investigations Provisions*.

> ***Compliance Measure Summary:*** (#1-7) Within 10 days of the end of each quarter the Department will provide the Monitors with a cumulative force synopsis for each incident in the Downtown Jail Complex. The Monitors will select a minimum of 25 force packages to review for compliance with the Action Plan of all reporting and investigations provisions through Vertical and Horizontal Assessments. The Department will provide each package and include a summary sheet that indicates how the Department assessed each applicable provision. Reporting and Investigations provisions will need to be 90% or more compliant for the Vertical Assessments.

**Vertical Assessment:** Of the 50 cases reviewed, thirty-eight (38) were found compliant with Reporting and Investigative Provisions, which constitutes 76% of all cases reviewed, which is below the 90% compliance threshold, though an increase from 72% in the Fifteenth Report, and a continued significant increase from the 56% in the Fourteenth Report, 46% in the Thirteenth Report, and 8% compliance rate in the Twelfth Report. Of the thirty-eight (38) cases in compliance with the Reporting and Investigative provisions, twenty-two (22) were from 3Q24 (ten at TTCF, four at IRC, and eight at MCJ) and sixteen (16) were from 4Q24 (eight at TTCF, one at IRC, and seven at MCJ).

**Horizontal Assessment:** The findings for the seventeen (17) Reporting & Investigative Provisions represent the Horizontal Assessment, which determines whether the Department is in Compliance with each of the applicable Provisions. It takes into consideration the objective of the provision and the nature and extent of any violations. Percentages are calculated based on packages reviewed in both quarters. Of the seventeen (17) provisions, fourteen (14) were found in compliance based on packages reviewed.

### 4.2 Mental Health Professionals

**Provision Description:** Supervisors investigating uses of force are required to interview mental health professionals who witnessed the incident or attempted to resolve it. Record interview if consented to.

Of the applicable cases reviewed, 100% (10 out of 10) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.2 Status:** Compliance          **As of Date:** January 1, 2023

### 5.2 Commander's Reviews

**Provision Description:** Evaluations of force incidents by Unit Commanders are reviewed pursuant to the category level requirement.

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**5.2 Status:** Compliance          **As of Date:** January 1, 2023

### 5.3 Unexplained Discrepancies

**Provision Description:** Any unexplained tactical decisions or discrepancies among witnesses should be referred in writing by the reviewing Commander(s) to the investigator.

Of the applicable cases reviewed, 96% (47 out of 49) were found to be in compliance, which exceeds the 90% threshold.

**5.3 Status:** Compliance            **As of Date:** July 1, 2022

### 12.2 Location of Inmate Interviews

**Provision Description:** Inmate witnesses to force incidents should be asked to be interviewed, and then interviewed, away from other inmates.

Of the applicable cases reviewed, 68% (19 out of 28) were found to be in compliance, which is below the 90% compliance threshold.

**12.2 Status:** Out of Compliance        **As of Date:** N/A

### 12.3 Suspect Interviews

**Provision Description:** No Department member involved in the use of force should be present for or participate in the interviews.

Of the applicable cases reviewed, 98% (45 out of 46) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.3 Status:** Compliance            **As of Date:** July 1, 2019

### 12.4 Uninvolved Supervisors

**Provision Description:** Force investigations should not be conducted by the direct supervisor of the staff member involved in the use of force.

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.4 Status:** Compliance            **As of Date:** July 1, 2023

### 12.5 Standard Order and Format

**Provision Description:** Use of force packages should be organized in a standard order and format.

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.5 Status:** Compliance            **As of Date:** July 1, 2019

### 15.1 Timeliness of Reports

**Provision Description:** Every staff member who uses or assists in a force incident completes a separate and independent written report before going off duty.

Of the applicable cases reviewed, 94% (47 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.1 Status:** Compliance            **As of Date:** January 1, 2025

### 15.2 All Department Witnesses

**Provision Description:** Each staff member who witnesses a use of force prepares a written report unless the Watch Commander specifically designates only certain witnesses to prepare reports when a large number witnessed the same event.

29

Of the applicable cases reviewed, 100% (49 out of 49) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.2 Status:** Compliance          **As of Date:** July 1, 2019

### 15.3 Force by Other Members

**Provision Description:** Staff members who use force must describe the type used in a written report as well the type used by others.

Of the applicable cases reviewed, 92% (44 out of 48) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.3 Status:** Compliance          **As of Date:** January 1, 2024

### 15.4 Description of Injuries

**Provision Description:** Staff members who witness a use of force incident must describe visible or apparent injuries to department members, inmates, or others involved.

Of the applicable cases reviewed, 84% (42 out of 50) were found to be in compliance, which is below the 90% compliance threshold.

**15.4 Status:** Out of Compliance          **As of Date:** N/A

### 15.5 Clarification After Video

**Provision Description:** A Department member who wants to make any clarifications or changes after viewing a video of a force incident should be required to either prepare a supplemental report or specifically note any changes to the Department member's initial report.

Of the applicable cases reviewed, 94% (15 out of 16) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.5 Status:** Compliance          **As of Date:** July 1, 2023

### 15.6 Separation of Deputies

**Provision Description:** To the extent practical, Department members should be separated until they have completed their use of force reports and/or witness reports.

Of the applicable cases reviewed, 83% (40 out of 48) were found to be in compliance, which is below the 90% compliance threshold. This represents a slight increase when compared to the 82% compliance in the Fifteenth Report, and a significant increase from the 47% and 48% in the Thirteenth and Fourteenth Reports, respectively, and an additional increase from the 16% compliance rate in the Twelfth Report.

**15.6 Status:** Out of Compliance          **As of Date:** N/A

### 15.7 Individual Perceptions

**Provision Description:** Report reviewers must ensure each report reflects individual perceptions and recollections of the events and that they do not have common wording or phrasing.

Of the applicable cases reviewed, 96% (48 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.7 Status:** Compliance          **As of Date:** January 1, 2025

### 16.1 Healthcare Assessment

**Provision Description:** A documented medical assessment of each inmate upon whom force is used as soon as practical after the force incident.

30

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the
90% compliance threshold.

**16.1 Status:** Compliance              **As of Date:** July 1, 2019

## 16.2 Photographs of Injuries

**Provision Description:** Supervisors investigating force incidents must photograph any injury, swelling, or
redness sustained by staff members and document the absence of injury.

Of the applicable cases reviewed, 91% (29 out of 32) were found to be in compliance, which exceeds the
90% compliance threshold.

**16.2 Status:** Compliance              **As of Date:** January 1, 2025

## 16.3 Medical Report of Injuries

**Provision Description:** Medical staff treating an injured inmate must report any injuries related to a use of
force or an allegation by the inmate of a use of force.

Of the applicable cases reviewed, 98% (48 out of 49) were found to be in compliance, which exceeds the
90% compliance threshold.

