OFFICE OF COUNTY COUNSEL
Dawyn Harrison (State Bar No. 173855)
County Counsel
  *dharrison@counsel.lacounty.gov*
Amy Loeliger (State Bar No. 235498)
Deputy County Counsel
  *aloeliger@counsel.lacounty.gov*
Stephen T. Niwa (State Bar No. 231990)
  *sniwa@counsel.lacounty.gov*
500 West Temple St., Floor 6
Los Angeles, California 90012
Telephone: 213.974.1811
Facsimile: 213.687.8822

KENDALL BRILL & KELLY LLP
Robert E. Dugdale (State Bar No. 167258)
  *rdugdale@kbkfirm.com*
10100 Santa Monica Boulevard, Suite 2500
Los Angeles, CA 90067
Telephone: 310.556.2700
Facsimile: 310.556.2705

Counsel for Defendant
Robert Luna, Sheriff of
Los Angeles County, in his Official Capacity

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ALEX ROSAS and JONATHAN GOODWIN on behalf of themselves and those similarly situated,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>ROBERT LUNA, Sheriff of Los Angeles County, in his official capacity,<br><br>　　　　Defendant. | Case No. 12-cv-00428-MWF<br><br>**STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA**<br><br>Status Conference Date:　3/10/26<br>Time:　　　　　　　　3:00 pm<br>Judge:　Hon. Michael W. Fitzgerald<br>Place:　Crtrm: 5A |

**Kendall Brill & Kelly LLP**
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. A BRIEF HISTORY OF THIS LITIGATION ................................................. 3

    A.    The Sprawling Nature of the Los Angeles County Jail System ............ 3

    B.    The Complaint, Settlement Agreement, and Implementation Plan ........ 3

    C.    The Focus Placed on Curbing Head Strikes, Ensuring the Proper Use of the WRAP Restraint Device, and Increasing Accountability Within the Department Following the Panel's Tenth Report .................................................................................................. 5

III. THE SUBSTANTIAL PROGRESS THE LASD HAS ACHIEVED IN REDUCING USES OF FORCE IN THE LACJ ............................................... 7

    A.    The Dramatic Cultural Shift the LACJ System Has Undergone in the Past Ten Years Has Eliminated Legitimate Fears by LACJ Inmates That They Will Be Subject to Abuse ........................................ 7

    B.    There Has Been a Drastic Decline in the Frequency With Which Deputies Engage in Uses of Force at the LACJ Since This Litigation Commenced, Including Significant Declines in Serious Uses of Force and Uses of Force Resulting in Head Strikes ............................................................................................................ 10

    C.    Data Shows LASD Deputies Take Steps to Avoid Using Force Against Inmates in the LACJ With Much Greater Frequency Than When Deputies Actually Use Force Against Inmates ................. 14

    D.    The LASD's Current Level of Compliance With the Implementation Plan's Requirements Has Improved and Is on the Verge of Even Greater Improvement ......................................................... 15

IV. THE DEPARTMENT HAS UNDERTAKEN SIGNIFICANT REMEDIAL MEASURES FOCUSED ON LIMITING HEAD STRIKES, ENSURING THAT THE WRAP RESTRAINT SYSTEM IS SAFELY USED, AND IMPROVING ITS SYSTEM OF ACCOUNTABILITY FOR UNREASONABLE USES OF FORCE ............ 17

    A.    The Department Has Taken Actions Which Have Brought the Use of Head Strikes in the LACJ to an All-Time Low ......................... 18

    B.    The Department Has Taken Steps To Ensure Its Personnel Use The WRAP in a Manner That Does Not Jeopardize Inmate Safety .................................................................................................................. 19

    C.    The Department Has Taken a Wide Variety of Steps to Address Concerns It Does Not Hold Its Personnel Accountable for Engaging in Improper Uses of Force and Fails to Identify Violations of Department Use of Force Policies, and It Should

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

Be Provided With Time to See the Impact of These Steps..................20

**Kendall Brill & Kelly LLP**
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

ii

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

## I.   INTRODUCTION

The complaint filed in this case in 2012 painted a dire portrait of how inmates detained in the Los Angeles County Jail System (the "LACJ") were allegedly subject to "extreme and unjustified violence" routinely perpetrated by deputies with the Los Angeles County Sheriff's Department (the "LASD" or the "Department"). (Dkt. No. 1).  To the LASD's great credit, in the 14 years since these accusations were levied against then-Sheriff Leroy Baca, how force is employed by deputies working in the LACJ has shifted in such a drastic way that the "pattern and practices of deputy-on-inmate violence" that allegedly persisted for many years prior to 2012 is something that is now overwhelmingly a remnant of the past.  It is undeniable, for instance, that the type of brutal, unjustified inmate beatings alleged in the complaint have ceased; that uses of force resulting in serious injuries to inmates at the LACJ have plummeted to such a degree that they are now extremely rare occurrences; and that the culture at the LACJ, which once allegedly celebrated the use of excess force, has been replaced with a culture of service where abuses of authority like those described in the complaint are no longer countenanced.

This significant turnaround did not come about by accident.  For many years, senior LASD officials, including, in a very pronounced way, current Sheriff Robert Luna, have made it a priority to end unlawful uses of force in the LACJ and to have inmates feel safe in the Department's jail facilities; a robust staff of LASD deputies and supervisors have worked extremely hard as members of a compliance unit that implements and oversees adherence with the Settlement Agreement and Implementation Plan entered in this case; and the LASD has initiated a number of new programs, trainings, policy changes, and systematic fixes designed to prevent, discourage, detect, and punish unconstitutional uses of force in the LACJ.

