Kathleen M. Kenney
343 Sweet Grass Way
Richmond, KY 40475
Email: kkenney@federalcourtmonitor.com

**Monitor and on behalf of Monitors**
**Robert Houston and Nicholas E. Mitchell**

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

ALEX ROSAS, et al.,
Plaintiffs,
v.

LOS ANGELES COUNTY SHERIFF ROBERT LUNA, in his official capacity,

Defendant.

Case No. 12-cv-00428-MWF (MRW)

**PANEL'S SEVENTEENTH REPORT**

Hon. Michael W. Fitzgerald
United States District Judge

Pursuant to Section V of the Settlement Agreement and Release of Claims, the Monitors appointed by this Court, Robert Houston, Nicholas E. Mitchell, and Kathleen Kenney (collectively, the "Panel") hereby submit the attached Panel's Seventeenth Report evaluating Defendant's compliance with the Action Plan for the six-month period from January 1, 2025 to June 30, 2025. This Report takes into consideration the comments from the parties in accordance with Section V of the Settlement Agreement. The Panel is available to answer any questions the Court may have regarding this Report at such times as are convenient for the Court and the parties.

DATED: September 8, 2026

Respectfully Submitted,

KATHLEEN M. KENNEY

By: /S/ Kathleen M. Kenney
Monitor and on behalf of Monitors
Robert Houston and
Nicholas E. Michell

# PANEL'S SEVENTEENTH REPORT

**Table of Contents**


Panel's Seventeenth Report 2

Action Plan Implementation Assessment 10

**I. Administrative Provisions 10**

A. Leadership and Accountability 10

B. Management Visits 15

C. Rotations and Transfers 16

**II. Use of Force Policies and Practices 18**

A. Overall Use of Force Policies 18

B. Use of Force Practices & Review of Force Packages 18

C. Quarterly Findings—Use of Force Provisions 23

**III. Training 27**

A. Use of Force Training 27

B. Ethics and Professionalism Training 27

C. Mental Health Training 28

D. New Deputy Sheriffs and Custody Assistants 28

E. Sergeant Training 29

**IV. Reporting and Investigation of Force Incidents 30**

A. Reporting and Investigation Provisions in Force Package Reviews 30

B. Reporting & Investigations Provisions as Reported by Department 33

C. Quarterly Findings—Reporting and Investigations Provisions 36

**V. Inmate Grievances 38**

A. Grievance Forms 38

B. Emergency Grievances 39

C. Inmate Grievance Coordinator 40

D. Handling of Grievances 41

E. Deadlines 43

F. Communications with Inmates 44

**VI. Use of Restraints 46**

**VII. Early Warning System 49**

Appendix A: Compliance Chart 51

# Panel's Seventeenth Report

The Settlement Agreement and Release (the "Settlement Agreement") between the Parties in *Alex Rosas, et al. v. Leroy Baca,* Case No. CV 12-00248-DPP (the "*Rosas*" case) provides that the Court-appointed Monitors (the "Panel") will "prepare and submit to the Parties and the Court periodic reports evaluating Defendant's compliance with the Action Plan [developed by the Panel] ('Reports') at intervals the Panel shall determine." This Report sets forth the Panel's assessment of the Los Angeles County Sheriff's compliance with the provisions of the Action Plan during the period from January 1, 2025, to June 30, 2025 (the "Seventeenth Reporting Period") and it takes into consideration comments received from the Plaintiffs' counsel and the Los Angeles County Sheriff's Department on August 7, 2026, and August 14, 2026.

In May 2014, the Parties retained the Panel "to develop a corrective action plan ('Action Plan') designed to ensure that [inmates] are not subject to excessive force in the Jail Complex in downtown Los Angeles" (the "Downtown Jail Complex"). The plan developed by the Panel sets forth provisions in twenty-one areas that the Sheriff is required to implement in the Downtown Jail Complex. The plan was approved by the Court on April 7, 2016. Under Paragraph VIII of the Settlement Agreement, "[w]hen the Panel certifies that any recommendation of the Action Plan has been implemented, it shall commence a period of monitoring the Defendant's compliance with respect to that recommendation ('Compliance Period')." As of November 1, 2018, the Sheriff's Department (the "Department") has implemented 104 of the Panel's 106 recommendations. The remaining two recommendations, Section 4.10 (expansion of conflict resolution training) and Section 9.1 (security checks), have been superseded by the Settlement Agreement and Stipulated Order of Resolution in *United States v. County of Los Angeles, et al*., CV No. 15-05903 (MWF-Ex) (the "DOJ case").

On November 24, 2025, the Court approved the Parties Joint Stipulation regarding the Implementation Plan and Compliance Measures. As described in more detail below, most of those changes were implemented during this reporting period. The remainder will be fully realized in the Eighteenth Reporting Period. By approving the Joint Stipulation, the Court ordered the following:

1. The Court approved the revisions to the Implementation Plan and noted the Plan was in its final form and is not subject to further revisions absent agreement of the parties, leave from the Court, or until the Department achieves substantial compliance with the provisions of the Settlement Agreement Implementation Plan for 18 months (see Rosas Settlement Agreement, paragraph VIII). The following provisions were revised:
    - 2.6 Head Strikes or Kicks
    - 13.1 Zero Tolerance Acts of Dishonesty
    - 13.2 Reporting 13.1 Violations to the Office of Inspector General
    - 15.7 Accurate and Honest Depiction of Incidents in Force Reports
    - 17.1 Prohibition Carotid Restraint/Choke Holds
    - 17.11 (new provision) WRAP Restraint
2. The Court also ordered that nineteen (19) provisions[1] be moved to a non-reporting status beginning in the Seventeenth Reporting Period.

---

[1] (1) 1.1 Assistant Sheriff, (2) 21.1 Transfers to Custody, (3) 2.1 Custody Force Manual, (4) 8.2 Combine Complaints of Retaliation Sections, (5) 17.2 Combine Restraint of Pregnant Inmates Sections, (6) 20.2 Reactive Force, (7) 3.3 Custody Training, (8) 4.8 Mentally Ill inmates (new staff), (9) 4.9 Crisis Intervention (new staff), (10) 5.2 Level of Command Review by Force Category, (11) 12.3 Suspect Interviews, (12) 11.1 Custody Force Review Team Involvement, (13) 6.1 Separate Grievance Forms, (14) 6.6 Right to Appeal Form, (15) 17.6 Multi-Point Restraint Procedures, (16) 17.7 Approval of Multi-Point Restraints, (17) 17.8 Continued Use of Multi-Point Restraints, (18) 17.9 Supervisor Approval of Multi-Point Restraints, and (19) 17.10 Involuntary Medication.

Those nineteen (19) provisions will not be covered in this report. The Panel reserves and retains the right to reinstate any of those provisions to reporting status, without Court involvement, if the Department makes changes that are contrary to those provisions or if the Panel becomes aware that the Department is no longer in compliance with any of the nineteen (19) provisions.

At the time the Court approved the changes to the provisions, the Panel had already reviewed approximately 25 out of the 50 use of force cases for the reporting period. The Panel utilized the revisions for 2.6 and 17.11 for the remaining 25 cases. Since the principles captured in those provisions were incorporated in the Department's revised Limitations on Force and WRAP Restraint policies, the Department was prepared for immediate implementation. With regard to 15.7, the Department advised that it would brief staff who reviewed force packages regarding the revised language of the provision. The revisions to 17.1 were definitional in nature, and not part of the Panel's review of use of force packages. The Department's definitions of Carotid Restraint and Choke Hold are consistent with the definitions added to 17.1. *See* Manual of Policy and Procedures 3-10/004.00 Use of Force Terms Defined. The revisions to 13.1 and 13.2 will be implemented in the Eighteenth Reporting Period.

Additionally, the Parties agreed to changes in Compliance Measures for the following Provisions:

- 1.3 Accountability Department Managers for Failing to Address Use of Force Problems
- 13.1 Zero Tolerance Acts of Dishonesty
- 13.2 Reporting 13.1 Violations to the Office of Inspector General
- 17.1 – 17.11 Restraint Provisions

The Panel assessed the 25 force packages in the Second Quarter of 2025 utilizing the revised Compliance Measure for 1.3. These assessments determine whether the Department's Supervisors' evaluations of use of force incidents were 1) sufficiently thorough; 2) sufficiently explained their reasons for their conclusions; and 3) appropriately identified policy violations and held staff accountable for identified policy violations. The Panel had previously provided the Department with a guidance document to assist them with understanding the Panel's 1.3 analysis of force packages. The Department noted there was a delay in sharing that document with supervisors who evaluate force packages. As a result of the delay, the Department requested that the Panel consider the fact that supervisors' evaluations of force packages prior to November 24, 2025, would not have the benefit of the guidance document. The Panel has engaged in regular dialogue with the Department's supervisors on the issues contained in the revised Compliance Measure. Over the past several reporting periods, the Panel has observed an improvement in the thoroughness of force evaluations and the identification of policy violations.

The revisions for the Compliance Measures in the Restraints Section (17.1 – 17.11) address the number of cases and the manner in which the Panel selects restraint cases for review. For this reporting period, the Panel randomly selected several cases involving the use of the WRAP Restraint. The Department is working with the Panel's auditors on implementation of the revised measures for 17.3 and 17.4. The revised Compliance Measures for 13.1 and 13.2 will be implemented in the Eighteenth Reporting Period.

*Use of Force Numbers*

For the Seventeenth Reporting Period, there was a total of 356 use of force incidents, which is a 12% decrease from 403 incidents in the Sixteenth Reporting Period, as shown in Figure 1. This decrease is largely due to the spike in 3Q24 incidents, as shown in Figure 2. When comparing incidents by quarter, there were 167 incidents in 1Q25 and 189 incidents in 2Q25, which represent increases since 4Q24. Specifically, a 4% increase between 4Q24 and 1Q25 and an additional 13% increase between 1Q25 and 2Q25. Based on preliminary data from 3Q25, this upward trend does not continue into the Eighteenth Reporting Period, with a 5% decrease in 3Q25.




*Figure 1*




*Figure 2*

As shown in Figure 3, when assessing facility-specific use of force numbers, MCJ and IRC showed small changes in overall use of force incidents between the Sixteenth Reporting Period and the Seventeenth Reporting Period: MCJ from 211 to 215 (<2% increase) and IRC from 58 to 51 (12% decrease). Comparatively, TTCF use of force incidents have decreased by 33% from 134 to 90 total use of force incidents.




*Figure 3*

*Head Strike Numbers*
The Department reported a total of fifteen (15) head strikes for the Seventeenth Reporting Period, which reversed the 27% increase (15 to 19) noted in the *Panel's Sixteenth Report* back to 15 total head strikes, a 21% decrease—as shown in Figure 4. When comparing head strikes by quarter, as shown in Figure 5, head strikes increased by 13% between 4Q24 and 1Q25 from 8 to 9. Head strikes decreased in 2Q25 by 33% from 9 to 6. Preliminary data for 3Q25 shows an 83% increase from 6 to 11 head strikes.




*Figure 4*




*Figure 5*

Within the jail facilities, there were shifts in the number of head strikes for the Seventeenth Reporting Period, as shown in Figure 6. IRC decreased from six (6) to two (2) head strikes, MCJ increased from seven (7) to nine (9) head strikes, and TTCF decreased from six (6) to four (4) head strikes. IRC reversed its increase noted in the *Panel's Sixteenth Report*, fluctuating from four (4) to six (6) to two (2). TTCF maintained six (6) head strikes between the Fifteenth and Sixteenth Reporting Periods and then decreased to four (4) for the Seventeenth Reporting Period. MCJ has had consistent increases in head strikes over the last three reporting periods—from five (5) to seven (7) to nine (9). The Panel requests the Department evaluate these head strike incidents at MCJ to determine if there are commonalities across incidents and corrective measures to implement to decrease the use of head strikes.




*Figure 6*

Based on preliminary data for the Eighteenth Reporting Period, MCJ and IRC show no significant change in frequency of head strikes: MCJ had five (5) head strikes in 1Q25, four (4) in 2Q25, and five (5) in 3Q25; IRC had one (1) head strike in each of the three quarters. TTCF shows a 67% decrease between 1Q25 and 2Q25, going from three (3) to one (1), followed by a 400% increase in 3Q25 from one (1) to five (5).

*Key Compliance Metrics*

The Panel reviewed 50 completed force packages selected from a comprehensive list of force incidents compiled by the Department. The Panel did not select force packages randomly or in proportion to the frequency with which various categories of force occur. Rather, the Panel selected for review the force incidents most likely to involve problematic uses of force. The Panel usually selects cases in which staff deployed/utilized the taser, WRAP or personal weapons. The personal weapons category includes head strikes. The Panel's intent has been to review every head strike case. The Panel has requested that the Department specifically identify head strikes as a separate category on the force tracker we use to select the force packages to review. This change will add greater certainty that all head strike cases are reviewed by the Panel, act as a check in data collection, and importantly, give stakeholders greater confidence that no head strike cases will be left unreviewed.[2]




*Figure 7*

The Panel found 41 of the 50 (82%) force packages reviewed compliant with use of force prevention principles of Provision 2.2. This is a slight increase from the 78% compliance in the Sixteenth Report and matches the 82% compliance in the Fifteenth Report, as shown in Figure 7.

Provision 2.6 of the Action Plan prohibits head strikes and kicks unless (1) the inmate is assaultive, (2) there is imminent danger of serious injury, and (3) there are no other more reasonable means to avoid serious physical injury. The Panel found 45 out of the 50 (90%) force packages reviewed compliant with Provision 2.6. This marks the first time in *Rosas* history that the Department has met the compliance threshold for 2.6, up from 82% compliance in the Sixteenth Report and 84% in the Fifteenth Report, as shown in Figure 8.[3]




*Figure 8*

Of the 50 cases the Panel reviewed for the Seventeenth Reporting Period, the Department used head strikes in 13 cases. The Panel found the Department's actions in eight (8) of the 13 cases met the criteria for 2.6 and were therefore compliant. In the five (5) remaining cases, the Department concluded there either was, or may be, a policy violation(s) in two (2) of the cases.[4] In the remaining three (3) cases, the Department determined the force was objectively reasonable and within Departmental policy. The gap between what the Panel finds out of compliance and what the Department finds out of compliance has narrowed. However, there is still work to be done, and a description of two (2) of the three (3) head strike cases where the gap exists can be found on p. 24.

*Timeliness of Force Reviews*

In order to achieve compliance with the *Rosas* Action Plan, the Department must focus on accountability, which begins with the Department conducting thorough and timely force reviews and, if warranted, administrative investigations. The Department is not completing its force reviews in a timely manner and has not documented for the Panel that sufficient actions are being taken to address these delays Force reviews often take several months to over one year to complete. Five (5) of the cases reviewed during this

[2] During the next reporting period, the Panel will conduct an analysis of head strike data, including cases it has requested but not yet received.

[3] For this reporting period, the Panel reviewed 13 cases involving head strikes, which is lower than the 19 cases in the Sixteenth Reporting Period and 15 cases in the Fifteenth Reporting Period.

[4] The Department referred both of these cases for administrative investigation. In one of the cases, one deputy received a 3-day suspension, and another deputy received a 5-day suspension. In the second case, two deputies and one custody assistant received written reprimands.

reporting period took the following days from the dates of incidents to Commander (final stage) review: 424 days, 255 days, 340 days, 322 days, and 567 days. In the case that took 567 days, the Unit Commander's review was completed on February 20th, 2025, and the Commander's review was completed on October 6th, 2025, a full 228 days later. Allowing a force incident to languish at a single phase of the review process for nearly two thirds of a year is neither effective nor consistent with the goals set forth in the Agreement.

These delays violate the Department's policy regarding use of force reviews.[5] The Department is also failing to provide completed force packages to the Panel in a timely manner. One of the Compliance Measures requires that "[o]n a rolling basis, the Department will provide the Monitors with the requested 25 force packages as expeditiously as possible so that the Monitors can review the packages before the end of the quarter." *See* Revised Monitoring Plan and Compliance Measures, Compliance Measure 3, p. 12. Force packages are not, in the aggregate, being provided "as expeditiously as possible."

Beyond meeting Policy and Provision requirements, there are more compelling reasons for more timely force reviews. Delays allow speculation and rumors to form, adversely affecting morale. Facts can become blurred as time passes; memories can be influenced by external factors. With delays, if consequences are eventually imposed, they may seem arbitrary, which can transform staff trust in the review process into bitterness. Confidence in rules and authority can erode. Further, behaviors that are not promptly corrected can lead to more harm.

When the Department established the Custody Force Investigations Team (CFIT), it repeatedly noted the unit would improve the timeliness of force reviews. While the CFIT investigations appear to be completed at a faster rate than when the first-level review was assigned to each facility, it does not appear to have improved the overall time of completing a force package.

Prior to finalizing the ratings for the specific Force Provisions, the Panel participated in meetings with Custody Executives and Supervisors, and the Plaintiffs' Counsel. The information exchanged before these meetings has led to more meaningful and focused discussions about specific compliance ratings. For several of the recent Monitoring visits, the Panel has not received the requisite 25 force packages to review prior to the visit, which degrades the use of the Panel's time on site and requires subsequent, virtual meetings with the Department and Plaintiffs to discuss the remaining force packages. Moreover, the Panel has consistently noted the value of these discussions would be improved if the cases at issue were recent. The 50 cases reviewed for this Reporting Period occurred between October 25, 2023, and August 18, 2025. Of the cases reviewed, twenty-four (24) incidents occurred in 2025, twenty-four (24) occurred in 2024, and two (2) occurred in 2023.