**16.3 Status:** Compliance              **As of Date:** July 1, 2019

| Reporting & Investigations, Packet Review | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 4.2 | Mental Health Professionals | 100% | 92% | 100% | 1/1/2023 | |
| 5.2 | Commander's Reviews | 100% | 100% | 100% | 1/1/2023 | |
| 5.3 | Unexplained Discrepancies | 98% | 97% | 96% | 7/1/2022 | |
| 12.2 | Location of Inmate Interviews | 49% | 60% | 68% | | |
| 12.3 | Suspect Interviews | 96% | 92% | 98% | 7/1/2019 | ✔ |
| 12.4 | Uninvolved Supervisors | 98% | 96% | 100% | 7/1/2023 | |
| 12.5 | Standard Order & Format | 100% | 98% | 100% | 7/1/2019 | ✔ |
| 15.1 | Timeliness of Reports | 88% | 86% | 94% | 1/1/2025 | |
| 15.2 | All Department Witnesses | 96% | 96% | 100% | 7/1/2019 | ✔ |
| 15.3 | Force by Other Members | 90% | 90% | 92% | 1/1/2024 | |
| 15.4 | Description of Injuries | 92% | 90% | 84% | | |
| 15.5 | Clarification After Video | 100% | 94% | 94% | 7/1/2023 | |
| 15.6 | Separation of Deputies | 48% | 82% | 83% | | |
| 15.7 | Individual Perceptions | 98% | 88% | 96% | 1/1/2025 | |
| 16.1 | Healthcare Assessment | 100% | 100% | 100% | 7/1/2019 | ✔ |
| 16.2 | Photograph of Injuries | 91% | 88% | 91% | 1/1/2025 | |
| 16.3 | Medical Report of Injuries | 100% | 100% | 98% | 7/1/2019 | ✔ |

# B. Reporting & Investigations Provisions as Reported by Department

Many of the recommendations in the Action Plan that pertain to the reporting and investigation of force
used by Department personnel in Custody Operations are assessed by the Panel through a review of the
completed force packages. Other provisions are reported by the Department as follows:

## 5.1 Tracking of Force Incidents

**Provision Description:** Requires the Department to track the status of all investigations, reviews, and
evaluations of all use of force incidents and allegations to ensure they were completed appropriately and
timely. By the end of the shift, a supervisor or Internal Affairs investigator enters incidents into a database
with a summary and an initial category classification.

31

*Compliance Measure Summary:* 5.1(2) On a quarterly basis, Monitors determine if the completed force packages reviewed were entered into the database pursuant to 5.1(1).

The Department reports that 100% of the force incidents were entered into the database for the Third and Fourth Quarters of 2024 within two hours after the end of the shift.

*Compliance Measures Summary:*
5.1(1) and (4a): 95% of use of force incidents are entered into the database within two hours of the end of shift in which the incident occurred.
5.1(4)b and c: 90% of investigations of Deputies and Custody Assistants were completed timely and appropriately.

The Department reports its compliance rate for the Third Quarter of 2024 at 76%, with TTCF at 100%, MCJ at 60%, and IRC at 66%. MCJ and IRC were issued Corrective Action Plans. As noted in the *Sixteenth Self-Assessment*, three of the ten cases assessed were found out of compliance—investigations were not completed within one year from the date the Department was made aware of the incident.

For the Fourth Quarter of 2024, the Department reports a collective compliance rate of 93% with MCJ and IRC at 100% compliance and TTCF at 80% compliance. One (1) of the random 15 cases assessed was found out of compliance. For the random cases assessed for the Sixteenth Reporting Period, 84% (21 out of 25) were found compliant, which is below the 90% compliance threshold.

**5.1 Status:** Out of Compliance          **As of Date:** N/A

## 8.3 CFRC Review

**Provision Description:** Evaluations of grievance investigations claiming force was used to retaliate against an inmate should be reviewed by the Custody Force Review Committee.

*Compliance Measures Summary:* A list of completed investigations of inmate grievances claiming force was used in retaliation is provided quarterly to the Monitors and will include the CFRC review of the investigation's evaluation.

There was no data to access for the Sixteenth Reporting Period. According to the posted information in SharePoint, there were no grievances in which an inmate claimed force was used in retaliation.[17]

**8.3 Status:** Compliance          **As of Date:** June 30, 2021

## 11.1 CFRT Involvement

**Provision Description:** The Custody Force Rollout Team (CFRT) involvement in reviewing evaluations should not delay the investigation.

*Compliance Measure Summary*: 95% of the investigations reviewed by CFRT were not delayed and discipline imposed timely if there is a policy violation finding.

During the Third and Fourth Quarters of 2024, there were no use of force incidents reviewed by CFRT in which there was a finding of a policy violation or misconduct.

**11.1 Status:** Compliance          **As of Date:** June 30, 2018

---

[17] During the Panel's monitoring visits, inmates have reported they do not view the grievance system as effective and, therefore, many choose not to utilize it.

### 13.1 Documenting Dishonesty

**Provision Description:** The Department must have a firm zero tolerance policy for acts of dishonesty, use of excessive force, failures to report uses of force, and violations of PREA. For any staff member not terminated for such an act documentation is made as to the reason and the discipline imposed as well as placement on a monitored performance review program.

> *Compliance Measures Summary:* 95% compliance with all completed investigations where there was a finding of dishonesty, failure to report uses of force, or PREA violations as well as documentation for incidents that did not result in termination.

The Department's Sixteenth Self-Assessment indicates it achieved 100% compliance in both quarters of the Sixteenth Reporting Period. The following is a summary of the data posted for each case: one (1) in the Third Quarter of 2024 and two (2) in the Fourth Quarter of 2024.

- Third Quarter of 2024: A Deputy Sheriff was relieved of duty on August 5, 2023, following an arrest report for assault with a deadly weapon. Following an Internal Affairs Investigation, he was released from probation from the position of Deputy Sheriff for violating the Honesty Policy, Obstructing an Investigation, and Cooperation during a Criminal Investigation.
- Fourth Quarter of 2024: A Deputy Sheriff was terminated on November 26, 2024, for violating policies related to general behavior, false statements, and dishonesty/failure to make statements following an off-duty, alcohol-involved hit and run incident. The second case involved a Custody Assistant who was suspended for 5 days for violating use of force reporting procedures following a Category 3 use of force investigation where it was discovered the Custody Assistant failed to author a force memo despite being a witness to the incident. This incident occurred June 19, 2022, and the discipline was imposed November 7, 2024, over two years from the date of the incident. This employee was not placed on a formal review program because she has not returned to work due to injuries suffered on June 19, 2022.

The Department has historically been over-inclusive in the information they have reported for this provision. For example, they have included cases involving off-duty misconduct in an effort to be transparent. In the Joint Stipulation re: Implementation Plan and Compliance Measures filed by the Parties on November 21, 2025, and approved by the Court on November 24, 2025, this Provision and its Compliance Measures have been revised. The Panel will assess the Department using those revisions in the Seventeenth Report.

**13.1 Status:** Compliance          **As of Date:** October 1, 2019

### 13.2 Reports of Dishonesty and PREA

**Provision Description:** All findings of dishonesty, failures to report uses of force, and violations of PREA and supporting documentation is provided to the Office of the Inspector General quarterly.

For the Sixteenth Reporting Period, the Inspector General was advised of all actions noted in Section 13.1.

**13.2 Status:** Compliance          **As of Date:** October 1, 2019

### 14.1 Review of Criminal Referrals

**Provision Description:** An additional review of referrals of inmates for criminal prosecution arising from incidents involving the use of force by Department members must be performed to ensure charges are not being brought to help justify the use of force.

> *Compliance Measures Summary:* Requires the Department to review all referrals of an inmate for criminal prosecution for assaulting a staff member and report to the Monitors that 95% of referrals were reviewed by the Unit Commander who verified charges were not brought as justification for use of force.

33

The Department exceeds the 95% compliance threshold for both quarters of the Sixteenth Reporting Period. The Department reports 97% compliance with Section 14.1 for the Third Quarter of 2024, with 35 out of 36 cases referred to and verified by the Unit Commander that charges were not brought as a justification for a use of force prior to the referral being sent to the District Attorney's Office. For the Fourth Quarter of 2024, the Department reports 97% compliance with 14.1, with 34 out of 35 cases reviewed by the Unit Commander prior to submission to the District Attorney's Office.