These efforts have borne considerable fruit.  In this regard:

\*      Over the past 10 years, uses of force at the Inmate Reception Center

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

1

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

("IRC"), Twin Towers Correctional Facility ("TTCF"), and Men's Central Jail ("MCJ") (collectively, the "Downtown Jail Facilities")—the three LACJ facilities subject to monitoring in this case—have plummeted by **more than 50%**;

* Over this same time span, the Department has reduced Category 2 uses of force—those uses of force that result in any form of injury to an inmate or which are otherwise considered serious—by **more than half** as well;

* Over the past five years, the LASD has decreased the number of uses of force involving head strikes (punches or strikes to the head) by approximately **65%**--from 82 uses of force involving head strikes in 2021 to only 29 uses of force involving head strikes throughout 2025 at the Downtown Jail Facilities;

* In 2025 alone, the Department identified **5,716** instances when deputies utilized their training to prevent or avoid a use of force during incidents occurring at the Downtown Jail Facilities, a number of occasions that is **more than eight times greater than** the number of occasions when deputies resorted to any type of use of force against an inmate housed in the three Downtown Jail Facilities;

* In the most recent Monitoring Report issued by the three-person monitoring panel that oversees the Department's compliance with the Settlement Agreement and Implementation Plan entered in this case (the "Panel")—the Panel's Sixteenth Report covering the last two quarters of 2024—the Panel determined that the Department had achieved substantial compliance with **82 of the 100** provisions subject to monitoring, and its findings further confirm that the Department is on the cusp of reaching substantial compliance with many of the 18 outstanding provisions for which the LASD has yet to achieve substantial compliance.

* The LASD has made meaningful gains in addressing three issues that were the subject of the most recent court proceedings in this case before the Honorable Dean D. Pregerson: (1) curbing the use of head strikes; (2) ensuring the safe use of a restraint device known as the "WRAP"; and (3) improving accountability when deputies engage in force incidents that violate LASD policy.

**Kendall Brill & Kelly LLP**
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

2

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

This Status Report will (a) provide a brief history of this litigation and an explanation of the structure used to determine the LASD's compliance with the Settlement Agreement; (b) examine the significant progress that has been made in drastically reducing the number of instances when force is used in the LACJ, transforming the culture in the LACJ in a way to ensure inmates have no legitimate fear they will be subjected to unreasonable uses of force, and improving the LASD's compliance with its obligations in this case; and (c) address the remedial measures the LASD has taken in three areas of focus to meet these goals.

## II.     A BRIEF HISTORY OF THIS LITIGATION

### A.     The Sprawling Nature of the Los Angeles County Jail System

Los Angeles County has the largest jail system in the United States.  The LACJ currently houses approximately 13,000 inmates, including approximately 6,700 inmates currently detained in the Downtown Jail Facilities.  In 2025, 50,380 inmates entered the LACJ through the IRC, the LACJ's single point of entry. Approximately 49% of the inmates currently detailed in the LACJ have serious mental health issues, and approximately 53% are in custody waiting for their cases to be adjudicated (a process that, in some cases, can drag on for years).  Over 94% of the LACJ's population are either facing felony charges or are serving a sentence for a felony conviction; and well more than half of the inmates housed in the LACJ are detained based on an arrest or conviction for a crime committed against another person, such as murder, attempted murder, assault, or robbery.

### B.     The Complaint, Settlement Agreement, and Implementation Plan Governing This Case

On January 18, 2012, Plaintiffs filed the instant class action case against former Sheriff Baca and members of his top command staff, alleging they had condoned a long-standing and widespread pattern and practice of violence by LASD deputies against inmates housed in the LACJ.  (Dkt. No. 1).  The complaint alleged dozens of instances of unlawful uses of force in the LACJ, including uses of force

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

3

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

resulting in serious injuries to inmates.  In describing what was portrayed as a decades-long pattern of the LASD's use of "extreme and unjustified violence" against inmates, the complaint sought injunctive and declaratory relief on behalf of all present and future inmates of the LACJ, alleging violations of those inmates' rights under the Eighth Amendment to the United States Constitution to be free of cruel and unusual punishment, as well as pretrial detainees' rights under the Fourteenth Amendment's prohibition of punishment prior to conviction.

In May 2014, the Parties reached a settlement in this case that was ultimately approved many months later by Judge Pregerson (the "Settlement Agreement").  As a key part to that Settlement Agreement, the Parties agreed to retain a panel of three monitors—one selected by the LASD, one selected by the ACLU on behalf of the Plaintiffs, and one selected by the Court—that was given the responsibility of developing "a correction actions plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles."  The plan developed by the Panel with the input of the Parties (subsequently referred to herein as the "Implementation Plan") set forth 106 provisions the LASD must achieve substantial compliance with, as determined under compliance measures agreed to by the Parties and the Panel.  These 106 provisions fall into seven overarching categories:  (1) Administrative Provisions; (2) Use of Force Provisions; (3) Training; (4) Force Reporting and Force Investigations; (5) Inmate Grievances; (6) the Use of Restraints; and (7) the Early Warning System the LASD has put into place to identify deputies who repeatedly engage in improper uses of force.  One hundred of the 106 provisions identified in the Implementation Plan have been subject to monitoring under the life of this agreement; two others were superseded as a result of a settlement agreement reached in a separate case between the LASD and the United States Department of Justice concerning the provision of services to individuals in the LACJ facing mental health issues (the "DOJ Jails Case"); and four additional provisions in the Implementation Plan are not

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

4

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

subject to monitoring because they involve the use of multi-point restraints on an inmate and the LASD does not use multi-point restraints in the LACJ.

Under the terms of the Settlement Agreement, the Panel must "prepare and submit to the Parties and the Court periodic reports" evaluating the LASD's compliance with the provisions in the Implementation Plan. The most recent of these periodic reports was the Panel's Sixteenth Report, covering the LASD's compliance with the Implementation Plan between July 1, 2024 and December 31, 2024; and it was filed with the Court on January 23, 2026. (Dkt. No. 352).

### C. The Focus Placed on Curbing Head Strikes, Ensuring the Proper Use of the WRAP Restraint Device, and Increasing Accountability Within the Department Following the Panel's Tenth Report

In the aftermath of the Panel's Tenth Report, which covered the time period spanning January 1, 2021 to June 30, 2021, the Panel requested a status conference to discuss what it viewed as a "recent lack of progress on key issues" related to the LASD's efforts to achieve substantial compliance with the Implementation Plan. (Dkt. No. 205). The key areas the Panel identified as requiring improvement were (1) decreasing the use of head strikes (punches to the head or face) during uses of force, which is addressed in Provision 2.6 of the Implementation Plan; (2) properly using force prevention principles, which is governed by Provisions 2.2 and 2.7 of the Implementation Plan; (3) ensuring the safe use of the WRAP, a restraint device used in the LACJ that was not addressed in the Implementation Plan at the time; and (4) properly holding LASD personnel accountable for improper uses of force and failing to identify improper uses of force during force reviews. (*Id.*).