*Rosas* Provision Compliance mandates that force packages be sent "as expeditiously as possible so that the Monitors can review the packages before the end of [each] quarter" (Revised Monitoring Plan and Compliance Measures). The 25 packages reviewed for 1Q25 were received between July 8, 2025, and September 23, 2025. The 25 packages reviewed for 2Q25 were received between October 1, 2025, and January 9, 2026. Delays in the Panel receiving force packages are a significant and ongoing problem that is adversely impacting the Panel's ability to assess recent cases and inform the Court of what is currently occurring at the jails.

### *Staff and Inmate Focus Groups*

The Panel conducted a series of focus groups with staff and discussions with inmates during its October 2025 and January 2026 Monitoring visits. The participants were randomly selected. The Panel continues to find the focus groups and discussions beneficial.

---

[5] LASD 3-10/112.00 – Use of Force Review – Unit Commander Responsibilities: Watch Commander reviews are to be completed no later than 21 days after the incident. Packages requiring division review should be submitted within 35 days of the incident.

The following ideas were expressed by custody staff during the focus groups: [6]

- Recommend force briefings after an incident to inform the good, better, or bad actions.
- Allowing the use of the WRAP Restraint more often will prevent a lot of physical force.
- Recommend removing the requirement for Watch Commander approval for using the WRAP.
- Stressed the importance of having a good mentor.
- Sergeants in the facilities believe they still have to do all the work related to a force incident before turning it over to the Custody Force Investigations Team (CFIT).
- Concerns were noted that inmates were claiming to be suicidal in order to be moved.
- Staff would like training focused on the practical application of placing someone in a Safety Chair and WRAP Restraint/Cart.

The following themes emerged from the group discussions with inmates: [7]

- Would like to participate in programs.
- Inmates residing in the Forensic In-Patient step-down unit favorably reported on their out-of-cell time and the support of the inmate mental health assistants.
- Reported issues with obtaining cleaning supplies.
- No force issues noted by the focus group participants. However, the Panel did speak with other inmates during the tours who raised concerns regarding unnecessary force.
- Concerns noted regarding the small portions of food served.

*Reporting Period Compliance Results*




*Figure 9*

For the Seventeenth Reporting Period, the Department is found in compliance with 78% (67 of 86) of the applicable provisions set forth by the Action Plan. As shown in Figure 9, compliance results per category are as follows:

1) 6 of 7 Administrative Provisions (86%)
2) 18 of 21 Force Provisions (86%)
3) 8 of 8 Training Provisions (100%)
4) 15 of 21 Investigations & Reporting Provisions (71%)
5) 16 of 22 Grievances Provisions (73%)
6) 1 of 4 Restraints Provisions (25%)
7) 3 of 3 Early Warning System Provisions (100%)

With the exception of Force, Training, and Early Warning Systems Provisions, all other categories saw a decrease in compliance compared to the Sixteenth Reporting Period, which resulted in compliance with 82% of provisions. However, this is, in part, due to the nineteen (19) compliant provisions that shifted to non-reporting status and are no longer included in the totals.

[6] In October 2025, staff focus groups were comprised of deputies, custody assistants, and sergeants from IRC and TTCF. In January 2026, the Panel spoke to deputies and sergeants from MCJ. The views expressed are not necessarily reflective of the views of all members of custody staff.

[7] The Panel spoke to approximately 39 inmates as part of focus groups during the October 2025 and January 2026 visits. All three facilities were represented in focus groups. The views expressed by the focus group participants are not necessarily reflective of all inmates. The Panel also gathered feedback from inmates dispersed throughout the Downtown Jail Complex during its tours, and with inmates specifically identified by Plaintiffs.

The Department submitted its Seventeenth Self-Assessment Report (the "*Seventeenth Self-Assessment*") regarding the non-force provisions on May 7, 2026. During the Seventeenth Reporting Period, the Panel reviewed records posted by the Department to verify the Department's self-assessments of its compliance with non-force provisions of the Action Plan. The Panel's evaluation of the provisions in the self-assessment reports is included in this Report. The Panel's auditors reviewed source documents associated with the Training Provisions and Restraint Provisions 17.3 and 17.4.

Provisions determined compliant for the Seventeenth Report that were found out of compliance in the *Panel's Sixteenth Report* include the following five (5) provisions: (1) 2.6 Head Strikes or Kicks, (2) 9.2 Escorting of Inmates, (3) 15.4 Description of Injuries, (4) 6.19 Response to Inmate Grievances, and (5) 19.2 Review of EWS Reports.

Provisions determined out of compliance for the Seventeenth Report that were found in compliance in the *Panel's Sixteenth Report* include the following five (5) provisions: (1) 15.3 Force by Other Members, (2) 15.5 Clarification After Video, (3) 16.2 Photograph of Injuries, (4) 7.2 Notification of Results, and (5) 8.1 Anti-Retaliation. See *Appendix A: Compliance Chart* for compliance status with each provision over the last three reports.

The Department continued to cooperate fully with the Panel during the Seventeenth Reporting Period. The Department and County Counsel responded to our inquiries and requests for documents and information. They engaged in constructive conversations with the Panel regarding use of force incidents, policy issues, and their continuing efforts to implement the terms of the *Rosas* Action Plan. We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.

# Action Plan Implementation Assessment

The Action Plan is divided into seven overarching categories: (1) Administrative; (2) Use of Force; (3) Training; (4) Force Reporting and Force Investigations; (5) Grievances; (6) Restraint; and (7) Early Warning System. Each category contains substantive provisions with corresponding compliance measures. The Panel's findings regarding compliance with each provision for the Seventeenth Reporting Period are provided below and organized to mirror the Action Plan.

## I. Administrative Provisions

### A. Leadership and Accountability

The recommendations in Sections 1.2 through 1.4 of the Action Plan require that the Sheriff be engaged personally in the management of the jails, the Department's managers be held accountable for any failures to address force problems in the Jails, and that the Department regularly reports to the Board of Supervisors on the use of force in the jails and on its compliance with the Action Plan.

#### 1.2 Personal Engagement of the Sheriff

**Provision Description:** Sheriff should be personally engaged in the management of the Department's jail facilities and regularly and adequately monitor the use of force policies and practices and compliance with the Action Plan.

> ***Compliance Measure Summary:*** Reports every six months on the Sheriff's personal involvement in managing the jail and monitoring use of force policies.

The Department has provided the Panel with a log of frequent meetings that Sheriff Robert Luna had with Assistant Sheriff Tokar during the First and Second Quarters of 2025. Between January 6, 2025 and June 25, 2025, the Sheriff and Assistant Sheriff had 48 meetings in which they discussed topics such as: use of force incidents, the use of less lethal weapons and personal weapons, cell extractions, Category 3 incidents and associated injuries, use of force against mentally ill inmates, dorm disturbances, gassing incidents, deployment of chemical agents, de-escalation of force, suicide attempts, inmates entering the facilities under the influence and available detox housing units, facility security concerns, assaults on staff, and alternative tactical approaches to address current inmate populations. Additionally, the Assistant Sheriff advised the Sheriff of any significant incidents/events deemed sensitive in nature as they occurred.

> ***Compliance Measure Summary:*** Meet with the Monitors at least once every six months to discuss personal involvement.

The Panel met with Sheriff Robert Luna on January 7, 2025. The Panel discussed progress towards *Rosas* compliance, maintenance issues at Men's Central Jail, and the crowding in the Inmate Reception Center Court Line.

**1.2 Status:** Compliance[8] **As of Date:** January 1, 2017

#### 1.3 Accountability for Failing to Address Policy Violations

**Provision Description:** Section 1.3 of the Action Plan provides that Department managers should be held accountable should they fail to address use of force problems at the jail facilities.

[8] Use of the term Compliance is a finding of compliance as of a certain date. The Panel's findings are set forth in the Appendix attached. For provisions not in compliance in this Report, the Department has either not yet achieved compliance or is no longer in compliance during the Seventeenth Reporting Period.

***Compliance Measure Summary:*** A quarterly report that sets forth the number and rank of personnel found to have violated use of force policies.

*Table 1: Cases with Discipline Imposed*

| | TTCF | MCJ | IRC | Total |
|---|---|---|---|---|
| 1Q25 | 0 | 4 | 0 | 4 |
| 2Q25 | 1 | 3 | 0 | 4 |

The Department provided a report for both quarters of the Seventeenth Reporting Period, which is summarized in *Table 1*. There were four (4) cases involving five (5) staff with various use of force policy violations reported in 1Q25—all from MCJ.[9] In 2Q25, there were four (4) cases involving seven (7) staff with various use of force policy violations—one (1) at TTCF and three (3) at MCJ. The resulting discipline for these violations is reflected in *Table 2*.

*Table 2: 1Q25 and 2Q25 Discipline Imposed*

| **First Quarter 2025** | | | |
|---|---|---|---|
| **Case No.** | **Facility** | **Rank** | **Discipline** |
| 1 | MCJ | Deputy | 1-Day Suspension |
| 2 | MCJ | Sergeant | 2-Day Suspension |
| 3 | MCJ | Deputy | 5-Day Suspension |
| | | Deputy | 5-Day Suspension |
| 4 | MCJ | Deputy | 5-Day Suspension |
| **Second Quarter 2025** | | | |
| **Case No.** | **Facility** | **Rank** | **Discipline** |
| 1 | MCJ | Deputy | Written Reprimand |
| | | Deputy | 15-Day Suspension |
| | | Deputy | Written Reprimand |
| 2 | MCJ | Deputy | Discharge |
| 3 | TTCF | Deputy | 2-Day Suspension |
| | | Deputy | Written Reprimand |
| 4 | MCJ | Deputy | 5-Day Suspension |

There were eight (8) cases of use of force policy violations with discipline imposed involving twelve (12) staff members: eleven (11) Deputies and one (1) Sergeant. Discipline imposed ranged from a Written Reprimand to a discharge. Of the twelve (12) staff members involved, three (3) received Written Reprimands, one (1) received a 1-day suspension, two (2) received 2-day suspensions, four (4) received 5-day suspensions, one (1) received a 15-day suspension, and one (1) was discharged. Overall, 67% (8 out of 12) of the staff

[9] The reporting for Provision 1.3 occurs when the discipline for the founded violation was imposed, not when the policy violation occurs. In this Report, the Panel found 9 out of 50 cases in violation of the force prevention principles of Section 2.2. The Panel found 5 out of 13 cases where head strikes were out of compliance with Section 2.6 and 8 of 50 cases out of compliance with Section 17.5. Should the Department find staff involved in those cases violated policy, those violations would not be recorded until the quarter the discipline was imposed.

disciplined for use of force violations received 2-day suspensions or higher. Note that the same staff member was involved in two separate incidents: one that resulted in the 15-day suspension and the second in the discharge. The timeline of these two incidents is described in more detail below. Due to the discharge, the 15-day suspension was not served; therefore, seven (7) of the eight (8) use of force policy violations resulted in actual imposition of discipline.

Of the seven (7) cases where discipline was imposed, discipline was imposed the day the investigation closed in three (3) incidents. In other cases, discipline was imposed 42, 61, and 66 days after the investigation was closed, with an additional case where discipline was imposed 244 days after the investigation was closed. When evaluating the number of days between the opening of an administrative investigation to the date discipline is imposed, on average discipline was imposed 221 days after the administrative investigation was opened. The number of days ranged from 56 days to 326. When considering the date the Department became aware of the incident to the date discipline was imposed, on average discipline was imposed 471 days after the Department became aware of the incident. Number of days ranged from 198 to 966 days. The Panel is concerned about the efficacy of imposing discipline over two and half years after a policy violation.

The Department became aware of a policy violation on October 24, 2023, regarding a deputy. An administrative investigation was opened February 27, 2024, and closed October 21, 2024, resulting in a 15-day suspension. The deputy initiated the formal grievance process regarding the 15-day suspension. While that process was pending, the deputy was involved in a separate use of force incident on April 23, 2024. An administrative investigation was opened on August 21, 2024, and closed on April 17, 2025, resulting in discharge, which was imposed May 29, 2025. After the second use of force incident on April 23, 2024, the deputy was never in a position to work directly with inmates. Discipline was imposed 401 days after the Department became aware of the second policy violation, and 583 days after the Department became aware of the initial policy violation.

Discipline is a critical component of an effective accountability system. Penalties must be commensurate to the severity of the offenses and administered in a timely and fair process. While the Panel has seen an increase in the penalties staff have received for policy violations, additional focus in this area will assist the Department with its compliance efforts.

> ***Compliance Measure Summary:*** Section 1.3 requires the Department to identify each facility in which there was a 25% increase in the number of use of force incidents or Category 3 incidents from the previous quarter.

*Overall Uses of Force*

The Department provided data on the number of use of force incidents per month by facility and category. The monthly numbers have been consolidated into quarters for the Reporting Period as shown in Figure 10.[10, 11] For the Seventeenth Reporting Period (1Q25 and 2Q25), there were a total of 356 use of force incidents: 167 in 1Q25 and 189 in 2Q25. The number of incidents increased by 4% between 4Q24 and 1Q25 (from 161 to 167) and increased by another 13% between 1Q25 and 2Q25 (from 167 to 189). Preliminary data for 3Q25 reports a 5% decrease between 2Q25 and 3Q25 (from 189 to 179).




*Figure 10*

Of the 356 use of force incidents recorded for the Seventeenth Reporting Period, TTCF accounted for 90 (25%), MCJ for 215 (60%), and IRC for 51 (14%) of the incidents, as shown in Figure 11. As shown in Figure 12, for both quarters, the majority of the 356 incidents were Category 1 with 255 incidents (72%). There were 58 Category 2 incidents (16%), 41 NCI incidents (11%), and 2 Category 3 incidents (1%). This allocation pattern resembles trends from previous reports.




*Figure 11*




*Figure 12*

The Department is also required to address, for each facility, increases of 25% or more in the total number of force incidents and the total number of Category 3 incidents.[12] For the Seventeenth Reporting Period, there were two (2) overall increases of 25% or more: NCI incidents increased by 73% between 1Q25 and 2Q25, from 15 to 26, and Category 3 incidents increased by two between 1Q25 and 2Q25, from 0 to 2. Category 3 incidents are further discussed in the dedicated *Category 3 Specific* section below.

The figures below identify the number of use of force incidents by category per facility. Data is included from both quarters of the Seventeenth Reporting Period (1Q25 and 2Q25) as well as the Fourth Quarter of

---

[10] The data provided to the Panel from CCSB is subject to change as incidents are categorized and recategorized following or during investigation. Thus, the numbers cited are subject to change and may not match the numbers in previous or future Panel Reports. The Panel uses data from the Monthly Force Used by Category Report provided in the closest proximity to the generation of the Panel's Report. Per the Department, 2025 data from the Basin Facilities Use of Force Overview reflect changes to data from the Monthly Force Used by Category Report provided. Therefore, the data cited here is consistent with Department data totals presented as of October 13, 2025, and January 14, 2026.

[11] Incident data from 4Q24 is included in this figure to calculate the percent change for 1Q25.

[12] This section includes discussion of increases in NCI, Category 1, and Category 2 force incidents that are not required by the compliance measure and the totals presented include NCI incidents. The Panel will include greater discussion of the reason for these inclusions in the 18th Monitoring Report.

2024 to reflect any changes of 25% or more between quarters. Note that only the increases or decreases of 25% or more are included in the narrative below.

*Twin Towers Correctional Facility*
For the Seventeenth Reporting Period, TTCF had a total of 90 use of force incidents—50 in 1Q25 and 40 in 2Q25. Figure 13 depicts the total number of incidents by category over three quarters at TTCF. For the Seventeenth Reporting Period, increases or decreases of more than 25% at TTCF are as follows:

- NCI incidents decreased by 43% from 7 to 4 between 4Q24 and 1Q25.
- NCI incidents increased by 25% from 4 to 5 between 1Q25 and 2Q25.
- Category 2 incidents decreased by 44% from 9 to 5 between 1Q25 and 2Q25.
- Category 3 incidents increased from 0 to 1 between 1Q25 and 2Q25.




*Figure 13*

*Men's Central Jail*
For the Seventeenth Reporting Period, MCJ had a total of 215 use of force incidents—95 in 1Q25 and 120 in 2Q25. Figure 14 depicts the total number of incidents by category over three quarters at MCJ. For the Seventeenth Reporting Period increases or decreases of more than 25% at MCJ are as follows:

- NCI incidents increased by 89% from 9 to 17 between 1Q25 and 2Q25.
- Category 2 incidents increased by 31% from 16 to 21 between 1Q25 and 2Q25.
- Category 3 incidents increased from zero to 1 between 1Q25 and 2Q25.
- Total number of incidents increased by 26% from 95 to 120 between 1Q25 and 2Q25.




*Figure 14*

*Inmate Reception Center*
For the Seventeenth Reporting Period, IRC had a total of 51 use of force incidents—22 in 1Q25 and 29 in 2Q25. Figure 15 depicts the total number of incidents by category over three quarters at IRC. For the Seventeenth Reporting Period increases or decreases of more than 25% at IRC are as follows:

- NCI incidents decreased by 33% from 3 to 2 between 4Q24 and 1Q25.
- NCI incidents increased by 100% from 2 to 4 between 1Q25 and 2Q25.
- Category 1 incidents increased by 31% from 13 to 17 between 4Q24 and 1Q25.