**14.1 Status:** Compliance                **As of Date:** January 1, 2025

## 14.2 Timeliness of Criminal Referrals

**Provision Description:** Timely forward incidents of officer misconduct that may amount to criminal violations to the Office of the District Attorney.

> *Compliance Measures Summary:* Requires the Department review all referrals of a staff member for possible prosecution for alleged misconduct and report to the Monitors that 90% of referrals were sent to the Office of the District Attorney within six months.

During the Third and Fourth Quarters of 2024, there were zero instances where Department custody personnel assigned to a Rosas facility met the criteria for 14.2.

**14.2 Status:** Compliance                **As of Date:** July 1, 2018

| Reporting & Investigations, Department Reported | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 5.1 | Tracking of Force Incidents | X | X | X | | |
| 8.3 | CFRC Review | C | C | C | 6/30/2021 | ✓ |
| 11.1 | CFRT Involvement | C | C | C | 6/30/2018 | ✓ |
| 13.1 | Documenting Dishonesty | C | C | C | 10/1/2019 | ✓ |
| 13.2 | Reports of Dishonesty/PREA | C | C | C | 10/1/2019 | ✓ |
| 14.1 | Review of Criminal Referrals | C | X | C | 1/1/2025 | |
| 14.2 | Timeliness of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |

# C. Quarterly Findings—Reporting and Investigations Provisions

## Third and Fourth Quarter 2024 Combined Results

For the Third and Fourth Quarters of 2024, the Panel reviewed 50 use of force incidents combined—23 from TTCF (46%), 20 from MCJ (40%), and 7 from IRC (14%).

The Department was not in Compliance with three (3) of the seventeen (17) Reporting & Investigations Provisions: (1) 12.2 Location of Inmate Interviews, (2) 15.4 Description of Injuries, and (3) 15.6 Separation of Deputies. Of the three (3) Reporting and Investigations Provisions out of compliance, one (1) had a compliance rate below 70% in the Sixteenth Reporting Period: 12.2 Inmate Interviews at 68% compliance.

The Department was in Compliance, or 90% or above, with the following fourteen (14) provisions: 4.2, 5.2, 5.3, 12.3, 12.4, 12.5, 15.1, 15.2, 15.3, 15.5, 15.7, 16.1, 16.2, and 16.3. Of the fourteen (14) in compliance, six (6) reached 100% compliance: 4.2, 5.2, 12.4, 12.5, 15.2, and 16.1.

## Third Quarter 2024 Results

For the Third Quarter of 2024, the Panel reviewed 25 force incidents— twelve (12) from TTCF (48%), eight (8) from MCJ (32%), and five (5) from IRC (20%).

The Department was not in Compliance with three (3) of the seventeen (17) Reporting & Investigations Provisions: (1) 12.2 Location of Inmate Interviews, (2) 15.5 Clarification After Video, and (3) 15.6 Separation of

34

Deputies. Of the three (3) Reporting and Investigations Provisions out of compliance, zero had a compliance rate below 70% in 3Q24.

The Department was in Compliance, or 90% or above, with the following fourteen (14) provisions: 4.2, 5.2, 5.3, 12.3, 12.4, 12.5, 15.1, 15.2, 15.3, 15.4, 15.7, 16.1, 16.2, and 16.3. Of the fourteen (14) in compliance, eight (8) reached 100% compliance: 4.2, 5.2, 5.3, 12.4, 12.5, 15.2, 15.7, and 16.1.

### Fourth Quarter 2024 Results

In the Fourth Quarter of 2024, the Panel reviewed 25 force incidents—11 from TTCF (44%), 12 from MCJ (48%), and 2 from IRC (8%).

The Department was not in Compliance with four (4) of the seventeen (17) Reporting & Investigations Provisions: (1) 12.2 Location of Inmate Interviews, (2) 15.4 Description of Injuries, (3) 15.6 Separation of Deputies, and (4) 16.2 Photograph of Injuries.

Of the four (4) Reporting and Investigations Provisions out of compliance, one (1) had a compliance rate below 70% in 4Q24: 12.2 Location of Inmate Interviews at 53% compliance.

The Department was in Compliance, or 90% or above, with the following thirteen (13) provisions: 4.2, 5.2, 5.3, 12.3, 12.4, 12.5, 15.1, 15.2, 15.3, 15.5, 15.7, 16.1, and 16.3.

35

# V. Inmate Grievances

The Action Plan requires extensive changes in how the Department handles inmate grievances and requests for service. On July 15, 2016, the Department issued a new *Inmate Grievance Manual* (Volume 8 of the Custody Division Manual) to implement a new grievance system. The Panel assessed the Department's implementation of the new grievance system in the Sixteenth Reporting Period as follows:

## A. Grievance Forms

### 6.1 Separate Grievance Forms

**Provision Description:** Inmate grievances and inmate requests must be reported on separate forms, either paper or electronically.

The Panel has previously concluded the forms meet the requirements of the Action Plan.

**6.1 Status:** Compliance          **As of Date:** January 1, 2017

### 6.2 Availability of Grievance Forms

**Provision Description:** Grievance forms are reasonably available to inmates at all times.

During the Panel's August and October 2024 visit to the Downtown Jail Complex, some of the boxes within the housing units did not contain grievance forms. Some inmates have reported their inability to access grievance forms to the Panel. Inmates who participated in the focus groups reported that they did have access to grievance forms.

**6.2 Status:** Out of Compliance          **As of Date:** N/A

### 6.6 Right to Appeal Form

**Provision Description:** Grievance forms must include a check box indicating whether the complaint was upheld or denied and a statement regarding the right to appeal and time frame.

> *Compliance Measures Summary:* Monitors determine the availability of forms and requirements of 6.1 through 6.6 through onsite visits, interviews with inmates and staff, and a review of 25 consecutive force and retaliation grievances in a month.

The Panel has previously concluded that the forms contain the appeals check box and meet the requirements of the Action Plan.

**6.6 Status:** Compliance          **As of Date:** January 1, 2017

### 7.1 Conflict Resolution Meeting

**Provision Description:** Inmates who submit grievances should be advised that a conflict resolution meeting is voluntary to address the grievances without a personnel investigation. If successful, the grievance resolution is documented accordingly.

CCSB reported no grievances against staff were adjudicated in the randomly selected months where a Conflict Resolution Meeting was conducted for either the Third or Fourth Quarter of 2024.

**7.1 Status:** Compliance          **As of Date:** January 1, 2017

### 6.4 Use of Force Grievances

**Provision Description:** Grievance forms should include "use of force" as a specific category of "grievances against staff" and brought to the attention of Unit Commanders.

36

*Compliance Measure Summary:* 90% of force grievances reviewed were brought to the attention of the Unit Commander within 10 days of receipt and properly handled.

The Department reports 100% compliance with this provision in the Third Quarter of 2024. Out of the seven (7) applicable grievances, all were brought to the attention of the Unit Commander within the required timeframe. During the Fourth Quarter of 2024, 100% of force and retaliation grievances were brought to the attention of the Unit Commander within ten (10) days. Out of the two (2) applicable grievances, the Unit Commander was notified within the required timeframe in both cases.

**6.4 Status:** Compliance                **As of Date:** January 1, 2024

## 6.5 Grievances Against Staff

**Provision Description:** Grievance forms should include "retaliation" and "harassment" as specific categories of "grievances against staff" and brought to the attention of Unit Commanders.