At the status conference that followed, held on May 12, 2022, the Parties discussed the Implementation Plan and how the LASD could achieve compliance with the Settlement Agreement, and the Court directed the Parties to develop and present to the Court a plan to address the areas of concern identified by the Panel. (Dkt. Nos. 214, 217). Over the course of the next three years, the Parties and the Panel met and conferred on dozens of occasions to discuss remedial measures,

**Kendall Brill
& Kelly LLP**

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

5

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

policy changes, and changes to the Implementation Plan designed to address the use of head strikes, the use of the WRAP, and the Implementation Plan's accountability provisions.  During this process, as set forth below, the LASD instituted numerous new practices, policies, and programs to improve its compliance in these areas— including new polices governing head strikes (the "Limitations on Force Policy") and the use of the WRAP that were explicitly approved by Judge Pregerson—and, as further explained below, the LASD has achieved improved compliance in these three areas as a result of these new practices, policies, and programs.

Ultimately, on November 21, 2025, the Parties submitted a Joint Stipulation and Proposed Order Regarding the Implementation Plan and Compliance Measures (the "Joint Stipulation"), which noted steps that have been taken by the LASD to address the use of head strikes, the use of the WRAP, and accountability issues. (Dkt. No. 348).  This Joint Stipulation requested that the Court enter an order (1) revising provisions of the Implementation Plan relating to Head Strikes or Kicks (Provision 2.6), Zero Tolerance for Acts of Dishonesty (Provision 13.1), Reporting Acts of Dishonesty to the Office of Inspector General (Provision 13.2), Requiring Accurate and Honest Depictions of Incidents in Force Reports (Provision 15.7), the Prohibition of the Use of Carotid Restraints/Choke Holds During Uses of Force (Provision 17.1), and the Use of the WRAP Restraint Device (Provision 17.11); and (2) moving 19 provisions in the Implementation Plan for which the LASD has achieved continuous substantial compliance for years to non-reporting status beginning in the reporting period that will be covered by the Panel's Seventeenth Report. (*Id.*).  Furthermore, the Parties agreed that the revisions to the Implementation Plan covered by the Joint Stipulation concluded the negotiations that had been ordered by Judge Pregerson to address the LASD's use of head strikes and the WRAP restraint device and also constituted "a partial resolution of negotiations about accountability." (*Id.* at ¶ 9).  Since then, following additional meet and confer sessions with the Panel and the Parties centered on steps the LASD

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

6

is currently taking to improve accountability when uses of force are unjustified, Plaintiffs have informed the LASD that—while they remained concerned about the degree to which the LASD holds its personnel accountable for uses of force that violate LASD policies—they will not be asking this Court to take any specific action on this issue before the Panel files its Eighteenth Report, in order to see if the remedial actions the LASD is taking address their concerns.

## III.    THE SUBSTANTIAL PROGRESS THE LASD HAS ACHIEVED IN REDUCING USES OF FORCE IN THE LACJ

Before addressing how the remedial actions the LASD has taken to address the specific subjects that have occupied the Parties' attention over the past few years, it is important not to lose the forest through the trees.  Any objective review of the LASD's performance in this case should lead to the conclusion that the Downtown Jail Facilities have undergone a transformational reform since this case was filed, particularly under the leadership of Sheriff Luna, who has made it a priority to curb violence in the LACJ and move the LASD closer to compliance in this case.  This is proven by, among other things:  (1) the dramatically transformed culture at the Downtown Jail Facilities; (2) unimpeachable data showing that uses of force against inmates—including head strikes—have dramatically plummeted and now sit at historical lows; (3) further data that proves that deputies working in the Downtown Jail Facilities, relying on the training they have received and operating in the culture described above, take steps to avoid potential uses of force with far more frequency than they use force; and (4) the LASD's improved compliance in reaching the lofty goals set forth in the Implementation Plan.

### A.    The Dramatic Cultural Shift the LACJ System Has Undergone in the Past Ten Years Has Eliminated Legitimate Fears by LACJ Inmates That They Will Be Subject to Abuse

In the aftermath of the Settlement Agreement—and in some cases even before it was executed—the LASD implemented a number of significant structural reforms aimed at curbing uses of force in the LACJ, including:

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

\* The wholesale turnover of the Downtown Jail Facilities' leadership team, which commenced with the prosecutions of former Sheriff LeRoy Baca, former Undersheriff Paul Tanaka, and several deputies accused of violating inmates' civil rights at the Downtown Jail Facilities;

\* The creation of a robust compliance team exclusively dedicated to working to move the Department toward compliance in this case;

\* The wholesale revision of the use of force policies that apply to LASD's Custody Division personnel;

\* Providing extensive, Panel-approved training on use of force and force avoidance principles to all LASD staff who worked in the LACJ at the time of the Settlement Agreement and to all new LASD staff once they begin working in the LACJ, as well as adding new training modules taught at the LASD Academy which focus on subjects relevant to working in a custodial environment;

\* The creation and involvement of new institutional bodies with direct oversight of the Downtown Jail Facilities and the conduct of the LASD deputies who work inside the LACJ system, including the Custody Compliance Sustainability Bureau, the Office of Inspector General, and the Civilian Oversight Commission, as well as the operation of the Citizen's Commission on Jail Violence, which was only newly in existence when Plaintiffs filed the instant lawsuit;

\* The settlement of the DOJ Jails Case, a case which has resulted in sweeping changes to the treatment of LACJ inmates with mental health issues, and which incorporates the entirety of the use-of-force provisions in this case to apply them to LACJ facilities apart from the Downtown Jail Facilities; and

\* The installation of virtual wall-to-wall video surveillance throughout the LACJ, including the Downtown Jail Facilities, an antiseptic measure long sought by those seeking reform in the jails, including Plaintiffs' counsel.