*Figure 15*

- Category 2 incidents decreased by 25% from 4 to 3 between 4Q24 and 1Q25.
- Category 2 incidents increased by 33% from 3 to 4 between 1Q25 and 2Q25.
- Total incidents increased by 32% from 22 to 29 between 1Q25 and 2Q25.

> ***Compliance Measure:*** When there is a 25% or more increase, with a minimum of two (2) or more incidents, from the previous quarter, the Unit Commander reports on his or her response to involved staff. If the Unit Commander failed to address the matter, the Department indicates its response to hold the Unit Commander accountable.

*Category 3 Specific*

An increase of more than 25% in force incidents with a minimum of two or more force incidents from the prior quarter triggers CCSB to request a response from the Unit Commander on its handling of staff involved in a Category 3 incident. Meaning CCSB only requests a response from a facility when there is an increase of two or more Category 3 incidents at that facility. TTCF and MCJ increased by only one (1) Category 3 incident, respectively, from the prior quarter; therefore, the Department was not required to notify nor request a response from the facilities.

> ***Compliance Measure:*** A report indicating what the Department did to hold Unit Commanders and Commanders accountable if they failed to address policy violations. Monitors will determine whether the evaluations were thorough, explained reasons for their conclusions, appropriately identified policy violations, and took necessary steps to hold staff accountable.

The Panel did not assess the 1Q25 Use of Force packages utilizing the revised Compliance Measure. There were several cases in this reporting period involving violations of policy, such as staff not using force as a last resort, failing to call a supervisor to the scene as soon as possible, and prohibited head strikes in which the supervisory reviews failed to identify policy violations. Of the applicable cases reviewed in 2Q25 utilizing the new Compliance Measure, 88% (22 out of 25) were found to be in compliance. The Panel acknowledges the progress the Department has made regarding more thorough force reviews and identifying policy violations. As noted above, though, there is more work to be done in this area for the Department to achieve Compliance with this provision and revised Compliance Measure.

**1.3 Status:** Out of Compliance **As of Date:** N/A

### 1.4 Reports to the Board of Supervisors

**Provision Description:** Department regularly reports to the Board of Supervisors on use of force status and compliance with the Action Plan.

> ***Compliance Measure:*** Report publicly at least every six months to the Board of Supervisors on use of force data, training, investigation outcome summaries, and discipline as well as overall compliance.

The Department's presentation to the Board of Supervisors occurred April 15, 2025. The Department's presentation included data and information regarding their use of force statistics, administrative investigations, training, and the status of compliance.

**1.4 Status:** Compliance **As of Date:** June 12, 2018

## B. Management Visits

The recommendations in Sections 10.1 and 10.2 of the Action Plan address required tours of senior managers and the documentation of visits on housing units.

### 10.1 Senior Manager Tours

**Provision Description:** Senior managers ranked Unit Commanders and above should be required to periodically tour jail facilities, including nights and weekends.

> ***Compliance Measures Summary:*** 10.1(a) Unit Commanders tour at least two evenings and one weekend day per quarter.

> ***Compliance Measures Summary:*** 10.1(b)–(e) Varying frequencies in visit requirements for Department executives—Unit Commanders up to Sheriff—to tour and inspect the Downtown Jail Complex.

For the First Quarter of 2025, the Unit Commanders, Commanders, and Chiefs in Custody Operations conducted 72 out of the 72 required tours and inspections for 100% compliance, which is above the 95% compliance threshold. The Assistant Sheriff and Sheriff conducted 9 of the 9 required inspections for 100% compliance, which exceeds the 95% compliance threshold.[13]

For the Second Quarter of 2025, the Unit Commanders, Commanders, Chiefs in Custody Operations conducted 72 out of the 72 required tours and inspections for 100% compliance, which is above the 95% compliance threshold. The Assistant Sheriff and Sheriff conducted 9 of the 9 required inspections for 100% compliance, which exceeds the 95% compliance threshold.

**10.1 Status:** Compliance **As of Date:** June 30, 2018

### 10.2 Housing Unit Documentation

**Provision Description:** Housing units should document visits from department managers in electronic records or visitor logs.

> ***Compliance Measure Summary:*** Visits by Department managers to the Downtown Jail Complex are documented and made available to the Monitors.

The visits to the jail facilities by Department managers (above the rank of Sergeant) were documented in electronic visitor logs for the First and Second Quarters of 2025. The posted electronic records included tours and inspections conducted for the two random weeks selected by the Monitors for each quarter.

**10.2 Status:** Compliance **As of Date:** January 1, 2024

## C. Rotations and Transfers

The recommendations in Sections 18.1, 18.2, and 21.1 address custody-wide rotation policies, semi-annual audits of unit compliance, and not assigning or transferring staff to custody as a formal sanction.

### 18.1 Custody-Wide Rotation Policy

**Provision Description:** Maintain a custody-wide rotation policy and rotate staff members as often as provided by policy.

### 18.2 Semi-Annual Rotation Audit

**Provision Description**: Conduct an audit semi-annually for each unit's compliance with rotation policies.

> ***Compliance Measures Summary:*** Maintain facility rotation policy and audit compliance every six months. Provide reports to the Monitors to demonstrate if at least 90% of staff were rotated according to policy.

---

[13] Per Compliance Measures 10 (d) and (e), the Assistant Sheriff is required to conduct at least two inspections per quarter, and the Sheriff is required to conduct at least one at each facility.

The Department achieved 99.9% compliance in the Seventeenth Reporting Period. The source documents indicate that Department personnel were rotated in compliance with the Unit Orders. CCSB audited TTCF on July 30, 2025 and found that seven of the ten individuals not in compliance with the rotation policy are exempt from rotation mandates. The other three were attributed to previous stay of rotation agreements. MCJ was audited and identified three discrepancies—one was an error, a second involved an individual under administrative investigation specifically assigned, and the third was an oversight by scheduling staff and was corrected. IRC was 100% compliant.

**18.1 Status:** Compliance **As of Date:** June 30, 2018
**18.2 Status:** Compliance **As of Date:** January 1, 2019

The chart below is a visual representation of compliance for the above provisions from the last three reports. The shading of the boxes indicates compliance status–blue for *compliance* and red for *out of compliance.* The "As Of" column shows the date since first found compliant and the last column includes a check mark if the date meets or exceeds three years of compliance. A chart is provided with each section.

| **Administrative Provisions** | | **Fifteenth Report** | **Sixteenth Report** | **Seventeenth Report** | | |
|---|---|---|---|---|---|---|
| **No.** | **Provision** | **1Q24 - 2Q24** | **3Q24 - 4Q24** | **1Q25 - 2Q25** | **AS OF** | **3YR+** |
| 1.2 | Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.3 | Accountability | X | X | X | | |
| 1.4 | Reports to Board | C | C | C | 6/12/2018 | ✓ |
| 10.1 | Senior Manager Tours | C | C | C | 6/30/2018 | ✓ |
| 10.2 | Housing Unit Documentation | C | C | C | 1/1/2024 | |
| 18.1 | Custody-Wide Rotation Policy | C | C | C | 6/30/2018 | ✓ |
| 18.2 | Semi-Annual Rotation Audit | C | C | C | 1/1/2019 | ✓ |

# II. Use of Force Policies and Practices

## A. Overall Use of Force Policies

### 20.1 Categories of Force in Policy

**Provision Description:** Policy indicates only two types of force: reactive and planned.

The Department's Supervisor's Use of Force Investigation Form (P438) was updated in January 2025 and only lists two types of force.

**20.1 Status:** Compliance **As of Date:** January 1, 2017

| Use of Force Policy Provisions | | Fifteenth Report | Sixteenth Report | Seventeenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 20.1 | Categories of Force | C | C | C | 1/1/2017 | ✓ |

## B. Use of Force Practices & Review of Force Packages

The recommendations in Sections 2.2 through 2.13, 4.1, 4.3 through 4.5, 9.2, 9.3, 17.5, and 20.3 have provisions related to policy as well as application. The Panel reviewed multiple drafts of the Department's policies to implement these recommendations, required changes where appropriate, and certified that the Department had implemented these policy recommendations effective December 1, 2015.

For the Seventeenth Reporting Period, a total of 50 packages were reviewed: 25 for 1Q25 and 25 for 2Q25. The cases did not occur in the quarter they were reviewed, nor was the investigation necessarily completed during that quarter. The Panel reviewed cases as they were received. The cases reviewed involved incidents from December 2023 through August 2025. Overall results for the Seventeenth Reporting Period by provision are below. Findings for each quarter are provided in Section C: *Quarterly Findings*.

> ***Compliance Measure Summary:*** (#1-7) Within 10 days of the end of each quarter the Department will provide the Monitors with a cumulative force synopsis for each incident in the Downtown Jail Complex showing the status of force investigations. The Monitors will select a minimum of 25 force packages to review for compliance with the Action Plan of all force provisions through Vertical and Horizontal Assessments. The Department will provide each package and include a summary sheet that indicates how the Department assessed each applicable provision. Force incidents will need to be 90% or more compliant with each provision for the Vertical Assessments.

**Vertical Assessment:** The vertical assessment represents the Panel's analysis of each case to determine the number of cases in which all force provisions were in compliance during the period. Of the 50 cases reviewed, thirty-one (31) were found compliant with all Force Provisions, which is 62% of cases reviewed, which is below the 90% compliance threshold. Of the thirty-one found in compliance with all Force provisions, fifteen (15) were from 1Q25 (four at TTCF, three at IRC, and eight at MCJ) and sixteen (16) from 2Q25 (nine at TTCF, one at IRC, and six at MCJ). In 1Q25, there was one (1) additional case found in compliance with 89% of the force provisions and two (2) in compliance with 88% of the force provisions. In 2Q25, there was another one (1) case found compliant with 89% of the force provisions and another four (4) found compliant with 88% of the force provisions.

**Horizontal Assessment:** The horizontal assessment represents the Panel's findings, by provision, for the twenty (20) use of force practice provisions to determine a compliance rating for each provision. It takes into consideration the objective of the provision and the nature and extent of any violations of the provision.

Percentages are calculated based on packages reviewed in both quarters.[14] Of the twenty (20) provisions, seventeen (17) were found in compliance based on the packages reviewed.

## 2.2 Force Prevention Principles

**Provision Description:** Policy provides that force be used as a last resort, with minimal amount of force necessary, terminated as soon as reasonably safe to do so, and de-escalated as resistance decreases.

Of the 50 use of force packages reviewed, 41 cases were found to be compliant with this provision, which amounts to 82% compliance and is below the 90% compliance threshold. Historically, the Department had substantial increases in compliance with 2.2 from 40% compliance (Twelfth) to 58% compliance (Thirteenth) to 86% (Fourteenth). The following two reporting periods reflected a slight yet consistent decrease to 82% compliance (Fifteenth) and then 78% compliance (Sixteenth). With this reporting period, the Department has discontinued the decline in compliance.

**2.2 Status:** Out of Compliance **As of Date:** N/A

## 2.3 Inmate-on-Inmate Violence

**Provision Description:** Policy indicates it is a violation for staff to cause, facilitate, or provoke inmate-on-inmate violence or to expose inmates to an unreasonable risk of assault. Further, staff are prohibited from publicly humiliating inmates or using slurs or obscenities.

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.3 Status:** Compliance **As of Date:** January 1, 2024

## 2.4 Use of Force as Discipline

**Provision Description:** Policy indicates use of force not be used as discipline or corporal punishment.

Of the applicable cases reviewed, 98% (49 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.4 Status:** Compliance **As of Date:** July 1, 2019

## 2.5 Force on Restrained Inmate

**Provision Description:** Policy indicates staff may not strike, use chemical agents, or Taser a restrained inmate, unless the inmate is assaultive, presents an immediate threat, and no other reasonable means.

Of the applicable cases reviewed, 92% (24 out of 26) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.5 Status:** Compliance **As of Date:** July 1, 2023

## 2.6 Head Strikes or Kicks

**Provision Description:** It is prohibited to strike an inmate in the head, kick an inmate who is on the ground, or kick an inmate above the knees if not on the ground unless the inmate is physically assaultive and presents an imminent danger of serious injury and/or death, and other techniques would be ineffective. Kicking an inmate who is not on the ground below the knees is prohibited unless the inmate is physically assaultive and the kick is used to create distance and prevent potential injury.

---

[14] For the Horizontal Assessments, the Panel has determined that Compliance will require 90% of the applicable force provisions were in Compliance. The Panel may exercise its discretion and depart from this 90% requirement when considering the objective of the provision and the nature and extent of any violation of the provision.

Of the applicable cases reviewed, 90% (45 out of 50) were found to be in compliance, which meets the 90% compliance threshold. Consistent with the 2.2 trend noted above, compliance with this provision had seen a slight yet consistent decrease over the last three reporting periods: 88% (Fourteenth) to 84% (Fifteenth) to 82% (Sixteenth). With this reporting period, the Department has discontinued the decline and has met the compliance threshold for the first time. For this Reporting Period, the Panel reviewed 13 cases where head strikes were used and, of those cases, the Panel found five (5) out of compliance.[15]

**2.6 Status:** Compliance **As of Date:** July 1, 2025

## 2.7 Supervisor Called to Scene

**Provision Description:** A supervisor must be called to the scene in a situation where use of force may be required as soon as time and circumstances permit.

Of the applicable cases reviewed, 76% (38 out of 50) were found to be in compliance, which is below the 90% compliance threshold.

**2.7 Status:** Out of Compliance **As of Date:** N/A

## 2.8 Prevent Excessive Force

**Provision Description:** All members are responsible for preventing excessive uses of force and those who witness such events have a duty to stop, reduce, or control the use of force being used.

Of the applicable cases reviewed, 88% (7 out of 8) were found to be in compliance, which is below the 90% compliance threshold. Given the small number of applicable cases and the fact there is only one (1) case deemed out of compliance, the Panel has exercised its discretion to find the Department in Compliance with this provision.

**2.8 Status:** Compliance **As of Date:** January 1, 2024

## 2.9 Armed Inmates

**Provision Description:** When confronting an armed inmate, every effort should be made to control the inmate at a distance.

Of the applicable cases reviewed, 100% (4 out of 4) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.9 Status:** Compliance **As of Date:** January 1, 2025

## 2.10 Authorized Weapons

**Provision Description:** Department members can only use authorized weapons for which they have been trained. Any available instrument can be used to prevent imminent loss of life or serious bodily injury if no other means or alternative is available.

Of the applicable cases reviewed, 96% (25 out of 26) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.10 Status:** Compliance **As of Date:** July 1, 2024

## 2.11 Planned Chemical Spray

**Provision Description:** After applying a chemical agent, members are required to wait a sufficient amount of time before applying additional chemical or force in a cell extraction or planned use of force.

---

[15] As set forth above, of those five (5) cases that the Panel found out of compliance with Provision 2.6, the Department determined there was a potential policy violation(s) in two (2) of the cases. In the remaining three (3) cases, the Department concluded the force was objectively reasonable and within Departmental policy.

Of the applicable cases reviewed, 100% (11 out of 11) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.11 Status:** Compliance **As of Date:** July 1, 2023

## 2.12 Chemical Spray & Tasers

**Provision Description:** Chemical sprays, tasers, and stun devices should not be used against an inmate who no longer presents a danger or is no longer resisting, ones known to suffer medical conditions that may be aggravated by use, or in a manner contradictory to manufacturer guidance or Department training.

Of the applicable cases reviewed, 89% (16 out of 18) were found to be in compliance, which is below the 90% compliance threshold. In one of the two cases the Panel found out of compliance with this provision, the Panel recognized the supervisor's need to authorize the use of OC Spray despite the contraindications in the inmate's medical file. There were significant security concerns for the staff to enter the cell and options for doing so safely were limited. In its discretion, the Panel finds the Department in Compliance with this provision.

**2.12 Status:** Compliance **As of Date:** July 1, 2024

## 2.13 Check of Medical Records

**Provision Description:** An inmate's medical/mental health records should be checked prior to use of chemical agents, tasers, or stun devices when time and circumstances permit.

Of the applicable cases reviewed, 100% (11 out of 11) were found to be in compliance, which exceeds the 90% compliance threshold.

**2.13 Status:** Compliance **As of Date:** July 1, 2024

## 4.1 Consult Mental Health Professionals

**Provision Description:** Require a mental health professional on-scene to attempt to resolve a situation during a cell extraction or planned use of force.

Of the applicable cases reviewed, 100% (9 out of 9) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.1 Status:** Compliance **As of Date:** January 1, 2025

## 4.3 Spray on Mental Health Inmates

**Provision Description:** Discontinue use of chemical following an initial burst if the inmate is acutely psychotic or severely mentally disabled and unable to conform behavior to commands.

Of the applicable cases reviewed, 100% (10 out of 10) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.3 Status:** Compliance **As of Date:** October 1, 2019

## 4.4 Cooling Off Periods

**Provision Description:** In situations involving a mentally ill inmate who does not present an obvious danger to self or others and is refusing to exit his or her cell, allow a reasonable cooling off period. After, a mental health professional or supervisor can attempt to obtain compliance without the use of force.

Of the applicable cases reviewed, 100% (12 out of 12) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.4 Status:** Compliance **As of Date:** January 1, 2023

## 4.5 Medical or Mental Health Provider Order

**Provision Description:** When a planned use of force is precipitated by a medical or mental health provider, such as for treatment purposes, the ordering provider, or designee, is given the opportunity to intervene to de-escalate and determine whether the order should remain in effect.