*Compliance Measure Summary:* 90% retaliation grievances reviewed were brought to the attention of the Unit Commander within 10 days of receipt and properly handled.

In the Third Quarter of 2024, the Department reports that 95% of the harassment and retaliation grievances (19 out of 20) were brought to the Unit Commanders' attention within 10 days and handled appropriately. The one (1) grievance that failed to be handled properly was brought to the attention of the Unit Commander after twelve (12) days. In the Fourth Quarter of 2024, the Department reports 100% (7 out of 7) of grievances were handled appropriately and brought to the attention of the Unit Commander within the timeframe. The Department was in compliance with 96% (26 out of 27) of harassment and retaliation grievances for this reporting period, which exceeds the 90% compliance threshold.

**6.5 Status:** Compliance                **As of Date:** July 1, 2023

# B. Emergency Grievances

## 6.3 Emergency Grievance Forms

**Provision Description:** A prominent box is placed on the form to indicate an "Emergency Grievance."

*Compliance Measure Summary:* Monitors verify compliance with 6.3 through interviews of staff and inmates and review of grievances marked "emergency."

A prominent box is located on the grievance form and confirmed through reviews and interviews.

**6.3 Status:** Compliance                **As of Date:** January 1, 2017

## 6.7 Handling Emergency Grievances

**Provision Description:** Grievances marked "emergency" are given to and reviewed by a supervisor as soon as possible to determine if immediate action is needed to protect life or safety. Provide the inmate a written response documenting action taken to address the emergency.

*Compliance Measure Summary:* Monitors review 50 consecutive grievances to ensure 95% of grievances marked "emergency" were reviewed and handled pursuant to Section 6.7.

The Department reports that it achieved 100% compliance with this provision in the Third and Fourth Quarters of 2024. No grievances met the criteria for Section 6.7 for the Sixteenth Reporting Period.

**6.7 Status:** Compliance                **As of Date:** July 1, 2018

### 6.8 Notification of Non-Emergency

**Provision Description:** If the grievance is determined to be non-emergent, the inmate is notified as soon as practical that the grievance will be handled as non-emergent with reason documented.

> *Compliance Measure Summary:* Monitors review 50 consecutive grievances to ensure 90% of those determined non-emergent were documented and notifications to inmates were made within five days.

For the Third Quarter of 2024, the Department reports 100% (18 out of 18) of the grievances were correctly downgraded and the inmate was notified in a timely manner that the grievance would be handled as non-emergent. The Department also reports it achieved 100% compliance in the Fourth Quarter of 2024, with 6 out of 6 emergency grievances downgraded to non-emergent being properly handled. All downgrade notifications were made within one day or less from the date of collection.

**6.8 Status:** Compliance          **As of Date:** July 1, 2018

## C. Inmate Grievance Coordinator

The recommendations in Sections 6.9, 6.13, 6.14, and 6.15 of the Action Plan address expectations and duties of the Inmate Grievance Coordinator position.

### 6.9 Inmate Grievance Coordinator

**Provision Description:** Requires all emergency grievances be forwarded to the Inmate Grievance Coordinator (IGC) who will review for proper handling and notify the Unit Commander if not properly handled.

The Department's posted data pertaining to Section 6.9 for 3Q24 indicates there were two (2) grievances deemed emergent at MCJ—one on 7/7/24 and the other on 8/3/24. As of 10/9/24, neither emergent grievance was reviewed by the IGC. There were no grievances deemed emergent in 4Q24. As noted in the *Sixteenth Self-Assessment*, the IGC at MCJ failed to review emergent grievances to ensure line supervisors property landed the grievances. A CAP was issued to the MCJ Commander. As a result, the IGC reviewed the pending emergent grievances.

**6.9 Status:** Out of Compliance          **As of Date:** N/A

### 6.13 Grievance Coordinator Tracking

**Provision Description:** Regularly track the handling of inmate grievances to ensure the investigations are completed timely and reasonably, and that inmates are notified of the results of the investigations.

### 6.14 Grievance Coordinator Reports

**Provision Description:** Provide a monthly report to Unit Commanders on the status of grievances, timeliness of investigations, responses to grievances and appeals, and inmate notifications.

### 6.15 Grievance Coordinator Analysis

**Provision Description:** Analyze inmate grievances monthly to identify any problematic trends and provide that analysis in a monthly report to Unit Commanders and senior management.

> *Compliance Measures Summary:* Provide the Monitors with one or more quarterly reports to address all requirements of the Coordinator provisions. The Inmate Grievance Coordinator will meet with the Monitors once a quarter.

The Custody Inmate Grievance Application (CIGA) generates monthly reports that summarizes the data noted in 6.13, 6.14 and 6.15. The Panel met with the Compliance and Sustainability Grievance Team during

the August and October 2024 Monitoring Visits. The Team is committed to ensuring the facility's grievance teams understand how to use the CIGA system and address training gaps as needed.

**6.13, 6.14, and 6.15 Status:** Compliance        **As of Date:** July 1, 2018

## 6.16 Centralized Grievance Unit

**Provision Description:** Establish a centralized unit to collect, review, categorize, forward for investigations, and make appropriate notifications for inmate grievances.

The Panel previously determined the Department's structure of a Grievance Coordinator supervising the grievance teams at all of the Downtown Jail Complex facilities was equivalent in function to a centralized system and was acceptable, pending progress and specific results. The Panel continues to deem the Department's Grievance Team structure acceptable.

**6.16 Status:** Compliance        **As of Date:** January 17, 2017

# D. Handling of Grievances

## 6.10 Collection of Grievances

**Provision Description:** Grievances should be collected from the locked grievance boxes on each living unit no less frequently than once per day. Collection time should be recorded in a log and reviewed within 24 hours of collection.

> ***Compliance Measures Summary:*** Monitors will inspect collection boxes, verify that the database is accurate and up-to-date, and ensure that 95% of grievances selected for review are collected, reviewed, entered, and tracked timely.

The Department's Sixteenth Self-Assessment reports that 100% of the reviewed grievances were collected and reviewed within 24 hours and handled as required in the Third Quarter of 2024. In prior Reports, the Panel had noted the Compliance Measure for Section 6.10 does not yield sufficient data to assess compliance with this provision. For example, the first 25 consecutive grievances at MCJ for the selected month were collected within the first four days, which does not provide a meaningful measurement of the Department's compliance with Section 6.10. Accordingly, the Panel has reviewed the Unit Collection compliance data for the entire randomly selected month to assess compliance with Section 6.10 below.

Third Quarter of 2024 (September):
- MCJ's monthly collection log shows a compliance rate of 93%. Three areas (2000 Control Booth, 3000 Control Booth, and Cell 40) have the lowest compliance rates (40%, 0%, and 53%, respectively).
- TTCF's compliance rate was 97%.
- IRC's compliance rate was 81% with three areas (Booking Front, Class Rear, and Custody Line) at the lowest compliance rate (50%, 33%, and 57%, respectively).

In the Panel's Fifteenth Report (p. 41), it was noted that the Department explained "there was an oversight including some of these areas…[that] has since been corrected." The results of the Third Quarter 2024 collection logs suggest additional support in those areas is needed.

Fourth Quarter of 2024 (November):
The Department reports in the randomly selected month that TTCF collected boxes 91% of the time and IRC 61% of the time, which is below the 95% threshold. Both facilities were issued CAPs. Briefings were held with supervisors at TTCF and IRC to discuss the requirements for collecting and documenting grievances in the e-UDAL.