These reforms, and many other steps taken by the LASD to change how uses of force against inmates are perceived, documented, regulated, and properly carried

**Kendall Brill & Kelly LLP**
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

8

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

out have contributed to a seismic change in the culture that currently exists in the LACJ system when compared to the time period captured by Plaintiff's complaint. This fact has been recognized for some time by the Panel, including the Plaintiffs' Monitor on the Panel. For instance, as long ago as November 16, 2021, the Panel appeared in a public meeting before the Los Angeles County Board of Supervisors, and Plaintiffs' Monitor at the time—Jeffrey Swartz—made the following remarks:

> The situation in 2008 to '11, then with the appointment of C.C.J.V. [the Citizen's Commission on Jail Violence], was truly terrible in the jails. Rather quickly, in the next couple of years, we found the beatings stopped. The situation with a bunch of deputies standing ground and beating an inmate or kicking an inmate—well documented, they have been gone since then. We have been very pleased. There has been no re-occurrence of those kinds of egregious situations. Second, and I think equally important, very quickly, in the first couple of years of monitoring, the Downtown Jails changed from anti-inmate enforcement oriented to a much more professional service oriented culture. That has also been maintained, and that is hugely important. I cannot tell you how many inmates, as we walk through the jail four times a year until COVID, said to us "What's changed? I've been here five times, and this time they are not beating the crap out of us," or something like that. Sometimes more colorful, but the inmates knew immediately about the change in the staff and the culture.

LA County Bd. of Supervisors Meeting (11/16/21); Tr. At 178:14-179:7 (available at http://file.lacounty/gov/SDSinter/bos/sop/transcripts/1115714_111621.pdf.)

Inmates at the LACJ—who are interviewed by the Panel as part of "focus groups" the Panel conducts when preparing its Monitoring Reports—have echoed this sentiment for years, with the majority of inmates repeatedly telling the Panel they are not concerned about being subjected to excessive force by LASD staff. *See e.g.*, Panel's Thirteenth Report, dated May 21, 2024, at p. 7 (Dkt. No. 316); Panel's Twelfth Report, dated October 20, 2023, at p. 6 (Dkt. No. 286); Panel's Eleventh Report, dated March 8, 2023, at p. 6. (Dkt. No. 238).

In short, there is (or at least should be) complete unanimity on the position that the LASD has done an admirable job creating a culture in the LACJ that discourages bad practices when it comes to uses of force against inmates; and, while there certainly is additional work that needs to be done to improve the LASD's

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429                                          9

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

compliance with certain aspects of Implementation Plan, the tableau painted in the complaint filed in this case of a system where acts of extreme violence directed toward inmates was both rampant and tolerated does not remotely reflect current conditions in the Downtown Jail Facilities or elsewhere in the LACJ system.[1]

**B.    There Has Been a Drastic Decline in the Frequency With Which Deputies Engage in Uses of Force at the LACJ Since This Litigation Commenced, Including Significant Declines in Serious Uses of Force and Uses of Force Resulting in Head Strikes**

The wide array of actions the LASD has taken to curb uses of force in the LACJ system has not only created an atmosphere in the Downtown Jail Facilities that is far different than that faced by inmates a decade ago, these actions have materially decreased instances when force is used against inmates in those facilities. In this regard, while the Panel's reports may show small and temporary fluctuations in the number of use of force incidents occurring in the Downtown Jail Facilities from quarter to quarter, there are three undeniable trends that the data capturing uses of force at these facilities shows.

---

[1] One key indicia of this drastic culture change is the transparency the LASD currently subjects its staff to when it comes to uses of force. In 2011, former Sheriff LeRoy Baca engaged in a scheme to threaten an FBI Special Agent with arrest upon discovering the FBI had been conducting an investigation into deputy-on-inmate abuses occurring in the Downtown Jail Facilities that involved an effort to document civil rights abuses using a cell phone camera smuggled into MCJ. In contrast to this conduct, which led to former Sheriff Baca's criminal conviction, over 2,000 closed circuit television cameras were installed in the LACJ after this lawsuit was filed to provide extensive video coverage of interactions between inmates and staff inside the LACJ. As explained below, this effort to provide transparency when it has come to documenting uses of force inside the LACJ has recently taken an even greater step forward, with the widespread rollout of the use of body worn cameras ("BWCs") inside the LACJ, a rollout that is being embraced by both LACJ staff and inmates. Panel's Sixteenth Report, dated January 23, 2026, at p. 6 (Dkt. No. 352).

**Kendall Brill & Kelly LLP**
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

10

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

First, in the past 10 years, spanning 2016 to 2025, the LASD has reduced the total number of uses of force occurring in the Downtown Jail Facilities by more than half.  As shown in the chart below, there were 1,508 uses of force that occurred in the Downtown Jail Facilities in 2016, and only 684 uses of force 10 years later in 2025.  The 684 uses of force that occurred in the Downtown Jail Facilities in 2025 not only represents a 55% drop in the number of uses of force that occurred in 2016; it marks the lowest number of force incidents reported in a single calendar year since this case began, including during years when the inmate population at the Downtown Jail Facilities was much smaller than the current population and years when inmates were largely restricted to their cells during the COVID-19 pandemic.[2]

---

[2]  To put these force statistics in their proper perspective, the Court can compare the number of times that force is employed in the Downtown Jail Facilities with the number of times that force has been employed at the closest custody analogue to these facilities—the Rikers Island Jail Complex run by the New York City of Department of Corrections ("NYCDOC").  As of March 1, 2025, Rikers Island housed 6,837 inmates, while the average population at the Downtown Jail Facilities in 2025 was 6,723 inmates.  The New York City Comptroller has reported that 1,691 incidents involving the use of force occurred at Rikers Island during the first quarter of 2025 alone.  *See* http://comptroller.nyc.gov/newsroom/doc-dashboard-updated-nyc-comptroller-releases-new-monthly-data-on-department-of-correction-2?#:~:text=53%20assults%20on%20staff%2C%2032,York%20City%20Comptroller%20Brad%20Lander.  As noted, above, during the entirety of 2025, there were only 684 incidents involving the use of force that occurred at the Downtown Jail Facilities.  **Accordingly, the total number of uses of force that occurred in the Downtown Jail Facilities during all of 2025 constituted only 40% of the total number of uses of force that occurred at Rikers Island during the first three months of 2025 alone.**