Of the applicable cases reviewed, 100% (10 out of 10) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.5 Status:** Compliance **As of Date:** January 1, 2023

## 9.2 Escorting of Inmates

**Provision Description:** Following a use of force, the staff member escorting the recalcitrant inmate to medical, holding, or segregation should not be the same member involved in the confrontation.

Of the applicable cases reviewed, 94% (44 out of 47) were found to be in compliance, which exceeds the 90% compliance threshold.

**9.2 Status:** Compliance **As of Date:** July 1, 2025

## 9.3 Duty to Protect & Intervene

**Provision Description:** Members have a duty to protect and to intervene in inmate-on-inmate violence when reasonably safe to do so.

Of the applicable cases reviewed, 100% (4 out of 4) were found to be in compliance, which exceeds the 90% compliance threshold.

**9.3 Status:** Compliance **As of Date:** July 1, 2022

## 17.5 Minimize Medical Distress

**Provision Description:** Avoid, to the extent possible, placing weight on an inmate's back or shoulders in a way that impairs breathing. Once under control, place the inmate on side to minimize breathing problems.

Of the applicable cases reviewed, 84% (42 out of 50) were found to be in compliance, which is below the 90% compliance threshold. This represents continued substantial increases in compliance from the 51% compliance rate in the Fourteenth Report, 64% in the Fifteenth Report, and 75% in the Sixteenth Report. The Panel continues to reiterate the importance of placing inmates in the recovery position as quickly as possible and holding staff accountable for violations.

**17.5 Status:** Out of Compliance **As of Date:** N/A

## 20.3 Planned Use of Force

**Provision Description:** Planned uses of force should be video recorded and include a medical professional on scene or on standby, a supervisor on scene, and occur after a Shift Supervisor approval has been obtained.

Of the applicable cases reviewed, 100% (13 out of 13) were found to be in compliance, which exceeds the 90% compliance threshold.

**20.3 Status:** Compliance **As of Date:** July 1, 2023

| Use of Force Practice Provisions, Packet Review | | Fifteenth Report | Sixteenth Report | Seventeenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 2.2 | Force Prevention Principles | 82% | 78% | 82% | | |
| 2.3 | Inmate on Inmate Violence | 92% | 93% | 100% | 1/1/2024 | |
| 2.4 | Use of Force as Discipline | 100% | 100% | 98% | 7/1/2019 | ✓ |
| 2.5 | Force on Restrained Inmates | 92% | 93% | 92% | 7/1/2023 | |
| 2.6 | Head Strikes or Kicks | 84% | 82% | 90% | 7/1/2025 | |
| 2.7 | Supervisors Called to Scene | 86% | 86% | 76% | | |
| 2.8 | Prevent Excessive Force | 100% | 100% | 88% | 1/1/2024 | |
| 2.9 | Armed Inmates | 50% | 100% | 100% | 1/1/2025 | |
| 2.10 | Authorized Weapons | 97% | 100% | 96% | 7/1/2024 | |
| 2.11 | Planned Chemical Spray | 100% | 100% | 100% | 7/1/2023 | |
| 2.12 | Chemical Spray & Tasers | 94% | 95% | 89% | 7/1/2024 | |
| 2.13 | Check of Medical Records | 100% | 100% | 100% | 7/1/2024 | |
| 4.1 | Consult Mental Health Professionals | 77% | 92% | 100% | 1/1/2025 | |
| 4.3 | Spray on Mental Health Inmates | 100% | 92% | 100% | 10/1/2019 | ✓ |
| 4.4 | Cooling Off Periods | 89% | 100% | 100% | 1/1/2023 | |
| 4.5 | Medical or Mental Health Provider Order | 91% | 100% | 100% | 1/1/2023 | |
| 9.2 | Escorting of Inmates | 88% | 88% | 94% | 7/1/2025 | |
| 9.3 | Duty to Protect & Intervene | 100% | 100% | 100% | 7/1/2022 | ✓ |
| 17.5 | Minimize Medical Distress | 64% | 75% | 84% | | |
| 20.3 | Planned Use of Force | 93% | 92% | 100% | 7/1/2023 | |

## C. Quarterly Findings—Use of Force Provisions

### Combined 1Q and 2Q 2025 Results

For the Seventeenth Reporting Period, the Panel reviewed 50 use of force incidents—20 from TTCF (40%), 21 from MCJ (42%), and 9 from IRC (18%).

The Department was not in Compliance with three (3) of the twenty (20) Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.7 Supervisors Called to Scene, and (3) 17.5 Minimize Medical Distress. Of the three (3) Use of Force Provisions out of compliance, zero had compliance rates below 70% for 1Q25 and 2Q25 combined.

The Department was in full compliance, or 90% or above, with the following fifteen (15) of the twenty (20) use of force provisions: 2.3, 2.4, 2.5, 2.6, 2.9, 2.10, 2.11, 2.13, 4.1, 4.3, 4.4, 4.5, 9.2, 9.3, and 20.3. In its discretion, the Panel found the Department in Compliance with the following two (2) of the twenty (20) use of force provisions: (1) 2.8 Prevent Excessive Force (88%) and (2) 2.12 Chemical Spray & Tasers (89%). Of the seventeen (17) provisions found in compliance, ten (10) reached 100% compliance.

### First Quarter 2025 Results

In the First Quarter of 2025, the Panel reviewed 25 force incidents—six (6) from TTCF (24%), twelve (12) from MCJ (48%), and seven (7) from IRC (28%).

The Department was not in Compliance with four (4) of the twenty (20) Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.6 Head Strikes or Kicks, (3) 2.7 Supervisors Called to Scene, and (4) 17.5 Minimize Medical Distress. Of the four (4) Use of Force Provisions out of compliance, zero had a compliance rate below 70%.

The Department was in full compliance, or 90% or above, with the following sixteen (16) of the twenty (20) Use of Force Provisions: 2.3, 2.4, 2.5, 2.8, 2.9, 2.10, 2.11, 2.12, 2.13, 4.1, 4.3, 4.4, 4.5, 9.2, 9.3, and 20.3. Of the sixteen (16) provisions found in compliance, fourteen (14) reached 100% compliance.

## Second Quarter 2025 Results

In the Second Quarter of 2025, the Panel reviewed 25 force incidents—14 from TTCF (56%), 9 from MCJ (36%), and 2 from IRC (8%).

The Department was not in Compliance with five (5) of the twenty (20) Use of Force Provisions as follows: (1) 2.2 Force Prevention Principles, (2) 2.7 Supervisors Called to Scene, (3) 2.8 Prevent Excessive Force, (4) 2.12 Chemical Spray & Tasers, and (5) 17.5 Minimize Medical Distress. Of the five (5) Use of Force Provisions out of compliance, one had a compliance rate below 70% in 2Q25: 2.8 Prevent Excessive Force at 50% compliance.

The Department was in full compliance, or 90% or above, with the following fifteen (15) of the twenty (20) Use of Force Provisions: 2.3, 2.4, 2.5, 2.6, 2.9, 2.10, 2.11, 2.13, 4.1, 4.3, 4.4, 4.5, 9.2, 9.3, and 20.3. Of the fifteen (15) found in compliance, ten (10) reached 100% compliance.

## Review of Force Incidents

The Panel highlights two head strike cases reviewed in which the Department found the force objectively reasonable and the Panel found it out of compliance. In both cases, video evidence shows the force used was preventable and that the force used did not comply with the Agreement. The first case involved an inmate who was handcuffed behind his back and seated at a spider table with a nurse. The nurse was checking his blood sugar level and getting ready to administer insulin. The inmate did not agree with the amount of insulin being administered, so he stood up and walked back to his cell. A deputy performed an immediate takedown and swung the inmate into a cell window frame. The results of this takedown were catastrophic. The inmate's neck was broken, and he became paralyzed. He was transferred to a care facility and died nine months later. The inmate's death certificate lists the immediate cause of death as cardiac arrest and the underlying cause as coronary artery disease.

The Department found the force and tactics used in this case were objectively reasonable and within Departmental policy. However, the Department determined there were pre-force and post-force policy violations. Specifically, the Department found that the responding supervisor failed to satisfactorily perform her duties when she failed to properly assess the inmate's injuries and failed to follow proper protocol for post force escort or medical attention. The sergeant was disciplined for her actions. The Department also determined that the deputy who performed the takedown failed to perform his duties to the highest standard when he failed to use de-escalation tactics such as verbal commands and/or use of time and distance and disciplined him.

Further, there were several inconsistencies between the reports and the available video that were not satisfactorily addressed by the Department. This includes the deputy's original report that indicated the inmate had "charged" him, resulting in a takedown during which he applied downward pressure to safely "guide the inmate to the floor." However, the video evidence depicts the inmate standing up, walking towards his cell, and not charging the deputy. Moreover, the video does not depict the deputy "guiding" the inmate to the floor. It depicts a rapid takedown that resulted in catastrophic injuries. Since this was a Category 3 case investigated by the Internal Affairs Bureau, there were not multiple layers of supervisory review in the force package. There was one level of supervisory review. The Executive Force Review Committee noted concerns with the deputies' lack of details in their force reports but did not acknowledge any issues with either inaccurate or dishonest statements in the reports. Provision 15.7 was recently revised to require Watch Commanders/Supervising Lieutenants and Unit Commanders to review Department members' force reports to ensure they accurately and honestly depict the incident. In order to achieve compliance with this provision, supervisors must hold staff accountable for force reports that do not accurately and honestly depict the incident, as reflected in available video.

In the second case, an unescorted mentally ill inmate, in full restraints and a waist chain, body checked a deputy into a wall. The inmate was taken to the floor by several deputies. One deputy used his elbow to rub the inmate's head onto the concrete. The inmate managed to bite the deputy's arm, apparently for this reason. In turn, the deputy responded with four (4) hammer punches to the inmate's head and ground his head onto the concrete floor, using his elbow and forearm, for over a minute. A sergeant looked on, even talking to the inmate, but did not stop the deputy's head compression.

The Watch Commander (WC) wrote:

> *"Deputies S and S continued to apply pressure on the suspect's head and back while he was laying prone on the ground, waist-chained, and with three other custody personnel assisting. They should have recognized the suspect could have been controlled through a concerted effort of the five custody personnel controlling him. This would have alleviated the undue pressure and possibly prevented the assault (bite) as Deputy S would not have placed his right elbow in such close proximity to the suspect's mouth."*

The Unit Commander (UC) wrote:

> *"[T]he suspect was on the floor and secured, it appeared there was an opportunity to place him in a recovery position. Additionally, Deputy S placement of his elbow/forearm near the suspect's neck and the pressure Deputy S applied to the suspect's head could have been addressed by the sergeant. The sergeant was present and should have directed the deputies to adjust their position to avoid the suspect's neck and head."*

The Commander agreed with this assessment. These are particularly noteworthy assessments because they identify policy violations and alternatives and show clear understanding of and value in scanning the environment and utilizing available resources. While the Panel has seen recent improvements in policy violations being called out generally, the commanders in this case did not call out the escort violations, perform a 2.6 three-prong head strike analysis, or refer the matter for an investigation, as recommended by the case Investigator. 2.6 requires a three-prong analysis by the investigator and reviewers to ensure assessment integrity.

The most notable issues in this incident involve force prevention, as follows:

1. Disregarding safe escorting procedures (not securing an inmate to prevent assaults on staff). *LASD Policy 5-03-010 Escorts and Inmate Passes*: High Observation Inmates (HOH) shall be under escort at all times, and when an "inmate is handcuffed or waist chained, escorting personnel shall maintain positive two-point contact with the inmate." A High Observation Housing (HOH) inmate walked freely, unescorted, in handcuffs and a waist chain, and was able to body check a deputy, causing the deputy's head to hit the door. **(2.5 Force on Restrained Inmates)**
2. Unreasonable force (elbow and forearm pressing an inmate's head onto a concrete floor). *LASD Chapter 10 • 3-10/030.00 – Unreasonable Force:* "Department members shall use only that force which is objectively reasonable. Unreasonable force is that force that is unnecessary or excessive given the totality of the circumstances presented to Department members involved in using force." For over a minute, a deputy needlessly pressed a restrained inmate's head onto a concrete floor. **(2.2 Must be objectively reasonable, minimal force, and must be de-escalated if resistance decreases)**
3. Failure to intervene (supervisor failure to stop head compression) *LASD Chater 10 Duty to Intervene*: "Any Department member witnessing unreasonable force shall intervene to prevent or stop the unreasonable force when safely able to do so and shall notify their immediate supervisor or a different supervisor if their immediate supervisor was involved in the force they are reporting." A sergeant looked on and took no action to stop the unreasonable force. **(2.8 All Department members are responsible for stopping excessive force)**

With the presence of numerous personnel, the inmate in full restraints on the floor, and scanning the totality of the circumstances, the deputy could have removed himself from harm's way and let other deputies fill in; deputies must be trained to disengage, when it's safe and appropriate, when they have become the focus of an inmate's rage to defuse this anger.

Other available means were listed as not possible in this force situation. However, Rosas 2.6 states "other techniques would be ineffective" meaning options may or may not include force. Deputy S could have leaned back and removed himself from the fully restrained inmate, in a suicide gown, arms tethered to his side, and surrounded by several deputies.

In a third incident that did not include a head strike, an inmate exited an open unit door and began walking down a corridor. The deputies ordered him to return to the unit, but he refused by standing still. The deputies did not call for a supervisor's assistance as required by the Custody Recalcitrant Inmate policy. Instead, one deputy placed his hands on the inmate's arms, and the other took him to the floor when he was refusing to be cuffed. The Panel found the deputies' actions out of compliance with 2.7, which requires calling and waiting for a supervisor to arrive prior to taking such action. Jail settings offer staff the ability to create time and distance due to the fact the inmate can be contained, Panel force analyses are in accordance with Provisions and related Force Policies specific to a jail setting. The freestanding Custody Manual was written specifically for jail settings, as is *Rosas* Provision 2.1:

> **Provision 2.1:** "The Department should have a separate, revised, free-standing, and logically organized Custody Force Manual for Custody Operations that includes all use of force policies and procedures that are in the Custody Division Manual and the sections of the Manual of Policy and Procedures that are applicable to the Custody Operations. The Custody Force Manual should not include sections of the Manual of Policy and Procedures that are only applicable to other areas of the Department and should not include sections that are not applicable to the use of force by Department members."

*Rosas* requires that training, supervision, and force analysis be evaluated within the context of a secure facility. Custody deputy reactions to disruptive inmate behavior should be considered in the context of an environment where time, distance, and control are possibilities. In jails, resources are more often available and should be expected to be utilized. Containment is a central component of safely managing inmate behavior. Where possible, planned force is safer for all **(20.3 Planned Force)**. By design, jails provide a greater level of this containment with more immediate access to personnel and resources. Field deputies often face delayed backup resources, resulting in greater uncertainty and heightened risks in community environments.

# III. Training

Sections 3.1, 3.2, and 3.4 of the Action Plan require that Department members receive training on use of force policies, custody-based use of force scenarios, ethics, and professionalism. Sections 4.6 and 4.7 require the Department to provide Custody-specific, scenario-based skill development training for existing and new personnel in Crisis Intervention and Conflict Resolution and in "identifying and working with mentally ill inmates." Sections 3.5 and 3.6 require specific training for new Deputy Sheriffs and Custody Assistants related to mentoring and probation reviews. Section 12.1 requires Custody Sergeants receive training in conducting force investigations.

The Panel has previously deemed the Department to be complying "as of" the date reported by the Department for the completion of the initial training required for existing personnel. The Department's continuing compliance with the training provisions is determined by its compliance with the refresher training required every year or every other year. The Department submitted its report on refresher training compliance for 2024 as part of its Sixteenth Self-Assessment. The Department's *Seventeenth Self-Assessment* notes that refresher training results for 2025, which will be included in the Panel's Eighteenth Report, are in progress.

## A. Use of Force Training

### 3.1 Use of Force Training

**Provision Description:** Requires use of force training for all existing Department members in Custody Operations, which should include at a minimum, a one-time eight-hour use of force policy training course for all members assigned to Custody and then a two-hour refresher course every year.

> ***Compliance Measure Summary:*** Section 3.1(a) requires that 90% of Deputies and Custody Assistants assigned to Custody as of July 1, 2016, completed the required training.

As of June 30, 2018, the Department was found to be compliant with Section 3.1(a).

> ***Compliance Measure Summary:*** Section 3.1(b) requires that 90% of Deputies and Custody Assistants assigned to Custody who completed the initial training receive the two-hour refresher course every year.

The Panel's auditors previously verified the Department's reported annual refresher training results, and the Department was found to be in Compliance with Section 3.1(b) as of January 1, 2022, through December 31, 2024

**3.1 Status:** Compliance **As of Date:** January 1, 2022

### 3.4 Custody-based Use of Force Scenarios

**Provision Description:** Custody-based, use of force scenarios included as part of the use of force policy training provided by the Custody Training & Standard Bureau on an in-service and refresher basis.

The use of force training approved by the Panel includes the custody-based use of force scenarios.

**3.4 Status:** Compliance **As of Date:** July 1, 2018

## B. Ethics and Professionalism Training

### 3.2 Ethics and Professionalism Training

**Provision Description:** Requires training all existing Department members in Custody Operations, which should include at a minimum, a one-time four (4) hour training course in ethics, professionalism, and treating inmates with respect, and then a two (2) hour refresher course every other year.

> ***Compliance Measure Summary:*** Section 3.2(a) requires that 90% of Deputies and Custody Assistants assigned to Custody as of July 1, 2016 completed the required training.

As of June 30, 2018, the Department was found in Compliance with the requirements of Section 3.2(a).