**6.10 Status:** Out of Compliance        **As of Date:** N/A

## 6.11 Failure to Properly Handle Grievances

**Provision Description:** Failing to provide an inmate with a grievance form when requested, destroying or concealing grievances, failing to respond appropriately to a grievance, attempting to intimidate an inmate from filing a grievance, and retaliating against an inmate who has filed a grievance, may each be a cause for disciplinary action.

> ***Compliance Measure Summary:*** Provide the Monitors with a log of any inmate grievances about the matters encompassed by Paragraph 6.11, the result of the investigations of those grievances, and documentation that appropriate corrective action was taken in 100% of cases.

For the Sixteenth Reporting Period, the Department reports that no staff members were found to have engaged in conduct encompassed by this Provision. The Panel is not aware of any cases in which the Department has found that staff retaliated against an inmate in a manner encompassed by this Provision. Inmates have informed the Panel that they are retaliated against for using, or attempting to use, the grievance system. They do not, however, always file grievances about this retaliation because they view that option as futile. For the next reporting period, the Panel will conduct a deeper analysis on a sample of the retaliation grievances.

**6.11 Status:** Compliance                **As of Date:** July 1, 2022

## 6.12 Tracking Inmate Grievances

**Provision Description:** All inmate grievances should be entered into and tracked in an inmate grievance database that reflects the nature and status of the grievance, and personnel responsible for the Department's handling of the grievance.

> ***Compliance Measures Summary:*** Monitors will review 25 grievances from MCJ and 25 from TTCF to ensure that 95% of grievances reviewed are collected, reviewed, entered, and tracked timely.

The Department's posted results report that 100% of the grievances at both MCJ and TTCF in the randomly selected months in the Third and Fourth Quarters of 2024 were entered into the database as required by Section 6.12. The source documents for these results were available to, and reviewed by, the Panel.

**6.12 Status:** Compliance                **As of Date:** July 1, 2018

## 8.1 Anti-Retaliation

**Provision Description:** Prohibits Department personnel from retaliating against inmates.

> ***Compliance Measures Summary:*** Department implements and enforces an anti-retaliation policy and provides Monitors with a quarterly log of cases and findings as well as the first 25 investigations alleging retaliation.

The Department posted the results of the investigations approved by Unit Commanders in the randomly selected months and the number of anti-retaliation grievances received and investigated in the Third and Fourth Quarters of 2024, which were as follows:

- Third Quarter of 2024 there were fifty-two (52) anti-retaliation grievances received, and zero investigations were completed.
- Fourth Quarter of 2024 there were twenty-three (23) anti-retaliation grievances received, and zero investigations completed.

The Panel notes that of the seventy-five (75) grievances received during this Reporting Period, no investigations were completed. In the Fifteenth Report, the Panel noted the Department needed to address the backlog in these investigations. The Panel will address this backlog with the Department's leadership during the next Monitoring visit in January 2026.

**8.1 Status:** Compliance                **As of Date:** April 1, 2019

## E. Deadlines

### 6.17 Use of Force Deadlines

**Provision Description**: A 30-day deadline in place for filing use of force grievances by inmates.

> ***Compliance Measures Summary:*** 1(a), 95% compliance with the first 25 use of force grievances determined by the Department to be untimely.

The Department's source documents for this provision indicate the Department achieved 100% compliance for the Sixteenth Reporting Period. There were two (2) grievances that met the criteria of this provision—one in each quarter—and they were all handled appropriately in accordance with 6.17. The Panel finds the Department in Compliance for the Sixteenth Reporting Period.

The Panel has previously requested, and been assured by the Department, that the grievance forms would be revised to reflect the 30-day deadline required by this Provision. In the Fifteenth Report, the Panel noted it had been "informed that the updated Grievance Forms, reflecting the 30-day deadline noted in this Provision, are in the final stages of approval. The Department has posted signs on each grievance box noting the 30-day deadline. Some of the posted signs have been removed by the inmates." Fifteenth Report, pg. 45. The Department needs to update the grievance forms during the next reporting period. If the updated forms are not available to the inmates in the next reporting period, the Panel will deem the Department out of compliance with this provision.

**6.17 Status:** Compliance            **As of Date:** October 1, 2019

### 6.18 PREA Deadline

**Provision Description:** There should be no deadline for filing Prison Rape Elimination Act grievances.

> ***Compliance Measures Summary:*** 1(b), 95% compliance with the first 25 PREA grievances.

In the Third Quarter of 2024, 100% (7 out of 7) of PREA grievances met the criteria for Section 6.18 and were handled appropriately. In the Fourth Quarter of 2024, 33% (1 out of 3) PREA grievances met the criteria for Section 6.18 and were handled appropriately. For the Sixteenth Reporting Period, 80% (8 out of 10) of the PREA grievances were handled appropriately in accordance with 6.18, which results in 80% compliance and is below the 95% compliance threshold.

As reported in the *Sixteenth Self-Assessment*, all PREA grievances related to 6.18 were accepted and processed within CIGA; however, the inmates were not notified of the investigation status within the required 15-day period. MCJ and TTCF were issued CAPs, and the grievance team received additional training on the importance of status reports to inmates.

Since the Department achieved compliance in the Third Quarter of 2024, has maintained compliance for seven years, and their failure to meet compliance in the Fourth Quarter only involved two grievances, the Panel has exercised its discretion to allow the Department to remain in Compliance with this provision.

**6.18 Status:** Compliance            **As of Date:** July 1, 2018

### 6.19 Response to Inmate Grievances

**Provision Description:** Department should respond to inmate grievances "within 15 calendar days after the submission of the grievance," absent exceptional circumstances, which must be documented.

41

*Compliance Measures Summary:* 1(d and e), 90% compliance with the first 25 grievances against staff and the first 25 grievances not against staff in which the investigation was not completed within 15 days.

As noted in the Panel's past four Reports, the purpose of this provision is to ensure inmates receive a substantive response to their grievance in a timely manner. The Department concurs they are out of compliance with this provision for this Reporting Period.

In the randomly selected month during the Third Quarter of 2024, 56% of inmate grievances were responded to within 15 days: inmate grievances against staff 20% of the time, and inmate grievances not against staff 92% of the time. In the randomly selected month during the Fourth Quarter of 2024, 39% of inmate grievances were responded to within 15 days: inmate grievances against staff 18% of the time, and inmate grievances not against staff 52% of the time. The Panel finds the Department out of compliance with this provision.

In the *Sixteenth Self-Assessment*, the Department reports it has asked the CSS team to contact the facilities and offer additional training on this issue, with a stated expectation for compliance in the Seventeenth Reporting Period.

**6.19 Status:** Out of Compliance          **As of Date:** N/A

## 6.20 Appeals of Grievances

**Provision Description:** Inmates should have 15 days from receipt of a denial of a grievance (or from release from segregations) to file an appeal of the grievance.

*Compliance Measures Summary:* 1(c), 95% compliance with the first 25 appeals of grievances determined by the Department to be untimely.

According to the Department's source documents, there were no appeals that met the criteria for this provision during the Sixteenth Reporting Period.

**6.20 Status:** Compliance          **As of Date:** July 1, 2018

# F. Communications with Inmates

## 7.2 Notification of Results

**Provision Description:** Inmate should be advised of the results of the investigation of grievances against personnel, but not any sanction imposed, within 10 days of adjudication.

*Compliance Measures Summary:* 1(f), 90% compliance with the first 25 completed grievances against staff, including the inmate notifications.