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

11

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA



**Basin Use of Force Incident Totals**

☐ CATEGORY NCI    ☐ CATEGORY I    ☐ CATEGORY II    ☐ CATEGORY III

Notes:
Basin facilities are Twin Towers Correctional Facility (TTCF), Men's Central Jail (MCJ) and Inmate Reception Center (IRC)
Non-Categorized Incidents (NCI) was implemented on October 1, 2017

Second, the dramatic decline in the overall number of times when uses of force have been employed in the Downtown Jail Facilities in the past 10 years has coincided with a massive decrease in the most serious uses of force against inmates. Category 2 uses of force—defined by the Department to include (a) all face, head, or neck strikes or punches with hands or fists; (b) any use of force that results in any identifiable injury; or (c) any use of force that results in a complaint of pain that a medical evaluation later determines is attributable to an identifiable injury—are generally the most serious uses of force that occur in the LACJ.[3]   As shown in the

---

[3]   Category 3 uses of force—which involve (a) uses of force that result in admission to a hospital; (b) uses of force that result in serious bodily injury, skeletal fractures, or death; and (c) uses of force that involve face, head, or neck strikes with an impact weapon or other object; kicks or knees to a person's face, head, or neck; or strikes to a person's face, head, or nagainst or with a hard object—are more serious uses of force than Category 2 uses of force.  However, while the Complaint alleges such uses of force were commonplace in the LACJ system prior to 2012, only a de minimus number of Category 3 uses of force occur in the Downtown Jail Facilities each year.  Indeed, there were only five such uses of force that occurred throughout the entirety of 2025, a year that saw 50,380 inmates cycle into the Downtown Jail Facilities.

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

12

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

chart below, there were only 104 Category 2 uses of force that occurred in the Downtown Jail Facilities in 2025, as compared to 255 such uses of force that occurred in the Downtown Jail Facilities in 2016.  With this 60% reduction in Category 2 uses of forces at the Downtown Jail Facilities over the past ten years, in 2025 the Department achieved the lowest number of uses of force resulting in any injury since the Department has been subject to monitoring in this case.[4]

Basin Category II Use of Force Incidents

| 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|------|------|------|------|------|------|------|------|------|------|
| 255  | 243  | 275  | 308  | 172  | 263  | 169  | 118  | 119  | 104  |

Finally, as recently recognized by the Panel, the Department has "maintained a significant downward trend in head strikes since 2021" (Panel's Sixteenth Report, dated January 23, 2026, at p. 4 (Dkt. 352)), and, in doing so, has effectively responded to one of the core issues that reignited this litigation back in 2022.  As shown in the chart below, in the aftermath of a series of corrective actions described below designed to limit the frequency with which head strikes are used during uses of force, the Department has slashed the total number of head strikes at the Downtown Jail Facilities by approximately 65% since 2021—reducing the total number of head strikes from 82 in 2021 to only 29 in 2025.  Furthermore, the 29

---

[4]  Notably, Category 2 uses of force only comprise a small percentage of force incidents that occur in the LACJ.  Category 1 uses of force—which are significantly lower level uses of force, such as takedowns that do not result in any injury—occur with greater frequency.  Indeed, Category 2 uses of force amounted to only 15% of the uses of force that occurred in the Downtown Jail Facilities in 2025.

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

13

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

instances when head strikes occurred in 2025 not only represents a small percentage of uses of force where head strikes were used (only 4.2%); they also represent the lowest number of force incidents involving head strikes since the LASD began closely tracking head strikes several years ago.

### C.   Data Shows LASD Deputies Take Steps to Avoid Using Force Against Inmates in the LACJ With Much Greater Frequency Than When Deputies Actually Use Force Against Inmates

In addition to data confirming that the Department is using force against inmates housed in LACJ far less frequently than when this case was initiated, data also shows—consistent with the culture change discussed above—that LASD deputies are engaging in behaviors that prevent uses of force many times more often than they employ uses of force.

As defined by the LASD Custody Division Manual, a "prevented use of force" occurs any time personnel are able to employ effective de-escalation techniques in order to gain compliance from inmates deemed recalcitrant or who are the subject of an inmate extraction or other planned use of force." *See* Custody Division Manual:  7-02/025.00.  Over the past five years, the LASD has directed its custody supervisors to document each occasion when deputies successfully de-escalate an incident and avoid a potential use of force; and these incidents are now tracked electronically by the LASD.  Through this system—which likely underreports the number of times custody personnel engage in behaviors that prevent uses of force—the Department can show its deputies engaged in **over 25,000 instances** in which they acted to prevent a use of force between 2021 and 2025 at the Downtown Jail Facilities, with **5,716** such cases occurring in 2025 alone. This means that, for every use of force that occurred in the Downtown Jail Facilities in 2025, there were approximately 8½ occasions when a potential use of force was avoided due to the actions of LASD deputies.  This staggering figure further demonstrates the drastic shift that has occurred in the LACJ system from a time

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

14

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

period when deputies allegedly initiated uses of force for unjustified reasons (or no reason at all) to the present day, when deputies, relying on their training, are habitually employing tactics designed to de-escalate potentially violent encounters with inmates and avoid uses of force altogether.

**D.    The LASD's Current Level of Compliance With the Implementation Plan's Requirements Has Improved and Is on the Verge of Even Greater Improvement**

The significant improvement the Department has achieved over the past 10 years related to how it has addressed uses of force against the inmates in its custody is also reflected in the improvements the Department has shown in reaching substantial compliance with a meaningful majority of the stringent requirements set forth in the Implementation Plan. As explained above, there are currently 100 separate provisions, spanning seven different categories, that the Panel assesses for compliance under compliance measures negotiated by the Parties and the Panel. As of the time period covered by the Panel's most recent monitoring report (July 1, 2024 to December 31, 2024), the Panel determined that the Department had achieved substantial compliance with **82 of these 100** provisions, including 100% of the Training Provisions (11 out of 11), 89% of the Administrative Provisions (8 out of 9), 83% of the Investigations & Reporting Provisions (20 our of 24), and 80% of the Use of Force Provisions (20 out of 25).[5] (Dkt. No. 352).