> ***Compliance Measure Summary:*** Section 3.2(b) requires that 90% of Deputies and Custody Assistants assigned to Custody who completed the initial training receive the two-hour refresher course every other year.

The Panel's auditors previously verified Compliance with Section 3.2(a) as of July 1, 2018, and with Section 3.2(b) as of January 1, 2020, through December 31, 2024.

**3.2 Status:** Compliance **As of Date:** July 1, 2018

## C. Mental Health Training

### 4.6 Crisis Intervention

**Provision Description:** The Department should provide a minimum of 32 hours of custody-specific, scenario-based, skill development training to all Deputy Sheriffs on Crisis Intervention and Conflict Resolution with eight (8) hours of refresher training every other year.

### 4.7 Mentally Ill Inmates

**Provision Description:** The Department should provide a minimum of eight (8) hours of custody specific, scenario based, skill development training on identifying and working with mentally ill inmates to all existing Custody personnel with a four (4) hour refresher course every other year.

> ***Compliance Measure Summary:*** Sections 4.6(a) and 4.7(a) require that 90% of Deputies assigned to Custody as of July 1, 2016, completed the required training.

As of June 30, 2018, the Department was found Compliant with the De-Escalation and Verbal Resolution Training (DeVRT), mentally ill inmates, and refresher training requirements of Sections 4.6(a) and 4.7(a).

> ***Compliance Measure Summary:*** Sections 4.6(b) and 4.7(b) require that 90% of Deputies assigned to Custody who completed the initial training receive the eight-hour refresher course every other year.

The Panel's auditors previously verified the Department's Compliance with Section 4.6(a) as of July 1, 2018, Section 4.6(b) as of December 31, 2018, and Section 4.7(b) as of January 1, 2023, through December 31, 2024.

**4.6 Status:** Compliance **As of Date:** July 1, 2018
**4.7 Status:** Compliance **As of Date:** January 1, 2023

## D. New Deputy Sheriffs and Custody Assistants

### 3.5 Additional Training and Mentoring

**Provision Description:** Requires Unit Commanders to determine "what additional training, counseling, or mentoring may be required when a personnel complaint involving the use of force is resolved with a finding that it 'Appears Employee Conduct Could Have Been Better' direct that the Department member undergo additional training, counseling, or mentoring, and document the action taken."

> ***Compliance Measure Summary:*** Section 3.5 requires that 90% of personnel complaints involving use of force that were resolved with a "Appears Employee Conduct Could Have Been Better" finding reflect documentation that the Unit Commander reasonably determined what additional training, counseling or mentoring was required.

The Department's *Seventeenth Self-Assessment* reports that there were no inmate grievances against staff involving use of force where the disposition was that it "Appears Employee Conduct Could Have Been Better." The Department is in Compliance with Section 3.5 as of July 1, 2019, through June 30, 2025.

**3.5 Status:** Compliance **As of Date:** July 1, 2019

### 3.6 Probation Reviews

**Provision Description:** Requires Unit Commanders to review new Department members within six (6) months of being initially assigned to Custody and again before the end of their probationary period.

> ***Compliance Measure Summary:*** Section 3.6 requires that 95% of the new Department members in Custody Operations were reviewed (1) within six months after being assigned to Custody and (2) again before their first post-probationary assignment.

The Department's Sixteenth Self-Assessment previously reported that it achieved 100% compliance in the Second Semester of 2024, greater than the 95% threshold required by Section 3.6. The Department's *Seventeenth Self-Assessment* reports that it achieved 100% compliance in the First Semester of 2025. These results have been verified by the Panel's auditors, and the Department is in Compliance with Section 3.6 as of January 1, 2023, through June 30, 2025.

**3.6 Status:** Compliance **As of Date:** January 1, 2023

## E. Sergeant Training

### 12.1 Force Investigations Training

**Provision Description:** Requires that all Custody Sergeants receive an initial 16-hour block of training in conducting use of force investigations, reviewing use of force reports, and the Department's protocols for conducting such investigations. It also requires a two (2) hour refresher course every year.

> ***Compliance Measure Summary:*** Section 12.1-1 requires that 90% of all Custody Sergeants received the initial training and a two (2) hour refresher course every year. Section 12.1-2 requires that 95% of new Sergeants completed the required training before or within 90 days after they assume their duties in Custody.

The Panel approved the 16-hour initial training course required by Section 12.1 on February 24, 2017. The Panel's auditors previously verified Compliance with Section 12.1 as of July 1, 2019, through December 31, 2024. The Department's *Seventeenth Self-Assessment* reports that it maintained compliance through June 30, 2025. These results have been verified by the Panel's auditors, and the Department is in Compliance with Section 12.1 as of July 1, 2019, through June 30, 2025.

**12.1 Status:** Compliance **As of Date:** July 1, 2019

| Training Provisions | | Fifteenth Report | Sixteenth Report | Seventeenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 3.1 | Use of Force Training | C | C | C | 1/1/2022 | ✓ |
| 3.2 | Ethics & Professionalism | C | C | C | 7/1/2018 | ✓ |
| 3.4 | Custody-based Scenarios | C | C | C | 7/1/2018 | ✓ |
| 3.5 | Add Training and Mentoring | C | C | C | 7/1/2019 | ✓ |
| 3.6 | Probation Reviews | C | C | C | 1/1/2023 | |
| 4.6 | Crisis Intervention | C | C | C | 7/1/2018 | ✓ |
| 4.7 | Mentally Ill Inmates | C | C | C | 1/1/2023 | |
| 12.1 | Force Investigations | C | C | C | 7/1/2019 | ✓ |

# IV. Reporting and Investigation of Force Incidents

## A. Reporting and Investigation Provisions in Force Package Reviews

The findings below pertain to application of policies into practice and are supported by the selection of use of force cases reviewed. For the Seventeenth Reporting Period 50 packages were reviewed: 25 in 1Q25 and 25 in 2Q25. Overall results for each provision during the Seventeenth Reporting Period are below. Findings for each quarter are in *Section C: Quarterly Findings-Reporting & Investigations Provisions*.

> ***Compliance Measure Summary:*** (#1-7) Within 10 days of the end of each quarter the Department will provide the Monitors with a cumulative force synopsis for each incident in the Downtown Jail Complex. The Monitors will select a minimum of 25 force packages to review for compliance with the Action Plan of all reporting and investigations provisions through Vertical and Horizontal Assessments. The Department will provide each package and include a summary sheet that indicates how the Department assessed each applicable provision. Reporting and Investigations provisions will need to be 90% or more compliant for the Vertical Assessments.

**Vertical Assessment:** Of the 50 cases reviewed, thirty-eight (38) were found compliant with Reporting and Investigative Provisions, which constitutes 76% of all cases reviewed and is below the 90% compliance threshold. This compliance rate matches the 76% compliance rate in the Sixteenth Report and represents a continued increase in compliance from 72% in the Fifteenth Report, 56% in the Fourteenth Report, 46% in the Thirteenth Report, and 8% in the Twelfth Report. Of the thirty-eight (38) cases in compliance with the Reporting and Investigative provisions, nineteen (19) were from 1Q25 (five at TTCF, six at IRC, and eight at MCJ) and nineteen (19) were from 2Q25 (thirteen at TTCF, zero at IRC, and six at MCJ).

**Horizontal Assessment:** The findings for the fifteen (15) Reporting & Investigative Provisions represent the Horizontal Assessment, which determines whether the Department is in Compliance with each of the applicable provisions. It takes into consideration the objective of the provision and the nature and extent of any violations. Percentages are calculated based on packages reviewed in both quarters. Of the fifteen (15) provisions evaluated for the Seventeenth Reporting Period, ten (10) were found in compliance for the First and Second Quarters of 2025 combined based on packages reviewed in each quarter.

### 4.2 Mental Health Professionals

**Provision Description:** Supervisors investigating uses of force are required to interview mental health professionals who witnessed the incident or attempted to resolve it. Record interview if consented to.

Of the applicable cases reviewed, 100% (11 out of 11) were found to be in compliance, which exceeds the 90% compliance threshold.

**4.2 Status:** Compliance **As of Date:** January 1, 2023

### 5.3 Unexplained Discrepancies

**Provision Description:** Any unexplained tactical decisions or discrepancies among witnesses should be referred in writing by the reviewing Commander(s) to the investigator.

Of the applicable cases reviewed, 94% (45 out of 48) were found to be in compliance, which exceeds the 90% threshold.

**5.3 Status:** Compliance **As of Date:** July 1, 2022

### 12.2 Location of Inmate Interviews

**Provision Description:** Inmate witnesses to force incidents should be asked to be interviewed, and then interviewed, away from other inmates.

Of the applicable cases reviewed, 75% (27 out of 36) were found to be in compliance, which is below the 90% compliance threshold.

**12.2 Status:** Out of Compliance **As of Date:** N/A

## 12.4 Uninvolved Supervisors

**Provision Description:** Force investigations should not be conducted by the direct supervisor of the staff member involved in the use of force.

Of the applicable cases reviewed, 98% (48 out of 49) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.4 Status:** Compliance **As of Date:** July 1, 2023

## 12.5 Standard Order and Format

**Provision Description:** Use of force packages should be organized in a standard order and format.

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**12.5 Status:** Compliance **As of Date:** July 1, 2019

## 15.1 Timeliness of Reports

**Provision Description:** Every staff member who uses or assists in a force incident completes a separate and independent written report before going off duty.

Of the applicable cases reviewed, 90% (45 out of 50) were found to be in compliance, which meets the 90% compliance threshold.

**15.1 Status:** Compliance **As of Date:** January 1, 2025

## 15.2 All Department Witnesses

**Provision Description:** Each staff member who witnesses a use of force prepares a written report unless the Watch Commander specifically designates only certain witnesses to prepare reports when a large number witnessed the same event.

Of the applicable cases reviewed, 98% (48 out of 49) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.2 Status:** Compliance **As of Date:** July 1, 2019

## 15.3 Force by Other Members

**Provision Description:** Staff members who use force must describe the type used in a written report as well the type used by others.

Of the applicable cases reviewed, 82% (36 out of 44) were found to be in compliance, which is below the 90% compliance threshold.

**15.3 Status:** Out of Compliance **As of Date:** N/A

## 15.4 Description of Injuries

**Provision Description:** Staff members who witness a use of force incident must describe visible or apparent injuries to department members, inmates, or others involved.

Of the applicable cases reviewed, 90% (45 out of 50) were found to be in compliance, which meets the 90% compliance threshold.

**15.4 Status:** Compliance **As of Date:** July 1, 2025

## 15.5 Clarification After Video

**Provision Description:** A Department member who wants to make any clarifications or changes after viewing a video of a force incident should be required to either prepare a supplemental report or specifically note any changes to the Department member's initial report.

Of the applicable cases reviewed, 76% (13 out of 17) were found to be in compliance, which is below the 90% compliance threshold.

**15.5 Status:** Out of Compliance **As of Date:** N/A

## 15.6 Separation of Deputies

**Provision Description:** To the extent practical, Department members should be separated until they have completed their use of force reports and/or witness reports.

Of the applicable cases reviewed, 80% (36 out of 45) were found to be in compliance, which is below the 90% compliance threshold.

In cases that are 15.6 non-compliant, either the Provision was not addressed in the package, or, more likely, standard language was used with no identification of the supervisor who admonished the deputies to write independent reports. In addition to Rosas 15.6, LASD Chapter 10 Force Policy prohibits "boiler plate language" from being used.

The Panel has advised the Department what is needed to achieve compliance with this provision. The Department reports that the Custody Compliance and Sustainability Bureau intends to publish a newsletter to improve understanding of its expectations with this provision.

**15.6 Status:** Out of Compliance **As of Date:** N/A

## 15.7 Individual Perceptions

**Provision Description:** Watch Commanders/Supervising Lieutenants and Unit Commanders review force reports to ensure an accurate and honest depiction of the incident, individual perception and recollection, and absence of common wording or phrasing that would suggest inappropriate collaboration.

Of the applicable cases reviewed, 96% (48 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**15.7 Status:** Compliance **As of Date:** January 1, 2025

## 16.1 Healthcare Assessment

**Provision Description:** A documented medical assessment of each inmate upon whom force is used as soon as practical after the force incident.

Of the applicable cases reviewed, 98% (49 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**16.1 Status:** Compliance **As of Date:** July 1, 2019

## 16.2 Photographs of Injuries

**Provision Description:** Supervisors investigating force incidents must photograph any injury, swelling, or redness sustained by staff members and document the absence of injury.

Of the applicable cases reviewed, 89% (41 out of 46) were found to be in compliance, which is below the 90% compliance threshold.

**16.2 Status:** Out of Compliance **As of Date:** N/A

## 16.3 Medical Report of Injuries

**Provision Description:** Medical staff treating an injured inmate must report any injuries related to a use of force or an allegation by the inmate of a use of force.

Of the applicable cases reviewed, 100% (50 out of 50) were found to be in compliance, which exceeds the 90% compliance threshold.

**16.3 Status:** Compliance **As of Date:** July 1, 2019

| Reporting & Investigations, Packet Review | | Fifteenth Report | Sixteenth Report | Seventeenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 4.2 | Mental Health Professionals | 92% | 100% | 100% | 1/1/2023 | |
| 5.3 | Unexplained Discrepancies | 97% | 96% | 94% | 7/1/2022 | ✓ |
| 12.2 | Location of Inmate Interviews | 60% | 68% | 75% | | |
| 12.4 | Uninvolved Supervisors | 96% | 100% | 98% | 7/1/2023 | |
| 12.5 | Standard Order & Format | 98% | 100% | 100% | 7/1/2019 | ✓ |
| 15.1 | Timeliness of Reports | 86% | 94% | 90% | 1/1/2025 | |
| 15.2 | All Department Witnesses | 96% | 100% | 98% | 7/1/2019 | ✓ |
| 15.3 | Force by Other Members | 90% | 92% | 82% | | |
| 15.4 | Description of Injuries | 90% | 84% | 90% | 7/1/2025 | |
| 15.5 | Clarification After Video | 94% | 94% | 76% | | |
| 15.6 | Separation of Deputies | 82% | 83% | 80% | | |
| 15.7 | Individual Perceptions | 88% | 96% | 96% | 1/1/2025 | |
| 16.1 | Healthcare Assessment | 100% | 100% | 98% | 7/1/2019 | ✓ |
| 16.2 | Photograph of Injuries | 88% | 91% | 89% | | |
| 16.3 | Medical Report of Injuries | 100% | 98% | 100% | 7/1/2019 | ✓ |

# B. Reporting & Investigations Provisions as Reported by Department

Many of the recommendations in the Action Plan that pertain to the reporting and investigation of force used by Department personnel in Custody Operations are assessed by the Panel through a review of the completed force packages. Other provisions are reported by the Department as follows:

## 5.1 Tracking of Force Incidents

**Provision Description:** Requires the Department to track the status of all investigations, reviews, and evaluations of all use of force incidents and allegations to ensure they were completed appropriately and timely. By the end of the shift, a supervisor or Internal Affairs investigator enters incidents into a database with a summary and an initial category classification.

> ***Compliance Measure Summary:*** 5.1(2) On a quarterly basis, Monitors determine if the completed force packages reviewed were entered into the database pursuant to 5.1(1).

The Department reports that 100% of the force incidents for the First Quarter of 2025 and 96% of the force incidents for the Second Quarter of 2025 were entered into the database within two hours of the end of the shift. The one incident that was not entered within two hours of the end of the shift was entered five (5) days from the date of the incident.

***Compliance Measures Summary:***
5.1(1) and (4a): 95% of use of force incidents are entered into the database within two hours of the end of shift in which the incident occurred.
5.1(4)b and c: 90% of investigations of Deputies and Custody Assistants were completed timely and appropriately.

The Department reports its compliance rate for investigations of use of force and allegations of force incidents for the First Quarter of 2025 at 93% (14 out of 15), with TTCF at 80% (4 out of 5), MCJ at 100% (5 out of 5), and IRC at 100% (5 out of 5). One (1) of the random 15 cases assessed was found out of compliance—investigations were not completed within one year from the date the Department was made aware of the incident.

For the Second Quarter of 2025, the Department reports 75% (9 out of 12) of use of force and allegations of force incidents were investigated appropriately and timely. Of the twelve (12) incidents, IRC achieved 100% compliance (2 out of 2), MCJ achieved 60% compliance (3 out 5), and TTCF achieved 80% compliance (4 out of 5). Three (3) of the investigations were not completed within one year of the incident. As reported by the Department's *Seventeenth Self-Assessment,* MCJ was issued a Corrective Action Plan (CAP) and implemented a Custody Force Investigative Team tracker with regular updates to Unit Commanders on progress and due dates.

For the Seventeenth Reporting Period, investigations were completed within one year from the date the Department was made aware of the incident in 85% (23 out of 27) of the incidents, which is below the 90% compliance threshold.

**5.1 Status:** Out of Compliance **As of Date:** N/A

## 8.3 CFRC Review

**Provision Description:** Evaluations of grievance investigations claiming force was used to retaliate against an inmate should be reviewed by the Custody Force Review Committee.

***Compliance Measures Summary:*** A list of completed investigations of inmate grievances claiming force was used in retaliation is provided quarterly to the Monitors and will include the CFRC review of the investigation's evaluation.