The *Sixteenth Self-Assessment* reports 100% compliance with this provision in the Third Quarter of 2024. There were 23 grievances that met the criteria for this provision, and timely notifications to the inmates were made for all of those grievances. For the Fourth Quarter of 2024, the *Sixteenth Self-Assessment* reports 88% compliance. Of the 25 grievances that met the 7.2 criteria, timely notification to the inmate occurred 100% of the time at MCJ (9 out of 9), 100% of the time at TTCF (12 out of 12), and 25% of the time at IRC (1 out of 4). The combined 45 out of 48 grievances for the Sixteenth Reporting Period results in 94% compliance, which exceeds the 90% compliance threshold.

**7.2 Status:** Compliance          **As of Date**: July 1, 2024

## 7.3 Prisoner-Staff Communications

**Provision Description:** The Department should ensure that there are adequate avenues for constructive prisoner-staff communication, such as Town Hall meetings.

> ***Compliance Measures Summary:*** Maintain logs of Town Hall meetings and report to the Monitors that each jail facility has conducted Town Hall meetings for a randomly selected month per quarter. Monitors interview inmates and staff to assess the adequacy of communications.

The *Sixteenth Self-Assessment* reports that the Department was in Compliance with Section 7.3 during the Third Quarter of 2024 and not in Compliance during the Fourth Quarter of 2024. The Department provided records from 10% of Town Hall meetings held at MCJ and TTCF during two randomly selected months in the Sixteenth Reporting Period. Town Hall meetings included special housing units as well as General Population housing units. For the Third Quarter (September) of 2024, there were 129 meetings conducted and logged between MCJ (45 meetings) and TTCF (84 meetings). For the Fourth Quarter (November) of 2024, the Department reports MCJ only conducted and logged 29 meetings. A CAP was issued where it was determined that fifteen (15) meetings had not been logged into the tracker. To prevent this issue in the future, the Department reports MCJ will conduct monthly audits.

**7.3 Status:** Out of Compliance          **As of Date:** N/A

| Grievance Provisions | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
|---|---|:---:|:---:|:---:|:---:|:---:|
| 6.1 | Separate Grievance Forms | C | C | C | 1/1/2017 | ✓ |
| 6.2 | Availabilty of Grievance Forms | X | X | X | | |
| 6.3 | Emergency Grievances Forms | C | C | C | 1/1/2017 | ✓ |
| 6.4 | Use of Force Grievances | C | C | C | 1/1/2024 | |
| 6.5 | Grievances Against Staff | C | C | C | 7/1/2023 | |
| 6.6 | Right to Appeal Form | C | C | C | 1/1/2017 | ✓ |
| 6.7 | Handling Emergency Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.8 | Notification of Non-Emergency | C | C | C | 7/1/2018 | ✓ |
| 6.9 | Grievance Coordinator Review | C | C | X | | |
| 6.10 | Collection of Grievances | C | C | X | | |
| 6.11 | Failure to Handle Grievances | C | C | C | 7/1/2022 | |
| 6.12 | Tracking Inmate Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.13 | Grievance Coordinator Tracking | C | C | C | 7/1/2018 | ✓ |
| 6.14 | Grievance Coordinator Reports | C | C | C | 7/1/2018 | ✓ |
| 6.15 | Grievance Coordinator Analysis | C | C | C | 7/1/2018 | ✓ |
| 6.16 | Centralized Grievance Unit | C | C | C | 1/17/2017 | ✓ |
| 6.17 | Use of Force Deadline | C | C | C | 10/1/2019 | ✓ |
| 6.18 | PREA Deadline | C | C | C | 7/1/2018 | ✓ |
| 6.19 | Response to Inmate Grievances | X | X | X | | |
| 6.20 | Appeals to Grievances | C | C | C | 7/1/2018 | ✓ |
| 7.1 | Conflict Resolution Meeting | C | C | C | 1/1/2017 | ✓ |
| 7.2 | Notification of Results | X | C | C | 7/1/2024 | |
| 7.3 | Prisoner-Staff Communications | C | X | X | | |
| 8.1 | Anti-Retaliation | C | C | C | 4/1/2019 | ✓ |

# VI.   Use of Restraints

## 17.1 Restraint Provisions

**Provision Description:** Custody Force Manual must include "a separate section that sets forth the general principles governing the use of restraints."

The Panel concludes that the Department included such a separate section in the Manual.

**17.1 Status:** Compliance          **As of Date:** December 1, 2015

## 17.3 Safety Chair Procedures

**Provision Description:** Requires immediate medical examinations of inmates placed in Safety Chairs with a use of force, or if the inmate struggles against the Safety Chair restraints. Section 17.3 also requires that inmates' vitals are checked every hour while in the Safety Chair.

> ***Compliance Measures Summary:*** Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex. The Monitors conduct a Vertical and Horizontal Assessment of approximately 25 incidents to determine at least 90% compliance with restraint provisions.

During the Sixteenth Reporting Period, the Department provided the Inmate Safety Chair Security Check Logs and Fixed Restraint Logs at the Downtown Jail Complex for the Third and Fourth Quarters of 2024. The Panel's auditors continue to note there is no indication that medical professionals, or any Custody personnel, are performing hourly vitals checks even though inmates are often in the safety chairs for several hours while in transport to and from court and during court proceedings. As noted in previous Panel Reports, periodic vitals checks are necessary to establish compliance even if the inmate does not struggle and force is not used to place the inmate in the Safety Chair. Out of the 23 unique safety chair records provided for the Third Quarter of 2024, the Panel's auditors noted that there were two explicit indications of a use of force to place inmates into the chairs. In both instances, the records reflected that a healthcare assessment was promptly performed.[18] Out of the 19 unique safety chair records provided for the Fourth Quarter of 2024, the Panel's auditors noted that there was one explicit indication of a use of force to place an inmate into the chair without a subsequent healthcare assessment. Due to vital checks not occurring as required, the Department remains out of Compliance with Section 17.3.

**17.3 Status:** Out of Compliance          **As of Date:** N/A

## 17.4 Safety Checks

**Provision Description:** Requires safety checks of inmates in fixed restraints every twenty minutes to verify and document the inmate is not in undue pain or that restraints are not creating injury.

> ***Compliance Measures Summary:*** Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex. The Monitors conduct a Vertical and Horizontal Assessment of approximately 25 incidents to determine at least 90% compliance with restraint provisions.

---

[18] A third record was indeterminate. Regardless, the record reflects that a healthcare assessment was promptly performed.

The Inmate Safety Chair Security Check Logs and Fixed Restraint Logs reflect that Department personnel consistently conduct safety checks on many inmates every twenty minutes, as required by Section 17.4.[19] However, six of the eight fixed restraint logs provided for the Third Quarter of 2024, and 17 of the 20 provided for the Fourth Quarter of 2024, did not explicitly document personnel verifying that the inmate was not in undue pain or that the restraints were not causing injury.[20] The records reflecting when a safety chair was not used for transportation, but rather as a means of temporary control, indicate that there were no visible signs of injury or complaint of pain. Due to the Fixed Restraint Logs not explicitly documenting whether the inmate was in undue pain or that the restraints were not causing injury, the Department remains Out of Compliance with Section 17.4.

        **17.4 Status:** Out of Compliance     **As of Date:** N/A

## 17.6 – 17.9 Multi-Point Restraints

**Provision Descriptions:** The provisions in these sections are specific to the use and application of multi-point restraints. The Department does not employ multi-point restraints and these provisions are therefore not applicable.

        **17.6 – 17.9 Status:** Not Applicable     **As of Date:** N/A

## 17.10 Involuntary Medications

**Provision Description:** The Department's Custody use of force policies should provide that medication may not be used solely for security purposes.