---

[5] While these compliance results related to the Investigations & Reporting Provisions and Use of Force Provisions may not appear to be overly impressive on their face, it is important to understand the methodology the Panel uses to compute them. To determine compliance for the Use of Force Provisions and the Investigations & Reporting Provisions, the Panel reviews 25 use of force incidents for each of the two quarters that comprise the reporting period covered by each of the Panel's Monitoring Reports. Significantly, these cases subject to the Panel's review are not randomly selected. Instead, to access the Department's compliance with the Implementation Plan's Use of Force Provisions and Investigation & Reporting Provisions, the Panel reviews 25 cases each quarter which represent some

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

15

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

In addition, it is notable that, in the case of 18 of the 100 provisions for which the LASD did not achieve substantial compliance during the Sixteenth Reporting Period, the LASD is near or trending toward compliance with many of these provisions. For instance, in the case of the five use of force provisions for which the LASD did not meet the 90% threshold required to achieve substantial compliance, the LASD's compliance scores ranged from 75% to 88%; and in the case of three of these provisions, the LASD missed achieving substantial compliance due to judgment calls made regarding how force was used in four, and in some cases two, of the 50 cases the Panel reviewed. Similarly, in the case of three of the four Investigative & Reporting Provisions for which the LASD did not meet the required 90% substantial compliance threshold, the LASD was one case short of reaching substantial compliance for one provision (Provision 5.1 – Tracking of Force Incidents), three cases away from reaching substantial compliance for another (Provision 15.4 – Description of Injuries), and four cases away from reaching substantial compliance for a third (Provision 15.6 – Separation of Deputies). In addition, during this reporting period, the LASD fell out of compliance with three other provisions for which it had previously achieved substantial compliance for one

---

of the most difficult situations deputies face when determining whether or not to use force and uses of force that appear questionable on their face based on various red flags. (For instance, the Panel selects cases for review by scanning Department records for use of force reports containing key terms such as "head strikes," "tasers," and other terms indicating a serious use of force was employed.) As a result of using this methodology, the Panel's assessments as to how force is employed in the LACJ are not an accurate portrayal of a typical use of force incident in the Downtown Jail Facilities, as the overwhelming majority of uses of force at those facilities do not involve head strikes, weapons, or serious uses of force. Moreover, by confining its review to the "tough" use of force cases that appear to be problematic on their face and involve only the most serious uses of force, the Panel has set up a system in which it is particularly challenging for the LASD to achieve substantial compliance, especially when it comes to the extremely high compliance thresholds it must meet in order to reach that mark.

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

16

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

year or more—Provision 6.9 (which addresses the review of inmate grievances by a Grievance Coordinator), Provision 6.10 (which addresses the collection of inmate grievances), and Provision 19.2 (which addresses the review of Early Warning System reports). In each of these cases, the LASD addressed the issues that caused these provisions to fall temporarily below a rating of substantial compliance.

Finally, it is notable that the LASD has been in substantial compliance for **years** with a sizeable majority of the 82 provisions the Panel graded as being in substantial compliance during the Sixteenth Reporting Period. Indeed, the LASD has been in sustained substantial compliance with 48 of these 82 provisions since **at least 2019.** Accordingly, the LASD has not only achieved the high bar needed to reach substantial compliance with a sizeable majority of the provisions of the Implementation Plan, it has done so through changes in practices and processes that have achieved lasting improvements in many areas.[6]

## IV.   THE DEPARTMENT HAS UNDERTAKEN SIGNIFICANT REMEDIAL MEASURES FOCUSED ON LIMITING HEAD STRIKES, ENSURING THAT THE WRAP RESTRAINT SYSTEM IS SAFELY USED, AND IMPROVING ITS SYSTEM OF ACCOUNTABILITY FOR UNREASONABLE USES OF FORCE

As noted above, over the past few years, the Department has placed a significant focus on three specific areas that have been the subject of considerable collaboration with the Panel and Plaintiffs' counsel: (1) decreasing the use of head

---

[6] The fact the LASD has reduced uses of force in the ways described above and improved its performance in this case is particularly impressive given the headwinds the LASD currently faces, which include a rising jail population that is well stocked with violent offenders; increases in the percentage of inmates in the LACJ who suffer from serious mental health issues; the requirement that deputies must execute the forced movement of inmates with increasing frequency, particularly inmates with serious mental health issues, to meet the housing requirements mandated in the DOJ Jails Case; the significant turnover of staff in the Downtown Jail Facilities, and the Custody Division in general, which leads to training and unit cohesion challenges; and the overall staffing shortages within the LASD.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

17

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

strikes; (2) ensuring that deputies safely use the WRAP device to restrain inmates who pose a danger to themselves or others during or following a use of force; and (3) enhancing accountability within the Department.  The Department has implemented a number of remedial actions to address each of these issues, and these remedial actions have led to marked improvements in each of these areas.

### A. The Department Has Taken Actions Which Have Brought the Use of Head Strikes in the LACJ to an All-Time Low

Since the overuse of head strikes was raised as a concern by the Panel in the Panel's Tenth Report issued almost four years ago, the Department has implemented numerous measures to curb the use of head strikes during uses of force.  In this regard, the Department has taken the following actions, among others:

\* The LASD has refined its use of force policies on several occasions since 2022 to restrict the use of head strikes, culminating in a Limitations on Force policy approved by Judge Pregerson on July 3, 2024, and finalized and implemented by the LASD on September 1, 2024, that clearly defines the circumstances when head strikes and other uses of force that pose a threat of injury may be employed;

\* The LASD has trained custodial staff working in the LACJ system in a manner consistent with this new Limitations on Force policy;

\* The LASD has implemented a "head strike tracker," which is reviewed regularly by the LACJ command staff in order to identify the frequency and locations where head strikes occur in the LACJ so the LASD can spot and address trends involving the use of head strikes;

\* The LASD has implemented safeguards that ensure an inmate receives prompt medical attention every time a head strike occurs during a use of force;

\* The LASD has changed its force reporting requirements to require deputies to explain whether any head strike administered during a use of force did or did not meet the requirements of the Limitations on Force policy; and

\* The LASD has mandated that all uses of force involving head strikes

**Kendall Brill & Kelly LLP**
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

18

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

undergo the enhanced review provided by a Custody Force Investigation Team ("CFIT"), a group of LASD personnel handpicked because of their experience and training to work exclusively on investigations involving serious uses of force that occur in the LACJ, including all Category 2 uses of force.