There was no data to access for the Seventeenth Reporting Period. According to the posted information in SharePoint, there were no grievances in which an inmate claimed force was used in retaliation. During the Panel's Monitoring visits, inmates have reported they have been retaliated against for filing grievances or seeking to file a grievance. Most of those reports indicate other types of retaliation (prevention of showers, food, etc.). The inmates report they don't file grievances for retaliation because they do not view doing so as an effective mechanism to resolve the issue.

**8.3 Status:** Compliance **As of Date:** July 1, 2021

## 13.1 Documenting Dishonesty

**Provision Description:** The Department must have a firm zero tolerance policy for acts of dishonesty, force-related violations, and failure to report uses of force. If the Department does not terminate or suspend a member who is found to have been dishonest in connection with a use of force policy violation or who failed to report a use of force, the Department should document the reason the member was not terminated or suspended. Members who receive a written reprimand of suspension on a formal and adequate performance review program and closely monitor performance.

***Compliance Measures Summary:*** 13.1 (a) 95% compliance with all completed investigations where there was a staff member who was found to have been dishonest in

connection with a use of force policy violation or who failed to report a use of force as well as documentation for incidents that did not result in termination.
13.1 (b) If not terminated or suspended, the Department will document the reasons why with mitigating and aggravating factors that support that outcome and the formal performance review program on which the member was placed and for how long.
13.1 (c) Department will provide detail and actions taken in the semi-annual assessment in response to specific cases/non-compliant findings identified by Monitors.

The Department's *Seventeenth Self-Assessment* indicates it achieved 100% compliance in both quarters of the Seventeenth Reporting Period. The following is a summary of the data posted for each case: two (2) in the First Quarter of 2025 and one (1) in the Second Quarter of 2025.

- First Quarter of 2025: In the first incident, a Custody Assistant at TTCF was arrested in January 2022 for driving under the influence and hit and run. Following an Internal Affairs Investigation, the decision was made to terminate the individual for violating the Honesty Policy, Dishonesty/False Statements, Obstructing an Investigation, and Cooperation during a Criminal Investigation. However, the individual resigned March 19, 2025 prior to discharge. In the second incident, a Custody Assistant at MCJ was released from their probationary period February 24, 2025 for violating the Honesty Policy, Dishonesty/Failure to Make Statements, and False Information of Record. The Custody Assistant had applied for a deputy sheriff position and disclosed during the background interview information that had been previously omitted or minimized.
- Second Quarter of 2025: A Deputy Sheriff was terminated on May 29, 2025, for violating policies related to honesty, dishonesty/false information, dishonesty/failure to make statements, and cooperation during criminal investigations.

The Department has historically reported off-duty misconduct under this provision. The Panel's Eighteenth Report will not include cases involving off-duty misconduct under this provision. In the Joint Stipulation re: Implementation Plan and Compliance Measures filed by the Parties on November 21, 2025, and approved by the Court on November 24, 2025, this Provision and its Compliance Measures have been revised.

**13.1 Status:** Compliance **As of Date:** October 1, 2019

## 13.2 Reports of Dishonesty and PREA

**Provision Description:** All findings of dishonesty, force-related violations, and failures to report uses of force by Department members; punishment imposed; and the reasons why any member was not terminated or suspended is reported to the Office of the Inspector General quarterly.

For the Seventeenth Reporting Period, the Inspector General was advised of all actions noted in Section 13.1.

**13.2 Status:** Compliance **As of Date:** October 1, 2019

## 14.1 Review of Criminal Referrals

**Provision Description:** An additional review of referrals of inmates for criminal prosecution arising from incidents involving the use of force by Department members must be performed to ensure charges are not being brought to help justify the use of force.

***Compliance Measures Summary:*** Requires the Department to review all referrals of an inmate for criminal prosecution for assaulting a staff member and report to the Monitors that 95% of referrals were reviewed by the Unit Commander who verified charges were not brought as justification for use of force.

The Department exceeds the 95% compliance threshold for both quarters of the Seventeenth Reporting Period. The Department reports 100% compliance with Section 14.1 for the First Quarter of 2025, with 26 out of 26 cases referred to and verified by the Unit Commander that charges were not brought as a justification for a use of force prior to the referral being sent to the District Attorney's Office. For the Second Quarter of 2025, the Department also reports 100% compliance with 14.1, with 26 out of 26 cases reviewed by the Unit Commander prior to submission to the District Attorney's Office.

**14.1 Status:** Compliance **As of Date:** January 1, 2025

### 14.2 Timeliness of Criminal Referrals

**Provision Description:** Timely forward incidents of officer misconduct that may amount to criminal violations to the Office of the District Attorney.

> ***Compliance Measures Summary:*** Requires the Department review all referrals of a staff member for possible prosecution for alleged misconduct and report to the Monitors that 90% of referrals were sent to the Office of the District Attorney within six months.

During the First Quarter of 2025, there was one (1) incident submitted to the District Attorney's Office for possible criminal prosecution. The referral occurred 779 days from the date the Department learned of the incident. The Department learned of the incident on January 10, 2023. The ICIB investigation was completed and submitted to the District Attorney's Office February 27, 2025. Reasons cited for this delay include staffing shortages, prioritization of cases nearing statutory deadlines, and availability of a witness. There were no incidents that fit the criteria for 14.2 in the Second Quarter of 2025.

**14.2 Status:** Compliance **As of Date:** July 1, 2018

| Reporting & Investigations, Department Reported | | Fifteenth Report | Sixteenth Report | Seventeenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 5.1 | Tracking of Force Incidents | X | X | X | | |
| 8.3 | CFRC Review | C | C | C | 7/1/2021 | ✓ |
| 13.1 | Documenting Dishonesty | C | C | C | 10/1/2019 | ✓ |
| 13.2 | Reports of Dishonesty/PREA | C | C | C | 10/1/2019 | ✓ |
| 14.1 | Review of Criminal Referrals | X | C | C | 1/1/2025 | |
| 14.2 | Timeliness of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |

## C. Quarterly Findings—Reporting and Investigations Provisions

### First and Second Quarter 2025 Combined Results

For the First and Second Quarters of 2025, the Panel reviewed 50 use of force incidents combined—20 from TTCF (40%), 21 from MCJ (42%), and 9 from IRC (18%).

The Department was not in Compliance with five (5) of the fifteen (15) Reporting & Investigations Provisions: (1) 12.2 Location of Inmate Interviews, (2) 15.3 Force by Other Members, (3) 15.5 Clarification After Video, (4) 15.6 Separation of Deputies, and (5) 16.2 Photograph of Injuries. Of the five (5) Reporting and Investigations Provisions out of compliance, zero had a compliance rate below 70% in the Seventeenth Reporting Period.

The Department was in Compliance, or 90% or above, with the following ten (10) provisions: 4.2, 5.3, 12.4, 12.5, 15.1, 15.2, 15.4, 15.7, 16.1, and 16.3. Of the ten (10) in compliance, three (3) reached 100% compliance: 4.2, 12.5, and 16.3.

### First Quarter 2025 Results

For the First Quarter of 2025, the Panel reviewed 25 force incidents—six (6) from TTCF (24%), twelve (12) from MCJ (48%), and seven (7) from IRC (28%).

The Department was not in Compliance with six (6) of the fifteen (15) Reporting & Investigations Provisions: (1) 12.2 Location of Inmate Interviews, (2) 15.3 Force by Other Members, (3) 15.4 Description of Injuries, (4) 15.5 Clarification After Video, (5) 15.6 Separation of Deputies, and (6) 16.2 Photograph of Injuries. Of the six (6) Reporting and Investigations Provisions out of compliance, zero had a compliance rate below 70% in 1Q25.

The Department was in Compliance, or 90% or above, with the following nine (9) provisions: 4.2, 5.3, 12.4, 12.5, 15.1, 15.2, 15.7, 16.1, and 16.3. Of the nine (9) in compliance, seven (7) reached 100% compliance: 4.2, 5.3, 12.4, 12.5, 15.2, 15.7, and 16.3.

**Second Quarter 2025 Results**

In the Second Quarter of 2025, the Panel reviewed 25 force incidents—fourteen (14) from TTCF (56%), nine (9) from MCJ (36%), and two (2) from IRC (8%).

The Department was not in Compliance with six (6) of the fifteen (15) Reporting & Investigations Provisions: (1) 5.3 Unexplained Discrepancies, (2) 12.2 Location of Inmate Interviews, (3) 15.1 Timeliness of Reports, (4) 15.3 Force by Other Members, (5) 15.5 Clarification After Video, and (6) 15.6 Separation of Deputies. Of the six (6) Reporting and Investigations Provisions out of compliance, zero had a compliance rate below 70% in 2Q25.

The Department was in Compliance, or 90% or above, with the following nine (9) provisions: 4.2, 12.4, 12.5, 15.2, 15.4, 15.7, 16.1, 16.2, and 16.3. Of the nine (9) in compliance, five (5) reached 100% compliance: 4.2, 12.5, 16.1, 16.2, and 16.3.

# V. Inmate Grievances

The Action Plan requires extensive changes in how the Department handles inmate grievances and requests for service. On July 15, 2016, the Department issued a new *Inmate Grievance Manual* (Volume 8 of the Custody Division Manual) to implement a new grievance system. The Panel assessed the Department's implementation of the new grievance system in the Sixteenth Reporting Period as follows:

## A. Grievance Forms

### 6.2 Availability of Grievance Forms

**Provision Description:** Grievance forms are reasonably available to inmates at all times.

During the Panel's April 2025 visit to the Downtown Jail Complex, some of the boxes within the housing units did not contain grievance forms. Similar to other Monitoring visits, inmates reported challenges with getting access to grievance forms.

**6.2 Status:** Out of Compliance **As of Date:** N/A

### 7.1 Conflict Resolution Meeting

**Provision Description:** Inmates who submit grievances should be advised that a conflict resolution meeting is voluntary to address the grievances without a personnel investigation. If successful, the grievance resolution is documented accordingly.

CCSB reported no grievances against staff were adjudicated in the randomly selected months where a Conflict Resolution Meeting was conducted for either the First or Second Quarter of 2025.

**7.1 Status:** Compliance **As of Date:** January 1, 2017

### 6.4 Use of Force Grievances

**Provision Description:** Grievance forms should include "use of force" as a specific category of "grievances against staff" and brought to the attention of Unit Commanders.

> ***Compliance Measure Summary:*** 90% of force grievances reviewed were brought to the attention of the Unit Commander within 10 days of receipt and properly handled.

The Department reports 100% compliance with this provision in the First Quarter of 2025. Out of the three (3) applicable grievances, all were brought to the attention of the Unit Commander within the required timeframe. During the Second Quarter of 2025, 86% (6 out of 7) of force and retaliation grievances were brought to the attention of the Unit Commander within the required timeframe. The one (1) outside of the required timeframe was brought to the attention of the Unit Commanders 14 days after receipt. As reported by the Department's *Seventeenth Self-Assessment*, MCJ was notified of this failure and will face a Corrective Action Plan if the issue recurs.

For the Seventeenth Reporting Period, nine (9) out of ten (10) applicable grievances were brought to the attention of the Unit Commanders within the required ten (10) days of receipt, which is 90% compliance and meets the 90% compliance threshold.

**6.4 Status:** Compliance **As of Date:** January 1, 2024

### 6.5 Grievances Against Staff

**Provision Description:** Grievance forms should include "retaliation" and "harassment" as specific categories of "grievances against staff" and brought to the attention of Unit Commanders.

> ***Compliance Measure Summary:*** 90% retaliation grievances reviewed were brought to the attention of the Unit Commander within 10 days of receipt and properly handled.

In the First Quarter of 2025, the Department reports that 100% (9 out of 9) of the harassment and retaliation grievances were brought to the Unit Commanders' attention within 10 days and handled appropriately. In the Second Quarter of 2025, the Department reports 88% (15 out of 17) of grievances were handled appropriately and brought to the attention of the Unit Commanders within the timeframe. The two (2) grievances that failed to be handled properly were brought to the attention of the Unit Commander after thirteen (13) and fourteen (14) days, respectively. As reported by the Department's *Seventeenth Self-Assessment*, MCJ was notified of this failure and will face a Corrective Action Plan if the issue recurs.

For the Seventeenth Reporting Period, 24 out of 26 harassment and retaliation grievances were brought to the attention of the Unit Commander within the required ten (10) days of receipt, which is 92% compliance and exceeds the 90% compliance threshold.

**6.5 Status:** Compliance **As of Date:** July 1, 2023

## B. Emergency Grievances

### 6.3 Emergency Grievance Forms

**Provision Description:** A prominent box is placed on the form to indicate an "Emergency Grievance."

> ***Compliance Measure Summary:*** Monitors verify compliance with 6.3 through interviews of staff and inmates and review of grievances marked "emergency."

A prominent box is located on the grievance form and confirmed through reviews and interviews.

**6.3 Status:** Compliance **As of Date:** January 1, 2017

### 6.7 Handling Emergency Grievances

**Provision Description:** Grievances marked "emergency" are given to and reviewed by a supervisor as soon as possible to determine if immediate action is needed to protect life or safety. Provide the inmate a written response documenting action taken to address the emergency.

> ***Compliance Measure Summary:*** Monitors review 50 consecutive grievances to ensure 95% of grievances marked "emergency" were reviewed and handled pursuant to Section 6.7.

The Department reports zero grievances met the criteria of this provision during either the First or Second Quarter of 2025.

**6.7 Status:** Compliance **As of Date:** July 1, 2018

### 6.8 Notification of Non-Emergency

**Provision Description:** If the grievance is determined to be non-emergent, the inmate is notified as soon as practical that the grievance will be handled as non-emergent with reason documented.

> ***Compliance Measure Summary:*** Monitors review 50 consecutive grievances to ensure 90% of those determined non-emergent were documented and notifications to inmates were made within five days.

For the First Quarter of 2025, the Department reports 100% (28 [16] out of 28) of the grievances were correctly downgraded and the inmate was notified in a timely manner that the grievance would be handled

[16] The posted results reflect that one (1) grievance was documented in the Custody Inmate Grievance Application (CIGA) and downgraded to non-emergent. However, the grievance was handled as an emergent grievance, and the inmate was contacted immediately.

as non-emergent. The Department also reports it achieved 97% compliance in the Second Quarter of 2025, with 39 out of 40 emergency grievances downgraded to non-emergent being properly handled. In the one (1) emergency grievance not handled properly, the notification to the inmate was made 22 days after collection. For the Seventeenth Reporting Period, 67 of the 68 grievances were properly downgraded to non-emergency for a 99% compliance rate, which exceeds the 90% compliance threshold.

**6.8 Status:** Compliance **As of Date:** July 1, 2018

## C. Inmate Grievance Coordinator

The recommendations in Sections 6.9, 6.13, 6.14, and 6.15 of the Action Plan address expectations and duties of the Inmate Grievance Coordinator position.

### 6.9 Inmate Grievance Coordinator

**Provision Description:** Requires all emergency grievances be forwarded to the Inmate Grievance Coordinator (IGC) who will review for proper handling and notify the Unit Commander if not properly handled.

The Department's posted data pertaining to Section 6.9 for 1Q25 and 2Q25 indicate there were zero grievances deemed emergent. As noted in the Department's *Seventeenth Self-Assessment*, the Inmate Grievance Coordinator (IGC) at MCJ failed to review emergent grievances to ensure line supervisors appropriately handled the grievances. A CAP was issued to the MCJ Commander. As a result, the IGC reviewed the pending emergent grievances.

**6.9 Status:** Out of Compliance **As of Date:** N/A

### 6.13 Grievance Coordinator Tracking

**Provision Description:** Regularly track the handling of inmate grievances to ensure the investigations are completed timely and reasonably, and that inmates are notified of the results of the investigations.

### 6.14 Grievance Coordinator Reports

**Provision Description:** Provide a monthly report to Unit Commanders on the status of grievances, timeliness of investigations, responses to grievances and appeals, and inmate notifications.

### 6.15 Grievance Coordinator Analysis

**Provision Description:** Analyze inmate grievances monthly to identify any problematic trends and provide that analysis in a monthly report to Unit Commanders and senior management.

> ***Compliance Measures Summary:*** Provide the Monitors with one or more quarterly reports to address all requirements of the Coordinator provisions. The Inmate Grievance Coordinator will meet with the Monitors once a quarter.

The Panel met with the Compliance and Sustainability Grievance Team during the January and April 2025 Monitoring visits. Staff reported the appeals report function had been completed. The Custody Inmate Grievance (CIGA)'s monthly reports summarize data related to the timeliness of investigations and responses to grievances and appeals. The reports also identify the top 5 categories for grievances against staff.

**6.13, 6.14, and 6.15 Status:** Compliance **As of Date:** July 1, 2018

### 6.16 Centralized Grievance Unit

**Provision Description:** Establish a centralized unit to collect, review, categorize, forward for investigations, and make appropriate notifications for inmate grievances.

The Panel previously determined the Department's structure of a Grievance Coordinator supervising the grievance teams at all of the Downtown Jail Complex facilities was equivalent in function to a centralized system and was acceptable, pending progress and specific results. The Panel continues to deem the Department's Grievance Team structure acceptable.

**6.16 Status:** Compliance **As of Date:** January 17, 2017

## D. Handling of Grievances

### 6.10 Collection of Grievances

**Provision Description:** Grievances should be collected from the locked grievance boxes on each living unit no less frequently than once per day. Collection time should be recorded in a log and reviewed within 24 hours of collection.

> ***Compliance Measures Summary:*** Monitors will inspect collection boxes, verify that the database is accurate and up-to-date, and ensure that 95% of grievances selected for review are collected, reviewed, entered, and tracked timely.