> *Compliance Measures Summary:* Department will provide a log documenting the administration of involuntary medications and the reason for it. Monitors will review the log and interview involved medical and mental health professionals to verify medication was not used solely for security purposes.

The Department's posted results reflect that every administration of involuntary medications was pursuant to court order and there were no instances in which medication was used solely for security purposes in the Sixteenth Reporting Period. According to the Administration of Involuntary Medication log, 123 inmates in the Third Quarter of 2024 and 131 inmates in the Fourth Quarter of 2024 received involuntary medication.

        **17.10 Status:** Compliance     **As of Date:** July 1, 2018

| Use of Restraint Provisions | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 17.1 | Restraint Provisions | C | C | C | 12/1/2015 | ✓ |
| 17.3 | Safety Chair Procedures | X | X | X | | |
| 17.4 | Safety Checks | X | X | X | | |
| 17.6 | Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.7 | Approval of Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.8 | Continued Use of Restraints | N/A | N/A | N/A | | |
| 17.9 | Supervisor Approval of Restraints | N/A | N/A | N/A | | |
| 17.10 | Involuntary Medication | C | C | C | 7/1/2018 | ✓ |

---

[19] While the use of safety chairs for inmate movement is not subject to Section 17.4, it should be noted that the Department's policy requires safety checks to be recorded every 15 minutes, which the majority of checks fall within. Based on the Department's posted documentation, all but three safety chair records provided for the Third and Fourth Quarters of 2024 are related to transportation.

[20] Unlike the Inmate Safety Chair Security Check Logs, which contain a field verifying whether or not there were "any visible signs of injury or complaint of pain caused by safety chair[,]" the Fixed Restraint Logs do not contain a similar field.

45

# VII. Early Warning System

## 19.1 Development of EWS

**Provision Description:** Develop a system to identify potentially problematic Department members based upon objective criteria, such as number of force incidents, inmate grievances, allegations of misconduct, performance reviews, and policy violations.

> ***Compliance Measure Summary:*** The system identifies potentially problematic employees upon objective criteria.

The Panel approved the Employee Review System ("ERS") in July 2018, and it was implemented by the Department as a pilot program in the Downtown Jail Complex on August 1, 2018, and in the rest of the jail facilities as of November 1, 2018.

**19.1 Status:** Compliance          **As of Date:** August 1, 2018

## 19.2 Review of EWS Reports

**Provision Description:** Compliance Lieutenants must review reports monthly to identify potentially problematic Department members and promptly notify the Unit Commander and the Assistant Sheriff for Custody Operations in writing.

> ***Compliance Measure Summary:*** Unit Commanders make notifications within ten days 90% of the time and within thirty days 95% of the time.

For the Third and Fourth Quarters of 2024, the Department's posted results indicate that the Compliance Lieutenant notified the appropriate Unit Commander and the Assistant Sheriff for Custody Operations in writing of potentially problematic employees within 10 days of receiving the monthly reports 76% and 80% of the time, and within thirty days 100% of the time. The Panel has determined the Department is out of Compliance with this provision.

**19.2 Status:** Out of Compliance          **As of Date:** N/A

## 19.3 Performance Mentoring Programs

**Provision Description:** Unit Commanders required to determine whether problematic employees should be placed on a performance mentoring program. For each potentially problematic Department member identified through the EWS, the Unit Commander must consult with the appropriate Chief and document the reasons why any problematic members are not placed on a performance mentoring program.

> ***Compliance Measure Summary:*** Chief is consulted 95% of the time to determine if a non-disciplinary performance program is appropriate. If so, specific performance metrics were in place and the reason for the decision was provided 95% of the time.

During the Third Quarter of 2024, the Department's Early Warning System (EWS) identified 13 employees as potentially problematic: two at TTCF, ten at MCJ, and one at IRC. Of those 13 employees identified, one (1) employee had three (3) uses of force in one month. There were "[n]o concerns…identified in any use of force incidents," and the Department determined that "[n]o review was necessary." The Department determined no further action was needed regarding the remaining 12 employees.

During the Fourth Quarter of 2024, the Department's EWS identified 15 employees as potentially problematic: five from TTCF, eight from MCJ, and two from IRC. Two (2) of those employees required secondary screening: One employee had three (3) uses of force in one month. The employee was recommended for training and reassignment within the unit. Another employee had five (5) use of force incidents in a 3-month period. The employee was reassigned to a position "where he is less likely to have an

46

interaction with [mental health] inmates." The Department determined no further action was needed regarding the remaining 13 employees. The Department's posted results for the Sixteenth Reporting Period reflect 100% compliance with this provision.

**19.3 Status:** Compliance                    **As of Date:** July 1, 2022

| Early Warning System Provisions | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 19.1 | Development of EWS | C | C | C | 8/1/2018 | ✓ |
| 19.2 | Review of EWS Reports | C | C | X | | |
| 19.3 | Performance Mentoring Programs | C | C | C | 7/1/2022 | |

47

# Appendix A: Compliance Chart

| Sixteenth Report Compliance Chart | | | | | | |
|---|---|---|---|---|---|---|
| **Administrative Provisions** | | Fourteenth Report | Fifteenth Report | Sixteenth Report | | |
| No. | Provision | 3Q23 - 4Q23 | 1Q24 - 2Q24 | 3Q24 - 4Q24 | AS OF | 3YR+ |
| 1.1 | Assistant Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.2 | Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.3 | Accountability | X | X | X | | |
| 1.4 | Reports to Board | C | C | C | 6/12/2018 | ✓ |
| 10.1 | Senior Manager Tours | C | C | C | 6/30/2018 | ✓ |
| 10.2 | Housing Unit Documentation | C | C | C | 1/1/2024 | |
| 18.1 | Custody-Wide Rotation Policy | C | C | C | 6/30/2018 | ✓ |
| 18.2 | Semi-Annual Rotation Audit | C | C | C | 1/1/2019 | ✓ |
| 21.1 | Transfers to Custody | C | C | C | 6/30/2018 | ✓ |
| **Use of Force Policy Provisions** | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
| 2.1 | Custody Force Manual | C | C | C | 1/1/2017 | ✓ |
| 8.2 | Complaints of Retaliation | C | C | C | 1/1/2017 | ✓ |
| 17.2 | Pregnant Inmates | C | C | C | 1/1/2017 | ✓ |
| 20.1 | Categories of Force | C | C | C | 1/1/2017 | ✓ |
| 20.2 | Reactive Force | C | C | C | 1/1/2017 | ✓ |
| **Use of Force Practice Provisions, Packet Review** | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
| 2.2 | Force Prevention Principles | 86% | 82% | 78% | | |
| 2.3 | Inmate on Inmate Violence | 98% | 92% | 93% | 1/1/2024 | |
| 2.4 | Use of Force as Discipline | 98% | 100% | 100% | 7/1/2019 | ✓ |
| 2.5 | Force on Restrained Inmates | 97% | 92% | 93% | 7/1/2023 | |
| 2.6 | Head Strikes or Kicks | 88% | 84% | 82% | | |
| 2.7 | Supervisors Called to Scene | 88% | 86% | 86% | | |
| 2.8 | Prevent Excessive Force | 100% | 100% | 100% | 1/1/2024 | |
| 2.9 | Armed Inmates | 67% | 50% | 100% | 1/1/2025 | |
| 2.10 | Authorized Weapons | 88% | 97% | 100% | 7/1/2024 | |
| 2.11 | Planned Chemical Spray | 100% | 100% | 100% | 7/1/2023 | |
| 2.12 | Chemical Spray & Tasers | 86% | 94% | 95% | 7/1/2024 | |
| 2.13 | Check of Medical Records | 83% | 100% | 100% | 7/1/2024 | |
| 4.1 | Consult Mental Health Professionals | 88% | 77% | 92% | 1/1/2025 | |
| 4.3 | Spray on Mental Health Inmates | 100% | 100% | 92% | 10/1/2019 | ✓ |
| 4.4 | Cooling Off Periods | 100% | 89% | 100% | 1/1/2023 | |
| 4.5 | Medical or Mental Health Provider Order | 100% | 91% | 100% | 1/1/2023 | |
| 9.2 | Escorting of Inmates | 88% | 88% | 88% | | |
| 9.3 | Duty to Protect & Intervene | 100% | 100% | 100% | 7/1/2022 | |
| 17.5 | Minimize Medical Distress | 51% | 64% | 75% | | |
| 20.3 | Planned Use of Force | 100% | 93% | 92% | 7/1/2023 | |