As noted above, the number of head strikes that have occurred during uses of force taking place in the Downtown Jail Facilities has precipitously dropped since these actions were taken. While the LASD is pleased with this fact, it recognizes that continued diligence will be required to curb the use of head strikes and to ensure that, when they are employed, their use aligns with the Limitations on Force policy. Accordingly, while Plaintiffs have agreed to withdraw the portion of a motion they have previously filed in this case to modify portions of the Implementation Plan related to use of head strikes at the Downtown Jail Facilities, the LASD's work on this issue continues.

**B.    The Department Has Taken Steps To Ensure Its Personnel Use The WRAP in a Manner That Does Not Jeopardize Inmate Safety**

The WRAP is a security restraint device, which consists of three components: a three-inch-wide ankle strap, a leg restraint, and a locking shoulder harness. It has been used at the LACJ as an approved restraint device since 2017 in order to <u>prevent</u> escalations of force by incapacitating inmates who pose an immediate threat to themselves or others. Using the WRAP is widely accepted as a safe and effective way to restrain individuals who pose a risk of harm to themselves or others, as evidenced by the fact that more than 2,000 federal, state, and local law enforcement agencies utilize it; and not one inmate has been injured due to the manner the LASD has used the WRAP in the more than eight years it has been deployed at the LACJ.

Despite of these facts, when the Plaintiffs and the Panel expressed concerns in 2022 that the misuse or overuse of the WRAP could be posing a risk to inmates, the LASD went to work to address those concerns by crafting a new policy governing the use of the WRAP which strictly limits its use and implements a series of clearly-

Kendall Brill & Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

19

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

defined measures to ensure, to the greatest extent possible, that the WRAP is used safely. This policy ultimately morphed into a policy that included significant input from Plaintiffs' counsel and the Panel; it was ultimately approved by Judge Pregerson; and it was finalized and made effective within the Custody Division of the LASD on September 1, 2024.[7] As a result of these steps to limit the use of the WRAP and to ensure it is used safely by LASD deputies inside the LACJ, Plaintiffs have agreed to withdraw the portion of a prior motion they filed to modify the Implementation Plan insofar as it concerns the WRAP.

### C. The Department Has Taken a Wide Variety of Steps to Address Concerns It Does Not Hold Its Personnel Accountable for Engaging in Improper Uses of Force and Fails to Identify Violations of Department Use of Force Policies, and It Should Be Provided With Time to See the Impact of These Steps

A final area of focus the Panel and Plaintiffs have identified as one that the Department must address in order to achieve substantial compliance with the totality of the Implementation Plan is one Judge Pregerson predicted would be the most difficult hurdle for the LASD (or any organization in its position) to clear: developing an effective system of accountability to address occasions when custody personnel engage in impermissible uses of force. To address this specific concern, the LASD has taken a number of significant steps aimed at improving accountability for conduct that does not live up to the Department's ideals.

First, the LASD has taken a significant step to provide improved transparency when it comes to accurately documenting what occurs during uses of force inside

---

[7] Among other things, this comprehensive, court-approved policy provides that the WRAP may only be used on inmates who pose an immediate threat to themselves or others, that its use can only be authorized by certain supervisors, that an inmate may only be placed in the WRAP for a prescribed amount of time, that inmates placed in the WRAP must be subject to frequent safety checks and monitored to ensure their placement in the WRAP does not put them in medical distress, and that detailed information concerning the use of the WRAP on any inmate must be documented in a "WRAP Restraint Security Check Log" maintained by the LASD.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

the LACJ by equipping deputies who work inside the jails with BWCs. As a culmination of a costly and years-long effort that involved a complete upgrade to the LASD's data storage infrastructure, the LASD began rolling out the use of BWCs in the LACJ on October 1, 2025. Since that time, the LASD's Body Worn Camera Unit has trained 2,072 LASD personnel who work in the LACJ on the proper use of BWCs and has deployed BWCs to those trained deputies. The LASD fully expects that the use of BWCs within the LACJ will enhance accountability by providing clearer evidence surrounding use of force incidents than previously existed. It also anticipates that the presence of BWCs will have a positive impact on further lowering the number of force incidents throughout the LACJ. Indeed, there is already some evidence that has occurred, as the Department achieved a 19% reduction in the uses of force throughout the entirety of the Custody Division between October 2025 and January 2026, as compared with this same four month period between October 2024 and January 2025.[8]

Second, as referenced above, on September 1, 2024, the Department, after working collaboratively with Plaintiffs' counsel and the Panel for months, finalized and instituted important court-approved revisions to the LASD's Limitations on Force Policy and a new policy governing the use of the WRAP. These new policies—which all custodial personnel working in the LACJ have now been trained to follow—were designed, among other things, to limit the use of head strikes and potentially dangerous uses of the WRAP and to provide clearer guidance to deputies regarding when the use of a head strike is permissible and when it is not. These new policies have already resulted in a reduction in the use of head strikes and the use of

---

[8] Specifically, while there were 351 separate uses of force throughout the entire Custody Division between October 1, 2024 and January 31, 2025, there were only 286 separate uses of force between October 1, 2025 (when the deployment of BWCs inside the LACJ started) and January 31, 2026.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

21

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

the WRAP; and, more importantly, as discussed below, the new Limitations on Force Policy, and the clarity it provides, appears to have already had a dramatic impact on curbing improper uses of head strikes in the Downtown Jail Facilities.