The Department's *Seventeenth Self-Assessment* reports that 100% of the reviewed grievances were collected and reviewed within 24 hours and handled as required in the First and Second Quarters of 2025. Since the *Panel's Eighth Report*, the Panel has noted the Compliance Measure for Section 6.10 does not yield sufficient data to assess compliance with this provision. For example, for 1Q25, the first 25 consecutive grievances at MCJ for the selected month were collected within the first five days, which does not provide a meaningful measurement of the Department's compliance with Section 6.10. Accordingly, the Panel has reviewed the Unit Collection compliance data for the entire randomly selected month to assess compliance with Section 6.10 below.

First Quarter of 2025 (February):

- MCJ's monthly collection log shows a compliance rate of 92%. Seven areas have the lowest compliance rates as follows in descending order:
  - 3000 Control Booth at 64%
  - 4000 Entry at 50%
  - Cell 40 Control at 46%
  - 2000 Control Booth, 9100-9200 Entry, and 9300-3400 Entry at 21%
  - 9500 Entry at 14%
- TTCF's compliance rate was 95%, with the lowest compliance rate of 79% in one area.
- IRC's compliance rate was 82%, with two areas at the lowest compliance rate: Class Rear at 32% and Clinic Entry at 57%. The Booking Front and Custody Line locations saw improvement from the Sixteenth Reporting Period. Class Rear continued its low compliance rate.

Second Quarter of 2025 (May):

- MCJ's monthly collection log reflects 80% compliance. Nine areas have the lowest compliance rates as follows in descending order:
  - 2000 Control Booth at 39%
  - 3000 Control Booth at 32%
  - 4000 Entry at 29%
  - 9100-9200, 9300-9400, and 9500 Entry at 19%
  - 4800 A/C and B/D Rows at 16%
  - Cell 40 Control at 10%
- TTCF's compliance rate was 99%, with the lowest compliance rate at 90%.

- IRC's compliance rate was 70%, with the three areas at the lowest compliance rate: Custody Line at 45%, Booking Front at 42% and Class Rear at 16%.

TTCF met and exceeded the 95% compliance threshold during the Seventeenth Reporting Period. MCJ and IRC fell below the compliance threshold in both quarters of 2025.

Since the *Panel's Twelfth Report* (p. 39) the Panel has been "...concerned with the low collection rates in certain floors/units within the downtown facilities." In the *Panel's Fifteenth Report* (p. 41), it was noted that the Department explained "there was an oversight including some of these areas…[that] has since been corrected." The Department reports issuance of CAPs and briefings with supervisors to discuss the daily collection requirements in its past self-assessments. The results of the First and Second Quarters of 2025 collection logs suggest additional support in those areas is needed.

**6.10 Status:** Out of Compliance **As of Date:** N/A

## 6.11 Failure to Properly Handle Grievances

**Provision Description:** Failing to provide an inmate with a grievance form when requested, destroying or concealing grievances, failing to respond appropriately to a grievance, attempting to intimidate an inmate from filing a grievance, and retaliating against an inmate who has filed a grievance, may each be a cause for disciplinary action.

> ***Compliance Measure Summary:*** Provide the Monitors with a log of any inmate grievances about the matters encompassed by Paragraph 6.11, the result of the investigations of those grievances, and documentation that appropriate corrective action was taken in 100% of cases.

For the Seventeenth Reporting Period, the Department reports that no staff members were found to have engaged in conduct encompassed by this Provision. The Panel is not aware of any cases in which the Department has found that staff retaliated against an inmate in a manner encompassed by this Provision. The Panel reviewed a sample of six grievances related to this provision and found that the disposition for three of them was "unresolved." In those three cases, the Department was unable to reach a determination. The Panel plans to meet with staff during their next Monitoring visit regarding this provision.

**6.11 Status:** Compliance **As of Date:** July 1, 2022

## 6.12 Tracking Inmate Grievances

**Provision Description:** All inmate grievances should be entered into and tracked in an inmate grievance database that reflects the nature and status of the grievance, and personnel responsible for the Department's handling of the grievance.

> ***Compliance Measures Summary:*** Monitors will review 25 grievances from MCJ and 25 from TTCF to ensure that 95% of grievances reviewed are collected, reviewed, entered, and tracked timely.

The Department's posted results report that 100% of the grievances at both MCJ and TTCF in the randomly selected months in the First and Second Quarters of 2025 were entered into the database as required by Section 6.12. The source documents for these results were available to, and reviewed by, the Panel.

**6.12 Status:** Compliance **As of Date:** July 1, 2018

## 8.1 Anti-Retaliation

**Provision Description:** Prohibits Department personnel from retaliating against inmates.

> ***Compliance Measures Summary:*** Department implements and enforces an anti-retaliation policy and provides Monitors with a quarterly log of cases and findings as well as the first 25 investigations alleging retaliation.

The Department posted the results of the investigations approved by Unit Commanders in the randomly selected months and the number of anti-retaliation grievances received and investigated in the First and Second Quarters of 2025, which were as follows:

- First Quarter of 2025 there were twenty-nine (29) anti-retaliation grievances received, and zero investigations were completed.
- Second Quarter of 2025 there were thirty-seven (37) anti-retaliation grievances received, and one (1) investigation completed.

The Panel notes that of the sixty-six (66) grievances received during this Reporting Period alleging retaliation, one (1) investigation was completed. In the *Panel's Fifteenth Report*, the Panel noted the Department needed to address the backlog in these investigations. Since the Fifteenth Reporting Period, there have been 308 grievances alleging retaliation—167 during the Fifteenth Reporting Period, 75 in the Sixteenth Reporting Period, and 66 in the Seventeenth Reporting Period—of which two (2) have been investigated. One investigation was completed in 2Q24 and the other in 2Q25. The Panel previously requested the Department address the backlog of these investigations. Since the Panel is unable to assess the results of the investigations, the Panel finds the Department Out of Compliance with this Provision.

**8.1 Status:** Out of Compliance **As of Date:** N/A

## E. Deadlines

### 6.17 Use of Force Deadlines

**Provision Description**: A 30-day deadline in place for filing use of force grievances by inmates.

> ***Compliance Measures Summary:*** 1(a), 95% compliance with the first 25 use of force grievances determined by the Department to be untimely.

The Department's source documents for this provision indicate the Department achieved 100% compliance for the Seventeenth Reporting Period. There were zero grievances that met 6.17 criteria in the First Quarter of 2025 and two (2) grievances that met the criteria of this provision in the Second Quarter of 2025. The first grievance alleging use of force was received 58 days from the date of occurrence; and the second was received 458 days from the date of occurrence. The two (2) untimely grievances were handled appropriately in accordance with 6.17. The Panel finds the Department in Compliance for the Seventeenth Reporting Period.

The Panel has previously requested that the grievance forms would be revised to reflect the 30-day deadline required by this Provision. During the Panel's April 2026 visit, the Department shared a copy of the revised grievance form that has been distributed to the downtown facilities.

**6.17 Status:** Compliance **As of Date:** October 1, 2019

### 6.18 PREA Deadline

**Provision Description:** There should be no deadline for filing Prison Rape Elimination Act grievances.

> ***Compliance Measures Summary:*** 1(b), 95% compliance with the first 25 PREA grievances.

In the First Quarter of 2025, 100% (7 out of 7) of PREA grievances met the criteria for Section 6.18 and were handled appropriately. In the Second Quarter of 2025, 100% (5 out of 5) PREA grievances met the criteria for Section 6.18 and were handled appropriately. For the Seventeenth Reporting Period, 100% (12 out of 12) of the PREA grievances were handled appropriately in accordance with 6.18, which results in

100% compliance and exceeds the 95% compliance threshold. The revised grievance form notes that PREA related grievances may be filed at any time.

**6.18 Status:** Compliance **As of Date:** July 1, 2018

### 6.19 Response to Inmate Grievances

**Provision Description:** Department should respond to inmate grievances "within 15 calendar days after the submission of the grievance," absent exceptional circumstances, which must be documented.

> ***Compliance Measures Summary:*** 1(d and e), 90% compliance with the first 25 grievances against staff and the first 25 grievances not against staff in which the investigation was not completed within 15 days.

In the randomly selected month during the First Quarter of 2025, 95% (19 out of 20) of inmate grievances against staff were responded to within 15 days, and 92% (23 out of 25) of inmate grievances not against staff were responded to within 15 days. In the randomly selected month during the Second Quarter of 2025, 100% (25 out of 25) of inmate grievances against staff were responded to within 15 days, and 96% (24 out of 25) of inmate grievances not against staff were responded to within 15 days.

In the *Sixteenth Self-Assessment*, the Department reported that it asked the CSS team to contact the facilities and offer additional training on the timeliness of responses to inmate grievances, with a stated expectation for compliance in the Seventeenth Reporting Period, which the Department has realized.

**6.19 Status:** Compliance **As of Date:** July 1, 2025

### 6.20 Appeals of Grievances

**Provision Description:** Inmates should have 15 days from receipt of a denial of a grievance (or from release from segregations) to file an appeal of the grievance.

> ***Compliance Measures Summary:*** 1(c), 95% compliance with the first 25 appeals of grievances determined by the Department to be untimely.

According to the Department's source documents, there were no appeals that met the criteria for this provision during the Seventeenth Reporting Period.

**6.20 Status:** Compliance **As of Date:** July 1, 2018

## F. Communications with Inmates

### 7.2 Notification of Results

**Provision Description:** Inmate should be advised of the results of the investigation of grievances against personnel, but not any sanction imposed, within 10 days of adjudication.

> ***Compliance Measures Summary:*** 1(f), 90% compliance with the first 25 completed grievances against staff, including the inmate notifications.

During the First Quarter of 2025, 28% (7 out of 25) of inmate notifications were made within ten (10) days of adjudication. Of those not in compliance, days between adjudication and notification ranged from 18 to 35 days. As reported in the Department's *Seventeenth Self-Assessment*, these grievances were assigned to the Office of PREA Compliance (OPC), which failed to notify the facilities in a timely manner further hindering compliance with this provision. The OPC was issued a CAP and, effective March 3, 2025, all grievance packages will be forwarded to the Facility Commander for review and approval once OPC completes its investigation to prevent any future delays. For the Second Quarter of 2025, 96% (24 out of 25) of inmate notifications were made within ten (10) days of adjudication. For the one (1) grievance not in compliance, the inmate notification was made 17 days from adjudication.

Of the grievances that met 7.2 criteria, timely notification to the inmate occurred 62% (31 out of 50) of the time, which is below the 90% compliance threshold.

**7.2 Status:** Out of Compliance **As of Date**: N/A

## 7.3 Prisoner-Staff Communications

**Provision Description:** The Department should ensure that there are adequate avenues for constructive prisoner-staff communication, such as Town Hall meetings.

> ***Compliance Measures Summary:*** Maintain logs of Town Hall meetings and report to the Monitors that each jail facility has conducted Town Hall meetings for a randomly selected month per quarter. Monitors interview inmates and staff to assess the adequacy of communications.

The *Seventeenth Self-Assessment* reports that the Department was out of Compliance with Section 7.3 during the First and Second Quarters of 2025. According to the Department's posted results, Town Hall meetings were conducted at 72% (37 out of 51) of the facility housing locations in the First Quarter of 2025, and at 71% (33 out of 46) of the facility housing locations in the Second Quarter of 2025. For the Seventeenth Reporting Period, Town Hall meetings were held in 72% (70 out of 97) of facility housing locations. The Department recognizes this rating as out of compliance.

As noted in the *Panel's Sixteenth Report* (p. 43) a CAP was previously issued to MCJ, and "...to prevent this issue in the future…MCJ will conduct monthly audits." In the Department's *Seventeenth Self-Assessment*, it reported MCJ received another CAP, held additional briefings with supervisors, "…and MCJ Operations is tracking the Town Hall meetings in the system." The Panel is concerned that the compliance rate is not the result of a clerical error; and instead, that Town Hall meetings may not be being held.

**7.3 Status:** Out of Compliance **As of Date:** N/A

| Grievance Provisions | | Fifteenth Report | Sixteenth Report | Seventeenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 6.2 | Availabilty of Grievance Forms | X | X | X | | |
| 6.3 | Emergency Grievances Forms | C | C | C | 1/1/2017 | ✓ |
| 6.4 | Use of Force Grievances | C | C | C | 1/1/2024 | |
| 6.5 | Grievances Against Staff | C | C | C | 7/1/2023 | |
| 6.7 | Handling Emergency Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.8 | Notification of Non-Emergency | C | C | C | 7/1/2018 | ✓ |
| 6.9 | Grievance Coordinator Review | C | X | X | | |
| 6.10 | Collection of Grievances | C | X | X | | |
| 6.11 | Failure to Handle Grievances | C | C | C | 7/1/2022 | ✓ |
| 6.12 | Tracking Inmate Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.13 | Grievance Coordinator Tracking | C | C | C | 7/1/2018 | ✓ |
| 6.14 | Grievance Coordinator Reports | C | C | C | 7/1/2018 | ✓ |
| 6.15 | Grievance Coordinator Analysis | C | C | C | 7/1/2018 | ✓ |
| 6.16 | Centralized Grievance Unit | C | C | C | 1/17/2017 | ✓ |
| 6.17 | Use of Force Deadline | C | C | C | 10/1/2019 | ✓ |
| 6.18 | PREA Deadline | C | C | C | 7/1/2018 | ✓ |
| 6.19 | Response to Inmate Grievances | X | X | C | 7/1/2025 | |
| 6.20 | Appeals to Grievances | C | C | C | 7/1/2018 | ✓ |
| 7.1 | Conflict Resolution Meeting | C | C | C | 1/1/2017 | ✓ |
| 7.2 | Notification of Results | C | C | X | | |
| 7.3 | Prisoner-Staff Communications | X | X | X | | |
| 8.1 | Anti-Retaliation | C | C | X | | |

# VI. Use of Restraints

## 17.1 Restraint Provisions

**Provision Description:** Instead of the introductory paragraph in 5-03/130.00 (Medically Ordered Restraint Devices), the Custody Force Manual should have a separate section that sets forth the general principles governing the use of restraints as follows: (1) restraints are either security restraints or medically ordered restraints; (2) restraints should not be used to punish inmates; (3) restraint devices should only be used when there is a potential threat of physical harm, destruction of property, or escape, or to escort or transport inmates; (4) caution must be used to guard against the risk of medical distress; (5) the longer the restraint, the greater the risk; (6) restraints should never be placed on the head, nose, or neck of an inmate or in any other manner that may interfere with breathing or blood flow; (7) in-cell security restraints should not be used except in emergency circumstances and for the shortest period of time possible; (8) inmates should not be restrained to fixed objects unless the object is designed for that purpose, and then only for the shortest period of time possible; (9) Department members are not authorized to use either a carotid restraint or choke holds. Any use of a carotid restraint or choke hold will be investigated as a Category 3 use of force with a mandatory Internal Affairs Bureau ("IAB") rollout. DEFINITIONS: **Carotid Restraint**: A vascular neck restraint or any similar restraint, hold, or other defensive tactic in which pressure is applied to the sides of a person's neck that involves a substantial risk of restricting blood flow and may render the person unconscious in order to subdue or control the person. **Choke Hold**: Any defensive tactic or force option in which direct pressure is applied to a person's trachea or windpipe; (10) it is the responsibility of Department members approving or applying restraints (other than restraints used to escort or transport inmates) to ensure that there is frequent, careful, and documented monitoring of the condition of the inmate(s) in restraints; and (11) medical assistance should be summoned immediately whenever an inmate appears to be experiencing medical distress or complains of difficulty breathing.

The Department's Manual of Policy and Procedures 3-10/004.00, Use of Force Teams Defined contains definitions for Corotid Restraint and Choke Hold that are consistent with the revised provision. Both the Custody Division Manual Policy CDM-701/030 Limitations on Force and the Manual of Policy and Procedures Section 3-10/025.00 Carotid Restraint and Choke Holds clearly prohibit Department members from using either a carotid restraint or choke hold.

**17.1 Status:** Compliance **As of Date:** December 1, 2015

## 17.3 Safety Chair Procedures

**Provision Description:** Requires immediate medical examinations of inmates placed in Safety Chairs with a use of force, or if the inmate struggles against the Safety Chair restraints. Section 17.3 also requires that inmates' vitals are checked every hour while in the Safety Chair.

> ***Compliance Measures Summary:*** Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex. The Monitors conduct a Vertical and Horizontal Assessment of approximately 25 incidents to determine at least 90% compliance with restraint provisions.

During the Seventeenth Reporting Period, the Department provided the Inmate Safety Chair Security Check Logs and Fixed Restraint Logs at the Downtown Jail Complex for the First and Second Quarters of 2025. The Panel's auditors continue to note there is no indication that medical professionals, or any Custody personnel, are performing hourly vitals checks even though inmates are often in the safety chairs for several hours while in transport to and from court and during court proceedings. As noted in previous Panel Reports, periodic vitals checks are necessary to establish compliance even if the inmate does not struggle and force is not used to place the inmate in the Safety Chair. Out of the 44 unique safety chair records provided for the First Quarter of 2025, the Panel's auditors noted that there were two explicit indications of a use of force to place

inmates into the chairs. In both instances, the records reflected that a healthcare assessment was promptly performed.[17] Out of the 42 unique safety chair records provided for the Second Quarter of 2025, the Panel's auditors noted that there were two explicit indications of a use of force to place an inmate into the chairs. In both instances, the records reflected that a healthcare assessment was promptly performed.[18] Due to vital checks not occurring as required, the Department remains out of Compliance with Section 17.3.