| Training Provisions | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 3.1 | Use of Force Training | C | C | C | 12/31/2021 | ✔ |
| 3.2 | Ethics & Professionalism | C | C | C | 6/30/2018 | ✔ |
| 3.3 | Custody Training | C | C | C | 6/30/2018 | ✔ |
| 3.4 | Custody-based Scenarios | C | C | C | 6/30/2018 | ✔ |
| 3.5 | Add Training and Mentoring | C | C | C | 7/1/2019 | ✔ |
| 3.6 | Probation Reviews | C | C | C | 1/1/2023 | |
| 4.6 | Crisis Intervention | C | C | C | 6/30/2018 | ✔ |
| 4.7 | Mentally Ill Inmates | C | C | C | 1/1/2023 | |
| 4.8 | Mentally Ill Inmates (new staff) | C | C | C | 6/30/2018 | ✔ |
| 4.9 | Crisis Intervention (new staff) | C | C | C | 6/30/2018 | ✔ |
| 12.1 | Force Investigations | C | C | C | 7/1/2019 | ✔ |
| Reporting & Investigations, Department Reported | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
| 5.1 | Tracking of Force Incidents | X | X | X | | |
| 8.3 | CFRC Review | C | C | C | 6/30/2021 | ✔ |
| 11.1 | CFRT Involvement | C | C | C | 6/30/2018 | ✔ |
| 13.1 | Documenting Dishonesty | C | C | C | 10/1/2019 | ✔ |
| 13.2 | Reports of Dishonesty/PREA | C | C | C | 10/1/2019 | ✔ |
| 14.1 | Review of Criminal Referrals | C | X | C | 1/1/2025 | |
| 14.2 | Timeliness of Criminal Referrals | C | C | C | 7/1/2018 | ✔ |
| Reporting & Investigations, Packet Review | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
| 4.2 | Mental Health Professionals | 100% | 92% | 100% | 1/1/2023 | |
| 5.2 | Commander's Reviews | 100% | 100% | 100% | 1/1/2023 | |
| 5.3 | Unexplained Discrepancies | 98% | 97% | 96% | 7/1/2022 | |
| 12.2 | Location of Inmate Interviews | 49% | 60% | 68% | | |
| 12.3 | Suspect Interviews | 96% | 92% | 98% | 7/1/2019 | ✔ |
| 12.4 | Uninvolved Supervisors | 98% | 96% | 100% | 7/1/2023 | |
| 12.5 | Standard Order & Format | 100% | 98% | 100% | 7/1/2019 | ✔ |
| 15.1 | Timeliness of Reports | 88% | 86% | 94% | 1/1/2025 | |
| 15.2 | All Department Witnesses | 96% | 96% | 100% | 7/1/2019 | ✔ |
| 15.3 | Force by Other Members | 90% | 90% | 92% | 1/1/2024 | |
| 15.4 | Description of Injuries | 92% | 90% | 84% | | |
| 15.5 | Clarification After Video | 100% | 94% | 94% | 7/1/2023 | |
| 15.6 | Separation of Deputies | 48% | 82% | 83% | | |
| 15.7 | Individual Perceptions | 98% | 88% | 96% | 1/1/2025 | |
| 16.1 | Healthcare Assessment | 100% | 100% | 100% | 7/1/2019 | ✔ |
| 16.2 | Photograph of Injuries | 91% | 88% | 91% | 1/1/2025 | |
| 16.3 | Medical Report of Injuries | 100% | 100% | 98% | 7/1/2019 | ✔ |

| Grievance Provisions | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
|---|---|:---:|:---:|:---:|:---:|:---:|
| 6.1 | Separate Grievance Forms | C | C | C | 1/1/2017 | ✓ |
| 6.2 | Availabilty of Grievance Forms | X | X | X | | |
| 6.3 | Emergency Grievances Forms | C | C | C | 1/1/2017 | ✓ |
| 6.4 | Use of Force Grievances | C | C | C | 1/1/2024 | |
| 6.5 | Grievances Against Staff | C | C | C | 7/1/2023 | |
| 6.6 | Right to Appeal Form | C | C | C | 1/1/2017 | ✓ |
| 6.7 | Handling Emergency Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.8 | Notification of Non-Emergency | C | C | C | 7/1/2018 | ✓ |
| 6.9 | Grievance Coordinator Review | C | C | X | | |
| 6.10 | Collection of Grievances | C | C | X | | |
| 6.11 | Failure to Handle Grievances | C | C | C | 7/1/2022 | |
| 6.12 | Tracking Inmate Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.13 | Grievance Coordinator Tracking | C | C | C | 7/1/2018 | ✓ |
| 6.14 | Grievance Coordinator Reports | C | C | C | 7/1/2018 | ✓ |
| 6.15 | Grievance Coordinator Analysis | C | C | C | 7/1/2018 | ✓ |
| 6.16 | Centralized Grievance Unit | C | C | C | 1/17/2017 | ✓ |
| 6.17 | Use of Force Deadline | C | C | C | 10/1/2019 | ✓ |
| 6.18 | PREA Deadline | C | C | C | 7/1/2018 | ✓ |
| 6.19 | Response to Inmate Grievances | X | X | X | | |
| 6.20 | Appeals to Grievances | C | C | C | 7/1/2018 | ✓ |
| 7.1 | Conflict Resolution Meeting | C | C | C | 1/1/2017 | ✓ |
| 7.2 | Notification of Results | X | C | C | 7/1/2024 | |
| 7.3 | Prisoner-Staff Communications | C | X | X | | |
| 8.1 | Anti-Retaliation | C | C | C | 4/1/2019 | ✓ |
| Use of Restraint Provisions | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
| 17.1 | Restraint Provisions | C | C | C | 12/1/2015 | ✓ |
| 17.3 | Safety Chair Procedures | X | X | X | | |
| 17.4 | Safety Checks | X | X | X | | |
| 17.6 | Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.7 | Approval of Multi-Point Restraints | N/A | N/A | N/A | | |
| 17.8 | Continued Use of Restraints | N/A | N/A | N/A | | |
| 17.9 | Supervisor Approval of Restraints | N/A | N/A | N/A | | |
| 17.10 | Involuntary Medication | C | C | C | 7/1/2018 | ✓ |
| Early Warning System Provisions | | Fourteenth Report | Fifteenth Report | Sixteenth Report | AS OF | 3YR+ |
| 19.1 | Development of EWS | C | C | C | 8/1/2018 | ✓ |
| 19.2 | Review of EWS Reports | C | C | X | | |
| 19.3 | Performance Mentoring Programs | C | C | C | 7/1/2022 | |

50