Third, the LASD significantly revamped to its force review system in an effort to ensure increased accountability in cases where Department personnel violate use of force polices through the creation and subsequent build up of the CFIT, a group of handpicked LASD personnel specifically trained for and tasked with investigating all Category 2 uses of force, including uses of force involving head strikes or the use of personal weapons, or resulting in any significant injury. Prior to the creation of the CFIT, LASD Sergeants working in the jails investigated Category 2 uses of force.  Given the many other responsibilities these supervisors already had, this system led to concerns that force reviews were taking too long to complete and were not being addressed with the thoroughness required.  The CFIT's creation was sparked by the LASD's desire to professionalize its force review practices by having the most serious uses of force in the LACJ reviewed by an independent team exclusively dedicated to that task; to eliminate the possibility Sergeants reviewing the work of those under their command could be accused of "cronyism," which could undermine the legitimacy of the LASD's force reviews; to accelerate the process of reviewing uses of force; and to standardize how force incidents are reported and reviewed.  Recently, in response to questions the Panel has posed regarding the CFIT's operations, the LASD conducted a comprehensive review of its force review processes, identified points of friction that could impact the timeliness and thoroughness of force reviews, and implemented a series of corrective measures aimed at improving the operation of the CFIT.  These corrective actions have included, among other things, memorializing the CFIT's function and processes in Unit Orders; designing and implementing a new "eForce" system, which tracks uses of force and force investigations through the review process; and instituting a requirement that CFIT Sergeants must personally respond to all

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

22

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

Category 2 force incidents to ensure documentation related to such uses of force is gathered promptly and to assist with the review and approval of that documentation.

Finally, working in collaboration with the Panel and Plaintiffs' counsel, the LASD has agreed to revise the Implementation Plan and its associated compliance measures in ways that will increase the reporting and oversight relevant to their accountability concerns.  These revisions are designed to ensure that the LASD has a "zero tolerance policy" when it comes to acts of dishonesty associated with force reporting (Provision 13.1), that violations of Provision 13.1 trigger reporting to the Office of Inspector General (Provision 13.2), and that accurate and honest depictions of incidents are included in force reports (Probation 15.7).

There is evidence these corrective actions have already had a positive impact on improving accountability within the LASD.  For instance, even though the Panel's Sixteenth Report largely covers reviews of force incidents that took place before many of these corrective actions were even implemented, the Panel noted that it "has seen positive progress from the Department leaders identifying force violations and opening administrative investigations for those violations" and further that "the gap between what the Panel finds out of compliance and what the Department finds out of compliance is narrowing."  *See* Panel Sixteenth Report, dated 1/23/26, at p. 5-6 (Dkt. No. 352).  Indeed, while Plaintiffs' counsel have previously complained that the LASD's force reviews "never" find head strikes by deputies out of compliance and that there is a monumental gulf between the number of instances when the Panel finds uses of force from its hand-picked group of potentially problematic cases out of compliance and the LASD's findings concerning those same cases, the Panel's Sixteenth Report, while still critical of the LASD's system of holding deputies accountable for impermissible uses of force,

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

23

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

shows clear improvement in both of these areas.[9]

In any event, the LASD believes it should be provided with a reasonable period of time to gauge the impact of the steps it has taken to improve accountability within its ranks—as many of them are of very recent vintage—before any aspect of the Implementation Plan is further modified related to this issue.[10]  Plaintiffs' counsel have informed LASD's counsel they "reluctantly agree" with this approach, and have indicated they will not be asking this Court to take any specific actions at this time—at least until the filing of the Panel's Eighteenth Report—so they can also see how these changes impact the process of holding deputies accountable if they

---

[9]  In this regard, the Panel's Sixteenth Report addresses how the Panel reviewed 19 cases from its handpicked group of potentially problematic cases that involved Department personnel using head strikes and concluded that the deputies' actions in 10 of these 19 cases were consistent with head strikes that were permissible under Provision 2.6 of the Implementation Plan.  Of these nine remaining cases, the LASD agreed with the Panel that there either was, or may be, a policy violation in five of those cases, and it disagreed with the Panel with regard to only four cases by determining that the use of force employed was reasonable and within LASD policy. *Id.*  That the LASD might have a disagreement with the Panel about the propensity of the force used in four cases does not constitute a monumental gap in how the LASD is presently assessing uses of force, as opposed to how the Panel has exercised its judgment on this issue.

[10]  Early indications are that these steps taken by the LASD have yielded favorable results.  Recently, the Panel provided the Parties with the "use of force matrix" it uses to access compliance with the Implementation Plan's use of force provisions as applied to the 25 handpicked cases the Panel is analyzing for the Second Quarter of 2025.  This matrix indicates that, in <u>every one</u> of the 25 handpicked uses of force packages it reviewed, the Panel determined that every head strike it examined was compliant with the requirements of Provision 2.6 and thus the LASD's Limitations on Force Policy.  This determination shows that the LASD is effectively minimizing (and in this case eliminating) the use of head strikes that are inconsistent with LASD policy, and it further assures that for this quarter of cases reviewed by the Panel there will be no gap at all between how the Panel views the appropriateness of the head strikes it reviewed and how the LASD views them.

---

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429                                        24

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA

engage in unreasonable uses of force.  The LASD believes that the clearer force policies that have been put into place, the improvements that are being made to enhance the use of the CFIT, the increased clarity BWCs will provide when force incidents occur in the LACJ, and the agreed-upon changes to the accountability provisions in the Implementation Plan will yield further substantial improvement on this front; and with the détente reached with Plaintiff's counsel on this issue, the LASD will continue to strive toward improvement when it comes to addressing the Panel's and Plaintiff's concerns related to accountability.

DATED:  March 5, 2026                     KENDALL BRILL & KELLY LLP

                                By:        /s/ Robert E. Dugdale
                                           Robert E. Dugdale
                                           Attorneys for Defendant
                                           Sheriff Robert Luna

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604490429

25

STATUS REPORT FILED ON BEHALF OF LOS ANGELES COUNTY SHERIFF ROBERT LUNA