**17.3 Status:** Out of Compliance **As of Date:** N/A

## 17.4 Safety Checks

**Provision Description:** Requires safety checks of inmates in fixed restraints every twenty minutes to verify and document the inmate is not in undue pain or that restraints are not creating injury.

> ***Compliance Measures Summary:*** Department to provide the Panel "with a list of incidents in which inmates were placed in a Safety Chair, restrained to a fixed object for more than twenty minutes, or subjected to security restraints for an extended length of time" in the Downtown Jail Complex. The Monitors conduct a Vertical and Horizontal Assessment of approximately 25 incidents to determine at least 90% compliance with restraint provisions.

The Inmate Safety Chair Security Check Logs and Fixed Restraint Logs reflect that Department personnel consistently conduct safety checks on many inmates every twenty minutes, as required by Section 17.4.[19] However, 4 of 27 fixed restraint logs provided for the Second Quarter of 2025 did not explicitly document personnel verifying that the inmate was not in undue pain or that the restraints were not causing injury.[20] The records reflecting when a safety chair was not used for transportation, but rather as a means of temporary control, indicate that there were no visible signs of injury or complaint of pain. Due to the Fixed Restraint Logs not explicitly documenting whether the inmate was in undue pain or that the restraints were not causing injury, the Department remains Out of Compliance with Section 17.4.

**17.4 Status:** Out of Compliance **As of Date:** N/A

## 17.11 Use of WRAP Restraints

**Provision Description:** Use of force policies should provide that Department members may only place an inmate in the WRAP Restraint when an inmate is violent or physically resisting; or has demonstrated by words or actions an intent to be violent or to physically resist, and based on the totality of the circumstances, reasonably appears presently capable of causing physical harm to themselves, custody staff, or others if the WRAP restraint is not applied. Absent emergency circumstances, the WRAP restraint shall be verbally authorized by the on-duty watch commander. Personnel shall immediately request medical aid if an inmate in any portion of a WRAP restraint complains of or exhibits medical distress and remove the inmate from the WRAP restraint if a medical emergency appears to exist or medical staff so direct because of the medical emergency. If it is determined an inmate shall remain in the WRAP restraint longer than fifteen (15) minutes, in addition to the in-person direct visual observation required at all times, Department members shall perform safety checks twice every thirty (30) minutes, approximately fifteen (15) minutes apart, until the WRAP

---

[17] A third record was indeterminate. Regardless, the record reflects that a healthcare assessment was promptly performed.

[18] Four other records were indeterminate. Regardless, three of the four records reflect that a healthcare assessment was promptly performed. The fourth record reflected that a healthcare assessment was performed at an undetermined time.

[19] While the use of safety chairs for inmate movement is not subject to Section 17.4, it should be noted that the Department's policy requires safety checks to be recorded every 15 minutes, which the majority of checks fall within. Based on the Department's posted documentation, all but seven safety chair records provided for the First and Second Quarters of 2025 are related to transportation.

[20] Unlike the Inmate Safety Chair Security Check Logs, which contain a field verifying whether or not there were "any visible signs of injury or complaint of pain caused by safety chair[,]" the Fixed Restraint Logs do not contain a similar field.

restraint is removed. A sergeant shall evaluate the inmate's retention in the WRAP restraint once every 30 minutes. Absent unusual circumstances when the medical needs of other patients take priority, inmates who arrive in the WRAP at the medical clinic will receive priority when it comes to receiving the medical assessment and/or treatment they require, and that medical assessment shall be conducted within one (1) hour from the time of placement in the WRAP restraint to determine if placement is safe based on the inmate's present physical or mental condition. Inmates shall not remain in the WRAP beyond two (2) hours. Inmates shall remain under in-person, direct visual observation for the duration of their placement in the WRAP restraint/WRAP Cart. If an inmate remains affixed to the WRAP Cart for more than one hour, all procedures for the WRAP restraint shall be followed.

The Department achieved compliance with 5 out of 8 applicable cases, or 63%, in the Seventeenth Reporting Period, and the Department is Out of Compliance with Section 17.11.

**17.11 Status:** Out of Compliance **As of Date:** N/A

| Use of Restraint Provisions | | Fifteenth Report | Sixteenth Report | Seventeenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 17.1 | Restraint Provisions | C | C | C | 12/1/2015 | ✓ |
| 17.3 | Safety Chair Procedures | X | X | X | | |
| 17.4 | Safety Checks | X | X | X | | |
| 17.11 | WRAP Procedures | N/A | N/A | X | | |

# VII. Early Warning System

## 19.1 Development of EWS

**Provision Description:** Develop a system to identify potentially problematic Department members based upon objective criteria, such as number of force incidents, inmate grievances, allegations of misconduct, performance reviews, and policy violations.

> ***Compliance Measure Summary:*** The system identifies potentially problematic employees upon objective criteria.

The Panel approved the Employee Review System ("ERS") in July 2018, and it was implemented by the Department as a pilot program in the Downtown Jail Complex on August 1, 2018, and in the rest of the jail facilities as of November 1, 2018.

**19.1 Status:** Compliance **As of Date:** August 1, 2018

## 19.2 Review of EWS Reports

**Provision Description:** Compliance Lieutenants must review reports monthly to identify potentially problematic Department members and promptly notify the Unit Commander and the Assistant Sheriff for Custody Operations in writing.

> ***Compliance Measure Summary:*** Unit Commanders make notifications within ten days 90% of the time and within thirty days 95% of the time.

For the First Quarter of 2025, the Unit Commander requested and reviewed the monthly EWS reports and made the required notifications to the Chief and Assistant Chief. Of the twelve (12) employees identified—one (1) from TTCF, eight (8) from MCJ, and three (3) from IRC—all were reported in writing of potentially problematic employees within 10 (ten) days of receiving the report.

For the Second Quarter of 2025, the Unit Commander requested and reviewed the monthly EWS reports and made the required notifications to the Chief and Assistant Chief. Of the seventeen (17) employees identified—one (1) from TTCF, twelve (12) from MCJ, and four (4) from IRC—all were reported in writing of potentially problematic employees within 10 (ten) days of receiving the report.

**19.2 Status:** Compliance **As of Date:** July 1, 2025

## 19.3 Performance Mentoring Programs

**Provision Description:** Unit Commanders required to determine whether problematic employees should be placed on a performance mentoring program. For each potentially problematic Department member identified through the EWS, the Unit Commander must consult with the appropriate Chief and document the reasons why any problematic members are not placed on a performance mentoring program.

> ***Compliance Measure Summary:*** Chief is consulted 95% of the time to determine if a non-disciplinary performance program is appropriate. If so, specific performance metrics were in place and the reason for the decision was provided 95% of the time.

During the First Quarter of 2025, the Department's Early Warning System (EWS) identified twelve (12) employees as potentially problematic: one (1) from TTCF, eight (8) from MCJ, and three (3) from IRC. Of those twelve (12) employees identified, ten (10) had three (3) uses of force in one month: one (1) employee at MCJ in January, two (2) at IRC in February, one (1) from TTCF in March, and six (6) at MCJ in March. After review of documentation the Department determined none of the twelve (12) employees identified required further action.

During the Second Quarter of 2025, the Department's EWS identified seventeen (17) employees as potentially problematic who required secondary screening: one (1) from TTCF, twelve (12) from MCJ, and four (4) from IRC. Of those seventeen (17) employees, sixteen (16) had at least three (3) uses of force in one month: one (1) at TTCF in May, eight (8) at MCJ in May, two (2) at IRC in May, four (4) at MCJ in June, and one (1) at IRC in June. The Department determined no further action was needed regarding the seventeen (17) employees. The Department's posted results for the Seventeenth Reporting Period reflect 100% compliance with this provision.

**19.3 Status:** Compliance **As of Date:** July 1, 2022

| Early Warning System Provisions | | Fifteenth Report | Sixteenth Report | Seventeenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 19.1 | Development of EWS | C | C | C | 8/1/2018 | ✓ |
| 19.2 | Review of EWS Reports | C | X | C | 7/1/2025 | |
| 19.3 | Performance Mentoring Programs | C | C | C | 7/1/2022 | |

# Appendix A: Compliance Chart

| Seventeenth Report Compliance Chart | | | | | | |
|---|---|---|---|---|---|---|
| **Administrative Provisions** | | **Fifteenth Report** | **Sixteenth Report** | **Seventeenth Report** | | |
| **No.** | **Provision** | **1Q24 - 2Q24** | **3Q24 - 4Q24** | **1Q25 - 2Q25** | **AS OF** | **3YR+** |
| 1.2 | Sheriff | C | C | C | 1/1/2017 | ✓ |
| 1.3 | Accountability | X | X | X | | |
| 1.4 | Reports to Board | C | C | C | 6/12/2018 | ✓ |
| 10.1 | Senior Manager Tours | C | C | C | 6/30/2018 | ✓ |
| 10.2 | Housing Unit Documentation | C | C | C | 1/1/2024 | |
| 18.1 | Custody-Wide Rotation Policy | C | C | C | 6/30/2018 | ✓ |
| 18.2 | Semi-Annual Rotation Audit | C | C | C | 1/1/2019 | ✓ |
| **Use of Force Policy Provisions** | | **Fifteenth Report** | **Sixteenth Report** | **Seventeenth Report** | **AS OF** | **3YR+** |
| 20.1 | Categories of Force | C | C | C | 1/1/2017 | ✓ |
| **Use of Force Practice Provisions, Packet Review** | | **Fifteenth Report** | **Sixteenth Report** | **Seventeenth Report** | **AS OF** | **3YR+** |
| 2.2 | Force Prevention Principles | 82% | 78% | 82% | | |
| 2.3 | Inmate on Inmate Violence | 92% | 93% | 100% | 1/1/2024 | |
| 2.4 | Use of Force as Discipline | 100% | 100% | 98% | 7/1/2019 | ✓ |
| 2.5 | Force on Restrained Inmates | 92% | 93% | 92% | 7/1/2023 | |
| 2.6 | Head Strikes or Kicks | 84% | 82% | 90% | 7/1/2025 | |
| 2.7 | Supervisors Called to Scene | 86% | 86% | 76% | | |
| 2.8 | Prevent Excessive Force | 100% | 100% | 88% | 1/1/2024 | |
| 2.9 | Armed Inmates | 50% | 100% | 100% | 1/1/2025 | |
| 2.10 | Authorized Weapons | 97% | 100% | 96% | 7/1/2024 | |
| 2.11 | Planned Chemical Spray | 100% | 100% | 100% | 7/1/2023 | |
| 2.12 | Chemical Spray & Tasers | 94% | 95% | 89% | 7/1/2024 | |
| 2.13 | Check of Medical Records | 100% | 100% | 100% | 7/1/2024 | |
| 4.1 | Consult Mental Health Professionals | 77% | 92% | 100% | 1/1/2025 | |
| 4.3 | Spray on Mental Health Inmates | 100% | 92% | 100% | 10/1/2019 | ✓ |
| 4.4 | Cooling Off Periods | 89% | 100% | 100% | 1/1/2023 | |
| 4.5 | Medical or Mental Health Provider Order | 91% | 100% | 100% | 1/1/2023 | |
| 9.2 | Escorting of Inmates | 88% | 88% | 94% | 7/1/2025 | |
| 9.3 | Duty to Protect & Intervene | 100% | 100% | 100% | 7/1/2022 | ✓ |
| 17.5 | Minimize Medical Distress | 64% | 75% | 84% | | |
| 20.3 | Planned Use of Force | 93% | 92% | 100% | 7/1/2023 | |
| **Training Provisions** | | **Fifteenth Report** | **Sixteenth Report** | **Seventeenth Report** | **AS OF** | **3YR+** |
| 3.1 | Use of Force Training | C | C | C | 1/1/2022 | ✓ |
| 3.2 | Ethics & Professionalism | C | C | C | 7/1/2018 | ✓ |
| 3.4 | Custody-based Scenarios | C | C | C | 7/1/2018 | ✓ |
| 3.5 | Add Training and Mentoring | C | C | C | 7/1/2019 | ✓ |
| 3.6 | Probation Reviews | C | C | C | 1/1/2023 | |
| 4.6 | Crisis Intervention | C | C | C | 7/1/2018 | ✓ |
| 4.7 | Mentally Ill Inmates | C | C | C | 1/1/2023 | |
| 12.1 | Force Investigations | C | C | C | 7/1/2019 | ✓ |

| Reporting & Investigations, Packet Review | | Fifteenth Report | Sixteenth Report | Seventeenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 4.2 | Mental Health Professionals | 92% | 100% | 100% | 1/1/2023 | |
| 5.3 | Unexplained Discrepancies | 97% | 96% | 94% | 7/1/2022 | ✓ |
| 12.2 | Location of Inmate Interviews | 60% | 68% | 75% | | |
| 12.4 | Uninvolved Supervisors | 96% | 100% | 98% | 7/1/2023 | |
| 12.5 | Standard Order & Format | 98% | 100% | 100% | 7/1/2019 | ✓ |
| 15.1 | Timeliness of Reports | 86% | 94% | 90% | 1/1/2025 | |
| 15.2 | All Department Witnesses | 96% | 100% | 98% | 7/1/2019 | ✓ |
| 15.3 | Force by Other Members | 90% | 92% | 82% | | |
| 15.4 | Description of Injuries | 90% | 84% | 90% | 7/1/2025 | |
| 15.5 | Clarification After Video | 94% | 94% | 76% | | |
| 15.6 | Separation of Deputies | 82% | 83% | 80% | | |
| 15.7 | Individual Perceptions | 88% | 96% | 96% | 1/1/2025 | |
| 16.1 | Healthcare Assessment | 100% | 100% | 98% | 7/1/2019 | ✓ |
| 16.2 | Photograph of Injuries | 88% | 91% | 89% | | |
| 16.3 | Medical Report of Injuries | 100% | 98% | 100% | 7/1/2019 | ✓ |
| **Reporting & Investigations, Department Reported** | | **Fifteenth Report** | **Sixteenth Report** | **Seventeenth Report** | **AS OF** | **3YR+** |
| 5.1 | Tracking of Force Incidents | X | X | X | | |
| 8.3 | CFRC Review | C | C | C | 7/1/2021 | ✓ |
| 13.1 | Documenting Dishonesty | C | C | C | 10/1/2019 | ✓ |
| 13.2 | Reports of Dishonesty/PREA | C | C | C | 10/1/2019 | ✓ |
| 14.1 | Review of Criminal Referrals | X | C | C | 1/1/2025 | |
| 14.2 | Timeliness of Criminal Referrals | C | C | C | 7/1/2018 | ✓ |
| **Grievance Provisions** | | **Fifteenth Report** | **Sixteenth Report** | **Seventeenth Report** | **AS OF** | **3YR+** |
| 6.2 | Availabilty of Grievance Forms | X | X | X | | |
| 6.3 | Emergency Grievances Forms | C | C | C | 1/1/2017 | ✓ |
| 6.4 | Use of Force Grievances | C | C | C | 1/1/2024 | |
| 6.5 | Grievances Against Staff | C | C | C | 7/1/2023 | |
| 6.7 | Handling Emergency Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.8 | Notification of Non-Emergency | C | C | C | 7/1/2018 | ✓ |
| 6.9 | Grievance Coordinator Review | C | X | X | | |
| 6.10 | Collection of Grievances | C | X | X | | |
| 6.11 | Failure to Handle Grievances | C | C | C | 7/1/2022 | ✓ |
| 6.12 | Tracking Inmate Grievances | C | C | C | 7/1/2018 | ✓ |
| 6.13 | Grievance Coordinator Tracking | C | C | C | 7/1/2018 | ✓ |
| 6.14 | Grievance Coordinator Reports | C | C | C | 7/1/2018 | ✓ |
| 6.15 | Grievance Coordinator Analysis | C | C | C | 7/1/2018 | ✓ |
| 6.16 | Centralized Grievance Unit | C | C | C | 1/17/2017 | ✓ |
| 6.17 | Use of Force Deadline | C | C | C | 10/1/2019 | ✓ |
| 6.18 | PREA Deadline | C | C | C | 7/1/2018 | ✓ |
| 6.19 | Response to Inmate Grievances | X | X | C | 7/1/2025 | |
| 6.20 | Appeals to Grievances | C | C | C | 7/1/2018 | ✓ |
| 7.1 | Conflict Resolution Meeting | C | C | C | 1/1/2017 | ✓ |
| 7.2 | Notification of Results | C | C | X | | |
| 7.3 | Prisoner-Staff Communications | X | X | X | | |
| 8.1 | Anti-Retaliation | C | C | X | | |

| Use of Restraint Provisions | | Fifteenth Report | Sixteenth Report | Seventeenth Report | AS OF | 3YR+ |
|---|---|---|---|---|---|---|
| 17.1 | Restraint Provisions | C | C | C | 12/1/2015 | ✓ |
| 17.3 | Safety Chair Procedures | X | X | X | | |
| 17.4 | Safety Checks | X | X | X | | |
| 17.11 | WRAP Procedures | N/A | N/A | X | | |
| **Early Warning System Provisions** | | **Fifteenth Report** | **Sixteenth Report** | **Seventeenth Report** | **AS OF** | **3YR+** |
| 19.1 | Development of EWS | C | C | C | 8/1/2018 | ✓ |
| 19.2 | Review of EWS Reports | C | X | C | 7/1/2025 | |
| 19.3 | Performance Mentoring Programs | C | C | C | 7/1/2022 | |